**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

ALEK SCHOTT,

     *Plaintiff,*

v.

JOEL BABB, in his individual and official
capacity; MARTIN A. MOLINA III, in his
individual and official capacity; JAVIER
SALAZAR, in his individual and official
capacity; and BEXAR COUNTY, TEXAS,

     *Defendants.*

Civil Action No. __5:23-cv-706__

## ORIGINAL COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND RETROSPECTIVE RELIEF

### INTRODUCTION

1.     Plaintiff Alek Schott files this lawsuit to protect his Fourth Amendment right to be free from unreasonable searches and seizures and to end Bexar County's policy and custom of using traffic stops as a tool to perform searches and seizures without any basis to suspect drivers of crimes.

2.     In March 2022, Alek was pulled over by Bexar County Sheriff's Office (BCSO) Deputy Joel Babb for the alleged minor traffic offense of drifting over the fog line on the highway. But video footage shows that at all times when he was within Babb's field of vision, Alek never drifted over the fog line and stayed within his lane—and no reasonable officer in Babb's shoes could have thought otherwise.

3.     Although Babb had no basis to support his assertion that Alek had drifted over the fog line (or any line), Babb nevertheless stopped Alek; interrogated him about his identity, travel,

work, family, living situation, truck, and criminal history; detained him, including by placing him in the back of a patrol car; ordered a drug dog sniff on his truck; and searched his truck—without consent or a warrant—from top to bottom.

4.      Alek was held on the side of the road for over an hour while Babb, later joined by BCSO Deputies Martin A. Molina III and Joe Gereb, questioned him and searched his truck for evidence of any crime. The deputies found nothing because there was nothing to find. When Alek was finally released to continue his drive home, his truck was a mess because the deputies had dumped the items from every bag and compartment onto the truck floor.

5.      But Alek's experience was not just a one-off occurrence. Rather, Bexar County has a policy and custom, as carried out by BCSO deputies, of using traffic stops as a tool to conduct searches and seizures without any reason to suspect drivers of crimes.

6.      Alek therefore brings this lawsuit to vindicate his Fourth Amendment right and to stop Bexar County and its law-enforcement officers from abusing their power by conducting baseless searches and seizures via traffic stops.

## JURISDICTION AND VENUE

7.      Alek brings this lawsuit under the Fourth Amendment (as incorporated through the Fourteenth Amendment) to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201.

8.      This Court has jurisdiction under 28 U.S.C. § 1331 because Alek brings claims under the U.S. Constitution and federal laws. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Alek seeks to redress the deprivation of federal constitutional rights under the color of state law or custom.

9.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Alek's claims occurred in this district.

## THE PARTIES

10.    Plaintiff Alek Schott is a resident of Houston, Texas who is suing to vindicate his rights after he was subjected to an unconstitutional traffic stop, frisk, stop extension, and car search while driving through Bexar County on a work trip.

11.    Defendant Joel Babb is a BCSO deputy assigned to BCSO's Criminal Interdiction Unit and is sued in his individual and official capacity. Babb conducted the traffic stop, frisk, stop extension, and car search challenged in this case in furtherance of Bexar County's criminal interdiction policies and customs.

12.    Defendant Martin A. Molina III is a BCSO deputy and K9 handler and is sued in his individual and official capacity. Molina conducted the dog sniff and car search challenged in this case in furtherance of Bexar County's criminal interdiction policies and customs.

13.    Defendant Javier Salazar is the Sheriff of Bexar County, Texas and is sued in his individual and official capacity. As Sheriff, Salazar is and was at all relevant times the final decisionmaker for Bexar County's law-enforcement activities, including the operation of BCSO and its Criminal Interdiction Unit. Salazar therefore sets Bexar County's law-enforcement policies and customs. Those policies and customs were and continue to be carried out by Bexar County and its deputies. Further, Salazar was and continues to be responsible for the training and supervision of deputies executing Bexar County's policies and customs, including Babb and Molina.

14.     Bexar County is a county operating under Texas's Constitution and law. BCSO is a component of the Bexar County government, and Sheriff Salazar exercises final policymaking authority over BCSO and its Criminal Interdiction Unit on Bexar County's behalf.

15.     BCSO is and was at all material times the employer of Babb, Molina, and Salazar.

16.     Babb, Molina, and Salazar were, at all relevant times, operating under the color of state law.

## FACTUAL ALLEGATIONS[1]

**Alek took a work trip in March 2022.**

17.     Alek is a married man in his mid-thirties with two young kids. He has no criminal history. Other than a few speeding tickets earned over the entire course of his life—for which Alek completed defensive driving instruction—Alek has a clean driving record. He also has never done illegal drugs.

18.     Alek works at his father's small business, RMS Controls, Inc., as Director of Operations and Business Development. RMS (short for "root mean square") provides specialized products for upstream and midstream pipeline companies—both manufacturing its own products and distributing the products of other manufacturers. The products RMS offers include remote power generators, filters, relief valves, and pipeline protection systems.

---

[1] The events underlying this lawsuit were largely captured by body-worn cameras (BWC) on each officer involved and by Alek's personal dashboard camera. The BWC footage was obtained from BCSO via an open-records request. For the Court's convenience, footage from the cameras is available at the following links:
- Deputy Babb BWC video A (Babb A): https://tinyurl.com/mrx2tmea.
- Deputy Babb BWC video B (Babb B): https://tinyurl.com/5de8cr9m.
- Officer Molina BWC video (Molina): https://tinyurl.com/2j3p7bjj.
- Officer Gereb BWC video (Gereb): https://tinyurl.com/2eceyxj3.
- Alek dashcam video (Dashcam): https://tinyurl.com/3efyfck4.

To protect against the public disclosure of private information, Alek's personal and family information was redacted from the linked version of Babb A.

19.     One of Alek's main responsibilities is to educate RMS's customers about the products that RMS sells both before and after sales are completed. Alek therefore facilitates trials of RMS's products and aids with the educational part of installation. These tasks regularly require Alek to visit RMS's customers and potential customers and their operations in person.

20.     Because he drives so much for work, Alek has a personal dashboard camera. Alek installed that camera so that he would have video evidence in case of an accident to avoid any unwarranted liability for himself and RMS.

21.     On March 15, 2022, Alek drove his black F-250 from the Houston area to Carrizo Springs, Texas in preparation for a customer meeting—a trial of a remote power engine—that was to take place the next day. That night, he stayed at a Holiday Inn.

22.     Early the next morning, on March 16, 2022, Alek met a colleague at the hotel to carpool to the site of the customer's pipeline operations. The colleague was the new employee of a manufacturer that RMS partners with and was accompanying Alek to the remote power engine trial as part of her training. After the trial, Alek dropped the colleague off at her vehicle in the Holiday Inn's parking lot.

23.     Alek then began the drive back to the Houston area. His route took him north on I-35, through Bexar County.

**Babb had no basis to stop Alek.**

24.     Shortly after 11:00 am, Alek was driving north on I-35, just south of San Antonio.

25.     At 11:12 am, while traveling in the left lane, Alek passed Babb's patrol car, which was parked in the grass on the right side of the highway.

26.     After Alek passed, Babb decided that he wanted to pull Alek over and drove his patrol car onto the highway to initiate a traffic stop.

27.      Alek's dashcam video shows that he maintained his lane and did not drift over or touch the line on either side of his lane (either the fog line or the lane divider) when he passed Babb's patrol car or at any time that he was within Babb's field of vision before, during, or after the stop. Dashcam.[2] The dashcam footage confirms that there was no sound indicating that Alek's truck touched the rumble strip on the left shoulder. Nor did Alek's truck—which audibly alerts when a driver starts to drift—give him a lane-departure warning. At all relevant times, Alek was driving carefully within his lane.

28.      Babb's patrol car did not have a forward-facing dashcam on March 16, 2022. Thus, Defendants do not possess any video footage of Alek driving before he was stopped that would refute what Alek's own dashcam video shows.

29.      While Babb did activate his body camera after he drove his patrol car out onto the highway, that camera does not capture any footage of Alek's truck before the stop. The following image shows the angle of Babb's body camera from its location on Babb's body before and during the initial part of the traffic stop:

---

[2] Alek subsequently verified via test drives that his dashcam would capture any lane departures and that even minor movement within his lane would be exaggerated on the dashcam footage because of the camera's wide-angle lens.



30.     On information and belief, given the angle between Babb's patrol car and Alek's truck when Alek passed by, the only way Babb could have seen if Alek touched or drifted over any line would be if Alek drifted far out of his lane. Again, though, Alek's dashcam video shows that he did not touch or drift over any line.

31.     Approximately two minutes before Babb pulled Alek over, Babb pulled his patrol car onto the highway. During those two minutes—while transitioning from being parked off the road to traveling at the speed of highway traffic—Babb ran Alek's license plate twice. Babb A at 0:00–2:04.[3]

32.     On information and belief, given the angle of Babb's patrol car when Alek passed, the fact that Babb was typing on his computer to run Alek's license plate while following Alek to pull him over, and the short time for which Babb followed Alek, Babb could not have seen if Alek touched or drifted over any line.

---

[3] Video time stamp citations refer to the duration of the individual video clip, not the embedded time stamp located in the upper right corner of all the BWC videos.

33.     On information and belief, Babb's search of Alek's license plate did not yield any reason to pull him over. Alek had no outstanding traffic violations or warrants, had no criminal history, and had a valid vehicle registration.

34.     Babb nevertheless pulled Alek over at approximately 11:15 am. Putting his turn signal on, Alek moved to the right shoulder of the highway and came to a complete stop.

35.     Babb stopped his patrol car behind Alek's truck, got out, and approached Alek's truck. Babb introduced himself and stated that "the only reason I'm stopping you is that when I was watching you over there you were drifting over that fog line pretty hard." Babb A at 2:27.

36.     On information and belief, Babb did not have or identify any traffic-related reason other than lane drifting to justify stopping Alek.

37.     As Babb asked for and received Alek's driver's license, Babb informed Alek that "it's not going to be a ticket. It's gonna be a warning." Babb A at 2:40. Babb then ordered Alek to "step out and sit in my passenger seat while I do your warning." Babb A at 3:00. To comply with this order, Alek left his truck with the engine running and started walking to Babb's passenger seat. Alek did not feel free to drive away, especially given that Babb had possession of Alek's license.

38.     Babb then approached Alek and said, "Do you mind if I give you a quick pat down just to make sure?" Babb A at 3:18. Without completing the thought or waiting for an answer, Babb patted Alek down. He then ordered Alek to "just have a seat next to me, man." At no point did Alek feel he could leave and disregard the orders that he get out of his truck and sit in Babb's patrol car.

39.     Both men entered Babb's patrol car, and Babb removed his body camera from its location on his person and placed it on the dashboard.

**Babb extended the stop without any justification.**

40.     Babb did not immediately issue Alek a warning. Instead, he began asking Alek questions about his identity, trip, and work. Alek confirmed his name and that his hometown was Houston. Babb A at 3:50. He explained the purpose of his travel—a work trip to meet with a customer concerning remote power provided by a helium-filled engine that runs continuously. Babb A at 3:57. He answered Babb's question about where his customer was located, explaining that the customer is near Carrizo Springs and that he had driven out to Carrizo Springs the prior night because it was too far to drive the morning of the meeting. Babb A at 4:19. When Babb asked where Alek stayed last night, Alek answered that he had stayed at a Holiday Inn. Babb A at 4:37.

41.     Alek directly and calmly answered all of Babb's questions. His answers described a run-of-the-mill work trip. Nothing in Alek's answers or demeanor would have given Babb—or a reasonable officer in Babb's shoes—a reason to suspect Alek of any crime or to extend the stop beyond the time necessary to write the traffic warning that Babb stated he intended to write.

42.     About two minutes after they entered the patrol car, Babb told Alek that "this thing I'm giving you, man, looks like a ticket but it's a warning." Babb A at 5:02. At this point Babb had completed running the computer checks on Alek, and those searches did not reveal any reason to keep detaining Alek. Alek had no outstanding citations or warrants, he had no criminal history, and his license was valid.

43.     Yet Babb continued to question Alek. Babb asked how long Alek had owned his truck, whether he lived in a house or apartment, more specifics about his work, and whether he had ever been in trouble with the law. Alek provided calm, truthful, and benign answers, including stating that he had no criminal history except for some speeding tickets for which he had already completed defensive driving instruction.

44.     At that point, Babb admitted the purpose of the stop was never really about a traffic violation:

> I'm on what's called a Criminal Interdiction Unit. So, I don't have to deal with all that crap [traffic violations]. I don't give tickets. I give warnings. And the main reason is, I sit on the side of the highway and I'm out here looking for . . . human smuggling, drug smuggling, and all those things like that.

Babb A at 11:09.

45.     With that statement, Babb began more intensely questioning Alek, apparently to find a reason to search Alek's truck. Babb broadly asked Alek, "Do you have anything in your vehicle that you are not supposed to have?" Alek shook his head no. Babb A at 12:17.

46.     Babb then said he was going to go through a list of standard questions, but before doing so asked if Alek was "stopped at all going down? . . . Because if you went down, you probably got the same type of stop so a lot of this will sound familiar." Babb A at 12:25.

47.     In other words, Babb thought it was likely that Alek was stopped while driving south through Bexar County the day before—even though Babb knew nothing about how Alek was driving that day.

48.     Babb then began running through his standard questions, asking whether Alek had particular drugs in his truck, whether he was carrying over $10,000 in cash, whether anyone had asked him to carry anything, whether he had anything illegal, and whether anyone else had driven his truck in the last 48 hours. Babb A at 12:32. Alek truthfully answered all these questions: He didn't have any drugs. Babb A at 12:32. He didn't have over $10,000 in cash (but he wished he did). Babb A at 12:59. He didn't have anything illegal in his truck, and no one asked him to carry anything. Babb A at 13:13. He was the only person who had driven his truck. Babb A at 13:18.

49.     Despite Alek's calm demeanor and direct, innocuous answers, Babb asked if Alek would allow him to search his vehicle and Alek answered that he would "prefer not." Babb A at 13:23.

50.     At the time Babb asked for consent to search Alek's truck, it had been about ten minutes since Babb first informed Alek that he was going to give Alek a warning and eight minutes since Babb stated that the paper he was giving Alek looked like a ticket but was a warning.

51.     In response to Alek's refusal to consent to a search, Babb stated he was going to have a K9 unit come walk around Alek's vehicle because Babb had "some reasons to believe there might be something in your vehicle." Babb A at 13:38. Babb explained that he does "behavioral analysis," and while he's "been wrong before, there's just some things I've seen that make me want to go a little further in the investigation." Babb A at 13:51.

52.     Babb then told Alek that he was going to wait for a K9 to walk around Alek's vehicle. Babb warned that "if [the dog] alerts to anything, then we'll do a search of the vehicle." Babb A at 14:05. Babb also explained, "I'll be straight up with you: So, because I am out here looking for big shit . . . If you have anything smaller, these dogs will alert right down to a roach in the ashtray. . . . A lot of times I'm lenient. I'd hate for a dog to come out here and have you have a dime bag of dope." Babb A at 14:10.

53.     On information and belief, Babb was trying to pressure Alek to consent to the search by suggesting that Babb would be more lenient if Alek let him search than if a drug dog alerted to something.

54.     Despite these additional comments from Babb, Alek still did not give Babb consent to search his truck. Alek calmly explained his refusal to consent, "The only reason I'm saying no

is from my law classes. They say you don't know if the guy doing the oil change dropped a joint." Babb A at 14:26. Alek maintained that he did not have anything to hide. Babb A at 14:45.

55.     Babb then confirmed that Alek had refused to consent to the search, explaining that even if Alek consented now, Babb would still call for the K9 unit. Babb A at 14:52. Babb recognized that if a driver only granted consent after an officer indicated he or she was calling for a K9 unit, then the officer's coercion would invalidate the consent.

56.     After this comment, Babb reached for his radio to call the K9 unit because he "kn[e]w that [the K9 unit] was not far." Babb A at 15:01.

57.     Babb called for a "narcotics K9" unit on the radio and then continued to hold Alek in his patrol car while they waited for the K9 unit to arrive. Babb A at 15:06. About five minutes later, Alek allowed Babb to turn his truck off for him. Babb A at 19:26. Alek consented to Babb turning his truck off because he had nothing to hide and continuing to run his truck would have wasted expensive fuel.

58.     When Babb returned to his patrol car after turning off Alek's truck, Babb printed out the traffic warning. Babb A at 20:44. At that time, Babb still had Alek's license in his hand. Babb A at 20:33.

59.     During the wait for the K9 unit, Babb shared that "I stop eighteen wheelers all day on normal traffic violations because, unfortunately . . . a lot of them . . . are pushing some serious bodies across the [border]." Babb A at 28:24. Babb explained San Antonio is a "hub for a lot of that crap but it's the hardest place to look for it because we have too much to dig through out here." Babb A at 28:45. These statements indicate Babb's role is not to enforce traffic laws but is to use traffic stops as a tool to investigate drivers and search their cars for other crimes.

60.     While Alek and Babb continued to wait for the K9 unit, Babb told Alek that he stopped him for "failure to maintain a lane." Babb A at 29:45.

61.     Babb recounted a story where he stopped another driver. During that prior stop, the driver told Babb that he knew Babb was not sitting on the side of the road looking for speeders. Babb A at 30:00. Because of that comment and because the driver was coming from a town on the border, Babb "searched the heck out of his car." Babb A at 30:02. Babb noted that those facts did not amount to probable cause but was "definitely reasonable suspicion." Babb A at 30:22. He further explained that the driver's comment would "add into a paragraph if I find something on this guy." Babb A at 30:25.

62.     On information and belief, Babb was referring to using the driver's comment in an affidavit or report to justify the search if Babb found any contraband in the car. Babb's comments showed that he knew he needed to have probable cause to search a vehicle without a warrant or consent and that he was prepared to report innocuous facts as providing probable cause *if* a search uncovered something illegal.

63.     Babb also told Alek that he "hope[d] you don't get any more stops today," explicitly clarifying that he meant "law-enforcement stops." Babb A at 31:45.

64.     While waiting for the K9 unit, Babb continued to question Alek. Babb asked about the person Alek met up with during his trip. Babb A at 32:46. Alek explained that he met up with a new colleague who had just started and who he was training. Alek and his colleague met at the hotel and the two carpooled to the customer's site. Babb A at 32:50. Babb asked if Alek's work was sales, and Alek explained that his work is half sales, half engineering. Babb A at 33:03.

65.     Alek's answers were not suspicious, did not suggest any involvement in criminal activity, and were consistent with Alek's truthful and innocent explanation for his travel. In other

words, nothing that Babb learned after he stopped Alek could have justified extending the stop to call for a K9 unit to sniff Alek's truck.

66.     Babb and Alek waited about twenty minutes from Babb's call for a narcotics K9 for the K9 unit to arrive. Babb A at 33:41.

**Deputies conducted an invasive search of Alek's truck.**

67.     When the K9 unit, Deputy Molina and his dog, arrived, Babb exited his patrol car with his body camera. Babb began talking with Molina, indicating that "I don't wanna [say] too much" with a gesture at his body camera that he knew was recording. Babb A at 34:20. Babb also said that "this [vehicle] was one of the ones"; "it's the one I've been looking for, they've been tracking it"; and it was "one of the ones that was riding tandem." Babb A at 34:30. These statements were false. Alek's truck has never been involved in any criminal or suspicious activity, and Alek had not recently been driving tandem with any other vehicle or person.

68.     Babb told Molina that Alek was traveling "to meet somebody for a job," was "real nervous," and was refusing to "really giv[e] me too much details of his trip." Babb A at 34:40. Yet Alek had been completely calm and had directly answered every question that Babb asked about his work trip.

69.     After talking with Babb, Molina approached Alek in Babb's patrol car and asked if Alek would "have a problem with me running my dog on your vehicle here?" Molina at 0:35. Alek, who did not feel free to leave or to say no, replied, "It's okay." Molina at 0:37. Alek was surprised that Molina asked permission for the drug dog sniff given that Babb had already told Alek that Babb was calling the dog without giving Alek any option to refuse and Babb had informed Alek that any subsequent consent to search would be coercion. Babb A at 36:00.

70.     Molina got his dog from his vehicle and began to circle Alek's truck, starting on the driver's side as the dog sniffed and jumped up and down. Molina at 1:37. After moving around the back of the truck, the dog tried to walk away from the truck to sniff the grassy ditch on the side of the road several times. Molina at 1:56, 2:00, 2:09. Molina directed the dog to return to the truck multiple times. Molina at 1:59, 2:02.

71.     Molina brought the dog to the driver's side of the truck a second time. Molina at 2:28. The dog sat at the driver's side door and looked to Molina. Molina at 2:32. Molina then looked at the dog, gestured upward with his right hand, and made an unintelligible noise. Molina at 2:33. The dog immediately leapt up, placing its paws on the driver's side door and barking. Molina at 2:34. Molina then reported on his radio that "we got a positive alert on the driver's side door." Molina at 2:39.

72.     On information and belief, Molina intentionally prompted the dog to alert and jump at the driver side door of Alek's truck.

73.     On information and belief, but for Molina's prompt for the dog to alert, the dog would not have alerted on Alek's truck.

74.     While Molina was taking the dog around Alek's truck, Babb returned to his patrol car to talk with Alek. Babb stated he had requested the K9 unit as "a reasonable suspicion thing." Babb A at 36:11. Babb added that "the good thing about my agency is that we're pretty smart about case law. . . . We all try to go to training as much as possible." Babb A at 36:21.

75.     Babb joined Molina and his dog outside Alek's truck. Molina admitted that "it is hard" to know what the alert was about. Babb A at 38:30; Molina at 3:59, 4:06. The windows of the truck were open during the entirety of the dog sniff. Babb A at 37:10, 38:32; Molina at 1:46, 2:38, 4:00. Further, Babb recognized that the wind was blowing and that the smell of roadkill—

which was immediately next to Babb's patrol car—was strong. Babb A 33:55, 37:33, 38:35, Molina at 4:00.

76.     On information and belief, even if Molina did not signal the dog to alert, the dog's alert was not reliable—and any reasonable officer would have known it was not reliable—because Molina returned the dog's attention to the truck multiple times; the roadkill, wind, and open truck windows made it difficult for the dog to feasibly detect any alert-worthy odors; and Molina brought the dog back to the driver's side door a second time after the dog did not alert on the first pass around the truck.

77.     After the dog's alert, Babb immediately opened the passenger side door of his patrol car to speak to Alek. Babb A at 37:22. Babb ordered Alek to sit in the back seat of the patrol car and said that Alek was "detained because of the positive alert." Babb A at 37:43. Alek moved from the passenger seat to the back seat.

78.     Although Babb first said that Alek was detained after the drug dog alerted, Alek had not felt free to leave since Babb pulled him over, took his license, and told him to sit in the patrol car.

79.     The following image shows Babb placing Alek in the back of Babb's patrol car:



80.     Babb did not provide Alek with a *Miranda* warning, either when he ordered Alek in the back of his patrol car or at any other time that day.

81.     After Babb shut Alek into the back of the patrol car, Babb and Molina began searching Alek's truck without Alek's consent or a warrant. Babb A at 39:00.

82.     Right after starting the search, Babb received a call from a supervisor, who Babb addressed as "sir." Babb A at 39:40. During that call, Babb stated that there had been a positive K9 alert on Alek's truck and that he was about to start searching. Babb A at 39:44. Babb relayed some of the facts that Alek had given about his trip but characterized Alek's explanation as "kinda broken up, the storyline." Babb A at 40:28. Babb also stated that Alek did not give Babb consent to search "but his story was enough beaten up." Babb A at 40:43.

83.     But Alek's answers to Babb's questions and description of his work trip weren't "broken up" or "beaten up." Rather, Alek's answers were direct and truthful.

84.     Babb asked his supervisor, "If I don't find anything though, is there anything that you need? If I release him?" Babb A at 43:48.

85.     Babb concluded the call by stating that he would do a "deep search just to make sure." Babb A at 43:58.

86.     Babb and Molina searched Alek's truck for about 40 minutes. They were joined by a third officer, Deputy Joe Gereb, who searched Alek's truck bed. Babb A at 51:20; Gereb at 0:20.

87.     Collectively, the deputies searched every crevice of Alek's truck and all his belongings. They emptied every bag and pulled at every part of the truck looking for a potential secret compartment. They found some food wrappers, an overnight bag with clothes in it, a hard hat, two kids' car seats, papers, and some work equipment—all items consistent with Alek's explanation of who he was and why he was traveling.

88.     But the deputies didn't find any drugs or any other evidence of a crime. That's because Alek never had anything illegal in his truck for the deputies to find.

89.     The deputies left Alek's truck and belongings a mess. Every compartment of the truck had been emptied and Alek's belongings were strewn all over the floor. The following image provides an example of how the deputies left Alek's truck:



90.     After ransacking Alek's truck, Babb finally returned Alek's license and handed Alek the written warning, saying "I'm going to give you this before I forget." Babb B at 16:15. Babb had kept Alek's license for over an hour.

91.     The warning claimed that Alek had committed the traffic violation of "fail[ing] to maintain single lane." It also indicated that "No Search" had occurred.

92.     Alek asked Babb "does this get documented somehow?" Babb B at 17:02. Babb responded that the warning Alek received has the incident number on it and that looking up the incident number will show that there was a search. Babb B at 17:04. Babb clarified his response, "other than that, no" and said that he would put in "key card notes, and it shows on the key card that there was a search and all that." Babb B at 17:17.

93.     It remains unclear whether Babb ever input "key card notes" or where those notes would be stored. On information and belief, the incident report for the stop does not show that a search occurred, and no other record of the search of Alek's truck was created.

94.     Before departing, Babb reassured Alek that he'd done his best to put everything back, "cause nine times out of ten, this is what happens"—meaning that BCSO officers typically find nothing when searching a vehicle. Babb B at 18:15.

**Alek reported the violation of his rights.**

95.     After the stop, Alek made a complaint to BCSO's internal affairs department via phone. Providing the incident number on his warning, Alek reported how he had been stopped even though he had not committed any traffic violation, that he had been detained for over an hour, and his truck had been searched for no legitimate reason.

96.     On April 12, 2022, Alek spoke with an internal affairs officer, Marta Rodriguez, who was following up on Alek's complaint. Rodriguez informed Alek that she had seen nothing wrong with the actions of the officers based on the BWC footage. Alek informed Rodriguez that his dashcam footage showed that he had not drifted out of his lane and that Babb did not have any reason to stop Alek.

97.     Later that evening, Alek received a follow-up call from a second internal affairs officer. On information and belief, that officer's last name was Hernandez.

98.     Hernandez said that he had looked at the recordings from Babb's body camera and could see that Alek had crossed over the fog line.

99.     But, again, because Babb's body camera did not capture any footage of the road or of Alek's driving, defendants have no footage of Alek's truck moving—let alone straying from its lane (which it never did). Alek pointed this fact out to Hernandez.

100.     Hernandez maintained that "we can see all of these violations you made from this body camera" and "if you don't like how we conduct our business, you should file a file a lawsuit."

101.    Hernandez told Alek that he could have left Babb's patrol car and driven away at any time. When Alek pointed out that Babb had kept his license and that he did not feel free to leave, Hernandez said that Alek could have driven away without his license.

102.    But Hernandez was wrong: Texas law requires a driver to have possession of his license while driving. Tex. Transp. Code § 521.025(a)(1). If Alek had driven off without his license, he would have been violating Texas law.

103.    When Alek continued to claim his rights had been violated, Hernandez laughed at Alek and put him on hold for twenty minutes. After checking to see if Alek was still there, Hernandez put Alek on hold for another fifteen minutes. Hernandez then checked to see if Alek was still there a second time.

104.    On information and belief, Hernandez thought that putting Alek on hold for an extended time would prompt Alek to hang up.

105.    When Alek confirmed that he was still on the line, Hernandez repeated his request that Alek "challenge us in court if you don't like how we conduct business" and hung up on Alek.

106.    Right after this call, Alek emailed Rodriguez, summarizing his phone call with Hernandez. Rodriguez initially didn't respond—to either Alek's complaint or to his summary of the call with Hernandez.

107.    Nearly two months later, after Alek sent at least two follow-up emails, Rodriguez finally responded to the substance of Alek's complaint. On June 2, 2022, she emailed Alek that "[w]hen I reviewed Deputy Babb's body worn camera (BWC) I did not see any policy violations." She added that "[n]o policy violations were viewed through BWC." Rodriguez therefore confirmed that Babb's and Molina's actions were consistent with Bexar County policies carried out by BCSO.

108.     Despite Alek's complaint, Babb and Molina have not been disciplined for violating any Bexar County policy and custom concerning the stop and search of Alek's truck.

**Alek's rights were violated due to a Bexar County policy and custom.**

109.     Bexar County has a policy and custom, that is executed by BCSO, of using traffic stops to conduct searches and seizures without any objective basis to suspect the driver of a crime.

110.     On information and belief, BCSO deputies commonly stop drivers without any reason to suspect a traffic violation was committed. Babb's comment that Alek was "probably" stopped on his drive south through Bexar County the day prior without any reason to think that Alek had committed a traffic violation that day (Babb A at 12:25) shows that Babb believes that merely driving though Bexar County is enough to trigger a traffic stop.

111.     Bexar County trains BCSO deputies, especially its Criminal Interdiction Unit officers, on how to get around the Fourth Amendment's protections in traffic stops. For example, for multiple years before Babb stopped Alek, Bexar County paid for training from Desert Snow, LLC. Desert Snow, LLC provides courses to law-enforcement officers on aggressive methods for highway interdiction, including how to manipulate the circumstances of a traffic stop to extend the stop and search the vehicle.

112.     Over the past two years, the percentage of BCSO traffic stops that include searches has increased while the number of searches where contraband was discovered has decreased. In fact, in 2022, BCSO reported conducting 536 searches during traffic stops but only discovering contraband in 115 of those searches.

113.     On information and belief, BCSO deputies sometimes fail to report car searches that find no contraband.

114.     On information and belief, BCSO's Criminal Interdiction Unit deputies perform more searches during traffic stops than other BCSO deputies.

115.     Additionally, BCSO regularly posts on its social media about successful searches following traffic stops. The posts follow a pattern of announcing that deputies found contraband after conducting a traffic stop and searching a vehicle, often in the wake of a K9 alert. These posts suggest that BCSO deputies routinely conduct dog sniffs and car searches during traffic stops.

116.     On information and belief, despite BCSO's social media posts touting the discovery of contraband during traffic stops, officers find nothing from most searches conducted during traffic stops. This conclusion is confirmed by Babb's comment that "nine times out of ten, this is what happens"—meaning that officers find nothing when searching a vehicle. Babb B at 18:15.

**Alek will drive through Bexar County twice a week for work.**

117.     Alek's work selling specialized pipeline products and educating customers requires him to routinely drive from Houston, where he lives and RMS Controls is located, to petroleum drilling and pipeline sites located across the Eagle Ford Shale Play.[4]

118.     The Eagle Ford Shale Play stretches across thirty Texas counties from the Texas-Mexico border to central Texas and is the most active shale play in the world with over 100 petroleum rigs running.

119.     As federal emissions standards have tightened,[5] oil and natural gas companies operating in the Eagle Ford Shale Play have increasingly turned to RMS for products to help

---

[4] A play is a group of oil fields or petroleum prospects in the same region that originate from the same geological circumstances.

[5] In June 2021, a congressional resolution reinstated 2016 standards to reduce the emission of methane from oil and natural gas operations. Joint Resolution of June 30, 2021, Pub. L. No. 117-23, 135 Stat. 295. The Environmental Protection Agency is in the process of developing an

comply with the higher standards. In the last year, RMS doubled its number of customers in south Texas and anticipates that its number of south Texas customers will continue to grow. Indeed, over the past four years, the share of RMS's revenue that comes from sales to customers operating in the Eagle Ford Shale Play has grown from nearly 0% to approximately 30%.

120.    Moving forward, Alek expects to visit the sites of current and potential customers in south Texas about once a week. Alek therefore expects to drive through Bexar County twice a week—once on the trip out to visit customers and once on the trip back to Houston. About 50 miles of Alek's route are in Bexar County, about 25 miles of which are on I-35—the same highway where the traffic stop occurred.

121.    That means Alek expects to drive 100 miles (over an hour) in Bexar County weekly, which adds up to over 5,000 miles (approximately 70 hours) in Bexar County yearly—half of which will be on I-35.

122.    Alek's weekly lengthy drives through Bexar County create a high risk that Alek will again be stopped and searched by a BCSO deputy even if Alek does nothing wrong.

**INJURY TO PLAINTIFF**

123.    The over-an-hour-long traffic stop interfered with Alek's ability to complete his trip when his time is already scarce given the needs of his young family and the demands of his job.

---

additional rule to further reduce emissions from oil and natural gas facilities and expects to issue a final rule sometime in 2023. EPA's Supplemental Proposal to Reduce Pollution from the Oil and Natural Gas Industry to Fight the Climate Crisis and Protect Public Health, at 2 (Nov. 11, 2022), https://tinyurl.com/4yt4p8pj.

124.   Being detained on the side of the road, placed into the back of a patrol vehicle, and forced to watch his truck get searched and his belongings get ransacked when he had done nothing wrong was an invasive, embarrassing, frustrating, and stressful experience for Alek.

125.   Alek was forced to answer dozens of probing questions about his identity, work, travels, family, living situation, criminal history, activities, and possessions—an invasion of his privacy.

126.   After the search, the officers left Alek's truck a mess with all compartments and bags emptied. In addition to the time Alek spent detained on the side of the road, Alek had to spend time cleaning up the mess the BCSO deputies made in his truck.

127.   Because Babb stopped Alek without a factual basis to believe Alek had committed a traffic violation, Babb violated Alek's right to be free from unreasonable seizures.

128.   Regardless of whether there was any factual basis for the stop, Babb extended the stop without any factual basis for doing so. As a result, a stop that should have only lasted a few minutes continued for over an hour. This also deprived Alek of his freedom of movement.

129.   Despite having no evidence that Alek had done anything wrong, Babb held Alek in the back of Babb's patrol car, further depriving Alek of freedom of movement.

130.   The invasive and unjustified search of Alek's person via the frisk and via the search of his truck and belongings invaded Alek's privacy and Alek's property rights.

131.   Because Babb and Molina searched Alek's truck without a warrant, without consent, and without probable cause to believe the truck contained contraband or other evidence of a crime, they violated Alek's right to be free from unreasonable searches.

132.   Because Alek's constitutional rights were violated, Alek has lost his sense of security and trust in BCSO, its officers, and law-enforcement officers generally.

133.    The violation of Alek's constitutional rights caused Alek stress and anxiety.

134.    There is a significant risk that Bexar County and its deputies will again pull over Alek as he travels through Bexar County when he has done nothing wrong. Alek remains stressed and anxious that his constitutional rights will be violated again.

135.    Alek's truck had some damage because the drug dog scratched the inside and outside of the vehicle. Bexar County offered Alek $7,268.46 for the damage to his truck. Alek accepted that amount and released Bexar County from any claims "on account of or in any way growing out of any and all known, foreseen and unforeseen property damage and the consequences thereof resulting or to result from the occurrence on or about the 16th of March 2022 in or around San Antonio, TX." This case is not about the damage to Alek's truck, and Alek does not seek damages resulting from or arising out of the damage to his truck.

### CAUSES OF ACTION

### Claim I
### 42 U.S.C. § 1983 – Violation of the Fourth Amendment and Fourteenth Amendment
### Unreasonable seizure by Babb in stopping Alek without any basis
### to conclude a traffic violation was committed

136.    Alek incorporates and realleges the allegations in paragraphs 1 through 135, above.

137.    The Fourth Amendment's prohibition on unreasonable seizures bars government officers from conducting traffic stops without probable cause—a particularized and objective basis—to believe a traffic violation has occurred.

138.    Simply put, Babb conducted an unreasonable seizure when he conducted a traffic stop without a particularized and objective basis for thinking Alek committed any traffic violation.

139.    Although Babb claimed that "the only reason I'm stopping you is that when I was watching you over there you were drifting over that fog line pretty hard," indisputable video

evidence shows that Alek did not cross the fog line at any time when he was within Babb's field of vision.

140.    The offense of crossing the fog line refers to violating Texas Transportation Code § 545.058, which permits a driver to use the "improved shoulder" of a public road only in certain situations. Alek was not driving on the improved shoulder, it is not an offense to briefly touch the fog line, and in any case, Alek did not touch the fog line.

141.    Although Babb later gave Alek a written warning for "fail[ing] to maintain a single lane," indisputable video evidence shows that Alek was in control of his vehicle and did not drift into another lane at any time when he was within Babb's field of vision.

142.    The offense of failure to maintain a single lane, a violation of Texas Transportation Code § 545.060(a), does not require a driver to stay entirely within a single lane. Rather, it applies only when the failure to stay "as nearly as practical" entirely within a single lane becomes unsafe. Babb made no claim that Alek failed to drive his vehicle safely, and in any case, Alek drove his truck safely at all times before the stop.

143.    Moreover, Babb lacked access to any information that would have allowed him to reasonably but mistakenly conclude that Alek crossed over the fog line, failed to maintain his lane, or committed any other traffic violation.

144.    Among other things, Babb would have had no way of seeing whether Alek crossed over the fog line when Alek first drove by because Alek was driving in the left lane and Babb was parked off the right shoulder, in the grass. And even after Babb pulled on to the highway and started following Alek, he spent much of the two minutes before pulling Alek over staring at his center console and typing Alek's license plate number into his computer.

27

145.    Setting aside Babb's subjective beliefs and assertions, no reasonable officer in his shoes could have concluded that Alek crossed over the fog line, failed to maintain his lane, or committed any other traffic violation.

146.    Nor did Babb have a reasonable factual basis for suspecting that Alek or his truck (as distinguished from any other white male driving a black Ford F-250 on I-35 that day) were involved or had recently been involved in any non-traffic-related criminal activity.

147.    At the time of stop, the law was clearly established that officers could not conduct a traffic stop without probable cause to believe that the driver had committed a traffic violation and could not conduct a non-traffic-related vehicle stop without reasonable suspicion to suspect the driver of a crime.

148.    Alek seeks damages from Babb for violating his clearly established Fourth and Fourteenth Amendment right to be free from unreasonable seizures.

**Claim II**
**42 U.S.C. § 1983 – Violation of the Fourth Amendment and Fourteenth Amendment**
**Unreasonable seizure and search by Babb in extending a traffic stop's**
**duration and scope without a legitimate reason**

149.    Alek incorporates and realleges the allegations in paragraphs 1 through 135, above.

150.    The Fourth Amendment's prohibition on unreasonable seizures bars government officers from prolonging a traffic stop beyond the time reasonably required to address the traffic violation that warranted the stop and attendant safety concerns. Authority for the traffic stop ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

151.    The Fourth Amendment's prohibition on unreasonable seizures bars government officers from stopping and frisking a person unless the officers observe unusual conduct that leads them to reasonably conclude that criminal activity may be afoot and the person with whom they are dealing may be armed and presently dangerous.

152.    Because Babb lacked probable cause or any reason at all to stop Alek, detaining Alek for any amount of time violated his clearly established Fourth Amendment right to be free from unreasonable seizures.

153.    But even if the initial stop was somehow justified, what came next was not because Babb lacked reasonable suspicion to prolong or expand the supposed traffic stop to investigate Alek for any other crimes.

154.    Babb unreasonably expanded the scope of the traffic stop by asking Alek to step out of his truck and frisking him. The frisk was not an ordinary part of a stop for a minor traffic violation and Babb lacked reasonable suspicion that Alek was both armed and dangerous.

155.    Babb completed, or reasonably should have completed, the tasks tied to either the offense of crossing the fog line or failing to maintain a lane within the first few minutes of the stop. Indeed, on information and belief, Babb completed the tasks related to the alleged traffic violation two minutes after Alek and Babb entered Babb's patrol car when Babb announced that "this thing I'm giving you, man, looks like a ticket but it's a warning." Babb A at 5:02. At that point, Babb had completed all computer checks on Alek, and the checks had come back clean. Babb had no legitimate reason to further prolong the stop.

156.    Babb nevertheless unreasonably continued the stop to investigate Alek for other crimes by interrogating Alek about his identity, trip, truck, living situation, and criminal history.

157.    Even if the stop was somehow justified up to this point, the stop should have ended when Alek directly and calmly answered all of Babb's initial questions. Nothing Alek said or did was suspicious, and Babb did not have a legitimate reason to continue the stop.

158.    When Babb admitted that, as part of BCSO's Criminal Interdiction Unit, he was actually out on patrol "looking for big shit" like human trafficking and drug smuggling (Babb A

at 14:10), Babb was no longer performing tasks related to the alleged traffic violation. Rather, he was fishing for evidence of any other crimes.

159.    Even if the stop was somehow justified up to this point, Babb unreasonably expanded the scope of the stop by asking Alek whether he had any particular drugs in his truck, was carrying over $10,000 in cash, whether he had anything illegal, and whether anyone else had driven his truck in the last 48 hours. Alek again answered Babb's second set of questions calmly and directly. Nothing in Alek's answers or demeanor was suspicious, and Babb did not have a legitimate reason to continue the stop.

160.    Even if the stop was somehow justified up to this point, Babb unreasonably expanded the scope of the stop by asking to search Alek's vehicle. When Alek refused to consent to the search, the stop should have ended because Babb had no legitimate reason to continue the stop.

161.    Even if the stop was somehow justified up to this point, Babb unreasonably prolonged the stop twenty minutes for the K9 unit to arrive. Babb had no legitimate reason to continue the stop to wait for a K9 unit.

162.    Even if the stop was somehow justified up to this point, Babb again unreasonably expanded the scope of the stop to include a dog sniff—which is not an ordinary part of a traffic stop—even though Babb had no legitimate reason to suspect Alek of a crime.

163.    Even if the stop was somehow justified up to this point, Babb further unreasonably expanded the scope of the stop by placing Alek in the back of his patrol car when Babb had no legitimate reason to suspect Alek of a crime or that Alek needed to be confined.

164.    Because Babb's authority to detain Alek ended well before dog sniff occurred, the subsequent search of Alek's truck was outside the scope of the traffic stop and should never have occurred.

165.    During the entirety of the stop, from when Babb first pulled Alek over until Babb completed the search of Alek's truck, Babb kept possession of Alek's license, and therefore Alek never felt free to leave. In total, Babb kept Alek's license for over an hour because Babb claimed that Alek had committed the minor offense of drifting over the fog line.

166.    Each time Babb prolonged or expanded the scope of the traffic stop, Babb violated Alek's Fourth Amendment right to be free from unreasonable searches and seizures.

167.    Any reasonable officer in Babb's position would have ended the traffic stop within a few minutes of stopping Alek. Indeed, no officer in Babb's shoes would have extended a stop for the minor traffic violation of crossing a fog line to over an hour in duration to frisk the driver, broadly investigate other hypothetical crimes, conduct a dog sniff, hold the driver in a patrol car, and search the driver's vehicle.

168.    At the time of stop, the law was clearly established that officers cannot extend the duration and scope of a traffic stop beyond the tasks necessary to address the traffic violation that warranted the stop.

169.    Further, the law was also clearly established that (1) an officer cannot frisk a person unless the officer observes unusual conduct that leads the officer to reasonably conclude that criminal activity may be afoot and that the person with whom they are dealing may be armed and presently dangerous, and (2) a dog sniff is not fairly characterized as part of an officer's mission for a traffic stop. A reasonable officer in Babb's position would have known that absent reasonable

suspicion, extension of a traffic stop to frisk and conduct a dog sniff violated the Constitution's shield against unreasonable searches and seizures.

170.    Alek seeks damages from Babb for violating his clearly established Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures.

**Claim III**
**42 U.S.C. § 1983 – Violation of the Fourth Amendment and Fourteenth Amendments**
**Unreasonable search by Molina and Babb in conducting**
**a warrantless search without probable cause**

171.    Alek incorporates and realleges the allegations in paragraphs 1 through 135, above.

172.    The Fourth Amendment's prohibition on unreasonable seizures bars government officers from searching a person's car during a roadside stop without a warrant unless an officer has probable cause to believe that contraband or evidence of a crime is located inside the car or the driver consents.

173.    On information and belief, because Molina intentionally prompted the dog to alert, the dog's alert could not have provided probable cause to search Alek's truck.

174.    Even if Molina did not signal the dog to alert, on information and belief, the dog's alert was not reliable given the totality of the circumstances—which include the presence of roadkill, the open truck windows, wind, the dog's desire to sniff the nearby grassy ditch, Molina's directions for the dog to return to the truck, and the fact that Molina brought the dog to the driver's side of the truck a second time.

175.    Because the dog's alert was not reliable, it could not have provided Molina and Babb with probable cause to search Alek's truck.

176.    Because Molina and Babb did not have probable cause to believe that Alek's truck possessed contraband, Molina and Babb violated Alek's Fourth Amendment right to be free from unreasonable searches by searching his truck without a warrant and without his consent.

177.    No reasonable officer in Molina's or Babb's positions could have believed that he had probable cause to search Alek's truck given the facts surrounding the dog alert.

178.    At the time of stop, the law was clearly established that, to search a person's car during a roadside stop without a warrant or consent, the officers needed probable cause to believe that contraband or evidence of a crime was located inside the car.

179.    At the time of the stop, the law was also clearly established that a manufactured or unreliable dog alert could not provide probable cause to search a car.

180.    Alek seeks damages from Molina and Babb for violating his clearly established Fourth and Fourteenth Amendment right to be free from unreasonable searches.

**Claim IV**
**42 U.S.C. § 1983 – Violation of the Fourth Amendment and Fourteenth Amendment**
**Unconstitutional Bexar County policy and custom**

181.    Alek incorporates and realleges the allegations in paragraphs 1 through 135, above.

182.    Bexar County has a policy, practice, and custom of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime. That policy, practice, and custom is executed by BCSO and its deputies, particularly the Criminal Interdiction Unit.

183.    The following facts, among others, show that Bexar County has an official policy, practice, and custom of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime:

   a.    Babb's statement that his position in the Criminal Interdiction Unit means he writes warnings, not tickets;

   b.    Babb's statement that he does not look for speeding but is looking for human and drug smuggling and "big shit";

   c.    BCSO deputies commonly make baseless traffic stops, as illustrated by Babb's comment that Alek had probably been stopped the day before on his trip down to

south Texas even though Babb knew nothing about how Alek had been driving that day;

d.  BCSO deputies commonly make baseless traffic stops, as shown by Babb's comment that he hoped Alek wouldn't be subjected to any more law-enforcement stops that same day he was stopped;

e.  Babb's statement that he already knew the K9 unit was "not far" from where he and Alek were stopped because it is Bexar County's policy and custom to search stopped vehicles even without facts giving rise to reasonable suspicion;

f.  Babb's statement that he stops eighteen wheelers "all day" on normal traffic violations with the purpose of searching those vehicles for human smuggling;

g.  The fact that, shortly after stopping Alek, Babb began asking Alek questions unrelated to the stop as part of fishing for evidence of other crimes;

h.  Babb and Molina admittedly recognized that the circumstances surrounding the dog alert made it difficult to know what the dog was alerting to but nevertheless searched every crevice of Alek's truck;

i.  The fact that Babb took a call with a supervisor during the stop and search of Alek's truck;

j.  Babb's statement to his supervisor that he would do a "deep search" of Alek's truck "just to make sure";

k.  The fact that Babb only gave Alek the warning as an afterthought, saying that he needed to give Alek the warning "before I forget";

l.  Babb's statement that "nine times out of ten, this is what happens"—meaning that officers find nothing when searching a vehicle—but suggesting the one out of ten times an officer finds something that supports continuing the practice;

m.  The Sheriff did not discipline Babb for stopping Alek without an objective basis to conclude Alek had committed a traffic violation;

n.  The Sheriff did not discipline Babb for extending the traffic stop beyond when the tasks tied to the alleged traffic violation were completed;

o.  The Sheriff did not discipline Babb or Molina for searching Alek's truck without a warrant, without consent, and without probable cause to believe that the truck contained contraband or other evidence of crime;

p.  Hernandez's claim that Babb's body camera showed that Alek crossed over the fog line even though Babb's body camera did not even show Alek's truck while moving;

34

q.    Hernandez's refusal to investigate Alek's claims that his rights had been violated, telling Alek that he should just file a lawsuit if Alek didn't like how BCSO conducted business;

r.    Hernandez's attempts to prompt Alek to hang up by putting him on extended holds to discourage Alek from continuing to press his complaint about the violation of his rights;

s.    Rodriguez's statements that she did not see any policy violations on the body camera footage, indicating that the deputies' actions were consistent with Bexar County policy;

t.    The fact that the warning and the incident report for the traffic stop of Alek do not indicate that a search was conducted on Alek's truck;

u.    The fact that Bexar County trains its BCSO deputies on how to manipulate the circumstances of a traffic stop to extend the stop and search the vehicle;

v.    The fact that over the past two years the share of traffic stops where BCSO deputies have reported conducting a search has increased while the number of times deputies have discovered contraband has decreased; and

w.    BCSO's social media posts highlight a routine of searching vehicles on traffic stops, often following dog sniffs.

184.    The following facts, among others, show that Sheriff Salazar—the policymaker for Bexar County's law-enforcement activities—has actual or constructive knowledge of Bexar County's unconstitutional policy, practice, and custom:

a.    Babb took a call with a supervisor during the stop and search of Alek's truck;

b.    Two officers in the internal affairs department of BCSO told Alek that they did not see any problem with the actions of the BCSO deputies during the stop and search;

c.    Sheriff Salazar failed to discipline Babb for making a traffic stop, extending that stop, and searching Alek without any objective basis to suspect Alek of a crime;

d.    Sheriff Salazar failed to discipline Babb or Molina for searching Alek's truck without any objective basis to suspect Alek's truck contained contraband or other evidence of a crime;

e.    The fact that BCSO's publicly reported data shows that over the past two years the share of traffic stops where BCSO deputies have reported conducting a search has increased while the number of times deputies have discovered contraband has decreased; and

f.      BCSO's social media posts indicate that it is routine to search vehicles and conduct dog sniffs on traffic stops.

185.    Bexar County's unconstitutional policy, practice, and custom was the moving force behind the violation of Alek's Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures.

186.    Accordingly, Alek seeks damages, declaratory relief, and injunctive relief against Bexar County and Salazar for violating his Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures.

## PRAYER FOR RELIEF

187.    For the violations of his Fourth and Fourteenth Amendment right to be free from unreasonable searches and seizures, Alek respectfully requests:

a.      An award of compensatory and punitive money damages against all Defendants for the injuries Alek suffered due to Defendants' violations of Alek's constitutional rights that occurred in pulling Alek over without any basis to suspect Alek of a crime;

b.      An award of compensatory and punitive money damages against all Defendants for the injuries Alek suffered due to Defendants' violations of Alek's constitutional rights that occurred in extending and expanding the scope of the traffic stop without reasonable suspicion;

c.      An award of compensatory and punitive money damages against all Defendants for the injuries Alek suffered due to Defendants' violations of Alek's constitutional rights that occurred in searching Alek's truck without his consent, a warrant, or probable cause;

d.      An award of $1 in nominal damages based on Defendants' violations of Alek's constitutional rights;

e.      A judgment declaring that Defendants' actions in, and Bexar County's policy and custom of, using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime violates the Fourth and Fourteenth Amendments;

f.      An order permanently enjoining Defendants from using traffic stops to conduct searches and seizures without any reason to suspect the driver of a crime;

g.     An award of reasonable attorneys' fees and costs; and

h.     Such other relief that this Court deems appropriate.

188.   Alek does not seek any relief related to or arising out of the property damage to his

truck.

Dated: June 1, 2023                           Respectfully submitted,

                                              /s/ Christen Mason Hebert
                                              Christen Mason Hebert (TX Bar No. 24099898)
                                              INSTITUTE FOR JUSTICE
                                              816 Congress Ave., Suite 960
                                              Austin, TX 78701
                                              Phone: (512) 480-5936
                                              Fax: (512) 480-5937
                                              chebert@ij.org

                                              Joshua Windham* (NC Bar No. 51071)
                                              Trace E. Mitchell* (DC Bar No. 178094)
                                              INSTITUTE FOR JUSTICE
                                              901 N. Glebe Rd., Suite 900
                                              Arlington, VA 22203
                                              Phone: (703) 682-9320
                                              Fax: (703) 682-9321
                                              jwindham@ij.org
                                              tmitchell@ij.org

                                              Attorneys for Plaintiff

                                              *Motions for Admission *Pro Hac Vice* to be filed