## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| ALEK SCHOTT,<br><br>  *Plaintiff,*<br><br>v.<br><br>JOEL BABB, in his individual and official capacity; MARTIN A. MOLINA III, in his individual and official capacity; JAVIER SALAZAR, in his individual and official capacity; and BEXAR COUNTY, TEXAS,<br><br>  *Defendants*. | Civil Action No. 5: 23-cv-00706-OLG-RBF |

## <u>RESPONSE TO DEFENDANT BEXAR COUNTY'S</u>
## <u>MOTION TO DISMISS</u>

This case is about an unconstitutional traffic stop, stop extension, and search. Bexar County (the County)'s motion to dismiss does not dispute that Alek Schott plausibly alleges that the stop extension and search he experienced were unconstitutional. Nor does the County's motion dispute that Alek's complaint satisfies the policymaker and causation requirements for a *Monell* claim. The core issue currently before the Court is whether Alek alleges enough facts to infer the County has a policy of using traffic stops as a tool to conduct baseless searches and seizures.

Alek far surpasses the pleading stage's low bar to establish an unconstitutional County policy. He offers a stack of facts showing the existence of a problematic policy—including that County officials told him that review of the illegal stop revealed "[n]o policy violations" and that he should sue if he did not like "how we conduct our business." Because Alek states a plausible claim against the County, the County's motion to dismiss should be denied and Alek's *Monell* claim should proceed to discovery.

1

**Factual Background**

On March 16, 2022, Alek Schott was driving home from a work trip when he was pulled over by Bexar County Sheriff's Office (BCSO) deputy Joel Babb. Babb claimed "the only reason I'm stopping you is that when I was watching you over there you were drifting over that fog line pretty hard." Compl. ¶35. But Alek's personal dashcam footage shows that Alek never crossed or even touched any line. *Id*. ¶27. No sound indicated that Alek had touched the rumble strip just over the fog line. *Id*. Nor did Alek's truck, which alerts when a driver starts to drift, give him a lane-departure warning. *Id*. Moreover, when Alek drove past Babb's patrol car, Alek was traveling in the left lane and Babb was parked in the grass off the right side of the highway. *Id*. ¶25. From that angle, the only way Babb could have seen if Alek touched or drifted over any line would have been if Alek drifted far out of his lane. *Id*. ¶30. Again, though, Alek's dashcam video shows that he stayed in his lane. *Id.*

After Babb stopped Alek, Babb took Alek's license and informed him that "it's not going to be a ticket. It's gonna be a warning." *Id*. ¶37. Babb nevertheless ordered Alek to sit in his patrol car and patted Alek down before he got in. *Id*. ¶¶37–39. Instead of promptly issuing Alek a warning, Babb began questioning Alek about his identity, trip, and work. *Id*. ¶40. Alek confirmed his name and hometown, explained the purpose of his travel, and answered Babb's other questions about his work trip. *Id*. ¶40. Alek answered all of Babb's questions directly and calmly, and nothing in Alek's answers or demeanor would have given Babb any reason to suspect Alek of a crime or extend the stop beyond the time needed to issue a warning. *Id*. ¶41.

About two minutes after they entered the patrol car, Babb told Alek that "this thing I'm giving you, man, looks like a ticket but it's a warning." *Id*. ¶42. At this point Babb had completed running the computer checks on Alek, and those checks did not reveal any reason to keep detaining him. *Id*. But Babb still continued to question Alek about his truck, his living situation, his work,

and whether he had ever been in trouble with the law. *Id*. ¶43. Alek calmly and truthfully provided

benign answers to all of Babb's questions. *Id*.

Babb then admitted that the purpose of the stop was never really about any supposed traffic

violation:

> I'm on what's called a Criminal Interdiction Unit. So, I don't have to deal with all
> that crap [traffic violations]. I don't give tickets. I give warnings. And the main
> reason is, I sit on the side of the highway and I'm out here looking for . . . human
> smuggling, drug smuggling, and all those things like that.

*Id*. ¶44. Babb then started questioning Alek more intensely, asking whether he had various drugs

in his truck, whether he was carrying over $10,000 in cash, whether anyone had asked him to carry

anything, whether he had anything illegal, and whether anyone else had driven his truck in the last

48 hours. *Id*. ¶¶45, 48. Alek calmly provided direct, innocent answers to Babb's questions. *Id*.

Babb also asked if Alek was "stopped at all going down," referring to Alek's trip the day

before. *Id*. ¶46. Babb stated that "if you went down, you probably got the same type of stop so a

lot of this will sound familiar." *Id*.

Almost ten minutes after Babb told Alek he would be issued a warning—and even though

Alek had given calm, non-suspicious answers to all Babb's questions—Babb asked if he could

search Alek's vehicle. *Id*. ¶¶49–50. Alek said he would "prefer not." *Id*. ¶50. Babb then announced

he would have a K9 unit come walk around Alek's vehicle anyway. *Id*. ¶51. He warned Alek that

"if [the dog] alerts to anything, then we'll do a search of the vehicle." *Id*. ¶52. Babb explained that

he was "out here looking for big shit" but "[i]f you have anything smaller, these dogs will alert[.]"

*Id*. Reaching for his radio, Babb noted that he "kn[e]w that [the K9 unit] was not far." *Id*. ¶56.

Babb radioed for a "narcotics K9" and then continued to hold Alek in his patrol car while he waited

for the K9 to arrive. *Id*. ¶57.

During that twenty-minute wait, Babb printed out the warning but did not give it to Alek or return Alek's license. *Id*. ¶¶58, 66. Babb shared that he "stop[s] eighteen wheelers all day on normal traffic violations because, unfortunately . . . a lot of them . . . are pushing some serious bodies across the [border]." *Id*. ¶59. He said San Antonio is a "hub for a lot of that crap but it's the hardest place to look for it because we have too much to dig through out here." *Id*. And he told Alek that he "hope[d] you don't get any more stops today," clarifying he meant "law-enforcement stops." *Id*. ¶63. Babb then continued to question Alek, mostly about his work and his trip. *Id*. ¶64. Alek's answers were not suspicious, did not suggest any involvement in criminal activity, and were consistent with Alek's innocent explanation for his travel. *Id*. ¶65.

When BCSO deputy Martin A. Molina III and his dog finally arrived, Molina circled the dog around Alek's truck starting on the driver's side. *Id*. ¶70. After moving around the back of the truck, the dog tried to walk away from the truck to sniff a grassy ditch that contained roadkill several times. *Id*. Molina directed the dog to return to the truck multiple times. *Id*. When Molina brought the dog to the driver's side door a second time, the dog sat at the driver's side door and looked to Molina. *Id*. ¶71. Molina looked at the dog, gestured upward with his right hand, and made an unintelligible noise. *Id*. The dog immediately alerted. *Id*. Molina then reported on his radio that "we got a positive alert on the driver's side door." *Id*. Absent Molina's signal, the dog would not have alerted on Alek's truck. *Id*. ¶¶72–73.

While Molina was conducting the dog sniff, Babb told Alek that he called the K9 as "a reasonable suspicion thing" and that "the good thing about my agency is that we're pretty smart about case law. . . . We all try to go to training as much as possible." *Id*. ¶74.

After the alert, Babb joined Molina outside of Alek's truck and Molina admitted "it is hard" to know what the alert was about. *Id*. ¶75. Any reasonable officer in Molina's or Babb's position

would have known that the alert was not reliable given that Molina returned the dog's attention to the truck multiple times; that roadkill, wind, and the truck's open windows made it difficult to detect any alert-worthy odors; and that the dog did not alert on the first pass. *Id*. ¶76.

Babb informed Alek of the alert and ordered him to sit in the back of the patrol car, noting Alek was "detained because of the positive alert." *Id*. ¶77. Babb and Molina then began searching Alek's truck without his consent or a warrant. *Id*.

Right after starting the search, Babb got a call from a supervisor. *Id*. ¶82. During that call, Babb stated there had been a positive K9 alert on Alek's truck and that he was starting to search. *Id*. Babb relayed some of the facts that Alek had given about his trip but mischaracterized Alek's explanation as "kinda broken up, the storyline." *Id*.

Babb and Molina, later joined by a third deputy, searched every crevice of Alek's truck, dumping out every bag and every compartment *Id*. ¶¶86–87. In the end, the deputies did not find drugs or any other evidence of a crime, but they left Alek's truck and belongings a mess. *Id*. ¶¶88–89.

Over an hour after pulling Alek over for allegedly drifting over the fog line, Babb finally returned Alek's license and gave him the written warning "before I forget." *Id*. ¶90. The warning claimed that Alek "fail[ed] to maintain single lane" and indicated that "No Search" had occurred. *Id*. ¶91. Before departing, Babb told Alek that "nine times out of ten, this is what happens"— meaning that BCSO deputies typically find nothing when searching a vehicle. *Id*. ¶94.

Alek reported the violation of his rights to BCSO. *Id*. ¶95. On April 12, 2022, an internal affairs officer, Marta Rodriguez, followed up on Alek's complaint. *Id*. ¶96. Rodriguez told Alek she had seen nothing wrong with the deputies' actions based on their body-camera footage, but Alek responded that his dashcam footage showed that he had not drifted. *Id*. Later that evening,

Alek spoke with another internal affairs officer, Hernandez, who said he had looked at the body-camera footage and saw that Alek had crossed over the fog line. *Id*. ¶¶97–98. But the deputies' body-camera footage did not capture any video of Alek's truck moving. *Id*. ¶¶29, 99. Hernandez maintained that "we can see all of these violations you made from this body camera" and told Alek that "if you don't like how we conduct our business, you should file a file a lawsuit." *Id*. ¶100. Hernandez told Alek that he could have driven away at any point, laughed when Alek said his rights had been violated, and put Alek on extended holds multiple times. *Id*. ¶¶101–05. When Alek remained on the line, Hernandez repeated that Alek could "challenge us in court if you don't like how we conduct business" and hung up. *Id.* ¶105.

Nearly two months later, after Alek followed up twice, Rodriguez sent an email stating that "[w]hen I reviewed Deputy Babb's body worn camera (BWC) I did not see any policy violations." *Id*. ¶107. She added that "[n]o policy violations were viewed through BWC," confirming again that Babb's and Molina's actions followed Bexar County policies. *Id*. Neither Babb nor Molina have been disciplined. *Id*. ¶108. And the incident report that Bexar County produced in response to open records requests does not indicate that a search occurred. *Id*. ¶93; *see also* Ex. 1 (Windham Decl.) ¶¶2–7.

On June 1, 2023, Alek filed this suit alleging that the BCSO deputies violated his Fourth Amendment rights by: pulling him over without probable cause to believe he committed a traffic violation (unreasonable seizure), extending the stop longer than necessary to issue him a warning (unreasonable seizure), and searching his car without a warrant or probable cause (unreasonable search). *Id*. ¶¶136–80.

Relevant here, Alek also sued Bexar County for its policy of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime. *Id*. ¶¶181–86.

Over the past two years, the percentage of BCSO traffic stops that include searches has increased while the number of searches where contraband was found has decreased. *Id.* ¶112. In 2022, BCSO reported conducting 536 searches during traffic stops but only finding contraband in 115 of those searches. *Id.* Those self-reported numbers do not reflect all the searches BCSO conducts because its deputies sometimes fail to report searches that find no contraband, as they did in Alek's case. *Id.* ¶¶91–92, 113.

To help carry out its policy, Bexar County trains BCSO deputies, especially its Criminal Interdiction Unit officers, on how to get around the Fourth Amendment's protections in traffic stops. *Id.* ¶111. For example, for multiple years before Babb stopped Alek, Bexar County paid for training from Desert Snow, LLC, which provides courses on how deputies seeking to find crime on highways can manipulate and extend traffic stops to search vehicles. *Id.*

Finally, BCSO regularly posts on social media to showcase how frequently it uses K9 alerts to search for and find contraband. *Id.* ¶115. Despite BCSO's social media posts touting the discovery of contraband during traffic stops, most searches conducted during traffic stops turn up nothing. *Id.* ¶116.

### Pleading Standard for Municipal Liability

"To survive a motion to dismiss, a complaint need not contain 'detailed factual allegations'; rather, it need only allege facts sufficient to 'state a claim for relief that is plausible on its face.'" *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). When reviewing a complaint, courts "must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmoving party." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). Courts "must consider the complaint in its entirety" and may consider documents referenced in the complaint and facts subject to judicial

notice—but not other documents or facts outside the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007).

To state a claim for municipal liability under 42 U.S.C. § 1983, a plaintiff must allege facts that "permit the reasonable inference (1) that a constitutional violation occurred and (2) that an official policy attributable to the [municipality's] policymakers (3) was the moving force behind it." *Littell*, 894 F.3d at 622–23 (cleaned up); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing the test for municipal liability). "An official policy usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Covington v. City of Madisonville*, 812 F. App'x 219, 225 (5th Cir. 2020) (quotations omitted).[1]

A plaintiff's description of a policy "cannot be conclusory; it must contain specific facts." *Pena v. Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (citation omitted). But because a "plaintiff will generally not have access to" facts about the policy at the pleading stage, the complaint "need not specifically state what the policy is." *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011). Rather, a plaintiff's factual allegations "may be more general" and will survive a motion to dismiss if they provide "minimal elaboration" to give "fair notice to the defendant" about the nature of the policy. *Id.* at 843; *see also Valadez v. City of San Antonio*, No. SA-21-CV-0002-JKP-RBF, 2022 WL 1608016, at *11 (W.D. Tex. May 20, 2022) (agreeing with *Thomas* that courts should give plaintiffs "suitable leniency in pleading a policy against a municipality").

---

[1] Throughout this brief, Alek uses the term "policy" as shorthand for "policy and custom."

**Argument**

Alek alleges that BCSO deputies violated his rights by pulling him over without any reason to suspect a traffic violation, by extending the traffic stop without any reason to suspect him of a crime, and by conducting a warrantless car search without probable cause. Those are well-settled Fourth Amendment violations. *See* Section I, below. And they are attributable to the County under *Monell* because Alek plausibly alleges that the deputies were following the County's policy of using traffic stops to perform suspicionless searches and seizures.

The County's motion to dismiss is narrow. It says nothing about two of the constitutional violations (the prolonged stop and the search, Counts II & III), focusing entirely on the initial stop (Count I). And it says nothing about the policymaker and causation components of *Monell* liability.[2] The County challenges only whether the initial stop was baseless and whether Alek alleges enough facts to support his claim that the County has an unconstitutional policy.

Both the County's arguments fall short. On the stop, Alek alleges—and video attached to the complaint confirms—that he did not commit the lane-drifting violation for which Babb stopped him. On the policy prong, Alek points to an array of facts—including, notably, that other County officers *told him* "[n]o policy violations" occurred and that he should sue if he did not like "how we conduct our business," Compl. ¶¶100, 107—that "permit the reasonable inference" that the deputies were following County policy when they violated his rights. *Littell*, 894 F.3d at 622–23. The County's motion to dismiss should therefore be denied.

---

[2] The County does not contest that Alek properly alleges that Sheriff Salazar is the policymaker for its law-enforcement activities, *see* Compl. ¶¶13, 184, or that Alek properly alleges the County's policy was the moving force behind the Fourth Amendment violations, *id.* ¶185.

I.      **Alek plausibly alleges three Fourth Amendment violations to support his *Monell* claim.**

Alek claims that BCSO deputies violated his Fourth Amendment rights in three separate ways: (1) by performing a traffic stop without evidence of a traffic violation, (2) by extending the stop without any reason to suspect Alek of a crime, and (3) by searching his car without a warrant or valid probable cause. Compl. ¶¶136–80. These are well-settled Fourth Amendment violations. *See Whren v. United States*, 517 U.S. 806, 810, 819 (1996) (traffic stops require "probable cause to believe that a traffic violation has occurred"); *Rodriguez v. United States*, 575 U.S. 348, 355, 358 (2015) (stop extensions require "reasonable suspicion of criminal activity"); *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (warrantless car searches require "probable cause").

The County challenges only the first violation, claiming that the traffic stop was justified. Mot. ¶¶11–13. At the very least, then, there is no dispute that Alek plausibly alleges two Fourth Amendment violations—the baseless stop extension and car search (Counts II & III)—that support his *Monell* claim (Count IV).

Even putting that aside for the sake of argument and focusing on the initial stop, Alek's complaint more than plausibly alleges that Babb lacked a basis to stop him. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Alek alleges, and his dashcam footage confirms, that he did not touch or cross over any line before Babb pulled him over. Compl. ¶¶2–3, 27, 139; *id*. at 4 n.1 (dashcam video).[3] He states that had he crossed over the fog line, his truck would have given him a lane-departure warning and would have made a noise

---

[3] To aid the Court's review, Alek attaches as Exhibit 5 to this response three screenshots of the dashcam footage for the five-second timeframe the County claims serves as the basis for the stop. *See* Mot. ¶12.

upon touching the rumble strip—neither of which occurred. *Id*. ¶¶30, 32, 143–45. And he alleges that, in any case, Babb was parked in the grass off the right shoulder and could not have seen Alek drifting over the fog line in the left lane from that angle. *Id*. ¶¶30, 32, 143–45.

The County does not contest these allegations, which must be taken as true at the motion-to-dismiss stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, the County does not even claim that Alek's truck ever touched, let alone crossed, any line. *See* Mot. ¶12. Instead, the County argues that Alek's dashcam footage shows another basis for the stop: that Alek's truck "begins to drift to the left and stay[s] there for about five seconds." *Id*.

But moving within your lane is not a crime. *See State v. Hardin*, 664 S.W.3d 867, 876 (Tex. Crim. App. 2022) ("At most, the record shows that Appellee drove 'as nearly as practical' entirely within a single lane, which is not a traffic violation." (quoting Tex. Transp. Code § 545.060(a))); *State v. Cortez*, 543 S.W.3d 198, 206 (Tex. Crim. App. 2018) (holding that if a driver's tires touched the fog line at all, "which is debatable, his momentary touch of the fog line, without any other indicator of criminal activity, was not enough to justify the stop of [the vehicle] for driving on an improved shoulder").[4] Thus, the County effectively concedes that Babb pulled Alek over for legal conduct.

To the extent the County claims the dashcam footage shows that Alek crossed the fog line, that argument (1) contradicts Alek's plausible allegations about what is captured on the footage, (2) ignores his allegations that there was no sound from his truck's lane-departure system or the rumble strip, and (3) that, in any case, Babb could not have seen whether Alek's tires crossed over

---

[4] The County's after-the-fact characterization of the alleged violation as drifting to the left for five seconds is also contradicted by Babb's statement that he stopped Alek for "drifting *over* that fog line *pretty hard*." Compl. ¶¶35, 139 (quoting Babb A at 2:27) (emphasis added).

the fog line onto the left shoulder of the road from Babb's vantage point off the right shoulder. Compl. ¶¶27, 30, 32.

Even assuming Babb could have seen Alek from his vantage point and that he mistakenly believed Alek had committed a traffic violation by moving within his lane, Babb's error cannot justify the stop. *United States v. Granado*, 302 F.3d 421, 423 (5th Cir. 2002) ("A trooper's incorrect belief that a motorist is in violation of state traffic laws is insufficient to justify a vehicle stop."); *United States v. Cole*, 444 F.3d 688, 689–90 (5th Cir. 2006) (holding that police officer's good faith did not justify a stop where officer mistakenly believed lawful driving was a traffic violation).

Nor does the fact that Alek apologized after Babb pulled him over change the fact that Babb had no basis for the stop. Alek's after-the-stop apology cannot provide any information about whether Babb had "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred[] . . . *before* stopping the vehicle." *Lopez-Moreno*, 420 F.3d 420, 430 (emphasis added). At most, Alek reflexively apologized after Babb accused him of doing something wrong (perhaps an example of being *too* polite), not that he admitted any violation.[5]

In sum, Alek alleges three plausible constitutional violations to support his *Monell* claim, including that Babb violated the Fourth Amendment by pulling him over without any basis. The County has not shown otherwise.

## II.      Alek alleges enough facts to establish a claim against the County.

### A.      Alek identifies an unconstitutional policy.

Alek plausibly alleges that Bexar County has a policy of using traffic stops as a tool to perform baseless searches and seizures—i.e., to conduct "suspicionless fishing expedition[s] in the hope that something [will] turn up." *Utah v. Strieff*, 579 U.S. 232, 242 (2016) (cleaned up). Most

---

[5] Alek later submitted a complaint to BCSO's internal affairs department about "how he had been stopped even though he had not committed any traffic violation." Compl. ¶95.

significantly, Alek alleges that when he reported the violation of his rights, BCSO's internal affairs officers reviewed the stop and told him that they "did not see any policy violations," that "[n]o policy violations were viewed through BWC," and that he should file a lawsuit if he didn't "like how we conduct our business." Compl. ¶¶96, 100, 107.

These facts alone are enough to show that Babb and Molina were following a County policy when they violated Alek's Fourth Amendment rights, especially at the motion-to-dismiss stage. *See Bond v. Nueces Cty.*, No. 20-40050, 2022 WL 4595000, at *7 (5th Cir. Sept. 30, 2022) ("The question here is whether [the plaintiff] has alleged enough to create a reasonable inference that a policy exists, or that there exists a failure to have any pertinent policy."). Because Alek makes "more than boilerplate allegations" and provides "fair notice" to the County "of the grounds for which it is being sued," the County's motion to dismiss fails. *See Thomas*, 800 F. Supp. 2d at 842–45 (emphasizing "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery").

But Alek alleges much more. And those facts "taken collectively" state a plausible claim. *Tellabs*, 551 U.S. at 322 (2007). Indeed, courts have held that a plaintiff has pled enough facts to state a *Monell* claim when the plaintiff alleges a combination of facts to plausibly suggest that a policy exists—as Alek does here.[6]

---

[6] *See, e.g.*, *Robinson v. Hunt Cty.*, 921 F.3d 440, 449 (5th Cir. 2019) (reversing dismissal of a viewpoint discrimination claim against a county based on allegations that sheriff's office posted on Facebook that "inappropriate speech" would be removed, plaintiff's Facebook comment was removed, and the comments of other users were removed); *Groden v. City of Dallas*, 826 F.3d 280, 282–83, 286–87 (5th Cir. 2016) (reversing dismissal of claims against a city where plaintiff alleged policy of baseless, retaliatory arrests based on city spokesperson's announcement of "crack down" on vendors, plaintiff's own baseless arrest, and emails sent by members of public with expectation that police would target vendors); *Barnes v. City of El Paso*, No. EP-22-CV-161-KC, 2023 WL

First, Alek points to Babb's own statements supporting the inference that he was following the County's policy of using traffic stops to conduct baseless searches and seizures in the hopes of finding evidence of crime. Those statements include that Babb's job on the Criminal Interdiction Unit means he sits on the side of the highway looking, not for speeding, but for drug smuggling, human trafficking, and other "big shit;" that the K9 unit was "not far" from where he stopped Alek; that he stops eighteen wheelers "all day" on normal traffic violations to conduct searches; and that "nine times out of ten" BCSO officers find nothing when they search a vehicle. Compl. ¶¶44, 52, 56, 59, 94, 183.

Alek also highlights Babb's comments that Alek was "probably" stopped on his drive south the prior day and that Babb hoped Alek wouldn't be subjected to any more law-enforcement stops "today." *Id.* ¶¶46, 63, 110, 183. Babb made these comments without knowing how Alek was driving the day prior or how Alek would be driving later that day. At the very least, these comments show that Babb expected BCSO officers are likely to pull over any driver traveling through Bexar County, regardless of how they were driving—which, again, suggests Babb knows the County has a policy of baselessly conducting and extending stops. *See Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (holding that prison guards' general testimony about how they had used an off-camera location to interrogate and punish detainees "on many occasions" was enough to preclude summary judgment on *Monell* claim).

---

4097075, at *7–8 (W.D. Tex. June 12, 2023) (holding plaintiff alleged a practice of excessive force against city where plaintiff alleged officers used excessive force 21 times and detailed 10 incidents); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 535–37 (W.D. Tex. 2017) (concluding plaintiffs pled sufficient facts that city and police department had a policy of using excessive force against the mentally ill where plaintiff alleged statistics and described incidents where mentally ill individuals had been killed or wounded by officers).

Second, Alek alleges that Babb and Molina were not disciplined for any actions concerning the stop and search of Alek's truck even though Alek reported the violation of his rights to BCSO. Compl. ¶¶108, 183. Indeed, not only were the deputies never disciplined, but the other officers who reviewed Babb and Molina's actions during the stop agreed that everything the deputies did was squarely within County policy. *Id.* ¶¶96, 101–05, 107–08; *see Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004) ("[T]he failure to take disciplinary action in response to an illegal arrest, when combined with other evidence, could tend to support an inference that there was a preexisting de facto policy of making illegal arrests[.]"); *Bordanaro v. McLeod*, 871 F.2d 1151, 1166–67 (1st Cir. 1989) (affirming the consideration of "evidence of the lack of proper internal investigation" and "the failure to take strong disciplinary action against the officers involved" at trial because "[p]ost-event evidence can shed some light on what policies existed in the [municipality] on the date of an alleged deprivation of constitutional right").

Third, Alek alleges facts showing that the stop and search Alek experienced were not isolated occurrences. For example, Alek alleges that the County trains BCSO deputies on how to get around the Fourth Amendment. Compl. ¶111. That allegation is specific: Alek cites how the County purchased courses from a specific company that teaches officers "aggressive methods for highway interdiction, including how to manipulate the circumstances of a traffic stop to extend the stop and search the vehicle." *Id.* Further, Babb's statement that his agency is "pretty smart about case law. . . . [and w]e all try to go to training as much as possible" suggests that Babb was following training from the County that specifically covered how to conduct stops like the one Alek experienced. *Id.* ¶74.

Alek also alleges facts suggesting that it is BCSO's practice to conduct dog sniffs and searches during traffic stops when there is no basis to do so. Alek highlights that BCSO "regularly"

15

posts on its social media about successful searches during traffic stops, and the posts show a pattern of searching cars following a K9 alert. *Id.* ¶115. Alek alleges that over the past two years, the percentage of BCSO traffic stops where cars were searched increased while the number of searches where contraband was found decreased. *Id*. ¶112. In 2022, for example, BCSO reported conducting 536 searches during traffic stops but only discovering contraband in 115 of those searches—thus finding contraband in about only 20% of searches during traffic stops. *Id.* And given that Alek alleges BCSO deputies sometimes fail to report searches that do not find contraband, the actual percentage of searches finding contraband is likely even lower. *Id*. ¶113. These facts—especially in light of Babb's comment that "nine times out of ten" searches turn up nothing, *id*. ¶94—suggest that BCSO routinely searches cars without probable cause, as a matter of policy. *Id*. ¶115.

Alek's allegations, construed liberally in his favor, are more than enough to state a *Monell* claim and proceed to discovery.

### B.     The County's contrary arguments fail.

Arguing that Alek has not pled enough facts, the County mostly relies on cases decided at the merits stage—after the parties conducted discovery. *See Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 806 (5th Cir. 2017) (summary judgment); *Fuentes v. Nueces Cty.*, 689 F. App'x 775, 778 (5th Cir. 2017) (summary judgment); *Barkley v. Dillard Dep't Stores, Inc.*, 277 F. App'x 406, 413 (5th Cir. 2008) (summary judgment); *Shepherd v. Dallas Cty.*, 591 F.3d 445, 449 (5th Cir. 2009) (affirming—after summary-judgment and a jury trial—district court's conclusion that plaintiff demonstrated serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illnesses); *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (summary judgment); *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) (holding that evidence introduced during jury trial could not support *Monell* liability); *Grandstaff v. City of*

*Borger*, 767 F.2d 161, 165–67, 171–72 (5th Cir. 1985) (affirming district court judgment against city entered after a two-week jury trial).

What's worse, in citing *Sanchez v. Gomez*, the County cites the district court's summary-judgment decision—which concluded that certain *Monell* liability theories should proceed to trial—rather than the decision denying a motion to dismiss, which is more relevant here. *Compare* Mot. ¶13 (citing *Sanchez v. Gomez*, No. EP-17-CV-133-PRM, 2020 WL 1036046 (W.D. Tex. Mar. 3, 2020)), *with Sanchez*, 283 F. Supp. 3d 524.

The Fifth Circuit has "criticized defendants for arguing that cases dismissed on summary judgment supported dismissal of their cases at the pleadings stage." *Bond*, 2022 WL 4595000, at *7 (quoting *Converse v. City of Kemah*, 961 F.3d 771, 776 n.3 (5th Cir. 2020)). "Accordingly, the Fifth Circuit has repeatedly cautioned district courts against relying on 'cases dismissed on summary judgment to support dismissal of cases at the pleadings stage.'" *Barnes*, 2023 WL 4097075, *8 (quoting *Bond*, 2022 WL 4595000, at *7) (cleaned up). If anything, the County's cases illustrate that plausible *Monell* claims should proceed to discovery so that courts can evaluate them on a full record.

Beyond faulting Alek for failing to provide summary-judgment level facts at the motion-to-dismiss stage, the County also takes a divide-and-conquer approach to Alek's allegations—claiming that components of Alek's factual allegations, considered separately, are not enough to establish a claim against the County. Mot. ¶¶14–23. But, as established above, the County's piecemeal attack contradicts the standard at the pleading stage: the court must consider "the complaint as a whole, regardless of how much of it is discussed in the motion to dismiss." *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016) (quotation omitted). And, besides, each of those separate attacks falls flat.

First, the County asserts that Alek fails to identify any formal, official policy. Mot. ¶15. But, at the motion-to-dismiss stage, a plaintiff "need not specifically state what the policy is, as the plaintiff will generally not have access to it[.]" *Thomas*, 800 F. Supp. 2d at 843. That's because it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Id.* at 842.

Second, the County argues Alek's complaint fails because it does not provide specific examples to show a pattern. Mot. ¶¶16–19. But the Fifth Circuit has expressly held that to prevail on a *Monell* claim—let alone state a plausible claim—"plaintiffs need not provide specific examples to meet the condition or practice element." *Moore*, 41 F.4th at 509 (cleaned up); *see also Wilson v. City of Chicago*, No. 09-C-2477, 2009 WL 3242300, at *3 (N.D. Ill. Oct. 7, 2009) ("It is not reasonable to expect a plaintiff to have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims.").

Third, the County argues that this case does not feature the "extreme factual situation" required to support a failure-to-discipline or failure-to-investigate claim. Mot. ¶¶20–23. But the County conflates Alek's allegations that the County's after-the-fact actions indicate a pre-existing policy or custom with ratification theory.[7] Ratification theory concerns whether a policymaker's approval of a subordinate's single act, without more, can establish municipal liability. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality opinion). The Fifth Circuit has limited ratification theory to the "extreme factual situation," where the policymaker's failure to react to

[7] The County can be forgiven for this mistake because "Fifth Circuit case law [about ratification] is, at times, less than clear[.]" *Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 794 (S.D. Tex. 2013) (collecting cases).

"so gross an abuse" means that courts can infer "an official policy of condoning such abuses." *Fuentes*, 689 F. App'x at 779 (analyzing *Grandstaff*, 767 F.2d 161).

By contrast, Alek does not claim that the failure to discipline alone is enough. Instead, that failure is just one of many facts that, taken together, show that the County had a preexisting policy of using traffic stops to conduct baseless searches and seizures. Compl. ¶¶108, 183–84. And Alek does not merely allege that the County failed to discipline Babb and Molina but that internal affairs officers confirmed that they acted according to County policy throughout the illegal stop, stop extension, and search. *See* Compl. ¶¶96, 100, 105, 107–08, 183–84. The Sheriff "did not discipline [Babb and Molina] because, in the [Sheriff's] eyes, the employee[s'] illegal conduct actually conformed with municipal policy." *Milam*, 113 F. App'x at 628.

### III. The County's attempt to introduce new, unauthenticated factual allegations with its motion to dismiss underscores the need for discovery.

Alek's complaint makes two references to "the incident report" for the traffic stop. Compl. ¶¶93, 183(t). Before filing this suit, both Alek and his counsel submitted multiple requests to BCSO under the Texas Public Information Act, Texas Government Code §§ 552.001 *et seq*. Ex. 1 (Windham Decl.) ¶¶3, 9. Alek requested the "incident reports" for all three deputies who participated in the stop and search. *Id.* ¶6. Counsel requested "[r]ecords in any format (written, digital, audio, video) associated with Incident #BCSO-2022-0082748"—the basis of this case. *Id.* ¶12. Both Alek and counsel received the document entitled "Incident Detail Report" attached as Exhibit 3. *Id.* ¶¶7, 13. Bexar County produced no other incident report to Alek or his counsel. *Id.* ¶¶8, 14.

The document entitled "Incident Detail Report" is the document that Alek references in his complaint. *Id.* ¶15. Alek's complaint uses the term "incident report" because, as far as Alek and his counsel knew, there was only one incident report—the one the County produced in response to

both Alek and his counsel's record requests. *See id.* ¶¶15–16. Yet now, several months after responding to both records requests and only after Alek filed this case, the County offers a never-before-seen, unauthenticated document titled "SPEARS Incident Summary: BCS220059233" as an exhibit to its motion to dismiss. *Id.* ¶16.

Alek's complaint does not reference the SPEARS Summary, and the document cannot be considered in evaluating Alek's allegations at this stage.[8] Moreover, the County fails to authenticate the SPEARS Summary or explain why it was not previously produced. At most, the fact that the County only offered the SPEARS Summary after Alek sued highlights the need for discovery. Through discovery, not only will Alek be able to explore the authenticity of the SPEARS Summary and why the County did not produce it when twice asked, but Alek will also be able to access other public records that may support his claim—and that the County has conveniently declined to disclose.

## Conclusion

Alek plausibly alleges that, when Babb and Molina violated his Fourth Amendment rights, they were following a Bexar County policy of using traffic stops to conduct baseless searches and seizures. Because Alek states a claim for municipal liability against the County, Alek respectfully requests that the Court deny the County's motion to dismiss.

---

[8] Nevertheless, most of the information in the SPEARS Summary confirms Alek's allegations. For example, Babb confirms that he had no basis for the stop other than his false assertion that Alek "dr[ove] over the painted line on the left side of the road." Mot. Ex. 1 at 3.

Dated: July 19, 2023                    Respectfully Submitted,

                                        /s/ Christen Mason Hebert
                                        **Christen Mason Hebert**
                                        (TX Bar No. 24099898)
                                        INSTITUTE FOR JUSTICE
                                        816 Congress Ave., Suite 960
                                        Austin, TX 78701
                                        Phone: (512) 480-5936
                                        Fax: (512) 480-5937
                                        chebert@ij.org

                                        **Joshua Windham\***
                                        (NC Bar No. 51071)
                                        **Trace E. Mitchell\***
                                        (DC Bar No. 178094)
                                        INSTITUTE FOR JUSTICE
                                        901 N. Glebe Rd., Suite 900
                                        Arlington, VA 22203
                                        Phone: (703) 682-9320
                                        Fax: (703) 682-9321
                                        jwindham@ij.org
                                        tmitchell@ij.org

                                        *Attorneys for Plaintiff*
                                        *\*Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which provided electronic service upon all attorneys of record.

/s/ Christen Mason Hebert
Christen Mason Hebert
