IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALEK SCHOTT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | 5-23-CV-00706-OLG-RBF |
| | § | |
| JOEL BABB, IN HIS INDIVIDUAL AND | § | |
| OFFICIAL CAPACITY; MARTIN A | § | |
| MOLINAIII, IN HIS INDIVIDUAL AND | § | |
| OFFICIAL CAPACITY; AND BEXAR | § | |
| COUNTY, TEXAS, | § | |
| | § | |
| *Defendants.* | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando Garcia:**

This Report and Recommendation concerns the Motion to Dismiss filed by Defendant Bexar County, Texas. *See* Dkt. No. 13 ("Mot." or "Motion"). All pretrial matters have been referred for resolution, pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 16. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, the Motion to Dismiss, Dkt. No. 13, should be **DENIED**.

**Consideration of Evidence Attached to, and Incorporated into, the Motion to Dismiss**

At the motion-to-dismiss stage, a court typically only considers the facts as alleged in a complaint, taken as true. *See Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016). In this case, however, the Court has additionally considered video evidence, which Plaintiff attached to his Complaint via hyperlinks and which the parties incorporated into the

1

present motion-to-dismiss briefing. *See* Dkt. No. 1 ("Compl." or "Complaint") at 4 n.1; Mot. at 6; Dkt. No. 18 ("Resp." or Response") at 2.

It is appropriate to consider evidence attached to a Rule 12(b)(6) motion if the evidence involves facts that "are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quotation omitted). The events captured by the video footage here are central to Plaintiff Schott's claims, and the videos are extensively referenced in his Complaint as well as referred to by both sides in the motion-to-dismiss briefing. Accordingly, it is appropriate for the Court to consider the video evidence at this stage. *See, e.g.*, *Hartman v. Walker*, 685 F. App'x. 366, 368 (5th Cir. 2017) (considering video footage at motion-to-dismiss stage and citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The Motion to Dismiss also attempts to incorporate an "incident report," which is attached as Exhibit 1 to the Motion. The Complaint, however, only makes two brief references to an "incident report," *see* Compl. at ¶¶ 93, 183(t), and Schott alleges that the referenced report is not the same document as the report attached to the Motion, *see* Resp. at 19-20. Because it is not clear that the "incident report" attached to the Motion is the same one "referred to in the plaintiff's complaint," and because no report is "central to the plaintiff's claim," *see Sullivan*, 600 F.3d at 546, the Court will not consider the incident report at this time.

Finally, the video evidence does not obviate the Court's obligation to presume as true the facts as alleged in the Complaint. The Court will reject Plaintiff Schott's pleaded version of events only when it is "blatantly contradict[ed]" and "utterly discredited" by the video evidence. *Scott*, 550 U.S. at 380 (considering video evidence at summary judgment and viewing facts in light most favorable to nonmovant unless nonmovant's version of facts are obviously

contradicted by the video evidence); *see Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014) (discussing review of video in summary judgment context); *Quinette v. Reed*, 805 F. App'x 696, 700 (11th Cir. 2020) (same with respect to the motion-to-dismiss stage).

Accordingly, the factual recitation below reflects the facts as pleaded by Schott, accepted as true for purposes of this Report and Recommendation, unless those pleaded facts are obviously contradicted by the video evidence.

### Factual and Procedural Background

Plaintiff Alek Schott filed his Complaint on June 1, 2023. The Complaint raises, via 42 U.S.C. § 1983, claims against Bexar County and two Bexar County Sheriff's Office ("BCSO") deputies, Defendants Joel Babb and Martin Molina. Alleged are violations of Schott's rights under the Fourth Amendment, as incorporated against the States via the Fourteenth Amendment, in connection with a March 16, 2022, traffic stop. *See* Compl. at 2, 33 (Claim IV).[1] Bexar County filed the present Motion to Dismiss, seeking dismissal of the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) and *Monell v. Department of Social Services*, 436 U.S. 693, 701 (1978). Thus, only the claims against the County are at issue in the Motion to Dismiss.

According to Schott's Complaint, which as mentioned the Court takes as true unless obviously contradicted by video evidence, Schott drove north on I-35 on March 16. As he traveled north but while he was still south of San Antonio, he passed Deputy Babb's patrol vehicle parked in the grass on the side of the highway. A few minutes later, Babb came up behind Schott and pulled Schott over. At the roadside, Babb explained that he pulled Schott over because Schott had crossed the fog line. Schott claims he didn't cross the fog line. *See* Compl. ¶

---

[1] The Complaint additionally names Javier Salazar, Sheriff of Bexar County, Texas, as a defendant. Schott has since dismissed all claims against Salazar. *See* Dkt. No. 19 (notice of dismissal).

27 ("At all relevant times, Alek [Schott] was driving carefully within his lane."). The video evidence does not obviously contradict Schott. *See* Alek dashcam video, Compl. at 4 n.1. The Court, therefore, addresses the present motion as though Schott never crossed the fog line.

At the roadside, Schott provided Babb his valid vehicle registration. Compl. ¶ 33. Schott had no outstanding warrants, traffic violations, or criminal history. *Id*. Babb informed Schott that Babb was just going to issue a warning, and he then told Schott to wait in the patrol vehicle while Babb prepared the warning. *Id*. ¶ 37 (providing that Babb ordered Schott, "step out and sit in my passenger seat while I do your warning"). At this point, Babb had Schott's license, and Schott did not feel free to leave or drive away. *Id*. ¶ 37-38.

While in the patrol car, Babb began to question Schott. Babb inquired about Schott's identity, his trip, and his work. *Id*. ¶ 40. Schott alleges he answered the questions "directly and calmly, and nothing in [his] demeanor would have given Babb any reason to suspect [Schott] of a crime or extend the stop beyond the time needed to issue a warning." Resp. at 2 (citing Compl. ¶ 41). In answering Babb's questions, Schott explained that he was on his way back from a business trip. Compl. ¶ 40.

Babb continued to question Schott, even after Babb had completed his computer checks on Schott. *Id*. ¶ 42. Babb, in turn, stated that he was part of the "criminal interdiction unit," and that he did not give tickets, but instead gave warnings. Compl. ¶ 44. Babb further explained that "the main reason is . . . I'm out here looking for . . . human smuggling, drug smuggling, and all those things like that." *Id*. Babb asked whether Schott had any drugs or large amounts of cash in his truck. *Id*. ¶ 48. Babb asked Schott if he had been stopped "going down," which Schott interpreted as referring to his business trip south of San Antonio, from which he was returning. *Id*. ¶¶ 46-47. Babb explained, "if you went down, you probably got the same type of stop so a lot

of this will sound familiar." *Id*. Schott answered calmly, providing direct, innocent answers to the questions. *Id*. ¶¶ 45-48

Babb, now about 10 minutes after first indicating he would give Schott only a warning, asked if he could search Schott's vehicle, and Schott said he would prefer that not happen. *Id*. ¶¶ 49-50. Babb then called a K-9 unit, explaining he was "out here looking for big shit" but that the dogs would also detect smaller things. *Id*. ¶ 52. While waiting for a K-9, Babb told Schott he stops "eighteen wheelers all day on normal traffic violations" because many of them are "pushing some serious bodies" across the border. *Id*. ¶ 59. He said San Antonio is a "hub" for that type of activity and that he hoped Schott wouldn't be subject to any more law-enforcement stops that day. *Id*. ¶¶ 59, 63. Schott alleges that none of his answers to Babb's questions were suspicious or at all suggested any involvement in criminal activity. *Id*. ¶ 65. The video doesn't obviously contradict Schott's assertion.

When the K-9 team arrived about 20 minutes after Babb called it, *id*. ¶ 66, Deputy Molina asked Schott if he could "run" the dog on the vehicle, and Schott said it was okay. Schott alleges he didn't feel able to refuse or leave the scene at that point, and he believed Babb had already authorized the search when he called for the K-9. *Id*. ¶ 69. Schott alleges Deputy Molina prompted the dog to give the "alert" that was used to justify searching Schott's vehicle. *Id*. ¶¶ 71-73 (citing Molina body-worn camera footage at 1:37-2:39). Schott further alleges that a reasonable officer would have known that any alert was unreliable, due to confounding factors such as wind conditions and nearby roadkill. *Id*. ¶¶ 75-76. The video doesn't reflect any obvious signal from the handler to the K-9, as far as the Court can see, and it's therefore unclear what serves as the basis for Schott's accusation of a prompted alert. Babb told Schott that the K-9 unit

was a "reasonable suspicion thing," and that in his agency "we're pretty smart about case law." *Id*. ¶ 74.

Following the K-9 alert, Babb informed Schott that Schott was being detained due to the alert, and Babb and Molina then searched Schott's vehicle. *Id*. ¶ 77. Schott maintains that he did not consent to the search, notwithstanding his apparent acquiescence at one point. *Id*. ¶¶ 81-82; *see also id*. ¶ 69. The search yielded nothing incriminating, and Babb eventually returned Schott's license and gave him the promised written warning. *Id*. ¶ 90. The written warning states that Schott failed to "maintain single lane" but also incorrectly indicates that "No Search" occurred. *Id*. ¶ 91. Babb told Schott that "nine times out of ten, this is what happens." *Id*. ¶ 94.

In recounting the above-described interaction between Schott, Babb, and Molina, the Complaint cites footage from Babb's body-worn camera and Molina's body-worn camera. *See, e.g*., *id*. at 8-19 (extensively citing Deputy Babb's body-worn camera A, and Deputy Molina's body-worn camera, each hyperlinked in the Complaint at 4 n.1). Again, viewing the evidence in the light most favorable to Plaintiff at this stage, nothing in the video evidence obviously contradicts Schott's description of events.[2]

Following this incident, Schott reported what he believed to be a violation of his rights to the Bexar County Sheriff's Office ("BCSO"). An internal-affairs officer, Marta Rodriguez, told Schott that she had reviewed the body-worn-camera footage and saw nothing wrong with the deputies' actions. *Id*. ¶ 96. Another internal-affairs officer, Hernandez, told Schott that the body-worn-camera footage showed Schott had crossed the fog line, and that Hernandez could see the violations Schott made from the footage. *Id*. ¶¶ 98-100. Hernandez told Schott he could file a

---

[2] The only factual allegation that the County directly attacks is Schott's claim that he didn't drift over the fog line or out of his lane. *See* Mot. ¶ 12. Otherwise, the County primarily argues that the Complaint lacks sufficient factual allegations to support a *Monell* claim, rather than arguing that the facts as alleged are obviously contradicted by the video evidence.

lawsuit if he didn't like how they conducted business. *Id.* ¶ 100. The video footage from the deputies hyperlinked in the Complaint, however, does not capture Schott's vehicle until after it was already stopped on the side of the road. *Id.* ¶¶ 29, 99; Deputy Babb body-worn camera A, Compl. at 4 n.1. When Schott attempted to follow-up on his complaint, he was again told that the body-worn-camera footage showed no policy violations on the part of the deputies, and Babb and Molina received no disciplinary action as a result of Schott's complaint. *Id.* ¶¶ 107-08.

Schott further alleges that (1) the percentage of BCSO traffic stops that include searches has increased over the past two years, while the number of searches that find contraband has decreased, *id.* ¶ 112; (2) BCSO deputies are trained on how to skirt the Fourth Amendment during traffic stops, including by paying for training from Desert Snow, LLC, *id.* ¶ 111; and (3) BCSO regularly makes social media posts showing the discovery of contraband during traffic stops and the use of K-9 alerts, *id.* ¶¶ 115-16.

## Analysis

Defendant Bexar County's Motion to dismiss the *Monell* claim should be denied. The Complaint states facts sufficient to support a claim that the County has an unconstitutional policy, practice, or custom that was the moving force behind the alleged violation of Schott's constitutional rights.

A county cannot be held liable for constitutional violations via § 1983 under a theory of *respondeat superior*. *See Monell*, 436 U.S. at 690, 694. Instead, a plaintiff must establish an official policy or custom, of which a policymaker can be charged with actual or constructive knowledge, and that the policy was the "moving force" behind the stated constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). An "[o]fficial policy is ordinarily contained in duly promulgated policy statements,

ordinances or regulations." *Id*. at 579. But a policy may also arise as a result of "'a persistent, widespread practice of . . . employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Id*. (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc); *see also id*. at 581. To survive a motion to dismiss, a plaintiff need not prove a *Monell* claim but rather must allege facts, when taken as true, that are sufficient to permit a "reasonable inference" that each element of the claim could be satisfied. *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 622-23 (5th Cir. 2018).

### A.   The Complaint Sufficiently States a Fourth Amendment Violation.

As a preliminary matter, Schott's Complaint sufficiently alleges a violation of his Fourth Amendment rights. The initial stop was not justified because, taking the alleged facts as true, Schott didn't cross the fog line prior to being pulled over by Babb. The video evidence does not clearly indicate otherwise. Schott's straying out of his lane is the only justification provided for initiating the stop in the first instance, and at this stage of the litigation this justification fails to defeat the claim. *See Terry v. Ohio*, 392 U.S. 1, 11, 15 (1968). "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). That was not the case here, according to the alleged facts.

Moreover, even assuming *arguendo* that the initial stop was justified, Schott's prolonged detention was not justified. Taking the pleaded facts as true, neither Schott's demeanor, his answers to the extended questioning from Babb, nor anything else raised by Defendant justified extending the stop beyond the brief period needed to examine Schott's license and registration,

8

check for outstanding warrants or other similar issues, and issue the promised warning. Again, the video evidence does not clearly indicate otherwise. It is well settled that once an investigatory stop occurs, "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

Finally, the search of Schott's car was not justified, according to the pleaded facts, because Deputies Babb and Molina (1) didn't have Schott's valid consent to search the vehicle, (2) didn't have a warrant, and (3) didn't have probable cause or even reasonable suspicion to believe the vehicle contained contraband or was otherwise involved in criminal activity. Although the K-9 alerted, the search, under the pleaded facts, was already unlawful before the K-9 began its sniff. Moreover, Schott alleges Molina signaled the dog to alert, and once again the video evidence does not obviously contradict the pleaded facts on this point. At best, the video is inconclusive because the Court is not sufficiently equipped or informed at this juncture to evaluate the K-9's behavior in performing the sniff.

### B. The Complaint Alleges Facts Capable of Sustaining a *Monell* Claim.

In addition to sufficiently pleading a constitutional violation, the Complaint alleges that the "moving force" behind these alleged Fourth Amendment violations was a BCSO policy, practice, or custom of utilizing unjustified or unlawfully prolonged traffic stops as a tool to perform unlawful searches and seizures. Compl. ¶¶ 182, 185. In ascertaining whether the allegations suffice to survive a motion to dismiss, the Court is mindful that a "plaintiff will generally not have access to" detailed facts about the alleged policy at the pleading stage. *Thomas v. City of Galveston*, 800 F.Supp. 2d 826, 842-43 (S.D. Tex. 2011). But at the same time, allegations in a complaint must "satisfy the requirement of providing not only 'fair notice'

of the nature of the claim, but also 'grounds' on which the claim rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), and further "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Balancing these considerations to "[d]etermin[e] whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

Here, the Complaint provides fair notice of the *Monell* claim and the grounds on which it rests. Schott's allegations that outline Babb's statements to Schott, detailed above, serve Schott in this regard. For example, when Babb questioned Schott, he asked if Schott had been similarly stopped on his way "down." This statement creates a reasonable inference that any such past stop, just like the stop then in progress (as pleaded), would have been pretextual. And Babb further indicated that he hoped Schott wouldn't be subject to any future law-enforcement stops that day, which once again supports a reasonable inference that there was a substantial risk Schott would again be stopped and searched without justification. Babb also seemed to imply, interpreting his statements in the light most favorable to Schott, that pretextual stops are not uncommon. *See* Compl. ¶ 183 (a)-(l) (listing Babb's statements alluding to the alleged policy and/or custom). The Court need not belabor the point; these and other statements and actions of Babb support an inference that Babb was acting pursuant to a pervasive policy or practice of initiating or extending stops to look for serious crime and contraband without a sufficient basis to do so.

The statements from BCSO's internal affairs personnel in response to Schott's complaint about the incident, which assured him that the actions of the deputies did not violate any policy, further support the *Monell* claim's survival at this stage. These statements not only bolster the

10

conclusion that an inappropriate policy existed, but also reflect that Babb's actions were pursuant to a policy about which the policymaker was or should have been aware. *See id.* ¶¶ 96, 100, 107. These allegations, viewed as a whole and in the light most favorable to Schott, are sufficient to raise a reasonable inference that a policy or custom exists as alleged in the Complaint and that the policymaker knew or should have known of its existence. *See Bond v. Nueces Cty.*, No. 20-40050, 2022 WL 4595000, at *7 (5th Cir. Sept. 30, 2022) (concluding that a complaint need only create a "reasonable inference" that a policy exists to survive a motion to dismiss); *Littell*, 894 F.3d at 625 (considering whether alleged facts, taken together, "permit[ted] the reasonable inference" that the relevant elements of a *Monell* claim were sufficiently stated to survive a motion to dismiss); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440, 449 (5th Cir. 2019) (finding statement made on sheriff's office Facebook page gave rise to "reasonable inference" that the statement could be attributed to the government, which supported the existence of an official policy at motion to dismiss stage).

The County urges that the Complaint fails to allege a policy or custom because it does not identify either a written official policy or a pattern of similar incidents and instead relies only on the single incident involving Schott. *See* Mot. ¶ 16. A written policy or evidence of a pattern of similar incidents would indeed provide additional assistance to Schott's efforts. But the lack of a pattern or written policy does not alone defeat every *Monell* claim. And, in any event, some of Babb's comments allude to a pattern of similar incidents. Babb referred to these types of encounters following a similar pattern nine out of ten times. He also alluded to the possibility of Schott being stopped on his way "down" or even again before he made it to his destination. As described above, the facts alleged in the Complaint, taken as a whole and viewed in the light most favorable to Schott, are sufficient to survive a motion to dismiss.

Finally, the County's arguments regarding a failure to investigate or failure to discipline, *see* Mot. at 10-11, miss the mark. Details about Schott's interactions with BCSO personnel following his complaint to them about the stop supply additional facts and context supporting the inference that a policy exists. *See* Compl. at 35-34; Resp. at 18-19.

### Conclusion and Recommendation

For the reasons discussed above, it is recommended that the Motion to Dismiss, Dkt. No. 13, be **DENIED**.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of the same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by the district court's standing orders. *See* Rule CV-7. The objecting party shall file the objections with the clerk of the court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely

file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 27th day of September, 2023.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE