EXHIBIT 11

1

2          ORAL DEPOSITION OF

3            JOE GEREB

4          FEBRUARY 27, 2024

5

6          W A R N I N G !

7  This unedited rough draft of the proceedings is not

8  certified.  The rough draft transcript may not be cited

9  or used in any way or at any time to rebut or contradict

10  the certified transcription of the proceedings.  There

11  will be discrepancies in this form and the final form,

12  because this form has not been edited, proofread,

13  corrected, finalized, indexed, bound or certified.  There

14  will also be a discrepancy in page numbers appearing on

15  the unedited rough draft and the edited, proofread,

16  corrected and certified final.

17          * * * * *

18      THE REPORTER:  We are on the record.

19          JOE GEREB,

20  having been first duly sworn, testified as follows:

21      E X A M I N A T I O N

22  BY MS. HEBERT:

23   Q   Good morning.

24   A   Good morning.

25   Q   Deputy Gereb -- am I saying your last name

1 correctly?

2    A    Yes.

3    Q    Because, you know, sometimes it's Gereb or

4 things like that.

5    A    It's -- I've heard a lot.

6    Q    Okay.  Gereb.  I'm Christen Hebert.  We just

7 met previously.  I represent the Plaintiff Alek Schott in

8 this case that we are here today.  These are my

9 colleagues you just met, Josh Windham and Daniel Nelson.

10        And today we're joined by the court reporter,

11 Molly.  And she's going to try to write down everything

12 that we say today.

13        We also have your Counsel, Charles Frigerio.

14        MS. HEBERT:  Charles, am I saying your name

15 correctly?

16        MR. FRIGERIO:  Yes.

17        MS. HEBERT:  And Hector -- Hector, I'm sorry --

18        MR. SAENZ:  Saenz.

19    Q    (By Ms. Hebert) -- Saenz, who are here with us

20 today.

21        We're going to kind of waive the usual

22 stipulations.  We just talked to Molly about that.  So

23 any defects in the deposition notice, you're here today.

24 And you're waiving any objections to Molly's

25 qualifications.  She's a good court reporter.  She's

                                3

1 here, she's going to take the record down.

2        So we'll kind of get started with some

3 preliminaries.  What is your full name?

4   A   Joe Albert Gereb.

5   Q   Joe Albert.  Not Joseph?

6   A   No.

7   Q   Okay.  And would you mind confirming your rank

8 for me today?  I want to make sure that I address you

9 respectfully and correctly.

10   A   Just deputy.

11   Q   Deputy?

12   A   That's it.

13   Q   And before we go on into the deposition, I want

14 to go over just like a couple of housekeeping matters.

15 Have you ever been deposed before?

16   A   No.

17   Q   Okay.  So this is your first deposition?

18   A   I'm sorry, I want to correct myself.  I've gone

19 through traffic ones for crashes.

20   Q   Okay.  So you've done a deposition before.

21   A   Yes.  Yes.  I'm sorry.  It took me a second

22 to --

23   Q   No, no, it's fine.  So you've testified under

24 oath.  You kind of know the general process.  Is that

25 fair?

4

1   A   Just show up, answer questions, that's it.

2 Yeah.

3   Q   Okay, cool.  And you understand that Molly just

4  put you under oath today.

5     A    Yes.

6     Q    And you understand that that means that you're

7  testifying here in this conference room the same as if

8  you were testifying before a judge in a courtroom?

9     A    Yes, ma'am.

10    Q    Okay.  And it's important today that Molly is

11 able to capture a clear record.  And so that means we

12 need to have clear kind of conversations between each

13 other.  And that means giving verbal answers.  No

14 "huh-uh" or "uh-huh."  We need a "yes" or a "no."  And

15 shaking your head obviously is not going to show up on

16 any kind of written transcript.

17    A    Yes.

18    Q    So I'll need you to make clear answers.

19         And if you don't understand a question that I

20 ask, feel free to ask me to clarify.  Either I'll try to

21 rephrase the question or we'll ask Molly to read it back

22 to try to make sure that we can figure out what we're

23 saying.

24         Also, try not to interrupt me when I'm asking

25 you a question.  I'll try to finish the whole question.

                              5

1  And then the same, I will try not to interrupt you before

2  I ask another question.

3         And if you don't know the answer to a question,

4  just say so.  Say "I don't know."  But if you do know the

5  answer to a question, you are required to answer it.  Do

6   you understand?

7   A   Yes, ma'am.

8   Q   Okay.  Mr. Frigerio, who represents the County

9   and the other Defendants in this case, may state an

10  objection after I ask a question.  That does not mean

11  that I've asked a bad question.  It does not mean that

12  you can refuse to answer the question.  It just means

13  that if we decide to use the question at a later date,

14  Mr. Frigerio can argue to the judge that the question was

15  improper.  Do you understand?

16  A   Yes, ma'am.

17  Q   Okay.  If you'd like to take a break today or

18  have a drink, you can have a drink while sitting here.

19  So don't feel like you have to be a camel.  That's fine.

20  Just let me know.  I only ask that you finish answering

21  the question before we take a break.

22  A   Yes, ma'am.

23  Q   Is there any reason that you are not able to

24  give your full testimony today, such as you're taking an

25  impairing medicine?

6

1   A   No, ma'am.

2   Q   And we're going to look at some documents

3   today.  You saw these lovely boxes over here.  And we

4   probably won't look at all of those documents.  We have

5   lots of paper.  But it is your right to read a document

6   in its entirety and look at that document with

7 Mr. Frigerio.  And I don't want to rush you through

8 anything.  So if you need more time to look at something,

9 we can take a break and you can fully review it.  And

10 just let me know if I'm asking you a question before

11 you're ready.  Is that fair?

12    A   Yes, ma'am.

13    Q   And then later today, we are probably going to

14 watch some videos, and I've identified some clips and

15 time stamps of those videos.  Because, to be frank,

16 watching all these videos would take a lot of time.  But

17 it is your right to say I'd like to take a break and

18 watch the video in its entirety with Mr. Frigerio.  Do

19 you understand?

20    A   Yes, ma'am.

21    Q   And I just, just to be clear, that I'm not

22 trying to trick you on any of the videos, just it will

23 take -- it would take a long time to watch all of them in

24 their entirety.

25       I'd like to start by letting you look at your
                                    7

1 deposition notice for today.

2       MS. HEBERT:  Daniel, will you pull out

3 Exhibit A --

4       MR. NELSON:  Yes.

5       MS. HEBERT:  -- and mark it as Exhibit 1?

6       MR. NELSON:  You want me to just swing around

7 and give it to --

8       MS. HEBERT:  Yeah.  Let me give that to Deputy

9 Gereb.

10   Q   (By Ms. Hebert) This is Exhibit 1, which is

11  your deposition notice for today.  Have you seen this

12  notice before?

13   A   I don't think I have.  I've just been told to

14  show up at locations.

15   Q   That's fine.  Did you do anything to prepare

16  for today's deposition?

17   A   I reviewed video.

18   Q   Okay.

19   A   My videos.

20   Q   So what videos did you review?

21   A   My -- my body camera.

22   Q   Your body camera from?

23   A   From the day of the incident.

24   Q   Which would be March 16th, 2022?

25   A   Yes.

                        8

1   Q   So you watched your video from your body camera

2  from March 16th, 2022?

3   A   Yes, ma'am.

4   Q   And how many videos?

5   A   There's two.  Two separate ones.

6   Q   Okay.  So is it fair for me to say that you

7  watched the two videos that are associated with the

8  traffic incident in this case from your body camera?

9   A   Yes, ma'am.

10    Q   Okay.  Did you review any documents?

11    A   No, ma'am.

12    Q   Okay.  Other than conversations with

13  Mr. Frigerio or your other Counsel, which just to be

14  clear I'm not asking about, did you talk to anybody about

15  your deposition today?

16    A   With them?  Nothing in detail.  No, ma'am.  I

17  did talk to obviously my supervisor because he is my

18  supervisor.  I haven't talked to Deputy Babb at all.

19  Obviously Deputy Molina, I asked him when he's doing it

20  but we haven't talked in detail any of this.

21    Q   Okay.  Who is your supervisor right now?

22    A   Sergeant Pete Gamboa.

23    Q   Okay.

24    A   He may go by Pedro.  I'm still confused on that

25  part.

9

1    Q   Okay.  Good to know.  I'll ask you about that

2  confusion probably.  But what did you guys talk about?

3    A   Oh, just when we were showing up and stuff like

4  that.  We don't talk about cases until they're settled.

5    Q   Okay.  Thank you for that clarification.

6        And you didn't talk about the substance at all

7  with Deputy Molina either?

8    A   No.

9    Q   Did you bring any documents with you today

10  deposition today?

11    A   No, ma'am.

12    Q    And today we're going to talk a lot about the

13 Bexar County Sheriff's Office.  Can we agree that when I

14 say the Sheriff's Office, I mean the Bexar County

15 Sheriff's Office?

16    A    Yes, ma'am.

17    Q    So we can just shorthand it to Sheriff's

18 Office, rather than every time we talk about the

19 Sheriff's Office saying Bexar County Sheriff's Office?

20    A    Yes, ma'am.

21    Q    And if we talk about the Sheriff, can we agree

22 that I'm talking about Sheriff Salazar?

23    A    Yes, ma'am.

24    Q    Thank you.  So I just would like to get to know

25 you a little bit better before we dig into anything that
                             10

 1 happened in March.  Why did you become a police officer?

 2    A    I needed something to do to raise my kid.  I

 3 was either going to be -- I was in the military at the

 4 time.  I was deployed in Iraq my first time.

 5    Q    Thank you for your service?

 6    A    Thank you, ma'am.  My daughter was born, and I

 7 was in the process of trying to get into the Rangers.

 8 And I decided, you know, I looked at the research and

 9 realized that this is -- that kind of unit is not for a

10 family.  At the time, it was 2007, and the height of the

11 Ranger unit was deployed every six months.  So they're

12 gone 180 days out of the year.  So that's not --

13    Q    My ex-boyfriend was a Ranger.  And it's a hard

14  life.

15    A    Yeah.

16    Q    It's a very hard life.

17    A    And as I say, I did the research and I said,

18  you know what, let me try my stab at being a police

19  officer.  And I tried with SAPD and then ended up getting

20  orders to go back to Iraq.  So I didn't really get to

21  really fulfill that part of going through the process of

22  it.  And then came back home and ended up back here.

23  So --

24    Q    So did you attend academy in the middle of

25  your?

                          11

1    A    No.

2    Q    Military service?  When did you attend academy?

3    A    I joined the Sheriff's Office in 2012 when I

4  was still a part of the Texas National Guard.  And when I

5  did their jailer's academy, you know, to go into the

6  jail, then during that time I obtained my peace officer's

7  license through the San Antonio College Law Enforcement

8  Academy.  And then in 2014 I tested for patrol.  And then

9  I came out in 2016.

10    Q    Okay.  So let me just summarize to make sure I

11  understood that.  You did the Bexar County Academy to

12  become a jailer?

13    A    Yes, ma'am.

14    Q    And then you tested into becoming a patrol

15 deputy?

16    A   Yes, ma'am.

17    Q   Is that fair?

18    A   Yes, ma'am.

19    Q   Is there a separate academy that happens

20 between being a jailer and becoming a patrol deputy?

21    A   Yes.  I had to obtain my peace officer's

22 license.

23    Q   Okay.

24    A   Which I did through the San Antonio College Law

25 Enforcement Academy.

                                12

1    Q   Okay.  Thank you.  And what is your current

2 position with the Sheriff's Office today?

3    A   I am a criminal interdiction deputy.

4    Q   Okay.  And how long have you been a criminal

5 interdiction deputy?

6    A   I would say about three-and-a-half years.

7 There was -- I started in 2020, and then I went back to

8 patrol for manning.  And then --

9    Q   For what was that?

10    A   Manning.  Like they were short staffed.

11    Q   Oh.

12    A   Short staffed, I'm sorry.  They were short

13 staffed.  And then about a year later I came back in

14 2021.

15    Q   Okay.  So break this down for me.  Help me

16 understand that, because I didn't understand manning at

17 first.  You became a criminal interdiction deputy in

18 2020?

19    A   Yes, that's when the unit started.

20    Q   Okay.  And how long did you work as a criminal

21 interdiction deputy?

22    A   I was there for about almost four months, and

23 then some of our guys had gotten some incidents involving

24 officer involved shootings, which created a staff

25 shortage.  So they sent me back to patrol to help with

13

1 the manning, or staffing.

2       And then about in May of 2021 is when I

3 returned back to the unit.

4    Q   Okay.  So you just took a brief pause to help

5 out with staffing --

6    A   Yes, ma'am.

7    Q   -- into patrol.  What did you do before you

8 became a criminal interdiction deputy?  What were your

9 prior positions?

10    A   I was regular patrolman.

11    Q   Okay.  How long were you a regular patrolman?

12    A   I would say from about 2016 to 2020.  So about

13 four years.

14    Q   So about four years?

15    A   Yes, ma'am.

16    Q   And let me summarize what I'm understanding you

17 to say.  You were a jailer, you became a patrol deputy.

18 Is that fair? And you were that for four years?

19    A    Yes, ma'am.

20    Q    And then what did you do immediately after

21 becoming a patrol deputy?

22    A    I was trying to get into our DWI unit. So I

23 was taking courses for traffic and DWI courses. And then

24 during that time, I was trying -- I did apply for our

25 traffic unit that, for DWI enforcement. And I

                              14

 1 unfortunately did not get in, and I was offered this

 2 position. So I took this position.

 3    Q    Okay. Thank you for being transparent about

 4 that. I know sometimes when you don't get something you

 5 want, it is a hard thing to talk about.

 6        What's the difference between the traffic unit

 7 then and the criminal interdiction unit?

 8    A    Traffic just purely enforces traffic

 9 enforcement. And the night guys are primarily DWIs,

10 unfortunately, because that's when primarily people are

11 driving while intoxicated. And then during the day it's

12 more the aggressive type of drivers and stuff like that.

13    Q    Okay.

14    A    But they also specialize in major crashes and

15 fatalities that involve crashes and stuff like that.

16    Q    So that's what the traffic unit does?

17    A    Yes, ma'am.

18    Q    Okay. Did you ever work in an administrative

19 role?

20    A   No, ma'am.

21    Q   Okay.  I think that that's really helpful.

22        I guess given your law enforcement patrol

23 deputy role -- am I saying that correctly, the law

24 enforcement patrol deputy or is there another way?

25    A   You can say patrol time or patrolman or however

15

1 you want to phrase that.

2    Q   Okay, thanks.  In that role as the patrol

3 deputy, did you do traffic stops as part of your regular

4 duties?

5    A   Yes, ma'am.

6    Q   So even though you weren't part of the traffic

7 unit, I think traffic unit, you still did traffic stops?

8    A   Yes, ma'am.

9    Q   And do all officers who go out in the field

10 perform traffic stops?

11    A   No, ma'am.

12    Q   Okay.  So what types of officers do traffic

13 stops?

14    A   Mostly proactive.

15    Q   Okay.  What do you mean by that?  Does that

16 mean that an officer chooses to do traffic stops if he

17 goes out in the field?

18    A   Yes, ma'am.  It's not required.  As a patrolman

19 you're not required to do traffic stops.  They train you

20 to do them.  But it's not required.  You're primarily --

21  your primary duties as a patrolman is to answer calls for

22  service, such as 911 check, disturbances, noise

23  complaint, anything of that nature.

24     Q    Okay.  So your primary duty as patrolman is to

25  respond for calls for service?

1     A    Yes, ma'am.

2     Q    Did you do traffic stops as a patrolman?

3     A    Yes, ma'am.

4     Q    And about how many traffic stops would you do

5  on an average patrol day?

6     A    I couldn't tell you.  It could be one.  It also

7  depends on the call volume.  If they're -- if we're

8  slammed with calls for services, I mean, I do a traffic

9  stop.  I mean, or if we're short staffed, I'll just sit

10  and wait for calls to pop up.  That's usually how that --

11  so I couldn't give you an average.

12     Q    I understand.  Every day is different.  So you

13  were a patrol deputy for four years.  If you could give

14  an estimate of how many traffic stops you might have done

15  during that four years?

16     A    I couldn't tell you.

17     Q    500?

18     A    Again, I couldn't tell you.  It's -- I never

19  really kept count like that.

20     Q    Yeah, okay.  So more than five?

21     A    Yes, ma'am.

22    Q    More than ten?

23    A    Yes, ma'am.

24    Q    Probably more than fifty?

25    A    I would say so, yes.

17

1    Q    Okay.  So more than -- at least more than fifty

2 traffic stops in four years?

3    A    Yes, ma'am.

4    Q    That's just helpful context.

5        And it seems like most traffic stops, based on

6 what you just said, are done by folks in the traffic

7 unit.  Is that fair?

8    A    Yes, ma'am.

9    Q    They do the outsized portion?

10    A    That's their primary duty, yes.

11    Q    And other officers who do traffic stops like

12 you probably do less of a percentage?  Other patrolmen

13 would be doing less.

14    A    Yes.

15    Q    Any other units that do traffic stops?

16    A    We have a street crimes unit that they're

17 uniformed deputies and they do same thing basically,

18 traffic stops, gang contacting, that nature.  They're

19 almost the same as what I do.

20    Q    Okay.  So we've got the traffic unit, we've got

21 patrolmen who choose to do traffic stops, got the street

22 crimes unit and we've got the criminal interdiction unit.

23    A    Yes, ma'am.

24    Q    Anybody else I'm missing in terms of units who

25  do traffic stops regularly?

1    A    Yes.  We also have a gang unit that's also

2  involved in that as well.  They work at night.

3    Q    So we've got street crimes, we've got patrol,

4  we've got criminal interdiction, we've got the traffic

5  unit, and we've got the gang unit?

6    A    Yes.

7    Q    Does every patrol vehicle that does traffic

8  stops have the same equipment?

9    A    No, ma'am.  I'll elaborate on that for you.

10  Some vehicles are in the process of getting dash cams.

11  Not every vehicle has been outfitted.  It's something the

12  County has always been behind with.  Technology has

13  always been the Achilles heel part of it.  But they're

14  still in the process of doing all that.

15    Q    Okay.  So some have dash cams, some do not?

16    A    Yes, ma'am.

17    Q    Okay.  I think it would be helpful maybe for me

18  to like walk through a list of equipment so we can just

19  talk about it.

20    A    Uh-huh.

21    Q    I know that traffic enforcement folks check for

22  speeding.  What equipment checks for speeding?

23    A    Radars.

24    Q    Radars.  And does every patrol car have a

25 radar?

1    A    Yes, ma'am.

2    Q    And where does the -- where is the radar on the

3 patrol car?

4    A    So the radar, there's one coned in the front

5 and one coned in the back.

6    Q    And by cone, you mean --

7    A    It's the device that is -- that reads the

8 radar.  Not reads the radar, it reads your speed.

9    Q    Okay, thank you.  So there's something that

10 reads on the front and something that reads on the back?

11    A    Yes, ma'am.

12    Q    And how do you make sure that the cone is

13 reading speeds correctly?

14    A    We have a tool called a tuning fork, and we do,

15 we tap on the window and it reads a certain speed.  So

16 one is read I believe 25 and the other is read at 40.

17    Q    Okay.  So you somehow, you use pitches, a

18 tuning fork to like figure out?

19    A    Yes.

20    Q    If it's calibrating correctly?

21    A    Yes, ma'am.

22    Q    And how does an officer record that he checked

23 his equipment?

24    A    There, there usually, on a patrolman's base, we

25 record everything through a body camera.  Or we have a

1  form that at the time most of us used the form.

2    Q    Okay.  So it's either on the body cam?

3    A    Yes, ma'am.

4    Q    Or it's, there's a particular form that you

5  fill out each time that you calibrate, check your speed

6  equipment?

7    A    Not so much calibrate but if we find a

8  deficiency in the vehicle, say the radar is not working

9  properly, unit radar off, write it down, submit it to our

10  I guess our repair shop, fleet maintenance, and the

11  vehicle will be taken for service.

12    Q    Okay.  So if -- go ahead.

13    A    If it's required.  If it's needed.

14    Q    All right.  So let me make sure I understand

15  what you just said.  You don't fill out the form unless

16  there's a problem?

17    A    No.  We still fill it out no matter what.

18  We'll put down deficiency, no deficiency or anything of

19  that nature.  If there is a deficiency, we'll mark it

20  down for whatever it is.

21    Q    Okay.  So you fill out a form whenever you're

22  doing the vehicle check?

23    A    Yes, ma'am.

24    Q    Okay.  That's helpful.  And when do you fill

25  out this form?

21

1    A    It's usually daily.  But since the body cameras

2  have come out, usually it's up to the -- on patrol side

3  it's required that the patrolmen around the vehicle

4  inspecting daily on the body camera.  That's for the

5  patrol side.  Our unit is taking, we have take-home

6  vehicles, and so we, we just -- we don't -- we usually,

7  when we get a new vehicle we'll document everything going

8  on.  Then after that it's really on the person himself to

9  do the inspection on themselves.  So that's usually on

10  that part.

11     Q    Okay.

12     A    But if there is a deficiency that comes up with

13  the vehicle, we report it and we get it serviced.

14     Q    All right.  So let me unpack -- that was a lot

15  of information.  Thank you.

16         So patrolmen, they don't get take-home

17  vehicles?

18     A    No, ma'am.

19     Q    And when they come on duty on a particular day,

20  they check their vehicle and fill out the form.  Is that

21  fair?

22     A    Yes, ma'am.

23     Q    And they are required to do that every day?

24     A    Yes, ma'am.

25     Q    And for the criminal interdiction unit, you

                              22

1  guys get patrol cars that you get to take home to and

2  from work?

3     A    Yes, ma'am.

4    Q    And it's your responsibility to check out your

5   vehicle and if you notice something's wrong, you fill out

6   a form?

7    A    Yes, ma'am.

8    Q    But you're not -- the criminal interdiction

9   patrol deputies aren't checking their vehicles every day.

10    A    We do check them every day.  I know for me

11   personally, I check mine every day.  I live in an

12   apartment complex, so people ding my doors all the time,

13   so I check, see if there's any deficiencies, see if

14   there's anything I need to report.  Whenever I start up

15   my vehicle, I check for, you know, I listen to the

16   engine, listen to the tires, see if the tire's flat,

17   check the radar, check my computer, make sure it's

18   working, make sure my printer is working, my cameras are

19   working.  If my cameras are not working I go get that

20   serviced right away.

21    Q    Okay.  So you have a best practice of you check

22   your vehicle every day you come on duty.

23    A    Yes, ma'am.

24    Q    But nothing requires you to do that.

25    A    That -- not required.

                              23

1    Q    And you don't have to fill out a form that you

2   did that?

3    A    No, ma'am.

4    Q    On a daily basis, like the patrol folks do.

5    A    No.  We're just told to be proactive.  If you

6  need to take it to service, go get it serviced.

7    Q   Okay.  Is there any equipment on a patrol

8  vehicle that helps you check to see if a driver's staying

9  in their lane?  I know there's like a lot of good

10  technology these days, I have one on my car that like

11  tells me when I'm moving or not in the lane.  Is there

12  anything on a will patrol vehicle that can tell you if a

13  driver's staying in their lane?

14    A   No, ma'am.

15    Q   Does every patrol car have a radio?

16    A   Yes, ma'am.

17    Q   Okay.  And I've seen patrol cars in the movies

18  with like the little hand held thing and then there's

19  like a spirally cord.  Is that part of the radio?

20    A   Yes, ma'am.

21    Q   And what's the term for this piece of

22  equipment?

23    A   Mike.

24    Q   Okay.

25    A   Microphone.

24

1    Q   It's just the microphone?

2    A   Yes.

3    Q   And in general, what's the purpose of the radio

4  in the police patrol vehicle?

5    A   To transmit information.

6    Q   And do you get information back from the radio?

7    A   Yes, ma'am.

8    Q   And is there, is there a log that's created, or

9 are the radio transmissions recorded?

10    A   They are recorded.  I know through audio, the

11 dispatchers have the ability to pull them.  And I believe

12 there's also an incident detail report.  I'm not sure if

13 that records anything said but if we type something in it

14 will record it.

15    Q   Okay.  So let me understand that.  There is a

16 report, and we can talk about those later, in a little

17 bit, that will record if you type something in your

18 computer.  But for the radio, there's an audio file that

19 records what's said?

20    A   Yes, ma'am.

21    Q   What is a license plate reader?

22    A   A license plate reader is a camera that reads

23 your license plate.

24    Q   Okay.  So it's -- does it automatically read

25 the license plate or do you have to type something in?
                              25

1    A   It automatically reads the license plate.

2    Q   Okay.  And do patrol vehicles have license

3 plate readers on them?

4    A   Not all patrol vehicles.  Usually special

5 equipment gets assigned to special units.

6    Q   Okay.  And what kind of units have license

7 plate readers?

8    A   My -- the criminal interdiction unit has them,

9  and then usually -- right now they're the only ones that

10  have them.

11    Q    And where on a patrol vehicle is the license

12  plate reader located?

13    A    So where we had ours, I know at the time I had

14  mine was on the push bumper, that grill, I guess the

15  grill you might call it, what's called the push bumper

16  and they mount the cameras right there.

17    Q    Okay.  So if I'm understanding you correctly

18  and bear with me because I don't know where the push

19  bumper is so like the front of the car somewhere?

20    A    Yes.

21    Q    And the grill of the car I think that's the

22  mesh on the front?

23    A    Yes, the push bumper, I call I a grill, some

24  people call it a grill.  It's the bars that are in front

25  of the vehicle.

26

1    Q    Okay.  That's helpful.  Thank you.  And what

2  kinds of information does an officer get from a license

3  plate reader?

4    A    It depends on the type of license plate reader

5  that you have and the accessibility you have to that

6  license plate reader system.  I will say that ours, we --

7  technically -- like I say, it really depends.  But the

8  ones that we use are commercial.  So it will scan, and if

9  there's an alert on a vehicle, it can tell you if it's

10  stolen, it can tell you if it's, if it's being used as a,

11  for smuggling or there's some type of alert with it,

12  amber alerts, clear alerts, if they get put into the

13  system, they'll -- it can -- it has the ability to notify

14  us.

15    Q   Okay.  There was a lot there, and so I'm going

16  to take us a couple of steps back so that I understand

17  what you just said.

18        You said it depends on the type of license

19  plate reader.  Are there different types?

20    A   Yes, ma'am.

21    Q   And what are the different types?

22    A   You have ones that are assigned to federal

23  databases.

24    Q   Okay.

25    A   You have some that are just commercial.  They

27

1  read -- for a tow truck company, they'll go around and

2  they'll use, for vehicles that are repo and they'll scan

3  them oh look this vehicle is repo.  They'll send the tow

4  truck in a little time after and then they're gone, which

5  is what we use.

6    Q   So you use?

7    A   Commercial.

8    Q   License plate reader?

9    A   Yes, ma'am.

10   Q   And what kinds of information does that give

11  you then?

12    A    It really, it really depends.  Most of them do

13  generally the same thing.  It can tell you where a

14  vehicle's been scanned at.

15    Q    Okay.

16    A    So say if it was on the highway, it will tell

17  you it's on this part of the highway and this block

18  range.  Or if the vehicle was scanned at a hotel, motel,

19  apartment, subdivision, it can really just result to

20  that.

21    Q    Okay.  How does that work.  I'm a little

22  confused.  So do people like, are there other police all

23  the time going around scanning license plate readers and

24  so then you can see what other police have scanned?

25    A    No, ma'am.  No, ma'am.  It's -- like tow truck
                              28

 1  companies, tow truck companies have people that -- they

 2  pay people that have these license plate readers.  And if

 3  you see a random car like with a Honda with those big

 4  rectangle cameras those are license plate readers.

 5  You'll see them going through neighborhoods, apartments,

 6  hotels, they're repos, looking for their, things like

 7  that.  That's a commercial reader.

 8    Q    Okay.  And I guess like you're saying

 9  commercial reader.  Are there like brands then of license

10  plate readers?

11    A    Yes, ma'am.

12    Q    And what brand do you guys use?

13   A   We use a vigilant.

14   Q   Okay.  And you were telling me a little bit

15 about alerts that you get.  Can you tell me more about

16 that?

17   A   Yes, ma'am.  The alerts, again, it could be if

18 a vehicle's been flagged for a possible smuggling, a

19 vehicle's been flagged for a murder suspect, alerts, like

20 amber, clear, silver, things of that nature.  And then

21 we've also had them that said alert for vehicles that

22 have been used in criminal activity.  So -- but that also

23 too goes, depends on the accessibility that we are

24 allowed to have.

25   Q   Okay.  So let me break that down.  How do you,
                                    29

1 how do you read a license plate reader?  Like where does

2 the information show up?

3   A   So we have a software, the Vigilant software

4 and it will pop up on our screen.  If it's an alert.  If

5 not, then we just scan them and then if we feel

6 there's -- if we feel there's something going on, we'll

7 look at the vehicle, or we have the, we'll type in the

8 information in the database and see what goes on.

9   Q   Okay.  So you're sitting in your patrol car.

10 You're, you've got your computer.  I'm going to talk

11 about the computer in a second.  But somehow the license

12 plate reader feeds information to that computer?

13   A   Yes.

14   Q   And then alerts will pop up?  Am I

15 understanding that correctly?

16   A   Yes.

17   Q   And you read the alerts?

18   A   Yes, ma'am.

19   Q   And do you, do you ever have to like

20 affirmatively point, direct the license plate reader at a

21 vehicle to have it read that or does it just like, is it

22 an automatic thing, the license plate reader's just

23 constantly reading?

24   A   They're constantly reading.

25   Q   Okay.

                          30

 1   A   They're on, they're reading.

 2   Q   Okay.  So you turn, do you have to turn your

 3 license plate reader on?

 4   A   Yes.  Once you activate the software, when we

 5 turn on the software computer for the day and the cameras

 6 turn on, you check your cameras and stuff like that.

 7   Q   Okay.  So you have to affirmatively turn your

 8 license plate reader on and then it scans all the license

 9 plates it sees?

10   A   Yes, ma'am.

11   Q   And then if something prompts an alert, that

12 pops up on your computer screen?

13   A   Yes, ma'am.

14   Q   Am I understanding all of that correctly?

15   A   Yes, ma'am.

16     Q    Okay.  And then are there logs of these alerts

17  that you can check?

18     A    No, ma'am.

19     Q    So it's just a real time alert pops up, you

20  click out of it, you'll never be able to access that

21  alert again?

22     A    No.  So if an agency like the Bexar County

23  Sheriff's Office says hey this vehicle has been, is a

24  suspect vehicle in a homicide, they'll -- if they, if the

25  investigator or the officer handling that case or the

                                      31

1  case agent handling that incident puts it into the --

2  enters it into the database that this vehicle is a

3  suspect vehicle in a homicide case or whatever criminal

4  activity was involved in, it will pop up.  And it has to

5  be -- it has to alert us.  And that's up to, again, the

6  individual officer to input that.  Like I said, Amber

7  Alert or clear alerts, they've got a vehicle that's, you

8  know, that's possibly involved, associated with that

9  incident, they'll type in that license plate into a, into

10  the database, and which is the software program.

11     Q    Sure.

12     A    And it gets shared with any people that have

13  access to their program.

14     Q    Okay.  And so if you wanted to go in and check

15  the record on a particular license plate, let's say you

16  found a car and you're not reading your license -- using

17  your license plate reader, you could type it in and it

18  would pull up all the alerts for that vehicle?

19     A    It could pull up the alerts for the vehicle or

20  it could show you where that vehicle's have been.

21     Q    Okay.  Tell me more about that.  How does it

22  show you where the vehicle's been?

23     A    It will give you a picture of the vehicle how

24  it's scanned.  So if it's on the highway, you'll see it

25  driving down the highway, not moving but ill you'll see
                                    32

 1  it's on the highway, parked at a building, so picture of

 2  the vehicle parked at a building.  And then it will show

 3  you a map of the block range where it's located at.

 4     Q    Okay.  So it will show you like each of the

 5  hits?

 6     A    Yes, ma'am.

 7     Q    Is that a good descriptor it will show you each

 8  hit for where the vehicle has been read?

 9     A    Yes, ma'am.

10     Q    Okay.  That's helpful.

11          How do you know if the information from a

12  license plate reader is correct?  I'm sure that maybe

13  there's like misreads sometimes?  How do you check it?

14  How do you know?

15     A    Can you rephrase that?

16     Q    Sure.  I guess how do you know that the license

17  plate reader is reading the correct license plate number

18  all the time?

19    A    You verify with the vehicle.

20    Q    You just visually look?

21    A    Yes.  So I look down, it says this, and it says

22  it's a Chrysler, or it's reading, I look at a Chrysler,

23  oh look, it's a Chrysler.  Then you also -- it's up to us

24  to do that work, you know, to make sure, look and

25  physically verify as well.

                                33

1    Q    Okay.  And have you ever seen the license plate

2  reader misread a license plate?

3    A    As far as?

4    Q    Like, you know, my license plate is LP 2, and

5  it reads it as LP 3?

6    A    No, ma'am.

7    Q    Okay.  And how do you know that the information

8  in the log is correct?  If, say like an officer who's in

9  a different entity, input the wrong license plate number,

10  would you necessarily know that?

11    A    Again it's up to us to verify and make those --

12  to further investigate that.  So if, like you said, if

13  another agency inputs that this vehicle is targeted for

14  something, like it's got something going on with it,

15  the -- it's up to us to call that agency and find out,

16  hey, what's going on, what's up with this vehicle, I'm

17  behind it, do you need it stopped.  And it's up to them

18  to verify with us what we're looking at.

19    Q    Okay.

20    A    So it goes into a whole network of finding out

21 what's going on.  And again, it's up to us to say okay,

22 even though we see it here, we still have to visually and

23 physically look and do our homework on it, I guess you

24 could say.

25    Q    Okay.  That's helpful.

34

1         And how often would you say that you have to

2 call another agency to do your homework?

3    A    It, so again that also goes to the

4 accessibility of the reader.  But not very often.

5    Q    And what do you mean by that then, the

6 accessibility of the reader?

7    A    So sometimes their other commercial readers.

8 We have to have access to TCIC/NCIC which is a federal

9 database.

10    Q    I'm going to write that down, TCIC/NCIC?

11    A    Yes.

12    Q    Did I get that ride?

13    A    Yes.

14    Q    What is that?

15    A    Basically, whenever we run your license plate,

16 it will give us the information of, hey, the vehicle is a

17 2022 Chrysler 300.  Belongs to John Doe.  This is the

18 last known address, the registration, if it's got

19 insurance, things of that nature.

20    Q    Okay.  So that's like the database of like

21 where your -- who owns what car and what license plate

22  and --

23    A   Yes.

24    Q   -- where it's registered.

25    A   Yes, ma'am.

35

1    Q   That's helpful.  Thank you.

2        And if a car is flagged for smuggling or, you

3  know, an Amber Alert, you wouldn't -- would you know if

4  that's correct other than calling the law enforcement

5  agency?

6    A   I would still call the law enforcement agency.

7    Q   Okay.  I think that's helpful.

8        So that I understand, your alert system, when

9  it pops up, that's automatic.  You don't have to do

10  anything affirmatively to get the alert to come up?

11    A   There -- you have to be, with the Vigilant

12  readers, you have to be on that agency's alert list.

13    Q   Okay.  So --

14    A   And you also have to -- it also has to be

15  accessed to TCIC/NCIC, which you need a, I believe it's

16  called an MOU, a mode of -- motion of understanding, I

17  believe I'm reading that right.  It has to be signed by

18  the D.A.'s office and the State.

19    Q   Okay.  I'm going to go back a little bit then.

20  How -- I'm trying to figure out how to ask this question.

21  What agencies do you work with?

22    A   A lot.

23    Q   Okay.

24     A    But primarily, local agencies wise, SAPD, Bexar

25  County, Castle Hills, anything that's got a law

1  enforcement entity to it.

2     Q    And do they all have license plate readers as

3  well?

4     A    Some do, some don't.

5     Q    And so when you're in the license plate reader

6  software, what do you do?  Like you're driving down the

7  road.  What do you -- I'm not quite understanding how it

8  works.  So tell me about what your screen looks like and

9  what you do to interact with the license plate reader.

10     A    At the time, when mine were working, it was a

11  screen, four screens, for however many cameras you've

12  got.  At that time we had four cameras on the thing,

13  positioned a certain way you want it.

14     Q    Four cameras on your patrol vehicle?

15     A    Yes.  And it would just read.  And it just pops

16  up, and you hear it ding, ding, positive read.  And so

17  it's up to you to control the volume on all that stuff,

18  setting you want it to work on.  If it's getting a good

19  read, it will alert the read, and then you look at it and

20  you go from there.

21          And then if you want to look into a vehicle and

22  you research it, that's up to you to follow that up.

23     Q    Okay.  Do you see -- you see what agencies

24  have?

25    A   No.

1    Q   Signed what vehicles on these things, these

2  alerts?

3    A   No, ma'am.  It will pop up if there is an

4  alert, and then you can -- you look at TCIC/NCIC and do

5  your homework on it, research it.  Find out, you know,

6  what's going on with the car.  And then if there is an

7  alert with it, TCIC/NCIC should have someone to contact.

8    Q   Okay.  So I think that's really helpful.  You

9  get an alert that pops up.  What do you see on the alert?

10    A   Depends on what it is.  If it's human

11  smuggling, possible narcotics vehicle, possible, you

12  know -- it just depends, possible Clear Alert vehicle,

13  and then, you know, you do your research on it.  If there

14  is a flag for it, you have to call the agency and find

15  out what's going on.

16    Q   Okay.  And how do vehicles get flagged?  So we

17  talked about human trafficking, you mentioned that one.

18  How does a vehicle get flagged for human trafficking?

19    A   It has to be input in by the, I guess you could

20  say the case agent, one who's investigating that vehicle,

21  it has to be inputted.

22    Q   Okay.  So some case agent at a different agency

23  inputs it into the license plate reader as potential

24  smuggling?

25    A   Yes, ma'am.

1    Q    Do you Sheriff's Office officers, your

2 Sheriff's Office officers ever input vehicle information

3 into the license plate reader database?

4    A    Yes.

5    Q    And why would you input a vehicle into the

6 database?

7    A    Ser if there's suspicion of some type of

8 activity that this person is involved in.  And you just,

9 you know, you forward it around, sharing information.

10 It's a network.

11    Q    Yeah.  So at what point do you have suspicion

12 that you can enter this person's information into the

13 database?  I mean, I guess what I'm trying to ask is, you

14 know, you see someone on the street, you say okay, that

15 person could be a drug dealer in your mind.  You have a

16 lot of experience.  You see that perp.  You say okay,

17 they could be someone who's up to no good.  At what

18 point, what information do you have to have to put that

19 person's car into the database?

20    A    Reasonable suspicion that they might be

21 involved.

22    Q    And so what kind of things create reasonable

23 suspicion for the license plate entry?

24    A    Typical reasonable suspicion.  Like I said, it

25 all depends on your interaction with that person.

                        39

1    Q    Okay.  Break down for me what a typical

2 reasonable suspicion facts would look like in this

3  example.  You can just use an example?

4     A   Example-wise, you stop someone, you find out

5  they've been, you know, hey where you been, you know,

6  talk to them, ask them whatever questions you feel like

7  you need to ask them.  Some I have talked to have had,

8  they've told me, yeah, I've been locked up federally for

9  smuggling of dope.  Okay.  Where are you going, you know,

10  what are you doing, what are you doing, you know, find

11  out, you know, their path.  And then if they're still

12  doing things that are in the same pattern of a typical

13  smuggler, then you can input it into a system.  And then

14  you could, you know, you go from there.  And then if they

15  get spotted by another agency and the agency says hey we

16  spotted this vehicle, they'll call you, hey, what did you

17  see, what did you hear with this guy, that's them doing

18  their investigation on their end.

19     Q   Okay.  That was helpful.  If you get an alert

20  from a license plate reader, are you automatically going

21  to stop that vehicle?

22     A   Me personally?  No.

23     Q   Okay.  Do you know if other officers stop based

24  purely on a license plate reader note or --

25        MR. FRIGERIO:  Objection, form.
                                40

1     A   No.

2     Q   (By Ms. Hebert) Do you know if other officers

3  stop based purely on license plate reader alerts?

4     A    Not that I know of.

5     Q    Okay.  If you don't automatically stop someone

6 based on a license plate reader, what exactly do you do?

7     A    My homework, my research.

8     Q    Right.  And so you talked a little bit about

9 that.  Who -- like who do you call?

10    A    If I need to call someone I make a phone call.

11 If not, I do -- like I go through the databases,

12 TCIC/NCIC, research the vehicle through the software and

13 stuff like that.

14    Q    That feels like a lot of tasks to do on the

15 side of the road.  How -- how do you manage that?

16    A    On the side of the road?

17    Q    Yeah.

18    A    Same way we do it always, you know, type it, if

19 it feels like something you need to go after, we'll go

20 after it.

21    Q    Okay.

22    A    And again sometimes, it all depends too is how

23 far are you from the county line, where your jurisdiction

24 ends.  If it goes into another jurisdiction, I'm kind of

25 already hitting the brakes but I'll make my phone call,
                                 41

1 hey there might be a vehicle that might have something

2 going on with it.

3     Q    Okay.

4     A    So --

5     Q    That was very helpful.  Thank you for being

6  patient with me as I learned about license plate readers.

7  I'd like to learn a little bit more about the body

8  cameras.  Does every sheriff's officer who goes out into

9  the field have a body camera?

10    A   Yes, ma'am.

11    Q   And is the body camera running the entire time

12  that you're in the field?

13    A   It is on.  Right now I have mine off because we

14  are in a court setting.  But it is on and it is required

15  to be in a -- if it's not recording a video, it's

16  required to be in what they call buffering.

17    Q   Okay.

18    A   So that way at the time it's hey I'm going to

19  turn mine on, it's already buffering.

20    Q   So it's like a standby mode?

21    A   Yes, ma'am.

22    Q   So, and I'm just going to summarize what I

23  understood you to say.  Every patrol officer has -- every

24  officer who goes in the field has a body camera?

25    A   Yes, ma'am.

                          42

1    Q   It's on all the time in the standby mode?

2    A   Yes, ma'am.

3    Q   What does an officer have to do to take the

4  body camera out of the standby mode into the active

5  recording mode?

6    A   You can activate it with -- ours, just press

7  the circle, the big circle here.

8    Q   The big circle in the middle?

9    A   Yes.  Sometimes they get activated by lights.

10 Once we're doing a traffic stop, everything, it will

11 activate itself.

12    Q   Oh you mean the patrol car lights?

13    A   Yes.

14    Q   I thought you meant lights in general.  So let

15 me understand that.  You can click the big button in the

16 middle and that turns it into the active mode?

17    A   Yes.

18    Q   And sometimes the body camera will

19 automatically go into active mode if you turn your patrol

20 car lights on?

21    A   It will always go on active mode.  If it's on,

22 it will -- as soon as you, as soon as you flip the

23 switch, turn on your lights, emergency lights, it will

24 automatically start recording.

25    Q   Okay.  That's helpful.  And how does the
                                43

1  footage from that little camera on your chest get saved?

2    A   It gets uploaded into the axon, I think it's

3  axon database.

4    Q   So does that mean that the camera that you're

5  wearing right now, like records into the cloud?

6    A   For lack of a better term, yes.

7    Q   Okay.  And you don't have to like plug it in

8  and link it and upload the footage?

9    A    No.  No.  Sometimes you do have to up dock it,

10 with the docking station.  Sometimes you get so many

11 videos it takes forever to upload.  Or there's an update.

12 So when you plug -- when you dock it, it will upload an

13 update or some kind of -- do a software for the camera.

14    Q    Okay.  How do you know if it's having trouble

15 uploading footage?

16    A    It just takes forever to record.  Or it will --

17 recently, most recent I've seen is it will sayer or -- it

18 will give some type offer or message, liker or, try again

19 later.  It will -- if it continues on with that, then you

20 report it.  So typically that's usually resolved just by

21 docking it on the docking camera and you need to update.

22    Q    Okay.  So let me break that down and go back a

23 little bit.  When it's having trouble uploading the

24 videos to the cloud, there's somewhere on the camera that

25 gets to be an indicator?

                          44

1    A    No.  So on your computer, in the on board, the

2 patrol vehicle's on board computer, it has a software

3 where we can -- which is through axon, and we can type in

4 title of the video, we can put down traffic stop,

5 warning, be and then we upload the video through

6 Bluetooth.  So this is reading -- it's transporting

7 information via Bluetooth to the computer, which is

8 getting uploaded to the axon database.

9    Q    Okay.  Thank you.  And the Bluetooth reading to

10 the computer, is that automatic?

11   A   For the dash, yes, it will automatically do it

12 if you don't get to it in time.  For the body camera, no.

13 You have to manually do it yourself.

14   Q   Okay.  So you have to connect the body camera

15 to the computer?

16   A   No.  You've just got to.

17   Q   Pair it?

18   A   Oh, I'm sorry.  That -- the question you told

19 me about earlier.  No, the body cameras have to be paired

20 to the computer.  And then once it's automatically

21 paired, it's up to you to manually go in and say upload.

22   Q   Okay.

23   A   And click on the upload button.  But it does

24 not have to be connected manually to the computer.

25   Q   Okay.  I think I understand that.  So let me,

                                    45

1 let me make sure I'm getting this right.  To upload the

2 body camera footage, it doesn't happen automatically.  It

3 goes through the computer to upload?

4   A   Yes.

5   Q   Okay.  And you have to click upload for -- on

6 the computer for it to upload?

7   A   Yes, ma'am.

8   Q   Okay.  And when do you -- when do you upload

9 footage from a body camera through the computer to the

10 cloud?

11   A   Me, the way I do it personally, is after every

12  stop.  After every incident, after everything, so it's

13  already recording -- or uploading.  I'm sorry.  And that

14  way it's not taking up memory.

15      Q    Okay.  And do you know how other officers, what

16  their practice is?

17      A    No, ma'am.

18      Q    Okay.  So your practice is after every stop,

19  you upload?

20      A    Yes, ma'am.

21      Q    Okay.  Can you -- when you're -- when you hit

22  the button to record or your lights have turned on your

23  body camera, can you turn it off?

24      A    Yes, ma'am.

25      Q    And can you mute it?

46

1      A    So the old ones, at the time of this incident,

2  you were able to mute your camera.  The new ones, you

3  don't have -- we don't have the ability to.

4      Q    Okay.  So when did you get the new ones that

5  you cannot mute?

6      A    On -- I recently got mine maybe in the fall of

7  last year.

8      Q    Fall of 2023?

9      A    Yes, ma'am.

10      Q    But before fall of 2023, you could choose to

11  mute it?

12      A    Yes, ma'am.

13    Q    Okay.  And can you turn it off now that you

14  have the new camera?

15    A    Yes, ma'am.

16    Q    And you could turn off the old camera too?

17    A    Yes, ma'am.

18    Q    Okay.  How does an officer check that his

19  camera is recording properly?

20    A    On -- the lights on the camera will show

21  that -- if it's green, buffering.  If it's red, red

22  flashing, it's recording.  And our supervisor's also now,

23  and I believe the old ones, they also have the ability to

24  watch it live.  So if this is on, as me and you are

25  talking, my supervisor could actually key in live and

                              47

1  watch the interaction going on.

2    Q    Okay.  Before the fall of 2023, would a

3  supervisor have to like access the records then of the

4  body camera, the footage, to review them at a later date?

5    A    Yes, ma'am.  They could do that whether it's

6  live or not live.

7    Q    Okay.  And today it has the live capacity?

8    A    Yes, ma'am.

9    Q    Okay.  And it seems like you just talked about

10  the green light is if it's in buffering, and the red

11  light means it's recording?

12    A    Yes, ma'am.

13    Q    So if you don't look down, you might not see

14  what status your light is?

15    A   Yes, ma'am.  But my, there's also a beeping

16 noise.  It will let you know, it can be activated or

17 deactivated.  If it's deactivated, it will vibrate.

18    Q   Okay.  So tell me more about that.  If you

19 activate your body camera, it makes a beeping noise?

20    A   Yes.  So every, after, every, I think it's two,

21 two to five minutes, something of that nature, it will --

22 you'll hear a beep beep, you know, that it's still

23 recording.  And then also, you know, say typically like

24 how your phone or air pods or whatever you're listening

25 to is going low on battery or something, it will make an

48

1 alert to you as well.

2    Q   And what does that sound like?

3    A   It will just make the beeping noise.

4    Q   Okay.

5    A   And it will become more frequent.

6    Q   So if it's beeping at you a lot then you know?

7    A   Something's going on.

8    Q   Running out of battery?

9    A   Yes, ma'am.

10    Q   And if it's beeping, as I understand what you

11 just said, if it's beeping regularly, beep beep, that

12 means my body camera is on?

13    A   Yes.

14    Q   And so I guess the indication there is if it's

15 not beep beeping for a long period of time, you're like

16  oh, my body camera, something's wrong with it?

17    A   It can be.  It really depends on the officer.

18  I like to leave mine on, because I can hear it, like it's

19  doing its job.

20    Q   Okay.  And how often have you seen an error

21  with your body camera?

22    A   Most recently with the new ones, because

23  there's been a lot of software, you know, they have their

24  kinks and bugs, just most recent with this one.  The old

25  one never had any issues.

                                49

1    Q   Okay.  So the new body camera since 2023 has

2  had a couple of issues?

3    A   It did -- that's really on the software.

4    Q   You got the kinks worked out?

5    A   Yes.

6    Q   The old one you had never like seen it

7  malfunction?

8    A   No, ma'am.

9    Q   Okay.  We talked a little bit about -- how are

10  we doing?  Everybody doing okay?

11    A   I'm fine.

12    Q   Okay.  I know coffee in the morning, sometimes

13  people need breaks.  We talked a little bit about dash

14  cameras and how not all of the patrol vehicles have cash

15  cameras at the beginning of the conversation you

16  indicated they're still rolling those out.  Is that fair?

17    A   Yes.

18    Q    What percentage of patrol vehicles would you

19  say had a dash camera right now?

20    A    I couldn't tell you.  I haven't been on patrol

21  in almost four years.

22    Q    Yeah.  Do all of the criminal interdiction

23  folks have a patrol or dash camera?

24    A    Yes, ma'am.  All specialized units have dash

25  cameras.

50

1    Q    And by specialized units, do you mean the

2  street crimes unit, the gang unit, the criminal

3  interdiction unit?  Anybody else that I'm missing?

4    A    The gang, street crimes, traffic, if you're a

5  marked unit or you're an unmarked unit, you're a

6  uniformed deputy, your car is supposed to be outfitted

7  with a camera.

8    Q    Okay.  That's helpful.  Thank you.

9        And do all of the cameras, all the patrol

10  vehicles -- I misspoke there -- do all of the patrol

11  vehicles who have a dash camera have both a front and

12  rear dash camera?

13    A    Patrol wise, like I said I couldn't tell you on

14  patrol.  Specialized units, yes.

15    Q    So they have both.  All the specialized units

16  have both a front and rear.

17    A    Yes, they are required.

18    Q    Okay.  Can we agree that I'll shorthand both

19  the front and rear cameras on a patrol vehicle as the

20  dash cam?

21    A   I'm sorry, can you repeat that?

22    Q   Can I just call the front and rear cameras the

23  dash camera generally?  Can we agree to use that term or

24  is there something you would prefer to use?

25    A   I would say dash is for front and rear for

                                    51

1  rear.

2    Q   Okay.  So if I say dash cam, that's specific to

3  the front camera?

4    A   Yes, ma'am.

5    Q   And if I want to say rear, we'll specifically

6  say that one?

7    A   Yes, ma'am.

8    Q   Do officers ever have like a term that they use

9  to refer to both of them together?

10    A   Cameras.

11    Q   Cameras.  Patrol cameras?

12    A   Yeah.

13    Q   Or patrol car cameras?

14    A   Your cameras are on?  That's it.

15    Q   When they say your cameras are on, are they

16  meaning your body camera too?

17    A   Yes, everything.

18    Q   So when they ask the general question of all

19  your cameras are on, they may be referring to all three?

20    A   Yes, ma'am.

21    Q    Is a dash camera and the rear camera running

22  the entire time that you're in your patrol vehicles?

23    A    No, ma'am.  They're on again standby until

24  activated.  The rear camera doesn't get activated until

25  you either have something of evidentiary value or you

52

1  have someone in the back seat.

2    Q    Okay.  So the rear camera then is not on the

3  rear of the vehicle pointing back.

4    A    It's in the back seat.

5    Q    Okay.  So it's in the back seat.  So you have

6  your dashboard camera, which is in the front of the

7  vehicle, and your rear camera looks at the, the --

8    A    The back seat basically.

9    Q    The back seat.  So where on the patrol vehicle

10  is the dash cam located?

11    A    It's on the windshield by the top by the rear

12  view mirror.

13    Q    Okay.  So it's somewhere up there?

14    A    Yes, ma'am.

15    Q    And when does the dash cam, the dash cam

16  specifically, become activated?

17    A    You can either activate it yourself manually or

18  you can, like when you activate your lights, it will

19  automatically turn on.

20        Now with Bexar County, we have our holsters can

21  also activate the, when we draw our firearm, can activate

22 the camera, the body camera and the dash cam, and as long

23 as our tasers.

24    Q    Okay.  So now there's a new technology that if

25 you take your gun out of your holster, it turns on all

                                        53

1 your cameras?

2    A    Yes.

3    Q    But otherwise, the dash cam, the front dash

4 cam, turns on if you manually turn it on or the lights

5 come on?

6    A    Yes, ma'am.

7    Q    And can you turn your dash camera off after it

8 automatically turns on?

9    A    Yes, ma'am.

10    Q    And what about the rear camera?  You talked a

11 little bit about it but I don't think I understood.  You

12 have -- do you have to manually turn on the rear camera

13 into the seat?

14    A    Yes, ma'am.  It's only, it's only -- it's only

15 activated manually.

16    Q    Okay.  So when you turn on your lights, the

17 rear camera does not turn on.

18    A    Yes, ma'am.

19    Q    How does the footage from the dash camera get

20 saved?  I think you were talking a little bit about this

21 before but I want to make sure I understood because I was

22 focused on the body camera earlier.  Is the saving for

23 the dash cam automatic?

24    A    Yes, ma'am.

25    Q    And so --

                        54

1     A    The same way as we do this.  If we don't get to

2  it in time, like title it or to label it, it will

3  automatically just upload on its own and you have to go

4  in at a later time and fix it.

5     Q    So no requirement for you to intervene to

6  upload the dash cam at all?

7     A    No, ma'am.

8     Q    Okay.  And so I assume the saving and the

9  uploading are basically the same thing in this context?

10    A    Yes, ma'am.

11    Q    Okay.  How often generally does an officer have

12  to check to make sure his dash cam is working?

13    A    We check it every day.

14    Q    Okay.  And is there -- is there a record of

15  that check that happens every day?

16    A    No, ma'am.  Once you turn it on, it will, like

17  I said, same thing, it has lights and it will tell you if

18  it's synced properly with the on board computer and then

19  you can look at the computer and see through a live view

20  and see that it's visually showing.

21    Q    Okay.  So when you get in your patrol vehicle

22  for the day and you turn on your patrol vehicle, you can

23  see the dash cam view through your computer.

24    A    Yes, ma'am.

25    Q   And tell me more about the lights on the dash
55

1  cam.

2    A   It's the same way.  I think they're purple and

3  green.  I know purple means that it's synced properly, or

4  that it's, you know, it's connected properly to the

5  computer.  And then green just says good to go, it's

6  ready to, as soon as -- it's buffering.

7    Q   So if both -- if the camera is working

8  correctly, both the purple and green lights should be on?

9    A   Yes, ma'am.

10    Q   Okay.

11    A   And if it's not synced, it will just be the

12  green light.

13    Q   And if it's not synced, does that mean it's not

14  going to record?

15    A   No.  It will still record.  It will still

16  record.  Again, it just has to go in there and look --

17  make sure it's uploaded properly and all that stuff.

18    Q   So if the purple light is not on it's not

19  synced to the computer, you'll have to manually do the

20  upload or double check it later?

21    A   Yes, ma'am.

22    Q   To get it to work?

23    A   Yes and if it's not there then you've got to

24  take it to get serviced.

25    Q   Okay.  That's helpful.  So if you're not seeing
56

1  the record of whatever you experienced, let's say you

2  turned on your lights and the dash camera is supposed to

3  be recording and you finish whatever you're doing and you

4  see that one of the lights isn't on or the purple light's

5  not on, you're supposed to take it in?

6    A   Yes, ma'am.

7    Q   And where do you mean take it in to?

8    A   We take it to our fleet maintenance and we'll

9  have people that work on the cameras come out and they'll

10  have a look at it.

11    Q   And has that ever happened to you where you've

12  realized the purple or the green light's not on and you

13  take it to the maintenance folks?

14    A   Yes, ma'am.

15    Q   And what happens?

16    A   They, they either say the memory was full, they

17  have to upload they'll do a repair sometimes they'll say

18  it needs a new camera.  They'll let you know what the

19  fault is.

20    Q   And if your camera as not working and you have

21  to go take it to get serviced, presumably that means

22  you're not out doing your job at that point.

23    A   A at that point we down the vehicle or we turn

24  the vehicle in to be serviced, we call it downing, and

25  then we'll just double up with another officer.
                                57

1    Q   Okay.  So if there's something wrong with your

2  dash cam or your car for, in general, you take it to the

3  service people and then you'll go out with another

4  deputy?

5      A   Yes, ma'am.

6      Q   That's fair.  We talked a little bit about the

7  computer.  And it seems like the computer is the source

8  that you used for the license plate reader system, the

9  place where your body camera footage gets synced to and

10  uploads and then the dash camera syncs and gets uploaded

11  to.  Is that fair?

12      A   Yes, ma'am.

13      Q   What else does the computer, the laptop in the

14  car do?

15      A   It's our access to TCIC/NCIC, it's our, you

16  know, shows that, our access to the CAD, how we can read

17  our calls.  It also displays, you know, where everybody's

18  at, where your fellow units are, the map of the County,

19  you know, we can do a report system or ticket writing

20  system.  Pretty much it's the brain.

21      Q   Okay.  You said a couple of things that I don't

22  understand.  What is a CAD?

23      A   Oh, I'm sorry, the CAD is the computer.

24      Q   So the computer itself is called the CAD?

25      A   Yes.  It's gone through many different names,
                              58

1  but we've always called it the CAD.

2      Q   Okay.

3      A   I don't know what the CAD means, because that

4  was a term used before I came out.  So --

5      Q    Okay.  So when you're referring to your

6  computer in the patrol vehicle, you say my CAD?

7      A    Yes.

8      Q    You also mentioned that you can see where

9  others, officers are located?

10     A    Yes, ma'am.

11     Q    So if you decided to go meet up with another

12  officer, you wouldn't have to ask them where they were?

13     A    No.  So, you know, you still ask them where

14  they're at.  Sometimes supervisors, sometimes you don't

15  see your supervisor.  Like my supervisor, but that's up

16  to them whether they want to be known or not known.

17  Sometimes you have undercover units, they'll be signed on

18  but you won't know that they're in a certain area.

19     Q    Okay.  So can you turn off your location

20  tracking then?

21     A    Yes, you can.  I've never done it.  Because I

22  don't know how.  And Number two is I don't like messing

23  with that kind of stuff because I don't want it to mess

24  up the computer.

25     Q    I understand that.  But if an officer knew how
                              59

1  to turn off their location tracking thing, they could?

2      A    They could.

3      Q    You talk a little bit about you can write

4  tickets through --

5      A    Yes, ma'am.

6    Q   -- your CAD.  I guess like the time where an

7  officer would flip out his notebook and write out the

8  ticket by hand is probably long gone.  So does that mean

9  that you print the tickets out?

10    A   Yes.  We have a printer that will print the

11  citation or warning.

12    Q   Okay.  So you have a printer in your vehicle

13  that prints out the citation or the warning, I'm just

14  going to call that generally a piece of paper.

15    A   Yes, ma'am.

16    Q   Okay.  And what kinds of searches can you run

17  from your CAD?

18    A   Searches as in to --

19    Q   Like you pull someone over, you're going to run

20  the checks, what kind of checks do you run?

21    A   We're able to do border crossing.

22    Q   Border crossing?

23    A   Yes.  Border crossing, if you have access to

24  the Vigilant database you can run.

25    Q   And that's the license plate database?
                        60

1    A   The LPR reader, yes.  Again you can run

2  criminal history as far as I run your information,

3  through your driver's license, they can, if you have a

4  local criminal history for us, we will, we'll see it.

5  And then of course that's -- and then of course vehicle

6  information, that's really about it.

7    Q    Okay.  So what I heard from you is border

8  crossing information -- what I heard from you is from the

9  computer you can run border crossing information, the

10  Vigilant license plate reader records, criminal history,

11  and vehicle history.  Did I miss anything?

12    A    That's -- oh, yeah, that's about it.  Well,

13  again, if you need to research, it does have internet

14  access.  So I don't know if that does any help.

15    Q    So in addition to the border crossing

16  information, the Vigilant license plate reader

17  information, the criminal history and the vehicle

18  history, you have internet access.  Do you do other

19  searches?

20    A    Only for checking my email and then -- which is

21  the work email -- and then that's it.  I think maps, like

22  if I need a map like hey we're going to this location,

23  can we check this location, things of that nature.

24    Q    Okay.  So you don't use the internet to --

25    A    Not for personal use.

                    61

1    Q    I understand that.

2    A    Yeah.

3    Q    But you don't use the internet to like Google

4  someone that you've stopped?

5    A    No, ma'am.

6    Q    So in terms of checks, the only things that you

7  do are the border information check, the Vigilant license

8  plate reader check, the criminal history check and the

9   vehicle information check?

10     A   Yes.

11     Q   Okay.  But you have access to the internet if

12   you need it for other things?

13     A   Yes, as far as work-related information.

14     Q   Okay.  And what kinds of things -- you talked

15   about work-related information email via the internet

16   access on your computer.  What kind of things are you

17   checking for on email on your CAD computer?

18     A   My work email, like say hey, we have, you have

19   to go to class here, other information being disseminated

20   by admin, supervisors sending you emails.  We have a

21   daily bulletin, things of that nature.  I signed up with

22   a lot of other trading companies, so they'll send me

23   emails that hey there's -- they'll advertise, hey there's

24   trading coming to your area, so I can, if I choose to

25   sign up or I get notified I need to be somewhere, things
                                62

1   of that -- like that.

2       A lot of times too we'll get court notices, you

3   know, when you show up for court.

4     Q   Okay.  So there's a lot that can be in there.

5   You talked a little bit about a daily bulletin.  Tell me

6   what that looked like.

7     A   The daily bulletin you see at work.  Like you

8   know, it says hey, this openings are coming open for

9   these positions.  This is, you have these trainings are

10  coming available.  Hey, this person did a good job,

11  things of that nature.

12     Q    So the daily bulletin is not like a daily

13  briefing.  It's more a news -- is it fair to say it's

14  more of a news alert for the Sheriff's Office?

15     A    Yes, ma'am.

16     Q    And you mentioned that you get emails from your

17  supervisor.

18     A    Yes, ma'am.

19     Q    Could you give me a gist of the range of emails

20  you get from your supervisor?

21     A    Did you sign up for this class, are you doing

22  this, could you send me this, could you send me that,

23  what's the information on this or what are you doing with

24  that.

25     Q    Okay.  So the, what I understood you to say is

                                63

1  the supervisor might recommend a class or tell you to

2  take a particular class via email; is that correct?

3     A    Yes, ma'am.

4     Q    And the supervisor might ask you particular

5  information about something that you're working on?

6     A    Yes, ma'am.

7     Q    Is that fair?  Will the supervisor tell you to

8  work on certain things?

9     A    They can, yes.

10     Q    Can you give me an example?

11     A    Can you go monitor Highway 35.  Can you monitor

12  this area.  We're getting a lot of reports of this going

13  on, can you go see what you can find.

14     Q     That's all done via email?

15     A     It can be via email, he can call it.  Just

16  depends on his or her range of how they want to

17  communicate out.

18     Q     Okay.  Are -- we talked, just to go back a

19  second, we talked a little bit about the searches you do,

20  the border crossing search, the Vigilant reared search,

21  criminal history search and vehicle history search is

22  there a log of all the searches you do?

23     A     Yes, incident detail report will record all of

24  that.

25     Q     Okay.  Incident detail report.  So the incident

                                   64

 1  detail report will include everything that you've run on

 2  a particular person or particular vehicle?

 3     A     As long as it's associated with the -- I

 4  believe it's associated with the TCIC/NCIC system.

 5     Q     And are there times when that, there would be

 6  checks that you do that aren't associated with the

 7  TCI/NCI system?

 8     A     If you run it, so if I run your license plate

 9  it's always done through TCIC/NCIC.  The only time if I

10  use the Vigilant readers I'm doing research on it.  But

11  there's always a time stamp.  So it will be at the bottom

12  of the screen, it will tell you something of the nature

13 of last activity, the activity ran on this date at this

14 time.

15    Q    Okay.  So when you run the various checks, the

16 TCI -- TCIC?  TCIC?  Am I saying that right?

17    A    Yes, ma'am.

18    Q    TCIC/NCIC, that information you'll get the log

19 of what you ran?

20    A    Yes.

21    Q    But with the license plate reader, you won't

22 necessarily get the log of what you ran together with

23 that?

24    A    No, ma'am.  I'm not sure if it's recorded.

25    Q    Okay.

                              65

 1    A    But I do know that that's the only thing that

 2 we can research on that.

 3    Q    Sure.

 4    A    As far as that.

 5    Q    Okay.  That's helpful.  And is there a log of

 6 what you print out?  So let's say during a day that

 7 you're on duty you print five warnings.  Would there be a

 8 way to check all things that were printed on a particular

 9 day?

10    A    Yes, ma'am.  That would be through the Brazos

11 system.

12    Q    Okay.  So you can access the Brazos system to

13 see all the tickets that an officer printed?

14    A    Yes, ma'am, you can.  And I believe that's also

15  done through the incident detail -- I don't think it's

16  the incident detail report.  It's done on the same

17  system.  I don't remember what it's called offhand.

18      Q    That's okay.  We talked a little bit about

19  calls.  Is there like a phone in the patrol car that you

20  use to call?

21      A    No, ma'am.

22      Q    Do you get a cell phone issued from the

23  Sheriff's Office?

24      A    During the time of this incident, I didn't have

25  one.

66

1      Q    Okay.  So sometimes the Sheriff's Office issues

2  cell phones?

3      A    Yes.

4      Q    When does the Sheriff's Office issue cell

5  phones?

6      A    Typically when you're part of a special unit.

7      Q    Okay.  So you just mentioned that you didn't

8  have one on March 16th, 2022.  How come?

9      A    Because I wasn't issued a county cell phone at

10  the time.

11      Q    Okay.  So did you use your personal cell phone

12  while you were on duty?

13      A    Yes, ma'am.

14      Q    And would you call other officers using your

15  personal cell phone while you were on duty then?

16    A   Yes, ma'am.

17    Q   And did you send -- do you send text messages

18  with officers, other officers when you're on duty?

19    A   Yes, ma'am.

20    Q   Now that you have a cell phone issued by the

21  Sheriff's Office, do you carry two phones then with you

22  all the time?

23    A   Yes, ma'am.

24    Q   And at the end of a work day, do you have to

25  currently turn in your Bexar County Sheriff's Office

                            67

1  phone?

2    A   No, ma'am.

3    Q   You take it home?

4    A   Yes, ma'am.

5    Q   And from your phone, your Bexar -- your

6  county -- your sheriff's -- from your Sheriff's Office

7  phone now, is there a way that it creates records from

8  that phone?

9    A   Yes, ma'am.

10    Q   Okay.  And do you send those records to the

11  Sheriff's Office?

12    A   No, ma'am.  We don't -- we don't turn in

13  records like that.  If for whatever reason they need it,

14  they can take the phone, they can research the records if

15  they need it.

16    Q   Okay.  So if they wanted to search the phone

17  they would take it from you and upload it or whatever?

18    A    Yes, ma'am.

19    Q    Okay.  And have you ever had your Sheriff's

20  Office phone taken to get records off of it?

21    A    No, ma'am.

22    Q    Okay.  And I understood that you just said

23  before you got a phone from the Sheriff's Office you used

24  to use your personal phone at work.

25    A    Yes, ma'am.

                              68

1    Q    And have you ever been asked for text messages

2  from your personal phone for work-related matters?

3    A    No, ma'am.

4    Q    Okay.  I'm sorry, I'm fighting off a cold.

5         Okay.  I think that I'd like to talk about

6  traffic stops that you did in your former role as a law

7  enforcement patrol deputy, before you became part of the

8  criminal interdiction unit.  So kind of put your criminal

9  interdiction experience to the side and just talk about,

10  you know, your prior experience doing traffic stops.

11        I know, as I've kind of indicated before, that

12  some of my questions might seem a little basic,

13  especially to someone who is experienced in the field.

14  And so I'm going to ask you to bear with me as I ask you

15  like acronyms and to break things down.  But ultimately

16  I'm just trying to better understand what your job looks

17  like.

18        And as I understand from what you said earlier,

19  you were a patrol deputy for four years; is that right?

20     A   Yes, ma'am.

21     Q   And when you were in that position, about how

22  much of your time was spent doing traffic stops?  Can you

23  give like a rough estimate?  5 percent?  10 percent?

24  More than 50 percent?

25     A   I would say probably -- estimated wise, maybe 5

69

1  percent.

2     Q   Sure.  So like a fraction, tiny fraction?

3     A   Yes, ma'am.

4     Q   Of your daily activities were traffic stops?

5     A   Yes, ma'am.

6     Q   Okay.  And what were the most common traffic

7  offenses that you saw as a patrol deputy?

8     A   Speeding, failing to maintain lanes, failure to

9  use turn signals, following too closely, pretty much the

10  same thing I do now.

11     Q   Okay.

12     A   It could also be -- I'm sorry, also equipment

13  violations, like such as window tint, lights are out, you

14  know, brake lights, things -- things of that nature.

15     Q   And those are the traffic violations you saw

16  the most frequently.  What would you say you stopped

17  people for most often?

18     A   If I saw those.

19     Q   Okay.

20     A   It would be those.

21    Q    And where did most of your stops occur as a

22  patrol deputy?

23    A    Where, where I was assigned to.  Primarily I

24  was assigned to either -- from Marbach and 1604 all the

25  way down to 281, U.S. Highway 281.  And those are three

                                70

 1  different districts.  So it just depends on where they

 2  had me assigned that day.

 3    Q    Okay so there were three places you were

 4  responsible for patrolling at different times and that's

 5  where you made your traffic stops?

 6    A    Yes, ma'am.

 7    Q    Okay.  And just so I'm clear, when you were

 8  patrol deputy, what was the purpose of making a traffic

 9  stop?

10    A    If they made a traffic violation, I stopped

11  them.

12    Q    Okay.  And can you help me understand that a

13  little bit?  I think the easiest place to start is just

14  how you decide to actually make a stop.

15        I think I read somewhere that like the average

16  driver, probably myself included, makes a traffic --

17  commits some kind of traffic violation every 20 minutes.

18  And I'm sure you're on the side of the road.  You see

19  lots of different traffic violations.  How do you decide

20  an offense is worth pulling someone over?

21    A    It's up to, really it's up to the discretion

22  of -- for me, discretion.

23     Q   Sure.

24     A   If I use my discretion, say hey, this person

25  was speeding, I'm going to go do the traffic stop.

71

1     Q   Okay.  So unpack that for me.  Like how do

2  you -- how would you, Deputy Gereb, make the decision

3  that a traffic violation merited making a stop?

4     A   Again, discretion.  If they're in violation of

5  the Transportation Code, I make a stop based on the

6  Transportation Code and go from there.

7     Q   Yeah.  So does that mean that every time you

8  saw a traffic violation, if you weren't busy doing

9  something else, you made a stop?

10     A   No.  Not always.

11     Q   Okay.  So when you saw a traffic stop -- a

12  traffic violation, when would you choose to make a stop?

13     A   Discretionary wise, if I was a patrolman,

14  sometimes it would be if it was just multiple violations

15  and it was at this point like hey I need to, I'm going to

16  go stop this person.  They're going to hurt somebody,

17  they're going to hurt themselves, let's go from there,

18  see what's going on.

19     Q   So when you were doing the patrol deputy role

20  and you're making traffic stops, you're focused on

21  safety?

22     A   Primarily safety, yes.

23     Q   And you're making the decision to stop when

24  you're concerned that there's some kind of safety issue?

25    A    Yes, ma'am.

72

1    Q    Is that fair?  Can you help me understand what

2  is a, what's a moving violation?

3    A    So it could be failing to maintain lanes,

4  you're swerving in your lane, you're going over the lane

5  markers, they're going, you're speeding, you're not using

6  your turn signal, you're making an improper turn, you're

7  going too wide on your turn.  As long as the vehicle's in

8  movement, then that's a moving violation.

9    Q    So then I guess that means you would

10  characterize things like not having a valid license plate

11  or having like a taillight out as something else?

12    A    That would be equipment violation.

13    Q    Okay.  So if it's something with the car, it's

14  an equipment violation?

15    A    Yes, ma'am.

16    Q    And if it's something that you do while

17  physically driving, it's a moving violation?

18    A    Yes, ma'am.

19    Q    Is there any other type of violation, am I

20  missing any other category?

21    A    No, ma'am.

22    Q    So it's either a moving violation or equipment

23  violation?

24    A    Yes, ma'am.

25     Q   It seems like there's probably a range of

73

1  moving violations, and I'm sure you kind of indicated

2  that you see drivers speeding and weaving, committing

3  maybe a series of multiple moving violations at a time,

4  and then there's situations where someone might fail to

5  signal before making a turn.  What kinds of offenses

6  would you characterize as minor moving violations?

7     A   All violations are considered minor.  It's a

8  Class C citation.  It's not a -- it's not necessarily an

9  arrestable offense.  It's something that can be used

10  discretion as a warning or citation.

11     Q   Okay.  It also seems like there are moving

12  violations with clear criteria, speed limit is 25 miles

13  per hour, and you're going 40 miles per hour, that is

14  speeding.  It also -- but there seems to be violations

15  that are harder to tell, like for instance I think the

16  rule is like you have to signal 100 feet before you

17  change lanes, and if you fail to signal appropriately.

18  How -- how do you evaluate the ones that are failure to

19  signal in enough time?

20     A   In that situation, I look at it as okay did

21  they give it, were they already turning and they

22  activated their signal on, were they already in the lane

23  when they activated their signal?  What was their action.

24        If they're -- if it appears that there was

25  enough time to make a proper turn and use the signal and

74

1  they used the signal properly and they made a proper

2  turn, then that's something, okay, let it go.  It's not

3  worth the probable -- there's no probable cause to pull

4  them over.

5     Q   Okay.  So if you see -- like help me understand

6  that last sentence.  If you see a violation, let's say

7  they didn't signal early enough like we were just talking

8  about, why wouldn't there be probable cause if you saw

9  them not -- if you saw a driver who didn't signal, you

10  know, 100 feet before the turn, that seems like it would

11  be a violation.

12     A   Yes, ma'am.

13     Q   So why wouldn't you have probable cause to pull

14  them over?

15     A   I'm sorry, no I meant, like I said, if there

16  was a significant distance.  So if they --

17     Q   Okay.

18     A   If there was a significant distance and they

19  turned their signal on and took the turn, okay, there's

20  no probable cause.

21     Q   Okay.

22     A   To actually stop them.

23     Q   Sure.  And how would other factors impact your

24  decision to stop someone?  So would time of day, for

25  example, impact your decision to make a traffic stop?

                           75

1     A   No, ma'am.

2     Q   Okay.  Would weather impact your decision to

3  make a traffic stop?

4      A    Yes.  Discretionary.  If it's pouring rain out

5  and you're driving 100 miles an hour then that would be a

6  reason to stop you because it's a safety issue at that

7  point.

8      Q    Sure.

9      A    But if it's say weather and you know, you can't

10  really see the road, then, you know, you're kind of

11  sweeping over, then at that point, also stop them for

12  safety, just give them a warning, hey be careful.  But if

13  it's just weather-based and, you know, there's nothing

14  really going on, there's nothing, nobody's committing any

15  violations, I'm not going to stop somebody.

16      Q    Okay.  And we talked just a little bit about

17  time of day and you said that doesn't impact the decision

18  to stop.  But I would assume that like at 2:15 a.m., when

19  all the bars close, you might stop people for things that

20  you wouldn't necessarily stop them at noon.  Is that

21  fair?

22      A    No, ma'am.

23      Q    Or am I incorrect?  Feel free to like disagree

24  with me.

25      A    No, ma'am.  When I was assigned to patrol, I

                                76

1  worked the midday part of the day.  So either from 2:00

2  or 3:00 p.m. to 10:00 or 11:00 o'clock at night.

3      Q    Okay.

4    A    And so if it was at high noon or --

5    Q    You weren't doing the bar closing shift?

6    A    I have done DWIs.

7    Q    Okay.

8    A    I did -- I volunteered to do the STEP program,

9  which was at a stated granted program.

10    Q    Sure.

11    A    For traffic.  I liked doing DWIs, again I was

12  on the DWI unit so I would go out and volunteer so that

13  way I could do traffic violations.

14    Q    Uh-huh.

15    A    But during the day -- and I've worked all times

16  during the day, probably 24 hours around the clock, I've

17  worked every single, probably every single hour.  The

18  same violations are the same all the way around.  There's

19  no difference.

20    Q    Okay.  So you see the same violations at every

21  time of day?

22    A    Yes, ma'am.

23    Q    Okay.  What about other factors in deciding to

24  make a traffic stop for a minor -- for a moving

25  violation, would you say that you would make a traffic
                                77

1  stop of a Mercedes-Benz the same as you would make of a,

2  like jalopy looking pickup truck?

3    A    No, ma'am.

4    Q    So you wouldn't -- like your traffic

5  enforcement, as a law enforcement patrol deputy, didn't

6  change based on the type of car?

7     A    No, ma'am.

8     Q    When you were a patrol deputy, you told me that

9  you exercised your discretion to make traffic stops.  Is

10  that fair?

11    A    Yes, ma'am.

12    Q    And you told me that you were proactive, and

13  only proactive deputies really were out there making

14  traffic stops.  Is that fair?

15    A    Yes, ma'am.

16    Q    And so if you're, at least when you were a

17  patrol deputy, no one was required to make traffic stops.

18    A    No, ma'am.

19    Q    Okay.  And because you were proactive and made

20  traffic stops, did you get recognized for that?

21    A    No, ma'am.

22    Q    No one ever said Deputy Gereb, thank you for,

23  you know, devoting that extra 5 percent of your time to

24  making the streets safer?

25    A    No, ma'am.

                              78

1     Q    Okay.  Anybody need a break?

2     A    I'm good.

3     Q    Okay.  Did you -- we talked about the fact that

4  you didn't necessarily get any praise for going out of

5  your way to work harder.  Did anybody ever evaluate how

6  you were conducting traffic stops?  And here's what I

7 mean by that.  Did anyone ever ride along with you and

8 say you're spotting traffic violations correctly?

9    A   No, ma'am.

10   Q   Okay.  So how did you learn how to spot a

11 traffic violation?

12   A   Through -- through FTO, field training officer.

13   Q   FTO?

14   A   Or as we -- that's the standard term.  The

15 Bexar County Sheriff's Office calls it a patrol training

16 officer.  PTO or FTO.

17   Q   Is that a particular training that you take?

18   A   That they took, yes.

19   Q   I don't understand.  I'm sorry.

20   A   So to become a training officer, a recognized

21 training officer, you go through a course.

22   Q   Okay.

23   A   I have never taken it -- I took it once, but

24 that was in the jail.

25   Q   Okay.
                        79

1    A   But I never actually trained anybody on that.

2 But they ride along with them, they show you how to

3 recognize traffic, they show you how to enforce traffic

4 law.  There is one week, at the time when I went through

5 the PTO process, that we are, we were required to ride

6 out with the DWI unit.  And at that time they showed us

7 how to enforce DWI and traffic law.

8    Q   Okay.  So let me make sure I understood that.

9   When you were -- before you became a patrol deputy, you

10  did a training with a certified instructor who rode along

11  with you?

12      A   Yes.  It's not a certified instructor -- oh,

13  for the PTO phase, yes.

14      Q   PTO.help me understand what PTO stands for?

15      A   Patrol training officer.

16      Q   Okay.  Patrol training officer?

17      A   For the PTO process, yes.

18      Q   Okay.

19      A   You were assigned to a person for a certain

20  amount of time and then you guys ride out together.  And

21  they tell you this is what you're doing with this call.

22  This is -- they train you how to be a patrolman.  Then

23  during that time frame, we were assigned one week that we

24  rode out with the traffic unit for doing the DWI process.

25      Q   Okay.  So when you were getting trained as a
                                80

 1  patrol officer, you did a period of time with the patrol

 2  training officer where you rode along?

 3      A   Yes.

 4      Q   About how long was that?

 5      A   15 weeks.

 6      Q   Long period of time.  Okay.  Then you did a

 7  single week with the DWI unit you rode along with them?

 8      A   Yes, ma'am.

 9      Q   Am I understanding that correctly?

10   A   Yes, ma'am.

11   Q   And when you rode along with the DWI unit, you

12 were focused on learning about the DWI enforcement

13 process?

14   A   Yes, ma'am.

15   Q   Is that fair?  Was there ever a separate

16 process for learning about just traffic violations in

17 general?

18   A   You're taught that when you go through the,

19 you're getting your peace officer's license, you are

20 taught through Transportation Code.  And then with the

21 Sheriff's, with the Bexar County Sheriff's Office, to

22 come out to patrol, you have to go back through a patrol

23 academy, which is, at the time for me was another 15

24 weeks.  So we did the 15 weeks of patrol training.

25   Q   Uh-huh.

                                81

1   A   Then did another 15 weeks with a patrol

2 training officer.

3   Q   Okay.  So there's the classroom component for

4 15 weeks.

5   A   Yes, ma'am.

6   Q   Am I understanding that correctly?  And then

7 there's the field component with the patrol training

8 officer that you ride along with.

9   A   Yes, ma'am.

10   Q   Is that fair?

11   A   Yes, ma'am.

12  Q   Okay.  Did you ever make a traffic stop or pull

13  someone over, I guess did you ever pull someone over if

14  you weren't certain there was a traffic violation?  Maybe

15  you just wanted to ask them what was going on?

16  A   No, ma'am.

17  Q   Okay.

18  A   This is me personally, I like multiple

19  violations.

20  Q   Yeah.

21  A   So if there's -- if I pull you over, there's no

22  doubt that you did commit a traffic violation.

23  Q   Okay.  So you personally, you're going to pull

24  someone over if there are multiple traffic violations.

25      I'll give you a really good story.  When I was

                              82

1  in high school, the only time I've really been pulled

2  over, I got pulled over, and I was pulled over because my

3  scarf had gotten stuck in the door, and I was driving

4  along and it was flapping in the wind.

5      And I was terrified, right?  I was a kid.  I

6  was terrified when the police officer pulled me over.  I

7  was freaking out, started crying already because I didn't

8  know what was going on.  He just wanted to tell me that

9  my scarf was flapping in the door, which was really kind

10  of him.

11      And so that was like an example.  He obviously

12  made a stop.  There was no -- I guess maybe there's a

13  minor -- that might be an equipment failure, given my

14  flapping scarf.  So would that be a traffic violation?

15     A    That would be considered assist the public.

16     Q    Okay.  So that would be assist the public.  So

17  if you stop someone looks like their kid is having a melt

18  down in the back seat or their hazards are stuck on or

19  something like that you would classify that as is not a

20  traffic stop?

21     A    No.  If me personally if I see like hey your

22  gas tank cap is hanging out from your thing, I'll pull up

23  next to you honk the horn like hey your thing is open.

24  Your, you know, or I'll let them know, like hey, you got

25  a flat tire.  If they need assistance from that point,

83

1  then I will go from that point.

2     Q    Okay.

3     A    But I'm not going to pull you -- me personally,

4  I won't pull you over unless I have those multiple

5  violations.

6         Now, if there's -- I'm not going to say I

7  haven't done it where there's single violation but me

8  personally I like multiple.

9     Q    Okay.  Can we talk a little bit about like

10  after the car is stopped and conducting the rest of the

11  stop?  And I want to learn more of like the typical

12  process for when you were a patrol deputy of how you went

13  through things.

14         Let's say that you pulled over a red Toyota and

15 you determined that this red Toyota didn't signal early

16 enough before changing lanes like we were kind of talking

17 about before.  You turn on your lights and you pull the

18 Toyota over.  And like both cars are stopped safely on

19 the side of the road.  What do you do next?

20    A    Well, I exit my patrol vehicle then I would

21 take the safest route to approach the vehicle.  If

22 there's room on the, like on the sidewalk or a shoulder,

23 then I'll approach them on the passenger's side.  And

24 then I'll just, I'll make contact with the -- well, first

25 I'll observe the vehicle, see what's going on, any extra

84

1 movement, any, anything like that.  You know, just for

2 safety, make sure they're not trying to grab something

3 that might harm me.

4       Walk up to the vehicle, let them know, hey,

5 Deputy Gereb with the Bexar County Sheriff's Office this

6 is the reason I'm stopping you.  Can I get your driver's

7 license and proof of insurance.

8    Q    Okay.  Before you get out of the vehicle, do

9 you have to do anything with your computer or run

10 anything at that time?

11    A    Yes.  So what we'll do is we'll put the license

12 plate in or if we get time -- me personally, I rush

13 myself.  I will already have run your license plate and

14 then I'll just press the traffic, that I'm doing a

15 traffic stop.

16    Q   Okay.  So help me unpack that.

17    A   So if I've made the decision -- you can run

18  information without initiating a call.  So --

19    Q   Okay.  So you can just run someone's like

20  plate?

21    A   Yes.

22    Q   Before you say I'm making a stop?

23    A   Yes.

24    Q   Okay.

25    A   It's -- the license plates are public

                              85

1  information.

2    Q   Okay.

3    A   So you can run like Tahoe, my patrol vehicle,

4  you can run my personal vehicle and it's public

5  information.

6    Q   Okay.

7    A   So if I deem that there's a reason to stop you,

8  then I already have your plate ran and I'll just initiate

9  a call, a call or an officer initiated a call by

10  activating, you know, the option for a traffic stop.

11    Q   Okay.  So let me make sure I understand this.

12  You have already usually entered the person's license

13  plate number into your system, and then when you are

14  stopped safely on the side of the road, you just hit a

15  button that says activate the traffic stop or make the

16  traffic stop?

17    A   Before I stop you, I'll activate my lights, and

18  then I'm activating the traffic stop on the computer

19  after I do that.

20    Q    Okay.  So the first step is you activate your

21  lights?

22    A    Yes.

23    Q    The second step is?

24    A    I'll activate my, my, the call.

25    Q    Okay.  So you hit the traffic stop button?
                              86

1    A    Yes.

2    Q    Okay.

3    A    And then I'll pull over.  And the reason I like

4  to -- the reason I prefer to do it in that order is

5  because the cameras start rolling.

6    Q    Okay.  That makes sense to me.

7        And so before -- so backing up a little bit,

8  that means before you get out to approach in the safest

9  manner, you've already run the license plate.

10    A    Yes.  And the reason I do that is, one, I get

11  the information.  Two is that, one, I'm not making the

12  mistake of pulling with the license plate, because

13  sometimes we'll run a plate and if you get one digit off

14  that might say the car is stolen and it's not, it's one

15  digit wrong.

16    Q    Okay.

17    A    Number two if the car decides they want to

18  evade police in that vehicle then I have that vehicle's

19 information and if it means the criteria for a vehicle

20 pursuit, then we'll go from there.  If it doesn't meet

21 the criteria for pursuit, I can still put down that that

22 vehicle evaded from police and I can write up a case

23 against that vehicle.

24    Q   Okay.  So I understand the pursuit part.  Can

25 you back up a little bit about the piece where one digit

87

1 might be off?

2    A   Yes, ma'am.

3    Q   So you're driving, you're trying to input the

4 license plate number in, and I can easily see like you

5 missed the 4 and you meant to hit the 5.

6    A   Yes.  Or you can see like an 8 instead of a B.

7    Q   Okay.

8    A   Or a W might be an N or an M.

9    Q   Okay.

10    A   So it could be similar letters.  Like K looks

11 like an X in the State of Texas.

12    Q   I can see that.

13    A   So it's -- so it could be the misreading of a

14 license plate.

15    Q   Okay.

16    A   So I like to make sure I'm pulling over the

17 right vehicle.  Because again if that vehicle takes off,

18 does that, then I have information on the vehicle

19 already.

20    Q   So when you're entering it you double check to

21  make sure this license plate inches what I've just input?

22     A    Yes, ma'am.

23     Q    And then you have it all set up so that by the

24  time you turn on your lights and you hit the main traffic

25  stop everything's kind of pre-going?
88

1     A    Yes, ma'am.

2     Q    And then you get out?

3     A    Yes, ma'am.

4     Q    Is that fair?  Well actually, before you get

5  out, do you tell anybody that you made a traffic stop?

6     A    No, ma'am.  So the -- the -- when we initiate a

7  call, whether it's any type of officer initiated

8  activity, it will automatically go to dispatch.  And

9  dispatch is to identify that, hey, so-and-so, I see

10  you're on a traffic stop.  And then that's it.  Then

11  because traffic stops are officer initiated, there is a

12  certain amount of time that we have to let them know that

13  we are okay.  So we can either do it by the radio or

14  there's a button in there that we can press says secure

15  let's them know hey this guy is okay, and we don't have

16  to alert everybody and their mom to try to come out and

17  save them.

18     Q    Okay.  So you don't, if you don't like let

19  everybody know that you're okay, it's just silent, they

20  might come looking for you?

21     A    Yes, ma'am.

22    Q    Okay.

23    A    And they'll send out an alert.

24    Q    Okay.  It will?

25    A    Yes.

89

1    Q    How long do you have before it sends out an

2 alert?

3    A    Initially, I believe it's two or three minutes.

4    Q    Okay.

5    A    They'll say, hey, you know, I am -- I'm secure.

6 Or if they haven't done that, they'll call your call sign

7 and they'll say are you secure?  If you haven't

8 responded, they'll call it again, are you secure?  After

9 the third time, if you have not let them know that you're

10 okay or you haven't secured yourself on the computer,

11 they will tone -- do what we call tone out.  They'll let

12 everybody know, like hey, he might be in trouble, you

13 need to get over there.

14    Q    Okay.  That's really helpful.

15         So generally, you're required to let everybody

16 know within a certain time that you're secure.

17    A    Yes, ma'am.

18    Q    Once the driver handed you, you came over,

19 walked over in a safe manner, you asked the driver for

20 the license?

21    A    Yes, ma'am.

22    Q    Is the next step is that fair?

23    A    No we go up, identify ourselves.

24     Q    Okay.

25     A    Hey I'm so-and-so with the Bexar County
                          90

1  Sheriff's Office.  The reason I'm stopping you today is,

2  for speeding or whatever the offenses are.  Can I get

3  your license and proof of insurance.

4     Q    Okay.  So you, and you get both of those.

5          After the driver hands those things over to

6  you, hands over their license and their proof of

7  insurance, about how long on average would it take you to

8  finish the rest of the stop?

9     A    It really depends on the first interaction.

10    Q    Okay.

11    A    For me it does.  If I see something, behavior

12  traits or --

13    Q    Sure?

14    A    Or I feel like there's some type of activity,

15  criminal activity going on, then I'll extend from there.

16    Q    Okay.  And so assuming that like there's

17  nothing suspicious, nothing raises your spidey sense,

18  nothing untoward happens, on average how long would a

19  like generic traffic stop take?

20    A    For me, 10 to 15 minutes.

21    Q    10 to 15 minutes.  Okay.  And how would you

22  decide whether to give a warning or an official ticket?

23  What do you call an official ticket?

24    A    Citation.

25    Q   Okay.  So how do you decide to give a warning

91

1 or citation?

2    A   Again, it's discretion.

3    Q   Okay.

4    A   If I have multiple offenses and your,

5 everything's just not good with your vehicle, or good

6 with your, you don't have a driver's license, things of

7 that nature, I'll use my discretion to say, okay, I'm

8 going to give you a citation for this, and which is what

9 you're receiving a citation for.

10    Q   Okay.

11    A   And I go from there.

12    Q   And when, when do you usually make the decision

13 whether to give out a warning or a citation?

14    A   Usually when I get back to my patrol vehicle.

15    Q   Okay.  So when you return to the patrol

16 vehicle, maybe based on the interaction of the driver you

17 make a decision on what they're going to get?

18    A   Yes, ma'am.

19    Q   Is that fair?  Okay.  And what percentage of

20 the time would you say you give someone a warning?

21    A   I would say primarily I give more warnings than

22 I do citations.

23    Q   Okay.  So more than 50 percent warnings?  More

24 than 90 percent warnings?

25    A   I try to do -- I try to do I guess say 40/60.

92

1   Q   Okay.  So 40 percent?

2   A   Citations.

3   Q   Citations, 60 percent warnings?

4   A   Yes, ma'am.

5   Q   Okay.  Once the driver hands over their license

6 to you, about how -- about how long does it take you to

7 check the license and run all the checks that you need to

8 with the insurance and the license?

9   A   Probably a couple minutes.

10   Q   So you said the whole stop takes you 10 to 15,

11 probably somewhere around 10?

12   A   Yeah.  So with Texas driver's licenses, or IDs,

13 it will come back if they've ever been given a citation

14 before, when it was, if there are license was suspended

15 or invalid.  It will show us when it was and when it's

16 due to renew or be reinstated.

17   Q   Okay.  So it sounds like you just type in the

18 driver's license number into your CAD and the like

19 information on the license comes back?

20   A   Yes, ma'am.

21   Q   And is that pretty quick?

22   A   Yes, ma'am.

23   Q   About how long would that take?

24   A   I would say 5 to 10 seconds.

25   Q   Okay.  So it's not like a, oh, the computer is
93

1 loading?

2   A   Sometimes it could be if there's an issue, you

3 know, a bigger issue, like if there's internet issues or

4 network issues, then it will take, sometimes it will take

5 a little longer.  But for the most part, no, it's usually

6 5 to 10 seconds.

7    Q   And when you say it takes a little longer, like

8 maybe one minute or two versus like a couple seconds.  Is

9 that fair?

10    A   It could be a minute or two.  It just depends

11 on if there's a, what they call CAD issues, there's a

12 service issue.

13    Q   Okay.

14    A   The network's being uploaded or something's

15 going on with, the network itself.  Not anything in

16 particular we're doing, just something like a bigger,

17 broader issue.

18    Q   Like the AT&T outage we just had?

19    A   Yes, ma'am.

20    Q   So if there was some kind of computer issue,

21 network issue, how would that be recorded?  Would that be

22 on, somewhere on the system or it would just be like it

23 took 10 minutes for the computer to load?

24    A   It will give you a time stamp.

25    Q   Okay.

                              94

1    A   When you get your return.

2    Q   Okay.

3    A   Or when you, I believe it's when you researched

4  it and when you got your return.  And then again, if

5  there's no -- if we're having issues with the network

6  itself.

7     Q    Sure.

8     A    Just write out your warning or citation, print

9  it out and you can hand it back to them.

10    Q    Okay.  So walk me through this a little bit.

11  And we're going to take a couple steps back.  You, you

12  know, ran the check on the license plate.  You turned on

13  your lights.  You had them make the stop.  You checked to

14  make sure everything's safe.  You indicate that you're

15  secure.

16    A    Uh-huh.

17    Q    You get out of the patrol vehicle.  You walk

18  around to either the driver's side or the passenger's

19  side, depending on which one's safer.  Is that fair?

20    A    Yes, ma'am.

21    Q    The next step is you identify yourself.  Is

22  that correct?

23    A    Yes, ma'am.

24    Q    And then you ask for their information?

25    A    Well, we notify them the reasons for the stop.
                                95

1     Q    Okay.  Thanks.  So you identify yourself, you

2  notify them for the reason for the stop and then?

3     A    Yes, ma'am.

4     Q    You ask for their information.  Is that all

5  fair?

6    A   Yes, ma'am.

7    Q   And then you took the driver's license and

8  insurance information back to your patrol vehicle?

9    A   Yes, ma'am.

10   Q   To run the information.  Is that fair?

11   A   Yes, ma'am.

12   Q   And then you decide whether to give a warning

13 or a citation?

14   A   Yes, ma'am.

15   Q   And then what do you do next?

16   A   I walk back to the vehicle and I'll return the

17 information.  If they get a citation, I'll explain to

18 them what it is.  If I can, I'll circle the information,

19 where they need to go to court, when the Court date is,

20 how to contact the Court, which is all listed on our

21 citations, and what times, phone numbers, anything of

22 that nature.

23   Q   Okay.  And after you've kind of gone over the,

24 either the warning or the citation with the driver, what

25 happens next?

                          96

1    A   If there's -- once I've handed all that back, I

2  tell them, you know, drive safe, have a good day.

3    Q   Okay.  And when you were a patrol deputy, did

4  you have to do anything else to end the stop?

5    A   We typically put in, well, whatever our actions

6  were on the, they get what's called a key card, basically

7  acknowledges that you're on a call.  And you'll put down,

8  you know, what we did, a citation or warning, body camera

9  available, and then we'll clear -- we'll do what they

10  call clearing out the call and then we'll go to --

11  there's a button that says, I want to say it's primary --

12  primary.  We'll click it and we'll put down, click the

13  button that says citation, and -- or what we'll do it

14  will give us an option of citation or warning issued and

15  whatever we chose to do, that will be it for the call.

16     Q   Okay.  So let me make sure I understood that.

17  So after you say have a nice day, you let them drive off?

18     A   Yes, ma'am.

19     Q   Is that fair?  And then you go back to your

20  vehicle?

21     A   Yes, ma'am.

22     Q   Then you do a bunch of clean up items and

23  follow up items to end the stop.  Is that fair?

24     A   Yes, ma'am.

25     Q   And you mentioned key card notes?
                              97

1     A   Yes.

2     Q   Can you explain to me what those are?

3     A   Just what you did.  So it could be.

4     Q   Type in your computer, here's what I just did?

5     A   Yeah.  So when we clear out a call we'll put

6  down DAR, daily activity report.  OIA for officer

7  initiated activity.  Traffic stop, warning or citation,

8  whatever we put.  And then I'll go to -- I'll press enter

9   and then I'll put down to go to the next line, I put BWC,

10  which is body worn camera available.

11   Q   Okay.

12   A   And then clear it out.

13   Q   What do you mean by clear it out?

14   A   Close out the call.ment I think it says primary

15  available and then we'll go.

16   Q   So like the unit is now available?

17   A   Yes.

18   Q   Okay.  I get it.  That was super helpful.  So

19  to close out the call you just basically turn your, your

20  taxicab light back on I'm available?

21   A   Yes.

22   Q   For another call.  Okay.  When you were making

23  stops as a patrol deputy, did you ever ask the driver to

24  step out of the vehicle?

25   A   Yes, ma'am.

                                98

1   Q   And what would prompt you to ask a driver to

2  step out of the vehicle?

3   A   Based on if I, if I smelled any kind of,

4  anything going on, like plain view, or if I smelled like

5  say marijuana in the vehicle.  And then I'd ask them

6  to -- if I observed their behavior and they appear to be

7  like extremely nervous, depending on what the behavior

8  is, if they've been drinking, you know, I'll have them

9  get out of the vehicle.  If they didn't have a driver's

10  license, I'll have them come to the rear of the vehicle

11  and we'll address it from there.

12    Q   Okay.  And what would you -- you see something

13  in plain view, you see marijuana, you smell marijuana,

14  you see like their behavior as extremely nervous or you

15  can tell alcohol if they've been drinking or they didn't

16  have a driver's license, those are the examples you gave

17  me and I'm sure there may be more.  What do you do next?

18  Where would you have the driver step out to?

19    A   So at times, when -- typically, I would have

20  them stand between their vehicle and my patrol vehicle.

21  If they were next to the sidewalk, I would stand on the

22  sidewalk.  When I was working with Deputy Babb, we would

23  write interviews.  Sometimes we would have them sit

24  inside the vehicle.

25    Q   Okay.  So did you work, you just mentioned, we
                              99

1  were talking about your patrol deputy experience?

2    A   Yeah.

3    Q   Did you work with Deputy Babb when you were at

4  patrol deputy?

5    A   No, ma'am.  He worked on the east side.  I

6  worked the west side.

7    Q   Okay.  So you didn't work with Deputy Babb when

8  you were doing patrol work.

9    A   No, ma'am.

10    Q   Okay.  So focusing on your --

11    A   Patrol days.

12    Q    -- patrol work --

13    A    Okay.

14    Q    Yeah, your patrol days --

15         THE REPORTER:  Okay.  Could y'all slow down?

16 And you're kind of talking over each other.

17         THE WITNESS:  Oh, I apologize.

18         MS. HEBERT:  Thank you, Molly.  Sorry.  I

19 apologize.

20    Q    (By Ms. Hebert) I know this is not like

21 necessarily a natural conversation, because Molly has to

22 record everything.  So my apologies.  I also tend to

23 interrupt people once I understand what they're trying to

24 say.  So my apologies.

25         We were talking about when you ask people to
                                100

1 get out of their vehicle or you told people to get out of

2 their vehicle.  As a patrol deputy, when you told people

3 to get out of their vehicle, you just indicated that you

4 had them stand behind the patrol car or on the sidewalk.

5 Is that fair?

6    A    No.  Behind their vehicle, so there's an area

7 between.

8    Q    Oh, behind their vehicle and between the

9 patrol --

10    A    Yes.  Or if I can have them stand safely on the

11 side of the road or on the sidewalk, that's what I would

12 do.

13    Q    Okay.  When you were a patrol deputy, how often

14  would you have someone come sit in your patrol car?

15    A    Never.

16    Q    Why is that?

17    A    I had never done it before.

18    Q    Okay.

19    A    I wasn't -- I wasn't versed in how that works.

20    Q    Sure.  And when you were a patrol deputy, did

21  you ever search a car?

22    A    Yes, ma'am.

23    Q    And what would cause you to search a car?

24    A    Reasonable suspicion.

25    Q    Okay.  Unpack that for me.  What do you mean by
                                    101

1  reasonable suspicion?

2    A    It could be the odor of marijuana, it could be

3  someone's -- I'm sorry, reasonable suspicion, if I had --

4  if I've been proactive about it, if I had some type of

5  reasonable suspicion, or they give you consent.

6    Q    Okay.

7    A    Or inventorying the vehicle.

8    Q    Okay.  So the three reasons you would search a

9  vehicle, if you got consent, there is a reasonable

10  suspicion of a crime?

11    A    Yes, ma'am.

12    Q    And then the last one you said inventory a

13  vehicle?

14    A    Inventory search of a vehicle, yes.

15    Q    Okay.  So let's talk about consent.  When would

16  you ask for consent to search a vehicle?

17    A    I would ask for consent when I had reasonable

18  suspicion this something was going on.

19    Q    Okay.

20    A    And usually, if I didn't feel like something

21  was going on then I didn't search the vehicle.  I didn't

22  bother asking.  And I'm the same way about if I have

23  somebody step out of the vehicle.

24    Q    All right.  Help me understand what you mean

25  about the same way about stepping someone out of the
                                    102

1  vehicle.

2    A    So if, like I said, well let me go back here.

3  If you don't have a driver's license, I'm going to have

4  you step out anyway.  That's because you are technically

5  not supposed to be behind the wheel.  But if it's just a,

6  your, everything's checking out, everything looks okay,

7  then I'm just going to go ahead and get you on your way.

8         But if I have that reasonable suspicion that

9  something's -- that the driver is up to something, or if

10  he has other occupants, if there's something else going

11  on in the vehicle, then I'm going to go from there.

12    Q    Okay.  When you say go from there, what do you

13  mean, what would you do next?

14    A    I'll have the driver step out, walk to a safe

15  area, and then we'll go -- we'll have our interaction

16  there, you know, interview them on the side of the road.

17    Q    Okay.  And what would that interview look like?

18    A    Where are you going, where are you coming from,

19  get to the side of the -- get their story, you know, hey,

20  I'm going to my friend's house over here.  Okay.  Where

21  are you going to after that?  Oh, going to this.  And

22  then where are you coming from now?  Who are the people,

23  if they have multiple passengers in the vehicle, or a

24  passenger in the vehicle, who is this relation to you.

25    Q    Okay.

103

1    A    So just really go from, from simple interaction

2  to, you know, a huge area.  Just a lot goes on.

3    Q    Okay.  So help me understand, why do you tell

4  the driver to get out of the vehicle?  Like why not have

5  the interview where you're talking to them through the

6  car?  Just curious?

7    A    Because if there's people in the -- if there's

8  multiple people in the vehicle, I'd rather have them step

9  out and if there is someone in that vehicle that might be

10  up to no good, then I want him, I want to keep them

11  separated.

12    Q    Okay.

13    A    Then I want to keep stories separated as well.

14    Q    Okay.

15    A    So if, if there are just two people, passenger,

16  driver, I want to know what he's talking, what his story

17  is and what that passenger's story is.

18    Q    So what about when there's only one person in

19  the car?

20    A    If there's only one person in the car, again,

21  behavior.  Sometimes I've done it in the car as well.  It

22  really just depends on area surrounding, behavior.  If

23  there is someone in the vehicle and I still will have --

24  if I feel that I'm going to do a search based on

25  reasonable suspicion, then I'm going to have them step

                                104

 1  out because I don't want them in the vehicle with me.

 2  And then on top of that if they have a weapon of some

 3  type, you know, officer safety dictates as well.

 4    Q    Okay.  I think you said if you have reasonable

 5  suspicion you're going to ask for consent.  Is that fair?

 6    A    Yes.

 7    Q    Does that mean you always ask for consent

 8  before you search the vehicle?

 9    A    I typically do.  It still shows that I'm trying

10  to work with this person as well.

11    Q    Okay.  Do you ever ask for consent if you don't

12  have reasonable suspicion?

13    A    No.

14    Q    Okay.  And what happens, when you were a patrol

15  deputy, would people ever say no?

16    A    There are some that would be -- that would

17  challenge it.  And then again, I also look at too is what

18  is the totality of everything.  What is it, is this

19 really worth going down this road.  What is this person,

20 you know, what is this person -- if they're just saying,

21 no, I don't want to, then okay.  But if they are

22 instructed to, then yes, they are required to step out.

23     Q   Okay.  I'm going to just take a step back

24 there.  So it seems like your default, just Deputy

25 Gereb's practice, is to always ask for consent if you're

                          105

 1 thinking that you need to search the vehicle.  Is that

 2 fair?

 3     A   Yes, ma'am.

 4     Q   And then if they say no, sometimes you let them

 5 go, as a patrol deputy?

 6     A   If my reasonable suspicion is there, then yes,

 7 I will, I will go -- will go beyond that.  Meaning that,

 8 okay, you're telling me no.  Okay.  You know, based on

 9 one of the interview questions I do ask, based on the

10 reactions to certain questions, then whether it will

11 dictate okay then I'm going to cut them loose, let them

12 be on their way, or I'm going to request a canine.

13     Q   Okay.  So I think that's fair.  So if they say

14 no to consent to a search, you're going to do some

15 additional investigation.  Is that fair?

16     A   Due to when I get to the point of the search,

17 I've already asked the questions I needed to ask.

18     Q   Okay.

19     A   And at that point, it's their reaction to my

20 questions that, that will allow me to dictate whether I'm

21  going to ask to search the vehicle or if I need to go

22  further with the stop.

23     Q    Okay.  So you're either going to ask for

24  consent to search the vehicle or you're going to do

25  something else?

106

1     A    If it's required, yes.

2     Q    And what do those other required things look

3  like?

4     A    Well, if they say no, then I will request a

5  canine.  If I feel that it's warranted for that

6  situation.

7     Q    Okay.  If they've said no, you feel like you

8  still have reasonable suspicion to search the vehicle,

9  would you ever not call the canine and just go to the

10  search directly?

11     A    No, ma'am.

12     Q    Okay.  So the normal practice, as patrol

13  deputy, was ask for consent to search.  They say no, and

14  you feel like you still have reasonable suspicion, you

15  call the canine to sniff the vehicle; is that correct?

16     A    Yes, ma'am.

17     Q    Okay.  And about how many times as a patrol

18  deputy did you call for a canine?

19     A    Very rarely.

20     Q    Okay.

21     A    I would say maybe, if I did 100 traffic stops,

22  maybe five.

23    Q   Okay.  So five, maybe 5 percent of the traffic

24  stops that you did you called for a canine.  And were

25  canine units always available when you called?

1    A   No, ma'am.

2    Q   So sometimes they would say sorry, there's no

3  canine unit available?

4    A   They would say no canine available or -- I look

5  at the distance too.  If the distance, if they're on the

6  other side of the County, there's -- there's no way.  I'm

7  not going to, I'm not going to have someone come out.

8  I'll see if there's -- if our canines are not

9  available --

10    Q   Like our being the Sheriff's Office?

11    A   The Sheriff's Office canines are not available,

12  I'll see if San Antonio Police Department has one

13  available or any of the municipalities might have one

14  available.

15    Q   Okay.  So how do you -- you're thinking you're

16  going to call for a canine.  How do you call for a

17  canine?

18    A   I get on the, the radio.

19    Q   Okay.

20    A   And I ask dispatch, do we have a canine

21  available to come out and do a sniff.

22    Q   Okay.  And they say yes, they have a canine

23  available, how do you check the distance?

24      A    I go to the map and see where they're at.

25      Q    Okay.  So the map that we talked about before

                                  108

1  on the CAD pops up with their locations?

2      A    Yes, ma'am.

3      Q    And as a general rule of thumb, what would be

4  too far?

5      A    Well, for me -- Bexar County is a big county.

6  If you're -- if I'm all the way on Highway 90 going out

7  towards Castroville, at the county line, and you're all

8  the way over on the northeast side, where there's high

9  traffic and stuff like that, you know, I'll take into

10  consideration, you know, hey, do -- how long, you know,

11  will this person take to get here.

12      Q    Okay.

13      A    But sometimes too I've been known to call, hey

14  man, how long are you out?  I don't want to have you come

15  all the way over here and we, you know, basically just,

16  just takes too long.

17      Q    Okay.

18      A    They'll let me know.

19      Q    And if it would have taken too long, let's say

20  they're on the other side of the county and it would

21  require them to go through traffic, what would you do?

22      A    I'd cut that person loose.

23      Q    Okay.

24      A    Again it comes to the point of how long is too

25  long.  How long are we going to take with this stop.

1    Q    Do you have a rule of thumb what is too long?

2    A    No.  I look at -- yes and no.  If you're

3  pushing 30 minutes, then that's way too long, for me

4  personally.  I know that there's -- for me again there's

5  no reason for me to hold you that long.

6    Q    Sure.  I understand.  Okay.  Let's say that,

7  you know, you've decided it wasn't too long to wait and

8  the canine unit arrives, what would happen next?

9    A    So --

10    Q    When you were patrol deputy?

11    A    So if I didn't have you in the back seat of my

12  vehicle, if there's no detention or anything like that, I

13  would have you stand off to the side.  I let them know,

14  hey, these dogs are, you know, they're canines, and

15  they're going to do a drug sniff, we're going to have you

16  create distance for safety.  Last thing we want is that,

17  one, is the dog to turn around and bite someone

18  unintentionally, or the driver or the owner of the

19  vehicle interfere with the dog.

20    Q    Okay.  And what would, what would the canine

21  unit then do after you've separated the driver from the

22  vehicle, what would happen next?

23    A    What I've seen, I've seen them go and ask them,

24  you know, they ask their questions.

25    Q    Ask their questions?

1    A    Either consent or hey I'm going to let them

2 know what their instructions of what they're going to do

3 beforehand.  And then they, they have the dog come out

4 and the dog does -- does whatever they're instructed to

5 do.

6    Q    Okay.  So let me just make sure, because you

7 use they.  So the --

8    A    The canine deputy.

9    Q    The canine deputy will talk to the driver and

10 ask some questions or the canine deputy will talk to you

11 and ask some questions?

12    A    He'll do both.

13    Q    Okay.  So the canine officer will probably talk

14 to you, and then he or she will go talk to the driver?

15    A    Yes.

16    Q    Is that fair?  And how often would you estimate

17 that a canine would have alerted, when you were a patrol

18 deputy?

19    A    I couldn't tell you offhand.  I couldn't tell

20 you offhand.

21    Q    That's okay.  Would you say more times than not

22 they alerted?

23    A    I would say more times.

24    Q    And so probably some greater majority was an

25 alert?

111

1    A    Yes, ma'am.

2    Q    Okay.  When you were a patrol deputy, did you

3  search the car by yourself?

4     A   Yes, ma'am.

5     Q   And so let's say that you had reasonable

6  suspicion that there was something going on and you

7  decided to search the vehicle, is there a situation like

8  that where you wouldn't call a canine at all?

9     A   I didn't --

10    Q   Yeah, sorry, that wasn't super clear.  Would

11  you stop someone and search their vehicle without calling

12  a canine if it wasn't an inventory search?

13    A   Yes, ma'am.

14    Q   Okay.  So you could skip over the canine step

15  if you felt like you had enough reason to search straight

16  away?

17    A   Yes, ma'am.

18    Q   And would you search by yourself, no other

19  officer --

20    A   Yes, ma'am.

21    Q   Okay.  And when would you, when would you call

22  for another officer to assist you in the search?

23    A   If I had multiple persons in the vehicle.  Or

24  if this, if the driver was displaying behavior that they

25  might get ready to run or they might do, do something

                              112

1  that is a safety issue to me.

2     Q   Okay.  So in general, you did not call for

3  assistance unless there were multiple people, the driver

4 seemed aggressive or was doing something else that you

5 think you needed assistance, and then there might have

6 been a third.

7    A    That's it.

8    Q    Okay.  So there's two examples.  Otherwise you

9 did the search yourself.

10    A    Yes, ma'am.

11    Q    And how often would you estimate that you found

12 contraband, drugs, money, guns, something along those

13 lines, when you were a patrol deputy?

14    A    I couldn't, I couldn't tell you offhand.  It

15 just, to me it's random.

16    Q    Right.

17    A    So --

18    Q    So I guess I'll ask you a similar question of,

19 you know, more times than not when you were searching a

20 vehicle did you find something that was not supposed to

21 be there?

22    A    Again, I couldn't tell you offhand.

23    Q    That's okay if you don't know?

24    A    I don't want to give you a opinion statement.

25 I couldn't tell you offhand.

                                113

1    Q    That's okay if you don't remember and you don't

2 know exactly.  I mean, you're doing the stop in the

3 moment.

4    A    Yes, ma'am.

5    Q    So I totally understand.

6        Did you ever search the car as a patrol deputy

7  and not find anything at all?

8     A    Yes, ma'am.

9     Q    Did any Sheriff's Officer supervisor or any

10  other officer praise you after maybe reviewing some of

11  your body camera footage or riding along with you or

12  being part of a stop and saying something like Deputy

13  Gereb you did a great job with that traffic stop?

14    A    No, ma'am.  I'm sorry, I'm going to take that

15  back.

16    Q    Sure.

17    A    It, you don't get like awards or pats on the

18  back.  It's like hey, good job.  That's it.  That's all

19  the praise you get.

20    Q    Sure?

21    A    So we're not getting big awards or anything

22  like that.  It's a all right, cool.

23    Q    Well, that's kind of unfortunate in some

24  extents, because you were talking about how, you know,

25  when you were a patrol deputy, not all of the officers

                              114

1  decided to do traffic stops.  Right?  Like you exercised

2  your discretion.  You went above and beyond.  And no one,

3  as far as I understand from your conversation, no one

4  said Deputy Gereb, like way to go, thank you for doing

5  that.  Is that fair?

6     A    Yes, ma'am.

7    Q   Okay.  And then, you know if they saw a

8  particular traffic stop and like you, I don't know, did

9  it well, they would say good job, that's it.  Right?

10   A   That's it.  Very stoic.

11   Q   Okay.  What would prompt them to say, like a

12  supervisor or a fellow officer, to say Deputy Gereb, you

13  did a good job?  What would cause that?

14   A   Just being professional.

15   Q   Okay.

16   A   Not, basically not going out on a limb on some,

17  you know, for the most part just being professional and

18  maintaining my bearings.

19   Q   Sure.  And did any officer, supervisor or not,

20  ever say look, I wouldn't have made a traffic stop there?

21  Maybe they saw your body camera footage and say there

22  wasn't enough for a traffic stop.  Did you ever get any

23  feedback like that?

24   A   No, ma'am.

25   Q   Did anybody ever review your body camera
                                115

1  footage or talk to you after a stop and say I don't think

2  you should have searched that time, it wasn't quite

3  reasonable suspicion?  Did anyone ever say anything like

4  that to you?

5   A   No, ma'am.

6   Q   Okay.  After you stopped a vehicle when you

7  were a patrol deputy, let's say you found some, like a

8  large amount of drugs, like dope or something, when you

9  were a patrol deputy, did that ever happen to you?

10    A   Yes, ma'am.

11    Q   Okay.  And I would assume that means that the

12  driver got charged.  I'm not probably using the right

13  vernacular, but more than a citation.

14    A   Yes, ma'am.

15    Q   What's the right term to say that they were

16  arrested, were they arrested?

17    A   Arrested, taken into custody, that's pretty

18  much the only two terms I ooh us.

19    Q   Okay.  Thanks.  So just bear with me.  So you

20  find drugs as a patrol deputy, you arrested the person,

21  they're taken into custody.  What would happen next to

22  that person?

23    A   So depending on, as a patrolman, in my

24  patrolman days, I would -- if it's narcotics, we would

25  contact the on call narcotics deputy at the time.
                          116

1    Q   Uh-huh.

2    A   And then we would let them know what we had.

3  Then they would say -- they would either come out or not

4  come out.  We would also -- what I would do too as well

5  is I would weigh, you know, get my weights, get my

6  charges of what I have, then I would also field test.

7    Q   Okay.

8    A   I mean, would I take a sample, after I weighed

9  the narcotics, and put it in a, some type of drug test.

10   Q   Sure.

11   A   And test if it was either positive or negative.

12 If it's not -- if I don't get a positive return, then

13 hey, I don't have anything.

14   Q   Sure.

15   A   And then depending like I said, again, what

16 type of narcotic we have, if it's pills, you've got to

17 identify the pills.

18        Again, after all that's said and done, contact

19 the on call.  And then if we're going to tow the vehicle,

20 tow the vehicle.  And then take the arrested person, take

21 them down to what we call the, well, the Bexar County

22 Jail.  At the time it's either the Magistrate or South

23 Tower, which is basically the Magistrate itself.  And we

24 would book them into the Bexar County Jail.

25        And then obviously -- obviously write our

                              117

1 reports, document our evidence, all that good stuff.

2 Take our report to our Assistant District Attorney, who

3 is there 24 hours a day.

4   Q   Wow.

5   A   And then they read the report and they either

6 accept the charges or reject the charges.  And then after

7 that point is said and done, the arrested person is in

8 custody of the Bexar County Jail.  Then we take our

9 evidence, we take it to our property room and we deposit

10 the evidence there.

11   Q   Okay.  Thank you.  And let's say the ADA

12  accepts the charges.

13    A   Yes, ma'am.

14    Q   Do you -- what role do you have in the

15  prosecution?

16    A   Nothing.

17    Q   Okay.

18    A   We just wait till we get, if we get called to

19  court or not.

20    Q   Okay.  And so how often would you say as patrol

21  deputy you got called to court?

22    A   For any narcotics?  Never.

23    Q   Never.  Okay.

24    A   Not for narcotics.  But it's, I have primarily

25  been taken for, when I've done DWIs.
                                118

1    Q   Sure.

2    A   Under ALR hearings or, you know, the actual

3  testimony, or there's been family violence cases,

4  criminal trespass, things of that nature.  But I have

5  never been for a narcotics case.

6    Q   Okay.  I need to take a couple steps back.

7  What is ALR?

8    A   Basically when you take someone for a DWI, I

9  forgot the acronym what it means, but it's basically in

10  the State of Texas they can challenge, try to keep their

11  license.

12    Q   Okay.  So that's a special DWI system?

13    A    Yes, ma'am.

14    Q    The ALR.  So when you were patrol deputy, you

15  mostly testified in the ALR DWI context.  Is that fair?

16    A    Mostly, yes.

17    Q    And you talked about a couple of other

18  examples, but I didn't quite understand?

19    A    Criminal trespass, like say I arrested someone

20  who didn't want to leave, took them down for trespassing.

21  And family violence cases.  But I have yet to be for --

22  when I was a patrolman, I have yet to be for a narcotics

23  case.

24    Q    Okay.  So as a patrolman, you've never had to

25  go testify because of something you found in someone's
                                119

 1  vehicle.

 2    A    Yes, ma'am.

 3    Q    Is that fair?

 4    A    Yes, ma'am.

 5    Q    And by yes, you mean you never had to testify?

 6    A    No, I never had to testify.

 7    Q    Okay.  As, as patrolman, did you ever follow up

 8  on whether the person you stopped was convicted?

 9    A    No, ma'am.

10    Q    Did you have any involvement in kind of the

11  outcome of cases, or did you -- yeah, did you have any

12  involvement in the outcome of cases from folks that you

13  stopped in traffic stops?

14    A    No, ma'am.

15    Q    Did you ever find out what happened in some of

16  those cases, the outcome?

17    A    No, ma'am.

18    Q    So as far as, you know, your role, your job is

19  to do the police work, give the evidence to the ADA, and

20  then your job is done?

21    A    Yes, ma'am.

22    Q    Is that fair?

23    A    (Nodding head.)

24    Q    And there's no feedback system from them saying

25  like Deputy Gereb, that guy you arrested on Friday has
                                120

 1  been convicted and is going to jail?

 2    A    No, ma'am.

 3    Q    Okay.  I think earlier you mentioned STEP

 4  enforcement.  And we're probably going to -- I'm probably

 5  going to take a break shortly, so let's just get through

 6  the STEP enforcement, and then we'll take a bathroom

 7  break.

 8        Can you share with me what your understanding

 9  of what STEP is?

10    A    STEP is an acronym, Selective Traffic

11  Enforcement Program.  It's a grant through the State of

12  Texas that gives agencies a grant, grant money to help

13  enforce traffic law.

14    Q    Okay.

15    A    It can either be done, either done running

16  regular traffic.  They don't just like hey I saw you

17  speeding here's a citation, or here's a warning.  Or it

18  can be done -- at the time you used to have the option to

19  do DWIs and we've done at night to enforce DWIs.

20     Q   Okay.  So is every officer who goes out on

21  patrol and does any kind of traffic stop, is that officer

22  participating in STEP?

23     A   No.  STEP is a volunteer thing you do aside

24  from patrol duties.

25     Q   So is it an off-duty activity?

                              121

1     A   No, ma'am.  No.  You still come in and sign in,

2  you know, for the traffic unit.  And you go out on doing,

3  I guess basically over time.  It's over time, in a sense.

4     Q   That's helpful.  So if you're doing -- if a

5  officer is doing STEP enforcement, it's separate from

6  their other duties.  Is that fair?

7     A   Yes, ma'am.

8     Q   And when an officer is doing STEP enforcement,

9  they are part of the traffic unit for that period of

10  time.  Is that fair?

11     A   Yes, ma'am.

12     Q   Okay.  Are there particular offenses that the

13  STEP program targets?

14     A   No, ma'am.

15     Q   Are there particular locations that the STEP

16  program targets?

17     A   Yes, ma'am.  There are -- every year, the state

18  will give the traffic unit, hey, this is the area we

19  want -- these are the areas that we would like y'all to

20  target.  And they'll give them the outline and then this

21  will' relay that information to the deputies that are

22  enrolled and actively working the STEP program.

23    Q    Okay.  And if there is a stop that is not in

24  the target area, is that still considered STEP

25  enforcement?

                          122

1     A    Yes, ma'am.

2     Q    Okay.  So there's like the priority areas for

3  the STEP enforcement, but that's not like the exclusive

4  territory of the STEP program?

5     A    No, ma'am.  They would like you to spend time

6  in that area.

7     Q    Sure?

8     A    They want you to be in that area primarily.  So

9  if you work a six-hour shift, they want you to be, spend

10  five, four, five hours in that area.

11    Q    And how do those areas get identified?

12    A    Usually it's by crashes.

13    Q    Okay.  So the high crash areas are the priority

14  areas?

15    A    Yes, ma'am.

16    Q    I feel like I-35 is probably a high crash area.

17  Is that fair?

18    A    Yes, it is a pretty bad area.

19    Q    Yeah.  I mean, you know, we drove down on I-35

20  last night, and I'm sure I gave Josh like several heart

21  palpitations, but that's just how it is on I-35.

22        MR. FRIGERIO:  You get used to it.

23    Q    (By Ms. Hebert) So, you know, I guess if you're

24  doing traffic stops, if an officer does traffic stops on

25  I-35, would those traffic stops classify as STEP

                            123

 1  enforcement?

 2    A    Yes, ma'am, as long as you're working the STEP

 3  program.

 4    Q    Okay.  So you have to be -- you have to have

 5  your STEP hat on for that particular traffic stop?

 6    A    Yes, ma'am.  So if, if you're doing -- if

 7  you're working your regular shift, you don't work STEP.

 8    Q    Okay.

 9    A    Okay.  But if you're going in to work STEP,

10  you're working overtime.

11    Q    Okay.

12    A    It's an overtime, volunteer overtime thing.

13    Q    That's really helpful.  Thank you.

14        MS. HEBERT:  Okay.  I think this is a good time

15  for a break.  Does everybody feel it's a good spot to

16  take --

17        MR. FRIGERIO:  Sure.

18        MS. HEBERT:  Okay.  We'll take ten minutes.

19        Molly, so if my watch is right, we'll come back

20  at five till?

21      THE REPORTER:  Yes.

22      (Recess from 11:46 a.m. to 11:57 a.m.)

23      THE REPORTER:  We're on the record.

24      Q    (By Ms. Hebert) So I'd like to talk, Deputy

25  Gereb, a little bit about record keeping, especially for

124

1  general activities and then maybe later for traffic

2  stops.  But before I go on, I think it's generally

3  important for police officers to have an accurate record

4  of their activities.  Is that fair?

5      A    As into what we do daily?

6      Q    Yeah.

7      A    If we have to write a report, yes.  We usually

8  don't keep that with us.

9      Q    Sure.  But I mean it's generally important for

10  that report to be accurate.  Is that fair?

11      A    Yes.

12      Q    And it seems like accurate reports and accurate

13  records of what happens is something that protects both

14  the police officers and the public.  Is that fair?  Would

15  you agree with that?

16      A    Yes, ma'am.

17      Q    And it also just generally provides a correct

18  record of what happened.  Is that also fair?

19      A    Yes, ma'am.

20      Q    Okay.  I'm going to look at a document.  Would

21  you mind getting Exhibit C?

22      MR. NELSON:  Sure.

23    Q    (By Ms. Hebert) And we're going to mark that

24  Exhibit 2.  Why don't you just take your time to review

25  this so you know what it is.  And I'm not expecting you

                              125

1  to be familiar with everything that is in this document,

2  to be entirely transparent.  I want to ask questions

3  about what the document is and like what various fields

4  in this form actually mean.  So when you're ready, can

5  you tell me what this document is?

6    A    This is a SPEARS Incident Summary report.

7    Q    Okay.  And what does the title of SPEARS

8  Incident Summary mean?

9    A    It's basically a report.

10    Q    Okay.

11    A    I don't recall the acronym of SPEARS, but

12  it's -- it's what gets printed out from our report

13  writing system.

14    Q    Okay.  So SPEARS is an acronym?

15    A    Yes.

16    Q    But you don't know what it stands for?

17    A    No, ma'am.

18    Q    Okay.  And how is this -- if I call this the

19  SPEARS summary, will you know what I'm referring to?

20    A    Yes.

21    Q    All right.

22    A    Or you could just say RMS report.

23    Q    Mess report?

24    A   RMS.

25    Q   RMS.  RMS report.  What does RMS stand for, do
                              126

1  you know?

2    A   I don't know.  It's a report writing system.

3  So we used to have everything on certain colored paper,

4  it would be reports like that.  And then several years

5  back, we went to an online report, which is what we have

6  here.

7    Q   Okay.  So back before the days of maybe

8  computers in the patrol vehicles, you had like a color,

9  the red report that you filled out?

10    A   Yes.

11    Q   Is that fair?

12    A   Yes.

13    Q   And this is a -- sometimes people, officers

14  call this the RMS report?

15    A   Yes, we usually call it the RMS report.

16    Q   Usually.

17    A   Yeah.

18    Q   Okay.  So, but if I say the SPEARS summary?

19    A   I'll still know what you're talking about.

20    Q   You know what I'm talking about.

21    A   Yes.

22    Q   Okay.  How does the SPEARS summary get created?

23    A   It gets created by every call.  So whenever we,

24  whenever we initiate a call or we respond to a call, it's

25  already -- it's already been created by, I think -- I

127

1  forgot how it gets created as far as how it gets input

2  into the system, but once it's created, it goes through,

3  I think our dispatches and all that have, that's their

4  level of stuff.  I don't know how they do that, so --

5     Q   So somebody on the dispatch side creates this

6  report?

7     A   Yes, ma'am.

8     Q   Somehow.  But as far as you know, this is an

9  automatic function.

10    A   Yes, ma'am.

11    Q   Am I understanding that correctly?

12    A   Yes, ma'am.

13    Q   So does a SPEARS summary get generated every

14  time you turn on your lights, for instance?

15    A   No, it does not.  A call has to be activated.

16    Q   Okay.  So earlier we talked about when you like

17  push the button to like make a stop, and I'm making a

18  stop, then a SPEARS summary would automatically get

19  created?

20    A   Yes, ma'am.

21    Q   And if you were responding to a domestic

22  violence call and they made a call for service, it would

23  automatically create a SPEARS summary.  Is that fair?

24    A   Yes, ma'am.

25    Q   Okay.  And who's responsible for filling out

128

1  these forms?  Based on kind of what you just said, it

2  seems like some of this gets generated automatically.  Is

3  that fair?

4     A    Yes, ma'am.

5     Q    And then some get filled out.  Is that also

6  fair?

7     A    No.  So it's -- when you go into the RMS system

8  or the SPEARS system, it's basically a fill in the blank.

9  It's a do you need this box?  Okay.  Fill in what you

10  need to fill in from that point.  Do you need this

11  criteria, like person, do you need to add this person's

12  information.  The person's here, you fill out the name,

13  date of birth, what information you have for that person.

14  Evidence, any evidence, vehicles, there are separate

15  sections for each one of those.

16     Q    Okay.  So I think I understand that.  So the

17  form gets automatically created when an incident happens;

18  is that correct?

19     A    Yes.

20     Q    And then there is a form, the fields of the

21  form an officer has to fill out.

22     A    Yes, ma'am.

23     Q    So -- and when you say the RMS system, the RMS

24  system is on your computer?

25     A    Yes.

129

1     Q    At your CAD that we talked about earlier?

2     A    Yes, ma'am.

3    Q    Okay.  So do you click into the RMS system to

4  get the SPEARS summary for a particular incident?

5    A    So we log in.  Usually if it's -- you get a --

6  we have two things.  We have an incident number and a

7  case number.  Okay?  Incident number is generally like

8  say a traffic stop, that you did everything you needed to

9  do, you give them a warning or citation, then you let

10  them on their way.  Those will not be generated until

11  after the call is completed.

12    Q    The incident number.

13    A    Yes.

14    Q    Okay.

15    A    Which if you look it says CAD master incident

16  number if you look on the top here.

17    Q    Okay.

18    A    And then a case number.  Now, if you do have a

19  case number, again, we are currently working an active

20  case, then you can go in and get the case number and you

21  can type in the case number and it will be the report.

22  And you can start working on what you need to work on.

23  Because you're going to be assigned to that case in its

24  entirety until it's completed from your end.

25    Q    You would have potentially multiple incidents

                                130

1  for a single case?

2    A    You can.  But those have to be -- so if you

3  have say three different incidents, and they're tied to

4  all the same case number, they have to be linked or

5  appended to that case number.  Well that's later on for

6  doing further investigations.

7     Q    Okay.  Let's take a couple steps back so that I

8  understand.  Can an officer ever choose not to create a

9  SPEARS summary so that if there's an incident, they make

10  the traffic stop, or they've been called for service,

11  could an officer say I don't need to create a SPEARS

12  summary?

13     A    No, it's automatic.  It's there no matter what.

14     Q    So the thing officers can choose is how much,

15  what they fill out?

16     A    Yes, whatever they feel is pertinent to the

17  situation.

18     Q    So are there parts of the SPEARS summary that

19  are optional?

20     A    Yes.  Yes and no.  So like say you get, you do

21  a traffic stop.  We enter the person's information.  But

22  you don't have any evidence or anything to put in, so you

23  don't have to fill out any evidence.

24         You go into -- they're not being charged with

25  anything, you don't have to fill out an arrest report.

131

1         You put down, hey, I made contact -- in this

2  case Mr. Lam, you know, made contact with Mr. Lam.  That

3  was it.  And you fill out his information.

4         And then there's a summary, which is, you see

5  up here under Incident Details.  So usually, if it's a

6 traffic stop, again, Kevin Lam was observed speeding --

7 or I'll just put simple, "Citation was issued."  I keep

8 it, you know, keep it simple, the things that go in

9 there.  Citation was issued for Mr. Lam, that was it.

10      But if it's a bigger case, like say caught

11 somebody with some type of evidence or narcotics or, you

12 know, weapon, something of that nature, then we start

13 filling out all this stuff.  Write Mr. Lam was found to

14 be in possession of a firearm.  And you go from there.

15   Q   Okay.  How are SPEARS summaries stored?  In the

16 RMS system?

17   A   Yes.

18   Q   And so if you wanted to go back and look at

19 your SPEARS summaries for the last month, let's say you

20 wanted to look for a case or figure something out, would

21 you go to a particular folder for Deputy Gereb's SPEARS

22 summaries?

23   A   So if -- no.  What you can do -- because if you

24 type in my, say you type in my name, you can look up our

25 name, every incident we've been involved in.

                            132

1      But if you're looking for a particular

2 incident, you can go in and research the incident number

3 or the case number.

4   Q   Okay.

5   A   And you can go from there.

6   Q   You can pull it up by either?

7    A   Yes.

8    Q   Okay.  Let's say the incident's over, you've

9 completed the SPEARS summary.  Do you submit it

10 somewhere?

11    A   It gets submitted and it goes to a supervisor.

12 Then the supervisor looks over everything and feels like

13 hey, if there's, that there's something that we're

14 missing that we didn't put on there, they can, we'll say

15 it gets rejected, sent back to us for rework.  They'll

16 say you need to add this, this is what's required you

17 need to put in there.

18    Q   So you can edit it after the fact if something

19 was missing?

20    A   Yeah, I guess you can say if it's not in the

21 report itself or if you need to add something to your

22 report like a supplemental report, hey why did you do

23 this, can you add a supplemental report to the incident

24 itself.

25    Q   Okay.  So like let's say we've got Kevin Lam
                              133

1 here as an involved person and let's say you realize that

2 you actually, or yeah, you realize his name is actually

3 Kelvin, and you have to go back and add the L rather than

4 because you thought it was Kevin, can you go back and

5 edit that?

6    A   You can, but I, if I do that, I'll just write a

7 supplement, Kevin Lam was actually identified as Kelvin

8 Lam.  There was a typo and our misunderstanding the name,

9  however I would justify the reason for the

10  misinterpretation of a name.

11    Q   So you can edit this document but your best

12  practice would be to supplement?

13    A   Yes.

14    Q   Okay.  That's helpful.

15        How did you learn how to complete this SPEARS

16  summary?

17    A   We go through a training class.  Again, just

18  like everything else, there was a lot of kinks to it, a

19  lot of officers making mistakes and learning what to put

20  in, learning what, when to put in.

21    Q   Sure.

22    A   Where to put it in.  Like if you do a DWI, a

23  DWI is not going to be done on the general report it's

24  going to be done through several different reports inside

25  that one report.

                          134

1    Q   Okay.

2    A   So you'll have the case number but you're going

3  to have like a vehicle in motion report, personnel

4  contact report.  It's going to have questions in itself.

5  So you have more to it.

6    Q   Okay.  So you might have more things to do with

7  particular different types of incidents?

8    A   Yes, ma'am.

9    Q   When you were learning the training on how to

10  do a SPEARS summary, did you do practice SPEARS summaries

11  then?

12     A   Yes.  I believe we did.  I don't recall per se.

13  But it was just basically a one-day 8-hour class you need

14  to show up and we're going to show you how to -- give you

15  the basic rundown on how to use this report.

16     Q   Okay.

17     A   And then since then it has actually evolved

18  since then, so updates and all that stuff.

19     Q   Sure, it makes -- they change the form or

20  change what's required?

21     A   Yes.

22     Q   And I think you said earlier when you submit

23  it, a supervisor reviews every SPEARS summary; is that

24  correct?

25     A   I'm sorry, can you repeat that.

                        135

1     Q   Does a supervisor review every SPEARS summary?

2     A   Yes.

3     Q   Okay.  Do you know anything about that review

4  process?

5     A   No.

6     Q   Okay.  So somehow it gets sent to the

7  supervisor, they do their review, you're not entirely

8  sure what that entails?

9     A   No.  They have whatever they want, they look at

10  whatever they need to look at.  As far as I'm concerned

11  or what I know, they say hey I don't like this, you need

12  to add this to your report, or hey did you add this as

13  a -- okay, you need to write a supplement as well.  So

14  they, as far as what they particularly look for, I don't

15  know.

16     Q   Okay.

17     A   Like I say, every supervisor's different.

18     Q   And have you ever -- has a supervisor ever

19  provided you direction or instruction, hey, you need to

20  add this to your SPEARS summary?

21     A   Yes.

22     Q   What kind of things have they asked you to add?

23     A   Mostly just like if I forgot to write an arrest

24  report -- I'll give you an example.  In the beginning of

25  the year, had a person that was wanted for human
                                    136

 1  smuggling.  She eventually was -- because the County did

 2  not want to extradite her, they rejected her

 3  confirmation.  So we couldn't technically keep her in

 4  custody.  So I didn't do an arrest report because she

 5  wasn't under arrest, and she was released.  Well, they

 6  said we need to do an arrest report anyway.  So I had to

 7  do an arrest report for her.

 8     Q   Okay.  So that's like an example of you getting

 9  feedback from your supervisor saying actually you do need

10  to do this report?

11     A   Yes.

12     Q   Has anyone, any supervisor ever talked to you

13 and said look you need to add more detail to your SPEARS

14 summaries?

15     A   Yes, because they can actually look at this

16 live.  This can actually be done, looked at live.  So I

17 can type it and he can look at it and then he'll send it

18 back or he'll call, we'll discuss it, hey you need to

19 figure out, like you need to add this.  Did you do this,

20 did you do that.  You know, whatever he feels I need to

21 add, and if I need -- and if I don't, I feel that it

22 doesn't need to be added, we'll discuss it as to why it

23 doesn't need to be added.

24     Q   Sure.

25     A   Or if it does need to be added, whatever

137

 1 nature.  Like say this is a case of a homicide, a

 2 supervisor is going to look over it, you know, and you

 3 know, live time, like hey, I'm going to look at it.

 4 Don't, don't submit it, but I'm going to look at what

 5 you're putting.  And then we're going to look at, hey,

 6 did you have contact with this person.  Did you have

 7 contact with that person.  What did you see?  You know,

 8 they're going to go through that, that range of motion.

 9 Did you identify any weapons, did you identify evidence,

10 did you mark it, what did you -- you know, they're going

11 to go through whatever they need to go through.

12         But for the most part, like I said, this is --

13 they usually have -- for me, it's very rare that I get a

14 kickback or rework.  But that's usually the situation.

15 But like I said, bigger situations they're going to

16 make -- not -- they're going to make sure things are done

17 properly.

18    Q   Sure.  And the way -- are you familiar with

19 Google docs?

20    A   Yes.

21    Q   So you know how when you open Google docs you

22 can see like my cursor is here, Deputy Gereb's cursor is

23 here.  Is that the kind of thing you can see here, it's

24 like live, you're both collaborating on a document?

25    A   No.  No.  It's hey, Sergeant, here's the report
                                 138

 1 for that, submit the report.  They're like well, okay,

 2 let me -- I'll let you know, I'll look at it.  They do it

 3 especially a lot for people who are in training forks

 4 deputies that are in training they want to review it

 5 before it gets submitted, to make sure the grounds being

 6 covered and that the PTO is doing a proper job of

 7 training that deputy.

 8    Q   Okay.  So the live reviewing process tends to

 9 happen more for newer folks?

10    A   It tends, yes.

11    Q   But if it's a big incident?

12    A   If it's a big incident they're still going to

13 look over it.  They're not going to -- they won't -- I'm

14 not going to say they're going to ask you to change your

15 report, they're going to ask you to make sure that you

16 have everything that needs to be in that report, in that

17 report. Otherwise they'll say hey, you need to make sure

18 that you do an arrest report or you do, you know, you put

19 down what ambulance showed up, you know, was it medic 1,

20 2, 3, was it -- what investigator showed up, make sure

21 that's in your report. You know, you know, who did the,

22 who did the log, who did the evidence collection, who,

23 you know, they're going to mention things of that nature.

24    Q   Okay. And when the -- before the, before the

25 report is submitted, did you access the report on your
                                139

1 computer at the same time that your supervisor is

2 accessing the report?

3    A   Yes.

4    Q   And so you guys can call each other and say

5 actually that woman was a female or you need to make sure

6 you include her gender?

7    A   Yes.

8    Q   Okay. Have you -- do you know of any officers

9 who have ever received a comment that they generally need

10 to improve their SPEARS summaries?

11    A   No. I'll say if, if it's become a issue, the

12 officer -- the supervisor will actually pull the person

13 aside. That's what we've always seen. Or if it's just a

14 general issue in itself, like everybody's making the same

15 issue, you know, they'll send out I guess an email or

16 some type of memo, or they'll address us in -- address

17 the shift as a whole, hey everybody, make sure that we're

18  doing this and this and this.

19    Q    Okay.

20    A    So that's what they'll do.

21    Q    So if an individual officer is having issues,

22  they'll pull them aside.  But if the unit or bigger

23  group, they'll send out an email and say fix this?

24    A    Yes.

25    Q    Okay.  Let's go back to this page for Exhibit
                              140

 1  2.  You talked a little bit at the beginning about these

 2  three numbers.  And I think I understand why there could

 3  be an incident number versus a case number, but why is

 4  there a different number for the SPEARS summary at the

 5  stop?

 6    A    This one I don't know.  I don't want to assume

 7  what it is.  I'm pretty sure it could be just a report

 8  number that SPEARS is connected in itself.  The master

 9  incident number, every call, everything you do gets a

10  master incident number.  The case number, if you need

11  one, will come secondary.

12    Q    Okay.  That's helpful.

13          And I think it would be helpful to walk down

14  the CAD problem nature in the incident details section.

15  What does that refer to?

16    A    The CAD problem, why are you there, this one,

17  stabbing in progress.

18    Q    And obviously the stabbing is no longer in

19 progress at this point.  So can this be updated or is

20 this what's just input in the beginning?

21    A    That's what inputted in the beginning.  It can

22 be updated.  Again, that's on the reporting officer.

23    Q    Okay.  So the reporting officer, whoever starts

24 the report, is in charge of updating this?

25    A    It can.  So if I'm the main officer, I'm the

                                      141

1 reporting, I'm the report responsible officer, it's my

2 job to go through and make sure I have everything in

3 there because ultimately it comes down to me.

4    Q    Okay.  And what does source refer to?

5    A    Source, how -- was it a 911 call?  Was it a,

6 what do you call it, how did you get that information,

7 how did we come about this, did you -- did you -- did you

8 activate it yourself, you know, was it officer initiated?

9 How did this, who did it, how did we get this info.

10    Q    And is this like a drop-down menu or do you

11 have to input it?

12    A    I believe it's a drop down.

13    Q    And then there's reported time.  What's that

14 about?

15    A    The date and time.

16    Q    Date and time.  What's the time of what?

17    A    That the incident started.

18    Q    Okay.  So reported time is the start.  And

19 incident type, we see homicide in that line.  What is

20 that referring to?

21   A   A murder, a homicide.

22   Q   Is that a drop-down menu I think as well or

23  what is that?

24   A   Usually everything down there is drop-down menu

25  and then other things you have to type in.

                        142

1   Q   And maybe if you see a place where you actually

2  have to type it in please let me know and I'll try to

3  remember to ask.

4   A   So like addresses, addresses are typically.

5   Q   Type in?

6   A   Type in.  Summaries, like I said, you've got a

7  detail here.  The CAD problem is your standard progress,

8  that's a drop down.  Your evidence, if you're labeling

9  evidence a certain way, like I say if you've got this

10  case, if it's a stabbing, probably a knife.  So what kind

11  of knife was it, if it, was it a personal knife, was it,

12  you know, something of that nature, those are drop downs.

13   Q   Okay, that's helpful?

14   A   But if you need to put detail into it, it's

15  usually an address, names, type in.  Addresses are

16  typically typed in.

17   Q   Okay.

18   A   The only thing on the address I would say that

19  it's not typed in because now it asks you if it's a

20  street, highway, commercial business.  Those are also a

21  drop-down menu.

22    Q    Okay.  So the classification.

23    A    Yes.

24    Q    Of a address.

25    A    (Nodding head.)

143

1    Q    I see that there, in the incident details

2  section there's priority 1.  I would assume a stabbing,

3  potential homicide is a really high priority.  So does

4  that mean 1 is the highest priority?

5    A    I'm going to say yes.  I believe that's

6  inputted by dispatch.

7    Q    Okay.  So dispatch puts in the priority level.

8    A    Yes.

9    Q    And then we've got incident time.  What does

10  that mean?

11    A    Usually, when I type, I type in, it's usually

12  the incident time that the reported time came out.

13    Q    Say that again.

14    A    So usually the way I've done it is that this is

15  different because it could be when they showed up on

16  scene.  But usually what I've done it's usually the same

17  as the starting time.  Because both --

18    Q    So when you do the report, help me understand,

19  the reported time and the incident time are the same

20  thing?

21    A    That's usually how I've done it.  Because

22  again, it's, the incident time is the time of the time of

23  the report, that's when it's happening.

24      Q    Okay.  So here we've got maybe 15 minutes

25  between the reported time and the incident time.  Why

144

1  would there be 15 minutes here.

2      A   I don't know.  I wasn't the reporting officer.

3      Q   Okay.  That's fine.  I just was trying to

4  understand what 15 minutes might be.

5      A   I couldn't tell you.  It could be the response

6  time.

7      Q   Okay.

8      A   How long it took them to get there.

9      Q   Okay.

10      A   I believe at this time, at this location,

11  because I used to -- this is one of the areas I also used

12  to patrol.

13      Q   Sure.

14      A   Traffic is heavy build up.

15      Q   So maybe this was the time -- am I

16  understanding correctly that you're saying the reported

17  time is maybe when the call came in?

18      A   Yes.

19      Q   And then the incident time is what?

20      A   Possibly when they made the location.

21      Q   Okay.

22      A   Again, I don't know what the reporting

23  person --

24      Q   Sure.  That's okay.  And incident location, is

25  this automatically generated or do they suggest ad,

1  select a drop down or do they have to input this, do you

2  know?

3     A    You have to input this.

4     Q    Input.  Okay.  Incident status and incident

5  status date, these are blank in this example but what

6  kind of information go in there.

7     A    I would say the same thing as reported time and

8  date.  I don't know -- I know it's a drop down, I just

9  don't remember what the drop downs are.

10    Q    Okay.  And then we already talked about

11  summary, you type into that classification.  I feel like

12  it's pretty self-evident.  That seems like it's drop

13  down?

14    A    I don't want to say yes or no.  I don't recall.

15    Q    That's okay.  You don't know.  The next section

16  is external incident numbers.  Do you know what kind of

17  information goes in this section?

18    A    No, ma'am.

19    Q    Okay.

20    A    The -- yeah, I don't know what would go in this

21  one.

22    Q    Okay.  And then we've got involved persons.

23  Would this be where a witness is -- information would go?

24    A    It could be a witness.  It could be the

25  arrested person.  It could be anybody that's involved.

1    Q   Okay.  So a potential suspect might be here?

2    A   I believe so.  If not, it's going to label them

3 as SP, or suspect, there is a, I know there's a box for a

4 suspect person, so -- and then there's, you have the

5 people of other and then you have a witness box.

6    Q   Okay.

7    A   When it prints out, I believe it comes up under

8 persons involved.

9    Q   So it all gets assembled here?

10    A   Yes.

11    Q   Under persons involved.  All that information

12 about people on the scene or the suspect, it all gets in

13 this document?

14    A   Yes.

15    Q   Okay.  Let's skip to Page 3, and involved

16 property.  And there's a pretty lengthy list here.  But

17 how is it generated?

18    A   Input.  It's handwritten input.

19    Q   Okay.

20    A   There are some drop down boxes.  So ID card.

21 You could put -- there's a drop down that says ID card,

22 and you could say school ID, personal ID, something of

23 that nature.

24    Q   Okay.  And let's skip to the next page, Page 4.

25 And look down to the section that's titled involved
                          147

1 officers.  In the first line, it says reporting officer.

2 Am I reading that correctly?

3    A   Yes.

4    Q   And then it's got, looks like a name in capital

5 letters.  Am I reading that correctly?  Is that an

6 officer name?

7    A   Yes.

8    Q   And what's the next number in the line?

9    A   That's a number, I believe that's going to be

10 the, the employee number.

11    Q   Their employee number?

12    A   Yes.

13    Q   At the Sheriff's Office employee number?

14    A   Yes.

15    Q   So you've got reporting officer, the name of

16 the officer employee number.  BCS what does that stand

17 for?

18    A   Bexar County officer.

19    Q   What does the next thing mean, sworn?

20    A   Sworn, we're sworn officers.

21    Q   Okay.  And then what's the next thing?  There's

22 violent crime in capital letters?

23    A   Violent crime.  So this person here is Sergeant

24 Mahon, he's assigned to the violent -- he's the

25 supervisor over the violent crime investigators.

                         148

1    Q   Okay.  And you can't tell their rank here based

2 on that?

3    A   No.

4   Q   You just knew that, right?

5   A   Yes.  I've worked with him several times.

6   Q   So their division number is what shows up at

7 the end of this line?

8   A   Yes.

9   Q   So looking to the next line, it starts with

10 assisting officer.  Am I reading that correctly?

11   A   Yes, ma'am.

12   Q   What is the difference between the reporting

13 and assisting officer?

14   A   Usually the reporting officer is the one taking

15 lead.  In this case, Sergeant Mahon might be taking lead

16 as the supervisor, and he, as far as for the

17 investigator's side.

18   Q   Okay.  So if someone's taking lead, does that

19 mean that the reporting officer might change if a

20 supervisor comes onto the scene?

21   A   I'm not too sure on how that gets labeled in

22 here because sometimes it will say reporting officer and

23 that wasn't the reporting officer.  It could be that he's

24 the reporting officer for that section, he's responsible

25 over that section for that scene.

149

1   Q   Okay.  And assisting officer, does that mean

2 that every officer who comes to the scene gets listed as

3 assisting if they're not reporting?

4   A   Yes.

5   Q   And how significant of a role do you have to

6  have as an officer to get listed as assisting?  For

7  example, like if you're the guy who's manning the

8  perimeter and signing people in, do you get listed as

9  assisting officer?

10    A   Yes.

11    Q   Okay.

12    A   You're -- as long as you're responding to the

13  call or assigned to the call, you're, you're there.

14    Q   Okay.  So default, doesn't matter how

15  insignificant a role you played in that?

16    A   You could be the last person on scene, showed

17  up, turned around and that was it, and you're still going

18  to be assigned to the call.

19    Q   Okay.  Let's go back to the second line where

20  we're talking about assisting officer and then we see a

21  name, and the employee ID number.  On the second line

22  there's inactive employee.  What does that mean?

23    A   So Randy is a Cal a, he was with the Sheriff's

24  Office.  He retired from the Sheriff's Office and is

25  currently with another agency.

                          150

1    Q   Okay.  So he's currently now with a different

2  agency?

3    A   Yes.

4    Q   But I assume that at the time of this stabbing,

5  he was not in an active employee?

6    A   No.  He was -- he was a sworn -- it would say

7  sworn.

8    Q   Okay.  So does that mean that this section of

9  the report changes based on when you print it?

10   A   I couldn't tell you.  I don't know.

11   Q   Okay.  What is score?

12   A   Score is -- it's a community policing unit.  I

13  think it's like the sheriff's community outreach.  I

14  forget what else that means.

15   Q   Okay.  So he was with the score unit at this

16  time.  Is that fair?

17   A   Yes, ma'am.

18   Q   Okay.  Let's go to Page 6.  And at the top it

19  says General Report, Incident, and it has the same SPEARS

20  number.  Can you tell me what this page is?

21   A   It's a report, general report.  I know, I think

22  I did mine by accident as a general report.  Because once

23  you, I have -- me personally, I have a bad habit of you

24  have to sign your, digitally sign, so you put it in by

25  putting your employee number.

151

1    Q   Okay.

2    A   So what you do, it says author, it's got that

3  number, that's my employee number.

4    Q   Okay.

5    A   And once you do that, you can't delete it.  So

6  I was supposed to right a supplemental and instead I just

7  did a general report on it.

8    Q   Okay.  So your general report in this example

9 was an accident?

10    A   No.  I was writing, I meant to put a

11 supplement, a supplemental report, but I accidentally

12 clicked on the general report so this is how it got sent,

13 so --

14    Q   Okay.  So let's go back to the involved

15 officers on Page 4.  Are you listed on the involved

16 officers?

17    A   Page 5.

18    Q   Or Page -- 4.  Oh, Page 5?

19    A   Page 5.

20    Q   So you're listed as assisting reporting

21 officer.  And why are you a reporting officer there?

22    A   I believe it's because I made a report.

23    Q   Okay.  So then does reporting officer here

24 indicate every officer who makes a report back here?

25    A   I believe so.  I couldn't tell you.  But I know
                                152

1 from my end I did a report on it so --

2    Q   Sure.  And in general, we were -- I think you

3 were talking about the fact that you meant to do a

4 supplemental report here.

5    A   Yes, ma'am.

6    Q   What's the difference between a general report

7 and a supplemental report?

8    A   A general report usually is the person that's

9 the reporting officer, the one that's taking lead that's

10 supposed to be over all of this. Because they, you know,

11 they were either first on scene or it was their incident

12 or this is their case, whatever the case is.

13      Supplement is hey I'm assisting you, this is

14 what I did on this day. This is what my actions were.

15   Q   Okay. So the general report is, for lack of a

16 better descriptor, the main report.

17   A   Yes.

18   Q   Is that fair?

19   A   Yes, ma'am.

20   Q   Okay.

21   A   And my, like I said, mine was accidental.

22   Q   That's okay. I think it's still just helpful

23 to understand what it is.

24      Are there general reports for every incident?

25   A   No, ma'am.

                         153

1   Q   Why not?

2   A   Because not every incident requires a case

3 number. Usually we do a general supplemental report.,

4 it's usually done because you have some type of offense

5 or some type of information you need to put in. If it

6 was an information report or, like this, a homicide, or

7 you have something that's going to be going further than

8 what the incident initially. Say if I do a field

9 contact, I come out, I talk to you, hey, I just did -- my

10 summary, I made contact with John Doe, he was walking

11 down the street. I did -- here is his information,

12  that's it.  It's not a general report, a supplemental

13  report is required.

14    Q    Okay.

15    A    But did a quick report.

16    Q    Okay.

17    A    If you go back to Page 1.

18    Q    Sure.

19    A    Which is right here, under Summary, it says

20  Kelvin Lam stabbed and killed his wife.  So it's a

21  summary of the incident.  So --

22    Q    And this -- was a summary required?

23    A    Usually, yes.  Yes.

24    Q    Okay.  But the general report is not required.

25    A    No.  If it's just an incident without a case
                                154

1  number.

2    Q    Okay.  And so I thought we kind of were talking

3  about earlier case numbers being like ones that are kind

4  of more ongoing.  Is that a fair assessment of case

5  number?

6    A    Yes, ma'am.

7    Q    And so -- but every call for service gets a

8  incident number.

9    A    Yes.  Every call -- every time there is an

10  incident, any time that there's, whether officer

11  initiated, call for service, anything, there is an

12  incident number for it.

13    Q    Okay.  So if we have a traffic stop, for

14  example, what parts of the SPEARS summary are required?

15    A    Typically, what's recently came out is the

16  person involved, and then you could put the vehicle,

17  their vehicle, and then the summary.

18    Q    Let me just stop you for a second.  The vehicle

19  would be the involved property?

20    A    Yes.  Or it should be --

21    Q    Somewhere in there?

22    A    Going to be involved property or should be a

23  vehicle section.

24    Q    Okay.  Or a separate section?

25    A    Yes.

                              155

 1    Q    That's okay.  I'm just helping to know.  So in

 2  every SPEARS summary there should be the like general up

 3  here incident details information, the summary, the

 4  involved person, and the involved property/vehicle.

 5    A    Yes.  Recently, it was -- it was more

 6  redirected, more specified on how to, what needs to be

 7  put in, especially for traffic stops.  It was more

 8  specified.  Probably about a year or so ago.  Used to

 9  because of the Sandra Bland Act it was here, here's your

10  warning, copy of your citation or copy of your warning

11  and we had to provide that to them.  And then it was

12  recently now because there was a big issue that the

13  officers weren't putting the proper information in now

14  you've got to put somebody's information into who you

15 made contact with.

16    Q    Okay.  So a year ago they started requiring you

17 to put in the driver information?

18    A    Yes.

19    Q    Am I understanding that correctly?

20    A    Yes.

21    Q    Before the Sandra Bland Act, you didn't

22 necessarily have to do that?

23    A    No.  We just had to provide them a copy of the

24 citation, or warning.

25    Q    The driver?

                              156

1    A    Yes.

2    Q    Okay.  Let's go back to Page 6 with your

3 report.  There's the author line and the entered by line.

4 Are these always the same?

5    A    Yes.

6    Q    So there's no reason that there would be a

7 separate author from entered by?

8    A    No, there shouldn't be any reason.

9    Q    Would there ever be a reason that the report

10 time and the entered time would be different?

11    A    No.

12    Q    So those should always be the same?

13    A    Yes.

14    Q    And is it required that an officer complete

15 their general report on the same day as the incident?

16    A    Typically if you're the main one, yes.

17    Q    Okay.

18    A    This one, I was, if I remember this incident

19  correctly, I was there to assist.

20    Q    Right.  And you were -- you already indicated

21  this particular example on Page 6 of Exhibit 2 was a

22  mistaken general report?

23    A    Yes.

24    Q    You meant to do a supplemental report and I'm

25  sorry that I picked this one for you.  But in general,
                            157

1  whoever's doing the main report has to do it the same

2  day?

3    A    Yes.

4    Q    Okay.  When you do something like a traffic

5  stop or a call for service like domestic violence, when

6  do you complete the general report?

7    A    Usually by the end of the day.

8    Q    So --

9    A    When I was on patrol, if it was a domestic

10  violence situation or whatnot, I typically would, if it

11  was an assault, I have to put all that stuff in, if

12  someone's getting taken to jail, the report has to be

13  done before you take it to the ADA.

14    Q    Okay.  So let's say you do the domestic

15  violence service call.  Do you fill out the general

16  report in your patrol vehicle immediately following the

17  call?

18     A    Yes.  Not if I have an arrest, if somebody's an

19  arrest, I will take and I will fill out the report when I

20  get down to the jail.

21     Q    Okay.  And when you do a traffic stop, do you

22  fill out the report, general report immediately after

23  doing the stop?

24     A    No general report is required unless you have

25  some type of case number that required say some type of

                                158

1  evidence or someone going to jail, something of that

2  nature.

3     Q    Okay.  But if you decided to fill one out or

4  you decided to fill, you had to fill one out, when would

5  you fill that out, that report?

6     A    Usually typically the same day.  I try to get

7  them done after the stop is over.  Because if not, the --

8  it builds up.  And traffic stops really aren't, I

9  wouldn't say not a primary issue.  They're not, they're

10  not a Cause Number.  They don't require a case number.

11     Q    Okay.  I'm going to go back to your example on

12  Page 6.  And I see the last sentence says BWC available.

13  What does that mean?

14     A    Body worn camera is available.

15     Q    And generally, we just talked about how every

16  officer that goes out in the field has a body worn

17  camera.  Shouldn't there be body worn cameras all the

18  time?

19   A   You mean on as in they're buffering.

20   Q   Just available footage, like if you're

21 responding to a service call, shouldn't the default be

22 that there's a body worn camera?

23   A   Yes.

24   Q   Available?  So like generally, all of these

25 incident reports should include body worn camera

                              159

1 available.  Is that fair?

2   A   Yes.

3   Q   Okay.

4   A   Now, I will say, like I said, if you show up

5 last on the scene, you should have one anyways, but

6 there's some people that if they're on the way there and

7 they're maybe a mile from a, from the scene, and they're

8 turned around because they get canceled.

9   Q   Yeah, I understand that.  So that would be the

10 exception to the general rule.  Is that fair?

11   A   Yes.

12   Q   Let's go to Page 7.  This seems to be one of

13 those supplemental reports that you were talking about;

14 is that correct?

15   A   Yes.

16   Q   And this is a, the author is a different

17 officer.  Is that also correct?  Am I reading that?

18   A   Yes.

19   Q   In the right way?  Okay.  And when should an

20 assisting officer complete a supplemental report?

21    A    Typically, usually do it the same day.  A lot

22  of officers will do it based on their involvement.  If

23  you were directly involved, like you were directly hands

24  on into the incident, you were there, you saw the whole

25  nine, typically it's all done right then and there, right

                              160

1  then as soon as possible.

2        Some officers have, they, if they're not

3  directly involved or they're just assisting like the

4  perimeter, they'll do a small supplemental like the next

5  day.

6    Q    And if you're assisting, are you required to do

7  a supplemental report?

8    A    Yes.  On the case I'm -- I would say yes.  I

9  would say not required, but if you're assisting depending

10  on say let's say a traffic stop, I showed up, you were

11  assisting, I show up to assist you, but nothing happened

12  or I just assisted you with a search of the vehicle, you

13  could put down -- I guess on the action entry, made

14  location, assisted with search of the vehicle, and then

15  that's it.  Some supervisors do want you to do a

16  supplemental if you're doing more hands on direct

17  involved in.

18    Q    From that I understand that you don't always

19  have to do a supplemental report when you assist.

20    A    Yes.  I believe that depends on the situation,

21  like I say, traffic stop, again, showed up, covered --

22  assisted with the cover, and that's it.  That's an action

23  entry.  But say if there's, if you're involved a little

24  bit more, then you add a little bit more onto it.

25     Q   Okay.  So generally, and if I'm understanding

                            161

1  you correctly, you should -- an assisting officer should

2  do a supplemental report if they have involvement in the

3  incident other than just I'm here.

4     A   Yes.

5     Q   Okay.  Let's skip the next couple of pages,

6  which seem to be more reports, and a whole bunch of

7  supplements.  Let's get to Page 11.  This looks like a

8  supplemental report done by Deputy Babb.  Am I reading

9  that correctly?

10    A   Yes.

11    Q   But the narrative is blank; is that correct?

12    A   Yes.

13    Q   Why -- why would that be the case?

14    A   I couldn't tell you.  I don't know what was

15  going on with this, with him, or if he did that

16  intentionally or if he did it, like something happened

17  that it wasn't saved properly.  Because there have been

18  times on my reports that I'll do the report, I'll write

19  my fancy report, and then I turn it into the ADA but then

20  when I go back it's not there.  I think that's a possible

21  glitch in the system.

22    Q   Okay.

23    A   But again, I don't know on his, I don't know

24  what was going on with that.

25   Q   So you wouldn't know exactly what happened
162

1  here?

2    A   No.

3    Q   Okay.  Let's skip on Page 25.  There's a lot of

4  supplemental reports in here.  I'm going to skip to 25.

5  I think this may be what you were referring to a little

6  earlier.  Let's look at the section that says action log.

7  What is the action log?

8    A   Everything that happened.  Everything that

9  happened that day.  Who -- basically an action log is, I

10  guess they do an entry.  So instead of doing the

11  supplemental report, it shows like say in the first

12  sentence I assisted in investigating by escorting

13  so-and-so downtown to the CID office and that was it.

14  That was hit involvement.

15   Q   Okay.  And is this what you meant earlier when

16  you were talking about key card notes?

17    A   No, no key card notes are put on the key card.

18   Q   Okay.

19    A   This is put into the actual SPEARS RMS report.

20   Q   Okay.  Help me understand, what are the key

21  card notes?

22    A   Key card notes is a, it's almost the same thing

23  as an action log entry.  It used to be what first came

24  out before the RMS, before the RMS system was available,

25  we would put down basically what an action log is, made

1  location, these were my actions, this is what I did.

2  Left location, that's it.  Now, because this is out, it's

3  become a little bit more -- less of putting it in there

4  and more of putting it into the report.

5     Q    Okay.  So let's take this section by section

6  then.  When it says type, in the first column, what does

7  that mean?

8     A    I'm sorry, you said type?

9     Q    Yeah.  We're looking at the action log.  In the

10  first, very first column says type.

11     A    Okay.  So this CID follow up, that's what they

12  were.  This, this deputy here is a CID advice Garrett.

13     Q    Okay.  So what I'm asking is the column type,

14  what are these entries?

15     A    Oh.

16     Q    What goes there?

17     A    What you did.  What kind of action you took.

18     Q    Okay.  What kind of action.

19     A    Yes.

20     Q    And is it a drop-down menu?

21     A    Yes, that one is a drop-down menu.

22     Q    Okay.  And entry time, does this mean --

23     A    That's generated when you click on it and do an

24  action log, just like with the reports, it's generated

25  when you select that option.

1    Q   Okay.  And is any of -- is that automatic at

2  all or you have to select, you say --

3    A   The time?

4    Q   Yeah.

5    A   No, no, it goes in when you do it.

6    Q   Okay.  When you enter whatever you're entering

7  it automatically gets the entry time?

8    A   Yes.

9    Q   And what is the event time?  It seems like all

10  of these match.  Right?  So why the two columns?  What's

11  the difference between these two columns entry time and

12  event time?

13    A   Entry time is when you enter it, event time is

14  when you enter it.  I don't know why it's separate like

15  that.

16    Q   Okay.

17    A   That's beyond me.

18    Q   And author, that would be the author of the

19  action?

20    A   Yes.

21    Q   And what does link mean?

22    A   I don't know.

23    Q   Okay.

24    A   That, I do not know.

25    Q   And what is the log entry column about?
                              165

1    A   It's basically what you did.

2    Q   And this is what an officer types in?

3    A    Yes.

4    Q    Is there any drop-down menu here?

5    A    No.  This is a type-in.

6    Q    Okay.  Let's skip down to the row that begins

7  review.

8    A    You said review?

9    Q    It's like the middle and then there's a large

10  blank space after it.  So it's that row before the blank

11  space.

12    A    I'm sorry -- oh, here it is.  There, I'm sorry.

13    Q    No, it's okay.  Very small print too.  What is

14  this line about, what does the review mean?

15    A    I assume it was -- I don't want to assume.  But

16  if it's a drop-down menu, that's probably what this

17  person, this reporting person or entry did.

18    Q    What did they review?

19    A    Whatever they put on here.

20    Q    Okay.

21    A    That's --

22    Q    That's the extent of what you know?

23    A    Yes.

24        MS. HEBERT:  I think this is a good time for a

25  quick lunch break.  How long do you think we could do

                            166

1  lunch in?

2        THE REPORTER:  We're off the record.

3    (Recess from 12:47 p.m. to 1:28 p.m.)

4          THE REPORTER:  We are back on the record.

5      Q    (By Ms. Hebert) We are now back from lunch and

6  I want to talk about criminal interdiction.  What does

7  criminal interdiction mean?

8      A    Well, criminal interdiction it's a broad scope.

9  It could range from -- it typically is, I guess you could

10  say typically identified as highway interdiction, where

11  you find large amounts of narcotics, money, guns, humans,

12  that's typically what it's associated with.

13          Interdiction, criminal interdiction is a broad

14  scope of things.  It can go from working at the airport,

15  working in the parcel interdiction, it can go all the way

16  to, you know, regular hotel, motel, interdiction is just

17  a broad scope.

18      Q    Okay.  And then for the Sheriff's Office, does

19  criminal interdiction mean highway interdiction or does

20  it include all these other things?

21      A    It includes all the other things.

22      Q    Okay.  So what are the goals of criminal

23  interdiction?

24      A    Just basically -- basically to stop crime and

25  be proactive, go out there looking for people that are

                              167

1  involved in large -- I guess on a more large scale of

2  criminal offenses.

3      Q    Okay.  And I think I remember you saying

4  earlier today that the Sheriff's Office criminal

5  interdiction unit was created in 2020; is that right?

6      A    There have been various forms of it.  They have

7   never lasted as long as our current unit is.  But since

8   I, since we, we started it in 2020, it's been going on

9   since then.

10     Q    Okay.  And what was the form of criminal

11  interdiction before the separate criminal interdiction

12  unit?

13     A    I believe that it was just traffic, guys

14  running traffic, from the traffic units, and they were on

15  the highways, just as a random thing and they would go do

16  it.

17          And they had small, like one or two guys that

18  would do it here and there.  And it was able to last,

19  from my understanding what I was told in the past, it

20  would last about two, three months and then it would

21  physician will out.

22     Q    So it would be more like a task force?

23     A    No.  No, no, no.

24     Q    Okay?

25     A    Just it was started and then it wouldn't catch
                                168

1   on, and so they would just do away with the unit.

2      Q    Okay.  And so were you part of the criminal

3   interdiction unit for the Sheriff's Office when it

4   started then in 2020?

5      A    Yes.

6      Q    So you were one of the, for lack of a better

7 descriptor, founding members?

8    A   Yes.

9    Q   Okay.  And when it was created in 2020, do you

10 know why the separate unit was created?

11    A   No.  I honestly don't.  They just said hey, you

12 want to do this, and I said yes, sure.

13    Q   Yeah.

14    A   That's pretty much, when you're a proactive

15 person, you get hand picked to do a job.  That usually

16 says a lot about the officer in itself.  And it shows

17 that people are looking at you and how you work and that

18 you get a good, I guess you could say you get a good

19 briefing or a good back story from people that, like

20 supervisors and stuff like that.

21    Q   I don't follow you.  I'm sorry.

22    A   Meaning, you know, a supervisor will reach out,

23 and like hey, how is this guy.  And you know, that -- the

24 supervisor will brief them, this is what we think of him,

25 this is how it looks.  My supervisor at the time, I never
                                169

1 got pats on the back, but he's a hard worker and does

2 what he's supposed to do.  And never, you never have to

3 get on him for anything.  And if you do, it's more

4 something minor.

5    Q   Okay.  And when the unit was created in 2020,

6 how many officers were part of the unit?

7    A   There were four.

8    Q   So in 2020, there were four criminal

9  interdiction officers?

10    A   Yes.

11    Q   Do you remember their names?

12    A   Yes.  One was John Aguillon.  Another one is

13  Deputy Treadwell.  And we had a couple of guys that

14  rotated out.  One was Chris Terrazas and he went back to

15  street crimes.  And the other one was Gil Martinez.  And

16  then of course me.

17    Q   Okay.  So that sounds like five.

18    A   There was five.  But Terrazas, when he went

19  back to street crimes, Gil Martinez replaced him.

20    Q   Okay.  And what's the size of the criminal

21  interdiction unit now?

22    A   Two.

23    Q   Two.  Why the decrease?

24    A   There -- so when I went back to patrol for

25  staffing issues, they went down to three.  And then there
                              170

 1  was a major event that happened.  There was a guy came

 2  in, was evading from police, shooting at law enforcement

 3  during an active vehicle pursuit.  They engaged -- they

 4  engaged in the shootout, and, you know, they were -- I

 5  don't know the, I guess the extent of their role.  I just

 6  know that they were involved in the shootout, which led

 7  to a person being deceased.

 8        So, and then of course they go on, not to

 9  leave, but during the investigation, cleared by Grand

10 Jury, and then the formation of TAG was started.

11    Q    What's TAG stand for?

12    A    Texas Anti-Gang unit.

13    Q    Okay.

14    A    Deputy Aguillon went to TAG, to the intel side.

15 Deputy Treadwell went back to traffic.  Deputy Gil went

16 to the covert side of TAG, and then I was just in patrol.

17    Q    Okay.

18    A    And Chris Terrazas was on street crimes, so --

19    Q    So today you're still on the criminal

20 interdiction unit?

21    A    Yes.  I came back and have been on since.

22    Q    And who else -- who's the other officer?

23    A    Right now it's deputy Louie Estrada.

24    Q    Okay.  And it was previously Deputy Babb.  He

25 was probably an officer with you.  At what point -- how

                              171

1 many, how many officers were there when Deputy Babb was a

2 criminal interdiction officer?

3    A    Just two.  Deputy Babb actually took a position

4 at the training academy.  He went to the training academy

5 and went, we -- at that point we brought on deputy

6 Estrada.

7    Q    Okay.  So it went down from five -- four, to

8 two?

9    A    Yes.

10    Q    And then Deputy Babb was replaced by this new

11 person?

12    A   Yes, ma'am.

13    Q   Okay.  Who is your supervisor today?

14    A   Still sergeant Gamboa.

15    Q   And so what is Sergeant Gamboa over?  If he's

16  not just over -- if he's not part of the criminal

17  interdiction unit?

18    A   He's over us.  He oversees our operations, as

19  well as over the intel side of TAG.

20    Q   Okay.  So are you part of the Texas Gang

21  Enforcement group then?

22    A   I'm a part of Organized Crime Unit.

23    Q   Okay.

24    A   We kind of -- and then we also work

25  hand-in-hand with TAG.

172

1    Q   Okay.  And who is Sergeant Gamboa's supervisor?

2    A   It would be Lieutenant Fred Viletti.

3    Q   We talked a little bit about criminal

4  interdiction including various different types of

5  interdiction activities.  You talked about highway

6  interdiction.  What percentage of criminal interdiction

7  activities is highway interdiction?

8    A   It really depends on the agent itself, the

9  agency itself, what they're targeting.  With us, we have

10  been removed from the highway due to a human smuggling

11  issue.  Human smuggling has become so dangerous that the

12  people that are -- the smugglers that are bringing these

13  people in are evading and they're crashing these cars and

14  people are getting hurt.  So we're not -- we're taking a

15  more precautionary investigative step to it and we're not

16  pursuing them on the highway.  I guess we're working off

17  more I'm tell based things so we can tie them down to a

18  location versus a vehicle.

19      Q   Okay.  So you're no longer doing traffic stops

20  on I-35?

21      A   Well, Bexar County, the map itself, has

22  multiple highways.

23      Q   Uh-huh.

24      A   Multiple loops.  Multiple Farm-to-Market county

25  roads, back roads into, into the County.  So there's more

173

1  ways to attack that than just hitting the highway.

2      Q   Sure.

3      A   But again, the issue is our admin does not, for

4  the safety of migrants, we don't want, we don't want them

5  to get hurt.  And there have been several issues over the

6  last year where migrants have been killed by, by agencies

7  pursuing them.  So it's a safety issue.  Mostly, you

8  know, for them.  Because we don't, like I said, we don't

9  want somebody getting hurt.

10     Q   Okay.  So you're still patrolling the, in

11  criminal interdiction fashion, making stops on other

12  places throughout the County, is that fair?

13     A   Yes, ma'am.

14     Q   And when you said our admin doesn't want, does

15  that mean it's management?

16    A    Yes.

17    Q    Or administrator --

18    A    Administration.  It's like I said mostly

19  because they look at everything to see what the other

20  agencies around us are doing and the liability it can

21  become.

22    Q    Okay.  So if I'm understanding you correctly,

23  management has pulled you off of certain highways and

24  said go be on these other places?

25    A    Yes, ma'am.

174

1    Q    Okay.  But you are still doing traffic stops in

2  the criminal interdiction capacity?

3    A    Yes, ma'am.

4    Q    Okay.  When you're working criminal

5  interdiction, do you respond to other calls for service,

6  like domestic violence or potential burglary or something

7  along those natures?

8    A    Yes.  From time to time we will assist patrol

9  with calls.  If there are calls that are a little bit

10  more extreme, such as a standoff or a barricaded subject,

11  something that needs a little bit more specialized

12  action, we will go out and assist.

13    Q    Okay.

14    A    Mostly, primarily on perimeter.  But we have

15  been known to be in the mix with like say SWAT and stuff

16  like that.

17     Q   And do you as an individual officer make the

18  decision to respond to a call for service or are you

19  given an order?

20     A   Both.

21     Q   Okay.

22     A   Both.  We -- we primarily, let's say we're

23  given the discretion of you know what you need to do.

24  You know your job.  You know what your responsibilities

25  are.  You go handle what you're supposed to handle.

                          175

1     Q   What percentage of your work time would you say

2  you make traffic stops?

3     A   Nowadays I would say about 60 percent.

4     Q   60 percent.  You say now ha days.  That means

5  it changed?

6     A   Because we shifted from the highways, we've

7  gone to more, the more specialized part of intervention,

8  such as -- like we work with UPS, and they'll allow us to

9  assist, you know, with something suspicious.

10     Q   United States parcel service?

11     A   Yes.

12     Q   Okay.

13     A   Or we'll be proactive, who's smuggling any type

14  of contraband through the mail.  And then we'll also,

15  we're also trying to work with Amtrak so we're trying to

16  get our hands on like the airports and things of that

17  nature because there are other ways of interdiction that

18  contraband and all that is being sent through.

19   Q   Have you been trained in criminal interdiction

20  specifically?

21   A   Yes.

22   Q   What does that training look like?

23   A   As in to?

24   Q   Did you attend a specific criminal interdiction

25  training, or for example, did the Sheriff's Office

                         176

 1  conduct a criminal interdiction training?

 2   A   Yes.  I've gone to interdiction training

 3  courses, from several different agencies.  And I've also

 4  done ride-alongs with other form groups.

 5   Q   Other what was that?

 6   A   Form groups, like other I guess you'd say task

 7  force.

 8   Q   In the Sheriff's Office or other entities?

 9   A   Other entities throughout Texas.

10   Q   Okay.  So let's break that down then.  What

11  kind of courses are interdiction courses?

12    A   Well, usually they're identified as some type

13  of -- it will say interdiction on it somehow or they'll

14  identify it as like concealment courses.  They call it

15  traps.  So basically it's another way of saying

16  concealment.

17       They'll also identify as, for lack of a better

18  understanding, behavior, deceptive behavior courses.

19  I've attended search warrant courses, narcotics search

20  warrant courses.

21     Q    Okay.

22     A    So I've attended several, quite a few courses.

23  And also such things as human trafficking, narcotics

24  trafficking, things of that nature.

25     Q    Okay.  And these ride-alongs that you have

                              177

1  talked about, who have you done ride-alongs with?

2     A    One company was the Attorney General's

3  investigators, I'm sorry, not Attorney General, D.A.'s

4  office, District Attorney investigators out by Odessa,

5  Texas.  I can't remember the name of the County that they

6  work for, but they have a task force out there.  We rode,

7  I believe, four or five days with them.

8        And then they have a training program, a

9  training company called HITS.

10     Q    HI?

11     A    TS.

12     Q    TS?

13     A    They're primarily highway.  And then I also

14  rode out with, before Deputy Babb passed to the other

15  unit, we went out with a group out of Tyler, Texas.

16     Q    Okay.

17     A    I believe it was Collin County and Smith

18  County, Texas.

19     Q    And in general during these training sessions,

20  what would you say were the best practices that you took

21 away from these training sessions?

22    A    Just how to identify possible behaviors and,

23 you know, watching them do the interviews, watch them how

24 they, how they conduct themselves.

25    Q    Uh-huh.

178

1    A    What questions -- what types of questions to

2 ask, what to, what kind of -- what to look for, what we

3 can typically associate with trafficking, things of that

4 nature.

5    Q    Okay.  Break that down for me.  Like what kind

6 of behaviors are you looking for, are you taught to look

7 for?

8    A    Nervousness, how they react to certain

9 questions, what's their responses to certain things, look

10 for deceptive behaviors, things of that nature.

11    Q    Okay.  And how do you tell what is normal

12 nervousness versus interacting with police nervousness?

13    A    Well, everybody's nervous when you interact

14 with law enforcement.  That's something that we can, I

15 can honestly say that -- and I address it nowadays more

16 on my body camera.  I see somebody like when they hand me

17 their license and they're shaking like a leaf, to the

18 point where I've seen the card almost vibrate.  I say

19 hey, are you okay?  I know I'm a police officer, but you

20 know, I know everybody's nervous around us, but I mean

21 it's okay.  It's a traffic stop.  I try to do my best to

22  de-escalate the situation, make light of the situation.

23  Because sometimes people are just nervous and it happens.

24  But I also look as what's their reaction.

25      I had one did the same thing, he kept looking
                              179

1  back, kept looking back, kept looking back, ended up

2  finding an ounce of spice and 6 grand of drug money in

3  the car.  So that was just on behavior alone.

4      Q   Okay.

5      A   Another one I had that was recently this year,

6  a guy I asked him a question of when, and he looks at his

7  car, looks back at me and says what.  There's nothing in

8  the car.  I said I didn't ask what, I asked when.  And he

9  challenged it, and we went from there.  I ended up

10  finding 18 grand in money and a gun and some vape

11  cartridges.

12     Q   Sure.

13     A   So those are just behavior.  Nervousness itself

14  could be anything.  But I have to be, you have to be able

15  to articulate what it is they're doing that makes it --

16  but I also just look at it as I don't base anything off

17  of just nervousness.  I look at it I'm going to ask

18  baseline questions for you, I'm going to figure out how

19  you respond to certain things.  Then I'm going to ask

20  some hard questions, like hey, is there anything in the

21  car I should know about, you know, because you're still

22  kind of nervous.  You know, I've kind of let you know,

23  like hey, this is okay, you know.

24        And then I'll just see how they respond to

25  certain questions.  I've seen audible tone changes.  I've
                              180

 1  seen people cry.  I've seen people just, just continue to

 2  shake.  I had one dude on a hot day just start shivering

 3  so and that's typically not normal.

 4    Q    So how do you tell what's not normal versus

 5  what's idiosyncratic for a particular person.  I've give

 6  you an example.  I have really dry eyes, especially when

 7  I'm getting tired at the end of the day I start to blink

 8  a lot.  So how do you tell whether that's just my unique

 9  personality tendencies or body versus, you know,

10  something that is a sign of guilt?

11    A    I ask questions.  Again, I don't just base it

12  on just like your body behavior.  I also base it on how

13  you were responding to certain questions.  I listen to

14  the interview.

15        Again, that goes back to am I going to search

16  this vehicle or not.  Is it just something that I need to

17  go with or are they just really that nervous, had they

18  really that way.  And if they're not, and I don't see any

19  reason to go further with it, here is a warning or here's

20  a citation, and let them on their way.

21    Q    Okay.  So that makes me ask a question, like

22  what prompts you to end the stop?  Are there certain

23  responses or answers that you get that you say, okay, I'm

24  done here?

25     A   Yes.  Again for me, it goes mostly by behavior.
                                181

1  When it came to certain, like the gentleman with the

2  money this year, him looking at his vehicle, looking back

3  at me.  I had already knew that there was an odor of

4  marijuana in the vehicle, but again, it goes back to

5  training, knowledge and experience of what I've seen.  It

6  could be again you stop ten cars in a day, that one car,

7  car Number 8 might be the car that might have the illegal

8  substance, illegal contraband in it.  And again, I do all

9  that.  But it's just training and experience over time.

10     Q   Okay.  So you just talked a little bit about

11  doing ten stops in a day.  About how many stops would you

12  say that you do when you're working as a criminal

13  interdiction officer during a day?

14     A   I couldn't tell you offhand.  I've done one

15  stop and I've gotten narcotics on it of it.  I've done

16  ten, fifteen stops and got nothing.

17     Q   Okay.  And earlier today we talked a little bit

18  about how long a traffic stop generally runs when you

19  were a patrol deputy, 10 to 15 minutes; is that correct?

20     A   It could be, yes.

21     Q   So in general, a traffic stop without anything

22  untoward or suspicious, when you were a patrol deputy,

23  was approximately 10 to 15 minutes.

24     A   Yes.

25     Q   And when you're working as a criminal
                                182

1  interdiction officer, what would you say the average

2  traffic stop runs in terms of duration?

3      A    So you mean as in like typical stop, as in

4  no --

5      Q    Yeah.  How long does a typical stop run or last

6  when you're working criminal interdiction?

7      A    About the same.

8      Q    Okay.

9      A    About the same.  It really depends on my first

10  interaction with you.

11      Q    Okay.  And does that first interaction then

12  determine the rest of your interaction?  Like if you,

13  if -- and I'll give you an example.  Like our first

14  interaction, you've stopped me, pulled me over, and our

15  first interaction is I'm really, really nervous or, you

16  know, I keep stuttering or something along those lines.

17  Does that mean -- at what point do you say, all right,

18  I'm going to continue the stop, or does that

19  automatically raise your flag?

20      A    It can raise a flag, but at the same time,

21  that's why I ask further questions into it.  And I see

22  how you are with certain questions.  And at that point if

23  I feel that there's nothing going on, some people are

24  just nervous, they have traffic warrants.  Some people

25  are nervous they don't have a driver's license.  And
                                    183

1  again, that doesn't mean that, you know, that you're

2  guilty of anything.  It just means that you just have

3  some type of behavior that is causing my, catching my

4  attention.  So I might ask a few more questions.  And if

5  that seems to calm you down a little bit more, I've seen

6  it happen, yeah I'm over here, I don't have a license.

7  Okay.  Well, here's a warning.  Hey, go, take care of

8  your stuff.  Handle your business, and have a nice day.

9      Q   Okay.  Have you ever heard of the term like

10  behavioral driving?

11     A   Yes.

12     Q   What does that mean?

13     A   Just a reaction to certain things.  Like for

14  me, I've seen people just in my mere presence have slowed

15  down, or they -- or not my mere presence, but the

16  presence of a marked vehicle that they can identify is

17  some type of law enforcement vehicle.  I've seen people

18  slow down, I've seen people slam on their brakes, on the

19  highway.  I've seen people just, I had one incident where

20  I caught a kid with some marijuana and a gun.  He

21  basically started moving over lanes, like making unsafe

22  lane changes in front of -- in heavy traffic, and cutting

23  people off.  So I would try to move over with him.  And

24  to safely make a traffic stop and get away from there.

25     Q   Okay.  So how do you determine what's
                        184

1  behavioral driving that is a sign of guilt versus, you

2  know, he had to pee and he was trying to get off the

3  highway quickly.  How do you determine that?

4    A   Well, behavior driving doesn't mean you're

5 guilty it just means you committed a traffic violation.

6    Q   Okay.

7    A   It could be in my presence.  It could be like I

8 said a reaction in the car, some going on inside we don't

9 know, until we actually walk up to that, until we walk up

10 to the window.

11   Q   Okay.  When you're in your criminal

12 interdiction capacity, do you ever receive a tip to look

13 for a particular vehicle?

14   A   Yes.

15   Q   Okay.  How do you get that tip?

16   A   It really depends.  Sometimes it can be a phone

17 call.  Most -- 90 percent of the time it's always been a

18 phone call or we're on an operation with a task force.

19   Q   Okay.  Before you had the cell phone from the

20 Sheriff's Office, did other people on a task force or

21 other law enforcement entities know to call your cell

22 phone?

23   A   They would get my number through some other

24 people that knew me.

25   Q   Okay.  So they would call your personal cell
                              185

1 phone and just let you know what's going on?

2    A   Yes.

3    Q   Okay.  And what kinds of information does a tip

4 usually include?

5    A   It can be hey I've got a vehicle coming up from

6  Eagle Pass and it's -- we've been -- I guess you would

7  say for lack of a better term, we've been watching the

8  vehicle.  It has ties to possible smuggling.  Can you do

9  a traffic stop for us.

10    Q    Okay.

11    A    Simple as that.

12    Q    And based on that information, do you do a task

13  stop?

14    A    I go yes.  But not on that information.  I

15  still have to develop my probable cause to stop the

16  vehicle.

17    Q    Okay.  And when you have to develop your

18  probable cause to stop the vehicle, what does that mean?

19    A    I have to look for a traffic infraction.

20    Q    Okay.

21    A    Violation of a traffic code.

22    Q    Okay.  So you get a tip from this other entity

23  to look for this vehicle, and then do you just follow

24  that vehicle until you get a traffic violation?  What

25  happens?

                              186

1    A    I usually, in my experience, I'll get -- when I

2  get the tip, I'll set up in the area and see if I can

3  spot the vehicle first.  Sometimes that vehicle is

4  already gone, it's already gone through.  Sometimes you

5  might get lucky and it's pulling up within 2 minutes.

6  But as I said, again, I have to develop my PC.  I don't

7  want to stop -- if the car goes 5, 10 miles, and I'll

8  call the agent, or whoever's given me the tip, like hey,

9  this car's gone 5, 10 miles, I don't got nothing on him.

10  Do you still -- how far -- like how -- what is, you know,

11  the reason for this, and what's going on?

12       And I let them explain to me how, you know, if

13  they want it stopped, how bad they want it, or if it's

14  something that they know is for sure going on.

15    Q   Sure.  And what do you mean by how bad they

16  want it?

17    A   So a lot of officers will tell us, hey, we've

18  been watching a vehicle.  We know that there's, that

19  they're transporting something.  They have been doing

20  their investigation, their research, their homework on

21  the vehicle.  And they say we know that it is currently

22  transporting something.  But we have a confidential font

23  that's given us the information this is on the way and

24  it's tied to this vehicle.  So at that point again we

25  still have to develop the PC to stop the vehicle.

                              187

1    Q   Now let's say you've gotten a call, there's

2  high likelihood that this vehicle has some contraband in

3  it.  The other agencies really want you to make this

4  stop, have you ever had the experience where you just,

5  you wanted to stop this person but you didn't see a

6  traffic violation happen?

7    A   Yes.

8    Q   And so what's the longest you have followed a

9 vehicle waiting for a traffic violation?

10   A   I would say about 2 or 3 miles and I've called.

11 I would tell them, like hey, what do you, what do you

12 want?  I can't get nothing on this vehicle.  They're

13 doing everything right.  And they'll tell me either stay

14 on it or let it go.

15   Q   Okay.  And then --

16   A   And usually I'll say hey, let's follow it maybe

17 another mile or two, see if anything happens, if not let

18 it go.

19   Q   Okay.  So in total how long would you say that

20 you would follow that vehicle until you say all right

21 there's no traffic violation here?

22   A   For a whisper stop, I give it up to the agent

23 itself.

24   Q   I'm sorry, hold on.  What's a whisper stop?

25   A   Like an intel stop, information, whisper stop
                              188

1 is the slang term for information stop.

2   Q   Okay.  So a whisper stop is when you get a tip

3 from someone else.

4   A   Yes.  Yes.

5   Q   Okay.  Thanks.  And based on this whisper, how

6 long do you give it before you say okay, I'm not doing

7 anything?

8   A   I usually give it a few miles and then I'll

9 call, hey, what do you want with this, how do you want

10  it.  Like well this is what I see, tell us.  Okay I'll

11  give it -- I go I got nothing.  I can't, I can't pull it

12  over.  You know, how far -- how much more do you want to

13  sit on this, or they'll say all right, they'll tell us

14  hey, just back off, and we'll take over and we'll just go

15  from there.

16      Q    Okay.  When you're doing criminal interdiction,

17  what would you say are the most common offenses that you

18  stop a car for?

19      A    Just moving violations.  Mostly movement, but I

20  have seen some equipment violations as well.  Again, it's

21  one of those I like to see more, more -- more movement

22  violations, because it's a possible reaction to my

23  presence.  But I've also seen, like hey, he's doing this

24  and this while moving, but I also see this is also wrong

25  with the car, like window tint's too dark or the lights

                              189

 1  are out on the vehicle, something, something equipment

 2  violation.  So that way I have, again, it's one of

 3  those -- it's multiple violations as the reason for me to

 4  stop that vehicle.

 5      Q    Okay.  And would you say -- I mean, how often

 6  would you say you stopped someone for speeding while

 7  doing criminal interdiction?

 8      A    Not very often.

 9      Q    Okay.  How often would you stop someone for

10  tailgating?

11      A    Tailgating?  I would say it depends on like

12  how, how often, how -- are they consisting tailgating or

13  is it just that car in front of them slowed down and they

14  just happen to be stuck behind it.

15    Q    Okay.

16    A    So I would say not very often.

17    Q    So from that it seems like, based on what you

18  just said, if it was just like a minor thing, just

19  slightly getting too close to someone, maybe they stopped

20  fast then they got class and then let it go, you wouldn't

21  stop them for that?  You wouldn't consider it enough to

22  stop someone?

23    A    I would consider it is enough to stop someone

24  but I also look for that other infraction, what else is

25  going on with this car.

                              190

1    Q    Okay.  Earlier today we talked extensively

2  about traffic stops in your patrol deputy role.  How do

3  your traffic stops when you're in the criminal

4  interdiction context differ?

5    A    They don't.

6    Q    Okay.

7    A    They're -- it's legitimately the same thing.

8    Q    Okay.  We talked a little bit about the fact

9  that you didn't have drivers come sit in your passenger's

10  seat until you were doing criminal interdiction earlier

11  today.  Is that fair?

12    A    Yes.

13    Q   And why the change?

14    A   It was a new, it was a new, I want to say tool,

15  a new type of way of doing it that Deputy Babb had shown

16  me that I had seen, I had also seen with other

17  instructors through courses I had taken.  As a patrol

18  man, we never did it.  Because some of the supervisors

19  that have never done that kind of work, kind of, they

20  frown upon it, because they don't, they're not trained or

21  versed in it.

22        What me and Deputy Babb started doing, because

23  Deputy Babb is kind of the one who trained me up on it a

24  little bit, I saw a little bit more benefits to it as

25  well.  Safety, plus being on the highway.  And then also
                                191

 1  when you're on the highway, you don't feel like you're

 2  shouting at somebody with all the cars passing by.  So

 3  it's more of a one, professional, Number two, it's a

 4  safety thing.  So they'll sit in the front.  And it's

 5  their option.  We advise them you can have a seat in the

 6  front.  If they say no, it's a no.  It's not something

 7  they have to do.

 8    Q   Okay.  I want to take a couple of steps back.

 9  You said the patrol supervisors kind of frowned upon it.

10  What did you mean by that?

11    A   Because we have some supervisors that were

12  never patrolmen.  They came, they went to the courthouse,

13  worked at the courthouse, then tested, became

14  investigators and then patrolmen supervisors.  Then you

15  had some that ran traffic, never were proactive, just

16  answered calls, became investigators, became supervisors.

17  So it really depends on the route of each supervisor's --

18      Q    And I get that.  But what do you mean by a

19  supervisor frowned -- why would a supervisor frown upon

20  the idea of having a driver sit in your passenger's seat?

21      A    Officer safety issue.  Because when they sit on

22  the right side, if you're a right-handed shooter, that

23  person can reach for your firearm, if they -- and in the

24  case of interdiction, it has happened.  They have shown

25  videos of troopers or officers or deputies fighting with

192

1  people that are, I guess they're, they know they're about

2  to get in trouble, possibility they're going to get in

3  trouble, so they, for lack of a better term, they freak

4  out.

5      Q    Yeah.  And I mean, I guess I can also see, like

6  you know you became a criminal interdiction officer in

7  2020, the hay day of the pandemic.  Butting someone in

8  your enclosed space opens you up to other risks, you

9  know, and you never know what your interaction with them

10  would be.  So why, why make the decision to have someone

11  sit in your patrol car with you?

12      A    So for me, it was a new way to try something

13  new.  I guess, and like there's never a wrong way to eat

14  a Reese's.  You know?

15      MR. WINDHAM:  Hear hear.

16      MS. HEBERT:  Hear hear.

17   A   So there really isn't a wrong way to eat a

18  Reese's.  So with traffic and police it can be done so

19  many ways.

20   Q   (By Ms. Hebert) Okay.  You talked a little bit

21  about Deputy Babb training you on that practice.  But you

22  started as a criminal interdiction officer long before he

23  did.  Seems like you would be the guy teaching him the

24  ropes.

25   A   So we, as -- as I've gone to these specialized

                          193

1  units, we learn from each other.  Babb had -- has far

2  more training than I ever took when I was a patrolman.  I

3  just happened to get lucky and catch the guy, you know,

4  for lack of a better term.  I just, I was a crap magnet.

5  I just happened to find that thing.  I could -- still to

6  this day, I can find that one person who's going to give

7  me problems, who's going to be, who's going to run, who's

8  going to cause issues.  Or I'm going to find the person

9  that has that money or has the dope, who has -- who's

10  doing something illegal.  Just happen to be that person

11  that just, it happens to me.

12      Or I'm going to get a flat tire on the highway

13  in a high speed pursuit and my wheel's going to fall off.

14  That's literally the kind of person I am.  If you ever

15  see that one person where you have that goofy person

16  stuff happens to, that's me.  So -- but like I said, I

17  learn from everybody.  I try to learn from senior

18  officers, I try to learn from officers who have more

19  knowledge, per se, in the field, because they've done it.

20  If they -- or they have some type of information on it.

21    Q   Okay.  I get that.  And we also talked a little

22  bit about you said it's the option for someone to come

23  sit in your patrol vehicle.  It seems like it's not a --

24  when, you know, it's not a question would you like to

25  come sit with me in my patrol car, but it seems more of a

                              194

1  guided direction.  Is that fair?

2    A   I, whenever I instruct people, like hey I'm

3  going to have you sit in my patrol vehicle.  That's kind

4  of guided direction.  They have the option I don't feel

5  comfortable doing that.  Fine you don't have to.  We can

6  do it out here.  And unfortunately if it's on the highway

7  we're going to shout at each other.  Not intentionally,

8  but just the way the volume is.

9    Q   Okay.  And have you had anyone say no?

10   A   Yeah.

11   Q   Like no -- what percentage of folks would you

12  say say no, I'm not going to get in your patrol vehicle?

13   A   I would say out of the whole time -- I used to

14  do that practice.  I haven't done it in a while.  I would

15  say maybe two or three people.

16   Q   Okay.  And then when folks refuse to get in the

17  patrol vehicle with you, what happened?

18   A   I continued the interview out there.

19     Q    Did you consider that suspicious when they said

20  no?

21     A    No.

22     Q    Okay.  Has anyone ever talked to you about the

23  decision to have folks come sit in your patrol vehicle?

24  And by that I mean has any supervisor said, hey, Deputy

25  Gereb, this is fine, you can continue to do this, or you

                                195

1  should stop doing this?

2     A    No.

3     Q    Okay.  So we talked earlier in the traffic, or

4  in the patrol deputy role about calling for a canine and

5  searches and things like that.  How often would you say

6  you call for a canine unit in the, when you're working in

7  the criminal interdiction?

8     A    I would say probably maybe 1 percent of the

9  time.

10     Q    Only 1 percent of the traffic stops?

11     A    Yes.

12     Q    Okay.  What would cause you -- what causes you

13  to call for a canine unit?

14     A    It really depends on the interview, how, how,

15  again, how is the person acting, how is their behavior,

16  what's their reaction to certain questions.

17          If I feel like there's something that they,

18  that they, you know, deny consent, if I feel -- if I have

19  reasonable suspicion to go for the vehicle, then I just

20  ask for consent.  And again, it all depends on how their

21  reaction and behavior is towards my interview questions.

22      Q    Okay.  And what do you mean by reasonable

23  suspicion to go for the vehicle.  Can you explain to me

24  what that really means?

25      A    So reasonable suspicion, any suspicion for the
                              196

1  vehicle, right, so you want to search the vehicle.

2      Q    Okay.

3      A    But you still have to have probable cause to

4  enter it.

5      Q    Okay.

6      A    So if I have the reasonable suspicion that

7  somebody, that this driver is in the commission of

8  something currently, and they're telling me no, but their

9  behavior is not -- their behavior and reactions to my

10  questions are not -- are still raising red flags, then I

11  will request a canine.  And I only ask once.

12      Q    Only ask once?  Excuse me?

13      A    If I ask you for consent to search the

14  vehicle -- if they ask me to clarify, I'll clarify what I

15  mean.  And if they don't give me a clear answer, I tell

16  them it's either a yes or a no.  And I know once they

17  tell me their answer then I'll go from there.

18      Q    Do you provide any kind of warning or context

19  when you're asking for a consent to search?

20      A    Yes.

21      Q    What do you say?

22    A    So I'm asking to search from bumper to bumper,

23 top, bottom, any concealed compartments, any

24 compartments, any bags, backpacks, any purses, glove

25 compartments, center consoles, anything under the car,

197

1 you know, in the engine bay, trunk.  I'll name all those

2 things off.  And if they say yes, nod their head yes,

3 then I'll go from there.

4    Q    Okay.  When you do call for a canine, is one

5 always available when you're working for criminal

6 interdiction?

7    A    No.

8    Q    Okay.  Have you had a call for a canine while

9 working criminal interdiction where the canine was not

10 available?

11    A    Yes.

12    Q    And what happened after that?

13    A    So I will go and give them the warning or

14 citation and I'll cut them loose.  And based on, on

15 training, knowledge and experience, they're going to --

16 eventually they're going to get caught, if in fact they

17 are indeed involved in some type of criminal activity.

18    Q    Okay.  And if the canine is able to come and

19 they do the sniff, how often would you say that the

20 canine alerts, in your criminal interdiction experience?

21    A    In my criminal interdiction experience?  I

22 think it's only been a couple of times they haven't

23 alerted.

24    Q    Have not?

25    A    Have not alerted.

                        198

1    Q    So the vast majority of the time the canine

2  will alert?

3    A    Yes.

4    Q    Would you say -- could you give me an estimate

5  on percentage?

6    A    Well --

7        MR. FRIGERIO:  Objection, form.

8    A    It's quite a -- it's quite a bit of times.

9  I --

10    Q    (By Ms. Hebert) Okay.  If you don't know,

11  that's fine.

12    A    I really don't know.

13    Q    Sure.  Your other answer is fine.

14        Can you explain to me what a dog alert looks

15  like?  And if you don't know, that's fine.  I know you're

16  not a canine expert.  I'm just asking, like you've

17  obviously seen a bunch of canine sniffs now.  What does a

18  canine alert look like?

19    A    The dog indicates to its handler that -- it

20  does some type of movement the most common one I've seen

21  is sitting.

22    Q    Okay.  So if the dog sits, in your experience,

23  that's an indicator?

24    A    That's up to the handler.

25   Q   Okay.

1   A   I let the handler -- I've seen it, and I let

2 the handler explain to me if it was indeed, in fact an

3 alert, or if it was just the dog, I guess you could say

4 the dog being, giving them some type of attitude.

5   Q   Being a dog?

6   A   Yeah.

7   Q   Okay.  Yeah.  So, you know, you -- sounds like

8 from what I'm understanding you to say, and correct me if

9 I'm -- please correct me if I'm wrong -- you rely on the

10 handler to tell you if it's just a dog being a dog or the

11 dog's actually alerted?

12   A   Yes.  Because I have seen that the dog give,

13 not necessarily a false alerts, but kind of give their

14 handler attitude, and they're being I guess not a good

15 dog.  And so the handler has to regain control of the

16 dog.  And I rely on that handler because that handler

17 knows that animal.  And since the handler knows the

18 animal, he's going to be able to tell me yes indeed that

19 was an alert or no indeed that was not an alert.

20   Q   Okay.  When you say like giving the handler

21 attitude, help me unpack that because I automatically

22 think of my toddler that gives me attitude and the

23 attitude is very clear?

24   A   Yeah.

25   Q   But I have no idea what attitude from a canine

1 unit dog would look like.

2    A    So I'll go back to the guy I had earlier this

3 year.  It was a good alert obviously.  The dog alerted.

4 Pretty much it leaned up on the car and he would look at

5 the car, look at his handler, look at the car, look at

6 his handler.  And when the handler would try to pull him

7 away, the dog would not move.  It was straight up

8 fighting him, like it's here, you know, and he's looking

9 at him like, you know, like hey stupid how much more --

10 that's exactly the way he looks at him.  That dog I

11 primarily work with a lot.

12    Q    What's that dog's name?

13    A    Maximus.

14    Q    Okay.

15    A    And that dog, I work with that dog a lot.  And

16 literally, since I started interdiction, I've worked with

17 that dog quite a few times.

18    Q    And what do you see with this dog?  Does this

19 dog have attitude problems?

20    A    No.  No.  He just, I've seen him with two

21 different handlers.

22    Q    Okay.

23    A    And I've seen how he reacts to each handler.

24 And he usually gives a good clear -- he gives a good

25 Clear Alert.

201

1    Q    Okay.

2    A    If he's got something, it's there, and the dog

3 is trained.

4    Q   And what does an alert look like in that

5 context?

6    A   For him, it's sitting.

7    Q   Okay.

8    A   It's always been sitting.  That's all I've

9 known him to do is sit.

10    Q   Okay.  How often would you say that when you do

11 a canine sniff and they alert you find no contraband at

12 all?

13    A   I couldn't tell you offhand.  There have been

14 times that it has happened, and it could be that the

15 person had smoked, say, marijuana, and they had residue

16 in the car.  That, that does happen.

17    Q   But how would you know if there was residue in

18 the car if -- I guess my question is, if the dog alerts

19 and you don't find anything in the car, how do you know

20 whether there was ever anything in the car?

21    A   It could be residue as in like the odor, an

22 odor residue.  It could be chrome, it could be anything.

23 It could be something, the person's clothes are stained

24 with an odor of marijuana.

25    Q   Okay.
                                202

1    A   So it could -- I literally had people that

2 never smoked in their vehicle, never smoked in their car,

3 but they just smoked at home and it stuck on their

4 clothes and now you smell marijuana in their vehicle.

5    Q    Obviously that's you, you smelling them when

6 they approach.  But do you have any indication that when

7 you search a car following a dog alert, that there

8 actually was a trace amount of something there?  How do

9 you identify that?

10    A    What do you mean, as if there was any type of

11 narcotics?

12    Q    Yeah.  I mean I guess the, taking it a step

13 back, how do you know an alert wasn't just wrong?

14    A    Well, that's for us to go through and -- again,

15 it's up to the handler.  I go off the handler tells me.

16    Q    Okay.  And do you ever say something to the

17 handler to the effect of hey that doesn't really seem

18 like an alert to me, or I don't think we should search

19 based on that alert?

20    A    No, because I don't know, I don't know what the

21 handler is -- again, I'm not a canine expert, so I rely

22 on his expertise.

23    Q    Okay.  So if the handler tells you Deputy

24 Gereb, that's an alert, you're not going to question

25 that?

203

1    A    No.

2    Q    Okay.  I think I'd like to talk about the stop

3 that we're here for today.

4    A    Yes.

5    Q    For Alek Schott.  And we talked a little bit

6 about it before.  It happened on March 16, 2022.  And I'd

7 like to just understand what happened for you on that

8 particular day.  On March 16th, 2022, what was your

9 position?

10     A   I was doing criminal interdiction.  I was --

11 Deputy Babb was doing a search.  So --

12     Q   And we'll get to some of those specifics?

13     A   Okay.

14     Q   I want to just start with some of the

15 preliminary stuff.  And on March 16th, 2022, who was your

16 supervisor that day during your patrolling?

17     A   Sergeant Gamboa.

18     Q   Okay.  And what time did you come on duty on

19 March 16th, do you remember?

20     A   I don't remember.  I think we were either 8:00

21 to 4:00 or 9:00 to 5:00.  I don't remember offhand.

22     Q   Okay.  Did you have a particular assignment on

23 March 16th, 2022, an area to cover for role to fulfill?

24     A   I don't recall.  I know we were hitting IH 35

25 South.

                              204

1     Q   Okay.  And as far as you remember on March

2 16th, 2022, was that an ordinary workday or was there

3 anything that stuck out in your mind about that day?

4     A   No.

5     Q   No, it was not an ordinary day or --

6     A   Oh, I'm sorry.  It was an ordinary day.

7  Nothing stuck out.

8    Q   Okay.  And there are two offenses that I think

9  it would be better, it would be helpful to understand for

10  the stop for Alek Schott.  Based on your prior work

11  enforcing traffic violations, what are the requirements

12  for failure to maintain a lane?

13    A   You're not maintaining a lane, you're swerving

14  either onto the shoulder, crossing the traffic lane

15  divider or they call it the fog line or you're going into

16  another lane which you're crossing over the broken stripe

17  white lines, or double white lines, double solid yellow

18  line, whatever is dividing that lane and I guess

19  designating that to be a lane, if you can't maintain it,

20  you're going over, to either left or right.  As long as

21  you're -- if you're over, you're over.

22    Q   Okay.  So if, you know, you go over once,

23  slightly, is that failure to maintain your lane?

24    A   It depends how far you go over.

25    Q   Okay.  So if you go out of your lane one time,
                            205

1  that could be failure to maintain your lane if what

2  happens?

3    A   If you go over the line like you -- I'm sorry,

4  can you rephrase.

5    Q   Yeah, yeah.  I asked you if you go over the

6  line, if that could be failure to maintain your lane, and

7  you said it could be.  So I'm asking you, when could it

8  be versus when couldn't it be?

9    A    Okay.  So simply touching the line doesn't

10 constitute failure to maintain lane.

11    Q    Uh-huh?

12    A    Going over the line as not maintaining that

13 lane.

14    Q    Okay.  So simply touching the line is not

15 enough?

16    A    No, it's not.

17    Q    Okay.  And how do you, how do you decide

18 whether to pull someone over for failure to maintain a

19 lane versus just let them go?  And by that I mean like I

20 can see there's just a slight, go outside of a lane then

21 they get back in their lane and they're fine.  So how do

22 you make a decision whether it's enough to stop someone?

23 You know, the other extreme is someone's constantly

24 swerving in and out of their lane, that seems pretty

25 clear.  So somewhere between threes two examples, how do

                          206

1 you make the decision, where do you decide?  Is it all

2 the way, as soon as you cross the line, I'm going to pull

3 you over for failure to maintain a lane, or is there

4 somewhere in the middle?

5    A    It's really officer's discretion.

6    Q    Okay.

7    A    So it could be one time, it could be five

8 times.

9    Q    Sure.

10    A    It really is on the individual officer's

11 discretion.

12    Q    And how do you evaluate the failure to maintain

13 a lane?  It seems like to me the easiest way to tell if

14 someone's failing to maintain their lane is to be driving

15 behind them and you see exactly where their wheels are.

16 Is that fair?

17    A    You can see that, or you can see it if you're

18 stationary.

19    Q    Okay.

20    A    I had times where I've seen them when I was

21 stationary, seen people cross over the lines.  I've seen

22 times when I'm moving they cross over the line.

23    Q    So tell me about when you're stationary.

24 Because like give me an example of a time where you're

25 stationary and you saw someone, failure to maintain the

                              207

1 lane?

2    A    So 35 South, I've been on the side of the

3 highway or in the medians where they have that emergency

4 turn around and I can see someone just cross, an

5 18-wheeler, somebody, their vehicle crosses over the line

6 and goes back over.

7    Q    Seems like it might be difficult to see that

8 given the rate of speed from parked on the side of the

9 road.  How, just like how do you see it?  Are you looking

10 at the front wheels?  Are you looking at the back wheels?

11 What are you looking at to gauge where they are in the

12 lines?

13    A    The wheels.  The wheels typically carry the

14 car, so it's, if you see the wheel go over, you're seeing

15 the bumpers go over.

16    Q    Okay.  And I'd like to learn more about your

17 experience with the stop of Alek Schott.  At some point

18 during that stop you arrived to help assist Deputy Babb;

19 is that right?

20    A    Yes, ma'am.

21    Q    I think it would be helpful here, Daniel, to

22 pull up the --

23    A    We don't need this any more, right?

24    Q    No.

25    A    Okay.  I just want to make sure.
                          208

1       MS. HEBERT:  Sorry.  I apologize.  Let's take a

2 brief bathroom break while we do the setup.

3       THE REPORTER:  Okay.  We're off the record.

4    (Recess from 2:20 p.m. to 2:29 p.m.)

5       THE REPORTER:  We are back on the record.

6    Q    (By Ms. Hebert) Before we get started here, I

7 just want to clean up a couple of other things.  How do

8 you know what the mission of the criminal interdiction

9 unit is?

10    A    What do you mean?

11    Q    How do you know what the purpose is?  Have you

12 seen any documents or has anyone ever said to you Deputy

13 Gereb, this is our mission critical?

14    A    No, not -- not necessarily anything written on

15 paper or anything in -- that has been specifically said.

16 But we've been told that we have multiple roles.  But our

17 primary thing is we're going to try to knock down

18 smuggling.  Because typically that's what interdictions

19 do.  They're involved in any type of smuggling.

20    Q    Smuggling?

21    A    Of contraband.  Contraband, narcotics, guns,

22 money, humans, anything.

23    Q    And do you get emails from Sergeant Gamboa

24 about criminal interdiction?

25    A    Normally, no.  If I have a question for him,
                            209

 1 I'll call him.

 2    Q    Okay.

 3    A    Or he'll call me.  We'll -- we try to get

 4 things done as easy as possible.

 5    Q    Okay.  And you talked a little bit about

 6 smelling marijuana.  Do you know how to smell the

 7 difference between hemp and marijuana?

 8    A    No.

 9    Q    Okay.  Do they smell the same or do you just

10 not know?

11    A    They usually smell the same.

12    Q    Okay.  We talked a little bit about the failure

13 to maintain a lane and the wheels, and you looking for

14 where the wheels are.  What happens if you can't see the

15  wheels?  Does that mean can't see a failure to maintain a

16  lane?

17      A    So you can -- if -- you can see a vehicle right

18  under the vehicle, you can see the tires, you can see the

19  gap between the car and the ground.  Okay?  And you can

20  see those front wheels, and then sometimes too the car

21  itself you just see that front bumper go over the line,

22  and that's over the line.

23      Q    Okay.  So help me break that down.  If you

24  can't see the wheels, you look to what?

25      A    I look to the bumper, and I, I gauge, look
                                    210

 1  down, and still look for that front wheel, wherever it's

 2  going.

 3      Q    Okay.

 4      A    So if I can't see the wheel, then it's not --

 5  again, I don't see the bumper, I don't see anything

 6  that's actually physically noticeably crossing over the

 7  line, then I don't, I don't look for it.  I don't -- I

 8  would see if there's anything else going on with the car,

 9  but other than that I won't look for that.

10      Q    Let me just clarify that because it got a

11  little confusing.  If you don't see the wheels or the

12  bumper going over the line, you won't make the stop for

13  failure to maintain?

14      A    No.

15      Q    Is that what I --

16    A    Yes.

17    Q    -- understand you correctly?

18         And if you can see the wheels and the bumper

19  but you can't see the line, does that matter?

20    A    What do you mean, like if the car is on the

21  line.

22    Q    No.  If you can see like let's say you're, I

23  can imagine the situation where you're far enough away

24  that you can see the car?

25    A    Yeah.

                              211

1    Q    You can see the bumper, you can see the wheels,

2  but you have no idea where the car is in relation to the

3  lines, besides he's on the road.  Is that fair?

4    A    No, because you're supposed to see the line.

5  That's what -- that's what divides the marks.

6    Q    For sure?

7    A    And the unit.

8    Q    I'll take a couple steps back.  Let's say

9  you're parked somewhere, you're stationary?

10    A    Okay.

11    Q    You're in your patrol vehicle.  Let's say

12  you've got the highway, the grass median strip, the

13  access role, you're over here access road maybe you're at

14  Chili's in the parking lot.  The highway's over here.

15  You can see the cars over here running on the highway?

16    A    Yeah.

17    Q    But you can't see the lines from all the way

18  over there.  Would you be able to decide whether someone

19  had failed to maintain a lane, without seeing the lines?

20     A   Well, no.  You've got to be able to see it.

21     Q   Okay.  So you have to be able to see the lines

22  to be able to tell if the car has failed to maintain a

23  lane.  Is that fair?

24     A   Yes.

25     Q   Okay.  And you don't -- you were telling me you
                        212

 1  don't have to be able to see the wheels to tell if a car

 2  failed to maintain the lanes.  You can do it based on the

 3  bumper?

 4     A   Well, you can see that the car is going over

 5  the line.  If the car is over the line, it's over the

 6  line.

 7     Q   Sure?

 8     A   And that's -- that's usually because it's

 9  failing to maintain a line.

10     Q   Okay.

11     A   I, in my, the way I personally use that

12  discretion is I like a clear offense.  I like a clear and

13  visible offense.

14     Q   Sure.

15     A   I don't like to do questionable stuff.  And

16  that's just me.

17     Q   Yeah.  And does that mean that you know other

18  officers are okay with a little more questionable items?

19      MR. FRIGERIO:  Objection, form.

20    A    I don't -- I don't -- I don't know.  I don't

21  speak to them, for them.

22    Q    (By Ms. Hebert) Sure?

23    A    I speak for myself as far as how I like to do

24  things.

25    Q    Sure.  All right.  I'd like to take a little
                                    213

1  bit, a look at some footage here.  And we just, we talked

2  about the fact that earlier -- earlier today we talked

3  about the fact that on March 16th, 2022, you at some

4  point arrived to assist Deputy Babb with a stop.

5      Let's -- let's watch this footage.  And we're

6  going to mark this as Exhibit 3, I think is our number.

7      MS. HEBERT:  Okay.  Let's watch from the

8  beginning to about 33 seconds, if that's okay, Daniel.

9    (Video playing.)

10      MS. HEBERT:  Okay.  That's good.

11    Q    (By Ms. Hebert) Do you recognize this footage?

12    A    Yes.

13    Q    What is it?

14    A    My recording of my body cam.

15    Q    Was this the recording of your body cam from

16  March 16, 2022?

17    A    Yes, ma'am.

18    Q    In this footage, in the clip we just watched,

19  it seems you arrived to the place on I-35 where Deputy

20  Babb stopped Alek Schott.  Is that your understanding of

21  what was happening in this part of the video and your

22  recollection correct?

23     A   Yes, ma'am.

24     Q   Okay.  Let's look at the -- there's some

25  numbers up in the right-hand corner of the screen.  The

                                214

 1  first number at the very stop, 2022-03-16, that seems

 2  like the date to me.  Is that correct?

 3     A   Yes.

 4     Q   What is the next number?

 5     A   I believe that's going to be Zulu time.

 6     Q   Zulu time?

 7     A   Yes.

 8     Q   Okay.  Tell me what Zulu time is?

 9     A   It's the part of the world where that time is

10  at.

11     Q   Okay.

12     A   It's -- so I recently learned that.

13     Q   Yeah.

14     A   I recently learned that because I had no idea.

15  I thought the cameras were just off on the time.  It's

16  Zulu time.  And I'm not familiar where, which, I know

17  there's -- because I used to know this because when I was

18  military they taught us this.  So that's what they call

19  Zulu time.  So it's a particular part of the world where

20  that's at.

21     Q   Okay.  So that -- maybe everybody else already

22  knows this.  But so that's a particular time stamp.  And

23  it is, in your experience, is that time stamp then

24  accurate based on Zulu time?

25      A    I don't know.  I don't know Zulu time as far as

                              215

1  that.

2      Q    Okay.  So -- how do you, how -- do we know how

3  much the Central Time is off of Zulu time?  Like what

4  time is that in central standard time?

5      A    Central standard, it would be 5:05 p.m.

6          MR. FRIGERIO:  It's just military time.

7      A    Yeah, that would be --

8      Q    (By Ms. Hebert) So this would be 5:05 p.m.?

9      A    That's what I -- yes.

10      Q    Okay.  And was this date, are we sure that's

11  right, because this stop doesn't seem like it was at 5:00

12  p.m.?

13      A    No, that's -- I don't think that it's timed

14  here.

15      Q    Okay.

16      A    I believe that the time is -- it fixes when it

17  gets uploaded so it's not that.

18      Q    Okay.  Maybe my question was unclear.  If

19  that's, if that's military time or that's 5:00 p.m. Zulu

20  time, what time is that here?  Do we know?

21      A    Don't know.

22      Q    Do you know what time that is Central Time?

23      A    Time?  No.

24    Q    Okay.  That's what I was trying to sort out,

25  how it matched up.

216

1    A    Okay.

2    Q    I want to go back a minute.  Before you arrived

3  to assist Deputy Babb, how did you learn that Deputy Babb

4  needed assistance?

5    A    He didn't necessarily ask for assistance.  I

6  just thought would show up see if he needed help.

7    Q    Okay.  So what prompted you to make that

8  decision?

9    A    I don't recall.  Usually it's if I hear

10  someone's doing a search and they're, especially them

11  being on 35, I'll show up anyway just for the assistance

12  of at least traffic control, to help put -- because that

13  way they're not going to get hit by an 18-wheeler.

14    Q    So if you see someone -- if you see another

15  officer made a stop on 35, are you going to go assist

16  them?

17    A    If I'm available, yes.

18    Q    Okay.  Seems like there are a lot of stops on

19  35.  Does that mean that ordinarily you would go assist

20  every time there was a stop if you were available?

21    A    No.  I wouldn't assist all the time.  But if

22  I'm available, I'm nearby, I'll go make a stop.

23    Q    Okay.  And what would you consider nearby?

24    A    A few miles.  Five, maybe ten miles.

25    Q    Okay.

217

1    A    It doesn't take -- on 35, it doesn't take that

2  long to get there.

3    Q    If location records from the Sheriff's Office

4  indicated that you were downtown near East Chavez and

5  South Flores Street, would you have any reason to think

6  you were at a different spot?

7    A    As in to correlation where he was located?

8    Q    Yeah.  So if the location records from the

9  Sheriff's Office on March 16th, 2022, said that you were,

10  before you headed south on I-35 at East Cesar Chavez and

11  South Flores would you have any reason to think that

12  wasn't right?

13    A    I'm having a hard time understanding what

14  you're meaning.

15    Q    Okay.  If there are documents that we received

16  from the Sheriff's Office?

17    A    Okay.

18    Q    That say Deputy Gereb was at this location,

19  which was Chavez and Flores.  Do you know approximately

20  where ha is downtown?

21    A    Chavez is.

22    Q    East-west and crosses Flores.

23    A    I'm trying to figure out where the map is at.

24  Yeah.  But --

25    Q    I think it's near the HEB off --

218

1     A   No, that's right there by the courthouse.  It's

2   by the parking garage.

3     Q   So if the Sheriff's Office said you were in the

4   downtown area, would you have any reason to say that that

5   was not right?

6     A   I don't know.  I don't know if I had pretrial

7   or court that day.

8     Q   Sure.

9     A   I don't recall.

10    Q   Sure.

11    A   But if I was in that area, that means I was

12   typically at court.

13    Q   Okay.  So you were in the, maybe the Court

14   area.  And you don't remember if you were at court

15   beforehand or not?

16    A   No.

17    Q   Okay.  And do you remember how you learned that

18   Deputy Babb had made a traffic stop?

19    A   It usually puts on the radio.  You know, people

20   communicate -- so if I'm in a certain area, I'll look to

21   see where my partners are at, just to kind of gauge, you

22   know, how far they're out, or where they're nearby or

23   where they're working.

24    Q   Okay.  So you'll look on the map to see where

25   they are?

219

1     A   Yeah.

2     Q   And so you saw maybe the general area, but how

3  did you know that Deputy Babb made a traffic stop?

4    A   It will, it will -- so whenever anybody that's

5  either officer I initiated or call comes out a flag pops

6  up or it will say traffic stop or officer initiated and

7  that's usually how we know.

8    Q   And did you, you could see that it was Deputy

9  Babb who had made this traffic stop?

10    A   Yes.

11    Q   Did you drive then to where Deputy Babb had

12  made the traffic stop?

13    A   Was I -- I'm trying to understand what timeline

14  you're looking at.

15    Q   No I'm just trying to break it down.  How did

16  you get there, how did you get to where Deputy Babb was?

17    A   Drove there.

18    Q   Did you activate your lights?

19    A   Yes.  When I got there I activated my lights

20  when I was pulling up, for traffic control.

21    Q   Okay.  So if you activated your lights, does

22  that mean the dash cam started recording?

23    A   Yes, it started recording.

24    Q   Okay.  And to your knowledge, did your dash cam

25  capture any footage of your drive from downtown to
                           220

1  wherever Deputy Babb was?

2    A   Again, I don't recall being downtown.

3    Q   Sure.

4    A   So I don't know if I, if I was at downtown, if

5  I rolled up to Deputy Babb, I don't know.

6    Q   Okay.  Well, where --

7    A   If we're looking at this video, this was on the

8  northbound side.

9    Q   Sure.

10    A   So if I'm coming up from there, I had to come

11  from way towards the south to get up to him.

12    Q   Sure.  But regardless of where you came from,

13  if you activated your lights, you would have dash cam

14  footage from wherever you came from.

15    A   It should, yeah.

16        MS. HEBERT:  Okay.  I think there's another

17  document that might help us, Daniel.  I'm sorry to --

18        MR. NELSON:  No, you're good.

19        MS. HEBERT:  -- disrupt you too.  Would you

20  mind pulling up AA?  Let's mark that as Exhibit 4.

21        MR. NELSON:  I'm going to actually put this one

22  on top.  Is that okay?

23        MS. HEBERT:  Sure.

24        MR. NELSON:  Just where it's not in the way.

25    Q   (By Ms. Hebert) Would you take a look at this,
                                221

1  Deputy Gereb?  And ill represent to you that this is a

2  version of the document that we received as Bates labeled

3  169.  So we received this from the Sheriff's Office.

4  This is printed to one page so that we can see it, but

5  they gave us to it in an Excel format.

6        And I know it's very small.  So if we need to

7  like get a magnifying glass out I'm sure we can figure

8  something out.

9        But I want to skip to there, you see the top

10  where it says the black, there's like a black row at the

11  top?

12    A   Yeah.

13    Q   Can you tell me, do you know what this document

14  is?

15    A   No.

16    Q   Okay.  Then let's skip down to one, two, three,

17  four, five -- no, four.  Do you see where it says 5I11?

18    A   Yeah.

19    Q   And then you see your name next to that?

20    A   Yes.

21    Q   What does 5I11 mean?

22    A   My call sign.

23    Q   What does the 5 stand for?

24    A   I don't know.  Typically that's special units.

25    Q   Okay.  Do you know what the I stands for?

                            222

1    A   India.

2    Q   Okay.

3    A   They call it India for interdiction.

4    Q   Okay.

5    A   And then 11 is just a number.

6    Q   For 5 interdiction 11?

7   A   So 5 India 11.

8   Q   So you don't say the I, you say India?

9   A   Yeah.

10   Q   Okay.  So the next one, or two down, 5K 18, you

11 would say 5 what?  What do you say for K?

12   A   Kilo.

13   Q   Kilo.  So I get the context now.  5 India 11 is

14 what your call sign is?

15   A   Yes.

16   Q   Okay.  And the next line looks like, or going

17 back to where your name is, the next column says 5 India

18 12, and then the next column says Joel Babb.  Is that

19 fair?

20   A   Yes.

21   Q   So does that mean that you contacted Joel Babb?

22   A   Yes.

23   Q   And is the next column looks like a time stamp

24 of whatever that was sent.  Is that fair?

25   A   Yes.

                            223

1   Q   And we're going to skip over the message

2 subject.  The message text says OMW.

3   A   On my way.

4   Q   And that means on my way?

5   A   Yes.

6   Q   Okay.  And so reading all of this together does

7 that mean that at 11:32 you sent Deputy Babb a message

8 that you were on your way?

9    A   Yes.

10    Q   Okay.  So at your time that you sent this

11  message, on my way, what did you understand to be

12  happening?  Why did you send that message?

13    A   I honestly don't recall.

14    Q   Okay.

15    A   If I was downtown, it could be I'm on my way to

16  the working area.

17    Q   Okay.

18    A   If it -- if I was -- if it was a search, I was

19  telling him I'm on my way.

20    Q   And do you remember if Deputy Babb asked for

21  your assistance?

22    A   No, I don't recall if he asked for it or not.

23    Q   Is it normal for you, or at the time was it

24  normal for you to just go assist Deputy Babb if you made

25  a traffic stop?

224

1    A   Yes.

2    Q   And was that, would you say -- how often would

3  you say you went to assist Deputy Babb when you made hey

4  traffic stop?

5    A   Well, we assisted each other.  The issue was

6  there was only two of us.  And we still had to cover each

7  other.

8    Q   Okay.

9    A   So if something does happen to him, you know, I

10 got to be nearby.

11   Q   Sure.

12   A   And same thing, vice versa.  There are cartels

13 known to go up and down 35 in that area.  We -- one of

14 our deputies a few years back got shot at by the Gulf

15 Cartel.  So it's not -- even though he might relatively

16 be safe, it's still something we go out there and help

17 out.

18   Q   Sure.  So does that mean if Deputy Babb made a

19 traffic stop, you were going to be there to assist him in

20 some capacity?

21   A   If it needed, if it warranted, yeah.

22   Q   Well, I guess how do you tell if it warranted

23 it versus didn't.  That's what I'm trying to figure out.

24 Is it all the time that you, when Deputy Babb makes a

25 traffic stop he comes to help you and you --

                              225

1   A   No.

2   Q   Or are there times where you have to make a

3 decision?

4   A   You have to make a decision.  It's determined

5 by -- if he says he's going to do a search, and then I'll

6 come, pull up behind him, and just kind of either let him

7 do his search and I'll just visit for security and

8 conduct traffic control.

9   Q   Sure.

10   A   Or depending on what, it really depends on what

11 he has.

12    Q    Okay.  So he would let you know kind of what's

13  going on and then you would make the decision if you

14  needed to go help him?

15    A    No.  I would just show up and say what do you

16  need.

17    Q    Okay.  So if Deputy Babb -- let me ask this

18  again.  If Deputy Babb made a traffic stop, would you go?

19    A    Not all the time.

20    Q    And so if it's not all the time, how did you

21  decide to go to where Deputy Babb was or not?

22    A    If he was doing a search.

23    Q    Okay.  And at what point would he say I'm doing

24  a search?

25    A    Sometimes he would notify on the radio I am
                          226

1  doing a, some type of search.

2    Q    Okay.  So you wouldn't go for a traffic stop,

3  you wouldn't go assist Deputy Babb for a traffic stop

4  where he just pulled someone over for speeding and then

5  let them go.

6    A    No, no.

7    Q    Okay.  You're only going to go assist Deputy

8  Babb if there's a search that's going to be happening.

9    A    Yes.  But I would also show up too just to

10  check on the status.  If he's been on a stop for a little

11  longer than usual.

12    Q    Uh-huh.

13    A   I would go over, show up, make sure he's okay,

14 and if he didn't need anything.

15    Q   Okay.  Sure.  Let's will look at another

16 document.

17       MS. HEBERT:  Daniel, I'm sorry to --

18    Q   (By Ms. Hebert) So let me just ask one more

19 question about this exhibit, and this was Exhibit --

20    A   4.

21    Q   4.  Exhibit 4, in the message subject place,

22 the second line, it is -- let's look at the, let's see,

23 one, two, third row.  It starts with 5 India 12, Joel

24 Babb, control.  And then let's go to the message subject.

25 I see there is a line person check, Hernandez Jeremiah, a

                        227

1 number true, some more information, and then it says Unit

2 5 India 12 received a hit at location, and then a

3 location location.  Did I read that correctly?

4    A   Yeah.

5    Q   And what does received a hit mean?

6    A   Okay, if you see they received a hit,

7 they're -- they received some type of intel, or they ran

8 something and they sent the information back to them.

9    Q   Okay.  So help me understand.  They ran

10 something?  They ran a check?

11    A   They ran, they possibly ran a check and it

12 alerted to something, like --

13    Q   What kind of alert?

14    A   It could be anything.  Commonly, if I a

15  vehicle, it could be received an alert for, or I guess

16  how you say, like vehicle stolen or not stolen, anything

17  of that nature.  Or for just running a vehicle in

18  general.

19    Q  Okay.

20    A  But this looks like the on board messaging

21  system that runs through our CAD.

22    Q  Uh-huh.

23    A  That's what it seems like this is doing.

24    Q  So these aren't your CAD logs?

25    A  No, no, no.  This is --

228

1    Q  How would you describe it?

2    A  That person to person, that internal message I

3  guess.

4    Q  Internal messaging?

5    A  Yes.

6    Q  Okay.

7    A  So I don't know what this is about.

8    Q  Sure.

9    A  But looks like he ran it, checked the name.

10    Q  Okay.  Let's look at another document.  Let's

11  look at L.  And this will be Exhibit 5.  Can you take a

12  look at this document, once Daniel passes it over to you,

13  can you -- once you get a chance to look at it, can you

14  tell me what it is?

15    A  It's the incident detail report for the --

16 pretty much the report from the key card.

17    Q    Okay.  This is where the key card notes?

18    A    Yes.

19    Q    This is what we were talking about earlier.

20 And is this the report that was generated from those key

21 card notes?

22    A    Yes.

23    Q    Okay.  And just to take a step back for a

24 second, when you have a traffic stop, you have a SPEARS

25 summary, if -- if it's created, like if there's an
                                229

1 incident?

2    A    It's supposed to be always created.

3    Q    So you have a traffic stop, you're supposed to

4 have a SPEARS summary?

5    A    Yes.

6    Q    Will you have an incident detail report?

7    A    Yes.

8    Q    Any other documents that come with a traffic

9 stop?

10    A    It could be a traffic citation, or copy of the

11 citation or warning.

12    Q    Okay.  So copy of the, some document of the

13 citation, which I think we might have.  We can take a

14 look at that in a minute.  And then I've seen somewhere

15 like a moving violation document.  Does that ring a bell

16 at all?

17    A    No.

18    Q    Okay.  So in order, in like the universe of

19  documents for a traffic stop, you would expect there to

20  be three documents, the SPEARS summary, the incident

21  detail report, and the citation, assuming that a citation

22  was issued or a warning was issued?

23    A    Yes.

24    Q    Anything else that I'm missing?

25    A    Not that I can recall.  Not on a typical stop.
                          230

1    Q    That's fine.  I just wanted to make sure that I

2  was understanding all that.

3        How was the incident detail report created?

4    A    So all this is generally from, well, the key

5  card was initiated.  So if you look on here, it talks

6  about longitude and latitude.  That's, that's where on

7  earth he was at when that was created.  So it will tell

8  you the time, who initiated it, what, what location we

9  were at, the disposition of it.

10    Q    Okay.  So to stop you there then, it seems like

11  what you're telling me then this is automatically

12  created?

13    A    Yes.

14    Q    And it runs off of data from the patrol

15  vehicle.

16    A    Yes.

17    Q    Is that all fair?

18    A    Yes, ma'am.

19    Q    Okay.  Can we start at the top and work our way

20  down?  We talked about the title.  Data source is data

21  warehouse, I assume that's some sort of database that the

22  Sheriff's Office has.  Is that fair?

23    A    Yes.

24    Q    The incident status closed.  Incident number,

25  we would expect the incident number to match whatever the

                                231

1  incident number is on the SPEARS summary.  Is that fair?

2    A    Yes.

3    Q    Okay.  And then if there was a case number, it

4  would be here?

5    A    Yes, ma'am.

6    Q    Okay.  The incident date was the date we've

7  been talking about, March 16th, 2022.  And I see

8  11:15:08.  What would that time indicate to you?

9    A    The time it was initiated.

10    Q    Okay.  Initiated.  And this next line, the

11  report generated, I see right now in there, in that field

12  is 9/14/2023, 14:05:29.  Am I reading that correctly?

13    A    Yes, ma'am.

14    Q    What does that line mean?

15    A    That means there was a report generated on that

16  date.

17    Q    Okay.  So that's when this report was printed

18  out from the data warehouse or downloaded from the data

19  warehouse?

20    A    I couldn't tell you.

21    Q    Sure.

22    A    I don't know.

23    Q    Okay.  So walking through some of this, I want

24  to look briefly at the time stamps.  I'm going to skip to

25  the time stamps here.  What does this section of the time
                              232

1  stamps show you?

2     A    Description, phone pick up, first key stroke,

3  in waiting queue, call taken complete, first unit

4  assigned, first unit en route, first unit arrived,

5  closed.

6     Q    All right.  So what does in waiting queue mean?

7  What does that mean?

8     A    I couldn't tell you.  I don't know.  If it's

9  waiting -- I couldn't tell you offhand.

10    Q    Okay.

11    A    I don't know.

12    Q    Let's go to the section on the right of the

13  same part of the page, elapsed times.  At the very

14  bottom, incident duration.  I see 1:16:12.  Does that

15  mean that the traffic stop lasted an hour and 16 minutes?

16  Do you see what I'm talking about?

17    A    Yes.  Yes.  I believe, yes, that's incident

18  duration.

19    Q    Okay.  And let's look at resources assigned,

20  which is the next section down from time stamps.  Reading

21  here, we looked at earlier you are 5 I 11; is that right?

22   A   Why.

23   Q   And 5 I 12, who's is that?

24   A   That would have been Deputy Babb.

25   Q   And then 5 kilo 18, who is that?

                                233

1   A   That's Deputy Molina.

2   Q   Okay.  And based on this time stamp, it says

3 that you were assigned at 12:22; is that right?

4   A   Yes.

5   Q   And then you were on, en route immediately,

6 right after you assigned it, 12:22:36; is that right?

7   A   Yes.

8   Q   And then it looks like at the very end there's

9 like a complete column and seems that the stop was

10 complete for you at 12:22:48.

11   A   So I don't --

12   Q   Is that right?

13   A   Yes.  That's what I was looking at.  So I don't

14 know if the, when I arrived, if dispatch had assigned me

15 or not.

16   Q   Sure.

17   A   But I know I assigned myself to the key card.

18   Q   Okay.  So at some point you got assigned but

19 you don't know exactly when?

20   A   Yes.

21   Q   And the personnel assigned, the next kind of

22 section, I see that it's got your unit and your names

23 again.  What's the number in the parentheses?

24     A    That's our -- that's the Bexar County law

25  enforcement, and that's our employee number again.

234

1     Q    Okay.  So just kind of looking at two documents

2  together, can you look at Exhibit 4?  Remember how it

3  said you were on your way?

4     A    Yes.

5     Q    At 11:32.  And then this says you were on your

6  way at 1122.  Why the difference?

7     A    You mean 12:22?

8     Q    Yes.  Sorry.  Let me just say that again just

9  so I can be clear.  In Exhibit 4 you sent the message

10  that you were on your way at 11:32.  And then this

11  document, Exhibit 5, says you were on route at 12:22.

12  Why the difference?

13     A    So 12:22, again that could have been when I

14  was -- either I wasn't assigned or I had to reassign

15  myself to the call, because there have been times that

16  you could tell dispatch, hey, I'm on the way to, say like

17  to Deputy Babb, or, and they didn't hear you for whatever

18  reason or they didn't assign you.  So you sign just to

19  let them know hey, I was here.

20     Q    Okay.

21     A    And then also on this one, I don't know where I

22  was at at 11:32.

23     Q    Sure.

24     A    So at that point, you mentioned I was downtown.

25 I don't know if I was downtown or not.  I don't recall

1 how that day went.

2   Q   Sure.  Let's look back at your body camera

3 footage.

4      MS. HEBERT:  Daniel, are you ready for that?

5   Q   (By Ms. Hebert) Let's watch the same clip again

6 from 0 to 33?

7      MR. WINDHAM:  Just what exhibit is this?

8      MS. HEBERT:  This is Exhibit 3.

9      MR. WINDHAM:  Okay.

10      MS. HEBERT:  The time stamp is 0:00 to 0:33.

11    (Video playing.)

12   Q   (By Ms. Hebert) Okay.  So we just saw you come

13 up -- to recap what we just watched, we saw you come up

14 to where Deputy Babb was on the side of Alek Schott's

15 truck.  Is that fair?

16   A   Yes.

17   Q   And we saw you have a brief exchange with him.

18 And then you walked around to the back of the truck; is

19 that correct?

20   A   Yes.

21   Q   The audio isn't captured of your conversation

22 with Deputy Babb.  And is that because you activated your

23 camera, but it wasn't still catching up before it

24 captured audio?

25   A   So I had activated my camera yet.  Usually, hey

1  what do you need?  If you need something then I'll stay

2  and activate my camera and get it going.  But it's also a

3  buffering period where it will come back a minute, 30

4  seconds to a minute before you refresh your audio again.

5    Q    Okay.

6    A    So it will play before you press the button, it

7  will still be recording 30 seconds to a minute

8  beforehand, without audio.

9    Q    So it's kind of like it grabs back the last

10  couple of seconds before you pressed the activation

11  button?

12    A    Yes, ma'am.

13    Q    So when we hear the beep, that's when you

14  pressed the activation button?

15    A    Yes.

16    Q    So you didn't press the activation button when

17  you came up to talk to Deputy Babb?

18    A    I don't think I did.

19    Q    Sure.  No, it's fine.  I'm just trying to

20  understand how the camera works.

21    A    Yeah.

22    Q    So you pressed the activation button when you

23  were about to search the car.

24    A    Yes, ma'am.

25    Q    I think that we actually have some of that
                                237

1  conversation captured by Deputy Babb's body camera.

2        MS. HEBERT:  Would you mind pulling up that

3  exhibit, Daniel?  It would be Exhibit H.

4        MR. NELSON:  Yes.

5        MS. HEBERT:  And we're going to look at the end

6  of this clip.  I think it's about a minute or so.  It

7  will be at a minute 51, through to the end.  It's a

8  video, Daniel.

9        MR. NELSON:  Oh.

10        MS. HEBERT:  We're at the video.  Exhibit H is

11  a video.

12        MR. NELSON:  Okay.

13        MS. HEBERT:  It's, I'll show you, this one.

14        MR. NELSON:  Babb Body 1?

15        MS. HEBERT:  Yes.

16        MR. NELSON:  Just for future reference, if you

17  could reference them as that, because they're not

18  listed --

19        MS. HEBERT:  Sure.

20    Q    (By Ms. Hebert) And we'll watch from minute 51

21  to the end.

22        MS. HEBERT:  I've given my colleagues my cold,

23  so sorry.

24        MR. NELSON:  51 minutes?

25        MS. HEBERT:  Yeah, minute 51.  51:00 to the
                              238

1  end.  That's fine right there.

2    (Video playing.)

3        MS. HEBERT:  Daniel, can you pause it?  We need

4 to turn up the volume.

5     MR. WINDHAM:  It's right there too.  Just turn

6 that up.

7     MS. HEBERT:  And we need to go back a little

8 bit.

9     MR. NELSON:  That's okay.  I can start it over.

10    (Video playing.)

11     MS. HEBERT:  Okay.  You can stop it there.

12    Q    (By Ms. Hebert) From what we just saw it seemed

13 like you came up to Deputy Babb and you had a brief

14 conversation.  Is that fair?

15    A    Yes.

16    Q    And I want to break down that exchange with

17 Deputy Babb.  What did you understand Deputy Babb to mean

18 when he said it's one of the vehicles from that thing?

19    A    As part of we were getting information.

20    Q    I'm sorry, I didn't hear that?

21    A    It's part of the task where we were getting

22 information from.  They're southern counties and stuff

23 that will send us information that, that vehicles are

24 possibly involved in the smuggling.  So again, it's up to

25 us we have to approve and investigate that.
                        239

1    Q    Okay.  So from your understanding, you

2 understood Deputy Babb to be saying he got information

3 from somewhere that it was a vehicle that he needed to

4 investigate?

5    A    That possibly might be involved in smuggling.

6    Q    Okay.  And what did you understand Deputy Babb

7  to mean by he was riding tandem?

8    A    Usually, when they say they might be riding

9  tandem, meaning that there's more than one vehicle

10  involved.  Typically, in the smuggling world, they're --

11  you'll have a scout vehicle, and then you'll have your

12  load vehicle and then you might have another scout

13  vehicle, to see where we're at.

14    Q    To see where who is at?

15    A    Law enforcement.

16    Q    Okay.

17    A    So that's typically, it's a pattern of trade.

18  Sometimes they send, they've been known to send bait

19  vehicles to see what we do.  They've been sent -- they're

20  doing their homework on us, just as we're doing homework

21  on them.

22    Q    Okay.  And what did you understand Deputy Babb

23  to mean by he checked out a bunch of places?

24    A    On that one, from the video, I don't recall him

25  saying that offhand.

                                240

1    Q    We can watch it again.

2    A    No, no from the video I remember.  But offhand

3  on the scene I don't remember him saying that.  But if

4  he's saying he checked out a bunch of places, it means he

5  either ran Vigilant on him or he checked him through a

6  border crossing.  I don't know as to that part.

7    Q   Okay.  So there was some record that Alek

8  Schott had been a bunch of places?

9    A   Yes.

10   Q   It seems like I heard you tell Deputy Babb that

11  I was sitting waiting for that white Chevy.

12   A   Yes.

13   Q   What did you mean by that?

14   A   I had also received information about a white

15  truck possibly coming in.

16   Q   Okay.  Do you remember how you got that

17  information?

18   A   I get information the same way Babb did.

19   Q   I guess I don't understand, when you say I got

20  that information?

21   A   So intel, information from other agencies.

22   Q   Does that mean someone called you and said look

23  out for this white Chevy?

24   A   It could be a white Chevy, it could be through

25  text message, it could be through many different ways
                                   241

1  they tell us.

2    Q   Sure.  And you said you were waiting for that

3  white Chevy.  Did you have any other information about

4  the vehicle besides that it was a white Chevy?

5    A   No.  I was doing, I was still doing my homework

6  on it.

7    Q   Sure.

8    A   And that's why I was -- well, I had decided to

9  come help Babb instead.  I know that I was still waiting

10  to see if it passed because I know it hadn't passed us at

11  that time.  So I was still waiting so I figured I would

12  come help out instead.

13     Q    Okay.  Did Deputy Babb already know what you

14  were talking about then when you said that white Chevy?

15     A    I don't know.

16     Q    Okay.  Let's go back to your body camera

17  footage.  And that is Exhibit 3.

18       MS. HEBERT:  And Daniel, we'll skip to 2:50.

19  And we'll watch from 2:50 to 3:40.

20     (Video playing.)

21     Q    (By Ms. Hebert) Okay.  So we saw you searching,

22  in that video, just to recap, we saw you searching the

23  back of Alek's truck some.  Is that fair?

24     A    Yes.

25     Q    And then we saw you pull out a cell phone.  Is

                                242

1  that fair?

2     A    Yes, ma'am.

3     Q    And we saw you use that cell phone in some

4  capacity, whether it was to text or check messages?

5     A    Yes, ma'am.

6     Q    Was this your personal cell phone at the time?

7     A    Yes, ma'am.

8     Q    And were you asked to provide any text messages

9  or call records from that phone for the day of March

10  16th, 2022?

11     A   Yes.  I did contact my provider, and they said

12  that it would have to be subpoenaed.  I attempted to look

13  for it myself beforehand.  But because there's a, I guess

14  it's, I would say archived, or they don't go back that

15  far back to get that information.  They couldn't give it

16  to me.

17     Q   Okay.

18     A   So I did relay that to the attorneys here.

19     Q   Sure.

20     A   Let them know what was going on.

21     Q   Sure.  Let's watch another portion of your body

22  cam?

23        MS. HEBERT:  5:40 to 6:36, Daniel.

24     (Video playing.)

25        MS. HEBERT:  Okay.  You can pause that.
                              243

 1  Thanks, Daniel.

 2     Q   (By Ms. Hebert)  This portion of the footage

 3  appeared to show you receiving a call.  Is that a fair

 4  representation of what we just watched?

 5     A   Yes, ma'am.

 6     Q   Who called you?

 7     A   I believe a -- he's also a retired deputy.

 8     Q   What was the name?  I'm sorry?

 9     A   Hector Avila.

10     Q   Okay.

11     A   He called for an assist, I believe it was an

12 ATL assist.

13    Q    ATL is what?

14    A    Attempt to locate.

15    Q    Okay.

16    A    He's a part of our intel unit which is also

17 under Sergeant Gamboa.  We get calls to help them out

18 with warrants and stuff like that.  So I believe he had a

19 warrant that he was looking for and that's what he was

20 calling me for.  But we were finishing up with this, and

21 I told him hey, I'll be there.  He was kind of giving me

22 a little attitude on the phone so that's why I was like a

23 little annoyed with him.

24    Q    That's okay.  No judgment here.  But you said,

25 what the F, and turned off your body camera.  Is that

                                  244

 1 accurate?

 2    A    Yes.

 3    Q    Okay.  Why did you turn your body camera off?

 4    A    I thought we were done.

 5    Q    Okay.

 6    A    I thought we were done.  I thought I was, you

 7 know, hey we're done, I'm going to shoot off that way.

 8    Q    Sure.

 9    A    But then as we started again, because Deputy

10 Babb was still continuing on.  I was like well, I'm going

11 to stay here till he's done.

12    Q    Okay.  Then let's look at the other portion of

13  your body camera footage.  This will be Gereb body camera

14  2.  And this will be Exhibit 6.  Did I miss one?

15      THE REPORTER:  I think you did.

16      MR. SAENZ:  I don't think you named Babb Number

17  1 --

18      MS. HEBERT:  Okay.  Let's name them -- Babb

19  Number 1 should be 6.

20      MR. NELSON:  Correct.

21      MS. HEBERT:  Okay.  And this -- I stand

22  corrected, this is Gereb Body Camera 2, and this should

23  be Exhibit 7.

24      MR. NELSON:  You want me to play the whole

25  thing?

                                245

1       MS. HEBERT:  Let's watch from 0:00 to 1:05.

2   (Video playing.)

3       MS. HEBERT:  Actually, Daniel, can you stop

4  right there?

5   Q   (By Ms. Hebert) Before we go any further, we're

6  watching the second portion of your camera footage; is

7  that correct?

8   A   Yes.

9   Q   And we are stopped at 00:46.  Who -- who's that

10  on the screen?

11  A   The green uniform is Deputy Molina.

12  Q   Deputy Molina.

13      MS. HEBERT:  Okay.  Let's continue on to 1:02.

14  (Video playing.)

15   Q   (By Ms. Hebert) Okay.  You said I'm trying to

16  watch for another truck right there, I haven't seen it.

17  Are you talking about that white Chevy?

18   A   Yes.

19   Q   And how did you -- where were you looking for

20  that particular truck?

21   A   On 35 coming northbound.

22   Q   Okay.  And so you said I'm trying to watch for

23  that truck, another truck right now.  How were you trying

24  to watch for another truck while you were doing the

25  search?

246

1   A   I, if you actually look at my camera, it shows

2  me standing on the side of the highway facing out towards

3  the highway, because I'm looking.

4   Q   Oh, so when you're going back, turning from the

5  search out to the highway, you're looking for that white

6  truck?

7   A   I'm looking to see if it's passed by.  I never

8  found it.

9   Q   Okay.  Sure.  And to be clear, when you're

10  turning to look at the highway, you were looking for a

11  white Chevy?

12   A   Well, and I'm looking for officer safety too

13  because some of those cars really do get close to us.

14   Q   I entirely understand that.  So officer safety

15  aside, when you're turning to look for the car, the truck

16 that you're referring to, you're turning to look for just

17 simply a white Chevy?

18   A   Yes.

19      MS. HEBERT:  Let's watch another portion of the

20 video.  Would you mind playing 2:20 to 2:42, Daniel?  And

21 to be abundantly clear, that's 2:20 to 2:42.

22   (Video playing.)

23   Q   (By Ms. Hebert) Okay.  This portion of the

24 video camera that we just watched captured a brief

25 exchange between you and Deputy Molina; is that correct?

                        247

1   A   Yes, ma'am.

2   Q   And you asked, "Where did he alert?"  Did I

3 hear that right?

4   A   Yes.

5   Q   And who were you talking to?

6   A   Deputy Molina.

7   Q   And what did you mean by that question?

8   A   Where did Canine Maximus alert on the vehicle.

9   Q   Okay.  And Deputy Molina seemed to respond to

10 your question, "Everywhere, because the windows were

11 down."  Is that fair?

12   A   Yes, ma'am.

13   Q   Okay.  What did you understand Deputy Molina's

14 comment to mean?

15   A   That because the windows were down, his canine

16 was alerting throughout the areas of the vehicle.

17   Q   Okay.  And what was your reaction when you

18  heard Deputy Molina's comments that the dog was alerting

19  everywhere?

20      A    I don't know if you want to play it back, but

21  usually, "Okay."

22      Q    Okay.

23          MS. HEBERT:  Let's watch 8:00 to 9:06.  That's

24  good, Daniel.

25      (Video playing.)

                            248

1          MS. HEBERT:  That's good.  Thanks.

2      Q    (By Ms. Hebert) During that clip that we just

3  asked -- or we just watched, you're searching the vehicle

4  with Deputy Babb and Deputy Molina.  Is that fair?

5      A    Yes.

6      Q    At one point we heard that beep beep.  Is that

7  what you were talking about earlier?

8      A    Yes.

9      Q    With the indicator that your body camera is

10  still on?

11      A    Yes, ma'am.

12      Q    Okay.  Is there a similar indicator for the

13  dash cam?  Is there like a beep beep?

14      A    Yes, ma'am.

15      Q    The dash cam is on?

16      A    Yes.

17      Q    And what's the indicator for the dash cam?

18      A    It's a similar beep.

19    Q    Just like two beeps beeps?

20    A    Yeah.

21    Q    Or different beep?

22    A    No two beeps, same exact ones.  Same exact

23  beeps.

24    Q    Okay.  So you know that your dash cam is

25  working when you hear the beep beeps?

                          249

1    A    Yes.

2    Q    We talked about the indicator lights earlier.

3  Have you ever known your dash cam to malfunction?

4    A    No.

5    Q    Okay.  When, on the clip that we just watched

6  also, during the clip, you asked Deputy Babb, you don't

7  have your thermometer, right?  What is the thermometer.

8  I mean obviously I know what a thermometer is but in this

9  context what do you mean?

10    A    So a thermometer can detect different

11  temperatures in the vehicle.  If you've got a lifted

12  truck or 18-wheeler, you look at the axle and the axle

13  has a hub which is a big old ball in the middle, best way

14  I can explain it.  And you look at one end, and it says

15  250 degrees.  You look at the other end and it says 90

16  degrees, there should have similar temperatures.  Not --

17  and it usually can be an indicator that they're using the

18  hub to, or somewhere in the vehicle that's not matching

19  normal temperatures.

20         So if you've got a hot car, you know, say this

21 vehicle's been on the highway.  High speeds, the

22 vehicle's warm, a lot of parts are hot.  But you get a

23 cold spot.  Not just like 5, 10 degrees, talking about a

24 significant cold spot, like 100, 200 degrees shorter than

25 what it should be.  And that's not really normal.
250

1 Possible indicator that something's going on either the

2 engine is malfunctioning at that part or there might be

3 some type of concealment.

4     Q     Okay.  That's super helpful.  Thank you.

5           And during that clip, we also heard Deputy Babb

6 say we're done.  What did you understand Deputy Babb to

7 mean when you said we're done?

8     A     Done with the traffic stop.

9     Q     The traffic stop is finished?

10    A     We're not doing any more.

11    Q     And ultimately you, Deputy Babb and Deputy

12 Molina, you didn't find anything in this vehicle, did

13 you?

14    A     No.

15    Q     And if there was a report indicating that you

16 or other deputies found an illegal substance in Alek

17 Schott's truck, that would be incorrect; is that fair?

18    A     Yes.  Well, from my, I didn't see nothing, so

19 putting it for myself, I didn't find nothing.  And I

20 wasn't told about anything.

21    Q     Yeah.  And just, just asking based on your

22  personal experience, you didn't see Deputy Babb find

23  anything.

24      A   No.

25      Q   You didn't see Deputy Molina find anything?

                          251

1       A   No.

2       Q   So if there's a report indicating something was

3   found that report would be incorrect?

4       A   Yes.

5           MR. FRIGERIO:  Objection, form.

6           MS. HEBERT:  Let's watch from 9:06 to the end

7   of this clip, Daniel?

8           MR. NELSON:  I actually need to move it back.

9           MS. HEBERT:  That's fine.

10           MR. NELSON:  Okay.

11      (Video playing.)

12      Q   (By Ms. Hebert) You told Deputy Babb that Sarge

13  was calling.  Who were you referring to?

14      A   Gamboa.  Sergeant Gamboa.

15      Q   Sergeant Pete Gamboa?

16      A   Yes.

17      Q   Also earlier you called, you said he might go

18  by Pedro?

19      A   I think -- I think his legal name is Pedro.

20      Q   Okay.

21      A   But I've seen his emails say Pete Gamboa, and

22  I've seen Pedro.  I'm like, so hey Sarge.  That's what I

23  call him now.

24   Q   That's fine.  I just wanted to check on that

25  from earlier.

252

1        And it sounded like someone else is calling

2  you, sounded like Ivy Love to me?

3    A    Avila.

4    Q    Avila.

5    A    Yes.  That was the person that called me

6  earlier in the video.

7        MS. HEBERT:  I'd like to look at another

8  document.  Let's pull up Exhibit N.  This will be marked

9  as Exhibit 8.  Is that correct, Daniel?

10       MR. NELSON:  Yes.

11       MS. HEBERT:  So we're looking at N as in Nancy.

12   Q   (By Ms. Hebert) Deputy Gereb, can you take a

13  look at this and let me know when you're ready.

14   A   Yes, ma'am.

15   Q   What is this document?

16   A   SPEARS incident report.

17   Q   Let's look down to the involved persons

18  section.  Whose name is there?

19   A   Mr. Schott.

20   Q   Okay.  And we've already discussed Mr. Schott

21  is the person who was stopped in this case, correct?

22   A   Yes, ma'am.

23   Q   Okay.  And so would it be fair if I said that

24  this is SPEARS summary from the traffic stop where Alek

25  Schott was stopped?

253

1    A    Yes, ma'am.

2    Q    Okay.  Let's go through this document.  I see

3  here that the case number is blank.  That means there was

4  no case number for this incident.  Is that fair?

5    A    Yes, ma'am.

6    Q    Okay.  The source says officer initiated by.

7  Is it normal for that to just have no officer at the end?

8  Is that just one of the options you pick?

9    A    That's one of the options.

10    Q    Okay.  Let's go to the summary section.  It

11  says traffic stop with positive canine alert.  Did I read

12  that correctly?

13    A    Yes, ma'am.

14    Q    If you and your fellow officers found something

15  in Alek's truck, would this summary have been different?

16    A    Possibly.  It depends on, on who was writing

17  the summary.

18    Q    Let's go to the next page, involved officers.

19  And this report indicates there are three officers

20  involved, and we saw all three of those officers on the

21  video footage.  That would be you, Deputy Molina and

22  Deputy Babb.  Did I get that right?

23    A    Yes, ma'am.

24    Q    And you're listed as covert operations here.

25  What does that mean?

254

1    A    Usually it's, so TAG has two sections, covert

2 and intel.  I think they just have us under that for, on

3 paper.  But we are under interdiction.

4    Q    So as far as I understand what you just said,

5 it means that the criminal interdiction unit is within

6 the covert section?

7    A    Yes, ma'am.

8    Q    Okay.  But at this time -- and by this time I

9 mean as of March 16th, 2022, were you part of the covert

10 operations?

11    A    No.  So when TAG came about, interdiction had

12 kind of been transferred from traffic over to -- so when

13 it first -- let me go back.  In 2020, we were under

14 training.  Then fell under traffic.  Then fell under --

15 because Sergeant Gamboa was over the training academy at

16 the time.  He was supervisor at the training academy.

17 And then he went -- then when TAG formed, he went over to

18 the TAG intel unit.  And pretty much he's, we've been

19 under him every time.  So he has, I think it's on paper

20 under covert operations.

21    Q    Okay.

22    A    But looking at the timeline that this is done,

23 Babb wasn't assigned to the training academy at the time,

24 and neither was Douglas.

25    Q    Okay.

255

1    A    So --

2    Q    So what does that mean?

3    A   Oh, just that's when Babb was at the training

4  academy, and this Douglas has started now and she's a

5  sergeant and she's currently over the training academy as

6  supervisor.

7    Q   Okay.  So let me just take a couple of steps

8  back.  When did Babb get assigned to training?  Do you

9  know?

10    A   I would say -- I want to say it's late 2022.

11    Q   Okay.  Late 2022.  What prompted, as far as you

12  know, Babb to get assigned to training?

13    A   That was where he wanted to go.  He had prior

14  military experience as an instructor.

15    Q   Uh-huh.

16    A   And he had expressed interest to do that.  So

17  like okay, go do it, man.

18    Q   Okay.

19    A   It's your career.  That's what I always tell

20  him.

21    Q   And he, but Babb wasn't in training when he

22  made the stop of Alek Schott.

23    A   No.

24    Q   He wasn't a trainer --

25    A   No, ma'am.

                          256

1    Q   -- when he made this stop of Alek Schott.

2        Okay.  I want to look at another version of

3  this document.

4       MS. HEBERT:  Can you pull up M, Daniel?  And

5  this will be marked as Exhibit 9.

6     Q    (By Ms. Hebert) Let me know when you're ready.

7     A    Okay.

8     Q    What is this document?

9     A    It appears to be redacted information from the

10  Exhibit 8.

11    Q    Sure.  So, so far as you can tell, same Exhibit

12  8 and Exhibit 9 are the same, just one's redacted?

13    A    Yes, ma'am.

14    Q    Okay.  Other than the redactions -- other than

15  the redactions, I want to look to the involved persons

16  section, involved officers section.  Excuse me.  On the

17  next page.  And look at the various involved officers.

18  And we'll start with the first line, assisting officer

19  Gereb, you're listed as special enforcement?

20    A    Yes, that's what we were under before we

21  went -- I'm still trying to figure out what my role is,

22  where I'm assigned to these days.  For some reason

23  interdiction kind of just bounces around.  We have

24  multiple sergeants, multiple supervisors.  But we fall

25  under primarily Gamboa and we have a new lieutenant.  So

1  we're trying to figure out, right now we're in a

2  transition phase.

3     Q    So I guess the first question I have to ask you

4  is it seems like this document changed.  There's two

5  versions of this document, one that lists you as covert

6  operations and one that lists you as special enforcement.

7  Why -- why did the document change?

8    A   Couldn't tell you.  It could have been how I

9  was inputted in the system.

10   Q   Sure.

11   A   I don't know.  That would be on the admin side.

12   Q   That's okay.

13   A   This doesn't -- we don't have any input as far

14 as how we're inputted into the RMS system.

15   Q   And from what I was understanding to you say a

16 couple of seconds ago, Sergeant Gamboa has been the

17 criminal interdiction guy, and the unit has gone where

18 he's gone is that fair?

19   A   Yes, ma'am.

20   Q   That's one of the reasons why it's been under

21 these different classifications.  It's followed him.

22   A   Yes, ma'am.

23   Q   Okay.  Let's go back to Exhibit 8, if you don't

24 mind.  And let's flip to Page 3.  And this looks like one

25 of those general reports we were talking about earlier;
                    258

1  is that correct?

2    A   Yes, ma'am.

3    Q   And based on the top two lines, it looks like

4  this was authored by and entered by Deputy Babb; is that

5  correct?

6    A   Yes, ma'am.

7    Q    When you have a general, a general report for

8  an incident, would you expect all the reasons you've

9  stopped a officer -- or stopped a driver to be in that

10  report?

11    A    Yes.

12    Q    And would you expect that all the reasons that

13  you decided you could search the vehicle would be in that

14  report?

15    A    Yes, ma'am.

16    Q    Okay.  Let's flip to the next page.  And what

17  is this page?

18    A    Supplemental by Deputy Molina.

19    Q    To be clear, this is Page 4.  So this does this

20  mean that Deputy Molina did a supplemental report?

21    A    Yes, ma'am.

22    Q    And let's flip to the next page.  Page 5.  What

23  is this page?

24    A    Another supplemental report by Deputy Babb.

25    Q    So that means Deputy Babb did a supplemental

259

1  report?

2    A    Yes, ma'am.

3    Q    And let's flip to the end.  Were there any more

4  pages?

5    A    No, ma'am.

6    Q    Okay.  So you didn't provide a reporting to

7  with this incident.  Is that fair?

8    A    Yes, ma'am.

9    Q    And why is that?

10    A    So at the time of the incident, traffic stops

11  usually assisting officers you can put something in there

12  or not.  They've clarified it since then that we needed

13  to have our input.  But at this time we, if you were just

14  an assisting officer, you didn't need to provide a

15  report.

16         Also, because this was, at the time was a

17  traffic stop, it was a warning issued, that there was no,

18  no actual, I want to say not law enforcement action,

19  there was no arrest made, there was no contraband was

20  found, nothing was done until later on Deputy Babb was

21  advised he needed to write a report.

22         I didn't, I wasn't instructed to write one, or

23  provide a supplement, because of my role.

24    Q    Sure.

25    A    I was purely assisting and covering.

                          260

1    Q    So at what point -- let me take a couple steps

2  back.  You talked about how the rules on when you need to

3  do a supplemental report have changed; is that correct?

4    A    Yes.

5    Q    When did that happen?  Do you -- at least to

6  your memory.  I mean obviously you're not going to know

7  on X date so-and-so told us we need to do this.  But to

8  your mind, when did it come down that you had to start

9  doing supplemental reports whenever you assisted?

10     A    I would say about probably a little over a year

11  ago.

12     Q    Okay.  And who clarified that?

13     A    That would be one of our supervisors.  Gamboa.

14  It would be one of our supervisors.  And then I've heard

15  it from other supervisors as well.

16     Q    Okay.  And you mentioned a couple of seconds

17  ago that there wouldn't have been a general report here

18  because it was a traffic stop with just a warning.  What

19  did you mean by that?

20     A    Meaning that on traffic stops, if there's no

21  other further law enforcement action taken, meaning

22  nobody's arrested, there's no evidence, there's nothing

23  to enter, nothing of that nature, we can close it out as

24  a traffic stop.  We put the person's information and then

25  we're on our way.

261

1     Q    Okay.  And what -- and you were talking about

2  this particular traffic stop that someone told Deputy

3  Babb he needed to write a report.  What do you -- what

4  did you mean by that?

5     A    I remember right -- because we don't typically

6  write general reports.  I believe that a complaint was

7  made by Mr. Schott after the fact.

8     Q    Okay.

9     A    So, and that's what I understand from that.

10     Q    Okay.  So you -- your understanding is that

11  Mr. Schott made a complaint --

12    A   Yes.

13    Q   -- and that prompted the creation of this

14  general report.

15    A   Yes.

16    Q   Okay.  And earlier today we talked about the

17  importance of having records on the same day when

18  you're -- by the end of your duty.  This general report

19  by Deputy Babb was completed on the 18th of March.  Is

20  that fair?

21    A   Yes, ma'am.

22    Q   So that was two days after the traffic stop; is

23  that correct?

24    A   Yes, ma'am.

25    Q   Okay.  And to your knowledge, were you involved
                        262

 1  in any of the conversations in between when Alek Schott

 2  was stopped and the traffic stop on the 16th and the

 3  18th?

 4    A   No, ma'am.

 5    Q   So no one came to you and talked to you and

 6  said Deputy Gereb, what happened?

 7    A   Yeah.  No one's talked to me at all about it

 8  until I was needed for here.

 9    Q   Sure.  That's fine.  I just wanted to know in

10  this context here whether anybody had any conversations

11  with you.

12        Let's go to Page 5, the action log.

13    A    Yes, ma'am.

14    Q    And earlier today we looked at a SPEARS summary

15  that had a list of action items in the action log.  This

16  one's blank.  Why?

17    A    Again, same thing, we didn't -- some of us had

18  gotten, I would say, you know, relaxed about putting the

19  action logs in when our role is so minute, or not as

20  vague.

21        Again, since then it has been clarified that we

22  are to do something about it, or write something in

23  there, whether it's assist coverage, assist with a

24  search, standby, something of that nature.

25    Q    Okay.

                              263

1    A    So since then, it has been -- we have been

2  directed again by supervisors to put an input in, have

3  some type of input.

4    Q    Let's go back to Exhibit 5.

5        MS. HEBERT:  Daniel, you don't need to do

6  anything.

7    Q    (By Ms. Hebert) Deputy Babb, or Deputy Gereb,

8  you might have Exhibit 5.

9    A    Right here.

10    Q    I'm going to go back to my version.  We looked

11  at this previously.  And I want to skip to -- let me make

12  sure I'm looking at the right document.  Okay.  Yeah, I

13  want to go to the second page of this document, and we

14  are looking at -- which number are we on?  What number is

15 this?

16        MR. WINDHAM:  5.

17        MS. HEBERT:  5.

18    Q    (By Ms. Hebert) I'm looking at Number 5.  And

19 can we look at the activity log section?  And the

20 activity log here says no call activity.  Is that fair?

21    A    Yes, ma'am.

22    Q    Okay.  And I want to look up at the comments

23 section.  You'll see the comments section at the top of

24 the page with the gray title.  And the first line is

25 3/16/2022, 11:15:08, Joel Babb response, and then I see a

264

1 license plate number.  Is that correct?

2    A    Yes, ma'am.

3    Q    What does that mean happened there?

4    A    That means when he entered the, when he

5 initiated the traffic stop, the traffic button, he put

6 the, tapped the license plate in.

7    Q    So that's when he entered the license plate?

8    A    Yes.

9    Q    At 11:15:08?

10    A    Yes, ma'am.

11    Q    Next line 11:49:50 there's a user number.  Do

12 you know what that corresponds to?

13    A    It's going to be -- that's an employee number.

14    Q    Okay.  That's an employee number?

15    A    Yes, I believe that might be a dispatcher's

16   number.  I don't know if it shows on the other exhibits

17   if that belongs to anybody else's.

18      Q   Okay.  And then the comments section, what is

19   that saying?

20      A   Canine deployment, timestamp.

21      Q   Explain what that means to me.

22      A   So a canine they usually have, when they deploy

23   their canine, they have to put a time stamp the dog was

24   taken out of the vehicle and did a sniff.

25      Q   So this 11:49:50 was a time stamp for when the

265

1   dog was removed from the vehicle?

2      A   Yes.

3      Q   And 11:50:49, there's another line of text.

4   Can you read that for me and explain what it says?

5      A   It says 5 kilo 18 positive alert, dash, or fort

6   slash forward slash driver's side door.

7      Q   What does that mean to you?

8      A   It's showing where the dog positively alerted

9   on.

10      Q   Okay.  The next Line 12:22:35 Molina response,

11   the comments section, can you read that for me and

12   decipher it?

13      A   Again it's canine daily activity report, canine

14   deployment, body worn camera available.

15      Q   What do you mean by canine daily activity

16   report?

17      A   Just -- so on ours, if you look at mine, the

18  next line says DAR.

19    Q    Uh-huh.

20    A    Okay.  It's his -- it's because he's canine,

21  K -- K for kilo, canine, that's kind of how they do that.

22    Q    Okay.  What does DAR then stand for?

23    A    Daily activity report.

24    Q    Okay.  So it's just -- where does that go, just

25  I'm reporting on my activity?

1    A    Yes.

2    Q    Okay.  And the second to last line that's

3  12:30:47, DAR OIA T stop X1 warning.  What's that saying?

4    A    So that was his daily activity report, officer

5  initiated activity.  Traffic stop, you have to put

6  traffic, traffic stop, in his case he put T stop, then

7  times one warning.

8    Q    Okay.  And then the last line, 12:30:58, Babb,

9  Joel responds, axon BWC, that means the body cam is

10  available?

11    A    Yes, ma'am.

12    Q    Okay.  And again, the activity log section of

13  this one is blank.  Is that fair?

14    A    Yes, ma'am.

15    Q    Okay.  What's the -- on the next page, which

16  has the Bates stamp 163 at the bottom, there's a little

17  bit of data on the top that says description, PSAP data,

18  Bexar County SO, then there's a phone number and mobile

19  3. Do you know what that's about?

20     A   I do not.

21     Q   That's okay.  And do you know what the next

22  line is about?

23     A   I do not.  This one -- if I'm reading that

24  right, it says SAPD channel and not SAPD means that it

25  was the area we were in was the San Antonio Police

                              267

1  Department patrols, or -- and again it will say not SAPD

2  because we're not -- even then we still, I don't think it

3  was putting out SAPD because.

4     Q   So this is like a jurisdictional marker.  You

5  weren't in the San Antonio Police Department district.

6     A   No, ma'am.

7        MS. HEBERT:  Okay.  I want to go to Exhibit KK.

8  And we may need the big version of this one too, Daniel.

9        MR. NELSON:  May need the what?

10        MS. HEBERT:  The big version of this one too.

11        MR. NELSON:  Okay.  Is it in --

12        MS. HEBERT:  No, we'll start with this one.

13  Just as a heads up.

14        MR. NELSON:  Okay.  Okay.

15        MS. HEBERT:  Let's mark this as Exhibit, what

16  exhibit are we at, 10?

17        MR. NELSON:  Yes.

18     Q   (By Ms. Hebert) And I'm going to represent to

19  you this is the same document we just looked at as

20  Exhibit 5, but the redacted version.  Is that fair?

21    A    Yes, ma'am.

22    Q    Okay. I want to skip to the next page. Well

23 actually the very bottom. Do you see the grayed out

24 portion at the very bottom that says activity log?

25    A    Yes.

                          268

1    Q    The third line up? And do you see an entry

2 there?

3    A    Yes.

4    Q    And let's stip to the next page. Is there a

5 considerable number of entries on activity log?

6    A    Yes.

7    Q    And can you tell me what the activity log is

8 showing?

9    A    There's --

10    Q    Just in general, like what is it for?

11    A    The key card. The actions of the key card.

12 When the call was initiated was officers secured, all

13 that entry, everything that goes on during the call.

14    Q    Okay. I want to take a -- take time and go

15 through all of these entries and let's figure out what

16 they say but let's take a brief break so I can get you a

17 copy that not so tiny, if that's okay?

18    A    I can read it.

19    Q    Well, we have a bigger version I can give it

20 are to you?

21    A    Okay.

22      MS. HEBERT:  Let's take a brief break.  We'll

23  go off the record for a second.

24      THE REPORTER:  We're off the record.

25      (Recess from 3:49 p.m. to 3:54 p.m.)
                            269

1       THE REPORTER:  We will back on the record.

2    Q    (By Ms. Hebert) We're going to hand you another

3  exhibit.  I think this is marked Exhibit 11?

4       MR. NELSON:  Correct.

5    Q    (By Ms. Hebert) And this is just the same

6  document on a bigger sheet of paper so we could try to

7  zoom it in.  Let's skip to the second page if you don't

8  mind.  Oh actually, can we go back to the first page?

9  What's the report generated date on this one?

10   A    7/13/22.

11   Q    Okay.  Can you look at Exhibit 5 again?  And

12  what was the report date on generated on that one?

13   A    9/14/23.

14   Q    See the exhibit we have is, 11, is earlier in

15  time than this exhibit.  Is that fair?

16   A    Yes, ma'am.

17   Q    Okay.  Let's look at the second page of Exhibit

18  11 and I was hoping that you would walk me through this

19  activity log.  Can we start at the top?  And the first

20  kind of column or the first row is the same date, March

21  16th, 2022, 11:15:07, 5 India 12, that's Deputy Babb; is

22  that correct?

23   A    Yes, ma'am.

24    Q    Then you have see response.  What does response

25  mean there?

270

1    A    Oh, that he's initiated a traffic stop.

2    Q    Okay.  And then over in the log entry column, I

3  think it starts responding from IH-35, and then a bunch

4  of language.  What is that log entry referring to?

5    A    Where he's coming from.

6    Q    Okay.

7    A    The part of the highway he's on.

8    Q    And then the next entry also at 11:15:07, 5I12

9  says in the activity column says on scene.  What does

10  that mean?

11    A    That means that, that he's secure -- not

12  secure, that he's on scene, that he's -- it's checking

13  out that he's started the call and that he's on scene at

14  the call.

15    Q    Okay.  And then the next line says incident in

16  waiting queue.  What does that mean?

17    A    I do not know.

18    Q    Okay.  And then the line after that says

19  waiting pending incident time warning.  Do you know what

20  that means?

21    A    So this is usually where dispatch, it does,

22  what I talked about earlier, they give us amount of time

23  to secure ourselves.  And so they always, they have a

24  running clock when we do officer initiated activities.

25  And if we don't respond during that clock let them know

1  we're okay they're going to start asking our status.

2      Q    Okay.  Well wit sounds like this is one of

3  those indicators to send their status and it had only

4  been 1 second since Deputy Babb responded.  So why would

5  you get a warning then?

6      A    No, I'm sorry, it's -- it's -- it is that but

7  it's starting the clock.

8      Q    Okay?

9      A    That's when the clock is starting.

10     Q    Super helpful that's when the clock is starting

11  for the hay you need to check in warning?

12     A    No, no that's a hey -- so when the dispatchers

13  sit in there and they see that get started, the clock, I

14  believe, automatically starts, like a timer.  So the next

15  thing is you check out officer initiated activity,

16  traffic stop or whatever.  A clock starts.  So that way

17  they can say hey, we need to make sure he's initially

18  secure, and then I believe once we're secured, another

19  clock starts again.  That gives us a little bit more time

20  to --

21     Q    Okay.  So this is the pre-security clock

22  starting?

23     A    Yes.

24     Q    Okay.  So you're not secured.  You started an

25  incident.  Your clock is starting to let us know that

1  you're okay.

2     A    Yes.

3     Q    Okay.  The next line says traffic stop incident

4  created.  And the log, the log entry says incident

5  created successfully from Unit 5 India 12 by Babb, Joel.

6  Did I read all that correctly?

7     A    Yes.

8     Q    Can you explain this line to me?

9     A    The traffic stop.  This is all from like the

10  dispatcher's side.  I don't know how the orderings, why

11  it puts it in whatever orders.  Usually, from my

12  understanding is I started it, that should be me starting

13  the whole problem.

14     Q    That kind of makes sense?

15     A    Yeah.

16     Q    Like this is all 1 second apart?

17     A    Yeah.

18     Q    So all these things are just like you hit

19  traffic stop and it started all these little timers and

20  indicators?

21     A    Yes.

22     Q    Is that fair?

23     A    (Nodding head.)

24     Q    Then let's skip down to the supplemental

25  information, supplemental vehicle record and there's a

                          273

1  number added for license plate.  What does that mean?

2     A    Are you talking about --

3   Q   I'm in the log entry?

4   A   11:17:32 we're looking at time.

5   Q   No 11:15:08?

6   A   Oh, okay.

7   Q   Where it says supplement at vehicle report?

8   A   I'm sorry, the 6:05 number.

9   Q   Yes, the 605 number?

10   A   Okay.  I see what you're talking about.  So

11 what was the question?

12   Q   What does that log entry mean?

13   A   I believe that's when he ran the -- or that's

14 when the license plate information was coming back.

15   Q   Okay.

16   A   I don't know what the number means.

17   Q   All right.  And then the next line says plate

18 number redacted was added.  Do you know what that means?

19   A   It was redacted?

20   Q   The next line in the log entry?

21   A   Plate number redacted has been added.  No, I

22 don't.

23   Q   Okay.  Let's go to -- it's hard to indicate the

24 marker.  There's a log entry that starts out with 5 India

25 12, incidental, incident LD.  Do you see what I'm talking

274

1 about?  It's 11:17:32 is the time?

2   A   Okay.

3       MR. FRIGERIO:  Over here.

4    A    You said 11:1732.

5    Q    (By Ms. Hebert) Here let's just go line by line

6  so make it easier.  So we've got 11:15:12; is that right?

7    A    Yes.

8    Q    That's when your move wait pending incident

9  warning is gone is that fair?

10    A    Yes.

11    Q    Then 11:16:44, 5 I 12 secure does that mean

12  Deputy Babb indicated he was secure at that moment?

13    A    Yes.

14    Q    So that means that he successfully made the

15  stop?

16    A    Yes.

17    Q    So as of 11:16:44, he had stopped Alek Schott.

18    A    Yes.

19    Q    Okay.  11:17:32, the next line, record check,

20  person check.  And then you see a couple of things in the

21  log entry.  Does that mean that at 11:17:32, Deputy Babb

22  ran the person check on Alek Schott?

23    A    Yes.

24    Q    And can we see what came back here, or does

25  this just indicate that it ran a check?

275

1    A    It just ran a check.  I think if he had

2  anything, a warrant, anything other than that it would

3  just be his driver's license that came back.

4    Q    Okay.

5    A    Meaning like if he had any warrants or if he

6  was wanted or outstanding, it would -- it would pop up.

7  But.

8     Q   It would show up here on this piece of --

9     A   I don't know.

10    Q   Paper?

11    A   I've never seen it here.

12    Q   Okay.

13    A   It's very rare that we look at these.

14    Q   So if something popped up, where would it show

15  up?

16    A   It would show up on the returns we get from --

17  so whenever we get a return for your license, vehicle

18  information, if he had a warrant or anything, it would

19  pop up on the same screen.

20    Q   Okay.  Do you know where that would be logged?

21    A   I don't know.

22    Q   Okay.  That's fine.  And the next check is

23  11:17:32.  It seems like there was another person check,

24  supplemental person check.  Is that fair?

25    A   Yes.

                         276

1     Q   And then again, the next line, 11:17:32, there

2  was another supplemental information.  There's a

3  supplemental information and the log entry says

4  supplemental person record, then a number was added for

5  Alek Schott.  Do you know what that's talking about?

6     A   No, ma'am.

7    Q   Okay.  11:27:05, there's 5 kilo 18 DISP.  What

8  is that line referring to?

9    A   He's dispatched, or he's on his way.

10    Q   Okay.  So at 11:2705 Deputy Molina was

11  dispatched.

12    A   Yes, ma'am.

13    Q   11 -- I'm going to skip down to 11:47:34.  And

14  you see 5 kilo 18 on scene.  Does that mean at 11:47:34,

15  Deputy Molina was on scene?

16    A   Yes.

17    Q   And he had arrived?

18    A   Yes, ma'am.

19    Q   The next one, 11:48:56, 5 kilo 18 secure, that

20  means that Deputy Molina was secure at that point?

21    A   Yes, ma'am.

22    Q   Okay.  And then there, the next entry is

23  12:22:35.  And that is 5 kilo 18 avail; is that correct?

24    A   Yes.

25    Q   And is that what you were referring to earlier
                                277

1  when you said cleared out?

2    A   Yes.  We're available.

3    Q   So now based on this indicator at 12:22, Deputy

4  Molina is ready to go back into the field and available

5  to be dispatched?

6    A   Yes, ma'am.

7    Q   Okay.  I want to skip to 3:17.  You see that,

8  at the very bottom, the last two rows.

9    A   Okay.

10   Q   And you got 8:06:56, read comment.  Then the

11  log entry, comment for incident 864 was marked as read.

12  Do you know what that's referring to?

13   A   No, ma'am.

14   Q   And I'm going to guess the answer to this is

15  also known.  Do you know what the next to last line user

16  action is about?

17   A   No, ma'am.

18   Q   Okay.  Just kind of one quick follow-up item.

19  Looking at the -- at the things that are time stamped

20  11:17:32, those are those three person checks, do you see

21  them in the activity log?

22   A   Okay, yes.

23   Q   There are three time stamps that say 11:17:32.

24  Do you see those three time stamp entries?

25   A   Yes.

                          278

1    Q   And those all talk about record check or

2   personal information, supplemental person.  Is that fair?

3    A   Yes.

4    Q   Does that mean that the computer checks were

5   done on Alek Schott at 11:17:32?

6    A   As in they were done running them?

7    Q   Yes.

8    A   I believe so.

9    Q   Okay.  Thank you.  And I know that was really

10  tiny print so thank you for bearing with me on that.  I

11  want to look at another document that is our Exhibit JJ?

12      MR. NELSON:  Okay.

13      MS. HEBERT:  And this will be marked as Exhibit

14  12.

15    Q    (By Ms. Hebert) Take a look at this when you

16  get a chance and let me know when you're done?

17    A    Okay.

18    Q    Are you ready?

19    A    Yes.

20    Q    What is this document?

21    A    It is a copy of the citation.

22    Q    Okay.  And how do officers refer to this

23  document?

24    A    Copy of the citation.

25    Q    Okay.  Just want to make sure if there's a

279

1  lingo and I missed it.  When is a copy of the citation

2  required?

3    A    Usually on every stop.

4    Q    Okay.  So every time a citation, even if it's a

5  warning, is issued, you print a copy of it?

6    A    Are you talking about for our personal records?

7    Q    No.  For the Sheriff's Office?

8    A    Oh, yeah, they go into the databases which is

9  where you can obtain a copy like this from.

10    Q    Okay.  So this is automatically created every

11  time a citation, be it a warning or a ticket, is issued?

12   A   Yes, through the Brazos, yes.

13   Q   And this is automatically created.  Once you

14  print it out and do the ticketing thing, this document is

15  the report, one of the reports you're talking about?

16   A   Yes, ma'am.

17   Q   Okay.  Let's look at the section location and

18  violation information.  Earlier today, do you see where

19  I'm talking about?

20   A   Yes.

21   Q   And let's look down at issued by Deputy Babb

22  and ID number.  Issue date and time.  And I'm seeing the

23  date as 3/16/2022 and the time is 9:32.  Do you see that?

24   A   Yes, ma'am.

25   Q   And earlier today we talked about the fact that
                              280

 1  the stop was at 11:15 a.m.  Why does this say 9:32 a.m.?

 2   A   I do not know.

 3   Q   Okay.

 4   A   I have -- there have been times that the E

 5  writers have their time off.  That's usually just a

 6  system update.

 7   Q   I'm sorry, I didn't understand what you said

 8  there are times when something has their time wrong?

 9   A   The E writer or Brazos system has their time

10  off and it's very rare that it does.

11   Q   Sure.

12   A   But it has happened.

13   Q   And let's look at the stuff on the right-hand

14  side of the page where it says diagram.

15   A   Yes.

16   Q   Reason for initial stop, moving traffic

17  violation.  Did I read that right?

18   A   Yes.

19   Q   And then three lines down, it says STEP, and

20  no.  Does that mean that this was not STEP traffic

21  enforcement?

22   A   Yes, it was not.

23   Q   So earlier we talked about STEP traffic

24  enforcement and you talked about how you would

25  specifically be on duty for STEP traffic enforcement.

281

 1  This stop was not STEP traffic enforcement?

 2   A   Correct.

 3   Q   Based on this record?

 4   A   Correct.

 5   Q   And then I want to go down to search.  Do you

 6  see where it says search?

 7   A   Yes.

 8   Q   Colon and no search?

 9   A   Yes.

10   Q   Why does it say no search?

11   A   It could have been that Deputy Babb didn't

12  check that box off properly.

13   Q   Okay.  So explain that to me.

14   A   I don't know what he was doing inside the car

15  at the time.

16      Q    Yeah, obviously you don't know what was going

17  on in Deputy Babb's mind --

18      A    But --

19      Q    But what do you -- you said check that box off.

20  What do you mean by check that box off?

21      A    So there's a drop down box that says did you

22  search the vehicle, was there probable cause, all that

23  stuff, what were you looking for.  That's usually what

24  that entails.

25      Q    Okay.  So if I'm understanding you correctly,
                            282

 1  when you're filling out this citation, there's some box

 2  that you can check for whether there's a search or not.

 3      A    Yes.

 4      Q    And the row underneath the search that's

 5  labeled contraband, that's blank, correct?

 6      A    Yes.

 7      Q    So I want to make sure we've got all the

 8  records for the Alek Schott stop.  Today we've looked at

 9  two copies of the SPEARS summary.  We've looked at two

10  versions of the incident detail report and this citation

11  report.  To your knowledge, would there be any other

12  documents or reports coming from the stop of Alek Schott?

13      A    Not that I know of.

14      Q    Okay.  And we've looked at the communications

15  log.  We talked about -- by communications log, I mean

16 the exhibit where you said on my way.

17    A   Yes.

18    Q   And we talked about some phone messages and

19 calls that you have not been able to obtain the records

20 for.  But are there any other ways that officers would

21 have communicated with Alek Schott?

22    A   No.

23    Q   Okay.

24    A   Not that I know of.

25    Q   There may be, and I think you did mention an

283

1 audio file for radio traffic.  There maybe some audio

2 file.  Is that fair?

3    A   Correct.

4    Q   Did you ever talk to Deputy Babb about this

5 stop after the fact?

6    A   After the fact?  No, not until I guess when he

7 had told me he had to write a report about it.  But other

8 than that, no.

9    Q   When did he tell you he had to write a report

10 about it?

11    A   I guess when the complaint came out.

12    Q   Okay.  So do you remember when the complaint

13 was?

14    A   I don't.

15    Q   Okay.  And what did Deputy Babb say to you when

16 the complaint came?

17    A   He had to write a report.

18    Q    Anything else?

19    A    That's it.

20    Q    Okay.  What did you say in response?

21    A    I don't remember.

22    Q    Okay.  Did you ever talk to Deputy Molina about

23  this stop?

24    A    Not until it came out that we had to do these

25  depositions.  But other than that, no, we haven't really
                              284

 1  discussed it.

 2    Q    Sure.  And to your knowledge, has anyone, any

 3  Sheriff's Officer been disciplined for any role in the

 4  stop of Alek Schott?

 5    A    Not that you're aware of.

 6    Q    I guess maybe disciplined is too harsh of a

 7  word.  Has any officer been counseled as a result of the

 8  stop of Alek Schott?

 9    A    Not that I'm aware of.

10    Q    Anything like we need to even make sure that

11  we're documenting our stops correctly?  Because we've

12  talked a little bit about how your practices have changed

13  with the traffic stops.  Do you know if the stop of Alek

14  Schott prompted any of those changes?

15    A    No, ma'am.

16    Q    Okay.  And we're here today because Alek Schott

17  has filed a lawsuit alleging that his constitutional

18  rights were violated.  To your knowledge, was there

19  any -- has there been any investigation of what happened

20  to Alek Schott after he filed this lawsuit?

21      A    I was called in to Internal Affairs to make a

22  statement.  But other than that, that was it.

23      Q    Okay.  And what happened when you were called

24  into Internal Affairs?

25      A    I wrote down what I did, from what I could

                              285

1  recall.  I wasn't able to review my camera at the time,

2  because the cameras had been archived already.  And you

3  have to pull them back from archives.  And they, it would

4  take probably about three hours they said.  So they said

5  just go off what I could recollect from that day.

6      Q    And I've never been involved in an Internal

7  Affairs conversation.  So what does that look like?

8      A    No, you show up, you have your union, I guess

9  union-appointed or agency, association-appointed

10  attorney.  For us we use a thing called CLEAT.  And if

11  not, then you just show up on your own and make your own

12  statement.

13      Q    Okay.  And so you go with an attorney that

14  potentially comes with you and you speak to who?

15      A    Whoever's investigating the incident.

16      Q    And who did you speak to?

17      A    That day it was Sergeant Bowser.

18      Q    Bowser.  Can you spell Bowser?

19      A    B-O-W-S-E-R.

20      Q    Okay.  And did he give you any feedback or make

21 any comments?

22    A   No, she did not.

23    Q   Or she?

24    A   No.  She said -- I told her I would like to

25 review my video on we tried to get in the back.

                              286

1 Unfortunately we're not able to get it back due to it

2 being archived.  So I went off the recollection what I

3 had.

4     Q   Okay.  And what -- since you've had that

5 recollection and you've watched the body camera videos,

6 did you like remember something new or see something new?

7     A   No.  I didn't realize I had two videos.  I

8 didn't remember.  It had been so long.  But the being

9 called back was, for Internal Affairs was pretty recent,

10 like within the last three months.

11    Q   Sure.

12    A   So I'm not aware of anything else as far as

13 that.

14    Q   And was your statement to the Internal Affairs

15 investigator, was that written down or recorded?

16    A   Yes, I typed up my statement.

17    Q   Okay.  You typed up your statement and sent it

18 to the Internal Affairs person?

19    A   Yes.  We were there in the office.

20    Q   Okay.  So help me understand this.  Did you

21 have -- you get called into Internal Affairs.  You have a

22  conversation with Bowser.  Do you write the -- write up

23  the report together?

24     A   No.  No.

25     Q   Okay.

287

1     A   She -- so we -- Internal Affairs investigating

2  deputy will step out, and we will do our part.

3     Q   Okay.  So you got called into Internal Affairs

4  deputy who was investigating, you talked with her, and

5  then you wrote up your recollection?

6     A   Yes.  So her, her involvement was very minute

7  as far as saying hey we're here.  This is for Deputy

8  Babb's case.  This is what you're presented with.  And

9  that was it.  Right?  I asked to review my dash cameras.

10  Wasn't able to retrieve my camera because of the archive,

11  and then from that point, I wrote what I could remember

12  offhand.

13     Q   Okay.  And so you wrote, then wrote down

14  everything that you could remember.  And what happened

15  after that?

16     A   That was it.  Now I'm here.

17     Q   And they sent you on your way?

18     A   Well, I already knew this was coming.  I had

19  already talked to.  But after that that was it.

20     Q   Okay.  Do you know what has happened as a

21  result of that investigation, the Internal Affairs

22  investigation?

23     A   No, ma'am.

24    Q   And have you heard if that investigation is

25 done?

288

1    A   No, ma'am.

2    Q   Okay.  So you have no idea as you sit here

3 today whether that investigation is opened or closed or

4 anything?

5    A   I have no idea what's going on with it.

6    Q   That's okay.

7         MS. HEBERT:  Let's look at Exhibit U, Daniel.

8         MR. NELSON:  U?

9         MS. HEBERT:  U.  U as in unicorn.

10         MR. NELSON:  Yep.  This should be 13, correct?

11         THE REPORTER:  Yes, that's correct.

12         MS. HEBERT:  Exhibit 13.

13    Q   (By Ms. Hebert) Let me know when you're ready.

14    A   Go ahead.

15    Q   What is this document?

16    A   It's a SPEARS Incident Report.

17    Q   I'm going to say the reported time, the date

18 looks like it's April 4th, 2022.  Am I reading that

19 correctly?

20    A   Yes.

21    Q   And then the incident time looks like it's

22 April 4th, 2022 as well.  And there's time stamps for

23 both of those pieces, both of those lines.  And it seems

24 like that's an hour apart; is that correct?

25    A    Yes.

1    Q    But there's not much other information here.  I

2  don't see anything in involved persons.  The address is

3  there, but we see two involved officers.  The assisting

4  officer would be yourself, and the reporting officer

5  would be Deputy Gereb [sic].  Why is the --

6    A    You got that backwards.

7    Q    Oh, sorry.  The assisting officer would be

8  Deputy Gereb, and the reporting officer would be Deputy

9  Babb.  The next page the action log is blank.  Why is

10  there not more information on this traffic stop incident

11  report?

12    A    I'm not aware of why.

13    Q    Okay.

14    A    There have been times that, every so often that

15  we, we get, we'll accidentally, instead of doing a

16  vehicle check, there's an option to do a vehicle check

17  and a traffic stop, we'll accidentally do a traffic stop

18  versus doing a vehicle check.  I don't know if that was

19  the case on this one.

20    Q    Sure.

21    A    And also at the same time, it goes back to,

22  what I mentioned earlier, that we weren't really harped

23  on make sure we have the input information, until -- it

24  was sometime after this.

25    Q    And remind me when that time was that you were

1  really told that, harped on to get more information in

2  your summaries?

3    A    About, about a year ago.  A little over a year

4  ago.

5    Q    So what, we're in February 2024.  So February

6  2023?

7    A    I would probably say probably late 2022.

8    Q    Okay.  So towards the end of 2022 was when

9  reporting started to change?

10    A    Yes, ma'am.

11        MS. HEBERT:  Okay.  All right.  I think this

12  would be a good time for a break if you don't mind.

13        THE REPORTER:  We're off the record.

14    (Recess from 4:20 p.m. to 4:30 p.m.)

15        THE REPORTER:  We are back on the record.

16    Q    (By Ms. Hebert) I wanted to talk a little bit

17  about the difference between your process for making a

18  traffic stop when you were a patrol deputy versus when

19  you were a criminal interdiction deputy.  When you pulled

20  someone over doing criminal interdiction, did you decide

21  whether to give them a warning or citation before you got

22  out of the vehicle?

23    A    No.

24    Q    Okay.  When we talked about your -- I'm going

25  to try to be super clear about which one's which, when we

                                291

1  talked about the patrol deputy, we talked about the fact

2  you would walk up to the passenger's side or driver's

3  side depending which one was the safer side, talk to the

4  driver, tell them who you are, why you pulled them over,

5  get their license and insurance information, go back to

6  your vehicle to run the check; is that correct?

7    A   Yes, ma'am.

8    Q   And then you would decide, based on running the

9  check and the information that you got, whether to give

10  them a citation or warning; is that fair?

11    A   Yes, ma'am.

12    Q   When you're a criminal interdiction, when you

13  were working as a criminal interdiction deputy, you walk

14  up to the passenger or the driver's side, whatever's

15  safer.  You tell them who you are; is that correct?

16    A   Yes.

17    Q   And you tell them why you pulled them over; is

18  that correct?

19    A   Yes, ma'am.

20    Q   Do you tell the driver at that point whether

21  they're getting a citation or a warning?

22    A   No.

23    Q   Okay.  What do you do?

24    A   Ask for their information.

25    Q   Same as with, as a --
                        292

1    A   As a patrolman.

2    Q   Okay.  And we talked a little bit about you

3  conducting interviews with the drivers.  At what point

4 during the interview do you usually decide whether to

5 give a citation or a warning?

6    A   Towards the end, after I've decided whether

7 this traffic stop's going to go any further than what it

8 needs to go, and I make that decision.  Based on, you

9 know, traffic history, what do I have, what was a real

10 safety issue, what, you know, were they being

11 cooperative, was there something else going on.  And is

12 this stop going to go any further than just a traffic

13 stop.  You know, is somebody going to go to jail, is

14 there contraband, you know, the whole -- again, it just

15 goes back to discretion.

16    Q   Sure.

17    A   Really using that discretion.  I look at

18 everything as a whole.

19    Q   Okay.  And did you ever write the warning or

20 print up -- I guess not writing any more -- did you ever

21 print a warning and just hold onto it before giving it to

22 the driver?

23    A   No.

24    Q   Okay.  So whenever you make a stop, you

25 decide -- you do the interview, you decide whether you're
                          293

1 going to do the citation or the warning and then you

2 print it.  Is that fair?

3    A   Yes, ma'am.

4    Q   Okay.  And you talked a little bit about now

5 your criminal interdiction practices have changed.  Only

6  60 percent of the time are you looking for traffic stops

7  for criminal interdiction; is that correct?

8      A   Yes, ma'am.  Mostly because of our, our -- our

9  assignment has changed because of where they want us to

10  be at.  I don't know if that's going to change again,

11  because we have, you know, some chain of command changes.

12  So we don't know if there's going to be any shifts or

13  anything like that.  But as of right now it's going to be

14  the same, hey, we're going to hit this area, we're going

15  to check out the, you know, motels, we're going to go to

16  UPS, check out, see if they've got anything, check out

17  the airports, Amtrak, see what we can run on.

18      Q   So before the change where you are now doing 40

19  percent other criminal interdiction work, before that

20  shift, how much of your time would you estimate was

21  traffic stop criminal interdiction work?

22      A   I would say about 99 percent of it.

23      Q   Okay.  I want to re-watch a portion of the

24  video -- of a video.

25          MS. HEBERT:  Let's look at Exhibit 6, Daniel.
                            294

1  And time stamp 51:00.

2      (Video playing.)

3      Q   Okay.  So you saw the body camera footage from

4  Deputy Babb cut out.  Is that fair, it ended?

5      A   Yes, ma'am.

6      Q   Why would it have ended in the middle of the

7  stop?

8    A   I don't know.  I know from what I've seen on

9  mine, I think once it gets to a certain amount of time,

10  it restarts another video.

11    Q   Okay.

12    A   That's what I've seen.

13    Q   Sure.

14    A   In the past with my old body camera.  So I've

15  had stops and camera footage that would go on three or

16  four hours, and it's, the system automatically does it on

17  its own.

18    Q   Okay.  So sometimes it stops automatically is

19  what you're telling me.

20    A   It won't stop.  It will start recording

21  another, usually the camera might say ongoing, it will

22  stop and start a new video.  So it won't -- not say stop.

23  It will just start a new video on its own.

24    Q   Okay.  That's helpful.  And we talked a little

25  bit about this conversation before between you and Deputy

                                295

1  Babb, this section.  But at the time of the stop for Alek

2  Schott, were the only two official criminal interdiction

3  officers you and Deputy Babb?

4    A   Yes.

5    Q   And we talked a little bit also about how the

6  criminal interdiction unit has followed Sergeant Gamboa

7  through his various places in the Sheriff's Office

8  organization.  Do you remember that?

9      A    Yes, ma'am.

10     Q    Why did it follow Sergeant Gamboa around?

11     A    I'm not sure.  He's also been the supervisor of

12  it.  That's above my head.

13     Q    Yeah.  Do you know if he created the?

14     A    He did --

15     Q    The criminal interdiction unit?

16     A    He did.

17     Q    And how do you know that?

18     A    Because I was there when he -- not there when

19  he started it, but I was one of the ones he brought on.

20     Q    Uh-huh, and -- or yes.  And when he started it,

21  what -- how was it explained to you?

22     A    That we're going to go hunt -- I guess we're

23  going to be looking for people that are involved in

24  smuggling activity, narcotics, stuff like that.  Because

25  at that time I didn't know what interdiction was.  I was

                           296

 1  so caught up with wanting to do DWIs.  I had taken

 2  courses for DWIs, become I guess what they call ARIDE.  I

 3  had gone through my breathalyzer course to become an

 4  intoxilyzer operator.  I was taking steps because that's

 5  the route I wanted to go.  And I think I had applied four

 6  times and did not get in.  So -- but Gamboa was looking

 7  for people, and he asked recommendations, and I was

 8  recommended.  So he offered it to me, and I said yeah,

 9  I'll do it.

10    Q    And did you meet with Sergeant Gamboa before

11  you accepted that?

12    A    No.  It was through phone calls.

13    Q    Okay.

14    A    I had been through, I had been -- because I

15  think we, you know, you see officers in passing, you get

16  to identify who they are and stuff like that.

17    Q    So did he call you then to talk to you about

18  the criminal interdiction unit?

19    A    Yes.

20    Q    And how did he explain the criminal

21  interdiction unit?

22    A    Again, like I said, he said we're going to be

23  looking for people that are involved in heavy criminal

24  activity, smuggling.

25    Q    Sure.  And I think you stopped yourself and I
                                297

1  just want to follow up.  You said at one point hunt.

2  What do you mean by that?

3    A    Hunt, traffic stops.  We call it hunting,

4  slang.  But they go out and find people that are involved

5  in criminal activity.

6    Q    Okay.  And on the section of the footage we

7  just watched, when you said -- when Deputy Babb said to

8  you it's, um, one of the vehicles from that thing then

9  Followed it up with he was riding tandem, what did -- did

10  you -- what did Deputy Babb know or what did you

11  understand Deputy Babb to know about this vehicle he was

12 looking at?

13    A    From what I know, that it was intel information

14 passed onto him.

15    Q    Right.  And what kind of information would

16 Deputy Babb have received?  Would he know the license

17 plate number, for example, of this vehicle?  Would he

18 know who the driver was?  Like what -- I'm just trying to

19 understand what Deputy Babb would have learned as part of

20 this tip process?

21    A    So normally if it's a vehicle, we don't know

22 who's in the vehicle.  It's -- it will be the license

23 plate and type of vehicle that we're looking for.

24    Q    Sure.

25    A    So in this case, whoever provided him the
                                298

 1 information said hey, this vehicle was stopped -- has

 2 been seen scanning.  And there's, you know, they'll say

 3 that -- because the information I've received in the past

 4 is the turnaround time how fast they went down to a

 5 certain area and came back up.

 6    Q    Okay.  And so you might get the turnaround time

 7 for how, from where the person went and then went -- let

 8 me take a step back.  Some of the information you might

 9 get might be the vehicle information, some of the vehicle

10 information, or the turnaround time on that vehicle; is

11 that correct?

12    A    Yes.

13    Q    Would there be occasions where you would only

14 get the color and make or model of the vehicle and the

15 turnaround time?

16    A    Yes.  But if you don't get, they don't get a

17 license plate, sometimes the license plate readers, if

18 they're not, if they don't pick up, they won't get a

19 picture of the vehicle.

20    Q    Sure.  So just to be clear, there are times

21 when you would get just the vehicle type, you know, a

22 white Chevy, for instance?

23    A    Correct.

24    Q    And you wouldn't have a license plate number;

25 is that correct?

                              299

1    A    Correct.

2    Q    And, you know, you talk about in this part of

3 the video that you were looking for a white Chevy.  Could

4 that be one of those times where you only knew it was a

5 white Chevy?

6    A    Correct.

7    Q    So we talked a little bit about in your patrol

8 deputy capacity how you would hand over the file to the

9 Assistant District Attorney and they would handle the

10 prosecution of the criminal case from your time as patrol

11 deputy.  Remember that?

12    A    Yes, ma'am.

13    Q    So when you worked as a criminal interdiction

14 officer, can you walk me through the process of what

15  happens for the situation where you did find, you know, a

16  big amount of drugs or contraband or something on a

17  vehicle, who do you -- who do you bring that to?

18      A    Same.  It's the same process.

19      Q    The same ADA?

20      A    Not the same ADA.  It's whoever's sitting in

21  the office at the time.

22      Q    Okay.

23      A    So if -- they have shifts.  So if ADA 1 gets

24  off at 4:00, and ADA 2 is there and I just happen to be

25  coming in at 3:00, I'm going to see ADA 2.
                                300

1      Q    I get it.  You just get whoever's on shift at

2  that time?

3      A    Yes.

4      Q    Have you ever talked with the ADA after you

5  submitted your report and your materials about what

6  happened to -- what the results of your search were?

7      A    No, because it's already in the report.

8      Q    Okay.  So they use your report.  And have you

9  ever had to testify, for instance, on what you discovered

10  during a search?

11      A    Not, not in a state jail.  I've done federal

12  side.

13      Q    Okay.

14      A    Because I was assisting on another case where

15  dope was found, a violation had happened.

16   Q   A traffic violation you mean?

17   A   So one of our deputies was chasing a vehicle.

18   Q   Okay.

19   A   And so I assisted with the pursuit.  Guy ended

20 up having some contraband in the vehicle, and he went --

21 they went to a federal trial.

22   Q   Okay.  And so what happened in the federal

23 trial?

24   A   I had to show up in a suit and testify.

25   Q   Okay.

301

1   A   Yeah.

2       MR. WINDHAM:  Sorry.

3       MS. HEBERT:  No, it's all good.  Sorry about

4 that.

5   Q   (By Ms. Hebert) And do you know what happened,

6 what the results of that federal trial were?

7   A   I don't.

8   Q   That's okay.  And have you ever gotten feedback

9 from maybe the ADA or the results of criminal proceedings

10 about your searches?  So here's an example, you discover

11 a bunch of dope in a car, they go through the process of

12 charging, and there's a question about whether you had

13 enough grounds to search the vehicle.  Has that ever

14 happened to you?

15   A   Yes.

16   Q   And how did that play out?  Tell me like the

17 process and then what the results were?

18    A    They asked me to elaborate.

19    Q    Who is they?

20    A    The ADA.

21    Q    Okay.  So they came back to you and said give

22  me some more information?

23    A    No so you're talking about after the fact after

24  everything was said and done after the month, next thing

25  or I'm sitting in the office with them currently turning

302

1  in my report.

2    Q    I mean after you've turned in your report, the

3  report is done.

4    A    Yes.

5    Q    And the added is trying to get the conviction?

6    A    So like a pretrial hearing.

7    Q    At the pretrial hearing or motion to suppress

8  hearing?

9    A    Okay.

10    Q    Have you ever gotten feedback about how that's

11  gone?

12    A    No, not -- not at that point.  They just ask me

13  to elaborate on mine.  That's it.

14    Q    So you've gotten some follow-up questions, for

15  example?

16    A    Yes.

17    Q    But you've never gotten any feedback from an

18  added that said look, Deputy Gereb, we weren't able to

19  bring in that evidence because the judge ruled that the

20  search shouldn't have happened.

21     A   No, never had.

22     Q   Has anybody ever talked to you about anything

23  like that?

24     A   No.

25     Q   Okay.  And as far as you know, there's no
                              303

1  process for the Sheriff's Office to check that the things

2  that they find actually get admitted in court?

3     A   As far as like being the, I guess you could say

4  the prosecution guy getting sent up to up there.

5     Q   Yeah.  So for example, you pull someone over,

6  you find dope.

7     A   Uh-huh.

8     Q   There's no process for the prosecutor for

9  saying, yes, the judge let that dope in because your

10  search was good?

11     A   I don't think it goes with the search.  I

12  believe there, there -- on my end it's, like I say it's

13  good or not good or whatever.  But from what I understand

14  with the narcotics investigators, they have to send off,

15  even though we do a field test on dope, when it comes

16  back positive, they still have to send it off to go to

17  the lab for it to be tested again, then resubmitted.  The

18  evidence has to be resubmitted.  And I'm not too sure

19  which form it is.  And then it has -- then it goes

20  through the process --

21    Q    Okay.  Let me just ask you differently.  Has

22  any Assistant District Attorney ever given you impression

23  that you aren't doing searches in the right way?

24    A    No.

25    Q    Do you know if there's any way for an Assistant
                                304

 1  District Attorney to communicate to the Sheriff's Office,

 2  like hey, your guys aren't doing searches correctly, or

 3  they are doing searches correctly?

 4    A    No.

 5    Q    Okay.  We talked a little bit about behavioral

 6  driving earlier today.  Do you remember that

 7  conversation?

 8    A    Yes, ma'am.

 9    Q    Have you ever stopped someone even if it was

10  not, it didn't become an official traffic stop, for

11  behavioral driving without a traffic violation?

12    A    No.

13        MS. HEBERT:  Anything else?

14        MR. WINDHAM:  Unless you want to do that.

15        MS. HEBERT:  Sure.

16    Q    (By Ms. Hebert) So during your criminal

17  interdiction traffic stops, at what point -- when you,

18  when you get out of the -- all right.  Let me take a step

19  back.  When during the criminal interdiction traffic

20  stops, do you radio to anybody and say this is what's

21  going on, this is what I've found?  Do you have any --

22  yeah, do you ever radio to someone and explain to them

23  what's going on?

24     A   Not over the radio.

25     Q   Okay.  How do you communicate?

305

1     A   Phone call.

2     Q   Okay.  So if you pulled someone over and you're

3  trying to figure out do I have enough to go on or this

4  sounds suspicious, you would call another officer?

5     A   What do you mean, like if we're questioning our

6  own stop?

7     Q   Yeah.

8     A   If I have, if I'm questioning my own stop, I

9  just, I cut it off.

10     Q   Okay.

11     A   Because at that point, if I have doubt in

12  myself, that means this case is going to have doubt.

13     Q   Okay.  That's fair.  And after you, let's say

14  you decide to ask the driver to get, or you decide to

15  tell the driver to get out of the vehicle, the driver

16  gets out of the vehicle.  Do you give the driver a

17  Miranda warning?

18     A   No.

19     Q   Okay.

20     A   Because they haven't been charged with

21  anything.

22     Q   Do you give them a Miranda warning before you

23  do the interview process?

24      A    No.

25      Q    When you used to choose to have the driver come
                            306

1  sit in your patrol car, did you ever give them a Miranda

2  warning before having the driver come sit in your

3  passenger seat?

4      A    No.

5      Q    At what point do you usually give the Miranda

6  warning?  What triggers the Miranda warning for you?

7      A    For me it's when they're about to be charged

8  with an offense or I have -- contraband has been found.

9  If I haven't -- if they're just detained, not arrested, I

10  let them know the Miranda warnings, because I'm going to

11  have questions.  And then at that point too, it also

12  would lead to an investigator coming out.

13      Q    Okay.  So if you put them in the back of your

14  patrol vehicle, say you're detained but you haven't

15  arrested them, would you give them the Miranda warning at

16  that time?

17      A    Not at that time, until I -- once my search and

18  everything is said and done, then if I find -- if there

19  is a charge coming or there's questions that are going to

20  be coming, stemming from the search, then I'll mirandize.

21      Q    Okay.  So you mirandize after you find

22  something if you think they're going to be arrested.

23      A    Not if I think they're going to be arrested.

24  If I know they're going to be charged with a crime.

25     Q   Okay.  I understand the difference that you

1  just said because that was me not understanding your

2  context.  So if you find something and you think they're

3  going to be charged with a crime even if they're not

4  going to the station today, you would still Miranda them?

5     A   Yes, because there's questions coming with it.

6        MS. HEBERT:  Thank you.  That's all I have.

7        MR. FRIGERIO:  We'll reserve our questions.

8  Thank you.

9        THE REPORTER:  We are off the record.

10     (Deposition concluded at 4:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25