EXHIBIT 14

1

2           ORAL DEPOSITION OF

3             MARTA ORTEGA

4           FEBRUARY 28, 2024

5

6           W A R N I N G !

7 This unedited rough draft of the proceedings is not

8 certified.  The rough draft transcript may not be cited

9 or used in any way or at any time to rebut or contradict

10 the certified transcription of the proceedings.  There

11 will be discrepancies in this form and the final form,

12 because this form has not been edited, proofread,

13 corrected, finalized, indexed, bound or certified.  There

14 will also be a discrepancy in page numbers appearing on

15 the unedited rough draft and the edited, proofread,

16 corrected and certified final.

17           * * * * *

18      THE REPORTER:  We are on the record.

19           MARTA ORTEGA,

20 having been first duly sworn, testified as follows:

21      E X A M I N A T I O N

22 BY MR. NELSON:

23   Q   All right.  Well, good morning, Sergeant

24 Ortega.  My name is Daniel Nelson and I represent Alek

25 Schott the Plaintiff in this case.  How are you today?

1    A   Good.

2    Q   Good.  And I've already asked your rank.  It is

3   sergeant?

4    A   Yes, sir.

5    Q   Okay.  And so throughout this deposition, I'll

6   sometimes refer to the Bexar County Sheriff's Office as

7   the Sheriff's Office or BCSO.  Does that make sense?

8    A   Yes.

9    Q   Before we get started, I want to run through

10  just some basic preliminary stuff.  So first you

11  understand you're testifying under oath today just as you

12  would in a courtroom?

13   A   Yes.

14   Q   Do you understand that you are not a defendant

15  in this case?

16   A   Yes.

17   Q   Is there anything that would prevent you from

18  testifying truthfully?

19   A   No.

20   Q   Have you ever been deposed before?

21   A   No.

22   Q   Okay.  So it will be helpful, I think, to go

23  through some just kind of basic instructions.  So the

24  reporter is going to record my questions, along with your

25  answers.  And just to kind of have a clear record, I'm

                          3

1   going to do my best not to speak over you, and I would

2   appreciate it if you could do the same, again, just to

3  have a clear record.

4      Another thing, and I'll do my best to remind

5  you, try to keep yes or no answers to like a yes or no as

6  opposed to like an uh-huh or huh-uh.

7      Definitely let me know -- excuse me --

8  definitely let me know if you don't understand my

9  question.

10    A   Okay.

11    Q   You know, at some point, I'll probably ask a

12  question that's not super clear and I'll just do my best

13  to rephrase it or if you just need to rehear it.  And

14  then absolutely let me know if you need a break at any

15  time.  Does that all make sense to you?

16    A   Yes.

17    Q   Great.  So what if anything have you done to

18  prepare for this deposition?

19    A   Well, I met with the attorneys.

20    Q   Okay.

21    A   And then I reviewed, to refresh my memory, the

22  report.  And then I saw the dash cam and then Deputy

23  Babb's body worn camera.

24    Q   Okay.  And by the dash cam, you mean --

25    A   The one that Alek provided.

                            4

1    Q   I see.  And then what do you mean by the report

2  that you reviewed?

3    A   Deputy Babb's report.

4    Q    I see.  Did you talk to any colleagues at the

5  Sheriff's Office about the case?

6    A    No.

7    Q    Okay.  And you're, of course, familiar with

8  Alek Schott, the Plaintiff in this case?

9    A    With -- through emails and --

10    Q    Right, right, right.

11    A    Yes.

12    Q    Okay, cool.  All right.  So let's dive a little

13  bit into your background.  So first, I just want to know,

14  why did you become a police officer?

15    A    I wanted to do something different every day.

16  I didn't want to be just sitting at the office every day,

17  you know.  So just, to me it was -- my uncle was a police

18  officer, and it was just like I wanted to do something

19  different every day.  So I started at the jail.

20    Q    Okay.

21    A    And I did four-and-a-half years at the jail

22  before I went to patrol.  I think in '24 [sic], I went to

23  patrol.  And then I was a patrol deputy for about a year.

24  Then I went to civil.  In civil, I moved around, I moved

25  around then got promoted to investigator.  Then when I

                         5

1  promoted to investigator -- I think that was 2016, '17,

2  investigator.  I moved around different sections, and I

3  went all the way to, I was a homicide detective, and then

4  promoted to sergeant, and then I think that was in 2019.

5        And then from there, patrol, I was a patrol

6 sergeant for a couple of months and then they moved me to

7 recruiting.  I was in recruiting for a while, I don't

8 even remember how long.  And then from recruiting I went

9 to Internal Affairs.  I don't know how long I was in

10 Internal Affairs.  And from Internal Affairs, now I'm in

11 CID, night crimes.

12    Q    Sorry, what is CID?

13    A    Criminal investigation division.

14    Q    Okay.  What do you do in CID?

15    A    So I'm the supervisor of detectives.

16    Q    Okay.

17    A    At nighttime.

18    Q    Got it.  And so it sounds like you've got a

19 pretty extensive history with BCSO?

20    A    Yes.

21    Q    Did you ever do any traffic enforcement?

22    A    When I was a patrol deputy, like in 2012.

23    Q    Okay.  So you're pretty familiar with Texas's

24 traffic laws and stuff like that?

25    A    Uh-huh.

                          6

1    Q    Okay.  And just out of curiosity, what -- I

2 mean, what were some of the most like common violations

3 you would see drivers commit?

4    A    Speeding, I used to do speeding, the

5 registration sticker, no license plate -- that I used to

6 stop a lot?  What is it called?  Obstruction.  Rear view

7  mirror, like when they have stuff hanging on their

8  mirror, their front mirror, the rear --

9    Q   Oh, okay.  Got it.  And just to be clear, so

10  those were not only the most common violations that you

11  saw, those were the most common violations you pulled

12  people over for?

13    A   Usually me, yes.

14    Q   Okay?

15    A   I used to work STEP, which is speeding

16  enforcement, so --

17    Q   Makes sense.  Did you do traffic enforcement

18  outside of STEP at all?

19    A   Here and there, when I was a patrol.

20    Q   Okay.  What percentage do you think you did

21  STEP enforcement versus non-STEP enforcement, if that's

22  the right way to phrase the question?

23    A   Percentage range as far as?  Because I was

24  patrol for a year, so STEP was only a couple months at a

25  time.

7

1    Q   Got it.

2    A   Because it was like a grant.

3    Q   Okay.

4    A   So --

5    Q   So let me ask it just more broadly then.  Was a

6  substantial amount of your traffic enforcement not

7  related to STEP?

8    A   Yes.  I was only in STEP months.

9    Q    Okay.  All right.  So you mentioned Internal

10 Affairs and you said you didn't remember off the top of

11 your head how long you were at Internal Affairs.  Do you

12 have like a basic idea?

13    A    Maybe a year.

14    Q    Okay.  And that's really understandable.

15 Because again, you've had several positions over the

16 years, so that makes sense.

17         Now, one question I have is, is Internal

18 Affairs, was it a section or a unit?  Do you know what I

19 mean by that?

20    A    It's a section, I would say section.

21    Q    Okay.  To the best of your memory it was a

22 section?

23    A    Yes.

24    Q    Got it.  And what was the division that

25 Internal Affairs fell under?

8

1    A    Fell under the administration.

2    Q    Okay. Did it -- what was it -- did it have any

3 relationship with the Professional Development &

4 Integrity Unit?  I think I'm using the right name there.

5    A    The Public Integrity Unit?  PIU?

6    Q    Well, that's -- let's ask about that, do that

7 one first?

8    A    I was like professional, what did you say,

9 professional?

10   Q   Professional Development & Integrity Unit.  And

11  we can unpack it later.  It's in the Sheriff's manual.

12   A   Okay.

13   Q   But if you're not familiar with the manual,

14  that's fine.  But I was also going to ask about the

15  Public Integrity Unit.  So did you work with them at all?

16  Was it a unit separate from Internal Affairs?

17   A   They're separate.

18   Q   Got it.  So you said you were -- sorry, you

19  said Internal Affairs was within the administrative

20  division?

21   A   Yes.

22   Q   Who, who did you personally report to when you

23  were at Internal Affairs?

24   A   To the lieutenant.

25   Q   Lieutenant who?

9

1   A   At the time, it was lieutenant Gonzalez and

2  Abraham, Abraham.  So I had two.  When I first started it

3  was Elizabeth Gonzalez, and then Abraham Abraham.

4   Q   Got it.  And who did they report to, do you

5  know?

6   A   If I'm not mistaken, I think to chief Lupe

7  Garza.

8   Q   Sorry, you said Chief Garza?

9   A   Yes.

10   Q   Got it.

11   A   The female one, because there's two.

12    Q    Got it.  And then who did she report to, Chief

13 Garza?

14    A    At the time, it was Chief Esqueda.

15    Q    And then who did -- I'm just going to keep

16 going up the chain?

17    A    I'm assuming Esqueda and then Serrato and then

18 Sheriff.

19    Q    Got it.

20    A    I'm assuming that's the way it goes.

21    Q    Perfect.  Thank you.  And I know I'm asking you

22 to really jog your memory on this, so I appreciate it?

23    A    Yeah, it's been a while.

24    Q    You have a good memory.  So what kind of

25 training did you obtain for your Internal Affairs
                          10

1 position?

2    A    On-the-job training by another officer that was

3 there, another sergeant that was there.

4    Q    What was that like?

5    A    Pretty much here's the forms we use, this is

6 for citizen complaints, this is for if there's something

7 that needs to be request for investigation, these are the

8 forms that complainants fill out like if they want to

9 pursue, like I get their statements.  I'm trying to

10 remember.  And then how you do your summary.  And then

11 the sections that IA uses for sustained, not sustained.

12 That's what we used to use before, whatever the

13 allegations were, either they were sustained or not

14 sustained.  And then I would sit in when, you know, when

15 the officers would come in to do their investigation, and

16 then there's requests for investigations and then there's

17 phone complaints, or citizen complaints.  So, but that

18 was basically, probably like two weeks maybe.

19    Q    Okay.

20    A    Of watching and just learning, and then that's

21 it.

22    Q    That's really helpful.  So what were -- so the

23 requests for investigation, were those the forms that

24 people could fill out?  Am I understanding that

25 correctly?

11

1    A    So the request for investigation is we get from

2 the administration.  And it's called, we called it RFI.

3 Those are assigned to I guess the OA gets them from IA,

4 wherever, from the sergeant, from the lieutenant, or

5 directly from the chiefs.  And those are investigations

6 that we need to look into based on whatever the

7 allegations are.

8        And that's when we review them.  And then we go

9 from there, as far as like if there's multiple officers

10 on the request for investigation, so we've got to bring

11 in everybody, we've got to look at everybody's report,

12 look at cameras, look at everything, and then bring in

13 one by one and they come in with attorneys or whatever.

14 So that's the request for investigation.  But that's

15 directly from the administration.

16    Q   I see.

17    A   And then the phone complaints are just citizens

18 that call in that they want to complain on a deputy for

19 whatever reason.  And those usually, the OA, as far as

20 Laura, I don't know if she's still there, Laura --

21    Q   Ingram?

22    A   Milam?

23    Q   Milam, sorry.

24    A   Right, Milam?

25    Q   Yeah, good memory.

                          12

1    A   Like at the time --

2    Q   That's it.

3    A   -- Laura Milam.

4    Q   Yeah.

5    A   So what she does, she does the full complaints.

6 And I guess when she gets numerous ones, then she

7 disperses them amongst all the sergeants.  She disperses

8 them.  And then we get them whenever she gives them to

9 us.

10        And either, it depends on -- to me, it depends

11 on your case load.  Because our case load, the RFIs have

12 timelines that we have to meet, our summaries.  And so

13 we -- if I have an RFI with ten officers, I need to bring

14 all these people in and then make sure their attorneys

15 can come in at the same time.  You know what I mean?  So

16  that's the timeline.  And the phone complaints we don't

17  have a timeline.

18     Q    Got it.

19     A    So the phone complaints, we look at them, and

20  that's when we call the complainant and see what their

21  complaint is.  And that's it.

22     Q    Okay.  That makes sense.  And then you said the

23  last -- so this was super helpful.  Thank you.  So --

24  just to kind of like understand kind of what the core of

25  your job was.

                                    13

1        So you said the third main duty you had was

2   handling written complaints that people would submit?

3       A    Yes.  So it was either, the ones that would

4   call in or the people that would walk in.  So you could

5   have walk ins, also complaints walk ins.

6       Q    Did people ever submit complaints by email?

7       A    I think so, yes.

8       Q    Okay.  Do you remember ever having any

9   complaints submitted by email?

10      A    Yes.  There was, but it's hard to track people

11  because sometimes they don't even put their information.

12  It's just their email.  So if they don't respond to you,

13  so yes, there's phone complaints, walk in complaints or

14  email complaints.

15      Q    Got it.  Okay.  So --

16      A    But usually those are all handed by Laura.

17      Q    So?

18    A    She assigns them to everybody.

19    Q    So Laura would actually, would she actually

20 investigate some of the complaints herself?

21    A    She wouldn't investigate.  She would just jot

22 it down, and then give us a thing, like hey --

23    Q    Divvy them out?

24    A    Yes.

25    Q    Got it.  So it sounds like, sounds like you had
                              14

 1 a lot of complaints to handle.

 2    A    Well, that depends, because there was five of

 3 us I think at the time.

 4    Q    Okay.  Let's, let's try to -- so how many, how

 5 many complaints -- well, not RFIs.  We'll do that

 6 separately.  How many complaints do you think like went

 7 on your desk, so to speak?

 8    A    It's been so long.

 9    Q    To the best of your memory?

10    A    Best of my memory, man, I can't even tell you.

11    Q    Well, let's try this.  More than fifty?

12    A    No.

13    Q    So way less?

14    A    Yes.

15    Q    Okay.  Ten?

16    A    Maybe ten, every week, every two weeks.  I

17 can't even tell you exactly how many.

18    Q    Okay.

19    A    Because I'm not sure.  I don't recall how many

20  complaints we would get in a week.  And it's like, like I

21  said, she would take them down and she wouldn't disperse

22  them right away --

23    Q    Hmm.

24    A    She would get numerous and then disperse them,

25  it wasn't even weekly.  I can't tell you weekly or not.

                                15

1    Q    Okay.  But it sounds like maybe roughly about

2  ten every week?

3    A    Maybe.

4    Q    Maybe.  And are those complaints that are

5  submitted to Internal Affairs or are those ones that you

6  are handling?  Does that make sense?

7    A    No.

8    Q    So you said there were five Internal Affairs

9  employees?

10    A    I think.  When I started there was five of us.

11    Q    Okay.  Would you all -- would you divvy out --

12  that's a terrible way of asking it.

13        Would you share the ten or so complaints that

14  would come in every week?

15    A    Yeah, two, two, two, two, yes.

16    Q    Got it.  Okay.  So it sounds -- so if you were

17  at Internal Affairs for about a year, and if you're doing

18  about two every week let's say -- and I know this is a

19  rough number, but it sounds like you did probably around

20  100 complaints when you were with Internal Affairs?

21   A   Could be.  Possible.

22   Q   I mean, does the math check out there?

23   A   Like I said, it's been so long, I don't want to

24  tell you a wrong number because I don't remember how many

25  a week.

1   Q   It's okay.  Just to the best of your memory.

2  If that seems right to you.  You know, if you're doing --

3  and we could just go back to, you know, are you doing

4  roughly two a week?

5   A   We were doing two a week, yeah.

6   Q   What about the RFIs, how many of those would

7  you do per week?

8   A   The RFIs are always coming in.  I can't tell

9  you how many.

10   Q   Were they more common than complaints?

11   A   Yes.

12   Q   Okay.  It sounds like by a lot, by your

13  reaction.

14   A   Yes.  Those are time lined.  So those are, as

15  they come in, she would enter into the system, the IA

16  Pro, and then she would divvy them up to everybody.

17   Q   And I do have, I will have more questions about

18  the IA Pro system in a little bit actually, so I'm glad

19  you brought that up.  But, and I realize I'm committing

20  you to a number again which admittedly is probably going

21  to be hard, but it sounds like, I mean, do you think you

22  were doing twice as many RFIs as you were complaints?

23    A    Oh, yeah.

24    Q    Three times as many?

25    A    Maybe.  I don't want to tell you an exact

17

1  number.  You know what I mean.

2    Q    That's okay.  But at least twice as many?

3    A    Yes.

4    Q    Okay.  So I want to go back to a question

5  earlier about training you did to become an Internal

6  Affairs officer.  And it sounds like you did -- you

7  mentioned on-the-job training.  Excuse me.  Did you --

8  was there any other training that you did, any courses,

9  anything like that?

10    A    I don't recall.

11    Q    Is it fair to say then that you were mostly

12  relying on the on-the-job training as well as just your

13  experience on the job?

14    A    Yes.

15    Q    And why, why did you transfer to Internal

16  Affairs, out of curiosity?

17    A    Just to learn that section.

18    Q    Sorry?

19    A    Just to learn that section.

20    Q    Just to learn that section?

21    A    (Nodding head.)

22    Q    And then why did you transfer out?

23    A    Just -- my, I always wanted to go to CID, since

24 I was a homicide detective, I always wanted to go back to

25 CID. It's just, I like being an investigator.

1    Q   You don't like being in an office all day, like

2 you were saying earlier?

3    A   Yes. No, I don't. I do not.

4    Q   I feel that sometimes?

5    A   And Internal Affairs is just there.

6    Q   Yeah. No, I get it. All right. So that's all

7 helpful. I think now that we've gone over the

8 background, I kind of want to get a little bit more of

9 your sense -- sorry, I want to get more of a sense of

10 your role at Internal Affairs.

11       Let me ask this. I mean, what, what was the

12 main purpose of Internal Affairs?

13   A   It's for officers who violate policy

14 violations, administrative.

15   Q   And was Internal Affairs' role to help ensure

16 compliance with --

17   A   With our policy?

18   Q   Uh-huh.

19   A   Yes.

20   Q   Okay. And you had mentioned officers who

21 violate -- who do policy violations and administrative

22 violations, correct?

23   A   Uh-huh.

24   Q   What's the difference between the two?

25    A   Well, administration -- well, it's, I'd say

1  administrative because we fall under administrative, but

2  it's all for policy, any policy violations, that's what

3  we investigate in IA.  So I don't know what's -- we just

4  call it administrative, but it's, all falls under policy

5  violations.

6    Q   I see.  Okay.  And can you just give me some

7  examples, just help me understand, like what would be

8  some common examples of either actual or alleged policy

9  violations?

10    A   Policy violations as far as we get a lot for

11  like the jail, complaints, like the checks, the times,

12  the checks, they're not doing it.  And those are some.

13  Excessive use of force, like sometimes the inmates always

14  complain that an officer used force, so we've got to

15  investigate and make sure that they didn't.  I don't

16  know, I'm trying to think of the most common ones.

17    Q   How about this.  What about in the context of

18  traffic enforcement?

19    A   Yes.

20    Q   What were some common actual or alleged policy

21  violations with traffic enforcement?

22    A   Trying to remember which ones I had for law

23  enforcement side.  Because a lot, most of the RFIs are

24  always from the jail.  Oh, so I had one for -- I'm trying

25  to remember the violation.  We get some body worn camera,

1 like a shooting, like they didn't turn on their body worn

2 camera, so they're supposed to have the body worn

3 cameras, once you initiate, like once you assign yourself

4 to a call or whatever, your body worn camera should be

5 on.  Because we get those allot.  Because sometimes the

6 officer turns it on after the fact or --

7    Q   Can we actually stop there, can we unpack that

8 a little bit?

9    A   Uh-huh.

10    Q   So what happens if an officer doesn't turn on

11 his or her body cam?  Is there any like discipline or

12 anything like that?

13    A   Well, as a IA, you do the packet, right, the

14 sergeant writes up the packet, for example, a shooting I

15 had, the officer turned on the camera afterwards.  So all

16 I do is, you know, sustained, he turned on the body worn

17 camera afterwards.  And policy states that it should be

18 on prior to -- once you log onto the call, you're

19 assigned to the call.  So we type it up and it gets sent

20 to the administrator, to the chiefs.  And they determine

21 what kind of punishment they get.  Like we don't

22 determine that at all.

23    Q   Right.  So you're not making the call?

24    A   No.

25    Q   You're just doing the assessment?

                            21

1    A   We just type up the facts that we find, that

2 yes, it's sustained, not sustained, and they're the ones

3  that do, well, give you 30 days, 35 days, whatever they

4  want to do.

5     Q   Got it.

6     A   So we don't even do -- we don't even suggest

7  nothing.  We just, not sustained, sustained, that's it.

8     Q   Okay.  That makes sense.

9        So you had mentioned most RFIs are out of the

10  jail system, right?

11     A   Most of them.  To me, it was -- to me it felt

12  like there was more jail than law enforcement.

13     Q   What percentage, you think?

14     A   Probably 60, 70.

15     Q   Okay?

16     A   Over LE, at least the ones I got assigned.

17     Q   And what about the percentage -- let me

18  rephrase that.  What percentage of RFIs were related to

19  traffic enforcement?

20     A   I wouldn't be able to tell you.

21     Q   Was it rare?

22     A   On my case load that I could remember?  Very

23  rare, my case load, because I don't remember doing

24  traffic violations RFIs, that I recall.

25     Q   Okay.  Do you know if other Internal Affairs --
                          22

1  and if you don't, it's totally fine, of course -- but do

2  you know if the other employees did traffic enforcement

3  related RFIs?

4      A    Some, but very few.

5      Q    Okay.  Got it.  So you've already alluded to

6  this.  In fact, you've mentioned it.  So it sounds like

7  the core part of your job was investigating an officer's

8  actions?

9      A    Uh-huh.

10     Q    Whether a complainant alleged something or if

11  you got an RFI about it; is that correct?

12     A    Uh-huh.  Yes.

13     Q    Okay.  And outside of the context of RFIs,

14  because I understand for you it was very rare, how often

15  did you investigate traffic stop complaints from like

16  private citizens?

17     A    Top of my head, two.

18     Q    Okay.  So presumably the case that we're

19  talking about today, Alek Schott's, that was one of them?

20     A    Uh-huh.

21     Q    What was the other one, do you remember?

22     A    The other one, I believe it was a walk in.

23  They were complaining that -- they were complaining that

24  they shouldn't have been stopped.  I don't even remember

25  the whole case.  But it was, I think it was a father, his

                                23

1  wife, the daughter, and they were upset because the

2  daughter got pulled over.  I don't even remember.  But I

3  just remember they were down, down at the office.  That's

4  how I remember.  But I don't remember the outcome.

5      Q    Okay.  You don't even remember like?

6    A   No.

7    Q   Your personal findings?

8    A   I don't remember.

9    Q   Okay.

10   A   I just remember because they were there.

11   Q   Yeah, yeah.  That makes sense.  And again,

12  totally fine.  I'm just asking to the best of your

13  memory.  And I understand it was a while ago, and you had

14  a lot of complaints, so I appreciate not only your good

15  memory but your doing your best to try to remember some

16  of these very hard to remember things?

17   A   It's been since 20 what, 2020 was it?  I don't

18  even remember.

19   Q   This case?  2022.

20   A   2022.

21   Q   Yeah.  Okay.  So -- and I don't believe I asked

22  this yet.  How common were traffic stop-related

23  complaints -- let me rephrase that.  How often did the

24  other Internal Affairs employees investigate traffic stop

25  complaints?

                            24

1    A   I don't know.

2    Q   No clue?

3    A   No clue.

4    Q   Okay.  Do you think it was rare?

5    A   No, I don't think it's rare.  Because you get

6  phone calls, I got stopped for no reason, like because I

7  was speeding, but I got a ticket.  Like everybody

8  complains because they got a ticket.

9     Q    Right.

10    A    But I don't know.

11    Q    Well, so did you get complaints like that as

12 well, beyond just the two that you mentioned earlier?

13    A    We get a lot of phone calls for like I got a

14 ticket but when you look into it, it's not even our

15 deputies.  Yes, we get calls for precinct 1, 2, 3, 4, and

16 other agencies sometimes, they stopped me, blah, blah,

17 blah.  Okay.  Who stopped you, deputy Celso.  We don't

18 have a deputy by that name.  No, I'm serious.  It's not

19 rare.

20    Q    Well, I'm sorry you have to deal with that?

21    A    It's not rare.  And a lot of people will call

22 from different agencies, especially precincts.

23    Q    Okay.

24    A    Because they're in our jurisdiction, so people

25 right away assume that it's the Sheriff's Office and it's

                              25

1  not.

2     Q    Right.  So just so I make sure I understand, as

3  far as traffic stop-related complaints, just like call

4  ins like you were talking about, how many of them would

5  have been from Bexar County, do you think?

6     A    I don't know.

7     Q    I'll ask it this way.  Do you think there were

8  more in addition to the two that you mentioned?

9    A   Oh, why.

10   Q   Okay.  Like how many, you think?  I know I keep

11 asking you numbers?

12   A   You keep on giving me numbers.  I don't know

13 numbers.  The one that's going to have numbers is going

14 to be Laura.

15   Q   Okay.  But it was -- was it pretty common?

16 Sounds like it was.

17   A   Yes.

18   Q   Okay.

19   A   For a ticket, yes.

20   Q   Got it.  So pretty common for tickets.  Did

21 people commonly call in about, not about the ticket, but

22 just about the stop?

23   A   We usually don't answer the phone.  The only

24 time we answer the phone is when Laura doesn't answer the

25 phone.  So she's the one that takes all the complaints.
                        26

1    Q   That makes sense.  And just bear with me a

2 moment because it sounds like, you know, you probably

3 weren't picking up the phone a lot for these situations

4 rbut would people call in to complain about a search of

5 their vehicle?

6    A   I never had one, except for --

7    Q   Those two?

8    A   Well, Schott's.

9    Q   Okay.  So what did an investigation look like

10  for you?  Let's just back up a little bit actually.  You

11  get a complaint either assigned to you or someone walks

12  in and says I want to complain.  Can you just walk me

13  through that process?  Because -- walk me through the

14  process of when you get the complaint to when you make

15  your conclusion.

16      A    Any complaint?  Or like his complaint?

17      Q    Let's just do -- we could just do like a, a

18  hypothetical traffic stop complaint.

19      A    So usually, like I said, a phone call

20  complaint, Laura gets them.  I don't know when she, how

21  many she gets.  Say today she gets four or five.  She

22  doesn't disperse them till maybe the end of the week or

23  next week, whenever she gives them to us.  So whatever

24  day that date is, whatever, I don't know.

25         So usually what I do is my RFIs, because
                                    27

 1  they're on a timeline, I try to take care of that.  And

 2  then in between that's when I look at my phone

 3  complaints.  And I read it and read the phone complaint

 4  and look at it, and I usually call the person, tell me

 5  what happened.  And if they answer, they answer.  If not,

 6  I leave a voice mail or whatever.

 7         And then if, say, like they answered, and they

 8  say oh, well, I was stopped by this deputy and whatever,

 9  I'm like okay, let me look into the body worn camera or

10  whatever I have to look into, whatever they tell me, you

11  know what I mean, and then I'll call you back.  So then I

12  would go back and review their body worn camera and if

13  there's no policy violations or nothing, I usually call

14  them back and tell them, hey, there's no policy

15  violations, and if they don't agree, it's like okay,

16  well, here's an open records, you could request the video

17  yourself and that's it.  Then I would just close it off.

18  But if there's more to investigate, well then, you know,

19  it just depends how long, one, it takes to investigate,

20  but also my timelines.

21     Q    Right.  Got it.  So what happens if there is

22  more to investigate?  Can you give me an example of where

23  there would be more to investigate beyond what you just

24  went through?

25     A    Well, maybe if there's more video, like more
                                28

1  officers, or what if, what if there is something.  You

2  know?  What if there is something wrong with the stop,

3  policy violation.  So, so we make the determination, and

4  if there's something that, you know, needs to be

5  investigated, then I'll tell my lieutenant, hey, watch

6  this, what do you think.  And then I go from there.

7     Q    Got it.  So in the situation where you think it

8  looks like there's probably a violation here, you send it

9  to your lieutenant to say, hey, will you look at this?

10     A    (Nodding head.)

11     Q    What does the lieutenant do?

12     A    Well, if there's enough for an investigation,

13  then it's written up.  And then it's sent to the chiefs.

14  And then they do the RFI and everything, and then they

15  send it back to do a request for investigation.

16    Q    Got it.  Okay.  And then who would do the RF --

17  who actually investigates the RFI when it gets sent back

18  down?

19    A    Whoever it's assigned to.

20    Q    Would that be somebody with Internal Affairs?

21    A    Internal Affairs.  If it's policy violation.

22  If it's criminal, then it goes to PIU.

23    Q    Okay.  And PIU is the Public Integrity Unit,

24  just to --

25    A    Yes.

29

1    Q    Okay.  And so couple of questions here, I

2  think.  Well, one, if an Internal Affairs officer

3  reviewed a complaint from a person and said, oh, it looks

4  like there's a violation, and it went up the chain, and

5  then went back down as an RFI, would the same Internal

6  Affairs officer investigate the RFI, or would it be

7  someone different?

8    A    It all depends who Laura gives it to.  Laura's

9  the one that just disperses they will.

10    Q    Okay.  And what happens -- let's say that --

11  well, let me ask, has that ever happened to you, have you

12  ever submitted a complaint, or I'm sorry, your findings

13  to the lieutenant, where it goes up the chain, comes back

14  down in the form of an RFI --

15   A   I never had a complaint to go into an RFI.

16   Q   Okay.  You have never had one?

17   A   Huh-uh.

18   Q   How many times did you send your findings to

19  the lieutenant, you think?

20   A   So you, if there's no findings, like if there's

21  no policy violation, you write a, like a little summary,

22  synopsis or whatever, on -- I don't even know what it's

23  called, the paper, and you put your conclusion like on

24  such-and-such date, I reviewed whatever, there's no

25  policy violations, it's closed.  Then once we're closed,
                                    30

 1  we give it to, we put it in the lieutenant's box and then

 2  he or she will sign off on it.  And then Laura will does

 3  whatever she does with it.

 4   Q   Okay.  So I just want to make sure I fully

 5  understand that.  So even if you do not find a policy

 6  violation, you still send it to the lieutenant?

 7   A   Uh-huh.

 8   Q   Who signs it.

 9   A   (Nodding head.)

10   Q   I see.

11   A   If she signs it, I don't know.  We give it to

12  them.  I don't know if she signs it.

13   Q   Fair.  Okay, that's helpful.

14       Was there any sort of -- let me back up for a

15  second.  So you get a complaint, you start investigating.

16  Was there any sort of guide or checklist that you had to

17  help you investigate?

18      A   (Shaking head.).  Just on-the-job training.

19      Q   Okay.  So then how do you know -- I mean, where

20  do you -- let me ask it this way.  Where do you look to

21  determine whether -- let me actually back up.

22          Let's start with a, let's say you got a traffic

23  stop complaint.  Where would you look to determine

24  whether there even is a policy violation or not?

25      A   So you have a, I don't know what section it is

31

1   in the policy, there's like different items, like poor

2   job performance, gosh, it's been so long.

3          So usually when we do the violation's sustained

4   or not sustained, it's usually from the policy and I

5   believe civil service.

6      Q   So what do you mean by that?

7      A   The policy violations that we normally use, I

8   don't know, it's in the manual we have, and it's usually

9   like, like truthfulness, poor job performance, there's

10  like a list of things, that will fall under like a policy

11  violation or like the body worn camera, it's under the

12  policy, you know, body worn camera, you should have it

13  on.

14          So we always use that policy violations to look

15  at the traffic stop and determine if there was something,

16  you know, that was violated.

17      Q   Got it.  So I just want to make sure I

18  understand, so I'm going to relay back what you said.

19      So essentially -- are you talking about the

20  Sheriff's manual?

21    A   Yes.

22    Q   Okay.  And so basically what you're doing is

23  it's up to you to say, okay, here's the issue that this

24  complainant is talking about, or alleges, and, you know,

25  it's up to me to look through the Sheriff's manual and to
                               32

 1  know what portions of the manual are essentially

 2  relevant.

 3    A   Uh-huh.

 4    Q   Okay.  Would you look anywhere else other than

 5  the Sheriff's manual?

 6    A   Well, depending on like a traffic violation,

 7  Transportation Code, or, you know, for different things.

 8  But I think the civil service also, I think in the civil

 9  service also, they go hand in hand as far as like the

10  RFIs.  I don't know if that makes sense.  I don't know

11  how to explain it.

12    Q   It doesn't, no.  Just unpack it for me.  Just

13  take your time.  What even is civil service.  I don't

14  even know what that is.

15    A   The civil service is kind of like our policy,

16  like -- so we have the Sheriff's policy and then we have

17  our collective bargaining then we have our civil service

18  rules.

19   Q   Okay.

20   A   And I don't know how to explain it.

21   Q   It's okay.  Take your time.

22   A   The civil service rules is, that applies for

23  deputies, for hearings and stuff.

24   Q   I mean, is it -- it's -- it sounds like it's a

25  document of some kind?

33

1   A   It's like a manual.

2   Q   Okay.

3   A   Like you have a policy, the sheriff's policy,

4  and then we have a civil service.  I don't know how to

5  explain it.

6   Q   All right.  Let's do this then, just so I like

7  understand what it even -- just so I get like sort a

8  vague sense of what it is at least.  Can you just give me

9  some examples of what is in it?  And you don't have to

10  quote it obviously, but just like some basic stuff.

11   A   Trying to think how to.

12      MR. FRIGERIO:  My suggestion would be like if

13  you talk, someone gets five days suspension and then it

14  goes through the appeal process.  Why don't you explain

15  that.

16   A   Yeah, I'm assuming something like that.  Oh my

17  God.  Civil process is kind of like, what we have to go

18  in front of -- so say they give you like 30 days, we have

19  civil process as a deputy, you know.  So if we don't

20  agree to the 30 days, we take it up to the higher, to a

21 higher command.  It keeps going higher.  And then they

22 have like a civil, like a civil hearing, like a civil

23 process hearing, where they hear the case and then

24 either -- I don't know how to explain it.

25   Q   (By Mr. Nelson) Okay.  All right.  I might

34

1 return back to that in a little bit, but thank you for

2 like trying?

3   A   Oh.

4   Q   Thank you for, sounds like it's hard to

5 describe.

6   A   Yes.

7   Q   Okay.  Yeah, we could -- I might return to that

8 later, but I think that's all I need for now on that.

9       Now, when you were investigating a complaint,

10 were you the only person in Internal Affairs who would

11 investigate the complaint, or would other Internal

12 Affairs employees help you with the investigation?

13   A   As far as like what do you mean?

14   Q   So when you get a complaint, when you get a

15 complaint on your desk so to speak and you start your

16 investigation process you start going through the manual

17 and body camera footage and everything else, is there

18 another Internal Affairs employee who is also helping

19 with that or is it just you?

20   A   No.  It's yours unless you have questions and

21 you ask somebody, like it's your complaint.

22   Q   Got it.  And you talked about some of the

23  evidence that you would typically try to collect to make

24  a call.  Right?

25   A   (Nodding head.)

35

1   Q   So you said normally you would just, you would

2  call the complainant, just say hey, what's up, especially

3  if the complainant made the complaint over the phone,

4  right?

5   A   Uh-huh.

6   Q   And then you would try to collect body cam

7  footage?

8   A   I would try to collect like, well, tell me what

9  happened.  You'd tell me what happened.  And then so from

10  there I would base on what I've got to do.

11   Q   So you would normally collect body cam footage

12  when?

13   A   I download it myself when, because it's through

14  axon.  I download the video.  I search the video myself.

15   Q   I see.  Would you also try to collect like dash

16  cam footage if relevant?

17   A   It should be in axon if it's available.

18   Q   What is axon?

19   A   Axon?  What that's what we use, our cameras are

20  action than on, and I think it's evidence.com, I believe,

21  but it's axon, we call it axon, and that's where all the

22  body worn camera goes uploaded.

23   Q   Got it?

24    A    Once they're docked.

25    Q    Oh, sorry.  And the dash cam footage?
                              36

1     A    Yes.

2     Q    Okay.  Would you review reports at all from

3 officers when investigating a complaint?

4     A    Yes.

5     Q    What kind of reports?

6     A    Their offense reports.

7     Q    So you would do -- well, there's a couple,

8 right?  So you would do SPEARS summaries, right?

9     A    Well, we call it RMS.  Y'all call it SPEARS,

10 where all the officers write their report, right?  Back

11 in the day we didn't have that right so now you call it

12 SPEARS I call it RMS.

13    Q    You had to handwrite all your?

14    A    Reports.

15    Q    Summaries?

16    A    Yeah.

17    Q    Yeah.

18    A    Back in the day.

19    Q    But that is one thing you would gather, right?

20    A    Yes.  The key cards.

21    Q    Okay.

22    A    The reports, the RMS.  So the key cards, y'all

23 name it something else.  The key cards, the one where it

24 says, like the key card is basically what you see on your

25  CAD, where like if you get dispatched to a call, like

1  where the call taker writes the notes.

2  Q   Oh, is it the incident details report?

3  A   Yes, we call it key cards.

4  Q   Got it.

5  A   So I pull the key cards, then I pull the

6  report, which is the RMS, the SPEARS.

7  Q   You can just call it, you can call it RMS, by

8  the way.  I'll remember?

9  A   Okay, the RMS and then if there's body worn

10  cameras, there's dash cam.  Whatever I need to -- you

11  know, sometimes, sometimes there's allegations where an

12  officer's somewhere they're not supposed to be.  GPS.

13  But that is collected from somewhere else, like from the

14  captain.  You know what I mean?  So it's just depending

15  what I've got to investigate, depending what tools I

16  need, that's where I start gathering everything I need.

17  Q   Got it.

18  A   To review.

19  Q   So the body cam and dash cam footage, how did

20  you -- is it Exxon like --

21  A   Axon, like AXON.

22  Q   AXON.  Where -- how would you get all the --

23  well, I'm going to take it one step at a time.  How would

24  you get the RMS reports?

25  A   Through RMS.

1   Q   Okay.  So it's like a --

2   A   It's on my computer.  RMS is on my computer.

3   Q   Okay.  So it's just some like program or

4 some --

5   A   (Nodding head.)

6   Q   Okay.  That's where all the RMS reports are?

7   A   (Nodding head.)

8   Q   Are the incident -- sorry.  You call them key

9 cards.  Are the key cards there as well?

10   A   That's another -- that's a website Visinet, I

11 think.

12       THE REPORTER:  What?  I'm sorry.

13       THE WITNESS:  Visinet.  Everybody calls it

14 different things, so --

15   Q   (By Mr. Nelson) Yeah.  Can you just spell it

16 for me?

17   A   I think it's V-I-S-I-N-E-T.  I think.

18   Q   Got it.  It doesn't have to be perfectly

19 accurate.  That's close enough at least?

20   A   There may be a different name.

21   Q   Are there any other reports, let's say you were

22 dealing with a traffic stop-related complaint.  Were

23 there any other reports that you would look at, like, for

24 example, would you look at the citation, the warning

25 citation that the person got?

                        39

1   A   That, I don't know how to look up.

2   Q   Okay.  Any other types of reports?

3    A    Not that I can think of.

4    Q    Okay.  Would you talk to the officer at all

5 that the person complained of?

6    A    So the phone complaints, usually I speak to

7 their supervisor.  I let their supervisor handle it as

8 far as if he thinks that he was wrong, whatever, for him

9 to talk to him.  You know what I mean?  For him to talk

10 to --

11    Q    I don't know.  Just slow down for me on this

12 one so I understand.

13    A    Usually phone complaints, I go through their

14 supervisor.  Because everybody has a supervisor.  I talk

15 to the supervisor.  Hey I got a complaint for this guy

16 for, you know, say the deputy was rude.  A lot of people

17 complain about rudeness.  Hey, so-and-so was being rude.

18 Can you talk to him.  Because, you know, if they're

19 complaining that he was rude to them, blah, blah, blah,

20 on the traffic stop.  Okay.  So I let their supervisor

21 handle it.

22    Q    That makes sense.  What about for -- so that's

23 for phone.  What about for a written complaint?

24    A    For a written complaint, depending what it is.

25 If it's the same thing, I would send it to their

40

1 supervisor.

2        Now, if it's a -- to me if it's an RFI, that's

3 when I bring you in.

4    Q   You would bring the officer in that

5   situation?

6    A   If it's a RFI.

7    Q   Okay.

8    A   But a phone complaint, if the supervisor

9   handles it, I'm not going to call the officer.

10   Q   And so just to kind of -- I'm sorry?

11   A   No, just, I'm just saying like I would let them

12   handle it.

13   Q   Got it.  So just so I understand, for non-RFI

14   investigations, you would not talk to the officer

15   complained of.  You would just talk to the supervisor.

16   A   Their supervisor.  I would talk to them first,

17   see what they tell me.

18   Q   How would you get the officer's version of

19   events?

20   A   So I'd talk to the supervisor, and speaking

21   with the supervisor, if it's handled at his level, I

22   don't really talk to them.  And I don't have, I've never

23   had a complaint where I've had to call the officer, but

24   their supervisor.

25   Q   And -- okay.  So maybe I should back up a
                                41

1   little bit.  So are there times where you would not need

2   to investigate a complaint, you would just send the

3   complaint along to the officer complained of, that

4   person's supervisor?

5    A   Depending what it is, yes.

6    Q    Okay.  Can you break down when you would, when

7  you would investigate versus when you would just send the

8  complaint to the relevant supervisor?

9    A    I don't -- like tell me -- give me an example.

10  Like I don't -- like I'm telling you, once I get a phone

11  complaint -- like his, his phone complaint, I talk to

12  him.  That requires investigation.  So I looked at

13  everything.  But I still spoke to his supervisor.

14    Q    And "his" being Alek Schott's complain?

15    A    Uh-huh.  So you just said hypothetically, but

16  there's so much hypothetically, like I don't know

17  scenarios.

18    Q    Well, I mean, just kind of help me understand

19  your thought process a little bit.  So if you're looking

20  at a complaint, what is going on in your mind when you're

21  like do I need to investigate whether there's a policy

22  violation at all or do I just need to send this to the

23  supervisor and say hey, some guy complained about this

24  officer, just letting you know?

25    A    No.  Usually I look at their stuff first, but I

                                42

1  still, you know, like tell their supervisor, hey, X YZ,

2  make sure you talk to this officer because they

3  complained, like regardless.

4    Q    I see.

5    A    After I conduct my investigation, I still --

6  it's a courtesy to tell their supervisor, like hey, this

7  guy got complained on.

8    Q   I see.  Okay.

9    A   Talk to him.

10   Q   Got it.  So you're still doing the

11  investigation?

12   A   Uh-huh.

13   Q   But you're also talking to the supervisor?

14   A   Yes.

15   Q   Saying hey, letting you know.  Okay.  Makes

16  total sense.  Sorry about that.  That was just me

17  misunderstanding.

18      So is there anything that you would do if you

19  noticed that, like an officer didn't correctly fill out

20  his or her RMS report?

21   A   I've never had one of those.

22   Q   Okay.  What about the incident detail report?

23   A   The incident detail report?  The key card?

24   Q   Yeah, I'm sorry.

25   A   That's usually typed up by the -- those are

43

1  like notes where the call taker types up stuff, or where

2  the deputy basically writes, like traffic stop, citation

3  issued.  Like those are, I don't know, like it's not like

4  a report where in the RMS where you type up your whole

5  report.  You know what I mean?

6    Q   Yeah.  Thank you.  Was there a certain standard

7  of proof you had to abide by when investigating a

8  complaint?

9    A    As far as?

10    Q    Well, I mean, let's say you have a complaint

11  where the complainant alleges some violation by an

12  officer, and the officer never even turned on the body

13  cam.  Right?  And so there's no video evidence of what

14  happened.  So now it's just a he-said/she-said, for

15  example.  What would you do in that situation, if that's

16  just what it came down to, just the complainant's account

17  versus the officer's account, say like in the RMS report?

18    A    And no body worn?

19    Q    There's nothing, no footage.

20    A    I would have to, that's when I would call their

21  supervisor and the deputy, like hey, there's a complaint

22  and there's no body worn camera, and ask them, was the

23  body worn camera down, did you not turn it on?  Because

24  that's a policy violation on its own.  You know what I

25  mean.  And see what they said.

                        44

1          And I would refer to my lieutenant, like hey,

2  there's no body worn camera, which is a policy violation.

3  What do you want to do?  You know, if it's going to turn

4  into RFI, is it just going to be a complaint.

5    Q    That makes sense.  And so essentially you would

6  report that there was no, that there was a body

7  cam-related violation, right?

8    A    (Nodding head.)

9    Q    What would you do, though, about the actual

10  like complaint at issue, like the actual allegation?  You

11  know, how do you -- because ultimately you have to make a

12  finding, right, for every investigation?

13       A    At that point, I would talk to the officer as

14  far as like hey, your body worn camera was on or off or

15  whatever because there's an allegation.  Depending what

16  the officer says.  But even at that, at that point, you

17  know, I can't determine if it's sustained or not

18  sustained because -- obviously it's a policy violation.

19  It has to go to the lieutenant.

20       Q    I see.  Okay.  So in that situation, you are

21  not actually -- and this is just me assuming, I'm

22  realizing.  So in that situation you wouldn't be saying

23  sustained or not sustained, you would just say I can't --

24  essentially, I can't make a conclusion because of this

25  policy violation about the body cam footage?
                              45

 1       A    And then they turn it into an RFI and then you

 2  bring them in and that's when they have the opportunity

 3  to come in with their attorney.

 4       Q    I see.  That makes sense.  So similarly would

 5  you do the -- so you said you would report the body cam

 6  violation.  Would you do that for dash cam as well?

 7       A    Dash cam a lot of times the dash cam from the

 8  vehicles are always down, either they don't work or, it's

 9  always something with the dash cam on patrol vehicles.

10       Q    So you would or would not report a dash cam

11  violation?

12   A   I would just document, like I would maybe just

13 say hey, there's no dash camera.  Because on the AXON, it

14 will show when there's dash or, and body worn.  And if

15 there's none, that means there's none.  Or it will show,

16 like it would be on there if there is some.

17   Q   Okay.

18   A   And most of the time, like I said, dash cam

19 sometimes don't work and that's why the officer on the

20 report should always notate, no dash cam, or body worn

21 camera.  Should.  A lot of them don't, but --

22   Q   Got it.  All right.  That's helpful.  Thank

23 you.

24      So were the complaints that you investigated

25 filed somewhere within Internal Affairs?
                              46

 1   A   Yeah.  Once they're done, we give them to

 2 Laura, well, the lieutenant.  They, whatever they do with

 3 them, I guess she archives them.  I don't know.

 4   Q   What about your, your findings and conclusions,

 5 are those filed away as well?

 6   A   Yeah, because we have to do a cover sheet for

 7 the complaint, like saying why we closed it or -- you

 8 know.

 9   Q   What about would all the evidence that you

10 relied on also be filed away?

11   A   The body worn camera, dash camera, all that

12 stuff, is on AXON.  You just look for it.  So it

13 doesn't -- we don't like put it on a disc or anything.

14   Q   Right?

15   A   And archive it, no, because that's already in

16 the cloud or wherever it goes.

17   Q   That makes sense.  What about any like written,

18 like any of the incident reports, would you -- would

19 those be filed away with your cover sheet?

20   A   Depending if I attached them or not.

21   Q   Okay.  So it wasn't --

22   A   They don't necessarily.

23   Q   Got it.

24   A   Have to be everything on there.  But if I put

25 it on there, I put it on there.  If I didn't --
                          47

1   Q   What about like your personal notes, would

2 those be filed away?

3   A   If I took notes, sometimes.

4   Q   Just sometimes?

5   A   Usually I try to write notes on the paper, the

6 phone complaint.

7   Q   Got it.  Any other notes, that you would file

8 away anyway?

9   A   I don't remember.  I don't know if I filed all

10 the notes in my, in the cases.

11   Q   Okay.  What about any other documents?

12   A   In complaints?  I don't recall.  Because

13 there's no standard way that, oh, you need to put

14 everything in there.  You know what I mean?  So I don't

15  recall if there was anything in there.

16      Q    Got it.  I guess last question on that, what

17  about emails between, I understand for investigations in

18  response to a complaint, you wouldn't talk to the

19  officer, you would just talk to the supervisor.  But.  So

20  you probably wouldn't have emails with the officer,

21  correct?

22      A    Huh-uh.

23      Q    Okay.  Email, just other emails that you sent

24  or received throughout the course of a particular

25  investigation, would those be filed anywhere?

                              48

 1      A    Probably not.

 2      Q    Okay.  And you mentioned the IA Pro system

 3  earlier.  What is that?

 4      A    The IA Pro system is all the cases that come in

 5  and complaints, Laura updates them, puts them in, and

 6  puts who they're assigned to, and then if I'm not

 7  mistaken you could put notes.  Can I put notes?  I'm

 8  trying to remember, because in CID we had a system too.

 9  Usually like the notes, close or open case or closed due

10  to no, no complainant or something.  I don't remember if

11  in IA Pro you could put notes or not.

12      Q    Okay.

13      A    I know it's a system where it has all the

14  cases, everybody's case load.  Then like if it's open or

15  closed.  But I don't remember if you could put notes in

16   it.

17   Q   Would the IA Pro system have phone complaints?

18   A   Yes.  It has the -- it should have the RFIs and

19   complaints.

20   Q   Okay.  And Laura would do that?

21   A   Yes.

22   Q   Presumably?

23   A   She's the one that enters everything in there.

24   Q   Got it.  How are you doing, by the way.  Do you

25   need a break at all?

                          49

1    A   I need some water.

2        MS. HEBERT:  I got it.

3    Q   (By Mr. Nelson) Do you also need a break?

4    A   No, I just need water.

5        MR. NELSON:  Okay.  Thank you, Christen.

6        THE WITNESS:  Thank you.

7        MS. HEBERT:  Sure.

8    Q   (By Mr. Nelson) So is it fair to say that

9    investigating complaints or RFIs was your primary

10   responsibility at Internal Affairs?

11   A   Yes.

12   Q   Did you do things outside of investigating

13   complaints or RFIs?

14   A   No.

15   Q   Nothing?  So you didn't do -- there was no

16   other way of ensuring compliance with BCSO policies?

17   A   We used to go to, we're on call like every

18  five, like every five weeks on call as far as Internal

19  Affairs, if there was a, like a death in the jail, we

20  have to respond to those.  Or if an officer got in

21  trouble, regardless if it was like an officer off duty,

22  got in a fight with his wife, and they dispatched patrol

23  out there, sometimes they would call Internal Affairs and

24  PIU.  For the deaths also they would call PIU.  So we

25  used to respond to stuff like that too.

                          50

1    Q    And what would you, what would be your role in

2  a situation where you responded to, let's say like a, you

3  said a jail, a death in the jail?

4    A    Uh-huh.

5    Q    Can you just like walk me through that?  Like

6  what would you be doing when you're responding to that?

7    A    Honestly, that's more of a PIU, but we just go

8  and we gather like a, we'll call it, let's call it the

9  guardian where they check every, depending on the pod,

10  it's either every 15 minutes or every 30 minutes or every

11  hour.  So it has to be under an hour, every 30 minutes.

12  So they have like a guardian, it's a stick.  And they

13  have like I guess where they put it in and it tells you

14  what time they checked the cells.

15        So that's how we determine, like did they miss

16  a check?  Did they not miss a check?  Like it's a policy

17  violation.  Make sure that the officer was in compliance

18  with policies.  But it's just real quick, just to get the

19  layout, what happened, just real quick, see what else

20  needs to be done, and then that's it until we get the RFI

21  and then we bring in the officer with the attorney.  Like

22  we don't even talk to, we don't question the officer or

23  nothing.  We wait untiling the RFI comes down and then

24  they come in with the attorney.

25      Q   So it sounds like you're almost being an
51

1  inspector in that situation, you're just going to inspect

2  to see whether there's a policy violation?

3      A   Yes.  Even if there's a policy violation right

4  there we're not going to do anything about it until the

5  RFI comes in.

6      Q   Right.  Got it?

7      A   Then if there's criminal, PIU handles it.

8      Q   Did you do anything like that -- let me

9  rephrase that question.  Did you respond to any

10  traffic-related issues in this context that you're

11  talking about?

12      A   No.

13      Q   Can you actually just give me -- because you

14  mentioned PIU does the jail stuff.  Right?  Can you

15  criminal.

16      Q   Sorry?

17      A   Criminal.

18      Q   Criminal.  Okay.  Can you just give me an

19  example of when you responded to -- and what's the term

20  for it, responded to?

21    A    We're on call, where we responded to jail

22  deaths and officer-involved shootings, and sometimes like

23  family violence, when it involves off-duty deputies.

24    Q    Oh, so those are the only three categories?

25  It's pretty narrow?

52

1    A    That I can think of, unless the chief calls and

2  tells you to go.

3    Q    I see.

4    A    The lieutenant.

5    Q    But you never really did anything outside of

6  those?

7    A    No.  The only two I responded to was an

8  officer-involved shooting and deaths at the jail.

9    Q    Got it.

10    A    Those are the only ones I've been to.

11    Q    That's helpful.  That makes sense.

12        Did you ever do -- and this is somewhat

13  related.  Did you ever do like ride-alongs with officers

14  to ensure that they were -- like in their patrol cars,

15  did you ever do ride-alongs with officers in their patrol

16  cars to ensure they were following certain rules?

17    A    No.

18    Q    Were you ever writing reports about a

19  particular officer outside the context of a complaint or

20  RFI?

21    A    Like?  Well, I guess what I'm trying to get at

22 is like what are, what are some ways that you -- that

23 Internal Affairs worked to ensure compliance with

24 officers outside of the context of just investigating

25 complaints and RFIs?  Does that make sense.

53

1   A   No.

2   Q   Well, let's try this.  Did you ever -- did you

3 ever research or like write reports about like certain

4 trends, like arrest trends or traffic trends?

5   A   No.

6   Q   Or nothing like that?

7   A   (Shaking head.)

8   Q   Did you, did you or anyone else at Internal

9 Affairs ever have any role in helping to develop

10 sheriff's, like the policy in the sheriff's manual?

11   A   I don't think so.

12   Q   Okay.  Would Internal Affairs ever do anything

13 like an internal audit of like a particular unit or

14 anything like that?

15   A   Not when I was there.

16   Q   But it had happened before?

17   A   I'm not sure.

18   Q   Okay.  All right.  Let's -- I'm going to show

19 you an exhibit.  That's the manual you were talking

20 about.

21   A   Policy?

22   Q   And this thing is big, as you know.

23   A   Uh-huh.

24   Q   And I'm going to mark this as --

25      MR. NELSON:  Exhibit 14, correct?

54

1      THE REPORTER:  Yes.

2   Q   (By Mr. Nelson) All right.  So what is this

3 document?

4   A   Policy.  Our policy.

5   Q   Okay.  And do you see where it says current as

6 of August 3rd, 2021?

7   A   Uh-huh.  Yes.

8   Q   Is it fair to say that this particular manual

9 that we're looking at right now was the manual in effect

10 when you were at Internal Affairs?

11   A   Was I Internal Affairs 2021?

12   Q   I can refresh your memory on that.  I'm going

13 to show you another exhibit.

14   A   They always update them.

15   Q   No, right.  Totally understand.  We just need

16 this one page.

17   A   My 201?

18   Q   Sorry, I'll hand you the document.  All right.

19 I'm handing Sergeant Ortega what I'm going to mark as

20 Exhibit 15.

21      MR. NELSON:  And Charles, I've got one for you

22 as well, if you want.

23      MR. FRIGERIO:  Okay.  Thanks.

24   Q   (By Mr. Nelson) All right.  So Sergeant Ortega,

25  what is that document?

1   A   We call it a 201.  The personal data.

2   Q   And does this reflect your employment history

3  with the Sheriff's Office?

4   A   Yes.

5   Q   Okay.  And do you see where it says, under

6  position, under that column, do you see where it says

7  Internal Affairs Section?

8   A   Yes.

9   Q   And do you see the date next to that?

10   A   September 20, 2021.

11   Q   Is it September or is it August?  Looks like an

12  8 to me maybe.

13   A   Oh, August.  I'm sorry.  August 2021.

14   Q   Okay.

15   A   Oh, yes, this is current.

16   Q   Okay.  And actually, while we're there, so is

17  this right, it looks like you were in the Internal

18  Affairs Section for just over a year?

19   A   Just over a year.

20   Q   Okay.  Up until October 15, 2022?

21   A   I remember October going to CID, criminal

22  investigations.  It's called major crimes, but --

23   Q   Okay.  So going back to Exhibit 14, can you

24  read the current as of date for me again?

25   A   August 3rd, 2021.

1   Q   So this would have been before your August

2  28th, 2021 --

3    A   Yes.

4   Q   Start date with Internal Affairs?

5   A   Yes, sir.

6   Q   Okay.  So then it is fair to say that this

7  manual, Exhibit 14 that we're looking at, was the manual

8  in effect?

9    A   Yes.

10    Q   When you were in Internal Affairs?

11    A   Yes.

12    Q   Got it.  Thank you.  That's just something we

13  have highway got to get for the record.  I'm certainly

14  not holding to -- I don't remember all my exact start

15  dates for my employment.  Heck no.

16      Let's turn to Chapter 14, which is on Page 176

17  of the manual.  And let me know when you're there.

18    A   Okay.

19    Q   And do you see at the top where it says Chapter

20  14, Professional Standards & Integrity Division?

21    A   Yes.

22    Q   Do you know what that is?

23    A   That's what IA uses.  I don't know, before we

24  used to call it, it was PSI.  That's when you said

25  professional.  So before Internal Affairs, it was PSI.  I

                              57

1  don't know, they're always -- like I said, there's

2  different names.

3    Q    They're always changing the names?

4    A    So Professional Standards & Integrity, that's

5 what they call Chapter 14.

6    Q    So what was it before, PSI, what does it stand

7 for?

8    A    I guess that's what it stands for, Professional

9 Standards & Integrity.

10    Q    Okay.  I just want to make sure.  So when you

11 mentioned, when you mentioned earlier that Internal

12 Affairs was under the administration division, is it

13 actually just the Professional Standards & Integrity

14 Division, you think?  To the best of your knowledge.

15    A    I don't know.

16    Q    Okay.  Let's just go through some of the, just

17 a couple of things in this Chapter 14.

18    A    Okay.

19    Q    And we'll see if it is something that governed

20 Internal Affairs.  I think we'll do it that way.

21        And I guess I actually will just ask this.  So

22 it sounds like you said yes.  But is this the main

23 chapter that governed Internal Affairs?

24    A    This and --

25    Q    I really wish there was an index in this thing.
                            58

1    A    I know.  So remember when I told you what we

2 use as sustained/not sustained, it was employee conduct,

3 which is general discharge of duties, performance of

4 duties, obedience -- Chapter 5.

5    Q    Chapter 5?

6    A    Addressing ranking deputies, harmony and

7 cooperation, statement concerning Sheriff's Office,

8 derogatory remarks, criticism, all that, this is what we

9 sustained/not sustained the allegations.

10    Q    Got it.

11        THE REPORTER:  What page is that?

12        THE WITNESS:  39.

13    Q    (By Mr. Nelson) 39.  Okay.  So just so I

14 understand, the two main chapters that governed Internal

15 Affairs would be -- or sorry, would have been Chapter 5

16 on Page 39, and then Chapter 14 on Page 176?

17    A    Yes.  But it would be anything in the policy,

18 technically anything in the policy.

19    Q    Right.  For sure.  But just like day-to-day?

20    A    Yes, this, and then this is what we used to

21 sustain, not sustain officers.

22    Q    Got it.

23    A    This, and then like I said the civil service is

24 a manual too.

25    Q    All right.  Thank you for reminding me of that.
                                59

1 That's helpful.  Thank you.

2        All right, let's look at -- let's go back to

3 Page 176.  Looks like you're there already?

4    A    Uh-huh.

5    Q    Perfect.  Do you see 14.03, organization?

6    A    Yes.

7    Q    Let's go down to Subsection G.  Do you see

8  where that is?

9    A    Yes.

10   Q    Okay.  And I'm actually going to read

11  Subsection G but before I do that I'm going to read the

12  first two lines below 14.03, organization.  So I'm just

13  going to quote it, just for the record.

14        So it says the Professional Standards &

15  Integrity Division had the responsibility and authority

16  to conduct investigations of the following situations.

17  Subsection G says any investigation assigned by the chief

18  deputy or the Sheriff.  Is that correct?

19   A    Yes.

20   Q    What -- let me just ask it this way.  When

21  would you get an investigation assigned by the chief

22  deputy or the Sheriff, just so I make sure I understand.

23   A    So like I said, the RFIs.

24   Q    Got it.

25   A    It will come from the chiefs.  And it could be
                                60

1  from chief deputy, I guess Serrato.  Sometimes it will

2  have his name.  It will have whoever, it will say by

3  whom, like a signature.  But those are all review for

4  investigation, which is RFIs.

5    Q    Perfect.  And that's what I figured, I honestly

6  just should have asked you that way, but I just wanted to

7  make sure.  So thank you for that.

8        Now, are you familiar with the investigation of

9  Deputy Babb's conduct during the March 16, 2022, stop of

10  Alek Schott, the Plaintiff in this case, that was

11  requested by Deputy Chief Garza and approved by Chief

12  Deputy James Serrato on June 13, 2023?

13     A   No.

14     Q   Okay.  So I'll show you another exhibit.

15     A   Are we done with this one?

16     Q   Here.

17     A   Just making sure.

18     Q   Let's do this.  I'll give you some more room.

19  I'm hogging all the room.

20     A   I don't want to mess up all the pages.

21        MR. NELSON:  That's a good call.

22        THE REPORTER:  I appreciate that.

23     Q   (By Mr. Nelson) All right.  I'm going to hand

24  you an exhibit that I am marking Exhibit 16.

25        MR. NELSON:  One for you, Charles.
                                61

1        MR. FRIGERIO:  Thanks.

2     Q   (By Mr. Nelson) All right.  So I'll ask some

3  questions about this particular exhibit, some other

4  questions I should say later.  But for now, I just want

5  to look at the front page.  Are you familiar -- well, let

6  me back up.  What is this?

7     A   An RFI.

8     Q   Sorry, what is the first page?

9     A    Request for investigation.

10    Q    Okay.  And have you ever seen that before?

11    A    , these are the RFIs, these are the ones I have

12 to investigate.  These are the ones I told you we have

13 timelines for these.

14    Q    That's what I figured.  But have you seen this

15 one?

16    A    This one?  No.

17    Q    You've never seen this?

18    A    Huh-uh.

19    Q    Did you know that this -- well actually, can

20 you just explain to me what this RFI is for?

21    A    This is a request for investigation for Deputy

22 Babb.  This is on March 16th, 2022, Deputy Babb.  Want me

23 to read the whole thing?

24    Q    Sure.  Why not?

25    A    "Deputy Babb, Joel, while working in the course
                            62

1 of his interdiction team duties, conducted a traffic stop

2 and detained the driver of the vehicle.  Deputy engaged

3 in a prolonged conversation with the driver and waited

4 for the canine unit to respond.  Upon the canine alerting

5 of possible drugs in the vehicle, deputy searched the

6 vehicle after obtaining consent from the driver.  The

7 body worn camera recording shows Deputy Babb exited the

8 vehicle several times, leaving the engine running while

9 the detainee was in the front seat of the vehicle until

10 Deputy Babb placed him at the back seat of his patrol

11 vehicle unrestrained."

12　Q　Do you know who this RFI is about?

13　A　Deputy Babb.

14　Q　And do you know who the, I guess driver is in

15 this RFI?

16　A　Who the driver is?

17　Q　And it's okay if you don't.

18　A　Just by reading this, no, because I don't

19 remember March 16th, 2022, where I was at.

20　Q　Would you have -- I guess I'll ask this, do you

21 have any reason to believe that this is not an RFI

22 concerning the March 16, 2022, stop of Alek Schott in

23 this case -- at issue in this case?

24　A　It could be.  Like I said, I -- when you look

25 at the whole thing, just by turning the page, yes, I know

63

1 it is, because my stuff is there.  You know what I mean?

2　Q　No, that's perfect.  So you said you had never

3 seen this RFI before, correct?

4　A　No.  This was after I left.  I was in CID

5 already.

6　Q　Okay.  And so you, did you know that this

7 RFI -- scratch that.

8　　Did you know that there was going to be an RFI

9 for Alek Schott's stop?

10　A　No.  When I found out about -- I don't even

11 remember when I found out about this whole thing.  And I

12  think it's because there's going to be, when Susan Bowen

13  called.  But I don't remember when that was.

14    Q    Okay.  So what I want to do is let's go ahead

15  and -- we're staying with this Exhibit 16.

16    A    Okay.

17    Q    Do you see the red numbers at the bottom, the

18  BC 00 number?

19    A    Yes.

20    Q    Okay.  Can we turn to -- let's just turn to the

21  next page actually, 2162.  So this was your closing of

22  the investigation concerning Alek Schott?

23    A    Yes.

24    Q    And what date did you close that investigation?

25    A    June 2nd, 2022.

                          64

1    Q    All right.  Let's turn back to 2161.  And

2  what's the date of the RFI?

3    A    June 12th, 2023.

4    Q    Okay.  So just over a year later, correct?

5    A    (Nodding head.)

6    Q    Is that common?  I mean, help me understand,

7  there's, you know, you close an investigation June 2nd,

8  2022.  And then over a year later, there's an RFI

9  concerning the same incident.  Is that normal?

10        MR. FRIGERIO:  Objection, form.

11    Q    (By Mr. Nelson) You can answer.

12    A    I don't know.  It's -- there's -- I can't

13 remember, I know something changed as far as complaints,

14 but I don't remember what it is.

15    Q    What do you mean by that?

16    A    Like a timeline for complaints.  Like there's

17 something that changed.  But I don't know, maybe he

18 didn't -- I guess maybe the Defendant didn't like my

19 conclusion and kept on calling or something.  I don't

20 know.

21    Q    So do you -- I mean, why do you think the --

22 why do you think there was an RFI submitted for --

23    A    Why there wasn't?

24    Q    Why there was.

25    A    Why there was?  Why there was?  I couldn't
                                65

1 answer that.  That's for the chiefs to say why they think

2 there was a reason to do an RFI.

3    Q    Okay.  Got it.

4         MR. WINDHAM:  Mind if we take a bathroom break?

5         MR. NELSON:  Let's take a break.

6         THE REPORTER:  We're off the record.

7    (Recess from 10:52 a.m. to 11:07 a.m.)

8         THE REPORTER:  We are back on the record.

9    Q    (By Mr. Nelson) Okay.  So, Sergeant Ortega, I

10 want to go back to --

11    A    I'm sorry.

12    Q    You're fine.  I want to go back.  I want to

13 make sure I fully understand the relationship between the

14 complaint process and the RFI process.  I think I'm a

15  little hazy on some of the timelines a little bit.  So,

16  so you get a complaint on your desk.  Let's just start

17  there.  Can you just walk me through step by step what

18  your process is for handling that complaint, just the

19  complaint portion first, then we'll get to the RFI part

20  next.

21      A   Depending on how much information's on the

22  complaint.  If I have enough information to look into

23  like the deputy and stuff like that, I'll start doing

24  that.  But I'd rather hear it firsthand from the

25  complainant.  So I'll usually call the complainant, hey,

66

1  let me know what happened.  I got your complaint.  Tell

2  me more.

3       So when they tell me more is when, then from

4  there, I start reviewing stuff that I need to review.

5   Q   Okay.  Do you always talk to the complainant?

6   A   If they answer, yes.

7   Q   Okay.

8   A   I give them three tries.  I do.  I'll call

9  three times.  No response, I'll close out your case.

10   Q   Okay.  So let's just do this then.  Step 1,

11  after you get the complaint -- actually, let's do Step 1,

12  you get the complaint on your desk.  Step 2, is it fair

13  to say Step 2 is you call the complainant?

14   A   Uh-huh.

15   Q   And hear their story?

16    A    Yes.

17    Q    What's the next step?

18    A    Depending on the information they give me, I

19  start conducting my investigation as far as like do I

20  need to pull reports, do I need to pull video, do I --

21  what do I need to do.

22    Q    Okay.  So Step 3 is gather evidence

23  essentially?

24    A    Uh-huh.

25    Q    And like we talked about before, that would

67

1  include like you, like you just said, the reports?

2    A    (Nodding head.)

3    Q    So the RMS report.  And the key card, and body

4  cam footage?

5    A    Uh-huh.

6    Q    Dash cam footage?

7    A    If there's some.

8    Q    One thing too I forgot to clearly ask about the

9  dash cam footage, so is it a policy violation if the dash

10  cam footage is not on?

11    A    I do not recall off the top of my head.  I

12  would have to look it up.

13    Q    Okay.

14    A    I know body worn for sure, but like I said dash

15  cameras are always failing, because even when I was on

16  patrol, they're like the dash cam don't work, the dash

17  cam don't work.

18    Q    Okay.  Now, before we get to Step 4, I just

19  want to make sure is there ever a situation where you get

20  a complaint on your desk and you decide I'm not going to

21  investigate this?

22    A    No.  We investigate every complaint.

23    Q    Got it.

24    A    Because we have to write, like this cover sheet

25  has to be in every complaint, if it's a case closed.

                            68

1         MR. WINDHAM:  I'm sorry, what page is that?

2         MR. FRIGERIO:  2162.

3         MR. NELSON:  Thank you, Josh.

4     A    And it tells you right there like the different

5   options why it was closed.

6     Q    (By Mr. Nelson) Okay.  That's helpful.  Thank

7   you.  So Step 3 is gather evidence?

8     A    Uh-huh.

9     Q    What's Step 4?

10    A    If it's either a case closed or we had to

11  submit it to the lieutenant for an RFI to be generated.

12    Q    Okay.  So Step 4 is case closed.  What does

13  case closed mean exactly?  I'm sorry, what page are you

14  on?

15    A    2163.

16        MR. FRIGERIO:  62.

17        THE WITNESS:  I'm sorry, 62.

18    Q    (By Mr. Nelson) I'm going to look at that with

19  you.  Which is Exhibit?

20     A    Exhibit 16.

21     Q    Exhibit 16, Page 2162?

22     A    So when there's a complaint and there's nothing

23  that I find policy violations then I'm going to close out

24  the case and it will tell you why.  Like these are the

25  different options why we close the case.  And like this

                              69

1  one there's an explanation because there's, and you put

2  your explanation, and you submitted it to the lieutenant.

3     Q    Got it.  Okay.  So the case is closed when

4  there's no, when you found no policy violation.

5     A    Uh-huh.

6     Q    Got it.

7     A    And like I said, like no, one that says

8  non-cooperative complainants is when I call you at least

9  three times and negative contact.

10     Q    Three strikes you're out.  Got it.

11        Okay.  And then you mentioned -- so in Step 4

12  you mentioned two possibilities, case closed, where you

13  find no policy violations, correct?

14     A    (Nodding head.) yes.  I'm sorry.

15     Q    You're find.  Good.  What was the other

16  possibility in Step 4?

17     A    In Step 4 if there's a policy that I see that's

18  violated, or that I believe is a violation, I will send

19  it up to the lieutenant.

20     Q    And you mentioned earlier that you, there's

21  like some box that you like just slip your -- well, let

22  me actually back up.  Well, no, go ahead, finish the

23  thought.

24     A    No, you said a box.  We just submit it to the

25  lieutenant.  Either we put them on his disc if he's
                              70

 1  there, we'll give it to him if he's there.  Or put it in

 2  his, everybody has like a little mailbox or box, whatever

 3  you want to call it.

 4     Q    Gotcha.  What is the actual document that you

 5  are giving the lieutenant?  Is it this 2162, is it a form

 6  like this?

 7     A    I never had to do one, so I don't know exactly.

 8     Q    Okay.

 9     A    I don't know if there's a form or we just tell

10  him, like there needs to be an investigation.

11     Q    And so does that mean you just never finder

12  found a policy violation?

13     A    On my complaints, no.

14     Q    Okay.  All right.  What is -- let me actually

15  ask a follow-up question on the case closed portion.

16  That's where you find no policy violation.  What happens

17  after -- well, you know what, let's do it this way.  It's

18  going to get a little confusing because we're branching

19  off, right?  Step 4 we've got two possibilities, case

20  closed where you find no policy violation, correct?

21     A    Uh-huh.

22    Q    Or there is a policy violation and you send

23  some form to the lieutenant but you never had to do that.

24    A    I never had to do that so I don't know if it's

25  a form or we just tell him directly like hey this

                                71

 1  complainant, this complaint looks like it needs to be an

 2  RFI.

 3    Q    Okay.

 4    A    For whatever reason, because they broke the

 5  policy, whatever.

 6    Q    So in a situation where the case is closed and

 7  you find no policy violation, what happens after that?

 8  What is the next step?

 9    A    So I submit this paperwork with them.  Usually

10  it's this one and the one that, the citizen complaint

11  sheet.

12    Q    Which is what page?

13    A    2163.

14    Q    Okay.  And this is on Exhibit -- can you?

15    A    Oh, Exhibit 16.

16    Q    Exhibit 16.  Okay.  Sorry, can you just restate

17  what you said there?

18    A    Okay.  So want me to give you the process for

19  the complaint?  When we get it, it's usually this.

20  Exhibit 16, Page 2163.  It's usually the citizen contact

21  sheet for Internal Affairs is a phone call complaint from

22  Laura.  And then sometimes Laura has a sheet attached to

23  it, like where she wrote her notes.

24    Q    Can we pause right there?  Can you turn to

25  2165?

72

1    A    This.

2    Q    Those are Laura's notes?

3    A    Yes.

4    Q    Okay.

5    A    So you get the complaint sheet with sometimes

6  her notes, because she usually just writes the notes down

7  and then she types it up for us.

8    Q    Got it.  And that really just, this really just

9  goes to Step 1, which is --

10    A    Yes.

11    Q    You got the complaint on your desk, so to

12  speak, when you get this citizen contact sheet, which is

13  2163, and if Laura happened to write some notes, you

14  would also get something like 2165?

15    A    Yes.

16    Q    That's helpful.

17    A    And then when we, when I close it out, we do

18  the cover sheet, which is 2162, plus 2163, and 2165.

19    Q    Got it.  And just to be clear -- that's

20  extremely helpful.  Thank you.

21        The case closed is 2162, because that's what

22  you submit.  And then just like as attachments you have

23  2163 and 2165?

24    A    Yes.

25   Q   Anything else?

73

1    A   Huh-uh.

2    Q   Okay.  All right.  So going back to Step 4, in

3 the situation where the case is closed and you find no

4 policy violations, you -- who do you submit this --

5    A   Return the packet to the lieutenant.

6    Q   And the packet being the 2162 plus the two --

7    A   Yes.

8    Q   Attachments?

9    A   Return it to the lieutenant and they read

10 off -- they read it I guess and -- I've seen some signed.

11 I don't know if they all get signed, but they go to the

12 lieutenant and the lieutenant gives them to Laura, which

13 she I guess goes into -- I'm assuming she goes into IA

14 Pro and closes them out and then archives them.

15   Q   So in other words step 5 where the case is

16 closed you send it to the lieutenant to basically review

17 it?

18   A   Uh-huh.

19   Q   The packet that is.  And then Laura -- sorry,

20 let me back up.  The lieutenant will then send the packet

21 to Laura -- is it the packet that he sends to Laura?

22   A   (Nodding head.)

23   Q   Or like his signature?

24   A   This whole thing.

25   Q   Okay.  He'll send it to Laura and then she then

74

1 takes that packet to close out the case in, you said IA

2 Pro?

3    A   Uh-huh.

4    Q   Got it.  Do you know -- I know you said you

5 never submitted whatever it is when you find the policy

6 violation, as opposed to not finding a policy violation

7 and closing the case.  But what would happen if you did

8 find a policy violation and you informed the lieutenant

9 of that?

10   A   The lieutenant should -- the lieutenant should

11 type, either talks to the chiefs or types up an RFI, and

12 then sends it to the chief so they could approve it

13 either for Internal Affairs, for the Public Integrity

14 Unit, or they'll deny the investigation, like it shows in

15 Exhibit 16, 2161.

16   Q   Okay.  Can we slow down there a little bit just

17 for my sake?

18   A   Okay.

19   Q   Because that was a lot of information for me.

20 But it was helpful.

21      So okay, just to make sure I understand, you

22 would send the -- you would inform the lieutenant of a

23 policy violation.

24   A   Uh-huh.

25   Q   The lieutenant would do one of two things,

75

1 either talk to the chief --

2    A   (Nodding head.)

3    Q    Who's the chief?

4    A    Lupe Garza.

5    Q    Okay.  So the chief, the chief of what is I

6  guess is what I'm asking.

7    A    Of IA.

8    Q    Oh, got it.

9    A    And then her chief at the time was Esqueda.

10    Q    Okay.  And so the lieutenant would either talk

11  to Chief Garza, head of IA, or type you up an RFI?

12    A    Uh-huh.

13    Q    Okay.  Now, what's the purpose -- why, what

14  would make the lieutenant talk to Chief Garza as opposed

15  to just typing up an RFI?

16    A    What they do, I don't know what they do.

17    Q    Okay?

18    A    I just submit my paperwork, hey, if there is, I

19  think there's a policy violation or something, and they

20  do whatever they got to do.

21    Q    Got it.

22    Q    Will Chief Garza sometimes type up an RFI or

23  request one?

24    A    Request one, because it says right here Deputy

25  Chief Maria Garza.

76

1    Q    Where's right here?

2    A    On Exhibit 16, 2161.

3    Q    Got it.

4    A   I think it's Maria Lupe Garza.  I'm sorry.  I

5  keep on referring to her as Lupe, but it's Maria.

6    Q   You said there were two Garcias [sic], right?

7  Is that why?

8    A   Two Garzas.  There's a Raul Garza and then

9  Maria Garza.

10   Q   I got you.  Okay.

11   A   But they call her Lupe Garza.

12   Q   Well, I appreciate the correction.  Okay.  This

13  is helpful.  This is coming together for me.  Thanks

14  again for walking through this timeline.

15       How often -- again, I understand you never

16  informed the lieutenant of a policy violation.  But when

17  there is, when an Internal Affairs officer does inform

18  the lieutenant of a policy violation, how often does that

19  result in the lieutenant or Chief Garza or someone else

20  creating an RFI?

21       MR. FRIGERIO:  Objection, form.

22   A   That's up to them.  That's beyond my pay grade.

23   Q   (By Mr. Nelson) That's fair.

24   A   That's beyond my pay grade.

25   Q   So in other words, you would have no idea of

                           77

1  how often a policy violation turns into an RFI?

2    A   No.

3    Q   Okay.  All right.  So before I move into the

4  RFI process, I think I have one last question about the

5  complaint process.

6          So in the situation where you closed the case

7   because you found no policy violation, you send it to the

8   lieutenant, who closes out the -- or you send it to the

9   lieutenant, who then sends it to Laura to close out the

10  case.  What happens after that?  Is it just done?  That's

11  it?

12     A   Uh-huh.

13     Q   Okay.  That's the end of the road.

14     A   Yes.

15     Q   Got it.  And before I get to the RFI process,

16  this is not the only time an RFI will be created,

17  correct, through this complaint process?

18     A   What do you mean?

19     Q   Are there situations where someone like the

20  lieutenant would create an RFI that has nothing to do

21  with a complaint?

22         MR. FRIGERIO:  Objection, form.

23     A   I still don't understand your question.

24     Q   (By Mr. Nelson) Sorry, that's -- I'm not

25  wording it well.  Let me think of a different way.
                              78

1      A   Like in the same case?

2      Q   No, no.

3      A   Because the lieutenant could, like the

4   lieutenant could do request for investigations, but

5   ultimately, the people that sign off on it are the

6   chiefs.  And they're the ones that approve it and that's

7  when we get an RFI.  He could type up all he wants, like

8  a request for investigation, but it has to be approved by

9  one of the chiefs.

10     Q   Got it.

11     A   And it tells you right there on the boxes.

12     Q   Right.  No, that's helpful.  Thank you?

13     A   No, it's like --

14     Q   And I'm really just wording the question

15  poorly, admittedly.  So let me try to just phrase it a

16  different way.

17         Would Chief Garza ever request -- send an RFI

18  to Internal Affairs that had nothing to do with a

19  complaint from a public citizen?

20         MR. FRIGERIO:  Objection, form.

21     A   I still don't understand your question.

22     Q   (By Mr. Nelson) We'll turn back to it later.

23  I'll think of a better way to phrase it.

24         But I think what I want to do now is I want to

25  just understand what happens with the RFI process.

                          79

1  Because I have this, I have a good sense of how the

2  complaint process works, from Step 1 to step 5.

3         So let's say Chief Garza submits a request for

4  investigation.

5     A   Uh-huh.

6     Q   How does that work in practice?

7     A   So the RFIs, like I said, Laura disperses them

8  amongst all the sergeants.  So when I get an RFI, on

9  Exhibit 16, 2161, where it says RE, reference, request

10  for investigation, then it says Deputy Babb, on this one

11  it says Deputy Babb.  So this one only has one person.

12  Sometimes you'll have numerous officers.

13    Q   Right.

14    A   So at this point, I have to gather all the

15  information that this -- because it's going to have more

16  than this page.

17    Q   Right.

18    A   It's going to be a big packet.  Say, say a use

19  of force at the jail.  Say there was five deputies

20  involved.  And it's going to say, pretty much, you know,

21  request for investigation for these five deputies on

22  so-and-so date, there was a code 2 and inmate so-and-so

23  says there was excessive force, whatever.  So I have to

24  pull all five videos, locate them, and sometimes it's

25  hard to locate them because the jail categorizes, or
                                80

1  categorizes them, sorry, different ways.  Like they're

2  not easy to find like patrol.

3    Q   Yeah.

4    A   So you've got to find all their videos, all

5  their RFIs, like their, their reports, each individual

6  report, everything.  So, and then if there's video on the

7  unit, pull the video on the unit, just to make sure

8  everything's done.

9        Once I get all my investigation that I need, I

10 type up questions that the officers need to answer to me.

11    Q    Okay.

12    A    That I saw like -- if, say, there was maybe --

13 for example, there was one that they were saying that the

14 officer tripped them when he had leg irons, so he fell

15 and busted his mouth.  So I have to, you know, look at

16 all the video and ask questions like did you kick him,

17 did you not -- you know, did you kick him, was he in

18 restraints.  So I've got to type up questions pertaining

19 to the incident.  And then I bring in each deputy one by

20 one into the office, and I show them all the evidence,

21 all the reports, everything.  And they've got to answer.

22 And that's when they come in with their attorney.

23    Q    Got it.  Okay, thank you for that.  That's

24 helpful.

25        So when I want to do is I want to relay that
                              81

 1 back to you but I want to do it with the step by step?

 2    A    Okay.

 3    Q    That we did with the complaint process just to

 4 make sure I understand.

 5    A    Okay.

 6    Q    So let's make Step 1, let's just use Chief

 7 Garza as an example.

 8    A    Okay.

 9    Q    So Chief Garza submits a request for

10 investigation.  Is that -- does that sound right for Step

11 1?

12    A    Yes.

13    Q    And what are the reasons why she would submit a

14  request for investigation?

15    A    That's beyond me.

16    Q    Well --

17    A    Like I said, that's -- they, they sign off.

18  They're the ones that make these RFIs and if it's signed,

19  we investigate them.  I can't tell you why she did this

20  RFI.  I can't.  That's not me.

21    Q    Well, let's take it this way.  So one way might

22  be that the lieutenant, because going back to what we

23  said earlier, the lieutenant could write up something to

24  Chief Garza that would perhaps prompt Chief Garza to say,

25  hey, I'm going to submit a request for investigation?

                              82

1    A    Yes.

2    Q    Is that correct?

3    A    Yes.

4    Q    Okay.  So that would be one way.  And other

5  than that, it's just, you have no idea how she would?

6    A    How they get their information or, you know, I

7  don't know.

8    Q    Okay.  Got it.  Now, Step 2, let me make sure

9  we got Step 1 down.  So Step 1, Chief Garza submits a

10  request for investigation?

11    A    Uh-huh.

12    Q    Step 2, what happens there?

13     A     That's when I review the documents they send

14 me.  And sometimes they don't even send me everything.

15 No, I'm serious.  So sometimes, like I said, like a use

16 of force at the jail.

17     Q     Yeah.

18     A     Sometimes they'll send me the names and why

19 we're investigating, and like one report, and it's

20 missing the other four reports of the officers.

21     Q     Who is they that doesn't send you everything?

22     A     Well, I'm saying they, as far as like the whole

23 packet.  Like the whole packet does not come with

24 everything.

25     Q     Sorry, who is sending you the affect?

83

1     A     It comes from the administration.

2     Q     Okay.

3     A     From the chiefs.  I don't know who does them

4 over there.  I'm not blaming nobody, but --

5     Q     No, that's helpful.  I just wasn't sure if the

6 officers had an obligation to send you their stuff or if

7 it was the administration.

8     A     Yeah, administration sends us this.  I don't

9 know who composes them over there at administration, but

10 they're the ones --

11     Q     Got it.  Okay.  So someone from Chief Garza's

12 office would send you all the information that you need

13 to look at.  Ideally, they would.

14     A     Yes.

15    Q   Okay.

16    A   So I read it.  And that's when I start my

17  investigation as far as like investigating what I need to

18  look into, which is reports, body camera, unit camera,

19  like any evidence to prove or disprove the allegations.

20    Q   Got it.  Now, are you going to be acquiring any

21  evidence outside of what the administration office sends

22  you?  Assuming they send you everything they're supposed

23  to.

24    A   Well, sometimes, like the unit cameras,

25  sometimes -- depending -- because you have the annex and

                              84

 1  the main jail.  I have access to the main jail, but not

 2  the annex.  But sometimes it's faster for them to provide

 3  me the video than me go down there, because then I got to

 4  take down time from my other, you know, other

 5  investigations to go out there and sometimes I'll have to

 6  sit there for hours, just to look at the video, pull the

 7  video, or download everything.  So sometimes I will just

 8  email whoever the sergeant was, if they have access to

 9  the video, or if they don't have the video from the

10  units.  Because some units have video and some don't, or

11  some have the ones that flip every 5, 10 minutes or

12  whatever.  So sometimes you won't capture what happened

13  in that unit.

14    Q   Okay.  That makes sense.  So in other words,

15  like Chief Garza's office is going to be sending you

16 ideally all of the files you're supposed to be looking

17 at, but then you might have to retrieve yourself body cam

18 footage?

19    A   Videos.  And some reports too that were not

20 included in there.

21    Q   Right.  Okay.  That makes sense.  All right.

22 So Step 3, it sounds like that's where you do your

23 investigation?

24    A   So after I get all the stuff I need, then I

25 have to do questions for each officer, and I've got to

                           85

 1 schedule each officer different dates, different times.

 2    Q   Are there specific questions that you have to

 3 ask?

 4    A   There's like four or five.  I can't remember

 5 exactly like pretty much like what's your name, your rank

 6 and title, do you know the policy, have you read the

 7 policy procedure, you know what I mean.  It's like the

 8 standard for everybody.  Can't remember the rest.

 9    Q   Is that anywhere in the sheriff's manual?

10    A   No.  That's all what we use in Internal

11 Affairs.

12    Q   Okay.  And you said one of the questions was

13 have you read all of the policy, or what was the question

14 again?

15    A   Something about have you -- are you familiar

16 with the policies and procedures.

17    Q   Is it just like are you familiar with the

18  entire manual, or is it are you familiar with the

19  relevant policies?

20      A   I can't tell you top of my head, no.

21      Q   You just don't remember?

22      A   I don't remember.

23      Q   That's fine.

24      A   But there's like a couple, like I said, like

25  four questions that are always asked of everybody.

86

1      Q   Are there any other questions other than the

2  ones you just listed, name, title, the policy question,

3  what was the other one?

4      A   I don't remember.  I can't remember.  It's been

5  so long, it's just -- I don't know, it's like four

6  different questions they ask, but those are always

7  standard questions.  And then you make up your own

8  questions as far as the investigation.

9      Q   Okay.

10      A   To ask every officer.

11      Q   And at this point, you're then investigating

12  this RFI similar to how you would investigate a

13  complaint?

14      A   Well, it's kind of different.  The RFI is

15  different because they're responding officers, as far as

16  like you have an opportunity to bring your attorney with

17  you.

18      Q   Got it.

19    A    Like you have legal counsel with you.

20    Q    But as far as like the type of, like the --

21  scratch that.

22         As far as the questions you're asking yourself

23  and like the determinations you're trying to make,

24  that's -- you're just trying to reach the right

25  conclusion, just like you would?

87

1    A    Yes.

2    Q    In the complaint process.  Got it.  Okay.  So

3  then what, after you ask questions to each officer, those

4  four-ish questions, and look at all the evidence, then

5  what do you do in Step 4?

6    A    Then I've got to type up everybody's, like what

7  they told me, and if they're sustained, not sustained, on

8  the violations.  Like a whole summary.

9    Q    Got it.  Easy enough.  What's step 5 after

10  that?

11    A    Then we submit our findings to the lieutenant,

12  and then the lieutenant will review it, send it back to

13  us if we need corrections, and then if not, it gets

14  submitted to the administration and what happens after

15  that I don't know.

16    Q    When would the lieutenant send back for

17  corrections?

18    A    Just like for spelling or, or if he thinks it

19  needs more explanation or whatever, like the findings.

20    Q    Would the lieutenant ever disagree with you on

21  your sustained, not sustained conclusion, and say I'm

22  sending it back, I need you to redo it?

23      A   I don't recall him doing that, or her.  I don't

24  recall him telling me that.

25      Q   Okay.  So then step 5, the lieutenant sends the

88

1  findings to admin, and then from there you don't know

2  what happens?

3      A   I don't know what happens after that.

4      Q   You never hear anything of an RFI, you do like

5  the conclusion or --

6      A   I don't -- sometimes we'll get here and there

7  like a, oh, we got to serve this person for admin leave.

8  But sometimes it's not even for my case, it's probably

9  for a different sergeant's case.  But we never find out

10  the actual ending, like say, like I said, they go

11  sometimes administrative leave and then they go through

12  the process and come back to work, I don't know when they

13  come back to work.  Or what they got, ended up with five

14  days, ten days, suspension, I don't know.  Like I said,

15  once it gets to that level we have nothing to do with it.

16      Q   Got it.  And so that's -- these are just these

17  five steps and there's not really anything beyond that?

18      A   (Shaking head.)

19      Q   Because again you don't know what happens?

20      A   I don't know if it gets closed or nothing.

21      Q   Okay.  Well, thank you for that.  I know that

22  was grueling.  But I just wanted to get a clear timeline

23  of exactly how the steps work.

24       All right.  So you had mentioned earlier, way

25  early on, that the RFIs had a timeline, I think was the

1  word you used; is that correct?

2    A   (Nodding head.)

3    Q   What's that timeline?

4    A   At the time when I was there, I believe it was

5  180 days that, from the date it was received.

6    Q   What does that mean, date it was received?

7    A   The date it was received in our office, the

8  RFI.

9    Q   Got it.  Okay.

10    A   I believe -- I believe it was 180 days that I

11  had to submit all my findings.

12    Q   Got it.  Okay.  Excellent.  Thank you.

13       All right.  So now I think I want to talk a

14  little bit about how you would determine if you were to

15  get a traffic stop complaint, how you would determine if

16  the traffic stop violated -- violated any sheriff's

17  manual policies.

18       So let's go back to the sheriff's manual, which

19  is Exhibit 14 right here.

20    A   Uh-huh.

21    Q   And I think how I want to proceed here is I

22  really kind of want to break this down into three steps.

23  I just want to ask -- I'm going to want to kind of unpack

24  what policies you would look to to determine whether

25  stopping a vehicle was okay or not, whether extending the

1  stop was okay -- okay or not, and then whether searching

2  the vehicle was okay or not.  Does that make sense?

3     A   Okay.

4     Q   All right.  So let's go to Page 236 of the

5  sheriff's manual, Exhibit 14.

6        Okay.  What does it say at the very top there?

7     A   Chapter 23, crash investigation and traffic

8  enforcement.

9     Q   Okay.  And I don't have anything specifically

10  on this page, but we're on Chapter 23 of the sheriff's

11  manual, correct?

12     A   Yes.

13     Q   Let's go to Page 245.  And do you see where it

14  says 23.09, random stopping of motorists?

15     A   Yes.

16     Q   What is 23.09?

17     A   Random stopping of motorists.

18     Q   When does -- when does this policy apply, in

19  your words?

20     A   (Reading document sotto voce.)  You want me to

21  read this verbatim for you?

22     Q   No, you can just summarize it.

23     A   Okay.  So they need probable cause, or

24  reason -- it says upon reasonable suspicion of criminal

25 activity, pursuant to standardized traffic stops, such as

91

1 driver's license checks, or other lawful justification

2 such as to prevent a hazard.

3    Q   So let's unpack probable cause a little bit.

4 So I'm going to read A1, I'm going to ask you some

5 southwest about that.  So it says officer shall not

6 randomly stop motorists but will stop vehicles only on

7 probable cause to believe a traffic violation has

8 occurred.

9        As an Internal Affairs investigator, what did

10 you understand the term probable cause to mean in this

11 context?

12    A   Probable cause is like facts, like something

13 that you did, like a crime was committed.  Probable

14 cause, like speeding, if you're doing the radar,

15 speeding, like you're going 60 in a 40, the radar shows

16 probable cause you're speeding.  Failing to maintain

17 lane, if you drift off, that's failure to maintain,

18 that's your probable cause to stop a vehicle.  Sometimes

19 there's no front license plate, and here you're supposed

20 to have, in Texas you're supposed to have a front and

21 back.  So for no front license plate that's probable

22 cause to stop a vehicle.

23    Q   That makes sense.  So right there you're

24 speaking of the violation.  From the officer's

25 perspective are you saying the officer needs to see

92

1 firsthand these violations?

2    A   When I was a patrol officer, yes.  You have to

3 have probable cause to stop a vehicle, so --

4    Q   And so, I mean, this might sound obvious, but

5 if you're not, if you're not witnessing the violations, a

6 traffic stop violation, would you lack probable cause,

7 you think, in that situation?

8       MR. FRIGERIO:  Objection, form.

9       MR. NELSON:  I'll rephrase.

10   Q   (By Mr. Nelson) Let's say you catch someone,

11 like in this case, failing to -- allegedly failing to

12 maintain a lane, right?

13   A   Uh-huh.

14   Q   Would an officer need to actually see that to

15 have probable cause of that alleged traffic violation?

16   A   You need probable cause for a traffic stop.

17   Q   Right.  I'm asking --

18   A   It needs to be seen by the officer.

19   Q   Okay.  Got it.  Thank you.

20      Did you ever do -- or let me ask it this way.

21 How many investigations, complaint investigations did you

22 do where an officer allegedly acted without probable

23 cause?  And this can be in a traffic stop context or in

24 other contexts.

25   A   When I was in Internal Affairs, none, because I
                            93

1 never gave a complaint to the lieutenant.

2    Q   Okay.

3    A   Or an RFI.

4    Q   Wait.  Say that again?

5    A   For it to be an RFI or anything, I never had a

6 complaint turn into an RFI.  Any of my complaints never

7 turned into an RFI.

8    Q   I'll rephrase the question.  Sorry.  I didn't

9 ask it very well.

10       So I'm just asking how many complaints did you

11 investigate where probable cause was a relevant issue?

12    A   The complainants are complaining there was a

13 probable cause or that I actually saw the probable cause?

14    Q   Well, a complainant alleged there was a lack of

15 probable cause or where you in the course of an

16 investigation concluded, oh, I need to look to determine

17 whether there's probable cause or not.

18    A   Those are two different questions.  Because a

19 complainant could say all day long that I was stopped for

20 no reason, but they were speeding.  Their probable cause

21 was speeding.

22    Q   Well, let's take one at a time then.

23    A   Huh?

24    Q   Let's do that one first.  So how often did you

25 get a complaint where someone alleged lack of probable
                              94

1 cause?

2    A   You get those all the time.

3    Q   All the time?

4    A   Yes.  But they're usually just like -- and like

5  I said earlier, most of them were not even pertaining to

6  us.  They're other agencies.

7    Q    That makes sense.  Okay.  Were there ever any

8  situations where -- I'll just scratch that.  I think that

9  makes total sense.

10       And you had said, just to reiterate, you had

11  said you did not have a situation where -- let me

12  rephrase.

13       You never found lack of probable cause in a

14  complaint investigation, correct?

15    A   I didn't really have so many traffic stops, you

16  know what I mean, complaints.

17    Q   Just yes or no.

18    A   No.

19    Q   Sorry.  Okay.  Let's turn to -- let's actually

20  stay on the same page.  So I have a question about

21  23.09A2.  So it says officers shall not randomly stop

22  motorists but will stop vehicles only upon reasonable

23  suspicion of other criminal activity.  Do you see that?

24    A   Uh-huh.  Yes.

25    Q   Can you give me an example of where an officer
                            95

1  would have reasonable suspicion of other criminal

2  activity such that he could, or she could randomly stop

3  the motorist?

4    A   The way I read that, as a patrol officer, I

5  would say dark, not well lit, high crime area.

6    Q   Sorry, can you unpack that for me a little bit?

7    A   Like if it's dark, and it's not well lit, the

8 area's not well lit, and it's a high crime activity

9 level, that neighborhood, that it's known, you know, for

10 drug dealers or -- and there's reasonable suspicions on a

11 vehicle for some reason.

12    Q   What do you mean there's reasonable suspicion

13 on the vehicle for some reason?

14    A   Just like say it's 2:00 o'clock in the morning

15 and we already know that this area, there's always

16 burglars breaking into vehicles and say we had a call

17 already for hey, we have such-and-such vehicle, like a

18 white BMW with something else, just leaving, when they're

19 trying to break in, you know, like pull the door handles,

20 and you see a white vehicle, you don't know the make and

21 model right away, but that's reasonable suspicious,

22 especially in that area.

23    Q   So you're saying reasonable suspicion would be,

24 it would require those several factors that you listed

25 kind of altogether, right?  Not just like the time of day
                              96

1 alone, for example?

2    A   That's what I'm saying, nighttime, like 2:00

3 o'clock in the morning, it's dark, not well lit area,

4 high crime area.

5    Q   Well, I'm just asking like would a high crime

6 area that's not well lit alone give an officer reasonable

7  suspicion to pull someone over?

8      MR. FRIGERIO:  Objection, form.

9    A   I can't respond for other officers.  You know

10  what I mean?

11    Q   (By Mr. Nelson) Well, let's say you got a

12  complaint where a complainant said, hey, I got pulled

13  over and let's just say the officer, the officer told me,

14  hey, you're in a high crime area, and it's not well lit.

15  That's why I pulled you over.  Would that officer have

16  reasonable suspicion?

17    A   There would have to be more to it.

18    Q   Okay.

19    A   Like I said, like a call that might lead up to

20  that --

21    Q   Got it.

22    A   -- that vehicle or description.

23    Q   Got it.  Okay.  All right, so let's -- let's

24  now turn to Page 127 of the sheriff's manual?

25    A   120 --

1    Q   127.  And what does it say on the top there?

2    A   Chapter 11, warrantless arrest.

3    Q   Okay.  There's a lot of stuff in this chapter

4  but I'm going to -- let's turn all the way to Page 147.

5  And do you see 11.21?

6    A   Yes.

7    Q   And Subsection A?  And I'm just going to read

8  it aloud.  So an officer may temporarily and voluntarily

9 detain a person for investigation when he has reasonable

10 suspicion that the particular person has been or is about

11 to be involved in criminal activity.  Did I read that

12 correctly?

13    A   Yes.

14    Q   Okay.  Is it fair to say that 11.21A would

15 govern traffic stops, extending a traffic stop?

16    A   What do you mean extending?

17    Q   So let's say an officer pulls over a driver for

18 a traffic violation, say speeding.  And the officer, you

19 know, runs the license plate, insurance, all that other

20 stuff, anything -- I guess not insurance, but license

21 plate, everything else.  And then the officer wishes to

22 extend the stop for reasons unrelated to the traffic

23 violation.  Would that officer need reasonable

24 suspicion -- well, let me actually back up.

25       What would the officer need to have continued
                              98

1 the stop and asked questions unrelated to the traffic

2 stop?

3    A   The probable cause to stop them was the

4 speeding.  And to extend it, like as far as what are you

5 trying to go at?  As like to search his vehicle?  Is that

6 what you're asking?

7    Q   No, just to extend the stop, to detain the

8 person and start asking questions unrelated to the

9 traffic violation.

10   A   Well, when I used to do traffic stops, like say

11 I pulled you over for speeding, and as I'm walking to

12 your vehicle, you have this odor of marijuana emitting

13 from the car and you make contact with the officer --

14 with the driver, hey, this is why I'm speeding -- I'm

15 pulling you over because you're speeding, and you smell

16 the marijuana, or you see weed in the center console,

17 whatever.  That's probable cause to search his vehicle

18 all day long.  Like hey, exit the vehicle, detain them,

19 put them in your vehicle.

20   Q   So that would be an example where --

21   A   That's where you extend it because you've got

22 to search now.

23   Q   In that situation, you would have reasonable

24 suspicion to, again, extend the stop and begin asking

25 questions unrelated to the speeding violation?

99

1   A   Uh-huh.

2   Q   Okay.  So can you just -- that was a helpful

3 example, but can you just unpack for me like what an

4 officer would need -- scratch that.

5       Let me ask it this way.  As an Internal Affairs

6 investigator, how would you describe reasonable suspicion

7 as a standard that you're applying to determine whether

8 an officer's conduct violated policy or not?

9   A   You have to give me like an example of

10 something.

11   Q   Well, I mean --

12    A    Like related to this case, in related to this

13 case, looking at, like I said, when I got this case, I

14 looked at all the evidence, which is the -- his body worn

15 camera, Alek's, his he provided dash cam, everything.  So

16 there were no policy violations.  As soon as Babb pulled

17 him over, he told him exactly why he pulled him over.  He

18 identifies himself, he tells him why he stopped him,

19 everything.  So when I reviewed everything, I didn't see

20 no policy violations, because he did fail to maintain the

21 lane, and when he was talking to him, he's in the front

22 seat, he's not detained, talking freely.  He's welcome to

23 leave whenever he wants.

24    Q    Got it.  So you said the Plaintiff in this

25 case, Alek Schott, had failed to maintain a lane.

100

1    A    Uh-huh.

2    Q    What evidence did you rely on to conclude that?

3    A    On the video he sent, the dash cam.

4    Q    The dash cam?

5    A    (Nodding head.)

6    Q    And did the dash cam footage, to your memory,

7 show the truck crossing over the --

8    A    Yes.

9    Q    Line?

10    A    You see his truck cross, before he even gets to

11 Deputy Babb, and then when he's approaching, when you see

12 Deputy Babb, he still does it again, and it looks like he

13 does a third time after Babb pulls him over.  Like before

14 he pulls him over, he does it again.

15    Q    Can you describe to me what, from your memory,

16 the dash cam was showing?  Was it showing the tires on

17 the road?  Was it just showing --

18    A    It showed like the, I guess you could see the

19 hood and the you could see the hood where it moves, and

20 the lane.  You could see like --

21    Q    I see.  So you concluded that he had -- that

22 Alek had crossed over the line, based off of where the

23 hood was relative to the line?

24    A    Uh-huh.  You could tell, because your tires

25 are, of course, at the beginning of the hood, and -- I

                            101

 1 don't know how to describe it.  Like the hood, like this,

 2 and you still had -- like your driver, I guess when

 3 you're driving right there, you could tell where it

 4 moves.

 5    Q    Understood.  Okay.  So that would have -- your

 6 conclusion in Alek's investigation was that that video

 7 gave probable cause --

 8    A    For the initial stop.

 9    Q    Got it.  Did you account for the fact that all

10 that -- you know, obviously Deputy Babb wasn't watching

11 the dash cam.  He was behind Alek.  Did that factor into

12 your investigation at all?

13    A    No, because daily, you see people drift over

14 the lanes.

15    Q   Did you review Deputy Babb's dash footage at

16  all for this?

17    A   His dash cam wasn't working.

18    Q   Okay.  And was the fact -- was that a

19  violation, that Deputy Babb did not have his dash cam on?

20    A   Like I said, most vehicles -- some vehicles

21  don't have dash cam at all.  And some vehicles, most of

22  the vehicles with a dash cam, for some reason rdoesn't

23  work.

24    Q   Okay.  So I get that they like malfunction a

25  lot apparently?

                        102

 1    A   Yeah, there's malfunctions, and you know, we

 2  can't do nothing -- we can't punish an officer for a

 3  malfunction.

 4    Q   Okay.  So it's --

 5    A   I don't know if his dash cam was malfunctioned,

 6  like if it was broken, was it broken, or if his vehicle

 7  had, you know what I mean, but I know there was no dash

 8  video.

 9    Q   So let me relay this back to you just to make

10  sure I understand.  So if the dash cam were

11  malfunctioning, you would say well that's not Deputy

12  Babb's fault?

13    A   Uh-huh.

14    Q   So he can't be found violating policy?

15    A   Not for the dash cam.

16    Q    If he, if Deputy Babb just --

17    A    If he intentionally, now, that's different.

18    Q    Okay.  Did you investigate whether he had

19  intentionally not turned the dash cam on or whether it

20  was malfunctioning?

21    A    I don't recall if there was, if he wrote on his

22  report or his sergeant said it wasn't working.  I don't

23  recall.

24    Q    Okay.  Well, he can go to -- well, let's hold

25  on for now.  But is there a way to determine whether the

                                  103

 1  dash cam is malfunctioning outside of just, you know,

 2  asking Deputy Babb or his supervisor?

 3    A    I don't know.

 4    Q    Well, like just for example, could you talk to

 5  some like any tech person at the Sheriff's Office and

 6  say, hey, can you tell me whether this dash cam was

 7  malfunctioning at the time of the stop?

 8    A    I don't know who's in charge of that, honestly.

 9  Like I said, patrol units every day, they malfunction.

10  So I don't know -- I don't even know who's in charge of

11  dash cameras to call and ask them like hey is this

12  malfunctioning or not.  You know what I mean?

13    Q    Right.  So I guess going back to my earlier

14  question, what was the evidence that you relied on to

15  determine whether -- let me rephrase it.

16        What was the evidence that you relied on to

17  determine that the dash cam in fact was malfunctioning?

18    A    I don't recall if it was the report or the

19  sergeant, like during the investigation.  I don't

20  remember if I read it on the report that there was no

21  dash cam, or if the sergeant told me.  I don't remember.

22    Q    Okay.

23    A    But I know on AXON, it should be there.  Like

24  if there's video on AXON, it's going to show it there.

25    Q    Got it.

                              104

1    A    And there is no dash cam there.

2    Q    So let's actually just turn to -- let me make

3  sure I got the exhibit right on this.  Since we're

4  talking about this anyway, let's go to, back to Exhibit

5  16.  So like let's just talk about your investigation of

6  the Alek Schott stop.  We'll just take it one at a time

7  here.

8    A    Could we take a restroom break real quick?

9    Q    Yes, absolutely.

10    (Recess from 11:59 a.m. to 12:10 p.m.)

11        THE REPORTER:  We are back on the record.

12    Q    (By Mr. Nelson) All right.  Sergeant Ortega,

13  let's just turn to Exhibit 16 again.  And I just want to

14  start unpacking, just like the timeline of the complaint

15  investigation process concerning Alek Schott's complaint

16  specifically.

17        So just based off of the five-step process that

18  you gave me before about the complaint investigation

19  process, sounds like the first thing you did or first

20  thing you saw about Alek Schott's complaint was 2165,

21  this handwritten note that Laura wrote; is that correct?

22      A   It would be both 2163 and 2165.

23      Q   2163 and 2165.

24      A   This is her cover sheet and then her notes.

25      Q   I see.  And when did Laura create the citizen

105

1  contact sheet?

2      A   On her day it says March 18th, 2022.

3      Q   Does that sound right to you?

4      A   That's what she wrote.

5      Q   Do you remember when you looked at it?

6      A   According to my notes, it's either what I wrote

7  my initial contact was April 12th.

8      Q   And is this on 2163?

9      A   Yes.

10      Q   And all those handwritten notes on the bottom

11  of 2163, those are your notes?

12      A   Yes.

13      Q   Okay.  Okay.  So let's go back to 2165.  And do

14  you see what I would -- let me actually back up.  So

15  according to Laura, there were essentially three

16  allegations.  See that area?  And I'll just list them.

17  So the way I'm looking at it is one, traffic stop without

18  cause.  Do you see that?

19      A   Uh-huh.  Yes.

20      Q   And is it fair that -- is it fair to

21 characterize that as an allegation that Alek must have

22 made to Laura?

23    A   Yes.

24    Q   Did you investigate a traffic stop without

25 cause?

106

1    A   When I first called, he didn't enter.

2 According to my notes, then he called back.  Then he told

3 me the deputy's name.  Because right here it doesn't say

4 who it was.  That's why I usually call the complainants.

5 That's when he first told me -- the first initial, that I

6 recall, my first initial contact with Alex [sic] was that

7 he was complaining about his vehicle being damaged.

8    Q   Okay.  And I see, going back to 2165, it does

9 say damaged my vehicle.  Do you see that?

10    A   Uh-huh.

11    Q   And he did complain about that to you over the

12 phone, right?

13    A   Yes.  Like I said, my first -- my initial

14 contact with him when I asked him, when I identified

15 myself, said what happened, and he told me that his

16 vehicle was damaged.

17    Q   Okay.  Did he --

18    A   That's the only thing I talked to him about,

19 and that he had dash cam in his vehicle.  So I said okay.

20 I'm going to send you my information.  And so you could

21 send me the dash cam.  That was my initial call.

22      The second time I talked to him, that's when he

23  stated that he was illegally detained.  But our first

24  conversation it was never brought up.

25      Q   Okay.  So just correct me if I'm wrong, the
                              107

1  second time you spoke with him over the phone, he did

2  complain of a traffic stop without cause?

3      A   Because I didn't even know that they had paid

4  him out.

5      Q   What does that mean?

6      A   For the damages.

7      Q   Okay.

8      A   Because according to him, his vehicle was

9  damaged.  So I don't know if it was -- right here,

10  there's emails where we interacted.

11      Q   Well, so let's back up a little bit.  So you,

12  did you call him the second time?

13      A   You know, it's been so long that I can't

14  remember if it was emails, talking to him, but I remember

15  my first initial contact with him was when I talked to

16  him to find out who the officer was and what happened,

17  and all he brought up was the damage to the vehicle.

18      Q   Okay.  So did you talk to him the second time

19  to just tell him, hey, you've already, I see you got a

20  payout?  Or help me understand why there was a second

21  conversation.

22      A   Yes.  Because at that time that's when I spoke

23  to Babb's supervisor, and --

24   Q   Sorry, before the second time you called Alek?

25   A   Yes, because he's the one that told me they

1   paid him out.

2   Q   Okay.

3   A   Or he -- it's been so long.  It's been so long.

4   No, he mentioned they paid him out, and that's why I

5   talked to his, Babb's supervisor.

6   Q   Who mentioned the payout.

7   A   Alex.  Alek.

8   Q   In the first phone call?

9   A   I don't remember if it was the first phone call

10   or the second one.

11   Q   Okay.  Let's do it this way, just to kind of

12   like help clarify your thoughts a little bit, because

13   this was a while ago?

14   A   I talked to a lot of people too, so I don't

15   remember.

16   Q   Let's do it this way, to the best of on your

17   memory, let's do it step by step like we did with the

18   complaint process.  Then we can refer to the documents

19   that were relevant.  So Step 1, what did you do?

20   A   Called him.

21   Q   And you called -- so I think we're missing

22   something here?

23   A   Well, I got the request for the citizen

24   complaint.

25     Q    Okay.  Got it.  So you got the citizen

1  complaint?

2     A    And obviously there's no name, the officer's

3  name, nothing.  So I called Alex.  Is it Alex or Alek?

4  Alek, right?

5     Q    Alek.

6     A    So I called Alek and asked him what happened,

7  and he says that he got pulled over and that his vehicle

8  was damaged.

9     Q    Well, let's slow down.  Step 2, you called him.

10  This is the first phone call?

11     A    Uh-huh.

12     Q    And the only thing you talk about is damage to

13  his vehicle.

14     A    Uh-huh.  And he, he tells me that it was Deputy

15  Babb, officer Babb, whatever, however he --

16     Q    Yeah, you've got to have, that was going to be

17  my next question, so he does reference Deputy Babb in

18  that conversation?

19     A    Uh-huh.

20     Q    And what does he say about Deputy Babb?

21     A    That he searched his vehicle and I guess there

22  was damages to his vehicle when they did the search.  But

23  like I said, that first conversation, he never mentioned

24  to me anything about being illegally detained.  That

25  first conversation, he never mentioned that to me.

1    Q    Got it.  So then Step 3, what did you do after

2  that phone conversation?

3    A    He told me he had dash cam in his vehicle.  So

4  I told him to send me the dash cam.

5    Q    Do you remember when he did that?

6    A    It's in the emails.

7    Q    Okay.

8    A    So I told him to send it to me, and he never

9  did, because it took a while.  I don't even know the

10  dates.  But I know it took him a while to send it to me,

11  because I asked him on email again, can you send me the

12  footage.  But I did, I looked at Dabb's -- at Babb's body

13  worn camera and I didn't see damage to the vehicle.  I

14  didn't see no damage to the vehicle.

15    Q    So let's, let's actually track this email down.

16  So it looks like, can we turn to 2166.  And do you see on

17  the bottom there where it says, can you send me the dash

18  video you have, this email?

19    A    Uh-huh, April 22nd, 2022.

20    Q    And this sounds like a silly question, but

21  that's your email, correct?

22    A    That's me.

23    Q    And when did you send it?

24    A    April 22nd, 2022.

25    Q    Okay.  So let's back up a little bit because it

111

1  looks like on the next page, there's a couple of emails

2  from Alek to you.  And the emails accent to you were on

3  April 12, 2022; is that correct?

4    A   Yes.  The one that's blank right here, the one

5  that says on 2168, it says April 12, 2022, 11:49, it's

6  blank.

7    Q   Uh-huh.

8    A   It just has my signature.

9    Q   Yes?

10   A   That's what I sent him.  That way he could send

11 me, so he could have my email and my information so he

12 could send me the dash cam.

13   Q   Okay.  So that would have been Step 3 then.

14 Did this -- did you send that April 12 email after you

15 talked to him on the phone?

16   A   Yes, because I needed to send him my

17 information.

18   Q   Got it?

19   A   Which is the same day we spoke.

20   Q   You sent the email on April 12, 2022, and that

21 was the same day you had your phone conversation?

22   A   Yeah, it says right here, April 12 at 10:24

23 a.m.  I called him negative contact, then he called me

24 back at 11:42 a.m., and then I told him, okay, well, send

25 me your dash cam and I'm going to send you my
                         112

1  information, which was at 11:49.

2    Q   And just so you reference right here, can you

3  just ID the page number of that, where you said you,

4  there's some note?

5    A    The note, 2163.

6    Q    Okay.  So I guess, help me understand, you said

7  in the first phone call you asked for his dash cam?

8    A    Yes, because he says he has, that there was

9  damage to his vehicle and he had dash cam.  So I told

10  him, can you send me the dash cam you have.  And I'm

11  going to send you my email, my information.  That's when

12  I emailed him my information.

13    Q    What would the dash cam help you with as far as

14  assessing whether the vehicle had damage?

15    A    Because I thought he had, you know how some

16  people have in dash too, like --

17    Q    Oh, I see.

18    A    Yeah.

19    Q    Okay.  Thank you for clarifying that.  I was a

20  little confused there.  Okay, that makes sense.  All

21  right.

22    A    I think he said I have pictures, or dash cam of

23  the damage or whatever, so --

24    Q    Got it.

25    A    I said well send it to me.

113

1    Q    Okay.  Thank you for that.  That's helpful.

2        So Step 3, you sent the April 12, 2022, email.

3  What did you do Step 4?

4    A    That's when I reviewed Babb's -- I'm assuming

5  that's when I started reviewing the reports and the dash

6  camera, the body worn camera.

7    Q    Whose body worn camera?

8    A    Babb's.

9    Q    Okay.  Did you review anyone else's body cam

10  footage?

11    A    I don't think so.

12    Q    Officer Molina?

13    A    I don't remember if I did or not his.

14    Q    Officer --

15    A    I know I didn't do Gereb's.

16    Q    Okay.

17    A    I didn't do Gereb's.  But Deputy Molina, I

18  don't remember if I reviewed his camera or not.

19    Q    Got it.  So Step 4, do you remember like

20  roughly, like was this before or April the April 22,

21  2022, emails, where you were reviewing body cam footage

22  and starting to look at the evidence?

23    A    It had to have been before because I'm asking

24  him again for the dash cam, because he never sent it.

25    Q    Got it.  And so you reviewed the body cam

114

1  footage, Babb's.  And I'm sorry, what other evidence did

2  you look at at this point?

3    A    His report, I pulled his report.

4    Q    Babb's report?

5    A    Yes, Babb's report and then his body worn

6  camera.

7    Q    What do you mean by his report?

8    A    His RMS.

9    Q    RMS, okay.  That's what I figured.  Just making

10   sure.  Anything else?

11     A    At -- this note that I have right here on 2163

12   says third party adjuster.  I don't remember -- I think

13   that's when I spoke to deputy Gamboa, I mean Sergeant

14   Gamboa, which is Babb's supervisor, and I asked him if --

15   I think it was something along the lines like hey, Alek

16   Schott, do you remember about him, Babb, a traffic stop,

17   I don't know, that they damaged his vehicle?  And I

18   believe he's the one that told me they paid him out.  I

19   said what do you mean they paid him out?  He goes they

20   paid him out for the damages.  I was like damages, you

21   know, because I didn't see no damages of the vehicle when

22   the dog was in there.  That's just me.

23   Q    Uh-huh.

24   A    So I don't know what damages he claimed, what

25   damages were done, because -- I don't know.  And I think
                             115

1   that's when I talked to Alek again.  And Alek confirmed,

2   yeah, they paid me out.  And then that's when he was like

3   I was illegally detained.

4    Q    Got it.  So you --

5    A    What date was that?  I don't know.

6    Q    Okay.  And this was the second phone

7   conversation where he -- where Alek, that is, references

8   that he was --

9    A   I believe so.

10   Q   Okay.  And what -- can you just like unpack the

11 substance of that conversation to the best of your

12 memory, just like quick recap of?

13   A   Um, I --

14   Q   What did he tell you?

15   A   I can't -- I do not remember.  I just briefly

16 remember that I called him and I told him there was, I

17 think I found there was no policy violations.  He

18 identified why he pulled you over, and I spoke to the

19 sergeant and they paid you out, and I think he's the one

20 that told me 7,000, I don't know what.  And that's when

21 he brings up the whole, I was illegally detained.  He

22 pulled me over and he had me there for -- he had me there

23 at the traffic stop, and he put me in the front seat, and

24 I don't even remember.  I can't remember what else he

25 said.  And I just -- and I told him, like there's, he
                              116

1 identified why he stopped you, everything.  And then sent

2 me the, and I think I requested the dash cam again.

3 Because I think that's when he told me, he pulled me

4 over -- I told him he pulled you over because of your

5 failure to maintain lane.  He identified all that.  He

6 was saying no, I didn't.  I have the dash cam.  I said

7 okay, well send me the dash cam because I never got it.

8    Q   Okay.

9    A   And then --

10    Q    Sorry.  At that point is that when accent you,

11  to the best of your memory, that's when accent you the

12  dash cam?

13    A    I'm assuming, because he sent the email.

14    Q    On what page are you looking at?

15    A    I'm like to look -- so 2167, he says hi, Marta,

16  can you confirm the disposition or status of my formal

17  complaint.

18    Q    And he, it looks like he sent that email on

19  April 12th, 2022?

20    A    No, I think that's the bottom one, isn't it?

21  That was April 22nd, on 2126.

22    Q    Oh, you're right thank you for clarifying?

23    A    So on 2126 this is April 22nd, 2022, from Alek

24  Schott.  He's asking me about can you confirm the

25  disposition or status of my formal complaint.  And that's

                                117

 1  when I replied on April 22nd, 2022, at 4:21, can you send

 2  me the dash video.

 3    Q    Got it.  All right.  That's helpful.

 4         Okay.  So at this point, you had the dash cam

 5  footage, right?  Or that's a little too vague.  So he

 6  sends you the dash cam footage, correct?

 7    A    He sends me the link.

 8    Q    Okay.  And so you have the dash cam footage,

 9  and you've got the body, Babb's body cam.

10    A    Uh-huh.

11    Q    You've got Babb's RMS report?

12   A   Uh-huh.

13   Q   Is there any other evidence you had collected

14 or acquired?

15   A   I don't think so.

16   Q   Okay.  So just those three things?

17   A   Yes.

18   Q   Got it.  Okay.  So we'll make -- I'm going to

19 make step 6 Alek sends you the dash cam.  And then what

20 happens after that?

21   A   I'm assuming I reviewed his dash and came to

22 the conclusion that there was no policy violation.

23   Q   Okay.  Well, and let's slow down a little bit

24 there.  So -- let's see.  It looks like you -- no, I

25 guess that's straightforward enough.
                           118

1       So step 7, you just start investigating with

2 all the evidence that you have, the body cam, the dash

3 cam, and RMS report?

4   A   Uh-huh.

5   Q   Okay.  And what was it that you were

6 investigating specifically?

7   A   Because he kept on saying that he pulled him

8 over for no reason, but his dash camera, he fails to

9 maintain the lane.

10   Q   Okay.  So let's go to, just so I make sure I'm

11 on the same page as you -- oops, I went past it a little

12 bit.  Let's go to 2165 again.

13      Okay.  So did you -- and I'm just reading off

14  of this 2165, which again would have been Laura's notes

15  about what Alek alleged, correct?

16    A   Uh-huh.

17    Q   So did you investigate traffic stop without

18  cause?

19    A   Which is what he's alleging.  But he did have

20  probable cause for -- oh, the illegal search?

21    Q   Yeah.  And I'm just asking whether you

22  investigated or not, just the answer --

23    A   But what illegal search, there's no illegal

24  search.

25    Q   Right.  So I'm not asking for the conclusion.
                              119

 1  I'm just asking whether you investigated.

 2    A   Yeah, I --

 3    Q   But I just wanted to start with the traffic

 4  stop without cause.  So you investigated that?

 5    A   Yes.

 6    Q   Okay.  And then you investigated illegal

 7  detainment?

 8    A   He alleges, yes.

 9    Q   Okay.  And is it fair to say that an illegal

10  detainment would basically just be like an extended stop,

11  that I was illegally detained after having been pulled

12  over?  Is that how you understood that?

13    A   Say that again.

14    Q   Yeah, that was a poorly way to word that

15 question.

16      Did you investigate whether Deputy Babb or any

17 of the other officers had reasonable suspicion to extend

18 the stop?  Remember we talked about that earlier.

19    A   Yes.

20    Q   Okay.  And then the last one here, illegal

21 search, did you investigate that as well?

22    A   Yes.

23    Q   Okay.  And just, I want to make sure I

24 understand what you looked at when you investigated the

25 allegedly unlawful traffic stop -- right?

120

 1    A   (Nodding head.)

 2    Q   The alleged unlawful detention, or extended

 3 stop, and then the illegal search.  And so I think maybe

 4 the best thing to do here would just be to go back to the

 5 sheriff's manual, which should be Exhibit 14.  And let's

 6 just take those three one at a time.

 7      All right.  Let's turn to Page 236 of the

 8 sheriff's manual.  And just let me know when you're

 9 there.  And again I'm sorry you don't have it in a nice

10 little binder like I do.

11      Okay.  So the first allegation that I want to

12 talk about is the -- is Alek's allegation that he never

13 failed to maintain a lane and shouldn't have been pulled

14 over for any traffic violation.  Does that make sense?

15    A   Yes.

16    Q    Okay.  So my -- just correct me if I'm wrong,

17  my understanding is that the relevant policy you would

18  look to to determine that would actually, it would be

19  Chapter 23 of the sheriff's manual that we talked about

20  earlier, and it would be specifically on Page 245.  Let

21  me know when you turn there.  Are you good?

22    A    Yes.

23    Q    Cool.  All right.  So 23.09 A1, so officer

24  shall not randomly stop motorists, but will stop vehicles

25  only on probable cause to believe a traffic violation has

121

1  occurred.

2         So my understanding is that that would be the

3  relevant policy you would look to to determine whether

4  Deputy Babb rightfully pulled over Alek Schott; is that

5  correct?

6    A    Yes.

7    Q    Would there be any other policies that you

8  would look to?

9    A    No, because this is the traffic violation.

10    Q    Okay.  And just going back to what you said

11  earlier, your conclusion was that based off of the dash

12  cam, you concluded that Deputy Babb did have probable

13  cause to pull Alek over for a traffic violation.

14    A    Yes.

15    Q    Got it.  All right.  Let's go to Page 127 of

16  the sheriff's manual, same exhibit, of course.  And I

17  want to talk next about Alek's second allegation, which

18 was the illegal detainment or the extended stop.  Does

19 that make sense?

20     A   Okay.

21     Q   And do you remember we talked earlier about

22 this Chapter 11, warrantless arrest?

23     A   Did we talk about it?

24     Q   We did.

25     A   We turned to it, but I don't remember.
                                122

1     Q   No, you're good.  So we'll turn to the part we

2 actually discussed, which is on Page 147.  And let me

3 know when you get there.  All good?

4     A   Yes.

5     Q   Excellent.  All right.  So let's go to 11.21 A.

6 And I'll just read it.  General rule, an officer may

7 temporarily and voluntarily detain a person for

8 investigation when he has reasonable suspicion that the

9 particular person has been, is or is about to be involved

10 in criminal activity.

11        Is that the relevant policy for determining

12 whether or not aqueous illegally detained by Deputy Babb?

13     A   Yes.

14     Q   Were there any other policies that you looked

15 to?

16     A   No.

17     Q   Okay.  But you did look to this policy?

18     A   I can't recall.

19   Q   Okay.  Did you assess whether --

20   A   But based on my experience, like I was patrol

21 officer too, so I know.

22   Q   Okay.  That's helpful.  So did you determine --

23 or let me put it this way, did you investigate whether or

24 not Deputy Babb had reasonable suspicion to extend the

25 stop?

123

1   A   He did.  Based on his report.

2   Q   Okay.  So you did investigate that.

3   A   Yes.

4   Q   Okay.  And just so I make sure I understand,

5 what was the -- you said he did have reasonable

6 suspicion, right, to extend the stop, Deputy Babb did?

7   A   Yes.

8   Q   What was the basis for that?

9   A   His RMS report.

10   Q   All right.  So let's turn to that.  This would

11 be Exhibit 16.  And you're talking specifically about?

12   A   2175.

13   Q   2175.  Okay.  And this is -- just tell me what

14 this is, 2175.

15   A   It's his report, Deputy Babb's report.

16   Q   Okay.  And you concluded Deputy Babb had

17 reasonable suspicion solely based off of this report

18 right here that we're looking at?

19   A   Yes, his report, and then watching his

20 movements, Alek's movements when he's inside the vehicle.

21   Q   Okay.

22   A   In the front seat.

23   Q   Did you look into any other evidence to confirm

24  whether Deputy Babb's story was correct?

25   A   No.

124

1   Q   So you never called Alek to just ask him, hey,

2  what's your side of the story?

3   A   No.  Just those two conversations I had, that

4  he said the damage to his vehicle and then he was

5  illegally detained, illegally detained.

6   Q   Okay.  Would you mind, if you can remember,

7  just identifying the portion of Babb's summary here that

8  you relied on to conclude that he had reasonable

9  suspicion to extend the stop?  And take your time by the

10  way because I know this is a long time ago and you need

11  to read it.

12   A   I know it says he observed Alek Schott was

13  sitting with his hands open and resting on the steering

14  wheel.  Alek Schott looked to be breathing harder than

15  normal by the raise and fall of his chest.  Alek Schott's

16  hands was trembling when he handed me his driver's

17  license.  I found this to be odd due to the fact that I

18  told Alek I was issuing him a warning for failure to

19  maintain lane.

20        So then he tells him to sit, to come out and

21  sit in his vehicle.  So he agrees, and Alek goes in and

22  sits in the vehicle.  So right here where he says I was

23  noticing when Alek Schott spoke with me about his job and

24  what he was going to do in reference to his, to the

25  client, he was responding -- he was responding with
                              125

 1  questions in a low tone than -- that I could barely hear.

 2  Alek Schott was also responding with a lot of delayed

 3  responses, such as um, um, when I spoke to Alek Schott

 4  about Houston and other things not pertaining to what he

 5  was doing down south, I observed a deviation in his

 6  behavior.  Alek Schott was speaking clearly and high

 7  volume -- at a high volume.  Using my training and

 8  experience, I found this deviation and behavior and his

 9  delaying statements to questions about his job to be

10  possible deception.

11         And then he also observed his OPR system that

12  Alek Schott had been on I-10 west at midnight the night

13  before heading south and had one-day turnaround.

14    Q    Okay.  That's helpful.  Thank you.

15         And so you reviewed that portion of Deputy

16  Babb's report and concluded that he had reasonable

17  suspicion to extend the stop and that's it?

18    A    Well, that was reasonable suspicion for him to

19  ask for a canine unit, because his demeanor.

20    Q    I'm just asking, is that -- so you just looked

21  at that summary and that's it?

22    A    Yes, because the way he was acting, that's

23  reasonable suspicion for him.  And for him, you know what

24  I mean, I can't respond to his actions.

25    Q    Got it.

126

1    A    I'm not there and I'm not him, so --

2    Q    Okay.

3    A    Every officer is different.

4    Q    All right.  Thank you.

5         All right.  So the last one, the last

6  allegation that Alek had was illegal search.  Sorry, I'll

7  say that again.

8    A    I'm sorry.

9    Q    You don't have to apologize for coughing.

10        So the last allegation Alek made, the illegal

11  search.  I want to talk about that a little bit.

12        So let's go to Page 183 of the sheriff's

13  manual.  And just let me know when you're there.  Okay.

14  And we're looking at Chapter 16, warrantless search and

15  seizure, correct?

16    A    Yes.

17    Q    Okay.  Let's turn to Page 187.  And do you see

18  on the bottom there where it says C, I guess that's like

19  a subsection, Subsection C, Vehicle Searches.  Do you see

20  that?

21    A    Yes.

22    Q    And I'll just read it.  So "Vehicle Searches:

23  The 'automobile exception':  Where there is probable

24  cause to search a motor vehicle, and exigent

25  circumstances exist, the vehicle may be searched without

1  warrant."

2       My understanding is that that is the relevant

3  policy are you would have looked to when assessing

4  whether Alek's allegation of an illegal search was true

5  or not true; is that correct?

6    A   Yes.

7    Q   Would there be any other policies that you

8  would look at?

9    A   Not really.

10   Q   And I want to back up a little bit.  You seemed

11  like a little uncertain.  But --

12   A   I just, I -- like I said, it goes back to my

13  training and experience.  Like I don't actually go and

14  read every little line.  You know what I mean?

15   Q   No, that makes sense.  Well, let's just put it

16  this way.  So is it fair to say that -- and what are we

17  even looking at?  16.04 C basically says an officer

18  cannot search a vehicle without a warrant unless the

19  officer has probable cause and exigent circumstances?

20   A   Yes.

21   Q   And is that the standard you applied when

22  determining whether the officers in this case rightfully

23  searched Alek's car?

24   A   Yeah, because the canine, yes.

25   Q   What do you mean for the canine?

1    A    So the reasonable suspicion was for the canine

2  to come over and sniff the car.  Once the canine alerts,

3  that's probable cause to search.

4    Q    Got it.  That was going to be my next question

5  was the basis.  Okay.  That's helpful.

6        Okay.  So that was the long step 7, the

7  investigation process.  So you've done your

8  investigating.  You've looked at the, you know, you've

9  considered the relevant standards and made your

10  conclusions based off of that.  So what did you do next?

11    A    Since there were no policy violations, I just

12  typed it up and did my Exhibit 16, 2162, and submitted it

13  to the lieutenant.

14    Q    Got it.

15        MR. NELSON:  Okay.  I think we could take a

16  quick break if you guys don't mind.

17        THE REPORTER:  We're off the record.

18    (Recess from 12:47 p.m. to 12:58 p.m.)

19        THE REPORTER:  We are on the record.

20    Q    (By Mr. Nelson) All right, sergeant, just a few

21  clarifying questions.  So Number 1, do all RFIs derive

22  from public complaints?

23    A    I'm assuming that an administrator gets a

24  complaint from somewhere.  I don't know exactly from

25  where.  Because the RFIs, like I said, those are -- those

                              129

1  come from the administration.  Where they get that

2  information from, I don't know.

3    Q   Okay.  And you mentioned you weren't familiar

4  with the RFI in this case, correct?

5    A   Exhibit 16 right here?

6    Q   Yes.

7    A   Nope.

8    Q   Okay.  Have you ever heard of a complaint

9  investigation being reopened by an RFI?

10    A   I've heard of an RFI reopened, but not a

11  complaint turned into RFI, like this.  You know what I

12  mean?

13    Q   No, I don't.

14    A   All right.  Rephrase your question.

15    Q   All right.  So have any complaints, or have any

16  investigations that you have done or any other Internal

17  Affairs employees, have those ever been reopened by an

18  RFI?

19    A   Not that I know of.

20    Q   Okay.  And so you've never heard of an Internal

21  Affairs investigation which was reopened by an RFI over a

22  year later, as is the case like we talked about earlier?

23    A   I'm not familiar with one.

24    Q   Okay.  And why would something like that

25  happen?

130

1        MR. FRIGERIO:  Objection, form.

2    Q   (By Mr. Nelson) I'll rephrase.  Why would an

3  RFI reopen an Internal Affairs investigation over a year

4  later?

5        MR. FRIGERIO:  Objection, form.

6     A   I don't know.  You would have to ask them.

7        MR. NELSON:  Okay.  All right.  That's it.

8        MR. FRIGERIO:  We'll reserve our questions.

9        THE REPORTER:  We are off the record.

10     (Deposition concluded at 1:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25