# EXHIBIT C

MOTION TO QUASH DEFENDANTS' SUBPOENAS FOR CATHERINE A. CASEY AND RMS CONTROLS, INC.

*Schott v. Babb, et al.*

Alek Schott                                              June 13, 2024

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3
ALEK SCHOTT,                    )
4       Plaintiff,              )
                                )
5  VS.                          )
                                )
6  JOEL BABB, in His            )
Individual and Official   )
7  Capacity; MARTIN A.       ) CIVIL ACTION
MOLINA, III, in His       ) NO. 5:23-CV-706-0LG-RBF
8  Individual and Official   )
Capacity; JAVIER          )
9  SALAZAR, in His           )
Individual and Official   )
10  Capacity; and BEXAR       )
COUNTY, TEXAS,            )
11      Defendants.            )
_____

12

13          ORAL AND VIDEOTAPED DEPOSITION OF

14                   ALEK SCHOTT

15                  JUNE 13, 2024

16  _____

17        ORAL AND VIDEOTAPED DEPOSITION of the witness, ALEK

18  SCHOTT, taken at the instance of the Defendants, in the

19  above entitled cause, before CATHEY RIMMER, Certified

20  Shorthand Reporter in and for Bexar County, Texas, on

21  June 13, 2024, the witness being located in Houston,

22  Harris County, Texas, between the hours of 10:01 o'clock

23  a.m. and 12:11 o'clock p.m., pursuant to the Federal

24  Rules of Civil Procedure and the provisions stated on

25  the record or attached hereto.

 1                  A P P E A R A N C E S

 2   APPEARING REMOTELY FOR PLAINTIFF:

 3       INSTITUTE FOR JUSTICE
         Ms. Christen Mason Hebert
 4       816 Congress Avenue, Suite 970
         Austin, Texas  78701
 5       (512) 480-5936
         chebert@ij.org
 6
         INSTITUTE FOR JUSTICE
 7       Mr. Joshua Windham
         901 N. Glebe Road, Suite 900
 8       Arlington, Virginia 22203
         (703) 682-9320
 9       jwindham@ij.org

10   APPEARING REMOTELY FOR DEFENDANT, JOEL BABB:

11       WRIGHT & GREENHILL, P.C.
         Mr. Blair J. Leake
12       4799 Mueller Blvd., Suite 200
         Austin, Texas  78723
13       (512) 379-2981
         BLeake@w-g.com
14
     APPEARING REMOTELY FOR DEFENDANTS, MARTIN A. MOLINA, III
15   AND BEXAR COUNTY, TEXAS:

16       LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
         Mr. Charles S. Frigerio
17       Mr. Hector X. Saenz
         Mr. Charles A. Frigerio
18       111 Soledad, Suite 465
         San Antonio, Texas  78205
19       (210) 271-7877
         Firm@FrigerioLawFirm.com
20
     ALSO APPEARING REMOTELY:
21
         ALEK SCHOTT, Witness
22
         TERESA McCULLOUGH, Videographer
23
         CATHEY RIMMER
24          Certified Shorthand Reporter
            in and for the State of Texas
25
                *-*-*-*-*-*-*

1    Q.  I'd also appreciate if you try to give audible

2   responses.  Everyday gestures that we may use do not

3   come out well in a deposition, such as a turning of the

4   head one way or the other.  So to the best of your

5   ability, try to give audible responses.  We'd appreciate

6   that.  Okay?

7    A.  Okay.

8    Q.  If at any time you do not understand one of my

9   questions, please feel free to ask me to rephrase it.

10  Otherwise, I'll assume that if you answer my question

11  that you have understood the question.  Does that seem

12  fair?

13   A.  Yes.

14   Q.  I'd like to start out with some -- a little bit

15  of background questions.  Where were you born, sir?

16   A.  Houston, Texas.

17   Q.  Okay.  So you're a native Texan all your life?

18   A.  Yes.

19   Q.  And where did you attend high school?

20   A.  Humble High School.

21   Q.  What year did you graduate?

22   A.  2004.

23   Q.  And after graduation did you attain any other

24  college courses or credits?

25   A.  Yes.

1      Q.  Where did you attend college?

2      A.  Baylor University.

3      Q.  Pardon?  I didn't catch that on the audio.

4  What was that?

5      A.  Baylor University.

6      Q.  Okay.  Baylor.  What years did you attend

7  Baylor?

8      A.  Until 2008.

9      Q.  Did you attain a degree from Baylor?

10     A.  Yes.

11     Q.  What was that degree in?

12     A.  Management information systems.

13     Q.  Any other further college after graduating

14  Baylor?

15     A.  No.

16     Q.  Did you ever attend law school anywhere?

17     A.  No.

18     Q.  So you never were admitted into any law --

19  accredited law school in the United States?

20     A.  Correct.

21     Q.  After graduating Baylor with a management

22  information, what did you -- what type of work did you

23  pursue?

24     A.  I worked for Hewlett-Packard in their finance

25  division.

1    Q.  How long did you work at Hewlett-Packard?

2    A.  Approximately five years.

3    Q.  So that would take us to approximately 2015?

4    A.  Yes.

5    Q.  And what was your next line of employment after

6  that?

7    A.  I'm sorry.  It would not take us to 2015.

8    Q.  Okay.  What year would it take us to?

9    A.  That would have been 2009 through 2013.

10    Q.  Okay.  What was after 2013?

11    A.  I did consulting for Accenture.

12    Q.  What type of business is Accenture?

13    A.  It's a consulting firm.

14    Q.  Any particular type of consulting?  What line

15  of work?

16    A.  I did IT consulting.

17    Q.  How long did you work at Accenture?

18    A.  Approximately two years.

19    Q.  That would bring us to 2015?

20    A.  Approximately.

21    Q.  And then what?  What line of work after

22  Accenture?

23    A.  I moved on to RMS Controls where I currently

24  also work.

25    Q.  Is that the partnership owned by your family?

1    A.  It's solely owned by my father.

2    Q.  What is your father's name?

3    A.  Jeff Schott.

4    Q.  So you've worked for RMS Partners since 2015?

5    A.  Yes.

6    Q.  And you currently are working there?

7    A.  Yes.

8    Q.  Can you tell us what type of work RMS

9  Partners -- what type of work they do?

10    A.  It's RMS Controls.  We do oil and gas sales and

11  services.

12    Q.  How long has RMS Controls been in business, if

13  you know?

14    A.  Over 20 years.

15    Q.  What exactly would be your position at RMS

16  Controls?

17    A.  I handle operations and business development.

18    Q.  Can you tell us a little bit about RMS Controls

19  besides the fact that it services the oil field?

20    A.  We're a manufacturer's rep for several

21  different companies, so we have territories that we can

22  solely sell their products in, and we also build

23  products that we manufacture ourselves.

24    Q.  Approximately how many employees would you say

25  are employed by RMS Controls?

1    A.  Eight.

2    Q.  Would that include yourself?

3    A.  Yes.

4    Q.  Besides working for RMS Controls do you work

5  for any other businesses?

6    A.  No.

7    Q.  That would be your full-time employment?

8    A.  Yes.

9    Q.  Looking at the date of the incident, March 16th

10  of 2022, how would you describe your position and what

11  you were working on at that time, let's say, in March

12  2022?

13    A.  I'm sorry.  Can you restate the question?

14    Q.  What was -- what would be your job

15  responsibilities or would they have been the same in

16  March of 2022?

17        MS. HEBERT:  Objection; form.

18        THE WITNESS:  I was still doing sales and

19  business development.

20    Q.  (BY MR. FRIGERIO)   Would that entail a lot of

21  traveling?

22    A.  Yes.

23    Q.  And would that traveling also include traveling

24  by vehicle?

25    A.  Yes.

1    Q.  What vehicle did you mainly travel in?

2    A.  My personal Ford pickup.

3    Q.  Was that the one you were traveling in on the

4 date of the incident in question?

5    A.  Yes.

6    Q.  Are you a married man as well?

7    A.  Yes.

8    Q.  And do you have a family?

9    A.  Yes.

10    Q.  How many children do you have?

11    A.  Currently two.

12    Q.  Okay.  What are their ages?

13    A.  Two and seven.

14    Q.  And what is your wife's name?

15    A.  Amanda.

16    Q.  On the -- in March, again getting back to the

17 time frame of the incident in question, what were you --

18 what was your purpose in traveling to Carrizo Springs on

19 March 15th of 2022?

20    A.  To work with a customer on a product

21 demonstration that they were trialing.

22    Q.  Do you recall the name of that customer?

23    A.  Chesapeake Energy.

24    Q.  They're in Carrizo Springs?

25    A.  The location that they were installing it on

Alek Schott

June 13, 2024
Page 81

1  last?

2    A.  Six months.

3    Q.  How much sleep would you lose over those six

4  months?

5    A.  Two hours a night.

6    Q.  This was a time you had a six-week-old baby,

7  correct?

8    A.  Yes.

9    Q.  And you said that you guys alternate, you and

10 your wife, on who would get up to help with the baby at

11 night?

12   A.  Yes.

13   Q.  How long has the frustration seeing police

14 lasted for you?

15   A.  It continues to this day.

16   Q.  What kind of mental health professionals have

17 you seen to help you with problems that you attribute to

18 this incident?

19   A.  I have spoken to a therapist.

20   Q.  What's that therapist's name?

21   A.  I don't recall her name.

22   Q.  How often have you seen this therapist?

23   A.  A dozen times.

24   Q.  Had you ever gone to a therapist before this

25 incident?

Alek Schott

June 13, 2024
Page 82

1      A.  Years prior.

2      Q.  When is the last time you went to this

3  therapist?

4      A.  Four to six weeks ago maybe.

5      Q.  Four to six weeks ago?  How did you find this

6  therapist?

7      A.  Through our insurance.

8      Q.  And you've been, you said -- did you say a

9  dozen times or dozens of times?

10     A.  A dozen.  One dozen times.

11     Q.  Do you see her through video chat or do you see

12  her in person?

13     A.  It's all online now.

14     Q.  Do you know what company she works for?  Like

15  is it -- I think Better Health is one that's an online

16  provider?

17     A.  It's a private practice.

18     Q.  Do you speak to this therapist about just the

19  effects of this incident or other things as well?

20     A.  I believe that's confidential.

21     Q.  Unfortunately, I don't believe it is, so I'd

22  reurge the question.

23     A.  Okay.  This as long -- this as well as other

24  topics.

25     Q.  What are the other topics?

1    A.  General mental health.

2    Q.  What other stressors have you -- and I know

3  those are personal questions, and so let me just explain

4  where we're going with this.  If your, you know,

5  testimony is that, you know, you have had these bad

6  mental health effects because of this, if you find out

7  that -- you know, like my father has Alzheimer's right

8  now.  I have been going to therapy for that.  Okay.  If

9  it turns out your father has Alzheimer's right now and

10  that that's something that you're losing sleep over too,

11  we have a right to know that to figure out if there's

12  another reason why you might be having a tough time

13  right now.  And so I hate to ask these questions, but,

14  you know, I have a duty to do so.  And so, you know,

15  what other stressors in your life have you discussed

16  with her generally?

17            MS. HEBERT:  Objection.  Blair, I'm going

18  to object to the extent that it calls for his

19  conversations with his therapist.  You're welcome to

20  ask, obviously, questions about, you know, what's going

21  on in his life, but communications with a medical

22  professional are confidential protected information.

23            MR. LEAKE:  I don't think it extends to

24  when there's a lawsuit that touches on mental health.

25  In my experience -- you know, I do a lot of personal

1   injury as well over the years, and this is all above

2   board when someone is asking for mental health damages,

3   such as the Constitutional case, 1983.  It ties into

4   personal injury state statutes.  In Texas you're allowed

5   to ask for other causes of -- potential causes of mental

6   health effects, and so I do believe we're allowed to get

7   into this and I would ask my question.  If you'd like to

8   instruct him not to answer, then, you know, we'll move

9   forward.

10          MS. HEBERT:  Sure.

11          THE WITNESS:  I'm sorry.  Am I instructed

12  not answer or to proceed?

13          MS. HEBERT:  No, you're instructed to

14  proceed.  But, again, I'm going to ask you, Blair, to

15  the extent possible limit those conversations to his

16  mental health challenges rather than what his

17  communications were with the professional.

18      Q.  (BY MR. LEAKE)  Without getting into super

19  specific detail, because I'm really -- I promise I'm not

20  trying to, you know, invade your privacy more than I

21  have to.  Generally speaking, what are the other

22  stresses in your life that you've discussed with your

23  therapist since this incident occurred?

24      A.  Predominantly this, these issues, and how to

25  handle and cope with them.

1     Q.  And what other issues besides this incident?

2     A.  Career and life satisfaction.

3     Q.  Are there things in your career and about your

4  life satisfaction that then are causing you, you know,

5  some mental health frustrations in the last several

6  months?

7     A.  No, just things to check up on.

8     Q.  I think I'm done, guys, but give me one minute

9  just to look over my notes and check, and then if so I

10 can pass.

11         MS. HEBERT:  Can we go off the record?

12         MR. LEAKE:  I don't think we need to.  It's

13 up to you guys.  No reason to take a break if we don't

14 need to.

15         MS. HEBERT:  No worries.

16         THE WITNESS:  Can I take a five-minute

17 break to go to the restroom?

18         MR. LEAKE:  Sure.

19         VIDEOGRAPHER:  Off the record at 11:56.

20         (Recess from 11:56 to 12:05.)

21         VIDEOGRAPHER:  Back on record at 12:05.

22     Q.  (BY MR. LEAKE)  On page six of the complaint I

23 went and found the actual quote.  It says, Nor did

24 Alek's truck, which audibly alerts when a driver starts

25 to drift, give him a lane departure warning.  Based on

1    Q.  Are you an employee of the corporation?

2    A.  Yes.

3    Q.  What is your annual salary?

4    A.  300,000.

5    Q.  You're not -- as far as this lawsuit is

6  concerned, you're not claiming that you have a loss of

7  earning capacity?

8    A.  I don't believe that was directly stated.

9    Q.  Well, let me ask you this just directly.

10  You're not claiming to have a loss of wages as a result

11  of this incident, correct?

12    A.  Correct.

13    Q.  Have you ever been involved in any other

14  lawsuits other than this one?

15    A.  Yes.

16    Q.  What other types of lawsuits have you been

17  involved in?

18    A.  We had to sue a contractor who did not complete

19  work performed, and my wife was hit by a drunk driver

20  who was underinsured and we had to sue for the

21  difference in value.

22    Q.  The first lawsuit that you're speaking of, were

23  you actually a plaintiff in that lawsuit?

24    A.  Yes.

25    Q.  How would you be a plaintiff as opposed to the