```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   ALEK SCHOTT,               )
     Plaintiff,                 ) Case Number
 4                              ) SA:23-CV-00706-OLG-RBF
     vs.                        )
 5                              )
     JOEL BABB, ET AL,          ) San Antonio, Texas
 6   Defendants.                ) December 12, 2024
     ********************************************************
 7            MOTION HEARING (via Zoom Videoconference)
            BEFORE THE HONORABLE RICHARD B. FARRER
 8               UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:
     FOR THE PLAINTIFF:
10   Christen Mason Hebert
     Joshua A. Windham
11   Institute for Justice
     816 Congress Avenue, Suite 970
12   Austin, Texas   78701
     (512)480-5936; chebert@ij.org
13
     FOR THE DEFENDANTS:
14   Charles S. Frigerio
     Attorney At Law
15   Riverview Towers, 111 Soledad, Suite 465
     San Antonio, Texas   78205
16   (210)271-7877; csf@frigeriolawfirm.com
     and
17   Blair J. Leake
     Wright & Greenhill, P.C.
18   4700 Mueller Boulevard, Suite 200
     Austin, Texas   78723
19   (512)476-4600; bleake@w-g.com
20
21   COURT RECORDER:  FTR GOLD
22   TRANSCRIBER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
23   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
24   San Antonio, Texas   78207
     Phone(210)244-5048; angela_hailey@txwd.uscourts.gov
25   Proceedings reported by electronic sound recording, transcript
     produced by computer-aided transcription.
```

MOTION HEARING                         2

1   *(December 12, 2024, 10:00 a.m.)*

2                              *   *   *

3          THE COURT:  This is Richard Farrer.  I'm the

4   Magistrate Judge.  Can you all hear me and see me okay?

5          MS. HEBERT:  Yes, Your Honor.

6          MR. WINDHAM:  Yes, Your Honor.

7          MR. FRIGERIO:  Yes, Your Honor.

8          THE COURT:  Great.  Let's go ahead and get started

9   then.  So we're on the record, this is SA:23-CV-00706-OLG,

10  Schott versus Babb, et al.  Why don't we just start with

11  appearances.  Counsel for plaintiff?

12         MS. HEBERT:  Good morning, Your Honor.  Christi Hebert

13  for plaintiff, and I'm joined by my colleagues, Josh Windham

14  and Josh Fox.

15         MR. WINDHAM:  Good morning, Your Honor.

16         THE COURT:  Good morning.  And for defendants?

17         MR. FRIGERIO:  Charles Frigerio for Bexar County and

18  Deputy Molina.

19         THE COURT:  Good morning to you as well.  So we've

20  got --

21         MR. FRIGERIO:  And Mr. Blair Leake is representing

22  Deputy Babb.

23         THE COURT:  Thank you.  Sorry, counsel.  Good morning

24  to you as well, Mr. Leake.  Okay, so we've got two matters on

25  the calendar this morning.  The first is a motion to exclude an

1  expert, Palacios, this is plaintiff's expert, and then there's

2  plaintiff's motion to quash some subpoenas.  Why don't we start

3  with the motion to exclude and why don't I start with you, Mr.

4  Frigerio.

5            MR. FRIGERIO:  Yes, Your Honor.

6            THE COURT:  Is it your motion or is it Mr. Leake's?

7            MR. FRIGERIO:  It's Bexar County's motion and Deputy

8  Molina's motion, Your Honor.  It was timely filed within the

9  timeframe of this Court's docket control order with the filing

10  of the expert report.  And we filed the motion to strike based

11  on the fact that this expert, Mr. Palacios, is basically

12  looking at the video from the plaintiff, Mr. Schott, and is

13  interpreting the video and giving his opinions about what he

14  interprets from the video which is very similar to *Roundtree*

15  *versus San Antonio* where Judge Chestney excluded an expert who

16  was testifying using again body-worn camera and saying and

17  making conclusions as to whether or not -- I believe that was

18  an excessive force case and to whether or not the officers

19  acted appropriately.

20            This individual, Mr. Palacios, makes many conclusions,

21  one about the fog line, which I believe the jurors can look at

22  the video themselves and determine whether or not the fog line

23  was crossed.  Second of all, he also gives legal conclusions

24  which are, I believe, inadmissible and we are objecting to that

25  as to how long you have to be across the fog line before it is

1  a violation of the law.  And third, he makes credibility

2  determinations with regard to Deputy Babb as to what -- he

3  concludes as to what he believes Deputy Babb could or could not

4  see, and those conclusions are based on speculation and again

5  off the video that he is claiming to have -- which he did view,

6  but he's drawing all these conclusions off the video which is

7  not going to enhance the jury because the jury can look at the

8  video themselves and determine what had occurred.

9          THE COURT:  Okay.  And you didn't depose him; is that

10  right?

11          MR. FRIGERIO:  We have a deposition scheduled, but we

12  did not depose him yet.  I believe it's scheduled for January.

13          THE COURT:  But you're going to depose him.  Should we

14  wait until after you've deposed him then to take this issue up?

15          MR. FRIGERIO:  I don't believe so, Your Honor.  We did

16  not actually set the deposition.  Deputy Babb set the

17  deposition of the expert.

18          THE COURT:  Okay.

19          MR. FRIGERIO:  That's whatever the Court wants, if you

20  would prefer.

21          THE COURT:  I guess you're proceeding with that

22  deposition at that time by agreement with the other side?

23  Isn't that right?  I guess Mr. Leake might be better informed

24  on that issue.  Is that how you're going forward with that one?

25          MR. FRIGERIO:  You're on mute, Blair.

1          THE COURT:  Sorry, we're not picking you up on the

2    sound.

3          MS. HEBERT:  Blair's sound is not working.  I'll just

4    speak until he can figure out his sound.  Mr. Windham is going

5    to respond on our side for the motion to exclude, but we have

6    his deposition actually set for next week and Blair noticed

7    that deposition, scheduled it, and we are presenting Sergeant

8    Palacios on Thursday next week.

9          THE COURT:  Okay.

10          MR. LEAKE:  And hopefully is my microphone working

11    now?

12          MR. FRIGERIO:  Yes.

13          MR. LEAKE:  Great, I second what Ms. Hebert said.

14          THE COURT:  All right, great.  Let me just hear --

15    unless, Mr. Frigerio, there's more you want to say.  Obviously

16    I've read the motion, but anything else you want to emphasize

17    before I get the opposing perspective?

18          MR. FRIGERIO:  No, Your Honor.  I believe that covers

19    it.

20          THE COURT:  All right.  Well, why don't we hear the

21    response then.

22          MR. WINDHAM:  Thank you, Your Honor.  And Josh Windham

23    for Alek Schott.  So Sergeant Palacios offers routine accident

24    reconstruction testimony, the sort of testimony that courts and

25    juries across the country hear pretty much every day when

MOTION HEARING                          6

1  deciding how to get to the bottom of what happened during a

2  traffic incident.  The only difference here is that this case

3  isn't about, you know, who caused the car accident, but whether

4  my client's tires crossed over the painted line on the left

5  side of the highway before Deputy Babb pulled him over.  And

6  the expert testimony here helps clarify that factual issue.

7  None of the County's objections justify striking it.

8          I want to start with Rule 702 which the County's

9  motion doesn't really address, but which I think does add some

10 helpful context to this discussion.  So Sergeant Palacios is

11 qualified, his testimony is relevant, and his testimony is

12 reliable.  I'll start with qualifications briefly.  He's got a

13 24-year career in law enforcement that included highway patrol,

14 writing tickets for things like failure to maintain a lane.  He

15 parleyed that career into a 17-year career in accident

16 reconstruction where he analyzes car movements in lines of

17 sight.  That's obviously more knowledge and experience than the

18 ordinary person has which is all 702 requires.

19          The testimony is relevant.  One of the main questions

20 in this case is whether Deputy Babb actually saw a traffic

21 violation.  If we had Deputy Babb's dash cam footage, we can

22 all just watch it and see for ourselves, but we don't have that

23 footage because Deputy Babb turned off his camera right before

24 the supposed violation.  So we've got to use Alek's dash cam

25 footage, which is helpful, but it doesn't directly show his

MOTION HEARING                    7

1   tires or Deputy Babb's perspective, which is where Sergeant

2   Palacios's testimony comes in.  And he visited the site of the

3   stop, he took measurements, he ran test drives, he drew a few

4   conclusions that you just can't get from watching Alek's dash

5   cam on its own.  One of those conclusions is that Alek's tires

6   are wider than the distance between the painted line and the

7   rumble strip, so if Alek had crossed over the line, you would

8   have heard that on his dash cam footage.  Two, if Alek had

9   crossed or even touched the line, the ridges on his hood, which

10  are all you can see on Alek's video, would have been further to

11  the left on the video than they were.  And number three, Deputy

12  Babb's perpendicular angle on the side of the road wouldn't

13  have allowed him to see Alek's tires on the left side of his

14  car.  All three of those points will help the fact finder

15  determine whether Deputy Babb saw a traffic violation, which

16  again, you can't get just from watching Alek's video.

17          Now, reliability.  The testimony is reliable, it flows

18  from his decades of experience in highway patrol, accident

19  reconstruction.  It relies on site measurements and test

20  drives, and it draws clear, easy to follow conclusions about

21  where Alek's tires were positioned and what Deputy Babb was

22  able to see.  If the County has concerns about the substance of

23  that analysis, that's an issue for cross-examination, not for

24  exclusion.

25          So let me address the County's three specific

1   objections which Mr. Frigerio kind of just covered.  About the

2   video, he's not just watching the video and narrating it like

3   the experts were in all the cases that the County cites.

4   Instead, what he's doing is he's going to the site, taking

5   measurements, and providing information that informs the jury

6   or this Court at summary judgment when it's watching the video.

7   It will give the fact finder more information so that it can

8   understand what the video is actually showing.  That's not

9   anything like what their cases involve, it's more like the

10  testimony from the Fifth Circuit decision in Alvarado-Zarza or

11  in Davis, from Judge Pitman's decision.

12          Now, as for speculation, the County says that Sergeant

13  Palacios is speculating about what Deputy Babb's state of mind

14  was.  He isn't, he's offering opinions about where Alek's tires

15  were located and what Deputy Babb's field of vision would have

16  allowed him to see.  Those opinions are based on measurements

17  and test drives that he coordinated himself.  None of that

18  involves speculation, it's basing an opinion on facts or data

19  which is what Rule 702(b) requires.

20          Now, finally, regarding the law, we agree, of course,

21  that, generally speaking, experts can't give legal conclusions,

22  but the few lines in the report about traffic law are just

23  there to provide some context for his analysis.  At summary

24  judgment, this Court will, of course, draw its own conclusions

25  about what Texas traffic law is.  If the claim goes to trial,

1    the County can seek a limiting instruction about the scope of

2    his testimony.  But at this stage, there's no basis for

3    striking the entirety of his report which is what the County

4    seeks to do based on a few lines about traffic law.

5            Now, one final point.  I just want to reiterate if

6    Deputy Babb had not turned off his dash camera at the moment of

7    truth, we wouldn't be here talking about this.  We could all

8    just watch the video and argue about what he saw, but we don't

9    have that video, we have Alek's video, and Sergeant Palacios's

10   analysis provides some helpful information for the fact finder

11   that will allow it to assess what the video shows.  Striking

12   his testimony wouldn't just be legally wrong, it would be I

13   think unjust because it would allow the County to benefit from

14   Babb's choice to thwart the best evidence of what he saw.  I

15   don't think the Court should allow that, and so we'd ask that

16   the motion to strike be denied.

17           (Pause.)

18           MR. FRIGERIO:  Judge, we can't hear you.

19           THE COURT:  You can't hear me?

20           MR. FRIGERIO:  No, you were off for a second.

21           THE COURT:  All right.  Can you hear me now?

22           MR. FRIGERIO:  Yes.

23           THE COURT:  All right, there we go.  So, counsel, just

24   break down for me, just provide an example, maybe a

25   hypothetical, what would be impermissible just sort of play by

1   play of the video versus sort of what you're talking about

2   here.  Just explain to me a little further sort of how you

3   anticipate this is going to go or would go if there's a

4   deposition or if there's testimony at a trial.

5        MR. WINDHAM:  Right, so I think a case involving play

6   by play, Castro is a case that they cite from the Western

7   District of Texas, 2022.  There, there's an expert who is

8   testifying about -- he's a safety expert, it's a slip-and-fall

9   case.  The expert was basically narrating the video as the jury

10  was watching it and testifying about the condition of the mat

11  that everybody could see in the video.  The difference here is

12  that we can't all see the fact at issue.  We can't see from

13  Alek's video where the tires are located.  That's where

14  Sergeant Palacios comes in.  He provides measurements of Alek's

15  car and he determines where the tires are located in relation

16  to ridges on the hood.  So that information will allow the jury

17  to say, okay, based on the spot of the ridges on the road, we

18  know where his tires are.  We don't have information here at

19  least about what Deputy Babb can see from his angle, so we had

20  to have Sergeant Palacios go out to the side of the road and to

21  the exact spot where Deputy Babb was, which the jury can't do

22  because we're talking about a dangerous highway with cars

23  flying by.  Having an expert go and stand in that spot and take

24  photos as we recreate Alek's driving provides a pretty good

25  example of what Deputy Babb could or couldn't have seen from

1    his angle on the side of the road.

2            THE COURT:  Okay.  And then what would be sort of

3    crossing the line, no pun intended, on legal conclusions,

4    right?  What can the expert say that informs the sort of

5    probable cause issue here and what is something that the expert

6    you wouldn't anticipate would be allowed to say?

7            MR. WINDHAM:  So I agree that to the extent Sergeant

8    Palacios characterizes Texas traffic law as such and says this

9    is a violation and this isn't, that's not binding on the Court,

10   of course.  And so to the extent that that's in the report, I

11   think it's -- the Court isn't bound by that, but it also

12   doesn't justify striking the entire report.  That said, his

13   testimony about what actually happened factually forms the

14   basis of the conclusion that the jury might reach about whether

15   a traffic violation was committed.  At the end of the day, this

16   is about what Deputy Babb saw, what he observed.  We know that

17   from Ren(ph), we know that from Cole.  It's about what he saw

18   that day.  Did he see a violation?  And having an expert

19   provide some information about where the tires are located in

20   relation to ridges on Alek's hood, what Deputy Babb's field of

21   vision did and did not include, that's all helpful information

22   the jury can consider and that will allow it to watch the video

23   with a bit more context.

24            (Pause.)

25            MR. FRIGERIO:  Judge, you're on mute again.  I'm not

1   sure what's going on.

2           THE COURT:  What's going on?  How about now?

3           MR. FRIGERIO:  Now you're on.

4           MR. WINDHAM:  It works.

5           THE COURT:  Who knows.  Is that the kind of state of

6   mind issue that Mr. Frigerio is talking about?  In other words,

7   if you're talking about what Deputy Babb saw or didn't saw as

8   opposed to what a person in that position could see or, you

9   know, sort of is that the distinction here?  What's he getting

10  at when he's talking about state of mind opinions, at least

11  from your perspective?

12          MR. WINDHAM:  So I hesitate to characterize Mr.

13  Frigerio's argument, but I take him to be saying that Sergeant

14  Palacios can't testify about what Deputy Babb thought.  And the

15  report if you read it isn't about what Deputy Babb thought one

16  way or the other.  What he thought is legally irrelevant under

17  the Ren*(ph)* case.  The question is what an officer in his shoes

18  could have seen that day, and that's what Sergeant Palacios's

19  testimony is all about, what he was able to see, what his field

20  of vision was and where Alek's tires actually were in relation

21  to the ridges on his hood, which again, you can't see from

22  Alek's video because we don't have those measurements unless

23  you have an expert go out there and take them.

24          THE COURT:  Okay.  All right.  I got you.  Thank you.

25  Mr. Frigerio, anything in reply?

1      MR. FRIGERIO:  In reply, Your Honor, I do not feel

2  that the expert's opinion will aid the jury.  The jury can well

3  look at the camera from Mr. Schott and make their own

4  determination.  As to the expert, Mr. Palacios, testifying to

5  the state of mind or what he believes, this expert believes

6  what Deputy Babb could or could not see, I believe that's

7  speculation and that should be inadmissible.  And I believe

8  that counsel has now admitted that the legal conclusions that

9  are in the report should be inadmissible as well.

10      THE COURT:  And are they correct at characterizing

11  your motion as seeking to strike the expert in his entirety?

12      MR. FRIGERIO:  Yes, Your Honor, but really the three

13  issues that we're dealing with were the ones that I just

14  described, the fog line, the violation of and legal conclusions

15  of law and the state of mind of Deputy Babb.

16      THE COURT:  Okay.  All right.  Well, I appreciate it.

17  Look, I'm comfortable with the argument from plaintiff with

18  respect to establishing just at least for gatekeeping purposes

19  the bona fides of this expert and this sort of baseline

20  reliability.  I don't think there's a basis here to exclude the

21  expert in its entirety, and I appreciate the acknowledgment

22  that to the extent that the report might sort of overreach or

23  overstep here or there, there's limiting instructions available

24  if we're going to be pretrial, and obviously the Court is not

25  going to be bound by -- so all that is to say I'm going to deny

1  the motion to exclude.

2          Let's go on to the motion to quash.  This is

3  plaintiff's motion, so why don't I stay with your side,

4  Ms. Hebert.  And which of you or your colleagues is going to

5  present your argument on that one?

6          MS. HEBERT:  Thank you, Your Honor, and I will present

7  our argument on the motion to quash.  Just as context for Your

8  Honor, plaintiff is asking the Court to quash two overbroad

9  third-party subpoenas that defendants have e-mailed to

10  Ms. Casey who is a therapist that Alek saw and his employer,

11  RMS.  And quite frankly, defendants can't bear their burden of

12  showing the necessity of these third-party subpoenas.  They ask

13  for all records pertaining to Alek Schott and they aren't

14  tailored to this dispute at all.  They are served by a

15  third-party record retrieval company which is not in and of

16  itself of course a problem, but it illustrates the fact that

17  these are just broad generic third-party subpoenas that someone

18  who is not familiar with the case serves or sends off, and they

19  seek every scrap of information pertaining to Alek.  All

20  e-mails, all performance evaluations, all benefits records, so

21  just incredibly broad.  And within that scope, they seek

22  irrelevant information, information that Alek has already

23  provided and, therefore, there's no necessity to subject a

24  third party to discovery burdens.

25          And then they also seek privileged and confidential

1    information.  The privileged information is the therapy notes

2    from this therapist.  And in the court-ordered conference that

3    this Court asked us to do before this hearing, counsel for

4    defendants indicated that the only thing they're really seeking

5    from the therapist is the therapy notes.  And those therapy

6    notes are at the heart of the psychotherapist/patient

7    privilege, which is recognized by the U.S. Supreme Court in the

8    case of Jaffee, and that the Fifth Circuit has also

9    subsequently recognized in a case called Murra, and other

10   District Courts in this Circuit have also recognized.  Now,

11   Murra is a --

12             THE COURT:  Haven't you put that information --

13             MR. FRIGERIO:  Can't hear you, Judge.

14             MS. HEBERT:  I'm sorry, Judge, your volume is really

15   low.

16             THE COURT:  I wonder why.

17             MS. HEBERT:  I just turned you up on mine.  Whatever

18   you did -- I think there might be a lag.

19             THE COURT:  I appreciate you all just letting me know

20   when you can't hear me, so please keep doing that.

21             I'm just asking you, haven't you put these notes at

22   issue by seeking damages for mental anguish?  And assuming

23   hypothetically that is the case and that this type of

24   information is discoverable, talk to me about a little bit

25   about those damages.  And in the motion you talk about sort of

1   garden variety mental anguish, maybe you could explain to me

2   what you're getting at there.

3            MS. HEBERT:  Sure.  And I would direct Your Honor to

4   two very relevant cases.  One that is *Stafford versus New*

5   *Dairy,* that's a 2024 case out of the Northern District, and

6   then one from the Western District out of 2023, and that's

7   *Flemming versus Methodist Hospital*, by Judge Chestney.  And

8   both of those cases say that merely alleging in your complaint

9   some emotional distress situation doesn't waive, doesn't put it

10  in issue someone's mental -- doesn't waive the privilege to

11  therapy notes.  And I'm going to just read the quote from

12  Chestney about what was alleged in that complaint.  The

13  plaintiff in a employment dispute alleged she suffered

14  embarrassment, humiliation, inconvenience, mental and physical

15  distress, loss of enjoyment of life, much broader than what we

16  allege here which is just like minor stress and anxiety.  And

17  Judge Chestney found that that is garden variety emotional

18  distress damages and doesn't waive the psychotherapist/patient

19  privilege to protect notes, because that's kind of a sacred

20  privilege to be able to talk to your therapist.  And for

21  someone like Alek, why this is so important, Your Honor, is

22  that it would penalize a plaintiff like Alek who has a

23  constitutional violation and has suffered some stress and

24  anxiety about it, talks to their therapist, any time a

25  plaintiff suffers stress or anxiety from a tort or

1  constitutional violation, they would be penalized by going to a
2  therapist because that record, that communication with that
3  therapist would then be discoverable.  And it also opens up
4  every plaintiff who brings a constitutional case to some
5  searching inquiry into their therapy records.
6          So from a policy perspective, it is really bad policy
7  to say that every time you put *I suffered some stress or*
8  *anxiety as a result of the violation of my constitutional*
9  *rights*, that means you waive your privilege to confidential
10 communications with your therapist.  And there is a different
11 type of situation where you put your mental condition as part
12 of a claim or as a cause of action in issue, and the cases that
13 find that waiver they tend to be things like personal injury
14 lawsuits where there are severe physical injuries or severe
15 mental injuries and the plaintiffs in those cases are relying
16 on medical experts and so would not be fair to allow a
17 plaintiff to shield that information.
18          But here we're not introducing the therapist as a
19 witness, we're not relying on her notes, we're not relying on
20 that evidence, and in fact, we're not really relying on the
21 fact that he went to therapy at all.  He's going to talk about
22 his own emotional reaction to the violation of his
23 constitutional rights.  It's irrelevant whether he went to
24 therapy or not.
25          THE COURT:  But is he seeking compensation for that?

1          MS. HEBERT:  He is seeking compensation for his stress

2     and anxiety, but if the Court finds that there is a waiver in

3     merely alleging stress and anxiety, he will pull those claims

4     down because we don't believe that that is a fair penalty for a

5     plaintiff, and so we refuse to waive that privilege.

6          THE COURT:  Okay.  And then you talked briefly about

7     the employment records.  Anything else you want to mention

8     about those?

9          MS. HEBERT:  Yeah, I guess the broader perspective is

10    they're just incredibly searching, and defendants haven't

11    really anchored that to any particular part of their case that

12    they are looking to prove.  And to the extent that they're

13    saying there's some element of damages, that's not enough for

14    this broad request to get all of his employment records and

15    that's been found by other courts not to be enough.  And to the

16    extent they're trying to say that there is a -- that the

17    employment records are potentially relevant to his travel

18    patterns or his job duties, there's no reason why they can't

19    request that information from Alek himself and have to subject

20    a third party to discovery burdens.

21          And I'll add a finer minor point, Your Honor, which we

22    say pales in comparison to the substantive points, but the

23    procedural point is that these subpoenas have not been

24    personally served.  And courts in this Circuit generally

25    require personal service for a subpoena, but to the extent

 1   there's any case for an alternative form of service, defendants

 2   just can't show that they've diligently attempted to serve

 3   these subpoenas.  They made one call to each of the respective

 4   recipients.  There's some allegation that a process server

 5   tried to get into the airport hanger, but our client didn't

 6   know who they were and we don't represent RMS.  And then

 7   there's handwritten notes that the process server resorted to

 8   e-mail, and defendants are just saying, you know, e-mail should

 9   be enough in this case.  And that, quite frankly, doesn't

10   satisfy the rules without a diligent attempt to serve and that

11   this Court then blesses.

12           THE COURT:  Okay, thank you.  Who would like to talk

13   on the other side?  Is that you, Mr. Frigerio?

14           MR. FRIGERIO:  Yes, Your Honor.  We went through

15   obviously a third party, Kim Tindall & Associates, which was

16   bought out by Magna Services.  It's a typical -- it's how you

17   obtain records.  There's nothing unusual about that, so as far

18   as service is concerned, they couldn't personally serve them,

19   they contacted them by e-mail, and then the motion was filed.

20   And of course, we ordered that to be stopped, the process,

21   until the Court were to rule on the substance of the subpoenas

22   themselves.  They are limited to a five-year period.  As far

23   as --

24           THE COURT:  Talk to me about that.  I mean, it's some

25   limitation, but I mean this stop happened in 2022, right?  So

1   why --

2        MR. FRIGERIO:  Yes, Your Honor.  I would be willing to

3   even make it even further, maybe a year before or year after.

4   I mean, we need to have some -- I thought five years was

5   limiting enough.  I'd be willing to limit it more, but the

6   issue is you can't have your cake and eat it too.  You can't

7   sue for damages and then say the only person that he has seen,

8   the only healthcare provider he has seen as a result of this

9   incident was Ms. Casey.  And then they turn around and say you

10  can't have the records.

11       THE COURT:  What are you going to do with those

12  records at this point?  Right?  Your time to get an expert on

13  him is over, so what's the value of these records now?  This

14  sort of -- I think you've just conceded, concededly overly

15  broad, maybe you're not conceding it, but I think we've arrived

16  at the point that five years of counseling records seems overly

17  broad as well as employment records.  So, you know, what are

18  you going to do with this stuff now?

19       MR. FRIGERIO:  I mean, we're entitled to them in case

20  when we go to trial we'll need to know whether or not he really

21  did suffer an anxiety.  Maybe he did and maybe he didn't, we

22  need to know.  We're entitled to be able to have those records.

23  The case that we cited, Braymiller, that was a discrimination

24  case in employment against Lowe's, and that was Judge Mathy who

25  determined that once you're suing for damages of mental

1   anguish, that you waive that and you are entitled -- the

2   defense is entitled to those records, and I don't think there's

3   any question about that.

4           MR. LEAKE:  Your Honor, may I add something here?

5           THE COURT:  Go ahead.

6           MR. LEAKE:  There was testimony in his deposition

7   along the lines of things like he lost sleep because of this

8   for six months.  Well, he also had a brand new child at that

9   time, and so if he's going through a rough time and talking to

10  his therapist and telling his therapist, look, I'm not sleeping

11  at night because my child is crying all night, that's going to

12  show that, hey, him losing sleep and him saying that it's about

13  this incident, he's told his therapist that it's actually due

14  to the fact that he's got a young child at home, etc.  He's

15  alleged all these things in his deposition that, you know, he

16  believes he suffered this anxiety, stress, etc., we're entitled

17  to see whether or not he has alternative causes for those

18  stressors and anxieties.  And so, you know, the pendency, the

19  duration of when we're talking about temporally, I think that

20  does come into place.  And while Mr. Frigerio did request the

21  records, you know, if he didn't do it, I was going to do it,

22  and so I would agree with Mr. Frigerio that this goes to the

23  heart of their damages.

24          There's no use of force here.  There's no personal

25  injury.  At that point, it comes down to a constitutional

1  violation on its own.  What is that worth?  And what is his

2  emotional anguish worth?  So this is our only chance to get

3  some sort of secondary look at what happened to him emotionally

4  other than what he's telling his self, which is obviously

5  biased.

6           MS. HEBERT:  Your Honor, may I respond to that?

7           THE COURT:  Go ahead.

8           MS. HEBERT:  Kind of two points and I want to address

9  the Braymiller case first.  That's a case where it's a

10  diversity case and it's Texas law that's being applied, and

11  what the Court is actually citing is Texas Rule of Evidence 509

12  which is completely different than the federal privilege rule.

13  The Texas 509 Rule is a physician/patient privilege and that

14  gets automatically waived under the Texas Rule of Evidence if

15  any party puts at issue a mental condition, so completely

16  different standard.  And then from the facts, they're very

17  different here.  In that case, the plaintiff was alleging

18  breathing problems and sleeping problems that were like much

19  broader than what's going on here.

20           And to the extent that Mr. Leake is drawing to the

21  deposition testimony, that illustrates exactly Mr. Leake's

22  point.  You can cross-examine plaintiff on those issues, *Didn't*

23  *you have a six-month child at home, didn't you have other*

24  *things going on?*  And Mr. Leake in the deposition, we limited,

25  we objected to the extent that there were discussions of what

1   Mr. Schott told his therapist, but it's well within Mr. Leake

2   and Mr. Frigerio's right to examine Mr. Schott on what other

3   factual circumstances are going on in Mr. Schott's life, but

4   what is protected is the communications between a therapist and

5   the patient.  And the Supreme Court likens that communication

6   privilege to a spousal communication privilege, to an

7   attorney/client communication privilege, the idea that you can

8   communicate freely because of policy reasons, quite frankly,

9   rather than the facts which are discoverable, as Mr. Leake has

10  already referenced.

11          THE COURT:  Okay.  So, you know, I think there's a bit

12  of a sliding scale in these situations.  Certainly information

13  pertaining to the plaintiff's anxiety and treatment for it,

14  it's relevant, but we're really looking at a sort of one

15  information and also proportionality.  And so once I start to

16  think about that, then I look at the context of this request.

17  It's a request sort of broadly sent for five years of, you

18  know, extremely confidential or personal information, along

19  with five years of work records, again for an event that takes

20  place in 2022.  And it's sort of -- I guess the message I

21  receive is, okay, well, then the Court can kind of figure it

22  out, the Court can narrow something or the Court can fashion

23  something, but I decline to do that.  I'm not a lawyer in this

24  case, I don't represent either of the parties and I don't think

25  it's my job to jump in and roll up my sleeves and conduct your

1   discovery for you all.  This is something that you all should

2   be able to do and I should be addressing here today a vastly

3   narrower and tailored request that's been properly served and

4   that has some sort of assurances for me from both sides that

5   efforts have been made to try to sort of accommodate each

6   side's concerns.  But instead, you all are miles apart and the

7   party that I think is -- the parties that I think are further

8   from the sort of reasonable position that I want you to be in

9   are the requesters here, are the defendants.  You know, yes,

10  you probably can get some of this information, but when you ask

11  for five years of it, it looks like a fishing expedition and

12  it's just not a good look.

13          So based on the request that I have and the record in

14  front of me, I'm going to go ahead and grant the motion.

15  Whether there's an opportunity to seek this information in a

16  different way or to seek some subset of information or to

17  approach this more thoughtfully, I'll leave that up to you

18  within the confines of your scheduling order, but you know,

19  obviously plaintiffs have raised some pretty powerful and

20  strong arguments about the sanctity of this type of information

21  in a case like this where the mental anguish at issue is

22  relatively minor, I think everybody would agree in the scope of

23  things.  Maybe there can be some sort of stipulations or

24  understandings about what that means in terms of how it would

25  translate into requests for damages in a case, you know, maybe

1    we're not talking about 20 million-dollar request for damages

2    or even a one million-dollar request, I don't know.  But you

3    know, I think those kinds of discussions would sort of inform

4    this request.  Maybe there's other ways to preserve Mr.

5    Schott's privacy and around some of these other things that

6    might have been discussed that maybe wouldn't be relevant to

7    the issue at hand.  I know that you all defendants are looking

8    to see if there's other issues that could be the cause of the

9    alleged mental anguish, but again, this is, like counsel said,

10   garden variety, low-dollar mental anguish, and so I just don't

11   think there's enough here to justify sort of pushing forward.

12   And I'm not going to pull out my scalpel at this stage to

13   perform surgery on these requests, so I'm going to go ahead and

14   grant the motion to quash the subpoenas.  Is there anything

15   further, Mr. Frigerio?

16          MR. FRIGERIO:  No, Your Honor, but I take it you're

17   not precluding us from filing another Subpoena Duces Tecum that

18   is more tailored.

19          THE COURT:  I'm not, but -- you know, I'm not

20   impressed by these discovery requests.  So if you do it and you

21   seek it, you better do it carefully and you better do it right,

22   and I would confer with opposing counsel significantly before

23   doing that.  Reach an agreement because assessing these

24   arguments again on a subsequent request after you've already

25   been to the well once, if it doesn't look like it's a slam dunk

1  to me, then I'll shift fees if I assess that motion.  Anything

2  further from you, Mr. Leake?

3          MR. LEAKE:  No, Your Honor.

4          THE COURT:  Okay.  Ms. Hebert, anything from you or

5  your team?

6          MS. HEBERT:  No, Your Honor.  Thank you.

7          THE COURT:  Okay.  Thanks, everyone.  I'll just issue

8  a brief written order that really just references the reasons

9  stated here on the record for the two rulings on the motions.

10  Thank you.  Court will be in recess.

11          *(10:36 a.m.)*

12                          *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      *   *   *   *   *

2          I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter.

5          I further certify that the transcript fees and format

6     comply with those prescribed by the Court and the Judicial

7     Conference of the United States.

8

9

10    Date:  December 20, 2024

11

12     /s/ Angela M. Hailey

13    Official Court Reporter
      United States District Court
14    262 West Nueva Street
      San Antonio, Texas  78207
15    (210)244-5048

16

17

18

19

20

21

22

23

24

25