# Exhibit 3

# Report of Gary D. Haston

*Case assessment of ALEK SCHOTT, Plaintiff, v. JOEL BABB, in his individual and official capacity; MARTIN A. MOLINA III, in his individual and official capacity; JAVIER SALAZAR, in his individual and official Capacity; and BEXAR County, Texas, Defendants.*

## Request for Evaluation

My name is Gary Haston. I have been requested by Blair Leake with the law office of Wright & Greenhill PC to use my experience, training and professional judgement to evaluate the above styled case and render independent professional opinion on narcotic enforcement and criminal interdiction, as related to the traffic stop, roadside interview, policy and training relative to Deputy Joel BABB's action in connection with Alek Schott.

My opinions are based on the documents, recordings, and sworn depositions, provided to me in this case to date, as well as my experience, training, education and research in the field of law enforcement. Should any additional information be forthcoming, I reserve the right to amend my report.

## My qualifications as an expert witness

I retired from the Williamson County, Texas Sheriff's Office after serving more than 30 years of service in the field of public safety.

I began my career as a Firefighter/ Emergency Medical Technician (EMT) with the City of Mexia Fire Department in 1988 before becoming a Paramedic with the East Texas Medical Center Emergency Medical Services (ETMC-EMS). In1992, and while working as a Paramedic, I attended the police academy working as a Reserve Police Officer before becoming a paid full time Police Officer with the City of Crockett, Texas in 1994. While working the streets of Crockett, Texas, I was afforded the opportunity to attended hundreds of hours of training in the field of narcotics while working for the Crockett Police Department.

During the early 1990's a then new form of training known as drug interdiction was being taught within law enforcement. I attended many courses related to drug interdiction, which has evolved, and now often called criminal interdiction. Law enforcement applied the techniques to many other crimes utilizing transportation during the commission of an offense.

I was a Paramedic until 1995 when offered a position with the Round Rock Police Department (RRPD). I was initially assigned to Patrol before being transferred to the traffic unit responsible for enforcing traffic law and crash investigations. I utilized my pervious interdiction training interdict drug summers using IH-35 as a smuggling route.

# **Report of Gary D. Haston**

At RRPD I was tasked with organizing a new team for the purpose of drug interdiction, to increase the effectiveness of narcotic investigations for the agency. During the same time frame in 1997, the Williamson County, Texas Sheriff's Office recruited and hired me for a Criminal Interdiction position assigned to the Capitol Area Narcotic Task Force (CANTF). CANTF was attached to the Texas Narcotic Control Program (TNCP) and one of more than forty-five (45) Drug Task Forces operating in Texas having been funded through the State of Texas Governor's Office. The task forces focused on narcotic enforcement primarily in areas where smaller police agencies had poor staffing, or minimum training in the field of narcotic enforcement.

At CANTF I was tasked with creating an effective drug interdiction team to focus on the major drug smuggling routes within the seven (7) county jurisdictional area including IH-35, IH-10, and US Highway's 71, 77, 79, 183 & 290. As a result, the CANTF increased seizures of drugs and became one of the top five (5) producing task forces in the state.

Through hundreds of drug investigations and interviews of drug couriers, I gained experience and knowledge about Mexican Drug Cartels. I received specialized training related to interview techniques, kinesics, communication analysis and intelligence increasing my training and experience in the profession. We expanded interdiction efforts to other forms of transportation such as AMTRAK and Mexican Bus companies, which all were found to have been heavily utilized to smuggle contraband by the Cartels.

In the late 1990's I transitioned into an undercover capacity at CATNF increasing my knowledge about the street and mid-level drug trade. During my undercover operative operations, I made hand to hand deliveries of Marijuana, Cocaine, Methamphetamine, Heroin and many other substances. I filed criminal cases in both state and federal courts, having the ability to direct file cases in the federal judicial courts though the United States Attorney's Office in the Western District of Texas. I regularly filed cases in the State District Courts of Travis, Williamson, Hays, Bastrop, Fayette, Lee and Caldwell County resulting in many hours of experience within the judicial system. I have testified in both state and federal courts on many occasions, having not only been a witness in my own cases, but also as an expert witness for narcotic cases by other officers.

In the early 2000's I was reassigned from the CANTF to the United States Department of Justice, Drug Enforcement Administration (DEA) at the Austin Regional Office (ARO) where I gained a better understanding of the drug industry through the use of complex conspiracy investigations.  I competed the federal Task Force Officer (TFO) training becoming a sworn federal DEA-TFO capable of operating within the policy and procedures of DEA.

I investigated cases that led to Title III Wire Intercepts, was familiar with investigative techniques that would fall under the Racketeer Influenced and Corrupt Organizations Act (RICO) and investigated international complex conspiracy investigations originating both North and South America.

# **Report of Gary D. Haston**

My duties as a DEA-TFO included being an undercover operative during cartel level investigations. I assisted local and state officers, conducting controlled deliveries when necessary, taking what would have been one person charged with a traffic stop to an entire drug cell charged through 18 U.S.C. 371. The knowledge and experience gained at DEA enhanced my understanding of the drug industry having been an interdiction officer, an undercover officer and having investigated complex conspiracy cases at a federal level.

In late 2004 I was reassigned to the Williamson County Sheriff's Office Narcotic Unit. In that role, I used my experience and understanding of policy and procedures from the state and federal task forces, which resulted in a promotion to Sergeant in 2009. The unit increased staffing, including the addition of a dedicated Lieutenant, an analyst assigned from the Texas National Guard Counter-Drug Division, and a full-time interdiction group. The county narcotic became an efficient and well-established group in respect to drug enforcement.

I am a member of the Texas Narcotic Officers Association (TNOA). I was appointed as a training coordinator and the state conference coordinator before I was nominated to the state board of elected positions to include, Regional Vice President, State Sergeant at Arms, and in 2011-2012 elected by my peers to be President of the second largest association of narcotic investigators in the nation. As President of the Association, I was responsible for the overall operations, leading the 18-member state board, developing by-laws, reviewing and approving contracts with conference centers, approving training instructors for annual training conferences and ensuring that narcotic officers within the United States were able to network with narcotic investigators in Texas.

In early 2016 a new administration for the Williamson County Sheriff's Office restructured the agency and I was reassigned as a Sergeant of a traffic unit. As a first line supervisor, I ensured the new policies were distributed, understood and implemented by the officers, they properly documented reports and that they proactively investigated leaving the scene collisions. In addition to traffic enforcement, I encouraged deputies to look further into traffic stops to detect other crimes.

In 2018 I placed first on the Lieutenant list where I was promoted and assigned to the Patrol Division night shift. As a lieutenant I was responsible for ensuring the Patrol Sergeants had the necessary equipment for their officers, that they properly reviewed reports of their subordinates, provided important information for the administration, and that every officer in the group maintained a professional work ethic.

As a Lieutenant having experience evaluating, creating and restricting groups, I was tasked to oversee the Canine (K9) unit which had a lead trainer and four dual certified canines. The unit was restructured with a Sergeant, the addition of a drug and explosive detection canine. As part of my duties, I focused on the improvement of offense, training and statistical reporting by the deputies, the success of the Sergeant and the overall Standard Operating Procedures (SOP) for drug enforcement and tracking.

# <u>Report of Gary D. Haston</u>

I was later reassigned to a newly created administrative position as Lieutenant to the Sheriff where I worked closely and supervised the Public Information Office (PIO). I was responsible for networking with the Division Commanders to ensure the accurate and consistent flow of information, attended meetings with business leaders, politicians and assisted the Sheriff with special events in the community.

In 2020 I was promoted to the position of Commander assigned to the Criminal Investigations Division (CID). The Division included groups working Crimes Against Persons, Crimes Against Property, the Organized Crime Unit (OCU), Criminal Interdiction, Auto Theft, Crime Scene Unit, Analyst Unit and Cold Case Unit. I was responsible for the overall operations for the investigative units within the agency.

I am, or have been, a member of the International Association of Chiefs of Police, the FBI Law Enforcement Executive Development Association, International Criminal Interdiction Association and the Texas Narcotic Officers Association.

I have been certified through the Texas Commission on Law Enforcement as a Law Enforcement Instructor and retired having a Master Peace Officer Certification.  My training included the certification in the use of Radar/LiDAR, and as a Law Enforcement Mobile Video Instructor. I have been certified through the United States Department of Justice, Drug Enforcement Administration (DEA) for Clandestine Laboratory Investigations and completed the Ground Development Executive & SWAT Commander Drug Unit Program. I have been certified as an instructor for the United States Department of Transportation- Drug Interdiction Assistance Program (DIAP) and the El Paso Intelligence Center (EPIC) Pipeline and Jetway programs.

I have attached a copy of my CV to this report which gives you a summary of my training and experience. I have been certified as an expert witness during criminal trials in Federal and State Courts in the area of police narcotic enforcement. I have not rendered opinions related to civil cases in the past, therefore this is my first civil case to render an expert opinion on. I am confident in my ability to be considered an expert related to criminal interdiction and narcotic enforcement by law enforcement officers related to this civil case.

# <u>Report of Gary D. Haston</u>

### <u>Research and Review</u>

As part of the review of this case I researched and reviewed:

1) Texas Transportation Code- Title 7; Section 545.060 Driving on Roadway Laned for Traffic
2) Texas Code of Criminal Procedure
3) Devenpeck v. Alford, 543 U.S. 146 (2004)
4) Terrell v. Allgrunn, 114 F.4th 2024 (5th Cir. 2024)
5) The State of Texas v. Sheila Jo Hardin PD-0799-19, 9 (2022) Decided November 02, 2022
6) Daniel v. State (2024) Decided February 14, 2024 Failure to Drive Within Lane
7) Rodriguez v. United States, 575 U.S. 348 (2015) Extension of Traffic Stop
8) Pennsylvania v. Mimms 434 U.S. 106 (1977) Driver Must Exit Vehicle
9) Terry v. Ohio 392 U.S. 1 (1968)
10) Wren v. United States 517 U.S. 806 (1996) Pretext Traffic Stops
11) United States v. Rederick, 2023 WL 3014781 (8th Cir. 2023)
12) Bexar County Sheriff's Office Policy Manual & Procedures
    a. Chapter 16-Warrantless Search & Seizure
    b. Chapter 17- Stop & Frisk
    c. Chapter 23- Crash Investigations and Traffic Enforcement
    d. Chapter 43- Pursuits and Stop Techniques
13) Depositions;
    a. Alek SCHOTT (taken 06-13-2024)
    b. Deputy Joel BABB (taken 07-15-2024)
    c. Deputy Martin A. MOLINA III (taken 04-18-2024)
    d. Deputy Joe GEREB (Vol.1 taken 02-27-2024; Vol.2 taken 08-01-2024)
    e. Captain Aaron Von Muldau (taken 07-17-2024)
14) Videos;
    a. Private dashcam of Alek SCHOTT
    b. Body worn camera (BWC) Joel BABB
    c. BWC Deputy Joe GEREB
    d. Exhibit #50-Patrol car video dated 04-12-2022 of telephone conversation between Joel BABB and Sergeant Gamboa
    e. Alek SCHOTT Deposition video (taken 06-13-2024)
    f. BWC Deputy Martin A. MOLINA III
    g. You Tube Video by the Institute for Justice dated June 06, 2023
    h. KENS5 News Report airing June 07, 2023
15) Bexar County Report BC172- Citation Detail Report for Alek SCHOTT
16) Bexar County- SPEARS Incident Summary: BCS220059233
17) Bexar County- Incident Detail Report 2022-0082748
18) Bexar County Incident Reports
    a. BC017409-17432 (2022)
    b. BC017492-17526 (2021)

# Report of Gary D. Haston

    c.  BC017527-17557 (2021)
    d.  BC017998 BCSO Asset Seizure Case Summaries
19) Bexar County Citation Data Spreedsheet.xlsx
20) Bexar County Sheriff's Office Internal Affairs Reports
    a.  BC11508-11510 Order of Dismissal dated 06-07-2024
    b.  BC11511 Response to Grievance dated 06-26-2024
    c.  BC11705-11824 Investigation into Allegations of Moral Conduct Supplement
21) Bexar County Training Documents
    a.  BC11512-BC11570 Texas Commission on Law Enforcement Standards (TCOLE) Training Course Documents
    b.  Deputy BABB 0001-0043 Training & Interdiction Certificates
22) New Jersey Office of the State Comptroller Investigation into the private Law Enforcement Training Company NJ Criminal Interdiction, LLC dba Street Cop Training- dated 12-06-2023
23) Original Complaint for Declaratory, Injunctive, and Retrospective Relief, Civil Action No. 5:23-cv-706 filed in the Western District of Texas-San Antonio Division

## Sequence of Events

On March 16, 2022 Deputy Joel BABB #1604 was working in an official capacity with the Bexar County, Texas Sheriff's Office, was a certified Texas Peace Officer sworn by Sheriff Javier SALAZAR and authorized to enforce the Texas Transportation Code within Bexar County, Texas. Deputy BABB was assigned to an Organized Crime Unit (OCU) working in a uniformed capacity in a marked Tahoe police vehicle focusing on human and drug trafficking that commonly utilized IH-35 as a smuggling route from south Texas and Mexico.

While working in the southern part of Bexar County, Deputy BABB conducted a traffic stop on a 2019 Ford F-250 truck bearing Texas license plate (LP) LJR-4135 on IH-35 near mile marker (MM) 135 at 11:16AM. The Ford F-250 was owned, registered to and driven by Alek Joseph Schott.

Prior to the traffic stop Deputy BABB utilized a messaging program called What's App to receive information that the 2019 F-250 displaying Texas (LP) LJR-4135 was northbound on IH-35 from Carrizo Springs, a city located in south Texas. The Source of Information (SOI) relayed to Deputy BABB that the truck had been identified having unusual traffic patterns, including having left Houston the day before, was in Carrizo Springs, Texas overnight, and was returning to Houston utilizing IH-35 through Bexar County. In addition, Deputy BABB was provided information that the truck had been at a hotel, had been tracked in tandem with an unidentified secondary vehicle and the driver had been with a female. The SOI relayed to Deputy BABB the truck frequently drove from Houston, Texas to various points in south Texas which could've been indicative the truck used to smuggle contraband to Houston, Texas. In addition, Deputy BABB had information through the Vigilant License Plate Reader (LPR) data that the license plate

# Report of Gary D. Haston

had been scanned in Fayette County, Texas traveling westbound from Houston the evening before.

Deputy BABB parked in the median between the east frontage road of IH-35 and the northbound main lanes where he was clearly visible to traffic approaching the patrol vehicle. Just after 1100HRS Alek Schott approached Deputy BABB traveling northbound on IH-35. A video camera was installed on the windshield in the F-250 driven by Schott which captured the conditions on the date, time, speed, road, traffic conditions, sounds and positioning of not only the F-250 on the roadway, but also the position of Deputy BABB upon its approach to the patrol vehicle.

After passing the patrol unit Alek Schott was stopped in the 16400 block of south IH-35 by Deputy BABB for a violation of the Texas Transportation Code, Title 7; Section 545.060 Driving on a Roadway Laned for Traffic. Schott immediately stopped as required by law and approached by Deputy BAB from the passenger side of the F-250.

Deputy BABB identified himself, the agency he worked for and the reason for the traffic stop, that being failure to drive in a single lane by drifting over the fog line. Deputy asked if he was good, with Schott replying that he has stayed in a hotel the night before. Deputy BABB asked for a driver's license, said that he would be issuing a warning and asked weapons in the F-250. Schott reply was "I don't think I have one", immediately followed by "I'm really sorry about that".

Deputy BABB informed Schott that he wanted him to step out, sit in the passenger seat of the patrol vehicle to be issued the warning citation, thanking him as Schott complied. Deputy BABB walked to the driver's side of the F-250 observing Schott exit the vehicle and walk to the rear where he raised his hands at chest level upon him seeing Deputy BABB come from the rear of the truck. Deputy BABB asked Schott if he minded that he gave him a quick pat down for which Schott complied by again raising his hands and turning his back to Deputy BABB.

Deputy BABB entered the driver side of the patrol unit placing his BWC on the dash to capture the entire front seating area. Schott entered the passenger side of the vehicle closing the door as Deputy BABB asked how Schott was doing that day. Schott replied that he "did not come that way often" in response to the question.

Deputy BABB began typing information into the in-car computer, sometimes referred to as a Mobile Date Terminal (MDT) where the ticket writing software was installed. Schott appeared to have visible deep and rapid breathing noticeable by the deep rise and fall of his chest and opening his mouth with respirations including tightening his lips on several occasions, that in itself could be construed as nervous behavior of a person receiving a traffic citation, however in this case Deputy BABB had indicated the infraction would be a warning.

During conversation with Schott, Deputy BABB asked about his work and where he had been traveling from as a result of the trip. Schott hesitated with an 'Uhhhh- Carrizo

# <u>Report of Gary D. Haston</u>

Springs with a lower pitch to his voice. Schott also informed Deputy BABB that he had stayed at a Holiday Inn Hotel overnight due to the distance of the trip. Schott appeared to had become more comfortable as he made a joke that he didn't feel any smarter after staying at the Holiday Inn, that being a marketing commercial for the hotel chain.

Deputy BABB explained to Schott the outcome of the traffic infraction would be a warning as he entered information on the MCT, at one point with Schott replying that he appreciated the warning. Conversations continued as Deputy BABB continued to communicate via text messing with the SOI who had given him the original information. Conversations referencing Human Smuggling by Deputy BABB resulted in Schott making the comment "Oh my God" and rubbing his face.

While Deputy BABB continued to input information, Schott initiated conversation asking personal questions such as where Deputy BABB was from and the amount of time he had lived in Texas. Deputy BABB responded to the questions before redirecting the conversation towards sleepy drivers and the dangers of falling asleep verses intoxicated driving. Schott volunteered information that he had a new born baby, therefore "that didn't help", insinuating that the lack of sleep could cause sleepy driving.

Deputy BABB continued to text the SOI and asked clarifying questions regarding the work trip, asking if the equipment sold was delivered and whether anyone had traveled to Carrizo Springs with him. Schott indicated the test equipment had been delivered and that he met someone in Carrizo Springs for the installation.

Deputy BABB continued to solicit criminal history information, which Scott denied. When Deputy BABB commented about information regarding Schott's driver license history, he asked about the emergency contact listed on his driver's license return, asking about his wife and mother being such contacts.

Deputy BABB asked Schott for consent to search the F-250 which Schott denied by saying "I prefer not". As a result of the denied consent, Deputy BABB called via radio for a canine unit to respond to the scene to conduct an open-air search around the vehicle. On two occasions Deputy Babb explained to Schott the plan to utilize a canine. Schott shook his head up and down in the gesture and agreed by saying ok the first time and gave a clearer understanding the second time by saying the only reason he was saying "no", meaning to the consent to search, was due to his law classes. Schott further explained his hesitation due to a person potential dropping a joint into the truck during an oil change as an example. Deputy BABB informed Schott that in cases where people deny consent and later decide to give consent, he would continue to wait for a K9 as to avoid coercion issues with the voluntariness of the consent

During the eighteen (18) minutes for the arrival of the canine Deputy BABB gave examples of previous traffic stops and his military service including three (3) deployments during war as Schott began to look at his watch indicating the desire to leave and at one point made the comment that he wished he had turned his truck off. Deputy BABB offered to turn the ignition off and before doing so, ensured that he was being given permission

# Report of Gary D. Haston

to enter the truck. Additional unsolicited comments by Schott were about the difficulty to speed, presumably being the speed limits was 75 mph, a conflicting comment considering the 84 mph speed his truck was traveling as captured on the video from his dash cam leading up to the traffic stop.

Prior to the canine arriving and during continued texting conversations Deputy BABB asked clarifying questions regarding the person Schott met in Carrizo Springs, as to the meeting having occurred at the actual job site or at a hotel. Deputy BABB was clearly communicating with someone within a law enforcement capacity who was in south Texas.

Deputy Molina then arrived with his K9 and met with Deputy BABB. Deputy BABB made comments to Deputy Molina that the F-250 was off of "one of those things," and that he didn't want to "say too much" but it was the one "he had been looking for", that "they had been tracking it". Deputy BABB invited Deputy Molina to talk with Schott prior to using his K9 which he did.

Deputy Molina briefly spoke with Schott asking if he has a problem with him running his K9 on the F-250. Schott replied by shaking his head side to side as an indication of no while he verbally replied "no". Deputy Molina confirmed the consent by asking "its, ok?", with Schott shaking his head up and down in the motion meaning yes. The final question was if the dog was going to find any drugs that he knew about for which Schott again shook his head and replied "no".

During the K9 search Deputy BABB continued to communicate via telephone with the SOI regarding the events transpiring on the traffic stop. After completing the telephone call and opening the driver side door, Schott told Deputy BABB that he was surprised that Deputy MOLINA asked for permission to use the dog, indicating Deputy MOLINA in fact asked for permission to search the truck with the dog.

Without any verbal confirmation from Deputy Molina that the dog had given a positive alert, Deputy BABB asked Schott to move from the front seat to the back seat explaining that he was being detained. Schott complied with all direction given by Deputy BABB without any change in demeanor one way or another. Schott was compliant, non-argumentative and didn't challenge the positive K9 alert.

Deputy BABB approached Deputy MOLINA near the front driver's door of the F-250 where a conversation between the two confirmed that Deputy MOLINA did in fact get a positive alert by the K9. Deputy BABB made comments that Schott was defeated and that he hoped whatever was in the truck was not in a compartment. Deputy MOLINA relayed to Deputy BABB his reasoning for the decision to call the alert positive, such as "the windows were down and the dog followed the odor to the ditch", "he kept messing with the center console", but before that he" hit the truck hard and started barking indicating he wanted in there bad". Deputy MOLINA walked the K9 back to his patrol unit and joined Deputy BABB with a physical search of the F-150.

# Report of Gary D. Haston

During the search Deputy MOLINA discovered after factory wiring within the dash that he continued to track while Deputy BABB discovered an after factory rear seat locking mechanism. In addition to the wiring and seat lock, the deputies had difficulty gaining entry into the closed bed cover on the F-150. Deputy BABB requested the assistance of Schott who agreed to help them access the bed of the truck but not before some damage may have occurred.

During the search by the three (3) deputies and after Schott assisted by opening the back seat and bed cover, Schott remained outside of the patrol unit and moved freely in the grass area. During the latter part of the search SCHOTT approached Deputy BABB asking about using the restroom. Deputy BABB pointed toward his patrol unit and can be heard saying "Yeah that's fine" indicating Schott could open the door and relieve himself with the cover of the door. Scott is observed on the BWC of Deputy Gereb contacting Deputy Babb, freely walking to the patrol unit and opening the front passenger door.

Deputy BABB, MOLINA and Gereb continued to search the truck eliminating areas where false compartments were commonly discovered. The deputies were assisted with the search by Deputy Joe Gereb for a short period of time, and from his BWC he had observed marks in the dust in the engine compartment for which he commented upon considering the possibility of an engine compartment but little, if any involvement with the investigation.

Deputy BABB followed up with Schott before terminating the search. Deputy BABB communicated with Schott as to the concerns regarding after factory additions he had seen while searching the F-250. Schott was able to relay to BABB that the wiring and switch on the dash was to mute a radar detector when it was activated and the red cable at the back seat area was added to release the latch to allow for access behind the seat. These were all reasonable explanations for the tampering the deputies had found.

Deputy BABB, Molina and Gereb concluded they were unable to find any contraband in the F-250. Deputy BABB met with Schott returning his driver license and copy of warning citation offering to help put anything back together that they had moved. Schott told Deputy "No" indicated he did not need help. Prior to leaving, Deputy BABB continued to help Schott by closing the bed cover, giving information about the documentation of the traffic stop and search utilizing the incident number and notes within the Computer Aided Dispatch (CAD).

The traffic stop was terminated by Schott telling Deputy BABB "I appreciate ya", Deputy BABB saying "Thank you sir, I appreciate it" and Schott replying "Have a good day". Deputy BABB documented on the BWC the stop was terminated with a warning issued.

## Review Standard and Methodology

# Report of Gary D. Haston

I evaluate the appropriateness of police conduct and procedures on a case-by-case basis. To ensure my methodology and opinions are reliable, I do not assign any credibility to witnesses or other sources of information prior to my review of the material provided to me in this case. I developed my understanding of relevant facts only after review of the provided material. I analyzed those facts against professional law enforcement training standards and general accepted practices, tactics, and procedures recognized, relied upon and used within law enforcement. Generally accepted policing, standards, tactics and procedures are established by collective training and experience of practitioners, academic research, court decisions, after action reviews and state mandated law enforcement training.

In determining whether the actions or decisions of the involved officer(s) are consistent with generally accepted police practices, I apply the reasonable police officer standard of officers based on training and experience in order to objectively evaluate the totality of the circumstances. The standard asks what information was knowable to the involved police officer(s) at the time the decision at issue was made, and not from 20/20 hindsight. Consideration is given to the fact that at times, officers are required to make split-second decisions in dangerous situations and rapidly evolving circumstances. In this case, an interdiction stop of a vehicle was made as it was traveling from south Texas—a known source of contraband smuggled into the United States—and Houston, Texas, which is a known destination of contraband smuggled by Mexican Drug Cartels.

An officer's decisions and actions are analyzed based on what a reasonable law enforcement officer trained on generally accepted policing practices would do in the same or similar circumstances. Officers are trained that they need probable cause before they initiate a stop or an arrest. An officer has probable cause if there is a probability or substantial chance of criminal activity, but probable cause does not require an actual showing of such activity. An officer has probable cause if the historical facts and events leading up to the arrest, viewed from the standpoint of an objectively reasonable officer, support a showing of probable cause. An officer's subjective beliefs about probable cause are irrelevant to the inquiry, all that matters if the action taken with the circumstances, when viewed objectively, justify that officer's actions.

This analysis is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type. My expertise regarding generally accepted police policy and procedures, tactics, and narcotic enforcement are relevant areas of testimony that would assist a jury in understanding the information presented to them.

I am familiar with and instruct narcotic courses regarding complex conspiracy investigations and criminal interdiction. I study and use as a resource when providing instruction to officers, federal court decisions of the United States Supreme Court, informed by, and consistent with, accepted research regarding law enforcement protocol. While I do not propose to offer any opinion on the law or case law, because my duties involve training law enforcement officers I often study and use judicial rulings.

# Report of Gary D. Haston

**I am not an attorney and nothing in this opinion should be considered as a "legal" opinion or to infringe on the role of a fact finder.** Any reference, in my opinion, to law, is for purpose of illustrating how the law is interpreted in the law enforcement profession, how it is taught to officers, and how a reasonable officer might be expected to comport his or her behavior with the profession's understanding of the law.

**If I am called to testify at trial in this matter, I will use my knowledge of case law to offer opinions about the standard of care applicable to the law enforcement profession, but I will do so without reference to case law. I will also refrain from quoting verbiage from case law.**

## Observations and Expert Opinion

In order to render my opinions, it is important to re-capture some of the events relative to Schott and Deputy BABB. The complete summary of facts is documented within the report. As part of the case review, certain language within Bexar County Sheriff's Office policy has been documented to outline relevant situations, however only pertinent sections of the policy have been written for reference.

I analyzed Officer BABB's actions under the standard of how law enforcement officers are trained to respond to generally comparable situations, with the understanding that all situations are different and unpredictable. My objective analysis involves evaluating how any well trained and reasonable law enforcement officer, not just Deputy BABB, could reasonably be expected to respond, when faced with similar circumstances that existed at the time.

### *Evaluating training specific to Criminal Interdiction:*

Texas police officers must complete the Texas Commission on Law Enforcement (TCOLE) certified training to be commissioned as a peace officer in Texas. Deputy BABB had met the minimum standards to be a Peace Officer according to TCOLE, and held a Master Peace Officer Certification, as well as the Basic Instructor Certification. In addition, according to the TCOLE training records, Deputy BABB had 324 hours of TCOLE credited training related to specialized law enforcement related to Narcotics, Criminal Interdiction, Interview Techniques, Human Smuggling, Gangs, and Linguistic Analysis. (DEF BATES BC11565) dated 07-08-2024

I was provided fifty-three (53) certificates of training, specific to Narcotic Training, where Deputy BABBS had either attended in person, online or via webcast during the time frame of January 2000-April 2022. The number of certificates compared to the TCOLE training records indicated several training certificates were not submitted to TCOLE for continuing education credit, however, it was law enforcement training provided by both government and private training companies that was either taken online, in person or via webcast, and completed by Deputy BABBS.

It is common practice and accepted within the law enforcement profession that an officer attend training outside of the agency, then distribute pertinent tactics to peers. I

# Report of Gary D. Haston

know from my experience and training that criminals consistently change methods of operation to avoid detection by law enforcement, having a diverse catalog of training is relevant, providing such training meets certain criteria and accepted by the agency. As common practice within law enforcement a supervisor or training officer should approve request for either departmental or outside training, to include evaluate the curriculum to ensure the instructor and company are properly vetted and pertinent caselaw or tactics being presented align with department expectations.

While reviewing the training certificates provided to me, Street Cop Training Company was a provider of training to Deputy BABB, as documented with eight (8) certificates of completion, one dated October 04, 2021 for the Street Cop Conference in Atlantic City, New Jersey. Unbeknownst to the attendees, an investigation by the New Jersey Comptroller's Office into the company NJ Criminal Interdiction Training, LLC dba Street Cop Training had been underway for substandard training techniques, unprofessionalism and unethical behavior by the instructors. The report was published in December 2023. (*New Jersey Office of the State Comptroller Investigation into the private Law Enforcement Training Company NJ Criminal Interdiction, LLC dba Street Cop Training- dated 12-06-2023*)

Several instructors were named within the New Jersey State Comptrollers report including Dennis Benigno, Kenny Williams, Brad Gilmore and Shawn Pardazi, each having presented blocks of instruction at the 2021 MVCI Conference in San Antonio, which Deputy BABB attended prior to the 2021 Street Cops Conference in New Jersey. (BABB 0004)

Only one (1) of eight (8) certificates issued to Deputy BABB, titled The Street-Smart Cop/Proactive Patrol Tactics (1 Day Course), from Street Cop Training was reported to TCOLE for continuing education credit, that being reported by Hays County Sheriff's Academy on March 23, 2021. (BABB 0034)

As part of my research and review of training certificates for Deputy BABB, Shawn Pardazi, the instructor and owner of Global Counter-Smuggling Training Consultants, LLC., presented a 32-hour training course titled Smugglers, Inc., September 01-04, 2020, which was reported by Parker County, Texas Sheriff's Office and was attended by Deputy BABB. (BABB 0010)

I have not reviewed any training syllabus, lesson plans or detailed training curriculum for any course presented by Street Cop Training, Global- Counter-Smuggling Training Consultants, or any other provider of law enforcement instruction to Deputy BABB. I know from my experience instructing criminal interdiction courses that officers only retain information they believe will be relevant and conform the policies of their respective agency. The training provided by instructors associated with Street Cops Training were only a small percentage of Criminal Interdiction training Deputy BABB had received from other training providers, none of which had controversy, to included; the Kendall County Sheriff's Office; the OSS Academy; Professional Law Enforcement

# **Report of Gary D. Haston**

Training (PLET); Desert Snow; Regional Counterdrug Training Academy'; Midwest Counterdrug Training Academy; Lower Rio Grande Valley Academy' Bexar County Sheriffs Office; and the United States Department of Transportation-Federal Motor Carrier Safety Administration. Mike Tamaz, the instructor for 720 Interdiction, was an instructor at the MCVI Conference in San Antonio, but not found to have been part of Street Cops Training, nor has any controversy regarding his curriculum.

Peace Officer's develop professional opinions related to their duties from many sources, both from government and private companies, which provide knowledge, equipment and software for law enforcement agencies. As a result, police officers retain, utilize and implement knowledge, developing a preference, or unique style, when working Criminal Interdiction. It is common practice for peace officers to analysis and apply applicable knowledge choosing their style of enforcement from all, a part, or not any of the information received from a training source.

An officer will tend to develop one or more styles related to traffic enforcement. On a major highway, such as IH-35 with multiple divided lanes, an officer may drive slower than traffic in the right lane watching traffic through mirrors as they approach, or may park clearly visible in the grass median where the approaching traffic can see them. Each method causes a reaction to people, particularly with people committing crimes, when seeing the marked patrol unit.

It has been by experience that both methods are effective. When working in a police vehicle and traveling in the right lane at a reduced speed, cars will clearly slow down and not pass the patrol unit, sometimes even when reducing speed, the vehicle being watched continues to slow. An officer performing this method watches the vehicles, not necessarily directly behind them, but those with buffer cars in between. It has also been my experience when parked in the grass median, cars will suddenly slow down, even if not speeding, and many times will change from the right lane to the left without a vehicle occupying the lane in front of them, subconsciously needing to create additional distance from the patrol unit. The driver may look away from the direction of the officer, place both hands on the steering wheel and grip tightly, look directly at the officer and have an exaggerated wave or emotional reaction.

On many occasions once past the marked patrol unit, the vehicle will continue to fall back from the other traffic that already increased speed and continued. It has been my experience, and a common for those enforcing traffic law, to see the driver of a vehicle continuously check mirrors to see if the patrol unit will leave the stationary position, causing a reaction and cross over either the solid yellow or the broken white lines dividing the lanes of travel. From my experience and training I know that vehicles are commonly used during the commission of crime and they behave differently than the general public when encountering a marked police unit.

Reviewing the one (1) minute video captured from the F-250 driven by Schott on March 22, 2022, Deputy BABB was parked in the grass median with his patrol unit clearly

# Report of Gary D. Haston

visible to Scott as he approached. In the deposition of Deputy BABB taken on July 15, 2024 (P00053 Pg75) he had intentionally parked in that manner to look for behavioral changes as vehicles approached his marked patrol unit. He wanted people to see his presence and wanted his vehicle to appear as a "billboard" so that he could watch for changes of the driver's behavior, as his training and experience had proven to be true in the past.

Deputy BABB observed Schott approach in the F-250, displaying the correct license plate, traveling the indicated direction on the highway during the correct time frame it took to travel from Carrizo Springs to the 135mm on IH-35. A reasonable officer with the same experience would have perceived credibility of the information received from the SOI in similar situations upon confirmation the vehicle existed.

### Probable Cause- Texas Transportation Code

My opinion regarding the probable cause for the traffic stop was formulated from my training, having completed the courses of Basic Radar Certification (09/1994) Radar Lidar Certification (11/2006), Mobile Video Instructor Certification (08/1999) and Digital Evidence Recovery (05/2010), as well as experience conducting traffic stops beginning in 1992 resulting in having stopped thousands of cars for violations of the Texas Transportation Code.

According to the deposition of Deputy BABB, he testified that he observed the F-250 as it approached and that the front left tire crossed the solid yellow line and that once behind it the tires hit the line again but he didn't remember the number of times. The actual offense found in the T*exas Transportation Code 545.060 (a)(1), of Driving on Roadway Laned for Traffic [1]* which *reads; An operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely.*

There wasn't a video from the dash camera of the patrol unit driven by Deputy Babb to review, however the one (1) minute video recorded from the F-250 provided by Scott was available and reviewed. Cameras and technology have improved, not only law enforcement, but also in vehicles for civilian use. The accuracy of content recorded would be a concern as it could be manipulated or edited and not be the actual footage. A video may have been edited using software if a person had knowledge or experience to do so, therefore all, some or none of the footage may be accurate. My opinion based from the video provided by Schott is that the video had some form of manipulation, or it wasn't the entire video depicting the incident as it was only one (1) minute in duration, and ended abruptly while Schott was mid-sentence in a telephone conversation.

The video depicts a camera appearing to be mounted on the windshield just to the left of the rearview mirror on the driver side of the F-250, which was confirmed through the testimony reviewed in the deposition of Schott. The F-250 was in the left lane of the highway with a solid yellow line to the left, and a broken white stripe to the right. There

# Report of Gary D. Haston

were indentions in the asphalt which began several inches to the left of the yellow line with asphalt visibly seen from the edge of the yellow line, to the beginning of the indentions in the asphalt. A black colored vehicle was situated to the right and in front of Schott, traveling in the right lane. Several car lengths in front of the black vehicle and in the right lane, was a tractor trailer with the name Amazon on it. In front of the F-250 Schott was driving, a Chevrolet truck was positioned in the left lane, and in front of the Amazon truck. The Chevrolet truck and Amazon truck appeared to be approaching a slight curve in the road that veered right.

Traffic traveling southbound on the opposite side of IH-35 and damaged steel barrier cables with orange paint was observed, indicting a prior crash had occurred in the center median. Data displayed on the screen reads 03/16/22; 11:12:18; 84 mph; HDR; Blackvue; DR900S; UHD/FHD. From my training and experience the Global Positioning Satellite (GPS) within the video system calculated and displayed within the video the vehicle traveling 84 mph when the video begins.

The hood of the F-250 is dark in color and had distinct contour lines that curve toward the center of the hood. The roadway had a yellow line to the left and a broken white line to the right. The distance from the yellow line to the contour line was symmetrically close to the distance from the broken white stripe to the adjacent contoured line, which would indicate Scott was within his lane of travel. During the next one minute the distance between lines change on several occasions.

At 11:12:26 Schott rapidly passed the black vehicle in the right lane, then the Amazon truck which was several car lengths ahead. According to the distance of the right line on the hood in relation to the yellow line, in my opinion, Schott swerved to the left in the curve as he passed the Amazon truck at 84mph. I reviewed the posted speed limit on that portion of IH-35, which was deemed to be 75mph maximum speed for the condition of the roadway. The Chevrolet truck traveling in the same lane as Schott changed to the right lane as Schott approached.

In relation to tires and striping being recorded on video at the same time, it was non-existent, therefore my opinion is based solely on my experience and training having instructed law enforcement officers on the use of mobile video during my career and from what I reviewed on the video as part of this case.

At 11:12:28 a "beep beep" is heard, believed to be the sound of a radar detector, followed by a rapid increase of sounds as he approached Deputy BABB who was parked in the grass median. At 11:12:31 Deputy BABB could be seen from the perspective of the video traveling 83mph according to the GPS on his truck.

As Schott approached at 11:12:49, Scott received a telephone call, just before passing Deputy BABB, slowed to 72mph never regaining speed after passing the patrol unit. Schott continued the telephone conversation passing a Ford truck. A noticeable change in position of the yellow line in relation to the contour line was observed, and depicted from 11:12:56 to 11:12:59 in the video. At 11:13:13 and during the phone

# Report of Gary D. Haston

conversation, Schott overtook the Ford truck at which time the left contour line was completely over the broken white line, potentially at an unsafe distance to the truck in the right lane. There wasn't a video depicting the exact location of the Ford truck traveling to the right of Schott as he passed. At 11:13:19 Schott is verbally heard saying "Oh Crap" as the video and audio abruptly ended during his conversation.

After reviewing the video recorded by Schott and from the testimony of Deputy BABB in his deposition, a reasonable officer would believe that Schott crossed the yellow line before approaching Deputy BABB, and after passing Deputy BABB he crossed the broken white line in proximity to the Ford truck traveling in the right lane. Despite Deputy BABB not articulating the offense, a reasonable officer could also believe from the video that Schott committed the traffic violation of failure to drive in a single marked lane, and that it was done in an unsafe manner. A reasonable officer could also believe that Schott had committed the traffic violation of speeding.

According to documents and videos provided by Schott to support his position, the video would be relevant to the case and the recording in its entirety could support his point of view associated with the probable cause of the traffic stop. Having a partial video that abruptly ends before an officer conducts the traffic stop questions the validity of his position relevant to the traffic violation. According to the Internal Affairs documents reviewed in this case, Deputy BABB was terminated from employment with the Sheriff's Office as a result of a second investigation into contact with Schott. The justification for termination stemmed from the fact his dash camera was not activated to record the traffic stop and that Bexar County Internal Affairs found reason to believe he was dishonest in the reasoning behind the circumstances. I was not asked to form an opinion related to the patrol camera not being activated.

It is relevant to research case law of similar situations when either instructing a law enforcement course or formulating an opinion. According to Texas case law, titled The State of Texas v. Sheila Jo Hardin PD-0799-19, 9 (2022) to stop a car based on failure to maintain lane, an officer must reasonably believe that the lane was not maintained and that this failure to maintain was unsafe. In the case at hand, I am of the opinion that a reasonable officer could have believed Schott did not drive in a single lane and that the offense was unsafe as he first passed the Amazon truck and secondly as he passed the Ford truck before being stopped by Deputy BABB.

A reasonable officer could have believed Schott was violating more than one traffic violation as recorded on his dash camera. As previously mentioned, Deputy BABB was parked stationary in the grass median watching traffic. Not only would Deputy BABB have been able to see a vehicle cross lines to guide traffic, but he would have been able to see Schott speeding as he rapidly passing slower traffic as he approached.

An officer who uses a speed measuring device, such as a radar, must also visually confirm a vehicle is speeding in order to conclude the number displayed on the radar is accurate, which over time and experience, effectively creates the ability to determine an

# Report of Gary D. Haston

approximate speed of a vehicle before using a radar. As depicted in the video, Schott rapidly passed slower traffic which would have led a reasonable officer to conclude he was going faster then the majority of other traffic and traveling over the posted speed limit.

Accordingly, a reasonable officer in Deputy BABB's position would have had the above articulated probable cause to pull over Schott based on the reviewable historical facts.

**Reasonable Suspicion**

On Wednesday March 16, 2022 Deputy BABB was working in a uniformed capacity, assigned to the Organized Crime Unit (OCU) of the Bexar County Sheriff's Office. Deputy BABB was authorized to enforce traffic law, as well as investigate other felony level offenses such as Human Smuggling and Narcotic Crimes within the jurisdiction of Bexar County, Texas. Deputy BABB had been provided and had access to Policy and Procedures authorized by Sheriff Javier SALAZAR, the elected Sheriff, through a department program identified as Power DMV.

Deputy BABB had 324 credited TCOLE hours of specialized training regarding human smuggling, street level, mid-level narcotic and limited exposure working high level investigations. According to the deposition taken of Deputy BABB, he commonly worked with an investigative unit indicating he had a higher degree of understanding than a patrol officer who was solely responsible for traffic enforcement or patrol. Deputy BABB was looking for a specific vehicle, the F-250 driven by Schott, for which he believed was part of an ongoing investigation by an agency other than the Bexar County, Sheriff's Office. Having such prior information and developing independent probable cause for a traffic stop would be considered a pretext traffic stop and subject to case law titled; *Wren v. United States*, 517 U.S. 806 (1996) Pretext Traffic Stops.

**16.01- Chapter 16, titled *Warrantless Search and Seizure;***

H.) Reasonable Suspicion- An officer's rational belief, based on credible and articulable information and circumstances, that something may be true (e.g., that an offense may have occurred or that a particular person may have committed an offense).

Upon review of the documents provided to me and 16.01 of the BCSO Policy, it is reasonable to believe that an officer with the same experience, training and under the same circumstances would have concluded they had Reasonable Suspicion to ask for consent to search the F-250 driven by Schott.

After review of the video and deposition of Deputy BABB I concluded from my experience and training, as would any reasonable officer with the same training and experience as Deputy BABB, that reasonable suspicion existed to ask for consent to search the truck. My opinion is not based on hindsight or on the outcome of the search, but in respect to what Deputy BABB believed at that time. A reasonable officer in the same

# Report of Gary D. Haston

situation as Deputy BABB, having knowledge of narcotic investigations and criminal interdiction could articulate the following reasons existed;

1) Deputy BABB had prior knowledge about the description, color, and license plate of the vehicle.
2) F-250 had been scanned by an LPR in Fayette County traveling westbound on IH-10 the night before.
3) Deputy BABB was told by a member of a law enforcement texting group, the F-250 had frequent traffic patterns to and from south Texas on multiple occasions.
4) Deputy BABB was told that the F-250 was possibly traveling in tandem with a secondary vehicle during trips to south Texas, which in his training and experience led him to believe the truck make be being used to smuggle people or drugs.
5) On March 22, 2022, Deputy BABB was informed via messaging app the F-250 left Carrizo Springs at a specific time utilizing IH-35.
6) Deputy BABB observed the F-250 driven by Scott on IH-35 confirming information received through the messenger App.
7) Scott reacted to the marked police vehicle in a manner Deputy BABB had seen from people committing crimes in the past. *In my expert opinion Schott was reacting to the marked patrol unit due to traveling over the posted speed limit at 84 mph in a 75-mph zone after having eight (8) previous encounters with law enforcement for traffic violations. (DEF BATES BC 008337)
8) Deputy BABB conducted a traffic stop for failure to drive in a single marked lane.
9) A permanently installed bedcover was installed on the F-250 which was commonly associated with vehicles used to smuggle people.
10) Upon contact on the passenger side of the F-250 Deputy Babb greeted Schott explaining the reason for the stop, asking if he were "good", receiving the response from Schott that he stayed in a hotel the night before, which further supported the accuracy of information Deputy BABB had previously received.
11) Deputy BABB asked Schott if there were weapons in the F-250, receiving the response, "I don't think I have one", which in combination with prior information, confirmation of truck, person and route, would lead a reasonable officer to conduct a Frisk or (Pat Down) for Safety. Terry v. Ohio (1968)
12) Deputy BABB requested Schott exit the vehicle and meet him at the rear at which time Deputy BABB walked from the rear of the truck observing Schott lift his arms to chest level without being instructed. Such reactions in combination with the #1-11 continue to support a Frisk, (Pat Down) of Schott.
13) Deputy BABB asked Schott to be seated in the passenger side of the patrol unit as he entered the driver's side, placing his body camera on the dash in a manner to record the events inside the police unit where Deputy BABB greeted Schott by asking how he was doing today, receiving an out of context answer that he, meaning Schott, did not come down that way very often.

# __Report of Gary D. Haston__

The events identified as #1-13 detail a specific set of details, that under the same, training, level of experience and conditions, **would have led a reasonable officer to believe the traffic stop warranted further investigation and would have asked for consent from Schott to search the F-250** before Deputy BABB initiated the front seat interview. In my opinion a reasonable officer would have recognized within the first three minutes and thirty-two seconds (3:32) of the traffic stop that Deputy BABB had reasonable suspicion to ask for consent to search the F-250 and continue to the investigation, therefore circumstances written in the court's opinion in the case of Rodriguez v. United States, 575 U.S. 348 (2015) Extension of Traffic Stop would not be applicable in relation to the events that transpired during this traffic stop.

According to the BWC of Deputy BABB, he continued to ask questions of Schott as he performed several tasks related to not only the completion of the warning citation, but also communicate information to the SOI regarding the answers being given by Schott, in order to confirm or deny what he interpreted as deceptiveness.

I have received training, specifically Kinesic Roadside and Field Interview Techniques (January 1995), and Practical Kinesic Interview and Interrogation Techniques (February 1998), Phase II Advanced Kinesic Interrogation Techniques (September 1998), Kinesic Field Interviews (November 2011), each authored and instructed by Stan Walters who is a subject matter expert on Interview & Interrogation to John Hopkins University and had publications presented at the American Psychological Association Conventions in 2000 & 2002. I utilized the training gaining experience in my ability to detect deception.

I have observed deceptive behavior during roadside and controlled environment interviews of people. Deceptive answers are answers to make someone believe something that is not true with some of the characteristics of deceptive answers being:

1.  Analysis of Verbal Behaviors- What we say and how we say it often gives clues as to whether our statements are truthful or lying. When a relevant question is posed to the subject, the clues are found in;
    a.  Voice and speech patterns
    b.  Line of thought
    c.  And through chosen words and phrases

Increasing the cognitive load of interviewees during an interview can also make it more difficult for liars to deceive. This can cause liars to display more observable signs of cognitive overload, such as pauses, response latencies, change of tone in their voice at particular times and body movements. As a result of my review of the statements by Deputy BABB during his deposition, the act of interviewing a person in the front seat of his vehicle, in combination of certain styled material that was visible, was his way to increase the cognitive load of Schott in order to gauge deception. The front seat interview is a style being instructed by instructors and is preferred by many officers. Accordingly, this style of interview used by Deputy BABB was in accordance with current training.

# <u>Report of Gary D. Haston</u>

As previously stated, a reasonable officer utilizes pieces of information to develop a style of enforcement best suited for themselves, and many officers with the same training and experience prefer to interview people in the front seat of the patrol unit. Relying on my experience and training regarding traffic stops and interviewing violators, I disagree generally with the training to use of front seat interview tactics, as it is not possible to physically or mentally detect deception according to the degree I prefer, or have used in the past. It would not be my position that front seat interviewing is not reliable, just that an interviewer commonly is not distracted by telephones, radios, computers when concentrating on factors relevant to detecting clusters commonly associated with deceptiveness, all being present inside the patrol unit.

To accurately detect deception, the interviewer structures an interview, and asks questions to develop a baseline, or the way a person answers non-threatening questions, while observing body language, such as facial expressions, finger, hand, and arm, leg movements. Seemingly non-threatening closed ended questions are asked while listening to tone and pitch of their voice effectively developing a baseline. An example would be, "Is the weather nice in Carrizo Springs", which is a non-threatening question. If answered yes or no with a constant pitch and audible tone with each non-threatening question the interviewer would determine the base was yes or no. When asking a question relevant to a crime, such as "are there any drugs in your car" and the answer changes to "No Sir" with a change in tone of voice, the interviewer knows to revisit questions related to drugs again and may ask clarifying questions in attempt to determine the type of drugs and possibly where it would be concealed in the vehicle.

It has been my experience, and I know from training that people are deceptive for many reasons and lie about things not related to the potential crime being suspected. The interviewer initially doesn't know why a person lies, just that there was a change in the way the question was answered and that more questions need to be asked in relation to the answer given. There isn't a singular movement, word, or expression that would lead a reasonable officer to detect deception. It is the combination of verbal and non-verbal clues during particular time, considered clustering, for which the interviewer detects and then focuses upon to determine clarifying questions.

According to the deposition of Deputy BABB, from his training and experience he believed the changes in tone of Schott's response required further exploratory questions, particularly related to the hotel Scott had stayed in, the female he met, and where they had traveled. Upon review of the video and from my experience and training, Deputy BABB detected changes in the tone of Schott's voice, although it was difficult at times to hear responses to Deputy BABBS questions upon review of the video. It has been my experience, and from training, that people who smuggle drugs commonly drive great distances to a source city, stay for a short period of time, meet a person who takes them to a stash house, load contraband into a vehicle and drive back to the origin without delay, which a reasonable officer could have believed was the case in this incident.

# Report of Gary D. Haston

Deputy BABB properly identified and attempted to clarify the discrepancy he detected regarding Schott meeting a female who was believed to have had either traveled with, met at the job site or, at the hotel. Compounding the situation was the information Deputy BABB received that the F-250 had "been tracked" and was in "tandem" with another vehicle. Officers conducting narcotic investigations would interpret the information from the SOI as the F-250 was either being driven as a vehicle containing contraband or a vehicle traveling as a "lookout", a "scout" or commonly referred to as a "chase car".

It is common for officers working interdiction to encounter vehicles traveling in tandem while trafficking drugs for Mexican drug cartels. They commonly utilize such tactics to identify routes, lessen encounters with criminal interdiction units and protect the contraband being smuggled. It is not unreasonable to believe that Deputy BABB believed the information from the SOI was creditable and played a significant role in the decisions he made.

A reasonable officer with the same training and experience as Deputy BABB would have believed the situation warranted further investigation to determine if Schott was transporting Humans or possibly drugs during his travel.

The Bexar County policy 16.04- A (1) (a) supported BABB's search of the F-250 driven by Schott.

**16.04-** _**Probable Cause Plus Exigent Circumstances Searches**_. General rule: A warrantless search may be made where there is probable cause to believe that contraband, instrumentalities, fruits, or evidence of a crime are present and exigent circumstances make obtaining a search warrant impractical.

1. Probable cause search where the facts and circumstances within the knowledge of the officer on scene and of which he has reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime

a) Factors which, under the circumstances, may give or contribute to probable cause to believe that evidence is present in a certain place include information from a reliable witness that a short time ago persons in a described vehicle left a robbery with stolen property, credible information that a person possesses narcotics at a certain location, observation of substance which appears to be narcotics, positive indication of narcotics by trained dogs, furtive dropping of a matchbox, flight from police, false or evasive answers to question.

**C. Vehicle searches**: The "automobile exception"; Where there is probable cause to search a motor vehicle, and exigent circumstances exist, the vehicle may be searched without a warrant.

# Report of Gary D. Haston

1. Moving vehicle: Where officers stop a moving, occupied vehicle on a public roadway, no further exigent circumstances need be shown this rational applies also to a stopped vehicle occupies by a suspect.

6. If probable cause is directed toward the whole car, all parts of the car may be searched. However, probable cause may exist only to search a specific part of the car, (for instance, finding a small amount of marijuana in the passenger compartment of a car occupied by apparent casual users will not justify search of the trunk.)

Schott denied consent to search the F-250 when asked by Deputy BABB. Deputy BABB respected the denied consent and did not violate the policy set forth by searching without the dog alert. While waiting for Deputy MOLINA Deputy BABB is heard commenting that, had Schott decided to change his mind and then consent to the search, he would have waited for Deputy MOLINA to use the K9 regardless. The statement supports the Bexar County Policy B(1) as Deputy BABB wanted to avoid coercion issues in court in the event evidence was discovered. Deputy BABB acted according to policy and law. It was only after Deputy MOLINA informed him the drug-dog gave a positive alert, that created the probable cause to search the truck without the need of a search warrant.

## 16.05- _Consent Searches_

A. General Rule: A warrant is not required where there is consent to search because consent waives the constitutional right to a warrant.

B. Critical Factors:

1)    Consent must be voluntary, not the result of duress or coercion, express or implied. Voluntariness is determined from all the circumstances.

g.) There is no requirement that a Miranda warning be given prior to obtaining consent to search.

Upon review of the BWC of Deputy BABB, he was in accordance with in order to frisk Schott for weapons, as the initial response to the question about weapons was concerning as was the demeanor identified by Deputy BABB upon Schott exiting the truck.

## 16.09- _Frisk for Weapons_

# Report of Gary D. Haston

A. General Rule: If an individual is lawfully, temporarily detained (for example, during a traffic stop upon reasonable suspicion), and if the officer has reason to believe he is dealing with an armed and dangerous person, he may conduct a limited search for the sole purpose of finding weapons.

> 1. It is essential that the officer have reason to believe that he is dealing with an armed and dangerous person; the sole justification for the search is protection of the officer and others nearby.

> 2. But he need not be absolutely certain the person is armed; it is enough that a reasonably prudent man could believe that he or another were in danger.

> 3. Factors which may combine to give an officer reasonable belief that a person detained is armed and dangerous include furtive gestures, bulges in clothing, lateness of the hour, dangerous neighborhood, intoxication, hostility, belligerence, and an indication of criminal activity.

>> c.) The officer should be able to express all factors which led him to fear for his safety.

> 4. A driver temporarily detained in a vehicle may be ordered out of the vehicle.  *(Pg 196) Believed to be a typographical error as a #4 previously is used within this section.*

Having experience as a narcotic investigator and as a uniformed officer, I have experienced and been a part of investigations where uniformed patrol officers utilized reasonable suspicion alone to stop and frisk either pedestrians, bicyclist or vehicles. Bexar County Sheriff's Office Chapter 17-Stop and Frisk provides guidance to the deputies. According to 17.01 the applicable sections related Deputy BABB's encounter would be relevant to his actions on March 22, 2022 during his investigation; (C)(D)(E)(G)(H)(I).

Chapter 17-***STOP AND FRISK***

17.01 Definitions

> C. Criminal Activity- Crimes of a serious nature (such as burglary, robbery, **or drug offense)** or crimes involving risk to the safety of a person or property (such as public intoxication, threats, or fighting words).

> D. Detention- (stop)- Action by an officer (verbal or physical) which places a person under the reasonable belief that he is not free to leave.

> E. Frisk- A weapons search of a person generally limited to a pat down of is outer clothing to **ensure the safety of the officer** and others.

> G. Probable Cause- The **total set of apparent facts and circumstances based on reasonable trustworthy information which would warrant a prudent person (in the position of and with the knowledge of the particular peace**

# Report of Gary D. Haston

officer) to believe something, for example that a particular person has committed some offense of the law.

H. Reasonable Suspicion- **An officer's rational belief, based on credible articulable information and circumstances, that something may be true (for example, that an offense may have occurred or that a particular person may have committed an offense).**

I. Suspect- A person who an officer reasonably suspects of involvement in criminal activity.

Bexar County Sheriff's Office Chapter 17.04- Stops for Questions is intended to guide the deputies in such situations. Section (A) authorizes a stop or a pedestrian or motorist. Section (D) outlines six (6) examples that's acceptable to stop and question either a pedestrian or motorist. When analyzing the traffic stop on Schott Deputy BABB, taking into consideration his training, experience, knowledge of job description, assignment to the Organized Crime Unit, (OCU), Section 17.04 (B) (1-6) would be considered relevant.

Considering the six reasons authorizing a Stop and Frisk by a Bexar County Deputy, an experienced officer with the same experience, training and having been in the same situation would be able to articulate the justification to stop and frisk the vehicle driven by Schott on March 22, 2022. Section (E), In evaluating a person's suspiciousness, an officer should rely on his training and experience, which included his knowledge and or experience in the investigation where 100 people were being smuggled in a tractor trailer. Similar to a tractor trailer, the F-250 truck had a bed cover concealing a location where people could have been trapped or located. In the scenario of human smuggling, safety is priority for the people essentially trapped in a vehicle without a method of escape.

Deputy BABB did not stop Schott merely to stop and frisk, having probable cause for a traffic violation. Deputy BABB was authorized to conduct traffic stops while in a marked Bexar County Sheriff's Office vehicle and did so according to Chapter 23- Crash Investigations and Traffic Enforcement.

### *17.04 STOPS FOR QUESTIONS*

***A. An officer may stop and question a person (including a pedestrian or motorist) whom he reasonably suspects may be involved in past, present, or imminent future criminal activity.*** If the questioned subject refuses to report or falsely reports his name and residence, the subject cannot be charged with "Failure to Identify" under 38.02(a) of the Penal Code unless the subject is already under arrest for another charge. However, the subject can be detained until he is identified. The identification process may include transport to the BCSO for fingerprinting and photographing. Prior to transport under these circumstances, the officer must receive authorization from a supervisor.

*D. Before an officer stops a person for questioning, he must be able to describe specific suspicious conduct or circumstances to justify that stop. For Example, the following*

# Report of Gary D. Haston

factors (generally a combination of one or more of these or similar factors) might contribute toward justifying a stop:

   1. The suspect is making evasive or furtive movements;

   2. The suspect fits a "wanted" notice'

   3. The suspect has a felony record (this factor alone is not sufficient);

   **_4. The suspect is near the scene of a recently committed crime;_**

   **_5. The suspect's actions, clothing, vehicle, or presence appears unusual for the time or the place'_**

   **_6. The officer observes some other factor or has received information even if anonymous which links the suspect to criminal activity._**

**_E. In evaluating a person's suspiciousness, an officer should rely on his training and experience._**

**_F. An officer may stop and question a potential witness to a crime if;_**

   **_1. The officer reasonably believes that a crime involving danger of forcible injury to persons_** or property or theft of property **_has just been committed near the place he finds such person, and_**

   **_2. The officer reasonably suspects that such person has knowledge of material aid in the investigation of such crime, and_**

   **_3. Such action is reasonably necessary to obtain or verify the identity of such person._**

**_H. Subject to subdivision K, an officer may detain a person he lawfully stopped for the minimum length of time he reasonably needs to;_**

   **_1. Verify his identification_**

   **_2. Account for his conduct_**

   **_3. Account for his presence, and_**

   **_4. Ascertain whether a crime occurred._**

I. A Miranda is not required during a temporary detention, unless the suspect is subjected to treatment that is the functional equivalent custodial arrest.

K. Unless he receives authorization from his supervisor, an officer shall release a suspect if the officer cannot develop probable cause to arrest the suspect within a reasonably brief period (which will usually not exceed 15 minutes).

   A reasonable officer with the same training and experience and under the same circumstance could have concluded just as Deputy BABB had, that probable cause

# Report of Gary D. Haston

existed to stop Schott for a valid traffic violation. Deputy BABB asked for and was refused consent to search the vehicle, utilized Deputy MOLINA to conduct an open-air sniff with a K9 only searching the vehicle after developing probable cause through a positive alert by a certified K9. According to Bexar County Sheriff's Office policy, many of the circumstances encountered by Deputy BABB would have fallen under Bexar County Policy for Stop and Frisk. An officer with the same experience, training and under the same circumstances could reasonably argue the vehicle driven by Scott could have been stopped for a brief detention to determine if a crime was a foot, in this case Human Smuggling, had the safety of people been the situation.

After review of this case as well as having been in similar circumstances, a reasonable officer could be suspicious and conclude—as Deputy BABB concluded—that Human Smuggling or narcotic trafficking was a plausible explanation for the information from the SOI.

Chapter 23 of the Bexar County Polices was reviewed and according to 23.08 (A);(B) ;(C) and (D) a reasonable officer would conclude Deputy BABB had the authority to stop Schott on March 22, 2022 for failure to drive in a single marked lane.

### *Chapter 23- Crash Investigations and Traffic Enforcement*

### 23.08 Uniform Traffic Enforcement

A. The Bexar County Sheriff's Office traffic enforcement program must achieve a high degree of uniformity to be acceptable to the public. It is imperative that individuals handled for identical offenses under similar condition and circumstances be accorded the same treatment at the hands of the enforcement agency. Non-uniformity in enforcement is unacceptable. Government employees, including Bexar County employees, are not exempt from the traffic laws of the state.

B. Uniformed officers in marked units shall be responsible for traffic enforcement, and shall stop violators and take traffic enforcement action when practical to do so.

C. The goal of traffic supervision by the Sheriff is expediting the flow of traffic with a high degree of safety. Blind adherence to the letter of the law when it conflicts with this principle shall be avoided.

D. It is the officer's responsibility to check for warrants on violations stops.

### 23.09 Random Stopping of Motorist

A. Officers shall not randomly stop motorists, but will stop vehicles only;

    1. On probable cause to believe, a traffic violation has occurred.

    2. Upon reasonable suspicion or of other criminal activity.

    3. Pursuant to standardized traffic stops such as drivers' license checks.

    4. Upon other lawful justification such as to prevent a hazard.

# Report of Gary D. Haston

B. Fixed check points for drivers' license checks and the like may be established where all vehicles are stopped or vehicles on a neutral systematic basis (such as every fifth vehicle)

**Final Expert Opinion and Conclusion**

After review of the material provided to me and from my experience and training, it was reasonable to believe that Deputy BABB was practicing standard law enforcement procedures on March 22, 2022 upon being informed about Schott traveling north on IH-35. Information from an ongoing investigation by another law enforcement officer was relied upon, despite the fact Deputy BABB wasn't informed of specific details. An officer known to be working a particular area is commonly asked to conduct traffic stops as part of investigations. Such investigations are often not in the same jurisdiction the officer works, therefore communication using telephones, networking apps and radios are common.

A reasonable officer working in the same capacity as Deputy BABB would believe that the information provided from the other agencies was true. Reviewing this case and from my experience and training, the credibility of the information Deputy BABB was provided was not lessened as a result of him not personally knowing the person providing said information. A reasonable officer in the same position would have given credibility to the information, considering it was consistent from training and experience that the F-250 could have been used to smuggle humans or drugs, between Houston, a common destination city, and south Texas, a common source of contraband imported into the United States. The fact no contraband was found has no bearing on what was knowable to Deputy BABB at the time, and therefore cannot be used from a hindsight perspective to invalidate the stop.

Despite Deputy BABB not knowing details, it was reasonable to believe the information was credible, and had validity with respect to travel patterns, destinations, and the involvement of a third-party, that being the female at the Holiday Inn. The fact pattern of the truck not only being at a hotel but having traveled to a remote area where humans and drugs are commonly staged could lead a reasonable officer to believe the truck was involved with smuggling. Drug Cartels commonly use a "stash house" in remote areas to stage dugs and/or humans before they are moved to destination cities.

I know from my experience and training that Mexican Drug Cartels illegally bring contraband from into the United States using an array of methods. The contraband is commonly taken to a location, or a "stash house" where it is concealed until which time it is concealed in a vehicle and transported to a destination in the United States. A person used to transport contraband from a stash house in commonly referred to as a "mule". The vehicle driven by a mule is relative to the type and size of contraband being smuggled. In the case under review, a reasonable officer with the same training and experience as Deputy BABB would have believed the F-250 driven by Schott was cable of transporting large quantities of drugs and or people.

# Report of Gary D. Haston

Deputy BABB stopped Schott for Failure to Drive in a Single marked lane, which from my experience and training was acceptable and valid as recorded on the dash camera video in Schott's vehicle. But that was not the only probable cause a reasonable officer could have perceived to initiate the stop, as Schott was not only traveling 9 mph over the posted speed limit, but was swerving in his lane, crossed the yellow and broken white lines and did so unsafely when not only passing the Amazon truck, but also while on the telephone when he can be heard saying "Oh Crap".

A reasonable officer parked in the grass median, while looking for a specific vehicle, has the ability to see traffic and recognize a particular style from greater distances. In combination with a photograph such as one from LPR data, and from the testimony given by Deputy BABB during his deposition, a reasonable officer with the same training and experience could conclude that Deputy BABB saw the F-250 as it approached his position, and therefore was able to see Schott drive upon, or cross the solid yellow line as stated in his deposition.

Upon initiating the stop and making contact with Schott, a reasonable officer could have believed Deputy BABB was concerned for his safety, and would have performed a Frisk. (Pat Down) Officers are trained and know from prior experience that people involved with drug trade are commonly armed. A reasonable officer with the same training and experience as Deputy Babb would have directed Schott to exit the F-250 to conduct the traffic stop for their safety. My research concluded from *Pennsylvania v. Mimms* 434 U.S. 106 (1977) Driver Must Exit Vehicle, that directing Schott to exit the vehicle was performed as a common and acceptable practice in cases similar to the traffic stop as that conducted by Deputy Babb.

In the case of *Rodriguez v. United States,* 575 U.S. 348 (2015) Extension of Traffic Stop the United States Supreme Court ruled that a traffic stop could not be unreasonably delayed to develop reasonable suspicion in order to call for a K9 to search a vehicle. Considering the totality of the circumstances faced by Deputy BABB, an officer with the same experience and training would believe under the same set of circumstances faced by Deputy BABB that articulable facts existed, and that further investigation would confirm or deny the suspicions perceived by Deputy BABB.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred. Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of the law had occurred.

Having experience and training related to Mexican Drug Cartels, I believe a reasonable officer with the same experience and training when faced with the same set

# Report of Gary D. Haston

of circumstances would conclude that Deputy BABB had prior information about the vehicle, he had been in communication with a member of law enforcement via a messaging app, and he continued to communicate details of the encounter as they transpired as is a common practice for law enforcement when investigating potential criminal activity.

Deputy BABB developed an opinion as to probable cause and observed what he believed were answers, behaviors and observations that established a reasonable suspicion and justified going beyond the scope of an ordinary traffic stop in order to dispel or prove a crime was being committed. An officer with the same training and experience as Deputy BABB would have believed articulable facts for extending the traffic stop were justified. Rodriguez v. United States focused on extension of a traffic stop in order to obtain the reasonable suspicion to call for a K9 to search a vehicle which wasn't applicable in this case.

As part of my research, I reviewed United States v. Rederick, 2023 WL 3014781 (8th Cir. 2023) where Larry D. Rederick moved to suppress evidence from a traffic stop, claiming that the officers unconstitutionally delayed the stop waiting for a drug-dog, and that the dog's alert did not provide probable cause to search referencing Rodriguez v. United States. The 8th Circuit disagreed concluding that law enforcement officers had probable cause to conduct the traffic stop based on the defendants traffic offense and on the collective knowledge of the officers conducting the investigation into the defendants alleged drug dealing; the state troopers who conducted the stop did not illegally prolong the stop in order to conduct a drug-dog search; the dogs alert was sufficient to alert the trooper to a positive result and the records showed the dog was reliable; the alert gave the officers probable cause to search the defendant's vehicle.

Presented with the same or similar circumstances, viewing the facts through the eyes of a law enforcement officer with the same level of training and experience, a reasonable officer under the same circumstances as Deputy BABB would have responded in the same way in order to confirm or dispel that a crime was in progress.

I was not asked to form an opinion related to the Bexar County Sheriff's Office Internal Affairs Investigation related to this traffic stop, therefore and opinion related to the patrol car video camera was not considered. The video provided by Schott, as well as the BWC of Deputy BABB, MOLINA and Gered provided sufficient video for review to formulate an opinion as to the events that day.

**Expert witness fees**

My fees for the work performed in connection with this case are a flat rate of $3700 for the initial case evaluation and report. Testimony/ Depositions-$ 2000.00 per day all or part, including time waiting to testify; Testimony/Trial- $2000.00 per day all or part, including time waiting to testify; Deposition/ trial preparation- $150.00 per hour in addition to the actual day of either event.

# <u>Report of Gary D. Haston</u>

**History of Prior Civil Cases**

      I have been deemed an expert in Federal and State court related to criminal prosecution of interdiction and narcotic enforcement, however, I have not testified in court or rendered an opinion in the past four (4) years in any criminal or civil proceeding.

Gary D. Haston