# Exhibit 6

Page 1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3     ALEK SCHOTT,                )
           Plaintiff,             )
 4                                 )
       v.                          ) Civil Action No.
 5                                 ) 5:23-cv-00706-OLG-RBF
       JOEL BABB, in his individual )
 6     and official capacity;      )
       MARTIN A. MOLINA III, in his )
 7     individual and official     )
       capacity; JAVIER SALAZAR,   )
 8     in his individual and       )
       official capacity; and BEXAR )
 9     COUNTY, TEXAS,              )
           Defendants.            )
10
11
12     ***************************************************
                       ORAL DEPOSITION OF
13
                         GARY HASTON
14
                       JANUARY 10, 2025
15     ***************************************************
16         ORAL DEPOSITION OF GARY HASTON, produced as a
17     witness at the instance of the Plaintiff, and duly
18     sworn, was taken in the above-styled and numbered cause
19     on January 10, 2025, from 9:07 a.m. to 4:46 p.m.,
20     before Donna Wright, CSR in and for the State of Texas,
21     reported by machine shorthand, at the LAW OFFICES OF
22     WRIGHT & GREENHILL, P.C., 4700 Mueller, Austin, Texas,
23     pursuant to the Federal Rules of Civil Procedure and
24     the provisions stated on the record or attached hereto.
25
```

Page 2

1                      A P P E A R A N C E S
2

   FOR THE PLAINTIFF:
3       Mr. Joshua A. Windham
        Ms. Christen M. Hebert
4       INSTITUTE FOR JUSTICE
        816 Congress Avenue
5       Suite 970
        Austin, Texas 78701
6       (512) 480-5936
        chebert@ij.org
7
             -and-
8
        Mr. Joshua A. Windham
9       Mr. Joshua Z. Fox
        Institute for Justice
10      901 North Glebe Road, Suite 900
        Arlington, VA  22203
11      (703) 682-9320
        jwindham@ij.org
12      jfox@ij.org
13

   FOR THE DEFENDANT JOEL BABB:
14      Mr. Stephen Barron
        WRIGHT & GREENHILL, P.C.
15      4700 Mueller Boulevard
        Suite 200
16      Austin, Texas 78723
        (512) 200-9697
17      sbarron@w-g.com
18

   FOR THE DEFENDANTS MARTIN A. MOLINA III
19   AND BEXAR COUNTY, TEXAS:
        Mr. Hector X. Saenz (via Zoom)
20      LAW OFFICES OF CHARLES S. FRIGERIO
        111 Soledad Street
21      Suite 840
        San Antonio, Texas 78205
22      (210) 271-7877
        csfrigeriolaw@sbcglobal.net
23
24
25

Page 3

1                         INDEX
2       Appearances....................................    2
3
4    GARY HASTON
5
       Examination by Ms. Hebert......................    4
6
       Reporter's Certificate.........................  274
7
8
                         EXHIBITS
9
     NUMBER              DESCRIPTION                     PAGE
10
       Exhibit 110   ...............................    9
11                    Haston Report with Correction
       Exhibit 111   ...............................    11
12                    Haston Report
       Exhibit 112   ...............................    14
13                    CV
       Exhibit 113   ...............................    210
14                    BlackVue Camera Systems Printout
       Exhibit 114   ...............................    251
15                    Steve Walters Training Materials
16
17
                 PREVIOUSLY MARKED EXHIBITS
18   NUMBER                                             PAGE
19
       Exhibit 49    ...............................    160
20
21
22
23
24
25

```
                                                    Page 4
 1                        GARY HASTON,
 2      having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4      BY MS. HEBERT:
 5          Q.   Good morning.
 6          A.   Good morning.
 7          Q.   Mr. Haston, my name is Christen Hebert.  I
 8      represent the plaintiff, Alek Schott, in this matter.
 9      We just met for the first time a few minutes ago; is
10      that correct?
11          A.   We did.
12          Q.   Can you state your full name for the record?
13          A.   It's Gary Don Haston, H-A-S-T-O-N.
14          Q.   Great.  I'm just going to introduce you to our
15      team.
16          A.   Okay.
17          Q.   You met Mr. Fox, Josh Fox --
18          A.   I have.
19          Q.   -- a few minutes ago.  And this is
20      Mr. Windham, Josh Windham.  And then in the room, we
21      also have Donna, the court reporter, which you met a
22      few minutes ago.  And then counsel, Stephen Barron, who
23      is representing Deputy Babb.  And on Zoom we have
24      Hector Saenz --
25                    MS. HEBERT:  I can never say your last
```

Page 5

1    name, Hector.

2                    MR. SAENZ:   That's good enough.

3         Q.   (BY MS. HEBERT)   Who is representing Bexar

4    County and Defendant Molina in this case.

5         A.   Okay.

6         Q.   So just usual stipulations, you're here, that

7    means you're waiving any defects in your deposition

8    notice.

9                    Before we go on today, I want to go over

10   a couple of housekeeping rules.   Have you ever been

11   deposed before?

12        A.   I have not.

13        Q.   Okay.   So you understand that you are under

14   oath today?

15        A.   I do.

16        Q.   And you understand that's the same oath that

17   you would take as if you were in the courtroom

18   testifying for before a judge?

19        A.   I do.

20        Q.   Okay.   It's important that we have a clear

21   record today.   Donna is going to take down everything I

22   say and everything you say, and that means that we need

23   to have clear verbal answers on the record.   So please

24   don't shake your head.   Nodding or shaking your head is

25   just not captured by the record, and we try to avoid

Page 6

1    things like "uh-huh" or "huh-huh."  So we'll try to say

2    yes or no, just so it's clear for Donna.

3         A.   Okay.

4         Q.   If you don't understand a question, please let

5    me know.

6                   Can we agree to that?

7         A.   I understand, yes.

8         Q.   And if you answer a question, I'm going to

9    assume you understood what I was saying.  Is that fair?

10        A.   That's fair.

11        Q.   Okay.  Similarly, let's try to not interrupt

12   each other.  Please don't start answering a question

13   until I have finished asking it, and vice versa, I'll

14   try not to interrupt you when you're answering a

15   question with the next question.  I know that it's not

16   a natural conversation because it kind of usually ebbs

17   and flows, but we will both do our best.  And if Donna

18   thinks we're doing a bad job, she will let us know, I'm

19   sure.

20        A.   I agree.

21        Q.   If you do not know the answer to a question,

22   it is okay for you to say so.

23        A.   Okay.

24        Q.   And the other attorneys here, Hector and

25   Stephen, may state an objection on the record, but that

Page 7

1    doesn't mean that you should not answer.  It's just

2    they are looking to preserve the objection so if we try

3    to use your answer later down the line, they can argue

4    to the judge that the form of the question was

5    improper, the question was improper.

6                      Does that make sense?

7        A.    Yes.

8        Q.    Okay.  If you would like to take a break, use

9    the restroom, get a drink, get lunch, just ask.  For

10   the most part, this is going to be an informal,

11   relatively informal conversation, so feel free to, you

12   know, shout.  The only thing I would ask you to do is

13   to finish answering a particular question before we

14   take a break.

15       A.    Sounds good.

16       Q.    And if there is something that I have asked

17   that you don't understand, feel free to ask me to

18   rephrase it.

19       A.    Of course.

20       Q.    We're going to look at some documents today.

21       A.    Okay.

22       Q.    It's your right to look at that document in

23   its entirety.  I'm not trying to trick you, I'm not

24   trying to rush you.  I may point you to some specific

25   parts of the document to ask questions, but if you want

Page 8

```
 1     to take time to review a whole document, we can take a

 2     break and you can review the whole thing.  That is your

 3     right.

 4          A.   Okay.

 5          Q.   Is there any reason that you're not able to

 6     give your full and best testimony today?

 7          A.   No.

 8          Q.   Okay.  And would it be fair for plaintiff's

 9     attorneys to rely on your testimony at trial?

10          A.   Of course.

11          Q.   Okay.  Are you generally clearheaded to

12     testify today?

13          A.   Yes.

14          Q.   You haven't taken any impairment medication?

15          A.   No.

16          Q.   You haven't had any alcohol this morning?

17          A.   No.

18          Q.   Did you prepare a report?

19          A.   I did.

20          Q.   And I see that you brought a document with

21     you?

22          A.   I have.

23          Q.   What is that document?

24          A.   It is the report.  However, I have reviewed it

25     this morning.  There are a few typographical errors
```

Page 9

1    that I want to make you aware of.

2        Q.    Sure.

3        A.    Other than that, you know, it's a complete

4    report.

5        Q.    And if there are errors in the report that you

6    want to just note as we go along, feel free to just

7    shout.

8                So I'm going to introduce your -- your --

9    the version of your report that you brought as an

10    exhibit.

11                MS. HEBERT:  Could you put an exhibit

12    sticker on that?  So whatever is -- 110.

13                MR. BARRON:  110.

14                (Exhibit 110 marked)

15        Q.    (BY MS. HEBERT)  Are there any notes on this

16    version of the report?

17        A.    Let me see if I may have -- I don't believe

18    there are.

19                (Discussion off the record)

20                THE WITNESS:  Yes, there is one

21    correction written on this report.

22        Q.    (BY MS. HEBERT)  Sure.  We will just --

23    because you brought it with you, we're going to put an

24    exhibit sticker on it.  I'm probably just going to just

25    give you a clean version of your report so we all know

Page 10

```
 1     that we're looking at the same thing.
 2                 I have been known to lose pages of
 3     documents because I don't have a stapler at my desk.
 4                 MR. BARRON:  I can get you a stapler.
 5                 MS. HEBERT:  Well, at my desk in the
 6     office.
 7                 MR. BARRON:  Oh, okay.
 8         Q.   (BY MS. HEBERT)  So we're just going to --
 9     Mr. Haston, we're just --
10         A.   I'm listening.
11         Q.   We're just going to put an exhibit sticker on
12     that one and you can hand it to Donna.
13         A.   Okay.  Are you going to give me a different
14     report?
15         Q.   Yeah, we're just going to give you the clean
16     version.
17         A.   Okay.  So just so I don't forget later --
18         Q.   Sure.
19         A.   -- the correction will be on page 17.
20         Q.   Excellent.
21         A.   It will be the first line.
22         Q.   Okay.
23         A.   And it will be where Scott -- Schott -- I
24     mispronounce his name a lot -- Schott overtook the Ford
25     truck, at which time the left contour line was
```

```
                                                  Page 11
 1      completely over the broken white line.  That is

 2      incorrect.  That should be the right contour line.

 3           Q.   Oh, okay.

 4           A.   So that's the only error that I see.

 5           Q.   Sure.

 6           A.   I just wanted to note that before you give

 7      me --

 8           Q.   And just so you know, that will be scanned in.

 9           A.   Okay.

10           Q.   And you will have a copy of it.

11           A.   Okay, good.

12           Q.   Okay, so that will be 110.  I will leave that

13      for Donna.

14                     (Exhibit 111 marked)

15           Q.   So we're going to hand you an exhibit that's

16      marked 111.  Take a second to review that.

17           A.   Okay.

18           Q.   Let me know when you're ready.

19           A.   I'm just going to make sure all of the page

20      numbers are correct.

21           Q.   Sure.

22           A.   It looks good.

23           Q.   All right.  So is this the report that you

24      prepared in this case?

25           A.   It is.
```

Page 12

1      Q.    And does this report contain the opinions that
2   you intend to testify about at trial in this case?
3      A.    It is.
4      Q.    Does this report contain all of the opinions
5   that you intend to testify about at trial in this case?
6      A.    Yes, unless there is something else that comes
7   up --
8      Q.    Okay.
9      A.    -- that I might need to readdress or amend my
10  report.  But at this time, yes.
11     Q.    And what kind of things would cause you to
12  amend your report?
13     A.    Oh, I don't know.  Being in law enforcement,
14  you know, I may learn things here today that I wasn't
15  aware of from, you know, things that I have been
16  provided to review.
17     Q.    Sure.  I guess, then, before writing this
18  report, did you have an opportunity to review all of
19  the evidence you wanted to review before offering an
20  opinion?
21     A.    I did.
22     Q.    Okay.  Did you have an opportunity to ask
23  Defendant Babb's counsel for additional data?
24     A.    I did.
25     Q.    Did you have an opportunity to ask for

                                                          Page 13

 1      additional evidence?  That can be different, depending

 2      on what's going on.

 3          A.   I did, yes.

 4          Q.   And did you ask for additional data or

 5      additional evidence?

 6          A.   I did, actually, throughout this.  I asked for

 7      policies from Bexar County Sheriff's Office to review

 8      those.

 9          Q.   And did you get everything you asked for from

10      defendant's attorney?

11          A.   I did.

12          Q.   Okay.  Did you have an opportunity to do any

13      testing that you wanted to do?

14          A.   I did.

15          Q.   And as we sit here today, do you have any

16      plans to revise or supplement your report?

17          A.   As of right now, no.

18          Q.   Okay.  We're going to hand you another

19      exhibit.

20          A.   Okay.

21          Q.   Exhibit F from our stuff, we're going to mark

22      this Exhibit 112.

23                    (Exhibit 112 marked)

24          Q.   We started, obviously, with Exhibit 110.

25      That's just because we continue through all of the

Page 14

1    depositions.

2         A.    That's cool.

3         Q.    I'm handing you what's marked 112.  Do you

4    know what this document is?

5         A.    Yes, it's my CV.

6         Q.    And I -- I guess I want to start at the top.

7    There is a header that says "Subject Matter Expert

8    Testimony Specialist and Consultant."

9                    Do you see that?

10        A.    I do.

11        Q.    How long have you been working as a

12   consultant?

13        A.    This is my first case.

14        Q.    Okay.  So when did you start working as a

15   consultant?

16        A.    I guess this would have been maybe, what,

17   October -- I believe October when I received this, or

18   November.  I can't remember exactly.

19        Q.    So October of 2024?

20        A.    2024, yes.  It's '25, so it's -- I have to get

21   used to changing the '24 to the '25, I guess.

22        Q.    Yeah, me too.  I'm not there.  I wrote '24

23   just yesterday.

24                    So what do you do as a consultant?

25        A.    I evaluate a case, particularly this case, I

Page 15

1    have been asked to evaluate regarding narcotic matters,

2    narcotic enforcement, which is my specialty.

3        Q.    Okay.  So have you ever been asked to evaluate

4    a case as an expert before?

5        A.    Not in a civil case.

6        Q.    Sure.

7        A.    I have testified on many occasions in criminal

8    court as an expert witness.

9        Q.    And those times that you testified in criminal

10   cases, were you involved with those criminal cases?

11       A.    I was not.

12       Q.    So were you retained as an outside expert to

13   offer an opinion about an event?

14       A.    Not necessarily retained, but subpoenaed.

15       Q.    Subpoenaed?

16       A.    To come to court, yes.

17       Q.    And when you were subpoenaed, who subpoenaed

18   you?

19       A.    Most of the time it was the district attorney

20   or the county attorney's office.

21       Q.    Did you ever testify on behalf of a defendant

22   in a criminal case?

23       A.    Well, in a criminal case, it's not necessarily

24   testifying on the behalf of a defendant or the behalf

25   of an officer.  It's similar to the civil case that I

Page 16

1  see here.  You know, they asked me to come in and to

2  give an opinion on, you know, matters revolving around

3  that case.

4          So both defendants and prosecutors are

5  allowed to question me in court, you know, to support

6  their position, you know, for me to help clarify what

7  happened during that case.  So it's really no different

8  than a civil case.

9      Q.   Understood.  And when you testify in a

10  criminal case, who usually pays you for that time?

11      A.   You're just paid by your agency.

12      Q.   Okay.

13      A.   Yeah.  It's -- most of the time, you're

14  just -- you're on duty, so you're paid by the agency.

15      Q.   Understood.  So when you've testified in a

16  criminal case, were you -- or when you had previously

17  testified in criminal cases, were you employed at the

18  Williamson County Sheriff's Office during that time?

19      A.   Yes.

20      Q.   Okay.  So since -- and you're no longer with

21  the Williamson County Sheriff's Office, correct?

22      A.   I'm retired.

23      Q.   Okay.  So since leaving the Williamson County

24  Sheriff's Office, have you testified in a criminal

25  case?

```
                                                    Page 17
 1          A.   I have not.

 2          Q.   Okay.

 3          A.   No, I have not.

 4          Q.   And --

 5          A.   Well, yes, I have.  I'm sorry.

 6          Q.   It's okay.

 7          A.   I actually was just subpoenaed to court within

 8     the last six months, I believe, surprisingly.

 9          Q.   And have you testified yet in that case?

10          A.   Yes, actually, from 24 years ago.

11          Q.   Okay.  And --

12          A.   So believe it or not, I was surprised.

13          Q.   And what was that case -- what was that case

14     about?

15          A.   It was -- it was a drug trafficking case where

16     I had arrested a guy for, you know, a lot of drugs and

17     he had gone to prison.  I think he served his sentence

18     and now he's contesting his representation by an

19     attorney who has now been arrested because I guess he's

20     gone corrupt, and so I was pulled back into court to

21     testify for that case involving his counsel and, you

22     know, whatever was going on with that.

23          Q.   So you had specific factual knowledge about

24     that particular case; is that correct?

25          A.   Well, yeah, from 24 years before that.  I
```

1    didn't remember very much.

2        Q.    Understood.

3        A.    Yeah.

4        Q.    So can you give me a rough estimate, how many

5    times would you estimate that you have testified in

6    court?

7        A.    More than 50.

8        Q.    Okay, got it.  And every one of those 50 has

9    been a criminal case thus far?

10       A.    Yes, ma'am.

11       Q.    Fair to say, then, this is your first case as

12   a consultant expert?

13       A.    In a civil case, yes.  But there's always a

14   first, right?  You've got to start somewhere.

15       Q.    Agreed.

16             So I want to just look at your experience

17   with --

18       A.    Sure.

19       Q.    -- the Williamson County Sheriff's Office.

20   How long did -- your last role was commander of the --

21   of the criminal investigations division; is that

22   correct?

23       A.    That's correct.

24       Q.    And how long did you work in that role?

25       A.    That was a short period of time.  That was

Page 19

1    less than a year before I retired.

2         Q.    Okay.  And so then when exactly did you leave

3    the Williamson County Sheriff's Office?

4         A.    December of 2020, I believe it was.

5         Q.    Okay.  And since December of 2020, it's now

6    the beginning of 2025, what have you been doing in the

7    last four some-odd years?

8         A.    Fishing.

9         Q.    What kind of fishing do you do?

10        A.    Crappie fishing.

11        Q.    Okay.

12        A.    No, actually now what I do for -- you know, I

13   work with an auction company, Gaston and Sheehan

14   auction company out of Pflugerville.

15        Q.    Okay.  That -- what is an auction company?

16   I'm sorry.  I have no idea, actually.

17        A.    Sure, yeah.  So it's -- it's where assets are

18   liquidated, like the city of Austin.  We have the city

19   of Austin contract where we sell everything that they

20   need to get rid of, you know, be it stolen property --

21        Q.    So are you like an auctioneer?

22        A.    Well, I'm actually more -- I go and get the

23   contracts, you know, with companies to sell online with

24   Gaston and Sheehan auction company.

25                    THE REPORTER:  With what?

Page 20

```
 1              THE WITNESS:  With Gaston and Sheehan
 2     auction company.  And we have the US Marshals contract,
 3     so we sell everything seized by the DEA and FBI in the
 4     nation on the jewelry contract.  We also sell cars for
 5     wrecker companies when people don't pick up their car,
 6     then they have a right to sell the car to recover their
 7     fees.  That's primarily what I do is I get contracts
 8     for wrecker companies to sell their cars online.  And
 9     we sell about 12,000 of those a year, just impound
10     cars.
11          Q.   (BY MS. HEBERT)  And who are the people who
12     you are contracting with?
13          A.   Gaston and Sheehan auction company.
14          Q.   No, no.  I guess like --
15          A.   Oh, you mean the customers?
16          Q.   Yeah, like who are the clients, I guess?
17          A.   Well, here in town, we have the city of
18     Austin.
19          Q.   So anything that the city of Austin seizes or
20     it's like lost and found?
21          A.   No, it's like their fleet.  You know,
22     everything.
23          Q.   Oh, okay.
24          A.   It could be stuff from the airport that they
25     take from TSA checkpoints, it's vehicles that are
```

Page 21

```
 1    seized, you know, as part of investigations, fleet,
 2    fire trucks, ambulances, police cars.  It's --
 3    everything that they need to get rid of, we sell it.
 4    That's one.
 5                Government agencies, bankruptcies, so
 6    companies that go out -- go out of business, we
 7    liquidate that to recover money for the bankruptcy
 8    court.  The wrecker companies, the towing companies,
 9    majority of the companies in Austin, we sell the cars
10    for them that people don't pick up.
11        Q.   What's the weirdest thing you've ever sold?
12        A.   Well, it's funny, someone asked me that
13    question the other day.  So I just went to McAllen to
14    one of the federal offices and picked up Johnny 5.  Do
15    you know who he is?  All you guys are young, right.
16                MS. HEBERT:  Do you know, Stephen?
17                MR. BARRON:  No.
18                THE WITNESS:  Johnny 5 is a robot that
19    they -- in the movie Short Circuit and it was part of
20    an investigation that FBI had done and they seized it
21    as part of this white collar case.  So I went and
22    picked Johnny 5 up here last year, so that's
23    interesting.
24                Art, we sell a lot of art.  We sell, you
25    know, a movie poster that Leonardo DiCaprio had and it
```

Page 22

```
 1     was sold to a white collar group that the FBI had done
 2     and it sold for like $1.1 million.  Right now, we have
 3     a lot of Pokemon cards on auction, where youngsters,
 4     you know, that know about -- maybe your age, that know
 5     about Pokemon cards and, you know, they are going for
 6     thousands of dollars online right now.  So it's
 7     unbelievable what we sell.
 8         Q.   (BY MS. HEBERT)  So would you say that most of
 9     the things that you're selling come from government
10     agencies?
11         A.   A lot.  Let's say a lot of it.  That's just
12     one aspect of the business.
13         Q.   Okay.
14         A.   Yeah.
15         Q.   That's cool.  I have not heard of that before.
16             When did you start doing the auction
17     business?
18         A.   When I left the -- when I retired from the
19     sheriff's office in 2020, I started to do that.
20         Q.   Okay.  So by my count -- and I'm notoriously
21     bad about this, so correct me if I'm wrong -- you
22     worked for the Williamson County Sheriff's Office for
23     23 years; is that right?
24         A.   Yes, since 1997.
25         Q.   Okay.  And there are a bunch of roles listed
```

Page 23

1    on pages 1, 2 and 3 in your CV.  Are those roles all

2    from working at the Williamson County Sheriff's Office?

3        A.   What's unique about that, and the reason

4    there's such detail in that, is -- it's related to why

5    I'm here today, actually -- I was recruited to go to

6    the sheriff's office to be an interdiction officer, to

7    work interdiction cases.

8                The Williamson County Sheriff's Office

9    was cooperating -- or they were part of a task force

10   through the Governor's office, so there were like 43

11   task forces or so in the state.  They needed an

12   interdiction guy to come over and to work interdiction

13   cases, so they recruited me from Round Rock PD and

14   said, "Hey, we have an interdiction position, we will

15   give you a car, seven counties to work in and all you

16   need to do is go find Mexican drug smugglers."  So

17   that's how I ended up at the sheriff's office.

18                The roles that I had during that time was

19   obviously an interdiction officer with the sheriff's

20   office assigned to the Capital Area Narcotics Task

21   Force.  Later, I became an undercover officer, again,

22   with the Capital Area Narcotics Task Force, and then I

23   was reassigned to the United States Department of

24   Justice Drug Enforcement Administration -- the DEA, as

25   people commonly know it -- as a task force officer

Page 24

1      federally deputized at DEA.

2                  At that point, I worked, again, a lot of

3      undercover, criminal interdiction on public

4      transportation, Amtrak, Greyhound buses, Mexican buses.

5      I did a lot of conspiracy investigations, you know,

6      leading to North and South America, everywhere in the

7      country.

8                  From that point, I was then reassigned

9      back to the sheriff's office, a short stint in CID as a

10     properties crime detective, and then new administration

11     came into office and I went back to the narcotic unit

12     to build up -- to help increase the size of the

13     narcotic unit at the sheriff's office itself.

14                 So then I spent many years there,

15     promoted to sergeant, became the supervisor of the unit

16     until a new administration came in in 2016 and then

17     then I moved to patrol or traffic.  So now I'm back in

18     uniform after I don't know how many years, wearing a

19     badge and a gun and a car with computers that I need to

20     learn how to use and, you know, how to cut video

21     cameras on in that particular car because they had

22     gotten so much better.

23                 From that point, I went through the

24     promotional process and became a lieutenant where I

25     went to working nights as a patrol lieutenant,

Page 25

1   supervising sergeants and deputies on the street, and

2   then I was appointed as commander of criminal

3   investigations during my last year there.

4                But that's basically what you're seeing

5   in that CV.

6        Q.    Okay, thank you.

7        A.    Yes, of course.

8        Q.    That's super helpful.  So how did you become

9   an interdiction guy?

10       A.    I was in Crockett, Texas in the early '90s

11  when interdiction was really in its infancy stages.

12  And at Crockett Police Department, there were several

13  federal housing projects there with a lot of open air

14  drug market, so really it was a lot of drug crimes.  So

15  my interest in working drug crimes came from Crockett,

16  Texas, a small town.

17               And this interdiction thing came about to

18  where officers were seizing large quantities of drugs

19  in the trunks of cars, you know, that they just put 100

20  pounds of drugs in a trunk and drive down the highway.

21  And that interested me, so I started going to training,

22  started going to schools and learning more about it.

23               And then I took that training and

24  realized that Crockett, being a dry county, Houston

25  County, having a lot of housing projects, they had an

Page 26

1    alcohol problem, actually, because it was a dry county.

2    So my first interdiction stop was not drugs, but it was

3    bootlegging.

4                    THE REPORTER:  It was what?

5                    THE WITNESS:  Bootlegging.

6                    THE REPORTER:  Oh, okay.

7                    THE WITNESS:  Yeah.  So my first actual

8    stop for criminal interdiction was a load of alcohol

9    going to the projects to be sold individually without a

10   TABC license.

11                   So from that point forward, you know,

12   there really wasn't a lot of Mexican drug smuggling

13   going to Crockett.  A lot of small drugs.  So I learned

14   this trade of interdiction from user amounts, midlevel

15   amounts of drugs until I came to Round Rock Police

16   Department in 1995.

17                   At that point, I had a major highway,

18   that being Interstate 35, and then I took all of the

19   knowledge that I learned from East Texas and I put it

20   to work on I-35 with Mexican drug smugglers.

21                   At that point, I started getting large

22   loads of drugs on Interstate 35.  I learned more about

23   it the more I interviewed the people in the cars and I

24   gained the interest for how the drug trafficking world

25   worked.  You know, instead of just stopping the car, I

Page 27

1    learned more about how -- you know, the operations of

2    the cartels.

3              So that's -- that's -- in a nutshell,

4    that's how I got involved in interdiction.

5         Q.    That's helpful.

6              So it sounds like, to me, at the Crockett

7    Police Department, you were there in the mid-'90s; is

8    that fair?

9         A.    Early to mid-'90s, yes.

10        Q.    Early to mid-'90s?

11        A.    Yeah, mid-'90s, probably mid-'90s.

12        Q.    You kind of developed an interest in

13   interdiction; is that correct?

14        A.    I did.

15        Q.    And then it sounds like when you worked for

16   the Round Rock Police Department you did traffic stops;

17   is that correct?

18        A.    I did.

19        Q.    And you started doing more interdiction?

20        A.    I did.

21        Q.    Okay.  And then after that is when you went to

22   the Williamson County Sheriff's Office?

23        A.    I was employed by Williamson County, assigned

24   to the Capital Area Narcotics Task Force.

25        Q.    Sure.  What did you do at the Capital Area

Page 28

1    Narcotics Task Force?

2          A.    Criminal interdiction.

3          Q.    So what did it look like there?

4          A.    It was a task force that we -- we had seven

5    counties that we were responsible for.

6          Q.    Can you -- can you list off those counties?

7          A.    Sure, absolutely.   Obviously Travis County.

8          Q.    Sure.

9          A.    Williamson County, Hays County, Bastrop

10   County, Lee County, Caldwell County and Fayette County.

11   So my responsibility was to work criminal interdiction,

12   look for drug smugglers on any of the routes going

13   through those counties.

14                In addition to that, I was an officer

15   that would be called to help the investigative side of

16   the task force by stopping cars that they had under

17   investigation or that they needed stopped because they

18   knew they had drugs in them or they just needed people

19   identified as part of that investigation.

20         Q.    Okay.   And how many officers did you have as

21   part of that task force?

22         A.    I don't recall.   I don't know -- well, this

23   won't answer that.   Each county had at least one

24   representative.   That's how they were part of the task

25   force.

Page 29

1       Q.   So you had at least six folks?

2       A.   Well, seven, there was at least seven, and the

3    then the interdiction guy, that's eight, another

4    interdiction, nine, the commander was from the Texas

5    Department of Public Safety, that's operated through

6    DPS, so there's the commander.  That's ten.  Roughly --

7    roughly ten in that particular time.

8       Q.   Okay, thank you.

9       A.   Uh-huh.

10       Q.   And these other roles, the DEA task force, did

11    you do traffic stops in that role?

12       A.   No.

13       Q.   Okay.  And then the detective of narcotic

14    enforcement, did you do traffic stops in that role?

15       A.   Sometimes.

16       Q.   How often?

17       A.   At the time the unit was -- was small.  We

18    didn't have a lot of undercover guys or guys to really

19    do big investigative cases.  So during slow times, we

20    purchased a police Tahoe and we would go out and work

21    in uniform doing interdiction for drug smugglers.

22       Q.   But that was not your -- was that your

23    daily -- daily activity?

24       A.   It varied.  It just depended upon how busy we

25    were on the other side of the house, right.  So I did a

Page 30

1      lot of it.

2          Q.   And excuse my ignorance.  What do you mean by

3      "the other side of the house"?

4          A.   The investigative side.

5          Q.   What does the investigative side look like?

6          A.   Investigative side is where they develop

7      informants, they use informants to develop probable

8      cause to -- you know, to get a search warrant and to,

9      you know, search houses.

10         Q.   Got it.  And in your sergeant of special

11     operations role, did you do traffic stops?

12         A.   At times I would because as part of the

13     sergeant in the narcotic unit, I was developing a new

14     criminal interdiction unit for the sheriff's office.

15     So, yes, I did have to recruit and train new guys in

16     the unit to help them understand narcotics, understand

17     criminal interdiction and, you know, to follow the

18     policies and the procedures and the way we wanted them

19     to do interdiction.

20               So, yes, I was heavily involved with

21     developing the criminal interdiction program as a

22     sergeant.

23         Q.   Okay.  And then as a patrol lieutenant, you

24     were out there doing traffic stops?

25         A.   I very rarely did traffic stops as a patrol

Page 31

1    lieutenant.

2        Q.   As the assistant to the sheriff, did you do

3    traffic stops?

4        A.   Not at all.

5        Q.   Okay.  And then as the commander, did you do

6    traffic stops?

7        A.   Not at all.

8        Q.   Okay.  I'll come back to some of your criminal

9    interdiction work in a minute.  I just kind of want to

10   finish your resume.

11       A.   Sure.

12       Q.   Can you flip to the last page of your CV?  I

13   actually don't know the difference between CV and

14   resume, so if I use the terms interchangeably, is that

15   okay?

16       A.   We are good, yes, ma'am.

17       Q.   So I want to take just a quick look at your

18   certifications.  Would it be fair to say this is a fair

19   summary of your certifications?

20       A.   Yeah, the majority of them.

21       Q.   Okay.  Would you say that these are the most

22   important certifications?

23       A.   Sure.

24       Q.   I have to ask you about one.

25       A.   Okay.

Page 32

1    Q.    Do you know which one I'm going to ask you

2    about?

3    A.    I do not.

4    Q.    The investigative hypnotist certification.

5    A.    Okay, yes, ma'am.

6    Q.    This is like --

7          MS. HEBERT:  You will just have to humor

8    me, Stephen, for like a second.  I have never seen that

9    before.

10   Q.    (BY MS. HEBERT)  What is an investigative

11   hypnotist?

12   A.    So there are times where there may be a victim

13   of a crime, right, or a witness to a crime.  I'll give

14   you an example.  You are at a 7-Eleven and you're not

15   thinking anything, you walk in, you go and get your --

16   you know, your water, you go to the counter and once

17   you get your water, you're walking out and then some

18   guy rushes in or rushes out and kind of bumps into you

19   and you don't think anything about it, but you looked

20   at them and made eye contact with them.

21         And then you go about your merry way,

22   right.  You may have walked out and you looked at the

23   car that he got out of and you may have, you know,

24   really not paid attention to it, but you made an effort

25   to go, "Oh, that guy drives, you know, an F-150

Page 33

1      pickup."

2              Well, then you find out that the 7-Eleven

3      was robbed and you come forward to the police and you

4      say, "Hey, you know, it's odd, but I was at that store

5      during that timeframe and I saw this guy rush in or

6      rush out, they bumped into me, you know, and I saw

7      their car, but, you know, I don't remember anything

8      about it.  It just went into my subconscious memory and

9      I don't know anything."

10             An investigative hypnotist can actually

11     hypnotize that witness and then bring that information

12     from the subconscious into basically the conscious mind

13     so they can actually see that license plate that's been

14     stored in their subconscious mind.  And then they will

15     actually, a lot of times, be able to say -- from

16     visually seeing it in their subconscious mind, they

17     will be able to say what that license plate number is,

18     even though they didn't really look at it and remember

19     it.  So that's what that is about.

20             I went to school.  That was put on by the

21     Texas Department of Public Safety, the Texas Rangers,

22     who utilize hypnosis for this purpose and I became a

23     certified hypnotist for law enforcement.  I did it

24     during the time I was in narcotics as a detective.  Not

25     that it was applicable to anything with narcotics, but

Page 34

```
1      being that an investigate -- investigator cannot
2      hypnotize your own witness, right, so you needed
3      someone that was not associated with the -- with the
4      case, and that's why I went.
5                    I have a friend that was a detective in
6      CID that wanted to do it and said, "Hey, I want you to
7      go with me," and so I said, "Hey, that's cool, I've
8      never heard of it.  Let's go."  I didn't really believe
9      in it at that time.  I didn't know much about it until,
10     during the course, and I'm at home with my daughters
11     and the dog and I practiced on them.
12          Q.    I'm sure they loved that.
13          A.    And, of course, I videotaped it, you know,
14     because I love video cameras.  I mean, I have always
15     watched videos, used videos in my job, you know, so of
16     course I videotaped this deal and, you know, they --
17     out like a light.  It was unbelievable.  And I'm
18     like -- you know what, even the dog -- the dog was out,
19     and I'm like, "Wow, this stuff is cool."
20                    During the training, my partner that was
21     in CID, I watched him be a participant, you know, as an
22     example, and he was about six foot three, he weighed
23     about 150 pounds, good shape, and they actually
24     hypnotized him and had two people hold him, one at his
25     head or his shoulders and one at his feet, and he was
```

1   like a board for minutes, physically like a board with

2   just two people holding him while he was hypnotized.

3   That was an example.

4          The other example is I watched the

5   instructor remove the letter L from someone's memory.

6   You know how you repeat the alphabet, ABCDEFGHIJKLMNOP,

7   right.  Well, they actually removed the L from his

8   mind.

9       Q.   Wow.

10      A.   And when he said that in saying the alphabet,

11  he never said L.

12      Q.   That's wild.

13      A.   So that being said --

14      Q.   So have you ever -- so I guess -- and I can

15  probably talk to you all day about this and it would be

16  really interesting --

17      A.   Sure.

18      Q.   -- so maybe we will have to do that.  But have

19  you ever used investigative hypnotism -- I'm not sure

20  if I'm saying that right -- hypnotism in a police

21  matter?

22      A.   I don't -- nothing sticks out.  I don't recall

23  anything specific at all.  I merely did it and

24  practiced it because they needed me to.  I don't recall

25  anything specific to where they ever called me to

Page 36

```
 1    actually come in and do it in -- in a police matter,
 2    no, but I did do it quite a bit, you know, in real life
 3    scenarios.
 4        Q.   Sure.  And this is an odd question that just
 5    popped into my brain.  I didn't think about it --
 6        A.   Of course.
 7        Q.   -- kind of beforehand, so, you know, just bear
 8    with me.
 9             Could you hypnotize Deputy Babb and see
10    what he saw?
11        A.   No.
12        Q.   Why is that?
13        A.   A person must commit to being hypnotized, a
14    person must want to be hypnotized.  If you do not want
15    to be hypnotized, you will never go into the trance,
16    ever.
17        Q.   And so what makes you say that Deputy Babb
18    would not want to be hypnotized?
19        A.   I can't say that, obviously.  I'm not
20    in Deputy -- I don't know what Deputy -- his mindset
21    is.  I can't say, right?
22        Q.   Sure.
23        A.   I would just say that he would not typically
24    be someone that would be a candidate for hypnosis.
25        Q.   Okay, that's fair.  I was just curious, like
```

Page 37

```
 1    you were talking about a crime --
 2        A.   Sure.
 3        Q.   -- and what people could see.  I was just
 4    curious whether you could hypnotize an officer and see
 5    like what they saw.
 6        A.   Not if they don't want to be.
 7        Q.   Understood.  So if you fight it, it won't
 8    work?
 9        A.   No.  And if -- there are shows, you know, like
10    people that do this for entertainment, right, and
11    it's -- you can watch -- the first thing about hypnosis
12    is that you must want to be hypnotized.  And when you
13    go to a show, let's say in Vegas, where a group of
14    people pay to go watch, you know, others get hypnotized
15    and, you know, they make them do -- they don't make
16    them, but they program them to do really silly things,
17    they pick their candidates from the audience and
18    that -- the first step is you must want to be
19    hypnotized.
20              So they ask, "Hey, who wants to
21    participate?"  It's like, "Oh, oh, oh, ah, ah, ah." So
22    that's your -- automatically, you know that person is
23    susceptible to hypnosis because they want to be
24    hypnotized.
25        Q.   Understood.
```

Page 38

1        A.    Whereas other people, like you or I, are like,
2    no, you're not putting me under.  That's not happening.
3    So I personally do not believe that -- that it would be
4    good, I don't think.
5        Q.    Okay.  So you're trained as a -- as an
6    investigative hypnotist, but you have never used that
7    in a law enforcement capacity?
8        A.    No.
9        Q.    Got it.  Okay.  Sorry to have like a huge
10   sidebar.
11       A.    That's fine.
12       Q.    It's just absolutely fascinating to me.
13             Can we look at the training section?
14       A.    Okay.
15       Q.    And, similarly, would you say this training
16   section provides kind of the list of topics you have
17   specialized training in?
18       A.    Yes.
19       Q.    So one question -- and I'm not trying to trick
20   you here, I'm not trying to be critical.  I'm just kind
21   of trying to set the record straight.  I don't see any
22   special certifications or training in accident
23   reconstruction.  Is that fair?
24       A.    That's fair.
25       Q.    Okay.  And I don't see any specialized

Page 39

```
 1      training in dash cameras.  Is that also fair?
 2          A.   No, that isn't fair.
 3          Q.   Okay.  So point it out to me.
 4          A.   Yeah.  So let's see if it's in here.  It's not
 5      in the CV.  However, it is in my report.
 6          Q.   Okay.
 7          A.   Yeah, it's not in the CV, but it is in my
 8      report.
 9          Q.   Sure.  And so I guess why didn't you put it on
10      your CV?
11          A.   It's something unique, right.  So it's -- this
12      case revolves around that, right, so digital evidence
13      of videotapes, things of that nature, law enforcement
14      uses it all the time.
15          Q.   Okay.
16          A.   You know, when you do a CV or a resume, that's
17      typically not -- there's many other training
18      certifications that I have, probably, you know,
19      hundreds of them that are not in here.
20          Q.   Okay.  Yeah, I'm not trying to trick you.  I'm
21      just trying to understand.
22          A.   The mobile video instructor -- I'm a mobile
23      video instructor through the University of Houston
24      course that I have taken many years ago.  That's one.
25      Digital evidence recovery is another course that I have
```

Page 40

```
 1      taken.  That's another.  Obviously those are important.
 2                  I guess since we're going down the video
 3      route and you're questioning whether or not, you know,
 4      it's important or I have knowledge with videos -- I
 5      guess I'm going to date myself, okay, I was an officer
 6      in 1994 who had some of the original video cameras
 7      before anyone had them.  It was a Sony eight millimeter
 8      digital camera -- not even digital, they had the tapes,
 9      and a mount that fit on the dash in my old patrol car
10      and I used that camera in law enforcement.  A lot of
11      cops didn't want to use them, but I had no problem
12      using a video camera.
13                  And it ultimately played in my favor
14      because I was on a traffic stop with a guy who was very
15      intoxicated one day and the video camera obviously
16      captured the scene as he's on the side of the passenger
17      side of the car with their standard in the movies, beer
18      cans fall out and clink everywhere and he's so
19      intoxicated he falls to the ground and hurts himself
20      and I can't even do a field sobriety right test on him.
21      I pick him up, dust him off, put him in the car.
22                  Unbeknownst to me, in that apartment
23      complex on the opposite side of the car was his family
24      who assumed that I had beat this man because he had
25      injuries and they actually filed a complaint with the
```

Page 41

```
 1      police department that I had violated this man's civil
 2      rights, and that videotape saved me because it recorded
 3      the entire incident.  So from that point forward, I
 4      have always been interested in videotapes.
 5          Q.   I understand.
 6          A.   So part of --
 7          Q.   And that makes sense that, you know, a video
 8      recording can protect both the police and the public.
 9      Is that fair?
10          A.   Well, that's fair, but I would like to
11      continue on with the other history that I have with
12      videos.
13          Q.   Sure.  And if you wouldn't mind, I'm going to
14      try to keep us from -- because we do have a time limit
15      on today --
16          A.   Sure.
17          Q.   -- so I'm going to try to like move us
18      forward.  And you mentioned this mobile video
19      instructor --
20          A.   Yes.
21          Q.   -- certification?
22          A.   Yes.
23          Q.   I think you mentioned the University of --
24          A.   Houston.
25          Q.   -- Houston?
```

Page 42

1        A.    Yes.

2        Q.    When did you obtain that certification?

3        A.    That was probably in like 1990 -- it was the

4    mid-1990s.

5        Q.    Okay.  And I think you mentioned a digital --

6        A.    Evidence recovery.

7        Q.    Evidence recovery.  Is that a course you took?

8        A.    Yes.

9        Q.    When did you take that course?

10       A.    That was probably in the early 2000s, maybe,

11   or somewhere in there.  I don't remember exactly.

12       Q.    And have you ever instructed folks in mobile

13   video?

14       A.    Yes.

15       Q.    And when was the last time you instructed

16   someone in that?

17       A.    Well, actually, it's -- it's -- you instruct

18   officers every day in mobile video and video cameras.

19       Q.    Sure.

20       A.    That's an important part of law enforcement

21   because that video camera is recording actions and

22   what's going on, right, and the placement of what's on

23   that video is important.

24             What happens a lot of times with officers

25   is they -- they don't pay attention to that video.

Page 43

1    They are just -- they are out doing their job and they

2    are not paying attention.

3         Q.   When you say "that video," are you talking

4    about the video from their patrol car, the dash camera

5    from their patrol car?

6         A.   Correct.

7         Q.   Okay.

8         A.   It's -- when you have a video system in your

9    car, it's normal, right.  So when you pull someone

10   over, when an officer pulls someone over, they don't --

11   they really should be paying attention to the placement

12   of that video camera, right, but they don't.

13             So part of this video instructor is to

14   teach them why that's important, to capture what's

15   happening on that scene.  So that's an ever-evolving

16   thing as a -- not only an interdiction guy, but as a

17   law enforcement trainer.  I've been an instructor since

18   1997 with criminal interdiction and it's always a

19   role --

20        Q.   Understood.

21        A.   -- in what I've instructed.  It's important.

22        Q.   Okay.

23        A.   So I have a lot of experience when it comes to

24   videos, training officers in videos, reviewing videos

25   from when -- when video started.

Page 44

1    Q.   Understood.  And so would you say the mobile

2    video instruction focuses on teaching officers how to

3    use their dash cams?

4    A.   The instruction -- the school for the

5    instructor school was to -- to go over the importance,

6    you know, to develop -- basically to teach that

7    curriculum to the officers on the video placement, the

8    importance of it, the way to either park or situate

9    patrol cars with the video cameras to be able to obtain

10   what they need to record for evidence purposes.

11               So, yes, that's what the video instructor

12   school was about.

13   Q.   Got it.  Did it include also instruction on

14   body camera usage?

15   A.   There wasn't body cameras back then.

16   Q.   And since then, have you instructed officers

17   on how to use their body cameras?

18   A.   No.

19   Q.   Okay.  I'm going to talk a little bit about

20   criminal interdiction and the work that you've done

21   there.

22               Can you define "criminal interdiction"?

23   A.   People really get hung up on this, right?

24   Every officer does criminal interdiction.  If an

25   officer is in a patrol car and he stops anyone on a

Page 45

1      traffic violation, he's doing criminal interdiction.

2      The only difference is some officers just write a

3      ticket, they don't pay attention to anything.  Other

4      officers, they pay attention to the little things and

5      they say, "Something else may be going on here," so

6      they dig a little deeper in the traffic stop.  That's

7      essentially what a criminal interdiction officer is, is

8      someone that just pays closer attention to the traffic

9      stop that he has made.

10                     There is no certain thing you're looking

11     for in criminal interdiction.  In my experience, I have

12     gotten U-Haul vans that are full of tires and wheels

13     that were just stolen from a brand new car lot where

14     they have left the cars on jacks, right, so that's a

15     criminal interdiction stop.  You know, even though it's

16     not drugs, I have stopped a theft organization, that's

17     criminal interdiction.

18                     I've gotten members of an organized

19     retail theft ring that travel Houston, Dallas,

20     San Antonio doing nothing but ripping off Dillard's and

21     Foley's, you know.  I've gotten just car loads and van

22     loads of brand new merchandise that still has the theft

23     detection tags, that's criminal interdiction.

24        Q.    Okay.  So when an officer works in criminal

25     interdiction capacity, what does success look like?

Page 46

```
 1        A.    Success in criminal interdiction?  I guess I
 2    don't understand what that question is.  I mean, what
 3    do you mean, success in criminal interdiction?
 4    Obviously, those examples I just gave you are
 5    successful, right?
 6              I managed to infiltrate a criminal
 7    organization through the weakest link of a crime.  The
 8    weakest link of a crime is the transportation phase.
 9    So everyone has to move around, everyone has to go from
10    point A to point B and criminals must use cars.
11              So criminal interdiction, in a successful
12    criminal interdiction stop, is where a very
13    detail-oriented officer detects that that crime exists
14    instead of just writing a ticket and letting that
15    person go.
16        Q.    That's helpful.
17              I guess relatedly, you've talked about a
18    lot of things that you've done in investigating the
19    crimes of narcotics.  You've been an undercover agent.
20    Is that the right word?
21        A.    Operative, whatever you want to say.  I've
22    been an undercover guy, how about that.
23        Q.    You've been an undercover guy?
24        A.    Yeah.
25        Q.    You've talked about robust investigations that
```

Page 47

```
1      you've led.  Is that also fair?
2          A.   Sure.
3          Q.   What are the tactics, for lack of a better
4      word, that lead to the most success in stopping
5      criminal enterprises who are at large?
6          A.   In my experience?
7          Q.   Yes, sir.
8          A.   As a criminal interdiction officer, not as an
9      investigator?  I mean, which one do you want?
10         Q.   Either is fine.
11         A.   You just want --
12         Q.   I mean, or just -- like what are these tactics
13     to stop folks who are doing things like drug smuggling,
14     what are the -- what are the tactics that you typically
15     use to do that?
16         A.   Okay, so --
17         Q.   Assuming that, you know, traffic stops is one,
18     right?
19         A.   I see what you -- okay, let me -- I guess, let
20     me -- can I just talk about the drug industry as a
21     whole, how it operates and then how law enforcement
22     reacts to the --
23         Q.   Sure, if you can keep it relatively short
24     because we don't need to, you know, learn the entirety
25     of how the drug -- I mean, I'm sure it's complicated
```

Page 48

```
 1    how drugs --
 2         A.    It's pretty simple.
 3         Q.    -- are smuggled.  Okay, go ahead.
 4         A.    Mexican cartels that import large quantities
 5    of drugs into the United States have to get it from
 6    Mexico to the United States.  They use people within
 7    their organization to recruit smugglers, people to
 8    drive the car.  These people are recruited at bars,
 9    places that they are down on their luck and they are
10    drinking and they need money.  They say, "You can make
11    a quick $5,000, just drive a car."  That's how they
12    recruit the drivers.  The drivers are considered to be
13    mules.
14              Okay.  The mule then says, "Yeah, I need
15    the money," they go to the Valley, typically from other
16    areas, or it could be from anywhere in the United
17    States, they get to the Mexican border, they are told
18    to pick up a car at -- most of the time at a public
19    place, H-E-B, Walmart, "This is the license plate
20    number, the color of the car."
21              The driver gets there, they get in the
22    car and they drive it north.  They say, "Go to Dallas,
23    go to this hotel, leave the keys in the car and go to
24    this room."  That's a mule.  The mule knows nothing
25    about what's going on, other than he's driving that
```

Page 49

1    car, and he knows that it's probably something illegal.

2                    Those guys are typically stopped a lot on

3    traffic stops, okay, committing a traffic violation for

4    something.  A lot of it was window tint, right.  Law

5    enforcement did not -- they didn't enforce window tint

6    in a certain area, so they have cars that have

7    compartments smuggling drugs and the car has window

8    tint.  So officers somewhere else stop cars all day

9    long for window tint and they get stopped, but they

10   only get a ticket, they don't get searched.  That's

11   because that officer doesn't look for anything other

12   than a ticket.  That cars makes it to the destination,

13   they drop the car off, they may or may not take the

14   money back to Mexico.

15                   That's how smuggling occurs, right.  You

16   know, you have somebody in charge, you have somebody

17   recruiting people, you have a driver and then you have

18   people on the other end who are taking the drugs and

19   distributing them somewhere else.

20        Q.   Okay.  So based on that summary, from your

21   experience, most of the drugs that come into the

22   country come from cars; is that correct?

23        A.   Well, no.

24        Q.   Okay.  Then --

25        A.   I mean, there's every form of transportation.

Page 50

```
 1          Q.    Okay.
 2          A.    Boats, trains, cars, on people.  Yeah,
 3     there's -- it comes in every form or fashion, but, yes
 4     cars are utilized heavily in the drug trafficking
 5     industry.
 6          Q.    Okay.  So every -- but every form of
 7     transportation?
 8          A.    Yes.
 9          Q.    And is it fair to say that drugs go from south
10     to north, then, generally?
11          A.    No.  I mean, related to Mexican drug
12     smuggling, yes.  But this whole new world of marijuana
13     being legalized in different states and growing
14     marijuana in Colorado and in California, it's reversed.
15          Q.    Okay.
16          A.    I mean, so you will have reversed.  It's not,
17     you know, carte blanche, this is the way drugs go.
18          Q.    Okay.  And so we were talking a little bit
19     about tactics.  If that's how it works, what are the
20     most effective ways to stop drug smuggling?
21          A.    In the transportation phase.
22          Q.    And tell me a little bit more about what you
23     mean there.
24          A.    Criminal interdiction.
25          Q.    So -- and when you say criminal interdiction
```

Page 51

1    in the transportation phase, are you referring to just
2    traffic stops?
3        A.    Any form of transportation.  Traffic stops,
4    trains, buses, airplane interdiction, hotel/motel
5    interdiction, package/parcel interdiction.  There's
6    many, many ways to intercept it, but they are all the
7    transportation phase, which is why I said it's the
8    weakest link --
9        Q.    Understood.
10        A.    -- in criminal activity.
11        Q.    Okay.  So in conducting criminal interdiction
12    in the transportation phase, how do -- is the only way
13    to investigate a method of transportation to stop
14    someone on an airplane violation or a boat violation
15    and then search their mode of transportation, or are
16    there other tools in the toolkit?
17        A.    You mean for -- as a whole?
18        Q.    Yes, sir.
19        A.    There is obviously undercover work, right,
20    where I'm the undercover guy, I'm acting as I'm either
21    a buyer or a seller of a typical drug.  In that
22    instance, you're trying to really climb the ladder, per
23    se.  The goal of law enforcement is not necessarily to
24    arrest one person who has, you know, an ounce of weed
25    on them or, you know, an eight ball of cocaine on them.

Page 52

1    That's not the goal, right.

2              The goal is to target the people who are

3    infiltrating it into the country, right, that's the

4    goal.  The way you get to them is climb the ladder.  So

5    if you picture a ladder, it's like -- the drug business

6    is just like any business.  You have a CEO and you have

7    everyone below, and the only way you get to the CEO is

8    you have to do investigations and you have to work your

9    way up that ladder through the people within that

10   organization to get to the big people.

11       Q.    Got it.

12       A.    That is your goal.  You do that through

13   undercover work, hand-to-hand buys, surveillance,

14   interdiction on traffic stops, Title 3 wire intercepts.

15   All of these things all work together to be able to get

16   to the higher level people or a whole cell of people

17   operating, not just the one guy with an eight ball.

18       Q.    Got it.  That's helpful.

19              Okay.  I don't know -- and you can tell

20   me if this question doesn't make sense because I know

21   you only worked as the commander for the criminal

22   investigations unit for a year or so.  But when you

23   were the commander, did you oversee the narcotics unit?

24       A.    I did.

25       Q.    And how many officers were in the narcotics

Page 53

1    unit?

2         A.    There was an interdiction group that had two

3    interdiction guys in it.  There was an investigative

4    group that had -- I think they were up to eight or ten,

5    I believe.  As the commander, I had a lieutenant that

6    was over a sergeant, actually two sergeants, so I had

7    a -- I had a lieutenant and two sergeants that

8    supervised those groups.

9         Q.    Okay.  And so what were the narcotics officers

10   doing on a daily basis?

11        A.    Everything I just told you.

12        Q.    So that means undercover work --

13        A.    Surveillance.

14        Q.    Surveillance?

15        A.    Informants, developing informants to be able

16   to gain the information within the organizations.  It

17   all works together, right?

18        Q.    Sure.

19        A.    It's all -- everyone has to do their job to go

20   after the entire network.

21        Q.    And were the narcotics officers that you

22   supervised, were they doing generic traffic stops, were

23   they out on the side of the road all day pulling people

24   over?

25        A.    Yes.

Page 54

1      Q.    Okay.  In addition to the other things that

2  they were doing?

3      A.    Yes, that particular group did, yes.

4      Q.    Okay.  And the criminal interdiction unit that

5  you oversaw, what did they do?

6      A.    They were stopping people all day long,

7  interdiction stops.

8      Q.    So they didn't do anything, really, other

9  than --

10      A.    Exclusive -- exclusive traffic stops.

11      Q.    Okay.  When you were supervising the criminal

12  interdiction unit, how did you evaluate the success of

13  the criminal interdiction unit?  I guess one of the

14  things that I'm thinking about here, just to be like

15  transparent, did you evaluate the number of traffic

16  stops to what they found?

17      A.    You can't do that.

18      Q.    Okay.  Tell me more.

19      A.    An officer -- you know, a police officer is

20  much like someone else -- I mean, it's much like being

21  an attorney, right?  So, you know, a police officer

22  goes to the academy, you learn the basic thing and you

23  go to work.  You figure out something specialized that

24  you like to do.  In this case, it's maybe criminal

25  interdiction.  There's this learning phase, right?

Page 55

1    Like I said, just like an attorney, I mean, you go to

2    law school, you come out, I mean, you don't learn until

3    you get in here, what you're doing, you know, or get

4    into court and try.  Not you, but attorneys as a whole,

5    right.

6              And law enforcement is the same way.  So

7    these cops get out and they learn on duty, they learn

8    on the job and so they have to learn.  So what you're

9    going to find, and this goes to your question about

10   traffic stops versus -- or searches versus the number

11   of stops.

12       Q.   Okay.

13       A.   An officer just learning interdiction is going

14   to search or ask for consent to search more cars than

15   an officer that's been doing it for a long time, and

16   the reason for that is he hasn't quite learned yet

17   everything he needs to know about the industry to be

18   able to eliminate a lot of the people who are just

19   traveling the highways and may have some stupid story

20   and it doesn't make sense to him.  Well, it may make

21   sense to somebody else, right?

22              So that officer has to learn about that

23   and that officer is going to search more cars than

24   another officer.  So those statistics that I would look

25   at would also -- I would have to look at how long they

Page 56

```
 1     have been doing it.
 2          Q.    Okay.
 3          A.    Now, if you have an officer that's been doing
 4     interdiction for years and he's searching half of the
 5     cars that he's stopping, I have a problem I need to
 6     address, right?
 7          Q.    Understood.
 8          A.    Because that's just not the right balance.
 9     If -- my experience as an officer, I searched a lot of
10     cars as well, learning this business.  But as I became
11     more experienced, I may stop 30 cars in a day and not
12     search anything, but that's because I had gained the
13     experience through things like body language, speech
14     patterns, you know, interview techniques and I
15     developed a roadside interview that I could talk to
16     people and determine basically within two minutes
17     whether I wanted to ask for consent to search or not.
18          Q.    Understood.
19          A.    So I hope that answers your question about --
20          Q.    It does.  It's helpful.  So I guess one of the
21     questions I have for you is, I guess, within the first
22     year of someone doing criminal interdiction, what is
23     the right balance of stops to search?  What would --
24     what would be abnormal for you, as the supervisor,
25     looking at how many stops and searches an officer was
```

Page 57

1    doing?

2         A.   When they searched everything, every car they

3    stopped.

4         Q.   Okay.  And then, I guess, more an intermediate

5    person who has had a couple of years doing it, what

6    would be the right balance?

7         A.   Half of the cars that they stop.

8         Q.   And then someone who is senior, what would you

9    expect there?

10        A.   I would expect them to be searching very few

11   cars that they stop.

12        Q.   Okay.

13             MR. BARRON:  We have been going for an

14   hour.  Do you want to take just a five-minute break so

15   I can use the restroom?

16             MS. HEBERT:  Yes, we can do that.

17             (Recess from 10:10 a.m. to 10:24 a.m.)

18        Q.   (BY MS. HEBERT)  A couple of questions to kind

19   of follow up.  You talked about mules.  What -- what is

20   a mule?  Can you make that explicit for me?

21        A.   Sure.  It's a term that's been given to

22   someone -- a courier, someone driving the vehicle.  You

23   know, they have no -- typically, they have no

24   investment in the drugs and -- or where they are going.

25   They are basically being paid to transport it.

Page 58

1        Q.    And you've had a lot of experience doing

2    criminal interdiction stuff.  What is the profile of a

3    mule?  What does -- what does the average mule look

4    like?

5        A.    The average mule is anybody that's breathing.

6                    THE REPORTER:  Breathing, you said,

7    right?

8                    MR. BARRON:  You might have to elaborate

9    on that.

10       Q.    (BY MS. HEBERT)  So you might have to explain

11    that a little bit.

12       A.    There is no profile of a mule.  It's anybody

13    that can drive a vehicle.

14       Q.    Okay.  And we have talked a lot about drug

15    smuggling.  Can you tell me a little bit about human

16    smuggling and how that works?

17       A.    Human smuggling is not something that was

18    really big back in the day.  That's something that's

19    really transpired more over the last, you know, I'd say

20    six, eight, ten years.  But it's no different than drug

21    smuggling, right, it's just they are smuggling people

22    instead of drugs.  Everything fits the same.

23                    The cartels in Mexico have learned that

24    smuggling people is very lucrative, so they will

25    smuggle people instead of drugs and/or drugs.  You

1    know, I would, over the years, encounter human

2    smuggling and you typically knew it because you would

3    stop the car and as soon as you walked up to the car --

4    like on Interstate 10 one day, I was working in Fayette

5    County, and I stopped the vehicle, it was an SUV, I

6    believe it was a Ford Explorer, dark tinted windows,

7    right, and they pulled over for the violation of dark

8    tinted windows.

9              I was -- as soon as I walked up to the

10   back of the vehicle, their foot stayed on the brake,

11   which police officers always pay attention to, and once

12   I got close enough, they took off.  So, of course, I go

13   back to the Tahoe, I get in, you know, it's a very

14   short -- not even a pursuit.  They just wanted to gain

15   some space, they ditched the vehicle, just drove over a

16   cliff, basically, hit some trees and they were -- oh,

17   man, if you watched the video on that, it was awesome.

18   They just kept coming out of the truck, you know, there

19   was like 13, 15 of them.  So that's a case of human

20   smuggling, you know, to where they are smuggling

21   people.

22        Q.   Okay.  So am I correct to understand that --

23   you said Mexican -- the Mexican nationals or the

24   Mexican cartel, that's the word you used, are they

25   smuggling -- is human smuggling going from south to

```
                                                    Page 60

 1    north, then?

 2         A.    Yes, that is -- that is pretty much most of

 3    the time.  You're not going to -- unless you're in

 4    Canada, right, but we're not going to see that this far

 5    down, typically.  But it's potentially -- I mean, it

 6    happens in Canada and they come south, right?

 7         Q.    Sure.

 8         A.    Any international border, your smuggling is

 9    going to be coming into the United States.

10         Q.    Got it.  And one thing that I think we didn't

11    quite finish before we took the restroom break was

12    talking about maybe your role in supervising the

13    criminal interdiction unit and I want to kind of go

14    back to that.

15              What would you say is the -- the year

16    mark for a beginner in criminal interdiction?  Zero to

17    one year, zero to two years, like at what point would

18    you consider someone a beginner?

19         A.    Once you're certified through the state as

20    being a peace officer, you're hired at the department

21    through the FTO process, your training process, all of

22    that.

23         Q.    FTO means?

24         A.    Oh, field training officer.  It's different

25    terminologies.  But -- so every agency should have some
```

Page 61

1    form of training program, you know, in addition to the
2    police academy.
3        Q.    Sure.
4        A.    You know, you're with an officer -- typically
5    that program is for four months, right.  You're with
6    another officer, riding with them, just exclusively
7    watching what they do.  And then, you know, the next
8    month you're allowed to do some of the activities, the
9    next month you're doing more of the activities than the
10   last month.  It's a ghost phase.  You're doing
11   everything and only being observed by that -- that
12   field training officer.  Once you pass that and you --
13   you can go on your own, but you're still under
14   probation as an officer, typically up to a year, before
15   you're really cut loose.
16            So an interdiction guy with interest,
17   he's still learning how to be a cop, so he hasn't
18   really understood, you know, there's more to being a
19   cop and more to traffic stops.  So I would say, you
20   know, three years, a five-year officer is really at
21   that point to where they start understanding more about
22   it, you know.
23            But, then again, it could be an officer
24   that, you know, he had knowledge of it before he went
25   to the police academy and that's all he ever wanted to

Page 62

 1    do was be an interdiction officer, so he went to the

 2    policy academy for that purpose, so as soon as he gets

 3    out of training.

 4                    It's hard to answer that question.  You

 5    know, it's just such an array of personalities and the

 6    way officers are.

 7        Q.    Understood.  But putting that exceptional

 8    individual who just like knew from birth that they

 9    wanted to be a criminal interdiction officer, would you

10    say a beginner criminal interdiction -- a beginner in

11    the criminal interdiction world is the zero to five

12    mark; is that fair, based on your summary?

13        A.    Probably, yes.

14        Q.    Okay.  And then an intermediate -- someone who

15    is going to practice intermediate criminal

16    interdiction, five to approximately what years?

17        A.    Well, it depends.  A person that is successful

18    at interdiction is someone that gets it, where they are

19    dedicated to training, I mean, so much that they go to

20    training on their own without the department even

21    sponsoring them.  They are looking, seeking, like a

22    sponge, this information.  That person makes a very

23    good interdiction officer.

24                    Typically, once they start getting loads

25    of drugs or people or merchandise, or whatever it is,

Page 63

```
 1    it kind of becomes this -- that's their addiction,
 2    basically, to where they love it and they don't want to
 3    do anything else.  They don't want to go take reports
 4    for, you know, little Johnny's bicycle was stolen or,
 5    you know, mom and dad are having an argument.
 6              So they want to do criminal interdiction,
 7    so some of them last a long time.  I mean, them want to
 8    do it forever.  I have seen guys that, actually, if
 9    they were not doing criminal interdiction, they would
10    retire because that's what they love to do, and that's
11    for years.
12              I mean, if you look at my history, I
13    mean, I spent more than 20 years in drugs, working drug
14    crimes because I love it, right.
15    Q.    And why do you love it?
16    A.    It's -- I have always been raised with morals
17    and I just don't like people to take advantage of other
18    people, and drugs do that.  Drugs take lives and drugs
19    harm kids and when kids get drugs, it hurts them and it
20    hurts families.  So I take it very personally.
21              And, in fact, my grown grandchildren
22    have -- have run into this problem here recently, which
23    even supports my -- my mission and supports what I've
24    done even more.  You know, I've had three of my
25    grandkids in California, here within the last two
```

Page 64

```
 1    years, found a bag of gummies, all under the age of

 2    five, and they all went unconscious and went to the

 3    emergency room.

 4        Q.   That's good to know.

 5        A.   So, you know, it's personal to me and the fact

 6    that my whole career has been to save children from

 7    drugs.  That's my passion for drug enforcement.

 8        Q.   So I guess one of the questions I have for you

 9    is how do you not get discouraged?  There's a lot of --

10        A.   You know what, it's --

11        Q.   There's a lot -- just let me finish that one.

12        A.   Of course.

13        Q.   There's a lot of drugs out there in the world,

14    and would it be fair to say that there are stretches

15    where you don't stop smuggling, drug smuggling or even

16    human smuggling, so how do you stay positive?

17        A.   You're asking me what I think?

18        Q.   Yeah, and in general for the criminal

19    interdiction industry.

20        A.   Every officer -- that's what makes a good

21    interdiction officer, what we're talking about here.  A

22    good interdiction officer is one that is at his best

23    when nothing is happening, you know, it's persistence,

24    you know.  This guy -- because the majority of the

25    time, you're not getting anything, you're not seizing
```

Page 65

1    drugs, you're not seeing anything, you're not finding

2    anything.

3              And if you're a person that's not easily

4    discouraged, you're a good interdiction guy.  If -- if

5    you are discouraged or you become bored and it becomes

6    monotonous and it's just not doing it for me anymore, I

7    can't find it, then you don't make a good interdiction

8    officer.  And you will see that those guys will move to

9    something else without staying with interdiction.

10        Q.   I want to talk a little bit about reporting.

11   You've been in various capacities as a police officer.

12   Would you agree that reports generally are more

13   accurate if they are written the same day as an event,

14   generally?

15        A.   Yes.  And I would even go further to say that,

16   you know, with video cameras, they've become even more

17   important to help officers because --

18        Q.   The video -- sorry, just to clarify, the video

19   cameras have become more important or the reports have

20   become more important?

21        A.   Well, the video cameras and what's recorded

22   from the video helps the officer with his report

23   because an officer doesn't remember everything that

24   happens.  I mean, there's things that happen

25   subconsciously, kind of like the hypnosis, that, you

1    know, we all pick up on.  You know, we just don't know

2    that it's there.  It's not important right now, but

3    once you watch your videotape and you're writing your

4    report, then you go back and you say, "Oh, that's why

5    that guy that did that, you know, that's why this

6    happened, that's why that happened."  And then it goes

7    into the report because it's important.  So they play a

8    role with another.

9         Q.    Understood.  So would you -- as a supervisor,

10    would you expect your officers to, if possible, consult

11    their video, their body camera, their dash camera when

12    they are writing their report?

13        A.    In a case where a report is necessary, yes.

14        Q.    Okay.  And I guess that begs the question of

15    when is a report necessary?

16        A.    A report is necessary when someone is

17    arrested, obviously.  A report is necessary when

18    there's an investigation into something to where -- you

19    know, it's building blocks, you know, this pieces of

20    the puzzle is important for the next piece, you know.

21             And like in an undercover case or in a

22    surveillance case, let's make a surveillance example,

23    you know, I get information on someone who may be

24    committing a crime, I go out, I conduct surveillance, I

25    watch the individual.  Documentation of what's going on

Page 67

```
 1      from the very basics of everything is an important --
 2      is very important in a report.
 3          Q.   Understood.
 4          A.   Yes.
 5          Q.   So I guess if an officer wrote a report after
 6      a member of the public complained, would you have
 7      questions about that report?
 8          A.   Okay.  So help me understand, please.  I
 9      don't -- I guess I don't understand --
10          Q.   This is great because sometimes I ask bad
11      questions.
12          A.   Well, I mean, so the question, as I understand
13      it, is that would I have concerns about the report
14      being written after a complaint is filed.  Okay, so
15      what -- there's different situations -- I mean, there's
16      different situations for that.  Do we want to use this
17      case as an example?
18          Q.   I mean, you can if you want to.
19          A.   Okay.
20          Q.   But you don't have to if there are other
21      examples you prefer to use.
22          A.   Well, with this particular investigation that
23      I've reviewed, it appears that Deputy Babb made a
24      traffic stop as part of an interdiction stop, he
25      searched the vehicle and he let the person go without
```

Page 68

1    any charges.  In a nutshell, that's what this is about.

2                I would not expect a report to be written

3    by anybody on a case or an example of that nature

4    because the existence of a CAD system, which is a

5    computer-aided dispatch system, right, there's call

6    modes, there's notes that an officer can type in that

7    may be relevant to something.  I've damaged a person's

8    car, right, you know, whatever it is.  You can put

9    those in CAD notes without writing a report.  So, no, I

10   would not expect a report to be written in that case.

11               Now, if a person were to complain, file a

12   lawsuit, as in this case, the supervisors are going to

13   tell that officer, "Hey, you need to write a report,

14   right, we've got litigation coming, you need to write a

15   report."

16               The problem and the concerns, as you

17   asked that I would have with that, is the memory that

18   the officer had, how long ago was this, because the

19   officer, I would think, in my mind, in a situation like

20   this, would be thinking, "Man, I don't remember

21   anything about that stuff, right, I don't really know

22   what to put in that report because I don't even

23   remember this guy.  I make 30 stops a day.  You know, I

24   may remember it because the guy -- you know, I damaged

25   his vehicle or something, but, you know, I don't really

Page 69

```
 1      remember everything that happened."

 2               So no, I mean, it wouldn't be unusual.

 3          Q.   Okay.  I guess one of the questions I have for

 4      you on reporting, are you familiar with the term

 5      "subsequent to prior knowledge"?

 6          A.   No.

 7          Q.   And --

 8          A.   Only from reading the deposition.

 9          Q.   Okay.

10          A.   Let me correct that.

11          Q.   So before reading the deposition, had you ever

12      heard of that as a phrase to use in reports?

13          A.   No.

14          Q.   In your experience, what were the most common

15      types of contraband smuggled in a car?

16          A.   Marijuana, cocaine, methamphetamine, heroin,

17      ecstasy, Valium, people and then the other things I

18      spoke about before, property -- you know, property

19      crime.

20          Q.   Okay.

21          A.   And then, of course, that's not even talking

22      about wanted people that are fleeing the country or

23      they have warrants and they exhibit a lot of same

24      things.  So that's another thing that could be in the

25      car.  It's contraband, you know, they are just wanted.
```

Page 70

1      Q.   Got it.  I don't know what Valium is.  What is

2    Valium?

3      A.   Diazepam is the real name.  It's for like if

4    you have a seizure, you know, it's just a sedative.  It

5    calms -- it's a downer.

6      Q.   Okay.  What is -- these others, I kind of know

7    what they look like.  What does Valium look like?

8      A.   It's pill form.  It's like prescription pill

9    abuse.  But like in my experience, you know, I had a

10   traffic stop one day that had eight pounds of it, you

11   know, it was like 20,000 pills coming from Mexico.

12     Q.   So if someone has like a giant wrapped thing

13   of pills or a giant -- you know, several boxes of all

14   of these pills, you're going to ask questions.  Is that

15   fair?

16     A.   Absolutely.

17     Q.   And Valium, X, those would be just things that

18   that are in pill form?

19     A.   Yes.

20     Q.   Okay.  For other things, I guess like

21   marijuana, how would you tell if something is

22   marijuana?

23     A.   How would you tell what?

24     Q.   How would you tell if something is marijuana?

25     A.   If it's marijuana, marijuana has a distinct

Page 71

```
 1    odor, you can smell it.  It has a distinct appearance

 2    to it, right, green, you know, it -- the old Mexican

 3    marijuana was green and leafy, had a lot of seeds,

 4    compacted into bricks with the odor of marijuana.  And

 5    then you could take a field test kit and then you could

 6    put it in a field test kit, see if it has a reaction.

 7                However, that didn't typically occur.

 8    Very rarely does an officer field test marijuana.  And

 9    there's various reasons for that, but --

10         Q.   I mean, I probably am illustrating how much of

11    a square I am right now, so just like I am a square.

12    But how do you -- what are the -- why don't you field

13    test marijuana?

14         A.   Today?

15         Q.   Yeah.

16         A.   No one is prosecuting for it, right.  It's --

17    and there's such confliction in the law, right, you

18    know, now you have legalized and then you have

19    municipalities that are trying to legalize it against

20    state law, you know.

21                So officers -- even though it's still

22    illegal in Texas, you know, typically it's not

23    prosecuted, so officers are not going to field test

24    marijuana.  Field test kits are expensive, believe it

25    or not, and they are not going to just, you know, waste
```

Page 72

1    revenue on field test kits for something that's not

2    going to get prosecuted, in a nutshell.

3         Q.    So let's assume an officer thinks he found

4    marijuana.  What does he do?

5         A.    Depends on the amount.

6         Q.    Okay.  Tell me more.

7         A.    Let's say in order to be prosecuted for

8    marijuana, it must be a usable amount, okay.  A usable

9    amount is something that you can actually take and put

10   it in a bong, light it with a lighter and inhale it or

11   in a joint and smoke it, and it needs a weight.  It

12   need to be able to be weighed, right.  If there's no

13   weight, then it's typically not a usable amount, so

14   therefore you cannot be prosecuted for it, so therefore

15   you won't field test it.

16              And there's a term called shake, okay.

17   Shake is what -- jargon.  You know what jargon is,

18   police jargon?  Typically they call it shake.  It's

19   where a person may be rolling a joint in the front seat

20   of a car and some spills on the floorboard or

21   something, and it's just little particles of green,

22   leafy substance that appears to be marijuana, may smell

23   like -- the car may reek of marijuana, you know, a

24   reasonable officer can believe that what he's seeing in

25   the floorboard is shake or marijuana, but it's not

Page 73

1    prosecutable because there's not enough there, it's not

2    usable.  So an officer is not going to field test that.

3        Q.   Okay.  And I guess there -- I cleaned my car

4    because my colleagues were driving in it because I had

5    a lot of -- my kids have been in the car over the

6    holiday break, so it was a wreck.  So it's clean right

7    now, but normally there's a lot of stuff on the

8    floorboards, Goldfish, whatever dirt the kids have been

9    rolling in, they are little.  How do you know what's --

10   what's dirt and what's schmutz, for lack of a better

11   descriptor, versus like shake?

12       A.   Shake is -- I mean, an experienced officer

13   that's seen a lot of marijuana, you know, maybe they

14   have been on search warrants in houses, you know, where

15   they have a tray, you know, where they are rolling

16   marijuana and, you know, an officer sees this over and

17   over and over again.  So there's a certain appearance

18   to what they call shake, just little green particles

19   that, I mean, you just become familiar with.

20            So on interdiction stops, in my history,

21   I ran across it all the time.  You know, it would be

22   beside the -- the seat, you know, falling off of the

23   console, in the floorboard or, in some cases, I found

24   it in empty compartments in vehicles where it had been

25   smuggled before and then there's, you know, shake

Page 74

```
 1    residue in there where you can see the little green
 2    particles.
 3                    And so a totality of everything that
 4    you've got going on, you know, you determine that it's
 5    marijuana shake, right.  But nobody is going to
 6    prosecute for it.  You're not even going to arrest for
 7    it.
 8         Q.   So I guess when you say the totality of
 9    everything that's going on, there have to be other
10    factors that also help you conclude that this is
11    probably shake?
12         A.   Yes.
13         Q.   One of the things you said was the car smells
14    like marijuana?
15         A.   Uh-huh.
16         Q.   What other factors might prompt you to
17    conclude that the green, leafy substance you are seeing
18    on the floor is shake?
19         A.   Maybe a criminal history for marijuana, you
20    know, you ran his criminal history and he's got a
21    history for it.  Physically, he may have burnt lips.
22    Common times, people that smoke weed, they burn their
23    lips on the pipes or whatever.  That's one.  Bloodshot
24    eyes, you know, your speech is different, you know,
25    you're like high.  You know, you can tell, you know,
```

Page 75

1      "Dude," you know.  I mean, you can typically tell when
2      someone is a pothead.
3                   You know, I have nothing against
4      marijuana other than it's illegal and I don't use it, I
5      don't believe in it.  But, you know what, people are
6      people and they use it.
7           Q.   Yeah.  So I guess, you know, in the
8      circumstances for me and and you're seeing my car full
9      of Goldfish, would you be prompted to conclude that
10     green, leafy or like what looks like little specs of
11     green on the floor is marijuana?
12          A.   That's kind of subjective for me in a way
13     because I'm not on the -- like a traffic stop with you
14     to be able to see, you know, how you're behaving,
15     what's going on, where you're coming from, where you're
16     going, you know, did you just come from the bar, you
17     know, or maybe the head shop.  So it's hard for me to
18     speculate on that, sorry.
19          Q.   No, that's fine.  I don't want you to
20     speculate.  What I'm asking is just based on your
21     knowledge.
22          A.   I would need all of those other things to be
23     able to really start to gauge whether or not I would
24     think that was marijuana or not.
25          Q.   So context matters?

Page 76

1        A.    Context matters.

2        Q.    And how do you know if green particles are

3    something like -- something from the grocery store

4    that's green, basil or spinach, or whatever else I've

5    been schlepping around?

6        A.    Well, again, everything goes back to the

7    circumstances at hand, right?  I mean, it's just hard

8    to answer that question without, you know, a scenario

9    on what's going on with the situation.  I couldn't -- I

10    couldn't, you know, elaborate or I couldn't speculate

11    on that.

12        Q.    No, that's fine.  Thank you.

13        A.    Yeah.

14        Q.    What are front seat interrogations?

15        A.    Interrogation is really not a good word for

16    it.  You know, people tend to get away from

17    interrogations.  It's a little rough around the edges,

18    right.  So front seat interviews, if I might comment

19    on, is where an officer places someone in the front

20    seat of their car while they conduct their business.

21        Q.    Okay.  And just to put a pin in that, what is

22    the difference between an interview and an

23    interrogation?  You focused on interview and I guess

24    I'm not clear on the difference, so help me understand.

25        A.    There isn't.  You know, some people use the

Page 77

```
 1     word "interrogation."  You know, officers try to get
 2     around that and, you know, it's an interview.  I mean,
 3     hardly anyone today, we don't call it an interrogation.
 4     You know, everything that we know it as is an
 5     interview, I'm interviewing someone, I'm talking with
 6     them, right, obtaining information.
 7         Q.   Okay.  So someone comes down -- you ask
 8     someone to come down to the police station or you
 9     arrest someone and you bring them into -- I don't know
10     what they call it -- the room, a conference room?
11         A.   Yeah, an interview room.
12         Q.   And that would be an interview as well?
13         A.   Yes.
14         Q.   Okay.  What is your position on front seat
15     interrogations?
16         A.   I'm not a fan of them, but that's a personal
17     preference.  An officer, any police officer, they
18     develop a skill set and they take little pieces of
19     training from one place or another place -- and I tell
20     people in the classes that I teach, "You need to do
21     that, you need to listen to what everybody has to say,
22     you need to take the good things that will benefit you
23     and apply it to what you're doing."  And that seems to
24     be the thing today, that seems to be what people are
25     doing.  They are doing these front seat interviews.
```

```
                                                        Page 78

 1                Now, you're asking me what I believe
 2       about them.  I've had an experience with one of my
 3       interdiction officers who was very, very adamant about
 4       doing front seat interviews, which I typically did not,
 5       you know, believe was the greatest way to do the
 6       interviews.  However, it's not illegal, it's not
 7       against policy.
 8                So in his case, what I told him was you
 9       can do front seat interviews, but only after your
10       safety is ensured.  So they must be patted down for
11       weapons and you need a backup officer there if they are
12       going to be sitting in your front seat.  So that was my
13       expectation for our interdiction.
14                But as far as saying that you can't do
15       them, you know, there's nothing illegal about it.  It's
16       just not my preference.
17       Q.   Okay.  And when you say -- you said something
18       like "it seems to be the thing."  Can you unpack that a
19       little bit more for me?
20       A.   Law enforcement training evolves.  As
21       officers, like myself, who did interdiction full time,
22       every day, as I promote through the ranks, new officers
23       begin criminal interdiction, they will go to outside
24       training from somewhere else, they will see some
25       instructor doing front seat interviews so they will
```

Page 79

1    decide, "Hey, I like that, I want to make that part of

2    my every day work," and then they will come back and

3    incorporate that into their -- their interview process.

4        Q.   Unless -- unless the agency says, "No, we're

5    not doing them."  Is that fair?

6        A.   That's correct.

7        Q.   And you talked a little bit about officer

8    safety concerns.  Are there -- what else -- is there

9    anything else that prompts you to feel that they are

10   not the greatest -- I think you said you felt that they

11   are not the greatest.  Any other concerns with front

12   seat interviews, front seat interrogations?

13       A.   Well, I mean, is this from my perspective, my

14   training, my experience and the skill set that I have

15   or is it --

16       Q.   Yes, sir.

17       A.   -- or is it from the skill set and the

18   expectations that an officer at his level is trying to

19   figure out things?  You know, I mean, there's a

20   difference, right.

21       Q.   I want to -- I want to hear your opinion first

22   and we can talk about this stuff later.

23       A.   Okay.  So I've had a lot of training and I

24   utilize body language, speech patterns, kinesics,

25   basically.  I use a lot of that in the interview that I

Page 80

1    have structured that works for me.  That happens

2    outside of the car on traffic stops.  So is --

3        Q.    When you do them?

4        A.    When I do them.  I'm comfortable outside the

5    car.  I want to be able to see everything about this

6    guy or girl.  I want to see their hands, I want to see

7    how they react to the questions that I ask them.

8        A.    I want to see the responses, I want to see

9    their -- you know, their lips, their eyes, their --

10   everything about them and then during my interview,

11   then I stress them and de-stress them according to what

12   I hear, the responses that I get from them during my

13   interview.

14              Now, it's very focused work, right, you

15   really have to focus and you have to be a person that

16   pays attention to everything while you're thinking

17   about the question you're going to ask after the answer

18   they just gave you.  So all of that you have to focus

19   on.

20              So for me, if that person is in the front

21   seat of a vehicle and there's a computer, there's a

22   radio, there's all of these distractions inside that

23   car, that interview may not give you everything.

24   You're going to miss some things when it comes to body

25   language and speech patterns.  Now, you're going to be

Page 81

1    able to see some and you're going to be able to

2    determine something is going on, but it's not to the

3    level that I expect from my training, my experience and

4    the way that I like to do it.

5              These youngsters that are out here

6    learning this stuff now, they like it, they believe in

7    it and it's just not my preference.

8    Q.    Would it be fair to say that with more

9    distractions in the patrol vehicle, there might be a

10   greater degree of error?

11   A.    Well, I mean, there's no error, per se.  You

12   know, you're an officer who knows nothing about what's

13   going on, other than you stopped this person, they are

14   in the front seat of the car with you and you're trying

15   to determine what's going on.

16             So to say that there's some form of error

17   with the interview process, that's really not good

18   terminology for that because, I mean, the officer has

19   no idea what he's doing right now.  He's trying to

20   develop there's a reasonable suspicion, you know, he's

21   trying to see if there's anything going on.  There's

22   something he has -- he has -- caught his eye, there's

23   something that he has seen previously or to put him in

24   the front seat to begin with.  So he's either going to,

25   you know, decide something is going on and develop his

Page 82

1     reasonable suspicion or he's going to let him go.

2          Q.   Okay.  I guess I'm a little confused there,

3     and I want to understand.  Let's say that Mr. Fox is a

4     drug smuggler and he's got -- he did not like that, I

5     could see in his reaction.

6          A.   He didn't.

7          Q.   I know.  Let's say Mr. Fox is a drug smuggler

8     and he has, you know, a couple of kilos of meth in his

9     car and you stop him, you do a front seat interview

10    with Mr. Fox, and you say, "There's nothing going on

11    here," and you let Mr. Fox go, would you say that's an

12    error?

13         A.   No.  It happens all the time.

14         Q.   Okay.  So tell me more about that.

15         A.   There's a difference in drug smugglers, right,

16    just like there's a difference in law enforcement when

17    it comes to experience, right.  A mule becomes --

18         Q.   Mr. Fox is not an experienced drug smuggler,

19    but keep going.

20         A.   Okay.  All right.

21         Q.   No, that's part of the joke.

22         A.   Okay, well, let's use that example.

23         Q.   For the record.

24         A.   I like the fact that you used that, okay,

25    because he would be more susceptible to getting away

Page 83

```
1       with it because it's his first time, right, he has no
2       history, he's wearing a suit, he's dressed for the
3       part.  As long as his vehicle matches the way he's
4       dressed, odds are that officer may not even ask him for
5       consent to search the car because there's nothing
6       that -- there's no reasonable suspicion that this
7       officer is going to pick up on to lead him to even ask
8       for consent to search the car.  So he would leave and
9       he would get away.  I've had that happen.
10          Q.   Okay.
11          A.   Yeah.
12          Q.   And that wouldn't be an error?
13          A.   Well, I mean, it's not an error.  It's just
14      the officer doesn't know.  You don't know what you
15      don't know.
16          Q.   Understood.  When you said Mr. Fox's suit
17      matches his car, can you explain that to me a little
18      bit?
19          A.   Sure.
20          Q.   I just -- I don't necessarily -- I don't pay
21      attention to cars also.  So what kind of cars would
22      match Mr. Fox?
23          A.   You're going to be an experienced interdiction
24      person by the time we're done.
25               So a person matches their car -- let's go
```

Page 84

1    back to your scenario, okay, we're going to use your

2    car, your scenario.  I have my car, I've got Goldfish

3    in the car, the kids tear it up, right, well, if I were

4    to stop someone like that that's a mother that has

5    young kids, I expect that, right.

6                    If I -- if Mr. Fox was in your car, then

7    I would like -- the first thing I would think is why

8    are there car seats in this car and there's no kids in

9    the car seat and he's a male dressed in a suit, right,

10   so that's the first thing I would wonder because why

11   does the mom with the kids not have the car seat?

12                   I had -- that was one of my things on

13   interdiction.  When I stopped a car and it was a male

14   subject and there was no family and there was car

15   seats, that was the number one thing I'm looking at

16   because that's what drug smugglers do.  They use car

17   seats as a prop, just like they use other things.

18                   You know, they try to copy a vehicle to

19   make it look like something else.  Let's say -- DirecTV

20   is a good one, so a DirecTV van, they will take a van

21   and they will wrap it with the exact markings as

22   DirecTV, put ladders on it, dress the guy up with the

23   DirecTV clothing, put him in the truck and send him up

24   the highway with a load of drugs.  So that officer has

25   to determine whether that's a real DirecTV van or not.

Page 85

```
 1                 Okay.  So to answer your question about
 2      the car matching the person, your car and the way it is
 3      when I stop you on a traffic stop would match you.  But
 4      if I put Mr. Fox in that car on Interstate 35 and he's
 5      from Chicago, Illinois and he's down in Austin, Texas
 6      in a suit with a car seat full of junk in the floor, it
 7      would raise my suspicion.
 8         Q.   Got it.
 9         A.   So he would not get away with the two kilos of
10      meth.
11         Q.   And let's pretend the car matches Mr. Fox in
12      whatever way.
13         A.   Okay.
14         Q.   What if Mr. Fox was like very nervous?  I
15      mean, I let Mr. Fox drive my car last night, which I
16      was super nervous about, but he did fine, but let's
17      pretend like he's a drug smuggler and this is his first
18      time driving a vehicle and he is so nervous, right, and
19      that's the only thing you've got.  What would you do
20      with that?
21         A.   So a lot of people are nervous on traffic
22      stops.  Just the mere red and blue lights on behind
23      you, they become nervous, right.  It's the officer's
24      responsibility, particularly an interdiction guy --
25      well, really even any officer, you know, calm that
```

Page 86

1  person down, right.  It's just a Class C violation,

2  right, it's no big deal, right.  To that person, it's a

3  big deal, right, "Oh, my God, my insurance is going to

4  go up, I'm getting points on my driver's license, I'm

5  going to lose my job, I'm late for my job," you know.

6  So an officer needs to understand that.

7              So you do everything you can do to try to

8  calm them down, calm Mr. Fox down, you know, "Calm

9  down, man, it's not a big deal," right, and it's just a

10  traffic violation, right.  So the officer should try to

11  calm him down, not be so threatening.  You know how a

12  trooper -- a DPS trooper has got their hats on and they

13  are down above their brow, they're all straight and

14  they walk out there all business, you know, that's

15  intimidating.

16              So an interdiction officer who is really

17  looking to try to develop that rapport with that person

18  to find out what's really going on, if anything at all

19  is going on, they are going to be nice to that person.

20  They are not going to be that intimidating guy.  That's

21  what a good interdiction officer does.

22      Q.   Got it.  And if -- even if, you know, you're

23  super nice to Mr. Fox, he's still nervous because he's

24  young, this is, you know, his first job, he doesn't

25  want to lose it, is that normal?

1      A.   Well, again, it goes back to the situation at
2  hand, right.  It goes back to the circumstance -- I
3  mean, these are all hypotheticals and I'm enjoying, you
4  know -- I think you guys are learning a lot, actually,
5  which helps you in your position, which is very
6  important.  And, you know, it's just -- hypotheticals
7  are those things that they can just go on and on and
8  on, there's never a resolution to a hypothetical.
9      Q.   Sure.
10      A.   So I would really need just like details of
11  everything that's going on, a scenario in front of me
12  that -- you know, to really be able to answer that.
13      Q.   Understood.  So context matters?
14      A.   It has to matter, you know.
15      Q.   Got it.
16      A.   I mean, what's going on at the time.
17      Q.   That's helpful.
18          Have you heard the term -- heard the term
19  "hunting" used in the criminal interdiction context?
20      A.   Yes.
21      Q.   And what does that term mean?
22      A.   Well, it's jargon, it's cop jargon.  You know,
23  police officers are out there looking for criminals,
24  you know, they are out hunting criminals, you know.
25  It's a cat and mouse game, believe it or not, it is.

Page 88

1    Crooks don't want to get caught, cops want to catch
2    them, right, so it's like cops are out hunting for bad
3    guys.  So it's common jargon in law enforcement.
4         Q.    Okay.  Have you ever used that term, I guess
5    in your criminal interdiction work?
6         A.    Sure.  I mean, cops -- I mean, I'm sure every
7    police officer has used the words, you know, "Let's go
8    hunting, let's go find something, get into something,"
9    you know, it's just slang.
10        Q.    Got it.  I think I know the answer to this,
11   but I'm just going to ask a couple of formulaic
12   questions that you kind of have to ask.
13              Other than for this case, have you ever
14   been retained by Mr. Barron and his firm?
15        A.    No.
16        Q.    Other than for this case, have you ever worked
17   with Bexar County before?
18        A.    In what capacity?
19        Q.    Well, let's just kind of break it down.  Have
20   you ever been paid by Bexar County before?
21        A.    No.
22        Q.    Have you ever coordinated your interdiction
23   activities with Bexar County?
24        A.    I'm certain that I have, but not -- nothing
25   case specific.  You know, being involved or working

Page 89

1    with DEA and working with the state and local task

2    forces, we were always going through San Antonio,

3    working in San Antonio, going to the border, going to

4    Dallas, you know.  So odds are, you know, we have used

5    Bexar County before and/or San Antonio PD during some

6    stop.

7        Q.    Okay.  Have you -- before being involved in

8    this case, did you know defendant Joel Babb?

9        A.    No.

10       Q.    Any of the criminal interdiction officers with

11   the Bexar County Sheriff's Office?

12       A.    No, I do not know anybody involved with this

13   case on any report that I have written -- I mean,

14   written -- reviewed, any videos I reviewed, I haven't

15   recognized anybody, never personally met them that I

16   know of.

17       Q.    So you haven't met Sheriff Salazar?

18       A.    Maybe.  And the reason I say that is I was the

19   president of Texas Narcotic Officers Association, and

20   as the president of that association, we oftentimes did

21   conferences in San Antonio and we would always invite

22   the sheriff or the police chief to do opening remarks.

23   So I may or may not have met him in the past.  I don't

24   know when he was elected, I didn't look into that.  But

25   I don't remember ever meeting him.

Page 90

1      Q.    Could you pick him out of a crowd?

2      A.    No.

3      Q.    A couple more like formulaic questions.

4            Who hired you to give an opinion in this

5      case?

6      A.    Well, obviously Blair -- is it Leake or Leaky?

7            MR. BARRON:  It's Leake.

8            THE WITNESS:  Blair Leake is the one that

9      reached out to me and hired me for -- you know, to

10     represent really no one, to give an expert opinion in

11     this matter.

12           The way I view my role here is that I do

13     not work for anyone in this room.  I work for the jury,

14     who may or may not hear this case, and my job is just

15     to help them understand, just as I think I'm doing for

16     you guys, more about what's going on to formulate

17     good -- good decisions and opinions.  I have no -- no

18     dog in this hunt with anybody here.

19     Q.    (BY MS. HEBERT)  Well, thank you.

20           And when you and Mr. Leake and Mr. Barron

21     were discussing this case and thinking about whether

22     you would make a good fit, what information did they

23     give you about the case?

24     A.    I was called and asked if I would be

25     interested in this case because, you know, I'm

Page 91

1    well-known about drug enforcement in this area.  I
2    mean, being the president of the Texas Narcotic
3    Officers Association, you know, the experience level.
4                 I believe there was another expert
5    witness on a use of force case or something that I know
6    and he's the one that referred me to the office because
7    he knew that I've taught criminal interdiction.
8         Q.   Is that Albert Rodriguez?  Does that sound
9    familiar?
10        A.   No, no, no, it was Mark Sawa.
11                 THE REPORTER:  What was the last name?
12                 THE WITNESS:  Mark Sawa, I think it's
13    S-A-U-A or something.  He's retired Travis County
14    Sheriff's Office and we go way back.  He's an expert
15    witness, I guess, on use of force, and I sat in on a
16    recent trial here in Travis County where he testified.
17                 So I assume that an expert witness was
18    needed in this case, my name came up in that manner and
19    then that's how they ended up calling me.
20        Q.   (BY MS. HEBERT)  Okay.  And before you were
21    officially hired, were you asked to give a preliminary
22    review or preliminary opinion?
23        A.   No.
24        Q.   Let's take a little bit of a look at your
25    report.  I want to ask you just a couple more form

Page 92

1    questions.

2              Would you mind going to page 30 of your

3    report?

4         A.   I hope that's a good start if we're going to

5    start at 30, right?

6         Q.   I like to jump to the end.  Let's get to the

7    bottom line and go to lunch.

8              MS. HEBERT:  What time is it?

9              MR. FOX:  It's 11:00.

10             MS. HEBERT:  Great, thanks.

11        Q.   (BY MS. HEBERT)  Do you see the last paragraph

12   on page 30?

13        A.   I do.

14        Q.   So I -- you can correct me if I'm wrong, I

15   understand you're charging a flat rate of $3,700 for

16   the initial case evaluation and report; is that

17   correct?

18        A.   That's correct.

19        Q.   Okay.  But I'm also seeing that you value your

20   time at $150 an hour; is that also right?

21        A.   Yes.

22             MS. HEBERT:  So I need my calculator.  I

23   might need you to get my calculator.  It's in that box.

24        Q.   (BY MS. HEBERT)  Is $150 an hour -- if you

25   were charging an hourly rate across this case, would

Page 93

 1    you expect to be charging $150 an hour?

 2         A.    I'm not charging a flat rate -- I mean, I'm

 3    charging a flat rate.

 4         Q.    Yeah.  I guess if you were charging an hourly

 5    rate, would your hourly rate be 150?

 6         A.    For the entire investigation?

 7         Q.    Yes, sir.

 8         A.    Yeah, sure.  I mean, but I think it's only

 9    fair that I just do a flat rate because $3,700 is going

10    to be less than $150 an hour.

11         Q.    Oh, for sure.

12         A.    You know, so I don't believe that it's fair

13    to, you know, tax anyone any more than that.  You know,

14    I enjoy doing the work, I enjoy, you know, learning

15    more, you know, as we go.  And so, yeah, I don't -- I

16    think -- I don't gouge people on prices.  I just do a

17    flat rate.

18         Q.    Okay.  So how many hours have you spent on

19    this case so far?

20         A.    I would say it's really hard to tell.  I read

21    cases from -- sometimes from 6:00 at night until 3:00

22    in the morning.  Sometimes I would read cases for four

23    hours, sometimes three hours, preparation, on the

24    Internet, you know, reviewing, you know, case law,

25    things of that nature.  So it's just hard to say how

Page 94

```
 1      many hours.  It's a lot of hours, though.
 2          Q.   Okay.  So I guess one way to think about about
 3      it is how many hours did you spend putting pen to paper
 4      to write your report?
 5          A.   Many.
 6          Q.   Any estimate?  More than ten?
 7          A.   Yes.
 8          Q.   More than 24 hours?
 9          A.   I would say so.
10          Q.   Okay.
11          A.   I'm an old school guy, right.  I'm not like
12      the youngsters who use artificial intelligence or
13      transcription, right.  So I'm -- I'm, hey, let's get in
14      and let's type a report.  So, you know, it took a long
15      time to write the report, actually.  Even though I took
16      a long time, I'm really -- I'm disappointed that I have
17      some spelling errors in here.  You know, I'm critical
18      of myself, of course, but --
19          Q.   That's okay.  We all have spelling errors, I'm
20      sure.  I love spell check for that reason.
21               Okay.  So would you say you've spent, you
22      know, a week writing this report of working time?
23          A.   Sure.
24          Q.   I mean, of course you slept.
25          A.   Yeah.
```

Page 95

1      Q.   More than a week?

2      A.   Just the report itself, writing the report

3   itself?

4      Q.   Just the report itself?

5      A.   Yeah, I mean, a week is fair enough.

6      Q.   So, you know, give or take a 40-hour workweek?

7      A.   Yeah.

8      Q.   Okay.  And then I guess how -- how many hours

9   would you say that you put into reviewing materials for

10  this case, whatever they may be?

11     A.   You know, I would say that's hard to tell.  I

12  didn't keep track.  I would be speculating on how many

13  hours I actually put into it.

14     Q.   More than ten?

15     A.   Oh, yeah.

16     Q.   More than 20?

17     A.   Well, more than the time that it took to write

18  the report.

19     Q.   Okay.  So more than a 40-hour workweek?

20     A.   Sure.

21     Q.   Okay.  I want to look more at the substance of

22  your report now.

23     A.   Okay.

24     Q.   But we're going to still stay focused at the

25  end, I think.  Let's go to page 28.

Page 96

1      A.    Okay.

2      Q.    And we're looking at Exhibit No. 111, page 28

3    of 111.  I'm looking at the first sentence there and I

4    see the date, March 22nd, 2022.  Did you mean

5    March 16th, 2022, the date of the traffic stop in this

6    case?  This is not a trick question.

7      A.    Yeah.

8      Q.    I'm going to represent to you that the traffic

9    stop happened on March 16th, 2022.

10     A.    You know, I think that might be an error in my

11   part, a typographical error, because I may have been

12   reading the date of the report that Deputy Babb had

13   done and I think that may have been dated on the 22nd

14   when they asked him to do the report.  So it could have

15   been that during that timeframe, I transposed those

16   numbers.

17     Q.    So when -- but when you're writing this first

18   sentence in the header "Final Expert Opinion and

19   Conclusion," you're referring to the date of the

20   traffic stop; is that correct?

21     A.    I am.

22     Q.    Okay.  I just wanted to make clear.  And I'm

23   going to just read this first sentence here.  "After

24   review of the material provided to me and from my

25   experience and training, it was reasonable to believe

1   that Deputy Babb was practicing standard law

2   enforcement procedures on March 22nd, 2022, upon being

3   informed that -- about Schott traveling north on

4   IH-35."

5            Did I read that correctly?

6        A.   Yes.

7        Q.   And we just clarified that March 16th, 2022,

8   you meant the day of the traffic stop of Mr. Schott?

9        A.   Exactly.  My mistake.

10       Q.   It's fine.

11            What are standard law enforcement

12   procedures?

13       A.   Just standard -- you're abiding by what is set

14   out -- set forth in policy and procedure by your

15   department that allows you to go out and do your work.

16       Q.   Okay.  So the standard law enforcement

17   procedure depends on the department?

18       A.   Yes.

19       Q.   And to evaluate the standard law enforcement

20   procedure, you evaluate what the department policies

21   and procedures are?

22       A.   Correct.

23       Q.   And how do you evaluate what a department's

24   policies and procedures are?

25       A.   In relation to this case?

Page 98

1        Q.    No, just in general.

2        A.    In general?

3        Q.    Like how do you know?

4        A.    You obtain their policy and procedure, you

5    read policy.

6        Q.    When you say that, you mean like their written

7    manual?

8        A.    Written manual.  In this case, all of their

9    policies, I believe, from what I have read, is on

10   PowerDMV.

11       Q.    I'm sorry, I don't know what that is.

12       A.    PowerDMV, it's a system that law enforcement

13   agencies use -- we had it, actually, in Williamson

14   County -- where when they do either -- they want an

15   officer to know what the policy is, the officer reads

16   the policy, it is electronically documented that they

17   read the policy and then they have it for future use,

18   right.  So that's what PowerDMV is.

19              If there's any additions to the policy,

20   something has changed, then it's just an easier way

21   that everyone gets the new information, they have read

22   it, they have signed it electronically and it's

23   tracked.  That's what PowerDMV is.  So the old way of

24   doing policies by paper and a policy manual, it's --

25   you know, things get missed.

Page 99

1    Q.   Okay.  So in evaluating whether Deputy Babb

2    was practicing standard law enforcement procedures, you

3    looked to the Bexar County Sheriff's Office's written

4    policies and procedures; is that correct?

5    A.   That was provided to me, yes.

6    Q.   Okay.  Anything else?

7    A.   No, not -- not related to the Bexar County

8    Sheriff's Office.

9    Q.   Sure.  The Bexar County Sheriff's Office

10   written policy -- if Deputy Babb was complying with the

11   Bexar County Sheriff's Office's written policy, does

12   that mean that Deputy Babb's actions were

13   constitutional?

14              MR. BARRON:  Objection, form.

15              THE WITNESS:  I obviously am not Deputy

16   Babb, right?  I mean, this situation -- every situation

17   is different, you know, every situation is subjective,

18   just as the examples that we had earlier.  You know,

19   I'm not there, I don't know exactly what went on, I can

20   only, you know, evaluate this case from their policy

21   and their procedure, from his reports, from the videos

22   that I watched or the video that I watched, you know.

23   So I couldn't speculate on whether what he did was

24   constitutional or not, right, in his brain.

25   Q.   Sure.  And I guess one thing that I'm trying

Page 100

```
 1       to understand is separate and apart of what Deputy Babb
 2       may have believed in that -- in this context, if Deputy
 3       Babb was following the written policies and procedures
 4       of Bexar County Sheriff's Office, does that mean he was
 5       practicing standard law enforcement procedures?
 6            A.    Yes.
 7            Q.    I'm just trying to shortcut stuff.
 8            A.    Of course.
 9                      MR. BARRON:  We've been going for nearly
10       another hour.  Do you want a five-minute break to
11       collect your thoughts?
12                      MS. HEBERT:  No, we're okay.
13                      MR. BARRON:  Okay.
14                      MS. HEBERT:  I'm trying to keep this
15       until lunch, I think.
16            Q.    (BY MS. HEBERT)  Did everything that Deputy
17       Babb did on March 22nd, 2022 --
18                      MR. FOX:  Do you mean 16th?
19                      MS. HEBERT:  Yeah.
20                      THE WITNESS:  I've got everybody messed
21       up, I apologize.
22            Q.    (BY MS. HEBERT)  No, that's fine.
23                      Did everything that Deputy Babb did on
24       March 16th, 2022 comply with standard law enforcement
25       procedures, based on your view?
```

Page 101

1         A.     Based on my training and experience with what

2    I have observed or read in this traffic stop, this is a

3    normal traffic stop, normal interdiction stop that

4    happens across the country every day.  There's nothing

5    that sets it apart from anything else.

6         Q.     Assume for a second that Deputy Babb did turn

7    his dash camera off before the traffic stopped, is that

8    a standard law enforcement procedure?

9         A.     You know, I wasn't asked to evaluate the

10   policy and the procedure on the cameras.  I do have an

11   opinion on what could have happened, but I wasn't asked

12   to evaluate that.

13        Q.     What's your opinion?

14        A.     Having been in many, many law enforcement

15   interdiction cases, having worked them, having stopped

16   cars, officers will sometimes catch up to a vehicle

17   that is interesting to them, right.  So they may be

18   parked in the median and the vehicle passes and they

19   may see something that that vehicle is -- matches

20   common vehicles that have been seized recently across

21   the country.  So they may want to catch up to that

22   vehicle just to see if it's got license plates, you

23   know, whatever the case is.

24               And when that happens, that officer

25   starts from zero miles an hour, that car may be going

Page 102

1    75 miles an hour, so they have to go fast to catch the

2    car.  That triggers the camera system.  When the camera

3    system triggers, officers hit the off button because it

4    triggers the camera, they don't know whether they are

5    going to stop this car or not, they are just catching

6    up to the car, right.  That kind of becomes muscle

7    memory, per se, for some officers.  They will hit that

8    trigger, they will reach up, they will cut that camera

9    off because they are not going to stop the car or they

10   don't know if they are going to stop the car.

11              And in my -- I don't know, but just from

12   reading this case, I can see where that -- that happens

13   a lot with officers, right.  Whether it happened in

14   this case or not, I don't know.  But that camera will

15   not reactivate when the lights come on, so that could

16   potentially be what happened in this case.  I don't

17   know.

18   Q.    Sure.

19   A.    I would be speculating.

20   Q.    No, that's okay.

21              I want to ask you a couple questions.

22   When you wrote here that it was reasonable to believe

23   that Deputy Babb was practicing standard law

24   enforcement procedures, are you saying that it was

25   reasonable to believe that -- it was reasonable for

Page 103

1    Deputy Babb to believe that he was practicing standard

2    law enforcement procedures or are you saying that you

3    believe that Deputy Babb was practicing standard law

4    enforcement procedures, or something else?

5                    MR. BARRON:  Objection, form.

6                    THE WITNESS:  I can't -- I don't know

7    what Deputy Babb was thinking or whether he thought

8    that he was performing them according to his policy and

9    law.  I don't know.  That would be speculation.

10                   The second part of that question, whether

11   I believe he was doing it according to his policy, yes,

12   I mean, I do.

13        Q.   (BY MS. HEBERT)  Okay.  And I just -- I wasn't

14   trying to trick you.

15        A.   Yes, of course.

16        Q.   I just wasn't exactly sure what the phrasing

17   meant there.

18        A.   Sure.

19        Q.   So based on, you know -- looking at this

20   opinion -- sorry, did you --

21        A.   Sorry, I thought he almost fell.

22                   MR. FOX:  Oh, no, no, no.

23        Q.   (BY MS. HEBERT)  Looking at these conclusions,

24   I guess one of the questions I have for you is, is it

25   your opinion that everything that Deputy Babb did

Page 104

1     during the traffic stop of Mr. Schott was consistent

2     with standard law enforcement procedures as written in

3     the Bexar County Sheriff's written policies?

4          A.   Everything is a broad term.  You know, again,

5     it kind of goes to speculation again, everything that

6     he did.  You know, if you could give me some type of

7     example on what you think that -- you know, you want

8     clarification on, then I would be more than happy to

9     give you a direct answer.

10          Q.   Well, sure.  I mean, I guess the easy way to

11     start with that is you wrote that you believed Deputy

12     Babb was practicing standard law enforcement

13     procedures.  What did you mean by that?

14          A.   I meant that I did not see anything with this

15     traffic stop, with this case, that wasn't just a normal

16     interdiction stop that's conducted across the country

17     every day.

18               This case in particular, you know, as we

19     discussed earlier, about Mr. Fox and his nervousness, I

20     mean, Deputy Babb exhibited compassion, he was -- he

21     was friendly, right, I mean, he did a lot of things

22     that led me to believe that he has got more experience

23     than your standard officer out there stopping cars

24     every day, if that makes sense.  So I kind of looked at

25     that and said, "Well, he's had some training, he's had

1     some experience stopping people."

2                    You know, I think it's -- this stop in

3     relation to stops that I've done in the past, it's no

4     different, I mean, there's just not -- there's not

5     anything there that I saw that just sticks out.

6          Q.    Sure.

7          A.    Minus, of course, your video camera issue.

8          Q.    And when you say "video camera issue," what do

9     you mean?

10         A.    Well, the video camera not being on, according

11    to policy.

12         Q.    And you mean Deputy Babb's dash camera?

13         A.    Yes.  And, you know, that's -- that's beside

14    the point.  But related to the traffic stop,

15    Mr. Schott, the things that Deputy Babb did, it's a

16    standard narcotic investigation.  It's not just a cold

17    stop, it's not just a stop that someone was driving

18    down the road and he decided to stop the car.  So

19    there's way more to this traffic stop than just a cold

20    stop, if that makes sense.

21         Q.    Okay.  And what does -- what do you mean by

22    "cold stop"?

23         A.    A cold stop is a term that people often use

24    when a deputy or an officer sees a vehicle, they

25    believe that vehicle may have some, you know,

Page 106

1          contraband in it and may be doing something illegal and

2          they decide that they are going to see if they can get

3          probable cause for a traffic violation to stop the car

4          and investigate to see if something is going on.  Many

5          times, nothing is going on.  Most of the time, nothing

6          is going on.  But that would be considered like a cold

7          stop.  The officer initiated that traffic stop, no

8          prior information, right.

9                    Compared to my review of this case, from

10         my training and experience, you know, I believe that

11         there was information that he had.  It was obvious from

12         his videos, from his interview, from the recordings,

13         from the body cameras that he was communicating with

14         somebody in law enforcement.  So he had prior knowledge

15         of this stop, so it was not a cold stop, in my opinion.

16         He had prior information.

17         Q.    Okay.  And I think we will get back to that

18         more just like to explore it, but I'm going to continue

19         walking through what we have here.

20                    In this first full paragraph on 28, you

21         wrote, and I'm going to quote here, "Such

22         investigations are -- are often not in the same

23         jurisdiction the officer works.  Therefore,

24         communication using telephones, networking apps and

25         radios are common."

Page 107

1              Did I read that sentence correctly?

2       A.    Yes.

3       Q.    And would it be fair to say that you're

4  informing us that it's common to use phones,

5  networking, radios when officers are working across

6  jurisdictions; is that correct?

7       A.    Yes.

8       Q.    Okay.  What constitutes an investigation?

9  What is an investigation?  What rises to the level of

10  investigation?

11      A.    Well, an investigation is where you're

12  developing, you know information, you're gathering

13  information to decide whether or not there's a crime

14  here, right.  You know, you're investigating whether

15  there's more to what's going on other than the traffic

16  stop.

17              In this case, there's prior information,

18  right.  He obviously knew this vehicle was coming, he

19  knew the description of the vehicle, he knew that

20  there's other people that he was told, according to the

21  videos I watched and the reports, he knew that someone

22  knew something more than he did, right?

23              So there's a lot of things going on here

24  before the traffic stop and they were credible, they

25  were credible in this way.  He was told that the

Page 108

1    vehicle was an F-250, it was an F-250.  He was told the
2    license plate number was exactly the same.  He was told
3    that the vehicle was in Carrizo Springs and it was
4    traveling north on Interstate 35 and left at a certain
5    time, the timeframe matched the time it left Carrizo
6    Springs until the time he saw it.
7              So there's a lot of things that are
8    credible behind the information that he had, even
9    before the traffic stop.  So, you know, that's why I
10   say "investigation."  I mean, I don't know, I wasn't
11   there and I don't know who the people are in Carrizo
12   Springs, I don't know what was going -- I do know that
13   there was -- I say "investigation" because this isn't
14   just a cold traffic stop, right?  That's the reason I
15   use that word, "investigation."
16        Q.   Got it.  Taking a step back from this
17   particular case for a second, when is it appropriate to
18   rely on information about a vehicle that an average Joe
19   posts on their -- their Facebook wall?
20        A.   Well, I don't know -- in my experience, I've
21   never taken information from a Facebook wall.
22        Q.   Why not?
23        A.   Well, I mean, that's not something that I am
24   currently monitoring, you know, during the duties of
25   that I do.  I mean, that's not -- do you mean a

Page 109

1      Facebook wall, like I'm watching a social media

2      Facebook, like a Meta Facebook page?

3          Q.   Yeah.  You login to Facebook, you see

4      Mr. Barron has posted about whatever Mr. Barron posts

5      about on Facebook and you say, "There might be a

6      vehicle for me to stop."

7          A.   Oh, all right.  With investigations, with the

8      investigative side of the house, sure, narcotic

9      officers do that all the time, you know.  I was still

10     on traffic stop here.  But, yeah, sure, narcotic

11     investigators to that.  You know, they monitor social

12     media sites, Facebook sites, you know, believe it or

13     not, Instagram and Snapchat, Snapchat is a big one.  So

14     it's commonly used in law enforcement with drug

15     investigations, any crimes.

16         Q.   Okay.  Well, let's pretend that Mr. Barron is

17     who Mr. Barron is and he's not in the drug industry.

18                    MR. FOX:   Pretend.

19         Q.   (BY MS. HEBERT)  Let's pretend and let's just

20     say he posts something about there was a suspicious

21     vehicle on I-35, would you rely on that information?

22         A.   Well, I mean, rely on the information, it

23     would be one thing that if I'm a guy looking at a

24     Facebook post or monitoring Facebook and, you know, I'm

25     using keyword searches, right, because we do that a

Page 110

```
1     lot, you know, we will type in something, and I
2     discover there's something that interests me, you know,
3     sure, I may -- I may want to take a look at it.  It
4     doesn't mean that anything is going on, it doesn't mean
5     that there's a crime.  It could be totally innocent,
6     right.
7              Secret Service and FBI does it every day,
8     you know, for protecting the president, you know, so
9     those keyword searches are important.  Does that mean
10    everybody is wanting to, you know, commit a crime
11    against an elected official, no, but somebody may be
12    venting on there and that keyword pops up and it
13    warrants that officer to at least take a look at it to
14    determine if something is going on.
15       Q.   Sure.  But if Mr. Barron posts a suspicious
16    tinted window -- or a suspicious vehicle driving on 35,
17    would you investigate that suspicious vehicle?
18       A.   Again, it's subjective.
19       Q.   If you didn't have anything else going on,
20    would you investigate it?
21       A.   Well, again, it's subjective.  I mean, what's
22    the other information that we have, you know.  Again,
23    it goes back to hypothetical situations --
24       Q.   Understood.
25       A.   -- that are never ending and, you know, I
```

1    can't give you an answer whether I would or I wouldn't.

2         Q.   Understood.  So context matters?

3         A.   It matters.  I'm sorry, but --

4         Q.   No, that's fine.

5         A.   -- I can't answer.

6         Q.   If Mr. Barron, an average Joe, sent you a

7    Facebook message that there was a suspicious vehicle on

8    I-35, would you investigate based on Mr. Barron's

9    Facebook message?

10        A.   What relation would I have with Mr. Barron, I

11   guess is the first thing that I would ask.  You know,

12   is Mr. Barron an associate of mine that I met, maybe

13   not even met, but exchanged numbers in like training

14   conference somewhere, is he one of those guys, you

15   know?

16        Q.   Let's say he's a member of the public, a

17   member of the public you have never met.

18        A.   I don't even know?

19        Q.   Right.

20        A.   I wouldn't typically give any credit to that.

21        Q.   Sure.  And if it's someone you met at a law

22   enforcement training seminar, you exchanged numbers,

23   you know who he is, he works for the city of Austin,

24   would you credit that information?

25        A.   Yes.

Page 112

1      Q.    Okay.  What about if Mr. Barron, who is a

2      lawyer, messaged you and claimed to be a police

3      officer, how would you -- what would you do in that

4      situation and you don't know if he is or not?

5      A.    You know, that's -- that's -- I know where

6      you're going with this related to this case.  So

7      typically, any communication platform should be vetted

8      by the department.  Do officers do it?  They do.

9      There's oftentimes -- there's oftentimes text groups on

10     the back end that they communicate on, right, when

11     something is going on because it's, you know, "Hey,

12     this guy is going across country."  There's a lot of

13     that stuff that goes on, right.

14                So to answer that question, if it is

15     somebody that I don't know, it's someone that I have no

16     idea who it is, no, I would not investigate or go stop

17     that car or even look for it.  If it was someone that

18     I'm in a group messaging with, even if it's not

19     against -- you know, even if it's not, you know,

20     policy, even if you're -- there's no policy around it,

21     right, even if the department -- the administration or

22     the department hasn't vetted this, most of the time

23     they don't even know this exists.  These officers just

24     do this stuff, you know.

25                And, sure, I would hold credibility in --

Page 113

1    in that information because I would believe that the
2    person on the other end of that giving me the
3    information is a police officer.
4        Q.    Would you do -- and what would -- what would
5    shape that belief for you?
6        A.    Previous encounters or previous things that
7    have occurred on such app or such messaging platform,
8    right, so there may be some history to that.  That's
9    why I said when you give me the example of just, you
10   know -- you know, just cold turkey, I don't know the
11   guy, absolutely not.  But there is credibility to a
12   group chat of some sort, even being social media, if
13   there has been prior cases that's been made, there's
14   been prior communication, you know, there's credibility
15   in that.

16             And related to, I guess information from
17   the public that you don't even know, I mean, you could
18   actually go and act upon that information as well to
19   determine whether something is -- it's kind of like a
20   DWI, you know, I mean, you don't know the person
21   calling, but the person says, "Hey, there's a car all
22   over the road and they are driving erratically and
23   almost crashing into people," you know, you don't know
24   that person, but the person is credible.
25             And, yes, you can affect the traffic stop

Page 114

1    and you can go and investigate that, you know, under

2    reasonable suspicion to determine if a crime happened.

3    So that's -- that's my opinion of differences in the

4    two.

5        Q.   I might be revealing the depths of my

6    ignorance, but in the example you just gave for the

7    DWI, would you have to observe that vehicle weaving, or

8    what have you, before stopping them --

9        A.   Sure.

10       Q.   -- or could you just pull the person over

11   based on the say-so of someone who called in?

12       A.   No, under the DWI you would want to develop

13   your probable cause.

14       Q.   Okay.  So you would have to then observe the

15   traffic violation, in addition to whatever you had

16   heard before?

17       A.   Yeah.  And it's been my experience -- I've had

18   that happen many times and it's been my experience

19   that, you know, oftentimes they are correct, oftentimes

20   they may have been correct, but now that you're behind

21   them in a police car, you know, they are straight and

22   narrow and I don't have probable cause to stop the car

23   for any traffic violation.  So, no, you wouldn't stop

24   the car.

25       Q.   Okay.  And let's say you are part of a law

Page 115

1    enforcement -- or a group, let's say you're part of a

2    text chat, do you do anything to verify who is running

3    the chat?

4        A.    Again, my personal opinion is that everyone

5    should be vetted.  You should know who you're talking

6    with.  However, does that happen, it doesn't happen.

7    You know, have there been occasions where I've spoken

8    with people, not on social media, but over the phone

9    who I don't know, sure, you know.  Has that information

10   been credible, sure.  Have I acted on it, sure.  Again,

11   it's subjective according to the case, right.

12       Q.    And I guess I want to ask you about the -- the

13   phone example.  When you speak to someone over the

14   phone about information, do you ask them questions?

15       A.    Yes.

16       Q.    What kind of questions do you ask?

17       A.    Well, as much as you can learn from them to

18   understand what's going on, you know, why they believe

19   this person is doing what they are doing, right.

20            So, you know, you're going to -- you're

21   going to ask -- okay, I guess I'll give you an example

22   of like maybe -- I don't know, I'm trying to get a drug

23   situation -- maybe an airport case, yeah, let's use an

24   airport case, right.

25            So you may have an officer who has

Page 116

```
 1       information that a person is smuggling something via
 2       commercial airplanes, so they may call.  I have no clue
 3       who this guy is, but they know you work criminal
 4       interdiction at Austin-Bergstrom International Airport
 5       and they know your name or they have called another
 6       deputy who had a class, you know, "Oh, yeah, call Gary
 7       Haston, he works in the airport."  So they will call.
 8       I don't know who the guy is.  But the guy will say,
 9       "Hey, there's a passenger getting on the plane in San
10       Francisco, it's a one-way ticket, they paid cash," you
11       know, so you may watch for this guy when they get to
12       Austin, the flight is going to be there at 2:15, right.
13                    Two-hour, three-hour flight, I go to the
14       airport, see the guy get off the plane.  Obviously I'm
15       going to find out clothing description, everything
16       about the guy, what he's carrying.  He gets to the
17       airport, you know, there he is.  He gets off the plane,
18       just like they said.  He's got the same clothes on,
19       just like they said.  He's got the bag description he
20       picks up at baggage claim, just like they said.
21                    There's a lot of credibility to that,
22       even though I don't know that guy, right, but he's a
23       law enforcement officer, he has this information and
24       you can count on that information.  I mean, it's
25       credible information to add to, you know, what you're
```

Page 117

1    doing.  I mean, at that point, I would ask for consent

2    to search just off of that alone.

3         Q.    Okay.  So in the example that you talked

4    about, you have the phone call, you verify what law

5    enforcement agency they work for.

6              Is that -- am I understanding that right?

7         A.    Sure.  You would ask who they are.

8         Q.    Right.  You ask who they are, you get the

9    information about the individual, you learn that they

10   paid in cash, based on what you talked about, they are

11   going to fly to Austin, you learned what they were

12   wearing, you learned what they were carrying.

13             Anything else that you learned there --

14   that you would have learned?

15        A.    Well, I mean, you could ask questions like

16   have they had prior, you know, flights, do you have any

17   knowledge of prior flights, itineraries, you know, have

18   they -- have you had anybody that actually saw them,

19   you know, before they got on the plane, right, things

20   of that nature.

21             Perfect example, and it's kind of related

22   to what, you know, could be happening in this

23   particular case is hotel/motel interdiction.  So what

24   will happen is an officer will be watching a hotel.

25   They may be in an area, Carrizo Springs is a perfect

Page 118

1   example, it's a source area, so you may have officers

2   watching the hotel.

3              When they see a vehicle that is not from

4   Carrizo Springs or the Valley, let's say from Houston,

5   Austin, San Antonio, and it's at that hotel where they

6   are running license plates, they are seeing if -- who

7   it is.

8              In this case, from San Francisco, it

9   could have been a hotel case to where someone is

10  watching a hotel, right.  And they see this guy, they

11  see the baggage, they see the clothing and then they

12  follow them to the airport, they watch him get the

13  ticket and they get on the plane and fly to Austin.  So

14  that whole thing originated around just an officer

15  watching and doing what they call hotel/motel

16  interdiction, right.

17     Q.   Okay, I understand that.  And I guess what I'm

18  having trouble understanding is how do you know that

19  the things that you're talking about, where someone

20  stayed, where they are traveling from, what they are

21  wearing, means that they might be involved in some kind

22  of criminal activity?

23     A.   Well, you don't know, right.  It could be

24  innocent travel, but that's why you go talk to them.

25  That's why you go out and you talk to them and then you

Page 119

1    either confirm or dispel there's criminal activity

2    afoot.  If there's no criminal activity, then you let

3    them go.  If there is criminal activity, then you put

4    them in jail.

5       Q.   We have covered a lot of this already, so I'm

6    just trying to skip through the --

7       A.   I'm sorry to -- I'm sorry to be jumping ahead

8    of you on a lot of this stuff.

9       Q.   No, you're great.  Then it just makes it, you

10   know, quicker.

11              Should an officer rely on information

12   from another law enforcement agency, let's assume for a

13   second it is another law enforcement agency, if the

14   information is only this vehicle was suspicious, don't

15   learn anything else?

16      A.   It happens all the time in law enforcement,

17   you know.  Again, it goes back to the -- to the

18   experience of that officer who is giving the

19   information.  You know, it may be normal travel, it may

20   be -- again, I gave you an example earlier about what

21   an officer believes is suspicious in a car, you know.

22   I mean, it may be suspicious to one officer because

23   he's learning, let's say his travel patterns, you know.

24   I guess let me clean this up for you, I'm sorry.

25      Q.   Nothing to apologize for.

Page 120

```
 1        A.   In my -- in my experience, when I was working

 2    interdiction and I was learning my traffic pattern on

 3    Interstate 35 north of Georgetown, okay, so I would

 4    work typically from the Williamson County line to north

 5    Georgetown and I would just be back and forth, less

 6    traffic, I don't have to deal with local commuters that

 7    are going to and from work, right.  But what I learned

 8    is that there were commuters that were traveling from

 9    Waco to San Antonio every day and they were driving

10    cars, that were commonly used to smuggle drugs.

11             So I told you earlier that there may be a

12    vehicle that the drug cartels use that's got a certain

13    place for a compartment, the officers know this so they

14    want to see if that car is being used.  Well, those

15    people driving from Waco to San Antonio every day is in

16    one of those cars and they happen to be in a car

17    without a seatbelt.  So I stop the car for probable

18    cause, he has no seatbelt on.  I learn that he drives

19    back and forth from Waco to San Antonio every day.

20             Well, everyday I'm on that highway, I see

21    that same car at that same time pass by.  I'm pretty

22    confident that that guy is not a drug smuggler, right,

23    but that experience that I gained and from the

24    beginning, not knowing, to the experience I had later,

25    knowing that that guy is in a drug smuggling type
```

Page 121

```
 1      vehicle, but he's not a drug smuggler may not be the
 2      same case with the guy in San Francisco at the hotel,
 3      right.  So he may think that this is suspicious with
 4      this guy because he has never seen it before, but then
 5      later on, after he gains more experience, he may
 6      realize that that's not suspicious at all.
 7                   So when that information comes from that
 8      officer, I don't know what his experience level is, but
 9      I think it's credible and I think he thinks it's
10      credible.  So it's worth taking a look at, it's worth
11      at least going out and seeing if anything is going on
12      illegally.
13          Q.   And when you say "seeing if anything is
14      illegal," seeing -- stopping that vehicle?
15          A.   Stopping the vehicle or a consensual
16      encounter, talking with the person, whatever the case
17      is.
18          Q.   Sure.  And is it fair to say that if the
19      information is coming from a law enforcement officer,
20      you're going to assume you can rely on it?
21          A.   Yes.
22          Q.   We can come back to this later.  Let's go to
23      the second paragraph on page 28.
24          A.   28, second paragraph.
25          Q.   Uh-huh.
```

Page 122

1              A.    Okay.

2              Q.    I'm going to read the third sentence, and it

3        starts, "A reasonable officer in the same position

4        would have given credibility to the information

5        considering it was consistent from training and

6        experience that F-250 could have been used to smuggle

7        humans or drugs between Houston, a common destination

8        city, and south Texas, a common source of contraband

9        imported into the United States."

10                   Did I read that correctly?

11             A.    You did.

12             Q.    Do human and drug smugglers use vehicles,

13       cars, other than F-250s?

14             A.    Yes.

15             Q.    What are the most common vehicles?

16             A.    Well, bigger vehicles where more people can be

17       placed in them, that's one way, right.  18-wheelers,

18       you know, is an example of that, larger pickup trucks,

19       vans, the example I gave you earlier on the traffic

20       stop that I did on the Ford Explorer that had 13, 15

21       people in it.  You know, you would never think you

22       could put that many people in a Suburban -- I mean,

23       Ford Explorer, but you can.  That's one part of it.

24                   But maybe this human smuggling

25       organization knows that the cops are looking for the

1 big vehicles, so they are only taking two people at a

2 time.  So those two people that are smuggling may be in

3 a Ford Escort, so you just really never know, right.

4 But the bigger the vehicle, the more people are

5 probably concealed, or drugs.  Same thing with small

6 cars, if you have a small car, fewer people are going

7 to be smuggled.

8     Does that make sense?

9  Q.   Yeah, I think so, but I'm not entirely sure.

10 So let me just try to tell you what I'm understanding

11 and you can correct me where I'm wrong.

12     It seems like what you're saying is all

13 cars can be used to smuggle drugs and people; is that

14 right?

15  A.   That's correct.

16  Q.   But bigger vehicles are more suspicious

17 because they can fit more drugs or more people, is that

18 fair?

19  A.   Well, I wouldn't say more suspicious.

20  Q.   Okay.

21  A.   You know, I would say that, again, it goes

22 back to the officer's experience and his training.  And

23 in this case, from the report that I read -- or not the

24 report, but the video that I watched of Deputy Babb --

25  Q.   And when you say video that you watched, what

Page 124

1     video are you referring to?

2         A.    That be would the body cam video, when it

3     was --

4         Q.    Deputy Babb's body cam video?

5         A.    Deputy Babb's body cam video, when it's in the

6     front of his car on the dash, he makes a comment about

7     an 18-wheeler that they had had that had a lot of

8     people being smuggled in it.  That led me to believe

9     that he has some experience with human smuggling,

10    right, and the F-250 that he has stopped on side of the

11    road during this traffic stop is also a vehicle that

12    could be commonly used to smuggle people because of the

13    bed topper, right, it's got a bed topper, it's got

14    heavier suspension.

15              In combination with that vehicle, with

16    the information that he had prior is -- leads me to

17    believe that he may have been thinking -- and, again,

18    I'm not in his mind, but if I was in his position, I

19    would have been first thinking human smuggling would be

20    the possibility, right, not drug smuggling.  But it

21    could have been drug smuggling.  Who knows.

22        Q.    Sure.  And do people travel between Houston

23    and South Texas for reasons other than human smuggling

24    and drug smuggling?

25        A.    Yes.

1     Q.   Okay.  And are the majority of people who are

2    traveling between Houston and South Texas involved in

3    drug smuggling or human smuggling?

4     A.   No.

5     Q.   By your estimate, what percentage of people

6    traveling between Houston and south Texas are involved

7    in either human smuggling or drug smuggling?

8     A.   That's the unknown question.  You know, I

9    can't answer that to be specific.  I can tell you the

10    answer that I give people in my training classes.

11     Q.   Yes, sir.

12     A.   That's a common question, believe it or not,

13    even with cops, you know, how many people are smuggling

14    drugs on the highway.  From my training and experience,

15    talking with people, interviews, dealing with Mexican

16    drug cartels and mules, you know, I would tell people

17    that for every traffic stop that I'm on, drugs or no

18    drugs, ten loads of dope passed me by.  Ten cars loaded

19    with drugs passed me by while I'm on one traffic stop.

20     Q.   So let's assume for a second traffic is

21    going -- how long would the traffic stop be?

22     A.   It depends on the circumstances.

23     Q.   What's your average traffic stop,

24    nothing found, just generally?

25     A.   From my experience or from the experience

Page 126

1    where Deputy Babb was?

2        Q.    From your experience?

3        A.    From my experience, you know, ten minutes is

4    actually -- I mean, I would -- I would have them cut

5    loose in ten minutes.

6        Q.    Ten minutes.  Okay, let's say ten minutes.

7    How many cars would you estimate pass by you in a

8    ten-minute timeframe?

9        A.    It depends, again, on the highway.  You know,

10   on Interstate 35 north of Georgetown, you know,

11   thousands.

12       Q.    So would 1,500 be a reasonable amount?

13       A.    I would not even venture to say -- I would say

14   it would be more than that.

15       Q.    Okay.  2000?  I have no idea.

16       A.    It's busy, it's packed.  You know, that's --

17   you really can't do statistics like that in trying to

18   figure things out because there's a difference in

19   traffic, there's a difference in how many cars pass you

20   on Interstate 35 in south San Antonio compared to

21   northern Georgetown.

22       Q.    Okay.

23       A.    So I don't -- I can't really come up with a

24   number.

25       Q.    Sure.  How about like a percentage?  I'm just

Page 127

1    trying to get like a -- get my arms around this.

2        A.   On how much drugs are being trafficked, is

3    that what we're talking about?

4        Q.   Yeah.  Just like the number of people who are

5    using these highways, would you say like 10 percent of

6    folks driving on I-35 are smuggling drugs or people?

7                MR. BARRON:  Objection, form.

8                THE WITNESS:  I wish we knew.

9        Q.   (BY MS. HEBERT)  Okay.  So you just don't have

10   a sense?

11       A.   If you take into consideration the amount of

12   drugs that are seized by the Department of Justice, the

13   Drug Enforcement Administration, the Homeland Security

14   during their investigations, Border Patrol, on the port

15   of entries, on the checkpoints, by every deputy and

16   officer who stops cars every day in the United States,

17   there -- there are a lot of drugs here.

18       Q.   Understood.

19       A.   And that means that a lot of drugs pass you by

20   on the highway.

21       Q.   Understood.  And I guess like I want to focus

22   for a second on -- on folks traveling from -- to and

23   from Houston and South Texas.  Would you say the

24   majority of folks traveling to and from Houston and

25   South Texas are smuggling drugs or people?

Page 128

1           A.    No.

2           Q.    So somewhere less than half?

3           A.    Absolutely.

4           Q.    Okay.  Does the fact that Alek drove an F-250

5      and that he drove between Houston and South Texas mean

6      that Deputy Babb had a reason to extend the traffic

7      stop here?

8           A.    Well, I don't know that -- no, I don't think

9      he -- the extension is not the issue.  I believe that

10     plays a role in his original reasonable suspicion to

11     ask for consent.  It played a significant role, in my

12     opinion.

13          Q.    Help me -- so take a step back there.  So you

14     believe the F-250 and the fact that he traveled from

15     Houston to South Texas played a role in his decision to

16     ask for consent; is that correct?

17          A.    In addition to the prior information that he

18     had?

19          Q.    Sure.

20          A.    It's possible, it's common all of the time

21     that people from Houston go to the Valley to pick up

22     drugs in large vehicles with bed toppers.  So do all of

23     them do it, no, of course not.  But in this case, he

24     had -- according to the information on the video, he

25     had prior experience with human smuggling.

Page 129

          1     According --
          2          Q.    And by "he," you're referring to Deputy Babb?
          3          A.    Deputy Babb, I'm sorry, yeah.  That's my bad.
          4               So Deputy Babb had experience, in some
          5     form or fashion, by his own admission in his video,
          6     about a tractor-trailer with a lot of people in it.
          7     Deputy Babb's training records indicate that he had a
          8     lot of training for human smuggling through courses.  I
          9     don't have the, you know, syllabus for those.  I don't
         10     know what -- what occurred in those trainings, but you
         11     can reasonably -- an officer could reasonably say he
         12     has some experience with smuggling, human smuggling.
         13               So between his training, his experience
         14     of prior human smuggling cases, the information that he
         15     had from the officer, or whoever it was he was talking
         16     with on the -- on the social media platform, all of
         17     that would make a reasonable officer believe that this
         18     truck traveling on a one-day turnaround from Houston to
         19     Carrizo Springs, staying the night at a hotel and
         20     encountering another person there and then traveling
         21     back northbound, that would add to the reasonable
         22     suspicion to ask for consent to search.  That plays a
         23     big role.
         24          Q.    Understood.  Are officers supposed to consider
         25     innocent explanations for facts like that, facts about

                                                          Page 130

1    travel?

2         A.    It's been my experience that I don't know what

3    an innocent explanation is until I either confirm or

4    deny everything going on as a -- as a whole, right.  So

5    as I'm on the scene as an officer in these situations,

6    I don't know whether the person is lying to me or not.

7    There are good liars and there are bad liars.

8              So I can only depend on the circumstances

9    at hand, which, of course, I wasn't there, I wasn't

10   Deputy Babb to see everything going on.  But from my

11   training and experience, you know, people are good

12   liars, so I don't take everybody for what they tell me.

13        Q.    So I guess that prompts the question for me of

14   how should an officer assess the explanation they are

15   given for travel?

16        A.    Yeah, of course.  They should ask questions,

17   you know, where are you going, where are you coming

18   from, you know, why are you there, have you ever been

19   there before, things of those natures to determine

20   whether or not that person regularly goes there for

21   business or personal or they are going to see family,

22   you know.

23              What I have found in my training and

24   experience before on these stops -- and I'll use

25   Interstate 35 as an example -- is, you know, you stop a

Page 131

1    guy -- and I had one one day, I stopped a guy north of

2    Georgetown.  In fact, it was at the county line, so

3    we're 25 miles north of downtown Austin.  And I asked

4    the guy, "Hey, how are you doing today?  Where are you

5    going?"  "Oh, I'm going from -- I'm going from the

6    Valley and I'm going to Austin," right.

7                 Well, immediately that's a red flag to

8    me, so I'm going to dig into that, right.  That's an

9    obvious problem, right.  But the --

10       Q.   When you say "obvious problem," it's an

11   obvious problem because it's inconsistent -- the

12   explanation is inconsistent with their action, is that

13   fair, just to make it explicit?

14       A.   Of course.  He's 25 miles north of Austin, but

15   he tells me he's going to Austin.  That's common for

16   drug smugglers.  From my training and experience, I

17   would see that all the time.  So that would be one of

18   the things that would drive me to ask more questions to

19   them, add that to my piece of the pie, right, in order

20   to build a reasonable suspicion to then ask for consent

21   to search the vehicle, right.

22                 So people lie to you, it's just sometimes

23   some lies are better than others and it's hard to

24   detect.  And if you're not -- if you have ever been

25   around a very narcissistic person who is a good liar,

1    sometimes you can't read it.  They are very good.

2        Q.    Yeah, Mr. Fox.

3        A.    They are very good at covering that.  So to

4    answer your question, it takes a long time and a lot of

5    experience for an officer to determine whether that

6    person is telling you the truth or not the truth.  And

7    even having a lot of experience, you still miss it, you

8    still miss the fact that they lied to you, you know.

9        Q.    So in terms of assessing someone's claimed

10   reason for traveling and claimed explanation for

11   things, you look for inconsistencies; is that fair?

12       A.    That's correct.

13       Q.    What else do you look for?

14       A.    Are we talking about an interdiction as a

15   whole?

16       Q.    Yeah.  I guess, you know, when you're

17   assessing someone's explanation, their innocent

18   explanation, their noncriminal explanation for their

19   behavior, how do you determine whether it's true or

20   not?  We talked about inconsistency.  What other things

21   do you look for?

22       A.    During the interview?

23       Q.    Yes, sir.

24       A.    Body language.  So when you're asking someone

25   a question, they respond to you in a certain way and

Page 133

1    their body tells you things that you don't know your

2    body is telling you, right.  So when you ask the

3    question, you're looking for other things.  You're

4    looking for gestures, facial expressions, you're

5    looking for hand movements, body movements.

6        Q.   It makes me automatically like super conscious

7    of my body language.  I'm like, what am I doing?

8        A.   Yeah, and no matter how -- and that's the

9    thing about it is no matter how hard you try, you know,

10    to control it, you can't.  And that makes people

11    uncomfortable, just as you're uncomfortable, right.

12    And it's like somebody on the side of the road that's

13    committing a crime, it intensifies, you know.

14              So think about the drug trafficker who

15    knows they have ten kilos of Coke in the car and they

16    are driving north, their whole plan is, "What am I

17    going to do when I get stopped?"  So when that does

18    happen and they are -- they are driven up, they are

19    very on the edge.  That's what causes the -- oftentimes

20    you hear they were very nervous, right, they were

21    breathing hard, they had dry lips, they were, you know,

22    avoiding eye contact with me, they were -- all of these

23    things are things that you look for, right.

24              Now, as you said earlier, a lot of people

25    are just that way, even innocent people, so that's why

Page 134

1     you have to calm them down.  You have to make them

2     realize, "You're not going to jail, this is just a

3     Class C violation."  That should help them with their

4     body language.  They are not going to exhibit these

5     things anymore, you know, that you would pick up on to

6     determine whether what they said was a lie or not a

7     lie, right.

8               And if that person does calm down, if

9     that person does stop all of these things that the

10    officer is seeing, odds are they were telling the

11    truth.  You know, if they continue and they are still

12    doing these things that -- you know, they are

13    stretching or, you know, they are answering a question

14    and they are covering their mouth or hitting their

15    nose, you know, at certain times during the interview,

16    then that is still cause for concern that they are

17    being deceptive.

18         Q.   How do you know, for body language, what's

19    normal for that person versus a sign of them being

20    nervous or trying to hide something?

21         A.   Sure.  I'm glad you asked.  You develop what

22    they call a baseline with nonthreatening questions that

23    have nothing to do with anything illegal.  Once you

24    develop that baseline, a person answers a question in a

25    certain way, right.

Page 135

1              Unbeknownst to them, they are answering,
2       "Yes, sir, no, sir, yes, ma'am, no, ma'am," right,
3       we're talking about the weather, the family, things of
4       that nature.  In their mind, they know that the, "Do
5       you have drugs" question is coming, so their body is
6       starting to tense, their blood pressure is going up,
7       maybe their carotid artery starts to pop, you know,
8       they start getting veins in their head that are popping
9       because their blood pressure is going up, they start
10      breathing more.  That's -- that's noticeable to an
11      officer trained to see it.
12              When that question does come that "Yes,
13      ma'am" or "no, ma'am" turns into a lot of different
14      things.  It could be no answer at all.  It could be a
15      nervous laugh, "No, of course not, no, I've never used
16      drugs in my life."  That's off of baseline.  That's not
17      the "yes, ma'am, no, ma'am."  That is now something
18      that triggered this guy's response because then you go
19      to, "Do you have any dead bodies in the car?"  "No,
20      sir."  "Do you have this --" so they go back to
21      baseline.
22              Now, that in itself doesn't mean anything
23      unless you go back and confirm it again.  That's just
24      something that you pick up on.  So then your interview
25      should be something nonstressful, go back and confirm

Page 136

 1    that their baseline is "yes, sir, no, sir" and then

 2    when you come back to that question and start talking

 3    about that more, they are going to go back to the "no,

 4    man," you know, and try to change the subject or do

 5    whatever they are doing.  That is something that I want

 6    to look into a little bit more, whatever that topic is.

 7              So that's how I determine whether or not

 8    a person is being truthful with me and the things that

 9    I look for during that interview and the baseline.

10    Q.   Okay.  Let me summarize what I'm taking away

11    from that and you can tell me what I miss and what I

12    don't get right.

13              You -- in your interviews, or in good

14    interviews, you -- an officer will move between

15    nonthreatening questions and questions that are

16    investigatory in nature and compare the responses to

17    those questions.

18              Am I understanding that correctly?

19    A.   Yes.

20    Q.   And if the two -- if the behaviors in response

21    to the two types of questions are different, that

22    raises a red flag?

23    A.   It does.  It doesn't mean that they are doing

24    anything illegal, right?  It's just telling you that

25    you need to revisit whatever that was, right.  There

Page 137

1    could be some legitimate reason behind it, you know.

2    Maybe there's not, right.

3         Q.   And would you say most of the drivers that

4    are -- let me rephrase that.

5              When an officer walks drivers through the

6    alternating nonthreatening investigatory questions,

7    would you say that most drivers are unaware of what the

8    officer is doing there?

9         A.   Oh, yeah, they don't know.

10        Q.   I want to go back to your report, and just

11   take a look at the third paragraph down.  And can you

12   just review this paragraph for a second and I'll ask

13   you some questions?

14        A.   That starts with "Deputy Babb"?

15        Q.   Yes, sir.

16        A.   Okay.

17        Q.   Is there anything illegal in driving from

18   Houston to a remote area of Texas?

19        A.   No.

20        Q.   Okay.  Is there anything illegal in driving

21   from Houston to a remote area and meeting a woman?

22        A.   No.

23        Q.   Is there anything illegal in driving from

24   Houston to a remote area and staying at a Holiday Inn?

25        A.   No.

Page 138

1        Q.     Meeting a woman at a Holiday Inn?

2        A.     Nope.

3        Q.     Are the majority of people driving from

4    Houston to a remote area in Texas driving to stash

5    houses?

6        A.     In the mind of who?  In a criminal

7    interdiction, you know, an officer that's looking for

8    drug smugglers, it's a big red flag, right.  Houston to

9    the Valley is a big red flag, only because Houston is

10   known as such a destination for large quantities of

11   drugs, right.

12              So how the drug industry works is it

13   comes across the border into Texas and, many times, the

14   drugs are stashed at a location, big bulk quantities,

15   or a lot of people.  A lot of times it's in a rural

16   area, right, and they don't want the cops around.

17              So the vehicle coming from Houston to the

18   Valley, going to a hotel and then leaving a hotel to go

19   to a remote area with another person that they met at

20   the hotel and then come back to the hotel and then

21   leave and go back to Houston, and that's a one-day

22   turnaround, that's suspicious to an officer, a criminal

23   interdiction officer.

24              And to answer the question, does that

25   occur a lot, yes, that is a big -- that happens the

Page 139

```
 1    majority of the time with drug smuggling cases, right,
 2    and officers know that.  That's common knowledge within
 3    the narcotic investigation world, right.
 4              So that puts more weight on the officer
 5    that knows that, that gives more credibility to what
 6    he's seeing and makes him want to either confirm or
 7    dispel that vehicle is involved simply from those
 8    factors.
 9        Q.   Sure.  I guess my natural response to that is
10    to think about all of my -- all of my friends who work
11    in the oil and gas industry and who are out in south
12    Texas all the time staying at hotels and going out to
13    remote areas.
14        A.   Oh, yeah.
15        Q.   And that's just a lot of what my friends do.
16        A.   Uh-huh, it's normal.
17        Q.   Yeah.  So, I guess, is that something an
18    officer should consider when evaluating folks who are
19    going from Houston to a remote area of Texas, whether
20    those folks are going for innocent work?
21        A.   Well, the majority of the people doing that
22    are going for innocent work, but the officer doesn't
23    know that, right, until he talks with them.  But once
24    he talks with that person, just as we said earlier, you
25    know, with Mr. Fox here, that person that's
```

Page 140

1     legitimately in an oil field truck driving north on the
2     interstate that gets stopped for a traffic violation,
3     they are not going to exhibit anything to that officer
4     that he will even ask for consent to search the truck.
5              So, typically, they won't even -- they
6     won't even get searched as far as, you know, ask for
7     consent to search.  Nothing.  Just like the scenario
8     you gave me with Mr. Fox with the two kilos of meth in
9     your car, they would have never known he had two kilos
10    of meth in his car because it was normal, right, it's
11    normal.  They work for an oil company, they answered
12    all of the questions, you know, they stayed at the
13    hotel -- because an oil company worker that works there
14    typically is in the hotel more than one night.  They
15    are there a lot, right, not just one time to the
16    Valley.  So it's normal, you just have to decide that
17    as you, you know, talk to the people.
18              Now, I want to address this oil field
19    worker issue that you brought up with your friends, or
20    people that you know, not necessarily your friends. But
21    the drug cartel commonly uses oil field vehicles as
22    smuggle vehicles.  It is common.  I've seen a lot of
23    them.  You know, they smuggle the drugs in the oil
24    tanks, the fuel cells, you know, I've gotten cocaine
25    and marijuana out of fuel cells in the back of these

Page 141

1    trucks.

2              In the case of -- in this case -- and

3    I'll go ahead and tell you this -- in this case, there

4    were two bottles in the back of this truck that

5    Mr. Schott had, right, two yellow bottles.  I've gotten

6    drugs out of those bottles, I've gotten cocaine out of

7    those, right.  That is a big red flag to me because

8    that is commonly used by drug smugglers in oil field

9    type trucks going northbound on I-35.

10             So all of those factors fit Mr. Schott's

11   vehicle, right.  So it doesn't mean he's a drug

12   smuggler, but it means that drug smugglers commonly use

13   innocent businesses to cover their activities.  And

14   it's up to that officer to stop that vehicle and either

15   confirm or dispel that that's a drug trafficker or if

16   it's a person just working.

17        Q.   Sure.  And we have been talking about I-35 and

18   Houston as like the two monikers, the two things.  But

19   would you say that everything we are talking about is

20   the same for any major Texas city and any major

21   highway?

22        A.   It differs in the drug industry because

23   Houston is just such a large city, right, and there's a

24   lot of drugs that go to Houston.  Dallas is a very

25   large city, a lot of drugs go to Dallas.  Fort Worth,

Page 142

```
 1      you don't see as much, right.  There are loads of drugs
 2      that go there, I've gotten loads of drugs going to Fort
 3      Worth on I-35, but not as much as Dallas.
 4                So the bigger cities are often known as
 5      being the places where the cartels like to set up shop.
 6      That's where they have got their people working to
 7      receive the drugs, right.  So does every major city
 8      have them, sure, they do.  But being this is in
 9      proximity to Mexico, Houston and Dallas are just --
10      they are just the biggest ones for this next stop in
11      the process of drug trafficking.
12          Q.   Understood.
13                MR. BARRON:  It's 12:15 and we're nearly
14      at three hours.  Do you want to take lunch now or keep
15      going?
16                MS. HEBERT:  Let's go for a couple more
17      minutes because I have a good -- like once we're
18      through this section, it will make a natural, I think,
19      break if we can finish off.
20                MR. BARRON:  Sure.
21          Q.   (BY MS. HEBERT)  I want to go to the fourth
22      paragraph and -- so one, two, three, four on page 28,
23      and it's the final sentence.  I'm going to read it for
24      you so we all will know where we are.
25                "In the case under review, a reasonable
```

Page 143

1    officer with the same training and experience as Deputy

2    Babb would have believed the F-250 driven by Schott was

3    capable -- well, was cable --"

4         A.    That was a misspelling.  I meant to tell you

5    about that one earlier too, sorry.

6         Q.    That's okay.  I normally read straight

7    through.  Let me start again.  "In the case under

8    review, a reasonable officer with the same training and

9    experience as Deputy Babb would have believed the F-250

10   driven by Schott was cable of transporting --"

11        A.    "Was able," it's supposed to be "able," I'm

12   sorry.

13        Q.    "-- large quantities of drugs and/or people."

14              Did I read that correctly?

15        A.    That's true.

16        Q.    Okay.  And "cable" should have been "able"?

17        A.    Yes, ma'am.

18        Q.    Okay.

19        A.    I apologize.

20        Q.    No, that's okay.  And I think that answers my

21   question because I wasn't quite sure what the --

22        A.    Oh, I'm sorry.

23        Q.    That's helpful.

24        A.    And I did recognize that earlier and I had

25   that, you know, and I just -- it was one of the

Page 144

1    misspells that I had.

2        Q.   Yeah.  So, I mean, I guess just to put a fine

3    point on it then, this sentence, you're saying that an

4    officer in the shoes of Deputy Babb would have believed

5    that an F-250 was able to transport large quantities of

6    drugs and people?

7        A.   Yes, ma'am.

8        Q.   Okay.  Just want to make sure I got it.

9        A.   I understand.

10       Q.   Let's skip to paragraph 11, which is page 30,

11   and it's the first full paragraph on page 30.  It

12   starts "Deputy Babb."

13            Do you see that part?

14       A.   Yes, ma'am.

15       Q.   And I want to look at the last sentence in

16   that paragraph and I'm going to read it.  "Rodriguez

17   versus United States focused on extension of a traffic

18   stop in order to obtain the reasonable suspicion to

19   call for a K9 to search a vehicle, which wasn't

20   applicable in this case."

21       A.   Yes, ma'am.

22       Q.   Did I read that correctly?

23       A.   Yes, ma'am.

24       Q.   Okay.  As I understand this sentence, you

25   concluded that the case of Rodriguez versus United

Page 145

1     States did not apply to this particular case.

2                    Am I understanding that correctly?

3         A.    Well, I'm going to put on the record I'm not

4     an attorney, right.  I can't determine what case law

5     says or not says.  But what happens is law enforcement

6     has to look at case law to guide them in future, you

7     know, cases, right.  So as part of our training, as

8     part of our experience, you know, we oftentimes train

9     officers on case law.  However, case law can only be

10    determined or -- you know, by a judge, right, an

11    attorney, someone smarter than me, right.

12                    However, this case with Rodriguez I

13    believe in.  I have actually had very -- I have

14    experience with this case because I always believe that

15    an officer should develop reasonable suspicion before

16    asking for consent to search a car, okay, I have always

17    instructed that.

18                    Unfortunately, throughout my career,

19    there have been officers who have attempted to take

20    criminal interdiction cases, turn them into consensual

21    encounters and then, you know, have somebody stopped on

22    the side of the road and say, "Oh, you're free to go,

23    here's your warning," let them walk back to the car,

24    "Oh, by the way, you know, I'm a police officer and my

25    duty is to look for drugs and contraband.  Can I search

Page 146

1    your car?"

2                When instructors would come to Williamson

3    County and they would teach that, it took me a year to

4    clean that up and to get these officers back to doing

5    what they should be doing, and that being don't ask for

6    consent to search the car unless you've got reasonable

7    suspicion to do so.  You're wasting your time with the

8    innocent public, right.  Don't do it.  I was happy that

9    Rodriguez came down because that clarified it from the

10   Supreme Court for everyone that you need to have

11   reasonable suspicion before you ask for consent when

12   you search a car.  I believe in the Rodriguez case.

13        Q.   Okay.  So help me understand why you conclude

14   it doesn't apply here.

15        A.   Because this case, this traffic stop is more

16   than just a cold traffic stop.  There was prior

17   information.  And in Deputy Babb's mind, at his level

18   of training, his level of experience, as we talked

19   about earlier, he believed, in my opinion, from his

20   videotape and from the reports, he believed that the

21   information that he received through that WhatsApp

22   was credible.

23                From his training and experience, as he

24   said on his video about the human smuggling, he

25   believed that truck could have been used in human

Page 147

1      smuggling.  I truly believe that's where -- that's
2      where this investigation was going to begin with.
3              So there are many things that transpired
4      that are credible or, in his mind at that time, that
5      lead to reasonable suspicion before he even stops the
6      truck, and that being the things we covered earlier,
7      right.  So he's received information -- and I've
8      already covered this once -- he received information
9      from someone -- do I need to go over it again?
10         Q.   We can deal with it more specifically later.
11     But he got information?
12         A.   Yeah, he got the information that the truck
13     came up I-35, it was the same license plate, it was the
14     same truck, it was a truck with a bed cover that, in
15     his experience, he believed could be used for human
16     smuggling.  There was probable cause to stop the truck
17     or, in his mind, a traffic violation.  He stops the
18     truck -- do you want me to continue with the -- what I
19     believe the reasonable suspicion to lead up -- once he
20     stops the truck, he asks the passenger -- or he asks
21     Mr. Schott about where he was coming from.  You know,
22     he talked about the -- you know, sleepy -- he talked
23     about the sleepy thing and Mr. Schott made a comment
24     about he stayed in a hotel last night.  Well, that's
25     subjective and could've been subjective in an officer's

Page 148

1      mind.

2                    (Discussion off the record)

3                    THE WITNESS:  It could have been

4      subjective in an officer's mind at the time, right,

5      because when I listen to that, from my training and

6      experience, that meant something, that confirmed to me

7      the information that he had received from the WhatsApp,

8      that he actually went down for a one-day turnaround,

9      which is big, coming from Houston to the Valley, it

10     adds to the reasonable suspicion, right.

11                   So I said that in this paragraph because

12     all of these things happened before he even put

13     Mr. Schott in the front seat of the car, and they can

14     all be articulated as to why an officer of the same

15     experience, the same training would have believed he

16     had reasonable suspicion to ask for consent.

17                   So that's why I think that the Rodriguez

18     case is not applicable here because that happened all

19     within three minutes and 30 seconds, I believe, of the

20     traffic stop.  He had all of those things already.

21     That's where it's important to -- in this particular

22     case, the previous information that he had that he

23     believed was credible in his mind is important.  It was

24     not just a cold stop.

25          Q.   Understood.  Let's skip to paragraph -- let's

Page 149

```
 1      skip to paragraph 8, which is --
 2           A.   What page would that be?
 3           Q.   I wrote numbers on them just because I was
 4      having a hard time.  I knew we would want to talk --
 5                MR. BARRON:  I'm not hallucinating those.
 6      Those are your numbers?
 7                MS. HEBERT:  Those are my numbers.
 8                MR. BARRON:  I'm not hallucinating.
 9                MS. HEBERT:  So that's why I'm like,
10      okay, paragraph 8, which is where.
11           Q.   (BY MS. HEBERT)  So 29, page 29, and the
12      fourth paragraph down, it starts, "In the case of
13      Rodriguez versus United States."
14           A.   Uh-huh.
15           Q.   I'm going to read the first sentence.
16           A.   Okay.
17           Q.   "In the case of Rodriguez versus United
18      States, 575 U.S. 348 (2015), extension of traffic stop,
19      the United States Supreme Court ruled that a traffic
20      stop could not be unreasonably delayed to develop
21      reasonable suspicion in order to call for a K9 to
22      search a vehicle."
23                Did I read that correctly?
24           A.   Yes, ma'am.
25           Q.   What does "unreasonably delayed" mean as you
```

Page 150

1   use that term there?

2        A.   It goes back to the example I gave you before

3   when I would have to clean up these trainings, right.

4   You're delaying a person when you stop the person,

5   you've talked with them, you tell them they they are

6   free to leave, they can go and then you try to continue

7   the traffic stop, you know, and then they say no,

8   because that's what happened in the Rodriguez case.

9   They say no.  What are your options as a police

10  officer?  None, let them go, right?

11              So that would be delaying -- if you told

12  them, "No, you're going to wait here until I get a

13  dog," they have delayed that person in order to get the

14  K9 there.  That's my opinion.

15       Q.   Okay.  And if a traffic stop is not extended

16  because of reasonable suspicion, how long should the

17  traffic stop go?

18       A.   A normal, everyday traffic stop, you can get

19  it done in ten minutes.

20       Q.   Okay.  The same paragraph, I want to look at

21  the second sentence here.  It's -- I'll read it, just

22  for sake of clarity.

23       A.   Thank you.

24       Q.   "Considering the totality of the circumstances

25  faced by Deputy Babb, an officer with the same

Page 151

1    experience and training would believe, under the same

2    set of circumstances faced by Deputy Babb, that

3    articulable facts existed and that further

4    investigation would confirm or deny the suspicions

5    perceived by Deputy Babb."

6              Did I read that correctly?

7         A.   Yes, ma'am.

8         Q.   And when you wrote, "The same set of

9    circumstances faced by Deputy Babb," what did you mean?

10        A.   It goes back to the level of experience that

11   Deputy Babb had is that particular time, right.  As I

12   said earlier, every officer has -- you know, they learn

13   things as they go throughout their career.  And at that

14   particular time, Deputy Babb believed that it was a

15   credible stop, the information was credible, so

16   therefore, in his mind, with his experience, he did

17   everything according to policy and just as any other

18   officer that I have seen in the past do, including

19   myself, I have done the same thing.  So that's nothing

20   inconsistent with standard law enforcement.

21        Q.   Understood.  And how did you determine the

22   circumstances of what Deputy Babb believed?  Is it fair

23   to say you got facts from Deputy Babb's testimony?

24        A.   So it goes back to the video, the body cam

25   video of Deputy Babb.

Page 152

1      Q.   Sure.

2      A.   The reports -- well, I guess I would say the

3   deposition, more so, that you did with him that I read

4   where there's way more detail than this report.

5           From those two things combined and from

6   my training and experience of being an officer that's

7   had similar circumstances, I can understand -- from his

8   level of training and from where he was at that

9   particular time, I can understand why he did what he

10  did.  Obviously, I don't know that for certain, I'm not

11  Deputy Babb, I'm not in his head and I can't, you know,

12  speculate on what he was thinking.  But it is

13  consistent with, you know, what I've done in the past.

14     Q.   Sure.  And just so that I'm clear, you

15  reviewed Deputy Babb's body camera and you reviewed his

16  deposition testimony to evaluate what Deputy Babb

17  believed?

18     A.   Correct, or what a reasonable officer would

19  believe in Deputy Babb's position, more or less.  I

20  mean, obviously, again, I'm not Deputy Babb, I can't

21  say what Deputy Babb believed, right.  It's just from

22  the position that he was in at that particular time.

23     Q.   Understood.  I think that this is a great spot

24  for a lunch break.

25           MR. BARRON:  Very good.

Page 153

```
 1              (Lunch recess from 12:29 p.m. to
 2     1:37 p.m.)
 3         Q.   (BY MS. HEBERT)  So we are back on the record
 4     after lunch.  A couple of form questions that I always
 5     have to ask.
 6              Did you talk to anybody about this case
 7     during the lunch break?
 8         A.   No.
 9         Q.   Great.  So let's look back at your report,
10     which we have marked as Exhibit 111.  Let's go to
11     page 1, the official page 1, and I'm going to skip to
12     the second paragraph on this first page and I'll read
13     this sentence.  "My opinions are based on the
14     documents, recordings and sworn depositions provided to
15     me in this case to date, as well as my experience,
16     training, education and research in the field of law
17     enforcement."
18              Did I read that correctly?
19         A.   Yes, ma'am.
20         Q.   Okay.  Did you do any new research in forming
21     an opinion in this case?
22         A.   No, ma'am.
23         Q.   Okay.  So would it be fair to say there were
24     two buckets of information you considered in forming
25     your opinion, the evidence and information about this
```

Page 154

```
 1    case that you had and your law enforcement training and

 2    experience?

 3         A.   It took me a minute to track with what you're

 4    doing, but I'm a visual person so I'm going with you.

 5         Q.   Got it.  Anything else that you did in forming

 6    your opinions here?

 7         A.   No, not that I can remember.

 8         Q.   Did you meet with Deputy Babb?

 9         A.   Absolutely not.

10         Q.   Did you meet with any Bexar County Sheriff's

11    officers?

12         A.   Absolutely not.

13         Q.   Did you conduct any site visits?

14         A.   I did not.

15         Q.   Did you do any testing?

16         A.   I did not.

17         Q.   Okay.  Let's skip to page 5 of your report.

18    Do you see the header "Research and Review," that's

19    where I'm looking on page 5?

20         A.   Yes, ma'am.

21         Q.   And it goes -- there's a list of items that

22    goes from page 5 to page 6.

23              Do you see that?

24         A.   Yes, ma'am.

25         Q.   Does the list on pages 5 through 6 contain
```

Page 155

1    everything that you reviewed in forming your opinion in

2    this case?

3         A.   Yes, ma'am.

4         Q.   Okay.  No other documents?

5         A.   No other documents.

6         Q.   No other recordings?

7         A.   No other recordings.

8         Q.   Okay.  And am I correct to say that these --

9    there's a list of 23 items here, with some of those

10   items containing multiple subcategories of things?

11        A.   Yes, that's correct.

12        Q.   Okay.  And it appears to me that items 1

13   through 11 are either Texas statutes or case law; is

14   that correct?

15        A.   That's correct.

16        Q.   How did you identify these sources of law, for

17   a lack of a better descriptor, of one through 11, as

18   relevant in this case?

19        A.   Texas Transportation Code is where traffic

20   violations are found.  The Texas Code of Criminal

21   Procedures guides -- governs law enforcement.  The case

22   law is case law that is -- I have found through my

23   training and experience or my research that are

24   relevant to drug interdiction cases or cases that are

25   similar to this one.

Page 156

1      Q.   Got it.  So how did you get copies of these

2   cases?

3      A.   Much of that is from research online.  I did

4   not use any case law that I had previously, but many of

5   these cases I have reviewed.  You know, Terry versus

6   Ohio, Whren versus United States, all of these cases

7   are cases that we have used in training before and they

8   are cases that, you know, I mean, I'm more familiar

9   with than others.

10              But in order to keep up with current case

11   law that may have changed, then obviously I do review

12   on the Internet and I find them on the Internet.

13      Q.   Understood.  And when you do review on the

14   Internet, do you read summaries of the cases or the

15   cases themselves or something else?

16      A.   I read the entirety of the case, for the most

17   part, depending on which one it is.  If I find that

18   it's not relevant, then, of course, I won't continue to

19   read it.

20              But in these particular cases, I try to

21   read -- I'm not going to say I read every one verbatim.

22   I couldn't say that.  I do read summaries in a lot of

23   them, but if I find them applicable to the situation at

24   hand, then I'll take more time to read -- read more

25   into the case law, read the whole thing.  It's

Page 157

1    confusing, I'm not an attorney and, you know, it's

2    Greek to me a lot of times.  That's what you guys'

3    specialty are, as far as being an attorney, and I'm not

4    an attorney.  But I do enjoy reading it just for it to

5    benefit my knowledge.

6         Q.    Understood.  Did you -- so the cases that are

7    listed here in this list on page 5, did you read all of

8    these cases in their entirety?

9         A.    I can't say that I read every one in their

10   entirety, no.

11        Q.    I want to ask you a question about No. 11.

12               Do you have access to Westlaw?

13        A.    Not Westlaw, no, ma'am.

14        Q.    Okay.  So how did you obtain a copy of United

15   States versus Redrick?

16        A.    So Redrick, I believe, is the California case,

17   if I'm not mistaken, or it's out of California, if I'm

18   not mistaken.  I believe that I found that case

19   through -- it may have been from the Institute of

20   Justice website.  If I'm not mistaken, that's where I

21   found that case.

22        Q.    Okay.  So you consulted the Institute for

23   Justice website and it was somewhere on there?

24        A.    Yes, ma'am.

25        Q.    Okay.

Page 158

 1          A.   It was either a website or it could have been
 2      a video that you guys have done, because I believe you
 3      guys did a video that I reviewed.
 4          Q.   Oh, okay, I see what you're saying.  14G,
 5      YouTube video by Institute for Justice dated June 6th,
 6      2023.
 7          A.   Yes, ma'am.
 8          Q.   Is that what you're talking about?
 9          A.   Yes, ma'am.  So I believe that's where I saw
10      the case of United States versus Redrick, which I found
11      interesting because I've never heard of it before.
12          Q.   Sure.
13          A.   So I thought that I would read it.
14          Q.   And then you obtained that case from Westlaw?
15          A.   No, I didn't obtain anything from Westlaw.
16          Q.   Okay.  So did you read this United States
17      versus Redrick case?
18          A.   I read a lot of the case.  I don't think that
19      I -- I don't think that case -- I don't think I
20      commented on that case anywhere in my report.  Maybe I
21      did.  I may be mistaken.
22          Q.   Page 30, second full paragraph, did you
23      discuss United States versus Redrick in this portion of
24      your report?
25          A.   Let me read the paragraph, if you don't mind.

Page 159

1        Q.   Sure, take your time.

2        A.   Oh, I was on the wrong paragraph, I'm sorry.

3   I was on the second paragraph, not necessarily the

4   complete paragraph.

5        Q.   Sorry, I know it's a little tricky.

6        A.   Yes, ma'am, I did write that and I did review

7   that case.

8        Q.   Okay.  So did you read that case in its

9   entirety?

10       A.   No.

11       Q.   Okay.  I want to look at -- go back to page 5.

12  Sorry, I'm jumping around a little.

13       A.   That's okay.  No, I appreciate you pointing

14  that out.  Okay.

15       Q.   And look at item 13 and you see the title

16  "Deposition" is there?

17       A.   Yes, ma'am.

18       Q.   For each of these depositions, did you review

19  the entirety of these depositions?

20       A.   I did.

21       Q.   Okay.  And for Martin Molina, I see that

22  there's a date of 04/18/2024.

23                 Do you see that?

24       A.   Yes, ma'am.

25       Q.   Did you review one deposition transcript for

Page 160

1    Deputy Molina?

2         A.    I believe there were two for Deputy Molina.

3         Q.    Okay.  But that second deposition transcript

4    isn't listed here?

5         A.    It is not.  It may be -- there also is not a

6    parentheses at the end, so I may have -- that may be an

7    omission on my part, a mistake on my part.

8         Q.    And there are one, two, three, four, five,

9    five people listed here under the title "Depositions."

10   Is that fair?

11        A.    Yes, ma'am.

12        Q.    So did you only review depositions from these

13   five individuals listed here on page 5 of your report?

14        A.    Yes, ma'am.  These are the five depositions

15   that I reviewed, yes, ma'am.

16        Q.    So if there are other depositions in this case

17   you did not read those?

18        A.    Not for purposes of my report, no, ma'am.

19        Q.    Okay.  I'm going to hand you what has been

20   previously marked Exhibit 49.  Would you mind pulling

21   that out?  And before we get to that -- go ahead and

22   pull that out.

23              Before we get to that, if we did not cite

24   United States versus Redrick -- Redrick from the Eighth

25   Circuit in our video, where would you have gotten that

Page 161

1    case?

2         A.   At that particular time, that was early in my

3    research of this case, so I was trying to catch up with

4    case law, any new case law that may be relevant.  So I

5    Google search and I get on and then I'll read case law

6    and then see if there's any other case law that is, you

7    know, mentioned within that case law that the judgment,

8    the summary judgment was made, so then I'll jump to

9    that case law and read it.

10             So odds are I could have seen that same

11   case in other -- within other case law or opinions, but

12   in all transparency, the first time I saw it, I think,

13   is whenever I looked at your website and I watched the

14   video on a PowerPoint slide that had something about

15   Redrick.  And I'm like, "Oh, that's new.  I didn't -- I

16   didn't know anything about that."

17        Q.   Sure.  And -- but you can't say, sitting here

18   today, whether you got this United States versus

19   Redrick from our PowerPoint or from Google searching?

20        A.   I don't remember specifically.  I just know

21   that that's the two ways that I -- I would have found

22   it.

23        Q.   Understood.  Okay.  Let's look at exhibit --

24   what has previously been marked Exhibit 49.  And I have

25   to get it for myself now.  Take a -- take a second to

                                                    Page 162

1     review it.

2         A.   Yes, ma'am.

3         Q.   If you need to spend some time reviewing a

4     couple of pages here, I'm happy to go off the record

5     for a minute.

6         A.   It will take a second because I just want to

7     read and see what it is.

8              MS. HEBERT:   Let's just take a

9     five-minute break, Donna.

10             (Recess from 1:50 p.m. to 1:56 p.m.)

11        Q.   (BY MS. HEBERT)  We took a short break.  We're

12    back on the record.  Did you have a chance to review

13    what's been previously marked Exhibit 49?

14        A.   I did, yes.

15        Q.   And have you ever seen this document before?

16        A.   I have not.

17        Q.   Okay.  Were you provided copies of all of the

18    exhibits that were reviewed during the depositions for

19    the deposition transcripts you reviewed?

20        A.   No, I was not.

21        Q.   Let's go back to your report.  Do you see

22    item 14 on page 5?

23        A.   Yes, ma'am.

24        Q.   And I see the header "Videos."

25             Do you see where I'm looking at?

```
                                              Page 163
 1          A.   I do.
 2          Q.   Are these videos that you viewed in forming
 3     your opinion?
 4          A.   It is.
 5          Q.   Okay.  For the first one, the private dash cam
 6     of Alek Schott, what dash cam are you referring to?
 7          A.   That would be a one-minute clip or so of a
 8     video from -- that was made from within his vehicle.
 9          Q.   Okay.  And was there only a single recording
10     that you reviewed from Mr. Schott's dash cam?
11          A.   Yes.
12          Q.   B -- body-worn camera, BWC, Joel Babb, do you
13     see that?
14          A.   I do.
15          Q.   Did you review one recording from Deputy
16     Babb's body-worn camera?
17          A.   Body-worn camera as far as video from the
18     patrol car, yes, with Mr. Schott, yes.
19          Q.   Okay.  So you reviewed one recording from
20     Deputy Babb's body-worn camera?
21          A.   That's correct.
22          Q.   From Deputy Gereb, one recording from Deputy
23     Gereb?
24          A.   Yes, ma'am, one.
25               THE REPORTER:  What was the name?
```

Page 164

1           MS. HEBERT:  Gereb, G-E-R-E-B.

2           THE WITNESS:  Well, there may be two on

3      that one.  I have marked two videos for that one,

4      volume 1, dated 2/27/24, and volume 2 taken 8/1/24 --

5      oh, that's depositions, I'm sorry, I'm sorry.  That's

6      my mistake.

7      Q.   (BY MS. HEBERT)  No, no, that's okay.

8           So 14C, BWC, Deputy Joe Gereb, you

9      reviewed one --

10     A.   One video, yes, ma'am.

11     Q.   -- from him?

12          And exhibit D, same, one video?

13     A.   Yes, ma'am.

14     Q.   Any of these categories, the 14 -- the videos

15     listed there that were multiple videos?

16     A.   Not to my recollection, no.

17     Q.   Okay.  Other than speaking with the lawyers in

18     this case, did you speak to anybody else in forming

19     your opinion in this case?

20     A.   No, ma'am.

21     Q.   Other than providing you copies of documents

22     of evidence in this case, did Mr. Leake or Mr. Barron

23     or their colleagues provide you copies of documents to

24     review?

25     A.   Other than what we have here?

Page 165

1      Q.    No.    Other than evidence that relates to the

2      facts of this case, did they provide you any of those

3      documents?

4      A.    No.

5      Q.    Okay.    Other than providing you documents, did

6      defendants' attorneys identify any assumptions that you

7      should rely on in forming your opinion in this case?

8      A.    No, ma'am.

9      Q.    I don't see any text messages listed in the

10     items on pages 5 through 6.

11           Am I understanding that correctly?

12     A.    Text message specifically, no, ma'am.

13     Q.    Did you review any text messages in forming

14     your opinion in this case?

15     A.    Not in forming my opinion, no.

16     Q.    And in -- otherwise?  I'm not talking about

17     your text messages with your kids or your partner or

18     anything like that.

19     A.    I understand, I understand.  No, I don't

20     remember any text messages, per se.  I'm trying to

21     think if any of the exhibits that came with that had

22     text messages.  I don't -- I don't recall using any

23     text messages in formulating my opinion in the report,

24     so I guess the answer is no, I don't recall.

25     Q.    That's fine.  Did you watch body-worn camera

Page 166

```
 1    of footage -- let me rephrase that.

 2                    Did you watch body-worn camera footage of

 3    any traffic stops, other than the traffic stop at issue

 4    with Mr. Schott?

 5         A.    Let me make sure I understand the question.

 6         Q.    Yeah, so I'm just asking about other traffic

 7    stops than the traffic stop with Mr. Schott.  Did you

 8    review body-worn camera footage from any other traffic

 9    stops besides the one between Deputy Babb and Alek

10    Schott?

11         A.    From Bexar County Sheriff's Office?

12         Q.    Yes.

13         A.    I believe I may have asked -- I can't

14    remember.  I may have asked for previous traffic stops

15    just to get an idea of how they make their traffic

16    stops, but I don't recall -- I don't recall whether I

17    reviewed those or not.  I just don't remember that.

18    They were not part of my report, no.

19         Q.    Okay.  By "they," do you mean Bexar County

20    Sheriff's Office?

21         A.    No, no, no.  The attorneys that have hired me,

22    Greenhill & Wright.

23         Q.    Right, but let me just make sure I understand

24    that.  So when you asked someone, the attorneys in this

25    case for additional footage --
```

Page 167

1      A.    Correct, to review, right.

2      Q.    -- to review of traffic stops other than the

3  one with Mr. Schott?

4      A.    I don't recall whether I did or I didn't.

5  They are not part of this investigation.  I don't --

6  that's what I'm saying is you asked a question that

7  has -- you know, I'm trying to review in my head

8  everything that I reviewed, which is a lot.  So -- and

9  I don't want to be dishonest with you and I don't want

10  to, you know -- but I don't recall seeing any other

11  videotapes from any other stops.

12      Q.    And if you did, would you list them here

13  and --

14      A.    Yeah, I would list them if they were -- if

15  they were part of the investigation, but I don't

16  remember that.  I don't remember getting any.

17      Q.    Okay.  So as we sit here today, you do not

18  remember seeing any other videos of other traffic

19  stops?

20      A.    No, not from Bexar County Sheriff's Office,

21  no.

22      Q.    That's fine.

23            One question I have for you, we talked a

24  lot earlier this morning about the stop of Mr. Schott

25  and the additional information that Deputy Babb may

Page 168

```
 1      have known from another law enforcement officer.

 2      Putting that information that Deputy Babb may have

 3      known from another officer kind of aside --

 4           A.    Okay.

 5           Q.    -- if it had just been -- I think you used the

 6      term "cold stop"?

 7           A.    Yes, ma'am.

 8           Q.    Would your opinion on whether Deputy Babb had

 9      reasonable suspicion or not change?

10           A.    I will respond to that just from my training

11      and experience.  An officer such as Deputy Babb, at his

12      level of experience and training, could have believed

13      reasonable suspicion existed.  Again, I'm not Deputy

14      Babb, I don't -- I don't want to speculate on what he

15      thought, what he saw because obviously he probably saw

16      and thought things that no one else -- no one is

17      thinking about, none of us were even thinking about.

18                     But under the same circumstances,

19      stopping a truck for a valid traffic violation, having

20      the responses that Mr. Schott made to the questioning

21      that Deputy Babb had asked regarding weapons, his

22      travel, the fact that he stayed in a hotel, the fact

23      that he was coming from Houston and he was going to

24      Carrizo Springs on a one-day turnaround to return back

25      to Houston, the fact that Mr. Schott had brought up and
```

Page 169

1    really avoided questioning about this female, there

2    seemed to be within the reports and within the

3    interviews that I reviewed on the body camera, there

4    seemed to be something hidden regarding this female.

5              So the answer is yes, he would have had

6    reasonable suspicion to ask more questions and to ask

7    for consent to search, based on those things.

8         Q.   Okay.  I think it might be helpful to examine

9    the next section of your report, page 6.  Do you see

10   the title "Sequence of Events"?

11        A.   I do.

12        Q.   What is this section of your report?

13        A.   It's basically the way that I review the case.

14   I read the depositions, I watch the video footage,

15   everything that I have that I'm going to review.

16              And I made the report a sequence of

17   events according to what I learned from everything that

18   I reviewed.  It's kind of a -- just a way to allow the

19   reader to understand kind of an overview, a summary, if

20   you would, of the case, from the understanding that I

21   had from what I reviewed.  It is not the actual events

22   that occurred.  I mean, sure, there are other things

23   that could have occurred that I'm not aware of.  I'm

24   not there and I would be speculating on that.  It is

25   just from the things that I reviewed as part of my

Page 170

1    report.

2        Q.   Sure.  Can we briefly go to page 12 and do you

3    see the header "Observations and Expert Opinion"?

4        A.   Yes, ma'am.

5        Q.   And do you see the second sentence -- I'm

6    going to read it so we're clear -- "The complete

7    summary of facts is documented within the report."

8              Did I read that correctly?

9        A.   You did.

10        Q.   And is that complete summary of facts

11    referring to the sequence of -- sequence of events

12    section?

13        A.   It's -- no, ma'am.  I mean, it's -- it's the

14    facts of my entire report.  It says I understand what

15    happened during this traffic stop.  The sequence of

16    events is just something that -- like I said, is

17    something, from my understanding, from the things that

18    I reviewed, was pertinent to this investigation, to

19    my -- asking for my opinion on what happened here,

20    right.

21              There are many other things that did

22    happen, that could have happened, that I don't know

23    that happened and, of course, I can't testify to that

24    and that would be all speculation on my part.  So, no,

25    that is not where everything came from.  It's the

Page 171

1    totality of my report is what that means.

2         Q.    Okay, I get it.  So you're -- what you're

3    saying to me is there might be facts that are somewhere

4    in your report that are in this sequence of events --

5         A.    Of course.

6         Q.    -- section, but the sequence of events section

7    and the report facts that are in your report are the

8    facts that you found pertinent, I think is the word you

9    used --

10        A.    Yes, ma'am.

11        Q.    -- or relevant to your analysis.  Is that

12   fair?

13        A.    From my training and experience, yes, ma'am.

14        Q.    Okay.  But there are facts that you decided

15   weren't relevant.  Is that also fair?

16        A.    Well --

17        Q.    I mean, let's put it this way.

18        A.    I mean, again, it would call for speculation

19   on my part because there could be things that are more

20   relevant than what I put in here.  There could be

21   things that are not as relevant, maybe not relevant at

22   all.  Maybe that's speculation on my part.

23        Q.    Okay.  I guess like, for instance, you

24   reviewed five depositions in this case.  Is that fair?

25        A.    Yes, ma'am.

Page 172

1    Q.   You reviewed eight videos, at least what's
2    listed here.  Is that fair?
3    A.   Yeah.
4    Q.   And you didn't summarize every fact from the
5    depositions and the videos and put it in your report.
6    Is that fair?
7    A.   Oh, that's true, not everything.
8    Q.   So how did you decide what facts mattered?
9    A.   So I was asked to review this case from the
10   objective of what an officer would do under the same
11   circumstances as Deputy Babb, right.  Were his actions
12   on this traffic stop consistent with law enforcement
13   standard, with what officers would do under the same
14   circumstances with the same training.  So those are
15   really the facts that I was looking at.  Those are the
16   facts that I'm talking about.
17            Deputy Babb, in my opinion, from
18   everything that I reviewed that's listed that you just
19   mentioned, the facts that I've talked about -- maybe
20   "facts" isn't the best word to put there, you know, if
21   we're talking, you know, terminology.  But they are
22   important things, they are important details that I
23   reviewed that were relevant to what happened here.
24            So I guess we're -- you know, we're
25   debating over this word, "fact," and maybe you and I

Page 173

1    just look at the word differently.  But these are

2    important observations.  This is important facts, as I

3    call them, as to what happened and why Deputy Babb did

4    what he did, from what I could tell from all of the

5    information I got.

6        Q.   Sure.  And I guess from what you just said a

7    little bit, you decided what facts were -- or details

8    were important based on what you thought would help

9    answer what you were asked to do in this case?

10       A.   Okay.  So, as I stated earlier, when we first

11   talked, I am not here to represent Deputy Babb,  I am

12   not here to represent anyone other than help the jury

13   understand what happens in drug investigations.

14       Q.   Sure.  And I understand that.

15       A.   So --

16       Q.   I'm not trying to cast aspersions.  What I'm

17   just trying to ask -- understand is your methodology

18   for how you got to these facts.

19       A.   Uh-huh.

20       Q.   And that's what -- if you want to phrase it in

21   a different way, like how you got here, how did you get

22   to this summary based on what you reviewed?

23       A.   Just as I just stated.  The training and

24   experience of Deputy Babb at the time that he made this

25   traffic stop compared to my experience, my training,

```
                                            Page 174

 1     what commonly transpires on traffic stops such as this
 2     one.  That's what I'm talking about.
 3          Q.   Okay.  So I want to look at item 14D.
 4          A.   Okay.  So is that a page number?
 5          Q.   It's back on your -- page 5, this 14D.
 6               Do you see where I am?
 7          A.   I do.  It's -- it's this Exhibit 50, the
 8     patrol car video?
 9          Q.   Yes, sir.
10          A.   Okay.
11          Q.   And did you watch this telephone conversation
12     between Deputy Babb and Sergeant Gamboa?
13          A.   I did.
14          Q.   Do you remember the nature of that
15     conversation?
16          A.   If I'm not mistaken, it was regarding needing
17     to write the report, I believe, if I'm not mistaken.
18          Q.   When you say "the report," what do you mean?
19          A.   Write the report for the traffic stop after
20     the fact, I believe on the 22nd or something.
21          Q.   Okay.  So something about the report for this
22     traffic stop?
23          A.   I'm sorry?
24          Q.   So something about the report for this traffic
25     stop.  Is that fair?
```

Page 175

1        A.    May have been, yes, I think so.  4/12/2022 --

2        Q.    Okay.

3        A.    So what I did, ma'am, and it could be my first

4    time of doing this, right, I just listed everything

5    that I reviewed as part of this investigation whether

6    or not there was anything relevant that I put with

7    something within the report.  So I may or may not have

8    put something about this within my main report, but I

9    did review it, which is why I put it under things that

10   were reviewed.

11       Q.    Understood.

12       A.    So that's why I'm having trouble -- unless I

13   have a place within the report that I can refer to and

14   I can better answer your question.

15       Q.    Understood.  And at that point, I was really

16   just asking if you did review it and what you

17   remembered.  Based on what I see -- I mean, you can

18   correct me if I'm wrong if you can see it somewhere

19   else -- I don't see where you referenced this

20   conversation that was recorded --

21       A.    That would be why.

22       Q.    -- in your report, and so I guess my follow-up

23   question on that is does that mean that you concluded

24   it wasn't relevant to your analysis?

25       A.    More than likely, if I not mention it within

Page 176

1   the report and I didn't reference this, then it's

2   something that I didn't consider within the report.

3        Q.   So --

4        A.   So I don't remember exactly what that video

5   was about, so I can't answer the question, right.

6        Q.   So I guess it would be fair to say that your

7   opinion is not based on that video?

8        A.   Yes, that's great.

9        Q.   And it wasn't something that you considered in

10  making your opinion.  You reviewed it --

11       A.   Well, I may have considered it, but, again,

12  without knowing what exactly transpired -- if I heard

13  that conversation again, you know, if I could hear it,

14  then I would remember.

15       Q.   Understood.  You know, I'm not asking -- I'm

16  not asking you to testify under oath what the content

17  of that conversation is.

18       A.   Of course.

19       Q.   I'm just trying to -- to figure out if you

20  decided not to discuss that conversation in your

21  report, does that mean you found that conversation not

22  to be relevant for the purposes of your opinion?

23       A.   Well, I'm going to refer back to what I told

24  you.  Everything that I reviewed I listed in this.

25  Whether or not I found it relevant to the case or not,

Page 177

1    I mean, I wanted to be transparent about everything.

2    Otherwise I wouldn't have put the YouTube for the

3    Institute of Justice, right.

4        Q.   Uh-huh.

5        A.   I wouldn't have put that, but that's for

6    transparency's sake, right.  So the Institute of

7    Justice video and the YouTube video, the news report

8    video, they are all similar to exactly what you're

9    asking me about that one.  I didn't mention them

10   anywhere in the report so, therefore, you know, are

11   they relevant or are they not relevant, I don't know.

12   I reviewed them.

13       Q.   Okay.

14       A.   So I guess the Institute for Justice video is

15   it a good example.  Did you find the Institute for

16   Justice video to be relevant for your analysis in

17   forming your opinion?

18       A.   No.

19       Q.   Okay.  Did you find the KENS5 news report

20   airing June 7th, 2023 to be relevant for your report?

21       A.   No.

22       Q.   And then did you find the patrol car video

23   dated 4/12/2022 to be relevant for your opinion?

24       A.   I don't recall.

25       Q.   To your memory, did Deputy Molina testify that

Page 178

1    he found marijuana in Alek's truck?

2        A.    I don't remember who said it, so I'm going to

3    say no to that answer.  But I do recall someone saying

4    that they saw shake.

5        Q.    Sure.

6        A.    Or marijuana residue, I think is what it was

7    called.

8        Q.    Okay.  So let's look at page 10 of your report

9    and I want to go down to the fifth paragraph, if you

10   count down from the top.  And I'm going to read that

11   first sentence.

12       A.    Sure.

13       Q.    "Deputy Babb, Molina and Gereb concluded

14   that -- concluded they were unable to find any

15   contraband in the F-250."

16             Did I read that correctly?

17       A.    Correct.

18       Q.    If you recall someone testifying that they

19   found shake in Mr. Schott's vehicle why did you write

20   that the three deputies concluded that they were unable

21   to find any contraband?

22             MR. BARRON:  Objection, form.

23             THE WITNESS:  Because it isn't

24   contraband.

25       Q.    (BY MS. HEBERT)  Okay.

Page 179

1      A.    It's not prosecutable, just as we discussed

2    earlier with the useable amount of marijuana.

3      Q.    Okay.  So what is your definition of

4    "contraband"?

5      A.    Something that's prosecutable, something that

6    someone can be arrested for, something that somebody

7    can be prosecuted for.  In law enforcement world, like

8    we discussed earlier, that shake or small portions of

9    what is believed to be marijuana, officers are not

10    going to take that.  They are not going to recover it,

11    they are not going to field test it.  It is just not

12    going to happen, so therefore -- and it's not

13    contraband.  No one is going to take it, no one is

14    going to test it, no one is going to be charged with

15    it.  So officers are not going to collect that as

16    evidence.

17      Q.    Okay.

18      A.    That's where I was going with that particular

19    statement.

20      Q.    Okay.  But did you -- let me ask you this.

21    Did you include in your report anywhere that an officer

22    testified that he found shake in Mr. Schott's vehicle?

23      A.    No.

24      Q.    Why not?

25      A.    Again, it goes back to the fact that an

Page 180

1      officer is not trained to take residual anything,

2      right.  I mean, it could be cocaine, it could be

3      methamphetamine, it could be anything, right.

4                    I mean, sometimes on search warrants on

5      houses, when a search warrant is executed in a house,

6      sometimes people will take cocaine and they will just,

7      you know, try to destroy and it goes all in the carpet

8      or wherever it goes.  It mixes with the dirt, you know.

9      That would be a similar circumstance.  We all know that

10     was probably cocaine, right, but we can't prove it so

11     we can't charge them with it.  There's nothing to field

12     test.  So is it contraband or is not contraband?  You

13     know, so it's not something that's relevant if you

14     can't be charged with it, if that makes sense.

15          Q.   Sure.  And you're -- you're making your

16     determination that it's not relevant because a shake

17     amount is not chargeable in Texas?

18          A.   It is not.

19          Q.   And so is that -- is that a yes, then, you're

20     making the determination that the shake amount is not

21     relevant because shake is not chargeable in Texas?

22          A.   Well, even if it was -- I mean, you can't even

23     prove that it was marijuana.  I mean, it's just from

24     the observation of the officer, whoever saw it, from

25     their training, their experience that that's what they

Page 181

1    saw.  You know, it may or may not have been marijuana.

2    Don't know.

3              In relation to this particular

4    investigation, again, you go back to the totality of

5    the circumstances -- and I think I know what you're

6    asking.  There's a dog alert in this case by a K9 and

7    that K9 alerted to something.  That could have been

8    what the K9 alerted to.  Maybe he did, you know.  Maybe

9    the person in the vehicle has been smoking marijuana

10   and they have got marijuana oil on their hands and then

11   they touch something and then the dog will react to

12   that as well.

13             So you just really don't know whether

14   what they saw was actually marijuana or not because

15   there's no field test, they didn't take it, so

16   therefore, no contraband was recovered from the truck.

17       Q.   Understood.  Have you ever been a K9 handler?

18       A.   I have not been a handler, no.

19       Q.   Okay.  Do you consider yourself an expert in

20   K9 practices?

21       A.   I consider myself someone who has been a

22   police officer a long time, has watched a lot of dogs,

23   you know, I've worked closely with K9 handlers, I have

24   supervised K9 handlers.  So I do have a lot of

25   knowledge of K9s and how they operate, but I am not a

Page 182

```
 1    K9 expert.
 2        Q.   Okay.  Can we look at page 9, second -- well,
 3    first full paragraph, it starts, "Prior to the K9
 4    arriving."
 5        A.   Yes, ma'am.
 6        Q.   Do you see what I'm referring to?
 7        A.   Gotcha, yes, ma'am.
 8        Q.   I'm going to read the last sentence of that
 9    paragraph.  "Deputy Babb was clearly communicating with
10    someone within a law enforcement capacity who was in
11    South Texas."
12                 Did I read that correctly?
13        A.   Yes, ma'am.
14        Q.   Okay.  If you wouldn't mind just quickly
15    reviewing the paragraph on page 8 before this and the
16    one after it so that I can ask you what you meant
17    there.
18        A.   Okay.
19        Q.   Because I think it's easier if we have a
20    little context.
21        A.   "During the 18 minutes of the arrival of the
22    K9"?
23        Q.   Yes, read there to, you know, the paragraph
24    after it because I just want some clarity on what the
25    paragraph meant.
```

Page 183

1          A.    Of course.  Do you want me -- let me look at
2     one more paragraph.
3          Q.    That's fine.
4          A.    I'm good now.
5          Q.    Okay.  As I understand this -- this first full
6     paragraph on nine to be communicating, I understand you
7     to be saying that Deputy Babb was texting with someone
8     in the law enforcement -- who worked in the law
9     enforcement capacity in South Texas while he was in the
10    patrol vehicle with Mr. Schott.  Am I understanding
11    what you're saying in this portion of your report
12    correctly?
13         A.    Well, not just in the car, but when he was
14    outside of the vehicle.  And he also spoke with him on
15    the phone.
16         Q.    Sure, and I understand that.  But what I'm
17    asking about is would this -- in this context, are you
18    referring to -- when you're talking about Deputy Babb
19    clearly communicating with someone, are you referring
20    to the entirety of all of the communications or just
21    what was happening in the K9 vehicle or in the patrol
22    vehicle?
23         A.    Yes, ma'am, I understand.  As an entirety, of
24    the entire things that I reviewed.
25         Q.    Okay.

Page 184

1          A.    And it's -- from my training and experience,

2     having worked undercover cases, hotel/motel

3     interdiction cases, things of that nature, and how law

4     enforcement works together with communication, and it

5     was clear to me by listening to this to watching the

6     video to reading the depositions that Deputy Babb was

7     communicating with someone.  He had more knowledge

8     than -- somebody was on the ground in Carrizo Springs.

9     He -- they even mentioned the female to him and I

10    believe that was -- at some point, they mentioned the

11    female to him and he asked Mr. Schott about the female.

12              So that -- that is what led me to believe

13    that there's someone he was communicating with via text

14    message, in addition to I hear him talking on the phone

15    with the guy.

16         Q.    Okay.  Can we go to page 9 and the second

17    paragraph from the bottom and I'll throw a monkey

18    wrench in here.  I'm going to read what I'm referring

19    to.

20         A.    Sure.

21         Q.    "Without any verbal confirmation from Deputy

22    Molina that the dog had given a positive alert, Deputy

23    Babb asked Schott to move from the front seat to the

24    back seat, explaining that he was being detained."

25              Did I read that correctly?

Page 185

1    A.    Yes, ma'am.

2    Q.    Okay.  So if -- based on your review of the

3    facts, how did Deputy Babb know that there was a reason

4    to move Mr. Schott from the front seat to the back

5    seat?

6    A.    I can't answer that question.  I'm not Deputy

7    Babb.  I wasn't there.  I have no idea.

8    Q.    Okay.  I think now is a good time to just walk

9    through generally what your methodology was in creating

10   this report.  We have talked a little bit about it.

11   And can you just walk me through the steps of what you

12   did to create your opinion?

13   A.    Well, first I reviewed and read the

14   depositions.  I believe I read Deputy Babb's -- well,

15   first I reviewed the complaint, I'm sorry, I reviewed

16   the complaint first.

17          Once I reviewed the complaint, then I

18   reviewed the depositions of Deputy Babb, Deputy Molina,

19   Gereb -- I haven't heard anyone say his name, so I

20   apologize.  I don't remember.

21   Q.    I won't tell him.

22   A.    Deputy Gereb, I think is what it is.  Also, I

23   reviewed the body cam videos of Deputy Babb?

24   Q.    After you reviewed the depositions?

25   A.    After I reviewed the depositions.  The first

Page 186

1    thing that I did was I read everything.  Before I

2    watched any videos, I read everything.  I say

3    everything; all of the depositions and everything.

4              Once I read the depositions, then I went

5    back and I watched the videos and then I compared the

6    videos that I watched from the body cam of Deputy Babb,

7    the video from Mr. Schott's truck, the body cam videos

8    of Deputy Molina, Deputy Gereb to compare them to

9    the -- the complaint and to the depositions.  I believe

10   I actually watched a video of the deposition of

11   Mr. Schott.

12        Q.   Yeah.  And I remember that being on your list,

13   too.

14        A.   Okay.  And this is all from memory.  And then

15   I reviewed -- I asked for -- from the law office, I

16   asked them to send me the policies and procedures for

17   different topics that I thought were relevant within

18   the investigation to see --

19        Q.   Right.  So you could evaluate the --

20        A.   And evaluate whether or not the policy was

21   followed.

22              I wanted to know whether Deputy Babb had

23   training.  They had originally sent me all of the

24   training certificates that Deputy Babb had taken.  I

25   reviewed all of the training certificates, I reviewed

Page 187

1    the internal affairs complaints, I reviewed the

2    dismissal orders, everything to have to do with

3    internal affairs.  I reviewed the initial internal

4    affair complaint -- or investigation prior to the

5    second one.

6         Q.   Okay.  And then to kind of shortcut this, just

7    for your sake --

8         A.   Sure.

9         Q.   -- you reviewed basically everything else that

10   was in -- on page 5 that you already listed out?

11        A.   Yes.

12        Q.   Okay.  And then what did you do after you

13   reviewed those materials?

14        A.   After I reviewed those materials, then, of

15   course, I researched case law.  I wanted to see if

16   there was any new case law out there that I didn't know

17   about, so I researched other case law.  I, of course,

18   watched the videos, because I wanted to know who you

19   guys were, from the Institute of Justice, so I reviewed

20   your website, which is where I obtained some case law,

21   I believe.

22             Once I reviewed all of that case law and

23   I reviewed the complaints and I the reviewed videos and

24   I reviewed the policies by the Bexar County Sheriff's

25   Office, then I decided whether or not Deputy Babb acted

Page 188

1      in accordance to the policy as I read them, and also if

2      Deputy Babb conducted this traffic stop in the manner

3      as any other officer with the same training, the same

4      experience, under the same conditions that he had and

5      decided whether what he did was justified compared to

6      what other officers would have done under the same

7      circumstances.

8                     And that's the way I viewed that, right.

9      I could not view that from hindsight, I could not

10     review that from my experience to where I am today

11     because that's not where Deputy Babb was that day at

12     his level of training and experience.

13                    So that was my methodology on determining

14     whether or not the traffic stop was a stop that, you

15     know, was normal, like everyone else makes, or if he

16     violated Mr. Schott's civil rights and that he did

17     something that he shouldn't have done, because I

18     100 percent believe that people have the right and

19     their freedoms and I have always operated that way and

20     officers don't appreciate other officers that violate

21     people's civil rights.  So I'm very passionate about

22     that.  So I took Mr. Babb's rights into

23     consideration --

24          Q.    You mean Mr. Schott's?

25          A.    I'm sorry, Mr. Schott's, you know, into

Page 189

1    consideration.  However, Deputy Babb, being a police

2    officer, is only working with what he knows at that

3    particular time and he's making decisions according to

4    what he's seeing -- or an officer, not Deputy Babb, but

5    any officer is making decisions according to what they

6    are seeing realtime and the responses that they are

7    getting at that particular time.  And that's the way I

8    viewed this case, that's the methodology I used.

9        Q.    Okay.  So what I kind of heard and understand,

10   based on what you just said, is you reviewed the

11   complaint first, you reviewed the depositions next.

12   After you reviewed depositions, you watched the videos

13   in this case and you compared the body-worn camera

14   footage, the dash camera footage and the complaint, and

15   then you reviewed the rest of the documents that you

16   had listed.  You did some research on the case law.

17   You asked for --

18       A.    Policy.

19       Q.    -- policies from Bexar County.  And then

20   looking at all of that evidence together, you weighed

21   whether Deputy Babb complied with those policies.  Is

22   that fair?

23       A.    I weighed whether or not I could see any

24   inconsistencies within the policies that Deputy Babb,

25   you know, may not have followed, right.

Page 190

1      Q.    Sure.

2      A.    I'm not Bexar County Sheriff's Office, nor am

3    I an administrator for Bexar County Sheriff's Office to

4    determine whether or not he violated any policies.  I

5    can't say that.  I can only look at the policy, review

6    it, look at what I saw and what I reviewed to formulate

7    an opinion.

8              From my training and experience, I know

9    that all departments have different policies, they have

10   different procedures and deputies, they perform their

11   job differently, you know.  It's not against policy and

12   it's not against the law, you know, for this officer to

13   do something different than another officer.  So I did

14   not see any discrepancies, I didn't see anything that

15   was just off the chart different than another

16   reasonable officer under those same circumstances.

17     Q.    Okay.  Let's go to page 11 and the second

18   paragraph and I'm going to just read this section.  I

19   think it's two sentences that it might just be helpful

20   to read.  "In determining whether the actions or

21   decisions of the involved officers are consistent with

22   generally accepted police practices, I applied a

23   reasonable police officer standard of officers based on

24   training and experience in order to objectively

25   evaluate the totality of the circumstances.  The

Page 191

 1      standard asks what information was knowable to the
 2      involved police officers at the time the decision was
 3      made and not from 2020 hindsight."
 4              Did I read that correctly?
 5          A.   Yes, ma'am.
 6          Q.   Is this what you were just kind of trying to
 7      explain to me, I think?
 8          A.   Yes, ma'am.
 9          Q.   Okay.  Can you explain to me the reasonable
10      police officer standard?
11          A.   Again, a reasonable officer under the same
12      conditions, I mean, I think we went over earlier how a
13      patrol officer is someone who may not have the same
14      experience or the same knowledge or the same desire to
15      really take a traffic stop and see if there's any other
16      crime associated with that particular traffic stop,
17      right.  That would be a patrol officer's standard,
18      right.
19              A criminal interdiction guy, he has more
20      training, he has more knowledge, he has more experience
21      in determining body language.  He knows more about the
22      drug industry.  He may have some knowledge of other
23      investigative strategies, such as hotel/motel, things
24      of that nature.
25              So this particular case was evaluated on

Page 192

1      those standards of that -- that type of officer, right,

2      not from the view of a patrol officer that knows

3      nothing about criminal interdiction.  In fact, when

4      reviewing the deposition of Deputy Molina, you could

5      tell that there's a difference between a K9 officer's

6      standards and the way he operates and the standards of

7      Deputy Babb because Deputy Molina -- Deputy Molina

8      appeared to not have any interest at all in being a

9      criminal interdiction guy.  He was focused on the K9s,

10     just as another deputy may focus on child molestation

11     cases, another one may focus on, "I don't want to do

12     anything other than be seen by the public and wave."

13              It takes each of these personalities in

14     order to effectively police the community.  You need

15     all of these people.  So there's not one set of

16     standards for quasi "a police officer" because there

17     are so many different things out there that these

18     officers have interest in.  That's the reasonableness

19     of that the particular -- that's what I'm trying to

20     refer to.

21          Q.   Okay, thank you.  What did you mean by

22     "objectively evaluate the totality of the

23     circumstances"?  How do you do that?

24          A.   So it goes back to if you were to take this

25     same situation and make it a cold traffic stop, like we

Page 193

1      talked about earlier --

2                      THE REPORTER:  A what?

3                      THE WITNESS:  A cold stop, a traffic stop

4      to where he had no knowledge, then there would be a

5      different set of circumstances, right.  Many of the

6      same, but probably fewer.  He had no knowledge, you

7      know, leading up to the traffic stop, right, underneath

8      a different scenario.

9                      So you have to objectively look at the

10     totality of the circumstances that Deputy Babb was --

11     was dealing with that particular day.  Any -- any

12     officer has to -- you have to understand what he was

13     thinking, the information that he had at that

14     particular time in order to determine whether he was

15     objectively doing what he was doing.

16         Q.    Okay.  Is your task then to kind of collect

17     all of the information and create an objective picture

18     of what was going on?

19         A.    For myself?

20         Q.    Yes.

21         A.    Sure.

22         Q.    You used the word "knowable."  What does

23     "knowable" mean?

24         A.    And which -- where did I use this word?

25         Q.    "The standard asked what information was

Page 194

1    knowable to the involved police officers."

2        A.    Sure.  That is what I'm referring to when I'm

3    saying he had prior information or it appeared that he

4    was communicating with someone.

5        Q.    Uh-huh.

6        A.    Something that he knew ahead of time before

7    the traffic stop.  Also, what he knows from his

8    training, his experience, what he knows from prior

9    interdiction stops that he has made compared to what

10   he's seeing on this stop.  Knowable, meaning any

11   training or any knowledge he has for body language,

12   right, seeing nervous behaviors, things of that nature

13   that he knows, that's known to him.

14       Q.    Okay.  So you're looking at specifically the

15   facts and experience -- experiences that Deputy Babb

16   has?

17       A.    Yes.

18       Q.    And if Deputy Babb did not have a fact, you

19   would not consider it?

20              MR. BARRON:  Objection, form.

21       Q.    (BY MS. HEBERT)  Let me rephrase.  If Deputy

22   Babb had a fact -- or if there was a fact -- I don't

23   know how to rephrase this.

24              If there's something that Deputy Babb did

25   not know, would you consider it?

Page 195

1            MR. BARRON:  Objection, form.

2            THE WITNESS:  Well, again, it goes back

3    to I don't know everything at the time that Deputy

4    Babb -- I don't know everything that happened there.  I

5    can only look to see from the things that I reviewed as

6    to formulate my opinion.  So Deputy Babb may or may not

7    have known other things, right.

8        Q.   Sure.

9        A.   So I can't -- that would be a subjective

10    answer.  I can't do that.

11        Q.   Sure.  So I guess the following question I

12    have for you is you reviewed the evidence in this case.

13    Did you evaluate each of those pieces of evidence for

14    whether Deputy Babb knew them or not?

15            MR. BARRON:  Objection, form.

16            THE WITNESS:  From -- I guess that's why

17    I evaluate everything from the perspective of the

18    officer from that particular time, during the training

19    and experience that he had during that particular time.

20            And I know I mentioned earlier that an

21    officer who has more experience, who has been doing

22    something, you know, longer, they may or may not view

23    it the same five years from now that they view it

24    today, right.  So a reasonable officer with the same

25    experience as Deputy Babb at that particular time would

Page 196

 1    have viewed this situation the same.

 2         Q.   Sure.  So I guess to crystallize what I'm

 3    trying to express, if an officer is -- if there's an

 4    event and the officer is standing there and the

 5    light -- the traffic light is red, but the officer,

 6    from where he's standing, couldn't have seen whether

 7    the traffic light was red, but you now know the traffic

 8    light was red based on traffic cameras at the scene,

 9    would you consider the fact that the traffic light was

10    red in evaluating the officer's actions?

11                    MR. BARRON:  Objection, form.

12                    THE WITNESS:  Again, that's a speculation

13    scenario, right.  I can't -- I can't say what the

14    officer saw, if the light was red or from what position

15    he was at as far as perspective, you know, from that

16    particular spot.  The only thing I can rely on is what

17    the -- is what the officer puts in the report or what

18    they testify to and I can't -- I can't say what -- what

19    else they saw.

20                    Now, many officers, you know, they --

21    they are really -- I guess we're going to get to the --

22    let's talk about the officer's -- the way he describes

23    something.  You know, everybody has different

24    terminology, right.  So an officer may see something,

25    but not really -- not really be able to explain it or

Page 197

1    put it in legal terms or the way that -- you know what

2    I mean.  So -- I'm sorry, so I can't say what an

3    officer -- whether he saw that red light or he didn't

4    see that red light.

5        Q.   I'm not -- I'm not asking you to.  I'm just

6    saying like if the officer said, "I couldn't see the

7    light," would you consider outside facts that said the

8    light was red?

9        A.   Yes.

10       Q.   Okay.  On page 12, if you wouldn't mind

11   looking at the second paragraph, and I read this

12   paragraph as you saying that you're not going to

13   reference case law in your opinions if you testify at

14   trial.  Is that fair?

15       A.   That's correct.

16       Q.   Okay.  What would happen if your understanding

17   of case law was incorrect for your opinion?

18               MR. SAENZ:  Objection, form.

19               THE WITNESS:  If some case law was

20   different than the way I perceived it or I read it,

21   then I believe that, you know, a judge who has the

22   ultimate authority to decipher case law will correct me

23   on that.

24       Q.   (BY MS. HEBERT)  And how would a jury know if

25   your conclusions were based on a misunderstanding of

Page 198

1    the case law if you don't reference case law in your --
2    your testimony?
3                    MR. BARRON:  Objection, form.
4                    THE WITNESS:  Well, again, I would
5    reiterate that this is one of those subject matters
6    that a law enforcement officer is not an attorney,
7    right, and -- but yet a law enforcement officer must
8    review case law in order to do his job correctly,
9    right.  So it kind of puts an officer in a position
10   such as this, to where you must depend upon case law to
11   guide you and to make an opinion or formulate an
12   opinion in this case.
13                   However, not being an attorney, not being
14   a judge, who is actually the ultimate decision on case
15   law and what the law says, it puts an officer in a
16   position.  So I can only explain it that way to a jury,
17   that we must depend on case law, right, but I can't
18   really testify to exactly what the case law says
19   because I'm not a judge who is the -- you know, the
20   man --
21        Q.   (BY MS. HEBERT)  Understood.
22        A.   -- or the lady.
23        Q.   Understood.  Let's go to page 12 -- we're
24   already on page 12.  I want to look at the Evaluating
25   Training Specific to Criminal Interdiction.

Page 199

 1                    Do you see that header?

 2        A.    Yes, ma'am.

 3        Q.    What was your overall conclusion with respect

 4   to Deputy Babb's criminal interdiction training?  I

 5   had a little hard time just like understanding what

 6   your conclusion on his training was about.

 7        Q.    Deputy Babb -- as I mentioned earlier, with an

 8   officer that is a good candidate for being an

 9   interdiction officer -- or not necessarily --

10   any topic, any officer that's specifically interested

11   in any one topic of law enforcement, they are going to

12   seek training relevant to whatever it is that they want

13   to learn about.

14                    In this case, Deputy Babb's training was

15   primarily for criminal interdiction matters and for

16   human smuggling matters.  That's what it seemed like he

17   was interested in from the training materials that I

18   saw, the certificates that I saw.  And he had taken a

19   lot of classes on it.  I believe I was provided with

20   the 53 certificates of training specialized in narcotic

21   enforcement.

22        Q.    Yeah.  And that just makes me -- prompts

23   another question.  Can you just quickly going to

24   page 18, and the paragraph that starts, "Deputy Babb

25   had 324 accredited TCOLE hours of specialized

Page 200

1    training"?

2        A.    Yes, ma'am.

3        Q.    Are these the same?

4        A.    Yes, ma'am.

5        Q.    Okay.  So the 53 certificates represent the

6    324 hours?

7        A.    Yes, ma'am.

8        Q.    Okay.

9        A.    So what I did is I looked at the certificate

10   and the amount of hours either on the certificate

11   itself or his TCOLE record and I totaled the hours up

12   from all of these -- these 53 certificates, and that's

13   how I calculated that he had 324 accredited TCOLE hours

14   regarding those two things, or regarding narcotics and

15   specialized investigations.

16       Q.    Great.  I just want to make sure there weren't

17   53 certificates plus 324 hours.

18       A.    You know, the training certificates for law

19   enforcement, they are confusing a lot of times.  And,

20   in fact, there were a lot of certificates that were

21   provided that were multiple certificates, so the --

22   apparently the -- you know, whoever their -- whoever

23   made --

24       Q.    By "multiple," you mean duplicates?

25       A.    Duplicates, right.  So there would be like --

Page 201

1    I think there was like, I don't know, three or four

2    sets of duplicate certificates, so I did not take into

3    account -- I mean, I found the duplicates and then I

4    found the hours for the training and looked at what he

5    had done.

6        Q.   So you excluded the duplicates.  Am I

7    understanding that correctly?

8        A.   Yes, I excluded the duplicates within these

9    hours that I totaled.  Now, of course, that's probably

10   not all of the training that an officer has taken

11   because there are many classes that they take where

12   they don't get a certificate.

13       Q.   Sure.  And looking back at this -- this

14   page 12, when you say specific to narcotic training,

15   does criminal interdiction fall under that umbrella of

16   narcotic training?

17       A.   Yes, ma'am.

18       Q.   Okay.  Is it fair to say that Deputy Babb had

19   more training certificates than his TCOLE records

20   indicated?

21       A.   Yes, ma'am.

22       Q.   Okay.  Did you evaluate whether all of the

23   training that Deputy Babb took, based on the

24   certificates, was TCOLE approved?

25       A.   I did look at that, yes, ma'am.

Page 202

1      Q.    Okay.  And what was your conclusion?

2      A.    It was not.

3      Q.    I'm going to read a portion of this sentence

4   here in the same paragraph.  "However, it was law

5   enforcement training provided by both government and

6   private training companies that was taken -- that was

7   either taken online, in person or via webcast and

8   completed by Deputy Babb."

9              Did I read that correctly?

10     A.    Yes, ma'am.

11     Q.    Simply because a training is provided by a

12  private entity, does that make it a good training, for

13  lack of a better descriptor, however you want to look

14  at it?

15     A.    No.

16     Q.    Earlier today, you talked a little bit about

17  trainings that you found the teachings to be

18  problematic and you did things to work with your

19  officers.  Can you talk to us a little more about that?

20     A.    Are you referring to the front seat

21  interviews?  That's what I was referring to.

22     Q.    I think it might have been front seat

23  interviews.  It might have also been folks trying --

24  folks using after the traffic stops to talk about

25  consensual encounters after the traffic stop had been

Page 203

1       over.  I think you were talking about something like

2       that, too.

3            A.   Oh, that was relevant to the Rodriguez case.

4            Q.   Okay.  So -- and you talk about doing --

5            A.   Not necessarily training.

6            Q.   -- cleanup trainings.  Can you just explain

7       that to me?

8            A.   Law enforcement training -- and it goes back

9       to the case law, right.  So you have case law from

10      different parts of the country, it's viewed differently

11      all over the country.  There's state case law and

12      there's federal case law.

13               There are training companies that

14      train -- people that train law enforcement that may be

15      from one area that has a specific set of case law or

16      facts or policies and procedures that then start

17      training officers in another part of the country and

18      then those officers are learning something that may not

19      necessarily be the way the courts view things in their

20      area.  That is common within law enforcement.  And

21      that's what I was referring to is when you have to

22      clean up something.

23               And in that case, it happened to be with,

24      you know, interdiction stops to where they were trying

25      to -- they were teaching people consensual encounters

Page 204

1    tactics, you know, to people in uniform and trying to
2    make it look like, you know, it's a consensual
3    encounter and not an actual, you know, detention on a
4    traffic stop.  And that's just not something that we
5    ever practiced in this area and they began teaching
6    that to officers in this area and then it would take me
7    a year to fix that, you know, to say, "That's not the
8    way we do it."
9              And, of course, I don't mean just my
10   agency.  I mean as a trainer in law enforcement in the
11   whole area.  I mean, I don't think I mentioned it.  It
12   is in my CV, but I've been an instructor since 1997 for
13   law enforcement classes.  So, I mean, I have taught all
14   over the country myself.  You have to be careful not to
15   teach people things that's not relevant to their area.
16   Q.   Understood.  And when you, as a supervisor, in
17   your role as a supervisor, if you discover that your
18   officers are learning something that you disagree with
19   or is inconsistent with your department's policy, what
20   do you do?
21   A.   Because I was a trainer, I always vetted the
22   instructors before the officers were allowed to take
23   that class.  So if an officer put in a request saying,
24   "Hey, Sergeant, I want to go take this class," the
25   first thing that I ask them to do is give me, you know,

Page 205

1    the curriculum for the class, give me the flier, is

2    what we call it, and that tells me what the class is

3    about, how much it costs, who the instructor is.

4              And then from that point, I do not want

5    them taking a class from someone that was not credible,

6    so I would vet the instructor.  I would research them

7    and then I would determine whether or not there may be

8    some problems, with, you know, what they are teaching

9    for my area and then I would approve or disapprove the

10   training.

11        Q.   Understood.  And let's say an officer didn't

12   ask for someone -- didn't ask for your approval for a

13   training.  I mean, some officers take, you know,

14   training on their own time.  If you learned that one of

15   your officers or some of your officers was doing

16   something that you found to be inconsistent with your

17   entity policy, what would you do?

18        A.   Well, you would -- you would have to retrain

19   them.  You would have to put them on the right path,

20   you know, review the material.  You know, you're

21   probably not going to know until something happens, to

22   be honest with you, right.  There's no way a supervisor

23   can keep up with everything that their officers are

24   watching and being trained, you know, especially with

25   online classes now.  So you really -- you don't know.

Page 206

1            If they turn a certificate in to get

2     credit for TCOLE, then they will turn it into the

3     training staff and then the training staff will submit

4     it to TCOLE for a credit.  And then that will be on the

5     record, so you will know that they have taken that

6     training.  But they may take something that you don't

7     know about.  So until something happens and they have

8     done something or a supervisor or a coworker says,

9     "Hey, man, you know, that's not -- you know, I've never

10    seen that before," then typically I'm not even going to

11    know about it.

12        Q.   Understood.  Let's go to page 13, and I'm

13    going to go to the paragraph at the very bottom of this

14    page and I'm going to read a sentence to you from that

15    paragraph.  "The training provided by instructors

16    associated with Street Cop Training were only a small

17    percentage of criminal interdiction training Deputy

18    Babb had received from other training providers."

19    There's more sentence there, but I'm just going to read

20    that portion.

21            Did I read that correctly?

22        A.   Yes, ma'am.

23        Q.   Okay.  Did you evaluate how much Deputy Babb

24    relied on the Street Cop training?

25        A.   Well, I don't know how much he relied on the

Page 207

1     Street Cop training.  There's nothing that I could
2     review that would tell me that, other than the number
3     of certificates that I reviewed, right, which there
4     were a lot of certificates for Street Cop -- Street Cop
5     Training.  Many of them were online or they were
6     webcast and I think only one of those was submitted for
7     TCOLE approval, and that being the one from Hays
8     County.
9                 Other than that, none of it was approved
10    for TCOLE, so I can't say how much he depended upon
11    that particular training.
12        Q.    That's fine.  Thank you.
13                Let's go to page 15 of your report.  I'm
14    looking at the second paragraph from the bottom and it
15    starts, "There wasn't a video."
16                Do you see where I'm referring to?
17        A.    Yes, ma'am.
18        Q.    Do you see where you reference the one-minute
19    video recorded from the F-250?
20        A.    Yes, ma'am.
21        Q.    Did you review a single one-minute clip from
22    Alek's dash camera footage from March 16th, 2022?
23        A.    Yes, ma'am.
24        Q.    Okay.  Did you ask Deputy Babb's attorneys
25    whether there was additional footage for you to review?

Page 208

1    A.   I did not.

2    Q.   Let's read the last sentence of that

3    paragraph.  I'm going to read that sentence in its

4    entirety.  "My opinion, based from the video provided

5    by Schott, is that the video had some form of

6    manipulation or it wasn't the entire video depicting

7    the incident as it was only one-minute in duration and

8    ended abruptly while Schott was mid-sentence in a

9    telephone conversation."

10            Did I read that correctly?

11   A.   Yes, ma'am.

12   Q.   In your opinion, did you conclude that the

13   footage from Alek's dash cam that you reviewed was

14   manipulated?

15   A.   It was obviously manipulated.  It's a

16   one-minute clip and I'm assuming, from my training and

17   my experience in watching videos in the past that the

18   video recorder has been going the whole time he's been

19   driving.  So if there's only a one-minute clip, there's

20   a five-minute clip or there's a ten-minute clip, it's

21   been manipulated because he's cut off mid-sentence when

22   the video ends, right, and there's only one minute.

23            So the video has been manipulated in some

24   form.  It's not an entire video that shows from when

25   the video camera was turned on until the time the

Page 209

```
 1   vehicle was turned off.  That's my -- that's what I'm
 2   talking about, manipulated.
 3        Q.   Understood.  And is there any other reason to
 4   conclude that Alek's dash camera footage had been
 5   manipulated, other than this one-minute aspect?
 6        A.   No, not from what I could tell.
 7        Q.   Are all dash cameras generally the same?
 8        A.   No, there's a lot of different cameras.
 9        Q.   Okay.  Do different types of dash cameras have
10   different mounting systems?
11        A.   They do.
12        Q.   Do different types of dash cameras have
13   different types of lenses?
14        A.   They to.
15        Q.   Do different types of dash cameras create
16   video with different resolutions?
17        A.   They do.
18        Q.   Do different dash cameras have different types
19   of storage systems, for instance, the cloud versus an
20   SD card?
21        A.   Sure.
22        Q.   And do different types of dash cameras have
23   different recording configurations?
24        A.   They do.
25        Q.   Do you recall Alek Schott testifying that he
```

Page 210

```
 1      had a BlackVue dash camera?

 2          A.   I do.  In fact, BlackVue is on the screen

 3      itself.

 4          Q.   Oh, okay.  Are you familiar with BlackVue dash

 5      cameras?

 6          A.   No, ma'am.

 7          Q.   Have you ever used a BlackVue dash camera?

 8          A.   Not BlackVue.

 9          Q.   Okay.  Did you do any research into how

10      BlackVue dash cameras record and store files?

11          A.   No.

12          Q.   I'm going to hand you what has been -- from --

13      I'm going to hand you from our files Exhibit K.  We're

14      going to mark that.  This is going to be marked

15      Exhibit  113.

16               (Exhibit 113 marked)

17          Q.   I'll hand that to you.

18          A.   Thank you.

19          Q.   Sure.  Now, I  thought about -- to be honest,

20      full transparency, I thought about connecting my laptop

21      to the computer so we could walk through how to get

22      this.  But can we agree that this is a printout -- or

23      at least -- you don't have to, you know, represent

24      beyond that.

25          A.   Sure.  No, we're good.
```

Page 211

1      Q.    What does this printout purport to be from?

2      A.    BlackVue Camera Systems.

3      Q.    Okay.  What's the title of this article?

4      A.    "Recording Video Segment Length."

5      Q.    Okay.  And can you read the first sentence of

6   the content for me?

7      A.    Of course.  "BlackVue cameras are built to

8   produce one-minute segments," and it's highlighted in

9   red, "of video recordings."

10     Q.    And based on this -- this information, if this

11  is correct, would you still believe that Alek's dash

12  camera has been manipulated?

13               MR. BARRON:  Objection, form.

14               THE WITNESS:  So, again, my opinion about

15  the manipulation of the video with the one-minute

16  segment, there's more video.  There are -- if it's a

17  one-minute segment, then it would have been important

18  for me to see, as someone evaluating this case, the

19  other minute before the minute -- particularly the

20  minute afterwards, right, even the ten minutes

21  afterwards.

22               So these recording devices, true enough,

23  they do record in one-minute segments.  However, they

24  store all of the information typically up to -- you

25  know, I have one similar to this, believe it or not,

Page 212

1    and it records in one-minute segments, but it stores

2    45 minutes worth.  So I can go back and review all 45

3    one-minute segments, right, which would have been

4    relevant and important in this case, in order to see.

5              Now, that potentially could answer as to

6    why the video cut off.  However, it would have been

7    important to listen to and see the video two minutes,

8    three minutes, four minutes after this.

9        Q.   But you didn't ask defendant's attorneys for

10   any other videos?

11       A.   I did not.

12       Q.   Did you do any research to evaluate whether

13   the speed reported by a dash -- a BlackVue dash camera

14   is accurate?

15       A.   From my training and experience with video

16   cameras, and particularly having video cameras, having

17   a telephone that has GPS on it, all of these video

18   cameras and telephones, they -- they are really

19   accurate with GPS coordinates.  So there was no reason

20   for me to believe that the speed on that camera was not

21   correct.

22       Q.   Sure.  And when you talk about your experience

23   as a -- I can't remember the phrase, mobile --

24       A.   Video instructor.

25       Q.   -- video instructor.  As a mobile video

Page 213

1      instructor, that experience was focused on teaching law

2      enforcement how to use their dash cameras; is that

3      correct?

4          A.   Yes, that and positioning the cameras.

5          Q.   Okay.  And the only other experience you have

6      with dash cameras is your personal experience; is that

7      correct?

8          A.   Oh, no.  So "only" is a strong word, right.

9      So in law enforcement, I mean, we always view dash

10     cameras, we review telephones, all sorts of video.  So

11     it's not just a small dash camera.  I mean, videos are

12     reviewed in law enforcement throughout your entire

13     career as an officer.  I have watched and, you know,

14     have a lot of experience with video cameras, and many

15     of those cameras are even button cameras, right.

16              From the undercover perspective, we're

17     always dealing with cameras and positioning of cameras,

18     the importance of cameras, the location of cameras to

19     be able to keep up with with undercover officers.  So,

20     you know, I just -- the word "only experience" is not

21     fair.

22         Q.   Sure, understood.

23         A.   I believe in my -- in my experience in law

24     enforcement, I've had a lot of experience with video

25     cameras.

Page 214

1        Q.    Okay.  Let me ask you a more, I guess --
2    you're entirely right to point that out.
3                    Have you ever used dash camera recordings
4    to do accident reconstruction?
5        A.    No.
6        Q.    What is more accurate -- can you tell me they
7    are the same accuracy or, you know, you can't make a
8    comparison, so don't feel like you're constrained for
9    the question.
10       A.    I understand.
11       Q.    A speedometer or a GPS speed indicator?
12       A.    In my personal opinion, I would -- the GPS
13   indicator, they are pretty much right on target.
14       Q.    Okay.  To your knowledge, has GPS calculation
15   improved in more recent dash camera models?
16       A.    I think everything improved in more recent
17   dash camera -- any camera system, you know, whether
18   it's like you mentioned, the resolution or, you know,
19   the angles, the view from the camera.  Camera systems
20   are -- I agree, they are unique, you know, to each
21   individual camera, which is why it's important in this
22   case.
23                    And, you know, something that looks far
24   away in the lens may actually be closer than it really
25   was, right, so certainly.  I mean, looking at a video

Page 215

1    on this computer screen from a camera that has a lens
2    this small is going to look different, you know, than
3    the small screen on the camera may have.
4            Q.    Understood.   And so would it be possible to
5    say that the speed calculation on a 2017 dash camera
6    would be less accurate than a camera today?
7                    MR. BARRON:   Objection, form.
8                    THE WITNESS:   You know, I'm going to date
9    myself again, but 2017 wasn't that long -- wasn't that
10   long ago and, you know, GPS technology was really good
11   in 2017.
12                    Now, if you would have used that scenario
13   of 1998, I would agree with you.   I'm sorry, but, you
14   know, 2017 is not that long ago.   There was good
15   technology in 2017.
16           Q.    (BY MS. HEBERT)   Sure.   But can you offer an
17   opinion on whether the technology has changed or not?
18           A.    The GPS technology?
19           Q.    Yes.
20           A.    Well, everything improves, you know.   I can't
21   deny that.   I mean, Elon Musk has satellites in the air
22   now that's doing wonders, you know.   So, of course,
23   since 2017, GPS has improved.
24           Q.    Let's return back to your report.   Let's go to
25   page 15, if you will.   And do you see the header

Page 216

1    "Probable Cause, Texas Transportation Code"?

2        A.    Yes, ma'am.

3        Q.    And we're going to walk through some of this

4    section.  But as I understand your report, you conclude

5    that a reasonable officer in Deputy Babb's shoes could

6    have pulled Alek Schott over for two offenses; is that

7    right?

8        A.    Had they observed the offenses, yes.

9        Q.    Okay.  And what are those two offenses?

10       A.    One would be, obviously, the speeding,

11   considering that the GPS indicated 84 miles per hour.

12   Number two would be the failure to drive in a single

13   marked lane.

14       Q.    Okay.  And let's look at page 17, the second

15   paragraph.  It's the first full paragraph, for the

16   avoidance of ambiguity?

17       A.    Okay.  I'm sorry, tell me -- page 17?

18       Q.    Yes.

19       A.    The first -- first full --

20       Q.    The first full paragraph, but the second

21   paragraph.

22       A.    Yes, ma'am, I'm tracking.

23       Q.    And I'm going to read, I think, that first

24   sentence.  "After reviewing the video recorded by

25   Schott and from the testimony of Deputy Babb in his

Page 217

1    deposition, a reasonable officer would believe that

2    Schott crossed the yellow line before approaching

3    Deputy Babb and after passing Deputy Babb, he crossed

4    the broken white line in proximity to the Ford truck

5    traveling in the right lane."

6                    Did I read that correctly?

7        A.    You did, ma'am.

8        Q.    Okay.  In this sentence, you reference the

9    dash cam or video recorded by Schott and the testimony

10   of Deputy Babb in his deposition.  Did you consider any

11   other evidence in evaluating whether a reasonable

12   officer would have concluded that Mr. Schott failed to

13   maintain his lane?

14       A.    Not that I recall.

15       Q.    Did you conduct a site visit?

16       A.    I did not.  I did review Google Earth, you

17   know, just so that I'm familiar with the area.  I'm

18   also -- I mean, I've traveled that road many times, you

19   know.  But other than that, I did not go to the site,

20   no, ma'am.

21       Q.    Okay.  Did you evaluate the place where Deputy

22   Babb's vehicle had been parked compared to where Alek

23   Schott's vehicle had been traveling?

24       A.    I did not go on a site visit, no.

25       Q.    Okay.  Did you evaluate how Deputy Babb's line

Page 218

 1    of sight might have been blocked by cars moving in the

 2    right lane?

 3        A.    I did see cars in the right lane and I did

 4    consider that, yes, ma'am.

 5        Q.    And when you see -- when you said "see cars in

 6    the right lane," you saw cars on --

 7        A.    It would be Mr. Schott's video.

 8        Q.    Okay.  So you reviewed Mr. Schott's video and

 9    saw that there were cars in the right lane?

10        A.    In the right lane, yes, ma'am.

11        Q.    Okay.  Did you evaluate what Deputy Babb's

12    line of sight could have been after Mr. Schott passed

13    him?

14        A.    The only evaluation I did with what Deputy

15    Babb testified to is from his deposition, from the

16    questions that he answered.

17        Q.    Okay.

18        A.    And he did -- in the questions or in his

19    responses, he did say in his deposition that he saw

20    Mr. Schott cross over the line, but he couldn't recall

21    exactly how many times.

22        Q.    So based on what we just reviewed in your

23    report, I understand your testimony to be that

24    Mr. Schott crossed over the line twice, based on what

25    you saw.  Is that fair?  Okay, I was imprecise.  Let me

Page 219

1    be more precise.

2              Do you plan to testify to the jury that a

3    reasonable officer in Deputy Babb's shoes would have

4    concluded that, one, Alek Schott crossed the yellow

5    line before approaching Deputy Babb and, two, Alek

6    Schott crossed the broken white line after approaching

7    Deputy Babb?

8        A.    Yes, ma'am.

9        Q.    Okay.  Is there any other conduct you conclude

10   that was relevant for the failure to maintain a lane?

11       A.    Yes, ma'am.

12       Q.    What other conduct?

13       A.    From reviewing the video from Mr. Schott's

14   vehicle, you can see that when he passes the Amazon

15   truck, the 18-wheeler in the right lane, when you look

16   at the contour lines of the truck and as he passes the

17   Amazon -- the Amazon truck, there's a slight curve in

18   the road and it is clear that Mr. Schott veered far to

19   the left as he went around that truck and then veered

20   back into his lane.

21       Q.    Okay.

22       A.    That's one occasion.  As he approached Deputy

23   Babb's vehicle, I mean, you could see Deputy Babb's

24   vehicle from the camera angle.  Now, I can't tell you

25   what Deputy Babb saw.  I wasn't there.  I'm only

Page 220

```
 1    testifying to what I observed on the actual camera, the
 2    view that I saw in the video.
 3         Q.    And by "the video," you're referring to
 4    Alek --
 5         A.    Schott, yeah.
 6         Q.    -- Schott's dash camera?
 7         A.    And in combination with what Deputy Babb had
 8    said that he -- when he saw Mr. Schott cross the line,
 9    before he approached and after he passed, while he was
10    behind them or catching up with them.
11              So, yes, in my opinion so, yes, he did
12    cross the line on numerous occasions while he was
13    passing the Amazon truck, while he was approaching
14    Deputy Babb and then after he passed Deputy Babb.
15         Q.    So the -- in your mind, there were
16    three crosses?
17         A.    Can I refer to my report?  It's in my report.
18         Q.    Yes, please do.  I'm trying to understand, so
19    feel free to refer to your report.
20         A.    Okay.
21         Q.    I guess what I'm trying to do is understand is
22    how many crosses there were --
23         A.    Yes, ma'am.
24         Q.    -- and which -- where they were.
25         A.    May I just read my report?
```

Page 221

```
 1        Q.   Well, we have to keep in mind --

 2        A.   Just the part -- just the part of the times --

 3        Q.   Sure.

 4        A.   -- on the video?

 5        Q.   We will give you a few minutes to read it.

 6        A.   No, I mean, out loud --

 7        Q.   Oh, yeah, sure.

 8        A.   -- to answer your question.

 9        Q.   Oh, absolutely.  And just tell me where you

10   are so I can follow along.

11        A.   Okay.  So this is page 16.

12        Q.   Uh-huh.

13        A.   And this would be the -- let's see -- one, two

14   three, this is the third full paragraph that starts

15   with, "At 11:12:26."

16        Q.   Yes, I see where you are.

17        A.   "Schott rapidly passed the vehicle in the

18   right lane and then Amazon truck, which several car

19   lengths ahead -- was several car lengths ahead.

20   According to the distance of the right line of the hood

21   in relation to the yellow line, in my opinion, Schott

22   swerved to the left in the curve as he passed the

23   Amazon truck at 84 miles an hour.  I reviewed the

24   posted speed limit on the portion of I-35 as being 75."

25                  That's not what I was -- that's not the
```

Page 222

1    violation I was -- .
2        Q.    Okay, so we'll call that, you know --
3        A.    That's one.
4        Q.    -- No. 1.
5        A.    Okay, let's see.  In relation to the -- okay,
6    so this would be the paragraph starting with, "In
7    relation to tires --
8        Q.    Sure.
9        A.    -- and striping being recorded on the video
10   at the same time --" let's see.  The "as Schott
11   approached at 11:12:49"  paragraph.
12       Q.    Okay, so the last one?
13       A.    It would be the very last paragraph.
14       Q.    Sure.
15       A.    "Schott received a telephone call just before
16   passing Deputy Babb, slowed to 72 miles an hour, never
17   regaining the speed after passing the patrol unit.
18   Schott continued the telephone conversation passing the
19   Ford truck.  A noticeable change in position of the
20   yellow line in relation to contour line was observed
21   and depicted from -- on, according to Deputy Schott's
22   video, 11:12:56 to 11:12:59."
23       Q.    And there's just one correction, you said
24   Deputy Schott at one point.
25       A.    Uh-oh, did I?  I'm sorry.

Page 223

1    Q.    Deputy Schott's video, but I think you mean --

2    A.    I'm sorry, I meant Mr. Schott's video.

3    Q.    Sure.  So that's No. 2?

4    A.    Yes, ma'am.

5    Q.    Okay.  And then can you identify for me No. 3?

6    A.    At that same paragraph and it continues to the

7    next page, "At 11:13:13 and during the phone

8    conversation, Schott overtook the Ford truck at which

9    time the left contour line was completely over the

10   broken -- the broken white line, potentially at an

11   unsafe distance to the truck in the right lane."

12           Now, this is where that correction that I

13   told you about earlier --

14   Q.    Yes.

15   A.    -- when he first started, that should have

16   been right contour line and not the left contour line.

17   Q.    Yep, I see it.  So the top of 17?

18   A.    Yes, ma'am.

19   Q.    Got it.

20   A.    "... potentially at an unsafe distance to the

21   truck in the right lane.  There wasn't a video

22   depicting the exact location of where the Ford truck

23   was traveling in the right lane next as he passed, but

24   at 11:13 Schott is verbally heard saying, "Oh, crap" as

25   the video and the audio abruptly ended during

Page 224

1      conversation."

2          Q.   Okay.  That was super helpful.

3               So there are three incidences, as you

4      reviewed the dash camera video --

5          A.   Yes.

6          Q.   -- where you concluded that Alek Schott's

7      vehicle crossed either the yellow or the white lines?

8          A.   Well, again, I'm -- I'm not there, right.  I'm

9      not in person, I can't see it.  I actually can just say

10     that from the video, from the testimony of Deputy Babb

11     on what he saw, according to the deposition, then it

12     matches what the video is depicting that I observed on

13     the video.  That's what I'm saying.

14               I can't definitively say, you know, that

15     he crossed the white line.  I can't say that.  I can

16     only say that there was a variance in the contour lines

17     at different times and that it appeared to me that he

18     crossed over the lines.  But I wasn't there and that

19     would be speculation on my part.

20         Q.   So help me understand a little bit, based on

21     what you just said there.  I understood -- I understood

22     you to say just now that you can't say whether Alek

23     Schott's vehicle crossed the line or not; is that

24     correct?

25         A.   Bad terminology.  I can't say what Deputy Babb

Page 225

1    saw when Deputy Babb said that he saw him crossing or

2    his tires on the line, right.  I can't see that.

3    That's speculation, right.  So I can only go from what

4    I saw in my training and experience and it's what I

5    believe from the video and from the testimony by Deputy

6    Babb that he did commit the traffic violation.  I

7    believe it's supported in the video, from my training

8    and experience, but I wasn't there personally to see

9    him commit the traffic violation.  That's all I'm

10   trying to say.

11        Q.   Understood.  Let's get -- maybe this will help

12   some, too.  Let's go to page 16 and the first -- the

13   third paragraph, but the second full paragraph.

14        A.   Yes, ma'am.

15        Q.   Can you review this paragraph for me?

16        A.   Yes, ma'am.

17        Q.   And in this paragraph that we just reviewed,

18   were you summarizing what you had seen on Alek's dash

19   camera footage?

20        A.   Yes, ma'am.

21        Q.   And you used the -- the word -- the phrase

22   "distinct contour lines."

23             Do you see where I'm referring, to that

24   first line?

25        A.   Yes, ma'am.

Page 226

1      Q.   What do you mean by "the distinct contour

2   lines"?

3      A.   When looking at Mr. Schott's video, the very

4   beginning, I mean at the still shot before the video

5   begins, you can see two contour lines on the hood, you

6   know.  They are symmetrical, they come from the -- the

7   top of the hood where the windshield is and they kind

8   of curve in towards the front of the hood.  Those are

9   the contour lines that I'm referring to.

10            At the very beginning, according to this

11   paragraph, he's within his lane, obviously so, and they

12   are equal to the broken white stripe on the right and

13   the solid yellow stripe to the left.  Those contour

14   lines are equal.

15      Q.   Okay.  I'm just going to pause you for a

16   second there.

17      A.   Okay.

18      Q.   When you say "the yellow line to the left," do

19   you mean the yellow line on the left of Alek's travel

20   lane as you saw in his dash camera footage?

21      A.   Yes, ma'am.

22      Q.   When you say "the broken right -- the broken

23   white line on the right, are you referring to the

24   broken white line you saw on the right in Alek's dash

25   camera footage?

Page 227

1       A.    Yes, ma'am.

2       Q.    Okay.

3       A.    That separates the right from the left lane of

4    the northbound Interstate 35.

5       Q.    Got it.  And so when you used the phrase

6    "crossed over the yellow line," do you mean that Alek's

7    truck passed over the yellow line?

8       A.    Either over it or on it.

9       Q.    Okay.  And how would you know which way --

10   which one worked, which -- how would you know which it

11   was?

12      A.    Well, looking at the -- at the video, looking

13   at -- you can see that there's a yellow line and then

14   there's several inches -- I don't know how many there

15   are -- and then there are rumble strips.  They are the

16   indentions within the shoulder to let you know that

17   you're crossing the line.

18      Q.    We've all driven on those.

19      A.    You've driven on those before, right?

20      Q.    Yep.

21      A.    So I do not believe he was on the rumble

22   strips.  I do not believe he was all the way across

23   that far.  I do believe, from the video, that his left

24   tires had gone over that line, over the yellow line on

25   it, but not far enough to hit the rumble strips.

Page 228

1      Q.   Okay.  So it's -- it's your opinion, based on
2   the dash camera footage that you reviewed, that
3   Mr. Schott's tires crossed over the yellow line, but
4   did not hit the rumble strips?
5      A.   Yes, ma'am.  And that particular time was
6   after he passed the Amazon truck.
7      Q.   Understood.  Was that the only time that you
8   believe that the tire moved over the yellow line, but
9   did not hit the rumble strips?
10     A.   I believe there was one more time that I
11  mentioned.
12     Q.   Sure.  And is that the No. 2 time we talked
13  about where right -- right -- just before passing
14  Deputy Babb on 16, the last paragraph?
15     A.   So that would be the second one.  I do not
16  believe that one was as noticeable, so I do not believe
17  he went as far as he did on the first one.
18     Q.   Understood.
19     A.   Yes, ma'am.
20     Q.   But, in your opinion, Mr. Schott's tire
21  crossed over the yellow line?
22     A.   Either over or on the line.
23     Q.   Okay.  Did you do anything to evaluate the
24  relationship between what Mr. Schott's dash camera
25  showed and the positioning of his tires?

Page 229

1          A.    No, ma'am.

2          Q.    So based on your review of the dash camera

3     footage, could you say where Mr. Schott's tires were

4     located?

5          A.    No, ma'am.  That is not -- you can't see that

6     from the angle of the video.

7          Q.    Can we go to page 16 and the first full

8     paragraph, it starts with, "In relation to tires and

9     striping."

10                Do you see that?

11         A.    Yes, ma'am.

12         Q.    I'm going to read some of this so we have the

13    entirety.  "In relation to tires and striping being

14    recorded on video at the same time, it was nonexistent.

15    Therefore, my opinion is based solely on my experience

16    and training having instructed law enforcement officers

17    on the use of mobile video during my career and from

18    what I reviewed on the video as part of this case."

19                Did I read that correctly?

20         A.    Yes, ma'am.

21         Q.    When you wrote "it was nonexistent," what were

22    you referring to?  I just -- I don't quite understand.

23         A.    The question that you just asked me, could I

24    see the tires and the yellow line in the same frame.

25         Q.    Okay.

Page 230

1          A.    And I could not.

2          Q.    So just to finish that out, I think, for the

3     failure to maintain a lane offense, it is your opinion

4     that will Alek Schott crossed the yellow line twice and

5     the broken white line once, based on the review of his

6     dash camera footage and Deputy Babb's testimony.

7                    Is that a fair summary of your opinion?

8          A.    I would like to make a comment about the

9     deposition that I read and reviewing this, if I may.

10    And there seems to be a lot of focus, from what I read

11    in the deposition, on the yellow line and what deputy

12    saw -- Deputy Babb saw as the vehicle approached him,

13    where the vehicle was located when --

14         Q.    When you say "the vehicle," you're referring

15    to --

16         A.    Mr. Schott's vehicle, I'm sorry.  Learning

17    curve for me.

18                    But there wasn't much conversation about

19    what transpired after Mr. Schott passed Deputy Babb.

20    There has not been very much testimony.  However,

21    Deputy Babb did testify that he did cross over and

22    failed to maintain his lane after he passed him and

23    while he was trying to catch up with him.

24                    That offense, to me, was very unsafe had

25    the white truck alongside him been in the position in

Page 231

1    the right lane that he was because Mr. Babb -- not

2    Mr. Babb.  Mr. Schott, I'm sorry.  Mr. Schott had

3    received a telephone call as he approached Deputy

4    Babb's vehicle, which will distract a lot of people on

5    a phone call, right.  You know, not many people can

6    answer a telephone, in my experience, being personal

7    experience as well, without looking at the telephone to

8    answer it.  That potentially is significant when

9    Mr. Schott answers the phone, takes his attention away

10   from the road as he's approaching Deputy Babb, which

11   could have caused him to cross the line.  He's on a

12   phone conversation after he passes Deputy Babb.

13            As he passes the white Ford truck in the

14   right lane while Deputy Babb is attempting to catch up

15   with him or is -- has caught up with him -- we don't

16   know because there's no vehicle on exactly his

17   positioning -- you can hear Mr. Schott say, "Oh, crap,"

18   which, in my experience in law enforcement, you know,

19   and actually been in those positions is you just got

20   lit up by the police, right.

21            So -- and there's a distinct right -- the

22   distinct discrepancy.  I mean, that -- that contour

23   line on the right side is way further over than it had

24   been at any one time.

25       Q.   And when you say "contour line on the right

Page 232

1    side," you're referring to the --

2        A.    On the hood of Mr. Schott's truck.

3        Q.    And in relation to --

4        A.    To the right broken stripe on the right,

5    separating the right and the left lane of the

6    northbound lane.

7        Q.    Okay.

8        A.    And that coincides with what Deputy Babb had

9    said in his deposition, that he observed that as he was

10   behind the vehicle.  So I just want to make sure that,

11   you know -- I saw that, you know, it's in my report.

12             So, in my opinion, that was very unsafe

13   with the truck being in the right lane.  Mr. Schott,

14   being on the telephone, being distracted and looking in

15   the rearview mirror as a patrol car is behind him,

16   which is obvious from the video by him saying "Oh,

17   crap."

18       Q.    Okay.  Did you evaluate what Deputy Babb could

19   have seen while he was driving to catch up with Alek

20   Schott's truck?

21       A.    Well, I mean, again, that would be speculation

22   on what Deputy Babb saw.  I don't know what he saw.

23   Obviously, he has a computer.  Obviously, there were

24   some things that I reviewed where he may have been

25   running license plates on the computer.  That in itself

Page 233

1     doesn't necessarily mean he's distracted or can't see

2     anything.

3              Officers all the time are on the computer

4     typing, you know, while they are driving.  Officers

5     don't just look at the computer the entire time they

6     are driving and not look at the road, you know.  They

7     are trained and they have experience in doing that.  So

8     it's been my experience with these computers in the car

9     and following someone that I can still see the traffic

10    violations that occur in front of me, even though I may

11    be running a license plate or, you know, anything of

12    that nature.

13              So, yes, he very well could have been

14    looking or running license plates, according to the

15    records, but I don't think that distracted him from

16    seeing what he saw.

17         Q.    Understood.  Did you evaluate whether texting

18    and driving could have impacted what Deputy Babb saw?

19         A.    Same scenario.

20         Q.    Okay.  So you just talked about the -- after

21    Alek Schott passed Deputy Babb, it is your opinion,

22    based on the dash camera footage and from Deputy Babb's

23    testimony, that Mr. Schott's car crossed over the white

24    lines on the right side of the travel lane that he was

25    on?

Page 234

1          A.    Yes, ma'am.

2          Q.    And before passing Deputy Babb, Alek Schott's

3     vehicle crossed over the yellow line twice?

4          A.    Yes, ma'am.

5          Q.    Any other conduct that led you to conclude

6     that Mr. Schott committed the offense of failure to

7     maintain a lane?

8          A.    You know, I watched that video many times, you

9     know, second by second and, you know, I really tried to

10    determine whether -- or where -- had I been in Mr. --

11    or in Deputy Babb's position, where would I have been

12    able to see Mr. Schott's vehicle to be able to see this

13    violation.  So I really considered that a lot, right.

14              And I came to the conclusion that, from

15    my training and my experience in this business, having

16    worked interdiction many, many years, police officers

17    who are looking for a certain vehicle, they are

18    fine-tuned focused on looking for a vehicle, and in

19    this case, Deputy Babb was looking for an F-250.

20              So his ability -- again, I'm not Deputy

21    Babb, but my ability to be able to see an F-250 and

22    recognize that one is coming would be at a greater

23    distance than probably a vehicle that I'm not looking

24    for.  Is that fair to say?

25         Q.    Sure.

Page 235

1      A.   So -- so having already known the vehicle,

2   make, model and even having a photograph of that truck,

3   I believe I would have been able to see that truck from

4   a greater distance and what it was doing, particularly

5   in relation to other vehicles, like the distance

6   between the vehicles, to determine whether they crossed

7   over the line, I would be able to see that.  So I took

8   that into consideration in this case.

9      Q.   Sure.  And I get that.  That makes total sense

10  to me.  But what -- in terms of the conduct, there were

11  three times, based on your perception of the testimony

12  and your review of the dash camera footage, that you

13  saw Mr. Schott's vehicle cross out of its lane.

14              Am I understanding that correctly?

15     A.   Yes, ma'am, in combination of everything I

16  reviewed, not what Deputy Babb saw.  Only what I

17  reviewed.

18     Q.   Sure.  And in evaluating the offense of

19  speeding, I'm going to move on to speeding, if that's

20  okay.  What evidence did you consider for speeding?

21     A.    In this case, that was the first thing that I

22  noticed on the video, to be honest with you.

23     Q.   And when you say "the video," you're referring

24  to --

25     A.   I'm sorry, I do apologize.  Mr. Schott's

Page 236

1    video, from Mr. Schott's --

2         Q.    So let's start that again.   In this case --

3         A.    Yes, ma'am.   In this case, Mr. Schott's video

4    that I reviewed, the first thing that I noticed was he

5    was passing traffic at a rapid speed, and that is when

6    I looked at the entire, you know, bottom frame of the

7    video and I saw the GPS speed of 84 miles an hour.

8    That explains why he's passing traffic at such a rapid

9    pace.

10              As an officer that has stopped thousands

11   of cars and having also, you know, been certified in

12   the use of radar to be able to write tickets for that,

13   you know, an officer is trained to first observe a

14   vehicle and if it appears that vehicle is speeding and

15   you judge that by the other traffic.   So in this case I

16   think that's why I noticed that first.

17              And then once I noticed that and I

18   noticed the speed, then I began looking for the failure

19   to drive in a single lane had he or had he not at that

20   particular time.

21        Q.    Sure.   So other than the dash camera footage

22   and Deputy Babb's testimony, did you have any other

23   evidence you -- you reviewed in making the conclusion

24   that Alek Schott was speeding?

25        A.    No, ma'am.

Page 237

1          Q.    Okay.  I want to talk a little bit about
2      source of information.
3          A.    Okay.
4          Q.    What is a source of information?
5          A.    You know, it's more police jargon.  A source
6      of information -- I'm going to use the Drug Enforcement
7      Administration here as an example.  When you write
8      DEA-6, which is a report with the Drug Enforcement
9      Administration, the DEA-6, if you're using a
10     confidential informant then oftentimes they refer to
11     them as confidential sources, which would mean CS for
12     short, right.  At my department, we use the words CI,
13     confidential informant, not confidential source, so it
14     would be CI.
15              But if it's an unknown person, someone
16     that is phoning in information and you don't
17     necessarily know who it is, then they are a source of
18     information.  It's someone who you do not have the
19     identity to, that being whether you're, you know,
20     having it in a confidential informant file or you're
21     putting the name in the report.  So that's what a
22     source of information is --
23         Q.    Got it.
24         A.    -- for this report.
25         Q.    Okay.  So then as you use the term "source of

Page 238

1    information" in your report, you're using that term

2    because you didn't know who the source of the

3    information is.  Is that fair?

4        A.   That's fair.

5        Q.   Okay.  Who is Kiki?

6        A.   I have no idea.

7        Q.   Okay.  Do you know what the Laredo Fusion

8    Center is?

9        A.   Uh-huh.  So not necessarily the Laredo Fusion

10   Center, but what a fusion center is, is where

11   information, intelligence --

12       Q.   Sure, sure.  And I'm not asking you what a

13   fusion center is more generally, but do you know what

14   the Laredo Fusion Center is specifically?

15       A.   Not unless it's one of the fusion centers

16   within the network.

17       Q.   Sure.  Did you do anything to evaluate whether

18   the Laredo Fusion Center exists?

19       A.   I'm certain they have one, but no.

20       Q.   Okay.  Did you do anything to learn who Kiki

21   was?

22       A.   No, ma'am.

23       Q.   Okay.  As you sit here today, do you know if

24   Kiki was a law enforcement officer?

25       A.   I do not.

Page 239

1    Q.   Let's look at page 6 of your report.  No. 6,
2    do you see the last paragraph here?
3    A.   Yes, ma'am.
4    Q.   I'm going to read the first sentence there.
5    "Prior to the traffic stop, Deputy Babb utilized a
6    messaging program called WhatsApp to receive
7    information that the 2019 F-250 displaying Texas LP
8    LJR-4135 was northbound on IH-35 in Carrizo Springs, a
9    city located in South Texas."
10   A.   Yes, ma'am.
11   Q.   Did I read that correctly?
12   A.   You did.
13   Q.   Okay.  Just for ground rules, what is
14   WhatsApp?
15   A.   WhatsApp is a messaging program that's -- they
16   don't use -- it's Internet based, it's not telephone
17   based, WhatsApp.  So, you know, it's where you can
18   create group messages, group -- you know, it's much
19   like a group text message, but it's utilizing WhatsApp,
20   which is merely just one of the programs that offers
21   that service.
22   Q.   Is WhatsApp a messaging program only for law
23   enforcement?
24   A.   No, ma'am.
25   Q.   Who can use WhatsApp?

Page 240

1          A.    Anyone with a phone.

2          Q.    To better understand your analysis, it would

3     be helpful to kind of have an understanding of your

4     perspective on the inputs to your analysis.  So feel

5     free to consult your report as we go, but I want to

6     understand your view of the facts.

7                    What information did Deputy Babb have

8     about Mr. Schott before he turned on his lights to make

9     the traffic stop?

10         A.    It's my understanding from the deposition,

11    from the body cameras that I reviewed that -- and

12    that's the body cameras of Deputy Babb, body cameras of

13    where he was speaking with Deputy Molina, which had a

14    lot of the same information, and it could have been

15    even Deputy Gereb.  He commonly referred to information

16    that he had prior to the stop.  He has very hesitant to

17    give up too much information that he had knowledge

18    about.

19                    That is -- in my opinion and my

20    experience in law enforcement, it's because he was

21    trying to protect some ongoing investigation that may

22    have been occurring where he got that information from.

23    He mentioned information about one-day turnaround, he

24    mentioned information about frequent trips, about a

25    potential female with him as he went to Carrizo Springs

Page 241

1    from Houston, about a female at a hotel in Carrizo

2    Springs, about the truck leaving the hotel, going to an

3    offsite place, information that the female was taken

4    back to the hotel and information that the truck was

5    heading northbound on I-35 and then arrived within the

6    timeframe.

7            So from my training and experience and

8    from reviewing all of that, from having experience on

9    the investigative side of narcotics, I can confidently

10   say that there was information he had that was -- that

11   was confirmed by what he saw.  According to the

12   depositions, you know, he had information.

13       Q.   Understood, understood.  And I'm -- I'm just

14   trying to capture all of the information.

15       A.   Yes, ma'am.

16       Q.   So it is your testimony that before Deputy

17   Babb turned on his lights to make the traffic stop of

18   Alek Schott, he had information about the one-day

19   turnaround, the frequent trips, some lady who had

20   traveled with Mr. Schott, a female at the hotel, that

21   Mr. Schott had moved from the hotel to offsite and

22   Mr. Schott had driven north on I-35 and Mr. Schott

23   arrived at the timeframe he was expected to arrive in

24   Bexar County; is that fair?

25       A.    If I can, let me refer to my report.  I have

Page 242

```
1     those, I think, outlined in the report.  Let me see.
2                    (Discussion off the record)
3                    THE WITNESS:  So on page 19 of my report.
4          Q.   (BY MS. HEBERT)  Sure.  19, okay.  Okay, got
5     it.
6          A.   No. 1, I outlined some of those things that
7     you're asking about.
8          Q.   Yeah.
9          A.   Deputy Babb had prior -- had prior knowledge
10    about the description, color and license plate of the
11    vehicle, so that would be one thing.  The F-250 had
12    been scanned by LTR in Fayette County traveling
13    westbound on IH-10 the night before.  That would be two
14    things.
15         Q.   Sure.
16         A.   Deputy Babb was told by a member of law
17    enforcement texting group, the F-250 had frequent
18    patterns to and from South Texas on multiple occasions.
19    That would be three.
20                    Deputy Babb was told that the F-250 was
21    possibly traveling in tandem with a secondary vehicle
22    during trips to South Texas.  That would be four.
23                    Let's see.  There's that date of
24    March the 22nd again, so I'm sure that's a typo.
25         Q.   He's referring to item 5.
```

Page 243

1      A.    Item 5, right.  Deputy Babb was informed via

2    messaging app the F-250 left Carrizo Springs at the

3    specific time utilizing I-35.  That should've been

4    March the 16th, not the 22nd.  That would be five.

5              Let's see.  Deputy Babb observed the

6    F-250 driven by Schott on IH-35 confirming the

7    information that he had received leading up to that,

8    basically.  That's No. 6.  So that would be six things

9    that related to the information that he had prior to

10    the traffic stop.

11      Q.    Okay.  So these six things are the only six

12    things that Deputy Babb knew before the traffic stop?

13      A.    I don't know what else he knew.  He may have

14    had other conversations via phone.  I don't know.  That

15    would be speculation.

16      Q.    Sure.  Well, we just talked about -- we talked

17    about a couple of things, about a female at the hotel

18    and a lady who traveled with him.  I don't see those in

19    items 1 through 6.  Is that fair?  Unless I'm missing

20    them.

21      A.    Well, so No. 4 is that Deputy Babb was told

22    that the F-250 was possibly traveling in tandem with

23    the secondary vehicle during trips to south Texas,

24    right.  So that -- that is the same as the female

25    that's involved.

Page 244

```
 1              Originally, there was confusion with
 2     whether the female was in another car, at what point
 3     she was in another car.  And I don't think Deputy Babb
 4     was clear on whether or not the female was coming from
 5     Houston or the female met him in Carrizo Springs.  So,
 6     you know, you can't pinpoint that particular topic
 7     because I don't think it was clear at any point where
 8     she was or where she -- other than that we know she was
 9     seen, according to Deputy Babb's conversation on the
10     phone, that's recorded on his body cam, while he's
11     searching the truck of Mr. Schott, he calls and he --
12     it has been assumed that that telephone call was to a
13     supervisor, right, and in the -- from the depositions
14     that I read -- well, actually, it's in the complaint as
15     well, the the complaint reads that he was in contact
16     with a supervisor.
17              Well, I believe that was the person in
18     Carrizo Springs that he was talking about, not a
19     supervisor on that particular call.  And this was
20     recorded on his body cam.  But -- so there's confusion.
21     You cannot pinpoint exact details from these
22     conversations.  So what these are, one through five or
23     six, really, is really just a generalization of
24     everything for totality of the circumstances.
25              So I can't -- I can't tell you what time,
```

Page 245

1    you know, the female was in the truck, but I can tell

2    you that that was part of my recording that there was a

3    secondary vehicle.

4        Q.   Understood.  So this summary of items that you

5    have on one through six, this is a summary of

6    information that you understand that Deputy Babb had at

7    some point about Mr. Schott; is that correct?

8        A.   Yes.

9        Q.   Okay.

10       A.   And I believe that those -- those particular

11   things were information that I either observed on the

12   video, I read in depositions, that he knew before the

13   traffic stop.

14       Q.   Okay.  So I'm going to ask this question

15   again.  Can you tell me what information Deputy Babb

16   had before the traffic stop, based on your review of

17   the evidence?

18       A.   It's the things that I just read.

19       Q.   So items 1 through 6?

20       A.   One through six.

21       Q.   So Deputy Babb had all of the information

22   listed in items 1 through 6 on page 19, as you

23   understand it, before he made the stop of Alek Schott?

24       A.   According to what I have observed during the

25   case evaluation, yes.

Page 246

```
 1        Q.    Okay.
 2                   MR. BARRON:  Do you want to take a break
 3     now?
 4                   MS. HEBERT:  This will be a great time.
 5                   (Recess from 3:52 p.m. to 4:03 p.m.)
 6        Q.    (BY MS. HEBERT)  Mr. Haston, are you ready?
 7        A.    I'm ready.  Thank you for the break, actually.
 8        Q.    Great.  I needed it, too.
 9                   I want to look at page 20 of your report.
10     And do you see the third paragraph, you talk about Stan
11     Walters?
12        A.    I do.
13        Q.    How does Stan Walters' instruction materials
14     help you detect detection -- detect deception?
15        A.    So Stan Walters is a -- is a well-known
16     instructor of kinesics.  I have taken a lot of his
17     classes over the years.  In fact, he was the first
18     person who, you know, introduced me to body language to
19     help me understand what I was seeing.  Everybody
20     understands and sees body language, it's just a lot of
21     people don't know how to interpret it.
22                   Stan Walters assisted me by -- through
23     his training programs that I had taken to help me
24     understand what I was seeing and to develop the
25     interviews in order to, you know, determine whether
```

Page 247

```
 1    something else is going on with the traffic stop, in

 2    this case.  So that's how he helped me, his classes,

 3    his courses.  He's a very well-known instructor of

 4    kinesics.

 5         Q.   Can you just explain what kinesics is?

 6         A.   Body language, speech patterns, things of --

 7    exactly what we've been talking about, you know, it's

 8    about how the body -- how the subconscious mind reacts

 9    under stressful situations.

10              And that -- it's really a lot like

11    hypnosis, which is why I enjoy the hypnosis class

12    because it's still a lot about the subconscious mind

13    and what's retained and how people react, you know, to

14    questions or to interviews or to situations, you know.

15         Q.   Okay.  Can you, in broad strokes, give me the

16    big takeaways you've learned from Mr. Walters?

17         A.   The big takeaways from Mr. Walters?

18         Q.   And I'm not -- this is not -- this is not a

19    quiz.  Like if you missed one, you're not going to like

20    lose points.  I just kind of want to understand the

21    general framework from your perspective.

22         A.   It's a lot of what I just said.  I mean, the

23    big takeaways from body language and speech patterns is

24    to be able to interview a person -- this is in my own

25    words -- be able to interview a person, observe the way
```

Page 248

1    their body reacts to the questions that I ask them, to

2    be able to respond and ask another question from the

3    answer that they gave me.

4               Are you tracking with me?

5    Q.    Yeah, I did.  I followed you on that one.

6    A.    And once they respond to the question, I

7    determine from what I see, body language-wise, whether

8    or not I need to revisit that particular topic or

9    whether I need to move on to something else.  That's

10   one thing.

11              The other thing, related to criminal

12   interdiction, is the way a person reacts upon meeting a

13   law enforcement officer in an official capacity,

14   especially one who is committing a crime, such as drug

15   trafficking.  Many of those indicators are stretching.

16   You know, there's many times when you stop a vehicle

17   and the person is a drug trafficker, they know they

18   have drugs, we talked about this earlier.  They're

19   thinking about what they're going to say when they're

20   stopped.  So you take that, you know, into

21   consideration.  And now they are stopped.  Now, when

22   they get out of the car, maybe they are in the car,

23   they stretch a lot, right, so they stretch.  Big

24   indicator.  I learned that from Stan Walters.  It

25   happens a lot.

Page 249

```
 1              Another indicator when you're talking
 2     with them is let's say you want to pat someone down,
 3     and say, "Hey, I need to pat you down," then they turn
 4     around and put their hands behind their back.  Well,
 5     typically, when you're going to pat someone down, they
 6     are going to raise their hands up, but when they put
 7     their hands behind their back, it's almost like they
 8     want to be handcuffed.  So that's the subconscious
 9     thing that they do, that they think they are under
10     arrest because they know they've got something going
11     on, potentially.  It's not every time, but, I mean,
12     it's just things that you look for.
13              Other things are clusters of being
14     deceptive.  So when someone is lying, then your body
15     does certain things that tells me that you're lying.
16     Not -- no one certain thing means that you're being
17     deceptive because everyone does it at one time or
18     another, but when there's clustering of things, meaning
19     that there are several things going on during that
20     time, such as they clear their throat, they, as I
21     mentioned before, may have a nervous laugh whenever
22     they answer a question after the baseline changes.  We
23     discussed that earlier.  I can go over it again, if you
24     would like.
25          Q.   But this came from Stan Walters?
```

Page 250

1        A.    All of that came from Stan Walters' training,
2    yes, ma'am.
3        Q.    Okay.  And you find Mr. Walters' ideas to be
4    helpful in detecting deception?
5        A.    He's one of the instructors, yes, ma'am.
6        Q.    Okay.  Do you list any other instructors here?
7        A.    Where is my training and experience section?
8    Okay.
9              No, ma'am, because there are a lot of
10   them.
11       Q.    Sure.
12       A.    So this is the one that I attended numerous
13   classes that he had.  There's also one by the name of
14   Rhoades, if I remember his name.
15       Q.    R-H-O-D --
16       A.    Maybe Stephen Rhoades.  R-H-O-A-D-E-S, maybe,
17   Rhoades.  I can't remember.  His was a long time ago.
18   I've taken a few of his classes.
19              I have not depended upon any body
20   language classes, any -- any anything of that nature
21   from law enforcement officers who teach in an
22   interdiction setting; only from people whom I consider
23   to be experts in the matter.
24       Q.    Sure.  And you consider Mr. Walters to be an
25   expert in the matter?

Page 251

```
 1        A.   Yes, ma'am.
 2        Q.   Okay.
 3             MS. HEBERT:  Let's look at Exhibit G.
 4   What number are we on?
 5             MR. FOX:  114.
 6             (Exhibit 114 marked)
 7        Q.   (BY MS. HEBERT)  We're going to hand you
 8   what's been marked Exhibit 114.
 9        A.   Sure.
10        Q.   I'm not going to ask you to review --
11             MR. BARRON:  Do you have another copy for
12   me?
13             MR. FOX:  Yeah, here you go.
14        Q.   (BY MS. HEBERT)  I'm not going to ask you to
15   review the entirety of this document.  I want you to
16   just look at the cover page and then to the bio, which
17   is the next page after the cover page.
18        A.   Yes, ma'am.
19        Q.   Is this the Stan Walters whose trainings you
20   have attended and his materials you have reviewed?
21        A.   Yes, ma'am.
22        Q.   Let's go -- the pages are numbered, but they
23   don't start until a few pages in.
24        A.   Okay.
25        Q.   Can you go to the page numbered No. 4?
```

Page 252

1          A.    Okay.

2          Q.    And can you tell me what the copyright here is

3     on this page at the bottom?

4          A.    2024.

5          Q.    Okay.  And let's go to page 7.  And I'm going

6     to go -- I'm going to read this second block of text.

7     It's about midway through the page.  "Interview and

8     interrogation is a very labor-intensive mental process.

9     One very common mistake interviewers make is spending

10    so much time and energy on their analysis of their

11    subject's behaviors that they forget the most important

12    part of interviewing:  Listening."

13                   Did I read that correctly?

14         A.    You did.

15         Q.    Do you agree with this statement?

16         A.    I do.

17         Q.    Have you seen officers make this mistake?

18         A.    I have seen myself make this mistake, and I

19    almost got killed over it.

20         Q.    That sounds pretty traumatic.

21         A.    Well, I almost lost my life.  This is great

22    stuff.  Body language, interview techniques, patterns.

23    It's great stuff.  I learned a lot from it.  I was very

24    successful in my career using it.  However, when -- and

25    I'll give you my example of what happened to me.

Page 253

1        I focused so much on finding drug

2    traffickers and utilizing body language and speech

3    patterns that I had challenged myself to be able to

4    find drug smugglers and get them to tell me where the

5    drugs were in the car without me even having to ask for

6    consent to search.  That's how I challenged myself in

7    this business.  And I became fairly successful at it

8    and I made many loads on Interstate 35 to where I found

9    the car, I talked with them, I interviewed them and

10    they told me the drugs -- where they were, what they

11    were and where they were going, right.

12        And that was, you know, I was -- I really

13    liked it, right.  I mean, it was very successful work.

14    But what I failed to do was pay attention to my police

15    training 101, and that is a lot of what happened with

16    Deputy Babb, or what didn't happen with Deputy Babb,

17    and that is I failed to watch the signs of a person

18    that's armed because I was so focused on interviewing

19    people through training I had gotten from Sam Walters,

20    right.

21        And that almost cost me my life because

22    the person that I'm speaking about had two 45 handguns

23    on him, he had a tactical shotgun with a lot of rounds

24    in the truck and he was out to kill people.  And I did

25    not pat him down because I was so focused on not

Page 254

1     listening and doing what I was doing.  So, yes, I do
2     agree.  This is a great tool, you know.  Investigation
3     of bad guys is a great tool, but it's a real business.
4          Q.   Understood.
5          A.   And if you do not pay attention to everything
6     and you lose focus and you don't listen, you will get
7     killed in this business, which is why you pat people
8     down for safety.
9          Q.   Understood.  And I'm sorry that happened to
10    you.
11         A.   Oh, no, I learned from it.  That was a
12    learning experience for me.
13         Q.   When you reviewed the body camera footage of
14    Deputy Babb and he had Alek in the front seat of his
15    vehicle, or before that, so just when you reviewed the
16    body camera footage of Deputy Babb, did you evaluate
17    whether Deputy Babb was making the same mistake you
18    made, failing to listen?
19         A.   I don't -- I can't -- again, I can't say what
20    Deputy Babb was thinking or what he saw.
21         Q.   Of course.
22         A.   But, however, from my training with deception,
23    with body language, that's why I say, and I keep saying
24    that at Deputy Babb's experience level that he had,
25    that put him at a different category from where --

Page 255

1     where other officers may be, right.  So Deputy Babb was

2     learning.  He was in the process of learning body

3     language, speech patterns and he didn't necessarily do

4     everything like this training tells you to do.

5          Q.    Sure.

6          A.    Right, because he hasn't formally had a lot of

7     this training and he hasn't put it to real-life use,

8     you know, in interview settings.  There's a difference

9     in interviewing a person with all of this education

10    from deception and body language and making that work

11    on the side of the road is two total different types of

12    an interview.  You're using basically the same

13    training, you're using the same methods, but it's

14    different because you don't have a controlled room like

15    we're in today and you can't just sit and focus on that

16    person in the front seat of that car and that's why I

17    prefer not to use the front seat approach is because I

18    cannot watch and listen and use these tactics with body

19    language to the level that I prefer.

20         Q.    I think something that might help us, let

21    me -- actually, will you look at page 13?

22         A.    On this -- The Lie Guy.

23         Q.    Yes, The Lie Guy.  And are you familiar with

24    Mr. Walters' discussion of contamination?

25         A.    I would have to read this.  It's been so long

1    since I've been to any of his classes.

2        Q.    Sure.  And I'll just -- look midway down the

3    pages, "What can contaminate a subject's behavior?  The

4    list can be endless.  External distractions, such as

5    noises, too many people around while watching or

6    listening, cell phones, knocks at the door, other

7    investigators or supervisors interrupting, temperature

8    extremes, most importantly in the interview, aggressive

9    behavior, condescending behavior, accusatory behavior,

10   encroachment on a subject's personal space, not

11   listening, interrupting the subject, yelling, anger,

12   finger pointing and many, many more."

13                Did I read that correctly?

14       A.    You did.

15       Q.    Is that what you're referring to,

16   distractions, other things that might cause -- or

17   interfere with your ability to detect dishonesty?

18       A.    As I put in my report, yes, ma'am, that's what

19   I was referring to.

20       Q.    Okay.  Let's go to page 14, which is the next

21   page, and I'm going to read the second paragraph.  "One

22   of the biggest killers of all effective interviews is

23   what I call the preconception assassin.  If you're

24   wandering through the woods looking for signs of Big

25   Foot because you believe there's one hiding in your

Page 257

1     backyard, you are going to find signs of Big Foot."
2                    Did I read that correctly?
3         A.    You did.
4         Q.    Can we refer to, for just like shorthand, this
5     paragraph as "the Big Foot problem," just between you
6     and I, just rather than like go through this again?
7         A.    Yeah.
8         Q.    Can we call this the Big Foot problem?
9         A.    Absolutely.
10        Q.    Are you familiar with the concept of the Big
11    Foot problem?
12        A.    It occurs in law enforcement as a whole.
13        Q.    Okay.  Tell me about your understanding of the
14    Big Foot problem.
15        A.    Well, I mean, I haven't necessarily heard of
16    this particular -- you know, this is probably something
17    that was, you know, after my time of going to his
18    classes.
19        Q.    Sure.
20        A.    So I don't recall hearing this in his classes
21    before, plus he has different levels of the classes.
22    So, you know, this may be one of the classes that I did
23    not attend with this curriculum.
24                    However, every law enforcement officer
25    and investigator should -- they can create false

Page 258

1    confessions simply by interviewing, right, because they
2    become so focused on what they believe that, you know,
3    if they don't look at everything as a whole, they can
4    actually misread what's going on.  It happens all the
5    time with homicide investigations, right.  That's how
6    innocent people end up in prison.
7                    And that's a lot of what you're reading
8    here.  You know, I mean, if your -- if your
9    preconceived thought is this and, by golly, I'm going
10   to prove that through product body language or
11   whatever, then you're losing focus.  The officer is
12   losing focus on everything else to exonerate this
13   person, right.
14                   So in law enforcement training you're
15   taught not to do that.  You're taught to look at
16   everything.  In fact, prove this person isn't guilty,
17   you know, don't look at it like he is guilty, and
18   that's the way you should view it.  So I hope that
19   helps me explain that that's what this is.
20       Q.    That does help.
21                   Can we skip to page 35?  And this -- the
22   top of this page says, "Chapter No. 4, Verbal
23   Behaviors."
24                   Did I read that right?
25       A.    You did.

```
                                                  Page 259
 1        Q.    And I'm going to skip down to the section that
 2    says, "Voice Quality."
 3                     Do you see where I am?
 4        A.    I do.
 5        Q.    I'm going to read that -- this portion.
 6    "Changes in voice quality are not a sign of deception.
 7    Pitch changes:  Up - most consistent with frustration,
 8    anger and excitement; down - most consistent with
 9    isolation, depression.  Volume changes:  Louder - most
10    consistent with anger -- excitement, anger.  Softer -
11    most consistent with depression, disinterest."
12                     Did I read those correctly?
13        A.    You did.
14        Q.    Do you agree with Mr. Walters that changes in
15    voice quality are not signs of deception?
16        A.    If you will look at the top of this page.
17        Q.    Sure.
18        A.    And I'm assuming this was downloaded off of
19    the Internet?
20        Q.    This is what Mr. Walters provided us.
21        A.    Provided for you?
22        Q.    Yeah.
23        A.    So it's a basic guide, right.  So when you
24    take this one page with voice quality analysis, it
25    could be construed that way.  But if you -- this is
```

Page 260

1      intended for if it's just this, right, if it's just the

2      change in pitch or the tone and you have nothing else.

3               That's what I said earlier.  There's no

4      one certain thing that means that a person is lying.

5      However, if you have a cluster of things, you have the

6      voice and pitch changes along with the stretching,

7      along with the interview at particular times where this

8      occurs each and every time and they cover their mouth

9      and they nervous laugh and they have speech patterns,

10     they are part of the cluster and they are signs of

11     deception.

12               And, you know, if you were to watch the

13     video of where I had the guy with the guns and I

14     realized that he had the guns --

15     Q.    It's not a video in this case?

16     A.    No, it is not a video in this case.  However,

17     I'm giving that as an example of my --

18     Q.    Sure.  Just clarifying the video for the jury.

19     A.    Oh, okay.  My pitch in my voice, upon

20     realizing what was going on, went very high,

21     skyrocketed, right, because my brain is now saying,

22     "Oh, man, you just made a mistake, you know, you almost

23     got yourself killed."  And so my pitch changed because

24     I was under extreme stress during that time.  And you

25     can see that -- I use that video in my law enforcement

Page 261

1    training, believe it or not, it's the last video that I

2    use, to show change in voice quality and pitches when a

3    person is under stress.

4              So I do not agree with this just one page

5    by itself in the circumstances of the case that I

6    reviewed or -- because it's all about timing and

7    clusters, things of that nature.

8        Q.   Understood, understood.  In the example that

9    you just talked about with the mistake you made in one

10   of your policing encounters, you had a voice change

11   that went really high.

12             Is that my fair understanding of what

13   you're saying?

14       A.   Yes.

15       Q.   And your pitch change wasn't because you were

16   trying to be deceptive?

17       A.   No, not -- not in that circumstance, but it

18   was a stress.  It's about stressing a person, right.

19   It's about interviewing a person, having a baseline on

20   the way they answer on nonthreatening questions,

21   nonstressful questions compared to stress questions,

22   and then you evaluate those changes in voice and pitch

23   changes.

24             Some people will not say anything at all.

25   Their voice will get so low.  I've had -- I've had

Page 262

1    occasions on interdiction stops, when I ask a question

2    about drugs, they won't even answer.  They will shake

3    their head no where every other time they have been

4    saying yes or no.  So that would be a change in pitch

5    because they didn't say anything at all.

6        Q.    Right.

7        A.    So that's what this refers to.

8        Q.    Okay.  Let's go to page 39.  Now, is this --

9    is the title of this page "Chapter 5, Nonverbal

10   Behaviors"?

11       A.    Yes, ma'am.

12       Q.    I'm going to read some of the second

13   paragraph, probably just the first sentence.  "Errors

14   in the analysis of spotting deception are most

15   frequently made when diagnosing body language."

16            Did I read that correctly?

17       A.    Yes, ma'am.

18       Q.    Do you agree with that statement?

19       A.    I do.

20       Q.    I'm going to read the first sentence of the

21   next paragraph.  "The largest portion of those

22   nonverbal cues are associated with changing levels of

23   stress that our subject may be experiencing.  However,

24   we must remember a sign of stress does not always

25   equate with deception."

Page 263

1               Did I read that sentence correctly?

2        A.    You did.

3        Q.    Do you agree with that statement?

4        A.    I do.

5        Q.    Let's go back to your report.  I think we're

6    done with this exhibit.

7        A.    Okay.

8        Q.    And we're returning to Exhibit 111, and let's

9    go to page 7.  In the last full paragraph, do you see

10   it starts, "Deputy Babb asked Schott"?

11       A.    On page 7?

12       Q.    Oh, sorry, wrong one, page 7.  This one.

13             MR. BARRON:  What page?

14             MS. HEBERT:  Hold on.  Let me figure out

15   right where I am.

16       Q.    (BY MS. HEBERT)  Okay.  Do you see page 7, the

17   last full paragraph?

18       A.    Yes, ma'am.

19       Q.    It begins "Deputy Babb began"?

20       A.    Yes, ma'am.

21       Q.    The second sentence, "Schott appeared," do you

22   see that?

23       A.    Yes, ma'am.

24       Q.    I'm going to read the entirety of that

25   sentence.

Page 264

1      A.   Okay.

2      Q.   "Schott appeared to have visible deep and

3  rapid breathing, noticeable by the rise -- deep rise

4  and fall of his chest and opening his mouth with

5  respirations, including tightening his lips on several

6  occasions.  That in itself could be construed as

7  nervous behavior of a person receiving a traffic

8  citation.  However, in this case, Deputy Babb had

9  indicated the infraction would be a warning."

10                Did I read that correctly?

11      A.   You did.

12      Q.   Okay.  Did you see these behaviors and body

13  language on the body-worn camera from Deputy Babb?

14      A.   Yes, that was placed on the magnet mount

15  within the vehicle.

16      Q.   Okay.  So you, independent of Deputy Babb, saw

17  these things that you're describing --

18      A.   Yes, ma'am.

19      Q.   -- on Deputy Babb's body-worn camera footage?

20      A.   Yes, ma'am, very clear.

21      Q.   Okay.  Did you consider whether these body

22  reactions were signs of stress?

23      A.   They were signs of stress, in my opinion.

24      Q.   Okay.  Did you conclude that they were signs

25  of deception?

Page 265

1          A.    No.

2          Q.    I think let's take a five-minute break and

3    then I can tell you whether we're done for the day.

4          A.    Okay.

5          Q.    Does that make sense?

6          A.    Sure, yeah.

7                (Recess from 4:29 p.m. to 4:35 p.m.)

8          Q.    (BY MS. HEBERT)  A couple of final questions.

9                When an officer is going to pull someone

10   over for speeding, how do they evaluate whether someone

11   was speeding?

12         A.    As I mentioned earlier, from my training, my

13   experience and the things that officers should do is,

14   first, you should identify the car, right, in

15   comparison to other traffic, which car is going faster

16   or appears to be passing other cars.  That's the first

17   thing.

18               The second thing is to determine with a

19   measurement device, that being a radar or a lidar,

20   depending.  It could be a radar that -- you know, a

21   radiowave radar or it could be a lidar that's basically

22   a laser that hits the front plate of the car and then,

23   you know, determines the speed.  And that way you're

24   checking whether or not that person that you saw

25   passing traffic faster is indeed actually speeding or

Page 266

 1    maybe the other traffic is going slower and that person
 2    is actually going the speed limit.
 3         Q.   Okay.  And would you ever pull someone over
 4    for speeding without doing the second step?
 5         A.   Yes, you can.
 6         Q.   And when would you do that?
 7         A.   When -- you can pace which -- pace a car to
 8    where you can get the behind the car and then pace it
 9    to see what speed that it's going.  You can do that.
10              And then it also depends on the traffic
11    behavior.  I mean, depending on traffic, how fast the
12    car is going, you know, it may not be the speed.  It
13    may be considered reckless driving.  And then if it's
14    considered reckless driving, that's -- that's not even
15    a Class C misdemeanor.
16              Then you're into a Class B misdemeanor to
17    where they are committing, you know, numerous
18    violations in a reckless manner, you know, like if
19    they're weaving and they almost caused a crash and they
20    appear to be going fast, you may not have gotten them
21    on radar, but you saw something that was potentially a
22    crash, right.  So you can stop them not necessarily for
23    a radar stop where they have seen the actual speed, but
24    you can stop them for the reckless driving behavior.
25         Q.   Okay.  When you're stopping them for reckless

Page 267

1    behavior, you're not stopping them for just speeding.
2    Is that fair?
3         A.   That's fair.  Most of the time it's a
4    combination.  We always -- you know, three or more
5    traffic violations, right.  That is not the case, I
6    believe, in this circumstance, a reckless driving case.
7         Q.   So I just want to understand the end of that.
8    Reckless driving is three or more traffic violations?
9         A.   Well, not necessarily.  It's -- you know, it's
10   almost like a drunk driver, you know, maybe in a crash,
11   almost a crash, traveling 110 miles an hour, things of
12   that nature, right.  That's why I don't necessarily
13   consider this a reckless driving case by any means.
14        Q.   Understood.  Okay.  I just wasn't
15   understanding exactly what you were saying.
16             So when someone is speeding, you identify
17   how the car is moving compared to traffic and you do
18   kind of one or -- one of two things.  You either use
19   radar or you pace the car.
20             Am I understanding your testimony?
21        A.   That's exactly right, yes, ma'am.
22        Q.   Can you give me an estimate about how far you
23   can see, like what's your distance of your sight?
24        A.   Me personally?
25        Q.   Uh-huh.

Page 268

```
 1        A.   You know, I mean, we're, what, one, two blocks
 2   away.  There's a silver SUV that's about to make the
 3   right turn at the corner.  I can clearly see the color
 4   of the vehicle.  It looks like it's a Toyota, maybe,
 5   you know.  So, I mean, I can see that distance, at
 6   least.  That's two, 2-1/2 blocks away and I can clearly
 7   see the color and the make of the car.
 8        Q.   Let the record reflect that the witness is
 9   looking out the window --
10        A.   I'm sorry.
11        Q.   -- to see what's going on outside the window
12   to evaluate how far he can see.
13             And based on your view out the window,
14   you're saying you can clearly see things two blocks
15   away.  Is that fair?
16        A.   Oh, yeah, easily.  So if I'm in the position
17   of where I'm looking for a specific vehicle, as in this
18   case, an F-350 that's dark in color, I'm going to be
19   able to see that truck even further than -- than from
20   here to two or 2-1/2 blocks.
21        Q.   Okay.  So, I mean, do you think you could see
22   three blocks away, you could see the vehicle?
23        A.   Yes.
24        Q.   Okay.  And three blocks away, do you think you
25   could see whether the driver had a seatbelt on?
```

Page 269

1          A.    No, I could not.

2          Q.    So is it fair to say that you could identify

3     the vehicle from three blocks away, but you might not

4     be able to see other things that are happening with the

5     vehicle?

6          A.    That's correct.

7                MR. BARRON:  Objection, form.

8                THE WITNESS:  That's correct.

9          Q.    (BY MS. HEBERT)  Did you do anything to

10    evaluate what Deputy Babb could have seen in terms of

11    the operation of the vehicle compared to the lane of

12    travel from where he was sitting, how far he could see

13    there?

14         A.    I don't -- I can't --

15         Q.    I don't think I did a good job of phrasing

16    that question, so let me think of a better way to

17    phrase it.

18                Did you do anything to evaluate at what

19    point when Mr. Schott was approaching Deputy Babb,

20    Deputy Babb could have seen if Alek Schott's tires

21    crossed the lines on marking the lane of travel?

22         A.    I based my evaluation on the video from

23    Mr. Schott's vehicle, right.  There's a curve in the

24    road -- Interstate 35, there's a slight curve.  There

25    was an Amazon 18-wheeler in the right lane and the road

Page 270

1    straightens out and then it goes -- it's straight.

2    There was a tree in the east median, there was another

3    vehicle in the right lane ahead of that.

4              During that time, just from the video

5    that I observed, I viewed, I could see Deputy Babb's

6    patrol car in the -- in the right ditch facing the

7    freeway.  That's -- again, it goes back to resolution

8    of the camera, the lens of the camera, but that's a

9    very small lens on that camera and I can see Deputy

10   Babb's patrol car.  A reasonable person could believe

11   that Deputy Babb, who is looking for the F-250, could

12   see the F-250 from the same distance.

13       Q.   Sure, understood.

14       A.   So that distance is what I used to gauge my

15   opinions on.

16       Q.   Sure.  And is there a difference between

17   seeing the vehicle and seeing the vehicle commit a

18   traffic violation?

19       A.   Again, I can't speculate as to what Deputy

20   Babb saw.  I can't say how far away he saw the car.

21   It's not clear to me from any testimony exactly where

22   the vehicle was, other than he had stated it was before

23   it reached him and after it passed him.

24       Q.   Understood.  But my question is, is there a

25   difference between seeing the vehicle and seeing the

Page 271

1    traffic violation?

2         A.   Again, I can't answer that question in this

3    particular case.

4         Q.   Okay.

5         A.   I can't answer that.

6         Q.   So is it your testimony that if you can see

7    the vehicle, you can see the failure to maintain the

8    lane?

9              MR. BARRON:  Objection, form.

10             THE WITNESS:  Again, that's a speculation

11   question.  I can't say that.  There are so many

12   variances in that.

13        Q.   (BY MS. HEBERT)  Sure.  At we sit here today,

14   is your opinion that Deputy Babb had probable cause to

15   stop Alek Schott?

16             MR. BARRON:  Objection, form.

17             THE WITNESS:  From -- again, from

18   everything that I reviewed, from the videotape from

19   Mr. Schott's vehicle, from the depositions by Deputy

20   Babb, who stated that he saw the violation of failure

21   to drive in a single marked lane, I can only conclude

22   that he's truthful in his answer and that the violation

23   occurred according to what I saw in the video.

24        Q.   (BY MS. HEBERT)  So is the answer -- the

25   answer to that question yes?

Page 272

1                    MR. BARRON:  Objection, form.

2                    THE WITNESS:  Again, I can't speculate on

3         what he saw.

4              Q.   (BY MS. HEBERT)  Okay.

5              A.   I can only answer in the way that I answered

6         it.

7              Q.   Okay.  Is there anything that we reviewed

8         today that caused you to doubt your opinion as put

9         forth in this report?

10                   MR. BARRON:  Objection, form.

11             Q.   (BY MS. HEBERT)  So anything that we reviewed

12        today that caused you to doubt your conclusions in this

13        case?

14             A.   No, absolutely not.

15             Q.   Okay.  Do you intend to amend your report?

16             A.   At this time, I do not.

17             Q.   We have no further questions today, but we're

18        going to hold the deposition open should you amend your

19        report --

20             A.   Of course.

21             Q.   -- or something of that nature.

22                   MS. HEBERT:  But, otherwise, we pass the

23        witness.

24                   MR. BARRON:  Okay.  So subject to -- so

25        subject to him amending his report, you pass this

Page 273

1      witness?

2                    MS. HEBERT:  Sure.

3                    MR. BARRON:  Understood.

4                    Hector, are you going to do this to me?

5      Do you have questions?

6                    MR. SAENZ:  No, sir.  We will reserve our

7      questions until the time of trial.

8                    MR. BARRON:  I appreciate that.  And I

9      reserve my questions for the time of trial as well.

10     Thank you.

11                   (Proceedings concluded at 4:46 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 274

```
1                   UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION
3       ALEK SCHOTT,                   )
            Plaintiff,                 )
4                                      )
        v.                             ) Civil Action No.
5                                      ) 5:23-cv-00706-OLG-RBF
        JOEL BABB, in his individual )
6       and official capacity;         )
        MARTIN A. MOLINA III, in his )
7       individual and official        )
        capacity; JAVIER SALAZAR,     )
8       in his individual and          )
        official capacity; and BEXAR )
9       COUNTY, TEXAS,                 )
            Defendants.                )
10
11
                  REPORTER'S CERTIFICATION OF THE ORAL
12                    DEPOSITION OF GARY HASTON
                        JANUARY 10, 2025
13
14              I, Donna Wright, a Certified Shorthand
15      Reporter and Notary Public in and for the State of
16      Texas, hereby certify to the following:
17              That the witness, GARY HASTON, was duly
18      sworn by the officer and that the transcript of the
19      oral deposition is a true record of the testimony given
20      by the witness;
21              That the original deposition was delivered to
22      Ms. Stephen Barron;
23              That a copy of this certificate was served on
24      all parties and/or the witness shown herein on
25      _____;
```

Page 275

1          I further certify that pursuant to FRCP Rule
2     30(3) that the signature of the deponent:
3          __X__ was requested by the deponent or a party
4     before the completion of the deposition and that the
5     signature is to be before any notary public and
6     returned within 30 days from date of receipt of the
7     transcript.  If returned, the attached Changes and
8     Signature page contains any changes and the reasons
9     therefore:
10          ____ was not requested by the deponent or a
11     party before the completion of the deposition.
12          I further certify that I am neither counsel
13     for, related to, nor employed by any of the parties or
14     attorneys in the action in which this proceeding was
15     taken, and further that I am not financially or
16     otherwise interested in the outcome of the action.
17          Certified to by me on this, the 14th day of
18     January, 2025.
19
20
21                    _Donna Wright_____
22                    DONNA WRIGHT, Texas CSR 1971
                      Expiration Date:  11/30/26
23                    VERITEXT LEGAL SOLUTIONS
                      300 Throckmorton Street
24                    Ft. Worth, Texas 76102
                      Firm Registration No. 571
25

Page 276

1   Stephen Barron, Esq.

2   sbarron@w-g.com

3                     January 14, 2025

4   RE:    Schott, Alek v. Babb, Joel, et al.

5        1/10/2025, Gary Haston (#7035888)

6        The above-referenced transcript is available for

7   review.

8        Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com.

16   Return completed errata within 30 days from

17  receipt of testimony.

18    If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 277

1    Schott, Alek v. Babb, Joel, et al.

2    Gary Haston (#7035888)

3                   E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Gary Haston                                    Date

25

Page 278

1    Schott, Alek v. Babb, Joel, et al.

2    Gary Haston (#7035888)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Gary Haston, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Gary Haston                        Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2023]**                                                                 Page 1

## &

**&**   1:22 2:14
166:22

## 0

**00706**   1:5
274:5
**04/18/2024**
159:22

## 1

**1**   23:1 153:11
153:11 155:12
164:4 222:4
242:6 243:19
245:19,22
**1,500**   126:12
**1.1**   22:2
**1/10/2025**
276:5
**10**   1:14,19 59:4
127:5 178:8
242:13 274:12
**100**   25:19
188:18
**101**   253:15
**10:10**   57:17
**10:24**   57:17
**11**   3:11 144:10
155:13,17
157:11 190:17
**11/30/26**
275:22

**110**   3:10 9:12
9:13,14 11:12
13:24 267:11
**111**   2:20 3:11
11:14,16 96:2
96:3 153:10
263:8
**112**   3:12 13:22
13:23 14:3
**113**   3:13
210:15,16
**114**   3:14 251:5
251:6,8
**11:00**   92:9
**11:12:26**
221:15
**11:12:49**
222:11
**11:12:56**
222:22
**11:12:59**
222:22
**11:13**   223:24
**11:13:13**   223:7
**12**   170:2
197:10 198:23
198:24 201:14
**12,000**   20:9
**12:15**   142:13
**12:29**   153:1
**13**   59:19
122:20 159:15
206:12 255:21

**14**   3:12 162:22
164:14 256:20
276:3
**14c**   164:8
**14d**   174:3,5
**14g**   158:4
**14th**   275:17
**15**   59:19
122:20 207:13
215:25
**150**   32:25
34:23 92:20,24
93:1,5,10
**16**   221:11
225:12 228:14
229:7
**160**   3:19
**16th**   96:5,9
97:7 100:18,24
207:22 243:4
**17**   10:19
216:14,17
223:17
**18**   122:17
124:7 182:21
199:24 219:15
269:25
**19**   242:3,4
245:22
**19082**   275:21
**1971**   275:22
**1990**   42:3
**1990s**   42:4

**1994**   40:6
**1995**   26:16
**1997**   22:24
43:18 204:12
**1998**   215:13
**1:37**   153:2
**1:50**   162:10
**1:56**   162:10

## 2

**2**   3:2 23:1
164:4 223:3
228:12
**2-1/2**   268:6,20
**2/27/24**   164:4
**20**   63:13 95:16
246:9 278:15
**20,000**   70:11
**200**   2:15
**200-9697**   2:16
**2000**   126:15
**2000s**   42:10
**2015**   149:18
**2016**   24:16
**2017**   215:5,9,11
215:14,15,23
**2019**   239:7
**2020**   19:4,5
22:19 191:3
**2022**   96:4,5,9
97:2,7 100:17
100:24 207:22
**2023**   158:6
177:20

**[2024 - 8/1/24]**                                                    Page 2

**2024**   14:19,20
252:4
**2025**   1:14,19
19:6 274:12
275:18 276:3
**210**   2:22 3:13
**22203**   2:10
**22nd**   96:4,13
97:2 100:17
174:20 242:24
243:4
**23**   22:23 155:9
**24**   14:21,22
17:10,25 94:8
**25**   14:20,21
131:3,14
**250**   108:1,1
122:6 124:10
128:4,14 143:2
143:9 144:5
178:15 207:19
234:19,21
239:7 242:11
242:17,20
243:2,6,22
270:11,12
**250s**   122:13
**251**   3:14
**271-7877**   2:22
**274**   3:6
**28**   95:25 96:2
106:20 121:23
121:24 142:22

**29**   149:11,11
**2:15**   116:12

**3**

**3**   23:1 52:14
223:5 275:2
**3,700**   92:15
93:9
**30**   56:11 68:23
92:2,5,12
144:10,11
148:19 158:22
275:2,6 276:16
**300**   275:23
**324**   199:25
200:6,13,17
**348**   149:18
**35**   26:18,20,22
85:4 97:4
108:4 109:21
110:16 111:8
120:3 126:10
126:20 127:6
130:25 141:9
141:17 142:3
147:13 221:24
227:4 239:8
241:5,22 243:3
243:6 253:8
258:21 269:24
**350**   268:18
**39**   262:8
**3:52**   246:5

**4**

**4**   3:5 243:21
251:25 258:22
**4/12/2022**
175:1 177:23
**40**   95:6,19
**4135**   239:8
**43**   23:10
**45**   212:2,2
253:22
**4700**   1:22 2:15
**480-5936**   2:6
**49**   3:19 160:20
161:24 162:13
**4:03**   246:5
**4:29**   265:7
**4:35**   265:7
**4:46**   1:19
273:11

**5**

**5**   21:14,18,22
154:17,19,22
154:25 157:7
159:11 160:13
162:22 165:10
174:5 187:10
242:25 243:1
262:9
**5,000**   48:11
**50**   18:7,8 174:7
**512**   2:6,16
**53**   199:20
200:5,12,17

**571**   275:24
**575**   149:18
**5:23**   1:5 274:5

**6**

**6**   154:22,25
165:10 169:9
237:8,9 239:1
239:1 243:8,19
245:19,22
**682-9320**   2:11
**6:00**   93:21
**6th**   158:5

**7**

**7**   32:14 33:2
252:5 263:9,11
263:12,16
**703**   2:11
**7035888**   276:5
277:2 278:2
**72**   222:16
**75**   102:1
221:24
**76102**   275:24
**78205**   2:21
**78701**   2:5
**78723**   2:16
**7th**   177:20

**8**

**8**   149:1,10
182:15
**8/1/24**   164:4

[816 - advantage]

**816**  2:4
**84**  216:11
  221:23 236:7
**840**  2:21

**9**

**9**  3:10 182:2
  184:16
**900**  2:10
**901**  2:10
**90s**  25:10 27:7
  27:9,10,11,11
**970**  2:5
**9:07**  1:19

**a**

**a.m.**  1:19 57:17
  57:17
**abcdefghijkl...**
  35:6
**abiding**  97:13
**ability**  234:20
  234:21 256:17
**able**  8:5 33:15
  33:17 44:9
  52:15 53:15
  55:18 72:12
  75:14,23 80:5
  81:1,1 87:12
  143:11,11,16
  144:5 196:25
  213:19 234:12
  234:12,21
  235:3,7 236:12
  247:24,25

248:2 253:3
268:19 269:4
**abnormal**
  56:24
**above**  1:18
  86:13 276:6
  278:7
**abruptly**  208:8
  223:25
**absolutely**  28:7
  38:12 70:16
  113:11 128:3
  154:9,12 221:9
  257:9 272:14
**abuse**  70:9
**academy**  54:22
  61:2,25 62:2
**accepted**
  190:22
**access**  157:12
**accident**  38:22
  214:4
**accordance**
  188:1
**account**  201:3
**accredited**
  199:25 200:13
**accuracy**  214:7
  276:9
**accurate**  65:13
  212:14,19
  214:6 215:6
**accusatory**
  256:9

**acknowledge...**
  278:3
**acknowledg...**
  276:12
**act**  113:18
**acted**  115:10
  187:25
**acting**  51:20
**action**  1:4
  131:12 274:4
  275:14,16
**actions**  42:21
  99:12 172:11
  190:20 196:10
**activities**  61:8,9
  88:23 141:13
**activity**  29:23
  51:10 118:22
  119:1,2,3
**actual**  26:7
  169:21 204:3
  220:1 266:23
**actually**  13:6
  17:7,10 19:12
  19:16,22 23:5
  26:1 31:13
  33:10,13,15
  34:23 35:7
  36:1 40:25
  42:17 53:6
  63:8 72:9 87:4
  94:15 95:13
  98:13 113:18
  117:18 126:4

145:13 148:8
181:14 186:10
198:14 214:24
224:9 231:19
244:14 246:7
255:21 258:4
265:25 266:2
**adamant**  78:3
**add**  116:25
  129:21 131:19
**addiction**  63:1
**addition**  28:14
  54:1 61:1
  114:15 128:17
  184:14
**additional**
  12:23 13:1,4,5
  166:25 167:25
  207:25
**additions**  98:19
  278:6
**address**  56:6
  140:18
**adds**  148:10
**administration**
  23:24 24:10,16
  112:21 127:13
  237:7,9
**administrator**
  190:3
**admission**
  129:5
**advantage**
  63:17

| | | | |
|---|---|---|---|
| **affair** 187:4 | **air** 25:13 | **alert** 181:6 | **amounts** 26:14 |
| **affairs** 187:1,3 | 215:21 | 184:22 | 26:15 |
| **affect** 113:25 | **airing** 177:20 | **alerted** 181:7,8 | **amtrak** 24:4 |
| **afoot** 119:2 | **airplane** 51:4 | **allotted** 276:19 | **analysis** 171:11 |
| **age** 22:4 64:1 | 51:14 | **allow** 169:18 | 175:24 177:16 |
| **agencies** 21:5 | **airplanes** 116:2 | **allowed** 16:5 | 240:2,4 252:10 |
| 22:10 98:13 | **airport** 20:24 | 61:8 204:22 | 259:24 262:14 |
| **agency** 16:11 | 115:23,24 | **allows** 97:15 | **anger** 256:11 |
| 16:14 60:25 | 116:4,7,14,17 | **alongside** | 259:8,10,10 |
| 79:4 117:5 | 118:12 | 230:25 | **angle** 219:24 |
| 119:12,13 | **al** 276:4 277:1 | **alphabet** 35:6 | 229:6 |
| 204:10 | 278:1 | 35:10 | **angles** 214:19 |
| **agent** 46:19 | **albert** 91:8 | **alternating** | **answer** 6:8,21 |
| **aggressive** | **alcohol** 8:16 | 137:6 | 7:1,3 28:23 |
| 256:8 | 26:1,8 | **amazon** 219:14 | 62:4 76:8 |
| **ago** 4:9,19,22 | **alek** 1:3 4:8 | 219:17,17 | 80:17 85:1 |
| 17:10 39:24 | 128:4 163:6 | 220:13 221:18 | 87:12 88:10 |
| 68:18 215:10 | 166:9 209:25 | 221:23 228:6 | 104:9 111:1,5 |
| 215:14 250:17 | 216:6 217:22 | 269:25 | 112:14 125:9 |
| **agree** 6:6,20 | 219:4,5 220:4 | **ambiguity** | 125:10 132:4 |
| 65:12 210:22 | 224:6,22 230:4 | 216:16 | 135:14 138:24 |
| 214:20 215:13 | 232:19 233:21 | **ambulances** | 165:24 169:5 |
| 252:15 254:2 | 234:2 236:24 | 21:2 | 173:9 175:14 |
| 259:14 261:4 | 241:18 245:23 | **amend** 12:9,12 | 176:5 178:3 |
| 262:18 263:3 | 254:14 269:20 | 272:15,18 | 185:6 195:10 |
| **agreed** 18:15 | 271:15 274:3 | **amending** | 212:5 221:8 |
| **ah** 37:21,21,21 | 276:4 277:1 | 272:25 | 231:6,8 248:3 |
| **ahead** 48:3 | 278:1 | **america** 24:6 | 249:22 261:20 |
| 119:7 141:3 | **alek's** 178:1 | **amount** 72:5,8 | 262:2 271:2,5 |
| 160:21 194:6 | 207:22 208:13 | 72:9,13 126:12 | 271:22,24,25 |
| 221:19,19 | 209:4 211:11 | 127:11 179:2 | 272:5 |
| 270:3 | 225:18 226:19 | 180:17,20 | **answered** |
| **aided** 68:5 | 226:24 227:6 | 200:10 | 140:11 218:16 |
| | | | 272:5 |

**answering** 6:12
6:14 7:13
134:13 135:1
**answers** 5:23
56:19 134:24
143:20 231:9
**antonio** 1:2
2:21 45:20
89:2,3,5,21
118:5 120:9,15
120:19 126:20
274:2
**anybody** 58:5
58:12 68:3
89:12,15 90:18
117:18 153:6
164:18
**anymore** 65:6
134:5
**apart** 100:1
101:5
**apartment**
40:22
**apologize**
100:21 119:25
143:19 185:20
235:25
**app** 113:7
243:2
**apparently**
200:22
**appear** 266:20
**appearance**
71:1 73:17

**appearances**
3:2
**appeared** 192:8
194:3 224:17
263:21 264:2
**appears** 67:23
72:22 155:12
236:14 265:16
**appended**
278:7
**applicable**
33:25 144:20
148:18 156:23
276:8
**applied** 190:22
**apply** 77:23
145:1 146:14
**appointed** 25:2
**appreciate**
159:13 188:20
273:8
**approach**
255:17
**approached**
219:22 220:9
222:11 230:12
231:3
**approaching**
217:2 219:5,6
220:13 231:10
269:19
**appropriate**
108:17

**approval**
205:12 207:7
**approve** 205:9
**approved**
201:24 207:9
**approximately**
62:16
**apps** 106:24
**area** 23:20,22
27:24,25 49:6
91:1 117:25
118:1 137:18
137:21,24
138:4,16,19
139:19 203:15
203:20 204:5,6
204:11,15
205:9 217:17
**areas** 48:16
139:13
**argue** 7:3
**argument** 63:5
**arlington** 2:10
**armed** 253:18
**arms** 127:1
**array** 62:5
**arrest** 51:24
74:6 77:9
249:10
**arrested** 17:16
17:19 66:17
179:6
**arrival** 182:21

**arrive** 241:23
**arrived** 241:5
241:23
**arriving** 182:4
**art** 21:24,24
**artery** 135:7
**article** 211:3
**articulable**
151:3
**articulated**
148:14
**artificial** 94:12
**aside** 168:3
**asked** 7:16 13:6
13:9 15:1,3
16:1 21:12
68:17 90:24
91:21 96:14
101:9,11 131:3
134:21 166:13
166:14,24
167:6 168:21
172:9 173:9
184:11,23
186:15,16
189:17 193:25
229:23 263:10
**asking** 6:13
64:17 75:20
78:1 132:24
145:16 166:6
170:19 175:16
176:15,16
177:9 181:6

183:17 197:5
238:12 242:7
**asks** 147:20,20
191:1
**aspect** 22:12
209:5
**aspersions**
173:16
**assassin** 256:23
**assess** 130:14
**assessing** 132:9
132:17
**assets** 19:17
**assigned** 23:20
27:23
**assistant** 31:2
**assisted** 246:22
**associate**
111:12
**associated** 34:3
191:16 206:16
262:22
**association**
89:19,20 91:3
**assume** 6:9
72:3 91:17
101:6 119:12
121:20 125:20
**assumed** 40:24
244:12
**assuming** 47:17
208:16 259:18
**assumptions**
165:6

**attached** 1:24
275:7 276:11
**attempted**
145:19
**attempting**
231:14
**attend** 257:23
**attended**
250:12 251:20
**attention** 32:24
42:25 43:2,11
45:3,4,8 59:11
80:16 83:21
231:9 253:14
254:5
**attorney** 13:10
15:19 17:19
54:21 55:1
145:4,11 157:1
157:3,4 198:6
198:13 276:13
**attorney's**
15:20
**attorneys** 6:24
8:9 55:4 165:6
166:21,24
207:24 212:9
275:14
**auction** 19:13
19:14,15,24
20:2,13 22:3
22:16
**auctioneer**
19:21

**audience** 37:17
**audio** 223:25
**austin** 1:22 2:5
2:16 19:18,19
20:18,19 21:9
85:5 111:23
116:4,12
117:11 118:5
118:13 131:3,6
131:14,15
**authority**
197:22
**automatically**
37:22 133:6
**available** 276:6
**avenue** 2:4
**average** 58:3,5
108:18 111:6
125:23
**avoid** 5:25
**avoidance**
216:16
**avoided** 169:1
**avoiding**
133:22
**aware** 9:1
12:15 169:23
**awesome** 59:17

**b**

**b** 46:10 48:19
163:12 164:1
266:16

**babb** 1:5 2:13
4:23 36:9,17
67:23 89:8
96:12 97:1
99:1,10,16
100:1,3,17,23
101:6 102:23
103:1,3,7,25
104:12,20
105:15 123:24
126:1 128:6
129:2,3,4
130:10 137:14
143:2,9 144:4
144:12 150:25
151:2,5,9,11,14
151:22,25
152:11,16,20
152:21 154:8
163:12 166:9
167:25 168:2,8
168:11,14,21
172:11,17
173:3,11,24
174:12 178:13
182:9 183:7,18
184:6,23 185:3
185:7,18,23
186:6,22,24
187:25 188:2
188:11 189:1,4
189:21,24
192:7 193:10
194:15,18,22

194:24 195:4,6
195:14,25
199:7,24
201:18,23
202:8 206:18
206:23 216:25
217:3,3,10
218:15 219:5,7
219:25 220:7
220:14,14
222:16 224:10
224:25 225:1,6
228:14 230:12
230:19,21
231:1,2,10,12
231:14 232:8
232:18,22
233:18,21
234:2,19,21
235:16 239:5
240:7,12
241:17 242:9
242:16,20
243:1,5,12,21
244:3 245:6,15
245:21 253:16
253:16 254:14
254:16,17,20
255:1 263:10
263:19 264:8
264:13,16
269:10,19,20
270:11,20
271:14,20

274:5 276:4
277:1 278:1
**babb's** 12:23
99:12 105:12
124:4,5 129:7
146:17 151:23
152:15,19
163:16,20
185:14 188:22
199:4,14
207:24 216:5
217:22,25
218:11 219:3
219:23,23
230:6 231:4
233:22 234:11
236:22 244:9
254:24 264:19
270:5,10
**back** 17:20
24:9,11,17
31:8 44:15
49:14 58:18
59:10,13 60:14
66:4 76:6 79:2
84:1 87:1,2
91:14 106:17
108:16 110:23
112:10 119:17
120:5,19
121:22 123:22
128:13 129:21
135:20,23,25
136:2,3 137:10

138:20,21
140:25 141:4
145:23 146:4
150:2 151:10
151:24 153:3,9
159:11 162:12
162:21 168:24
174:5 176:23
179:25 181:4
184:24 185:4
186:5 192:24
195:2 201:13
203:8 212:2
215:24 219:20
241:4 249:4,7
263:5 270:7
**backup** 78:11
**backyard**
257:1
**bad** 6:18 22:21
67:10 88:2
129:3 130:7
224:25 254:3
**badge** 24:19
**bag** 64:1
116:19
**baggage** 116:20
118:11
**balance** 56:8,23
57:6
**ball** 51:25
52:17
**bankruptcies**
21:5

**bankruptcy**
21:7
**bar** 75:16
**barron** 2:14
4:22 9:13 10:4
10:7 21:17
57:13 58:8
88:14 90:7,20
99:14 100:9,13
103:5 109:4,4
109:16,17
110:15 111:6
111:10,12
112:1 127:7
142:13,20
149:5,8 152:25
164:22 178:22
194:20 195:1
195:15 196:11
198:3 211:13
215:7 246:2
251:11 263:13
269:7 271:9,16
272:1,10,24
273:3,8 274:22
276:1
**barron's** 111:8
**bars** 48:8
**based** 49:20
62:12 75:20
100:25 101:1
103:19 111:8
114:11 117:10
153:13 169:7

[based - big]                                                    Page 8

173:8,22
175:17 176:7
185:2 189:10
190:23 196:8
197:25 201:23
208:4 211:10
218:22,24
224:20 228:1
229:2,15 230:5
233:22 235:11
239:16,17
245:16 268:13
269:22
**baseline** 134:22
134:24 135:16
135:21 136:1,9
249:22 261:19
**basic** 54:22
259:23
**basically** 25:4
33:12 44:6
56:16 57:25
59:16 63:2
79:25 169:13
187:9 243:8
255:12 265:21
**basics** 67:1
**basil** 76:4
**basis** 53:10
**bastrop** 28:9
**bear** 36:7
**beat** 40:24
**bed** 124:13,13
128:22 147:14

**beer** 40:17
**began** 204:5
236:18 263:19
**beginner** 60:16
60:18 62:10,10
**beginning** 19:6
120:24 226:4
226:10
**begins** 226:5
263:19
**begs** 66:14
**behalf** 15:21,24
15:24
**behaving** 75:14
**behavior**
132:19 256:3,9
256:9,9 264:7
266:11,24
267:1
**behaviors**
136:20 194:12
252:11 258:23
262:10 264:12
**belief** 113:5
**believe** 9:17
14:17 17:8,12
19:4 34:8 38:3
53:5 59:6
71:24 72:24
75:5 78:1,5
81:6 87:25
91:4 93:12
96:25 98:9
102:22,25

103:1,3,11
104:22 105:25
106:10 109:12
113:1 115:18
124:8,17
125:12 128:9
128:14 129:17
145:13,14
146:12 147:1
147:19 148:19
151:1 152:19
157:16,18
158:2,9 160:2
166:13 174:17
174:20 184:10
184:12 185:14
186:9 187:21
188:18 197:21
199:19 211:11
211:25 212:20
213:23 217:1
225:5,7 227:21
227:22,23
228:8,10,16,16
235:3 244:17
245:10 256:25
258:2 261:1
267:6 270:10
**believed** 100:2
104:11 143:2,9
144:4 146:19
146:20,25
147:15 148:15
148:23 151:14

151:22 152:17
152:21 168:12
179:9
**believes** 119:21
**benefit** 77:22
157:5
**bergstrom**
116:4
**best** 6:17 8:6
64:22 172:20
**better** 24:22
47:3 73:10
131:23 155:17
175:14 202:13
240:2 269:16
**bexar** 1:8 2:19
5:3 13:7 88:17
88:20,23 89:5
89:11 99:3,7,9
99:11 100:4
104:3 154:10
166:11,19
167:20 187:24
189:19 190:2,3
241:24 274:8
**beyond** 210:24
**bicycle** 63:4
**big** 29:19 52:10
58:18 86:2,3,9
109:13 123:1
129:23 138:8,9
138:14,25
141:7 148:9
247:16,17,23

[big - busy]                                                    Page 9

248:23 256:24
257:1,5,8,10,14
**bigger**  122:16
123:4,16 142:4
**biggest**  142:10
256:22
**bio**  251:16
**birth**  62:8
**bit**  36:2 44:19
50:18,22 58:11
58:15 65:10
78:19 79:7
83:18 91:24
136:6 173:7
185:10 202:16
224:20 237:1
**blackvue**  3:14
210:1,2,4,7,8
210:10 211:2,7
212:13
**blair**  90:6,8
**blanche**  50:17
**block**  252:6
**blocked**  218:1
**blocks**  66:19
268:1,6,14,20
268:22,24
269:3
**blood**  135:6,9
**bloodshot**
74:23
**blue**  85:22
**board**  35:1,1

**boat**  51:14
**boats**  50:2
**bodies**  135:19
**body**  44:14,15
44:17 56:13
66:11 79:24
80:24 106:13
124:2,4,5
132:24 133:1,2
133:5,7 134:4
134:18 135:5
151:24 152:15
163:12,16,17
163:20 165:25
166:2,8 169:3
185:23 186:6,7
189:13 191:21
194:11 240:11
240:12,12
244:10,20
246:18,20
247:6,8,23
248:1,7 249:14
250:19 252:22
253:2 254:13
254:16,23
255:2,10,18
258:10 262:15
264:12,13,19
264:21
**bong**  72:10
**bootlegging**
26:3,5

**border**  48:17
60:8 89:3
127:14 138:13
**bored**  65:5
**bottles**  141:4,5
141:6
**bottom**  92:7
184:17 206:13
207:14 236:6
252:3
**boulevard**  2:15
**box**  92:23
**boxes**  70:13
**brain**  36:5
99:24 260:21
**brake**  59:10
**brand**  45:13,22
**break**  7:8,14
8:2 57:14
60:11 73:6
88:19 100:10
142:19 152:24
153:7 162:9,11
246:2,7 265:2
**breathing**  58:5
58:6 133:21
135:10 264:3
**bricks**  71:4
**briefly**  170:2
**bring**  33:11
77:9
**broad**  104:4
247:15

**broken**  11:1
217:4 219:6
223:10,10
226:12,22,22
226:24 230:5
232:4
**brought**  8:20
9:9,23 140:19
168:25
**brow**  86:13
**buckets**  153:24
**build**  24:12
131:20
**building**  66:19
**built**  211:7
**bulk**  138:14
**bumped**  33:6
**bumps**  32:18
**bunch**  22:25
**burn**  74:22
**burnt**  74:21
**buses**  24:4,4
51:4
**business**  21:6
22:12,17 52:5
52:6 56:10
76:20 86:14
130:21 234:15
253:7 254:3,7
**businesses**
141:13
**busy**  29:24
126:16

**[button - car]** Page 10

**button** 102:3
213:15
**buyer** 51:21
**buys** 52:13
**bwc** 163:12
164:8

**c**

**c** 2:1 86:1 134:3
266:15
**cable** 143:3,10
143:16
**cad** 68:4,9
**calculated**
200:13
**calculation**
214:14 215:5
**calculator**
92:22,23
**caldwell** 28:10
**california**
50:14 63:25
157:16,17
**call** 68:5 72:18
73:18 77:3,10
116:2,6,7
117:4 118:15
134:22 144:19
149:21 171:18
173:3 205:2
222:2,15 231:3
231:5 244:12
244:19 256:23
257:8

**called** 28:15
35:25 72:16
90:24 114:11
116:5 178:7
239:6
**calling** 91:19
113:21
**calls** 244:11
**calm** 85:25
86:8,8,8,11
134:1,8
**calms** 70:5
**cam** 124:2,4,5
151:24 163:5,6
163:10 185:23
186:6,7 208:13
217:9 244:10
244:20
**camera** 3:14
40:8,10,12,15
42:21 43:4,12
44:14 66:11,11
101:7 102:2,2
102:4,8,14
105:7,8,10,12
152:15 163:12
163:16,17,20
165:25 166:2,8
169:3 189:13
189:14 207:22
208:25 209:4
210:1,7 211:2
211:12 212:13
212:20 213:11

214:3,15,17,17
214:19,19,21
215:1,3,5,6
219:24 220:1,6
224:4 225:19
226:20,25
228:2,24 229:2
230:6 233:22
235:12 236:21
254:13,16
264:13,19
270:8,8,9
**cameras** 24:21
34:14 39:1
40:6 42:18
44:9,15,17
65:16,19,21
101:10 106:13
196:8 209:7,8
209:9,12,15,18
209:22 210:5
210:10 211:7
212:16,16,18
213:2,4,6,10,14
213:15,15,17
213:17,18,18
213:25 240:11
240:12,12
**cams** 44:3
**canada** 60:4,6
**candidate**
36:24 199:8
**candidates**
37:17

**cans** 40:18
**capable** 143:3
**capacities**
65:11
**capacity** 1:6,7
1:8 38:7 45:25
88:18 182:10
183:9 248:13
274:6,7,8
**capital** 23:20
23:22 27:24,25
**capture** 43:14
241:14
**captured** 5:25
40:16
**car** 20:5,6
23:15 24:19,21
26:25 32:23
33:7 40:9,17
40:21,23 43:4
43:5,9 44:25
45:13,21 48:8
48:11,18,20,22
48:23 49:1,7
49:13 57:2
59:3,3 68:8
69:15,25 72:20
72:23 73:3,5
74:13 75:8
76:20 80:2,5
80:23 81:14
82:9 83:5,8,17
83:25 84:2,2,3
84:6,8,8,9,11

| | | | |
|---|---|---|---|
| 84:13,14,16 | **careful** 204:14 | 120:12 125:16 | 144:20,25 |
| 85:2,2,4,6,11 | **carotid** 135:7 | 142:5 | 145:1,4,6,9,9 |
| 85:15 101:25 | **carpet** 180:7 | **case** 5:4 11:24 | 145:12,14 |
| 102:2,5,6,9,10 | **carrizo** 108:3,5 | 12:2,5 14:13 | 146:12,15 |
| 105:18 106:3 | 108:11 117:25 | 14:25,25 15:4 | 148:18,22 |
| 112:17 113:21 | 118:4 129:19 | 15:5,22,23,25 | 149:12,17 |
| 114:21,22,24 | 168:24 184:8 | 16:3,7,8,10,16 | 150:8 153:6,15 |
| 119:21 120:14 | 239:8 240:25 | 16:25 17:9,13 | 153:21 154:1 |
| 120:16,17,21 | 241:1 243:2 | 17:13,15,21,24 | 155:2,13,18,21 |
| 123:6 124:6 | 244:5,18 | 18:9,11,13 | 155:22 156:4 |
| 133:15 135:19 | **carrying** | 21:21 34:4 | 156:10,16,25 |
| 140:9,10 | 116:16 117:12 | 39:12 54:24 | 157:16,18,21 |
| 145:16,23 | **cars** 20:4,8,10 | 59:19 66:13,21 | 158:10,14,17 |
| 146:1,6,12 | 21:2,9 25:19 | 66:22 67:17 | 158:18,19,20 |
| 148:13 163:18 | 26:23 28:16 | 68:3,10,12 | 159:7,8 160:16 |
| 174:8 177:22 | 44:9 45:14 | 78:8 88:13,16 | 161:1,3,4,4,5,6 |
| 183:13 221:18 | 46:10 49:6,8 | 88:25 89:8,13 | 161:7,9,11,11 |
| 221:19 232:15 | 49:12,22 50:2 | 90:5,14,21,23 | 164:18,19,22 |
| 233:8,23 244:2 | 50:4 55:14,23 | 90:25 91:5,18 | 165:2,7,14 |
| 244:3 248:22 | 56:5,10,11 | 92:16,25 93:19 | 166:25 169:13 |
| 248:22 253:5,9 | 57:7,11 83:21 | 93:24 95:10 | 169:20 171:24 |
| 255:16 265:14 | 83:21 101:16 | 96:6 97:25 | 172:9 173:9 |
| 265:15,22 | 104:23 120:10 | 98:8 99:20 | 176:25 181:6 |
| 266:7,8,12 | 120:16 122:13 | 101:23 102:12 | 187:15,16,17 |
| 267:17,19 | 123:6,13 | 102:14,16 | 187:20,22 |
| 268:7 270:6,10 | 125:18 126:7 | 104:15,18 | 189:8,13,16 |
| 270:20 | 126:19 127:16 | 106:9 107:17 | 191:25 195:12 |
| **card** 209:20 | 218:1,3,5,6,9 | 108:17 112:6 | 197:13,17,19 |
| **cards** 22:3,5 | 236:11 265:16 | 115:11,23,24 | 197:22 198:1,1 |
| **career** 64:6 | **carte** 50:17 | 117:23 118:8,9 | 198:8,10,12,14 |
| 145:18 151:13 | **cartel** 59:24 | 121:2,16 | 198:17,18 |
| 213:13 229:17 | 140:21 | 123:23 128:23 | 199:14 203:3,9 |
| 252:24 | **cartels** 27:2 | 141:2,2,3 | 203:9,11,12,15 |
| | 48:4 58:23 | 142:25 143:7 | 203:23 211:18 |

212:4 214:22
229:18 234:19
235:8,21 236:2
236:3,15
245:25 247:2
260:15,16
261:5 264:8
267:5,6,13
268:18 271:3
272:13
**cases** 15:10,10
16:17 23:7,13
29:19 73:23
93:21,22
101:15 113:13
129:14 139:1
145:7,20
155:24,24
156:2,5,6,7,8
156:14,15,20
157:6,8 184:2
184:3 192:11
**cash** 116:10
117:10
**cast** 173:16
**cat** 87:25
**catch** 88:1
101:16,21
102:1 161:3
230:23 231:14
232:19
**catching** 102:5
220:10

**categories**
164:14
**category**
254:25
**caught** 81:22
88:1 231:15
**cause** 1:18
12:11 30:8
106:3 114:13
114:22 120:18
134:16 147:16
216:1 256:16
271:14
**caused** 231:11
266:19 272:8
272:12
**causes** 133:19
**cell** 52:16 256:6
**cells** 140:24,25
**center** 238:8,10
238:10,13,14
238:18
**centers** 238:15
**ceo** 52:6,7
**certain** 45:10
49:6 73:17
88:24 108:4
120:12 132:25
134:15,25
152:10 234:17
238:19 249:15
249:16 260:4
**certainly**
214:25

**certificate** 3:6
200:9,10
201:12 206:1
274:23
**certificates**
186:24,25
199:18,20
200:5,12,17,18
200:20,21
201:2,19,24
207:3,4
**certification**
32:4 41:21
42:2 274:11
**certifications**
31:18,19,22
38:22 39:18
**certified** 33:23
60:19 236:11
274:14 275:17
**certify** 274:16
275:1,12
**challenged**
253:3,6
**chance** 162:12
**change** 136:4
168:9 222:19
260:2 261:2,10
261:15 262:4
277:4,7,10,13
277:16,19
**changed** 98:20
156:11 215:17
260:23

**changes** 249:22
259:6,7,9,14
260:6 261:22
261:23 275:7,8
276:10 278:6
**changing** 14:21
262:22
**chapter** 258:22
262:9
**charge** 49:16
180:11
**chargeable**
180:17,21
**charged** 179:14
180:14
**charges** 68:1
**charging** 92:15
92:25 93:1,2,3
93:4
**charles** 2:20
**chart** 190:15
**chat** 113:12
115:2,3
**chebert** 2:6
**check** 94:20
**checking**
265:24
**checkpoints**
20:25 127:15
**chest** 264:4
**chicago** 85:5
**chief** 89:22
**child** 192:10

**children** 64:6
**christen** 2:3 4:7
**ci** 237:12,14
**cid** 24:9 34:6
　34:21
**circuit** 21:19
　160:25
**circumstance**
　87:2 180:9
　261:17 267:6
**circumstances**
　75:8 76:7
　125:22 130:8
　150:24 151:2,9
　151:22 152:7
　168:18 172:11
　172:14 181:5
　188:7 190:16
　190:25 192:23
　193:5,10
　244:24 261:5
**citation** 264:8
**cite** 160:23
**cities** 142:4
**city** 19:18,18
　20:17,19
　111:23 122:8
　141:20,23,25
　142:7 239:9
**civil** 1:4,23
　15:5,25 16:8
　18:13 41:1
　188:16,21
　274:4

**claim** 116:20
**claimed** 112:2
　132:9,10
**clarification**
　104:8
**clarified** 97:7
　146:9
**clarify** 16:6
　65:18
**clarifying**
　260:18
**clarity** 150:22
　182:24
**class** 86:1
　116:6 134:3
　204:23,24
　205:1,2,5
　247:11 266:15
　266:16
**classes** 77:20
　125:10 199:19
　201:11 204:13
　205:25 246:17
　247:2 250:13
　250:18,20
　256:1 257:18
　257:20,21,22
**clean** 9:25
　10:15 73:6
　119:24 146:4
　150:3 203:22
**cleaned** 73:3
**cleanup** 203:6

**clear** 5:20,23
　6:2 76:24
　96:22 152:14
　170:6 184:5
　219:18 244:4,7
　249:20 264:20
　270:21
**clearheaded**
　8:11
**clearly** 182:9
　183:19 268:3,6
　268:14
**clients** 20:16
**cliff** 59:16
**climb** 51:22
　52:4
**clink** 40:18
**clip** 163:7
　207:21 208:16
　208:19,20,20
**close** 59:12
**closely** 181:23
**closer** 45:8
　214:24
**clothes** 116:18
**clothing** 84:23
　116:15 118:11
**cloud** 209:19
**clue** 116:2
**cluster** 260:5
　260:10
**clustering**
　249:18

**clusters** 249:13
　261:7
**cocaine** 51:25
　69:16 140:24
　141:6 180:2,6
　180:10
**code** 155:19,20
　216:1
**coincides** 232:8
**coke** 133:15
**cold** 105:16,19
　105:22,23
　106:6,15
　108:14 113:10
　146:16 148:24
　168:6 192:25
　193:3
**collar** 21:21
　22:1
**colleagues** 73:4
　164:23
**collect** 100:11
　179:15 193:16
**color** 48:20
　242:10 268:3,7
　268:18
**colorado** 50:14
**combination**
　124:15 220:7
　235:15 267:4
**combined**
　152:5
**come** 15:16
　16:1 22:9

23:12 31:8
33:3 36:1
49:21,22 55:2
60:6 75:16
77:8 79:2
102:15 121:22
126:23 135:12
136:2 138:20
146:2 226:6
**comes** 12:6
43:23 50:3
77:7 80:24
82:17 121:7
138:13
**comfortable**
80:4
**coming** 59:18
60:9 68:14
70:11 75:15
107:18 121:19
130:17 135:5
138:17 147:21
148:9 168:23
234:22 244:4
**commander**
18:20 25:2
29:4,6 31:5
52:21,23 53:5
**comment** 76:18
124:6 147:23
230:8
**commented**
158:20

**commercial**
116:2
**commit** 36:13
110:10 225:6,9
270:17
**committed**
234:6
**committing**
49:3 66:24
133:13 248:14
266:17
**common** 69:14
74:22 88:3
101:20 106:25
107:4 122:7,8
122:15 125:12
128:20 131:15
139:2 140:22
203:20 252:9
**commonly**
23:25 109:14
120:10 124:12
140:21 141:8
141:12 174:1
240:15
**communicate**
112:10
**communicating**
106:13 182:9
183:6,19 184:7
184:13 194:4
**communication**
106:24 112:7
113:14 184:4

**communicati...**
183:20
**community**
192:14
**commuters**
120:6,8
**compacted**
71:4
**companies**
19:23 20:5,8
21:6,8,8,9
202:6 203:13
**company** 19:13
19:14,15,24
20:2,13 140:11
140:13
**compare**
136:16 186:8
**compared**
106:9 126:20
173:25 186:5
188:5 189:13
194:9 217:22
261:21 267:17
269:11
**comparison**
214:8 265:15
**compartment**
120:13
**compartments**
49:7 73:24
**compassion**
104:20

**complain** 68:11
**complained**
67:6
**complaint**
40:25 67:14
185:15,16,17
186:9 187:4
189:11,14
244:14,15
**complaints**
187:1,23
**complete** 9:3
159:4 170:6,10
278:8
**completed**
202:8 276:16
**completely**
11:1 223:9
**completion**
275:4,11
**complex** 40:23
**complicated**
47:25
**complied**
189:21
**comply** 100:24
**complying**
99:10
**computer** 68:5
80:21 210:21
215:1 232:23
232:25 233:3,5
**computers**
24:19 233:8

[concealed - contain]    Page 15

**concealed**
123:5
**concept** 257:10
**concern** 134:16
**concerns** 67:13
68:16 79:8,11
**conclude** 74:10
74:17 75:9
146:13 208:12
209:4 216:4
219:9 234:5
264:24 271:21
**concluded**
144:25 175:23
178:13,14,20
217:12 219:4
224:6 273:11
**conclusion**
96:19 199:3,6
202:1 234:14
236:23
**conclusions**
103:23 197:25
272:12
**condescending**
256:9
**conditions**
188:4 191:12
**conduct** 66:24
76:20 154:13
217:15 219:9
219:12 234:5
235:10

**conducted**
104:16 188:2
**conducting**
51:11
**conference**
77:10 111:14
**conferences**
89:21
**confessions**
258:1
**confident**
120:22
**confidential**
237:10,11,13
237:13,20
**confidently**
241:9
**configurations**
209:23
**confirm** 119:1
130:3 135:23
135:25 139:6
141:15 151:4
**confirmation**
184:21
**confirmed**
148:6 241:11
**confirming**
243:6
**confliction**
71:17
**confused** 82:2
**confusing**
157:1 200:19

**confusion**
244:1,20
**congress** 2:4
**connecting**
210:20
**conscious**
33:12 133:6
**consensual**
121:15 145:20
202:25 203:25
204:2
**consent** 55:14
56:17 83:5,8
117:1 128:11
128:16 129:22
131:20 140:4,7
145:16 146:6
146:11 148:16
169:7 253:6
**consider** 60:18
129:24 139:18
176:2 181:19
181:21 194:19
194:25 196:9
197:7 217:10
218:4 235:20
250:22,24
264:21 267:13
**consideration**
127:11 188:23
189:1 235:8
248:21
**considered**
48:12 106:6

153:24 176:9
176:11 234:13
266:13,14
**considering**
122:5 150:24
216:11
**consistent**
104:1 122:5
152:13 172:12
190:21 259:7,8
259:10,11
**console** 73:23
**conspiracy**
24:5
**constitutes**
107:8
**constitutional**
99:13,24
**constrained**
214:8
**construed**
259:25 264:6
**consult** 66:10
240:5
**consultant** 14:8
14:12,15,24
18:12
**consulted**
157:22
**contact** 32:20
133:22 244:15
**contain** 12:1,4
154:25

containing
  155:10
contains   275:8
contaminate
  256:3
contamination
  255:24
content   176:16
  211:6
contesting
  17:18
context   75:25
  76:1 87:13,19
  100:2 111:2
  182:20 183:17
continue   13:25
  41:11 106:18
  134:11 147:18
  150:6 156:18
continued
  222:18
continues
  223:6
contour   10:25
  11:2 219:16
  222:20 223:9
  223:16,16
  224:16 225:22
  226:1,5,9,13
  231:22,25
contraband
  69:15,25 106:1
  122:8 145:25
  178:15,21,24

179:4,13
180:12,12
181:16
contract   19:19
  20:2,4
contracting
  20:12
contracts   19:23
  20:7
control   133:10
controlled
  255:14
conversation
  6:16 7:11
  174:11,15
  175:20 176:13
  176:17,20,21
  208:9 222:18
  223:8 224:1
  230:18 231:12
  244:9
conversations
  243:14 244:22
cool   14:2 22:15
  34:7,19
cooperating
  23:9
coordinated
  88:22
coordinates
  212:19
cop   61:17,19
  87:22 206:16
  206:24 207:1,4

207:4
copies   156:1
  162:17 164:21
  164:23 276:14
cops   40:11 55:7
  88:1,2,6
  122:25 125:13
  138:16
copy   11:10
  84:18 157:14
  251:11 274:23
copyright
  252:2
corner   268:3
correct   4:10
  11:20 16:21
  17:24 18:22,23
  22:21 27:13,17
  43:6 49:22
  59:22 69:10
  79:6 92:14,17
  92:18 96:20
  97:22 99:4
  107:6 114:19
  114:20 123:11
  123:15 128:16
  132:12 152:18
  155:8,11,14,15
  163:21 167:1
  175:18 178:17
  197:15,22
  211:11 212:21
  213:3,7 224:24
  245:7 269:6,8

278:8
correction   3:11
  9:21 10:19
  222:23 223:12
corrections
  278:6
correctly   97:5
  107:1 122:10
  136:18 143:14
  144:22 145:2
  149:23 151:6
  153:18 165:11
  170:8 178:16
  182:12 183:12
  184:25 191:4
  198:8 201:7
  202:9 206:21
  208:10 217:6
  229:19 235:14
  239:11 252:13
  256:13 257:2
  259:12 262:16
  263:1 264:10
corrupt   17:20
cost   253:21
costs   205:3
could've
  147:25
counsel   4:22
  12:23 17:21
  275:12 276:14
count   22:20
  116:24 178:10

| | | | |
|---|---|---|---|
| **counter** 32:16 | 142:16 153:4 | **covered** 119:5 | 46:7,8,13 |
| **counties** 23:15 | 162:4 243:17 | 147:6,8 | 66:24 69:19 |
| 28:5,6,13 | 265:8 | **covering** 132:3 | 107:13 110:5 |
| **country** 24:7 | **courier** 57:22 | 134:14 | 110:10 114:2 |
| 49:22 52:3 | **course** 7:19 | **coworker** | 133:13 191:16 |
| 69:22 101:4,21 | 8:10 25:7 | 206:8 | 248:14 |
| 104:16 112:12 | 34:10,13,16 | **crap** 223:24 | **crimes** 25:14 |
| 203:10,11,17 | 36:6 39:24,25 | 231:17 232:17 | 25:15 46:19 |
| 204:14 | 42:7,9 59:12 | **crappie** 19:10 | 63:14 109:15 |
| **county** 1:9 2:19 | 64:12 69:21 | **crash** 266:19 | **criminal** 15:7,9 |
| 5:4 13:7 15:20 | 94:18,24 100:8 | 266:22 267:10 | 15:10,22,23 |
| 16:18,21,23 | 103:15 105:7 | 267:11 | 16:10,16,17,24 |
| 18:19 19:3 | 128:23 130:9 | **crashing** | 18:9,21 24:3 |
| 22:22 23:2,8 | 130:16 131:14 | 113:23 | 25:2 26:8 28:2 |
| 25:24,25 26:1 | 135:15 156:18 | **create** 185:12 | 28:11 30:14,17 |
| 27:22,23 28:7 | 170:23 171:5 | 193:17 209:15 | 30:21 31:8 |
| 28:9,9,10,10,10 | 176:18 183:1 | 239:18 257:25 | 43:18 44:20,22 |
| 28:10,23 59:5 | 187:15,17 | **creating** 185:9 | 44:24 45:1,7 |
| 88:17,20,23 | 201:9 204:9 | **credibility** | 45:11,15,17,23 |
| 89:5,11 91:13 | 211:7 215:22 | 112:25 113:11 | 45:24 46:1,3,6 |
| 91:16 98:14 | 254:21 272:20 | 113:14 116:21 | 46:11,12 47:5 |
| 99:3,7,9,11 | **courses** 129:8 | 122:4 139:5 | 47:8 50:24,25 |
| 100:4 104:3 | 247:3 | **credible** 107:24 | 51:10,11 52:21 |
| 120:4 131:2 | **court** 1:1 4:21 | 107:25 108:8 | 54:4,11,13,24 |
| 146:3 154:10 | 15:8,16 16:5 | 113:24 115:10 | 56:22 58:2 |
| 166:11,19 | 17:7,20 18:6 | 116:25 121:9 | 60:13,16 62:9 |
| 167:20 187:24 | 21:8 55:4 | 121:10 146:22 | 62:10,11,15 |
| 189:19 190:2,3 | 146:10 149:19 | 147:4 148:23 | 63:6,9 64:18 |
| 207:8 241:24 | 274:1 | 151:15,15 | 74:19,20 78:23 |
| 242:12 274:9 | **courtroom** 5:17 | 205:5 | 87:19 88:5 |
| **couple** 5:10 | **courts** 203:19 | **credit** 111:20 | 89:10 91:7 |
| 57:5,18 82:8 | **cover** 141:13 | 111:24 206:2,4 | 116:3 118:22 |
| 88:11 90:3 | 147:14 251:16 | **crime** 24:10 | 119:1,2,3 |
| 91:25 102:21 | 251:17 260:8 | 32:13,13 37:1 | 138:6,22 |

145:20 155:20
191:19 192:3,9
198:25 199:4
199:15 201:15
206:17 248:11
**criminals** 46:10
87:23,24
**critical** 38:20
94:17
**crockett** 25:10
25:12,15,24
26:13 27:6
**crooks** 88:1
**cross** 218:20
220:8,12
230:21 231:11
235:13
**crossed** 217:2,3
218:24 219:4,6
224:7,15,18,23
227:6 228:3,21
230:4 233:23
234:3 235:6
269:21
**crosses** 220:16
220:22
**crossing** 225:1
227:17
**crowd** 90:1
**crystallize**
196:2
**cs** 237:11
276:15

**csfrigeriolaw**
2:22
**csr** 1:20 275:22
**cues** 262:22
**curious** 36:25
37:4
**current** 156:10
**currently**
108:24
**curriculum**
44:7 205:1
257:23
**curve** 219:17
221:22 226:8
230:17 269:23
269:24
**customers**
20:15
**cut** 24:20 61:15
102:8 126:4
208:21 212:6
**cv** 1:5 3:13 14:5
23:1 25:5
31:12,13 39:5
39:7,10,16
204:12 274:5

**d**

**d** 164:12
250:15,16
**dad** 63:5
**daily** 29:23,23
53:10

**dallas** 45:19
48:22 89:4
141:24,25
142:3,9
**damaged** 68:7
68:24
**dark** 59:6,7
268:18
**dash** 39:1 40:9
43:4 44:3
66:11 101:7
105:12 124:6
163:5,6,10
189:14 207:22
208:13 209:4,7
209:9,12,15,18
209:22 210:1,4
210:7,10
211:11 212:13
212:13 213:2,6
213:9,11 214:3
214:15,17
215:5 217:9
220:6 224:4
225:18 226:20
226:24 228:2
228:24 229:2
230:6 233:22
235:12 236:21
**data** 12:23 13:4
**date** 40:5 96:4
96:5,12,19
153:15 159:22
215:8 242:23

275:6,22
277:24 278:12
**dated** 96:13
158:5 164:4
177:23
**daughters**
34:10
**day** 21:13
35:15 40:15
42:18 49:8
53:23 54:6
56:11 58:18
59:4 65:13
68:23 70:10
78:22 79:2
97:8 101:4
104:17,24
110:7 120:9,15
120:19 127:16
129:18 131:1
138:21 148:8
168:24 188:11
193:11 240:23
241:18 265:3
275:17 278:15
**days** 275:6
276:16
**de** 80:11
**dea** 20:3 23:24
24:1 29:10
89:1 237:8,9
**dead** 135:19
**deal** 34:16 86:2
86:3,9 120:6

147:10
dealing  125:15
  193:11 213:17
debating
  172:25
december  19:4
  19:5
deception
  246:14 250:4
  254:22 255:10
  259:6,15
  260:11 262:14
  262:25 264:25
deceptive
  134:17 249:14
  249:17 261:16
decide  79:1
  81:25 106:2
  107:13 140:16
  172:8
decided  105:18
  171:14 173:7
  176:20 187:25
  188:5
decipher
  197:22
decision  128:15
  191:2 198:14
decisions  90:17
  189:3,5 190:21
declare  278:4
dedicated
  62:19

deemed  278:6
deep  264:2,3
deeper  45:6
defects  5:7
defendant  2:13
  5:4 12:23
  15:21,24 89:8
defendant's
  13:10 212:9
defendants  1:9
  2:18 16:4
  165:6 274:9
define  44:22
definition
  179:3
definitively
  224:14
degree  81:10
delayed  149:20
  149:25 150:13
delaying  150:4
  150:11
delivered
  274:21
deny  130:4
  151:4 215:21
department
  23:23 25:12
  26:16 27:7,16
  29:5 33:21
  41:1 60:20
  62:20 97:15,17
  97:20 112:8,21
  112:22 127:12

237:12
department's
  97:23 204:19
departments
  190:9
depend  130:8
  198:10,17
depended
  29:24 207:10
  250:19
depending  13:1
  156:17 265:20
  266:11
depends  62:17
  72:5 97:17
  125:22 126:9
  266:10
depicted
  222:21
depicting  208:6
  223:22 224:12
deponent  275:2
  275:3,10
  276:13 278:3
deposed  5:11
deposing
  276:13
deposition  1:12
  1:16 5:7 69:8
  69:11 152:3,16
  159:16,25
  160:3 162:19
  186:10 192:4
  217:1,10

218:15,19
  224:11 230:9
  230:11 232:9
  240:10 272:18
  274:12,19,21
  275:4,11
depositions
  14:1 153:14
  159:18,19
  160:9,12,14,16
  162:18 164:5
  169:14 171:24
  172:5 184:6
  185:14,18,24
  185:25 186:3,4
  186:9 189:11
  189:12 241:12
  244:13 245:12
  271:19
depression
  259:9,11
depths  114:5
deputies  25:1
  178:20 190:10
deputized  24:1
deputy  4:23
  36:9,17,20,20
  67:23 96:12
  97:1 99:1,10
  99:12,15 100:1
  100:2,16,23
  101:6 102:23
  103:1,3,7,25
  104:11,20

105:12,15,24
116:6 123:24
124:4,5 126:1
127:15 128:6
129:2,3,4,7
130:10 137:14
143:1,9 144:4
144:12 146:17
150:25 151:2,5
151:9,11,14,22
151:23,25
152:11,15,16
152:19,20,21
154:8 160:1,2
163:15,20,22
163:22 164:8
166:9 167:25
168:2,8,11,13
168:21 172:11
172:17 173:3
173:11,24
174:12 177:25
178:13 182:9
183:7,18 184:6
184:21,22
185:3,6,14,18
185:18,22,23
186:6,8,8,22,24
187:25 188:2
188:11 189:1,4
189:21,24
192:4,7,7,7,10
193:10 194:15
194:18,21,24

195:3,6,14,25
199:4,7,14,24
201:18,23
202:8 206:17
206:23 207:24
216:5,25 217:3
217:3,10,21,25
218:11,14
219:3,5,7,22,23
219:25 220:7
220:14,14
222:16,21,24
223:1 224:10
224:25 225:1,5
228:14 230:6
230:11,12,19
230:21 231:3
231:10,12,14
232:8,18,22
233:18,21,22
234:2,11,19,20
235:16 236:22
239:5 240:7,12
240:13,15
241:16 242:9
242:16,20
243:1,5,12,21
244:3,9 245:6
245:15,21
253:16,16
254:14,16,17
254:20,24
255:1 263:10
263:19 264:8

264:13,16,19
269:10,19,20
270:5,9,11,19
271:14,19
**describes**
196:22
**describing**
264:17
**description** 3:9
107:19 116:15
116:19 242:10
**descriptor**
73:11 155:17
202:13
**desire** 191:14
**desk** 10:3,5
**destination**
49:12 122:7
138:10
**destroy** 180:7
**detail** 23:4
46:13 152:4
**details** 87:10
172:22 173:7
244:21
**detained**
184:24
**detect** 131:24
246:14,14
256:17
**detecting** 250:4
**detection** 45:23
246:14

**detective** 24:10
29:13 33:24
34:5
**detects** 46:13
**detention** 204:3
**determination**
180:16,20
**determine**
56:16 74:4
81:2,15 84:25
110:14 113:19
114:2 130:19
132:5,19 134:6
136:7 145:4
151:21 190:4
193:14 205:7
234:10 235:6
246:25 248:7
265:18
**determined**
145:10
**determines**
265:23
**determining**
188:13 190:20
191:21
**develop** 30:6,7
44:6 77:18
81:20,25 86:17
114:12 134:21
134:24 145:15
149:20 246:24
**developed**
27:12 56:15

**developing**
  30:13,21 53:15
  107:12
**device** 265:19
**devices** 211:22
**diagnosing**
  262:15
**diazepam** 70:3
**dicaprio** 21:25
**difference**
  31:13 45:2
  76:22,24 79:20
  82:15,16
  126:18,19
  192:5 255:8
  270:16,25
**differences**
  114:3
**different** 10:13
  13:1 16:7
  50:13 58:20
  60:24 67:15,16
  74:24 99:17
  105:4 135:13
  136:21 173:21
  186:17 190:9
  190:10,13,15
  192:17 193:5,8
  196:23 197:20
  203:10 209:8,9
  209:10,12,13
  209:15,16,18
  209:18,22,23
  215:2 224:17

  254:25 255:11
  255:14 257:21
**differently**
  173:1 190:11
  203:10
**differs** 141:22
**dig** 45:6 131:8
**digital** 39:12,25
  40:8,8 42:5
**dillard's** 45:20
**direct** 104:9
**directv** 84:19
  84:20,22,23,25
**dirt** 73:8,10
  180:8
**disagree**
  204:18
**disappointed**
  94:16
**disapprove**
  205:9
**discouraged**
  64:9 65:4,5
**discover** 110:2
  204:17
**discrepancies**
  190:14
**discrepancy**
  231:22
**discuss** 158:23
  176:20
**discussed**
  104:19 179:1,8
  249:23

**discussing**
  90:21
**discussion** 9:19
  148:2 242:2
  255:24
**dishonest** 167:9
**dishonesty**
  256:17
**disinterest**
  259:11
**dismissal** 187:2
**dispatch** 68:5
**dispel** 119:1
  139:7 141:15
**displaying**
  239:7
**distance** 221:20
  223:11,20
  234:23 235:4,5
  267:23 268:5
  270:12,14
**distinct** 70:25
  71:1 225:22
  226:1 231:21
  231:22
**distract** 231:4
**distracted**
  232:14 233:1
  233:15
**distractions**
  80:22 81:9
  256:4,16
**distributing**
  49:19

**district** 1:1,1
  15:19 274:1,1
**ditch** 270:6
**ditched** 59:15
**division** 1:2
  18:21 274:2
**document** 7:22
  7:25 8:1,20,23
  14:4 162:15
  251:15
**documentation**
  66:25
**documented**
  98:16 170:7
**documents**
  7:20 10:3
  153:14 155:4,5
  164:21,23
  165:3,5 189:15
**dog** 34:11,18
  34:18 90:18
  150:13 181:6
  181:11 184:22
**dogs** 181:22
**doing** 6:18 19:6
  22:16 27:19
  29:21 30:24
  43:1 45:1,20
  47:13 53:10,22
  54:2 55:3,15
  56:1,3,22 57:1
  57:5 58:1 61:9
  61:10 63:9
  65:6 77:23,25

77:25 78:4,25
79:5 81:19
90:15 93:14
98:24 103:11
106:1 115:19
115:19 117:1
118:15 131:4
133:7 134:12
136:5,23 137:8
139:21 146:4,5
154:4 175:4
193:15,15
195:21 203:4
205:15 215:22
233:7 235:4
254:1,1 266:4
**dollars**  22:6
**don**  4:13
**donna**  1:20
4:21 5:21 6:2
6:17 10:12
11:13 162:9
274:14 275:22
**door**  256:6
**dope**  125:18
**doubt**  272:8,12
**downer**  70:5
**downloaded**
259:18
**downtown**
131:3
**dps**  29:6 86:12
**dress**  84:22

**dressed**  83:2,4
84:9
**drink**  7:9
**drinking**  48:10
**drive**  25:20
48:8,11,22
58:13 85:15
131:18 216:12
236:19 271:21
**driven**  133:18
143:2,10
227:18,19
241:22 243:6
**driver**  48:21
49:17 267:10
268:25
**driver's**  86:4
**drivers**  48:12
48:12 137:3,5
137:7
**drives**  32:25
120:18
**driving**  48:25
57:22 73:4
85:18 105:17
110:16 113:22
120:9,15 127:6
133:16 137:17
137:20,23
138:3,4 140:1
208:19 232:19
233:4,6,18
266:13,14,24
267:6,8,13

**drop**  49:13
**drove**  59:15
128:4,5
**drug**  17:15
23:16,24 25:14
25:14,15 26:12
26:20,24 28:12
29:21 47:13,20
47:25 50:4,11
50:20 51:21
52:5 58:14,20
63:13 64:7,15
82:4,7,15,18
84:16 85:17
91:1 109:14,17
115:22 120:12
120:22,25
121:1 122:12
124:20,21,24
125:3,7,16
127:13 131:16
133:14 138:8
138:12 139:1
140:21 141:8
141:11,12,15
141:22 142:11
155:24 173:13
191:22 237:6,8
248:14,17
253:1,4
**drugs**  17:16
25:18,20 26:2
26:13,15,22
28:18 45:16

48:1,5 49:7,18
49:21 50:9,17
57:24 58:22,25
58:25 62:25
63:13,18,18,18
63:19 64:7,13
65:1 84:24
120:10 122:7
123:5,13,17
125:14,17,18
125:19 127:2,6
127:12,17,19
127:25 128:22
135:5,16
138:11,14
140:23 141:6
141:24,25
142:1,2,7
143:13 144:6
145:25 248:18
253:5,10 262:2
**drunk**  267:10
**dry**  25:24 26:1
133:21
**dude**  75:1
**duly**  1:17 4:2
274:17
**duplicate**  201:2
**duplicates**
200:24,25
201:3,6,8
**duration**  208:7
**dust**  40:21

**duties**  108:24
**duty**  16:14 55:7
  145:25
**dwi**  113:20
  114:7,12

**e**

**e**  2:1,1 48:19
  164:1,1 250:16
  277:3,3,3
**earlier**  99:18
  104:19 119:20
  120:11 122:19
  133:24 139:24
  143:5,24
  146:19 147:6
  151:12 167:24
  173:10 179:2,8
  191:12 193:1
  195:20 199:7
  202:16 223:13
  248:18 249:23
  260:3 265:12
**early**  25:10
  27:9,10 42:10
  161:2
**earth**  217:16
**easier**  98:20
  182:19
**easily**  65:3
  268:16
**east**  26:19
  270:2

**easy**  104:10
**ebbs**  6:16
**ecstasy**  69:17
**edge**  133:19
**edges**  76:17
**education**
  153:16 255:9
**effective**  50:20
  256:22
**effectively**
  192:14
**effort**  32:24
**eight**  29:3 40:7
  51:25 52:17
  53:4 58:20
  70:10 172:1
**eighth**  160:24
**either**  44:8
  47:10 51:20
  81:24 98:14
  119:1 125:7
  130:3 139:6
  141:14 155:13
  158:1 200:10
  202:7 224:7
  227:8 228:22
  245:11 267:18
**elaborate**  58:8
  76:10
**elected**  89:24
  110:11
**electronically**
  98:16,22

**eleven**  32:14
  33:2
**eliminate**  55:18
**elon**  215:21
**emergency**
  64:3
**employed**
  16:17 27:23
  275:13
**empty**  73:24
**encounter**  59:1
  121:16 204:3
**encountering**
  129:20
**encounters**
  113:6 145:21
  202:25 203:25
  261:10
**encroachment**
  256:10
**ended**  23:17
  91:19 208:8
  223:25
**endless**  256:4
**ends**  208:22
**energy**  252:10
**enforce**  49:5
**enforcement**
  12:13 15:2
  23:24 29:14
  33:23 38:7
  39:13 40:10
  42:20 43:17
  47:21 49:5

51:23 55:6
  64:7 78:20
  82:16 88:3
  91:1 97:2,11
  97:16,19 98:12
  99:2 100:5,24
  101:8,14
  102:24 103:2,4
  104:2,12
  106:14 109:14
  111:22 115:1
  116:23 117:5
  119:12,13,16
  121:19 127:13
  145:5 151:20
  153:17 154:1
  155:21 168:1
  172:12 179:7
  182:10 183:8,9
  184:4 198:6,7
  199:11,21
  200:19 202:5
  203:8,14,20
  204:10,13
  213:2,9,12,24
  229:16 231:18
  237:6,8 238:24
  239:23 240:20
  242:17 248:13
  250:21 257:12
  257:24 258:14
  260:25
**enjoy**  93:14,14
  157:4 247:11

enjoying  87:3
ensured  78:10
enterprises
    47:5
entertainment
    37:10
entire  41:3
    53:20 93:6
    170:14 183:24
    208:6,24
    213:12 233:5
    236:6
entirely  123:9
    214:2
entirety  7:23
    47:24 156:16
    157:8,10 159:9
    159:19 183:20
    183:23 208:4
    229:13 251:15
    263:24
entity  202:12
    205:17
entries  127:15
equal  226:12
    226:14
equate  262:25
errata  276:11
    276:13,16
erratically
    113:22
error  11:4
    81:10,11,16
    82:12 83:12,13

96:10,11
errors  8:25 9:5
    94:17,19
    262:13
escort  123:3
especially
    205:24 248:14
esq  276:1
essentially  45:7
estimate  18:4,5
    94:6 125:5
    126:7 267:22
et  276:4 277:1
    278:1
evaluate  14:25
    15:1,3 54:12
    54:15 97:19,20
    97:23 99:20
    101:9,12
    152:16 186:19
    186:20 190:25
    192:22 195:13
    195:17 201:22
    206:23 212:12
    217:21,25
    218:11 228:23
    232:18 233:17
    238:17 254:16
    261:22 265:10
    268:12 269:10
    269:18
evaluated
    191:25

evaluating  99:1
    139:18 196:10
    198:24 211:18
    217:11 235:18
evaluation
    92:16 218:14
    245:25 269:22
event  15:13
    65:13 196:4
events  169:10
    169:17,21
    170:11,16
    171:4,6
everybody
    77:21 100:20
    110:10 130:12
    196:23 246:19
everyday
    120:20 150:18
evidence  12:19
    13:1,5 39:12
    39:25 42:6,7
    44:10 153:25
    164:22 165:1
    179:16 189:20
    195:12,13
    217:11 235:20
    236:23 245:17
evolves  78:20
evolving  43:15
exact  84:21
    223:22 244:21
exactly  14:18
    19:2 42:11

97:9 99:19
    103:16 108:2
    176:4,12 177:8
    198:18 218:21
    231:16 247:7
    267:15,21
    270:21
examination
    3:5 4:3
examine  169:8
example  32:14
    34:22 35:3,4
    66:22 67:17
    68:3 82:22
    104:7 113:9
    114:6 115:13
    115:21 117:3
    117:21 118:1
    119:20 122:18
    122:19 130:25
    150:2 177:15
    237:7 252:25
    260:17 261:8
examples  46:4
    67:21 99:18
excellent  10:20
exceptional
    62:7
exchanged
    111:13,22
excitement
    259:8,10
excluded  201:6
    201:8

| | | | |
|---|---|---|---|
| **exclusive** 54:10 | **expectation** | 152:6 153:15 | 250:25 |
| 54:10 | 78:13 | 154:2 155:23 | **experts** 250:23 |
| **exclusively** | **expectations** | 168:11,12 | **expiration** |
| 61:6 | 79:18 | 171:13 173:24 | 275:22 |
| **excuse** 30:2 | **expected** | 173:25 180:25 | **explain** 58:10 |
| **executed** 180:5 | 241:23 | 184:1 188:4,10 | 83:17 191:7,9 |
| **exhibit** 3:10,11 | **expensive** | 188:12 190:8 | 196:25 198:16 |
| 3:12,13,14,19 | 71:24 | 190:24 191:14 | 203:6 247:5 |
| 9:10,11,14,24 | **experience** | 191:20 194:8 | 258:19 |
| 10:11 11:14,15 | 18:16 43:23 | 194:15 195:19 | **explaining** |
| 13:19,21,22,23 | 45:11 47:6 | 195:21,25 | 184:24 |
| 13:24 69:23 | 49:21 56:9,13 | 208:17 212:15 | **explains** 236:8 |
| 96:2 134:4 | 58:1 69:14 | 212:22 213:1,5 | **explanation** |
| 140:3 153:10 | 70:9 78:2 | 213:6,14,20,23 | 130:3,14 |
| 160:20 161:23 | 79:14 81:3 | 213:24 225:4,8 | 131:12 132:10 |
| 161:24 162:13 | 82:17 91:3 | 229:15 231:6,7 | 132:17,18,18 |
| 164:12 174:7 | 96:25 101:1 | 231:18 233:7,8 | **explanations** |
| 210:13,15,16 | 104:22 105:1 | 234:15 240:20 | 129:25 |
| 251:3,6,8 | 106:10 108:20 | 241:7,8 250:7 | **explicit** 57:20 |
| 263:6,8 | 114:17,18 | 254:12,24 | 131:13 |
| **exhibited** | 119:18 120:1 | 265:13 | **explore** 106:18 |
| 104:20 | 120:23,24 | **experienced** | **explorer** 59:6 |
| **exhibits** 3:8,17 | 121:5,8 122:6 | 56:11 73:12 | 122:20,23 |
| 162:18 165:21 | 123:22 124:9 | 82:18 83:23 | **express** 196:3 |
| **existed** 151:3 | 125:14,25,25 | **experiences** | **expressions** |
| 168:13 | 126:2,3 128:25 | 194:15 | 133:4 |
| **existence** 68:4 | 129:4,12,13 | **experiencing** | **extend** 128:6 |
| **exists** 46:13 | 130:2,11,24 | 262:23 | **extended** |
| 112:23 238:18 | 131:16 132:5,7 | **expert** 14:7 | 150:15 |
| **exonerate** | 143:1,9 145:8 | 15:4,8,12 | **extension** 128:9 |
| 258:12 | 145:14 146:18 | 18:12 90:10 | 144:17 149:18 |
| **expect** 57:9,10 | 146:23 147:15 | 91:4,14,17 | **external** 256:4 |
| 66:10 68:2,10 | 148:6,15 151:1 | 96:18 170:3 | **extreme** 260:24 |
| 81:3 84:5 93:1 | 151:10,16 | 181:19 182:1 | |

**extremes** 256:8
**eye** 32:20 81:22
 133:22
**eyes** 74:24 80:9

**f**

**f** 13:21 32:25
 108:1,1 122:6
 122:13 124:10
 128:4,14 143:2
 143:9 144:5
 178:15 207:19
 234:19,21
 239:7 242:11
 242:17,20
 243:2,6,22
 268:18 270:11
 270:12
**facebook**
 108:19,21
 109:1,2,2,3,5
 109:12,24,24
 111:7,9
**faced** 150:25
 151:2,9
**facial** 133:4
**facing** 270:6
**fact** 63:21 64:5
 82:24 128:4,14
 131:2 132:8
 168:22,22,25
 172:4,25
 174:20 179:25
 192:3 194:18

194:22,22
196:9 200:20
210:2 246:17
258:16
**factors** 74:10
 74:16 139:8
 141:10
**facts** 129:25,25
 151:3,23 165:2
 170:7,10,14
 171:3,7,8,14
 172:8,15,16,19
 172:20 173:2,7
 173:18 185:3
 194:15 197:7
 203:16 240:6
**factual** 17:23
**failed** 217:12
 230:22 253:14
 253:17
**failing** 254:18
**fails** 276:18
**failure** 216:12
 219:10 230:3
 234:6 236:18
 271:7,20
**fair** 6:9,10 8:8
 18:11 27:8
 31:18,18 36:25
 38:23,24 39:1
 39:2 41:9,10
 47:1 50:9
 62:12 64:14
 70:15 79:5

81:8 93:9,12
95:5 107:3
121:18 123:18
131:13 132:11
151:22 153:23
160:10 171:12
171:15,24
172:2,6 174:25
176:6 189:22
197:14 201:18
213:21 218:25
230:7 234:24
238:3,4 241:24
243:19 261:12
267:2,3 268:15
269:2
**fairly** 253:7
**fall** 40:18
 201:15 264:4
**falling** 73:22
**falls** 40:19
**false** 257:25
**familiar** 69:4
 73:19 91:9
 156:8 210:4
 217:17 255:23
 257:10
**families** 63:20
**family** 40:23
 84:14 130:21
 135:3
**fan** 77:16
**far** 18:9 60:4
 78:14 93:19

140:6 157:3
163:17 196:15
214:23 219:18
227:23,25
228:17 267:22
268:12 269:12
270:20
**fascinating**
 38:12
**fashion** 50:3
 129:5
**fast** 102:1
 266:11,20
**faster** 265:15
 265:25
**favor** 40:13
**fayette** 28:10
 59:4 242:12
**fbi** 20:3 21:20
 22:1 110:7
**federal** 1:23
 21:14 25:13
 203:12
**federally** 24:1
**feel** 7:11,17 9:6
 79:9 214:8
 220:19 240:4
**fees** 20:7
**feet** 34:25
**fell** 103:21
**felt** 79:10
**female** 169:1,4
 184:9,11,11
 240:25 241:1,3

241:20 243:17
243:24 244:2,4
244:5 245:1
**fewer** 123:6
193:6
**field** 40:20
60:24 61:12
71:5,6,8,12,23
71:24 72:1,15
73:2 140:1,18
140:21 141:8
153:16 179:11
180:11 181:15
**fifth** 178:9
**fight** 37:7
**figure** 54:23
79:19 126:18
176:19 263:14
**file** 68:11
237:20
**filed** 40:25
67:14
**files** 210:10,13
**final** 96:18
142:23 265:8
**financially**
275:15
**find** 23:16 33:2
55:9 65:7
86:18 88:8
116:15 156:12
156:17,23
177:15,19,22
178:14,21

250:3 253:4
257:1
**finding** 65:1
253:1
**fine** 38:11
47:10 75:19
76:12 85:16
97:10 100:22
111:4 144:2
165:25 167:22
234:18
**finger** 256:12
**finish** 7:13
31:10 60:11
64:11 142:19
230:2
**finished** 6:13
**fire** 21:2
**firm** 88:14
275:24
**first** 4:2,9
10:21 14:13
18:11,14 26:2
26:7 37:11,18
56:21 79:21
83:1 84:7,10
85:17 86:24
96:3,17,23
106:20 111:11
124:19 144:11
149:15 153:12
161:12 163:5
173:10 175:3

178:11 182:3
183:5 185:13
185:15,16,25
189:11 204:25
211:5 216:15
216:19,19,20
216:23 223:15
225:12,24
228:17 229:7
235:21 236:4
236:13,16
239:4 246:17
262:13,20
265:14,16
**fishing** 19:8,9
19:10
**fit** 40:9 90:22
123:17 141:10
**fits** 58:22
**five** 57:14
61:20 62:11,16
64:2 100:10
160:8,9,13,14
162:9 171:24
195:23 208:20
243:4 244:22
265:2
**fix** 204:7
**flag** 131:7
136:22 138:8,9
141:7
**flat** 92:15 93:2
93:3,9,17

**fleeing** 69:22
**fleet** 20:21 21:1
**flier** 205:1
**flight** 116:12
116:13
**flights** 117:16
117:17
**flip** 31:12
**floor** 74:18
75:11 85:6
**floorboard**
72:20,25 73:23
**floorboards**
73:8
**flows** 6:17
**fly** 117:11
118:13
**focus** 80:15,18
127:21 192:10
192:11 230:10
254:6 255:15
258:11,12
**focused** 76:23
80:14 95:24
144:17 192:9
213:1 234:18
253:1,18,25
258:2
**focuses** 44:2
**foley's** 45:21
**folks** 29:1
42:12 47:13
127:6,22,24
139:18,20

**[folks - front]**                                                          Page 28

202:23,24
**follow** 30:17
  57:19 118:12
  175:22 221:10
**followed**
  186:21 189:25
  248:5
**following** 100:3
  195:11 233:9
  274:16
**follows** 4:2
**foot** 34:22
  59:10 256:25
  257:1,5,8,11,14
**footage** 166:1,2
  166:8,25
  169:14 189:14
  189:14 207:22
  207:25 208:13
  209:4 225:19
  226:20,25
  228:2 229:3
  230:6 233:22
  235:12 236:21
  254:13,16
  264:19
**force** 23:9,21
  23:22,25 27:24
  28:1,4,16,21,25
  29:10 91:5,15
**forces** 23:11
  89:2
**ford** 10:24 59:6
  122:20,23

123:3 217:4
222:19 223:8
223:22 231:13
**foregoing**
  278:5
**forever** 63:8
**forget** 10:17
  252:11
**form** 7:4 49:25
  50:3,6 51:3
  61:1 70:8,18
  81:16 91:25
  99:14 103:5
  127:7 129:5
  153:4 178:22
  194:20 195:1
  195:15 196:11
  197:18 198:3
  208:5,24
  211:13 215:7
  269:7 271:9,16
  272:1,10
**formally** 255:6
**forming** 153:20
  153:24 154:5
  155:1 163:2
  164:18 165:7
  165:13,15
  177:17
**formulaic**
  88:11 90:3
**formulate**
  90:16 190:6
  195:6 198:11

**formulating**
  165:23
**fort** 141:25
  142:2
**forth** 97:14
  120:5,19 272:9
**forward** 26:11
  33:3 41:3,18
**found** 20:20
  54:16 64:1
  72:3 73:23
  125:24 130:23
  155:20,22
  157:18,21
  158:10 161:21
  171:8 176:21
  176:25 178:1
  178:19 179:22
  201:3,4 202:17
  205:16 253:8
**four** 19:7 61:5
  93:22 142:22
  160:8 201:1
  212:8 242:22
**fourth** 142:21
  149:12
**fox** 2:9 4:17,17
  82:3,7,10,11,18
  83:22 84:6
  85:4,11,14,15
  86:8,23 92:9
  100:18 103:22
  104:19 109:18
  132:2 139:25

140:8 251:5,13
**fox's** 83:16
**frame** 229:24
  236:6
**framework**
  247:21
**francisco**
  116:10 118:8
  121:2
**frcp** 275:1
**free** 7:11,17 9:6
  145:22 150:6
  220:19 240:5
**freedoms**
  188:19
**freeway** 270:7
**frequent**
  240:24 241:19
  242:17
**frequently**
  262:15
**friend** 34:5
**friendly** 104:21
**friends** 139:10
  139:15 140:19
  140:20
**frigerio** 2:20
**front** 72:19
  76:14,18,19
  77:14,25 78:4
  78:9,12,25
  79:11,12 80:20
  81:14,24 82:9
  87:11 124:6

148:13 184:23
185:4 202:20
202:22 226:8
233:10 254:14
255:16,17
265:22
**frustration**
259:7
**ft** 275:24
**fto** 60:21,23
**fuel** 140:24,25
**full** 4:12 8:6
45:12 75:8
78:21 85:6
106:20 144:11
158:22 182:3
183:5 210:20
216:15,19,20
221:14 225:13
229:7 263:9,17
**funny** 21:12
**further** 65:15
151:3 231:23
268:19 272:17
275:1,12,15
**fusion** 238:7,9
238:10,13,14
238:15,18
**future** 98:17
145:6

**g**

**g** 164:1 251:3

**g.com** 2:17
276:2
**gain** 53:16
59:14
**gained** 26:24
56:12 120:23
**gains** 121:5
**gamboa** 174:12
**game** 87:25
**gary** 1:13,16
3:4 4:1,13
116:6 274:12
274:17 276:5
277:2,24 278:2
278:4,12
**gas** 139:11
**gaston** 19:13
19:24 20:1,13
**gathering**
107:12
**gauge** 75:23
270:14
**general** 64:18
98:1,2 247:21
**generalization**
244:23
**generally** 8:11
50:10 65:12,14
125:24 185:9
190:22 209:7
238:13
**generic** 53:22
**georgetown**
120:3,5 126:10

126:21 131:2
**gereb** 163:22
163:23 164:1,8
178:13 185:19
185:22 186:8
240:15
**gestures** 133:4
**getting** 26:21
62:24 64:25
82:25 86:4
116:9 135:8
167:16 189:7
**ghost** 61:10
**giant** 70:12,13
**girl** 80:6
**give** 8:6 9:25
10:13,15 11:6
16:2 18:4
23:15 32:13
80:23 90:4,10
90:23 91:21
95:6 104:6,9
111:1,20 113:9
115:21 125:10
204:25 205:1
221:5 240:17
247:15 252:25
267:22
**given** 57:21
122:4 130:15
184:22 274:19
278:9
**gives** 139:5

**giving** 113:2
119:18 260:17
**glad** 134:21
**glebe** 2:10
**go** 5:9,9 9:6
19:22 21:6,6
23:5,16 29:20
32:15,16,21,25
34:7,8 36:15
37:13,14 44:5
46:9,15 48:3
48:15,22,23,23
50:9,17 53:19
54:23 55:1
59:12 60:13
61:13 62:19
63:3 65:15
66:4,24 67:25
78:23 82:1,11
83:25 86:4
87:7 88:7,8
91:14 92:7
93:15 95:25
97:15 102:1
112:16 113:18
114:1 116:13
118:24,25
119:3 121:22
128:21 135:18
135:20,23,25
136:3 137:10
138:18,21
141:3,24,25
142:2,16,21

| | | | |
|---|---|---|---|
| 145:22 147:9 | 9:23,24 10:8 | 112:6,11,12 | 208:18 210:12 |
| 150:6,10,17 | 10:11,13,15 | 115:18,20,21 | 210:13,14,14 |
| 151:13 153:10 | 11:15,19 13:2 | 116:12,15 | 215:2,8 216:3 |
| 159:11 160:21 | 13:18,21 17:22 | 117:11 120:7 | 216:23 226:15 |
| 162:4,21 170:2 | 22:5 25:21,22 | 121:11,11,20 | 229:12 235:19 |
| 178:9 181:4 | 26:9,13 28:12 | 122:2 123:6 | 237:6 239:4 |
| 184:16 190:17 | 32:1 40:2,5 | 125:21 130:4 | 241:2 245:14 |
| 198:23 204:24 | 41:13,17 42:22 | 130:10,17,21 | 247:1,19 |
| 206:12,13 | 44:19 45:5 | 131:5,5,5,6,8 | 248:19 249:5,6 |
| 207:13 212:2 | 48:25 55:9,13 | 131:15 133:17 | 249:10,19 |
| 215:24 217:19 | 55:23 57:13,24 | 134:2,4 135:6 | 251:7,10,14 |
| 217:24 225:3 | 59:25 60:3,4,9 | 135:9 136:3 | 252:5,6 253:11 |
| 225:12 229:7 | 62:15 66:25 | 138:18 139:12 | 256:21 257:1 |
| 240:5 249:23 | 68:12 70:14 | 139:19,20,22 | 257:17 258:4,9 |
| 251:13,22,25 | 71:23,25 72:2 | 140:3 141:9 | 259:1,5 260:20 |
| 252:5,6 256:20 | 73:2 74:4,5,6,9 | 142:2,15,23 | 262:12,20 |
| 257:6 262:8 | 75:15,16 76:9 | 144:16 145:3 | 263:24 265:9 |
| 263:5,9 | 78:12 80:17,24 | 147:2 149:15 | 265:15 266:1,2 |
| **goal** 51:23 52:1 | 80:25 81:1,2 | 150:12 153:11 | 266:9,12,20 |
| 52:2,4,12 | 81:13,15,21,24 | 154:4 156:21 | 268:11,18 |
| **god** 86:3 | 81:25 82:1,10 | 160:19 168:23 | 272:18 273:4 |
| **goes** 54:22 55:9 | 82:19 83:7,23 | 169:15 170:6 | **goldfish** 73:8 |
| 66:6 76:6 87:1 | 84:1 86:3,5,18 | 176:23 178:2 | 75:9 84:2 |
| 87:2 104:5 | 86:19,19,20 | 178:10 179:10 | **golly** 258:9 |
| 110:23 112:13 | 87:11,16 88:11 | 179:10,11,12 | **good** 4:5,6 5:2 |
| 119:17 123:21 | 89:2,3,3 90:16 | 179:13,14,14 | 7:15 11:11,22 |
| 130:20 150:2 | 92:2,4 93:9 | 179:15,18 | 31:16 34:23 |
| 151:10,24 | 95:24 96:8,23 | 182:8 184:18 | 38:4 62:23 |
| 154:21,22 | 100:9 101:25 | 190:18 193:18 | 64:4,20,22 |
| 179:25 180:7,8 | 102:5,9,10 | 196:21 197:12 | 65:4,7 76:15 |
| 192:24 195:2 | 106:2,4,5,6,18 | 199:11,23 | 77:22 81:17 |
| 203:8 270:1,7 | 106:21 107:15 | 202:3 205:21 | 84:20 86:21 |
| **going** 4:14 5:21 | 107:23 108:12 | 206:10,13,14 | 90:17,17,22 |
| 6:8 7:10,20 9:8 | 110:4,14,19 | 206:19 208:3 | 92:4 130:7,11 |

131:25 132:1,3
136:13 142:17
152:25 177:15
183:4 185:8
199:8 202:12
210:25 215:10
215:14 269:15
**google** 161:5,19
217:16
**gotcha** 182:7
**gotten** 24:22
45:12,18,21
140:24 141:5,6
142:2 160:25
253:19 266:20
**gouge** 93:16
**government**
21:5 22:9
202:5
**governor's**
23:10
**governs** 155:21
**gps** 212:17,19
214:11,12,14
215:10,18,23
216:11 236:7
**grandchildren**
63:21
**grandkids**
63:25
**great** 4:14
67:10 92:10
119:9 152:23
153:9 176:8

200:16 246:4,8
252:21,23
254:2,3
**greater** 81:10
234:22 235:4
**greatest** 78:5
79:10,11
**greek** 157:2
**green** 71:2,3
72:21 73:18
74:1,17 75:10
75:11 76:2,4
**greenhill** 1:22
2:14 166:22
**greyhound**
24:4
**grocery** 76:3
**ground** 40:19
184:8 239:13
**group** 22:1
37:13 53:2,4
54:3 112:18
113:12 115:1
239:18,18,19
242:17
**groups** 53:8
112:9
**growing** 50:13
**grown** 63:21
**guess** 12:17
14:6,16,21
17:19 20:14,16
35:14 39:9
40:2,5 46:1,17

47:19 54:13
56:20,21 57:4
64:8 66:14
67:5,9 69:3
70:20 73:3
74:8 75:7
76:23 82:2
88:4 91:15
93:4 94:2 95:8
99:25 103:24
104:10 111:11
113:16 115:12
115:21 118:17
119:24 127:21
130:13 132:16
139:9,17 144:2
152:2 165:24
171:23 172:24
173:6 175:22
176:6 177:14
195:11,16
196:2,21 214:1
220:21
**guide** 145:6
198:11 259:23
**guides** 155:21
**guilty** 258:16
258:17
**gummies** 64:1
**gun** 24:19
**guns** 260:13,14
**guy** 17:16
23:12 25:9
29:3 32:18,25

33:5 40:14
43:16 46:22,23
51:20 52:17
61:16 64:24
65:4 66:5
68:23,24 80:6
84:22 85:24
86:20 94:11
109:23 112:12
113:11 116:3,8
116:8,11,14,16
116:22 118:10
120:22,25
121:2,4 131:1
131:1,4 184:15
191:19 192:9
255:22,23
260:13
**guy's** 135:18
**guys** 21:15
29:18,18 30:15
49:2 53:3 63:8
65:8 87:4 88:3
90:16 111:14
157:2 158:2,3
187:19 254:3

**h**

**h** 4:13 48:19
250:15,16
277:3
**half** 56:4 57:7
128:2

**hallucinating**
149:5,8
**hand** 10:12
11:15 13:18
52:13,13 76:7
87:2 130:9
133:5 156:24
160:19 210:12
210:13,17
251:7
**handcuffed**
249:8
**handguns**
253:22
**handing** 14:3
**handler** 181:17
181:18
**handlers**
181:23,24
**hands** 80:6
181:10 249:4,6
249:7
**happen** 65:24
83:9 114:18
115:6,6 117:24
120:16 133:18
170:22 179:12
197:16 253:16
**happened** 16:7
66:6,6 69:1
96:9 101:11
102:13,16
114:2 148:12
148:18 150:8

170:15,19,22
170:23 172:23
173:3 195:4
203:23 252:25
253:15 254:9
**happening** 38:2
43:15 64:23
117:22 183:21
269:4
**happens** 42:24
60:6 65:24
80:1 82:13
101:4,24
102:12 119:16
138:25 145:5
173:13 205:21
206:7 248:25
258:4
**happy** 104:8
146:8 162:4
**hard** 62:4
75:17 76:7
93:20,25 95:11
131:23 133:9
133:21 149:4
199:5
**harm** 63:19
**haston** 1:13,16
3:4,11,12 4:1,7
4:13 10:9
116:7 246:6
274:12,17
276:5 277:2,24
278:2,4,12

**hats** 86:12
**haul** 45:12
**hays** 28:9 207:7
**head** 5:24,24
34:25 75:17
135:8 152:11
167:7 262:3
**header** 14:7
96:18 154:18
162:24 170:3
199:1 215:25
**heading** 241:5
**hear** 79:21
80:12 90:14
133:20 176:13
184:14 231:17
**heard** 22:15
34:8 69:12
87:18,18
114:16 158:11
176:12 185:19
189:9 223:24
257:15
**hearing** 257:20
**heavier** 124:14
**heavily** 30:20
50:4
**hebert** 2:3 3:5
4:4,7,25 5:3
9:11,15,22
10:5,8 20:11
21:16 22:8
32:7,10 57:16
57:18 58:10

90:19 91:20
92:8,10,11,22
92:24 100:12
100:14,16,19
100:22 103:13
103:23 109:19
127:9 142:16
142:21 149:7,9
149:11 153:3
162:8,11 164:1
164:7 178:25
194:21 197:24
198:21 215:16
242:4 246:4,6
251:3,7,14
263:14,16
265:8 269:9
271:13,24
272:4,11,22
273:2
**hector** 2:19
4:24 5:1 6:24
273:4
**help** 16:6 24:12
28:15 30:16
65:17 67:8
74:10 76:24
90:15 128:13
134:3 146:13
173:8,12
224:20 225:11
246:14,19,23
255:20 258:20

**helped**  247:2
**helpful**  25:8
  27:5 46:16
  52:18 56:20
  87:17 143:23
  169:8 190:19
  224:2 240:3
  250:4
**helps**  65:22
  87:5 258:19
**hereto**  1:24
  278:7
**heroin**  69:16
**hesitant**  240:16
**hey**  23:14 33:4
  34:6,7 37:20
  68:13 79:1
  94:13 112:11
  113:21 116:9
  131:4 204:24
  206:9 249:3
**hidden**  169:4
**hide**  134:20
**hiding**  256:25
**high**  74:25
  260:20 261:11
**higher**  52:16
**highlighted**
  211:8
**highway**  25:20
  26:17 84:24
  120:20 125:14
  126:9 127:20
  141:21

**highways**  55:19
  127:5
**hindsight**  188:9
  191:3
**hired**  60:20
  90:4,9 91:21
  166:21
**history**  41:11
  63:12 73:20
  74:19,20,21
  83:2 113:8
**hit**  59:16 102:3
  102:7 227:25
  228:4,9
**hits**  265:22
**hitting**  134:14
**hold**  34:24
  112:25 263:14
  272:18
**holding**  35:2
**holiday**  73:6
  137:24 138:1
**home**  34:10
**homeland**
  127:13
**homicide**  258:5
**honest**  205:22
  210:19 235:22
**hood**  221:20
  226:5,7,8
  232:2
**hope**  56:19
  92:4 258:18

**hotel**  48:23
  51:4 117:23,24
  118:2,5,9,10,15
  121:2 129:19
  138:18,18,20
  138:20 140:13
  140:14 147:24
  168:22 184:2
  191:23 241:1,2
  241:4,20,21
  243:17
**hotels**  139:12
**hour**  57:14
  92:20,24 93:1
  93:10 95:6,19
  100:10 101:25
  102:1 116:13
  116:13 216:11
  221:23 222:16
  236:7 267:11
**hourly**  92:25
  93:4,5
**hours**  93:18,23
  93:23 94:1,1,3
  94:8 95:8,13
  142:14 199:25
  200:6,10,11,13
  200:17 201:4,9
**house**  29:25
  30:3 109:8
  180:5
**housekeeping**
  5:10

**houses**  30:9
  73:14 138:5
  180:5
**housing**  25:13
  25:25
**houston**  25:24
  39:23 41:24,25
  45:19 118:4
  122:7 124:22
  125:2,6 127:23
  127:24 128:5
  128:15,21
  129:18 137:18
  137:21,24
  138:4,8,9,17,21
  139:19 141:18
  141:23,24
  142:9 148:9
  168:23,25
  241:1 244:5
**huge**  38:9
**huh**  6:1,1,1
  29:9 74:15
  121:25 139:16
  149:14 173:19
  177:4 194:5
  221:12 238:9
  267:25
**human**  58:15
  58:17 59:1,19
  59:25 64:16
  122:12,24
  124:9,19,23
  125:3,7 128:25

| | **i** | **impacted** | **incident**   41:3 |
|---|---|---|---|
| 129:8,12,14 | | 233:18 | 208:7 |
| 146:24,25 | **idea**   19:16 | **impairment** | **include**   44:13 |
| 147:15 199:16 | 81:19 112:16 | 8:14 | 179:21 |
| **humans**   122:7 | 126:15 166:15 | **import**   48:4 | **including** |
| **humor**   32:7 | 185:7 238:6 | **importance** | 151:18 264:5 |
| **hundreds** | **ideas**   250:3 | 44:5,8 213:18 | **inconsistencies** |
| 39:19 | **identified** | **important**   5:20 | 132:11 189:24 |
| **hung**   44:23 | 28:19 | 31:22 40:1,4 | **inconsistency** |
| **hunt**   90:18 | **identify**   155:16 | 42:20,23 43:14 | 132:20 |
| **hunting**   87:19 | 165:6 223:5 | 43:21 65:17,19 | **inconsistent** |
| 87:24 88:2,8 | 265:14 267:16 | 65:20 66:2,7 | 131:11,12 |
| **hurts**   40:19 | 269:2 | 66:20 67:1,2 | 151:20 204:19 |
| 63:19,20 | **identity**   237:19 | 87:6 110:9 | 205:16 |
| **hypnosis**   33:22 | **ignorance**   30:2 | 148:21,23 | **incorporate** |
| 36:24 37:11,23 | 114:6 | 172:22,22 | 79:3 |
| 65:25 247:11 | **ih**   97:4 239:8 | 173:2,2,8 | **incorrect**   11:2 |
| 247:11 | 242:13 243:6 | 211:17 212:4,7 | 197:17 |
| **hypnotism** | **iii**   1:6 2:18 | 214:21 252:11 | **increase**   24:12 |
| 35:19,20 | 274:6 | **importantly** | **indentions** |
| **hypnotist**   32:4 | **ij.org**   2:6,11,12 | 256:8 | 227:16 |
| 32:11 33:10,23 | **illegal**   49:1 | **imported**   122:9 | **independent** |
| 38:6 | 71:22 75:4 | **impound**   20:9 | 264:16 |
| **hypnotize** | 78:6,15 106:1 | **imprecise** | **index**   3:1 |
| 33:11 34:2 | 121:14 134:23 | 218:25 | **indicate**   129:7 |
| 36:9 37:4 | 136:24 137:17 | **improper**   7:5,5 | **indicated** |
| **hypnotized** | 137:20,23 | **improved** | 201:20 216:11 |
| 34:24 35:2 | **illegally**   121:12 | 214:15,16 | 264:9 |
| 36:13,14,15,18 | **illinois**   85:5 | 215:23 | **indicator** |
| 37:12,14,19,24 | **illustrating** | **improves** | 214:11,13 |
| **hypothetical** | 71:10 | 215:20 | 248:24 249:1 |
| 87:8 110:23 | **immediately** | **inches**   227:14 | **indicators** |
| **hypotheticals** | 131:7 | **incidences** | 248:15 |
| 87:3,6 | | 224:3 | |

**individual**  1:5
  1:7,8 62:8
  66:25 117:9
  214:21 274:5,7
  274:8
**individually**
  26:9
**individuals**
  160:13
**industry**  47:20
  50:5 55:17
  64:19 109:17
  138:12 139:11
  141:22 191:22
**infancy**  25:11
**infiltrate**  46:6
**infiltrating**
  52:3
**informal**  7:10
  7:11
**informant**
  237:10,13,20
**informants**
  30:7,7 53:15
  53:15
**information**
  33:11 53:16
  62:22 66:23
  77:6 90:22
  98:21 106:8,11
  106:16 107:12
  107:13,17
  108:8,18,21
  109:21,22

110:22 111:24
113:1,3,16,18
115:9,14 116:1
116:23,24,25
117:9 119:11
119:14,19
121:7,19 122:4
124:16 128:17
128:24 129:14
146:17,21
147:7,8,11,12
148:7,22
151:15 153:24
153:25 167:25
168:2 173:5
191:1 193:13
193:17,25
194:3 211:10
211:24 237:2,4
237:6,16,18,22
238:1,3,11
239:7 240:7,14
240:15,17,22
240:23,24
241:3,4,10,12
241:14,18
243:7,9 245:6
245:11,15,21
**informed**  97:3
243:1
**informing**
107:4
**infraction**
264:9

**inhale**  72:10
**initial**  92:16
  187:3
**initiated**  106:7
**injuries**  40:25
**inn**  137:24
  138:1
**innocent**  110:5
  118:24 129:25
  130:3 132:17
  133:25 139:20
  139:22 141:13
  146:8 258:6
**inputs**  240:4
**inside**  80:22
**instagram**
  109:13
**instance**  1:17
  51:22 171:23
  209:19
**institute**  2:4,9
  157:19,22
  158:5 177:3,6
  177:14,15
  187:19
**instruct**  42:17
**instructed**
  42:12,15 43:21
  44:16 145:17
  229:16
**instruction**
  44:2,4,13
  246:13

**instructor**  35:5
  39:22,23 41:19
  43:13,17 44:5
  44:11 78:25
  204:12 205:3,6
  212:24,25
  213:1 246:16
  247:3
**instructors**
  146:2 204:22
  206:15 250:5,6
**insurance**  86:3
**intelligence**
  94:12 238:11
**intend**  12:2,5
  272:15
**intended**  260:1
**intensifies**
  133:13
**intensive**  252:8
**intercept**  51:6
**intercepts**
  52:14
**interchangea...**
  31:14
**interdiction**
  23:6,7,12,12,14
  23:19 24:3
  25:9,11,17
  26:2,8,14 27:4
  27:13,19 28:2
  28:11 29:3,4
  29:21 30:14,17
  30:19,21 31:9

43:16,18 44:20
44:22,24 45:1
45:7,11,15,17
45:23,25 46:1
46:3,11,12
47:8 50:24,25
51:4,5,5,11
52:14 53:2,3
54:4,7,12,13,25
55:13 56:4,22
58:2 60:13,16
61:16 62:1,9
62:10,11,16,18
62:23 63:6,9
64:19,21,22
65:4,7,9 67:24
73:20 78:3,13
78:21,23 83:23
84:13 85:24
86:16,21 87:19
88:5,22 89:10
91:7 101:3,15
104:16 116:4
117:23 118:16
120:2 132:14
138:7,23
145:20 155:24
184:3 191:19
192:3,9 194:9
198:25 199:4,9
199:15 201:15
203:24 206:17
234:16 248:12
250:22 262:1

interest   25:15
  26:24 27:12
  61:16 192:8,18
interested
  25:21 41:4
  90:25 199:10
  199:17 275:16
interesting
  21:23 35:16
  101:17 158:11
interests   110:2
interfere
  256:17
intermediate
  57:4 62:14,15
internal   187:1
  187:3,3
international
  60:8 116:4
internet   93:24
  156:12,12,14
  239:16 259:19
interpret
  246:21
interrogation
  76:15,23 77:1
  77:3 252:8
interrogations
  76:14,17 77:15
  79:12
interrupt   6:11
  6:14
interrupting
  256:7,11

interstate
  26:18,22 59:4
  85:4 108:4
  120:3 126:10
  126:20 130:25
  140:2 227:4
  253:8 269:24
interview   56:14
  56:15 76:22,23
  77:2,5,11,12
  79:3,25 80:10
  80:13,23 81:17
  82:9 106:12
  132:22 134:15
  135:24 136:9
  247:24,25
  252:7,22 255:8
  255:12 256:8
  260:7
interviewed
  26:23 253:9
interviewers
  252:9
interviewing
  77:5 252:12
  253:18 255:9
  258:1 261:19
interviews
  76:18 77:25
  78:4,6,9,25
  79:12 125:15
  136:13,14
  169:3 202:21
  202:23 246:25

247:14 256:22
intimidating
  86:15,20
intoxicated
  40:15,19
introduce   4:14
  9:8
introduced
  246:18
investigate
  34:1 51:13
  106:4 110:17
  110:20 111:8
  112:16 114:1
investigating
  46:18 107:14
investigation
  21:20 28:17,19
  66:18 67:22
  93:6 105:16
  107:8,9,10,11
  108:10,13,15
  139:3 147:2
  151:4 167:5,15
  170:18 175:5
  181:4 186:18
  187:4 240:21
  254:2
investigations
  18:21 21:1
  24:5 25:3
  46:25 52:8,22
  106:22 109:7
  109:15 127:14

173:13 200:15
258:5
**investigative**
28:15 29:19
30:4,5,6 32:4
32:10 33:10
35:19 38:6
53:3 109:8
191:23 241:9
**investigator**
34:1 47:9
257:25
**investigators**
109:11 256:7
**investigatory**
136:16 137:6
**investment**
57:24
**invite** 89:21
**involved** 15:10
27:4 30:20
88:25 89:7,12
118:21 125:2,6
139:7 190:21
191:2 194:1
243:25
**involving** 17:21
**isolation** 259:9
**issue** 105:7,8
128:9 140:19
166:3
**item** 159:15
162:22 174:3
242:25 243:1

**items** 154:21
155:9,10,12
165:10 243:19
245:4,19,22
**itineraries**
117:17

**j**

**jacks** 45:14
**jail** 119:4 134:2
**january** 1:14
1:19 274:12
275:18 276:3
**jargon** 72:17
72:17,18 87:22
87:22 88:3
237:5
**javier** 1:7 274:7
**jewelry** 20:4
**jfox** 2:12
**job** 6:18 34:15
43:1 53:19
55:8 86:5,5,24
90:14 190:11
198:8 269:15
**joe** 108:18
111:6 164:8
**joel** 1:5 2:13
89:8 163:12
274:5 276:4
277:1 278:1
**johnny** 21:14
21:18,22

**johnny's** 63:4
**joint** 72:11,19
**joke** 82:21
**josh** 4:17,20
**joshua** 2:3,8,9
**judge** 5:18 7:4
145:10 197:21
198:14,19
236:15
**judgment**
161:7,8
**jump** 92:6
161:8
**jumping** 119:7
159:12
**june** 158:5
177:20
**junk** 85:6
**jurisdiction**
106:23
**jurisdictions**
107:6
**jury** 90:13
173:12 197:24
198:16 219:2
260:18
**justice** 2:4,9
23:24 127:12
157:20,23
158:5 177:3,7
177:14,16
187:19
**justified** 188:5

**jwindham** 2:11

**k**

**k** 210:13
**k9** 144:19
149:21 150:14
181:6,7,8,17,20
181:23,24
182:1,3,22
183:21 192:5
**k9s** 181:25
192:9
**keep** 41:14
47:23 82:19
95:12 100:14
142:14 156:10
205:23 213:19
221:1 254:23
**kens5** 177:19
**kept** 59:18
**keys** 48:23
**keyword**
109:25 110:9
110:12
**kids** 63:19,19
73:5,8 84:3,5,8
84:11 165:17
**kiki** 238:5,20
238:24
**kill** 253:24
**killed** 252:19
254:7 260:23
**killers** 256:22

| | | | |
|---|---|---|---|
| **kilos** 82:8 85:9 | 9:25 11:8,18 | 66:23 68:8,21 | 102:17 103:6,9 |
| 133:15 140:8,9 | 12:13,14,15 | 68:23,24,25 | 103:19 104:4,6 |
| **kind** 6:16 12:11 | 14:4 16:1,2,5,6 | 69:18,25 70:1 | 104:7,18 105:2 |
| 19:9 27:12 | 17:16,22 19:12 | 70:4,6,9,11,13 | 105:13,25 |
| 31:9 32:18 | 19:20,23 20:21 | 71:2,18,20,22 | 106:10 107:12 |
| 36:7 38:16,20 | 21:1,15,16,25 | 71:25 72:17,23 | 107:14 108:9 |
| 57:18 60:13 | 22:4,4,4,5 | 73:9,13,14,15 | 108:10,11,12 |
| 63:1 65:25 | 23:25 24:5,18 | 73:16,21,22,25 | 108:12,20,24 |
| 70:6 75:12 | 24:20 25:19 | 74:4,20,24,24 | 109:9,11,12,24 |
| 83:21 88:12,19 | 26:11,25 27:1 | 74:25,25 75:1 | 110:1,2,8,8,10 |
| 102:6 104:5,24 | 28:22 30:8,9 | 75:3,5,7,14,16 | 110:22,25 |
| 113:19 115:16 | 30:17 31:13 | 75:17 76:2,8 | 111:11,15,18 |
| 117:21 118:21 | 32:1,16,23,25 | 76:10,16,25 | 111:23 112:4,5 |
| 168:3 169:18 | 33:4,6,7,9 34:9 | 77:1,2,4,4,9 | 112:5,11,15,19 |
| 169:19 187:6 | 34:13,15,16,18 | 78:5,15 79:19 | 112:19,23,24 |
| 189:9 191:6 | 34:21 35:6 | 80:9 81:12,20 | 113:10,10,10 |
| 193:16 198:9 | 36:2,7,20 37:9 | 81:25 82:7,8 | 113:14,17,20 |
| 226:7 240:3 | 37:14,15,22 | 83:14,14,15 | 113:20,23,23 |
| 247:20 267:18 | 39:16,18 40:3 | 84:18 85:25 | 114:1,19,21 |
| **kinesics** 79:24 | 41:7 44:6 | 86:5,8,11,14,22 | 115:5,7,9,9,18 |
| 246:16 247:4,5 | 45:15,21 47:17 | 86:24 87:4,6 | 115:20,22 |
| **kit** 71:5,6 | 47:24 49:16 | 87:12,14,22,24 | 116:3,5,6,8,11 |
| **kits** 71:24 72:1 | 50:17 51:24,25 | 87:24 88:7,9 | 116:17,22,25 |
| **knew** 28:18 | 52:19,20 54:19 | 88:10,25 89:4 | 117:16,17,19 |
| 59:2 62:8 91:7 | 54:21 55:3,17 | 89:4,8,12,16,24 | 117:22 118:18 |
| 107:18,19,19 | 56:14 57:23 | 90:9,25 91:3,5 | 118:23 119:10 |
| 107:21,22 | 58:19 59:1,13 | 93:12,13,13,14 | 119:17,19,21 |
| 127:8 149:4 | 59:18,20 61:1 | 93:15,24,24 | 119:23 120:13 |
| 194:6 195:14 | 61:4,7,18,20,22 | 94:14,17,22 | 121:8 122:18 |
| 243:12,13 | 61:24 62:5 | 95:6,11 96:10 | 122:21 123:3 |
| 245:12 | 63:4,5,24 64:4 | 98:3,11,15,25 | 123:21 125:8 |
| **knocks** 256:6 | 64:5,10,23,24 | 99:17,18,19,20 | 125:13,16 |
| **know** 6:5,15,18 | 65:16 66:1,1,1 | 99:22 101:9,23 | 126:3,9,10,16 |
| 6:21 7:12 9:3 | 66:5,19,19,20 | 102:4,10,11,14 | 128:8 129:9,10 |

130:2,6,11,17
130:18,22,25
132:8,16 133:1
133:9,13,21
134:5,11,12,13
134:15,18
135:4,7 136:4
137:1,9 138:7
139:2,23,25
140:6,12,17,20
140:23,24
142:24 143:25
145:7,8,10,21
145:24 147:21
147:22 150:7
151:12 152:10
152:11,13
156:5,8 157:1
159:5 161:7,16
161:20 167:7
167:10 170:22
172:20,21,24
176:13,15
177:10,11
180:7,8,9,13
181:1,2,5,8,13
181:23 182:23
185:3 186:22
187:16,18
188:15,25
189:25 190:8
190:11,12
193:7 194:23
194:25 195:3,4

195:20,22
196:7,15,20,23
197:1,21,24
198:19 200:18
200:22 201:1
203:24 204:1,2
204:3,7,25
205:8,13,20,20
205:21,24,25
206:5,7,9,9,11
206:25 210:23
211:25 213:13
213:20 214:7
214:17,18,20
214:23 215:2,8
215:10,14,20
215:22 217:17
217:19 222:2
224:14 226:6
227:9,10,14,16
231:5,16,18
232:11,11,22
233:4,6,11
234:8,9,9
236:6,11,13
237:5,17,19
238:2,7,13,23
239:17,18
241:12 243:13
243:14 244:6,8
245:1 246:18
246:21,25
247:7,13,14
248:16,17,20

249:10 253:12
254:2 255:8
257:16,17,22
258:2,8,17
260:12,22
265:20,23
266:12,17,18
267:4,9,10
268:1,5
**knowable**
191:1 193:22
193:23 194:1
194:10
**knowing**
120:24,25
176:12
**knowledge**
17:23 26:19
40:4 61:24
69:5 75:21
106:14 117:17
139:2 157:5
181:25 184:7
191:14,20,22
193:4,6 194:11
214:14 240:17
242:9
**known** 10:2
91:1 138:10
140:9 142:4
168:1,3 194:13
195:7 235:1
246:15 247:3

**knows** 48:24
49:1 81:12
122:25 124:21
133:15 139:5
189:2 191:21
192:2 194:7,8
194:13

**l**

**l** 35:5,7,11
**labor** 252:8
**lack** 47:3 73:10
155:17 202:13
**ladder** 51:22
52:4,5,9
**ladders** 84:22
**lady** 198:22
241:19 243:18
**lane** 216:13
217:5,13 218:2
218:3,6,9,10
219:10,15,20
221:18 223:11
223:21,23
226:11,20
227:3 230:3,22
231:1,14 232:5
232:6,13
233:24 234:7
235:13 236:19
269:11,21,25
270:3 271:8,21
**language** 56:13
79:24 80:25

| | | | |
|---|---|---|---|
| 132:24 133:7 | 93:24 97:1,11 | 213:1,9,12,23 | 247:16 248:24 |
| 134:4,18 | 97:16,19 98:12 | 229:16 231:18 | 252:23 254:11 |
| 191:21 194:11 | 99:2 100:5,24 | 238:24 239:22 | **learning** 25:22 |
| 246:18,20 | 101:8,14 | 240:20 242:16 | 54:25 55:13 |
| 247:6,23 248:7 | 102:23 103:2,3 | 248:13 250:21 | 56:10 61:17 |
| 250:20 252:22 | 103:9 104:2,12 | 257:12,24 | 81:6 87:4 |
| 253:2 254:23 | 106:14 109:14 | 258:14 260:25 | 93:14 119:23 |
| 255:3,10,19 | 111:21 114:25 | **lawsuit** 68:12 | 120:2 203:18 |
| 258:10 262:15 | 116:23 117:4 | **lawyer** 112:2 | 204:18 230:16 |
| 264:13 | 119:12,13,16 | **lawyers** 164:17 | 254:12 255:2,2 |
| **laptop** 210:20 | 121:19 145:4,5 | **lead** 47:4 83:7 | **leave** 11:12 |
| **laredo** 238:7,9 | 145:6,9,9 | 147:5,19 | 19:2 48:23 |
| 238:14,18 | 151:20 153:16 | **leading** 24:6 | 83:8 138:21 |
| **large** 25:18 | 154:1 155:13 | 193:7 243:7 | 150:6 |
| 26:21 47:5 | 155:16,21,22 | **leads** 124:16 | **leaving** 16:23 |
| 48:4 128:22 | 155:22 156:4 | **leafy** 71:3 | 138:18 241:2 |
| 138:10 141:23 | 156:11,25 | 72:22 74:17 | **led** 47:1 104:22 |
| 141:25 143:13 | 161:4,4,5,6,7,9 | 75:10 | 124:8 184:12 |
| 144:5 | 161:11 168:1 | **leake** 90:6,7,8 | 234:5 |
| **larger** 122:18 | 172:12 179:7 | 90:20 164:22 | **lee** 28:10 |
| **largest** 262:21 | 182:10 183:8,8 | **leaky** 90:6 | **left** 10:25 22:18 |
| **laser** 265:22 | 184:3 186:15 | **learn** 12:14 | 45:14 108:4,5 |
| **late** 86:5 | 187:15,16,17 | 24:20 47:24 | 219:19 221:22 |
| **laugh** 135:15 | 187:20,22 | 54:22 55:2,7,7 | 223:9,16 |
| 249:21 260:9 | 189:16 190:12 | 55:8,22 115:17 | 226:13,18,19 |
| **law** 1:21 2:20 | 197:13,17,19 | 117:9 119:15 | 227:3,23 232:5 |
| 12:13 33:23 | 197:22 198:1,1 | 120:18 151:12 | 243:2 |
| 38:7 39:13 | 198:6,7,8,10,15 | 199:13 238:20 | **legal** 197:1 |
| 40:10 42:20 | 198:15,17,18 | **learned** 26:13 | 275:23 276:23 |
| 43:17 47:21 | 199:11 200:18 | 26:19,22 27:1 | **legalize** 71:19 |
| 49:4 51:23 | 202:4 203:8,9 | 55:16 58:23 | **legalized** 50:13 |
| 55:2,6 71:17 | 203:9,11,12,14 | 117:11,12,13 | 71:18 |
| 71:20 78:20 | 203:15,20 | 117:14 120:7 | **legitimate** |
| 82:16 88:3 | 204:10,13 | 169:17 205:14 | 137:1 |

**[legitimately - local]**                                                    Page 41

| | | | |
|---|---|---|---|
| **legitimately** | **lied**   132:8 | 226:24 227:6,7 | 245:22 |
| 140:1 | **lies**   131:23 | 227:13,17,24 | **listen**   77:21 |
| **length**   211:4 | **lieutenant** | 227:24 228:3,8 | 148:5 212:7 |
| **lengths**   221:19 | 24:24,25 30:23 | 228:21,22 | 254:6,18 |
| 221:19 | 31:1 53:5,7 | 229:24 230:4,5 | 255:18 |
| **lens**   214:24 | **life**   36:2 135:16 | 230:11 231:11 | **listening**   10:10 |
| 215:1 270:8,9 | 252:21 253:21 | 231:23,25 | 184:5 252:12 |
| **lenses**   209:13 | 255:7 | 234:3 235:7 | 254:1 256:6,11 |
| **leonardo**   21:25 | **light**   34:17 | 277:4,7,10,13 | **lit**   231:20 |
| **letter**   35:5 | 72:10 196:5,5 | 277:16,19 | **litigation**   68:14 |
| **letting**   46:14 | 196:7,8,9,14 | **lines**   219:16 | **little**   44:19 45:4 |
| **level**   52:16 | 197:3,4,7,8 | 224:7,16,18 | 45:6 50:18,22 |
| 79:18 81:3 | **lighter**   72:10 | 225:22 226:2,5 | 58:11,15 63:4 |
| 91:3 107:9 | **lights**   85:22 | 226:9,14 | 65:10 72:21 |
| 121:8 146:17 | 102:15 240:8 | 233:24 269:21 | 73:9,18 74:1 |
| 146:18 151:10 | 241:17 | **link**   46:7,8 51:8 | 75:10 76:17 |
| 152:8 168:12 | **liked**   253:13 | **lips**   74:21,23 | 77:18 78:19 |
| 188:12 254:24 | **likely**   175:25 | 80:9 133:21 | 79:7 82:2 |
| 255:19 | **limit**   41:14 | 264:5 | 83:17 91:24 |
| **levels**   257:21 | 221:24 266:2 | **liquidate**   21:7 | 136:6 159:5,12 |
| 262:22 | **line**   7:3 10:21 | **liquidated** | 173:7 182:20 |
| **liar**   131:25 | 10:25 11:1,2 | 19:18 | 185:10 199:5 |
| **liars**   130:7,7,12 | 92:7 120:4 | **list**   28:6 38:16 | 202:16,19 |
| **license**   26:10 | 131:2 217:2,4 | 154:21,25 | 224:20 237:1 |
| 33:13,17 48:19 | 217:25 218:12 | 155:9 157:7 | **lives**   63:18 |
| 86:4 101:22 | 218:20,24 | 167:12,14 | **ljr**   239:8 |
| 108:2 118:6 | 219:5,6 220:8 | 186:12 250:6 | **load**   26:8 84:24 |
| 147:13 232:25 | 220:12 221:20 | 256:4 | **loaded**   125:18 |
| 233:11,14 | 221:21 222:20 | **listed**   22:25 | **loads**   26:22 |
| 242:10 | 222:20 223:9 | 157:7 160:4,9 | 45:21,22 62:24 |
| **lidar**   265:19,21 | 223:10,16,16 | 160:13 164:15 | 125:18 142:1,2 |
| **lie**   131:22 | 224:15,23 | 165:9 172:2,18 | 253:8 |
| 134:6,7 255:22 | 225:2,24 | 175:4 176:24 | **local**   89:1 |
| 255:23 | 226:18,19,23 | 187:10 189:16 | 120:6 |

| | | | |
|---|---|---|---|
| **located**  229:4 | 174:3 178:8 | 234:17,18,19 | 116:21 119:5,8 |
| 230:13 239:9 | 182:2 183:1 | 234:23 236:18 | 124:7 127:17 |
| **location**  138:14 | 190:5,6 193:9 | 256:24 268:9 | 127:19 129:6,8 |
| 213:18 223:22 | 195:5 198:24 | 268:17 270:11 | 132:4,7 133:24 |
| **login**  109:3 | 201:25 202:13 | **looks**  11:22 | 135:13 138:15 |
| **long**  14:11 | 204:2 215:2 | 75:10 214:23 | 138:15,25 |
| 18:20,24 49:9 | 216:14 219:15 | 268:4 | 139:15 140:15 |
| 54:6 55:15,25 | 233:5,6 239:1 | **loose**  61:15 | 140:22 141:24 |
| 63:7 68:18 | 246:9 249:12 | 126:5 | 141:25 156:22 |
| 83:3 94:14,16 | 251:3,16 | **lose**  10:2 86:5 | 157:2 158:18 |
| 125:21 132:4 | 255:21 256:2 | 86:25 247:20 | 167:8,24 |
| 150:16 181:22 | 258:3,15,17 | 254:6 | 181:22,24 |
| 215:9,10,14 | 259:16 | **losing**  258:11 | 199:19 200:19 |
| 250:17 255:25 | **looked**  32:19 | 258:12 | 200:20 207:4 |
| **longer**  16:20 | 32:22 99:3 | **lost**  20:20 | 209:8 213:14 |
| 195:22 | 104:24 161:13 | 252:21 | 213:24 230:10 |
| **look**  7:20,22 | 200:9 201:4 | **lot**  10:24 17:16 | 231:4 234:13 |
| 18:16 28:3,12 | 236:6 | 21:24 22:3,11 | 240:14 246:16 |
| 30:5 31:17 | **looking**  7:2 | 22:11 24:2,5 | 246:20 247:10 |
| 33:18 38:13 | 10:1 45:10 | 25:13,14,25 | 247:12,22 |
| 45:25 49:11 | 56:25 62:21 | 26:12,13 29:18 | 248:23,25 |
| 55:24,25 58:3 | 84:15 86:17 | 30:1 33:15 | 250:9 252:23 |
| 63:12 70:7,7 | 87:23 96:2,3 | 40:10 42:24 | 253:15,23 |
| 84:19 89:24 | 103:19,23 | 43:23 45:13 | 255:6 258:7 |
| 91:24 95:21 | 109:23 122:25 | 46:18 49:2,4 | **loud**  221:6 |
| 110:3,13 | 133:3,4,5 | 55:18 56:9 | **louder**  259:9 |
| 112:17 121:10 | 138:7 154:19 | 58:1,14 64:9 | **love**  34:14 63:2 |
| 132:11,13,21 | 162:25 172:15 | 64:11,13 69:23 | 63:10,14,15 |
| 133:23 136:6,9 | 189:20 194:14 | 71:3 73:5,7,13 | 94:20 |
| 137:11 144:15 | 197:11 201:13 | 79:23,25 85:21 | **loved**  34:12 |
| 145:6,25 | 207:14 214:25 | 87:4 94:1 | **low**  261:25 |
| 150:20 153:9 | 226:3 227:12 | 102:13 104:21 | **lp**  239:7 |
| 159:11,15 | 227:12 231:7 | 107:23 108:7 | **ltr**  242:12 |
| 161:23 173:1 | 232:14 233:14 | 110:1 112:12 | |

**[luck - march]**                                                    Page 43

**luck** 48:9
**lucrative** 58:24
**lunch** 7:9 92:7
  100:15 142:14
  152:24 153:1,4
  153:7
**lying** 130:6
  249:14,15
  260:4

**m**

**m** 2:3
**ma'am** 18:10
  31:16 32:5
  135:2,2,13,13
  135:17,17
  143:17 144:7
  144:14,21,23
  149:24 151:7
  153:19,22
  154:20,24
  155:3 157:13
  157:24 158:7,9
  159:6,17,24
  160:11,14,15
  160:18 162:2
  162:23 163:24
  164:10,13,20
  165:8,12 168:7
  170:4,13
  171:10,13,25
  175:3 182:5,7
  182:13 183:23
  185:1 191:5,8

199:2 200:2,4
200:7 201:17
201:21,25
202:10 206:22
207:17,20,23
208:11 210:6
216:2,22 217:7
217:20 218:4
218:10 219:8
219:11 220:23
223:4,18
225:14,16,20
225:25 226:21
227:1 228:5,19
229:1,5,11,20
234:1,4 235:15
236:3,25
238:22 239:3
239:10,24
241:15 250:2,5
250:9 251:1,18
251:21 256:18
262:11,17
263:18,20,23
264:18,20
267:21
**machine** 1:21
**made** 32:20,24
  45:9 67:23
  113:13 147:23
  161:8 163:8
  168:20 169:16
  173:24 191:3
  194:9 200:23

245:23 253:8
254:18 260:22
261:9 262:15
278:5
**magnet** 264:14
**main** 175:8
**maintain**
  217:13 219:10
  230:3,22 234:7
  271:7
**major** 26:17
  141:20,20
  142:7
**majority** 21:9
  31:20 64:24
  125:1 127:24
  138:3 139:1,21
**make** 7:6 9:1
  11:19 37:15,15
  48:10 52:20
  55:20,20 57:20
  65:7 66:22
  68:23 79:1
  84:19 90:22
  96:22 123:8
  129:17 131:13
  134:1 142:18
  144:8 166:5,15
  166:23 192:25
  198:11 200:16
  202:12 204:2
  214:7 230:8
  232:10 235:2
  240:8 241:17

252:9,17,18
265:5 268:2,7
**makes** 36:17
  41:7 49:12
  62:22 64:20
  104:24 105:20
  119:9 124:6
  133:6,10 139:6
  180:14 188:15
  199:22 235:9
**making** 176:10
  180:15,20
  189:3,5 236:23
  254:17 255:10
**male** 84:9,13
**man** 40:24
  59:17 68:20
  86:9 136:4
  198:20 206:9
  260:22
**man's** 41:1
**managed** 46:6
**manipulated**
  208:14,15,21
  208:23 209:2,5
  211:12
**manipulation**
  208:6 211:15
**manner** 91:18
  188:2 266:18
**manual** 98:7,8
  98:24
**march** 96:4,5,9
  97:2,7 100:17

100:24 207:22
242:24 243:4
**marijuana**
 50:12,14 69:16
 70:21,22,24,25
 70:25 71:3,4,8
 71:13,24 72:4
 72:8,22,23,25
 73:13,16 74:5
 74:14,19 75:4
 75:11,24
 140:25 178:1,6
 179:2,9 180:23
 181:1,9,10,14
**mark**  13:21
 60:16 62:12
 91:10,12
 210:14
**marked**  3:17
 9:14 11:14,16
 13:23 14:3
 153:10 160:20
 161:24 162:13
 164:3 210:14
 210:16 216:13
 251:6,8 271:21
**market**  25:14
**marking**
 269:21
**markings**  84:21
**marshals**  20:2
**martin**  1:6 2:18
 159:21 274:6

**match**  83:22
 85:3
**matched**  108:5
**matches**  83:3
 83:17,25 85:11
 101:19 224:12
**matching**  85:2
**material**  96:24
 205:20
**materials**  3:15
 95:9 187:13,14
 199:17 246:13
 251:20
**matter**  4:8 14:7
 35:21 36:1
 87:14 90:11
 133:8,9 250:23
 250:25
**mattered**  172:8
**matters**  15:1
 16:2 75:25
 76:1 87:13
 111:2,3 198:5
 199:15,16
**mcallen**  21:13
**mean**  7:1 20:15
 30:2 34:14
 46:2,3 47:9,12
 47:25 49:25
 50:11,16,23
 51:17 54:20
 55:1,2 60:5
 62:19 63:7,12
 63:13 65:24

67:12,15,18
69:2 71:10
73:12,19 75:1
76:7 77:2
79:13,19 81:11
81:18 83:13
85:15 87:3,16
87:21 88:6,6
89:13 91:2
93:2,8 94:24
95:5 96:4 98:6
99:12,16 100:4
100:18 103:12
104:10,13,20
104:21 105:4,9
105:12,21
108:10,23,25
108:25 109:22
110:4,4,9,21
113:17,20
116:24 117:1
117:15 119:22
122:22 126:4
128:5 135:22
136:23 141:11
144:2 149:25
151:9 152:20
156:8 166:19
169:22 170:13
171:17,18
174:18 175:17
175:23 176:21
177:1 180:2,4
180:22,23

188:24 191:12
192:21 193:23
197:2 200:24
201:3 204:9,10
204:11,13
205:13 213:9
213:11 214:25
215:21 217:18
219:23 221:6
223:1 226:1,4
226:19 227:6
231:22 232:21
233:1 237:11
247:22 249:11
253:13 257:15
258:8 266:11
268:1,5,21
**meaning**
 194:10 249:18
**means**  5:7,22
 53:12 60:23
 118:21 127:19
 141:12 171:1
 249:16 260:4
 267:13
**meant**  97:8
 103:17 104:14
 143:4 148:6
 182:16,25
 223:2
**measurement**
 265:19
**media**  109:1,12
 113:12 115:8

129:16
**median** 101:18
270:2
**medication**
8:14
**meet** 154:8,10
**meeting** 89:25
137:21 138:1
248:12
**member** 67:6
111:16,17
242:16
**members** 45:18
**memory** 33:8
35:5 68:17
102:7 177:25
186:14
**mental** 252:8
**mention** 175:25
177:9
**mentioned**
41:18,23 42:5
161:7 172:19
184:9,10
195:20 199:7
204:11 214:18
228:11 240:23
240:24 249:21
265:12
**merchandise**
45:22 62:25
**mere** 85:22
**merely** 35:23
239:20

**merry** 32:21
**message** 111:7
111:9 165:12
184:14 239:19
**messaged**
112:2
**messages** 165:9
165:13,17,20
165:22,23
239:18
**messaging**
112:18 113:7
239:6,15,22
243:2
**messed** 100:20
**met** 4:9,17,21
89:15,17,23
111:12,13,17
111:21 138:19
244:5
**meta** 109:2
**meth** 82:8
85:10 140:8,10
**methampheta...**
69:16 180:3
**method** 51:13
**methodology**
173:17 185:9
188:13 189:8
**methods**
255:13
**mexican** 23:16
24:4 26:12,20
48:4,17 50:11

59:23,23,24
71:2 125:15
**mexico** 48:6
49:14 58:23
70:11 142:9
**mid** 27:7,9,10
27:11,11 42:4
208:8,21
**midatlantic**
276:15
**midlevel** 26:14
**midway** 252:7
256:2
**miles** 101:25
102:1 131:3,14
216:11 221:23
222:16 236:7
267:11
**millimeter** 40:7
**million** 22:2
**mind** 33:12,14
33:16 35:8
41:13 68:19
92:2 124:18
135:4 138:6
146:17 147:4
147:17 148:1,4
148:23 151:16
158:25 160:20
182:14 197:10
220:15 221:1
247:8,12
**mindset** 36:20

**mine** 111:12
**minus** 105:7
**minute** 31:9
57:14 100:10
126:8 154:3
162:5,9 163:7
207:18,21
208:7,16,19,20
208:20,22
209:5 211:8,15
211:17,19,19
211:20,23
212:1,3 265:2
**minutes** 4:9,19
4:22 35:1
56:16 126:3,5
126:6,6 142:17
148:19 150:19
182:21 211:20
212:2,7,8,8
221:5
**mirror** 232:15
**misdemeanor**
266:15,16
**mispronounce**
10:24
**misread** 258:4
**missed** 98:25
247:19
**missing** 243:19
**mission** 63:23
**misspelling**
143:4

misspells  144:1
mistake  97:9
    160:7 164:6
    252:9,17,18
    254:17 260:22
    261:9
mistaken
    157:17,18,20
    158:21 174:16
    174:17
misunderstan...
    197:25
mixes  180:8
mobile  39:22
    39:22 41:18
    42:12,18 44:1
    212:23,25
    229:17
mode  51:15
model  235:2
models  214:15
modes  68:6
molestation
    192:10
molina  1:6 2:18
    5:4 159:21
    160:1,2 177:25
    178:13 184:22
    185:18 186:8
    192:4,7,7
    240:13 274:6
mom  63:5
    84:11

money  21:7
    48:10,15 49:14
monikers
    141:18
monitor  109:11
monitoring
    108:24 109:24
monkey  184:17
monotonous
    65:6
month  61:8,9
    61:10
months  17:8
    61:5
morals  63:16
morning  4:5,6
    8:16,25 93:22
    167:24
motel  51:4
    117:23 118:15
    184:2 191:23
mother  84:4
mount  40:9
    264:14
mounting
    209:10
mouse  87:25
mouth  134:14
    260:8 264:4
move  41:17
    46:9 65:8
    136:14 184:23
    185:4 235:19
    248:9

moved  24:17
    228:8 241:21
movements
    133:5,5
movie  21:19,25
movies  40:17
moving  218:1
    267:17
mueller  1:22
    2:15
mule  48:14,24
    48:24 57:20
    58:3,3,5,12
    82:17
mules  48:13
    57:19 125:16
multiple
    155:10 164:15
    200:21,24
    242:18
municipalities
    71:19
muscle  102:6
musk  215:21

**n**

n  2:1 4:13
name  4:7,12
    5:1 10:24 70:3
    91:11,18 116:5
    163:25 185:19
    237:21 250:13
    250:14

narcissistic
    131:25
narcotic  15:1,2
    24:11,13 29:13
    30:13 89:19
    91:2 105:16
    109:8,10 139:3
    199:20 201:14
    201:16
narcotics  23:20
    23:22 27:24
    28:1 30:16
    33:24,25 46:19
    52:23,25 53:9
    53:21 200:14
    241:9
narrow  114:22
nation  20:4
nationals  59:23
natural  6:16
    139:9 142:18
nature  39:13
    68:3 93:25
    117:20 135:4
    136:16 174:14
    184:3 191:24
    194:12 233:12
    250:20 261:7
    267:12 272:21
natures  130:19
nearly  100:9
    142:13
necessarily
    15:14,23 51:23

83:20 140:20
159:3 199:9
203:5,19 233:1
237:17 238:9
255:3 257:15
266:22 267:9
267:12
**necessary**
66:13,15,16,17
278:6
**need** 5:22 12:9
19:20 21:3
23:16 24:19
44:10 47:24
48:10,14 56:5
68:13,14 72:12
75:22 77:20,21
77:22 78:11
87:10 92:22,23
136:25 146:10
147:9 162:3
192:14 248:8,9
249:3
**needed** 23:11
28:17,18 34:2
35:24 91:18
246:8
**needing** 174:16
**needs** 55:17
72:11 86:6
**neither** 275:12
**nervous** 85:14
85:16,18,21,23
86:23 133:20

134:20 135:15
194:12 249:21
260:9 264:7
**nervousness**
104:19
**network** 53:20
238:16
**networking**
106:24 107:5
**never** 4:25 32:8
34:8 35:11
36:15 38:6
87:8 89:15
108:21 110:25
111:17 121:4
122:21 123:3
135:15 140:9
158:11 206:9
222:16
**new** 24:10,16
30:13,15 45:13
45:22 50:12
78:22 98:21
153:20 161:4
161:15 187:16
**news** 177:7,19
**nice** 86:19,23
**night** 85:15
93:21 129:19
140:14 147:24
242:13
**nights** 24:25
**nine** 29:4 183:6

**nodding** 5:24
**noises** 256:5
**noncriminal**
132:18
**nonexistent**
229:14,21
**nonstressful**
135:25 261:21
**nonthreatening**
134:22 136:15
137:6 261:20
**nonverbal**
262:9,22
**nope** 138:2
**normal** 43:9
86:25 101:3,3
104:15 119:19
134:19 139:16
140:10,11,16
150:18 188:15
**normally** 73:7
143:6
**north** 2:10 24:6
48:22 50:10
60:1 97:3
108:4 120:3,4
126:10 131:1,3
131:14 133:16
140:1 241:22
**northbound**
129:21 141:9
227:4 232:6
239:8 241:5

**northern**
126:21
**nose** 134:15
**notary** 274:15
275:5 278:13
278:19
**note** 9:6 11:6
276:10
**noted** 278:7
**notes** 9:15 68:6
68:9
**notice** 5:8
**noticeable**
135:10 222:19
228:16 264:3
**noticed** 235:22
236:4,16,17,18
**notoriously**
22:20
**november**
14:18
**number** 3:9,18
33:17 48:20
54:15 55:10
84:15 108:2
126:24 127:4
174:4 207:2
216:12 251:4
**numbered** 1:18
251:22,25
**numbers** 11:20
96:16 111:13
111:22 149:3,6
149:7

**numerous**
220:12 250:12
266:17
**nutshell** 27:3
68:1 72:2

**o**

**o** 4:13 250:15
250:16
**oath** 5:14,16
176:16
**objection** 6:25
7:2 99:14
103:5 127:7
178:22 194:20
195:1,15
196:11 197:18
198:3 211:13
215:7 269:7
271:9,16 272:1
272:10
**objective**
172:10 193:17
**objectively**
190:24 192:22
193:9,15
**observation**
180:24
**observations**
170:3 173:2
**observe** 114:7
114:14 236:13
247:25

**observed** 61:11
101:2 216:8
220:1 222:20
224:12 232:9
243:5 245:11
245:24 270:5
**obtain** 42:2
44:9 98:4
144:18 157:14
158:15
**obtained**
158:14 187:20
**obtaining** 77:6
**obvious** 106:11
131:9,10,11
232:16
**obviously**
13:24 23:19
28:7 36:19
40:1,15 46:4
51:19 66:17
90:6 99:15
107:18 116:14
152:10,20
156:11 168:15
208:15 216:10
226:11 232:23
232:23
**occasion**
219:22
**occasions** 15:7
115:7 220:12
242:18 262:1
264:6

**occur** 71:7
138:25 233:10
**occurred** 113:7
129:10 169:22
169:23 271:23
**occurring**
240:22
**occurs** 49:15
257:12 260:8
**october** 14:17
14:17,19
**odd** 19:7 33:4
36:4
**odds** 83:4 89:4
134:10 161:10
**odor** 71:1,4
**offense** 230:3
230:24 234:6
235:18
**offenses** 216:6
216:8,9
**offer** 15:13
215:16
**offering** 12:19
**offers** 239:20
**office** 10:6 13:7
15:20 16:18,21
16:24 18:19
19:3 22:19,22
23:2,6,8,10,17
23:20 24:9,11
24:13 27:22
30:14 89:11
91:6,14 99:8,9

100:4 166:11
166:20 167:20
186:15 187:25
190:2,3
**office's** 99:3,11
**officer** 15:25
23:6,19,21,25
28:14 37:4
40:5 43:10
44:24,25 45:7
45:24 46:13
47:8 49:11
54:19,19,21
55:13,15,22,23
55:24 56:3,9
56:25 60:20,24
61:4,6,12,14,20
61:23 62:1,9
62:23 64:20,21
64:22 65:8,11
65:22,23 67:5
68:6,13,18,19
71:8 72:3,24
73:2,12,16
76:19 77:17,17
78:11 79:7,18
81:12,18 83:4
83:7,14 84:24
85:25 86:6,10
86:16,21 88:7
98:15,15
101:24 104:23
105:24 106:7
106:23 110:13

112:3 113:3
115:25 116:23
117:24 118:14
119:11,18,21
119:22 121:8
121:19 122:3
127:16 129:11
129:15,17
130:5,14 132:5
134:10 135:11
136:14 137:5,8
138:7,22,23
139:4,18,22
140:3 141:14
143:1,8 144:4
145:15,24
148:14 150:10
150:25 151:12
151:18 152:6
152:18 168:1,3
168:11 172:10
179:21 180:1
180:24 181:22
188:3 189:2,4
189:5 190:12
190:13,16,23
191:10,11,13
192:1,2,16
193:12 195:18
195:21,24
196:3,4,5,14,17
196:24 197:3,6
198:6,7,9,15
199:8,9,10

201:10 204:23
205:11 213:13
216:5 217:1,12
219:3 236:10
236:13 238:24
248:13 257:24
258:11 265:9
274:18
**officer's**  85:23
123:22 147:25
148:4 191:17
192:5 196:10
196:22
**officers**  25:18
28:20 42:18,24
43:24 44:2,7
44:16 45:2,4
49:8 52:25
53:9,21 59:11
62:6 65:17
66:10 71:21,23
77:1 78:3,21
78:22 87:23
89:10,19 91:3
101:16 102:3,7
102:13 107:5
109:9 112:8,23
118:1 120:13
129:24 139:2
145:9,19 146:4
154:11 172:13
179:9,15 188:6
188:20,20
190:21,23

191:2 192:18
194:1 196:20
202:19 203:17
203:18 204:6
204:18,22
205:13,15,15
205:23 213:19
229:16 233:3,4
234:16 250:21
252:17 255:1
265:13
**offices**  1:21
2:20 21:14
**official**  1:6,7,8
110:11 153:11
248:13 274:6,7
274:8
**officially**  91:21
**offsite**  241:3,21
**oftentimes**
89:20 112:9,9
114:19,19
133:19 145:8
237:10
**oh**  10:7 11:3
12:13 20:15,23
26:6 32:25
37:21,21,21
59:16 60:24
66:4 86:3
93:11 95:15
103:22 109:7
116:6 131:5
137:9 139:14

143:22 145:22
145:24 158:4
159:2 161:15
164:5 172:7
203:3 210:4
213:8 221:7,9
222:25 223:24
231:17 232:16
254:11 260:19
260:22 263:12
268:16
**ohio**  156:6
**oil**  139:11
140:1,11,13,18
140:21,23
141:8 181:10
**okay**  4:16 5:5
5:13,20 6:3,11
6:22,23 7:8,21
8:4,8,11 10:7
10:13,17,22
11:3,9,11,12,17
12:8,22 13:12
13:18,20 14:14
15:3 16:12,20
16:23 17:2,6
17:11 18:8
19:2,5,11,15
20:23 22:13,20
22:25 25:6
26:6 27:21
28:20 29:8,13
30:23 31:5,8
31:15,21,25

**[okay - opening]**                                                    Page 50

32:5 36:25
38:5,9,14,25
39:3,6,15,20
40:5 42:5 43:7
43:22 44:19
45:24 47:16,19
48:3,14 49:3
49:20,24 50:1
50:6,15,18
51:11 52:19
53:9 54:1,4,11
54:18 55:12
56:2 57:4,12
58:14 59:22
62:14 66:14
67:8,14,19
69:3,9,20 70:6
70:20 72:6,8
72:16 73:3
76:21 77:7,14
78:17 79:23
82:2,14,20,22
82:24 83:10
84:1 85:1,13
88:4 89:7
91:20 92:19
93:18 94:2,10
94:19,21 95:8
95:19,21,23
96:1,22 97:16
99:1,6 100:12
100:13 102:20
103:13 105:21
106:17 107:8

109:16 112:1
114:14,25
115:21 117:3
118:17 120:3
122:1 123:20
125:1 126:6,15
126:22 127:9
128:4 136:10
137:16,20
143:6,16,18,20
144:8,24
145:16 146:13
149:10,16
150:15,20
153:20,23
154:17 155:4,8
155:12 157:14
157:22,25
158:4,16 159:8
159:11,13,14
159:21 160:3
160:19 161:23
162:17 163:5,9
163:19 164:7
164:17 165:5
166:19 167:17
168:4 169:8
171:2,14,23
173:10 174:3,4
174:10,21
175:2 177:13
177:19 178:8
178:25 179:3
179:17,20

181:19 182:2
182:14,18
183:5,25
184:16 185:2,8
186:14 187:6
187:12 189:9
190:17 191:9
192:21 193:16
194:14 197:10
197:16 200:5,8
201:18,22
202:1 203:4
206:23 207:24
209:9 210:4,9
211:3,5 213:5
214:1,14 216:9
216:14,17
217:8,21,25
218:8,11,17,25
219:9,21
220:20 221:11
222:2,5,5,12
223:5 224:2
226:15,17
227:2,9 228:1
228:23 229:25
232:7,18
233:20 235:20
237:1,3,25
238:5,7,20,23
239:13 242:4,4
243:11 245:9
245:14 246:1
247:15 250:3,6

250:8 251:2,24
252:1,5 256:20
257:13 260:19
262:8 263:7,16
264:1,12,16,21
264:24 265:4
266:3,25
267:14 268:21
268:24 271:4
272:4,7,15,24
**old**   40:9 71:2
94:11 98:23
**olg**   1:5 274:5
**omission**   160:7
**once**   32:16
59:11 60:19
61:12 62:24
66:3 134:23
139:23 142:17
147:8,19
185:17 186:4
187:22 230:5
236:17 248:6
**ones**   142:10
**ongoing**   240:21
**online**   19:23
20:8 22:6
156:3 202:7
205:25 207:5
**open**   25:13
272:18
**opening**   89:22
264:4

[operate - page]                                                    Page 51

| | | | |
|---|---|---|---|
| operate  181:25 | 215:17 220:11 | oriented  46:13 | pace  236:9 |
| operated  29:5 | 221:21 228:1 | original  40:6 | 266:7,7,8 |
| 188:19 | 228:20 229:15 | 128:10 274:21 | 267:19 |
| operates  47:21 | 230:3,7 232:12 | originally | package  51:5 |
| 192:6 | 233:21 240:19 | 186:23 244:1 | packed  126:16 |
| operating | 264:23 271:14 | originated | page  3:9,18 |
| 52:17 | 272:8 | 118:14 | 10:19 11:19 |
| operation | opinions  12:1,4 | ounce  51:24 | 31:12 92:2,12 |
| 269:11 | 90:17 153:13 | outcome | 95:25 96:2 |
| operations  27:1 | 154:6 161:11 | 275:16 | 109:2 121:23 |
| 30:11 | 197:13 270:15 | outlined  242:1 | 142:22 144:10 |
| operative  46:21 | opportunity | 242:6 | 144:11 149:2 |
| opinion  12:20 | 12:18,22,25 | outside  15:12 | 149:11 153:11 |
| 15:13 16:2 | 13:12 | 78:23 80:2,4 | 153:11,12 |
| 79:21 90:4,10 | opposite  40:23 | 183:14 197:7 | 154:17,19,22 |
| 91:22 96:18 | options  150:9 | 268:11 | 154:22 157:7 |
| 101:11,13 | oral  1:12,16 | overall  199:3 | 158:22 159:11 |
| 103:20,25 | 274:11,19 | oversaw  54:5 | 160:13 162:22 |
| 106:15 114:3 | order  72:7 | oversee  52:23 | 169:9 170:2 |
| 115:4 128:12 | 131:19 144:18 | overtook  10:24 | 174:4,5 178:8 |
| 146:19 150:14 | 149:21 150:13 | 223:8 | 182:2,15 |
| 153:21,25 | 156:10 190:24 | overview | 184:16 187:10 |
| 155:1 163:3 | 192:14 193:14 | 169:19 | 190:17 197:10 |
| 164:19 165:7 | 198:8 212:4 | own  34:2 61:13 | 198:23,24 |
| 165:14,15,23 | 246:25 | 62:20 129:5 | 199:24 201:14 |
| 168:8 170:3,19 | orders  187:2 | 205:14 247:24 | 206:12,14 |
| 172:17 176:7 | organization | | 207:13 215:25 |
| 176:10,22 | 45:16 46:7 | **p** | 216:14,17 |
| 177:17,23 | 48:7 52:10 | p  2:1,1 | 221:11 223:7 |
| 185:12 190:7 | 122:25 | p.c.  1:22 2:14 | 225:12 229:7 |
| 195:6 197:17 | organizations | p.m.  1:19 153:1 | 239:1 242:3 |
| 198:11,12 | 53:16 | 153:2 162:10 | 245:22 246:9 |
| 208:4,12 | organized | 162:10 246:5,5 | 251:16,17,17 |
| 211:14 214:12 | 45:18 | 265:7,7 273:11 | 251:25 252:3,5 |

252:7 255:21
256:20,21
258:21,22
259:16,24
261:4 262:8,9
263:9,11,12,13
263:16 275:8
277:4,7,10,13
277:16,19
**pages** 10:2 23:1
154:25 162:4
165:10 251:22
251:23 256:3
**paid** 16:11,14
32:24 57:25
88:20 116:10
117:10
**paper** 94:3
98:24
**paragraph**
92:11 106:20
121:23,24
137:11,12
142:22 144:10
144:11,16
148:11,25
149:1,10,12
150:20 153:12
158:22,25
159:2,3,4
178:9 182:3,9
182:15,23,25
183:2,6 184:17
190:18 197:11

197:12 199:24
202:4 206:13
206:15 207:14
208:3 216:15
216:15,20,21
221:14 222:6
222:11,13
223:6 225:13
225:13,15,17
226:11 228:14
229:8 239:2
246:10 256:21
257:5 262:13
262:21 263:9
263:17
**parcel** 51:5
**parentheses**
160:6
**park** 44:8
**parked** 101:18
217:22
**part** 7:10 21:1
21:19,21 23:9
28:19,21,24
30:12 41:6
42:20 43:13
67:24 79:1
82:21 83:3
96:11 103:10
114:25 115:1
122:23 144:13
145:7,8 156:17
160:7,7 166:18
167:5,15

169:25 170:24
171:19,22
175:5 203:17
221:2,2 224:19
229:18 245:2
252:12 260:10
**participant**
34:21
**participate**
37:21
**particles** 72:21
73:18 74:2
76:2
**particular** 7:13
17:24 24:21
29:7 54:3
67:22 104:18
108:17 117:23
145:1 148:21
151:11,14
152:9,22
156:20 161:2
179:18 181:3
189:3,7 191:16
191:25 192:19
193:11,14
195:18,19,25
196:16 207:11
228:5 236:20
244:6,19
245:10 248:8
257:16 260:7
271:3

**particularly**
14:25 85:24
211:19 212:16
235:4
**parties** 274:24
275:13
**partner** 34:20
165:17
**parts** 7:25
203:10
**party** 275:3,11
**pass** 61:12
120:21 126:7
126:19 127:19
272:22,25
**passed** 125:18
125:19 218:12
220:9,14
221:17,22
223:23 227:7
228:6 230:19
230:22 233:21
270:23
**passenger**
40:16 116:9
147:20
**passes** 101:18
219:14,16
231:12,13
**passing** 217:3
220:13 222:16
222:17,18
228:13 234:2
236:5,8 265:16

265:25
**passion** 64:7
**passionate**
  188:21
**past** 89:23
  105:3 151:18
  152:13 208:17
**pat** 249:2,3,5
  253:25 254:7
**path** 205:19
**patrol** 24:17,25
  30:23,25 40:9
  43:4,5 44:9,25
  81:9 127:14
  163:18 174:8
  177:22 183:10
  183:21 191:13
  191:17 192:2
  222:17 232:15
  270:6,10
**patted** 78:10
**pattern** 120:2
**patterns** 56:14
  79:24 80:25
  119:23 242:18
  247:6,23
  252:22 253:3
  255:3 260:9
**pause** 226:15
**pay** 37:14
  42:25 45:3,4
  59:11 83:20
  253:14 254:5

**paying** 43:2,11
**pays** 16:10 45:8
  80:16
**pd** 23:13 89:5
**peace** 60:20
**pen** 94:3
**people** 20:5,11
  21:10 23:25
  26:23 28:18
  34:24 35:2
  37:3,10,14
  38:1 44:23
  48:6,7,8 49:17
  49:18 50:2
  52:2,9,10,16,16
  53:23 54:6
  55:18 56:16
  58:21,24,25
  59:21 62:25
  63:17,18 69:17
  69:22 74:22
  75:5,6 76:16
  76:25 77:20,24
  85:21 93:16
  105:1,23
  107:20 108:11
  113:23 115:8
  120:15 122:16
  122:21,22
  123:1,2,4,6,13
  123:17 124:8
  124:12,22
  125:1,5,10,13
  125:15,16

127:4,6,25
  128:21 129:6
  130:11 131:22
  133:10,24,25
  138:3,15
  139:21 140:17
  140:20 142:6
  143:13 144:6
  160:9 180:6
  188:18 192:15
  203:14,25
  204:1,15 231:4
  231:5 246:21
  247:13 250:22
  253:19,24
  254:7 256:5
  258:6 261:24
**people's** 188:21
**perceived**
  151:5 197:20
**percent** 127:5
  188:18
**percentage**
  125:5 126:25
  206:17
**perception**
  235:11
**perfect** 117:21
  117:25
**perform** 190:10
**performing**
  103:8
**period** 18:25

**persistence**
  64:23
**person** 36:13
  36:14 37:22
  46:15 51:24
  57:5 62:17,22
  65:3 67:25
  68:11 72:19
  80:15,20 81:13
  83:24,25 85:2
  86:1,2,17,19
  113:2,20,21,24
  113:24 114:10
  115:19 116:1
  121:16 129:20
  130:6,20
  131:25 132:6
  134:8,9,19,24
  136:8 138:19
  139:24,25
  141:16 150:4,4
  150:13 154:4
  181:9 202:7
  224:9 237:15
  244:17 246:18
  247:24,25
  248:12,17
  253:17,22
  255:9,16
  258:13,16
  260:4 261:3,18
  261:19 264:7
  265:24 266:1
  270:10

| | | | |
|---|---|---|---|
| **person's** 68:7 | **phrase** 69:12 | **pitch** 259:7 | **play** 66:7 |
| **personal** 64:5 | 173:20 212:23 | 260:2,6,19,23 | **played** 40:13 |
| 77:16 115:4 | 225:21 227:5 | 261:15,22 | 128:11,15 |
| 130:21 213:6 | 269:17 | 262:4 | **plays** 128:10 |
| 214:12 231:6 | **phrasing** | **pitches** 261:2 | 129:22 |
| 256:10 | 103:16 269:15 | **place** 48:19 | **please** 5:23 6:4 |
| **personalities** | **physically** 35:1 | 77:19,19 | 6:12 67:8 |
| 62:5 192:13 | 74:21 | 120:13 175:13 | 220:18 |
| **personally** 38:3 | **pick** 20:5 21:10 | 217:21 241:3 | **plus** 200:17 |
| 63:20 89:15 | 37:17 40:21 | **placed** 122:17 | 257:21 |
| 225:8 267:24 | 48:18 66:1 | 264:14 | **point** 7:24 24:2 |
| **perspective** | 83:7 90:1 | **placement** | 24:8,23 26:11 |
| 79:13 195:17 | 128:21 134:5 | 42:22 43:11 | 26:17,21 39:3 |
| 196:15 213:16 | 135:24 | 44:7 | 41:3 46:10,10 |
| 240:4 247:21 | **picked** 21:14 | **places** 48:9 | 60:17 61:21 |
| **pertinent** | 21:22 | 76:19 142:5 | 105:14 117:1 |
| 170:18 171:8 | **picks** 116:20 | **plaintiff** 1:3,17 | 144:3 175:15 |
| **pflugerville** | **pickup** 33:1 | 2:2 4:8 274:3 | 184:10 205:4 |
| 19:14 | 122:18 | **plaintiff's** 8:8 | 214:2 222:24 |
| **phase** 46:8 | **picture** 52:5 | **plan** 133:16 | 244:2,7 245:7 |
| 50:21 51:1,7 | 193:17 | 219:2 | 269:19 |
| 51:12 54:25 | **pie** 131:19 | **plane** 116:9,14 | **pointing** |
| 61:10 | **piece** 66:20 | 116:17 117:19 | 159:13 256:12 |
| **phone** 115:8,13 | 131:19 | 118:13 | **points** 86:4 |
| 115:14 117:4 | **pieces** 66:19 | **plans** 13:16 | 247:20 |
| 183:15 184:14 | 77:18 195:13 | **plate** 33:13,17 | **pokemon** 22:3 |
| 223:7 231:5,9 | **pill** 70:8,8,18 | 48:19 108:2 | 22:5 |
| 231:12 240:1 | **pills** 70:11,13 | 147:13 233:11 | **police** 21:2 |
| 243:14 244:10 | 70:14 | 242:10 265:22 | 25:12 26:15 |
| **phones** 107:4 | **pin** 76:21 | **plates** 101:22 | 27:7,16 29:20 |
| 256:6 | **pinpoint** 244:6 | 118:6 232:25 | 33:3 35:20 |
| **phoning** 237:16 | 244:21 | 233:14 | 36:1 41:1,8 |
| **photograph** | **pipes** 74:23 | **platform** 112:7 | 54:19,21 59:11 |
| 235:2 | | 113:7 129:16 | 61:2,25 65:11 |

72:18 77:8,17
87:23 88:7
89:22 112:2
113:3 114:21
145:24 150:9
181:22 189:1
190:22,23
191:2,10
192:14,16
194:1 231:20
234:16 237:5
253:14
**policies** 13:7
30:18 97:20,24
98:9,24 99:4
100:3 104:3
186:16 187:24
189:19,21,24
190:4,9 203:16
**policing** 261:10
**policy** 62:2
78:7 97:14
98:4,5,15,16,17
98:19,24 99:10
99:11,20
101:10 103:8
103:11 105:11
112:20,20
151:17 186:20
188:1 189:18
190:5,11
204:19 205:17
**pop** 135:7

**popped** 36:5
**popping** 135:8
**pops** 110:12
**port** 127:14
**portion** 158:23
183:11 202:3
206:20 221:24
259:5 262:21
**portions** 179:8
**position** 16:6
23:14 77:14
87:5 122:3
124:18 152:19
152:22 196:14
198:9,16
222:19 230:25
234:11 268:16
**positioning**
213:4,17
228:25 231:17
**positions**
231:19
**positive** 64:16
184:22
**possibility**
124:20
**possible** 66:10
128:20 215:4
**possibly** 242:21
243:22
**post** 109:24
**posted** 109:4
221:24

**poster** 21:25
**posts** 108:19
109:4,20
110:15
**potential**
240:25
**potentially**
60:5 102:16
212:5 223:10
223:20 231:8
249:11 266:21
**pothead** 75:2
**pounds** 25:20
34:23 70:10
**powerdmv**
98:10,12,18,23
**powerpoint**
161:14,19
**practice** 62:15
**practiced** 34:11
35:24 204:5
**practices**
181:20 190:22
**practicing** 97:1
99:2 100:5
102:23 103:1,3
104:12
**precise** 219:1
**preconceived**
258:9
**preconception**
256:23
**prefer** 67:21
255:17,19

**preference**
77:17 78:16
81:7
**preliminary**
91:21,22
**preparation**
93:23
**prepare** 8:18
**prepared** 11:24
**prescription**
70:8
**preserve** 7:2
**president** 89:19
89:20 91:2
110:8
**pressure** 135:6
135:9
**pretend** 85:11
85:17 109:16
109:18,19
**pretty** 48:2
60:2 120:21
214:13 252:20
**previous** 113:6
113:6 148:22
166:14
**previously** 3:17
16:16 81:23
156:4 160:20
161:24 162:13
**prices** 93:16
**primarily** 20:7
199:15

[printout - pulled]                                                    Page 56

**printout**  3:14
    210:22 211:1
**prior**  69:5
    106:8,14,16
    107:17 113:13
    113:14 117:16
    117:17 124:16
    128:17,25
    129:14 146:16
    182:3 187:4
    194:3,8 239:5
    240:16 242:9,9
    243:9
**prison**  17:17
    258:6
**private**  163:5
    202:6,12
**probable**  30:7
    106:3 114:13
    114:22 120:17
    147:16 216:1
    271:14
**probably**  9:24
    27:11 35:15
    39:18 42:3,10
    49:1 62:13
    71:10 74:11
    123:5 168:15
    180:10 193:6
    201:9 205:21
    234:23 257:16
    262:13
**probation**
    61:14

**problem**  26:1
    40:11 56:5
    63:22 68:16
    131:9,10,11
    257:5,8,11,14
**problematic**
    202:18
**problems**  205:8
**procedure**  1:23
    97:14,17,20
    98:4 99:21
    101:8,10
**procedures**
    30:18 97:2,12
    97:21,24 99:2
    99:4 100:3,5
    100:25 102:24
    103:2,4 104:2
    104:13 155:21
    186:16 190:10
    203:16
**proceeding**
    275:14
**proceedings**
    273:11
**process**  24:24
    60:21,21 79:3
    81:17 142:11
    252:8 255:2
**produce**  211:8
**produced**  1:16
**product**  258:10
**profile**  58:2,12

**program**  30:21
    37:16 61:1,5
    239:6,15,22
**programs**
    239:20 246:23
**projects**  25:13
    25:25 26:9
**promote**  78:22
**promoted**
    24:15
**promotional**
    24:24
**prompt**  74:16
**prompted**  75:9
**prompts**  79:9
    130:13 199:22
**prop**  84:17
**properties**
    24:10
**property**  19:20
    69:18,18
**prosecutable**
    73:1 179:1,5
**prosecute**  74:6
**prosecuted**
    71:23 72:2,7
    72:14 179:7
**prosecuting**
    71:16
**prosecutors**
    16:4
**protect**  41:8
    240:21

**protecting**
    110:8
**prove**  180:10
    180:23 258:10
    258:16
**provide**  164:23
    165:2
**provided**  12:16
    96:24 99:5
    153:14 162:17
    199:19 200:21
    202:5,11
    206:15 208:4
    259:20,21
**providers**
    206:18
**provides**  38:16
**providing**
    164:21 165:5
**provisions**  1:24
**proximity**
    142:9 217:4
**public**  24:3
    29:5 33:21
    41:8 48:18
    67:6 111:16,17
    113:17 146:8
    192:12 274:15
    275:5 278:19
**pull**  43:9
    114:10 160:22
    265:9 266:3
**pulled**  17:20
    59:7 216:6

**pulling** 53:23
160:20
**pulls** 43:10
**purchased**
29:20
**purport** 211:1
**purpose** 33:22
62:2
**purposes** 44:10
160:18 176:22
**pursuant** 1:23
275:1
**pursuit** 59:14
**put** 9:11,23
10:11 25:19
26:19 33:20
39:9 40:21
68:8,22 71:6
72:9 76:21
81:23 84:22,23
85:4 95:9,13
119:3 122:22
144:2 145:3
148:12 171:17
171:20 172:5
172:20 175:6,8
175:9 177:2,5
197:1 204:23
205:19 249:4,6
254:25 255:7
256:18 272:8
**puts** 139:4
196:17 198:9
198:15

**putting** 38:2
62:7 94:3
168:2 237:21
**puzzle** 66:20

**q**

**quality** 259:2,6
259:15,24
261:2
**quantities**
25:18 48:4
138:10,14
143:13 144:5
**quasi** 192:16
**question** 6:4,8
6:12,15,15,21
7:4,5,13 16:5
21:13 36:4
38:19 46:2
52:20 55:9
56:19 62:4
66:14 67:12
76:8 80:17
85:1 96:6
103:10 112:14
125:8,12
130:13 132:4
132:25 133:3
134:13,24
135:5,12 136:2
138:24 143:21
157:11 166:5
167:6,23
175:14,23

176:5 185:6
195:11 199:23
214:9 221:8
229:23 245:14
248:2,6 249:22
262:1 269:16
270:24 271:2
271:11,25
**questioning**
40:3 168:20
169:1
**questions** 7:25
56:21 57:18
64:8 67:7,11
69:3 70:14
80:7 88:12
90:3 92:1
102:21 103:24
115:14,16
117:15 130:16
131:18 134:22
136:15,15,17
136:21 137:6
137:13 140:12
153:4 169:6
218:16,18
247:14 248:1
261:20,21,21
265:8 272:17
273:5,7,9
**quick** 31:17
48:11
**quicker** 119:10

**quickly** 182:14
199:23
**quite** 36:2
55:16 60:11
143:21 229:22
**quiz** 247:19
**quote** 106:21

**r**

**r** 2:1 164:1
250:15,16
277:3,3
**radar** 236:12
265:19,20,21
266:21,23
267:19
**radio** 80:22
**radios** 106:25
107:5
**radiowave**
265:21
**raise** 85:7
249:6
**raised** 63:16
**raises** 136:22
**ran** 73:21
74:20
**rangers** 33:21
**ranks** 78:22
**rapid** 236:5,8
264:3
**rapidly** 221:17
**rapport** 86:17

**[rarely - reasonable]** Page 58

| | | | |
|---|---|---|---|
| **rarely** 30:25 | 157:7,9 158:13 | **reader** 169:19 | 126:23 169:1 |
| 71:8 | 158:16,18,25 | **reading** 69:8,11 | 172:15 175:15 |
| **rate** 92:15,25 | 159:8 160:17 | 96:12 102:12 | 181:13 191:15 |
| 93:2,3,5,5,9,17 | 161:5,9 162:7 | 157:4 184:6 | 196:21,25,25 |
| **rather** 257:6 | 169:14 170:6,8 | 258:7 | 198:18 205:25 |
| **rbf** 1:5 274:5 | 178:10,16 | **reads** 98:15 | 212:18 214:24 |
| **reach** 102:8 | 182:8,12,23 | 244:15 | 215:10 234:9 |
| **reached** 90:9 | 184:18,25 | **ready** 11:18 | 234:13 244:23 |
| 270:23 | 185:13,14 | 246:6,7 | 244:23 247:10 |
| **react** 80:7 | 186:1,2,4 | **real** 36:2 70:3 | 253:12 261:11 |
| 181:11 247:13 | 188:1 190:18 | 84:25 254:3 | **realtime** 189:6 |
| **reaction** 71:6 | 190:20 191:4 | 255:7 | **rearview** |
| 82:5 | 197:11,20 | **realize** 121:6 | 232:15 |
| **reactions** | 202:3,9 206:14 | 134:2 | **reason** 8:5 23:3 |
| 264:22 | 206:19,21 | **realized** 25:24 | 55:16 89:18 |
| **reactivate** | 208:2,3,10 | 260:14 | 94:20 108:14 |
| 102:15 | 211:5 216:23 | **realizing** | 128:6 132:10 |
| **reacts** 47:22 | 217:6 220:25 | 260:20 | 137:1 185:3 |
| 247:8 248:1,12 | 221:5 229:12 | **really** 16:7 | 209:3 212:19 |
| **read** 93:20,22 | 229:19 230:9 | 25:11,14 26:12 | 276:11 277:6,9 |
| 96:23 97:5 | 230:10 239:4 | 29:18 32:24 | 277:12,15,18 |
| 98:5,9,17,21 | 239:11 244:14 | 33:18 34:8 | 277:21 |
| 101:2 107:1 | 245:12,18 | 35:16 37:16 | **reasonable** |
| 122:2,10 | 252:6,13 | 43:11 44:23 | 72:24 81:20 |
| 123:23 132:1 | 255:25 256:13 | 51:22 54:8 | 82:1 83:6 |
| 142:23 143:6 | 256:21 257:2 | 58:18,19 61:15 | 96:25 102:22 |
| 143:14 144:16 | 258:24 259:5 | 61:18,20 68:21 | 102:25,25 |
| 144:22 149:15 | 259:12 262:12 | 68:25 75:23 | 114:2 122:3 |
| 149:23 150:21 | 262:16,20 | 76:15 80:15 | 126:12 128:10 |
| 151:6 152:3 | 263:1,24 | 81:17 85:25 | 129:17,21 |
| 153:12,18 | 264:10 276:9 | 86:16,18 87:10 | 131:20 142:25 |
| 156:14,16,19 | 278:5 | 87:12 90:10 | 143:8 144:18 |
| 156:21,21,22 | **readdress** 12:9 | 93:20 94:16 | 145:15 146:6 |
| 156:24,24,25 | | 123:3 126:17 | 146:11 147:5 |

147:19 148:10
148:16 149:21
150:16 152:18
168:9,13 169:6
190:16,23
191:9,11
195:24 216:5
217:1,11 219:3
270:10
**reasonableness**
192:18
**reasonably**
129:11,11
**reasons** 71:9
124:23 275:8
**reassigned**
23:23 24:8
**recall** 28:22
35:22,24
165:22,24
166:16,16
167:4,10
177:24 178:3
178:18 209:25
217:14 218:20
257:20
**receipt** 275:6
276:17
**receive** 142:7
239:6
**received** 14:17
146:21 147:7,8
148:7 206:18
222:15 231:3

243:7
**receiving** 264:7
**recent** 91:16
214:15,16
**recently** 63:22
101:20
**recess** 57:17
153:1 162:10
246:5 265:7
**reckless** 266:13
266:14,18,24
266:25 267:6,8
267:13
**recognize**
143:24 234:22
**recognized**
89:15
**recollection**
164:16
**reconstruction**
38:23 214:4
**record** 1:24
4:12 5:21,23
5:25 6:25 9:19
38:21 44:10
82:23 145:3
148:2 153:3
162:4,12
200:11 206:5
210:10 211:23
242:2 268:8
274:19
**recorded** 41:2
65:21 175:20

207:19 216:24
217:9 222:9
229:14 244:10
244:20
**recorder**
208:18
**recording** 41:8
42:21 163:9,15
163:19,22
209:23 211:4
211:22 245:2
**recordings**
106:12 153:14
155:6,7 211:9
214:3
**records** 129:7
201:19 212:1
233:15
**recover** 20:6
21:7 179:10
**recovered**
181:16
**recovery** 39:25
42:6,7
**recruit** 30:15
48:7,12
**recruited** 23:5
23:13 48:8
**recruiting**
49:17
**red** 85:22 131:7
136:22 138:8,9
141:7 196:5,7
196:8,10,14

197:3,4,8
211:9
**redrick** 157:15
157:16 158:10
158:17,23
160:24,24
161:15,19
**reek** 72:23
**refer** 175:13
176:23 192:20
220:17,19
237:10 241:25
257:4
**reference** 176:1
197:13 198:1
207:18 217:8
**referenced**
175:19 276:6
**referred** 91:6
240:15
**referring** 51:1
96:19 124:1
129:2 163:6
170:11 182:6
183:18,19
184:18 194:2
202:20,21
203:21 207:16
220:3 225:23
226:9,23
229:22 230:14
232:1 235:23
242:25 256:15
256:19

| | | | |
|---|---|---|---|
| **refers** 262:7 | 171:11,15,20 | **remote** 137:18 | 170:1,7,14 |
| **reflect** 268:8 | 171:21,21 | 137:21,24 | 171:1,4,7,7 |
| **regaining** | 172:23 175:6 | 138:4,19 | 172:5 174:17 |
| 222:17 | 175:24 176:22 | 139:13,19 | 174:18,19,21 |
| **regarding** 15:1 | 176:25 177:11 | **remove** 35:5 | 174:24 175:7,8 |
| 168:21 169:4 | 177:11,16,20 | **removed** 35:7 | 175:13,22 |
| 174:16 200:14 | 177:23 180:13 | **repeat** 35:6 | 176:1,2,21 |
| 200:14 | 180:16,21 | **rephrase** 7:18 | 177:7,10,19,20 |
| **registration** | 186:17 199:12 | 137:4 166:1 | 178:8 179:21 |
| 275:24 | 203:3 204:15 | 194:21,23 | 183:11 185:10 |
| **regularly** | 212:4 219:10 | **report** 3:11,12 | 196:17 207:13 |
| 130:20 | **relied** 206:24 | 8:18,24 9:4,5,9 | 215:24 216:4 |
| **reiterate** 198:5 | 206:25 | 9:16,21,25 | 218:23 220:17 |
| **related** 23:4 | **rely** 8:9 108:18 | 10:14 11:23 | 220:17,19,25 |
| 50:11 99:7 | 109:21,22 | 12:1,4,10,12,18 | 232:11 237:8 |
| 105:14 112:6 | 119:11 121:20 | 13:16 39:5,8 | 237:21,24 |
| 113:16 117:21 | 165:7 196:16 | 65:22 66:4,7 | 238:1 239:1 |
| 243:9 248:11 | **remarks** 89:22 | 66:12,13,15,16 | 240:5 241:25 |
| 275:13 | **remember** | 66:17 67:2,5,7 | 242:1,3 246:9 |
| **relatedly** 46:17 | 14:18 18:1 | 67:13 68:2,9 | 256:18 263:5 |
| **relates** 165:1 | 33:7,18 42:11 | 68:10,13,15,22 | 272:9,15,19,25 |
| **relation** 97:25 | 65:23 68:20,23 | 89:13 91:25 | **reported** 1:21 |
| 105:3 111:10 | 68:24 69:1 | 92:3,16 94:4 | 212:13 |
| 181:3 221:21 | 89:25 154:7 | 94:14,15,22 | **reporter** 4:21 |
| 222:5,7,20 | 161:20 165:20 | 95:2,2,4,18,22 | 19:25 26:4,6 |
| 229:8,13 232:3 | 166:14,17 | 96:12,14 | 58:6 91:11 |
| 235:5 | 167:16,16,18 | 123:23,24 | 163:25 193:2 |
| **relationship** | 174:14 176:4 | 137:10 152:4 | 274:15 |
| 228:24 | 176:14 178:2 | 153:9 154:17 | **reporter's** 3:6 |
| **relatively** 7:11 | 185:20 186:12 | 158:20,24 | 274:11 |
| 47:23 | 212:23 250:14 | 160:13,18 | **reporting** |
| **relevant** 68:7 | 250:17 262:24 | 162:21 165:23 | 65:10 69:4 |
| 155:18,24 | **remembered** | 166:18 169:9 | **reports** 63:3 |
| 156:18 161:4 | 175:17 | 169:12,16 | 65:12,19 69:12 |

99:21 107:21
146:20 152:2
169:2
**represent** 4:8
90:10 96:8
173:11,12
200:5 210:23
**representation**
17:18
**representative**
28:24
**representing**
4:23 5:3
**request** 204:23
**requested**
275:3,10
**required**
278:13
**research**
153:16,20
154:18 155:23
156:3 161:3
189:16 205:6
210:9 212:12
**researched**
187:15,17
**reserve** 273:6,9
**residual** 180:1
**residue** 74:1
178:6
**resolution** 87:8
214:18 270:7
**resolutions**
209:16

**respect** 199:3
**respirations**
264:5
**respond** 132:25
168:10 248:2,6
**response**
135:18 136:20
139:9
**responses** 80:8
80:12 136:16
168:20 189:6
218:19
**responsibility**
28:11 85:24
**responsible**
28:5
**rest** 189:15
**restroom** 7:9
57:15 60:11
**resume** 31:10
31:14 39:16
**retail** 45:19
**retained** 15:12
15:14 88:14
247:13
**retire** 63:10
**retired** 16:22
19:1 22:18
91:13
**retrain** 205:18
**return** 168:24
215:24 276:13
276:16

**returned** 275:6
275:7
**returning**
263:8
**revealing** 114:5
**revenue** 72:1
**reversed** 50:14
50:16
**review** 8:1,2
11:16 12:16,18
12:19 13:7
91:22 96:24
106:9 137:12
142:25 143:8
154:18 156:11
156:13 159:6
159:18,25
160:12 162:1
162:12 163:15
164:24 165:13
166:8 167:1,2
167:7 169:13
169:15 172:9
175:9,16 185:2
188:10 190:5
198:8 205:20
207:2,21,25
212:2 213:10
217:16 225:15
229:2 230:5
235:12 245:16
251:10,15
276:7

**reviewed** 8:24
67:23 89:14,14
152:15,15
155:1 156:5
158:3 160:15
162:18,19
163:10,19
164:9 166:17
167:8 169:3,18
169:21,25
170:18 171:24
172:1,18,23
173:22 175:5
175:10 176:10
176:24 177:12
183:24 185:13
185:15,15,17
185:18,23,24
185:25 186:15
186:25,25
187:1,3,9,13,14
187:19,22,23
187:23,24
189:10,11,12
189:15 190:6
195:5,12 207:3
208:13 213:12
218:8,22
221:23 224:4
225:17 228:2
229:18 232:24
235:16,17
236:4,23
240:11 251:20

| | | | |
|---|---|---|---|
| 254:13,15 | 58:7,21 59:7 | 131:9,19,21 | 219:15 221:18 |
| 261:6 271:18 | 60:4,6 61:5 | 133:2,11,20,23 | 221:20 223:11 |
| 272:7,11 | 63:14 66:2 | 134:7,25 135:2 | 223:16,21,23 |
| **reviewing** | 68:5,8,14,21 | 136:12,24,25 | 224:8 225:2,3 |
| 43:24 93:24 | 71:2,11,16,17 | 137:2 138:8,11 | 226:12,22,23 |
| 95:9 162:3 | 72:12 73:6 | 138:16 139:1,3 | 226:24 227:3 |
| 182:15 192:4 | 74:5 76:7,18 | 139:23 140:10 | 227:19 228:13 |
| 216:24 219:13 | 77:6 79:20 | 140:15 141:5,7 | 228:13 231:1,5 |
| 230:9 241:8 | 80:14 81:19 | 141:11,23 | 231:14,20,21 |
| **revise** 13:16 | 82:15,17,20 | 142:1,7 145:4 | 231:23,25 |
| **revisit** 136:25 | 83:1 84:3,5,9 | 145:7,10,11 | 232:4,4,5,13 |
| 248:8 | 85:18,23 86:1 | 146:8 147:7 | 233:24 234:13 |
| **revolves** 39:12 | 86:2,2,3,9,10 | 148:4,10 150:3 | 237:12 243:1 |
| **revolving** 16:2 | 87:2 88:2 92:5 | 150:10 151:11 | 243:24 244:13 |
| **rhoades** 250:14 | 92:20 94:11,13 | 152:21 166:23 | 248:23 253:11 |
| 250:16,17 | 98:18 99:16,24 | 167:1 170:20 | 253:13,20 |
| **rid** 19:20 21:3 | 101:17 102:6 | 172:11 175:4 | 255:1,6 258:1 |
| **riding** 61:6 | 102:13 104:21 | 176:5 177:3,6 | 258:5,13,24 |
| **right** 7:22 8:3 | 106:8 107:14 | 180:2,3,10 | 259:23 260:1 |
| 11:2,23 13:17 | 107:18,22 | 186:19 188:8 | 260:21 261:18 |
| 18:14 20:6 | 108:14 109:7 | 188:18 189:25 | 262:6 263:15 |
| 21:15 22:2,6 | 109:25 110:6 | 191:17,18 | 265:14 266:22 |
| 22:23 29:25 | 111:19 112:10 | 192:1 193:5,7 | 267:5,12,21 |
| 32:13,22 34:2 | 112:13,21 | 194:12 195:7 | 268:3 269:23 |
| 35:7,20 36:21 | 113:8 115:11 | 195:24 196:13 | 269:25 270:3,6 |
| 37:10 39:11,12 | 115:19,24 | 196:24 198:7,9 | **rights** 41:2 |
| 40:20 42:22 | 116:12,22 | 198:17 200:25 | 188:16,21,22 |
| 43:9,12 44:23 | 117:6,8,19 | 203:9 205:19 | **ring** 45:19 |
| 45:14 46:5,20 | 118:10,16,23 | 205:22 207:3 | **ripping** 45:20 |
| 47:18 49:4,15 | 120:7,22 121:3 | 208:22 211:20 | **rise** 264:3,3 |
| 51:19 52:1,3 | 122:17 123:3 | 212:3 213:8,15 | **rises** 107:9 |
| 53:17 54:21,25 | 123:14 124:10 | 214:2,13,25 | **road** 2:10 |
| 55:5,21 56:6,8 | 124:13,20 | 216:7 217:5 | 53:23 105:18 |
| 56:23 57:6 | 130:4 131:6,8 | 218:2,3,6,9,10 | 113:22 124:11 |

**[road - scanned]**                                                    Page 63

133:12 145:22
217:18 219:18
231:10 233:6
255:11 269:24
269:25
**roadside** 56:15
**robbed** 33:3
**robot** 21:18
**robust** 46:25
**rock** 23:13
26:15 27:16
**rodriguez** 91:8
144:16,25
145:12 146:9
146:12 148:17
149:13,17
150:8 203:3
**role** 18:20,24
29:11,14 30:11
43:19 60:12
66:8 90:12
128:10,11,15
129:23 204:17
**roles** 22:25
23:1,18 29:10
**rolling** 72:19
73:9,15
**room** 4:20
48:24 64:3
77:10,10,11
90:13 255:14
**rough** 18:4
76:17

**roughly** 29:6,7
**round** 23:13
26:15 27:16
**rounds** 253:23
**route** 40:3
**routes** 28:12
**rule** 275:1
**ruled** 149:19
**rules** 1:23 5:10
239:13
**rumble** 227:15
227:21,25
228:4,9
**run** 63:22
**running** 115:2
118:6 232:25
233:11,14
**rural** 138:15
**rush** 7:24 33:5
33:6
**rushes** 32:18,18

**s**

**s** 2:1,20 4:13
91:13 250:16
277:3
**saenz** 2:19 4:24
5:2 197:18
273:6
**safety** 29:5
33:21 78:10
79:8 254:8
**sake** 150:22
177:6 187:7

**salazar** 1:7
89:17 274:7
**sam** 253:19
**san** 1:2 2:21
45:20 89:2,3,5
89:21 116:9
118:5,8 120:9
120:15,19
121:2 126:20
274:2
**sat** 91:15
**satellites**
215:21
**save** 64:6
**saved** 41:2
**saw** 33:5,6
36:10 37:5
105:5 108:6
117:18 158:9
161:12 168:15
168:15 178:4
180:24 181:1
181:14 190:6
196:14,19
197:3 199:18
199:18 218:6,9
218:19,25
219:25 220:2,8
224:11 225:1,1
225:4 226:20
226:24 230:12
230:12 232:11
232:22,22
233:16,18

235:13,16
236:7 241:11
254:20 264:16
265:24 266:21
270:20,20
271:20,23
272:3
**sawa** 91:10,12
**saying** 6:9
35:10,20 78:14
102:24 103:2
123:12 144:3
158:4 167:6
171:3 178:3
183:7,11 194:3
197:6,12
204:23 223:24
224:13 232:16
254:23 260:21
261:13 262:4
267:15 268:14
**says** 14:7 48:14
79:4 113:21
145:5,5 170:14
198:15,18
206:8 258:22
259:2
**sbarron** 2:17
276:2
**sbcglobal.net**
2:22
**scanned** 11:8
242:12

**scenario** 76:8
84:1,2 87:11
140:7 193:8
196:13 215:12
233:19
**scenarios** 36:3
**scene** 40:16
43:15 130:5
196:8
**schlepping**
76:5
**schmutz** 73:10
**school** 33:20
44:4,5,12 55:2
94:11
**schools** 25:22
**schott** 1:3 4:8
10:23,24 97:3
97:8 104:1
105:15 141:5
143:2,10
147:21,23
148:13 163:6
163:18 166:4,7
166:10 167:3
167:24 168:20
168:25 183:10
184:11,23
185:4 186:11
208:5,8 209:25
216:6,25 217:2
217:9,12
218:12,20,24
219:4,6,18

220:5,8 221:17
221:21 222:10
222:15,18,24
223:8,24 230:4
230:19 231:2,2
231:9,17
232:13 233:21
234:6 236:24
240:8 241:18
241:20,21,22
241:22 243:6
244:11 245:7
245:23 263:10
263:21 264:2
269:19 271:15
274:3 276:4
277:1 278:1
**schott's** 141:10
163:10 178:19
179:22 186:7
188:16,24,25
217:23 218:7,8
219:13 220:6
222:21 223:1,2
224:6,23 226:3
228:3,20,24
229:3 230:16
232:2,20
233:23 234:2
234:12 235:13
235:25 236:1,3
269:20,23
271:19

**scott** 10:23
**screen** 210:2
215:1,3
**sd** 209:20
**se** 51:23 81:11
102:7 165:20
**search** 30:8,9
51:15 55:14,14
55:23 56:12,17
56:23 73:14
83:5,8 117:2
129:22 131:21
140:4,7 144:19
145:16,25
146:6,12
149:22 161:5
169:7 180:4,5
253:6
**searched** 49:10
56:9 57:2
67:25 140:6
**searches** 55:10
56:25 109:25
110:9
**searching** 56:4
57:10 161:19
244:11
**seat** 72:19
73:22 76:14,18
76:20 77:14,25
78:4,9,12,25
79:12,12 80:21
81:14,24 82:9
84:9,11 85:6

148:13 184:23
184:24 185:4,5
202:20,22
254:14 255:16
255:17
**seatbelt** 120:17
120:18 268:25
**seats** 84:8,15
84:17
**second** 11:16
32:8 101:6
103:10 108:17
119:13 121:23
121:24 125:20
127:22 137:12
150:21 153:12
158:22 159:3
160:3 161:25
162:6 170:5
182:2 184:16
187:5 190:17
197:11 207:14
216:14,20
225:13 226:16
228:15 234:9,9
252:6 256:21
262:12 263:21
265:18 266:4
**secondary**
242:21 243:23
245:3
**seconds** 148:19
**secret** 110:7

| | | | |
|---|---|---|---|
| **section**  38:13 | 169:9 170:3,5 | **seeds**  71:3 | **segment**  211:4 |
| 38:16 142:18 | 174:6 175:17 | **seeing**  25:4 | 211:16,17 |
| 169:9,12 | 175:18,19 | 33:16 65:1 | **segments**  211:8 |
| 170:12 171:6,6 | 182:6 186:18 | 72:24 74:17 | 211:23 212:1,3 |
| 190:18 216:4 | 187:15 189:23 | 75:8 92:19 | **seized**  20:3 |
| 250:7 259:1 | 190:14,14 | 118:6 121:11 | 21:1,20 101:20 |
| **security**  127:13 | 191:15 195:5 | 121:13,14 | 127:12 |
| **sedative**  70:4 | 196:24 197:4,6 | 134:10 139:6 | **seizes**  20:19 |
| **see**  8:20 9:17 | 199:1 207:16 | 167:10,18 | **seizing**  25:18 |
| 11:4 14:9 16:1 | 207:18 211:18 | 189:4,6 194:10 | 64:25 |
| 33:13 36:9 | 212:4,7 215:25 | 194:12 233:16 | **seizure**  70:4 |
| 37:3,4 38:21 | 218:3,5,5 | 246:19,24 | **sell**  19:19,23 |
| 38:25 39:4 | 219:14,23 | 270:17,17,25 | 20:3,4,6,8,9 |
| 47:19 60:4 | 221:13,16 | 270:25 | 21:3,9,24,24 |
| 65:8 71:6 74:1 | 222:5,10 | **seek**  199:12 | 22:7 |
| 75:14 78:24 | 223:17 224:9 | **seeking**  62:21 | **seller**  51:21 |
| 80:5,6,6,8,8 | 225:2,8,23 | **seemed**  169:2,4 | **selling**  22:9 |
| 81:1,21 82:5 | 226:5 227:13 | 199:16 | **seminar**  111:22 |
| 92:11 96:4 | 229:5,10,24 | **seems**  77:23,24 | **send**  84:23 |
| 101:19,22 | 233:1,9 234:12 | 78:18 123:12 | 186:16 |
| 102:12 104:14 | 234:12,21 | 230:10 | **senior**  57:8 |
| 106:2,4 109:3 | 235:3,7 239:2 | **seen**  32:8 63:8 | **sense**  7:6 41:7 |
| 116:14 118:3 | 242:1,23 243:5 | 73:13 81:23 | 52:20 55:20,21 |
| 118:10,11,11 | 243:18 246:10 | 121:4 140:22 | 104:24 105:20 |
| 120:14,20 | 248:7 259:3 | 151:18 161:10 | 123:8 127:10 |
| 130:10,21 | 260:25 263:9 | 162:15 192:12 | 180:14 235:9 |
| 131:17 135:11 | 263:16,22 | 196:6 206:10 | 265:5 |
| 142:1 144:13 | 264:12 266:9 | 225:18 232:19 | **sent**  111:6 |
| 154:18,23 | 267:23 268:3,5 | 244:9 252:17 | 186:23 276:14 |
| 158:4 159:15 | 268:7,11,12,14 | 252:18 266:23 | **sentence**  17:17 |
| 159:21,23 | 268:19,21,22 | 269:10,20 | 96:3,18,23 |
| 161:6 162:7,21 | 268:25 269:4 | **sees**  73:16 | 107:1 122:2 |
| 162:24,25 | 269:12 270:5,9 | 105:24 246:20 | 142:23 144:3 |
| 163:13 165:9 | 270:12 271:6,7 | | 144:15,24 |

**[sentence - similarly]**                                    Page 66

149:15 150:21
153:13 170:5
178:11 182:8
202:3 206:14
206:19 208:2,3
208:8,21 211:5
216:24 217:8
239:4 262:13
262:20 263:1
263:21,25
**sentences**
190:19
**separate**  100:1
**separates**  227:3
**separating**
232:5
**sequence**
169:10,16
170:11,11,15
171:4,6
**sergeant**  24:15
30:10,13,22
53:6 174:12
204:24
**sergeants**  25:1
53:6,7
**served**  17:17
274:23
**service**  110:7
239:21
**set**  38:21 77:18
79:14,17 97:13
97:14 142:5
151:2,8 192:15

193:5 203:15
**sets**  101:5
201:2
**setting**  250:22
**settings**  255:8
**seven**  23:15
28:4 29:2,2
**several**  25:12
70:13 221:18
221:19 227:14
249:19 264:5
**shake**  5:24
72:16,17,18,25
73:11,12,18,25
74:5,11,18
178:4,19 179:8
179:22 180:16
180:20,21
262:2
**shaking**  5:24
**shape**  34:23
113:5
**sheehan**  19:13
19:24 20:1,13
**sheet**  276:11
**sheriff**  31:2
89:17,22
**sheriff's**  13:7
16:18,21,24
18:19 19:3
22:19,22 23:2
23:6,8,17,19
24:9,13 27:22
30:14 89:11

91:14 99:3,8,9
99:11 100:4
104:3 154:10
166:11,20
167:20 187:24
190:2,3
**shoes**  144:4
216:5 219:3
**shop**  75:17
142:5
**short**  18:25
21:19 24:9
47:23 59:14
162:11 237:12
**shortcut**  100:7
187:6
**shorthand**  1:21
257:4 274:14
**shot**  226:4
**shotgun**  253:23
**should've**
243:3
**shoulder**
227:16
**shoulders**
34:25
**shout**  7:12 9:7
**show**  37:13
261:2
**showed**  228:25
**shown**  274:24
**shows**  37:9
208:24

**side**  28:15
29:25 30:3,4,5
30:6 40:16,17
40:23 53:23
109:8 124:10
133:12 145:22
231:23 232:1
233:24 241:9
255:11
**sidebar**  38:10
**sight**  218:1,12
267:23
**sign**  134:19
259:6 262:24
276:12
**signature**  275:2
275:5,8,21
**signed**  98:22
276:19
**significant**
128:11 231:8
**signs**  253:17
256:24 257:1
259:15 260:10
264:22,23,24
**silly**  37:16
**silver**  268:2
**similar**  15:25
152:7 155:25
177:8 180:9
211:25
**similarly**  6:11
38:15

simple  48:2
simply  139:7
  202:11 258:1
single  163:9
  207:21 216:12
  236:19 271:21
sir  47:7 51:18
  79:16 93:7
  125:11 132:23
  135:2,2,20
  136:1,1 137:15
  174:9 273:6
sit  13:15
  167:17 238:23
  255:15 271:13
site  154:13
  217:15,19,24
sites  109:12,12
sitting  78:12
  161:17 269:12
situate  44:8
situation  68:19
  76:9 87:1
  99:16,16,17
  112:4 115:23
  156:23 192:25
  196:1
situations
  67:15,16
  110:23 130:5
  247:9,14
six  17:8 29:1
  34:22 58:20
  243:8,11,11

244:23 245:5
  245:20
size  24:12
skill  77:18
  79:14,17
skip  119:6
  144:10 148:25
  149:1 153:11
  154:17 258:21
  259:1
skyrocketed
  260:21
slang  88:9
sleepy  147:22
  147:23
slept  94:24
slide  161:14
slight  219:17
  269:24
slow  29:19
slowed  222:16
slower  266:1
small  25:16
  26:13 29:17
  123:5,6 179:8
  206:16 213:11
  215:2,3 270:9
smarter  145:11
smell  71:1
  72:22
smells  74:13
smoke  72:11
  74:22

smoking  181:9
smuggle  58:25
  120:10 122:6
  123:13 124:12
  140:22,23
smuggled  48:3
  69:15 73:25
  123:7 124:8
smuggler  82:4
  82:7,18 85:17
  120:22 121:1
  141:12
smugglers
  23:16 26:20
  28:12 29:21
  48:7 82:15
  84:16 122:12
  131:16 138:8
  141:8,12 253:4
smuggling
  26:12 47:13
  49:7,15 50:12
  50:20 58:15,16
  58:17,21,21,24
  59:2,20,20,25
  59:25 60:8
  64:15,15,16
  116:1 120:25
  122:24 123:2
  124:9,19,20,21
  124:23,24
  125:3,3,7,7,13
  127:6,25
  128:25 129:8

129:12,12,14
  139:1 146:24
  147:1,16
  199:16
snapchat
  109:13,13
sobriety  40:20
social  109:1,11
  113:12 115:8
  129:16
softer  259:10
sold  21:11 22:1
  22:2 26:9
soledad  2:20
solely  229:15
solid  226:13
solutions
  275:23 276:23
somebody
  49:16,16 55:21
  106:14 110:11
  112:15 133:12
  145:21 179:6
  184:8
someone's  35:5
  132:9,17
sony  40:7
soon  59:3,9
  62:2
sorry  17:5
  19:16 38:9
  65:18 75:18
  98:11 103:20
  103:21 111:3

**[sorry - standard]** Page 68

119:7,7,24
129:3 143:5,12
143:22 159:2,5
159:12 164:5,5
174:23 185:15
188:25 197:2
215:13 216:17
222:25 223:2
230:16 231:2
235:25 254:9
263:12 268:10
**sort** 113:12
**sorts** 213:10
**sound** 91:8
**sounds** 7:15
27:6,15 252:20
**source** 118:1
122:8 237:2,4
237:5,13,17,22
237:25 238:2
**sources** 155:16
237:11
**south** 24:6 50:9
59:25 60:6
122:8 124:23
125:2,6 126:20
127:23,25
128:5,15
139:11 182:11
183:9 239:9
242:18,22
243:23
**space** 59:15
256:10

**speak** 115:13
164:18
**speaking**
164:17 240:13
253:22
**special** 30:10
38:22
**specialist** 14:8
**specialized**
38:17,25 54:23
199:20,25
200:15
**specialty** 15:2
157:3
**specific** 7:24
17:23 35:23,25
88:25 125:9
198:25 201:14
203:15 243:3
268:17
**specifically**
147:10 161:20
165:12 194:14
199:10 238:14
**specs** 75:10
**speculate** 75:18
75:20 76:10
99:23 152:12
168:14 270:19
272:2
**speculating**
95:12 102:19
169:24

**speculation**
103:9 104:5
170:24 171:18
171:22 196:12
224:19 225:3
232:21 243:15
271:10
**speech** 56:13
74:24 79:24
80:25 247:6,23
253:2 255:3
260:9
**speed** 212:13
212:20 214:11
215:5 221:24
222:17 236:5,7
236:18 265:23
266:2,9,12,23
**speeding**
216:10 235:19
235:19,20
236:14,24
265:10,11,25
266:4 267:1,16
**speedometer**
214:11
**spell** 94:20
**spelling** 94:17
94:19
**spend** 94:3
162:3
**spending** 252:9
**spent** 24:14
63:13 93:18

94:21
**spills** 72:20
**spinach** 76:4
**spoke** 69:18
183:14
**spoken** 115:7
**sponge** 62:22
**sponsoring**
62:21
**spot** 152:23
196:16
**spotting** 262:14
**springs** 108:3,6
108:12 117:25
118:4 129:19
168:24 184:8
239:8 240:25
241:2 243:2
244:5,18
**square** 71:11
71:11
**staff** 206:3,3
**stages** 25:11
**stan** 246:10,13
246:15,22
248:24 249:25
250:1 251:19
**standard** 40:17
97:1,11,13,16
97:19 99:2
100:5,24 101:8
102:23 103:1,3
104:2,12,23
105:16 151:20

**[standard - stopped]**                                    Page 69

172:13 190:23
191:1,10,17
193:25
**standards**
192:1,6,6,16
**standing** 196:4
196:6
**stapler** 10:3,4
**start** 6:12 14:6
14:14 18:14
22:16 61:21
62:24 75:23
92:4,5 104:11
135:8,9 136:2
143:7 203:16
236:2 251:23
**started** 13:24
22:19 25:21,22
26:21 27:19
43:25 223:15
**starting** 135:6
222:6
**starts** 101:25
122:3 135:7
137:14 144:12
149:12 182:3
199:24 207:15
221:14 229:8
263:10
**stash** 138:4
**stashed** 138:14
**state** 1:20 4:12
6:25 23:11
60:19 71:20

89:1 203:11
274:15
**stated** 1:24
173:10,23
270:22 271:20
**statement**
179:19 252:15
262:18 263:3
**states** 1:1 23:23
48:5,6,17
50:13 60:9
122:9 127:16
144:17 145:1
149:13,18,19
156:6 157:15
158:10,16,23
160:24 161:18
274:1
**station** 77:8
**statistics** 55:24
126:17
**statutes** 155:13
**stay** 64:16
95:24
**stayed** 59:10
118:20 140:12
147:24 168:22
**staying** 65:9
129:19 137:24
139:12
**step** 37:18
108:16 128:13
266:4

**stephen** 2:14
4:22 6:25
21:16 32:8
250:16 274:22
276:1
**steps** 185:11
**steve** 3:15
**sticker** 9:12,24
10:11
**sticks** 35:22
105:5
**stint** 24:9
**stipulations** 5:6
**stolen** 19:20
45:13 63:4
**stop** 26:2,8
40:14 45:6,9
45:15 46:12
47:13 49:8
50:20 51:13
56:11 57:7,11
59:3 64:15
67:24,24 70:10
75:13 82:9
84:4 85:3,3
89:6 96:5,9,20
97:8 101:2,3,3
102:5,9,10
104:1,15,16
105:2,14,17,17
105:18,19,20
105:22,23
106:3,7,7,15,15
107:16,24

108:9,14 109:6
109:10 112:16
113:25 114:22
114:23 120:17
122:20 124:11
125:17,19,21
125:23 128:7
130:25 134:9
141:14 142:10
144:18 146:15
146:16 147:16
148:20,24
149:18,20
150:4,7,15,17
150:18 151:15
166:3,7 167:24
168:6 170:15
172:12 173:25
174:19,22,25
188:2,14,14
191:15,16
192:25 193:3,3
193:7 194:7,10
202:25 204:4
239:5 240:9,16
241:17 243:10
243:12 245:13
245:16,23
247:1 248:16
266:22,23,24
271:15
**stopped** 28:17
45:16 49:2,9
57:3 59:5

[stopped - summarize]                                    Page 70

81:13 84:13
101:7,15
124:10 131:1
133:17 140:2
145:21 236:10
248:20,21
**stopping**  26:25
28:16 47:4
54:6 56:5
104:23 105:1
114:8 121:14
121:15 168:19
266:25 267:1
**stops**  27:16
29:11,14 30:11
30:24,25 31:3
31:6 44:25
47:17 49:3
51:2,3 52:14
53:22 54:7,10
54:16 55:10,11
56:23,25 61:19
68:23 73:20
80:2 85:22
105:3 127:16
130:24 147:5
147:17,20
166:3,7,9,14,16
167:2,11,19
174:1 194:9
202:24 203:24
262:1
**storage**  209:19

**store**  33:4 76:3
210:10 211:24
**stored**  33:14
**stores**  212:1
**story**  55:19
**straight**  38:21
86:13 114:21
143:6 270:1
**straightens**
270:1
**strategies**
191:23
**street**  2:20 25:1
206:16,24
207:1,4,4
275:23
**stress**  80:11,11
260:24 261:3
261:18,21
262:23,24
264:22,23
**stressful**  247:9
**stressing**
261:18
**stretch**  248:23
248:23
**stretches**  64:14
**stretching**
134:13 248:15
260:6
**stripe**  226:12
226:13 232:4
**striping**  222:9
229:9,13

**strips**  227:15
227:22,25
228:4,9
**strokes**  247:15
**strong**  213:8
**structured**  80:1
**stuff**  13:21
20:24 34:19
58:2 68:21
73:7 79:22
81:6 100:7
112:13,24
119:8 252:22
252:23
**stupid**  55:19
**styled**  1:18
**subcategories**
155:10
**subconscious**
33:8,12,14,16
247:8,12 249:8
**subconsciously**
65:25
**subject**  14:7
84:14 136:4
198:5 256:11
262:23 272:24
272:25
**subject's**
252:11 256:3
256:10
**subjective**
75:12 99:17
110:18,21

115:11 147:25
147:25 148:4
195:9
**submit**  206:3
**submitted**
207:6
**subpoenaed**
15:14,15,17,17
17:7
**subscribed**
278:14
**subsequent**
69:5
**substance**
72:22 74:17
95:21
**suburban**
122:22
**success**  45:25
46:1,3 47:4
54:12
**successful**  46:5
46:11 62:17
252:24 253:7
253:13
**suit**  83:2,16
84:9 85:6
**suite**  2:5,10,15
2:21
**summaries**
156:14,22
**summarize**
136:10 172:4

**[summarizing - systems]** Page 71

| | | | |
|---|---|---|---|
| **summarizing** 225:18 | **sure** 6:19 9:2 9:22 10:18 | 170:2 173:6,14 178:5,12 | **suspension** 124:14 |
| **summary** 31:19 49:20 62:12 161:8 169:19 170:7,10 173:22 230:7 245:4,5 | 11:5,19,21 12:17 15:6 18:18 19:17 27:25 28:7,8 31:11,23 34:12 35:17,19 36:4 36:22 37:2 | 180:15 183:16 184:20 187:8 190:1 193:21 194:2 195:8,11 196:2 200:16 201:13 209:21 210:19,25 | **suspicion** 81:20 82:1 83:6 85:7 114:2 128:10 129:22 131:20 144:18 145:15 146:7,11 147:5 147:19 148:10 |
| **super** 25:8 85:16 86:23 133:6 224:2 | 39:9 41:13,16 42:19 47:2,23 47:25 53:18 | 212:22 213:22 215:16 221:3,7 222:8,14 223:3 | 148:16 149:21 150:16 168:9 168:13 169:6 |
| **supervised** 53:8,22 181:24 | 57:21 60:7 61:3 83:19 | 228:12 232:10 234:25 235:9 | **suspicions** 151:4 |
| **supervising** 25:1 54:11 60:12 | 87:9 88:6,6 93:8,11 94:20 94:23 95:20 | 235:18 236:21 238:12,12,17 242:4,15,24 | **suspicious** 109:20 110:15 110:16,17 |
| **supervisor** 24:15 56:24 66:9 204:16,17 205:22 206:8 244:13,16,19 | 99:9,25 102:18 103:16,18 104:10 105:6 109:8,10 110:3 110:15 111:21 | 243:16 250:11 250:24 251:9 255:5 256:2 257:19 259:17 260:18 265:6 | 111:7 119:14 119:21,22 121:3,6 123:16 123:19 138:22 |
| **supervisors** 68:12 256:7 | 112:25 114:9 115:9,10,10 | 270:13,16 271:13 273:2 | **suv** 59:5 268:2 **swerved** 221:22 |
| **supplement** 13:16 | 117:7 121:18 123:9 124:22 | **surprised** 17:12 | **sworn** 1:18 4:2 153:14 274:18 278:14 |
| **support** 16:5 | 126:25 128:19 134:21 139:9 | **surprisingly** 17:8 | **syllabus** 129:9 |
| **supported** 225:7 | 141:17 142:8 142:20 143:21 | **surveillance** 52:13 53:13,14 66:22,22,24 | **symmetrical** 226:6 |
| **supports** 63:23 63:23 | 144:8 152:1,14 158:12 159:1 | **susceptible** 37:23 82:25 | **system** 43:8 68:4,5 98:12 102:2,3 214:17 |
| **supposed** 129:24 143:11 | 161:17 166:5 166:23 169:22 | | **systems** 3:14 209:10,19 |
| **supreme** 146:10 149:19 | | | |

| | | | |
|---|---|---|---|
| 211:2 214:19 | 246:2 248:20 | 243:16 248:18 | **tax** 93:13 |
| **t** | 259:24 265:2 | 253:9 261:9 | **tcole** 199:25 |
| **t** 4:13 277:3,3 | **takeaways** | **talking** 37:1 | 200:11,13 |
| **tabc** 26:10 | 247:16,17,23 | 43:3 50:18 | 201:19,24 |
| **tactical** 253:23 | **taken** 1:18 8:14 | 60:12 64:21 | 206:2,4 207:7 |
| **tactics** 47:3,12 | 39:24 40:1 | 69:21 77:5 | 207:10 |
| 47:14 50:19 | 108:21 164:4 | 115:5 118:19 | **teach** 43:14 |
| 204:1 255:18 | 186:24 199:18 | 121:16 125:15 | 44:6 77:20 |
| **tags** 45:23 | 201:10 202:6,7 | 127:3 129:15 | 146:3 204:15 |
| **tahoe** 29:20 | 206:5 241:3 | 132:14 135:3 | 250:21 |
| 59:13 | 246:16,23 | 136:2 141:17 | **teaching** 44:2 |
| **take** 5:17,21 | 250:18 275:15 | 141:19 158:8 | 203:25 204:5 |
| 7:8,14 8:1,1 | **takes** 132:4 | 165:16 172:16 | 205:8 213:1 |
| 11:16 20:25 | 192:13 231:9 | 172:21 174:2 | **teachings** |
| 31:17 42:9 | **talk** 35:15 | 183:18 184:14 | 202:17 |
| 49:13 57:14 | 44:19 47:20 | 203:1 209:2 | **team** 4:15 |
| 63:3,17,18,20 | 56:15 65:10 | 244:18 247:7 | **tear** 84:3 |
| 71:5 72:9 | 79:22 118:24 | 249:1 | **techniques** |
| 77:18,22 84:20 | 118:25 140:17 | **talks** 139:23,24 | 56:14 252:22 |
| 91:24 95:6 | 149:4 153:6 | **tandem** 242:21 | **technology** |
| 110:3,13 | 196:22 202:19 | 243:22 | 215:10,15,17 |
| 127:11 128:13 | 202:24 203:4 | **tanks** 140:24 | 215:18 |
| 130:12 137:11 | 212:22 237:1 | **tapes** 40:8 | **telephone** |
| 142:14 145:19 | 246:10 | **target** 52:2 | 174:11 208:9 |
| 156:24 159:1 | **talked** 46:17,25 | 214:13 | 212:17 222:15 |
| 161:25,25 | 57:19 58:14 | **task** 23:9,11,20 | 222:18 231:3,6 |
| 162:6,8 179:10 | 79:7 117:3,10 | 23:22,25 27:24 | 231:7 232:14 |
| 179:13 180:1,6 | 132:20 146:18 | 28:1,4,16,21,24 | 239:16 244:12 |
| 181:15 191:15 | 147:22,22 | 29:10 89:1 | **telephones** |
| 192:24 201:2 | 150:5 167:23 | 193:16 | 106:24 212:18 |
| 201:11 204:6 | 172:19 173:11 | **taught** 91:7 | 213:10 |
| 204:22,24 | 185:10 193:1 | 204:13 258:15 | **tell** 50:22 52:19 |
| 205:13 206:6 | 202:16 228:12 | 258:15 | 54:18 58:15 |
| | 233:20 243:16 | | 68:13 70:21,23 |

| | | | |
|---|---|---|---|
| 70:24 72:6 | **term** 57:21 | **testifying** 5:18 | 243:23 274:1,9 |
| 74:25 75:1 | 69:4 72:16 | 15:24 178:18 | 274:16 275:22 |
| 77:19 82:14 | 87:18,18,21 | 209:25 220:1 | 275:24 |
| 93:20 95:11 | 88:4 104:4 | **testimony** 8:6,9 | **text** 112:9 |
| 123:10 125:9 | 105:23 150:1 | 14:8 151:23 | 115:2 165:9,12 |
| 125:16 130:12 | 168:6 237:25 | 152:16 198:2 | 165:13,17,20 |
| 136:11 141:3 | 238:1 | 216:25 217:9 | 165:22,23 |
| 143:4 150:5 | **terminologies** | 218:23 224:10 | 184:13 239:19 |
| 173:4 185:21 | 60:25 | 225:5 230:6,20 | 252:6 |
| 192:5 207:2 | **terminology** | 233:23 235:11 | **texting** 183:7 |
| 209:6 214:6 | 81:18 172:21 | 236:22 241:16 | 233:17 242:17 |
| 216:17 219:24 | 196:24 224:25 | 267:20 270:21 | **thank** 25:6 29:8 |
| 221:9 244:25 | **terms** 31:14 | 271:6 274:19 | 76:12 90:19 |
| 245:1,15 252:2 | 132:9 197:1 | 276:9,17 278:8 | 150:23 192:21 |
| 253:4 257:13 | 235:10 269:10 | **testing** 13:13 | 207:12 210:18 |
| 265:3 | **terry** 156:5 | 154:15 | 246:7 273:10 |
| **telling** 132:6 | **test** 40:20 71:5 | **texas** 1:1,9,20 | **thanks** 92:10 |
| 133:2 134:10 | 71:6,8,13,23,24 | 1:22 2:5,16,19 | **theft** 45:16,19 |
| 136:24 | 72:1,15 73:2 | 2:21 25:10,16 | 45:22 |
| **tells** 131:15 | 179:11,14 | 26:19 29:4 | **thing** 7:12 8:2 |
| 133:1 205:2 | 180:12 181:15 | 33:21,21 71:22 | 10:1 21:11 |
| 249:15 255:4 | **testified** 4:2 | 85:5 89:19 | 25:17 37:11 |
| **temperature** | 15:7,9 16:15 | 91:2 122:8 | 43:16 45:10 |
| 256:7 | 16:17,24 17:9 | 124:23 125:2,6 | 54:22 60:10 |
| **ten** 29:6,7 53:4 | 18:5 91:16 | 127:23,25 | 69:24 70:12 |
| 58:20 94:6 | 179:22 218:15 | 128:5,15 | 77:24 78:18 |
| 95:14 125:18 | **testify** 8:12 | 137:18 138:4 | 84:7,10,15 |
| 125:18 126:3,5 | 12:2,5 15:21 | 138:13 139:12 | 85:19 99:25 |
| 126:6,6,8 | 16:9 17:21 | 139:19 141:20 | 109:23 111:11 |
| 133:15 150:19 | 170:23 176:16 | 155:13,19,20 | 118:14 123:5 |
| 208:20 211:20 | 177:25 196:18 | 180:17,21 | 133:9 147:23 |
| **tend** 76:16 | 197:13 198:18 | 182:11 183:9 | 151:19 156:25 |
| **tense** 135:6 | 219:2 230:21 | 216:1 239:7,9 | 186:1 196:16 |
| | | 242:18,22 | 204:25 235:21 |

| | | | |
|---|---|---|---|
| 236:4 242:11 | 183:24 184:3 | 152:23 158:18 | 168:15,16 |
| 248:10,11 | 191:23 192:17 | 158:19,19 | 173:8 186:17 |
| 249:9,16 260:4 | 194:12 195:5,7 | 161:12 165:21 | 210:19,20 |
| 265:17,18 | 200:14 202:18 | 168:5 169:8 | 258:9 |
| **things** 6:1 | 203:19 204:15 | 171:8 175:1 | **thoughts** |
| 12:11,14,15 | 232:24 242:6 | 178:6 181:5 | 100:11 |
| 22:9 37:16 | 242:14 243:8 | 182:19 185:8 | **thousands** 22:6 |
| 39:13 45:4 | 243:11,12,17 | 185:22 190:19 | 126:11 236:10 |
| 46:18 47:13 | 245:11,18 | 191:7,12 201:1 | **threatening** |
| 52:15 54:1,14 | 247:6 249:12 | 202:22 203:1 | 86:11 |
| 56:13 65:24 | 249:13,15,18 | 204:11 207:6 | **three** 34:22 |
| 69:17,24 70:17 | 249:19 256:16 | 214:16 216:23 | 61:20 63:24 |
| 70:20 74:13 | 260:5 261:7 | 223:1 230:2 | 93:23 116:13 |
| 75:22 77:22 | 264:17 265:13 | 233:15 236:16 | 142:14,22 |
| 79:19 80:24 | 267:11,18 | 242:1 244:3,7 | 148:19 160:8 |
| 84:12,17 87:7 | 268:14 269:4 | 249:9 255:20 | 178:20 201:1 |
| 93:25 98:25 | **think** 17:17 | 263:5 265:2 | 212:8 220:16 |
| 104:21 105:15 | 32:19 36:5 | 268:21,24 | 221:14 224:3 |
| 107:23 108:7 | 38:4 41:23 | 269:15,16 | 235:11 242:19 |
| 113:6 117:19 | 42:5 53:4 | **thinking** 32:15 | 267:4,8 268:22 |
| 118:19 126:18 | 60:10 64:17 | 54:14 68:20 | 268:24 269:3 |
| 130:19 131:18 | 68:19 75:24 | 80:16 90:21 | **throat** 249:20 |
| 132:11,20 | 79:10 84:7 | 103:7 124:17 | **throckmorton** |
| 133:1,3,23,23 | 87:4 88:10 | 124:19 152:12 | 275:23 |
| 134:5,9,12 | 90:15 91:12 | 168:17,17 | **throw** 184:17 |
| 135:3,14 136:8 | 93:8,16 94:2 | 193:13 248:19 | **ticket** 45:3 |
| 141:18 147:3,6 | 95:25 96:10,13 | 254:20 | 46:14 49:10,12 |
| 148:12,20 | 100:15 104:7 | **thinks** 6:18 | 116:10 118:13 |
| 151:13 152:5 | 105:2 106:17 | 72:3 121:9 | **tickets** 236:12 |
| 155:10 168:16 | 121:3,9,9 | **third** 122:2 | **tightening** |
| 169:7,22,25 | 122:21 123:9 | 137:11 221:14 | 264:5 |
| 170:17,21 | 128:8 133:14 | 225:13 246:10 | **time** 4:9 8:1 |
| 171:19,21 | 139:10 142:18 | **thought** 103:7 | 10:25 12:10 |
| 172:22 175:9 | 143:20 148:17 | 103:21 158:13 | 15:19 16:10,13 |

| | | | |
|---|---|---|---|
| 16:18 18:25 | 229:14 231:24 | 227:24 228:3 | 94:14,15 95:17 |
| 23:18 29:7,17 | 233:3,5 236:20 | 228:25 229:3,8 | 146:3 154:3 |
| 33:24 34:9 | 243:3 244:25 | 229:13,24 | 162:11 188:22 |
| 39:14 41:14 | 246:4 249:11 | 269:20 | 201:23 235:7 |
| 42:15 48:18 | 249:17,20 | **title** 52:14 | **tool** 254:2,3 |
| 55:15 60:3 | 250:17 252:10 | 159:15 160:9 | **toolkit** 51:16 |
| 63:7 64:25 | 257:17 258:5 | 169:10 211:3 | **tools** 51:16 |
| 73:21 78:21 | 260:8,24 262:3 | 262:9 | **top** 14:6 178:10 |
| 82:13 83:1,24 | 267:3 270:4 | **today** 5:9,14,21 | 223:17 226:7 |
| 85:18 87:16 | 272:16 273:7,9 | 7:20 8:6,12 | 258:22 259:16 |
| 92:8,20 94:15 | 276:18 | 12:14 13:15 | **topic** 136:6 |
| 94:16,22 95:17 | **timeframe** 33:5 | 23:5 41:15 | 199:10,11 |
| 106:5 108:5,5 | 96:15 108:5 | 71:14 77:3,24 | 244:6 248:8 |
| 108:6 109:9 | 126:8 241:6,23 | 131:4 161:18 | **topics** 38:16 |
| 112:22 119:16 | 276:8 | 167:17 188:10 | 186:17 |
| 120:21 123:2 | **times** 15:9 18:5 | 195:24 202:16 | **topper** 124:13 |
| 128:20 131:17 | 29:19 30:12 | 215:6 238:23 | 124:13 |
| 132:4 139:1,12 | 32:12 33:15 | 255:15 271:13 | **toppers** 128:22 |
| 140:15 146:7 | 42:24 74:22 | 272:8,12,17 | **total** 235:9 |
| 147:4 148:4 | 106:5 114:18 | **together** 52:15 | 255:11 |
| 149:4 151:11 | 134:15 138:13 | 53:17 184:4 | **totaled** 200:11 |
| 151:14 152:9 | 138:15 157:2 | 189:20 | 201:9 |
| 152:22 156:24 | 200:19 217:18 | **told** 48:17 | **totality** 74:3,8 |
| 159:1 161:2,12 | 218:21 221:2 | 53:11 78:8 | 150:24 171:1 |
| 162:3 173:24 | 224:17 234:8 | 107:20,25 | 181:4 190:25 |
| 175:4 181:22 | 235:11 248:16 | 108:1,2 120:11 | 192:22 193:10 |
| 185:8 189:3,7 | 260:7 | 150:11 176:23 | 244:24 |
| 191:2 193:14 | **timing** 261:6 | 223:13 242:16 | **totally** 110:5 |
| 194:6 195:3,18 | **tint** 49:4,5,8,9 | 242:20 243:21 | **touch** 181:11 |
| 195:19,25 | **tinted** 59:6,8 | 253:10 | **towards** 226:8 |
| 199:5 205:14 | 110:16 | **tone** 260:2 | **towing** 21:8 |
| 208:18,25 | **tire** 228:8,20 | **took** 25:23 | **town** 20:17 |
| 222:10 223:9 | **tires** 45:12 | 26:18 42:7 | 25:16 |
| 228:5,7,10,12 | 222:7 225:2 | 59:12 60:11 | |

| | | | |
|---|---|---|---|
| **toyota** 268:4 | 146:15,16 | **trafficking** | 152:6,8 153:16 |
| **track** 95:12 | 147:17 148:20 | 17:15 26:24 | 154:1 155:23 |
| 154:3 | 149:18,19 | 50:4 142:11 | 156:7 168:10 |
| **tracked** 98:23 | 150:7,15,17,18 | 248:15 | 168:12 171:13 |
| **tracking** | 155:19 166:3,3 | **trailer** 129:6 | 172:14 173:23 |
| 216:22 248:4 | 166:6,7,8,14,15 | **train** 30:15 | 173:25 180:25 |
| **tractor** 129:6 | 167:2,18 | 145:8 203:14 | 184:1 186:23 |
| **trade** 26:14 | 168:19 170:15 | 203:14 | 186:24,25 |
| **traffic** 24:17 | 172:12 173:25 | **trained** 38:5 | 188:3,12 190:8 |
| 27:16 29:11,14 | 174:1,19,22,24 | 135:11 180:1 | 190:24 191:20 |
| 30:11,24,25 | 188:2,14 | 205:24 233:7 | 194:8,11 |
| 31:3,6 40:14 | 191:15,16 | 236:13 | 195:18 198:25 |
| 45:1,6,8 47:17 | 192:25 193:3,7 | **trainer** 43:17 | 199:4,6,12,14 |
| 49:3,3 51:2,3 | 194:7 196:5,7 | 204:10,21 | 199:17,20 |
| 52:14 53:22 | 196:7,8,9 | **training** 3:15 | 200:1,18 201:4 |
| 54:10,15 55:10 | 202:24,25 | 25:21,23 34:20 | 201:10,14,16 |
| 61:19 67:24 | 204:4 225:6,9 | 38:13,15,17,22 | 201:19,23 |
| 70:10 75:13 | 233:9 236:5,8 | 39:1,17 43:24 | 202:5,6,11,12 |
| 80:2 85:3,21 | 236:15 239:5 | 60:21,24 61:1 | 203:5,8,13,17 |
| 86:10 96:5,8 | 240:9 241:17 | 61:12 62:3,19 | 205:10,13,14 |
| 96:20 97:8 | 243:10,12 | 62:20 77:19 | 206:3,3,6,15,16 |
| 101:2,3,7 | 245:13,16 | 78:20,24 79:14 | 206:17,18,24 |
| 104:1,15 | 247:1 264:7 | 79:23 81:3 | 207:1,5,11 |
| 105:14,19 | 265:15,25 | 96:25 101:1 | 208:16 212:15 |
| 106:3,7 107:15 | 266:1,10,11 | 104:25 106:10 | 225:4,7 229:16 |
| 107:24 108:9 | 267:5,8,17 | 111:13,22 | 234:15 241:7 |
| 108:14 109:10 | 270:18 271:1 | 122:5 123:22 | 246:23 250:1,7 |
| 113:25 114:15 | **trafficked** | 125:10,14 | 253:15,19 |
| 114:23 120:2,6 | 127:2 | 129:7,8,13 | 254:22 255:4,7 |
| 122:19 124:11 | **trafficker** | 130:11,23 | 255:13 258:14 |
| 125:17,19,20 | 133:14 141:15 | 131:16 143:1,8 | 261:1 265:12 |
| 125:21,23 | 248:17 | 145:7 146:18 | **trainings** |
| 126:19 128:6 | **traffickers** | 146:23 148:5 | 129:10 150:3 |
| 140:2 144:17 | 253:2 | 148:15 151:1 | 202:17 203:6 |

251:19
**trains** 50:2
51:4
**trance** 36:15
**transcript**
159:25 160:3
274:18 275:7
276:6,19 278:5
278:8
**transcription**
94:13
**transcripts**
162:19
**transparency**
161:12 210:20
**transparency's**
177:6
**transparent**
54:15 177:1
**transpired**
58:19 147:3
176:12 230:19
**transpires**
174:1
**transport**
57:25 144:5
**transportation**
24:4 46:8
49:25 50:7,21
51:1,3,7,12,13
51:15 155:19
216:1
**transporting**
143:10

**transposed**
96:15
**traumatic**
252:20
**travel** 45:19
118:24 119:19
119:23 124:22
130:1,15
168:22 226:19
233:24 269:12
269:21
**traveled** 128:14
217:18 241:20
243:18
**traveling** 55:19
97:3 108:4
118:20 120:8
125:2,6 127:22
127:24 129:18
129:20 132:10
217:5,23
223:23 242:12
242:21 243:22
267:11
**travis** 28:7
91:13,16
**tray** 73:15
**tree** 270:2
**trees** 59:16
**trial** 8:9 12:2,5
91:16 197:14
273:7,9
**trick** 7:23
38:19 39:20

96:6 103:14
**tricky** 159:5
**tried** 234:9
**trigger** 102:8
**triggered**
135:18
**triggers** 102:2
102:3,4
**trips** 240:24
241:19 242:22
243:23
**trooper** 86:12
86:12
**trouble** 118:18
175:12
**truck** 10:25
59:18 84:23
129:18 140:1,4
141:4 146:25
147:6,12,14,14
147:16,18,20
168:19 178:1
181:16 186:7
217:4 219:15
219:16,17,19
220:13 221:18
221:23 222:19
223:8,11,21,22
227:7 228:6
230:25 231:13
232:2,13,20
235:2,3 241:2
241:4 244:11
245:1 253:24

268:19
**trucks** 21:2
122:18 141:1,9
**true** 132:19
143:15 172:7
211:22 274:19
278:8
**truly** 147:1
**trunk** 25:20
**trunks** 25:19
**truth** 132:6,6
134:11
**truthful** 136:8
271:22
**try** 5:25 6:1,11
6:14 7:2 41:14
41:17 55:4
77:1 84:18
86:7,10,17
123:10 133:9
136:4 150:6
156:20 180:7
**trying** 7:23,24
38:19,20,21
39:20,21 51:22
71:19 79:18
81:14,19,21
99:25 100:7,14
103:14 115:22
119:6 126:17
127:1 134:20
161:3 165:20
167:7 173:16
173:17 176:19

**[trying - understand]**                                           Page 78

191:6 192:19
196:3 202:23
203:24 204:1
220:18,21
225:10 230:23
240:21 241:14
261:16
**tsa**  20:25
**tuned**  234:18
**turkey**  113:10
**turn**  101:6
145:20 206:1,2
249:3 268:3
**turnaround**
129:18 138:22
148:8 168:24
240:23 241:19
**turned**  208:25
209:1 240:8
241:17
**turns**  135:13
**twice**  218:24
230:4 234:3
**two**  34:24 35:2
53:2,6,7 56:16
60:17 63:25
85:9 114:4
116:13 123:1,2
136:20,21
140:8,9 141:4
141:5,18,18
142:22 152:5
153:24 160:2,8
161:21 164:2,3

190:19 200:14
212:7 216:6,9
216:12 219:5
221:13 226:5
242:13 253:22
255:11 267:18
268:1,6,14,20
**type**  68:6 94:14
104:6 110:1
120:25 141:9
192:1
**types**  69:15
136:21 209:9
209:12,13,15
209:18,22
255:11
**typical**  51:21
**typically**  36:23
39:17 47:14
48:15 49:2
57:23 59:2
60:5 61:4,14
62:24 71:7,22
72:13,18 75:1
78:4 111:20
112:7 120:4
140:5,14
206:10 211:24
249:5
**typing**  233:4
**typo**  242:24
**typographical**
8:25 96:11

**u**

**u**  45:12 91:13
**u.s.**  149:18
**uh**  6:1 29:9
74:15 121:25
139:16 149:14
173:19 177:4
194:5 221:12
222:25 238:9
267:25
**ultimate**
197:22 198:14
**ultimately**
40:13
**umbrella**
201:15
**unable**  178:14
178:20
**unaware**  137:7
**unbeknownst**
40:22 135:1
**unbelievable**
22:7 34:17
**uncomfortable**
133:11,11
**unconscious**
64:2
**under**  5:13
28:16 38:2
61:13 64:1
114:1,12
142:25 143:7
151:1 160:9

168:18 172:10
172:13 175:9
176:16 188:4,6
190:16 191:11
201:15 247:9
249:9 260:24
261:3
**undercover**
23:21 24:3
29:18 46:19,22
46:23 51:19,20
52:13 53:12
66:21 184:2
213:16,19
**underneath**
193:7
**understand**
5:13,16 6:4,7
7:17 30:16,16
39:21 41:5
46:2 59:22
67:8,9,12
76:24 82:3
86:6 90:15
92:15 100:1
115:18 118:17
144:9,24
146:13 152:7,9
165:19,19
166:5,23
169:19 170:14
173:13,14,17
183:5,6,16,23
189:9 193:12

214:10 216:4
218:23 220:18
220:21 224:20
229:22 240:2,6
245:6,23
246:19,24
247:20 267:7
**understanding**
61:21 117:6
118:18 123:10
136:18 145:2
165:11 169:20
170:17 183:10
197:16 199:5
201:7 235:14
240:3,10
257:13 261:12
267:15,20
**understands**
246:20
**understood**   6:9
16:9,15 18:2
37:7,25 43:20
44:1 51:9 56:7
56:18 61:18
62:7 66:9 67:3
83:16 87:13
110:24 111:2
127:18,21
129:24 142:12
148:25 151:21
152:23 156:13
157:6 161:23
175:11,15

176:15 181:17
198:21,23
204:16 205:11
206:12 209:3
213:22 215:4
224:21,21
225:11 228:7
228:18 233:17
241:13,13
245:4 254:4,9
261:8,8 267:14
270:13,24
273:3
**unfortunately**
145:18
**uniform**   24:18
29:21 204:1
**unique**   23:3
39:11 214:20
**unit**   24:11,13
24:15 29:17
30:13,14,16
52:22,23 53:1
54:4,12,13
60:13 222:17
**united**   1:1
23:23 48:5,6
48:16 60:9
122:9 127:16
144:17,25
149:13,17,19
156:6 157:14
158:10,16,23
160:24 161:18

274:1
**university**
39:23 41:23
**unknown**   125:8
237:15
**unpack**   78:18
**unreasonably**
149:20,25
**unsafe**   223:11
223:20 230:24
232:12
**unusual**   69:2
**usable**   72:8,8
72:13 73:2
**usage**   44:14
**use**   7:3,8 24:20
30:7 31:14
40:11 44:3,17
46:10 47:15
48:6 57:15
67:16,21 69:12
75:4,6 76:25
79:25 82:22
84:1,16,17
91:5,15 94:12
98:13,17
105:23 107:4
108:15 115:23
120:12 122:12
130:24 141:12
150:1 156:4
193:24 213:2
229:17 236:12
237:6,12,25

239:16,25
255:7,17,18
260:25 261:2
267:18
**useable**   179:2
**used**   14:21
34:15 35:19
38:6 40:10
59:24 82:24
87:19 88:4,7
89:4 109:14
120:10,14
122:6 123:13
124:12 135:15
141:8 146:25
147:15 156:7
168:5 171:9
189:8 193:22
210:7 214:3
215:12 225:21
227:5 270:14
276:19
**user**   26:14
**uses**   39:14
140:21
**using**   40:12
106:24 109:25
127:5 165:22
202:24 237:9
238:1 252:24
255:12,13
**usual**   5:6
**usually**   6:16
16:10

**[utilize - video]** Page 80

| | | | |
|---|---|---|---|
| **utilize** 33:22 | **vegas** 37:13 | 234:23 235:1 | **versus** 55:10,10 |
| 79:24 | **vehicle** 57:22 | 235:13 236:14 | 73:11 134:19 |
| **utilized** 50:4 | 58:13 59:5,10 | 236:14 242:11 | 144:17,25 |
| 239:5 | 59:15 67:25 | 242:21 243:23 | 149:13,17 |
| **utilizing** 239:19 | 68:25 80:21 | 245:3 248:16 | 156:5,6 157:15 |
| 243:3 253:2 | 81:9 83:3 | 254:15 264:15 | 158:10,17,23 |
| **v** | 84:18 85:18 | 268:4,17,22 | 160:24 161:18 |
| | 101:16,18,19 | 269:3,5,11,23 | 209:19 |
| **v** 1:4 274:4 | 101:22 105:24 | 270:3,17,17,22 | **vet** 205:6 |
| 276:4 277:1 | 105:25 107:18 | 270:25 271:7 | **vetted** 112:7,22 |
| 278:1 | 107:19 108:1,3 | 271:19 | 115:5 204:21 |
| **va** 2:10 | 108:18 109:6 | **vehicles** 20:25 | **vice** 6:13 |
| **valid** 168:19 | 109:21 110:16 | 73:24 101:20 | **victim** 32:12 |
| **valium** 69:17 | 110:17 111:7 | 122:12,15,16 | **video** 24:20 |
| 70:1,2,7,17 | 114:7 118:3 | 123:1,16 | 34:14 39:22,23 |
| **valley** 48:15 | 119:14 120:12 | 128:22 140:21 | 40:2,6,12,15 |
| 118:4 128:21 | 121:1,14,15 | 140:22 235:5,6 | 41:7,18 42:13 |
| 131:6 138:9,18 | 123:4 124:11 | **veins** 135:8 | 42:18,18,21,23 |
| 140:16 148:9 | 124:15 131:21 | **venting** 110:12 | 42:25 43:3,4,8 |
| **value** 92:19 | 138:17 139:7 | **venture** 126:13 | 43:12,13,25 |
| **van** 45:21 | 141:11,14 | **verbal** 5:23 | 44:2,7,9,11 |
| 84:20,20,25 | 144:19 149:22 | 184:21 258:22 | 59:17 65:16,18 |
| **vans** 45:12 | 163:8 178:19 | **verbally** 223:24 | 65:18,21,22 |
| 122:19 | 179:22 181:9 | **verbatim** | 66:11 99:22 |
| **variance** | 183:10,14,21 | 156:21 | 105:7,8,10 |
| 224:16 | 183:22 209:1 | **verify** 115:2 | 123:24,25 |
| **variances** | 217:22,23 | 117:4 276:9 | 124:1,2,4,5 |
| 271:12 | 219:14,23,24 | **veritext** 275:23 | 128:24 129:5 |
| **varied** 29:24 | 221:17 224:7 | 276:14,23 | 146:24 151:24 |
| **various** 65:11 | 224:23 230:12 | **veritext.com.** | 151:25 158:2,3 |
| 71:9 | 230:13,14,16 | 276:15 | 158:5 160:25 |
| **veered** 219:18 | 231:4,16 | **versa** 6:13 | 161:14 163:8 |
| 219:19 | 232:10 234:3 | **version** 9:9,16 | 163:17 164:10 |
| | 234:12,17,18 | 9:25 10:16 | 164:12 169:14 |

**[video - want]**                                                            Page 81

174:8 176:4,7
177:7,7,8,14,16
177:22 184:6
186:7,10
207:15,19
208:4,5,6,18,22
208:23,24,25
209:16 211:4,9
211:15,16
212:6,7,15,16
212:17,24,25
212:25 213:10
213:14,24
214:25 216:24
217:9 218:7,8
219:13 220:2,3
221:4 222:9,22
223:1,2,21,25
224:4,10,12,13
225:5,7 226:3
226:4 227:12
227:23 229:6
229:14,17,18
232:16 234:8
235:22,23
236:1,3,7
245:12 260:13
260:15,16,18
260:25 261:1
269:22 270:4
271:23
**videos** 34:15,15
40:4 41:12
43:24,24,24

89:14 99:21
106:12 107:21
162:24 163:2
164:3,14,15
167:18 172:1,5
185:23 186:2,5
186:6,7 187:18
187:23 189:12
208:17 212:10
213:11
**videotape** 41:2
66:3 146:20
271:18
**videotaped**
34:13,16
**videotapes**
39:13 41:4
167:11
**view** 90:12
100:25 188:9
192:2 195:22
195:23 203:19
213:9 214:19
220:2 240:6
258:18 268:13
**viewed** 163:2
188:8 189:8
196:1 203:10
270:5
**violate** 188:20
**violated** 41:1
188:16 190:4
**violation** 45:1
49:3 51:14,14

59:7 86:1,10
106:3 114:15
114:23 134:3
140:2 147:17
168:19 222:1
225:6,9 234:13
270:18 271:1
271:20,22
**violations**
155:20 233:10
266:18 267:5,8
**visible** 264:2
**visit** 217:15,24
**visits** 154:13
**visual** 154:4
**visually** 33:16
**voice** 259:2,6
259:15,24
260:6,19 261:2
261:10,22,25
**volume** 164:4,4
259:9

| **w** |
| --- |

**w** 2:17 276:2
**waco** 120:9,15
120:19
**wait** 150:12
**waiving** 5:7
**walk** 32:15
86:14 145:23
185:8,11
210:21 216:3

**walked** 32:22
59:3,9
**walking** 32:17
106:19
**walks** 137:5
**wall** 108:19,21
109:1
**walmart** 48:19
**walters** 3:15
246:11,13,15
246:22 247:16
247:17 248:24
249:25 250:1,3
250:24 251:19
253:19 255:24
259:14,20
**wandering**
256:24
**want** 5:9 7:25
9:1,6 14:6
18:16 31:9,17
34:6 36:14,14
36:18 37:6,12
37:18,23 40:11
46:21 47:9,11
57:14 60:13
63:2,3,6,7
65:10 67:16,18
75:19 79:1,21
79:21 80:5,6,6
80:8,8 82:3
86:25 88:1,1
91:25 95:21
98:14 100:10

101:21 102:21
104:7 110:3
114:12 115:12
120:14 127:21
136:5 137:10
138:16 139:6
140:18 142:14
142:21 144:8
144:15 147:18
149:4 150:20
157:11 159:11
162:6 167:9,9
168:14 173:20
174:3 178:9
182:24 183:1
192:11 198:24
199:12 200:16
202:13 204:24
205:4 232:10
237:1 240:5
246:2,9 247:20
249:2,8 251:15
267:7
**wanted**  11:6
12:19 13:13
30:18 34:6
56:17 59:14
61:25 62:9
69:22,25 96:22
177:1 186:22
187:15,18
**wanting**  110:10
**wants**  37:20

**warning**
145:23 264:9
**warrant**  30:8
180:5
**warrants**  69:23
73:14 110:13
180:4
**waste**  71:25
**wasting**  146:7
**watch**  37:11,14
66:3,25 116:11
118:12 165:25
166:2 169:14
174:11 253:17
255:18 260:12
**watched**  34:15
34:21 35:4
59:17 99:22,22
107:21 123:24
123:25 161:13
181:22 186:2,5
186:6,10
187:18 189:12
213:13 234:8
**watching**  61:7
109:1 117:24
118:2,10,15
184:5 205:24
208:17 256:5
**water**  32:16,17
**wave**  192:12
**way**  30:18
32:21 44:8
50:17 51:12

52:4,7,9 55:6
62:6 75:12
78:5 81:4 83:3
85:2,12 90:12
91:14 94:2
98:20,23
104:10 105:19
107:25 116:10
122:17 132:25
133:25 134:25
145:24 152:4
169:13,18
171:17 173:21
188:8,19 189:7
192:6 196:22
197:1,20
198:16 203:19
204:8 205:22
227:9,22
231:23 247:25
248:12 258:18
259:25 261:20
265:23 269:16
272:5
**ways**  50:20
51:6 161:21
**we've**  68:14
100:9 227:18
247:7
**weakest**  46:7,8
51:8
**weapons**  78:11
168:21

**wearing**  24:18
83:2 117:12
118:21
**weather**  135:3
**weaving**  114:7
266:19
**webcast**  202:7
207:6
**website**  157:20
157:23 158:1
161:13 187:20
**weed**  51:24
74:22
**week**  94:22
95:1,5
**weighed**  34:22
72:12 189:20
189:23
**weight**  72:11
72:13 139:4
**weirdest**  21:11
**went**  21:13,21
24:11,23,25
27:21 33:8,20
34:4 61:24
62:1 64:2,2
99:19 148:8
186:4 191:12
219:19 228:17
240:25 260:20
261:11
**westbound**
242:13

**[western - wrap]**                                                    Page 83

| | | | |
|---|---|---|---|
| **western**  1:1 | **window**  49:4,5 | **woods**  256:24 | **worker**  140:13 |
| 274:1 | 49:7,9 110:16 | **word**  46:20 | 140:19 |
| **westlaw**  157:12 | 268:9,11,13 | 47:4 59:24 | **working**  14:11 |
| 157:13 158:14 | **windows**  59:6,8 | 76:15 77:1 | 14:14 23:2 |
| 158:15 | **windshield** | 108:15 171:8 | 24:25 25:15 |
| **whatsapp** | 226:7 | 172:20,25 | 59:4 63:13 |
| 146:21 148:7 | **wire**  52:14 | 173:1 193:22 | 88:25 89:1,3 |
| 239:6,14,15,17 | **wise**  248:7 | 193:24 213:8 | 94:22 107:5 |
| 239:19,22,25 | **wish**  127:8 | 213:20 225:21 | 120:1 141:16 |
| **wheeler**  124:7 | **witness**  1:17 | **words**  88:7 | 142:6 189:2 |
| 219:15 269:25 | 9:20 15:8 20:1 | 237:12 247:25 | **works**  45:24 |
| **wheelers** | 21:18 26:5,7 | **work**  18:24 | 50:19 53:17 |
| 122:17 | 32:13 33:11 | 19:13 23:7,12 | 58:16 80:1 |
| **wheels**  45:12 | 34:2 90:8 91:5 | 23:15 26:20 | 106:23 111:23 |
| **white**  11:1 | 91:12,15,17 | 28:11 29:20 | 116:7 138:12 |
| 21:21 22:1 | 99:15 100:20 | 31:9 37:8 | 140:13 184:4 |
| 217:4 219:6 | 103:6 127:8 | 44:20 51:19 | **workweek**  95:6 |
| 223:10 224:7 | 148:3 164:2 | 52:8,13,15 | 95:19 |
| 224:15 226:12 | 178:23 193:3 | 53:12 54:23 | **world**  26:24 |
| 226:23,24 | 195:2,16 | 79:2 80:14 | 50:12 62:11 |
| 230:5,25 | 196:12 197:19 | 88:5 90:13,13 | 64:13 139:3 |
| 231:13 233:23 | 198:4 211:14 | 93:14 97:15 | 179:7 |
| **whren**  156:6 | 215:8 242:3 | 116:3 117:5 | **worn**  163:12,16 |
| **wild**  35:12 | 268:8 269:8 | 120:4,7 139:10 | 163:17,20 |
| **williamson** | 271:10,17 | 139:20,22 | 165:25 166:2,8 |
| 16:18,21,23 | 272:2,23 273:1 | 140:11 202:18 | 189:13 264:13 |
| 18:19 19:3 | 274:17,20,24 | 253:13 255:10 | 264:19 |
| 22:22 23:2,8 | 276:8,10,12,18 | **worked**  22:22 | **worth**  121:10 |
| 27:22,23 28:9 | **woman**  137:21 | 24:2 26:25 | 121:10 141:25 |
| 98:13 120:4 | 138:1 | 27:15 52:21 | 142:3 212:2 |
| 146:2 | **wonder**  84:10 | 88:16 101:15 | 275:24 |
| **windham**  2:3,8 | **wonders** | 181:23 183:8 | **wow**  34:19 35:9 |
| 4:20,20 | 215:22 | 184:2 227:10 | **wrap**  84:21 |
| | | 234:16 | |

| | | | |
|---|---|---|---|
| **wrapped** 70:12 | **x** | 268:16 | 94:12 |
| **wreck** 73:6 | **x** 2:19 70:17 | **year** 19:1 20:9 | **youtube** 158:5 |
| **wrecker** 20:5,8 | 275:3 | 21:22 25:3 | 177:2,7 |
| 21:8 | **y** | 52:22 56:22 | **z** |
| **wrench** 184:18 | **yeah** 10:15 | 60:15,17 61:14 | **z** 2:9 |
| **wright** 1:20,22 | 14:22 16:13 | 61:20 146:3 | **zero** 60:16,17 |
| 2:14 166:22 | 17:25 18:3 | 204:7 | 62:11 101:25 |
| 274:14 275:22 | 19:17 20:16 | **years** 17:10,25 | **zoom** 2:19 4:23 |
| **write** 45:2 | 22:14 26:7 | 19:7 22:23 | |
| 68:13,14 94:4 | 27:11 31:20 | 24:14,18 39:24 | |
| 94:15 95:17 | 39:4,7,20 | 56:4 57:5 | |
| 159:6 174:17 | 46:24 48:14 | 58:20 59:1 | |
| 174:19 178:19 | 50:2 64:18 | 60:17 61:20 | |
| 236:12 237:7 | 71:15 75:7 | 62:16 63:11,13 | |
| **writing** 12:17 | 76:13 77:11 | 64:1 195:23 | |
| 46:14 66:3,12 | 83:11 93:4,8 | 234:16 246:17 | |
| 68:9 94:22 | 93:15 94:25 | **yelling** 256:11 | |
| 95:2 96:17 | 95:5,7,15 96:7 | **yellow** 141:5 | |
| **written** 9:21 | 100:19 109:3 | 217:2 219:4 | |
| 65:13 67:14 | 109:10 114:17 | 221:21 222:20 | |
| 68:2,10 89:13 | 115:23 116:6 | 224:7 226:13 | |
| 89:14 98:6,8 | 123:9 127:4 | 226:18,19 | |
| 99:3,10,11 | 129:3 130:16 | 227:6,7,13,24 | |
| 100:3 104:2,3 | 132:2,16 133:8 | 228:3,8,21 | |
| **wrong** 22:21 | 137:9 139:14 | 229:24 230:4 | |
| 92:14 123:11 | 139:17 144:2 | 230:11 234:3 | |
| 159:2 175:18 | 147:12 166:6 | **yep** 223:17 | |
| 263:12 | 167:14 172:3 | 227:20 | |
| **wrote** 14:22 | 186:12 199:22 | **yesterday** | |
| 67:5 102:22 | 220:5 221:7 | 14:23 | |
| 104:11 106:21 | 242:8 248:5 | **young** 21:15 | |
| 149:3 151:8 | 251:13 257:7 | 84:5 86:24 | |
| 229:21 | 259:22 265:6 | **youngsters** | |
| | | 22:3 81:5 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.