```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   ALEK SCHOTT,                )
                                 )
 4        Plaintiff,             )
                                 )
 5          v.                   )   Docket No. 5:23-cv-00706-OLG-RBF
                                 )
 6   BEXAR COUNTY, TEXAS,        )   San Antonio, Texas
                                 )   March 5, 2025
 7        Defendant.             )
     _____)
 8
                  TRANSCRIPT OF MOTION HEARING (BY VIDEO)
 9             BEFORE THE HONORABLE RICHARD B. FARRER
                  UNITED STATES MAGISTRATE JUDGE
10
     A P P E A R A N C E S:
11
     FOR THE PLAINTIFF:
12   Christen Mason Hebert
     Institute for Justice
13   816 Congress Ave., Suite 970
     Austin, TX 78701
14
     Joshua A. Windham
15   Institute for Justice
     901 North Glebe Road, Suite 900
16   Arlington, VA 22203

17   FOR DEFENDANTS BEXAR COUNTY, TEXAS, AND MARTIN MOLINA, III:
     Charles Straith Frigerio
18   Hector Xavier Saenz
     Charles A. Frigerio
19   Law Offices of Charles S. Frigerio
     111 Soledad, Suite 465
20   San Antonio, TX 78205

21   FOR DEFENDANT JOEL BABB:
     Stephen B. Barron
22   Wright and Greenhill PC
     4700 Mueller Blvd., Suite 200
23   Austin, TX 78723

24   COURT RECORDER:  Zoom

25   Proceedings reported by electronic sound recording.  Transcript
     produced by computer-aided transcription.
```

```
 1      (1:06 p.m.)
 2          THE COURT:  Good afternoon, everyone.
 3          MS. HEBERT:  -- Your Honor.
 4          THE COURT:  This is Judge Farrer.  I think we're ready
 5  to begin.  Why don't you -- well, here.  Why don't I call the
 6  case.  That's easier.  This is SA:23-CV-00706-OLG, Alek Schott
 7  versus Joel Babb, et al.
 8      Counsel for plaintiff, would you please make your
 9  appearances.
10          MS. HEBERT:  Good afternoon, Your Honor.  Christy
11  Hebert for plaintiff, as well as my colleague, Josh Windham.
12          THE COURT:  Okay.  And for the defense side, who do we
13  have?
14          MR. FRIGERIO:  Charles Frigerio, Charles A. Frigerio,
15  and Hector Saenz for Bexar County and Deputy Molina.
16          THE COURT:  Okay.
17          MR. BARRON:  Judge, Stephen Barron appearing for
18  Deputy Babb.
19          THE COURT:  All right.  Very good.
20      So we have three Rule 702 motions to take up.  It's always
21  a little bit confusing to me who should start here, given that
22  we've got the movant who typically starts, but then, as the
23  clarification in the rules have informed us, the proponent of
24  the evidence has the burden in this kind of posture.
25      So I might just sort of start with a few questions maybe to
```

```
 1   each or both of you, and then based on where that leads us, I
 2   might call on you just to -- just to jump in to present the
 3   meat of your argument.
 4           MS. HEBERT:  Your Honor.
 5           THE COURT:  Yes.
 6           MS. HEBERT:  Before we take up the motions to strike,
 7   there are a couple of housekeeping matters in this case.
 8           THE COURT:  Sure.
 9           MS. HEBERT:  Your Honor might be aware that there are
10   two motions to dismiss pending for Deputy Babb and Deputy
11   Molina, and that might help deal with some of this stuff today.
12   Was wondering if we could take those up potentially first, if
13   Your Honor had questions about those motions.  It's on the
14   docket as number 100 and 103.
15           THE COURT:  Sure.  I don't have tons of questions.
16   But if you just want to address those briefly, why don't you
17   just go ahead and give me your thoughts, Ms. Hebert, and then I
18   can hear any thoughts from the other side, too.
19           MS. HEBERT:  Sure.  And neither of those motions are
20   opposed.  We're just --
21           THE COURT:  Right.
22           MS. HEBERT:  -- moving to dismiss the two individual
23   defendants in this case and exercising, you know, our
24   discretion over what claims to proceed with and not.
25           THE COURT:  Yeah.  So I think you all -- to the extent
```

1  that I would take them up, which would be sort of *pro forma*, I

2  don't -- unless there's -- if I hear something different from

3  counsel for either of the two individual defendants, you all

4  could expect that those would be granted.

5      But probably the more streamlined handling of those would

6  just be to have the district judge pull a reference as to those

7  two motions and just go ahead and grant them, which is

8  something I anticipate doing after, you know, we speak today.

9      So I think we're safe to assume for purposes of today's

10  hearing that those motions will be granted.  Indeed, if they're

11  not and anybody representing either of those defendants needs

12  to be heard on these issues, then I could probably give you an

13  opportunity to be heard.  I would -- I could reset another

14  argument.

15      But I think for just efficiency's sake -- so I appreciate

16  the housekeeping question, actually, now that I think it

17  through, Ms. Hebert, because to the extent there are any

18  arguments that are different or that the individual defendants

19  would want to make, I don't think there's any need to get into

20  them today.  We can just hear the arguments for the defendants

21  who we're -- at this point everybody's sure are still in the

22  case, which would be -- what is that?  Molina and the county;

23  is that right?

24          MR. FRIGERIO:  Just Bexar County, Your Honor, be the

25  only defendant left.

1          THE COURT:  Okay.  So it would just be -- it would

2     just be the *Monell* claims then?

3          MR. FRIGERIO:  Yes.

4          THE COURT:  Okay.  So let's just proceed under that

5     posture today.  And if for some reason there's any kind of a

6     glitch or hiccup in getting those motions to dismiss granted,

7     then I'll give you an opportunity to be heard to the extent

8     that Babb and Molina need to be heard on these motions.

9          And look, if there's -- since they're not formally

10    dismissed, if there's anything that counsel for either of those

11    two defendants really feels like they need to emphasize or

12    stress today, then I won't stop you.  So don't be shy about

13    making your record today.  But I don't think you need to be

14    overly stressed or, you know, bothered about doing that today,

15    if you'd prefer to just have Mr. Frigerio and Mr. Saenz make

16    those arguments.

17         Does that -- does that clarify matters enough for

18    everybody, at least sufficiently to carry on?

19         MR. BARRON:  Yes, Judge.  Stephen Barron for Deputy

20    Babb.  I think that the only issue is that Mr. Frigerio will

21    then be using Deputy Babb's expert, Mr. Haston.  And he'll make

22    the arguments that I made in the motion practice on the

23    expert's behalf today.

24         THE COURT:  Okay.  That's fine.

25         And anything for Molina?

1          MR. FRIGERIO:  No, Your Honor.

2          THE COURT:  Okay.  All right.  And is that all right

3   with you, Ms. Hebert?

4          MS. HEBERT:  To the extent that Mr. Frigerio and

5   Bexar County is stepping into the shoes of designating Haston

6   as their expert, we don't oppose to that.  But we would ask the

7   Court to effectively consider the motion to strike, at least

8   for Haston, as unopposed.  Mr. Frigerio and Bexar County never

9   filed an opposition to the motion to strike and are now seeking

10  to step into the shoes of Deputy Babb.  We would say that that

11  motion is effectively unopposed, but we're still prepared to

12  argue the substance today.

13         THE COURT:  Okay.  Well, appreciate that point.  Let's

14  just take up the substance.  And, again --

15         MR. FRIGERIO:  We did file an advisory, Your Honor,

16  stepping into those shoes.

17         THE COURT:  Yeah.  I think we'll be okay.  Let's just

18  go ahead and take it up on substance today.  And we can -- you

19  know, we can see how it shakes out.

20      I will tell you all that on an initial lead there does seem

21  to be a substantial amount of merit to these motions or

22  certainly at least in part.  But there's also -- and I think

23  it's apropos to a quotation in one of the responses to a

24  decision by Judge Lane in Austin, in which -- in that

25  quotation, in which Judge Lane sort of expressed feelings that

1  are -- that are similar to mine, which are that it's really
2  tough to -- and I'm paraphrasing.  He's much more pithy than I
3  am.  It's really tough to dig into the details, to a, you know,
4  high level of granularity on sort of anticipated expert
5  testimony, when much of the matters discussed would be
6  better -- maybe not better, but more efficiently addressed in a
7  motion in limine or just raised at trial.
8      There's some pretty broad categories of objections here
9  that, you know, may very well be well taken.  I'm just not sure
10  what the best way to address all of this is by order in the
11  posture of a Rule 702 motion.
12      I have more -- and that goes -- that's with -- and look,
13  that's my initial reading, and I'm obviously, as always, open
14  to be convinced otherwise by counsel at the hearing.  But
15  that's my initial reading as to Rodriguez and Haston.  And as
16  to Sheldahl, my concerns are even more significant.  And on
17  that one, you know, the Court is contemplating granting the
18  motion in its entirety.
19      So with all of that, I mean, I don't know what the best way
20  to proceed is.  Did any of you all have strong feelings about
21  who ought to go first or what the most efficient way to handle
22  it would be?  Otherwise, I suppose I'd hand it over to
23  Ms. Hebert.
24          MS. HEBERT:  Your Honor, we're happy to go first and
25  kind of offer a little bit of a broader overview.  And then

1  if -- and address the individual motions following that.  But

2  I'm also prepared at the end to kind of offer a direction on

3  how to proceed.  I understand the points that you're making

4  here about the difficulty of drawing the lines, given the

5  breadth of the testimony.  So we're happy to start.

6          THE COURT:  Okay.  Well, and let's do that.

7      And, I mean, obviously, Mr. Frigerio and Mr. Saenz, to the

8  extent that -- obviously, to the extent that you all disagree

9  with any of these tentative initial conclusions, I'm looking

10  forward to hearing that.

11      I'm also -- you know, what would be helpful, too, is if

12  there are any concessions that you all can make with respect to

13  anticipated testimony from these experts.  If you're not

14  intending to elicit testimony from them about legal conclusions

15  like, you know, what amounted to reasonable suspicion or

16  probable cause or was or wasn't reasonable, for example, then

17  maybe we can just sort of clarify that on the record and move

18  to what it is that you all feel is the most useful permissible

19  testimony that you're going to elicit and use, and maybe we can

20  just kind of join issue on that.

21      So I just thought I would just sum that up for you all so

22  you can be thinking about that while Ms. Hebert and her

23  colleague are going through their points.

24      Okay.  Go ahead, Ms. Hebert.

25          MS. HEBERT:  And, Your Honor, may I share my screen

1  briefly?

2          THE COURT:  Sure.  That's fine.

3          MS. HEBERT:  Okay.  All right.  Is this seeable for

4  you?

5          THE COURT:  Sure is.

6          MS. HEBERT:  Great.

7      So I'm just going to start by briefly refreshing the Court

8  that this is a Fourth Amendment lawsuit.  If the motions to

9  dismiss are granted, we've got a *Monell* claim remaining.  And

10  it concerns a traffic stop.  Deputy Babb was the stopping

11  officer.  He called the canine officer, Deputy Molina, who

12  conducted the sniff, then the dog alerted and then they

13  searched the cars.  And Alek is bringing a claim that

14  Bexar County violated his Fourth Amendment rights.  So that's

15  kind of the context of where we are here.

16      And the bigger picture is that there are three former

17  police officers that Bexar County is seeking to offer as

18  experts in this case.  And those three former police officers

19  are generally looking to opine about the constitutionality of

20  what Bexar County and its officers did.  And that's

21  impermissible testimony.

22      But we're not asking the Court, as the Court already

23  recognized, to strike all three.  We're asking the Court to

24  limit two and cut out the inadmissible portions of their

25  testimony and just exclude one.

1        And for reference, because I know it kind of gets a little
2   confusing with all the different names, each of these experts
3   is being offered to address or bless the conduct and the
4   actions of particular defendants, or former defendants in this
5   case.  So Rodriguez is being offered to talk about
6   Bexar County's customs and policies.  Sheldahl is being offered
7   to talk about the actions of the canine officer, Deputy Molina.
8   And Gary Haston is being offered to talk about the actions of
9   Deputy Babb, the stopping officer.  So that's the kind of broad
10  framework here.
11       And my colleague, Josh, is going to address Kevin
12  Sheldahl's claims -- or Kevin Sheldahl's testimony, and I'm
13  going to talk about Rodriguez and Haston.
14       And just to dive into the Rodriguez issue, it's important
15  for all three of these experts to be curtailed here because
16  what we're dealing with is a jury trial.  And so what's going
17  to happen here is that they're going to trot out three former
18  police officers to bless the actions of these particular
19  defendants and Bexar County.  And that's particularly
20  prejudicial.
21       And so we're asking the Court here at this time to exercise
22  its gatekeeping role so that the parties can better do its
23  motion for summary judgment briefing, which is due immediately
24  following these motions to strike, and then prepare for trial.
25  And that's why it's important that the Court rule now rather

1  than, you know, setting it up for trial at some day in the
2  future.
3      For Rodriguez, we're asking for three things, really,
4  excluding the legal conclusions, which Your Honor kind of
5  already flagged, excluding opinions about customs and practices
6  and excluding opinions about the content of training actually
7  received.
8      Your Honor already flagged the legal conclusion issue.  I
9  just highlighted some of the paragraphs here so that if we
10  needed to talk about them, we could.  Happy to go back to that.
11  But Your Honor has already at least alluded to this fact.
12      And I think the second bullet here is probably the most
13  important.  It's the idea that this expert wants to say there's
14  no evidence of any *Monell* liability.  This language almost
15  tracks word for word what's required for *Monell*, and he's
16  effectively saying that there is no liability for Bexar County.
17      On the opinions about custom and practice, here, Rodriguez
18  is a use of force expert.  He wants to opine about how
19  Bexar County is doing traffic stops in the real world.  He
20  hasn't done a traffic stop since 1993.  He's seen about one per
21  year.  He didn't watch all of the videos of this particular
22  traffic stop, and he has not seen a single other Bexar County
23  traffic stop.
24      He did no interviews.  He didn't look at any performance
25  evaluations.  He admitted that he didn't know about canine

1    deployment or searches and didn't teach about when to extend a

2    stop versus not extend a stop.

3        And so the real question is, like, what did he do here?

4    And by his own admission, for these policies, he did two

5    things.  He looked at the written policies, and he counted up

6    summaries of complaints.  And for 702 purposes, that's not

7    sufficient basis, sufficient data for him to have these

8    sweeping opinions about all of Bexar County's policies and

9    customs with regard to traffic stops.

10        And he expressly admitted that if officers were doing

11    something different in the field than what was in writing, in

12    the written policies, he didn't know about it, and that was

13    kind of outside of his purview.  And that's captured here by

14    this testimony.

15        And then we're also asking Your Honor to exclude any

16    opinions about the content that Deputy Molina and Deputy Babb

17    received in actual training.  He looked at their list of

18    classes, said, yep, that list of classes is accurate.  They're

19    receiving training.

20        He didn't look at any of the content of the training they

21    attended.  He didn't do any review of how officers are being

22    trained in the field.  He just checked the box on the training

23    list.

24        And so we're asking the Court to limit these three

25    inadmissible portions of testimony because they don't satisfy

1   702's requirements.

2        And it's a much narrow perspective on three things that the

3   Court should exclude as inadmissible rather than drawing any

4   kind of line that we should take it up at the bar during a jury

5   trial.

6        I'm happy to pause here, or we can launch into Sheldahl.

7   But it feels like this might be a good time to invite opposing

8   counsel to talk about Rodriguez.

9        THE COURT:  Sure.  Let's do that.

10       MR. FRIGERIO:  Yes, Your Honor.  Charles Frigerio,

11   representing Bexar County.

12       Let me start by saying that, given the fact that the

13   individuals are being dismissed, we're still talking about a

14   constitutional deprivation under the Fourth Amendment, which is

15   at issue in this case.  So we still have the same issues, and

16   they're divided -- we have three different experts.  Commander

17   Rodriguez, who was DPS commander at the Texas Department of

18   Public Safety and taught training for over 30 years, has been

19   our expert.  And as far as the *Daubert* factors are concerned,

20   he is qualified.  The evidence is relevant to the suit, and the

21   evidence is reliable.

22       When we talk about legal conclusions, you know, I've had

23   him as an expert probably over a dozen times in the last 20

24   years.  There isn't a time where I'm going to ask -- I never

25   have asked and typically you don't ask an expert about the law.

 1    You don't do that.  That's why we cited the case of *Neal v.*
 2    *Hempstead*.  In that case it specifically talked about these --
 3    when the other opposing party makes an objection with regard to
 4    legal conclusions, and that the other side, he should not be
 5    allowed to testify because all he is testifying to is legal
 6    conclusions.  And this was, ironically, the opposite side,
 7    where the City of Austin, I believe, was trying to strike an
 8    expert that the plaintiff was attempting to use.
 9        And the Court ultimately allowed the expert to testify
10    because in that opinion he said, you would want an expert --
11    puts in their report that he has based his opinions on the law.
12    For instance, *Graham v. Connor*, you would want an expert to
13    know what *Graham v. Connor* is.  That doesn't mean I'm going to
14    ask Albert Rodriguez what *Graham v. Connor* is.  It's only
15    laying the substantial basis for his conclusions.
16        Albert Rodriguez in this case, his conclusions are to rebut
17    the allegations of plaintiff, that Bexar County has a policy
18    and custom that is executed by conducting illegal traffic stops
19    to circumvent the Fourth Amendment.
20        Albert Rodriguez will say he's looked at the policies and
21    procedures of the Bexar County Sheriff's Department, and on
22    their face they are valid and sound.  They're sound policies.
23    The TCOLE requirements and the schooling that have been taught
24    to both Babb and Molina are within the Texas Commission on Law
25    Enforcement's standards and education and that they are

1  acceptable courses that they both have taken.  Not that they're

2  courses that teach, as the allegations that plaintiff puts

3  forth in the complaint, how to circumvent the Fourth Amendment

4  but, rather, how to comply with the Fourth Amendment.  And

5  that's why Albert Rodriguez' testimony is important.

6       He has a very detailed report.  And he does base his

7  opinions on case law.  That doesn't mean that his opinions

8  are -- it doesn't mean, one, that he's going to be able to

9  testify -- he wouldn't be testifying as to the law.  He's

10 testifying as to acceptable police standards, practices and

11 customs.

12          THE COURT:  "Acceptable" meaning that it's in

13 compliance with -- I mean, is he going to provide an opinion

14 that, I've looked at these policies X, Y and Z, and these

15 comply with the Fourth Amendment?

16          MR. FRIGERIO:  They comply with acceptable standards

17 of care for law enforcement officers.  He would not be expected

18 to talk about what the Fourth Amendment is, but he would be

19 expected to talk about the best practices for law enforcement.

20          MS. HEBERT:  Your Honor, may I respond?

21          THE COURT:  Well, hold on.  Let's let Mr. Frigerio

22 finish, and I'll come back to you.

23       Okay.  Anything else, Mr. Frigerio, with respect to

24 Rodriguez?

25          MR. FRIGERIO:  Not with regard to Rodriguez, Your

1  Honor.

2          THE COURT:  Okay.  All right.  Go ahead, Ms. Hebert.

3          MS. HEBERT:  Sure.  My first point is going to be, the

4  paragraphs 64 through 68 of Rodriguez' report summarize his

5  conclusions, and Your Honor can look through those paragraphs

6  and see that they are peppered with legal conclusions,

7  concluding that the policies and customs are consistent with

8  the Fourth Amendment.

9      So the problem here is not just that Rodriguez is going to

10 say the law that he's basing his analysis off of or his

11 understanding.  It's that he's looking to offer conclusions

12 about the ultimate issues here on *Monell* liability and Fourth

13 Amendment.  So just kind of want to establish that base point.

14     The other point that I want to focus on for Your Honor is

15 that in our motion -- in our written motion we have focused on

16 the affirmative relief of what Rodriguez could be allowed to

17 testify.  And that's completely consistent with what Charles

18 Frigerio, Mr. Frigerio, just outlined.  Rodriguez can testify

19 that the written policies on their face satisfy the state

20 standards or law enforcement standards.  We don't dispute that.

21 He has experience writing policies.  He looked at the written

22 policies here.  And so that makes sense.

23     He can also testify, as Mr. Frigerio just alluded to, the

24 fact that Deputy Molina and Deputy Babb completed

25 state-certified training.  We don't object to that either.  And

1  he can talk about, in theory, what that state-certified

2  training might include.  But he didn't actually look at the

3  courses that Deputy Molina and Deputy Babb took and the

4  non-state-certified courses that they took.

5      So I think we're, relatively speaking, on the same page

6  about what is actually in Rodriguez' wheelhouse.  What's not in

7  his wheelhouse are actual conclusions about how this case

8  should -- the outcome, whether Bexar County's policies and

9  procedures are consistent with the Fourth Amendment or have

10  *Monell* liability, that he did anything to assess how traffic

11  stops are being done in practice in this case, and that he did

12  anything to assess the actual training that Deputy Babb and

13  Deputy Molina received.

14      So I think, relatively speaking, there's not that much

15  daylight, at least on what Mr. Frigerio had just argued.

16          THE COURT:  Okay.  Thank you, counsel.

17      Mr. Frigerio, anything that you want to --

18          MR. FRIGERIO:  I would to -- I would like to add, Your

19  Honor, that, you know, the Court's role at this point, as

20  gatekeeper, is not intended to serve as a replacement for the

21  adversarial system.  So the rejection of expert testimony is

22  exception rather than the rule.

23      Mr. Albert Rodriguez has been accepted and has testified in

24  the Western District of Texas, personally, I know of, the

25  Southern District I personally know of, and the Eastern

1    District, and has been accepted as an expert in the *Daubert*

2    factors, an expert that's qualified.  The evidence is obviously

3    relevant.  We're talking about *Monell* issues and policies and

4    customs.

5         And since he is qualified, we request the Court not to --

6    we're not asking that he's going to testify as to legal

7    conclusions.  We never -- we never have put that forth.  He

8    obviously had to put it in his report.  Otherwise, he wouldn't

9    have any substance.  He wouldn't have a foundation of which to

10   base his opinions on.  We'd ask the Court to deny the motion to

11   strike.

12            THE COURT:  Okay.  Well, Mr. Frigerio, given that

13   Ms. Hebert isn't asking to strike Rodriguez in his entirety

14   and, indeed, she's even explained and summed up sort of what in

15   her view would be the permissible scope of his testimony, do

16   you -- do you disagree with her articulation of that line

17   between what he -- I mean, you're very reasonably conceding

18   that he wouldn't be entitled to testify as to legal

19   conclusions, and she's kind of made an effort at sort of

20   summing that up, how that looks like within the context of this

21   case.

22        Do you -- do you take issue with how she's drawn those

23   lines?

24            MR. FRIGERIO:  Well, I just take issue that, one, do

25   we even have to have this with regard to Mr. Rodriguez because

I think he's ultimately qualified?  And that's what that *Neal*
*v. City of Hempstead* case spoke directly to, that you just
can't object because they put forth legal conclusions in a
record.  They have to have a basis for -- again, you wouldn't
want an expert in a Fourth Amendment case that didn't know what
*Graham v. Connor* was.

They obviously put things in their report to show that they
are -- that they have taught and they are instructors, as
Commander Rodriguez was a commander at the DPS school and has
taught various schools before.  So he obviously knows the case
law.  That doesn't mean that anyone's going to ask him the case
law while he's on the stand.

THE COURT:  Okay.  All right.  I got you.

And let's move on to the canine expert, Sheldahl.  You want
to take that one up, Ms. Hebert?  Or I think you said it was
your colleague who was going to do this one.

MS. HEBERT:  That's right.  Mr. Windham.

MR. WINDHAM:  Hi, Your Honor.  Josh Windham for
plaintiff Alek Schott.

As you know, this case does involve a dog alert on
Mr. Schott's car.  Defendants have hired Kevin Sheldahl as an
expert to endorse that alert, effectively.  Our objection is
not limited.  Unfortunately, we can't, you know, kind of slice
and dice the way that we have with the other two motions.

The issue here is that the opinions in his report just

don't satisfy Rule 702.  And there's two basic reasons for
that.  First of all, the report is largely an exercise in
drawing legal conclusions.  It looks like a legal brief, to be
honest with you.  And, second, the handful of kind of nonlegal
opinions in his report are not reliable.  So we'd ask the Court
strike him entirely.

And I just want to address kind of those two buckets.  So
starting with legal conclusions, again, our point here is it's
pretty simple.  He has six opinions in his report.  All six of
those look like they could be part of the argument section of
the county's summary judgment brief.  He lists a few facts.  He
cites his favorite Supreme Court cases, and then he says the
canine alert was valid under those cases.

And happy to go through all six opinions.  But just a few
kind of choice examples, opinion one, he says the canine sniff
was, quote, appropriate under the collective knowledge
doctrine.

Opinion two, he says, quote, the positive indication by
canine Max provided probable cause necessary to conduct a such.

Opinion five, he says, quote, this canine alert/indication
providing probable cause is supported under *Florida v. Harris*.
And he goes on and on like that.

And I asked him in his deposition if there were any other
opinions he intended to offer in this case.  And he told me,
point blank, no.  I think that's all the Court really needs to

1  know here on this motion.  But if the Court is inclined to kind
2  of go through, with a scalpel, line by line and find some, you
3  know, nonlegal conclusions, there are a couple scattered
4  throughout that I want to address.
5      So for the first category is that he says this canine's
6  deployment records show that he was 90 percent successful at
7  finding drugs.  That's a hard statistic that he's giving in the
8  report.  But it's not just this shaky conclusion he's offering.
9  It's a totally made-up conclusion.  His report does not say
10  which records he reviewed.  I asked him in deposition, and he
11  couldn't remember, although he thought he might -- thought he
12  might have looked at some records that postdated this incident
13  by two years.
14      I asked if he had any notes showing his work because, of
15  course, experts have to have a reliable methodology.  He didn't
16  have any notes.  In fact, he admitted he, quote, just did some
17  rough counting in my head.  That's not a reliable method.  It's
18  not -- it's not any method.
19      And the other category of nonlegal opinion in his report is
20  that he says he watched the canine handler's body camera video
21  and concluded that there was no direction or cue to the dog,
22  which would violate *Florida v. Harris*.  But he doesn't tell us
23  how he got there.  He doesn't define any of his terms.  He
24  doesn't identify any principles or best practices in the
25  industry that handlers should follow.  And he doesn't connect

1  his experience at all to his conclusions.  He's just kind of

2  asking us to take his word for it.  And Rule 702 requires a lot

3  more than that.

4      I think, just to give an example, the Eleventh Circuit's

5  decision in *Rivera v. Ring*, which is a case the defendants cite

6  here, gives a really good example of what proper canine expert

7  testimony looks like.  The Court in that case allowed an expert

8  to testify about whether a dog bite met Florida's canine

9  standards, not state constitutional standards but, you know,

10 police standards, where the expert laid out and summarized

11 those standards in detail in his report.

12     And the problem here is that Sheldahl didn't do anything

13 like that here.  He's just giving us his conclusions on a

14 platter.

15     I do want to make one final point about industry standards

16 because that makes -- defendant's brief makes it sound like

17 that's all he really wants to offer here.  You know, tell the

18 jury about standard practices in the industry, like the *Rivera*

19 case.  The problem is, his report didn't do that.  It cites

20 Supreme Court decisions.  It gives us legal standards.  And he

21 can't give us new opinions at trial or at summary judgment that

22 were not disclosed in his report.  That would violate Rule 26.

23 And we prepared for a deposition based on what his report

24 wrote.

25     So to kind of conclude, Your Honor, because his report

1 consists really almost entirely of legal conclusions and has a

2 few, you know, nonlegal assertions that are unreliable, we'd

3 ask the Court to strike it in its entirety and exclude him from

4 testifying in this case.

5         THE COURT:  Okay.  Thank you, counsel.

6 Anything in response?

7         MR. FRIGERIO:  Yes, Your Honor.

8 Mr. Sheldahl is a nationally-recognized canine expert.  In

9 fact, he teaches instructors how to instruct.  He testifies in

10 federal court in Utah and in New Mexico with regard to motion

11 to suppress hearings.  We were fortunate to be able to retain

12 his services.

13 His deposition was taken for over six hours.  He directly

14 contradicts the fact that -- the allegations that plaintiff's

15 making, that the dog was cued.  In fact, his report, as well as

16 his deposition testimony, directly contradict that.

17 Now, how do you get to that in a canine expert?  This is

18 where it's very interesting.  So there's a program called

19 NCATS.  And NCATS -- you, the handler, and the dog must submit

20 film, which is supervised in a controlled atmosphere, and

21 certain -- at certain junctures are vehicle searches, some are

22 building searches and et cetera.  Sometimes there are no drugs

23 to be found.  Sometimes there's multiple drugs to be found.

24 He witnessed these NCAT certifications, which were sent to

25 NCAT, which we have provided in this case.  And that's what he

1  used to show and mark that the dog was not being cued.  He

2  could tell how the handler, in this case, Deputy Molina, and

3  Max worked together.

4      And, in fact, as counsel knows, through the extensive

5  discovery in this case, NCATS has a program that every

6  deployment that the dog has is graded.  And that's where the 90

7  percent came up.  So this dog, which is now retired, actually

8  has the best record in Bexar County history at 90 percent

9  accuracy with regard to interdiction.

10      So really what we are talking about, Your Honor, is the

11  fact that they're making an allegation that you cue the dog.

12  We're saying here, here's our expert who teaches other experts,

13  and he's looked at the video that we're sending to NCATS as to

14  how this team works, as well as how it worked on the date of

15  the incident on March 16th of 2022.  He has come to conclusion

16  that there was not cueing.

17      Specifically, his opinion number five specifically says,

18  the dog independently works a pattern on the vehicle and

19  indicates by sitting, and the handler properly moves past the

20  dog.

21      He was able to show that this particular situation, where

22  the dog did alert -- he not only instructed but alerted, and

23  that those were reasonable expectations that he would teach

24  with regard to other canine handlers.

25      So he is -- he meets all of the background of whether or

1  not he's reliable.  It's obviously relevant because this is
2  something very different for this case.  We have
3  different -- you know, there's the initial Fourth Amendment
4  issue is, was there probable cause to stop?  And we'll be
5  getting to that probably with Mr. Haston.
6      Then, when you have the stop, you can only detain for the
7  purposes of asking the questions that need to be asked for the
8  purposes of the motor vehicle stop.  But once reasonable
9  suspicion then develops, then you go to reasonable suspicion to
10  call a dog handler.  That's what we're talking about in *Flores*
11  *[sic] v. Harris*.  That's why you would expect, as, again --
12  this expert to know what those cases are because he needs to
13  know the constitutional parameters of the use of the canine.
14      Once the canine is called out based on reasonable suspicion
15  and the dog alerts, then the search can be conducted inside the
16  vehicle.  That's what happened in this case.  And it was not
17  the result of anybody cueing the dog.  It was the result of the
18  dog doing its job, which it did, and the NCATS score of over 90
19  percent, Your Honor.
20      This is a very proficient dog, and it was done
21  appropriately.  And that's why this will help the trier of fact
22  to see what canines are taught and how the handlers are taught
23  and why this was not a cue.
24      Thank you, Your Honor.
25          THE COURT:  Sure.

1          So where is it, Mr. Frigerio, that Mr. Sheldahl explains

2     all of this?  Where is the --

3               MR. FRIGERIO:  He explains it at --

4               THE COURT:  Yeah.  Where is it that -- sorry.  Where

5     is it that he explains what his methodology is and not --

6     because, you know, the other side has quoted some -- as often

7     the case, has pulled some quotes from the deposition that don't

8     look particularly favorable to the expert.

9          So where is it that this methodology is explained, such

10    that it's not just, here's an expert who we're going to

11    recognize as an expert in this field, and then the person's

12    just going to say, you know, everything that happened was fine.

13    How do you know that?  Well, just trust me.  I'm an expert.

14    Right?  That's what the Court -- in exercising its gatekeeping

15    function, that's one of the things that the Court is supposed

16    to step in and prevent, is this *ipse dixit* testimony.

17         So talk me through where it is we know how this expert came

18    to these conclusions apart from simply just asserting.

19              MR. FRIGERIO:  Well, on Page 8 of opinion five he

20    talks about -- which I had just previously read:  In reviewing

21    the body-worn camera video of the deployment of canine Max on

22    plaintiff's vehicle and in comparing it to the video of several

23    sniffs of vehicles from the NCATS video.

24         The NCATS video were those videos that were submitted to

25    where the dog became certified, the dog and Deputy Molina.

1    He also spoke of those in deposition on the pages that we

2    cited, on Pages 101, 123 through 124, 133 and 198.  Page 198

3    through 200 --

4              THE COURT:  So he reviews the -- he reviews the video.

5    He reviews this certification video, and then he opines what?

6              MR. FRIGERIO:  That the dog was not cued, number one;

7    that this team works together.  You can tell if a dog is being

8    cued by the handler by the film that it gives to NCATS because

9    that's what NCATS looked at.  They want to make sure that the

10   dog is independent of the handler, the handler isn't cueing the

11   dog.

12       So those videos have been -- plaintiff has them.  Our

13   expert has them.  That's what he testified to for six hours

14   regarding his qualifications.  And he talked about -- there is

15   a talk on Pages 198 through 200 that they were trying to -- on

16   cross-examination, that the dog was not accurate.  And

17   Mr. Sheldahl said, once the dog instructs and once he alerts,

18   he, the dog, is accurate to smelling the odor.  Doesn't

19   necessarily mean there's drugs inside the vehicle now, but that

20   there was an odor of drugs inside that vehicle.  And this is

21   what he explained in his deposition.

22       And that's critical, Your Honor, to whether or not

23   there's -- they're claiming a constitutional violation with

24   regard to -- even though Molina's no longer a party now, it's

25   still Bexar County's responsibility to show, you know, that we

1  don't have dog handlers that just willy-nilly go out and cue

2  individuals in part of a larger conspiracy.

3          MR. WINDHAM:  Your Honor, may I respond?

4          THE COURT:  Yeah.  Why don't -- why don't -- let's

5  hear your response, counsel.

6          MR. WINDHAM:  Okay.  I just have a couple -- or a few

7  points here.  So, first of all, I didn't hear Mr. Frigerio

8  defend 95 percent of this report, which is an exercise in

9  giving legal conclusions.

10     The remaining portion he did defend, he said a whole heck

11  of a lot more than Mr. Sheldahl said in his report about NCATS,

12  about comparing NCATS to the final non-cue or cue, however you

13  want to adjudge that.  There's a lot more explanation in what

14  he just said than Mr. Sheldahl gives in his report.

15     When it comes to NCATS itself, there's not an explanation

16  of what NCATS is, how it fares among different certification

17  entities.  There's no explanation of how NCATS goes through its

18  procedure of certifying, what weight that certification holds.

19  There's just not an explanation of what's actually going on

20  here in terms of getting from A to B in this -- in this

21  conclusion he's offering that this -- the alert is not cued.

22     Just the fact that a dog is certified does not mean the dog

23  wasn't cued on the actual day of the -- of the search.  And he

24  doesn't really connect the dots.

25     Now, when it comes to NCATS itself and this 90-percent

1  figure, Mr. Frigerio is just mistaken on what the report says.

2  The report says that Sheldahl reviewed the deployment reports.

3  Deployment reports are different than NCATS, which is training

4  videos that go to the initial certification.  Deployment

5  reports are all the records you would have had between the

6  certification and this incident.

7      Mr. Sheldahl claims he looked at the deployment reports and

8  came up with a 90-percent figure based on thumbing through and

9  counting in his head.  And that's the kind of conclusion we're

10  saying has no basis in the record and doesn't satisfy Rule 702.

11          THE COURT:  Okay.  Mr. Frigerio, anything in response

12  to that?

13          MR. FRIGERIO:  Further in response, Your Honor, during

14  the deposition, plaintiff brought -- Mr. Wortham, this counsel,

15  brought a seminar that Mr. Sheldahl teaches, and they went

16  through that in grave detail.  So there was almost an exercise

17  in explaining to plaintiff's counsel how these dogs are

18  trained.

19      Now, there is -- the computer program that Bexar County

20  uses for each of these deployments, that's where the 90 percent

21  came from.  The history of this dog was the most accurate of

22  any Bexar County canine that existed prior to that time.

23      Ultimately we don't have to have a 90 percent.  Ultimately

24  all we need to do is show that there was not a cueing, that the

25  dog was certified and the dog worked.  And that's what

1  occurred.

2      And it's disingenuous to say that Mr. Sheldahl did not

3  explain this thoroughly in his six-hour deposition.  But the

4  pages that we have recited in our motion, Pages 101, 123

5  through 124, Page 133 and Pages 198 through 200, show and

6  explain to the Court how Mr. Sheldahl arrived at his

7  determinations.

8          THE COURT:  Okay.  So if I review those pages in his

9  deposition, that is -- in your view that will provide the

10  evidence needed to meet your burden as the proponent of the

11  expert testimony?

12          MR. FRIGERIO:  Under 702.  Yes, Your Honor.

13          THE COURT:  Okay.  All right.  Gotcha.

14      Okay.  Let's go to the last one then, Haston.

15      MS. HEBERT:  Yes, Your Honor.  So as you might

16  remember, Haston is offering testimony about the actions of

17  Deputy Babb, the officer who made the stop and then extended

18  the stop and called for the canine handler to do the sniff in

19  this case.

20      We're asking the Court to limit Mr. Haston's testimony.  We

21  don't object generally to his testimony about criminal

22  interdiction practices or the standards.  Here, we're asking

23  the Court to exclude specifically three areas:  His legal

24  conclusions, that the Court already mentioned; exclude the

25  testimony about what was in Deputy Babb's own head, what Deputy

1  Babb knew; and then exclude testimony about what the videos in

2  this case show.

3      Now, the legal conclusions -- Your Honor briefly already

4  talked about this.  I'm happy to offer more.  But the big

5  picture here is that Haston can't stand in Deputy Babb's shoes

6  and say, this is what a reasonable officer would have done.

7  This is what a reasonable officer would have concluded.  Under

8  the Fourth Amendment, reasonableness is the issue and is a

9  legal conclusion.

10     We also ask the Court to exclude the testimony about what

11 Deputy Babb knew.  He can't testify what was in Deputy Babb's

12 own head.  And, quite frankly, Haston's testimony seeks to

13 contradict what Deputy Babb testified that he knew.  Deputy

14 Babb testified that he knew specific facts when he decided to

15 pull over Mr. Schott.  And Haston seeks to add to those facts

16 and kind of muddy the waters about what Deputy Babb knew when,

17 and expert testimony can't create that kind of fact issue.

18     And I think there's an important point here, that it is the

19 facts that Deputy Babb knew at the inception, when the stop was

20 made, that mattered.  It doesn't matter what an officer from a

21 360-degree view over the entire scene, with omniscient powers,

22 could know.  It's what Deputy Babb knew.

23     And *Devenpeck*, which is a U.S. Supreme Court, and its

24 progeny, make that point time and time again.  The subjective

25 conclusion from those facts is one thing, but the facts that

1    the officer actually knew is the test.

2        We also ask that the Court exclude Haston's conclusions

3    about what the videos show.  And there's two videos, Your

4    Honor, that we're talking about here.  It's the dash cam from

5    Mr. Schott and body camera footage from Deputy Babb himself.

6        On the dash cam Haston has no special experience.  He

7    doesn't do accident reconstruction.  He admitted that he wasn't

8    able to tell where the tires were compared to the view of the

9    dash camera; that he did no special analysis.  Unlike

10   plaintiff's exhibit -- or expert, he didn't go out and do a

11   site visit.  He did no testing.  He simply watched the dash cam

12   video and interprets what he sees.

13       And then, secondly, the body camera footage, it's the same

14   there.  Haston is looking to kind of narrate this footage and

15   say exactly what he's seeing in terms of what Alek Schott is

16   doing and then what Deputy Babb could have concluded from that

17   footage.

18       The jury has ordinary experience to look at body language.

19   They can decide if Mr. Schott scratched his nose at this point

20   or looked out the window at this point.  And Haston can provide

21   testimony about what officers are trained to look for.  But in

22   terms of viewing the actual footage and opining of what its --

23   what the footage is showing, that's not proper expert testimony

24   here.

25       So kind of in sum, exclude the legal conclusions, exclude

1  the testimony about what Deputy Babb knew that contradicts
2  Deputy Babb's own testimony, and exclude his opinions about
3  what the videos show.
4      And I'm happy to provide an overall summary, Your Honor,
5  but I'm more than happy to hear what opposing counsel -- their
6  position on Haston's testimony, too.
7          THE COURT:  Okay.  Thanks, counsel.
8      Let's go to the other side.  Mr. Frigerio.
9          MR. FRIGERIO:  Yes, Your Honor.  As a point of initial
10 contention, I'd like to adopt my colleague, Mr. Barron's
11 response in opposition to the motion to strike.  And as we have
12 previously stated, that we filed an advisory to the Court
13 retaining Mr. Haston.  And we incorporate Mr. Barron's
14 response.
15     In going over his response, this is a very unique aspect of
16 law enforcement, criminal interdiction.  And one, we need to be
17 able to explain what that is because, still, even though
18 Bexar County's the only one left in this -- in the case, as the
19 sole defendant, whether or not there was a constitutional
20 deprivation is still at issue, whether or not there is a
21 violation of the Fourth Amendment.  So we need to understand
22 what criminal interdiction is and how these officers are
23 trained and what they are trained to look for.
24     Mr. Haston did an excellent job in his report and in
25 deposition at talking about interreactions with the cartels,

1  the drug cartels and what they are looking for, as well as

2  human smuggling and how license plate readers are used in drug

3  interdictions as well as the fusion center.  That was an

4  interesting aspect of this case, the Laredo fusion center was

5  used, and how this was initially given a tip-off.

6      So all these are important to explain to the jury.  And, of

7  course, Commander Haston, with over 30 years' experience, is

8  well qualified.  And the information that he has is relevant to

9  this particular case.

10     As to the conduct of Deputy Babb, he can specifically state

11 that it was within the acceptable standard of care as to how

12 Deputy Babb acted in this particular circumstance.  Again, not

13 going into legal conclusions, but what are the best practices,

14 how are interdiction officers trained.  Not that they're

15 trained to circumvent the Fourth Amendment.  No, contrary to

16 that, but how they are trained to fulfill the Fourth Amendment

17 and what Officer Babb was doing in this particular case on

18 March 16th of 2022.

19     The video evidence is interesting because the same

20 objections that we made to plaintiff's expert, they are now

21 using the same cases to say that Commander Haston shouldn't be

22 allowed to talk with regard to the video of Mr. Schott.

23     Well, in his opinion Mr. Schott violated the law and that

24 there was probable cause in his opinion, looking at Schott's

25 own video, as far as, one, crossing the line and, two,

1  interestingly enough, by his own video it shows that he was
2  speeding.
3      So that brings us to another point as to the constitutional
4  deprivation, that there was no constitutional deprivation
5  because of *Devenpeck v. Alford*.  That is, can an objective
6  officer look at the circumstance and determine that, yes, there
7  was probable cause?
8      Well, probable cause by Schott's own video shows that he
9  was speeding at the time, and he could have been stopped then
10  for speeding.  And, of course, that's something they don't
11  want -- they obviously don't want to go into.
12      The case that Mr. Barron cited, *Terrell v. Allgrunn*,
13  specifically talked about the fact that it's not subjective.
14  It's not a subjective test.  It's an objective test.  That was
15  also elicited in *Almendarez [sic] v. Gabbert*, which is a case
16  that we had up to the Fifth Circuit, that it's objective
17  reasonableness.  It's not necessarily only what Babb knew.
18  It's what any officer, given this circumstance -- what arguable
19  probable cause could have existed.
20      So he should be allowed to discuss, one, the video, as well
21  as the body-worn camera of the interaction between Officer Babb
22  and Mr. Schott because that will show how, in his opinion,
23  Officer Babb acted reasonably, as an interdiction officer, in
24  developing the reasonable suspicion to call the canine out
25  because --

1          THE COURT:  So he should be allowed to testify that

2  he -- that he acted reasonably?

3          MR. FRIGERIO:  Yes, as a reasonable interdiction

4  officer.

5          THE COURT:  Okay.  All right.  Sorry.  I interrupted

6  you.

7          MR. FRIGERIO:  Your Honor, I believe it's important to

8  show because, again, we have these three different stages.

9  One, was there probable cause for the initial traffic stop?

10  Two, once you have the traffic stop, was there reasonable

11  suspicion then to call the canine officer out?  And then,

12  three, was there the reasonable suspicion to conduct the search

13  in question?  That goes back to the canine.  But with regard to

14  Commander Haston, he has shown that there was probable cause

15  for the stop and that the interreaction between Babb and Schott

16  was acceptable standard of care for an interdiction officer

17  under this specialized area of the law.

18          THE COURT:  Okay.  Thank you, counsel.

19     Response from the other side?

20          MS. HEBERT:  Yes, Your Honor.  A couple of points.  I

21  think Your Honor has seen that opposing counsel and his expert

22  are seeking to offer opinions about what Deputy Babb did and

23  whether it was reasonable or not, which is exactly the point in

24  terms of opining on the ultimate issue of whether there was a

25  Fourth Amendment violation here.

1    And I just want to flag a couple of things on the videos,

2    in particular, the video of the dash cam.  The question is what

3    Deputy Babb knew at the time.  The deputy, Babb, didn't have

4    Alek's dash cam.  He wasn't looking at Alek's dash cam.  Deputy

5    Babb testified that, based on the facts that he had, the only

6    violation he saw was this lane movement offense.

7        And so now what's happening is the expert here is using

8    Alek Schott's own dash cam against him to say, aha, Deputy Babb

9    could have also concluded that he was speeding.  Based on this

10   number that's in the bottom corner of Alek's dash camera, the

11   officer could have observed this additional violation.

12       And that contradicts a case from the Western District

13   called *United States v. Waller*, where the Court said, you can't

14   add these *post hoc* justifications, these things that the

15   officer didn't know at the inception of the traffic stop as an

16   additional justification of why the traffic stop was

17   permissible.

18       And that's important here in relation to the standard

19   that's applied.  It's not all the facts that an omniscient

20   officer, from a 360 view could have known.  Instead, we take

21   the facts of what Deputy Babb knew.  And he testified about

22   what he actually knew.  He testified about what he saw.  He

23   testified about the information that was coming in to him at a

24   particular time.  And it can't be that defendant's expert can

25   then supplement that with additional facts after the fact,

1  after the stop.  That's what's impermissible here.

2      I think those are the main points, Your Honor.  If you have

3  further questions, we're happy to address them.

4          THE COURT:  Okay.  No.  I think I'm good.

5          MR. FRIGERIO:  If I may, Your Honor?

6          THE COURT:  Yeah.  Go ahead, Mr. Frigerio.

7          MR. FRIGERIO:  Specifically, that actually is not the

8  law.  The *Terrell* case *v. Allgrunn*, which was cited by

9  Mr. Barron, as well as *Devenpeck v. Alford*, it's an objective

10  reasonableness test.  It doesn't -- it's not based on what Babb

11  knew.  It's what any officer viewing this circumstance would

12  have known.  And, therefore, if speeding was a part of it, that

13  also goes into the arguable probable cause.

14          MS. HEBERT:  Your Honor, if I may?

15          THE COURT:  Go ahead.

16          MS. HEBERT:  We address the cases that opposing

17  counsel cites in his brief in our reply.  And the main point of

18  that is that the facts as the officer knew them are what sets

19  the parameters of this test.  So any confusion, look at the

20  Fifth Circuit applications of *Devenpeck*, and the facts as the

21  officer knew them are what controls, not supplemental facts

22  that could have been discovered at a later time by an expert

23  doing additional analysis of evidence that the officer didn't

24  have.

25          THE COURT:  Okay.  All right.  Well, thank you,

1  counsel.

2      I don't know that I've arrived at a different place than

3  where I was at the outset.  I may have just, you know, more

4  questions or just more reason to return to the briefing and the

5  record and look things over again a final time before offering

6  the ruling.  But I do think that there's significant relief

7  warranted here.

8      But I also still am a little bit at a loss, for all the

9  reasons I stated at the outset, that were articulated by Judge

10 Lane, where, you know, a great deal of what we're going to sort

11 of have to flyspeck and get into is stuff -- for lack of a

12 better word, is stuff that, you know, Mr. Frigerio appears to

13 concede, on one hand that, for example, these experts shouldn't

14 be offering legal conclusions, but then on the other hand, in

15 the midst of arguing in support of these experts, he invokes

16 legal conclusions that the experts need to draw.

17     So I'll have to provide more guidance.  I'm going to have

18 to write on this, which means it'll take a little bit of time

19 to get to it.  I'm sensitive to that because, as was mentioned

20 at the outset, you all are, I guess, sort of poised for

21 dispositive motions based on what's going to happen here.

22     So, you know, we'll just have to -- we'll just have to get

23 to it as quickly as we can.  If the time that it takes the

24 Court to get to this topic presents a difficulty for you all in

25 your other briefing, just let me know by motion.  And I'm sure

 1    I can give you a little bit of relief, depending on how the
 2    other deadlines are looking.  But this looks like something
 3    that I'll have to spend some time writing on and, honestly,
 4    just providing some more guidance to everybody in the case.
 5        With all of that, does that kick up any concerns or issues
 6    for any of you that you'd like to discuss, since I have you
 7    all?
 8            MS. HEBERT:  Your Honor, the only thing that I can
 9    think of is just to try to provide you a little bit of a
10    summary, which we prepared to do at the end, of maybe a way
11    forward to help you kind of triage all of this into one order.
12        And I'll summarize it here.  Number one, we ask you to
13    exclude Sheldahl and, number two, prohibit Rodriguez and Haston
14    from offering legal conclusions.  And the way maybe to do that
15    is no opinions about constitutionality and then, similarly,
16    prohibit using the word "reasonable" or similar terms to
17    characterize an officer or an officer's actions or conclusions.
18    That's kind of how we've tried to wrap our way around this.
19        And then Rodriguez, we would ask that you prohibit him from
20    talking about customs and practices and the content of
21    training.  I didn't hear anything from opposing counsel
22    objecting to that.
23        And then, finally, prohibiting Haston from testifying about
24    what Deputy Babb knew and what the videos show.  Ultimately,
25    the videos are going to be shown to the jury.  They can speak

1  for themselves, and Deputy Babb can speak for himself about

2  what he actually knew.  And that counsel is free to make

3  arguments about it, but what shouldn't be used is an expert to

4  make counsel's arguments.

5          THE COURT:  Okay.  And any summary from you,

6  Mr. Frigerio?

7          MR. FRIGERIO:  The summary I would have -- I don't

8  have one in a PowerPoint -- is that experts are every day used

9  to talk about the acceptable standard of care or best

10  practices.  So we can argue verbiage, but they are allowed to

11  speak as to what acceptable standard of care for law

12  enforcement is.

13    Mr. Rodriguez should be allowed to talk about the TCOLE

14  training that was given to the officers as well and the

15  training and the custom and policies.

16    With regard to the video, you know, plaintiff wants it one

17  way.  They want their expert to be able to look at the video

18  and interpret it, but they don't want Mr. Haston to be able to

19  interpret the video.  Those are reasonable experts.  And the

20  fact that they had differing opinions, it still should be

21  something that is allowed in front of the jury.  And it would

22  be, I believe, error to allow one side to admit the video

23  deposition of Schott and talk about it in his expert opinion

24  and not talk about it with regard to Commander Haston.

25          THE COURT:  Okay.  All right.  Thank you, counsel.

1       Well, I think, with that, we'll just take it under

2   advisement.  And just keep an eye out on the docket for further

3   guidance from the Court.  And like I said, if issues arise,

4   just let us know by motion.  Okay?

5           MS. HEBERT:  Thank you, Your Honor.

6           MR. FRIGERIO:  Thank you.

7           THE COURT:  Thanks, counsel.

8   * * *

9       *(2:06 p.m.)*

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Date:  4/23/2025     /s/ Chris Poage
                     Approved Transcriber