Sheriff Javier Salazar                                          July 16, 2024

                                                        Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3

    ALEK SCHOTT,                    §
4            Plaintiff,             §
                                    §
5                                   §
    VS.                             §
6                                   §
    JOEL BABB, in his individual    §   CIVIL ACTION NO.
7   and official capacity;          §   5:23-cv-00706-OLG-RBF
    MARTIN A. MOLINA III, in his    §
8   individual and official         §
    capacity; JAVIER SALAZAR, in    §
9   his individual and official     §
    capacity; and BEXAR COUNTY,     §
10  TEXAS,                          §
             Defendants.            §
11

12      -------------------------------------------

13                  ORAL DEPOSITION OF

14                SHERIFF JAVIER SALAZAR

15                    JULY 16, 2024

16      -------------------------------------------

17          ORAL DEPOSITION of SHERIFF JAVIER SALAZAR,

18  produced as a witness at the instance of the Plaintiff(s)

19  and duly sworn, was taken in the above-styled and

20  numbered cause on July 16, 2024, from 9:04 a.m. to 3:21

21  p.m., before Molly Carter, Certified Shorthand Reporter

22  in and for the State of Texas, reported by machine

23  shorthand, at the Bexar County Sheriff's Office,

24  207 North Comal Street, San Antonio, Texas, pursuant to

25  the Federal Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF(S):
Ms. Christen M. Hebert
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, Texas 78701
(512) 480-5936
chebert@ij.org
Mr. Joshua A. Windham
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
jwindham@ij.org

FOR THE BEXAR COUNTY DEFENDANT(S):
Mr. Charles S. Frigerio
Mr. Hector X. Saenz
LAW OFFICES OF CHARLES S. FRIGERIO P.C.
111 Soledad, Suite 465
San Antonio, Texas 78205
(210) 271-7877
csf@frigeriolawfirm.com

FOR THE DEFENDANT(S) SHERIFF JAVIER SALAZAR:
Mr. Blair J. Leake (via Zoom)
WRIGHT & GREENHILL, PC
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
(512) 476-4600
bleake@w-g.com

Page 3

INDEX

Appearances ............................................. 2

SHERIFF JAVIER SALAZAR
    Examination by Mr. Windham ...................... 4

Signature and Changes ................................ 233
Reporter's Certificate ................................. 234

EXHIBITS
NUMBER      DESCRIPTION                    PAGE
Exhibit 46 .......................................... 145
        Internal Affairs Investigation Report

Exhibit 52 .......................................... 8
        Plaintiff's Notice of Deposition of
        Sheriff Javier Salazar

Exhibit 53 .......................................... 60
        Bexar County Sheriff's Office
        Organizational Chart

Exhibit 54 .......................................... 191
        Babb Interdiction Training Documentation
        and Certifications

Exhibit 55 .......................................... 222
        6/26/24 Response to Grievance

Page 4

1    THE REPORTER:  We are on the record.
2         SHERIFF JAVIER SALAZAR,
3    having been first duly sworn, testified as follows:
4         E X A M I N A T I O N
5    BY MR. WINDHAM:
6    Q   Well, good morning, Sheriff Salazar.  How are
7    you doing?
8    A   Good, sir.  And you?
9    Q   Good, good.  My name is Josh Windham.  I
10   represent the Plaintiff Alek Schott in this matter.  I
11   just want to ask how you prefer to be addressed today.
12   A   Sheriff, or Mr. Salazar, whatever you prefer.
13   Q   Okay.  So no strong opinions on that.
14   A   Call me Javier if you want to.
15   Q   By the way, what is your full name?
16   A   Sheriff Javier Salazar.
17   Q   Okay.  And we're joined here in the room by my
18   co-counsel Christie Hebert, by a few other attorneys in
19   the room, Charles Frigerio, Hector --
20        MR. WINDHAM:  What's your last name?
21        MR. SAENZ:  Saenz.
22   Q   (By Mr. Windham) Okay.  Hector Saenz.  And
23   Blair Leake represents Deputy Babb in this case.
24        And the court reporter, whose name is Molly,
25   she's going to record our conversation today and try to

Page 5

1    get down every word that we say.  Does that make sense?
2    A   Sure.
3    Q   Great.  And do you agree that by being here
4    today you waive any defects in the deposition notice that
5    led you to be here today?
6    A   Yes.
7    Q   Okay.  And likewise, to the reporter's
8    qualifications, you waive any defects to her
9    qualifications?
10   A   Yes.
11   Q   And she is very qualified, I can tell you.
12        Great.  So to kick us off today, I just want to
13   ask, have you ever been deposed before?
14   A   Yes, sir.
15   Q   And I may ask you about that later, but you
16   know, the reason I ask that up front is just because I
17   want to see how familiar you are with deposition.  How
18   many times have you been deposed?
19   A   Oh, three or four that I can remember.
20   Q   Okay.
21   A   Over the years.
22   Q   So let's just talk about a few of the ground
23   rules.  You've probably heard this kind of boilerplate
24   before.  But, you know, you're testifying today as if
25   you're under oath, in a courtroom, before a judge.  Does

Page 6

1 that make sense to you?

2    A    Yes, sir.

3    Q    Okay.  Is there any reason you can't testify
4 truthfully today?

5    A    No.

6    Q    Like you're not on alcohol or drugs or anything
7 that would impair your judgment?

8    A    No, sir.

9    Q    Okay.  And when I ask a question, please try
10 to, you know, let me finish my question before you answer
11 it.  And likewise, I'll do the same for you when you're
12 giving an answer.  Does that make sense?

13    A    Absolutely.

14    Q    And let's try to talk -- I talk relatively
15 fast.

16    A    Same here.

17    Q    Let's try to talk in a measured way so that
18 Molly can get everything down and avoid, you know,
19 nonverbal responses like uh-huh and huh-uh.  Make sense?

20    A    Absolutely.

21    Q    Cool.  And let me know if you don't understand
22 a question that I ask today.  The goal here is to, you
23 know, get to the truth and get to the facts of this case.
24 And so if I'm not asking a question that makes any sense
25 to you, just let me know.

Page 7

1    A    Sure.

2    Q    Cool.  And I'm going to show you some documents
3 today.  Maybe some videos.  It's your right to review all
4 of that with your attorney before getting into some
5 questions.  So if you want to take a minute to do that,
6 just speak up, let me know, and we can take a break.

7    A    Yes, sir.

8    Q    And by the way, you are the master of breaks
9 today.  So if you have to use the restroom or you're just getting tired, let me know
10 a bite to eat or you're just getting tired, let me know
11 and we can take a break at any time.

12    A    Okay.  Well, just bear with me a bit, I've
13 already -- I've had allergies for about a month now, and
14 decided to jump on a tractor and mow six acres last
15 night, so I'm just a little congested, so bear with me if
16 I have a coughing fit.

17    Q    I'll bear with you.

18    MS. HEBERT:  You can have cough drops too, if
19    you need some.

20    A    Thank you.

21    Q    (By Mr. Windham) And your attorney may object
22 to a question I ask, and please still answer the question
23 unless you're instructed not to do so.  Okay?

24    A    (Nodding head.)

25    Q    And those objections -- was that a yes?

Page 8

1    A    Yes, sir.  Sorry.

2    Q    Okay.  Sorry.  I don't mean to be pushy, but --
3 all right.  So before today's deposition, did you do
4 anything to prepare yourself?

5    A    No, sir, not particularly.

6    Q    Didn't talk to anybody other than your
7 attorneys?

8    A    No.

9    Q    Didn't review any documents or anything like
10 that?

11    A    No, sir.

12    Q    No videos?

13    A    No, sir.

14    Q    Okay.  I mean, let me just introduce one and
15 see if you've seen it before.

16    All right.  So Ms. Hebert is handing you what
17 we've marked as Exhibit 52.  And just take a minute to
18 look at it.  Let me know if you've seen it before.

19    A    I don't specifically recall having seen it, but
20 I know what it is.

21    Q    Okay.  And what is it?

22    A    It's a notice for me to appear for deposition.

23    Q    And here we are, right?

24    A    Yes, sir.

25    Q    Okay, great.  And so that's the sort of thing

Page 9

1 I'm asking, have you reviewed documents before.  You
2 haven't seen that, but you're here today.

3    A    Yes, sir.

4    Q    All right.  So I want to clarify some lingo
5 that we might be using today, because "Bexar County
6 Sheriff's Office" is a mouthful.  If I said that
7 a million times today, we would be here for an hour
8 extra.  So can I just use "BCSO"?

9    A    Absolutely.

10    Q    Okay, great.  Is that the term you use?

11    A    Yes, sir.

12    Q    Okay.  And when I refer to "the County" or "the
13 Sheriff," can we understand that I'm referring to Bexar
14 County and you, the Bexar County Sheriff?

15    A    Yes, sir.

16    Q    Great.  Okay.  Let me know if you want to use
17 that in a different sense.  For example, if you're
18 talking about a different County Sheriff, just let me
19 know, so the record is clear about that.

20    A    Understood.

21    Q    Great.  And you said you've been deposed a few
22 times.  Can we just briefly go through what those were
23 about, if you recall?

24    A    Yes, sir.  I can recall some termination cases,
25 at least one termination case where a deputy was

Page 10

1 terminated and I was deposed as a part of that.
2     Another one where a member of the former
3 command staff before I took office sued -- was in the
4 process of suing me, and I was deposed as a result of
5 that as well.
6     And then at least once before that I can
7 remember I was deposed on some sort of a civil case, but
8 I don't -- I don't recall what it was. And if memory
9 serves, I think it was something from my San Antonio
10 police days, but I wasn't deposed until I was already the
11 sitting Sheriff. But I can't recall what case it was. I
12 just remember --
13 Q Okay. And I realize memories get fuzzy over
14 time. So I do want to ask you a little bit about those,
15 and we'll just maybe do our best to remember.
16 A Sure.
17 Q I'm not going to dive too deep. But I want to
18 know, just starting off, maybe -- it sounds like the
19 oldest one in time might have been the San Antonio Police
20 Department one; is that fair?
21 A Yes.
22 Q Do you recall about what year that lawsuit
23 might have started?
24 A Gosh, I don't.
25 Q Okay.

Page 11

1 A I don't.
2 Q Okay. And you were the sitting Sheriff at the
3 time?
4 A I believe so.
5 Q And when did you -- sorry.
6 A No, I took office January 1st of 2017.
7 Q Okay. And so to your recollection, you were
8 sued at some point after that, after you were elected?
9 A No, I don't recall. It may have been -- I may
10 have even -- it may have even been before I took office.
11 It just sticks out -- the only reason that it sticks out
12 is it was my first time being deposed, and I remember
13 having a conversation with the gentleman that deposed me.
14 He complimented me on my testimony, and he was a former
15 chief or a sheriff himself, and he was now working as --
16 doing some sort of expert testimony and complimented me
17 on my testimony.
18     But that conversation -- I remember that
19 conversation more so than I do the actual testimony or
20 the reason for being there.
21 Q Okay. I mean, that's actually why I'm going
22 through this is that I -- I mostly just want to know if
23 anything that you've been, you know, involved in before
24 as a witness was related at all --
25 A Oh, no.

Page 12

1 Q -- to this matter. So, you know, I'll assess
2 that for myself, but I do want to ask if you have any
3 recollection of the subject matter of the lawsuit that
4 you were deposed for regarding your time in the
5 San Antonio Police Department.
6 A I don't remember. I wish I did. I'm sorry.
7 Q Okay. Maybe we'll come back to that. Do you
8 know if you have any documents from that or anything like
9 that?
10 A No, sir.
11 Q Okay. And what about this other lawsuit you
12 mentioned from former command staff of Bexar County
13 Sheriff's Office, what was that one about?
14 A It was about -- when I came into office, you
15 know, I did what typically people taking office do is
16 they interview for members of their new command staff.
17 And sometimes people from the prior command staff are
18 retained and sometimes they are not.
19     In this instance, I did not -- I chose to not
20 retain somebody, and they filed some sort of a lawsuit
21 based upon that. It was a man named Henry Reyes, and I
22 testified and gave my reasonings for why I chose to not
23 retain him.
24 Q Okay. Do you recall why you chose not to
25 retain him?

Page 13

1 A He was -- to me, he was a person of
2 questionable character.
3 Q Okay. And you know that because of his actions
4 on the job, or how do you know that he was of
5 questionable character?
6 A So as I understand the facts, he had had a
7 child out-of-wedlock with a subordinate deputy at the
8 time that he was actually married to someone that still
9 works here to this day. That was just one of several
10 things. And then I just chose to exercise my prerogative
11 to not retain somebody.
12 Q Okay. And is that, just so that I'm clear on
13 understanding it -- because I don't work in law
14 enforcement and the chain of command is something I'm
15 still getting used to, so is there something abnormal
16 about, I guess, relationships among folks in the
17 Sheriff's Department?
18 A No, not among people. I mean, people have
19 relationships in the workplace all the time. But you can
20 imagine -- as you can imagine, it would be problematic
21 for somebody to be having a relationship with somebody
22 that's a subordinate way down the chain of command from
23 them, and then the fact -- plus the fact on top of
24 that -- and I'm not the morality police, right.
25 Q Sure.

Sheriff Javier Salazar
July 16, 2024

Page 14

1    A    I personally don't cheat on my wife, but I, you
2    know, frown upon people that do.  And that's -- to me,
3    that's not somebody that I want on my command staff.  If
4    you can't respect the most basic promise that anybody
5    could make and the most important, then to me that's not
6    somebody that I want associated with me or with my
7    command staff.
8         Plus the fact that if you can't control your
9    urges with your subordinates, how are you going to be
10   when I've got you -- if and when I've got you as a chief
11   over 1500 young deputies.
12   Q    So it's just a conflict of interest.
13   A    It was a conflict of interest and it just -- at
14   the end of the day had that not occurred, had I not been
15   made aware of that, probably still would not have
16   selected that person.  I just -- I chose to not retain
17   the vast majority of the people in that prior
18   administration.
19   Q    Okay.  How did that lawsuit turn out?
20   A    It was dismissed.  I believe it was dismissed.
21   Q    Okay.  And you did one deposition for that and
22   that was about it?
23   A    That was it.
24   Q    Okay.  And we may get into this later, but
25   since you mentioned it now, so what percentage of your --

Page 15

1    if you know, what percentage of your, the command staff
2    that was there when you arrived as Sheriff did you
3    retain?
4    A    One.
5    Q    You retained one person?
6    A    Out of ten --
7    Q    Okay.
8    A    -- in that prior administration, I retained
9    one.  And he's still here to this day.
10   Q    Who's the one you retained?
11   A    Otis Hutchinson.
12   Q    Okay.  Everybody else in command staff, since
13   you took office, is a new hire?
14   A    Yes, sir.
15   Q    Okay.  And at a high level, if there's
16   something that kind of globally connects the nine folks
17   that you didn't keep -- let me ask it a different way
18   actually.
19        What accounts for the fact that there was that
20   much turnover?
21   A    It's just typical.  When you come into office,
22   you bring in your own command staff, you know, based upon
23   how you're going to structure the department.
24        Like for example, I restructured the agency.
25   Literally, I restructured it.  And so, you know, I chose

Page 16

1    my team accordingly.  So I equate it to, you know,
2    building a football team.  You don't just go out and
3    pick, you know, eleven big guys because they look
4    imposing.  You pick a quarterback with a skill set of a
5    quarterback.  You pick a running back with the skill set
6    of a running back.
7    Q    This is hitting home for me, because I love
8    football.
9    A    Absolutely.  So I picked -- based upon how I
10   was going to structure the agency and how it's structured
11   to this day, I picked people that possessed the skill
12   sets and attributes that I was looking for for this, for
13   this, for this.
14   Q    Okay.  That's really helpful.  I mean, I guess
15   I'm curious, as Sheriff -- and I want to get kind of into
16   a more global discussion of what you do as Sheriff in a
17   second.
18   A    Sure.
19   Q    But as Sheriff, what sort of role do you have,
20   generally speaking, in the structuring of the agency at
21   large?
22   A    I mean, I call the shots.  You know, as
23   conservator of the peace, if you will, as the top ranking
24   law enforcement, uniformed law enforcement officer in the
25   county, I call the shots as far as the Sheriff's Office

Page 17

1    goes.  You know, selection of command staff, on down to
2    selection of equipment and uniforms in some instances.
3    Q    Yeah.  The folks that you hired to your command
4    staff, what were the major, I don't know, qualities you
5    were looking for in that kind of new, first new command
6    staff that you hired?
7    A    Well, some of the first new command staff that
8    I hired coming in are no longer here.  But I looked
9    for -- for example, the Chief Deputy that I have now,
10   James Serrato, he -- he and I were co-workers at the
11   San Antonio Police Department together.
12        He ran the Research and Planning section of the
13   SAPD, San Antonio Police Department.  He was a sergeant
14   like I was.  I was the Director of Media Relations.  I
15   was the spokesman, the PIO.
16        He and I were both sergeants, but we both
17   operated at a level that was a bit higher than our rank.
18   In other words, some -- in many instances, if the Chief
19   needed advice, he would come to us versus a member of his
20   command staff.
21   Q    You guys are sort of go-getters?
22   A    Yeah.  And we were taught to think globally
23   more so.  And so he was a natural.  He was not my initial
24   pick for Chief Deputy, because I wanted somebody that had
25   institutional knowledge from here.  He -- coming with me

5 (Pages 14 - 17)

Sheriff Javier Salazar                                July 16, 2024

Page 18

1 from the SA -- from the SAPD, I wanted somebody that knew
2 the ins and outs here.
3          So initially, I picked a guy that was a captain
4 when I took office. And he was my Chief Deputy. And
5 then James was Chief of Staff, so one rank below that
6 Chief Deputy.
7   Q   Who was the first guy?
8   A   Don Tijerina.
9   Q   Okay.
10   A   Ultimately, Don and I discovered that we had a
11 difference -- we were not compatible. So Don was asked
12 to leave, and Chief Serrato was bumped up to Chief Deputy
13 at that point.
14   Q   Okay.
15   A   So Chief Serrato is one that he runs a lot of
16 the day-to-day operations for me, and I can concentrate
17 on keeping us in office.
18   Q   Okay. Just to make sure that I understood that
19 last comment, the Sheriff is an elected official, right?
20   A   I am.
21   Q   So does that mean that a fair amount of what
22 you do is public relations?
23   A   A decent amount of it, yes.
24   Q   Okay. And in terms of the -- you just used the
25 phrase "day-to-day." So is most of the day-to-day

Page 19

1 handled by Chief Deputy Serrato?
2   A   Yes.
3   Q   Okay. And has that always been true since you
4 hired him?
5   A   Yes.
6   Q   Okay. And we were talking a second ago about
7 the qualities you were looking for in that first command
8 staff that you hired.
9   A   Uh-huh.
10   Q   You mentioned folks who are familiar with the
11 San Antonio area or Bexar County area rather.
12   A   Uh-huh.
13   Q   I'm trying to remember others that you
14 mentioned. You mentioned wanting Serrato. Were there
15 any other qualities you were looking for?
16   A   In other people?
17   Q   Just as -- let's think of it this way. You're
18 coming in as a new administration, right?
19   A   Uh-huh.
20   Q   Presumably, you have a vision for what you want
21 for the Sheriff's Office.
22   A   Uh-huh.
23   Q   What are some of the qualities you wanted in
24 that first command staff to execute your vision?
25   A   So I wanted a good split of internal versus

Page 20

1 external. I wanted some people from outside, about half,
2 and then I wanted to bring in people that had already --
3 that grew up here, so to speak. And so I tried to, tried
4 to mix it up. Along with some skill sets on that first
5 command staff, I had people that -- from the external,
6 from literally, federal, state and local experience on
7 that -- the outside half, so I had people that grew up in
8 the federal, in federal agencies, people who grew up in
9 state agencies, and some from local.
10   Q   Okay. And you mentioned another lawsuit. We
11 talked about two of them, right?
12   A   Uh-huh.
13   Q   So the third was what?
14   A   The third was the most recent, and it was a
15 lieutenant that had taken part in the insurrection --
16   Q   Okay.
17   A   -- in Washington, D.C.
18   Q   Seems very straightforward.
19   A   -- January 6. And yeah, she no longer works
20 here.
21   Q   Okay. I don't think I need to ask about that.
22          So I do -- you've alluded to this a little bit.
23 I want to just kind of unpack this. Before you took the
24 role of Sheriff, or were elected as Sheriff rather, I
25 assume you worked in law enforcement.

Page 21

1   A   I did.
2   Q   Can you give me -- I know this is hard. Can
3 you give me an overview of your law enforcement career?
4   A   Sure. I'm in -- I'm about to hit my 32nd year
5 in law enforcement. So I came on with the San Antonio
6 Police Department. Started the training academy in 1992
7 and graduated in 1993, April 10th of 1993.
8   Q   What training academy was that?
9   A   The San Antonio --
10   Q   Okay.
11   A   -- police training academy, SAPD. Served there
12 for just shy of 24 years. But over the course of those
13 years, I worked patrol, community policing, bike patrol.
14 That was my first five years, I worked in those three
15 assignments.
16          I was promoted to detective in 1998. Worked
17 narcotics -- for the next ten years I spent in covert
18 operations in narcotics. Was promoted to sergeant in --
19 during that time I was promoted -- during that ten years,
20 as part of that ten years, I was promoted to sergeant in
21 2002, I believe, and stayed in the narcotics realm until
22 about 2008, when I went to work for the Chief, Chief
23 McManus, as the administrative sergeant in the Chief's
24 office.
25          There, I oversaw the executive protection

Sheriff Javier Salazar                                                                July 16, 2024

---

Page 22

1  detail.  So in other words, the body guards for the high
2  level dignitaries of the city, I oversaw them.
3         After a few years there -- not a few years,
4  about 18 months there, I moved over to Internal Affairs
5  and worked as an Internal Affairs investigator for about
6  three years.
7         Then I became the spokesman for the agency in
8  2012.  2015 I lost my mind and decided I wanted to run
9  for Bexar County Sheriff.
10  Q   I'll ask you about --
11  A   So --
12  Q   -- what happened to your brain then.
13  A   From there -- I didn't have to leave the
14  agency, but I had to step down as spokesman.
15  Q   Okay.
16  A   Conflict of interest, you know.  And so then
17  from there I went and I oversaw the -- at that time it
18  was called the Intelligence Unit.  But during my tenure
19  there, about 14 months while I ran for office, we
20  actually changed the name to the Integrity Unit.  So it
21  was a unit that was dedicated to investigating criminal
22  allegations against law enforcement officers.
23  Q   Okay.
24  A   Different from Internal Affairs that
25  investigates administrative.  This is the criminal side

---

Page 23

1  of those investigations.  So I actually oversaw the
2  detectives that handled those sorts of investigations.
3  So we changed it -- to delineate intel from what we did,
4  we changed it to the Integrity Unit.  Don't know what
5  it's called to this day over there.  I have a unit that
6  does that here that I created called the Public Integrity
7  Unit.
8  Q   Okay.  That's a way better survey than I could
9  give of my career, and you've been in your profession
10  longer, which I commend you for.
11  A   Thank you, sir.
12  Q   Let me ask -- there's a lot there.  Let me ask
13  about a few components of that.  So is it fair -- you
14  said that you started out as a patrol officer after you
15  finished the academy, right?
16  A   Yes, sir.
17  Q   And that was at San Antonio Police Department?
18  A   Yes, sir.
19  Q   Okay.  Can you just give me an overview of what
20  being a patrol officer at San Antonio Police Department
21  involved?
22  A   Sure.  Responding to calls for service, 911
23  calls, you know, anything from just routine patrols,
24  traffic stops, traffic enforcement, to, you know,
25  handling shootings, you know, shootings, murders, sexual

---

Page 24

1  assaults, you name it.
2         My -- the area where I broke out, where I
3  first -- we called it breaking out -- where I first went
4  out on my own after training was right here in this, in
5  what we call the 23 Section, the shallow west side of
6  San Antonio.
7         I worked here at a time that they called --
8  San Antonio had the distinguishing nickname of the
9  drive-by capital of the world -- drive-by shooting
10  capital of the world.  And I worked here at that time.
11  And boy, oh boy, was I at the epicenter of that.
12  Q   Sounds dangerous.
13  A   Yes, sir.  It was the early '90s, and drive-by
14  shootings were all the rage.  Kind of like it is now
15  again.  But back then, you know, it was a different time
16  in policing for sure.  But that was -- that was where
17  I -- right here was where I cut my teeth.
18  Q   Okay.  You mentioned traffic stops.  How big a
19  part of your job was that back then?
20  A   It was a part of what I did.  I mean, it was on
21  a routine basis.  I worked out here on the dog watch
22  shift, the graveyard shift.  So it was part of what
23  you -- what we did was conduct traffic stops.
24         Now, I only spent about, oh, a year and a half
25  on vehicle patrol before moving on to bike patrol

---

Page 25

1  downtown.
2  Q   Another type of vehicle.
3  A   Yes, sir.
4  Q   The first type of vehicle, you know, patrol
5  car, I mostly just want to get a sense of how much
6  personal experience you have with traffic stops.  So it
7  sounds like you did about a year and a half of traffic
8  stops in your patrol car?
9  A   Well, yes.  You know, believe it or not, I did
10  my fair share of traffic stops on a bike as well, so we
11  can certainly talk about that.  But I did, yes, I did --
12  I do have a fair amount of experience with traffic stops.
13  Q   You did about five years of traffic stops on a
14  bike as well?
15  A   No.  I wasn't -- bike patrol for a year --
16  maybe a year and a half there as well.
17  Q   Okay.
18  A   And then I moved on to community policing,
19  which I also conducted patrols.  A little more PR, as a
20  community policing officer.  But still did some uniformed
21  enforcement as well.
22  Q   So in that first five-ish years of patrol work,
23  at various points you did traffic stops kind of on and
24  off with different levels of focus.
25  A   Yes, sir.

---

7 (Pages 22 - 25)

Page 26

1    Q    Okay.  Do you have a sense -- it's hard to put
2  a number.  Do you have a sense of how many traffic stops
3  you've conducted in your career?
4    A    Oh gosh, hundreds.  Thousands.
5    Q    Do you think it's closer to thousands or closer
6  to hundreds?
7    A    Probably closer to thousands.
8    Q    Okay.
9    A    I still conduct traffic stops, so...
10    Q    As the Sheriff?
11    A    Yes, sir.
12    Q    I mean --
13    A    I'm a working Sheriff.
14    Q    I don't want to get distracted, but I do want
15  to know what that involves.  Could you briefly tell me
16  about that?
17    A    Sure.  I mean, I drive an unmarked vehicle.  I
18  have two vehicles.  I have an unmarked vehicle, and I
19  have a marked unit as well that I just recently obtained.
20  But if I'm out and about and somebody -- usually I won't
21  just pull somebody over for speeding or whatever.  But if
22  I suspect somebody's a drunk driver, for example, I
23  will -- I will initiate a traffic stop on them.  And in
24  some of those instances, we have made arrests for DWI
25  based upon a stop that I made.

Page 27

1        I can think of another instance where a young
2  man was -- appeared to be gesturing out a window,
3  possibly with a gun.  And this was broad daylight on a
4  Saturday afternoon.  I was on my way home from a full
5  Saturday.  I work seven days a week.  And I initiated --
6    Q    Bet your wife loves that.
7    A    Oh, she's -- yes, absolutely.  So I was on the
8  way home, and initiated the traffic stop, and sure enough
9  we found this young man was a documented gang member, was
10  wanted out of another state, and was armed with a pistol,
11  that he was most likely waving around at that time.
12        And so those are just a few of the stops that I
13  still have made up to now.  But up until then I've made
14  traffic stops for various things throughout the years.
15    Q    The traffic stops you did in your capacity as a
16  San Antonio police officer --
17    A    Uh-huh.
18    Q    -- if that's the right phrase for it --
19    A    Uh-huh.
20    Q    Okay.
21    A    Yes, sir, I'm sorry.  She doesn't do uh-huhs,
22  I'm assuming.
23    Q    I appreciate that.  You're catching me now.
24  Did any of those ever turn into something more than just
25  a traffic stop?

Page 28

1    A    Oh, sure.
2    Q    Could you elaborate on that?
3    A    You know, without any certain one jumping out,
4  I mean, I can tell you there have been times that you,
5  you know, you start out with a traffic stop and it turns
6  out to be a load of dope, or you know, a human smuggling
7  operation.  Or a murder weapon under the front seat that,
8  you know, nobody knew about, you know, until such time as
9  it's found during the course of a search.  So sure, I've
10  had cases develop into something more.
11    Q    Has that happened when you've, in your capacity
12  as Sheriff as well?
13    A    No.
14    Q    Okay.
15    A    No.  I think the worst that we've ended up with
16  in my capacity as Sheriff has been, again, somebody, you
17  know, an armed gang member, documented gang member, or a
18  DWI.
19    Q    Okay.  In those traffic stops that turned into
20  something more while you were at the San Antonio Police
21  Department, is it fair to -- I just want to make sure I
22  get the language right -- is it fair to call that
23  reactive policing?
24    A    No, I think it's proactive.
25    Q    Okay.

Page 29

1    A    Traffic stops by their nature are pretty much
2  proactive, I think.  Because you're, you're, you know,
3  patrolling and you see a traffic violation occur and you
4  stop it.  I mean, I guess that part of it could be
5  considered reactive.  But, you know, many times you do
6  proactive patrols and traffic stops, when it's slow and
7  there's no calls for service, you go out and just start
8  patrolling.  And if you happen to see a traffic
9  infraction, you stop it and you conduct the stop
10  accordingly.
11    Q    Sure.  That's sort of what I'm getting at is
12  that the part of the stop that would lead you to
13  investigate some other crime that isn't traffic related,
14  that part is reactive?
15    A    The -- you're proactively patrolling.  But then
16  when you see a violation or an infraction, that part I
17  guess is reactive.  So there's proactive, reactive
18  components to it, sure.
19    Q    Okay.  Let's see.  I do want to ask about this
20  narcotics role you mentioned.  What was that?
21    A    Over the course of that ten years, you know, I
22  started out working undercover assignments.  So, you
23  know, low level street buys, you know, search warrants,
24  consents to search.  I did a lot of consent searches on
25  homes.  Knock and talks, so to speak.  You knock on the

Sheriff Javier Salazar                                                  July 16, 2024

Page 30

1  door, you tell them why you're there, you ask for consent
2  to search, and then they sign a form if they consent to
3  it, and you find the drugs or you don't find the drugs,
4  depending upon if they have any or not.
5        A lot of testifying in court. A lot of
6  executing search warrants. I did some drug interdiction,
7  highway drug interdiction for a time there, uniform
8  highway drug interdiction for a time.
9        And then when I became -- I did that, so as a
10 detective -- I was a detective for just over four years.
11 So I did all of that within four years. When I promoted
12 to sergeant, I went -- so when I promoted to sergeant, I
13 was actually in the drug interdiction unit at that time.
14 When I promoted, they moved me back down to street
15 narcotics as a supervisor. So I then supervised the guys
16 that I used to be one of.
17       Q   Okay. I just want to make sure I understand a
18 few terms you used. So there was a drug interdiction
19 unit at the San Antonio Police Department.
20       A   It was called the HIDTA Task Force, H-I-D-T-A.
21 It's an acronym, High Intensity Drug Trafficking Areas.
22 It's a -- so HIDTA is a federal program that if a certain
23 area exists that is a high -- that they consider to be a
24 high intensity area, the federal government will
25 establish a HIDTA unit there with federal funds, and then

Page 31

1  you target that high intensity drug traffic.
2        Q   When you say "they," are you referring to DEA
3  or some specific federal agency?
4        A   No, it's the -- golly, it is the -- I think
5  it's the -- I'll be honest with you, I think it's the
6  DOJ, but I can't remember exactly what federal office
7  oversees it, but it's established -- it's designated a
8  HIDTA area.
9        Q   Yeah.
10       A   And then federal monies are put there, and then
11 usually the agencies would then assign somebody over to
12 the HIDTA task force.
13       Q   Okay. So just so that I'm clear on how it
14 worked at the San Antonio Police Department, the federal
15 government would designate a particular geographical area
16 as a HIDTA area?
17       A   As a HIDTA.
18       Q   Okay. And then that would come with funds,
19 right?
20       A   Yes.
21       Q   Sort of like a grant?
22       A   Yes, sir.
23       Q   Okay. And then who -- would the staff on that
24 unit be purely local San Antonio Police Department staff?
25       A   No. It's typically a mixed bag. So usually

Page 32

1  there's -- it's a task force type situation with people
2  from different agencies assigned to it. In my instance,
3  when I was there working in HIDTA, it was SAPD,
4  San Antonio Police, and the DPS, the Texas Department of
5  Public Safety.
6        Q   Okay. So state and local agencies?
7        A   (Nodding head.) And there were some federal.
8        Q   Sorry, you were nodding.
9        A   I'm sorry?
10       Q   Is that a yes?
11       A   Yes. Sorry. And then there were some -- for a
12 time there were some federal people assigned there as
13 well, DEA.
14       Q   Okay. Are you aware of if the HIDTA program is
15 still going on?
16       A   I believe it is.
17       Q   Okay. And what area was designated -- I mean,
18 let me ask it this way. How big was the HIDTA area that
19 was designated when you were working at San Antonio
20 Police Department?
21       A   So that, I don't know, if it's several counties
22 or a region. I honestly don't know how they picked it.
23 At that time I really didn't think like that. I was --
24 that was before my time as a globally thinking
25 supervisor. I was just a young detective that was out,

Page 33

1  you know, doing the Lord's work.
2        Q   I mostly want to know -- I mean, maybe we'll
3  get into this a little bit later --
4        A   Sure.
5        Q   -- but I mostly want to know if a HIDTA area
6  can be as big as a whole state or if it's something more
7  small, like Bexar County or --
8        A   I think it's more regional than the whole
9  state. I think it's more -- I believe it's more
10 regional. I don't -- I'll be honest, I don't know what
11 our HIDTA looks like.
12       Q   Okay. And those -- the federal funds that
13 would come in, at least when you were with San Antonio
14 Police Department, for the HIDTA work, were funds that
15 were designed to help facilitate additional law
16 enforcement activity to track down drug trafficking? Is
17 that fair?
18       A   To disrupt drug trafficking organizations, to
19 find drugs.
20       Q   And you used the phrase "criminal
21 interdiction," right?
22       A   Uh-huh. I didn't -- I actually did not use the
23 phrase "criminal interdiction."
24       Q   What phrase did you use?
25       A   Drug interdiction, highway interdiction.

9 (Pages 30 - 33)

Sheriff Javier Salazar                                                July 16, 2024

Page 34

1    Q    Thanks for the correction.  So what's highway
2  interdiction?
3    A    Basically you set up and work traffic.  So
4  you're just a traffic -- you're just enforcing traffic is
5  all you're doing.  But then, you know, so you stop
6  somebody for a bona fide traffic infraction, hazardous or
7  nonhazardous, depending.  And then you, you know, do your
8  seven-step approach.  "Hello, I'm Officer so-and-so with
9  the San Antonio Police Department.  The reason that you
10  were stopped today is because of speeding.  You know, may
11  I see your driver's license and insurance."  And you go
12  from there.
13         THE WITNESS:  Am I talking too fast?
14         THE REPORTER:  No, you're fine.  I just noticed
15  the Zoom.  Do we need to get him back on?
16         MS. HEBERT:  Probably.  I don't know what
17  happened there.
18         MR. WINDHAM:  We can take a -- you want to go
19  off the record for a minute?
20         THE REPORTER:  Yeah, we're off the record.
21         (Recess from 9:37 a.m. to 9:39 a.m.)
22         THE REPORTER:  We are back on the record.
23    Q    (By Mr. Windham)  All right, Sheriff Salazar, do
24  you recognize that you're still under oath?
25    A    Yes, sir.

Page 35

1    Q    So we were just talking about highway
2  interdiction, right?
3    A    Yes, sir.
4    Q    At the San Antonio Police Department, right?
5    A    Yes, sir.
6    Q    And because our train of thought was cut off a
7  little bit, could you just repeat what you were saying
8  about what highway interdiction is?
9    A    It's just traffic enforcement.  You know, you
10  conduct a traffic stop.  You -- you know, there's a bona
11  fide violation, infraction of the law, either hazardous
12  or nonhazardous, equipment violation, speeding, what have
13  you.  You do your approach.  And then any observations
14  that you make during that approach might lead you to
15  conducting an interview.  And then based upon how that
16  interview goes, you may take it to the next level and ask
17  for consent or you may -- if there's reasonable suspicion
18  present, you may start a canine.  Or you may say:  Thank
19  you for your time.  Here's your warning or your ticket.
20  Have a nice day.  Drive safe.
21    Q    Okay.  Just want to unpack that a little bit.
22  So maybe a good reference point would be the patrol --
23    A    Now, if I may --
24    Q    Please do.
25    A    The time that I spent doing highway

Page 36

1  interdiction is different, probably a lot different than
2  it is today.  There were a lot of factors that were not
3  present back then to me in the early '90s that are today.
4         We didn't, we didn't have smart phones, we
5  didn't have social media.  Probably a lot less access to
6  technology.  I mean, we were pretty -- we had some
7  technology available to us back then, but the tools were
8  different, and probably the smuggling methods were a bit
9  different.  It's an evolving business, the drug trade.
10        So I may say things on how we did them back
11  then, because truth be told, I don't know a lot about how
12  it's done now.  It may be done differently nowadays.
13    Q    Okay.  When you say "done differently
14  nowadays," are you referring to the Bexar County
15  Sheriff's Office?
16    A    Just nowadays, drug interdiction, the business
17  of drug interdiction.
18    Q    Oh.
19    A    It's just -- it's probably vastly different
20  than it was back in my day.
21    Q    Okay.  Well, let's maybe unpack how it worked
22  in your day and we'll --
23    A    That's it.
24    Q    Yeah.  So at least back in your day, you know,
25  you gave the reference point a second ago of working in

Page 37

1  kind of standard patrol when you were focused on --
2    A    Traffic, standard traffic enforcement.
3    Q    Right.  So is the motivation or the purpose of
4  a traffic officer, at least when you were with
5  San Antonio Police Department, different than a highway
6  interdiction officer?
7    A    They're still out there to enforce the law.
8  They're still out there to act on anything that's found.
9  I mean, I can think of instances where just a routine
10  traffic stop, by a, what we called white hats back in the
11  day at the San Antonio Police Department -- traffic
12  officers wear a white police cap instead of blue -- where
13  it turned into, in at least one instance, the largest
14  seizure of drug money in the history of the San Antonio
15  area was done by a white hat, by a traffic officer.
16        So do they still find things?  Absolutely.  Do
17  they still conduct a roadside interview?  Yes.  And if
18  those questions lead them to believe something else is
19  occurring, then they're going to act on it.  But, so that
20  part is similar to what drug interdiction officers or
21  deputies do, or did back then.
22        But the purpose of the drug interdiction units
23  is to find drugs.
24    Q    Okay.  That's helpful.  So at least back then
25  with the drug interdiction unit or the highway

10 (Pages 34 - 37)

Sheriff Javier Salazar                                    July 16, 2024

Page 38

1  interdiction unit that you were working on, your mission
2  was just slightly different. Your focus rather.
3      A   Yes.
4      Q   Okay. It's all law enforcement, I understand
5  that.
6      A   Sure.
7      Q   But the focus is on finding drugs, whereas with
8  the traffic enforcement guys, the focus was on traffic
9  violations. Fair?
10     A   Yes, sir.
11     Q   Okay. Were there any special trainings or
12 tactics that you had to become apprised of to work on the
13 drug interdiction unit?
14     A   Yes. I attended several training classes
15 that -- one in Laughlin, Nevada, called Desert Snow, was
16 a dedicated course to teach you how to be a better drug
17 interdiction officer. They concentrated real heavily on
18 showing things like hidden compartments and how to
19 conduct that roadside interview and how to notice -- how
20 to detect signs of deception on your interview.
21        I also attended a class in Louisiana, New
22 Orleans, Louisiana, that was along -- I don't think that
23 one necessarily had a name, but it was along the same
24 lines, how to conduct a roadside interview and how to,
25 you know, conduct a search and look for hidden

Page 39

1  compartments.
2        Back then -- I don't know how it is now, but
3  back then, hidden compartments were a pretty big deal.
4  So they would show you, for example, in a Ford Mustang,
5  1980 to 1986, they had a hidden compartment here near the
6  door panel. So they would show you different common
7  smuggling methods, common natural voids in a car or how
8  they would add an after-market compartment to a car.
9      Q   Okay. You talked a little bit about how to
10 detect suspicious behavior. Is that the phrase you used?
11     A   How to detect deception.
12     Q   Deception. Sorry. Thank you. I mean, is the
13 term of art for that "behavioral analysis"? Is that the
14 way you think of it?
15     A   I mean, I guess that could be one
16 interpretation of it. That wouldn't be -- that wasn't
17 the term I used. I didn't say that. But I could --
18 yeah, I could see where you would analyze somebody's
19 behavior, somebody's reaction to a question or the way
20 somebody answers the question maybe the second time you
21 ask it. So sure, there's an amount of behavioral
22 analysis that goes into it.
23     Q   Okay. And that's -- honestly, I'm just trying
24 to get at -- I'm not from the interdiction world, right?
25     A   Sure.

Page 40

1      Q   So I'm just trying to understand the lingo.
2  And I've heard this term kind of floated around. So I
3  wanted to see if you were familiar with it.
4      A   Sure.
5      Q   And is that sure, as in you've heard of it,
6  or --
7      A   Yes.
8      Q   Okay. Got it. This sequence we talked about a
9  second ago of while you were on the interdiction unit for
10 the San Antonio Police Department conducting a traffic
11 stop and then making observations after that, that would
12 then lead you to an interview. Is that a fair
13 description so far of kind of how that --
14     A   Yes.
15     Q   Okay. Where would that roadside interview take
16 place?
17     A   On the side of the highway typically, on the
18 shoulder, or you know if you pulled them off the highway,
19 if you were in a particularly narrow part of the highway,
20 you would get on the speaker and say: Hey, can you pull
21 off here and meet me in this parking lot or off -- on the
22 access road.
23        So you would do it in a way that was the safest
24 environment that you could possibly find, for yourself
25 and for the violator.

Page 41

1      Q   Did that ever involve asking somebody to sit in
2  your patrol car and chat with them?
3      A   No.
4      Q   Okay. And then if the roadside interview led
5  you to believe that there was potentially some criminal
6  activity concealed in the car, that's when you would call
7  the canine; is that fair?
8      A   If there was enough reasonable suspicion
9  there --
10     Q   Okay.
11     A   -- to call a canine, then you certainly would.
12 But there were not canines assigned to us on a full-time
13 basis when I worked it.
14     Q   Okay. How long did you work again in that
15 capacity?
16     A   Maybe -- maybe a year. I was in the process of
17 studying for sergeant, so I know I took off three months,
18 studying and waiting for the birth of my child. I took
19 off about three months to, you know, put my nose in the
20 books and to await the birth of my child.
21     Q   Great. And you also worked at Internal
22 Affairs, right?
23     A   I did, sometime after that, yes.
24     Q   Okay. And I know we're a little bit off the
25 chronology now, but I just want to make sure I understand

11 (Pages 38 - 41)

Sheriff Javier Salazar                                           July 16, 2024

Page 42

1  what you did for Internal Affairs at San Antonio Police
2  Department.
3      A   I was an investigator, so at that point I was
4  already a supervisor. I had been a supervisor for about
5  six years at that point. No, maybe seven years at that
6  point. And all, all supervisors there at the San Antonio
7  police and here at the BCSO, all the investigators in
8  Internal Affairs are supervisors. They're sergeants.
9  Because you need the ability to order, to issue an order.
10 And so to order somebody of any rank, you have to have a
11 supervisory rank.
12     Q   Okay. At San Antonio Police Department -- and
13 by the way, just so you have a sense of why I'm asking
14 about your career and history, I just want to know kind
15 of the knowledge and experience you had coming into your
16 role at Bexar County. Is that fair?
17     A   Sure, absolutely.
18     Q   So at the San Antonio Police Department with
19 this Internal Affairs role, was your job to -- you
20 mentioned investigations. Was it investigations for
21 violation of San Antonio Police Department policy?
22     A   Yes, sir.
23     Q   Okay. And by the way, "policy" is a -- I know
24 it can be kind of an amorphous term, so I want to see if
25 we can agree on a definition for today. And feel free to

Page 43

1  suggest a different one. I don't want to put words in
2  your mouth.
3          But the way I think of it is rules and customs
4  that a law enforcement agency requires its officers to
5  follow. And those --
6      A   In writing.
7      Q   Okay. That's a great clarification. So
8  they're all in writing?
9      A   Well, let me clarify a bit. There may be a
10 verbal order that's issued that if you violate it, you're
11 subject to scrutiny by the Internal Affairs unit.
12     Q   Right.
13     A   So any orders, either verbal or written, by way
14 of a policy manual, a unit SOP, standard operating
15 procedure, or a written directive by, you know, a
16 supervisor or member of management, or I guess as we
17 mentioned a verbal directive by any supervisor or member
18 of management.
19     Q   Right. So because you just used a lot of
20 words, the reason I want to use "policy" to kind of
21 capture all that is that --
22     A   Yes.
23     Q   -- it's a shorthand, right?
24     A   Sure.
25     Q   So just so that I understand what we're

Page 44

1  agreeing to, a policy is the rules that a law enforcement
2  agency requires its officers to follow --
3      A   Uh-huh.
4      Q   -- largely written, but they can sometimes be
5  oral, unwritten rules --
6      A   Right.
7      Q   -- as orders.
8      A   Yes.
9      Q   Okay. What about, is it fair to say that --
10 no, that's a good definition. Let's use that. Does that
11 work for you?
12     A   Yes, sir.
13     Q   Okay, good.
14         All right. So what about disciplinary
15 proceedings that might have occurred in the Internal
16 Affairs department at San Antonio, how did those work, if
17 they did?
18     A   So you would conduct the investigation as an
19 Internal Affairs investigator. You would interview
20 witnesses. You would obtain documents. You would
21 conduct the entire investigation. At the end of it --
22 well, you would call non-respondent officers, in other
23 words, not the guy or girl that's under investigation,
24 but anybody else that was there as non-respondent
25 officers would be the second to the last people that

Page 45

1  would get called in. And then at the end of it all, once
2  your investigation was complete, you would call in the
3  respondent officer or officers. They would be given the
4  opportunity to see everything that was -- that's used
5  against them, so to speak. They would then be required
6  to write a response to that, maybe answer some questions.
7          And then the findings of that, whatever -- you
8  would take your case file, you would add the responses of
9  the officer or officers, the respondents. You would
10 present that to the Chief's advisory action board, which
11 was a board made up of civilian members from the
12 community, as well as uniformed members of the agency of
13 various ranks.
14         You would present the case, not with any
15 findings, just -- or not with any opinion, just basically
16 here's the facts of the case. I, as the Internal Affairs
17 investigator, investigated this, here's what I uncovered,
18 there's my findings. And then the board would vote on
19 culpable, not culpable. And then if they were found
20 guilty of it, what's their punishment going to consist
21 of.
22         That recommendation would find its way -- would
23 make its way to the Chief. Because it being an advisory
24 action board, it was advisory in nature. So the Chief
25 could then say, I agree, I concur with what the advisory

12 (Pages 42 - 45)

Page 46

1 action board is recommending, or I disagree with it a
2 little bit and I'm going to depart from it, or they got
3 it wrong, here's what I'm going to do.
4    Q   Okay.  That's really helpful.  One thing I
5 thought was interesting about that was your role as an
6 investigator involved presenting your findings to a
7 board.  Is that fair?
8    A   Yes.
9    Q   And your findings, it didn't involve a
10 recommendation about whether policy was violated?
11    A   We would -- we would say the allegation is
12 waste or conversion of city property.  They are accused
13 of waste or conversion of city property.  They used the
14 city computer to research an ex-boyfriend and --
15    Q   As an example?
16    A   As an example.  And here's what we found,
17 here's what we uncovered.  You decide as the advisory
18 action board member if what they did was improper.
19 Here's what we found.
20      So then the advisory action -- now, I wasn't
21 allowed to say, "I think they messed up."
22    Q   Okay.
23    A   It was, "Here's what we found.  You be the
24 judge."
25    Q   Were you allowed to -- or maybe was it your job

Page 47

1 to present:  Here are the policies I think are relevant
2 to this --
3    A   Yes.
4    Q   Because policy manuals can be quite big, right?
5    A   So, as an example -- if you want me to
6 elaborate on it.
7    Q   Yes, please do.
8    A   As an example, the initial complaint may come
9 in, I'm an ex-boyfriend of such-and-such officer.  I
10 believe she conducted improper research on me and my
11 current girlfriend.  Here's my complaint.  You would
12 research that.
13      But then during the course of that
14 investigation, if you found other things that were done,
15 then that was included.  Oh, okay -- oh, she sent an
16 inappropriate -- she was conducting research on her
17 ex-boyfriend, but during the course of it, she sent an
18 inappropriate message by computer to another officer.  So
19 there's another allegation.  Now that's initiated by the
20 administration.
21      The ex-boyfriend didn't bring that up.  We
22 found that during the course of your investigation.  Oh,
23 here she is, she took a two-hour lunch break and she
24 did -- so there's another allegation.
25      So it was pretty common for us to find

Page 48

1 additional violations aside from what the original was.
2 All of that would be presented to the board.
3    Q   Just what I want to really drill down on is
4 whether you in that role were responsible for -- I
5 understand that you said a second ago that you weren't
6 supposed to make a recommendation about the outcome to
7 the board, right?
8    A   Right.
9    Q   But was your job to identify the policies that
10 might have been violated?
11    A   Yes.
12    Q   Okay.
13    A   Now, let me -- can I say something though?
14    Q   Sure.
15    A   That was the San Antonio Police procedure.
16    Q   Uh-huh.
17    A   A little different than what they do here --
18    Q   Yeah.
19    A   -- what we do here.
20    Q   I'm going to ask about what you do here.  I
21 just wanted to make sure I understood your own personal
22 experience with this sort of stuff.
23      So let's talk about 2015, and you said you went
24 a little crazy and decided to run for Sheriff.  Is that
25 fair?

Page 49

1    A   Yes.
2    Q   Okay.
3    A   "Lost my mind" was the term I used.
4    Q   Lost your mind.  I appreciate you correcting
5 me.  Sometimes I forget the exact phrasing of things, so
6 I appreciate that.  Tell me about what was going through
7 your head and why you decided to run.
8    A   I say that jokingly.  I'm actually having the
9 time of my life as Sheriff.  But I just, you know,
10 there's a little bit of craziness that goes into seeing
11 somebody do a job, seeing somebody get the heck kicked
12 out of them on the news every day and going, "I could do
13 that better," you know.  And so I did.
14      You know, I obviously talked it over with my
15 wife.  I had reached a point in my career where I had
16 done all the jobs that I kind of wanted to do over there.
17 I was getting a little -- I wouldn't say "burned out" is
18 the term, but I was just -- you know, I had done all the
19 cool stuff that I wanted to do.
20      I wanted to then -- I was entertaining retiring
21 and going and running another agency.  So I told my wife,
22 you know, I don't know, I kind of see some of my friends
23 going off and becoming chiefs of police at school
24 districts or at smaller towns.  You know, what do you
25 think of that?  You know, maybe go be the chief of

13 (Pages 46 - 49)

Sheriff Javier Salazar                                        July 16, 2024

Page 50

1    security at a company. Maybe go be a spokesman for one
2    of the bigger school districts, you know, because that
3    was -- that's a skill set that I had at the time.
4          So talking over with my wife, she says, you
5    know, she -- it was one of those things, every time there
6    was a lull in the conversation, I would come back to it.
7    She got tired of hearing about it. Finally she goes,
8    "Look, I don't want to hear about it. I don't want to
9    talk about this anymore. Run for Sheriff or something.
10   I don't know." You know, "Or shut up. But just shut up
11   about it at this point," or "Stay put and shut up," you
12   know -- that was the words to that effect.
13         So I decided at that point, talked it over with
14   some of my friends: You know what, I think I'm going to
15   run for Sheriff.
16   Q    I don't mean to throw any aspersions at all on
17   the prior administration, because that's not the point of
18   this --
19   A    Understood.
20   Q    -- but you did use the phrase "I thought I
21   could do it better," right? So what did you see the
22   prior administration doing that you thought to yourself,
23   I could do this better?
24   A    So first and foremost, I thought the previous
25   Sheriff was a bit out of touch with the community. She

Page 51

1    wasn't from here. She was a transplant through the
2    military. She didn't come from a career in law
3    enforcement. She was a retired Air Force general, and so
4    literally, no law enforcement experience. Now all of a
5    sudden, she's the sitting Sheriff, which the law allowed
6    for back then. It's changed since then.
7          And I just, having seen some of the decisions
8    that were made, having seen some of the things that were
9    done, I thought that's -- she seems out of touch with the
10   community. I thought -- I felt like I had a pretty good
11   grasp on the community, having come from here, having
12   worked here my entire career, having been the spokesman
13   at the PD. I said, you know what, I could do a better
14   job, and decided to go for it.
15   Q    And I do want to get a little bit concrete
16   about it. You said there were some choices she made or
17   decisions that, you know, might have been out of touch
18   with the community.
19   A    Uh-huh.
20   Q    I mean, can you -- we don't have to play by
21   play assess her entire work product.
22   A    Sure.
23   Q    But I just want to get a general sense of what
24   you were focused on back then.
25   A    Things like equipment that had been selected

Page 52

1    for the agency, or things like -- you know, decisions
2    that were made on high profile, at least one high profile
3    shooting that happened during her time here. You know,
4    relationship with the deputy sheriffs, the actual boots
5    on the ground, with the union, for example. A lot of
6    that just was very, very strained. And I just decided,
7    you know what, I could do better.
8    Q    Was she -- I'm just sort of like guessing here,
9    right, from what you're saying. But was she not in touch
10   with what was going on on the ground for deputy sheriffs?
11   A    I didn't believe so. In my opinion, she was
12   not. In my opinion, she surrounded herself with some
13   people that I didn't think she should have been taking
14   advice from. That's my personal opinion. She probably
15   thought they were the greatest thing ever. But some
16   decisions were just being made that I just didn't like.
17         You know, there was -- having -- being the
18   spokesman at the agency, I was in touch with a lot of the
19   community activists. They were not happy with her, the
20   way things were being handled here at the Sheriff's
21   Office.
22         So I said, you know what, I think -- again, I
23   think I could do better. I've got the relationships in
24   the community. People know who I am. I'm the spokesman
25   for the SAPD.

Page 53

1          I keep checking as well the TV, so I'm sorry.
2          I'm well-known in the community. I think I'm
3    well spoken enough. I speak -- I'm fluent in Spanish.
4    I'm going to give it a shot.
5    Q    All right. And you know, I was asking a second
6    ago about whether she was in touch with what boots on the
7    ground were actually doing. Do you think you've done a
8    better job?
9    A    I do.
10   Q    Okay. With staying in touch with what officers
11   on the ground are actually doing?
12   A    I do.
13   Q    Okay. In terms of your -- it's a political
14   position, right, so you have to, I guess, give a sense to
15   voters of what you're going to prioritize; is that fair?
16   A    Yes, sir.
17   Q    Okay.
18   A    I do have to steer the agency a certain way,
19   and I have what my strategic priorities are for the next
20   week, month, year, four years, five years, whatever that
21   may be.
22   Q    Right. When you first ran, what were your
23   strategic priorities?
24   A    To again reestablish some of the relationships
25   within the community that I felt were, were strained. To

14 (Pages 50 - 53)

Page 54

1 try to reestablish that relationship between the boots on
2 the ground and the upper echelons of the agency, and to
3 expand outwards regionally and be good partners with our
4 surrounding counties and federal partners.
5     Q   Are there any problems that are -- I'm trying
6 to think how to phrase this.  I mean, I think it's
7 probably obvious that the San Antonio area, Bexar County
8 area, is in a unique part of the country.  Is that fair
9 to say?
10    A   Yes.
11    Q   I mean, you're close to the border, right?
12    A   (Nodding head.)
13    Q   Are there any -- was your law enforcement
14 strategy, coming in as Sheriff, at all tailored to those
15 unique problems?
16    A   Yes.
17    Q   Okay.  Can you tell me how?
18    A   Well, obviously, you know, organized crime and,
19 you know, human smuggling, border issues, if you will,
20 are some of the things that we've built entire units
21 dedicated to combating those issues.  Things like
22 fentanyl.  We have an enforcement component that targets
23 fentanyl, that Organized Crime Unit that I referred to.
24 But there's also the public information aspect to it that
25 we spend quite a bit of time educating the community on

Page 55

1 the dangers of fentanyl.  I personally teach a class on
2 the dangers of fentanyl.
3         So that's just one of the issues that, or
4 several of the issues that I see that we've used tools in
5 our toolbox or created tools in the toolbox to target
6 more specifically.
7     Q   And just at a high level, how do you think --
8 how would you grade yourself on that after the -- what's
9 it been, seven years since you --
10    A   Yes, sir.
11    Q   -- took office?
12    A   About.
13    Q   About seven years, what would you give yourself
14 as a grade on combating those problems?
15    A   I give myself an A plus on effort.
16    Q   Okay.
17    A   Because if I'm awake, I'm working.  And I'm an
18 insomniac.  So the taxpayers get their money's worth out
19 of this Sheriff, because I'm working 20 hours a day, you
20 know.  I may just be sitting watching Yellowstone, but
21 I'm checking emails and I'm issuing orders and doing what
22 I need to do.
23    Q   I always give myself an A plus on effort too.
24    A   Absolutely.  Look, I'll give myself an A plus
25 on some -- a lot of our results as well.  Are there some

Page 56

1 things we've missed the mark on?  Absolutely.  But you
2 learn from it, you dust yourself off, and you find a
3 better way of doing it.
4     Q   Great.  So this is a good kind of segue into,
5 what's your role as Bexar County Sheriff?  We've kind of
6 circled around this a little bit.  Could you give me a,
7 maybe a clean statement of, as Bexar County Sheriff, what
8 is your job?
9     A   Well, I oversee law enforcement operations for
10 the entire county.  1200 square miles of -- you know,
11 geographic area, 1200 square miles.  2.2 million Bexar
12 County residents.  And we provide wall-to-wall law
13 enforcement coverage for that area.  Even if you're in
14 the city, we're still your Sheriff's Office.  I'm still
15 your Sheriff.  If you're in one of the smaller
16 municipalities, I'm still your Sheriff and we're still
17 your Sheriff's Office.
18        Now, you may not need all of our services if
19 you live in those areas, but we provide it.  Over to you
20 if you want it or not.  And over to the agency that
21 oversees it whether they want it or not.
22        So I've got, on the law enforcement side of the
23 house, I've got deputies that patrol in cars, on bikes,
24 on motorcycles, helicopters, drones, robots.  You know,
25 I've got undercover officers, deputies.  I've got a full

Page 57

1 CID that investigates homicides, violent crimes, property
2 crimes.  I've got a SWAT team.  I've got, again, covert
3 operations.  Civil process, because that's the difference
4 between us and a police department is we serve civil
5 process.  I've got prisoner transport back and forth to
6 the state prisons, to, you know, outside picking up
7 people from other counties that may be wanted here, we'll
8 go pick them up from the jail and bring them here.
9        Which let me -- let me segue into another part
10 of what we do.  I also oversee safety and security at the
11 courthouse complex, right?  As Sheriff that's one of my
12 main jobs -- our main jobs is to oversee security.
13        Last survey, last numbers that I had, 3 million
14 people a year pass through the doors of the courthouse.
15 Judges, lawyers, prosecutors, defendants, witnesses,
16 jurors, people doing business at the courthouse for
17 assumed names, marriage licenses, things like that,
18 3 million people.  I'm in charge of making sure they're
19 all safe as they conduct their business.
20        And then the third function that we serve is we
21 oversee the jail, which is right across the street.  At
22 any given time I've got between 4 and 5,000 inmates,
23 closer to 5,000 usually, certainly today.  Over 5,000
24 today.  Inmates that we are responsible for their safety
25 and security as well, as well as keeping them contained.

15 (Pages 54 - 57)

Sheriff Javier Salazar                                                July 16, 2024

Page 58

1      At present, we actually have inmates housed out
2  to other counties because we're over capacity.  And you
3  can't have them crammed to the point where they're packed
4  in there like sardines.  We still have to maintain jail
5  standards.  So we've got some of our people housed out.
6      So in a nutshell I serve three major functions,
7  law enforcement services for the whole county, the
8  courthouse, and then the jail.
9      Q    Okay.  That's really helpful.  And you
10 obviously kind of touched on a lot there.  But for those
11 three functions that the Sheriff's Office performs, I
12 just want to get a sense of your relationship to those
13 things.  So is it fair to say, from what you just were
14 telling me, that you are setting Bexar County Sheriff's
15 Office policies and priorities; is that fair?
16     A    Yes, sir.
17     Q    And you are supervising officers or --
18     A    Managing.
19     Q    I'm sorry, go ahead.
20     A    Managing officers.
21     Q    Okay.  What's the distinction in your view?
22     A    A supervisor is a guy that sits over your
23 shoulder and goes:  Hey, do this, don't do that.
24     I don't have a lot of day-to-day dealings with
25 the boots on the ground.  I manage assets.  I manage

Page 59

1  resources.
2      Do I get out there and work with them from time
3  to time?  Yes.  But on a daily basis, I may go days or
4  even weeks without getting to talk, physically talk to or
5  work next to a deputy.
6      Q    Okay.  So you are managing Bexar County
7  Sheriff's Office assets and higher level officials to
8  ensure that those policies are being followed and those
9  goals are being met.  Is that fair?
10     A    Yes, sir.
11     Q    Okay.  Who -- I mean, you just mentioned a kind
12 of problem I've been wondering about, which is -- you're
13 sort of at the top of the food chain at the Bexar County
14 Sheriff's Office, right?
15     A    Yes, sir.
16     Q    How do you get the information you need to
17 ensure that you know what's happening on the ground?
18     A    Well, it has to get communicated to me.  Right?
19 I have to know that A, B or C happened overnight.  So
20 like, for example, the first thing I do when I wake up at
21 zero dark 30 is I check my emails from overnight and
22 figure out what occurred last night.
23     Q    It might be useful -- let me just give you an
24 exhibit, because I'm a visual learner.
25     A    Sure.

Page 60

1      Q    So I've got a couple of org charts that we can
2  take a look at.
3      All right.  So Ms. Hebert has just handed you
4  what we've marked as Exhibit 53.
5      A    Oh, my goodness gracious, I can't read this.
6      Q    I'm sorry about the size and the color, but
7  hopefully it's legible enough for me to just ask you a
8  few high level things about it.
9      A    Sure.
10     Q    Okay.  So first of all, have you seen this --
11 it looks like four pages.  Have you seen these pages
12 before?
13     A    Yes, sir.
14     Q    Okay.  What are they?
15     A    The first two are the organizational chart for
16 the BCSO.  The third is, looks like a snapshot of what my
17 command staff looked like at one point.  And the fourth
18 seems to be what it looks like, for the most part, today.
19     Q    Okay.  Just on that last page real quick, is
20 there any difference today in the command staff?
21     A    Yes.  Jaime Rios no longer works here.
22     Q    Okay.
23     A    He was the deputy -- he's the Deputy Chief, the
24 name that appears next to last on the page.
25     And this is not a blank position --

Page 61

1      Q    Deputy Chief?
2      A    -- anymore.  Yeah.
3      Q    Okay.  Who currently has Deputy Chief as their
4  position?
5      A    Deputy Chief Chris Molleda, M-O-L-L-E-D-A.
6      Q    Thank you.  I do want to kind of grasp the
7  relationship between the list of the command staff and
8  the two charts.  So let me tell you what I think is going
9  on, and you tell me if I'm wrong about this.
10     A    Okay.
11     Q    So it looks to me like the first page, BC 6036,
12 on the bottom left it says March 18, 2020.  Do you see
13 that?
14     A    Oh, my gosh.  Yes, sir.
15     Q    Okay.  And so is it fair to say that this chart
16 then is a reflection of how the Bexar County Sheriff's
17 Office was structured on March 18 of 2020?
18     A    I'd have to rely on this.
19     Q    Okay.  You don't have any reason to doubt it?
20     A    I don't have any reason to doubt it, no, sir.
21     Q    Okay.  What about the third page now, so BC
22 6038, is that the list of command staff we were just
23 talking about?
24     A    Yes, sir.
25     Q    Does that correspond to this March 18, 2020,

16 (Pages 58 - 61)

Sheriff Javier Salazar                                                July 16, 2024

Page 62

1  timestamp?
2     A  I believe it does.
3     Q  Okay.  And then likewise, for the second chart
4  and the second list of command staff, do those two
5  correspond as well?
6     A  This says April 21st -- is that 2022?
7     Q  Yes, 2022.
8     A  Okay.  It possibly matches it.  I'm not
9  100 percent positive.
10    Q  Okay.
11    A  But I believe it does.
12    Q  Does much of it match?
13    A  Much of it does.
14    Q  Okay.  All right.  That's mostly what I wanted
15  to know on that.
16    A  Okay.
17    Q  So -- okay.  So we were just talking, going
18  back to our discussion a second ago, about how you get
19  the information you need to do this managing.  Looks to
20  me like from both of these two organizational charts,
21  your name is at the top with four stars; is that fair?
22    A  Yes, sir.
23    Q  And that, you know, seems obvious, but that
24  means you're at the top of the food chain, right?  And
25  everybody below you is subordinate, right?

Page 63

1     A  Yes, sir.
2     Q  Okay.  So could you explain to me -- I mean,
3  you mentioned the three kind of main functions of the
4  Bexar County Sheriff's Office.
5     A  Uh-huh.
6     Q  Do those correspond with the three, on this
7  first chart here, those three big boxes with the two
8  stars, so Adult Detention Bureau, Chief of Staff, and Law
9  Enforcement Bureau?
10    A  Yes.  But the three areas of responsibility
11  don't necessarily line up perfectly with the three
12  branches.  In other words, there's some crossover and
13  cooperation that has to take place in there.
14       Now, there's -- the Chief of Staff oversees
15  what I call shared services.  So he or she at any given
16  time could cross over to the law enforcement side, could
17  to cross over to the detention side.  But they oversee
18  things that are shared by the whole agency.  So like
19  Internal Affairs, the Public Integrity Unit, dispatch,
20  communications, the media office.  That is centered in
21  what we call the administration.
22    Q  Okay.  And I do want to kind of walk a little
23  bit through the chain of command.  We're not going to get
24  to the point where the boxes are so small you can't read
25  them.

Page 64

1     A  Okay.
2     Q  But I do want to ask you about some of the
3  stuff at the top there.
4     A  Okay.
5     Q  So we just talked about the fact that on both
6  charts -- let's just start with the chart from 2020, to
7  not get confused.  So you're at the top.  The Chief
8  Deputy with three stars there, that is Chief Deputy
9  Serrato, right?
10    A  Yes, sir.
11    Q  And he's had that role since you started as
12  Sheriff?
13    A  No.
14    Q  Oh, I'm sorry, yeah.
15    A  Since 2019, I believe.  January of 2019.
16    Q  Okay.  And is he sort of your eyes and ears?
17    A  He is.
18    Q  Okay.  Does most of the information -- well,
19  let me ask it more open ended.  How are you getting most
20  of the information that you use to decide officers on the
21  ground are doing their job the right way?
22    A  Usually through the chain of command.
23    Q  Okay.
24    A  So I would say 90 percent of it flows up
25  through Chief Serrato, but some of it comes from one of

Page 65

1  the deputy chiefs or sometimes even lower down.
2     Q  Okay.
3     A  I've got folks that I talk to throughout the
4  agency.
5     Q  Yeah.
6     A  Much to the chagrin of my managers, sometimes I
7  talk directly to the boots on the ground.
8     Q  Okay.  What's -- do you have regular meetings
9  with Chief Deputy Serrato?
10    A  Yes, sir.
11    Q  Okay.  How often are you talking with him?
12    A  I mean, I may go a couple of days without
13  seeing him, because I'm out shaking hands, kissing
14  babies.
15    Q  Yeah.
16    A  Or, you know, doing different things -- I
17  travel out of the state sometimes on business.  And so --
18  but I'm pretty confident that he's got it covered.
19  That's why I feel comfortable going to D.C. or going to
20  Austin, whatever I'm doing.
21       So I'd say at least once a day, if we can.  It
22  may not be a standard meeting.  I may just stick my head
23  in his door or vice versa.  "Everything going good?"
24       "Yes."
25       "Okay.  Let me know if it doesn't."

17 (Pages 62 - 65)

Sheriff Javier Salazar                                            July 16, 2024

Page 66

1    So usually on a daily basis we're talking.
2    Q   When you say, "Let me know if it doesn't,"
3   would he -- does he debrief you on things that are not
4   going well?
5    A   No.  He debriefs me on things that are going
6   well, aren't going well, things that I need to know
7   about.  For example, yesterday I had to miss a command
8   staff meeting.  We have our command staff meetings Monday
9   mornings here.  Usually I sit here, Chief Serrato sits
10  there, Chief of Staff sits here, and then lower rank
11  chiefs for the rest of the room.
12       We touch base on what's everybody doing.  What
13  did y'all do last week, what did y'all do over the
14  weekend, what are we doing today, what are we doing the
15  rest of the week.  So everybody gives everybody else a
16  view, a vision of what's going on in their respective
17  piece of the pie.
18       Yesterday I missed it.  I missed that meeting
19  because I was talking to a new cadet class.  So Chief
20  Deputy Serrato was supposed to brief me on what happened
21  during the meeting.  We got about halfway through that
22  yesterday when we got interrupted, and so he still hasn't
23  finished briefing me on what happened, and maybe I get to
24  him today, maybe I don't.  But the fact that he's not
25  knocking on this door or pulling me out, tells me

Page 67

1   nothing's on fire right now.  So it's all good.  I can
2   wait till later to get that briefing.
3    Q   That's really helpful.  So the command staff
4   meeting, is it fair to say there's a representative at
5   that meeting from every kind of like major component of
6   the Bexar County Sheriff's Office?
7    A   Usually the Deputy Chiefs, Assistant Chiefs,
8   and Chief Deputy.
9    Q   Okay.  And just the org chart again, back to
10  the 2020 one, is it fair to say there's nothing that the
11  Bexar County Sheriff's Office does or its employees do
12  that is not somewhere on this chart?
13   A   Things that we do today may not be on this
14  chart.
15   Q   Sure.
16   A   So -- but yes.
17   Q   That's an inartful question.  So I guess as of
18  March 18, 2020, is it fair to say that nothing the Bexar
19  County Sheriff's Office would have been doing would not
20  be captured in one of these boxes?
21   A   Well, it may not say, you know, jail canine or
22  whatever.  There may be a unit or a team or an effort
23  that's not here, but I could certainly point to the box
24  and go, hey, even though it doesn't say that word, they
25  work right here.

Page 68

1    Q   That's sort of what I'm getting at is I just
2   want to make sure I understand that if Bexar County
3   Sheriff's Officers are doing something, you could point
4   to a box that that falls under?
5    A   For the most part.
6    Q   Okay.
7    A   Right.  I've got things like an honor guard.  I
8   have a mariachi group here.  Right?
9    Q   Not going to be on the box.
10   A   But you're not going to find the box that says
11  mariachi on my org chart.
12   Q   That's fair.  What we just talked about, would
13  those same things be true for the second chart of
14  March -- or sorry, April 21st, 2022?
15   A   Yes, sir.
16   Q   Okay, great.  All right.  And you mentioned I
17  think earlier on that you structure the whole agency; is
18  that fair?
19   A   Yes, sir.
20   Q   So is this org chart a reflection of that
21  structuring you were talking about?
22   A   Yes, sir.
23   Q   Both of the charts?
24   A   Yes.
25   Q   Okay.  What about the creation of units?  How

Page 69

1   does that work?
2    A   Typically, if there's an issue that is present
3   and we -- oh, did it stop again?
4        MS. HEBERT:  Let's go off the record.
5        THE REPORTER:  We are off the record.
6    (Recess from 10:18 a.m. to 10:26 a.m.)
7        THE REPORTER:  We are back on the record.
8    Q   (By Mr. Windham)  All right.  Sheriff Salazar,
9   do you recognize you're still under oath?
10   A   Yes, sir.
11   Q   Great.  So I think we were just talking about
12  the creation of units before we went off the record.
13  Does that sound right to you?
14   A   Yes, sir.
15   Q   Okay.  So -- and we do still have --
16   A   So --
17   Q   Yeah.
18   A   I'm sorry.
19   Q   No, go ahead.
20   A   We were talking about -- I think the last thing
21  you had asked me, if I'm not mistaken, was how are units
22  created, what drives a unit to be created, is that --
23   Q   Why and how, that's exactly what I was going to
24  ask you.
25   A   Why and how.  So sometimes it's a problem that

18 (Pages 66 - 69)

Sheriff Javier Salazar                                        July 16, 2024

Page 70

1  exists within the community, and if we don't have
2  something to cover that efficiently, then we have to
3  create a unit to do that.  And I'll give you a perfect
4  example now.
5        Senior fraud, white collar crimes is what we're
6  seeing popping up a lot.  People ripping off people from
7  the undocumented community, from the immigrant community,
8  bilking them out of literally, in one case, millions of
9  dollars of -- like 40 complainants got ripped off for a
10 total of over a million dollars.
11       We're seeing -- a pretty common scam right now
12 is: Hey, you missed jury duty.  You're going to be
13 arrested by the Sheriff's Office unless you buy Apple
14 gift cards and you --
15       You know, these people fall for the scam.
16       So I don't have a fraud/scam unit.  So right
17 now we're in the process of trying to figure out how to
18 get some people over there that are good at that, that
19 like doing that sort of work, and then we figure it out.
20       Now, you've seen the videos.  Commissioner's
21 Court is not going to say:  Oh, you need five more
22 detectives.  Let's give you the money.
23       I've got to figure out where is it going to
24 hurt less to give me some detectives to target that, and
25 then we create -- we stand up that unit if and when we

Page 71

1  get to that point.  So that's one of the ways that the
2  units are created.
3    Q    Okay.  And just so -- let me just summarize for
4  my own understanding.  The way I kind of took that is if
5  there's a law enforcement problem out there in the world,
6  a need that is being unmet, you will create a unit
7  tailormade to kind of address that need at the Bexar
8  County Sheriff's Office; is that fair?
9    A    Uh-huh.  And sometimes -- and they can be more
10 temporary in nature sometimes.  Sometimes experimental in
11 nature.  Clearly, I don't think senior fraud's going
12 anywhere any time soon.  I think it's going to be a
13 problem moving forward.  So that one I know that I'm
14 going to have to have something that does that.
15       Is it going to be three detectives or twenty at
16 some point?  I don't know.  But sometimes we just try
17 things, and then if they don't work out the way we
18 expected or the problem goes away, then we stand it down.
19    Q    Does the creation of a unit require your final
20 signature or sign-off, or how does that work
21 administratively is my question?
22    A    I just have to know about it in some instances.
23 Like, for example, members of the Street Crimes Unit --
24 all right.  I've got a Street Crimes Unit that they
25 just -- they're out looking for dope and guns and gang

Page 72

1  members, and doing proactive policing.  If we have a
2  particular part of town that's getting torn up by car
3  burglars, which we do at any given time, they'll tell me,
4  "Hey, Sheriff, we're going to grab four members of the
5  Street Crimes, and we're going to put two of them in
6  jeans and T-shirts, the other two are going to stay in
7  uniform, and they're going to go chase car burglars."
8        "Okay, let me know how it goes."
9        You know, sometimes it's as simple as that.
10   Q    So those kind of structural shifts are things
11 that would have to come across your desk in some
12 capacity?
13   A    They don't have to.  You know, I've -- there's
14 been instances where, "Hey, these guys made a really good
15 arrest last night on" whatever.  "Oh, yeah, we've got" --
16 "we assigned some guys to target that."
17       "Oh, cool.  They're doing a great job.  Keep it
18 going."
19   Q    I'm less asking about maybe like ad hoc, you
20 know, people being assigned to specific projects and more
21 about this structural stuff we've been talking about with
22 the organizational chart --
23   A    Sure.
24   Q    -- and the formation of units.  What I'm trying
25 to understand is, is it fair to say that you would

Page 73

1  understand if a unit had been formed?
2    A    I would understand the reasoning behind it?  Is
3  that what you're asking?
4    Q    You would know if it had happened.
5    A    I should know if it had happened.
6    Q    Okay.
7    A    Yes.
8    Q    And you sometimes decide to create units
9  yourself, right?
10   A    Uh-huh.
11   Q    Okay.
12   A    Yes, I'm sorry.
13   Q    Thank you.  I appreciate that.  What about
14 hiring?  Are you responsible for choosing who runs these
15 units?
16   A    Not necessarily.  You know, sometimes there's
17 already command structure in place or supervisors in
18 place, and we say:  Hey, look we're going to have a unit
19 that does this.  Let's put it here, and let so-and-so --
20       But I don't know that I necessarily go grab a
21 sergeant from over here and stick them over here, you
22 know.  I don't always do that.
23   Q    Yeah, okay.  So maybe the way to think of this
24 is if a new unit is formed and it already falls under one
25 of these big umbrellas that, you know, we see here on the

19 (Pages 70 - 73)

Sheriff Javier Salazar                                          July 16, 2024

Page 74

1    org charts --

2    A    Yes.

3    Q    -- you would have managerial authority over

4    that through the chain of command that we've been talking

5    about.

6    A    Yes, sir.

7    Q    And you would be briefed on what's going on

8    with that through the command staff meetings and those

9    type of things.

10   A    Yes, sir.

11   Q    All right.  What about -- this might be too

12   granular, but I just want to understand it.  What about

13   like equipment that Bexar County Sheriff's officers in

14   these different units are actually using, do you have any

15   role in that?

16   A    Some.  But I'll be honest, I still find out, a

17   new piece of equipment or a new capability that exists

18   that:  Wow, I didn't know we had that.  You know?

19        So, so for the most part, yes.  But like, for

20   example, our Axon body cameras, you know, cameras that we

21   have, I was pretty instrumental in getting that system

22   here.  But even to this day, I find out things that that

23   system is able to do that is a new feature that they just

24   turned on for us or that we purchased last budget cycle

25   and I just, I just found out about it.

Page 75

1    Q    So if there's equipment or technology that

2    officers on the ground are using, that is somehow going

3    to fall under -- it's going to come from somewhere in

4    Bexar County Sheriff's Office's budget, right?

5    A    Yes.

6    Q    That's fair?  Okay.  And I did want to ask

7    about the body cams.  So you said you were pretty

8    instrumental in getting those adopted?

9    A    Yes, sir.

10   Q    What was your thought process behind that?

11   A    I didn't like the body camera system in place

12   when I came into office.  It was -- it wasn't -- in my

13   opinion, it wasn't a dedicated body camera system.  It

14   was a cobbled together, let's take this smart watch

15   remote control and a -- literally a cell phone, and then

16   let's affix that cell phone to the officer's shirt.

17        Let's -- I'm not kidding here, cut a hole in

18   the shirt to allow the camera, the phone to see out.  And

19   then, it looks like an iWatch, but it's rubber and it's

20   got remote control features on it that's literally a

21   remote control for Bluetooth speakers.  And let's use

22   that to control this cell phone/camera.

23        That was what existed here.  And I hated it.

24   And so I set about getting a new system.

25   Q    So you wanted like a more --

Page 76

1    A    Actual body camera system.

2    Q    And the idea there, I assume, was to have a

3    kind of more comprehensive --

4    A    Yes.

5    Q    I'm not trying to put words in your mouth, but

6    just to understand, a more comprehensive accountability

7    measure for officers on the ground?  Or what was the

8    idea?

9    A    Something that made more sense for law

10   enforcement.  Again, this is where I think I can point to

11   the difference between a Sheriff that never spent a day

12   in a law enforcement uniform, and one that is a career

13   law enforcement officer.  Okay?

14        To think that a rubberized all black remote

15   control could be used to control this cell phone that I

16   glued to my chest, under a stress situation, where fine

17   motor skills go out the window the minute bullets start

18   flying or, you know, you're yelling at, trying to control

19   ten gangbangers, you know.

20        You're not going to sit there and -- especially

21   if you're like me and you need those glasses to see, this

22   doesn't make -- "Hang on, don't start shooting yet.  I'm

23   trying to control my," you know, Bluetooth whatever.

24   That didn't make sense.  So I said no, we need a

25   dedicated system.

Page 77

1        To me, thankfully, when James Serrato and I

2    worked at the San Antonio Police Department, we were

3    pretty familiar with Axon body cameras.  He oversaw the

4    implementation of Axon body cameras over there.  I -- as

5    the spokesman, it was my job to articulate to the

6    community why we needed that system.

7        And so between the two of us, we knew a lot

8    about it.  We were impressed by it.  And that was the

9    version of when we got it, it was -- that system has

10   grown by leaps and bounds since we took office.  But

11   that's an example of one product that I brought in, and I

12   think it was a great decision.

13   Q    Are all officers who do law enfor- -- active

14   law enforcement activities required to wear these Axon

15   body cams?

16   A    No.  Only those that we've got them assigned

17   to.  I wish we had everybody outfitted.  But budget-wise,

18   we can't afford to do that.  But those that have them are

19   required to use them.

20   Q    Let me just give a couple of examples.  The

21   folks who are doing whatever the comparator is for the

22   traffic enforcement we talked about from the San Antonio

23   Police Department -- I assume that goes on at Bexar

24   County.

25   A    It is.

20 (Pages 74 - 77)

Sheriff Javier Salazar                                July 16, 2024

Page 78

1    Q    Right?  And those folks have to wear a body
2  cam.
3    A    Absolutely.
4    Q    I assume that there's a comparator for the drug
5  interdiction, highway interdiction work we talked about
6  at Bexar County, right?
7    A    Yes.
8    Q    And they have to wear a body cam, right?
9    A    Yes.
10   Q    Okay.  What about dash cam, are officers
11 required to have dash cams for those same functions?
12   A    If they're equipped, then yes.  There's a
13 policy that lays out when you have to have it on and when
14 you do not.
15   Q    Do you know if those types of officers I was
16 just describing are required to have dash cams on their
17 cars?
18   A    I don't know that they're required to have dash
19 cams on their cars.  But if they do, then they're
20 required to utilize them under certain circumstances.
21   Q    Okay.  What is -- this may be obvious, but I'm
22 not in the world, right?  So what is the value of having
23 body cam and dash cam on officers?
24   A    Well, you're -- it's an unblinking second set
25 of eyes that is going to capture from as close to the

Page 79

1  officer's or deputy's perspective what occurred.  And for
2  the most part -- well, it can't be manipulated, you know.
3  And we spend quite a bit of time selecting and
4  configuring the system that can't be manipulated.
5    Q    I mean, I assume that -- I would think that the
6  point of having that unblinking eye, as a record of what
7  the officer was able to see, is both useful for
8  transparency, right?
9    A    Yes.
10   Q    And for protecting the officer against
11 presumably allegations they did something wrong, right?
12   A    Yes.  And also protecting the suspect and
13 giving the public a more complete picture of what it is
14 that, why the officer did what he or she did.
15   Q    Let me just kind of give an example and see if
16 we could make it a little bit concrete.  So suppose an
17 officer -- let's think of a traffic officer, right?
18 Suppose you conduct a traffic stop for the driver having
19 a broken taillight.  Is that an offense?
20   A    It is.
21   Q    Okay.  Just wanted to make sure.  And then the
22 driver alleges after the incident, "You know what, both
23 my taillights worked.  That was made up."  Right?  The
24 dash cam, I assume, is there to protect the officer from
25 that kind of allegation.

Page 80

1    A    Yes, sir.
2    Q    Right?  And if the officer doesn't have the
3  dash cam footage, presumably they're going to have a
4  harder time of disproving the allegation, right?
5    A    Yes, sir.
6    Q    Because they don't have the evidence they need
7  to do that.
8    A    Right.
9    Q    Right.  And that's just sort of a he said/she
10 said, I would think, right?
11   A    You would think.  But back in the day, like in
12 my days on patrol, we didn't have dash cameras.  You just
13 relied on officer testimony.
14   Q    Yeah.
15   A    And it's how well can you articulate what you
16 saw and does the judge or the jury believe you.  You
17 know, how believable are you.  That's what it came down
18 to back then.
19   Q    Yeah.
20   A    Nowadays, yeah, we've got to have as much
21 evidence as we possibly can.
22        Now, I don't wear a body camera.  And sometimes
23 in an extreme circumstance, I'll conduct law, you know, a
24 law enforcement function when there's nobody around to
25 stop a DWI, for example.  And it's back down to me, how

Page 81

1  believable am I when I say that this guy was weaving in
2  and out of traffic or doing 100 miles an hour or waving a
3  gun around.
4    Q    Presumably you have enough scrutiny on you
5  already --
6    A    Absolutely.
7    Q    -- I would think.  Okay.  Let's see here.  Just
8  a few questions about the charts.  I realize the text is
9  small, so if you have trouble reading, I can read
10 something to you, and we can just --
11   A    Okay.
12   Q    -- you know, confirm if it's correct or not.
13        MS. HEBERT:  And we're looking at Exhibit --
14        MR. WINDHAM:  Yeah, we're on Exhibit 53.
15        THE WITNESS:  Yes, sir.  The 2020 side or the
16 2022 side?
17   Q    (By Mr. Windham)  Yeah, I'm going to let you
18 know.  I'm still deciding what I want to ask you about.
19        Okay.  So let's start here.  Earlier you were
20 talking about -- and let's go to the 2020 chart.  So
21 that's going to be BC 6036.  When you were talking about
22 your Internal Affairs and traffic enforcement work at the
23 San Antonio Police Department, is there a kind of
24 comparable unit that deals with those things on this
25 chart?

21 (Pages 78 - 81)

Page 82

1    A    With Internal Affairs?
2    Q    Both that and with the traffic enforcement
3   stuff we talked about.
4    A    Yes, there is an Internal Affairs unit, and
5   yes, there is a Traffic Unit.
6    Q    Okay.  I mean, I think it seems obvious where
7   those are, but I want to make sure I have that right.  So
8   on the March 18, 2020, chart, there's a small box.  And
9   I'm sorry to do this to you, and I'll point to it so you
10  can see it.  But see that right there?
11   A    Yes, sir.
12   Q    Okay.  So there's a box that says "Internal
13  Affairs" that is under the big "Chief of Staff" box.
14   A    Yes.
15   Q    Right?  Is that what you're talking about?
16   A    Yes, sir.
17   Q    Okay.  They do the Internal Affairs type of
18  work that we were talking about earlier --
19   A    Yes, sir.
20   Q    -- with San Antonio Police Department.  Is
21  there any meaningful difference in how Bexar County
22  Sheriff's Office does it?  You alluded to the fact there
23  might be a difference.
24   A    There wasn't when I -- or there was a big
25  difference when I got here.  There was not an Internal

Page 83

1   Affairs unit when I got here.  I created that.  So back
2   then it was called the Professional Standards and
3   Integrity Unit.  So they did some Internal Affairs stuff.
4   To me they crossed over a little too much into the
5   criminal.
6        And I don't know if you know much about how
7   that works, but those have -- those two worlds have to be
8   kept separate for a reason.  It's not a good idea to have
9   your Internal Affairs people conducting criminal
10  investigations on officers.  It's too -- it muddies the
11  waters too much.
12        So I came in and I said, "No, we're not doing
13  it that way.  We're creating an Internal Affairs unit
14  that does this, administrative, and we're going to create
15  a Public Integrity Unit that does the criminal side of
16  it."  So I created both of those units.
17        So now it's structured a lot like what I was
18  used to at the San Antonio Police Department, what I
19  worked within at the San Antonio Police Department.
20   Q    And the difference between the Public Integrity
21  Unit and the Internal Affairs Units are that the
22  Public -- I'm sorry -- that the Public Integrity Unit
23  does criminal investigations and the Internal Affairs
24  unit investigates policy --
25   A    Administrative, yes, sir, policy.

Page 84

1    Q    Policy violations.  Okay.  Policy violations;
2   is that right?
3    A    Yes, policy violations.
4    Q    Okay.  Just wanted to make sure the record is
5   clear.
6        What about -- I think you talked earlier too
7   about the -- remember we were discussing the mechanics of
8   how Internal Affairs investigation worked at San Antonio
9   Police Department?
10   A    Yes, sir.
11   Q    And you were saying that you would do the
12  investigation and present your findings to a board?
13   A    Yes, sir.
14   Q    Is that how it works here?  Or tell me how it
15  works here.
16   A    Well, we're in the process of mimicking that.
17  Okay?  At present -- and I'll be honest, I don't like
18  this.  At present, our Public -- our Internal Affairs
19  supervisors, investigators, if you will, still determine
20  culpability themselves, the sergeant.  And I don't -- I'm
21  not fond of that.
22        So here this last contract, we were able to get
23  it in the collective bargaining agreement between us and
24  the County and the Sheriff's Association, the Deputy
25  Sheriff's Association.  We mutually agreed and put in the

Page 85

1   collective bargaining agreement that we would have an
2   advisory action board along the lines of what SAPD has.
3   And then they would advise me.
4        We're still in the process of building that.
5   It's been a couple of years.  Things move a little slow
6   for my taste around here.  But we're getting to the point
7   where we're going to have a similar setup to what SAPD
8   has, an advisory action board.
9    Q    So let's unpack that a little bit.  Why are you
10  not too happy with the way it works now where the
11  supervisor of the unit is determining culpability?
12   A    I just, I don't like it.  It doesn't -- I don't
13  like having one supervisor deciding if this occurred.  In
14  my opinion, and mine counts for a lot around here, right,
15  I want more eyes on it.  And I like the public having the
16  ability to weigh in on it, members of the public having
17  the ability to weigh in on things.
18        You know, before an officer is terminated or
19  given a 30-day suspension or cleared, I think members of
20  the public should have a seat at the table.  And so we're
21  trying to get to that point here.
22   Q    So an advisory board, if you get kind of the
23  board you want, would have public members?
24   A    It would have public members.  They would meet
25  here.  And our Internal Affairs investigators would stop

22 (Pages 82 - 85)

Sheriff Javier Salazar                                          July 16, 2024

Page 86

1  assigning culpability or clearing or whatever. They
2  would conduct a thorough investigation, present the
3  findings in an unbiased fashion to this advisory action
4  board. That advisory action board would then advise me:
5  Here's what we decided. We think this is worthy of a
6  30-day suspension, or a 3-day, or nothing, no action.
7      Q   At least with regard to how it works now and
8  how it has worked since you started, are Internal Affairs
9  officers -- these are all sergeants, right?
10     A   They're all sergeants.
11     Q   Are Internal Affairs officers required to get
12  any special training on how to do this job?
13     A   They -- you know, in a perfect world, we'd send
14  them -- we send them to trainings. You know, we don't
15  have an Internal Affairs school here. So we rely on
16  companies or agencies that host those throughout the
17  country. So sometimes we'll send people to another state
18  or another city. There's an Internal Affairs school
19  going on, put on by the Houston Police Department or by
20  the Public Agency Training Council, which is a company
21  that does different kinds of classes. So we'll send
22  them.
23         But a lot of what they do is on-the-job, right?
24  So they're all supervisors. They've all, most of them
25  have worked in another unit, they supervise people. So

Page 87

1  now it's like: Okay, you know how to supervise. Now
2  it's your turn to investigate whether what this officer
3  or deputy did was proper or not.
4      Q   In order to be a -- well, I would assume this
5  is -- let me back up. In order to be a Bexar County
6  Sheriff's officer at all, I would assume you would have
7  to be pretty familiar with Bexar County policies, right?
8      A   Pretty familiar. I mean, you have to know that
9  they exist. And you know, most deputies can't quote you
10 chapter and verse. But they should at least know right
11 from wrong, and know, okay, I'm not allowed to do this, I
12 am allowed to do this. I don't know what the exact
13 wording is, but I know I'm not allowed to do this.
14     Q   Does the importance or need of knowing policy
15 in a bit more granular fashion increase as you go up the
16 chain of command?
17     A   Yes.
18     Q   Okay. And so the supervisors and sergeants who
19 work on the Internal Affairs cases, and those
20 investigations, I assume they have to be pretty familiar
21 with what Bexar County policies are.
22     A   They should be. Again, they are not
23 necessarily expected to be able to quote you chapter and
24 verse, but they should at least know where to go find it.
25     Q   Yeah. That makes sense. And then I'm just

Page 88

1  trying to figure out a little bit more about your kind of
2  apprehension about the way it works now. Do you have
3  any -- I can't think how to ask this -- you know, are you
4  regularly questioning the conclusions of the Internal
5  Affairs investigations as they're currently conducted?
6      A   I can. That's not outside the realm of
7  possibilities that I would go, "I don't like how that
8  worked out. We need to reinvestigate that."
9      Q   I guess, let me ask it a different way. That's
10 not quite what I'm getting at. What I'm trying to figure
11 out is the system in place right now, do you generally
12 trust its conclusions, as like kind of a presumption?
13     A   Yes.
14     Q   Okay. But sometimes you do decide, okay, the
15 outcome of that one was wrong, in your own capacity?
16     A   Sometimes I'll say, you know, "Did we ask this,
17 this and this?"
18         "Oh, no, that wasn't asked."
19         "Well, send it back and ask that."
20         You know, and that's -- that creates a, not a
21 hardship, but okay, now we have to give a deputy a 48
22 hours notice to come back to Internal Affairs to ask
23 questions that should have been asked before.
24         But that's why I tell people, "Look, I know
25 your job. I'm going to scrutinize your work if it comes

Page 89

1  down to it. Do it right the first time, and I won't have
2  to send it back."
3      Q   How do these things come across your desk?
4      A   Typically I won't have an occasion to read over
5  a complaint -- or a case, unless it becomes a termination
6  case. Most of the times if it's -- or unless it's
7  something that's really egregious and is going to get a
8  hefty suspension, I'll be brought into the loop.
9          But for the most part, termination cases, I'm
10 the last -- I'm the deciding factor. It can be either
11 me -- either me or Chief Serrato can make that ultimate
12 decision. Typically it's me.
13     Q   Okay. We're going to get into some more
14 Internal Affairs stuff later. But right now I'm kind of
15 on the chart and trying to understand some of these
16 pieces.
17         So we identified where the Internal Affairs
18 unit is on the March 18th, 2020, chart.
19     A   Uh-huh. Yes.
20     Q   Let me just make sure I understand. Looks to
21 me like it shifted a little bit on the March -- on the
22 April 21st, 2022, chart. It's now in a different spot.
23 You see that?
24     A   Yes.
25     Q   Okay. So tell me -- I mean, it looks to me

23 (Pages 86 - 89)

Sheriff Javier Salazar
July 16, 2024

Page 90

1  like it's directly under Professional Standards and
2  Development, right?
3      A   Yes.
4      Q   Is there any meaningful difference in -- is
5  that just more of a --
6      A   Well, it looks like we shifted that one star
7  above it.  Chief Lupe Garza when she came in was the
8  Community Readiness and Training Division.  And then we
9  restructured a bit and changed her to Professional
10 Standards and Investigations Division, and then put
11 Public Integrity and Internal Affairs under her.
12     Q   Okay.  Was there any reason for that?
13     A   No.  We just restructured based upon -- like if
14 an incoming chief comes in, I'm going to capitalize on
15 what their skill set is.
16     Q   Okay.
17     A   Whatever they did before they got here, I'm
18 going to capitalize on that.  Oh, you've got experience
19 in this?  Okay, well, then you're going to oversee this
20 unit.  You're not going to oversee this one anymore.
21 This one is going over here.
22     Q   Got it.
23     A   So again, I tailor a lot of what we do based
24 upon what my chiefs know how to do, what their background
25 is.

Page 91

1      Q   Great.  That's helpful.
2          What about -- let's see here, I see on the
3  March 18th, 2020, chart -- I'm sorry the font is so
4  small.
5      A   No worries.
6      Q   I see a Traffic Enforcement Section.  Do you
7  know where that is, or do you want me to point it out to
8  you?
9      A   On which one are we looking at?
10     Q   The March 18th, 2020.
11     A   Okay.  I see Traffic Enforcement.
12     Q   Okay.  I mean, I assume this is obvious, but we
13 were talking earlier about the Traffic Enforcement
14 officers and unit.  That's where it is, right, on the --
15     A   Yes, sir.
16     Q   -- 2020 version of the chart.  Okay.  And then
17 I get a little bit confused, because then when we go to
18 the April 21st, 2022, chart, I just don't see Traffic
19 Enforcement.  And I don't know what happened to the unit,
20 so I'm wondering if maybe you can explain.
21     A   So I know at a certain point, and I don't know
22 that it was in 2022, but we moved Traffic Enforcement out
23 from under there where it was.
24     Q   Uh-huh.
25     A   To -- so the same chief, Molleda, that I talked

Page 92

1  to you about earlier --
2      Q   Right.
3      A   -- he oversees Patrol and Traffic.  So that's
4  on the law enforcement side of the house is where Traffic
5  is located now, today.  I don't remember at what point we
6  made that change or when Chief Molleda was brought in --
7          (Phone ringing.)
8          THE WITNESS:  I don't know what it's doing or
9  why it's doing that.  You can just ignore it.
10         MR. WINDHAM:  Just let the record reflect
11 there's a phone call coming in and we're --
12         THE WITNESS:  -- figuring out how to ignore it.
13         MR. WINDHAM:  There we go.  Problem solved.
14     A   So I know physically where Traffic is located
15 now.  I don't know why it wouldn't be on the org chart.
16     Q   (By Mr. Windham) Okay.
17     A   But we've always had a Traffic Unit.
18     Q   And I'm not trying to do a gotcha.  I more want
19 to know --
20     A   Understood.
21     Q   -- kind of where it is organizationally.  So
22 what you're saying, and tell me if I'm wrong about this,
23 Traffic Enforcement now is conducted under the Patrol
24 Division --
25     A   Yes, sir.

Page 93

1      Q   -- on the April 21st, 2022 chart.
2      A   Yes, sir.
3      Q   Great.  Thank you.
4          THE REPORTER:  I'm sorry, could you try to slow
5  down just a little bit, please?
6          MR. WINDHAM:  Yes.  And I realize I keep
7  messing up some of the dates and correcting myself.  I
8  apologize.
9      Q   (By Mr. Windham) I just had a few questions
10 about some specific units on here that I didn't
11 understand, and I do want to take a little bit of a break
12 after that.  So let's see if I can find it.
13         All right.  So back on the March 18th, 2020,
14 chart, on the very far right, there's something called
15 Criminal Investigations Division.  Do you see that?
16     A   Oh, my gosh.  Hang on a second.
17     Q   And I'm going to read to you what's under some
18 of the boxes and, you know, certainly object or your
19 Counsel can object if I'm getting that wrong.  But do you
20 see on the very far right Criminal Investigations
21 Division?
22         MR. FRIGERIO:  Are you talking about 2020?
23         MR. WINDHAM:  I am.
24     A   Yes.  I'm sorry.  I was looking at the wrong
25 spot.  I was looking at the little boxes.  Yes, the one

24 (Pages 90 - 93)

Veritext Legal Solutions

star.
Q (By Mr. Windham) Okay. It's the one star. And what I just want to ask about is a few of these little boxes. So I'm sorry they're small. But what is CID branch?
A Criminal Investigations.
Q I'm just curious why it's another box under Division. Division, branch, is there a difference or --
A Well, because that -- she's the Criminal Investigations Chief. And then the CID branch is -- now it's overseen by a captain.
Q Uh-huh.
A That -- it goes by the same name, I guess, but that's a captain now.
Q Has that always been the same person?
A No.
Q Who is it now?
A Now that captain there is Captain Agustin Pruneda.
Q And who was it in 2020?
A I don't recall.
Q Okay. And then I wanted to ask you about -- I know it gets smaller as we go down, but there's a little box that says "Narcotics Section." Do you see that?
A Yes, sir.

Q Okay. And then there's three smaller lighter colored boxes, and so I just want to briefly ask you about what those are. And maybe we can start at the bottom, because it corresponds, I think, to what you were talking about earlier about the high intensity drug trafficking area stuff.
A Uh-huh, yes.
Q It says, "HIDTA Task Force."
A Yes.
Q Is that the same thing it was at San Antonio Police Department?
A No, because I think that at the San Antonio Police Department, there was a whole unit. Like it was ten detectives. That, for us here, may mean we have one person assigned to that task force.
Q As of March 18, 2020.
A I believe so.
Q Okay. Was that one person or maybe a few people, were they doing the same type of work as the folks at the San Antonio Police Department version were doing?
A The same type of work, you know, obviously they're still targeting narcotics. But on a day-to-day, I'm not sure what it is that they do.
Q Okay. I mean, does Bexar County Sheriff's

Office still have this task force, do you know?
A I don't know if we still have somebody assigned. In other words, at the San Antonio Police Department it was our task force. We were the HIDTA task force for the San Antonio Police Department. Here I don't actually have a HIDTA task force. I may have one person assigned to someone else's task force.
Q Oh.
A So I think that's what those little boxes mean, that we just have somebody assigned there. It's actually one deputy.
Q Okay. That's helpful. Because the box above that says, "DEA Task Force."
A Yes.
Q And is it the same sort of thing?
A Same thing. It's not our task force, it's the DEA's. And I've got maybe a deputy or two assigned to various task forces over there. We're in the process of doing a second one to the DEA.
Q What about Asset Forfeiture right above that?
A Asset Forfeiture, at present, I believe we've got two deputies that that's what they do.
Q I just -- what is Asset Forfeiture?
A They -- so for example, if we, you know, hit a dope dealer's -- a drug dealer's house, and they've

got -- clearly they're living the lifestyle because they're dealing in hundreds of thousands of dollars in drug money and they've got, you know, big screen TVs and all this fancy stuff that they've bought with drug proceeds, we will seize those assets. And if we can establish a nexus to the, that it was bought with ill-gotten monies, we can seize those assets and --
Q Is that -- I'm sorry.
A Through a civil proceeding, we can seize those assets. Well, these deputies that I have doing that sort of work know that process.
Q That occurs prior to any criminal conviction, because it's civil, right?
A Well, it could happen prior to or before. It's a separate, separate proceeding. It's a civil proceeding that happens.
Q Okay. Does that also -- you mentioned the bust of a big drug dealer's house. Does that also happen during traffic stops too?
A It could.
Q I'm sorry, just to finish the question for the record. Does a asset forfeiture also happen during traffic stops?
A It could.
Q Are you aware if it does at all?

Veritext Legal Solutions

Page 98

1    A    Yes.
2    Q    Okay.  Is it, is it common at Bexar County
3  Sheriff's Office?
4    A    It happens.  I couldn't tell you if it's
5  something that we do every single day.  But it is
6  something that's possible every single day.
7    Q    What happens to the assets that are seized once
8  they're seized?
9    A    Sometimes they are auctioned, and then that
10  money is then deposited into an asset forfeiture account
11  or sometimes they're converted to agency use.
12    Q    Okay.  So I'm trying to think of when it would
13  be -- let me give you an example.  And tell me if this is
14  farfetched.
15    A    Sure.
16    Q    I don't know.  I'm just trying to understand.
17  Has a car ever been seized via asset forfeiture?
18    A    Yes.
19    Q    Okay.  And are cars ever converted to agency
20  use throughout --
21    A    Yes.
22    Q    Okay.  And what about the proceeds that go into
23  the asset forfeiture account, can that be used for
24  anything at Bexar County Sheriff's Office?
25    A    We can use it for training, equipment,

Page 99

1  different -- if we want to purchase a piece of equipment
2  and it doesn't exist in the budget, we can use asset
3  forfeiture funds.
4    Q    What about for hiring new employees?
5    A    No, I don't -- I don't think that we can use
6  that money for new employees.  And I don't think we can
7  use it to like pay overtime or things like that.
8  There's -- there's rules in place, laws in place that
9  dictate how we're able to spend that money and how we're
10  not.
11    Q    Okay.  I think this is a pretty good time for a
12  short break.  Is that okay with you?
13    A    Sure.
14        MR. WINDHAM:  Great.
15        THE REPORTER:  We're off the record.
16        (Recess from 10:59 a.m. to 11:07 a.m.)
17        THE REPORTER:  We are back on the record.
18    Q    (By Mr. Windham) Okay.  Sheriff Salazar, do you
19  recognize you're still under oath?
20    A    Yes, sir.
21    Q    I just had a quick clarifying question about a
22  comment you made earlier about the Internal Affairs
23  process.  And I think you used the word "unbiased" when
24  talking about how you want it to be with this new panel
25  system, this new board system.  Is that fair?

Page 100

1    A    Yes.
2    Q    Okay.  Do you -- I just want to clarify, do you
3  think that the way the system currently works has any
4  sort of bias problem?
5    A    No.  I think it lends itself to the ability to
6  claim bias.
7    Q    Okay.
8    A    And I just want to remove even a specter of
9  that.  Like I just, I don't like that system that was in
10  place when I got here.  I don't prefer it.
11    Q    So you don't -- you're not like -- you don't
12  personally think that your sergeants in charge of IA
13  investigations right now are biased?
14    A    No, of course not.  I don't think that they're
15  bad people.  I just don't like the system.  I don't like
16  that as a way of doing things.
17    Q    Okay.
18    A    I want to change our business practices.
19    Q    So the reason you don't like the system has to
20  do with who gets to decide.
21    A    Correct.
22    Q    That's your concern?
23    A    Correct.
24    Q    So it's not with the scope of evidence that
25  goes into the decision, it's just with who gets to

Page 101

1  decide?
2    A    Correct.
3    Q    Ultimately the buck stops with you, though,
4  right?
5    A    Yes, sir.
6    Q    Okay.  I do want to discuss Bexar County's
7  Criminal Interdiction Unit.  Are you familiar with that
8  unit?
9    A    It's more of a team, but yes.
10    Q    Okay.  Why do you say that?
11    A    Because that -- like it's not a unit that
12  you're going to see on the org chart, again.  It was --
13  it had been a team of deputies that tried to dedicate
14  themselves to that, but got pulled away a lot for other
15  things.  And just, to me, wasn't as effective as I would
16  have expected them to be.
17    Q    Let's walk through it a little bit.  When is
18  the first time that there was something called either the
19  Criminal Interdiction Unit or this team you're talking
20  about?
21    A    Uh-huh.
22    Q    When did that first show up?
23    A    I don't remember when we did it.  But I can
24  tell you that having been around other Sheriff's Offices
25  other parts of the state, I saw where -- like for

26 (Pages 98 - 101)

Sheriff Javier Salazar                                          July 16, 2024

Page 102

1  example, in North Texas they have a team that that's what
2  they do.  And they partnered with several surrounding
3  counties, and they established an interdiction team among
4  those counties, and they gave all those deputies shared
5  jurisdiction in that, in that region.
6       So that county devoted to, this county devoted
7  to, that county devoted to, plus patrol cars, and then we
8  all work in this county.  And it seems to work great in
9  North Texas.
10      We started exploring the idea of doing
11 something like that here with our surrounding Sheriff's
12 Offices.  We tried it as an experiment.  And again, to
13 me, it just -- it didn't work out.  I thought there was
14 better uses for those people.  So those, the deputies
15 that had been doing that sort of work have now been
16 redirected and absorbed elsewhere.
17      Q   I just want to -- I want to understand kind of
18 the time period.  So you called it an experiment.  How
19 long did that experiment last?
20      A   I don't recall.  It was at least a couple years
21 that we tried it.  But it just didn't perform as
22 expected.
23      Q   Whose idea was it?
24      A   Myself and my chiefs.  We thought about let's
25 try it, let's see how it works.  And maybe we'll get to

Page 103

1  the point where if it's working out well, we'll jump on
2  board with some of the surrounding counties and do a task
3  force along the lines of what they do in North Texas.
4       There are -- there is -- there are several task
5  forces that operate like that here locally, but we don't
6  belong to any of them.
7       Q   The initial vision for this -- I'm struggling
8  with the term if it's unit or team.  How do you want to
9  refer to it?
10      A   I guess task force.  Task forces are more
11 temporary in nature, because it's like, you know, it may
12 take root and become something.  It may not.  It's just
13 temporary in nature.
14      Q   Okay.  So let's, let's use that.  The Criminal
15 Interdiction task force -- is that a fair --
16      A   That's fair.
17      Q   -- way to put it?  What was the model for that
18 in your head?  What was -- sorry.  Go ahead.
19      A   We took a couple of deputies that had traffic
20 experience, so to speak.  I said:  Look, we're going to
21 try you guys out on the highways doing highway drug
22 interdiction.
23      Q   The same sort of stuff you were doing at the
24 San Antonio Police Department?
25      A   Kind of.

Page 104

1       Q   Okay.
2       A   A little more technologically advanced
3  nowadays, different tactics, different methods, you know,
4  of detecting -- detecting contraband that -- same basic
5  principle as what we had back then, but it's just a
6  different animal nowadays.
7       Q   Just to give one concrete -- because you
8  mentioned the Desert Snow training you got, right?
9       A   Yes, sir.
10      Q   So in the same vein as that kind of the Desert
11 Snow interdiction?
12      A   Along the same lines.  But again, a lot of the
13 tactics have changed.  A lot of the concealment methods
14 have changed, and a lot of the equipment and capabilities
15 that exist nowadays did not exist back then for us.
16      Q   So just to make sure I kind of get the
17 differences, are the differences between how you did it
18 back then based on that training and how it might have
19 worked on this interdiction task force at Bexar County
20 Sheriff's Office differences more in refinement of the
21 techniques?
22      A   Perfect example, back in the day when I worked
23 highway drug interdiction, it was not uncommon for us to
24 find a car heading south with a hidden compartment with
25 $100,000 cash in it, literally bulk cash being smuggled

Page 105

1  in a hidden compartment heading south, drug proceeds,
2  right?
3       Nowadays, that's not as common as finding a
4  prepaid phone card.  It looks like a prepaid phone card.
5  It's actually got a million dollars hidden on it, because
6  the powers that be, the evil technology people found a
7  way to put money on a hotel room key with a strip on the
8  back can be converted, and it's actually -- if you scan
9  it, it's actually got -- you know, leads to an account
10 somewhere with a million dollars in it.
11      That didn't exist back in the day.  I would
12 have looked at you like, you know:  What do you mean that
13 room key has a million dollars on it?
14      You know, for one thing, I don't even think
15 actual card keys existed back then.  You had a key to a
16 hotel room.
17      So again, there's just things that exist now
18 that did not exist back then.
19      Q   I completely get that.  I think what I'm
20 getting at is a little bit more kind of basic, which
21 is -- it sounded to me like from what you were saying
22 earlier with your drug interdiction work at San Antonio
23 Police Department that largely what you were doing was
24 stopping people for traffic violations, and then if there
25 was -- looking for evidence of criminality, like drug

27 (Pages 102 - 105)

Sheriff Javier Salazar                                        July 16, 2024

Page 106

1  trafficking, human smuggling, that kind of stuff, and
2  then extending the investigation as needed to investigate
3  that activity. Is that fair?
4      A   Yes.
5      Q   And that all arose from traffic stops, right?
6      A   Yes.
7      Q   Right? And you used the phrase, I think,
8  "interview." So you would conduct a roadside
9  interview --
10     A   Yes, sir.
11     Q   -- as a part of that. And then depending on
12  how that interview went, you would call a canine to the
13  scene, right?
14     A   Sometimes, or sometimes I would ask for consent
15  to search the vehicle, and I would search the vehicle.
16     Q   Okay. So what I'm trying to wrap my head
17  around is whether this interdiction task force that Bexar
18  County Sheriff's Office had, whether those basic
19  mechanics were kind of the same.
20     A   The same basic mechanics, yes. Just different
21  technologies exist and different smuggling methods
22  nowadays.
23     Q   Okay.
24     A   But overall the same concept.
25     Q   And I know you said you weren't quite sure of

Page 107

1  the date range, but I do want to try to see if we can
2  figure that out a little bit.
3      THE REPORTER: Can you please talk slower?
4      MR. WINDHAM: Yes.
5      THE REPORTER: Thank you.
6      Q   (By Mr. Windham) Do you have any sense of when
7  it might have been started?
8      A   I don't. Not in front of me. Maybe --
9  maybe -- so 2020 is -- no, I'm sorry. 2021 is when we
10  restructured and created the Organized Crime Unit,
11  division, at the TAG.
12     Prior to that, it was a little more fragmented,
13  like we had a Narcotics Unit, we had a Street Crimes
14  Unit, we had a Gang Unit. But when -- in 2021, when we
15  restructured and created the Organized Crime group, I put
16  all those people together, all those teams were squeezed
17  together. And we assigned them all at the TAG, which is
18  the Texas Anti-Gang facility.
19     It's a building here in San Antonio where every
20  agency in the area, federal, state, local, has a presence
21  at the TAG. All of my Organized Crime people are located
22  out there.
23     So that was 2021. So I would say maybe late
24  2021, early 2022 is when we decided to try this drug
25  interdiction, highway drug interdiction.

Page 108

1      Q   Okay. So turning back to Exhibit 53, Page BC
2  6037, I'm trying to place this task force --
3      A   Okay.
4      Q   -- that we've been talking about.
5      A   And which -- you're looking at 2020?
6      Q   I'm looking at April 21st, 2022, BC 6037.
7      A   Okay.
8      Q   And it sounds -- I mean, I'm just guessing, so
9  tell me if I'm wrong about this, but it sounds to me like
10  this drug -- this Criminal Interdiction task force would
11  have been located under the Organized Crime -- under the
12  Tactical Operations section; is that right?
13     A   Yes.
14     Q   And it would have been the Special Enforcement
15  Unit?
16     A   It would have been.
17     Q   Okay. And did that unit have things going on
18  other than this criminal interdiction work?
19     A   Yes.
20     Q   What else did it have going on?
21     A   Animal cruelty.
22     Q   Okay.
23     A   Astray cattle. That's a function of what
24  Sheriff's Offices are tasked with.
25     Q   Yeah.

Page 109

1      A   It's weird. Literally, by law, tasked with
2  stray cattle. That's what we do. And every Sheriff in
3  the state has an Astray deputy or an Astray unit, and
4  that's what you do.
5      And that Astray deputy, in this instance, was
6  coupled with an Animal Cruelty investigator, and that's
7  what they did. That was part of Special Enforcement.
8  And then when we -- Sergeant Pete Gamboa ran Special
9  Enforcement for us, the drug interdiction guys worked
10  under Sergeant Gamboa as well.
11     Q   Okay. Do you happen to know, is Sergeant
12  Gamboa still in charge of that?
13     A   No. He runs intelligence for me now.
14     Q   Okay. When was --
15     A   Intelligence, yeah.
16     Q   I'm sorry. When was that shift?
17     A   It kind of morphed into that. So he started
18  getting people assigned to that unit that did intel work,
19  cyber type stuff. And then it kind of morphed into it.
20     So at present that unit's kind of doing some
21  things with the jail and with street level intelligence
22  work. Right now we're awaiting the award of a federal
23  grant that's going to allow us to really establish a
24  jail-based intel unit.
25     So right now Sergeant Gamboa is kind of running

28 (Pages 106 - 109)

Page 110

1  it as a task force until such time as that grant money
2  comes in and we're going to stand up a full-fledged intel
3  unit that does cyber intel and then really capitalizes on
4  the -- I'm pointing this way over my left shoulder
5  because the jail's over there.
6    Q    Okay.
7    A    And that's a gold mine of information.  So the
8  jail-based intel unit, we'll be capitalizing on that a
9  lot.  And it will be located here in this building.  And
10 that's what they're going to do.  Sergeant Gamboa runs
11 that effort for me right now.
12   Q    Okay.  Going back to the formation of the
13 Special Enforcement Unit and the Criminal Interdiction
14 task force that was a part of that unit, was Sergeant
15 Gamboa chosen to run all that from the beginning?
16   A    Yes.
17   Q    And why was he selected?
18   A    He comes from that background.  Sergeant Gamboa
19 has worked, you know, covert operations and -- he
20 actually wears several hats for the agency.  But he came
21 from that background and I like his work ethic.
22   Q    Just because I don't quite understand what you
23 mean by "that background," do you mean interdiction
24 background?
25   A    No, not necessarily interdiction.  Narcotics,

Page 111

1  the narcotics world, covert operations.  I think he's a
2  strong leader, and I personally like his work ethic.
3    Q    Great.  While he was in charge of all that
4  we've been talking about, the special operations -- I'm
5  sorry, Special Enforcement Unit and the Drug Interdiction
6  task force -- scratch that.  I'm saying these words
7  wrong.
8        While Sergeant Gamboa was in charge of the
9  Special Enforcement Unit and the Criminal Interdiction
10 task force, was he attending these weekly meetings that
11 we talked about earlier where you were being debriefed
12 on?
13   A    Command staff?
14   Q    Yes.
15   A    No.
16   Q    Okay.  So how were you getting information on
17 what this task force was doing through the chain of
18 command?
19   A    Up his chain of command to Deputy Chief Nancy
20 Sanford, who still serves in that function.  She will
21 brief us on:  Hey, you know, last night we -- or this
22 weekend we handled a dog fighting ring, we handled, you
23 know, a sexual assault, and we're working on that murder
24 from last week.
25        You know, she kind of -- she oversees all

Page 112

1  things investigations, except Internal Affairs and PIU.
2  That's a different chief.  But she handles all of our
3  criminal investigations.
4    Q    Okay.  So was -- what was her title?
5    A    She's the CID chief, deputy chief.
6    Q    I just want to address her the right way.
7  Deputy Chief Sanford?
8    A    Deputy Chief Nancy Sanford.
9    Q    Okay.  Deputy Chief Nancy Sanford.  Was she in
10 that sort of intermediary position between yourself and
11 Sergeant Gamboa for the duration of this Criminal
12 Interdiction task force?
13   A    She's one of the persons that is -- was.
14   Q    Okay.  I'm just trying to -- just so you know
15 why I'm asking, I'm trying to get a sense of like how
16 you -- how the information was channeled to you and if
17 people changed in and out during that process.
18   A    Oh, yes.  But through others, through her and
19 then to me typically.
20   Q    Okay.  Was there any other major person from
21 whom you would have gotten information about the Criminal
22 Interdiction task force while it existed?
23   A    Well, like for example, I don't -- there's a
24 lieutenant in the mix there somewhere.  And at present I
25 don't remember if that lieutenant is Lieutenant Angela

Page 113

1  Freveletti or at the time Lieutenant Ray Ortega was in
2  that chain of command.  He's since moved on.
3        But sometimes I would call -- if I didn't have
4  time or if there was something going on or the media's
5  asking my, my media office for information right now on
6  what's going on, I might call Lieutenant Freveletti
7  directly and go, "Hey, what do we have working in the 800
8  block of West Commerce?"
9        You know, so it was not uncommon.  But if time
10 allowed and under normal circumstances it would go up the
11 chain and get to me.
12   Q    Okay.
13   A    Sometimes I would go directly to the source.
14   Q    The officers involved?
15   A    No, the -- mostly the supervisors.
16   Q    Okay.
17   A    It was a rare occurrence that I would have to
18 call an officer involved.  Because typically I don't have
19 their numbers.  I don't communicate with them too much.
20 But it's not uncommon for me to call Sergeant Gamboa, for
21 example.  Sergeant Gamboa and I are also personal
22 friends.
23   Q    Okay.
24   A    So not outside the realm of possibilities that
25 he and I are riding horses together off duty and talking

29 (Pages 110 - 113)

Page 114

1  shop or whatever.
2      Q    That's great.  I'm kind of curious now how
3  often, while this Criminal Interdiction task force
4  existed, did you talk to Sergeant Gamboa about what it
5  was doing.
6      A    I can't point to any specific times, but, you
7  know, during that time, we would be doing Mounted Patrol
8  stuff together.  I point to the Mounted Patrol insignia
9  on my chest.  Sometimes we would be doing a Mounted
10  Patrol function, looking for a body, for example, and
11  just talking as we're out riding horses somewhere, and
12  he'd, you know:  Hey, we're trying to find a load of dope
13  right now, we're trying to do this, we're trying to do
14  that.
15      So I can't say ten times or maybe fewer than
16  ten times, over the course of the existence of this, he
17  and I talked directly about stuff.
18      Q    Okay.  And honestly, I just want to kind of
19  understand the people who would have given you
20  information.  So it would have been occasional
21  conversations with Sergeant Gamboa about this task force.
22  Information sent, channeled to you through Nancy Sanford,
23  right?
24      A    Yes, sir.
25      Q    Any other major people who would have given you

Page 115

1  information about --
2      A    Well, sure.  Sometimes Deputy Chief Sanford --
3  like right now she answers to Assistant Chief Roland
4  Schuler.  And then, of course, they both answer to Chief
5  Deputy Serrato.  So sometimes Chief Schuler would come to
6  me with stuff, and sometimes Chief Serrato.
7      All those chiefs, whether they're chief deputy,
8  assistant chief, deputy chief, generically we call them
9  all "chief."
10      Q    Okay.
11      A    So I don't mean to confuse the issue.
12      Q    Okay.  That's -- so basically everybody in the
13  chain of command between Sergeant Gamboa and yourself is
14  somebody who would have given you some information on
15      A    Sometimes, if they could.
16      Q    -- the task force.  I'm sorry?
17      A    They could.
18      Q    Okay.  I mean, that's helpful.  What about the
19  command staff meetings, did the Criminal Interdiction
20  task force ever come up in those meetings?
21      A    I imagine it would have.  I can't point to any
22  specific days that it did.  But certainly that would be
23  something that if they did something monumental, Deputy
24  Chief Sanford would say:  Oh, and we had a whatever kind
25  of case over the weekend, and Sergeant Gamboa's outfit

Page 116

1  handled it.
2      Q    Okay.  Did you feel like you had all the
3  information you needed to have a basic grasp on what the
4  folks on the Criminal Interdiction task force were up to?
5      A    I kind of knew basically what they do, what
6  they did.  But day-to-day I couldn't tell you:  Hey,
7  their lunch breaks are way too long or they --
8      I can tell you they didn't, they didn't find a
9  whole lot of dope while they were out there doing it.
10  And I think part of it was, was they would get pulled
11  away a lot by other units.
12      So like, for example, if the coverts had
13  something working and they were watching a house, many
14  times I would -- I would come up on a scene:  Hey, we
15  just arrested the guy that we were looking for on this
16  drug investigation.
17      And I'd pull up and there's my highway drug
18  interdiction guy that just stopped -- obviously sat on
19  surveillance for hours and hours with my coverts, and
20  then stopped a guy.  And I would be like:  Why are y'all
21  using him?  He's supposed to be on the highway.  He's a
22  highway drug interdiction guy.
23      So I think sometimes, through no fault of their
24  own, they just were not very productive with doing
25  drug -- highway drug interdiction.

Page 117

1      Q    Do you have any sense of -- and I'm not going
2  to hold you to a number or anything like that.
3      A    Sure.
4      Q    But do you have any sense of sort of how
5  successful they were at finding drug or human smuggling
6  during these traffic stops?
7      A    They weren't very successful at it, I can tell
8  you.  I just, I can't think of any -- I can't think of
9  any instances where it got called for:  Hey, the guys just
10  hit a load of 20 kilos of cocaine coming up.  I can't
11  think of any instance like that.
12      Again, I don't think it's any fault of their
13  own.  We sent them to training.  They were good cops.
14  Just -- but highway drug interdiction is not one of those
15  things where you're going to be hitting a load of dope
16  every single day.  It's a very -- it can be very boring
17  at times.
18      And for every load of dope that you're, you
19  know, celebrating and high-fiving on the side of the road
20  for, you're going to stop a thousand cars to get to that
21  one load of dope.  So it's a very -- it's very easy to
22  get discouraged on it, and it's also very easy for them
23  to get bored with that and go:  Hey, Narcotics needs me.
24  I'm going to go over there and help Narcotics, you know.
25      So again, they weren't very successful.  I

Sheriff Javier Salazar                                      July 16, 2024

Page 118

1  don't think it was through lack of training or desire on
2  their part to be successful.  I just think the agency
3  overall didn't lend itself to that, to having that sort
4  of unit and being extremely successful, along the lines
5  of what we see in North Texas.
6      Q.  Yeah.  If the unit had been more successful at
7  finding drug and human smuggling during traffic stops,
8  would you have kind of kept it around?
9      A.  Possibly.  Sure, possibly.  But like for
10  example, I saw that some of the surrounding counties that
11  have units that do that were just literally every single
12  day getting in high speed pursuits with truckloads of
13  undocumented smuggling, people being smuggled.  And a lot
14  of times those would result in really bloody crashes.
15  And I didn't want any part of that.  So I just like, like
16  let's just pull these guys off the highway and at some
17  point -- they're good cops.  Let's reassign them
18  somewhere else, because this just isn't working.
19      Q.  Did you ever send them direction -- send this
20  task force direction like not to chase, not to engage in
21  those chases on the highway?
22      A.  Absolutely.  And I don't remember when we did
23  that.  But when it started to happen with a lot of
24  frequency, other like surrounding counties would chase
25  into Bexar County and then have a rollover.  Because

Page 119

1  look, a pickup truck already handles weird in a high
2  speed pursuit.  Put 12 people in the back of that bed,
3  and it's going to handle differently.  That's a bad --
4  that's a bad day waiting to happen.
5      Q.  Yeah.
6      A.  And I didn't want to be responsible for that.
7  So I was like let's -- if you know that it's not a load
8  of dope you're chasing, it's a load of people, let's
9  figure out a different way.  Obviously, we still need to
10  rescue these people and get them stopped, but we're not
11  going to be engaging in long pursuits with a vehicle that
12  we know is going to handle funny and probably roll over
13  on us.
14      Q.  Do you remember any other -- I know memories
15  are fuzzy sometimes.  But do you remember any other --
16      A.  Can I stop you for a second?
17      Q.  Sure, yeah.
18      A.  You asked if I gave the officers direction.  I
19  would have never given individual officers direction for
20  that.  It would have gone through the chiefs: Hey, we
21  need to not do these type of pursuits.
22      Q.  And I guess to kind of connect the dots there,
23  it would have probably been communicated to them through
24  Sergeant Gamboa?
25      A.  At some point, yes.

Page 120

1      Q.  Okay.  And then likewise for that process, can
2  you recall any other time when you gave a direction that
3  you wanted the folks in that task force to follow?
4      A.  That specific -- specifically them?
5      Q.  Yes.
6      A.  I can't think of anything offhand.
7      Q.  You mentioned that they went to training.  Do
8  you know much about the training that they received for
9  criminal interdiction?
10      A.  I don't.  I think -- I believe, if memory
11  serves, we actually sent them to North Texas to train
12  with that task force up there.  Sheriff Jim Skinner is a
13  good friend of mine.  He's -- he's a -- I don't think
14  he -- I don't know that he runs that task force up there,
15  but he's a part of it.  He's very helpful.  And so I
16  believe we sent some of these, at least some of these
17  guys up to North Texas to ride with that group for a
18  while.
19      Q.  Okay.  Are Bexar County Sheriff's officers --
20  this is a general question --
21      A.  Sure.
22      Q.  -- encouraged to do outside training?
23      A.  Sometimes that's the only choice we have.
24      Q.  Okay.
25      A.  If that training doesn't exist here, we'll send

Page 121

1  them outside.
2      Q.  Just to be clear about our terms, Bexar County
3  Sheriff's Office has a training academy, right?
4      A.  Yes.
5      Q.  And so what you're saying is that sometimes the
6  only, or the best option is to send them to a training
7  outside of the academy that you guys have?
8      A.  Yes, sir.
9      Q.  Okay.  And when that training occurs through an
10  outside party or vendor, does it need to receive approval
11  from Bexar County Sheriff's Office?
12      A.  Yes.
13      Q.  Okay.  How does -- do you know much about how
14  the approval process works for that?
15      A.  No, sir.
16      Q.  Okay.
17      A.  Just get a piece of paper on my desk at some
18  point, and it magically appears and I either sign it or
19  don't.
20      Q.  Okay.
21      A.  Sometimes.  Sometimes one of the chiefs will
22  approve it, and I don't even know that we sent somebody.
23  I'll find out after the fact.
24      Q.  Okay.  So sometimes that approval request will
25  come to your desk because you're the guy available and

31 (Pages 118 - 121)

Sheriff Javier Salazar                                                July 16, 2024

Page 122

1  other times it might go to Chief Deputy Serrato --
2      A   Yeah.  Yes, sir.
3      Q   -- and other folks in the command staff.
4      A   Sure.
5      Q   Okay.  And, I guess, on that question of
6  approving training -- by the way, my thinking face looks
7  like I'm rolling my eyes.
8      A   Understood.
9      Q   I get this all the time.  So I'm not --
10     A   No offense taken.
11     Q   I'm not rolling my eyes at you.
12         MS. HEBERT:  We have given him that feedback at
13  work many times.
14         MR. WINDHAM:  Yeah.  Trust me, when I was first
15  hired, it was a big problem.  And I haven't conquered it.
16         THE WITNESS:  I'm a girl dad.  I'm used to
17  rolled eyes.
18     Q   (By Mr. Windham) So what I want to know is when
19  either yourself or somebody else in the command staff is
20  deciding whether to approve one of these outside
21  trainings, how do you decide between approving and not
22  approving?
23     A   Is it too expensive, is it something that's a
24  traveling road show, so is it going to eventually come
25  here to San Antonio?  I'm not going to send somebody to

Page 123

1  New York for a training that I know next month is going
2  to be here.  Right?
3         We try really hard not to send people to
4  training in Las Vegas or New Orleans or Miami, right, for
5  obvious reasons.  Perception as well, right?  Even
6  they -- they may be the best cop in the world and they're
7  going to go do everything right, but just it doesn't look
8  good to send a team to Las Vegas for a week --
9      Q   Yeah.
10     A   -- you know.  Have we done it?  Absolutely.
11  I've gone to Vegas for training.  But it just -- it's got
12  to be -- we've got to make sure that they're doing what
13  they're supposed to be doing if they're going to go
14  somewhere like Vegas.
15     Q   And if you're going to approve something,
16  presumably you need a little bit of a description of what
17  the training --
18     A   Yeah.
19     Q   -- is going to entail, right?
20     A   Sure.
21     Q   And that material has to cohere with your goals
22  and policies here at the county, right?
23     A   Sure, sure.
24     Q   So if a training from an outside group was just
25  sort of not what you guys stand for --

Page 124

1      A   Yes.
2      Q   -- you would deny the approval?
3      A   Absolutely.  And what I saw drug interdiction
4  morph into here regionally is absolutely that.  It
5  doesn't -- it doesn't align with what I do.  Right?  A
6  lot of the agencies around here that do highway
7  interdiction, you'll see them posting on social media:
8  Look, we caught a bunch of illegals.
9         That is like nails on a chalkboard to me, that
10  word even.
11         And that's not what we're there -- I don't
12  think that's what we exist for.  And so that's, again,
13  one of the main reasons that this never took root and it
14  never formed into a task force with these other agencies.
15         Not to say they're bad people in those other
16  surrounding counties, but just -- but that sort of work
17  doesn't align with what I think we should be doing.
18     Q   So you were -- I'm just trying to drill down on
19  this now.  So in terms of what this unit -- sorry, not
20  unit -- what the Criminal Interdiction task force morphed
21  into, could you kind of spell out what your main concerns
22  were with that?
23     A   Just -- they weren't successful.  They weren't
24  like hitting a lot of dope.  They weren't finding a lot
25  of dope.  They weren't doing -- they spent a lot of time

Page 125

1  off the highway anyway, being pulled away.  And so I
2  said:  You know what, let's just redirect them.  There's
3  a better -- to borrow a term from my real estate days,
4  highest and best use.  Let's redirect these assets
5  somewhere else that I need them.  They're just not doing
6  what I need them to be doing.
7      Q   So that decision was you looking back,
8  hindsight is 20/20 --
9      A   It's just not working.
10     Q   Okay, but on the front end, were you
11  comfortable with the goals of the criminal interdiction
12  task force?
13     A   I was, because there was really no:  Hey, y'all
14  have got to find X amount of dope, you have to seize X
15  number of money, X number of guns heading south.
16         It was just:  Hey, let's get out there and see
17  what we find.  And then if it turns into something
18  worthwhile, like if we see that, holy cow, there's so
19  much dope going through here and we're hitting it
20  consistently every single day, let's go ahead and do
21  that, and then let's join forces with the surrounding
22  agencies.
23         Either join those that are south of us or join
24  those that are north of us, let's join forces along the
25  lines of what's in North Texas.  But it never came to

32 (Pages 122 - 125)

Page 126

1  that, because it just wasn't working.
2      Q   And I don't want to put words in your mouth,
3  but I want to summarize -- because we've talked about
4  this for a little bit.
5      A   Sure.
6      Q   And I want to see if I can kind of summarize
7  it.  So as Sheriff you were happy with the goals of the
8  Criminal Interdiction task force on the front end.  You
9  were happy with the training.  You liked the mission --
10     A   Yes.
11     Q   -- and the mechanics of how this work was done.
12 But at the end of the day, after a couple of years of
13 this, you thought this is a failed experiment?
14     A   Yes, sir.
15     Q   Okay.  What about any equipment that Criminal
16 Interdiction officers might have had that was different
17 from other officers?  Are you aware of anything like
18 that?
19     A   I know for a while they had LPRs, license plate
20 readers.  Other units had those as well, but I think
21 those guys used them a bit more.  I don't remember if
22 they were physically on the cars or if they were
23 stationary or what we were using.
24     I know there -- they wore a utility type
25 uniform that there are other units in the agency that

Page 127

1  wear a similar uniform to that.  But you wear that based
2  upon what kind of work you're going to be doing and how
3  likely is it that you're going to tear something like
4  this or look filthy all the time.  Right?  So we would
5  put them in a uniform that's modified to allow whatever,
6  to facilitate whatever their mission is.
7      Q   I don't know a ton about license plate readers,
8  but maybe you can help me understand.
9      A   I don't either.
10     Q   Okay, that's fair.  Let me just ask you this
11 then.  Are you aware that Bexar County Sheriff's Office,
12 at least during the period when this task force existed,
13 had a subscription with Vigilant --
14     A   Yes.
15     Q   -- license plate readers?  Okay.  That would
16 have been paid for by Bexar County Sheriff's Office,
17 right?
18     A   (Nodding head.)
19     Q   Is that right?
20     A   I think.  I think.
21     Q   Okay.  Well, tell me --
22     A   I can't remember if it was a trial, like they
23 gave it a trial basis, or if it was a paid subscription,
24 or if TAG paid for it for us.  I don't remember how.  I
25 do remember that it went away for a while, and then now

Page 128

1  my understanding is our -- I believe -- I understand, as
2  I understand it, our Axon system actually does some of
3  that now, the dash cameras actually do some of that now.
4  That was something I learned yesterday.
5      Q   Okay.  Just so I'm clear on that, are you
6  saying that the Axon dash cam system that BCSO has has
7  the capacity to do license plate reading?
8      A   Like it does something like that.  I don't know
9  to what extent.  I don't know if it does it the same way
10 Vigilant does.  But the reason it came up -- the reason
11 it came up is a couple of days ago I read an email, and
12 it was about a hit and run where a Dodge Charger had run
13 over a young man during the course of a drug deal gone
14 bad and broke his leg.
15     And in the report I read that there were
16 several license plate scans that happened in -- in other
17 words, patrol cars passed this guy and scanned his
18 license plate in the minutes leading up to this thing.
19 And I asked my chief, "What do you mean scanned?"
20 Because I know we don't have a whole bunch of LPRs out
21 there, if any.
22     They said, "No, Axon does that now."
23     "Oh, okay.  Great, cool."
24     So that's one of those things I don't -- I
25 don't even know if we still have Vigilant or if we need

Page 129

1  to because Axon now does some of that.
2      Q   Have you heard of a Fusion Center?
3      A   I have.
4      Q   What is a Fusion Center?
5      A   So a Fusion Center is a center, the one here
6  anyway is run by the San Antonio Police Department and
7  it's a facility where all agencies -- most of the area
8  agencies have a representation there, and it's shared
9  information.  So they'll gather information from
10 somewhere, work it, turn it into actionable intelligence,
11 and then put it out in a way that would, is appropriate
12 to whatever agencies.  It may be, "Hey, San Antonio
13 Police made a disturbance call at this guy's house.  He
14 threatened to commit suicide by cop, and now he's out
15 roaming around with an AR-15 looking for a cop to shoot
16 him," you know.  They may put out a bulletin like that.
17     They may say, "Laredo called us and said that
18 there's a load of dope coming our way.  It's in a maroon
19 Chevy Malibu, unknown license plate."
20     So the Fusion Center puts out information to us
21 about different things.  It could be an ongoing thing.
22 It could be a murder suspect.  It could be an officer
23 safety issue.  That's what I understand the Fusion Center
24 is.
25     Q   You said Laredo.  Do you mean the -- is there a

Sheriff Javier Salazar                                      July 16, 2024

Page 130

1  Fusion Center in Laredo?
2      A   I don't remember if it's in Laredo or in the
3  Rio Grande Valley or both. I know there's a Fusion
4  Center at SAPD, and I'm pointing toward the San Antonio
5  Police Fusion Center.
6      Q   You've got a good compass.
7      A   I used to work over there, so I know some
8  folks. I know there's others like that in other parts of
9  the state, but I don't remember where.
10     Q   Okay. There may be one in Laredo, to your
11 knowledge.
12     A   Might be. Might be.
13     Q   I still am a little bit shady on how these --
14 shaky on how they work. So are they staffed by people
15 from all the different law enforcement agencies who would
16 get information from them?
17     A   No.
18     Q   Okay. Do you know who they're staffed by
19 generally?
20     A   Usually the local, whoever runs it local. Like
21 obviously at the San Antonio Police Department, it's
22 mostly SAPD personnel that work in there, in that
23 facility. But I have deputies that work in that facility
24 as well, you know. But like, for example -- I think
25 there's actually some of the school districts actually

Page 131

1  have people that work in the Fusion Center as well, but
2  that's not to say that because you don't have anybody
3  there, you're not going to get information from them.
4      Q   Okay.
5      A   Right? So like, for example, South San --
6  South San Antonio Independent School District does not
7  have, to my knowledge, officers assigned to Fusion. But
8  if Fusion develops information that there's a threat on
9  the South San school, absolutely they're going to get
10 information about it, whether they have somebody assigned
11 there or not.
12     Q   Were you aware while the Criminal Interdiction
13 task force existed -- and that is such a mouthful. I
14 hate that I decided that was the phrase to use -- but
15 were you aware of that while the Criminal Interdiction
16 task force existed at Bexar County Sheriff's Office that
17 it was receiving information from Fusion Centers?
18     A   And you can just say "interdiction team" and
19 I'll know who you're talking about --
20     Q   Awesome.
21     A   -- if you want to.
22     Q   Great.
23     A   Was I aware that they were receiving? I don't
24 know specifically, but that would be the type of people
25 that I would want receiving information from various

Page 132

1  intel centers, whether it be a Fusion, a TAG, a HIDTA, or
2  very, very soon, hopefully, our jail-based intel.
3      Q   See, you would have -- sorry to cut you off.
4      A   No worries.
5      Q   You would have wanted the interdiction team to
6  receive intel from Fusion Centers to do their jobs,
7  right?
8      A   That's not -- yeah, however, whatever they need
9  to get the information. They may see it on social media
10 and then decide they're going to do something. They may
11 receive information from Fusion. They may have
12 informants that call in. So I'm like any good legit
13 source of information that you can get information from,
14 work it, do it.
15     Q   Right. And I'm not trying to lock down on like
16 they got their information from one type of source. I'm
17 just trying to confirm that that was a source that --
18     A   Sure.
19     Q   -- you would have wanted them to get info from.
20     A   Absolutely.
21     Q   Okay. And you used the example of a Fusion
22 Center providing a tip about a vehicle that meets a
23 certain description was coming your way, they're
24 suspected of being involved in drug or human smuggling;
25 is that fair?

Page 133

1      A   Yes.
2      Q   Is that the sort of intel that you would have
3  wanted the interdiction team to have used?
4      A   Everybody in my agency should be using
5  information like that, but certainly the interdiction
6  team. That's -- you know, get out there and do your job,
7  and find dope and find guns and find documented gang
8  members, find victims of smuggling, find victims of
9  trafficking, which is different than smuggling in some
10 instances. Go forth and prosper, go do what you do, and
11 then get -- whatever information comes your way from
12 wherever, absolutely. So yes, to answer your question,
13 yes.
14     Q   Okay. Let's see here.
15     (Discussion off the record.)
16     Q   In terms of the information that, you know, you
17 would want officers to use in these kinds of stops, I
18 think you said like good or legitimate or something like
19 that.
20     A   Yes, sir.
21     Q   How do you evaluate whether that information is
22 the sort you would want your officers to use?
23     A   I mean, is it legit? Can it be documented?
24 You know, is it legal? Is what you're doing legal?
25     Q   In the interdiction world -- and tell me if I'm

34 (Pages 130 - 133)

Page 134

1  getting this wrong -- my sense is that this has a lot to
2  do -- the focus is on human and drug smuggling. Is that
3  kind of a fair -- in this area.
4      A   Any contraband. Any contraband.
5      Q   Okay.
6      A   Yes, so humans, drugs, guns heading south, cash
7  heading south, anything.
8      Q   Okay. You said humans heading south? You said
9  humans heading south? Or just guns and cash?
10     A   Guns heading south and cash heading south.
11     Q   And humans would be coming north, right?
12     A   Humans could be heading south.
13     Q   They could be?
14     A   Absolutely.
15     Q   Okay.
16     A   And sold into slavery in Mexico.
17     Q   Okay. I see what you're saying.
18         You would -- I mean, tell me if I'm getting
19  this wrong. But you would want the information, the
20  intel that the interdiction team is using, to suggest
21  that one of these crimes is going on, right?
22     A   Say that again. I'm sorry.
23     Q   Yeah. Fair enough. You would want the intel
24  that the interdiction team is receiving to suggest that
25  one of these crimes is going on, right?

Page 135

1      A   Well, it's not a matter of me wanting the
2  information to suggest. It's a viable -- like if you get
3  information that X, Y, Z is occurring, then go look for
4  X, Y, Z.
5      Q   And I'm not getting at necessarily your
6  preferences. I'm more getting at, you'd want them to be
7  using reliable information as opposed to just --
8      A   Oh, yes. Absolutely.
9      Q   Okay. Got it.
10     A   As reliable as can be expected.
11     Q   Sure. We're making good progress. We may be
12  able to skip a lot of this stuff.
13         MR. FRIGERIO: Skip all you want.
14         MR. WINDHAM: Hear, hear, Charles.
15     Q   (By Mr. Windham) Okay. This is a pretty good
16  time for a short break.
17     A   Okay.
18     Q   Maybe five minutes. Is that cool?
19     A   Sure.
20         THE REPORTER: We're off the record.
21         (Recess from 11:48 a.m. to 11:56 a.m.)
22         THE REPORTER: We're on the record.
23     Q   (By Mr. Windham) All right. Sheriff Salazar,
24  we're back on the record. Do you recognize you're still
25  under oath?

Page 136

1      A   Yes.
2      Q   I want to ask kind of a capstone question about
3  this interdiction team. Do you recall when they, when
4  the team was disbanded?
5      A   It was here a couple months ago. I believe
6  Joel Babb at one point went to work at the training
7  academy. And I don't think we ever replaced him in the
8  unit.
9          And then Joe Gereb was being pulled away so
10  much that we just decided, you know what, the stuff that
11  he's getting pulled away from, let's just redirect him to
12  that.
13     Q   Okay. You mentioned Joel Babb. Do you know
14  him personally?
15     A   I do.
16     Q   Do you have an opinion of him?
17     A   Overall, I think he was a good deputy, of what
18  I knew of him, you know. For example, when he got -- it
19  seemed he got burned out on interdiction, for whatever
20  reason, and wanted to go to the training academy. I
21  thought that was a good move for us.
22         Just looking at that -- obviously I didn't know
23  that other stuff had occurred at that point. But looking
24  at that, I thought that was a good, that was a good move
25  for us. I liked his command presence with cadets. He

Page 137

1  seemed to be a very good instructor. And overall I
2  admired his work ethic.
3      Q   Just to circle back on one thing real quick, on
4  the interdiction team, and the staffing stuff that you
5  just mentioned, do you recall saying that he, he left and
6  you didn't replace him?
7      A   I don't believe we did.
8      Q   Okay. So you would be surprised --
9      A   You know what, we may have replaced him with
10  Louie -- another deputy. I don't remember his name.
11     Q   Okay.
12         MR. WINDHAM: Do you happen to know, Christie?
13         MS. HEBERT: (Shaking head.)
14         MR. WINDHAM: I'm curious if anybody knows the
15  name.
16     Q   (By Mr. Windham) So you wouldn't be surprised
17  if somebody else had replaced him on the unit?
18     A   I wouldn't.
19     Q   Okay. You just don't recall who that was?
20     A   I can see his face. He was a deputy that
21  worked in narcotics for a while, went to patrol, came
22  back. Louie something. I don't remember his last name.
23     Q   The point, from my perspective at least, is
24  that the interdiction team did not end when Deputy Babb
25  left it.

Sheriff Javier Salazar                                                July 16, 2024

Page 138

1    A   Right.
2    Q   There was some additional staffing that was
3  added after he left.
4    A   I don't know that we added.  I think we did
5  ultimately replace him for a while before redirecting
6  those folks elsewhere.
7    Q   Okay.  Where were they redirected to?
8    A   So I'm not positive on where they went.  I
9  think either one or both of them may work in Intel under
10 Sergeant Gamboa again.  But I'm not positive about that.
11 They may have been redirected to Uniform Gang Unit or
12 whatever.
13   Q   Where is Intel physically located?
14   A   Well, their office is here, but they're hardly
15 ever there.  They're in the field doing stuff.
16   Q   Okay.
17   A   But they have work stations here.
18   Q   Got it.  And do you recall where -- Sergeant
19 Gamboa, has his office always been physically located in
20 the same place?
21   A   No, no.  That was a very recent move.  And I'm
22 sorry, I'm pointing over my right shoulder because
23 through this wall -- through a couple of walls over here
24 is where they're located.  They had been working out of
25 the TAG, the Texas Anti-Gang center.  And they still

Page 139

1  maintain a presence there.
2        So Sergeant Gamboa, even though his office is
3  technically here, he's got deputies that he's responsible
4  for that work at the TAG.  I believe the people at the
5  Fusion also work for him, I believe.
6    Q   Okay.  So just to be clear, Sergeant Gamboa
7  has -- tell me if I'm getting this wrong -- Bexar County
8  Sheriff's Office employees who work at the San Antonio --
9    A   Fusion.
10   Q   -- Police Department Fusion Center.
11   A   Yes, sir.
12   Q   Okay.
13   A   That are assigned there.
14   Q   Okay.  Do you know how many?
15   A   I think one.
16   Q   Okay.  And the sort of umbrella that covers
17 Sergeant Gamboa's various units he supervisors, is that
18 Criminal Investigation Division, or what is the formal
19 umbrella for that?
20   A   It's under -- it's under the chief that runs
21 Criminal Investigations, but she oversees CID, which is
22 homicide, robbery, sexual assaults, special victims unit.
23 She oversees that.  But then she also oversees the
24 Organized Crime component.  He works under the Organized
25 Crime component.

Page 140

1    Q   Okay.  And the Organized Crime component is
2  chiefly located in the TAG building; is that correct?
3    A   Yes.
4    Q   Okay.  Just want to make sure I understood all
5  that.  There's a lot of acronyms flying around.
6    A   Yeah, I know.  We love our acronyms in law
7  enforcement.  It's irritating.
8    Q   I get it.  I've used them today.
9        So in terms of Deputy Babb being transferred or
10 moving to the training academy, we talked about that a
11 second ago, what are the qualifications to work in the
12 training academy?
13   A   Well, you have to have at some point the
14 ability to get a TCOLE instructor license.  Not everybody
15 enjoys that kind of work of being an instructor.  Some
16 people love it and are great at it.  He seemed to be good
17 at it.  I liked the command presence that he brought to
18 it.  You know, you're trying to instill in cadets this
19 level of professionalism, and his command presence lends
20 itself to that.  I like the way he, you know, presented
21 to the cadets.
22        So you have to have a willingness.  You have to
23 be good at it as well.
24   Q   Good at the instruction work?
25   A   Good at the instruction work.

Page 141

1    Q   What about good at actual law enforcement work?
2    A   Well, I mean, obviously you have to know what
3  you're talking about.  I'm not going to have you teaching
4  use of force if you've never been in a position to
5  utilize force.
6        You know, most -- like, for example, most of
7  our firearms instructors have been in shootings and
8  they've done -- obviously they survived them, and they've
9  done -- they're good at it.  They're good shooters and
10 they're good -- but they're also -- it's not enough to be
11 a good shooter.  You've got to be a good instructor to be
12 able to convey that and teach that skill.
13       So again, you can't just say:  Hey, you're a
14 good instructor, I'm going to send you to the academy and
15 be, you know, good at everything that they teach.
16       Some people are better tactics instructors than
17 they are on the firearms or they might be better at
18 teaching Penal Code, but I'd never let them near the gun
19 range, that sort of thing.
20   Q   And presumably, as far as teaching cadets,
21 folks who are instructors in the academy have to be
22 pretty well versed in Bexar County policy, right?
23   A   Absolutely.
24   Q   So tell me if I'm missing a qualification, but
25 the main qualifications I think that we just talked about

36 (Pages 138 - 141)

Page 142

1  were, to be an academy instructor, you have to have the
2  TCOLE certification, you have to be a good instructor,
3  you have to be a good officer, and you've got to know
4  BCSO policy.  Is that fair?
5      A   Yes, sir.
6      Q   And Deputy Babb met those qualifications,
7  according to you?
8      A   On the surface, it seemed that he -- sure, he
9  seemed like a good, squared-away officer.  You know,
10  ultimately his career here came to an end.  That's a
11  shame.  But perhaps, at least on some level, he wasn't
12  what we thought he was.  Or he committed something that
13  we just clearly didn't see eye to eye on, and it was time
14  for him to go.
15      Q   Okay.  And we can talk about that a little bit
16  later.
17      A   Sure.
18      Q   I'm just trying to grasp the move to the
19  academy at the time and the thought process that might
20  have been -- did you have to sign off on that, his shift
21  to the academy?
22      A   No.  I don't typically sign off on transfers.
23  I can veto them, though.  If the chiefs are going to move
24  somebody somewhere and I'm like, "No, I know that person,
25  that person's not going to" -- "we're not going to get

Page 143

1  the performance that you think we're going to get," I can
2  veto it.
3          But in that instance, at some point I found out
4  Babb wanted to go to the academy.  I thought it was a
5  good move.
6      Q   So you didn't veto it?
7      A   No.
8      Q   Okay.  And I -- at the very beginning of this
9  deposition, I mentioned that I represent Alek Schott in
10  the lawsuit that brings us here today.  Are you familiar
11  at all with the incidents of March 16, 2022, that gave
12  rise to this lawsuit?
13      A   Overall, I know some -- I know some of what
14  happened, yes.
15      Q   Okay.  You don't have to tell me everything you
16  know, but I'm curious how you came to know about it.
17      A   At some point I found out, and I don't remember
18  how I found out, if I was briefed by a chief or my media
19  officer or whomever, but I just knew that there was a
20  traffic stop, a vehicle was damaged by a canine, if I'm
21  not mistaken, and the gentleman that was stop disagreed
22  with the stop itself and made a complaint.
23      Q   Okay.  Did you learn about that prior to the
24  filing of this lawsuit?  Do you know?
25      A   I think so.

Page 144

1      Q   Okay.  Do you know how you would have learned
2  that?
3      A   No, sir.
4      Q   Okay.  Maybe I'll jog your memory in a second
5  with a document or two.
6          Have you seen any videos of the incident?
7      A   I don't think so.
8      Q   Okay.  Have you read any documents describing
9  what happened?
10      A   So if you told me I had, it wouldn't surprise
11  me.  But for example, I know that Babb has been
12  terminated, but I didn't terminate him, so I don't -- I
13  don't know that I would have had a chance to read
14  whatever it was.  And I don't remember why I wasn't the
15  one that terminated him.  Typically it is me.  But in
16  this instance, I don't know if I was out of town when it
17  occurred or if something happened and I couldn't be here,
18  so Chief Serrato did it.  So I don't know if I've read
19  any documents on it.
20      Q   Okay.  And we'll look at a couple.  I mostly
21  just want to know about your background knowledge so I
22  know what you don't know.
23          MR. WINDHAM:  Okay.  Let's try -- we're on
24  Exhibit 54, right?  Okay.  I'm going to introduce another
25  exhibit.

Page 145

1          MS. HEBERT:  This would probably be a good time
2  for a break, about here.
3          MR. WINDHAM:  Okay.  Let's do that.  Is that
4  fine?
5          THE WITNESS:  Sure.
6          THE REPORTER:  We're off the record.
7          (Recess from 12:07 p.m. to 1:31 p.m.)
8          THE REPORTER:  We are back on the record.
9      Q   (By Mr. Windham) All right.  We're back from
10  lunch.  Sheriff Salazar, do you realize you're still
11  under oath?
12      A   Yes, sir.
13      Q   Great.  So before the break, I was going to
14  hand you an exhibit, and I'm going to do that now.
15          All right.  Sheriff Salazar, I'm handing you
16  what's been marked and previously introduced as Exhibit
17  46.
18      A   Okay.
19      Q   And it's a big document, so take a minute to
20  look through and let me know if you recognize what it is.
21      A   It appears to be an Internal Affairs case
22  packet, case file.
23      Q   Okay.  And if you flip to 8349 through 8359,
24  this appears to me to be the case file for the initial
25  Internal Affairs investigation into the stop of Alek

Sheriff Javier Salazar                                           July 16, 2024

1  Schott --
2      A   Yes.
3      Q   -- on March 16 of 2022; is that fair?
4      A   Yes, sir.
5      Q   Okay.  And I want to just kind of get a sense
6  of how these Internal Affairs investigations go.  So just
7  maybe you could tell me, how does an investigation start
8  in Internal Affairs?
9      A   Several different ways.  A member of the public
10  that feels they were wronged can come in and do a sworn
11  statement with us and initiate things that way.  Or in
12  some cases a member of the administration can find
13  something and initiate a use of force -- or a complaint
14  on that, based on a filing of use of force, for example,
15  if a supervisor is reviewing body camera footage and
16  goes, "Whoa, wait a second, that's not proper," they can
17  initiate based upon what they find.
18      Q   Okay.  So there are kind of two pathways to the
19  Internal Affairs unit starting an investigation, one of
20  which would be a complaint from a member of the public,
21  the other of which would be somebody in the Internal
22  Affairs unit starting the investigation?
23      A   No, anybody from -- any member of the agency
24  can initiate if an officer -- a deputy sees another
25  deputy do something and it's improper, he could say,

1  "Hang on just a second.  I need to write that up.  I
2  witnessed something wrong."
3      Q   Okay.  So then the two ways an investigation
4  could start in Internal Affairs are from a public
5  complaint and from an internal --
6      A   Yes, sir.
7      Q   -- source?
8      A   Yes, sir.
9      Q   Okay.
10      A   And in that instance, the administration is
11  considered to be the complainant.
12      Q   Okay.  In terms of these public complaints, you
13  did use the phrase earlier "sworn statement."  Are they
14  always sworn statements?
15      A   To my knowledge.
16      Q   How can people submit complaints?
17      A   I mean good question.  I'm not 100 percent
18  positive on all the ins and outs of it.  But I mean,
19  certainly they can come in to the Internal Affairs office
20  and do one sworn.
21          But somebody out of state, I'm not sure if they
22  could just like submit a sworn affidavit with the help of
23  an attorney.  I don't know how that works.  But I know
24  the majority of the time that I know of is they come to
25  IA and they do -- IA being Internal Affairs -- they come

1  to IA and do a sworn statement.
2      Q   Okay.  If you flip to 8352 -- just take a
3  minute to get there.
4      A   Okay.
5      Q   It looks like to me these are some handwritten
6  notes from a call with Alek Schott on March 18 of 2022.
7      A   Uh-huh.
8      Q   Is that fair?
9      A   Yes.
10      Q   Okay.  And I don't know whether this would have
11  been a sworn statement.  I'm not sure if you know.
12      A   I don't know whose handwriting this is.
13      Q   Okay.  Does it -- is it possible that a
14  complaint could be submitted that isn't under oath, in
15  person?
16      A   I, I'm under the impression that it's got to be
17  a sworn statement to initiate a formal investigation.  I
18  could be mistaken on that.  But it's possible we'd still
19  look into something if -- if not.  I mean, especially if
20  someone says, "Hey, I'm out of state, there's no way I
21  can come in, but here's what happened," and it seems
22  pretty serious, I think we'd be remiss in not initiating
23  something.
24      Q   If an investigation -- I mean, if it's correct
25  that this investigation began after Alek Schott called to

1  complain about the March 16th incident, would that have
2  triggered a --
3      A   Sure --
4      Q   -- Internal Affairs process?
5      A   -- it would have triggered some sort of a
6  response from us.
7      Q   Okay.  Just tell me at a high level, what does
8  the investigation process look like for these kinds of
9  public complaints?
10      A   This one in particular?
11      Q   Well, maybe in general, first, how they work.
12      A   Okay.  I mean, we'd begin, obviously not having
13  been an Internal Affairs investigator here, I don't know
14  100 percent what their job is.  But I can tell you they
15  have to start investigating:  Was it even us that's being
16  complained on?  Because a lot of times they'll call us to
17  complain, and that's SAPD that did that, that wasn't even
18  our agency.  So we'll call them back and say, "Hey, wrong
19  agency.  Here's the number to SAPD."
20          But we look into, can we pull the case number?
21  Okay, what video is there associated with that case
22  number?  Let's watch it.  Let's figure it out.  Let's --
23  you know, what's the complaint being made?  And then can
24  we either prove or disprove that that happened?
25      Q   Okay.  And you know, we can look through these

Sheriff Javier Salazar                                          July 16, 2024

Page 150

1  pages if you want to. My understanding from the email
2  thread we have here in the page range of 8349 through
3  8359 --
4      A  Uh-huh.
5      Q  -- and from some of the notes in here is that
6  Sergeant Marta Rodriguez -- now Ortega, right?
7      A  Yes, sir.
8      Q  -- is the person who investigated this
9  complaint; is that fair?
10     A  Yes, sir.
11     Q  Okay. That she reviewed Deputy Babb's body cam
12  when investigating this complaint; is that fair?
13     A  Yes, sir. Now, are you asking me if I know
14  that?
15     Q  Well, I'm asking you if that's your
16  understanding based on these pages and certainly --
17     A  I haven't read them in detail.
18     Q  That's totally fine. Do you have any awareness
19  of how this investigation was conducted?
20     A  No. I know that there was a -- an initial
21  investigation that didn't go as deep as the second one
22  did. My understanding is that the first one was
23  initiated by Mr. Schott. The second one may have been
24  initiated by a member of the administration once we found
25  something that wasn't found on the first one. Does that

Page 151

1  sound about right?
2      Q  Well, I don't know that it's right for me to
3  answer questions.
4      A  Oh, I see.
5      Q  Does it sound right to you?
6      A  That's what -- that's what my understanding of
7  it is. So you're giving me the "I'll ask the questions
8  here."
9      Q  In the nicest possible way.
10     A  No, that's my understanding of it. I could be
11  wrong.
12     Q  Okay. I mean, what I really want to get at,
13  frankly, is if we look at 8349, it looks to me like this
14  is the document that Sergeant Rodriguez -- I'm just going
15  to call her Sergeant Rodriguez --
16     A  That's fine.
17     Q  -- even though she's now Ortega -- that
18  Sergeant Rodriguez would have filled out to explain her
19  findings for this investigation.
20     A  Right.
21     Q  Is that fair?
22     A  Yes, sir.
23     Q  Okay. At the top, I see "Case Closed," so --
24  and at the bottom I see "Case Closed." I would assume
25  that means that this investigation is complete as far as

Page 152

1  the Internal Affairs unit is concerned, right?
2      A  Say that again. I'm sorry.
3      Q  I would assume that "Case Closed" at the top
4  and the bottom means that, for purposes of this Internal
5  Affairs investigation, it is complete.
6      A  No more activity is what I gather from this.
7      Q  Okay, right.
8      A  I've never seen this document. But what it
9  looks like is some sort of a form checklist that: Hey,
10  I'm closing the case, and it's one of these boxes that
11  applies.
12     Q  Okay. I do see a line in here -- actually, a
13  couple times. I see under the explanation -- and I'm
14  just clipping a quote, so you know. Feel free to read
15  the paragraph if you need to. But I see in the second
16  sentence, "When I reviewed Deputy Babb's body worn camera
17  (BWC), I did not see any policy violations." And if you
18  move forward a little bit, another sentence that
19  says, "No policy violations were viewed through BWC."
20         Do you see all that?
21     A  Yes, sir.
22     Q  Okay. Do you have any reason to doubt that
23  conclusion?
24     A  I do now.
25     Q  Okay. Tell me about that.

Page 153

1      A  Well, my understanding is that at some point a
2  camera was turned off. But in honesty, I don't remember
3  if it was his body worn or the dash cam.
4      Q  Okay.
5      A  But my understanding is that there was not --
6  the camera was not on when it -- at some point it should
7  have -- one of those cameras was not on when at some
8  point it should have been.
9      Q  Okay.
10     A  Again, that's my understanding of it today.
11     Q  Fair. Setting aside any issues with cameras,
12  do you have any other reason to doubt the conclusion that
13  Sergeant Rodriguez reached that no policy violations
14  occurred during the stop?
15     A  Okay. Say it again. I'm sorry.
16     Q  Fair enough. Setting aside the camera issues
17  that you just flagged, do you have any other reason to
18  doubt Sergeant Rodriguez's conclusion that no policy
19  violations occurred during this incident?
20     A  Just based upon what I see here, I can't think
21  of anything. As I stand here -- I mean, as I sit here
22  now, do I wish that she'd done a more thorough case
23  investigation on the front end of this? Absolutely.
24     Q  Okay.
25     A  I wish she had gone deeper.

39 (Pages 150 - 153)

Sheriff Javier Salazar                                July 16, 2024

Page 154

1    Q    Into the camera stuff that you flagged?
2    A    Yes.
3    Q    Okay. Sorry, that was a question, and you're
4  saying yes in response?
5    A    Yes.
6    Q    Okay. Earlier, I think we talked about your
7  general sense that Internal Affairs does a good job,
8  right? Is that fair?
9    A    They do.
10    Q    I mean, setting aside the potential issue with,
11  you know, wanting there to be a board that they send
12  their conclusions to, right, other than that, they know
13  Bexar County policy, right?
14    A    They should, yes.
15    Q    And they do a good job of investigating these
16  complaints generally speaking, right?
17    A    (Nodding head.)
18    Q    Fair?
19    A    Yes.
20    Q    So your presumption would be that this
21  conclusion, setting aside the camera issue, is correct?
22    A    Yes.
23    Q    Okay. I do want to ask you about kind of what
24  happened next, because it seems like this, in some form,
25  was reopened as an investigation. Is that your

Page 155

1  understanding?
2    A    Yes.
3    Q    Okay. Can you tell me about how that might
4  have come to be?
5    A    So my understanding -- and again, I could be
6  wrong here, and I'm not exact on timelines, but my
7  understanding is later on, everybody thought this was
8  closed. At a certain point, we were served with either a
9  demand letter or some sort of paperwork regarding a
10  lawsuit.
11        Captain Von Muldau or somebody in his shop did
12  a review of it, looked then found some improprieties
13  with body -- with a camera at that point. Again, I think
14  it was dash cam, and then it was reopened and reinitiated
15  with new information brought to life by a member of the
16  administration.
17    Q    Okay. Just to kind of distill that down a
18  little bit, after this lawsuit was filed, which I'll
19  represent to you was in June of 2023, the Internal
20  Affairs investigation was reopened?
21    A    Or a new one was begun, however we end up doing
22  that, based upon some findings there. I believe it was
23  Captain Von Muldau, and I believe he was the one that
24  found it.
25    Q    Okay. If you'll flip for me to Page 8311.

Page 156

1  Just let me know when you get there.
2    A    Okay.
3    Q    Okay. First of all, do you recognize this
4  document?
5    A    It's what we call an RFI, Request For
6  Investigation.
7    Q    Okay. For, for this incident? Is that fair?
8    A    Yes, for this incident.
9    Q    Right. And I just wanted to ask you -- I know
10  that we talked a little bit about some of these names
11  before, but I just want to have kind of a clean statement
12  of it, so can we just talk through the "To," "From" -- or
13  sorry, "To," "Through" and "From" lines here? Yeah --
14    A    That's always kind of confusing.
15    Q    -- that's my muscle memory.
16    A    So the "From" is who initiated it.
17    Q    Okay.
18    A    And then the ultimate "To" is whoever she's
19  writing it to. But the "Through" means anybody else
20  between them two on the chain of command.
21    Q    Okay. So just to kind of slow walk it a little
22  bit, Deputy Chief Garza is the person who initiated this
23  investigation --
24    A    Yes, sir.
25    Q    -- right? On June 12 of 2023?

Page 157

1    A    Yes, sir, by the looks of it.
2    Q    Okay. And at the time, do you know what Deputy
3  Chief Garza's role would have been in relation to Deputy
4  Babb?
5    A    So at that time, I think he was already working
6  at the training academy. So she was in his chain of
7  command because of the training academy, if that were the
8  case. But also she's in charge of Internal Affairs and
9  Public Integrity.
10    Q    Okay. And then between Chief -- Deputy Chief
11  Garza and Chief Deputy James Serrato is Assistant Chief
12  Deputy Roland Schuler; is that fair?
13    A    Yes.
14    Q    And then what's -- do you know if he would have
15  been looped in on this investigation or if he's just
16  somebody who would have taken this piece of paper and
17  handed it to Chief Deputy Serrato?
18    A    All my senior commands, so the chief deputy and
19  the assistant chiefs, should all be looped in to most
20  things that occur here. We actually have a weekly
21  meeting with just the senior command staff as well. So
22  none of the deputy chiefs are in here, just the
23  assistants, the two stars, a three star, and then myself.
24        So typically we try to do a decent job of
25  keeping each other apprised, but it wouldn't be

40 (Pages 154 - 157)

Sheriff Javier Salazar                                    July 16, 2024

Page 158

1  necessary, you know, necessarily. This could proceed.
2         At this point -- oh, well, at this point Chief
3  Schuler was the Chief of Staff. So he would have been
4  Lupe's -- Chief Garza's boss at that time.
5     Q   Okay. I'm a little bit confused now given what
6  you just said about the weekly meetings. I thought -- so
7  earlier my understanding was that you had a weekly
8  command staff meeting where you're kind of debriefed on
9  the day-to-day operations of the agency; is that fair?
10    A   Yes.
11    Q   And then did you just mention a different
12 weekly meeting?
13    A   On Fridays we do a senior command staff meeting
14 to where it's just myself, again, in typically my chair,
15 and then Chief Serrato, and then the three assistant
16 chiefs. But none of the deputy chiefs are present for
17 that meeting typically, unless somebody's out sick or
18 whatever and they have somebody sit in as a proxy. But
19 that's a Friday meeting, is just senior command staff.
20    Q   What, if anything, is different about the
21 content of that meeting as opposed to the other meetings?
22    A   It's a lot more strategic, I guess, so to
23 speak, like: Hey, this -- the Law Enforcement Bureau's
24 going to do this over the course of the next week.
25 Where -- here's everything that happened since Deputy

Page 159

1  Chief Sanford briefed you on Monday about ongoing
2  investigations. Here's what happened in those during the
3  week.
4         So we just kind of touch base: Here's what
5  we've got planned for next week.
6         Sometimes it's the same information being
7  updated on, or different, different stuff overall.
8     Q   Okay. At both of those meetings, I assume
9  you're being debriefed on what's going on --
10    A   Oh, sure.
11    Q   -- for lack of a better phrase. Okay. Would
12 you ever, during either of those meetings, receive notice
13 of this kind of investigation being opened?
14    A   Yes.
15    Q   Okay. Did you in this case?
16    A   I don't remember.
17    Q   Okay. How common would you say it is for you
18 to be looped in on these kinds of investigations?
19    A   It's pretty common, because look, I'm big on no
20 surprises. So I'm out at -- like I said, I work seven
21 days a week. So not outside the realm of possibilities
22 that I'll be out on a Sunday -- Saturday morning at a,
23 you know, fun event, community event or something, and a
24 member of the media go, "Hey, Sheriff what do you think
25 about" -- right? And they'll ambush me. So at the

Page 160

1  Friday meetings a lot of times they'll say, "Hey, here's
2  what you may get ambushed on tomorrow when you're out at
3  the MS Walk," you know.
4         So they brief me on these, because it may be
5  something that I may get hit with over the weekend and I
6  need to not have that deer in the headlights look. I
7  need to be prepared to address it.
8     Q   So because you're accountable to the public in
9  your capacity as Sheriff, you have to have a knowledge of
10 what's going on.
11    A   Absolutely. And I'm out there a lot. I'm a
12 very visible and very accessible member of the agency,
13 obviously. For obvious reasons I have to be.
14    Q   I think you said earlier that you haven't
15 watched the video from this incident.
16    A   I don't recall having watched it.
17    Q   Do you know if you were, at any point during
18 this Internal Affairs process, briefed on the facts of
19 what happened?
20    A   I don't remember at what point I learned all
21 this stuff that I just told you about. Like I said, I
22 could be wrong on some of it, or a lot of it. That's
23 just my understanding of it.
24         And I think the reason that -- like I haven't
25 watched the video is because, for whatever reason, and I

Page 161

1  still don't know what that is, for whatever reason I was
2  not the one that terminated Babb. Typically, they'll
3  bring me, "Hey, tomorrow you've got this termination
4  hearing with this deputy. Here's the case file. Here's
5  the videos associated with it." And I'll watch it then.
6         But in this instance, for some reason, I wasn't
7  the one that was there for that termination, so I don't
8  recall having ever watched that video.
9     Q   Okay. So if you had been there for the
10 termination, you might have had a reason to watch the
11 video --
12    A   Yes.
13    Q   -- for example, and maybe read the complaint in
14 this case.
15    A   Yes.
16    Q   Have you read the complaint in this case?
17    A   I don't remember. I don't recall if I read it.
18    Q   All right. That's fine. At the bottom of
19 8311, it looks like Deputy Serrato signed this document
20 and approved it --
21    A   Uh-huh.
22    Q   -- for Internal Affairs investigation; is that
23 fair?
24    A   Yes, sir.
25    Q   Okay. And that kind of initiated the process

41 (Pages 158 - 161)

Page 162

1  of going through a full-fledged investigation.
2  A  Yes, sir.
3  Q  And then what does, what does a full-fledged
4  investigation look like after this point?  What does it
5  involve?
6  A  The same thing that we would do if it were, had
7  it been handled from the onset when Sergeant Rodriguez
8  got it initially.  You review all the footage that's
9  there.  You talk to witnesses.  You, you know, get
10  medical records or whatever else is -- any documents
11  associated with it.  You call in all the nonrespondent
12  deputies.  And at the end of it you call the respondent
13  deputy and say, "Here's everything we developed as a
14  result of your case.  Answer those questions."
15       Typically we give them interrogatories, just a
16  list of questions.  Answer those.
17  Q  Okay.  So the sequence is investigation begins
18  as a formal matter, right?  That's step one.  Is that
19  fair?
20  A  Yes, sir.
21  Q  And step two would be the collection of all
22  documents and video relevant to the incident that BCSO
23  possesses.
24  A  Yes.
25  Q  And then step three would be interview --

Page 163

1  A  Well, review all of that.
2  Q  Fair enough.  Step three would be review
3  everything.
4  A  Uh-huh.
5  Q  And then step four would be -- you mentioned
6  interviews.
7  A  Start calling in witnesses.
8  Q  Okay.  And that would include the officers
9  involved?
10  A  Nonrespondent officers, yes.
11  Q  Okay.  And then anybody else?
12  A  Like for example, if it happened at a
13  restaurant, you call in the wait staff from that
14  restaurant.  "What did y'all see?"  You know?  And then,
15  you know, ask that question, "Is there any video from the
16  restaurant?  Because we don't have any in our file, but
17  do you guys have video in your restaurant?  You do?
18  Okay, I'd like to get copies of that."
19       So you may have to go back and get additional
20  evidence that was missed on the first go-round.
21       Then you call in all the nonrespondent deputies
22  almost at the very end.  And then at the end, you call in
23  the respondent deputy, and you have to show them
24  everything.  All the evidence that's being used against
25  him or her, they have to be given opportunity to review

Page 164

1  it and answer to it.
2  Q  Okay.  It helps me to think of things in steps.
3  I'm not sure if that's --
4  A  That's fine.
5  Q  Okay.  So just to kind of get us back into that
6  framework, I want to clarify one thing about -- let me
7  just start by understanding the sequence and then see if
8  I can put it in terms of steps.
9  A  Sure.
10  Q  So on the sequence front, we have interview
11  nonrespondent deputies, right?
12  A  Yes, sir.
13  Q  And then after that, is it that you interview
14  the respondent deputy --
15  A  Yes, sir.
16  Q  -- or that you do the interrogatories?
17  A  Well, you write your interrogatories -- let me
18  just tell you, the interrogatories, that's -- again,
19  that's something I introduced to the agency.
20  Q  Okay.
21  A  When I first got here, obviously in my review
22  of this agency, "How do y'all do things?"
23       "Well, we just sit him down and tell him to
24  write a report."
25       "But I don't know that you get a complete

Page 165

1  picture unless you ask pointed questions."
2       "Well, we don't do that here."
3       I said, "Okay.  Well, where I grew up, we did
4  that."
5       Like you -- I may give 300 questions:  Did you
6  do this?  Did you say this?  If you did not, please
7  provide a thorough explanation of what you did and what
8  you said and why.
9       Right?  They didn't do that here when I got
10  here.  So I introduced interrogatories.
11       So what you do is at the end of it -- before --
12  between -- where are we at, steps five and six?
13  Q  I'm going to go through the steps again.  I
14  just wanted to make sure we understand the last part of
15  it.
16  A  So after you're done with all your witnesses
17  and nonrespondents and documents and everything, or at
18  least you think you are, you're about to bring in the
19  respondent, you're going to sit there and you're going to
20  write down all your questions to get a complete picture
21  based upon what they said, what they did, what do you --
22  you know, so for example, the complainant may not even
23  know that A, B or C was said, but one of the
24  nonrespondent deputies may say, "Yeah, he whispered to me
25  when that guy was away."  So you're going to write a

Page 166

question: Hey, Deputy so-and-so said that you said blah, blah, blah.

So you're going to give him a -- you should be anyway. If you're doing the investigation the way I would prefer, you're going to give him a list of questions. And that list of questions may be ten questions, it may be 300. I've given -- I've given interrogatories of 300 questions before.

Q After the interrogatories, then there's a in-person meeting with the respondent deputy; is that right?

A Yes.

Q Okay. And then what happens?

A They are given the opportunity to do -- to answer, answer to the interrogatories. And then they usually come in with their attorney.

Q Okay.

A You sit them down, you give them some privacy to consult with their attorney. You ask them to write the questions -- to respond to the questions. Hopefully the attorney's not signing the -- not answering the questions for them. And then you take it all in. While they're still there, a good Internal Affairs investigator is going to read everything, make sure they covered -- "Oh, you didn't answer this one. Here, go back and," you

Page 167

know --

And then once you're satisfied that they've answered all those questions and there are no follow-up questions, you cut them loose, and then you compile your report.

Now, here, again, what they're still in the process of doing and we're trying to get away from is determining guilt or innocence basically, so to speak.

Again, I'm not in favor of that way of doing things. I'm more trying to get them geared toward you're going to prep it to present to the advisory action board at some point.

Q Let me try to summarize. We'll see how I do.

A All right.

Q But in general, a good Internal Affairs investigation should involve the following steps: One, a complaint is initiated, right?

A Yes.

Q Two, documents relevant to the incident that BCSO possesses, which would include videos and other records, are collected and reviewed, right?

A (Nodding head.)

Q Three, nonrespondent deputies are interviewed?

A Yes.

Q Four, the respondent deputy is sent

Page 168

interrogatories.

A Nope.

Q Okay.

A He's called in.

Q He's called in.

A And handed the interrogatories.

Q And handed the interrogatories. At which point he fills them out, right?

A There at the office.

Q There at the office. And then five, those interrogatories are reviewed and a preliminary determination is made as to whether BCSO policy was violated.

A Yes, sir.

Q Okay. What happens after that?

A So after that, it's forwarded up through that, the commander of Internal Affairs. In this case, it's a lieutenant, reviews the work of the sergeant.

It's possible they may say: No, we're kicking it back. You didn't ask them A, B and C. You didn't write them up for this other thing you must have missed. Right? So it may get kicked back.

Or the lieutenant goes: Yeah, I think this is good. Then they'll send it over to Deputy Chief Lupe Garza, and it's for review. Then she reads it and she

Page 169

may kick it back or she may forward it up to Chief -- or Assistant Chief Raul Garza, and he may kick it back or he may forward it up.

So at some point it will be finalized, yes, nothing occurred, or this is worth 30 days, this is worth three days, whatever it is.

Q Okay. I want to talk a little bit more later about the tail end of that process, but before we do that, can we just circle back to what happened here with the initial Internal Affairs investigation? Because I'm a little bit confused on sort of why it didn't take this course.

A Okay.

Q Do you have any thoughts on that?

A I do.

Q Okay.

A So to me it almost seems like she didn't go deep enough. Bear in mind -- and they say, right -- they say you should never measure your subordinates by how you would perform a task because you're going to be disappointed.

I was, I was pretty much of a nightmare as Internal Affairs investigator. I was very thorough and I was very meticulous in how I handled my investigations, right? Anything that falls short of that I don't like

Page 170

1 necessarily. Not that it's wrong. It's just not up to
2 my standards. So I've got high standards, high
3 expectations for Internal Affairs, the way things should
4 be handled.
5        That process that I gave you about long
6 interrogatories, that's how I prefer to see it done in
7 every case. I realize it's not done like that in every
8 case.
9        But from what I gather on Sergeant Rodriguez's
10 first swing at this, I think she looked at what was being
11 alleged and she may -- she says she reviewed body camera
12 footage. And okay, you saw nothing wrong with that body
13 camera footage that you saw, but did you catch that there
14 was body camera footage that wasn't there -- or camera
15 footage that wasn't there that should have been?
16        And I think, I think the absence of that camera
17 footage is what led Captain Von Muldau to go: Wait a
18 second, something's missing here that should be.
19        But I think on the surface, if you just look at
20 the body camera footage that is there and, you know, he's
21 saying there was no traffic violation, but yet here's
22 evidence that there was, I think case is closed.
23        Had she gone a little bit further and figured
24 out that there was something missing that should have
25 been there, I think maybe that would have triggered a

Page 171

1 more in-depth investigation. Clearly that did not occur,
2 until later on down the road when somebody reviewed it
3 more in depth and said: Wait a second, something's wrong
4 here, something's missing.
5        Q   So to -- do you think it's possible that maybe
6 the reason that this was -- and you were talking about
7 her first swing at this, Sergeant Rodriguez. Do you
8 think it's possible that her first swing at this didn't
9 go quite as deep because it was a oral complaint over the
10 phone?
11        A   No, I don't think that's necessarily what's at
12 the root of this. I think it was just she was just
13 looking at what's being alleged, what's there, no, I
14 think we're -- and I'm sorry, I'm making horse blinder
15 gesture --
16        Q   Tunnel vision gesture.
17        A   -- saying I don't think she looked broad
18 enough. I think she looked at what's being alleged, can
19 I prove or disprove that. It's either proven or
20 disproven. We're done. I don't think that that was as
21 thorough as I would have liked to have seen, in
22 retrospect, of course.
23        Q   On 8350, could you turn there real quick for
24 me? I just want to make sure we're being precise about
25 the point you're making about what was alleged and what

Page 172

1 she would have looked into.
2        A   Yes, sir.
3        Q   So I see a line there that says "Nature of
4 Complaint." Do you see that?
5        A   Yes.
6        Q   Okay. And I'll just read it out loud.
7 "Deputies allegedly illegally searched and detained
8 complainant and damaged his vehicle in the process."
9        So as I understand that, that's an allegation
10 that the detainment was illegal in some way, that the
11 search was illegal in some way, and that there was damage
12 to the vehicle. Is that fair?
13        A   That's the claim?
14        Q   Yes.
15        A   I think so.
16        Q   That's the claim.
17        A   I believe so.
18        Q   So that's what she would have investigated,
19 right?
20        A   I believe so.
21        Q   And then if you flip to the next 8352, it looks
22 to me as well, from the handwritten notes, like another
23 allegation was traffic stop without cause. Do you see
24 that?
25        A   Yes, sir.

Page 173

1        Q   Okay. So that also would have been part of
2 Sergeant Rodriguez's initial kind of narrow investigation
3 into this.
4        A   Right.
5        Q   Okay.
6        A   Is this her handwriting? Oh, you can't answer
7 questions. Sorry.
8        Q   We can have a chat later.
9        Let's see. Okay. So I said I was going to
10 circle back to the tail end of the full Internal Affairs
11 investigation. And by the way, I know that we're -- it
12 can be confusing because there's two of these. So how
13 about for the Sergeant Rodriguez first swing, we talk
14 about that as the first Internal Affairs investigation,
15 and the later one that started on June 12 of 2023, how
16 about that's the second one?
17        A   Sure.
18        Q   Okay, great. So for the second one, we talked
19 about kind of the several steps that that involves. At
20 the very end of it, before we get into the facts of this
21 one, how does it conclude?
22        A   How does what conclude? I'm sorry.
23        Q   How does the second Internal Affairs
24 investigation, as a general matter in Bexar County,
25 right, how does it finish?

Page 174

1    A    Well, I mean, the findings are still forwarded
2    up the chain, and then at some point anybody in that
3    chain can say:  No, y'all need to do some more work on
4    this, and kick it back.  Or they can say:  Yeah, this
5    is -- you know, once it reaches usually the deputy chief
6    of that division, they can say:  Yeah, I think this is a
7    30-day spanking, or no, this is termination.
8    Q    I'm mostly kind of trying to figure out where
9    in the chain of command these are supposed to end up.
10   A    Ultimately, the findings are given to the
11   deputy's chain of command.  So it will go up Deputy Chief
12   Lupe Garza, because she's the Internal Affairs, she's
13   over Internal Affairs.  It will go to the Chief of Staff.
14   And then typically if it's a straight-up patrol deputy,
15   let's say, it will go over to the Patrol deputy chief.
16   He or she will make the determination of what the
17   discipline should be, because it's one of his or her
18   folks, right.  In this instance, though, it didn't have
19   to go to Patrol because it so happened that Deputy Chief
20   Lupe Garza was over Internal Affairs.  She was also his
21   boss, so --
22   Q    Deputy Babb's boss?
23   A    Deputy Babb's boss.  If I'm not mistaken, he
24   was at the training academy at that time.  She's over
25   the -- she, I think, was over the training academy at

Page 175

1    that time.  So she would have been his boss.  So she
2    would be one of the ones determining what the next steps
3    are.
4    Q    Okay.  So tell me if I'm getting this wrong.
5    She could have concluded there's nothing to this
6    investigation, he didn't violate any policies, it's over?
7    A    She could have.
8    Q    Okay.  And only because maybe she thought there
9    was some merit to this investigation did she send it on
10   up the chain further?
11   A    Are you talking about the second one?
12   Q    The second one.
13   A    I don't know.  You'd have -- now, that would be
14   a question for her.  I couldn't really tell you what was
15   going on in her mind or why she --
16   Q    Maybe a different way to ask this, because I
17   want to understand when you would factor into this, would
18   be -- earlier you mentioned that generally speaking you
19   would decide on termination.
20   A    Yes.
21   Q    Right?  So at least it's fair to say that if a
22   policy violation was bad enough, that it would justify
23   termination, you would be looped in on that as a general
24   matter?
25   A    Sometimes before that.  If it's something,

Page 176

1    again, high profile or more egregious than most, is:
2    Hey, Sheriff, this one we think is going to be 30-day,
3    but it's likely to land us in the news media.  So again,
4    you could get ambushed on this at some point.  We're
5    thinking 30 days.  What are your thoughts on it?  You
6    weigh in on it too.
7         Because ultimately, I've got to deal with the
8    consequences for the agency of us mishandling something.
9    So they're going to put me in the loop.  And they'll -- I
10   always tell my chiefs, bug me at 3:00 in the morning if
11   you've got a question on something.  I'm okay with that.
12   I'd rather that than not know.
13   Q    Can you give me a sense of the different levels
14   of severity in punishment for a violation of policy?
15   A    Oh, I mean, it could go anything from a written
16   reprimand, which is basically don't do this again, but
17   it's in writing, to termination.  And anything, anything
18   along the way.
19   Q    So what's an example, just maybe a common
20   example, of something that warrants a written reprimand?
21   A    Took an hour and a half to handle the case
22   because it was busy, and he wanted to go eat, so he went
23   and ate while on this call so that he wouldn't get
24   assigned another call.  Right?  First time offense, it
25   hasn't happened before.  Usually a good deputy, but you

Page 177

1    screwed up one time and took a little too much time on
2    the call.  Nobody died as a result of it.
3         It's just the sergeant realized, "Hey, you were
4    out for an hour and a half, but your report is this long.
5    What gives?"
6         "Oh, I stopped to eat a burger on the way."
7         "Okay.  That's a written reprimand.  Don't do
8    that again."
9    Q    Okay.  So --
10   A    Completely made-up scenario, by the way.
11   Q    Yeah.  Just tell me if I'm kind of getting
12   this, the idea right.
13   A    Sure.
14   Q    That an officer with a generally good track
15   record, who hasn't violated policies in the past, who's a
16   good officer, and maybe just kind of commits kind of a
17   housekeeping error, for lack of a better term, that's
18   going to be a written reprimand?
19   A    Well, it depends how big the housekeeping error
20   is.  I mean, you can come out, your first offense right
21   out of the gate and it's a whopper, you're going to get a
22   whopper punishment, right?  This is not eating a
23   hamburger while you should be handling a car crash.  You
24   know, this is -- this has got to be something -- if it's
25   egregious enough, you could get hammered all the way up

Sheriff Javier Salazar                                    July 16, 2024

Page 178

1  to and including with a termination, even if it's your
2  first offense.
3      Q   Okay.  I mean, the example you gave me, at
4  least as an outsider, sounds like it's, you know, sounds
5  important, where you have somebody who should be handling
6  a law enforcement matter, and they're instead eating a
7  hamburger.
8      A   Sure.
9      Q   That seems like a policy violation, right?
10     A   Sure.
11     Q   That warrants some attention; is that fair?
12     A   Yes.
13     Q   But that's only a written reprimand, according
14  to --
15     A   Well, do that same scenario but somebody gets
16  killed because of his inaction, or he hears gunshots a
17  block over and doesn't do anything because he's so
18  enthralled with his burger, and it turns out there was a
19  quadruple murder around the block while he was eating a
20  burger, that's going to be a little bit more than a
21  written reprimand.
22         So totality of circumstances have to be
23  factored in, along with has he or she done this before.
24     Q   Okay.  So on the extreme end of the spectrum is
25  some kind of misconduct that results in death; is that

Page 179

1  fair?
2      A   Could be it results in death, it results in
3  high monetary loss to somebody.  There's a lot of
4  different things that could go into play.
5      Q   What about that middle ground of like a 30-day
6  suspension, like can you give me an example of a common
7  violation that might trigger that?
8      A   Yeah.  This is his second time having a burger
9  or third time having a burger when he shouldn't be.
10  That's a 30 day.  Like you should have known better and
11  you still did it.  You knew it was wrong and you knew
12  something was coming on your next one, but you still did
13  it anyway.
14     Q   Okay.  Is there anything in between 30 day and
15  termination that you see relatively commonly?
16     A   Oh, you know, there's 45 days, there's 50 days,
17  there's, you know, 60-day suspensions.  There's all kinds
18  of stuff.
19     Q   Okay.  That makes sense.
20     A   You know, he was having a burger, and to get to
21  his next call he was doing 60 miles an hour through a
22  school zone, didn't hit anybody, but he was caught doing
23  60 miles an hour through a school zone.  Well, clearly
24  that's not going to be the same 30-day suspension you
25  were about to get, because now you were driving like an

Page 180

1  idiot through a school zone.  That's a 60-day.
2      Q   Makes sense.  On BC 8311, which is that
3  initial --
4      A   Yes.
5      Q   -- initial letter we looked at --
6      A   Okay.
7      Q   So there's a line.  See that check box with the
8  "Approved for Internal Affairs"?
9      A   Yes, sir.
10     Q   There's a paragraph above that.  I just want to
11  read it to you and ask you a couple questions.  "At this
12  time we are requesting an investigation be conducted to
13  determine the facts of the case and to identify all
14  potential misconduct by any Sheriff's personnel as well
15  as all potential violations of statutes, laws, and/or
16  local ordinances."
17         Did I read that right?
18     A   Yes, sir.
19     Q   Okay.  So what I want to ask is, would that
20  scope of investigation include an investigation into all
21  of the initial allegations that Mr. Schott made that
22  prompted the first Internal Affairs investigation?
23     A   First off, I think that's kind of boilerplate
24  language that's used.  But what's your question?
25     Q   My question is really just, the second Internal

Page 181

1  Affairs investigation seems to me, from this document, to
2  be basically asking them to do a do-over of the first
3  one.  Is that fair?
4      A   Yes.
5      Q   Okay.  So it would have included, for example,
6  an investigation into whether the stop was valid.
7      A   Yes.
8      Q   And it would have included an investigation
9  into whether the detention was valid.
10     A   Yes.
11     Q   And the search of the car, right?
12     A   Yes.
13     Q   Okay.
14     A   In other words, I don't think you just peel it
15  back to the level that Sergeant Rodriguez left it off at.
16  You need to peel it back all the way to the beginning,
17  and we're back at square one.
18     Q   To see if any Bexar County policies were
19  violated?
20     A   Sure.
21     Q   Okay.
22     A   Had they just gone back to her part, I would
23  have not been happy with that.  I think you've got to
24  take it all the way back down to the bare metal.
25     Q   What do you mean?

46 (Pages 178 - 181)

Sheriff Javier Salazar                                                July 16, 2024

Page 182

1     A    I think you go back from the onset and you
2   review the whole thing from the beginning of it again.
3     Q    Okay.  Let's turn to 8321.  And on 8321 through
4   8328, looks to me like this is a copy of the
5   interrogatories that would have been -- sorry -- that
6   Deputy Babb would have been asked to fill out during the
7   second Internal Affairs investigation; is that fair?
8     A    Yes.
9     Q    Okay.  I just -- I'm not going to go through
10  all of them, because that would take forever, but I do
11  want to ask a few questions about it.  Let's turn to
12  Question 5.
13    A    Okay.
14    Q    Which is on 8322.  And just let me know when
15  you see that.
16    A    Yes, sir.
17    Q    All right.  I'm going to ask you to do this for
18  each one that I flag, so take a minute to read the
19  question and the answer for me.  And just let me know
20  when you're done.
21    A    (Reviewing document.)  Okay.
22    Q    Okay.  Just, so just a few questions.  His
23  answer says, "I was assigned to Criminal Interdiction
24  Unit."  Is that a reference to the Criminal Interdiction
25  task force that we were talking about earlier?

Page 183

1     A    It's -- yes.
2     Q    I just want to make sure we were talking about
3   the same thing.
4     A    I don't think it's incorrect.  I don't think
5   he's lying.  I think he just calls it something different
6   than the rest of us call it.
7     Q    But Deputy Babb had a formal assignment to this
8   task force we've been talking about?
9     A    Yes.
10    Q    He says, "I started in the Unit 5/1/21 and was
11  there until 7/22."  So that would have been within the
12  date range that you said this task force operated, right?
13    A    Yes, sir.
14    Q    Okay.  And then I just want to ask about that
15  last sentence.  I'll just read it.  "My duties included
16  looking for human smuggling, drug smuggling, weapon
17  smuggling, money laundering and other criminal activities
18  utilizing motor vehicle criminal interdiction tactics
19  with the training I received."
20        Did I read that right?
21    A    Yes.
22    Q    Do you agree with that statement of his duties?
23    A    I mean, I think that's a part of it.  He had
24  other duties as assigned as well.
25    Q    But he says his duties would have included

Page 184

1   those things.
2     A    Yes.
3     Q    Is that fair?
4     A    Yes.
5     Q    Okay.  And I do want to ask about motor vehicle
6   interdiction tactics.  I mean, do you have a sense of
7   what that means, that phrase?
8     A    I've got a sense of what it meant in the late
9   '90s when I did it.
10    Q    Okay.
11    A    Again, I know that now it's not substantially
12  different than back then, but again, I know that there's
13  new tactics employed by the smugglers, there's new
14  methods that we would utilize to catch them.  So, now I've
15  got an idea of what it is that he's talking about.
16    Q    Do you have any sense at all of how Deputy Babb
17  approached these duties?
18    A    I don't.
19    Q    Okay.  Are you familiar with the idea of a
20  front seat interview?
21    A    I am now.
22    Q    Okay.  How did you become familiar with that?
23    A    So with this case, it was asked of me by my
24  attorney if that's something that I would have done back
25  in the day.  I'd tell you right now I would not have.

Page 185

1   But I think I can see what they're trying to accomplish
2   with it now.  I'm not 100 percent positive that my idea
3   is correct.
4         I think it's because there's a camera there and
5   you're trying to capture some, you know, micro movements
6   of the face or is he lying to you or what's he saying.
7   So that way there's video evidence of what the person's
8   telling you.
9         Tactically, I think it's a horrible idea.  I
10  don't think that's a good idea to have somebody sitting
11  in the front seat of your patrol car.  But if that's what
12  they're being taught out there, okay.  I can't say I
13  agree with the safety of it.
14    Q    Okay.  So maybe a way to sum that up is, as a
15  general matter it seems like this tactic might have been
16  used to help the officer evaluate the behavior of the
17  person in the vehicle.  Is that fair?
18    A    Yes.
19    Q    To determine if it was suspicious in some way.
20    A    Yes.
21    Q    And your view is that if that's how
22  interdiction courses were teaching officers to do it
23  today, you're okay with that?
24    A    Well, I still cringe when I see it, right,
25  because it's -- he's right there next to your gun.  Like

47 (Pages 182 - 185)

Page 186

1   he could take your gun at any given time.  So I still
2   cringe.  But if that's what's being taught nowadays,
3   okay, I -- I can't say I'm excited about it, but I get
4   it.  I can see why they're training that as a way of
5   doing it.
6       Q    Okay.  So I think there was maybe two separate
7   issues.  And you can correct me if I'm thinking about
8   this the wrong way, but one issue might be officer
9   safety?
10      A    Officer safety.
11      Q    Like maximum officer safety.  Another issue
12  might be like effective interdiction techniques.  Right?
13  Is it fair to think of it as those are two important
14  things in the interaction, but they're both kind of at
15  play?
16      A    I think they're both at play, yes, sir.
17      Q    Okay.  And so just to kind of summarize this,
18  if officers are being trained in interdiction courses to
19  deploy these front seat interviews as an effective
20  interdiction tactic, you understand why that would be the
21  case, right?
22      A    I can see why they would teach it.  I still
23  don't think it's a good idea.
24      Q    Okay.  Are you -- I mean, do you -- I guess
25  maybe you answered this already, but I'll just try it

Page 187

1   again.  Are you aware of if this was happening while this
2   unit was in operation?
3       A    No.
4       Q    Okay.  I'm going to flip to Question 6.  So
5   it's a little longer.  Read the question and answer for
6   me to yourself, and then I'll ask you about it.
7       A    (Reviewing document.)  Okay.
8       Q    And I don't remember, I may have asked this
9   already.  I'm sorry to repeat questions.  But I forget
10  whether you said, have you seen these interrogatory
11  responses before?
12      A    On this case?
13      Q    In this case.
14      A    No, I haven't.
15      Q    Okay, thanks.  I just wanted to make sure I
16  wasn't assuming something.
17           So, have you heard of the interdiction courses
18  that Deputy Babb lists in his response to Question 6?
19      A    Just Desert Snow, because I actually attended
20  that one.  That was the one I went to in Laughlin,
21  Nevada.  The other ones, it's possible they didn't exist
22  back when I was on the road.
23      Q    Okay.
24      A    But I -- so I've never heard of them.
25      Q    So based on our discussion earlier of outside

Page 188

1   courses and the approval process for those, is it fair to
2   say that Bexar County Sheriff's Office would have
3   approved these courses and that's why they're listed
4   here?
5       A    It's possible, but it's also possible -- some
6   guys -- because some of our deputies really enjoy a
7   certain -- they gravitate toward a certain kind of law
8   enforcement work.  And so it's not outside the realm of
9   possibilities that he may have paid for some of these
10  schools on his own time before he was even assigned here.
11  I've heard that happening before.
12      Q    Okay.  Are there -- this is my thinking face
13  again.
14           Are there annual requirements for officers to
15  do training hours?
16      A    Yes.
17      Q    Okay.  And what's that look like?
18      A    It's in-service training that deputies have to
19  go to.  Now, when I got here, it was 20 hours a year,
20  which is the State minimum.  And as part of that 20
21  hours, the State usually gives you State mandates that
22  you have to teach.  As part of your 20 hours that's
23  required, we want you to teach this.
24           So to me, that wasn't -- it wasn't enough
25  training.  Again, I grew up at the SAPD where we always

Page 189

1   did 40 hours of in-service training regardless.  And you
2   went and you were assigned to the academy for that whole
3   40 hours, and you were going to sit in class.  Regardless
4   of what the State mandates, we're going to teach you
5   those, but we're also going to teach you this, this and
6   this.
7           So I went -- I converted us to 40 hours.  And
8   so that's what it looks like is they go to the training
9   academy for 40 hours.
10          Now, now we're starting to introduce more
11  online learning as part of your 40 hours, so now you may
12  not be going to the academy for the whole 40.  You're
13  going to do 40 hours, but some of it may be done at your
14  substation online.
15      Q    Are all the -- well, let me ask it this way.
16  For the 40 hours of training you're saying officers have
17  to do per year for BCSO, does all of that have to be in
18  the training academy?
19      A    No.  That's what I'm saying.  We're starting to
20  introduce online learning to some of it.
21      Q    I guess my question is sort of a little
22  different.  Can some of it be -- we talked earlier about
23  outside courses.  Can some of it be those outside
24  courses?
25      A    No.  You're going to go your 40 hours, and then

48 (Pages 186 - 189)

Sheriff Javier Salazar                                    July 16, 2024

Page 190

1  if you want to do outside courses on top of that, you
2  can, or we may need to send you specifically to stuff on
3  top of that. But my intent was to do 40 hours of what
4  we're going to tell you you have to get. And then if you
5  want to go to a SWAT school or a media school or a canine
6  school above and beyond that, that's fine. It's just got
7  to be approved, or unless you're going to do it on your
8  own time.
9      Q    Okay. So that's helpful. So what I'm hearing
10  is that officers are encouraged to do outside training.
11     A    If they want to.
12     Q    Right, if they want to. Sometimes it is
13  approved, other times it is not approved.
14     A    Yes.
15     Q    What is the importance of the approval? What
16  role does that play at all in the --
17     A    Well, it depends if you're going to get, you
18  know -- are we going to put you on special assignment to
19  go or are we going to require you to -- like, for
20  example, if I've got a community policing deputy, just
21  really wants to go be a canine deputy at some point, but
22  it serves no agency purpose for me to pay for him to go
23  to a $5,000 canine school, but he really wants to go
24  because he likes dogs and in his mind he's going to go be
25  a canine guy at some point.

Page 191

1      "Hey, Sheriff, I found this school I want to go
2  to. You know, can I go?"
3      "Well, yeah, but you're going to have to burn
4  your own vacation and you're going to have to pay for
5  that out of pocket. I'm not paying for you to go to
6  that. If and when we send you to canine, okay, I'll pay
7  for you to go to school then, but that's because you want
8  to go, that's on you."
9      So he or she will use their own vacation time
10  and they'll pay out of pocket to attend. That's not that
11  weird for deputies to do that.
12     Q    That makes sense. At the risk of doing --
13  going all exception on you and doing exhibits within
14  exhibits --
15     A    Okay.
16     Q    -- I do want to introduce one to maybe help
17  make this more concrete. Let's see here.
18      You're laughing.
19     A    My campaign literature?
20     Q    Yeah, we'll see if we get to it. Maybe not.
21     MS. HEBERT: Are there other copies of this?
22     MR. WINDHAM: There are other copies. Just a
23  moment.
24     MS. HEBERT: Going to mark this as Exhibit 54.
25     Q    (By Mr. Windham) All right. Ms. Hebert is

Page 192

1  handing you what's been marked as Exhibit 54. Okay.
2  Take a minute to flip through. I realize this document
3  also is a little bit meaty.
4      A    Okay. (Reviewing document.) Okay.
5      Q    Do you recognize this document?
6      A    Yes, sir. I mean, I think I know what it is.
7  I've never seen it before, but I think I know what it is.
8      Q    Okay. What is it?
9      A    Seems to be supporting documentation regarding
10  interdiction training class.
11     Q    For Deputy Babb?
12     A    Yes. And it looks like class rosters for
13  everybody that attended, if I'm not mistaken. Yes.
14     Q    I guess what I'm trying to figure out here is
15  it looks like the cover page here is about Deputy Babb.
16     A    Yes, sir.
17     Q    So could this be like a file for him of all the
18  courses he's had that might be relevant to interdiction?
19     A    I'm not seeing that. Maybe I'm missing
20  something.
21     Q    No, I mean --
22     A    This looks like it's all about that 720
23  Roadside Training.
24     Q    Well, let's take it piece by piece.
25     A    Okay, go ahead.

Page 193

1      Q    Yeah, that might be easier.
2      A    Sure.
3      Q    So maybe I'll just start with the first page
4  here.
5      A    Okay.
6      Q    BC 11512. Just what is this first page? I
7  just don't know what this is. What is this?
8      A    TCOLE is our licensing authority, Texas
9  Commission on Law Enforcement. These various numbers, it
10  looks like the course date, 12/4/20. Number of hours.
11  This looks like some sort of cover sheet.
12     Q    Okay. What is a roster?
13     A    So roster typically is to show -- usually
14  training classes, everybody has to sign up -- sign in and
15  out. So that way you can prove to the, your agency that
16  you were where you say you were going to be.
17      In other words, you go to Vegas for a class,
18  you better have some rosters to show you weren't at the
19  Mirage, you know. Not outside that realm of
20  possibilities. So you're going to have to do that.
21      But then all that roster needs to be submitted
22  to TCOLE so they can give you credit hours for having
23  been in class. So in order for TCOLE to vouch for yes,
24  this guy is certified in bike patrol, he did go to a bike
25  patrol class.

49 (Pages 190 - 193)

Sheriff Javier Salazar                                    July 16, 2024

Page 194

1    Q   I mean, that's sort of what I'm -- just because
2  I'm not in the law enforcement world, I'm not quite
3  understanding the role of TCOLE and like what trainings
4  officers have to have versus trainings that they can just
5  choose to get. So maybe I'll ask it this way. It looks
6  like to me 11513, which is right in front of you on your
7  left --
8    A   Uh-huh.
9    Q   -- that to me looks like a request from Deputy
10  Babb for approval to take this class. Is that the right
11  way to think about this?
12    A   Honestly, I've never seen this form before
13  either. But I think this is to show us that he went to
14  the class that we sent him to. I think that's what this
15  is.
16    Q   At the coordinator's --
17    A   Because it looks like it's signed after he came
18  back. So I think this is us -- him telling us -- and
19  he's writing in the past tense. So it looks like we had
20  him do this when he got back. Okay, you say you were in
21  class. We have rosters that you were in class. Write us
22  a review.
23    Q   And that coordinator's signature line, Roland
24  Schuler, he's deputy chief, right?
25    A   He was at that time.

Page 195

1    Q   He was, I'm sorry. What is the point of him
2  signing this? What effect does that have?
3    A   Probably, and of course I'm speculating, but I
4  believe -- because he was -- I believe at that time Chief
5  Schuler was our TCOLE guy of record. He's attesting to
6  TCOLE that yes, this guy went to this class and yes, we
7  think he deserves to have these hours added to his
8  training record.
9    Q   Okay.
10    A   It's a lot like the mandatory continuing
11  education courses you guys go to.
12    Q   Yeah, that's what I'm trying to figure out.
13  Because you were saying earlier that the mandatory hours
14  that officers have to do annually is 40 hours, but
15  they're only in the academy, right, either remotely or in
16  person?
17    A   Yes.
18    Q   And this is not in the --
19    A   This is aside from that.
20    Q   Right. So what is the point of this is what
21  I'm asking.
22    A   If you want to get good at a certain other
23  thing, or if your unit calls for it, you know, or
24  whatever.
25    Q   Okay. So this, maybe this is a way to think

Page 196

1  about this. Some units require specialized training.
2    A   Yes.
3    Q   Is that fair? And the criminal interdiction
4  team did, right?
5    A   I don't know if it was required, but you've got
6  to show some sort of specialized training to do it.
7    Q   You need specialized skills to do this work?
8    A   Absolutely, yeah.
9    Q   Okay. And so Deputy Babb, it looks to me, and
10  you can correct me if I'm wrong, would have gone through
11  a process of taking some outside training that was
12  specialized in criminal interdiction; is that fair?
13    A   Yes.
14    Q   And then he would have submitted those
15  trainings for approval to BCSO.
16    A   Yes.
17    Q   And then if those courses were approved, they
18  could have been formally added to his TCOLE --
19    A   Training hours, yeah.
20    Q   Okay. And then is there any other effect of
21  getting approval? For example, maybe reimbursement for
22  going to the course?
23    A   Sure.
24    Q   Okay. So the courses that are approved, the
25  officer can get reimbursed for those, the registration?

Page 197

1    A   Sure.
2    Q   Okay.
3    A   Also, do we as an agency want to continue to
4  send people to the school if our deputy's coming back and
5  telling us the school was a horrible school.
6    Q   Okay.
7    A   So that's probably another reason -- again, I'm
8  speculating.
9    Q   Sure.
10    A   But that's probably another reason we would
11  have them do an evaluation at the end of it is did we get
12  our money's worth out of you going to this school.
13    Q   Sure. Do you know if -- you may not know, but
14  do you know if somebody like Sergeant Gamboa, who would
15  have been Deputy Babb's direct supervisor on the
16  interdiction team, would have been aware of these
17  trainings?
18    A   Should have been. I don't think that you're
19  going to skip over that supervisor and go directly to a
20  chief to ask can I go to this school or what have you.
21    Q   Okay. Flip for me to 11520. And I'm not sure
22  if you're going to know the answer to these questions,
23  but I figured I'd ask because I have you here and you've
24  been so helpful. On learning objectives --
25    A   Okay.

50 (Pages 194 - 197)

Sheriff Javier Salazar                                    July 16, 2024

Page 198

1    Q    -- there's just a few lines I don't know how to
2    make sense of.  So the second bullet says, "Understand
3    the foundation of consequential limbic responses."
4    A    I don't even -- I don't know what that means.
5    Q    Okay.  And you may -- you know, cut me off if
6    you like.  But the next one says, "Outline the three
7    faces of limbic based driving behavior."
8    A    I don't know what limbic means.
9    Q    That's okay.  Let's see here.  Let me ask about
10   one more, and then I'll stop.
11   A    Sounds cool.
12   Q    It does sound cool.  "Know all five questions
13   that can trigger a noncognitive consequential limbic
14   response if an occupant is involved in smuggling
15   contraband."
16   A    I don't know what that means.
17   Q    Okay.  I'll tell you the inference I'm making,
18   and you can tell me if you disagree or you just don't
19   have an opinion, but the inference I'm making from this
20   is that when officers are conducting these interviews
21   with drivers roadside, there are going to be some
22   behaviors that are involuntary that drivers engage in if
23   they are smugglers.  Is that a fair way to read this?
24   A    What's a limbic response?
25   Q    I don't know.

Page 199

1    A    You can't answer me.  Okay.  So --
2    Q    You don't have to answer if you don't know.
3    A    No.
4        MR. FRIGERIO:  I think for purposes of the
5    record I'm going to object to form, but you can go ahead
6    and answer if you want.
7    A    Okay.  I mean, like years ago I went to schools
8    that helped you detect lies.  And there's a, you know,
9    some schools that will tell you if they look up and to
10   the left they're lying, but if they look up and to the
11   right they're recalling from their childhood.  And then
12   there's other experts that will go that's a bunch of
13   crap.
14        So I don't know.  I know that they can make all
15   kinds of claims here, but that doesn't necessarily mean
16   that that's true.  So I don't know what limbic means.  I
17   guess I'm going to go Google it after this.
18   Q    (By Mr. Windham)  Okay.
19   A    But I don't know what that means.
20   Q    I mean, are you -- I'm getting a sense -- I
21   don't mean to put words in your mouth.  Are you skeptical
22   of the scientific validity of this kind of analysis of
23   people's behavior?
24   A    Well --
25        MR. FRIGERIO:  Objection, form.

Page 200

1    Q    (By Mr. Windham)  You can answer.
2    A    Okay.  I mean, if it said limbic response if an
3    occupant is being deceptive, but how do I know he's got a
4    trunk load of cocaine based upon how he holds his eyes or
5    whatever?  I don't know.  I'm not -- I'm not familiar
6    with this course at all.
7    Q    Okay.
8    A    This person may be the best instructor ever.  I
9    just don't know.  And I don't know what limbic means.
10   Q    That's fair.
11   A    Okay.
12   Q    And I don't want to make you answer questions
13   if you don't know.
14   A    Okay.
15   Q    I just wanted to see if you did know.
16   A    Okay.
17   Q    Let's see here.  Let me just ask one more
18   question about some of these training items.  So on
19   11548 --
20   A    Okay.
21   Q    -- do you see the Street Cop Training page?
22   A    Yes.
23   Q    Have you heard of Street Cop before?
24   A    No, sir.
25   Q    You have not.  There's a line in here I just

Page 201

1    wanted to ask you about.  It's in the first paragraph,
2    and I'll just read it to you.  "The class will enhance an
3    officer's understanding and awareness of identifying a
4    criminal vehicle in addition to subsequent
5    investigation."  Do you have an understanding of what the
6    phrase "criminal vehicle" means?
7    A    No.
8    Q    Okay.  That's fine.  All right.  So let me
9    circle back to the exhibit we were on before this one,
10   which I believe is --
11   A    46.
12   Q    -- 46.  Thank you.  Okay.  So back at BC
13   8323 --
14   A    Okay.
15   Q    Okay.  So I just want to return to Question 6,
16   maybe in light of some of what we discussed about course
17   approvals and that kind of thing.  So my understanding
18   from the question -- the question asks, "What training
19   did you receive related for this position?"  Fair?  Is
20   that fair?
21   A    Say that again, please.
22   Q    I just want to make sure I'm reading it right.
23   The question says, "What training did you receive for
24   this position?"
25   A    "Related to this position."

Page 202

1    Q   "Related to this position," right?

2    A   Uh-huh.

3    Q   And then that follows Question 5, which refers

4  to him being on the interdiction unit, right?

5    A   Yes.

6    Q   Okay.  So fair to say that Deputy Babb's

7  response here indicates he was receiving the following

8  courses as training for his interdiction tasks, right?

9    A   Yes.

10    Q   And then some of those courses, but maybe not

11  all of them, we don't know, were approved by Bexar County

12  Sheriff's Office.

13    A   Right.

14    Q   Okay.  That's helpful.  And the ones that were

15  approved would have been approved because they were

16  useful for his job, right?

17    A   Well, they would have been approved because the

18  agency saw a need for the agency, a benefit for the

19  agency to send him to that course.

20    Q   Sure.  Okay.  That's all I wanted to know.  I'm

21  sorry it took us so long to get there.

22    A   That's all right.

23    Q   All righty.  So Question 7, take a minute to

24  read that question and the answer.

25    A   I closed it.  I'm sorry.

Page 203

1    Q   I'm sorry.  That's going to be on Page 8324.

2    A   Okay.  Question 7?

3    Q   Uh-huh.  Just take a minute to read the

4  question and the response.

5    A   (Reviewing document.)  Okay.

6    Q   Do you have any disagreement with -- let me put

7  it this way.  Is it fair to say that Deputy Babb is

8  describing, in basic terms, what he did during this

9  incident?

10    A   It is.

11    Q   Okay.  And the basis for his conduct?

12    A   It is.

13    Q   Do you have any issue or problem with what he

14  describes here?

15    A   Well, I mean, the conduct that he's describing

16  could also -- there could be a rational explanation for

17  why somebody would be going down to Laredo with a female

18  passenger and coming back without.  So it could be

19  criminal activity, but it also could be completely

20  innocent behavior.

21    Q   I mean, that's an interesting point, because

22  what I was going to ask you is -- he says here that he

23  identified the license plate of -- I'm sorry, quote, I

24  identified the license plate of his vehicle and observed

25  him crossing over the fog line.  I utilized the probable

Page 204

1  cause failure to maintain lane to conduct a traffic stop,

2  unquote.  Is that a fair reading of that?

3    A   Yes.

4    Q   Okay.  So if he hadn't observed that, do you

5  think the stop would have been valid, based on this

6  description?

7    A   Without a traffic violation?

8    Q   Right.

9    A   No.

10    Q   Okay.  Based on the Fusion Center information

11  about the one-day turnaround, you don't think that would

12  have been a valid basis for a stop?

13    A   No, it's not PC for a stop.  You've got to have

14  a violation.

15    Q   Do you mean probable cause?

16    A   Yes, probable cause, PC.  Sorry.

17    Q   Thanks.  I knew what you meant.  I just wanted

18  the record to be clear.

19    A   Cop jargon.

20    Q   No, fair enough.  And then on this offense of

21  crossing over the fog line, have you heard of that

22  before?

23    A   So I had never heard it called a fog line

24  before this case came to be.  I think that's more of -- I

25  think it's like an East Coast term.  But if I recall,

Page 205

1  Babb's from the East Coast, so maybe that's what they

2  called it where he grew up.

3    Q   Uh-huh.  What do you understand it to mean in

4  this paragraph, if you have an understanding of it?

5    A   I call it a solid white line.

6    Q   Okay.

7    A   You know, so leading to the shoulder.

8    Q   Yeah.

9    A   But that's just what I call it because I grew

10  up here.

11    Q   So we're talking about the solid white line

12  leading into the shoulder; is that fair?

13    A   Yes.

14    Q   And then what does the offense of crossing over

15  the solid white line involve?

16    A   Failure to maintain lane I think is -- is that

17  what you mean?

18    Q   I'm just asking what a car actually has to do

19  to commit the violation.

20    A   Oh, it's got to cross over the white line and

21  onto the shoulder, the non-driving portion of the

22  roadway.

23    Q   So the tire has to pass the line?

24    A   I guess it could either -- it either has to

25  pass the line or touch the line or drive on the line for

Sheriff Javier Salazar                                              July 16, 2024

Page 206

1  some time. I guess there's various interpretations of
2  what the deputy saw, and did he consider that to be
3  illegal.
4      Q   Have you -- I mean, you're a patrolling officer
5  still, right?
6      A   I have patrolled still. It isn't my normal
7  job, but I -- I mean, like if you ask me if on the way
8  home am I going to observe activities and take actions
9  that I see appropriate if I see something happen? Yes,
10  absolutely.
11      Q   Okay. I mean, what I'm trying to get at is how
12  you understand this offense as an officer of the law,
13  right? So you said crossing over, and you also said
14  touching. I want to know if you have an opinion about is
15  it both? Is it either?
16      A   I don't know what he saw. I didn't -- I've
17  never seen the video.
18      Q   My --
19      A   But I could see where a deputy would go: Well,
20  he touched the line and he drove on it for 100 yards, and
21  never crossed it, but he was on it.
22      Q   Yeah.
23      A   Okay. Well, that's a violation of the law, as
24  I see it.
25      Q   It is?

Page 207

1      A   Uh-huh. So I don't know how long he was over.
2  I don't know if he just --
3      Q   Yeah.
4      A   -- went over real quick and came back over. I
5  don't know if both wheels went over. I just don't know.
6      Q   And I'm not asking your opinion about a video
7  you haven't seen.
8      A   Right.
9      Q   I don't want to do that to you. My question is
10  only about your understanding of this offense, right?
11      A   Sure.
12      Q   The nature of the offense itself as a legal
13  matter, not --
14      A   Now, I don't know specifically what the Traffic
15  Code says about it these days. I don't know. I haven't
16  read the Traffic Code in a while.
17      Q   That's totally fair. Is your instinct that if
18  a car -- you mentioned driving on the line for a long
19  time that would be a violation.
20      A   I would think so.
21      Q   Okay. What if a car's tire just brushed the
22  line?
23      A   Again, I don't know what the law says. But you
24  know, it could be a violation of the law. A minor one.
25  But I don't -- so I don't know what the -- again, chapter

Page 208

1  and verse, I don't know what the Traffic Code says.
2      Q   Okay. Would you yourself pull someone over for
3  that?
4      A   Well, no. Not me. But, of course, I don't
5  work patrol on a normal basis.
6      Q   That's fair. Okay. So let's see here.
7          Whether the fog line offense here requires
8  touching or going over the line, we can set that to the
9  side for a second. But as a law enforcement officer,
10  what do you have to observe to know if a car has
11  committed this kind of offense?
12      A   You've got to observe the violation and know
13  that it's a violation.
14      Q   Does that mean observe, like seeing the tires?
15      A   I would assume if the violation's for driving
16  over a fog line that you have to physically see it drive
17  over a fog line.
18      Q   And in order to see that, you'd have to see the
19  tires on the line, right?
20      A   I would assume, yes, sir.
21      Q   Well, I'm just asking what you understand this
22  to involve, as an officer.
23      A   Well, yes, you've got to be able to see the
24  totality of the violation in order for it to be valid.
25  I'm not following your question.

Page 209

1      Q   I just want to know how you think of it is all
2  I'm asking. Yeah. So if you're saying that you have to
3  be able to see the tire and the line, that's fine.
4      A   You have to see all the elements of that
5  infraction.
6      Q   Okay.
7      A   And I would imagine tires driving over a fog
8  line, you've got to see tires, you've got to see a fog
9  line.
10      Q   Okay. Let's turn to BC 8362. Okay. First of
11  all, have you seen this page before?
12      A   Not this one in particular, but I know what it
13  is.
14      Q   Okay. What is it?
15      A   It's a page from one of our incident reports.
16      Q   Okay. And it looks like Deputy Babb filled
17  this out at the top there?
18      A   Looks like it, yes, sir.
19      Q   Okay. On March 18th of 2022.
20      A   Yes, sir.
21      Q   Okay. In the first paragraph of this report --
22  well, actually, I want to ask if you understand this to
23  be a report about the incident involving Alek Schott. So
24  take a minute to read it if you have to.
25      A   (Reviewing document.) I see -- yeah, I see

53 (Pages 206 - 209)

Sheriff Javier Salazar                                        July 16, 2024

Page 210

1  enough to --
2      Q   Okay.  I just wanted to confirm that so we know
3  what we're talking about.
4      A   Yes, sir.
5      Q   Okay.  In the first paragraph, I'll just read
6  you the sentence I want to ask you about.  "I was sitting
7  static on the side of U.S. Highway 35 South.  I" -- oh,
8  South.  "I observed the listed Ford F-250, Texas license
9  plate LJR4135 driving over the painted line on the left
10  side of the road.  I activated my red and blue emergency
11  lights and initiated a traffic stop."  Is that fair?
12      A   Yes, sir.
13      Q   Okay.  If an officer was sitting static on the
14  side of the road, and they were on the right side of the
15  road, could they even see the offense of drifting over
16  the fog line on the left side of the road?
17          MR. FRIGERIO:  Objection, form.
18      Q   (By Mr. Windham) You can answer.
19      A   Sure.
20      Q   How?
21      A   I don't know how.  But you could see.  I mean,
22  I could see where he would be able to see a violation, if
23  he's sitting -- you're saying he's sitting on the right
24  shoulder.
25      Q   Correct.

Page 211

1      A   And the infraction's alleged to have occurred
2  on the left side of the road.
3      Q   Correct.
4      A   I could see where he could see that.
5      Q   Okay.  I mean, I -- I don't understand, so I'm
6  hoping you can maybe explain how an officer might see
7  this.
8      A   Well, it depends where in relation to the
9  officer -- I'm picturing it myself.  If it happened like
10  right here right next to him, no, he's going to have a
11  hard time seeing it because of the depth perception of.
12  But if I'm looking further down the road and he crosses
13  over, I think I'd be in a position to see that.
14      Q   Oh, I see what you're saying.  So --
15      A   Or if it happened in my rear view mirror,
16  again, the further away he is I could see more of that.
17      Q   Okay.
18      A   Versus if it happened right next to me.
19      Q   That's helpful.  So just to kind of summarize
20  that.  If you're sitting static on the side of the road
21  as a police officer, the farther a car away is the easier
22  it's going to be to see this kind of offense.
23      A   For me personally --
24      Q   Sure.
25      A   -- yes, I believe so.

Page 212

1      Q   But if the car is right in front of you, it's
2  going to be hard to see an offense on the other side of
3  the car; is that fair?
4          MR. FRIGERIO:  Objection, form.
5      A   I mean, I think it presents its challenges.  Me
6  personally, the closer they are together, I think it
7  would present its challenges.  But again, I can't attest
8  to what Babb saw or didn't see.  I'm going to have to
9  rely upon what his report says.
10      Q   (By Mr. Windham) Sure.  That's helpful.  Let's
11  see here.  I just wanted to -- I mean, we can flip to
12  83 -- I want to find Question 8 in the questionnaire
13  again.  I just want to know what page that's on.  Let's
14  see here.
15          MS. HEBERT:  It is Page 8324.
16      A   Yep.
17      Q   (By Mr. Windham) Okay.  So yeah, read that
18  question for me and his answer.
19      A   (Reviewing document.) Okay.
20      Q   Do you find anything about his response -- I
21  don't mean to ask this in a way that suggests an answer.
22  I'm just trying to understand.  Is there anything out of
23  the ordinary about this response?
24      A   I think if you just conducted a traffic stop
25  and the typical thing is you write your ticket, you do

Page 213

1  your racial profiling information that's required by law
2  and then you submit the ticket or the warning or whatever
3  it may be.
4          I think that it sounds like he got an inkling
5  that, oh, I may hear something about this one again, I
6  better go ahead and proactively write a report, then he
7  wrote a report.
8      Q   Do you know when officers are required to write
9  reports after a traffic stop?
10      A   No, I mean, I don't know what the policy says
11  chapter and verse on it, but typically they're not.  The
12  ticket and the probable cause, everything is
13  self-contained right there after a traffic stop.  Now, if
14  they find something or take some sort of action above and
15  beyond the traffic stop, I could see them having to write
16  a report.
17      Q   Okay.  So let's talk about that something else.
18  Because I understand what you're saying about just
19  writing a ticket, that might be the record --
20      A   Uh-huh.
21      Q   -- of the interaction, right?  What if they
22  found, you know, a kilo?
23      A   Oh, that's going to be an offense report.
24  We're going to make an arrest and we're going to write a
25  report for possession of controlled substance over 200

54 (Pages 210 - 213)

Page 214

1  grams.
2      Q   Okay.  And what's the purpose of writing a
3  report in that situation?
4      A   Because you, you took some action above and
5  beyond just the traffic stop itself.
6      Q   Well, I mean, between finding the kilo after a
7  full search of the car and a traffic stop that results in
8  a ticket, seems like there's a range of stuff that could
9  fall in between, right?
10     A   Sure.
11     Q   Is that fair?  So, for example, if an officer
12 searched a car but didn't find anything, would that
13 require a report?
14     A   No.  There's a spot on the paperwork that we
15 submit with the ticket to account for search done, you
16 know, by consent, you know, where you have to check a
17 box, by consent, by, you know, inventory or whatever.
18 Findings, none.  So it's already contained on that
19 document that we submit.
20     Q   Got it.  Okay.  Would you expect that line,
21 that box about whether a search occurred to be filled out
22 correctly by officers on a regular basis?
23     A   Yes.  It's for tracking purposes.
24     Q   Okay.
25     A   So it needs to be.

Page 215

1      Q   What's the reason you guys want to track that
2  information?
3      A   Well, by law we have to.  We have a racial
4  profiling report that is prepared, and they want to know
5  things like the race of the driver, the race of the
6  officer, was the race known prior to the stop.  Most of
7  the time it's not.  Was there a search conducted, was
8  there contraband found, you know.  So all that's stuff
9  that we have to track, so it's got to be done as
10 accurately as possible.
11     Q   What would your reaction be to a slip of paper
12 like that that had the wrong information?  So, for
13 example, said that a search didn't occur when it did
14 occur?
15     A   I'd want to know why.
16     Q   Okay.  Why would you want to know why?
17     A   Well, because now it's going to cause our
18 numbers to be off.  So was it done maliciously, or was it
19 done -- was it an oversight?  Did you accidentally fill
20 out the answers on this traffic stop from that one and
21 did you transpose?  Why?  Why is it incorrect?  Because
22 it's going to cause our numbers -- could cause our
23 numbers to be thrown off.
24     Q   Okay.  Let's see here.  How about Question 15.
25 We're working our way through this.

Page 216

1      A   Sure.  Is there a bathroom break in our future?
2      Q   Oh, you're more than welcome to ask for one.
3  You want one now?
4      A   Is now a good time to take a break or --
5      Q   Let me see.  Yeah, I have two of these
6  questions.
7      A   Let's do it.
8      Q   Okay.  Then we'll take a break.
9      A   Yes, sir.
10     Q   So we're on Question 15.  And just take a
11 minute to read it and let me know when you're done.
12     A   (Reviewing document.)  Okay.
13     Q   Okay.  Same question as before.  Anything out
14 of the ordinary in this response, to your mind?
15     A   Can you elaborate?  I'm not sure what you --
16     Q   I just want to know, I mean -- maybe what we
17 talked about earlier answers this.  But it seems like
18 Deputy Babb is saying that his standard practice is to do
19 interdiction interviews in his patrol car.  Is that fair?
20     A   That's what he's saying.
21     Q   Okay.  And that would have been consistent with
22 how, presumably how Deputy Gamboa wanted this to go,
23 right?
24         MR. FRIGERIO:  Objection, form.
25     A   Deputy Gamboa?

Page 217

1      Q   (By Mr. Windham) I'm sorry, Sergeant Gamboa.
2      A   Sergeant Gamboa, yeah.
3      Q   Thank you.
4      A   But presumably what?
5      Q   That would have been consistent with how
6  Sergeant Gamboa wanted these officers to perform these
7  stops, right?
8      A   I don't know anything about how Sergeant Gamboa
9  wanted it.
10     Q   Oh, you don't know?
11     A   No, sir.
12     Q   Okay.  And what about Deputy -- any other
13 officers who might have been in Criminal Interdiction at
14 the time?  Are you aware of any other officers who
15 performed these stops?
16     A   I mean, I know that there was another deputy
17 named Joe Gereb that was in that unit at the same time.
18     Q   Okay.  And maybe I know the answer to this, but
19 let me just ask, are you aware of whether Deputy Gereb
20 did this same kind of tactic?
21     A   I'm not.
22     Q   Okay.  Let's see here.  All right.  I think
23 actually we can skip the next question.  So let's take a
24 bathroom break.
25     A   Okay.

Sheriff Javier Salazar                                      July 16, 2024

Page 218

1        THE REPORTER:  We are off the record.
2    (Recess from 2:54 p.m. to 3:01 p.m.)
3        THE REPORTER:  We are back on the record.
4    Q    (By Mr. Windham) Okay.  Sheriff Salazar, do you
5    realize you're still under oath?
6    A    Yes, sir.
7    Q    Okay.  Let me just take a step back and ask you
8    how you first met Deputy Babb.
9    A    Oh, I think he was working in the jail when I
10   first met him.  But I don't recall.  I think he was on
11   the SERT Team.
12   Q    On the what team?
13   A    On the SERT Team.  That's our SWAT team in the
14   jail.  That's our special operations team in the jail.
15   Q    Okay.
16   A    Riot control, firefighting, they actually --
17   any emergency situation action that happens in the jail,
18   that's who responds.  And if I'm not mistaken, he was on
19   the SERT Team.
20   Q    Let me ask it this way.  Do you recall what
21   year that was?
22   A    It would have been when I took office, 2017.
23   Q    So in those seven years since you first met
24   Deputy Babb, do you have any sense of how many
25   interactions you've had with him?

Page 219

1    A    Maybe a dozen, two dozen.
2    Q    Okay.  Did any of those involve traffic stops?
3    A    I believe so.
4    Q    Can you tell me about that?
5    A    Sure.  One in particular, there was some sort
6    of an operation going on, I don't remember -- I know it
7    was just far south, like Von Ormy area, which is a city
8    on the southern end of the county.  And our covert people
9    were conducting surveillance.  A car was leaving.  And I
10   think several of us were trying to catch up to it, up to
11   the moving surveillance.  Somebody was going to conduct a
12   traffic stop.  There was a guy, I think they had a felony
13   warrant for him or something.  And if I'm not mistaken,
14   Babb was the one that ultimately ended up catching up and
15   making the traffic stop.  And it was near like Rittiman
16   and 35 area.
17   Q    So this was an incident that involved several
18   officers; is that fair?
19   A    Oh, absolutely.
20   Q    Okay.  And you were one of the folks that were
21   there?
22   A    I was just trying to catch up to the
23   surveillance.
24   Q    So you talked to maybe Deputy Babb at some
25   point during that incident?

Page 220

1    A    I did.
2    Q    Okay.  Have you ever been in Deputy Babb's
3    patrol car during a traffic stop?
4    A    Maybe in that one.  I don't remember if I -- I
5    don't think I sat in it for any prolonged period of time,
6    but he may have shown me around.  Matter of fact, I think
7    it was right after he came back from one of these classes
8    because he was telling me some stuff about what they do
9    now.
10   Q    About the behavioral analysis and that kind of
11   thing?
12   A    I don't remember details, but I just remember
13   him telling me about some of the things that he learned.
14   I can't remember in detail what it was.  And I don't
15   remember which class it was.
16   Q    I mean, is it fair to say that if Deputy Babb
17   had told you anything during that conversation about what
18   he had learned that was flatly inconsistent with Bexar
19   County policy, you would remember that?
20   A    Oh, yeah.  Absolutely.
21   Q    Okay.  Do you recall seeing any stickers in
22   Deputy Babb's car?
23   A    No, not offhand.
24   Q    Okay.  Are there any other incidents involving
25   traffic stops with him that you can recall?

Page 221

1    A    I don't think so.
2    Q    Okay.  And any involving his time on the
3    interdiction team that you can recall?
4    A    Not stops.  I think there was another instance
5    where we were at a search warrant of some sort and I was
6    actually making fun of him a bit.  I'm a -- I like to
7    joke around, especially with my -- you know, I like to
8    joke around with my deputies from time to time.  And I
9    remember making fun of them -- I would rib them about not
10   being very effective at drug interdiction, not finding
11   drugs very often.
12       And at one point I remember we were at a search
13   warrant, not related to the highway, and Sergeant Gamboa
14   was there, and I said, "Hey, Sarge, watch this."  And I
15   said, "Babb, that's cocaine.  That's what it looks like
16   right there."  And, you know, we laughed.
17       And I felt bad because he actually gave me a
18   gift right after that, and so I felt horrible for having
19   given him a little crap, so to speak.  But that, that's
20   the only other interaction that I can -- but I don't
21   think it was near his patrol car.
22       And the gift, before you ask, was a little
23   velcro patch, and it was a mounted patrol horse.  It was
24   a little patch that he had bought somewhere because he
25   knows I like mounted patrol stuff.  He gave one to

56 (Pages 218 - 221)

Page 222

1  Sergeant Gamboa as well.
2      But that's the only two things that I can think
3  of that I had interactions with him.
4      Q   Okay.
5      A   Oh, you know what, hang on. I'm sorry. No,
6  this wasn't a traffic stop. One time on patrol, I was
7  driving home, I believe on a Saturday, and I had heard
8  patrol people out with some sort of a disturbance or
9  something involving a guy that was in the woods, a
10  suspicious person. And Babb and I both responded to
11  that.
12      He was on patrol at the time. It was before
13  his time in the interdiction unit. But that was another
14  dealing that I had with him.
15      Q   Okay. Fair to say all those interactions were
16  positive interactions with him?
17      A   Yeah.
18      Q   He seemed professional --
19      A   Yes.
20      Q   -- and all the rest? Okay. I think this is
21  going to be our final exhibit. Don't make me change my
22  mind, but I think this is going to be it. So this is
23  going to be Exhibit 55. Oh, wrong folder.
24      Okay. So Ms. Hebert has just handed you what's
25  been marked as Exhibit 55. Take a minute to look through

Page 223

1  that and let me know if you recognize it.
2      A   Yes, sir.
3      Q   You do recognize it?
4      A   Yes, sir.
5      Q   Okay. What is it?
6      A   It's a response to grievance. So basically
7  after a deputy meets with a member of command staff to
8  appeal a suspension or a proposed suspension, that member
9  of command staff will prepare a document that says: Hey,
10  on this day we met, you appealed your suspension to me,
11  and I agree with you we should reduce it to 15 days, or
12  nothing that you said changed my mind, here's what you're
13  going to get.
14      And then typically if they disagree with it --
15  if it's a deputy chief, they can disagree with that and
16  say: No, I want to go to the next level up and I want to
17  appeal it to the assistant chief.
18      In this instance, this looks like it was the
19  final one. And if memory does serve, it was James, Chief
20  Serrato that actually affirmed his termination. And at
21  this point he's considered terminated from the agency.
22      Q   And I just wanted the record to reflect that
23  there are actually, to my knowledge, seems like there
24  were two hearings held, is that fair, when you flip
25  through this?

Page 224

1      A   It does look like it.
2      Q   Okay. And I can just kind of walk through that
3  with you. So it looks like at BC 11587 there was a
4  hearing on June 5th of 2024. Is that fair?
5      A   Yes.
6      Q   That would have been before Chief Raul Garza
7  and others; is that fair?
8      A   It would have been in front of Chief Serrato.
9      Q   Oh, okay. Well, at the top of BC 11587 I see
10  attendees Chief Raul Garza --
11      A   Oh, I'm sorry. I'm looking at 581. My
12  apologies. 587. Yes.
13      Q   Okay. So there's a hearing on June 5th, 2024,
14  in front of Chief Raul Garza, right?
15      A   Yes.
16      Q   And then it looks like on BC 11582 there was a
17  second hearing on June 25 in front of Chief Serrato.
18      A   Yes.
19      Q   Is that fair? Okay. I mean, just as a general
20  question, do you have a sense of why there would have
21  been two hearings?
22      A   Yes.
23      Q   Okay.
24      A   So clearly whatever actions Chief Garza took he
25  disagreed with it, and he wanted to bump it up to myself

Page 225

1  or Chief Serrato.
2      Q   Okay. Understood. So let's walk -- let's go
3  to the first hearing on 11587.
4      A   Okay.
5      Q   And I see a line from Deputy Babb the second
6  time he speaks. I'll just read it. "I'm not that guy.
7  I've worked with Javier Salazar. He knows my work ethic.
8  And to just get dismissed. He knows my training and
9  tactics. I've done several classes."
10      Do you have an opinion on this statement?
11      A   Yeah, I don't like him calling me by my name.
12  I don't know -- we don't -- we don't have it like that.
13  So I don't appreciate that. But with that being said,
14  okay.
15      Q   Well, I just -- is that your --
16      A   I take exception to him not using my rank.
17      Q   Okay. That's fair. Other than --
18      A   We're not friends, put it that way.
19      Q   Okay. Other than him using your first name, do
20  you have any other disagreement with this statement?
21      A   I mean, you've got a great work ethic, that's
22  awesome. And I appreciate that. However that also
23  doesn't prevent you from getting fired if you do
24  something that's egregious enough.
25      Q   All right. Any other disagreement with this

Page 226

1  statement?
2  A  I don't know his training and tactics to that
3  level.  Again, I know that he's been to some training,
4  but until you showed me that, I actually didn't know it
5  was that much training.  That's a lot.  And as far as his
6  tactics, I don't --
7  Q  So you don't personally know about those
8  things?
9  A  Huh-uh.
10  Q  Okay.  Maybe just folks down the chain of
11  command; is that fair?
12  A  What do you mean?
13  Q  Well, he's talking about his training and
14  tactics.
15  A  Uh-huh.
16  Q  I would think that somebody between you and him
17  knows about those things.  Is that fair?
18  A  I would hope somebody does.
19  Q  Okay.  Perhaps Sergeant Gamboa?
20  A  Sure.
21  Q  Okay.
22  A  But that doesn't, also doesn't mean that all of
23  your tactics are correct.
24  Q  Sure.  Sure.  And then when this was, you know,
25  before Chief Garza, it looks to me on BC 11584 that the

Page 227

1  determination by Chief Garza after this hearing that I
2  just read a clip from was that he should be dismissed.
3  Is that fair?
4  A  Yes.  This would have been -- but that's not --
5  that's not Garza's signature, though, I don't think.  I
6  think that's Schuler's signature.
7  Q  You know what, I agree, given that I've seen
8  Schuler's signature before.
9  A  Uh-huh.
10  Q  Do you have a sense of what's going on there?
11  A  It says "R. Schuler for Raul Garza."
12  Q  Okay.
13  A  So I don't know if he had to -- maybe Chief
14  Garza had some sort of emergency and had to leave and
15  Chief Garza -- or Chief Schuler sat in on it, but clearly
16  he's signing for him.
17  Q  Okay.  My question is really about kind of the
18  final determination.
19  A  Sure.
20  Q  At least after this June 25, 2024, hearing.
21  A  Uh-huh.
22  Q  And that would have been that he should be
23  terminated.
24  A  It looks like they met, he appealed it, and
25  then whomever signed that document said:  No, you didn't

Page 228

1  change my mind.  I'm going to uphold your termination.
2  Q  So I want to be careful about the fact it seems
3  there are two hearings here, initial determination and an
4  appeal.  So can we break that down a little bit?
5  A  Sure.
6  Q  I'm asking right now about the initial hearing
7  on June 5th and the decision based on that hearing.  I
8  realize there was an appeal.
9  A  It's always an appeal.  There are several
10  appeals.
11  Q  Okay.
12  A  So usually you meet with your deputy chief,
13  your one star.  He or she says, "Hate to break this to
14  you, you're getting terminated."
15     "I don't agree with it."
16     "Okay.  Well, you can appeal it to the two
17  star, your assistant chief."
18     "Hey, I'm appealing the determination that the
19  one star said that I was getting.  I met with him, and he
20  didn't change it.  It's still a termination."
21     "Okay.  What do you got?  No, you're not
22  changing my mind either.  It's still a termination."
23     "Okay.  Well, then I want to appeal to the
24  three star or the four star."
25     So myself -- at that point, myself or Chief

Page 229

1  Serrato -- in this instance it was Chief Serrato met with
2  him and said, "No, you didn't change my mind either,
3  still a termination."
4     So they're all called appeals.
5  Q  That's why I was confused.  I appreciate that.
6  A  Yes.
7  Q  So the thing I wanted to ask you about is the
8  basis for the termination.
9  A  Okay.
10  Q  I'll just try to summarize, because we have
11  four pages here.  We could walk through it all, but to
12  make it quick, maybe -- it seems like what's going on
13  here is that Deputy Babb was terminated based on the dash
14  cam policy violation that is articulated in these
15  documents.  Is that fair?
16  A  I think it's a little deeper than that.
17  Q  Okay.
18  A  I think, if memory serves -- and I haven't read
19  this.  I could certainly read it.  I think it was because
20  of dishonesty, because of lying.  About that, but also
21  about lying about it --
22  Q  Okay.
23  A  -- is my understanding.
24  Q  That sounds right to me as well.  And what I
25  want to really understand is other than that, the dash

Page 230

1  cam issue and the lying about it, was there any other
2  policy violation that you think Deputy Babb was violated
3  for -- or sorry, terminated for?
4      A   Manually turning off the mobile recording
5  device, poor job performance; failing to activate the
6  mobile recording device, poor job performance; submitting
7  an untruthful supplement report is dishonesty.
8      Q   Yeah.
9      A   Looks like there's three.
10     Q   Okay.  Do any of those things, to your
11 knowledge, have to do with the way he conducted the
12 traffic stop?
13     A   No.
14     Q   Okay.  So he wasn't fired, for example, for the
15 stop itself being invalid?
16     A   I don't think -- not based on this, I don't
17 think so.
18     Q   So he wasn't stopped for the detention being
19 invalid -- or sorry, he wasn't fired for the detention
20 being invalid?
21     A   I don't think so.
22     Q   And he wasn't fired for the search being
23 invalid?
24     A   I don't think so.
25     Q   Okay.  And it looks like that's the final

Page 231

1  decision made by James Serrato, Chief Deputy, on
2  Page 11581 --
3      A   Yes.
4      Q   -- fair?  Okay.  Okay.  So after this second
5  Internal Affairs investigation concluded and Deputy Babb
6  was terminated, did you decide to make any policy shifts
7  at all?
8      A   After his termination?  Nothing springs to
9  mind.
10     Q   Okay.  So you haven't determined, either based
11 on this investigation or even just knowledge of this
12 lawsuit, to make any policy shifts at all?
13     A   I can't think of anything offhand.
14     Q   So like nothing about how to handle dash cams,
15 for example?
16     A   Nothing springs to mind.
17     Q   Okay.  And nothing about how to conduct traffic
18 stops or anything like that?
19     A   I don't think so.
20     Q   Okay.  Are you planning to make any policy
21 shifts at all?
22     A   Nothing springs to mind.  I think the policy
23 was in effect, and it just didn't get followed.
24     Q   Okay.
25     A   Plus, it's always going to be in policy that

Page 232

1  you can't lie to us about it.
2      Q   And the policy that you are saying was in
3  effect was the dash cam policy and the don't lie policy?
4      A   Yes, all of those.
5          MR. WINDHAM:  Okay.  Okay.  Let's take like a
6  3-minute break.  I think I'm about done.
7          THE REPORTER:  We're off the record.
8          (Recess from 3:18 p.m. to 3:21 p.m.)
9          THE REPORTER:  We are back on the record.
10     Q   (By Mr. Windham) Okay.  Sheriff Salazar, do you
11 realize you're still under oath?
12     A   Yes.
13         MR. WINDHAM:  Okay.  We'll pass the witness.
14         MR. FRIGERIO:  We'll reserve our questions.
15 Thank you.
16         MR. LEAKE:  We will likewise reserve our
17 questions for time of trial.
18         THE REPORTER:  We are off the record.
19 Deposition is concluded.
20     (Deposition concluded at 3:21 p.m.)
21
22
23
24
25

Page 233

CHANGES AND SIGNATURE OF WITNESS

WITNESS NAME:  SHERIFF JAVIER SALAZAR

DATE OF DEPOSITION:  JULY 16, 2024

PAGE/LINE  CHANGE              REASON FOR CHANGE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20   I, SHERIFF JAVIER SALAZAR, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24         _____
25         SHERIFF JAVIER SALAZAR

59 (Pages 230 - 233)

Page 234

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3
    ALEK SCHOTT,              §
 4       Plaintiff,          §
                             §
 5                           §
    VS.                      §
 6                           §
    JOEL BABB, in his individual  §  CIVIL ACTION NO.
 7  and official capacity;         §  5:23-cv-00706-OLG-RBF
    MARTIN A. MOLINA III, in his   §
 8  individual and official        §
    capacity; JAVIER SALAZAR, in   §
 9  his individual and official    §
    capacity; and BEXAR COUNTY,    §
10  TEXAS,                         §
         Defendants.               §
11
12              - - - - - -
13          REPORTER'S CERTIFICATION
14    ORAL DEPOSITION OF SHERIFF JAVIER SALAZAR
15                JULY 16, 2024
16              - - - - - -
17      I, MOLLY CARTER, Certified Shorthand Reporter in and
18  for The State of Texas, hereby certify to the following:
19      That the witness, SHERIFF JAVIER SALAZAR, was duly
20  sworn by the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by the
22  witness;
23      I further certify that pursuant to FRCP Rule
24  30(e)(1), that the signature of the deponent:
25  _XX_ was requested by the deponent or a party before
```

Page 235

```
 1  the completion of the deposition and returned within 30
 2  days from date of receipt of the transcript.  If
 3  returned, the attached Changes and Signature Page
 4  contains any changes and the reasons therefor;
 5  _____ was not requested by the deponent or a party
 6  before the completion of the deposition.
 7      I further certify that I am neither attorney nor
 8  counsel for, related to, nor employed by any of the
 9  parties to the action in which this testimony was taken.
10  Further, I am not a relative or employee of any attorney
11  of record in this cause, nor do I have a financial
12  interest in the action.
13      Certified to by me on this 25th day of July 2024.
14
15
16
17
18  MOLLY CARTER, CSR NO. 2613
    Expires:  04/30/2024
19
    Veritext Legal Solutions
20  Firm Registration No. 571
    300 Throckmorton, Suite 1600
21  Fort Worth, Texas  76102
    800-336-4000
22
23
24
25
```

Page 236

```
 1  Charles Frigerio, Esquire
 2  csf@frigeriolawfirm.com
 3          July 29, 2024
 4  RE:   Schott, Alek v. Babb, Joel Et Al
 5    7/16/2024, Sheriff Javier Salazar (#6664594)
 6      The above-referenced transcript is available for
 7  review.
 8      Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  clientservices-va@veritext.com
16  Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25
```