# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

ALEK SCHOTT

     *Plaintiff,*

v.

BEXAR COUNTY, TEXAS,

     *Defendant.*

Civil Action No. 5:23-cv-00706-OLG-RBF

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Christen M. Hebert (TX Bar No. 24099898)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org

Joshua A. Windham* (NC Bar No. 51071)
William R. Aronin* (NY Bar No. 4820031)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jwindham@ij.org
waronin@ij.org
*Admitted *pro hac vice*

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................... ii

Index of Exhibits ........................................................................................................... iv

Introduction ..................................................................................................................... 1

Undisputed Facts ............................................................................................................. 2

    I.   BCSO's interdiction unit used a three-step tactic to search cars without cause ............... 2

    II.   BCSO's interdiction unit treated Alek like a criminal for going on a work trip ............. 3

    III.  BCSO has repeatedly doubled down on how its interdiction unit treated Alek ............... 6

Legal Standard ................................................................................................................. 8

Argument ......................................................................................................................... 8

    I.   The interdiction unit's three-step tactic was customary within that unit .......................... 9

        A.   The interdiction unit routinely stopped drivers for one-day turnarounds .............. 9

        B.   The interdiction unit extended stops with front-seat interrogations ..................... 11

        C.   The interdiction unit used a drug dog that was cued to alert ................................ 14

    II.   The Sheriff had actual and constructive knowledge of the three-step tactic ................... 19

    III.  The interdiction unit's three-step tactic led to the violation of Alek's Fourth
        Amendment rights ............................................................................................................ 21

        A.   Alek's business trip did not give Babb reasonable suspicion to stop him ........... 21

        B.   Alek's normal behavior did not give Babb any reason to extend the stop ........... 23

        C.   Max's rigged alert did not generate probable cause to search Alek's car ............ 25

Conclusion ...................................................................................................................... 25

Certificate of Service ...................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .................................................................................................8

*Connick v. Thompson,*
    563 U.S. 51 (2011) ...................................................................................................9

*Florida v. Harris,*
    568 U.S. 237 (2013) ...............................................................................................25

*Kansas v. Glover,*
    589 U.S. 376 (2020) ...............................................................................................21

*Maryland v. Dyson,*
    527 U.S. 465 (1999) ...............................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...............................................................................................11

*Milam v. City of San Antonio,*
    113 F. App'x 622 (5th Cir. 2004) .......................................................................9, 20

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) .................................................................................................8

*Moore v. LaSalle Mgmt. Co.,*
    41 F.4th 493 (5th Cir. 2022) ..................................................................8, 9, 19, 21

*Rodriguez v. United States,*
    575 U.S. 348 (2015) ...............................................................................................23

*State v. Cortez,*
    543 S.W.3d 198 (Tex. Crim. App. 2018) ...............................................................22

*United States v. Alvarado-Zarza,*
    782 F.3d 246 (5th Cir. 2015) .................................................................................21

*United States v. Cavitt,*
    550 F.3d 430 (5th Cir. 2008) .................................................................................23

*United States v. Chavez-Villarreal,*
    3 F.3d 124 (5th Cir. 1993) .....................................................................................14

*United States v. Hill*,
    752 F.3d 1029 (5th Cir. 2014) ........................................................................14, 21

*United States v. Jenson*,
    462 F.3d 399 (5th Cir. 2006) ........................................................................23

*United States v. Landaverde-Castillo*,
    731 F. App'x 293 (5th Cir. 2018) ................................................................22

*United States v. Lopez-Moreno*,
    420 F.3d 420 (5th Cir. 2005) ........................................................................21

*United States v. Lopez-Valdez*,
    178 F.3d 282 (5th Cir. 1999) ........................................................................23

*United States v. Macias*,
    658 F.3d 509 (5th Cir. 2011) ........................................................................24

*United States v. Madrigal*,
    626 F. App'x 448 (5th Cir. 2015) ................................................................23

*United States v. Monsivais*,
    848 F.3d 353 (5th Cir. 2017) ........................................................................24

*United States v. Spears*,
    636 F. App'x 893 (5th Cir. 2016) ................................................................21

*Utah v. Strieff*,
    579 U.S. 232 (2016) ........................................................................................1

*Williams v. Kaufman Cnty.*,
    352 F.3d 994 (5th Cir. 2003) ........................................................................19

## RULES AND STATUTES

Fed. R. Civ. P. 56(a) ............................................................................................8

Tex. Crim. Code § 545.058 ..................................................................................22

**INDEX OF EXHIBITS**

| Exhibit Description | Exhibit Number |
| --- | --- |
| Salazar Deposition Transcript | 1 |
| Gamboa (Vol. 1) Deposition Transcript | 2 |
| Babb Deposition Transcript | 3 |
| Gereb (Vol. 1) Deposition Transcript | 4 |
| Gamboa (Vol. 2) Deposition Transcript | 5 |
| Bexar County Deposition Transcript | 6 |
| Second Internal Affairs Report | 7 |
| Gereb (Vol. 2) Deposition Transcript | 8 |
| Declaration of Alek J. Schott | 9 |
| Alek Dashcam (Passing Babb) – VIDEO | 10 |
| Babb BWC A – VIDEO | 11 |
| Schott Incident Report | 12 |
| Computer-Aided Dispatch Event Log | 13 |
| Patrol Vehicle Records | 14 |
| Molina BWC – VIDEO | 15 |
| Molina (Vol. 1) Deposition Transcript | 16 |
| Gereb BWC A – VIDEO | 17 |
| Babb BWC B – VIDEO | 18 |
| Gereb BWC B – VIDEO | 19 |
| Schott K9 Report | 20 |
| Schott SPEARS Summary | 21 |
| Warning Photo | 22 |
| First Internal Affairs Report | 23 |
| Ortega Deposition Transcript | 24 |
| Babb-Gamboa Call – VIDEO | 25 |
| Gereb Work Text Conversation 3 | 26 |
| WhatsApp Group Chat | 27 |
| Babb Car Position Drawing | 28 |
| Gereb Car Position Drawing | 29 |
| Gereb Personal Text Conversation 22 | 30 |
| Gereb Personal Text Conversation 21 | 31 |
| Interdiction Videos – SEALED | 32 |
| Ochoa Deposition Transcript | 33 |
| Herrera (Vol. 1) Deposition Transcript | 34 |
| Herrera (Vol. 2) Deposition Transcript | 35 |
| Matched K9 Records | 36 |
| Molina (Vol. 2) Deposition Transcript | 37 |
| Babb Q1 Citations 2022 – SEALED | 38 |
| Declaration of Ricardo J. Palacios | 39 |
| Palacios Report | 39a |
| Palacios Expert Materials | 39b |
| Alek Dashcam (After Passing Babb) – VIDEO | 40 |

| | |
|---|---|
| Alek Dashcam (Stop) – VIDEO | 41 |
| Alek Correspondence with Marta Rodiguez (Ortega) | 42 |
| Schott Warning Record | 43 |
| Molina Text Conversation 8 | 44 |
| Babb's Dismissal Documents | 45 |
| Traffic Stop Report Examples | 46 |
| Declaration of Christen M. Hebert | 47 |

## INTRODUCTION

In 2019, the Bexar County Sheriff launched a "criminal interdiction" unit that was designed to roam the highways using traffic stops as a pretext to hunt for smugglers. By early 2022, the unit had developed a three-step tactic to "get into" cars: (1) stop people for making trips with one-day turnarounds, (2) extend stops with front-seat interrogations, and (3) if a driver refused consent to search, call a drug dog that was cued to alert. Using this tactic, the interdiction unit stopped innocent drivers, forced them into a trap where everything they did justified further investigation, and then conjured up a reason to search the car. Simply put, the Bexar County Sheriff's Office (BCSO) created a machine designed to skirt the Fourth Amendment with "suspicionless fishing expedition[s] in the hope that something [will] turn up." *Utah v. Strieff*, 579 U.S. 232, 242 (2016) (cleaned up).

BCSO's interdiction unit targeted Alek Schott, a married father of two with no criminal record, while he was on a business trip in March 2022. Interdiction Deputy Babb pulled Alek over on the pretext that Alek drifted over a fog line, but the undisputed facts show that Alek drove within his lane and that Babb actually stopped him for making a one-day turnaround. Babb then ordered Alek into his patrol car and interrogated him—even though Alek acted normally and all computer checks came back clean right after they entered Babb's car. Finally, when Alek refused consent to search his car, Babb called a drug dog that, over the previous year, had never failed to alert on a roadside free air sniff. When the rigged dog alerted, interdiction officers searched Alek's car for 40 minutes, prying open every crevice and pouring out every bag. They found nothing because there was nothing to find.

Babb and his fellow BCSO officers violated Alek's Fourth Amendment rights, and Alek is entitled to judgment as a matter of law against Bexar County under *Monell*.

## UNDISPUTED FACTS

### I.    BCSO's interdiction unit used a three-step tactic to search cars without cause.

In 2019, Sheriff Salazar formed a criminal interdiction unit. The idea was to take "a couple of deputies that had traffic experience" and "try [them] out on the highways doing highway drug interdiction." Ex. 1 (Salazar Dep.) 101:17–103:22; Ex. 2 (Gamboa Vol. 1 Dep.) 44:4–45:7. The Sheriff tapped Sergeant Gamboa, who had experience in "the narcotics world, covert operations," to lead the unit. Ex. 1 (Salazar Dep.) 110:12–111:2; Ex. 2 (Gamboa Vol. 1 Dep.) 44:4–45:7. Gamboa's understanding was that the unit would do "[p]roactive policing on highways" by making traffic stops to search for drugs and human smuggling. Ex. 2 (Gamboa Vol. 1 Dep.) 44:13–45:3. Unlike normal traffic stops, which "react[] to the crime that has already happened," Ex. 3 (Babb Dep.) 57:15–58:2, "proactive" stops allow officers to "build" a reason to search cars. Ex. 2 (Gamboa Vol. 1 Dep.) 38:11–39:2. Gamboa picked officers for the unit because they knew how to use traffic stops to "get into the vehicle." *Id.* at 50:21–52:17.

In early 2022—the period before the traffic stop here—the interdiction unit had two officers: Deputy Babb and Deputy Gereb. Ex. 4 (Gereb Vol. 1 Dep.) 175:16–177:25; Ex. 5 (Gamboa Vol. 2 Dep.) 69:12–70:8. During this period, the interdiction unit was overseen by Gamboa and housed within BCSO's organized crime division. Ex. 4 (Gereb Vol. 1 Dep.) 178:1–10, 265:19–266:2; Ex. 1 (Salazar Dep.) 108:8–16. That division had a primary K9 unit: Deputy Molina and his narcotics dog Max. Ex. 6 (County Dep.) 208:1–209:19; *accord* Ex. 7 (Second IA Report) BC8325.

BCSO's interdiction unit, encouraged by Gamboa and armed with a K9 who never failed to alert on roadside free air sniffs, knew their task: "go hunt" for "smuggling activity" on highways. Ex. 4 (Gereb Vol. 1 Dep.) 303:20–304:14; Ex. 8 (Gereb Vol. 2 Dep.) 134:7–135:6 (confirming criminal interdiction work was "hunting"); *see also* Ex. 3 (Babb Dep.) 206:10–25 (describing a "Kilo Hunter" sticker in his car). As discussed in detail below, the interdiction unit used a three-step

hunting tactic: First, pull drivers over for making trips with one-day turnarounds rather than actual traffic violations. Second, extend the stop by ordering drivers into the front seat of their patrol cars and interrogating them. Third, if drivers refused consent to a search, call in the K9 cued to alert.

## II.    BCSO's interdiction unit treated Alek like a criminal for going on a work trip.

In March 2022, BCSO's criminal interdiction unit used its three-step tactic on Alek. Ex. 9 (Schott Decl.) ¶ 26. Alek is a married man in his 30s with two young kids and no criminal history (save a few traffic tickets that were resolved by March 2022). *Id.* ¶¶ 3–5. He works for his dad's small business, RMS Controls, which manufactures and distributes products to pipeline companies. *Id.* ¶ 7. His job requires him to drive to client sites throughout Texas, especially South and West Texas, which are major regions for Texas's oil and gas industry. *Id.* ¶¶ 8–9, 62–65. At all relevant times, Alek drove a black Ford F-250. *Id.* ¶ 17. Because he drives so much for work, Alek installed a dashcam, which was recording on the date of the traffic stop at issue in this case. *Id.* ¶¶ 10–11, 30.

On March 15, Alek left his home in Houston for a customer meeting—a trial of a remote power engine—to take place near Carrizo Springs, Texas, the next day. *Id.* ¶¶ 17–18. That night, he stayed at a Holiday Inn in Pearsall (southwest of San Antonio). *Id.* ¶ 18. The next morning, on March 16, Alek met a colleague in the hotel lobby to carpool to the customer site. *Id.* ¶ 19. The colleague worked for a manufacturer that RMS Controls partners with. *Id.* Afterwards, Alek dropped her off back at the hotel parking lot. *Id.* ¶ 20. Alek then began the drive home to Houston, taking I-35 north through Bexar County. *Id.* ¶¶ 20–21.

Unknown to Alek, BCSO Interdiction Deputy Babb "was watching for his license plate." Ex. 3 (Babb Dep.) 102:1–4. Babb was parked off I-35 with his car facing perpendicular to the highway. Ex. 10 (Alek Dashcam (Passing Babb)) 0:34. Babb was looking for Alek because he had received a text through a WhatsApp group (of which BCSO Interdiction Deputy Gereb was also a member, Ex. 2 (Gamboa Vol. 1 Dep.) 151:13–152:16) that Alek had made a "one-day turnaround"

from Houston to Carrizo Springs. Ex. 3 (Babb Dep.) 133:11–20, 137:4–18. The text was from "Kiki"—a man Babb had never spoken to and whose real name he didn't know—who Babb thought worked at the Laredo Fusion Center—a place Babb has never visited and that nobody else is even sure exists. *Id.* at 146:8–152:6; Ex. 2 (Gamboa Vol. 1 Dep.) 241:18–242:5; Ex. 8 (Gereb Vol. 2 Dep.) 59:25–60:2; Ex. 1 (Salazar Dep.) 129:25–130:12.

Of course, countless Texans work in the oil and gas industry and make one-day trips to the Carrizo Springs area. Ex. 9 (Schott Decl.) ¶ 16. Even Babb knew there was nothing suspicious about Carrizo Springs "the place itself." Ex. 3 (Babb Dep.) 213:16–23. Babb, however, deemed Alek's one-day turnaround an "irregular travel pattern" that, "[i]n the criminal interdiction world," implied Alek was engaged in "human smuggling and narcotic smuggling." *Id.* at 135:4–136:17, 156:8–157:7. So Babb pulled Alek over. When Babb approached Alek's passenger door, Babb said "[t]he only reason I'm stopping you is that when I was watching you over there, you were drifting over that fog line pretty hard." Ex. 11 (Babb BWC A) 2:27–2:43. But Babb later admitted that "the irregular travel pattern was the reason I was actually doing the stop." Ex. 3 (Babb Dep.) 133:6–20.

Having stopped Alek for a one-day turnaround, Babb moved to the interdiction unit's second tactic: the front-seat interrogation. Babb ordered Alek to exit his truck and come sit in Babb's patrol car "while I do your warning." Ex. 11 (Babb BWC A) 3:00–3:04. Less than a minute after entering Babb's car, Babb ran computer checks on Alek and (besides a few old, resolved traffic tickets) they came back clean. Ex. 4 (Gereb Vol. 1 Dep.) 283:7–284:19; Ex. 7 (Second IA Report) BC8337–38. Even so, Babb interrogated Alek about who he was, where he was going, what he did for work, who he was related to—and then asked a battery of questions about whether Alek had large amounts of cash or anything illegal in his truck. Ex. 11 (Babb BWC A) 12:30–13:22. Babb never gave Alek a *Miranda* warning at any point during the stop. Ex. 9 (Schott Decl.) ¶ 47.

Alek answered every question calmly and truthfully: He was on a work trip, had no drugs, and had no large amounts of cash. Ex. 11 (Babb BWC A) 12:30–13:22. But that wasn't good enough. Babb asked if Alek would allow him to search his truck. *Id.* at 13:23–13:38. When Alek said he would "prefer not," Babb claimed he had "reasons to believe there that might be something in your vehicle" and that, after performing "behavioral analysis" on Alek, "there's just some things I've seen that make me want to go a little further in the investigation." *Id.* at 13:38–13:59. When Alek still did not consent to a search, Babb stated he was calling for a K9 and that Alek no longer had the option to consent. *Id.* at 14:48–15:00; Ex. 9 (Schott Decl.) ¶ 39. Applying the interdiction unit's third tactic, Babb called for Molina and his drug dog, Max, who Babb knew was "not far" away. *Id.* at 15:00. Gereb, who assisted Babb on traffic stops "if he was doing a search," messaged Babb *four minutes* after the call for Molina that he was "omw" (on my way) and sped there at 90 miles an hour. Ex. 13 (CAD Events Log) BC169; Ex. 4 (Gereb Vol. 1 Dep.) 230:2–23, 233:8–22; Ex. 14 (Patrol Vehicle Records) BC5687–89 (showing Gereb's speed during the time he traveled to the traffic stop).

When Molina arrived, he ran Max around Alek's truck and—like clockwork, *infra* pp. 15–16 (explaining how Max was rigged)—Max "alerted" on Alek's driver's side door. Ex. 15 (Molina BWC) 2:33–2:48. Molina opened the door, let Max inside, and gave Max a reward for alerting. *Id.* at 2:35–2:45, 4:24–4:38; Ex. 16 (Molina Vol. 1 Dep.) 148:21–149:14. Babb placed Alek in the back of his patrol car and said "you are detained because of a positive alert." Ex. 11 (Babb BWC A) 37:43–37:45. For the next 40 minutes, Babb, Molina, and Gereb (after he arrived) searched every crevice and emptied every bag in Alek's truck. Ex. 9 (Schott Decl.) ¶ 45; Ex. 11 (Babb BWC A) 39:22 (Babb and Molina starting search); Ex. 17 (Gereb BWC A) 0:00 (Gereb starting search).

There were no drugs in Alek's truck, and there never had been. Ex. 9 (Schott Decl.) ¶ 46. While at the traffic stop, all three officers wore bodycams and none of them claimed to have found

drugs. *See* Ex. 11 (Babb BWC A); Ex. 18 (Babb BWC B); Ex. 15 (Molina BWC); Ex. 17 (Gereb

BWC A); Ex. 19 (Gereb BWC B). Both Babb and Gereb testified that no one found any evidence of

illegal activity in the truck. Ex. 3 (Babb Dep.) 89:25–90:14; Ex. 4 (Gereb Vol. 1 Dep.) 258:10–259:3.

Every record of the stop is consistent with that result, except one: Molina's K9 deployment report

says "Trace" marijuana was found. *Compare* Ex. 12 (Schott Incident Report) (no drugs mentioned),

*and* Ex. 21 (Schott SPEARS Summary) (same), *with* Ex. 20 (Schott K9 Report) (asserting "Trace"

was found). In deposition, Molina claimed to have seen "two small . . . green flakes" while searching

Alek's truck, ten minutes after rewarding Max. Ex. 16 (Molina Vol. 1 Dep.) 158:23–161:18. Molina

never told anyone about these flakes, never touched them in any way, and never did anything to

confirm they were marijuana. *Id.* at 148:1–12, 162:12–22, 164:14–18.

After the search, Babb released Alek and handed him a traffic warning. Ex. 9 (Schott Decl.)

¶ 26; Ex. 18 (Babb BWC B) 16:18. The warning stated "No Search" had occurred. Ex. 9 (Schott

Decl.) ¶ 27; Ex. 22 (Warning Photo). Before Alek left, Babb lamented that the interdiction unit had

found nothing illegal: "nine times out of ten, this is what happens." Ex. 18 (Babb BWC B) 18:15.

### III. BCSO has repeatedly doubled down on how its interdiction unit treated Alek.

Two days later, Alek complained to BCSO about how he had been stopped and his car had

been searched for no reason. Ex. 9 (Schott Decl.) ¶ 50. Internal affairs opened an investigation.

Ex. 23 (First IA Report) BC2152; Ex. 24 (Ortega Dep.) 108:17–109:17, 120:25–124:13. When

Gamboa heard about the investigation, he called Alek. Ex. 9 (Schott Decl.) ¶ 52. Gamboa then put

Alek on hold and secretly called Babb, who said Alek's stop "was one of those from the app, the

intel stops of a one-day turnaround." Ex. 25 (Babb-Gamboa Call) 0:34–0:41. Babb also shared that

he wrote part of his report to "cover my ass." *Id.* at 0:41–0:57. Gamboa responded that he had told

Alek "nothing that [Babb] did [was] illegal." *Id.* at 1:27–1:47; Ex. 9 (Schott Decl.) ¶¶ 52–53. After

his sidebar with Babb, Gamboa told Alek "we can see all of these violations you made from [Babb's]

body camera" and urged him to "challenge us in court if you don't like how we conduct business." Ex. 9 (Schott Decl.) ¶¶ 54–55; Ex. 23 (First IA Report) BC2156–57. But Babb's bodycam did not capture any footage of Alek's truck before the stop—let alone any traffic violations. *See* Ex. 11 (Babb BWC A). Soon after Gamboa's call with Alek, internal affairs closed Alek's complaint because it "did not see any policy violations." Ex. 23 (First IA Report) BC2150, 2154.

A few months later, Babb became an instructor at BCSO's academy. Ex. 3 (Babb Dep.) 20:7–22:13. To become an instructor, an officer must be good at his job and know BCSO policy. *Id.* at 21:7–22:25; Ex. 1 (Salazar Dep.) 141:24–143:5. Both the Sheriff and Gamboa were aware of Babb's tactics. Gamboa routinely reviewed Babb's (and Gereb's) bodycam footage. Ex. 2 (Gamboa Vol. 1 Dep.) 116:23–117:16, 120:12–18. Babb knew, based on these "regular[]" reviews, that Gamboa was "pretty happy with what he saw." Ex. 3 (Babb Dep.) 67:17–21, 70:7–71:10. And Gamboa kept the Sheriff updated about the interdiction unit. Ex. 1 (Salazar Dep.) 111:8–116:7. The Sheriff "knew basically what they do, what they did," and approved. *Id.* at 116:2–7, 220:2–20; Ex. 3 (Babb Dep.) 271:2–22 ("Sheriff Salazar is in full understanding of what I do, how I do it[,] and what my training is."). Based on what he knew, the Sheriff thought making Babb an instructor was a "good move." Ex. 1 (Salazar Dep.) 141:24–143:5. Babb's perception, too, was that "[t]hey hired me to be an instructor at the academy because of what I've done." Ex. 3 (Babb Dep.) 238:24–239:6. For over a year, Babb taught new BCSO officers how to perform traffic stops and showed them videos of his interdiction stops. *Id.* at 191:18–193:15.

Alek filed this lawsuit in June 2023. Days later, after the lawsuit gained interest "on social media," BCSO opened a second internal affairs investigation limited to Babb's conduct. Ex. 7 (Second IA Report) BC8307, 8311; Ex. 6 (County Dep.) 156:15–158:2. The County learned that Babb had "manually turned off" his dashcam moments before he stopped Alek and that Babb had

done so on other occasions. Ex. 7 (Second IA Report) BC8306; Ex. 6 (County Dep.) 169:2–171:1. Ultimately, after a full investigation, the County fired Babb for lying about his dashcam but found "insufficient evidence indicating [Babb] violated [Alek's] civil rights." Ex. 7 (Second IA Report) BC8307; Ex. 6 (County Dep.) 150:18–152:8; *see also* Ex. 45 (Babb Dismissal Docs.). The Sheriff stands by the results of the second investigation as a final decision that Babb conducted Alek's traffic stop consistent with BCSO policy. Ex. 1 (Salazar Dep.) 229:7–231:3.

## LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This case is solely about municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "To prevail," Alek "must show (1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (cleaned up).

## ARGUMENT

Alek is entitled to summary judgment. The County's interdiction unit had a custom of using a three-step tactic—stop drivers for one-day turnarounds, extend stops with front-seat interrogations, and deploy a drug dog cued to alert—to search cars with zero evidence of crime (Section I). The County's law enforcement policymaker, Sheriff Salazar, knew about that custom (Section II). And the custom produced all three Fourth Amendment violations here: Babb stopped Alek for lawful driving, Babb extended the stop based on totally normal behavior, and the officers searched Alek's truck based on a cued dog alert (Section III). Under *Monell*, the County should be held responsible.

I.     **The interdiction unit's three-step tactic was customary within that unit.**

A county can be held liable for a "custom . . . that led to a constitutional violation." *Moore*, 41 F.4th at 509. Tactics are customary when they are "so persistent and widespread as to practically have the force of law." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Where, as here, a plaintiff argues that a tactic was standard within a specific unit, "discussion among" members of that unit can prove that the practice was customary. *Moore*, 41 F.4th at 509–11 (guards' testimony about spraying prisoners with chemicals off-camera suggested the tactic was customary). Further, "persistent" conduct "tolerated by municipal policymakers" can prove "a preexisting de facto policy[.]" *Milam v. City of San Antonio*, 113 F. App'x 622, 625, 628 (5th Cir. 2004). Applying this standard, the interdiction unit's three-step tactic was a "customary policy." *Id.* at 627.

A.     **The interdiction unit routinely stopped drivers for one-day turnarounds.**

BCSO's interdiction unit routinely stopped cars for making one-day turnarounds. To Deputy Babb, a one-day turnaround is "travel[ing] long distances and [not] stay[ing] for a couple days." Ex. 3 (Babb Dep.) 156:8–157:7. Deputy Gereb put it more simply: a "turnaround [that] was really fast. That's it." Ex. 8 (Gereb Vol. 2 Dep.) 58:2–8; Ex. 4 (Gereb Vol. 1 Dep.) 306:6–21. Either way, the interdiction unit treated a one-day turnaround as a "red flag" and a "common reason" to stop a car. Ex. 3 (Babb Dep.) 300:1–301:1. For example, a supervisor urged interdiction officers to stop cars for ordinary travel like "going towards Houston and then turning around." Ex. 26 (Gereb Work Text Convo 3); Ex. 2 (Gamboa Vol. 1 Dep.) 20:12–21.

The interdiction unit received "intel" about one-day turnarounds from two main sources. *Cf.* Ex. 25 (Babb-Gamboa Call) 0:34–0:41 (Babb explaining to Gamboa that Alek's stop "was one of those from the app, the intel stops of a one-day turnaround"). First, officers used license plate readers to access detailed travel histories of passing vehicles. Each interdiction car had four plate readers placed in different spots so "every vehicle that passed . . . got snapshotted." Ex. 3 (Babb Dep.) 86:21–

87:18; *see also* Ex. 2 (Gamboa Vol. 1 Dep.) 140:23–141:6, 147:17–22; Ex. 4 (Gereb Vol. 1 Dep.) 39:20–40:12. These readers fed into, and allowed access to, a vast database of scans from other agencies and commercial sources. Ex. 4 (Gereb Vol. 1 Dep.) 29:12–35:24. With a single keystroke, officers unlocked a car's travel history and photos of the car. Ex. 3 (Babb Dep.) 85:3–87:18.

Second, interdiction officers used a WhatsApp group chat, where anonymous and unvetted numbers fed them information, to select targets for traffic stops. Ex. 2 (Gamboa Vol. 1 Dep.) 152:10–16; Ex. 3 (Babb Dep.) 152:7–10; Ex. 8 (Gereb Vol. 2 Dep.) 57:3–59:24. Unidentified people dropped car and travel descriptions into the chat. *E.g.*, Ex. 27 (WhatsApp Group Chat) (flagging cars for "[q]uick turnaround," "[o]dd travel," and "oilfield travel"). And interdiction officers acted on that intel. Ex. 2 (Gamboa Vol. 1 Dep.) 151:19–152:16; Ex. 3 (Babb Dep.) 135:4–140:10, 152:7–10, 292:13–293:15. These unknown watchers would whisper information into the group chat—a car's color, its make, sometimes a plate number—and officers would hunt for their prey, ready to stop any car that matched the description. Ex. 8 (Gereb Vol. 2 Dep.) 55:2–56:11. A simple "white Chevy" was enough. Ex. 4 (Gereb Vol. 1 Dep.) 248:2–23, 253:17–254:6.

After picking targets based on one-day turnarounds, interdiction officers stopped cars under the guise of traffic enforcement. County data show that Babb and Gereb—just two of the County's 250+ officers doing some traffic enforcement—made nearly 30% of all BCSO stops for three lane violations: unsafe lane change, failure to signal lane change, and failure to maintain single lane. Ex. 6 (County Dep.) 17:18–19:24, 110:5–114:10. Before these stops, Babb and Gereb manipulated their dashcams to avoid capturing footage of these alleged traffic violations. Ex. 32 (Interdiction Videos) BC517 at 33:35–33:46 (Babb explaining how he drives his patrol car so the dashcam is "never on"). Or they strategically parked their cars perpendicular to the road, Ex. 3 (Babb Dep.) 73:20–76:24; Ex. 28 (Babb Car Position Drawing); Ex. 8 (Gereb Vol. 2 Dep.) 91:16–96:3; Ex. 29 (Gereb Car

Position Drawing), which ensured their front-facing dashcams wouldn't see the alleged violations. Ex. 7 (Second IA Report) BC8307 (BCSO report finding the "orientation of [Babb's] vehicle on the side of the roadway would not have allowed [Babb's] dashcam to capture the traffic violation [Babb] reported"); Ex. 8 (Gereb Vol. 2 Dep.) 92:17–93:6, 95:18–96:3 (admitting that, when he parks perpendicular, "the camera will not capture the traffic violation"). Interdiction officers' strategic angles were so well-known that officers joked about it: "Bet ur dash didn't catch it. Sounds right for interdiction deputies." Ex. 30 (Gereb Personal Text Convo 22).

No "rational trier of fact" could believe that cars flagged for one-day turnarounds committed the same lane violations again and again—miraculously—right when they drove by Babb and Gereb. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Other BCSO officers knew this and teased the interdiction officers about it. After one of Gereb's traffic stops, a sergeant texted other officers that Gereb "found[,] I mean made up" probable cause. Ex. 31 (Gereb Personal Text Convo 21). Another text in that same thread teased that Gereb's typo of "meed" probable cause, when he meant "need," revealed what was really happening on interdiction stops: Violations were "a combination of made up and need[.]" *Id.*

## B.    The interdiction unit extended stops with front-seat interrogations.

Every interdiction traffic stop was—at the outset—"a form of arrest," Ex. 6 (County Dep.) 215:7–13, that officers treated as "long term" investigations into unspecified (non-traffic) crimes, Ex. 8 (Gereb Vol. 2 Dep.) 82:5–17; *accord* Ex. 5 (Gamboa Vol. 2 Dep.) 21:4–17. In the interdiction unit's lingo, these were "proactive" stops. Ex. 2 (Gamboa Vol. 1 Dep) 38:11–39:2, 65:8–14, 79:25–80:7. Unlike normal stops, which involve "react[ing] to the crime that has already happened," Ex. 3 (Babb Dep.) 57:15–58:2, "proactive" stops allow officers to "build" reasons to search cars for drugs and evidence of other crimes. Ex. 2 (Gamboa Vol. 1 Dep.) 38:11–45:3. These broad investigations began "as soon as the driver contact was made." Ex. 5 (Gamboa Vol. 2 Dep.) 82:25–83:7. Officers

approached with disarming smiles, using their first names and promising "just a warning"—a tactic to "relax [a driver] and try to make him more comfortable," to "build rapport." Ex. 3 (Babb Dep.) 133:21–134:13; *see also id.* at 78:5–17 ("I'm not out here to give tickets in criminal interdiction. So most people are getting written warnings."); Ex. 4 (Gereb Vol. 1 Dep.) 185:1–14.[1] But this friendly front was just the first move in "the game of interdiction." Ex. 3 (Babb Dep.) 133:21–134:13.

Then came the trap. Interdiction officers ordered drivers to come sit in the front seat of their patrol cars while they wrote a warning—not because of any suspicion, but because it was the unit's "way of operating" and "general practice." Ex. 5 (Gamboa Vol. 2 Dep.) 96:17–97:7; Ex. 3 (Babb Dep.) 184:8–187:3 (noting he has done it hundreds of times), 271:2–272:2 (noting the Sheriff saw it and condoned it); Ex. 4 (Gereb Vol. 1 Dep.) 197:8–199:15 (noting he performed them too). Babb and Gereb were trained to conduct "interviews" to trigger responses allegedly "associate[d] with trafficking." Ex. 4 (Gereb Vol. 1 Dep.) 182:25–184:19. They placed bodycams on their dashboards to catch drivers' every response and nervous twitch. *Id.* at 184:9–187:11; Ex. 8 (Gereb Vol. 2 Dep.) 45:20–46:17; Ex. 3 (Babb Dep.) 199:20–202:9, 238:3–17. They did not give *Miranda* warnings or tell drivers they could refuse to enter the patrol car. Ex. 4 (Gereb Vol. 1 Dep.) 314:7–315:18; Ex. 3 (Babb Dep.) 186:18–187:3. These interactions were "not [actually] an interview," Ex. 3 (Babb Dep.) 71:11–22—they were interrogations.

These interrogations were routine and extended far beyond a traffic-enforcement purpose while the officer dragged out writing a warning. Ex. 5 (Gamboa Vol. 2 Dep.) 95:12–98:4 (confirming the routine of an interdiction stop); Ex. 3 (Babb Dep.) 71:14–73:11 (explaining his standard steps). Officers asked manipulating questions, following a script that shows up across dozens of bodycam

---

[1] *See, e.g.*, Ex. 32 (Interdiction Videos) BC385 at 2:38–3:09, BC414 at 0:56–1:56, BC433 at 1:10–1:42, BC488 at 2:15–3:00, BC10831 at 2:15–4:45.

videos.[2] They started with easy questions to set a "baseline," then strategically jumped between topics—family, weather, travel—while scrutinizing every change in behavior. Ex. 4 (Gereb Vol. 1 Dep.) 186:8–19; Ex. 3 (Babb Dep.) 238:3–17. Babb even placed provocative stickers around his car, like one that said "Kilo Hunter," to see if "visual stimulation" would prompt suspicious responses— like failing to notice his stickers. Ex. 3 (Babb. Dep.) 208:6–22. Then came "hard questions, like, 'Hey, is there anything in the car I should know about?[']" Ex. 4 (Gereb Vol. 1 Dep.) 186:8–19. Drugs? Money? Anything?[3] Even though computer checks took mere seconds, Ex. 4 (Gereb Vol. 1 Dep.) 97:6–20, officers prolonged these interrogations to see if they could induce "deviations in behavior." Ex. 3 (Babb Dep.) 238:7–17.

It was "mostly by behavior" that interdiction officers decided to keep investigating. Ex. 4 (Gereb Vol. 1 Dep.) 187:12–188:1. A driver's *chosen* behavior didn't matter. The game was rigged. Officers could—and did—spin anything as suspicious: Putting your hands up? Suspicious. Ex. 3 (Babb Dep.) 132:10–18. Looking out the window? Suspicious. *Id.* at 236:14–237:4. Looking straight ahead? Suspicious. *Id.* at 81:10–18. Looking at your car and back at the officer? Suspicious. Ex. 4 (Gereb Vol. 1 Dep.) 187:12–188:1. Laughing? Suspicious. Ex. 3 (Babb Dep.) 242:15–243:17. Not laughing? Suspicious. *Id.* at 208:6–22. Breaking silence? Suspicious. *Id.* at 231:2–18. Staying silent? Suspicious. *Id.* at 208:6–22. Speaking quietly? Suspicious. *Id.* at 216:5–217:6. Breathing slightly

---

[2] *See, e.g.*, Ex. 32 (Interdiction Videos) BC310 at 3:03–8:10, BC401 at 2:16–11:49, BC433 at 2:05–5:08, BC488 at 3:15–14:10, BC9814 at 2:53–8:25, BC9880 at 5:39–8:50, BC10632 at 2:06–5:59, BC10758 at 2:08–9:04, BC10761 at 2:20–7:35, BC10769 at 4:25–9:05, BC10772 at 3:39–9:16, BC10776 at 2:57–10:51, BC10793 at 5:05–8:19, BC10823 at 4:48–10:49, BC10831 at 5:38–18:06.

[3] *See, e.g.*, Ex. 32 (Interdiction Videos) BC310 at 8:12–9:09, BC385 at 11:15–11:41, BC401 at 11:50–13:56, BC414 at 9:38–10:46, BC433 at 5:09–6:49, BC488 at 14:10–16:02, BC9814 at 8:28–9:23, BC9880 at 8:54–9:29, BC10632 at 6:00–7:17, BC10769 at 9:10–11:38, BC10772 at 9:18–10:34, BC10793 at 8:20–14:17, BC10823 at 11:24–12:35, BC10831 at 18:16–19:22.

more than average? Suspicious. *Id.* at 170:16–24. Answering "absolutely not" to questions about drugs when previous answers had been "nope"? Suspicious. *Id.* at 242:15–243:17. And on and on.

With just a few simple questions, interdiction officers could "put an ominous gloss on what appear[ed] almost entirely ordinary." *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014). In other words, front-seat interrogations were a hack—a way to "build reasonable suspicion" out of normal conversations. Ex. 3 (Babb Dep.) 82:8–83:14, 171:16–172:14; Ex. 2 (Gamboa Vol. 1 Dep.) 38:19–39:2, 153:21–154:12. Note the word choice. Reasonable suspicion did not *arise* during traffic stops; officers *constructed* it to justify a predetermined result—searching the car.

The whole point of front-seat interviews was "to gain access into the vehicle." Ex. 5 (Gamboa Vol. 2 Dep.) 77:22–78:10. So, when interdiction officers felt the interview had gone on long enough, they asked for consent to search and, if that didn't work, they called a K9 that would give them a basis to "search the vehicle." Ex. 1 (Salazar Dep.) 106:7–24. Gamboa claims the unit typically got consent. Ex. 2 (Gamboa Vol. 1 Dep.) 182:19–183:6. But its officers never told drivers they could refuse. *Id.* at 184:21–25; Ex. 4 (Gereb Vol. 1 Dep.) 203:24–204:9. And, even if they had, the coercion of an invalid stop would have "taint[ed]" any consent. *United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993).

### C.    The interdiction unit used a drug dog that was cued to alert.

For the rare driver who refused to "consent" to search, the interdiction unit played its trump card: Deputy Molina and his drug dog Max—a rigged K9 team the interdiction unit used to fake probable cause to search. Molina was the interdiction unit's primary K9 handler on traffic stops. Ex. 2 (Gamboa Vol. 1 Dep.) 206:19–207:19, 210:24–211:1; *see also* Ex. 7 (Second IA Report) BC8325 (Babb noting that "Molina was the K9 handler on the same shift as me"); Ex. 4 (Gereb Vol. 1 Dep.) 207:6–19 (noting he "primarily work[ed] with" Molina's dog on the interdiction unit). Molina often waited in the wings, ready to deploy Max, while the interdiction unit was out hunting

on highways. Ex. 2 (Gamboa Vol. 1 Dep.) 214:12–20. Sometimes, Gamboa even ordered Molina to bring Max to a stop *before* officers pulled the target over. *Id.* at 214:2–5.

Molina, unlike other K9 officers, manipulated Max's reward structure so that Max would be cued to alert on cars regardless of whether drugs were present. Sergeant Ochoa, who supervised the K9 unit from 2015 to 2023, and Deputy Herrera, who was a K9 unit trainer and Max's handler before Molina, Ex. 33 (Ochoa Dep.) 16:21–23, 25:17–23, 37:13–38:25, explained how K9 deployments are supposed to work. "[T]he whole purpose of a dog doing any type of work . . . is to fill their mouth. That's all they care about." Ex. 34 (Herrera Vol. 1 Dep.) 102:14–103:4. Handlers use that drive to deploy K9s. When a dog alerts to drugs, the handler gives a "reward," typically food or a toy, as "reinforcement." Ex. 33 (Ochoa Dep.) 55:7–17, 74:16–76:5. The reward "drives them" to alert to drugs. *Id.* at 74:16–76:5; *see also* Ex. 35 (Herrera Vol. 2 Dep.) 46:22–47:10 (agreeing).

Crucially, rewards can be abused. Just as a dog can be trained to alert to drugs, it can be trained to alert to the *prospect* of a reward. Ex. 33 (Ochoa Dep.) 56:12–62:20. If a dog's reward is a toy, and a handler gives the toy every time the dog alerts—even when the alert is false—that trains the dog to "alert[] to nothing that's there just in anticipation of getting the toy." *Id.* at 56:21–58:24. Even a certified K9 can be made unreliable if his handler allows him to develop this habit. *Id.* at 62:5–63:4 ("that could happen, yes"). That risk grows during roadside sniffs, where handlers don't know whether a car contains drugs until after they search it. *Id.* at 79:24–80:3. In that context, a handler must "pay [his] dog" *after* "sources [are] recovered." Ex. 34 (Herrera Vol. 1 Dep.) 102:14–25; *see also* Ex. 33 (Ochoa Dep.) 81:7–18 ("everybody knows that").

Molina broke this cardinal rule during traffic stops. Max's reward was a toy. Ex. 16 (Molina Vol. 1 Dep.) 27:18–28:2. Molina's standard practice, during every roadside free air sniff, was to take out the toy and "put it on my hip." *Id.* at 64:24–65:13; Ex. 37 (Molina Vol. 2 Dep.) 34:18–35:25.

15

Then, after priming Max with the toy, Molina rewarded Max for alerting on cars *before* confirming there were illegal drugs inside. Ex. 16 (Molina Vol. 1 Dep.) 65:20–66:2. Botching Max's rewards in this way—reinforcing *alerts* rather than *finds*—trained Max to "alert[] . . . just in anticipation of getting the toy." Ex. 33 (Ochoa Dep.) 56:21–58:24.

And the numbers prove it. In the year leading into Alek's traffic stop, Max automatically alerted on *every* roadside free air sniff. He performed 15 free air sniffs on cars during traffic stops and alerted all 15 times. Ex. 36 (Matched K9 Records) BC4900, 4822, 4823, 4820, 4801, 4749, 4712, 4707, 4653, 4644, 4643, 4638, 4615, 4612, 4600.[4] That's exactly what the interdiction team wanted. Indeed, Molina knew that the *whole point* of calling him to a stop was to create probable cause for Babb and Gereb to search a car. Ex. 16 (Molina Vol. 1 Dep.) 58:15–24. When Max alerted, the interdiction officers searched—no questions asked. Ex. 2 (Gamboa Vol. 1 Dep.) 187:12–22. They didn't care about Max's reliability. They cared about getting into cars under cover of a dog alert.

Had the officers actually cared about Max's reliability, his records reveal a pattern of whiffs and cover-ups in the year leading into Alek's stop. If we take Molina's deployment reports at face value, they claim drugs were found on 14 out of 15 roadside free air sniffs over this period. *Cf.* Ex. 36 (Matched K9 Records) BC 4707 (lone record that does not assert drugs were found). But that's the issue: Max's reports *can't* be taken at face value. On 7 reports, Molina noted a "trace" amount of drugs. *Id.* at BC4823, 4801, 4749, 4644, 4638, 4615, 4600. On 3 more reports, Molina noted a tiny amount of drugs with few details. *See id.* at BC4900 ("0.02 GM" marijuana), 4712 ("1.00 GM" marijuana), 4653 ("Subst. Pres."). So, if an alert was ever questioned (e.g., in a suppression motion),

---

[4] Plaintiff analyzed the deployments Molina identified as "K9 Free Air Sniff" because that is how Molina described Max's deployment on Alek's truck. *See* Ex. 16 (Molina Vol. 1 Dep.) 134:10–18 (calling the deployment "a free air sniff").

Molina's reports made it *appear* as if drugs were found nearly every time Max alerted. *See* Ex. 6 (County Dep.) 180:18–23 (asserting "logs show . . . [Max] is not inconsistent").

But that appearance is deceiving. Within BCSO, the term "trace" is notoriously loose. A report noting "trace" marijuana could easily mean the K9 officer found green or brown specks on the floorboard, like debris from shoes "mixed in . . . with a little bit of dirt," oregano, or anything else. Ex. 33 (Ochoa Dep.) 95:14–96:10, 132:13–133:24. Likewise, a report noting "trace" cocaine could easily mean the officer found baby powder or sugar. *Id.* at 132:13–133:24. But nobody was checking. BCSO left it up to Molina's discretion how to use the term "trace," when to write that he found it, whether to record evidence that he found it, and whether to tell others that he found it. *Id.* at 132:9–21, 133:5–24, 137:21–138:1; Ex. 16 (Molina Vol. 1 Dep.) 148:6–12, 162:17–22, 164:14–18 (confirming that he made no record of seeing "trace" besides the deployment report). As a result, consistent with BCSO policy, Molina could report that Max alerted to a "trace" amount of drugs even when nobody saw or found anything illegal in the car.

Because Molina's K9 reports contain so little detail, the only way to learn more about what happened is to pull *every* traffic stop report for the date, select the reports that list Molina, and then match the time and place listed in the K9 report with the time and place for each traffic stop. Ex. 47 (Hebert Decl.) ¶ 35; *see also* Ex. 16 (Molina Vol. 1 Dep.) 200:5–25 (similar). But this hunt-for-a-match method assumes the interdiction unit kept accurate records, which it didn't. The unit's traffic reports are threadbare, often listing only the date and time and failing to note whether a search occurred—even when the stop lasted over an hour. *E.g.*, Ex. 46 (Traffic Stop Report Examples) BC2518, 2951, 2512, 2419, 2541. When the unit wrote only a warning, a report might not exist at all even when a search occurred. Ex. 3 (Babb Dep.) 94:8–16; Ex. 4 (Gereb Vol. 1 Dep.) 267:15–

17

268:1. Worse, warnings after interdiction stops always stated that "No Search" occurred even when that was false. Ex. 6 (County Dep.) 200:3–201:25; Ex. 38 (Babb Q1 Citations 2022).

Where the records *can* be matched, the jig is up. Consider three clear examples from the set of 15 alerts discussed above, all just a few weeks before Alek's stop. On January 17, 2022, Molina said Max alerted to "Marijuana (1.00 Trace Amount)." Ex. 36 (Matched K9 Records) BC4644. But corresponding records show that while Molina noted a "poss[ible] alert under driver seat," *id.* at BC17411–13, or perhaps an "alert[] on door," there were actually "no findings." *Id.* at BC8196. On January 27, 2022, Molina said Max alerted to "Methamphetamine (1.00 Trace Amount)." *Id.* at BC4638. But while matched records mention a "poss[ible] alert," they say nothing about finding drugs. *Id.* at BC8272–73, 17420–22. On February 18, 2022, finally, Molina again said Max alerted to "Methamphetamine (1.00 Trace Amount)." *Id.* at BC4615. But a matched report changes the story and claims Max "alerted to the center console where a bunch of marijuana shake was at." *Id.* at BC8199–8200. Molina couldn't even get his own story straight on these records.

The bottom line is that Molina's K9 reports can't be trusted. He wrote "trace" on the report for Alek's stop even though no drugs were found. He wrote "trace" and similar terms on reports for 10 of 15 alerts before Alek's stop even though matching records—where they exist—reveal a pattern of hiding Max's misses. And there is every reason to think Max was often wrong, including that Max alerted to cash. Ex. 44 (Molina Text Convo 8). Molina's own colleagues knew the interdiction unit rarely found anything. *Cf.* Ex. 18 (Babb BWC B) 18:15 (Babb noting, after finding nothing in Alek's car, that "nine times out of ten, this is what happens"); Ex. 1 (Salazar Dep.) 117:4–11 (Sheriff noting they "weren't very successful" at finding smugglers), 221:6–16 (Sheriff noting he teased them for "not being very effective at drug interdiction"). Despite their poor track record, interdiction officers used Max's automatic alerts to claim they had probable cause whenever a driver refused consent.

## II.    The Sheriff had actual and constructive knowledge of the three-step tactic.

Next, Alek must identify a policymaker who "can be charged with actual or constructive knowledge" of the three-step tactic. *Moore*, 41 F.4th at 509. Sheriff Salazar is the County's "final policymaker[] in the area of law enforcement." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003). A policymaker can be charged with actual knowledge when they have either personal knowledge of the custom or when they "fail[] to take corrective action after their subordinates violate the constitution." *Moore*, 41 F.4th at 550. Otherwise, a policymaker can be charged with constructive knowledge when the custom is "so persistent and widespread that [it was] the subject of prolonged public discussion." *Id.* at 551. Here, the Sheriff had both actual *and* constructive knowledge.

Start with actual knowledge. The Sheriff created the criminal interdiction unit. Ex. 1 (Salazar Dep.) 101:17–103:22. He knew how the unit operated. *Id.* at 116:2–7 ("I kind of knew basically what they do, what they did."). As Babb testified, "Sheriff Salazar is in full understanding of what I do, how I do it[,] and what my training is," right down to "my stickers" and use of "visual stimulation." Ex. 3 (Babb Dep.) 271:2–22. Both the Sheriff and Babb confirmed they discussed the unit's tactics, including "some stuff about what [interdiction officers] do now" and "some of the things that [Babb] had learned [from training]." Ex. 1 (Salazar Dep.) 220:2–9; *see also* Ex. 3 (Babb Dep.) 271:2–22. Nothing the Sheriff learned about the unit's practices was inconsistent with County policy. Ex. 1 (Salazar Dep.) 220:2–20. Babb thought the Sheriff approved of the unit's tactics. Ex. 3 (Babb Dep.) 271:20–272:2. And even if the Sheriff did not approve, the Sheriff's "fail[ure] to take corrective action" is "evidence that [he] kn[e]w about [the] unconstitutional custom." *Moore*, 41 F.4th at 510. Otherwise, "changes would have been made." *Id.* at 510 n.56 (citation omitted).

Separately, the Sheriff had at least constructive knowledge of the interdiction unit's three-step tactic. Gamboa, who supervised the interdiction unit, actively reviewed Babb's and Gereb's bodycam footage. Ex. 2 (Gamboa Vol. 1 Dep.) 116:23–117:16, 120:12–18. Babb knew, based on

these "regular[]" reviews, that Gamboa was "pretty happy with what he saw." Ex. 3 (Babb Dep.) 67:17–21, 70:7–71:10. Gamboa kept the Sheriff updated about the interdiction unit by sending reports up through the chain of command. Ex. 1 (Salazar Dep.) 111:8–116:1. And the Sheriff "talked directly" with Gamboa about the unit. *Id.* at 112:20–114:17 ("It's not uncommon for me to call Sergeant Gamboa."). These discussions made the Sheriff constructively aware of the unit's tactics.

Last, the Sheriff's and BCSO's response to the violation of Alek's Fourth Amendment rights provides both "evidence of the content" of BCSO policy and evidence that "in the policymaker['s] eyes, [Babb]'s illegal conduct actually conformed with municipal policy." *Milam*, 113 F. App'x at 628. After the interdiction unit used its three-step tactic on Alek and violated his rights (Section III below), Alek promptly complained. Ex. 9 (Schott Decl.) ¶¶ 50–51. But an internal affairs investigator "did not see any policy violations" and closed the complaint. Ex. 23 (First IA Report) BC2150, 2154. BCSO then made Babb an instructor, Ex. 3 (Babb Dep.) 20:7–22:13—a position reserved for officers with good performance and a stellar grasp of BCSO policy. Ex. 1 (Salazar Dep.) 141:24–143:5. The Sheriff thought that was a "good move." *Id.*

After Alek sued, BCSO launched a second internal affairs investigation that found Babb had followed policy (besides lying about his dashcam) and saw "insufficient evidence indicating [Babb] violated [Alek's] civil rights." Ex. 7 (Second IA Report) BC8307; Ex. 6 (County Dep.) 150:18–152:8. The Sheriff stands by that as a final decision that Babb conducted Alek's stop consistent with BCSO policy. Ex. 1 (Salazar Dep.) 229:7–231:3. Further, the second investigation flagged Max, the interdiction unit's regular narcotics dog, for "inconsistent performance" in "call history associated with" Babb, and received information indicating that interdiction officers did "not typically submit traffic stop reports in situations such as [Alek's]" (where the searched turned up nothing). Ex. 7 (Second IA Report) BC8324. Yet Molina, Gereb, Gamboa, and the interdiction unit more generally

were not investigated at all. Ex. 6 (County Dep.) 179:2–16. Nor did BCSO make any policy changes after the second investigation. Ex. 1 (Salazar Dep.) 231:4–23; Ex. 6 (County Dep.) 184:5–9. That's because the interdiction unit's practices didn't surprise BCSO leadership, let alone the Sheriff.

### III.    The interdiction unit's three-step tactic led to the violation of Alek's Fourth Amendment rights.

Not only was the three-step tactic entirely within the norm for a BCSO interdiction stop, Ex. 3 (Babb Dep.) 50:21–51:4, it also checks the final *Monell* box: It "led to a constitutional violation." *Moore*, 41 F.4th at 509. Here, it produced three separate Fourth Amendment violations. First, Babb stopped Alek based on a one-day turnaround rather than reasonable suspicion of a crime. Second, Babb used a front-seat interrogation to extend the stop without reasonable suspicion based on Alek's entirely normal behavior. Third, the officers lacked probable cause to search Alek's car because they based their search on an alert by a rigged dog. All of that violated Alek's Fourth Amendment rights.

### A.    Alek's business trip did not give Babb reasonable suspicion to stop him.

For a traffic stop to be valid, "an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Spears*, 636 F. App'x 893, 898 (5th Cir. 2016) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). Reasonable suspicion requires "specific and articulable facts" that connect a driver to a crime. *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citation omitted). Thus, police can't "stop drivers whose conduct is no different from any other driver's." *Kansas v. Glover*, 589 U.S. 376, 385 (2020); *see also Hill*, 752 F.3d at 1034 (reasonable suspicion can't "put an ominous gloss on what appears almost entirely ordinary").

Babb lacked reasonable suspicion to stop Alek. Babb testified that failure to maintain a lane "was the only traffic violation that I saw." Ex. 3 (Babb Dep.) 101:20–103:23; *see also* Ex. 11 (Babb

BWC A) 2:27–2:43 (similar).[5] He claims he saw Alek "touch" the "yellow painted line" on the left side of the road both when Alek passed him and again after he pulled out behind Alek. Ex. 3 (Babb Dep.) 102:13–103:6. For starters, that's not even a violation. The relevant traffic statute, Texas Criminal Code § 545.058, requires a driver to "*cross over* the fog line." *State v. Cortez*, 543 S.W.3d 198, 206 (Tex. Crim. App. 2018) (emphasis in original)). Merely "touch[ing] the fog line alongside the roadway" is not a violation. *Id*. So Babb's stated basis for the stop is baseless.

Moreover, even on Babb's view of the law, Alek did not violate it. Because Babb turned off his dashcam right before the stop, there is no video from his perspective. Alek, though, had his own dashcam that day. Ex. 9 (Schott Decl.) ¶¶ 10–11, 30. Sergeant Palacios, an accident reconstruction expert and former Texas highway patrol sergeant, reviewed Alek's dashcam video, conducted tests with Alek's truck, and determined where Alek's tires would have sat on the road before, during, and after passing Babb. Ex. 39a (Palacios Report) ¶¶ 4–7, 15, 29–56. Palacios concluded that Alek never touched or crossed over the yellow line. *Id*. ¶¶ 57–61, 81(a)–(b), (e). Palacios also concluded that, even if Alek had done so, Babb could not have seen it unless Alek crossed the line "in an extreme and exaggerated fashion." *Id*. ¶¶ 62–81(d), (f)–(g). One look at Alek's video confirms that he never made any wild movements. *Id*. ¶ 81(d); Ex. 10 (Alek Dashcam (Passing Babb)); Ex. 40 (Alek Dashcam (After Passing Babb)); Ex. 41 (Alek Dashcam (Stop)). Palacios's opinions are unrebutted.

Absent a traffic violation, Babb needed reasonable suspicion of another crime to justify the stop. But he didn't have it. Babb decided to stop Alek based on four facts from the enigmatic "Kiki" in the WhatsApp chat: (1) Alek's name, (2) his license plate number, (3) his one-day turnaround

---

[5] The County offers a new basis for the stop: It says Alek's dashcam reveals speeding. County MSJ (ECF No. 117) 13–14. But the County misunderstands the law. The stop had to be "justified at its inception," meaning Babb had to observe a traffic violation "before stopping the vehicle." *United States v. Landaverde-Castillo*, 731 F. App'x 293, 296 (5th Cir. 2018) (quotation omitted). Facts the County (believes it) learned in discovery have no bearing on what Babb knew *before* stopping Alek.

from Houston to Carrizo Springs, and (4) his female passenger. Ex. 3 (Babb Dep.) 142:5–144:4. Alek's name and license plate number weren't suspicious. Nor was the female passenger. *See United States v. Lopez-Valdez,* 178 F.3d 282, 287 (5th Cir. 1999) (old sedan with 6–8 visible passengers 20 miles from border was not suspicious). That leaves the one-day turnaround. And on that score, the Fifth Circuit has been clear: a one-day turnaround, even a road trip far longer than Alek's with no hotel stop, is "not unusual." *United States v. Madrigal*, 626 F. App'x 448, 451 (5th Cir. 2015) (driving from Mexico to Houston and back in one day was not suspicious). All told, Babb stopped Alek for going on a business trip—the sort of trip countless people make every day. That's unconstitutional.

### B.    Alek's normal behavior did not give Babb any reason to extend the stop.

Even if the initial stop was somehow valid, what happened next was not. Traffic stops must "end[] when tasks tied to the traffic infractions are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354–57 (2015). Dog sniffs and questions about "other crimes" are not traffic tasks. *Id.* at 356. The Fifth Circuit has adopted a clear rule for when traffic stops should end: "If all computer checks come back clean, then as a general matter . . . there is no legitimate reason for extending the stop." *United States v. Jenson*, 462 F.3d 399, 403–06 (5th Cir. 2006). At that point, the driver must be released "unless additional reasonable suspicion, supported by articulable facts, developed during the stop." *United States v. Cavitt*, 550 F.3d 430, 436–38 (5th Cir. 2008). But, following the interdiction unit's protocol, Babb violated that rule.

As usual, Babb ordered Alek to exit his truck and come sit in Babb's patrol car "while I do your warning." Ex. 11 (Babb BWC A) 3:00–3:04. Less than a minute after entering his car, Babb ran computer checks on Alek and they came back clean (besides a few old, resolved traffic tickets). Ex. 4 (Gereb Vol. 1 Dep.) 283:7–284:19; Ex. 12 (Schott Incident Report); Ex. 7 (Second IA Report) BC8337–38. At that point, there was nothing more for Babb to do except hand Alek the warning. Indeed, about a minute later, Babb told Alek that "this thing I'm giving you, man, looks like a ticket

but it's a warning." Ex. 11 (Babb BWC A) 5:02. Babb, though, did not hand Alek a warning until over an hour later, after finding nothing in his truck. Ex. 18 (Babb BWC B) 16:18. Because all traffic-related tasks were complete within two minutes of entering Babb's car, whether Babb could lawfully extend the stop turned entirely on whether he had reason to suspect a non-traffic crime at that time.

He did not. Besides the facts discussed above, Babb claims to have observed a few things that, "group[ed]" together, made him "want to go a little further and talk to [Alek] some more." Ex. 3 (Babb Dep.) 178:11–179:5. Before they entered his patrol car, Babb says (1) Alek held his hands up when Babb approached, (2) Alek replied "I don't think so" when Babb asked if there was a gun in his car, and (3) Alek's hand was trembling and he was breathing hard when he handed Babb his license. *Id.* at 166:24–180:16. To Babb, these behaviors didn't suggest "a specific crime," just "any type of crime." *Id*. Then, after they entered Babb's car, Babb flagged a few more things. He claims (4) Alek spoke in a "low tone" when talking about his trip, and (5) Alek was nervously looking at the computer Babb was using to type the warning. *Id.* at 215:23–225:20. Babb started to think Alek was "being deceptive with something," *id.* at 222:2–224:7—it's unclear what.

None of this was suspicious or connected Alek with a crime. Even taking Babb's claims at face value, they amounted to this: A man driving home from a work trip was nervous when a cop pulled him over and forced him into his patrol car. That's it. "Nervousness, standing alone," though, "generally is not sufficient to support reasonable suspicion." *United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011). Even Babb admitted it's normal for people to get nervous when they're stopped or in his car. Ex. 3 (Babb Dep.) 215:4–6, 259:2–8. In truth, Alek acted the way anybody reading this brief would. He was an innocent man who tried to stay calm when a cop treated him like a criminal. Because Babb had no "objectively logical reason to impute criminality" to Alek, *United States v. Monsivais*, 848 F.3d 353, 362 (5th Cir. 2017), the stop should have ended. But it didn't. Instead,

Babb followed his training: He interrogated Alek about his life and whether he had anything illegal in his car and, when Alek refused a search, called a drug dog. Ex. 11 (Babb BWC A) 15:01–33:41.

### C.    Max's rigged alert did not generate probable cause to search Alek's car.

Having stopped Alek for a one-day turnaround (without reasonable suspicion) and extended the stop with a front-seat interrogation (without reasonable suspicion), Babb moved to the third step: Call Molina and his rigged dog. To search a car without a warrant, police need probable cause to think there's contraband inside. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). While dog alerts are presumptively reliable, that presumption is rebuttable with "conflicting evidence" that "the dog's (or handler's) history in the field" or "circumstances surrounding a particular alert . . . undermine the case for probable cause." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013). If, for example, "the officer cued the dog (consciously or not)," that would invalidate the alert. *Id*. at 247.

That happened here. Molina, the K9 handler assigned to the interdiction unit, rewarded Max for *alerting* rather than for *finding drugs* in cars. *Supra* pp. 14–16. That pattern "cued the dog (consciously or not)" to alert to the mere prospect of rewards. *Harris*, 568 U.S. at 247. As a result, Max *never failed* to alert on a car during a free air sniff in the year leading into stop. *Supra* pp. 14–16. Gereb's actions before Max alerted on Alek's car prove that he knew it would happen again. Gereb assisted "if [Babb] was doing a search." Ex. 4 (Gereb Vol. 1 Dep.) 233:8–22. That day, Gereb messaged Babb that he was "omw" (on my way) to Alek's stop just *four minutes* after Babb called Molina. Ex. 13 (CAD Events Log) BC169; Ex. 4 (Gereb Vol. 1 Dep.) 230:2–23, 233:8–22. With Molina en route, Gereb knew the search was inevitable. Based on Max's training and history, no "reasonably prudent" officer could think he reliably alerted on Alek's car. *Harris*, 568 U.S. at 248.

### CONCLUSION

Alek is entitled to summary judgment on liability because there is no genuine dispute as to any material fact. The County is directly liable for the violation of Alek's Fourth Amendment rights.

Dated: June 11, 2025.          Respectfully submitted,

<u>/s/ Christen M. Hebert</u>
Christen M. Hebert (TX Bar No. 24099898)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org

Joshua A. Windham* (NC Bar No. 51071)
William R. Aronin* (NY Bar No. 4820031)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jwindham@ij.org
waronin@ij.org
*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Christen Mason Hebert
Christen Mason Hebert