# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# EXHIBIT 2

Peter Gamboa
July 23, 2024

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
3      ALEK SCHOTT,                  )
                    PLAINTIFF,       )
4                                    )
       VS.                           )
5                                    )
       JOEL BABB, IN HIS             )
6      INDIVIDUAL AND OFFICIAL       )    CIVIL ACTION NO.
       CAPACITY; MARTIN A.           )  5:23-CV-00706-OLG-RBF
7      MOLINA III, IN HIS            )
       INDIVIDUAL AND OFFICIAL       )
8      CAPACITY; JAVIER SALAZAR,     )
       IN HIS INDIVIDUAL AND         )
9      OFFICIAL CAPACITY; AND        )
       BEXAR COUNTY, TEXAS,          )
10                   DEFENDANTS.     )
       ********************************************************
11                      ORAL DEPOSITION OF
12                    SERGEANT PETER GAMBOA
13                       July 23, 2024
14     ********************************************************
15
16            ORAL DEPOSITION of SERGEANT PETER GAMBOA,
17     produced as a witness at the instance of the Plaintiff,
18     and duly sworn, was taken in the above-styled and
19     numbered cause on the 23rd day of July, 2024, from
20     9:29 a.m. to 4:46 p.m., before Anica Diaz, CSR, RPR,
21     CRR, in and for the State of Texas, reported by machine
22     shorthand, at the Law Offices of Charles S. Frigerio,
23     111 Soledad Street, Suite 465, San Antonio, Texas,
24     pursuant to the Federal Rules of Civil Procedure and the
25     provisions stated on the record or attached.
```

Peter Gamboa                                        July 23, 2024

```
 1                   A P P E A R A N C E S
 2     COUNSEL FOR THE PLAINTIFF:
 3              MS. CHRISTEN M. HEBERT
                INSTITUTE FOR JUSTICE
 4              816 Congress Avenue, Suite 970
                Austin, Texas 78701
 5              Tel: (512) 480-5936
                chebert@ij.org
 6
                MR. JOSHUA A. WINDHAM
 7              INSTITUTE FOR JUSTICE
                901 North Glebe Road, Suite 900
 8              Arlington, Virginia 22203
                Tel: (703) 682-9320
 9              jwindham@ij.org
10
       COUNSEL FOR THE DEFENDANTS:
11
                MR. CHARLES S. FRIGERIO
12              MR. CHARLES A. FRIGERIO
                LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
13              111 Soledad Street, Suite 465
                San Antonio, Texas 78205
14              Tel: (210) 271-7877
                csfrigeriolaw@sbcglobal.net
15              firm@frigeriolawfirm.com
16
       COUNSEL FOR DEFENDANT JOEL BABB:
17
                MR. RYAN ELLSWORTH
18              WRIGHT & GREENHILL, PC
                4700 Mueller Boulevard, Suite 200
19              Austin, Texas 78723
                Tel: (512) 476-4600
20              rellsworth@w-g.com
21
       ALSO PRESENT:
22
                Mr. Hector Saenz
23
24
25
```

Peter Gamboa                                                July 23, 2024

Page 3

1                         I N D E X

2                                                          PAGE

3     Appearances.....................................    02

4     Exhibits........................................    04

5

6     SERGEANT PETER GAMBOA

7          Examination by Ms. Hebert..................    05

           Examination by Mr. Frigerio...............    245

8          Examination by Ms. Hebert..................    248

9

10    Changes and Signature...........................    252

11    Reporter's Certificate..........................    254

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      Page 4

1                        E X H I B I T S

2                                                      PAGE

3    Plaintiff's Exhibit No. 16

              Internal Affairs Records..............    235

4

     Plaintiff's Exhibit No. 50

5             Babb-Gamboa Phone Call, No Subtitles..    225

6    Plaintiff's Exhibit No. 51

              Babb-Gamboa Phone Call, Subtitles.....    229

7

     Plaintiff's Exhibit No. 53

8             Organization Chart....................     66

9    Plaintiff's Exhibit No. 64

              Gamboa Conversation #19...............     94

10

     Plaintiff's Exhibit No. 65

11            Interrogatories Propounded by Plaintiff    95

12   Plaintiff's Exhibit No. 66

              Social Media Training Flyer...........     98

13

     Plaintiff's Exhibit No. 67

14            Criminal MAPP Training Flyer..........    100

15

16

17

18

19

20

21

22

23

24

25

Peter Gamboa                                                      July 23, 2024

Page 5

1                    P R O C E E D I N G S

2               (Proceedings began at 9:29 a.m.)

3               THE REPORTER:  Okay.  On the record at

4       9:29 a.m.

5               Counsel, would you prefer to have me read

6       the script for a Federal Deposition and then introduce

7       yourselves, or would you prefer to waive this?

8               MS. HEBERT:  We can waive.

9               MR. FRIGERIO:  We'll waive.

10              (Per agreement of all counsel, Federal

11      Rule 30(b)(5) Read-On was waived.)

12                   SERGEANT PETER GAMBOA,

13      having been duly sworn, was called as a witness and

14      testified as follows:

15              THE WITNESS:  I do.

16              THE REPORTER:  Thank you.

17                       EXAMINATION

18      BY MS. HEBERT:

19          Q.  Good morning.  I'm Christie Hebert, and I

20      represent Alek Schott in this case.  We met previously;

21      is that right?

22          A.  Yes, ma'am.

23          Q.  I'm going to kind of go through the same

24      rigmarole just so that it's all on the record, but so

25      just bear with me here.

Peter Gamboa

July 23, 2024

Page 6

```
 1        A.   Sure.  No problem.

 2        Q.   First, I'm going to introduce everybody.

 3   Obviously, I'm Christie and this is my colleague,

 4   Joshua Windham.  We are joined by Anica, the court

 5   reporter, and she's going to write down everything you

 6   say today, and everything I say today.

 7             This is Mr. Ellsworth, he represents

 8   Mr. Babb in this matter.  And then you are joined by

 9   your counsel, Charles Frigerio, or the County's counsel,

10   excuse me, Charles Frigerio, Hector Saenz and Charlie

11   Frigerio.  So I've got everybody here.

12             We're going to just say the usual

13   stipulations, so by being here today, you waive any

14   objections or defects in your deposition notice.  So

15   you're here, basically.

16        A.   Yes.

17        Q.   And you're going to waive any objections to the

18   court reporter's qualifications, Ms. Anica is a

19   qualified court reporter to take down your information

20   today; is that fair?

21        A.   Sure.  Absolutely.  Thank you.

22        Q.   So generally, what we're going to start with

23   the basic questions, what is your full name?

24        A.   Pedro Maldonado Gamboa.

25        Q.   Okay.  And is it okay if I call you
```

Peter Gamboa                                                    July 23, 2024

                                                                    Page 7

1    Sergeant Gamboa today?

2         A.   Absolutely.

3         Q.   And before we go on, I'll go over a couple

4    housekeeping matters.  You've heard me do this before.

5    Have you testified under oath before today?

6         A.   I have.

7         Q.   Okay.  And can you tell me about that?

8         A.   So during my career as a patrol deputy, I made

9    several arrests and had to testify in court for those

10   arrests.

11        Q.   Those were all criminal matters?

12        A.   Correct.

13        Q.   Any civil matters?

14        A.   I have.

15        Q.   Okay.

16        A.   As an investigator, I did crimes against

17   children, and I had to testify before a civil hearing.

18        Q.   Okay.  So would it be fair to say that all of

19   your testimony has previously been related to crimes?

20        A.   Yes, ma'am.

21        Q.   Okay.  Have you ever had your deposition taken

22   before?

23        A.   No, ma'am.

24        Q.   And you understand you are under oath today?

25        A.   I do understand.

Peter Gamboa                                           July 23, 2024

                                                      Page 8

1          Q.  And you understand that means that you swore to
2     tell the truth?
3          A.  Yes, ma'am.
4          Q.  And that's -- your testimony today is the same
5     as if it were before a judge in a court?
6          A.  Absolutely.
7          Q.  It's important that we create a clear record
8     today, and that means that I need to ask clear questions
9     and you need to give clear answers.
10         A.  Okay.
11         Q.  So please do not nod or shake your head in
12    response to a question.  And things like "uh-huh" or
13    "nuh-uh," we'll try to say "yes" or "no" instead so the
14    court reporter can capture that; is that fair?
15         A.  Yes, ma'am.
16         Q.  And I'll try to help you too, and you can try
17    to help me as well.
18              If you don't understand a question, please
19    let me know, and I will try to clarify it.  It's
20    important that you understand the question and I ask
21    clear questions.  It's also important that I try to
22    finish answer -- or asking a question before you start
23    to answer it, and I try to wait for you to finish
24    answering a question before I ask another one.  I know
25    it's not like a natural conversation, where you kind of

Peter Gamboa

July 23, 2024

Page 9

1     see where someone is going and you start talking.  So

2     let's try to not interrupt each other; is that okay?

3          A.  Yes, ma'am.

4          Q.  If you do not know the answer to a question,

5     it's okay to say, I don't know.  But if you do know the

6     answer, you are required to provide it.  Do you

7     understand?

8          A.  Yes, ma'am.

9          Q.  Your attorney, Mr. Frigerio, may state an

10    objection.  That does not necessarily mean I've asked a

11    bad question.  It also does not mean that you can refuse

12    to answer it.  Only if Mr. Frigerio instructs you not to

13    answer are you to refuse to answer a question.

14              Mr. Frigerio or other counsel may state an

15    objection and that is merely to preserve the right to

16    object to the question later, if we want to use the

17    answer before a court so we can argue that the question

18    was improper to a judge.  Do you understand?

19          A.  I do.

20          Q.  If you would like to take a break, use the

21    bathroom, get a drink, get a snack, that's okay.  Just

22    let me know.  The only thing I would ask is that you

23    finish answering a question before we take a break.

24          A.  Yes, ma'am.

25          Q.  We're going to look at some documents today,

1    and you have the right to read that document in its

2    entirety and if you need to take a break to fully review

3    it, that's fine too.  I'm just going to point us to

4    specific points of the document to avoid spending all

5    day on the document.  Do you understand?

6         A.  Yes, ma'am.

7         Q.  And similarly, we may look at some video clips

8    today.  I'm going to identify parts of the video clip to

9    ask you questions about.

10         A.  Okay.

11         Q.  But, again, you have the right to review that

12    video clip in its entirety and if we need to, we'll take

13    a break so you can watch the whole thing.

14         A.  Okay.

15         Q.  And that goes, I guess, for this entire

16    conversation.  I'm not looking to trick you or trap you.

17    I'm looking to ask questions and get your answers on the

18    record and create a clear record for both sides.  Do you

19    understand?

20         A.  Yes, ma'am.

21         Q.  Is there any reason why you are not able to

22    give your fullest and best testimony today such as

23    you're taking an impairing medication?

24         A.  No, ma'am.

25         Q.  Did you drink alcohol this morning?

Peter Gamboa                                              July 23, 2024

1          A.   No, ma'am.

2          Q.   And are you generally clearheaded to testify?

3          A.   I am.

4          Q.   And other than speaking with your attorneys,

5     and I'm not asking about that at all, did you do

6     anything to prepare for your deposition today?

7          A.   Just reviewed our policies, and reviewed a

8     video.

9          Q.   Okay.  When you say reviewed policies, can you

10    tell me what you mean by that?

11         A.   Just went over our manual and looked at some of

12    the policies that we would work under at that time.

13         Q.   Okay.  And do you happen to remember, like,

14    what parts you looked at or what your --

15         A.   Stop and frisk.

16         Q.   Okay.

17         A.   Warrantless arrest.

18         Q.   Okay.  Anything else?

19         A.   That's pretty much it.

20         Q.   And it's my memory that those are just distinct

21    chapters?

22         A.   Correct.

23         Q.   There's a chapter on stop and frisk --

24         A.   Correct.

25         Q.   -- and there's a chapter on warrantless arrest.

Peter Gamboa                                                    July 23, 2024

Page 12

```
 1          A.   Correct.   Correct.

 2          Q.   And when you said reviewed video, what video

 3    did you review?

 4          A.   Deputy Babb's stop on March 16th.

 5          Q.   Okay.   And when you say Deputy Babb's stop,

 6    what -- what video of that stop did you review?

 7          A.   The specific stop with Mr. Schott.

 8          Q.   Yes, yes, I understand that.   But I know

 9    there's, like, a bunch of different videos of that

10    floating around.   So for instance --

11          A.   Body camera.

12          Q.   -- did you review Deputy Babb's body camera

13    footage?

14          A.   Correct.

15          Q.   Did you review any other officer's body camera

16    footage?

17          A.   Deputy Molina's.

18          Q.   Okay.   Okay.

19          A.   And also Deputy Gereb's.

20          Q.   Okay.   So other than reviewing two chapters of

21    the sheriff's manual and the body worn camera of Babb's,

22    Molina and Gereb, anybody else?

23          A.   No.

24          Q.   Anything else?

25          A.   That was it.
```

Peter Gamboa                                    July 23, 2024

Page 13

```
 1        Q.  Okay.  Other than conversations with your
 2   counsel, and again I'm not asking you about those, did
 3   you have any conversations with anybody else in
 4   preparation for this deposition?
 5        A.  No, ma'am.
 6        Q.  Okay.
 7        A.  Except for the time I was here.
 8        Q.  Right.  And so when you refer to the time --
 9   when you're referring to the time you were here, you're
10   referring to when you sat in on the 30(b)(6) deposition;
11   is that correct?
12        A.  Captain Von Muldau's deposition.
13        Q.  Correct?
14        A.  Yes, ma'am.
15        Q.  We are going to talk a lot about Bexar County's
16   sheriff's office today.  Can we agree that when I say
17   the sheriff's office, I'm referring to the Bexar County
18   sheriff's office?
19        A.  Yes, ma'am.
20        Q.  And when I refer to the county, can we agree
21   that I'm referring to Bexar County?
22        A.  Correct.  Yes, ma'am.
23        Q.  And when I say the sheriff, can we agree that
24   I'm referring to the sheriff of Bexar County?
25        A.  Yes, ma'am.
```

Peter Gamboa                                    July 23, 2024

Page 14

1      Q.   Okay.  I'd like to just get to know you a

2  little bit about your position.  Why did you become a

3  police officer?

4      A.   All my life, growing up, I looked up to police

5  officers.  We had an officer named Sharp, who would come

6  and do our bike rodeos when I was in elementary.  And

7  got along well with him.  And really all my life, it's

8  what I wanted to do.

9      Q.   So did you become a police officer straight out

10  of high school?

11     A.   No.  So, when I graduated, one of my first jobs

12  was working for the state as a janitor.  From there, I

13  moved to Big Red Bottling Company and I was a night

14  loader, I worked overnight.

15          There was an opportunity for the City of

16  San Antonio Municipal Courts as a detention officer is

17  where I started my law enforcement career.  From there,

18  I came over to Bexar County.  So August will be

19  26 years.

20     Q.   Congratulations.

21     A.   Thank you.

22     Q.   So did you attend academy with San Antonio or

23  Bexar County?

24     A.   So, I went through SAC, San Antonio College --

25     Q.   Uh-huh.

Peter Gamboa                                         July 23, 2024

Page 15

1         A.  -- to get my -- first my jailer's license.

2    Then I went through the Bexar County academy, detention

3    academy, graduated there, and then I went through San

4    Antonio College for my peace officer's license.

5         Q.  Okay.  Around what is your current position

6    with the sheriff's office?

7         A.  Currently, I am a supervisor over the intel

8    unit.  I am the commander over the sheriff's mounted

9    patrol.  I am the supervisor over the sheriff's

10   executive protection unit.

11        Q.  A lot of responsibility.

12        A.  Yes, ma'am.  And over the intel unit, I have

13   got two sections in the jail that work for me.

14        Q.  Okay.  And when you say you're over the intel

15   unit, you've got two sections in the jail, does that

16   mean there are sections that are not in the jail?

17        A.  Yes, ma'am.

18        Q.  And what are the sections that are not in the

19   jail?

20        A.  So the TAG, which is the Texas Antigang intel

21   Unit is on the law enforcement side.  They work mostly

22   outside the jail environment.  I do have two of those

23   officers that do work some in the jail capacity as far

24   as conducting interviews in the jail, taking statements

25   in the jail.  But I also have a gang intel unit that are

Peter Gamboa                                        July 23, 2024

Page 16

1    detention deputies that are assigned to the jail.  So we

2    have two tiers.  We have the detention bureau and then

3    we have the law enforcement bureau.

4         Q.   Okay.

5         A.   So the two officers that I mentioned that work

6    on the outside are assigned to the law enforcement

7    bureau.  I've got currently four deputies that are

8    assigned to detention bureau, assigned to the gang intel

9    unit.

10        Q.   Okay.  So in total, would you say that you

11   supervise then six folks in the --

12        A.   No.  So total I've got --

13        Q.   I'm just talking about the intel side right

14   now.

15        A.   Right.

16        Q.   Okay.

17        A.   So total on the intel side, I've got -- let's

18   see, one, two, three, four, five, six, seven, eight,

19   nine -- ten.

20        Q.   Ten?

21        A.   Ten on the law enforcement side.

22        Q.   Ten on the law enforcement side and is it six?

23        A.   And four.

24        Q.   Four on the detention side?

25        A.   Detention.

Peter Gamboa                                      July 23, 2024

Page 17

```
 1        Q.  Okay.  Thanks.  And is the -- does the intel

 2   group fall under the organized crime division?

 3        A.  Yes, ma'am.

 4        Q.  Okay.  And what is the role of the organized

 5   crime division?

 6        A.  So we mostly -- so even though we do some

 7   short-term investigations, most of our investigations

 8   are long term, dealing with the organized crime side of

 9   it.

10        Q.  Okay.  And you talked a little bit about the

11   Texas Anti-Gang Unit.

12        A.  Yes, ma'am.

13        Q.  Can you tell me more about that?  You said it

14   was a little bit outside?

15        A.  So it's a -- so Texas Anti-Gang is a program

16   through the governor's office, and that is geared

17   towards gang members.  And so anything that -- that we

18   do usually has a tie to some type of gang group.

19        Q.  Okay.  So maybe it would help to phrase it this

20   way, tell me about a typical workday for you.

21        A.  So --

22        Q.  -- recognizing that there are some days that

23   are just atypical.

24        A.  Right.  So we deal in anything with drugs,

25   guns, auto theft, any kind of robberies, burglaries.
```

```
 1    Actual -- any kind of gambling, human trafficking,

 2    human smuggling.

 3         Q.   Okay.  So those are the crimes that you target,

 4    right?

 5         A.   Right.

 6         Q.   And how do you go about targeting those crimes

 7    on a typical workday?

 8         A.   So usually it's either by confidential sources.

 9    We also use tips.  We have a tips hotline.  Or if we're

10    out canvassing areas, we may conduct traffic stops, and

11    lead to further investigation into these crimes.

12         Q.   Okay.  So what I heard you say is they're kind

13    of like two buckets of things that you're doing.  The

14    first is acting on information from confidential

15    informants, confidential information, tips, that kind of

16    stuff, online information.

17         A.   Correct.

18         Q.   And then canvassing/traffic stops.

19         A.   Correct.

20         Q.   So, did I get that right?

21         A.   Yes, ma'am.

22         Q.   Are there any other kind of categories of

23    activities that you do in the intel group?

24         A.   So, we do some financial crimes, money

25    laundering.  We do some digital forensics.  We do some
```

Peter Gamboa                                          July 23, 2024

1    social media activities in the open source information.

2         Q.  Okay.  So in terms of, like, the buckets of

3    activities, there would be confidential information

4    tips, people calling in the hotline, canvassing and

5    traffic stops, and then online investigations?

6         A.  More -- yeah.  More the online.

7         Q.  Okay.  Anything else?

8         A.  That's pretty much it.

9         Q.  Okay.

10        A.  And of course everything kind of geared to, is

11   there a mechanism for the organized crime, three or more

12   people committing these types of crimes.

13        Q.  Okay.  And on a typical workday, do you have a

14   shift?

15        A.  I work from 9:00 in the morning until 5:00.

16   But mostly, our investigations go past that.  So --

17        Q.  Sure.

18        A.  I tell everybody our times are from 9:00 to

19   whenever we get off.

20        Q.  I understand.  And is that -- how many days a

21   week do you generally work?

22        A.  How many hours per week?

23        Q.  How many days.

24        A.  Oh.  Five days.

25        Q.  Okay.  And what days, Monday through Friday?

Peter Gamboa                                          July 23, 2024

Page 20

1          A.   Monday through Friday.

2          Q.   Okay.  And so how do you usually start your

3     day?

4          A.   Will come in, I'll meet with all my group, find

5     out what's going on, does anybody have any surveillance

6     that we need to conduct?  Is there any search warrants

7     that are going to be taking place?  Any arrest warrants

8     that we have prepared and ready to execute, things of

9     that nature.

10         Q.   And so that's your morning meeting?

11         A.   Yes, ma'am.

12         Q.   And what do you usually do after the morning

13    meeting?

14         A.   So after the morning meeting, I'll send them

15    out to the field, do what they're going to do.  Then

16    I'll meet with my counterpart, the sergeant who's over

17    covert, and our lieutenant, who is over the organized

18    crime.

19         Q.   Okay.  And who is your lieutenant who's over

20    organized crime?

21         A.   Angela Freveletti.

22         Q.   Okay.  Does the sheriff's office, the organized

23    crime division specifically, have relationships with

24    other law enforcement agencies about sharing

25    information?

Peter Gamboa
July 23, 2024

Page 21

1        A.  We do.

2        Q.  Can you tell me about those?

3        A.  So as far as agencies?

4        Q.  Yeah.  And the -- and the relationships.

5        A.  So as part of the TAG, we're all in one

6    building.  So we work with DEA, FBI, ATF, his, the

7    Office of Inspector General's office, and SAPD.  I'm

8    trying to think who else.  Border Patrol are the main

9    ones that we work with.

10       Q.  Sure.  And I understand most of those acronyms.

11   The two that I don't, I'm not familiar with:  His, what

12   is that?

13       A.  Homeland Security.

14       Q.  Oh, okay.  Duh.  And ATF?

15       A.  Alcohol Tobacco Firearms.

16       Q.  Okay.  And do you have formal agreements in

17   place with these folks, these different agencies?

18       A.  So we do have TFOs.

19       Q.  And TFOs are?

20       A.  They are --

21       Q.  I know, I'm not trying to quiz you on acronyms.

22       A.  No, no.  I'm trying to remember.

23       Q.  I just don't know what that is.

24       A.  They are task force.  Task force officers.

25       Q.  Okay.

Peter Gamboa                                    July 23, 2024

                                                    Page 22

1        A.  So we have officers assigned to DEA, and there

2    is an MOU in place --

3        Q.  Okay.

4        A.  -- with these agencies.  DEA, FBI, Secret

5    Service, HIDTA.

6        Q.  What is HIDTA?

7        A.  Which is a high intense trafficking drug

8    organization.

9        Q.  Is it HIDO or --

10       A.  No, no.  It's HIDTA.  High intensive traffic

11   organization.  I'm not sure what the H stands for.

12       Q.  Okay.

13       A.  And there is MOUs with those.

14       Q.  Okay.  And who's responsible for drafting,

15   putting together these MOUs?

16       A.  That would be the lieutenant for our -- for our

17   group.  And then it would go through the DA's office to

18   get the final approval.

19       Q.  Okay.  Are there any agencies that the

20   sheriff's office does not partner with?  And by that,

21   I mean, are there any agencies that the sheriff's office

22   has said, you know, we're not going to work with so and

23   so because they're not that good, or we're not going to

24   share information with Y?

25       A.  No, ma'am.

Peter Gamboa                                              July 23, 2024

Page 23

1        Q.  Okay.

2        A.  No law enforcement agencies.

3        Q.  Sure.  Any private entities that you can think

4   of?  I'm just asking because you qualified with law

5   enforcement.

6        A.  So we have worked with some groups for the

7   human smuggling side of it that provide food, shelter,

8   clothing to immigrants that are involved in the human

9   smuggling side of it.

10       Q.  You have?

11       A.  Yes.

12       Q.  Previously?

13       A.  Yes, ma'am.

14       Q.  But you no longer do that?

15       A.  No, we do.  But I don't think there's

16  anything -- no contracts or anything with that.

17       Q.  Sure.  Okay.  If someone calls an officer

18  claiming to work for one of these agencies, and saying

19  that they have information on a particular criminal,

20  what would you expect that officer to do with that

21  information?

22       A.  As far as our officers?

23       Q.  Yes, sir.

24       A.  Well, I mean, they -- they would have -- I

25  would have to vet, if it was me, I would have to vet

Peter Gamboa

July 23, 2024

Page 24

1    who's giving me this information.

2          Q.   Okay.

3          A.   If it's Border Patrol, then, you know, I would

4    make contact with the officers that we work with in a

5    daily basis and confirm that information.

6          Q.   And that sounds like that's your practice.

7          A.   Yes, ma'am.

8          Q.   Have you instructed your officers that that's

9    how they're supposed to operate?

10         A.   So we've really never had that conversation --

11         Q.   Sure.

12         A.   -- but I would expect it that they would do

13    that.

14         Q.   Okay.

15         A.   If there was questions about it, then they

16    would come to me with that information and that's how I

17    would guide them --

18         Q.   Okay.

19         A.   -- to vet the information.

20         Q.   Okay.  At one point, the sheriff mentioned an

21    employee that works at the San Antonio fusion center.

22         A.   Okay.

23         Q.   What is a fusion center?

24         A.   So the fusion center is -- SAPD runs the unit,

25    and what they do is they'll collect information from

Peter Gamboa

1    different areas, different agencies, and then they'll

2    put out the information, decimate [sic] the information

3    to law enforcement agencies that it may be affecting.

4         Q.   Okay.  So what kind of information do they put

5    out?

6         A.   So like they'll get information nationwide,

7    like, for example, now Fentanyl --

8         Q.   Uh-huh.

9         A.   -- is a hot button topic, right?  So they'll

10   get information from other states and they'll decimate

11   that information to the local agencies and surrounding

12   agencies that work here in San Antonio.

13        Q.   Okay.  Is there a sheriff's office employee, an

14   officer, who is with the fusion center?

15        A.   So they -- they do -- they are assigned there,

16   but they're assigned on the mental health side of the

17   fusion center.  Same thing, they'll get information

18   through the fusion center, that officer will, of course,

19   pass on the information to us, as far as anything having

20   to do with mental health.

21        Q.   Okay.

22        A.   Any kind of officer safety bulletins that are

23   generated by the fusion center will come through him and

24   then he'll pass them on to us.

25        Q.   Okay.  And do you supervise that person?

```
 1        A.  I do.

 2        Q.  So even though there are mental health person,

 3   you still supervise them?

 4        A.  Correct.

 5        Q.  And do they --

 6        A.  So our lieutenant --

 7        Q.  Sure.

 8        A.  -- like me, has different hats.  She is the

 9   commander over mental health.

10        Q.  Okay.  So she has two roles?

11        A.  Yes.

12        Q.  And so you're -- in addition to your work in

13   the intel unit and as the mount commander and the

14   sheriff's executive protection detail, you're overseeing

15   some of the mental health stuff?

16        A.  Only him.

17        Q.  Only this person --

18        A.  Yes, ma'am.

19        Q.  -- who works at the fusion center?

20        A.  Yes, ma'am.

21        Q.  And why would you be overseeing him?

22        A.  So the position --

23        Q.  Uh-huh.

24        A.  -- that position falls under the organized

25   crime --
```

Peter Gamboa                                                July 23, 2024

Page 27

1          Q.  Okay.

2          A.  -- under the umbrella of our lieutenant.  So

3     she has assigned that person -- that assignment to me.

4          Q.  I understand.  But it sounds like that person

5     doesn't really have much to do with organized crime.

6     They're just seated there.

7          A.  Correct.

8          Q.  Okay.  I guess, do you have a, kind of a

9     working knowledge about how the fusion center operates,

10    the San Antonio fusion center?

11         A.  I'm -- just like I said, the only operation or

12    operating that I know about it is the decimation of

13    information.

14         Q.  So you're receiving information.  That's about

15    what you know?

16         A.  Well, we can -- I mean, we can inquire, right?

17    We can ask, hey, can you, you know, get information on

18    this?  But -- but our intel, my intel unit does that.

19              So we -- we really don't use them very much

20    unless it's something -- usually the patrol division is

21    who uses the fusion center.

22         Q.  And patrol division of the sheriff's office.

23         A.  Correct.

24         Q.  Okay.  And does the fusion center then call

25    officers directly?

Peter Gamboa                                                July 23, 2024

1      A.   They can.  But they'll most likely ask, who is

2   this officer assigned to, I need to get ahold of him.

3      Q.   Okay.

4      A.   You know, for whatever information.

5      Q.   So generally, it runs down the

6   chain -- information from a fusion center runs down the

7   chain of command?

8      A.   Yes, ma'am.

9      Q.   Is that a fair assessment?

10      A.   Pretty much, yes, ma'am.

11      Q.   Okay.

12      A.   Now we all have -- you know, local, right, we

13   all know each other so sometimes somebody that's

14   assigned from SAPD to the fusion center may know an

15   officer assigned to our patrol division.  So, you know,

16   they're buddies, so they may call each other and have,

17   you know, that conversation.

18      Q.   Understood.  And do you know anything about how

19   other fusion centers operate?

20      A.   So we've used El Paso's intelligence center.

21      Q.   Uh-huh.

22      A.   Also a fusion center type.  We use them for

23   information on vehicles that we may have stopped on the

24   highway.  Say it's a vehicle out of Florida, they may

25   have intel on the driving pattern of this vehicle, how

Peter Gamboa                                                July 23, 2024

                                                              Page 29

 1    many times have they come to San Antonio, how many times

 2    have they crossed the border, how many times, you know,

 3    they -- you know, who was the drivers.  Things of that

 4    nature.

 5         Q.  Okay.  And what is the purpose of getting that

 6    information from the El Paso fusion center?

 7         A.  So it -- it builds the reasonable suspicion

 8    moving towards the probable cause for the stop.  Or not

 9    for the stop, but to get into a vehicle, whether it'd be

10    for smuggling, narcotic courier, currency courier,

11    things of that nature.  Guns, things of that nature.

12         Q.  Okay.  So walk me through how that works then.

13    When do you -- when do you contact these -- the El Paso

14    fusion center for information?

15         A.  So the way I would do it back when I was on

16    patrol, I would make the stop.  Say it's a vehicle out

17    of Florida.

18         Q.  Sure.

19         A.  And so then I would run the plate.  Out of

20    state returns give very little information.  So then I

21    would run it through border checks.  That would give me

22    more information on how many times -- if we're on 35,

23    how many times they've gone to Mexico through Laredo.

24              What happens is there's different systems,

25    different -- that are used, that report the returns to

Peter Gamboa                                    July 23, 2024

Page 30

1    EPIC, through the El Paso Intelligence Center.

2         Q.   Sure.

3         A.   And then so I'll contact them, I would contact

4    them and say, hey, I'm on a traffic stop.  Vehicle is

5    traveling southbound.  The driver is very nervous,

6    giving evasive answers, contradicting answers, things of

7    that nature.  Do you have any information on this car,

8    on this person?

9              And then they would look it up and they

10   would tell me, yes, he's been stopped by Laredo, or Webb

11   County sheriff's office.  He was arrested for drug

12   smuggling.  He was arrested for money laundering, things

13   of that nature.

14        Q.   Okay.  So does that mean you're only going to

15   reach out to the El Paso Intelligence Center when you've

16   already made a stop?

17        A.   Correct.

18        Q.   Okay.  And you're only going to reach out to

19   the El Paso Intelligence Center when you have reason to

20   ask for additional information?

21        A.   Correct.

22        Q.   And do you ever get alerts from the El Paso

23   Intelligence Center?

24        A.   They can.  I've never received them.  But there

25   can be in the return, once we run a license plate, there

Peter Gamboa                                                   July 23, 2024

Page 31

1    might be an alert saying this is a drug courier.  This

2    person is known to have arrest warrants for, you know,

3    any kind of federal charges, any kind of state, local

4    charges, things of that nature.

5         Q.   Okay.  I guess one question that I have for you

6    is, do you do traffic -- do you, personally, do traffic

7    stops today?

8         A.   Very little.

9         Q.   Okay.  How often would you estimate that you do

10   traffic stops?

11        A.   I would probably say --

12        Q.   And I'll give you just, like, a fair caveat:

13   The sheriff told us that he -- if he sees a traffic

14   violation, a particularly egregious one, he'll do the

15   traffic stop.

16        A.   Yes, ma'am.

17        Q.   Is that the kind of thing that you do?

18        A.   More than likely, yes.

19        Q.   Okay.

20        A.   Probably a little bit more only because if we

21   have an operation where we're going to be doing traffic

22   stops, I'll -- I'll -- usually, I'm in plain clothes,

23   but I'll come in uniform and I've got a marked unit that

24   is assigned to me and I will do traffic stops.

25        Q.   Okay.  So you just mentioned an operation where

Peter Gamboa

July 23, 2024

Page 32

```
1    you will be doing traffic stops.  Can you tell me about
2    what you mean by that?
3         A.  So we're doing surveillance and we -- the
4    information that we have is this person is known to
5    traffic narcotics.
6         Q.  Uh-huh.
7         A.  We'll -- we'll do surveillance on the
8    vehicle -- I mean, on the residence.  The information
9    that we have is he'll deliver.  We'll see him leave the
10   house, and we'll do a traffic stop.  We'll develop
11   probable cause and do a traffic stop.
12        Q.  Okay.  So are the only traffic stops then for
13   operations, very specific tailored traffic stops, is
14   that correct?
15        A.  Well, so for those operations.
16        Q.  Sure.
17        A.  I mean, we have officers, gang unit officers
18   that are assigned to organized crime that will work
19   areas of a county, and they'll -- just like a traffic
20   officer would do traffic stops.
21        Q.  Okay.
22        A.  So we have a unit, street crimes, and they are
23   Monday through Friday, and they do training on
24   Wednesdays.  We have the gang unit, who is operational
25   Sunday through -- no, I'm sorry.  Tuesday -- no, I'm
```

Peter Gamboa                                                July 23, 2024

Page 33

1    sorry.  Wednesday through Saturday, and they're off

2    Sunday, Monday, Tuesdays.

3                On Wednesdays, on their first day back,

4    they work our shift, 9:00 to 5:00, because the street

5    crimes --

6        Q.  Are doing the training?

7        A.  Right.

8        Q.  I understand.  Anybody else doing traffic

9    stops?

10       A.  So I have two officers assigned to me that are

11   special enforcement.  And it's -- now, I mean, it's

12   pretty much they'll, if we have an operation, hey, we

13   need you in the area in case we have enough information

14   to start doing some traffic stops.

15               THE WITNESS:  Thank you, sir.

16       Q.  (By Ms. Hebert)  Okay.  So you were talking

17   about basically organized crime officers spanning out in

18   areas of the county.  Is that a fair --

19       A.  Yes, ma'am.

20       Q.  -- conclusion?  And in spanning out to areas of

21   the county, the following groups that are what I

22   understood are folks who do traffic stops generally --

23       A.  Yes, ma'am.

24       Q.  -- for organized crime.  Street crimes?

25       A.  Yes, ma'am.

Peter Gamboa                                            July 23, 2024

Page 34

1          Q.   Gang unit and two officers with the special

2     enforcement unit; is that right?

3          A.   Correct.

4          Q.   And all these of these groups are doing generic

5     traffic stops as part of their organized crime duties.

6          A.   Correct.

7          Q.   Okay.   Now, you previously attended the

8     county's deposition.   We talked about this --

9          A.   Yes, ma'am.

10         Q.   -- where Captain Von Muldau testified on behalf

11    of county.   Do you remember that?

12         A.   Yes, ma'am.

13         Q.   And Captain Von Muldau said that you were the

14    best person to speak about the county's policies and

15    practices on criminal interdiction.   Do you remember

16    that?

17         A.   Yes, ma'am.

18         Q.   Is there any reason that you would disagree

19    with Captain Von Muldau's statement that you are the

20    best person to speak about criminal interdiction?

21         A.   Yes, ma'am.   I agree.

22         Q.   You agree.   Okay.   So there's no reason that

23    you disagree?

24         A.   No.

25         Q.   You agree that you're the right person for this

Peter Gamboa                                    July 23, 2024

1    topic?

2         A.   Yes.   Yes, ma'am.

3         Q.   As the county uses it, what does the term

4    criminal interdiction mean?

5         A.   So criminal interdiction is a proactive unit

6    that, through traffic stops, they would encounter

7    persons with active warrants, any kind of narcotics, the

8    illegal possession of firearms, human smuggling, human

9    trafficking, and any violation of the traffic laws.

10        Q.   Okay.   That's helpful.

11             And so generally those are the crimes that

12   criminal interdiction targets; is that fair?

13        A.   Correct.

14        Q.   Can I ask a couple questions about that?

15        A.   Yes, ma'am.

16        Q.   Help me understand the difference between human

17   smuggling and human trafficking.

18        A.   Human smuggling is actually bringing immigrants

19   illegally into the United States.   Trafficking would be

20   having those immigrants work for, like, slave labor.

21   Not paying them correctly, paying off a debt that they

22   may owe for having them brought over into the

23   United States.   That would be the trafficking side of

24   it.   There's a spin off also for the sex trafficking --

25        Q.   Uh-huh.

Peter Gamboa                                                    July 23, 2024

                                                                Page 36

1          A.  -- part of it.  And so of course, it would be

2     using them to pay their debt through sex.

3          Q.  I understand.

4              Do all officers who go on patrol do some

5     form of criminal interdiction?

6          A.  Yes, ma'am.

7          Q.  Can you tell me about that?

8          A.  So proactive policing, right, I think that is

9     probably what will sum it up.  So in between calls for

10    service, right, that they're responding to, if there is

11    a slow day for calls, if there's such a thing, then

12    they'll do proactive policing, where they'll be driving

13    in their districts where they patrol and be actively

14    doing traffic stops.

15         Q.  Okay.

16         A.  And it may be from complaints that this

17    neighbor has a lot of traffic coming in and out.  And so

18    they'll work the area, they'll watch somebody leave,

19    they'll traffic stop them.  See if they have anything,

20    any kind of drugs, any kind of illegal firearms, things

21    of that nature.

22         Q.  Sure.  What is -- help me understand what

23    proactive policing really means then.  Unpack that term

24    for me.

25         A.  So proactive policing would -- would be someone

1    who is active in making traffic stops, active in their

2    district.  That they make contact with residents,

3    organizations, and they will receive tips, complaints,

4    of illegal activities going on.  So they'll -- as they

5    have time to, they'll do some of that work, making

6    traffic stops, making contacts.  They may go up to a

7    resident, knock on the door, talk to them, hey, we're

8    getting complaints that there's a lot of gang members

9    hanging around here.  What's going on?

10                   And so that is my definition of proactive

11   policing.

12        Q.   Okay.  I understand.  So it seems like there

13   are two categories, and you can correct me if I'm wrong.

14   There are proactive policing through traffic stops and

15   then proactive policing through community relations.

16        A.   Correct.

17        Q.   And I guess I want to talk a little bit more

18   about proactive policing through traffic stops.

19                   Can you help me understand how that works?

20        A.   So like I said earlier, so they'll concentrate

21   on traffic violations, for example.

22        Q.   Uh-huh.

23        A.   They'll -- I'm going to work this area, and any

24   kind of traffic violations -- I was always taught the

25   rule of thumb, right, three traffic violations, you make

1    a stop.

2                So that's kind of what happens is if I'm

3    working traffic, I'm assigned to patrol, but I'm -- on

4    this day, it's a Sunday, not have many things are

5    happening, daylight hours from 6:00 in the morning to

6    2:00 in the afternoon, so I would go and do proactive

7    policing doing traffic stops.  Any kind of speeders,

8    anything that may be people are failing to maintain a

9    single lane, they would not use their signals, things of

10   that nature.

11        Q.  Okay.  And it seems like in the -- in the

12   proactive policing genre for traffic stops, there are

13   two categories of proactive traffic stops.  It seems

14   like one category of proactive policing is looking for

15   bad drivers, drivers who endangering the public.

16        A.  Yes, ma'am.

17        Q.  And stopping those; is that fair?

18        A.  Correct.  Yes, ma'am.

19        Q.  And then the other seems to be looking for

20   traffic violations with an eye towards searching the

21   vehicle; is that fair?

22        A.  Correct.

23        Q.  And when -- when the latter category is

24   happening, are you -- is an officer supposed to be

25   looking for things that build -- that builds

Peter Gamboa                                                    July 23, 2024

Page 39

```
1    justification to search the car?

2         A.   Yes, ma'am.

3         Q.   I kind of want to take a couple steps back.

4         A.   Okay.

5         Q.   How did you become the interdiction guy?

6         A.   So during my time as a patrolman, I did a lot

7    of proactive policing.  I guess it would just, you know,

8    what people knew me as.  I did work -- I was assigned

9    when I first came out to patrol to the gang unit, so I

10   dealt with a lot of the gang and what they deal with,

11   extortion, money laundering, drugs, things of that

12   nature.

13            As I had more experience, I went into

14   street crimes as a deputy, and one of our assignments

15   was doing interdiction work.  And so because of my

16   experience is why I was picked to be the supervisor over

17   the interdiction unit.

18        Q.   I understand.  That's helpful.  Thank you.

19            And you talked about when you were a patrol

20   guy, you did a lot of proactive policing and then

21   eventually kind of got transitioned to being the

22   interdiction dude.  Does that mean the sheriff's

23   office's best officers are the ones doing proactive

24   policing; is that a fair assessment?

25        A.   So when -- when I first was assigned to put
```

1    this unit together as far as patrolmen, that's who I

2    would look for is an officer.

3         Q.  When you're saying this unit, what do you mean

4    by that?

5         A.  Criminal interdiction.

6         Q.  Okay.

7         A.  So I picked officers that did proactive

8    policing.  And that's what I would base it on.  Of

9    course, one of the questions is, have you done criminal

10   interdiction?  Have you had any training in criminal

11   interdiction?  And most of the officers that I chose or

12   all -- the original officers that I chose had training

13   in criminal interdiction.

14        Q.  And what is training in criminal interdiction?

15        A.  Courses that they take by experts that teach

16   the different aspects of criminal interdiction.

17        Q.  Okay.  We'll get to that more later.  I have

18   questions about the trainings and such.

19        A.  Okay.

20        Q.  But at one point, the sheriff's office created

21   a standalone criminal interdiction unit; is that fair?

22        A.  Yes, ma'am.

23        Q.  And before that unit was created how did the

24   sheriff's office handle its criminal interdiction

25   activities?

1    A.  So, it was mostly through traffic, the traffic

2    unit.  But street crimes would also do some of that

3    proactive policing on highways and back streets, things

4    of that nature.

5    Q.  Okay.  So before there was a separate criminal

6    interdiction unit, folks who were doing stops generally

7    were expected to do criminal interdiction activities; is

8    that fair?

9    A.  Not expected but they would -- they would end

10   up doing that, which would be like the definition of

11   criminal interdiction, right?  Working highways, making

12   traffic stops, arresting people for warrants, drugs,

13   money laundering, couriers, illegal possession of

14   firearms, things of that nature.

15   Q.  Okay.  And then once the criminal interdiction

16   unit was formed and there were officers specifically

17   assigned to that unit, were -- did that unit become like

18   the exclusive mechanism of doing criminal interdiction?

19   A.  So the criminal interdiction

20   originally -- well, the hope, time of the interdiction,

21   criminal interdiction unit, it was set up as a pilot

22   program.  There was no policy for criminal interdiction.

23   We used and we operate under the sheriff's policies and

24   procedures.

25   Q.  Uh-huh.

1          A.   And so that's -- that's -- but it would

2     take -- it would keep from officers that may, I don't

3     want to go to -- I don't want to respond to a call for

4     disturbance, I'd rather go do traffic stops.

5               So, it was kind of supplementing patrol, so

6     that way patrol would respond for calls for service.

7     The criminal interdiction unit didn't have to respond to

8     regular calls.  They would be working the highways and

9     back streets of that nature.

10         Q.   Okay.  Let me make sure I understand that then.

11    It sounds like the criminal interdiction unit was

12    created so that there were officers that could

13    exclusively focus on patrolling the highways --

14         A.   Correct.

15         Q.   -- is that fair?

16         A.   Correct.

17         Q.   And other patrolmen, other officers had to

18    respond to calls for service.

19         A.   Correct.

20         Q.   But when they weren't responding to a call for

21    service, they would be expected to do things like

22    criminal interdiction?

23         A.   Not expected.

24         Q.   Sorry.  I'm probably not using the right word.

25         A.   Yeah.  So they would do it, you know, just for

Peter Gamboa

1    the policing part of it.

2        Q.  Okay.  So if they weren't expected to do it,

3    was -- like, help me understand the right word choice

4    then.

5        A.  Okay.

6        Q.  If they're not -- if an officer, a generic

7    patrolman is not responding to a call for service, what

8    would be -- what would that officer be expected to be

9    doing?

10       A.  Well, I mean, just keeping the community safe

11   is what they're expected to do.

12       Q.  Okay.

13       A.  They had the discretion to do proactive

14   policing.

15       Q.  Okay.  I understand.  So that helps a lot.

16           So generally, a generic patrolman or

17   someone else who is required to respond to calls for

18   service --

19       A.  Correct.

20       Q.  -- and then when they're not responding to a

21   call for service, those officers can exercise their

22   discretion to do criminal interdiction.

23       A.  Correct.

24       Q.  Okay.  And the generic way they do criminal

25   interdiction is through traffic stops --

Peter Gamboa                                    July 23, 2024

1          A.   Correct.

2          Q.   -- is that fair?

3          A.   Correct.

4          Q.   When was the criminal interdiction unit formed?

5          A.   I would say that it was formed 2019.  And I'm

6     going to say it's probably around the springtime, about

7     March, April of 2019.

8          Q.   Okay.  And did any particular person in the

9     sheriff's office lead the efforts to create this

10    criminal interdiction unit?

11         A.   So the sheriff approached me about creating the

12    unit.

13         Q.   Okay.  And can you tell me about how the

14    sheriff approached you?

15         A.   He just one day, you know, we met and -- at the

16    time, I was the sergeant over at the sheriff's academy.

17    And one of the days that he came and spoke to classes,

18    said, hey, I'm thinking about creating this unit.  Would

19    you be up to heading it up?

20         Q.   And what did you say?

21         A.   Yes.

22         Q.   And what was your understanding of what the

23    unit was going to do?

24         A.   Proactive policing on highways and making

25    traffic stops for those crimes that I mentioned.

Peter Gamboa                                           July 23, 2024

Page 45

 1        Q.   Okay.  Making traffic stops for -- to find
 2    evidence of these crimes that you mentioned?
 3        A.   Correct.
 4        Q.   Okay.  Anybody else involved in the
 5    conversation to create a criminal interdiction unit?
 6        A.   No.  As far as I know, it was a conversation me
 7    and the sheriff had.
 8        Q.   Okay.  And do you know why the sheriff was
 9    proposing creation of a criminal interdiction unit?
10        A.   I don't.
11        Q.   Okay.  So you mentioned that the sheriff's
12    office classified the criminal interdiction unit as a
13    pilot program.
14        A.   Correct.
15        Q.   How was that classification communicated?  Did
16    you tell folks that you were doing a pilot program on
17    criminal interdiction activities?
18        A.   So when they put out orders for the officers --
19        Q.   Uh-huh.
20        A.   -- it was a temporary assignment.
21        Q.   Okay.  And when you say orders for the
22    officers, help me understand what that means.
23        A.   So when -- when someone would be transferred
24    from patrol into criminal interdiction, they would have
25    orders to report to myself.

Peter Gamboa                                July 23, 2024

1          Q.   Uh-huh.

2          A.   In those orders, the assignments would be

3    temporary assignment.

4          Q.   So would there be an end date on the temp -- on

5    their order?

6          A.   No.

7          Q.   Okay.

8          A.   No.

9          Q.   So if I were to look at an order where someone

10   is being assigned to you, would it literally say

11   temporary assignment?

12         A.   Yes, ma'am.

13         Q.   And where would you find that?

14         A.   So they would have probably records of those

15   orders in their 201 file.

16         Q.   Sure.  And I'm talking about the actual order.

17   Would it be, like, on the top --

18         A.   Oh, yes.

19         Q.   -- temporary assignment?

20         A.   No, yeah.  So temporary assignment to criminal

21   interdiction.

22         Q.   Understand.  Understand.

23              And when this pilot program from criminal

24   interdiction was started, how long did you expect it to

25   run?

Peter Gamboa                                                        July 23, 2024

1        A.   Well, I expected it to become a actual unit.

2   So my expectation was that it would never stop.

3        Q.   Okay.  And what happened?

4        A.   So I would say, like, in September of '22, we

5   started seeing an uptick in human smuggling, where the

6   drivers of these vehicles would end up in high speed

7   chases, and disregard the human life to get away, were

8   involved in accidents where people would get injured.

9             So I would say in December of '23 is when

10  we stopped doing criminal interdiction, and those guys

11  were still assigned to me under organized crime doing

12  the special enforcement.

13       Q.   And you put criminal interdiction in that last

14  answer in quotes.  What did you mean by that?

15       A.   Because I still kept the same officers.

16       Q.   Okay.

17       A.   They were just assigned to different duties.

18       Q.   Okay.  So does that mean that the sheriff's

19  office no longer does traffic stops for the purpose of

20  finding evidence of illegal activity on the highways?

21       A.   We -- we don't work the highways anymore.

22  Traffic are the ones who now patrol the highways.

23       Q.   Okay.

24       A.   Now, we, of course have done traffic stops on

25  highways, right, but our main concentration is not just

Peter Gamboa                                           July 23, 2024

Page 48

1    working the highways for interdiction purposes.  Those

2    guys are assigned to me, and like we talked about

3    before, with the organized crime, it might be an

4    operation that we're doing surveillance and they're

5    going to -- they're going to do a traffic stop, and it

6    just so happens that that person is on the highway.

7         Q.  Understood.  So now for the most part, the

8    folks that you supervise aren't doing highway traffic

9    stops for the most part?

10        A.  Right.

11        Q.  And it sounds like they're still doing

12   interdiction traffic stops just not on the highway.

13        A.  So interdiction, right, like I explained

14   before, encompasses these types of crimes, organized

15   crime.  What we do does involve these crimes.  So if we

16   need a traffic stop because the information that we have

17   is he's a drug courier, he's going to deliver drugs to

18   another location, then we would use them to conduct

19   those traffic stops.

20        Q.  Understood.  Do you know of other pilot

21   programs or test units that the sheriff's office has

22   tried?

23        A.  So currently, we are doing a crime analysis

24   pilot program.

25        Q.  And tell me about that.

Peter Gamboa                                              July 23, 2024

Page 49

```
 1        A.   So the group is a mixture of detention

 2    officers, investigators, deputies, and a -- currently,

 3    we have a civilian intel analyst that's assigned to the

 4    unit.  And it's kind of geared to doing proactive -- not

 5    proactive, but kind of looking for hot spots, and

 6    gathering those numbers on any crime that may be in a

 7    certain area of the county.

 8              And so for example, maybe on Saturdays --

 9    Casa Blanca is a theater.  I'm not sure if you're

10    familiar with that, but Casa Blanca is on the northwest

11    side of the county, off of 151.  So, Saturdays, there's

12    a high propensity of vehicle burglaries.  So the crime

13    analysis pilot program is concentrating on looking for

14    those types of hot spots.  And so that way then we'll

15    use resources that we have in organized crime and the

16    criminal investigation division, CID, to hit those

17    areas.

18        Q.   Okay.  And do you, Sergeant Gamboa, oversee

19    this crime analysis program?

20        A.   I do.

21        Q.   Okay.  And how long do you expect this crime

22    analysis pilot program to run?

23        A.   I'm expecting it to become a full unit.

24        Q.   Okay.  Thanks.  I guess I want to go back a

25    little bit to the criminal interdiction unit.  How was
```

Peter Gamboa                                                July 23, 2024

Page 50

1    the criminal interdiction unit evaluated?  So what did

2    success look like?  What were folks looking for in terms

3    of success?

4         A.  So there was -- there was not -- I was not

5    given any expectation of anything that we needed to

6    measure success, just to be proactive in doing that,

7    that type of work.

8         Q.  Sure.  So you didn't have any concept of what a

9    good criminal interdiction unit would look like?

10        A.  So I would -- one of the units that I would

11   compare us to was to -- Collin County had a criminal

12   interdiction unit.  And same thing, I don't think they

13   had, like, an expectation of any kind of stat

14   statistical.

15        Q.  Right.  And I'm not asking you about quota or

16   anything like that just what does success look like?

17        A.  Just, you know, San Antonio a hub, and drugs,

18   and human smugglers and everything else comes through

19   here, and just to kind of disrupt that criminal

20   organization type.

21        Q.  Understood.  How many officers were initially

22   part of the criminal interdiction unit?

23        A.  Four officers and myself.

24        Q.  Okay.  And who were those four officers?

25        A.  John Aguillon, Dustin Treadwell, Christopher

Peter Gamboa                                    July 23, 2024

Page 51

1    Terrazas, and Joe Guerra.

2         Q.   Okay.  And you talked a little bit about this,

3    but I want to go back.  How did you select those four

4    officers initially?

5         A.   So John Aguillon and Dustin Treadwell were

6    assigned to the traffic unit --

7         Q.   Uh-huh?

8         A.   -- as an aggressive driver unit.  Because they

9    were proactive in that type of work is why I chose them.

10             Chris Terrazas was assigned to street

11   crimes at the time, and he made a lot of traffic stops,

12   and had a niche for getting probable cause and seeing

13   those types of -- to get into vehicles.  He had a good

14   eye for traffic violations, making contact with people,

15   and observing inside the vehicle which either, you know,

16   using one of his five senses to get into the vehicle.

17             Joe Guerra was one of the first ones.  He

18   came from patrol, but he took classes in interdiction.

19   So that -- I had kind of a little mixture of experience.

20   John Aguillon was a veteran officer that had been with

21   the sheriff's office for a little longer than I have.  I

22   think he just retired.  He had 30 -- 30 years.

23             So Chris Terrazas was also a veteran

24   officer.  He'd be on, I would say probably, 12,

25   15 years.  Of those -- of that time, he did serve some

Peter Gamboa                                    July 23, 2024

Page 52

1    time in the courthouse and some time in street crimes.

2    So his proactive policing, his experience from the

3    courthouse, look -- watching officers testify, and his

4    experience actually doing the work, those two, I felt

5    that it would be able to guide the two younger officers,

6    which was Justin Treadwell and Joe Guerra.

7          Q.  I understand.  So would it be fair to say that

8    you kind of tried to create a unit where everybody was

9    balancing each other out?

10         A.  Yes, ma'am.

11         Q.  And it sounds like the some of the things that

12   you prioritized were experience doing traffic stops,

13   period.

14         A.  Correct.

15         Q.  And the ability to understand when to get into

16   a vehicle.

17         A.  Correct.

18         Q.  How did you recruit these four?  Did they all

19   say, yes, I want to do interdiction?  Did you explain to

20   them what interdiction looked like?  So just generally,

21   how did you recruit them?

22         A.  Yes, ma'am, that's how it was.  It was

23   John Aguillon and myself worked together in the gang

24   unit, patrol, narcotics.  So we -- I knew his work

25   ethic.  I knew him as probably going to be the most

```
 1    senior in the unit.  He would guide the other -- the
 2    younger officers.  But I did have conversations with the
 3    others, and I told them this is what we'll be doing, and
 4    that's how they were selected.
 5         Q.  So when you said, this is what we would be
 6    doing, what did you mean?
 7         A.  Working the highways, looking for anything
 8    criminal.
 9         Q.  Okay.  I just have, like, a question:  Was
10    John Aguillon a deputy when he retired?
11         A.  Yes, ma'am.
12         Q.  And it sounds like you guys have comparable
13    experience.
14         A.  Yes, ma'am.
15         Q.  And this is just something that I don't
16    understand.  Like, how did you become a sergeant while
17    he remained a deputy?
18         A.  Motivation.
19         Q.  Okay.  So what does it take to become sergeant?
20         A.  Test.  So all our promotions are through
21    testing and a oral interview.  So from patrolman, you
22    have to have a minimum of two years, you test for
23    investigator.  As an investigator, you have to do two
24    years minimum to test for sergeant.  Sergeant, minimum
25    of two years, test for lieutenant.  Lieutenant, minimum
```

Peter Gamboa                                           July 23, 2024

Page 54

1    of two years and college hours.  If you don't have the

2    time then they substitute college for time.

3        Q.  Understood.  Understood.  That's helpful to

4    just understand that progression.

5                So it sounds like John Aguillon didn't

6    pursue --

7        A.  Right.

8        Q.  -- didn't opt in to taking the test and the

9    hours and all of that.

10       A.  Yes, ma'am.

11       Q.  Okay.  And why did you?

12       A.  So as a patrolman --

13       Q.  I mean, and clearly, like the sergeants are

14   probably going to make more money.  So, like, let's put

15   that to the side.

16       A.  Yeah, yeah, yeah.

17       Q.  The financial piece, which is a motivator in

18   and of itself, don't get me wrong.

19       A.  Yes, yes.  Myself was this:  I was -- and I

20   loved what I did as a patrolman.  I had -- I was blessed

21   to be assigned to different units, like I mentioned.

22   So, gang was a unit that was specialized, criminal

23   warrants was a unit that was specialized, narcotics was

24   a unit that was specialized, traffic was a unit that was

25   specialized.

Peter Gamboa                                              July 23, 2024

Page 55

1       Q.  And these are all the units that you were

2    previously a part of?

3       A.  Yes, ma'am.  Yes, ma'am.  And so I was blessed,

4    right, to be able to work myself into those specialized

5    units.  I did come back to patrol during -- during

6    different stints, right?  And I saw officers that I grew

7    up with that didn't have the experience that I did,

8    right?  And they were promoting to investigators and

9    sergeants.  And they didn't -- some of them at the time

10   didn't even do any patrol time.  They went from the

11   courthouse to investigator to sergeant.

12              And so that was my motivation, like, these

13   guys are doing it, and they don't have half the

14   experience that I do, what am I waiting for?

15              And my -- so anywhere that I went and

16   gained that experience, came back to patrol, I would

17   teach the younger officers:  You can do this as a

18   patrolman.  You don't have to just wait for a call to

19   come out.  You can do proactive policing.  You can do

20   traffic stops.  This is what you look for.  Use your

21   five senses, smell, hear, and I would -- I would do that

22   to any of the officers that would work alongside me.

23              So after, I guess I was probably a deputy

24   for -- let's see -- 14 years when I decided, I'm going

25   to take the test for investigator.

Peter Gamboa                                    July 23, 2024

1          Q.  I understand.  Is the test hard?

2          A.  It was hard.

3          Q.  Because it seems like not everybody goes on to

4      investigator.

5          A.  So and -- so it kind of progresses, right?  So

6      at first, when you first test, the material is Penal

7      Code, CCP.

8          Q.  CCP is?

9          A.  Code of Criminal Procedures.  And then policy

10     and procedure, right?

11              Then from patrol, investigator.  From

12     investigator to sergeant.  Now they add civil service

13     and all those others, plus civil service, plus

14     collective bargaining contract:  Same thing, sergeant to

15     lieutenant.  They add the same thing.  And managerial

16     style is also one of the things.

17         Q.  So it sounds like generally throughout your

18     career, you've had a passion for sharing your knowledge

19     and teaching other officers policing tactics.

20         A.  Yes, ma'am.

21         Q.  All right.  So I got sidetracked by just John

22     and his experience, but I want to go back to the

23     criminal interdiction unit.

24         A.  Okay.

25         Q.  At some point, it seems like the criminal

Peter Gamboa                                                    July 23, 2024

Page 57

```
 1    interdiction unit became only two officers; is that
 2    fair?
 3         A.  Yes, ma'am.  Yes, ma'am.
 4         Q.  Why did the unit end up with fewer officers?
 5         A.  So what happened was that Deputy Aguillon and
 6    Deputy Treadwell were involved in an officer involved
 7    shooting, and so they were reassigned to TAG.  And this
 8    was prior to it being organized crime.  TAG was under
 9    CID at the time.  They were reassigned to there, to the
10    intel unit.  Intel/gang unit.
11         Q.  Okay.
12         A.  And because of personnel shortages, they never
13    filled those -- that position.
14         Q.  Okay.
15         A.  Or those two positions.
16         Q.  So let me understand -- let me backtrack a
17    little bit.
18              The officer involved shooting, how did
19    that -- what was -- can you tell me just the overview of
20    what happened there?
21         A.  So what happened was there was a pursuit that
22    came from Atascosa County, where the person was firing
23    at officers.  And so as it's coming into Bexar County,
24    they notified us and so I sent them to assist.  Because
25    they were here in the county, they were upfront in the
```

1    pursuit, calling it out just because we had

2    communications at the time and the other counties

3    didn't.

4                And so it ended up in front of a school.

5    The guy ran his vehicle until it couldn't run no more.

6    It stopped, he jumped out, shot at officers.  They

7    returned fire and neutralized him.

8        Q.  Okay.  And so when they were reassigned to TAG

9    is it fair to say that they -- I guess, they were

10   reassigned to a desk job for a while?

11       A.  Yes, ma'am.

12       Q.  Okay.  And then you talked about the fact that

13   budget shortage, officer shortage was why the criminal

14   interdiction unit didn't become four officers again.

15       A.  Correct.

16       Q.  Did you -- so is it your conclusion that if

17   there had been more resources, more personnel the

18   criminal interdiction unit would have become four

19   officers again?

20       A.  Yes, ma'am.

21       Q.  At some point, I guess Terrazas --

22       A.  Yes, ma'am.

23       Q.  -- left the criminal interdiction unit.

24       A.  Yes, ma'am.

25       Q.  Do you know why?

Page 59

1         A.  He felt that he was not producing to what he

2    felt he held himself to.  And so he decided to go back

3    to street crimes.

4              So they were -- he was swapped with Officer

5    Gil Martinez.  Gil Martinez and I worked together in

6    street crimes, so he had the experience.  I knew he had

7    the experience for criminal interdiction.  So I didn't

8    have a problem with that swap.

9         Q.  Okay.  So it sounds like Terrazas left of his

10   own accord.

11        A.  Yes, ma'am.

12        Q.  Is that correct?

13        A.  Yes, ma'am.

14        Q.  And you said, you know, you phrased it very

15   nicely, he felt like he was not producing what he wanted

16   to produce.  Can you unpack:  What does that mean?

17        A.  So he felt that he had to get -- his arrest had

18   to be kilos, had to be millions of dollars, had to be

19   loads of human smuggling victims, things of that nature.

20   Guns, right?

21              And he was making stops and getting zero

22   to, you know, and he felt that he was not living up to

23   what criminal interdiction should be.

24        Q.  Understood.  So Officer Terrazas, Deputy

25   Terrazas --

Peter Gamboa                                                    July 23, 2024

 1          A.   Deputy Terrazas, yes.

 2          Q.   -- was looking for big stuff and he wasn't

 3     finding it.

 4          A.   Right.

 5          Q.   Okay.  And then Officer Terrazas, Deputy

 6     Terrazas was replaced by Deputy Martinez?

 7          A.   Correct.

 8          Q.   And how long did Deputy Martinez participate in

 9     the criminal interdiction unit?

10          A.   So he was there for a very short time because

11     he put in to go to TAG as a covert officer when the new

12     alignment for organized crime was created.

13          Q.   Okay.  So Martinez left.  He wanted to go do

14     the covert operations.

15          A.   Correct.

16          Q.   Got it.  And is that when Deputy Babb came on

17     board?

18          A.   Yes.

19          Q.   Okay.  So Deputy Babb came into Martinez's

20     slot?

21          A.   Correct.

22          Q.   And Deputy Guerra was there the entire time?

23          A.   So deputy -- he was reassigned to patrol for a

24     short time because they had -- it was a short time that

25     they were short of officers, and so he was reassigned

Peter Gamboa                                           July 23, 2024

Page 61

1    back to patrol.

2         Q.   Okay.  So short window, went to patrol --

3         A.   Yeah.

4         Q.   -- and then he came back to criminal

5    interdiction.

6         A.   Correct.

7         Q.   Okay.  I guess when Martinez's spot on the

8    criminal interdiction unit came available, how did you

9    select Deputy Babb?

10        A.   So during that time, I did put an opening

11   through the intranet for officers that were interested

12   in --

13        Q.   And you said intranet?

14        A.   Yes.

15        Q.   Is that the sheriff's office internal system?

16        A.   Yes, ma'am.  Yes, ma'am.

17        Q.   Okay.  So you put an opening on the sheriff's

18   office internal system.

19        A.   Correct.

20        Q.   Tell me more about that?

21        A.   And I put out the opening, the announcement for

22   the opening.  You had to have a minimum of two years on

23   patrol, and what I would like to see an experienced

24   patrolman, training in interdiction.  And also, I

25   believe I had added some of the chapters that we would

1    be working under.

2           Q.   The chapters --

3           A.   To be familiar with.

4           Q.   And by chapters, you mean chapters of the

5    sheriff's policy manual?

6           A.   Correct.  Yes, ma'am.

7           Q.   I guess then there was a formal job description

8    that you posted --

9           A.   I did.

10          Q.   -- on the intranet?  And how many applicants

11   did you get?

12          A.   I believe we had, like, 12.

13          Q.   Rough estimate is fine.

14          A.   Yeah, about 12.

15          Q.   Sure.  And you talked a little bit about the

16   two years at least of a patrolman, training and

17   interdiction experience, and then the chapters of the --

18          A.   Familiar, be familiar.

19          Q.   Being familiar with certain chapters.

20               Tell me about the second category, training

21   in interdiction experience.  What kind of training did

22   you look for?

23          A.   Anything that they may have taken that would

24   deal with interdiction.  Anything dealing with traffic,

25   traffic stops, and then of course the interdiction side

Page 63

1    of it.

2         Q.  I'm sorry.  I missed that last part.  And of

3    course the -- what did you say?

4         A.  The, like, traffic, anything with traffic.

5         Q.  Uh-huh?

6         A.  And then, of course with -- anything with

7    interdiction.

8         Q.  Okay.  And by interdiction, did you mean things

9    that had interdiction in the title of the training?

10        A.  Interdiction, yeah.  Yes, ma'am.

11        Q.  Are there specific trainings that you looked

12   for an officer to have?

13        A.  So -- so there -- so there's training for

14   18-wheelers.  The title doesn't include anything with

15   interdiction, but that's one of the vehicles that we

16   make stops on because of transporting illegals, weapons,

17   smuggling, narcotics, things of that nature.

18        Q.  Understood.  So what is the status of the

19   criminal interdiction unit today?

20        A.  We're not operating anymore.

21        Q.  Okay.  So when was it ended?

22        A.  It was -- my best guess was December of '23.

23        Q.  And who ended it?

24        A.  The sheriff.

25        Q.  And did the sheriff say why?

Peter Gamboa                                                    July 23, 2024

 1          A.  Because of the -- the human smuggling.

 2          Q.  Uh-huh?

 3          A.  Working the highways, we would have vehicles

 4     driving at high rate of speeds.

 5          Q.  Right.

 6          A.  And of course, we would --

 7          Q.  So what you mentioned previously --

 8          A.  Correct.

 9          Q.  -- about the dangers --

10          A.  Yes.

11          Q.  -- of human smuggling, traffic stops ending up

12     in a high speed chase?

13          A.  Correct.

14          Q.  Even though the criminal interdiction unit has

15     ended, that doesn't mean that the sheriff's office has

16     abandoned all criminal interdiction efforts; is that

17     fair?

18          A.  Yes.  Correct.

19          Q.  So that answer was a little ambiguous, and I

20     want to make sure I understand it.

21               Does that mean that the sheriff's

22     office -- does the fact that the criminal interdiction

23     unit is no longer in existence, does that mean that the

24     sheriff's office has completely abandoned criminal

25     interdiction efforts?

Peter Gamboa                                                    July 23, 2024

Page 65

1        A.   So, no.

2        Q.   So sheriff's office still does criminal

3    interdiction?

4        A.   We do not have criminal interdiction, but we do

5    proactive policing for illegal weapons, narcotics, human

6    smuggling, money laundering, any kind of couriers,

7    things of that nature.

8        Q.   And we've previously talked about the different

9    categories of proactive policing.

10       A.   Correct.

11       Q.   And I guess the one I'm referring to is

12   proactive policing, traffic stops for the purpose of

13   searching a vehicle?

14       A.   Correct.

15       Q.   I want to talk a little bit about kind of where

16   the criminal interdiction unit fell in the

17   organizational chart.

18       A.   Okay.

19       Q.   So I'm going use an exhibit here?

20       A.   Sure.

21            MS. HEBERT:   Josh --

22       Q.   And this exhibit was previously marked

23   Exhibit 53, so we're going to add an exhibit sticker

24   here.

25       A.   Okay.

Peter Gamboa
July 23, 2024

Page 66

1              (Exhibit No. 53 marked.)

2              MS. HEBERT:  Charles, we have a copy for

3      you.

4              MR. FRIGERIO:  Thank you.

5              MS. HEBERT:  And then I have only color

6      copies, so that's not quite right, so I'm going to give

7      those to you to share.

8          Q.  (By Ms. Hebert)  So I want to talk about this

9      organizational chart.  You mentioned that the criminal

10     interdiction unit was created in 2019.

11         A.  Correct.

12         Q.  When it was created, where did the criminal

13     interdiction unit fall in -- within the sheriff's

14     office?

15         A.  So is this org chart from --

16         Q.  This is -- the date --

17         A.  2019?

18         Q.  -- I have for this org chart is March 18, 2020.

19     It's very small print at the bottom.

20         A.  Okay.  This one says --

21         Q.  So if it doesn't fall on this chart then, you

22     now, I guess, is there an earlier chart for 2019?

23         A.  Okay.  I was looking at the wrong side.

24              Okay.  This is 2020.  I'm not sure if there

25     was another org chart prior to this.

Peter Gamboa                                      July 23, 2024

Page 67

1          Q.  And if it didn't -- if your answer is it didn't

2     fall in this org chart and there's an earlier one,

3     that's okay too.

4          A.  Yeah.  I -- yeah, let me -- so from this date,

5     I've got March 18, 2020.

6          Q.  Yes, sir.

7          A.  Let me see where it would fall under.  So at

8     the time was, we were under the support division because

9     I was over --

10         Q.  Okay.  So I'm seeing the adult detention

11    bureau, the compliance and support division; is that

12    right?

13         A.  Okay.  Let's see.  Administration and support.

14    Chief of staff --

15         Q.  Okay.  Got it.  So the center one.

16         A.  Uh-huh, yes, ma'am.

17         Q.  So tell me where you were and where the

18    criminal interdiction unit fell.

19         A.  So, let's see.

20         Q.  I think I might be able to help this.  I think

21    that when you --

22         A.  Training academy.

23         Q.  Okay.  So when the -- when the criminal

24    interdiction unit was created, it fell under the

25    training academy?

Peter Gamboa                                      July 23, 2024

1          A.   Correct.

2          Q.   Okay.  And what other places within the

3     organization, within the sheriff's office, did

4     the -- did the criminal interdiction unit end up?

5          A.   So it -- it ended up for a very short time

6     under organized crime.

7          Q.   And organized crime, tell me where that is?

8          A.   And that -- and that -- let's see.  So --

9          Q.   So I'm looking at the 2020 version.

10         A.   Organized crime section of 20 -- the org chart

11    for April 21st, 2022.

12         Q.   Okay.  So now you flipped to the April 1st,

13    2022 organizational chart --

14         A.   Correct.

15         Q.   -- is that fair?

16         A.   Yes, ma'am.

17         Q.   And on this chart, after the reorganization,

18    was that when the criminal interdiction unit was moved

19    from the training academy?

20         A.   Correct.

21         Q.   Okay.  And where did it move to?

22         A.   To -- under criminal investigations division --

23         Q.   Yes, sir.

24         A.   -- under tactical operation section?

25         Q.   Yes, sir.

Peter Gamboa                                    July 23, 2024

Page 69

1          A.   Special enforcement unit.

2          Q.   Okay.  So it moved to the special enforcement

3     unit in April 2020 with the reorg.

4          A.   Yes.

5          Q.   Was there any other division that the org unit,

6     where the criminal interdiction unit was placed to your

7     knowledge?

8          A.   No, ma'am.

9          Q.   So when the unit was -- when the criminal

10    interdiction unit was dissolved, it was part of the

11    special enforcement unit?

12         A.   Correct.

13         Q.   Okay.  There were a couple of names associated

14    with the criminal interdiction unit that I just

15    would -- it would be helpful to understand, like, how

16    they fit.

17         A.   Okay.

18         Q.   Just -- and you can put this way.

19         A.   Okay.

20         Q.   And we can pull it out if we need to.

21         A.   Okay.

22         Q.   But at one point, I saw the name Lieutenant

23    Ray Ortega floating around.

24         A.   Yes.

25         Q.   What was Lieutenant Ortega's relationship to

Peter Gamboa                                          July 23, 2024

Page 70

```
1     the criminal interdiction unit?
2          A.  So at the time -- so he, at one point was
3     assigned to the training academy.  That's in the very
4     beginning so I would -- 2019, 2020, some time, he was
5     the commander over the academy.  So we fell under him as
6     far as the lieutenant.
7          Q.  Understood.  And when he was the lieutenant,
8     did he have an active role in understanding what the
9     criminal interdiction unit was doing?  It sounds like he
10    was mostly the training guy.
11         A.  So, he did.  He knew what we were doing.  But
12    he was there for a short time, then -- then he moved
13    from the training academy over to tactical
14    operations -- or I'm not sure.  Let me see if it's
15    strategic or tactical.
16         Q.  And I'm sorry, you probably need your glasses
17    for this tiny print.
18         A.  So let's see.  So -- okay.  So here they have
19    tactical operations section in the April 21, 2022.  And
20    under -- under the chief of staff, under administration
21    support, they have strategic operations, which
22    encompassed the training academy section.  So
23    originally, he was under that, strategic operations.
24         Q.  Uh-huh.  In the 2020 version?
25         A.  Correct.  Yes.  And then under the 2021, it
```

1    came under criminal investigation division.

2         Q.  You mean 2022?

3         A.  Ah, 2022, sorry.  April 21, 2022.

4         Q.  Understood.

5         A.  Came under -- it was moved -- or he was moved

6    under tactical operations for the special operations

7    unit, which was SWAT.

8         Q.  Okay.  So he became the tactical operations

9    section lieutenant?

10        A.  Correct.  Commander.

11        Q.  Commander, okay.

12             And can you tell me who Officer Steven

13   Sanchez is?

14        A.  Steven Sanchez is the street crimes sergeant

15   under the most current 2022, it would be under organized

16   crime, Texas Anti-Gang unit.

17        Q.  Okay.  So under the 2022 organization chart,

18   what rank is -- he's a sergeant?

19        A.  Sergeant, yes, ma'am.

20        Q.  So Sergeant Sanchez is part of the Texas

21   Anti-Gang unit?

22        A.  Correct.

23        Q.  And how many deputies does he oversee?

24        A.  I believe he has eight.

25        Q.  Eight deputies?

Peter Gamboa
July 23, 2024

1        A.   Deputies.

2        Q.   And do you know what his deputies do?

3        A.   Street crimes.

4        Q.   Okay.  So what does that mean?  I'm sorry.

5        A.   So --

6        Q.   I know you talked a little bit about it, but

7    I'm not entirely clear.

8        A.   So in 2005, Sheriff Lopez at the time,

9    Ralph Lopez, did away with the gang unit.  So we were

10   all reassigned to either patrol, different divisions.

11   Interdiction -- I mean, not interdiction, narcotics or

12   criminal warrants.

13            Shortly thereafter, they created a street

14   crimes unit.  And at the time, we had a chief -- and I

15   can't remember his last name.  His first name was Andy,

16   and I want to say -- Chief Andy was a patrol division

17   chief.  They created street crimes under him at the

18   time.

19            So moving forward -- and so street crimes

20   was the gang unit with a different name.  So moving

21   forward to currently --

22       Q.   So essentially, the sheriff recognized that he

23   made a mistake, and so he recreated a unit with the

24   street crimes name.

25       A.   Yes.

Peter Gamboa                                          July 23, 2024

Page 73

1       Q.   Okay.

2       A.   And so they do gang unit work with identifying

3   gang members, targeting areas of high crime that involve

4   any kind of gang activity.

5       Q.   Understood.

6       A.   But they're a daylight team.

7       Q.   Understood.

8       A.   The gang unit that is now in place, works the

9   nights with our owed hours as the gang unit.

10       Q.   Understood.  Okay.  Can you tell me where on

11   the organizational chart Deputy Gereb is today?

12       A.   He's under organized crime, under myself, under

13   intel.

14       Q.   Okay.  So I see the organized crime section.

15       A.   So we're all under Texas Anti-Gang unit.

16       Q.   Okay.  So all -- you're under the Texas

17   Anti-Gang unit?

18       A.   Correct.

19       Q.   And Deputy Gereb is under there too?

20       A.   Correct.

21       Q.   And do you still oversee him?

22       A.   Yes, ma'am.

23       Q.   Okay.  And --

24       A.   And currently, from the two, I now just have

25   Gereb.

1          Q.   Understood.  And but there are other sergeants

2     in the Texas Anti-Gang.

3          A.   Yes, ma'am.

4          Q.   And one of those other sergeants is Steven

5     Sanchez?

6          A.   Yes, ma'am.

7          Q.   Understood.  And then we talked a little bit

8     about Lieutenant Freveletti?

9          A.   Yes, ma'am.

10         Q.   When did she come into the picture?

11         A.   So when they reorganized and made the organized

12    crime, she became the supervisor over -- or the

13    commander over the plainclothes officers.  That's

14    probably the best way to describe it.

15         Q.   Okay.  So she -- she's a lieutenant, like

16    at -- over the umbrella of the organized crime section,

17    but she's mostly in charge of plainclothes people?

18         A.   Correct.  Correct.

19         Q.   And plainclothes people are used for kind of

20    what?

21         A.   So they're -- the intel officers that work for

22    me, covert officers that work for Sergeant Hendricks.

23    The TFOs that are assigned to DEA, HIDTA, Secret

24    Service.

25         Q.   Okay.  So she isn't your direct supervisor?

Peter Gamboa                                           July 23, 2024

```
 1          A.  She is now my direct supervisor.

 2          Q.  She is now.  Okay.  So she at some point, do

 3     you know when she became the plainclothes lieutenant?

 4          A.  So when they created organized crime is when

 5     she -- she became the commander over TAG, plainclothes.

 6          Q.  Okay.  And so that was in 2020, April 2022

 7     zone?

 8          A.  Right.

 9          Q.  And she transitioned to a new role?

10          A.  No.  That's where she is currently.

11          Q.  Okay.  But now she's over you?

12          A.  Correct.  I came into --

13          Q.  Ah.  Okay.  So now you're -- I understand now.

14              So you are a part of the plainclothes

15     group --

16          A.  Correct.

17          Q.  -- now?

18          A.  Yes.

19          Q.  And Deputy Gereb is part of the plainclothes

20     group now?

21          A.  In uniform.

22          Q.  He's in uniform?

23          A.  Yeah.

24          Q.  But you still supervise him?

25          A.  Yes.
```

Peter Gamboa                                                July 23, 2024

1         Q.   Okay.  So sounds like they're -- the

2    plainclothes and the uniform people are intermeshed

3    organizationally?

4         A.   Yes, yes.

5         Q.   Okay.

6         A.   So the way it works is, now, Angela Freveletti

7    is a lieutenant over the plainclothes, and then you have

8    Lieutenant Brian Curtis, who's over the uniform officers

9    that are assigned to TAG, which would be street crimes,

10   gang unit.  I think that's it for now.

11        Q.   Okay.  So someone like Deputy Gereb, and Deputy

12   Gereb, who's a uniformed organized crime division

13   officer, reports to you.

14        A.   Correct.

15        Q.   And then you report to Lieutenant Curtis for

16   Deputy Gereb?

17        A.   No.

18        Q.   Okay.

19        A.   I only now report to -- well, Lieutenant

20   Freveletti is my direct lieutenant unless she's off.

21   Then I will report to -- all of us will report to

22   Curtis.

23        Q.   Understood.  So is Lieutenant Freveletti,

24   Deputy Gereb's --

25        A.   Yes.

Page 77

1          Q.   -- boss?

2          A.   Yes.

3          Q.   Still?

4          A.   Yes.

5          Q.   Okay.  Even though he's in uniform and she's

6     plainclothes?

7          A.   Correct.

8          Q.   Understood.  Okay.  I think I understand.

9               And then who is currently the person above

10    Freveletti?

11         A.   It would be, I believe it's

12    chief -- deputy -- or Deputy Chief Nancy Sanford.

13         Q.   Okay.

14         A.   But I might be wrong because there is a captain

15    in CID now.

16         Q.   Okay.

17         A.   Augustine Pruneda.

18         Q.   And I'm going to bet that Anica here, Ms. Anica

19    is going to ask you to spell some of these names on the

20    break so just be prepared for that.

21         A.   Sure.  Yes.

22         Q.   Who is a Ben Rangel, R-A-N-G-E-L?

23         A.   Ben Rangel?

24         Q.   Rangel?  Who's Ben Rangel?

25         A.   He is a civilian assigned to fleet.

Peter Gamboa                                        July 23, 2024

Page 78

1          Q.  So he works for the Bexar County Sheriff's

2     Office?

3          A.  Correct.

4          Q.  But he's not an officer?

5          A.  Correct.

6          Q.  And when you say fleet, does that mean he

7     manages or is part of the operation running the patrol

8     vehicles?

9          A.  Patrol -- yes, ma'am.  For maintenance and

10    things of that nature.

11         Q.  Okay.  Understood.  All right.  So I think it's

12    a good time for a break.  What time is it right now?

13                    MR. WINDHAM:  11:06.

14                    MS. HEBERT:  Yeah.  Let's take a short

15    break just to use the bathroom because you've been going

16    for a long time.  And I know I, mentally, need to use

17    the -- need a break, use the bathroom.  So we'll take a

18    quick break.  Maybe ten minutes?  So we'll come back on

19    at 11:07.

20                    (Break taken from 11:17 a.m. to 11:25 a.m.)

21         Q.  (By Ms. Hebert)  Okay.  Thanks for coming back

22    from the break.

23                    A couple of things to just clean up.  You

24    talked about HIDTA.

25         A.  Okay.

Peter Gamboa                                          July 23, 2024

Page 79

1        Q.  Can we go back and, like, figure out the

2    acronym.  I think it might be something like highway

3    interdiction drug trafficking area or high intensity

4    drug trafficking area?

5        A.  Yes.

6        Q.  Can you help me understand what it was?

7        A.  Yeah.  I think it was highway intensity or

8    highway drug --

9        Q.  High Intensity Drug Trafficking Area?

10       A.  Trafficking area.

11       Q.  Does that sound right?

12       A.  Yes.

13       Q.  Okay.  I think we got there eventually

14   together.  So HIDTA --

15       A.  I get confused with that and OCDETF.

16       Q.  Okay.  OCDETF, what is that one?

17       A.  Organized crime drug -- wait.  Let me see.

18   OC -- OCDEFG.  Organized Crime Drug Enforcement -- yeah,

19   something like that.

20       Q.  Let the record reflect that opposing counsel

21   did not give the witness paper to figure out what the

22   acronym on this thing was, and Sergeant Gamboa had to

23   write it on his hand.  Thank you for not writing it on

24   the exhibit.  That was kind of you.

25                Okay.  So I want to also talk about the

1    sheriff -- the sheriff's office current criminal

2    interdiction efforts.  We've talked a lot about

3    proactive policing, and how certain officers do

4    proactive policing in the form of traffic stops to get

5    access to vehicles to search for certain contraband; is

6    that correct?

7         A.   Correct.

8         Q.   And in general, would you say that the -- the

9    folks who are doing that kind of criminal interdiction

10   work, are still using the same methods as folks who were

11   a part of the criminal interdiction unit when there was

12   a standalone unit?  Putting aside the fact that they're

13   not, like, searching highways?

14        A.   Correct.

15             MR. FRIGERIO:  Objection; form.

16        Q.   (By Ms. Hebert)  Putting aside the fact that

17   they're not sitting on highways or looking at the

18   highways?

19        A.   Right.

20        Q.   Okay.

21        A.   But they can.

22        Q.   They can.  If they exercise their discretion?

23        A.   Correct.

24        Q.   Okay.  So let me just summarize then.  I guess,

25   the criminal interdiction unit no longer exists.

Peter Gamboa                                          July 23, 2024

Page 81

1          A.  Correct.

2          Q.  But the sheriff's office still does criminal

3     interdiction efforts, sometimes at an officer's

4     discretion, when they -- when they -- when the officers

5     do criminal interdiction efforts, they're using the same

6     methods that criminal interdiction unit used to use

7     except for they're not sitting on the highways, waiting

8     for traffic?

9          A.  Right.  So the patrolmen use their discretion

10    for proactive policing.  Not so much criminal

11    interdiction, right, because that's -- the difference

12    would be that's all you do is criminal interdiction.

13    They're doing proactive policing as patrolmen.

14         Q.  Okay.  And when they're doing proactive

15    policing related to traffic stops, we talked about

16    community proactive policing --

17         A.  Correct.

18         Q.  -- when they're doing proactive policing

19    related to traffic stops, they're using the same methods

20    of stopping a vehicle.  For instance --

21         A.  Correct.

22         Q.  -- interviewing --

23         A.  Right.

24         Q.  -- the driver; is that fair?

25         A.  Yes.

```
 1          Q.  Okay.  Now, I want to talk about training.  We
 2     talked a little bit about at the start of the criminal
 3     interdiction unit, you looked for specific training; is
 4     that correct?
 5          A.  Yes, ma'am.
 6          Q.  Were there specific companies that you looked
 7     for training from?
 8          A.  Not specific companies, but I would get either
 9     flyers through email that an agency was teaching certain
10     techniques for interdiction.  And then if it -- if it
11     met what -- you know, our mission was, then I would try
12     to get the guys that training.
13          Q.  Understood.  So what kind of techniques are you
14     talking about?
15          A.  So, like techniques would be to identify
16     compartments.
17          Q.  Okay.
18          A.  Techniques, interview techniques.  Things of
19     that nature.
20          Q.  Okay.  And unpacking both of those, when you
21     say compartments, I'm assuming, tell me if I'm wrong,
22     that that means identifying places where people were
23     hiding things in the vehicles?
24          A.  Correct.
25          Q.  And when you say interview, what are you
```

Peter Gamboa                                    July 23, 2024

Page 83

1    talking about there?

2         A.   So they would teach interview techniques, and

3    not so much being authority figure; more of rapport

4    building, get them to relax, get them to tell you, you

5    know, where they're coming from, where they've been.

6    Who they met with.  Identifying if there's -- if they

7    tell you that they were staying at a certain hotel,

8    motel, identify -- have them identify something in that

9    motel room where it would trip them up because those

10   hotels don't use certain curtains, things of that

11   nature.

12        Q.   Okay.  So would behavioral analysis be

13   something you would look for --

14        A.   Also.

15        Q.   -- training in?

16        A.   Yes, ma'am.

17        Q.   Okay.

18        A.   So during the interview techniques, they would

19   talk about behavioral analysis.  Profusely sweating,

20   it's 15 degrees outside.  Their carotid artery just

21   going off because they're so nervous.  Things of that

22   nature.

23        Q.   Understood.  And when you said techniques that

24   met the mission, can you just explain what you meant by

25   that?

Peter Gamboa
July 23, 2024

Page 84

1          A.   Just for criminal interdiction.  The mission

2     that, you know, there's a lot of drugs that come through

3     our area, illegal weapons, money laundering going down

4     south, human smuggling coming up north, things of that

5     nature.

6          Q.   Okay.  At the start of the criminal

7     interdiction, you had four officers --

8          A.   Uh-huh.

9          Q.   -- coming on board; is that right?

10         A.   Correct.  Yes, ma'am.

11         Q.   Any -- did you do any foundational preparation

12    as a unit when you were first getting started?  By that,

13    I mean, how did you kick off?

14         A.   I mean just pretty much like we would do

15    on -- as like a traffic unit.  We kicked it off hitting

16    the highway.

17         Q.   Okay.  So did you do any group training or unit

18    training before you guys got started?

19         A.   So, we did.  We went to a place in the Dallas

20    area and did some -- there was a couple interdiction

21    officers there that worked for the DA's office over

22    there.  And I can't remember his name.  His name was

23    Billy.  He was an instructor in criminal interdiction.

24              And so as a whole -- as a group, all five

25    of us went down there, and worked three days with them

Peter Gamboa                                              July 23, 2024

Page 85

1    on how they did things as a criminal interdiction unit.

2         Q.  Okay.  Did you ride-alongs during that time?

3         A.  Yes.

4         Q.  And you were there three days; did I get that

5    right?

6         A.  Correct.

7         Q.  And what did you learn from that Dallas

8    interdiction group?

9         A.  So pretty much how they did things was what we

10   were going to do with following our policies and

11   procedures for the sheriff's office.  We would observe a

12   violation, traffic violation.  We would make a traffic

13   stop.  We would conduct interviews, roadside interviews.

14   Whether -- you know, we began with reasonable suspicion,

15   up to probable cause using one of our five senses to get

16   into the vehicles.

17        Q.  Understood.  Did the Dallas interdiction unit

18   do front seat interviews?

19        A.  They did.

20        Q.  Okay.

21        A.  They did.

22        Q.  And did the Dallas interdiction unit use a K-9?

23        A.  They do have K-9.

24        Q.  And did they use a K-9 unit as part of the

25   interdiction traffic stops?

```
1        A.   I believe they had a K-9 assigned to their

2    interdiction unit.

3        Q.   Okay.  And other than this training that the

4    five of you went to in Dallas, was there any other at

5    the start training or preparation that the criminal

6    interdiction unit did?

7        A.   So not right away, but I did look for classes,

8    and would send them individually to the classes.  It may

9    have not been all four at one time, but I would have

10   maybe picked one or two just to -- John Aguillon and

11   myself went through interdiction classes way back when,

12   so I knew he had some already, but I would send him for

13   refreshers.

14       Q.   Understood.  Okay.  So there was a lot there

15   but I'm going to just unpack that.

16       A.   Yes.

17       Q.   So after the criminal interdiction unit started

18   working, you didn't go to a training as a unit because

19   then nobody would be left --

20       A.   Right.

21       Q.   -- in town; is that fair?

22       A.   Right, yes.

23       Q.   So you sent folks individually or twos to

24   training?

25       A.   Yes, ma'am.
```

Peter Gamboa                                          July 23, 2024

Page 87

1      Q.   Okay.  And you said that you looked for classes

2  for them.  What classes did you specifically look for?

3      A.   The 18-wheeler classes was one of them.  Any

4  type of compartment classes, just to familiarize

5  themselves on things to look for while they're doing the

6  search, you know.  Things of that nature.

7      Q.   Anything else?  So there were 18-wheeler

8  classes, compartment classes, any other topics?

9      A.   Any type of interview techniques, any type of

10  kinesiology, any type of --

11      Q.   Okay.  I'm not familiar with kinesiology.  So

12  tell me --

13      A.   Just like behavioral, watching the body.

14      Q.   Okay.

15      A.   React to certain questions, certain situations.

16      Q.   Okay.  So tell me -- tell me about that.  Like,

17  what were you hoping that your criminal interdiction

18  deputies would learn from kinesiology instruction?

19      A.   So, during their interviews, that they would be

20  able to recognize somebody who is being deceptive.

21      Q.   Okay.  And you talked a little bit about

22  training that you and John Aguillama --

23      A.   Aguillon.

24      Q.   Aguillon.  Thank you.  I'm going to ask you

25  that, like, eight more times.  That you and John

Peter Gamboa                                    July 23, 2024

Page 88

1    Aguillon went to previously, what training did you two

2    attend together?

3        A.  So we attended several of the compartment

4    classes, and we also attended 18-wheeler classes.

5        Q.  And that's it?

6        A.  I'm trying to remember.  Desert Storm was one

7    of the companies that --

8        Q.  Would it be Desert Snow?

9        A.  Snow.

10       Q.  Does that sound familiar?

11       A.  Snow, yes.

12       Q.  So you and John -- I'm going say John A --

13       A.  Yeah.

14       Q.  -- just to save myself the embarrassment of

15   mispronouncing that a million times.

16              You and John A went to compartment class or

17   two.

18       A.  Yes.

19       Q.  18-wheeler class or two?

20       A.  Correct.

21       Q.  Desert Snow training?

22       A.  Correct.

23       Q.  Do you remember what that was about?

24       A.  I believe it was interview techniques, and I

25   believe they gave us a small portion of compartments.

Peter Gamboa                                              July 23, 2024

Page 89

1          Q.   Okay.  Any other criminal interdiction training

2     that you personally, Sergeant Gamboa, have been there?

3          A.   So we did have, through the sheriff's office,

4     and I can't remember who the group was, but we did have

5     a compartment class that I went through at the sheriff's

6     office.  And then I did do a stint in auto theft.

7          Q.   Uh-huh.

8          A.   And we did some courses in recognizing the VIN

9     numbers and second VIN numbers in vehicles and

10    trailers --

11         Q.   Okay.

12         A.   -- also.  Identify a vehicle that may have been

13    stolen.

14         Q.   I get it.  Did you ever attend a 720

15    interdiction course?

16         A.   I have not.

17         Q.   Okay.  Did you ever attend a street cop

18    interdiction course?

19         A.   So, I believe the one that we went through the

20    county was a street cop course --

21         Q.   Okay.

22         A.   -- that they came over.  720 is more -- is that

23    Mike -- he is now a chief of police over by the

24    Rio Grande Valley.  He -- I think he teaches that 720.

25         Q.   Okay.  So some officer from elsewhere in Texas

Peter Gamboa                                              July 23, 2024

Page 90

1    teaches the 720?

2         A.  Yes ma'am.

3         Q.  Okay.

4         A.  I have not attended his classes.  I take that

5    back.  During a K-9 conference, I -- one time, I had a

6    K-9 unit from detention under me.

7         Q.  Okay.

8         A.  I did attend a K-9 class, where he was one of

9    the speakers.  So I did attend that class.

10        Q.  Okay.  And you mentioned a minute ago that the

11   sheriff's office may have had a street cop training come

12   to provide --

13        A.  The sheriff's office.

14        Q.  -- internal training?

15        A.  Yes, ma'am.

16        Q.  Can you tell me about that?  What do you

17   recall, when was it?

18        A.  So it was -- it was compartments, cars,

19   18-wheelers, because remember they brought in, I think

20   it was like three or four cars that had different

21   compartments.  18-wheelers where they could hide people,

22   narcotics, guns, and different compartments within the

23   18-wheelers that where they would hide stuff.  So --

24        Q.  Okay.  And was there any other aspect -- the

25   only thing that the street cop training that was

Peter Gamboa                                          July 23, 2024

Page 91

1    internal to the Bexar County sheriff's office, the only

2    thing they covered was compartments?

3            A.  Compartments.

4            Q.  Didn't do anything else?

5            A.  No.

6            Q.  Okay.  So we talked a little bit about this,

7    but was there a particular skill or knowledge level that

8    you needed to see from a new criminal interdiction

9    officer before you sent him out to the streets?

10           A.  Just proactive policing.

11           Q.  Okay.

12           A.  Like I said, the first four that started the

13   unit, they had that experience, traffic, street crimes.

14   And Gereb, who came from patrol, would always -- was

15   very proactive in patrol.

16           Q.  And you might remember this, but you might not,

17   Captain Von Muldau testified that the sheriff's office

18   provided some internal criminal interdiction training,

19   and we just talked about the street cop training.  Were

20   there any other internal interdiction related trainings

21   that the sheriff's office provided?

22           A.  Could have.

23           Q.  Uh-huh.

24           A.  But nothing that I would -- that I attended

25   that I can think of.

Peter Gamboa                                            July 23, 2024

Page 92

1          Q.  Who would know?

2          A.  The training academy would have -- probably

3     have records of who would have taught those classes.

4          Q.  Okay.  And so the training academy then trains

5     both new recruits and continuing officers?

6          A.  Yes.

7          Q.  Okay.

8          A.  But the reason why they would have it is

9     because to give TCOLE credit, they would have to have

10    collected the information they needed for TCOLE

11    requirement.

12         Q.  Got it.  And I understand that the sheriff's

13    office encourages officers to complete outside training?

14         A.  Correct.

15         Q.  Did you ever suggest a training to your

16    interdiction officers?  I think we've talked a little

17    bit about it.

18         A.  What was that?

19         Q.  Did you ever suggest a particular training to

20    your interdiction officers?

21         A.  I did.  I've always kind of was for the

22    idea -- if you see a class that you're interested in,

23    whether it'd be interdiction or something to further

24    your career, let me know, and -- and I would try to get

25    it approved.

Peter Gamboa                                                      July 23, 2024

Page 93

1          Q.   Okay.  So tell me about that approval process.

2     Let's say, you know, one of your officers comes to you

3     and says, Sergeant Gamboa, this is the training.  I

4     think it sounds great.  What would you do next?

5          A.   So I would review it.  I said okay, let me have

6     the flyer, let me review what it's about.  If it was

7     something at the time for, like, specific to criminal

8     interdiction, then I would approve it.  If -- you know,

9     if that was something that I think that was good for the

10    unit, and then I would submit it to the lieutenant for

11    their approval, and then it would go up through the

12    chain of command, through the chief, and then the chief

13    deputy.

14         Q.   Okay.  So you look at -- and correct me if I'm

15    wrong.  I'm just going to try to summarize.

16              You get a flyer from the deputy, you look

17    at the flyer, you decide whether it makes sense for

18    criminal interdiction or not, and then you submit it up

19    the chain.

20         A.   Correct.

21         Q.   In the review process, did you do any homework

22    on the particular training or did you just -- was the

23    flyer enough?

24         A.   Yeah.  If the flyer talked about, like, the

25    objectives of the class, then that was -- that would be

1    enough for me.

2         Q.  Okay.  I think that I have an example here, and

3    I think it would be super helpful to just talk through

4    it.  Hold on.

5              Let's look at our exhibit -- our internal

6    Exhibit P.  This is a new exhibit.  Do you remember

7    what --

8         A.  53 is the last one that I have here.

9         Q.  Yeah.  That's a previous one.  So hold on one

10   second.  So we're going to mark this as

11   exhibit -- that's not P.  Nope, that's not what I have

12   as P.

13              (Exhibit No. 64 marked.)

14        Q.  (By Ms. Hebert)  Okay.  I'm handing you what my

15   colleague has marked Exhibit 64.  We'll hand out copies

16   for other folks.

17              So I'm going to represent to you that this

18   is a conversation that the cell phone forensics examiner

19   received from -- obtained from your county cell phone.

20   Do you recall submitting your county cell phone for a

21   forensic examination in this case?  Do you remember

22   that?

23        A.  Yes, ma'am.

24        Q.  Okay.  And the forensic examiner pulled certain

25   conversations with certain words and one of these

1    conversations is this conversation you see before you.

2         A.  Uh-huh.

3         Q.  Does this -- and I understand if it doesn't

4    look exactly familiar because this is the format that

5    we've gotten from the examiner.

6         A.  Okay.

7         Q.  Do you know what number this is?  And it's okay

8    if you don't.  I have ways to figure it out.

9         A.  I believe that this number belongs to

10   Joseph Garza.

11        Q.  Okay.  And I'm going to say that, you know, we

12   have a organized crime division phone list that says

13   you're right.  It comes with -- from Deputy Garza, and

14   I'm going to just talk to Charles about something for a

15   second about that.

16             MS. HEBERT:  Would you mind handing out

17   Exhibit BB as the next exhibit.  And this is going to be

18   marked Exhibit 65.

19             (Exhibit No. 65 marked.)

20        Q.  (By Ms. Hebert)  And I apologize, Sergeant

21   Gamboa, this has nothing to do with you.  This is just

22   like us trying to get our records straight --

23        A.  No problem.

24        Q.  -- with the county.  And with the county's

25   counsel, can you flip to the page that's labeled 4.

1        A.   Okay.

2        Q.   And I think Line 21, will you take a look at

3   that.  And I'm seeing the number (210) 508-3922.  Do you

4   see that?

5        A.   I do.

6        Q.   And will you look at the conversation that we

7   were just looking at, Exhibit 64.

8        A.   Yes, ma'am.  Yes, ma'am.

9        Q.   And is that the number (210) 508-3992?

10       A.   3922.

11       Q.   3922.  Excuse me.  You're right.  Do those

12  numbers match the number on 64, and the number we were

13  just looking at --

14       A.   Yes, ma'am.

15       Q.   On Line 21?

16       A.   Yes, ma'am.

17       Q.   And it seems that this was labeled as

18  unidentified, not Bexar County; is that correct?

19       A.   Correct.

20            MS. HEBERT:  And, Charles, I'll just want

21  to clean up the record there, that was listed -- this

22  number is listed as Deputy Garza on the organized crime

23  division phone list.  So we're going to ask that the

24  county take a look at their responses, their

25  interrogatory responses, and verify that these numbers

Peter Gamboa                                                July 23, 2024

Page 97

1    are actually correct because we're seeing some

2    discrepancies.

3                    MR. FRIGERIO:  That's fine.

4        Q.  (By Ms. Hebert)  Okay.  So now that we cleaned

5    that up, that has nothing to do with you, I apologize,

6    but we just need to get some records straight.

7                    So let's go back to Exhibit 64, and this is

8    a text conversation that you had with Deputy Garza; is

9    that fair?

10       A.  Yes.

11       Q.  Okay.  And it seems like the first one is

12   Deputy Garza texting you about a particular training.

13       A.  Uh-huh.

14       Q.  Is that kind of how it happened with officers

15   suggesting trainings that they thought they would want

16   to take?

17       A.  Yes, ma'am.

18       Q.  Okay.  And the -- right in front of the

19   text -- the text messages message, do you see an OBJ,

20   there's like a little box right on the same line?

21                    I'm going to represent to you that, as my

22   understanding of the forensic examination results is

23   that there's an object attached to that.  And I'm going

24   to look at our Exhibit Q, and mark that as the next

25   exhibit.

Peter Gamboa

July 23, 2024

Page 98

1               (Exhibit No. 66 marked.)

2          Q.  (By Ms. Hebert)  And this will be marked as

3     Exhibit 66.

4               My colleague is going to hand you what's

5     marked Exhibit 66.  Does this look familiar to you?

6          A.  I don't recall it, but it would be something

7     that I would look at.

8          Q.  Sure.  And it -- I guess even if you don't

9     remember this specific one, is this the kind of

10    materials that a deputy would send you as flagging a

11    potential training?

12         A.  Correct.

13         Q.  Okay.  Do you remember if you approved this

14    training or not?

15         A.  I don't.

16         Q.  I'm not trying to catch you up.  I'm just

17    trying to understand the process.

18         A.  Yeah, yeah.  No.  I don't remember, but

19    according to my text with Joseph, I said I'll put in for

20    it, or is that him saying?

21         Q.  Local user would be you.  It's the person who

22    owns the phone, that's my understanding.

23         A.  Okay.  So then I would have said, hey, I'll put

24    in for it and see if we can get it approved.

25         Q.  Okay.  And then --

Peter Gamboa                                                July 23, 2024

Page 99

 1          A.   So just -- and just to clarify, Joseph was not

 2     part of criminal interdiction.

 3          Q.   That's okay.  I'm just trying to understand,

 4     like, the process of --

 5          A.   Oh, got you.

 6          Q.   -- training, like identifying training and

 7     approving for it.

 8          A.   Yes.

 9          Q.   So just to summarize, Deputy Garza sent you

10     this picture text message, and you said you would put in

11     for it; is that fair?

12          A.   Correct.

13          Q.   And then the next -- I want to look at the next

14     message.

15               The next message looks like to me, be a

16     message from Deputy Garza from February 4th, 2023.

17     Again, sent sharing an object and saying a good class

18     for intel and interdiction.

19               Did I read that correctly?

20          A.   Yes.

21          Q.   And did you understand that message to be

22     Deputy Garza sharing a training with you?

23          A.   Yes, ma'am.

24          Q.   Okay.  And then I'm going to flag what the

25     associated image is with that.  We're going to introduce

Page 100

1    another exhibit.

2         A.  Okay.

3         Q.  I'm going to mark this as Exhibit 67.

4              (Exhibit No. 67 marked.)

5         Q.  And we're going to do R.

6              Okay.  Does this image look familiar to

7    you?  And it's okay if you don't remember this specific

8    training, just try to decide whether you remember seeing

9    this one or not.

10        A.  I don't remember.

11        Q.  Okay.  Does this look like the kind of image

12   that Deputy Garza might have shared with you --

13        A.  Yes, ma'am.

14        Q.  -- about a training?  And looking at this

15   training information, is this the kind of thing that

16   would have been good for interdiction and intel?

17        A.  Yes, ma'am.

18        Q.  And why is that?

19        A.  Because they're dealing with motel, airport

20   parking lot and parcel.

21        Q.  Okay.  And tell me more about that.

22        A.  And so that is something that we did not have

23   too much training on, parcel interdiction, airport

24   interdiction.  And so that would be something that I

25   would want more information about.

Peter Gamboa                                                July 23, 2024

Page 101

1          Q.   Okay.  And what would you do to get more

2    information?

3          A.   I would have them, hey, send me more

4    information on this.  The objectives, what are they

5    going to be teaching, things of that nature.

6          Q.   Okay.  And I guess, what kind of -- what would

7    you look for in getting that additional information?

8          A.   As far as objectives, okay, what -- what will

9    we be dealing with in airport interdiction?  Which would

10   probably be people coming off the airport, anything that

11   they would claim or not claim, and then it would be some

12   type of contraband.

13         Q.   Okay.  So then would it be fair, after -- after

14   you did this review, and then you recommended -- say,

15   you recommended it to your deputies, hey, I want one of

16   you to take this training, does that mean you approved

17   the training and the objectives that the training was

18   going to achieve?

19         A.   Correct.

20         Q.   Okay.  Do you have a sense of whether

21   noncriminal interdiction officers generally have taken

22   some of the criminal interdiction courses as part of

23   their own personal improvement?

24         A.   You're talking about, like, patrolmen?

25         Q.   Yes, sir.

Peter Gamboa                                      July 23, 2024

                                                    Page 102

1            A.   Yes.

2            Q.   And what kind of courses do you think that

3    those officers have taken?

4            A.   So they've -- I've heard or them tell me, I've

5    taken the courses from 720.

6            Q.   Uh-huh.

7            A.   Desert Snow.

8            Q.   Uh-huh.

9            A.   Things of that nature.

10           Q.   Street cop?

11           A.   Street cop.

12           Q.   So it's your understanding that patrolmen also

13   take courses like 720, Desert Snow and street cop

14   offered courses that help with interdiction?

15           A.   Yes, ma'am.

16           Q.   Okay.  What time are we at?  I don't want to

17   keep him?  11:56?  Okay.  Keeping time for lunch.

18                So I want to talk a limit about your

19   supervision of the criminal interdiction unit.

20           A.   Okay.

21           Q.   Recognizing that, you know, we may not get

22   through all of this before lunch.

23           A.   Sure.

24           Q.   So when the criminal interdiction unit was a

25   separate unit, did the -- did those officers have a

Peter Gamboa                                                July 23, 2024

                                                       Page 103

1    particular shift?

2         A.  They did have a particular shift.  With the

3    understanding that the shift could change at any day.

4         Q.  Okay.  And what was the particular shift?

5         A.  So we were a 8:00 to 4:00, Monday through

6    Friday.

7         Q.  And was there a training day, like the

8    other -- one of the other units you mentioned?

9         A.  No.  No.  No.

10        Q.  Okay.  So can you walk me through the typical

11   day of a criminal interdiction unit officer?  It started

12   at 8:00, what was the first things that you expected

13   them to do?  One of the first things you expected them

14   to do?

15        A.  So during role call, make sure everybody was

16   there.  Then I would say today randomly, we're going to

17   work 35 southbound side, or northbound side.

18        Q.  Uh-huh?

19        A.  So we would stagger up from the county line to

20   the county line on 35.  And then they would work that

21   area.  And then I would tell them, hey, two of

22   y'all -- you know, if you're going to go north, two of

23   y'all stay together, y'all going to go south, two of

24   y'all stay together.

25        Q.  Okay.  I want to go back a little bit.  When

Peter Gamboa

July 23, 2024

```
1    you say roll call --
2         A.  Uh-huh.
3         Q.  -- what did you mean by roll call?
4         A.  Make sure that they're at work.  If I would do
5    a general uniform inspection, vehicle inspection.
6         Q.  So you guys were all together?
7         A.  Correct.
8         Q.  It wasn't just roll call, like, everybody call
9    up and say, all right, are you on?  You guys, did you
10   meet at HQ?
11        A.  I mean, there might be some days that we would
12   just meet out in the field.
13        Q.  Uh-huh?
14        A.  But at the time, I was the academy sergeant, so
15   I was mostly at the academy so I would have them come
16   meet me at the academy.  Make sure that they had their
17   body cams on the dock to make sure that any videos that
18   they had were uploaded.  If they needed batteries for
19   tasers, they had that.
20        Q.  Do you carry around a stash of batteries in
21   your patrol car?
22        A.  Well, no, but they were there at the academy.
23        Q.  Okay.
24        A.  Yeah.  So that's why -- reasons why we would
25   meet there.
```

Peter Gamboa                                         July 23, 2024

1      Q.   Uh-huh.

2      A.   Or if I -- at the -- you know, by chance I was

3  teaching a class, hey, I'm not going to meet you on the

4  field, come over here.

5      Q.   Understand.

6      A.   I'll meet you all during a break.  And then,

7  hey, go work this highway, you know, go work this, and

8  then go from there.

9      Q.   You would give them an assignment --

10     A.   Correct.

11     Q.   -- for a particular day?

12     A.   Correct.

13     Q.   And then you talked a little bit about

14  assigning them to a particular highway on a given day.

15     A.   Correct.

16     Q.   And then would it be fair to say that you kind

17  of created -- and I don't know the right way to phrase

18  this, so just bear with me.  Like, kind of a

19  downstream/upstream line of the officers, like, when --

20  from the county line to the county line, they'd

21  communicate information to each other in a row?

22     A.   They could have, yeah.

23     Q.   Is that how that worked?  Or were they just,

24  like, taking different parts?

25     A.   Radio.  Computer.  They would see each other on

Peter Gamboa                                                          July 23, 2024

Page 106

1       the computer.

2              Q.   Okay.  And they would chat on the computer, or

3       they just see where each other was located?

4              A.   They could see if somebody was on traffic stop,

5       and maybe they -- hey, you know, I've got something, you

6       know, then he'd have backup come.

7              Q.   Okay.  Deputy Babb talked a little bit about

8       having breakfast together.  Can you tell me about that?

9              A.   They would just maybe meet to go eat before

10      they hit the street.

11             Q.   Was that before they started shift or during

12      the shift?

13             A.   Probably during the shift.

14             Q.   Okay.  And was that part of the roll call that

15      you would sometimes do?

16             A.   Sometimes probably.  Yeah.

17             Q.   Like, you do roll call and the initial meeting

18      over breakfast?

19             A.   Right.

20             Q.   Okay.  And what were an interdiction officer's

21      main responsibility during a shift?  I guess like

22      another way to think about this is, how did you expect

23      the interdiction officer to spend his time during that

24      shift?

25             A.   Just observing the traffic.  That's all I

Peter Gamboa                                        July 23, 2024

Page 107

1    expected.

2         Q.  And so the -- the whole goal, the whole shift

3    would be spent watching traffic; is that fair?

4         A.  Correct.

5         Q.  And making traffic stops?

6         A.  Yes.  If they would have something, a -- if a

7    violation was committed in their presence or view then

8    that's what they would initiate a traffic stop for.

9         Q.  Okay.  And at the end of a particular shift,

10   what were a officer's responsibilities?  Do they have

11   to, for example, fill out certain documents?

12        A.  If they had reports to write, they would fill

13   out those reports.  If they had any type of use of

14   force, they would have to fill out those reports.

15   Things of that nature.

16        Q.  Okay.  So at the end of the shift, an officer

17   had to complete his reports --

18        A.  Correct.

19        Q.  -- is that fair?

20        A.  Yes.

21        Q.  And can we walk through the kinds of reports an

22   officer would have to complete?  You mentioned use of

23   force, so there's a special use of force --

24        A.  Form.

25        Q.  -- report?

Peter Gamboa                                          July 23, 2024

1          A.   Yes.

2          Q.   Is there a special traffic stop form that they

3     needed to complete?

4          A.   No.

5          Q.   Okay.  So for every traffic stop, there isn't a

6     form that they needed to complete?

7          A.   No.

8          Q.   When would an officer complete a form for a

9     traffic stop?

10          A.   Usually -- so that would be an RMS report.  So

11     that would --

12          Q.   These are things that say SPEARS summaries --

13          A.   Yes.

14          Q.   -- on the top?  Okay.  RMS report, SPEARS

15     summary, same thing?

16          A.   They're all the same thing.

17          Q.   Okay.

18          A.   And so they would usually do that after the

19     traffic stop.

20          Q.   Okay.  Is that every traffic stop?

21          A.   Yes.

22          Q.   Okay.

23          A.   So not necessarily, they didn't have to do it

24     at that point in time.  But it would be -- there would

25     be a record showing, hey, you still have this incident

Peter Gamboa                                           July 23, 2024

Page 109

1    open --

2         Q.  Okay.

3         A.  -- until you finish the RMS report.

4         Q.  So you close it out?

5         A.  Correct.

6         Q.  Okay.  So would there -- and I just want to go

7    back a little bit.  So would there be an RMS report or

8    SPEARS summary report done for every traffic stop?

9         A.  Yes.

10        Q.  Okay.  And when did an officer have to do a

11   narrative as part of completing their RMS?

12        A.  If they had an arrest.

13        Q.  Okay.  And would you expect an officer to have

14   completed all of their narratives when they signed off

15   for the day, when their shift was over?

16        A.  I would expect for them to do that.

17        Q.  But that didn't always happen?

18        A.  It probably didn't always happen.

19        Q.  So tell me about that.

20        A.  I'm -- so they would have tasks in the RMS

21   that -- that needed to be completed.  So if -- I don't

22   know, for example, they had an incident -- a disturbance

23   they rolled up on.

24        Q.  And that's like a call for service?

25        A.  Correct.

Peter Gamboa                                                July 23, 2024

Page 110

1          Q.  Okay.

2          A.  And so it's off the highway somewhere.  They

3     pulled up on it because they saw the -- you know,

4     arguing, or two people outside their vehicle, check to

5     see if everything is okay.

6               So things like that, they would probably

7     get all the information they needed, and then later come

8     to that -- to complete that report, that narrative.

9          Q.  Okay.  And how long would you expect an officer

10    to take to complete that narrative?

11         A.  So I would -- I would probably give him to the

12    next day.

13         Q.  Okay.  So if they stopped someone on the first,

14    you would expect the report to be completed by the

15    second?

16         A.  Right.

17         Q.  Okay.  And how long is too long to wait to

18    complete a report?

19         A.  So, they have timers on the reports that would

20    tell me this task has not been completed, and so then,

21    before you do anything, complete this.

22         Q.  Okay.  So I want to go back a little bit.

23              You said that the -- an officer only needed

24    to complete the narrative, the write-out portion of an

25    RMS or SPEARS summary if they made an arrest?

Peter Gamboa                                    July 23, 2024

Page 111

 1        A.   Correct.

 2        Q.   So does that mean unless -- if an arrest was

 3   made, the timer would start?

 4        A.   Yes.

 5        Q.   And if no arrest was made, there'd be no timer?

 6        A.   Correct.

 7        Q.   Okay.  So that's something internal to the RMS

 8   system?

 9        A.   Right.  But it would still have a timer because

10   the task would still be open.

11        Q.   Okay.

12        A.   Right?  Even though they don't have a write a

13   report, but the task would still be open.

14        Q.   Okay.

15        A.   So they would have to go into the RMS, select

16   traffic stop, and then location.  Link it, you know, to

17   the call -- to the stop, and then at the very end, where

18   was the traffic stop conducted?  Was it a highway,

19   roadway?  So that they would select that and then -- and

20   then close it out.

21        Q.   Okay.  And would you expect an officer to close

22   out his traffic stop when the traffic stop was done?

23   Like, when the traffic stop was finished?

24        A.   So it would just depend.  Because they may see

25   something else that they're going to wait, but they're

Peter Gamboa                                               July 23, 2024

Page 112

1    going to -- they're going to follow another violator.

2        Q.   Okay.  So putting aside, you know, the writing

3    of reports when there's, like, been an arrest or you did

4    a call for service, would you expect an officer to close

5    out all of his traffic stop RMS records at the end of a

6    shift?

7        A.   I would expect them to, yeah.

8        Q.   Okay.  I just wanted to understand.  Would

9    there be any reason why just like a generic traffic stop

10   record would be open across shifts?

11       A.   They -- they didn't close it out.

12       Q.   Okay.  But they should have?

13       A.   They should have.

14       Q.   Okay.  I mean, I understand that mistakes

15   happen.

16       A.   Yeah, yeah.

17       Q.   But generally they --

18       A.   Or, "I'm frustrated, I've got a headache and

19   I'll take -- I'll do it later."

20       Q.   Okay.  How did you personally communicate with

21   your -- your criminal interdiction officers when they

22   were in the field?  And I'll explain:  Did you use the

23   radio?  Did you call them?  Like, how did -- how did

24   communication happen?

25       A.   All of the above.

Peter Gamboa                                      July 23, 2024

Page 113

1          Q.   Okay.

2          A.   Yeah.  So it just depends on for what reason.

3     I may just call them.  I may -- you know, if I call them

4     and I need to talk to them and they're not answering

5     then I get them on the radio.  Dispatch, you know, get

6     ahold of Engine 11, Engine 12, have them call me.

7          Q.   Okay.  And what kind of things did you call the

8     officers about?

9          A.   Just depends.  You know, it could be, they need

10    to sign paperwork.  I'm going to relocate them somewhere

11    else.  They need go to court.  You know, if for some

12    reason court would call and, hey, we need them for

13    pretrial ASAP, in the next five minutes.  Okay.  I'll

14    get ahold of them, things of that nature.

15         Q.   Okay.  And what about calling and contacting

16    them about the actual criminal interdiction work that

17    they were doing?  Were you involved in consulting during

18    the actual traffic stops or did you necessarily just

19    wait for a problem to develop?

20         A.   It just depends.  If I had time, I would be out

21    there with them.

22         Q.   Okay.

23         A.   And kind of talk to them about, hey, this is

24    what I would do, you know, this is the angle that I

25    would use, to get them to tell you, you know.  Both

Page 114

1    Gereb and Babb were really good, real patient at

2    interviewing.  Treadwell was kind of very deep voice,

3    he's about this tall, but very deep voice.  And --

4         Q.  Let the record reflect that Sergeant Gamboa

5    gestured to approximately between three and four feet

6    tall.

7         A.  Very short guy, but very deep voice, right?

8         Q.  Okay.

9         A.  And people would complain about him all the

10   time.  He was very matter of fact, and they would

11   complain of him being rude, him not giving -- you know,

12   him not giving them a break, things of that nature.

13            So I would, you know, coach them and tell

14   them, hey, you know, not all people are bad, you know.

15   I said it's your discretion on whether you want to cut

16   them a break or not.  You can give them warnings.  I

17   don't expect that you give everybody a citation, but

18   it's up to you.  You know, things of that nature.

19        Q.  Okay.  So when you said you were out there with

20   them, does that mean you were riding along with them, or

21   did you take your own patrol car?

22        A.  My own patrol car.

23        Q.  Okay.  And so tell me about how that worked.

24   Did you just wait until Deputy Gereb made a traffic stop

25   and then joined Deputy Gereb on a traffic stop?

Page 115

```
 1        A.  Correct, yeah.

 2        Q.  And then tell me how the process worked?

 3        A.  So I would kind of, like, evaluate them on

 4   their tactics.

 5        Q.  Uh-huh?

 6        A.  They're doing roadside interviews, are they

 7   standing right by the fog line, or are they on the side

 8   of the road where if somebody comes crashing into them,

 9   they'll be in a safe place.

10             Talk to them, hey, you know, it's -- you're

11   going a little bit above and beyond.  You know, that's

12   not good.  You know, things like that.

13        Q.  Okay.  I understand.  So you were coaching

14   them --

15        A.  Yeah.

16        Q.  -- on conducting a stop?

17        A.  Correct.

18        Q.  And if you saw something that they weren't

19   doing correctly, you'd give them feedback and help them

20   correct that.

21        A.  Yes, ma'am.

22        Q.  Okay.  I guess you're going to laugh at this.

23   But if you were giving out an A or, you know, if the

24   county were to give out bonuses, if that would be

25   nice --
```

Peter Gamboa                                    July 23, 2024

Page 116

1        A.   I wish.

2        Q.   I know.  What would truly excellent criminal

3   interdiction work look like?

4        A.   So my guys did excellent work.  I would very

5   rare get complaints about them.  They loved to do the

6   work that they did, and how I could tell was there were

7   very minimal, if any, call ins.  You know, of course, if

8   they went to a training, you know, they wouldn't be at

9   work.  But, like, they were self-motivated.  I didn't

10  have to, you know, kick them in the butt, go, you know,

11  do some stops, things of that nature.

12       Q.   I understand.

13       A.   So my guys, from the very get-go, the four

14  original guys that I picked were very good at doing

15  criminal interdiction.  If I was to give raises, they

16  would all be getting raises all the time because they do

17  good work.

18       Q.   And that went for the four originals, but was

19  that the truth --

20       A.   The whole time.

21       Q.   -- the whole time?

22       A.   Yes, ma'am.

23       Q.   Okay.  How often did you review body worn

24  camera footage of criminal interdiction?

25       A.   So in the beginning was real easy because I

Page 117

```
1     only had four guys to have to review.  And so they -- we

2     get through Axon, we get notification that we need to

3     review 12 videos.  And --

4          Q.  Is that a subset of the videos or is that all

5     the videos?

6          A.  No, no.

7          Q.  So when Axon gives you a notification to review

8     12 videos --

9          A.  Random, random.

10         Q.  So it's random assignment.  So Axon through the

11    computer system collects videos for you to review?

12         A.  Correct.

13         Q.  Okay.

14         A.  But because in the very beginning, I would try

15    to review as much as I could because I was excited to

16    see what they were doing and how they were progressing.

17              Now, because I have so many units, it's

18    hard.  But I share with street crimes, I share with

19    covert.  So there's other supervisors that we review

20    videos.

21         Q.  Okay.  So you still review body worn camera

22    footage today?

23         A.  Correct.

24         Q.  And would it be correct to say you still review

25    body worn camera footage of officers conducting traffic
```

Peter Gamboa                                    July 23, 2024

Page 118

1    stops today?

2         A.   To those that are assigned to my group, yes.

3         Q.   Did you ever make notes about reviewing body

4    worn camera footage?

5         A.   If I did, it would be on those individual

6    reviews.

7         Q.   Okay.

8         A.   So there's a section where you can comment on

9    there.

10        Q.   All right.  Let me just understand that.  So

11   when you're doing a review of body worn camera footage,

12   there's some kind of screen that pops up; is that

13   correct?

14        A.   Yes.

15        Q.   And you can put notes in that screen?

16        A.   Correct.

17        Q.   Okay.  And do those notes go to the officer

18   whose body worn camera it was?

19        A.   I'm sure.  Because -- yes.  So there's another

20   box to let them know.  So then I would check the box and

21   then they would get it --

22        Q.   Okay.

23        A.   -- through email.

24        Q.   Yeah.  So there's like an automated system --

25        A.   Correct.

Peter Gamboa                                    July 23, 2024

                                                    Page 119

1        Q.  -- Axon selects randomly --

2        A.  Yes.

3        Q.  -- body worn camera footage for you to review.

4    You review it?

5        A.  Correct.

6        Q.  You make notes?

7        A.  Correct.

8        Q.  And then the officer gets note -- gets a

9    notification, Sergeant Gamboa made a note for your body

10   worn camera, and then they can review that note; is that

11   fair?

12       A.  Right.  And so from my recollection, it would

13   mostly be language.

14       Q.  Oh, okay.  So most of the time that you're

15   correcting --

16       A.  That I've seen that I would correct would be

17   language.

18       Q.  And by that you mean, they were using profane

19   language that you didn't want them to be using?

20       A.  Well, a choice of better words.

21       Q.  Okay.

22       A.  And I get what they were doing, right?

23   They're -- they're coming down -- and I'm just a person.

24   I'm not a cop in uniform.  And so my thing was, okay, I

25   get it.  I know what you're doing.  But let's be a

Page 120

1    little bit more professional.

2        Q.  Okay.  Explain to me like what kind of language

3    you would correct?

4        A.  Like profanity.

5        Q.  Okay.  So I was right.

6        A.  Yeah, yeah.  Profanity, yes.

7        Q.  I thought maybe I wasn't understanding.

8        A.  No, no, no.  Yeah, yeah, yeah.  Profanity.

9        Q.  Okay.  And so most of the time you're

10   correcting profanity?

11       A.  Correct.

12       Q.  Sometimes would you be correcting how they were

13   conducting a stop, like, their tactics?

14       A.  If I would see that, yes.  If I would see that,

15   I would make note that, hey, next time, get on the other

16   side of the car.  You're right at the fog line.

17   Somebody is not paying attention on the phone, drunk,

18   whatever, will just take you out.

19       Q.  Okay.  Does the -- does the similar system

20   exist for dash camera footage?  A review or auditing

21   system?

22       A.  Right, yes.  So same thing.  It would -- it

23   would be picked random from Axon, and then sent for me

24   to review.

25       Q.  Okay.  Did you ever identify a problem with

Peter Gamboa                                                July 23, 2024

Page 121

1    missing dash camera footage?

2         A.  It would be hard to because unless -- well, it

3    wouldn't.  If there's no dash camera, then Axon wouldn't

4    send it to me.

5         Q.  So you wouldn't know to review or how to review

6    whether an officer was turning his dash camera on or

7    off?

8         A.  Right.  The only -- the only way that I would

9    know is if there was a report:  Hey, Sarge, my dash

10   camera is not working.

11        Q.  Okay.  And what would happen when you got that

12   kind of report?

13        A.  So then I would tell him, hey, well we need to

14   get that over to fleet so they can fix it.

15        Q.  Okay.

16        A.  And in a perfect world, right, that would

17   happen instantaneously, right?  But they were busy doing

18   other things.  So, hey, I'll make an appointment for

19   you, bring it in on Wednesday, and I'll take a look at

20   it.

21        Q.  I get it.

22        A.  So there might be like a couple days that the

23   camera was down.  And -- and then Wednesday they would

24   go get it fixed.

25        Q.  I get it.  I have that issue with IT all the

Page 122

1    time.

2         A.  Yes.

3         Q.  I need it fixed now not --

4         A.  Yes.

5         Q.  -- two weeks from now.

6         A.  Yes.

7         Q.  Okay.  So if an officer had a dash camera

8    issue, would you expect him to call you?

9         A.  Yes.

10        Q.  And if an officer wrote in his report that he

11   had a dash camera issue, would you necessarily see that?

12        A.  No.

13        Q.  Okay.  I guess that brings up a broader

14   question:  Were you reviewing narrative reports from

15   your officers?

16        A.  Sometimes.  If there was -- well, at the time,

17   I wouldn't get them.  It was Lieutenant Ortega would get

18   them at that time.  Now, I do receive reports and I read

19   them.

20             And so the whole RMS system is kind of

21   different of how it should be working.  So, the way it

22   should work was they would fill out a probable cause

23   statement for an arrest.  I would get that

24   automatically, and then I would approve it.  The mag

25   office is -- what that would be what the mag office

Peter Gamboa                                    July 23, 2024

Page 123

1    would receive.

2         Q.   And by mag, you mean magistrate judge?

3         A.   Magistrate judge.  They're supposed to get that

4    for approval for the arrest, or if it was just an

5    incident then I would get it in my bucket.  But if it

6    was arrest, that's all that would be needed, and that

7    kind of never happened.

8              So it should be that -- it should have been

9    that a supervisor had to approve on a report before they

10   completed that final arrest.

11        Q.   Before it went to the magistrate judge?

12        A.   Right.

13        Q.   Okay.

14        A.   But that's not the way it works.  So they'll

15   fill it out, and then they'll take them, they'll print

16   it out, give that to the ADA to review, and then they

17   get magistrate.

18        Q.   Okay.  So it's still kind of got a paper copy

19   issue?

20        A.   Yes.

21        Q.   You mentioned that at the time it would go to

22   Ortega.  What timeframe are we talking about?

23        A.   2019.

24        Q.   To?

25        A.   I would probably say maybe -- maybe a year or

Peter Gamboa                                            July 23, 2024

                                                        Page 124

1    so.

2         Q.   2020?

3         A.   Yeah.   About 2020, 2021, around there.

4         Q.   Okay.   And then at that time, 2019 to 2021, the

5    RMS summary with a narrative would go to Ortega --

6         A.   Correct.

7         Q.   -- to approve?

8         A.   Right.

9         Q.   And then after 2021, what happened?

10        A.   Then the sergeants would review those

11   narratives.

12        Q.   Okay.   So after 2021, then narrative reports go

13   to the sergeant to review?

14        A.   Correct.   Correct.

15        Q.   If a narrative report was completed did that

16   mean you had to approve it?   Like was every --

17        A.   No.

18        Q.   -- narrative report reviewed by you?

19        A.   So -- yes.

20        Q.   Okay.   So you reviewed --

21        A.   Because it would go -- so once I approve it,

22   then it goes into another bucket.   Which if it was

23   narcotics, it would go to covert.   If it was child

24   abuse, it would go to child safe to investigations.   If

25   it was a firearm, it would go to criminal

Peter Gamboa                                        July 23, 2024

Page 125

1    investigations.

2                    Now, the way it works is, anything that

3    organized crime uniform officers will come to us.

4         Q.   Okay.

5         A.   And then we have investigators that we assign

6    those cases too.

7         Q.   Okay.  So when you were doing your criminal

8    interdiction unit supervision, would you look at or

9    receive -- would you receive -- let's start this way.

10                    Would you receive every narrative report

11   that one of your criminal interdiction officers did?

12        A.   Yes.

13        Q.   Okay.  So it came into your email?

14        A.   Correct.

15        Q.   Every time they finished?

16        A.   Well, my not my email, but in the RMS bucket,

17   yes, ma'am.

18        Q.   Okay.  So every time one of your criminal

19   interdiction officers completed a narrative summary, it

20   came into your system?

21        A.   Correct.

22        Q.   And did you review every narrative summary that

23   your interdiction officers did?

24        A.   If -- if I felt there was something that I

25   needed to stay on top of.  If -- if I would review one

Peter Gamboa                                              July 23, 2024

Page 126

1    that it was just horrible spelling, then, hey, I'm going

2    to keep on top of you because we can't have that.

3         Q.   Okay.

4         A.   You know, every once in a while a mistake,

5    okay, no biggie.  But like every other word, like, no.

6    Things of that nature.

7         Q.   Okay.  So generally, you wouldn't review every

8    RMS --

9         A.   Correct.

10        Q.   -- summary narrative; is that fair?

11        A.   Correct.  Yes, ma'am.

12        Q.   Only if there was some kind of red flag?

13        A.   Issue, right.

14        Q.   Okay.  I want to talk a little bit about how

15   you communicated about the interdiction unit and

16   interdiction activities to supervising officers.  Did

17   you just -- did you have conversations with supervising

18   officers about the criminal interdiction unit generally?

19        A.   With just general supervisors or, like, my

20   lieutenant?

21        Q.   Your lieutenant.

22        A.   Okay.  Yeah, he would -- like, so he -- he

23   would compile a -- like a -- like, a weekly summary --

24        Q.   Uh-huh.

25        A.   -- of what we did.  Any shortages, any

Peter Gamboa                                           July 23, 2024

                                                       Page 127

1    equipment that we're asking for.  Maybe our -- maybe we

2    had a vehicle down that we needed to try and get another

3    vehicle, things of that nature.

4        Q.  Uh-huh.

5        A.  I would communicate with the lieutenant.

6        Q.  Okay.  Would you provide information for the

7    lieutenant's weekly report every week?

8        A.  So we would talk and he would ask, hey,

9    anything different?  In the beginning, right, we had the

10   four officers.  After I lost the two officers, then that

11   was mainly my, my gripe to him is, hey, I need the two

12   positions filled, things of that nature.

13       Q.  Okay.  Did you provide any summary or

14   information about the activities that the criminal

15   interdiction officers had been doing?

16       A.  I think just, you know, if we had, for example,

17   a money laundering case, where they may have seized some

18   drugs and some money, that would -- that would be

19   something that I would communicate to him.

20            And then he -- that was kind of a highlight

21   for him to talk to the chief about.  Hey, this is what

22   we did, this is what the guys seized this week, things

23   of that nature.

24       Q.  So if there was a big success, you --

25       A.  Correct.

Peter Gamboa                                    July 23, 2024

Page 128

1          Q.  -- flagged that?

2          A.  Yes.

3          Q.  But did you provide any information about, for

4     example, we stopped 20 vehicles this week?

5          A.  No.  Not -- not in particular.

6          Q.  Okay.  And what was your understanding on how

7     the lieutenant's weekly reports were used?

8          A.  So that was used for the meeting with the

9     chief.

10         Q.  And this would be Chief Sanford?

11         A.  Sanford, correct.  And what I think she would

12    use it for is during command staff, hey, these are my

13    units and this is what they're doing.

14         Q.  Okay.

15         A.  And this is the success that they have.

16         Q.  Did you ever get any feedback in response to

17    the reports, something like, the criminal interdiction

18    unit is doing a great job, keep it up?

19         A.  So the chief would call me and say, hey, y'all

20    are doing good.  I know that you're missing two people.

21    I'm trying to get those filled, but right now, we're

22    short.  So --

23         Q.  Okay.  Did you get ever get any feedback, like,

24    we need to improve X, Y or Z?

25         A.  No.

Peter Gamboa                                    July 23, 2024

Page 129

1          Q.   Okay.   Did you ever get any questions in
2     response to -- did Deputy Chief Sanford ever call you
3     and say, hey, I want to know more about X or Y?
4          A.   No.   Unless it was like a complaint, hey, tell
5     me about this traffic stop, or whatever.
6          Q.   Okay.
7          A.   And then I would tell her what I knew.
8          Q.   And did that happen, do you remember?
9          A.   Very rare.
10         Q.   Okay.
11         A.   Very rare.   And it was mostly a gang member
12    that was arrested.   They took my phone, where's my
13    phone.   It's in the property room.
14         Q.   Okay.   Do you still do weekly reports today?
15         A.   I don't do them.
16         Q.   Okay.
17         A.   No.
18         Q.   Or do you still provide information for a
19    weekly report today?
20         A.   So now what we do is we have a weekly activity
21    sheet that all the officers turn in, but they turn that
22    in to our office assistant and she records it.
23         Q.   Okay.   So I just want to understand that.   So
24    every officer has to complete a weekly activity sheet
25    now?

Page 130

 1        A.   Correct.

 2        Q.   And then the office assistant does what with

 3   the weekly activity?

 4        A.   So she'll record it, and then the lieutenant,

 5   when quarterly or whenever they meet with the chief

 6   about stats, she'll bring out a final draft of all the

 7   stats that we have provided.

 8        Q.   Okay.  I want to ask a couple of questions

 9   about funding and then we'll take a break.

10        A.   Okay.

11        Q.   Does that sound good?

12        A.   Sure.

13        Q.   Where did the money for starting the criminal

14   interdiction unit come from?

15        A.   So it was pulled from different sections.

16   Traffic, we encompassed two of their traffic vehicles,

17   that came with the two officers from traffic.  Street

18   crimes, the officer came with his vehicle.  And the

19   academy, one vehicle came from the training academy.

20             Training was approved through either the

21   training academy in the beginning, or CID, and now

22   organized crime.

23        Q.   Okay.  So the money for the training -- let me

24   understand that.  The money from the training came from

25   either the training academy budget or eventually --

Peter Gamboa                                          July 23, 2024

                                                    Page 131

1          A.  At the time, right.  When we were assigned

2     under the training academy, so that -- that money came

3     from the training academy budget.

4          Q.  Understood.

5          A.  Then when we moved over under criminal

6     investigations, then that money would have come

7     from -- from that division.

8          Q.  Okay.  And what about salaries?  Where did the

9     criminal interdiction unit salaries come from?  Did it

10    come from the same place their vehicles came from?

11         A.  So at the time, it would have -- if you're a

12    deputy, then it would come from the patrol budget.

13         Q.  Okay.

14         A.  My salary came, of course, from training

15    academy, and then criminal investigations.

16         Q.  Okay.  So just mechanics?

17         A.  Yes.

18         Q.  All deputies are paid from the patrol bucket?

19         A.  Correct.  Correct.

20         Q.  And then sergeants and above --

21         A.  Just depends where they're assigned.

22         Q.  Okay.  Did the criminal interdiction unit bring

23    any revenue in?

24         A.  Well, just if they wrote tickets, then it would

25    go to the general fund.

Peter Gamboa                                                    July 23, 2024

Page 132

1     Q.  Okay.

2     A.  Not -- not to the sheriff's office.

3     Q.  And you mean, the county's general funds?

4     A.  Correct.

5     Q.  Okay.

6     A.  Now seizures, asset forfeiture seizures would

7  be like anything else.  The sheriff's office would get a

8  certain percentage, and the district attorney's office

9  would get the big chunk.  And that would go to asset

10  forfeiture.

11    Q.  Okay.  I want to go back to that a little bit.

12  So by seizure, you mean if 10k was found with drugs, and

13  they seized the 10k --

14    A.  Right.

15    Q.  -- the sheriff's office and the district

16  attorney's office --

17    A.  Correct.

18    Q.  -- would get some of that cash.

19    A.  Right.  Under the asset forfeiture statutes.

20    Q.  Okay.  And do you -- I don't know this might be

21  a statutory thing.  Do you know how much goes to the

22  sheriff's office, like, what percentage?

23    A.  I think it's -- I think it's -- well, now it's

24  sheriff's office 30 percent.  DA's office would have

25  gotten 70 percent.  I'm not sure if they've changed it

Peter Gamboa                                    July 23, 2024

1    from then to now, but I know now that's what it's

2    currently.

3         Q.  Okay.  And you don't remember what it was

4    previously?

5         A.  No.

6         Q.  And where does -- where does the -- where did

7    the seized funds go for the sheriff's office?

8         A.  Asset forfeiture.  So that would be used for

9    equipment, training.

10         Q.  So there's a fund?

11         A.  Correct.

12         Q.  And so that money would go to the asset

13    forfeiture fund?

14         A.  Correct.

15         Q.  And are there rules about what the money can be

16    used for from the --

17         A.  Yes.

18         Q.  -- asset forfeiture fund?

19         A.  Yes.

20         Q.  And what are those rules?

21         A.  Training, equipment.

22         Q.  Anything else?

23         A.  That's all that I know of.

24         Q.  Okay.  So let me just make sure I understand

25    that.  If an officer seizes $10,000 through a traffic

Peter Gamboa                                                July 23, 2024

Page 134

1    stop, $3,000 are going to go to the sheriff's office --

2         A.   Correct.

3         Q.   -- to be used in the -- to be put in their

4    asset forfeiture fund.

5         A.   Correct.

6         Q.   And then that fund can be spent on equipment or

7    training.

8         A.   Correct.

9         Q.   Okay.  If a particular unit is doing all of the

10   seizing, do they get more of the training and equipment?

11   So let's say --

12        A.   They can.

13        Q.   -- like, the gang unit theoretically is doing

14   all the seizing of the money.  Does that mean they get

15   more equipment and training?

16        A.   Possibly.

17        Q.   Okay.

18        A.   Possibly.  Because that's at the discretion of

19   the chiefs.

20        Q.   Okay.  And would you say based on your

21   experience that that's how it worked?

22        A.   So I don't know only because I would know if,

23   like our training, if we would submit for training,

24   like, I would use, hey, we seized X amount of money.  We

25   have -- you know, and we don't have no more training

Peter Gamboa                                    July 23, 2024

Page 135

1   money, can we use asset forfeiture money to send the

2   guys to training.  So that's what I would use.  But I

3   don't know if patrol would get money from that because I

4   wasn't there.

5        Q.  Sure.  So and you can only talk about your

6   experience.

7        A.  Exactly.

8        Q.  I entirely understand.

9        A.  Yeah.

10       Q.  So for your experience, you know, let's say the

11  gang, folks today, seize $10,000.  Would you expect to

12  be able to say to your supervisor, hey, my guys just

13  seized a bunch of cash.

14       A.  I would use that, yes.  I would.

15            MS. HEBERT:  I think that's a good time for

16  a break.

17            MR. FRIGERIO:  Okay.

18            (Break taken from break 12:35 to 1:40 p.m.)

19       Q.  (By Ms. Hebert)  And we're back from lunch.  I

20  have to ask you these kind of generic questions just

21  because that's what I do.

22       A.  Sure.

23       Q.  Did you talk to anybody about this case during

24  lunch --

25       A.  No.

Page 136

1     Q.   -- besides your attorneys?

2     A.   No.

3     Q.   Okay.  Any phone calls during lunch?

4     A.   I did have one, and it was about a scheduling.

5  It had nothing to do with the case.

6     Q.   Sure.  Great.  Okay.  So now we can go back to

7  the substance of what we were talking about.

8            I want to talk about criminal interdiction

9  activities and when sheriffs officers do criminal

10  interdiction traffic stops.

11     A.   Okay.

12     Q.   So when a sheriff officer does a criminal

13  interdiction traffic stop, how are those officers

14  expected or supposed to identify a vehicle that might be

15  involved in some of the crimes you talked about

16  previously?

17     A.   So initially, they won't know unless maybe it's

18  an out of state plate.  But initially, they won't know

19  until they start a conversation with the violator.  And

20  then that's where they may start getting the -- building

21  that reasonable suspicion, they may be couriers or

22  smugglers, things of that nature.

23     Q.   Okay.  And I guess to follow up on that, you

24  talked about out-of-state plates.

25     A.   Uh-huh.

Peter Gamboa                                    July 23, 2024

1     Q.  So do out-of-state plates raise a red flag?

2     A.  No.  Not in and of itself.  Of course, if a lot

3  of the rental companies use out-of-state plates, right,

4  but in them having that roadside interview, they may

5  find out that they are out of state, and coming -- you

6  know, driving down south or vice versa.  They're coming

7  from south, Mexico, coming up north.  They'll ask, you

8  know, what they're doing here, you know, business,

9  pleasure, stuff like that.

10    Q.  Okay.  And I understand that the criminal

11 interdiction unit patrol cars had license plate readers

12 on them.

13    A.  Correct.

14    Q.  Can you tell me when the criminal interdiction

15 unit patrol cars got those license plate readers?

16    A.  So that was in late -- no.  I would say

17 probably early 2022.

18    Q.  Okay.  Early 2022.  Who --

19    A.  January or February, somewhere around there.

20 Yeah.

21    Q.  Okay.  And who made the decision to get the

22 license plate readers?

23    A.  So that was approved through the sheriff and

24 the chief deputy.

25    Q.  Do you know why they got the license plate

Peter Gamboa                                                    July 23, 2024

Page 138

1      readers?

2           A.  So they had a grant.  I believe, they had money

3      from a grant for license plate readers.

4           Q.  Huh.  Okay.  And do you know the service

5      provider for the license plate readers?

6           A.  Vigilant.

7           Q.  Vigilant.  Does the sheriff's office have a

8      formal contract with Vigilant?

9           A.  No.

10          Q.  Okay.  Do you know how many license plate

11     readers the sheriff's office has?

12          A.  20.

13          Q.  20.  And who gets those license plate readers?

14          A.  So those were all for the criminal interdiction

15     unit.

16          Q.  Okay.  So all the license plate readers went to

17     the criminal interdiction unit?

18          A.  Right.  We had four vehicles that each vehicle

19     had four cameras on each car.

20          Q.  Okay.  My math may not be great, but that's 16.

21          A.  Five.

22          Q.  Oh, for your vehicle too?

23          A.  Yeah.

24          Q.  Okay.

25          A.  Five vehicles, yeah.

Peter Gamboa                                                    July 23, 2024

Page 139

1        Q.  So you had five vehicles --

2        A.  Yes, ma'am.

3        Q.  -- with four each?

4        A.  Correct.

5        Q.  Do you know if officers who do not have license

6   plate readers on their patrol car can access the license

7   plate reader system?

8        A.  Yes.

9        Q.  They can?

10       A.  They can.

11       Q.  Okay.  And do you know how many -- I'm going to

12  use the word licenses.  Licenses to access the LPR

13  system, the sheriff's office has?

14       A.  Well, I'm trying to think.  I believe there's

15  about 166 users.

16       Q.  That was pretty good.  That was pretty

17  impressive.

18       A.  So I'm one of the administrators, so that's

19  why.  And if -- if somebody doesn't use it for 30 days,

20  then I've got to reactivate them.  So that's why I

21  always get emails for, hey, I haven't -- okay.  I can

22  get you reactivated.

23       Q.  Okay.  So it sounds like you're getting those

24  requests like fairly regularly to reactivate?

25       A.  Not really.

Page 140

1       Q.  Okay.

2       A.  But, for example, we've just had a bunch of

3   promotions for deputy to investigators.  Well, they'll

4   use that program to find suspects that they're looking

5   for.

6       Q.  The investigators will?

7       A.  Right.

8       Q.  Okay.

9       A.  So right now, those -- those are the ones that

10  are kind of, send me the emails.  I used to have

11  Vigilant.  I haven't used it in a while.  Okay.  I'll

12  reactivate you.

13      Q.  Got it.  So who gets -- who are the officers

14  who get access, who are the 166 officers?

15      A.  So, they're from all over.

16      Q.  Okay.

17      A.  It could be deputies, investigators,

18  supervisors.  It just depends on what they're working on

19  or in the unit that they're working on that they may ask

20  for access.

21      Q.  Okay.  And what does that access give an

22  officer?

23      A.  So it'll give them locations from the license

24  plate readers -- you know, frequent locations where

25  they -- this car may be at.  And then traveling

Peter Gamboa                                    July 23, 2024

Page 141

1      patterns.

2          Q.  Okay.  And by traveling patterns, what do you

3      mean by that?

4          A.  If a vehicle is always traveling up I-10 east

5      towards Houston, always coming down I-10 westbound,

6      coming from Houston would be a traveling pattern.

7          Q.  Okay.  Does the sheriff's office, through the

8      LPR database, have access to private scans?  So things

9      like towing companies or realtors -- or not realtors.

10     Real -- what's the word I'm looking for -- retailers.  I

11     was like, what's the word I'm looking for?  Retailers.

12         A.  So if Vigilant is part of those private

13     companies, they may have access to that.

14         Q.  Okay.

15         A.  But if it's -- if it's not tied into Vigilant

16     then it would not show.

17         Q.  Okay.  So would it be fair then to say that

18     sheriff's office officers through the Vigilant system,

19     have access to whatever Vigilant has?

20         A.  Correct.

21         Q.  Okay.  So we just talked about the fact there

22     were 20 license plate readers, and they were with the

23     criminal interdiction unit.  Where are those license

24     plate readers now?

25         A.  So we actually -- when vehicles got replaced

Peter Gamboa                                    July 23, 2024

                                                        Page 142

1    and they removed those cameras, they didn't remove the

2    wires to connect them, and so we had to order new

3    wiring, and got lost somewhere in the shuffle.

4                So the last unit that was working was mine,

5    and so when they removed those cameras off of my

6    vehicle, I asked them to put them in another vehicle

7    that would be utilized, but that never happened.  So

8    right now, all the cameras, those Vigilant cameras are

9    inoperable right now.

10        Q.   Okay.  So as we sit here today --

11        A.   They are at Industrial Communication.

12        Q.   And no -- no officer has a license plate

13   readers on his or her vehicle?

14        A.   Not from Vigilant.

15        Q.   From other entities?

16        A.   Axon.

17        Q.   Okay.

18        A.   So now Axon provides a license plate reader

19   through the dash cams.

20        Q.   Okay.  So tell me more about how that works.

21        A.   Same thing.  It's the program that they offer.

22   And at the moment, that's what we use for LPR readers.

23        Q.   Okay.

24        A.   So now those vehicles are throughout the fleet.

25   Patrol, street crimes, gangs, my one special enforcement

Peter Gamboa                                          July 23, 2024

Page 143

```
1    unit has that camera.  I'm not sure if FAU uses them or

2    not.  I don't know.

3         Q.  FAU is?

4         A.  Felony Apprehension Unit.  I don't know if they

5    have them, but patrol, street crimes, gangs and special

6    enforcement.

7         Q.  Okay.  So to use the Axon license plate reader

8    software, did an officer need to get a new dash cam?

9         A.  Yes.

10        Q.  So it's a special dash cam that allows --

11        A.  The newest, yeah.

12        Q.  -- the newest version?

13        A.  The latest version, yeah.

14        Q.  That allows them to scan a license plate with a

15   dash cam.

16        A.  Correct.

17        Q.  And how does that work?  So obviously, you

18   know, there was a separate camera previously and then it

19   went to Vigilant software?

20        A.  So this one is Axon.

21        Q.  Okay.  No.  So I'm talking about previously.

22        A.  Okay.

23        Q.  So previously you have Vigilant, right?

24        A.  Right.

25        Q.  And there were license plate readers?
```

Peter Gamboa                                          July 23, 2024

Page 144

1        A.  Correct.

2        Q.  And it went to, I assume, Vigilant software?

3        A.  Yes, ma'am.

4        Q.  Okay.  Now the dash cam scans, where does it

5    go?

6        A.  Axon.

7        Q.  And Axon has its own software?

8        A.  Correct.

9        Q.  And can an officer access that software live in

10   their vehicle?

11       A.  Yes.

12       Q.  Okay.  And when using the Axon license plate

13   reader, what does an officer have -- what information

14   does an officer get?

15       A.  Same thing.  They'll get travel patterns.  If a

16   vehicle is scanned in a particular place, they'll

17   receive those returns also.

18       Q.  So they get alerts?

19       A.  So the alerts come from anything that is

20   entered.  For example, if a vehicle is stolen, the

21   officers -- if they're driving down the road, that

22   camera will pick up on the stolen license plate, and

23   then alert the officer that -- that may be a stolen

24   vehicle.

25       Q.  And as the administrator, do you set the

Page 145

1    settings for alerts?

2         A.  So, not for Axon.

3         Q.  Okay.

4         A.  For Vigilant, I don't set -- I don't set alerts

5    or filters.  All I do is activate personnel to

6    have -- to be able to access that program.  Axon is a

7    different system.  I'm not administrator for that.

8         Q.  Okay.  That's helpful.

9              For Axon, if an officer turns on his dash

10   camera, does that mean the license plate reader is on?

11        A.  Yes.

12        Q.  And we previously talked with, I want to say,

13   Officer Gereb about when a dash camera turns on, and he

14   would tell -- he told us how the dash camera turned on

15   when you were going a certain speed or --

16        A.  Activated.

17        Q.  Activated, excuse me.

18        A.  Yes.

19        Q.  Activated when you went a certain speed, or if

20   you turned it on or things like that.

21        A.  Lights.

22        Q.  Yeah.

23        A.  If you turn your lights on.

24        Q.  Uh-huh.

25        A.  If you turn your body camera on, if another

Peter Gamboa                                                July 23, 2024

                                                        Page 146

1    officer turns his lights on, if you're going a certain

2    speed is when the camera comes on.

3          Q.   Is that still the case today?

4          A.   Yes.

5          Q.   So I guess that creates a question for me.  Can

6    the license plate reader run when the dash camera is not

7    activated?

8          A.   Yes.

9          Q.   Okay.  And can you -- can an officer turn his

10   license plate reader off?

11         A.   They can.

12         Q.   They can.  And I assume simultaneously an

13   officer can also turn off his dash camera --

14         A.   Correct.

15         Q.   -- generally.  Okay.  Does the sheriff's office

16   have rules for using license plate readers?

17         A.   They're -- well, not license plate readers.

18   The dash cam and body cams.

19         Q.   Yes.

20         A.   The license plate reader is just a program in

21   the dash cams.

22         Q.   I understand.  Now?

23         A.   Yes.

24         Q.   Okay.  So let me give you an example.  So I

25   assume and, you know, tell me if the assumption is

Peter Gamboa                                    July 23, 2024

1    wrong.  I assume that if an officer scanned his

2    girlfriend's license plate to just figure out where she

3    was going, that would be against sheriff's policy?

4         A.  Yes.

5         Q.  Is that fair?

6         A.  Yes.

7         Q.  So how would an officer know that that kind of

8    scanning was prohibited?

9         A.  So that would probably fall under CJIS

10    compliance.

11        Q.  What was that?

12        A.  CJIS, C-J-I-S, compliance.

13        Q.  C-J-I-S.  Okay.

14        A.  And I believe that would fall under that for

15    personal gain.

16        Q.  Okay.  All right.  So putting like this

17    personal gain example aside.  Is it okay, is it allowed

18    for an officer to scan every license plate that goes

19    down the highway?

20        A.  So it does automatically.

21        Q.  Okay.

22        A.  Both Vigilant and Axon.

23        Q.  Okay.  How would the sheriff's office tell if

24    an officer had been using a license plate reader for

25    something like personal use?

Peter Gamboa                                        July 23, 2024

1        A.   Probably through a complaint.

2        Q.   Okay.  So unless someone complained, you

3   wouldn't necessarily know if an officer was using the

4   license plate reader system for personal gain?

5        A.   Right.

6        Q.   Okay.  So in doing criminal interdiction work,

7   how is a sheriff's officer supposed to use the license

8   plate reader?

9        A.   So like I mentioned, right, the license plate

10  readers are on.  They're scanning multiple lanes, and so

11  all four could record four different license plates at

12  one time.  Potentially, right?

13       Q.   And we're just talking about the Vigilant

14  system, right?

15       A.   Correct, right.  If you're at the right place

16  at the right time, vehicles are passing at the same

17  time, they can.  Because each -- each camera is

18  independent of each other.

19       Q.   Okay.  So --

20       A.   So they're automatic.  So they're automatic --

21  so as you're driving, say I'm driving to a spot on the

22  highway, as I'm driving, the cameras are recording

23  everything.  And so if we get a plate that may be

24  driving opposite of me, and it's a stolen vehicle, that

25  camera could pick up that front plate, and see if it's

Peter Gamboa                                           July 23, 2024

Page 149

1    entered as stolen, it would alert me.  And it would

2    bring up a picture of the vehicle, right, and so then I

3    know what vehicle I'm looking at, and I know that it's

4    driving opposite me.  So I would turn around and look

5    for that vehicle to confirm that that's the same

6    vehicle, same plate that was entered as being stolen.

7        Q.  Okay.  And putting aside the stolen example --

8        A.  Okay.

9        Q.  -- what would you expect officers doing

10   criminal interdiction work to look for?  So other than,

11   you know, the stolen vehicle alerts, what would you

12   expect a criminal interdiction officer to look for using

13   the license plate reader?

14       A.  Well, I mean, it's just a tool.  They wouldn't

15   necessarily use that vehicle -- that tool to actually

16   find a violator unless it was entered for some type of

17   alert.

18       Q.  Okay.

19       A.  They're expected to observe the flow of traffic

20   and any violations that they may see, whether it'd be

21   equipment violation, moving violations, things of that

22   nature.

23       Q.  Understood.  So we just talked a little bit

24   about the scanning of license plate readers by -- or the

25   scanning of license plates by Bexar County Sheriff's

Peter Gamboa                                    July 23, 2024

                                              Page 150

1    Office license plate readers.  Who has access to Bexar

2    County's scanned results?

3          A.  The 166 --

4          Q.  Officers?

5          A.  -- or so people that have --

6          Q.  And are there folks outside of the sheriff's

7    office who also would have access to?

8          A.  Yeah.  Anybody -- any agency that has access

9    through Vigilant would have access to those reads.

10         Q.  And now Axon?

11         A.  And now Axon, correct.

12         Q.  Okay.  Can you tell me what an intel stop is?

13         A.  An intel stop?  I've never heard of an intel

14   stop.  But what I would imagine is to gather information

15   about the occupants of the car.

16         Q.  Okay.  I want to talk a little bit about this

17   particular traffic stop.  For this one, the one of

18   Mr. Schott.

19         A.  Okay.

20         Q.  Deputy Babb testified that he got information

21   from a WhatsApp group, a chat group called the Northwest

22   Highway Group.

23         A.  Okay.

24         Q.  Have you ever heard of that before?

25         A.  I've heard that they had a WhatsApp chat.  I

Peter Gamboa                                    July 23, 2024

Page 151

1    never looked into or knew of if they had a certain name

2    to it.

3         Q.  Do you have WhatsApp on your phone?

4         A.  I believe I do.

5         Q.  Do you use it?

6         A.  We use it on one case.  It was a smuggling case

7    that we were using it for.

8         Q.  And who's we?

9         A.  So we have within organized crime, the TAG

10   unit, we have a transnational organized crime group.

11   That group, a lot of the work that we do is for human

12   smuggling type offenses or crimes.

13        Q.  Okay.  So you used the WhatsApp group for one

14   operation targeting human smuggling?

15        A.  Correct.

16        Q.  So were you part of the Northwest Highway Group

17   on WhatsApp?

18        A.  No.

19        Q.  Okay.  Did you talk about the Northwest Highway

20   Group at all with other officers?

21        A.  So they -- they would tell me about it, how

22   they would get all these vehicles that were driving high

23   rate of speed but they couldn't catch up to them, so

24   they're on their way to your county.  And so that's kind

25   of like the conversation that we had about it.

Peter Gamboa                                               July 23, 2024

Page 152

```
 1        Q.   Okay.  Can I unpack.  What -- who was the they
 2   you're referring to?
 3        A.   Gereb and Babb.
 4        Q.   Okay.  So you knew that this Gereb and Babb
 5   used this app and this chat group?
 6        A.   Correct.
 7        Q.   Okay.  Did you ever tell them not to use that
 8   group?
 9        A.   No.
10        Q.   Okay.  Do you know what kind of information
11   they received through that group?
12        A.   So like I said, if there was -- say there was a
13   car driving northbound from South Texas somewhere, and
14   they would tell them, hey, they're on their way to
15   Bexar County.  You know, they would tell me about stuff
16   like that.
17        Q.   Okay.  Did you ever hear -- did you ever learn
18   from your officers any -- them using any other app?
19        A.   No.
20        Q.   Any other chat?
21        A.   No.
22        Q.   Okay.  When Deputy Babb and Deputy Gereb were
23   talking about this criminal interdiction Northwest
24   Highway Group --
25        A.   Uh-huh.
```

Page 153

1          Q.   -- did you give them any instructions about

2     that group --

3          A.   No.

4          Q.   -- about how to use the information from that

5     group?

6          A.   (Witness shakes head.)

7          Q.   Okay.

8               MR. WINDHAM:   That's not on the record.   He

9     shook his head.

10         A.   Oh, no.   Sorry.   Good catch.

11         Q.   (By Ms. Hebert)   I'll ask that question again.

12    Did you give Deputy Babb and Deputy Gereb any

13    instruction about how to use the information from the

14    Northwest Highway Group?

15         A.   No, ma'am.   So any -- any intel, any

16    information, anyone conducting traffic stops, may be

17    used for their reasonable suspicion after they've

18    obtained probable cause to make a traffic stop.

19         Q.   Okay.   So let me just make sure I understand

20    that.

21              After an officer has probable cause to make

22    the traffic stop, putting that aside, all information is

23    above board, is okay to rely on?

24         A.   Correct.

25         Q.   Does an officer have to do anything to verify

Peter Gamboa                                                July 23, 2024

Page 154

1    any of the investigation he or she is relying on?

2         A.   Yes.  So they have to vet the information that

3    they're receiving.  For example, if it's someone who is

4    known to be a narcotic trafficker, okay, and in -- for

5    example, this group, right, they get the text message,

6    hey, this vehicle is driving into your county, we

7    couldn't catch up to him, but he's a narcotic

8    trafficker.  They get the probable cause to make the

9    stop, they make the roadside interview as they're making

10   contact with the violator.  They, at that time, start

11   building their reasonable suspicion to prolong the

12   traffic stop if that's what they're going to do.

13            Given the information provided, as they're

14   talking to the violator, they may see a duffel bag with

15   narcotics hanging out, they may see a bucket of guns in

16   the back seat, right?  So that's developing their

17   probable cause to further their investigation.

18        Q.   Okay.

19        A.   So they have to vet -- just because you get a

20   text saying, hey, this guy is driving dirty, doesn't

21   mean that that's what they're going to use to get in a

22   vehicle.

23        Q.   Okay.  You talked a little bit about the

24   evidence just now, about the evidence of drug

25   trafficking, for instance, that an officer could see.

Peter Gamboa                                            July 23, 2024

Page 155

1    And it seems obvious that if an officer saw a bunch of

2    drugs sitting on the front seat or in the back seat,

3    that would be evidence of drug smuggling?

4         A.   Correct.

5         Q.   What other evidence would an officer look for,

6    besides the obvious --

7         A.   Right.

8         Q.   -- as evidence of drug smuggling?

9         A.   So anything that is contraband, right, and them

10   as officers using any one of their five senses.  If they

11   see it, maybe they hear it.  You know, just depends what

12   it is, right?  Somebody tied up in the trunk of a car,

13   they hear it, they smell it.

14             Using their -- any of their five senses

15   would develop reasonable suspicion to further their

16   investigation.  Giving them probable cause to -- you

17   know, the evidence of probable cause to search the car.

18        Q.   Sure.  And I understand that.  But using any of

19   the five senses, if we take out the smelling or seeing

20   of drugs.

21        A.   Okay.

22        Q.   Let's just put those aside, what other types of

23   things would an officer look for as evidence of drug

24   smuggling?

25        A.   I mean, it -- so the obvious, right?  They can

Peter Gamboa                                    July 23, 2024

Page 156

```
 1    get consent.  If they -- if they -- was it seeing,

 2    smelling?

 3         Q.   Yeah.  They can't see and they can't smell it.

 4         A.   So, no smell.  No -- okay.

 5         Q.   What evidence are we talking?

 6         A.   So if they -- I mean, they can touch, right?

 7         Q.   Sure.

 8         A.   They can, you know, if -- they touch a part of

 9    the car that may be involved in an accident as a

10    hit-and-run, they can use that.  In their roadside

11    interview, they developed a reasonable suspicion, right?

12    When -- when the violator is giving conflicting or

13    evasive answers.

14         Q.   Okay.  So I think that's like a good example.

15         A.   Okay.

16         Q.   So a type of evidence would be inconsistent

17    answers --

18         A.   Uh-huh.

19         Q.   -- is that fair?

20         A.   Yes.

21         Q.   So other than seeing or smelling drugs, so I

22    just want to put that one to the side.

23         A.   Okay.

24         Q.   When you can't see them and you can't smell

25    them, how do you evaluate the potential drug smuggling?
```

Peter Gamboa                                          July 23, 2024

Page 157

1    So one of the things you just gave me was inconsistent

2    answers.

3         A.   Correct.

4         Q.   Are there other kinds of evidence that you

5    would look for?

6         A.   Well, I mean, other evidence would come from

7    the reasonable suspicion in having that conversation.

8         Q.   Okay.  So can you give me an example?

9         A.   So one time, my experience, we did a traffic

10   stop on a gentleman driving north from Laredo.  He had

11   just stopped at a gas station.  We're south, just inside

12   the county line on 1604 and 35.  He had just stopped for

13   gas in -- I believe it was Natalia Devine, probably 30

14   minutes away.  He was stopping again for gas.

15              When we made contact with him and I asked

16   him, well, you have this receipt for gas just in the

17   town before you entered Bexar County.  Why are you

18   stopping for gas now?  He didn't have an answer.  So

19   then, in talking to him, he was down there for a job

20   interview, and when he was asked who the person

21   of -- the contact person was, he had no answer.

22              So that reasonable suspicion gave me the

23   probable cause to -- well, reasonable suspicion, call

24   K-9.  K-9 came over, alerted on the gas tank.  We had a

25   DPS trooper that drove up on us.  He had a -- a scope

Peter Gamboa                                    July 23, 2024

Page 158

1    that went into the gas tank, and you could see the

2    packages of marijuana floating.

3         Q.  Okay.  And so I guess in that example, you had

4    inconsistent answers with what his behavior had been.

5         A.  Right.

6         Q.  And then just --

7         A.  And then also the gas one town, stopping.

8         Q.  Yeah.  So I guess behavior that didn't make

9    sense.

10        A.  Right.

11        Q.  Other than those two things, so we've got drug

12   that is you see, drugs that you smell, we understand

13   that.  You had inconsistent answers and we've got

14   behavior that doesn't -- doesn't connect --

15        A.  Was not consistent.

16        Q.  Was not consistent with answers.

17        A.  Right.

18        Q.  Is that a good way to phrase that?

19        A.  Yeah, yes.

20        Q.  So we've got drugs that you see.  Drugs that

21   you smell, inconsistent answers, and behavior that

22   doesn't match your answers.

23        A.  Correct.

24        Q.  Anything else that would be evidence of drug

25   smuggling?

Peter Gamboa                                                    July 23, 2024

                                                            Page 159

1          A.  So, again, right, developing your reasonable

2    suspicion.  Travel patterns.  If they're giving

3    inconsistent answers, and using Vigilant, you see that

4    this particular vehicle is going -- is hitting the

5    border twice a week for the last six months.  That

6    reasonable suspicion with the total understanding of

7    what's going on, answers, things of that nature,

8    behavioral, would be something that you would want to

9    further that investigation.

10         Q.  Okay.  So if you added the travel pattern to

11   these other four things that we talked about --

12         A.  Correct.

13         Q.  -- seeing, smelling, inconsistent answers,

14   behavior, inconsistent answers, and then a travel

15   pattern, you would add that.  But would travel pattern

16   alone be enough?

17         A.  No.

18         Q.  Okay.  So that's drug smuggling.  I want to put

19   that to the side and talk about human smuggling/human

20   trafficking.

21         A.  Okay.

22         Q.  That feels a lot harder because you can't see

23   it or smell it.  So what is the evidence that you look

24   for for human smuggling?

25         A.  So in the evidence for smuggling, you would

Peter Gamboa                                                July 23, 2024

Page 160

1    still have the violation, right, to cause the traffic

2    stop.  But what we see is these people are driving in

3    high rate of speed already before you even see them.

4                   If you're using a radar, all of a sudden

5    you get a bleep of 100 miles an hour and it goes away.

6    And you're like, wait a minute, what is that?  Well,

7    just coming over the hill, you see this car that's

8    passing everybody else up like if they're standing

9    still, so now you know where that 100 miles an hour

10   bleep came from on your radar.

11                  Then depends if the vehicle, if it's a car,

12   four windows.  If it's not really dark tinted, just

13   normal car then you're going to see probably in the back

14   seat, five, six heads.  Where normally, you would have

15   two or three people.  You're going to see a lot of

16   people in the back seat.

17                  If it's a van and as they're moving, they

18   become top heavy, and you see the -- the van rocking.

19   18-wheelers, if they have people in the back, they're

20   probably not going to stop.  But that's all with

21   experience of what I've seen, right?  So it just depends

22   on the individual officer and what they see to know that

23   it's possibly a human smuggler.

24        Q.   Okay.  So it sounds like there's a lot of

25   different things, human smuggling, that you would just

Peter Gamboa                                    July 23, 2024

Page 161

1    get a tip off --

2         A.  Correct.

3         Q.  -- that there was people -- people in the

4    vehicle?

5         A.  Right.

6         Q.  Is that a fair summary?

7         A.  Yes.

8         Q.  Okay.  So I want to make sure that I understand

9    what we're looking at.  When you're -- when an officer

10   is looking for evidence of drug smuggling, they look for

11   five things:  Seeing drugs, smelling drugs, inconsistent

12   answers to an officer's questions, inconsistent behavior

13   with the answers that they've given to an officer's

14   questions --

15        A.  Correct.

16        Q.  -- and then the traffic pattern in addition to

17   all those other things?

18        A.  Correct.

19        Q.  Is there anything else that you would think an

20   officer should be looking for as evidence of drug

21   smuggling?

22        A.  I'm just trying to run some scenarios through

23   my head of something different.  I can't think of

24   anything right now.  I think that's pretty much it.

25        Q.  That's okay.  And then we just talked about

Peter Gamboa                                          July 23, 2024

                                                        Page 162

1    human smuggling.  Human smuggling, human trafficking

2    would you look for the same things?

3         A.  So on the trafficking side, you may have just

4    one person.

5         Q.  Okay.  So then I'll come back to human

6    trafficking then.  So smuggling, you're going to be

7    looking for evidence there's a bunch of people in the

8    vehicle; is that fair?

9         A.  Correct.

10        Q.  Okay.  And there's a lot of different

11   indicators, but essentially you're looking for there are

12   a bunch of people?

13        A.  Multiple people.

14        Q.  Okay.  And trafficking, tell me what you look

15   for in trafficking?

16        A.  So in trafficking when you make that contact,

17   violator contact, and you see one other person.  Maybe a

18   passenger, front seat passenger, maybe a back seat

19   passenger.  If they don't speak English, I speak

20   Spanish, so I can question them in Spanish.  And if I

21   ask them if they know who the driver is, or what is the

22   driver to them, they may say something like, a friend of

23   mine.  What is your friend 's name and how long have you

24   known your friend?  Then that's when they start becoming

25   evasive in their answers.

Peter Gamboa                                                July 23, 2024

Page 163

1        Q.  Okay.

2        A.  So that may be a clue.  If they're maybe

3    working out of a motel room and we make contact with

4    them, other indicators may be that they're carrying

5    everything with them because they're not going to leave

6    anything in that room, including toothbrush, any

7    hygiene, things of that nature, would alert me to start

8    asking more questions.  If -- what type of work they do,

9    do they have somebody that they answer to, things like

10   that.

11       Q.  Okay.  I guess I understand -- I understand

12   some of that.  So if they're weird answers, like, they

13   don't know the name of the person they're driving with,

14   that makes total sense to me, and I'll just put that in

15   the bucket of weird answers.

16       A.  Yes.

17       Q.  We can come back to that in a second.  But the

18   other two things you talked about, stuff from the hotel,

19   carrying lots of stuff from the hotel, and I'm trying to

20   remember what the third was.  Information about their

21   job or their employer.  I mean, sounds like there can be

22   lots of innocent explanations for those two; is that

23   fair?

24       A.  Yes, absolutely.

25       Q.  Okay.  So help me understand how that fits

Peter Gamboa                                              July 23, 2024

Page 164

1    together.

2         A.   The problem -- the problem what happens is

3    when -- if I'm a cook, and they take five minutes to

4    think of I'm a cook, as an indicator, right, that okay

5    I'm sure you know how to cook, but what do you actually

6    do?  And how much do you get paid?  You know,

7    they -- they may tell you, I don't get paid, right?  So

8    then that would be a red flag to say, okay, what's going

9    on here?  Nobody works for free.

10              I owe my friend money so I'm working for

11   his company.  I owe my friend a debt for another family

12   member, things of that nature.  Would raise flags for us

13   officers.

14        Q.   Understood.  So and you're asking all of these

15   questions when it's two or more people in -- together?

16        A.   For the trafficking, it's usually one person.

17   It could be multiple, it could be two people, but you

18   would separate them.

19        Q.   Okay.

20        A.   And then how do you know him?  How do you know

21   her?  You know, where are y'all from, things like that.

22   And so, if I know you, and we've been friends since we

23   were little kids, we know where we were raised.  We

24   know, you know, things of that nature.  Well, they

25   start, oh, we live in the same town.  What school did

Peter Gamboa                                    July 23, 2024

Page 165

1    you go to?  Oh, I went to a school on the other side of

2    Mexico.  Or they may say, I'm from this side.

3         Q.  I understand.  But that only works if there are

4    two people; is that fair?

5         A.  Correct.

6         Q.  And if there's only one person are you

7    investigating human trafficking for one driver?

8         A.  So, well -- and it may not even be a driver,

9    right?  Motel interdiction, right?  So it might be a

10   person that we have information that there's immigrants

11   staying at this hotel, and they all answer to this one

12   person that comes and sees them every day at 9:00 in the

13   morning.  Gives them food, a bag of clothes and then

14   they leave.  You know, so that's -- you know, we'll go

15   and do surveillance.  And then we'll do the interdiction

16   interviews --

17        Q.  Got it.

18        A.  -- to get that information.

19        Q.  Okay.  That's helpful.

20             And in the context of a -- of a car, are

21   you going to look for evidence of human trafficking when

22   it's just one person?

23        A.  You can.

24        Q.  Okay.

25        A.  Right?  They avoid making eye contact.  And

Peter Gamboa                                                    July 23, 2024

1      just depends, right?  Children, right, one of the big

2      things for trafficking that I ask is, who's this person

3      driving you?

4          Q.  Uh-huh.

5          A.  When they don't have an answer, or all they say

6      is, mommy's friend, daddy's friend, you know something

7      like that --

8          Q.  Uh-huh?

9          A.  -- then that raises --

10         Q.  A flag?

11         A.  -- a big flag for me because the driver is

12     going to tell me something totally different.  Their

13     name -- when I ask them for their name, they're going to

14     give me something totally different.  When I run the

15     name, it's not going to come up on anything.

16         Q.  Sure.

17         A.  They're not going to have any information for

18     this child, right, or teenager reported as a runaway.

19     So that's how we prolong the traffic stop to get more

20     information.

21         Q.  Okay.  And that makes sense if there's a child

22     in the vehicle with the driver.  But one of my question

23     is, if there's just a driver, there's nobody else in the

24     vehicle --

25         A.  Okay.

Peter Gamboa                                           July 23, 2024

                                                      Page 167

1        Q.   -- what do you look for in that situation for

2    human trafficking?

3        A.   Well --

4        Q.   Can you investigate -- do you investigate

5    trafficking, human trafficking when there's only one

6    person in the vehicle?

7        A.   Unless it's the victim that's driving, which is

8    very rare, because part of the trafficking is to keep

9    them -- correct.  And so for them to be driving --

10       Q.   Just so we're clear because I did that

11   while we're on the record.  Human trafficking requires

12   you to get the trafficked victim under surveillance?

13       A.   Correct.  Yes.  And so for a traffic victim to

14   be driving, they can get away from that trafficker.  So

15   that's --

16       Q.   That's not going to happen.

17       A.   Yeah, not really.

18       Q.   Okay.  And so what about the trafficker?

19   Presumably, a trafficker would drive.  Is that something

20   you're going to investigate a driver for?

21       A.   So that -- okay.  So if we're -- have

22   information that the trafficker may have a stash house

23   with victims of trafficking, and he leaves, we may stop

24   him and ask them questions.

25       Q.   Them being the driver?

Peter Gamboa                                                    July 23, 2024

1          A.   Them being the driver by themselves.

2          Q.   Okay.

3          A.   Where is he coming from?  Where does he live?

4     We may even say, why is your car at this location every

5     day at this time?  And you walk in with six bags of

6     tacos, and who's living there?  Who stays there?  Go

7     from there.

8          Q.   Understood.  So that makes all sense to me.  So

9     you're going to investigate someone for human

10    trafficking when you have prior knowledge to suspect

11    that they were a human trafficker --

12         A.   Correct.

13         Q.   -- is that fair?

14         A.   Yes.

15         Q.   But if you pull over Joe Schmo on the highway

16    are you going to investigate Joe Schmo on the highway

17    for human trafficking?

18         A.   Probably not.

19         Q.   Okay.  Okay.  So I want to return to carrying

20    out a criminal interdiction traffic stop.

21         A.   Okay.

22         Q.   Can you help me walk through what a criminal

23    interdiction traffic stop looks like?

24         A.   Okay.

25         Q.   Let's start from an officer pulls over a driver

Peter Gamboa                                      July 23, 2024

1    for an unsafe lane change.  And both the officer and the

2    driver come to a complete stop.  What would you expect

3    the officer to do next?

4         A.  Make contact with the driver.

5         Q.  Okay.  So what does that look like?

6         A.  So they'll check out on their computer, on

7    their CAD, and then they'll exit their vehicle, walk up

8    to -- it just depends.  It could be the driver's side

9    door or it could be the passenger's side door, and make

10   contact with the driver.  Introduce themselves, and give

11   the reason why the traffic stop.

12        Q.  Okay.  When you said check the CAD, the

13   computer, what are they checking the CAD, the computer

14   for?

15        A.  So they'll -- on the computer, they'll enter

16   the driver -- the license plate.  And then they may add

17   in there if there's one occupant or multiple occupants.

18        Q.  So they may enter information into the

19   computer --

20        A.  Into the computer.

21        Q.  -- before speaking to the driver?

22        A.  Correct.

23        Q.  Okay.

24        A.  They -- I do and some officers do, enter a make

25   and model of the vehicle.  I'll enter a blue Chevy

Peter Gamboa                                    July 23, 2024

Page 170

1    Camaro.  So some officers do that.  It's not required.

2    Just the traffic officer in me, I would do that.

3         Q.  Okay.

4         A.  I advise them, I'm now Sergeant Gamboa.

5         Q.  All right.  Before we get to that.

6         A.  Okay.

7         Q.  So we're on the CAD.

8         A.  Okay.

9         Q.  So they've entered the license plate number.

10   Would you expect the officer to look for something from

11   the license plate number?

12        A.  No.  So they enter it, that way dispatchers

13   know that they're on a traffic stop, where they're at,

14   and what type of vehicle in the event --

15        Q.  Something happens?

16        A.  -- something happens.  Dispatchers will say, he

17   was on a traffic stop with a blue Camaro, license plate

18   at 35, mile marker whatever, intersection whatever.  So

19   if something does happen then they can send help

20   starting there on.

21        Q.  Okay.  Would you expect an officer to look at

22   whether there was an alert for a stolen vehicle before

23   they get out of the vehicle, before they get out of the

24   patrol car?

25        A.  If they enter the license plate and the vehicle

Peter Gamboa                                      July 23, 2024

Page 171

1    is stolen, they're going to get an alert automatically

2    and then it's going to say, stolen vehicle.

3         Q.   Okay.   Any other alerts that they would get

4    automatically?

5         A.   If they're a licensed carry.

6         Q.   On their license plate?

7         A.   Yeah.

8         Q.   From their license plate --

9         A.   Correct.

10        Q.   -- you get that information?

11        A.   Yes, ma'am.

12        Q.   Okay.

13        A.   If there are any active alerts for a wanted

14   person maybe driving that car, when they enter

15   the -- they'll get that alert also.

16             I'm trying to think what else.   If that

17   vehicle is entered as a sexual predator, that will also

18   come out.

19        Q.   Okay.

20        A.   I think those are the only ones that come out

21   for -- oh.   If that vehicle is registered and CPS, Child

22   Protective Services, has that vehicle entered for alert

23   because they have not been able to contact that family,

24   that vehicle will also send out an alert at that time.

25        Q.   Okay.   So like Silver Alert, Amber Alert --

Peter Gamboa                                                July 23, 2024

Page 172

1        A.   Correct.

2        Q.   -- all that would come up --

3        A.   Yes.

4        Q.   -- for that particular license plate too?

5        A.   Yes, ma'am.  And not that you have to look for

6   it because it's going to pop it.

7        Q.   It's going to pop up and let you know.

8        A.   Yes.

9        Q.   And then you talked about walk up and make

10  contact, and I think what you were walking me through

11  was, like, there's like a generic script, a dialogue

12  that you're expected to go through --

13       A.   Yes.

14       Q.   -- at a traffic stop?

15       A.   Correct.

16       Q.   Is that fair?

17       A.   Yes.

18       Q.   And I understood you to say introducing

19  yourself --

20       A.   Correct.

21       Q.   -- and explaining why you made the stop --

22       A.   Correct.

23       Q.   -- as part of that script?

24       A.   Yes.

25       Q.   Okay.  Is part of that script also telling the

Peter Gamboa
July 23, 2024

Page 173

1    driver what's going to happen next in terms of a warning

2    or a citation?

3         A.  It can be.

4         Q.  Okay.

5         A.  It's not part of the script, but you as an

6    officer can tell them.

7         Q.  Okay.  Is there anything else that was part of

8    the script that I missed?

9         A.  So, it's the reason for the stop.

10        Q.  Uh-huh.

11        A.  Your information, reason for the stop, the

12   check for wants and warrants.

13        Q.  Uh-huh.

14        A.  Identification, right, through either driver's

15   license or ID, or out-of-state license or ID.  Then

16   if -- on the return, after you've ran them, checked

17   them, if you're going to cite them or give them a

18   warning.  And then there's one more before -- there's

19   one more step.  It's a seven step violator --

20        Q.  Uh-huh.

21        A.  -- contact.

22        Q.  And this seven step process, is that part of

23   the -- the Bexar County --

24        A.  No.

25        Q.  -- training?

Peter Gamboa                                          July 23, 2024

Page 174

1        A.   No.

2        Q.   Okay.   Where does it come from?

3        A.   So that's -- that term is used, I believe, by

4    DPS.  But we cover it as traffic -- or conducting

5    traffic stops, right?  So that way you -- you

6    potentially answer any questions a violator may have

7    without being rude or just wasting somebody's time.

8        Q.   Understood.  But when you said we cover it,

9    what were you referring to?

10        A.   So us officers.

11        Q.   Okay.  So is it --

12        A.   So it's not a -- it's not a policy, it's not a

13    procedure that is taught.  It's just something

14    when -- as an FTO, right, a field training officer,

15    teaches their trainee, this is how you conduct a traffic

16    stop.  This is what you're going to cover.

17             And we use the term seven step violator is

18    because that's the term that is through DPS.

19        Q.   Okay.  Would it be fair then to characterize

20    that as, like, a practice?

21        A.   A practice.

22        Q.   Best practice?

23        A.   Best practice is very good.

24        Q.   Okay.  So you just talked about the fact that

25    you would ask for a driver's ID, and you would run a

Peter Gamboa                                         July 23, 2024

                                                      Page 175

1      check on that ID.

2           A.   Correct.

3           Q.   And then after you ran the check on the ID, you

4      would let them know if they were having a warning or

5      a -- or a citation?

6           A.   Correct.

7           Q.   When would you let them know -- let a driver

8      know that you were giving them a warning or citation

9      before checking an ID?

10          A.   Your discretion.

11          Q.   Okay.  Officer discretion?

12          A.   Yes.

13          Q.   Could an officer ever let a driver go without

14      giving them a warning or a citation?

15          A.   So now you can't because of Sandra Bland Act.

16      But sometimes what happens, and I'll use me as an

17      example, my printer doesn't work.  And so I can't give

18      them a copy of their warning because I don't have a

19      printer.

20               Now, if I do write them a citation and I

21      can't print them the citation, I do tell them that we

22      will mail them the citation.  So then I can go back to

23      the office, print it out, and then have the office

24      assistant mail it off to them.

25          Q.   And there's nothing wrong with that?

Peter Gamboa                                      July 23, 2024

Page 176

```
 1        A.   Yeah.
 2        Q.   Okay.  If your printer doesn't work, what do
 3   you do?  Do you need to register the printer failure
 4   somewhere?
 5        A.   So I'll call IT, and tell them my printer is
 6   not working, I can't figure out why, because it was just
 7   working.  Bring it in, we'll check it out.
 8        Q.   Okay.  And so you -- do you have to, like, flag
 9   that your printer isn't working if you're not going to
10   be handing out citations?
11        A.   No, no.  I mean, I do it because I need it.
12        Q.   Right.
13        A.   But I don't have to report it as --
14        Q.   Okay.
15        A.   -- equipment failure.
16        Q.   So let me ask you this then, can an officer
17   choose to write citations and warnings without giving
18   someone printed copies?  It sounds like -- you're
19   telling me about how if a printer was broken, you could
20   go back to the office and have the admin mail some
21   tickets.  Could an officer just say, hey, I'm not going
22   to bother with printing citations.  I'll just have the
23   admin do them all?
24        A.   No because -- because -- so I don't -- my job
25   is not to make traffic stops only to supervise, right?
```

Peter Gamboa                                        July 23, 2024

Page 177

1          Q.   Right.

2          A.   But I do have the discretion to make traffic

3     stops.

4          Q.   Right.

5          A.   Their job, if they're going to make traffic

6     stops, they have to issue something --

7          Q.   Understood.

8          A.   -- a citation or a warning.  Now for a same

9     example, if it doesn't work at this traffic stop, right,

10    I'm going to give you a warning, but it would probably

11    be on their body cam:  My printer is not working, so I'm

12    giving you a warning.  Or I'm going to give you a

13    citation and it will be mailed to you.

14         Q.   Okay.  So the default would be, an officer is

15    supposed to give a printed ticket.

16         A.   Yes.

17         Q.   Except if there's a technological glitch.

18         A.   Yes, ma'am.

19         Q.   Okay.  And the default that an officer is

20    supposed to give a printed ticket, is that through the

21    Brazos ticket writing system?

22         A.   Yes, ma'am.

23         Q.   That --

24         A.   The program, yes.

25         Q.   That Captain Von Muldau talked about?

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 179 of 322

Peter Gamboa                                           July 23, 2024

Page 178

1        A.   Yes, ma'am.  Yes, ma'am.

2        Q.   And this may be dating myself a little bit

3    here, but you know, I grew up watching movies where the

4    officer has their, like, black note pad, and then they

5    write up a ticket and rip it off and they hand it to

6    you.  Right?

7        A.   Yes.

8        Q.   I'm sure you are well familiar with that.

9        A.   Yes, ma'am.

10       Q.   Is that gone?  Like, is that -- does that exist

11   at all?

12       A.   So I don't know anyone in the sheriff's office

13   that still has a ticket book --

14       Q.   Okay.

15       A.   -- because they quit printing them.  But if for

16   some reason they did, they could still turn that ticket

17   in to the JP, where there would be filed.

18       Q.   Okay.

19       A.   If somebody --

20       Q.   By they, you mean the officer?

21       A.   The officer, correct.

22       Q.   So the officer would have to turn the copy into

23   the JP?

24       A.   Right.  So if somebody --

25       Q.   Justice of the Peace?

877-907-4278              434-293-3300              434-239-2552

Peter Gamboa                                    July 23, 2024

Page 179

1          A.   -- during the time had access to ticket books,

2     and, well, I write a lot of tickets, I'm taking these

3     ten with me, he may still have tickets.

4          Q.   But you don't know of anybody in the sheriff's

5     office --

6          A.   I don't know of anybody.

7          Q.   -- who is using a ticket book?

8          A.   No.  Only because I've asked for ticket books

9     and nobody has them.

10         Q.   Okay.

11         A.   So --

12         Q.   And so to your knowledge has anyone you've

13     supervised in the last few years used a ticket book?

14         A.   No, ma'am.

15         Q.   And we'll say few.  The last five years has

16     anybody used a ticket book?

17         A.   No, ma'am.

18         Q.   Okay.  So when an officer is doing a criminal

19     interdiction traffic stop, style traffic stop, is the

20     officer expected to ask a series of questions to the

21     driver?

22         A.   Are they expected, no.

23         Q.   Okay.

24         A.   Do they have the ability, yes.

25         Q.   Okay.  So an officer who was working criminal

Peter Gamboa                                          July 23, 2024

                                                    Page 180

1    interdiction could ask no questions of a driver?

2         A.   They can.

3         Q.   Okay.  But if an officer exercises his or her

4    discretion to ask questions of an officer, are there

5    standard criminal interdiction style questions?

6         A.   So, yes.  There are questions of where you're

7    coming from, where you're going?  Who are you making

8    contact with?  Who have you contacted?  Have you stopped

9    anywhere between there and here?  Has anybody had reason

10   to be in your car without your knowledge?  Is there

11   anything illegal in your car?  Are you transporting

12   large amounts of money?  Anything illegal?  Any

13   firearms?  And none of those are in that order just

14   things that I'm thinking of, but those are the types of

15   questions that we'd be asking.

16        Q.   Okay.  And when would you expect an officer to

17   be asking those types of questions if they're doing a

18   criminal interdiction traffic stop?

19        A.   So the -- the first 30 seconds of the violator

20   contact.

21        Q.   Okay.  So questions, the standard criminal

22   interdiction style questions run through the first

23   30 seconds of the traffic stop and then what happens?

24        A.   Just depends on the answers and if the officer

25   is building reasonable suspicion because of something

Peter Gamboa                                                    July 23, 2024

Page 181

1    that they know, then they would further their

2    investigation.

3         Q.   Okay.

4              MR. ELLSWORTH:   Can we do a quick restroom

5    break pretty soon?

6              MS. HEBERT:   Sure.   Let's do one now.

7              (Break taken from 2:39 p.m. to 2:50 p.m.)

8         Q.   (By Ms. Hebert)   Okay.   I think we can shortcut

9    a lot of this.   I know that you said you reviewed the

10   body camera footage from Deputy Babb, Deputy Molina and

11   Deputy Gereb.

12        A.   Yes, ma'am.

13        Q.   In reviewing that footage, did you see anything

14   from the traffic stop of Alek Schott that you had a

15   problem with?

16        A.   No.   No.   I think at the point when Deputy Babb

17   printed the citation -- the warning, at that point, I

18   would have given it to him.   And I know that he had

19   already called for the K-9 because he had reasonable

20   suspicion.

21              At that time, I would have gave him the

22   citation and, you know, at that time it would tell me

23   that that traffic stop was over.   He held on to it, and

24   I know that he -- he had already notified K-9 to meet

25   the location so that may be why he didn't give it to

Peter Gamboa                                          July 23, 2024

                                                    Page 182

1    him.  But at that -- I would have given it to him at

2    that time.

3              There's no problem with it, there's no

4    policy violation for it.  Just me giving them, hey, this

5    is why.  Now, from this point on, it's because of the

6    reasonable suspicion that I have and let K-9 do his

7    work.

8        Q.  Understood.  So other than Deputy Babb holding

9    on to the written citation --

10       A.  Correct.

11       Q.  -- there was no problem that you saw?

12       A.  No, ma'am.

13       Q.  Okay.  And even the fact that Deputy Babb held

14   on to the written citation, that holding on to the

15   citation was not a policy violation?

16       A.  Correct.

17       Q.  It's just, you would have done it differently.

18       A.  Right.

19       Q.  Okay.  In general, would you expect an officer

20   conducting a criminal interdiction traffic stop to ask

21   for a -- to ask for consent to search the vehicle first?

22   And by first, I mean before searching the vehicle?

23       A.  Yes.  Yes.

24       Q.  Okay.  Do you have any estimate on the

25   percentage of times that a driver has refused consent to

Peter Gamboa                                          July 23, 2024

Page 183

1    search?

2         A.   In my experience?

3         Q.   In general.  I mean, in your experience but

4    also in the experience of your criminal interdiction

5    unit.

6         A.   From my experience, we usually get consent.

7    And we found narcotics or we have found contraband at

8    times, and times we haven't.

9         Q.   Following consent?

10        A.   Following consent, yes, ma'am.  The times that

11   consent was not given, but we have enough reasonable

12   suspicion, same thing.  Times that we have, times that

13   we haven't found any contraband.

14        Q.   Okay.  And so you said most of the time, you

15   get consent?

16        A.   Higher percentage, we get consent.

17        Q.   And can you give me a rough estimate of the

18   breakdown of consent versus no consent?

19        A.   I would just say more times than not.  I can't

20   give a 51 percent, 49, no.  It's just more times than

21   not, we get consent.

22        Q.   Okay.  When would it be appropriate -- when

23   would it be inappropriate to ask for consent to search?

24   Is it ever inappropriate to ask for consent to search

25   first?

Peter Gamboa                                           July 23, 2024

Page 184

1        A.   If -- if you have no reasonable suspicion.  And

2    that would probably come through a complaint, right?  I

3    was held -- there was no reason why the officer should

4    have held me.  And then I have that conversation, okay,

5    what was your reasonable suspicion to further the

6    investigation?  The guy is a turd.  Okay.  What does

7    that mean?  That's not a reason.  Right?  So

8    then -- then we'd have that conversation.

9        Q.   Okay.  So if there's no reasonable suspicion,

10   an officer should not ask for consent --

11       A.   Right.

12       Q.   -- to search?

13       A.   Right.  If there's no -- yeah.  If there's no

14   reasonable suspicion to further your prolonged traffic

15   stop for, in furtherance of your investigation, give

16   them a warning, write them a ticket, let them go.

17       Q.   But the only way that a inappropriate ask for

18   consent would come to your attention would be through a

19   complaint?

20       A.   That I would know of, yes.

21       Q.   Okay.  Before asking a driver if they consented

22   to a search, are officers, are sheriff officers required

23   to give any kind of warning about a driver's right to

24   refuse to consent?

25       A.   No.

Peter Gamboa                                                    July 23, 2024

                                                              Page 185

1          Q.  So an officer isn't required to inform a driver

2     that they have a right to refuse?

3          A.  No.  Nuh-uh.

4          Q.  If someone refused to consent to a search,

5     would you expect the officer to then call for a K-9?

6          A.  Only if -- using their discretion, but because

7     they have reasonable suspicion to further the

8     investigation.

9          Q.  Okay.  Help me understand --

10         A.  If somebody is maybe being evasive, not

11    consistent in their answers, would be a reason why I

12    would further the investigation.

13         Q.  Okay.  Let me just go back here because I think

14    you told me that it would be inappropriate to ask for a

15    consent to search if the officer did not have reasonable

16    suspicion.

17         A.  Correct.

18         Q.  And if the officer asked for consent to search

19    and was denied consent to search, wouldn't that officer

20    still have reasonable suspicion and therefore have to

21    call the K-9?

22         A.  Could have.

23         Q.  Could have?

24         A.  Could have.  But again, maybe they're going to

25    further their investigation by having that conversation,

Peter Gamboa                                    July 23, 2024

Page 186

1    asking more questions.

2        Q.  Okay.  So --

3        A.  So not necessarily just to call the K-9, but

4    maybe it's because the guy is being evasive because he's

5    got warrants and he's giving a fictitious name.  Maybe.

6    You wouldn't need K-9 for that.

7        Q.  Okay.  So --

8        A.  Does that make sense?

9        Q.  I guess -- yeah.  So that asks for me a broader

10   question.  When should an officer call for a K-9?

11       A.  So a K-9 is used for -- and it just depends.

12   Narcotics, if it's a narcotic K-9.  If it's a bomb

13   sniffing K-9, they would call for bomb K-9.  Or if in

14   the jail setting, suspected telephone in a cell, then

15   they would use a cell phone or article dog for that.

16       Q.  Okay.  So if -- how often does an officer call

17   for a bomb K-9 for a traffic stop?

18       A.  Very seldom.

19       Q.  Okay.  So would it be fair to say that

20   90 -- over 95 percent of K-9 calls for a traffic stop

21   are going to be for narcotics K-9's?

22       A.  Yes, I agree with that.

23       Q.  And so would an officer have to have reasonable

24   suspicion that the vehicle is being used for drug

25   trafficking to call for a K-9?

Peter Gamboa                                July 23, 2024

                                              Page 187

1          A.   Yes, ma'am.

2          Q.   And that's the only thing you would call for a

3     drug -- let me start that again.

4               Is suspecting the driver or the vehicle of

5     drug smuggling the only reason you would call for a

6     narcotics K-9?

7          A.   Correct.

8          Q.   Okay.  If the K-9 alerted, would you expect the

9     sheriff's officer to search the vehicle?

10         A.   I'm sorry.  I didn't catch that.  One more

11    time?

12         Q.   Yeah, if the K-9 alerted on vehicle --

13         A.   Okay.

14         Q.   -- would you expect the officer to then search

15    the vehicle?

16         A.   Yes.

17         Q.   Would you ever expect an officer not to search

18    a vehicle following a K-9 alert?

19         A.   No.

20         Q.   So if a K-9 alerts, the officer should search

21    the vehicle?

22         A.   Yes.

23         Q.   How long would you expect a stopping officer to

24    wait for a K-9 unit to arrive?

25         A.   If I'm not mistaken, I believe case law has

Peter Gamboa                                        July 23, 2024

Page 188

1    gave -- I want to say one hour.

2          Q.  One hour.  So I guess is that -- the one hour

3    would be the maximum amount of time you would want your

4    officers to wait for a K-9 to arrive?

5          A.  Yes.

6          Q.  Okay.  And anything less than an hour wait for

7    a K-9 officer would be okay?

8          A.  Correct.

9          Q.  Deputy Gereb testified that he understood the

10   role of the criminal interdiction unit was to hunt

11   for -- hunt via traffic stops for people involved in

12   criminal activity.  Would you agree with Deputy Gereb's

13   understanding of the role of the criminal interdiction

14   unit?

15         A.  I wouldn't use "hunt."  I would talk to him

16   about using a word -- the word hunt.  And more

17   comfortable with looking for people on the roadway

18   committing criminal activity.

19         Q.  Okay.  What does hunting mean to you in the

20   context of criminal interdiction?

21         A.  So hunting, the word hunting for me is going

22   out to hunt for -- if you're bird hunting then you're

23   looking for birds; if you're deer hunting, you're

24   looking for deer.  So to me, the word "hunting" is more

25   aggressive --

Peter Gamboa                                           July 23, 2024

                                                        Page 189

1        Q.  Okay.

2        A.  -- than what I would use.

3        Q.  Sure.  Would it be fair to say that the primary

4    objective of the criminal interdiction unit was not

5    enforcing traffic laws, but using traffic laws to

6    enforce -- to stop other crimes?

7        A.  So I would say, okay -- now I'm going to break

8    it down for you.

9             Enforcing, right, doesn't necessarily mean

10   having to write citations.  But stopping the behavior

11   and making somebody realize, whether it'd be by citation

12   or by warning, for what they're committing, right?  For

13   example, failure to maintain a single lane.  Not

14   necessarily do I need to write you a ticket, but my

15   concern is, are you not paying attention?  Driver

16   inattention, right, because that's one of the reasons

17   for accidents.  Are you tired?  And that's why you're

18   not maintaining a single lane, or maybe you drank too

19   much, and now you can't handle your faculties to be able

20   to stay between the line.

21       Q.  Uh-huh.

22       A.  So my enforcement would be to make the traffic

23   stop, and to make you realize, hey, like, there's other

24   people on the highway.  You need to pay attention.  Quit

25   texting on your phone.  If you're falling asleep, pull

Page 190

1    over.  Rest for a little bit.  Drink a coffee and then

2    continue on your way.  Things in that nature.

3                 So the word "enforcement" to me is not

4    necessarily having to write a ticket, but make people

5    aware of what's going on.

6         Q.  Okay.  At one point, did you supervise the

7    sheriff's office K-9 unit?

8         A.  I did.

9         Q.  Okay.  And when was that?

10        A.  So it was between Sergeant Ochoa's time and

11   Sergeant Olvera's time.

12        Q.  Can you give me approximate dates?

13        A.  Probably.  So we're in '24 -- let's see.  I

14   would say October of '23, until about February '24.

15        Q.  So less than a year?

16        A.  Yes.

17        Q.  And --

18        A.  Very short time.

19        Q.  And it was last October until just a few months

20   ago?

21        A.  March, yeah.

22        Q.  Okay.

23        A.  February, March.

24        Q.  When -- before you became the K-9 supervisor,

25   did you have any experience with police K-9's other

1    than, you know, working with them in a traffic stop?

2        A.  No.

3        Q.  Okay.  You'd never been a handler?

4        A.  Never been a handler.

5        Q.  Okay.  And you'd never been part of a K-9 unit?

6        A.  No.  The reason why they ask me to oversee them

7    is because of my skills with horses.

8        Q.  Oh.

9        A.  That's why.  So --

10       Q.  Did you find --

11       A.  So animals --

12       Q.  Did you find your horse skills translated to

13   dog skills?

14       A.  A little bit.

15       Q.  A little bit?

16       A.  A little bit.

17       Q.  Okay.

18       A.  But it's because I'm not a handler, it was just

19   more supervising the personnel.  But I understood about

20   training.  I understood about, you know, making sure

21   that the animal is healthy, things of that nature.

22       Q.  Okay.  I guess as the K-9 supervisor, what were

23   your responsibilities?

24       A.  Oversee the operation of the K-9 unit.

25       Q.  Okay.  So did you review training, for example?

Peter Gamboa                                    July 23, 2024

Page 192

1          A.  So I started to and implemented different

2     training aspects.  In my experience with K-9 officers,

3     deputies were always afraid when a K-9 would arrive on

4     their scene.

5          Q.  Huh.

6          A.  Because from experience, our K-9's at one time

7     would attack our own officers, right?  So because they

8     know when you release them, tracking, you release them,

9     they're on a scent.  They see you in front, they think

10    you're the toy.

11              So I really -- and Sergeant Ochoa had

12    already started this.  But I failed, I took one of the

13    K-9's off assignment and transferred him -- ultimately,

14    transferred him out because his dog, in my opinion,

15    failed during a training, where the dog went at an

16    officer.

17              And so he was one of the most senior K-9

18    handlers, but prior to me getting there, really didn't

19    care, really didn't train, wouldn't bring his dog out

20    during training.  And so, in reviewing that and

21    everybody knew that everyone was expected to follow this

22    training to evaluate the dog.  And so when he released

23    the dog, he called him off, right?  Off, to stop, right?

24    The dog didn't stop.  And so when he recalled him, the

25    dog wouldn't come back.

Peter Gamboa                                    July 23, 2024

Page 193

```
 1              So to me, that was a big liability if we
 2      were out on a scene and he couldn't call his dog or have
 3      his dog return.  So at that point in time, I told him,
 4      put him up.  And I gave him another chance to show that
 5      the dog was on track with training, and again, didn't
 6      happen.  So at that point in time, I notified the
 7      lieutenant, and it was Ortega at the time.  And he
 8      notified Chief Sanford and the Assistant Deputy Chief,
 9      Roland Schuler, that we were going to remove him and put
10      the dog through training with a new handler to get him
11      certified as a patrol dog.
12          Q.  Okay.  Let me go back on that a couple of
13      times.  When you said remove him, did you mean remove
14      the dog or the handler?
15          A.  When I told him to remove -- I mean,
16      remove -- remove the dog, right, put him up.  Remove
17      him, the handler, because there was a lack of training
18      on his part.
19          Q.  On the handler's part?
20          A.  Correct.
21          Q.  Okay.  So that handler got taken out of the
22      K-9 unit.
23          A.  Yes.
24          Q.  And the dog is still in the K-9 unit --
25          A.  Yes.
```

Peter Gamboa                                                July 23, 2024

                                                    Page 194

1          Q.  -- but was going to go through different

2    additional training?

3          A.  Through training with a new hander, correct.

4          Q.  Okay.  Got it.  That's helpful.

5              Was that, was your actions the actions that

6    you took in response to this dog not listening, was that

7    the first time that you had heard of or learned of Bexar

8    County removing a dog from service?

9          A.  That I know of, for training purposes or for

10   the liability of the dog and the lack of training, yes.

11         Q.  Okay.  I mean --

12         A.  That's the first I heard.

13         Q.  I guess let me be precise.  You probably have

14   heard about dogs retiring previously?

15         A.  Yes, right.

16         Q.  Probably had heard about dogs going out sick?

17         A.  Yes.

18         Q.  Is that fair?

19         A.  Yes.  Hurt, injured.

20         Q.  Injured, yeah.  That's probably a better -- I

21   just didn't know the right way to phrase that.

22              So other than those -- other than health --

23         A.  Medical.

24         Q.  -- and old age, retirement --

25         A.  Uh-huh.

Peter Gamboa                                July 23, 2024

                                                      Page 195

1         Q.  -- had you ever heard of Bexar County or

2    learned of -- had you ever learned of Bexar County

3    removing a dog for performance issues?

4         A.  No.

5         Q.  Okay.  So you were the first guy.  That sounds

6    like it was probably pretty difficult?

7         A.   In dealing with horses, right, training -- the

8    repetitive of training for that horse which is what

9    makes him a good mount.

10        Q.  Uh-huh.

11        A.  Dogs are the same way.  The repetitive training

12   to keep on, right?  They have their own brain, right?

13   Dogs, horses have their own brain, so they can have an

14   off day.

15              But in reviewing what this officer had been

16   doing for training, in the short time that I was there,

17   I saw that he would not do his job.  He had a bomb dog.

18   His dog was a bomb dog and patrol.  We -- the sheriff's

19   office has multi-uses for their dogs, right?  Patrol and

20   either narcotic, bomb, or in case of the dog that's

21   assigned to the jail, he's a, an article dog, right?

22              So when we evaluate -- and I don't know if

23   Sergeant Ochoa would evaluate them on a schedule basis.

24   I've learned during that time that the supervisor would

25   not go do home inspections.

Peter Gamboa                                    July 23, 2024

Page 196

1        Q.  Oh, home inspections of the dog and their

2    handler?

3        A.  Yes.

4        Q.  Okay.

5        A.  And so they are required certain things.  And

6    so when I did the first home inspection, he did not

7    pass.

8        Q.  Why not?

9        A.  He didn't have a fenced yard.  The kennel was

10    in the middle of the sun.  So he didn't have a cover,

11    but he said he just tore it so he was going to get it

12    replaced, which he did.  He did replace it.  And the dog

13    was kept inside, which is okay, right, if you're in a

14    kennel inside your house, that's fine.  But he didn't

15    have no signs up warning of the dog.

16              So those three things were crucial enough

17    for me to make sure that the lieutenant knew about it

18    and the chief knew about it because those dogs are very

19    expensive.  Not that they -- they can, right, they're

20    dogs, attack somebody, but if he got away then it's our

21    fault.

22        Q.  Understood.

23        A.  So just that liability in and of its own with

24    the signs saying there's a, you know, K-9, police dog on

25    property, somebody breaks into the house and there's no

Peter Gamboa                                      July 23, 2024

Page 197

1    warning, we could be liable.

2         Q.   You're avoiding a liability.

3         A.   Yes.

4         Q.   So you talked about the fact that when you came

5    on in October of 2023, home inspections with K-9

6    officers and their dogs had not been done for a while;

7    is that fair?

8         A.   Yes.

9         Q.   Okay.  And you started doing them?

10        A.   Yes.

11        Q.   You talked a little bit about this problematic

12   officer and this dog, and there being a problem with

13   their training.  Why -- what was the problem with their

14   training?  They hadn't done it?

15        A.   Right.

16        Q.   Okay.  So how did you discover that?

17        A.   Through the evaluation.

18        Q.   Okay.  Tell me more about that.

19        A.   So the evaluation -- the part of the evaluation

20   was to down your dog, send them off.  Down your dog,

21   send them off, and have them return to you.  It sounds

22   more difficult, but if you're training, if you're doing

23   this, second nature to that dog.

24        Q.   I couldn't do it with my dog, but you know, a

25   K-9 dog, okay.

Peter Gamboa                                    July 23, 2024

Page 198

1        A.  Second nature for these guys, right?  And so

2    very simple ask of a dog.  And so when he couldn't do

3    it, and when asked for the officer, oh, it's because I

4    don't have a collar on him, which is a -- a shock

5    collar, right?

6             Okay.  So they should -- at this point in

7    his training, he's not a young dog.  He's a veteran dog.

8    You're a veteran trainer.  You're a senior K-9 handler,

9    shouldn't need a shock collar.  So he failed that

10   portion.  I told him, put him up.  He's a liability now.

11            The second time, he wanted to use a shock

12   collar, I told him no.  You're a veteran, he's a

13   veteran.  He should know.  If that's what it takes to

14   train him, you should have already been training him, so

15   that way he can evaluate.  So the second time that he

16   didn't -- he didn't down, he didn't return.  So that's

17   when I -- I said it's -- now he's going to abuse -- not

18   that he was.  To me, is now he's going to abuse him

19   because without this shock collar, he's not listening to

20   him.

21       Q.  Sure, and I get that.  That makes sense to me.

22   It seems what I hear you saying is, this handler and

23   this dog weren't able to do a very simple task --

24       A.  Yes.

25       Q.  -- that they should have been able to do if

Peter Gamboa                                                    July 23, 2024

```
 1    they had been doing their training.

 2         A.   Yes.

 3         Q.   Did you see other red flags of officers, of K-9

 4    officers and their dogs not doing the training that they

 5    were supposed to?

 6         A.   So I did get with the unit because we did have

 7    some dogs that had problems with tracking.  And

 8    so -- and what happened is, we would set a track.  We'd

 9    have an officer run in the field, in the brush, and the

10    dog picks up on orders, dead skin, the area, right, of

11    crushed grass, things of that nature.  Freshly crushed

12    grass, right?  They pick up on all those orders.

13              And so we're doing a night search, which

14    I -- okay.  I would expect some of the daylight dogs

15    maybe because now you're -- no light, very dark.  You

16    know, that would maybe confuse them.  But those -- some

17    of those dogs did very well.  We had some that didn't do

18    as well as tracking dogs.  They didn't find their

19    target, right?  So I told them that they -- that's what

20    they needed to work on.

21              So I did recognize some deficiencies with

22    the unit, and brought it to their attention.  But

23    they've -- they would correct it.  They have -- we'd go

24    back and they would correct their deficiencies.

25         Q.   Understood.  So you -- it seems like you were
```

Peter Gamboa                                    July 23, 2024

                                            Page 200

1    trying to get things back on track --

2         A.  Yes.

3         Q.  -- with training.  Why -- why do you think they

4    fell -- the training fell off track?

5         A.  I -- I would say that as a supervisor, on the

6    outside looking in, is why I would -- I observe that,

7    not necessarily that Sergeant Ochoa didn't pay

8    attention, but for whatever reason those deficiencies

9    were not looked at at the time.

10        Q.  Sure.  And I completely get it.  You're not

11   trying to -- I'm not trying to throw Sergeant Ochoa

12   under the bus --

13        A.  Right.

14        Q.  -- or ask you to throw Sergeant Ochoa under the

15   bus.  There might have been some systemic reasons why

16   training wasn't meeting the right standard.

17        A.  Right.

18        Q.  And do you have any idea why the training

19   wasn't meeting the right standard?  I don't even know

20   the right way to phrase that.

21        A.  I don't know why.

22        Q.  Okay.

23        A.  I wasn't there long enough to be able to say,

24   oh, this is why.

25        Q.  You came in spotted some problems?

Page 201

1        A.   Yeah.

2        Q.   Started fixing them?

3        A.   Correct.

4        Q.   Let me ask you this, how many K-9 units -- when

5    you came in, how many K-9 units -- and by unit I mean,

6    handler plus dog --

7        A.   Okay.

8        Q.   -- equals unit.  How many K-9 units were there?

9        A.   I believe we had -- let's see.  I believe we

10   had eight on the law enforcement side -- well, we had

11   eight units.  We had a ninth dog that when I first came

12   over, didn't have a handler.  And so I interviewed and

13   picked a handler for the detention dog during the short

14   time that I was there.

15       Q.   And that ninth dog was the detention dog?

16       A.   Correct.

17       Q.   And by detention dog, you mean a dog who works

18   in jail?

19       A.   Yes.

20       Q.   Okay.  So you had eight law enforcement dogs at

21   the time you started?

22       A.   Yes.

23       Q.   And all of those eight were matched with a

24   handler?

25       A.   Yes.

Peter Gamboa                                                July 23, 2024

Page 202

1          Q.  Can you give me the breakdown on those eight

2     dogs, how many of them were bomb sniffing, explosives

3     dog?

4          A.  Two explosive, six narcotic, and all eight are

5     patrol trained as well.

6          Q.  And by patrol trained does that mean

7     apprehensive --

8          A.  Tracking.

9          Q.  Apprehension training?

10         A.  Apprehension, yes.

11         Q.  I'm just trying to understand the terms.

12         A.  Yes, yes, yes.

13         Q.  And was that the entirety of the K-9 unit then?

14         A.  Yes.

15         Q.  Or were there other officers who were not

16    handlers part of the K-9 unit?

17         A.  No, that was it.

18         Q.  Okay.  So it's handlers plus the supervisor?

19         A.  Correct.

20         Q.  And who -- when you came in in October of 2023,

21    who was the longest serving K-9 officer, do you know?

22         A.  The longest --

23         Q.  If you don't know, that's okay.  I was just

24    curious.

25         A.  The longest serving was Joe Garcia.

Peter Gamboa                                    July 23, 2024

1        Q.  Joe Garcia.  Joe Garcia.  And do you remember

2    what Joe Garcia's dog's name is?

3        A.  His dog was -- let me think.

4        Q.  It's okay if you can't.

5        A.  I can't remember.

6        Q.  That's all right.  Do you know what Joe

7    Garcia's dog was trained to smell?  Explosives or --

8        A.  Explosives.

9        Q.  Explosives.  Okay.

10        A.  And apprehension.

11        Q.  And who was the most senior narcotic dog and

12    handler?

13        A.  I believe it was Martin Molina.

14        Q.  He was the most senior?

15        A.  I believe so.  Let me think.  We

16    had -- Faustino was the youngest, and you had -- I can't

17    think of the other officers.  Oh.  John -- Joseph

18    Garcia, Joseph Z. Garcia.  And then you had.

19        Q.  So, two Joe Garcias?

20        A.  Yes.  One narcotic and one explosive.

21        Q.  Okay.  I just want to make sure I was getting

22    that.

23        A.  Yes, uh-huh.  So we separate them by Joe Z and

24    Joe G.

25        Q.  Okay.  And so Joe G is the explosives guy?

Peter Gamboa                                    July 23, 2024

Page 204

```
 1         A.   Yes.

 2         Q.   And Joe Z is the narcotics guy?

 3         A.   Yes.

 4         Q.   Okay.

 5         A.   And then you had -- I'm trying to think of who

 6    else.  Five; there's got to be one more.  I can't think

 7    of the sixth guy.  I'm trying to picture their faces.

 8         Q.   That's okay.  We can come back to it and try to

 9    remember.

10         A.   Yeah.

11         Q.   So to your memory, Deputy Molina and his K-9,

12    Max, had the most experience as narcotics K-9's?

13         A.   Correct.

14         Q.   Does that mean that the other folks who were

15    narcotics K-9's, they -- so I'll tell you this:  My

16    memory, and I could be wrong, but my memory is that

17    Deputy Molina started as a narcotics K-9 officer in the

18    beginning of 2021.

19         A.   Okay.

20         Q.   Is that -- is that correct?  Does that sound

21    right?

22         A.   Somewhere around there, yes, ma'am.

23         Q.   So does that mean the other five narcotics

24    K-9's and officers started after March of -- or after

25    the beginning of 2021?
```

Peter Gamboa                                    July 23, 2024

1          A.  I believe so.

2          Q.  Okay.  That seems like a pretty dramatic

3     overhaul.  Do you know what happened with the K-9 unit?

4          A.  Retirements, people leaving, people just being

5     reassigned for, you know, whatever reason.

6          Q.  Is that level of turnover normal for a

7     sheriff's office unit?

8          A.  It's not normal, but the expectancy of their

9     activities, I'm sure, was different than before.

10         Q.  I don't understand what that means.

11         A.  So before -- and this is just from experience,

12    our K-9 dogs were not up to par like these -- like this

13    group is.  They're always training.  They're always

14    doing things with their dogs, right?  These

15    handlers -- before, we had an inmate -- it may be the

16    dogs too, right?  Before we had dogs that would attack

17    their handlers.  They would -- very out of control.  And

18    I don't know if they changed the program -- they changed

19    the program or what they did, but I give kudos to these

20    guys because these dogs are amazing in what they do.

21         Q.  The dogs that the sheriff's office has now?

22         A.  Correct.

23         Q.  And the system that the sheriff's office has

24    now?

25         A.  Yes, yes.

Peter Gamboa                                    July 23, 2024

Page 206

1      Q.  And if you were to draw like a dividing time,

2   you said before and after, when would -- when was that

3   marker approximate to your mind?

4      A.  I would say when Sheriff Salazar came into

5   office.  So, 2017.

6      Q.  So 2017 things began to change with the

7   K-9 unit?

8      A.  Yes.

9      Q.  Do you know what Sheriff Salazar or his

10  administration did that helped change things?

11     A.  So for one thing, I didn't know if there was a

12  select day that K-9 would train all day.  Before, that

13  was not heard of.  It was -- they trained on their own,

14  they do on their own.

15          Under the Sheriff Salazar, Tuesday's K-9

16  trains, patrol duties, narcotics, bombs,

17  whatever -- whatever the lesson plan for that training

18  is what they do.

19     Q.  Okay.  Okay.  I want to talk about Deputy

20  Molina and Max's K-9 specifically.  Again, you were here

21  when Captain Von Muldau testified on behalf of the

22  county, and he testified that Deputy Molina was part of

23  the organized crime division --

24     A.  Correct.

25     Q.  -- as of March 16th, 2022; is that right?

Peter Gamboa                                          July 23, 2024

Page 207

```
 1        A.   Correct.

 2        Q.   Okay.  Why did the -- let me ask you this

 3   before I go on to that:  Does the organized crime

 4   division have a dedicated K-9 today?

 5        A.   Yes.

 6        Q.   And who is the dedicated K-9 today?

 7        A.   Martin Molina.

 8        Q.   Still Martin Molina?

 9        A.   Yes.

10        Q.   So Deputy Molina is dedicated K-9 in 2022, and

11   he's still the dedicated K-9 today?

12        A.   Yes.

13        Q.   What why does the organized crime division need

14   a dedicated K-9?

15        A.   A lot of our traffic stops deals with gang

16   members that deal drugs.  And so they -- that's why they

17   have a dedicated K-9 for that.

18        Q.   Okay.  I guess why -- why a dedicated K-9 for

19   that versus just calling for K-9 unit?

20        A.   So prior to Bucky Molina, we had another K-9

21   handler named Jared Tubbs.  He was actually assigned to

22   DEA as a K-9 handler.  And so anything K-9 related, he

23   was called upon for TAG.  So he was the TAG K-9, DEA,

24   SAPD.  If they had a stop and they need a K-9, they

25   would call Tubbs, he would come out to that.
```

Peter Gamboa                                          July 23, 2024

Page 208

1          Q.   Okay.

2          A.   So when he retired, when he left and retired,

3    then Bucky was picked to replace him.  But was not

4    assigned fully to DEA like Tubbs was.  He was assigned

5    to TAG but to provide service for everyone in the TAG.

6          Q.   Okay.

7          A.   And then Converse has a K-9 unit, sorry, who

8    also helps out.

9          Q.   Who's Converse?

10         A.   Converse is a small city --

11         Q.   Oh, okay.

12         A.   -- east of --

13         Q.   Sorry.  I wasn't sure if that was a -- so

14   Converse, the city, has a K-9 unit?

15         A.   Correct.

16         Q.   Okay.  I didn't mean to interrupt you.

17         A.   And so he -- so he also helps the TAG group

18   with K-9 services.

19         Q.   Deputy Molina or the -- the K-9 unit from

20   Converse city --

21         A.   From Converse, yes.

22         Q.   -- also helps y'all?

23         A.   Right.

24         Q.   Okay.

25         A.   So instead of one assigned to DEA, they have

Page 209

```
1    two assigned to TAG.

2         Q.  Got it.

3         A.  If that makes sense.

4         Q.  Okay.  To the TAG unit which has multiple

5    entities in it.

6         A.  Correct.

7         Q.  Got it.  Okay.  So do you know when Deputy

8    Molina was assigned to the TAG unit, the organized crime

9    division?

10        A.  I don't know the time because he was -- he

11   replaced Tubbs.

12        Q.  Okay.

13        A.  So when he left, when he retired, that's when

14   he was brought over.

15        Q.  And you don't remember --

16        A.  I don't.

17        Q.  -- when Tubbs retired?

18        A.  No, ma'am.

19        Q.  Okay.  To your knowledge, was there any

20   particular reason that Officer Tubbs retired?

21        A.  I believe they were going to retire his dog.

22        Q.  Okay.

23        A.  And I'm not sure if -- if it was for medical

24   reasons or he was aged out, but he didn't want to get

25   another dog.  He wanted to stay as a task force officer
```

Peter Gamboa

July 23, 2024

Page 210

1    assigned to the DEA, and administration said no.

2         Q.  Okay.

3         A.  So when he was getting transferred back to

4    patrol, he said, I'm going to retire.

5         Q.  Got it.  He rather than make the change he

6    said, all right.  I'm out.

7         A.  I'm out.

8         Q.  Okay.  So in a more general manner, like, when

9    a K-9 officer like Deputy Molina is assigned to the

10   organized crime division, what does that mean the K-9's

11   officer responsibilities are?

12        A.  His responsibilities are if anyone in TAG

13   needed a sniff, whether it'd be because they had a

14   search warrant or traffic stop, then he would be

15   available for -- for that.

16        Q.  Did Deputy Molina have a particular shift?

17        A.  He was, I believe, either 8:00 to 3:00 or 9:00

18   to 4:00.

19        Q.  Okay.  It doesn't matter the exact time.

20        A.  Yeah.

21        Q.  So what would a TAG officer do, Deputy Molina

22   is not on?  Does Deputy Molina get called in?

23        A.  No.  We would just use another K-9.

24        Q.  Okay.  So to summarize then:  Deputy Molina

25   would be the default K-9 unless he was off?

Peter Gamboa
July 23, 2024

Page 211

```
 1        A.  Correct.

 2        Q.  Okay.  And who would be Deputy Molina's

 3   officer?

 4        A.  The K-9 sergeant would still be his supervisor.

 5        Q.  And who was that?  Is that Sergeant Ochoa?

 6        A.  Ochoa.

 7        Q.  Okay.

 8        A.  But Lieutenant Ortega would be -- would have

 9   been his lieutenant, his commander, and he kept the same

10   hours.

11             So, you wouldn't really see Sergeant Ochoa

12   at the TAG because Lieutenant Ortega was the

13   commander -- uniform command at the time.

14        Q.  Okay.  So when Deputy Molina was assigned to

15   the organized crime division, Ochoa was still with the

16   K-9 unit?

17        A.  Correct.

18        Q.  But Deputy Molina reported to Lieutenant Ortega

19   as well?

20        A.  Correct.

21        Q.  And now does Deputy Molina report to Lieutenant

22   Freveletti?

23        A.  Curtis.

24        Q.  What's Curtis's first name?

25        A.  Brian.  Brian Curtis.
```

Peter Gamboa                                              July 23, 2024

Page 212

1          Q.  So now Deputy Molina reports to Lieutenant

2    Curtis?

3          A.  Correct.

4          Q.  And Sergeant Ortega?

5          A.  Olvera.

6          Q.  Because Olvera is replaced?

7          A.  Correct.

8          Q.  So he has two bosses?

9          A.  Right.  His direct supervisor, field supervisor

10   is Olvera, and K-9 falls under the umbrella of

11   Lieutenant Curtis as their commander.

12         Q.  Got it.  Okay.  And -- okay.  That's helpful.

13              In 2022, when Deputy Molina was already

14   assigned to the organized crime division, was one of

15   Deputy Molina's responsibilities to your knowledge

16   making traffic stops?

17         A.  He could.

18         Q.  He could.  So it was part of his discretion?

19         A.  Correct.

20         Q.  He didn't have to?

21         A.  Correct.

22         Q.  But he could?

23         A.  Correct.

24         Q.  Okay.

25         A.  And he can respond to patrol.  If patrol needed

Peter Gamboa                                    July 23, 2024

1     a K-9 and another K-9 was not available, he can respond

2     and help out patrol.

3         Q.   Okay.  So he could volunteer to help other

4     officers not in the organized crime division?

5         A.   Correct.

6         Q.   In general, do you know how Deputy Molina and

7     Max are dispatched to a traffic stop?

8         A.   Yeah.  I mean, they -- the officer conducting

9     the traffic stop could call them.

10        Q.   Okay.

11        A.   Or what they do is, the officer conducting the

12    traffic stop may just reach out to dispatch and say, do

13    we have a narcotic K-9 available.

14        Q.   Okay.  So the two -- is it fair to say then,

15    the two main ways are the officer conducting the stop

16    could call Deputy Molina directly, or the dispatcher

17    could call for a K-9 generally.

18        A.   Correct.

19        Q.   Is that fair?

20        A.   Yes.

21        Q.   Any other ways?

22        A.   For narcotics, that's usually -- so for a short

23    time, we did not have a handler, if the jail needed a

24    narcotics K-9, they would -- they would call dispatch,

25    dispatch would generate a key card, and then have K-9

Peter Gamboa                                                    July 23, 2024

Page 214

1    respond to the jail.

2        Q.  Understood.  Would Deputy Molina ever be

3    ordered to bring Max to a traffic stop before officers

4    actually started the traffic stop?

5        A.  Yes.

6        Q.  Can you tell me about that?

7        A.  So if the operation was for a narcotic courier,

8    and we knew we were going to do a traffic stop for

9    narcotics, then he could be called to be in the area.

10       Q.  Okay.  So you could have -- let me rephrase

11   that.

12            The sheriff's office could have -- could

13   ask Deputy Molina and his dog to be waiting in the

14   wings?

15       A.  Yes.

16       Q.  And was the idea there, the call to Deputy

17   Molina to wait for the traffic stop, the idea that this

18   traffic stop was going to happen, so please be ready to

19   sniff the vehicle?

20       A.  Correct.

21       Q.  Okay.  Has Deputy Molina's role in traffic

22   stops changed at all since Mr. Schott filed this

23   lawsuit?

24       A.  Not to my knowledge.

25       Q.  I think this is a good stopping point, if we

Peter Gamboa                                                July 23, 2024

Page 215

1    could take a brief break --

2          A.  Sure.

3          Q.  -- and then continue on.  We're getting close.

4    We're not there yet, but we're getting closer.

5          A.  Okay.

6          Q.  Thanks.

7                (Break taken from 3:37 p.m. to 3:49 p.m.)

8          Q.  (By Ms. Hebert)  Okay.  We're back on record.

9    I wanted to ask one follow-up question about the license

10   plate reader system.

11         A.  Sure.

12         Q.  The Vigilant system, it provided alerts; is

13   that correct, or, no, it didn't provide any alerts?

14         A.  I don't believe so.  I take that back.  I

15   received one, and it was for a wanted person.

16         Q.  Uh-huh.

17         A.  And I believe Babb and Gereb received one at

18   one time for a hot plate that was entered.  And I don't

19   remember if it was for a courier of some type either

20   narcotics or money or what.  I can't remember what it

21   was for.

22         Q.  Okay.  So the LPR system gave alerts, very

23   specific alerts usually for someone who law enforcement

24   knew was committing a crime.

25         A.  Correct.

Peter Gamboa                                    July 23, 2024

Page 216

1       Q.   Okay.  Did the LPR system, to your knowledge,

2    give an alert for travel patterns?

3       A.   No.

4       Q.   Did the LPR system give an alert for one day

5    turnarounds?

6       A.   No.

7       Q.   Okay.

8       A.   Unless that plate was entered.  So if a

9    particular plate was entered for a vehicle, it would be

10   a hot plate.  And then so not for travel patterns, not

11   for -- what was the other one you said?

12      Q.   One day turnaround?

13      A.   One day turnaround.  Not for that, but if that

14   plate was entered as a hot plate, then it would alert.

15      Q.   Okay.  Help me understand what is a hot plate?

16      A.   A hot plate is a plate that you enter into

17   Vigilant.

18      Q.   You as in the officer who's on patrol --

19      A.   Yes.

20      Q.   -- enters a license plate number into Vigilant?

21      A.   Correct.

22      Q.   Okay.  So if an officer enters a license plate

23   number into Vigilant, that license plate becomes hot?

24      A.   A hot plate.

25      Q.   Okay.  And then what happens?

1          A.   And so it will alert.  If it hits a LPR, then

2     it will alert that officer.  Contact, officer Babb.

3     Contact --

4          Q.   Okay.  I get what you're saying now?

5          A.   Yeah.

6          Q.   Anytime an officer entered a license plate into

7     a system it became a hot plate.  But what you're saying

8     if an officer creates an alert --

9          A.   Correct.

10         Q.   -- for the license plate on Josh Windham's car,

11    and every time Josh Windham's license plate gets

12    scanned, it's going to notify the officer who created

13    that?

14         A.   Yes, yes.

15         Q.   Is that fair?

16         A.   Yes.

17         Q.   It's not that an officer enters, searching a

18    license plate, and then suddenly once you search it,

19    license plate becomes hot?

20         A.   No.  No, no, no.

21         Q.   Hot plate means an officer --

22         A.   Entered.

23         Q.   -- created an alert --

24         A.   Yes.

25         Q.   -- for that license plate?

Peter Gamboa

July 23, 2024

Page 218

1          A.  That plate.

2          Q.  And only -- so only the officer who creates the

3      hot plate alert get the hot plate alerts?

4          A.  Yes.

5          Q.  So if you entered a license plate into the hot

6      plate, into the system, Officer Frigerio would not get

7      your hot plate alerts?

8          A.  Correct.  Unless he was an administrator.

9          Q.  Huh.  Okay.  So administrators get everybody's

10     hot plate alerts?

11         A.  Yes.  For the agency.

12         Q.  And you, as the administrator for Vigilant,

13     would get everybody's hot plate alerts?

14         A.  Correct.

15         Q.  And did Deputy Babb and Deputy Gereb create a

16     lot of hot plate alerts?

17         A.  Not that I can recall.

18         Q.  Okay.  Did they create --

19         A.  I'm sure they have, but I haven't gotten no

20     returns.  I have gotten returns for wanted persons.

21     Narcotic couriers, human smugglers, things of that

22     nature, I do get those returns.

23         Q.  Okay.  Got it.  So other than alerts for a

24     wanted person, and an officer-created hot plate, are

25     there any other alerts in the Vigilant system?

Page 219

1      A.   Yes.  So there is alerts for wanted persons,
2   for any type of narcotic courier, money courier, human
3   smugglers, any type of illegal weapons.
4      Q.   Okay.  I guess maybe I'm not understanding or
5   being clear.  If the license -- would the license plate
6   reader give an officer an alert saying, hey, this
7   vehicle is a narcotics vehicle?
8      A.   (Witness nods head.)
9      Q.   It would?
10      A.   Yes.
11      Q.   And that would pop up on the officer's screen?
12      A.   Yes.
13      Q.   Okay.  And an alert would pop up on an
14   officer's screen that this was a human smuggling
15   vehicle?
16      A.   Correct.
17      Q.   Okay.  But nothing -- there would be no alerts
18   about one-day turnarounds?
19      A.   Not for that.  No.
20      Q.   Okay.  Got it.  Okay.  I'd like to talk a
21   little bit about the stop of Mr. Schott, the Plaintiff
22   in this case.
23      A.   Sure.
24      Q.   Do you remember when you, Sergeant Gamboa,
25   first learned about the traffic stop of Mr. Schott?

Peter Gamboa                                                    July 23, 2024

Page 220

1          A.   Okay.  Yes.

2          Q.   Can you tell me the details of what you learned

3     and when that was?

4          A.   I believe the first time that I heard was

5     through the complaint.  Internal Affairs Sergeant

6     Marta Rodriguez called me, said that Alek Schott had

7     made a complaint through Internal Affairs and there was

8     nothing they can do about it, what he was complaining.

9     He was complaining about the traffic stop.

10               So at that time, I asked her to give me his

11    number and I would call him.

12         Q.   Okay.  So do you remember when

13    Sergeant Rodriguez called you about Mr. Schott's

14    complaint, approximately?

15         A.   I would probably say probably a month after.

16    So, about April.

17         Q.   April 2022?

18         A.   Yeah.

19         Q.   Okay.  I will represent to you that the stop of

20    Mr. Schott occurred on March 16th, 2022.  Does that

21    sound about right to you?

22         A.   Yes.

23         Q.   On March 16th, 2022, did you hear anything

24    about the stop of Mr. Schott, from Deputy Babb or

25    elsewhere?

Peter Gamboa                                July 23, 2024

Page 221

1        A.  I believe he did tell me that he was probably
2   going to get a complaint for the stop.
3        Q.  Uh-huh.
4        A.  And my reply to that was, did you do something
5   wrong?  He goes, no.  I said, okay.  Well then, I'll
6   handle it when it comes in.
7        Q.  Okay.  Did -- at that time, on March 16th or
8   thereabouts, did Deputy Babb tell you anything about his
9   dash camera not working?
10       A.  No.
11       Q.  Okay.
12       A.  Not that I believe so.
13       Q.  Sure.  I'll also represent to you that
14  Mr. Schott called the county to complain two days later
15  on March 18th, 2022.
16       A.  Okay.
17       Q.  Did you learn anything about Mr. Schott's
18  complaint on March 18th, 2022?
19       A.  No.
20       Q.  Okay.  So the first time you remember hearing
21  about Mr. Schott's complaint was sometime in April of
22  2022?
23       A.  Correct.
24       Q.  And when Sergeant Rodriguez, now Sergeant
25  Ortega --

Peter Gamboa                                            July 23, 2024

Page 222

```
 1        A.  Correct.
 2        Q.  -- called you to let you know about this
 3   complaint, what did you do next?
 4        A.  I called him.
 5        Q.  You called who?
 6        A.  Mr. Schott.
 7        Q.  You called Mr. Schott.  And did you do any
 8   investigation before calling Mr. Schott?
 9        A.  No.
10        Q.  So you got the complaint -- news of the
11   complaint from Marta Rodriguez, and then you just called
12   Mr. Schott.
13        A.  Correct.
14        Q.  Okay.  Can you tell me about that call with
15   Mr. Schott?
16        A.  Sure.  He called and --
17        Q.  He called you?
18        A.  Well, I called him when I talked to him.  He
19   said that his complaint was that Deputy Babb had damaged
20   his tonneau cover.  That he wanted to know how the
21   county was going to pay him for that.
22             I said, I have not reviewed his body cam.
23   If he would allow me to review it, I would call him back
24   and give him more answers.
25             So at that time is the first time that I
```

Peter Gamboa                                              July 23, 2024

Page 223

1    reviewed that particular traffic stop.  And because a

2    complaint was the tonneau cover, I fast forwarded to the

3    spot where Babb was at the tonneau cover.

4        Q.  By tonneau cover, you mean the back bed cover?

5        A.  Yes.  And so -- so I started playing it from

6    there.  I saw that it was not -- Babb was trying to find

7    a way to open it, couldn't find a way for whatever

8    reason.  He had Mr. Schott come out, and Mr. Schott

9    opened the tonneau cover for him.

10             I reviewed the video, and saw when Martin

11   Molina did the sniff around the truck.  The dog alert.

12   Sit, alert, and then he opened the door.  The dog jumped

13   in.  Saw that part of it.  Saw that Gereb was searching

14   through the truck bed.  He looked at toolbox, I believe

15   a tote bag, and another can, cannister or something.

16   And then that was pretty much it.  I guess he got a

17   phone call and he left the traffic stop.  I guess

18   somebody else was calling for help or something.  And he

19   left the traffic stop.

20             So I reviewed Deputy Molina's body cam,

21   which coincided with what I saw on Deputy Babb's body

22   cam.  Deputy Gereb's body cam coincided with what I saw

23   also on Deputy Babb's and left.

24             So then, called Mr. Schott back.  I told

25   him, okay, I was able to review the video.  Your

Peter Gamboa                                              July 23, 2024

Page 224

1    complaint is that Deputy Babb damaged your tonneau cover

2    when, I guess, he was trying to open it.  And I told him

3    that he's the one that opened it.

4         Q.  Okay.

5         A.  He said, well, I have another complaint.  The

6    dog scratched my truck when he alerted.  I said okay.  I

7    said, I did review that.  I said that dog is trained to

8    alert by sitting down.  I said, and that's what I saw.

9    I didn't see him scratch at your door.  He goes, well,

10   he damaged my seats when he was inside the truck.  Could

11   be.  I did not see the damage.  I'll have to review that

12   and be able to tell you something.  And that was his

13   chief complaints at that time.

14        Q.  Okay.

15        A.  And so I said, can I help you with anything

16   else?  He said, no, I'm going to seek legal action.  And

17   we hung up.  And I hadn't talked to him since.

18        Q.  So you had one phone call --

19        A.  Yes, ma'am.

20        Q.  -- with Mr. Schott; is that fair?

21        A.  Yes, ma'am.

22        Q.  And we just kind of walked through what you

23   remember of the phone call --

24        A.  Yes.

25        Q.  -- is that fair?

Peter Gamboa                                    July 23, 2024

Page 225

1                    Okay.  Can you tell me about how long that

2      phone call lasted?

3           A.  I would probably say around maybe 10,

4      12 minutes.

5           Q.  Okay.  Okay.  I think we're going to watch a

6      video now.

7           A.  Okay.

8           Q.  Bear with me because tech is not my strong

9      suit.  We are going to look at what has previously been

10     marked Exhibit 50.  Bear with me, folks.

11                    (Exhibit No. 50 marked.)

12          Q.  (By Ms. Hebert)  Okay.  Let's try this one

13     instead.  Okay.  I'm going to show you a clip from

14     Deputy Babb's dash camera.

15          A.  Okay.

16          Q.  The whole thing is -- I don't know, 14 minutes

17     long.

18          A.  Okay.

19          Q.  And so for the sake of time, I'm going to skip

20     to the end and focus on a particular part.  And I'm just

21     going to make sure that -- for the record this is BC307,

22     just so we have it on record which Bates label video, so

23     Charles can find it later if he needs to.

24          A.  Okay.  Now is this the same traffic stop?

25          Q.  No.  This is a different traffic stop.

Page 226

1          A.   Different, okay.  Got you.

2          Q.   And if you wouldn't mind -- before we get

3    started, I think this is a good way to help.

4               There are numbers up in the right hand -- I

5    check my right from my left.  There are numbers up at

6    the top at the right-hand corner; is that correct?

7          A.   Yes.

8          Q.   And the first line of numbers, what does that

9    line represent?

10         A.   The date and the time.

11         Q.   Okay.  And what's the date on this video?

12         A.   4/12 of '22.

13         Q.   Okay.  And the time that seems -- that's in a

14   24 hour clock?

15         A.   Yes, ma'am.

16         Q.   And I understand that that's Zulu time; is that

17   correct?

18         A.   Correct.

19         Q.   And so 22 --

20         A.   So it would be 5:41.

21         Q.   P.m.?

22         A.   P.m.

23         Q.   Okay.  You're good at that.  That would have

24   taken me a couple minutes to figure out.

25               So this video is from April 12th, 2022, at

Peter Gamboa                                              July 23, 2024

                                                          Page 227

1    approximately 5:40 p.m.?

2         A.   Correct.

3         Q.   Okay.  I'm going to skip to 11:30.  So

4    11 minutes and 30 seconds into the video.  And the part

5    that I'd like you to watch is relatively short.  I'm

6    going to watch from 11:30 to the end of this video.

7         A.   Okay.

8         Q.   Let me make sure my sound is on actually.

9              (Video begins playing.)

10        Q.   (By Ms. Hebert)  Okay.  We just heard

11   Deputy Babb making a call with someone to whom he

12   referred to as Sergeant.  Was that call to you?

13        A.   Yes.

14        Q.   And was that your voice we heard --

15        A.   Yes.

16        Q.   -- on the recording with Deputy Babb?

17        A.   Yes, ma'am.

18        Q.   Okay.  In the recording of the phone

19   conversation we just watched, were you and Deputy Babb

20   discussing Mr. Schott's complaint?

21        A.   I believe so.

22        Q.   Okay.  Now I want to watch another clip.  This

23   is a clip like a shortened version of the video clip we

24   just watched.  So instead of the traffic stop at the end

25   we just cut to the --

Peter Gamboa                                                    July 23, 2024

                                                              Page 228

1        A.  Actual.

2        Q.  -- the actual conversation.

3        A.  Okay.

4        Q.  And then with that clip, added subtitles, and

5    before we discuss kind of the video and the

6    conversation, which is short, it's only two minutes, I'd

7    like you to watch the video again to confirm that the

8    subtitles are accurate.

9        A.  Okay.

10       Q.  Is that they're saying -- that they're

11   capturing exactly what you're saying, and if there's

12   something inaccurate, we can -- we can discuss that.

13            So, there are some things that I believe

14   that you are quoting what Mr. Schott said, and I've put

15   those in quotation marks just so that I can understand

16   from the context you were repeating what I understood

17   Mr. Schott to be saying.

18       A.  Okay.

19       Q.  And, again, if you see a place where the

20   subtitles are wrong, please immediately let me know.

21   We'll pause and we'll make sure we note the correct

22   words.

23       A.  Okay.

24       Q.  So I'm going to introduce what has

25   previously -- I'm just going to -- I think it's easier

1    if I do it this way.  Previously been marked Exhibit 51.

2                    (Exhibit No. 51 marked.)

3         Q.  (By Ms. Hebert)  This is just going to take me

4    a second as I pull everything up.  Here we go.

5                    Okay.  I'm going to start it and, again,

6    correct me if there's anyplace where the subtitles

7    aren't captured what you said correctly.

8         A.  Okay.  Sure.

9                    (Video begins playing.)

10        Q.  (By Ms. Hebert)  Okay.  Did subtitles

11   accurately reflect your conversation --

12        A.  Yes, ma'am.

13        Q.  -- with Deputy Babb?

14        A.  Yes, ma'am.

15        Q.  All right.  So I want to go through parts of

16   Exhibit 51, and ask you a couple of questions.

17        A.  Okay.

18        Q.  I'm going to watch from the beginning to

19   13 seconds in.

20                    (Video begins playing.)

21        Q.  (By Ms. Hebert)  Okay.  So when you said,

22   "yeah, I'm reviewing the K-9," what were you referring

23   to?

24        A.  I don't remember if it was a K-9 video or what

25   it could be.

Peter Gamboa                                                July 23, 2024

Page 230

1          Q.  Okay.

2          A.  Only because dealing with -- also dealing with

3     the traffic stop and K-9, Deputy Molina was involved.

4          Q.  If you were to think back to how you would use

5     K-9, would you think you were reviewing the K-9 body

6     camera footage or something else?

7          A.  Probably the K-9 body camera footage.

8          Q.  Okay.  And when you said, "So he's challenging

9     the stop," was the "he" referring to Alek Schott?

10         A.  Yes.

11         Q.  Let's watch 13 to 30.  So we'll watch 0:13

12    seconds to 0:30 seconds.

13                  (Video begins playing.)

14         Q.  (By Ms. Hebert)  Okay.  I understood in this

15    clip that we just watched you to be telling Deputy Babb

16    about your phone conversation with Mr. Schott; is that

17    right?

18         A.  Correct.

19         Q.  When you told Deputy Babb that you told Alek

20    Schott, "you can argue that in court," were you saying

21    that you told Mr. Schott, he could challenge the stop in

22    court?

23         A.  That if it was -- if he was cited for it, that

24    he can challenge that in court.  But because he was not

25    cited and he was only given a warning, I don't know what

Peter Gamboa                                        July 23, 2024

Page 231

1    I -- you know, what else I could do for him.

2        Q.   Okay.  So let me just make sure I understood

3    that.

4            You were explaining to Deputy Babb that you

5    had told Mr. Schott that because he had not received a

6    citation, he had only received a warning, that you

7    didn't know what you could do for him?

8        A.   Correct.

9        Q.   But if Mr. Schott had received a citation, he

10   could then challenge that in court?

11       A.   Correct.

12       Q.   But you can't challenge a warning in court.

13       A.   Right.  Because there's no court appearance.

14       Q.   Okay.  I was going to watch this next piece.

15   But we'll watch from 0:30 to 0:40.  And that -- by that

16   I mean, we'll watch from 30 seconds to 40 seconds.

17       A.   Okay.

18            (Video begins playing.)

19       Q.   (By Ms. Hebert)  Okay.  When Deputy Babb said,

20   "It was one of those from the app," what app did you

21   understand Deputy Babb to be referring to?

22       A.   I'm going to assume he was referring to the

23   WhatsApp app with that group.

24       Q.   The Northwest Highway Group?

25       A.   Correct.

Peter Gamboa                                           July 23, 2024

                                                    Page 232

1          Q.   Okay.  And when Deputy Babb said, "The intel

2     stops of a one-day turnaround," what did you understand

3     Deputy Babb to be referring to?

4          A.   Just information on the one-day turnaround.

5          Q.   Okay.  I'm going to watch a longer section.  So

6     from 40 seconds to a minute and 30 seconds.

7          A.   Okay.

8               (Video begins playing.)

9          Q.   (By Ms. Hebert)  Actually, we're going to pause

10    there.  So we just watched from 0:30 --

11         A.   0:40.

12         Q.   0:40, thanks, 0:56.  When Deputy Babb said,

13    "cover my ass in that report," what did you understand

14    him to be referring to?

15         A.   On his report, I'm not sure if he would have

16    listed prior to knowledge about the one-day turnaround

17    and the traffic stop.

18         Q.   I don't understand.  I'm sorry.

19         A.   So I took that as he was -- because he had the

20    knowledge from the app that he would have put that

21    traffic stop, or the violation prior to or subsequent to

22    the prior knowledge of the traffic stop.  If that makes

23    sense.

24         Q.   I think so.  So you understood him saying,

25    "cover my ass in the report" to say that he wrote that

Peter Gamboa                                                July 23, 2024

Page 233

1   he had probable cause for making the traffic stop.

2        A.   Correct.

3        Q.   Okay.  And he also referenced putting

4   subsequent prior knowledge in his report.  Do you

5   know -- what do you understand that to mean?

6        A.   So, pretty much that he had PC for the stop,

7   but he also had the information from the app.

8        Q.   Okay.  And we're going to watch now from 56 to,

9   hopefully, one minute and 30 seconds.

10            (Video begins playing.)

11       Q.   (By Ms. Hebert)  Okay.  So we just heard you at

12  the end of this -- this part of the clip say, "I've got

13  him on hold."  Was the "him" a reference to Mr. Schott?

14       A.   I don't remember.

15       Q.   Okay.  If it wasn't a reference to Mr. Schott,

16  who could it have been a reference to?

17       A.   I -- I don't know.

18       Q.   Okay.

19       A.   It could have been.  I'm not sure.  I don't

20  recall talking to him during the conversation with

21  Mr. Schott.

22       Q.   Okay.  So you don't remember talking to

23  Deputy Babb --

24       A.   The same day.

25       Q.   -- during the conversation as Mr. Schott?

Peter Gamboa                                              July 23, 2024

Page 234

```
 1        A.  Correct.

 2        Q.  Okay.  I'm going to watch from 1:30 to -- or

 3   play from 1:30 to 1:36.

 4              (Video continues playing.)

 5        Q.  (By Ms. Hebert)  I got to 1:47.  Apologies.

 6   When you said, "I reviewed his body cam," were you

 7   indicating that you told Mr. Schott that you reviewed

 8   Deputy Babb's body cam?

 9        A.  I may have.  Yes.

10        Q.  Okay.  And when you said, "you know, there's

11   nothing that he did illegal," were you indicating that

12   you told Mr. Schott that you didn't think Deputy Babb

13   violated any law?

14        A.  Correct.

15        Q.  I want to watch from 1:47 to 2:07.

16              (Video continues playing.)

17        Q.  (By Ms. Hebert)  We just watched to 2:07.  In

18   the clip that we just watched, it seems like you were

19   summarizing what you saw on Deputy Babb's body camera

20   footage and telling Deputy Babb that you told Mr.

21   Schott, you didn't see any problems on Deputy Babb's

22   body camera footage; is that right?

23        A.  Correct, yes.

24        Q.  Let's just watch from 2 :07 to the end of this.

25              (Video continues playing.)
```

Peter Gamboa                                    July 23, 2024

Page 235

1      Q.  (By Ms. Hebert)  Okay.  The dash camera shut

2  off; is that correct?

3      A.  Yes.

4      Q.  Do you remember what happened with the rest of

5  the call with Deputy Babb?

6      A.  I don't.

7           (Exhibit No. 16 marked.)

8      Q.  (By Ms. Hebert)  Okay.  I want to look at an

9  exhibit.  This exhibit has previously been marked

10  Plaintiff's Exhibit 16.  It's our B, Mr. Windham.

11  Again, this was previously admitted as Plaintiff's

12  Exhibit 16.

13           I'm going to represent to you that

14  Sergeant Rodriguez, now Sergeant Ortega, previously

15  confirmed that these were Internal Affairs records from

16  her investigation.  And I would like to go to the first

17  page, or the second page, excuse me.  There's BC-2162 at

18  the bottom.

19      A.  Yes, ma'am.

20      Q.  Do you see that?

21      A.  Yes, ma'am.

22      Q.  And as I understand it, as I understand

23  Sergeant Rodriguez's testimony, this was kind of her

24  notes on closing the investigation of Mr. Schott's

25  complaint.

Peter Gamboa                                      July 23, 2024

1          A.   Okay.

2          Q.   And do you see the section that says

3     explanation?

4          A.   Yes.

5          Q.   Do you see there's a large paragraph --

6          A.   Uh-huh.

7          Q.   -- and then you see there's a sentence starting

8     Sergeant Gamboa?

9          A.   Yes.

10         Q.   I'm going to read that section --

11         A.   Okay.

12         Q.   -- that sentence.  Sergeant Gamboa also spoke

13    for Steve for about 2.5 hours and was not satisfied.

14         A.   Okay.

15         Q.   Did I read that correctly?

16         A.   Yes.

17         Q.   Did you speak to Mr. Schott for 2.5 hours?

18         A.   I don't recall.  I have no reason to

19    dispute it.

20         Q.   Okay.  So --

21         A.   I may have.

22         Q.   You may have spoke to Mr. Schott for 2.5 hours.

23    That seems like a long call.

24         A.   Uh-huh.

25         Q.   Okay.  Let's go to BC-2167, which is a couple

Peter Gamboa                                          July 23, 2024

Page 237

1    pages later.

2          A.   Okay.

3          Q.   And I want to direct you to about -- you see

4    BC-2167?

5          A.   Yes, ma'am.

6          Q.   And about the middle of the page, there is the

7    start of an email.  And it looks like that email is from

8    April 12th, 2022 at 6:04 p.m.  Does that look right to

9    you?

10         A.   Yes, ma'am.

11         Q.   Okay.  And it's my understanding that this is

12   an email that Mr. Schott wrote to Sergeant Rodriguez.

13   Can you take a second and review this email, which goes

14   from Page 2167 to the top of 2168.

15         A.   Sure.  Okay.

16         Q.   Okay.  I will represent to you that

17   Sergeant Rodriguez previously testified that these were

18   her email records --

19         A.   Okay.

20         Q.   -- with Mr. Schott.  It seems like Mr. Schott

21   sent this email after the call with you.  Would that be

22   your understanding?

23         A.   Yes.

24         Q.   Okay.  Did anything in the email that

25   Mr. Schott sent Sergeant Rodriguez about the call he had

Peter Gamboa                                          July 23, 2024

Page 238

1    with you seem incorrect?

2         A.  So I believe -- I think on here, he says -- and

3    I'm not sure if he's asking me or if he asks

4    Sergeant Rodriguez.  I asked if placing people in front

5    of the police vehicles while running their ID is

6    standard practice, and then she said, not me.  So, I'm

7    not sure if that's a typo, or if that's her answering.

8         Q.  Sure.

9         A.  I don't remember that.  And he says he claimed

10   I wasn't being detained even though the officer was

11   withholding my driver's license, and warning paperwork

12   while forcing me to wait for a drug dog without probable

13   cause.

14             He said, I should have just left without my

15   license if I wanted to go and not wait for the dog.  So

16   I don't -- I don't remember having that conversation

17   with him.

18        Q.  Okay.

19        A.  I think he was referring to the body cam to

20   Babb's body cam, saying that I kept talking in circles,

21   saying he could see the violation from the body cam even

22   though it was inside his patrol car facing him.

23             I don't recall that.  That I told him -- or

24   I assume he's referring to me, to file a lawsuit if I

25   have additional concerns with how the conduct -- they

Peter Gamboa                                          July 23, 2024

Page 239

1    conduct business.

2          Q.   Do you remember saying that?

3          A.   No.

4          Q.   Okay.

5          A.   And then, sergeant then laughed at me, put me

6    on hold for an extended amount of time just to pick up

7    and say, are you still there?  And then put me back on

8    hold in hopes that I would hang up.

9               He later joined after leaving me -- so I

10   could have been reviewing the dash cam while I was

11   talking to him.

12         Q.   Okay.  So it's possible you placed Mr. Schott

13   on hold?

14         A.   Yeah, I told him to hold on, let me review it.

15   Later joined me on hold and had no sufficient evidence

16   for a stop.

17               I would never have told him that.

18               No sufficient reason to detain me to wait

19   for a drug dog, and told me to challenge your department

20   in court.

21         Q.   Yeah, I don't -- just to be fair.  I don't

22   think that he was saying that you said that.  I think

23   that was just his characterization.

24         A.   Oh, I see.

25         Q.   Is that fair?

Peter Gamboa                                          July 23, 2024

Page 240

```
 1        A.   Yeah.

 2             MR. FRIGERIO:   Objection; form.

 3        A.   Could have.

 4        Q.   (By Ms. Hebert)   Okay.   So do you

 5   recall putting him on hold?

 6        A.   I may have.   I don't recall it, but I may have.

 7        Q.   Okay.

 8        A.   It may have.

 9        Q.   Sure.

10        A.   I mean, as a supervisor I wanted to make sure

11   that if they -- somebody in the public has a complaint,

12   I want to try and address it as best as I can.   So I

13   could have been.

14        Q.   Okay.   And I want to go back to the first

15   paragraph of the email, if you don't mind.

16             You flagged from the sentence, I asked if

17   people -- if placing people in the front of their police

18   vehicles, you flagged from there down.

19        A.   Okay.

20        Q.   I want to go back to the, if I asked if

21   removing someone from their vehicle is standard practice

22   and he said, not for me.

23             Do you recall saying that, not for me?

24        A.   I could have said.   Because that's my -- that's

25   not my general practice.
```

Peter Gamboa                                   July 23, 2024

                                                    Page 241

1          Q.   Okay.  But you were aware that criminal

2    interdiction deputies placed drivers in the front seat

3    of their vehicles; is that right?

4          A.   Yes, ma'am.  Yes, ma'am.

5          Q.   And you never told them that they should not do

6    that; is that correct?

7          A.   Correct.  Correct.

8          Q.   And at the time that you were the sergeant over

9    the criminal interdiction unit, you didn't conduct

10   traffic stops as part of your daily duties; is that

11   right?

12         A.   Correct.

13         Q.   Okay.  I think you can put that away.

14         A.   Okay.

15         Q.   I just have one more topic to just ask you

16   about.

17         A.   Sure.

18         Q.   Have you ever heard of the Laredo Fusion

19   Center?

20         A.   I have not.

21         Q.   And have you ever heard or know -- do you know

22   an law enforcement officer named Kiki, that goes by the

23   name of Kiki?

24         A.   No.

25         Q.   So you wouldn't know if there was a law

Peter Gamboa                                        July 23, 2024

Page 242

1    enforcement officer named Kiki?

2        A.  (Witness shakes head.)

3        Q.  Okay.

4            MR. FRIGERIO:  That's a no?

5        A.  No.  Sorry.

6        Q.  (By Ms. Hebert)  No, that's okay.  I forget

7    sometimes too.

8            And to your knowledge, the sheriff's office

9    has worked with a fusion center in El Paso; is that

10   right?

11       A.  Correct.

12       Q.  Are there any other fusion centers in the

13   Valley area that the Bexar County Sheriff's Office has

14   worked with?

15       A.  Not that I know of.

16           MS. HEBERT:  Okay.  Any other questions?

17   Okay.  We don't have any other questions at this time.

18   But I am going to raise some production issues.  We're

19   here on --

20           MR. FRIGERIO:  We can do that.  I might

21   have some questions for him.

22           MS. HEBERT:  For --

23           MR. FRIGERIO:  For Sergeant.

24           MS. HEBERT:  Sure.  But I'm still going to

25   raise these production issues now and then we can pass

Peter Gamboa                                          July 23, 2024

Page 243

1      the witness.

2                    I'm going to say that we still are waiting

3      for those criminal interdiction weekly reports.  Those

4      were responsive to our RFP40.  It is now July 23rd, and

5      defendant's were supposed to comply with the Court's

6      order on a motion to compel.

7                    MR. FRIGERIO:  We didn't even know about

8      this weekly report until we took the deposition.

9                    MS. HEBERT:  On June -- but, Counsel,

10     that's your obligation.  It's not our obligation to

11     figure out what documents exist on your side.

12                    MR. FRIGERIO:  I don't know that they were

13     responsive, but you'll have them today.

14                    MS. HEBERT:  Well, we just took poor

15     Sergeant Gamboa's deposition without those weekly

16     criminal interdiction reports, and we took the 30(b)(6)

17     without those criminal interdiction reports.  So I'm

18     going leave Sergeant Gamboa's deposition open given that

19     we might need to examine someone about what these weekly

20     interdiction reports are about.

21                    We're also saying Defendants have failed to

22     proactively look for documents in response to

23     Plaintiff's request for production.  It shouldn't be up

24     to poor Captain Von Muldau to figure out what is the

25     whole universe of things without counsel responsive to

Peter Gamboa                                          July 23, 2024

Page 244

1    our request for production.

2              I'll also add, we're going to call for

3    production of the criminal interdiction job description

4    that Sergeant Gamboa discussed today that he placed on

5    Internet, or the intranet.  Excuse me.  That's

6    responsive to our RFP26, which includes documents

7    reflecting the purpose of the criminal interdiction

8    unit, among others.

9              We also requested documents about the

10   budget and funding of the special enforcement unit,

11   which is the unit that the criminal interdiction unit

12   was part of.  And Sergeant Gamboa today testified about

13   the criminal interdiction budget, so that would be

14   responsive -- those documents would be responsive to

15   RFP41.

16             We are also going to ask for Sergeant

17   Gamboa's Axon body camera notes for criminal

18   interdiction officers.

19             And then again, we talked about that a

20   little bit earlier, the Interrogatory 2, and ask that

21   the county revisit Interrogatory 2, and verify that its

22   information it's providing in response to

23   Interrogatory 2 is correct.

24             And then final finally I'll note that my

25   email to counsel on July 18th, asked for Captain Von

Peter Gamboa                                July 23, 2024

Page 245

1    Muldau's testimony about specific entries on the

2    incident detail report that he did not know.  He was

3    going to provide information about the last two entries

4    of activity on the activity log section, so we're still

5    waiting for that information.

6                      MR. FRIGERIO:  Sergeant, I have a few

7    questions for you.

8                      THE WITNESS:  Sure.

9                           EXAMINATION

10   BY MR. FRIGERIO:

11       Q.  Can you tell us a time period you were the

12   supervisor of the K-9 division for the Bexar County

13   Sheriff's Office?

14       A.  I believe it was from about October of '23,

15   until about, I would say, like March, April of 2024.

16       Q.  Did you have time during that time period that

17   you were supervisor to look at the work ethic and the

18   work product of Deputy Molina?

19       A.  I did.

20       Q.  What did -- what was your opinion as to Deputy

21   Molina and his K-9 Max?

22       A.  K-9 Max and Deputy Molina are very good team.

23   You can tell by seeing them work that they know each

24   other.  They are very good officers at what they do.

25   And they hold up a high standard for the sheriff's

Peter Gamboa                                          July 23, 2024

Page 246

1    office K-9 unit.

2         Q.   Is he one of the best K-9 handlers that you

3    have?

4         A.   Absolutely.

5         Q.   And Molina is a certified K-9 handler?

6         A.   He is, yes, sir.  And I'll give you a example,

7    if I can.

8         Q.   Okay.

9         A.   So we had been requested for some assistance

10   from HSI on a particular day, and the subject, I

11   believe, was a narcotic courier that came, and I believe

12   it was El Paso.  Not -- not Eagle Pass.  I believe it

13   was coming from El Paso.  Was going to deliver a car

14   that was loaded with narcotics.

15             We got probable cause.  The -- during the

16   reasonable suspicion for the narcotic K-9, Deputy Molina

17   and Max came over.  They did an open air sniff, and K-9

18   Max alerted to the gas tank of the car.

19             So we had -- we removed the car from the

20   roadway.  We took it over to sheriff's office, the

21   fleet, our Bexar County fleet.  We dropped the gas tank

22   and it was loaded.  And I believe it was about 33 kilos

23   of methamphetamine.

24             So knowing that the gas, the fumes, the

25   heavy scent of the gas and a dog can decipher between

Peter Gamboa                                    July 23, 2024

Page 247

1    that and narcotics is what amazed me to know that these

2    guys are doing the necessary training to make sure

3    that -- that he is certified in narcotics.

4         Q.  With regard to your -- the interdiction unit

5    that you were the supervisor of, were there financial

6    records for the interdiction unit?

7         A.  No, sir.  As far as for budget?

8         Q.  Right.  How did you acquire funding?

9         A.  So, like I had stated earlier, so when I was

10   assigned to the training academy, and interdiction was

11   assigned to me, we, for training purposes, to pay for

12   that training, we used money out of the training

13   academy.

14        Q.  There was no line item that said interdiction

15   unit?

16        A.  No.  No.

17        Q.  Was there ever in any financial of the Bexar

18   County Sheriff's department ever a line item that said

19   interdiction unit?

20        A.  No.  No, sir.  So then when we were moved from

21   the training academy under administration and support,

22   and were under criminal investigation division under

23   that, that training was paid for by funds out of CID,

24   criminal investigation division.  So we never had any

25   funding for ourselves.

Peter Gamboa                                      July 23, 2024

Page 248

1        Q.  And there was never a line item that talked

2    about interdiction unit?

3        A.  No.

4             MR. FRIGERIO:  I'll pass the witness.

5                     EXAMINATION

6    BY MS. HEBERT:

7        Q.  A couple of questions, Sergeant Gamboa and I'm

8    sorry to keep you here.

9             You were the supervisor for the K-9 unit

10   from October 2023 to March 2024; is that fair?

11       A.  I believe, yes.

12       Q.  And you were never a K-9 handler?

13       A.  Correct.

14       Q.  Had you ever been trained in K-9 handling?

15       A.  No.  But I did -- I was present for training,

16   and I also attended some days when I had two detention

17   officers sent to training -- handler school.

18       Q.  Okay.  So you had visited some training?

19       A.  Yes.

20       Q.  Is that fair?

21       A.  Yes.

22       Q.  But you'd never been trained yourself?

23       A.  Correct.

24       Q.  Is that fair?

25       A.  Yes, ma'am.

Peter Gamboa                                            July 23, 2024

Page 249

1          Q.  Do you know what the process is for certifying

2     a K-9 handler?

3          A.  So from my understanding, is they use a third

4     party and they go through the process for narcotics.

5     They record the training, send that to a third party,

6     and then the third party certifies that they are doing

7     what needs to be done to get certified.

8          Q.  And that's how Bexar County handles its

9     certification process?

10         A.  Yes.

11         Q.  Were you ever involved in that certification

12    process?

13         A.  No.

14         Q.  Did you ever see it happen?

15         A.  No, ma'am.

16         Q.  Okay.  To your knowledge, do you know what

17    certifications Deputy Molina and Max, his K-9, hold?

18         A.  I don't know currently.

19         Q.  Okay.  Have you ever reviewed the deployment

20    records of Deputy Molina and his K-9 Max?

21         A.  No, I haven't.  But I know that there is a

22    computer record for every deployment that they -- if

23    that's what they still use.

24         Q.  Sure.  And have you ever reviewed that

25    deployment --

Peter Gamboa                                              July 23, 2024

                                                        Page 250

```
 1        A.   No.

 2        Q.   -- record?

 3        A.   No.

 4        Q.   Have you ever reviewed the training records of

 5   Deputy Molina and his K-9 Max?

 6        A.   I did review training for them.  So originally

 7   he wasn't -- he didn't go through a K-9 handlers school.

 8   He was trained by the sheriff's office K-9 trainer at

 9   the time.

10        Q.   Sure.

11        A.   Who was a -- I believe was a certified train

12   the trainer.  So he can certify K-9 officers.

13        Q.   But, I mean, you just said I believe, do you

14   know if he was a certified K-9 --

15        A.   I don't know because by the time I was there,

16   he had already passed away.  So I didn't have --

17        Q.   Sure.

18        A.   -- his training records.

19        Q.   Okay.  So we talked a little bit about the

20   deployment records, you hadn't reviewed that.  So did

21   you ever review Deputy Molina's training records?

22        A.   I did.

23        Q.   Okay.  And what did you review?

24        A.   What he -- what he had as far as getting him

25   certified at the time.
```

Peter Gamboa                                              July 23, 2024

                                                          Page 251

1          Q.  Okay.  So you reviewed his precertification

2     records?

3          A.  Correct.

4          Q.  Did you review Deputy Molina's training records

5     from certification onward?

6          A.  No.

7          Q.  Okay.  Was Deputy Molina the first K-9 handler

8     completely trained inhouse for Bexar County?

9          A.  That I know of, yes.

10         Q.  Was he the last?

11         A.  That I know of.  Yes.

12              MS. HEBERT:  Anything else?  We'll pass the

13     witness, leaving Sergeant Gamboa's testimony open at

14     this time.

15              MR. FRIGERIO:  Reserve our questions.

16              MR. ELLSWORTH:  Same, reserve.

17              (Proceedings ended at 4:46 p.m.)

18

19

20

21

22

23

24

25

Peter Gamboa                                                July 23, 2024

                                                    Page 252

1                        CHANGES AND SIGNATURE

2      WITNESS NAME:  SERGEANT PETER GAMBOA

3      DATE OF DEPOSITION: 07/23/2024

4      PAGE LINE        CHANGE                    REASON

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____

Peter Gamboa                                                July 23, 2024

Page 253

1          I, SERGEANT PETER GAMBOA, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5

6                        _____

7                    SERGEANT PETER GAMBOA

8     THE STATE OF TEXAS)

9     COUNTY OF _____)

10         Before me, _____, on

11    this day personally appeared SERGEANT PETER GAMBOA,

12    known to me (or proved to me under oath or through

13    _____) (description of identity card or

14    other document) to be the person whose name is

15    subscribed to the foregoing instrument and acknowledged

16    to me that they executed the same for the purposes and

17    consideration therein expressed.

18         Given under my hand and seal of office this

19    _____ day of _____, 2024.

20

21                   _____

22                    Notary Public in and for

23                    The State of Texas

24

25

Page 254

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
 3        ALEK SCHOTT,              )
                                    )
 4                  PLAINTIFF,      )
                                    )
 5        VS.                       )
                                    )
 6        JOEL BABB, IN HIS         )
          INDIVIDUAL AND OFFICIAL   )      CIVIL ACTION
 7        CAPACITY; MARTIN A.       )          NO.
          MOLINA III, IN HIS        )   5:23-CV-00706-OLG-RBF
 8        INDIVIDUAL AND OFFICIAL   )
          CAPACITY; JAVIER SALAZAR, )
 9        IN HIS INDIVIDUAL AND     )
          OFFICIAL CAPACITY; AND    )
10        BEXAR COUNTY, TEXAS,      )
                                    )
11                  DEFENDANTS.     )
12     ***********************************************************
13                    REPORTER'S CERTIFICATION
                DEPOSITION OF SERGEANT PETER GAMBOA
14                        July 23, 2024
15              I, Anica Diaz, Certified Shorthand Reporter in
       and for the State of Texas, hereby certify to the
16     following:
17              That the witness, SERGEANT PETER GAMBOA, was
       duly sworn by the officer and that the transcript of the
18     oral deposition is a true record of the testimony given
       by the witness;
19
                I further certify that pursuant to FRCP Rule
20     30(f)(1) that the signature of the deponent:
21         __X__ was requested by the deponent or a party
       before the completion of the deposition and that the
22     signature is to be before any notary public and returned
       within 30 days from date of receipt of the transcript.
23     If returned, the attached Changes and Signature Page
       contains any changes and the reasons therefor;
24
                _____ was not requested by the deponent or a party
25     before the completion of the deposition.
```

Peter Gamboa                                                    July 23, 2024

Page 255

1          I further certify that I am neither counsel

for, related to, nor employed by any of the parties or

2   attorney in the action in which this proceeding was

taken, and further that I am not financially or

3   otherwise interested in the outcome of the action.

4          Certified to by me this 9th day of

August, 2024.

5

6

7

8                    Anica Diaz, Texas CSR(8021), RPR, CRR

Expiration Date:  08-31-24

9                    Veritext Legal Solutions

Firm Registration No. 571

10                   300 Throckmorton Street, Suite 1600

Fort Worth, Texas 76102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Peter Gamboa

July 23, 2024

Page 256

1    Chrles Frigerio, Esquire

2    csfrigeriolaw@sbcglobal.net

3                      August 9, 2024

4    RE:    Schott, Alek v. Babb, Joel Et Al

5        7/23/2024, Peter Gamboa (#6680575)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   clientservices-va@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

Peter Gamboa
July 23, 2024

**[& - 30]**                                                        Page 1

| & |
|---|
| **&** 2:18 |

| 0 |
|---|
| **00706** 1:6 254:7 |
| **02** 3:3 |
| **04** 3:4 |
| **05** 3:7 |
| **07** 234:24 |
| **07/23/2024** 252:3 |
| **08-31-24** 255:8 |
| **0:30** 230:12 231:15 232:10 |
| **0:40** 231:15 232:11,12 |
| **0:56** 232:12 |

| 1 |
|---|
| **1** 254:20 |
| **10** 141:4,5 225:3 |
| **10,000** 133:25 135:11 |
| **100** 4:14 160:5 160:9 |
| **10k** 132:12,13 |
| **11** 113:6 227:4 |
| **111** 1:23 2:13 |
| **11:06** 78:13 |
| **11:07** 78:19 |
| **11:17** 78:20 |
| **11:25** 78:20 |
| **11:30** 227:3,6 |
| **11:56** 102:17 |
| **12** 51:24 62:12 62:14 113:6 |

117:3,8 225:4
**12:35** 135:18
**12th** 226:25 237:8
**13** 229:19 230:11
**14** 55:24 225:16
**15** 51:25 83:20
**151** 49:11
**16** 4:3 138:20 235:7,10,12
**1600** 255:10
**1604** 157:12
**166** 139:15 140:14 150:3
**16th** 12:4 206:25 220:20 220:23 221:7
**18** 63:14 66:18 67:5 87:3,7 88:4,19 90:19 90:21,23 160:19
**18th** 221:15,18 244:25
**19** 4:9
**1:30** 234:2,3
**1:36** 234:3
**1:40** 135:18
**1:47** 234:5,15
**1st** 68:12

| 2 |
|---|
| **2** 234:24 244:20,21,23 |
| **2.5** 236:13,17 236:22 |

**20** 68:10 128:4 138:12,13 141:22
**200** 2:18
**2005** 72:8
**201** 46:15
**2017** 206:5,6
**2019** 44:5,7 66:10,17,22 70:4 123:23 124:4
**2020** 66:18,24 67:5 68:9 69:3 70:4,24 75:6 124:2,3
**2021** 70:25 124:3,4,9,12 204:18,25
**2022** 68:11,13 70:19 71:2,3,3 71:15,17 75:6 137:17,18 206:25 207:10 212:13 220:17 220:20,23 221:15,18,22 226:25 237:8
**2023** 99:16 197:5 202:20 248:10
**2024** 1:13,19 245:15 248:10 253:19 254:14 255:4 256:3
**21** 70:19 71:3 96:2,15
**210** 2:14 96:3,9

**2162** 235:17
**2167** 236:25 237:4,14
**2168** 237:14
**21st** 68:11
**22** 47:4 226:12 226:19
**22203** 2:8
**225** 4:5
**229** 4:6
**23** 1:13 47:9 63:22 190:14 245:14 254:14
**235** 4:3
**23rd** 1:19 243:4
**24** 190:13,14 226:14
**245** 3:7
**248** 3:8
**252** 3:10
**254** 3:11
**26** 14:19
**271-7877** 2:14
**2:00** 38:6
**2:07** 234:15,17
**2:39** 181:7
**2:50** 181:7

| 3 |
|---|
| **3,000** 134:1 |
| **30** 5:11 13:10 51:22,22 132:24 139:19 157:13 180:19 180:23 227:4 230:11 231:16 232:6 233:9 |

243:16 254:20
254:22 256:16
**300**  255:10
**32255**  255:7
**33**  246:22
**35**  29:22
103:17,20
157:12 170:18
**3922**  96:10,11
**3:00**  210:17
**3:37**  215:7
**3:49**  215:7

### 4

**4**  95:25
**4/12**  226:12
**40**  231:16
232:6
**465**  1:23 2:13
**4700**  2:18
**476-4600**  2:19
**480-5936**  2:5
**49**  183:20
**4:00**  103:5
210:18
**4:46**  1:20
251:17
**4th**  99:16

### 5

**5**  5:11
**50**  4:4 225:10
225:11
**508-3922**  96:3
**508-3992**  96:9
**51**  4:6 183:20
229:1,2,16
**512**  2:5,19

**53**  4:7 65:23
66:1 94:8
**56**  233:8
**571**  255:9
**5:00**  19:15 33:4
**5:23**  1:6 254:7
**5:40**  227:1
**5:41**  226:20

### 6

**6**  13:10 243:16
**64**  4:9 94:13,15
96:7,12 97:7
**65**  4:10 95:18
95:19
**66**  4:8,12 98:1
98:3,5
**6680575**  256:5
**67**  4:13 100:3,4
**682-9320**  2:8
**6:00**  38:5
**6:04**  237:8

### 7

**7/23/2024**
256:5
**70**  132:25
**703**  2:8
**720**  89:14,22
89:24 90:1
102:5,13
**76102**  255:10
**78205**  2:13
**78701**  2:4
**78723**  2:19

### 8

**8021**  255:8

**816**  2:4
**8:00**  103:5,12
210:17

### 9

**9**  85:22,23,24
86:1 90:5,6,8
157:24,24
181:19,24
182:6 185:5,21
186:3,6,10,11
186:12,13,13
186:17,20,25
187:6,8,12,18
187:20,24
188:4,7 190:7
190:24 191:5
191:22,24
192:2,3,17
193:22,24
196:24 197:5
197:25 198:8
199:3 201:4,5
201:8 202:13
202:16,21
204:11,17
205:3,12 206:7
206:12,15,20
207:4,6,10,11
207:14,17,18
207:19,20,22
207:22,23,24
208:7,14,18,19
210:9,23,25
211:4,16
212:10 213:1,1
213:13,17,24
213:25 229:22

229:24 230:3,5
230:5,7 245:12
245:21,22
246:1,2,5,16
246:17 248:9
248:12,14
249:2,17,20
250:5,7,8,12
250:14 251:7
256:3
**9's**  186:21
190:25 192:6
192:13 204:12
204:15,24
210:10
**90**  186:20
**900**  2:7
**901**  2:7
**94**  4:9
**95**  4:11 186:20
**970**  2:4
**98**  4:12
**9:29**  1:20 5:2,4
**9th**  255:4

### a

**a.m.**  1:20 5:2,4
78:20,20
**abandoned**
64:16,24
**ability**  52:15
179:24
**able**  10:21 52:5
55:4 67:20
87:20 135:12
145:6 171:23
189:19 198:23
198:25 200:23

223:25 224:12

**above** 1:18
77:9 112:25
115:11 131:20
153:23 253:3
256:6

**absolutely** 6:21
7:2 8:6 163:24
246:4

**abuse** 124:24
198:17,18

**academy** 14:22
15:2,3 44:16
67:22,25 68:19
70:3,5,13,22
92:2,4 104:14
104:15,16,22
130:19,19,21
130:25 131:2,3
131:15 247:10
247:13,21

**access** 80:5
139:6,12
140:14,20,21
141:8,13,19
144:9 145:6
150:1,7,8,9
179:1

**accident** 156:9

**accidents** 47:8
189:17

**accord** 59:10

**accuracy** 256:9

**accurate** 228:8

**accurately**
229:11

**achieve** 101:18

**acknowledged**
253:15

**acknowledg...**
256:12

**acquire** 247:8

**acronym** 79:2
79:22

**acronyms**
21:10,21

**act** 175:15

**acting** 18:14

**action** 1:6
224:16 254:6
255:2,3

**actions** 194:5,5

**activate** 145:5

**activated**
145:16,17,19
146:7

**active** 35:7
37:1,1 70:8
171:13

**actively** 36:13

**activities** 18:23
19:1,3 37:4
40:25 41:7
45:17 126:16
127:14 136:9
205:9

**activity** 47:20
73:4 129:20,24
130:3 188:12
188:18 245:4,4

**actual** 18:1
46:16 47:1
113:16,18
228:1,2

**actually** 35:18
52:4 97:1
141:25 149:15
164:5 207:21
214:4 227:8
232:9

**ada** 123:16

**add** 56:12,15
65:23 159:15
169:16 244:2

**added** 61:25
159:10 228:4

**addition** 26:12
161:16

**additional**
30:20 101:7
194:2 238:25

**address** 240:12

**admin** 176:20
176:23

**administration**
67:13 70:20
206:10 210:1
247:21

**administrator**
144:25 145:7
218:8,12

**administrators**
139:18 218:9

**admitted**
235:11

**adult** 67:10

**advise** 170:4

**affairs** 4:3
220:5,7 235:15

**affecting** 25:3

**affix** 253:2

**afraid** 192:3

**afternoon** 38:6

**age** 194:24

**aged** 209:24

**agencies** 20:24
21:3,17 22:4
22:19,21 23:2
23:18 25:1,3
25:11,12

**agency** 82:9
150:8 218:11

**aggressive** 51:8
188:25

**ago** 90:10
190:20

**agree** 13:16,20
13:23 34:21,22
34:25 186:22
188:12

**agreement** 5:10

**agreements**
21:16

**aguillama**
87:22

**aguillon** 50:25
51:5,20 52:23
53:10 54:5
57:5 86:10
87:23,24 88:1

**ah** 71:3 75:13

**ahold** 28:2
113:6,14

**air** 246:17

**airport** 100:19
100:23 101:9
101:10

**al** 256:4

alcohol 10:25
21:15
alek 1:3 5:20
181:14 220:6
230:9,19 254:3
256:4
alert 31:1
144:23 149:1
149:17 163:7
170:22 171:1
171:15,22,24
171:25,25
187:18 216:2,4
216:14 217:1,2
217:8,23 218:3
219:6,13
223:11,12
224:8
alerted 157:24
187:8,12 224:6
246:18
alerts 30:22
144:18,19
145:1,4 149:11
171:3,13
187:20 215:12
215:13,22,23
218:3,7,10,13
218:16,23,25
219:1,17
alignment
60:12
allotted 256:19
allow 222:23
allowed 147:17
allows 143:10
143:14

alongs 85:2
alongside
55:22
amazed 247:1
amazing
205:20
amber 171:25
ambiguous
64:19
amount 134:24
188:3 239:6
amounts
180:12
analysis 48:23
49:13,19,22
83:12,19
analyst 49:3
andy 72:15,16
angela 20:21
76:6
angle 113:24
anica 1:20 6:4
6:18 77:18,18
254:15 255:8
animal 191:21
animals 191:11
announcement
61:21
answer 8:22,23
9:4,6,12,13,13
9:17 47:14
64:19 67:1
157:18,21
163:9 165:11
166:5 174:6
answering 8:24
9:23 113:4
238:7

answers 8:9
10:17 30:6,6
156:13,17
157:2 158:4,13
158:16,21,22
159:3,7,13,14
161:12,13
162:25 163:12
163:15 180:24
185:11 222:24
anti 17:11,15
71:16,21 73:15
73:17 74:2
antigang 15:20
antonio 1:2,23
2:13 14:16,22
14:24 15:4
24:21 25:12
27:10 29:1
50:17 254:2
anybody 12:22
13:3 20:5 33:8
45:4 135:23
150:8 179:4,6
179:16 180:9
anymore 47:21
63:20
anyplace 229:6
anytime 217:6
apologies 234:5
apologize
95:20 97:5
app 152:5,18
231:20,20,23
232:20 233:7
appearance
231:13

appearances
3:3
appeared
253:11
applicable
256:8
applicants
62:10
appointment
121:18
apprehension
143:4 202:9,10
203:10
apprehensive
202:7
approached
44:11,14
appropriate
183:22
approval 22:18
93:1,11 123:4
approve 93:8
122:24 123:9
124:7,16,21
approved
92:25 98:13,24
101:16 130:20
137:23
approving 99:7
approximate
190:12 206:3
approximately
114:5 220:14
227:1
april 44:7
68:11,12 69:3
70:19 71:3
75:6 220:16,17

| | | | |
|---|---|---|---|
| 221:21 226:25 237:8 245:15 | 157:20 179:8 185:18 198:3 220:10 238:4 240:16,20 244:25 | 86:1 118:2 131:1,21 195:21 207:21 208:4,4,25 209:1,8 210:1 210:9 211:14 212:14 247:10 247:11 | **attack** 192:7 196:20 205:16 |
| **area** 33:13 36:18 37:23 49:7 79:3,4,9 79:10 84:3,20 103:21 199:10 214:9 242:13 | | | **attend** 14:22 88:2 89:14,17 90:8,9 |
| | **asking** 8:22 11:5 13:2 23:4 50:15 127:1 163:8 164:14 180:15,17 184:21 186:1 238:3 | | **attended** 34:7 88:3,4 90:4 91:24 248:16 |
| **areas** 18:10 25:1 32:19 33:18,20 49:17 73:3 | | **assigning** 105:14 | **attention** 120:17 184:18 189:15,24 199:22 200:8 |
| | | **assignment** 27:3 45:20 46:3,11,19,20 105:9 117:10 192:13 | **attorney** 9:9 255:2 256:13 |
| **argue** 9:17 230:20 | **asks** 186:9 238:3 | | **attorney's** 132:8,16 |
| **arguing** 110:4 | **asleep** 189:25 | **assignments** 39:14 46:2 | **attorneys** 11:4 136:1 |
| **arlington** 2:8 | **aspect** 90:24 | | |
| **arrest** 11:17,25 20:7 31:2 59:17 109:12 110:25 111:2,5 112:3 122:23 123:4,6,10 | **aspects** 40:16 192:2 | **assist** 57:24 | **atypical** 17:23 |
| | **ass** 232:13,25 | **assistance** 246:9 | **auditing** 120:20 |
| | **assessment** 28:9 39:24 | **assistant** 129:22 130:2 175:24 193:8 | **august** 14:18 255:4 256:3 |
| | **asset** 132:6,9 132:19 133:8 133:12,18 134:4 135:1 | | **augustine** 77:17 |
| **arrested** 30:11 30:12 129:12 | | **associated** 69:13 99:25 | **austin** 2:4,19 |
| **arresting** 41:12 | | **assume** 144:2 146:12,25 147:1 231:22 238:24 | **authority** 83:3 |
| **arrests** 7:9,10 | **assign** 125:5 | | **auto** 17:25 89:6 |
| **arrive** 187:24 188:4 192:3 | **assigned** 16:1,6 16:8,8 22:1 25:15,16 27:3 28:2,14,15 31:24 32:18 33:10 38:3 39:8,25 41:17 46:10 47:11,17 48:2 49:3 51:6 51:10 54:21 70:3 74:23 76:9 77:25 | | **automated** 118:24 |
| **artery** 83:20 | | **assuming** 82:21 | **automatic** 148:20,20 |
| **article** 186:15 195:21 | | **assumption** 146:25 | **automatically** 122:24 147:20 171:1,4 |
| **asap** 113:13 | | **atascosa** 57:22 | |
| **aside** 80:12,16 112:2 147:17 149:7 153:22 155:22 | | **atf** 21:6,14 | **available** 61:8 210:15 213:1 213:13 256:6 |
| | | **attached** 1:25 97:23 254:23 256:11 | |
| **asked** 9:10 142:6 157:15 | | | |

**avenue** 2:4
**avoid** 10:4
  165:25
**avoiding** 197:2
**aware** 190:5
  241:1
**axon** 117:2,7
  117:10 119:1
  120:23 121:3
  142:16,18
  143:7,20 144:6
  144:7,12 145:2
  145:6,9 147:22
  150:10,11
  244:17

**b**

**b** 4:1 5:11
  13:10 235:10
  243:16
**babb** 1:5 2:16
  4:5,6 6:8 60:16
  60:19 61:9
  106:7 114:1
  150:20 152:3,4
  152:22 153:12
  181:10,16
  182:8,13
  215:17 217:2
  218:15 220:24
  221:8 222:19
  223:3,6 224:1
  227:11,16,19
  229:13 230:15
  230:19 231:4
  231:19,21
  232:1,3,12
  233:23 234:12

  234:20 235:5
  254:6 256:4
**babb's** 12:4,5
  12:12,21
  223:21,23
  225:14 234:8
  234:19,21
  238:20
**back** 29:15
  33:3 39:3 41:3
  42:9 49:24
  51:3 55:5,16
  56:22 59:2
  61:1,4 78:18
  78:21 79:1
  86:11 90:5
  97:7 103:25
  109:7 110:22
  132:11 135:19
  136:6 154:16
  155:2 160:13
  160:16,19
  162:5,18
  163:17 175:22
  176:20 185:13
  192:25 193:12
  199:24 200:1
  204:8 210:3
  215:8,14
  222:23 223:4
  223:24 230:4
  239:7 240:14
  240:20
**backtrack**
  57:16
**backup** 106:6
**bad** 9:11 38:15
  114:14

**bag** 154:14
  165:13 223:15
**bags** 168:5
**balancing** 52:9
**bargaining**
  56:14
**base** 40:8
**based** 134:20
**basic** 6:23
**basically** 6:15
  33:17
**basis** 24:5
  195:23
**bates** 225:22
**bathroom** 9:21
  78:15,17
**batteries**
  104:18,20
**bb** 95:17
**bc** 235:17
  236:25 237:4
**bc307** 225:21
**bear** 5:25
  105:18 225:8
  225:10
**becoming**
  162:24
**bed** 223:4,14
**began** 5:2
  85:14 206:6
**beginning** 70:4
  116:25 117:14
  127:9 130:21
  204:18,25
  229:18
**begins** 227:9
  229:9,20
  230:13 231:18

  232:8 233:10
**behalf** 34:10
  206:21
**behavior** 158:4
  158:8,14,21
  159:14 161:12
  189:10
**behavioral**
  83:12,19 87:13
  159:8
**believe** 61:25
  62:12 71:24
  77:11 86:1
  88:24,25 89:19
  95:9 138:2
  139:14 147:14
  151:4 157:13
  174:3 187:25
  201:9,9 203:13
  203:15 205:1
  209:21 210:17
  215:14,17
  220:4 221:1,12
  223:14 227:21
  228:13 238:2
  245:14 246:11
  246:11,12,22
  248:11 250:11
  250:13
**belongs** 95:9
**ben** 77:22,23
  77:24
**best** 10:22
  34:14,20 39:23
  63:22 74:14
  174:22,23
  240:12 246:2

**bet** 77:18
**better** 119:20
194:20
**bexar** 1:9
13:15,17,21,24
14:18,23 15:2
57:23 78:1
91:1 96:18
149:25 150:1
152:15 157:17
173:23 194:7
195:1,2 242:13
245:12 246:21
247:17 249:8
251:8 254:10
**beyond** 115:11
**big** 14:13 60:2
127:24 132:9
166:1,11 193:1
**biggie** 126:5
**bike** 14:6
**billy** 84:23
**bird** 188:22
**birds** 188:23
**bit** 14:2 17:10
17:14 31:20
37:17 49:25
51:2 57:17
62:15 65:15
72:6 74:7 82:2
87:21 91:6
92:17 103:25
105:13 106:7
109:7 110:22
115:11 120:1
126:14 132:11
149:23 150:16
154:23 178:2

190:1 191:14
191:15,16
197:11 219:21
244:20 250:19
**black** 178:4
**blanca** 49:9,10
**bland** 175:15
**bleep** 160:5,10
**blessed** 54:20
55:3
**blue** 169:25
170:17
**board** 60:17
84:9 153:23
**body** 12:11,12
12:15,21 87:13
104:17 116:23
117:21,25
118:3,11,18
119:3,9 145:25
146:18 177:11
181:10 222:22
223:20,21,22
230:5,7 234:6
234:8,19,22
238:19,20,21
244:17
**bomb** 186:12
186:13,17
195:17,18,20
202:2
**bombs** 206:16
**bonuses** 115:24
**book** 178:13
179:7,13,16
**books** 179:1,8
**border** 21:8
24:3 29:2,21

159:5
**boss** 77:1
**bosses** 212:8
**bother** 176:22
**bottling** 14:13
**bottom** 66:19
235:18
**boulevard** 2:18
**box** 97:20
118:20,20
**brain** 195:12
195:13
**brazos** 177:21
**break** 9:20,23
10:2,13 77:20
78:12,15,17,18
78:20,22 105:6
114:12,16
130:9 135:16
135:18,18
181:5,7 189:7
215:1,7
**breakdown**
183:18 202:1
**breakfast**
106:8,18
**breaks** 196:25
**brian** 76:8
211:25,25
**brief** 215:1
**bring** 121:19
130:6 131:22
149:2 176:7
192:19 214:3
**bringing** 35:18
**brings** 122:13
**broader** 122:13
186:9

**broken** 176:19
**brought** 35:22
90:19 199:22
209:14
**brush** 199:9
**bucket** 123:5
124:22 125:16
131:18 154:15
163:15
**buckets** 18:13
19:2
**bucky** 207:20
208:3
**buddies** 28:16
**budget** 58:13
130:25 131:3
131:12 244:10
244:13 247:7
**build** 38:25
**building** 21:6
83:4 136:20
154:11 180:25
**builds** 29:7
38:25
**bulletins** 25:22
**bunch** 12:9
135:13 140:2
155:1 162:7,12
**bureau** 16:2,3
16:7,8 67:11
**burglaries**
17:25 49:12
**bus** 200:12,15
**business** 137:8
239:1
**busy** 121:17
**butt** 116:10

**button** 25:9

**c**

**c** 2:1 5:1
  147:12,13
**cad** 169:7,12
  169:13 170:7
**call** 4:5,6 6:25
  27:24 28:16
  42:3,20 43:7
  43:21 55:18
  103:15 104:1,3
  104:8,8 106:14
  106:17 109:24
  111:17 112:4
  112:23 113:3,3
  113:6,7,12
  116:7 122:8
  128:19 129:2
  157:23 176:5
  185:5,21 186:3
  186:10,13,16
  186:25 187:2,5
  193:2 207:25
  213:9,16,17,24
  214:16 220:11
  222:14,23
  223:17 224:18
  224:23 225:2
  227:11,12
  235:5 236:23
  237:21,25
  244:2
**called** 5:13
  150:21 181:19
  192:23 207:23
  210:22 214:9
  220:6,13

221:14 222:2,4
222:5,7,11,16
222:17,18
223:24
**calling** 19:4
  58:1 113:15
  207:19 222:8
  223:18
**calls** 23:17 36:9
  36:11 42:6,8
  42:18 43:17
  136:3 186:20
**cam** 143:8,10
  143:15 144:4
  146:18 177:11
  222:22 223:20
  223:22,22
  234:6,8 238:19
  238:20,21
  239:10
**camaro** 170:1
  170:17
**camera** 12:11
  12:12,15,21
  116:24 117:21
  117:25 118:4
  118:11,18
  119:3,10
  120:20 121:1,3
  121:6,10,23
  122:7,11 143:1
  143:18 144:22
  145:10,13,14
  145:25 146:2,6
  146:13 148:17
  148:25 181:10
  221:9 225:14
  230:6,7 234:19

234:22 235:1
  244:17
**cameras**
  138:19 142:1,5
  142:8,8 148:22
**cams** 104:17
  142:19 146:18
  146:21
**cannister**
  223:15
**canvassing**
  18:10,18 19:4
**capacity** 1:6,8
  1:9 15:23
  254:7,8,9
**captain** 13:12
  34:10,13,19
  77:14 91:17
  177:25 206:21
  243:24 244:25
**capture** 8:14
**captured** 229:7
**capturing**
  228:11
**car** 30:7 39:1
  104:21 114:21
  114:22 120:16
  138:19 139:6
  140:25 150:15
  152:13 155:12
  155:17 156:9
  160:7,11,13
  165:20 168:4
  170:24 171:14
  180:10,11
  217:10 238:22
  246:13,18,19

**card** 213:25
  253:13
**care** 192:19
**career** 7:8
  14:17 56:18
  92:24
**carotid** 83:20
**carry** 104:20
  171:5
**carrying** 163:4
  163:19 168:19
**cars** 90:18,20
  137:11,15
**casa** 49:9,10
**case** 5:20 33:13
  94:21 127:17
  135:23 136:5
  146:3 151:6,6
  187:25 195:20
  219:22
**cases** 125:6
**cash** 132:18
  135:13
**catch** 98:16
  151:23 153:10
  154:7 187:10
**categories**
  18:22 37:13
  38:13 65:9
**category** 38:14
  38:23 62:20
**cause** 1:19 29:8
  32:11 51:12
  85:15 122:22
  153:18,21
  154:8,17
  155:16,17
  157:23 160:1

233:1 238:13
246:15
**caveat** 31:12
**ccp** 56:7,8
**cell** 94:18,19,20
186:14,15
**center** 24:21,23
24:24 25:14,17
25:18,23 26:19
27:9,10,21,24
28:6,14,20,22
29:6,14 30:1
30:15,19,23
67:15 241:19
242:9
**centers** 28:19
242:12
**certain** 49:7
62:19 80:3,5
82:9 83:7,10
87:15,15 94:24
94:25 107:11
132:8 145:15
145:19 146:1
151:1 196:5
**certificate** 3:11
**certification**
249:9,11 251:5
254:13
**certifications**
249:17
**certified**
193:11 246:5
247:3 249:7
250:11,14,25
254:15 255:4
**certifies** 249:6

**certify** 250:12
254:15,19
255:1
**certifying**
249:1
**chain** 28:6,7
93:12,19
**challenge**
230:21,24
231:10,12
239:19
**challenging**
230:8
**chance** 105:2
193:4
**change** 103:3
169:1 206:6,10
210:5 252:4
**changed**
132:25 205:18
205:18 214:22
**changes** 3:10
252:1 254:23
254:23 256:10
**chapter** 11:23
11:25
**chapters** 11:21
12:20 61:25
62:2,4,4,17,19
**characterizati...**
239:23
**characterize**
174:19
**charge** 74:17
**charges** 31:3,4
**charles** 1:22
2:11,12,12 6:9
6:10 66:2

95:14 96:20
225:23
**charlie** 6:10
**chart** 4:8 65:17
66:9,15,18,21
66:22,25 67:2
68:10,13,17
71:17 73:11
**chase** 64:12
**chases** 47:7
**chat** 106:2
150:21,25
152:5,20
**chebert** 2:5
**check** 110:4
118:20 169:6
169:12 173:12
175:1,3 176:7
226:5
**checked** 173:16
**checking**
169:13 175:9
**checks** 29:21
**chevy** 169:25
**chief** 67:14
70:20 72:14,16
72:17 77:12,12
89:23 93:12,12
127:21 128:9
128:10,19
129:2 130:5
137:24 193:8,8
196:18 224:13
**chiefs** 134:19
**child** 124:23,24
166:18,21
171:21

**children** 7:17
166:1
**choice** 43:3
119:20
**choose** 176:17
**chose** 40:11,12
51:9
**chris** 51:10,23
**christen** 2:3
**christie** 5:19
6:3
**christopher**
50:25
**chrles** 256:1
**chunk** 132:9
**cid** 49:16 57:9
77:15 130:21
247:23
**circles** 238:20
**citation** 114:17
173:2 175:5,8
175:14,20,21
175:22 177:8
177:13 181:17
181:22 182:9
182:14,15
189:11 231:6,9
**citations**
176:10,17,22
189:10
**cite** 173:17
**cited** 230:23,25
**city** 14:15
208:10,14,20
**civil** 1:6,24
7:13,17 56:12
56:13 254:6

civilian 49:3
  77:25
cjis 147:9,12
claim 101:11
  101:11
claimed 238:9
claiming 23:18
clarify 8:19
  99:1
class 88:16,19
  89:5 90:8,9
  92:22 93:25
  99:17 105:3
classes 44:17
  51:18 86:7,8
  86:11 87:1,2,3
  87:4,8,8 88:4,4
  90:4 92:3
classification
  45:15
classified 45:12
clean 78:23
  96:21
cleaned 97:4
clear 8:7,8,9,21
  10:18 72:7
  167:10 219:5
clearheaded
  11:2
clearly 54:13
clientservices
  256:15
clip 10:8,12
  225:13 227:22
  227:23,23
  228:4 230:15
  233:12 234:18

clips 10:7
clock 226:14
close 109:4
  111:20,21
  112:4,11 215:3
closer 215:4
closing 235:24
clothes 31:22
  165:13
clothing 23:8
clue 163:2
coach 114:13
coaching
  115:13
code 56:7,9
coffee 190:1
coincided
  223:21,22
collar 198:4,5,9
  198:12,19
colleague 6:3
  94:15 98:4
collect 24:25
collected 92:10
collective 56:14
collects 117:11
college 14:24
  15:4 54:1,2
collin 50:11
color 66:5
come 14:5 20:4
  24:16 25:23
  29:1 31:23
  55:5,19 74:10
  78:18 84:2
  90:11 104:15
  105:4 106:6
  110:7 125:3

130:14 131:6,9
  131:10,12
  144:19 157:6
  162:5 163:17
  166:15 169:2
  171:18,20
  172:2 174:2
  184:2,18
  192:25 204:8
  207:25 223:8
comes 50:18
  93:2 95:13
  115:8 146:2
  165:12 221:6
comfortable
  188:17
coming 36:17
  57:23 78:21
  83:5 84:4,9
  101:10 119:23
  137:5,6,7
  141:5,6 160:7
  168:3 180:7
  246:13
command 28:7
  93:12 128:12
  211:13
commander
  15:8 26:9,13
  70:5 71:10,11
  74:13 75:5
  211:9,13
  212:11
comment 118:8
committed
  107:7
committing
  19:12 188:18

189:12 215:24
communicate
  105:21 112:20
  127:5,19
communicated
  45:15 126:15
communicati...
  112:24 142:11
communicati...
  58:2
community
  37:15 43:10
  81:16
companies
  82:6,8 88:7
  137:3 141:9,13
company 14:13
  164:11
comparable
  53:12
compare 50:11
compartment
  87:4,8 88:3,16
  89:5
compartments
  82:16,21 88:25
  90:18,21,22
  91:2,3
compel 243:6
compile 126:23
complain 114:9
  114:11 221:14
complained
  148:2
complaining
  220:8,9
complaint
  129:4 148:1

184:2,19 220:5
220:7,14 221:2
221:18,21
222:3,10,11,19
223:2 224:1,5
227:20 235:25
240:11
**complaints**
36:16 37:3,8
116:5 224:13
**complete** 92:13
107:17,22
108:3,6,8
110:8,10,18,21
110:24 129:24
169:2
**completed**
109:14,21
110:14,20
123:10 124:15
125:19 256:16
**completely**
64:24 200:10
251:8
**completing**
109:11
**completion**
254:21,25
**compliance**
67:11 147:10
147:12
**comply** 243:5
**computer**
105:25 106:1,2
117:11 169:6
169:13,13,15
169:19,20
249:22

**concentrate**
37:20
**concentrating**
49:13
**concentration**
47:25
**concept** 50:8
**concern** 189:15
**concerns**
238:25
**conclusion**
33:20 58:16
**conduct** 18:10
20:6 48:18
85:13 174:15
238:25 239:1
241:9
**conducted**
111:18
**conducting**
15:24 115:16
117:25 120:13
153:16 174:4
182:20 213:8
213:11,15
**conference**
90:5
**confidential**
18:8,14,15
19:3
**confirm** 24:5
149:5 228:7
**confirmed**
235:15
**conflicting**
156:12
**confuse** 199:16

**confused** 79:15
**congratulatio...**
14:20
**congress** 2:4
**connect** 142:2
158:14
**consent** 156:1
182:21,25
183:6,9,10,11
183:15,16,18
183:18,21,23
183:24 184:10
184:18,24
185:4,15,18,19
**consented**
184:21
**consideration**
253:17
**consistent**
158:15,16
185:11
**consulting**
113:17
**contact** 24:4
29:13 30:3,3
37:2 51:14
154:10 157:15
157:21 162:16
162:17 163:3
165:25 169:4
169:10 171:23
172:10 173:21
180:8,20 217:2
217:3
**contacted**
180:8
**contacting**
113:15

**contacts** 37:6
**contains**
254:23
**context** 165:20
188:20 228:16
**continue** 190:2
215:3
**continues**
234:4,16,25
**continuing**
92:5
**contraband**
80:5 101:12
155:9 183:7,13
**contract** 56:14
138:8
**contracts** 23:16
**contradicting**
30:6
**control** 205:17
**conversation**
4:9 8:25 10:16
24:10 28:17
45:5,6 94:18
95:1 96:6 97:8
136:19 151:25
157:7 184:4,8
185:25 227:19
228:2,6 229:11
230:16 233:20
233:25 238:16
**conversations**
13:1,3 53:2
94:25 95:1
126:17
**converse** 208:7
208:9,10,14,20
208:21

**cook** 164:3,4,5
**cop** 89:17,20
  90:11,25 91:19
  102:10,11,13
  119:24
**copies** 66:6
  94:15 176:18
  256:14
**copy** 66:2
  123:18 175:18
  178:22
**corner** 226:6
**correct** 7:12
  11:22,24 12:1
  12:1,14 13:11
  13:13,22 18:17
  18:19 26:4
  27:7,23 30:17
  30:21 32:14
  34:3,6 35:13
  37:13,16 38:18
  38:22 42:14,16
  42:19 43:19,23
  44:1,3 45:3,14
  52:14,17 58:15
  59:12 60:7,15
  60:21 61:6,19
  62:6 64:8,13
  64:18 65:10,14
  66:11 68:1,14
  68:20 69:12
  70:25 71:10,22
  73:18,20 74:18
  74:18 75:12,16
  76:14 77:7
  78:3,5 80:6,7
  80:14,23 81:1
  81:17,21 82:4

82:24 84:10
85:6 88:20,22
92:14 93:14,20
96:18,19 97:1
98:12 99:12
101:19 104:7
105:10,12,15
107:4,18 109:5
109:25 111:1,6
115:1,17,20
117:12,23,24
118:13,16,25
119:5,7,16
120:3,11 124:6
124:14,14
125:14,21
126:9,11
127:25 128:11
130:1 131:19
131:19 132:4
132:17 133:11
133:14 134:2,5
134:8 137:13
139:4 141:20
143:16 144:1,8
146:14 148:15
150:11 151:15
152:6 153:24
155:4 157:3
158:23 159:12
161:2,15,18
162:9 165:5
167:9,13
168:12 169:22
171:9 172:1,15
172:20,22
175:2,6 178:21
182:10,16

185:17 187:7
188:8 193:20
194:3 199:23
199:24 201:3
201:16 202:19
204:13,20
205:22 206:24
207:1 208:15
209:6 211:1,17
211:20 212:3,7
212:19,21,23
213:5,18
214:20 215:13
215:25 216:21
217:9 218:8,14
219:16 221:23
222:1,13 226:6
226:17,18
227:2 228:21
229:6 230:18
231:8,11,25
233:2 234:1,14
234:23 235:2
241:6,7,7,12
242:11 244:23
248:13,23
251:3 253:3
**correcting**
  119:15 120:10
  120:12
**correctly** 35:21
  99:19 115:19
  229:7 236:15
**counsel** 2:2,10
  2:16 5:5,10 6:9
  6:9 9:14 13:2
  79:20 95:25
  243:9,25

244:25 255:1
256:14
**counterpart**
  20:16
**counties** 58:2
**county** 1:9
  13:17,20,21,24
  14:18,23 15:2
  30:11 32:19
  33:18,21 34:11
  35:3 49:7,11
  50:11 57:22,23
  57:25 78:1
  89:20 91:1
  94:19,20 95:24
  96:18,24
  103:19,20
  105:20,20
  115:24 149:25
  151:24 152:15
  154:6 157:12
  157:17 173:23
  194:8 195:1,2
  206:22 221:14
  222:21 242:13
  244:21 245:12
  246:21 247:18
  249:8 251:8
  253:9 254:10
**county's** 6:9
  13:15 34:8,14
  95:24 132:3
  150:2
**couple** 7:3
  35:14 39:3
  69:13 78:23
  84:20 121:22
  130:8 193:12

| | | | |
|---|---|---|---|
| 226:24 229:16 | **covered** 91:2 | 130:22 151:9 | 56:25 58:13,18 |
| 236:25 248:7 | **covert** 20:17 | 151:10 206:23 | 58:23 59:7,23 |
| **courier** 29:10 | 60:11,14 74:22 | 207:3,13 209:8 | 60:9 61:4,8 |
| 29:10 31:1 | 117:19 124:23 | 210:10 211:15 | 63:19 64:14,16 |
| 48:17 214:7 | **cps** 171:21 | 212:14 213:4 | 64:22,24 65:2 |
| 215:19 219:2,2 | **crashing** 115:8 | 215:24 | 65:4,16 66:9 |
| 246:11 | **create** 8:7 | **crimes** 7:16,19 | 66:12 67:18,23 |
| **couriers** 41:13 | 10:18 44:9 | 18:3,6,11,24 | 68:4,18,22 |
| 65:6 136:21 | 45:5 52:8 | 19:12 32:22 | 69:6,9,14 70:1 |
| 218:21 | 218:15,18 | 33:5,24 35:11 | 70:9 71:1 |
| **course** 19:10 | **created** 40:20 | 39:14 41:2 | 72:12 80:1,9 |
| 25:18 36:1 | 40:23 42:12 | 44:25 45:2 | 80:11,25 81:2 |
| 40:9 47:24 | 60:12 66:10,12 | 48:14,15 51:11 | 81:5,6,10,12 |
| 62:25 63:3,6 | 67:24 72:13,17 | 52:1 59:3,6 | 82:2 84:1,6,23 |
| 64:6 89:15,18 | 75:4 105:17 | 71:14 72:3,14 | 85:1 86:5,17 |
| 89:20 116:7 | 217:12,23 | 72:17,19,24 | 87:17 89:1 |
| 131:14 137:2 | 218:24 | 76:9 91:13 | 91:8,18 93:7 |
| **courses** 40:15 | **creates** 146:5 | 117:18 130:18 | 93:18 99:2 |
| 89:8 101:22 | 217:8 218:2 | 136:15 142:25 | 101:22 102:19 |
| 102:2,5,13,14 | **creating** 44:11 | 143:5 151:12 | 102:24 103:11 |
| **court** 1:1 6:4 | 44:18 | 189:6 | 112:21 113:16 |
| 6:18,19 7:9 8:5 | **creation** 45:9 | **criminal** 4:14 | 116:2,15,24 |
| 8:14 9:17 | **credit** 92:9 | 7:11 23:19 | 124:25 125:7 |
| 113:11,12 | **crime** 17:2,5,8 | 34:15,20 35:4 | 125:11,18 |
| 230:20,22,24 | 19:11 20:18,20 | 35:5,12 36:5 | 126:18 127:14 |
| 231:10,12,13 | 20:23 26:25 | 40:5,9,10,13 | 128:17 130:13 |
| 239:20 254:1 | 27:5 32:18 | 40:14,16,21,24 | 131:5,9,15,22 |
| **court's** 243:5 | 33:17,24 34:5 | 41:5,7,11,15 | 136:8,9,12 |
| **courthouse** | 47:11 48:3,15 | 41:18,19,21,22 | 137:10,14 |
| 52:1,3 55:11 | 48:23 49:6,12 | 42:7,11,22 | 138:14,17 |
| **courts** 14:16 | 49:15,19,21 | 43:22,24 44:4 | 141:23 148:6 |
| **cover** 174:4,8 | 57:8 60:12 | 44:10 45:5,9 | 149:10,12 |
| 174:16 196:10 | 68:6,7,10 | 45:12,17,24 | 152:23 168:20 |
| 222:20 223:2,3 | 71:16 73:3,12 | 46:20,23 47:10 | 168:22 179:18 |
| 223:4,4,9 | 73:14 74:12,16 | 47:13 49:16,25 | 179:25 180:5 |
| 224:1 232:13 | 75:4 76:12 | 50:1,9,11,19 | 180:18,21 |
| 232:25 | 79:17,18 95:12 | 50:22 53:8 | 182:20 183:4 |
| | 96:22 125:3 | 54:22 56:9,23 | 188:10,12,13 |

188:18,20
189:4 241:1,9
243:3,16,17
244:3,7,11,13
244:17 247:22
247:24
**crossed** 29:2
**crr** 1:21 255:8
**crucial** 196:16
**crushed** 199:11
199:11
**csfrigeriolaw**
2:14 256:2
**csr** 1:20 255:8
**curious** 202:24
**currency** 29:10
**current** 15:5
71:15 80:1
**currently** 15:7
16:7 48:23
49:2 72:21
73:24 75:10
77:9 133:2
249:18
**curtains** 83:10
**curtis** 76:8,15
76:22 211:23
211:25 212:2
212:11
**curtis's** 211:24
**cut** 114:15
227:25
**cv** 1:6 254:7

**d**

**d** 3:1 5:1
**da's** 22:17
84:21 132:24

**daddy's** 166:6
**daily** 24:5
241:10
**dallas** 84:19
85:7,17,22
86:4
**damage** 224:11
**damaged**
222:19 224:1
224:10
**dangers** 64:9
**dark** 160:12
199:15
**dash** 120:20
121:1,3,6,9
122:7,11
142:19 143:8
143:10,15
144:4 145:9,13
145:14 146:6
146:13,18,21
221:9 225:14
235:1 239:10
**database** 141:8
**date** 46:4 66:16
67:4 226:10,11
252:3 254:22
255:8
**dates** 190:12
**dating** 178:2
**day** 1:19 10:5
20:3 33:3
36:11 38:4
44:15 103:3,7
103:11 105:11
105:14 109:15
110:12 165:12
168:5 195:14

206:12,12
216:4,12,13
219:18 232:2,4
232:16 233:24
246:10 253:11
253:19 255:4
**daylight** 38:5
73:6 199:14
**days** 17:22
19:20,23,24,25
44:17 84:25
85:4 104:11
121:22 139:19
221:14 248:16
254:22 256:16
**dea** 21:6 22:1,4
74:23 207:22
207:23 208:4
208:25 210:1
**dead** 199:10
**deal** 17:24
39:10 62:24
207:16
**dealing** 17:8
62:24 100:19
101:9 195:7
230:2,2
**deals** 207:15
**dealt** 39:10
**debt** 35:21 36:2
164:11
**december** 47:9
63:22
**deceptive**
87:20
**decide** 93:17
100:8

**decided** 55:24
59:2
**decimate** 25:2
25:10
**decimation**
27:12
**decipher**
246:25
**decision** 137:21
**dedicated**
207:4,6,10,11
207:14,17,18
**deep** 114:2,3,7
**deer** 188:23,24
**default** 177:14
177:19 210:25
**defects** 6:14
**defendant** 2:16
**defendant's**
243:5
**defendants**
1:10 2:10
243:21 254:11
**deficiencies**
199:21,24
200:8
**definition**
37:10 41:10
**degrees** 83:20
**deliver** 32:9
48:17 246:13
**denied** 185:19
**department**
239:19 247:18
**depend** 111:24
**depends** 113:2
113:9,20
131:21 140:18

Peter Gamboa
July 23, 2024

[depends - discussed]

Page 15

| | | | |
|---|---|---|---|
| 155:11 160:11 | 97:8,12 98:10 | **describe** 74:14 | 90:20,22 |
| 160:21 166:1 | 99:9,16,22 | **description** | 105:24 122:21 |
| 169:8 180:24 | 100:12 106:7 | 62:7 244:3 | 127:9 130:15 |
| 186:11 | 114:24,25 | 253:13 | 145:7 148:11 |
| **deployment** | 129:2 131:12 | **desert** 88:6,8 | 160:25 161:23 |
| 249:19,22,25 | 137:24 140:3 | 88:21 102:7,13 | 162:10 166:12 |
| 250:20 | 150:20 152:22 | **desk** 58:10 | 166:14 192:1 |
| **deponent** | 152:22 153:12 | **detail** 26:14 | 194:1 205:9 |
| 254:20,21,24 | 153:12 181:10 | 245:2 | 225:25 226:1 |
| 256:13 | 181:10,11,16 | **details** 220:2 | **differently** |
| **deposing** | 182:8,13 188:9 | **detain** 239:18 | 182:17 |
| 256:13 | 188:12 193:8 | **detained** | **difficult** 195:6 |
| **deposition** 1:11 | 204:11,17 | 238:10 | 197:22 |
| 1:16 5:6 6:14 | 206:19,22 | **detention** | **digital** 18:25 |
| 7:21 11:6 13:4 | 207:10 208:19 | 14:16 15:2 | **direct** 74:25 |
| 13:10,12 34:8 | 209:7 210:9,16 | 16:1,2,8,24,25 | 75:1 76:20 |
| 243:8,15,18 | 210:21,22,24 | 49:1 67:10 | 212:9 237:3 |
| 252:3 253:2 | 211:2,14,18,21 | 90:6 201:13,15 | **directly** 27:25 |
| 254:13,18,21 | 212:1,13,15 | 201:17 248:16 | 213:16 |
| 254:25 | 213:6,16 214:2 | **develop** 32:10 | **dirty** 154:20 |
| **deputies** 16:1,7 | 214:13,16,21 | 113:19 155:15 | **disagree** 34:18 |
| 49:2 71:23,25 | 218:15,15 | **developed** | 34:23 |
| 72:1,2 87:18 | 220:24 221:8 | 156:11 | **discover** |
| 101:15 131:18 | 222:19 223:20 | **developing** | 197:16 |
| 140:17 192:3 | 223:21,22,23 | 154:16 159:1 | **discrepancies** |
| 241:2 | 224:1 225:14 | **devine** 157:13 | 97:2 |
| **deputy** 7:8 | 227:11,16,19 | **dialogue** | **discretion** |
| 12:4,5,12,17 | 229:13 230:3 | 172:11 | 43:13,22 80:22 |
| 12:19 39:14 | 230:15,19 | **diaz** 1:20 | 81:4,9 114:15 |
| 53:10,17 55:23 | 231:4,19,21 | 254:15 255:8 | 134:18 175:10 |
| 57:5,6 59:24 | 232:1,3,12 | **difference** | 175:11 177:2 |
| 60:1,5,6,8,16 | 233:23 234:8 | 35:16 81:11 | 180:4 185:6 |
| 60:19,22,23 | 234:12,19,20 | **different** 12:9 | 212:18 |
| 61:9 73:11,19 | 234:21 235:5 | 21:17 25:1,1 | **discuss** 228:5 |
| 75:19 76:11,11 | 245:18,20,22 | 26:8 29:24,25 | 228:12 |
| 76:16,24 77:12 | 246:16 249:17 | 40:16 47:17 | **discussed** |
| 77:12 93:13,16 | 249:20 250:5 | 54:21 55:6 | 244:4 |
| 95:13 96:22 | 250:21 251:4,7 | 65:8 72:10,20 | |

discussing
  227:20
dispatch  113:5
  213:12,24,25
dispatched
  213:7
dispatcher
  213:16
dispatchers
  170:12,16
dispute  236:19
disregard  47:7
disrupt  50:19
dissolved  69:10
distinct  11:20
district  1:1,1
  37:2 132:8,15
  254:1,1
districts  36:13
disturbance
  42:4 109:22
dividing  206:1
division  1:2
  17:2,5 20:23
  27:20,22 28:15
  49:16 67:8,11
  68:22 69:5
  71:1 72:16
  76:12 95:12
  96:23 131:7
  206:23 207:4
  207:13 209:9
  210:10 211:15
  212:14 213:4
  245:12 247:22
  247:24 254:2
divisions  72:10

dock  104:17
document  10:1
  10:4,5 253:14
documents
  9:25 107:11
  243:11,22
  244:6,9,14
dog  186:15
  191:13 192:14
  192:15,19,22
  192:23,24,25
  193:2,3,5,10
  193:11,14,16
  193:24 194:6,8
  194:10 195:3
  195:17,18,18
  195:20,21
  196:1,12,15,24
  197:12,20,20
  197:23,24,25
  198:2,7,7,23
  199:10 201:6
  201:11,13,15
  201:15,17,17
  202:3 203:3,7
  203:11 209:21
  209:25 214:13
  223:11,12
  224:6,7 238:12
  238:15 239:19
  246:25
dog's  203:2
dogs  194:14,16
  195:11,13,19
  196:18,20
  197:6 199:4,7
  199:14,17,18
  201:20 202:2

205:12,14,16
  205:16,20,21
doing  18:13
  31:21 32:1,3
  33:6,8,14 34:4
  36:14 38:7
  39:15,23 41:6
  41:10,18 43:9
  45:16 47:10,11
  48:4,8,11,23
  49:4 50:6 52:4
  52:12 53:3,6
  55:13 70:9,11
  80:9 81:13,14
  81:18 87:5
  113:17 115:6
  115:19 116:14
  117:16 118:11
  119:22,25
  121:17 125:7
  127:15 128:13
  128:18,20
  134:9,13 137:8
  148:6 149:9
  179:18 180:17
  195:16 197:9
  197:22 199:1,4
  199:13 205:14
  247:2 249:6
dollars  59:18
door  37:7
  169:9,9 223:12
  224:9
downstream
  105:19
dps  157:25
  174:4,18

draft  130:6
drafting  22:14
dramatic  205:2
drank  189:18
draw  206:1
drink  9:21
  10:25 190:1
drive  167:19
driver  30:5
  51:8 81:24
  162:21,22
  165:7,8 166:11
  166:22,23
  167:20,25
  168:1,25 169:2
  169:4,10,16,21
  173:1 175:7,13
  179:21 180:1
  182:25 184:21
  185:1 187:4
  189:15
driver's  169:8
  173:14 174:25
  184:23 238:11
drivers  29:3
  38:15,15 47:6
  241:2
driving  28:25
  36:12 64:4
  137:6 144:21
  148:21,21,22
  148:24 149:4
  151:22 152:13
  154:6,20
  157:10 160:2
  163:13 166:3
  167:7,9,14
  171:14

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 274 of 322
Peter Gamboa    July 23, 2024
[dropped - equipment]    Page 17

**dropped**
246:21
**drove** 157:25
**drug** 22:7
30:11 31:1
48:17 79:3,4,8
79:9,17,18
154:24 155:3,8
155:23 156:25
158:11,24
159:18 161:10
161:20 186:24
187:3,5 238:12
239:19
**drugs** 17:24
36:20 39:11
41:12 48:17
50:17 84:2
127:18 132:12
155:2,20
156:21 158:12
158:20,20
161:11,11
207:16
**drunk** 120:17
**dude** 39:22
**duffel** 154:14
**duh** 21:14
**duly** 1:18 5:13
254:17
**dustin** 50:25
51:5
**duties** 34:5
47:17 206:16
241:10

**e**

**e** 2:1,1 3:1 4:1
5:1,1 77:22
**eagle** 246:12
**earlier** 37:20
66:22 67:2
244:20 247:9
**early** 137:17,18
**easier** 228:25
**east** 141:4
208:12
**easy** 116:25
**eat** 106:9
**efforts** 44:9
64:16,25 80:2
81:3,5
**egregious**
31:14
**eight** 16:18
71:24,25 87:25
201:10,11,20
201:23 202:1,4
**either** 18:8
51:15 72:10
82:8 130:20,25
173:14 195:20
210:17 215:19
**el** 28:20 29:6
29:13 30:1,15
30:19,22 242:9
246:12,13
**elementary**
14:6
**ellsworth** 2:17
6:7 181:4
251:16

**email** 82:9
118:23 125:13
125:16 237:7,7
237:12,13,18
237:21,24
240:15 244:25
**emails** 139:21
140:10
**embarrassment**
88:14
**employed**
255:1
**employee**
24:21 25:13
**employer**
163:21
**encompassed**
70:22 130:16
**encompasses**
48:14
**encounter** 35:6
**encourages**
92:13
**endangering**
38:15
**ended** 58:4
63:21,23 64:15
68:5 251:17
**enforce** 189:6
**enforcement**
14:17 15:21
16:3,6,21,22
20:24 23:2,5
25:3 33:11
34:2 47:12
69:1,2,11
79:18 142:25
143:6 189:22

190:3 201:10
201:20 215:23
241:22 242:1
244:10
**enforcing**
189:5,9
**engine** 113:6,6
**english** 162:19
**enter** 169:15,18
169:24,25
170:12,25
171:14 216:16
**entered** 144:20
149:1,6,16
157:17 170:9
171:17,22
215:18 216:8,9
216:14 217:6
217:22 218:5
**enters** 216:20
216:22 217:17
**entire** 10:15
60:22
**entirely** 72:7
135:8
**entirety** 10:2
10:12 202:13
**entities** 23:3
142:15 209:5
**entries** 245:1,3
**environment**
15:22
**epic** 30:1
**equals** 201:8
**equipment**
127:1 133:9,21
134:6,10,15
149:21 176:15

errata  256:11
  256:13,16
esquire  256:1
essentially
  72:22 162:11
estimate  31:9
  62:13 182:24
  183:17
et  256:4
ethic  52:25
  245:17
evaluate  115:3
  156:25 192:22
  195:22,23
  198:15
evaluated  50:1
evaluation
  197:17,19,19
evasive  30:6
  156:13 162:25
  185:10 186:4
event  170:14
eventually
  39:21 79:13
  130:25
everybody  6:2
  6:11 19:18
  52:8 56:3
  103:15 104:8
  114:17 160:8
  192:21
everybody's
  218:9,13
evidence  45:2
  47:20 154:24
  154:24 155:3,5
  155:8,17,23
  156:5,16 157:4

157:6 158:24
  159:23,25
  161:10,20
  162:7 165:21
  239:15
exact  210:19
exactly  95:4
  135:7 228:11
examination
  3:7,7,8 5:17
  94:21 97:22
  245:9 248:5
examine
  243:19
examiner
  94:18,24 95:5
example  25:7
  37:21 49:8
  94:2 107:11
  109:22 127:16
  128:4 140:2
  144:20 146:24
  147:17 149:7
  154:3,5 156:14
  157:8 158:3
  175:17 177:9
  189:13 191:25
  246:6
excellent  116:2
  116:4
except  13:7
  81:7 177:17
  253:3
excited  117:15
exclusive  41:18
exclusively
  42:13

excuse  6:10
  96:11 145:17
  235:17 244:5
execute  20:8
executed
  253:16
executive  15:10
  26:14
exercise  43:21
  80:22
exercises  180:3
exhibit  4:3,4,6
  4:7,9,10,12,13
  65:19,22,23,23
  66:1 79:24
  94:5,6,6,11,13
  94:15 95:17,17
  95:18,19 96:7
  97:7,24,25
  98:1,3,5 100:1
  100:3,4 225:10
  225:11 229:1,2
  229:16 235:7,9
  235:9,10,12
exhibits  3:4
exist  120:20
  178:10 243:11
existence  64:23
exists  80:25
exit  169:7
expect  23:20
  24:12 46:24
  49:21 106:22
  109:13,16
  110:9,14
  111:21 112:4,7
  114:17 122:8
  135:11 149:9

149:12 169:2
  170:10,21
  180:16 182:19
  185:5 187:8,14
  187:17,23
  199:14
expectancy
  205:8
expectation
  47:2 50:5,13
expected  41:7,9
  42:21,23 43:2
  43:8,11 47:1
  103:12,13
  107:1 136:14
  149:19 172:12
  179:20,22
  192:21
expecting
  49:23
expensive
  196:19
experience
  39:13,16 51:19
  52:2,4,12
  53:13 55:7,14
  55:16 56:22
  59:6,7 62:17
  62:21 91:13
  134:21 135:6
  135:10 157:9
  160:21 183:2,3
  183:4,6 190:25
  192:2,6 204:12
  205:11
experienced
  61:23

| | | | |
|---|---|---|---|
| experts 40:15 | failed 192:12 | falls 26:24 | 125:24 |
| expiration | 192:15 198:9 | 212:10 | fenced 196:9 |
| 255:8 | 243:21 | familiar 21:11 | fentanyl 25:7 |
| explain 52:19 | failing 38:8 | 49:10 62:3,18 | fewer 57:4 |
| 83:24 112:22 | fails 256:18 | 62:18,19 87:11 | fictitious 186:5 |
| 120:2 | failure 176:3 | 88:10 95:4 | field 20:15 |
| explained | 176:15 189:13 | 98:5 100:6 | 104:12 105:4 |
| 48:13 | fair 6:20 7:18 | 178:8 | 112:22 174:14 |
| explaining | 8:14 28:9 | familiarize | 199:9 212:9 |
| 172:21 231:4 | 31:12 33:18 | 87:4 | figure 79:1,21 |
| explanation | 35:12 38:17,21 | family 164:11 | 83:3 95:8 |
| 236:3 | 39:24 40:21 | 171:23 | 147:2 176:6 |
| explanations | 41:8 42:15 | far 15:23 21:3 | 226:24 243:11 |
| 163:22 | 44:2 52:7 57:2 | 23:22 25:19 | 243:24 |
| explosive 202:4 | 58:9 64:17 | 40:1 45:6 70:6 | file 46:15 |
| 203:20 | 68:15 81:24 | 101:8 247:7 | 238:24 |
| explosives | 86:21 97:9 | 250:24 | filed 178:17 |
| 202:2 203:7,8 | 99:11 101:13 | fast 223:2 | 214:22 |
| 203:9,25 | 105:16 107:3 | fau 143:1,3 | fill 107:11,12 |
| expressed | 107:19 119:11 | fault 196:21 | 107:14 122:22 |
| 253:17 | 126:10 141:17 | faustino 203:16 | 123:15 |
| extended 239:6 | 147:5 156:19 | fbi 21:6 22:4 | filled 57:13 |
| extortion 39:11 | 161:6 162:8 | february 99:16 | 127:12 128:21 |
| eye 38:20 51:14 | 163:23 165:4 | 137:19 190:14 | filters 145:5 |
| 165:25 | 168:13 172:16 | 190:23 | final 22:18 |
| | 174:19 186:19 | federal 1:24 | 123:10 130:6 |
| **f** | 189:3 194:18 | 5:6,10 31:3 | 244:24 |
| f 254:20 | 197:7 213:14 | feedback | finally 244:24 |
| faces 204:7 | 213:19 217:15 | 115:19 128:16 | financial 18:24 |
| facing 238:22 | 224:20,25 | 128:23 | 54:17 247:5,17 |
| fact 58:12 | 239:21,25 | feels 159:22 | financially |
| 64:22 80:12,16 | 248:10,20,24 | feet 114:5 | 255:2 |
| 114:10 141:21 | fairly 139:24 | fell 65:16 67:18 | find 20:4 45:1 |
| 174:24 182:13 | fall 17:2 66:13 | 67:24 70:5 | 46:13 137:5 |
| 197:4 | 66:21 67:2,7 | 200:4,4 | 140:4 149:16 |
| faculties | 147:9,14 | felony 143:4 | 191:10,12 |
| 189:19 | falling 189:25 | felt 52:4 59:1,2 | 199:18 223:6,7 |
| | | 59:15,17,22 | 225:23 |

**finding** 47:20
60:3
**fine** 10:3 62:13
97:3 196:14
**finish** 8:22,23
9:23 109:3
**finished** 111:23
125:15
**fire** 58:7
**firearm** 124:25
**firearms** 21:15
35:8 36:20
41:14 180:13
**firing** 57:22
**firm** 2:15 255:9
**first** 6:2 14:11
15:1 18:14
33:3 39:9,25
51:17 56:6,6
72:15 84:12
91:12 97:11
103:12,13
110:13 180:19
180:22 182:21
182:22 183:25
194:7,12 195:5
196:6 201:11
211:24 219:25
220:4 221:20
222:25 226:8
235:16 240:14
251:7
**fit** 69:16
**fits** 163:25
**five** 16:18
19:24 51:16
55:21 84:24
85:15 86:4

113:13 138:21
138:25 139:1
155:10,14,19
160:14 161:11
164:3 179:15
204:6,23
**fix** 121:14
**fixed** 121:24
122:3
**fixing** 201:2
**flag** 99:24
126:12 137:1
164:8 166:10
166:11 176:8
**flagged** 128:1
240:16,18
**flagging** 98:10
**flags** 164:12
199:3
**fleet** 77:25 78:6
121:14 142:24
246:21,21
**flip** 95:25
**flipped** 68:12
**floating** 12:10
69:23 158:2
**florida** 28:24
29:17
**flow** 149:19
**flyer** 4:12,14
93:6,16,17,23
93:24
**flyers** 82:9
**focus** 42:13
225:20
**fog** 115:7
120:16

**folks** 16:11
21:17 33:22
41:6 45:16
48:8 50:2 80:9
80:10 86:23
94:16 135:11
150:6 204:14
225:10
**follow** 112:1
136:23 192:21
215:9
**following**
33:21 85:10
183:9,10
187:18 254:16
**follows** 5:14
**food** 23:7
165:13
**footage** 12:13
12:16 116:24
117:22,25
118:4,11 119:3
120:20 121:1
181:10,13
230:6,7 234:20
234:22
**force** 21:24,24
107:14,23,23
209:25
**forcing** 238:12
**foregoing**
253:2,15
**forensic** 94:21
94:24 97:22
**forensics** 18:25
94:18
**forfeiture**
132:6,10,19

133:8,13,18
134:4 135:1
**forget** 242:6
**form** 36:5 80:4
80:15 107:24
108:2,6,8
240:2
**formal** 21:16
62:7 138:8
**format** 95:4
**formed** 41:16
44:4,5
**fort** 255:10
**forward** 72:19
72:21
**forwarded**
223:2
**found** 132:12
183:7,7,13
**foundational**
84:11
**four** 16:7,18,23
16:24 50:23,24
51:3 52:18
58:14,18 84:7
86:9 90:20
91:12 114:5
116:13,18
117:1 127:10
138:18,19
139:3 148:11
148:11 159:11
160:12
**frcp** 254:19
**free** 164:9
**frequent**
140:24

freshly 199:11
freveletti 20:21
  74:8 76:6,20
  76:23 77:10
  211:22
friday 19:25
  20:1 32:23
  103:6
friend 162:22
  162:23,24
  164:10,11
  166:6,6
friends 164:22
frigerio 1:22
  2:11,12,12 3:7
  5:9 6:9,10,11
  9:9,12,14 66:4
  80:15 97:3
  135:17 218:6
  240:2 242:4,20
  242:23 243:7
  243:12 245:6
  245:10 248:4
  251:15 256:1
frigeriolawfir...
  2:15
frisk 11:15,23
front 58:4
  85:18 97:18
  148:25 155:2
  162:18 192:9
  238:4 240:17
  241:2
frustrated
  112:18
fto 174:14
full 6:23 49:23

fullest 10:22
fully 10:2
  208:4
fumes 246:24
fund 131:25
  133:10,13,18
  134:4,6
funding 130:9
  244:10 247:8
  247:25
funds 132:3
  133:7 247:23
further 18:11
  92:23 154:17
  155:15 159:9
  181:1 184:5,14
  185:7,12,25
  254:19 255:1,2
furtherance
  184:15
fusion 24:21,23
  24:24 25:14,17
  25:18,23 26:19
  27:9,10,21,24
  28:6,14,19,22
  29:6,14 241:18
  242:9,12

g

g 5:1 77:22
  203:24,25
g.com 2:20
gain 147:15,17
  148:4
gained 55:16
gambling 18:1
gamboa 1:12
  1:16 3:6 4:5,6

4:9 5:12 6:24
  7:1 49:18
  79:22 89:2
  93:3 95:21
  114:4 119:9
  170:4 219:24
  236:8,12 244:4
  244:12 248:7
  252:2 253:1,7
  253:11 254:13
  254:17 256:5
gamboa's
  243:15,18
  244:17 251:13
gang 15:25
  16:8 17:11,15
  17:17,18 32:17
  32:24 34:1
  37:8 39:9,10
  52:23 54:22
  57:10 71:16,21
  72:9,20 73:2,3
  73:4,8,9,15,17
  74:2 76:10
  129:11 134:13
  135:11 207:15
gangs 142:25
  143:5
garcia 202:25
  203:1,1,18,18
garcia's 203:2
  203:7
garcias 203:19
garza 95:10,13
  96:22 97:8,12
  99:9,16,22
  100:12

gas 157:11,13
  157:14,16,18
  157:24 158:1,7
  246:18,21,24
  246:25
gather 150:14
gathering 49:6
geared 17:16
  19:10 49:4
general 80:8
  104:5 126:19
  131:25 132:3
  182:19 183:3
  210:8 213:6
  240:25
general's 21:7
generally 6:22
  11:2 19:21
  28:5 33:22
  35:11 41:6
  43:16 52:20
  56:17 101:21
  112:17 126:7
  126:18 146:15
  213:17
generate
  213:25
generated
  25:23
generic 34:4
  43:6,16,24
  112:9 135:20
  172:11
genre 38:12
gentleman
  157:10
gereb 12:22
  73:11,19,25

75:19 76:11,12
76:16 91:14
114:1,24,25
145:13 152:3,4
152:22 153:12
181:11 188:9
215:17 218:15
223:13
**gereb's** 12:19
76:24 188:12
223:22
**gestured** 114:5
**getting** 29:5
37:8 51:12
59:21 84:12
101:7 116:16
136:20 139:23
192:18 203:21
210:3 215:3,4
250:24
**gil** 59:5,5
**girlfriend's**
147:2
**give** 8:9 10:22
29:20,21 31:12
66:6 79:21
92:9 105:9
110:11 114:16
114:17 115:19
115:24 116:15
123:16 140:21
140:23 146:24
153:1,12 157:8
166:14 169:10
173:17 175:17
177:10,12,15
177:20 181:25
183:17,20

184:15,23
190:12 202:1
205:19 216:2,4
219:6 220:10
222:24 246:6
**given** 50:5
105:14 154:13
161:13 181:18
182:1 183:11
230:25 243:18
253:18 254:18
**gives** 117:7
165:13
**giving** 24:1
30:6 114:11,12
115:23 155:16
156:12 159:2
175:8,14
176:17 177:12
182:4 186:5
**glasses** 70:16
**glebe** 2:7
**glitch** 177:17
**go** 5:23 7:3,3
18:6 19:16
22:17 36:4
37:6 38:6 42:3
42:4 49:24
51:3 56:22
59:2 60:11,13
79:1 86:18
93:11 97:7
103:22,23,25
105:7,7,8
106:9 109:6
110:22 111:15
113:11 116:10
116:13 118:17

121:24 123:21
124:5,12,21,23
124:24,25
131:25 132:9
132:11 133:7
133:12 134:1
136:6 144:5
165:1,14 168:6
172:12 175:13
175:22 176:20
184:16 185:13
193:12 194:1
195:25 199:23
207:3 229:4,15
235:16 236:25
238:15 240:14
240:20 249:4
250:7
**goal** 107:2
**goes** 10:15 56:3
124:22 132:21
147:18 160:5
221:5 224:9
237:13 241:22
**going** 5:23 6:2
6:5,12,17,22
9:1,25 10:3,8
13:15 20:5,7
20:15 22:22,23
30:14,18 31:21
37:4,9,23 44:6
44:23 48:5,5
48:17 52:25
54:14 55:24
65:19,23 66:6
77:18,19 78:15
83:21 84:3
85:10 86:15

87:24 88:12
93:15 94:10,17
95:11,14,17
96:23 97:21,23
98:4 99:24,25
100:3,5 101:5
101:18 103:16
103:22,23
105:3 111:25
112:1,1 113:10
115:11,22
126:1 134:1
139:11 145:15
146:1 147:3
154:12,21
159:4,7 160:13
160:15,20
162:6 163:5
164:8 165:21
166:12,13,15
166:17 167:16
167:20 168:9
168:16 171:1,2
172:6,7 173:1
173:17 174:16
176:9,21 177:5
177:10,12
180:7 185:24
186:21 188:21
189:7 190:5
193:9 194:1,16
196:11 198:17
198:18 209:21
210:4 214:8,18
217:12 221:2
222:21 224:16
225:5,9,13,19
225:21 227:3,6

228:24,25
229:3,5,18
231:14,22
232:5,9 233:8
234:2 235:13
236:10 242:18
242:24 243:2
243:18 244:2
244:16 245:3
246:13
**good** 5:19
22:23 50:9
51:13 78:12
93:9 99:17
100:16 114:1
115:12 116:14
116:17 128:20
130:11 135:15
139:16 153:10
156:14 158:18
174:23 195:9
214:25 226:3
226:23 245:22
245:24
**gotten** 95:5
132:25 218:19
218:20
**governor's**
17:16
**graduated**
14:11 15:3
**grande** 89:24
**grant** 138:2,3
**grass** 199:11
199:12
**great** 93:4
128:18 136:6
138:20

**greenhill** 2:18
**grew** 55:6
178:3
**gripe** 127:11
**group** 17:2,18
18:23 20:4
22:17 49:1
75:15,20 84:17
84:24 85:8
89:4 118:2
150:21,21,22
151:10,11,13
151:16,20
152:5,8,11,24
153:2,5,14
154:5 205:13
208:17 231:23
231:24
**groups** 23:6
33:21 34:4
**growing** 14:4
**guerra** 51:1,17
52:6 60:22
**guess** 10:15
27:8 31:5
37:17 39:7
49:24 55:23
58:9,21 61:7
62:7 63:22
65:11 66:22
80:24 98:8
101:6 106:21
115:22 122:13
136:23 146:5
158:3,8 163:11
186:9 188:2
191:22 194:13
207:18 219:4

223:16,17
224:2
**guide** 24:17
52:5 53:1
**guns** 17:25
29:11 59:20
90:22 154:15
**guy** 39:5,20
58:5 70:10
114:7 154:20
184:6 186:4
195:5 203:25
204:2,7
**guys** 47:10
48:2 53:12
55:13 82:12
84:18 104:6,9
116:4,13,14
117:1 127:22
135:2,12 198:1
205:20 247:2

**h**

**h** 4:1 22:11
**half** 55:13
**hand** 79:23
94:15 98:4
178:5 226:4,6
253:18
**hander** 194:3
**handing** 94:14
95:16 176:10
**handle** 40:24
189:19 221:6
**handler** 191:3
191:4,18
193:10,14,17
193:21 196:2

198:8,22 201:6
201:12,13,24
203:12 207:21
207:22 213:23
246:5 248:12
248:17 249:2
251:7
**handler's**
193:19
**handlers**
192:18 202:16
202:18 205:15
205:17 246:2
250:7
**handles** 249:8
**handling**
248:14
**hang** 239:8
**hanging** 37:9
154:15
**happen** 11:13
109:17,18
112:15,24
121:11,17
129:8 167:16
170:19 173:1
193:6 214:18
249:14
**happened** 47:3
57:5,20,21
97:14 123:7
124:9 142:7
199:8 205:3
235:4
**happening**
38:5,24
**happens** 29:24
38:2 48:6

164:2 170:15
170:16 175:16
180:23 216:25
**hard** 56:1,2
117:18 121:2
**harder** 159:22
**hats** 26:8
**he'll** 25:24
31:14 32:9
**head** 8:11
153:6,9 161:23
219:8 242:2
**headache**
112:18
**heading** 44:19
**heads** 160:14
**health** 25:16,20
26:2,9,15
194:22
**healthy** 191:21
**hear** 55:21
152:17 155:11
155:13 198:22
220:23
**heard** 7:4
18:12 102:4
150:13,24,25
194:7,12,14,16
195:1 206:13
220:4 227:10
227:14 233:11
241:18,21
**hearing** 7:17
221:20
**heavy** 160:18
246:25
**hebert** 2:3 3:7
3:8 5:8,18,19

33:16 65:21
66:2,5,8 78:14
78:21 80:16
94:14 95:16,20
96:20 97:4
98:2 135:15,19
153:11 181:6,8
215:8 225:12
227:10 229:3
229:10,21
230:14 231:19
232:9 233:11
234:5,17 235:1
235:8 240:4
242:6,16,22,24
243:9,14 248:6
251:12
**hector** 2:22
6:10
**held** 59:2
181:23 182:13
184:3,4
**help** 8:16,17
17:19 35:16
36:22 37:19
43:3 45:22
67:20 79:6
102:14 115:19
163:25 168:22
170:19 185:9
213:2,3 216:15
223:18 224:15
226:3
**helped** 206:10
**helpful** 35:10
39:18 54:3
69:15 94:3
145:8 165:19

194:4 212:12
**helps** 43:15
208:8,17,22
**hendricks**
74:22
**hey** 27:17 30:4
33:12 37:7
44:18 98:23
101:3,15
103:21 105:3,7
106:5 108:25
113:12,23
114:14 115:10
120:15 121:9
121:13,18
126:1 127:8,11
127:21 128:12
128:19 129:3,4
134:24 135:12
139:21 152:14
154:6,20
176:21 182:4
189:23 219:6
**hide** 90:21,23
**hiding** 82:23
**hido** 22:9
**hidta** 22:5,6,10
74:23 78:24
79:14
**high** 14:10 22:7
22:10 47:6
49:12 64:4,12
73:3 79:3,9
151:22 160:3
245:25
**higher** 183:16
**highlight**
127:20

**highway** 28:24
48:6,8,12 79:2
79:7,8 84:16
105:7,14 110:2
111:18 147:19
148:22 150:22
151:16,19
152:24 153:14
168:15,16
189:24 231:24
**highways** 41:3
41:11 42:8,13
44:24 47:20,21
47:22,25 48:1
53:7 64:3
80:13,17,18
81:7
**hill** 160:7
**hit** 49:16
106:10 156:10
**hits** 217:1
**hitting** 84:15
159:4
**hold** 94:4,9
233:13 239:6,8
239:13,14,15
240:5 245:25
249:17
**holding** 182:8
182:14
**home** 195:25
196:1,6 197:5
**homeland**
21:13
**homework**
93:21
**hope** 41:20

Peter Gamboa                                      July 23, 2024

**hopefully**
233:9
**hopes** 239:8
**hoping** 87:17
**horrible** 126:1
**horse** 191:12
195:8
**horses** 191:7
195:7,13
**hot** 25:9 49:5
49:14 215:18
216:10,14,15
216:16,23,24
217:7,19,21
218:3,3,5,7,10
218:13,16,24
**hotel** 83:7
163:18,19
165:11
**hotels** 83:10
**hotline** 18:9
19:4
**hour** 160:5,9
188:1,2,2,6
226:14
**hours** 19:22
38:5 54:1,9
73:9 211:10
236:13,17,22
**house** 32:10
167:22 196:14
196:25
**housekeeping**
7:4
**houston** 141:5
141:6
**hq** 104:10

**hsi** 246:10
**hub** 50:17
**huh** 8:12 14:25
25:8 26:23
28:21 32:6
35:25 37:22
41:25 45:19
46:1 51:7 63:5
64:2 67:16
70:24 84:8
89:7 91:23
95:2 97:13
102:6,8 103:18
104:2,13 105:1
115:5 126:24
127:4 136:25
138:4 145:24
152:25 156:18
166:4,8 173:10
173:13,20
189:21 192:5
194:25 195:10
203:23 215:16
218:9 221:3
236:6,24
**human** 18:1,2
23:7,8 35:8,8
35:16,17,18
47:5,7 50:18
59:19 64:1,11
65:5 84:4
151:11,14
159:19,19,24
160:23,25
162:1,1,1,5
165:7,21 167:2
167:5,11 168:9
168:11,17

218:21 219:2
219:14
**hung** 224:17
**hunt** 188:10,11
188:15,16,22
**hunting** 188:19
188:21,21,22
188:23,24
**hurt** 194:19
**hygiene** 163:7

**i**

**idea** 92:22
200:18 214:16
214:17
**identification**
173:14
**identify** 10:8
82:15 83:8,8
89:12 120:25
136:14
**identifying**
73:2 82:22
83:6 99:6
**identity** 253:13
**iii** 1:7 254:7
**ij.org** 2:5,9
**illegal** 35:8
36:20 37:4
41:13 47:20
65:5 84:3
180:11,12
219:3 234:11
**illegally** 35:19
**illegals** 63:16
**image** 99:25
100:6,11

**imagine** 150:14
**immediately**
228:20
**immigrants**
23:8 35:18,20
165:10
**impairing**
10:23
**implemented**
192:1
**important** 8:7
8:20,21
**impressive**
139:17
**improper** 9:18
**improve**
128:24
**improvement**
101:23
**inaccurate**
228:12
**inappropriate**
183:23,24
184:17 185:14
**inattention**
189:16
**incident** 108:25
109:22 123:5
245:2
**include** 63:14
**includes** 244:6
**including**
163:6
**inconsistent**
156:16 157:1
158:4,13,21
159:3,13,14
161:11,12

**incorrect** 238:1
**independent**
  148:18
**indicating**
  234:7,11
**indicator** 164:4
**indicators**
  162:11 163:4
**individual** 1:6
  1:7,8 118:5
  160:22 254:6,8
  254:9
**individually**
  86:8,23
**industrial**
  142:11
**inform** 185:1
**informants**
  18:15
**information**
  6:19 18:14,15
  18:16 19:1,3
  20:25 22:24
  23:19,21 24:1
  24:5,16,19,25
  25:2,2,4,6,10
  25:11,17,19
  27:13,14,17
  28:4,6,23 29:6
  29:14,20,22
  30:7,20 32:4,8
  33:13 48:16
  92:10 100:15
  100:25 101:2,4
  101:7 105:21
  110:7 127:6,14
  128:3 129:18
  144:13 150:14

  150:20 152:10
  153:4,13,16,22
  154:2,13
  163:20 165:10
  165:18 166:17
  166:20 167:22
  169:18 171:10
  173:11 232:4
  233:7 244:22
  245:3,5
**inhouse** 251:8
**initial** 106:17
**initially** 50:21
  51:4 136:17,18
**initiate** 107:8
**injured** 47:8
  194:19,20
**inmate** 205:15
**innocent**
  163:22
**inoperable**
  142:9
**inquire** 27:16
**ins** 116:7
**inside** 51:15
  157:11 196:13
  196:14 224:10
  238:22
**inspection**
  104:5,5 196:6
**inspections**
  195:25 196:1
  197:5
**inspector** 21:7
**instance** 1:17
  12:10 81:20
  154:25

**instantaneou...**
  121:17
**institute** 2:3,7
**instructed** 24:8
**instruction**
  87:18 153:13
**instructions**
  153:1
**instructor**
  84:23
**instructs** 9:12
**instrument**
  253:15
**intel** 15:7,12,14
  15:20,25 16:8
  16:13,17 17:1
  18:23 26:13
  27:18,18 28:25
  49:3 57:10,10
  73:13 74:21
  99:18 100:16
  150:12,13,13
  153:15 232:1
**intelligence**
  28:20 30:1,15
  30:19,23
**intense** 22:7
**intensity** 79:3,7
  79:9
**intensive** 22:10
**interdiction**
  34:15,20 35:4
  35:5,12 36:5
  39:5,15,17,22
  40:5,10,11,13
  40:14,16,21,24
  41:6,7,11,15
  41:18,19,20,21

  41:22 42:7,11
  42:22 43:22,25
  44:4,10 45:5,9
  45:12,17,24
  46:21,24 47:10
  47:13 48:1,12
  48:13 49:25
  50:1,9,12,22
  51:18 52:19,20
  56:23 57:1
  58:14,18,23
  59:7,23 60:9
  61:5,8,24
  62:17,21,24,25
  63:7,8,9,10,15
  63:19 64:14,16
  64:22,25 65:3
  65:4,16 66:10
  66:13 67:18,24
  68:4,18 69:6
  69:10,14 70:1
  70:9 72:11,11
  79:3 80:2,9,11
  80:25 81:3,5,6
  81:11,12 82:3
  82:10 84:1,7
  84:20,23 85:1
  85:8,17,22,25
  86:2,6,11,17
  87:17 89:1,15
  89:18 91:8,18
  91:20 92:16,20
  92:23 93:8,18
  99:2,18 100:16
  100:23,24
  101:9,21,22
  102:14,19,24
  103:11 106:20

106:23 112:21
113:16 116:3
116:15,24
125:8,11,19,23
126:15,16,18
127:15 128:17
130:14 131:9
131:22 136:8
136:10,13
137:11,14
138:14,17
141:23 148:6
149:10,12
152:23 165:9
165:15 168:20
168:23 179:19
180:1,5,18,22
182:20 183:4
188:10,13,20
189:4 241:2,9
243:3,16,17,20
244:3,7,11,13
244:18 247:4,6
247:10,14,19
248:2
**interested**
61:11 92:22
255:3
**intermeshed**
76:2
**internal** 4:3
61:15,18 90:14
91:1,18,20
94:5 111:7
220:5,7 235:15
**internet** 244:5
**interrogatories**
4:11

**interrogatory**
96:25 244:20
244:21,23
**interrupt** 9:2
208:16
**intersection**
170:18
**interview**
53:21 82:18,25
83:2,18 87:9
88:24 137:4
154:9 156:11
157:20
**interviewed**
201:12
**interviewing**
81:22 114:2
**interviews**
15:24 85:13,13
85:18 87:19
115:6 165:16
**intranet** 61:11
61:13 62:10
244:5
**introduce** 5:6
6:2 99:25
169:10 228:24
**introducing**
172:18
**investigate**
167:4,4,20
168:9,16
**investigating**
165:7
**investigation**
18:11 49:16
71:1 154:1,17
155:16 159:9

181:2 184:6,15
185:8,12,25
222:8 235:16
235:24 247:22
247:24
**investigations**
17:7,7 19:5,16
68:22 124:24
125:1 131:6,15
**investigator**
7:16 53:23,23
55:11,25 56:4
56:11,12
**investigators**
49:2 55:8
125:5 140:3,6
140:17
**involve** 48:15
73:3
**involved** 23:8
45:4 47:8 57:6
57:6,18 113:17
136:15 156:9
188:11 230:3
249:11
**issue** 121:25
122:8,11
123:19 126:13
177:6
**issues** 195:3
242:18,25
**it'd** 29:9 92:23
149:20 189:11
210:13
**it'll** 140:23
**item** 247:14,18
248:1

## j

**j** 147:12,13
**jail** 15:13,15,16
15:19,22,23,24
15:25 16:1
186:14 195:21
201:18 213:23
214:1
**jailer's** 15:1
**janitor** 14:12
**january** 137:19
**jared** 207:21
**javier** 1:8
254:8
**job** 58:10 62:7
128:18 157:19
163:21 176:24
177:5 195:17
244:3
**jobs** 14:11
**joe** 51:1,17
52:6 168:15,16
202:25 203:1,1
203:2,6,19,23
203:24,25
204:2
**joel** 1:5 2:16
254:6 256:4
**john** 50:25
51:5,20 52:23
53:10 54:5
56:21 86:10
87:22,25 88:12
88:12,16
203:17
**joined** 6:4,8
114:25 239:9

239:15
**joseph** 95:10
98:19 99:1
203:17,18
**josh** 65:21
217:10,11
**joshua** 2:6 6:4
**jp** 178:17,23
**judge** 8:5 9:18
123:2,3,11
**july** 1:13,19
243:4 244:25
254:14
**jumped** 58:6
223:12
**june** 243:9
**justice** 2:3,7
178:25
**justification**
39:1
**justin** 52:6
**jwindham** 2:9

**k**

**k** 85:22,23,24
86:1 90:5,6,8
157:24,24
181:19,24
182:6 185:5,21
186:3,6,10,11
186:12,13,13
186:17,20,21
186:25 187:6,8
187:12,18,20
187:24 188:4,7
190:7,24,25
191:5,22,24
192:2,3,6,13

192:17 193:22
193:24 196:24
197:5,25 198:8
199:3 201:4,5
201:8 202:13
202:16,21
204:11,12,15
204:17,24
205:3,12 206:7
206:12,15,20
207:4,6,10,11
207:14,17,18
207:19,20,22
207:22,23,24
208:7,14,18,19
210:9,10,23,25
211:4,16
212:10 213:1,1
213:13,17,24
213:25 229:22
229:24 230:3,5
230:5,7 245:12
245:21,22
246:1,2,5,16
246:17 248:9
248:12,14
249:2,17,20
250:5,7,8,12
250:14 251:7
**keep** 42:2
102:17 126:2
128:18 167:8
195:12 248:8
**keeping** 43:10
102:17
**kennel** 196:9
196:14

**kept** 47:15
196:13 211:9
238:20
**key** 213:25
**kick** 84:13
116:10
**kicked** 84:15
**kids** 164:23
**kiki** 241:22,23
242:1
**kilos** 59:18
246:22
**kind** 5:23 8:25
17:25 18:1,12
18:15,22 19:10
25:4,22 27:8
31:3,3,17 35:7
36:20,20 37:24
38:2,7 39:3,21
42:5 49:4,5
50:13,19 51:19
52:8 56:5
62:21 65:6,15
73:4 74:19
79:24 80:9
82:13 92:21
97:14 98:9
100:11,15
101:6 102:2
105:16,18
113:7,23 114:2
115:3 118:12
120:2 121:12
122:20 123:7
123:18 126:12
127:20 135:20
140:10 147:7
151:24 152:10

184:23 224:22
228:5 235:23
**kinds** 107:21
157:4
**kinesiology**
87:10,11,18
**knew** 39:8
52:24,25 59:6
70:11 86:12
129:7 151:1
152:4 192:21
196:17,18
214:8 215:24
**knock** 37:7
**know** 8:19,24
9:4,5,5,22 12:8
14:1 21:21,23
22:22 24:3
27:12,15,17
28:4,12,13,14
28:15,17,18
29:2,3 31:2
39:7 42:25
44:15 45:6,8
48:20 50:17
51:15 58:25
59:14,22 72:2
72:6 75:3
78:16 82:11
83:5 84:2
85:14 87:6
92:1,24 93:2,8
95:7,11 102:21
103:22 105:2,7
105:17 106:5,6
109:22 110:3
111:16 112:2
113:3,5,9,11

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 286 of 322
Peter Gamboa                                                July 23, 2024
[know - license]                                                    Page 29

113:24,25
114:11,13,14
114:14,18
115:10,11,12
115:23 116:2,7
116:8,10,10
118:20 119:25
121:5,9 126:4
127:16 128:20
129:3 132:20
132:21 133:1
133:23 134:22
134:22,25
135:3,10
136:17,18
137:6,8,8,25
138:4,10 139:5
139:11 140:24
143:2,4,18
146:25 147:7
148:3 149:3,3
149:11 152:10
152:15 155:11
155:17 156:8
160:9,22
162:21 163:13
164:5,6,20,20
164:21,22,23
164:24,24
165:14,14
166:6 170:13
172:7 175:4,7
175:8 178:3,12
179:4,6 181:1
181:9,18,22,24
184:20 191:1
191:20 192:8
194:9,21

195:22 196:24
197:24 198:13
199:16 200:19
200:21 202:21
202:23 203:6
205:3,5,18
206:9,11 209:7
209:10 213:6
222:2,20
225:16 228:20
230:25 231:1,7
233:5,17
234:10 241:21
241:21,25
242:15 243:7
243:12 245:2
245:23 247:1
249:1,16,18,21
250:14,15
251:9,11

**knowing**
246:24

**knowledge**
27:9 56:18
69:7 91:7
168:10 179:12
180:10 209:19
212:15 214:24
216:1 232:16
232:20,22
233:4 242:8
249:16

**known** 31:2
32:4 154:4
162:24 253:12

**kudos** 205:19

## l

**l** 77:22
**label** 225:22
**labeled** 95:25
96:17
**labor** 35:20
**lack** 193:17
194:10
**lane** 38:9 169:1
189:13,18
**lanes** 148:10
**language**
119:13,17,19
120:2
**laredo** 29:23
30:10 157:10
241:18
**large** 180:12
236:5
**lasted** 225:2
**late** 137:16
**latest** 143:13
**laugh** 115:22
**laughed** 239:5
**laundering**
18:25 30:12
39:11 41:13
65:6 84:3
127:17
**law** 1:22 2:12
14:17 15:21
16:3,6,21,22
20:24 23:2,4
25:3 187:25
201:10,20
215:23 234:13
241:22,25

**laws** 35:9 189:5
189:5
**lawsuit** 214:23
238:24
**lead** 18:11 44:9
**learn** 85:7
87:18 152:17
221:17
**learned** 194:7
195:2,2,24
219:25 220:2
**leave** 32:9
36:18 163:5
165:14 243:18
**leaves** 167:23
**leaving** 205:4
239:9 251:13
**left** 58:23 59:9
60:13 86:19
208:2 209:13
223:17,19,23
226:5 238:14
**legal** 224:16
255:9 256:23
**lesson** 206:17
**level** 91:7
205:6
**liability** 193:1
194:10 196:23
197:2 198:10
**liable** 197:1
**license** 15:1,4
30:25 137:11
137:15,22,25
138:3,5,10,13
138:16 139:5,6
140:23 141:22
141:23 142:12

142:18 143:7
143:14,25
144:12,22
145:10 146:6
146:10,16,17
146:20 147:2
147:18,24
148:4,7,9,11
149:13,24,25
150:1 169:16
170:9,11,17,25
171:6,8 172:4
173:15,15
215:9 216:20
216:22,23
217:6,10,11,18
217:19,25
218:5 219:5,5
238:11,15
**licensed** 171:5
**licenses** 139:12
139:12
**lieutenant**
20:17,19 22:16
26:6 27:2
53:25,25 56:15
69:22,25 70:6
70:7 71:9 74:8
74:15 75:3
76:7,8,15,19
76:20,23 93:10
122:17 126:20
126:21 127:5
130:4 193:7
196:17 211:8,9
211:12,18,21
212:1,11

**lieutenant's**
127:7 128:7
**life** 14:4,7 47:7
**light** 199:15
**lights** 145:21
145:23 146:1
**likely** 28:1
31:18
**limit** 102:18
**line** 96:2,15
97:20 103:19
103:20 105:19
105:20,20
115:7 120:16
157:12 189:20
226:8,9 247:14
247:18 248:1
252:4
**link** 111:16
**list** 95:12 96:23
**listed** 96:21,22
232:16
**listening** 194:6
198:19
**literally** 46:10
**little** 14:2
17:10,14 29:20
31:8,20 37:17
49:25 51:2,19
51:21 57:17
62:15 64:19
65:15 72:6
74:7 82:2
87:21 91:6
92:16 97:20
103:25 105:13
106:7 109:7
110:22 115:11

120:1 126:14
132:11 149:23
150:16 154:23
164:23 178:2
190:1 191:14
191:15,16
197:11 219:21
244:20 250:19
**live** 144:9
164:25 168:3
**living** 59:22
168:6
**loaded** 246:14
246:22
**loader** 14:14
**loads** 59:19
**local** 25:11
28:12 31:3
98:21
**located** 106:3
**location** 48:18
111:16 168:4
181:25
**locations**
140:23,24
**log** 245:4
**long** 17:8 46:24
49:21 60:8
78:16 110:9,17
110:17 162:23
187:23 200:23
225:1,17
236:23
**longer** 23:14
47:19 51:21
64:23 80:25
232:5

**longest** 202:21
202:22,25
**look** 9:25 10:7
30:9 40:2 46:9
50:2,9,16 52:3
55:20 62:22
83:13 86:7
87:2,5 93:14
93:16 94:5
95:4 96:2,6,24
97:24 98:5,7
99:13 100:6,11
101:7 116:3
121:19 125:8
149:4,10,12
155:5,23 157:5
159:23 161:10
162:2,14
165:21 167:1
169:5 170:10
170:21 172:5
225:9 235:8
237:8 243:22
245:17
**looked** 11:11
11:14 14:4
52:20 63:11
82:3,6 87:1
151:1 200:9
223:14
**looking** 10:16
10:17 38:14,19
38:25 49:5,13
50:2 53:7 60:2
66:23 68:9
80:17 96:7,13
100:14 140:4
141:10,11

149:3 161:9,10
161:20 162:7
162:11 188:17
188:23,24
200:6
**looks** 99:15
168:23 237:7
**lopez** 72:8,9
**lost** 127:10
142:3
**lot** 13:15 15:11
36:17 37:8
39:6,10,20
43:15 51:11
80:2 84:2
86:14 100:20
137:2 151:11
159:22 160:15
160:24 162:10
179:2 181:9
207:15 218:16
**lots** 163:19,22
**loved** 54:20
116:5
**lpr** 139:12
141:8 142:22
215:22 216:1,4
217:1
**lunch** 102:17
102:22 135:19
135:24 136:3

**m**

**m** 2:3
**ma'am** 5:22
7:20,23 8:3,15
9:3,8,24 10:6
10:20,24 11:1

13:5,14,19,22
13:25 15:12,17
17:3,12 18:21
20:11 22:25
23:13 24:7
26:18,20 28:8
28:10 31:16
33:19,23,25
34:9,12,17,21
35:2,15 36:6
38:16,18 39:2
40:22 46:12
52:10,22 53:11
53:14 54:10
55:3,3 56:20
57:3,3 58:11
58:20,22,24
59:11,13 61:16
61:16 62:6
63:10 67:16
68:16 69:8
71:19 73:22
74:3,6,9 78:9
82:5 83:16
84:10 86:25
90:2,15 94:23
96:8,8,14,16
97:17 99:23
100:13,17
102:15 115:21
116:22 125:17
126:11 139:2
144:3 153:15
171:11 172:5
177:18,22
178:1,1,9
179:14,17
181:12 182:12

183:10 187:1
204:22 209:18
224:19,21
226:15 227:17
229:12,14
235:19,21
237:5,10 241:4
241:4 248:25
249:15
**machine** 1:21
**made** 7:8 30:16
51:11 72:23
74:11 110:25
111:3,5 114:24
119:9 137:21
157:15 172:21
220:7
**mag** 122:24,25
123:2
**magistrate**
123:2,3,11,17
**mail** 175:22,24
176:20
**mailed** 177:13
**main** 21:8
47:25 106:21
213:15
**maintain** 38:8
189:13
**maintaining**
189:18
**maintenance**
78:9
**make** 24:4
29:16 37:2,25
42:10 54:14
63:16 64:20
85:12 103:15

104:4,16,17
118:3 119:6
120:15 121:18
133:24 153:18
153:19,21
154:8,9 158:8
161:8 162:16
163:3 169:4,9
169:24 172:9
176:25 177:2,5
186:8 189:22
189:23 190:4
196:17 203:21
210:5 225:21
227:8 228:21
231:2 240:10
247:2
**makes** 93:17
163:14 166:21
168:8 195:9
198:21 209:3
232:22
**making** 37:1,5
37:6 41:11
44:24 45:1
51:14 59:21
107:5 154:9
165:25 180:7
189:11 191:20
212:16 227:11
233:1
**maldonado**
6:24
**managerial**
56:15
**manages** 78:7
**manner** 210:8

Peter Gamboa                                                        July 23, 2024

| | | | |
|---|---|---|---|
| **manual** 11:11 | **material** 56:6 | 149:14 154:21 | 200:16,19 |
| 12:21 62:5 | **materials** | 155:25 156:6 | **member** |
| **mapp** 4:14 | 98:10 | 157:6 163:21 | 129:11 164:12 |
| **march** 12:4 | **math** 138:20 | 176:11 178:20 | **members** 17:17 |
| 44:7 66:18 | **matter** 6:8 | 182:22 183:3 | 37:8 73:3 |
| 67:5 190:21,23 | 114:10 210:19 | 184:7 188:19 | 207:16 |
| 204:24 206:25 | **matters** 7:4,11 | 189:9 193:13 | **memory** 11:20 |
| 220:20,23 | 7:13 | 193:15 194:11 | 204:11,16,16 |
| 221:7,15,18 | **max** 204:12 | 201:5,17 202:6 | **mental** 25:16 |
| 245:15 248:10 | 213:7 214:3 | 204:14,23 | 25:20 26:2,9 |
| **marijuana** | 245:21,22 | 208:16 210:10 | 26:15 |
| 158:2 | 246:17,18 | 213:8 223:4 | **mentally** 78:16 |
| **mark** 94:10 | 249:17,20 | 231:16 233:5 | **mentioned** |
| 97:24 100:3 | 250:5 | 240:10 250:13 | 16:5 24:20 |
| **marked** 31:23 | **max's** 206:20 | **means** 8:1,8 | 31:25 44:25 |
| 65:22 66:1 | **maximum** | 36:23 45:22 | 45:2,11 54:21 |
| 94:13,15 95:18 | 188:3 | 82:22 205:10 | 64:7 66:9 |
| 95:19 98:1,2,5 | **mean** 9:10,11 | 217:21 | 90:10 103:8 |
| 100:4 225:10 | 11:10 15:16 | **meant** 83:24 | 107:22 123:21 |
| 225:11 229:1,2 | 22:21 23:24 | **measure** 50:6 | 148:9 |
| 235:7,9 | 27:16 30:14 | **mechanics** | **merely** 9:15 |
| **marker** 170:18 | 32:2,8,17 | 131:16 | **message** 97:19 |
| 206:3 | 33:11 35:4 | **mechanism** | 99:10,14,15,16 |
| **marks** 228:15 | 39:22 40:3 | 19:11 41:18 | 99:21 154:5 |
| **marta** 220:6 | 43:10 47:14,18 | **media** 4:12 | **messages** 97:19 |
| 222:11 | 53:6 54:13 | 19:1 | **met** 5:20 44:15 |
| **martin** 1:6 | 59:16 62:4 | **medical** 194:23 | 82:11 83:6,24 |
| 203:13 207:7,8 | 63:8 64:15,21 | 209:23 | **methampheta...** |
| 223:10 254:7 | 64:23 71:2 | **medication** | 246:23 |
| **martinez** 59:5 | 72:4,11 78:6 | 10:23 | **methods** 80:10 |
| 59:5 60:6,8,13 | 84:13,14 | **meet** 20:4,16 | 81:6,19 |
| **martinez's** | 101:16 104:3 | 104:10,12,16 | **mexico** 29:23 |
| 60:19 61:7 | 104:11 111:2 | 104:25 105:3,6 | 137:7 165:2 |
| **match** 96:12 | 112:14 114:20 | 106:9 130:5 | **middle** 196:10 |
| 158:22 | 119:18 123:2 | 181:24 | 237:6 |
| **matched** | 124:16 132:3 | **meeting** 20:10 | **mike** 89:23 |
| 201:23 | 132:12 134:14 | 20:13,14 | **mile** 170:18 |
| | 141:3 145:10 | 106:17 128:8 | |

**miles** 160:5,9
**million** 88:15
**millions** 59:18
**mind** 95:16
  206:3 226:2
  240:15
**mine** 142:4
  162:23
**minimal** 116:7
**minimum**
  53:22,24,24,25
  61:22
**minute** 90:10
  160:6 232:6
  233:9
**minutes** 78:18
  113:13 157:14
  164:3 225:4,16
  226:24 227:4
  228:6
**mispronounc...**
  88:15
**missed** 63:2
  173:8
**missing** 121:1
  128:20
**mission** 82:11
  83:24 84:1
**mistake** 72:23
  126:4
**mistaken**
  187:25
**mistakes**
  112:14
**mixture** 49:1
  51:19
**model** 169:25

**molina** 1:7
  12:22 181:10
  203:13 204:11
  204:17 206:20
  206:22 207:7,8
  207:10,20
  208:19 209:8
  210:9,16,21,22
  210:24 211:14
  211:18,21
  212:1,13 213:6
  213:16 214:2
  214:13,17
  223:11 230:3
  245:18,21,22
  246:5,16
  249:17,20
  250:5 251:7
  254:7
**molina's** 12:17
  211:2 212:15
  214:21 223:20
  250:21 251:4
**moment** 142:22
**mommy's**
  166:6
**monday** 19:25
  20:1 32:23
  33:2 103:5
**money** 18:24
  30:12 39:11
  41:13 54:14
  65:6 84:3
  127:17,18
  130:13,23,24
  131:2,6 133:12
  133:15 134:14
  134:24 135:1,1

135:3 138:2
  164:10 180:12
  215:20 219:2
  247:12
**month** 220:15
**months** 159:5
  190:19
**morning** 5:19
  10:25 19:15
  20:10,12,14
  38:5 165:13
**motel** 83:8,9
  100:19 163:3
  165:9
**motion** 243:6
**motivated**
  116:9
**motivation**
  53:18 55:12
**motivator**
  54:17
**mou** 22:2
**mount** 26:13
  195:9
**mounted** 15:8
**mous** 22:13,15
**move** 68:21
**moved** 14:13
  68:18 69:2
  70:12 71:5,5
  131:5 247:20
**movies** 178:3
**moving** 29:8
  72:19,20
  149:21 160:17
**mueller** 2:18
**muldau** 34:10
  34:13 91:17

177:25 206:21
  243:24
**muldau's** 13:12
  34:19 245:1
**multi** 195:19
**multiple**
  148:10 162:13
  164:17 169:17
  209:4
**municipal**
  14:16

**n**

**n** 2:1 3:1 5:1
  77:22
**name** 6:23
  69:22 72:15,15
  72:20,24 84:22
  84:22 151:1
  162:23 163:13
  166:13,13,15
  186:5 203:2
  211:24 241:23
  252:2 253:14
**named** 14:5
  207:21 241:22
  242:1
**names** 69:13
  77:19
**nancy** 77:12
**narcotic** 29:10
  154:4,7 186:12
  195:20 202:4
  203:11,20
  213:13 214:7
  218:21 219:2
  246:11,16

**narcotics** 32:5
35:7 52:24
54:23 63:17
65:5 72:11
90:22 124:23
154:15 183:7
186:12,21
187:6 204:2,12
204:15,17,23
206:16 213:22
213:24 214:9
215:20 219:7
246:14 247:1,3
249:4
**narrative**
109:11 110:8
110:10,24
122:14 124:5
124:12,15,18
125:10,19,22
126:10
**narratives**
109:14 124:11
**natalia** 157:13
**nationwide**
25:6
**natural** 8:25
**nature** 20:9
29:4,11,11
30:7,13 31:4
36:21 38:10
39:12 41:4,14
42:9 59:19
63:17 65:7
78:10 82:19
83:11,22 84:5
87:6 101:5
102:9 107:15

113:14 114:12
114:18 116:11
126:6 127:3,12
127:23 136:22
149:22 159:7
163:7 164:12
164:24 190:2
191:21 197:23
198:1 199:11
218:22
**necessarily**
9:10 108:23
113:18 122:11
148:3 149:15
186:3 189:9,14
190:4 200:7
**necessary**
247:2
**need** 8:8,9 10:2
10:12 20:6
28:2 33:13
48:16 69:20
70:16 78:16,17
97:6 113:4,9
113:11,12
117:2 121:13
122:3 127:11
128:24 143:8
176:3,11 186:6
189:14,24
198:9 207:13
207:24 243:19
**needed** 50:5
91:8 92:10
104:18 108:3,6
109:21 110:7
110:23 123:6
125:25 127:2

199:20 210:13
212:25 213:23
**needs** 225:23
249:7
**neighbor** 36:17
**neither** 255:1
**nervous** 30:5
83:21
**neutralized**
58:7
**never** 24:10
30:24 47:2
57:12 123:7
142:7 150:13
151:1 191:3,4
191:5 239:17
241:5 247:24
248:1,12,22
**new** 60:11 75:9
91:8 92:5 94:6
142:2 143:8
193:10 194:3
**newest** 143:11
143:12
**news** 222:10
**nice** 115:25
**nicely** 59:15
**niche** 51:12
**night** 14:13
199:13
**nights** 73:9
**nine** 16:19
**ninth** 201:11
201:15
**nod** 8:11
**nods** 219:8
**noncriminal**
101:21

**nope** 94:11
**normal** 160:13
205:6,8
**normally**
160:14
**north** 2:7 84:4
103:22 137:7
157:10
**northbound**
103:17 152:13
**northwest**
49:10 150:21
151:16,19
152:23 153:14
231:24
**notary** 253:22
254:22
**note** 119:8,9,10
120:15 178:4
228:21 244:24
256:10
**noted** 253:3
**notes** 118:3,15
118:17 119:6
235:24 244:17
**notice** 6:14
**notification**
117:2,7 119:9
**notified** 57:24
181:24 193:6,8
**notify** 217:12
**nuh** 8:13 185:3
**number** 95:7,9
96:3,9,12,12
96:22 170:9,11
216:20,23
220:11

| | | | |
|---|---|---|---|
| **numbered** 1:19 | **occupants** | 132:16,22,24 | 140:22 142:12 |
| **numbers** 49:6 | 150:15 169:17 | 132:24 133:7 | 143:8 144:9,13 |
| 89:9,9 96:12 | **occurred** | 134:1 138:7,11 | 144:14,23 |
| 96:25 226:4,5 | 220:20 | 139:13 141:7 | 145:9,13 146:1 |
| 226:8 | **ocdefg** 79:18 | 141:18 146:15 | 146:9,13 147:1 |
| **o** | **ocdetf** 79:15,16 | 147:23 150:1,7 | 147:7,18,24 |
| **o** 5:1 | **ochoa** 192:11 | 175:23,23 | 148:3,7 149:12 |
| **oath** 7:5,24 | 195:23 200:7 | 176:20 178:12 | 153:21,25 |
| 253:12 | 200:11,14 | 179:5 190:7 | 154:25 155:1,5 |
| **obj** 97:19 | 211:5,6,11,15 | 195:19 205:7 | 155:23 160:22 |
| **object** 9:16 | **ochoa's** 190:10 | 205:21,23 | 161:9,20 |
| 97:23 99:17 | **october** 190:14 | 206:5 214:12 | 168:25 169:1,3 |
| **objection** 9:10 | 190:19 197:5 | 242:8,13 | 170:2,10,21 |
| 9:15 80:15 | 202:20 245:14 | 245:13 246:1 | 173:6 174:14 |
| 240:2 | 248:10 | 246:20 250:8 | 175:11,13 |
| **objections** 6:14 | **offenses** 151:12 | 253:18 | 176:16,21 |
| 6:17 | **offer** 142:21 | **office's** 39:23 | 177:14,19 |
| **objective** 189:4 | **offered** 102:14 | **officer** 14:3,5,9 | 178:4,20,21,22 |
| **objectives** | **office** 13:16,17 | 14:16 23:17,20 | 179:18,20,25 |
| 93:25 101:4,8 | 13:18 15:6 | 25:14,18,22 | 180:3,4,16,24 |
| 101:17 | 17:16 20:22 | 28:2,15 32:20 | 182:19 184:3 |
| **obligation** | 21:7,7 22:17 | 38:24 40:2 | 184:10 185:1,5 |
| 243:10,10 | 22:20,21 25:13 | 43:6,8 51:20 | 185:15,18,19 |
| **observe** 85:11 | 27:22 30:11 | 51:24 57:6,18 | 186:10,16,23 |
| 149:19 200:6 | 40:20,24 44:9 | 58:13 59:4,24 | 187:9,14,17,20 |
| **observing** | 45:12 47:19 | 60:5,11 63:12 | 187:23 188:7 |
| 51:15 106:25 | 48:21 51:21 | 71:12 76:13 | 192:16 195:15 |
| **obtained** 94:19 | 61:15,18 64:15 | 78:4 89:25 | 197:12 198:3 |
| 153:18 | 64:22,24 65:2 | 91:9 103:11 | 199:9 202:21 |
| **obvious** 155:1 | 66:14 68:3 | 106:23 107:16 | 204:17 209:20 |
| 155:6,25 | 78:2 80:1 81:2 | 107:22 108:8 | 209:25 210:9 |
| **obviously** 6:3 | 84:21 85:11 | 109:10,13 | 210:11,21 |
| 143:17 | 89:3,6 90:11 | 110:9,23 | 211:3 213:8,11 |
| **oc** 79:18 | 90:13 91:1,17 | 111:21 112:4 | 213:15 216:18 |
| **occupant** | 91:21 92:13 | 118:17 119:8 | 216:22 217:2,2 |
| 169:17 | 122:25,25 | 121:6 122:7,10 | 217:6,8,12,17 |
| | 129:22 130:2 | 129:24 130:18 | 217:21 218:2,6 |
| | 132:2,7,8,15 | 133:25 136:12 | 218:24 219:6 |

| | | | |
|---|---|---|---|
| 238:10 241:22 | 129:21 130:17 | 17:4,10,19 | 70:18 71:8,11 |
| 242:1 254:17 | 136:9,13 139:5 | 18:3,12 19:2,7 | 71:17 72:4 |
| **officer's** 12:15 | 140:13,14 | 19:9,13,25 | 73:1,10,14,16 |
| 15:4 81:3 | 141:18 144:21 | 20:2,19,22 | 73:23 74:15,25 |
| 106:20 107:10 | 149:9 150:4 | 21:14,16,25 | 75:2,6,11,13 |
| 161:12,13 | 151:20 152:18 | 22:3,12,14,19 | 76:1,5,11,18 |
| 219:11,14 | 155:10 164:13 | 23:1,17 24:2 | 77:5,8,13,16 |
| **officers** 14:5 | 169:24 170:1 | 24:14,18,20,22 | 78:11,21,25 |
| 15:23 16:5 | 174:10 184:22 | 25:4,13,21,25 | 79:13,16,25 |
| 21:24 22:1 | 184:22 188:4 | 26:10 27:1,8 | 80:20,24 81:14 |
| 23:22 24:4,8 | 192:2,7 197:6 | 27:24 28:3,11 | 82:1,17,20 |
| 27:25 32:17,17 | 199:3,4 202:15 | 29:5,12 30:14 | 83:12,17 84:6 |
| 33:10,17 34:1 | 203:17 204:24 | 30:18 31:5,9 | 84:17 85:2,20 |
| 36:4 39:23 | 213:4 214:3 | 31:19,25 32:12 | 86:3,14 87:1 |
| 40:7,11,12 | 244:18 245:24 | 32:21 33:16 | 87:11,14,16,21 |
| 41:16 42:2,12 | 248:17 250:12 | 34:7,22 35:10 | 89:1,11,17,21 |
| 42:17 43:21 | **offices** 1:22 | 36:15 37:12 | 89:25 90:3,7 |
| 45:18,22 47:15 | 2:12 | 38:11 39:4 | 90:10,24 91:6 |
| 49:2 50:21,23 | **official** 1:6,7,9 | 40:6,17,19 | 91:11 92:4,7 |
| 50:24 51:4 | 254:6,8,9 | 41:5,15 42:10 | 93:1,5,14 94:2 |
| 52:3,5 53:2 | **oh** 19:24 21:14 | 43:2,5,12,15 | 94:14,24 95:6 |
| 55:6,17,22 | 46:18 99:5 | 43:24 44:8,13 | 95:7,11 96:1 |
| 56:19 57:1,4 | 119:14 138:22 | 45:1,4,8,11,21 | 97:4,11,18 |
| 57:23 58:6,14 | 153:10 164:25 | 46:7 47:3,16 | 98:13,23,25 |
| 58:19 60:25 | 165:1 171:21 | 47:18,23 49:18 | 99:3,24 100:2 |
| 61:11 74:13,21 | 191:8 196:1 | 49:21,24 50:24 | 100:6,7,11,21 |
| 74:22 76:8 | 198:3 200:24 | 51:2 53:9,19 | 101:1,6,8,13 |
| 80:3 81:4 84:7 | 203:17 208:11 | 54:11 56:24 | 101:20 102:16 |
| 84:21 92:5,13 | 239:24 | 57:11,14 58:8 | 102:17,20 |
| 92:16,20 93:2 | **okay** 5:3 6:25 | 58:12 59:9 | 103:4,10,25 |
| 97:14 101:21 | 6:25 7:7,15,18 | 60:5,13,19 | 104:23 106:2,7 |
| 102:3,25 | 7:21 8:10 9:2,5 | 61:2,7,17 63:8 | 106:14,20 |
| 105:19 112:21 | 9:21 10:10,14 | 63:21 65:18,25 | 107:9,16 108:5 |
| 113:8 117:25 | 11:9,13,16,18 | 66:20,23,24 | 108:14,17,20 |
| 122:15 125:3 | 12:5,18,18,20 | 67:3,10,13,15 | 108:22 109:2,6 |
| 125:11,19,23 | 13:1,6 14:1 | 67:23 68:2,12 | 109:10,13 |
| 126:16,18 | 15:5,14 16:4 | 68:21 69:2,13 | 110:1,5,9,13 |
| 127:10,10,15 | 16:10,16 17:1 | 69:17,19,21 | 110:17,22 |

| | | | |
|---|---|---|---|
| 111:7,11,14,21 | 142:23 143:7 | 179:18,23,25 | 219:4,13,17,20 |
| 112:2,8,12,14 | 143:21,22 | 180:3,16,21 | 219:20 220:1 |
| 112:20 113:1,7 | 144:4,12 145:3 | 181:3,8 182:13 | 220:12,19 |
| 113:13,15,22 | 145:8 146:9,15 | 182:19,24 | 221:5,7,11,16 |
| 114:8,19,23 | 146:24 147:13 | 183:14,22 | 221:20 222:14 |
| 115:13,22 | 147:16,17,21 | 184:4,6,9,21 | 223:25 224:4,6 |
| 116:23 117:13 | 147:23 148:2,6 | 185:9,13 186:2 | 224:14 225:1,5 |
| 117:21 118:7 | 148:19 149:7,8 | 186:7,16,19 | 225:5,7,12,13 |
| 118:17,22 | 149:18 150:12 | 187:8,13 188:6 | 225:15,18,24 |
| 119:14,21,24 | 150:16,19,23 | 188:7,19 189:1 | 226:1,11,13,23 |
| 120:2,5,9,19 | 151:13,19 | 189:7 190:6,9 | 227:3,7,10,18 |
| 120:25 121:11 | 152:1,4,7,10 | 190:22 191:3,5 | 227:22 228:3,9 |
| 121:15 122:7 | 152:17,22 | 191:17,22,25 | 228:18,23 |
| 122:13 123:13 | 153:7,19,23 | 193:12,21 | 229:5,8,10,17 |
| 123:18 124:4 | 154:4,18,23 | 194:4,11 195:5 | 229:21 230:1,8 |
| 124:12,20 | 155:21 156:4 | 196:4,13 197:9 | 230:14 231:2 |
| 125:4,7,13,18 | 156:14,15,23 | 197:16,18,25 | 231:14,17,19 |
| 126:3,5,7,14 | 157:8 158:3 | 198:6 199:14 | 232:1,5,7 |
| 126:22 127:6 | 159:10,18,21 | 200:22 201:7 | 233:3,8,11,15 |
| 127:13 128:6 | 160:24 161:8 | 201:20 202:18 | 233:18,22 |
| 128:14,23 | 161:25 162:5 | 202:23 203:4,9 | 234:2,10 235:1 |
| 129:1,6,10,14 | 162:10,14 | 203:21,25 | 235:8 236:1,11 |
| 129:16,23 | 163:1,11,25 | 204:4,8,19 | 236:14,20,25 |
| 130:8,10,23 | 164:4,8,19 | 205:2 206:19 | 237:2,11,15,16 |
| 131:8,13,16,22 | 165:19,24 | 206:19 207:2 | 237:19,24 |
| 132:1,5,11,20 | 166:21,25 | 207:18 208:1,6 | 238:18 239:4 |
| 133:3,24 134:9 | 167:18,21 | 208:11,16,24 | 239:12 240:4,7 |
| 134:17,20 | 168:2,19,19,21 | 209:4,7,12,19 | 240:14,19 |
| 135:17 136:3,6 | 168:24 169:5 | 209:22 210:2,8 | 241:1,13,14 |
| 136:11,23 | 169:12,23 | 210:19,24 | 242:3,6,16,17 |
| 137:10,18,21 | 170:3,6,8,21 | 211:2,7,14 | 246:8 248:18 |
| 138:4,10,16,20 | 171:3,12,19,25 | 212:12,12,24 | 249:16,19 |
| 138:24 139:11 | 172:25 173:4,7 | 213:3,10,14 | 250:19,23 |
| 139:21,23 | 174:2,11,19,24 | 214:10,21 | 251:1,7 |
| 140:1,8,11,16 | 175:11 176:2,8 | 215:5,8,22 | **old**  194:24 |
| 140:21 141:2,7 | 176:14 177:14 | 216:1,7,15,22 | **olg**  1:6 254:7 |
| 141:14,17,21 | 177:19 178:14 | 216:25 217:4 | **olvera**  212:5,6 |
| 142:10,17,20 | 178:18 179:10 | 218:9,18,23 | 212:10 |

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 295 of 322
Peter Gamboa                                    July 23, 2024
[olvera's - paperwork]                                    Page 38

**olvera's** 190:11
**once** 30:25
  41:15 124:21
  126:4 217:18
**ones** 21:9 39:23
  47:22 51:17
  140:9 171:20
**online** 18:16
  19:5,6
**onward** 251:5
**open** 19:1
  109:1 111:10
  111:13 112:10
  223:7 224:2
  243:18 246:17
  251:13
**opened** 223:9
  223:12 224:3
**opening** 61:10
  61:17,21,22
**operate** 24:9
  28:19 41:23
**operates** 27:9
**operating**
  27:12 63:20
**operation**
  27:11 31:21,25
  33:12 48:4
  68:24 78:7
  151:14 191:24
  214:7
**operational**
  32:24
**operations**
  32:13,15 60:14
  70:14,19,21,23
  71:6,6,8

**opinion** 192:14
  245:20
**opportunity**
  14:15
**opposing** 79:20
**opposite**
  148:24 149:4
**opt** 54:8
**oral** 1:11,16
  53:21 254:18
**order** 46:5,9,16
  142:2 180:13
  243:6
**ordered** 214:3
**orders** 45:18
  45:21,25 46:2
  46:15 199:10
  199:12
**org** 66:15,18,25
  67:2 68:10
  69:5
**organization**
  4:8 22:8,11
  50:20 68:3
  71:17
**organizational**
  65:17 66:9
  68:13 73:11
**organization...**
  76:3
**organizations**
  37:3
**organized** 17:2
  17:4,8 19:11
  20:17,20,22
  26:24 27:5
  32:18 33:17,24
  34:5 47:11

48:3,14 49:15
  57:8 60:12
  68:6,7,10
  71:15 73:12,14
  74:11,16 75:4
  76:12 79:17,18
  95:12 96:22
  125:3 130:22
  151:9,10
  206:23 207:3
  207:13 209:8
  210:10 211:15
  212:14 213:4
**original** 40:12
  116:14
**originally**
  41:20 70:23
  250:6
**originals**
  116:18
**ortega** 69:23
  122:17 123:22
  124:5 193:7
  211:8,12,18
  212:4 221:25
  235:14
**ortega's** 69:25
**outcome** 255:3
**outside** 15:22
  16:6 17:14
  83:20 92:13
  110:4 150:6
  200:6
**overhaul** 205:3
**overnight**
  14:14
**oversee** 49:18
  71:23 73:21

191:6,24
**overseeing**
  26:14,21
**overview** 57:19
**owe** 35:22
  164:10,11
**owed** 73:9
**own** 59:10
  101:23 114:21
  114:22 144:7
  192:7 195:12
  195:13 196:23
  206:13,14
**owns** 98:22

**p**

**p** 2:1,1 5:1 94:6
  94:11,12
**p.c.** 2:12
**p.m.** 1:20
  135:18 181:7,7
  215:7,7 226:21
  226:22 227:1
  237:8 251:17
**packages** 158:2
**pad** 178:4
**page** 3:2 4:2
  95:25 235:17
  235:17 237:6
  237:14 252:4
  254:23
**pages** 237:1
**paid** 131:18
  164:6,7 247:23
**paper** 79:21
  123:18
**paperwork**
  113:10 238:11

**par** 205:12
**paragraph**
  236:5 240:15
**parcel** 100:20
  100:23
**parking** 100:20
**part** 21:5 34:5
  36:1 43:1 48:7
  48:9 50:22
  55:2 63:2
  69:10 71:20
  75:14,19 78:7
  80:11 85:24
  99:2 101:22
  106:14 109:11
  141:12 151:16
  156:8 167:8
  172:23,25
  173:5,7,22
  191:5 193:18
  193:19 197:19
  202:16 206:22
  212:18 223:13
  225:20 227:4
  233:12 241:10
  244:12
**participate**
  60:8
**particular**
  23:19 44:8
  91:7 92:19
  93:22 97:12
  103:1,2,4
  105:11,14
  107:9 128:5
  134:9 144:16
  150:17 159:4
  172:4 209:20

210:16 216:9
  223:1 225:20
  246:10
**particularly**
  31:14
**parties** 255:1
**partner** 22:20
**parts** 10:8
  11:14 105:24
  229:15
**party** 249:4,5,6
  254:21,24
**paso** 29:6,13
  30:1,15,19,22
  242:9 246:12
  246:13
**paso's** 28:20
**pass** 25:19,24
  196:7 242:25
  246:12 248:4
  251:12
**passed** 250:16
**passenger**
  162:18,18,19
**passenger's**
  169:9
**passing** 148:16
  160:8
**passion** 56:18
**past** 19:16
**patient** 114:1
**patrol** 7:8 15:9
  21:8 24:3
  27:20,22 28:15
  29:16 36:4,13
  38:3 39:9,19
  42:5,6 45:24
  47:22 51:18

52:24 55:5,10
  55:16 56:11
  60:23 61:1,2
  61:23 72:10,16
  78:7,9 91:14
  91:15 104:21
  114:21,22
  131:12,18
  135:3 137:11
  137:15 139:6
  142:25 143:5
  170:24 193:11
  195:18,19
  202:5,6 206:16
  210:4 212:25
  212:25 213:2
  216:18 238:22
**patrolling**
  42:13
**patrolman**
  39:6 43:7,16
  53:21 54:12,20
  55:18 61:24
  62:16
**patrolmen** 40:1
  42:17 81:9,13
  101:24 102:12
**pattern** 28:25
  141:6 159:10
  159:15,15
  161:16
**patterns** 141:1
  141:2 144:15
  159:2 216:2,10
**pause** 228:21
  232:9
**pay** 36:2
  189:24 200:7

222:21 247:11
**paying** 35:21
  35:21 120:17
  189:15
**pc** 2:18 233:6
**peace** 15:4
  178:25
**pedro** 6:24
**penal** 56:6
**people** 19:4,12
  38:8 39:8
  41:12 47:8
  51:14 74:17,19
  76:2 82:22
  90:21 101:10
  110:4 114:9,14
  128:20 150:5
  160:2,15,16,19
  161:3,3 162:7
  162:12,13
  164:15,17
  165:4 188:11
  188:17 189:24
  190:4 205:4,4
  238:4 240:17
  240:17
**percent** 132:24
  132:25 183:20
  186:20
**percentage**
  132:8,22
  182:25 183:16
**perfect** 121:16
**performance**
  195:3
**period** 52:13
  245:11,16

| | | | |
|---|---|---|---|
| **person** 25:25 | 223:17 224:18 | **plain** 31:22 | 217:6,7,10,11 |
| 26:2,17 27:3,4 | 224:23 225:2 | **plainclothes** | 217:18,19,21 |
| 30:8 31:2 32:4 | 227:18 230:16 | 74:13,17,19 | 217:25 218:1,3 |
| 34:14,20,25 | **phrase** 17:19 | 75:3,5,14,19 | 218:3,5,6,7,10 |
| 44:8 48:6 | 105:17 158:18 | 76:2,7 77:6 | 218:13,16,24 |
| 57:22 77:9 | 194:21 200:20 | **plaintiff** 1:3,17 | 219:5 |
| 98:21 119:23 | **phrased** 59:14 | 2:2 4:11 | **plates** 136:24 |
| 157:20,21 | **pick** 144:22 | 219:21 254:4 | 137:1,3 148:11 |
| 162:4,17 | 148:25 199:12 | **plaintiff's** 4:3,4 | 149:25 |
| 163:13 164:16 | 239:6 | 4:6,7,9,10,12 | **play** 234:3 |
| 165:6,10,12,22 | **picked** 39:16 | 4:13 235:10,11 | **playing** 223:5 |
| 166:2 167:6 | 40:7 86:10 | 243:23 | 227:9 229:9,20 |
| 171:14 215:15 | 116:14 120:23 | **plan** 206:17 | 230:13 231:18 |
| 218:24 253:14 | 201:13 208:3 | **plate** 29:19 | 232:8 233:10 |
| **personal** | **picks** 199:10 | 30:25 136:18 | 234:4,16,25 |
| 101:23 147:15 | **picture** 74:10 | 137:11,15,22 | **please** 8:11,18 |
| 147:17,25 | 99:10 149:2 | 137:25 138:3,5 | 214:18 228:20 |
| 148:4 | 204:7 | 138:10,13,16 | **pleasure** 137:9 |
| **personally** 31:6 | **piece** 54:17 | 139:6,7 140:24 | **plus** 56:13,13 |
| 89:2 112:20 | 231:14 | 141:22,24 | 201:6 202:18 |
| 253:11 | **pilot** 41:21 | 142:12,18 | **point** 10:3 |
| **personnel** | 45:13,16 46:23 | 143:7,14,25 | 24:20 40:20 |
| 57:12 58:17 | 48:20,24 49:13 | 144:12,22 | 56:25 58:21 |
| 145:5 191:19 | 49:22 | 145:10 146:6 | 69:22 70:2 |
| **persons** 35:7 | **place** 20:7 | 146:10,16,17 | 75:2 108:24 |
| 218:20 219:1 | 21:17 22:2 | 146:20 147:2 | 181:16,17 |
| **peter** 1:12,16 | 73:8 84:19 | 147:18,24 | 182:5 190:6 |
| 3:6 5:12 252:2 | 115:9 131:10 | 148:4,8,9,23 | 193:3,6 198:6 |
| 253:1,7,11 | 144:16 148:15 | 148:25 149:6 | 214:25 |
| 254:13,17 | 228:19 | 149:13,24 | **points** 10:4 |
| 256:5 | **placed** 69:6 | 150:1 169:16 | **police** 14:3,4,9 |
| **phone** 4:5,6 | 239:12 241:2 | 170:9,11,17,25 | 89:23 190:25 |
| 94:18,19,20 | 244:4 | 171:6,8 172:4 | 196:24 238:5 |
| 95:12 96:23 | **places** 68:2 | 215:10,18 | 240:17 |
| 98:22 120:17 | 82:22 | 216:8,9,10,14 | **policies** 11:7,9 |
| 129:12,13 | **placing** 238:4 | 216:14,15,16 | 11:12 34:14 |
| 136:3 151:3 | 240:17 | 216:16,20,22 | 41:23 85:10 |
| 186:15 189:25 | | 216:23,24 | |

**policing** 36:8
36:12,23,25
37:11,14,15,18
38:7,12,14
39:7,20,24
40:8 41:3 43:1
43:14 44:24
52:2 55:19
56:19 65:5,9
65:12 80:3,4
81:10,13,15,16
81:18 91:10
**policy** 41:22
56:9 62:5
147:3 174:12
182:4,15
**poor** 243:14,24
**pop** 172:6,7
219:11,13
**pops** 118:12
**portion** 88:25
110:24 198:10
**position** 14:2
15:5 26:22,24
57:13
**positions** 57:15
127:12
**possession** 35:8
41:13
**possible** 239:12
**possibly** 134:16
134:18 160:23
**posted** 62:8
**potential** 98:11
156:25
**potentially**
148:12 174:6

**practice** 24:6
174:20,21,22
174:23 238:6
240:21,25
**practices** 34:15
**precertification**
251:1
**precise** 194:13
**predator**
171:17
**prefer** 5:5,7
**preparation**
13:4 84:11
86:5
**prepare** 11:6
**prepared** 20:8
77:20
**presence** 107:7
**present** 2:21
248:15
**preserve** 9:15
**presumably**
167:19
**pretrial** 113:13
**pretty** 11:19
19:8 28:10
33:12 84:14
85:9 139:16,16
161:24 181:5
195:6 205:2
223:16 233:6
**previous** 94:9
**previously** 5:20
7:19 23:12
34:7 55:2 64:7
65:8,22 88:1
133:4 136:16
143:18,21,23

145:12 194:14
225:9 228:25
229:1 235:9,11
235:14 237:17
**primary** 189:3
**print** 66:19
70:17 123:15
175:21,23
**printed** 176:18
177:15,20
181:17
**printer** 175:17
175:19 176:2,3
176:5,9,19
177:11
**printing**
176:22 178:15
**prior** 57:8
66:25 168:10
192:18 207:20
232:16,21,22
233:4
**prioritized**
52:12
**private** 23:3
141:8,12
**proactive** 35:5
36:8,12,23,25
37:10,14,15,18
38:6,12,13,14
39:7,20,23
40:7 41:3
43:13 44:24
49:4,5 50:6
51:9 52:2
55:19 65:5,9
65:12 80:3,4
81:10,13,14,16

81:18 91:10,15
**proactively**
243:22
**probable** 29:8
32:11 51:12
85:15 122:22
153:18,21
154:8,17
155:16,17
157:23 233:1
238:12 246:15
**probably** 31:11
31:20 36:9
42:24 44:6
46:14 51:24
52:25 54:14
55:23 70:16
74:14 92:2
101:10 106:13
106:16 109:18
110:6,11
123:25 137:17
147:9 148:1
157:13 160:13
160:20 168:18
177:10 184:2
190:13 194:13
194:16,20
195:6 220:15
220:15 221:1
225:3 230:7
**problem** 6:1
59:8 95:23
113:19 120:25
164:2,2 181:15
182:3,11
197:12,13

**problematic**
  197:11
**problems**
  199:7 200:25
  234:21
**procedure**  1:24
  56:10 174:13
**procedures**
  41:24 56:9
  85:11
**proceeding**
  255:2
**proceedings**
  5:2 251:17
**process**  93:1,21
  98:17 99:4
  115:2 173:22
  249:1,4,9,12
**produce**  59:16
**produced**  1:17
**producing**  59:1
  59:15
**product**  245:18
**production**
  242:18,25
  243:23 244:1,3
**profane**  119:18
**profanity**
  120:4,6,8,10
**professional**
  120:1
**profusely**
  83:19
**program**  17:15
  41:22 45:13,16
  46:23 48:24
  49:13,19,22
  140:4 142:21

145:6 146:20
  177:24 205:18
  205:19
**programs**
  48:21
**progresses**
  56:5
**progressing**
  117:16
**progression**
  54:4
**prohibited**
  147:8
**prolong**  154:11
  166:19
**prolonged**
  184:14
**promoting**
  55:8
**promotions**
  53:20 140:3
**propensity**
  49:12
**property**
  129:13 196:25
**proposing**  45:9
**propounded**
  4:11
**protection**
  15:10 26:14
**protective**
  171:22
**proved**  253:12
**provide**  9:6
  23:7 90:12
  127:6,13 128:3
  129:18 208:5
  215:13 245:3

**provided**  91:18
  91:21 130:7
  154:13 215:12
**provider**  138:5
**provides**
  142:18
**providing**
  244:22
**provisions**  1:25
**pruneda**  77:17
**public**  38:15
  240:11 253:22
  254:22
**pull**  69:20
  168:15 189:25
  229:4
**pulled**  94:24
  110:3 130:15
**pulls**  168:25
**purpose**  29:5
  47:19 65:12
  244:7
**purposes**  48:1
  194:9 247:11
  253:16
**pursuant**  1:24
  254:19
**pursue**  54:6
**pursuit**  57:21
  58:1
**put**  25:2,4
  39:25 45:18
  47:13 54:14
  60:11 61:10,17
  61:21 69:18
  98:19,23 99:10
  118:15 134:3
  142:6 155:22

156:22 159:18
  163:14 193:4,9
  193:16 198:10
  228:14 232:20
  239:5,7 241:13
**putting**  22:15
  80:12,16 112:2
  147:16 149:7
  153:22 233:3
  240:5

**q**

**qualifications**
  6:18
**qualified**  6:19
  23:4
**quarterly**
  130:5
**question**  8:12
  8:18,20,22,24
  9:4,11,13,16
  9:17,23 31:5
  53:9 122:14
  146:5 153:11
  162:20 166:22
  186:10 215:9
**questions**  6:23
  8:8,21 10:9,17
  24:15 35:14
  40:9,18 87:15
  129:1 130:8
  135:20 161:12
  161:14 163:8
  164:15 167:24
  174:6 179:20
  180:1,4,5,6,15
  180:17,21,22
  186:1 229:16

242:16,17,21
245:7 248:7
251:15
**quick** 78:18
181:4
**quit** 178:15
189:24
**quite** 66:6
**quiz** 21:21
**quota** 50:15
**quotation**
228:15
**quotes** 47:14
**quoting** 228:14

**r**

**r** 2:1 5:1 77:22
100:5
**radar** 160:4,10
**radio** 105:25
112:23 113:5
**raise** 137:1
164:12 242:18
242:25
**raised** 164:23
**raises** 116:15
116:16 166:9
**ralph** 72:9
**ran** 58:5
173:16 175:3
**random** 117:9
117:9,10
120:23
**randomly**
103:16 119:1
**rangel** 77:22
77:23,24,24

**rank** 71:18
**rapport** 83:3
**rare** 116:5
129:9,11 167:8
**rate** 64:4
151:23 160:3
**rather** 42:4
210:5
**ray** 69:23
**rbf** 1:6 254:7
**reach** 30:15,18
213:12
**react** 87:15
**reactivate**
139:20,24
140:12
**reactivated**
139:22
**read** 5:5,11
10:1 99:19
122:18 236:10
236:15 253:1
256:9
**reader** 139:7
142:18 143:7
144:13 145:10
146:6,10,20
147:24 148:4,8
149:13 215:10
219:6
**readers** 137:11
137:15,22
138:1,3,5,11
138:13,16
139:6 140:24
141:22,24
142:13,22
143:25 146:16

146:17 148:10
149:24 150:1
**reads** 150:9
**ready** 20:8
214:18
**real** 114:1
116:25 141:10
**realize** 189:11
189:23
**really** 14:7
24:10 27:5,19
36:23 114:1
139:25 160:12
167:17 192:11
192:18,19
211:11
**realtors** 141:9
141:9
**reason** 10:21
30:19 34:18,22
92:8 112:9
113:2,12
169:11 173:9
173:11 178:16
180:9 184:3,7
185:11 187:5
191:6 200:8
205:5 209:20
223:8 236:18
239:18 252:4
256:11
**reasonable**
29:7 85:14
136:21 153:17
154:11 155:15
156:11 157:7
157:22,23
159:1,6 180:25

181:19 182:6
183:11 184:1,5
184:9,14 185:7
185:15,20
186:23 246:16
**reasons** 104:24
189:16 200:15
209:24 254:23
**reassigned**
57:7,9 58:8,10
60:23,25 72:10
205:5
**recall** 90:17
94:20 98:6
218:17 233:20
236:18 238:23
240:5,6,23
**recalled** 192:24
**receipt** 157:16
254:22 256:17
**receive** 37:3
122:18 123:1
125:9,9,10
144:17
**received** 30:24
94:19 152:11
215:15,17
231:5,6,9
**receiving** 27:14
154:3
**recognize**
87:20 199:21
**recognized**
72:22
**recognizing**
17:22 89:8
102:21

recollection
119:12
recommended
101:14,15
record  1:25 5:3
5:24 8:7 10:18
10:18 79:20
96:21 108:25
112:10 114:4
130:4 148:11
153:8 167:11
215:8 225:21
225:22 249:5
249:22 250:2
254:18
recording
148:22 227:16
227:18
records  4:3
46:14 92:3
95:22 97:6
112:5 129:22
235:15 237:18
247:6 249:20
250:4,18,20,21
251:2,4
recreated
72:23
recruit  52:18
52:21
recruits  92:5
red  14:13
126:12 137:1
164:8 199:3
refer  13:8,20
reference
233:13,15,16

referenced
233:3 256:6
referred
227:12
referring  13:9
13:10,17,21,24
65:11 152:2
174:9 229:22
230:9 231:21
231:22 232:3
232:14 238:19
238:24
reflect  79:20
114:4 229:11
reflecting
244:7
refreshers
86:13
refuse  9:11,13
184:24 185:2
refused  182:25
185:4
regard  247:4
register  176:3
registered
171:21
registration
255:9
regular  42:8
regularly
139:24
related  7:19
81:15,19 91:20
207:22 255:1
relations  37:15
relationship
69:25

relationships
20:23 21:4
relatively
227:5
relax  83:4
release  192:8,8
released
192:22
rellsworth  2:20
relocate  113:10
rely  153:23
relying  154:1
remained
53:17
remember
11:13 21:22
34:11,15 72:15
84:22 88:6,23
89:4 90:19
91:16 94:6,21
98:9,13,18
100:7,8,10
129:8 133:3
163:20 203:1,5
204:9 209:15
215:19,20
219:24 220:12
221:20 224:23
229:24 233:14
233:22 235:4
238:9,16 239:2
remove  142:1
193:9,13,13,15
193:16,16,16
removed  142:1
142:5 246:19
removing
194:8 195:3

240:21
rental  137:3
reorg  69:3
reorganization
68:17
reorganized
74:11
repeating
228:16
repetitive
195:8,11
rephrase
214:10
replace  196:12
208:3
replaced  60:6
141:25 196:12
209:11 212:6
reply  221:4
report  29:25
45:25 76:15,19
76:21,21
107:25 108:10
108:14 109:3,7
109:8 110:8,14
110:18 111:13
121:9,12
122:10 123:9
124:15,18
125:10 127:7
129:19 176:13
211:21 232:13
232:15,25
233:4 243:8
245:2
reported  1:21
166:18 211:18

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 302 of 322
Peter Gamboa                                         July 23, 2024
[reporter - right]                                           Page 45

| | | | |
|---|---|---|---|
| **reporter** 5:3,16 6:5,19 8:14 254:15 | **residence** 32:8 | **retired** 51:22 53:10 208:2,2 209:13,17,20 | **reviewed** 11:7 11:7,9 12:2 124:18,20 |
| **reporter's** 3:11 6:18 254:13 | **resident** 37:7 **residents** 37:2 **resources** 49:15 58:17 | **retirement** 194:24 | 181:9 222:22 223:1,10,20 234:6,7 249:19 249:24 250:4 |
| **reports** 76:13 107:12,13,14 107:17,21 110:19 112:3 122:14,18 124:12 128:7 128:17 129:14 212:1 243:3,16 243:17,20 | **respond** 42:3,6 42:7,18 43:17 212:25 213:1 214:1 **responding** 36:10 42:20 43:7,20 **response** 8:12 128:16 129:2 194:6 243:22 244:22 | **retirements** 205:4 **retiring** 194:14 **return** 30:25 168:19 173:16 193:3 197:21 198:16 256:13 256:16 **returned** 58:7 254:22,23 | 250:20 251:1 **reviewing** 12:20 118:3 122:14 181:13 192:20 195:15 229:22 230:5 239:10 **reviews** 118:6 **revisit** 244:21 |
| **represent** 5:20 94:17 97:21 220:19 221:13 226:9 235:13 237:16 | **responses** 96:24,25 **responsibilities** 107:10 191:23 210:11,12 212:15 | **returns** 29:20 29:25 144:17 218:20,20,22 **revenue** 131:23 **review** 10:2,11 | **rfp26** 244:6 **rfp40** 243:4 **rfp41** 244:15 **ride** 85:2 **riding** 114:20 **right** 5:21 9:15 |
| **represents** 6:7 **request** 243:23 244:1 **requested** 244:9 246:9 254:21,24 | **responsibility** 15:11 106:21 **responsible** 22:14 **responsive** 243:4,13,25 244:6,14,14 | 12:3,6,12,15 93:5,6,21 101:14 116:23 117:1,3,7,11 117:15,19,21 117:24 118:11 119:3,4,10 | 10:1,11 13:8 16:13,15 17:24 18:4,5,20 25:9 27:16 28:12 33:7 34:2,25 36:8,10 37:25 |
| **requests** 139:24 **required** 9:6 43:17 170:1 184:22 185:1 196:5 | **rest** 190:1 235:4 **restroom** 181:4 **results** 97:22 150:2 | 120:20,24 121:5,5 123:16 124:10,13 125:22,25 126:7 191:25 222:23 223:25 | 41:11 42:24 43:3 47:25 48:10,13 50:15 54:7 55:4,6,8 56:5,10,21 59:20 60:4 |
| **requirement** 92:11 **requires** 167:11 **reserve** 251:15 251:16 | **retailers** 141:10,11 **retire** 209:21 210:4 | 224:7,11 237:13 239:14 250:6,21,23 251:4 256:7 | 64:5 66:6 67:12 75:8 78:11,12 79:11 80:19 81:9,11 |

81:23 84:9
85:5 86:7,20
86:22 95:13
96:11 97:18,20
104:9 105:17
106:19 110:16
111:9,12 114:7
115:7 118:10
119:12,22
120:5,16,22
121:8,16,17
123:12 124:8
126:13 127:9
128:21 131:1
132:14,19
137:3 138:18
140:7,9 142:8
142:9 143:23
143:24 147:16
148:5,9,12,14
148:15,15,16
149:2 154:5,16
155:7,9,12,25
156:6,11 158:5
158:10,17
159:1 160:1,21
161:5,24 164:4
164:7 165:9,9
165:25 166:1,1
166:18 170:5
173:14 174:5
174:14 176:12
176:25 177:1,4
177:9 178:6,24
182:18 184:2,7
184:11,13,23
185:2 189:9,12
189:16 192:7

192:23,23
193:16 194:15
194:21 195:7
195:12,12,19
195:21 196:13
196:19 197:15
198:1,5 199:10
199:12,19
200:13,16,17
200:19,20
203:6 204:21
205:14,16
206:25 208:23
210:6 212:9
220:21 226:4,5
226:6 229:15
230:17 231:13
234:22 237:8
241:3,11
242:10 247:8
**rigmarole**  5:24
**rio**  89:24
**rip**  178:5
**rms**  108:10,14
109:3,7,11,20
110:25 111:7
111:15 112:5
122:20 124:5
125:16 126:8
**road**  2:7 115:8
144:21
**roadside**  85:13
115:6 137:4
154:9 156:10
**roadway**
111:19 188:17
246:20

**robberies**
17:25
**rocking**  160:18
**rodeos**  14:6
**rodriguez**
220:6,13
221:24 222:11
235:14 237:12
237:17,25
238:4
**rodriguez's**
235:23
**roland**  193:9
**role**  17:4 70:8
75:9 103:15
188:10,13
214:21
**roles**  26:10
**roll**  104:1,3,8
106:14,17
**rolled**  109:23
**room**  83:9
129:13 163:3,6
**rough**  62:13
183:17
**row**  105:21
**rpr**  1:20 255:8
**rude**  114:11
174:7
**rule**  5:11 37:25
254:19
**rules**  1:24
133:15,20
146:16
**run**  29:19,21
30:25 46:25
49:22 58:5
146:6 156:10

161:22 166:14
174:25 180:22
199:9
**runaway**
166:18
**running**  78:7
238:5
**runs**  24:24
28:5,6
**ryan**  2:17

**s**

**s**  1:22 2:1,11,12
4:1 5:1 147:12
147:13 162:23
**sac**  14:24
**saenz**  2:22 6:10
**safe**  43:10
115:9 124:24
**safety**  25:22
**sake**  225:19
**salaries**  131:8
131:9
**salary**  131:14
**salazar**  1:8
206:4,9,15
254:8
**san**  1:2,23 2:13
14:16,22,24
15:3 24:21
25:12 27:10
29:1 50:17
254:2
**sanchez**  71:13
71:14,20 74:5
**sandra**  175:15
**sanford**  77:12
128:10,11

129:2 193:8
**sapd** 21:7
24:24 28:14
207:24
**sarge** 121:9
**sat** 13:10
**satisfied**
236:13
**saturday** 33:1
**saturdays** 49:8
49:11
**save** 88:14
**saw** 55:6 69:22
110:3 115:18
155:1 182:11
195:17 223:6
223:10,13,13
223:21,22
224:8 234:19
**saying** 23:18
31:1 40:3
98:20 99:17
154:20 196:24
198:22 217:4,7
219:6 228:10
228:11,17
230:20 232:24
238:20,21
239:2,22
240:23 243:21
**says** 66:20 93:3
95:12 236:2
238:2,9
**sbcglobal.net**
2:14 256:2
**scan** 143:14
147:18

**scanned** 144:16
147:1 150:2
217:12
**scanning** 147:8
148:10 149:24
149:25
**scans** 141:8
144:4
**scenarios**
161:22
**scene** 192:4
193:2
**scent** 192:9
246:25
**schedule**
195:23
**scheduling**
136:4
**schmo** 168:15
168:16
**school** 14:10
58:4 164:25
165:1 248:17
250:7
**schott** 1:3 5:20
12:7 150:18
181:14 214:22
219:21,25
220:6,20,24
221:14 222:6,7
222:8,12,15
223:8,8,24
224:20 228:14
228:17 230:9
230:16,20,21
231:5,9 233:13
233:15,21,25
234:7,12,21

236:17,22
237:12,20,20
237:25 239:12
254:3 256:4
**schott's** 220:13
221:17,21
227:20 235:24
**schuler** 193:9
**scope** 157:25
**scratch** 224:9
**scratched**
224:6
**screen** 118:12
118:15 219:11
219:14
**script** 5:6
172:11,23,25
173:5,8
**seal** 253:18
**search** 20:6
39:1 80:5 87:6
155:17 182:21
183:1,23,24
184:12,22
185:4,15,18,19
187:9,14,17,20
199:13 210:14
217:18
**searching**
38:20 65:13
80:13 182:22
217:17 223:13
**seat** 85:18
154:16 155:2,2
160:14,16
162:18,18
241:2

**seated** 27:6
**seats** 224:10
**second** 62:20
89:9 94:10
95:15 110:15
163:17 197:23
198:1,11,15
229:4 235:17
237:13
**seconds** 180:19
180:23 227:4
229:19 230:12
230:12 231:16
231:16 232:6,6
233:9
**secret** 22:4
74:23
**section** 68:10
68:24 70:19,22
71:9 73:14
74:16 118:8
232:5 236:2,10
245:4
**sections** 15:13
15:15,16,18
130:15
**security** 21:13
**see** 9:1 16:18
32:9 36:19
55:24 61:23
67:7,13,19
68:8 70:14,18
73:14 79:17
91:8 92:22
95:1 96:4
97:19 98:24
105:25 106:3,4
110:5 111:24

| | | | |
|---|---|---|---|
| 117:16 120:14 | sees 31:13 | 155:10,14,19 | 244:4,12,16 |
| 120:14 122:11 | 165:12 | sent 57:24 | 245:6 248:7 |
| 148:25 149:20 | seize 135:11 | 86:23 91:9 | 251:13 252:2 |
| 154:14,15,25 | seized 127:17 | 99:9,17 120:23 | 253:1,7,11 |
| 155:11 156:3 | 127:22 132:13 | 237:21,25 | 254:13,17 |
| 156:24 158:1 | 133:7 134:24 | 248:17 256:14 | sergeants |
| 158:12,20 | 135:13 | sentence 236:7 | 54:13 55:9 |
| 159:3,22 160:2 | seizes 133:25 | 236:12 240:16 | 74:1,4 124:10 |
| 160:3,7,13,15 | seizing 134:10 | separate 41:5 | 131:20 |
| 160:18,22 | 134:14 | 102:25 143:18 | series 179:20 |
| 162:17 181:13 | seizure 132:12 | 164:18 203:23 | serve 51:25 |
| 190:13 192:9 | seizures 132:6 | september 47:4 | service 22:5 |
| 199:3 201:9 | 132:6 | sergeant 1:12 | 36:10 42:6,18 |
| 211:11 224:9 | seldom 186:18 | 1:16 3:6 5:12 | 42:21 43:7,18 |
| 224:11 228:19 | select 51:3 61:9 | 7:1 20:16 | 43:21 56:12,13 |
| 234:21 235:20 | 111:15,19 | 44:16 49:18 | 74:24 109:24 |
| 236:2,5,7 | 206:12 | 53:16,19,24,24 | 112:4 138:4 |
| 237:3 238:21 | selected 53:4 | 55:11 56:12,14 | 194:8 208:5 |
| 239:24 249:14 | selects 119:1 | 71:14,18,19,20 | services 171:22 |
| seeing 47:5 | self 116:9 | 74:22 79:22 | 208:18 |
| 51:12 67:10 | send 20:14 | 89:2 93:3 | serving 202:21 |
| 96:3 97:1 | 86:8,12 98:10 | 95:20 104:14 | 202:25 |
| 100:8 155:19 | 101:3 121:4 | 114:4 119:9 | set 41:21 |
| 156:1,21 | 135:1 140:10 | 124:13 170:4 | 144:25 145:4,4 |
| 159:13 161:11 | 170:19 171:24 | 190:10,11 | 199:8 |
| 245:23 | 197:20,21 | 192:11 195:23 | setting 186:14 |
| seek 224:16 | 249:5 | 200:7,11,14 | settings 145:1 |
| seem 238:1 | senior 53:1 | 211:4,5,11 | seven 16:18 |
| seems 37:12 | 192:17 198:8 | 212:4 219:24 | 173:19,22 |
| 38:11,13,19 | 203:11,14 | 220:5,13 | 174:17 |
| 56:3,25 96:17 | sense 93:17 | 221:24,24 | several 7:9 |
| 97:11 155:1 | 101:20 158:9 | 227:12 235:14 | 88:3 |
| 198:22 199:25 | 163:14 166:21 | 235:14,23 | sex 35:24 36:2 |
| 205:2 226:13 | 168:8 186:8 | 236:8,12 | sexual 171:17 |
| 234:18 236:23 | 198:21 209:3 | 237:12,17,25 | shake 8:11 |
| 237:20 | 232:23 | 238:4 239:5 | shakes 153:6 |
| seen 119:16 | senses 51:16 | 241:8 242:23 | 242:2 |
| 160:21 | 55:21 85:15 | 243:15,18 | |

share  22:24
  66:7 117:18,18
shared  100:12
sharing  20:24
  56:18 99:17,22
sharp  14:5
she'll  130:4,6
sheet  129:21,24
  256:11
shelter  23:7
sheriff  13:23
  13:24 24:20
  31:13 44:11,14
  45:7,8 63:24
  63:25 72:8,22
  80:1 136:12
  137:23 184:22
  206:4,9,15
sheriff's  12:21
  13:16,17,18
  15:6,8,9 20:22
  22:20,21 25:13
  26:14 27:22
  30:11 39:22
  40:20,24 41:23
  44:9,16 45:11
  47:18 48:21
  51:21 61:15,17
  62:5 64:15,21
  64:24 65:2
  66:13 68:3
  78:1 80:1 81:2
  85:11 89:3,5
  90:11,13 91:1
  91:17,21 92:12
  132:2,7,15,22
  132:24 133:7
  134:1 138:7,11

139:13 141:7
141:18 146:15
147:3,23 148:7
149:25 150:6
178:12 179:4
187:9 190:7
195:18 205:7
205:21,23
214:12 242:8
242:13 245:13
245:25 246:20
247:18 250:8
sheriffs  136:9
shift  19:14 33:4
  103:1,2,3,4
  106:11,12,13
  106:21,24
  107:2,9,16
  109:15 112:6
  210:16
shifts  112:10
shock  198:4,9
  198:11,19
shook  153:9
shooting  57:7
  57:18
short  17:7
  60:10,24,24,25
  61:2 68:5
  70:12 78:14
  114:7 128:22
  190:18 195:16
  201:13 213:22
  227:5 228:6
shortage  58:13
  58:13
shortages
  57:12 126:25

shortcut  181:8
shortened
  227:23
shorthand  1:22
  254:15
shortly  72:13
shot  58:6
show  141:16
  193:4 225:13
showing
  108:25
shuffle  142:3
shut  235:1
sic  25:2
sick  194:16
side  15:21
  16:13,17,21,22
  16:24 17:8
  23:7,9 25:16
  35:23 49:11
  54:15 62:25
  66:23 103:17
  103:17 115:7
  120:16 156:22
  159:19 162:3
  165:1,2 169:8
  169:9 201:10
  243:11
sides  10:18
sidetracked
  56:21
sign  113:10
  256:12
signals  38:9
signature  3:10
  252:1 253:2
  254:20,22,23
  255:7

signed  109:14
  256:19
signs  196:15,24
silver  171:25
similar  120:19
similarly  10:7
simple  198:2
  198:23
simultaneously
  146:12
single  38:9
  189:13,18
sir  23:23 33:15
  67:6 68:23,25
  101:25 246:6
  247:7,20
sit  142:10
  223:12
sitting  80:17
  81:7 155:2
  224:8
situation  167:1
situations
  87:15
six  16:11,18,22
  159:5 160:14
  168:5 202:4
sixth  204:7
skill  91:7
skills  191:7,12
  191:13
skin  199:10
skip  225:19
  227:3
slave  35:20
slot  60:20
slow  36:11

Case 5:23-cv-00706-OLG-RBF    Document 119-2    Filed 06/11/25    Page 307 of 322
Peter Gamboa                                              July 23, 2024
[small - standing]                                          Page 50

| | | | |
|---|---|---|---|
| **small** 66:19 | **snow** 88:8,9,11 | 53:12 54:5 | 93:7 98:9 |
| 88:25 208:10 | 88:21 102:7,13 | 56:17 59:9 | 100:7 215:23 |
| **smell** 55:21 | **social** 4:12 19:1 | 70:9 76:1 93:4 | 245:1 |
| 155:13 156:3,4 | **software** 143:8 | 139:23 160:24 | **specifically** |
| 156:24 158:12 | 143:19 144:2,7 | 163:21 176:18 | 20:23 41:16 |
| 158:21 159:23 | 144:9 | 195:5 197:21 | 87:2 206:20 |
| 203:7 | **soledad** 1:23 | **source** 19:1 | **speed** 47:6 |
| **smelling** | 2:13 | **sources** 18:8 | 64:12 145:15 |
| 155:19 156:2 | **solutions** 255:9 | **south** 84:4 | 145:19 146:2 |
| 156:21 159:13 | 256:23 | 103:23 137:6,7 | 151:23 160:3 |
| 161:11 | **somebody** | 152:13 157:11 | **speeders** 38:7 |
| **smuggler** | 28:13 36:18 | **southbound** | **speeds** 64:4 |
| 160:23 | 87:20 106:4 | 30:5 103:17 | **spell** 77:19 |
| **smugglers** | 115:8 120:17 | **spanish** 162:20 | **spelling** 126:1 |
| 50:18 136:22 | 139:19 155:12 | 162:20 | **spend** 106:23 |
| 218:21 219:3 | 163:9 178:19 | **spanning** 33:17 | **spending** 10:4 |
| **smuggling** 18:2 | 178:24 185:10 | 33:20 | **spent** 107:3 |
| 23:7,9 29:10 | 189:11 196:20 | **speak** 34:14,20 | 134:6 |
| 30:12 35:8,17 | 196:25 223:18 | 162:19,19 | **spin** 35:24 |
| 35:18 47:5 | 240:11 | 236:17 | **spoke** 44:17 |
| 59:19 63:17 | **somebody's** | **speakers** 90:9 | 236:12,22 |
| 64:1,11 65:6 | 174:7 | **speaking** 11:4 | **spot** 61:7 |
| 84:4 151:6,12 | **soon** 181:5 | 169:21 | 148:21 223:3 |
| 151:14 155:3,8 | **sorry** 32:25 | **spears** 108:12 | **spots** 49:5,14 |
| 155:24 156:25 | 33:1 42:24 | 108:14 109:8 | **spotted** 200:25 |
| 158:25 159:18 | 63:2 70:16 | 110:25 | **springtime** |
| 159:19,24,25 | 71:3 72:4 | **special** 33:11 | 44:6 |
| 160:25 161:10 | 153:10 187:10 | 34:1 47:12 | **staff** 67:14 |
| 161:21 162:1,1 | 208:7,13 | 69:1,2,11 71:6 | 70:20 128:12 |
| 162:6 187:5 | 232:18 242:5 | 107:23 108:2 | **stagger** 103:19 |
| 219:14 | 248:8 | 142:25 143:5 | **standalone** |
| **snack** 9:21 | **sound** 79:11 | 143:10 244:10 | 40:21 80:12 |
| **sniff** 210:13 | 88:10 130:11 | **specialized** | **standard** 180:5 |
| 214:19 223:11 | 204:20 220:21 | 54:22,23,24,25 | 180:21 200:16 |
| 246:17 | 227:8 | 55:4 | 200:19 238:6 |
| **sniffing** 186:13 | **sounds** 24:6 | **specific** 10:4 | 240:21 245:25 |
| 202:2 | 27:4 42:11 | 12:7 32:13 | **standing** 115:7 |
| | 48:11 52:11 | 63:11 82:3,6,8 | 160:8 |

| | | | |
|---|---|---|---|
| **stands** 22:11 | **states** 1:1 25:10 | 48:16 85:13 | 230:3,9,21 |
| **start** 6:22 8:22 | 35:19,23 254:1 | 106:4 107:8 | 232:17,21,22 |
| 9:1 20:2 33:14 | **station** 157:11 | 108:2,5,9,19 | 233:1,6 239:16 |
| 82:2 84:6 86:5 | **statistical** | 108:20 109:8 | **stopped** 28:23 |
| 111:3 125:9 | 50:14 | 111:16,17,18 | 30:10 47:10 |
| 136:19,20 | **stats** 130:6,7 | 111:22,22,23 | 58:6 110:13 |
| 154:10 162:24 | **status** 63:18 | 112:5,9 114:24 | 128:4 157:11 |
| 163:7 164:25 | **statutes** 132:19 | 114:25 115:16 | 157:12 180:8 |
| 168:25 187:3 | **statutory** | 120:13 129:5 | **stopping** 38:17 |
| 229:5 237:7 | 132:21 | 134:1 136:13 | 81:20 157:14 |
| **started** 14:17 | **stay** 103:23,24 | 150:12,13,14 | 157:18 158:7 |
| 46:24 47:5 | 125:25 189:20 | 150:17 153:18 | 187:23 189:10 |
| 84:12,18 86:17 | 209:25 | 153:22 154:9 | 214:25 |
| 91:12 103:11 | **staying** 83:7 | 154:12 157:10 | **stops** 18:10,18 |
| 106:11 192:1 | 165:11 | 160:2,20 | 19:5 31:7,10 |
| 192:12 197:9 | **stays** 168:6 | 166:19 167:23 | 31:22,24 32:1 |
| 201:2,21 | **step** 173:19,19 | 168:20,23 | 32:12,13,20 |
| 204:17,24 | 173:22 174:17 | 169:2,11 | 33:9,14,22 |
| 214:4 223:5 | **steps** 39:3 | 170:13,17 | 34:5 35:6 |
| 226:3 | **steve** 236:13 | 172:14,21 | 36:14 37:1,6 |
| **starting** 130:13 | **steven** 71:12,14 | 173:9,11 | 37:14,18 38:7 |
| 170:20 236:7 | 74:4 | 174:16 177:9 | 38:12,13 41:6 |
| **stash** 104:20 | **sticker** 65:23 | 179:19,19 | 41:12 42:4 |
| 167:22 | **stint** 89:6 | 180:18,23 | 43:25 44:25 |
| **stat** 50:13 | **stints** 55:6 | 181:14,23 | 45:1 47:19,24 |
| **state** 1:21 9:9 | **stipulations** | 182:20 184:15 | 48:9,12,19 |
| 9:14 14:12 | 6:13 | 186:17,20 | 51:11 52:12 |
| 29:20 31:3 | **stolen** 89:13 | 189:6,23 191:1 | 55:20 59:21 |
| 136:18,24 | 144:20,22,23 | 192:23,24 | 62:25 63:16 |
| 137:1,3,5 | 148:24 149:1,6 | 207:24 210:14 | 64:11 65:12 |
| 173:15 253:8 | 149:7,11 | 213:7,9,12,15 | 80:4 81:15,19 |
| 253:23 254:15 | 170:22 171:1,2 | 214:3,4,8,17 | 85:25 107:5 |
| **stated** 1:25 | **stop** 11:15,23 | 214:18 219:21 | 113:18 116:11 |
| 247:9 | 12:4,5,6,7 29:8 | 219:25 220:9 | 118:1 136:10 |
| **statement** | 29:9,16 30:4 | 220:19,24 | 153:16 174:5 |
| 34:19 122:23 | 30:16 31:15 | 221:2 223:1,17 | 176:25 177:3,6 |
| **statements** | 32:10,11 36:19 | 223:19 225:24 | 188:11 207:15 |
| 15:24 | 38:1 47:2 48:5 | 225:25 227:24 | 212:16 214:22 |

**[stops - sure]**

232:2 241:10
**storm** 88:6
**straight** 14:9
95:22 97:6
**strategic** 70:15
70:21,23
**street** 1:23 2:13
32:22 33:4,24
39:14 41:2
51:10 52:1
59:3,6 71:14
72:3,13,17,19
72:24 76:9
89:17,20 90:11
90:25 91:13,19
102:10,11,13
106:10 117:18
130:17 142:25
143:5 255:10
**streets** 41:3
42:9 91:9
**strong** 225:8
**stuff** 18:16
26:15 60:2
90:23 137:9
152:15 163:18
163:19
**style** 56:16
179:19 180:5
180:22
**styled** 1:18
**subject** 246:10
**submit** 93:10
93:18 134:23
**submitting**
94:20
**subscribed**
253:15

**subsequent**
232:21 233:4
**subset** 117:4
**substance**
136:7
**substitute** 54:2
**subtitles** 4:5,6
228:4,8,20
229:6,10
**success** 50:2,3
50:6,16 127:24
128:15
**sudden** 160:4
**suddenly**
217:18
**sufficient**
239:15,18
**suggest** 92:15
92:19
**suggesting**
97:15
**suit** 225:9
**suite** 1:23 2:4,7
2:13,18 255:10
**sum** 36:9
**summaries**
108:12
**summarize**
80:24 93:15
99:9 210:24
**summarizing**
234:19
**summary**
108:15 109:8
110:25 124:5
125:19,22
126:10,23
127:13 161:6

**sun** 196:10
**sunday** 32:25
33:2 38:4
**super** 94:3
**supervise**
16:11 25:25
26:3 48:8
75:24 176:25
190:6
**supervised**
179:13
**supervising**
126:16,17
191:19
**supervision**
102:19 125:8
**supervisor**
15:7,9 39:16
74:12,25 75:1
123:9 135:12
190:24 191:22
195:24 200:5
202:18 211:4
212:9,9 240:10
245:12,17
247:5 248:9
**supervisors**
117:19 126:19
140:18
**supplementing**
42:5
**support** 67:8
67:11,13 70:21
247:21
**supposed** 24:9
38:24 123:3
136:14 148:7
177:15,20

199:5 243:5
**sure** 6:1,21
19:17 21:10
22:11 23:3,17
24:11 26:7
29:18 30:2
32:16 36:22
42:10 46:16
49:9 50:8
62:15 64:20
65:20 66:24
70:14 77:21
98:8 102:23
103:15 104:4
104:16,17
118:19 130:12
132:25 133:24
135:5,22 136:6
143:1 153:19
155:18 156:7
161:8 164:5
166:16 178:8
181:6 189:3
191:20 196:17
198:21 200:10
203:21 205:9
208:13 209:23
215:2,11
218:19 219:23
221:13 222:16
225:21 227:8
228:21 229:8
231:2 232:15
233:19 237:15
238:3,7,8
240:9,10
241:17 242:24
245:8 247:2

Peter Gamboa

July 23, 2024

249:24 250:10
250:17
**surrounding**
25:11
**surveillance**
20:5 32:3,7
48:4 165:15
167:12
**suspect** 168:10
**suspected**
186:14
**suspecting**
187:4
**suspects** 140:4
**suspicion** 29:7
85:14 136:21
153:17 154:11
155:15 156:11
157:7,22,23
159:2,6 180:25
181:20 182:6
183:12 184:1,5
184:9,14 185:7
185:16,20
186:24 246:16
**swap** 59:8
**swapped** 59:4
**swat** 71:7
**sweating** 83:19
**swore** 8:1
**sworn** 1:18
5:13 254:17
**system** 61:15
61:18 111:8
117:11 118:24
120:19,21
122:20 125:20
139:7,13

141:18 145:7
148:4,14
177:21 205:23
215:10,12,22
216:1,4 217:7
218:6,25
**systemic**
200:15
**systems** 29:24

## t

**t** 4:1
**tacos** 168:6
**tactical** 68:24
70:13,15,19
71:6,8
**tactics** 56:19
115:4 120:13
**tag** 15:20 21:5
57:7,8 58:8
60:11 75:5
76:9 151:9
207:23,23
208:5,5,17
209:1,4,8
210:12,21
211:12
**tailored** 32:13
**take** 6:19 9:20
9:23 10:2,12
39:3 40:15
42:2 53:19
55:25 78:14,17
90:4 96:2,24
97:16 101:16
102:13 110:10
112:19 114:21
120:18 121:19

123:15 130:9
155:19 164:3
215:1,14 229:3
237:13
**taken** 1:18 7:21
62:23 78:20
101:21 102:3,5
135:18 181:7
193:21 215:7
226:24 255:2
**takes** 198:13
**talk** 13:15 37:7
37:17 65:15
66:8 79:25
82:1 83:19
94:3 95:14
102:18 113:4
113:23 115:10
126:14 127:8
127:21 135:5
135:23 136:8
150:16 151:19
159:19 188:15
206:19 219:20
**talked** 17:10
34:8 39:19
48:2 51:2
58:12 62:15
65:8 72:6 74:7
78:24 80:2
81:15 82:2
87:21 91:6,19
92:16 93:24
105:13 106:7
136:15,24
141:21 145:12
149:23 154:23
159:11 161:25

163:18 172:9
174:24 177:25
197:4,11
222:18 224:17
244:19 248:1
250:19
**talking** 9:1
16:13 33:16
46:16 82:14
83:1 101:24
123:22 136:7
143:21 148:13
152:23 154:14
156:5 157:19
233:20,22
238:20 239:11
**tall** 114:3,6
**tank** 157:24
158:1 246:18
246:21
**target** 18:3
199:19
**targeting** 18:6
73:3 151:14
**targets** 35:12
**tasers** 104:19
**task** 21:24,24
110:20 111:10
111:13 198:23
209:25
**tasks** 109:20
**taught** 37:24
92:3 174:13
**tcole** 92:9,10
**teach** 40:15
55:17 83:2
**teaches** 89:24
90:1 174:15

teaching  56:19
  82:9 101:5
  105:3
team  73:6
  245:22
tech  225:8
techniques
  82:10,13,15,18
  82:18 83:2,18
  83:23 87:9
  88:24
technological
  177:17
teenager
  166:18
tel  2:5,8,14,19
telephone
  186:14
tell  7:7 8:2
  11:10 17:13,20
  19:18 21:2
  30:10 32:1
  36:7 44:13
  45:16 48:25
  57:19 61:20
  62:20 67:17
  68:7 71:12
  73:10 82:21
  83:4,7 87:12
  87:16,16 90:16
  93:1 100:21
  102:4 103:21
  106:8 109:19
  110:20 113:25
  114:13,23
  115:2 116:6
  121:13 129:4,7
  137:14 142:20

145:14 146:25
  147:23 150:12
  151:21 152:7
  152:14,15
  162:14 164:7
  166:12 173:6
  175:21 176:5
  181:22 197:18
  204:15 214:6
  220:2 221:1,8
  222:14 224:12
  225:1 245:11
  245:23
telling  172:25
  176:19 230:15
  234:20
temp  46:4
temporary
  45:20 46:3,11
  46:19,20
ten  16:19,20,21
  16:22 78:18
  179:3
term  17:7,8
  35:3 36:23
  174:3,17,18
terms  19:2 50:2
  173:1 202:11
terrazas  51:1
  51:10,23 58:21
  59:9,24,25
  60:1,5,6
test  48:21
  53:20,22,24,25
  54:8 55:25
  56:1,6
testified  5:14
  7:5 34:10

91:17 150:20
  188:9 206:21
  206:22 237:17
  244:12
testify  7:9,17
  11:2 52:3
testimony  7:19
  8:4 10:22
  235:23 245:1
  251:13 254:18
  256:9,17
testing  53:21
texas  1:1,9,21
  1:23 2:4,13,19
  15:20 17:11,15
  71:16,20 73:15
  73:16 74:2
  89:25 152:13
  253:8,23 254:1
  254:10,15
  255:8,10
text  97:8,19,19
  98:19 99:10
  154:5,20
texting  97:12
  189:25
tfos  21:18,19
  74:23
thank  5:16
  6:21 14:21
  33:15 39:18
  66:4 79:23
  87:24
thanks  17:1
  49:24 78:21
  215:6 232:12
theater  49:9

theft  17:25
  89:6
theoretically
  134:13
thereabouts
  221:8
therefor
  254:23
thing  9:22
  10:13 25:17
  31:17 36:11
  50:12 56:14,15
  79:22 90:25
  91:2 100:15
  108:15,16
  119:24 120:22
  132:21 142:21
  144:15 183:12
  187:2 206:11
  225:16
things  8:12
  18:13 20:8
  29:3,11,11
  30:6,12 31:4
  36:20 38:4,9
  38:25 39:11
  41:3,14 42:21
  52:11 56:16
  59:19 63:8,17
  65:7 78:10,23
  82:18,23 83:10
  83:21 84:4
  85:1,9 87:5,6
  101:5 102:9
  103:12,13
  107:15 108:12
  110:6 113:7,14
  114:12,18

115:12 116:11
121:18 126:6
127:3,12,22
136:22 141:8
145:20 149:21
155:23 157:1
158:11 159:7
159:11 160:25
161:11,17
162:2 163:7,9
163:18 164:12
164:21,24
166:2 180:14
190:2 191:21
196:5,16
199:11 200:1
205:14 206:6
206:10 218:21
228:13 243:25
**think** 21:8 23:3
23:15 36:8
50:12 51:22
67:20,20 76:10
77:8 78:11
79:2,7,13
89:24 90:19
91:25 92:16
93:4,9 94:2,3
96:2 102:2
106:22 127:16
128:11 132:23
132:23 135:15
139:14 156:14
161:19,23,24
164:4 171:16
171:20 172:10
181:8,16
185:13 192:9

200:3 203:3,15
203:17 204:5,6
214:25 225:5
226:3 228:25
230:4,5 232:24
234:12 238:2
238:19 239:22
239:22 241:13
**thinking** 44:18
180:14
**third** 163:20
249:3,5,6
**thought** 97:15
120:7
**three** 16:18
19:11 37:25
84:25 85:4
90:20 114:5
160:15 196:16
**throckmorton**
255:10
**throw** 200:11
200:14
**thumb** 37:25
**ticket** 177:15
177:20,21
178:5,13,16
179:1,7,8,13
179:16 184:16
189:14 190:4
**tickets** 131:24
176:21 179:2,3
**tie** 17:18
**tied** 141:15
155:12
**tiers** 16:2
**time** 11:12 13:7
13:8,9 37:5

39:6 41:20
44:16 51:11,25
52:1,1 54:2,2
55:9,10 57:9
58:2 60:10,22
60:24,24 61:10
67:8 68:5 70:2
70:4,12 72:8
72:14,18 78:12
78:12,16 85:2
86:9 90:5 93:7
102:16,17
104:14 106:23
108:24 113:20
114:10 116:16
116:20,21
119:14 120:9
120:15 122:1
122:16,18
123:21 124:4
125:15,18
131:1,11
135:15 148:12
148:16,17
154:10 157:9
168:5 171:24
174:7 179:1
181:21,22
182:2 183:14
187:11 188:3
190:10,11,18
192:6 193:3,6
193:7 194:7
195:16,24
198:11,15
200:9 201:14
201:21 206:1
209:10 210:19

211:13 213:23
215:18 217:11
220:4,10 221:7
221:20 222:25
222:25 224:13
225:19 226:10
226:13,16
239:6 241:8
242:17 245:11
245:16,16
250:9,15,25
251:14 256:18
**timeframe**
123:22 256:8
**timer** 111:3,5,9
**timers** 110:19
**times** 19:18
29:1,1,2,22,23
87:25 88:15
182:25 183:8,8
183:10,12,12
183:19,20
193:13
**tinted** 160:12
**tiny** 70:17
**tip** 161:1
**tips** 18:9,9,15
19:4 37:3
**tired** 189:17
**title** 63:9,14
**tobacco** 21:15
**today** 6:6,6,13
6:20 7:1,5,24
8:4,8 9:25 10:8
10:22 11:6
13:16 31:7
63:19 73:11
103:16 117:22

118:1 129:14
129:19 135:11
142:10 146:3
207:4,6,11
243:13 244:4
244:12
**together** 22:15
40:1 52:23
59:5 79:14
88:2 103:23,24
104:6 106:8
164:1,15
**told** 31:13 53:3
145:14 185:14
193:3,15
198:10,12
199:19 223:24
224:2 230:19
230:19,21
231:5 234:7,12
234:20 238:23
239:14,17,19
241:5
**tonneau** 222:20
223:2,3,4,9
224:1
**took** 51:18
129:12 192:12
194:6 232:19
243:8,14,16
246:20
**tool** 149:14,15
**toolbox** 223:14
**toothbrush**
163:6
**top** 46:17
108:14 125:25
126:2 160:18

226:6 237:14
**topic** 25:9 35:1
241:15
**topics** 87:8
**tore** 196:11
**total** 16:10,12
16:17 159:6
163:14
**totally** 166:12
166:14
**tote** 223:15
**touch** 156:6,8
**towards** 17:17
29:8 38:20
141:5
**towing** 141:9
**town** 86:21
157:17 158:7
164:25
**toy** 192:10
**track** 193:5
199:8 200:1,4
**tracking** 192:8
199:7,18 202:8
**traffic** 18:10,18
19:5 22:10
30:4 31:6,6,10
31:13,15,21,24
32:1,5,10,11
32:12,13,19,20
33:8,14,22
34:5 35:6,9
36:14,17,19
37:1,6,14,18
37:21,24,25
38:3,7,12,13
38:20 41:1,1
41:12 42:4

43:25 44:25
45:1 47:19,22
47:24 48:5,8
48:12,16,19
51:6,11,14
52:12 54:24
55:20 62:24,25
63:4,4 64:11
65:12 80:4
81:8,15,19
84:15 85:12,12
85:25 91:13
106:4,25 107:3
107:5,8 108:2
108:5,9,19,20
109:8 111:16
111:18,22,22
111:23 112:5,9
113:18 114:24
114:25 117:25
129:5 130:16
130:16,17
133:25 136:10
136:13 149:19
150:17 153:16
153:18,22
154:12 157:9
160:1 161:16
166:19 167:13
168:20,23
169:11 170:2
170:13,17
172:14 174:4,5
174:15 176:25
177:2,5,9
179:19,19
180:18,23
181:14,23

182:20 184:14
186:17,20
188:11 189:5,5
189:22 191:1
207:15 210:14
212:16 213:7,9
213:12 214:3,4
214:8,17,18,21
219:25 220:9
223:1,17,19
225:24,25
227:24 230:3
232:17,21,22
233:1 241:10
**trafficked**
167:12
**trafficker**
154:4,8 167:14
167:18,19,22
168:11
**trafficking**
18:1 22:7 35:9
35:17,19,23,24
79:3,4,9,10
154:25 159:20
162:1,3,6,14
162:15,16
164:16 165:7
165:21 166:2
167:2,5,5,8,11
167:23 168:10
168:17 186:25
**trailers** 89:10
**train** 192:19
198:14 206:12
250:11
**trained** 202:5,6
203:7 206:13

224:7 248:14
248:22 250:8
251:8
**trainee** 174:15
**trainer** 198:8
250:8,12
**training** 4:12
4:14 32:23
33:6 40:10,12
40:14 61:24
62:16,20,21
63:9,13 67:22
67:25 68:19
70:3,10,13,22
82:1,3,7,12
83:15 84:17,18
86:3,5,18,24
87:22 88:1,21
89:1 90:11,14
90:25 91:18,19
92:2,4,13,15
92:19 93:3,22
97:12 98:11,14
99:6,6,22
100:8,14,15,23
101:16,17,17
103:7 116:8
130:19,20,21
130:23,24,25
131:2,3,14
133:9,21 134:7
134:10,15,23
134:23,25
135:2 173:25
174:14 191:20
191:25 192:2
192:15,20,22
193:5,10,17

194:2,3,9,10
195:7,8,11,16
197:13,14,22
198:7,14 199:1
199:4 200:3,4
200:16,18
202:9 205:13
206:17 247:2
247:10,11,12
247:12,21,23
248:15,17,18
249:5 250:4,6
250:18,21
251:4
**trainings** 40:18
63:11 91:20
97:15
**trains** 92:4
206:16
**transcript**
254:17,22
256:6,19
**transferred**
45:23 192:13
192:14 210:3
**transitioned**
39:21 75:9
**translated**
191:12
**transnational**
151:10
**transporting**
63:16 180:11
**trap** 10:16
**travel** 144:15
159:2,10,14,15
216:2,10

**traveling** 30:5
140:25 141:2,4
141:6
**treadwell**
50:25 51:5
52:6 57:6
114:2
**trick** 10:16
**tried** 48:22
52:8
**trip** 83:9
**trooper** 157:25
**truck** 223:11
223:14 224:6
224:10
**true** 253:3
254:18
**truly** 116:2
**trunk** 155:12
**truth** 8:2
116:19
**try** 8:13,16,16
8:19,21,23 9:2
82:11 92:24
93:15 100:8
117:14 127:2
204:8 225:12
240:12
**trying** 21:8,21
21:22 88:6
95:22 98:16,17
99:3 128:21
139:14 161:22
163:19 171:16
200:1,11,11
202:11 204:5,7
223:6 224:2

**tubbs** 207:21
207:25 208:4
209:11,17,20
**tuesday** 32:25
**tuesday's**
206:15
**tuesdays** 33:2
**turd** 184:6
**turn** 129:21,21
145:23,25
146:9,13 149:4
178:16,22
**turnaround**
216:12,13
232:2,4,16
**turnarounds**
216:5 219:18
**turned** 145:14
145:20
**turning** 121:6
**turnover** 205:6
**turns** 145:9,13
146:1
**twice** 159:5
**two** 12:20
15:13,15,22
16:2,5,18
18:13 21:11
26:10 33:10
34:1 37:13
38:13 52:4,5
53:22,23,25
54:1 57:1,15
61:22 62:16
73:24 86:10
88:1,17,19
103:21,22,23
110:4 122:5

| | | | |
|---|---|---|---|
| 127:10,11 | 84:8 89:7 | **understand** | 159:6 188:13 |
| 128:20 130:16 | 91:23 95:2 | 7:24,25 8:1,18 | 219:4 237:11 |
| 130:17 158:11 | 97:13 102:6,8 | 8:20 9:7,18 | 237:22 249:3 |
| 160:15 163:18 | 103:18 104:2 | 10:5,19 12:8 | **understood** |
| 163:22 164:15 | 104:13 105:1 | 19:20 21:10 | 28:18 33:22 |
| 164:17 165:4 | 115:5 126:24 | 27:4 33:8 | 48:7,20 50:21 |
| 202:4 203:19 | 127:4 136:25 | 35:16 36:3,22 | 54:3,3 59:24 |
| 209:1 212:8 | 145:24 152:25 | 37:12,19 39:18 | 63:18 70:7 |
| 213:14,15 | 156:18 166:4,8 | 42:10 43:3,15 | 71:4 73:5,7,10 |
| 221:14 228:6 | 173:10,13,20 | 45:22 46:22,22 | 74:1,7 76:23 |
| 245:3 248:16 | 185:3 189:21 | 52:7,15 53:16 | 77:8 78:11 |
| **twos** 86:23 | 194:25 195:10 | 54:4 56:1 | 82:13 83:23 |
| **type** 17:18 | 203:23 215:16 | 57:16 64:20 | 85:17 86:14 |
| 28:22 50:7,20 | 221:3 236:6,24 | 69:15 75:13 | 131:4 149:23 |
| 51:9 87:4,9,9 | **ultimately** | 77:8 79:6 | 164:14 168:8 |
| 87:10 101:12 | 192:13 | 92:12 95:3 | 172:18 174:8 |
| 107:13 149:16 | **umbrella** 27:2 | 98:17 99:3,21 | 177:7 182:8 |
| 151:12 156:16 | 74:16 212:10 | 105:5 112:8,14 | 188:9 191:19 |
| 163:8 170:14 | **under** 7:5,24 | 115:13 116:12 | 191:20 196:22 |
| 215:19 219:2,3 | 11:12 17:2 | 118:10 129:23 | 199:25 214:2 |
| **types** 19:12 | 26:24 27:2 | 130:24 133:24 | 228:16 230:14 |
| 48:14 49:14 | 41:23 47:11 | 135:8 137:10 | 231:2 232:24 |
| 51:13 155:22 | 57:8 62:1 67:7 | 146:22 153:19 | **unidentified** |
| 180:14,17 | 67:8,24 68:6 | 155:18 158:12 | 96:18 |
| **typical** 17:20 | 68:22,24 70:5 | 161:8 163:11 | **uniform** 31:23 |
| 18:7 19:13 | 70:20,20,20,23 | 163:11,25 | 75:21,22 76:2 |
| 103:10 | 70:25 71:1,5,6 | 165:3 185:9 | 76:8 77:5 |
| **typo** 238:7 | 71:15,15,17 | 202:11 205:10 | 104:5 119:24 |
| **u** | 72:17 73:12,12 | 216:15 226:16 | 125:3 211:13 |
| | 73:12,15,16,19 | 228:15 231:21 | **uniformed** |
| **uh** 8:12,13 | 90:6 131:2,5 | 232:2,13,18 | 76:12 |
| 14:25 25:8 | 132:19 147:9 | 233:5 235:22 | **unit** 15:8,10,12 |
| 26:23 28:21 | 147:14 167:12 | 235:22 | 15:15,21,25 |
| 32:6 35:25 | 200:12,14 | **understanding** | 16:9 17:11 |
| 37:22 41:25 | 206:15 212:10 | 44:22 70:8 | 24:24 26:13 |
| 45:19 46:1 | 247:21,22,22 | 97:22 98:22 | 27:18 31:23 |
| 51:7 63:5 64:2 | 253:12,18 | 102:12 103:3 | 32:17,22,24 |
| 67:16 70:24 | | 120:7 128:6 | 34:1,2 35:5 |

**[unit - vehicle]**                                                    Page 59

| | | | |
|---|---|---|---|
| 39:9,17 40:1,3 | 137:15 138:15 | **upstream** | **user**   98:21 |
| 40:21,23 41:2 | 138:17 140:19 | 105:19 | **users**   139:15 |
| 41:6,16,17,17 | 141:23 142:4 | **uptick**   47:5 | **uses**   27:21 35:3 |
| 41:21 42:7,11 | 143:1,4 151:10 | **use**   9:16,20 | 143:1 195:19 |
| 44:4,10,12,18 | 183:5 187:24 | 18:9 27:19 | **using**   36:2 |
| 44:23 45:5,9 | 188:10,14 | 28:22 38:9 | 42:24 51:16 |
| 45:12 47:1 | 189:4 190:7 | 48:18 49:15 | 80:10 81:5,19 |
| 49:4,23,25 | 191:5,24 | 55:20 65:19 | 85:15 119:18 |
| 50:1,9,12,22 | 193:22,24 | 78:15,16,17 | 119:19 144:12 |
| 51:6,8 52:8,24 | 199:6,22 201:5 | 81:6,9 83:10 | 146:16 147:24 |
| 53:1 54:22,23 | 201:8 202:13 | 85:22,24 | 148:3 149:12 |
| 54:24,24 56:23 | 202:16 205:3,7 | 107:13,22,23 | 151:7 152:18 |
| 57:1,4,10,10 | 206:7 207:19 | 112:22 113:25 | 155:10,14,18 |
| 58:14,18,23 | 208:7,14,19 | 128:12 134:24 | 159:3 160:4 |
| 60:9 61:8 | 209:4,8 211:16 | 135:1,2,14 | 179:7 185:6 |
| 63:19 64:14,23 | 241:9 244:8,10 | 137:3 139:12 | 188:16 189:5 |
| 65:16 66:10,13 | 244:11,11 | 139:19 140:4 | **usual**   6:12 |
| 67:18,24 68:4 | 246:1 247:4,6 | 142:22 143:7 | **usually**   17:18 |
| 68:18 69:1,3,5 | 247:15,19 | 147:25 148:7 | 18:8 20:2,12 |
| 69:6,9,10,11 | 248:2,9 | 149:15 151:5,6 | 27:20 31:22 |
| 69:14 70:1,9 | **united**   1:1 | 152:7 153:4,13 | 108:10,18 |
| 71:7,16,21 | 35:19,23 254:1 | 154:21 156:10 | 164:16 183:6 |
| 72:9,14,20,23 | **units**   48:21 | 174:17 175:16 | 213:22 215:23 |
| 73:2,8,9,15,17 | 50:10 54:21 | 186:15 188:15 | **utilized**   142:7 |
| 76:10 80:11,12 | 55:1,5 103:8 | 189:2 198:11 | |
| 80:25 81:6 | 117:17 128:13 | 210:23 230:4 | **v** |
| 82:3 84:12,15 | 201:4,5,8,11 | 249:3,23 | **v**   256:4 |
| 84:17 85:1,17 | **universe** | **used**   28:20 | **va**   256:15 |
| 85:22,24 86:2 | 243:25 | 29:25 41:23 | **valley**   89:24 |
| 86:6,17,18 | **unpack**   36:23 | 74:19 81:6 | 242:13 |
| 90:6 91:13 | 59:16 86:15 | 128:7,8 133:8 | **van**   160:17,18 |
| 93:10 102:19 | 152:1 | 133:16 134:3 | **vehicle**   28:24 |
| 102:24,25 | **unpacking** | 140:10,11 | 28:25 29:9,16 |
| 103:11 125:8 | 82:20 | 151:13 152:5 | 30:4 32:8 |
| 126:15,18 | **unsafe**   169:1 | 153:17 174:3 | 38:21 49:12 |
| 128:18 130:14 | **upfront**   57:25 | 179:13,16 | 51:15,16 52:16 |
| 131:9,22 134:9 | **uploaded** | 186:11,24 | 58:5 65:13 |
| 134:13 137:11 | 104:18 | 247:12 256:19 | 81:20 89:12 |

104:5 110:4
127:2,3 130:18
130:19 136:14
138:18,22
141:4 142:6,6
142:13 144:10
144:16,20,24
148:24 149:2,3
149:5,6,11,15
154:6,22 159:4
160:11 161:4
162:8 166:22
166:24 167:6
169:7,25
170:14,22,23
170:25 171:2
171:17,21,22
171:24 182:21
182:22 186:24
187:4,9,12,15
187:18,21
214:19 216:9
219:7,7,15
240:21
**vehicles** 28:23
47:6 51:13
63:15 64:3
78:8 80:5
82:23 85:16
89:9 128:4
130:16 131:10
138:18,25
139:1 141:25
142:24 148:16
151:22 238:5
240:18 241:3
**verify** 96:25
153:25 244:21

256:9
**veritext** 255:9
256:14,23
**veritext.com**
256:15
**versa** 137:6
**version** 68:9
70:24 143:12
143:13 227:23
**versus** 183:18
207:19
**vet** 23:25,25
24:19 154:2,19
**veteran** 51:20
51:23 198:7,8
198:12,13
**vice** 137:6
**victim** 167:7,12
167:13
**victims** 59:19
167:23
**video** 10:7,8,12
11:8 12:2,2,6
223:10,25
225:6,22
226:11,25
227:4,6,9,23
228:5,7 229:9
229:20,24
230:13 231:18
232:8 233:10
234:4,16,25
**videos** 12:9
104:17 117:3,4
117:5,8,11,20
**view** 107:7
**vigilant** 138:6
138:7,8 140:11

141:12,15,18
141:19 142:8
142:14 143:19
143:23 144:2
145:4 147:22
148:13 150:9
159:3 215:12
216:17,20,23
218:12,25
**vin** 89:8,9
**violated** 234:13
**violation** 31:14
35:9 85:12,12
107:7 149:21
160:1 182:4,15
232:21 238:21
**violations**
37:21,24,25
38:20 51:14
149:20,21
**violator** 112:1
136:19 149:16
154:10,14
156:12 162:17
173:19 174:6
174:17 180:19
**virginia** 2:8
**visited** 248:18
**voice** 114:2,3,7
227:14
**volunteer**
213:3
**von** 13:12
34:10,13,19
91:17 177:25
206:21 243:24
244:25

**vs** 1:4 254:5

**w**

**w** 2:20
**wait** 8:23 55:18
79:17 110:17
111:25 113:19
114:24 160:6
187:24 188:4,6
214:17 238:12
238:15 239:18
**waiting** 55:14
81:7 214:13
243:2 245:5
**waive** 5:7,8,9
6:13,17
**waived** 5:11
**walk** 29:12
103:10 107:21
168:5,22 169:7
172:9
**walked** 224:22
**walking** 172:10
**want** 9:16
37:17 39:3
42:3,3 49:24
51:3 52:19
56:22 64:20
65:15 66:8
72:16 79:25
82:1 96:20
97:15 99:13
100:25 101:15
102:16,18
103:25 109:6
110:22 114:15
119:19 126:14
129:3,23 130:8

Case 5:23-cv-00706-OLG-RBF   Document 119-2   Filed 06/11/25   Page 318 of 322
Peter Gamboa                                                      July 23, 2024
[want - words]                                                    Page 61

132:11 136:8
145:12 150:16
156:22 159:8
159:18 161:8
168:19 188:1,3
203:21 206:19
209:24 227:22
229:15 234:15
235:8 237:3
240:12,14,20
**wanted** 14:8
59:15 60:13
112:8 171:13
198:11 209:25
215:9,15
218:20,24
219:1 222:20
238:15 240:10
**wants** 173:12
**warning** 173:1
173:18 175:4,8
175:14,18
177:8,10,12
181:17 184:16
184:23 189:12
196:15 197:1
230:25 231:6
231:12 238:11
**warnings**
114:16 176:17
**warrant**
210:14
**warrantless**
11:17,25
**warrants** 20:6
20:7 31:2 35:7
41:12 54:23
72:12 173:12

186:5
**wasting** 174:7
**watch** 10:13
36:18 225:5
227:5,6,22
228:7 229:18
230:11,11
231:14,15,16
232:5 233:8
234:2,15,24
**watched**
227:19,24
230:15 232:10
234:17,18
**watching** 52:3
87:13 107:3
178:3
**way** 17:20
29:15 42:6
43:24 49:14
69:18 74:14
76:6 86:11
105:17 106:22
121:8 122:21
123:14 125:2,9
151:24 152:14
158:18 170:12
174:5 184:17
190:2 194:21
195:11 198:15
200:20 223:7,7
226:3 229:1
**ways** 95:8
213:15,21
**we've** 24:10
28:20 65:8
80:2 92:16
95:5 140:2

158:11,13,20
164:22
**weapons** 63:16
65:5 84:3
219:3
**webb** 30:10
**wednesday**
33:1 121:19,23
**wednesdays**
32:24 33:3
**week** 19:21,22
127:7,22 128:4
159:5
**weekly** 126:23
127:7 128:7
129:14,19,20
129:24 130:3
243:3,8,15,19
**weeks** 122:5
**weird** 163:12
163:15
**went** 11:11
14:24 15:2,3
39:13 55:10,15
61:2 84:19,25
86:4,11 88:1
88:16 89:5,19
116:8,18
123:11 138:16
143:19 144:2
145:19 158:1
165:1 192:15
**westbound**
141:5
**western** 1:1
254:1
**whatsapp**
150:21,25

151:3,13,17
231:23
**wheeler** 87:3,7
88:4,19
**wheelers** 63:14
90:19,21,23
160:19
**windham** 2:6
6:4 78:13
153:8 235:10
**windham's**
217:10,11
**window** 61:2
**windows**
160:12
**wings** 214:14
**wires** 142:2
**wiring** 142:3
**wish** 116:1
**withholding**
238:11
**witness** 1:17
5:13,15 33:15
79:21 153:6
219:8 242:2
243:1 245:8
248:4 251:13
252:2 254:17
254:18 256:8
256:10,12,18
**word** 42:24
43:3 126:5
139:12 141:10
141:11 188:16
188:16,21,24
190:3
**words** 94:25
119:20 228:22

**work** 11:12
15:13,21,23
16:5 19:15,21
21:6,9 22:22
23:18 24:4
25:12 26:12
32:18 33:4
35:20 36:18
37:5,23 39:8
39:15 47:21
50:7 51:9 52:4
52:24 55:4,22
73:2 74:21,22
80:10 103:17
103:20 104:4
105:7,7 113:16
116:3,4,6,9,17
122:22 143:17
148:6 149:10
151:11 163:8
175:17 176:2
177:9 182:7
199:20 245:17
245:18,23
**workday** 17:20
18:7 19:13
**worked** 14:14
23:6 52:23
59:5 84:21,25
105:23 114:23
115:2 134:21
242:9,14
**working** 14:12
27:9 38:3
41:11 42:8
48:1 53:7 62:1
64:3 86:18
121:10 122:21

140:18,19
142:4 163:3
164:10 176:6,7
176:9 177:11
179:25 191:1
221:9
**works** 24:21
26:19 29:12
37:19 73:8
76:6 78:1
123:14 125:2
142:20 164:9
165:3 201:17
**world** 121:16
**worn** 12:21
116:23 117:21
117:25 118:4
118:11,18
119:3,10
**worth** 255:10
**wright** 2:18
**write** 6:5 79:23
107:12 110:24
111:12 175:20
176:17 178:5
179:2 184:16
189:10,14
190:4
**writing** 79:23
112:2 177:21
**written** 182:9
182:14
**wrong** 37:13
54:18 66:23
77:14 82:21
93:15 147:1
175:25 204:16
221:5 228:20

**wrote** 122:10
131:24 232:25
237:12

| x |
| --- |

**x** 3:1 4:1
128:24 129:3
134:24 254:21

| y |
| --- |

**y** 22:24 128:24
129:3
**y'all** 103:22,23
103:23,24
128:19 164:21
208:22
**yard** 196:9
**yeah** 19:6 21:4
42:25 46:20
54:16,16,16
61:3 62:14
63:10 67:4,4
75:23 78:14
79:7,18 88:13
93:24 94:9
98:18,18
104:24 105:22
106:16 112:7
112:16,16
113:2 115:1,15
118:24 120:6,6
120:8,8,8
124:3 126:22
135:9 137:20
138:23,25
143:11,13
145:22 150:8
156:3 158:8,19
167:17 171:7

176:1 184:13
186:9 187:12
190:21 194:20
201:1 204:10
210:20 213:8
217:5 220:18
229:22 239:14
239:21 240:1
**year** 123:25
190:15
**years** 14:19
51:22,25 53:22
53:24,25 54:1
55:24 61:22
62:16 179:13
179:15
**young** 198:7
**younger** 52:5
53:2 55:17
**youngest**
203:16

| z |
| --- |

**z** 128:24
203:18,23
204:2
**zero** 59:21
**zone** 75:7
**zulu** 226:16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.