# Plaintiff's Motion for Summary Judgment on Liability

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# Exhibit 5

Page 1

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3

    ALEK SCHOTT,                )
4          Plaintiff            )
                                )
5    VS.                        )  CIVIL ACTION NO.
                                )  5:23CV-00706-OLG-RBF
6    JOEL BABB, in his          )
     individual and official    )
7    capacity; MARTIN A.        )
     MOLINA, III, in his        )
8    individual and official    )
     capacity; JAVIER           )
9    SALAZAR, in his            )
     individual and official    )
10   capacity; and BEXAR        )
     COUNTY, TEXAS              )
11         Defendants           )

12

            ORAL DEPOSITION OF PEDRO GAMBOA
13                  AUGUST 1, 2024
                     VOLUME 2

14

15         ORAL DEPOSITION OF PEDRO GAMBOA, produced as a

16   witness at the instance of the Plaintiff and duly sworn,

17   was taken in the above styled and numbered cause on

18   Thursday, August 1, 2024, from 9:01 a.m. to 12:29 p.m.,

19   before Janalyn Elkins, CSR, in and for the State of

20   Texas, reported by computerized stenotype machine, at

21   the offices of Charles S. Frigerio, 111 Soledad, Suite

22   465, San Antonio, Texas, pursuant to the Federal Rules

23   of Civil Procedure and any provisions stated on the

24   record herein.

25

Page 2

```
 1                   A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3       CHRISTIE HEBERT
         INSTITUTE OF JUSTICE
 4       816 Congress Avenue, Suite 960
         Austin, Texas  78701
 5       Tel:  (512) 480-5936
         chebert@ij.org
 6     - AND -
         JOSHUA WINDHAM
 7       INSTITUTE OF JUSTICE
         901 N. Glebe Road, Suite 900
 8       Arlington, Virginia 22203
         Tel:  (703) 682-9320
 9       Jwindham@ij.org
10     FOR THE DEFENDANT BEXAR COUNTY, TEXAS:
         CHARLES S..FRIGERIO
11       HECTOR SAENZ
         CHARLES A. FRIGERIO
12       LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
         111 Soledad, Suite 465
13       San Antonio, Texas  78205
         Tel:  (210) 271-7877
14       csfrigeriolaw@sbcglobal.net
         Charlie@frigeriolawfirm.com
15
16     FOR THE DEFENDANT JOEL BABB:
         RYAN ELLSWORTH
17       WRIGHT & GREENHILL, P.C.
         4700 Mueller Boulevard, Suite 200
18       Austin, Texas  78723
         Tel:  (512) 476-4600
19       rellsworth@w-g.com
20
21
22
23
24
25
```

Page 3

1                          I N D E X
2                                                    PAGE
3

   Appearances ...................................   2
4

   Stipulations .................................    4
5

PEDRO GAMBOA
6    Examination by Ms. Hebert ...................   4
7    Signature and Changes....................... 142
8    Reporter's Certificate...................... 143
9

10                      E X H I B I T S
11    NO.              DESCRIPTION              PAGE
      Exhibit 71    Emails                        10
12    Exhibit 72    Orders of Commissioners
                    Court June 20, 2023           24
13    Exhibit 73    2021 MVCI Conference
                    Agenda                        30
14    Exhibit 74    Assignment                    80
      Exhibit 75    Excel Spreadsheet of Video
15                  Reviews                       91
      Exhibit 76    Axon Body Cam Records         99
16    Exhibit 77    Transfer Orders              112
      Exhibit 78    Transfer Orders              114
17    Exhibit 79    Transfer Orders              116
      Exhibit 80    Video                        117
18    Exhibit 80A   Video                        121
      Exhibit 81    Criminal Interdiction Unit
19                  Yearly Stats                 123
      Exhibit 82    Criminal Interdiction Unit
20                  Presentation                 128
      Exhibit 83    Results of Forensic
21                  Analysis                     133
22
23
24
25

Page 4

1                 THE REPORTER:  Christie, you want a rough

2    draft, right?

3                 MS. HEBERT:  Yes, please.

4                 THE REPORTER:  Charles, do you want a copy?

5                 MR. FRIGERIO:  Yes.

6                 THE REPORTER:  And do you want a rough

7    draft?

8                 MR. FRIGERIO:  No.

9                 THE REPORTER:  Ryan, do you want a copy?

10                MR. ELLSWORTH:  Yes, please.

11                THE REPORTER:  And do you want a rough

12   draft?

13                MR. ELLSWORTH:  I don't think so.

14                SERGEANT PEDRO GAMBOA,

15   having been duly sworn, testified as follows:

16                      EXAMINATION

17       Q.  (BY MS. HEBERT)  Good morning, Sergeant Gamboa.

18   We're back here again.  Thank you for being with us.

19   Again, I'm Christie Hebert.  I represent the Plaintiff

20   Alek Schott in this case.  You and I have previously met

21   twice before.  The first at Captain Von Muldau's

22   deposition and then your own last week.

23       A.  Correct, yes, ma'am.

24       Q.  I know we've recently gone over the rules for

25   depositions.  I'm not going to go through everything

```
 1    again because I think you probably remember most of it,
 2    so I'm going to hit the highlights.  This is my
 3    colleague Josh Windham.  We're joined today by the
 4    counsel for Defendant Bexar County and Defendant Molina,
 5    Mr. Frigerio, Mr. Saenz, and Mr. Frigerio, then we're
 6    also joined by counsel for Defendant Babb,
 7    Mr. Ellsworth, and then we've got the court reporter,
 8    Janalyn, today who is going to take down everything that
 9    is said.
10         A.  Yes, ma'am.
11         Q.  We'll do kind of the usual stipulations,
12    waiving any defects with your deposition notice.  You're
13    here today, and we're going to waive any objections to
14    the court reporter's qualifications.  Janalyn's a
15    qualified court reporter to take down your deposition.
16         A.  Yes, ma'am.
17         Q.  Again, would you mind stating your full name
18    for the record?
19         A.  Pedro Gamboa.
20         Q.  And you understand you're under oath today?
21         A.  I do.
22         Q.  And it's the same oath as last time you
23    testified?
24         A.  Yes, ma'am.
25         Q.  And it's the same oath as if you were before a
```

Page 6

1     judge in a courtroom?

2          A.  Yes, ma'am.

3          Q.  Okay.  Again, it's important we have a clear

4     record, so that means not just nodding or saying uh-huh

5     or oh yeah.  It's giving me clear answers and it's

6     important that I ask clear questions.  So if you don't

7     understand my question, let me know.  And, again, we'll

8     try to avoid interrupting each other.  Is that okay?

9          A.  Yes, ma'am.

10         Q.  Okay.  We're going to look at some documents

11    today.  Again, it's your right to look at the entirety

12    of the document, and if you need more time, we can take

13    a break and let you fully review it.  And we're also

14    going to look at some videos today.  Again, that's your

15    right to review the entirety of a video.  I'm going to

16    direct your attention to specific portions so we don't

17    spend hours watching videos.  But if you want to watch

18    the whole thing, it is your right to do so during the

19    deposition or with counsel afterwards.

20         A.  Yes, ma'am.

21         Q.  Is there any reason that you can't give your

22    full and best testimony today?

23         A.  No, ma'am.

24         Q.  You're generally clear headed to testify?

25         A.  I am.

Page 7

1      Q.   Cool.  Preparation.  Anything -- did you do

2   anything for this deposition other than speak to your

3   attorneys?

4      A.   No, ma'am.

5      Q.   Okay.  Did you review any other additional

6   documents?

7      A.   The only one that I sent was the criminal

8   interdiction announcement.  I -- I forwarded that over

9   to Captain Von Muldau.

10     Q.   Okay.  When you say "announcement", can you

11   help me understand what that is?

12     A.   It's the opening for criminal interdiction.

13     Q.   The start of the unit or the position opening?

14     A.   No, the position opening.

15     Q.   Got it.  So the job description?

16     A.   Correct.

17     Q.   Cool.  Thank you.

18     A.   Yes, ma'am.

19     Q.   Did you review any other videos?

20     A.   No.

21     Q.   Okay.  Any other --

22     A.   Well, except -- what I normally.

23     Q.   Okay.  Tell me about that?

24     A.   So I get -- I guess it's periodically, we get

25   12 videos that we have to review.  Those are the ones I

Page 8

1    reviewed.

2        Q.  Okay.  So you did your periodic body camera

3    footage review?

4        A.  Correct.

5        Q.  And is that for your current position?

6        A.  Correct.

7        Q.  Okay.  And the videos that you reviewed weren't

8    necessarily as part of appearing for this deposition?

9        A.  No.

10       Q.  Okay.  And the videos that you reviewed; I

11   assume that's in your role as a sergeant with the

12   organized crime division today?

13       A.  Correct.

14       Q.  Okay.  And the videos that you reviewed, were

15   there traffic stops on them?

16       A.  No, ma'am.

17       Q.  Okay.  No traffic stops.

18              Any other materials that you reviewed

19   between deposition -- last deposition and this

20   deposition?

21       A.  No, ma'am.

22       Q.  Okay.  Other than your conversations with your

23   attorneys, which again, I'm not asking about that, did

24   you have any conversations with anybody else about your

25   last deposition or what this deposition was going to

1    entail?

2         A.  No, ma'am.

3         Q.  Okay.  Like last time, we're going to talk a

4    lot about Bexar County Sheriff's Office.  So when I say

5    sheriff's office, can we agree that I'm just referring

6    to the Bexar County Sheriff's Office?

7         A.  Yes, ma'am.

8         Q.  And, again, like last time, when I say

9    "sheriff", can we agree that I'm referring to the Bexar

10   County sheriff?

11        A.  Yes, ma'am.

12        Q.  And then can we agree that when we say "the

13   county", we're referring to Bexar County?

14        A.  Yes, ma'am.

15        Q.  Okay.  I want to start by looking at some

16   documents.

17        A.  Sure.

18        Q.  So I know that this will be lots of fun.  I'm

19   going to hand you a document that my colleague is going

20   to mark Exhibit 71.  And I understand that you

21   previously provided a lot of information about the

22   criminal interdiction activities to your lieutenant for

23   the weekly report.  Is that fair?

24        A.  Correct.

25        Q.  And we talked about several lieutenants during

Page 10

1    your time at -- at the Bexar County Sheriff's Office.

2    What lieutenant did you provide information about the

3    criminal interdiction unit's weekly activities?

4         A.  Lieutenant Ray Ortega.

5         Q.  The only -- is that the only one?

6         A.  At the time, yes, ma'am.

7         Q.  Did you ever provide weekly report on criminal

8    interdiction activities to Lieutenant Freveletti?

9         A.  No, I don't believe so.

10        Q.  Okay.  And did you ever provide weekly reports

11   on criminal interdiction activities to Lieutenant

12   Curtis?

13        A.  No, ma'am.

14        Q.  Okay.

15             (Exhibit No. 71 was marked.)

16        Q.  (BY MS. HEBERT)  So we're going to hand you a

17   very large document that we're going to mark 71.  I have

18   a tabulated version, so this is my version over here.

19   And we're just going to kind of walk through it.

20        A.  Okay.

21             MR. WINDHAM:  Give me a moment to handle

22   this behemoth.

23        Q.  (BY MS. HEBERT)  Okay.  I'll represent to you

24   that the county produced the documents here as emails

25   and attachments, and I put the emails in chronological

Page 11

```
 1    order with each attachment following the email that it

 2    was attached to.

 3                    Would you mind just taking a second to

 4    like, thumb through it and review what you're seeing

 5    here and we'll talk about the document generally before

 6    looking at different pages.

 7                    You don't have to review the whole thing

 8    unless you want to.  So just let me know -- we'll kind

 9    of be going through the pages, I just want you to have a

10    general idea of what -- what we're looking at.

11        A.  Yeah, it's all of them.  Okay.

12        Q.  Okay.  So what are the documents attached to

13    these emails?

14        A.  So looks to appear to me as the weekly activity

15    reports.

16        Q.  For?

17        A.  Special enforcement.

18        Q.  Okay.  And based on your understanding, did

19    Lieutenant Ortega create these weekly activity reports

20    from some information that you provided him?

21        A.  I believe so, yes.

22        Q.  Okay.  And I see -- looking at page 1, the

23    subject is "Weekly Activity Report, Special Enforcement

24    Unit."  Did you oversee the special enforcement unit?

25        A.  I did.
```

1      Q.   Okay.  And then was just Lieutenant Ortega over

2    you?

3      A.   Yes, ma'am.

4      Q.   Okay.  And it's my understanding that criminal

5    interdiction -- criminal interdiction activities were

6    part of this unit?

7      A.   Correct.

8      Q.   And then other than criminal interdiction

9    deputies, who was part of the special enforcement unit?

10     A.   At the time, I had animal cruelty

11   investigations.  I had the estray deputy.

12     Q.   Tell me...

13     A.   Loose livestock.

14     Q.   Oh, loose livestock.  Okay.  The estray.

15     A.   Yes.

16     Q.   Got it.  They were separate deputies?

17     A.   Yes.

18     Q.   Okay.

19     A.   And then the mounted patrol, which was more of

20   a volunteer unit.  The sheriff's executive protection.

21   The marine patrol unit.  I believe that was all, I

22   think.

23     Q.   Okay.  So I just want to talk through the

24   numbers here.  There was one independent animal cruelty

25   deputy?

```
 1        A.   Yes.

 2        Q.   And then one loose livestock deputy?

 3        A.   Correct.

 4        Q.   And then the mounted patrol folks, did they

 5   pull from other units?

 6        A.   Yes.

 7        Q.   Was there any devoted mounted patrol deputy?

 8        A.   No.

 9        Q.   Any devoted executive protection deputy?

10        A.   There was two others.

11        Q.   Two devoted deputies?

12        A.   Yes.

13        Q.   Were they part of other units?

14        A.   Yes.  They had other duties.

15        Q.   Oh, they had other duties, okay.  So other than

16   whatever role they were -- these executive protection

17   deputies were doing as part of special enforcement, they

18   had other daily duties?

19        A.   Correct.

20        Q.   Okay.  And those other daily duties, were they

21   part of special enforcement?

22        A.   No.

23        Q.   Okay.  So you only -- these additional two

24   deputies that did executive protection, you only oversaw

25   them in their executive protection capacity?
```

1          A.   Correct.

2          Q.   Okay.  And the marine patrol, was there a

3     devoted marine patrol deputy?

4          A.   No, ma'am.

5          Q.   Okay.  That's helpful.

6               So we previously talked about how the

7     criminal interdiction unit was formed in the spring of

8     2019.  Am I getting that right?

9          A.   Yes, ma'am.

10         Q.   Can you look at the date on page?  And I see

11    Friday, August 6th, 2021; is that right?

12         A.   Correct.

13         Q.   So would there be weekly reports before

14    August 6th, 2021?

15         A.   No, so -- I believe this is when they probably

16    started making these forms to be filled out.

17         Q.   Okay.  So before August 6th, 2021, how did you

18    report on the criminal interdiction unit or the special

19    enforcement unit?

20         A.   Just talking to the lieutenant.

21         Q.   Okay.  You would just have a verbal

22    conversation?

23         A.   Correct.

24         Q.   Okay.  All right.  So we're going to walk

25    through some of these pages.

Page 15

1        A.   Okay.

2        Q.   Let's go to page 8 -- page 3.  And we'll just

3    kind of put a thumb in page 3.  Page 3 is attached to

4    the email from page 1; is that correct?

5        A.   I believe so, yes.

6        Q.   All right.  So the date of this report would

7    have been somewhere in August 2021?

8        A.   Correct.

9        Q.   And the date on page 2 indicates that it's

10   July 31 through August 6, and that would be 2021?

11       A.   Correct.

12       Q.   Okay.  In looking at page 3, there -- the first

13   bullet on the top of page 3, it says, (Reading:)

14   Criminal Interdiction Unit took part with the Sheriff's

15   Conference and was involved in meeting with

16   approximately 15 sheriff's from different counties to

17   initiate a Criminal Interdiction Task Force.

18            Did I read that correctly?

19       A.   Yes, ma'am.

20       Q.   Can you tell me what this bullet is about?

21       A.   So during the sheriff's conference here in

22   San Antonio, Sheriff Salazar had invited sheriffs

23   throughout Texas to join in in meeting and talking about

24   creating a criminal interdiction task force.

25       Q.   Okay.  So I -- I would like to just kind of

1    figure out exactly what that was about.  So you're

2    telling me that Sheriff Salazar invited other sheriffs

3    from around Texas to come to Bexar County?

4         A.  Correct.  So -- so the conference at that time

5    was here in Bexar County in San Antonio.

6         Q.  Understood.

7         A.  So they're attending classes and guest

8    speakers, things of that nature.  And then during, I

9    believe, it was either a breakout or after the

10   conference, he invited the sheriffs to -- to meet about

11   talking about the task force.

12        Q.  Okay.  So this is some kind of regular

13   conference that the sheriffs all get together?

14        A.  Correct.  Yes, ma'am.

15        Q.  And at that collecting -- collection of

16   sheriffs meeting, Sheriff Salazar invited the sheriffs

17   to talk about forming a criminal interdiction task

18   force?

19        A.  Correct.

20        Q.  And were you at that meeting?

21        A.  I was.

22        Q.  Okay.  Can you tell me what happened at that

23   meeting?

24        A.  Well, they were just talking about how -- how

25   San Antonio is the hub for narcotics, illegal firearms,

1    money, couriers, things of that nature.  And, you know,

2    it goes, you know, south -- south Texas, you know, they

3    travel up and down these highways, up north, north

4    Texas, you know, same thing, you know, they get the

5    traffic coming from out of state, things of that nature.

6        Q.  Okay.  So tell me how that relates to what the

7    sheriff was proposing with a criminal interdiction task

8    force?

9        A.  Of forming a task force with the -- with the

10   central south regions of Texas to create this task

11   force.

12       Q.  Okay.  And what would the task force do?

13       A.  Work the highways for anything criminal to

14   include active warrants, any kind of narcotics, any kind

15   of illegal weapons, money laundering, things of that

16   nature.

17       Q.  Okay.  So the idea behind the task force would

18   be to search for criminal activity along the highways?

19       A.  It would be to stop or disrupt the criminal

20   activities traveling through Texas.

21       Q.  Understood.  And how did -- how did the task

22   force expect to achieve that?

23       A.  So they -- what the plan was to mimic what

24   Dallas County or Collin County was doing, and what

25   Collin County was doing, they had seven counties that

1    were involved in the task force, north Texas.  And --

2    and what they would do is they would work the highways

3    and they would disrupt this criminal activity.

4         Q.  Okay.  I guess I'm not clear on how this task

5    force and these counties would disrupt criminal

6    activity.  Can you explain that to me?

7         A.  By making the traffic stops, intercepting

8    anything illegal, anything criminal, warrants,

9    kidnappings, robberies, narcotics, illegal firearms,

10   things of that nature.

11        Q.  Okay.  So how -- how would the counties work

12   together to do that?  It seems like --

13        A.  So they would have an agreement --

14        Q.  Okay.

15        A.  -- between the counties.

16        Q.  And what would the nature of that agreement

17   kind of be?

18        A.  Probably that each county's officers were

19   allowed to work in other counties that were part of the

20   task force and be able to submit a case for prosecution

21   in those counties.

22        Q.  Understood.  So it's an agreement that allows

23   jurisdiction --

24        A.  Correct.

25        Q.  -- of different deputies to be expanded?

Page 19

1          A.   Yes, ma'am.

2          Q.   And why -- why would the sheriffs want to do

3     that?

4          A.   Well, because -- so it's -- it's hard to,

5     personnel-wise, to devote ten people to -- not that they

6     don't do it or that they can't do it, but it's hard for

7     other counties, smaller counties, to be able to devote

8     that amount of people to work this type of proactive

9     policing.  So in coming together with surrounding

10    counties, then you would be able to have maybe a ten-man

11    team, one from this county, maybe two from this county.

12    So that way now you'd have a big enough group to be able

13    to work together to be effective.

14         Q.   Okay.  So help me understand why you need a big

15    group to be effective?

16         A.   Because of all the highways that -- that are

17    passing through the different counties.

18         Q.   And how would these -- this group of officers

19    on the task force, how would they work together?

20         A.   So -- so depending on where they would be

21    working, that host county would kind of take the lead.

22    And then that way if we're working -- for example, if

23    we're working here in San Antonio and we're working 35,

24    then we'd have officers stretched out 35 to be able to

25    intercept this criminal activity.

Page 20

1      Q.   Okay.  I guess that to me, how -- how does that

2   work for having officers stretched out to intercept the

3   criminal activity?

4      A.   So that way you have coverage.  So what happens

5   is a lot of these traffickers will send escorts to see

6   if there's any law enforcement on a particular roadway.

7   So they'll turn, go different routes to circumvent

8   having to go through that particular highway.  So

9   there would stretch -- we will stretch out for here for

10  San Antonio would be, like, 281, Highway 16, Highway 90,

11  so we'd have four highways covered with officers that

12  these traffickers could potentially come through one of

13  those sections where they were being policed.

14     Q.   Okay.  I guess for me, how do you know when

15  someone turns off on a highway to go on a different

16  highway but they're not taking -- it's part of their

17  route or they're avoiding traffic, it's -- my Google

18  alert always tells me get on this other highway and go

19  this way, so how do you evaluate that?

20     A.   So it's -- it's all, you know, open, you know.

21  It's not based on somebody this is the only route that I

22  take.  It's just covering the roadways and these

23  traffickers are known to travel.

24     Q.   Okay.  Okay.  I think I understand that.  So

25  you kind of create a net?

Page 21

1          A.   Correct.

2          Q.   Is that a fair description?

3          A.   Something like that.  Yes, ma'am.

4          Q.   And did the criminal interdiction task force

5     have a way of identifying who they wanted to catch in

6     that net?  By that I mean, like, what was the criteria?

7          A.   Proactive policing.

8          Q.   Okay.

9          A.   Anybody violating the law.  I mean, through

10    traffic stops, through speeding, through failure to

11    maintain single lanes, through defective equipment,

12    that -- that type of enforcement.

13         Q.   Okay.  So any traffic violation was fair

14    game --

15         A.   Correct.

16         Q.   -- to start an investigation?

17         A.   Yes, ma'am.

18         Q.   All right.  Let's go to another page.  And

19    Sergeant Gamboa, I apologize, if you need a break from

20    this document, we can take a break.

21         A.   Sure.

22         Q.   Let's go to page 8.  Now on page 8, I want to

23    just look at the top, "Total Authorized", and I think

24    that means personnel.  I see seven.  Can you tell me who

25    those seven folks were?

1      A.   So it would be the four criminal interdiction.

2   Then it would be the animal cruelty investigator, the

3   estray deputy -- and I'm trying to think who I'm

4   missing, oh, myself.

5      Q.   Okay.  So that would be the seven folks?

6      A.   Correct.

7      Q.   Okay.  I want to look down to the -- okay, this

8   is a good question.  At this time in 2021, the criminal

9   interdiction unit had two deputies or more?

10     A.   I believe there was two at the time.

11     Q.   Okay.  So who were the -- who were the other

12  two?  So by my math, you've got one animal cruelty

13  deputy, one estray deputy, yourself, two criminal

14  interdiction, that's five.  So I'm missing one -- I'm

15  missing two?

16     A.   So the two were on administrative duty.

17     Q.   Okay.  And this was John Aguillon?

18     A.   Aguillon.

19     Q.   Aguillon, and?

20     A.   Dustin Treadwell.

21     Q.   Dustin Treadwell.

22          So I see that admin leave is three under

23  total payout.  Why -- who's the third one then?

24     A.   I don't remember who.

25     Q.   Okay.  All right.  So I want to skip down to

Page 23

1    the "Accomplishments" section.

2         A.   Okay.

3         Q.   And the second bullet, can I read that to you?

4         A.   Sure.

5         Q.   Says, (Reading:)  Interdiction had more than 20

6    arrests as a 2--man team concentrating on the Highways

7    and Interstate.  They have seized $14,569 in Money and

8    vehicles for the Month of August.

9              Did I read that correctly?

10        A.   Yes, ma'am.

11        Q.   Okay.  So just a couple of questions about

12   that.  20 arrests.  Is that typical?

13        A.   It could be.  It's a proactive unit, so, I

14   mean, possible.

15        Q.   Okay.  And based on your experience, about how

16   many stops would that have been?

17        A.   I mean, it could -- it could be a car full of

18   criminals.  So, I mean, there's no really -- no telling

19   on the number of stops.

20        Q.   Sure.  And the $14,569, is that a typical

21   amount of money seized from a week in criminal

22   interdiction activities?

23        A.   So just reading this, I believe that may be of

24   combination of maybe money that was seized and vehicles

25   that were either recovered or seized for those criminal

Page 24

1    activity.

2         Q.  Okay.  So that was an estimated value --

3         A.  Correct.

4         Q.  -- of money and vehicles seized?

5         A.  Correct.

6         Q.  Okay.  That makes me -- I'm going to ask

7    another question and I'm going to pull from an exhibit

8    that's not here, Josh.  So I'm going to use this one.

9              MR. WINDHAM:  It's not on here.

10             MS. HEBERT:  Can you mark this 72?

11             (Exhibit No. 72 was marked.)

12        Q.  (BY MS. HEBERT)  And I'm going to represent to

13   you that these are orders -- a document that we received

14   from the county attached to an email about criminal --

15   or commissioner's court meeting.

16        A.  Okay.

17        Q.  I think it was labeled as draft minutes or

18   minutes.  And I want to flip to page 11.  I think it's

19   page 11.  And if you wouldn't minute looking at Item 34

20   on page 11 when you get a chance.

21        A.  Okay.

22        Q.  And I'm just going to read that to you.

23   (Reading:)  The Court hereby ordered and approved a

24   motion approving the Sheriff's request to place a seized

25   2021 Ford F-150 sedan VN No. 1FTEW1EP1MFC29029 into

Page 25

1    service in the Organized Crime Division. (Record).

2                    Did I read that correctly?

3        A.   Yes, ma'am.

4        Q.   Okay.  Can you tell me what's going on here?

5    It seems to me that a vehicle that the organized crime

6    division seized was then put into service to be used by

7    the organized crime division.  Is that a fair assessment

8    of what's happening here?

9        A.   Yes, ma'am.

10       Q.   Okay.

11                   MS. HEBERT:  So we can close this document

12   and put it to the side, Exhibit 72.

13       Q.   (BY MS. HEBERT)  So looking back at Exhibit 71

14   on page 8, is this kind of what the seizure of a vehicle

15   that this exhibit was talking about, some kind of

16   vehicle that was seized perhaps in a traffic stop?

17       A.   Could have been, yes, ma'am.

18       Q.   Okay.  Let's flip to page 9 and if you wouldn't

19   mind going to the section on "for follow up."

20                   MR. WINDHAM:  What exhibit are we on, for

21   the record?

22                   MS. HEBERT:  71.

23       Q.   (BY MS. HEBERT)  And I'm going to read this one

24   to you, too.  (Reading:)  I received dates from Sheriff

25   Skinner out of Collin County SO.  He is available to

Page 26

1    come down September 14th, 15th, or 16th.  I will be

2    sending an email to the sheriffs from the conference

3    meeting about his availability.

4            Explain to me what this bullet is about?

5        A.   So Sheriff Skinner is a sheriff in Collin

6    County.  And they are -- they have a task force that the

7    sheriff wanted to try to have -- make a task force here

8    that would match what they're doing in north Texas.

9        Q.   Okay.  And is this that regional several county

10   task force we previously talked about?

11       A.   Correct.  Yes, ma'am.

12       Q.   Okay.  And did you ever visit Sheriff Skinner

13   in the Collin County task force?

14       A.   I did.

15       Q.   And when did you visit them?

16       A.   It was probably at the beginning of creating

17   the criminal interdiction pilot program.

18       Q.   Okay.  So that was sometime in 2019?

19       A.   Maybe, yeah, around that time maybe.

20       Q.   That's fine.  And what did that visit look

21   like?

22       A.   We just went to see what their -- you know,

23   everyday operation was and how they would be working

24   interdiction.

25       Q.   Okay.  Does that mean you did ridealongs with

1    them?

2        A.   We -- I believe we did maybe a couple hours.

3    But it was mostly just me sitting meeting in their

4    office talking about what they do.

5        Q.   Okay.  And what did you learn from that

6    experience?

7        A.   So just the -- the MOU that they had with the

8    different counties on how things would work out with

9    them.

10       Q.   Okay.  How to navigate?

11       A.   Correct.

12       Q.   A collaboration amongst counties?

13       A.   Yes, ma'am.

14       Q.   And doing the ridealongs, what did you learn

15   through that experience?

16       A.   Just, you know, they showed us the different

17   highways in north Texas that -- that they've seen a lot

18   of the traffic coming from either California or from the

19   east, New Orleans and how the different traffic, you

20   know, comes in through their counties and it either come

21   down south Texas or they travel west to California or

22   east to New Orleans.

23       Q.   Okay.  So you drove around looking at highways?

24       A.   Yeah.

25       Q.   Was that it?

Page 28

1          A.   That was pretty much it.

2          Q.   Did you do any traffic stops with them?

3          A.   No.  No.

4          Q.   Okay.  This meeting when Sheriff Skinner was

5     supposed to come down to visit, who was going to attend

6     this meeting?

7          A.   So the sheriffs that attended the first meeting

8     at the conference were the only contacts that I had.  So

9     the invite was going to go out to them.

10         Q.   Okay.  Can we look down to the last two bullets

11    on this page.  The first one says, (Reading:)  Waiting

12    on Transfer papers for Goliath (Bobcat), Dexter (Tiger).

13              What's that about?

14         A.   So the animal cruel investigation side of it of

15    special enforcement, we had seized both of these cats

16    from a residence here in Bexar County.

17         Q.   And you wanted to take them home?

18         A.   No, we were -- we were seizing them and placing

19    them in one of our rescues.

20         Q.   Understood.  And then the last bullet,

21    (Reading:)  Waiting on Transfer papers for the lemur?

22         A.   So same thing.  We had seized a lemur and were

23    waiting on the transfer papers so that way we can

24    actually give possession to one of our rescues here.

25         Q.   Oh, so it was an actual lemur?

Page 29

1          A.  Yes, ma'am.

2          Q.  Cool.  All right.  So I'm going to flip to

3     another page.  If you mind going to page 15.  We'll flip

4     back a little bit just to check the email to see the

5     date here.  This report was attached to the August 30th,

6     2021 email.

7          A.  Okay.

8          Q.  Does that seem right?

9          A.  Yes, ma'am.

10          Q.  I see a bullet, the second bullet under "New

11     Business."  (Reading:)  Motor Vehicle Criminal

12     Interdiction Conference next week Aug 30 - September 2

13     interdiction will be attending.

14               What is this conference?

15          A.  I believe it was a Motor Vehicle Criminal

16     Interdiction Conference.

17          Q.  And did you attend this conference?

18          A.  I'm sure I did.  I can't remember.

19          Q.  Okay.  Interdiction will be attending.  Did

20     that mean the entire unit attended this conference?

21          A.  I'm sure, yes.

22          Q.  And at the time of August 2021, that would have

23     been Deputy Gereb, Deputy Babb, and yourself?

24          A.  Correct.

25          Q.  I think, hold on, let me see if we have another

Page 30

1      exhibit.

2                    MR. HEBERT:  Will you pull out CC and R

3      exhibits, Mr. Windham.  I have a lot of paper today, so

4      bear with us.

5                    THE WITNESS:  No problem.

6                    (Exhibit No. 73 was marked.)

7                    MS. HEBERT:  Mr. Windham, what number is

8      this exhibit?

9                    MR. WINDHAM:  73.

10         Q.  (BY MS. HEBERT)  Okay.  My colleague handled --

11     handed you what has been marked Exhibit 73.  Is this the

12     Motor Vehicle Criminal Interdiction Conference that took

13     place from August 30th, 2021 to September 2nd?

14         A.  I believe so, yes, ma'am.

15         Q.  And this looks like the agenda to me?

16         A.  Yes, ma'am.

17         Q.  Is this refreshing your memory, did you attend

18     this conference?

19         A.  I'm sure I did perhaps.  I don't recall.  I

20     mean, it's been a while.

21         Q.  It looks like it was here in San Antonio?

22         A.  Yes.

23         Q.  Can we maybe talk about some of it and see if

24     you remember any of the content?

25         A.  Sure.  Sure.

Page 31

```
 1        Q.  It seems like the first day, Sunday,
 2   August 29th, you probably wouldn't have attended that
 3   much.  We can skip that one.  Monday, August 30th, I see
 4   a -- after the morning break a course on target
 5   selection by Shawn Pardazi?
 6        A.  Pardazi.
 7        Q.  Thanks.  Do you -- do you know what this course
 8   would have covered?
 9        A.  I'm sure it would probably cover moving
10   vehicles on the highways.
11        Q.  So explain -- explain to me what you mean by
12   that?
13        A.  Like, noticing driving patterns of evading.  If
14   you're on the -- in the center median, you'll see a
15   vehicle abruptly get off that lane, that nearest lane
16   towards you, forget to use a turn signal, either swerve
17   in and out from that lane and just recognizing the
18   traffic violation.
19        Q.  Okay.  So it sounds like there was a lot in
20   there.  Was this course on identifying traffic
21   violations, like, hey, this is what...
22        A.  So that specific target selection from 9:30 to
23   11:30 so the whole conference wouldn't be about that.
24   It was just this section would cover that.
25        Q.  Okay.  And did this class review the Texas
```

1    Criminal Code or the Texas Traffic Code, then?

2        A.   It may have.  I'm not sure.  I can't remember.

3        Q.   Okay.  And it seemed like you talked -- you

4    talked a little bit about behavioral driving.  What is

5    behavioral driving?

6        A.   Just patterns that drivers do, right.  So

7    everybody drives a certain way.  And they react

8    different to maybe recognizing that there's a law

9    enforcement officer right next to you and you avoid eye

10   contact because, you know, possibly you've got -- maybe

11   you're driving faster than the speed limit.  Speed limit

12   is 70, you're driving 71, 72 miles an hour.  Just like

13   I'm going -- they're going to stop me because I'm going

14   to two miles over the speed limit.

15              That creates a reaction.  It may cause a

16   traffic violation because they're concentrating on

17   something else other than driving normally.

18       Q.   Okay.  So what I --

19       A.   That was just an example.

20       Q.   Okay.  Yeah, sure.  So what I hear you saying

21   is you're looking for certain behaviors that happen in

22   response to seeing law enforcement?

23       A.   Correct.

24       Q.   Okay.  And this course by Shawn Pardazi would

25   have likely covered that?

Page 33

1          A.   Correct.

2          Q.   Can we flip to the next page, so second page of

3     this document, Exhibit 73.

4          A.   Yes, ma'am.

5          Q.   There's another course from 1300 hours to 1455,

6     "Evading Honesty", and it looks like it's also by that

7     Shawn Pardazi?

8          A.   Pardazi.

9          Q.   Uh-huh.  What would this "Evading Honesty"

10    class be about?

11         A.   So just maybe asking questions during the field

12    site interview that either they're evasive in answering

13    because they don't want to be tied to something, tied to

14    their story.  So they -- instead of answering the

15    question, they'll evade telling the truth.

16         Q.   Okay.  So would it be fair to say that this

17    course was about detecting deception?

18         A.   Yes.

19         Q.   And you mentioned questions during the field

20    site interview.  Can you explain that to me?

21         A.   Just the officer asking questions where they're

22    coming from, where they're going, who they're meeting,

23    things of that nature.

24         Q.   Okay.  So would it be fair to say for every

25    traffic stop, every criminal interdiction stop, you

Page 34

```
 1    would be asking certain questions to assess the driver's
 2    answers?
 3         A.  Yes.  If they -- when they initially make
 4    contact with them, that could happen that fast.
 5         Q.  Okay.  Explain that to me, "could happen that
 6    fast"?
 7         A.  So if they say, for example, that they are
 8    traveling down south and they're going to be there
 9    for -- on vacation for a week.  And --
10         Q.  And they means the driver?
11         A.  Right.  And he's asked if they -- you know,
12    maybe they live down south somewhere.  They said no,
13    this is their first time ever being there, and there's
14    no luggage or anything that's going to confirm that
15    they're on -- that they're going to go on vacation to
16    any normal person.  Then that would be kind of the
17    deception side of it that they would continue asking
18    questions about.
19         Q.  Okay.  Would this "Evading Honesty" course
20    include looking at people's physical reactions?
21         A.  Could have, yes, ma'am.
22         Q.  And it looks like there was another "Evading
23    Honesty" class from 1500 hours and ten minutes to 1650.
24    Is that fair?
25         A.  Yes, ma'am.
```

```
 1        Q.  And so in total, I'm not sure how much time
 2   that looks like.  But there were two courses on evading
 3   honesty during this conference?
 4        A.  Yes, ma'am.
 5        Q.  Okay.
 6        A.  I'm sure it's probably the same course, just
 7   they split it.
 8        Q.  They took a break?
 9        A.  Yes.
10        Q.  Okay.  And -- and is the main thrust of this
11   "Evading Honesty" course that you interview drivers?
12        A.  Correct.
13        Q.  Okay.  Can we look at the next course that you
14   see a name by?
15        A.  Okay.
16        Q.  And the date for that would be August 31st.  I
17   see 8:15 to 9:45 "Rapid Accessing the Passenger Car" by
18   Mike Tamez?
19        A.  Tamez.  Uh-huh.
20        Q.  720?
21        A.  Yes, ma'am.
22        Q.  Can you tell me what this course would be
23   about?
24        A.  Just because of the title, I would say that any
25   kind of vehicle used to carry passengers.
```

1    Q.  Okay.  So it doesn't seem like this course

2    would be about identifying vehicles that carry

3    passengers.  Rapid accessing to me sounds like getting

4    quick access to a passenger car.  Is that fair?

5    A.  Yeah.

6    Q.  So would this course have been -- was this

7    course about techniques to get rapid access to a

8    passenger car?

9    A.  So I believe that the rapid accessing would

10   probably cover, like, trains, buses, commercial buses,

11   things of that nature.

12   Q.  Okay.  I don't understand how those would be

13   passenger cars.  To me, passenger cars seems like, you

14   know, your sedan, your Honda Civics, your -- I don't

15   know any other cars.  Your Toyotas?

16   A.  Any car could be a passenger car.

17   Q.  Okay.

18   A.  But I believe what this would be covering

19   would -- would be your authority to enter a bus, train.

20   Q.  Okay.

21   A.  Things of that nature.

22   Q.  Sure.  And then the 1500 hour 10 minutes class,

23   "CMV's and Smuggling" by Ray Herndon, Diamond Back?

24   A.  Yes, ma'am.

25   Q.  Does CMV stand for commercial motor vehicle?

Page 37

1       A.   Yes, ma'am.

2       Q.   So this would have been a course about

3   commercial motor vehicles and smuggling and how that

4   works?

5       A.   Correct.

6       Q.   And what is a commercial motor vehicle?

7       A.   Anything that you would need a commercial

8   driver's license to operate.

9       Q.   So like a tractor-trailer?

10      A.   Correct.

11      Q.   Okay.  Same course the next day.  We can skip

12  that then.  Again, that course is again at 1300 hours on

13  September 1st.  I want to look at the "15 Tactics to

14  Greater Success" by Dennis Benigno, Street Cop.  What

15  was this course about?

16      A.   I would imagine that it was your training

17  tactics to make sure that you're safe during a traffic

18  stop.

19      Q.   Okay.  Can you tell me more about that?

20      A.   Just positioning yourself, how you approach a

21  car, what to look for if someone all of a sudden is

22  making a furtive movement under their seat, you know, to

23  protect yourself.

24      Q.   Okay.  Well, this doesn't seem like 15 tactics

25  to greater safety.  It seems like 15 tactics to greater

Page 38

1    success.  So what would success look like to these

2    traffic stops?

3         A.  You make it home.

4         Q.  You make it home, okay.

5              Okay.  Thursday, September 2, there is a

6    "Vehicle Selection" course by Kenny Williams, Street

7    Cop.

8         A.  Okay.

9         Q.  What is that course likely about?

10        A.  I would imagine -- I mean, it probably would be

11   around the same thing of looking at vehicles as they're

12   approaching you or driving away from you and noticing

13   something that would stick out that would not be normal.

14        Q.  Okay.  And then the last course, "Common Hidden

15   Compartments" by Brad Gilmore from Street Cop.  What was

16   this course about?

17        A.  Different hidden compartments in the vehicles

18   and trailers and things like that.

19        Q.  So basically how to identify those

20   compartments?

21        A.  Well, probably not how to identify them.  But

22   recognize the areas that are commonly used as hidden

23   compartments.

24        Q.  Okay.  Got it.

25              And would you and the criminal interdiction

Page 39

1    deputies who attended this conference -- let me ask --
2    let me rephrase that.
3                Did you and the criminal interdiction
4    deputies who attended this conference apply these
5    lessons, this training, to criminal interdiction
6    activities that you guys did after the training?
7         A.   It's a -- it's a tool to use.
8         Q.   Sure.
9         A.   Was it used?  Could have been.  You know, if
10   you recognize something that you just learned, you can,
11   you know, explore that.
12        Q.   Okay.  And I -- I understand that you didn't do
13   traffic stops.  But the two deputies who did do traffic
14   stops with the criminal interdiction unit, they could
15   choose to use these tactics or not.  Is that fair?
16        A.   Yes, ma'am.  Yes, ma'am.
17        Q.   And if your deputies used any of the tactics
18   that were part of the instruction or from the
19   instruction of this conference, you would have approved
20   those tactics?
21        A.   Yes, ma'am.
22        Q.   Okay.  Let's look at another page.  We're going
23   to put this agenda away.
24        A.   Okay.
25        Q.   We're going to go back to Exhibit 71.  And

Page 40

1    let's skip to page 20.  And just looking at the prior

2    page, page 19, this report would have been attached to

3    the Friday, September 10th, 2021 email?

4         A.   Correct, yes, ma'am.

5         Q.   And so this was the weekly activity report from

6    9/4 to 9/10, 2021?

7         A.   Yes, ma'am.

8         Q.   Can we look the "Critical Issues Section" at

9    the last bullet, (Reading:)  Interdiction is now

10   assisting Traffic in writing Traffic Citations as well

11   as Traffic Warnings, and will possibly be added to the

12   "TSU On Call" list to assist with Fatalities and

13   Critical Incidents.

14              Did I get that right?

15        A.   Yes, ma'am.

16        Q.   What is the TSU on-call list?

17        A.   Traffic safety unit on-call list.

18        Q.   Okay.  Can you explain to me what that is?

19        A.   So our traffic safety unit is our traffic unit

20   and they are responsible for handling all major

21   accidents and fatalities.

22        Q.   Okay.  And what -- what does the on-call list

23   mean?

24        A.   So they would be called out to assist the

25   traffic safety unit.

Page 41

```
 1        Q.   Okay.  So if like there's like a big crash or
 2   something?
 3        A.   Correct.  Yes, ma'am.
 4        Q.   The criminal interdiction deputies would be
 5   called to help with that?
 6        A.   Correct.
 7        Q.   Okay.  In the first part where "interdiction is
 8   now assisting Traffic in writing citations as well as
 9   Traffic Warnings", does that mean before September
10   of 2021, interdiction was only writing traffic warnings?
11        A.   No.  So I'm going to assume what he meant by
12   this was whatever citations or warnings that they wrote
13   would be counted with the citations and warnings that
14   the traffic safety unit would document.
15        Q.   Okay.  So does that mean that interdiction
16   traffic citations and warnings were then getting double
17   counted as interdiction traffic warnings and citations
18   and traffic unit citations and warnings?
19        A.   No.  Before interdiction was by itself, the
20   warnings and citations would be just part of
21   interdiction.  Now it would be part of the traffic
22   safety unit numbers.
23        Q.   Okay.
24        A.   I believe.  I don't know for -- for sure what
25   he meant by that.
```

Page 42

1      Q.  Okay.  Let's go to page 22.  And to me, this
2   "Criminal Interdiction Stats:  May 1, to Present" looks
3   like statistics about the criminal interdiction unit's
4   activities.  Is that a fair assessment?
5      A.  Yes, ma'am.
6      Q.  Do you know how these statistics were
7   generated?  Like, where do they come from?
8      A.  I assume it would be from the interdiction
9   unit's activities.
10     Q.  Right.  And so how would you create this?  Were
11  you, Sergeant Gamboa, keeping a list?
12     A.  I may have been, yes, ma'am.
13     Q.  Okay.  And where did you get the information in
14  your list?
15     A.  From the deputies.
16     Q.  So the deputy would call you and say I made a
17  traffic stop?
18     A.  Correct.
19     Q.  And then you'd write it down in your booklet?
20     A.  Correct.
21     Q.  Okay.  What is "Officer Initiated Activity" on
22  the first line?
23     A.  Anything that is initiated by the officer,
24  traffic stops, contacts, field contacts, gang con --
25  contacts, things of that nature.

```
                                              Page 43

 1          Q.  Okay.  So officer initiated activity could
 2     include traffic stops plus talking to someone on the
 3     street?
 4          A.  Yes, ma'am.
 5          Q.  Got it.  And so as a subset, there is 261
 6     traffic stops of the officer initiated activity of 271?
 7          A.  Correct.
 8          Q.  Got it.
 9               I'm going to hand you a calculator.
10          A.  Sure.
11          Q.  And 261, which is the number of traffic stops,
12     minus 217.  To me, I get 44 stops without warnings?
13          A.  Correct.
14          Q.  Okay.  And then I see citations issued.  Can
15     you subtract 18 from that 44?
16          A.  26.
17          Q.  Okay.  So these are 26 traffic stops without
18     warnings or citations.  Do you know what's going on with
19     these 26 traffic stops?
20          A.  It could have been arrests.
21          Q.  Okay.  So arrests would not fall into the
22     citations or warnings issues bucket?
23          A.  Correct.
24          Q.  Okay.  But then I see a "persons arrested"
25     number.  And that's 64.
```

Page 44

1        A.   Okay.

2        Q.   So can you help me understand the difference

3   there, like, why would there be 64 arrests and then 26

4   potential arrests that were neither warnings nor

5   citations?

6        A.   Well, it just depends.  I mean, multiple people

7   in vehicles.  It could be they went to a call and

8   arrested somebody, things of that nature.

9        Q.   Okay.  Can you take 64 and divide that by 271.

10  So 64 persons arrested, divided by 271 officer initiated

11  activity?

12       A.   4.23.

13       Q.   64 divided by 271.  Are you sure?

14       A.   4.23.

15       Q.   Let me make sure I'm doing that right.

16            MS. HEBERT:  Josh, can you check my math?

17            MR. WINDHAM:  I get .236.

18       Q.   (BY MS. HEBERT)  Okay.  Let's try that again.

19  64 divided by 271?

20       A.   64.  271.  Okay.  .236.

21       Q.   Okay.  Does that mean 20 percent -- 23 percent

22  of officer initiated activity here is generating 64

23  people, there's 23 percent of arrests.  So let me

24  rephrase that.

25            23 percent of these officer -- officer

Page 45

1    initiated activities are generating arrests?

2        A.   So the officer initiated activity number could

3    be anything, right.  So they could be following up on

4    traffic hazards.

5        Q.   Sure.

6        A.   So -- so that wouldn't -- I mean, potentially

7    be, you know, they've arrested off of that officer.

8        Q.   Right-- right.  But that would mean, I guess,

9    to put a finer point on it, only 23 percent of the 271

10   officer initiated activities were leading to arrests.

11   So the vast majority of these officer initiated

12   activities, all those things that you just summarized

13   are officer initiated activities would not lead to

14   arrests?

15       A.   Correct.

16       Q.   Okay.  Can we go down to "Estimated Value

17   Recovered"?

18       A.   Yes, ma'am.

19       Q.   And I see 30,000?

20       A.   Uh-huh.

21       Q.   Where did this number come from?

22       A.   Probably from the recovered stolen vehicles.

23       Q.   Okay.  And what happens to recovered stolen

24   vehicles?  We looked at one instance in a

25   commissioner -- county commissioner meeting minute notes

Page 46

```
 1    where the organized crime division received the seized
 2    vehicle.  What happens otherwise?
 3         A.  So stolen recovered vehicles would be returned
 4    to the owners.
 5         Q.  Okay.  And that's helpful.
 6             Okay.  Can we flip to the next page?
 7         A.  Sure.
 8         Q.  And about four lines down or the last four
 9    lines of the first section says, (Reading:)  Consent
10    search, search(s) hours, probable cause search, and
11    other activities.
12             Do you see those lines?
13         A.  Yes, ma'am.
14         Q.  And I'm seeing 123 consent searches?
15         A.  Correct.
16         Q.  Does that mean that this is the number of times
17    that a driver consented to be searched during this
18    period?
19         A.  Yes, ma'am.
20         Q.  Okay.  And, again, how did you get this number?
21    By your deputies just calling and telling you about it?
22         A.  Correct.
23         Q.  Okay.  And is there any record here, just
24    looking it over, I'm not seeing it, but if I'm missing
25    it, tell me.
```

```
 1        A.   Okay.
 2        Q.   About times that folks said no to consenting to
 3   search?
 4        A.   No, no actual line.
 5        Q.   Okay.  And probable cause searches, I see 53?
 6        A.   Correct.
 7        Q.   And my understanding is those are searches
 8   where the officer identified probable cause to do the
 9   search?
10        A.   Absolutely.
11        Q.   And there was no consent to those situations?
12        A.   Correct.
13        Q.   And I see it -- just to go back a little bit
14   higher, training hours?
15        A.   Okay.
16        Q.   141.5; is that right?
17        A.   Yes, ma'am.
18        Q.   Does that mean that the criminal interdiction
19   unit as a whole had 141 hours during this time period?
20        A.   Total, total, yes, ma'am.
21        Q.   Okay.  And were all of those training hours
22   outside of Bexar County from outside training sources?
23        A.   Well, it's just training hours.  So it could be
24   in-service training, it could be court testimony
25   training.
```

Page 48

1      Q.  So it might not -- sure.  It might not be

2  criminal interdiction specific training.  Like, the

3  broad umbrella of any training criminal interdiction

4  did.

5      A.  Yes, ma'am.  Yes, ma'am.

6      Q.  Okay.  I see the next section is about

7  different narcotics seized.  Is that fair?

8      A.  Yes, ma'am.

9      Q.  And I see the last one, 28,569 currency seized?

10     A.  Yes, ma'am.

11     Q.  Does that mean that this was the amount of

12  money in the time period we're talking about that

13  criminal interdiction deputies seized from vehicles?

14     A.  Well, just total money that they've seized.

15  Not --

16     Q.  Not just from vehicles?

17     A.  Not just vehicles.

18     Q.  Okay.  So other places, too?

19     A.  Correct.

20     Q.  And where would those other places be?

21     A.  I mean, it could be hotels.  It could be any

22  search warrants that were conducted, things of that

23  nature.

24     Q.  Okay.  So any time the criminal interdiction

25  unit was involved?

Page 49

1          A.   Was involved.  Yes, ma'am.

2          Q.   Could you -- on our little handy-dandy

3     calculator.  Would you mind doing a little math for me.

4     I think I remember you telling me that the sheriff's

5     office gets 30 percent of funds received?

6          A.   I believe that's what it is now, yes, ma'am.

7          Q.   Okay.  Was it a different amount at this time?

8          A.   I don't know.  It could have been.  At the

9     time, I didn't know what it was.

10         Q.   Right.  So as far as you know, the rule has

11    always been 30 percent?

12         A.   Could have been, yes, ma'am.

13         Q.   Okay.  Can you do 30 percent of 28569, so times

14    28569 by .3?  I know we're testing everybody's -- yeah.

15         A.   569.  I'm sorry 28569.

16         Q.   Times .3?

17         A.   Times .3.  8570 -- .70.

18         Q.   So does that mean that assuming that the

19    30 percent is right, the sheriff's office would have

20    taken home $8,570.70 from this amount?

21         A.   Yes, ma'am.

22         Q.   Okay.  Thanks.  All right.  I think you can

23    give my calculator back hopefully.  Appreciate that.

24               And then I go to another page.  Let me just

25    find the next page.  Page 27.  And if you wouldn't mind,

Page 50

1    we'll just date this one to see what the date looks

2    like.  The date on this would be September 17th, 2021;

3    is that right?

4         A.  9 -- oh, I'm sorry.  Yes, ma'am.

5         Q.  Okay.  And I'm going to read this bullet item

6    that we see on the top page of 27.  (Reading:)  Sheriff

7    Jim Skinner out of Collin County SO, came out and the

8    meeting was a huge success with lots of information

9    passed about their Criminal Interdiction.  The Sheriff's

10   approached Sergeant Pete Gamboa that at the next meeting

11   they would like to include a target date to begin the

12   South/Central Criminal Interdiction Unit.

13              Did I read that correctly?

14        A.  Yes, ma'am.

15        Q.  Okay.  So what I'm taking away from this bullet

16   is that Sheriff Skinner visited Bexar County.  Is that

17   fair?

18        A.  Yes, ma'am.

19        Q.  What kind of information did he pass along at

20   that time?

21        A.  I'm sure he talked about their task force and

22   operationally, how it's working with the -- with the

23   counties that are involved and probably some success

24   stories of what has been done over there.

25        Q.  Okay.  And would he have shared any, like,

```
 1   how-tos?
 2        A.  He may have.  Matter of fact, he talked about
 3   how in their region, their commissioners were very
 4   proactive for the interdiction unit.
 5        Q.  Okay.  What do you mean by "commissioners"?
 6        A.  Like, they supported their idea.
 7        Q.  Is this the county commissioners, then?
 8        A.  Correct.
 9        Q.  Okay.  So the county -- he talked about how the
10   county commissioners were supportive?
11        A.  How they're -- yeah.  In their regions, yes,
12   ma'am.
13        Q.  Okay.  And what is -- I have no idea how this
14   works.  So what does support from the county
15   commissioners look like?
16        A.  So they would have -- they would approve the
17   actual task force moving -- you know, to move forward,
18   to work together.
19        Q.  Got it.  So approval for the task force had to
20   go through the county commissioners?
21        A.  Correct.
22        Q.  Got it.  And the next sentence, "the
23   Sheriff's", and that has the sheriff's apostrophe S,
24   approached Sergeant Pete Gamboa.
25                Does that mean multiple sheriffs, is that
```

Page 52

1    just a typo, approached you?  Or --

2        A.  No, multiple.

3        Q.  Okay.  So who approached you?

4        A.  I couldn't remember exactly who.  But I know it

5    was multiple of them.

6        Q.  Okay.  So some collection of sheriffs from the

7    surrounding area approached you?

8        A.  Yes, ma'am.

9        Q.  Were you at this meeting with the --

10       A.  I believe so, yes.

11       Q.  Okay.  And do you remember what the target date

12   was to begin this south/central criminal -- criminal

13   interdiction unit?

14       A.  I don't remember a target date.  I know we

15   talked about trying to get this because our -- our

16   problem for Bexar County was to try to get commissioners

17   court to authorize us to be involved in this task force.

18       Q.  Okay.  And why was that a problem for -- for

19   y'all?

20       A.  Just different reasons.  I mean, they wouldn't

21   always see eye to eye with the sheriff and some of the

22   things that he wanted to conduct here in Bexar County.

23       Q.  Okay.  And did the south/central criminal

24   interdiction unit ever start?

25       A.  No, ma'am.  No, ma'am.

Page 53

1          Q.   What happened?

2          A.   So eventually when migrants started coming over

3     to the United States and teenagers were being recruited

4     to transport these migrants over, they would get into

5     pursuit, vehicle pursuits, where sometimes it would end

6     up in someone being hurt or killed.

7          Q.   Okay.

8          A.   So the sheriff kind of at that point --

9          Q.   Nixed it.

10         A.   -- nixed it.

11         Q.   So, but -- do you remember what point the

12    sheriff nixed it?

13         A.   At what point?

14         Q.   Yeah, what time period?

15         A.   I don't.

16         Q.   It's okay.

17         A.   I don't.

18         Q.   Were there emails back and forth with other

19    counties about setting this south/central criminal

20    interdiction unit up?

21         A.   There could have been, yes, ma'am.

22         Q.   And did you ever see a draft MOU?

23         A.   No.

24         Q.   Okay.  So you never got to the point of

25    drafting MOUs with the other counties?

Page 54

1          A.  No, ma'am.

2          Q.  And then the rest of this page 27, I see

3    "Criminal Interdiction Stats: May 1 to -- To Present".

4    Is that fair?

5          A.  Yes, ma'am.

6          Q.  And it looks like the officer initiated

7    activity is up to 286.  Does this just mean there were

8    additional things added the next week --

9          A.  Yes, ma'am.

10         Q.  -- to the original stats we looked at on page

11    whatever that was before?

12         A.  Yes, ma'am.

13         Q.  Okay.  Can we go to the next report.  So this

14    will be the report for Friday, September 26th, 2021.

15         A.  September 24th?

16         Q.  Oh, you're right.  September 24th.  And just

17    briefly, I see the -- the interdiction stats on page 32;

18    is that right?

19         A.  Yes, ma'am.

20         Q.  Okay.  I can skip on to the next one.

21              This is Friday, October 1st, 2021?

22         A.  Yes, ma'am.

23         Q.  And I see "Accomplishments" on page 35,

24    (Reading:)  Interdiction has made a point of contact

25    with UPS on interdicting parcels.  And Interdiction

Page 55

```
 1    Deputies have assisted BCSO Patrol multiple calls for
 2    service, along with OCD and TSU with several critical
 3    incidents.
 4              Did I read those right?
 5         A.  Yes, ma'am.
 6         Q.  And I understand the accomplishments there,
 7    there's some kind of contact with the United States
 8    Postal Service.  Is that fair?
 9         A.  No, it's UPS.  Yeah, the company, not the --
10         Q.  Not the U.S. version?
11         A.  Right.
12         Q.  Sorry.  I always get those confused.  UPS
13    versus USPS.  This is -- this the private company, UPS?
14         A.  Yes, ma'am.
15         Q.  Got it.  And then there were some assisting
16    with other sheriff's office units.  Is that fair?
17         A.  Correct.
18         Q.  Okay.  Does that mean that the big
19    accomplishments for that week was only those two things.
20    I guess -- that's a better way of getting at the point,
21    there weren't any big drug findings or money findings
22    during that period?
23         A.  I -- I don't believe so.
24         Q.  So if there was like a big bust or big stop
25    that yielded, let's say, kilos of drugs, that would have
```

Page 56

1    been reported here in the accomplishments section?

2         A.   Should have, yes, ma'am.

3         Q.   Okay.  So in this report, and I'm flipping

4    through pages 35 through 37.  I'm not seeing the

5    criminal interdiction stats here.

6         A.   Okay.

7         Q.   Do you know why?  Like, what happened?

8         A.   I don't know.  He may not have included it for

9    this particular week.

10        Q.   Sure.  And just to be fair, like, I don't see

11   the criminal interdiction stats in, like, any other

12   weekly -- weekly reports, like, going forward.  Do you

13   know why those stats dropped out?

14        A.   No.

15        Q.   Okay.  Did you still give Lieutenant Ortega

16   stats?

17        A.   I'm sure I would have if we were giving him

18   stats, yeah.

19        Q.   Okay.  So in -- at the end -- we're looking at

20   the end of September of 2021, you still collected stats

21   on interdiction activities in September of 2021?

22        A.   Possible, yes.

23        Q.   Okay.  But you don't exactly remember sitting

24   here?

25        A.   I don't exactly remember, yeah.

```
 1         Q.  And how did you collect those stats?  Did you
 2    take notes?
 3         A.  Notes, daily activity reports that the officers
 4    would -- would submit.
 5         Q.  Okay.
 6         A.  But at some point, and I can't remember exactly
 7    when, and this may be the time when they wouldn't submit
 8    them to me anymore.  They would submit them straight to
 9    our office assistant.
10         Q.  Okay.  So at some point, you, Sergeant Gamboa,
11    stopped collecting all the weekly interdiction reports,
12    the daily interdiction reports?
13         A.  Right.
14         Q.  And it went to some admin?
15         A.  Right.
16         Q.  Okay.  Got it.  And can you tell me more about
17    these daily interdiction reports?  What are we talking
18    about?  What is a daily interdiction report?
19         A.  Just their daily activities of what they did
20    that day.
21         Q.  Is there a form they fill out?
22         A.  Yes, ma'am.
23         Q.  Okay.  So did you require your criminal
24    interdiction activities to fill out this daily activity
25    report?
```

Page 58

1        A.  Yes, ma'am.

2        Q.  So every day Deputy Gereb was on the job doing

3    criminal interdiction, he would have filled out a

4    report?

5        A.  Yes, ma'am.

6        Q.  Every day that Deputy Babb was on the job doing

7    criminal interdiction, he would have filled out a

8    report?

9        A.  Yes, ma'am, should have, yes, ma'am.

10       Q.  Did you ever hear about or learn about, did you

11   ever learn about them not filling out that report?

12       A.  So when I was collecting them, there would be

13   times where I would --  I would ask them, hey, I haven't

14   gotten your report for Monday, you know.  I need to get

15   that.

16       Q.  Sure.  So you would follow up?

17       A.  Yes.

18       Q.  And if they didn't turn in their report, there

19   would be a problem?

20       A.  Yeah, I mean...

21       Q.  You would say, deputy -- deputy, I need your

22   report?

23       A.  Yeah.

24       Q.  And you would get it?

25       A.  Yeah.

1    Q.  If they didn't turn in the report, what would

2    happen?

3    A.  They would do it the next day or, you know,

4    before they went out somewhere, I would make them do

5    their report.

6    Q.  So they would follow your order?

7    A.  Yes, ma'am.

8    Q.  Okay.  And if they didn't follow your order

9    what would you do?  Let's say, you know, I'm a bad

10   student.  Let's say I don't do my homework and I refused

11   to fill out my report after you ordered me to?

12   A.  It never -- yeah, it never got to that point --

13   Q.  Sure.

14   A.  -- but, I mean, worst-case scenario, then they

15   would be at the office doing reports.

16   Q.  You'd bench them?

17   A.  Yeah.

18   Q.  Got it.  Okay.  So let's flip to page 37.  And

19   in the follow-up section on page 37, the second bullet,

20   can I read that to you?

21   A.  Yes, ma'am.

22   Q.  (Reading:)  Need to setup having BCSO

23   Interdiction Unit deputies head to Collin County SO to

24   observe and TRNG with the North Texas Interdiction Unit

25   for additional hands on TRNG.

Page 60

```
1                    Did I read that right?
2         A.  Yes, ma'am.
3         Q.  So there's a couple of, like, abbreviations in
4    here, so I want to make sure that I'm actually
5    understanding what's being said.
6         A.  Sure.
7         Q.  It seems like this bullet is saying that the
8    sheriff's office needed to set up having its
9    interdiction deputies go to Collin County to their
10   sheriff's office to observe and train with the north
11   Texas interdiction unit for additional hands-on
12   training.
13                   Is that -- unpacking all the shorthand and
14   abbreviations, is that what that says?
15        A.  Yes, ma'am.
16        Q.  Okay.  And is this a second time, then, that
17   Bexar County Sheriff's Office deputies went to Collin
18   County?
19        A.  So no.  So the first time I went.
20        Q.  Just you?
21        A.  Yes, ma'am.
22        Q.  Understood.  And this second time, you sent the
23   deputies out?
24        A.  They went, yes, ma'am.  But I -- if I'm not
25   mistaken, I think it never happened because they
```

Page 61

```
 1    rescheduled.
 2         Q.  Sure.
 3         A.  And then our schedule was conflicting so
 4    they --
 5         Q.  We can check as we go.  But that would -- this
 6    was -- you went at the formation --
 7         A.  Correct.
 8         Q.  -- of the criminal interdiction unit and then
 9    you sent your -- or tried to send your deputies later?
10         A.  Yes, ma'am.
11         Q.  Okay.  And let's go to page 39 and the date on
12    this report would have been October 18th, 2021?
13         A.  Yes, ma'am.
14         Q.  If you wouldn't mind going to the ongoing
15    business.  (Reading:)  Had followup meeting last week at
16    TAG six counties:  Kendall, Kerr, Gillespie, Live Oak,
17    and Atacosa --
18         A.  Atascosa.
19         Q.  -- Atascosa to continue with SA area South
20    Texas Interdiction.
21              Is this bullet referring to the
22    interdiction task force we've talked about combining
23    efforts from different counties?
24         A.  Yes, ma'am.
25         Q.  Okay.  And are these the counties that Bexar
```

Page 62

1    County, this counties listed here on page 39, the

2    counties that Bexar County was attempting to collaborate

3    with?

4        A.  Yes, ma'am.

5        Q.  And who attended on behalf of all the counties?

6    Were they deputies or the sheriffs or some other person?

7    Like, who was there?

8        A.  I believe most of them were the sheriffs

9    themselves.

10       Q.  Okay.

11       A.  But they may have -- I'm trying to remember if

12   it was all sheriffs.  It was all the sheriffs and they

13   may have had somebody with them, I guess with them.

14       Q.  An attaché of sorts?

15       A.  Yeah.

16       Q.  Were you at this meeting?

17       A.  I believe so, yes.

18       Q.  Was Sheriff Salazar at this meeting?

19       A.  Yes.

20       Q.  Okay.  Can we flip to page 42.  And this report

21   is from October 25th, 2021.  Is that fair?  Looking at

22   the prior page on 41, October 25th, 2021?

23       A.  Yes, ma'am.

24       Q.  Okay.  Would you mind looking at the third

25   bullet in the "Accomplishments" section?  Do you see

Page 63

1    where it says "our Interdiction Unit is currently in

2    Negotiator Training"?

3         A.  Yes, ma'am.

4         Q.  I'm going to read the whole thing, rephrase.

5    (Reading:)  Our Interdiction Unit is currently in

6    Negotiator Training.  This Training will help

7    tremendously on Interdiction Stops.

8                   Did I read that right?

9         A.  Yes, ma'am.

10        Q.  Okay.  Why negotiator training for interdiction

11   stops, how would that help?

12        A.  Communication.

13        Q.  Tell me more about that?

14        A.  Okay.  So they learn to communicate, learn to

15   ask better questions with the drivers.

16        Q.  Okay.  So would it be fair to say that the

17   negotiator training was -- was training your

18   interdiction deputies to conduct interviews?

19        A.  To help them conduct interviews, yes, ma'am.

20        Q.  Okay.  And at time of October 2021, the

21   deputies who attended this would have been Deputy Gereb

22   and Deputy Babb.  Is that fair?

23        A.  Correct.

24        Q.  Would you mind flipping to the next page?

25        A.  Sure.

1    Q.  43.  This is a long bullet for the "For Follow

2    Up" sections so I'm not going to read the whole thing.

3    Just feels large.  Would you mind reviewing it?  Let me

4    know when you're done.

5    A.  Yes, ma'am.

6    Q.  Okay.  So it seems like to me six counties

7    committed to joining the task force, although it says

8    unit.  I think this was referring to the task force that

9    we've talked about previously?

10    A.  Yes, ma'am.

11    Q.  By task force, we mean the joint interdiction

12    task force that would have been across several counties?

13    A.  Correct.

14    Q.  And would those six counties have been the

15    counties we saw previously, Kendall, Kerr, Gillespie,

16    Live Oak, Atascosa?

17    A.  Atascosa.

18    Q.  Atascosa, why do I struggle with that one?

19    Kendall, Kerr -- Kerr -- Kendall, Kerr, Gillespie, Live

20    Oak, Atascosa, those would be the six counties?

21    A.  Yes, ma'am.

22    Q.  Okay.  And what did -- how did they commit to

23    the unit?  Did they just say yes, we're going to it?

24    A.  Yes, ma'am.

25    Q.  And I see this next part about sending out a

1    last email for any others to jump on.  Who would this

2    email go to?

3         A.  Any -- any of the other counties that had

4    attended the meetings prior.

5         Q.  Okay.  So there would have been some email sent

6    to other counties saying, hey, come join our criminal

7    interdiction task force?

8         A.  Would you like to, yes, ma'am.

9         Q.  Okay.  The verbiage -- the last sentence;

10   "Verbiage will need to be added to Inter Local

11   Agreement."

12              Did I get that right?

13        A.  Yes.

14        Q.  What is the interlocal agreement?

15        A.  That would be that MOU that would be signed

16   between the different counties.

17        Q.  For the task force?

18        A.  Correct.

19        Q.  So it sounds like then it was already drafted?

20        A.  No.

21        Q.  No?

22        A.  No, but it would -- it would need to be.

23        Q.  Oh, and is that in reference to this prior

24   sentence about, "My suggestion is for Bexar County to be

25   part of both since we are the HUB"?

Page 66

 1          A.  Correct.  Correct.

 2          Q.  Okay.  So it seems like reading this paragraph

 3     then, together, there was a proposal that there be two

 4     separate task forces?

 5          A.  Yes, ma'am.

 6          Q.  And Bexar County would be part of two separate

 7     task force?

 8          A.  Correct.

 9          Q.  Because they're in the middle?

10          A.  Right.

11          Q.  And there would need to be words reflecting

12     that fact?

13          A.  Yes, ma'am.

14          Q.  I'm understanding all of that right?

15          A.  Yes, ma'am.

16          Q.  Okay.  We're done with that page.  I'm going to

17     see if I've got anything else.  Okay, let's go to

18     page 59.  And looking at the prior page, 58, the date on

19     this report would be November 26th, 2021?

20          A.  Yes, ma'am.

21          Q.  Okay.  And then I see "Critical Issues," the

22     first bullet in "Critical Issues" section.  (Reading:)

23     We need to send our two Interdiction deputies to North

24     Texas Interdiction Unit to receive OTJ TRNG from those

25     deputies.

Page 67

1              Am I reading that correctly?

2         A.   Yes, ma'am.

3         Q.   And I understand the abbreviations in this

4    sentence to be on-the-job training from those deputies?

5         A.   Correct.

6         Q.   Okay.  And it seems like as of November 2021,

7    that training that we talked about earlier had not

8    happened.  Is that fair?

9         A.   Correct.

10        Q.   Why was that training -- there's a discussion

11   about training in other places in this report.  Why was

12   it moved to critical issues.  Do you know?

13        A.   I believe they had -- our command staff had not

14   made the decision to allow them to travel to attend that

15   training.

16        Q.   Okay.  So it's like, we need to do this now?

17        A.   Yeah.

18        Q.   Okay.  Was there a particular reason that you

19   and Lieutenant Ortega felt that the deputies needed

20   additional training?

21        A.   No, just -- just to help them be better at what

22   they're doing.

23        Q.   Okay.  And the two interdiction deputies at

24   that time were Deputy Gereb and Deputy Babb?

25        A.   Correct.

1      Q.   Okay.   Looking to see if there's anything else

2   in this section.   Bear with me.   Okay.   If you wouldn't

3   mind flipping to page 71, I think that's the next one.

4   It looks like 71, "Accomplishments."   The first bullet

5   of that section.   And this report, just to date it, this

6   report would have been completed December 19th, 2021; is

7   that right?

8      A.   Yes.

9      Q.   Okay.   The first bullet in the

10   "Accomplishments" sections -- section, (Reading:)

11   Travel Request Forms completed to Interdiction Unit

12   deputies To North Texas Interdiction Unit to receive

13   on-the-job training from North Texas Interdiction Unit.

14           Did I read that correctly?

15      A.   Yes, ma'am.

16      Q.   Does this mean that the travel forms were

17   completed for the two interdiction deputies to go to

18   that training?

19      A.   Yes, ma'am.

20      Q.   And tell me about the travel request, are those

21   preauthorization forms or retroactive authorization

22   forms?

23      A.   No, they're retro.

24      Q.   They're retro?

25      A.   Well, I'm sorry.   We -- it does happen.   But --

Page 69

1    so we -- I would have filled out the form and turned it

2    in so that way they can get approved to attend that

3    training.

4          Q.   Okay.  So these would have been forms that were

5    completed and approved before they went to training?

6          A.   Correct.

7          Q.   Got it.  I think that we're done with the 2021

8    report.  You get to keep that exhibit, so don't worry.

9    I just have them separated by years.  I'm going to flip

10   to the 2022 reports.  And would you mind going to

11   page 98 of your exhibit?

12                MS. HEBERT:  Which exhibit is this again?

13                MR. WINDHAM:  71?

14         Q.   (BY MS. HEBERT)  71.

15         A.   Yes, ma'am.

16         Q.   And I understand the date on this report would

17   have been February 18th, 2022; is that right?

18         A.   Yes, ma'am.

19         Q.   Can you look at the "Critical Issues" section.

20   And the second bullet, I'm going to read it, (Reading:)

21   Need more deputies to expand Interdiction Unit.

22         A.   Yes, ma'am.

23         Q.   Did I read that right?

24         A.   Yes, ma'am.

25         Q.   Was it Bexar County Sheriff's Office intention

Page 70

1    to expand the interdiction unit at this time?

2        A.   Well, just looking at the bullet above it, I'm

3    asking to get back the two positions that -- that were

4    reassigned --

5        Q.   Sure.

6        A.   -- and trying to get them -- those two

7    positions back to expand from two man to a four-man

8    team.

9        Q.   So at the very least, you wanted four deputies

10   to be doing criminal interdiction?

11       A.   Yes, ma'am.

12       Q.   If they had given you more, let's say they gave

13   you six deputies total, would you have been happy with

14   that?

15       A.   Absolutely.

16       Q.   You would have accepted that?

17       A.   Yes, ma'am.

18       Q.   Okay.  I think we're going to skip a big

19   section to 107.  And the date on this report is

20   February -- excuse me, March 11th, 2022.  Did I read

21   that right?

22       A.   Yes, ma'am.

23       Q.   So I want to look at the "New Business."

24   (Reading:)  All Spec. Enforcement Unit deputies will be

25   relocating offices from 490 HQ to the TAG building with

Page 71

1    the rest of OCD units due to Sergeant Gamboas transfer

2    to OCD Intel.

3              Did I read that right?

4         A.  Yes, ma'am.

5         Q.  So is this the time period when you were

6    transferred from the training academy to the criminal --

7    or to the organized crime division?

8         A.  No.  So I was -- I was assigned to our

9    headquarters at that -- at this time and from

10   headquarters moved to the TAG -- to the intel unit.

11        Q.  Okay.  So they moved you buildings?

12        A.  Yes.

13        Q.  Did you change supervision structures at that

14   point?

15        A.  No, because that's, I believe -- well, I'm

16   trying to think.  So Lieutenant Ortega was --

17        Q.  Which one?  Ray Ortega?

18        A.  Ray.

19        Q.  Got it.

20        A.  He was reassigned from the academy to now the

21   SWAT commander under the organized crime division.

22   And -- and had -- and still had the uniform officers

23   under -- under him, under his umbrella.

24        Q.  Okay.

25        A.  So -- so we were under his umbrella, but he's

Page 72

```
1    kind of the one that had changed, moving over to the
2    TAG.  So we still fell under him.
3         Q.  Okay.  So you were moved to a different
4    building --
5         A.  Yes.
6         Q.  -- with Lieutenant Ortega?
7         A.  Correct.
8         Q.  Okay.
9         A.  So I had two bosses at that time.  So I had
10   Lieutenant Ortega or the uniform officers, which special
11   enforce -- enforcement fell under.  And then I was also
12   under Lieutenant Freveletti for the covert.
13        Q.  Got it.  Okay.  And was Lieutenant Freveletti
14   also in the TAG building?
15        A.  Yes, ma'am.
16        Q.  Got it.  Okay, we can skip that.  I think we
17   already covered that one.  Can we look at page 143?  And
18   this report is from June 12th, 2022; is that right?  I'm
19   sorry.  I went too fast for you.  Page 143.
20        A.  Okay.  June 12th, yes, ma'am.
21        Q.  So June 12th, 2020?
22        A.  2.
23        Q.  2.
24        A.  Yes, ma'am.
25        Q.  Can you look at the "Accomplishments" section?
```

Page 73

1      A.   Sure.

2      Q.   And, (Reading:)  Interdiction unit conducted a

3   small bust interdiction operation at the Greyhound Bus

4   Station Downtown on Friday 06/10.

5           Did I get that right?

6      A.   Yes, ma'am.

7      Q.   Can you tell me what this is about?

8      A.   So the unit went downtown to the Greyhound bus

9   and was conducting consensual contacts, anything where

10  they may have intercepted either people with warrants,

11  people that may have been transporting narcotics or

12  currency, anything illegal, things of that nature.

13     Q.   So, I mean, can you explain to me how that

14  worked here?  Because, you know, you're not doing

15  traffic stops.  So are you just, you know, pulling

16  people over to the side and saying?

17     A.   Can I talk to you?

18     Q.   Okay.  And then you talk to them, and what

19  happens during that?

20     A.   And so they may have made contact with somebody

21  that was traveling because they maybe had warrants,

22  maybe they were, you know, evading something from

23  somewhere else.  So, you know, they would carry that

24  conversation on with them.

25     Q.   Okay.  So help me understand how -- unpack that

 1    for me how it would work.  You're -- I'm a person

 2    traveling in this bus station.  You're the interdiction

 3    officer.  Tell me -- tell me how it works?

 4         A.  So I'm -- I'm there in uniform and perhaps

 5    somebody is getting off a bus and they're walking --

 6         Q.  I'm getting off the bus?

 7         A.  And you're walking towards me and you then you

 8    notice that I'm law enforcement in uniform, and you

 9    abruptly change your travel from walking towards me to

10    maybe to the office or somewhere else to now I'm going

11    somewhere else to avoid making contact.

12         Q.  Okay.  So it's just, like, change directions?

13         A.  Yes.

14         Q.  Okay.  So then what happens?

15         A.  So then, sir, ma'am, can I talk to you?  You

16    know, yes.  Are you here visiting?  You know, you're

17    getting off the bus, you know.  What are your plans?

18    Where are you going?  And so if they -- if they answer

19    the questions and they continue asking questions to

20    maybe lead to, can I get your name, do you have any kind

21    of warrants, are you on parole, probation, are you a

22    gang member.

23         Q.  Do they ask for ID?

24         A.  Ask for ID and then they'll check them to see

25    if they've got any watch warrants.  And then just

1    depends on what their answer is, what they find, you

2    know, if they make an arrest or they just end it there.

3        Q.   Okay.  And what if I had run away or I said,

4    no, I don't want to talk to you?

5        A.   Well, I mean it's all based on consensual

6    contact.  So if you ignore, you know, hey, ma'am, or hey

7    you, let me talk to you, if you ignore it, then -- then

8    it is what it is.

9        Q.   Okay.  Who was at this interdiction operation,

10   who was there?  Do you remember?

11       A.   It would -- it would have been probably --

12   well, I'm trying to think.  If Gereb was still there --

13   I mean, Babb was still there at that time.  I think he

14   still was.

15       Q.   I don't know, so that's why I asked.  I don't

16   know.

17           So if -- if it was -- if Deputy Babb was

18   there it would have been him and Deputy Gereb; is that

19   correct?

20       A.   Correct.

21       Q.   Was Deputy Molina there?

22       A.   Could have been.

23       Q.   Okay.  So Deputy Molina and his K-9 could have

24   been there?

25       A.   Correct.

Page 76

1      Q.   Okay.  How would we know if Deputy Molina had

2   been at this interdiction unit, small bus interdiction

3   operation?

4      A.   He would -- more than likely would have

5   included in his deployment records.

6      Q.   Go it.  Okay.  That's helpful.  Thanks.

7           Can you flip to the next page?  144,

8   "Whatever Happened To".

9      A.   Yes, ma'am.

10      Q.   And the MOU for surrounding counties south of

11   Bexar County:  Atascosa, Medina, Frio, Live Oak,

12   et cetera, to move forward on South Texas Interdiction

13   Unit.  Is this that MOU you were talking about

14   previously?

15      A.   Yes, ma'am.

16      Q.   And I guess they were checking in to find out

17   the status of that?

18      A.   Correct.

19      Q.   And, again, that wasn't drafted?

20      A.   Right.

21      Q.   Okay.  Okay.  I think we're going to flip --

22   skip a large chunk.  Are you ready.  Skip to 158.  And I

23   understand this page -- this report to be from

24   July 17th, 2022; is that right?

25      A.   July 17, 2022, yes, ma'am.

Page 77

1      Q.   Can you look at the "Accomplishments" section?

2      A.   Sure.

3      Q.   Bullet two.  (Reading:)  Friday 07/15

4    Interdiction Unit deputies assisted BCSO TFO assigned to

5    HIDTA DEA with a Tstop, which led to the arrest of a

6    subject with 10.5 kilos of methamphetamine narcotics in

7    the vehicle.

8              Did I read that correctly?

9      A.   Yes, ma'am.

10      Q.   Okay.  So can you summarize for me what this is

11    about?

12      A.   So we have deputies assigned to -- as task

13    force officers to DEA.  They more than likely were

14    surveilling a suspect, narcotic courier, and so they

15    asked for the assistance of the interdiction unit to get

16    probable cause to conduct a traffic stop which ended up

17    recovering 10 and half kilos of methamphetamines.

18      Q.   Okay.  So this -- this particular traffic stop

19    was likely a target identified by this task force.  Is

20    that fair?

21      A.   Yes, ma'am.

22      Q.   And does that mean a criminal interdiction unit

23    deputy made the traffic stop?

24      A.   Correct.

25      Q.   Okay.  And the task for the criminal

```
 1    interdiction unit deputy was to develop probable cause
 2    to do the search?
 3         A.  To make the stop.
 4         Q.  To make the stop.  Okay.  So just to make the
 5    stop?
 6         A.  Correct.
 7         Q.  So once they have probable cause to make --
 8    make the stop, then what would happen?
 9         A.  Then they would conduct their field interview
10    to gain access into the vehicle.
11         Q.  Okay.  Got it.
12              MR. ELLSWORTH:  Can we take a break?
13              MS. HEBERT:  Yeah.  Let's take a break.
14    Now is a great time to take a break.
15              MR. WINDHAM:  Hold on a second.
16              MS. HEBERT:  Yeah, before I -- this is a
17    good task, before we take the break, Charles, would you
18    mind just emailing us the criminal interdiction unit job
19    description, the deputy job description.  We can
20    probably use it here.
21              MR. FRIGERIO:  Yeah, I can get it.  I think
22    it actually is part of what we gave you, but he sent me
23    one this morning --
24              MS. HEBERT:  I haven't -- I haven't seen it
25    so if you wouldn't mind just, like, while we're
```

Page 79

```
 1   breaking --

 2               MR. FRIGERIO:  Yeah, sure.

 3               MS. HEBERT:  -- sending that so we can look

 4   at it.

 5               MR. FRIGERIO:  Do you prefer email or

 6   paper?

 7               MS. HEBERT:  If you've got paper, I'll just

 8   take some time to process it.  That would be great.

 9               All right.  We're off the record for a few

10   minutes.  10 minutes.

11               (Brief recess.)

12       Q.  (BY MS. HEBERT)  We're back on the record after

13   a short break.  I'd like to look at page 166 of

14   Exhibit 71.  And I understand the date of this report is

15   August 7th, 2022.  Can you confirm that when you get a

16   chance?

17       A.  August 7th, 2022, yes, ma'am.

18       Q.  Okay.  And if you wouldn't mind looking at the

19   "Critical Issues" section.

20       A.  Sure.

21       Q.  The second bullet, (Reading:)  Deputy Babb was

22   recently transferred to TRNG Academy.  Sheriff Salazar

23   and CD Schuler gave verbals last week that the position

24   would be filled ASAP.

25               Did I get that right?
```

Page 80

```
 1          A.  Yes, ma'am.
 2          Q.  Why did they want the position vacated by
 3     Deputy Babb to be filled ASAP?
 4          A.  Because he would be the only one, you know,
 5     working the interdiction.
 6          Q.  Okay, so you mean Deputy Gereb would be by
 7     himself?
 8          A.  Correct.
 9          Q.  And you wanted a two-man team?
10          A.  Yes.
11          Q.  Got it.
12               MS. HEBERT:  Let's do another exhibit.
13               Josh, would you do another stamp for the
14     next exhibit?
15               MR. WINDHAM:  Sure.  74.
16          Q.  (BY MS. HEBERT)  Okay.  I'm going to hand you
17     what's being marked Exhibit 74.
18               (Exhibit No. 74 was marked.)
19          Q.  (BY MS. HEBERT)  Would you take a look at this
20     document?
21          A.  Yes, ma'am.
22          Q.  And when you've had a chance to review it,
23     would you mind telling me what it is?
24          A.  This is the announcement for the opening for
25     the criminal interdiction unit.
```

Page 81

1      Q.   Is this the announcement for the job position

2   that Deputy Babb left?

3      A.   Correct.

4      Q.   Okay.  And would it be fair to say that this is

5   the job description for the interdiction deputy as of

6   2022?

7      A.   Yes, ma'am.

8      Q.   Okay.  Did you write this?

9      A.   Yes, ma'am.

10     Q.   Okay.  You just hesitated a little bit there?

11     A.   So some --  like, some of this stuff, like,

12  number 9, "You must not have been a recipient of any

13  disciplinary" -- that was taken from previous

14  announcements.

15     Q.   Oh, okay.  I mean, but you -- you assembled

16  this and said, this is the accurate description?

17     A.   Yes, ma'am.

18     Q.   Some of it you might have borrowed from prior

19  job descriptions.  Is that fair?

20     A.   Correct.  Yes, ma'am.

21     Q.   Okay.  I understand.  I want to look just

22  briefly at the "Preferred Qualifications."

23     A.   Okay.

24     Q.   And do you see items 3 through 8?

25     A.   Yes, ma'am.

Page 82

1        Q.   Generally speaking, these are the specific

2    chapters of the sheriff's office's policy manual that a

3    criminal interdiction unit deputy would understand

4    applies to their direct day-to-day.  Is that fair?

5        A.   Yes, ma'am.

6        Q.   And then I'd like to go back up to the

7    "Essential Duties and Responsibilities."

8        A.   Okay.

9        Q.   "Advanced criminal enforcement, driver

10   behaviors, and smuggling compartments."  Would you

11   expect a criminal interdiction deputy to have those

12   skills like from the get-go or would you expect them to

13   develop those skills over time?

14       A.   So I would like to have seen that they had some

15   training in that just to -- just for the sake of

16   learning curve is why I added that on there.

17       Q.   Understood.  Does that mean that the job

18   applicants for this position, like, listed out their

19   trainings for you?

20       A.   Yes, ma'am.

21       Q.   Okay.  And then "Advanced criminal roadside

22   interview techniques."  Would this be the same, they

23   would have listed out trainings that they had?

24       A.   Correct.

25       Q.   And does that mean that the roadside interview

1    was something that was part of almost every traffic stop

2    for interdiction?

3          A.   Yes, ma'am.

4          Q.   And that interview began as soon as the traffic

5    stop started or as soon as the traffic stop started.   Is

6    that fair?

7          A.   As soon as the driver contact was made.

8          Q.   Understood.   Okay.   I think we can put this to

9    the side right now.   I just want to make sure that we --

10   the date on this -- on this job description is

11   August 16th, 2022 on the second page.   Is that fair?

12         A.   Yes, ma'am.

13         Q.   Okay.   You can put this to the side for now.

14              I want to go back to our famous friend,

15   Exhibit 71.

16         A.   Yes, ma'am.

17         Q.   And I think we can skip a couple pages to page

18   176.   And the date on this weekly report would be

19   September 5th, 2022.   Did I get that right?

20         A.   Correct.

21         Q.   Okay.   Would you mind looking at the "For

22   Follow Up" section at the bottom of page 176?

23         A.   Yes, ma'am.

24         Q.   And it seems like the bullets got a little

25   messed up here, so I just want to read the second

1    bullet.

2         A.   Sure.

3         Q.   (Reading:)  Interdiction Unit interviews were

4    conducted.  Deputy Louie Estrada from East Patrol first

5    shift was selected.  (Status ETA of being transferred?)

6              Did I get that right?

7         A.   Yes, ma'am.

8         Q.   So it seems like the -- Deputy Babb transferred

9    out of the criminal interdiction unit as we looked at

10   just a couple minutes ago at the beginning of

11   August 2022 and then the position was filled

12   approximately four weeks later.  Is that fair?

13        A.   Yes, ma'am.

14        Q.   Okay.  Let's go to page 199.  And I understand

15   the date of this weekly report is November 27th, 2022?

16        A.   Yes, ma'am.

17        Q.   Okay.  "New Business".  Go to that section.

18        A.   Yes, ma'am.

19        Q.   I want to read that one.  (Reading:)

20   Interdiction Units will begin concentrating on

21   motel/hotel, bus/train station and airport interdiction

22   with UC TAG sections.

23              Did I get that right?

24        A.   Yes.

25        Q.   Can you explain to me, like, what's happening

Page 85

1    in this -- this bullet?

2         A.   So I believe it's probably around the time that

3    the criminal -- the actual criminal interdiction unit

4    was -- the mission had changed from highway interdiction

5    to assist with the UCs and TAG to be supportive of their

6    mission.  So they would be concentrating not on

7    interdiction, but more assisting with what their follow

8    ups would be.

9              But at the same time, concentrating on --

10   at their discretion if they weren't working with TAG,

11   they would be working the motel, hotel, bus, train

12   stations, and airport.

13        Q.   Got it.  So who made that decision?

14        A.   That was the sheriff's decision.

15        Q.   Okay.  So the sheriff decided to pull the

16   interdiction units off the highways and to focus on

17   these other things?

18        A.   Correct.

19        Q.   And these other things; we previously talked

20   about the interviews that the sheriff's office would do

21   at the bus station, the bus station operation?

22        A.   Correct.

23        Q.   Would the -- would the interdiction unit be

24   doing those kinds of interviews at the motel, hotel,

25   bus, train station, and airport interdictions?

Page 86

1      A.  Yes, ma'am.

2      Q.  Okay.  Was Deputy Molina part of this as well?

3      A.  Could have been, yes, ma'am.  Since he was

4  assigned to TAG, he may have been assigned to this also.

5      Q.  So do you know whether he was going to these

6  hotel, motel, bus station, train station, and airport

7  interdiction?

8      A.  I don't for sure.  But like I said before, his

9  deployment records would probably reflect that.

10      Q.  Okay.  And at this time, which was

11  November 27th, 2022, was the criminal interdiction unit

12  still doing traffic stops or did they completely stop?

13      A.  So, they -- I mean, they would do just like any

14  other patrolman.  If they saw any kind of violation,

15  they could do traffic stop at their discretion.

16      Q.  So it was at their discretion --

17      A.  Right.

18      Q.  -- whether they continued to do traffic stops?

19      A.  Correct.

20      Q.  Got it.  Okay.  Can we look at page 207?  And

21  the date on this report is January 2nd, 2023.

22      A.  Yes, ma'am.

23      Q.  And if you wouldn't mind looking at the

24  "Critical Issues."  It says, (Reading:)  Need more

25  deputies to expand interdiction units -- Interdiction

Page 87

1    Unit, excuse me.

2              Did I read that correctly?

3        A.  Yes, ma'am.

4        Q.  At this time in the beginning of 2023, were you

5    still asking to add more deputies back to interdiction?

6        A.  Yes, ma'am.

7        Q.  Okay.  Let's look at page 213.  I think we can

8    actually just skip this one.  Skip that.

9        A.  Okay.

10       Q.  We've already kind of done that.  We've done

11   that.  Can we look at page 242?  And just to date this,

12   it looks like to me this report is from Sunday,

13   May 14th, 2023.  I'm actually looking at page 240 right

14   now.

15       A.  Okay.  Yes, ma'am.

16       Q.  So I see in the subject here that it's "SpecOps

17   Units Weekly Reports", am I getting that right, the

18   subject?

19       A.  Yes, ma'am.

20       Q.  So we had previously looked at special

21   enforcement units in the -- on the first page -- on

22   page 1.  And now it's labeled "SpecOps Units Weekly

23   Reports".  Can you help me understand, like, did the

24   criminal interdiction unit then start falling under

25   special operations?

Page 88

1        A.   Yes, ma'am.

2        Q.   Got it.  So at one point, the criminal

3    interdiction just kind of blended into the special

4    operations unit?

5        A.   Correct.

6        Q.   Got it.  On page 242, then, which is the report

7    for Sunday, May 14th, 2023, can we look at the last two

8    bullets on this page?

9        A.   Sure.

10       Q.   (Reading:)  Interdiction Unit assisted with

11   TAG, T-A-G, VTCF and targeted West San Antonio, U.S.

12   Highway 90 West -- I don't think I read that right.  I'm

13   going to start that over.

14            Interdiction Unit assisted with TAG VCTF

15   and targeted West San Antonio, U.S. Highway 90 West and

16   Military surrounding areas for gang and criminal

17   activity conducting pedestrian and vehicle stops.

18            Did I get that right?

19       A.   Yes, ma'am.

20       Q.   Okay.  So what is TAG VCTF?

21       A.   TAG is Texas Anti-Gang.  VCTF is Violent Crimes

22   Task Force.

23       Q.   Got it.  Okay, that's helpful.

24            And help me understand this bullet.  So it

25   sounding like interdiction unit worked with the TAG

1   violent crime unit and targeted a specific area for

2   pedestrian and vehicle stops.  Am I understanding that

3   correctly?

4       A.  Yes, ma'am.

5       Q.  And what does that mean in this context?  Walk

6   me through what's happening.

7       A.  So they're working the area and making contact

8   with people who may have any kind of violent crimes

9   warrants or they're doing any kind of violent crimes

10  criminal activity, things of that nature.

11      Q.  So as I understand it, then, they're doing the

12  same kind of pedestrian stops we talked about with the

13  bus station?

14      A.  Correct.

15      Q.  They're saying, hey, can I talk to you, and

16  then talking to people and interviewing them.  Is that

17  fair?

18      A.  Correct.

19      Q.  Vehicle stops, same thing.  They're stopping

20  people for some kind of traffic violation --

21      A.  Right.

22      Q.  -- and then interviewing them?

23      A.  Correct.

24      Q.  Okay.  I think we can skip the rest of that.

25  Can we look at page 246, which the date of that would be

1    May 28th, 2023?

2         A.  Yes, ma'am.

3         Q.  Can we look at the "Accomplishments" bullet

4    section and look at the first one?

5         A.  Sure.

6         Q.  I see like a repeat Monday 5/22.  I'll skip

7    that part.  (Reading:)  SOU uniformed deputies targeted

8    UBC C10 West SATX with proactive traffic stops and

9    pedestrian stops on suspected criminal and gang

10   activity.

11                  Did I get that right?

12        A.  Yes, ma'am.

13        Q.  Okay.  What is SOU?

14        A.  Special Operations Unit.

15        Q.  Okay.  So the -- the uniformed deputies from

16   that unit.  Is that fair?

17        A.  Correct.

18        Q.  And what is UBC C10?

19        A.  Unincorporated Bexar County, Charlie 10 is the

20   district.

21        Q.  Okay.  So like an area of Bexar County?

22        A.  Correct.

23        Q.  And west, is that San Antonio, SATX?

24        A.  Yes.

25        Q.  So the SOU uniformed deputies targeted a

Page 91

1    specific area of Bexar County with traffic stops and

2    pedestrian stops.  Is that fair?

3         A.  Yes, ma'am.

4         Q.  These are the same kind of traffic stops and

5    pedestrian stops we talked about previously?

6         A.  Correct.

7         Q.  Okay.  Congratulations.  I think we're done

8    with 71.  I'm going to put these away.

9              Okay.  We need to set up an exhibit.

10             MS. HEBERT:  Joshua, can you get the cord?

11   I want to look at an Excel document.  And I'm trying to

12   avoid having to stop and take a giant break, so you

13   might just have to bear with us as we set up the

14   technology.  Let's just go off the record for a minute

15   while we get this up.

16             (Discussion off the record.)

17             (Exhibit No. 75 was marked.)

18        Q.  (BY MS. HEBERT)  Okay.  So we pulled up on the

19   big screen what is being marked as Exhibit 75.  I'm

20   handing Janalyn a placeholder worksheet for that.

21             Do you know what this Excel document is?

22   Trying to make sure that all the tabs are visible.  Have

23   you ever seen this before?

24        A.  No.

25        Q.  This is what has been labeled by Defendants as

Page 92

1    BC 12116.  It's an Excel spreadsheet.  And I'll

2    represent to you that it was labeled video reviews.  And

3    I -- what I understand it to be is video reviews from

4    specific time, like the record of it from you.  Do you

5    see your name here in the "Reviewing Supervisor"

6    section?

7        A.  Yes, ma'am.

8        Q.  Is that you?

9        A.  Yes.

10       Q.  Is that your officer number?

11       A.  That's my employee number.

12       Q.  Employee number?

13       A.  Yes, ma'am.

14       Q.  And I see a series of dates here of review

15   completed.  Would those be the dates that you completed

16   these reviews?

17       A.  I believe so, yes.

18       Q.  Okay.  And I see a group of officers here in

19   the "Recorded By" section?

20       A.  Yes, ma'am.

21       Q.  I see four officers like here total and I'm

22   happy to, like, filter it so we can confirm that.

23       A.  Yeah, I see Gereb, Hernandez, Babb, Aguillon.

24       Q.  Yeah, and those are all that I see.

25               Were you the supervising officer for all

Page 93

1   four of those folks in 2022?

2       A.  I believe so.

3       Q.  Okay.

4       A.  Now, they may have -- they may have, like John

5   Aguillon --

6       Q.  Sure.

7       A.  -- may have been moved from special

8   enforcement.  But they -- they hadn't moved him off of

9   my profile.  So I would still get his videos.

10      Q.  So you were still reviewing his videos even

11  though you weren't necessarily his supervisor?

12      A.  Correct.

13      Q.  Because the AXON system was pushing them to

14  you.  Is that fair?

15      A.  Correct.

16      Q.  Got it.  Okay.  And I'm going to just try to

17  make this as easy for us as possible.  I'm going select

18  the filtering option for the top rows just so we can see

19  the dates.  And I see three dates here for the reviews.

20  January 10th, January 20th, June 4th, 2022; is that

21  right?

22      A.  Correct.

23      Q.  Okay.  So there were three dates that you did,

24  like, AXON generated reviews --

25      A.  Correct.

Page 94

1      Q.  -- in 2022?

2      A.  Yes.

3      Q.  Did you review other footage than what AXON

4  prompted you to review?

5      A.  I may have.  Yes, ma'am.

6      Q.  Okay.  And if you did other review, it wouldn't

7  necessarily be captured in this Excel sheet?

8      A.  Correct.

9      Q.  Got it.  Did all four of the officers listed

10  here, even though I know you weren't supervising John

11  Aguillon at the time, did they all do traffic stops?

12     A.  They could, but not necessarily.

13     Q.  Okay.

14     A.  For example, Richard Hernandez was, at the

15  time, was the estray.

16     Q.  I didn't see that there were two Hernandezes.

17  Apologize.  There's a Jonathan Hernandez and a Richard

18  Hernandez.

19     A.  Yes, ma'am.

20     Q.  Understood.  Okay.  So there's actually five

21  officers here?

22     A.  Correct.

23     Q.  Got it.

24     A.  That I can see, yes.

25             Richard Hernandez was the estray deputy so

Page 95

1    he more than likely, unless it's something egregious,

2    would not make traffic stops.

3         Q.   Understood.   What about Jonathan Hernandez?

4         A.   Same thing.   So he was the animal cruelty

5    investigator --

6         Q.   Got it.

7         A.   -- so more than likely would not have any

8    traffic stops.

9         Q.   Understood.   So mainly Deputy Babb and Deputy

10   Gereb?

11        A.   Correct.

12        Q.   Okay.   And I guess would you say that both

13   Deputy Babb and Deputy Gereb followed the same routine

14   pattern of conducting a traffic stop?

15        A.   Yes, ma'am.

16        Q.   And of course there's going to be, like,

17   idiosyncratic differences --

18        A.   Right.

19        Q.   -- your style is maybe different than Deputy

20   Babb's style or Mr. Frigerio's style if they were

21   conducting traffic stops.   But -- so I guess I just want

22   to, like, understand what the bones would be that you

23   would be looking for Deputy Gereb and Deputy Babb's

24   traffic stops generally.

25              I mean, I guess would it be fair to say

1    that you expected them to stop the driver and pull to

2    somewhere safe to have a conversation?

3         A.  Yes, ma'am.

4         Q.  And would you -- would it be fair to say that

5    you expected the officer to get out and introduce

6    himself and say why they were stopping --

7         A.  Correct.

8         Q.  -- the driver?

9         A.  Yes, ma'am.

10        Q.  Would it be fair to say that you would expect

11   the officer to ask, for, you know, the driver's license

12   or an ID?

13        A.  Correct.

14        Q.  Would it be fair to say that you would expect

15   your officers to interview, ask questions of a driver?

16        A.  Yes.

17        Q.  Would it be fair that you would expect the --

18   your interdiction officers, Babb and Gereb to ask the

19   driver to get out of the vehicle?

20        A.  I don't expect it, but that was their way of

21   operating.

22        Q.  Okay.  Would it be fair to say that if they

23   asked the driver to get out of vehicle, you would expect

24   them to do a pat down?

25        A.  Yes, ma'am.

1      Q.  Okay.  Would it be fair to say that you would

2  expect both of them to have the driver come sit in their

3  patrol vehicle?

4      A.  Not expect them.  But at their discretion, they

5  would.

6      Q.  And that was their general practice?

7      A.  Yes, ma'am.

8      Q.  Okay.  Would you -- would it be fair to say

9  that you expected Deputy Gereb and Deputy Babb to

10 complete the citation or warning while interviewing the

11 driver in their patrol vehicle?

12     A.  Yes, ma'am.

13     Q.  Okay.  Would it be fair to say that you

14 expected both Deputy Gereb and Deputy Babb to ask for

15 consent to search the vehicle?

16     A.  If -- if they felt that there was reasonable

17 suspicion, yes.

18     Q.  Sure.  And I guess, would the default be ask

19 for consent first to search if there was reasonable

20 suspicion to ask for consent first as like the let's ask

21 for consent before taking any other step?

22     A.  If they did not have probable cause, they would

23 need to ask for consent.

24     Q.  Okay.  Got it.  But even if they had probable

25 cause, wouldn't they just ask for consent because if the

Page 98

1    driver consented, then you don't have to worry about

2    anything else later?

3         A.   They wouldn't need to ask if they had probable

4    cause.

5         Q.   Okay.  Looking back at the Excel sheet, there's

6    a column, I'm going to try to expand some of these

7    columns so you can see the whole title.  Just expand

8    them out, even if we have to like scroll over.  Do you

9    see this column that says "Selected Criteria" at the

10   top?

11        A.   Yes, ma'am.

12        Q.   And I see for every row it says "no concern

13   raised."

14              Do you see that?

15        A.   Yes, ma'am.

16        Q.   And does that mean that for every video you

17   reviewed, at least for this 2022 batch, you didn't have

18   any concerns?

19        A.   Correct.

20        Q.   Okay.  I want to look at the next column.  And

21   I'm going to scroll down to -- there's an optional note

22   this column is titled "Optional Note."  I'm going to

23   scroll down to where I see one optional note.  I don't

24   see any others so far.  Do you see any others?

25        A.   No.

Page 99

1        Q.   Just one note.

2        A.   Yes, ma'am.

3        Q.   I'm reading "be aware of your camera

4    recording"; is that right?

5        A.   Yes, ma'am.

6        Q.   And I'm going to scroll over.  This was on a

7    deputy recorded by Deputy Babb; is that correct?

8        A.   Correct.

9        Q.   What -- what were you talking about here?

10       A.   Without looking at the video, I'm not sure.  It

11   could have been anything.

12       Q.   Okay.  Sure.  Okay.  I think we're done with

13   that exhibit for now.  We'll just leave it up in case we

14   need to use the computer so we don't have to worry about

15   it.

16              Let's look at Exhibit K.  And we're going

17   to mark this Exhibit 76.

18              (Exhibit No. 76 was marked.)

19       Q.   (BY MS. HEBERT)  Okay.  My colleague is handing

20   you what's been marked Exhibit 76.  Can you take a look

21   at this and just, like, briefly flip through it.  And

22   I'm going to -- let me know when you're ready.

23              MR. WINDHAM:  I have at least one more copy

24   that wasn't scrambled.

25              THE WITNESS:  Okay.

Page 100

```
 1         Q.  (BY MS. HEBERT)  Do you know what this document
 2    is?  Can you tell me, describe what it is?
 3         A.  It's a snapshot of the AXON body camera.
 4         Q.  Okay.  So would it be fair to say, then, that
 5    this exhibit, Exhibit 76, is just a series of AXON body
 6    camera records?
 7         A.  Yes.
 8         Q.  Okay.  Let's go to BC 12065.  Okay.  And I'm
 9    going to look at the picture on page 12065.  And in
10    the -- in the picture, I see some text, in the text of
11    the left side -- left upper side of the picture.  I see
12    the date March 16th, 2022.
13              Do you see that?
14         A.  Yes, ma'am.
15         Q.  And I see the timestamp of 11:13 a.m.
16              Do you see that?
17         A.  Yes.
18         Q.  Okay.  I'm going to represent to you that the
19    traffic stop of Mr. Schott took place on 3/16/2022 at
20    approximately 11:15 a.m.  Does that sound right to you?
21         A.  Yes, ma'am.
22         Q.  Okay.  Looking at the text on the right-hand
23    column of 12 -- of BC 12065 and BC 12066 and to 12067
24    and 12068 all the way to, let's see, BC 12078, it seems
25    like on that right-hand column, this is a transcript of
```

Page 101

1    what is happening in the body camera footage.  Is that

2    fair?

3        A.  Yes, ma'am.

4        Q.  Have you seen this before?

5        A.  No.

6        Q.  Have you seen, like, the ability to generate a

7    transcript from the body camera footage before?

8        A.  The actual text?

9        Q.  Not like this text in general.  But have you

10   seen, like, the AXON software --

11       A.  Yes.

12       Q.  -- can generate a transcript?

13       A.  Yes.

14       Q.  Is that a fair understanding?

15       A.  Yes.

16       Q.  AXON software can generate a transcript of what

17   happened in the body camera footage?

18       A.  Yes, ma'am.

19       Q.  Okay.  Is there -- do you know if there's a way

20   to download that transcript?

21       A.  I don't know.

22       Q.  Okay.  Sure.

23       A.  Are you talking about just the transcript

24   itself?

25       Q.  Yeah.  Like this -- this -- I mean, we clearly

Page 102

1     have a transcript in the right margin.  And it's kind of
2     hard to read as you can see.  Like, obviously it's,
3     like, a very narrow and very tiny print.  So do you know
4     if there's a way to download it, to say oh, generate the
5     transcript?
6          A.  Only -- yeah, no, I don't.
7          Q.  Okay.  Can we look -- flipping through the
8     pages here --
9          A.  If I -- if wanted to.
10          Q.  Sure.
11          A.  I would probably highlight everything
12     transcribed and put it on to another Word document,
13     blank, to maybe help me read it if -- if I had that
14     trouble.
15          Q.  Go it.  You'd copy and paste it into a Word
16     document?
17          A.  Yeah.
18          Q.  Understood.  Thank you.
19                    So I want to look at generally from page
20     160 -- 1265 to -- all the way to 12083.  Do these pages
21     reflect records from the body camera footage of Deputy
22     Babb on -- at the traffic stop of Mr. Schott?
23          A.  Let me check.  Well, it goes to page 12081,
24     No. 18, I believe.  Because then it changes to
25     April 12th.

Page 103

1      Q.  To page No. 18.  Okay.  I see -- I see where

2   you're looking at.  Page 12081.

3      A.  Yes, ma'am.

4      Q.  Let's just go there.  So I see you're looking

5   at row 18 on BC 12081.  Is that fair?

6      A.  Yes, ma'am.

7      Q.  So what does this row reflect?

8      A.  The -- I would say, the date of the incident.

9      Q.  This is a --

10     A.  No, I'm sorry.  It's -- so it would be

11  different.

12     Q.  So I see a date of March 18th, 2022?

13     A.  Yes, ma'am.

14     Q.  And in the user column, I see Deputy Babb.  Is

15  that fair?

16     A.  Yes, ma'am.

17     Q.  Okay.  And then, I think let's go to the

18  "Activity" section.  Do you see "Evidence Record

19  Streamed"?

20     A.  Yes.

21     Q.  Okay.  And so --

22     A.  Accessed.  "Evidence Record Accessed."

23     Q.  Oh, I was looking at row 18.  But if you're --

24  are you looking at row 16 then?

25     A.  Oh, sorry.  I was -- yeah.  I see where you're

Page 104

1    at now.

2         Q.   Now I see where you are.  Let's look at row 16.

3    Row 16, the date on row 16 is what?

4         A.   The date is 18 March 2022.

5         Q.   The user is who?

6         A.   Babb, Deputy Babb.

7         Q.   And the activity is what?

8         A.   Evidence record accessed.

9         Q.   Okay.  So I'm going to flip back to page 12080.

10   And let's look at the -- the title here looks like

11   "Evidence Audit Trail."  Am I reading that right?

12        A.   Oh, yes, ma'am.

13        Q.   And I see the record start date is March 16th,

14   2022, 11:13.  Am I reading that right?  It's a -- a row

15   kind of on the left side, I see record start.

16        A.   Okay.

17        Q.   Do you see that March 16th, 2022, 11:13?

18        A.   Yes, ma'am.

19        Q.   And the next row is uploaded 16th March 2022,

20   1504?

21        A.   Yes, ma'am.

22        Q.   Uploader, I see Deputy Babb; is that correct?

23        A.   Yes, ma'am.

24        Q.   So it's my understanding based on this record

25   of BC 1280 and then the subsequent pages, this is the

1   evidence audit trail for Deputy Babb's body camera from

2   March 16th, 2022.  Is that fair?

3       A.  Yes, ma'am.

4       Q.  And this would be some of the body camera

5   footage from Deputy Babb; is that right?

6       A.  Correct.

7       Q.  And so do the next couple of pages each of the

8   rows reflect access to or what happened with that body

9   camera footage?

10      A.  Yes, ma'am.

11      Q.  Okay.  So it looks like -- let's just start

12  with row 1.  It looks like that's the -- the date on

13  that is March 16, 2022?

14      A.  Yes, ma'am.

15      Q.  And the time is 1500 hours 04 minutes.  So that

16  would have been what, 3:00 p.m.?

17      A.  Yes, ma'am.  3:04 p.m.

18      Q.  And that's when the evidence record was

19  created.  Is that fair?

20      A.  Yes, ma'am.

21      Q.  And then I see the next line of activity,

22  "Retention Level Updated"; is that right?

23      A.  Retention level updated.

24      Q.  In the activity row, the activity column?

25      A.  Oh, yes, ma'am.

Page 106

1    Q.  So it seems like the next -- all of these rows

2    that kind of follow it, at least for the initial part,

3    are all March 16th, 2022 and it seems to me that they

4    reflect the body camera footage being added to the

5    system.  Is that fair?

6    A.  Yes, ma'am.

7    Q.  Okay.  Then let's flip to the next page.  And

8    again on the next page, I see in row 13, I see the date

9    is different.

10                Do you see that?

11   A.  Correct.  Yes, ma'am.

12   Q.  And that's two days later, after the stop.  Is

13   that fair?

14   A.  Yes, ma'am.

15   Q.  March 18th, 2022?

16   A.  Yes, ma'am.

17   Q.  And the user here is Deputy Babb; is that

18   right?

19   A.  Yes, ma'am.

20   Q.  And the activity is the evidence record was

21   accessed.

22   A.  Yes, ma'am.

23   Q.  So does that mean on March 18th, 2022 p.m. at

24   the time here, 3:12 p.m., Deputy Babb accessed his body

25   camera footage?

Page 107

1          A.  Yes, ma'am.

2          Q.  And it looks like the next few rows, up until

3     row 18, are all about Deputy Babb accessing and

4     streaming his body camera footage on March 18, 2022?

5          A.  Yes, ma'am.

6          Q.  Okay.  The next date that I see is row 19 with

7     April 12th, 2022.

8               Do you see that?

9          A.  Yes, ma'am.

10          Q.  And the user there is Lieutenant Ortega --

11     Lieutenant Marta Ortega?

12          A.  It's -- LE is law enforcement Sergeant Ortega.

13          Q.  Oh, excuse me.  Yeah, thank you for correcting

14     me.  Sorry.  Sergeant Marta Ortega accessed the body

15     camera footage on April 12th, 22; is that right?

16          A.  Correct.

17          Q.  And she was the -- at this time -- okay, I'd

18     just like to put a bow on it.  Sergeant Marta Ortega

19     previously was Sergeant Marta Rodriguez; is that right?

20          A.  Correct.

21          Q.  Okay.  So Sergeant Marta Ortega accessed and

22     reviewed, it looks like, the body camera footage in all

23     of those rows from 19 through 21 are her accessing it

24     and reviewing that footage.  Is that fair?

25          A.  Yes, ma'am.

Page 108

1       Q.  On April 12th, 2022?

2       A.  Yes, ma'am.

3       Q.  And it looks like the next one is row 22, also

4    April 12th, 2022; is that right?

5       A.  Yes, ma'am.

6       Q.  And the date on that is -- or the time on that,

7    excuse me, is 12:38 p.m.; is that right?

8       A.  Yes, ma'am.

9       Q.  And it seems like the next user is you.

10      A.  Correct.

11      Q.  Is that fair?

12      A.  Yes, ma'am.

13      Q.  So did you access and review Deputy Babb's body

14   camera footage on April 12th, 2022?

15      A.  I would have, yes, ma'am.

16      Q.  Okay.  It seems like that is generally like

17   the -- the same time frame around in the 12 o'clock hour

18   you accessing until you get to row 28.  And then it

19   seems like row 29, you accessed the body camera or

20   watched the body camera again at 1700 hours on

21   April 12th.  Is that fair?

22      A.  Yes.

23      Q.  And you watched the body camera footage in some

24   capacity or another until -- all during the 1700 hour

25   which is what, 6:00 p.m.?

1          A.  5:00.

2          Q.  5:00 p.m.  Thank you.  Sorry, I'm not good at

3     the 24-hour clock.  The 5:00 p.m. hour.

4               I want to look at then row 34.  It looks

5     like on April 18th someone else accessed the body camera

6     footage?

7          A.  Yes, ma'am.

8          Q.  I see --

9          A.  Detention.

10         Q.  -- Detention Lieutenant Castillo?

11         A.  Yes, ma'am.

12         Q.  Who is Detention Lieutenant Castillo?

13         A.  I believe she was assigned to maybe open

14    records at the time.

15         Q.  Okay.  So this is maybe the open records

16    request access?

17         A.  Correct.

18         Q.  Got it.  That's helpful.

19              So it looks like she accessed it until

20    row -- and her entries are until row 43, is that fair,

21    on page 12082?

22         A.  Yes, ma'am.

23         Q.  And then at row 44, it looks like Sergeant

24    Marta Ortega accessed the body camera footage again; is

25    that correct?

Page 110

1          A.   Yes, ma'am.

2          Q.   And, again, Marta Ortega's entries run to row

3     54, and I see two dates; May 16th and May 17th.  Is that

4     fair?

5          A.   Yes.

6          Q.   And then row 55, it looks like Lieutenant

7     Castillo accessed it again; is that right?

8          A.   Yes, ma'am.

9          Q.   And then -- we'll continue -- let's look at row

10    58.

11         A.   Okay.

12         Q.   I see the date of October 2022, October 7th of

13    2022?

14         A.   Yes, ma'am.

15         Q.   And I see that the user for these last three

16    entries is Deputy Ross Garza.

17              Do you see that?

18         A.   Yes, ma'am.

19         Q.   Who's Deputy Ross Garza?

20         A.   He's a training academy instructor.

21         Q.   Okay.  So Exhibit 58 through 60, a training

22    academy instructor accessed and streamed Deputy Babb's

23    body worn camera footage from Alek Schott's stop?

24         A.   Correct.

25         Q.   I think my computer just went to sleep or

Page 111

 1    something.  Can you help me bring that back on.  Don't

 2    know why.  Don't look.  Don't even remember my password

 3    sometimes.  Sorry about that.  Went to sleep.  I don't

 4    know if we need it, but I want it there.

 5                   Can we look back at BC 12083?  These last

 6    three rows with Deputy Garza, you mentioned he was with

 7    the training academy at the time?

 8         A.  Correct.

 9         Q.  Why would he be accessing Deputy Babb's body

10    worn camera footage?

11         A.  I -- I don't know.

12         Q.  Okay.

13         A.  Now, they do have the ability for training to

14    access body camera footage.  But I'm not sure why, if

15    that's what he was using it for or if open records

16    requested him to look at it and see if anything stuck

17    out.

18         Q.  Sure.

19         A.  That he wanted to, you know, let them know

20    about.  So no idea.

21         Q.  Sure.  Thanks.

22                   Okay.  I think we can put that to the side

23    for now.

24                   MS. HEBERT:  Let's -- let's get out Exhibit

25    O, Mr. Windham.

Page 112

```
 1         Q.  (BY MS. HEBERT)  And I'll just ask you a couple
 2    questions before we hand that out.
 3              During your first deposition, we talked
 4    about how the criminal interdiction deputy assignment
 5    was categorized as temporary assignment.  Do you
 6    remember that?
 7         A.  Yes.
 8         Q.  And you mention that the orders assigning
 9    officers to the criminal interdiction unit would have
10    had an indication that the assignment was temporary?
11         A.  Correct.
12         Q.  I want to look at some of those orders just so
13    that I understand what I'm looking at because I don't
14    necessarily always understand what the -- what the text
15    is.
16         A.  Sure.  76.
17              MR. WINDHAM:  Exhibit 77.
18              (Exhibit No. 77 was marked.)
19         Q.  (BY MS. HEBERT)  Take a second to review this.
20    Let me know when you're ready.
21         A.  Okay.
22         Q.  Is this the order assigning Deputy Gereb to you
23    for work in the criminal interdiction unit in July of
24    2020?
25         A.  Yes, ma'am.
```

Page 113

1      Q.   Okay.  And I don't see the language criminal

2  interdiction unit anywhere on here.  Is that fair?

3      A.   No, yeah, you're right.

4      Q.   And why?  Why not?

5      A.   I believe because it was just a pilot program,

6  I'm going to assume.

7      Q.   Sure.  But I don't see the word pilot program

8  on here either?

9      A.   Correct.

10      Q.   Okay.  And --

11      A.   Oh, I'm sorry.  (Reading:)  Reassigned to

12  Administration Support Bureau, Strategic Operations

13  Crime Interdiction Unit.

14      Q.   Oh, yeah, you're right.  Thank you.  This is

15  why I'm asking you these questions about it.  Okay.

16           And I do see -- and I didn't realize this

17  now, like, I am learning this with you.  It seems like

18  the reassignment is temporary in accordance with the

19  provision of the rules of Bexar County.  And there's a

20  bunch of other sentences.  Is that what you're referring

21  to?

22      A.   Yes, ma'am.

23      Q.   Are there rules in the Civil Service

24  Commissioning and Bargaining Agreement here that deal

25  with the temporary assignment, or are they just -- is

Page 114

1    there just like, the reassignment is temporary, and then

2    these are the general rules that apply to all positions?

3         A.   Correct.  Yes, ma'am.

4         Q.   Okay.  That's helpful.  I think that's all we

5    need to do with that.  So you can put that to the side.

6         A.   Okay.

7              MS. HEBERT:  Let's look at Exhibit N,

8    Mr. Windham.  And this would be Exhibit 78.

9              (Exhibit No. 78 was marked.)

10        Q.   (BY MS. HEBERT)  Do you mind taking a look at

11   this one as well?

12        A.   Sure.

13        Q.   Let me know when you're ready.

14        A.   Yes, ma'am.

15        Q.   Okay.  The date on this document is April 30th,

16   2021.  Is that fair?

17        A.   Yes, ma'am.

18        Q.   And, again, I think it governs Deputy Gereb; is

19   that correct?

20        A.   Correct.

21        Q.   And I'm not entirely sure what's going on here,

22   so help me out, explain.  It looks like Deputy Gereb is

23   being reassigned to the Admin and Support Division

24   Special Enforcement Unit from the Law Enforcement

25   Bureau.  So can you explain to me, like, what happened?

Page 115

1      A.  So there was a time during this period where

2  Deputy Gereb was transferred back to patrol for

3  personnel shortages --

4      Q.  Sure.

5      A.  -- and then brought back over.

6      Q.  Okay.  So is this the reassignment then to

7  him -- of him to you?

8      A.  Again, yes, ma'am.

9      Q.  Okay.  And so I see instructions, (Reading:)

10  You are to report to Sergeant Pedro Gamboa, is -- so on

11  April 30th, 2021, Deputy Gereb was assigned back to

12  criminal interdiction.  Is that fair?

13      A.  Correct.

14      Q.  Okay.  And comparing this exhibit, Exhibit 78

15  with Exhibit 77.

16      A.  Yes, ma'am.

17      Q.  If we look at the -- this reassignment section,

18  it seems like the word "temporary" is no longer a part

19  of this version of the order.  Is that fair?

20      A.  Correct.

21      Q.  So the reassignment when Deputy Gereb was

22  reassigned back to you in August -- or April 30th, 2021,

23  the assignment was no longer listed as temporary?

24      A.  Correct.

25              MS. HEBERT:  Okay.  I want to look at

Page 116

 1    another exhibit, Mr. Windham.

 2                    THE WITNESS:  We're done with this one?

 3                    MS. HEBERT:  Yeah, you can put that one to

 4    the side.  Exhibit M.

 5                    (Exhibit No. 79 was marked.)

 6         Q.  (BY MS. HEBERT)  My colleague is handing you

 7    what's been marked Exhibit 79.  Sergeant Gamboa, what is

 8    this document?

 9         A.  It's a transfer order for Deputy Babb.

10         Q.  Okay.  And I see special enforcement unit is

11    the assignment and I see your name, (Reading:)

12    Instructions:  You are to report to Sergeant Pedro

13    Gamboa.

14                    Do you see that?

15         A.  Yes, ma'am.

16         Q.  Is this the assignment the order assigning

17    Deputy Babb to the criminal interdiction unit?

18         A.  Correct.

19         Q.  Okay.  And I don't see "temporary" on this

20    order either.  Is that fair?

21         A.  Yes, ma'am.

22         Q.  So the assignment of Deputy Babb to the

23    criminal interdiction unit was not listed as temporary?

24         A.  Correct.

25         Q.  Okay.  I want to watch a couple videos, so

Page 117

1    you're going to have to bear with me as I figure -- as I

2    navigate that.  Hold on, because this is going to take

3    me a couple minutes.

4                    MR. WINDHAM:  Do you want to go off the

5    record?

6                    MS. HEBERT:  Yeah, do you mind just taking

7    a quick pause.  Unless anybody needs a break, we won't

8    take a break.

9                    (Brief recess.)

10    Q.  (BY MS. HEBERT)  So we're back on the record

11    after now we got the tech set up.  I'm going to

12    introduce an exhibit.  This exhibit was produced as BC

13    1084.  Okay.  Didn't work.  Hold on one second.  We just

14    had a technology issue pop up.  I don't know what's

15    going on.  Hold on, please.  We might have to take a

16    longer break.  Something's not right.  Let's go off the

17    record and I'll try to figure out what's going on.

18                    (Brief recess.)

19    Q.  (BY MS. HEBERT)  Okay, we're back on the

20    record.

21                    We're going to hand you what is being

22    marked exhibit -- we're going to play what's being

23    marked Exhibit 80.  I'm handing Janalyn the place holder

24    sheet for Exhibit No. 80.

25                    (Exhibit No. 80 was marked.)

Page 118

1          Q.   (BY MS. HEBERT)  Just so everybody is aware,

2     this is BC 10842.  We're going to watch part of the

3     video here.  You're welcome to watch the entire thing.

4     We can take another break and you can catch the whole

5     thing.  But I'm -- as I said before, I'm going to try to

6     focus on, like, specific parts.  So we're not watching

7     the whole 57 minutes.

8          A.   Sure.

9          Q.   I'm going to summarize to you what happened in

10    like, the first 11 minutes here.  Deputy Gereb stopped a

11    car that had been going 107 miles per hour on the

12    highway, driving recklessly.  The driver was a young

13    male, late teens to early 20s.  There were two teenage

14    girls in the car with him that he has sit over the side

15    and they're getting picked up by their parents.  We're

16    going to watch the part where Deputy Gereb starts to

17    search the car.

18         A.   Okay.

19         Q.   Okay.  And I'm going to play from minute -- 11

20    minutes and 9 seconds to 11 minutes and 23 seconds.

21         A.   And just for the sake -- was there a pursuit?

22         Q.   There was not a pursuit.  I don't think so.

23    Not what I saw on the body camera footage and Deputy

24    Gereb doesn't really say anything about, like, a

25    pursuit.

Page 119

```
 1        A.   Okay.

 2        Q.   And the date on this body camera footage is

 3   3/10/2022.

 4        A.   Okay.

 5        Q.   I'm going to play from 11:09 to 11:23.

 6             (Video playing.)

 7        Q.   (BY MS. HEBERT)  I stopped at 11:24.  Sorry.  A

 8   little longer.  I saw Deputy Gereb there.  I heard his

 9   voice begin to search a vehicle, looks like he found

10   illegal narcotics in the car.  Is that fair?

11        A.   Yes, ma'am.

12        Q.   I'm going to watch.  I'm going to skip ahead to

13   another point.  I'm going to watch 13-something.  Let's

14   skip to 13:19 to 14:10.  So we'll watch about a minute.

15             (Video playing.)

16        Q.   (BY MS. HEBERT)  Okay.  We stopped at 14:12.

17   And what I understood just happened in the clip was

18   Deputy Gereb and Deputy Babb were having a conversation

19   at the traffic stop.  Is that fair?

20        A.   Yes, ma'am.

21        Q.   And seems like Deputy Gereb had concluded that

22   the driver was a drug dealer.  Is that fair?

23             THE REPORTER:  Is what?

24             MS. HEBERT:  A drug dealer.

25             MR. FRIGERIO:  Objection, form.
```

```
                                              Page 120
```

1        Q.   (BY MS. HEBERT)  We can go back and watch what

2    we just watched.  We'll watch -- we'll go back to 3:19.

3    I think -- no offense, Mr. Windham, he sneezed during

4    the part.

5                  MR. WINDHAM:  Apologies.  I have a knack

6    for timing.

7                  MS. HEBERT:  We'll watch from 3:19 forward

8    and watch it again.  So 3:19.  I'll stop it in a minute.

9                  (Video playing.)

10       Q.   (BY MS. HEBERT)  Okay.  Did you hear a

11   conversation between Deputy Babb and Deputy Gereb on

12   that clip?

13       A.   Yes.

14       Q.   Did Deputy Gereb say that the driver was going

15   down for dealing?

16       A.   Yes.

17       Q.   Okay.  Based on the evidence that Deputy Gereb

18   found in the vehicle?

19       A.   Yes, ma'am.

20       Q.   Okay.  I'm going to watch from -- or play from

21   3:37:20.  So we're going to try to get to 3:37:20.  Come

22   on.  So we're going to start -- I'm going to play 37:20

23   to about 38.

24       A.   Okay.

25                  MS. HEBERT:  It might have frozen.  Yep,

Page 121

1    that's the freezing that I'm talking about.  Can we

2    switch to yours?

3                    MR. WINDHAM:  Sure.

4        Q.  (BY MS. HEBERT)  Sometimes, I don't know why it

5    does this, it freezes when I try to skip, like, large

6    sections of the video.

7        A.  I see.

8        Q.  We're going to mark this for the record as

9    Exhibit 80A, and we'll produce both videos.  They're the

10    same file but different -- different sources and so I

11    want to make sure that it's clear that Defendants have

12    access to both videos that were played and, you know,

13    there's no one -- no one is trying to trick anybody

14    here.

15                    MR. WINDHAM:  How do you want to do this,

16    hand you my laptop or plug it in?

17                    MS. HEBERT:  Can we hand it to you?

18                    MR. WINDHAM:  Sure.

19                    MS. HEBERT:  Or we can try it -- let's try

20    plugging it in.  Let's just try it.

21                    MR. WINDHAM:  Sure.

22                    MS. HEBERT:  And I will -- if it doesn't

23    work, it doesn't work.

24                    MR. WINDHAM:  Sure.

25                    (Exhibit No. 80A was marked.)

```
                                                    Page 122
 1        Q.  (BY MS. HEBERT)  Same video.  We're marking

 2    this video as 80A, just so that there's consistency.

 3    Let's go to 37:20.  Are you there?  We're going to play

 4    to approximately 38 minutes.

 5               (Video playing.)

 6        Q.  (BY MS. HEBERT)  Okay.  In the clip that we

 7    just watched from 37:20 to 38, seemed like Deputy Gereb

 8    was counting money that he found in the driver's

 9    vehicle.  Is that fair?

10        A.  Yes, ma'am.

11        Q.  Okay.  And I heard Deputy Gereb say "I'll talk

12    to the sarge, see if he want me to take the money."  Did

13    you hear that?

14        A.  Yes.

15        Q.  Okay.  Would the sarge be you?

16        A.  Yes.

17        Q.  Okay.  When criminal interdiction officers

18    found cash in a vehicle, did you expect them to call

19    you?

20        A.  Yes.

21        Q.  Why?

22        A.  Just if it meets the criteria for asset

23    forfeiture.

24        Q.  Okay.  And what is the criteria for asset

25    forfeiture?
```

Page 123

1          A.  Minimum $1500.

2          Q.  Okay.  Why would the amount matter?

3          A.  Because 1500 and it being money obtained

4     through the illicit criminal activity would be another

5     charge, which would be the money laundering charge.

6     Anything under that, I -- I could approve to still take

7     the money and place it for evidence as money obtained

8     from the illicit drug sales.

9          Q.  Okay.  Got it.  That's helpful.  I think that

10    we're done with that exhibit.

11               MS. HEBERT:  Josh, I'm going to hand you

12    this flash drive.  You can plug it into your computer?

13               MR. WINDHAM:  You want me to unplug this?

14               MS. HEBERT:  Oh, just turn it off for now.

15    And we'll plug that in so -- there's a document I want

16    to show.  I think this is the version.  Just plug it in.

17    And the Excel file right there.

18               I don't have place holder for you for this

19    one.  My apologies.  And what number are we on?

20               THE REPORTER:  81.

21               MR. WINDHAM:  It will be 81.

22               (Exhibit No. 81 was marked.)

23          Q.  (BY MS. HEBERT)  Okay.  I am showing you BC

24    16571.  I'm going to scroll up to the top here.  We are

25    marking this as Exhibit 81.  We'll provide a copy to the

Page 124

1     court reporter.

2               Do you know what this document is?

3        A.   That's the Criminal Interdiction Unit Activity

4     Sheet.

5        Q.   Okay.  And I see the date of July 1st, 2020 to

6     October 19th, 2020 on the document.  What is that

7     talking about?

8        A.   The dates provided, I believe, for -- for this

9     document.

10       Q.   Okay.  And I see badge No. 401.  Do you know

11    who badge 401 is?

12       A.   That would be the sheriff.

13       Q.   Okay.  So that's the sheriff's badge.  Thank

14    you.  That's helpful.

15               And I see a bunch of data.  Looks like

16    consent and probable cause searches in the officer

17    initiated activity.  Am I reading that right?

18       A.   Yes, ma'am.

19       Q.   And I see a number of traffic stops, 214.

20    Would that be the number of the traffic stops that the

21    interdiction team did probably in this time period?

22       A.   Probably.  Yes, ma'am.

23       Q.   Okay.  I want to look at this number here.

24    "Currency recovered" I see the number $456,937.  Seems

25    like a lot of currency recovered for a couple months?

Page 125

 1          A.   I think that's a typo.

 2          Q.   Who -- where would the typo be?

 3          A.   That -- that number.

 4          Q.   Okay.  What would you expect the number to be?

 5          A.   I would have known if we had recovered that

 6     much money.

 7          Q.   So you didn't recover that much money, to your

 8     knowledge?

 9          A.   Right.

10          Q.   Cool.  What would you -- where would you expect

11     the number to be?  Where would the range generally be?

12          A.   I mean, it just depends.  I mean, that's a

13     significant amount.  So I don't remember at any point

14     that we'd have that much in currency recovered.

15          Q.   Sure.

16          A.   Now with our -- now with the TAG, we did

17     recover in a case $608,000.

18          Q.   $608,000?  Okay.

19          A.   So I don't -- but, again, I don't know if they

20     use that money or if that's the sheriff making this --

21     filling out this activity sheet for those dates.  I'm

22     not sure where that money would come from.

23          Q.   So have you ever seen this document before?

24          A.   This one specifically, no.

25          Q.   Okay.  That's okay.  So you haven't seen this

Page 126

1    document before and you don't know who filled it out?

2        A.  Correct.

3        Q.  What's the most the criminal interdiction unit

4    ever recovered?

5        A.  If I can remember, it was probably less than

6    10,000.

7        Q.  Okay.

8        A.  At any specific time.

9        Q.  And the minimum would have been zero?

10       A.  Right.

11       Q.  So somewhere between zero and 10K is the

12   general recovery for the criminal interdiction unit if

13   they found currency?

14       A.  Right.

15       Q.  Okay.  Do you know what the -- I know that --

16   let me back up.  I know the criminal interdiction unit

17   officially ran from 2019 to sometime in 2023.  Is that

18   fair?

19       A.  Correct.

20       Q.  Do you know what the total amount the criminal

21   interdiction recovered would be?

22       A.  I don't.

23       Q.  Okay.  Do you -- did you have any yearly totals

24   on what the criminal interdiction unit recovered?

25       A.  I'm sure there was.  I just -- I just don't

1    know the amount.

2         Q.   Sure.  And did you compile those statistics?

3         A.   I would have.

4         Q.   Okay.  So somewhere in your files or at the

5    county's files, there should be a total amount recovered

6    per year?

7         A.   Right.

8         Q.   Okay.  Thank you.  I have -- we just got some

9    of these documents yesterday so I haven't, like, read

10   all of them so I'll just be a hundred percent

11   transparent with you.  There's one document that I want

12   to ask you about.

13        A.   Sure.

14        Q.   I don't -- I haven't read it.  I just want to

15   ask what it was used for --

16        A.   Sure.

17        Q.   -- if that's okay?

18             MS. HEBERT:  Let's turn this off for a

19   second so I can navigate through Mr. Windham's computer.

20   Wrong one.  Sorry.  I know I'm just, like, taking over

21   your computer without much notice.

22             They are labeled.  Sorry, Charles.

23        Q.   (BY MS. HEBERT)  Okay.  I'm showing you what is

24   BC 16581.  We're going to mark this electronically as

25   Exhibit --

Page 128

```
 1              MS. HEBERT:  What number are we on,
 2    Mr. Windham?
 3              MR. WINDHAM:  82.
 4              MS. HEBERT:  82.  So this is Exhibit 82.
 5    We do not have a place holder.
 6              (Exhibit No. 82 was marked.)
 7              MS. HEBERT:  But we'll provide you an
 8    electronic copy to add to the file.
 9        Q.  (BY MS. HEBERT)  Sergeant Gamboa, have you ever
10    seen this before?
11        A.  Not that I can recall.
12        Q.  I see your name is on the first page, Sergeant
13    Pete Gamboa.  Why would your name be on the first page?
14        A.  Because I was part of the unit.
15        Q.  Okay.  Do you know who gave this presentation?
16        A.  It could have been both Deputy Louie Estrada
17    and Deputy Gereb.  I don't know if -- so at one time
18    they were helping the Explorer program.
19        Q.  The, like, youth program for the sheriff's
20    office?
21        A.  Yes.  Yes.  So I'm not sure if this
22    presentation was for that.  But they would probably
23    know.
24        Q.  You didn't give this presentation?
25        A.  No.
```

Page 129

1          Q.   Okay.   That's it.   That's all I want to ask

2      about that one.

3          A.   Okay.

4          Q.   I just didn't realize.

5          A.   So I believe that -- that narcotics was the

6      recovery from Max and Deputy Molina when, remember I

7      talked about that -- the dog -- the team is so good in

8      training that he smelled the narcotics through the gas.

9          Q.   Sure.

10         A.   That's what --

11         Q.   That's where that is from?

12         A.   Yeah.

13         Q.   They cleaned it up?

14         A.   Yeah.

15         Q.   And took the gas off of it?

16         A.   Okay.

17         Q.   Okay.   I think we can turn off the screen

18     hopefully and not come back to it.   I want to ask a

19     couple more questions and then cut you loose, hopefully.

20         A.   Okay.   Sure.

21         Q.   So we've talked about previously the -- I don't

22     expect you to remember this date, so I'll just keep

23     reminding you on it.   The traffic stop with Mr. Schott

24     happened on March 16th, 2022.   We've talked about that a

25     couple of times.   Mr. Schott called and complained on

```
                                              Page 130
 1    March 18th, 2022.  And during your last deposition, we
 2    talked about how you spoke with Mr. Schott on
 3    April 12th, '22.  Do you remember that?
 4         A.  Yes.
 5         Q.  Okay.  Do those dates generally sound right to
 6    you?
 7         A.  Yes, ma'am.
 8         Q.  Okay.  And after you spoke with Mr. Schott on
 9    April 12th, 2022, did you think that Mr. Schott was
10    going to file a lawsuit?
11         A.  No.
12         Q.  Did you think there was a possibility he might?
13         A.  No.
14         Q.  Okay.  Mr. Schott filed this lawsuit on
15    June 1st of 2023.  How did you learn about it?
16         A.  I believe it was through Captain Von Muldau.
17         Q.  Okay.  So the captain notified you in some way?
18         A.  Yes, ma'am.
19         Q.  And what did -- what did you learn from Captain
20    Muldau?
21         A.  Just that Mr. Schott had filed the case in
22    federal court.
23         Q.  Okay.  Anything else?
24         A.  That was pretty much it.
25         Q.  Sure.  Did Captain von Muldau give you any
```

Page 131

1    instructions as part of...

2         A.   So the only thing that he had asked was about

3    the auditing of -- through Vigilant for Mr. Schott's

4    license plate.

5         Q.   Okay.  So Captain von Muldau asked about the

6    Vigilant license plate reader records from Mr. Schott's

7    stop?

8         A.   Correct.

9         Q.   And what did you -- did you give him records?

10   Like, what happened in that situation?

11        A.   I -- I believe that I had advised him that we'd

12   have to go through Vigilant to navigate that and obtain

13   those records.

14        Q.   Okay.  Anything else?  Did you guys talk about

15   anything else?

16        A.   Nothing that sticks out.

17        Q.   Sure.  Did Captain von Muldau give you any

18   instructions to make sure videos were saved?

19        A.   No, because he controls that.  I wouldn't

20   control that.

21        Q.   Understood.  Did Captain von Muldau give you

22   any instructions to make sure emails were saved?

23        A.   No.

24        Q.   Okay.  And did Captain von Muldau give you any

25   instructions to make sure text messages or call logs

Page 132

1    were saved?

2         A.  No.

3         Q.  Did anyone from the county give you

4    instructions on how to save call logs or text messages?

5         A.  No.

6         Q.  Is it your practice, generally, to save call

7    logs or text messages from your county phone?

8         A.  Yeah, I don't delete them.

9         Q.  Yeah.  Okay.  So you don't delete them.  But

10   do -- do you affirmatively save them anywhere?  So you

11   just generally try not to delete them?

12        A.  Yeah.

13        Q.  You've got to remember to say yes for the

14   record.

15        A.  Yes.  I'm sorry.  Thank you.

16        Q.  That's okay.  That's -- and I'll just repeat

17   that, because I don't think it got captured.  What is

18   your practice with call logs and text messages?

19        A.  I -- I keep them.  I don't delete them.  I

20   don't erase them.

21        Q.  And do you save them anywhere?

22        A.  No, ma'am.

23        Q.  Okay.  And to your knowledge, did the county

24   take any steps to make sure that call logs and text

25   messages were saved from your county phone or the county

Page 133

1    phones of officers who were involved in the stops or any

2    other -- involved in the stop of Mr. Schott or any other

3    phones, to your knowledge?

4        A.  I do -- I do not know.  I just know that our

5    phones were taken from us so that way they can be

6    dumped.

7        Q.  And that was part of this lawsuit.  Is that

8    fair?

9        A.  Correct.

10       Q.  Before the court ordered your phones to be

11   examined, did the county take your phones to take data?

12       A.  No.

13       Q.  I want to look at Exhibit L and we'll mark this

14   Exhibit 83.

15              (Exhibit No. 83 was marked.)

16       Q.  (BY MS. HEBERT)  Okay.  I'm going to represent

17   that this is the forensic examination report that the

18   county produced following examination of your county

19   phone.  I understand that you recently provided your

20   personal phone for examination, but we don't have the

21   results of that examination yet.  So this report, as far

22   as I understand it, is for your county phone only.  I

23   just want to make that clear.

24       A.  Okay.

25       Q.  And I don't expect you to read the whole thing,

Page 134

1    it's kind of 14 pages of stuff.  But I do want to flip

2    to page 11.  Let me know when you get there.

3         A.  Okay.

4         Q.  Do you see there's like a dark blue box.  It

5    says "Analysis of Evidence Item" and then a number?

6         A.  Yes, ma'am.

7         Q.  Do you see below that, is that your name?

8         A.  It is.

9         Q.  Okay.  I'm going to represent to you this is

10   the examiner's findings from your -- your phone.  Did

11   you have an Apple iPhone 12 from the county?

12        A.  Yes, ma'am.

13        Q.  Okay.  And at -- let's skip to the "Messaging

14   Apps" section.  And I see the second paragraph.  Can I

15   read that to you?

16        A.  Sure.

17        Q.  (Reading:)  At the time of examination, message

18   retention for iMessage was set to "Forever."

19             Did I read that correctly?

20        A.  Yes.

21        Q.  And is that consistent with what you just told

22   me your practice was.  You don't -- you try not to

23   delete messages and you set the retention to -- to

24   forever.  Is that fair?

25        A.  Yes.

Page 135

1      Q.  Okay.  I want to look down to the next like

2   blue, light blue paragraph section.  Do you see the

3   header says "3/16/2022 BCSO Communication"?

4      A.  Yes.

5      Q.  And there are only -- I'm going to read the

6   text there.  (Reading:)  The only communication items

7   for that date are two calendar entries or that date one

8   is labeled "TVTP grant review" and the other is for

9   Saint Patrick's Day.  Is that fair?

10      A.  Yes.

11      Q.  And then I want to look at the next section,

12   "3/16/2022 All Calls."

13           Do you see that?

14      A.  Yes.

15      Q.  And I see there are no call log entries for

16   this date; is that right?

17      A.  Correct.

18      Q.  Okay.  And I want to skip to the next page,

19   page 12.  And I want to look at deleted items.  Do you

20   see that header?

21      A.  Yes.

22      Q.  The first paragraph says, I'm going to read

23   that to you, (Reading:)  The call logs would have

24   contained 14,296 entries if none were deleted.  At the

25   time of examination there were 2,082 entries.  There are

Page 136

1   no entries at all prior to 1/25/2003.

2              Did I read that right?

3       A.  Yes.

4              MR. WINDHAM:  2023.

5              MS. HEBERT:  2023, thank you.  Got to keep

6   me honest here.

7       Q.  (BY MS. HEBERT)  I'm going to just do the math

8   for you.

9       A.  Sure.

10      Q.  Unless you want to do it.  Sergeant Gamboa, do

11  you want to plug into the calculator?

12      A.  No, I don't care.  Yeah.

13      Q.  Okay.  I'm going to do 14 -- 14296 minus 2082.

14  So I get that 12,214 call logs were missing.  Is that

15  fair based on those numbers?

16             MR. FRIGERIO:  Objection, form.

17             THE WITNESS:  Sure.

18      Q.  (BY MS. HEBERT)  What happened to those call

19  log entries, to your knowledge?

20      A.  So it may be because they changed my phone out

21  from previous.  And they --

22      Q.  Do you know when your phone was changed out?

23      A.  I don't remember exactly when, but I believe it

24  was during -- probably during this time in January

25  of '23.

Page 137

1      Q.   Okay.  So sometime in January of '23 --

2      A.   I got a new phone.

3      Q.   -- do you remember you got a new county phone?

4      A.   Correct.

5      Q.   And did you attempt to transfer all the data

6   from your old county phone to your new county phone?

7      A.   So it -- it was done by, I believe, it was AT&T

8   that did it.

9      Q.   Okay.  So when you get a new phone from the

10   county, what happens?

11      A.   So we'll give -- and I don't remember ever

12   using anybody but AT&T, so we'll hand them the old

13   phone.  They'll transfer the -- they'll connect the two

14   phones.  They'll transfer the data over.  And then when

15   it's done transferring, they give us the new phone.

16      Q.   Okay.  So somehow, AT&T is supposed to be doing

17   the transfer?

18      A.   Correct.

19      Q.   Okay.  Do you know if there is a back up

20   somewhere of your data?

21      A.   I don't know.

22      Q.   Sure.  And during the -- the time we're talking

23   about, let's say 2022 to 2024, '25, just 2024, was AT&T

24   the only provider for Bexar County, to your knowledge?

25      A.   Yes, ma'am.

Page 138

```
 1        Q.   Okay.  Do you know who the provider is for your
 2    personal cell phone?
 3        A.   AT&T.
 4        Q.   So you use both -- AT&T for both of them.
 5             Just say yes, for the record.
 6        A.   Yes.  Sorry.
 7        Q.   It's okay.  It's natural to start nodding.
 8             Do you have a backup of your personal
 9    phone?
10        A.   I don't know.
11        Q.   It's okay.  Let's look back at page 12 of
12    exhibit -- what exhibit number is this?
13             MR. WINDHAM:  83.
14             MS. HEBERT:  83.
15        Q.   (BY MS. HEBERT)  Let's look back at page 12.
16    Would you mind looking at the second paragraph in
17    "Deleted Items."
18        A.   Sure.
19        Q.   I'll read that to you.  (Reading:)  The
20    iMessages are stored in a database filed called
21    'sms.db'.  There would've been 78,201 message entries if
22    none were deleted.  At the time of examination there
23    were 77,518 messages.  There were no messages prior to
24    8/4/2022.
25             Did I get that right?
```

Page 139

1           A.  Yes.

2           Q.  Okay.  What would have happened to any text

3      messages before 8/4/2022?

4           A.  No idea.

5           Q.  Okay.  To your knowledge, is there any way to

6      obtain the missing text messages and missing call logs

7      that would have been on your phone prior to 8/4/2022 and

8      1/25/2023?

9           A.  I don't -- I don't know of any other way or

10     where that would be.

11          Q.  Sure.  That's fine.  And I think you can put

12     this away.  I think we're done with that.

13               I just have a couple of, I think follow-up

14     questions.

15          A.  Sure.

16          Q.  Both Deputy Gereb and Deputy Babb did a fair

17     amount of traffic stops, and you know, fair is in the

18     eye of the beholder, more than one traffic stop during

19     their time as a criminal interdiction deputy.  Fair?

20          A.  Yes, ma'am.

21          Q.  Probably more than 50.  Is that fair?

22          A.  Yes, ma'am.

23          Q.  Would you say more than -- probably more than a

24     hundred?

25          A.  I would say yes.

Page 140

1      Q.  Okay.  And, you know, I'm not looking to pin

2   you down on the number of traffic stops.  So more than a

3   hundred traffic stops at least?

4      A.  Yes, ma'am.

5      Q.  With more than a hundred traffic stops, I

6   understand that success looks like coming home safe.  So

7   putting that aside, what would a good -- what would a

8   successful traffic stop for criminal interdiction look

9   like?

10     A.  If some person breaking the law, doing some

11  kind of criminal activity, was put in jail.

12     Q.  That's fair.

13            MS. HEBERT:  I think that's all I have for

14  questions.

15            Charles, I'm going to call for production

16  of all the daily reports, worksheets, activity sheets

17  that Sergeant Gamboa talked about for the criminal

18  interdiction unit.

19            MR. FRIGERIO:  Is that the same as the CAD

20  report?

21            THE WITNESS:  No, that would -- that would

22  be that form that she showed.

23            MS. HEBERT:  Not quite that form because

24  that was the one filled out by the sheriff.

25            THE WITNESS:  Well, not that form, but

Page 141

1    that -- that format.

2                    MR. FRIGERIO:  What's -- what's the actual

3    name?

4                    THE WITNESS:  Daily activity sheet.

5                    MS. HEBERT:  At this time, I'll pass the

6    witness.  I will say that given that we still don't have

7    all the records, sorry, Sergeant Gamboa, I apologize,

8    you might have to come back and hang out with me again.

9    So we're going to leave this deposition open, should we

10   need to speak with you again.

11                   THE WITNESS:  Sure.

12                   MR. ELLSWORTH:  We'll reserve questions.

13                   MR. FRIGERIO:  Reserve our questions.

14                   (Deposition concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 142

1                           ERRATA PAGE

2     WITNESS NAME:  PEDRO GAMBOA    DATE:  08/01/2024

3     PAGE  LINE  CHANGE                REASON

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

Page 143

1                    ACKNOWLEDGMENT OF DEPONENT

2

3            I, PEDRO GAMBOA, do hereby certify that I have

4      read the foregoing pages and that the same is a correct

5      transcription of the answers given by me to the

6      questions therein propounded, except for the corrections

7      or changes in form or substance, if any, noted on the

8      attached errata page.

9

10     _____

       PEDRO GAMBOA                    DATE

11

12

13     THE STATE OF TEXAS    )

                              )

14     COUNTY OF _____)

15

               Before me,                 , on this day

16     personally appeared PEDRO GAMBOA, known to me (or proved

       to me under oath or through

17     (description of identity card or other document) to be

       the person whose name is subscribed to the foregoing

18     instrument and acknowledged to me that they executed the

       same for the purposes and consideration therein

19     expressed.

20            Given under my hand and seal of office this

       ____ day of                 ,         .

21

22

                              NOTARY PUBLIC IN AND FOR

23                            THE STATE OF

24

25

Page 144

                    REPORTER'S CERTIFICATION

                 DEPOSITION OF PEDRO GAMBOA

                    TAKEN AUGUST 1, 2024

1

2

3          I, Janalyn Elkins, Certified Shorthand

4    Reporter in and for the State of Texas, hereby certify

5    to the following:

6          That the witness, PEDRO GAMBOA, was duly sworn

7    by the officer and that the transcript of the oral

8    deposition is a true record of the testimony given by

9    the witness;

10          That the original deposition was delivered to

11    CHRISTIE HEBERT;

12          That a copy of this certificate was served on

13    all parties and/or the witness shown herein on

14    _____.

15          I further certify that pursuant to FRCP No.

16    30(f)(i) that the signature of the deponent was

17    requested by the deponent or a party before the

18    completion of the deposition and that the signature is

19    to be returned within 30 days from date of receipt of

20    the transcript.  If returned, the attached Changes and

21    Signature Page contains any changes and the reasons

22    therefor.

23          I further certify that I am neither counsel

24    for, related to, nor employed by any of the parties in

25    the action in which this proceeding was taken, and

Page 145

1    further that I am not financially or otherwise

2    interested in the outcome of the action.

3              Certified to by me this 18th day of August

4      2024.

5

6                        JANALYN ELKINS

7                        Texas CSR 3631

                         Expiration Date 1/31/2025

8                        Veritext Legal Solutions

                         300 Throckmorton Street, Suite 1600

9                        Fort Worth, Texas  76102

                         Firm Registration No. 571

10                       PH:  (817) 336-3042

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 146

1    Charles S. Frigerio, Esq.

2    Charlie@frigeriolawfirm.com

3         August 18, 2024

4    RE:    Schott, Alek v. Babb, Joel Et Al

5         8/1/2024, Sergeant Pedro Gamboa (#6725911)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 31 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22              Yours,

23              Veritext Legal Solutions

24

25

**&**

**&** 2:17

**0**

**00706** 1:5
**04** 105:15
**06/10** 73:4
**07/15** 77:3
**08/01/2024**
 142:2

**1**

**1** 1:13,18 11:22
 15:4 42:2 54:3
 87:22 105:12
 144:2
**1/25/2003**
 136:1
**1/25/2023**
 139:8
**1/31/2025**
 145:7
**10** 3:11 36:22
 77:17 79:10
 90:19
**10,000** 126:6
**10.5** 77:6
**107** 70:19
 118:11
**1084** 117:13
**10842** 118:2
**10k** 126:11
**10th** 40:3 93:20
**11** 24:18,19,20
 118:10,19,20
 134:2

**111** 1:21 2:12
**112** 3:16
**114** 3:16
**116** 3:17
**117** 3:17
**11:09** 119:5
**11:13** 100:15
 104:14,17
**11:15** 100:20
**11:23** 119:5
**11:24** 119:7
**11:30** 31:23
**11th** 70:20
**12** 7:25 100:23
 108:17 134:11
 135:19 138:11
 138:15
**12,214** 136:14
**12065** 100:8,9
 100:23
**12066** 100:23
**12067** 100:23
**12068** 100:24
**12078** 100:24
**12080** 104:9
**12081** 102:23
 103:2,5
**12082** 109:21
**12083** 102:20
 111:5
**121** 3:18
**12116** 92:1
**123** 3:19 46:14
**1265** 102:20

**12798** 145:6
**128** 3:20
**1280** 104:25
**12:29** 1:18
**12:38** 108:7
**12th** 72:18,20
 72:21 102:25
 107:7,15 108:1
 108:4,14,21
 130:3,9
**13** 106:8
 119:13
**1300** 33:5
 37:12
**133** 3:21
**13:19** 119:14
**14** 134:1
 136:13
**14,296** 135:24
**14,569** 23:7,20
**141** 47:19
**141.5** 47:16
**142** 3:7
**14296** 136:13
**143** 3:8 72:17
 72:19
**144** 76:7
**1455** 33:5
**14:10** 119:14
**14:12** 119:16
**14th** 26:1 87:13
 88:7
**15** 15:16 29:3
 37:13,24,25

**150** 24:25
**1500** 34:23
 36:22 105:15
 123:1,3
**1504** 104:20
**158** 76:22
**15th** 26:1
**16** 20:10
 103:24 104:2,3
 104:3 105:13
**160** 102:20
**1600** 145:8
**1650** 34:23
**16571** 123:24
**16581** 127:24
**166** 79:13
**16th** 26:1 83:11
 100:12 104:13
 104:17,19
 105:2 106:3
 110:3 129:24
**17** 76:25
**1700** 108:20,24
**176** 83:18,22
**17th** 50:2 76:24
 110:3
**18** 43:15
 102:24 103:1,5
 103:23 104:4
 107:3,4 146:3
**18th** 61:12
 69:17 103:12
 106:15,23
 109:5 130:1
 145:3

**19**  40:2 107:6
107:23
**199**  84:14
**19th**  68:6 124:6
**1ftew1ep1mf...**
24:25
**1st**  37:13 54:21
124:5 130:15

**2**

**2**  1:13 3:3 15:9
23:6 29:12
38:5 72:22,23
**2,082**  135:25
**20**  3:12 23:5,12
40:1 44:21
**200**  2:17
**2019**  14:8
26:18 126:17
**2020**  72:21
112:24 124:5,6
**2021**  3:13
14:11,14,17
15:7,10 22:8
24:25 29:6,22
30:13 40:3,6
41:10 50:2
54:14,21 56:20
56:21 61:12
62:21,22 63:20
66:19 67:6
68:6 69:7
114:16 115:11
115:22
**2022**  69:10,17
70:20 72:18

76:24,25 79:15
79:17 81:6
83:11,19 84:11
84:15 86:11
93:1,20 94:1
98:17 100:12
103:12 104:4
104:14,17,19
105:2,13 106:3
106:15,23
107:4,7 108:1
108:4,14
110:12,13
129:24 130:1,9
137:23
**2023**  3:12
86:21 87:4,13
88:7 90:1
126:17 130:15
136:4,5
**2024**  1:13,18
137:23,23
144:2 145:4
146:3
**207**  86:20
**2082**  136:13
**20s**  118:13
**20th**  93:20
**21**  107:23
**210**  2:13
**213**  87:7
**214**  124:19
**217**  43:12
**22**  42:1 107:15
108:3 130:3

**22203**  2:8
**23**  44:21,23,25
45:9 118:20
136:25 137:1
**236**  44:17,20
**24**  3:12 109:3
**240**  87:13
**242**  87:11 88:6
**246**  89:25
**24th**  54:15,16
**25**  137:23
**25th**  62:21,22
**26**  43:16,17,19
44:3
**261**  43:5,11
**26th**  54:14
66:19
**27**  49:25 50:6
54:2
**271**  43:6 44:9
44:10,13,19,20
45:9
**271-7877**  2:13
**27th**  84:15
86:11
**28**  108:18
**28,569**  48:9
**281**  20:10
**28569**  49:13,14
49:15
**286**  54:7
**28th**  90:1
**29**  108:19
**29th**  31:2

**2nd**  30:13
86:21

**3**

**3**  15:2,3,3,12,13
49:14,16,17
81:24
**3/10/2022**
119:3
**3/16/2022**
100:19 135:3
135:12
**30**  3:13 29:12
49:5,11,13,19
144:16,19
**30,000**  45:19
**300**  145:8
**30th**  29:5 30:13
31:3 114:15
115:11,22
**31**  15:10
146:16
**31st**  35:16
**32**  54:17
**336-3042**
145:10
**34**  24:19 109:4
**35**  19:23,24
54:23 56:4
**3631**  145:7
**37**  56:4 59:18
59:19
**38**  120:23
122:4,7
**39**  61:11 62:1

**[3:00 - above]**                                                          Page 3

**3:00**  105:16
**3:04**  105:17
**3:12**  106:24
**3:19**  120:2,7,8
**3:37:20**  120:21
  120:21

**4**

**4**  3:4,6
**4.23.**  44:12,14
**401**  124:10,11
**41**  62:22
**42**  62:20
**43**  64:1 109:20
**44**  43:12,15
  109:23
**456,937**  124:24
**465**  1:22 2:12
**4700**  2:17
**476-4600**  2:18
**480-5936**  2:5
**490**  70:25
**4th**  93:20

**5**

**5/22**  90:6
**50**  139:21
**512**  2:5,18
**53**  47:5
**54**  110:3
**55**  110:6
**569**  49:15
**57**  118:7
**571**  145:9
**58**  66:18
  110:10,21

**59**  66:18
**5:00**  109:1,2,3
**5:23cv**  1:5
**5th**  83:19

**6**

**6**  15:10
**60**  110:21
**608,000**  125:17
  125:18
**64**  43:25 44:3,9
  44:10,13,19,20
  44:22
**6725911**  146:5
**682-9320**  2:8
**6:00**  108:25
**6th**  14:11,14,17

**7**

**70**  32:12 49:17
**703**  2:8
**71**  3:11 9:20
  10:15,17 25:13
  25:22 32:12
  39:25 68:3,4
  69:13,14 79:14
  83:15 91:8
**72**  3:12 24:10
  24:11 25:12
  32:12
**720**  35:20
**73**  3:13 30:6,9
  30:11 33:3
**74**  3:14 80:15
  80:17,18

**75**  3:14 91:17
  91:19
**76**  3:15 99:17
  99:18,20 100:5
  112:16
**76102**  145:9
**77**  3:16 112:17
  112:18 115:15
**77,518**  138:23
**78**  3:16 114:8,9
  115:14
**78,201**  138:21
**78205**  2:13
**78701**  2:4
**78723**  2:18
**79**  3:17 116:5,7
**7th**  79:15,17
  110:12

**8**

**8**  15:2 21:22,22
  25:14 81:24
**8,570.70**  49:20
**8/1/2024**  146:5
**8/4/2022**
  138:24 139:3,7
**80**  3:14,17
  117:23,24,25
**80a**  3:18 121:9
  121:25 122:2
**81**  3:18 123:20
  123:21,22,25
**816**  2:4
**817**  145:10
**82**  3:19 128:3,4
  128:4,6

**83**  3:20 133:14
  133:15 138:13
  138:14
**8570**  49:17
**8:15**  35:17

**9**

**9**  25:18 50:4
  75:23 81:12
  118:20
**9/10**  40:6
**9/4**  40:6
**90**  20:10 88:12
  88:15
**900**  2:7
**901**  2:7
**91**  3:15
**960**  2:4
**98**  69:11
**99**  3:15
**9:01**  1:18
**9:30**  31:22
**9:45**  35:17

**a**

**a.m.**  1:18
  100:15,20
**abbreviations**
  60:3,14 67:3
**ability**  101:6
  111:13
**able**  18:20 19:7
  19:10,12,24
**above**  1:17
  70:2 146:6

**abruptly** 31:15
74:9
**absolutely**
47:10 70:15
**academy** 71:6
71:20 79:22
110:20,22
111:7
**accepted** 70:16
**access** 36:4,7
78:10 105:8
108:13 109:16
111:14 121:12
**accessed**
103:22,22
104:8 106:21
106:24 107:14
107:21 108:19
109:5,19,24
110:7,22
**accessing** 35:17
36:3,9 107:3
107:23 108:18
111:9
**accidents** 40:21
**accomplishm...**
23:1 54:23
55:6,19 56:1
62:25 68:4,10
72:25 77:1
90:3
**accordance**
113:18
**accuracy** 146:9

**accurate** 81:16
**achieve** 17:22
**acknowledged**
143:18
**acknowledg...**
143:1 146:12
**action** 1:5
144:25 145:2
**active** 17:14
**activities** 9:22
10:3,8,11 12:5
17:20 23:22
39:6 42:4,9
45:1,10,12,13
46:11 56:21
57:19,24
**activity** 11:14
11:19,23 17:18
18:3,6 19:25
20:3 24:1 40:5
42:21 43:1,6
44:11,22 45:2
54:7 57:3,24
88:17 89:10
90:10 103:18
104:7 105:21
105:24,24
106:20 123:4
124:3,17
125:21 140:11
140:16 141:4
**actual** 28:25
47:4 51:17
85:3 101:8
141:2

**actually** 28:24
60:4 78:22
87:8,13 94:20
**add** 87:5 128:8
**added** 40:11
54:8 65:10
82:16 106:4
**additional** 7:5
13:23 54:8
59:25 60:11
67:20
**admin** 22:22
57:14 114:23
**administration**
113:12
**administrative**
22:16
**advanced** 82:9
82:21
**advised** 131:11
**affirmatively**
132:10
**agenda** 3:13
30:15 39:23
**ago** 84:10
**agree** 9:5,9,12
**agreement**
18:13,16,22
65:11,14
113:24
**aguillon** 22:17
22:18,19 92:23
93:5 94:11
**ahead** 119:12

**airport** 84:21
85:12,25 86:6
**al** 146:4
**alek** 1:3 4:20
110:23 146:4
**alert** 20:18
**allotted** 146:19
**allow** 67:14
**allowed** 18:19
**allows** 18:22
**amount** 19:8
23:21 48:11
49:7,20 123:2
125:13 126:20
127:1,5 139:17
**analysis** 3:21
134:5
**animal** 12:10
12:24 22:2,12
28:14 95:4
**announcement**
7:8,10 80:24
81:1
**announcements**
81:14
**answer** 74:18
75:1
**answering**
33:12,14
**answers** 6:5
34:2 143:5
**anti** 88:21
**antonio** 1:2,22
2:13 15:22
16:5,25 19:23

20:10 30:21
88:11,15 90:23
**anybody**  8:24
21:9 117:7
121:13 137:12
**anymore**  57:8
**apologies**  120:5
123:19
**apologize**  21:19
94:17 141:7
**apostrophe**
51:23
**appear**  11:14
**appearances**
3:3
**appeared**
143:16
**appearing**  8:8
**apple**  134:11
**applicable**
146:8
**applicants**
82:18
**applies**  82:4
**apply**  39:4
114:2
**appreciate**
49:23
**approach**
37:20
**approached**
50:10 51:24
52:1,3,7
**approaching**
38:12

**approval**  51:19
**approve**  51:16
123:6
**approved**
24:23 39:19
69:2,5
**approving**
24:24
**approximately**
15:16 84:12
100:20 122:4
**apps**  134:14
**april**  102:25
107:7,15 108:1
108:4,14,21
109:5 114:15
115:11,22
130:3,9
**area**  52:7 61:19
89:1,7 90:21
91:1
**areas**  38:22
88:16
**arlington**  2:8
**arrest**  75:2
77:5
**arrested**  43:24
44:8,10 45:7
**arrests**  23:6,12
43:20,21 44:3
44:4,23 45:1
45:10,14
**asap**  79:24 80:3
**aside**  140:7

**asked**  34:11
75:15 77:15
96:23 131:2,5
**asking**  8:23
33:11,21 34:1
34:17 70:3
74:19 87:5
113:15
**assembled**
81:15
**assess**  34:1
**assessment**
25:7 42:4
**asset**  122:22,24
**assigned**  71:8
77:4,12 86:4,4
109:13 115:11
**assigning**  112:8
112:22 116:16
**assignment**
3:14 112:4,5
112:10 113:25
115:23 116:11
116:16,22
**assist**  40:12,24
85:5
**assistance**
77:15
**assistant**  57:9
**assisted**  55:1
77:4 88:10,14
**assisting**  40:10
41:8 55:15
85:7

**assume**  8:11
41:11 42:8
113:6
**assuming**  49:18
**at&t**  137:7,12
137:16,23
138:3,4
**atacosa**  61:17
**atascosa**  61:18
61:19 64:16,17
64:18,20 76:11
**attached**  11:2
11:12 15:3
24:14 29:5
40:2 143:8
144:20 146:11
**attachment**
11:1
**attachments**
10:25
**attaché**  62:14
**attempt**  137:5
**attempting**
62:2
**attend**  28:5
29:17 30:17
67:14 69:2
**attended**  28:7
29:20 31:2
39:1,4 62:5
63:21 65:4
**attending**  16:7
29:13,19
**attention**  6:16

**[attorney - bexar]** Page 6

**attorney**
  146:13
**attorneys** 7:3
  8:23
**audit** 104:11
  105:1
**auditing** 131:3
**aug** 29:12
**august** 1:13,18
  14:11,14,17
  15:7,10 23:8
  29:5,22 30:13
  31:2,3 35:16
  79:15,17 83:11
  84:11 115:22
  144:2 145:3
  146:3
**austin** 2:4,18
**authority** 36:19
**authorization**
  68:21
**authorize**
  52:17
**authorized**
  21:23
**availability**
  26:3
**available** 25:25
  146:6
**avenue** 2:4
**avoid** 6:8 32:9
  74:11 91:12
**avoiding** 20:17
**aware** 99:3
  118:1

**axon** 3:15
  93:13,24 94:3
  100:3,5 101:10
  101:16

**b**

**b** 3:10
**babb** 1:6 2:16
  5:6 29:23 58:6
  63:22 67:24
  75:13,17 79:21
  80:3 81:2 84:8
  92:23 95:9,13
  96:18 97:9,14
  99:7 102:22
  103:14 104:6,6
  104:22 105:5
  106:17,24
  107:3 116:9,17
  116:22 119:18
  120:11 139:16
  146:4
**babb's** 95:20
  95:23 105:1
  108:13 110:22
  111:9
**back** 4:18
  25:13 29:4
  36:23 39:25
  47:13 49:23
  53:18 70:3,7
  79:12 82:6
  83:14 87:5
  98:5 104:9
  111:1,5 115:2
  115:5,11,22

  117:10,19
  120:1,2 126:16
  129:18 137:19
  138:11,15
  141:8
**backup** 138:8
**bad** 59:9
**badge** 124:10
  124:11,13
**bargaining**
  113:24
**based** 11:18
  20:21 23:15
  75:5 104:24
  120:17 136:15
**basically** 38:19
**batch** 98:17
**bc** 92:1 100:8
  100:23,23,24
  103:5 104:25
  111:5 117:12
  118:2 123:23
  127:24
**bcso** 55:1 59:22
  77:4 135:3
**bear** 30:4 68:2
  91:13 117:1
**began** 83:4
**beginning**
  26:16 84:10
  87:4
**behalf** 62:5
**behavioral**
  32:4,5

**behaviors**
  32:21 82:10
**behemoth**
  10:22
**beholder**
  139:18
**believe** 10:9
  11:21 12:21
  14:15 15:5
  16:9 22:10
  23:23 27:2
  29:15 30:14
  36:9,18 41:24
  49:6 52:10
  55:23 62:8,17
  67:13 71:15
  85:2 92:17
  93:2 102:24
  109:13 113:5
  124:8 129:5
  130:16 131:11
  136:23 137:7
**bench** 59:16
**benigno** 37:14
**best** 6:22
**better** 55:20
  63:15 67:21
**bexar** 1:10 2:10
  5:4 9:4,6,9,13
  10:1 16:3,5
  28:16 47:22
  50:16 52:16,22
  60:17 61:25
  62:2 65:24
  66:6 69:25

76:11 90:19,21
91:1 113:19
137:24
**big**  19:12,14
41:1 55:18,21
55:24,24 70:18
91:19
**bit**  29:4 32:4
47:13 81:10
**blank**  102:13
**blended**  88:3
**blue**  134:4
135:2,2
**bobcat**  28:12
**body**  3:15 8:2
100:3,5 101:1
101:7,17
102:21 105:1,4
105:8 106:4,24
107:4,14,22
108:13,19,20
108:23 109:5
109:24 110:23
111:9,14
118:23 119:2
**bones**  95:22
**booklet**  42:19
**borrowed**
81:18
**bosses**  72:9
**bottom**  83:22
**boulevard**  2:17
**bow**  107:18
**box**  134:4

**brad**  38:15
**break**  6:13
21:19,20 31:4
35:8 78:12,13
78:14,17 79:13
91:12 117:7,8
117:16 118:4
**breaking**  79:1
140:10
**breakout**  16:9
**brief**  79:11
117:9,18
**briefly**  54:17
81:22 99:21
**bring**  111:1
**broad**  48:3
**brought**  115:5
**bucket**  43:22
**building**  70:25
72:4,14
**buildings**  71:11
**bullet**  15:13,20
23:3 26:4
28:20 29:10,10
40:9 50:5,15
59:19 60:7
61:21 62:25
64:1 66:22
68:4,9 69:20
70:2 77:3
79:21 84:1
85:1 88:24
90:3
**bullets**  28:10
83:24 88:8

**bunch**  113:20
124:15
**bureau**  113:12
114:25
**bus**  36:19 73:3
73:8 74:2,5,6
74:17 76:2
84:21 85:11,21
85:21,25 86:6
89:13
**buses**  36:10,10
**business**  29:11
61:15 70:23
84:17
**bust**  55:24 73:3

**c**

**c**  2:1
**c10**  90:8,18
**cad**  140:19
**calculator**  43:9
49:3,23 136:11
**calendar**  135:7
**california**
27:18,21
**call**  40:12,16,17
40:22 42:16
44:7 122:18
131:25 132:4,6
132:18,24
135:15,23
136:14,18
139:6 140:15
**called**  40:24
41:5 129:25
138:20

**calling**  46:21
**calls**  55:1
135:12
**cam**  3:15
**camera**  8:2
99:3 100:3,6
101:1,7,17
102:21 105:1,4
105:9 106:4,25
107:4,15,22
108:14,19,20
108:23 109:5
109:24 110:23
111:10,14
118:23 119:2
**capacity**  1:7,8
1:10 13:25
108:24
**captain**  4:21
7:9 130:16,17
130:19,25
131:5,17,21,24
**captured**  94:7
132:17
**car**  23:17 35:17
36:4,8,16,16
37:21 118:11
118:14,17
119:10
**card**  143:17
**care**  136:12
**carry**  35:25
36:2 73:23
**cars**  36:13,13
36:15

**[case - commercial]**

**case** 4:20 18:20
  59:14 99:13
  125:17 130:21
**cash** 122:18
**castillo** 109:10
  109:12 110:7
**catch** 21:5
  118:4
**categorized**
  112:5
**cats** 28:15
**cause** 1:17
  32:15 46:10
  47:5,8 77:16
  78:1,7 97:22
  97:25 98:4
  124:16
**cc** 30:2
**cd** 79:23
**cell** 138:2
**center** 31:14
**central** 17:10
  50:12 52:12,23
  53:19
**certain** 32:7,21
  34:1
**certificate** 3:8
  144:12
**certification**
  144:1
**certified** 144:3
  145:3
**certify** 143:3
  144:4,15,23

**cetera** 76:12
**chance** 24:20
  79:16 80:22
**change** 71:13
  74:9,12 142:3
**changed** 72:1
  85:4 136:20,22
**changes** 3:7
  102:24 143:7
  144:20,21
  146:10
**chapters** 82:2
**charge** 123:5,5
**charles** 1:21
  2:10,11,12 4:4
  78:17 127:22
  140:15 146:1
**charlie** 2:14
  90:19 146:2
**chebert** 2:5
**check** 29:4
  44:16 61:5
  74:24 102:23
**checking** 76:16
**choose** 39:15
**christie** 2:3 4:1
  4:19 144:11
**chronological**
  10:25
**chunk** 76:22
**circumvent**
  20:7
**citation** 97:10
**citations** 40:10
  41:8,12,13,16

  41:17,18,20
  43:14,18,22
  44:5
**civics** 36:14
**civil** 1:5,23
  113:23
**class** 31:25
  33:10 34:23
  36:22
**classes** 16:7
**cleaned** 129:13
**clear** 6:3,5,6,24
  18:4 121:11
  133:23
**clearly** 101:25
**clip** 119:17
  120:12 122:6
**clock** 109:3
**close** 25:11
**cmv** 36:25
**cmv's** 36:23
**code** 32:1,1
**collaborate**
  62:2
**collaboration**
  27:12
**colleague** 5:3
  9:19 30:10
  99:19 116:6
**collect** 57:1
**collected** 56:20
**collecting**
  16:15 57:11
  58:12

**collection**
  16:15 52:6
**collin** 17:24,25
  25:25 26:5,13
  50:7 59:23
  60:9,17
**column** 98:6,9
  98:20,22
  100:23,25
  103:14 105:24
**columns** 98:7
**combination**
  23:24
**combining**
  61:22
**come** 16:3
  20:12 26:1
  27:20 28:5
  42:7 45:21
  65:6 97:2
  120:21 125:22
  129:18 141:8
**comes** 27:20
**coming** 17:5
  19:9 27:18
  33:22 53:2
  140:6
**command**
  67:13
**commander**
  71:21
**commercial**
  36:10,25 37:3
  37:6,7

commissioner
45:25,25
commissioner's
24:15
commissioners
3:12 51:3,5,7
51:10,15,20
52:16
commissioning
113:24
commit 64:22
committed 64:7
common 38:14
commonly
38:22
communicate
63:14
communication
63:12 135:3,6
company 55:9
55:13
comparing
115:14
compartments
38:15,17,20,23
82:10
compile 127:2
complained
129:25
complete 97:10
completed 68:6
68:11,17 69:5
92:15,15
146:16

completely
86:12
completion
144:18
computer
99:14 110:25
123:12 127:19
127:21
computerized
1:20
con 42:24
concentrating
23:6 32:16
84:20 85:6,9
concern 98:12
concerns 98:18
concluded
119:21 141:14
conduct 52:22
63:18,19 77:16
78:9
conducted
48:22 73:2
84:4
conducting
73:9 88:17
95:14,21
conference
3:13 15:15,21
16:4,10,13
26:2 28:8
29:12,14,16,17
29:20 30:12,18
31:23 35:3
39:1,4,19

confirm 34:14
79:15 92:22
conflicting 61:3
confused 55:12
congratulations
91:7
congress 2:4
connect 137:13
consensual
73:9 75:5
consent 46:9,14
47:11 97:15,19
97:20,21,23,25
124:16
consented
46:17 98:1
consenting
47:2
consideration
143:18
consistency
122:2
consistent
134:21
contact 32:10
34:4 54:24
55:7 73:20
74:11 75:6
83:7 89:7
contacts 28:8
42:24,24,25
73:9
contained
135:24

contains
144:21
content 30:24
context 89:5
continue 34:17
61:19 74:19
110:9
continued
86:18
control 131:20
controls 131:19
conversation
14:22 73:24
96:2 119:18
120:11
conversations
8:22,24
cool 7:1,17 29:2
125:10
cop 37:14 38:7
38:15
copies 146:14
copy 4:4,9
99:23 102:15
123:25 128:8
144:12
cord 91:10
correct 4:23
7:16 8:4,6,13
9:24 12:7 13:3
13:19 14:1,12
14:23 15:4,8
15:11 16:4,14
16:19 18:24
21:1,15 22:6

24:3,5 26:11
27:11 29:24
32:23 33:1
35:12 37:5,10
40:4 41:3,6
42:18,20 43:7
43:13,23 45:15
46:15,22 47:6
47:12 48:19
51:8,21 55:17
61:7 63:23
64:13 65:18
66:1,1,8 67:5,9
67:25 69:6
72:7 75:19,20
75:25 76:18
77:24 78:6
80:8 81:3,20
82:24 83:20
85:18,22 86:19
88:5 89:14,18
89:23 90:17,22
91:6 93:12,15
93:22,25 94:8
94:22 95:11
96:7,13 98:19
99:7,8 104:22
105:6 106:11
107:16,20
108:10 109:17
109:25 110:24
111:8 112:11
113:9 114:3,19
114:20 115:13
115:20,24

116:18,24
126:2,19 131:8
133:9 135:17
137:4,18 143:4
**correcting**
107:13
**corrections**
143:6
**correctly**  15:18
23:9 25:2
50:13 67:1
68:14 77:8
87:2 89:3
134:19
**counsel**  5:4,6
6:19 144:23
146:14
**counted**  41:13
41:17
**counties**  15:16
17:25 18:5,11
18:15,19,21
19:7,7,10,17
27:8,12,20
50:23 53:19,25
61:16,23,25
62:1,2,5 64:6
64:12,14,15,20
65:3,6,16
76:10
**counting**  122:8
**county**  1:10
2:10 5:4 9:4,6
9:10,13,13
10:1,24 16:3,5

17:24,24,25
19:11,11,21
24:14 25:25
26:6,9,13
28:16 45:25
47:22 50:7,16
51:7,9,10,14,20
52:16,22 59:23
60:9,17,18
62:1,2 65:24
66:6 69:25
76:11 90:19,21
91:1 113:19
132:3,7,23,25
132:25 133:11
133:18,18,22
134:11 137:3,6
137:6,10,24
143:14
**county's**  18:18
127:5
**couple**  23:11
27:2 60:3
83:17 84:10
105:7 112:1
116:25 117:3
124:25 129:19
129:25 139:13
**courier**  77:14
**couriers**  17:1
**course**  31:4,7
31:20 32:24
33:5,17 34:19
35:6,11,13,22
36:1,6,7 37:2

37:11,12,15
38:6,9,14,16
95:16
**courses**  35:2
**court**  1:1 3:12
5:7,14,15
24:15,23 47:24
52:17 124:1
130:22 133:10
**courtroom**  6:1
**cover**  31:9,24
36:10
**coverage**  20:4
**covered**  20:11
31:8 32:25
72:17
**covering**  20:22
36:18
**covert**  72:12
**crash**  41:1
**create**  11:19
17:10 20:25
42:10
**created**  105:19
**creates**  32:15
**creating**  15:24
26:16
**crime**  8:12 25:1
25:5,7 46:1
71:7,21 89:1
113:13
**crimes**  88:21
89:8,9
**criminal**  3:18
3:19 7:7,12

9:22 10:3,7,11
12:4,5,8 14:7
14:18 15:14,17
15:24 16:17
17:7,13,18,19
18:3,5,8 19:25
20:3 21:4 22:1
22:8,13 23:21
23:25 24:14
26:17 29:11,15
30:12 32:1
33:25 38:25
39:3,5,14 41:4
42:2,3 47:18
48:2,3,13,24
50:9,12 52:12
52:12,23 53:19
54:3 56:5,11
57:23 58:3,7
61:8 65:6
70:10 71:6
77:22,25 78:18
80:25 82:3,9
82:11,21 84:9
85:3,3 86:11
87:24 88:2,16
89:10 90:9
112:4,9,23
113:1 115:12
116:17,23
122:17 123:4
124:3 126:3,12
126:16,20,24
139:19 140:8
140:11,17

**criminals** 23:18
**criteria** 21:6
  98:9 122:22,24
**critical** 40:8,13
  55:2 66:21,22
  67:12 69:19
  79:19 86:24
**cruel** 28:14
**cruelty** 12:10
  12:24 22:2,12
  95:4
**cs** 146:15
**csfrigeriolaw**
  2:14
**csr** 1:19 145:7
**currency** 48:9
  73:12 124:24
  124:25 125:14
  126:13
**current** 8:5
**currently** 63:1
  63:5
**curtis** 10:12
**curve** 82:16
**cut** 129:19

**d**

**d** 3:1
**daily** 13:18,20
  57:3,12,17,18
  57:19,24
  140:16 141:4
**dallas** 17:24
**dandy** 49:2
**dark** 134:4

**data** 124:15
  133:11 137:5
  137:14,20
**database**
  138:20
**date** 14:10 15:6
  15:9 29:5
  35:16 50:1,1,2
  50:11 52:11,14
  61:11 66:18
  68:5 69:16
  70:19 79:14
  83:10,18 84:15
  86:21 87:11
  89:25 100:12
  103:8,12 104:3
  104:4,13
  105:12 106:8
  107:6 108:6
  110:12 114:15
  119:2 124:5
  129:22 135:7,7
  135:16 142:2
  143:10 144:19
  145:7
**dates** 25:24
  92:14,15 93:19
  93:19,23 110:3
  124:8 125:21
  130:5
**day** 31:1 37:11
  57:20 58:2,6
  59:3 82:4,4
  135:9 143:15
  143:20 145:3

**days** 106:12
  144:19 146:16
**dea** 77:5,13
**deal** 113:24
**dealer** 119:22
  119:24
**dealing** 120:15
**december** 68:6
**deception**
  33:17 34:17
**decided** 85:15
**decision** 67:14
  85:13,14
**default** 97:18
**defective** 21:11
**defects** 5:12
**defendant** 2:10
  2:16 5:4,4,6
**defendants**
  1:11 91:25
  121:11
**delete** 132:8,9
  132:11,19
  134:23
**deleted** 135:19
  135:24 138:17
  138:22
**delivered**
  144:10
**dennis** 37:14
**depending**
  19:20
**depends** 44:6
  75:1 125:12

[deployment - doing]                                            Page 12

**deployment**
  76:5 86:9
**deponent**  143:1
  144:16,17
  146:13
**deposing**
  146:13
**deposition**  1:12
  1:15 4:22 5:12
  5:15 6:19 7:2
  8:8,19,19,20,25
  8:25 112:3
  130:1 141:9,14
  144:1,8,10,18
**depositions**
  4:25
**deputies**  12:9
  12:16 13:11,17
  13:24 18:25
  22:9 39:1,4,13
  39:17 41:4
  42:15 46:21
  48:13 55:1
  59:23 60:9,17
  60:23 61:9
  62:6 63:18,21
  66:23,25 67:4
  67:19,23 68:12
  68:17 69:21
  70:9,13,24
  77:4,12 86:25
  87:5 90:7,15
  90:25
**deputy**  12:11
  12:25 13:2,7,9

14:3 22:3,13
22:13 29:23,23
42:16 58:2,6
58:21,21 63:21
63:22 67:24,24
75:17,18,21,23
76:1 77:23
78:1,19 79:21
80:3,6 81:2,5
82:3,11 84:4,8
86:2 94:25
95:9,9,13,13,19
95:23,23 97:9
97:9,14,14
99:7,7 102:21
103:14 104:6
104:22 105:1,5
106:17,24
107:3 108:13
110:16,19,22
111:6,9 112:4
112:22 114:18
114:22 115:2
115:11,21
116:9,17,22
118:10,16,23
119:8,18,18,21
120:11,11,14
120:17 122:7
122:11 128:16
128:17 129:6
139:16,16,19
**describe**  100:2
**description**
  3:11 7:15 21:2

78:19,19 81:5
81:16 83:10
143:17
**descriptions**
  81:19
**detecting**  33:17
**detention**  109:9
  109:10,12
**develop**  78:1
  82:13
**devote**  19:5,7
**devoted**  13:7,9
  13:11 14:3
**dexter**  28:12
**diamond**  36:23
**difference**  44:2
**differences**
  95:17
**different**  11:6
  15:16 18:25
  19:17 20:7,15
  27:8,16,19
  32:8 38:17
  48:7 49:7
  52:20 61:23
  65:16 72:3
  95:19 103:11
  106:9 121:10
  121:10
**direct**  6:16 82:4
**directions**
  74:12
**disciplinary**
  81:13

**discretion**
  85:10 86:15,16
  97:4
**discussion**
  67:10 91:16
**disrupt**  17:19
  18:3,5
**district**  1:1,1
  90:20
**divide**  44:9
**divided**  44:10
  44:13,19
**division**  1:2
  8:12 25:1,6,7
  46:1 71:7,21
  114:23
**document**  6:12
  9:19 10:17
  11:5 21:20
  24:13 25:11
  33:3 41:14
  80:20 91:11,21
  100:1 102:12
  102:16 114:15
  116:8 123:15
  124:2,6,9
  125:23 126:1
  127:11 143:17
**documents**
  6:10 7:6 9:16
  10:24 11:12
  127:9
**dog**  129:7
**doing**  13:17
  17:24,25 26:8

27:14 44:15
49:3 58:2,6
59:15 67:22
70:10 73:14
85:24 86:12
89:9,11 137:16
140:10
**double** 41:16
**download**
101:20 102:4
**downtown** 73:4
73:8
**draft** 4:2,7,12
24:17 53:22
**drafted** 65:19
76:19
**drafting** 53:25
**drive** 123:12
**driver** 34:10
46:17 82:9
83:7 96:1,8,15
96:19,23 97:2
97:11 98:1
118:12 119:22
120:14
**driver's** 34:1
37:8 96:11
122:8
**drivers** 32:6
35:11 63:15
**drives** 32:7
**driving** 31:13
32:4,5,11,12,17
38:12 118:12

**dropped** 56:13
**drove** 27:23
**drug** 55:21
119:22,24
123:8
**drugs** 55:25
**due** 71:1
**duly** 1:16 4:15
144:6
**dumped** 133:6
**dustin** 22:20,21
**duties** 13:14,15
13:18,20 82:7
**duty** 22:16

**e**

**e** 2:1,1 3:1,10
**earlier** 67:7
**early** 118:13
**east** 27:19,22
84:4
**easy** 93:17
**effective** 19:13
19:15
**efforts** 61:23
**egregious** 95:1
**either** 16:9
23:25 27:18,20
31:16 33:12
73:10 113:8
116:20
**electronic**
128:8
**electronically**
127:24

**elkins** 1:19
144:3 145:6
**ellsworth** 2:16
4:10,13 5:7
78:12 141:12
**email** 11:1 15:4
24:14 26:2
29:4,6 40:3
65:1,2,5 79:5
**emailing** 78:18
**emails** 3:11
10:24,25 11:13
53:18 131:22
**employed**
144:24
**employee** 92:11
92:12
**ended** 77:16
**enforce** 72:11
**enforcement**
11:17,23,24
12:9 13:17,21
14:19 20:6
21:12 28:15
32:9,22 70:24
72:11 74:8
82:9 87:21
93:8 107:12
114:24,24
116:10
**entail** 9:1
**enter** 36:19
**entire** 29:20
118:3

**entirely** 114:21
**entirety** 6:11
6:15
**entries** 109:20
110:2,16 135:7
135:15,24,25
136:1,19
138:21
**equipment**
21:11
**erase** 132:20
**errata** 142:1
143:8 146:11
146:13,16
**escorts** 20:5
**esq** 146:1
**essential** 82:7
**estimated** 24:2
45:16
**estrada** 84:4
128:16
**estray** 12:11,14
22:3,13 94:15
94:25
**et** 76:12 146:4
**eta** 84:5
**evade** 33:15
**evading** 31:13
33:6,9 34:19
34:22 35:2,11
73:22
**evaluate** 20:19
**evasive** 33:12
**eventually** 53:2

everybody  32:7
  118:1
everybody's
  49:14
everyday  26:23
evidence
  103:18,22
  104:8,11 105:1
  105:18 106:20
  120:17 123:7
  134:5
exactly  16:1
  52:4 56:23,25
  57:6 136:23
examination
  3:6 4:16
  133:17,18,20
  133:21 134:17
  135:25 138:22
examined
  133:11
examiner's
  134:10
example  19:22
  32:19 34:7
  94:14
excel  3:14
  91:11,21 92:1
  94:7 98:5
  123:17
except  7:22
  143:6
excuse  70:20
  87:1 107:13
  108:7

executed
  143:18
executive  12:20
  13:9,16,24,25
exhibit  3:11,12
  3:13,14,14,15
  3:16,16,17,17
  3:18,18,19,20
  9:20 10:15
  24:7,11 25:12
  25:13,15,20
  30:1,6,8,11
  33:3 39:25
  69:8,11,12
  79:14 80:12,14
  80:17,18 83:15
  91:9,17,19
  99:13,16,17,18
  99:20 100:5,5
  110:21 111:24
  112:17,18
  114:7,8,9
  115:14,14,15
  116:1,4,5,7
  117:12,12,22
  117:23,24,25
  121:9,25
  123:10,22,25
  127:25 128:4,6
  133:13,14,15
  138:12,12
exhibits  30:3
expand  69:21
  70:1,7 86:25
  98:6,7

expanded
  18:25
expect  17:22
  82:11,12 96:10
  96:14,17,20,23
  97:2,4 122:18
  125:4,10
  129:22 133:25
expected  96:1,5
  97:9,14
experience
  23:15 27:6,15
expiration
  145:7
explain  18:6
  26:4 31:11,11
  33:20 34:5
  40:18 73:13
  84:25 114:22
  114:25
explore  39:11
explorer
  128:18
expressed
  143:19
eye  32:9 52:21
  52:21 139:18

f

f  24:25 144:16
fact  51:2 66:12
fails  146:18
failure  21:10
fair  9:23 21:2
  21:13 25:7
  33:16,24 34:24

36:4 39:15
42:4 48:7
50:17 54:4
55:8,16 56:10
62:21 63:16,22
67:8 77:20
81:4,19 82:4
83:6,11 84:12
89:17 90:16
91:2 93:14
95:25 96:4,10
96:14,17,22
97:1,8,13
100:4 101:2,14
103:5,15 105:2
105:19 106:5
106:13 107:24
108:11,21
109:20 110:4
113:2 114:16
115:12,19
116:20 119:10
119:19,22
122:9 126:18
133:8 134:24
135:9 136:15
139:16,17,19
139:21 140:12
fall  43:21
falling  87:24
famous  83:14
far  49:10 98:24
  133:21
fast  34:4,6
  72:19

**[faster - four]**

**faster** 32:11
**fatalities** 40:12
40:21
**february** 69:17
70:20
**federal** 1:22
130:22
**feels** 64:3
**fell** 72:2,11
**felt** 67:19 97:16
**field** 33:11,19
42:24 78:9
**figure** 16:1
117:1,17
**file** 121:10
123:17 128:8
130:10
**filed** 130:14,21
138:20
**files** 127:4,5
**fill** 57:21,24
59:11
**filled** 14:16
58:3,7 69:1
79:24 80:3
84:11 126:1
140:24
**filling** 58:11
125:21
**filter** 92:22
**filtering** 93:18
**financially**
145:1
**find** 49:25 75:1
76:16

**findings** 55:21
55:21 134:10
**fine** 26:20
139:11
**finer** 45:9
**firearms** 16:25
18:9
**firm** 145:9
**first** 4:21 15:12
28:7,11 31:1
34:13 41:7
42:22 46:9
60:19 66:22
68:4,9 84:4
87:21 90:4
97:19,20 112:3
118:10 128:12
128:13 135:22
**five** 22:14
94:20
**flash** 123:12
**flip** 24:18 25:18
29:2,3 33:2
46:6 59:18
62:20 69:9
76:7,21 99:21
104:9 106:7
134:1
**flipping** 56:3
63:24 68:3
102:7
**focus** 85:16
118:6
**folks** 13:4
21:25 22:5

47:2 93:1
**follow** 25:19
58:16 59:6,8
59:19 64:1
83:22 85:7
106:2 139:13
**followed** 95:13
**following** 11:1
45:3 133:18
144:5
**follows** 4:15
**followup** 61:15
**footage** 8:3
94:3 101:1,7
101:17 102:21
105:5,9 106:4
106:25 107:4
107:15,22,24
108:14,23
109:6,24
110:23 111:10
111:14 118:23
119:2
**force** 15:17,24
16:11,18 17:8
17:9,11,12,17
17:22 18:1,5
18:20 19:19
21:4 26:6,7,10
26:13 50:21
51:17,19 52:17
61:22 64:7,8
64:11,12 65:7
65:17 66:7
77:13,19 88:22

**forces** 66:4
**ford** 24:25
**foregoing**
143:4,17
**forensic** 3:20
133:17
**forever** 134:18
134:24
**forfeiture**
122:23,25
**forget** 31:16
**form** 57:21
69:1 119:25
136:16 140:22
140:23,25
143:7
**format** 141:1
**formation** 61:6
**formed** 14:7
**forming** 16:17
17:9
**forms** 14:16
68:11,16,21,22
69:4
**fort** 145:9
**forth** 53:18
**forward** 51:17
56:12 76:12
120:7
**forwarded** 7:8
**found** 119:9
120:18 122:8
122:18 126:13
**four** 20:11 22:1
46:8,8 70:7,9

[four - going]    Page 16

84:12 92:21
93:1 94:9
**frame**  108:17
**frcp**  144:15
**freezes**  121:5
**freezing**  121:1
**freveletti**  10:8
72:12,13
**friday**  14:11
40:3 54:14,21
73:4 77:3
**friend**  83:14
**frigerio**  1:21
2:10,11,12 4:5
4:8 5:5,5 78:21
79:2,5 119:25
136:16 140:19
141:2,13 146:1
**frigerio's**  95:20
**frigeriolawfir...**
2:14 146:2
**frio**  76:11
**frozen**  120:25
**full**  5:17 6:22
23:17
**fully**  6:13
**fun**  9:18
**funds**  49:5
**further**  144:15
144:23 145:1
**furtive**  37:22

**g**

**g**  88:11
**g.com**  2:19

**gain**  78:10
**gamboa**  1:12
1:15 3:5 4:14
4:17 5:19
21:19 42:11
50:10 51:24
57:10 115:10
116:7,13 128:9
128:13 136:10
140:17 141:7
142:2 143:3,10
143:16 144:1,6
146:5
**gamboas**  71:1
**game**  21:14
**gang**  42:24
74:22 88:16,21
90:9
**garza**  110:16
110:19 111:6
**gas**  129:8,15
**general**  11:10
97:6 101:9
114:2 126:12
**generally**  6:24
11:5 82:1
95:24 102:19
108:16 125:11
130:5 132:6,11
**generate**  101:6
101:12,16
102:4
**generated**  42:7
93:24

**generating**
44:22 45:1
**gereb**  29:23
58:2 63:21
67:24 75:12,18
80:6 92:23
95:10,13,23
96:18 97:9,14
112:22 114:18
114:22 115:2
115:11,21
118:10,16,24
119:8,18,21
120:11,14,17
122:7,11
128:17 139:16
**getting**  14:8
36:3 41:16
55:20 74:5,6
74:17 87:17
118:15
**giant**  91:12
**gillespie**  61:16
64:15,19
**gilmore**  38:15
**girls**  118:14
**give**  6:21 10:21
28:24 49:23
56:15 128:24
130:25 131:9
131:17,21,24
132:3 137:11
137:15
**given**  70:12
141:6 143:5,20

144:8
**giving**  6:5
56:17
**glebe**  2:7
**go**  4:25 15:2
20:7,8,15,18
21:18,22 28:9
34:15 39:25
42:1 45:16
47:13 49:24
51:20 54:13
60:9 61:5,11
65:2 66:17
68:17 76:6
82:6,12 83:14
84:14,17 91:14
100:8 102:15
103:4,17 117:4
117:16 120:1,2
122:3 131:12
**goes**  17:2
102:23
**going**  4:25 5:2
5:8,13 6:10,14
6:15 8:25 9:3
9:19,19 10:16
10:17,19 11:9
14:24 24:6,7,8
24:12,22 25:4
25:19,23 28:5
28:9 29:2,3
32:13,13,13
33:22 34:8,14
34:15 39:22,25
41:11 43:9,18

50:5 56:12
61:14 63:4
64:2,23 66:16
69:9,10,20
70:18 74:10,18
76:21 80:16
86:5 88:13
91:8 93:16,17
95:16 98:6,21
98:22 99:6,16
99:22 100:9,18
104:9 113:6
114:21 117:1,2
117:11,15,17
117:21,22
118:2,5,9,11,16
118:19 119:5
119:12,12,13
120:14,20,21
120:22,22
121:8 122:3
123:11,24
127:24 130:10
133:16 134:9
135:5,22 136:7
136:13 140:15
141:9
**goliath** 28:12
**good** 4:17 22:8
78:17 109:2
129:7 140:7
**google** 20:17
**gotten** 58:14
**governs** 114:18

**grant** 135:8
**great** 78:14
79:8
**greater** 37:14
37:25,25
**greenhill** 2:17
**greyhound**
73:3,8
**group** 19:12,15
19:18 92:18
**guess** 7:24 18:4
20:1,14 45:8
55:20 62:13
76:16 95:12,21
95:25 97:18
**guest** 16:7
**guys** 39:6
131:14

**h**

**h** 3:10
**half** 77:17
**hand** 9:19
10:16 43:9
80:16 100:22
100:25 112:2
117:21 121:16
121:17 123:11
137:12 143:20
**handed** 30:11
**handing** 91:20
99:19 116:6
117:23
**handle** 10:21
**handled** 30:10

**handling** 40:20
**hands** 59:25
60:11
**handy** 49:2
**hang** 141:8
**happen** 32:21
34:4,5 59:2
68:25 78:8
**happened**
16:22 53:1
56:7 60:25
67:8 76:8
101:17 105:8
114:25 118:9
119:17 129:24
131:10 136:18
139:2
**happening** 25:8
84:25 89:6
101:1
**happens** 20:4
45:23 46:2
73:19 74:14
137:10
**happy** 70:13
92:22
**hard** 19:4,6
102:2
**hazards** 45:4
**head** 59:23
**headed** 6:24
**header** 135:3
135:20
**headquarters**
71:9,10

**hear** 32:20
58:10 120:10
122:13
**heard** 119:8
122:11
**hebert** 2:3 3:6
4:3,17,19
10:16,23 24:10
24:12 25:11,13
25:22,23 30:2
30:7,10 44:16
44:18 69:12,14
78:13,16,24
79:3,7,12
80:12,16,19
91:10,18 99:19
100:1 111:24
112:1,19 114:7
114:10 115:25
116:3,6 117:6
117:10,19
118:1 119:7,16
119:24 120:1,7
120:10,25
121:4,17,19,22
122:1,6 123:11
123:14,23
127:18,23
128:1,4,7,9
133:16 136:5,7
136:18 138:14
138:15 140:13
140:23 141:5
144:11

**hector** 2:11
**help** 7:11 19:14
 41:5 44:2 63:6
 63:11,19 67:21
 73:25 87:23
 88:24 102:13
 111:1 114:22
**helpful** 14:5
 46:5 76:6
 88:23 109:18
 114:4 123:9
 124:14
**helping** 128:18
**hernandez**
 92:23 94:14,17
 94:18,25 95:3
**hernandezes**
 94:16
**herndon** 36:23
**hesitated** 81:10
**hey** 31:21
 58:13 65:6
 75:6,6 89:15
**hidden** 38:14
 38:17,22
**hidta** 77:5
**higher** 47:14
**highlight**
 102:11
**highlights** 5:2
**highway** 20:8
 20:10,10,15,16
 20:18 85:4
 88:12,15
 118:12

**highways** 17:3
 17:13,18 18:2
 19:16 20:11
 23:6 27:17,23
 31:10 85:16
**hit** 5:2
**hold** 29:25
 78:15 117:2,13
 117:15
**holder** 117:23
 123:18 128:5
**home** 28:17
 38:3,4 49:20
 140:6
**homework**
 59:10
**honda** 36:14
**honest** 136:6
**honesty** 33:6,9
 34:19,23 35:3
 35:11
**hopefully** 49:23
 129:18,19
**host** 19:21
**hotel** 84:21
 85:11,24 86:6
**hotels** 48:21
**hour** 32:12
 36:22 108:17
 108:24 109:3,3
 118:11
**hours** 6:17 27:2
 33:5 34:23
 37:12 46:10
 47:14,19,21,23

 105:15 108:20
**hq** 70:25
**hub** 16:25
 65:25
**huge** 50:8
**huh** 6:4 33:9
 35:19 45:20
**hundred**
 127:10 139:24
 140:3,5
**hurt** 53:6

**i**

**idea** 11:10
 17:17 51:6,13
 111:20 139:4
**identified** 47:8
 77:19
**identify** 38:19
 38:21
**identifying**
 21:5 31:20
 36:2
**identity** 143:17
**idiosyncratic**
 95:17
**ignore** 75:6,7
**iii** 1:7
**ij.org** 2:5,9
**illegal** 16:25
 17:15 18:8,9
 73:12 119:10
**illicit** 123:4,8
**imagine** 37:16
 38:10

**imessage**
 134:18
**imessages**
 138:20
**important** 6:3
 6:6
**incident** 103:8
**incidents** 40:13
 55:3
**include** 17:14
 34:20 43:2
 50:11
**included** 56:8
 76:5
**independent**
 12:24
**indicates** 15:9
**indication**
 112:10
**individual** 1:6
 1:8,9
**information**
 9:21 10:2
 11:20 42:13
 50:8,19
**initial** 106:2
**initially** 34:3
**initiate** 15:17
**initiated** 42:21
 42:23 43:1,6
 44:10,22 45:1
 45:2,10,11,13
 54:6 124:17
**instance** 1:16
 45:24

**institute**  2:3,7
**instruction**
  39:18,19
**instructions**
  115:9 116:12
  131:1,18,22,25
  132:4
**instructor**
  110:20,22
**instrument**
  143:18
**intel**  71:2,10
**intention**  69:25
**inter**  65:10
**intercept**  19:25
  20:2
**intercepted**
  73:10
**intercepting**
  18:7
**interdicting**
  54:25
**interdiction**
  3:18,19 7:8,12
  9:22 10:3,8,11
  12:5,5,8 14:7
  14:18 15:14,17
  15:24 16:17
  17:7 21:4 22:1
  22:9,14 23:5
  23:22 26:17,24
  29:12,13,16,19
  30:12 33:25
  38:25 39:3,5
  39:14 40:9

41:4,7,10,15,17
41:19,21 42:2
42:3,8 47:18
48:2,3,13,24
50:9,12 51:4
52:13,24 53:20
54:3,17,24,25
56:5,11,21
57:11,12,17,18
57:24 58:3,7
59:23,24 60:9
60:11 61:8,20
61:22 63:1,5,7
63:10,18 64:11
65:7 66:23,24
67:23 68:11,12
68:13,17 69:21
70:1,10 73:2,3
74:2 75:9 76:2
76:2,12 77:4
77:15,22 78:1
78:18 80:5,25
81:5 82:3,11
83:2 84:3,9,20
84:21 85:3,4,7
85:16,23 86:7
86:11,25,25
87:5,24 88:3
88:10,14,25
96:18 112:4,9
112:23 113:2
113:13 115:12
116:17,23
122:17 124:3
124:21 126:3

126:12,16,21
126:24 139:19
140:8,18
**interdictions**
  85:25
**interested**
  145:2
**interlocal**
  65:14
**interrupting**
  6:8
**interstate**  23:7
**interview**  33:12
  33:20 35:11
  78:9 82:22,25
  83:4 96:15
**interviewing**
  89:16,22 97:10
**interviews**
  63:18,19 84:3
  85:20,24
**introduce**  96:5
  117:12
**investigation**
  21:16 28:14
**investigations**
  12:11
**investigator**
  22:2 95:5
**invite**  28:9
**invited**  15:22
  16:2,10,16
**involved**  15:15
  18:1 48:25
  49:1 50:23

52:17 133:1,2
**iphone**  134:11
**issue**  117:14
**issued**  43:14
**issues**  40:8
  43:22 66:21,22
  67:12 69:19
  79:19 86:24
**item**  24:19 50:5
  134:5
**items**  81:24
  135:6,19
  138:17

**j**

**jail**  140:11
**janalyn**  1:19
  5:8 91:20
  117:23 144:3
  145:6
**janalyn's**  5:14
**january**  86:21
  93:20,20
  136:24 137:1
**javier**  1:8
**jim**  50:7
**job**  7:15 58:2,6
  67:4 68:13
  78:18,19 81:1
  81:5,19 82:17
  83:10
**joel**  1:6 2:16
  146:4
**john**  22:17 93:4
  94:10

**join** 15:23 65:6
**joined** 5:3,6
**joining** 64:7
**joint** 64:11
**jonathan** 94:17
  95:3
**josh** 5:3 24:8
  44:16 80:13
  123:11
**joshua** 2:6
  91:10
**judge** 6:1
**july** 15:10
  76:24,25
  112:23 124:5
**jump** 65:1
**june** 3:12 72:18
  72:20,21 93:20
  130:15
**jurisdiction**
  18:23
**justice** 2:3,7
**jwindham** 2:9

**k**

**k** 75:23 99:16
**keep** 69:8
  129:22 132:19
  136:5
**keeping** 42:11
**kendall** 61:16
  64:15,19,19
**kenny** 38:6
**kerr** 61:16
  64:15,19,19,19

**kidnappings**
  18:9
**killed** 53:6
**kilos** 55:25 77:6
  77:17
**kind** 5:11 10:19
  11:8 15:3,25
  16:12 17:14,14
  18:17 19:21
  20:25 25:14,15
  34:16 35:25
  50:19 53:8
  55:7 72:1
  74:20 86:14
  87:10 88:3
  89:8,9,12,20
  91:4 102:1
  104:15 106:2
  134:1 140:11
**kinds** 85:24
**knack** 120:5
**know** 4:24 6:7
  9:18 11:8 17:1
  17:2,2,4,4
  20:14,20,20
  26:22 27:16,20
  31:7 32:10
  34:11 36:14,15
  37:22 39:9,11
  41:24 42:6
  43:18 45:7
  49:8,9,10,14
  51:17 52:4,14
  56:7,8,13
  58:14 59:3,9

64:4 67:12
73:14,15,22,23
74:16,16,17
75:2,6,15,16
76:1 80:4 86:5
91:21 94:10
96:11 99:22
100:1 101:19
101:21 102:3
111:2,4,11,19
111:19 112:20
114:13 117:14
121:4,12 124:2
124:10 125:19
126:1,15,15,16
126:20 127:1
127:20 128:15
128:17,23
133:4,4 134:2
136:22 137:19
137:21 138:1
138:10 139:9
139:17 140:1
**knowledge**
  125:8 132:23
  133:3 136:19
  137:24 139:5
**known** 20:23
  125:5 143:16

**l**

**l** 133:13
**labeled** 24:17
  87:22 91:25
  92:2 127:22
  135:8

**lane** 31:15,15
  31:17
**lanes** 21:11
**language** 113:1
**laptop** 121:16
**large** 10:17
  64:3 76:22
  121:5
**late** 118:13
**laundering**
  17:15 123:5
**law** 2:12 20:6
  21:9 32:8,22
  74:8 107:12
  114:24 140:10
**lawsuit** 130:10
  130:14 133:7
**le** 107:12
**lead** 19:21
  45:13 74:20
**leading** 45:10
**learn** 27:5,14
  58:10,11 63:14
  63:14 130:15
  130:19
**learned** 39:10
**learning** 82:16
  113:17
**leave** 22:22
  99:13 141:9
**led** 77:5
**left** 81:2 100:11
  100:11 104:15
**legal** 145:8
  146:23

**lemur** 28:21,22
  28:25
**lessons** 39:5
**level** 105:22,23
**license** 37:8
  96:11 131:4,6
**lieutenant** 9:22
  10:2,4,8,11
  11:19 12:1
  14:20 56:15
  67:19 71:16
  72:6,10,12,13
  107:10,11
  109:10,12
  110:6
**lieutenants**
  9:25
**light** 135:2
**likely** 32:25
  38:9 76:4
  77:13,19 95:1
  95:7
**limit** 32:11,11
  32:14
**line** 42:22 47:4
  105:21 142:3
**lines** 46:8,9,12
**list** 40:12,16,17
  40:22 42:11,14
**listed** 62:1
  82:18,23 94:9
  115:23 116:23
**little** 29:4 32:4
  47:13 49:2,3
  81:10 83:24

  119:8
**live** 34:12
  61:16 64:16,19
  76:11
**livestock** 12:13
  12:14 13:2
**local** 65:10
**log** 135:15
  136:19
**logs** 131:25
  132:4,7,18,24
  135:23 136:14
  139:6
**long** 64:1
**longer** 115:18
  115:23 117:16
  119:8
**look** 6:10,11,14
  14:10 21:23
  22:7 26:20
  28:10 35:13
  37:13,21 38:1
  39:22 40:8
  51:15 69:19
  70:23 72:17,25
  77:1 79:3,13
  80:19 81:21
  86:20 87:7,11
  88:7 89:25
  90:3,4 91:11
  98:20 99:16,20
  100:9 102:7,19
  104:2,10 109:4
  110:9 111:2,5
  111:16 112:12

  114:7,10
  115:17,25
  124:23 133:13
  135:1,11,19
  138:11,15
  140:8
**looked** 45:24
  54:10 84:9
  87:20
**looking** 9:15
  11:6,10,22
  15:12 24:19
  25:13 27:23
  32:21 34:20
  38:11 40:1
  46:24 56:19
  62:21,24 66:18
  68:1 70:2
  79:18 83:21
  86:23 87:13
  95:23 98:5
  99:10 100:22
  103:2,4,23,24
  112:13 138:16
  140:1
**looks** 11:14
  30:15,21 33:6
  34:22 35:2
  42:2 50:1 54:6
  68:4 87:12
  104:10 105:11
  105:12 107:2
  107:22 108:3
  109:4,19,23
  110:6 114:22

  119:9 124:15
  140:6
**loose** 12:13,14
  13:2 129:19
**lot** 9:4,21 20:5
  27:17 30:3
  31:19 124:25
**lots** 9:18 50:8
**louie** 84:4
  128:16
**luggage** 34:14

| m |
|---|

**m** 116:4
**ma'am** 4:23
  5:10,16,24 6:2
  6:9,20,23 7:4
  7:18 8:16,21
  9:2,7,11,14
  10:6,13 12:3
  14:4,9 15:19
  16:14 19:1
  21:3,17 23:10
  25:3,9,17
  26:11 27:13
  29:1,9 30:14
  30:16 33:4
  34:21,25 35:4
  35:21 36:24
  37:1 39:16,16
  39:21 40:4,7
  40:15 41:3
  42:5,12 43:4
  45:18 46:13,19
  47:17,20 48:5
  48:5,8,10 49:1

49:6,12,21
50:4,14,18
51:12 52:8,25
52:25 53:21
54:1,5,9,12,19
54:22 55:5,14
56:2 57:22
58:1,5,9,9 59:7
59:21 60:2,15
60:21,24 61:10
61:13,24 62:4
62:23 63:3,9
63:19 64:5,10
64:21,24 65:8
66:5,13,15,20
67:2 68:15,19
69:15,18,22,24
70:11,17,22
71:4 72:15,20
72:24 73:6
74:15 75:6
76:9,15,25
77:9,21 79:17
80:1,21 81:7,9
81:17,20,25
82:5,20 83:3
83:12,16,23
84:7,13,16,18
86:1,3,22 87:3
87:6,15,19
88:1,19 89:4
90:2,12 91:3
92:7,13,20
94:5,19 95:15
96:3,9,25 97:7

97:12 98:11,15
99:2,5 100:14
100:21 101:3
101:18 103:3,6
103:13,16
104:12,18,21
104:23 105:3
105:10,14,17
105:20,25
106:6,11,14,16
106:19,22
107:1,5,9,25
108:2,5,8,12,15
109:7,11,22
110:1,8,14,18
112:25 113:22
114:3,14,17
115:8,16
116:15,21
119:11,20
120:19 122:10
124:18,22
130:7,18
132:22 134:6
134:12 137:25
139:20,22
140:4
**machine**  1:20
**made**  42:16
  54:24 67:14
  73:20 77:23
  83:7 85:13
**main**  35:10
**maintain**  21:11

**major**  40:20
**majority**  45:11
**make**  26:7 34:3
  37:17 38:3,4
  44:15 59:4
  60:4 75:2 78:3
  78:4,4,7,8 83:9
  91:22 93:17
  95:2 121:11
  131:18,22,25
  132:24 133:23
**makes**  24:6
**making**  14:16
  18:7 37:22
  74:11 89:7
  125:20
**male**  118:13
**man**  19:10 23:6
  70:7,7 80:9
**manual**  82:2
**march**  70:20
  100:12 103:12
  104:4,13,17,19
  105:2,13 106:3
  106:15,23
  107:4 129:24
  130:1
**margin**  102:1
**marine**  12:21
  14:2,3
**mark**  9:20
  10:17 24:10
  99:17 121:8
  127:24 133:13

**marked**  10:15
  24:11 30:6,11
  80:17,18 91:17
  91:19 99:18,20
  112:18 114:9
  116:5,7 117:22
  117:23,25
  121:25 123:22
  128:6 133:15
**marking**  122:1
  123:25
**marta**  107:11
  107:14,18,19
  107:21 109:24
  110:2
**martin**  1:7
**match**  26:8
**materials**  8:18
**math**  22:12
  44:16 49:3
  136:7
**matter**  51:2
  123:2
**max**  129:6
**mean**  21:6,9
  23:14,17,18
  26:25 29:20
  30:20 31:11
  38:10 40:23
  41:9,15 44:6
  44:21 45:6,8
  46:16 47:18
  48:11,21 49:18
  51:5,25 52:20
  54:7 55:18

58:20 59:14
64:11 68:16
73:13 75:5,13
77:22 80:6
81:15 82:17,25
86:13 89:5
95:25 98:16
101:25 106:23
125:12,12
**means** 6:4
21:24 34:10
**meant** 41:11,25
**median** 31:14
**medina** 76:11
**meet** 16:10
**meeting** 15:15
15:23 16:16,20
16:23 24:15
26:3 27:3 28:4
28:6,7 33:22
45:25 50:8,10
52:9 61:15
62:16,18
**meetings** 65:4
**meets** 122:22
**member** 74:22
**memory** 30:17
**mention** 112:8
**mentioned**
33:19 111:6
**message** 134:17
138:21
**messages**
131:25 132:4,7
132:18,25

134:23 138:23
138:23 139:3,6
**messaging**
134:13
**messed** 83:25
**met** 4:20
**methampheta...**
77:6
**methampheta...**
77:17
**midatlantic**
146:15
**middle** 66:9
**migrants** 53:2
53:4
**mike** 35:18
**miles** 32:12,14
118:11
**military** 88:16
**mimic** 17:23
**mind** 5:17 11:3
25:19 29:3
49:3,25 61:14
62:24 63:24
64:3 68:3
69:10 78:18,25
79:18 80:23
83:21 86:23
114:10 117:6
138:16
**minimum**
123:1 126:9
**minus** 43:12
136:13

**minute** 24:19
45:25 91:14
118:19 119:14
120:8
**minutes** 24:17
24:18 34:23
36:22 79:10,10
84:10 105:15
117:3 118:7,10
118:20,20
122:4
**missing** 22:4,14
22:15 46:24
136:14 139:6,6
**mission** 85:4,6
**mistaken** 60:25
**molina** 1:7 5:4
75:21,23 76:1
86:2 129:6
**moment** 10:21
**monday** 31:3
58:14 90:6
**money** 17:1,15
23:7,21,24
24:4 48:12,14
55:21 122:8,12
123:3,5,7,7
125:6,7,20,22
**month** 23:8
**months** 124:25
**morning** 4:17
31:4 78:23
**motel** 84:21
85:11,24 86:6

**motion** 24:24
**motor** 29:11,15
30:12 36:25
37:3,6
**mou** 27:7 53:22
65:15 76:10,13
**mounted** 12:19
13:4,7
**mous** 53:25
**move** 51:17
76:12
**moved** 67:12
71:10,11 72:3
93:7,8
**movement**
37:22
**moving** 31:9
51:17 72:1
**mueller** 2:17
**muldau** 7:9
130:16,20,25
131:5,17,21,24
**muldau's** 4:21
**multiple** 44:6
51:25 52:2,5
55:1
**mvci** 3:13

**n**

**n** 2:1,7 3:1
114:7
**name** 5:17
35:14 74:20
92:5 116:11
128:12,13
134:7 141:3

**[name - officers]**

142:2 143:17

**narcotic**  77:14

**narcotics**  16:25
17:14 18:9
48:7 73:11
77:6 119:10
129:5,8

**narrow**  102:3

**natural**  138:7

**nature**  16:8
17:1,5,16
18:10,16 33:23
36:11,21 42:25
44:8 48:23
73:12 89:10

**navigate**  27:10
117:2 127:19
131:12

**nearest**  31:15

**necessarily**  8:8
93:11 94:7,12
112:14

**need**  6:12 19:14
21:19 37:7
58:14,21 59:22
65:10,22 66:11
66:23 67:16
69:21 86:24
91:9 97:23
98:3 99:14
111:4 114:5
141:10

**needed**  60:8
67:19

**needs**  117:7

**negotiator**  63:2
63:6,10,17

**neither**  44:4
144:23

**net**  20:25 21:6

**never**  53:24
59:12,12 60:25

**new**  27:19,22
29:10 70:23
84:17 137:2,3
137:6,9,15

**nixed**  53:9,10
53:12

**nodding**  6:4
138:7

**normal**  34:16
38:13

**normally**  7:22
32:17

**north**  17:3,3
18:1 26:8
27:17 59:24
60:10 66:23
68:12,13

**notary**  143:22

**note**  98:21,22
98:23 99:1
146:10

**noted**  143:7

**notes**  45:25
57:2,3

**notice**  5:12
74:8 127:21

**noticing**  31:13
38:12

**notified**  130:17

**november**
66:19 67:6
84:15 86:11

**number**  23:19
30:7 43:11,25
45:2,21 46:16
46:20 81:12
92:10,11,12
123:19 124:19
124:20,23,24
125:3,4,11
128:1 134:5
138:12 140:2

**numbered**  1:17

**numbers**  12:24
41:22 136:15

**o**

**o**  111:25

**o'clock**  108:17

**oak**  61:16
64:16,20 76:11

**oath**  5:20,22,25
143:16

**objection**
119:25 136:16

**objections**  5:13

**observe**  59:24
60:10

**obtain**  131:12
139:6

**obtained**  123:3
123:7

**obviously**
102:2

**ocd**  55:2 71:1,2

**october**  54:21
61:12 62:21,22
63:20 110:12
110:12 124:6

**offense**  120:3

**office**  9:4,5,6
10:1 27:4 49:5
49:19 55:16
57:9 59:15
60:8,10,17
69:25 74:10
85:20 128:20
143:20

**office's**  82:2

**officer**  32:9
33:21 42:21,23
43:1,6 44:10
44:22,25,25
45:2,7,10,11,13
47:8 54:6 74:3
92:10,25 96:5
96:11 124:16
144:7

**officers**  18:18
19:18,24 20:2
20:11 57:3
71:22 72:10
77:13 92:18,21
94:9,21 96:15
96:18 112:9
122:17 133:1

| | | | |
|---|---|---|---|
| **offices** 1:21 | 28:4,10 29:7 | 67:6,16,18,23 | 110:21 111:12 |
| 2:12 70:25 | 29:19 30:10 | 68:1,2,9 69:4 | 111:22 112:21 |
| **official** 1:6,8,9 | 31:19,25 32:3 | 70:18 71:11,24 | 113:1,10,15 |
| **officially** | 32:18,20,24 | 72:3,8,13,16,20 | 114:4,6,15 |
| 126:17 | 33:16,24 34:5 | 73:18,25 74:12 | 115:6,9,14,25 |
| **oh** 6:5 12:14 | 34:19 35:5,10 | 74:14 75:3,9 | 116:10,19,25 |
| 13:15 22:4 | 35:13,15 36:1 | 75:23 76:1,6 | 117:13,19 |
| 28:25 50:4 | 36:12,17,20 | 76:21,21 77:10 | 118:18,19 |
| 54:16 65:23 | 37:11,19,24 | 77:18,25 78:4 | 119:1,4,16 |
| 81:15 102:4 | 38:4,5,8,14,24 | 78:11 79:18 | 120:10,17,20 |
| 103:23,25 | 39:12,22,24 | 80:6,16 81:4,8 | 120:24 122:6 |
| 104:12 105:25 | 40:18,22 41:1 | 81:10,15,21,23 | 122:11,15,17 |
| 107:13 113:11 | 41:7,15,23 | 82:8,21 83:8 | 122:24 123:2,9 |
| 113:14 123:14 | 42:1,13,21 | 83:13,21 84:14 | 123:23 124:5 |
| **okay** 6:3,8,10 | 43:1,14,17,21 | 84:17 85:15 | 124:10,13,23 |
| 7:5,10,21,23 | 43:24 44:1,9 | 86:2,10,20 | 125:4,18,25,25 |
| 8:2,7,10,14,17 | 44:18,20,21 | 87:7,9,15 | 126:7,15,23 |
| 8:22 9:3,15 | 45:16,23 46:5 | 88:20,23 89:24 | 127:4,8,17,23 |
| 10:10,14,20,23 | 46:6,20,23 | 90:13,15,21 | 128:15 129:1,3 |
| 11:11,12,18,22 | 47:1,5,15,21 | 91:7,9,18 | 129:16,17,20 |
| 12:1,4,14,18,23 | 48:6,18,24 | 92:18 93:3,16 | 130:5,8,14,17 |
| 13:15,20,23 | 49:7,13,22 | 93:23 94:6,13 | 130:23 131:5 |
| 14:2,5,17,21,24 | 50:5,15,25 | 94:20 95:12 | 131:14,24 |
| 15:1,12,25 | 51:5,9,13 52:3 | 96:22 97:1,8 | 132:9,16,23 |
| 16:12,22 17:6 | 52:6,11,18,23 | 97:13,24 98:5 | 133:16,24 |
| 17:12,17 18:4 | 53:7,16,24 | 98:20 99:12,12 | 134:3,9,13 |
| 18:11,14 19:14 | 54:13,20 55:18 | 99:19,25 100:4 | 135:1,18 |
| 20:1,14,24,24 | 56:3,6,15,19,23 | 100:8,8,18,22 | 136:13 137:1,9 |
| 21:8,13 22:5,7 | 57:5,10,16,23 | 101:19,22 | 137:16,19 |
| 22:7,11,17,25 | 59:8,18 60:16 | 102:7 103:1,17 | 138:1,7,11 |
| 23:2,11,15 | 61:11,25 62:10 | 103:21 104:9 | 139:2,5 140:1 |
| 24:2,6,16,21 | 62:20,24 63:10 | 104:16 105:11 | **old** 137:6,12 |
| 25:4,10,18 | 63:14,16,20 | 106:7 107:6,17 | **olg** 1:5 |
| 26:9,12,18,25 | 64:6,22 65:5,9 | 107:21 108:16 | **once** 78:7 |
| 27:5,10,23 | 66:2,16,17,21 | 109:15 110:11 | |

[ones - passenger]

ones  7:25
ongoing  61:14
open  20:20
   109:13,15
   111:15 141:9
opening  7:12
   7:13,14 80:24
operate  37:8
operating
   96:21
operation
   26:23 73:3
   75:9 76:3
   85:21
operationally
   50:22
operations
   87:25 88:4
   90:14 113:12
option  93:18
optional  98:21
   98:22,23
oral  1:12,15
   144:7
order  11:1 59:6
   59:8 112:22
   115:19 116:9
   116:16,20
ordered  24:23
   59:11 133:10
orders  3:12,16
   3:16,17 24:13
   112:8,12
organized  8:12
   25:1,5,7 46:1

71:7,21
original  54:10
   144:10
orleans  27:19
   27:22
ortega  10:4
   11:19 12:1
   56:15 67:19
   71:16,17 72:6
   72:10 107:10
   107:11,12,14
   107:18,21
   109:24
ortega's  110:2
otj  66:24
outcome  145:2
outside  47:22
   47:22
oversaw  13:24
oversee  11:24
own  4:22
owners  46:4

**p**

p  2:1,1
p.c.  2:12,17
p.m.  1:18
   105:16,17
   106:23,24
   108:7,25 109:2
   109:3
page  3:2,11
   11:22 14:10
   15:2,2,3,3,4,9
   15:12,13 21:18
   21:22,22 24:18

24:19,20 25:14
25:18 28:11
29:3,3 33:2,2
39:22 40:1,2,2
42:1 46:6
49:24,25,25
50:6 54:2,10
54:17,23 59:18
59:19 61:11
62:1,20,22
63:24 66:16,18
66:18 68:3
69:11 72:17,19
76:7,23 79:13
83:11,17,22
84:14 86:20
87:7,11,13,21
87:22 88:6,8
89:25 100:9
102:19,23
103:1,2 104:9
106:7,8 109:21
128:12,13
134:2 135:18
135:19 138:11
138:15 142:1,3
143:8 144:21
pages  11:6,9
   14:25 56:4
   83:17 102:8,20
   104:25 105:7
   134:1 143:4
paper  30:3 79:6
   79:7

papers  28:12
   28:21,23
paragraph
   66:2 134:14
   135:2,22
   138:16
parcels  54:25
pardazi  31:5,6
   32:24 33:7,8
parents  118:15
parole  74:21
part  8:8 12:6,9
   13:13,17,21
   15:14 18:19
   20:16 39:18
   41:7,20,21
   64:25 65:25
   66:6 78:22
   83:1 86:2 90:7
   106:2 115:18
   118:2,16 120:4
   128:14 131:1
   133:7
particular  20:6
   20:8 56:9
   67:18 77:18
parties  144:13
   144:24
parts  118:6
party  144:17
pass  50:19
   141:5
passed  50:9
passenger
   35:17 36:4,8

[passenger - potentially]                                      Page 27

36:13,13,16
passengers
  35:25 36:3
passing  19:17
password
  111:2
paste  102:15
pat  96:24
patrick's  135:9
patrol  12:19,21
  13:4,7 14:2,3
  55:1 84:4 97:3
  97:11 115:2
patrolman
  86:14
pattern  95:14
patterns  31:13
  32:6
pause  117:7
payout  22:23
pedestrian
  88:17 89:2,12
  90:9 91:2,5
pedro  1:12,15
  3:5 4:14 5:19
  115:10 116:12
  142:2 143:3,10
  143:16 144:1,6
  146:5
people  19:5,8
  44:6,23 73:10
  73:11,16 89:8
  89:16,20
people's  34:20

percent  44:21
  44:21,23,25
  45:9 49:5,11
  49:13,19
  127:10
period  46:18
  47:19 48:12
  53:14 55:22
  71:5 115:1
  124:21
periodic  8:2
periodically
  7:24
person  34:16
  62:6 74:1
  140:10 143:17
personal
  133:20 138:2,8
personally
  143:16
personnel  19:5
  21:24 115:3
persons  43:24
  44:10
pete  50:10
  51:24 128:13
ph  145:10
phone  132:7,25
  133:19,20,22
  134:10 136:20
  136:22 137:2,3
  137:6,6,9,13,15
  138:2,9 139:7
phones  133:1,3
  133:5,10,11

137:14
physical  34:20
picked  118:15
picture  100:9
  100:10,11
pilot  26:17
  113:5,7
pin  140:1
place  24:24
  30:13 100:19
  117:23 123:7
  123:18 128:5
placeholder
  91:20
places  48:18,20
  67:11
placing  28:18
plaintiff  1:4,16
  2:2 4:19
plan  17:23
plans  74:17
plate  131:4,6
play  117:22
  118:19 119:5
  120:20,22
  122:3
played  121:12
playing  119:6
  119:15 120:9
  122:5
please  4:3,10
  117:15
plug  121:16
  123:12,15,16
  136:11

plugging
  121:20
plus  43:2
point  45:9 53:8
  53:11,13,24
  54:24 55:20
  57:6,10 59:12
  71:14 88:2
  119:13 125:13
policed  20:13
policing  19:9
  21:7
policy  82:2
pop  117:14
portions  6:16
position  7:13
  7:14 8:5 79:23
  80:2 81:1
  82:18 84:11
positioning
  37:20
positions  70:3
  70:7 114:2
possession
  28:24
possibility
  130:12
possible  23:14
  56:22 93:17
possibly  32:10
  40:11
postal  55:8
potential  44:4
potentially
  20:12 45:6

practice 97:6
132:6,18
134:22
preauthorizat...
68:21
prefer 79:5
preferred
81:22
preparation
7:1
present 42:2
54:3
presentation
3:20 128:15,22
128:24
pretty 28:1
130:24
previous 81:13
136:21
previously 4:20
9:21 14:6
26:10 64:9,15
76:14 85:19
87:20 91:5
107:19 129:21
print 102:3
prior 40:1
62:22 65:4,23
66:18 81:18
136:1 138:23
139:7
private 55:13
proactive 19:8
21:7 23:13
51:4 90:8

probable 46:10
47:5,8 77:16
78:1,7 97:22
97:24 98:3
124:16
probably 5:1
14:15 18:18
26:16 31:2,9
35:6 36:10
38:10,21 45:22
50:23 75:11
78:20 85:2
86:9 102:11
124:21,22
126:5 128:22
136:24 139:21
139:23
probation
74:21
problem 30:5
52:16,18 58:19
procedure 1:23
proceeding
144:25
process 79:8
produce 121:9
produced 1:15
10:24 117:12
133:18
production
140:15
profile 93:9
program 26:17
113:5,7 128:18
128:19

prompted 94:4
proposal 66:3
proposing 17:7
propounded
143:6
prosecution
18:20
protect 37:23
protection
12:20 13:9,16
13:24,25
proved 143:16
provide 10:2,7
10:10 123:25
128:7
provided 9:21
11:20 124:8
133:19
provider
137:24 138:1
provision
113:19
provisions 1:23
public 143:22
pull 13:5 24:7
30:2 85:15
96:1
pulled 91:18
pulling 73:15
purposes
143:18
pursuant 1:22
144:15
pursuit 53:5
118:21,22,25

pursuits 53:5
pushing 93:13
put 10:25 15:3
25:6,12 39:23
45:9 83:8,13
91:8 102:12
107:18 111:22
114:5 116:3
139:11 140:11
putting 140:7

**q**

qualifications
5:14 81:22
qualified 5:15
question 6:7
22:8 24:7
33:15
questions 6:6
23:11 33:11,19
33:21 34:1,18
63:15 74:19,19
96:15 112:2
113:15 129:19
139:14 140:14
141:12,13
143:6
quick 36:4
117:7
quite 140:23

**r**

r 2:1 30:2
raised 98:13
ran 126:17

**range**  125:11
**rapid**  35:17
  36:3,7,9
**ray**  10:4 36:23
  71:17,18
**rbf**  1:5
**react**  32:7
**reaction**  32:15
**reactions**  34:20
**read**  15:18 23:3
  23:9 24:22
  25:2,23 50:5
  50:13 55:4
  59:20 60:1
  63:4,8 64:2
  68:14 69:20,23
  70:20 71:3
  77:8 83:25
  84:19 87:2
  88:12 102:2,13
  127:9,14
  133:25 134:15
  134:19 135:5
  135:22 136:2
  138:19 143:4
  146:9
**reader**  131:6
**reading**  15:13
  23:5,23 24:23
  25:24 28:11,21
  29:11 40:9
  46:9 50:6
  54:24 59:22
  61:15 63:5
  66:2,22 67:1

68:10 69:20
70:24 73:2
77:3 79:21
84:3,19 86:24
88:10 90:7
99:3 104:11,14
113:11 115:9
116:11 124:17
134:17 135:6
135:23 138:19
**ready**  76:22
  99:22 112:20
  114:13
**realize**  113:16
  129:4
**really**  23:18
  118:24
**reason**  6:21
  67:18 142:3
  146:11
**reasonable**
  97:16,19
**reasons**  52:20
  144:21
**reassigned**  70:4
  71:20 113:11
  114:23 115:22
**reassignment**
  113:18 114:1
  115:6,17,21
**recall**  30:19
  128:11
**receipt**  144:19
  146:17

**receive**  66:24
  68:12
**received**  24:13
  25:24 46:1
  49:5
**recently**  4:24
  79:22 133:19
**recess**  79:11
  117:9,18
**recipient**  81:12
**recklessly**
  118:12
**recognize**
  38:22 39:10
**recognizing**
  31:17 32:8
**record**  1:24
  5:18 6:4 25:1
  25:21 46:23
  79:9,12 91:14
  91:16 92:4
  103:18,22
  104:8,13,15,24
  105:18 106:20
  117:5,10,17,20
  121:8 132:14
  138:5 144:8
**recorded**  92:19
  99:7
**recording**  99:4
**records**  3:15
  76:5 86:9
  100:6 102:21
  109:14,15
  111:15 131:6,9

131:13 141:7
**recover**  125:7
  125:17
**recovered**
  23:25 45:17,22
  45:23 46:3
  124:24,25
  125:5,14 126:4
  126:21,24
  127:5
**recovering**
  77:17
**recovery**
  126:12 129:6
**recruited**  53:3
**reference**  65:23
**referenced**
  146:6
**referring**  9:5,9
  9:13 61:21
  64:8 113:20
**reflect**  86:9
  102:21 103:7
  105:8 106:4
**reflecting**
  66:11
**refreshing**
  30:17
**refused**  59:10
**region**  51:3
**regional**  26:9
**regions**  17:10
  51:11
**registration**
  145:9

| | | | |
|---|---|---|---|
| **regular** 16:12 | 69:8,16 70:19 | **rescues** 28:19 | **reviewing** 64:3 |
| **related** 144:24 | 72:18 76:23 | 28:24 | 92:5 93:10 |
| **relates** 17:6 | 79:14 83:18 | **reserve** 141:12 | 107:24 |
| **rellsworth** 2:19 | 84:15 86:21 | 141:13 | **reviews** 3:15 |
| **relocating** | 87:12 88:6 | **residence** 28:16 | 92:2,3,16 |
| 70:25 | 115:10 116:12 | **response** 32:22 | 93:19,24 |
| **remember** 5:1 | 133:17,21 | **responsibilities** | **richard** 94:14 |
| 22:24 29:18 | 140:20 | 82:7 | 94:17,25 |
| 30:24 32:2 | **reported** 1:20 | **responsible** | **ridealongs** |
| 49:4 52:4,11 | 56:1 | 40:20 | 26:25 27:14 |
| 52:14 53:11 | **reporter** 4:1,4 | **rest** 54:2 71:1 | **right** 4:2 6:11 |
| 56:23,25 57:6 | 4:6,9,11 5:7,15 | 89:24 | 6:15,18 14:8 |
| 62:11 75:10 | 119:23 123:20 | **results** 3:20 | 14:11,24 15:6 |
| 111:2 112:6 | 124:1 144:4 | 133:21 | 21:18 22:25 |
| 125:13 126:5 | **reporter's** 3:8 | **retention** | 29:2,8 32:6,9 |
| 129:6,22 130:3 | 5:14 144:1 | 105:22,23 | 34:11 40:14 |
| 132:13 136:23 | **reports** 10:10 | 134:18,23 | 42:10 44:15 |
| 137:3,11 | 11:15,19 14:13 | **retro** 68:23,24 | 45:3,8,8 47:16 |
| **reminding** | 56:12 57:3,11 | **retroactive** | 49:10,19,22 |
| 129:23 | 57:12,17 59:15 | 68:21 | 50:3 54:16,18 |
| **repeat** 90:6 | 69:10 87:17,23 | **return** 146:13 | 55:4,11 57:13 |
| 132:16 | 140:16 | 146:16 | 57:15 60:1 |
| **rephrase** 39:2 | **represent** 4:19 | **returned** 46:3 | 63:8 65:12 |
| 44:24 63:4 | 10:23 24:12 | 144:19,20 | 66:10,14 68:7 |
| **report** 9:23 | 92:2 100:18 | **review** 6:13,15 | 69:17,23 70:21 |
| 10:7 11:23 | 133:16 134:9 | 7:5,19,25 8:3 | 71:3 72:18 |
| 14:18 15:6 | **request** 24:24 | 11:4,7 31:25 | 73:5 76:20,24 |
| 29:5 40:2,5 | 68:11,20 | 80:22 92:14 | 79:9,25 83:9 |
| 54:13,14 56:3 | 109:16 | 94:3,4,6 | 83:19 84:6,23 |
| 57:18,25 58:4 | **requested** | 108:13 112:19 | 86:17 87:13,17 |
| 58:8,11,14,18 | 111:16 144:17 | 135:8 146:7 | 88:12,18 89:21 |
| 58:22 59:1,5 | **require** 57:23 | **reviewed** 8:1,7 | 90:11 93:21 |
| 59:11 61:12 | **rescheduled** | 8:10,14,18 | 95:18 99:4 |
| 62:20 66:19 | 61:1 | 98:17 107:22 | 100:20,22,25 |
| 67:11 68:5,6 | | | 102:1 104:11 |

**[right - section]**

104:14 105:5
105:22 106:18
107:15,19
108:4,7 110:7
113:3,14
117:16 123:17
124:17 125:9
126:10,14
127:7 130:5
135:16 136:2
138:25
**road**   2:7
**roadside**   82:21
82:25
**roadway**   20:6
**roadways**
20:22
**robberies**   18:9
**rodriguez**
107:19
**role**   8:11 13:16
**ross**   110:16,19
**rough**   4:1,6,11
**route**   20:17,21
**routes**   20:7
**routine**   95:13
**row**   98:12
103:5,7,23,24
104:2,3,3,14,19
105:12,24
106:8 107:3,6
108:3,18,19
109:4,20,20,23
110:2,6,9

**rows**   93:18
105:8 106:1
107:2,23 111:6
**rule**   49:10
**rules**   1:22 4:24
113:19,23
114:2
**run**   75:3 110:2
**ryan**   2:16 4:9

**s**

**s**   1:21 2:1,10,12
3:10 46:10
51:23 146:1
**sa**   61:19
**saenz**   2:11 5:5
**safe**   37:17 96:2
140:6
**safety**   37:25
40:17,19,25
41:14,22
**saint**   135:9
**sake**   82:15
118:21
**salazar**   1:9
15:22 16:2,16
62:18 79:22
**sales**   123:8
**san**   1:2,22 2:13
15:22 16:5,25
19:23 20:10
30:21 88:11,15
90:23
**sarge**   122:12,15
**satx**   90:8,23

**save**   132:4,6,10
132:21
**saved**   131:18
131:22 132:1
132:25
**saw**   64:15
86:14 118:23
119:8
**saying**   6:4
32:20 60:7
65:6 73:16
89:15
**says**   15:13 23:5
28:11 46:9
60:14 63:1
64:7 86:24
98:9,12 134:5
135:3,22
**sbcglobal.net**
2:14
**scenario**   59:14
**schedule**   61:3
**schott**   1:3 4:20
100:19 102:22
129:23,25
130:2,8,9,14,21
133:2 146:4
**schott's**   110:23
131:3,6
**schuler**   79:23
**scrambled**
99:24
**screen**   91:19
129:17

**scroll**   98:8,21
98:23 99:6
123:24
**seal**   143:20
**search**   17:18
46:10,10,10
47:3,9 48:22
78:2 97:15,19
118:17 119:9
**searched**   46:17
**searches**   46:14
47:5,7 124:16
**seat**   37:22
**second**   11:3
23:3 29:10
33:2 59:19
60:16,22 69:20
78:15 79:21
83:11,25
112:19 117:13
127:19 134:14
138:16
**seconds**   118:20
118:20
**section**   23:1
25:19 31:24
40:8 46:9 48:6
56:1 59:19
62:25 66:22
68:2,5,10
69:19 70:19
72:25 77:1
79:19 83:22
84:17 90:4
92:6,19 103:18

[section - sheriff]                                    Page 32

115:17 134:14
135:2,11
**sections** 20:13
64:2 68:10
84:22 121:6
**sedan** 24:25
36:14
**see** 11:22 14:10
20:5 21:24
22:22 26:22
29:4,10,25
30:23 31:3,14
35:14,17 43:14
43:24 45:19
46:12 47:5,13
48:6,9 50:1,6
52:21 53:22
54:2,17,23
56:10 62:25
64:25 66:17,21
68:1 74:24
81:24 87:16
90:6 92:5,14
92:18,21,23,24
93:18,19 94:16
94:24 98:7,9
98:12,14,23,24
98:24 100:10
100:11,13,15
100:16,24
102:2 103:1,1
103:4,12,14,18
103:25 104:2
104:13,15,17
104:22 105:21

106:8,8,10
107:6,8 109:8
110:3,12,15,17
111:16 113:1,7
113:16 115:9
116:10,11,14
116:19 121:7
122:12 124:5
124:10,15,19
124:24 128:12
134:4,7,14
135:2,13,15,20
**seeing** 11:4
32:22 46:14,24
56:4
**seem** 29:8 36:1
37:24
**seemed** 32:3
122:7
**seems** 18:12
25:5 31:1
36:13 37:25
60:7 64:6 66:2
67:6 83:24
84:8 100:24
106:1,3 108:9
108:16,19
113:17 115:18
119:21 124:24
**seen** 27:17
78:24 82:14
91:23 101:4,6
101:10 125:23
125:25 128:10

**seized** 23:7,21
23:24,25 24:4
24:24 25:6,16
28:15,22 46:1
48:7,9,13,14
**seizing** 28:18
**seizure** 25:14
**select** 93:17
**selected** 84:5
98:9
**selection** 31:5
31:22 38:6
**send** 20:5 61:9
66:23
**sending** 26:2
64:25 79:3
**sent** 7:7 60:22
61:9 65:5
78:22 146:14
**sentence** 51:22
65:9,24 67:4
**sentences**
113:20
**separate** 12:16
66:4,6
**separated** 69:9
**september** 26:1
29:12 30:13
37:13 38:5
40:3 41:9 50:2
54:14,15,16
56:20,21 83:19
**sergeant** 4:14
4:17 8:11
21:19 42:11

50:10 51:24
57:10 71:1
107:12,14,18
107:19,21
109:23 115:10
116:7,12 128:9
128:12 136:10
140:17 141:7
146:5
**series** 92:14
100:5
**served** 144:12
**service** 25:1,6
47:24 55:2,8
113:23
**set** 60:8 91:9,13
117:11 134:18
134:23
**setting** 53:19
**setup** 59:22
**seven** 17:25
21:24,25 22:5
**several** 9:25
26:9 55:2
64:12
**shared** 50:25
**shawn** 31:5
32:24 33:7
**sheet** 94:7 98:5
117:24 124:4
125:21 141:4
146:11
**sheets** 140:16
**sheriff** 9:9,10
15:22 16:2,16

17:7 25:24
26:5,5,7,12
28:4 50:6,16
52:21 53:8,12
62:18 79:22
85:15 124:12
125:20 140:24
**sheriff's** 9:4,5,6
10:1 12:20
15:14,16,21
24:24 49:4,19
50:9 51:23,23
55:16 60:8,10
60:17 69:25
82:2 85:14,20
124:13 128:19
**sheriffs** 15:22
16:2,10,13,16
16:16 19:2
26:2 28:7
51:25 52:6
62:6,8,12,12
**shift** 84:5
**short** 79:13
**shortages**
115:3
**shorthand**
60:13 144:3
**show** 123:16
**showed** 27:16
140:22
**showing** 123:23
127:23
**shown** 144:13

**side** 25:12
28:14 34:17
73:16 83:9,13
100:11,11
104:15 111:22
114:5 116:4
118:14
**sign** 146:12
**signal** 31:16
**signature** 3:7
144:16,18,21
145:6
**signed** 65:15
146:19
**significant**
125:13
**single** 21:11
**sir** 74:15
**sit** 97:2 118:14
**site** 33:12,20
**sitting** 27:3
56:23
**situation**
131:10
**situations**
47:11
**six** 61:16 64:6
64:14,20 70:13
**skills** 82:12,13
**skinner** 25:25
26:5,12 28:4
50:7,16
**skip** 22:25 31:3
37:11 40:1
54:20 70:18

72:16 76:22,22
83:17 87:8,8
89:24 90:6
119:12,14
121:5 134:13
135:18
**sleep** 110:25
111:3
**small** 73:3 76:2
**smaller** 19:7
**smelled** 129:8
**sms.db'.** 138:21
**smuggling**
36:23 37:3
82:10
**snapshot** 100:3
**sneezed** 120:3
**software**
101:10,16
**soledad** 1:21
2:12
**solutions** 145:8
146:23
**somebody**
20:21 44:8
62:13 73:20
74:5
**something's**
117:16
**soon** 83:4,5,7
**sorry** 49:15
50:4 55:12
68:25 72:19
103:10,25
107:14 109:2

111:3 113:11
119:7 127:20
127:22 132:15
138:6 141:7
**sorts** 62:14
**sou** 90:7,13,25
**sound** 100:20
130:5
**sounding** 88:25
**sounds** 31:19
36:3 65:19
**sources** 47:22
121:10
**south** 17:2,2,10
27:21 34:8,12
50:12 52:12,23
53:19 61:19
76:10,12
**speak** 7:2
141:10
**speakers** 16:8
**speaking** 82:1
**spec** 70:24
**special** 11:17
11:23,24 12:9
13:17,21 14:18
28:15 72:10
87:20,25 88:3
90:14 93:7
114:24 116:10
**specific** 6:16
31:22 48:2
82:1 89:1 91:1
92:4 118:6
126:8

**specifically**
125:24
**specops** 87:16
87:22
**speed** 32:11,11
32:14
**speeding** 21:10
**spend** 6:17
**split** 35:7
**spoke** 130:2,8
**spreadsheet**
3:14 92:1
**spring** 14:7
**staff** 67:13
**stamp** 80:13
**stand** 36:25
**start** 7:13 9:15
21:16 52:24
87:24 88:13
104:13,15
105:11 120:22
138:7
**started** 14:16
53:2 83:5,5
**starts** 118:16
**state** 1:19 17:5
143:13,23
144:4
**stated** 1:23
**states** 1:1 53:3
55:7
**stating** 5:17
**station** 73:4
74:2 84:21
85:21,21,25

86:6,6 89:13
**stations** 85:12
**statistics** 42:3,6
127:2
**stats** 3:19 42:2
54:3,10,17
56:5,11,13,16
56:18,20 57:1
**status** 76:17
84:5
**stenotype** 1:20
**step** 97:21
**steps** 132:24
**stick** 38:13
**sticks** 131:16
**stipulations** 3:4
5:11
**stolen** 45:22,23
46:3
**stop** 17:19
25:16 32:13
33:25,25 37:18
42:17 55:24
77:16,18,23
78:3,4,5,8 83:1
83:5,5 86:12
86:15 91:12
95:14 96:1
100:19 102:22
106:12 110:23
119:19 120:8
129:23 131:7
133:2 139:18
140:8

**stopped** 57:11
118:10 119:7
119:16
**stopping** 89:19
96:6
**stops** 8:15,17
18:7 21:10
23:16,19 28:2
38:2 39:13,14
42:24 43:2,6
43:11,12,17,19
63:7,11 73:15
86:12,18 88:17
89:2,12,19
90:8,9 91:1,2,4
91:5 94:11
95:2,8,21,24
124:19,20
133:1 139:17
140:2,3,5
**stored** 138:20
**stories** 50:24
**story** 33:14
**straight** 57:8
**strategic**
113:12
**streamed**
103:19 110:22
**streaming**
107:4
**street** 37:14
38:6,15 43:3
145:8
**stretch** 20:9,9

**stretched** 19:24
20:2
**structures**
71:13
**struggle** 64:18
**stuck** 111:16
**student** 59:10
**stuff** 81:11
134:1
**style** 95:19,20
95:20
**styled** 1:17
**subject** 11:23
77:6 87:16,18
**submit** 18:20
57:4,7,8
**subscribed**
143:17
**subsequent**
104:25
**subset** 43:5
**substance**
143:7
**subtract** 43:15
**success** 37:14
38:1,1 50:8,23
140:6
**successful**
140:8
**sudden** 37:21
**suggestion**
65:24
**suite** 1:21 2:4,7
2:12,17 145:8

| | | | |
|---|---|---|---|
| **summarize** 77:10 118:9 | 88:9 90:5 91:22 93:6 97:18 99:10,12 101:22 102:10 111:14,18,21 112:16 113:7 114:12,21 115:4 118:8 121:3,11,18,21 121:24 125:15 125:22 126:25 127:2,13,16 128:21 129:9 129:20 130:25 131:17,18,22 131:25 132:24 134:16 136:9 136:17 137:22 138:18 139:11 139:15 141:11 | **system** 93:13 106:5 | 89:15 122:11 131:14 |
| **summarized** 45:12 | | **t** | **talked** 9:25 14:6 26:10 32:3,4 50:21 51:2,9 52:15 61:22 64:9 67:7 85:19 89:12 91:5 112:3 129:7,21 129:24 130:2 140:17 |
| **sunday** 31:1 87:12 88:7 | | **t** 3:10 88:11 | |
| **supervising** 92:25 94:10 | | **tabs** 91:22 | |
| **supervision** 71:13 | | **tabulated** 10:18 | |
| **supervisor** 92:5 93:11 | | **tactics** 37:13,17 37:24,25 39:15 39:17,20 | |
| **support** 51:14 113:12 114:23 | | **tag** 61:16 70:25 71:10 72:2,14 84:22 85:5,10 86:4 88:11,14 88:20,21,25 125:16 | |
| **supported** 51:6 | | | **talking** 14:20 15:23 16:11,24 25:15 27:4 43:2 48:12 57:17 76:13 89:16 99:9 101:23 121:1 124:7 137:22 |
| **supportive** 51:10 85:5 | | | |
| **supposed** 28:5 137:16 | | **take** 5:8,15 6:12 19:21 20:22 21:20 28:17 44:9 57:2 78:12,13 78:14,17 79:8 80:19 91:12 99:20 112:19 117:2,8,15 118:4 122:12 123:6 132:24 133:11,11 | **tamez** 35:18,19 |
| **sure** 9:17 21:21 23:4,20 29:18 29:21 30:19,25 30:25 31:9 32:2,20 35:1,6 36:22 37:17 39:8 41:24 43:10 44:13,15 45:5 46:7 48:1 50:21 56:10,17 58:16 59:13 60:4,6 61:2 63:25 70:5 73:1 77:2 79:2 79:20 80:15 83:9 84:2 86:8 | **surrounding** 19:9 52:7 76:10 88:16 | | **target** 31:4,22 50:11 52:11,14 77:19 |
| | **surveilling** 77:14 | | **targeted** 88:11 88:15 89:1 90:7,25 |
| | **suspect** 77:14 | | **task** 15:17,24 16:11,17 17:7 17:9,10,12,17 17:21 18:1,4 18:20 19:19 21:4 26:6,7,10 26:13 50:21 51:17,19 52:17 |
| | **suspected** 90:9 | | |
| | **suspicion** 97:17 97:20 | **taken** 1:17 49:20 81:13 133:5 144:2,25 | |
| | **swat** 71:21 | | |
| | **swerve** 31:16 | **talk** 9:3 11:5 12:23 16:17 30:23 73:17,18 74:15 75:4,7 | |
| | **switch** 121:2 | | |
| | **sworn** 1:16 4:15 144:6 | | |

**[task - time]**                                                    Page 36

61:22 64:7,8
64:11,12 65:7
65:17 66:4,7
77:12,19,25
78:17 88:22
**team** 19:11
23:6 70:8 80:9
124:21 129:7
**tech** 117:11
**techniques**
36:7 82:22
**technology**
91:14 117:14
**teenage** 118:13
**teenagers** 53:3
**teens** 118:13
**tel** 2:5,8,13,18
**tell** 7:23 12:12
15:20 16:22
17:6 21:24
25:4 35:22
37:19 46:25
57:16 63:13
68:20 73:7
74:3,3 100:2
**telling** 16:2
23:18 33:15
46:21 49:4
80:23
**tells** 20:18
**temporary**
112:5,10
113:18,25
114:1 115:18
115:23 116:19

116:23
**ten** 19:5,10
34:23
**testified** 4:15
5:23
**testify** 6:24
**testimony** 6:22
47:24 144:8
146:9,17
**testing** 49:14
**texas** 1:1,10,20
1:22 2:4,10,13
2:18 15:23
16:3 17:2,4,10
17:20 18:1
26:8 27:17,21
31:25 32:1
59:24 60:11
61:20 66:24
68:12,13 76:12
88:21 143:13
144:4 145:7,9
**text** 100:10,10
100:22 101:8,9
112:14 131:25
132:4,7,18,24
135:6 139:2,6
**tfo** 77:4
**thank** 4:18 7:17
102:18 107:13
109:2 113:14
124:13 127:8
132:15 136:5
**thanks** 31:7
49:22 76:6

111:21
**therefor** 144:22
**thing** 6:18 11:7
17:4 28:22
38:11 63:4
64:2 89:19
95:4 118:3,5
131:2 133:25
**things** 16:8
17:1,5,15
18:10 27:8
33:23 36:11,21
38:18 42:25
44:8 45:12
48:22 52:22
54:8 55:19
73:12 85:17,19
89:10
**think** 4:13 5:1
12:22 20:24
21:23 22:3
24:17,18 29:25
49:4,22 60:25
64:8 68:3 69:7
70:18 71:16
72:16 75:12,13
76:21 78:21
83:8,17 87:7
88:12 89:24
91:7 99:12
103:17 110:25
111:22 114:4
114:18 118:22
120:3 123:9,16
125:1 129:17

130:9,12
132:17 139:11
139:12,13
140:13
**third** 22:23
62:24
**three** 22:22
93:19,23
110:15 111:6
**throckmorton**
145:8
**thrust** 35:10
**thumb** 11:4
15:3
**thursday** 1:18
38:5
**tied** 33:13,13
**tiger** 28:12
**time** 5:22 6:12
9:3,8 10:1,6
12:10 16:4
22:8,10 26:19
29:22 34:13
35:1 47:19
48:12,24 49:7
49:9 50:20
53:14 57:7
60:16,19,22
63:20 67:24
70:1 71:5,9
72:9 75:13
78:14 79:8
82:13 85:2,9
86:10 87:4
92:4 94:11,15

**[time - trng]**

105:15 106:24
107:17 108:6
108:17 109:14
111:7 115:1
124:21 126:8
128:17 134:17
135:25 136:24
137:22 138:22
139:19 141:5
146:18
**timeframe**
146:8
**times** 46:16
47:2 49:13,16
49:17 58:13
129:25
**timestamp**
100:15
**timing** 120:6
**tiny** 102:3
**title** 35:24 98:7
104:10
**titled** 98:22
**today** 5:3,8,13
5:20 6:11,14
6:22 8:12 30:3
**together** 16:13
18:12 19:9,13
19:19 51:18
66:3
**told** 134:21
**took** 15:14
30:12 35:8
100:19 129:15

**tool** 39:7
**top** 15:13 21:23
50:6 93:18
98:10 123:24
**tos** 51:1
**total** 21:23
22:23 35:1
47:20,20 48:14
70:13 92:21
126:20 127:5
**totals** 126:23
**towards** 31:16
74:7,9
**toyotas** 36:15
**tractor** 37:9
**traffic** 8:15,17
17:5 18:7
20:17 21:10,13
25:16 27:18,19
28:2 31:18,20
32:1,16 33:25
37:17 38:2
39:13,13 40:10
40:10,11,17,19
40:19,25 41:8
41:9,10,14,16
41:17,18,21
42:17,24 43:2
43:6,11,17,19
45:4 73:15
77:16,18,23
83:1,4,5 86:12
86:15,18 89:20
90:8 91:1,4
94:11 95:2,8

95:14,21,24
100:19 102:22
119:19 124:19
124:20 129:23
139:17,18
140:2,3,5,8
**traffickers** 20:5
20:12,23
**trail** 104:11
105:1
**trailer** 37:9
**trailers** 38:18
**train** 36:19
60:10 84:21
85:11,25 86:6
**training** 37:16
39:5,6 47:14
47:21,22,23,24
47:25 48:2,3
60:12 63:2,6,6
63:10,17,17
67:4,7,10,11,15
67:20 68:13,18
69:3,5 71:6
82:15 110:20
110:21 111:7
111:13 129:8
**trainings** 82:19
82:23
**trains** 36:10
**transcribed**
102:12
**transcript**
100:25 101:7
101:12,16,20

101:23 102:1,5
144:7,20 146:6
146:19
**transcription**
143:5
**transfer** 3:16
3:16,17 28:12
28:21,23 71:1
116:9 137:5,13
137:14,17
**transferred**
71:6 79:22
84:5,8 115:2
**transferring**
137:15
**transparent**
127:11
**transport** 53:4
**transporting**
73:11
**travel** 17:3
20:23 27:21
67:14 68:11,16
68:20 74:9
**traveling** 17:20
34:8 73:21
74:2
**treadwell** 22:20
22:21
**tremendously**
63:7
**trick** 121:13
**tried** 61:9
**trng** 59:24,25
66:24 79:22

**[trouble - updated]**

| | | | |
|---|---|---|---|
| **trouble** 102:14 | 77:3 80:9 88:7 | 84:14 87:23 | 53:20 59:23,24 |
| **true** 144:8 | 94:16 106:12 | 88:24 89:11 | 60:11 61:8 |
| **truth** 33:15 | 110:3 118:13 | 92:3 95:22 | 63:1,5 64:8,23 |
| **try** 6:8 26:7 | 135:7 137:13 | 112:13,14 | 66:24 68:11,12 |
| 44:18 52:16 | **type** 19:8 21:12 | 133:19,22 | 68:13 69:21 |
| 93:16 98:6 | **typical** 23:12 | 140:6 | 70:1,24 71:10 |
| 117:17 118:5 | 23:20 | **understanding** | 73:2,8 76:2,13 |
| 120:21 121:5 | **typo** 52:1 125:1 | 11:18 12:4 | 77:4,15,22 |
| 121:19,19,20 | 125:2 | 47:7 60:5 | 78:1,18 80:25 |
| 132:11 134:22 | | 66:14 89:2 | 82:3 84:3,9 |
| **trying** 22:3 | **u** | 101:14 104:24 | 85:3,23 86:11 |
| 52:15 62:11 | **u.s.** 55:10 88:11 | **understood** | 87:1,24 88:4 |
| 70:6 71:16 | 88:15 | 16:6 17:21 | 88:10,14,25 |
| 75:12 91:11,22 | **ubc** 90:8,18 | 18:22 28:20 | 89:1 90:14,16 |
| 121:13 | **uc** 84:22 | 60:22 82:17 | 112:9,23 113:2 |
| **tstop** 77:5 | **ucs** 85:5 | 83:8 94:20 | 113:13 114:24 |
| **tsu** 40:12,16 | **uh** 6:4 33:9 | 95:3,9 102:18 | 116:10,17,23 |
| 55:2 | 35:19 45:20 | 119:17 131:21 | 124:3 126:3,12 |
| **turn** 20:7 31:16 | **umbrella** 48:3 | **uniform** 71:22 | 126:16,24 |
| 58:18 59:1 | 71:23,25 | 72:10 74:4,8 | 128:14 140:18 |
| 123:14 127:18 | **under** 5:20 | **uniformed** 90:7 | **unit's** 10:3 42:3 |
| 129:17 | 22:22 29:10 | 90:15,25 | 42:9 |
| **turned** 69:1 | 37:22 71:21,23 | **unincorporated** | **united** 1:1 53:3 |
| **turns** 20:15 | 71:23,23,25 | 90:19 | 55:7 |
| **tvtp** 135:8 | 72:2,11,12 | **unit** 3:18,19 | **units** 13:5,13 |
| **twice** 4:21 | 87:24 123:6 | 7:13 11:24,24 | 55:16 71:1 |
| **two** 13:10,11 | 143:16,20 | 12:6,9,20,21 | 84:20 85:16 |
| 13:23 19:11 | **understand** | 14:7,18,19 | 86:25 87:17,21 |
| 22:9,10,12,13 | 5:20 6:7 7:11 | 15:14 22:9 | 87:22 |
| 22:15,16 28:10 | 9:20 19:14 | 23:13 29:20 | **unpack** 73:25 |
| 32:14 35:2 | 20:24 36:12 | 39:14 40:17,19 | **unpacking** |
| 39:13 55:19 | 39:12 44:2 | 40:19,25 41:14 | 60:13 |
| 66:3,6,23 | 55:6 67:3 | 41:18,22 47:19 | **unplug** 123:13 |
| 67:23 68:17 | 69:16 73:25 | 48:25 50:12 | **updated** 105:22 |
| 70:3,6,7 72:9 | 76:23 79:14 | 51:4 52:13,24 | 105:23 |
| | 81:21 82:3 | | |

**uploaded**
  104:19
**uploader**
  104:22
**upper**  100:11
**ups**  54:25 55:9
  55:12,13 85:8
**use**  24:8 31:16
  39:7,15 78:20
  99:14 125:20
  138:4
**used**  25:6 35:25
  38:22 39:9,17
  127:15 146:19
**user**  103:14
  104:5 106:17
  107:10 108:9
  110:15
**using**  111:15
  137:12
**usps**  55:13
**usual**  5:11

### v

**v**  146:4
**vacated**  80:2
**vacation**  34:9
  34:15
**value**  24:2
  45:16
**vast**  45:11
**vctf**  88:14,20
  88:21
**vehicle**  25:5,14
  25:16 29:11,15
  30:12 31:15

35:25 36:25
37:6 38:6 46:2
53:5 77:7
78:10 88:17
89:2,19 96:19
96:23 97:3,11
97:15 119:9
120:18 122:9
122:18
**vehicles**  23:8
  23:24 24:4
  31:10 36:2
  37:3 38:11,17
  44:7 45:22,24
  46:3 48:13,16
  48:17
**verbal**  14:21
**verbals**  79:23
**verbiage**  65:9
  65:10
**verify**  146:9
**veritext**  145:8
  146:14,23
**veritext.com.**
  146:15
**version**  10:18
  10:18 55:10
  115:19 123:16
**versus**  55:13
**video**  3:14,17
  3:18 6:15 92:2
  92:3 98:16
  99:10 118:3
  119:6,15 120:9
  121:6 122:1,2

122:5
**videos**  6:14,17
  7:19,25 8:7,10
  8:14 93:9,10
  116:25 121:9
  121:12 131:18
**vigilant**  131:3,6
  131:12
**violating**  21:9
**violation**  21:13
  31:18 32:16
  86:14 89:20
**violations**
  31:21
**violent**  88:21
  89:1,8,9
**virginia**  2:8
**visible**  91:22
**visit**  26:12,15
  26:20 28:5
**visited**  50:16
**visiting**  74:16
**vn**  24:25
**voice**  119:9
**volume**  1:13
**volunteer**
  12:20
**von**  4:21 7:9
  130:16,25
  131:5,17,21,24
**vs**  1:5
**vtcf**  88:11

### w

**w**  2:19
**waiting**  28:11
  28:21,23
**waive**  5:13
**waiving**  5:12
**walk**  10:19
  14:24 89:5
**walking**  74:5,7
  74:9
**want**  4:1,4,6,9
  4:11 6:17 9:15
  11:8,9 12:23
  19:2 21:22
  22:7,25 24:18
  33:13 37:13
  60:4 70:23
  75:4 80:2
  81:21 83:9,14
  83:25 84:19
  91:11 95:21
  98:20 102:19
  109:4 111:4
  112:12 115:25
  116:25 117:4
  121:11,15
  122:12 123:13
  123:15 124:23
  127:11,14
  129:1,18
  133:13,23
  134:1 135:1,11
  135:18,19
  136:10,11

**wanted**  21:5
26:7 28:17
52:22 70:9
80:9 102:9
111:19
**warning**  97:10
**warnings**  40:11
41:9,10,12,13
41:16,17,18,20
43:12,18,22
44:4
**warrants**  17:14
18:8 48:22
73:10,21 74:21
74:25 89:9
**watch**  6:17
74:25 116:25
118:2,3,16
119:12,13,14
120:1,2,7,8,20
**watched**
108:20,23
120:2 122:7
**watching**  6:17
118:6
**way**  19:12,22
20:4,19 21:5
28:23 32:7
55:20 69:2
96:20 100:24
101:19 102:4
102:20 130:17
133:5 139:5,9
**we've**  4:24 5:7
61:22 64:9

87:10,10
129:21,24
**weapons**  17:15
**week**  4:22
23:21 29:12
34:9 54:8
55:19 56:9
61:15 79:23
**weekly**  9:23
10:3,7,10
11:14,19,23
14:13 40:5
56:12,12 57:11
83:18 84:15
87:17,22
**weeks**  84:12
**welcome**  118:3
**went**  26:22
44:7 57:14
59:4 60:17,19
60:24 61:6
69:5 72:19
73:8 110:25
111:3
**west**  27:21
88:11,12,15,15
90:8,23
**western**  1:1
**williams**  38:6
**windham**  2:6
5:3 10:21 24:9
25:20 30:3,7,9
44:17 69:13
78:15 80:15
99:23 111:25

112:17 114:8
116:1 117:4
120:3,5 121:3
121:15,18,21
121:24 123:13
123:21 128:2,3
136:4 138:13
**windham's**
127:19
**wise**  19:5
**witness**  1:16
30:5 99:25
116:2 136:17
140:21,25
141:4,6,11
142:2 144:6,9
144:13 146:8
146:10,12,18
**word**  102:12,15
113:7 115:18
**words**  66:11
**work**  17:13
18:2,11,19
19:8,13,19
20:2 27:8
51:18 74:1
112:23 117:13
121:23,23
**worked**  73:14
88:25
**working**  19:21
19:22,23,23
26:23 50:22
80:5 85:10,11
89:7

**works**  37:4
51:14 74:3
**worksheet**
91:20
**worksheets**
140:16
**worn**  110:23
111:10
**worry**  69:8
98:1 99:14
**worst**  59:14
**worth**  145:9
**would've**
138:21
**wright**  2:17
**write**  42:19
81:8
**writing**  40:10
41:8,10
**wrong**  127:20
**wrote**  41:12

| x |
|---|
| **x**  3:1,10 |

| y |
|---|

**y'all**  52:19
**yeah**  6:5 11:11
26:19 27:24
32:20 36:5
49:14 51:11
53:14 55:9
56:18,25 58:20
58:23,25 59:12
59:17 62:15
67:17 78:13,16

78:21 79:2
92:23,24
101:25 102:6
102:17 103:25
107:13 113:3
113:14 116:3
117:6 129:12
129:14 132:8,9
132:12 136:12
**year**  127:6
**yearly**  3:19
126:23
**years**  69:9
**yep**  120:25
**yesterday**
127:9
**yielded**  55:25
**young**  118:12
**youth**  128:19

**z**

**zero**  126:9,11

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.