**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# EXHIBIT 9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ALEK SCHOTT<br><br>*Plaintiff*,<br><br>v.<br><br>BEXAR COUNTY, TEXAS,<br><br>*Defendant*. | Civil Action No. 5:23-cv-00706-OLG-RBF |

### DECLARATION OF ALEK J. SCHOTT
### IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Alek J. Schott, declare the following:

1. I am a United States citizen, a Texas resident, over 18 years old, and competent to make this declaration, which I make voluntarily based on my personal knowledge.

2. I am the Plaintiff in this action. I have knowledge of the facts set forth herein, and if called upon to testify as a witness thereto, I could and would competently do so under oath.

3. I am 39 years old, was born in Houston, Texas, lived there at all times relevant to this suit—including in March 2022—and still live there today.

4. I am married, a father of two young children, and live with my family at our home in Houston.

5. I have never taken or possessed illegal drugs and have no criminal history other than a few traffic tickets. I have resolved each of those traffic tickets, and none were unresolved in March 2022.

6. I have a bachelor's degree from Baylor University in management information systems.

1

7. Since 2015, I have worked at my dad's small business, RMS Controls, Inc., which manufactures, distributes, and sells both its own products and other companies' products to clients in the oil, gas, and pipeline industry.

8. Since starting at RMS Controls, and still today, my job has included operations and business development, which frequently involves road trips to client sites to demonstrate and sell products.

9. For example, I frequently take business trips that involve driving from my home in Houston to drilling and pipeline sites in South Texas associated with the Eagle Ford Shale Play, which is the most active shale play in the world and has over 100 petroleum rigs running.

10. Because I drive so much for work, I installed a dashcam in my truck to ensure that I would have the evidence necessary to defend myself in the event somebody falsely accused me of wrongdoing (e.g., fault in a traffic accident). That dashcam was running and recording footage on March 16, 2022.

11. The particular dashcam that I use is always running and recording, but it saves footage in one-minute segments.

12. When I first began taking business trips to sites in South Texas, I took U.S. 59, which took me down the coast from Houston, because most of the sites that I was visiting were south of Laredo.

13. Over time, I began servicing customers with sites in South Texas that required taking a different route—taking I-35 through Bexar County. I first began taking that new route in March 2022. I now routinely take I-35 through Bexar County to visit customer sites.

14. Because it takes several hours to drive from Houston to customer sites within the Eagle Ford Shale Play, I will often stay in a hotel overnight at some point during the trip before driving home.

15. These business trips to South Texas are often two-day (one-night) trips: I will drive down taking I-35 through Bexar County, stay in a hotel, visit the customer site the next morning, and then drive back home along the same route.

16. Based on my years of experience working in the Texas oil and gas industry, I have found that it is extremely common for people who work in the industry to make two-day (one-night) business trips to South Texas like the ones I make.

17. On March 15–16, 2022, I used my black 2019 Ford F-250 (license plate number LJR4135) to take one of the business trips I have described above. The purpose of the trip was to conduct a trial of a remote power engine for a customer, Chesapeake Energy, at a site located near Carrizo Springs, Texas.

18. On March 15, 2022, I left Houston at approximately 5:00 pm, drove south on I-35 through Bexar County, and stopped at a Holiday Inn Express in Pearsall, Texas (southwest of San Antonio) for the night.

19. On March 16, 2022, I met a female colleague named Celine Liron, a sales manager for Qnergy, Inc. (the company whose remote power engine we planned to trial) in the hotel lobby, and I drove her from the Holiday Inn Express to the Chesapeake Energy site.

20. Following the trial, I drove Celine back to the Holiday Inn Express, dropped her off at her car, and started driving back home toward Houston.

21. As I was taking I-35 through Bexar County, I drove by a Bexar County Sheriff's Office (BCSO) patrol car that was parked in a grassy area off the right side of the highway. I was driving in the left lane of the two-lane highway at the time.

22. The patrol car was parked perpendicular to the road such that the front of the car was square with the road, rather than angled toward oncoming traffic.

23. After I drove by the parked patrol car, I continued to drive in the left lane.

24. Approximately two minutes after I passed the BCSO patrol car, I noticed flashing patrol car lights behind me and realized I was being told to pull over, which I promptly did when I saw the lights. I drove my truck over to the right shoulder and parked slightly off the highway.

25. After I pulled over, I rolled both my front windows down, and a BCSO officer approached and introduced himself as Joel with the Bexar County Sheriff's Office. I later learned that the officer's last name was Babb and that his rank was deputy.

26. I was held on the side of the road for over an hour after Deputy Babb pulled me over. The following is a brief summary of what happened during that time: First, Deputy Babb approached my truck, told me I would receive just a warning, and ordered me to come sit in his patrol car while he wrote the warning. Second, we entered Deputy Babb's patrol car, Deputy Babb positioned his bodycam on his dashboard facing us, and Deputy Babb then interrogated me with progressively intrusive questions about me, my job, my family, my truck, my trip, and whether I had anything illegal in my truck. Third, Deputy Babb requested my "consent" to search my truck and, when I refused, Deputy Babb called for a canine unit. Approximately twenty minutes later, Deputy Martin Molina III arrived with a canine. After Deputy Molina used the canine to sniff my truck, Deputy Babb told me that the canine had alerted. Deputy Babb then placed me in the back of his patrol car and proceeded to search my truck with Deputy Molina without my consent or a

4

warrant. Deputies Babb and Molina were joined by a third deputy, Deputy Joe Gereb, who assisted with the search. They didn't find anything illegal because there was nothing to find. Eventually, I was released, and Deputy Babb gave me a written warning.

27.     Exhibit 22 is a true and accurate picture that I took of the warning that I received from Deputy Babb. That warning indicates that "No Search" occurred.

28.     The traffic stop is largely captured on bodycam footage from Deputies Babb, Molina, and Gereb. I will not restate all the facts captured on video here. I do, however, wish to provide context for what was happening at various points during the stop to the extent that the bodycam videos are unclear.

29.     After pulling me over, Deputy Babb approached my vehicle and stated that "the only reason I'm stopping you is that when I was watching you over there you were drifting over that fog line pretty hard." But Babb's assertion was false. From the moment his patrol car came into my field of vision until the moment he pulled me over, I was driving within my lane and did not touch—much less cross over—the painted lines on either side of my line.

30.     Fortunately, I had my own dashcam recording footage of my driving that day. Exhibits 10, 40, and 41 in support of my motion for summary judgment are true and correct copies of segments of the dashcam from the period of time when I approached and passed Deputy Babb to the point when I pulled over.

31.     Exhibits 10, 40, and 41 accurately reflect my memory that I drove within my lane and did not touch—much less cross over—the painted lines on either side of my lane that day.

32.     Further, the 2019 Ford F-250 I was driving that day had a lane-departure warning system that would alert me with a steering-wheel vibration if I had started to drift out of my lane. I can feel and often hear that alert. My car did not give me any lane-departure warning at any point

5

from the moment that Deputy Babb's patrol car came into my field of vision until the moment that he pulled me over. Nor did I ever feel my car touch the rumble strips on the shoulder of the road.

33. Early in the stop, while I was still in my truck, Deputy Babb asked to see my driver's license. I calmly handed it to him. As I did so, I was breathing normally and my hand was not shaking, but I was nervous about being pulled over by a police officer.

34. Early in the stop, while I was still sitting in my truck, Deputy Babb asked if I had any firearms in my vehicle. I replied, "I don't think I have one right now." I sometimes carry my shotgun in my truck when I am on business trips, especially since my trips take me to remote, isolated customer sites along the U.S.-Mexico border. When answering Deputy Babb's question about firearms, I did not want to misspeak in case I was misremembering that my shotgun was not in the truck that day. I sought to convey to Deputy Babb that I was relatively certain that I did not have my shotgun in the truck.

35. Early in the stop, while I was still sitting in my truck, I remarked "I'm really sorry about that" regarding the alleged traffic violation. I was not admitting guilt, and that was not my intent. I was, rather, reflexively apologizing out of deference to an armed law enforcement officer and a desire to be polite.

36. Later in the stop, while Deputy Babb was interrogating me in his patrol car, I answered every question calmly, truthfully, and to the best of my ability. I had nothing to hide.

37. Although I was nervous about Deputy Babb's extensive questioning—because it was clear to me that he was fishing for something other than details related to the alleged traffic violation—at no point during Babb's questioning was I breathing heavily or visibly shaking. Sitting in the front seat of a police patrol car while the officer recorded me on video was an

6

intimidating experience that made me anxious. I had never been in a police car before, let alone interrogated like that by an officer.

38. I did not consent to entering Deputy Babb's patrol car or being questioned by Deputy Babb in his patrol car.

39. I did not consent to the search of my truck or the canine sniff of my truck. After I refused Deputy Babb's request for consent to search, Deputy Babb informed me that he was going to have a canine come sniff my truck. He warned me that the dog would alert to even small amounts of drugs. I believed, and still believe, that Deputy Babb was trying to pressure me to change my answer about consenting to search. I told Deputy Babb that I was refusing consent because I had learned during an undergraduate law course never to consent to a search because you never know whether something outside of your control happened to your vehicle. Babb then informed me that he was calling the canine and that I could no longer consent "because then it's coercion."

40. When Deputy Molina arrived, he informed me that he was going to be conducting a canine sniff of my truck and asked me if I had a problem with that. I responded that "[i]t's okay" because I was confirming that I understood what was happening. I did not consent to the sniff and did not believe that I could have objected to the sniff, especially because Deputy Babb had already told me the sniff was going to happen and that my chance to refuse consent had passed.

41. I did not feel free to leave until Deputy Babb said I could go, returned my license, and gave me the written warning.

42. During the entire time I was in Deputy Babb's patrol car and while the search was occurring, Babb had my driver's license.

43. My business trip on March 15–16, 2022 was my first business trip that required me to spend the night away from home since my wife had given birth to our second child. When

Deputy Babb ordered me to go into his patrol car, I left my cell phone in my truck and left the truck's engine running. During the time I was detained in Babb's patrol car and while the officers were searching my truck, my wife called several times looking for me. I was concerned about being out of contact with her, especially because she was home alone with our newborn.

44. At one point during the search, I informed Deputy Babb that I needed to use the restroom. He instructed me to urinate on the side of the highway (as cars were speeding by), and I did, which was both uncomfortable and humiliating.

45. The officers' warrantless search was intrusive and disorienting. They opened every bag in my car, emptied out every compartment, threw my belongings all over the floor, and left the entire car a mess.

46. The officers did not find anything illegal or verbally claim to have found anything illegal in my car. That is because there was nothing illegal in my car—drugs or otherwise—and there never has been.

47. At no point during the traffic stop on March 16, 2022, did Deputy Babb or any other BCSO officer provide me with a *Miranda* warning.

48. After the BCSO officers allowed me to leave, I drove home upset, confused, and humiliated about what the officers had done to me: Being held captive on the side of the highway; being forced to watch as the officers ransacked my car in plain sight as if I were a criminal as countless of my fellow citizens drove by; having my personal bags, work items, and childcare items pored over and tossed around; experiencing increasing fear about how these armed officials were treating me and what they might do next—all for being innocent, telling the truth, and trying to remain calm—was a traumatizing experience.

49. Among other things, that experience completely undermined my confidence in and trust of police officers. I now worry that any officer I pass on the road will pull me over for no reason to interrogate me and search my truck.

50. The same day as the traffic stop, I started calling numbers associated with Bexar County to complain about the stop and search. I tried several different numbers and made several calls before I found the correct person to take my formal complaint. On March 18, 2022, I spoke via phone with a person in the BCSO internal affairs unit about how I had been stopped and my truck had been searched for no reason. I also complained about how the BCSO officers and the canine damaged my truck and my belongings.

51. On April 12, 2022, I spoke with internal affairs officer Marta Rodriguez about my complaints. Officer Rodriguez informed me that she had seen nothing wrong with the actions of the officers during the traffic stop and search based on the officers' bodycam footage. I informed Rodriguez that I had dashcam footage of my driving that showed I did not commit a traffic violation. I reiterated my complaint that Deputy Babb had no legitimate reason to pull me over. After the call, I shared my dashcam footage with Officer Rodriguez via email.

52. Later that same day, I received a call from another BCSO officer who I initially believed was a second internal affairs officer. I did not catch the officer's name and incorrectly believed that officer might have introduced himself as Hernandez. Through this lawsuit, I learned that the second officer who I spoke with on the phone that day was Sergeant Pete Gamboa.

53. During the call, Sergeant Gamboa asserted that Deputy Babb had done nothing wrong. Gamboa claimed to have watched Babb's bodycam footage and claimed that he had seen my truck cross over the fog line in that footage. I informed Sergeant Gamboa that I never moved

9

outside of my lane, let alone crossed or touched any line. I also told Sergeant Gamboa that I had dashcam footage confirming that fact.

54. In response, Sergeant Gamboa maintained that "we can see all of these violations you made from this body camera" and "if you don't like how we conduct our business, you should file a lawsuit." Gamboa told me that I could have left Deputy Babb's patrol car and driven away at any time. When I pointed out that Babb had kept my license and that I did not feel free to leave, Gamboa told me that I could have driven away without my license. I disagreed and believed that I could not have left Babb's patrol car and simply driven off without my driver's license.

55. When I continued to claim that my rights had been violated, Sergeant Gamboa laughed and put me on hold for twenty minutes. After checking to see if I was still on the line, Gamboa put me on hold for another fifteen minutes. When Gamboa returned the second time, he again checked to see if I was still there, and I confirmed that I was. Gamboa again stated "we can see all of these violations you made from the body camera," repeated that I should "challenge us in court if you don't like how we conduct business," and hung up on me.

56. Based on Sergeant Gamboa's dismissive attitude toward my complaints, I believe that he put me on two extended holds because he thought the holds would prompt me to hang up.

57. Immediately after the call with Sergeant Gamboa, I emailed Officer Rodriguez and provided her with a summary of my phone call with Gamboa.

58. Officer Rodriguez did not initially respond to my complaints about the stop and search. Nor did she respond to my email summarizing my conversation with Sergeant Gamboa.

59. Nearly two months later, after I sent at least two follow-up emails, Officer Rodriguez finally responded to the substance of my complaints. On June 2, 2022, she emailed me

that "[w]hen I reviewed Deputy Babb's body worn camera (BWC) I did not see any policy violations." She added that "[n]o policy violations were viewed through BWC."

60. Exhibit 42 is a true and correct copy of my email correspondence with Officer Rodriguez.

61. In light of BCSO's refusal to take my complaints about the traffic stop and search seriously, I filed this lawsuit just as Sergeant Gamboa told me that I should. And, until the Court grants relief ordering BCSO to stop pulling over innocent drivers like me to interrogate us and search our cars, I will not feel secure traveling through Bexar County.

62. There is no practical way for me to avoid traveling through Bexar County moving forward. My work for RMS Controls—tied as it is to Texas's oil, gas, and pipeline industry both in the Eagle Ford and Permian Basins—will require me to continue taking trips through Bexar County to South Texas and West Texas similar to the one that resulted in the traffic stop above.

63. Indeed, my understanding is that BCSO targeted me and pulled me over *because* I made a one-day turnaround from Houston to the Carrizo Springs area. That is precisely the kind of trip I will continue making for work for the foreseeable future.

64. My best estimate, based on the current demands of my job (having added 330 installations in South Texas and West Texas in the past two years) and the state of the Texas oil, gas, and pipeline industry, is that I expect to continue making similar trips through Bexar County to the one I made on March 15–16, 2022 about four times per month—meaning I will drive through Bexar County two times per week (once in each direction)—for the foreseeable future.

65. About 50 miles of that route are in Bexar County, meaning I will drive 100 miles (over an hour) in Bexar County weekly, which adds up to 5,000 miles (about 70 hours) yearly.

And for about half of that distance, I will have to drive entirely on I-35—the same highway where the traffic stop occurred.

66.  Every time I drive through Bexar County, I experience fear and anxiety about the fact that I was previously stopped for no reason and that BCSO could stop me again in a similar manner at any time it pleases. The only way to relieve that fear and anxiety is for me to know that BCSO is legally barred from employing the same tactics its officers used on me before.

**The remainder of this page has intentionally been left blank.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of June, 2025

_____
Alek Schott