# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# EXHIBIT 16

Page 1

```
 1            UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION
 3    ALEK SCHOTT,                  )
              Plaintiff,           )
 4                                 )
      VS.                          ) CIVIL ACTION NO.
 5                                 ) 5:23-CV-00706-OLG-RBF
      JOEL BABB, IN HIS            )
 6    INDIVIDUAL AND OFFICIAL      )
      CAPACITY; MARTIN A.          )
 7    MOLINA III, IN HIS           )
      INDIVIDUAL AND OFFICIAL      )
 8    CAPACITY; JAVIER SALAZAR,    )
      IN HIS INDIVIDUAL AND        )
 9    OFFICIAL CAPACITY; AND       )
      BEXAR COUNTY, TEXAS,         )
10            Defendants.          )
11
            -----------------------------------
12
                   ORAL DEPOSITION OF
13                 MARTIN MOLINA, III
                    APRIL 18, 2024
14
            -----------------------------------
15
16            ORAL DEPOSITION OF MARTIN MOLINA, III,
17    produced as a witness at the instance of the Plaintiff,
18    and duly sworn, was taken in the above-styled and
19    numbered cause on the 18th day of April 2024, from
20    9:04 a.m. to 3:27 p.m., before JAZZMEN CANALES, CSR, in
21    and for the State of Texas, reported by machine
22    shorthand at Law Offices of Charles S. Frigerio, 111
23    Soledad, Suite 465, San Antonio, Texas 78205, pursuant
24    to the Federal Rules of Civil Procedure and the
25    provisions stated on the record or attached hereto.
```

Deputy Martin Molina , III                                    April 18, 2024

Page 2

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF:
 3          MR. WILL ARONIN
            MS. CHRISTEN HEBERT
 4          Institute For Justice
            901 North Glebe Road, Suite 900
 5          Arlington, Virgina 22203
            703-682-9320
 6          E-mail:  waronin@ij.org
 7    FOR THE DEFENDANTS:
 8          MR. CHARLES S. FRIGERIO
            MR. CHARLES A. FRIGERIO
 9          MR. HECTOR SAENZ
            Law Offices of Charles S. Frigerio
10          111 Soledad Street, Suite 465
            San Antonio, Texas 78205
11          210-271-7877
            E-mail:  csf@frigeriolawfirm.com
12
13          MR. BLAIR LEAKE
            Wright & Greenhill PC
14          4700 Mueller Boulevard, Suite 200
            Austin, Texas 78723
15          512-379-2960
            E-mail:  bleake@w-g.com
16
17
18
19
20
21
22
23
24
25
```

Deputy Martin Molina , III                                    April 18, 2024

Page 3

1                    I N D E X

2                                                    PAGE

3    Appearances.................................   2

4  MARTIN MOLINA, III

5    Examination By Mr. Aronin...................   4

6

7                   E X H I B I T S

8    NUMBER          DESCRIPTION              PAGE

9    Exhibit 26    Molina certifications         24

10    Exhibit 27    Deployment records           33

11    Exhibit 28    Policy manual                87

12    Exhibit 29    Herrera training report      91

13    Exhibit 30    Molina training reports      91

14    Exhibit 31    Video BC000605              130

15    Exhibit 32    Molina bodycam search       132

16    Exhibit 33    Bates 5916                  177

17    Exhibit 34    BC002969                    186

18    Exhibit 35    Def Bates 004959            189

19    Exhibit 36    Def Bates 004947            199

20    Exhibit 37    Delta-8 photograph          225

21    Exhibit 38    Def Bates 004900            222

22    Exhibit 39    Def Bates 4013              226

23    Exhibit 40    Def Bates 4323              228

24    Exhibit 41    Def Bates 007623            236

25    * exhibit 31 not in posession of reporter

Deputy Martin Molina , III                                    April 18, 2024

Page 4

```
 1                    MARTIN MOLINA,

 2     having been first duly sworn, testified as follows:

 3                      EXAMINATION

 4    BY MR. ARONIN:

 5        Q.  Thank you.  Very nice to meet you.

 6        A.  Yes, sir.

 7        Q.  First and most important question I want to ask

 8    you.  Deputy is an appropriate way to refer to you?  I

 9    want to make sure I am showing proper respect.

10        A.  Yeah, that's fine.

11        Q.  Perfect.  My name is Will Aronin, and I am one

12    of the attorneys who represents Alek Schott, the

13    Plaintiff in this case.  Before anything else, do you

14    mind just saying and spelling your full name for the

15    record, please.

16        A.  Martin Molina.  M-A-R-T-I-N M-O-L-I-N-A.

17        Q.  Nice.  The other favorite thing is I get to

18    make my same bad jokes from yesterday, they all had to

19    suffer through it, but I expect you to laugh at them at

20    least.  So one bad joke is -- I'm really going to enjoy

21    asking a police officer this -- but is there any reason

22    you cannot testify truthfully today?

23        A.  No.

24        Q.  No.  Are you on any illegal drugs or

25    substances?
```

Deputy Martin Molina, III                                    April 18, 2024

Page 5

1          A.  No.

2          Q.  Okay.  The one that could be legitimate is, any

3    prescription medications that would prevent you from

4    either remembering something or focusing or testifying

5    truthfully?

6          A.  No.

7          Q.  Okay.  Very good.  And you understand that you

8    just took an oath; is that correct?

9          A.  Yes.

10         Q.  Okay.  And what do you understand the oath to

11   mean?

12         A.  To say everything I remember truthfully.

13         Q.  Perfect.  And it is the same oath that you

14   would take in court, correct?

15         A.  Yes.

16         Q.  Perfect.  And although we are sitting on the

17   opposite side of the table, and although we are on the

18   other side of the V in the case, we are the Plaintiffs.

19   I really just am doing this to get an understanding.

20   You know a lot more about how dogs work than I do,

21   frankly.  None of my questions are meant to be tricks,

22   traps, anything like that; is that fair?

23         A.  That's fine.

24         Q.  Likewise, I'm going to ask a lot of bad

25   questions.  It is just -- I do that.  And if you don't

Page 6

1    understand anything or it doesn't make sense, you can

2    tell me to rephrase it as many times as you need.  Cool?

3         A.  Okay.

4         Q.  Great.  The only like weird thing about this is

5    every answer does have to be verbal.  You can't do the

6    yes -- or the nodding, the shaking the head, uh-huh,

7    just that's bad for our court reporter.  Cool?

8         A.  Yup.  Sounds good.

9         Q.  Everyone does it.  It is what it is.  I am

10   going to have some documents for you to review.  I may

11   be kind of directing you to pages.  But any piece of

12   paper I show you, you have the absolute right to take as

13   much time with it as you need.  You can review all of

14   it.  You just tell me when you are ready for it.  Okay?

15        A.  Okay.

16        Q.  There may be objections.  Based on yesterday, I

17   don't think either of us are particularly aggressive

18   objectors, which is the right way to do it.  But if

19   there are any objections, it's for the record.  It's so

20   we can argue about something later.  It does not mean do

21   not answer, fair?

22        A.  Okay.

23        Q.  Okay.  The exception to that is if I ask you

24   anything that seems like I am asking you about a

25   conversation you've had with your lawyer, that is my

Deputy Martin Molina , III                                April 18, 2024

Page 7

1    mistake.  Do not tell me anything you have said to your

2    lawyers or your lawyers have said to you.  Okay?  That's

3    not my business.  Cool?

4         A.  Yes, sir.

5         Q.  Awesome.  Okay.  We can take as many breaks as

6    you want.  There's so many like introductions, I know.

7    We can take as many breaks as you want.  Just tell us.

8    All I ask is that if there is an open question, just

9    kind of answer the last question and we can take a

10   break.  Okay?

11        A.  Okay.

12        Q.  Great.  Very basic, some like background info.

13   Have you ever been a witness before?

14        A.  I have been -- I guess, yes, you can say, for

15   court.

16        Q.  Just tell me a little bit about that.

17        A.  I was a spotter on a track for another -- for

18   another handler.

19        Q.  Okay.

20        A.  Out in Floresville.  We were tracking a

21   murders -- or not a murder suspect.  The lady didn't

22   die, but attempted murder.  And they pulled me in to

23   court to testify.

24        Q.  What's a spotter?

25        A.  It's a guy who walks next to the handler.  So

Deputy Martin Molina , III                                   April 18, 2024

                                                            Page 8

1    the handler can't -- you are pretty much in protection,

2    I guess you can say.  The guy is watching the spotter --

3    the handler is watching his dog.  The spotter has to

4    have eyes around neutralizing any threats they see.  You

5    know --

6                  (Court reporter clarification.)

7                  THE WITNESS:  Neutralizing any threats.

8         A.  Like if someone pops up with a gun.  The dog

9    handler has his hands on the leash.  He don't have a

10   weapon out, so the spotter's job is to have his weapon

11   out around for any potential threats.

12        Q.  (BY MR. ARONIN)  Makes sense.  Watch the back,

13   right?

14        A.  Yes.

15        Q.  That makes a lot of sense.  Have you ever

16   testified in any other criminal case?

17        A.  I did.  It was a -- I can't remember.  I want

18   to say it was some search warrant.  I can't recall too

19   much.

20        Q.  Was it as a K-9 officer or before?

21        A.  K-9 officer, yeah.

22        Q.  Okay.  Can you give me a little bit more than

23   that?  If you don't remember, you don't remember.  But

24   anything more you can give me, I'd appreciate it.

25        A.  They called me because I had the bodycam

Deputy Martin Molina , III                                    April 18, 2024

                                                           Page 9

1    footage.

2        Q.  Okay.

3        A.  And I was walking around the house, obviously,

4    searching for my dog.  So they called me in to stop --

5    they had still pictures, I guess, of my body camera.

6    They were just asking me questions about it, and I think

7    that was it.  I can't really recall too much, but I know

8    it was a search warrant.

9        Q.  Okay.  And you think those are the only two

10   criminal cases you testified in?

11       A.  Yeah.

12       Q.  Okay.  Do you know what a suppression hearing

13   is?

14       A.  No.

15       Q.  Okay.  It would be a time when -- I am going to

16   try to define this, probably not beautifully.  But it's

17   where a criminal defendant tries to keep evidence out,

18   and I can imagine some of that would be evidence that

19   was discovered in the dog search.  And the judge kind of

20   hear testimony not in front of a jury.  Have you ever

21   done any of those?

22       A.  No.  It was all in front of a jury.

23       Q.  Okay.  Everything -- you have done two of them,

24   and they have both been in front of juries?

25       A.  Yes.

Deputy Martin Molina, III                                    April 18, 2024

                                                                Page 10

1        Q.  Thank you very much.  Have you ever been

2    deposed, like we are here today?

3        A.  I have been in a deposition once for an

4    18-wheeler crash.

5        Q.  I'm sorry.  I didn't hear the last part.

6        A.  For an 18-wheeler crash.  I've been in a

7    deposition.

8        Q.  What's 18-wheeler?

9        A.  18-wheeler.

10       Q.  Oh.  Sorry.

11       A.  Semi-truck.

12       Q.  Was it as a police officer, or was it --

13       A.  I did the crash, yes.

14       Q.  Okay.  You did the crash investigation, you did

15   not crash the car, right?

16       A.  Yes, correct.  Yes.

17       Q.  Fair enough.  Awesome.  Have you ever been an

18   expert witness or anything like that?

19       A.  No.

20       Q.  Okay.  Have you ever been like a plaintiff or a

21   defendant in a lawsuit other than where -- other than if

22   you were named in like a civil rights suit, something

23   that happened not as a police officer?

24       A.  No.

25       Q.  Okay.  Have you ever been named in a civil

Deputy Martin Molina, III                              April 18, 2024

                                                        Page 11

1    rights suit other than this one?

2        A.  No.

3        Q.  Okay.  This is another question that I am going

4    to enjoy asking.  Do you have any criminal history I

5    should know about?

6        A.  No.

7        Q.  I didn't think so, but I wanted to ask anyway.

8    Awesome.  Again, do not tell me any conversations you've

9    had with your lawyer, but you can tell me if you met

10   with them.  What did you do to prepare for today?

11       A.  I met with my attorneys.

12       Q.  Okay.  How many times and when?

13       A.  Once last week.

14       Q.  Last week.  Okay.  Did you speak to anyone

15   other than your attorneys about your testimony?

16       A.  No.

17       Q.  Did you speak with Deputy Herrera either before

18   or after yesterday?

19       A.  No.

20       Q.  Okay.  I asked that imprecisely.  Did you speak

21   with him yesterday?

22       A.  No.

23       Q.  Did you review any documents or evidence before

24   your testimony?

25       A.  I met with the attorneys on Thursday.  My

Deputy Martin Molina , III                                    April 18, 2024

Page 12

1    bodycam and my report.

2         Q.   Okay.  So when you say your report, what do you

3    mean?

4         A.   My supplemental I did for Babb's traffic stop.

5         Q.   Okay.  So the SPEARS report?

6         A.   Yes.

7         Q.   Did you review the printout of the K-9

8    deployment?

9         A.   I did, yes.

10        Q.   Okay.  Thank you.  And you said reviewed your

11   bodycam from Mr. Schott's stop; is that correct?

12        A.   Yes, from me running my dog around the vehicle.

13        Q.   Awesome.  And did you review Deputy Babb's?

14   Any footage?

15        A.   I did not.

16        Q.   Okay.  Great.  Thank you.  This is a question

17   that I always ask.  I don't really know why, but -- my

18   firm's name is the Institute for Justice.  We do

19   constitutional cases.  I call it IJ.  And whenever I do

20   an IJ case, I always ask this question.  What do you

21   understand our lawsuit is about?

22        A.   From what I read, violation of 4th and 14th

23   Amendments.

24        Q.   Fair enough.

25        A.   And -- pretty much it.

Deputy Martin Molina, III                                   April 18, 2024

                                                              Page 13

1        Q.  Fair enough.  And we're really here to

2    challenge some of the policies, not to really call out

3    any one officer.  We really -- we are more interested in

4    changing how this works going forward.  Does that kind

5    of -- is that generally what you understand?

6                    MR. FRIGERIO:  Objection.  Form.

7                    MR. ARONIN:  Fair enough.

8        Q.  (BY MR. ARONIN)  You can answer.

9        A.  Not really.

10       Q.  Okay.  Fair enough.  I can move on.  But you do

11   understand that this suit -- the lawsuit is about the

12   stop -- the stop and search of Alek Schott's car,

13   correct?

14       A.  Correct.

15       Q.  Do you remember doing that one?

16       A.  I remember running my dog on it, yes.

17       Q.  Okay.  Fair enough.  And did you help with the

18   search as well, correct?

19       A.  Correct.

20       Q.  All right.  And do you remember finding drugs?

21       A.  I remember finding a, I want to call it, shake.

22       Q.  Okay.

23       A.  Like very little small crumbs, I guess you can

24   say.

25       Q.  Okay.

Deputy Martin Molina, III                                    April 18, 2024

                                                          Page 14

1        A.  Put it in simple terms.  But I can't remember
2    if it was in the center console or between seats in the
3    carpet.
4        Q.  Okay.  Fair enough.  And I know what the word
5    "shake" means, so we will talk about that later.  Fair
6    enough?
7        A.  Sounds good.
8        Q.  Cool.  So with that insanely long introduction
9    that I need to learn to get rid of, we are finally going
10   to talk about just general background.
11              How long have you been with the Bexar
12   County Sheriff's Office?
13       A.  July 2012.
14       Q.  And what positions did you have since then?
15       A.  Detention officer.
16       Q.  Okay.
17       A.  And then in the jail, I was a gang officer.
18   And I did parole, so the parole hearing officer.  Came
19   to patrol, and I was a district officer for about three
20   years.
21       Q.  Okay.
22       A.  And then I came to K-9.
23       Q.  What was like your background before the
24   sheriff's office, schooling, things like that?
25       A.  Yeah.  I went to college at Palo Alto and SAC.

Deputy Martin Molina , III                    April 18, 2024

1    I got my peace officer license.  I worked on airplanes

2    with GORE and Boeing airlines.

3                    (Court reporter clarification.)

4        Q.  (BY MR. ARONIN)  Very cool.  What made you

5    decided to be a K-9 officer?  Obviously it seems pretty

6    cool, so I am just kind of curious.

7        A.  Growing up, my father was one, so I just simply

8    followed footsteps.

9        Q.  Nice.  That's really cool.  Did you grow up

10   with dogs?

11       A.  Yes, I did.

12       Q.  I grew up with a German Shepherd.

13       A.  Yes, I had one.

14       Q.  Is Max your first dog -- first police dog?

15       A.  Yes.  Yes.

16       Q.  Great.  Tell me about how you got certified,

17   how you got trained to be a K-9 officer.

18       A.  We had a head trainer named Floyd Cardenas.  He

19   was certified to train the trainer.  So I went through a

20   352-hour handler course with him, roughly about three

21   months.

22       Q.  Okay.

23       A.  And we did drug detections, apprehension bites,

24   building searchs.  We did stuff every day and had to

25   sign a paper every day.  We had curriculums, and then he

Deputy Martin Molina, III                              April 18, 2024

Page 16

1     let me on my own once he felt that I met -- once I met

2     all the criteria and he felt that I was able to go on my

3     own and let me go.

4          Q.   Approximately how long was that before he

5     felt -- before he let you go on your own?

6          A.   We had to do the mandatory -- the mandatory

7     three months.

8          Q.   Uh-huh.

9          A.   So, I mean, right after we are done, the

10    352 hours that were required, he let me go.  He still

11    stayed with me, shadowed me, but I would go to calls by

12    myself, but he will show up, you know, make sure

13    everything was okay.

14         Q.   Fill me in on what that means, like if he is

15    not with you the whole time.

16         A.   Just, I guess, you can call him my cover

17    officer.  He will always be there.  He wouldn't step in.

18    He would let me handle the situation if my dog was

19    needed or not.  And then at the end, we would have a

20    talk like, hey, you know, you can do this better next

21    time or fix this.

22         Q.   Okay.  So would he show up to all of your --

23         A.   No.

24         Q.   Okay.  I am not going to hold you to this, just

25    do your best.  Approximately, how many -- like what

Deputy Martin Molina, III                                    April 18, 2024

1    percentage would he show up to?

2         A.  He wasn't around that long, so --

3         Q.  Oh, yeah.  Sorry about that, honestly.

4         A.  Maybe like five or six -- five or six of them.

5         Q.  Five or six of your stops?

6         A.  Yeah.

7         Q.  And how many stops do you think you did?

8         A.  Well, they weren't all stops.

9         Q.  Okay.

10        A.  I think one or two were house deployments.  You

11   know, suspect is hiding in a house with felonies, things

12   like that.  Traffic stops, I think it was two or three.

13   That was it.

14        Q.  Okay.  Okay.  So he showed up for about two or

15   three.  And I understand that he passed away, is that

16   correct, in the line of duty?

17        A.  Yes, sir, he did.

18        Q.  I'm sorry about that.  May I ask who took

19   over -- he was the supervisor?

20        A.  He was the head trainer.

21        Q.  Who took that role?

22        A.  Joseph Canales.

23        Q.  Who is the supervisor now?

24        A.  Benjamin Olvera.

25        Q.  Okay.  Can you just tell me who has been the

Deputy Martin Molina , III                          April 18, 2024

Page 18

1    supervisor?  Like tell me all the supervisors since you

2    started in this process.

3         A.   Rene Ochoa, and then we had Pedro Gamboa, but

4    he was unofficially assigned there.  He was just

5    watching us.  And then we had Benjamin Olvera.

6         Q.   Thank you very much.  I want to follow up on

7    one thing you said.  You said there was 352 hours that

8    was mandated; is that correct?

9         A.   Yeah.  There was -- my TCOLE record says 350 or

10   352.  I can't recall.

11        Q.   I think it says 350.  But those are the types

12   of things -- like I'm not here to like catch you.

13   That's fine.  Either 350 or 352.  It doesn't matter.

14   You said that is mandated; is that correct?

15        A.   I mean, I would think so.  I signed all the

16   papers.

17        Q.   Fair.

18        A.   I signed the curriculum.

19        Q.   Mandated to you by whom?

20        A.   I don't know.  I guess -- I guess what he had.

21   I'm not sure.  I guess what Floyd had prepared.  I'm not

22   sure if it is something he did or if he -- I don't know.

23   I can't really -- I can't really explain like if it was

24   what he had in store for me, you know.  He was the

25   trainer.  He -- I don't know if he had certain

Deputy Martin Molina, III                          April 18, 2024

Page 19

1    curriculums or where he got them from.

2         Q.  You don't -- do you know, sitting here right

3    now, whether or not that is required by the Bexar County

4    Sheriff's Office?

5         A.  To be handler certified?

6         Q.  Yeah.  The 350 hours.

7         A.  350 hours.  I don't know.  But handler

8    certified, yes, it is required.

9         Q.  And is that one of your certifications?

10        A.  Yes.

11        Q.  And is that what you understand a certification

12   to mean?

13        A.  Yes.

14        Q.  Okay.  Thank you very much.  You mentioned --

15   I'm sorry.  We are going to pass notes to each other.

16        A.  No.  That's fine.

17        Q.  It's just a thing we are going to do.  You did

18   mention, Deputy, please correct me if I use the wrong

19   titles, but Deputy Gamboa was a supervisor at one point?

20        A.  Yes.

21        Q.  And just tell me about what his role was at the

22   time.

23        A.  He was our -- he would watch over us.

24        Q.  Okay.

25        A.  He was a sergeant, but he was a sergeant for

Deputy Martin Molina, III                                    April 18, 2024

Page 20

1    our intel union -- our intel unit.  And they just

2    assigned them to us to watch, because we did not have

3    any supervision.

4        Q.  Do you know if he has any involvement with the

5    Criminal Interdiction Unit as well?

6        A.  He did at one point.

7        Q.  Just tell me about that, please.

8        A.  He was a supervisor over there.

9        Q.  When?

10       A.  When this stop happened.

11       Q.  Okay.  What is the Criminal Interdiction Unit?

12       A.  They run highway interdiction.  They run city

13   interdiction.  They just look for drugs, I guess.

14       Q.  Forgive my ignorance.  But just what does the

15   word "interdiction" mean in this context?

16       A.  For me, I would just say find.  I don't know.

17   Investigate.

18       Q.  Like find drugs?

19       A.  Not drugs necessarily, but criminals and stuff,

20   but --

21       Q.  So some of the things they might do is finding

22   drugs, right?

23       A.  Uh-huh.

24       Q.  That's the first one?

25       A.  I'm sorry.  I'm sorry.

1          Q.   Everyone does it.  I do it too.  I do it all

2     the time.  Okay.  So one of things they would do is

3     investigate for drugs, correct?

4          A.   Correct.

5          Q.   Another thing they would do is investigate to

6     apprehend suspects; is that correct?

7          A.   For any kind of -- felony warrants, anything.

8          Q.   Do they also look for those potentially helping

9     illegal border crossings?

10         A.   I don't know.

11         Q.   Or human trafficking?

12         A.   I don't know.

13         Q.   Fair enough.  I don't know is a perfectly good

14    answer if you don't know.  The -- and who is in the

15    Criminal Interdiction Unit?

16         A.   We had -- since I have been on K-9 --

17         Q.   Yes, please.

18         A.   -- or do you mean prior to this stop?

19         Q.   Tell me what you know.

20         A.   I think it was just Gil Martinez and then it

21    went to Guerra -- Joe Guerra and then Joel Babb.

22         Q.   Okay.  And that's the entire unit?

23         A.   It was always two men.  So when someone would

24    leave, someone would take the new position.

25         Q.   And was -- I believe you said Sergeant --

1    Sergeant Gamboa working with the Criminal Interdiction

2    Unit and the K-9 squad simultaneously?

3        A.  I don't know if he was over interdiction

4    anymore, because I know they got a new supervisor.  But

5    I can't say yes or no.  I mean --

6        Q.  That's fair.  Let me push a little.  What about

7    in March of 2022, when this happened, was Sergeant

8    Gamboa working with both units at the same time?

9        A.  He was -- no, he wasn't.  We still had Rene

10   Ochoa.

11              (Court reporter clarification.)

12       Q.  (BY MR. ARONIN)  Okay.  And how much did you

13   end up working with the two deputies who were in the CI

14   unit?

15       A.  You mean other than Babb?

16       Q.  Yeah.

17       A.  I mean, there was only two narc K-9s on, so it

18   would be me or the other guy.  I can't say I was always

19   there.

20       Q.  Okay.

21       A.  I would be helping the TFO from DEA or tied up,

22   you know.  And if I was not busy, then I would go, but

23   if I was tied up, they would pull the other K-9.

24       Q.  Did you say TFO?

25       A.  Yeah.  Task force officer.

Deputy Martin Molina , III                                April 18, 2024

Page 23

1          Q.   Thank you very much.   Who was the other K-9

2     officer?

3          A.   Kevin Rasmuessen.

4               (Court reporter clarification.)

5               THE WITNESS:   Kevin Rasmuessen.

6     R-A-S-M-U-E-S-S-E-N.   Maybe something like that.

7          Q.   (BY MR. ARONIN)   And how often would you say

8     the Criminal Interdiction deputies would call out for a

9     K-9?

10         A.   Not often.   Especially Deputy Babb.

11         Q.   Okay.

12         A.   I would think I would help Deputy Guerra more.

13         Q.   Okay.   And like what was the process by which

14    they contacted you?

15         A.   They had a traffic stop, whatever PC they had.

16    They got to have reasonable suspicion to call me, get me

17    on the radio, dispatch call me.   And then if I was

18    available, I would go.

19         Q.   Okay.   And one thing I asked about -- with

20    Deputy Herrera was open calls verses just the general

21    radio.   Does that make sense?

22         A.   Open calls like?

23         Q.   Like an open channel on the radio.

24         A.   No.   It was always on primary -- yeah.   There's

25    an open channel, but it is still monitored by dispatch

Deputy Martin Molina, III                               April 18, 2024

Page 24

1    and everything.

2         Q.   Just like when CI wanted to speak with you,

3    would they say --

4         A.   Go to open, yeah.

5         Q.   Okay.

6         A.   That's just so we don't have to tie up a

7    channel.

8         Q.   I'm not suggesting there's anything wrong with

9    it.  I'm just trying to get a sense for literally how it

10   works.  And forgive me for doing this.  Do you say, hey,

11   Bucky, get on an open channel, I just want to talk to

12   you?

13        A.   They can say -- for example, me, I will be like

14   5kilo18 can you have Zulu23 go to open.  So whatever

15   channel -- if we are on west or east, they both have

16   open channel.

17        Q.   Perfect.  Thank you.  That makes a lot more

18   sense.  Awesome.  I want to jump back into the

19   certifications a little bit, so I am going to show you

20   the first documents.

21              (Exhibit 26 marked.)

22        Q.   (BY MR. ARONIN)  Okay.  Cool.  So I am showing

23   you what has been marked as Exhibit 26, and I will tell

24   you these are four certificates that were provided to

25   us.  This is just the orders that were provided to us.

Deputy Martin Molina, III                                    April 18, 2024

                                                              Page 25

1    Please just take a look at all four of them briefly.

2        A.  Okay.  Sure thing.

3        Q.  Okay.  Are these all of your certifications?

4        A.  Yes.

5        Q.  Okay.  Excellent.  So sitting here today, you

6    do not know of any other certifications you received on

7    K-9 training, correct?

8        A.  Yes, sir.

9        Q.  Okay.  Perfect then.  I have them all, that's

10   all I wanted to know about that topic.  I want to know a

11   lot more things.  But let's take a look at the first

12   page.  It looks like this is the certificate from the --

13   that 350 training that we talked about; is that right?

14       A.  Yes.

15       Q.  Okay.  And am I right that you did it from

16   basically January 5th, 2021, to March 11th, 2021?

17       A.  Yes, sir.

18       Q.  And that was when you were allowed to go out on

19   your own?

20       A.  Yes.

21       Q.  And your supervisor did come to somewhere

22   between two, three, maybe four traffic stops after that

23   to shadow; is that right?

24       A.  Yes.

25       Q.  And if I am reading this right -- please don't

Deputy Martin Molina , III                                    April 18, 2024

Page 26

1    let me put words in your mouth, make sure I understand.

2    This was done by the Bexar County Sheriff's Office,

3    correct?

4            A.   It was.

5            Q.   This is purely an internal training, correct?

6            A.   Yes.

7            Q.   Okay.   They were in charge of it?

8            A.   Yes.

9            Q.   They set the -- they set like the policies of

10   what you had to learn; is that correct?

11           A.   Yes.

12           Q.   And they determined whether or not you had

13   satisfactorily completed -- completed it -- withdrawn.

14                They determined if you did well, right?

15           A.   Yes.

16           Q.   Okay.   Very cool.   And just, again, this is

17   just literally I don't know how this works.   Like what

18   did you learn?

19           A.   So you got to bond the dog -- bond with the

20   dog, right?   Obviously, it has been with somebody else

21   before.   So part of that is a bonding process.   A couple

22   of weeks.   Then you got to learn to walk the dog, take

23   them in and out of the car, and then the obedience part,

24   which is the hardest.

25           Q.   Okay.

Deputy Martin Molina, III                                    April 18, 2024

1       A.  The vehicle searches, the building searches for

2    narcotics, both of them.  Once we completed that, we did

3    the apprehension work for suspects and then recalls on a

4    dog, call the dog back to you.  That's if it is engaged

5    on somebody.  Tracking a suspect.  Those are all the

6    main ones.

7       Q.  Okay.  Why is obedience the hardest?

8       A.  Because they are a dog.  They are animals.  You

9    know, they got to stay next to you.  They got to walk,

10    you know.  They can't run off.  If you don't do it every

11    day or every week, you know, they get dirty, they get

12    sloppy, and they will just start being a dog.

13       Q.  Fair enough.  How do you -- how do you -- how

14    do you ensure the dog is being obedient?

15       A.  He won't get his toy.

16       Q.  Dog like his toy?

17       A.  Yup.

18       Q.  What is the toy?

19       A.  The Kong.

20       Q.  The Kong?

21       A.  Yeah.

22       Q.  What do you fill the Kong with?

23       A.  Nothing.

24       Q.  Really?

25       A.  Uh-huh.

Deputy Martin Molina, III                          April 18, 2024

Page 28

1        Q.  It is just the chew toy itself?

2        A.  Yeah.

3        Q.  You are still working with Max, right?

4        A.  Yes, I do.

5        Q.  Awesome.  He lives with you, all that?

6        A.  Yes.

7        Q.  Good dog, right?

8        A.  Yes, very good dog.

9        Q.  In my outline, if you brought the dog, I

10   actually have questions for him specifically.  Who is a

11   good boy.  Who is --

12       A.  No, he would be wanting to jump on you and play

13   with you.

14              (Discussion off the record.)

15       Q.  (BY MR. ARONIN)  Okay.  All right.  Now, I am

16   completely distracted now.  So we talked about obedience

17   training.  How -- so tell me -- I am jumping around a

18   little bit.  But like tell me what an alert, an

19   indication is, or anything else you understand like

20   that.

21       A.  So alert, he will stop, right?  So I run him by

22   a car or a house -- I'll give you an example.  Say, the

23   bookshelf, for example.  Since we are in the room,

24   everybody can look at it, right?

25       Q.  Uh-huh.

Deputy Martin Molina, III                                      April 18, 2024

1      A.  I will start him around the room clockwise.  He

2  will fringe there.  He will be working it.  I say, okay.

3  He will stay in one area.  He will just stay.  And I

4  say, okay, he is giving me an alert.  And he will sit

5  down, lay down.  That's the indication right there for

6  me.

7      Q.  Okay.  So indication is laying down or an alert

8  is sitting down; is that right?

9      A.  No.  The indication, for me --

10     Q.  I think I missed it.

11     A.  So the alert is him just there fringed looking

12  at it.

13     Q.  Okay.

14     A.  So I will wait him out.

15     Q.  Okay.

16     A.  And then if he finds the source like -- if the

17  source is there, he is going to want to put his head in

18  it, so he will just stay there.  Usually he will get

19  closer, and once it is satisfying enough for him, boom,

20  he will give me an indication.

21     Q.  So alert is like the first level, indication is

22  like there is something there, right?

23     A.  Yes.  Yes.

24     Q.  Okay.  Awesome.  One thing Deputy Herrera was

25  talking about was a change in behavior.

1          A.   Yes.

2          Q.   What is that phrase?

3          A.   So it is, like I said, you know, he went to the

4     bookshelf, but he is going back and forth.  He just

5     can't pinpoint it, so he has a big change in behavior.

6     So say, for example, I am walking my dog around the

7     trash can or something, changes, and goes right to it.

8     That's a big change of behavior for me.  He was just

9     walking around along with me nonchalant, you know.

10         Q.   What are some of the other things specifically

11    Max can have that would be a change in behavior that

12    would make you raise your suspicions?

13         A.   Change behavior how?  For narcotics?

14         Q.   Yeah, please.

15         A.   He would just -- like if we weren't even

16    looking for anything but he just veers off and starts

17    searching high, low, you know, I see his head go high,

18    goes low.  That's a big change of behavior for me.

19         Q.   What about if you are looking?  So, let's say,

20    you are called out to search a car.  What types of

21    things are you looking to observe with drugs -- let's

22    say you are -- you were called to search a car.  List

23    the change -- the potential changes of behavior for me,

24    please.

25         A.   So I will start.  We'll run.  He starts

Deputy Martin Molina , III                                April 18, 2024

Page 31

1    checking high, low.  If the wind is blowing, he will

2    pass it up, he will come back.

3        Q.  Okay.

4        A.  I will just keep walking, let him do his thing.

5    But the big change in behavior I saw, you know, he will

6    turn around and go back and check the thing again.  And

7    if I keep walking and then he breaks off, then he broke

8    off.  Let's keep going.  Then we will go again.  And if

9    he does the same change of behavior the same the second

10   time, same spot, then I am going to help him.  I will

11   start being more -- I don't know how to use that word,

12   but I will tap the headlight.  I will tap the wheel.  I

13   will tap the fender, you know, helping him check more

14   places because there is something there for him, he just

15   can't find it.  He needs assistance, so I will help him.

16       Q.  I am going to change topics a little bit

17   because the next thing I'm going to ask you about is a

18   lot of how the actual traffic stops work.

19       A.  Okay.

20       Q.  So I am going to go in more detail.  It is my

21   lack of focus.  I want to go back to the training

22   certificate.

23                MR. LEAKE:  Hey, Will.

24                MR. ARONIN:  Yeah.

25                MR. LEAK:  Do you mind -- I hate to

Page 32

1    interrupt.  Can you turn the screen towards the witness

2    a little?  I am having trouble hearing him.  I think it

3    will help.

4                    MR. ARONIN:  No.  You are good.  You are

5    good.  Better?

6                    MR. LEAKE:  I think it will be.  Cool.

7         Q.  (BY MR. ARONIN)  So I do want to go back to the

8    certificates.  And having spoken with Deputy Herrera

9    yesterday, I think I learned some things.  I might not

10   have, but I think so.  One of the things I learned is

11   what the NCATS system is.

12                    (Court reporter clarification.)

13        Q.  (BY MR. ARONIN)  Can you just tell me, what is

14   that?

15        A.  It is the National -- let me see.  I think it

16   is National K-9 Audit Tracking System.

17        Q.  Okay.  The thing I learned is that's the

18   software that you have in the car and on your equipment

19   that you create these reports on?

20        A.  NCATS is the people who certify us.

21        Q.  Okay.

22        A.  And our software in the car, I'm not sure if it

23   is related to it or not.

24        Q.  How did you learn how to use the software in

25   the car?

Deputy Martin Molina , III                                    April 18, 2024

Page 33

1        A.   Oh, man, that was hard.

2        Q.   Okay.

3        A.   I had another deputy sit down with me in our

4    office and show me how you use it.  It has -- it took me

5    a while, you know, I'd always call for help until I

6    actually got the hang of it.  But it has all our

7    trainings --

8        Q.   Okay.

9        A.   -- deployments, and just keeps records of

10   everything for situations like this can be pulled.

11       Q.   Fair enough.  You know what the deployment

12   reports are, right?

13       A.   Yes.

14       Q.   Okay.  I am going to show you another exhibit.

15            MR. ARONIN:  Just very quickly off the

16   record.

17            (Off record discussion.)

18            (Exhibit 27 marked.)

19       Q.   (BY MR. ARONIN) Okay.  So this is -- first of

20   all, do you know what this document is?

21       A.   Yes.  It is the deployment report that I did

22   after the vehicle we are on.

23       Q.   For this case, right?

24       A.   Yes.

25       Q.   Okay.  So I want to ask you -- at some point

Deputy Martin Molina , III                                    April 18, 2024

1    I'm going to ask you about the content of it, but for

2    now I just want to get the sense of the form itself.

3         A.   Okay.

4         Q.   So these deployment reports are the same for --

5    the same basic form regardless of the stop; is that

6    correct?

7         A.   Yes.

8         Q.   And this is the form that gets created based on

9    the software that you are given in the car and your

10   equipment, correct?

11        A.   Yes.

12        Q.   So you basically, am I correct, that you enter

13   the information into sort of the dropdown menus and then

14   it generates this report?

15        A.   Yeah.

16        Q.   Okay.  Give me a -- I realize I shouldn't be

17   leading these questions.  Just explain to me how -- like

18   how you enter the information generally.

19        A.   So it doesn't look like this.

20        Q.   Okay.

21        A.   The one we have in our computer prints out like

22   this.  Pretty much the same thing, though.  You know, if

23   you had a deployment, it'd be what it was for, tracking,

24   search warrant, et cetera, et cetera.  This one I put,

25   you know, exterior vehicle scenting.  That is what I was

Deputy Martin Molina, III                                    April 18, 2024

Page 35

1    doing that day.

2        Q.  Okay.

3        A.  And then obviously it has the time started on

4    here.  That's the time we initiated.  Well, why I

5    initiated, I should say.  The location of where we were

6    at.  Our agency for us.  The vehicle type and all that,

7    we don't really put that in there.

8        Q.  Okay.

9        A.  All we usually do is our activity finds, if we

10   got an alert or indication if a substance was present.

11       Q.  Okay.  I'm going on ask you about those in a

12   moment.

13       A.  Okay.

14       Q.  So how did you learn how to like fill out this

15   part of the system?

16       A.  By a fellow -- prior K-9 deputy who was there

17   in the unit.

18       Q.  Okay.  Did you discuss this at all with your

19   supervisor?

20       A.  Yeah.  The head trainer?

21       Q.  Yeah.

22       A.  Yes.  Well, he tasked that deputy to teach me

23   the system.

24       Q.  Okay.  So the head trainer -- the head trainer,

25   when you were learning, who was it again?

Deputy Martin Molina, III                                    April 18, 2024

Page 36

1          A.   Floyd Cardenas.

2          Q.   I am just bad with names.  Sergeant Cardenas?

3          A.   No, deputy.

4          Q.   Deputy Cardenas tasked another deputy to train

5     you on the system; is that correct?

6          A.   Yes.

7          Q.   And who was that other deputy?

8          A.   Raymond Ruiz.

9          Q.   Okay.  Thank you very much.  And Deputy Ruiz

10    taught you how to use it, correct?

11         A.   Yes.

12         Q.   Did anyone ever go over the reports with you

13    after that?

14         A.   Deputy Cardenas did because he had approved

15    them.

16         Q.   Okay.  What did he --

17         A.   He approved our -- I'm sorry.  He approved our

18    training records, not our deployments.  Our supervisor

19    would approve the deployments.

20         Q.   Who was approving the deployments?

21         A.   Rene Ochoa.

22         Q.   Okay.  I'm sorry.  This is like just my pure

23    ignorance.  What is the difference between a trainer and

24    a supervisor?

25         A.   So the trainer is just -- we don't have

1    corporals, but it would be like a corporal.  So it would

2    a be veteran -- it's the veteran officer who has the

3    most experience.  He has the most training.  Floyd went

4    to train the trainers, so he was the most certified.  So

5    he was our boss, I guess you can say.

6        Q.   Uh-huh.

7        A.   And obviously once something happened in the

8    field, our sergeant would come out.

9        Q.   And that would be a supervisor?

10       A.   Yes.

11       Q.   And you said that Sergeant Cardenas?

12       A.   Deputy Cardenas.

13       Q.   I'm sorry.

14       A.   It's fine.

15       Q.   The supervisor is --

16       A.   The supervisor -- sorry.  The supervisor is

17   Rene Ochoa.  He is just our -- Cardenas is just our

18   trainer to train us.  He is the head trainer.

19       Q.   Perfect.  I am going to continue to mess this

20   up.

21       A.   That's fine.

22       Q.   But I do apologize.  I don't mean it to be

23   disrespectful.  The supervisor, Ochoa?

24       A.   Yes.

25       Q.   He discussed how -- he discussed the reports

Deputy Martin Molina , III                                April 18, 2024

Page 38

1    with you?

2         A.   No.  He would just approve -- we will go

3    through them and approve them.  If something was wrong,

4    then he would discuss.  Like if we messed up or

5    something or if we missed something, he will take it

6    back to us and say, fix it.

7         Q.   Did that ever happen to you?

8         A.   No.

9         Q.   Not a single time?

10        A.   No.

11        Q.   So every single one of your deployment reports

12   was approved?

13        A.   Yes.

14        Q.   And no further feedback on them whatsoever?

15        A.   No.

16        Q.   Okay.  I do want to ask you about what these

17   things generally mean when I am looking at the alert

18   given, indication, substance presence.  Do you see where

19   I am looking?

20        A.   Yes.

21        Q.   Wonderful.  Although some may be obvious, I

22   think some are not.  Can you just tell me, what does,

23   alert given, mean?

24        A.   Alert given is like he found the area, like he

25   found the area that he liked, I guess.  Not he liked,

Deputy Martin Molina, III                                    April 18, 2024

Page 39

1    but -- we are narcotic.  Where he is getting the

2    scent -- where he is getting the odor of narcotics.  I

3    will put it that way.

4         Q.  Would it be fair to say that it means that the

5    dog gave an alert?

6         A.  Yes.

7         Q.  Okay.  And what does indication mean?

8         A.  Where he gave his final alert, either sit down

9    or lay down.

10         Q.  Okay.  And those are the only two final

11    indications, correct?

12         A.  For my dog, uh-huh.

13         Q.  Okay.  That's a very fair point.  For all these

14    questions, when I ask about alert and indications, it is

15    about your dog, fair?

16         A.  Yes, sir.

17         Q.  Thank you very much.  I assume subs pres means

18    substance present; is that correct?

19         A.  Correct.  Yes.

20         Q.  What does substance present actually mean?

21         A.  Substance present is, was there any narcotics

22    found.

23         Q.  Okay.

24         A.  Doesn't matter very, very little, you can't

25    even use, or kilos.

Deputy Martin Molina, III                           April 18, 2024

1          Q.   Okay.  So substance present means that you

2     discovered some amount of narcotics; is that correct?

3          A.   Yes.

4          Q.   That's what a yes would mean, correct?

5          A.   Yes.

6          Q.   And then no would mean that no amount of

7     narcotics was discovered, correct?

8          A.   Yes.

9          Q.   Okay.  What does substantiated mean?

10          A.   I can't give you a good definition.

11          Q.   Have you ever checked that box?

12          A.   No.

13          Q.   Okay.  So you just -- you don't know what it

14     means?

15          A.   No.

16          Q.   Okay.  Fair enough.  Is it -- don't let me put

17     words in your mouth.  I don't think you would anyway.

18     But am I correct in understanding if you found drugs,

19     then the way that this would be reported is under

20     substance present, right?

21          A.   Yes.

22          Q.   And that's sort of what the report means,

23     right?

24          A.   Yes.

25          Q.   Awesome.  And same thing with loc known,

Deputy Martin Molina, III                                      April 18, 2024

Page 41

1    location known?

2        A.   Correct.

3        Q.   Do you know what that means?

4        A.   Yes.

5        Q.   What does that mean?

6        A.   I knew where the location was where the

7    narcotics were found.

8        Q.   Explain that to me.  I don't understand.

9        A.   So if he found narcotics in the gas tank, I

10   knew where it was.  So like, say, trainingwise, we know

11   where locations are.  These, we don't.  So all trainings

12   we don't, though.  But like if I do training on my own,

13   my dog, let's say he -- say we had training today and he

14   missed -- he missed where the dope was.  Okay.  Well,

15   the next day, I am going to start working with my dog.

16   So I am going to go out, put the narcotics, and then run

17   my dog.  So when I do training, I put location known as,

18   yes, because I knew where they were the whole time.

19       Q.   Thank you.  I did not understand that at all.

20   So typically for a traffic stop, that should be a no.

21       A.   Yes.

22       Q.   Okay.  Unless for some reason the driver says,

23   yes, it is in my gas tank or something, correct?

24       A.   Correct.  And it has happened.

25       Q.   I believe it.  I don't know why it's happened,

1    but I believe it.  Okay.  I am assuming this is vehicle

2    release, but for the record, it is veh.rel.  What does

3    that mean?

4         A.  I can't tell.  Like I said, this looks

5    different here compared to our -- our computer screen.

6    And I don't -- I don't even think it has these on there.

7    Where we check, all it says, alert given, substance

8    presence, all that.  But I -- and it says like the wind.

9    But I don't recall ever seeing this.  I mean, it must be

10   there, but I never messed with it.

11        Q.  Okay.  You just -- that is not a form that you

12   would fill out one way or the other; is that correct --

13   or rather an input on a form that you would fill out one

14   way or the other, correct?

15        A.  Yes.

16        Q.  And just informally, what do you call the

17   system that you like enter all the stuff into?

18        A.  It is called K-9 -- I can't -- I don't remember

19   if it is Legacy or -- I can't recall.  But it is

20   something like a K-9 something.  It started with a K,

21   though, not a C.

22        Q.  Interestingly -- my understanding, and

23   Mr. Frigerio can correct me, is that Deputy Herrera said

24   that the system is called the NCATS?

25        A.  I don't know if it's NCATS certification or if

Deputy Martin Molina, III                                April 18, 2024

Page 43

1    the report goes to NCATS from there.  I don't know if it

2    is linked or -- I just input stuff.

3         Q.  Okay.

4         A.  I don't know if they are inter-tied with each

5    other or how that works.

6         Q.  Fair enough.  Like I said, I don't know is a

7    perfectly fair answer.  Now, going back.  I am going to

8    ask you more about this document when we talk more about

9    Mr. Schott's case.

10        A.  Okay.

11        Q.  So keep it sort of readily accessible, and I

12   will do the same.  But going back to the certificates,

13   so it looks like you did one NCATS certification each

14   year.  Is that the remainder of your certifications?

15        A.  Yes.

16        Q.  So it looks like you did one in 2021, one in

17   2022, and one in 2023; is that correct?

18        A.  Yes, it is.

19        Q.  And looks like they were all in May of that

20   year, right?

21        A.  Yes.

22        Q.  How long did that take?

23        A.  Two to three weeks.  But we would only do them

24   on Tuesday, which is our unit training.  That is when

25   everybody is together.  So we would do one day vehicle

Deputy Martin Molina, III                                    April 18, 2024

Page 44

1    narcotics, everybody is there.  But we just can't do

2    vehicle narcotics because we have two dogs that are

3    explosives.

4          Q.  Okay.

5          A.  So once we are done with them, we got to set up

6    explosive, and that's our whole day.

7          Q.  What do you do while they are training the

8    explosive dog?  I don't like to call them explosive

9    dogs.  Dogs that detects explosives.  What do you do

10   while they are doing that?

11         A.  So either I'm recording them for the videos to

12   send here.

13         Q.  Okay.

14         A.  If not, I am helping other people with their

15   dogs, whatever problems they have.

16         Q.  Okay.  And these are full-day trainings?

17         A.  Yes.

18         Q.  And you said it is -- I believe you said it is

19   two weeks; is that right?

20         A.  So I said it took us about two to three weeks.

21         Q.  Okay.

22         A.  Our trainings are on Tuesdays.

23         Q.  So it is two or three full-day trainings,

24   correct?

25         A.  Yes.

Deputy Martin Molina, III                                  April 18, 2024

Page 45

1          Q.  Okay.

2          A.  Yeah, yeah, yeah.  I had to think about that,

3     yes.

4          Q.  So like two or three Tuesdays in a row in May

5     of 2021 and again in 2022 and 2023, correct?

6          A.  Yes.

7          Q.  And you said those are internal.  So you didn't

8     get like sent anywhere.  This was still through Bexar

9     County Sheriff's department?

10          A.  Yes.  So we use a -- we use a K-9 facility out

11     in Somerset.  They have cars, buses, you know, houses

12     for us to use.

13          Q.  Okay.  And if you would turn -- give me one

14     second.  Do you know -- and you probably don't.  There

15     is no reason for you to.  Do you know what a Bates stamp

16     is?

17          A.  Nope.

18          Q.  Okay.  May I?  Do you mind if I reach over and

19     point?  This -- these are going to be the numbers I

20     refer to as Bates stamp.  It is just numbers that

21     lawyers put on documents so we know how to refer to

22     them.  That's going to be the page numbers I give you

23     throughout today.  Okay?  Cool?

24          A.  Yep.  Sounds good.

25          Q.  Awesome.  So let's take a look quickly at 7606.

Deputy Martin Molina, III                                      April 18, 2024

Page 46

1    It is the 2021 one.

2         A.   Okay.

3         Q.   Okay.  One thing it seems -- if I am reading it

4    right, the actual training was under NCATS patrol and

5    narcotics audits standards.  Am I reading that

6    correctly?

7         A.   Yes.

8         Q.   What does audit mean?

9         A.   Audit means they go and check -- make sure

10   everything is good to go.

11        Q.   What is that -- like what are they checking

12   for?

13        A.   So here they are checking our videos that we

14   sent to them for narcotics, drugs -- I mean, not drugs,

15   narcotics, vehicles, buildings, or apprehensions.  And

16   if they meet their standards, then I guess we are

17   certified.

18        Q.   Do they check your reports?

19        A.   I don't know.

20        Q.   Okay.  Do you know if they check your training

21   records?

22        A.   I don't know.

23        Q.   Okay.  Fair enough.  And it seems you did

24   the -- if you turn to the next page, it seems that you

25   did the same type of training the following year; is

Deputy Martin Molina , III                                  April 18, 2024

Page 47

1   that right?

2          A.   Yes.

3          Q.   Okay.  Very good.  And I noticed you corrected

4   drugs to narcotics.  Is that like the right way to say

5   it is narcotics and not drugs?

6          A.   Yes.  Narcotics.

7          Q.   I will do my best, but I probably won't do it

8   as well as you.

9          A.   No.  That's fine.

10         Q.   I will probably say drugs.  Okay.  I want to

11  get a sense of like how an actual vehicle stop works.

12  So this is where I would like for you to give me as much

13  detail as you can.  And then I am going to come back and

14  ask like follow-up questions on the pieces.  Cool?

15         A.   Uh-huh.

16         Q.   Okay.  The -- just how does it work?  Like you

17  get called out to the scene for a narcotic search on a

18  car.  Walk me through everything.

19         A.   I get there.  I talk to the deputy, whoever it

20  is.  They will give me the rundown.  Hey, I stopped the

21  car for this, this, and this.  I said, okay.  I believe

22  it has this, this, and this inside.

23              So I guess I will go more for you.  I made

24  a traffic stop for stopping at a stop sign out of a

25  motel, I guess you could say.  It's a drug-known area.

Deputy Martin Molina , III                                    April 18, 2024

Page 48

1      Q.   Okay.  What was the word you used?  A motel?

2      A.   A motel.  Like motel or like a drug-known area.

3      Q.   Okay.

4      A.   You know, I talked to the deputy.  I get there,

5    the deputy is telling me, yeah, the car didn't stop at

6    the stop sign.  I saw it at this motel or a drug-area

7    house.  All these people kept coming in and out of it.

8    They left, I stopped it.  I said, okay.

9           And then you could say a guy has a -- he is

10   on bond for possession right now and this, this, and

11   that.  Okay.  I go talk to the guy.  And I ask them if

12   he has any problem running my dog around his vehicle.

13   He will say, no, it's fine.  So now I pull my dog out

14   and run my dog around the vehicle, and if he alerts, I

15   let the deputy know, hey, my dog alerted here.  I put my

16   dog up.

17          And then depending where we are, if --

18   depending on the circumstances, I will -- I will stay,

19   watch the suspect.  And then I will get in my truck and

20   leave.

21     Q.   Okay.  What do you mean you will stay and watch

22   the suspect?

23     A.   Because sometimes they don't put them in the

24   back seat.  If we are in an area, they will have him

25   stand in the curb, in the grass.

```
 1        Q.   Okay.

 2        A.   That way if something happens to the vehicle or

 3   it gets hit or something, the person is out of harm's

 4   way.

 5        Q.   Also, it is like being a spotter?

 6        A.   I don't want that guy to jump on the deputy, so

 7   I will stand there, but --

 8        Q.   I understand.  I am going to kind of break it

 9   down piece by piece.

10        A.   Uh-huh.

11        Q.   But one thing I want to get a sense of is how

12   do you treat a -- are there any differences in how you

13   treat a stop when the driver has or has not given

14   consent to search?

15        A.   No.

16        Q.   You treat them exactly the same?

17        A.   Yes.

18        Q.   Why do you do that?

19        A.   Just how I practice.

20        Q.   Is that how you were trained to practice?

21        A.   No.  It's just me personally.  Like I -- I go

22   talk to them.  I say, do you give me consent to run your

23   car?  Yeah.  Okay.  But I'll still run it as a free air.

24        Q.   Okay.

25        A.   And I go talk to them.  Do you give me consent
```

Deputy Martin Molina, III                                     April 18, 2024

1    to run your car?  No, I don't give you consent.  I say,

2    okay, just know I am going to run my dog anyway.  You

3    know, I just thought I'd give it to you as common

4    courtesy.

5         Q.  Uh-huh.

6         A.  And I run my dog.

7         Q.  Okay.  And when the -- when the driver has not

8    given consent, you do the exact same thing?

9         A.  Yeah.  I have them step out of the car for

10   their safety, roll the windows up, and then --

11        Q.  And, again, how did you -- so I would have no

12   idea how to run a car.  Like I just wouldn't know what

13   to do.  I mean, that seems right, right?  That seems

14   correct?

15        A.  Yeah.

16        Q.  Yeah.  Like you had to be trained to do this,

17   correct?

18        A.  Yes.

19        Q.  You did not come out of the police academy

20   knowing how do this, correct?

21        A.  Correct.

22        Q.  So how did you learn how to do this?

23        A.  Through my certification training.  So --

24        Q.  Please.

25        A.  -- with Deputy Cardenas, yeah.

Deputy Martin Molina, III                                    April 18, 2024

                                                          Page 51

1          Q.  So with the Bexar County Sheriff's Office, you

2     learned how to -- learned how to run the stops this way?

3          A.  Yes.

4          Q.  And they taught you how to interact with a

5     driver; is that correct?

6          A.  Not necessarily driver, just how to run my dog

7     around the vehicle.

8          Q.  Okay.  How to deal with the dog, correct?

9          A.  Yes.  The interaction I did was same way I

10    talked to people when I was on patrol.

11         Q.  Okay.

12         A.  Respect goes a long way is what I tell

13    everybody.

14         Q.  As you've said, you were also -- were shadowed,

15    at least a few times?

16         A.  Yes.

17         Q.  During some of these searches, correct?

18         A.  Yes.

19         Q.  And no one has ever spoken to you and said,

20    this is not the way to do it, correct?

21         A.  Correct.

22         Q.  Okay.  Now, we are going to go through the

23    details.  By the way, no obligation, nothing like that,

24    would you like to take a break before I changed topics

25    or --

Deputy Martin Molina, III                                          April 18, 2024

Page 52

1        A.   No.   I'm fine.   As long as y'all are all good,

2    everything is fine, I'm good.

3              MR. ARONIN:   The offer is for everybody.

4    Let's keep going.   Cool.

5        Q.   (BY MR. ARONIN)   Okay.   So I am going to kind

6    of do what we did, but in much more detail.   So you are

7    getting a call, let's say, from a deputy saying, I have

8    a -- actually, let's take one step back.

9              When does a driver turn into a suspect?

10   Like you are not -- withdrawn.

11             You are not a suspect when you like roll

12   through a stop sign, right?

13       A.   Not until you are -- you are not a suspect, you

14   are just detained.

15       Q.   Yeah.

16       A.   So you are not in trouble.   Once the lights

17   come on, you are detained, you cannot leave.

18       Q.   Okay.   For how long?

19       A.   Until the stop is done.

20       Q.   So you can -- an individual is detained

21   until -- you fill me in.

22       A.   Individual is detained until that stop is done.

23   Unless that officer has reasonable suspicion to think

24   otherwise, then he can keep digging in more.   And they

25   can call for a K-9, and there's no time for a K-9.

Deputy Martin Molina, III                                    April 18, 2024

Page 53

1    Depending how far we are.

2         Q.  So someone rolls through a stop sign and --

3    withdrawn.

4              A driver rolls through a stop sign, and

5    they are detained until the deputy clears them to leave;

6    is that correct?

7         A.  If it is just for that stop sign, yes.

8         Q.  Okay.  And if they want -- if they want to call

9    for a deputy, the detention continues, correct?

10        A.  Yes.  But they have to make sure they have

11   reasonable suspicion to do it.

12        Q.  What is reasonable suspicion?

13        A.  They believe they have -- I don't know word for

14   word.

15        Q.  Me either.  It is okay.

16        A.  But, you know, it is, you -- you have suspicion

17   that something else is going on other than them rolling

18   through a stop sign.  So, I mean, like the example I

19   gave you, you know, you are leaving a drug-known area.

20   A lot of people are in and out of your car.  You have

21   priors.  The officer has reasonable suspicion that you

22   might have narcotics in there, you might have been

23   selling them, or you might have been buying them.

24        Q.  Okay.  And that is how -- that is how you were

25   trained to understand traffic stops; is that correct?

1      A.   Understand them how?

2      Q.   What -- I mean, what you were saying about how

3   traffic stops work, that is what you understand is --

4      A.   That's what I understand, yeah.

5      Q.   Fair enough.  And your understanding comes from

6   your role as deputy with the Bexar County Sheriff's

7   Office; is that correct?

8      A.   Yes.

9      Q.   And your understanding comes from your

10  training; is that correct?

11     A.   Yes.

12     Q.   Okay.  And you have continuing training,

13  correct?

14     A.   Yes, I do.

15     Q.   You have taken 16 hours a month of training,

16  correct?

17     A.   Yes, I do.

18     Q.   Where you discuss these very issues; is that

19  correct?

20     A.   Yes.

21     Q.   And any one of those issues that you mentioned,

22  for example, someone in and out of the car, could

23  potentially create reasonable suspicion, correct?

24     A.   Yes.

25     Q.   Or leaving a drug-known area, correct?

Deputy Martin Molina , III                                April 18, 2024

Page 55

1          A.   Yes.

2          Q.   Fair enough.  Thank you.  I do want to ask

3      about the -- just standard protocol.  So let's say you

4      are getting a call, any deputy, Deputy Mike -- I don't

5      want it to be Babb -- just any deputy, call and says,

6      hey, I need a K-9.  What information do you try to get

7      before you go there?

8          A.   What do you need a dog for?

9          Q.   Okay.

10          A.   What's the reason?  If he just -- the guy is

11      not letting you in the car, just not to let you in and

12      you have nothing else, I'm not showing up.

13          Q.   You get to make that decision?

14          A.   Yeah.

15          Q.   You can just refuse because you don't think

16      there is articulable reasonable suspicion?

17          A.   Yes.

18          Q.   Have you ever done that?

19          A.   No.

20          Q.   Okay.  What types of things would cause you to

21      do that?

22          A.   They don't have reasonable suspicion to further

23      investigate.  It is just a stop.

24          Q.   Okay.

25          A.   So I don't know, man.  A guy blew by me, I

Deputy Martin Molina, III                                    April 18, 2024

Page 56

1    don't know, 100 miles an hour, whatever, we stop him.

2    He won't let me search his car.  For what, just for

3    speeding?  Yeah, no, that ain't going to work.

4         Q.  So in that situation, if he refuses consent,

5    you would refuse to go with a dog?

6         A.  Uh-huh.

7         Q.  Okay.

8         A.  Yes.  I'm sorry.

9         Q.  Dude, everybody does it.

10        A.  Sorry.

11        Q.  It is so normal.  In fact, if you had gone the

12   entire time without doing that, I would be very, very

13   concerned.  All right.  Cool.  So -- and you understand

14   from your training that you are authorized to make that

15   decision, correct?

16        A.  Yes.

17        Q.  But you have never made that decision, correct?

18        A.  Yes.

19        Q.  So you have gone -- you have gone to the scene

20   every single time you have been called?

21        A.  Yes.

22        Q.  Okay.  Thank you very much.  Is there any other

23   information you try to get before even getting to the

24   scene?

25        A.  No.  I usually get the rest of it when I get

1    there.

2        Q.  What information do you get when you get there?

3        A.  I will talk to the driver -- or from them, and

4    I will make sure there is no -- the car is not

5    cluttered.  You know, people hoard their cars, I ain't

6    going to run my dog around that.  Usually -- somehow

7    when the doors don't even close, there are like bungee

8    cords because my dog might try to go in and poke himself

9    with something, and ain't going to have that.

10       Q.  So is the safest way to run drugs is to have a

11   really, really, messy, dirty car?

12       A.  Yeah.  Yeah.

13       Q.  I promise I will not use that information in

14   any inappropriate way.  Okay.  So you try to get a sense

15   of just the safety of the vehicle itself, correct?

16       A.  Yes.

17       Q.  Okay.  Are there any other questions you would

18   ask either the calling deputy or the driver?

19       A.  No, not really.

20       Q.  Okay.  What about, would you ask if there was

21   consent to search?

22       A.  Oh, yeah.  Yes.

23       Q.  Okay.  You may have said that.  I may have

24   missed it.  I am not suggesting you did not say it.  I

25   have no idea.

1          A.   I've had that happen, where they have consent,

2     but they still call me.  And I say, I am not going to

3     run my dog.  I will stand here with you and watch you

4     search the car, and I will watch them.  But I am not

5     going to run my dog.  That's doing -- it is either for

6     you to search the car or for me to run my dog.

7          Q.   So if they get consent, you will not even ask

8     the dog to go out?

9          A.   No.

10         Q.   Because they can skip the whole dog process and

11    just search, right?

12         A.   Yes.

13         Q.   Because the purpose of the dog search is to --

14    withdrawn.

15              The purpose of the dog sniff is to search,

16    correct?

17         A.   Yes.

18         Q.   Is to be able to search the car, correct?

19         A.   Yes.

20         Q.   That's what the office -- the calling deputy

21    wants when they call you?

22         A.   Yes.

23         Q.   To be able to search the car, correct?

24         A.   Yes.

25         Q.   Okay.  I want to go through the details of how

Deputy Martin Molina, III                                    April 18, 2024

1    you actually search.  So first, do you want the driver

2    in the car or out of the car?

3           A.  Out of the car.

4           Q.  Why?

5           A.  For safety purposes.

6           Q.  I think I probably understand, but sometimes I

7    ask a lot of stupid question.  Just explain that to me,

8    please.

9           A.  Some people, their cars don't roll up -- the

10   windows don't roll up.  You know, they are sitting

11   there.  My dog searches high and low, something happened

12   to my dog.  My dogs are apprehension dogs, you know, so

13   for some reason they try to bite the guy.

14          Q.  Fair enough.  So you were concerned about your

15   safety, the dog's safety, the suspect's safety,

16   everyone's safety, correct?

17          A.  Yes.

18          Q.  That seems very understandable.  Do you want

19   the windows rolled up or rolled down?

20          A.  If the -- if the guy is in the -- the driver is

21   still in the car, I'll have him roll the windows up.

22          Q.  I thought you won't do the search if the driver

23   is in the car?

24          A.  No, I will pull them out.

25          Q.  Okay.

Deputy Martin Molina, III                    April 18, 2024

Page 60

1      A.   But I will have them roll the windows up and

2  step out.

3      Q.   Okay.  So you would prefer the windows be

4  rolled up before you run the dog out; is that correct?

5      A.   Yes.  Yes.

6      Q.   Why?

7      A.   Just, you know, contains everything inside the

8  vehicle, there's something there, easier to pinpoint.

9      Q.   Okay.  Would you want the calling deputy to

10  have rolled up the windows beforehand?

11      A.   No.

12      Q.   Okay.

13      A.   Leave it -- no, just leave it as it is.  If the

14  windows are down and the guy's already out of the car,

15  just leave it alone.

16      Q.   Okay.  And just basically leave it be until you

17  get there?

18      A.   Yeah.

19      Q.   And you can set the conditions, correct?

20      A.   I wouldn't even set them.  I would probably

21  leave it as it be and just run the dog.

22      Q.   Okay.  If the suspect is out of the car and the

23  windows are open, you are leaving that as is, correct?

24      A.   Yes.

25      Q.   Understood.  Thank you.  How is all of this

1    communicated to the deputies to be like, hey, these are

2    the best practices for when you call me, this is what I

3    would like the car to look like.  How did the deputies

4    know this?

5         A.  So when they are in the academy, we have them

6    for a day or two.  So we will go over building searches

7    with them, tracking suspects, and we will give them a

8    big PowerPoint about K-9.  But they don't remember that.

9    I told them, I'm a K-9, but I don't remember none of

10   that when they came and talked to us.  So they are going

11   to forget.

12        Q.  So how do you --

13        A.  Whenever we see them in the road, we'll tell

14   them, or somebody else tell them, hey, this is how they

15   like to do it.

16        Q.  These are your coworkers, right?  You just talk

17   to them?

18        A.  Yes.

19        Q.  And just like -- just like -- just you and I

20   discuss like random stuff and work.  That's how it works

21   in the sheriff's department, right?

22        A.  Yes.

23        Q.  You guys might be discussing like the last or

24   the next traffic stop, right?

25        A.  Yeah.

Deputy Martin Molina, III                                    April 18, 2024

Page 62

1      Q.  And you might just be discussing the Spurs,

2   right?

3      A.  Yep.

4      Q.  Because Wemby is amazing.

5      A.  I haven't watched them too much.

6      Q.  Okay.  I was throwing that out.  I'm kind of

7   jealous that he is on your team.  So you are now -- you

8   arrived at the scene, the driver is now out of the car,

9   and the windows are up.  Now, what do you do?

10      A.  I will talk to the deputy, see what he says.

11      Q.  Okay.

12      A.  Hear what he has to say.  And then a lot of the

13   times they are like, you want to talk to the driver?

14   Yeah.  So I go talk to the driver.

15      Q.  What -- there is two parts to that.  What would

16   you discuss with the deputy, and then tell me what you

17   will discuss with the driver.

18      A.  So the deputy, they usually walk up to me and

19   tell me, hey, I stopped the car for this, this, and

20   this.  Same rundown as earlier, you know.  Same

21   violations, whatever they had.  Same thing, people in

22   and out of the car.  I am giving you the same example.

23   Okay.  He is not giving me consent to search.

24      Q.  Okay.

25      A.  So I go talk to the guy.  And I introduce

Deputy Martin Molina , III                          April 18, 2024

Page 63

1    myself, who I am, Deputy Molina, K-9 unit.  Is there

2    anything in the vehicle that you are not supposed to

3    have?  No.  Do you mind if I run my dog around the

4    vehicle to check?  No, it's fine.

5         Q.  Okay.  How do you interpret a driver or a

6    suspect's like refusal to give consent?

7         A.  Me?

8         Q.  Yeah.

9         A.  How do I interpret them?

10        Q.  Yeah.

11        A.  Sometimes like, no, why?  Why do you want to

12   search my car?

13        Q.  What does that mean to you?  How do you -- like

14   how do you interpret that?

15        A.  You can't really interpret it one way.

16   Because, you know, some people have bad run-ins with the

17   cops.  And maybe somebody just left a bad taste in their

18   mouths, you know, messed their car up and never -- or

19   broke something or just mean to them or maybe with their

20   moms and dads at the house, you know.  So I just can't

21   take it as one way, you know.

22        Q.  That's fair.  You are out there looking for

23   some real stuff, right?  Like I have seen some of your

24   reports, and you found like kilos of drugs, right?

25        A.  Yes.

Deputy Martin Molina , III                                    April 18, 2024

Page 64

1        Q.  What's the most you have ever found?

2        A.  70 something kilos.

3        Q.  Of heroin or cocaine?

4        A.  No, methamphetamine in the gas tank.

5        Q.  That's just really a lot of dangerous stuff,

6   right?

7        A.  Yes.

8        Q.  Like you are not out there with the guy with

9   the joint, right?

10        A.  No.

11        Q.  Okay.  So like how do you feel about the idea

12   of just like you are doing an important thing and like

13   if people don't have drugs, maybe they should just be

14   more cooperative?

15        A.  I wish that would happen.  But, you know,

16   sometimes, like I said, they just have bad experiences.

17   They just don't want to be in that situation right now.

18        Q.  Yeah.  But if like they have nothing to hide,

19   like there is no reason not to give consent; is that

20   fair?

21        A.  It is.

22        Q.  Do you think that is true?

23        A.  Not always.

24        Q.  Okay.  Fair enough.  I respect both -- like I

25   respect the position you have taken there.  Okay.  So

Deputy Martin Molina, III                                    April 18, 2024

Page 65

1     you were there.  You are now about to search -- I assume

2     you are now about to run the dog; is that correct?

3          A.  Yes.  After I talked to both parties.

4          Q.  Okay.  So you talked -- spoken to both parties.

5     Now what?

6          A.  I go back to my car, I get the dog's toy.

7          Q.  Okay.

8          A.  And I will put it on my hip.  Get the leash,

9     hook the dog up, play with his head, pull him out.  If

10    it's -- if he can use the restroom, I'll let him use it.

11    If there's a tree or something nearby, depending where

12    the stop is at, I'll let him use the restroom.  And then

13    we will start.

14         Q.  What's the toy for?

15         A.  Award.

16         Q.  Award for what?

17         A.  Finding narcotics.

18         Q.  If you find narcotics --

19         A.  If he alerts, I should say, he gets a toy.

20         Q.  If he alerts, he gets the toy; is that correct?

21         A.  Yes.

22         Q.  Regardless -- you do that immediately after --

23    withdrawn.

24              You do that like generally right after the

25    alert as opposed to if you determine if there's drugs,

Deputy Martin Molina , III                                    April 18, 2024

Page 66

1    right?

2         A.   Yes.

3         Q.   So it is an award for alerting, right?

4         A.   It is an award for alerting for narcotics only.

5         Q.   Fair enough.

6         A.   And nothing else.

7         Q.   Okay.  And your dog is a -- withdrawn.

8              Max is a dual-purpose dog, correct?

9         A.   Yes, he is.

10        Q.   Narcotics dog and a --

11        A.   Apprehension.

12        Q.   Apprehension dog, correct?

13        A.   Yes.

14        Q.   So no award for biting someone, right?

15        A.   No award.  That's his award, I should say.

16   It's ugly to say, but that is his award.

17        Q.   I am not touching that with a ten-foot pole,

18   dude.  Okay.  So the -- but the -- the award is for

19   alerting to narcotics, correct?

20        A.   Yes.

21        Q.   Because he wouldn't alert to anything else,

22   right?

23        A.   Correct.

24        Q.   He would not alert to like explosives, correct?

25        A.   Correct.

Deputy Martin Molina, III                                    April 18, 2024

1      Q.  He would not alert to cell phones?

2      A.  Correct.

3      Q.  Or cigarettes, right?

4      A.  Right.  Unless they were laced.

5      Q.  Unless there were drugs in there.  Okay.  So

6   you are now about to do a pass on the car.  Where do you

7   start?

8      A.  The front -- either the passenger or the driver

9   side, depending -- so if I start on the passenger side,

10  we will run down the driver side, come around the back,

11  up the passenger side again.  And then we will run a

12  second pass.

13     Q.  Okay.  Why do you do two passes?

14     A.  So usually the first time, if he's just working

15  it, and I see him in the area, we will just keep going.

16  The second time, I know the area, and now I am going to

17  start helping out.

18     Q.  Okay.  What do you mean helping out?

19     A.  That is only if I have consent.  If it is a

20  free air, I ain't doing nothing.  The dog has to do it

21  by itself.

22     Q.  Let's stick with the first version of it.

23  Assuming it is consent.

24     A.  Uh-huh.

25     Q.  You will be helping the dog out.  What does

1    that mean?

2         A.   I will tap the headlight, the fender, the hood,

3    the bed, the gas tank, the tire, tailgate.  That way he

4    can search these areas.  That way he can put his nose

5    here and maybe help him pinpoint a better area where the

6    narcotics are.  If does he all these areas, he needs a

7    little help.  So I will say, check right here, man.

8         Q.   Okay.  And you will do that on all the places

9    you mentioned?

10        A.   Uh-huh.  Any workable area on the vehicle.

11   Yes.

12        Q.   And you did the uh-huh thing.  That is a yes,

13   right?

14        A.   Yes.

15                  (Discussion off the record.)

16        Q.   (BY MR. ARONIN)  So the -- now, I want to ask,

17   how do you handle the leash, by the way?

18        A.   Like a fishing line.

19        Q.   Explain that to me.

20        A.   Like fishing.  You know, pull it out, let it

21   slide out, let it come in, let it out.

22        Q.   How much slack do you give?

23        A.   I give pretty good slack, but sometimes he

24   pulls and he will use the whole thing.  So I will try to

25   catch up and pass him up to have slack again.

Page 69

1       Q.  Oh, that was the question I wanted to ask.

2   What is Max's command to sit?  Not that -- I am going to

3   withdraw that to be clear about what I'm asking.

4               I'm not saying in the middle of a search.

5   I am saying like, let's say you are home with Max, and

6   presumably you can tell him to sit, right?

7       A.  Uh-huh.

8       Q.  Yes?

9       A.  Yes.  I'm sorry.

10      Q.  What is his command?

11      A.  Sit.

12      Q.  Okay.  Is there a hand gesture?

13      A.  No.

14      Q.  It's just purely verbal?

15      A.  Yes.

16      Q.  Okay.  Just out of curiosity one day, just try

17  this (indicating), like raise power fist.

18      A.  He will probably try to bite it.

19      Q.  Deputy Herrera said that it may have been for

20  Max at one point.

21      A.  No.

22      Q.  Okay.  Fair enough.  I am not telling you how

23  to train your dog.  You know a lot more about it than

24  me.  Okay.  So you do two passes, the -- just clarify

25  this for me.  You may have said it, and I may have just

Deputy Martin Molina , III                                    April 18, 2024

Page 70

1    missed it.  When you were helping, would you do that on

2    the first pass or only on the second?

3         A.   It really depends.  I mean, if he is on the

4    first pass and he is really finding it, then I will help

5    him out.

6         Q.   Okay.

7         A.   It just depends.

8         Q.   Okay.  Now, one thing I really do want to

9    understand, because it does seem to come up, how does

10   wind factor in?

11        A.   So say -- say I got a call for a guy running --

12   or do you want me to do a traffic stop?  However you

13   want.  I don't care.

14        Q.   You may as well just tell me about the wind

15   running.  I want to focus on narcotics.  But you

16   started, might as well just tell me.

17        A.   Well, guy ran through greenbelt or something.

18   He threw narcotics out.  So I get there.  They say, man,

19   we last saw him right here.  We think he threw something

20   because he ran through here.

21        Q.   Okay.

22        A.   Well, I am going to see which way the wind is

23   blowing.  So whatever the way the wind is blowing, I'm

24   going to try to get in front of that.  I want the wind

25   blowing towards me.  That way the dog has a faster hit

Deputy Martin Molina , III                          April 18, 2024

Page 71

1    on the narcotics going towards him.  Other than going

2    towards him, it is hard to pick it up that way.

3         Q.  Okay.  Now, it sounded like most of that was

4    dealing with the suspect or, potentially, like a missing

5    person?

6         A.  No, the narcotics he threw.

7         Q.  Oh, the narcotics he thew?

8         A.  Yeah.  So the wind blowing is throwing the odor

9    of the narcotics.

10        Q.  Okay.

11        A.  So we are trying to get a head up to that wind,

12   so he can pick it up.

13        Q.  That makes sense.  Thank you.  Now, if you

14   don't mind, please explain how wind factors in for just

15   a traffic stop for narcotics.

16        A.  I can use this one.  Windows were down in the

17   truck.  The wind was blowing towards the ditch.  When I

18   ran the dog, he pulled off to the ditch, and I called

19   him back.  And then he tried to run off again, and I

20   called him back.  And then we kept going.  So the

21   windows are down.  Wind is blowing through the truck.

22   So whatever the odor is picking up from inside the truck

23   from narcotics, it is pushing it out.  So my dog is

24   searching farther, but he is going to be moving back

25   closer.

Deputy Martin Molina, III                              April 18, 2024

Page 72

1          Q.  Okay.  It sounded to me like you are talking

2     specifically about Alek Schott's stop; is that right?

3          A.  I was.  That way we all know.

4          Q.  No.  That makes a lot of sense.  I was going to

5     ask you about the ditch later.  I probably still will,

6     but you can actually help me understand it now then.  So

7     one, how do you remember about the ditch?  That was like

8     two years ago.

9          A.  I reviewed the bodycam footage.

10         Q.  Got it.  Okay.  So this was from the cam

11    footage.  That is how I know it too.

12         A.  Yes.

13         Q.  Okay.  Explain to me again, because I didn't

14    fully get it from the video, how it is the ditch a

15    factor in there.

16         A.  The windows were down, and the wind is blowing

17    that way.  So when I am coming around the back, my dog

18    veers that way.  I call him back.  He is going to veer

19    again.  And I call him back, and we keep going.

20         Q.  Because the dog can't really like go into the

21    ditch, right?

22         A.  Yeah.

23         Q.  Okay.  So basically you are farther away.

24         A.  He's going where the dope is -- the smell is.

25    It is not there, let me call him back.  So I call him

Deputy Martin Molina , III                                    April 18, 2024

Page 73

1    back, and he goes again.  And I call him back again.  It

2    is because the odor is pushing that way (indicating).

3        Q.  Don't let me put words in your mouth.  Tell me

4    if I'm understanding this correctly.  It's just like the

5    dog has to be farther away from the car because there's

6    a ditch then you would otherwise like it; is that right?

7        A.  Say that again.

8        Q.  So the way I am understanding it, there is a

9    car.

10       A.  Uh-huh.

11       Q.  There's ditch.

12       A.  Uh-huh.

13       Q.  And the dog can't get in the ditch, right?

14       A.  No, he can.  But I want him to finish his run.

15       Q.  Okay.

16       A.  So even though he is pulling me that way, my

17   thing is, I know the windows are down, air is going that

18   way, let me keep running around the truck.

19       Q.  And does the wind blowing to the ditch make it

20   harder to get a sense of where the dog is alerting to?

21       A.  No.

22       Q.  No?  Same thing?

23       A.  Yeah.  It is just because the ditch is past the

24   truck.  That's the way the wind is blowing, so it is

25   just picking up whatever odor from narcotics and pushing

Deputy Martin Molina , III                                    April 18, 2024

Page 74

1    it that way.

2          Q.  Okay.

3          A.  So my goal is to get him out of there.  Let's

4    start our run again away from the wind.  Like the wind

5    is hitting the truck, so he should be fine there.

6          Q.  Okay.  Fair enough.  I think you said, correct

7    me, that there is -- this is the general description

8    from -- withdrawn.

9               I think you said that generally how you

10   described your -- using the dog to conduct a sniff is

11   basically the same for both a consent and a nonconsent

12   search, right?

13         A.  Yes, I do.

14         Q.  Okay.  So like everything you described is more

15   or less the same?

16         A.  Yes.

17         Q.  He just walks around the car, correct?

18         A.  I try to be nonverbal with him the best I can.

19         Q.  Okay.

20         A.  I try not to touch nothing like unless I have

21   to.  But if it is a free air, I can't.  But this one we

22   had consent, so I still try not to.  But if he needed

23   help, I'd help him.

24         Q.  Thank you very much.

25         A.  Yes, sir.

Deputy Martin Molina , III                                    April 18, 2024

Page 75

1          Q.  I think we kind of covered this, but just

2     correct me if I'm wrong.  Max's indications, final

3     indications, are lying down or sitting down, correct?

4          A.  Yes.

5          Q.  Those are the only two, correct?

6          A.  Yes.

7          Q.  And then there is also a thing called a change

8     in behavior, correct?

9          A.  Yes.

10         Q.  And that requires your judgment to determine if

11    he's --

12         A.  Yes.  If I saw a change in behavior.

13         Q.  And my understanding -- is it fair to say that

14    is based on just like your experience with the dog?

15         A.  Yes.  Every dog has a different change in

16    behavior.

17         Q.  So it really has to be something that you

18    subjectively observe; is that correct?

19         A.  Yes.

20         Q.  And that you maintained that -- that you think

21    is like different, right?

22         A.  Yes.

23         Q.  Like I couldn't observe Max and be like, that's

24    a change of behavior, right?

25         A.  Yes.

Deputy Martin Molina, III                                    April 18, 2024

Page 76

1       Q.  You would have to be the one to do it, correct?

2       A.  Yes.

3       Q.  And it's therefor inherently subjective,

4   correct?

5       A.  What does that mean?  I'm sorry.

6       Q.  It was also a bad question.  I am just going to

7   withdraw it.

8               But it is based on your like perception,

9   right?

10      A.  Yes.

11      Q.  Very good.  Does whining or barking tell you

12  anything?

13      A.  He is getting frustrated.

14      Q.  What does that mean?

15      A.  Because I am not -- like he is getting

16  frustrated, like, no, Dad, it is right here, because I

17  proof my dog.

18      Q.  What does that mean?

19      A.  If he alerts here on the speaker, I am going to

20  come to the iPad or something.  And, hey, come check

21  over here, buddy.  Come check here.  I am going to start

22  tapping it.

23      Q.  Okay.

24      A.  So he likes his toy.  So I give this reference

25  all the time.  You know, kids like their Xbox,

Deputy Martin Molina , III                        April 18, 2024

Page 77

1    PlayStation 5s, but if they don't do what they are

2    supposed to do, their parents ain't going to give them

3    that -- they aren't going to let them play.  Same thing

4    with Max.  So he obeys me, but he obeys narcotics more.

5        Q.  Okay.

6        A.  So if I say, Max, come here, he is going to

7    come here.  But if there's narcotics, he ain't coming

8    here.  He's like, I am staying right here, it's right

9    here.

10       Q.  Okay.

11       A.  And if I keep pushing him, like, hey, come

12   here, come here, he is going to start getting frustrated

13   and whining and barking, jump up sometimes, you know,

14   it's like right here.

15       Q.  Okay.

16       A.  I'm like, okay.

17       Q.  So he's like, hey, look where I am pointing,

18   like I am trying to get your attention on this, correct?

19       A.  Yes.  Yes.

20       Q.  Okay.  And that would -- how would you like

21   record that?  Would that just be a change of behavior

22   type of thing?

23       A.  No, that would be -- so he does that after he

24   alerts already.

25       Q.  Okay.  That is only after an alert?

Deputy Martin Molina , III                      April 18, 2024

Page 78

1          A.  Yes.

2          Q.  Okay.  What -- so how do you know if a dog is

3     changing his behavior because of narcotics or just

4     because of distraction?

5          A.  So it is only going to be narcotics.  We do a

6     lot of distractions with our dogs.

7          Q.  Okay.

8          A.  To build them up to not be phased, I guess you

9     can say.  We do trainings on highways.

10         Q.  Okay.

11         A.  We do a room full of cans.  All the loud

12    noises.  I had him in an 18-wheeler, a lot of unsteady

13    boxes, and he is like almost going to fall but he still

14    goes.  So we train our dogs, don't worry about these

15    distractions.

16         Q.  All right.

17         A.  To keep going for narcotics.

18         Q.  I believe the word you said was, we do a lot of

19    training.  We do training a lot on distractions.  Is

20    that an accurate description?

21         A.  Yes.  So when -- I'm sorry.  It is part of

22    certification.

23         Q.  Please.

24         A.  We do train on distraction certifications.

25         Q.  And what about -- there was required like

Deputy Martin Molina , III                                    April 18, 2024

Page 79

```
 1   16 hours of training a month, correct?

 2        A.   Yes.  And it is not always on -- we don't

 3   always do distractions.  It is just focus on -- if

 4   someone had a bad day doing something, we will set up

 5   that problem, and we will all work it.

 6        Q.   What would be a bad day?  What is -- what could

 7   you do wrong?

 8        A.   Not us.  You know, dogs have bad days, just

 9   like humans do.  So if I see my dog not being himself,

10   he is just there laying down.  So I will tell the

11   supervisor and the other K-9, hey, my dog is not feeling

12   it today.  You need to go ahead and take the calls, and

13   if you get busy, I will help you out.

14        Q.   Fair enough.  I didn't mean to suggest you were

15   doing something wrong.  I mean as a team.

16        A.   No, no, that's fine.

17        Q.   Understood.  So like what are some of the

18   things the dog can do wrong, other than biting someone?

19        A.   No.  I mean, just have a bad day.  They cannot

20   be listening to me.

21        Q.   Okay.

22        A.   Not wanting to search.  You know, they don't

23   want to do anything.  It could be nothing.  I have had

24   it where they get sick and they don't want to do

25   nothing.
```

Deputy Martin Molina, III                                    April 18, 2024

Page 80

```
 1        Q.  Fair enough.  What about alerting when there's
 2    no drugs?
 3        A.  So, you know, they can alert, but they only
 4    alert if there's drugs.  So if the drugs are not there,
 5    drugs had to be there at one point.
 6        Q.  Okay.  So if a dog alerts and there is nothing
 7    there, it is a human problem, not a dog problem?
 8        A.  Yeah.  Like either the dog knows it is there,
 9    either, one, we ain't finding it, or it's gone.
10        Q.  Dog's always right?
11        A.  Yes.
12        Q.  Dog never make mistakes?
13        A.  They do, but not for narcotics.
14        Q.  Okay.  Fair enough.  The dogs don't make
15    mistakes for narcotics?
16        A.  Correct.
17        Q.  Okay.  So there is no such thing as a false
18    positive; is that correct?
19             MR. FRIGERIO:  Objection.  Form.
20        Q.  (BY MR. ARONIN)  Is there such a thing as a
21    false positive?
22        A.  It's hard to say.  Like maybe there was a
23    vehicle that's always used, you know, as a trap.  It is
24    empty, but it is a positive alert.  You know, it is not
25    false, but they can say it's false because it is empty.
```

Deputy Martin Molina , III                           April 18, 2024

Page 81

1    But, you know, it doesn't smell like anything, we can't

2    smell anything, but the dog smells if something is

3    there.

4         Q.  So if the dog alerts, there were narcotics

5    there at one point?

6         A.  At one point.

7         Q.  And the dog is never wrong about that; is that

8    correct?

9         A.  Correct.

10        Q.  And if there are problems -- I realize I am

11   jumping around a little bit.  But like if there are

12   problems in the field, that's the things you would

13   address in the training, correct?

14        A.  Yes.

15        Q.  You would discuss the problems you had with

16   your trainer or your supervisor, correct?

17        A.  Yes.

18        Q.  And they would like kind of try to help it so

19   you -- you and the dog as a team improved?

20        A.  Yeah.  So we will get everybody involved also.

21   That way, we'll put their dog through it anyway even if

22   they didn't fail, that way they can get through it.

23        Q.  Excellent.  I know the answer to this, but just

24   help me understand how I should know it.  So what

25   narcotics are Max -- is Max trained on?

Deputy Martin Molina, III                                    April 18, 2024

Page 82

```
 1        A.   Cocaine, heroin, meth, and marijuana.

 2        Q.   Okay.  Where is that documented?

 3        A.   Those are the only four groups that we use.

 4        Q.   And just sort of like you know that he has been

 5   trained on those things and the sheriff's department

 6   therefor knows it; is that fair?

 7        A.   He was trained when George had him.

 8        Q.   Okay.

 9        A.   They started the process to him.  They just

10   handed me a leash and boom.

11        Q.   Said, go to town?

12        A.   Yes.  Now, our other dogs that go through --

13   that they get from the vendors and stuff, they are

14   specifically -- they have papers and stuff that says dog

15   is on heroin, et cetera, et cetera.

16        Q.   But we -- but you know that Max has been

17   trained on all four of those substances, correct?

18        A.   Yes.

19        Q.   Okay.  Is there any way to know which of those

20   four substances Max is alerting to based on the alert?

21        A.   No.

22        Q.   Okay.  It is just -- it is just a binary, he is

23   alerting or he is not, correct?

24        A.   Correct.

25        Q.   And it doesn't matter whether it is meth or
```

1    marijuana, it is the same exact thing, correct?

2         A.  Yes.

3         Q.  What about quantity?

4         A.  That plays a factor.

5         Q.  Explain that to me, please.

6         A.  So it is overwhelming.  I'll try to give an

7    example, so I have to give a dog one.  Like when I first

8    got Max, this other guy was in the unit.  He was

9    assigned to DEA.  Well, he wasn't there one day, but

10   they needed K-9, so I went.  I ran the dog.  Search

11   warrant.  I found a little bit of cocaine and something

12   else.  Well, next day the guy comes up and tells me,

13   hey, your dog missed a kilo of heroin in a pillow sack.

14   I said, okay, man, my dog doesn't train for that

15   quantity amount.  I said, it is just overwhelming for

16   him.  He doesn't know what to do with it.

17              Eventually, I started doing more and more

18   trainings and started to get called out more.  And Max

19   started getting familiarized with these larger odors --

20   larger amounts, I should say.  So he was used to that

21   overwhelming hit of the odor.  So he started getting --

22   he started alerting to them.  Usually, a young dog who

23   is not used to seeing that much amount, he ain't going

24   to know what to do.  It's just his nose and brain is

25   going crazy like he doesn't know what to do.

Deputy Martin Molina, III                                April 18, 2024

Page 84

1          Q.   Okay.  First of all, how did you later learn

2    that there was a Kilo of heroin in that car?

3          A.   It was in the house.  I'm sorry.

4          Q.   I apologize.  A house.

5          A.   No.  The deputy searching the house found it.

6          Q.   Oh, okay.

7          A.   So they let me know.

8          Q.   If there was problems with the search

9    conducted, like another member of the sheriff's

10   department will tell you about it, correct?

11         A.   Yes.

12         Q.   And there's nothing wrong with that.

13         A.   No, there's not.  It helps betters myself.

14         Q.   Yeah.  I can assure you, I screw up all the

15   time, and my bosses have no problem telling me.  She is

16   not my boss, and she has no problem telling me too.

17   Okay.  So -- but that is how it works in the sheriff's

18   department too, right?

19         A.   Yes.

20         Q.   If you have made a mistake, someone is going to

21   tell you about it, right?

22         A.   Yes.

23         Q.   And that's not a problem.  That's the way it's

24   supposed to go, right?

25         A.   Yes.

Deputy Martin Molina, III                                    April 18, 2024

Page 85

1        Q.   So you can improve?

2        A.   Yes.

3        Q.   And that's the policy, correct?  The policy is

4    to improve every single day, right?

5        A.   It is to me.

6        Q.   For you?  Sounds good.  Okay.  I am interested,

7    though, about the overwhelming smell that you talked

8    about.  So have you been, over the last three years,

9    training Max on increasing quantities to get him used to

10   like stronger odors?

11       A.   I did.  I would go out with this prior deputy,

12   anytime he had a stop coming up, because he was part of

13   the task force officer, he would call me.  Hey, come out

14   here, this is what we found.  I'm going to put it here,

15   run your dog, see what happens.  He would help me train

16   on the job pretty much.

17       Q.   Okay.

18       A.   And help my dog get used to these odors.

19       Q.   What about like continuing to train him on just

20   a gram of marijuana?

21       A.   Yeah, we still do.

22       Q.   Okay.  Out of curiosity, why?

23       A.   Well, we don't -- we train on marijuana still.

24   But we don't arrest unless it is a bigger amount.

25       Q.   Okay.  Fair enough.  Okay.  And this is just a

Deputy Martin Molina, III                                          April 18, 2024

Page 86

1    question I have.  I honestly don't know if -- I'm not

2    suggesting I am right about something.  Could it be

3    helpful if the dog just didn't alert to extremely small

4    quantities that it like sort of doesn't distract and

5    waste time?

6          A.  You can't just -- we can't tell a dog not to

7    alert on a gram.

8          Q.  Why?

9          A.  They are going to alert either way.

10         Q.  Okay.

11         A.  That's how you start working them up.  That's

12   how you start working them up to the odors.

13         Q.  Okay.  Is there anything like -- like a -- is

14   there any way to tell how confident the dog is in the

15   alert?  Like both you and Deputy Herrera used the

16   expression, hey, Dad.  So now I'm going to do it.  Like,

17   hey, Dad, I am sure there is a lot of drugs here,

18   versus, hey, there is something, I am not really sure

19   what it is.  Is there a confidence issue?

20         A.  No.

21         Q.  This is a binary, right?

22         A.  Yes.

23         Q.  And if the dog alerts, there is something

24   there, correct?

25         A.  Yes.

Deputy Martin Molina, III                                April 18, 2024

                                                    Page 87

 1        Q.  Or at least there was something there, correct?

 2              MR. ARONIN:  I would like to use the

 3     restroom, so does anyone mind if we take a break?

 4              (Recess taken.)

 5        Q.  (BY MR. ARONIN)  I am going to hand you the

 6     policy manual, if you don't mind.

 7              (Exhibit 28 marked.)

 8        Q.  (BY MR. ARONIN)  Take your time with it.  You

 9     tell me when you are ready.

10        A.  You can start.  I will go through whenever we

11     get to it.

12        Q.  Awesome.  Whatever you prefer.  You are

13     honestly in charge today.  So -- okay.  So you have

14     reviewed this before in the past, right?

15        A.  Yes, I have.

16        Q.  Tell me about that.

17        A.  They had it revised, and we all had to sit down

18     and read it together.

19        Q.  How much time did you spend with it?

20        A.  A day.  A whole shift.

21        Q.  Fair enough.  I mean, it is 13 pages, so you

22     spent real time reviewing it, correct?

23        A.  Yes.

24        Q.  You said it was revised.  Is there a newer

25     version of this one or is this the newest?

Page 88

1          A.   Oh, you know what, this is the policy manual.

2     I'm thinking about the SOP.   I'm sorry.

3          Q.   I'm sorry.   What is that?

4          A.   It's our operating procedure -- is this the

5     52 -- Chapter 52?

6          Q.   This is Chapter 52.

7          A.   Okay.   I am getting confused myself.   This is

8     it then.

9          Q.   Are there other documents that I need -- like

10    detail how like the K-9 unit is supposed to --

11         A.   No.   I was getting confused.   I'm sorry.

12         Q.   There's nothing wrong with that.   Being

13    confused is fine.   One of -- like my intros are actually

14    supposed to be longer than my ridiculously, stupid

15    intros.   But like one of the things is, none of these

16    questions are meant to be a trap.   If like you realize,

17    oh, I misspoke, tell me any time.   It doesn't matter.

18         A.   Okay.

19         Q.   You correct the record.   It is all fine.   Okay.

20    So this was a new policy.   Did this -- so you also

21    operated as a K-9 -- withdrawn.

22              It looks like this went into effect October

23    of 2022; is that correct?

24         A.   Yes.

25         Q.   And is that generally what you understand, what

Deputy Martin Molina, III                              April 18, 2024

Page 89

```
1     you remember?
2          A.  Yes.
3          Q.  And I am not trying to quiz you on the day.
4     Did this policy change how you do things on the job in
5     any meaningful way?
6          A.  No.  It was the same one.
7          Q.  Okay.
8          A.  It was just never implemented as policy.
9          Q.  Okay.
10         A.  They had sent it up, what -- from my
11    understanding, from 2017, 2018, somewhere around there,
12    I'm not really sure on the year.  But it is the same
13    thing.  It just finally got -- finally submitted into a
14    policy policy.
15         Q.  Okay.
16         A.  But this was always something we went by
17    anyway.
18         Q.  Okay.  This is now a formal piece of paper that
19    says the same things that you have been doing since the
20    beginning, correct?
21         A.  Yes.
22         Q.  How were those like prewritten policies
23    communicated to you?
24         A.  It was on the same -- I don't know if I had the
25    same header, but it was pretty much similar like this.
```

Deputy Martin Molina, III                                    April 18, 2024

Page 90

1    And it just told us everything we have here.  It was

2    just -- it just wasn't -- it was the same thing.

3         Q.  Okay.  I mean, did your supervisors tell you to

4    do basically the same things that were in this written

5    policy?

6         A.  Yes.

7         Q.  Okay.  Did the supervisors still enforce a

8    16-hour training requirement?

9         A.  Yes.

10        Q.  Was the supervisor still -- were they still

11   required to sign off on your deployment reports?

12        A.  Yes.

13        Q.  Were they required to sign off on your training

14   reports?

15        A.  The trainer is, not the supervisor.

16        Q.  Thank you.  Thank you.  Please keep correcting

17   me on that.

18        A.  No.  You're good.  You were right on the other

19   ones.

20        Q.  Okay.  Excellent.  Okay.  So the supervisor was

21   still supposed to sign off on --

22        A.  Deployments.

23        Q.  -- deployments.

24        A.  Yes.

25        Q.  Thank you.  Yes?

Deputy Martin Molina, III                                    April 18, 2024

Page 91

1          A.   Yes.  And the trainer does the trainings.

2          Q.   Thank you.  And that was true before

3     October 7th, 2022, correct?

4          A.   Yes.

5          Q.   And that is still true today?

6          A.   Yes.

7          Q.   Okay.  So all this document did was formalize

8     the policies that already existed, correct?

9          A.   Yes.

10         Q.   Did this change your day-to-day life in any

11    way?

12         A.   No.

13         Q.   I want to ask you about those 16-hour trainings

14    a bit.  So I am just going to hand these out.  These are

15    long documents, and lawyers hate trees.  And I made that

16    joke yesterday, which is why they aren't laughing.  They

17    laughed yesterday.

18                   (Exhibit 29 and 30 marked.)

19         Q.   (BY MR. ARONIN)  Take all the time you need.

20    Refamiliarize yourself.  None of it is meant to be a pop

21    quiz or anything.  Tell me when you are comfortable

22    talking about this.

23         A.   They are all mine, right?

24         Q.   Yes, unless I made a mistake, and I don't

25    believe I did.

Deputy Martin Molina, III                                April 18, 2024

```
 1        A.  No.  I was just making sure.  That's fine.  We

 2   can go through whatever.

 3        Q.  I'm not going through every page, I promise

 4   you.

 5        A.  Okay.

 6             MR. ARONIN:  Unless anyone here would

 7   really, really, really like me to.  Please raise your

 8   hand.  Seeing no one other than my co-counsel, I am

 9   choosing to ignore.

10        A.  Okay.  Whenever you are ready.

11        Q.  (BY MR. ARONIN)  Thank you very much.  So I

12   know you have done these trainings.  Have you ever

13   actually seen the printouts in this form before?

14        A.  No, not till -- not since -- this is the first

15   training one.  The deployment, I guess, is a little

16   different, right?

17        Q.  Feel free to compare.  It's similar --

18        A.  Yeah, it is shorter.  Yeah.  It's the first

19   time I have seen the training one like this.

20        Q.  Okay.  And it's -- but you have seen the

21   deployment records before, right?

22        A.  Yes.

23        Q.  And it looks like they are basically the same

24   type of forms, right?

25        A.  Yes.
```

Deputy Martin Molina, III                                    April 18, 2024

Page 93

1          Q.   And my understanding is they are generated

2     using the same software, correct?

3          A.   That's correct.

4          Q.   And I will represent to you that my

5     understanding of Deputy Herrera's testimony is that that

6     is the NCATS software, you are just not sure of that?

7          A.   I am not sure.  If that's what he said, I'm not

8     sure.

9          Q.   You should not take my word for it or anything

10    else.  I'm just saying that is what I understood.  I'm

11    seeing if you also understood it.

12         A.   No, I don't know.

13         Q.   That's perfectly fine.  The -- okay.  Now, as

14    you said, one of the requirements from the policy, both

15    before and after October 2022, was that the trainer

16    signed off on your training reports, correct?

17         A.   Yes.

18         Q.   I will represent I see some where there was

19    signatures, but not many.  Do you have any idea why the

20    vast majority of these are unsigned?

21         A.   It's because he has -- he still has everyday

22    duties.  They don't get admin day to go do this.  You

23    know, he still had do it through his eight-hour shift

24    while he is still doing sweeps at the courthouse, at the

25    taxes office, or explosives, you know, and with calls.

Deputy Martin Molina , III                                   April 18, 2024

Page 94

1    So that's what I think.  But I can't say like what he

2    does every day.

3         Q.  That's perfectly --

4         A.  They don't give him a, hey, this is your day to

5    go through and sign everything.

6         Q.  I honestly understand.  I have worked the piles

7    up too.  Trust me.  And I respect it.  But the -- all of

8    your trainings have essentially been approved, correct?

9         A.  Yes.

10        Q.  And like regardless whether the written policy

11   is to require a supervisor signature, the fact remains

12   that you have been -- your trainings have been accepted,

13   correct?

14        A.  Yes.

15        Q.  And these are the -- the documents here

16   represented all of the trainings that you have done

17   while a member of the K-9 unit with the Bexar County

18   Sheriff's department, correct?

19        A.  Yes.

20        Q.  Fair enough.  I want to just ask you about some

21   of them.  I am not going through a ton.  Just if you

22   would turn -- remember we talked about the Bates stamps.

23   So if you would turn to Page 1971.

24        A.  Okay.

25        Q.  Thank you.

Deputy Martin Molina, III                                April 18, 2024

Page 95

1                MR. ARONIN:  Everyone just let me know when

2        you are there.

3            Q.  (BY MR. ARONIN)  I just noted that this is

4        when -- this is what you were talking about, how you

5        spend basically a day and went through the new policy,

6        correct?

7            A.  Yes.

8            Q.  Okay.  And that counted as your training,

9        correct?

10           A.  It did.

11           Q.  Okay.  If you would turn to Page 1981 now.

12       Take your time.

13           A.  I am ready.

14           Q.  Awesome.  I note that, one, this one again is

15       not signed, correct?

16           A.  No.

17           Q.  Let me rephrase that.  That was unartfully

18       said.  You signed -- you signed it, correct?

19           A.  I signed it, yes.

20           Q.  But the approving signature was blank, correct?

21           A.  Correct.

22           Q.  But this was approved, correct?

23           A.  Yes.  It was approved because -- I mean, the

24       training records.

25           Q.  Uh-huh.

Deputy Martin Molina, III                                        April 18, 2024

Page 96

1       A.  But the trainer is the one that sets all the

2   trainings up, so --

3       Q.  And just day to day, even if it's not signed,

4   they are accepted, correct?

5       A.  Yes, sir.

6       Q.  Perfectly fine.  Do you see where it says narc

7   scented item (meth)?  If I may, I can point, but I don't

8   want to be rude.  Perfect.  Thank you.

9       A.  Okay.

10      Q.  So what does that mean?

11      A.  So we -- narc scent, it was like -- assuming we

12  did an area search because it said bracketing, which was

13  the example I gave earlier of us in a greenbelt.  So I

14  don't remember this day.  But just reading my report

15  here, we were training with meth that day.  They might

16  have went and put it in the field somewhere, and we had

17  to find it.

18      Q.  Fair enough.  Let me put a little bit of a

19  finer point on.  I can show you the documents, but they

20  are actually from Deputy Herrera's training.  So I want

21  to ask you about it generally.

22      A.  Okay.

23      Q.  If you would prefer I just give you the

24  document to review, I can do that as well.  I saw -- or

25  we all saw in -- yesterday there were at least some

1    training records where the dog was training on pseudo

2    cocaine or pseudo heroin, which I understand,

3    informally, is basically a chemical compound that mimics

4    the scent.  Have you ever heard of something like that?

5         A.  I do, and I don't use it.

6         Q.  You would never use that?

7         A.  I do not use it.

8         Q.  Why not?

9         A.  I never liked it.  Well, I never knew -- yeah,

10   they say this is heroin -- or this is a form of heroin,

11   but how do I know?

12        Q.  Okay.

13        A.  You know, I'd rather use our narcotics that we

14   get that we know is pure from DEA and go from there.

15        Q.  Perfect.  So at least in the entire time that

16   you've had Max, you have only trained on actual

17   narcotics, correct?

18        A.  Yes, sir.

19        Q.  How do you know they are real drugs?

20        A.  They come from the DEA.

21        Q.  Okay.  And this is a bit of a funny moment, at

22   least to me.  You get to drive around with drugs,

23   right -- narcotics.  You get to drive around with

24   narcotics?

25        A.  We do it in a lockbox.

Deputy Martin Molina , III                                    April 18, 2024

Page 98

```
 1        Q.  And that's so you can do the trainings on your
 2    own, correct?
 3        A.  And to take them whenever we are training.  So
 4    we will pick them up from our safe and meet them at the
 5    park and take them there and put them where we need
 6    them.
 7        Q.  So another dog would almost certainly alert to
 8    your car, right?
 9        A.  Oh, yeah.
10        Q.  Why doesn't Max?  Why doesn't Max alert to your
11    car if there's drugs by it all the time?
12        A.  Well, it's not always in my car.
13        Q.  Fair enough.
14        A.  Usually the trainer takes them because he is
15    explosives.  So he is explosives, so he has narcotics in
16    his car.  And we will take his explosives because our
17    dogs aren't imprinted on that.
18        Q.  Oh, okay.  Okay.  So usually actually you are
19    carrying the thing in your car that Max will not alert
20    to?
21        A.  The explosives.
22        Q.  The explosives.  Whereas the explosives-trained
23    dog -- I am not going to say exploding dog.  The
24    explosive-trained dog would have the narcotics, so it's
25    not constantly alerting, correct?
```

Deputy Martin Molina , III                          April 18, 2024

Page 99

```
 1          A.   Correct.

 2          Q.   What's the reason --

 3          A.   I mean, I don't know if it will be alerting all

 4     the time.  I can't tell you.  I know they are -- they

 5     are in a -- they are in sealed -- sealed bags, vacuumed

 6     sealed.  And then they are like in -- I don't know how

 7     to say it -- one of those hard container boxes.

 8          Q.   In fairness, you've definitely found, while

 9     searching, vacuum-sealed drugs, right?

10          A.   That's what I am saying.  Yup.

11          Q.   When like traffickers try to like hide the

12     scent, like that's not working, right?

13          A.   We just -- the explosive guy is going to have

14     them, and then we will keep theirs.

15          Q.   Why -- why wouldn't you want Max to be with

16     narcotics?  Like --

17          A.   Because I don't want him to be around the odor

18     all the time.  As a -- it's a normal to him.  Like no.

19          Q.   Okay.  That -- that makes a lot of sense.  One

20     of the things I noted is -- so training, like timing

21     training, again, you have to do 16 hours a month,

22     correct?

23          A.   Yes.

24          Q.   And it can be 15 in one month and 17 the next.

25     It's probably not a big deal, right?
```

Deputy Martin Molina , III                                    April 18, 2024

                                                        Page 100

1         A.  We usually do more.

2         Q.  Okay.

3         A.  We train every day, but Tuesday is our group.

4    So I can put in 20, 30 hours a week.  Not a week, I'm

5    sorry.  A month.

6         Q.  20 to 30 a week seems like a lot.

7         A.  Yeah, no.  I'm sorry.

8         Q.  That's fine.

9         A.  A month.

10        Q.  How do you track the time?

11        A.  So we just do 8:30, be here.  Got it.  Be there

12   8:30, and then whenever we are done, 4 o'clock, 3:00.

13   That's how our time fluctuates.  We do 16 hours, 17, 15.

14   It differs, or we will get pulled away.  We get pulled

15   away a lot for suspect searchers or something, pursuits.

16   So our training is cut short.

17        Q.  Okay.  But basically if you start the training

18   and you keep counting the hours until you are done,

19   correct?

20        A.  We make a keycard in our computer, our CAD

21   system.

22        Q.  Okay.

23        A.  So we will put a keycard, enter the location

24   where we are at, all the units assigned, and it's time

25   stamped.

Deputy Martin Molina , III                                  April 18, 2024

Page 101

1        Q.  A what system?

2        A.  CAD system.

3        Q.  CATS?

4        A.  CAD, C-A-D.

5        Q.  C-A-D?

6        A.  Yeah.  It's our main police system that we use

7    for calls and dispatch.

8        Q.  And that is different from the NCATS system

9    that we are not sure what it is, right?

10       A.  Yeah.  Yeah.  That's totally different.  This

11   is what everybody uses, like all the sheriffs and around

12   the county.  Yes.

13       Q.  Awesome.  And, again, this is just my own

14   ignorance.  I just don't know how this all works.

15       A.  No, it's fine.  This is what dispatch uses to

16   give us calls.

17       Q.  Thank you very much.  And just all of that time

18   counts, right?

19       A.  Yes.

20       Q.  I am actually going to -- rather than creating

21   another exhibit, I could have done this more

22   efficiently.  Bear with me one moment.  Do me a favor

23   and turn to Page -- let me confirm that I am right.

24   Yes.  Can you turn to Page 2072, please.

25       A.  Okay.

Deputy Martin Molina , III                                    April 18, 2024

                                                        Page 102

1          Q.  Do me a favor.  Read through this one.  I want

2     you to kind of explain it to me.  So just familiarize

3     yourself with it as much as you can.

4          A.  So we are at Farm Road.

5          Q.  Okay.

6          A.  And we were doing tracking that day.

7          Q.  Okay.

8          A.  So it says here on my notes -- I will read it

9     out loud.  K-9 Max was on the track and then lost scent

10    and had to backtrack for the scent.  K-9 Max was on the

11    track and located the decoy in a tree.

12         Q.  Okay.  And it looks to me this is a 230-meter

13    like course.  Am I reading that correctly?

14         A.  So, yeah, it's not really a course.  We just

15    have a guy.  I can't see him.  He just takes off.  You

16    know, the trainer will be, hey, start here and go

17    somewhere.  Try to make it 200, 400 meters.

18         Q.  Okay.  Fair enough.  So it is outside and

19    trying to see if you can --

20         A.  In the woods, the brush.

21         Q.  See if you can track a suspect or potentially

22    track a missing person, correct?

23         A.  We don't do missing persons.

24         Q.  Okay.  I didn't know that.

25         A.  Apprehension dogs.

Deputy Martin Molina , III                                                    April 18, 2024

                                                                    Page 103

    1         Q.   Because the dog might potentially bite, right?

    2         A.   Yes.

    3         Q.   Why -- one thing I don't understand is, why did

    4    that take six hours?

    5         A.   So everybody does it, not just me.

    6         Q.   Oh, okay.

    7         A.   The whole team.

    8         Q.   But that counts as six hours of training for

    9    you, correct?

   10         A.   Yes.

   11         Q.   And part of it is because you are observing

   12    other people, in all fairness, right?

   13         A.   And when they are tracking, I can be doing

   14    obedience with my dog.  That's one thing.  We always got

   15    to be doing obedience with them.

   16         Q.   Thank you.  That was exactly the missing piece

   17    that I didn't understand.  Thank you very much on that

   18    one.  Let me just backtrack for a moment.  One -- I want

   19    to ask you to turn to Page 2017 -- actually, excuse me.

   20    This is in the report.  So 2015 through 2017 and

   21    through 2018 as well.

   22         A.   2015 you said?

   23         Q.   Yeah.

   24         A.   Okay.

   25         Q.   One thing I see, there is a lot of blanks in

Deputy Martin Molina , III                                        April 18, 2024

Page 104

1    this one in all fairness.  Although there was some

2    blanks, this was sort of the most like concentrated

3    version of it which is just a lot of it in one training.

4    Do you have any idea why that would be?

5         A.  So there was one day -- this might be the day.

6         Q.  Okay.

7         A.  That place we go to in Somerset, which is where

8    this is at --

9         Q.  Uh-huh.

10        A.  They have a bunch of cars, rows and rows and

11   rows.  So they will go set up dope.  Okay.  They will

12   call each team one by one, go up.  Okay.  Start at this

13   car, run them, and tell me when you alert.  So we just

14   kept running cars until we hit alert.  So a blank would

15   be a blank car, the next one was blank, until we finally

16   got an alert.

17        Q.  Okay.  So it's just -- it's almost like a

18   parking lot and like most cars are clean and like one or

19   two, whatever, maybe has --

20        A.  Yes.  Yes.

21        Q.  Okay.  How often would you say you and Max

22   train on blanks?

23        A.  Every Tuesday.  I wouldn't say every Tuesday,

24   but we usually set up a blank somewhere in there.

25        Q.  So do me a favor, turn back to -- actually, I

Deputy Martin Molina , III                          April 18, 2024

                                                    Page 105

1    will come back to that in a second.  Let me just -- let

2    me finish one thing.  If you turn to the next one, 2017,

3    I also see that they listed distractions here.  Do you

4    see where it says that?

5         A.  Yes.

6         Q.  Same sort of question.  How often do you train

7    with distractions?

8         A.  I mean, there's distractions every day.

9         Q.  Okay.

10        A.  You know, there are the jet planes flying over.

11   You know, that's usually really loud where we are at.

12        Q.  Okay.  So I should probably ask it a little

13   more specifically.  When we look at Pages 20 -- when we

14   look at that page, 2017, there's specifically additional

15   distractions added in, right?

16        A.  Over here?

17        Q.  Yeah, yeah, yeah.  For example, and for the

18   record, what I am looking at is the --

19        A.  The cat?

20        Q.  Yeah, there's a cat.  Exactly right.

21        A.  Yeah.  There's a cat there.  The guy has cats.

22   They have a deer.  Charlie comes over around all the

23   time.  They have a pet deer.  We are in a -- it is a big

24   acre and the deer just comes.  And he has a collar and

25   everything.

Deputy Martin Molina , III                                    April 18, 2024

Page 106

1        Q.   Okay.  So it strikes me that there's a

2    difference between just the world has distractions and

3    the police department -- excuse me, the sheriff's office

4    is expressly and affirmatively adding in distractions?

5        A.   Yes.

6        Q.   Would you agree there's a difference in those

7    things?

8        A.   We add our own in.  For like training purposes,

9    you mean?

10       Q.   Yeah.

11       A.   Yes.

12       Q.   But when the sheriff's department adds in the

13   distractions that are listed, as I am seeing, on

14   Page 2017, correct?

15       A.   Yeah.  But this cat, we didn't add it in.  It

16   was just there.

17       Q.   So that was one of the natural occurring ones,

18   and it was listed in the training sheets, correct?  Is

19   that what is supposed to happen if there are naturally

20   occurring distractions, they are supposed to be listed

21   on training?

22       A.   Not supposed to be, but it can.

23       Q.   Okay.  This is -- this document is actually in

24   reverse chronological order, so the newest ones I have,

25   I believe, are on the top.

Deputy Martin Molina , III                                April 18, 2024

Page 107

1      A.   Okay.

2      Q.   Just do me a favor.  This isn't meant to be a

3  gotcha or a quiz or anything like that.  Can you scroll

4  and see when you see blanks, because it took me a while.

5      A.   February 7th.

6      Q.   Okay.  Perfect.  I think that was the first one

7  I saw as well, actually, and I just -- we are looking at

8  training records between July and February.  So that's

9  five months, right?

10      A.   Uh-huh.

11      Q.   So that would be --

12      A.   Yes.  Sorry.

13      Q.   Okay.  I didn't even catch it that time.

14  The -- the -- that's five months without blank training,

15  or are they just not listed?

16      A.   It could be -- it could be not listed, but I am

17  not for sure.

18      Q.   Okay.  And if you would continue -- same sort

19  of thing for distractions.  One of the reasons I

20  highlighted the page I showed you was because I don't

21  see a ton of distractions.

22      A.   Yeah.  We don't really -- it's not required to

23  put them in.

24      Q.   Okay.  The policy does not require you to list

25  the distractions, correct?

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 108

1          A.  Correct.

2          Q.  All right.  Cool.  These are all up to the

3      policy, correct?

4          A.  That's all up to the policy, I guess.

5          Q.  Yeah.  And we know that there's no real change

6      between pre-October 2022 policy and when it was written,

7      correct?

8          A.  Correct.

9          Q.  Okay.  Thank you.  There's a word I learned

10     yesterday.  Do you know what, in this context and

11     training context, the phrase "dissociative odor" means?

12         A.  No.

13         Q.  It may just be -- it is something that I

14     learned from Deputy Herrera.  It may be his word.  I

15     honestly don't know.  And subject to correction, if

16     Mr. Frigerio may disagree with my interpretation, but my

17     understanding it is something like throwing cotton balls

18     into a container that had marijuana or another drug in

19     it to kind of get the odor onto the cotton balls and see

20     if that will distract or in any way change the way the

21     dog would alert.  Do you understand there to be anything

22     like that?

23         A.  Not with none of our dogs currently.

24         Q.  Okay.

25         A.  I can't say if it was like that when George was

Deputy Martin Molina , III                                    April 18, 2024

Page 109

1    there.

2        Q.  Okay.  So you never like trained with -- you

3    never trained Max with like Q-tips or cotton balls or

4    anything like that, right?

5        A.  No.

6        Q.  Fair enough.  So like let me ask you this.

7    What does the phrase "residual odor" mean in this

8    context?  Let me rephrase, and I am going to build the

9    foundation.  Do you know -- have you heard the phrase

10   "residual odor" in the context of K-9 units?

11       A.  I might have heard it, but I can't be for sure.

12       Q.  So at the least, if you had heard it, it is not

13   something that you were trained on; is that correct?

14       A.  I don't really know what it is.  I can't say if

15   I am trained on it or not.

16       Q.  Fair enough.  I'm going to try and describe it

17   in laymen's terms, and I don't know if this will be

18   helpful at all.  So like let's say I am an officer or

19   sheriff.  I am not doing this.  But let's just say I am

20   going and grabbing this bundle of marijuana.  And I have

21   no drugs on me, but I am stopped an hour later.  Would

22   the dog alert to me if --

23       A.  What did you -- did you -- did you grabbed it?

24       Q.  Say I grabbed a big bundle of it and like

25   rolled around in it.

Deputy Martin Molina , III                                    April 18, 2024

                                                        Page 110

1           A.  For how long?

2           Q.  I don't know.  Will that make a difference if I

3      just like kind of briefly touch it or if I am like

4      hanging out with it?

5           A.  If you are with it for a period of time.

6           Q.  Okay.

7           A.  There's a difference.

8           Q.  There's some amount of odor that sticks to me,

9      right?

10          A.  I want to say -- I can't fully say yes.  I

11     can't fully say no, all the time.

12          Q.  Okay.  Fair enough.  I don't know is an

13     acceptable answer.  It really is when it is true, that's

14     all that matters.

15          A.  I don't know.

16          Q.  So let me ask it differently.  What about a

17     Ziploc bag that had an ounce of marijuana in it for

18     however long it takes to smoke an ounce of marijuana,

19     would that alert?

20          A.  Yes.

21          Q.  Okay.  What about like a dime bag that had a

22     gram in it that, you know, somebody smoked pretty

23     quickly?

24          A.  Yes.

25          Q.  Okay.  So like would that be like the

Deputy Martin Molina , III                                      April 18, 2024

                                                        Page 111

1   residual -- could that be -- actually, I'm not going to

2   ask you to guess.  I am withdrawing that question.  I'm

3   sorry.

4                But a container that had a drug in it, a

5   narcotic in it, could that still have that smell?

6        A.  Yes.  But there could still be -- a lot of

7   times you see those containers, there's still very,

8   very, very little residue, if you want to call it that,

9   in there, and the dog could pick it up.

10       Q.  I want to ask you about marijuana specifically.

11   Do you know the phrase "flower"?

12       A.  No.

13       Q.  That's fair.  My understanding is that it often

14   looks like the actual bud is called, there's no flower.

15       A.  Okay.

16       Q.  If I refer to the bud of the marijuana, do you

17   know what I'm referring to?

18       A.  Yes.

19       Q.  It's the thing that people smoke, right?

20       A.  Yes.

21       Q.  You know what that looks like, right?

22       A.  Yes.

23       Q.  Fair enough.  Do you know if there are other

24   substances that look like that?

25       A.  Not to my knowledge.

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 112

1          Q.  Okay.  Do you know if there's -- have you ever
2     heard of CBD?
3          A.  I have.
4          Q.  Do you know what that looks like?
5          A.  Similar to marijuana, unless it is tested.
6          Q.  Fair enough.  Do you then -- if the answer is
7     you don't know, that's an acceptable answer.  Do you
8     know whether Max will alert to CBD?
9          A.  Unless it is laced or has THC.
10         Q.  Okay.  Do you know if Max will alert to hemp?
11         A.  Unless it is laced or has THC.
12         Q.  So you don't believe that Max will alert to
13    either of those substances, correct?
14         A.  I can't say yes or no.  I don't know.
15         Q.  Fair enough.  So you have not trained to
16    determine whether or not he would, correct?
17         A.  Correct.
18         Q.  Okay.  Thank you.  Bear with me one moment.  I
19    just want to look at my notes.  Oh, yes.  Sorry.
20    Sticking to training records for one second.  How would
21    I know how Max did on any one of these trainings?  Like
22    did he find it on the first pass?  Did he find it on the
23    second?  Like was there any way to know like if he did a
24    good job?  Was he a good boy or not?
25         A.  You can write the notes in right here where it

Deputy Martin Molina , III                                   April 18, 2024

                                               Page 113

1    says narrative.  I can add more stuff, if I wanted to.

2    Like how I did on that tracking one, you know, passed it

3    up and came back.

4        Q.  Fair.

5        A.  But that's the only way to know, if I wrote --

6    if I wanted to write more in there.

7        Q.  Okay.  Fair enough.  The only place we know how

8    he did is in the narrative, correct?

9        A.  For second passes, yes.

10       Q.  Perfect.  Thank you very much.  Okay.  I am

11   done for now, I think, with the training records.  I

12   just want to ask you generally about the handover.

13   Withdrawn.

14             You -- originally, Max was with Deputy

15   Herrera, correct?

16       A.  Yes.

17       Q.  And then you kind of took over.  How would you

18   phrase that?

19       A.  It was just the -- took over the dog.

20       Q.  You got the dog, right?

21       A.  Yes.

22       Q.  Awesome.  You became that dad -- that dog's

23   dad, right?

24       A.  Yes.

25       Q.  All right.  Cool.  In case it is not clear, I

Deputy Martin Molina , III                                    April 18, 2024

Page 114

```
1    obviously love dogs.  Oh, do you know where Max was

2    originally trained?

3        A.  I don't.

4        Q.  Do you know what Full Armor is?

5        A.  I believe it is a company which is now JIREH, I

6    want to say.

7        Q.  Okay.

8        A.  It's JIREH.  One of the brothers run JIREH

9    training.

10       Q.  Does it still exist?

11       A.  Not that Full Armor.  JIREH does.

12       Q.  JIREH does.  And they are still doing police

13   dogs?

14       A.  Yeah, that one brother.  Those two brothers --

15   I want to say they are two brothers.  I'm not too sure.

16   I don't know.  But I know one of them is still doing

17   police dogs.

18       Q.  And do you know if the Bexar County Sheriff's

19   Office is still getting dogs from JIREH?

20       A.  No, we are not.

21       Q.  Why not?

22       A.  I don't know.  We only go through local K-9.

23       Q.  When did that change?

24       A.  After Floyd passed away.

25       Q.  After George Floyd?
```

Deputy Martin Molina , III                                April 18, 2024

Page 115

```
 1        A.  No, no, no, the trainer Floyd.

 2        Q.  Sorry.  I --

 3        A.  No, that's fine.

 4        Q.  There was a lot of changes that happened in

 5   there.

 6        A.  The trainer.

 7        Q.  Or Cardenas?

 8        A.  Yes.

 9        Q.  I apologize.  Why would that have made a

10   difference?

11        A.  He had a strong role with where we get dogs

12   from, and I think he used to get them from the hill

13   county.

14        Q.  Good working relationship with one person and

15   then just someone takes over and they have a good

16   working relationship with someone else, right?

17        A.  Yes.

18        Q.  Okay.  Understood.  I want to talk a little bit

19   about the handoff.  The only purpose is for timing.  The

20   reason I am showing you this is at least to the best of

21   my --

22              (Exhibit marked.)

23        Q.  (BY MR. ARONIN)  Like based on the documents I

24   have, this is Deputy Herrera's last training detailed

25   report and your first one.  Let's just take a look
```

Deputy Martin Molina , III                           April 18, 2024

Page 116

1    generally, if that makes a little bit of sense to you.

2    Generally, it seemed like it was about a month between

3    the last time Deputy Herrera had the dog and you did,

4    correct?

5         A.  Yes.

6         Q.  How did the handover go?  Like how does that

7    work?

8         A.  Went to his house, picked him up.  Deputy

9    Herrera went with me to a park that he only went with

10   Max to down by his house.  We were there for three or

11   four hours.  He was teaching me some of the basic

12   commands.  Playing with the dog.  Walking with the dog.

13   Making sure the dog -- making me get him in and out of

14   the car.  You know, making sure he didn't see any

15   problems.  That's pretty much it.  Like basic.

16        Q.  It wasn't like a joint custody arrangement for

17   a little while?

18        A.  No.

19        Q.  No visitation?

20        A.  No.

21        Q.  All right.  The -- so I am asking this as a

22   layperson.  I grew up with dogs.  I love dogs, but you

23   know so much more about this than I do, man.  But I

24   imagine it took a while before Max saw you as his new

25   like father figure after being with Deputy Herrera for a

Deputy Martin Molina , III                                April 18, 2024

Page 117

1    couple of years.  Am I wrong about that?

2         A.  No.

3         Q.  I am right about it, right?

4         A.  Yeah.

5         Q.  So how did that happen?

6         A.  It took him a while to trust me.  I will get

7    him home, and we will go for rides in the car.  Whenever

8    I would go, I will try to take him with me, bond time

9    with him, sit outside in his cage.  He would not listen

10   to me a lot of times.  You know, because he will know,

11   you are not my dad.  He thought he was just staying with

12   me, who knows.  In training, I remember we were going to

13   start doing narcotic training somewhere, and I had his

14   toy in my pocket.  Well, he started biting it, like

15   pulling me around, wouldn't let it go.  I had a hard

16   time making him have the toy.  He didn't have no respect

17   for me, I guess.  Easiest way to put it.

18        Q.  So dogs are bonded to their owners, right?

19        A.  Right.

20        Q.  How long did that process take?  I am sure it

21   got better with time.  But like how long until before

22   you were his commander?

23        A.  I guess summertime.

24        Q.  So like six to seven months, right?

25        A.  Yes.

Deputy Martin Molina , III                                April 18, 2024

Page 118

1        Q.  And obviously like it gets better day by day?

2        A.  It got better, yeah.  But by that time we were

3    full blown.  He can hang out with me on the couch and my

4    kids and stuff like that.

5        Q.  And is -- and you were in the field like before

6    summertime with Max, correct?

7        A.  Yes.

8        Q.  Were there any issues about that?

9        A.  No.

10       Q.  At least when -- in the field he would

11   obviously listen to you?

12       A.  When it was time to work, he knew what he was

13   supposed to do.  He was in control.  He was behind the

14   wheel.  I was just holding on.

15       Q.  Fair enough.  You -- is that still true, is he

16   in control during the searches?

17       A.  No.  No.

18       Q.  Now, you are right?

19       A.  Oh, yeah.

20       Q.  Okay.  When do you think that switched?

21       A.  Summertime.

22       Q.  Around the same thing, about six, seven months

23   to really get your feet under you?

24       A.  Uh-huh.

25       Q.  Make sense.  I'm sorry.  Yes?

Deputy Martin Molina , III                                                April 18, 2024

                                                                    Page 119

 1          A.   Yeah.  I'm sorry.

 2          Q.   No, no, you are good, dude.  You do not have to

 3     answer this question.  You have to answer almost all the

 4     other questions, but this one if you don't want to, you

 5     don't have to.  But out of curiosity, have you ever

 6     wondered -- so if you and Deputy Herrera were in a field

 7     and like 100 yards apart and both called Max, who do you

 8     think he would go to right now --

 9          A.   Me.

10          Q.   -- how long do you think before that would it

11     have changed?

12          A.   I don't know.  I don't know.

13          Q.   That is just literally I am curious.  That's

14     all.  Do you and Deputy Herrera ever kind of interact

15     together?

16          A.   Whenever I go to the range to qualify or

17     something and I have the dog with me, I let him see him.

18          Q.   Okay.  They still get along very well?

19          A.   At first it took him a while, but after a

20     while, yeah.

21          Q.   He was like, hey, Dad, where did you go?

22          A.   Uh-huh.

23          Q.   It is like when I get home --

24          A.   But he still came back to me real quick.

25          Q.   That is really cool.  So how often do you like

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 120

1    interact with Deputy Herrera?

2         A.  Not often.  Last time I interacted with him was

3    when I got in my -- you know, that was before.  In the

4    range when I did the qualification with a gun, but --

5         Q.  Is he a good instructor?

6         A.  He is a firearms, yes.

7         Q.  Is he good?

8         A.  Uh-huh.  Yes.

9         Q.  Seems like he would be.  Did you two interact

10   more in those six months during the kind of handoff or

11   not really?

12        A.  No.

13        Q.  Okay.  So I do know that Deputy Herrera left

14   the K-9 unit to become an instructor.  That's -- I am

15   correct about that, right?

16        A.  Yes.

17        Q.  Did you ever talk about that?

18        A.  No.

19        Q.  Do you know why he left?

20        A.  No.

21        Q.  All right.  Any guesses?

22        A.  No.

23        Q.  All right.  Fair enough.  So when a dog hands

24   off to a new handler, obviously you two as a team need

25   to become certified, correct?

Deputy Martin Molina , III                                    April 18, 2024

                                                         Page 121

 1          A.  Yes.

 2          Q.  And that's that 350 hours we talked about,

 3     right?

 4          A.  That I did, yes.

 5          Q.  How much like retraining does the dog need?

 6          A.  None really.  For like narcotics, really none.

 7     For me, it is just helping him with the obedience.

 8     That's the hardest part is the obedience cause

 9     everything else was good.  It is just being obedient to

10     me.

11          Q.  Max still knew how to smell meth, right?

12          A.  Yes.

13          Q.  And the same kind of interaction with marijuana

14     as he would have had before, right?

15          A.  Yes.

16          Q.  It was more of the sense of you two bonding and

17     understanding each other?

18          A.  Yes.

19          Q.  That's sort of where it would come in, right?

20          A.  Yes.

21          Q.  Fair enough.  If you would just bear with me

22     while I look at my notes.

23          A.  No, that's fine.

24          Q.  Thank you so much.  We are at an interesting

25     break point.  It is not quite -- it is a little early

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 122

1     for lunch, but the next thing I would like to do is go

2     through some of the videos.  Which would you rather do,

3     break now or power through and take a slightly later

4     lunch?  What's your preference?

5          A.   Whatever.

6                    MR. ARONIN:  Let's take a five-minute

7     break, use restrooms, and then kind of come back and

8     look at videos.  Cool.

9                    (Recess taken.)

10         Q.   (BY MR. ARONIN)  So thank you for accommodating

11    with the break.  I honestly really do appreciate it.

12    Before I kind of jump into just Alek -- Mr. Schott's

13    stop and go through some videos with you, I want to ask

14    just about one of the record questions I have.

15         A.   Okay.

16         Q.   You mentioned the software you use, correct?

17    That was a terrible question.

18                    You mentioned the software that you help

19    generate the training reports and the deployment

20    reports, right?  We talked a bit about that?

21         A.   Yes.

22         Q.   I thought it was the NCATS system.  You are not

23    sure if it is, it could be something else.  Some of the

24    things you said led us to look up these things.  And for

25    the record, what I have done, we are on k9software.com

Deputy Martin Molina , III

April 18, 2024

Page 123

1    and on their screenshots website.  Does this look like

2    the software?

3         A.  So that's K-96, it says right there at the top

4    corner.  That's where we are going to.

5         Q.  Going to?

6         A.  We are going to, yes.

7         Q.  Okay.  But that is not your current software?

8         A.  Correct.

9         Q.  Is there some sort of thing on the top where it

10   says the name of the software, in your current one?

11        A.  I don't know.  I keep saying Legacy, but I

12   might be wrong.  Visual Pro.

13        Q.  Visual Pro?

14        A.  Vision Pro.  Visual Pro.  That sounds familiar,

15   but it is just an icon I click.  I can't --

16             (Court reporter clarification.)

17             THE WITNESS:  It is either Visual Pro.  It

18   is going to be K-9 Visual Pro or K-9 Vision Pro.  I

19   don't think it is Vision Pro.  Something like that.  I

20   can't be too sure.

21        Q.  (BY MR. ARONIN)  So let me ask you this.  Do

22   you have access to it on your phone through an app?

23        A.  No, I don't.

24        Q.  This is your work laptop?

25        A.  The computer in car.

Deputy Martin Molina , III

April 18, 2024

Page 124

```
 1          Q.   What about in precinct, can you access it?

 2          A.   Our desktop computer in the office.

 3          Q.   Okay.  But it's either the laptop that stays in

 4     the car or on the office computer, correct?

 5          A.   Yes.  Whenever we upgrade on this one, we would

 6     be able to do it on our phones.

 7          Q.   Very cool.  So I will say, we are going to call

 8     for production of more information on what the system

 9     is.  Normally, I would like to get into how hard it

10     would be to take screenshots because I respect that you

11     are the police.  I understand you may not know the

12     answers to like what you can and can't do.

13               MR. ARONIN:  Mr. Frigerio, we will work

14     together to get this thing.  Do you agree?

15               MR. FRIGERIO:  Sure.

16               MR. ARONIN:  Awesome.

17          Q.   (BY MR. ARONIN)  I am going to put this down.

18     Cool.  So the way I think the best way to do this, I am

19     going to ask you -- I am going to keep calling him Alek.

20          A.   That's fine.

21          Q.   Alek's stop and kind of just get a sense of it,

22     and then I'm going to show you video and sort of maybe

23     walk through it in a little more detail.  The purpose of

24     doing it two ways is not to like trap you.  If you say

25     something and it turns out the video is a little bit
```

Deputy Martin Molina , III                              April 18, 2024

Page 125

1    off, that's okay.  I am asking about what you remember,

2    and then it's okay if it's a little bit different just

3    based on the video.  That's normal.  Fair enough?

4         A.  That's fine.

5         Q.  Okay.  Like I just want you to know that's not

6    designed to be a trick.  But if it was one, I'm not

7    going to tell you, right?  Oh, this actually is

8    important.  Before I do that, when you are on duty, do

9    you ever use a cell phone?

10        A.  I have a county phone.

11        Q.  Do you have a -- it's a phone that the

12   sheriff's office gives you?

13        A.  Yes.

14        Q.  Will you text using that phone?

15        A.  Yes.

16        Q.  Let me put a finer point.  Would you text your

17   other fellow police officers using that?

18        A.  Work related.  Yes.

19        Q.  Okay.  I don't want to know anything about

20   texting family members or something personal.  But like

21   would you text, for example, Deputy Babb using that

22   phone?

23        A.  Yes.

24        Q.  Okay.  When did you get a county phone?

25        A.  I don't remember.

Deputy Martin Molina , III                                    April 18, 2024

Page 126

1          Q.  Are we talking like recently or since you have

2     been a K-9 officer?

3          A.  No, since I have been K-9.

4          Q.  Okay.  Thank you.  And are there any other sort

5     of like messaging applications you would use to speak

6     with your other officers, WhatsApp, Linkedin, Twitter?

7          A.  No.

8          Q.  Creeping in each other's DM's?

9          A.  No.

10         Q.  Let the record reflect, everyone laughed at

11    that, huge laugh.

12              All right.  I am going to talk generally

13    about the stop, and then we are going to go through the

14    videos.

15         A.  Okay.

16         Q.  So obviously you did go to Alek Schott's stop;

17    is that correct?

18         A.  Yes.

19         Q.  How did the call come in?

20         A.  Through dispatcher radio.

21         Q.  Okay.  Open channel -- what's the opposite of

22    the open channel?  What's the word for that?  Main

23    channel --

24         A.  So, yeah, the main channel.

25         Q.  -- like is what I refer to, everyone can hear

Deputy Martin Molina , III                                April 18, 2024

                                                    Page 127

1      is the main channel, and then open is just whoever goes

2      on to like that frequency?

3           A.   Yeah.   Just talk on the side real fast, yes.

4           Q.   Okay.   Thank you.   It comes through the main

5      channel, and then what happens?

6           A.   He can be requesting a K-9, so the dispatch

7      will ask for available K-9.   The available will key up,

8      me or the other guy.   Hey, I need you over here.   They

9      will assign me to a call, and it will come up on the

10     computer.

11          Q.   Fair enough.   I want to be clear, and to the

12     extent possible -- if you don't remember, that's okay.

13     I want to talk specifically about Alek's stop.   Do you

14     remember how that call went down?

15          A.   No.

16          Q.   That's fine.   Fair enough.   Do you remember if

17     any information was given to you by Deputy Babb?

18          A.   No.

19          Q.   You just don't remember?

20          A.   No.

21          Q.   Fair enough.   You do remember heading over at

22     that point, correct?

23          A.   Yeah.   It took me 25 to 30 minutes, something

24     like that.

25          Q.   And do you remember -- do you remember the stop

Page 128

1    itself?

2         A.   To where I ran my dog?  Yeah.

3         Q.   Okay.  Fair enough.  Do you remember -- like

4    does it stand out, or is it just like, well, I got sued

5    about it, so I was thinking about it and reviewed it?

6         A.   Yeah.  Once I was done, I didn't care until

7    this thing came up.

8         Q.   That's fair.  And, again, I sort of asked you

9    about this generally, but do you independently remember

10   if you were messaging at all with Deputy Babb, Gereb, or

11   any other BCSO member about this stop specifically?

12        A.   No.

13        Q.   No, you did not, or, no, you don't remember?

14        A.   No, I didn't message anybody.

15        Q.   Fair enough.  I also know, and I will represent

16   to you, to the best of my recollection, Deputy Gereb

17   testified that he has worked with you a lot.  I realize

18   a lot is subjective.  But just generally, have you

19   worked with Gereb a decent amount?

20        A.   Yes.

21        Q.   Tell me why.

22        A.   He requests K-9 on his traffic stops.

23        Q.   And there is only two of you who work with

24   that?

25        A.   Yes.

Deputy Martin Molina , III                                    April 18, 2024

Page 129

```
 1        Q.  So it's give or take 50 percent of the stops?

 2        A.  50/50.

 3        Q.  Fair enough.  And honestly like I am pretty

 4   chill with my coworkers.  Like is it similar with the

 5   sheriff's office?  Generally, you are friendly or

 6   friends with your coworkers?

 7        A.  Yes.

 8        Q.  Do you grab drinks with your coworkers?

 9        A.  Sometimes.

10             MR. FRIGERIO:  Objection.  Form.

11        Q.  (BY MR. ARONIN)  It's not important if you

12   don't want to answer.

13        A.  Off times, maybe sometimes.

14        Q.  I was only asking about off times, when it

15   would be appropriate to do so.  Do you -- do you work

16   with the Criminal Interdiction Unit?  So withdrawn.

17             We know that Gereb was on, at the time, the

18   Criminal Interdiction Unit, right?

19        A.  He was.

20        Q.  Okay.  Fair enough.  So when you worked with

21   him, you were working on Criminal Interdiction at that

22   point, correct?

23        A.  No.

24        Q.  Please help me understand that.

25        A.  I wasn't working on them.  I was just assisting
```

Deputy Martin Molina, III                                April 18, 2024

Page 130

```
 1   on traffic stops.

 2        Q.  Fair.  Clarification.  When you were -- when

 3   you were doing the K-9 searches or sniffs, you were

 4   assisting with the Criminal Interdiction Unit.  Is that

 5   a fair way of saying it?

 6        A.  Yes.  Yes.

 7        Q.  Okay.  Fair enough.  I am going to show you

 8   your -- some bodycam photos.  So we are going to your

 9   search.  I may do some of Babb's.  I honestly haven't

10   decided yet, quite frankly.  So very quickly, I am going

11   to show you a 30-second one.  Let's actually just talk

12   about this briefly.

13                  MR. ARONIN:  How do we want to do this?

14                  (Discussion off the record.)

15                  (Exhibit 31 marked.)

16        Q.  (BY MR. ARONIN)  So for the record, what I am

17   looking at right now is Bates stamp 605, and this is a

18   31-second video.  I just want to get a sense of what

19   happened.  And I believe, Deputy, this is from you.

20                  (Video being played.)

21        Q.  (BY MR. ARONIN)  Okay.  So for the record,

22   there was no sound until the very end, two beeps.  We

23   can hear road sound, and then it shut off.  What was I

24   looking at there?

25        A.  That was me driving to the call.
```

Deputy Martin Molina , III                              April 18, 2024

Page 131

```
 1        Q.  Okay.  What were the two beeps?

 2        A.  The dashcam being activated.

 3        Q.  Being activated or --

 4        A.  Yes.

 5        Q.  -- deactivated?

 6        A.  Activated.  So the first 30 seconds is muted.

 7        Q.  Okay.

 8        A.  So it rewinds 30 seconds.  So if I activate my

 9   camera at Commerce Street, it's going to back up to two

10   more exits or three more exits, whatever 30 seconds is.

11        Q.  So there is sort of a buffer of 30 seconds.

12   Whenever it starts --

13        A.  Everything is going to be muted until then.

14        Q.  The bigger question I have is, why did the

15   video shut off?

16        A.  I turned the camera off.

17        Q.  Why?

18        A.  It didn't need to be on.  It turned on because

19   of speed.

20        Q.  Oh, okay.  So the reason it is only 30 seconds

21   is when you hit a certain speed, it automatically turns

22   on?

23        A.  Yeah.

24        Q.  Okay.  And you turned it off because --

25        A.  I didn't need it on yet.
```

Deputy Martin Molina , III                                          April 18, 2024

                                                              Page 132

1          Q.   Okay.  Why not?

2          A.   I am not at the call.

3          Q.   Okay.  Fair enough.  And that is your dashcam,

4     correct?

5          A.   Correct.

6          Q.   Okay.

7                    MR. LEAKE:  Can we turn my iPad to face

8     the --

9                    MR. ARONIN:  Yes.

10                   MR. LEAKE:  -- screen showing the video,

11    just so I can follow along easily.  Thanks.

12                   MR. ARONIN:  Cool.

13         Q.   (BY MR. ARONIN)  Okay.  That was very quick.  I

14    just wanted to get a sense of how that works.  I am now

15    using -- for the record, this is the video that was

16    attached to the complaint listed as Molina's.

17                   (Exhibit 32 marked.)

18         Q.   (BY MR. ARONIN)  Pausing.  So just as the

19    document, you have the absolute right -- it will take a

20    while, but you have the right, we can just sit here and

21    watch the entire thing or I can jump around and kind of

22    show you things.  That is your decision.  What would you

23    prefer?

24         A.   You can show me whatever you want to ask me.

25         Q.   Okay.  Fair enough.  Okay.  Bear with me.

Deputy Martin Molina , III                                      April 18, 2024

                                                        Page 133

1      Let's just start from the beginning from now, and we can

2      jump around as it goes because it is 22 minutes.

3                      (Video being played.)

4          Q.  (BY MR. ARONIN)  Now, in the first 15 seconds,

5      who are you speaking with?

6          A.  Deputy Babb.

7          Q.  And, again, no sound is coming out?

8          A.  Correct.

9          Q.  Why is that?

10         A.  Because it is still backed up 30 seconds.

11         Q.  Oh, okay.  So presumably then, we should see

12     sounds in approximately 30 seconds?

13         A.  Yes.

14         Q.  Okay.

15                     (Video being played.)

16         Q.  (BY MR. ARONIN)  Exactly 30 seconds.

17                     (Video being played.)

18         Q.  (BY MR. ARONIN)  So that is similar to what you

19     described you would do typically.  For the record, we

20     paused at 46 seconds.  Is that normally the kind of

21     conversation you would have with a driver or suspect?

22         A.  Yes.

23         Q.  Was there anything that Mr. Schott was doing

24     there that, to you, seemed suspicion?

25         A.  No, just sitting there.

Deputy Martin Molina , III                                    April 18, 2024

Page 134

1          Q.  For the record, it seems like you went back to

2     the truck and grabbed Max, correct?

3          A.  Yes.

4          Q.  Everything you have done there is just by

5     policy and everything you typically would.  Is that fair

6     to say?

7          A.  Yes, sir.

8          Q.  Thank you very much.

9               (Video being played.)

10         Q.  (BY MR. ARONIN)  So can you kind of narrate

11    what you are doing here a little bit.  We are up to

12    2:07.  We've watched about 30 seconds.

13         A.  The vehicle scenting.

14         Q.  Okay.

15         A.  Vehicle scenting, so I am running my dog on a

16    free air even though I got consent.  I am watching as he

17    searched the vehicle to see if he has any change of

18    behavior or anything like that.

19         Q.  Fair enough.  For this part I would ask just

20    kind of -- just narrate, tell me what I am looking at.

21    Just like tell me what you are doing and why you are

22    doing it, if you can.  And tell me when to pause, and I

23    will be happy to.  Cool?

24         A.  I am watching my dog.  I am pushing him on the

25    truck.  He is in the grass, in the ditch.  I get his

Deputy Martin Molina , III                                    April 18, 2024

1    attention back on the truck.

2         Q.  Thank you.  Oh, so the thing we are looking

3    at -- and I am paused a 2:17.  It was probably a couple

4    seconds before.  This is what you refer to as the ditch?

5         A.  Yes.

6         Q.  And do --

7         A.  Or the median, whatever.  I say ditch.

8         Q.  Totally fair.  Do you know why the dog keeps

9    going down to that like slight depression?

10        A.  He is probably just checking the area.  It can

11   either be the winds are down, like I said before, air

12   blowing that way, various things.

13        Q.  Okay.  Please continue letting me know what you

14   are doing and why.

15        A.  I am watching the dog as he searches.  He

16   checks that door again.  I am leaning back still

17   following him.  He hits on the door right there.  I pass

18   him.  See what he does.  He is already sitting down.

19        Q.  Okay.  I am going to go back a few seconds.

20   This happens on all the videos.  It occasionally does

21   like two beeps.  I think --

22        A.  It is just part of the timer.  That's all.

23        Q.  What do you mean the timer?

24        A.  On the bodycam.  It beeps every minute, every

25   two minutes, however the settings.  It just beeps to let

Deputy Martin Molina , III                           April 18, 2024

                                                    Page 136

1    you know it's still recording.

2         Q.  Your bodycam has been off for the entire

3    deposition, correct?

4         A.  It sure has.

5         Q.  Okay.  Just checking.  Okay.  When you said the

6    dog is already sitting, i want you to kind of --

7         A.  Well, he is already in the proximity 'cause you

8    can tell he is already locked on the odor.

9         Q.  Okay.

10        A.  Go ahead.  I will show you.

11        Q.  Okay.  I am going to go back.  We are stopped

12   at 2:30.  I'm going back to about 2:11.

13        A.  So you will see me -- you are going to see me

14   just walk past him, and he is already locked on that

15   door.

16        Q.  Okay.

17        A.  I bring him around, get back on the truck.  We

18   will go.  We will push off again.  I will bring him back

19   to the tire.  He is going to go where the door is.  He

20   is going to put his nose on it.  He is already on it.  I

21   pass him up to see if he follows me, but he doesn't.

22   That's why I turn towards him, and he is already

23   sitting.

24        Q.  So when I am looking -- ironically, again,

25   stopped at 2:31 exactly.  And tell me if I understand

Deputy Martin Molina , III                          April 18, 2024

                                        Page 137

1    what you are saying correctly, please.  Prior to this,

2    the dog was in front of you, and now you have gotten in

3    front of the dog?

4         A.  Yeah.  I am passing him up.  I want to see if

5    he is going to follow me or keep walking.

6         Q.  Okay.  I am continuing.

7                  (Video being played.)

8         A.  He is already down.

9         Q.  (BY MR. ARONIN)  At 2:33, the dog is sitting?

10        A.  Yeah.  Right when I was passing him up, he was

11   already down.

12        Q.  And what does that say to you?

13        A.  It was alert or indication.

14        Q.  I also would like you to -- do you see your

15   reflection?

16        A.  I do.

17        Q.  And do you see your right hand at 2:33?

18        A.  Yes.

19        Q.  Okay.  I would like -- we are going to play it

20   once, and then you are going to tell me what it is you

21   are doing.  Okay?

22        A.  Yeah.

23        Q.  Okay.  So we are at 2:36.  What was that?

24        A.  It is my secondary proofing.  So the dog

25   already alerted as I pass him down.  He didn't follow

Deputy Martin Molina , III                    April 18, 2024

Page 138

1    me.  I said, let me check him.  It is like

2    double-checking your work.  Let me check.  I called to

3    the next probable -- not probable cause -- the workable

4    area of the truck.  So I have my hand out and say, come

5    here.  He doesn't come here.  So I tap, come here, Max.

6    That's when he whines and barks, getting frustrated,

7    like I said, like, no, it is right here.

8         Q.  And don't let me put words in your mouth.  Tell

9    me if I am essentially paraphrasing you accurately.  You

10   are trying to direct the dog to continue following you,

11   and you are pushing upward or slightly towards you?

12        A.  To come check that area.

13        Q.  Okay.

14        A.  To come check the fender well.  That's what it

15   is called.

16        Q.  Okay.  That's what you were pointing to over

17   there?

18        A.  Yes.

19        Q.  So it is above the rear driver's side wheel,

20   correct?

21        A.  Yes.

22        Q.  Okay.  And the fact that the dog then jumped up

23   and whined, what does that convey to you?

24        A.  That he is getting frustrated, like it's right

25   here, I'm telling you, it is right here.

Deputy Martin Molina , III                          April 18, 2024

Page 139

1          Q.   Okay.   Thank you.   Did you understand what you

2     just said?

3          A.   I got a positive alert, driver's side door.

4          Q.   Nice.   Thank you.   Let's keep watching.   We are

5     at 2:47 and 2:49, you've allowed Max into the door and

6     closed the door behind him.   Did I describe that

7     accurately?

8          A.   Yes.

9          Q.   Walk me through your thought process, please.

10          A.   I pop the door, slowly.   I'm just used to doing

11     that.   It is common practice.   Like I said, normally I

12     roll the windows up.   So when I open the door real slow,

13     it's to keep whatever odor is in there from coming out.

14     I don't open the door all the way.   He goes in there.   I

15     close it.   I watch him.   I will watch him to see where

16     he is working.

17          Q.   Can you either tell from the video or do you

18     recall if the windows are open or closed there?

19          A.   They are open.

20          Q.   They are open.   Okay.   All right.   So the dog

21     is inside.   We are at 2:49.   What are you -- do you

22     recall seeing anything while you are looking in?   We can

23     see your reflection.

24          A.   No.   I am watching the dog, where he is

25     working.   He is working the front area.

Deputy Martin Molina , III                                April 18, 2024

Page 140

1        Q.   Okay.  Thank you.

2        A.   Yes, sir.

3             (Video being played.)

4        Q.   (BY MR. ARONIN)  Okay.  So we are at 3:37.  I

5    am going to go back a couple of seconds, and it appears

6    that Deputy Babb came over and said, he is defeated?

7        A.   Yes.

8        Q.   Yes.  What does that mean to you?

9        A.   I don't know.  I don't know what he was doing.

10       Q.   That's fair.  All right.  I don't even need to

11   go back.  Let's continue from here.  Can you just --

12   what did Deputy Babb say to you there?

13       A.   Heard him say, he is really hoping it's not

14   something.

15       Q.   The word I heard was "compartment".  Does that

16   word mean anything to you?

17       A.   The vehicle with compartments built into them.

18       Q.   Can you explain what that means?

19       A.   It is a false -- false compartment, it is not

20   factory -- or not stock from the factory --

21       Q.   Okay.

22       A.   -- that people hide narcotics in or can.

23       Q.   Basically built in, like a physical thing, to

24   hide drugs?

25       A.   Yes.

Deputy Martin Molina, III                               April 18, 2024

                                                        Page 141

1          Q.   Okay.

2          A.   Or currency -- drugs, currency, whatever,

3     different things.

4          Q.   It looks like Deputy Babb is quite happy and

5     smiling.  Would you agree with that?

6          A.   I see his mouth open.

7          Q.   Let the record reflect that now you are happy

8     and smiling.  That is because I am funny.  But does

9     Deputy Babb appear to be happy that this alert has come

10    back?

11               MR. LEAKE:  Objection.  Form.

12         Q.   (BY MR. ARONIN)  You can answer.

13         A.   I don't know what he is feeling.

14         Q.   All right.  He said, I am hoping, I am hoping,

15    correct?

16         A.   He said, I'm hoping.  I don't know if that was

17    twice but --

18         Q.   But he is hoping for an alert, correct?

19               MR. LEAKE:  Objection.  Form.

20               MR. FRIGERIO:  Hey, Blair.

21               (Discussion off the record.)

22         Q.   (BY MR. ARONIN)  Okay.  I am going to tell you,

23    I try not to play hide the ball.  So there's going to be

24    some conversations between you and Deputy Babb coming up

25    in the next few minutes, and I really do want you to

1   explain the conversations to me.  Okay?  Like what you

2   were saying, what you understood him to be saying.  I

3   don't need you to speculate or guessing of his state of

4   mind.  But you do have to tell me what you understood at

5   the time; is that fair?

6         A.   That's fine.

7         Q.   Thank you.

8              MR. ARONIN:  Blair, how you like that

9   instruction?

10             MR. LEAKE:  Good stuff.

11             MR. ARONIN:   Thank you, pal.

12        Q.   (BY MR. ARONIN)  Let's continue.  We are at

13   3:51.

14             (Video being played.)

15        Q.   (BY MR. ARONIN)  Okay.  There was some

16   discussion about the ditch, wind blowing, and center

17   console.  Please talk to me about that.  What were you

18   conveying?

19        A.   So the ditch is when the -- the ditch is where

20   my dog had veered off to.  And I was telling him because

21   the wind is blowing, it's blowing through the windows

22   that are down towards the median/ditch area.

23        Q.   Okay.  And you -- there's -- I will tell you,

24   in several videos it is discussed with Gereb, it's

25   discussed here, it's also on Deputy Babb's video,

Deputy Martin Molina , III                                  April 18, 2024

Page 143

```
1    although it is basically the same thing from the other

2    perspective.  There really is a lot of discussion of

3    wind.  It keeps coming up, I will represent that to you.

4         A.  That's fine.

5         Q.  Why is it a big deal that it comes up with

6    discussion?

7         A.  Because the wind plays a big factor.  It can

8    push the odor anywhere.  Me and my dog need to pinpoint

9    exactly where it is coming from.

10        Q.  Does it -- does it make the alert less

11   reliable?

12        A.  No.

13        Q.  It makes it -- what does it make harder?  I

14   don't fully understand.

15        A.  Harder for my dog to pinpoint exactly where it

16   is at.

17        Q.  It is just that you know there's an alert,

18   correct?

19        A.  Yes.

20        Q.  And you previous said -- you previously

21   testified today that if there's an alert, there either

22   are drugs or there were drugs relatively recently.  Did

23   I characterize that correctly?

24        A.  Yes.

25        Q.  And am I understanding that the wind just makes
```

Page 144

1    it harder for the human to search and find out the

2    source; is that correct?

3         A.   It makes it harder for the dog.  Us not

4    necessarily, because we can't smell it.  The dog can

5    smell it.

6         Q.   All right.  This is a conversation -- we are

7    stopped at 4:16, and my notes says it was at 4:15.  So

8    it was good time.  I need to know what you and Deputy

9    Babb are about to talk about right here.  Okay?

10        A.   Uh-huh.

11             (Video being played.)

12        Q.   (BY MR. ARONIN)  I went back at 4:08.  Going

13   back to 4:08.  The conversation about that thing, and I

14   will tell you later, starts at approximately 4:15.  I

15   want you to hear it again, and I need to know what you

16   understood him to be conveying.  Okay?

17        A.   Sounds good.

18        Q.   Okay.  And I will tell you -- I will represent

19   to you, we have that conversation and some version of it

20   in a few different videos.  I got an alert from that

21   thing.  I will tell you about it later.  What did you

22   understand or perceive Deputy Babb to be discussing?

23        A.   I guess he was talking to somebody else, or he

24   knew information I didn't know.

25        Q.   Okay.  He always, at some point, will be saying

Deputy Martin Molina , III                                    April 18, 2024

                                                            Page 145

1      something to the effect of, I got a hit off that thing.

2      Do you know what that -- what he could be referring to?

3           A.  No.

4           Q.  Okay.  We are going to watch more videos about

5      it, though.  Okay?

6           A.  Okay.

7           Q.  I will say, you did not respond to him, I don't

8      know what you are talking about, right?

9           A.  No.  I didn't say anything to him.

10          Q.  Yeah.

11          A.  I was just watching my dog.

12          Q.  Okay.  He said -- and from the conversation, he

13     said, I'm quoting, I will tell you later from that

14     thing.  Did you hear him say that?

15          A.  On the video, yes.

16          Q.  Okay.  On the video, you heard him say that,

17     correct?

18          A.  Yes.

19          Q.  Okay.  First question, did he tell you anything

20     about it later?

21          A.  I can't recall.

22          Q.  Okay.  Let me ask another one.  Did you know at

23     the time what that thing is?

24          A.  No.

25          Q.  Okay.  Do you know, sitting here now, what this

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 146

1    thing is?

2         A.  No.

3         Q.  Do you know anything about license plate

4    readers?

5         A.  Yes.

6         Q.  What do you know about license plate readers?

7         A.  They are scanned by tow truck drivers.  They

8    are scanned by LPRs on the highway by border patrol.  I

9    think a couple of cars we have have them in the front

10   bumper.

11        Q.  Do you know of any systems that the Criminal

12   Interdiction Unit had at that time that would give

13   information about a car or a driver based on license

14   plate readers?

15        A.  No.  I know they had LPRs.

16             (Court reporter clarification.)

17             THE WITNESS:  LPR, license plate readers.

18        Q.  (BY MR. ARONIN)  Do you have any idea whether

19   the thing that he was referring to was an LPR or a

20   license plate reader?

21        A.  I don't.

22        Q.  You did not know then?

23        A.  No, I didn't know that.

24        Q.  And you don't know now?

25        A.  No.

Page 147

1          Q.  Now, as I have said, pull up, if you would,

2    Alek's deployment report, please.

3          A.  Whose?  Oh, my deployment?

4          Q.  The current one.  The current one.  I can give

5    you another copy if you need it.  That's it.

6          A.  Maybe right here.  There you go.  Right here.

7          Q.  For the record, would you read the exhibit tab

8    on the bottom what number it is?

9          A.  27.

10         Q.  Okay.  And we were looking at the March 16th,

11   2022, 11:49, a.m. report, correct?

12         A.  Yes.

13         Q.  Wonderful.  As I've said repeatedly, I don't

14   play hide the ball.  This is about the trace amount

15   issue.  We are going to be discussing that.

16         A.  Okay.

17         Q.  What did you find in Alek's car?

18         A.  Some green flake, I guess you can say.  Shake,

19   very, very, very, very little amount.  I don't know if

20   that was in the console or between the seat.  I can't

21   recall.  That's all I can find where when my dog was

22   alerting.

23         Q.  Okay.  You don't independently recall where you

24   saw it?

25         A.  I can't remember from now, no.

Deputy Martin Molina , III                                  April 18, 2024

Page 148

1          Q.  You don't independently recall where in the car

2     it was?

3          A.  The center console or between the seats.  You

4     know how the seats are real close to it, somewhere right

5     there.

6          Q.  What is it that you understand it to be?  Just

7     a green leafy substance?

8          A.  Not even a useable amount.

9          Q.  Okay.  And you did not take a photo of it?

10         A.  No.

11         Q.  Or document it in any way, correct?

12         A.  No.  Correct.

13         Q.  We are going to watch the search, and I want

14    you to tell me if you see anything like that.

15         A.  Okay.

16              (Video being played.)

17         Q.  (BY MR. ARONIN)  Sorry.  We are at 4:42.  You

18    were calling the dog out of the car; is that right?

19         A.  Yes.

20              (Video being played.)

21         Q.  (BY MR. ARONIN)  In fairness, that is a pretty

22    consistent explanation of what happened as you just gave

23    today, correct?

24         A.  Yes.

25         Q.  And you were speaking to Deputy Babb at

Deputy Martin Molina , III                                    April 18, 2024

Page 149

1     approximately between 4:45, and we are at 4:52, correct?

2          A.  Yes.

3          Q.  Oh.  This is a very good question.  The toy,

4     did the dog get the toy then?

5          A.  He did, yes.

6          Q.  When would you give the dog the toy, typically?

7          A.  When I was ready to pull him out.  It went

8     through the window.  And I told Babb, he broke the rope

9     yesterday.  He already had the toy.

10         Q.  Oh, so he already had the toy?

11         A.  Yes.

12         Q.  Okay.  Got it.  So he would have had the toy in

13    Alek's car?

14         A.  He did, yes.

15         Q.  Thank you.  Oh, that is what the broken rope

16    was?

17         A.  He has the toy in his mouth.  You can see it

18    right there.

19         Q.  Oh, yes.  I see what you are referring to.  And

20    for the record, we are around 5:10, 5:12.  And in

21    fairness, the reason to have given Max the toy there was

22    that he had positively alerted on Alek's car; is that

23    right?

24         A.  Yes.

25         Q.  So it is positive reenforcement for the actions

Page 150

1    that he took?

2         A.   And it's also because he didn't want to come

3    off that seat.

4         Q.   Okay.  For both?

5         A.   Yes.

6         Q.   From watching the video or from your

7    recollection, have you seen the trace amount yet at this

8    time?

9         A.   I can't recall.

10        Q.   Okay.  Well, you were not in the car yet,

11   correct?

12        A.   No, I wasn't.  But I don't know if it was when

13   I was pulling the dog out or when I went on the

14   passenger side.  I want to say I was in the passenger

15   side, but I can't remember.

16        Q.   At the least, you have not like called out or

17   say anything to Deputy Babb?

18        A.   No, I didn't at all.

19        Q.   Say that again.  I didn't hear you.

20        A.   I didn't at all.  He didn't even know I found

21   anything.

22        Q.   Deputy Babb didn't know that you found trace

23   amounts?

24        A.   No.  It's not a big deal.  It's not even a

25   useable amount.  The DEA wouldn't do anything with it.

```
 1        Q.  Right.  Well, it is still like creating a

 2   written piece of record that my client had illegal

 3   substance with him.  I mean, you do understand that

 4   that's an official document, correct?

 5        A.  Yeah, but I'm not lying on it.

 6        Q.  Okay.  All right.  I would like you to --

 7   again, the purpose of what I am asking you to watch is I

 8   want you to tell me if and when you see the trace

 9   amounts.  Okay?

10        A.  Okay.

11        Q.  You have the power to stop me at any time or

12   anything else you would like to point out.  You have the

13   power to ask me to pause any time.

14             (Video being played.)

15        Q.  (BY MR. ARONIN)  For the record, you put Max

16   back in the car, right?

17        A.  I did, yes.

18        Q.  And you are putting on latex gloves, right?

19        A.  Yes.

20        Q.  Do you typically -- so you are helping with the

21   search in this case, right?

22        A.  Yes.

23        Q.  Do you typically do so?

24        A.  Sometimes.

25        Q.  Any reason why you would or would not?
```

Deputy Martin Molina , III                              April 18, 2024

                                                        Page 152

1        A.  No.  He is by himself on the highway, can't get

2    the guy out of the car and put him on the side of the

3    road.  So I figured he is safe in the car, come out and

4    help him get him out of here faster.

5        Q.  Cool.

6                (Video being played.)

7        Q.  (BY MR. ARONIN)  Now, at 6:10, you are on the

8    passenger side and you are searching and looking in the

9    car seat, correct?

10       A.  Yes.

11       Q.  Okay.  You have not -- did you see anything

12   that was trace amounts yet?

13       A.  No.

14       Q.  Okay.  Pausing at 7:09.  You are still on the

15   passenger seat.  You kind of move the glove box back.

16   You are going to do what I would consider to be a fair

17   and thorough search.  Do you think that's an accurate

18   description of it?

19       A.  Yes.  Just trying to see if I can see anything

20   behind it.

21       Q.  And, again, same question, is there anything on

22   video that would --

23       A.  No, I haven't.

24       Q.  I have to ask the question.  I'm sorry.

25       A.  No, it's fine.

Page 153

1         Q.   Nothing on trace amounts, correct?

2         A.   No.   No.

3              (Video being played.)

4         Q.   (BY MR. ARONIN)   I am going to go back one

5     second or so.   Just replaying something.   Okay.   That is

6     a pretty good shot of the passenger seat at 7:21.   Would

7     you agree with that?

8         A.   Yes.

9         Q.   Is that trace amounts?

10        A.   No.

11        Q.   That's not what you are talking about, correct?

12        A.   No.   I am trying to remember now.

13        Q.   Let's pause.   And if there's something you are

14    trying to remember, please take your time.

15        A.   I want to say when I was looking there, like by

16    the seat belt area, because it goes down in the back,

17    like right behind that wire.

18        Q.   Okay.   Yes.   For the record, you are referring

19    to the seat belt area, the passenger side seat.   And I

20    do understand that there was some sort of aftermarket

21    wire in his car, correct?

22        A.   Yes.

23        Q.   And for the record, my understanding from

24    another bodycam video, one with Deputy Babb, it has

25    something to do with a radar detector.   Does that sound

Deputy Martin Molina , III                                    April 18, 2024

                                                              Page 154

1    right to you?

2         A.   I don't know.

3         Q.   Fair.  What we have at 7:21 is a very clear

4    shot of that area; is that correct?

5         A.   Yes.

6         Q.   Do you see anything that's trace amounts there?

7         A.   No.

8         Q.   And what is it that you were trying to recall?

9         A.   I don't know if it was right there in that

10   valley.  Keep playing.  I will see it.

11        Q.   Okay.  Tell me if you are like reaching in or

12   pull anything out or anything else in the video.  I

13   honestly don't remember.

14        A.   Yes, sir.

15        Q.   For the record, you actually turned away from

16   it and went to the back seat, correct?  You may have

17   come back later.  I honestly don't remember.

18              So pausing at 7:55.  And this is a pretty

19   clear shot of the side of the seat in the rear

20   passenger; is that correct?

21        A.   Yes, it is.

22        Q.   And you see there is just obviously like dirt

23   and dust, not a ton, but some on the bottom, correct?

24        A.   Yes.

25        Q.   That's not trace amounts, right?

Deputy Martin Molina , III                                April 18, 2024

                                                          Page 155

1          A.   No, it's not.

2          Q.   That's normal stuff in the car?

3          A.   Yes.

4          Q.   Because I have a 3 and a half year old, you see

5     the red rainbow goldfish?

6          A.   Yes.

7          Q.   This is mostly a joke.  But that's not trace

8     amounts, right?

9          A.   No.

10         Q.   That's just -- that kind of fits the car seat,

11    right?

12         A.   Yup.

13         Q.   Okay.  Looking at the car seat at 8:33, no

14    trace amounts, right?

15         A.   Not on the car seat, no.

16         Q.   Okay.  I don't think he -- that's anything you

17    intentionally did.  There's something like interfering

18    with the camera, probably blocking it.

19         A.   I didn't do that.

20         Q.   Like physically got close to something?

21         A.   Probably on top of something.

22         Q.   Okay.  And that cleared off within seconds.  So

23    at this point, Deputy Babb is speaking to someone on his

24    phone, not to you.  But he is talking about not finding

25    anything, correct?

Page 156

1          A.  Yes, he mentioned that.

2          Q.  Is he contemplating releasing Alek, correct?

3          A.  Yeah.  He would let him go if they didn't find

4     anything.

5          Q.  And there wasn't any discussion about finding

6     drugs, right?

7          A.  No.

8               (Video being played.)

9          Q.  (BY MR. ARONIN)  What does that mean -- and for

10    the record, I just paused at 10:20 -- after -- I am

11    paraphrasing.  But Deputy Babb asked, pretty hard alert.

12    And you said something to the effect of, hard enough to

13    throw him in a ditch.

14         A.  Yes.

15         Q.  Explain that conversation to me.

16         A.  The odor was strong enough to push my dog into

17    the ditch area.

18         Q.  So basically, because the wind was blowing

19    through the -- from the driver's side to the passenger

20    side, it was blowing where the dog was kind of alerting,

21    correct?

22         A.  Yes.

23         Q.  It feels like there are a lot of drugs here,

24    correct?

25         A.  Yeah.  To me, a big -- good quantity amount.

Deputy Martin Molina , III                                    April 18, 2024

Page 157

1        Q.  Fair enough.  And that definitely was not

2    discovered, correct?

3        A.  Correct.

4        Q.  I have to ask.  Do you -- do you think that

5    there -- sitting here today, do you think that there was

6    like a quantity of drugs that you just missed from

7    Alek's car?

8        A.  I don't know.  Could be.

9        Q.  You think that's a real possibility, sitting

10   here today?

11       A.  I think so.  I think so.  If everything that

12   happened -- you know, I don't know the guy, but the way

13   my dog reacted, I think so.  Maybe we just didn't find

14   it.

15       Q.  With all this going on, you think, at this

16   point, he could have a good quantity of drugs in his car

17   that day?

18       A.  Had or had had.

19       Q.  Or was transporting a significant --

20       A.  It is already gone.

21       Q.  And not just like a trace amount or nonuseable

22   quantity, correct?

23       A.  Yes, sir.

24               (Video being played.)

25       Q.  (BY MR. ARONIN)  All right.  At 10:41, we are

Deputy Martin Molina , III                                                    April 18, 2024

Page 158

1    pausing.  You removed the car seat and flipped open the

2    back of the seat.  Again, tell me if you see trace

3    amounts.  I'm not going to keep pausing it every 30

4    seconds.  It is on you to tell me if you see it.  Fair?

5        A.  That's fine.

6        Q.  Thank you.  I said I wouldn't stop every 30

7    seconds.  It has been several minutes.  No trace

8    amounts, right?

9        A.  No.

10       Q.  Okay.  Thank you.

11       A.  There it is when I was searching right there.

12       Q.  Okay.  We are at 4:22.

13       A.  Yeah.

14       Q.  We are going to go back -- let's go back

15   several times.  We are now at 13:50.  I am hitting play.

16   You tell me.

17       A.  Right when I move that -- right when I move

18   that red -- I think the bolt for that seat belt goes

19   right there, underneath the seat.

20       Q.  Okay.  I am pausing at 14:16.

21       A.  So where my hand is at, I am going to move that

22   red -- there's a red bag there.

23       Q.  (BY MR. ARONIN)  I am going to hit play again

24   and go for a couple of seconds and hit pause.

25                   (Video being played.)

Deputy Martin Molina , III                                    April 18, 2024

Page 159

1      A.  It is right in there.  That's where I saw it

2  at.

3      Q.  I am at 14:22.  And where your hand is right

4  now?

5      A.  Right to the right of it, inside, underneath.

6      Q.  And what is it that you see?

7      A.  Just the two small -- not two small, but just

8  green flakes right there.

9      Q.  Just green flakes?

10     A.  That's when -- remember, you had the open view

11 and I was watching the seat belt.  I remember that's

12 what it was.  Because it connects right to the floor,

13 the back seat bolt for the chair, and the bolt for the

14 actual seat belt, that bolts right there.

15     Q.  I am -- we are going to go back to 14:22 in a

16 moment.  I am going to keep hitting play to see if you

17 have a clear view of it.  I see what the red thing is

18 you are referring to at 14:23.

19              (Video being played.)

20     Q.  (BY MR. ARONIN)  We are at 14:30.  I am going

21 back to 14 -- I wish I can do it second by second.  I

22 just can't.

23              (Video being played.)

24     Q.  (BY MR. ARONIN)  Okay.  We are at 14:23.  This

25 is -- would you agree, this is a clear view of what you

Deputy Martin Molina , III                                    April 18, 2024

Page 160

1    are referring to?

2         A.   Yeah, that area.  Yes, sir.

3         Q.   Okay.  You are about to pull out some sort of

4    like white --

5         A.   I think that was after it, though.  I don't

6    know what that netting was.

7         Q.   Looks to me like apples -- or like pears come

8    in.

9         A.   That little fruit netting.

10        Q.   Yeah, like fruit netting.  That's what it looks

11   like to me.  Remember, there was Goldfish and kids

12   there, right?

13        A.   Yes.

14        Q.   Okay.  So we are now at 14:26, and you are

15   holding out the netting, correct?

16        A.   Yes.

17        Q.   Do you agree, it kind of looks like the fruit

18   netting?

19        A.   Yeah.  It looks kind of weird.

20        Q.   I'm not asking to agree that is what it is.  I

21   don't know what it is.  Just for visible description,

22   that's sort of what it looks like, right?

23        A.   Sure.

24        Q.   Okay.  You have not pulled out a flake of green

25   substance, right?

Deputy Martin Molina , III                                    April 18, 2024

Page 161

1          A.  I don't even touch it.

2          Q.  Okay.  You don't touch it?

3          A.  I don't do nothing.

4          Q.  You see -- now, I want to be clear.  Your body

5     is outside of this F-250, correct?

6          A.  It is.

7          Q.  Okay.  And your hand is inside, and you are

8     underneath the seat, correct?

9          A.  The passenger seat, yes.

10         Q.  It is your testimony that you have seen a

11    couple of green leafs at this point, right?

12         A.  Not leafs, more like specs.

13         Q.  Flake.  Let's -- just for definitional

14    purposes -- although, it is very uncomfortable to do

15    with a police officer.  Flake is like the stuff left

16    behind in a dime bag after there was drugs in it,

17    correct?

18         A.  Like residue almost.

19         Q.  Yeah.  It is not tar.  It is not burn ashes,

20    correct?

21         A.  It is not -- it wasn't gray.

22         Q.  Yeah.

23         A.  It could have been -- I don't know.  Could have

24    been -- I don't know whoever was there.  Go like this,

25    stuff falls off (indicating).

877-907-4278                    434-293-3300                    434-239-2552

Deputy Martin Molina , III                                      April 18, 2024

Page 162

1        Q.   Yeah.

2        A.   Could have been like that.

3        Q.   It's not -- it's not --

4        A.   It wasn't burned, though, like you said.  No.

5        Q.   It wasn't a roach?

6        A.   It wasn't wrapped or nothing.

7        Q.   And by roach, for the record, again, we are

8   talking about the ends of either a marijuana cigarette

9   or a marijuana wrapped cigar.  Most of the time they

10  call it a blunt, correct?

11       A.   Yeah.

12       Q.   I am enjoying this a lot.  All right.  So green

13  leafy substance.  Could it have been grass clippings?

14       A.   I don't think so.  I mean, my dog alerted to

15  that area, the seat, center console area.  No telling

16  what that is for sure.

17       Q.   But you did not pull it out for sure?

18       A.   No.

19       Q.   Did not tag it for evidence?

20       A.   No.

21       Q.   Did not take a photo of it?

22       A.   No.

23       Q.   Could it have been like a crushed leaf that

24  someone stepped in by like their feet in the back seat?

25       A.   I don't think so.

Deputy Martin Molina , III                                    April 18, 2024

Page 163

1     Q.  Could it have been oregano from pizza?

2     A.  No.

3     Q.  I mean, an oregano leaf does look like shake,

4  doesn't it?

5     A.  It does.  But, I mean, unless there was a trap

6  and my dog alerted on something.  It could have been,

7  though.  I ain't throwing it out.

8     Q.  It could have been oregano.  But, I mean, I

9  don't -- you should not -- and I don't ask you to agree

10  that was fruit netting.  But assuming it was that, could

11  have been kale from the grocery store, right?

12          MR. FRIGERIO:  Objection.  Form.

13     Q.  (BY MR. ARONIN)  It's an understandable

14  objection, but answer anyway.

15     A.  I don't know.

16     Q.  Okay.  Do you know if there are legal

17  substances that look like marijuana?

18     A.  What you mentioned earlier, CBD.

19     Q.  All right.  We will go through that a little

20  bit.

21     A.  Okay.

22     Q.  For -- but, again, this goes back to, if the

23  dog alerted, there are drugs in the car or were drugs in

24  the car recently, correct?

25     A.  Yes.

Deputy Martin Molina , III                                      April 18, 2024

                                                      Page 164

1        Q.   You are certain of that?

2        A.   Yes.

3        Q.   That is 100 percent?

4        A.   Oh, yeah.

5        Q.   Oh, yeah?  Yes.

6        A.   Yes.

7        Q.   Okay.  Okay.  Is -- so based on your

8    recollection, is that the only time you would have found

9    trace amounts of marijuana in that search, or should we

10   continue watching?

11       A.   I don't know.  When I saw that clear view, it

12   refreshed my memory.  And then when I saw that, it

13   clicked.

14       Q.   Okay.  Now -- and, again, forgive the asked and

15   answer.  If I asked this specific, I am leading to

16   something.  You did not, again, call it out to Deputy

17   Babb like, hey, here's something, right?

18       A.   No.

19       Q.   All right.  I do want to continue for another

20   thing.  Do you hear that beep in like -- while you are

21   wearing it?

22       A.   Yes.

23       Q.   Does it not drive you crazy?

24       A.   I put it as low as I can.

25       Q.   Oh, God.  I am sorry you have to listen to that

Deputy Martin Molina , III                                    April 18, 2024

Page 165

1     beep all the time.

2          A.  It is louder like this because it is right on

3     the video, but it is not too bad.

4          Q.  For the record, we are back to 14 -- give or

5     take, 14:45 to 14:47.  You are actually going back to

6     the front seat?

7          A.  Yes, sir.

8          Q.  And you are actually looking in a relatively

9     similar area to where you said you saw the flake,

10    correct?

11         A.  Yes.  The center console area.

12         Q.  Okay.  Excellent.  I want to point out -- the

13    reason I am showing you this is that you actually do

14    call out something.  You call out the wire; is that

15    correct?

16         A.  I don't remember.

17         Q.  That is a fair point.  Let's watch.

18              (Video being played.)

19         Q.  (BY MR. ARONIN)  We are at 15:48.  There has

20    been no mention more of like a couple of leafs or trace

21    or shake or anything like that, right?

22         A.  Correct.

23         Q.  And you wouldn't have seen anything on the

24    video that would have like shown another view of it,

25    correct?

Deputy Martin Molina, III                                    April 18, 2024

                                                        Page 166

 1          A.  No, sir.

 2          Q.  Okay.  We can't see what you see in the center

 3      console, but you are -- you do appear to be searching

 4      the center console right now.

 5          A.  Yeah.  I was looking with one hand.

 6          Q.  Yeah.  Because you -- and it sounds like Deputy

 7      Babb -- if you see any keys -- and you identified a

 8      bunch of keys, right?

 9          A.  Yes.

10          Q.  And my understanding is because Deputy Babb is

11      trying to get to the -- like the trunk bed through the

12      back seat, right?

13          A.  He said something had a lock on it, I believe.

14          Q.  Yeah.  That's fair.  Did you hear Deputy Babb

15      say, it's one of the vehicles from that thing?

16          A.  Yes, I did.

17          Q.  Did you know at the time what that thing was?

18          A.  No.

19          Q.  Do you, sitting here, know what that thing was?

20          A.  No.

21          Q.  Do you have any suspicion about what that thing

22      was?

23          A.  Something to do with interdiction, I guess.

24          Q.  Okay.  Could it be a license plate reader?

25          A.  Could be.

Deputy Martin Molina , III

April 18, 2024

Page 167

```
 1        Q.  Could it be a system that gives information
 2    about where a car has been?
 3        A.  That's what that LPRs are.  That's what the
 4    license plate readers are.
 5        Q.  Okay.  Have you ever used one of them?
 6        A.  I have used one, but I have used the system.
 7        Q.  What does the system have?
 8        A.  Type in a license plate.
 9        Q.  Okay.
10        A.  And it would give you last location where the
11    car was scanned.
12        Q.  Would it give you more than that?
13        A.  No.
14        Q.  Okay.  So it will tell you the literal last
15    location?
16        A.  Yes.
17        Q.  Do you know if it can -- do you know if it's
18    possible for those readers to give you more information
19    than that?
20        A.  No, not that system.  It's some other system,
21    but not the LPRs.
22        Q.  Okay.  What system do you use?  If you don't
23    know, it is okay.
24        A.  I don't use it.
25        Q.  Okay.  You did say that.  What was the system
```

Deputy Martin Molina , III                                      April 18, 2024

Page 168

1    that you said you tried or used once?

2        A.   I have used Vigilant.  It's what it is called.

3    That's what LPRs come on.

4        Q.   Okay.  So Vigilant.  Do you know if there is

5    another system on top of that?

6        A.   That's just for license plates and vehicles.

7    But if you need more information where people live and

8    stuff like that, it's a whole different system.

9        Q.   But sitting there hearing it -- you do hear now

10   multiple times in which Deputy Babb is talking about

11   that thing, right?

12       A.   Yes.

13       Q.   Okay.  And sitting here, you do not know what

14   he was referring to, correct?

15       A.   I didn't even ask.

16       Q.   That is true.  And sitting here today, you do

17   not know, correct?

18       A.   No, I don't know.

19       Q.   Okay.  My background is criminal defense.  I

20   used to organize crime defense.  There's a lot of -- in

21   New York, all of -- the place with the guy, with the

22   thing, that time.

23       A.   I hear that in movies all the time.

24       Q.   Movies, amazingly it's a real thing.  It's

25   suspicious when people talk like that, right?

Page 169

1      A.  Yeah, sometimes.  I guess it's like a code

2   talking, I guess.

3      Q.  And you want me to meet you at that place.

4   It's weird when people do that, right?

5      A.  Sure.

6      Q.  Yeah.

7           (Video being played.)

8      Q.  (BY MR. ARONIN)  I think that was you who said,

9   I think I got a wire in here, dude.

10     A.  It kind of sounded like my voice.

11     Q.  So you did call the thing that you observed

12   that was strange, correct?

13     A.  I did.  When we had the still shot.

14     Q.  I'm sorry?

15     A.  When we had the picture.

16     Q.  Yeah.

17     A.  That's what you are talking about?  When I

18   pointed at the seat belt and there was a wire?

19     Q.  Yeah.

20     A.  Yes.

21     Q.  Yeah, because it was weird to see an

22   aftermarket wire, correct?

23     A.  Yes.

24     Q.  That is unusual, correct?

25     A.  It is.

Deputy Martin Molina , III                                    April 18, 2024

Page 170

1      Q.  But, again, you did not call anything --

2    anything about drugs, correct?

3      A.  Correct.

4      Q.  Okay.  All right.  At 19 minutes, it looks like

5    you are now putting things back, correct?

6      A.  Yes.

7      Q.  You were wrapping up your search, correct?

8      A.  On that side, yes.  I mean, that might be

9    everything.  I'm not sure.  But from that side, I am.

10      Q.  That's completely fair.  And you are the only

11    person -- withdrawn.

12           To your knowledge, are you the only person

13    who identified any drug substance whatsoever at that --

14    during that search?

15      A.  Yeah.  I didn't say it out loud, but I saw it.

16    Yes.

17      Q.  Okay.  To your knowledge, even today, nobody

18    else identified any drugs, correct?

19      A.  Correct.

20           (Video being played.)

21      Q.  (BY MR. ARONIN)  Okay.  At 20:26, you left the

22    front passenger side door and you are now back to the

23    rear passenger inside the door; is that correct?

24      A.  Yes.

25      Q.  Okay.  And it appears you, frankly, very

Deputy Martin Molina , III                                    April 18, 2024

                                                         Page 171

1    courteous, put the car seat back, which seems polite.

2         A.  Yeah.  I try to put everything back that I took

3    out.

4         Q.  I respect that.  But you are -- it looks to me

5    like you are basically done searching inside of the car;

6    is that right?

7         A.  Yes.

8         Q.  There would be no other searching that you did

9    that we would not have bodycam footage?

10        A.  No.  That's all.

11        Q.  The searching there seen in this video, is the

12   only searching that you did, correct?

13        A.  Yes.  I am going to show you something this

14   time.

15        Q.  Thank you.  We are at 20:46.

16        A.  Right where it shows our cars.

17        Q.  Okay.

18        A.  Just pause it when it shows both our cars, I'm

19   going to show you something.  See those cameras in the

20   front, in the grille, those are LPRs.

21        Q.  These?

22        A.  Yes.

23        Q.  Okay.  Thank you very much.  This is 20:21.

24        A.  Both of them have them.  If you press play, it

25   will show his car.

Deputy Martin Molina , III                                        April 18, 2024

                                                        Page 172

 1                    (Video being played.)

 2        Q.  (BY MR. ARONIN)  Okay.  Great.  Pausing at

 3    20:35.  The thing basically directly above the license

 4    plate at the bottom of the grille, there's two LPRs?

 5        A.  Four.

 6        Q.  Four?

 7        A.  Yeah.  Two in the middle, two on the outside.

 8        Q.  Oh, yes.  There are four.  Thank you.  Not that

 9    this will come across clear on the record.  But it is

10    one, two, three, four.

11        A.  Yes.

12        Q.  For the record, I moved my mouse over it, and

13    that will be useless in a transcript.

14              Let me ask you.  Any -- so we are paused at

15    20:42.  And we are now looking at what appears to be

16    like helium or some sort of gas containers, correct?

17        A.  Correct.

18        Q.  Do you know if there's any possibility that's

19    just like chemical substances that are unusual that

20    could cause a dog to alert?

21        A.  No.

22        Q.  Why is that?

23        A.  Because like if it is not narcotics, they

24    aren't going to alert to it.

25        Q.  You are very confident about that.  You really

Deputy Martin Molina , III                                            April 18, 2024

Page 173

1     are certain that just the dog will alert to drugs and

2     there is no false positives and nothing else will make

3     them alert, right?

4          A.  Yes, sir.

5               (Video being played.)

6          Q.  (BY MR. ARONIN)  Okay.  For the record, you are

7     now in the driver seat.  You are looking at the keys,

8     and you are basically in the driver seat of a car,

9     correct?

10         A.  Yes.

11         Q.  And that's at 21:25, correct?

12         A.  Yes.

13         Q.  Again, same thing applies.  Tell me if you see

14    shake or any trace amounts.  I am looking -- I am

15    pausing at 20:25, and I see what -- just like for lack

16    of a better word, shmutz.  Shmutz just on the floor.

17    That's not what you are referring to, correct?

18         A.  No.

19         Q.  Okay.

20              MR. ARONIN:  S-H-M-U-T-Z, shmutz.

21              (Video being played.)

22         Q.  (BY MR. ARONIN)  For the record, 20:38.  Again,

23    this is just regular shmutz or dry dust.  This is just

24    stuff that every single person has in their car, right?

25         A.  Yes, sir.

Deputy Martin Molina , III                                          April 18, 2024

                                                           Page 174

 1                MR. FRIGERIO:  Objection.  Form.

 2          Q.  (BY MR. ARONIN)  Unless they are --

 3                MR. ARONIN:  Good one.

 4          Q.  (BY MR. ARONIN)  But like you have seen this a

 5     lot.  This is not drug residue, right?

 6          A.  No.

 7          Q.  And that was the end of the video, correct?

 8          A.  Yes.

 9          Q.  And that is -- we have 100 percent of the video

10     of you searching, correct?

11          A.  Yes.

12          Q.  So trace amounts were on that video.  That's

13     it, period, right?

14          A.  Yes, sir.

15          Q.  There's not other video, correct?

16          A.  No, there's not.

17          Q.  There's no some other photo, correct?

18          A.  No.

19          Q.  There's no evidence of it other than what --

20     your word and what was in the document, correct?

21          A.  Yes, sir.

22          Q.  Okay.

23                MR. ARONIN:  May I have one moment just to

24     review my notes?  Just off the record for a second.

25                (Recess taken.)

Deputy Martin Molina, III                                                          April 18, 2024

                                                                    Page 175

1          Q.  (BY MR. ARONIN)  We did that entire video, and

2     you see it does take quite a bit of time?

3          A.  Yes.

4          Q.  Can be dull, right?

5          A.  Yes.

6          Q.  Yes, I know.  I'm sorry about that.

7          A.  No, it's okay.

8          Q.  I am not going to make you -- make everyone and

9     you sit here and do it the same, review from the other

10    angle.  I don't think we need to see Deputy Babb's.  Do

11    you think there is something that would show a trace

12    amount from another angle --

13         A.  No.

14         Q.  -- in another video?

15         A.  No, I don't.

16         Q.  Okay.  Just a closer image does not exist,

17    correct?

18         A.  Correct.

19         Q.  Okay.  I do want to show you -- I do want to

20    show you one more video -- one more video.  I hope.  It

21    is from -- is it Deputy Gereb?

22         A.  Gereb.

23         Q.  Deputy Gereb where -- sort of from different

24    scenes, and there's some discussions and things like

25    that.  So I will show you hopefully only one more video,

Deputy Martin Molina , III                                          April 18, 2024

Page 176

1   and it is not as long.

2            Oh, sorry.  Before I change topics, just a

3   couple of questions.  So we don't have video of you back

4   in the car with Max, correct?

5       A.  Correct.

6       Q.  And that's perfectly fine.  There would be no

7   reason for you to keep your bodycam on, correct?

8       A.  Yes.

9       Q.  Plus, the beeping would drive you crazy, right?

10      A.  Probably.

11      Q.  Okay.  If you know, what was Max's behavior

12  like after the search?

13      A.  Just normal.  Just in the cage.

14      Q.  Just -- dog is just chilling, being a dog?

15      A.  Yes, sir.

16      Q.  Okay.  Let me ask you this.  So my

17  understanding is that the dog essentially alerted to the

18  center console or at least just like the general driver

19  side, correct -- or excuse me, the -- the front -- the

20  whole front passenger seat, the whole center console

21  media area.

22      A.  You can put it that way.

23      Q.  Okay.  And I understand there was wind blowing

24  from the driver to the passenger side.  So it's a little

25  hard to pinpoint odor.  Is that a fair understanding?

Page 177

1       A.  Yes.

2       Q.  Okay.  So if the alert is accurate and limited

3   to that area, why search everything including the crew

4   cab, the back of the bed, the gas chamber -- like the

5   helium chamber -- like the cylinders that are in the --

6       A.  Just doing a full, thorough check.

7       Q.  So I don't mean this as a gotcha.  It is just

8   sort of -- if the dog is accurate and the alert is

9   really quite tailored because the dog sense of smell is

10  so great, why not just limit the search?  Like is it

11  that you trust the search -- or the alert or not

12  enough to --

13      A.  Trust the alert.  We look, don't see nothing

14  there, so we move more into.  As you can see, Babb gets

15  on the driver seat on the video, that's where he starts

16  looking.  He doesn't find anything, so we extend the

17  search.

18      Q.  Okay.  Fair enough.  I am going to show you

19  just one more.

20      A.  Okay.

21      Q.  Again, the 30-second buffering.

22      A.  Yes.

23              MR. FRIGERIO:  That's Bates 5916.

24              MR. ARONIN:  Thank you very much for that.

25              (Exhibit 33 marked.)

Deputy Martin Molina , III                                    April 18, 2024

Page 178

```
 1                  (Video being played.)

 2        Q.  (BY MR. ARONIN)  For the record, that was a

 3   pretty clear shot of the license plate reader.  We can

 4   now see all four of them on both cars.

 5        A.  Yes.

 6        Q.  Thank you for helping me understand that.  Do

 7   you remember -- that was a video paused at 52 seconds.

 8   Do you remember Alek actually getting out and helping

 9   Deputy Babb, like opening the back seat for him?

10        A.  Yeah.  I think I was done, though.

11        Q.  You are --

12        A.  I mean, I didn't see this video.  But --

13        Q.  Yeah, let me go back a second.

14                  (Video being played.)

15        Q.  (BY MR. ARONIN)  You can actually see your

16   reflection.  That's you, right?

17        A.  Yes.

18        Q.  Okay.  4 -- it's not a reflection, actually.

19   That's you at 46 seconds, right?

20        A.  Yes.

21                  (Video being played.)

22        Q.  (BY MR. ARONIN)  And at 50, you saw -- at 50

23   seconds, you can now see the reflection.  Immediately

24   before that you saw Alek walking back?

25        A.  Yes.
```

Deputy Martin Molina , III                                  April 18, 2024

Page 179

1      Q.  And he had helped open the back seat, correct?

2      A.  Yes.

3      Q.  Okay.  And you can see it in Deputy Babb's

4  video.  They speak for themselves.  I'm not going to

5  make you watch it.  In your recollection, is that in any

6  way suspicious?

7      A.  No.  I remember on my video Babb had a hard

8  time opening whatever it was.

9      Q.  Yeah.

10     A.  So I think he just had the owner of the vehicle

11  come try and open it.  Since it is his truck, he should

12  know how to open it.

13     Q.  In fact, he was really quite helpful, at least

14  in my lay opinion.  Would you agree with that?

15     A.  Yes.

16              (Video being played.)

17     Q.  (BY MR. ARONIN)  From 1:35 we can just see Alek

18  is walking back unsupervised to the passenger side seat

19  of a police like SUV, right?

20     A.  Yes.

21     Q.  Like, I mean, does not appear that anyone

22  considers Alek to be a threat or dangerous at this

23  point, correct?

24     A.  Correct.

25              (Video being played.)

Deputy Martin Molina , III                                      April 18, 2024

                                                           Page 180

1          Q.   (BY MR. ARONIN)  Did you hear that?

2          A.   Yes.

3          Q.   Okay.  At 20 -- let's say, 26 to 29 seconds,

4     what did you hear -- what did you hear someone say to

5     you, and what did you hear yourself say?

6          A.   Where did he alert.

7          Q.   And where did you say?

8          A.   Everywhere, because the windows are down.

9          Q.   I am a little confused on he alerted in the

10    center console in the front versus everywhere.  Can you

11    just explain the difference.

12         A.   He jumped to the back seat first.  He came to

13    the front.  He kept going in circles.  Then he hit the

14    center console.

15         Q.   I understand.  Thank you.  And you always

16    mentioned again that the windows were down in this

17    situation, correct?

18         A.   Yes.

19         Q.   And this is because the wind was blowing,

20    correct?

21         A.   Correct.

22         Q.   Okay.  I want to go back one second because --

23    okay.  Just going back like a little.  What I have in

24    the notes on -- it is a little hard to hear.  I want to

25    know if you have a better understanding of it -- is

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 181

1     right after you say windows were down, I hear another

2     officer saying, oh -- and what sounds to me like, oh, F.

3     I am going to do it one time on the record.  It sounds

4     to me like someone is saying, oh, fuck.  But it also

5     beeps at exactly that time.  Can you just tell me what

6     you hear and what you understand?

7          A.   Sure.

8          Q.   Thank you.

9               (Video being played.)

10         Q.   (BY MR. ARONIN)  What did you hear?

11         A.   Oh.  That's how he talks.  Like he has bad

12    speech.

13         Q.   Who was that?

14         A.   Gereb.

15         Q.   Okay.  And he then asks, anything in there,

16    correct?

17         A.   Yes.

18         Q.   And you do not say, I saw a trace amount,

19    correct?

20         A.   I don't know.  Can you play it.  I don't

21    remember.

22         Q.   I absolutely can.

23               (Video being played.)

24         Q.   (BY MR. ARONIN)  You did not?

25         A.   I didn't hear anything.

Deputy Martin Molina , III                                April 18, 2024

                                            Page 182

1          Q.   Right.   I am going to skip around this.   If you

2    want to watch the whole thing, it's not quite as long.

3    It is 9:23.

4          A.   No.   You can keep going.

5          Q.   For sure.   I want to go to approximately

6    4:30 -- sorry.   Let me back up.   Is that Gereb in the

7    reflection?

8          A.   It is.

9          Q.   Okay.   Thank you.   That's 4:06.   It's just a

10   reflection.   Alek's truck is quite clean, as a matter of

11   fact, right?

12         A.   It is like shinny.

13               (Video being played.)

14         Q.   (BY MR. ARONIN)   Yeah.   Between 4:30 and 4:40,

15   Gereb -- Gereb?

16         A.   Gereb.

17         Q.   -- is saying, nothing, correct?

18         A.   Asking, yes.

19         Q.   Meaning they found nothing, correct?

20         A.   He was asking Babb if he found anything.

21         Q.   And Babb is not indicating that he had,

22   correct?

23         A.   Correct.

24         Q.   And neither do you, correct?

25         A.   Correct.

Deputy Martin Molina , III                                April 18, 2024

                                                    Page 183

1          Q.  I am going to skip ahead.  I am going to skip

2     ahead again to about 6:30.  You are there, and they are

3     looking at the front of the vehicle.  Take a look for a

4     moment.  Tell me if you want me to go back further.  We

5     are at 6:23.  At some point, you are going to say

6     something.  I didn't write it as a quote, but it is

7     close enough to, that's y'all's game, not me.  It sounds

8     like you are the one that is saying it.  Listen for it.

9     Explain to me what's going on.

10         A.  Okay.

11         Q.  Thank you.

12              (Video being played.)

13         Q.  (BY MR. ARONIN)  Was that you who said it?

14         A.  Yes.

15         Q.  Okay.  Just explain to me like what was

16    happening in that conversation.

17         A.  He's asking me about the engine compartment.  I

18    guess he sees prints or something on the front end.  I

19    told him, that's y'all's game.  They are interdiction.

20    They go to all those interdiction schools and learn

21    about compartments.  I don't.  I don't go into that

22    class.

23         Q.  That's fair enough.  You were there to help as

24    a K-9, and interdiction is there to --

25         A.  That's their --

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 184

1        Q.   -- search and find drugs, right?

2        A.   That's all them, yes, sir.

3        Q.   That's what interdiction is there for, right?

4        A.   Yes, sir.

5        Q.   Finding drugs, finding crimes, right?

6        A.   Yes, sir.

7        Q.   All right.  The -- and it looks like they're --

8    withdrawn.

9        A.   I guess my camera died.

10       Q.   I was going to ask you.

11       A.   Because if I turned it off, you would see my

12   hand get in front of it.  It must have been bad battery.

13       Q.   Fair.  But more importantly, there's no other

14   thing that exists that would have shown the trace

15   amounts, correct?

16       A.   Correct.

17       Q.   Fair enough.  Okay.  I don't see anything else

18   I need to ask about this video.  I do want to go back to

19   Alek's search, though.  Fair enough?

20            MR. ARONIN:  Does anyone want a break?

21            (Recess taken.)

22       Q.   (BY MR. ARONIN)  I just want to ask you a

23   little bit more about the search before I sort of move

24   on to my next topic.  And that's -- the video of the

25   search of the whole thing was 23 minutes, right?  Is

1    that give or take what you remember?

2         A.  Yes.

3         Q.  Okay.  And that includes the dog sniff itself,

4    right?

5         A.  Yes.

6         Q.  And you talk about the fact that -- I mean,

7    when the alert that's -- there are drugs.  But it also

8    seems like after 20 minutes, it stopped.  How do you

9    square those two things?

10        A.  There was something there at one point.  You

11   know, I've had it where -- I had it where the guy --

12   they had to stop the truck, got the guy out like regular

13   procedure.  Like I would run the dog around the car,

14   alert it, alert the driver seat.  Search the car,

15   nothing.  They had the guy on the push bumper of my

16   truck, which is the black bar on the front.  I'm walking

17   my dog back to the car, and he just veers off right to

18   that guy, smells his crotch area.  And I pull him back.

19   It's not common practice, you know.  We don't search

20   people, our dogs.  Put them in the car.  Told the

21   deputy, hey, check that guy.  And he had a kilo -- or

22   less than a kilo of heroin in his crotch.  So, you know,

23   my dog's alert wasn't wrong.  On the seat, there was

24   narcotics there.  It left.  It was with the guy.

25        Q.  I mean, fair enough.  But like -- I think that

Deputy Martin Molina , III                                April 18, 2024

Page 186

1    is fair enough, which I have been told is an expression

2    I use way too much, and it will show up in this

3    transcript a lot.

4                (Exhibit 34 marked.)

5                Okay.  I want to show you this SPEARS

6    report.  What is it?  While I look for it, what is a

7    SPEARS report?

8        A.  We call it RMS.  It is what the icon shows on

9    our desktop.  And it's where the incident goes, and it

10   is where we can fill out all the -- everything that

11   happened.  I can fill it out, my part.  If someone wants

12   to help me -- like say they want to enter the vehicle

13   information, they can log in the case number and enter

14   the vehicle information and other information, that way

15   they can help me get things done faster.  It is just

16   record of report of that incident.

17       Q.  Fair enough.  It strikes me that's sort of the

18   -- it's like the official report, right?

19       A.  It is.

20       Q.  You may not know.  Is that the sort of thing

21   that's given to a criminal defendant as like the main

22   report?

23       A.  I assume so.

24       Q.  Fair enough.  I cannot believe it, but I don't

25   remember what the FBI version of that is called.  Take

Deputy Martin Molina , III                                    April 18, 2024

                                                        Page 187

1    your time.  Refamiliarize yourself.  At the least, feel

2    free to take a look at your report, your portion of it,

3    which is Page 4 -- or, rather, for the record, 2972.

4    Ready?

5         A.  Yes, sir.

6         Q.  Thank you.  Honestly, no clue what this is.

7    What is BWC?

8         A.  Body-worn camera.

9         Q.  I think you know my real question here.

10   Nowhere in this report do you mention trace amounts,

11   correct?

12        A.  Correct.

13        Q.  You do not mention finding anything, correct?

14        A.  Correct.

15        Q.  And, in fact, if you'll go back one page --

16   please feel free to read the whole thing.  At the least,

17   I would ask if you would read the final paragraph, which

18   is Deputy Babb's report.

19        A.  So I read the last paragraph?

20        Q.  Yes.

21        A.  I did.

22        Q.  Do you see where Deputy Babb writes, after I

23   completed the search, we found nothing?

24        A.  Yes.

25        Q.  And nowhere does he mention trace amounts that

Page 188

1   he discovered, correct?

2        A.  Correct.

3        Q.  Or anything else, correct?

4        A.  Yes.

5        Q.  I also noted -- I apologize.  If you will go

6   back to your report.  It seems to say that Maximus

7   alerted on the driver's side door, and once inside, he

8   alerted on the passenger side of the truck; is that

9   correct?

10       A.  Yes.

11       Q.  Just help me interpret that, those two lines,

12  please.  What are you trying to say there?

13       A.  So he alerted on the door, which is the first

14  indication outside.  I open the door, I put him inside

15  the truck, and that's when he started going everywhere.

16  He was on the passenger seat, center console, between

17  the seat area.  So that's why I put passenger side.

18       Q.  And you, in fact, searched the passenger side?

19       A.  And that's where I found the flake underneath

20  the passenger seat.

21       Q.  Fair enough.  Which you did not mention --

22       A.  Correct.

23       Q.  -- in this report, correct?

24       A.  Yes, sir.

25       Q.  Okay.  We have to go through your deployment

Deputy Martin Molina , III                                    April 18, 2024

                                                           Page 189

1     amounts and talk more about trace amounts.

2          A.  Okay.

3                    (Discussion off the record.)

4          Q.  (BY MR. ARONIN)  So we've discussed deployment

5     reports generally, correct?

6          A.  Yes.

7          Q.  And we discussed Alek's, correct?

8          A.  Yes, we did.

9          Q.  You filled out many, many more deployment

10    reports than just that one, correct?

11         A.  Yes.

12         Q.  Okay.  And how did you learn how to fill them

13    out?

14         A.  With the help of other deputies, K-9 unit -- I

15    mean, K-9 deputies.

16         Q.  And it is the policy both before and after

17    October 2029 [sic] for the supervisor to sign off on

18    those, correct?

19         A.  Yes.  Deployments yes.

20         Q.  For the deployments.  We are going to go

21    through quite a few of them.  I will tell you, I have

22    reviewed all of them.

23         A.  Okay.

24         Q.  And I want to go through some with you.

25                    (Exhibit 35 marked.)

Deputy Martin Molina , III                                    April 18, 2024

Page 190

1          Q.   (BY MR. ARONIN)   What I have done, I have

2     actually categorized them.   First of all, you have

3     provided all of your deployment reports to your

4     attorney, correct?

5          A.   Yes.

6          Q.   And they have provided them to me in discovery,

7     which is why I have them.   I believe I have reviewed and

8     compiled every one.   If I am wrong, then the other

9     extremely competent attorneys will make me look bad

10    about it.   So we are going to do it my way, fair?

11         A.   Yep.

12         Q.   Okay.   This category -- withdrawn.

13              One of the things that can happen is that

14    the dog can alert and no drugs can be found, correct?

15         A.   Yes.

16         Q.   I was calling that, internally, just a false

17    positive.   But it strikes me -- how would you categorize

18    those?

19         A.   It can be somebody who smokes at the house, in

20    the car, and the odor just lingers in there.

21         Q.   Fair.   Or it could be just the humans did not

22    find the drugs that the dog believed, correct?

23         A.   Correct.

24         Q.   Okay.   Regardless, one of the things that can

25    happen again is an alert with no drugs found, correct?

Page 191

```
 1        A.   Yes.

 2        Q.   I would like for you to look through these.

 3        A.   Okay.

 4        Q.   And these are in chronological order, and we

 5   are going to go through them.  And it appears, as I look

 6   through, on the first one, that happened in February of

 7   2021 to you, correct?  First page.  Literally first

 8   page.

 9        A.   This one?

10        Q.   Yeah.

11        A.   24 -- February 24th?

12        Q.   Yes.  Yes.  Excuse me.  There was -- we need to

13   agree to a word.  Let's just go alert, but nothing

14   found.

15        A.   That's fine.

16        Q.   Because I don't want to call it a false

17   positive because we don't agree that's what it is.  So

18   alert, but nothing found, correct?

19        A.   Yes.

20        Q.   Fair term?

21        A.   Yes, that's fine.

22        Q.   So there was an alert, but nothing found in

23   February of 2021, correct?

24        A.   Yes.

25        Q.   Okay.  And the supervisor did not sign that
```

Deputy Martin Molina , III                                        April 18, 2024

Page 192

1    report, correct?

2         A.  Correct.

3         Q.  Okay.  Another one, actually the same day,

4    February 24th of 2021, on the next page.  Alert, but

5    nothing found, correct?

6         A.  Yes.

7         Q.  And, again, not signed, correct?

8         A.  Yes.

9         Q.  There was another alert, but nothing found on

10   the next page in March of 2021, correct?

11        A.  Yes.

12        Q.  Okay.  Not signed, correct?

13        A.  Yes.

14        Q.  Let me -- let's just agree.  You signed all of

15   these, correct?

16        A.  I did.

17        Q.  So when I say not signed, I mean the supervisor

18   did not sign them, correct?

19        A.  Yes.

20        Q.  Despite the fact that that is policy, correct?

21        A.  Yes.

22        Q.  Next page.  There was another alert, but

23   nothing found in April of 2021, correct?

24        A.  Yes.

25        Q.  Okay.  Same thing, not signed, correct?

Deputy Martin Molina , III                                          April 18, 2024

                                                        Page 193

1          A.  Yes.

2          Q.  Next page.  May of 2021.  Alert, but nothing

3     found, correct?

4          A.  Yes.

5          Q.  Nothing signed, correct?

6          A.  Yes.

7          Q.  Next page.  June of 2021, this happened again,

8     correct?

9          A.  Yes.

10         Q.  And, again, not signed, correct?

11         A.  Yes.

12         Q.  Now, it hasn't happened again until November --

13    excuse me, September of 2021, correct?

14         A.  Yes.

15         Q.  And it is still not signed, correct?

16         A.  Yes.

17         Q.  It has begin -- it did happen again in October

18    of 2021, correct?

19         A.  Yes.

20         Q.  And this one, Deputy or Sergeant Ochoa?

21         A.  Sergeant Ochoa.

22         Q.  Thank you.  Sergeant Ochoa did, in fact, sign

23    that one, correct?

24         A.  Yes.

25         Q.  Again, in October of 2021, an alert, but

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 194

1    nothing found.  And that was signed, correct?

2         A.  Yes.

3         Q.  Okay.  Again, it happened in November of 2021?

4         A.  Yes.

5         Q.  November 9th, 2021, correct?

6         A.  Yes.

7         Q.  And, now, there's no signature again from the

8    supervisor?

9         A.  Yes.  Correct.

10        Q.  Once again, it happened the very next day,

11   November 10th, 2021, correct?

12        A.  Yes.

13        Q.  Not signed?

14        A.  Yes.

15        Q.  It now happened again in January of 2022,

16   correct?

17        A.  Yeah.

18        Q.  And not signed?

19        A.  Not signed, but substance present, yes.  And

20   there was another one too that was substance present.

21        Q.  Please correct me.  Thank you.  Don't just say

22   yes because I said --

23        A.  October 13th.

24        Q.  October 13th.  Thank you very much.  Bear with

25   me.

Deputy Martin Molina, III                                    April 18, 2024

Page 195

1          A.   Yes.

2          Q.   Yes.   There's substance present.   Let's go back

3     to then October 13th, and that is, for the record, 4709,

4     correct?

5          A.   Yes.

6          Q.   Okay.   I do see where you checked substance

7     present?

8          A.   Yes.

9          Q.   I do not, however, see where you listed the

10    substance.   Am I correct?

11         A.   Correct.

12         Q.   What substance did you find?

13         A.   So usually I wait until the next day.

14         Q.   Okay.

15         A.   They will put it on the -- I probably didn't

16    stick around.   I probably took off.   I can't recall.   We

17    would have to look at the report.   But usually they will

18    put out RMS or SPEARS, and I go back in there and pull

19    the evidence, what they found, and enter it in the

20    system.

21         Q.   Thank you.   And I do actually note that you

22    signed this --

23         A.   Yes.

24         Q.   -- two weeks later --

25         A.   Uh-huh.

Deputy Martin Molina , III                                    April 18, 2024

Page 196

1          Q.   -- right?

2          A.   What day is that?  Yes, 27th.

3          Q.   So you actually drafted this report -- or

4     rather you entered the information into the system on

5     October 13th, 2021, correct?

6          A.   Yes.

7          Q.   And on -- you signed it on October 27th, 2021,

8     two weeks later, correct?

9          A.   Yes.

10          Q.   And at no point did you add in the substance

11     that was found, correct?

12          A.   No.  I must have forgot.

13          Q.   Mistakes do happen.  I respect that.  But the

14     supervisor actually signed this one.

15          A.   Yup.

16          Q.   So ironically, the one with the mistake is the

17     one the supervisor signed?

18          A.   Yes.

19          Q.   Yeah.  And you also pointed out that one on

20     January 13th, 2022.  And for the record, I am looking at

21     4653.

22          A.   Yes, you are.

23          Q.   Okay.  And this one, likewise, was -- there was

24     a checkbox, yes, substance found, correct?

25          A.   Yes.

Deputy Martin Molina , III                                    April 18, 2024

Page 197

1       Q.  But there is no listing of the substance?

2       A.  Correct.

3       Q.  No listing of the quantity of the substance?

4       A.  Correct.

5       Q.  No listing of even like which drug it was,

6    right?

7       A.  Right.

8       Q.  And this was, again, digitally signed six days

9    after the actual report was after -- after you entered

10   any information, correct?

11      A.  Yes.

12      Q.  And this one was not signed, correct?

13      A.  Yeah.

14      Q.  But thank you for clarifying that for me and

15   catching it, because, as I said, I make mistakes.  So

16   thank you.  Please let me know if you catch any of mine.

17             I now see on March 2022, there's, again, an

18   alert given, an indication yes, and substance present

19   yes, correct?

20      A.  Yes.

21      Q.  But, again, no substance has been listed?

22      A.  Yup.

23      Q.  And no quantity has been listed?

24      A.  Correct.

25      Q.  Okay.  And this is digitally signed by you, but

Deputy Martin Molina , III                                    April 18, 2024

Page 198

1    not the supervisor?

2         A.   Yes, sir.  So what year is this?

3         Q.   This would have been March 28th, 2022.

4         A.   No.  We still had a supervisor.

5         Q.   Okay.  Fair enough.

6         A.   I was making sure we still had one.

7         Q.   Please, I genuinely do appreciate that.  But,

8    again, you entered the information and then signed it,

9    either six or seven days, depending on if there's 30 or

10   31 days in March.

11        A.   Yes.

12        Q.   And I am not going to make the reporter type in

13   while I do the limerick to figure it out.  And, now,

14   turn to the next page, if you would, please.  This is

15   the next time I found an alert, but nothing found.  And

16   that is in December of 2022.

17        A.   Which one are you on?

18        Q.   I am on 4 -- 4325 Bates stamp.

19        A.   The alert, nothing found?

20        Q.   Yes.

21        A.   Yup.

22        Q.   Now, it is possible I may have just missed

23   some.  And, as I said, your very competent defense

24   counsel will make me look bad if I did.  But it strikes

25   me that there were several alerts, but nothing found in

Deputy Martin Molina , III                    April 18, 2024

Page 199

1    2021.  Would you agree with that assessment?

2         A.  Yeah.

3         Q.  Yes.  And as far as I can see, there were none

4    of them between March 28th, 2022, and December 23rd,

5    2022; is that correct?

6              MR. FRIGERIO:  Objection.  Form.

7         Q.  (BY MR. ARONIN)  Is that what these documents

8    show?

9         A.  So are these all of my deployments?

10        Q.  I certainly believe so, and it is possible I am

11   wrong.

12        A.  Okay.

13        Q.  But I believe so.

14        A.  Okay.  Just making sure.  It is kind of weird I

15   do one, two, three, four deployments in 2022.

16        Q.  Oh, I apologize.  Let me clarify.  These are

17   all of your deployment reports (indicating).  These are

18   all of the ones that are an alert, but nothing found

19   (indicating).  I will go through different categories

20   instead of doing them just date.  I am trying to do it

21   by category.  So this is everything that I found in all

22   of the discoverable ones that are an alert, but no drugs

23   found.

24              (Exhibit 36 marked.)

25              MR. FRIGERIO:  That's not accurate because

Deputy Martin Molina , III                                    April 18, 2024

                                                      Page 200

1    we have already seen a few that have been found.

2                    MR. ARONIN:  Okay.  I disagree with the

3    assessment.  There is no listing of narcotics, but I

4    take your point as well.

5         A.  So I can pull up all of these reports up on

6    SPEARS, and you can have the narcotic found.

7         Q.  (BY MR. ARONIN)  I would -- how would you do

8    that?

9         A.  Just run case numbers.  Just run case numbers,

10   go back to these days.  Run case numbers.  The officer

11   who did the main report -- and you will see -- that's

12   how you will know for sure if -- like if you pull that

13   SPEARS that we have somewhere, there's no evidence

14   there.  But it will be under evidence, it will have

15   narcotics, it will have meth, X-amount, you know.

16        Q.  Is the -- is the case number the same thing as

17   the reference number on the deployment report?

18        A.  No, it's not.

19        Q.  Where is the case number?

20        A.  These don't have them on here.

21        Q.  Okay.

22        A.  You would have to go back to this day -- this

23   day, that time, and see what unit I was attached to.

24   Get that case number, run it on SPEARS, pull the report,

25   and see if the officer put any narcotics in there.

Deputy Martin Molina , III                                    April 18, 2024

Page 201

1          Q.  Okay.  Fair enough.  I will -- how would you --

2     so --

3          A.  It had to be open records, public records.

4          Q.  It would have to be through discovery in this

5     lawsuit, in fairness.

6          A.  Yeah.

7          Q.  Okay.  We will call production of these -- of

8     all of the ones for alert, but nothing found.

9     Regardless of whether -- maybe there are three of these

10    that were alert, but found -- alert where you found

11    drugs, these are also several times where there was an

12    alert, but nothing was found, correct?

13         A.  Correct.

14         Q.  That is the thing that happens, correct?

15         A.  It does.

16         Q.  Yeah.  Just nobody finds any drugs, right?

17         A.  Correct.

18         Q.  And as I read these -- let me -- as I read

19    these reports, that did not happen between March of 2022

20    and December of 2022.  That is a full eight or nine

21    months, I guess, without any alerts, but nothing found,

22    correct?

23         A.  It's one -- let me see.  One -- that's two out

24    of eight months, nine months.

25         Q.  Okay.

Deputy Martin Molina , III                                    April 18, 2024

                                                    Page 202

1          A.   Yeah.

2          Q.   And then it begins to happen again in 2023.  We

3     have -- for example, on Pages 4313, we have them

4     beginning of January 2023.  This is another situation in

5     which alert is yes, substance presence is yes, but there

6     is nothing listed, correct?

7          A.   Yes.

8          Q.   And this was, once again, not signed --

9          A.   Yes.

10         Q.   -- by the supervisor, correct?

11         A.   Yes.

12         Q.   Okay.  The next page is, again, the same thing.

13    There's no -- this is in May -- excuse me -- yes,

14    May 12th of 2023.  There's no listing of drugs, but you

15    do put yes for substance present, correct?

16         A.   Yes.

17         Q.   And, again, it is not signed, correct?

18         A.   Yes.

19         Q.   Okay.  And, again, on the next page, in May of

20    2023, we once again have a situation where you have hit

21    yes for alert and indication, yes for substance present,

22    but not listed all, correct?

23         A.   Yes.

24         Q.   And, once again, it is not signed, correct?

25         A.   Yes.

Deputy Martin Molina , III                                    April 18, 2024

Page 203

1          Q.  Okay.  Same thing in -- actually, this is the

2     same thing, yes, on -- in November of 2023, yes for

3     alert given, yes for indication, and yes for substance

4     present, correct?

5          A.  Yes.

6          Q.  And nothing listed, once again, correct?

7          A.  Yes.

8          Q.  And, once again, not signed by the supervisor?

9          A.  Yes.

10         Q.  Next page.  Yes, yes, yes.  Again, alert, but

11    no substance listed.

12         A.  Yeah.  We have a new supervisor here --

13         Q.  Okay.

14         A.  -- or we were getting one, so he didn't have

15    access to this stuff yet.  I'm pretty sure they should

16    be getting signed.  He is trying to catch up on all the

17    records.

18         Q.  I certainly respect that.  But this would then

19    be alert given and some sort of substance found.  We

20    don't know how much or anything, right?

21         A.  Correct.

22         Q.  Okay.  Next page.  Same thing, alert given,

23    indication given, substance present, nothing listed,

24    correct?

25         A.  Yes.

Deputy Martin Molina , III                            April 18, 2024

Page 204

1        Q.   Okay.  Same thing on the next page.  Alert,
2    indication, and substance present, yes?
3        A.   Yes.
4        Q.   And, for the record, I am now up to 3962.  It
5    is, again, no substance listed, correct?
6        A.   Yes.
7        Q.   And, finally, the last page, which is the most
8    recent one I have.  Same thing, alert given, indication
9    given, and substance present, but nothing listed,
10   correct?
11       A.   Yes.
12       Q.   So then I want to check something.  Can you go
13   back to the last page, please?
14       A.   Sure.
15       Q.   This is, for the record, Bates stamp 3941.
16   This is, again, where it is alert given, indication yes,
17   substance present, yes?
18       A.   Yes.
19       Q.   And I already asked that.  This is, again,
20   there is no substance listed.  But if I look above that,
21   it says no search?
22       A.   It does.
23       Q.   How can a substance be present if there was no
24   search?
25       A.   I might have clicked the wrong one.  On the

Page 205

1    dropdown tab, I might have clicked the wrong one.

2          Q.  That could have happened on any one of these,

3    correct?

4          A.  Yes, sir.

5          Q.  In fact, now that you point out a different way

6    of reading these, would you turn to Bates 4325?  It is

7    December 23rd, 2022.

8                    MR. FRIGERIO:  What's the Bates stamp?

9                    THE WITNESS:  4325.

10                    MR. ARONIN:  Thank you.

11          Q.  (BY MR. ARONIN)  Then if we -- if we credit

12   what you've said about substances were found in all the

13   other ones, this is the last time that there was an

14   alert given, but nothing was found; is that right?  You

15   haven't had an alert given, but nothing found since

16   2022?

17          A.  I guess.  I don't know.

18          Q.  I mean, is that what your recollection is?

19          A.  That's what the record says.  I mean, I don't

20   recall.  I do a lot of -- I get called a lot.

21          Q.  Okay.  So I am going to interrupt my own flow

22   to, in all fairness, be -- give you credit for

23   something, because I don't want you to feel like I'm

24   attacking you.  I really don't mean to.  Here is a

25   really big folder of all the time you found drugs.  It

Deputy Martin Molina , III                                April 18, 2024

Page 206

1    happens too, right?

2         A.  Okay.

3         Q.  There's a lot of alerts given where you, in

4    fact, find drugs, correct?

5         A.  Yep.

6         Q.  Sometimes it is a gram of marijuana, right?

7         A.  (Moving head up and down.)

8         Q.  Yes?

9         A.  Yes.

10         Q.  And sometimes it's kilos of cocaine?

11         A.  Yes.

12         Q.  And you have helped keep kilos of cocaine off

13    the street, right?

14         A.  Yes.

15         Q.  Fair enough.  I respect that tremendously.

16    Now, going back to what this is.  Alert given, but

17    nothing found.  We don't have a single one since 2022.

18    And, in fact, only one after March of 2022.  And for the

19    record, that would be Bates 4581.  Fair?

20         A.  Okay.

21         Q.  Okay.

22         A.  And you are looking for alerts, nothing found?

23         Q.  Yes.

24         A.  Okay.

25         Q.  Now, I want to ask you about trace amounts.

Deputy Martin Molina , III                                    April 18, 2024

Page 207

```
 1        A.   Okay.

 2        Q.   Okay.  You tell me when you are ready.  If you

 3   would like to review them --

 4        A.   Okay.

 5        Q.   -- I am going to do the exact same thing.

 6        A.   Okay.

 7        Q.   This is pulling what I believe -- and I may

 8   have made mistakes, but what I believe is all of your

 9   deployment records that say trace amount on them.

10        A.   Okay.

11        Q.   Okay.  And I put them, once again, in

12   chronological order.

13        A.   Okay.

14        Q.   So it looks like, from the first page, that it

15   happened one time in March of 2021; is that correct?

16        A.   Yes.

17        Q.   Okay.  It happened again in March of 2021 on

18   the next page?

19        A.   Uh-huh.  Yes.

20        Q.   Okay.  And it happened again in April of 2021,

21   correct?

22        A.   Yes.

23        Q.   It happened several more times in April in the

24   next two pages in 2021; is that correct?

25        A.   Yes.
```

Deputy Martin Molina , III                                    April 18, 2024

Page 208

1          Q.   I apologize.  I should have been doing this all

2     of these are, again, not signed by the supervisor,

3     correct?

4          A.   Yes.

5          Q.   So no one approved you putting in trace amounts

6     as the quantity, correct?

7          A.   Correct.

8          Q.   It happened again in May a couple of times in

9     2021, correct?

10         A.   Yes.

11         Q.   Again, unsigned, right?

12         A.   Yes.

13         Q.   In each of these, this was -- you saw -- like

14    this was all listed as marijuana, correct?

15         A.   Yes.

16         Q.   And this is all just like shake?

17         A.   Yes.

18         Q.   Things where you just observed like leafy,

19    green substances, correct?

20         A.   Yes.

21         Q.   Okay.

22         A.   So it is me and then the searching deputy,

23    whoever does traffic stop.  Same thing.

24         Q.   So someone in that situation found some amount

25    of drugs, correct?

Deputy Martin Molina , III                                    April 18, 2024

Page 209

1        A.   Yeah.

2        Q.   Okay.   Once again, in the next page we are up

3    to 4825, trace amounts of marijuana in May of 2021,

4    correct?

5        A.   Yes.

6        Q.   And also trace amounts of methamphetamine,

7    correct?

8        A.   Yes.

9        Q.   What is a trace amount of methamphetamine?

10       A.   It's residue.

11       Q.   Okay.   So like you would find a -- actually,

12   this one I don't know.   A pipe?

13       A.   You can find a pipe.   It can be paraphernalia

14   and residue.   You can find a busted bag with just not

15   even useable amounts.

16       Q.   Okay.   So it is just an incredibly -- how do

17   you know it is meth?

18       A.   We still have enough to test it.

19       Q.   So this would have been tested, correct?

20       A.   Marijuana, no.   Meth, yes.   Yes.

21       Q.   Okay.   That is fair.   And next, again, in 2021,

22   correct?

23       A.   Yes.

24       Q.   As we continue on with these pages -- actually,

25   go back --

Deputy Martin Molina , III                                      April 18, 2024

Page 210

1          A.   Okay.

2          Q.   Thank you.  -- to the one with trace amount of

3     methamphetamine.

4          A.   Okay.

5          Q.   That would be 4825.

6          A.   Yes.

7          Q.   It actually does -- when we look where it says

8     that, it does not indicate the field test or a lab test,

9     is that --

10         A.   I don't do it.  The handler deputy does.

11         Q.   So you will never fill that part out?

12         A.   Yeah, unless I do it.

13         Q.   Do you ever do the --

14         A.   Rare.

15         Q.   Okay.  How does one do a field test?

16         A.   With our drug test kits.

17         Q.   So we continue to see them.  And as you just

18    scroll through, I am going to -- instead of just calling

19    out each individual one, this continues to happen in

20    2021.  And the first time -- actually, if you would go

21    to 4708.

22         A.   Okay.

23         Q.   In October of 2021 is the first time the

24    supervisor signed off on the trace amounts number,

25    assuming my records are correct, right?

Deputy Martin Molina, III                                April 18, 2024

Page 211

1          A.  Yes.

2          Q.  Okay.  So in all of the previous times whenever

3     you put it, it was approved without a supervisor

4     reviewing it, correct?

5          A.  Yes.

6          Q.  Did anyone ever speak to you about these trace

7     amounts in your reports?

8          A.  No.

9          Q.  Okay.  Here is what -- where I am sort of

10    building up to if you get to 4644.

11         A.  Okay.

12         Q.  Before this time, we are in 2021.  And before

13    this time, your records indicate there were a series of

14    alerts, but nothing found, correct?

15         A.  Yes.

16         Q.  That was in 2021?

17         A.  Yes.

18         Q.  Okay.  And we agree that there are -- there

19    were none in between March and December of 2022 with no

20    alerts -- excuse me, yes alert, but nothing found,

21    correct?

22         A.  Yeah.  These previous ones, yes.

23         Q.  Okay.  Now, we are beginning to see -- excuse

24    me, we are now beginning to once again see trace amounts

25    in 2022 on 4644 and unsigned; is that correct?

Deputy Martin Molina , III                                        April 18, 2024

Page 212

1          A.  Yes.

2          Q.  Next page, in January of '22, trace amounts,

3     nothing signed, correct?

4          A.  Yeah.

5          Q.  4638.  Trace amounts, but nothing signed for

6     January 2022 again, correct?

7          A.  Yup.

8          Q.  Next page.  Same thing for February 2022,

9     correct?

10         A.  Yup.

11         Q.  Now, this is where we get to March.  Again,

12    trace amounts and nothing signed on March 3rd, correct?

13         A.  Yes.

14         Q.  Not signed?

15         A.  Yeah.

16         Q.  A week later on March 10th, trace amounts, and

17    nothing signed, correct?

18         A.  Yes.

19         Q.  Okay.  March 16th, trace amounts of marijuana,

20    nothing signed?

21         A.  Yes.

22         Q.  Okay.  March 23rd again?

23         A.  Yup.

24         Q.  March 24th, the very next day.

25         A.  Trace amount of methamphetamine, yes.

Deputy Martin Molina , III                              April 18, 2024

Page 213

1          Q.  And you would not have done the lab search,

2     correct?

3          A.  Correct.

4          Q.  Okay.  That is a fair point.  And then on

5     March 24th, that day, again, you found trace amounts of

6     marijuana, but not signed, correct?

7          A.  Yes.

8          Q.  And no one was arrested, correct?

9          A.  For me, yes.  But no arrests.

10         Q.  Fair enough.  You actually, a third time in

11    that day, found a trace amount on the next page; is that

12    correct?

13         A.  Yes.

14         Q.  And then the -- a week -- or maybe between a

15    week or two it happened again?

16         A.  Yes.  But then arrest, it says.

17         Q.  Okay.

18         A.  Somebody got arrested.

19         Q.  Would he have been arrested for a trace amount

20    of marijuana?

21         A.  No, probably something else.

22         Q.  It could have been a felon in possession of a

23    weapon, right?

24         A.  Could have been that.  Yep.

25         Q.  Resisting arrest.  But he was not arrested for

Page 214

1    drugs; is that correct?

2         A.  I have no idea.

3         Q.  Okay.

4         A.  It could have been -- no telling, unless I see

5    the report, you know.

6         Q.  I'm going to call for production of these

7    reports, of these SPEARS reports.  We look again, and

8    now we are into April.  So this is the period where

9    there are no instances where there's no alerts, but

10   nothing found.  We are having it again.  April 20th,

11   2022, trace amounts of marijuana, correct?

12        A.  Yes.

13        Q.  Not signed.  Then later on, May 16th, the exact

14   same thing, correct?

15        A.  Yes.

16        Q.  Okay.  June it happened again?

17        A.  Yes.

18        Q.  Okay.  And in June -- so it happened, actually,

19   twice in June 16th, correct?

20        A.  Yes.

21        Q.  Where you found a green, leafy substance and

22   said it was shake essentially, correct?

23        A.  Yes.

24        Q.  Okay.

25        A.  Either I found it or the deputy found it, no

1    telling.  I don't remember.

2         Q.  Fair enough.  Next day it happened again?

3         A.  Yes.

4         Q.  And three days later it happened again?

5         A.  Yes.  I don't know what that one was, though.

6    It doesn't say.  It says trace amount.

7         Q.  True.  It does not say it.  But this was

8    approved.  No one asked you about it, correct?

9         A.  Yup.

10         Q.  No one said, fix your mistake, right?

11         A.  Nope.

12         Q.  There is a mistake in this, right?

13         A.  Yep.

14         Q.  Okay.  Happened again in July?

15         A.  Yes.

16         Q.  And it -- and throughout these entire several

17    months, there wasn't a single, what I call, the false

18    positive.  But we all agreed together to call an alert,

19    but nothing found, correct?

20         A.  Uh-huh.

21         Q.  Yes?

22              MR. FRIGERIO:  Objection.  Form.

23         Q.  (BY MR. ARONIN)  You said uh-huh.  By uh-huh,

24    did you mean yes?

25         A.  So these -- you said alert, but nothing found?

Page 216

1        Q.  Yes.  Withdrawn.

2              During this time period?

3        A.  I knew something was found.  It says marijuana,

4   trace amount.

5        Q.  No, I agree.  During this time period around

6   July of 2022, we are in the six -- nine -- eight- to

7   nine-month period where at no point did Max ever alert

8   to a car where no drugs were found, correct?

9              MR. FRIGERIO:  Objection.  Form.

10       Q.  (BY MR. ARONIN)  You can answer.

11       A.  I don't know.  I'm going to say I don't know

12   for now.

13       Q.  Fair enough.  Let's just continue.  This

14   does -- I don't need to go through every little page.

15   But literally this does continue to happen, correct?

16       A.  Yes.

17       Q.  But I will say that once we get to 2023 -- so

18   now 4314.  4314, it happened over the next -- one, two,

19   three, four pages.  It happened four times in

20   January '23; is that correct?

21       A.  Yes, for marijuana and methamphetamines.

22       Q.  In fairness, two of them are methamphetamine,

23   correct?

24       A.  Yes.

25       Q.  Okay.  And then it then happened again once in

Deputy Martin Molina , III                                    April 18, 2024

                                                         Page 217

1     March of 2023, correct?

2          A.   Yes.

3          Q.   It happened zero times between March and August

4     of 2023; is that correct?

5               MR. FRIGERIO:  Objection.  Form.

6          A.   What year is it?  '24?

7          Q.   (BY MR. ARONIN)  Yeah.

8          A.   I believe I might have been out.  I was in a

9     critical injury.

10         Q.   I am sorry to hear that.  I hope you are doing

11    better.  Was it in the line of duty?

12         A.   Sure was.

13         Q.   Did it have anything to do with Alek Schott's

14    stop?

15         A.   Nope.

16         Q.   Good.  Was there any -- were you investigated

17    for any misconduct?

18         A.   No.

19         Q.   Was there any investigation of you for anything

20    inappropriate?

21         A.   No.

22         Q.   You were hurt and out of commission for a

23    while?

24         A.   (Moving head up and down.)

25         Q.   When did you get back?

Deputy Martin Molina , III                                    April 18, 2024

Page 218

1        A.   August.

2        Q.   Of '23?

3        A.   Yup.

4        Q.   Okay.  So you were back in August of 2023?

5        A.   Yes.

6        Q.   And it actually -- if we look at 4062, we had

7    August 23rd of 2023, there was a trace amount of

8    marijuana, correct?

9        A.   Yes.

10        Q.   And nothing -- and not signed?

11        A.   Not signed.

12        Q.   And then it happened again one time in October

13    of 2023, correct?

14        A.   Yes.

15        Q.   And also -- I'm sorry.  I didn't follow up.

16    When were you injured?

17        A.   I don't remember the month.

18        Q.   Can you give me your best estimate?  And I

19    won't hold you to it.

20        A.   April, May.

21        Q.   Fair enough.  And then, to the best of my

22    searching abilities -- and maybe I'm not very good at

23    this, it is certainly possible -- the last time you

24    found trace amounts was October 12th, 2023, fair?

25        A.   Yes.

Deputy Martin Molina , III                                    April 18, 2024

                                                        Page 219

1          Q.  Okay.  I now want to kind of discuss with you

2     what trace amounts really is, because it is not just a

3     useable amount, correct?

4          A.  Correct.

5          Q.  And, again, we are talking about a leafy

6     substance, correct?

7          A.  Yes.

8          Q.  But you are certain it's not grass clippings,

9     correct?

10         A.  No.  It didn't look like grass clipping.

11         Q.  In any of these incidents, correct?

12         A.  In these?  No.

13         Q.  Okay.  Could it have been literally just a leaf

14    that someone stepped on?

15              MR. FRIGERIO:  Objection.  Form.

16         A.  No, I don't think so.  Because the way I saw

17    it, it would have -- a leaf don't break up that really,

18    really small.

19         Q.  (BY MR. ARONIN)  Because you know what

20    marijuana looks like, correct?

21         A.  Yes.

22         Q.  You are a sheriff, you are trained on drugs.

23    You are trained to know what narcotics are, correct?

24         A.  Yes.  Yes.

25         Q.  Okay.  You know what marijuana looks like,

Deputy Martin Molina , III                                    April 18, 2024

Page 220

1    correct?

2        A.   Yes.

3        Q.   And it could not be oregano, correct?

4        A.   No.  Correct.

5        Q.   Or just the detritus or, as I call it, shmutz

6    on the car, correct?

7        A.   Correct.

8        Q.   But you never bagged anything in evidence,

9    correct?

10       A.   Correct.

11       Q.   You never took a photo of it any single time,

12   correct?

13       A.   Correct.

14       Q.   Okay.  And -- fair enough.

15       A.   I didn't do it with these either.

16       Q.   That's fair.  Do you know what Delta-8 is?

17       A.   Delta-8?

18       Q.   Yeah.

19       A.   I've heard about it, but I ain't never seen it.

20       Q.   You've never seen it?

21       A.   No.

22       Q.   Do you know what its illegal status is?  You do

23   know whether this is --

24       A.   What is it a --

25       Q.   Let me show you this photo.  This looks like

Deputy Martin Molina , III                                    April 18, 2024

Page 221

1    marijuana, right?

2         A.  Yeah, it does.

3         Q.  If put -- if that was in front of you, you

4    would call that marijuana, correct?  Withdraw.

5              There is no visible or visual difference

6    between that and marijuana, correct?

7         A.  Not right now.

8         Q.  And you are tasked by the Bexar County

9    Sheriff's Office to enforce drug laws in the state of

10   Texas; is that correct?

11        A.  Yes.

12        Q.  You do not know whether the substance is legal

13   in the state of Texas, sitting here right now?

14              MR. FRIGERIO:  Objection.  Form.

15        Q.  (BY MR. ARONIN)  Do you know -- withdrawn.

16              You are absolutely right.  Do you know

17   whether this substance is illegal in the state of Texas

18   right now?

19              MR. FRIGERIO:  Objection.  Form.

20        A.  I don't know.

21        Q.  (BY MR. ARONIN)  Okay.  That's fair enough.

22        A.  I don't really mess with marijuana.

23        Q.  Honestly, neither do I.  But you are the one

24   putting that you have seen trace amounts based on a

25   green, leafy substance, correct?

Deputy Martin Molina , III                                   April 18, 2024

Page 222

1          A.  Correct.

2          Q.  I now want to get a sense of what it means.  I

3      now want to talk to you about what -- I now want to talk

4      about what trace amount is because I am really

5      struggling to get my head around it.  There are a lot of

6      times in which you found it, right?

7          A.  Yes.  That's the only thing -- this is the only

8      option this gives us, trace amount.

9          Q.  Okay.

10         A.  That's the lowest amount it goes.  It doesn't

11     say shake.  It doesn't say -- trace amount is the least

12     you can click.

13         Q.  I'm not so sure that's correct based on the

14     documents I showed you, and I think it is probably just

15     an honest mistake.  Let's not dig into that too much.

16         A.  Okay.

17         Q.  I mean, attorneys would have dug in, but

18     there's --

19              (Exhibit 38 marked.)

20         Q.  (BY MR. ARONIN)  Just out of curiosity, what is

21     agency number on the top?  Do you see where it says

22     that, top right?

23         A.  Yes.

24         Q.  What is that?

25         A.  That was a case number put in, I believe.

Deputy Martin Molina , III                                    April 18, 2024

                                                          Page 223

1     That's how it usually goes.

2          Q.  That's the case number?

3          A.  I believe so.

4          Q.  Okay.  I don't believe I saw case numbers on

5     the other ones.

6          A.  No.  Some are just -- I don't know what they

7     are.

8          Q.  All right.  As I said, I believe you made an

9     honest mistake on whether or not a smaller amount can be

10    put in, because this appears to be marijuana,

11    0.02 grams, correct?

12         A.  Correct.  That's going to be something that

13    where your scale can pick up.  What I saw, a scale

14    wouldn't even pick up.

15         Q.  So when you say a trace amount, it is just not

16    even a useable amount, correct?

17         A.  The scale is going to say 00.  It's not even

18    going to weigh it.

19         Q.  So to make sure I understand.  In the -- in all

20    of the times we have covered that you put trace amount,

21    you have independently seen and known it to be marijuana

22    based on less than 0.02 grams of it?

23         A.  Yeah.  A lot of times people will tell you,

24    yeah, I smoked in here.  It is right here.  I just

25    brushed it off my clothes.

Deputy Martin Molina , III                                    April 18, 2024

                                                              Page 224

1        Q.   Okay.

2        A.   You put -- I am just giving an example.

3        Q.   Is that something that happened to you?

4        A.   Yeah.

5        Q.   So you will put trace amount if someone says, I

6    was smoking a joint?

7        A.   No.  I will see it.  But I'll say, what's this.

8    And they're like, oh, I was smoking earlier.

9        Q.   I mean, Alek did not say he was smoking?

10       A.   No.  I didn't even ask him about it.

11       Q.   Okay.  Okay.  So we -- so a trace amount is

12   something that is so small that you literally could not

13   pick it up?

14       A.   Can't even weigh it.

15       Q.   It is 0.00?

16       A.   Yes.  If you get some of that, whatever you

17   call it, on a carpet and put it on a scale, it is not

18   going to weigh anything.  It is going to say 00.

19       Q.   But you have found it in that many times in

20   carpet on a car?

21       A.   Oh, yeah.  Oh, yeah.

22       Q.   Okay.  So it is less than 0.02.  I want to show

23   you another one.  But 0.02 would not be trace amounts,

24   correct?

25       A.   Correct.

Deputy Martin Molina , III                                    April 18, 2024

                                                              Page 225

1          Q.   Okay.   That is too much to be trace amount?

2          A.   Correct.   We still wouldn't do anything with

3     it.   I can actually get it weighed.   We just put it on

4     there.

5          Q.   Do you have any visible sense of how little

6     marijuana 0.02 grams is?

7          A.   Oh, yeah.

8          Q.   How much is it?   Can you give me like --

9          A.   Probably like a leaf -- if you broke one of

10    these things off, it would be a top stem right there.

11    Maybe two of those.

12               (Exhibit 37 marked.)

13         Q.   (BY MR. ARONIN)   I would like for you to do a

14    demonstrative.   Does anyone have a red pen?   I am going

15    to hand you a red pen.   I would like you to -- on

16    Exhibit 37.

17         A.   Okay.

18         Q.   I would like you to draw a line where you

19    believe approximately 0.02 grams -- do it on this one

20    because that one has got the sharpest point.

21         A.   This one?

22         Q.   Yeah.   What do you think 0.02 grams is?

23         A.   (Complying.)

24         Q.   Okay.   And marijuana is a dark, green

25    substance, correct?

Deputy Martin Molina , III

April 18, 2024

Page 226

```
 1        A.   Correct.  Unless it is dried out.  It gets more
 2   brown.
 3        Q.   That's fair.  So it is either dark green, like
 4   that image, correct, or it is dark brown, right?
 5        A.   Yeah.
 6        Q.   Okay.  You have seen less than that in Alek's
 7   car with black carpet?
 8        A.   Yeah.
 9        Q.   Okay.  And you have seen it all of those times
10   less than that quantity with your eye, correct?
11        A.   Uh-huh.
12        Q.   Just to narrate this out -- I don't even know
13   how to narrate it.  It is, for the report, my best
14   estimate is a third the size of my pinky nail.  I am
15   standing over you.  I don't mean to be rude.
16        A.   Yeah.  That's about right.
17             (Exhibit 39 marked.)
18        Q.   (BY MR. ARONIN)  Okay.  Here's another one of
19   these.  Okay.  We are looking at Bates 41 -- excuse me,
20   4013.  Is that what I have too?
21        A.   Yes.
22        Q.   Okay.  Wonderful.  This is 0.08 grams of
23   methamphetamine, correct?
24        A.   Yes.
25        Q.   That is too much to be a trace amount, correct?
```

Deputy Martin Molina , III                                    April 18, 2024

Page 227

1        A.   Yes.

2        Q.   Okay.

3        A.   It is a gram.  So it is going to be a good

4    little-sized rock.

5        Q.   Respectfully, it is one-tenth of a gram.  Less

6    than one-tenth of a gram.

7        A.   No, sir.  It is almost -- yeah, it's almost

8    going to be a gram.

9        Q.   Like .1 would be a tenth of a gram, right?

10       A.   Uh-huh.

11       Q.   Yes?

12       A.   Oh, I got confused.  I thought a ten rolled

13   over.  I'm sorry.

14       Q.   No, no.  You are fine.  Again, we can always

15   correct it.  This is less than one-tenth of one gram of

16   meth, correct?

17       A.   Yes.

18       Q.   I'm going to be honest, I actually have no idea

19   what methamphetamine looks like, other than Breaking

20   Bad.  How small is this?

21       A.   You are talking a couple little -- bigger than

22   salt.

23       Q.   Yeah.

24       A.   It's going to be -- I can't even tell you.  It

25   can be a bunch of broken up pieces, not a big rock, but

Deputy Martin Molina , III                                    April 18, 2024

Page 228

1    one solid bigger piece, I guess you can say.

2        Q.   Okay.  So it kind of looks like glass crystal,

3    right?

4        A.   It does.

5        Q.   It's a little bit like cloudy, right?

6        A.   Sometimes.  Dirty.  Depends.

7        Q.   And like this is too much -- this is too large

8    of a quantity to be a trace amount, correct?

9        A.   Yes.

10       Q.   And like, again, the times we saw trace amounts

11   of methamphetamine, like you just found less than this

12   with your naked eye, correct?

13       A.   Yes.

14       Q.   But did not photograph it?

15       A.   Correct.

16       Q.   Did not tag it for evidence?

17       A.   Correct.

18       Q.   Did not bag it?

19       A.   Correct.

20       Q.   Did not put anything in evidence locker?

21       A.   Yeah.

22                (Exhibit 40 marked.)

23       Q.   (BY MR. ARONIN)  Okay.  And finally, I am

24   looking at 4323, for the record.

25       A.   Yes.

Page 229

1        Q.  And this is the situation where you said, alert

2    given, indication yes?

3        A.  Yes.

4        Q.  And substance present, correct?

5        A.  Yes.

6        Q.  And here you actually do list what it is that

7    you found, correct?

8        A.  Yeah.  THC bottle under the seat.

9        Q.  Yeah.  So this is an empty vial, essentially?

10       A.  Yes.

11       Q.  It's a container, basically.  This thing had

12   marijuana in it, right?

13       A.  Or that clear yellow whatever it is, THC.

14       Q.  Oh, it could have been the oil, right?

15       A.  Yes.  Yes.

16       Q.  Okay.  Got it.  So it could have been the oil,

17   but this is essentially an empty container, correct?

18       A.  It could be an empty container.  It could have

19   stuff in it.  I'm not too sure.

20       Q.  Could it be a trace amount of stuff in it?

21       A.  I don't know.  We don't have a thing on here --

22   I don't think we have a thing on here for it, for like

23   THC.  I'm not too sure.

24       Q.  Yeah.

25       A.  It would have to be whoever the deputy was.

Deputy Martin Molina , III                                    April 18, 2024

Page 230

1          Q.  You were the deputy.

2          A.  No.  The one at the traffic stop.

3          Q.  Oh, thank you.  I understand.  Excuse me.

4      Okay.  So an empty bottle or with a tiny little amount,

5      that also is not something you would code as trace

6      amounts, correct?

7          A.  If we had the option probably, but I'm going to

8      write THC bottles.  It's easier for that.

9          Q.  Fair enough.

10         A.  Maybe if we get it on there and it says trace

11     amount, I will take it.

12         Q.  I am actually surprised you haven't found more

13     empty bottles, in all fairness.

14         A.  You got to have a THC test kit.  A lot of us

15     don't have that.  Then you got to get it lab tested to

16     even do anything.

17         Q.  Okay.  So you find like an empty bag that you

18     think, and how do you code it?

19         A.  I don't.

20         Q.  Huh?

21         A.  (Moving head side to side.)

22         Q.  Well, I mean, I looked at the records.

23         A.  You mean an empty bag?  I thought you meant

24     THC.  I'm sorry.

25         Q.  Let's say you found an empty bag that you --

Deputy Martin Molina , III                                      April 18, 2024

                                                        Page 231

1    just in your experience, you think is probably a dime

2    bag and had drugs in it, but essentially empty.  How

3    would you code that?

4        A.  Just a trace amount.

5        Q.  That would be trace amount?

6        A.  Yup.

7        Q.  Fair enough.

8        A.  Yup.

9        Q.  And that would only be if it was less than

10   .02 grams?

11       A.  Yeah, if it's nothing.  I'm telling you,

12   nothing.

13       Q.  Literally nothing?

14       A.  Yeah.

15       Q.  Can we take like a five-minute break, please?

16       A.  Yeah.  Sure.

17              (Recess taken.)

18       Q.  (BY MR. ARONIN)  I am bad at this, but I am bad

19   at depositions in general.  But I am bad at this, and I

20   am going to think that we are almost done.  We are

21   almost done.  I really believe so.  I want to ask you

22   about -- obviously you know that Mr. Schott did file

23   suit over this traffic stop, right?

24       A.  Yes.

25       Q.  That's why we are here.  Do you know whether he

Deputy Martin Molina , III                                      April 18, 2024

Page 232

1    ever filed an internal investigation complaint?

2         A.  He did.

3         Q.  How did you know?

4         A.  I got called into internal affairs.

5         Q.  When did you get called into internal affairs?

6         A.  This year, I thought.

7         Q.  In 2024?

8         A.  I think so.  Maybe late 2023.  Can't recall.

9         Q.  Did you give any statements?

10        A.  Witness statement.

11        Q.  Okay.  Was that in writing or oral or was it

12   recorded?

13        A.  Writing.

14        Q.  You wrote that statement.  Do you know whether

15   he filed internal affairs complaint like around the time

16   of the incident, so in March or April of 2022?

17        A.  I don't know.

18        Q.  Fair enough.  Were you ever called in at that

19   time?

20        A.  No.

21        Q.  Have you ever been disciplined for anything

22   that happened in this case?

23        A.  No.

24        Q.  Have you ever been sanctioned?

25        A.  No.

Deputy Martin Molina , III                                April 18, 2024

Page 233

1        Q.  Has anyone ever told you that you did something

2    wrong in this?

3        A.  No.

4        Q.  Has anyone ever told you that everything you

5    did was correct in this?

6        A.  Yes.

7        Q.  Who told you that?

8        A.  Some people at a conference.  They actually

9    pulled my case up.  We were at a K-9 conference here,

10   and they didn't know we were in the audience.  They

11   said, let's just see some stuff in Bexar County.  And

12   they pulled the YouTube videos up.

13       Q.  Sorry about that.

14       A.  Everybody started talking, and we just stayed

15   quiet.  She knew -- I said, that was me, I'm here.  She

16   said, all right, just stay quiet, I am going to ask

17   everybody -- not everybody, but a lot of people.  And

18   she just gave different questions, and people answered.

19       Q.  So your peers think that the way this search

20   was done was appropriate, correct?

21       A.  Different handlers from different states,

22   whoever was there, yes.

23       Q.  Fair enough.  And did they know about the trace

24   amounts quantity in there?

25       A.  No.

Deputy Martin Molina , III                                       April 18, 2024

Page 234

```
 1          Q.  When they said it was well done, it does not
 2     include anything about trace amounts, correct?
 3          A.  Correct.
 4          Q.  Okay.  And did that involve -- do you know
 5     whether that included Deputy Babb's involvement in this
 6     or just yours?
 7          A.  Just mine.
 8          Q.  Fair enough.  So not what led you to be called
 9     out, correct?
10          A.  Correct.
11          Q.  And not what caused the stop to be as long as
12     it was, correct?
13          A.  Correct.
14          Q.  Just your portion of the search, correct?
15          A.  Yes, sir.
16          Q.  And not the trace amounts?
17          A.  Yes, sir.
18          Q.  Okay.  Has anyone within the Bexar County
19     Sheriff's Department -- withdrawn.
20               Has anyone within either the Bexar County
21     Sheriff's Office or internal affairs told you that what
22     you did was fine?
23          A.  No, no one has talked to me.
24          Q.  No one has talked to you at all about this,
25     correct?
```

Deputy Martin Molina , III                                    April 18, 2024

Page 235

```
1        A.  Yeah.

2        Q.  Has anyone ever talked to you about the trace

3    amounts in the reports?

4        A.  No.

5        Q.  Never?  Not once?

6        A.  No.  We brought it up last week, that was about

7    it, when I met with the attorney.

8        Q.  Don't tell me anything you said with the

9    attorney.

10       A.  I am saying that's all.  It is part of it.

11       Q.  The supervisor has never mentioned this to you,

12   correct?

13       A.  No.  No.

14       Q.  Okay.  What video did they pull up on YouTube?

15       A.  I don't know.  Both of them, I think.  I can't

16   recall.

17       Q.  Do you know how long they were, give or take?

18       A.  They were long.

19       Q.  Was it like the one we looked at?

20       A.  Longer.  Yeah, like that, but then they talk

21   and break everything in pieces and all that stuff.  So

22   it goes on for a long time.

23       Q.  So it would have been your bodycam footage?

24       A.  Yeah.  And then it has pictures of attorneys

25   and Alek is talking and this and that.
```

Deputy Martin Molina , III                                    April 18, 2024

                                                      Page 236

1          Q.   Got it.   Now, I do probably understand.   Excuse

2     me.   I think the only other thing then I want to discuss

3     is just some other records.

4          A.   Okay.

5               (Exhibit 41 marked.)

6          Q.   (BY MR. ARONIN)   I only -- I only have one

7     question.   I never say that.   So this is -- this is a

8     document that I received at 6:00 p.m. the night before

9     deposition -- the dog depositions, yours and Deputy

10    Herrera, started.   So I do not -- I have not thoroughly

11    reviewed this.

12         A.   Okay.

13         Q.   The way I would have -- the way I think you can

14    see I thoroughly reviewed the other documents.

15         A.   Yes.   Correct.

16         Q.   So I am not going to ask you any substantive

17    questions about it.   I am only going to ask you one.

18    There's weights listed in this?

19         A.   Yes.

20         Q.   What unit of measure?

21         A.   Grams.

22         Q.   Those are grams?   Okay.   That was literally all

23    that I -- so that I can now evaluate this report, I just

24    wanted to know what the unit of measure is.   Whenever I

25    see these numbers, regardless of whether it is heroin or

Deputy Martin Molina , III                                    April 18, 2024

                                                              Page 237

1    whatever it is, those are grams?

2         A.  Yes.

3         Q.  Cool.  You have seen this document before,

4    right?

5         A.  Oh, yeah.

6         Q.  I asked you two questions about it.  Okay.

7    Finally, I believe I am --

8              MR. ARONIN:  We're calling for production

9    on quite a few things.  I want the internal affairs

10   reports, especially of witness statements given.  We

11   definitely want the SPEARS reports for any of the ones

12   where either trace amounts were listed or --

13             MR. FRIGERIO:  Why don't you make a list

14   for me and send it?

15             MR. ARONIN:  I can do it.  What I do want

16   on the record, though, is as we e-mailed when we

17   received the documents 6:00 p.m. before the depositions,

18   we're keeping both Herrera and Molina open in case

19   there's something in those reports or in the new

20   documents.

21             MR. FRIGERIO:  You received them.  That's

22   the same day I got them, just to let you know.

23             MR. ARONIN:  I want to be really clear.

24   None of that do I blame you.  Seriously, this has been a

25   very collegial experience.  It is just I will not rush

1    to prep.  I will prep.  And I think you agree that we

2    both have the opportunity to review them in detail

3    before we finalize this.  Do you agree?

4                    MR. FRIGERIO:  I am just telling you.  I am

5    telling you it is not like I was hiding them.  You got

6    them the same day I did.

7                    MR. ARONIN:  I want to put on the record, I

8    don't think hide the ball -- I don't believe you were

9    hiding the ball.  I just think sometimes things come

10   later than we like, and we just have to keep things

11   open; is that fair?

12                   MR. FRIGERIO:  Yes.

13                   THE WITNESS:  Yeah.

14                   MR. ARONIN:  And we are continuing to be

15   courteous.

16        Q.  (BY MR. ARONIN)  And with that, I know the

17   answer is going to be no to this, but I ask it every

18   single time.  Is there anything else you would like to

19   tell me?

20        A.  No.

21        Q.  I didn't think so.

22                   MR. ARONIN:  I have no further questions.

23                   MR. FRIGERIO:  We will reserve our

24   questions.

25                   MR. LEAKE:  I will also reserve my

Deputy Martin Molina , III                                        April 18, 2024

Page 239

1     questions for the time of trial.

2                    (Proceedings ended at 3:27 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deputy Martin Molina , III                                          April 18, 2024

Page 240

1                     CHANGES AND SIGNATURE

2        PAGE/LINE              CHANGE              REASON

3        _____

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

Deputy Martin Molina , III                                    April 18, 2024

Page 241

1          I, MARTIN MOLINA, III, have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.

3

4                        _____

                         MARTIN MOLINA, III
5

6

7

8  THE STATE OF TEXAS)

9  COUNTY OF _____)

10         Before me, _____, on
   this day personally appeared MARTIN MOLINA, III, known
11 to me (or proved to me under oath or through
   _____) (description of identity card
12 or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
13 to me that they executed the same for the purposes and
   consideration therein expressed.

14
           Given under my hand and seal of office this
15 _____ day of _____, 2024.

16

17
                         _____
18                       NOTARY PUBLIC IN AND FOR
                         THE STATE OF TEXAS
19                       MY COMMISSION EXPIRES:
                         _____
20

21

22

23

24

25

Page 242

1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION
3        ALEK SCHOTT,              )
               Plaintiff,          )
4                                  )
         VS.                       ) CIVIL ACTION NO.
5                                  ) 5:23-CV-00706-OLG-RBF
         JOEL BABB, IN HIS         )
6        INDIVIDUAL AND OFFICIAL   )
         CAPACITY; MARTIN A.       )
7        MOLINA III, IN HIS        )
         INDIVIDUAL AND OFFICIAL   )
8        CAPACITY; JAVIER SALAZAR, )
         IN HIS INDIVIDUAL AND     )
9        OFFICIAL CAPACITY; AND    )
         BEXAR COUNTY, TEXAS,      )
10             Defendants.         )
11
12                REPORTER'S CERTIFICATION
                   ORAL DEPOSITION OF
13                  MARTIN MOLINA, III
                    APRIL 18, 2024
14
15             I, JAZZMEN CANALES, Certified Shorthand
    Reporter in and for the State of Texas, hereby certify
16  to the following:
17             That the witness, MARTIN MOLINA, III, was
    duly sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given
    by the witness;
19
               I further certify that pursuant to FRCP
20  Rule 30(f)(1) that the signature of the deponent
21      __X__ was requested by the deponent or a party
    before the completion of the deposition and returned
22  within 30 days from date of receipt of the transcript.
    If returned, the attached Changes and Signature Page
23  contains changes and the reasons therefor;
24      _____ was not requested by the deponent or a party
    before the completion of the deposition.
25

Deputy Martin Molina , III                                    April 18, 2024

Page 243

1              I further certify that I am neither
attorney nor counsel for, related to, nor employed by
2   any of the parties to the action in which this testimony
was taken.

3

            Further, I am not a relative or employee
4   of any attorney of record in this cause, nor do I have a
financial interest in the action.

5

            Subscribed and sworn to on this _____ day
6   of _____, 2024.

7

8

9

10

11              /s/ Jazzmen Canales
                JAZZMEN C. CANALES, Texas CSR 9344
12              Expiration Date: 04/30/2023
                Veritext Legal Solutions
13              Firm Registration No. 571
                300 Throckmorton Street, Suite 1600
14              Fort Worth, Texas 76102

15

16

17

18

19

20

21

22

23

24

25

Page 244

1    Charles Frigerio, Esquire

2    csf@frigeriolawfirm.com

3                          May 7, 2024

4    RE:    Schott, Alek v. Babb, Joel Et Al

5        4/18/2024, Deputy Martin Molina , III (#6491516)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   clientservices-va@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

| & | | | |
|---|---|---|---|

**&** 2:13

**0**

**0.00** 224:15
**0.02** 223:11,22
 224:23 225:6
 225:19,22
**0.02.** 224:22
**0.08** 226:22
**00** 223:17
 224:18
**004900** 3:21
**004947** 3:19
**004959** 3:18
**00706** 1:5
 242:5
**007623** 3:24
**02** 231:10
**04/30/2023**
 243:12

**1**

**1** 227:9 242:20
**100** 56:1 119:7
 164:3 174:9
**10:20** 156:10
**10:41** 157:25
**10th** 194:11
 212:16
**111** 1:22 2:10
**11:49** 147:11
**11th** 25:16
**12th** 202:14
 218:24
**13** 87:21
**130** 3:14

**132** 3:15
**13:50** 158:15
**13th** 194:23,24
 195:3 196:5,20
**14** 159:21
 165:4
**14:16** 158:20
**14:22** 159:3,15
**14:23** 159:18
 159:24
**14:26** 160:14
**14:30** 159:20
**14:45** 165:5
**14:47** 165:5
**14th** 12:22
**15** 99:24
 100:13 133:4
**15:48** 165:19
**16** 54:15 79:1
 90:8 91:13
 99:21 100:13
**1600** 243:13
**16th** 147:10
 212:19 214:13
 214:19
**17** 99:24
 100:13
**177** 3:16
**18** 1:13 10:4,6
 10:8,9 78:12
 242:13
**186** 3:17
**189** 3:18
**18th** 1:19
**19** 170:4
**1971** 94:23
**1981** 95:11

**199** 3:19
**1:35** 179:17

**2**

**2** 3:3
**20** 100:4,6
 105:13 180:3
 185:8
**200** 2:14
 102:17
**2012** 14:13
**2015** 103:20,22
**2017** 89:11
 103:19,20
 105:2,14
 106:14
**2018** 89:11
 103:21
**2021** 25:16,16
 43:16 45:5
 46:1 191:7,23
 192:4,10,23
 193:2,7,13,18
 193:25 194:3,5
 194:11 196:5,7
 199:1 207:15
 207:17,20,24
 208:9 209:3,21
 210:20,23
 211:12,16
**2022** 22:7
 43:17 45:5
 88:23 91:3
 93:15 108:6
 147:11 194:15
 196:20 197:17
 198:3,16 199:4
 199:5,15

 201:19,20
 205:7,16
 206:17,18
 211:19,25
 212:6,8 214:11
 216:6 232:16
**2023** 43:17
 45:5 202:2,4
 202:14,20
 203:2 216:17
 217:1,4 218:4
 218:7,13,24
 232:8
**2024** 1:13,19
 232:7 241:15
 242:13 243:6
 244:3
**2029** 189:17
**2072** 101:24
**20:21** 171:23
**20:25** 173:15
**20:26** 170:21
**20:35** 172:3
**20:38** 173:22
**20:42** 172:15
**20:46** 171:15
**20th** 214:10
**210-271-7877**
 2:11
**21:25** 173:11
**22** 133:2 212:2
**222** 3:21
**22203** 2:5
**225** 3:20
**226** 3:22
**228** 3:23
**23** 184:25
 216:20 218:2

| | | | |
|---|---|---|---|
| **230**  102:12 | 131:10,11,20 | **4/18/2024** | **4th**  12:22 |
| **236**  3:24 | 133:10,12,16 | 244:5 | **5** |
| **23rd**  199:4 | 134:12 158:3,6 | **40**  3:23 228:22 | **50**  129:1 |
| 205:7 212:22 | 177:21 198:9 | **400**  102:17 | 178:22,22 |
| 218:7 | 242:20,22 | **4013**  3:22 | **50/50**  129:2 |
| **24**  3:9 191:11 | 244:16 | 226:20 | **512-379-2960** |
| 217:6 | **300**  243:13 | **4062**  218:6 | 2:15 |
| **24th**  191:11 | **31**  3:14,25 | **41**  3:24 226:19 | **52**  88:5,5,6 |
| 192:4 212:24 | 130:15,18 | 236:5 | 178:7 |
| 213:5 | 198:10 | **4313**  202:3 | **571**  243:13 |
| **25**  127:23 | **32**  3:15 132:17 | **4314**  216:18,18 | **5916**  3:16 |
| **250**  161:5 | **33**  3:10,16 | **4323**  3:23 | 177:23 |
| **26**  3:9 24:21,23 | 177:25 | 228:24 | **5:10**  149:20 |
| 180:3 | **34**  3:17 186:4 | **4325**  198:18 | **5:12**  149:20 |
| **27**  3:10 33:18 | **35**  3:18 189:25 | 205:6,9 | **5:23**  1:5 242:5 |
| 147:9 | **350**  18:9,11,13 | **4581**  206:19 | **5kilo18**  24:14 |
| **27th**  196:2,7 | 19:6,7 25:13 | **46**  133:20 | **5s**  77:1 |
| **28**  3:11 87:7 | 121:2 | 178:19 | **5th**  25:16 |
| **28th**  198:3 | **352**  15:20 | **4638**  212:5 | **6** |
| 199:4 | 16:10 18:7,10 | **4644**  211:10,25 | **605**  130:17 |
| **29**  3:12 91:18 | 18:13 | **465**  1:23 2:10 | **6491516**  244:5 |
| 180:3 | **36**  3:19 199:24 | **4653**  196:21 | **6:00**  236:8 |
| **2972**  187:3 | **37**  3:20 225:12 | **4700**  2:14 | 237:17 |
| **2:07**  134:12 | 225:16 | **4708**  210:21 | **6:10**  152:7 |
| **2:11**  136:12 | **38**  3:21 222:19 | **4709**  195:3 | **6:23**  183:5 |
| **2:17**  135:3 | **39**  3:22 226:17 | **4825**  209:3 | **6:30**  183:2 |
| **2:30**  136:12 | **3941**  204:15 | 210:5 | **7** |
| **2:31**  136:25 | **3962**  204:4 | **4:06**  182:9 | **7**  244:3 |
| **2:33**  137:9,17 | **3:00**  100:12 | **4:08**  144:12,13 | **70**  64:2 |
| **2:36**  137:23 | **3:27**  1:20 239:2 | **4:15**  144:7,14 | **703-682-9320** |
| **2:47**  139:5 | **3:37**  140:4 | **4:16**  144:7 | 2:5 |
| **2:49**  139:5,21 | **3:51**  142:13 | **4:22**  158:12 | **7606**  45:25 |
| **3** | **3rd**  212:12 | **4:30**  182:6,14 | **76102**  243:14 |
| **3**  155:4 | **4** | **4:40**  182:14 | **78205**  1:23 |
| **30**  3:13 91:18 | **4**  3:5 100:12 | **4:42**  148:17 | 2:10 |
| 100:4,6 127:23 | 178:18 187:3 | **4:45**  149:1 | |
| 130:11 131:6,8 | 198:18 | **4:52**  149:1 | |

| | | | |
|---|---|---|---|
| **78723** 2:14 | **9:04** 1:20 | **acknowledged** | **add** 106:8,15 |
| **7:09** 152:14 | **9:23** 182:3 | 241:12 | 113:1 196:10 |
| **7:21** 153:6 | **9s** 22:17 | **acknowledg...** | **added** 105:15 |
| 154:3 | **9th** 194:5 | 244:12 | **adding** 106:4 |
| **7:55** 154:18 | **a** | **acre** 105:24 | **additional** |
| **7th** 91:3 107:5 | | **action** 1:4 | 105:14 |
| **8** | **a.m.** 1:20 | 242:4 243:2,4 | **address** 81:13 |
| | 147:11 | **actions** 149:25 | **adds** 106:12 |
| **8** 3:20 220:16 | **abilities** 218:22 | **activate** 131:8 | **admin** 93:22 |
| 220:17 | **able** 16:2 58:18 | **activated** 131:2 | **affairs** 232:4,5 |
| **87** 3:11 | 58:23 124:6 | 131:3,6 | 232:15 234:21 |
| **8:30** 100:11,12 | **above** 1:18 | **activity** 35:9 | 237:9 |
| **8:33** 155:13 | 138:19 172:3 | **actual** 31:18 | **affirmatively** |
| **9** | 204:20 241:2 | 46:4 47:11 | 106:4 |
| | 244:6 | 97:16 111:14 | **affix** 241:1 |
| **9** 8:20,21 12:7 | **absolute** 6:12 | 159:14 197:9 | **aftermarket** |
| 14:22 15:5,17 | 132:19 | **actually** 28:10 | 153:20 169:22 |
| 21:16 22:2,23 | **absolutely** | 33:6 39:20 | **agency** 35:6 |
| 23:1,9 25:7 | 181:22 221:16 | 52:8 59:1 72:6 | 222:21 |
| 32:16 35:16 | **academy** 50:19 | 88:13 92:13 | **aggressive** 6:17 |
| 42:18,20 45:10 | 61:5 | 96:20 98:18 | **ago** 72:8 |
| 52:25,25 55:6 | **acceptable** | 101:20 103:19 | **agree** 106:6 |
| 61:8,9 63:1 | 110:13 112:7 | 104:25 106:23 | 124:14 141:5 |
| 79:11 83:10 | **accepted** 94:12 | 107:7 111:1 | 153:7 159:25 |
| 88:10,21 94:17 | 96:4 | 125:7 130:11 | 160:17,20 |
| 102:9,10 | **access** 123:22 | 154:15 165:5,8 | 163:9 179:14 |
| 109:10 114:22 | 124:1 203:15 | 165:13 178:8 | 191:13,17 |
| 120:14 123:18 | **accessible** | 178:15,18 | 192:14 199:1 |
| 123:18 126:2,3 | 43:11 | 190:2 192:3 | 211:18 216:5 |
| 127:6,7 128:22 | **accommodati...** | 195:21 196:3 | 238:1,3 |
| 130:3 183:24 | 122:10 | 196:14 203:1 | **agreed** 215:18 |
| 189:14,15 | **accuracy** 244:9 | 209:11,24 | **ahead** 79:12 |
| 233:9 | **accurate** 78:20 | 210:7,20 | 136:10 183:1,2 |
| **900** 2:4 | 152:17 177:2,8 | 213:10 214:18 | **ain't** 56:3 57:5 |
| **901** 2:4 | 199:25 | 218:6 225:3 | 57:9 67:20 |
| **91** 3:12,13 | **accurately** | 227:18 229:6 | 77:2,7 80:9 |
| **9344** 243:11 | 138:9 139:7 | 230:12 233:8 | 83:23 163:7 |
| **96** 123:3 | | | 220:19 |

**air** 49:23 67:20
  73:17 74:21
  134:16 135:11
**airlines** 15:2
**airplanes** 15:1
**al** 244:4
**alek** 1:3 4:12
  13:12 72:2
  122:12 124:19
  126:16 156:2
  178:8,24
  179:17,22
  217:13 224:9
  235:25 242:3
  244:4
**alek's** 124:21
  127:13 147:2
  147:17 149:13
  149:22 157:7
  182:10 184:19
  189:7 226:6
**alert** 28:18,21
  29:4,7,11,21
  35:10 38:17,23
  38:24 39:5,8
  39:14 42:7
  65:25 66:21,24
  67:1 77:25
  80:3,4,24
  82:20 86:3,7,9
  86:15 98:7,10
  98:19 104:13
  104:14,16
  108:21 109:22
  110:19 112:8
  112:10,12
  137:13 139:3
  141:9,18

143:10,17,21
  144:20 156:11
  172:20,24
  173:1,3 177:2
  177:8,11,13
  180:6 185:7,14
  185:14,23
  190:14,25
  191:13,18,22
  192:4,9,22
  193:2,25
  197:18 198:15
  198:19 199:18
  199:22 201:8
  201:10,10,12
  202:5,21 203:3
  203:10,19,22
  204:1,8,16
  205:14,15
  206:16 211:20
  215:18,25
  216:7 229:1
**alerted** 48:15
  137:25 149:22
  162:14 163:6
  163:23 176:17
  180:9 188:7,8
  188:13
**alerting** 66:3,4
  66:19 73:20
  80:1 82:20,23
  83:22 98:25
  99:3 147:22
  156:20
**alerts** 48:14
  65:19,20 76:19
  77:24 80:6
  81:4 86:23

198:25 201:21
  206:3,22
  211:14,20
  214:9
**allotted** 244:19
**allowed** 25:18
  139:5
**alto** 14:25
**amazing** 62:4
**amazingly**
  168:24
**amendments**
  12:23
**amount** 40:2,6
  83:15,23 85:24
  110:8 128:19
  147:14,19
  148:8 150:7,25
  156:25 157:21
  175:12 181:18
  200:15 207:9
  208:24 209:9
  210:2 212:25
  213:11,19
  215:6 216:4
  218:7 219:3
  222:4,8,10,11
  223:9,15,16,20
  224:5,11 225:1
  226:25 228:8
  229:20 230:4
  230:11 231:4,5
**amounts** 83:20
  150:23 151:9
  152:12 153:1,9
  154:6,25 155:8
  155:14 158:3,8
  164:9 173:14

174:12 184:15
  187:10,25
  189:1,1 206:25
  208:5 209:3,6
  209:15 210:24
  211:7,24 212:2
  212:5,12,16,19
  213:5 214:11
  218:24 219:2
  221:24 224:23
  228:10 230:6
  233:24 234:2
  234:16 235:3
  237:12
**angle** 175:10
  175:12
**animals** 27:8
**answer** 6:5,21
  7:9 13:8 21:14
  43:7 81:23
  110:13 112:6,7
  119:3,3 129:12
  141:12 163:14
  164:15 216:10
  238:17
**answered**
  233:18
**answers** 124:12
**antonio** 1:2,23
  2:10 242:2
**anybody**
  128:14
**anymore** 22:4
**anytime** 85:12
**anyway** 11:7
  40:17 50:2
  81:21 89:17
  163:14

Case 5:23-cv-00706-OLG-RBF    Document 119-16    Filed 06/11/25    Page 250 of 304
Deputy Martin Molina , III                                    April 18, 2024
[apart - assigned]                                                    Page 5

apart  119:7
apologize
   37:22 84:4
   115:9 188:5
   199:16 208:1
app  123:22
appear  141:9
   166:3 179:21
appearances
   3:3
appeared
   241:10
appears  140:5
   170:25 172:15
   191:5 223:10
apples  160:7
applicable
   244:8
applications
   126:5
applies  173:13
appreciate
   8:24 122:11
   198:7
apprehend
   21:6
apprehension
   15:23 27:3
   59:12 66:11,12
   102:25
apprehensions
   46:15
appropriate
   4:8 129:15
   233:20
approve  36:19
   38:2,3

approved
   36:14,17,17
   38:12 94:8
   95:22,23 208:5
   211:3 215:8
approving
   36:20 95:20
approximately
   16:4,25 133:12
   144:14 149:1
   182:5 225:19
april  1:13,19
   192:23 207:20
   207:23 214:8
   214:10 218:20
   232:16 242:13
area  29:3 38:24
   38:25 47:25
   48:2,6,24
   53:19 54:25
   67:15,16 68:5
   68:10 96:12
   135:10 138:4
   138:12 139:25
   142:22 153:16
   153:19 154:4
   156:17 160:2
   162:15,15
   165:9,11
   176:21 177:3
   185:18 188:17
areas  68:4,6
argue  6:20
arlington  2:5
armor  114:4,11
aronin  2:3 3:5
   4:4,11 8:12
   13:7,8 15:4

22:12 23:7
24:22 28:15
31:24 32:4,7
32:13 33:15,19
52:3,5 68:16
80:20 87:2,5,8
91:19 92:6,11
95:1,3 115:23
122:6,10
123:21 124:13
124:16,17
129:11 130:13
130:16,21
132:9,12,13,18
133:4,16,18
134:10 137:9
140:4 141:12
141:22 142:8
142:11,12,15
144:12 146:18
148:17,21
151:15 152:7
153:4 156:9
157:25 158:23
159:20,24
163:13 165:19
169:8 170:21
172:2 173:6,20
173:22 174:2,3
174:4,23 175:1
177:24 178:2
178:15,22
179:17 180:1
181:10,24
182:14 183:13
184:20,22
189:4 190:1
199:7 200:2,7

205:10,11
215:23 216:10
217:7 219:19
221:15,21
222:20 225:13
226:18 228:23
231:18 236:6
237:8,15,23
238:7,14,16,22
arrangement
   116:16
arrest  85:24
   213:16,25
arrested  213:8
   213:18,19,25
arrests  213:9
arrived  62:8
articulable
   55:16
ashes  161:19
asked  11:20
   23:19 128:8
   156:11 164:14
   164:15 204:19
   215:8 237:6
asking  4:21
   6:24 9:6 11:4
   69:3 116:21
   125:1 129:14
   151:7 160:20
   182:18,20
   183:17
asks  181:15
assessment
   199:1 200:3
assign  127:9
assigned  18:4
   20:2 83:9

100:24
assistance
31:15
assisting
129:25 130:4
assume 39:17
65:1 186:23
assuming 42:1
67:23 96:11
163:10 210:25
assure 84:14
attached 1:25
132:16 200:23
242:22 244:11
attacking
205:24
attempted 7:22
attention 77:18
135:1
attorney 190:4
235:7,9 243:1
243:4 244:13
attorneys 4:12
11:11,15,25
190:9 222:17
235:24
audience
233:10
audit 32:16
46:8,9
audits 46:5
august 217:3
218:1,4,7
austin 2:14
authorized
56:14
automatically
131:21

available 23:18
127:7,7 244:6
award 65:15
65:16 66:3,4
66:14,15,15,16
66:18
awesome 7:5
10:17 11:8
12:13 24:18
28:5 29:24
40:25 45:25
87:12 95:14
101:13 113:22
124:16

**b**

b 3:7
babb 1:5 21:21
22:15 23:10
55:5 125:21
127:17 128:10
133:6 140:6,12
141:4,9,24
144:9,22
148:25 149:8
150:17,22
153:24 155:23
156:11 164:17
166:7,10,14
168:10 177:14
178:9 179:7
182:20,21
187:22 242:5
244:4
babb's 12:4,13
130:9 142:25
175:10 179:3
187:18 234:5

back 8:12
24:18 27:4
30:4 31:2,6,21
32:7 38:6 43:7
43:12 47:13
48:24 52:8
65:6 67:10
71:19,20,24
72:17,18,19,25
73:1,1 104:25
105:1 113:3
119:24 122:7
131:9 134:1
135:1,16,19
136:11,12,17
136:18 140:5
140:11 141:10
144:12,13
151:16 152:15
153:4,16
154:16,17
158:2,14,14
159:13,15,21
162:24 163:22
165:4,5 166:12
170:5,22 171:1
171:2 176:3
177:4 178:9,13
178:24 179:1
179:18 180:12
180:22,23
182:6 183:4
184:18 185:17
185:18 187:15
188:6 195:2,18
200:10,22
204:13 206:16
209:25 217:25

218:4
backed 133:10
background
7:12 14:10,23
168:19
backtrack
102:10 103:18
bad 4:18,20
5:24 6:7 36:2
63:16,17 64:16
76:6 79:4,6,8
79:19 165:3
181:11 184:12
190:9 198:24
227:20 231:18
231:18,19
bag 110:17,21
158:22 161:16
209:14 228:18
230:17,23,25
231:2
bagged 220:8
bags 99:5
ball 141:23
147:14 238:8,9
balls 108:17,19
109:3
bar 185:16
barking 76:11
77:13
barks 138:6
based 6:16
34:8 75:14
76:8 82:20
115:23 125:3
146:13 164:7
221:24 222:13
223:22

**basic** 7:12 34:5
116:11,15
**basically** 25:16
34:12 60:16
72:23 74:11
90:4 92:23
95:5 97:3
100:17 140:23
143:1 156:18
171:5 172:3
173:8 229:11
**bates** 3:16,18
3:19,21,22,23
3:24 45:15,20
94:22 130:17
177:23 198:18
204:15 205:6,8
206:19 226:19
**battery** 184:12
**bc000605** 3:14
**bc002969** 3:17
**bcso** 128:11
**bear** 101:22
112:18 121:21
132:25 194:24
**beautifully**
9:16
**bed** 68:3
166:11 177:4
**beep** 164:20
165:1
**beeping** 176:9
**beeps** 130:22
131:1 135:21
135:24,25
181:5
**beginning**
89:20 133:1

202:4 211:23
211:24
**begins** 202:2
**behavior** 29:25
30:5,8,11,13
30:18,23 31:5
31:9 75:8,12
75:16,24 77:21
78:3 134:18
176:11
**believe** 21:25
41:25 42:1
44:18 47:21
53:13 78:18
91:25 106:25
112:12 114:5
130:19 166:13
186:24 190:7
199:10,13
207:7,8 217:8
222:25 223:3,4
223:8 225:19
231:21 237:7
238:8
**believed**
190:22
**belt** 153:16,19
158:18 159:11
159:14 169:18
**benjamin**
17:24 18:5
**best** 16:25 47:7
61:2 74:18
115:20 124:18
128:16 218:18
218:21 226:13
**better** 16:20
32:5 68:5

117:21 118:1,2
173:16 180:25
217:11
**betters** 84:13
**bexar** 1:9
14:11 19:3
26:2 45:8 51:1
54:6 94:17
114:18 221:8
233:11 234:18
234:20 242:9
**big** 30:5,8,18
31:5 61:8
99:25 105:23
109:24 143:5,7
150:24 156:25
205:25 227:25
**bigger** 85:24
131:14 227:21
228:1
**binary** 82:22
86:21
**bit** 7:16 8:22
24:19 28:18
31:16 81:11
83:11 91:14
96:18 97:21
115:18 116:1
122:20 124:25
125:2 134:11
163:20 175:2
184:23 228:5
**bite** 59:13
69:18 103:1
**bites** 15:23
**biting** 66:14
79:18 117:14

**black** 185:16
226:7
**blair** 2:13
141:20 142:8
**blame** 237:24
**blank** 95:20
104:14,15,15
104:24 107:14
**blanks** 103:25
104:2,22 107:4
**bleake** 2:15
**blew** 55:25
**blocking**
155:18
**blowing** 31:1
70:23,23,25
71:8,17,21
72:16 73:19,24
135:12 142:16
142:21,21
156:18,20
176:23 180:19
**blown** 118:3
**blunt** 162:10
**body** 9:5 161:4
187:8
**bodycam** 3:15
8:25 12:1,11
72:9 130:8
135:24 136:2
153:24 171:9
176:7 235:23
**boeing** 15:2
**bolt** 158:18
159:13,13
**bolts** 159:14
**bond** 26:19,19
48:10 117:8

bonded  117:18
bonding  26:21
  121:16
bookshelf
  28:23 30:4
boom  29:19
  82:10
border  21:9
  146:8
boss  37:5 84:16
bosses  84:15
bottle  229:8
  230:4
bottles  230:8
  230:13
bottom  147:8
  154:23 172:4
boulevard  2:14
box  40:11
  152:15
boxes  78:13
  99:7
boy  28:11
  112:24
bracketing
  96:12
brain  83:24
break  7:10
  49:8 51:24
  87:3 121:25
  122:3,7,11
  184:20 219:17
  231:15 235:21
breaking
  227:19
breaks  7:5,7
  31:7

briefly  25:1
  110:3 130:12
bring  136:17
  136:18
broke  31:7
  63:19 149:8
  225:9
broken  149:15
  227:25
brother  114:14
brothers  114:8
  114:14,15
brought  28:9
  235:6
brown  226:2,4
brush  102:20
brushed
  223:25
bucky  24:11
bud  111:14,16
buddy  76:21
buffer  131:11
buffering
  177:21
build  78:8
  109:8
building  15:24
  27:1 61:6
  211:10
buildings  46:15
built  140:17,23
bumper  146:10
  185:15
bunch  104:10
  166:8 227:25
bundle  109:20
  109:24

bungee  57:7
burn  161:19
burned  162:4
buses  45:11
business  7:3
busted  209:14
busy  22:22
  79:13
buying  53:23
bwc  187:7

**c**

c  2:1 42:21
  101:4,5 243:11
cab  177:4
cad  100:20
  101:2,4
cage  117:9
  176:13
call  12:19 13:2
  13:21 16:16
  23:8,16,17
  27:4 33:5
  42:16 44:8
  52:7,25 53:8
  55:4,5 58:2,21
  61:2 70:11
  72:18,19,25,25
  73:1 85:13
  104:12 111:8
  124:7 126:19
  127:9,14
  130:25 132:2
  162:10 164:16
  165:14,14
  169:11 170:1
  186:8 191:16
  201:7 214:6

215:17,18
  220:5 221:4
  224:17
called  8:25 9:4
  30:20,22 42:18
  42:24 47:17
  56:20 71:18,20
  75:7 83:18
  111:14 119:7
  138:2,15
  150:16 168:2
  186:25 205:20
  232:4,5,18
  234:8
calling  57:18
  58:20 60:9
  124:19 148:18
  190:16 210:18
  237:8
calls  16:11
  23:20,22 79:12
  93:25 101:7,16
cam  72:10
camera  9:5
  131:9,16
  155:18 184:9
  187:8
cameras
  171:19
canales  1:20
  17:22 242:15
  243:11,11
cans  78:11
capacity  1:6,8
  1:9 242:6,8,9
car  10:15 13:12
  26:23 28:22
  30:20,22 32:18

32:22,25 34:9
47:18,21 48:5
49:23 50:1,9
50:12 53:20
54:22 55:11
56:2 57:4,11
58:4,6,18,23
59:2,2,3,21,23
60:14,22 61:3
62:8,19,22
63:12,18 65:6
67:6 73:5,9
74:17 84:2
98:8,11,12,16
98:19 104:13
104:15 116:14
117:7 123:25
124:4 146:13
147:17 148:1
148:18 149:13
149:22 150:10
151:16 152:2,3
152:9 153:21
155:2,10,13,15
157:7,16 158:1
163:23,24
167:2,11 171:1
171:5,25 173:8
173:24 176:4
185:13,14,17
185:20 190:20
216:8 220:6
224:20 226:7
**card** 241:11
**cardenas** 15:18
36:1,2,4,14
37:11,12,17
50:25 115:7

**care** 70:13
128:6
**carpet** 14:3
224:17,20
226:7
**carrying** 98:19
**cars** 45:11 57:5
59:9 104:10,14
104:18 146:9
171:16,18
178:4
**case** 4:13 5:18
8:16 12:20
33:23 43:9
113:25 151:21
186:13 200:9,9
200:10,16,19
200:24 222:25
223:2,4 232:22
233:9 237:18
**cases** 9:10
12:19
**cat** 105:19,20
105:21 106:15
**catch** 18:12
68:25 107:13
197:16 203:16
**catching**
197:15
**categories**
199:19
**categorize**
190:17
**categorized**
190:2
**category**
190:12 199:21

**cats** 101:3
105:21
**cause** 1:19
55:20 121:8
136:7 138:3
172:20 243:4
**caused** 234:11
**cbd** 112:2,8
163:18
**cell** 67:1 125:9
**center** 14:2
142:16 148:3
162:15 165:11
166:2,4 176:18
176:20 180:10
180:14 188:16
**certain** 18:25
131:21 164:1
173:1 219:8
**certainly** 98:7
199:10 203:18
218:23
**certificate**
25:12 31:22
**certificates**
24:24 32:8
43:12
**certification**
19:11 42:25
43:13 50:23
78:22 242:12
**certifications**
3:9 19:9 24:19
25:3,6 43:14
78:24
**certified** 15:16
15:19 19:5,8
37:4 46:17

120:25 242:15
**certify** 32:20
242:15,19
243:1
**cetera** 34:24,24
82:15,15
**chair** 159:13
**challenge** 13:2
**chamber** 177:4
177:5
**change** 29:25
30:5,8,11,13
30:18,23 31:5
31:9,16 75:7
75:12,15,24
77:21 89:4
91:10 108:5,20
114:23 134:17
176:2 240:2
**changed** 51:24
119:11
**changes** 30:7
30:23 115:4
240:1 242:22
242:23 244:10
**changing** 13:4
78:3
**channel** 23:23
23:25 24:7,11
24:15,16
126:21,22,23
126:24 127:1,5
**chapter** 88:5,6
**characterize**
143:23
**charge** 26:7
87:13

**charles** 1:22
2:8,8,9 244:1
**charlie** 105:22
**check** 31:6,13
42:7 46:9,18
46:20 63:4
68:7 76:20,21
138:1,2,12,14
177:6 185:21
204:12
**checkbox**
196:24
**checked** 40:11
195:6
**checking** 31:1
46:11,13
135:10 136:5
138:2
**checks** 135:16
**chemical** 97:3
172:19
**chew** 28:1
**chill** 129:4
**chilling** 176:14
**choosing** 92:9
**christen** 2:3
**chronological**
106:24 191:4
207:12
**ci** 22:13 24:2
**cigar** 162:9
**cigarette** 162:8
**cigarettes** 67:3
**circles** 180:13
**circumstances**
48:18
**city** 20:12

**civil** 1:4,24
10:22,25 242:4
**clarification**
8:6 15:3 22:11
23:4 32:12
123:16 130:2
146:16
**clarify** 69:24
199:16
**clarifying**
197:14
**class** 183:22
**clean** 104:18
182:10
**clear** 69:3
113:25 127:11
154:3,19
159:17,25
161:4 164:11
172:9 178:3
229:13 237:23
**cleared** 155:22
**clears** 53:5
**click** 123:15
222:12
**clicked** 164:13
204:25 205:1
**client** 151:2
**clientservices**
244:15
**clipping** 219:10
**clippings**
162:13 219:8
**clockwise** 29:1
**close** 57:7
139:15 148:4
155:20 183:7

**closed** 139:6,18
**closer** 29:19
71:25 175:16
**clothes** 223:25
**cloudy** 228:5
**clue** 187:6
**cluttered** 57:5
**cocaine** 64:3
82:1 83:11
97:2 206:10,12
**code** 169:1
230:5,18 231:3
**collar** 105:24
**college** 14:25
**collegial**
237:25
**come** 25:21
31:2 37:8
47:13 50:19
52:17 67:10
68:21 70:9
76:20,20,21
77:6,7,11,12
85:13 97:20
105:1 121:19
122:7 126:19
127:9 138:4,5
138:5,12,14
141:9 150:2
152:3 154:17
160:7 168:3
172:9 179:11
238:9
**comes** 54:5,9
83:12 105:22
105:24 127:4
143:5

**comfortable**
91:21
**coming** 48:7
72:17 77:7
85:12 133:7
139:13 141:24
143:3,9
**command** 69:2
69:10
**commander**
117:22
**commands**
116:12
**commerce**
131:9
**commission**
217:22 241:19
**common** 50:3
139:11 185:19
**communicated**
61:1 89:23
**company** 114:5
**compare** 92:17
**compared** 42:5
**compartment**
140:15,19
183:17
**compartments**
140:17 183:21
**competent**
190:9 198:23
**compiled** 190:8
**complaint**
132:16 232:1
232:15
**completed**
26:13,13 27:2
187:23 244:16

| | | | |
|---|---|---|---|
| **completely** | 74:11,22 | 138:10 140:11 | **copy** 147:5 |
| 28:16 170:10 | 134:16 | 142:12 164:10 | **cords** 57:8 |
| **completion** | **consider** | 164:19 209:24 | **corner** 123:4 |
| 242:21,24 | 152:16 | 210:17 216:13 | **corporal** 37:1 |
| **complying** | **consideration** | 216:15 | **corporals** 37:1 |
| 225:23 | 241:13 | **continues** 53:9 | **correct** 5:8,14 |
| **compound** | **considers** | 210:19 | 10:16 12:11 |
| 97:3 | 179:22 | **continuing** | 13:13,14,18,19 |
| **computer** | **consistent** | 54:12 85:19 | 17:16 18:8,14 |
| 34:21 42:5 | 148:22 | 137:6 238:14 | 19:18 21:3,4,6 |
| 100:20 123:25 | **console** 14:2 | **control** 118:13 | 25:7 26:3,5,10 |
| 124:2,4 127:10 | 142:17 147:20 | 118:16 | 34:6,10,12 |
| **concentrated** | 148:3 162:15 | **conversation** | 36:5,10 39:11 |
| 104:2 | 165:11 166:3,4 | 6:25 133:21 | 39:18,19 40:2 |
| **concerned** | 176:18,20 | 144:6,13,19 | 40:4,7,18 41:2 |
| 56:13 59:14 | 180:10,14 | 145:12 156:15 | 41:23,24 42:12 |
| **conditions** | 188:16 | 183:16 | 42:14,23 43:17 |
| 60:19 | **constantly** | **conversations** | 44:24 45:5 |
| **conduct** 74:10 | 98:25 | 11:8 141:24 | 50:14,17,20,21 |
| **conducted** 84:9 | **constitutional** | 142:1 | 51:5,8,17,20 |
| **conference** | 12:19 | **convey** 138:23 | 51:21 53:6,9 |
| 233:8,9 | **contacted** | **conveying** | 53:25 54:7,10 |
| **confidence** | 23:14 | 142:18 144:16 | 54:13,16,19,23 |
| 86:19 | **container** 99:7 | **cool** 6:2,7 7:3 | 54:25 56:15,17 |
| **confident** | 108:18 111:4 | 14:8 15:4,6,9 | 57:15 58:16,18 |
| 86:14 172:25 | 229:11,17,18 | 24:22 26:16 | 58:23 59:16 |
| **confirm** 101:23 | **containers** | 32:6 45:23 | 60:4,19,23 |
| **confused** 88:7 | 111:7 172:16 | 47:14 52:4 | 65:2,20 66:8 |
| 88:11,13 180:9 | **contains** 60:7 | 56:13 108:2 | 66:12,19,23,24 |
| 227:12 | 242:23 | 113:25 119:25 | 66:25 67:2 |
| **connects** | **contemplating** | 122:8 124:7,18 | 74:6,17 75:2,3 |
| 159:12 | 156:2 | 132:12 134:23 | 75:5,8,18 76:1 |
| **consent** 49:14 | **content** 34:1 | 152:5 237:3 | 76:4 77:18 |
| 49:22,25 50:1 | **context** 20:15 | **cooperative** | 79:1 80:16,18 |
| 50:8 56:4 | 108:10,11 | 64:14 | 81:8,9,13,16 |
| 57:21 58:1,7 | 109:8,10 | **copies** 244:14 | 82:17,23,24 |
| 62:23 63:6 | **continue** 37:19 | **cops** 63:17 | 83:1 84:10 |
| 64:19 67:19,23 | 107:18 135:13 | | 85:3 86:24 |

**[correct - course]**

87:1,22 88:19
88:23 89:20
91:3,8 93:2,3
93:16 94:8,13
94:18 95:6,9
95:15,18,20,21
95:22 96:4
97:17 98:2,25
99:1,22 100:19
102:22 103:9
106:14,18
107:25 108:1,3
108:7,8 109:13
112:13,16,17
113:8,15 116:4
118:6 120:15
120:25 122:16
123:8 124:4
126:17 127:22
129:22 132:4,5
133:8 134:2
136:3 138:20
141:15,18
143:18 144:2
145:17 147:11
148:11,12,23
149:1 150:11
151:4 152:9
153:1,11,21
154:4,16,20,23
155:25 156:2
156:21,24
157:2,3,22
160:15 161:5,8
161:17,20
162:10 163:24
165:10,15,22
165:25 168:14

168:17 169:12
169:22,24
170:2,3,5,7,18
170:19,23
171:12 172:16
172:17 173:9
173:11,17
174:7,10,15,17
174:20 175:17
175:18 176:4,5
176:7,19 179:1
179:23,24
180:17,20,21
181:16,19
182:17,19,22
182:23,24,25
184:15,16
187:11,12,13
187:14 188:1,2
188:3,9,22,23
189:5,7,10,18
190:4,14,22,23
190:25 191:7
191:18,23
192:1,2,5,7,10
192:12,15,18
192:20,23,25
193:3,5,8,10
193:13,15,18
193:23 194:1,5
194:9,11,16,21
195:4,10,11
196:5,8,11,24
197:2,4,10,12
197:19,24
199:5 201:12
201:13,14,17
201:22 202:6

202:10,15,17
202:22,24
203:4,6,21,24
204:5,10 205:3
206:4 207:15
207:21,24
208:3,6,7,9,14
208:19,25
209:4,7,19,22
210:25 211:4
211:14,21,25
212:3,6,9,12
212:17 213:2,3
213:6,8,12
214:1,11,14,19
214:22 215:8
215:19 216:8
216:15,20,23
217:1,4 218:8
218:13 219:3,4
219:6,9,11,20
219:23 220:1,3
220:4,6,7,9,10
220:12,13
221:4,6,10,25
222:1,13
223:11,12,16
224:24,25
225:2,25 226:1
226:4,10,23,25
227:15,16
228:8,12,15,17
228:19 229:4,7
229:17 230:6
233:5,20 234:2
234:3,9,10,12
234:13,14,25
235:12 236:15

241:2
**corrected**  47:3
**correcting**
90:16
**correction**
108:15
**correctly**  46:6
73:4 102:13
137:1 143:23
**cotton**  108:17
108:19 109:3
**couch**  118:3
**counsel**  92:8
198:24 243:1
244:14
**counted**  95:8
**counting**
100:18
**counts**  101:18
103:8
**county**  1:9
14:12 19:3
26:2 45:9 51:1
54:6 94:17
101:12 114:18
115:13 125:10
125:24 221:8
233:11 234:18
234:20 241:9
242:9
**couple**  26:21
117:1 135:3
140:5 146:9
158:24 161:11
165:20 176:3
208:8 227:21
**course**  15:20
102:13,14

court  1:1 5:14
    6:7 7:15,23 8:6
    15:3 22:11
    23:4 32:12
    123:16 146:16
    242:1
courteous
    171:1 238:15
courtesy  50:4
courthouse
    93:24
cover  16:16
covered  75:1
    223:20
coworkers
    61:16 129:4,6
    129:8
crash  10:4,6,13
    10:14,15
crazy  83:25
    164:23 176:9
create  32:19
    54:23
created  34:8
creating
    101:20 151:1
credit  205:11
    205:22
creeping  126:8
crew  177:3
crime  168:20
crimes  184:5
criminal  8:16
    9:10,17 11:4
    20:5,11 21:15
    22:1 23:8
    129:16,18,21
    130:4 146:11

168:19 186:21
criminals
    20:19
criteria  16:2
critical  217:9
crossings  21:9
crotch  185:18
    185:22
crumbs  13:23
crushed  162:23
crystal  228:2
csf  2:11 244:2
csr  1:20 243:11
curb  48:25
curiosity  69:16
    85:22 119:5
    222:20
curious  15:6
    119:13
currency  141:2
    141:2
current  123:7
    123:10 147:4,4
currently
    108:23
curriculum
    18:18
curriculums
    15:25 19:1
custody  116:16
cut  100:16
cv  1:5 242:5
cylinders  177:5

d

d  3:1 101:4,5
dad  76:16
    86:16,17

113:22,23
    117:11 119:21
dads  63:20
dangerous  64:5
    179:22
dark  225:24
    226:3,4
dashcam  131:2
    132:3
date  199:20
    242:22 243:12
day  1:19 15:24
    15:25 27:11
    35:1 41:15
    43:25 44:6,16
    44:23 61:6
    69:16 79:4,6
    79:19 83:9,12
    85:4 87:20
    89:3 91:10,10
    93:22 94:2,4
    95:5 96:3,3,14
    96:15 100:3
    102:6 104:5,5
    105:8 118:1,1
    157:17 192:3
    194:10 195:13
    196:2 200:22
    200:23 212:24
    213:5,11 215:2
    237:22 238:6
    241:10,15
    243:5
days  79:8
    197:8 198:9,10
    200:10 215:4
    242:22 244:16

dea  22:21 83:9
    97:14,20
    150:25
deactivated
    131:5
deal  51:8 99:25
    143:5 150:24
dealing  71:4
december
    198:16 199:4
    201:20 205:7
    211:19
decent  128:19
decided  15:5
    130:10
decision  55:13
    56:15,17
    132:22
decoy  102:11
deer  105:22,23
    105:24
def  3:18,19,21
    3:22,23,24
defeated  140:6
defendant  9:17
    10:21 186:21
defendants
    1:10 2:7
    242:10
defense  168:19
    168:20 198:23
define  9:16
definitely  99:8
    157:1 237:11
definition
    40:10
definitional
    161:13

**delta** 3:20
220:16,17
**demonstrative**
225:14
**department**
45:9 61:21
82:5 84:10,18
94:18 106:3,12
234:19
**depending**
48:17,18 53:1
65:11 67:9
198:9
**depends** 70:3,7
228:6
**deployment**
3:10 12:8
33:11,21 34:4
34:23 38:11
90:11 92:15,21
122:19 147:2,3
188:25 189:4,9
190:3 199:17
200:17 207:9
**deployments**
17:10 33:9
36:18,19,20
90:22,23
189:19,20
199:9,15
**deponent**
242:20,21,24
244:13
**deposed** 10:2
**deposing**
244:13
**deposition** 1:12
1:16 10:3,7

136:3 236:9
241:1 242:12
242:18,21,24
**depositions**
231:19 236:9
237:17
**depression**
135:9
**deputies** 22:13
23:8 61:1,3
189:14,15
**deputy** 4:8
11:17 12:13
19:18,19 23:10
23:12,20 29:24
32:8 33:3
35:16,22 36:3
36:4,4,7,9,14
37:12 42:23
47:19 48:4,5
48:15 49:6
50:25 52:7
53:5,9 54:6
55:4,4,5 57:18
58:20 60:9
62:10,16,18
63:1 69:19
84:5 85:11
86:15 93:5
96:20 108:14
113:14 115:24
116:3,8,25
119:6,14 120:1
120:13 125:21
127:17 128:10
128:16 130:19
133:6 140:6,12
141:4,9,24

142:25 144:8
144:22 148:25
150:17,22
153:24 155:23
156:11 164:16
166:6,10,14
168:10 175:10
175:21,23
178:9 179:3
185:21 187:18
187:22 193:20
208:22 210:10
214:25 229:25
230:1 234:5
236:9 244:5
**describe**
109:16 139:6
**described**
74:10,14
133:19
**description** 3:8
74:7 78:20
152:18 160:21
241:11
**designed** 125:6
**desktop** 124:2
186:9
**despite** 192:20
**detail** 31:20
47:13 52:6
88:10 124:23
238:2
**detailed** 115:24
**details** 51:23
58:25
**detained** 52:14
52:17,20,22
53:5

**detections**
15:23
**detector**
153:25
**detects** 44:9
**detention**
14:15 53:9
**determine**
65:25 75:10
112:16
**determined**
26:12,14
**detritus** 220:5
**die** 7:22
**died** 184:9
**difference**
36:23 106:2,6
110:2,7 115:10
180:11 221:5
**differences**
49:12
**different** 42:5
75:15,21 92:16
101:8,10 125:2
141:3 144:20
168:8 175:23
199:19 205:5
233:18,21,21
**differently**
110:16
**differs** 100:14
**dig** 222:15
**digging** 52:24
**digitally** 197:8
197:25
**dime** 110:21
161:16 231:1

| | | | |
|---|---|---|---|
| **direct** 138:10 | **dispatch** 23:17 | 174:20 236:8 | 80:12 81:2,4,7 |
| **directing** 6:11 | 23:25 101:7,15 | 237:3 241:12 | 81:19,21 82:14 |
| **directly** 172:3 | 127:6 | **documented** | 83:7,10,13,14 |
| **dirt** 154:22 | **dispatcher** | 82:2 | 83:22 85:15,18 |
| **dirty** 27:11 | 126:20 | **documents** | 86:3,6,14,23 |
| 57:11 228:6 | **disrespectful** | 6:10 11:23 | 97:1 98:7,23 |
| **disagree** | 37:23 | 24:20 45:21 | 98:23,24 103:1 |
| 108:16 200:2 | **dissociative** | 88:9 91:15 | 103:14 108:21 |
| **disciplined** | 108:11 | 94:15 96:19 | 109:22 111:9 |
| 232:21 | **distract** 86:4 | 115:23 199:7 | 113:19,20 |
| **discoverable** | 108:20 | 222:14 236:14 | 116:3,12,12,13 |
| 199:22 | **distracted** | 237:17,20 | 119:17 120:23 |
| **discovered** | 28:16 | **dog** 8:3,8 9:4 | 121:5 128:2 |
| 9:19 40:2,7 | **distraction** | 9:19 12:12 | 134:15,24 |
| 157:2 188:1 | 78:4,24 | 13:16 15:14,14 | 135:8,15 136:6 |
| **discovery** | **distractions** | 16:18 26:19,20 | 137:2,3,9,24 |
| 190:6 201:4 | 78:6,15,19 | 26:22 27:4,4,8 | 138:10,22 |
| **discuss** 35:18 | 79:3 105:3,7,8 | 27:12,14,16 | 139:20,24 |
| 38:4 54:18 | 105:15 106:2,4 | 28:7,8,9 30:6 | 142:20 143:8 |
| 61:20 62:16,17 | 106:13,20 | 39:5,12,15 | 143:15 144:3,4 |
| 81:15 219:1 | 107:19,21,25 | 41:13,15,17 | 145:11 147:21 |
| 236:2 | **district** 1:1,1 | 44:8 48:12,13 | 148:18 149:4,6 |
| **discussed** | 14:19 242:1,1 | 48:14,15,16 | 150:13 156:16 |
| 37:25,25 | **ditch** 71:17,18 | 50:2,6 51:6,8 | 156:20 157:13 |
| 142:24,25 | 72:5,7,14,21 | 55:8 56:5 57:6 | 162:14 163:6 |
| 189:4,7 | 73:6,11,13,19 | 57:8 58:3,5,6,8 | 163:23 172:20 |
| **discussing** | 73:23 134:25 | 58:10,13,15 | 173:1 176:14 |
| 61:23 62:1 | 135:4,7 142:16 | 59:11,12 60:4 | 176:14,17 |
| 144:22 147:15 | 142:19,19,22 | 60:21 63:3 | 177:8,9 185:3 |
| **discussion** | 156:13,17 | 65:2,9 66:7,8 | 185:13,17 |
| 28:14 33:17 | **division** 1:2 | 66:10,12 67:20 | 190:14,22 |
| 68:15 130:14 | 242:2 | 67:25 69:23 | 236:9 |
| 141:21 142:16 | **dm's** 126:8 | 70:25 71:18,23 | **dog's** 59:15 |
| 143:2,6 156:5 | **document** | 72:17,20 73:5 | 65:6 80:10 |
| 189:3 | 33:20 43:8 | 73:13,20 74:10 | 113:22 185:23 |
| **discussions** | 91:7 96:24 | 75:14,15 76:17 | **dogs** 5:20 |
| 175:24 | 106:23 132:19 | 78:2 79:9,11 | 15:10 44:2,9,9 |
| | 148:11 151:4 | 79:18 80:6,7,8 | 44:15 59:12,12 |

| | | | |
|---|---|---|---|
| 78:6,14 79:8 | **dried** 226:1 | 86:17 97:19,22 | 224:8 |
| 80:14 82:12 | **drinks** 129:8 | 98:11 99:9 | **early** 121:25 |
| 98:17 102:25 | **drive** 97:22,23 | 109:21 140:24 | **easier** 60:8 |
| 108:23 114:1 | 164:23 176:9 | 141:2 143:22 | 230:8 |
| 114:13,17,19 | **driver** 41:22 | 143:22 156:6 | **easiest** 117:17 |
| 115:11 116:22 | 49:13 50:7 | 156:23 157:6 | **easily** 132:11 |
| 116:22 117:18 | 51:5,6 52:9 | 157:16 161:16 | **east** 24:15 |
| 185:20 | 53:4 57:3,18 | 163:23,23 | **effect** 88:22 |
| **doing** 5:19 | 59:1,20,22 | 170:2,18 173:1 | 145:1 156:12 |
| 13:15 24:10 | 62:8,13,14,17 | 184:1,5 185:7 | **efficiently** |
| 35:1 44:10 | 63:5 67:8,10 | 190:14,22,25 | 101:22 |
| 56:12 58:5 | 133:21 146:13 | 199:22 201:11 | **eight** 93:23 |
| 64:12 67:20 | 173:7,8 176:18 | 201:16 202:14 | 201:20,24 |
| 79:4,15 83:17 | 176:24 177:15 | 205:25 206:4 | 216:6 |
| 89:19 93:24 | 185:14 | 208:25 214:1 | **either** 5:4 6:17 |
| 102:6 103:13 | **driver's** 138:19 | 216:8 219:22 | 11:17 18:13 |
| 103:15 109:19 | 139:3 156:19 | 231:2 | 39:8 44:11 |
| 114:12,16 | 188:7 | **dry** 173:23 | 53:15 57:18 |
| 117:13 124:24 | **drivers** 146:7 | **dual** 66:8 | 58:5 67:8 80:8 |
| 130:3 133:23 | **driving** 130:25 | **dude** 56:9 | 80:9 86:9 |
| 134:11,21,22 | **dropdown** | 66:18 119:2 | 112:13 123:17 |
| 135:14 137:21 | 34:13 205:1 | 169:9 | 124:3 135:11 |
| 139:10 140:9 | **drug** 15:23 | **dug** 222:17 | 139:17 143:21 |
| 177:6 199:20 | 47:25 48:2,6 | **dull** 175:4 | 162:8 198:9 |
| 208:1 217:10 | 53:19 54:25 | **duly** 1:18 4:2 | 214:25 220:15 |
| **door** 135:16,17 | 108:18 111:4 | 242:17 | 226:3 234:20 |
| 136:15,19 | 170:13 174:5 | **dust** 154:23 | 237:12 |
| 139:3,5,6,10 | 197:5 210:16 | 173:23 | **employed** |
| 139:12,14 | 221:9 | **duties** 93:22 | 243:1 |
| 170:22,23 | **drugs** 4:24 | **duty** 17:16 | **employee** |
| 188:7,13,14 | 13:20 20:13,18 | 125:8 217:11 | 243:3 |
| **doors** 57:7 | 20:19,22 21:3 | | **empty** 80:24,25 |
| **dope** 41:14 | 30:21 40:18 | **e** | 229:9,17,18 |
| 72:24 104:11 | 46:14,14 47:4 | **e** 2:1,1,6,11,15 | 230:4,13,17,23 |
| **double** 138:2 | 47:5,10 57:10 | 3:1,7 23:6,6 | 230:25 231:2 |
| **drafted** 196:3 | 63:24 64:13 | 237:16 | **ended** 239:2 |
| **draw** 225:18 | 65:25 67:5 | **earlier** 62:20 | **ends** 162:8 |
| | 80:2,4,4,5 | 96:13 163:18 | |

| | | | |
|---|---|---|---|
| **enforce** 90:7 | **everybody** | 191:12 193:13 | 59:7 68:19 |
| 221:9 | 28:24 43:25 | 202:13 211:20 | 71:14 72:13 |
| **engaged** 27:4 | 44:1 51:13 | 211:23 226:19 | 83:5 102:2 |
| **engine** 183:17 | 52:3 56:9 | 230:3 236:1 | 140:18 142:1 |
| **enjoy** 4:20 11:4 | 81:20 101:11 | **executed** | 156:15 180:11 |
| **enjoying** | 103:5 233:14 | 241:13 | 183:9,15 |
| 162:12 | 233:17,17 | **exhibit** 3:9,10 | **explanation** |
| **ensure** 27:14 | **everyday** 93:21 | 3:11,12,13,14 | 148:22 |
| **enter** 34:12,18 | **everyone's** | 3:15,16,17,18 | **exploding** |
| 42:17 100:23 | 59:16 | 3:19,20,21,22 | 98:23 |
| 186:12,13 | **evidence** 9:17 | 3:23,24,25 | **explosive** 44:6 |
| 195:19 | 9:18 11:23 | 24:21,23 33:14 | 44:8,8 98:24 |
| **entered** 196:4 | 162:19 174:19 | 33:18 87:7 | 99:13 |
| 197:9 198:8 | 195:19 200:13 | 91:18 101:21 | **explosives** 44:3 |
| **entire** 21:22 | 200:14 220:8 | 115:22 130:15 | 44:9 66:24 |
| 56:12 97:15 | 228:16,20 | 132:17 147:7 | 93:25 98:15,15 |
| 132:21 136:2 | **exact** 50:8 83:1 | 177:25 186:4 | 98:16,21,22,22 |
| 175:1 215:16 | 207:5 214:13 | 189:25 199:24 | **expressed** |
| **equipment** | **exactly** 49:16 | 222:19 225:12 | 241:13 |
| 32:18 34:10 | 103:16 105:20 | 225:16 226:17 | **expression** |
| **errata** 244:11 | 133:16 136:25 | 228:22 236:5 | 86:16 186:1 |
| 244:13,16 | 143:9,15 181:5 | **exist** 114:10 | **expressly** 106:4 |
| **especially** | **examination** | 175:16 | **extend** 177:16 |
| 23:10 237:10 | 3:5 4:3 | **existed** 91:8 | **extent** 127:12 |
| **esquire** 244:1 | **example** 24:13 | **exists** 184:14 | **exterior** 34:25 |
| **essentially** 94:8 | 28:22,23 30:6 | **exits** 131:10,10 | **extremely** 86:3 |
| 138:9 176:17 | 53:18 54:22 | **expect** 4:19 | 190:9 |
| 214:22 229:9 | 62:22 83:7 | **experience** | **eye** 226:10 |
| 229:17 231:2 | 96:13 105:17 | 37:3 75:14 | 228:12 |
| **estimate** | 125:21 202:3 | 231:1 237:25 | **eyes** 8:4 |
| 218:18 226:14 | 224:2 | **experiences** | |
| **et** 34:24,24 | **excellent** 25:5 | 64:16 | **f** |
| 82:15,15 244:4 | 81:23 90:20 | **expert** 10:18 | |
| **evaluate** | 165:12 | **expiration** | **f** 161:5 181:2 |
| 236:23 | **except** 241:2 | 243:12 | 242:20 |
| **eventually** | **exception** 6:23 | **expires** 241:19 | **face** 132:7 |
| 83:17 | **excuse** 103:19 | **explain** 18:23 | **facility** 45:10 |
| | 106:3 176:19 | 34:17 41:8 | **fact** 56:11 |
| | | | 94:11 138:22 |

179:13 182:11
185:6 187:15
188:18 192:20
193:22 205:5
206:4,18
**factor**   70:10
72:15 83:4
143:7
**factors**   71:14
**factory**   140:20
140:20
**fail**   81:22
**fails**   244:18
**fair**   5:22 6:21
10:17 12:24
13:1,7,10,17
14:4,5 18:17
21:13 22:6
27:13 33:11
39:4,13,15
40:16 43:6,7
46:23 54:5
55:2 59:14
63:22 64:20,24
66:5 69:22
74:6 75:13
79:14 80:1,14
82:6 85:25
87:21 94:20
96:18 98:13
102:18 109:6
109:16 110:12
111:13,23
112:6,15 113:4
113:7 118:15
120:23 121:21
125:3 127:11
127:16,21

128:3,8,15
129:3,20 130:2
130:5,7 132:3
132:25 134:5
134:19 135:8
140:10 142:5
152:16 154:3
157:1 158:4
165:17 166:14
170:10 176:25
177:18 183:23
184:13,17,19
185:25 186:1
186:17,24
188:21 190:10
190:21 191:20
198:5 201:1
206:15,19
209:21 213:4
213:10 215:2
216:13 218:21
218:24 220:14
220:16 221:21
226:3 230:9
231:7 232:18
233:23 234:8
238:11
**fairness**   99:8
103:12 104:1
148:21 149:21
201:5 205:22
216:22 230:13
**fall**   78:13
**falls**   161:25
**false**   80:17,21
80:25,25
140:19,19
173:2 190:16

191:16 215:17
**familiar**   123:14
**familiarize**
102:2
**familiarized**
83:19
**family**   125:20
**far**   53:1 199:3
**farm**   102:4
**farther**   71:24
72:23 73:5
**fast**   127:3
**faster**   70:25
152:4 186:15
**father**   15:7
116:25
**favor**   101:22
102:1 104:25
107:2
**favorite**   4:17
**fbi**   186:25
**february**   107:5
107:8 191:6,11
191:23 192:4
212:8
**federal**   1:24
**feedback**   38:14
**feel**   64:11
92:17 187:1,16
205:23
**feeling**   79:11
141:13
**feels**   156:23
**feet**   118:23
162:24
**fellow**   35:16
125:17

**felon**   213:22
**felonies**   17:11
**felony**   21:7
**felt**   16:1,2,5
**fender**   31:13
68:2 138:14
**field**   37:8 81:12
96:16 118:5,10
119:6 210:8,15
**figure**   116:25
198:13
**figured**   152:3
**file**   231:22
**filed**   232:1,15
**fill**   16:14 27:22
35:14 42:12,13
52:21 186:10
186:11 189:12
210:11
**filled**   189:9
**final**   39:8,10
75:2 187:17
**finalize**   238:3
**finally**   14:9
89:13,13
104:15 204:7
228:23 237:7
**financial**   243:4
**find**   20:16,18
31:15 65:18
96:17 112:22
112:22 144:1
147:17,21
156:3 157:13
177:16 184:1
190:22 195:12
206:4 209:11
209:13,14

Case 5:23-cv-00706-OLG-RBF    Document 119-16    Filed 06/11/25    Page 264 of 304
Deputy Martin Molina , III                                    April 18, 2024
[find - found]                                                      Page 19

230:17
**finding** 13:20
13:21 20:21
65:17 70:4
80:9 155:24
156:5 184:5,5
187:13
**finds** 29:16
35:9 201:16
**fine** 4:10 5:23
18:13 19:16
37:14,21 47:9
48:13 52:1,2
63:4 74:5
79:16 88:13,19
92:1 93:13
96:6 100:8
101:15 115:3
121:23 124:20
125:4 127:16
142:6 143:4
152:25 158:5
176:6 191:15
191:21 227:14
234:22
**finer** 96:19
125:16
**finish** 73:14
105:2
**firearms** 120:6
**firm** 243:13
**firm's** 12:18
**first** 4:2,7
15:14,14 20:24
24:20 25:11
29:21 33:19
59:1 67:14,22
70:2,4 83:7

84:1 92:14,18
107:6 112:22
115:25 119:19
131:6 133:4
145:19 180:12
188:13 190:2
191:6,7,7
207:14 210:20
210:23
**fishing** 68:18
68:20
**fist** 69:17
**fits** 155:10
**five** 17:4,4,5
107:9,14 122:6
231:15
**fix** 16:21 38:6
215:10
**flake** 147:18
160:24 161:13
161:15 165:9
188:19
**flakes** 159:8,9
**flipped** 158:1
**floor** 159:12
173:16
**floresville** 7:20
**flow** 205:21
**flower** 111:11
111:14
**floyd** 15:18
18:21 36:1
37:3 114:24,25
115:1
**fluctuates**
100:13
**flying** 105:10

**focus** 31:21
70:15 79:3
**focusing** 5:4
**folder** 205:25
**follow** 18:6
47:14 132:11
137:5,25
218:15
**followed** 15:8
**following**
46:25 135:17
138:10 242:16
**follows** 4:2
136:21
**foot** 66:17
**footage** 9:1
12:14 72:9,11
171:9 235:23
**footsteps** 15:8
**force** 22:25
85:13
**foregoing**
241:1,12
**forget** 61:11
**forgive** 20:14
24:10 164:14
**forgot** 196:12
**form** 13:6 34:2
34:5,8 42:11
42:13 80:19
92:13 97:10
129:10 141:11
141:19 163:12
174:1 199:6
215:22 216:9
217:5 219:15
221:14,19

**formal** 89:18
**formalize** 91:7
**forms** 92:24
**fort** 243:14
**forth** 30:4
**forward** 13:4
**found** 38:24,25
39:22 40:18
41:7,9 63:24
64:1 83:11
84:5 85:14
99:8 150:20,22
164:8 182:19
182:20 187:23
188:19 190:14
190:25 191:14
191:18,22
192:5,9,23
193:3 194:1
195:19 196:11
196:24 198:15
198:15,19,25
199:18,21,23
200:1,6 201:8
201:10,10,12
201:21 203:19
205:12,14,15
205:25 206:17
206:22 208:24
211:14,20
213:5,11
214:10,21,25
214:25 215:19
215:25 216:3,8
218:24 222:6
224:19 228:11
229:7 230:12
230:25

Deputy Martin Molina , III                                                April 18, 2024

[foundation - gloves]                                                        Page 20

**foundation**
109:9

**four** 24:24 25:1
25:22 82:3,17
82:20 116:11
172:5,6,8,10
178:4 199:15
216:19,19

**frankly** 5:21
130:10 170:25

**frcp** 242:19

**free** 49:23
67:20 74:21
92:17 134:16
187:2,16

**frequency**
127:2

**friendly** 129:5

**friends** 129:6

**frigerio** 1:22
2:8,8,9 13:6
42:23 80:19
108:16 124:13
124:15 129:10
141:20 163:12
174:1 177:23
199:6,25 205:8
215:22 216:9
217:5 219:15
221:14,19
237:13,21
238:4,12,23
244:1

**frigeriolawfir...**
2:11 244:2

**fringe** 29:2

**fringed** 29:11

**front** 9:20,22
9:24 67:8
70:24 137:2,3
139:25 146:9
165:6 170:22
171:20 176:19
176:20 180:10
180:13 183:3
183:18 184:12
185:16 221:3

**fruit** 160:9,10
160:17 163:10

**frustrated**
76:13,16 77:12
138:6,24

**fuck** 181:4

**full** 4:14 44:16
44:23 78:11
114:4,11 118:3
177:6 201:20

**fully** 72:14
110:10,11
143:14

**funny** 97:21
141:8

**further** 38:14
55:22 183:4
238:22 242:19
243:1,3

**g**

**g.com** 2:15

**gamboa** 18:3
19:19 22:1,8

**game** 183:7,19

**gang** 14:17

**gas** 41:9,23
64:4 68:3

172:16 177:4

**general** 14:10
23:20 74:7
176:18 231:19

**generally** 13:5
34:18 38:17
65:24 74:9
88:25 96:21
113:12 116:1,2
126:12 128:9
128:18 129:5
189:5

**generate**
122:19

**generated** 93:1

**generates**
34:14

**genuinely**
198:7

**george** 82:7
108:25 114:25

**gereb** 128:10
128:16,19
129:17 142:24
175:21,22,23
181:14 182:6
182:15,15,16

**german** 15:12

**gesture** 69:12

**getting** 39:1,2
52:7 55:4
56:23 76:13,15
77:12 83:19,21
88:7,11 114:19
138:6,24 178:8
203:14,16

**gil** 21:20

**give** 8:22,24
28:22 29:20
34:16 40:10
45:13,22 47:12
47:20 49:22,25
50:1,3 61:7
63:6 64:19
68:22,23 76:24
77:2 83:6,7
94:4 96:23
101:16 129:1
146:12 147:4
149:6 165:4
167:10,12,18
185:1 205:22
218:18 225:8
232:9 235:17

**given** 34:9
38:18,23,24
42:7 49:13
50:8 127:17
149:21 186:21
197:18 203:3
203:19,22,23
204:8,9,16
205:14,15
206:3,16 229:2
237:10 241:14
242:18

**gives** 125:12
167:1 222:8

**giving** 29:4
62:22,23 224:2

**glass** 228:2

**glebe** 2:4

**glove** 152:15

**gloves** 151:18

Deputy Martin Molina , III

April 18, 2024

**[go - gram]**

Page 21

| | | | |
|---|---|---|---|
| **go** 16:2,3,5,10 | 195:18 199:19 | 84:20 85:14 | 224:18,18 |
| 16:11 22:22 | 200:10,22 | 86:9,16 87:5 | 225:14 227:3,8 |
| 23:18 24:4,14 | 204:12 209:25 | 91:14 92:3 | 227:18,24 |
| 25:18 30:17 | 210:20 216:14 | 94:21 98:23 | 230:7 231:20 |
| 31:6,8,20,21 | **goal** 74:3 | 99:13 101:20 | 233:16 236:16 |
| 32:7 36:12 | **god** 164:25 | 109:8,16,20 | 236:17 238:17 |
| 38:2 41:16 | **goes** 30:7,18 | 111:1 117:12 | **goldfish** 155:5 |
| 46:9,10 47:23 | 43:1 51:12 | 123:4,5,6,18 | 160:11 |
| 48:11 49:21,25 | 73:1 78:14 | 124:7,17,19,19 | **good** 5:7 6:8 |
| 51:22 55:7 | 127:1 133:2 | 124:22 125:7 | 14:7 21:13 |
| 56:5 57:8 58:8 | 139:14 153:16 | 126:12,13 | 28:7,8,11 32:4 |
| 58:25 61:6 | 158:18 163:22 | 130:7,8,10 | 32:5 40:10 |
| 62:14,25 65:6 | 186:9 222:10 | 131:9,13 135:9 | 45:24 46:10 |
| 72:20 79:12 | 223:1 235:22 | 135:19 136:11 | 47:3 52:1,2 |
| 82:11,12 84:24 | **going** 4:20 5:24 | 136:12,13,19 | 68:23 76:11 |
| 85:11 87:10 | 6:10 9:15 11:3 | 136:20 137:5 | 85:6 90:18 |
| 92:2 93:22 | 13:4 14:9 | 137:19,20 | 112:24,24 |
| 94:5 97:14 | 16:24 19:15,17 | 140:5 141:22 | 115:14,15 |
| 102:16 104:7 | 24:19 29:17 | 141:23 144:12 | 119:2 120:5,7 |
| 104:11,12 | 30:4 31:8,10 | 145:4 147:15 | 121:9 142:10 |
| 114:22 116:6 | 31:16,17,20 | 148:13 152:16 | 144:8,17 149:3 |
| 117:7,8,15 | 33:14 34:1 | 153:4 157:15 | 153:6 156:25 |
| 119:8,16,21 | 35:11 37:19 | 158:3,14,21,23 | 157:16 174:3 |
| 122:1,13 | 41:15,16 43:7 | 159:15,16,20 | 217:16 218:22 |
| 126:13,16 | 43:7,12 45:19 | 165:5 171:13 | 227:3 |
| 135:19 136:10 | 45:22 47:13 | 171:19 172:24 | **gore** 15:2 |
| 136:11,18,19 | 49:8 50:2 | 175:8 177:18 | **gotcha** 107:3 |
| 140:5,11 147:6 | 51:22 52:4,5 | 179:4 180:13 | 177:7 |
| 153:4 156:3 | 53:17 56:3 | 180:23 181:3 | **gotten** 137:2 |
| 158:14,14,24 | 57:6,9 58:2,5 | 182:1,4 183:1 | **grab** 129:8 |
| 159:15 161:24 | 61:10 67:15,16 | 183:1,5,9 | **grabbed** |
| 163:19 178:13 | 69:2 70:22,24 | 184:10 188:15 | 109:23,24 |
| 180:22 182:5 | 71:1,1,20,24 | 189:20 190:10 | 134:2 |
| 183:4,20,21 | 72:4,18,19,24 | 191:5 198:12 | **grabbing** |
| 184:18 187:15 | 73:17 76:6,19 | 205:21 206:16 | 109:20 |
| 188:5,25 | 76:21 77:2,3,6 | 207:5 210:18 | **gram** 85:20 |
| 189:20,24 | 77:12 78:5,13 | 214:6 216:11 | 86:7 110:22 |
| 191:5,13 195:2 | 78:17 83:23,25 | 223:12,17,18 | 206:6 227:3,5 |

[gram - headlight]

227:6,8,9,15
**grams** 223:11
  223:22 225:6
  225:19,22
  226:22 231:10
  236:21,22
  237:1
**grass** 48:25
  134:25 162:13
  219:8,10
**gray** 161:21
**great** 6:4 7:12
  12:16 15:16
  172:2 177:10
**green** 147:18
  148:7 159:8,9
  160:24 161:11
  162:12 208:19
  214:21 221:25
  225:24 226:3
**greenbelt**
  70:17 96:13
**greenhill** 2:13
**grew** 15:12
  116:22
**grille** 171:20
  172:4
**grocery** 163:11
**group** 100:3
**groups** 82:3
**grow** 15:9
**growing** 15:7
**guerra** 21:21
  21:21 23:12
**guess** 7:14 8:2
  9:5 13:23
  16:16 18:20,20
  18:21 20:13

37:5 38:25
46:16 47:23,25
78:8 92:15
108:4 111:2
117:17,23
144:23 147:18
166:23 169:1,2
183:18 184:9
201:21 205:17
228:1
**guesses** 120:21
**guessing** 142:3
**gun** 8:8 120:4
**guy** 7:25 8:2
  22:18 48:9,11
  49:6 55:10,25
  59:13,20 62:25
  64:8 70:11,17
  83:8,12 99:13
  102:15 105:21
  127:8 152:2
  157:12 168:21
  185:11,12,15
  185:18,21,24
**guy's** 60:14
**guys** 61:23

**h**

**h** 3:7 173:20
**half** 155:4
**hand** 69:12
  87:5 91:14
  92:8 137:17
  138:4 158:21
  159:3 161:7
  166:5 184:12
  225:15 241:14

**handed** 82:10
**handle** 16:18
  68:17
**handler** 7:18
  7:25 8:1,3,9
  15:20 19:5,7
  120:24 210:10
**handlers**
  233:21
**handoff** 115:19
  120:10
**handover**
  113:12 116:6
**hands** 8:9
  120:23
**hang** 33:6
  118:3
**hanging** 110:4
**happen** 38:7
  58:1 64:15
  106:19 117:5
  190:13,25
  193:17 196:13
  201:19 202:2
  210:19 216:15
**happened**
  10:23 20:10
  22:7 37:7
  41:24,25 59:11
  115:4 130:19
  148:22 157:12
  186:11 191:6
  193:7,12 194:3
  194:10,15
  205:2 207:15
  207:17,20,23
  208:8 213:15
  214:16,18

215:2,4,14
216:18,19,25
217:3 218:12
224:3 232:22
**happening**
  183:16
**happens** 49:2
  85:15 127:5
  135:20 201:14
  206:1
**happy** 134:23
  141:4,7,9
**hard** 33:1 71:2
  80:22 99:7
  117:15 124:9
  156:11,12
  176:25 179:7
  180:24
**harder** 73:20
  143:13,15
  144:1,3
**hardest** 26:24
  27:7 121:8
**harm's** 49:3
**hate** 31:25
  91:15
**head** 6:6 15:18
  17:20 29:17
  30:17 35:20,24
  35:24 37:18
  65:9 71:11
  206:7 217:24
  222:5 230:21
**header** 89:25
**heading** 127:21
**headlight**
  31:12 68:2

**hear** 9:20 10:5
62:12 126:25
130:23 144:15
145:14 150:19
164:20 166:14
168:9,23 180:1
180:4,4,5,24
181:1,6,10,25
217:10
**heard** 97:4
109:9,11,12
112:2 140:13
140:15 145:16
220:19
**hearing** 9:12
14:18 32:2
168:9
**hebert** 2:3
**hector** 2:9
**helium** 172:16
177:5
**help** 13:17
23:12 31:10,15
32:3 33:5 68:5
68:7 70:4 72:6
74:23,23 79:13
81:18,24 85:15
85:18 122:18
129:24 152:4
183:23 186:12
186:15 188:11
189:14
**helped** 179:1
206:12
**helpful** 86:3
109:18 179:13
**helping** 21:8
22:21 31:13

44:14 67:17,18
67:25 70:1
121:7 151:20
178:6,8
**helps** 84:13
**hemp** 112:10
**hereto** 1:25
**heroin** 64:3
82:1,15 83:13
84:2 97:2,10
97:10 185:22
236:25
**herrera** 3:12
11:17 23:20
29:24 32:8
42:23 69:19
86:15 108:14
113:15 116:3,9
116:25 119:6
119:14 120:1
120:13 236:10
237:18
**herrera's** 93:5
96:20 115:24
**hey** 16:20
24:10 31:23
47:20 48:15
55:6 61:1,14
62:19 76:20
77:11,17 79:11
83:13 85:13
86:16,17,18
94:4 102:16
119:21 127:8
141:20 164:17
185:21
**hide** 64:18
99:11 140:22

140:24 141:23
147:14 238:8
**hiding** 17:11
238:5,9
**high** 30:17,17
31:1 59:11
**highlighted**
107:20
**highway** 20:12
146:8 152:1
**highways** 78:9
**hill** 115:12
**hip** 65:8
**history** 11:4
**hit** 49:3 70:25
83:21 104:14
131:21 145:1
158:23,24
180:13 202:20
**hits** 135:17
**hitting** 74:5
158:15 159:16
**hoard** 57:5
**hold** 16:24
218:19
**holding** 118:14
160:15
**home** 69:5
117:7 119:23
**honest** 222:15
223:9 227:18
**honestly** 17:3
86:1 87:13
94:6 108:15
122:11 129:3
130:9 154:13
154:17 187:6
221:23

**hood** 68:2
**hook** 65:9
**hope** 175:20
217:10
**hopefully**
175:25
**hoping** 140:13
141:14,14,16
141:18
**hour** 15:20
56:1 90:8
91:13 93:23
109:21
**hours** 16:10
18:7 19:6,7
54:15 79:1
99:21 100:4,13
100:18 103:4,8
116:11 121:2
**house** 9:3
17:10,11 28:22
48:7 63:20
84:3,4,5 116:8
116:10 190:19
**houses** 45:11
**huge** 126:11
**huh** 6:6 16:8
20:23 27:25
28:25 37:6
39:12 47:15
49:10 50:5
56:6 67:24
68:10,12 69:7
73:10,12 95:25
104:9 107:10
118:24 119:22
120:8 144:10
195:25 207:19

215:20,23,23
226:11 227:10
230:20
**human** 21:11
80:7 144:1
**humans** 79:9
190:21
**hurt** 217:22

**i**

**icon** 123:15
186:8
**idea** 50:12
57:25 64:11
93:19 104:4
146:18 214:2
227:18
**identified**
166:7 170:13
170:18
**identity** 241:11
**ignorance**
20:14 36:23
101:14
**ignore** 92:9
**iii** 1:7,13,16 3:4
241:1,4,10
242:7,13,17
244:5
**ij** 12:19,20
**ij.org** 2:6
**illegal** 4:24
21:9 151:2
220:22 221:17
**image** 175:16
226:4
**imagine** 9:18
116:24

**immediately**
65:22 178:23
**implemented**
89:8
**important** 4:7
64:12 125:8
129:11
**importantly**
184:13
**imprecisely**
11:20
**imprinted**
98:17
**improve** 85:1,4
**improved**
81:19
**inappropriate**
57:14 217:20
**incident** 186:9
186:16 232:16
**incidents**
219:11
**include** 234:2
**included** 234:5
**includes** 185:3
**including**
177:3
**increasing** 85:9
**incredibly**
209:16
**independently**
128:9 147:23
148:1 223:21
**indicate** 210:8
211:13
**indicating**
69:17 73:2
161:25 182:21

199:17,19
**indication**
28:19 29:5,7,9
29:20,21 35:10
38:18 39:7
137:13 188:14
197:18 202:21
203:3,23 204:2
204:8,16 229:2
**indications**
39:11,14 75:2
75:3
**individual** 1:6
1:7,8 52:20,22
210:19 242:6,7
242:8
**info** 7:12
**informally**
42:16 97:3
**information**
34:13,18 55:6
56:23 57:2,13
124:8 127:17
144:24 146:13
167:1,18 168:7
186:13,14,14
196:4 197:10
198:8
**inherently** 76:3
**initiated** 35:4,5
**injured** 218:16
**injury** 217:9
**input** 42:13
43:2
**ins** 63:16
**insanely** 14:8
**inside** 47:22
60:7 71:22

139:21 159:5
161:7 170:23
171:5 188:7,14
**instance** 1:17
**instances** 214:9
**institute** 2:4
12:18
**instruction**
142:9
**instructor**
120:5,14
**instrument**
241:12
**intel** 20:1,1
**intentionally**
155:17
**inter** 43:4
**interact** 51:4
119:14 120:1,9
**interacted**
120:2
**interaction**
51:9 121:13
**interdiction**
20:5,11,12,13
20:15 21:15
22:1,3 23:8
129:16,18,21
130:4 146:12
166:23 183:19
183:20,24
184:3
**interest** 243:4
**interested** 13:3
85:6
**interesting**
121:24

Deputy Martin Molina , III                                          April 18, 2024

**[interestingly - kind]**                                                    Page 25

**interestingly**
  42:22
**interfering**
  155:17
**internal**  26:5
  45:7 232:1,4,5
  232:15 234:21
  237:9
**internally**
  190:16
**interpret**  63:5
  63:9,14,15
  188:11
**interpretation**
  108:16
**interrupt**  32:1
  205:21
**introduce**
  62:25
**introduction**
  14:8
**introductions**
  7:6
**intros**  88:13,15
**investigate**
  20:17 21:3,5
  55:23
**investigated**
  217:16
**investigation**
  10:14 217:19
  232:1
**involve**  234:4
**involved**  81:20
**involvement**
  20:4 234:5
**ipad**  76:20
  132:7

**ironically**
  136:24 196:16
**issue**  86:19
  147:15
**issues**  54:18,21
  118:8
**it'd**  34:23
**item**  96:7

**j**

**jail**  14:17
**january**  25:16
  194:15 196:20
  202:4 212:2,6
  216:20
**javier**  1:8
  242:8
**jazzmen**  1:20
  242:15 243:11
  243:11
**jealous**  62:7
**jet**  105:10
**jireh**  114:5,8,8
  114:11,12,19
**job**  8:10 85:16
  89:4 112:24
**joe**  21:21
**joel**  1:5 21:21
  242:5 244:4
**joint**  64:9
  116:16 224:6
**joke**  4:20 91:16
  155:7
**jokes**  4:18
**joseph**  17:22
**judge**  9:19
**judgment**
  75:10

**july**  14:13
  107:8 215:14
  216:6
**jump**  24:18
  28:12 49:6
  77:13 122:12
  132:21 133:2
**jumped**  138:22
  180:12
**jumping**  28:17
  81:11
**june**  193:7
  214:16,18,19
**juries**  9:24
**jury**  9:20,22
**justice**  2:4
  12:18

**k**

**k**  8:20,21 12:7
  14:22 15:5,17
  21:16 22:2,17
  22:23 23:1,9
  25:7 32:16
  35:16 42:18,20
  42:20 45:10
  52:25,25 55:6
  61:8,9 63:1
  79:11 83:10
  88:10,21 94:17
  102:9,10
  109:10 114:22
  120:14 123:3
  123:18,18
  126:2,3 127:6
  127:7 128:22
  130:3 183:24
  189:14,15

  233:9
**k9software.c...**
  122:25
**kale**  163:11
**keep**  9:17 31:4
  31:7,8 43:11
  52:4,24 67:15
  72:19 73:18
  77:11 78:17
  90:16 99:14
  100:18 123:11
  124:19 137:5
  139:4,13
  154:10 158:3
  159:16 176:7
  182:4 206:12
  238:10
**keeping**  237:18
**keeps**  33:9
  135:8 143:3
**kept**  48:7 71:20
  104:14 180:13
**kevin**  23:3,5
**key**  127:7
**keycard**  100:20
  100:23
**keys**  166:7,8
  173:7
**kids**  76:25
  118:4 160:11
**kilo**  83:13 84:2
  185:21,22
**kilos**  39:25
  63:24 64:2
  206:10,12
**kind**  6:11 7:9
  9:19 13:4 15:6
  21:7 49:8 52:5

62:6 75:1
81:18 102:2
108:19 110:3
113:17 119:14
120:10 121:13
122:7,12
124:21 132:21
133:20 134:10
134:20 136:6
152:15 155:10
156:20 160:17
160:19 169:10
199:14 219:1
228:2
**kit**   230:14
**kits**   210:16
**knew**   41:6,10
41:18 97:9
118:12 121:11
144:24 216:3
233:15
**know**   5:20 7:6
8:5 9:7,12 11:5
12:17 14:4
16:12,20 17:11
18:20,22,24,25
19:2,7 20:4,16
21:10,12,13,14
21:19 22:3,4
22:22 25:6,10
25:10 26:17
27:9,10,11
30:3,9,17 31:5
31:11,13 33:5
33:11,20 34:22
34:25 40:13
41:3,10,25
42:25 43:1,4,6

45:11,14,15,21
46:19,20,22
48:4,15 50:2,3
50:12 53:13,16
53:19 55:25
56:1 57:5
59:10,12 60:7
61:4 62:20
63:16,18,20,21
64:15 67:16
68:20 69:23
72:3,11 73:17
76:25 77:13
78:2 79:8,22
80:3,23,24
81:1,23,24
82:4,16,19
83:16,24,25
84:7 86:1 88:1
89:24 92:12
93:12,23,25
95:1 97:11,13
97:14,19 99:3
99:4,6 101:14
102:16,24
105:10,11
108:5,10,15
109:9,14,17
110:2,12,15,22
111:11,17,21
111:23 112:1,4
112:7,8,10,14
112:21,23
113:2,5,7
114:1,4,16,16
114:18,22
116:14,23
117:10,10

119:12,12
120:3,13,19
123:11 124:11
125:5,19
128:15 129:17
135:8,13 136:1
140:9,9 141:13
141:16 143:17
144:8,15,24
145:2,8,22,25
146:3,6,11,15
146:22,23,24
147:19 148:4
150:12,20,22
154:2,9 157:8
157:12,12
160:6,21
161:23,24
163:15,16
164:11 166:17
166:19 167:17
167:17,23
168:4,13,17,18
172:18 175:6
176:11 179:12
180:25 181:20
185:11,19,22
186:20 187:9
197:16 200:12
200:15 203:20
205:17 209:12
209:17 214:5
215:5 216:11
216:11 219:19
219:23,25
220:16,22,23
221:12,15,16
221:20 223:6

226:12 229:21
231:22,25
232:3,14,17
233:10,23
234:4 235:15
235:17 236:24
237:22 238:16
**knowing**   50:20
**knowledge**
111:25 170:12
170:17
**known**   40:25
41:1,17 47:25
48:2 53:19
54:25 223:21
241:10
**knows**   80:8
82:6 117:12
**kong**   27:19,20
27:22

**l**

**l**   4:16
**lab**   210:8 213:1
230:15
**laced**   67:4
112:9,11
**lack**   31:21
173:15
**lady**   7:21
**laptop**   123:24
124:3
**large**   228:7
**larger**   83:19,20
**late**   232:8
**latex**   151:18
**laugh**   4:19
126:11

Case 5:23-cv-00706-OLG-RBF    Document 119-16    Filed 06/11/25    Page 272 of 304
Deputy Martin Molina , III                                        April 18, 2024
[laughed - locked]                                                    Page 27

laughed 91:17
126:10
laughing 91:16
law 1:22 2:9
laws 221:9
lawsuit 10:21
12:21 13:11
201:5
lawyer 6:25
11:9
lawyers 7:2,2
45:21 91:15
lay 29:5 39:9
179:14
laying 29:7
79:10
laymen's
109:17
layperson
116:22
leading 34:17
164:15
leaf 162:23
163:3 219:13
219:17 225:9
leafs 161:11,12
165:20
leafy 148:7
162:13 208:18
214:21 219:5
221:25
leak 31:25
leake 2:13
31:23 32:6
132:7,10
141:11,19
142:10 238:25

leaning 135:16
learn 14:9
26:10,18,22
32:24 35:14
50:22 84:1
183:20 189:12
learned 32:9,10
32:17 51:2,2
108:9,14
learning 35:25
leash 8:9 65:8
68:17 82:10
leave 21:24
48:20 52:17
53:5 60:13,13
60:15,16,21
leaving 53:19
54:25 60:23
led 122:24
234:8
left 48:8 63:17
120:13,19
161:15 170:21
185:24
legacy 42:19
123:11
legal 163:16
221:12 243:12
244:23
legitimate 5:2
letting 55:11
135:13
level 29:21
license 15:1
146:3,6,13,17
146:20 166:24
167:4,8 168:6
172:3 178:3

life 91:10
lights 52:16
liked 38:25,25
97:9
likes 76:24
likewise 5:24
196:23
limerick
198:13
limit 177:10
limited 177:2
line 17:16
68:18 217:11
225:18 240:2
lines 188:11
lingers 190:20
linked 43:2
linkedin 126:6
list 30:22
107:24 229:6
237:13
listed 105:3
106:13,18,20
107:15,16
132:16 195:9
197:21,23
202:6,22 203:6
203:11,23
204:5,9,20
208:14 236:18
237:12
listen 117:9
118:11 164:25
183:8
listening 79:20
listing 197:1,3
197:5 200:3
202:14

literal 167:14
literally 24:9
26:17 119:13
191:7 216:15
219:13 224:12
231:13 236:22
little 7:16 8:22
13:23 22:6
24:19 28:18
31:16 32:2
39:24 68:7
81:11 83:11
92:15 96:18
105:12 111:8
115:18 116:1
116:17 121:25
124:23,25
125:2 134:11
147:19 160:9
163:19 176:24
180:9,23,24
184:23 216:14
225:5 227:4,21
228:5 230:4
live 168:7
lives 28:5
loc 40:25
local 114:22
located 102:11
location 35:5
41:1,6,17
100:23 167:10
167:15
locations 41:11
lock 166:13
lockbox 97:25
locked 136:8
136:14

**locker** 228:20
**log** 186:13
**long** 14:8,11
  16:4 17:2
  43:22 51:12
  52:1,18 91:15
  110:1,18
  117:20,21
  119:10 176:1
  182:2 234:11
  235:17,18,22
**longer** 88:14
  235:20
**look** 20:13 21:8
  25:1,11 28:24
  34:19 45:25
  61:3 77:17
  105:13,14
  111:24 112:19
  115:25 121:22
  122:8,24 123:1
  163:3,17
  177:13 183:3
  186:6 187:2
  190:9 191:2,5
  195:17 198:24
  204:20 210:7
  214:7 218:6
  219:10
**looked** 230:22
  235:19
**looking** 29:11
  30:16,19,21
  38:17,19 63:22
  105:18 107:7
  130:17,24
  134:20 135:2
  136:24 139:22

  147:10 152:8
  153:15 155:13
  165:8 166:5
  172:15 173:7
  173:14 177:16
  183:3 196:20
  206:22 226:19
  228:24
**looks** 25:12
  42:4 43:13,16
  43:19 88:22
  92:23 102:12
  111:14,21
  112:4 141:4
  160:7,10,17,19
  160:22 170:4
  171:4 184:7
  207:14 219:20
  219:25 220:25
  227:19 228:2
**lost** 102:9
**lot** 5:20,24 8:15
  24:17 25:11
  31:18 53:20
  59:7 62:12
  64:5 69:23
  72:4 78:6,12
  78:18,19 86:17
  99:19 100:6,15
  103:25 104:3
  104:18 111:6
  115:4 117:10
  128:17,18
  143:2 156:23
  162:12 168:20
  174:5 186:3
  205:20,20
  206:3 222:5

  223:23 230:14
  233:17
**loud** 78:11
  102:9 105:11
  170:15
**louder** 165:2
**love** 114:1
  116:22
**low** 30:17,18
  31:1 59:11
  164:24
**lowest** 222:10
**lpr** 146:17,19
**lprs** 146:8,15
  167:3,21 168:3
  171:20 172:4
**lunch** 122:1,4
**lying** 75:3
  151:5

─────── **m** ───────

**m** 4:16,16 23:6
  173:20
**machine** 1:21
**made** 15:4
  47:23 56:17
  84:20 91:15,24
  115:9 207:8
  223:8
**mail** 2:6,11,15
**mailed** 237:16
**main** 27:6
  101:6 126:22
  126:24 127:1,4
  186:21 200:11
**maintained**
  75:20

**majority** 93:20
**make** 4:9,18
  6:1 16:12
  23:21 26:1
  30:12 46:9
  53:10 55:13
  56:14 57:4
  73:19 80:12,14
  100:20 102:17
  110:2 118:25
  143:10,13
  173:2 175:8,8
  179:5 190:9
  197:15 198:12
  198:24 223:19
  237:13
**makes** 8:12,15
  24:17 71:13
  72:4 99:19
  116:1 143:13
  143:25 144:3
**making** 92:1
  116:13,13,14
  117:16 198:6
  199:14
**man** 33:1 55:25
  68:7 70:18
  83:14 116:23
**mandated** 18:8
  18:14,19
**mandatory**
  16:6,6
**manual** 3:11
  87:6 88:1
**march** 22:7
  25:16 147:10
  192:10 197:17
  198:3,10 199:4

Case 5:23-cv-00706-OLG-RBF    Document 119-16    Filed 06/11/25    Page 274 of 304
Deputy Martin Molina , III                                    April 18, 2024
[march - meth]                                                  Page 29

201:19 206:18
207:15,17
211:19 212:11
212:12,16,19
212:22,24
213:5 217:1,3
232:16
**marijuana**
82:1 83:1
85:20,23
108:18 109:20
110:17,18
111:10,16
112:5 121:13
162:8,9 163:17
164:9 206:6
208:14 209:3
209:20 212:19
213:6,20
214:11 216:3
216:21 218:8
219:20,25
221:1,4,6,22
223:10,21
225:6,24
229:12
**marked**  24:21
24:23 33:18
87:7 91:18
115:22 130:15
132:17 177:25
186:4 189:25
199:24 222:19
225:12 226:17
228:22 236:5
**martin**  1:6,13
1:16 3:4 4:1,16
241:1,4,10

242:6,13,17
244:5
**martinez**  21:20
**matter**  18:13
39:24 82:25
88:17 182:10
**matters**  110:14
**max**  15:14 28:3
30:11 66:8
69:5,20 75:23
77:4,6 81:25
81:25 82:16,20
83:8,18 85:9
97:16 98:10,10
98:19 99:15
102:9,10
104:21 109:3
112:8,10,12,21
113:14 114:1
116:10,24
118:6 119:7
121:11 134:2
138:5 139:5
149:21 151:15
176:4 216:7
**max's**  69:2
75:2 176:11
**maximus**  188:6
**mean**  5:11 6:20
12:3 16:9
18:15 19:12
20:15 21:18
22:5,15,17
37:22 38:17,23
39:7,20 40:4,6
40:9 41:5 42:3
42:9 46:8,14
48:21 50:13

53:18 54:2
63:13,19 67:18
68:1 70:3 76:5
76:14,18 79:14
79:15,19 87:21
90:3 95:23
96:10 99:3
105:8 106:9
109:7 135:23
140:8,16 151:3
156:9 162:14
163:3,5,8
170:8 177:7
178:12 179:21
185:6,25
189:15 192:17
205:18,19,24
215:24 222:17
224:9 226:15
230:22,23
**meaning**
182:19
**meaningful**
89:5
**means**  14:5
16:14 39:4,17
40:1,14,22
41:3 46:9
108:11 140:18
222:2
**meant**  5:21
88:16 91:20
107:2 230:23
**measure**
236:20,24
**media**  176:21
**median**  135:7
142:22

**medications**
5:3
**meet**  4:5 46:16
98:4 169:3
**member**  84:9
94:17 128:11
**members**
125:20
**memory**
164:12
**men**  21:23
**mention**  19:18
165:20 187:10
187:13,25
188:21
**mentioned**
19:14 54:21
68:9 122:16,18
156:1 163:18
180:16 235:11
**menus**  34:13
**mess**  37:19
221:22
**message**
128:14
**messaging**
126:5 128:10
**messed**  38:4
42:10 63:18
**messy**  57:11
**met**  11:9,11,25
16:1,1 235:7
**meter**  102:12
**meters**  102:17
**meth**  82:1,25
96:7,15 121:11
200:15 209:17
209:20 227:16

**methampheta...**
64:4 209:6,9
210:3 212:25
216:22 226:23
227:19 228:11
**methampheta...**
216:21
**middle** 69:4
172:7
**mike** 55:4
**miles** 56:1
**mimics** 97:3
**mind** 4:14
31:25 45:18
63:3 71:14
87:3,6 142:4
**mine** 91:23
197:16 234:7
**minute** 122:6
135:24 231:15
**minutes** 127:23
133:2 135:25
141:25 158:7
170:4 184:25
185:8
**misconduct**
217:17
**missed** 29:10
38:5 41:14,14
57:24 70:1
83:13 157:6
198:22
**missing** 71:4
102:22,23
103:16
**misspoke** 88:17
**mistake** 7:1
84:20 91:24

196:16 215:10
215:12 222:15
223:9
**mistakes** 80:12
80:15 196:13
197:15 207:8
**molina** 1:7,13
1:16 3:4,9,13
3:15 4:1,16
63:1 237:18
241:1,4,10
242:7,13,17
244:5
**molina's**
132:16
**moment** 35:12
97:21 101:22
103:18 112:18
159:16 174:23
183:4
**moms** 63:20
**monitored**
23:25
**month** 54:15
79:1 99:21,24
100:5,9 116:2
216:7 218:17
**months** 15:21
16:7 107:9,14
117:24 118:22
120:10 201:21
201:24,24
215:17
**motel** 47:25
48:1,2,2,6
**mouse** 172:12
**mouth** 26:1
40:17 73:3

138:8 141:6
149:17
**mouths** 63:18
**move** 13:10
152:15 158:17
158:17,21
177:14 184:23
**moved** 172:12
**movies** 168:23
168:24
**moving** 71:24
206:7 217:24
230:21
**mueller** 2:14
**multiple**
168:10
**murder** 7:21
7:22
**murders** 7:21
**muted** 131:6,13

| **n** |
|---|

**n** 2:1 3:1 4:16
4:16 23:6
**nail** 226:14
**naked** 228:12
**name** 4:11,14
12:18 123:10
241:12
**named** 10:22
10:25 15:18
**names** 36:2
**narc** 22:17
96:6,11
**narcotic** 39:1
47:17 111:5
117:13 200:6

**narcotics** 27:2
30:13 39:2,21
40:2,7 41:7,9
41:16 44:1,2
46:5,14,15
47:4,5,6 53:22
65:17,18 66:4
66:10,19 68:6
70:15,18 71:1
71:6,7,9,15,23
73:25 77:4,7
78:3,5,17
80:13,15 81:4
81:25 97:13,17
97:23,24 98:15
98:24 99:16
121:6 140:22
172:23 185:24
200:3,15,25
219:23
**narrate** 134:10
134:20 226:12
226:13
**narrative**
113:1,8
**national** 32:15
32:16
**natural** 106:17
**naturally**
106:19
**ncats** 32:11,20
42:24,25 43:1
43:13 46:4
93:6 101:8
122:22
**nearby** 65:11
**necessarily**
20:19 51:6

144:4

**need** 6:2,13
14:9 55:6,8
79:12 88:9
91:19 98:5
120:24 121:5
127:8 131:18
131:25 140:10
142:3 143:8
144:8,15 147:5
168:7 175:10
184:18 191:12
216:14

**needed** 16:19
74:22 83:10

**needs** 31:15
68:6

**neither** 182:24
221:23 243:1

**netting** 160:6,9
160:10,15,18
163:10

**neutralizing**
8:4,7

**never** 42:10
56:17 63:18
80:12 81:7
89:8 97:6,9,9
109:2,3 210:11
220:8,11,19,20
235:5,11 236:7

**new** 21:24 22:4
88:20 95:5
116:24 120:24
168:21 203:12
237:19

**newer** 87:24

**newest** 87:25
106:24

**nice** 4:5,17
15:9 139:4

**night** 236:8

**nine** 201:20,24
216:6,7

**nodding** 6:6

**noises** 78:12

**nonchalant**
30:9

**nonconsent**
74:11

**nonuseable**
157:21

**nonverbal**
74:18

**nope** 45:17
215:11 217:15

**normal** 56:11
99:18 125:3
155:2 176:13

**normally** 124:9
133:20 139:11

**north** 2:4

**nose** 68:4 83:24
136:20

**notary** 241:18

**note** 95:14
195:21 244:10

**noted** 95:3
99:20 188:5
241:2

**notes** 19:15
102:8 112:19
112:25 121:22
144:7 174:24
180:24

**noticed** 47:3

**november**
193:12 194:3,5
194:11 203:2

**number** 3:8
147:8 186:13
200:16,17,19
200:24 210:24
222:21,25
223:2

**numbered** 1:19

**numbers** 45:19
45:20,22 200:9
200:9,10 223:4
236:25

**o**

**o** 4:16

**o'clock** 100:12

**oath** 5:8,10,13
241:11

**obedience**
26:23 27:7
28:16 103:14
103:15 121:7,8

**obedient** 27:14
121:9

**obeys** 77:4,4

**objection** 13:6
80:19 129:10
141:11,19
163:12,14
174:1 199:6
215:22 216:9
217:5 219:15
221:14,19

**objections** 6:16
6:19

**objectors** 6:18

**obligation**
51:23

**observe** 30:21
75:18,23

**observed**
169:11 208:18

**observing**
103:11

**obvious** 38:21

**obviously** 9:3
15:5 26:20
35:3 37:7
114:1 118:1,11
120:24 126:16
154:22 231:22

**occasionally**
135:20

**occurring**
106:17,20

**ochoa** 18:3
22:10 36:21
37:17,23
193:20,21,22

**october** 88:22
91:3 93:15
108:6 189:17
193:17,25
194:23,24
195:3 196:5,7
210:23 218:12
218:24

**odor** 39:2 71:8
71:22 73:2,25
83:21 99:17
108:11,19
109:7,10 110:8
136:8 139:13

143:8 156:16
176:25 190:20
**odors**  83:19
85:10,18 86:12
**offer**  52:3
**office**  14:12,24
19:4 26:2 33:4
51:1 54:7
58:20 93:25
106:3 114:19
124:2,4 125:12
129:5 221:9
234:21 241:14
**officer**  4:21
8:20,21 10:12
10:23 13:3
14:15,17,18,19
15:1,5,17
16:17 22:25
23:2 37:2
52:23 53:21
85:13 109:18
126:2 161:15
181:2 200:10
200:25 242:17
**officers**  125:17
126:6
**offices**  1:22 2:9
**official**  1:6,7,9
151:4 186:18
242:6,7,9
**oh**  10:10 17:3
33:1 57:22
69:1 71:7 84:6
88:1,17 98:9
98:18 103:6
112:19 114:1
118:19 125:7

131:20 133:11
135:2 147:3
149:3,10,15,19
164:4,5,25
172:8 176:2
181:2,2,4,11
199:16 224:8
224:21,21
225:7 227:12
229:14 230:3
237:5
**oil**  229:14,16
**okay**  5:2,7,10
6:3,14,15,22
6:23 7:2,5,10
7:11,19 8:22
9:2,9,12,15,23
10:14,20,25
11:3,12,14,20
12:2,5,10,16
13:10,17,22,25
14:4,16,21
15:22 16:13,22
16:24 17:9,14
17:14,25 19:14
19:24 20:11
21:2,22 22:12
22:20 23:11,13
23:19 24:5,22
25:2,3,5,9,15
26:7,16,25
27:7 28:15
29:2,4,7,13,15
29:24 31:3,19
32:17,21 33:2
33:8,14,19,25
34:3,16,20
35:2,8,11,13

35:18,24 36:9
36:16,22 38:16
39:7,10,13,23
40:1,9,13,16
41:14,22 42:1
42:11 43:3,10
44:4,13,16,21
45:1,13,18,23
46:2,3,20,23
47:3,10,16,21
48:1,3,8,11,21
49:1,23,24
50:2,7 51:8,11
51:22 52:5,18
53:8,15,24
54:12 55:9,20
55:24 56:7,22
57:14,17,20,23
58:25 59:25
60:3,9,12,16
60:22 62:6,11
62:23,24 63:5
64:11,24,25
65:4,7 66:7,18
67:5,13,18
68:8 69:12,16
69:22,24 70:6
70:8,21 71:3
71:10 72:1,10
72:13,23 73:15
74:2,6,14,19
76:23 77:5,10
77:15,16,20,25
78:2,7,10
79:21 80:6,14
80:17 82:2,8
82:19,22 83:14
84:1,6,17 85:6

85:17,22,25,25
86:10,13 87:13
88:7,18,19
89:7,9,15,18
90:3,7,20,20
91:7 92:5,10
92:20 93:13
94:24 95:8,11
96:9,22 97:12
97:21 98:18,18
99:19 100:2,17
100:22 101:25
102:5,7,12,18
102:24 103:6
103:24 104:6
104:11,12,17
104:21 105:9
105:12 106:1
106:23 107:1,6
107:13,18,24
108:9,24 109:2
110:6,12,21,25
111:15 112:1
112:10,18
113:7,10 114:7
115:18 118:20
119:18 120:13
122:15 123:7
124:3 125:1,2
125:5,19,24
126:4,15,21
127:4,12 128:3
129:20 130:7
130:21 131:1,7
131:20,24
132:1,3,6,13
132:25,25
133:11,14

134:14 135:13
135:19 136:5,5
136:9,11,16
137:6,19,21,23
138:13,16,22
139:1,20 140:1
140:4,21 141:1
141:22 142:1
142:15,23
144:9,16,18,25
145:4,5,6,12
145:16,19,22
145:25 147:10
147:16,23
148:9,15
149:12 150:4
150:10 151:6,9
151:10 152:11
152:14 153:5
153:18 154:11
155:13,16,22
158:10,12,20
159:24 160:3
160:14,24
161:2,7 163:16
163:21 164:7,7
164:14 165:12
166:2,24 167:5
167:9,14,22,23
167:25 168:4
168:13,19
170:4,17,21,25
171:17,23
172:2 173:6,19
174:22 175:7
175:16,19
176:11,16,23
177:2,18,20

178:18 179:3
180:3,22,23
181:15 182:9
183:10,15
184:17 185:3
186:5 188:25
189:2,12,23
190:12,24
191:3,25 192:3
192:12,25
194:3 195:6,14
196:23 197:25
198:5 199:12
199:14 200:2
200:21 201:1,7
201:25 202:12
202:19 203:1
203:13,22
204:1 205:21
206:2,20,21,24
207:1,2,4,6,10
207:11,13,17
207:20 208:21
209:2,11,16,21
210:1,4,15,22
211:2,9,11,18
211:23 212:19
212:22 213:4
213:17 214:3
214:16,18,24
215:14 216:25
218:4 219:1,13
219:25 220:14
221:21 222:9
222:16 223:4
224:1,11,11,22
225:1,17,24
226:6,9,18,19

226:22 227:2
228:2,23
229:16 230:4
230:17 232:11
234:4,18
235:14 236:4
236:12,22
237:6
**old** 155:4
**olg** 1:5 242:5
**olvera** 17:24
18:5
**once** 10:3
11:13 16:1,1
27:2 29:19
37:7 44:5
52:16 128:6
137:20 168:1
188:7 194:10
202:8,20,24
203:6,8 207:11
209:2 211:24
216:17,25
235:5
**ones** 27:6 90:19
106:17,24
199:18,22
201:8 205:13
211:22 223:5
237:11
**open** 7:8 23:20
23:22,23,25
24:4,11,14,16
60:23 126:21
126:22 127:1
139:12,14,18
139:19,20
141:6 158:1

159:10 179:1
179:11,12
188:14 201:3
237:18 238:11
**opening** 178:9
179:8
**operated** 88:21
**operating** 88:4
**opinion** 179:14
**opportunity**
238:2
**opposed** 65:25
**opposite** 5:17
126:21
**option** 222:8
230:7
**oral** 1:12,16
232:11 242:12
242:18
**order** 106:24
191:4 207:12
**orders** 24:25
**oregano** 163:1
163:3,8 220:3
**organize**
168:20
**originally**
113:14 114:2
**ounce** 110:17
110:18
**outline** 28:9
**outside** 102:18
117:9 161:5
172:7 188:14
**overwhelming**
83:6,15,21
85:7

Deputy Martin Molina , III

April 18, 2024

**[own - perspective]**

Page 34

| | | | |
|---|---|---|---|
| **own** 16:1,3,5 | **papers** 18:16 | 152:15 153:6 | 64:13 103:12 |
| 25:19 41:12 | 82:14 | 153:19 154:20 | 111:19 140:22 |
| 98:2 101:13 | **paragraph** | 156:19 161:9 | 168:7,25 169:4 |
| 106:8 205:21 | 187:17,19 | 170:22,23 | 185:20 223:23 |
| **owner** 179:10 | **paraphernalia** | 176:20,24 | 233:8,17,18 |
| **owners** 117:18 | 209:13 | 179:18 188:8 | **perceive** |
| | **paraphrasing** | 188:16,17,18 | 144:22 |
| **p** | 138:9 156:11 | 188:20 | **percent** 129:1 |
| **p** 2:1,1 | **parents** 77:2 | **passes** 67:13 | 164:3 174:9 |
| **p.m.** 1:20 236:8 | **park** 98:5 | 69:24 113:9 | **percentage** |
| 237:17 239:2 | 116:9 | **passing** 137:4 | 17:1 |
| **page** 3:2,8 | **parking** 104:18 | 137:10 | **perception** |
| 25:12 45:22 | **parole** 14:18 | **past** 73:23 | 76:8 |
| 46:24 92:3 | 14:18 | 87:14 136:14 | **perfect** 4:11 |
| 94:23 95:11 | **part** 10:5 26:21 | **patrol** 14:19 | 5:13,16 24:17 |
| 101:23,24 | 26:23 35:15 | 46:4 51:10 | 25:9 37:19 |
| 103:19 105:14 | 78:21 85:12 | 146:8 | 96:8 97:15 |
| 106:14 107:20 | 103:11 121:8 | **pause** 134:22 | 107:6 113:10 |
| 187:3,15 191:7 | 134:19 135:22 | 151:13 153:13 | **perfectly** 21:13 |
| 191:8 192:4,10 | 186:11 210:11 | 158:24 171:18 | 43:7 93:13 |
| 192:22 193:2,7 | 235:10 | **paused** 133:20 | 94:3 96:6 |
| 198:14 202:12 | **particularly** | 135:3 156:10 | 176:6 |
| 202:19 203:10 | 6:17 | 172:14 178:7 | **period** 110:5 |
| 203:22 204:1,7 | **parties** 65:3,4 | **pausing** 132:18 | 174:13 214:8 |
| 204:13 207:14 | 243:2 | 152:14 154:18 | 216:2,5,7 |
| 207:18 209:2 | **parts** 62:15 | 158:1,3,20 | **person** 49:3 |
| 212:2,8 213:11 | **party** 242:21 | 172:2 173:15 | 71:5 102:22 |
| 216:14 240:2 | 242:24 | **pc** 2:13 23:15 | 115:14 170:11 |
| 242:22 | **pass** 19:15 31:2 | **peace** 15:1 | 170:12 173:24 |
| **pages** 6:11 | 67:6,12 68:25 | **pears** 160:7 | 241:12 |
| 87:21 105:13 | 70:2,4 112:22 | **pedro** 18:3 | **personal** |
| 202:3 207:24 | 135:17 136:21 | **peers** 233:19 | 125:20 |
| 209:24 216:19 | 137:25 | **pen** 225:14,15 | **personally** |
| **pal** 142:11 | **passed** 17:15 | **people** 32:20 | 49:21 241:10 |
| **palo** 14:25 | 113:2 114:24 | 44:14 48:7 | **persons** 102:23 |
| **paper** 6:12 | **passenger** 67:8 | 51:10 53:20 | **perspective** |
| 15:25 89:18 | 67:9,11 150:14 | 57:5 59:9 | 143:2 |
| | 150:14 152:8 | 62:21 63:16 | |

| | | | |
|---|---|---|---|
| **pet** 105:23 | **piles** 94:6 | 158:25 159:19 | 144:25 151:12 |
| **phased** 78:8 | **pillow** 83:13 | 159:23 165:18 | 155:23 157:16 |
| **phone** 123:22 | **pinky** 226:14 | 169:7 170:20 | 161:11 165:12 |
| 125:9,10,11,14 | **pinpoint** 30:5 | 172:1 173:5,21 | 165:17 179:23 |
| 125:22,24 | 60:8 68:5 | 178:1,14,21 | 183:5 185:10 |
| 155:24 | 143:8,15 | 179:16,25 | 196:10 200:4 |
| **phones** 67:1 | 176:25 | 181:9,23 | 205:5 213:4 |
| 124:6 | **pipe** 209:12,13 | 182:13 183:12 | 216:7 225:20 |
| **photo** 148:9 | **pizza** 163:1 | **playing** 116:12 | **pointed** 169:18 |
| 162:21 174:17 | **place** 104:7 | 154:10 | 196:19 |
| 220:11,25 | 113:7 168:21 | **plays** 83:4 | **pointing** 77:17 |
| **photograph** | 169:3 | 143:7 | 138:16 |
| 3:20 228:14 | **places** 31:14 | **playstation** | **poke** 57:8 |
| **photos** 130:8 | 68:8 | 77:1 | **pole** 66:17 |
| **phrase** 30:2 | **plaintiff** 1:3,17 | **please** 4:15 | **police** 4:21 |
| 108:11 109:7,9 | 2:2 4:13 10:20 | 19:18 20:7 | 10:12,23 15:14 |
| 111:11 113:18 | 242:3 | 21:17 25:1,25 | 50:19 101:6 |
| **physical** | **plaintiffs** 5:18 | 30:14,24 50:24 | 106:3 114:12 |
| 140:23 | **planes** 105:10 | 59:8 71:14 | 114:17 124:11 |
| **physically** | **plate** 146:3,6 | 78:23 83:5 | 125:17 161:15 |
| 155:20 | 146:14,17,20 | 90:16 92:7 | 179:19 |
| **pick** 71:2,12 | 166:24 167:4,8 | 101:24 129:24 | **policies** 13:2 |
| 98:4 111:9 | 172:4 178:3 | 135:13 137:1 | 26:9 89:22 |
| 223:13,14 | **plates** 168:6 | 139:9 142:17 | 91:8 |
| 224:13 | **play** 28:12 65:9 | 147:2 153:14 | **policy** 3:11 |
| **picked** 116:8 | 77:3 137:19 | 187:16 188:12 | 85:3,3 87:6 |
| **picking** 71:22 | 141:23 147:14 | 194:21 197:16 | 88:1,20 89:4,8 |
| 73:25 | 158:15,23 | 198:7,14 | 89:14,14 90:5 |
| **picture** 169:15 | 159:16 171:24 | 204:13 231:15 | 93:14 94:10 |
| **pictures** 9:5 | 181:20 | **plus** 176:9 | 95:5 107:24 |
| 235:24 | **played** 130:20 | **pocket** 117:14 | 108:3,4,6 |
| **piece** 6:11 49:9 | 133:3,15,17 | **point** 19:19 | 134:5 189:16 |
| 49:9 89:18 | 134:9 137:7 | 20:6 33:25 | 192:20 |
| 103:16 151:2 | 140:3 142:14 | 39:13 45:19 | **polite** 171:1 |
| 228:1 | 144:11 148:16 | 69:20 80:5 | **pop** 91:20 |
| **pieces** 47:14 | 148:20 151:14 | 81:5,6 96:7,19 | 139:10 |
| 227:25 235:21 | 152:6 153:3 | 121:25 125:16 | **pops** 8:8 |
| | 156:8 157:24 | 127:22 129:22 | |

**portion** 187:2
234:14
**posession** 3:25
**position** 21:24
64:25
**positions** 14:14
**positive** 80:18
80:21,24 139:3
149:25 190:17
191:17 215:18
**positively**
149:22
**positives** 173:2
**possession**
48:10 213:22
**possibility**
157:9 172:18
**possible** 127:12
167:18 198:22
199:10 218:23
**potential** 8:11
30:23
**potentially**
21:8 54:23
71:4 102:21
103:1
**power** 69:17
122:3 151:11
151:13
**powerpoint**
61:8
**practice** 49:19
49:20 139:11
185:19
**practices** 61:2
**pre** 108:6
**precinct** 124:1

**prefer** 60:3
87:12 96:23
132:23
**preference**
122:4
**prep** 238:1,1
**prepare** 11:10
**prepared** 18:21
**pres** 39:17
**prescription**
5:3
**presence** 38:18
42:8 202:5
**present** 35:10
39:18,20,21
40:1,20 194:19
194:20 195:2,7
197:18 202:15
202:21 203:4
203:23 204:2,9
204:17,23
229:4
**press** 171:24
**presumably**
69:6 133:11
**pretty** 8:1
12:25 15:5
34:22 68:23
85:16 89:25
110:22 116:15
129:3 148:21
153:6 154:18
156:11 178:3
203:15
**prevent** 5:3
**previous**
143:20 211:2
211:22

**previously**
143:20
**prewritten**
89:22
**primary** 23:24
**printout** 12:7
**printouts** 92:13
**prints** 34:21
183:18
**prior** 21:18
35:16 85:11
137:1
**priors** 53:21
**pro** 123:12,13
123:14,14,17
123:18,18,19
**probable** 138:3
138:3
**probably** 9:16
45:14 47:7,10
59:6 60:20
69:18 72:5
99:25 105:12
135:3,10
155:18,21
176:10 195:15
195:16 213:21
222:14 225:9
230:7 231:1
236:1
**problem** 48:12
79:5 80:7,7
84:15,16,23
**problems**
44:15 81:10,12
81:15 84:8
116:15

**procedure** 1:24
88:4 185:13
**proceedings**
239:2
**process** 18:2
23:13 26:21
58:10 82:9
117:20 139:9
**produced** 1:17
**production**
124:8 201:7
214:6 237:8
**promise** 57:13
92:3
**proof** 76:17
**proofing**
137:24
**proper** 4:9
**protection** 8:1
**protocol** 55:3
**proved** 241:11
**provided** 24:24
24:25 190:3,6
**provisions** 1:25
**proximity**
136:7
**pseudo** 97:1,2
**public** 201:3
241:18
**pull** 22:23
48:13 59:24
65:9 68:20
147:1 149:7
154:12 160:3
162:17 185:18
195:18 200:5
200:12,24
235:14

**pulled** 7:22
33:10 71:18
100:14,14
160:24 233:9
233:12
**pulling** 73:16
117:15 150:13
207:7
**pulls** 68:24
**pure** 36:22
97:14
**purely** 26:5
69:14
**purpose** 58:13
58:15 66:8
115:19 124:23
151:7
**purposes** 59:5
106:8 161:14
241:13
**pursuant** 1:23
242:19
**pursuits**
100:15
**push** 22:6
136:18 143:8
156:16 185:15
**pushing** 71:23
73:2,25 77:11
134:24 138:11
**put** 14:1 26:1
29:17 34:24
35:7 39:3
40:16 41:16,17
45:21 48:15,23
65:8 68:4 73:3
81:21 85:14
96:16,18 98:5

100:4,23
107:23 117:17
124:17 125:16
136:20 138:8
151:15 152:2
164:24 171:1,2
176:22 185:20
188:14,17
195:15,18
200:25 202:15
207:11 211:3
221:3 222:25
223:10,20
224:2,5,17
225:3 228:20
238:7
**putting** 151:18
170:5 208:5
221:24

**q**

**qualification**
120:4
**qualify** 119:16
**quantities** 85:9
86:4
**quantity** 83:3
83:15 156:25
157:6,16,22
197:3,23 208:6
226:10 228:8
233:24
**question** 4:7
7:8,9 11:3
12:16,20 59:7
69:1 76:6 86:1
105:6 111:2
119:3 122:17

131:14 145:19
149:3 152:21
152:24 187:9
236:7
**questions** 5:21
5:25 9:6 28:10
34:17 39:14
47:14 57:17
88:16 119:4
122:14 176:3
233:18 236:17
237:6 238:22
238:24 239:1
**quick** 119:24
132:13
**quickly** 33:15
45:25 110:23
130:10
**quiet** 233:15,16
**quite** 121:25
130:10 141:4
175:2 177:9
179:13 182:2
182:10 189:21
237:9
**quiz** 89:3 91:21
107:3
**quote** 183:6
**quoting** 145:13

**r**

**r** 2:1 4:16 23:6
**radar** 153:25
**radio** 23:17,21
23:23 126:20
**rainbow** 155:5
**raise** 30:12
69:17 92:7

**ran** 70:17,20
71:18 83:10
128:2
**random** 61:20
**range** 119:16
120:4
**rare** 210:14
**rasmuessen**
23:3,5
**rather** 42:13
97:13 101:20
122:2 187:3
196:4
**raymond** 36:8
**rbf** 1:5 242:5
**reach** 45:18
**reaching**
154:11
**reacted** 157:13
**read** 12:22
87:18 102:1,8
147:7 187:16
187:17,19
201:18,18
241:1 244:9
**reader** 146:20
166:24 178:3
**readers** 146:4,6
146:14,17
167:4,18
**readily** 43:11
**reading** 25:25
46:3,5 96:14
102:13 205:6
**ready** 6:14
87:9 92:10
95:13 149:7
187:4 207:2

**real**  63:23
  87:22 97:19
  108:5 119:24
  127:3 139:12
  148:4 157:9
  168:24 187:9
**realize**  34:16
  81:10 88:16
  128:17
**really**  4:20
  5:19 9:7 12:17
  13:1,2,3,9 15:9
  18:23,23 27:24
  35:7 57:11,11
  57:19 63:15
  64:5 70:3,4,8
  72:20 75:17
  86:18 89:12
  92:7,7,7
  102:14 105:11
  107:22 109:14
  110:13 118:23
  119:25 120:11
  121:6,6 122:11
  140:13 141:25
  143:2 172:25
  177:9 179:13
  205:24,25
  219:2,17,18
  221:22 222:4
  231:21 237:23
**rear**  138:19
  154:19 170:23
**reason**  4:21
  41:22 45:15
  55:10 59:13
  64:19 99:2
  115:20 131:20

  149:21 151:25
  165:13 176:7
  240:2 244:11
**reasonable**
  23:16 52:23
  53:11,12,21
  54:23 55:16,22
**reasons**  107:19
  242:23
**recall**  8:18 9:7
  18:10 42:9,19
  139:18,22
  145:21 147:21
  147:23 148:1
  150:9 154:8
  195:16 205:20
  232:8 235:16
**recalls**  27:3
**receipt**  242:22
  244:17
**received**  25:6
  236:8 237:17
  237:21
**recent**  204:8
**recently**  126:1
  143:22 163:24
**recess**  87:4
  122:9 174:25
  184:21 231:17
**recollection**
  128:16 150:7
  164:8 179:5
  205:18
**record**  1:25
  4:15 6:19 18:9
  28:14 33:16,17
  42:2 68:15
  77:21 88:19

  105:18 122:14
  122:25 126:10
  130:14,16,21
  132:15 133:19
  134:1 141:7,21
  147:7 149:20
  151:2,15
  153:18,23
  154:15 156:10
  162:7 165:4
  172:9,12 173:6
  173:22 174:24
  178:2 181:3
  186:16 187:3
  189:3 195:3
  196:20 204:4
  204:15 205:19
  206:19 228:24
  237:16 238:7
  242:18 243:4
**recorded**
  232:12
**recording**
  44:11 136:1
**records**  3:10
  33:9 36:18
  46:21 92:21
  95:24 97:1
  107:8 112:20
  113:11 201:3,3
  203:17 207:9
  210:25 211:13
  230:22 236:3
**red**  155:5
  158:18,22,22
  159:17 225:14
  225:15

**reenforcement**
  149:25
**refamiliarize**
  91:20 187:1
**refer**  4:8 45:20
  45:21 111:16
  126:25 135:4
**reference**  76:24
  200:17
**referenced**
  244:6
**referring**
  111:17 145:2
  146:19 149:19
  153:18 159:18
  160:1 168:14
  173:17
**reflect**  126:10
  141:7
**reflection**
  137:15 139:23
  178:16,18,23
  182:7,10
**refreshed**
  164:12
**refusal**  63:6
**refuse**  55:15
  56:5
**refuses**  56:4
**regardless**  34:5
  65:22 94:10
  190:24 201:9
  236:25
**registration**
  243:13
**regular**  173:23
  185:12

related 32:23
125:18 243:1
relationship
115:14,16
relative 243:3
relatively
143:22 165:8
release 42:2
releasing 156:2
reliable 143:11
remainder
43:14
remains 94:11
remember 5:12
8:17,23,23
13:15,16,20,21
14:1 42:18
61:8,9 72:7
89:1 94:22
96:14 117:12
125:1,25
127:12,14,16
127:19,21,25
127:25 128:3,9
128:13 147:25
150:15 153:12
153:14 154:13
154:17 159:10
159:11 160:11
165:16 178:7,8
179:7 181:21
185:1 186:25
215:1 218:17
remembering
5:4
removed 158:1
rene 18:3 22:9
36:21 37:17

repeatedly
147:13
rephrase 6:2
95:17 109:8
replaying
153:5
report 3:12
12:1,2,5 33:21
34:14 40:22
43:1 96:14
103:20 115:25
147:2,11 186:6
186:7,16,18,22
187:2,10,18
188:6,23 192:1
195:17 196:3
197:9 200:11
200:17,24
214:5 226:13
236:23
reported 1:21
40:19
reporter 3:25
6:7 8:6 15:3
22:11 23:4
32:12 123:16
146:16 198:12
242:15
reporter's
242:12
reports 3:13
32:19 33:12
34:4 36:12
37:25 38:11
46:18 63:24
90:11,14 93:16
122:19,20
189:5,10 190:3

199:17 200:5
201:19 211:7
214:7,7 235:3
237:10,11,19
represent 93:4
93:18 128:15
143:3 144:18
represented
94:16
represents 4:12
requested
242:21,24
requesting
127:6
requests
128:22
require 94:11
107:24
required 16:10
19:3,8 78:25
90:11,13
107:22
requirement
90:8
requirements
93:14
requires 75:10
reserve 238:23
238:25
residual 109:7
109:10 111:1
residue 111:8
161:18 174:5
209:10,14
resisting
213:25
respect 4:9
51:12 64:24,25

94:7 117:16
124:10 171:4
196:13 203:18
206:15
respectfully
227:5
respond 145:7
rest 56:25
restroom 65:10
65:12 87:3
restrooms
122:7
retraining
121:5
return 244:13
244:16
returned
242:21,22
reverse 106:24
review 6:10,13
11:23 12:7,13
96:24 174:24
175:9 207:3
238:2 244:7
reviewed 12:10
72:9 87:14
128:5 189:22
190:7 236:11
236:14
reviewing
87:22 211:4
revised 87:17
87:24
rewinds 131:8
rid 14:9
rides 117:7
ridiculously
88:14

| | | | |
|---|---|---|---|
| **right** 6:12,18 | 111:19,21 | 171:6,16 173:3 | **rolled** 59:19,19 |
| 8:13 10:15 | 112:25 113:20 | 173:24 174:5 | 60:4,10 109:25 |
| 13:20 16:9 | 113:23,25 | 174:13 175:4 | 227:12 |
| 19:2 20:22 | 115:16 116:21 | 176:9 178:16 | **rolling** 53:17 |
| 25:13,15,23,25 | 117:3,3,18,19 | 178:19 179:19 | **rolls** 53:2,4 |
| 26:14,20 28:3 | 117:24 118:18 | 181:1 182:1,11 | **room** 28:23 |
| 28:7,15,21,24 | 119:8 120:15 | 184:1,3,5,7,25 | 29:1 78:11 |
| 29:5,8,22 30:7 | 120:21,23 | 185:4,17 | **rope** 149:8,15 |
| 33:12,23 40:20 | 121:3,11,14,19 | 186:18 196:1 | **roughly** 15:20 |
| 40:23 43:20 | 122:20 123:3 | 197:6,7 201:16 | **row** 45:4 |
| 44:19 46:4 | 125:7 126:12 | 203:20 205:14 | **rows** 104:10,10 |
| 47:1,4 48:10 | 129:18 130:17 | 206:1,6,13 | 104:11 |
| 50:13,13 52:12 | 132:19,20 | 208:11 210:25 | **rude** 96:8 |
| 56:13 58:11 | 135:17 137:10 | 213:23 215:10 | 226:15 |
| 61:16,21,24 | 137:17 138:7 | 215:12 221:1,7 | **ruiz** 36:8,9 |
| 62:2 63:23,24 | 138:24,25 | 221:13,16,18 | **rule** 242:20 |
| 64:6,9,17 | 139:20 140:10 | 222:6,22 223:8 | **rules** 1:24 |
| 65:24 66:1,3 | 141:14 144:6,9 | 223:24 225:10 | **run** 20:12,12 |
| 66:14,22 67:3 | 145:8 147:6,6 | 226:4,16 227:9 | 27:10 28:21 |
| 67:4 68:7,13 | 148:4,18 | 228:3,5 229:12 | 30:25 41:16 |
| 69:6 70:19 | 149:18,23 | 229:14 231:23 | 48:14 49:22,23 |
| 72:2,21 73:6 | 151:1,6,16,18 | 233:16 237:4 | 50:1,2,6,12 |
| 73:13 74:12 | 151:21 153:17 | **rights** 10:22 | 51:2,6 57:6,10 |
| 75:21,24 76:9 | 154:1,9,25 | 11:1 | 58:3,5,6 60:4 |
| 76:16 77:8,8 | 155:8,11,14 | **rms** 186:8 | 60:21 63:3,16 |
| 77:14 78:16 | 156:6 157:25 | 195:18 | 65:2 67:10,11 |
| 80:10 84:18,21 | 158:8,11,17,17 | **roach** 162:5,7 | 71:19 73:14 |
| 84:24 85:4 | 158:19 159:1,3 | **road** 2:4 61:13 | 74:4 85:15 |
| 86:2,21 87:14 | 159:5,5,8,12 | 102:4 130:23 | 104:13 114:8 |
| 90:18 91:23 | 159:14 160:12 | 152:3 | 185:13 200:9,9 |
| 92:16,21,24 | 160:22,25 | **rock** 227:4,25 | 200:10,24 |
| 97:23 98:8 | 161:11 162:12 | **role** 17:21 | **rundown** 47:20 |
| 99:9,12,25 | 163:11,19 | 19:21 54:6 | 62:20 |
| 101:9,18,23 | 164:17,19 | 115:11 | **running** 12:12 |
| 103:1,12 | 165:2,21 166:4 | **roll** 50:10 | 13:16 48:12 |
| 105:15,20 | 166:8,12 | 52:11 59:9,10 | 70:11,15 73:18 |
| 107:9 108:2 | 168:11,25 | 59:21 60:1 | 104:14 134:15 |
| 109:4 110:9 | 169:4 170:4 | 139:12 | |

| | | | |
|---|---|---|---|
| **rush** 237:25 | 69:5 93:10 | **schott's** 12:11 | **searched** |
| **s** | 99:10 123:11 | 13:12 43:9 | 134:17 188:18 |
| **s** 1:22 2:1,8,9 | 130:5 137:1 | 72:2 122:12 | **searchers** |
| 3:7 23:6,6,6 | 142:2,2 144:25 | 126:16 217:13 | 100:15 |
| 173:20 243:11 | 181:2,4 182:17 | **screen** 32:1 | **searches** 27:1,1 |
| **sac** 14:25 | 183:8 235:10 | 42:5 132:10 | 51:17 59:11 |
| **sack** 83:13 | **says** 18:9,11 | **screenshots** | 61:6 118:16 |
| **saenz** 2:9 | 41:22 42:7,8 | 123:1 124:10 | 130:3 135:15 |
| **safe** 98:4 152:3 | 55:5 62:10 | **screw** 84:14 | **searching** 9:4 |
| **safest** 57:10 | 82:14 89:19 | **scroll** 107:3 | 30:17 71:24 |
| **safety** 50:10 | 96:6 102:8 | 210:18 | 84:5 99:9 |
| 57:15 59:5,15 | 105:4 113:1 | **seal** 241:14 | 152:8 158:11 |
| 59:15,15,16 | 123:3,10 144:7 | **sealed** 99:5,5,6 | 166:3 171:5,8 |
| **salazar** 1:8 | 204:21 205:19 | 99:9 | 171:11,12 |
| 242:8 | 210:7 213:16 | **search** 3:15 | 174:10 208:22 |
| **salt** 227:22 | 215:6 216:3 | 8:18 9:8,19 | 218:22 |
| **san** 1:2,23 2:10 | 222:21 224:5 | 13:12,18 30:20 | **searchs** 15:24 |
| 242:2 | 230:10 | 30:22 34:24 | **seat** 48:24 |
| **sanctioned** | **scale** 223:13,13 | 47:17 49:14 | 147:20 150:3 |
| 232:24 | 223:17 224:17 | 56:2 57:21 | 152:9,15 153:6 |
| **satisfactorily** | **scanned** 146:7 | 58:4,6,11,13 | 153:16,19,19 |
| 26:13 | 146:8 167:11 | 58:15,18,23 | 154:16,19 |
| **satisfying** | **scene** 47:17 | 59:1,22 62:23 | 155:10,13,15 |
| 29:19 | 56:19,24 62:8 | 63:12 65:1 | 158:1,2,18,19 |
| **saw** 31:5 48:6 | **scenes** 175:24 | 68:4 69:4 | 159:11,13,14 |
| 70:19 75:12 | **scent** 39:2 | 74:12 79:22 | 161:8,9 162:15 |
| 96:24,25 107:7 | 96:11 97:4 | 83:10 84:8 | 162:24 165:6 |
| 116:24 147:24 | 99:12 102:9,10 | 96:12 130:9 | 166:12 169:18 |
| 159:1 164:11 | **scented** 96:7 | 144:1 148:13 | 171:1 173:7,8 |
| 164:12 165:9 | **scenting** 34:25 | 151:21 152:17 | 176:20 177:15 |
| 170:15 178:22 | 134:13,15 | 164:9 170:7,14 | 178:9 179:1,18 |
| 178:24 181:18 | **schooling** | 176:12 177:3 | 180:12 185:14 |
| 208:13 219:16 | 14:24 | 177:10,11,17 | 185:23 188:16 |
| 223:4,13 | **schools** 183:20 | 184:1,19,23,25 | 188:17,20 |
| 228:10 | **schott** 1:3 4:12 | 185:14,19 | 229:8 |
| **saying** 4:14 | 133:23 231:22 | 187:23 204:21 | **seats** 14:2 |
| 52:7 54:2 69:4 | 242:3 244:4 | 204:24 213:1 | 148:3,4 |
| | | 233:19 234:14 | |

| | | | |
|---|---|---|---|
| **second** 31:9 | 151:8 152:11 | 150:7 161:10 | **sets** 96:1 |
| 45:14 67:12,16 | 152:19,19 | 165:23 171:11 | **settings** 135:25 |
| 70:2 105:1 | 154:6,10,22 | 174:4 200:1 | **seven** 117:24 |
| 112:20,23 | 155:4 158:2,4 | 220:19,20 | 118:22 198:9 |
| 113:9 130:11 | 159:6,16,17 | 221:24 223:21 | **several** 142:24 |
| 130:18 153:5 | 161:4 166:2,2 | 226:6,9 237:3 | 158:7,15 |
| 159:21,21 | 166:7 169:21 | **sees** 183:18 | 198:25 201:11 |
| 174:24 177:21 | 171:19 173:13 | **selling** 53:23 | 207:23 215:16 |
| 178:13 180:22 | 173:15 175:2 | **semi** 10:11 | **shadow** 25:23 |
| **secondary** | 175:10 177:13 | **send** 44:12 | **shadowed** |
| 137:24 | 177:14 178:4 | 237:14 | 16:11 51:14 |
| **seconds** 131:6 | 178:12,15,23 | **sense** 6:1 8:12 | **shake** 13:21 |
| 131:8,10,11,20 | 179:3,17 | 8:15 23:21 | 14:5 147:18 |
| 133:4,10,12,16 | 184:11,17 | 24:9,18 34:2 | 163:3 165:21 |
| 133:20 134:12 | 187:22 195:6,9 | 47:11 49:11 | 173:14 208:16 |
| 135:4,19 140:5 | 197:17 199:3 | 57:14 71:13 | 214:22 222:11 |
| 155:22 158:4,7 | 200:11,23,25 | 72:4 73:20 | **shaking** 6:6 |
| 158:24 178:7 | 201:23 210:17 | 99:19 116:1 | **sharpest** |
| 178:19,23 | 211:23,24 | 118:25 121:16 | 225:20 |
| 180:3 | 214:4 222:21 | 124:21 130:18 | **sheet** 244:11 |
| **see** 8:4 30:17 | 224:7 233:11 | 132:14 177:9 | **sheets** 106:18 |
| 32:15 38:18 | 236:14,25 | 222:2 225:5 | **shepherd** 15:12 |
| 61:13 62:10 | **seeing** 42:9 | **sent** 45:8 46:14 | **sheriff** 109:19 |
| 67:15 70:22 | 83:23 92:8 | 89:10 244:14 | 219:22 |
| 79:9 85:15 | 93:11 106:13 | **september** | **sheriff's** 14:12 |
| 93:18 96:6 | 139:22 | 193:13 | 14:24 19:4 |
| 102:15,19,21 | **seem** 70:9 | **sergeant** 19:25 | 26:2 45:9 51:1 |
| 103:25 105:3,4 | **seemed** 116:2 | 19:25 21:25 | 54:6 61:21 |
| 107:4,4,21 | 133:24 | 22:1,7 36:2 | 82:5 84:9,17 |
| 108:19 111:7 | **seems** 6:24 | 37:8,11 193:20 | 94:18 106:3,12 |
| 116:14 119:17 | 15:5 46:3,23 | 193:21,22 | 114:18 125:12 |
| 133:11 134:17 | 46:24 50:13,13 | **series** 211:13 | 129:5 221:9 |
| 135:18 136:13 | 59:18 100:6 | **seriously** | 234:19,21 |
| 136:13,21 | 120:9 134:1 | 237:24 | **sheriffs** 101:11 |
| 137:4,14,17 | 171:1 185:8 | **set** 26:9,9 44:5 | **shift** 87:20 |
| 139:15,23 | 188:6 | 60:19,20 79:4 | 93:23 |
| 141:6 148:14 | **seen** 63:23 | 104:11,24 | **shinny** 182:12 |
| 149:17,19 | 92:13,19,20 | | |

**shmutz** 173:16
173:16,20,23
220:5
**short** 100:16
**shorter** 92:18
**shorthand** 1:22
242:15
**shot** 153:6
154:4,19
169:13 178:3
**show** 6:12
16:12,22 17:1
24:19 33:4,14
96:19 124:22
130:7,11
132:22,24
136:10 171:13
171:19,25
175:11,19,20
175:25 177:18
186:2,5 199:8
220:25 224:22
**showed** 17:14
107:20 222:14
**showing** 4:9
24:22 55:12
115:20 132:10
165:13
**shown** 165:24
184:14
**shows** 171:16
171:18 186:8
**shut** 130:23
131:15
**sic** 189:17
**sick** 79:24
**side** 5:17,18
67:9,9,10,11

127:3 138:19
139:3 150:14
150:15 152:2,8
153:19 154:19
156:19,20
170:8,9,22
176:19,24
179:18 188:7,8
188:17,18
230:21,21
**sign** 15:25
47:24 48:6
52:12 53:2,4,7
53:18 90:11,13
90:21 94:5
189:17 191:25
192:18 193:22
244:12
**signature**
94:11 95:20
194:7 240:1
241:1 242:20
242:22
**signatures**
93:19
**signed** 18:15
18:18 93:16
95:15,18,18,19
96:3 192:7,12
192:14,17,25
193:5,10,15
194:1,13,18,19
195:22 196:7
196:14,17
197:8,12,25
198:8 202:8,17
202:24 203:8
203:16 208:2

210:24 212:3,5
212:12,14,17
212:20 213:6
214:13 218:10
218:11 244:19
**significant**
157:19
**similar** 89:25
92:17 112:5
129:4 133:18
165:9
**simple** 14:1
**simply** 15:7
**simultaneously**
22:2
**single** 38:9,11
56:20 85:4
173:24 206:17
215:17 220:11
238:18
**sir** 4:6 7:4
17:17 25:8,17
39:16 74:25
96:5 97:18
134:7 140:2
154:14 157:23
160:2 165:7
166:1 173:4,25
174:14,21
176:15 184:2,4
184:6 187:5
188:24 198:2
205:4 227:7
234:15,17
**sit** 29:4 33:3
39:8 69:2,6,11
87:17 117:9
132:20 175:9

**sitting** 5:16
19:2 25:5 29:8
59:10 75:3
133:25 135:18
136:6,23 137:9
145:25 157:5,9
166:19 168:9
168:13,16
221:13
**situation** 16:18
56:4 64:17
180:17 202:4
202:20 208:24
229:1
**situations**
33:10
**six** 17:4,4,5
103:4,8 117:24
118:22 120:10
197:8 198:9
216:6
**size** 226:14
**sized** 227:4
**skip** 58:10
182:1 183:1,1
**slack** 68:22,23
68:25
**slide** 68:21
**slight** 135:9
**slightly** 122:3
138:11
**sloppy** 27:12
**slow** 139:12
**slowly** 139:10
**small** 13:23
86:3 159:7,7
219:18 224:12
227:20

smaller  223:9
smell  72:24
  81:1,2 85:7
  111:5 121:11
  144:4,5 177:9
smells  81:2
  185:18
smiling  141:5,8
smoke  110:18
  111:19
smoked  110:22
  223:24
smokes  190:19
smoking  224:6
  224:8,9
sniff  58:15
  74:10 185:3
sniffs  130:3
software  32:18
  32:22,24 34:9
  93:2,6 122:16
  122:18 123:2,7
  123:10
soledad  1:23
  2:10
solid  228:1
solutions
  243:12 244:23
somebody
  26:20 27:5
  61:14 63:17
  110:22 144:23
  190:19 213:18
somerset  45:11
  104:7
sop  88:2
sorry  10:5,10
  17:3,18 19:15

20:25,25 36:17
36:22 37:13,16
56:8,10 69:9
76:5 78:21
84:3 88:2,3,11
100:5,7 107:12
111:3 112:19
115:2 118:25
119:1 148:17
152:24 164:25
169:14 175:6
176:2 182:6
217:10 218:15
227:13 230:24
233:13
sort  34:13
  40:22 43:11
  82:4 86:4
  104:2 105:6
  107:18 121:19
  123:9 124:22
  126:4 128:8
  131:11 153:20
  160:3,22
  172:16 175:23
  177:8 184:23
  186:17,20
  203:19 211:9
sound  130:22
  130:23 133:7
  153:25
sounded  71:3
  72:1 169:10
sounds  6:8
  14:7 45:24
  85:6 123:14
  133:12 144:17
  166:6 181:2,3

183:7
source  29:16
  29:17 144:2
speak  11:14,17
  11:20 24:2
  126:5 179:4
  211:6
speaker  76:19
speaking  133:5
  148:25 155:23
spears  12:5
  186:5,7 195:18
  200:6,13,24
  214:7 237:11
specific  164:15
specifically
  28:10 30:10
  72:2 82:14
  105:13,14
  111:10 127:13
  128:11
specs  161:12
speculate  142:3
speech  181:12
speed  131:19
  131:21
speeding  56:3
spelling  4:14
spend  87:19
  95:5
spent  87:22
spoken  32:8
  51:19 65:4
spot  31:10
spotter  7:17,24
  8:2,3 49:5
spotter's  8:10

spurs  62:1
squad  22:2
square  185:9
stamp  45:15,20
  130:17 198:18
  204:15 205:8
stamped
  100:25
stamps  94:22
stand  48:25
  49:7 58:3
  128:4
standard  55:3
standards  46:5
  46:16
standing
  226:15
start  27:12
  29:1 30:25
  31:11 41:15
  65:13 67:7,9
  67:17 74:4
  76:21 77:12
  86:11,12 87:10
  100:17 102:16
  104:12 117:13
  133:1
started  18:2
  35:3 42:20
  70:16 82:9
  83:17,18,19,21
  83:22 117:14
  188:15 233:14
  236:10
starts  30:16,25
  131:12 144:14
  177:15

**state** 1:21
142:3 221:9,13
221:17 241:8
241:18 242:15
**stated** 1:25
**statement**
232:10,14
**statements**
232:9 237:10
**states** 1:1
233:21 242:1
**status** 220:22
**stay** 27:9 29:3
29:3,18 48:18
48:21 233:16
**stayed** 16:11
233:14
**staying** 77:8
117:11
**stays** 124:3
**stem** 225:10
**step** 16:17 50:9
52:8 60:2
**stepped** 162:24
219:14
**stick** 67:22
195:16
**sticking** 112:20
**sticks** 110:8
**stock** 140:20
**stop** 9:4 12:4
12:11 13:12,12
20:10 21:18
23:15 28:21
34:5 41:20
47:11,24,24
48:5,6 49:13
52:12,19,22

53:2,4,7,18
55:23 56:1
61:24 65:12
70:12 71:15
72:2 85:12
122:13 124:21
126:13,16
127:13,25
128:11 151:11
158:6 185:12
208:23 217:14
230:2 231:23
234:11
**stopped** 47:20
48:8 62:19
109:21 136:11
136:25 144:7
185:8
**stopping** 47:24
**stops** 17:5,7,8
17:12 25:22
31:18 51:2
53:25 54:3
128:22 129:1
130:1
**store** 18:24
163:11
**strange** 169:12
**street** 2:10
131:9 206:13
243:13
**strikes** 106:1
186:17 190:17
198:24
**strong** 115:11
156:16
**stronger** 85:10

**struggling**
222:5
**stuff** 15:24
20:19 42:17
43:2 61:20
63:23 64:5
82:13,14 113:1
118:4 142:10
155:2 161:15
161:25 168:8
173:24 203:15
229:19,20
233:11 235:21
**stupid** 59:7
88:14
**styled** 1:18
**subject** 108:15
**subjective** 76:3
128:18
**subjectively**
75:18
**submitted**
89:13
**subs** 39:17
**subscribed**
241:12 243:5
**substance**
35:10 38:18
39:18,20,21
40:1,20 42:7
148:7 151:3
160:25 162:13
170:13 194:19
194:20 195:2,6
195:10,12
196:10,24
197:1,3,18,21
202:5,15,21

203:3,11,19,23
204:2,5,9,17
204:20,23
214:21 219:6
221:12,17,25
225:25 229:4
**substances**
4:25 82:17,20
111:24 112:13
163:17 172:19
205:12 208:19
**substantiated**
40:9
**substantive**
236:16
**sued** 128:4
**suffer** 4:19
**suggest** 79:14
**suggesting** 24:8
57:24 86:2
**suit** 10:22 11:1
13:11 231:23
**suite** 1:23 2:4
2:10,14 243:13
**summertime**
117:23 118:6
118:21
**supervision**
20:3
**supervisor**
17:19,23 18:1
19:19 20:8
22:4 25:21
35:19 36:18,24
37:9,15,16,16
37:23 79:11
81:16 90:10,15
90:20 94:11

189:17 191:25
192:17 194:8
196:14,17
198:1,4 202:10
203:8,12 208:2
210:24 211:3
235:11
**supervisors**
18:1 90:3,7
**supplemental**
12:4
**supposed** 63:2
77:2 84:24
88:10,14 90:21
106:19,20,22
118:13
**suppression**
9:12
**sure** 4:9 16:12
18:21,22 25:2
26:1 32:22
46:9 53:10
57:4 86:17,18
89:12 92:1
93:6,7,8 101:9
107:17 109:11
114:15 116:13
116:14 117:20
122:23 123:20
124:15 136:4
160:23 162:16
162:17 169:5
170:9 181:7
182:5 198:6
199:14 200:12
203:15 204:14
217:12 222:13
223:19 229:19

229:23 231:16
**surprised**
230:12
**suspect** 7:21
17:11 27:5
48:19,22 52:9
52:11,13 60:22
71:4 100:15
102:21 133:21
**suspect's** 59:15
63:6
**suspects** 21:6
27:3 61:7
**suspicion** 23:16
52:23 53:11,12
53:16,21 54:23
55:16,22
133:24 166:21
**suspicions**
30:12
**suspicious**
168:25 179:6
**suv** 179:19
**sweeps** 93:24
**switched**
118:20
**sworn** 1:18 4:2
242:17 243:5
**system** 32:11
32:16 35:15,23
36:5 42:17,24
100:21 101:1,2
101:6,8 122:22
124:8 167:1,6
167:7,20,20,22
167:25 168:5,8
195:20 196:4

**systems** 146:11

**t**

**t** 3:7 4:16
173:20
**tab** 147:7 205:1
**table** 5:17
**tag** 162:19
228:16
**tailgate** 68:3
**tailored** 177:9
**take** 5:14 6:12
7:5,7,9 21:24
25:1,11 26:22
38:5 43:22
45:25 51:24
52:8 63:21
79:12 87:3,8
91:19 93:9
95:12 98:3,5
98:16 103:4
115:25 117:8
117:20 122:3,6
124:10 129:1
132:19 148:9
153:14 162:21
165:5 175:2
183:3 185:1
186:25 187:2
200:4 230:11
231:15 235:17
**taken** 1:18
54:15 64:25
87:4 122:9
174:25 184:21
231:17 243:2
**takes** 98:14
102:15 110:18

115:15
**talk** 14:5,10
16:20 24:11
43:8 47:19
48:11 49:22,25
57:3 61:16
62:10,13,14,25
115:18 120:17
126:12 127:3
127:13 130:11
142:17 144:9
168:25 185:6
189:1 222:3,3
235:20
**talked** 25:13
28:16 48:4
51:10 61:10
65:3,4 85:7
94:22 121:2
122:20 234:23
234:24 235:2
**talking** 29:25
72:1 91:22
95:4 126:1
144:23 145:8
153:11 155:24
162:8 168:10
169:2,17 219:5
227:21 233:14
235:25
**talks** 181:11
**tank** 41:9,23
64:4 68:3
**tap** 31:12,12,13
68:2 138:5
**tapping** 76:22
**tar** 161:19

| | | | |
|---|---|---|---|
| **task** 22:25 85:13 | 142:4,23 144:14,18,21 | **testimony** 9:20 11:15,24 93:5 | 187:6 193:22 194:21,24 |
| **tasked** 35:22 36:4 221:8 | 145:13,19 148:14 151:8 | 161:10 242:18 243:2 244:9,17 | 195:21 197:14 197:16 205:10 |
| **taste** 63:17 | 154:11 158:2,4 | **texas** 1:1,9,21 | 210:2 230:3 |
| **taught** 36:10 51:4 | 158:16 167:14 173:13 181:5 | 1:23 2:10,14 221:10,13,17 | **thanks** 132:11 **thc** 112:9,11 |
| **taxes** 93:25 | 183:4 189:21 | 241:8,18 242:1 | 229:8,13,23 |
| **tcole** 18:9 | 207:2 223:23 | 242:9,15 | 230:8,14,24 |
| **teach** 35:22 | 227:24 235:8 | 243:11,14 | **theirs** 99:14 |
| **teaching** 116:11 | 238:19 | **text** 125:14,16 125:21 | **therefor** 76:3 82:6 242:23 |
| **team** 62:7 | **telling** 48:5 69:22 84:15,16 | **texting** 125:20 | **thew** 71:7 |
| 79:15 81:19 103:7 104:12 | 138:25 142:20 | **tfo** 22:21,24 | **thing** 4:17 6:4 18:7 19:17 |
| 120:24 | 162:15 214:4 | **thank** 4:5 10:1 | 21:5 23:19 |
| **tell** 6:2,14 7:1,7 | 215:1 231:11 | 12:10,16 18:6 | 25:2 29:24 |
| 7:16 11:8,9 | 238:4,5 | 19:14 23:1 | 31:4,6,17 |
| 15:16 17:25 | **tells** 83:12 | 24:17 36:9 | 32:17 34:22 |
| 18:1 19:21 | **ten** 66:17 | 39:17 41:19 | 40:25 46:3 |
| 20:7 21:19 | 227:12 | 55:2 56:22 | 49:11 50:8 |
| 24:23 28:17,18 | **tenth** 227:5,6,9 | 60:25 71:13 | 62:21 64:12 |
| 32:13 38:22 | 227:15 | 74:24 90:16,16 | 68:12,24 70:8 |
| 42:4 51:12 | **term** 191:20 | 90:25 91:2 | 73:17,22 75:7 |
| 61:13,14 62:16 | **terms** 14:1 | 92:11 94:25 | 77:3,22 80:17 |
| 62:19 69:6 | 109:17 | 96:8 101:17 | 80:20 83:1 |
| 70:14,16 73:3 | **terrible** 122:17 | 103:16,17 | 89:13 90:2 |
| 76:11 79:10 | **test** 209:18 | 108:9 112:18 | 98:19 103:3,14 |
| 84:10,21 86:6 | 210:8,8,15,16 | 113:10 121:24 | 103:25 105:2 |
| 86:14 87:9,16 | 230:14 | 122:10 126:4 | 107:19 111:19 |
| 88:17 90:3 | **tested** 112:5 | 127:4 134:8 | 118:22 122:1 |
| 91:21 99:4 | 209:19 230:15 | 135:2 139:1,4 | 123:9 124:14 |
| 104:13 125:7 | **testified** 4:2 | 140:1 142:7,11 | 128:7 132:21 |
| 128:21 134:20 | 8:16 9:10 | 149:15 158:6 | 135:2 140:23 |
| 134:21,22 | 128:17 143:21 | 158:10 171:15 | 143:1 144:13 |
| 136:8,25 | **testify** 4:22 | 171:23 172:8 | 144:21 145:1 |
| 137:20 138:8 | 7:23 | 177:24 178:6 | 145:14,23 |
| 139:17 141:22 | **testifying** 5:4 | 180:15 181:8 182:9 183:11 | 146:1,19 |

| | | | |
|---|---|---|---|
| 159:17 164:20 | 32:2,6,9,10,15 | 227:12 230:23 | 97:15 98:11 |
| 166:15,17,19 | 38:22 40:17 | 232:6 | 99:4,18 100:10 |
| 166:21 168:11 | 42:6 45:2 | **threat** 179:22 | 100:13,24 |
| 168:22,24 | 52:23 55:15 | **threats** 8:4,7 | 101:17 105:23 |
| 169:11 172:3 | 59:6 64:22 | 8:11 | 107:13 110:5 |
| 173:13 182:2 | 70:19 74:6,9 | **three** 14:19 | 110:11 116:3 |
| 184:14,25 | 75:1,20 94:1 | 15:20 16:7 | 117:8,16,21 |
| 186:20 187:16 | 107:6 113:11 | 17:12,15 25:22 | 118:2,12 120:2 |
| 192:25 200:16 | 115:12 118:20 | 43:23 44:20,23 | 129:17 142:5 |
| 201:14 202:12 | 119:8,10 | 45:4 85:8 | 144:8 145:23 |
| 203:1,2,22 | 123:19 124:18 | 116:10 131:10 | 146:12 150:8 |
| 204:1,8 207:5 | 135:21 146:9 | 172:10 199:15 | 151:11,13 |
| 208:23 212:8 | 152:17 155:16 | 201:9 215:4 | 153:14 162:9 |
| 214:14 222:7 | 157:4,5,9,11 | 216:19 | 164:8 165:1 |
| 229:11,21,22 | 157:11,13,15 | **threw** 70:18,19 | 166:17 168:22 |
| 236:2 | 158:18 160:5 | 71:6 | 168:23 171:14 |
| **things** 14:24 | 162:14,25 | **throckmorton** | 175:2 179:8 |
| 17:11 18:12 | 169:8,9 175:10 | 243:13 | 181:3,5 187:1 |
| 20:21 21:2 | 175:11 178:10 | **throw** 156:13 | 198:15 200:23 |
| 25:11 30:10,21 | 179:10 185:25 | **throwing** 62:6 | 205:13,25 |
| 32:9,10 38:17 | 187:9 219:16 | 71:8 108:17 | 207:15 210:20 |
| 55:20 79:18 | 222:14 225:22 | 163:7 | 210:23 211:12 |
| 81:12 82:5 | 229:22 230:18 | **thursday** 11:25 | 211:13 213:10 |
| 88:15 89:4,19 | 231:1,20 232:8 | **tie** 24:6 | 216:2,5 218:12 |
| 90:4 99:20 | 233:19 235:15 | **tied** 22:21,23 | 218:23 220:11 |
| 106:7 122:24 | 236:2,13 238:1 | 43:4 | 232:15,19 |
| 122:24 132:22 | 238:8,9,21 | **till** 92:14 | 235:22 238:18 |
| 135:12 141:3 | **thinking** 88:2 | **time** 6:13 9:15 | 239:1 244:18 |
| 170:5 175:24 | 128:5 | 16:15,21 19:22 | **timeframe** |
| 185:9 186:15 | **third** 213:10 | 21:2 22:8 | 244:8 |
| 190:13,24 | 226:14 | 31:10 35:3,4 | **timer** 135:22 |
| 208:18 225:10 | **thorough** | 38:9 41:18 | 135:23 |
| 237:9 238:9,10 | 152:17 177:6 | 52:25 56:12,20 | **times** 6:2 11:12 |
| **think** 6:17 9:6 | **thoroughly** | 67:14,16 76:25 | 51:15 62:13 |
| 9:9 11:7 17:7 | 236:10,14 | 84:15 86:5 | 111:7 117:10 |
| 17:10,12 18:11 | **thought** 50:3 | 87:8,19,22 | 129:13,14 |
| 18:15 21:20 | 59:22 117:11 | 88:17 91:19 | 158:15 168:10 |
| 23:12 29:10 | 122:22 139:9 | 92:19 95:12 | 201:11 207:23 |

208:8 211:2
216:19 217:3
222:6 223:20
223:23 224:19
226:9 228:10
**timing** 99:20
115:19
**tiny** 230:4
**tips** 109:3
**tire** 68:3
136:19
**titles** 19:19
**today** 4:22 10:2
11:10 25:5
41:13 45:23
79:12 87:13
91:5 143:21
148:23 157:5
157:10 168:16
170:17
**together** 43:25
87:18 119:15
124:14 215:18
**told** 61:9 90:1
149:8 183:19
185:20 186:1
233:1,4,7
234:21
**ton** 94:21
107:21 154:23
**took** 5:8 17:18
17:21 33:4
44:20 107:4
113:17,19
116:24 117:6
119:19 127:23
150:1 171:2
195:16 220:11

**top** 106:25
123:3,9 155:21
168:5 222:21
222:22 225:10
**topic** 25:10
184:24
**topics** 31:16
51:24 176:2
**totally** 101:10
135:8
**touch** 74:20
110:3 161:1,2
**touching** 66:17
**tow** 146:7
**towards** 32:1
70:25 71:1,2
71:17 136:22
138:11 142:22
**town** 82:11
**toy** 27:15,16,18
28:1 65:6,14
65:19,20 76:24
117:14,16
149:3,4,6,9,10
149:12,17,21
**trace** 147:14
150:7,22 151:8
152:12 153:1,9
154:6,25 155:7
155:14 157:21
158:2,7 164:9
165:20 173:14
174:12 175:11
181:18 184:14
187:10,25
189:1 206:25
207:9 208:5
209:3,6,9

210:2,24 211:6
211:24 212:2,5
212:12,16,19
212:25 213:5
213:11,19
214:11 215:6
216:4 218:7,24
219:2 221:24
222:4,8,11
223:15,20
224:5,11,23
225:1 226:25
228:8,10
229:20 230:5
230:10 231:4,5
233:23 234:2
234:16 235:2
237:12
**track** 7:17
100:10 102:9
102:11,21,22
**tracking** 7:20
27:5 32:16
34:23 61:7
102:6 103:13
113:2
**traffic** 12:4
17:12 23:15
25:22 31:18
41:20 47:24
53:25 54:3
61:24 70:12
71:15 128:22
130:1 208:23
230:2 231:23
**traffickers**
99:11

**trafficking**
21:11
**train** 15:19
36:4 37:4,18
69:23 78:14,24
83:14 85:15,19
85:23 100:3
104:22 105:6
**trained** 15:17
49:20 50:16
53:25 81:25
82:5,7,17
97:16 98:22,24
109:2,3,13,15
112:15 114:2
219:22,23
**trainer** 15:18
15:19 17:20
18:25 35:20,24
35:24 36:23,25
37:18,18 81:16
90:15 91:1
93:15 96:1
98:14 102:16
115:1,6
**trainers** 37:4
**training** 3:12
3:13 25:7,13
26:5 28:17
31:21 36:18
37:3 41:12,13
41:17 43:24
44:7 46:4,20
46:25 50:23
54:10,12,15
56:14 78:19,19
79:1 81:13
85:9 90:8,13

92:15,19 93:16
95:8,24 96:15
96:20 97:1,1
98:3 99:20,21
100:16,17
103:8 104:3
106:8,18,21
107:8,14
108:11 112:20
113:11 114:9
115:24 117:12
117:13 122:19
**trainings** 33:7
41:11 44:16,22
44:23 78:9
83:18 91:1,13
92:12 94:8,12
94:16 96:2
98:1 112:21
**trainingwise**
41:10
**transcript**
172:13 186:3
242:17,22
244:6,19
**transporting**
157:19
**trap** 80:23
88:16 124:24
163:5
**traps** 5:22
**trash** 30:7
**treat** 49:12,13
49:16
**tree** 65:11
102:11
**trees** 91:15

**tremendously**
206:15
**trial** 239:1
**trick** 125:6
**tricks** 5:21
**tried** 71:19
168:1
**tries** 9:17
**trouble** 32:2
52:16
**truck** 10:11
48:19 71:17,21
71:22 73:18,24
74:5 134:2,25
135:1 136:17
138:4 146:7
179:11 182:10
185:12,16
188:8,15
**true** 64:22 91:2
91:5 110:13
118:15 168:16
215:7 241:2
242:18
**trunk** 166:11
**trust** 94:7
117:6 177:11
177:13
**truthfully** 4:22
5:5,12
**try** 9:16 55:6
56:23 57:8,14
59:13 68:24
69:16,18 70:24
74:18,20,22
81:18 83:6
99:11 102:17
109:16 117:8

141:23 171:2
179:11
**trying** 24:9
71:11 77:18
89:3 102:19
138:10 152:19
153:12,14
154:8 166:11
188:12 199:20
203:16
**tuesday** 43:24
100:3 104:23
104:23
**tuesdays** 44:22
45:4
**turn** 31:6 32:1
45:13 46:24
52:9 94:22,23
95:11 101:23
101:24 103:19
104:25 105:2
132:7 136:22
198:14 205:6
**turned** 131:16
131:18,24
154:15 184:11
**turns** 124:25
131:21
**twice** 141:17
214:19
**twitter** 126:6
**two** 9:9,23
17:10,12,14
21:23 22:13,17
25:22 39:10
43:23 44:2,19
44:20,23 45:4
61:6 62:15

67:13 69:24
72:8 75:5
104:19 114:14
114:15 120:9
120:24 121:16
124:24 128:23
130:22 131:1,9
135:21,25
159:7,7 172:4
172:7,7,10
185:9 188:11
195:24 196:8
199:15 201:23
207:24 213:15
216:18,22
225:11 237:6
**type** 35:6 46:25
77:22 92:24
167:8 198:12
**types** 18:11
30:20 55:20
**typically** 41:20
133:19 134:5
149:6 151:20
151:23

**u**

**u** 23:6 173:20
**ugly** 66:16
**uh** 6:6 16:8
20:23 27:25
28:25 37:6
39:12 47:15
49:10 50:5
56:6 67:24
68:10,12 69:7
73:10,12 95:25
104:9 107:10

118:24 119:22
120:8 144:10
195:25 207:19
215:20,23,23
226:11 227:10
**unartfully**
95:17
**uncomfortable**
161:14
**under** 40:19
46:4 118:23
200:14 229:8
241:11,14
**underneath**
158:19 159:5
161:8 188:19
**understand** 5:7
5:10 6:1 12:21
13:5,11 17:15
19:11 26:1
28:19 41:8,19
49:8 53:25
54:1,3,4 56:13
59:6 70:9 72:6
81:24 88:25
94:6 97:2
103:3,17
108:21 124:11
129:24 136:25
139:1 143:14
144:22 148:6
151:3 153:20
176:23 178:6
180:15 181:6
223:19 230:3
236:1
**understandable**
59:18 163:13

**understanding**
5:19 40:18
42:22 54:5,9
73:4,8 75:13
89:11 93:1,5
108:17 111:13
121:17 143:25
153:23 166:10
176:17,25
180:25
**understood**
60:25 79:17
93:10,11
115:18 142:2,4
144:16
**union** 20:1
**unit** 20:1,5,11
21:15,22 22:2
22:14 35:17
43:24 63:1
83:8 88:10
94:17 120:14
129:16,18
130:4 146:12
189:14 200:23
236:20,24
**united** 1:1
242:1
**units** 22:8
100:24 109:10
**unofficially**
18:4
**unsigned** 93:20
208:11 211:25
**unsteady** 78:12
**unsupervised**
179:18

**unusual** 169:24
172:19
**upgrade** 124:5
**upward** 138:11
**use** 19:18 31:11
32:24 33:4
36:10 39:25
45:10,10,12
57:13 65:10,10
65:12 68:24
71:16 82:3
87:2 97:5,6,7
97:13 101:6
122:7,16 125:9
126:5 167:22
167:24 186:2
**useable** 148:8
150:25 209:15
219:3 223:16
**used** 48:1
80:23 83:20,23
85:9,18 86:15
115:12 139:10
167:5,6,6
168:1,2,20
244:19
**useless** 172:13
**uses** 101:11,15
**using** 74:10
93:2 125:14,17
125:21 132:15
**usually** 29:18
35:9 56:25
57:6 62:18
67:14 83:22
98:14,18 100:1
104:24 105:11
195:13,17

223:1

**v**

**v** 5:18 244:4
**va** 244:15
**vacuum** 99:9
**vacuumed** 99:5
**valley** 154:10
**various** 135:12
**vast** 93:20
**veer** 72:18
**veered** 142:20
**veers** 30:16
72:18 185:17
**veh.rel.** 42:2
**vehicle** 12:12
27:1 33:22
34:25 35:6
42:1 43:25
44:2 47:11
48:12,14 49:2
51:7 57:15
60:8 63:2,4
68:10 80:23
134:13,15,17
140:17 179:10
183:3 186:12
186:14
**vehicles** 46:15
166:15 168:6
**vendors** 82:13
**verbal** 6:5
69:14
**verify** 244:9
**veritext** 243:12
244:14,23
**veritext.com**
244:15

**[verses - watch]**

**verses** 23:20
**version** 67:22
  87:25 104:3
  144:19 186:25
**versus** 86:18
  180:10
**veteran** 37:2,2
**vial** 229:9
**video** 3:14
  72:14 124:22
  124:25 125:3
  130:18,20
  131:15 132:10
  132:15 133:3
  133:15,17
  134:9 137:7
  139:17 140:3
  142:14,25
  144:11 145:15
  145:16 148:16
  148:20 150:6
  151:14 152:6
  152:22 153:3
  153:24 154:12
  156:8 157:24
  158:25 159:19
  159:23 165:3
  165:18,24
  169:7 170:20
  171:11 172:1
  173:5,21 174:7
  174:9,12,15
  175:1,14,20,20
  175:25 176:3
  177:15 178:1,7
  178:12,14,21
  179:4,7,16,25
  181:9,23

  182:13 183:12
  184:18,24
  235:14
**videos** 44:11
  46:13 122:2,8
  122:13 126:14
  135:20 142:24
  144:20 145:4
  233:12
**view** 159:10,17
  159:25 164:11
  165:24
**vigilant** 168:2
  168:4
**violation** 12:22
**violations**
  62:21
**virgina** 2:5
**visible** 160:21
  221:5 225:5
**vision** 123:14
  123:18,19
**visitation**
  116:19
**visual** 123:12
  123:13,14,17
  123:18 221:5
**voice** 169:10
**vs** 1:4 242:4

**w**

**w** 2:15
**wait** 29:14
  195:13
**walk** 26:22
  27:9 47:18
  62:18 124:23
  136:14 139:9

**walking** 9:3
  30:6,9 31:4,7
  116:12 137:5
  178:24 179:18
  185:16
**walks** 7:25
  74:17
**want** 4:7,9 7:6
  7:7 8:17 13:21
  18:6 24:11,18
  25:10 29:17
  31:21 32:7
  33:25 34:2
  38:16 47:10
  49:6,11 53:8,8
  55:2,5 58:25
  59:1,18 60:9
  62:13 63:11
  64:17 68:16
  70:8,12,13,15
  70:24 73:14
  79:23,24 91:13
  94:20 96:8,20
  99:15,17 102:1
  103:18 110:10
  111:8,10
  112:19 113:12
  114:6,15
  115:18 119:4
  122:13 125:5
  125:19 127:11
  127:13 129:12
  130:13,18
  132:24 136:6
  137:4 141:25
  144:15 148:13
  150:2,14 151:8
  153:15 161:4

  164:19 165:12
  169:3 175:19
  175:19 180:22
  180:24 182:2,5
  183:4 184:18
  184:20,22
  186:5,12
  189:24 191:16
  204:12 205:23
  206:25 219:1
  222:2,3,3
  224:22 231:21
  236:2 237:9,11
  237:15,23
  238:7
**wanted** 11:7
  24:2 25:10
  69:1 113:1,6
  132:14 236:24
**wanting** 28:12
  79:22
**wants** 58:21
  186:11
**waronin** 2:6
**warrant** 8:18
  9:8 34:24
  83:11
**warrants** 21:7
**waste** 86:5
**watch** 8:12
  19:23 20:2
  48:19,21 58:3
  58:4 132:21
  139:15,15
  145:4 148:13
  151:7 165:17
  179:5 182:2

**[watched - work]**

| | | | |
|---|---|---|---|
| **watched** 62:5 134:12 | **weapon** 8:10 8:10 213:23 | **wheel** 31:12 118:14 138:19 | **withdrawn** 26:13 52:10 |
| **watching** 8:2,3 18:5 134:16,24 135:15 139:4 139:24 145:11 150:6 159:11 164:10 | **wearing** 164:21 **website** 123:1 **week** 11:13,14 27:11 100:4,4 100:6 212:16 213:14,15 235:6 | **wheeler** 10:4,6 10:8,9 78:12 **whined** 138:23 **whines** 138:6 **whining** 76:11 77:13 **white** 160:4 | 53:3 58:14 65:23 66:7 74:8 88:21 113:13 129:16 170:11 184:8 190:12 216:1 221:15 234:19 |
| **way** 4:8 6:18 39:3 40:19 42:12,14 47:4 49:2,4 51:2,9 51:12,20,23 57:10,14 63:15 63:21 68:3,4 68:17 70:22,23 70:25 71:2 72:3,17,18 73:2,8,16,18 73:24 74:1 81:21,22 82:19 84:23 86:9,14 89:5 91:11 108:20,20 112:23 113:5 117:17 124:18 124:18 130:5 135:12 139:14 148:11 157:12 176:22 179:6 186:2,14 190:10 205:5 219:16 233:19 236:13,13 | **weeks** 26:22 43:23 44:19,20 195:24 196:8 **weigh** 223:18 224:14,18 **weighed** 225:3 **weights** 236:18 **weird** 6:4 160:19 169:4 169:21 199:14 **wemby** 62:4 **went** 14:25 15:19 21:21 30:3 37:3 83:10 88:22 89:16 95:5 96:16 116:8,9 116:9 127:14 134:1 144:12 149:7 150:13 154:16 **west** 24:15 **western** 1:1 242:1 | **wind** 31:1 42:8 70:10,14,22,23 70:24 71:8,11 71:14,17,21 72:16 73:19,24 74:4,4 142:16 142:21 143:3,7 143:25 156:18 176:23 180:19 **window** 149:8 **windows** 50:10 59:10,19,21 60:1,3,10,14 60:23 62:9 71:16,21 72:16 73:17 139:12 139:18 142:21 180:8,16 181:1 **winds** 135:11 **wire** 153:17,21 165:14 169:9 169:18,22 | **witness** 1:17 7:13 8:7 10:18 23:5 32:1 123:17 146:17 205:9 232:10 237:10 238:13 242:17,18 244:8,10,12,18 **wondered** 119:6 **wonderful** 38:21 147:13 226:22 **woods** 102:20 **word** 14:4 20:15 31:11 48:1 53:13,14 78:18 93:9 108:9,14 126:22 140:15 140:16 173:16 174:20 191:13 |
| **ways** 124:24 **we've** 134:12 189:4 | **whatsapp** 126:6 **whatsoever** 38:14 170:13 | **wish** 64:15 159:21 **withdraw** 69:3 76:7 221:4 **withdrawing** 111:2 | **words** 26:1 40:17 73:3 138:8 **work** 5:20 27:3 31:18 47:16 54:3 56:3 61:20 79:5 |

116:7 118:12
123:24 124:13
125:18 128:23
129:15 138:2
**workable**
68:10 138:3
**worked**   15:1
94:6 128:17,19
129:20
**working**   22:1,8
22:13 28:3
29:2 41:15
67:14 86:11,12
99:12 115:14
115:16 129:21
129:25 139:16
139:25,25
**works**   13:4
24:10 26:17
43:5 47:11
61:20 84:17
101:14 132:14
**world**   106:2
**worn**   187:8
**worry**   78:14
**worth**   243:14
**wrapped**   162:6
162:9
**wrapping**
170:7
**wright**   2:13
**write**   112:25
113:6 183:6
230:8
**writes**   187:22
**writing**   232:11
232:13

**written**   90:4
94:10 108:6
151:2
**wrong**   19:18
24:8 38:3 75:2
79:7,15,18
81:7 84:12
88:12 117:1
123:12 185:23
190:8 199:11
204:25 205:1
233:2
**wrote**   113:5
232:14

| x |
| --- |

**x**   3:1,7 200:15
242:21
**xbox**   76:25

| y |
| --- |

**y'all**   52:1
**y'all's**   183:7,19
**yards**   119:7
**yeah**   4:10 8:21
9:11 14:25
17:3,6 18:9
19:6 22:16,25
23:24 24:4
27:21 28:2
30:14 31:24
34:15 35:20,21
45:2,2,2 48:5
49:23 50:9,15
50:16,25 52:15
54:4 55:14
56:3 57:12,12
57:22 60:18
61:25 62:14

63:8,10 64:18
71:8 72:22
73:23 80:8
81:20 84:14
85:21 92:18,18
97:9 98:9
100:7 101:6,10
101:10 102:14
103:23 105:17
105:17,17,20
105:21 106:10
106:15 107:22
108:5 114:14
117:4 118:2,19
119:1,20
126:24 127:3
127:23 128:2,6
131:23 137:4
137:10,22
145:10 151:5
156:3,25
158:13 160:2
160:10,19
161:19,22
162:1,11 164:4
164:5 166:5,6
166:14 169:1,6
169:16,19,21
170:15 171:2
172:7 178:10
178:13 179:9
182:14 191:10
194:17 196:19
197:13 199:2
201:6,16 202:1
203:12 209:1
210:12 211:22
212:4,15 217:7

220:18 221:2
223:23,24
224:4,21,21
225:7,22 226:5
226:8,16 227:7
227:23 228:21
229:8,9,24
231:11,14,16
235:1,20,24
237:5 238:13
**year**   43:14,20
46:25 89:12
155:4 198:2
217:6 232:6
**years**   14:20
72:8 85:8
117:1
**yellow**   229:13
**yep**   45:24 62:3
190:11 206:5
213:24 215:13
**yesterday**   4:18
6:16 11:18,21
32:9 91:16,17
96:25 108:10
149:9
**york**   168:21
**young**   83:22
**youtube**   233:12
235:14
**yup**   6:8 27:17
99:10 155:12
196:15 197:22
198:21 212:7
212:10,23
215:9 218:3
231:6,8

| z |
|---|
| **z**  173:20 |
| **zero**  217:3 |
| **ziploc**  110:17 |
| **zulu23**  24:14 |

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to
witness. The deposition officer must provide the
original deposition transcript to the witness for
examination and signature. If the witness is
represented by an attorney at the deposition, the
deposition officer must provide the transcript to
the attorney instead of the witness.

(b) Changes by witness; signature. The witness may
change responses as reflected in the deposition
transcript by indicating the desired changes, in
writing, on a separate sheet of paper, together
with a statement of the reasons for making the
changes. No erasures or obliterations of any kind
may be made to the original deposition transcript.
The witness must then sign the transcript under
oath and return it to the deposition officer. If
the witness does not return the transcript to the
deposition officer within 20 days of the date the
transcript was provided to the witness or the

witness's attorney, the witness may be deemed to have waived the right to make the changes.

(c) Exceptions. The requirements of presentation and signature under this subdivision do not apply:

(1) if the witness and all parties waive the signature requirement;

(2) to depositions on written questions; or

(3) to non-stenographic recordings of oral depositions.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.


Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.