# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# EXHIBIT 24

Marta Ortega                                    February 28, 2024

Page 1

 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE WESTERN DISTRICT OF TEXAS

 2                    SAN ANTONIO DIVISION

 3

    ALEK SCHOTT,                     §

 4        Plaintiff,                 §

                                     §

 5                                   §

    VS.                              §

 6                                   §

    JOEL BABB, in his individual     §   CIVIL ACTION NO.

 7  and official capacity;           §   5:23-cv-00706-OLG-RBF

    MARTIN A. MOLINA III, in his     §

 8  individual and official          §

    capacity; JAVIER SALAZAR, in     §

 9  his individual and official      §

    capacity; and BEXAR COUNTY,      §

10  TEXAS,                           §

          Defendants.               §

11

12  -------------------------------------------

13                  ORAL DEPOSITION OF

14                    MARTA ORTEGA

15                  FEBRUARY 28, 2024

16  -------------------------------------------

17          ORAL DEPOSITION of MARTA ORTEGA, produced as a

18  witness at the instance of the Plaintiff(s), and duly

19  sworn, was taken in the above-styled and numbered cause

20  on February 28, 2024, from 9:28 a.m. to 1:00 p.m., before

21  Molly Carter, Certified Shorthand Reporter in and for the

22  State of Texas, reported by machine shorthand, at the Law

23  Offices of Charles S. Frigerio, 111 Soledad, Suite 465,

24  San Antonio, Texas, pursuant to the Federal Rules of

25  Civil Procedure.

Page 2

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF(S):
          Ms. Christen M. Hebert
4         INSTITUTE FOR JUSTICE
          816 Congress Avenue, Suite 970
5         Austin, Texas 78701
          (512) 480-5936
6         chebert@ij.org
7         Mr. Daniel Z. Nelson
          Mr. Joshua A. Windham
8         INSTITUTE FOR JUSTICE
          901 North Glebe Road, Suite 900
9         Arlington, Virginia 22203
          (703) 682-9320
10        dnelson@ij.org
          jwindham@ij.org
11

12  FOR THE DEFENDANT(S):
          Mr. Charles S. Frigerio
13        Mr. Hector X. Saenz
          LAW OFFICES OF CHARLES S. FRIGERIO P.C.
14        111 Soledad, Suite 465
          San Antonio, Texas 78205
15        (210) 271-7877
          csf@frigeriolawfirm.com
16

17

18

19

20

21

22

23

24

25

Marta Ortega                                          February 28, 2024

Page 3

1                         I N D E X

2

Appearances ........................................  2

3

4    MARTA ORTEGA
          Examination by Mr. Nelson .....................  4

5

6    Reporter's Certificate ........................... 136

7

8

9

10

11                         EXHIBITS

12   NUMBER         DESCRIPTION                        PAGE

13   Exhibit 14 ........................................  57

                    Bexar County Sheriff's Office Manual of
14                  Policy and Procedure (as of 8/3/21)

15   Exhibit 15 ........................................  58

                    Marta Maria Rodriguez (Ortega) Personal
16                  Data and Employment History

17   Exhibit 16 ........................................  64

                    6/12/23 Request for Investigation, and
18                  Report Documents

19

20

21

22

23

24

25

Marta Ortega                                    February 28, 2024

                                                        Page 4

1                    MARTA ORTEGA,

2    having been first duly sworn, testified as follows:

3                  E X A M I N A T I O N

4    BY MR. NELSON:

5         Q    All right.  Well, good morning, Sergeant

6    Ortega.  My name is Daniel Nelson, and I represent Alek

7    Schott, the Plaintiff in this case.  How are you today?

8         A    Good.

9         Q    Good.  And I've already asked your rank.  It is

10   sergeant?

11        A    Yes, sir.

12        Q    Okay.  And so throughout this deposition, I'll

13   sometimes refer to the Bexar County Sheriff's Office as

14   the Sheriff's Office or BCSO.  Does that make sense?

15        A    Yes.

16        Q    Before we get started, I want to run through

17   just some basic preliminary stuff.  So first, you

18   understand you're testifying under oath today just as you

19   would in a courtroom?

20        A    Yes.

21        Q    Do you understand that you are not a Defendant

22   in this case?

23        A    Yes.

24        Q    Is there anything that would prevent you from

25   testifying truthfully?

Marta Ortega                                    February 28, 2024

Page 5

1       A     No.

2       Q     Have you ever been deposed before?

3       A     No.

4       Q     Okay.  So it will be helpful, I think, to go

5   through some just kind of basic instructions.  So the

6   reporter is going to record my questions, along with your

7   answers.  And just to kind of have a clear record, I'm

8   going to do my best not to speak over you, and I would

9   appreciate it if you could do the same, again, just to

10  have a clear record.

11          Another thing, and I'll do my best to remind

12  you, try to keep yes or no answers to like a yes or a no

13  as opposed to like an uh-huh or huh-uh.

14          Definitely let me know -- excuse me.

15  Definitely let me know if you don't understand my

16  question.

17      A     Okay.

18      Q     You know, at some point, I'll probably ask a

19  question that's not super clear, and I'll just do my best

20  to rephrase it, or if you just need to rehear it.  And

21  then absolutely let me know if you need a break at any

22  time.  Does that all make sense to you?

23      A     Yes.

24      Q     Great.  So what, if anything, have you done to

25  prepare for this deposition?

Marta Ortega                                                    February 28, 2024

Page 6

```
 1         A     Well, I met with the attorneys.

 2         Q     Okay.

 3         A     And then I reviewed, to refresh my memory, the

 4    report.  And then I saw the dash cam and then Deputy

 5    Babb's body-worn camera.

 6         Q     Okay.  And by the dash cam, you mean --

 7         A     The one that Alek provided.

 8         Q     I see.  And then what do you mean by the report

 9    that you reviewed?

10         A     Deputy Babb's report.

11         Q     I see.  Did you talk to any colleagues at the

12    Sheriff's Office about the case?

13         A     No.

14         Q     Okay.  And you're, of course, familiar with

15    Alek Schott, the Plaintiff in this case?

16         A     With -- through emails and --

17         Q     Right, right, right.

18         A     Yes.

19         Q     Okay, cool.  All right.  So let's dive a little

20    bit into your background.  So first, I just want to know,

21    why did you become a police officer?

22         A     I wanted to do something different every day.

23    I didn't want to be just sitting at the office every day,

24    you know.  So just, to me it was -- my uncle was a police

25    officer, and it was just like I wanted to do something
```

1    different every day.  So I started at the jail.

2         Q    Okay.

3         A    And I did four-and-a-half years at the jail

4    before I went to patrol.  I think in '24 [sic], I went to

5    patrol.  And then I was a patrol deputy for about a year.

6    Then I went to civil.  In civil, I moved around, and then

7    I promoted to investigator.  Then when I promoted to

8    investigator -- I think that was 2016, '17, investigator.

9    I moved around different sections, and I went all the way

10   to -- was a homicide detective, and then promoted to

11   sergeant, and then I think that was in 2019.

12             And then from there, patrol.  I was a patrol

13   sergeant for a couple of months, and then they moved me

14   to recruiting.  I was in recruiting for a while.  I don't

15   even remember how long.  And then from recruiting, I went

16   to Internal Affairs.  I don't know how long I was in

17   Internal Affairs.  And from Internal Affairs, now I'm in

18   CID, night crimes.

19        Q    Sorry, what is CID?

20        A    Criminal investigation division.

21        Q    Okay.  What does that do?  Or what do you do in

22   CID?

23        A    So I'm the supervisor of the detectives.

24        Q    Okay.

25        A    At nighttime.

Page 8

1    Q    Got it.  And so it sounds like you've got a

2    pretty extensive history with BCSO.

3    A    Yes.

4    Q    Did you ever do any traffic enforcement?

5    A    When I was a patrol deputy, like in 2012.

6    Q    Okay.  So you're pretty familiar with Texas's

7    traffic laws and stuff like that?

8    A    Uh-huh.

9    Q    Okay.  And just out of curiosity, what -- I

10   mean, what were some of the most like common violations

11   you would see drivers commit?

12   A    Speeding.  I used to do speeding.  The

13   registration sticker, no license plate.

14        That I used to stop a lot?  What is it called?

15   Obstruction in the rear view mirror.  Like when they have

16   stuff hanging on the mirror, their front mirror, the

17   rear --

18   Q    Oh, okay.  Got it.  And just to be clear, so

19   those were not only the most common violations that you

20   saw, those were the most common violations that you

21   pulled people over for?

22   A    Usually me, yes.

23   Q    Okay.

24   A    I used to work STEP, which is speeding

25   enforcement, so --

Marta Ortega                                        February 28, 2024

Page 9

1      Q    Makes sense.  Did you do traffic enforcement

2    outside of STEP at all?

3      A    Here and there, when I was a patrol.

4      Q    Okay.  What percentage do you think you did

5    STEP enforcement versus non-STEP enforcement?  If that's

6    the right way to phrase the question.

7      A    Percentage range as far as?  Because I was

8    patrol for a year, so STEP was only a couple months at a

9    time.

10      Q    Got it.

11      A    Because it was like a grant.

12      Q    Okay.

13      A    So --

14      Q    So let me ask it just more broadly then.  Was a

15    substantial amount of your traffic enforcement not

16    related to STEP?

17      A    Yes.  I was only in STEP months.

18      Q    Okay.  All right.  So you mentioned Internal

19    Affairs, and you said you didn't remember off the top of

20    your head how long you were at Internal Affairs.  Do you

21    have like a basic idea?

22      A    Maybe a year.

23      Q    Okay.  And that's really understandable.

24    Because again, you've had several positions over the

25    years, so that totally makes sense.

Page 10

```
 1              Now, one question I have is, is Internal

 2    Affairs, was it a section or a unit?  Do you know what I

 3    mean by that?

 4         A    It's a section.  I would say section.

 5         Q    Okay.  To the best of your memory it was a

 6    section?

 7         A    Yes.

 8         Q    Got it.  And what was the division that

 9    Internal Affairs fell under?

10         A    Fell under the administration.

11         Q    Okay.  Did it -- what was it -- did it have any

12    relationship with the Professional Development &

13    Integrity Unit?  I think I'm using the right name there.

14         A    The Public Integrity Unit?  PIU?

15         Q    Well, that's -- let's ask about that -- let's

16    do that one first.

17         A    I was like professional -- what did you say,

18    professional?

19         Q    Professional Development & Integrity Unit.  And

20    we can unpack it later.  It's in the Sheriff's manual.

21         A    Okay.

22         Q    But if you're not familiar with the manual,

23    that's fine.  But I was also going to ask about the

24    Public Integrity Unit.  So did you work with them at all?

25    Was it a unit separate from Internal Affairs?
```

Marta Ortega                                            February 28, 2024

Page 11

```
 1        A    They're separate.

 2        Q    Got it.  So you said you were -- sorry, you

 3   said Internal Affairs was within the administrative

 4   division.

 5        A    Yes.

 6        Q    Who, who did you personally report to when you

 7   were at Internal Affairs?

 8        A    To the lieutenant.

 9        Q    Lieutenant who?

10        A    At the time, it was Lieutenant Gonzalez and

11   Abraham Abraham.  So I had two.  When I first started, it

12   was Elizabeth Gonzalez, and then Abraham Abraham.

13        Q    Got it.  And who did they report to, do you

14   know?

15        A    If I'm not mistaken, I think to Chief Lupe

16   Garza.

17        Q    Sorry, you said Chief Garza?

18        A    Yes.

19        Q    Got it.

20        A    The female one, because there's two.

21        Q    Got it.  And then who did she report to, Chief

22   Garza?

23        A    At the time, it was Chief Esqueda.

24        Q    And then who did -- I'm just going to keep

25   going up the chain.
```

Marta Ortega                                              February 28, 2024

Page 12

1    A    I'm assuming Esqueda and then Serrato and then

2    Sheriff.

3    Q    Got it.

4    A    I'm assuming that's the way it goes.

5    Q    Perfect.  Thank you.  And I know I'm asking you

6    to really jog your memory on this, so I appreciate it.

7    A    Yeah, it's been a while.

8    Q    You have a good memory.

9         So what kind of training did you obtain for

10   your Internal Affairs position?

11   A    On-the-job training by another officer that was

12   there, another sergeant that was there.

13   Q    What was that like?

14   A    Pretty much:  Here's the forms we use, this is

15   for citizen complaints, this is for if there's something

16   that needs to be -- Request For Investigation, these are

17   the forms that the complainants fill out, like if they

18   want to pursue -- like they give their statements.  I'm

19   trying to remember.

20        And then how you do your summary.  And then the

21   sections that IA uses for sustained/not sustained.

22   That's what we used to use before, like -- whatever the

23   allegations were, either they were sustained or not

24   sustained.

25        And then I would sit in when, you know, when

Marta Ortega                                          February 28, 2024

                                                            Page 13

1     the officers would come in to do their investigation.

2     And then there's Requests For Investigations, and then

3     there's phone complaints, or citizen complaints.

4              So, but that was basically, probably like two

5     weeks maybe --

6         Q    Okay.

7         A    -- of watching and just learning, and then

8     that's it.

9         Q    That's really helpful.  So what were -- so the

10    Requests For Investigation, were those the forms that

11    people could fill out?  Am I understanding that

12    correctly?

13        A    So the Request For Investigation is we get from

14    the administration.  And it's called -- we called it RFI.

15    Those are assigned to -- I guess the OA gets them from

16    IA, wherever, from the sergeant, from the lieutenant, or

17    directly from the chiefs.  And those are investigations

18    that we need to look into based on whatever the

19    allegations are.

20             And that's when we review them.  And then we go

21    from there.  As far as like if there's multiple officers

22    on the Request For Investigation, so we've got to bring

23    in everybody -- we've got to look at everybody's report,

24    look at cameras, look at everything, and then bring in

25    one by one, and they come in with attorneys or whatever.

Marta Ortega                                February 28, 2024

                                                    Page 14

1            So that's the Request For Investigation.  But

2    that's directly from the administration.

3       Q    I see.

4       A    And then the phone complaints are just citizens

5    that call in that they want to complain on a deputy for

6    whatever reason.  And those usually, the OA -- at the

7    time Laura.  I don't know if she's still there.  Laura --

8       Q    Ingram?

9       A    Milam?

10      Q    Milam, sorry.

11      A    Right, Milam?

12      Q    Yeah, good memory.

13      A    Like at the time --

14      Q    That's it.

15      A    -- Laura Milam.

16      Q    Yeah.

17      A    So what she does, she does the phone

18   complaints.  And then she does -- I guess when she gets

19   numerous ones, then she disperses them amongst all the

20   sergeants.  She disperses them.  And then we get them

21   whenever she gives them to us.

22           And either, it depends on -- to me, it depends

23   on your caseload.  Because our caseload, the RFIs have

24   timelines that we have to meet, our summaries.  And so

25   we -- if I have an RFI with ten officers, I need to bring

Marta Ortega                                    February 28, 2024

                                                     Page 15

1    all these people in and then make sure their attorneys

2    can come in at the same time.  You know what I mean?  So

3    that's the timeline.  And the phone complaints, we don't

4    have a timeline.

5         Q    Got it.

6         A    So the phone complaints, we look at them, and

7    that's when we call the complainant and see what their

8    complaint is.  And that's it.

9         Q    Okay.  That makes sense.  And then you said the

10   last -- so this was super helpful.  Thank you.  So --

11   just to kind of like understand kind of what the core of

12   your job was.

13        So you said the third main duty you had was

14   handling written complaints that people would submit?

15        A    Yes.  So it was either, the ones that would

16   call in or the people that would walk in.  Because you

17   could have walk-ins, also complaint walk-ins.

18        Q    Did people ever submit complaints by email?

19        A    I think so, yes.

20        Q    Okay.  Do you remember ever having any

21   complaints submitted by email?

22        A    Yes.  There was, but it's hard to track people

23   because sometimes they don't even put their information.

24   It's just their email.  So if they don't respond to

25   you -- so yes, there's phone complaints, walk-in

Marta Ortega                                              February 28, 2024

Page 16

 1    complaints or email complaints.

 2         Q    Got it.  Okay.  So --

 3         A    But usually those are all handled by Laura.

 4         Q    So --

 5         A    She assigns them to everybody.

 6         Q    So Laura would actually -- would she actually

 7    investigate some of the complaints herself?

 8         A    She wouldn't investigate.  She would just jot

 9    it down, and then give us a thing, like hey --

10         Q    Divvy them out.

11         A    Yes.

12         Q    Got it.  So it sounds like, sounds like you had

13    a lot of complaints to handle.

14         A    Well, that depends, because there was five of

15    us I think at the time.

16         Q    Okay.  Let's, let's try to -- so how many, how

17    many complaints -- well, not RFIs.  We'll do that

18    separately.  How many complaints do you think like went

19    on your desk, so to speak?

20         A    It's been so long.

21         Q    To the best of your memory.

22         A    Best of my memory, man, I can't even tell you.

23         Q    Well, let's try this.  More than fifty?

24         A    No.

25         Q    So way less?

Marta Ortega                                February 28, 2024

Page 17

```
 1       A    Yes.

 2       Q    Okay.  Ten?

 3       A    Maybe ten, every week, every two weeks.  I

 4  can't even tell you exactly how many --

 5       Q    Okay.

 6       A    -- to be sure, because I don't know.  I don't

 7  recall how many complaints we would get in a week.  And

 8  it's like -- like I said, she would take them down and

 9  she wouldn't disperse them right away.

10       Q    Hmm.

11       A    She would get numerous, and then disperse them.

12  It wasn't even weekly.  I can't even tell you weekly or

13  not.

14       Q    Okay.  But it sounds like maybe roughly about

15  ten every week?

16       A    Maybe.

17       Q    Maybe.  And are those complaints that are

18  submitted to Internal Affairs, or are those ones that you

19  are handling?  Does that make sense?

20       A    No.

21       Q    So you said there were five Internal Affairs

22  employees.

23       A    I think.  When I started, there was five of us.

24       Q    Okay.  Would you-all -- would you divvy out --

25  that's a terrible way of asking it.
```

Marta Ortega                                    February 28, 2024

Page 18

```
 1           Would you share the ten or so complaints that
 2      would come in every week?
 3           A    Yeah.  Two, two, two, two, yes.
 4           Q    Got it.  Okay.  So it sounds -- so if you were
 5      at Internal Affairs for about a year, and if you're doing
 6      about two every week, let's say -- and I know this is a
 7      rough number, but it sounds like you did probably around
 8      100 complaints when you were with Internal Affairs?
 9           A    Could be.  Possible.
10           Q    I mean, does the math check out there?
11           A    Like I said, it's been so long, I don't want to
12      tell you a wrong number, because I don't remember how
13      many a week.
14           Q    It's okay.  Just to the best of your memory.
15      If that seems right to you.  You know, if you're doing --
16      and we could just go back to, you know, are you doing
17      roughly two a week?
18           A    We were doing two a week, yeah.
19           Q    What about the RFIs, how many of those would
20      you do per week?
21           A    The RFIs are always coming in.  I can't tell
22      you how many.
23           Q    Were they more common than complaints?
24           A    Yes.
25           Q    Okay.  It sounds like by a lot, by your
```

Marta Ortega                                    February 28, 2024

Page 19

 1   reaction.

 2        A    Yes.  Those are time lined.  So those are -- as

 3   they come in, she would enter into the system, the IA

 4   Pro, and then she would divvy them up again to everybody.

 5        Q    And I do have -- I will have more questions

 6   about the IA Pro system in a little bit actually, so I'm

 7   glad you brought that up.  But -- and I realize I'm

 8   committing you to a number again, which admittedly is

 9   probably going to be hard.  But it sounds like -- I mean,

10   do you think you were doing twice as many RFIs as you

11   were complaints?

12        A    Oh, yeah.

13        Q    Three times as many?

14        A    Maybe.  I don't want to tell you an exact

15   number.  You know what I mean?

16        Q    That's okay.  But at least twice as many

17   probably?

18        A    Yes.

19        Q    Okay.  So I want to go back to a question

20   earlier about training you did to become an Internal

21   Affairs officer.  And it sounds like you did -- you

22   mentioned on-the-job training.  Excuse me.  Did you --

23   was there any other training that you did, any courses,

24   anything like that?

25        A    I don't recall.

Marta Ortega                                    February 28, 2024

Page 20

 1        Q    Is it fair to say then that you were mostly
 2   relying on the on-the-job training as well as just your
 3   experience on the job?
 4        A    Yes.
 5        Q    And why, why did you transfer to Internal
 6   Affairs, out of curiosity?
 7        A    Just to learn that section.
 8        Q    Sorry?
 9        A    Just to learn that section.
10        Q    Just to learn that section?
11        A    (Nodding head.)
12        Q    And then why did you transfer out?
13        A    Just my -- I always wanted to go to CID.  Since
14   I was a homicide detective, I always wanted to go back to
15   CID.  It's just -- I like being an investigator.
16        Q    You don't like being in an office all day, like
17   you were saying earlier?
18        A    Yes.  No, I don't.  I do not.
19        Q    I feel that sometimes.
20        A    And Internal Affairs is just there.
21        Q    Yeah.  No, I get it.  All right.  So that's all
22   helpful.  I think now that we've gone over the
23   background, I kind of want to get a little bit more of
24   your sense -- sorry, I want to get more of a sense of
25   your role at Internal Affairs.

Marta Ortega                                    February 28, 2024

Page 21

1           Let me ask this.  I mean, what, what was the

2   main purpose of Internal Affairs?

3       A    It's for officers who violate policy

4   violations, administrative.

5       Q    And was Internal Affairs' role to help ensure

6   compliance with --

7       A    With our policy?

8       Q    Uh-huh.

9       A    Yes.

10      Q    Okay.  And you had mentioned officers who

11  violate -- who do policy violations and administrative

12  violations, correct?

13      A    Uh-huh.

14      Q    What's the difference between the two?

15      A    Well, administration -- well, it's I'd say

16  administrative, because we fall under administrative, but

17  it's all for policy.  Any policy violations, that's what

18  we investigate in IA.

19           So I don't know what's -- we just call it

20  administrative, but it all falls under policy violations.

21      Q    I see.  Okay.  And can you just give me some

22  examples, just help me understand.  Like what would be

23  some common examples of either actual or alleged policy

24  violations?

25      A    Policy violations, as far as -- we get a lot

Marta Ortega                                    February 28, 2024

                                                        Page 22

1    for like the jail, complaints, like the checks, the

2    times, the checks, they're not doing it.  Those are some.

3    Excessive use of force.  Like sometimes the inmates

4    always complain that an officer used force, so we've got

5    to investigate and make sure that they didn't.

6            I don't know, I'm trying to think of the most

7    common ones.

8        Q    How about this.  What about in the context of

9    traffic enforcement?

10       A    Yes.

11       Q    What were some common, actual or alleged policy

12   violations with traffic enforcement?

13       A    Trying to remember which ones I had for law

14   enforcement side.  Because a lot -- most of the RFIs are

15   always from the jail.

16           Oh, so I had one for -- I'm trying to remember

17   the violation.  We get some for body-worn camera, like a

18   shooting.  Like they didn't turn on their body-worn

19   camera.  So they're supposed to have the body-worn

20   cameras, once you initiate -- like once you assign

21   yourself to a call or whatever, your body-worn camera

22   should be on.  So we get those a lot, because sometimes

23   the officer turns it on after the fact or --

24       Q    Can we actually stop there?  Can we unpack that

25   a little bit?

Marta Ortega                                              February 28, 2024

Page 23

1          A       Uh-huh.

2          Q       So what happens if an officer doesn't turn on

3     his or her body cam?  Is there any like discipline or

4     anything like that?

5          A       Well, as a IA, you do the packet, right?  Like

6     the sergeant writes up the packet.  For example, a

7     shooting I had, the officer turned on the camera

8     afterwards.  So all I do is, you know, sustained, he

9     turned on the body worn camera afterwards.  And policy

10    states that it should be on prior to -- once you log onto

11    the call, you're assigned to the call.

12              So we type it up, and it gets sent to the

13    administrative, to the chiefs.  And they determine what

14    kind of punishment they get.  Like we don't determine

15    that at all.

16         Q       Right.  So you're not making the call.

17         A       No.

18         Q       You're just doing the assessment?

19         A       We just type up the facts that we find, that

20    yes, it's sustained/not sustained, and they're the ones

21    that do -- we'll give you 30 days, 35 days, whatever they

22    want to do.

23         Q       Got it.

24         A       So we don't do -- we don't even suggest

25    nothing.  We just, not sustained/sustained, that's it.

Marta Ortega                                              February 28, 2024

Page 24

 1      Q    Okay.  That makes sense.

 2           So you had mentioned most RFIs are out of the

 3   jail system, right?

 4      A    Most of them.  To me, it was -- to me it felt

 5   like there was more jail than law enforcement.

 6      Q    What percentage do you think?

 7      A    Probably 60, 70 --

 8      Q    Okay.

 9      A    -- over LE, at least the ones I got assigned.

10      Q    Okay.  And what about the percentage -- let me

11   rephrase that.  What percentage of RFIs were related to

12   traffic enforcement?

13      A    I wouldn't be able to tell you.

14      Q    Was it rare?

15      A    On my caseload, that I could remember?  Very

16   rare, my caseload, because I don't remember doing traffic

17   violations RFIs, that I recall.

18      Q    Okay.  Do you know if other Internal Affairs --

19   and if you don't, it's totally fine, of course -- but do

20   you know if the other employees did traffic enforcement

21   related RFIs?

22      A    Some, but very few.

23      Q    Okay.  Got it.  So you've already alluded to

24   this.  In fact, you've mentioned it.  So it sounds like

25   the core part of your job was investigating an officer's

Page 25

```
 1   actions --

 2        A     Uh-huh.

 3        Q     -- whether a complainant alleged something or

 4   if you got an RFI about it; is that correct?

 5        A     Uh-huh.  Yes.

 6        Q     Okay.  And outside of the context of RFIs,

 7   because I understand for you it was very rare, how often

 8   did you investigate traffic stop complaints from like

 9   private citizens?

10        A     Top of my head, two.

11        Q     Okay.  So presumably the case that we're

12   talking about today, Alek Schott's, that was one of them?

13        A     Uh-huh.

14        Q     What was the other one, do you remember?

15        A     The other one, I believe it was a walk-in.

16   They were complaining that -- they were complaining that

17   they shouldn't have been stopped.  I don't even remember

18   the whole case.  But it was, I think it was a father, his

19   wife, the daughter, and they were upset because the

20   daughter got pulled over.  I don't even remember.  But I

21   just remember they were down, down at the office.  That's

22   how I remember.  But I don't remember the outcome.

23        Q     Okay.  You don't even remember like --

24        A     No.

25        Q     -- your personal findings?
```

Marta Ortega                                    February 28, 2024

Page 26

1        A    I don't remember.

2        Q    Okay.

3        A    I just remember because they were there.

4        Q    Yeah, yeah.  That makes sense.  And again,

5    totally fine.  I'm just asking to the best of your

6    memory.  And I understand it was a while ago, and you had

7    a lot of complaints, so I appreciate not only your good

8    memory but you doing your best to try to remember some of

9    these very hard to remember things.

10       A    It's been since 20- -- what, 2020, was it?  I

11   don't even remember.

12       Q    This case?  2022.

13       A    2022.

14       Q    Yeah.  Okay.  So -- and I don't believe I asked

15   this yet.  How common were traffic stop-related

16   complaints -- let me rephrase that.  How often did the

17   other Internal Affairs employees investigate traffic stop

18   complaints?

19       A    I don't know.

20       Q    No clue?

21       A    No clue.

22       Q    Okay.  Do you think it was rare?

23       A    No, I don't think it's rare.  Because you get

24   phone calls, "I got stopped for no reason," like "because

25   I was speeding, but I got a ticket."  Like everybody

Marta Ortega                                          February 28, 2024

Page 27

```
 1    complains because they got a ticket.

 2         Q    Right.

 3         A    But I don't know.

 4         Q    Well, so did you get complaints like that as

 5    well, beyond just the two that you mentioned earlier?

 6         A    We get a lot of phone calls for like, "I got a

 7    ticket," but when you look into it, it's not even our

 8    deputies.  Yes, we get calls for Precinct 1, 2, 3, 4, and

 9    other agencies sometimes.  "They stopped me, blah, blah,

10    blah."

11              "Okay.  Who stopped you?"

12              "Deputy so and so."

13              "We don't have a deputy by that name."

14              No, I'm serious.  It's not rare.

15         Q    Well, I'm sorry you had to deal with that.

16         A    It's not rare.  And a lot of people will call

17    from different agencies, especially precincts.

18         Q    Okay.

19         A    Because they're in our jurisdiction, so people

20    right away assume that it's the Sheriff's Office, and

21    it's not.

22         Q    Right.  So just so I make sure I understand, as

23    far as traffic stop-related complaints, just like

24    call-ins, like you were talking about, how many of them

25    would have been from Bexar County, do you think?
```

Marta Ortega                                    February 28, 2024

Page 28

1      A    I don't know.

2      Q    I'll ask it this way.  Do you think there were

3  more in addition to the two that you mentioned?

4      A    Oh, yes.

5      Q    Okay.  Like how many, you think?  I know I keep

6  asking you numbers, but --

7      A    You keep on giving me numbers.  I don't know

8  numbers.  The one that's going to have numbers is going

9  to be Laura.

10     Q    Okay.  But it was -- was it pretty common?

11 Sounds like it was.

12     A    Yes.

13     Q    Okay.

14     A    For a ticket, yes.

15     Q    Got it.  So pretty common for tickets.  Did

16 people commonly call in about -- not about the ticket,

17 but just about the stop?

18     A    We usually don't answer the phone.  The only

19 time we answer the phone is when Laura doesn't answer the

20 phone.  So she's the one that takes all the complaints.

21     Q    That makes sense.  And just bear with me a

22 moment, because it sounds like, you know, you probably

23 weren't picking up the phone a lot for these situations.

24 But would people call in to complain about a search of

25 their vehicle?

Marta Ortega                                    February 28, 2024

Page 29

1      A     I never had one, except for --

2      Q     Those two?

3      A     Well, Schott's.

4      Q     Okay.  So what did an investigation look like

5   for you?  Let's just back up a little bit actually.  You

6   get a complaint, either assigned to you or someone walks

7   in and says, "I want to complain."  Can you just walk me

8   through that process?  Because -- walk me through the

9   process of when you get the complaint to when you make

10  your conclusion.

11     A     Any complaint?  Or like his complaint?

12     Q     Let's just do -- we could just do like a, a

13  hypothetical traffic stop complaint.

14     A     So usually, like I said, a phone call

15  complaint, Laura gets them.  I don't know when she, how

16  many she gets.  Say today she gets four or five.  She

17  doesn't disperse them till maybe the end of the week or

18  next week, whenever she gives them to us.  So whatever

19  day that date is, whatever, I don't know.

20          So usually what I do is, my RFIs, because

21  they're on a timeline, I try to take care of that.  And

22  then in between, that's when I look at my phone

23  complaints.  And I read it and read the phone complaint

24  and look at it, and I usually call the person, "Tell me

25  what happened."  And if they answer, they answer.  If

Page 30

1    not, I leave a voice mail or whatever.

2              And then if, say, like they answered, and they

3    say, "Oh, well, I was stopped by this deputy," and

4    whatever.

5              I'm like, "Okay, let me look into the body-worn

6    camera," or whatever I have to look into.  Whatever they

7    tell me.  You know what I mean?  "And then I'll call you

8    back."

9              So then I would go back and review their

10   body-worn camera.  And if there's no policy violations or

11   nothing, I usually call them back and tell them, "Hey,

12   there's no policy violations."  And if they don't agree,

13   it's like, "Okay, well, here's an open records.  You

14   could request the video yourself."  And that's it.  Then

15   I would just close it off.

16             But if there's more to investigate, well then,

17   you know, it just depends how long, one, it takes to

18   investigate, but also my timelines.

19        Q    Right.  Got it.  So what happens if there is

20   more to investigate?  Can you give me an example of where

21   there would be more to investigate beyond what you just

22   went through?

23        A    Well, maybe if there's more video, like more

24   officers.  Or what if -- what if there is something, you

25   know?  What if there is something wrong with the stop,

Marta Ortega                                February 28, 2024

Page 31

1    policy violation?  So, so we make the determination, and

2    if there's something that, you know, needs to be

3    investigated, then I'll tell my lieutenant, "Hey, watch

4    this.  What do you think?"  And then I go from there.

5        Q    Got it.  So in the situation where you think it

6    looks like there's probably a violation here, you send it

7    to your lieutenant to say, "Hey, will you look at this?"

8        A    (Nodding head.)

9        Q    What does the lieutenant do?

10       A    Well, if there's enough for an investigation,

11   then it's written up.  And then it's sent to the chiefs.

12   And then they do the RFI and everything, and then they

13   send it back to do a Request For Investigation.

14       Q    Got it.  Okay.  And then who would do the RF --

15   who actually investigates the RFI when it comes back

16   down?

17       A    Whoever it gets assigned to.

18       Q    Would that be somebody with Internal Affairs?

19       A    Internal Affairs.  If it's policy violation.

20   But if it's criminal, then it goes to PIU.

21       Q    Okay.  And PIU is the Public Integrity Unit,

22   just to --

23       A    Yes.

24       Q    Okay.  And so couple of questions here, I

25   think.  Well, one, if an Internal Affairs officer

Marta Ortega                                    February 28, 2024

Page 32

1    reviewed a complaint from a person and said, "Oh, it

2    looks like there's a violation," and it went up the

3    chain, and then went back down as an RFI, would the same

4    Internal Affairs officer investigate the RFI, or would it

5    be someone different?

6        A    It all depends who Laura gives it to.  Laura's

7    the one that just disperses them.

8        Q    Okay.  And what happens -- let's say that --

9    well, let me ask, has that ever happened to you?  Have

10   you ever submitted a complaint -- or I'm sorry -- your

11   findings to the lieutenant, where it goes up the chain,

12   comes back down in the form of an RFI and then --

13       A    I never had a complaint to go on to an RFI.

14       Q    Okay.  You have never had one?

15       A    Huh-uh.

16       Q    How many times did you send your findings to

17   the lieutenant, you think?

18       A    So you -- if there's no findings, like if

19   there's no policy violation, you write a, like a little

20   summary, synopsis or whatever, on -- I don't even know

21   what it's called, the paper, and you put your conclusion

22   like on such-and-such date, you know, I reviewed

23   whatever, there's no policy violations, it's closed.

24           Then once we're closed, we give it to -- we put

25   it in the lieutenant's box, and then he or she will sign

Marta Ortega                                    February 28, 2024

Page 33

```
 1   off on it.  And then Laura does whatever she does with

 2   it.

 3        Q    Okay.  So I just want to make sure I fully

 4   understand that.  So even if you do not find a policy

 5   violation, you still send it to the lieutenant --

 6        A    Uh-huh.

 7        Q    -- who signs it.

 8        A    (Nodding head.)

 9        Q    I see.

10        A    If she signs it, I don't know.  We give it to

11   them.  I don't know if she signs it.

12        Q    Fair.  Okay, that's helpful.

13             Was there any sort of -- let me back up for a

14   second.  So you get a complaint, you start investigating.

15   Was there any sort of guide or checklist that you had to

16   help you investigate?

17        A    (Shaking head.)  Just on-the-job training.

18        Q    Okay.  So then how do you know -- I mean, where

19   do you -- let me ask it this way.  Where do you look to

20   determine whether -- let me actually back up.

21             Let's start with a, let's say you got a traffic

22   stop complaint.  Where would you look to determine

23   whether there even is a policy violation or not?

24        A    So you have a -- I don't know what section it

25   is in the policy.  There's like different items, like
```

Page 34

1    poor job performance -- gosh, it's been so long.

2            So usually when we do the violation's sustained

3    or not sustained, it's usually from the policy and from,

4    I believe, civil service.

5        Q    So what do you mean by that?

6        A    The policy violations that we normally use, I

7    don't know, it's in the manual we have, and it's usually

8    like, like truthfulness, poor job performance -- there's

9    like a list of things that will fall under like a policy

10   violation.  Or like the body-worn camera, it's under the

11   policy.  You know, body-worn camera, you should have it

12   on.

13           So we always use that policy violations to look

14   at the traffic stop and determine if there was something,

15   you know, that was violated.

16       Q    Got it.  So I just want to make sure I

17   understand, so I'm going to relay back what you said.

18           So essentially -- are you talking about the

19   Sheriff's manual?

20       A    Yes.

21       Q    Okay.  And so basically what you're doing is

22   it's up to you to say, okay, here's the issue that this

23   complainant is talking about, or alleges, and, you know,

24   it's up to me to look through the Sheriff's manual and to

25   know what portions of the manual are essentially

Marta Ortega                                    February 28, 2024

Page 35

 1   relevant?

 2        A    Uh-huh.

 3        Q    Okay.  Would you look anywhere else other than

 4   the Sheriff's manual?

 5        A    Well, depending on -- like a traffic violation,

 6   Transportation Code, or, you know, for different things.

 7   But I think the civil service also -- I think in the

 8   civil service also, they go hand in hand as far as like

 9   the RFIs.  I don't know if that makes sense.  I don't

10   know how to explain it.

11        Q    It doesn't, no.  Just unpack it for me.  Just

12   take your time.  What even is civil service?  I don't

13   even know what that is.

14        A    The civil service is kind of like our policy,

15   like -- so we have the Sheriff's policy and then we have

16   our collective bargaining and then we have our civil

17   service rules.

18        Q    Okay.

19        A    And I don't know how to explain it.

20        Q    It's okay.  Take your time.

21        A    The civil service rules is, that applies for

22   our deputies, for hearings and stuff.

23        Q    I mean, is it -- it's -- it sounds like it's a

24   document of some kind.

25        A    It's like a manual.

Marta Ortega                                           February 28, 2024

Page 36

1       Q    Okay.

2       A    Like you have a policy, the sheriff's policy,

3   and then we have a civil service.  I don't know how to

4   explain it.

5       Q    All right.  Let's do this then, just so I like

6   understand what it even -- just so I get like a vague

7   sense of what it is at least.

8            Can you just give me some examples of what is

9   in it?  And you don't have to quote it obviously, but

10  just like some basic stuff.

11      A    Trying to think how to.

12           MR. FRIGERIO:  My suggestion would be like if

13  you talk, someone gets five days suspension, and then it

14  goes through the appeal process.  Why don't you explain

15  that?

16      A    Yeah, I'm assuming something like that.  Oh, my

17  God.  Civil process is kind of like -- what we have to go

18  in front of -- so say they give you like 30 days.  We

19  have civil process as a deputy, you know.  So if we don't

20  agree to the 30 days, we take it up to the higher, to a

21  higher command.  It keeps going higher.  And then they

22  have like a civil -- like a civil hearing, like a civil

23  process hearing, where they hear the case and then

24  either -- I don't know how to explain it.

25      Q    (By Mr. Nelson) Okay.  All right.  I might

Marta Ortega                                    February 28, 2024

Page 37

1    return back to that in a little bit, but thank you for

2    like trying --

3         A    Oh.

4         Q    Thank you for -- sounds like it's hard to

5    describe.

6         A    Yes.

7         Q    Okay.  Yeah, we could -- I might return to that

8    later, but I think that's all I need for now on that.

9              Now, when you were investigating a complaint,

10   were you the only person in Internal Affairs who would

11   investigate the complaint, or would other Internal

12   Affairs employees help you with the investigation?

13        A    As far as like what do you mean?

14        Q    So when you get a complaint, when you get a

15   complaint on your desk, so to speak, and you start your

16   investigation process, you start going through the manual

17   and getting the body cam footage and everything else, is

18   there another Internal Affairs employee who is also

19   helping you with that?  Or is it just you?

20        A    No.  It's yours, unless you have questions and

21   you ask somebody or -- like it's your complaint.

22        Q    Got it.  And you talked about some of the

23   evidence that you would typically try to collect to make

24   a call.  Right?

25        A    (Nodding head.)

1    Q    So you said normally you would just, you would

2    call the complainant, just say, "Hey, what's up,"

3    especially if the complainant made the complaint over the

4    phone, right?

5    A    Uh-huh.

6    Q    And then you would try to collect body cam

7    footage?

8    A    I would try to collect like, "Well, tell me

9    what happened."  You'd tell me what happened.  And then

10   so from there, I would base on what I've got to do.

11   Q    So you would normally collect body cam footage

12   when --

13   A    I download it myself when, because it's through

14   Axon.  I download the video.  I search the video myself.

15   Q    I see.  Would you also try to collect like dash

16   cam footage, if relevant?

17   A    It should be in Axon if it's available.

18   Q    What is Axon?

19   A    Axon?  That's what we use.  Our cameras are

20   Axon, and it's -- I think it's evidence.com, I believe,

21   but it's Axon.  We call it Axon, and that's where all the

22   body-worn camera goes uploaded --

23   Q    Got it.

24   A    -- once they're docked.

25   Q    Oh, sorry.  And the dash cam footage?

Marta Ortega                                                    February 28, 2024

Page 39

1          A     Yes.

2          Q     Okay.  Would you review reports at all from

3     officers when investigating a complaint?

4          A     Yes.

5          Q     What kind of reports?

6          A     Their offense reports.

7          Q     So you would do -- well, there's a couple,

8     right?  So you would do SPEARS summaries, right?  You

9     would collect those?

10         A     Well, we call it RMS.  Y'all call it SPEARS.

11    Where all the officers write their document, right?

12         Q     Right.

13         A     Well, back in the day, we didn't have that.

14    Like I didn't have that.  We had green and yellow.  So

15    now they have that -- you call it SPEARS.  We call it

16    RMS.

17         Q     Okay.  You had to handwrite all your --

18         A     Reports.

19         Q     -- summaries?

20         A     Yeah.

21         Q     Wow.

22         A     Back in the day.

23         Q     But that is one thing you would gather, right?

24         A     Yes.  The key cards.

25         Q     Okay.

Marta Ortega                                    February 28, 2024

Page 40

1       A    The reports, the RMS.  So the key cards, y'all

2   name it something else.  The key cards, the one where it

3   says like -- the key card is basically what you see on

4   your CAD, where -- like if you get dispatched to a call,

5   like where the call-taker writes the notes.

6       Q    Oh, is it the Incident Detail Report?

7       A    Yes.  We call it key cards.

8       Q    Got it.

9       A    So I pull the key cards, and then I pull the

10  report, the RMS, which is the SPEARS.

11      Q    You can just call it -- you can call it RMS, by

12  the way.  I'll remember.

13      A    Yeah, the RMS.  And then if there's body-worn

14  camera, if there's dash cam -- whatever I need to -- you

15  know, sometimes -- sometimes there's allegations where an

16  officer's somewhere they're not supposed to be.  GPS.

17  But that is collected from somewhere else, like from the

18  captain.  You know what I mean?

19           So it's just -- depending what I've got to

20  investigate, depending what tools I need, that's where I

21  start gathering everything I need --

22      Q    Got it.

23      A    -- to review.

24      Q    So the body cam and dash cam footage, how did

25  you -- is it Exxon like --

Marta Ortega                                    February 28, 2024

Page 41

```
1          A      Axon, A-X-O-N.

2          Q      A-X-O-N.  Where -- how would you get all the --

3   well, I'm going to take it one step at a time.  How would

4   you get the RMS reports?

5          A      Through RMS.

6          Q      Okay.  So it's like a --

7          A      It's on my computer.  RMS is just on my

8   computer.

9          Q      Okay.  So it's just some like program or

10  some --

11         A      (Nodding head.)

12         Q      Okay.  That's where all the RMS reports are?

13         A      (Nodding head.)

14         Q      Are the incident -- sorry.  You call them key

15  cards.  Are the key cards there as well?

16         A      That's another -- that's a website.  Visinet, I

17  think.

18                THE REPORTER:  What?  I'm sorry.

19                THE WITNESS:  Visinet.  I think it's Visinet.

20  Everybody calls it different things, so --

21         Q      (By Mr. Nelson) Yeah.  Can you just spell it

22  for me?

23         A      I think it's V-I-S-I-N-E-T.  I think.

24         Q      Got it.  It doesn't have to be perfectly

25  accurate.  That's close enough, at the very least.
```

Marta Ortega                                                    February 28, 2024

Page 42

1      A     Yeah.  Everybody has different names.

2      Q     Are there any other reports -- let's say you

3  were dealing with a traffic stop-related complaint.  Were

4  there any other reports that you would look at?  Like,

5  for example, would you look at the citation -- the

6  warning citation that the person got?

7      A     That, I don't know how to look up.

8      Q     Okay.  Any other types of reports?

9      A     Not that I can think of.

10     Q     Okay.  Would you talk to the officer at all

11  that the person complained of?

12     A     So the phone complaints, usually I speak to

13  their supervisor.  I let their supervisor handle it as

14  far as if he thinks that he was wrong, whatever, for him

15  to talk to him.  You know what I mean?  For him to talk

16  to --

17     Q     I don't know.  Just slow down for me on this

18  one so I understand.

19     A     So usually phone complaints, I go through their

20  supervisor.  Because everybody has a supervisor.  So I

21  talk to the supervisor.  "Hey, I got a complaint on this

22  guy for" -- you know, say the deputy was rude.  A lot of

23  people complain about rudeness.  "Hey, so-and-so was

24  being rude.  Can you talk to him?  Because, you know,

25  they're complaining that he was rude to them, blah, blah,

Page 43

```
 1   blah, on the traffic stop."

 2             "Okay."

 3             So I let their supervisor handle it.

 4        Q    That makes sense.  What about for -- so that's

 5   for phone.  What about for a written complaint?

 6        A    For a written complaint, depending what it is.

 7   If it's the same thing, I would send it to their

 8   supervisor.

 9             Now, if it's a -- to me if it's an RFI, that's

10   when I bring you in.

11        Q    You would bring the officer in in that

12   situation?

13        A    If it's a RFI.

14        Q    Okay.

15        A    But a phone complaint, if the supervisor

16   handles it, I'm not going to call the officer.

17        Q    And so just to kind of -- I'm sorry?

18        A    No, just -- I'm just saying like I would let

19   them handle it.

20        Q    Got it.  So just so I understand, for non-RFI

21   investigations, you would not talk to the officer

22   complained of.  You would just talk to the supervisor.

23        A    Their supervisor.  I would talk to them first,

24   see what they tell me.

25        Q    How would you get the officer's version of
```

Marta Ortega                                    February 28, 2024

Page 44

1    events?

2         A    So I'd talk to the supervisor, and speaking

3    with the supervisor, if it's handled at his level, I

4    don't really talk to them.  And I don't have -- I've

5    never had a complaint where I've had to call the officer,

6    but their supervisor.

7         Q    And -- okay.  So maybe I should back up a

8    little bit.  So are there times where you would not need

9    to investigate a complaint, you would just send the

10   complaint along to the officer complained of, that

11   person's supervisor?

12        A    Depending what it is, yes.

13        Q    Okay.  Can you break down when you would, when

14   you would investigate versus when you would just send the

15   complaint to the relevant supervisor?

16        A    I don't -- like tell me -- give me an example.

17   Like I don't -- like I'm telling you, once I get a phone

18   complaint -- like his, his phone complaint, I talk to

19   him.  That requires investigation.  So I looked at

20   everything.  But I still spoke to his supervisor.

21        Q    And "his" being Alek Schott's complain?

22        A    Uh-huh.

23        Q    Got it.

24        A    So -- because you're just telling me

25   hypothetically, but there's so much hypothetically, like

Marta Ortega                                              February 28, 2024

Page 45

1    I don't know scenarios.

2        Q    Well, I mean, just kind of help me understand

3    your thought process a little bit.  So if you're looking

4    at a complaint, what is going on in your mind when you're

5    like, do I need to investigate and see whether there's a

6    policy violation at all, or do I just need to send this

7    to the supervisor and say, "Hey, some guy complained

8    about this officer.  Just letting you know"?

9        A    No.  Usually I look at their stuff first, but I

10   still, you know, like tell their supervisor, hey, XYZ,

11   like make sure that you talk to this officer because they

12   complained -- like regardless.

13       Q    I see.

14       A    After I conduct my investigation, I still --

15   it's a courtesy to tell their supervisor, like, hey, this

16   guy got complained on.

17       Q    I see.  Okay.

18       A    Talk to him.

19       Q    Got it.  So you're still doing the

20   investigation, but you're also --

21       A    Uh-huh.

22       Q    -- talking to the supervisor and --

23       A    Yes.

24       Q    -- saying hey, letting you know.  Okay.  Makes

25   total sense.  Sorry about that.  That was just me

Marta Ortega                                    February 28, 2024

Page 46

1    misunderstanding.

2           So is there anything that you would do if you

3    noticed that -- like an officer didn't correctly fill out

4    his or her RMS report?

5       A    I've never had one of those.

6       Q    Okay.  What about the Incident Detail Report?

7       A    The Incident Detail Report?  The key card?

8       Q    Yeah, I'm sorry.

9       A    That's usually typed up by the -- those are

10   like notes where the call-taker types up stuff, or where

11   the deputy basically writes like, "Traffic stop, citation

12   issued."  Like those are, I don't know -- like it's not

13   like a report where in the RMS where you type up your

14   whole report.  You know what I mean?

15      Q    Yeah.  Thank you.  Was there a certain standard

16   of proof that you had to abide by when investigating a

17   complaint?

18      A    As far as?

19      Q    Well, I mean, let's say you have a complaint

20   where the complainant alleges some violation by an

21   officer, and the officer never even turned on the body

22   cam.  Right?  And so there's no video evidence of what

23   happened.  So now it's just a he-said/she-said, for

24   example.  What would you do in that situation, if that's

25   just what it came down to, just the complainant's account

Page 47

1    versus the officer's account, say like in the RMS report?

2        A    And there's no body worn?

3        Q    There's nothing, no footage.

4        A    I would have to -- that's when I would call

5    their supervisor and the deputy, like, "Hey, there's a

6    complaint and there's no body-worn camera," and ask them,

7    "Was the body-worn camera down?  Did you not turn it on?"

8    Because that's a policy violation on its own.  You know

9    what I mean.  And see what they said.

10          And I would refer to my lieutenant, like, "Hey,

11   there's no body-worn camera, which is a policy violation.

12   What do you want to do?"  You know, is it going to turn

13   into RFI?  Is it just going to be a complaint?

14       Q    That makes sense.  And so essentially you would

15   report that there was no -- that there was a body

16   cam-related violation, right?

17       A    (Nodding head.)

18       Q    What would you do, though, about the actual

19   like complaint at issue, like the actual allegation?  You

20   know, how do you -- because ultimately you have to make a

21   finding, right, for every investigation?

22       A    At that point, I would talk to the officer as

23   far as like, "Hey, your body-worn camera, was it on or

24   off," or whatever, "because there's an allegation."

25   Depending what the officer says.  But even at that -- at

Marta Ortega                                                    February 28, 2024

Page 48

1    that point, you know, I can't determine if it's sustained

2    or not sustained because -- obviously it's a policy

3    violation.  It has to go to the lieutenant.

4         Q    I see.  Okay.  So in that situation, you are

5    not actually -- and this is just me assuming, I'm

6    realizing.  So in that situation you wouldn't be saying

7    sustained or not sustained.  You would just say I

8    can't -- essentially, I can't make a conclusion because

9    of this policy violation about the body-cam footage.

10        A    And then they turn it into an RFI, and then

11   that's when you bring them in, and that's when they have

12   the opportunity to come in with their attorney.

13        Q    I see.  That makes sense.  Similarly would you

14   do the -- so you said you would report the body cam

15   violation.  Would you do that for dash cam as well?

16        A    Dash cam -- a lot of times the dash cam from

17   the vehicles are always down.  Either they don't work,

18   some vehicles don't have dash cams or -- it's always

19   something with the dash cams on patrol vehicles.

20        Q    So you would or would not report a dash cam

21   violation?

22        A    I would just document -- like I would maybe

23   just say, "Hey, there's no dash camera."  Because on the

24   Axon, it will show when there's dash or -- and body worn.

25   And if there's none, then that means there's none.  Or it

Marta Ortega                                        February 28, 2024

Page 49

1    will show -- like it would be on there if there is some.

2         Q    Okay.

3         A    And most of the time, like I said, dash cam

4    sometimes don't work, and that's why the officer on the

5    report should always notate no dash cam or body worn

6    camera.  Should.  A lot of them don't, but --

7         Q    Got it.  All right.  That's helpful.  Thank

8    you.

9              So were the complaints that you investigated

10   filed somewhere within Internal Affairs?

11        A    Yeah.  Once they're done, we give them to

12   Laura -- well, the lieutenant.  They -- whatever they do

13   with them -- I guess she archives them.  I don't know.

14        Q    What about your, your findings and conclusions?

15   Are those filed away as well?

16        A    Yeah, because we have to do a cover sheet for

17   the complaint, like saying why we closed it or -- you

18   know.

19        Q    What about -- would all the evidence that you

20   relied on also be filed away?

21        A    The body-worn camera, dash camera, all that

22   stuff, is on Axon.  You just look for it.  So it

23   doesn't -- we don't like put it on a disc or anything --

24        Q    Right.

25        A    -- and archive it, no, because that's already

Marta Ortega                                February 28, 2024

Page 50

1    in the cloud or wherever it goes.

2         Q    That makes sense.  What about any like written,

3    like any of the incident reports, would you -- would

4    those be filed away with your cover sheet?

5         A    Depending if I attached them or not.

6         Q    Okay.  So it wasn't --

7         A    They don't necessarily --

8         Q    Got it.

9         A     -- have to be everything on there.  But if I

10   put it on there, I put it on there.  If I didn't --

11        Q    What about like your personal notes, would

12   those be filed away?

13        A    If I took notes, sometimes.

14        Q    Just sometimes?

15        A    Usually I try to write notes on the paper, the

16   phone complaint.

17        Q    Got it.  Any other notes, that you would file

18   away anyway?

19        A    I don't remember.  I don't know if I filed all

20   the notes in my, in the cases.

21        Q    Okay.  What about any other documents?

22        A    In complaints?  I don't recall.  Because

23   there's no standard way that, oh, you need to put

24   everything in there.  You know what I mean?  So I don't

25   recall if there was anything in there.

Marta Ortega                                              February 28, 2024

Page 51

1       Q    Got it.  I guess last question on that, what

2  about emails between -- I understand at least for

3  investigations in response to a complaint, you wouldn't

4  talk to the officer, you would just talk to the

5  supervisor.  But -- so you probably wouldn't have emails

6  with the officer, correct?

7       A    Huh-uh.

8       Q    Okay.  Email -- just other emails that you sent

9  or received throughout the course of a particular

10  investigation, would those be filed anywhere?

11       A    Probably not.

12       Q    Okay.  And you mentioned the IA Pro system

13  earlier.  What is that?

14       A    The IA Pro system is all the cases that come in

15  and complaints, Laura updates them, puts them in there,

16  and puts who they're assigned to.  And then if I'm not

17  mistaken, you could put notes.  Can I put notes?  I'm

18  trying to remember, because in CID we had a system too.

19  Usually like the notes, close or open case or closed due

20  to no, no complainant or something.  I don't remember if

21  in IA Pro you could put notes or not.

22       Q    Okay.

23       A    I know it's a system where it has all the

24  cases, everybody's caseload and then like if it's open or

25  closed.  But I don't remember if you could put notes in

Marta Ortega                                    February 28, 2024

Page 52

1    it.

2        Q    Would the IA Pro system have phone complaints?

3        A    Yes.  It has the -- it should have the RFIs and

4    complaints.

5        Q    Okay.  And Laura would do that --

6        A    Yes.

7        Q    -- presumably.

8        A    She's the one that enters everything in there.

9        Q    Got it.  How are you doing, by the way?  Do you

10   need a break at all?

11       A    I need some water.

12            MS. HEBERT:  I got it.

13       Q    (By Mr. Nelson) Do you also need a break?

14       A    No, I just need water.

15            MR. NELSON:  Okay.  Thank you, Christie.

16            THE WITNESS:  Thank you.

17            MS. HEBERT:  Sure.

18       Q    (By Mr. Nelson) So is it fair to say that

19   investigating complaints or RFIs was your primary

20   responsibility at Internal Affairs?

21       A    Yes.

22       Q    Did you do things outside of investigating

23   complaints or RFIs?

24       A    No.

25       Q    Nothing?  So you didn't do -- there was no

Marta Ortega                                                    February 28, 2024

Page 53

1    other way of ensuring compliance with BCSO policy?

2        A    We used to go to -- we're on-call like every

3    five -- there was five of us -- like every five weeks

4    on-call.  As far as Internal Affairs, if there was a,

5    like a death in the jail, we have to respond to those.

6    Or if an officer got in trouble, regardless if it was

7    like an officer off duty got in a fight with his wife and

8    they dispatched patrol out there.  Sometimes they would

9    call Internal Affairs and PIU.  For the deaths also they

10   would call PIU.  So we used to respond to stuff like that

11   too.

12       Q    And what did you -- what would be your role in

13   a situation where you responded to, let's say, like a --

14   you said a jail -- a death in the jail?

15       A    Uh-huh.

16       Q    Can you just like walk me through that?  Like

17   what would you be doing when you're responding to that?

18       A    Honestly, that's more of a PIU, but we just go

19   and we gather like a, we'll call it -- let's call it the

20   guardian where they check every -- depending on the pod,

21   it's either every 15 minutes or every 30 minutes or every

22   hour.  So it has to be under an hour, every 30 minutes.

23   So they have like a guardian, it's a stick.  And they

24   have like I guess where they put it in and it tells you

25   what time they checked the cells.

Marta Ortega                                                    February 28, 2024

Page 54

1              So that's how they determine, like did they

2      miss a check, did they not miss a check?  Like it's a

3      policy violation.  Make sure that the officer was in

4      compliance with policies.  But it's just real quick, just

5      to get the layout, what happened, just real quick, see

6      what else needs to be done, and then that's it, until we

7      get the RFI, and then we bring in the officer with the

8      attorney.  Like we don't even talk to -- we don't

9      question the officer or nothing.  We wait until the RFI

10     comes down, and then they come in with the attorney.

11          Q    So it sounds like you're almost being an

12     inspector in that situation.  You're just going to

13     inspect to see whether there's a policy violation?

14          A    Yes.  Even if there's a policy violation right

15     there and then, like we're not going to do nothing about

16     it until the RFI comes in.

17          Q    Right.  Got it.

18          A    And if there's anything criminal, PIU handles

19     it.

20          Q    Did you do anything like that -- let me

21     rephrase that question.  Did you respond to any

22     traffic-related issues in this context that you're

23     talking about?

24          A    No.

25          Q    Can you actually just give me -- because you

Marta Ortega                                                              February 28, 2024

Page 55

1    mentioned PIU does the jail stuff.  Right?  Can you --

2         A    Criminal.

3         Q    Sorry?

4         A    Criminal.

5         Q    Criminal.  Okay.  Can you just give me an

6    example of when you responded to -- and what's the term

7    for it -- responded to?

8         A    We're on call, where we responded to jail

9    deaths and officer-involved shootings, and sometimes like

10   family violence, when it involves off-duty deputies.

11        Q    Oh, so those are the only three categories?

12   It's pretty narrow?

13        A    That I can think of, unless the chief calls and

14   tells you to go.

15        Q    I see.

16        A    The lieutenant.

17        Q    But you never really did anything outside of

18   those?

19        A    No.  The only two that I responded to was an

20   officer-involved shooting and deaths at the jail.

21        Q    Got it.

22        A    Those are the only ones that I've been to.

23        Q    That's helpful.  That makes sense.

24             Did you ever do -- and this is somewhat

25   related.  Did you ever do like ride-alongs with officers

Marta Ortega                                    February 28, 2024

Page 56

1    to ensure that they were -- like in their patrol cars,

2    did you ever do ride-alongs with officers in their patrol

3    cars to ensure they were following certain rules?

4         A    No.

5         Q    Were you ever writing reports about a

6    particular officer outside the context of a complaint or

7    RFI?

8         A    Like?

9         Q    Well, I guess what I'm trying to get at is like

10   what are -- what are some ways that you -- that Internal

11   Affairs worked to ensure compliance with officers outside

12   of the context of just investigating complaints and RFIs?

13   Does that make sense?

14        A    No.

15        Q    Well, let's try this.  Did you ever -- did you

16   ever research or like write reports about like certain

17   trends, like arrest trends or traffic trends or --

18        A    No.

19        Q    Nothing like that?

20        A    (Shaking head.)

21        Q    Did you, did you or anyone else at Internal

22   Affairs ever have any role in helping to develop

23   Sheriff's -- like the policy in the Sheriff's manual?

24        A    I don't think so.

25        Q    Okay.  Would Internal Affairs ever do anything

Marta Ortega                                February 28, 2024

Page 57

1    like an internal audit of like a particular unit or

2    anything like that?

3         A    Not when I was there.

4         Q    But it had happened before?

5         A    I'm not sure.

6         Q    Okay.  All right.  Let's -- I'm going to show

7    you an exhibit.  That's the manual you were talking

8    about.

9         A    Policy.

10        Q    And this thing is big, as you know.

11        A    Uh-huh.

12        Q    And I'm going to mark this as --

13             MR. NELSON:  Exhibit 14, correct?

14             THE REPORTER:  Yes.

15        Q    (By Mr. Nelson) All right.  So what is this

16   document?

17        A    Policy.  Our policy.

18        Q    Okay.  And do you see where it says current as

19   of August 3rd, 2021?

20        A    Uh-huh.  Yes.

21        Q    Is it fair to say that this particular manual

22   that we're looking at right now was the manual in effect

23   when you were at Internal Affairs?

24        A    Was I Internal Affairs in 2021?

25        Q    I can refresh your memory on that.  I'm going

Marta Ortega                                    February 28, 2024

Page 58

1    to show you another exhibit.

2         A    They always update them.

3         Q    No, right.  Totally understand.  We just need

4    this one page.

5         A    My 201?

6         Q    Sorry, I'll hand you the document.

7              All right.  I'm handing Sergeant Ortega what

8    I'm going to mark as Exhibit 15.

9              MR. NELSON:  And Charles, I've got one for you

10   as well, if you want.

11             MR. FRIGERIO:  Okay.  Thanks.

12        Q    (By Mr. Nelson) All right.  So Sergeant Ortega,

13   what is that document?

14        A    We call it a 201.  The personal data.

15        Q    And does this reflect your employment history

16   with the Sheriff's Office?

17        A    Yes.

18        Q    Okay.  And do you see where it says, under

19   Position, under that column, do you see where it says

20   Internal Affairs Section?

21        A    Yes.

22        Q    And do you see the date next to that?

23        A    September 20, 2021.

24        Q    Is it September or is it August?  Looks like an

25   8 to me maybe.

Marta Ortega                                            February 28, 2024

Page 59

1        A     Oh, August.  I'm sorry.  August 2021.

2        Q     Okay.

3        A     So yes, this is current.

4        Q     Okay.  And actually, while we're there, so is

5    this right, it looks like you were in the Internal

6    Affairs Section for just over a year?

7        A     Just over a year.

8        Q     Okay.  Up until October 15, 2022?

9        A     I remember October going to CID, criminal

10   investigations.  It's called major crimes, but --

11       Q     Okay.  So going back to Exhibit 14, can you

12   read the current as-of date for me again?

13       A     August 3rd, 2021.

14       Q     So this would have been before your August

15   28th, 2021 --

16       A     Yes.

17       Q     -- start date with Internal Affairs?

18       A     Yes, sir.

19       Q     Okay.  So then it is fair to say that this

20   manual, Exhibit 14 that we're looking at, was the manual

21   in effect?

22       A     Yes.

23       Q     When you were in Internal Affairs?

24       A     Yes.

25       Q     Got it.  Thank you.  That's just something we

Marta Ortega                                                February 28, 2024

Page 60

1    have got to get for the record.  I'm certainly not

2    holding to -- I don't remember all my exact start dates

3    for my employment.  Heck, no.

4            Let's turn to Chapter 14, which is on Page 176

5    of the manual.  And let me know when you're there.

6        A    Okay.

7        Q    And do you see at the top where it says Chapter

8    14, Professional Standards & Integrity Division?

9        A    Yes.

10       Q    Do you know what that is?

11       A    That's what IA uses.  I don't know, before we

12   used to call it -- it was PSI.  That's when you said

13   professional.  So before Internal Affairs, it was PSI.  I

14   don't know why.  Now it's Internal Affairs.  I don't

15   know.  They're always -- like I said, there's different

16   names.

17       Q    They're always changing the names.

18       A    So Professional Standards & Integrity, I guess

19   that's what they call Chapter 14.

20       Q    So what was it before?  PSI, what does it stand

21   for?

22       A    I guess that's what it stands for, Professional

23   Standards & Integrity.

24       Q    Okay.  I just want to make sure.

25            So when you mentioned -- when you mentioned

Page 61

1    earlier that Internal Affairs was under the

2    administration division, is it actually just the

3    Professional Standards & Integrity Division, you think?

4    To the best of your knowledge.

5         A    I don't know.

6         Q    Okay.  Let's just go through some of the, just

7    a couple of things in this Chapter 14.

8         A    Okay.

9         Q    And we'll see if it is something that governed

10   Internal Affairs.  I think we'll do it that way.

11        And I guess I actually will just ask this.  So

12   it sounds like you said yes.  But is this the main

13   chapter that governed Internal Affairs?

14        A    This and --

15        Q    I really wish there was an index in this thing.

16        A    I know.  So remember when I told you what we

17   use as sustained/not sustained, it was employee conduct,

18   which is general discharge of duties, performance of

19   duties, obedience -- Chapter 5.

20        Q    Chapter 5?

21        A    Addressing ranking deputies, harmony and

22   cooperation, statement concerning Sheriff's Office,

23   derogatory remarks, criticism, all that, this is what we

24   sustained/not sustained the allegations.

25        Q    Got it.

Marta Ortega                                    February 28, 2024

Page 62

1       A    On the RFIs.

2            THE REPORTER:  What page is that?

3            THE WITNESS:  39.

4       Q    (By Mr. Nelson) 39.  Okay.  So just so I

5   understand, the two main chapters that governed Internal

6   Affairs would be -- or sorry, would have been Chapter 5

7   on Page 39, and then Chapter 14 on Page 176?

8       A    Yes.  But it would be anything in the policy,

9   technically anything in the policy.

10      Q    Right.  For sure.  But just like day-to-day.

11      A    Yes, this, and then this is what we used to

12  sustain/not sustain officers.

13      Q    Got it.

14      A    This, and then like I said the civil service is

15  a manual too.

16      Q    All right.  Thank you for reminding me of that.

17  That's helpful.  Thank you.

18           All right, let's look at -- let's go back to

19  Page 176.  Looks like you're there already.

20      A    Uh-huh.

21      Q    Perfect.  Do you see 14.03, Organization?

22      A    Yes.

23      Q    Let's go down to Subsection G.  Do you see

24  where that is?

25      A    Yes.

Marta Ortega                                    February 28, 2024

Page 63

1      Q    Okay.  And I'm actually going to read

2  Subsection G, but before I do that, I'm going to read the

3  first two lines below 14.03, Organization.  So I'm just

4  going to quote it, just for the record.

5          So it says, "The Professional Standards &

6  Integrity Division had the responsibility and authority

7  to conduct investigations of the following situations."

8  Subsection G says, "Any investigation assigned by the

9  Chief Deputy or the Sheriff."  Is that correct?

10     A    Yes.

11     Q    What -- let me just ask it this way.  When

12  would you get an investigation assigned by the Chief

13  Deputy or the Sheriff?  Just so I make sure I understand.

14     A    So like I said, the RFIs --

15     Q    Got it.

16     A    -- it will come from the chiefs.  And it could

17  be from Chief Deputy, I guess Serrato.  Sometimes it will

18  have his name.  It will have -- whoever.  It will say by

19  whom, like a signature.  But those are all review for

20  investigation, which is RFIs.

21     Q    Perfect.  And that's what I figured.  I

22  honestly just should have asked you that way, but I just

23  wanted to make sure.  So thank you for that.

24          Now, are you familiar with the investigation of

25  Deputy Babb's conduct during the March 16, 2022, stop of

Page 64

1    Alek Schott, the Plaintiff in this case, that was

2    requested by Deputy Chief Garza and approved by Chief

3    Deputy James Serrato on June 13, 2023?

4         A    No.

5         Q    Okay.  So I'll show you another exhibit.

6         A    Are we done with this one?

7         Q    Here.

8         A    Just making sure.

9         Q    Let's do this.  I'll give you some more room.

10   I'm hogging all the room.

11        A    I don't want to mess up all the pages.

12             MR. NELSON:  That's a good call.

13             THE REPORTER:  I appreciate that.

14        Q    (By Mr. Nelson) All right.  I'm going to hand

15   you an exhibit that I am marking Exhibit 16.

16             MR. NELSON:  One for you, Charles.

17             MR. FRIGERIO:  Thanks.

18        Q    (By Mr. Nelson) All right.  So I'll ask some

19   questions about this particular exhibit, some other

20   questions I should say, later.  But for now, I just want

21   to look at the front page.  Are you familiar -- well, let

22   me back up.  What is this?

23        A    An RFI.

24        Q    Sorry, what is the first page?

25        A    Request for Investigation.

Marta Ortega                                    February 28, 2024

Page 65

1    Q    Okay.  And have you ever seen that before?

2    A    These are the RFIs.

3         THE REPORTER:  I'm sorry?

4    A    The RFIs, they're the ones that we have to

5    investigate.  Those are the ones that I told you these

6    are -- we have timelines for these.

7    Q    That's what I figured.  But have you seen this

8    one?

9    A    This one?  No.

10   Q    You've never seen this?

11   A    Huh-uh.

12   Q    Did you know that this -- well, actually, can

13   you just explain to me what this RFI is for?

14   A    This is a Request For Investigation for Deputy

15   Babb.  This is on March 16th, 2022, Deputy Babb.  Want me

16   to read the whole thing?

17   Q    Sure.  Why not?

18   A    "Deputy Babb, Joel, while working in the course

19   of his interdiction team duties, conducted a traffic stop

20   and detained the driver of the vehicle.  Deputy engaged

21   in a prolonged conversation with the driver and waited

22   for the canine unit to respond.  Upon the canine alerting

23   of possible drugs in the vehicle, deputy searched the

24   vehicle after obtaining consent from the driver.  The

25   body-worn camera recording shows Deputy Babb exited the

Marta Ortega                                    February 28, 2024

Page 66

1    vehicle several times, leaving the engine running while

2    the detainee was in the front seat of the vehicle until

3    Deputy Babb placed him at the back seat of his patrol

4    vehicle unrestrained."

5         Q    Do you know who this RFI is about?

6         A    Deputy Babb.

7         Q    And do you know who the, I guess driver is in

8    this RFI?

9         A    Who the driver is?

10        Q    And it's okay if you don't.

11        A    Just by reading this, no, because I don't

12   remember March 16th, 2022, where I was at.

13        Q    Would you have -- I guess I'll ask this, do you

14   have any reason to believe that this is not an RFI

15   concerning the March 16, 2022, stop of Alek Schott in

16   this case -- at issue in this case?

17        A    It could be.  Like I said, I -- when you look

18   at the whole thing, just by turning the page, yes, I know

19   it is, because my stuff is there.  You know what I mean?

20        Q    No, that's perfect.  So you said you had never

21   seen this RFI before, correct?

22        A    No.  This was after I left.  I was in CID

23   already.

24        Q    Okay.  And so you, did you know that this

25   RFI -- scratch that.

Marta Ortega                                February 28, 2024

Page 67

1          Did you know that there was going to be an RFI

2    for Alek Schott's stop?

3          A    No.  When I found out about -- I don't even

4    remember when I found out about this whole thing.  And I

5    think it's because there's going to be -- when Susan

6    Bowen called.  But I don't even remember when that was.

7          Q    Okay.  So what I want to do is let's go ahead

8    and -- we're staying with this Exhibit 16.

9          A    Okay.

10         Q    Do you see the red numbers at the bottom, the

11   BC 00 number?

12         A    Yes.

13         Q    Okay.  Can we turn to -- let's just turn to the

14   next page actually, 2162.  So this was your closing of

15   the investigation concerning Alek Schott?

16         A    Yes.

17         Q    And what date did you close that investigation?

18         A    June 2nd, 2022.

19         Q    All right.  Let's turn back to 2161.  And

20   what's the date of the RFI?

21         A    June 12th, 2023.

22         Q    Okay.  So just over a year later, correct?

23         A    (Nodding head.)

24         Q    Is that common?  I mean, help me understand.

25   There's -- you know, you close an investigation June 2nd,

1    2022.  And then over a year later, there's an RFI

2    concerning the same incident.  Is that normal?

3              MR. FRIGERIO:  Objection, form.

4        Q    (By Mr. Nelson) You can answer.

5        A    I don't know.  It's -- there's -- I can't

6    remember -- I know something changed as far as

7    complaints, but I don't remember what it is.

8        Q    What do you mean by that?

9        A    Like a timeline for complaints.  Like there's

10   something that changed.  But I don't know, maybe he

11   didn't -- I guess maybe the Defendant didn't like my

12   conclusion and kept on calling or something.  I don't

13   know.

14       Q    So do you -- I mean, why do you think the --

15   why do you think there was an RFI submitted for --

16       A    Why there wasn't?

17       Q    Why there was.

18       A    Why there was?  Why there was?  I couldn't

19   answer that.  That's for the chiefs to say why they think

20   there was a reason to do an RFI.

21       Q    Okay.  Got it.

22             MR. WINDHAM:  Mind if we take a bathroom break?

23             MR. NELSON:  Let's take a break.

24             THE REPORTER:  We're off the record.

25        (Recess from 10:52 a.m. to 11:07 a.m.)

Marta Ortega                                    February 28, 2024

Page 69

1              THE REPORTER:  We are back on the record.

2        Q     (By Mr. Nelson) Okay.  So, Sergeant Ortega, I

3   want to go back to --

4        A     I'm sorry.

5        Q     You're fine.  I want to go back.  I want to

6   make sure I fully understand the relationship between the

7   complaint process and the RFI process.  I think I'm a

8   little hazy on some of the timelines a little bit.  So,

9   so you get a complaint on your desk.  Let's just start

10  there.  Can you just walk me through step by step what

11  your process is for handling that complaint, just the

12  complaint portion first, then we'll get to the RFI part

13  next.

14       A     Depending on how much information's on the

15  complaint.  If I have enough information to look into

16  like the deputy and stuff like that, I'll start doing

17  that.  But I'd rather hear it firsthand from the

18  complainant.  So I'll usually call the complainant, "Hey,

19  let me know what happened.  What's going on?  I got your

20  complaint.  Tell me more."

21             So when they tell me more is when, then from

22  there, I start reviewing stuff that I need to review.

23       Q     Okay.  Do you always talk to the complainant?

24       A     If they answer, yes.

25       Q     Okay.

Marta Ortega                                    February 28, 2024

Page 70

1       A    I give them three tries.  I do.  I'll call

2    three times.  No response, I close out your case.

3       Q    Okay.  So let's just do this then.  Step 1,

4    after you get the complaint -- actually, let's do Step 1,

5    you get the complaint on your desk.  Step 2 -- is it fair

6    to say Step 2 is you call the complainant?

7       A    Uh-huh.

8       Q    And hear their story?

9       A    Yes.

10      Q    What's the next step?

11      A    Depending on the information they give me, I

12   start conducting my investigation as far as like do I

13   need to pull reports, do I need to pull video, do I --

14   what do I need to do?

15      Q    Okay.  So Step 3 is gather evidence

16   essentially?

17      A    Uh-huh.

18      Q    And like we talked about before, that would

19   include like you, like you just said, the reports.

20      A    (Nodding head.)

21      Q    So the RMS report.  And the key card, and body

22   cam footage.

23      A    Uh-huh.

24      Q    Dash cam footage?

25      A    If there's some.

Marta Ortega                                February 28, 2024

Page 71

1    Q    One thing too I forgot to clearly ask about the

2    dash cam footage.  So is it a policy violation if the

3    dash cam footage is not on?

4    A    I do not recall off the top of my head.  I

5    would have to look it up.

6    Q    Okay.

7    A    I know body-worn for sure, but like I said,

8    dash cameras are always failing, because even when I was

9    on patrol, they're like the dash cam don't work, the dash

10   cam don't work.

11   Q    Okay.  Now, before we get to Step 4, I just

12   want to make sure, is there ever a situation where you

13   get a complaint on your desk and you decide I'm not going

14   to investigate this?

15   A    No.  We investigate every complaint.

16   Q    Got it.

17   A    Because we have to write -- like this cover

18   sheet has to be in every complaint, if it's a case

19   closed.

20        MR. WINDHAM:  I'm sorry, what page is that?

21        MR. FRIGERIO:  2162.

22        MR. NELSON:  Thank you, Josh.

23   A    And it tells you right there like the different

24   options why it was closed.

25   Q    (By Mr. Nelson) Okay.  That's helpful.  Thank

1    you.  So Step 3 is gather evidence.

2        A    Uh-huh.

3        Q    What's Step 4?

4        A    If it's either a case closed or we had to

5    submit it to the lieutenant for an RFI to be generated.

6        Q    Okay.  So Step 4 is case closed.  What does

7    case closed mean exactly?  I'm sorry, what page are you

8    on?

9        A    2163.

10           MR. FRIGERIO:  62.

11           THE WITNESS:  I'm sorry, 62.

12        Q    (By Mr. Nelson) I'm going to look at that with

13    you.  And this is Exhibit?

14        A    Exhibit 16.

15        Q    Exhibit 16, Page 2162.

16        A    So when there's a complaint and there's nothing

17    that I find policy violations, then I'm going to close

18    out the case, and it will tell you why.  Like these are

19    the different options why we close the case.  And like

20    this one there's an explanation because there's -- and

21    you put your explanation, and you submit it to the

22    lieutenant.

23        Q    Got it.  Okay.  So the case is closed when

24    there's no -- when you found no policy violation.

25        A    Uh-huh.

Marta Ortega                                                    February 28, 2024

Page 73

1        Q    Got it.

2        A    And like I said, like no -- non-cooperative

3    complainant, that's when I call you three --

4             THE REPORTER:  I'm sorry?  I can't hear you.

5             THE WITNESS:  I said the one that says

6    non-cooperative complainants is when I call you at least

7    three times and negative contact.

8        Q    (By Mr. Nelson) Three strikes you're out.  Got

9    it.

10            Okay.  And then you mentioned -- so in Step 4

11   you mentioned two possibilities, case closed, where you

12   find no policy violations, correct?

13       A    (Nodding head.)  Yes.  I'm sorry.

14       Q    You're fine.  Good memory.

15            What was the other possibility in Step 4?

16       A    In Step 4 if there's a policy that I see that's

17   violated, or that I believe is a violation, I will send

18   it up to the lieutenant.

19       Q    And you mentioned earlier that you, there's

20   like some box that you like just slip your -- well, let

21   me actually back up.  Well, no, go ahead, finish the

22   thought.

23       A    No, you said a box.  We just submit it to the

24   lieutenant.  Either we put them on his desk.  If he's

25   there -- we'll give it to him if he's there.  Or put it

Marta Ortega                                    February 28, 2024

Page 74

1    in his -- you know, everybody has like a little mailbox

2    or box, whatever you want to call it.

3         Q    Gotcha.  What is the actual document that you

4    are giving the lieutenant?  Is it this 2162, is it a form

5    like this?

6         A    I never had to do one, so I don't know exactly.

7         Q    Okay.

8         A    I don't know if there's a form or we just tell

9    him, like there needs to be an investigation.

10        Q    And so does that mean you just never found a

11   policy violation?

12        A    On my complaints, no.

13        Q    Okay.  All right.  What is -- let me actually

14   ask a follow-up question on the case closed portion.

15   That's where you find no policy violation.  What happens

16   after -- well, you know what, let's do it this way.  It's

17   going to get a little confusing because we're branching

18   off, right?  Step 4 we've got two possibilities, case

19   closed where you find no policy violation, correct?

20        A    Uh-huh.

21        Q    Or there is a policy violation and you send

22   some form to the lieutenant but you never had to do that.

23        A    I never had to do that, so I don't know if it's

24   a form or we just tell him directly like, hey, this

25   complainant -- this complaint looks like it needs to be

Marta Ortega                                           February 28, 2024

Page 75

1    an RFI.

2         Q    Okay.

3         A    For whatever reason, because they broke the

4    policy, whatever.

5         Q    So in a situation where the case is closed and

6    you find no policy violation, what happens after that?

7    What is the next step?

8         A    So I submit this paperwork with them.  Usually

9    it's this one and the one that, the citizen complaint

10   sheet.

11        Q    Which is what page?

12        A    2163.

13        Q    Okay.  And this is on Exhibit -- can you --

14        A    Oh, Exhibit 16.

15        Q    Exhibit 16.  Okay.  Sorry, can you just restate

16   what you said there?

17        A    Okay.  So want me to give you the process for

18   the complaint?  When we get it, it's usually this.

19   Exhibit 16, Page 2163.  It's usually the citizen contact

20   sheet for Internal Affairs is a phone call complaint from

21   Laura.  And then sometimes Laura has a sheet attached to

22   it, like where she wrote her notes.

23        Q    Can we pause right there?  Can you turn to

24   2165?

25        A    This one.

Marta Ortega                                          February 28, 2024

Page 76

1        Q    Those are Laura's notes?

2        A    Yes.

3        Q    Okay.

4        A    So you get the complaint sheet with sometimes

5   her notes, because she usually just writes the notes

6   down, and then she types it up for us.

7        Q    Got it.  And that really just -- this really

8   just goes to Step 1, which is --

9        A    Yes.

10       Q    -- you got the complaint on your desk, so to

11  speak, when you get this citizen contact sheet, which is

12  2163, and if Laura happened to write some notes, you

13  would also get something like 2165?

14       A    Yes.

15       Q    That's helpful.

16       A    And then when we, when I close it out, we do

17  the cover sheet, which is 2162, plus 2163, and 2165.

18       Q    Got it.  And just to be clear -- that's

19  extremely helpful.  Thank you.

20            The case closed is 2162, because that's what

21  you submit.  And then just like as attachments you have

22  2163 and 2165?

23       A    Yes.

24       Q    Anything else?

25       A    Huh-uh.

Marta Ortega                                                    February 28, 2024

Page 77

1          Q    Okay.  All right.  So going back to Step 4, in

2     the situation where the case is closed and you find no

3     policy violations, you -- who do you submit this --

4          A    Return the packet to the lieutenant.

5          Q    And the packet being the 2162 plus the two --

6          A    Yes.

7          Q    -- attachments?

8          A    Return it to the lieutenant and they read

9     off -- they read it I guess and -- I've seen some signed.

10    I don't know if they all get signed, but they go to the

11    lieutenant and the lieutenant gives them to Laura, which

12    she I guess goes into -- I'm assuming she goes into IA

13    Pro and closes them out and then archives them.

14         Q    So in other words, Step 5, where the case is

15    closed, you send it to the lieutenant to basically review

16    it?

17         A    Uh-huh.

18         Q    The packet that is.  And then Laura -- sorry,

19    let me back up.  The lieutenant will then send the packet

20    to Laura -- is it the packet that he sends to Laura?

21         A    (Nodding head.)

22         Q    Or like his signature?

23         A    This whole thing.

24         Q    Okay.  Then he'll send it to Laura, and she

25    then takes that packet to close out the case in -- you

Page 78

1   said IA Pro?

2        A    Uh-huh.

3        Q    Got it.  Do you know -- I know you said you

4   never submitted whatever it is when you find the policy

5   violation, as opposed to not finding a policy violation

6   and closing the case.  But what would happen if you did

7   find a policy violation and you informed the lieutenant

8   of that?

9        A    The lieutenant should -- the lieutenant should

10  type -- either talks to the chiefs or types up an RFI,

11  and then sends it to the chief so they could approve it

12  either for Internal Affairs, for the Public Integrity

13  Unit, or they'll deny the investigation, like it shows in

14  Exhibit 16, 2161.

15       Q    Okay.  Can we slow down there a little bit just

16  for my sake?

17       A    Okay.

18       Q    Because that was a lot of information for me.

19  But it was helpful.

20            So okay, just to make sure I understand, you

21  would send the -- you would inform the lieutenant of a

22  policy violation.

23       A    Uh-huh.

24       Q    The lieutenant would do one of two things,

25  either talk to the chief --

Marta Ortega                                    February 28, 2024

Page 79

1       A     (Nodding head.)

2       Q     Who's the chief?

3       A     Lupe Garza.

4       Q     Okay.  So the chief -- the chief of what, I

5   guess is what I'm asking.

6       A     Of IA.

7       Q     Oh, got it.

8       A     And then her chief at the time was Esqueda.

9       Q     Okay.  And so the lieutenant would either talk

10  to Chief Garza, head of IA, or type you up an RFI?

11      A     Uh-huh.

12      Q     Okay.  Now, what's the purpose -- why, what

13  would make the lieutenant talk to Chief Garza as opposed

14  to just typing up an RFI?

15      A     What they do -- I don't know what they do.

16      Q     Okay.

17      A     I just submit my paperwork, hey, if there is --

18  I think there's a policy violation or something, and they

19  do whatever they got to do.

20      Q     Got it.  Will Chief Garza sometimes type up an

21  RFI or request one?

22      A     Request one, because it says right here Deputy

23  Chief Maria Garza.

24      Q     Where's right here?

25      A     On Exhibit 16, 2161.

Marta Ortega                                              February 28, 2024

Page 80

1          Q     Got it.

2          A     I think it's Maria Lupe Garza.  I'm sorry.  I

3     keep on referring to her as Lupe, but it's Maria.

4          Q     You said there were two Garcias [sic], right?

5     Is that why?

6          A     Two Garzas.  There's a Raul Garza and then a

7     Maria Garza.

8          Q     I got you.  Okay.

9          A     But they call her Lupe Garza.

10         Q     Well, I appreciate the correction.  Okay.  This

11    is helpful.  This is coming together for me.  Thanks

12    again for walking through this timeline.

13               How often -- again, I understand you never

14    informed the lieutenant of a policy violation.  But when

15    there is, when an Internal Affairs officer does inform

16    the lieutenant of a policy violation, how often does that

17    result in the lieutenant or Chief Garza or someone else

18    creating an RFI?

19               MR. FRIGERIO:  Objection, form.

20         A     That's up to them.  That's beyond my pay grade.

21         Q     (By Mr. Nelson) That's fair.

22         A     That's beyond my pay grade.

23         Q     So in other words, you would have no idea of

24    how often a policy violation turns into an RFI?

25         A     No.

Marta Ortega                                    February 28, 2024

Page 81

1        Q    Okay.  All right.  So before I move into the

2    RFI process, I think I have one last question about the

3    complaint process.

4             So in the situation where you closed the case

5    because you found no policy violation, you send it to the

6    lieutenant, who closes out the -- or you send it to the

7    lieutenant, who then sends it to Laura to close out the

8    case.  What happens after that?  Is it just done?  That's

9    it?

10       A    Uh-huh.

11       Q    Okay.  That's the end of the road.

12       A    Yes.

13       Q    Got it.  And before I get to the RFI process,

14   this is not the only time an RFI will be created,

15   correct, through this complaint process?

16       A    What do you mean?

17       Q    Are there situations where someone like the

18   lieutenant would create an RFI that has nothing to do

19   with a complaint?

20            MR. FRIGERIO:  Objection, form.

21       A    I still don't understand your question.

22       Q    (By Mr. Nelson) Sorry, that's -- I'm not

23   wording it well.  Let me think of a different way.

24       A    Like in the same case?

25       Q    No, no.

Marta Ortega                                    February 28, 2024

Page 82

```
 1        A     Because the lieutenant could -- like the

 2   lieutenant could do Request For Investigations, but

 3   ultimately, the people that sign off on it are the

 4   chiefs.  And they're the ones that approve it and that's

 5   when we get an RFI.  He could type up all he wants, like

 6   a Request For Investigation, but it has to be approved by

 7   one of the chiefs.

 8        Q     Got it.

 9        A     And it tells you right there on the boxes.

10        Q     Right.  No, that's helpful.  Thank you.

11        A     No, it's like --

12        Q     And I'm really just wording the question

13   poorly, admittedly.  So let me try to just phrase it a

14   different way.

15              Would Chief Garza ever request -- send an RFI

16   to Internal Affairs that had nothing to do with a

17   complaint from a public citizen?

18              MR. FRIGERIO:  Objection, form.

19        A     I still don't understand your question.

20        Q     (By Mr. Nelson) We'll turn back to it later.

21   I'll think of a better way to phrase it.

22              But I think what I want to do now is I want to

23   just understand what happens with the RFI process.

24   Because I have this -- I have a good sense of how the

25   complaint process works, from Step 1 to Step 5.
```

Page 83

1            So let's say Chief Garza submits a Request For

2    Investigation.

3        A    Uh-huh.

4        Q    How does that work in practice?

5        A    So the RFIs, like I said, Laura disperses them

6    amongst all the sergeants.  So when I get an RFI, on

7    Exhibit 16, 2161, where it says RE, reference, Request

8    For Investigation, then it says Deputy Babb -- on this

9    one it says Deputy Babb.  So this one only has one

10   person.  Sometimes you'll have numerous officers.

11       Q    Right.

12       A    So at this point, I have to gather all the

13   information that this -- because it's going to have more

14   than this page.

15       Q    Right.

16       A    It's going to be a big packet.  Say, say a use

17   of force at the jail.  Say there was five deputies

18   involved.  And it's going to say, pretty much, you know,

19   Request For Investigation for these five deputies on

20   so-and-so date, there was a Code 2 and inmate so-and-so

21   says there was excessive force, whatever.  So I have to

22   pull all five videos, locate them, and sometimes it's

23   hard to locate them because the jail categorizes -- or

24   categorizes them, sorry, different ways.  Like they're

25   not easy to find like patrol.

Marta Ortega                                                    February 28, 2024

Page 84

1        Q     Yeah.

2        A     So you've got to find all their videos, all

3    their RFIs, like their, their reports, each individual

4    report, everything.  So, and then if there's video on the

5    unit, pull the video on the unit, just to make sure

6    everything's done.

7              Once I get all my investigation that I need, I

8    type up questions that the officers need to answer to me.

9        Q     Okay.

10       A     That I saw like -- if, say, there was maybe --

11   for example, there was one that they were saying that the

12   officer tripped them when he had leg irons, so he fell

13   and busted his mouth.  So I have to, you know, look at

14   all the video and ask questions like did you kick him,

15   did you not -- you know, did you kick him, was he in

16   restraints.  So I've got to type up questions pertaining

17   to the incident.  And then I bring in each deputy one by

18   one into the office, and I show them all the evidence,

19   all the reports, everything.  And they've got to answer.

20   And that's when they come in with their attorney.

21       Q     Got it.  Okay, thank you for that.  That's

22   helpful.

23             So what I want to do is I want to relay that

24   back to you, but I want to do it with the step by step --

25       A     Okay.

1        Q    -- like we did with the complaint process, just

2    to make sure I understand.

3        A    Okay.

4        Q    So let's make Step 1 -- let's just use Chief

5    Garza as an example.

6        A    Okay.

7        Q    So Chief Garza submits a Request For

8    Investigation.  Is that -- does that sound right for Step

9    1?

10       A    Yes.

11       Q    And what are the reasons why she would submit a

12   Request For Investigation?

13       A    That's beyond me.

14       Q    Well --

15       A    Like I said, that's -- they, they sign off.

16   They're the ones that make these RFIs, and if it's

17   signed, we investigate them.  I can't tell you why she

18   did this RFI.  I can't.  That's not me.

19       Q    Well, let's take it this way.  So one way might

20   be that the lieutenant -- because going back to what we

21   said earlier, the lieutenant could write up something to

22   Chief Garza that would perhaps prompt Chief Garza to say,

23   "Hey, I'm going to submit a Request For Investigation."

24       A    Yes.

25       Q    Is that correct?

Page 86

1          A      Yes.

2          Q      Okay.  So that would be one way.  And other

3     than that, it's just, you have no idea why she would?

4          A      How they get their information or -- you know,

5     I don't know.

6          Q      Okay.  Got it.  Now, Step 2 -- let me make sure

7     we got Step 1 down.  So Step 1, Chief Garza submits a

8     Request For Investigation.

9          A      Uh-huh.

10         Q      Step 2, what happens there?

11         A      That's when I review the documents they send

12    me.  And sometimes they don't even send me everything.

13    No, I'm serious.  So sometimes, like I said, like a use

14    of force at the jail --

15         Q      Yeah.

16         A      -- sometimes they'll send me the names and why

17    we're investigating, and like one report, and it's

18    missing the other four reports of the officers.

19         Q      Who is "they" that doesn't send you everything?

20         A      Well, I'm saying "they," as far as like the

21    whole packet.  Like the whole packet does not come with

22    everything.

23         Q      Sorry, who is sending you the packet?

24         A      It comes from the administration.

25         Q      Okay.

Marta Ortega                                          February 28, 2024

Page 87

1       A     From the chiefs.  I don't know who does them

2    over there.  I'm not blaming nobody, but --

3       Q     No, that's helpful.  I just wasn't sure if it

4    was like the officers had an obligation to send you their

5    stuff or if it was the administration.

6       A     Yeah, administration sends us this.  I don't

7    know who composes them over there at administration, but

8    they're the ones --

9       Q     Got it.  Okay.  So someone from Chief Garza's

10   office would send you all the information that you need

11   to look at.  Ideally, they would.

12      A     Yes.

13      Q     Okay.

14      A     So I read it.  And that's when I start my

15   investigation as far as like investigating what I need to

16   look into, which is reports, body camera, unit camera,

17   like any evidence to prove or disprove the allegations.

18      Q     Got it.  Now, are you going to be acquiring any

19   evidence outside of what the administration office sends

20   you?  Assuming they send you everything they're supposed

21   to.

22      A     Well, sometimes, like the unit cameras,

23   sometimes -- depending -- because you have the annex and

24   the main jail.  I have access to the main jail, but not

25   the annex.  But sometimes it's faster for them to provide

Marta Ortega                                                February 28, 2024

Page 88

1   me the video than me go down there, because then I've got

2   to take down time from my other, you know, other

3   investigations to go out there, and sometimes I'll have

4   to sit there for hours, just to look at the video, pull

5   the video, or download everything.  So sometimes I will

6   just email whoever the sergeant was, if they have access

7   to the video, or if they don't have the video from the

8   unit.  Because some units have video and some don't, or

9   some have the ones that flip every 5, 10 minutes or

10  whatever.  So sometimes you won't capture what happened

11  in that unit.

12       Q    Okay.  That makes sense.  So in other words,

13  like Chief Garza's office is going to be sending you

14  ideally all of the files you're supposed to be looking

15  at, but then you might have to retrieve yourself body cam

16  footage?

17       A    Videos.  And some reports too that were not

18  included in there.

19       Q    Right.  Okay.  That makes sense.  All right.

20  So Step 3, it sounds like that's where you do your

21  investigation.

22       A    So after I get all the stuff I need, then I

23  have to do questions for each officer, and I've got to

24  schedule each officer different dates, different times.

25       Q    Are there specific questions that you have to

Marta Ortega                                    February 28, 2024

Page 89

1    ask?

2         A    There's like four or five.  I can't remember

3    exactly.  Like pretty much like what's your name, your

4    rank and title, do you know the policy, have you read the

5    policy procedure, you know what I mean.  It's like the

6    standard for everybody.  I can't remember the rest.

7         Q    Is that anywhere in the Sheriff's manual?

8         A    No.  That's all what we use in Internal

9    Affairs.

10        Q    Okay.  And you said one of the questions was

11   have you read all of the policy -- or what was the

12   question again?

13        A    Something about have you -- are you familiar

14   with the policies and procedures.

15        Q    Is it just like are you familiar with the

16   entire manual, or is it are you familiar with the

17   relevant policies?

18        A    I can't tell you top of my head, no.

19        Q    You just don't remember?

20        A    I don't remember.

21        Q    That's fine.

22        A    But there's like a couple, like I said, like

23   four questions that are always asked of everybody.

24        Q    Are there any other questions other than the

25   ones you just listed, name, title, the policy question --

Page 90

1    what was the other one?

2         A    I don't remember.  I can't remember.  It's been

3    so long, it's just -- I don't know, it's like four

4    different questions they ask, but those are always

5    standard questions.  And then you make up your own

6    questions as far as the investigation --

7         Q    Okay.

8         A    -- to ask every officer.

9         Q    And at this point, you're then investigating

10   this RFI similar to how you would investigate a

11   complaint?

12        A    Well, it's kind of different.  The RFI is

13   different because they're responding officers, as far as

14   like you have an opportunity to bring your attorney with

15   you.

16        Q    Got it.

17        A    Like you have legal counsel with you.

18        Q    But as far as like the type of, like the --

19   scratch that.

20             As far as the questions you're asking yourself

21   and like the determinations you're trying to make,

22   that's -- you're just trying to reach the right

23   conclusion, just like you would --

24        A    Yes.

25        Q    -- in the complaint process.  Got it.  Okay.

Marta Ortega                                      February 28, 2024

Page 91

1    So then what -- so after you ask questions to each

2    officer, those four-ish questions, and look at all the

3    evidence, then what do you do in Step 4?

4         A    Then I've got to type up everybody's -- like

5    what they told me, and if they're sustained/not

6    sustained, on the violations.  Like a whole summary.

7         Q    Got it.  Easy enough.  What's Step 5 after

8    that?

9         A    Then we submit our findings to the lieutenant,

10   and then the lieutenant will review it, send it back to

11   us if we need corrections, and then if not, it gets

12   submitted to the administration.  And what happens after

13   that, I don't know.

14        Q    When would the lieutenant send back for

15   corrections?

16        A    Just like for spelling or, or if he thinks it

17   needs more explanation or whatever, like the findings.

18        Q    Would the lieutenant ever disagree with you on

19   your sustained/not sustained conclusion, and say, "I'm

20   sending it back.  I need you to redo it"?

21        A    I don't recall him doing that, or her.  I don't

22   recall him telling me that.

23        Q    Okay.  So then Step 5, the lieutenant sends the

24   findings to admin, and then from there you don't know

25   what happens?

Marta Ortega                                    February 28, 2024

Page 92

1        A     I don't know what happens after that.

2        Q     You never hear anything of an RFI, you do like

3   the conclusion or --

4        A     I don't -- sometimes we'll get here and they're

5   like a, "Oh, we got to serve this person for admin

6   leave."  But sometimes it's not even for my case, it's

7   probably for a different sergeant's case.  But we never

8   find out the actual ending, like say -- like I said, they

9   go sometimes administrative leave, and then they go

10  through the process and they come back to work.  I don't

11  even know when they come back to work, or what they got,

12  ended up -- ending up with five days, ten days, 15 days,

13  30 days, suspension, I don't know.  Like I said, once it

14  gets to their level, we have nothing to do with it.

15       Q     Got it.  And so that's -- these are just these

16  five steps and there's not really anything beyond that --

17       A     (Shaking head.)

18       Q     -- because, again, you just don't know what

19  happens --

20       A     I don't even know if it gets closed or nothing.

21       Q     Okay.  Well, thank you for that.  I know that

22  was grueling.  But I just wanted to get a clear timeline

23  of exactly how the steps work.

24             All right.  So you had mentioned earlier, way

25  early on, that the RFIs had a timeline.  I think that was

Marta Ortega                                                   February 28, 2024

Page 93

```
 1   the word you used; is that correct?

 2        A     (Nodding head.)

 3        Q     What's that timeline?

 4        A     At the time when I was there, I believe it was

 5   180 days that, from the date it was received.

 6        Q     What does that mean, date it was received?

 7        A     The date it was received in our office, the

 8   RFI.

 9        Q     Got it.  Okay.

10        A     I believe -- I believe it was 180 days that I

11   had to submit all my findings.

12        Q     Got it.  Okay.  Excellent.  Thank you.

13              All right.  So now I think I want to talk a

14   little bit about how you would determine -- if you were

15   to get a traffic stop complaint, how you would determine

16   if the traffic stop violated -- violated any Sheriff's

17   manual policies.

18              So let's go back to the Sheriff's manual, which

19   is Exhibit 14 right here.

20        A     Uh-huh.

21        Q     And I think how I want to proceed here is I

22   really kind of want to break this down into three steps.

23   I just want to ask -- I'm going to want to kind of unpack

24   what policies you would look to to determine whether

25   stopping a vehicle was okay or not, whether extending the
```

Marta Ortega                              February 28, 2024

Page 94

1      stop was okay -- okay or not, and then whether searching

2      the vehicle was okay or not.  Does that make sense?

3          A    Okay.

4          Q    All right.  So let's go to Page 236 of the

5      Sheriff's manual, Exhibit 14.

6               Okay.  What does it say at the very top there?

7          A    Chapter 23, Crash Investigation and Traffic

8      Enforcement.

9          Q    Okay.  And I don't have anything specifically

10     on this page, but we're on Chapter 23 of the Sheriff's

11     manual, correct?

12         A    Yes.

13         Q    Let's go to Page 245.  And do you see where it

14     says 23.09, Random Stopping of Motorists?

15         A    Yes.

16         Q    What is 23.09?

17         A    Random Stopping of Motorists.

18         Q    When does -- when does this policy apply, in

19     your words?

20         A    (Reading document sotto voce.)

21              You want me to read this verbatim for you?

22         Q    No, you can just summarize it.

23         A    Okay.  So they need probable cause, or

24     reason -- it says upon reasonable suspicion of a criminal

25     activity, pursuant to standardized traffic stops, such as

Page 95

1    driver's license checks, or other lawful justification

2    such as to prevent a hazard.

3         Q    So let's unpack probable cause a little bit.

4    So I'm going to read A1, I'm going to ask you some

5    questions about that.

6              So it says, "Officers shall not randomly stop

7    motorists but will stop vehicles only on probable cause

8    to believe a traffic violation has occurred."

9              As an Internal Affairs investigator, what did

10   you understand the term "probable cause" to mean in this

11   context?

12        A    Probable cause is like facts, like something

13   that you did -- like a crime was committed.  Probable

14   cause, like speeding, if you're doing the radar,

15   speeding, like you're going 60 in a 40, the radar

16   shows -- you know, that's your probable cause, you're

17   speeding.

18             Failing to maintain lane, if you drift off,

19   that's failure to maintain, that's your probable cause to

20   stop a vehicle.  Sometimes there's no front license

21   plate, and here you're supposed to have -- in Texas

22   you're supposed to have a front and back.  So for no

23   front license plate that's probable cause to stop a

24   vehicle.

25        Q    That makes sense.  So right there you're kind

Marta Ortega                                          February 28, 2024

Page 96

1    of speaking of the violation.  From the officer's

2    perspective are you saying the officer needs to see

3    firsthand these violations?

4        A    When I was a patrol officer, yes.  You have to

5    have probable cause to stop a vehicle, so --

6        Q    And so, I mean, this might sound obvious, but

7    if you're not, if you're not witnessing the violation, a

8    traffic stop violation, would you lack probable cause,

9    you think, in that situation?

10            MR. FRIGERIO:  Objection, form.

11            MR. NELSON:  I'll rephrase.

12       Q    (By Mr. Nelson) Let's say you catch someone,

13   like in this case, failing to -- allegedly failing to

14   maintain a lane, right?

15       A    Uh-huh.

16       Q    Would an officer need to actually see that to

17   have probable cause of that alleged traffic violation?

18       A    You need probable cause for a traffic stop.

19       Q    Right.  I'm asking --

20       A    It needs to be seen by the officer.

21       Q    Okay.  Got it.  Thank you.

22            Did you ever do -- or let me ask it this way.

23   How many investigations, complaint investigations did you

24   do where an officer allegedly acted without probable

25   cause?  And this can be in a traffic stop context or in

Page 97

1    other contexts.

2         A    When I was in Internal Affairs, none, because I

3    never gave a complaint to the lieutenant.

4         Q    Okay.

5         A    Or an RFI.

6         Q    Wait.  Say that again.

7         A    For it to be an RFI or anything -- I never had

8    a complaint turn into an RFI.  Any of my complaints never

9    turned into an RFI.

10        Q    I'll rephrase the question.  Sorry.  I didn't

11   ask it very well.

12             So I'm just asking how many complaints did you

13   investigate where probable cause was a relevant issue?

14        A    The complainants are complaining that there was

15   no probable cause or that I actually saw the probable

16   cause?

17        Q    Where a complainant alleged there was a lack of

18   probable cause or where you in the course of an

19   investigation concluded, oh, I need to look to determine

20   whether there's probable cause or not.

21        A    Those are two different questions.  Because a

22   complainant could say all day long that I was stopped for

23   no reason, but they were speeding.  Their probable cause

24   was speeding.

25        Q    Well, let's take one at a time then.

Marta Ortega                                              February 28, 2024

Page 98

1        A    Huh?

2        Q    Let's do that one first.  So how often did you

3   get a complaint where someone alleged lack of probable

4   cause?

5        A    You get those all the time.

6        Q    All the time?

7        A    Yes.  But they're usually just like -- and like

8   I said earlier, most of them were not even pertaining to

9   us.  They're other agencies.

10       Q    That makes sense.  Okay.  Were there ever any

11  situations where -- I'll just scratch that.  I think that

12  makes total sense.

13            And you had said -- just to reiterate, you had

14  said you did not have a situation where -- let me

15  rephrase.

16            You never found lack of probable cause in a

17  complaint investigation, correct?

18       A    I didn't really have so many traffic stops, you

19  know what I mean, complaints.

20       Q    Just yes or no.

21       A    No.

22       Q    Sorry.  Okay.  Let's turn to -- let's actually

23  stay on the same page.  So I have a question about

24  23.09A2.  So it says, "Officers shall not randomly stop

25  motorists, but will stop vehicles only upon reasonable

Marta Ortega                                        February 28, 2024

Page 99

1  suspicion of other criminal activity."  Do you see that?

2       A    Uh-huh.  Yes.

3       Q    Can you give me an example of where an officer

4  would have reasonable suspicion of other criminal

5  activity such that he could, or she could randomly stop

6  the motorist?

7       A    The way I read that, as a patrol officer, I

8  would say dark, not well lit, high crime area.

9       Q    Sorry, can you unpack that for me a little bit?

10      A    Like if it's dark, and it's not well lit, the

11 area's not well lit, and it's a high crime activity

12 level, that neighborhood, that it's known, you know, for

13 drug dealers or -- and there's reasonable suspicions on a

14 vehicle for some reason.

15      Q    What do you mean there's reasonable suspicion

16 on the vehicle for some reason?

17      A    Just like say it's 2:00 o'clock in the morning,

18 and we already know that this area, there's always

19 burglars breaking into vehicles.  And say we had a call

20 already for, hey, we have such-and-such vehicle, like a

21 white BMW with something else, just leaving, when they're

22 trying to break in, you know, like pull the door handles,

23 and you see a white vehicle, you don't know the make and

24 model right away, but that's reasonable suspicion,

25 especially in that area.

Marta Ortega                                          February 28, 2024

                                                              Page 100

1        Q    So you're saying reasonable suspicion would

2    be -- it would require those several factors that you

3    listed kind of altogether, right?  Not just like the time

4    of day alone, for example?

5        A    That's what I'm saying, nighttime, like 2:00

6    o'clock in the morning, it's dark, not well lit area,

7    high crime area.

8        Q    Well, I'm just asking like would a high crime

9    area that's not well lit alone give an officer reasonable

10   suspicion to pull someone over?

11            MR. FRIGERIO:  Objection, form.

12       A    I can't respond for other officers.  You know

13   what I mean?

14       Q    (By Mr. Nelson) Well, let's say you got a

15   complaint where a complainant said, "Hey, I got pulled

16   over," and let's just say the officer -- the officer told

17   me, "Hey, you're in a high crime area, and it's not well

18   lit.  That's why I pulled you over."  Would that officer

19   have reasonable suspicion?

20       A    There would have to be more to it.

21       Q    Okay.

22       A    Like I said, like a call that might lead up to

23   that --

24       Q    Got it.

25       A    -- that vehicle or description.

Marta Ortega                                                February 28, 2024

                                                              Page 101

1        Q    Got it.  Okay.  All right, so let's -- let's

2   now turn to Page 127 of the Sheriff's manual.

3        A    120 --

4        Q    127.  And what does it say on the top there?

5        A    Chapter 11, Warrantless Arrest.

6        Q    Okay.  There's a lot of stuff in this chapter,

7   but I'm going to -- let's turn all the way to Page 147.

8   And do you see 11.21?

9        A    Yes.

10       Q    And Subsection A?  And I'm just going to read

11  it aloud.  "An officer may temporarily and voluntarily

12  detain a person for investigation when he has reasonable

13  suspicion that the particular person has been or is about

14  to be involved in criminal activity."  Did I read that

15  correctly?

16       A    Yes.

17       Q    Okay.  Is it fair to say that 11.21A would

18  govern traffic stops, extending a traffic stop?

19       A    What do you mean extending?

20       Q    So let's say an officer pulls over a driver for

21  a traffic violation, say speeding.  And the officer, you

22  know, runs the license plate, insurance, all that other

23  stuff, anything -- I guess not insurance, but license

24  plate, everything else.  And then the officer wishes to

25  extend the stop for reasons unrelated to the traffic

Marta Ortega                                    February 28, 2024

Page 102

1    violation.  Would that officer need reasonable

2    suspicion -- well, let me actually back up.

3            What would the officer need to have continued

4    the stop and asked questions unrelated to the traffic

5    stop?

6        A    The probable cause to stop them was the

7    speeding.  And to extend it, like as far as -- what are

8    you trying to go at?  As in -- like to search his

9    vehicle?  Is that what you're asking?

10       Q    No, just to extend the stop, to detain the

11   person and start asking questions unrelated to the

12   traffic violation.

13       A    Well, when I used to do traffic stops, like say

14   I pulled you over for speeding, and as I'm walking to

15   your vehicle, you have this odor of marijuana emitting

16   from the car, and you make contact with the officer --

17   with the driver, "Hey, this is why I'm speeding" -- "I'm

18   pulling you over because you're speeding," and you smell

19   the marijuana, or you see weed in the center console,

20   whatever.  That's probable cause to search his vehicle

21   all day long.  Like, "Hey, exit the vehicle," detain

22   them, put them in your vehicle.

23       Q    Okay.  So that example is useful.  So that

24   would be an example where --

25       A    That's where you extend it, because you've got

Marta Ortega                                    February 28, 2024

Page 103

1    to search now.

2         Q    In that situation, you would have reasonable

3    suspicion to, again, extend the stop and begin asking

4    questions unrelated to the speeding violation?

5         A    Uh-huh.

6         Q    Okay.  So can you just -- that was a helpful

7    example, but can you just unpack for me like what an

8    officer would need -- scratch that.

9              Let me ask it this way.  As an Internal Affairs

10   investigator, how would you describe reasonable suspicion

11   as a standard that you're applying to determine whether

12   an officer's conduct violated policy or not?

13        A    You have to give me like an example of

14   something.

15        Q    Well, I mean --

16        A    Like related to this case, in related to this

17   case, looking at -- like I said, when I got this case, I

18   looked at all the evidence, which is the -- his body-worn

19   camera, Alek's, his -- he provided dash cam, everything.

20   So there were no policy violations.

21             As soon as Babb pulled him over, he told him

22   exactly why he pulled him over.  He identifies himself,

23   he tells him why he stopped him, everything.  So when I

24   reviewed everything, I didn't see no policy violations,

25   because he did fail to maintain the lane.  And when he

Marta Ortega                                    February 28, 2024

Page 104

1    was talking to him, he's in the front seat, he's not

2    detained, talking freely.  He's welcome to leave whenever

3    he wants.

4        Q    Got it.  So you said the Plaintiff in this

5    case, Alek Schott, had failed to maintain a lane.

6        A    Uh-huh.

7        Q    What evidence did you rely on to conclude that?

8        A    On the video he sent, the dash cam.

9        Q    The dash cam?

10       A    (Nodding head.)

11       Q    And did the dash cam footage, to your memory,

12   show the truck crossing over the --

13       A    Yes.

14       Q    -- line?

15       A    You see his truck cross, before he even gets to

16   Deputy Babb.  And then when he's approaching, when you

17   see Deputy Babb, he still does it again, and it looks

18   like he does a third time after Babb pulls him over.

19   Like before he pulls him over, he does it again.

20       Q    Can you describe to me what, from your memory,

21   the dash cam was showing?  Was it showing the tires on

22   the road?  Was it just showing --

23       A    It showed like the -- I guess you could see the

24   hood and you could see the hood where it moves, and the

25   lane.  You could see like --

Marta Ortega                                                February 28, 2024

Page 105

1        Q    I see.  So you concluded that he had -- that

2    Alek had crossed over the line, based off of where the

3    hood was relative to the line?

4        A    Uh-huh.  You could tell, because your tires

5    are, of course, at the beginning of the hood, and -- I

6    don't know how to describe it.  Like the hood's like

7    this, and you still had -- like your driver -- I guess

8    when you're driving, like right there, you could tell

9    where it moves.

10       Q    Understood.  Okay.  So that would have -- your

11   conclusion in Alek's investigation was that that video

12   gave probable cause --

13       A    For the initial stop.

14       Q    Got it.  Did you account for the fact that all

15   that -- you know, obviously Deputy Babb wasn't watching

16   the dash cam.  He was behind Alek.  Did that factor into

17   your investigation at all?

18       A    No, because daily, you see people drift over

19   the lanes.

20       Q    Did you review Deputy Babb's dash cam footage

21   at all for this?

22       A    His dash cam wasn't working.

23       Q    Okay.  And was the fact -- was that a

24   violation, that Deputy Babb did not have his dash cam on?

25       A    Like I said, most vehicles -- some vehicles

Marta Ortega                                              February 28, 2024

Page 106

1     don't have dash cam at all.  And some vehicles -- most of

2     the vehicles with a dash cam, for some reason, doesn't

3     work.

4          Q    Okay.  So I get that they like malfunction a

5     lot apparently?

6          A    Yeah, there's malfunctions, and you know, we

7     can't do nothing -- we can't punish an officer for a

8     malfunction.

9          Q    Okay.  So it's --

10         A    I don't know if his dash cam was malfunctioned,

11    like if it was broken, was it broken, or if his vehicle

12    had -- you know what I mean, but I know there was no dash

13    video.

14         Q    So let me relay this back to you just to make

15    sure I understand.  So if the dash cam were

16    malfunctioning, you would say, well, that's not Deputy

17    Babb's fault --

18         A    Uh-huh.

19         Q    -- so he can't be found violating policy.

20         A    Not for the dash cam.

21         Q    If he, if Deputy Babb just --

22         A    If he intentionally, now, that's different.

23         Q    Okay.  Did you investigate whether he had

24    intentionally not turned the dash cam on or whether it

25    was malfunctioning?

Page 107

1        A    I don't recall if there was, if he wrote on his

2   report or his sergeant said it wasn't working.  I don't

3   recall.

4        Q    Okay.  Well, we can go to -- well, let's hold

5   on for now.  But is there a way to determine whether the

6   dash cam is malfunctioning outside of just, you know,

7   asking Deputy Babb or his supervisor?

8        A    I don't know.

9        Q    Well, like just for example, could you talk to

10  some, like any tech person at the Sheriff's Office and

11  say, "Hey, can you tell me whether this dash cam was

12  malfunctioning at the time of the stop?"

13       A    I don't know who's in charge of that, honestly.

14  Like I said, patrol units every day, they malfunction.

15  So I don't know -- I don't even know who's in charge of

16  dash cameras to call and ask them like, "Hey, is this

17  malfunctioning or not?"  You know what I mean?

18       Q    Right.  So I guess going back to my earlier

19  question, what was the evidence that you relied on to

20  determine whether -- let me rephrase it.

21            What was the evidence that you relied on to

22  determine that the dash cam in fact was malfunctioning?

23       A    I don't recall if it was the report or the

24  sergeant, like during the investigation.  I don't

25  remember if I read it on the report that there was no

Marta Ortega                                        February 28, 2024

Page 108

1    dash cam, or if the sergeant told me.  I don't remember.

2         Q    Okay.

3         A    But I know on Axon, it should be there.  Like

4    if there's video on Axon, it's going to show it there.

5         Q    Got it.

6         A    And there is no dash cam there.

7         Q    So let's actually just turn to -- let me make

8    sure I got the exhibit right on this.  Since we're

9    talking about this anyway, let's go to, back to Exhibit

10   16.  So like let's just talk about your investigation of

11   the Alek Schott stop.  We'll just take it one at a time

12   here.

13        A    Could we take a restroom break real quick?

14        Q    Yes, absolutely.

15        (Recess from 11:59 a.m. to 12:10 p.m.)

16             THE REPORTER:  We are back on the record.

17        Q    (By Mr. Nelson) All right.  Sergeant Ortega,

18   let's just turn to Exhibit 16 again.  And I just want to

19   start unpacking, just like the timeline of the complaint

20   investigation process concerning Alek Schott's complaint

21   specifically.

22             So just based off of the five-step process that

23   you gave me before about the complaint investigation

24   process, it sounds like the first thing you did or first

25   thing you saw about Alek Schott's complaint was 2165,

Marta Ortega                                                February 28, 2024

Page 109

1     this handwritten note that Laura wrote; is that correct?

2          A     It would be both 2163 and 2165.

3          Q     2163 and 2165.

4          A     This is her cover sheet and then her notes.

5          Q     I see.  And when did Laura create the citizen

6     contact sheet?

7          A     On her date it says March 18th, 2022.

8          Q     Does that sound right to you?

9          A     That's what she wrote.

10         Q     Do you remember when you looked at it?

11         A     According to my notes, it's either what I

12    wrote -- my initial contact was April 12th.

13         Q     And is this on 2163?

14         A     Yes.

15         Q     And all those handwritten notes on the bottom

16    of 2163, those are your notes?

17         A     Yes.

18         Q     Okay.  Okay.  So let's go back to 2165.  And do

19    you see what I would -- let me actually back up.  So

20    according to Laura, there were essentially three

21    allegations.  See that area?  And I'll just list them.

22    So the way I'm looking at it is one, traffic stop without

23    cause.  Do you see that?

24         A     Uh-huh.  Yes.

25         Q     And is it fair that -- is it fair to

1   characterize that as an allegation that Alek must have

2   made to Laura?

3       A    Yes.

4       Q    Did you investigate a traffic stop without

5   cause?

6       A    When I first called, he didn't answer,

7   according to my notes.  Then he called back.  Then he

8   told me the deputy's name.  Because right here it has

9   nothing that says who it was.  That's why I usually call

10  the complainants.

11          That's when he told me -- the first initial --

12  that I recall, my first initial contact with Alex

13  [sic] was that he was complaining about his vehicle being

14  damaged.

15      Q    Okay.  And I see, going back to 2165, it does

16  say "damaged my vehicle."  Do you see that?

17      A    Uh-huh.

18      Q    And he did complain about that to you over the

19  phone, right?

20      A    Yes.  Like I said, my first -- my initial

21  contact with him when I asked him, when I identified

22  myself, said what happened, and he told me that his

23  vehicle was damaged.

24      Q    Okay.  Did he --

25      A    That's the only thing I talked to him about,

Marta Ortega                                                    February 28, 2024

Page 111

1    and that he had dash cam in his vehicle.  So I said,

2    "Okay.  I'm going to send you my information, and so you

3    could send me the dash cam."  That was my initial call.

4              The second time I talked to him, that's when he

5    stated that he was illegally detained.  But our first

6    conversation it was never brought up.

7         Q    Okay.  So just correct me if I'm wrong, the

8    second time you spoke with him over the phone, he did

9    complain of a traffic stop without cause?

10        A    Because I didn't even know that they had paid

11   him out.

12        Q    What does that mean?

13        A    For the damages.

14        Q    Okay.

15        A    Because according to him, his vehicle was

16   damaged.  So I don't know if it was -- right here,

17   there's emails where we interacted.

18        Q    Well, so let's back up a little bit.  So you,

19   did you call him the second time?

20        A    You know, it's been so long that I can't

21   remember if it was emails, talking to him, but I remember

22   my first initial contact with him was when I talked to

23   him to find out who the officer was and what happened,

24   and all he brought up was the damage to the vehicle.

25        Q    Okay.  So did you talk to him the second time

1    to just tell him, "Hey, you've already -- "I see you got

2    a payout"?  Or help me understand why there was a second

3    conversation.

4         A    Yes.  Because at that time that's when I spoke

5    to Babb's supervisor, and --

6         Q    Sorry, before the second time you called Alek?

7         A    Yes, because he's the one that told me that

8    they paid him out.

9         Q    Okay.

10        A    Or he -- it's been so long.  It's been so long.

11   No, he mentioned they paid him out, and that's when I

12   talked to his -- Babb's supervisor.

13        Q    Who mentioned the payout?

14        A    Alex.  Alek.

15        Q    In the first phone call?

16        A    I don't remember if it was the first phone call

17   or the second one.

18        Q    Okay.  Let's do it this way, just to kind of

19   like help clarify your thoughts a little bit, because

20   this was a while ago.

21        A    I talk to a lot of people too, so I don't

22   remember.

23        Q    Let's do it this way.  To the best of your

24   memory, let's just kind of do it step by step like we did

25   with the complaint and the RFI process.  Can we do that?

Marta Ortega                                            February 28, 2024

Page 113

1    And then we can refer to the documents where relevant.

2    So Step 1, what did you do?

3         A    Called him.

4         Q    And you called -- so I think we're missing

5    something here.

6         A    Well, I got the request for the citizen

7    complaint.

8         Q    Okay.  Got it.  So you got the citizen

9    complaint?

10        A    And obviously there's no name, no officer's

11   name, nothing.  So I called Alek.  Is it Alex or Alek?

12   Alek, right?

13        Q    Alek.

14        A    So I called Alek and asked him what happened,

15   and he says that he got pulled over and that his vehicle

16   was damaged.

17        Q    Well, let's slow down.  Step 2, you called him.

18   This is the first phone call?

19        A    Uh-huh.

20        Q    And the only thing you talk about is damage to

21   his vehicle.

22        A    Uh-huh.  And he, he tells me that it was Deputy

23   Babb, Officer Babb, whatever, however he --

24        Q    Yeah, you got ahead of me.  That was going to

25   be my next question.  So he does reference Deputy Babb in

Marta Ortega                                        February 28, 2024

Page 114

1     that conversation?

2          A     Uh-huh.

3          Q     And what does he say about Deputy Babb?

4          A     That he searched his vehicle, and I guess there

5     was damages to his vehicle when they did the search.  But

6     like I said, that first conversation, he never mentioned

7     to me anything about being illegally detained.  That

8     first conversation, he never mentioned that to me.

9          Q     Got it.  So then Step 3, what did you do after

10    that phone conversation?

11         A     He told me he had dash cam in his vehicle.  So

12    I told him to send me the dash cam.

13         Q     Do you remember when he did that?

14         A     It's in the emails.

15         Q     Okay.

16         A     So I told him to send it to me, and he never

17    did, because it took a while.  I don't even know the

18    dates.  But I know it took him a while to send it to me,

19    because I asked him on email again, can you send me the

20    footage.  But I did -- I looked at Dabb's -- at Babb's

21    body-worn camera, and I didn't see damage to the vehicle.

22    I didn't see no damage to the vehicle.

23         Q     So let's, let's actually track this email down.

24    So it looks like -- can we turn to 2166?  And do you see

25    on the bottom there where it says, "Can you send me the

1    dash video you have," this email?

2        A    Uh-huh, April 22nd, 2022.

3        Q    And this sounds like a silly question, but

4    that's your email, correct?

5        A    That's me.

6        Q    And when did you send it?

7        A    April 22nd, 2022.

8        Q    Okay.  So let's back up a little bit, because

9    it looks like on the next page, there's a couple of

10    emails from Alek to you.  And the emails Alek sent to you

11    were on April 12, 2022; is that correct?

12        A    Yes.  The one that's blank right here, the one

13    that says on 2168, it says April 12, 2022, 11:49, it's

14    blank.

15        Q    Uh-huh.

16        A    It just has my signature.

17        Q    Yes.

18        A    That's what I sent him.  That way he could send

19    me, so he could have my email and my information so he

20    could send me the dash cam.

21        Q    Okay.  So that would have been Step 3 then.

22    Did this -- did you send that April 12 email after you

23    talked to him on the phone?

24        A    Yes, because I needed to send him my

25    information.

1      Q    Got it.

2      A    Which is the same day we spoke.

3      Q    You sent the email on April 12, 2022, and that

4  was the same day you had your first phone conversation?

5      A    Yeah, it says right here, April 12 at 10:24

6  a.m.  I called him, negative contact.  Then he called me

7  back at 11:42 a.m., and then I told him, "Okay, well,

8  send me your dash cam, and I'm going to send you my

9  information," which was at 11:49.

10     Q    And just -- so you reference right here, can

11 you just ID the page number of that, where you said

12 you -- there's some note?

13     A    The note, 2163.

14     Q    Okay.  So I guess, help me understand, you said

15 in the first phone call you asked for his dash cam?

16     A    Yes, because he says he has, that there was

17 damage to his vehicle and he had dash cam.  So I told

18 him, "Can you send me the dash cam you have?  And I'm

19 going to send you my email, my information."  That's when

20 I emailed him my information.

21     Q    What would the dash cam help you with as far as

22 assessing whether the vehicle had damage?

23     A    Because I thought he had -- you know how some

24 people have in-dash too, like --

25     Q    Oh, I see.

```
 1        A     Yeah.

 2        Q     Okay.  Thank you for clarifying that.  I was a

 3  little confused there.  Okay, that makes sense.  All

 4  right.

 5        A     I think he said I have pictures, or dash cam of

 6  the damage or whatever, so --

 7        Q     Got it.

 8        A     I said, "Well, send it to me."

 9        Q     Okay.  Thank you for that.  That's helpful.

10              So Step 3, you sent the April 12, 2022, email.

11  What did you do Step 4?

12        A     That's when I reviewed Babb's -- I'm assuming

13  that's when I started reviewing the reports and the

14  camera, the body-worn camera.

15        Q     Whose body-worn camera?

16        A     Babb's.

17        Q     Okay.  Did you review anyone else's body cam

18  footage?

19        A     I don't think so.

20        Q     Officer Molina?

21        A     I don't remember if I did or not his.

22        Q     Officer --

23        A     I know I didn't do Gereb's.

24        Q     Okay.

25        A     I didn't do Gereb's.  But Deputy Molina, I
```

Marta Ortega                                                    February 28, 2024

Page 118

1    don't remember if I reviewed his camera or not.

2        Q    Got it.  So Step 4, do you remember like

3    roughly -- like was this before or after these April 22,

4    2022, emails, where you were reviewing body cam footage

5    and starting to look at the evidence?

6        A    It had to have been before, because I'm asking

7    him again for the dash cam, because he never sent it.

8        Q    Got it.  And so you reviewed the body cam

9    footage, Babb's.  And I'm sorry, what other evidence did

10   you look at at this point?

11       A    His report, I pulled his report.

12       Q    Babb's report?

13       A    Yes, Babb's report and then his body-worn

14   camera.

15       Q    What do you mean by his report?

16       A    His RMS.

17       Q    RMS, okay.  That's what I figured.  Just making

18   sure.  Anything else?

19       A    At -- this note that I have right here on 2163

20   says third party adjuster.  I don't remember -- I think

21   that's when I spoke to Deputy Gamboa -- I mean Sergeant

22   Gamboa, which is Babb's supervisor, and I asked him if --

23           I think it was something along the lines like,

24   "Hey, Alek Schott, do you remember about him, Babb, a

25   traffic stop?  I don't know.  They damaged his vehicle?"

Marta Ortega                                          February 28, 2024

Page 119

1              And I believe he's the one that told me they

2      paid him out.

3              I said, "What do you mean they paid him out?"

4              He goes, "They paid him out for the damages."

5              I was like, "Damages?"  You know, because I

6      didn't see no damages of the vehicle when the dog was in

7      there.  That's just me.

8         Q    Uh-huh.

9         A    So I don't know what damages he claimed, what

10     damages were done, because -- I don't know.  And I think

11     that's when I talked to Alek again.  And Alek confirmed,

12     "Yeah, they paid me out."  And then that's when he was

13     like, "I was illegally detained."

14        Q    Got it.  So you --

15        A    What date was that?  I don't know.

16        Q    Okay.  And this was the second phone

17     conversation where he -- where Alek, that is, references

18     that he was --

19        A    I believe so.

20        Q    Okay.  And what -- can you just like unpack the

21     substance of that conversation to the best of your

22     memory, just like quick recap of --

23        A    Um, I --

24        Q    What did he tell you?

25        A    I can't -- I do not remember.  I just briefly

1    remember that I called him and I told him there was -- I

2    think I told him there was no policy violations.  He

3    identified why he pulled you over, and I spoke to the

4    sergeant and they paid you out.  And I think he's the one

5    that told me 7,000, I don't know what.  And that's when

6    he brings up the whole, "I was illegally detained.  He

7    pulled me over.  He had me there for -- he had me there

8    at the traffic stop, and he put me in the front seat."

9    And I don't even remember.  I can't remember what else he

10   said.

11             And I just -- and I told him, like there's --

12   "He identified why he stopped you, everything."  And then

13   he sent me the -- and I think I requested the dash cam

14   again.

15             Because I think that's when he told me, "He

16   pulled me over" -- I told him, "He pulled you over

17   because of your failure to maintain lane.  He identified

18   all that."

19             He was saying, "No, I didn't.  I have the dash

20   cam."

21             I said.  "Okay.  Well, send me the dash cam,"

22   because I never got it.

23        Q    Okay.

24        A    And then --

25        Q    Sorry.  At that point is that when Alek sent

Page 121

1    you -- to the best of your memory, that's when Alek sent

2    you the dash cam?

3         A    I'm assuming, because he sent the email.

4         Q    On what page are you looking at?

5         A    I'm trying to look -- so 2167, he says, "Hi,

6    Marta, can you confirm the disposition or status of my

7    formal complaint?"

8         Q    And he -- it looks like he sent that email on

9    April 12th, 2022?

10        A    No, I think that's the bottom one, isn't it?

11   That was April 22nd, on 2126.

12        Q    Oh, you're right.  Thank you for correcting me.

13   Yeah, you're right.

14        A    So on 2126, this is April 26th -- 22nd, 2022,

15   at 2:20, Alek Schott.  He's asking me about, "Can you

16   confirm the disposition or status of my formal

17   complaint?"  And that's when I replied on April 22nd,

18   2022, at 4:21, "Can you send me the dash video?"

19        Q    Got it.  All right.  That's helpful.

20             Okay.  So at this point, you had the dash cam

21   footage, right?  Or that's a little too vague.  So he

22   sends you the dash cam footage, correct?

23        A    He sends me the link.

24        Q    Okay.  And so you have the dash cam footage,

25   and you've got the body -- Babb's body cam.

1      A    Uh-huh.

2      Q    You've got Babb's RMS report?

3      A    Uh-huh.

4      Q    Is there any other evidence you had collected

5  or acquired at this --

6      A    I don't think so.

7      Q    Okay.  So just those three things?

8      A    Yes.

9      Q    Got it.  Okay.  So we'll make -- I'm going to

10 make Step 6 Alek sends you the dash cam.  And then what

11 happens after that?

12     A    I'm assuming I reviewed his dash and came to

13 the conclusion that there was no policy violation.

14     Q    Okay.  Well, and let's slow down a little bit

15 there.  So -- let's see.  It looks like you -- no, I

16 guess that's straightforward enough.

17          So Step 7, you just start investigating with

18 all the evidence that you have, the body cam, the dash

19 cam, and RMS report?

20     A    Uh-huh.

21     Q    Okay.  And what was it that you were

22 investigating specifically?

23     A    Because he kept on saying that he pulled him

24 over for no reason, but his dash camera, he fails to

25 maintain the lane.

Marta Ortega                                              February 28, 2024

Page 123

1        Q    Okay.  So let's go to -- just so I make sure

2   I'm on the same page as you -- oops, I went past it a

3   little bit.  Let's go to 2165 again.

4            Okay.  So did you -- and I'm just reading off

5   of this 2165, which again would have been Laura's notes

6   about what Alek alleged, correct?

7        A    Uh-huh.

8        Q    So did you investigate traffic stop without

9   cause?

10       A    Which is what he's alleging.  But he did have

11  probable cause for -- oh, the illegal search?

12       Q    Yeah.  And I'm just asking whether you

13  investigated or not, just the answer --

14       A    But what illegal search -- there's no illegal

15  search.

16       Q    Right.  So I'm not asking for the conclusion.

17  I'm just asking whether you investigated.

18       A    Yeah, I --

19       Q    But I just wanted to start with the traffic

20  stop without cause.  So you investigated that?

21       A    Yes.

22       Q    Okay.  And then you investigated illegal

23  detainment?

24       A    He alleges, yes.

25       Q    Okay.  And is it fair to say that an illegal

1     detainment would basically just be like an extended stop,

2     that I was illegally detained after having been pulled

3     over?  Is that how you understood that?

4          A     Say that again.

5          Q     Yeah, that was a poor way to word that

6     question.

7               Did you investigate whether Deputy Babb or any

8     of the other officers had reasonable suspicion to extend

9     the stop?  Remember we talked about that earlier.

10         A     Yes.

11         Q     Okay.  And then the last one here, illegal

12    search, did you investigate that as well?

13         A     Yes.

14         Q     Okay.  And just, I want to make sure I

15    understand what you looked at when you investigated the

16    allegedly unlawful traffic stop -- right?

17         A     (Nodding head.)

18         Q     The alleged unlawful detention, or extended

19    stop, and then the illegal search.  And so I think maybe

20    the best thing to do here would just be to go back to the

21    Sheriff's manual, which should be Exhibit 14.  And let's

22    just take those three one at a time.

23               All right.  Let's turn to Page 236 of the

24    Sheriff's manual.  And just let me know when you're

25    there.  And again, I'm sorry you don't have it in a nice

Page 125

1    little binder like I do.

2              Okay.  So the first allegation that I want to

3    talk about is the -- is Alek's allegation that he never

4    failed to maintain a lane and shouldn't have been pulled

5    over for any traffic violation.  Does that make sense?

6         A    Yes.

7         Q    Okay.  So my -- just correct me if I'm wrong,

8    my understanding is that the relevant policy you would

9    look to to determine that would actually -- it would be

10   Chapter 23 of the Sheriff's manual that we talked about

11   earlier, and it would be specifically on Page 245.  Let

12   me know when you turn there.  Are you good?

13        A    Yes.

14        Q    Cool.  All right.  So 23.09A1, so "Officer

15   shall not randomly stop motorists, but will stop vehicles

16   only on probable cause to believe a traffic violation has

17   occurred."

18             So my understanding is that that would be the

19   relevant policy you would look to to determine whether

20   Deputy Babb rightfully pulled over Alek Schott; is that

21   correct?

22        A    Yes.

23        Q    Would there be any other policies that you

24   would look to?

25        A    No, because it's a traffic violation.

Marta Ortega                                          February 28, 2024

Page 126

1          Q    Okay.  And just going back to what you said

2    earlier, your conclusion was that based off of the dash

3    cam, you concluded that Deputy Babb did have probable

4    cause to pull Alek over for a traffic violation.

5          A    Yes.

6          Q    Got it.  All right.  Let's go to Page 127 of

7    the Sheriff's manual, same exhibit, of course.  And I

8    want to talk next about Alek's second allegation, which

9    was the illegal detainment or the extended stop.  Does

10   that make sense?

11         A    Okay.

12         Q    And do you remember we talked earlier about

13   this Chapter 11, Warrantless Arrest?

14         A    Did we talk about it?

15         Q    We did.

16         A    We turned to it, but I don't remember.

17         Q    No, you're good.  So we'll turn to the part we

18   actually discussed, which is on Page 147.  And let me

19   know when you get there.  All good?

20         A    Yes.

21         Q    Excellent.  All right.  So let's go to 11.21A.

22   And I'll just read it.  General rule, "An officer may

23   temporarily and voluntarily detain a person for

24   investigation when he has reasonable suspicion that the

25   particular person has been, is or is about to be involved

Marta Ortega                                    February 28, 2024

                                                              Page 127

1    in criminal activity."

2              Is that the relevant policy for determining

3    whether or not Alek was illegally detained by Deputy

4    Babb?

5         A    Yes.

6         Q    Were there any other policies that you looked

7    to?

8         A    No.

9         Q    Okay.  But you did look to this policy?

10        A    I can't recall.

11        Q    Okay.  Did you assess whether --

12        A    But based on my experience, like I was patrol

13   officer too, so I know.

14        Q    Okay.  That's helpful.  So did you determine --

15   or let me put it this way, did you investigate whether or

16   not Deputy Babb had reasonable suspicion to extend the

17   stop?

18        A    He did.  Based on his report.

19        Q    Okay.  So you did investigate that.

20        A    Yes.

21        Q    Okay.  And just so I make sure I understand,

22   what was the -- you said he did have reasonable

23   suspicion, right, to extend the stop, Deputy Babb did?

24        A    Yes.

25        Q    What was the basis for that?

Page 128

```
 1        A    His RMS report.

 2        Q    All right.  So let's turn to that.  This would

 3   be Exhibit 16.  And you're talking specifically about --

 4        A    2175.

 5        Q    2175.  Okay.  And this is -- just tell me what

 6   this is, 2175.

 7        A    It's his report, Deputy Babb's report.

 8        Q    Okay.  And you concluded Deputy Babb had

 9   reasonable suspicion solely based off of this report

10   right here that we're looking at?

11        A    Yes, his report, and then watching his

12   movements, Alek's movements when he's inside the

13   vehicle --

14        Q    Okay.

15        A    -- in the front seat.

16        Q    Did you look into any other evidence to confirm

17   whether Deputy Babb's story was correct?

18        A    No.

19        Q    So you never called Alek to just ask him, "Hey,

20   what's your side of the story?"

21        A    No.  Just those two conversations that I had,

22   that he said they damaged his vehicle and then he was

23   illegally detained -- illegally detained.

24        Q    Okay.  Would you mind, if you can remember,

25   just identifying the portion of Babb's summary here that
```

Marta Ortega                                              February 28, 2024

Page 129

1    you relied on to conclude that he had reasonable

2    suspicion to extend the stop?  And take your time by the

3    way, because I know this is a long time ago and you need

4    to read it.

5        A    I know.  It says he observed "Alek Schott was

6    sitting with his hands open and resting on the steering

7    wheel.  Alek Schott looked to be breathing harder than

8    normal by the raise and fall of his chest.

9            "Alek Schott's hands was trembling when he

10   handed me his driver's license.  I found this to be odd

11   due to the fact that I told Alek I was issuing him a

12   warning for failure to maintain lane."

13           So then he tells him to sit -- to come out and

14   sit in his vehicle.  So he agrees, and Alek goes in and

15   sits in the vehicle.

16           So right here where he says, "I was noticing

17   when Alek Schott spoke with me about his job and what he

18   was going to do in reference to his -- to the client, he

19   was responding -- he was responding with questions in a

20   low tone than -- that I could barely hear.  Alek Schott

21   was also responding with a lot of delayed responses, such

22   as um, uh.

23           "When I spoke to Alek Schott about Houston and

24   other things not pertaining to what he was doing down

25   south, I observed a deviation in his behavior.

Marta Ortega                                    February 28, 2024

Page 130

1          "Alek Schott was speaking clearly and high

2    volume -- at a high volume.  Using my training and

3    experience, I found this deviation in behavior and his

4    delaying statements to questions about his job to be

5    possible deception."

6          And then he also observed his OPR system, that

7    Alek Schott had been on I-10 West at midnight the night

8    before heading south and had a one-day turnaround.

9          Q    Okay.  That's helpful.  Thank you.

10         And so you reviewed that portion of Deputy

11   Babb's report and concluded that he had reasonable

12   suspicion to extend the stop and that's it?

13         A    Well, that was reasonable suspicion for him to

14   ask for a canine unit, because of his demeanor.

15         Q    I'm just asking, is that -- so you just looked

16   at that summary and that's it?

17         A    Yes, because the way he was acting, that's

18   reasonable suspicion for him.  And for him -- you know

19   what I mean, I can't respond to his actions.

20         Q    Got it.

21         A    I'm not there and I'm not him, so --

22         Q    Okay.

23         A    Every officer is different.

24         Q    All right.  Thank you.

25         All right.  So the last one, the last

Marta Ortega                                        February 28, 2024

Page 131

```
 1    allegation that Alek had was illegal search.  Sorry, I'll

 2    say that again.

 3         A    I'm sorry.

 4         Q    You don't have to apologize for coughing.

 5              So the last allegation Alek made, the illegal

 6    search.  I want to talk about that a little bit.

 7              So let's go to Page 183 of the Sheriff's

 8    manual.  And just let me know when you're there.  Okay.

 9    And we're looking at Chapter 16, warrantless search and

10    seizure, correct?

11         A    Yes.

12         Q    Okay.  Let's turn to Page 187.  And do you see

13    on the bottom there where it says C -- I guess that's

14    like a subsection, Subsection C, Vehicle Searches.  Do

15    you see that?

16         A    Yes.

17         Q    And I'll just read it.  So "Vehicle Searches:

18    The 'automobile exception':  Where there is probable

19    cause to search a motor vehicle, and exigent

20    circumstances exist, the vehicle may be searched without

21    warrant."

22              My understanding is that that is the relevant

23    policy you would have looked to when assessing whether

24    Alek's allegation of an illegal search was true or not

25    true; is that correct?
```

Marta Ortega                                      February 28, 2024

Page 132

 1        A     Yes.

 2        Q     Would there be any other policies that you

 3   would look at?

 4        A     Not really.

 5        Q     And I want to back up a little bit.  You seemed

 6   like a little uncertain.  But --

 7        A     I just, I -- like I said, it goes back to my

 8   training and experience.  Like I don't actually go and

 9   read every little line.  You know what I mean?

10        Q     No, that makes sense.  Well, let's just put it

11   this way.  So is it fair to say that -- and what are we

12   even looking at?  16.04C basically says an officer cannot

13   search a vehicle without a warrant unless the officer has

14   probable cause and exigent circumstances?

15        A     Yes.

16        Q     And is that the standard you applied when

17   determining whether the officers in this case rightfully

18   searched Alek's car?

19        A     Yeah, because the canine, yes.

20        Q     What do you mean "for the canine"?

21        A     So the reasonable suspicion was for the canine

22   to come over and sniff the car.  Once the canine alerts,

23   that's probable cause to search.

24        Q     Got it.  That was going to be my next question

25   was the basis.  Okay.  That's helpful.

Marta Ortega                                    February 28, 2024

Page 133

1          Okay.  So that was the long Step 7, the

2    investigation process.  So you've done your

3    investigating.  You've looked at the -- you know, you've

4    considered the relevant standards and made your

5    conclusions based off of that.  So what did you do next?

6        A    Since there were no policy violations, I just

7    typed it up and did my Exhibit 16, 2162, and submitted it

8    to the lieutenant.

9        Q    Got it.

10           MR. NELSON:  Okay.  I think we could take a

11   quick break if you guys don't mind.

12           THE REPORTER:  We're off the record.

13       (Recess from 12:47 p.m. to 12:58 p.m.)

14           THE REPORTER:  We are on the record.

15       Q    (By Mr. Nelson) All right, Sergeant, just a few

16   clarifying questions.  So number one, do all RFIs derive

17   from public complaints?

18       A    I'm assuming that an administrator gets a

19   complaint from somewhere.  I don't know exactly from

20   where.  Because the RFIs, like I said, those are -- those

21   come from the administration.  Where they get that

22   information from, I don't know.

23       Q    Okay.  And you mentioned you weren't familiar

24   with the RFI in this case, correct?

25       A    Exhibit 16 right here?

1          Q    Yes.

2          A    Nope.

3          Q    Okay.  Have you ever heard of a complaint

4     investigation being reopened by an RFI?

5          A    I've heard of an RFI reopened, but not a

6     complaint turned into RFI, like this.  You know what I

7     mean?

8          Q    No, I don't.

9          A    All right.  Rephrase your question.

10         Q    All right.  So have any complaints, or have any

11    investigations that you have done or any other Internal

12    Affairs employees, have those ever been reopened by an

13    RFI?

14         A    Not that I know of.

15         Q    Okay.  And so you've never heard of an Internal

16    Affairs investigation which was reopened by an RFI over a

17    year later, as is the case like we talked about earlier?

18         A    I'm not familiar with one.

19         Q    Okay.  And why would something like that

20    happen?

21              MR. FRIGERIO:  Objection, form.

22         Q    (By Mr. Nelson) I'll rephrase.  Why would an

23    RFI reopen an Internal Affairs investigation over a year

24    later?

25              MR. FRIGERIO:  Objection, form.

Marta Ortega                                    February 28, 2024

Page 135

1      A    I don't know.  You would have to ask them.

2           MR. NELSON:  Okay.  All right.  That's it.

3           MR. FRIGERIO:  We'll reserve our questions.

4           THE REPORTER:  We are off the record.

5       (Deposition concluded at 1:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE WESTERN DISTRICT OF TEXAS

 2                    SAN ANTONIO DIVISION

 3

     ALEK SCHOTT,                      §

 4          Plaintiff,                 §

                                       §

 5                                     §

     VS.                               §

 6                                     §

     JOEL BABB, in his individual      §   CIVIL ACTION NO.

 7   and official capacity;            §   5:23-cv-00706-OLG-RBF

     MARTIN A. MOLINA III, in his      §

 8   individual and official           §

     capacity; JAVIER SALAZAR, in      §

 9   his individual and official       §

     capacity; and BEXAR COUNTY,       §

10   TEXAS,                            §

             Defendants.               §

11

12                    - - - - - -

13              REPORTER'S CERTIFICATION

14          ORAL DEPOSITION OF MARTA ORTEGA

15               FEBRUARY 28, 2024

16                    - - - - - -

17       I, MOLLY CARTER, Certified Shorthand Reporter in and

18   for The State of Texas, hereby certify to the following:

19       That the witness, MARTA ORTEGA, was duly sworn by

20   the officer and that the transcript of the oral

21   deposition is a true record of the testimony given by the

22   witness;

23       I further certify that pursuant to FRCP Rule

24   30(e)(1), that the signature of the deponent:

25          ____ was requested by the deponent or a party before
```

Page 137

1    the completion of the deposition and returned within 30

2    days from date of receipt of the transcript.  If

3    returned, the attached Changes and Signature Page

4    contains any changes and the reasons therefor;

5        _XX_ was not requested by the deponent or a party

6    before the completion of the deposition.

7        I further certify that I am neither attorney nor

8    counsel for, related to, nor employed by any of the

9    parties to the action in which this testimony was taken.

10   Further, I am not a relative or employee of any attorney

11   of record in this cause, nor do I have a financial

12   interest in the action.

13       Certified to by me on this 12th day of March 2024.

14

15

16

17

18                    MOLLY CARTER, CSR NO. 2613

                      Expires:  04/30/2024

19

                      Veritext Legal Solutions

20                    Firm Registration No. 571

                      300 Throckmorton, Suite 1600

21                    Fort Worth, Texas  76102

                      800-336-4000

22

23

24

25

| & | | | |
|---|---|---|---|
| **&** 10:12,19 60:8,18,23 61:3 63:5 | **12752** 137:17 **12:10** 108:15 **12:47** 133:13 **12:58** 133:13 **12th** 67:21 109:12 121:9 137:13 | **183** 131:7 **187** 131:12 **18th** 109:7 **1:00** 1:20 135:5 | 74:4 76:17,20 77:5 133:7 **2163** 72:9 75:12,19 76:12 76:17,22 109:2 109:3,13,16 116:13 118:19 |

**0**

**00** 67:11
**00706** 1:7 136:7
**04/30/2024** 137:18

**1**

**1** 27:8 70:3,4 76:8 82:25 85:4,9 86:7,7 113:2 136:24
**10** 88:9 130:7
**100** 18:8
**10:52** 68:25
**11** 101:5 126:13
**11.21** 101:8
**11.21a** 101:17
**11.21a.** 126:21
**111** 1:23 2:14
**11:07** 68:25
**11:42** 116:7
**11:49** 115:13 116:9
**11:59** 108:15
**12** 115:11,13 115:22 116:3,5 117:10
**120** 101:3
**127** 101:2,4 126:6

**13** 64:3
**136** 3:6
**14** 3:13 57:13 59:11,20 60:4 60:8,19 61:7 62:7 93:19 94:5 124:21
**14.03** 62:21 63:3
**147** 101:7 126:18
**15** 3:15 53:21 58:8 59:8 92:12
**16** 3:17 63:25 64:15 66:15 67:8 72:14,15 75:14,15,19 78:14 79:25 83:7 108:10,18 128:3 131:9 133:7,25
**16.04c** 132:12
**1600** 137:20
**16th** 65:15 66:12
**17** 7:8
**176** 60:4 62:7 62:19
**180** 93:5,10

**2**

**2** 3:2 27:8 70:5 70:6 83:20 86:6,10 113:17
**20** 26:10 58:23
**201** 58:5,14
**2012** 8:5
**2016** 7:8
**2019** 7:11
**2020** 26:10
**2021** 57:19,24 58:23 59:1,13 59:15
**2022** 26:12,13 59:8 63:25 65:15 66:12,15 67:18 68:1 109:7 115:2,7 115:11,13 116:3 117:10 118:4 121:9,14 121:18
**2023** 64:3 67:21
**2024** 1:15,20 136:15 137:13
**210** 2:15
**2126** 121:11,14
**2161** 67:19 78:14 79:25 83:7
**2162** 67:14 71:21 72:15

**2165** 75:24 76:13,17,22 108:25 109:2,3 109:18 110:15 123:3,5
**2166** 114:24
**2167** 121:5
**2168** 115:13
**2175** 128:4,5,6
**22** 118:3
**22203** 2:9
**22nd** 115:2,7 121:11,14,17
**23** 94:7,10 125:10
**23.09** 94:14,16
**23.09a1** 125:14
**23.09a2.** 98:24
**236** 94:4 124:23
**24** 7:4
**245** 94:13 125:11
**2613** 137:18
**26th** 121:14
**271-7877** 2:15
**28** 1:15,20 136:15
**28th** 59:15
**2:20** 121:15

Marta Ortega                                                    February 28, 2024

**2nd**  67:18,25

**3**

**3**  27:8 70:15
   72:1 88:20
   114:9 115:21
   117:10
**30**  23:21 36:18
   36:20 53:21,22
   92:13 136:24
   137:1
**300**  137:20
**35**  23:21
**39**  62:3,4,7
**3rd**  57:19
   59:13

**4**

**4**  3:4 27:8
   71:11 72:3,6
   73:10,15,16
   74:18 77:1
   91:3 117:11
   118:2
**40**  95:15
**465**  1:23 2:14
**480-5936**  2:5
**4:21**  121:18

**5**

**5**  61:19,20 62:6
   77:14 82:25
   88:9 91:7,23
**512**  2:5
**57**  3:13
**571**  137:20
**58**  3:15
**5:23**  1:7 136:7

**6**

**6**  122:10
**6/12/23**  3:17
**60**  24:7 95:15
**62**  72:10,11
**64**  3:17
**682-9320**  2:9

**7**

**7**  122:17 133:1
**7,000**  120:5
**70**  24:7
**703**  2:9
**76102**  137:21
**78205**  2:14
**78701**  2:5

**8**

**8**  58:25
**8/3/21**  3:14
**800-336-4000**
   137:21
**816**  2:4

**9**

**900**  2:8
**901**  2:8
**970**  2:4
**9:28**  1:20

**a**

**a.m.**  1:20 68:25
   68:25 108:15
   116:6,7
**a1**  95:4
**abide**  46:16
**able**  24:13
**above**  1:19
**abraham**  11:11
   11:11,12,12

**absolutely**  5:21
   108:14
**access**  87:24
   88:6
**account**  46:25
   47:1 105:14
**accurate**  41:25
**acquired**  122:5
**acquiring**
   87:18
**acted**  96:24
**acting**  130:17
**action**  1:6
   136:6 137:9,12
**actions**  25:1
   130:19
**activity**  94:25
   99:1,5,11
   101:14 127:1
**actual**  21:23
   22:11 47:18,19
   74:3 92:8
**actually**  16:6,6
   19:6 22:24
   29:5 31:15
   33:20 48:5
   54:25 59:4
   61:2,11 63:1
   65:12 67:14
   70:4 73:21
   74:13 96:16
   97:15 98:22
   102:2 108:7
   109:19 114:23
   125:9 126:18
   132:8
**addition**  28:3

**addressing**
   61:21
**adjuster**
   118:20
**admin**  91:24
   92:5
**administration**
   10:10 13:14
   14:2 21:15
   61:2 86:24
   87:5,6,7,19
   91:12 133:21
**administrative**
   11:3 21:4,11
   21:16,16,20
   23:13 92:9
**administrator**
   133:18
**admittedly**
   19:8 82:13
**affairs**  7:16,17
   7:17 9:19,20
   10:2,9,25 11:3
   11:7 12:10
   17:18,21 18:5
   18:8 19:21
   20:6,20,25
   21:2,5 24:18
   26:17 31:18,19
   31:25 32:4
   37:10,12,18
   49:10 52:20
   53:4,9 56:11
   56:22,25 57:23
   57:24 58:20
   59:6,17,23
   60:13,14 61:1
   61:10,13 62:6

75:20 78:12
80:15 82:16
89:9 95:9 97:2
103:9 134:12
134:16,23
**agencies** 27:9
27:17 98:9
**ago** 26:6
112:20 129:3
**agree** 30:12
36:20
**agrees** 129:14
**ahead** 67:7
73:21 113:24
**alek** 1:3 4:6 6:7
6:15 25:12
44:21 64:1
66:15 67:2,15
104:5 105:2,16
108:11,20,25
110:1 112:6,14
113:11,11,12
113:13,14
115:10,10
118:24 119:11
119:11,17
120:25 121:1
121:15 122:10
123:6 125:20
126:4 127:3
128:19 129:5,7
129:9,11,14,17
129:20,23
130:1,7 131:1
131:5 136:3
**alek's** 103:19
105:11 125:3
126:8 128:12

131:24 132:18
**alerting** 65:22
**alerts** 132:22
**alex** 110:12
112:14 113:11
**allegation**
47:19,24 110:1
125:2,3 126:8
131:1,5,24
**allegations**
12:23 13:19
40:15 61:24
87:17 109:21
**alleged** 21:23
22:11 25:3
96:17 97:17
98:3 123:6
124:18
**allegedly** 96:13
96:24 124:16
**alleges** 34:23
46:20 123:24
**alleging** 123:10
**alluded** 24:23
**alongs** 55:25
56:2
**aloud** 101:11
**altogether**
100:3
**amount** 9:15
**annex** 87:23,25
**answer** 28:18
28:19,19 29:25
29:25 68:4,19
69:24 84:8,19
110:6 123:13
**answered** 30:2

**answers** 5:7,12
**antonio** 1:2,24
2:14 136:2
**anyway** 50:18
108:9
**apologize**
131:4
**apparently**
106:5
**appeal** 36:14
**appearances**
3:2
**applied** 132:16
**applies** 35:21
**apply** 94:18
**applying**
103:11
**appreciate** 5:9
12:6 26:7
64:13 80:10
**approaching**
104:16
**approve** 78:11
82:4
**approved** 64:2
82:6
**april** 109:12
115:2,7,11,13
115:22 116:3,5
117:10 118:3
121:9,11,14,17
**archive** 49:25
**archives** 49:13
77:13
**area** 99:8,18,25
100:6,7,9,17
109:21

**area's** 99:11
**arlington** 2:9
**arrest** 56:17
101:5 126:13
**asked** 4:9 26:14
63:22 89:23
102:4 110:21
113:14 114:19
116:15 118:22
**asking** 12:5
17:25 26:5
28:6 79:5
90:20 96:19
97:12 100:8
102:9,11 103:3
107:7 118:6
121:15 123:12
123:16,17
130:15
**assess** 127:11
**assessing**
116:22 131:23
**assessment**
23:18
**assign** 22:20
**assigned** 13:15
23:11 24:9
29:6 31:17
51:16 63:8,12
**assigns** 16:5
**assume** 27:20
**assuming** 12:1
12:4 36:16
48:5 77:12
87:20 117:12
121:3 122:12
133:18

attached   50:5
75:21 137:3
attachments
76:21 77:7
attorney   48:12
54:8,10 84:20
90:14 137:7,10
attorneys   6:1
13:25 15:1
audit   57:1
august   57:19
58:24 59:1,1
59:13,14
austin   2:5
authority   63:6
automobile
131:18
available   38:17
avenue   2:4
axon   38:14,17
38:18,19,20,21
38:21 41:1
48:24 49:22
108:3,4

**b**

babb   1:6 65:15
65:15,18,25
66:3,6 83:8,9
103:21 104:16
104:17,18
105:15,24
106:21 107:7
113:23,23,25
114:3 118:24
124:7 125:20
126:3 127:4,16
127:23 128:8

136:6
babb's   6:5,10
63:25 105:20
106:17 112:5
112:12 114:20
117:12,16
118:9,12,13,22
121:25 122:2
128:7,17,25
130:11
back   18:16
19:19 20:14
29:5 30:8,9,11
31:13,15 32:3
32:12 33:13,20
34:17 37:1
39:13,22 44:7
59:11 62:18
64:22 66:3
67:19 69:1,3,5
73:21 77:1,19
82:20 84:24
85:20 91:10,14
91:20 92:10,11
93:18 95:22
102:2 106:14
107:18 108:9
108:16 109:18
109:19 110:7
110:15 111:18
115:8 116:7
124:20 126:1
132:5,7
background
6:20 20:23
barely   129:20
bargaining
35:16

base   38:10
based   13:18
105:2 108:22
126:2 127:12
127:18 128:9
133:5
basic   4:17 5:5
9:21 36:10
basically   13:4
34:21 40:3
46:11 77:15
124:1 132:12
basis   127:25
132:25
bathroom
68:22
bc   67:11
bcso   4:14 8:2
53:1
bear   28:21
beginning
105:5
behavior
129:25 130:3
believe   25:15
26:14 34:4
38:20 66:14
73:17 93:4,10
93:10 95:8
119:1,19
125:16
best   5:8,11,19
10:5 16:21,22
18:14 26:5,8
61:4 112:23
119:21 121:1
124:20

better   82:21
bexar   1:9 3:13
4:13 27:25
136:9
beyond   27:5
30:21 80:20,22
85:13 92:16
big   57:10 83:16
binder   125:1
bit   6:20 19:6
20:23 22:25
29:5 37:1 44:8
45:3 69:8
78:15 93:14
95:3 99:9
111:18 112:19
115:8 122:14
123:3 131:6
132:5
blah   27:9,9,10
42:25,25 43:1
blaming   87:2
blank   115:12
115:14
bmw   99:21
body   6:5 22:17
22:18,19,21
23:3,9 30:5,10
34:10,11 37:17
38:6,11,22
40:13,24 46:21
47:2,6,7,11,15
47:23 48:9,14
48:24 49:5,21
65:25 70:21
71:7 87:16
88:15 103:18
114:21 117:14

Marta Ortega                                February 28, 2024

**[body - case]**                                                Page 5

| | c | cam 6:4,6 23:3 | 118:1,14 |
|---|---|---|---|

117:15,17
118:4,8,13
121:25,25
122:18
**bottom** 67:10
109:15 114:25
121:10 131:13
**bowen** 67:6
**box** 32:25
73:20,23 74:2
**boxes** 82:9
**branching**
74:17
**break** 5:21
44:13 52:10,13
68:22,23 93:22
99:22 108:13
133:11
**breaking** 99:19
**breathing**
129:7
**briefly** 119:25
**bring** 13:22,24
14:25 43:10,11
48:11 54:7
84:17 90:14
**brings** 120:6
**broadly** 9:14
**broke** 75:3
**broken** 106:11
106:11
**brought** 19:7
111:6,24
**burglars** 99:19
**busted** 84:13

**c**

**c** 2:1 131:13,14
**cad** 40:4
**call** 14:5 15:7
15:16 21:19
22:21 23:11,11
23:16 27:16,24
28:16,24 29:14
29:24 30:7,11
37:24 38:2,21
39:10,10,15,15
40:4,5,7,11,11
41:14 43:16
44:5 46:10
47:4 53:2,4,9
53:10,19,19
55:8 58:14
60:12,19 64:12
69:18 70:1,6
73:3,6 74:2
75:20 80:9
99:19 100:22
107:16 110:9
111:3,19
112:15,16
113:18 116:15
**called** 8:14
13:14,14 32:21
59:10 67:6
110:6,7 112:6
113:3,4,11,14
113:17 116:6,6
120:1 128:19
**calling** 68:12
**calls** 26:24 27:6
27:8 41:20
55:13

**cam** 6:4,6 23:3
37:17 38:6,11
38:16,25 40:14
40:24,24 46:22
47:16 48:9,14
48:15,16,16,20
49:3,5 70:22
70:24 71:2,3,9
71:10 88:15
103:19 104:8,9
104:11,21
105:16,20,22
105:24 106:1,2
106:10,15,20
106:24 107:6
107:11,22
108:1,6 111:1
111:3 114:11
114:12 115:20
116:8,15,17,18
116:21 117:5
117:17 118:4,7
118:8 120:13
120:20,21
121:2,20,22,24
121:25 122:10
122:18,19
126:3
**camera** 6:5
22:17,19,21
23:7,9 30:6,10
34:10,11 38:22
40:14 47:6,7
47:11,23 48:23
49:6,21,21
65:25 87:16,16
103:19 114:21
117:14,14,15

118:1,14
122:24
**cameras** 13:24
22:20 38:19
71:8 87:22
107:16
**cams** 48:18,19
**canine** 65:22
65:22 130:14
132:19,20,21
132:22
**capacity** 1:7,8
1:9 136:7,8,9
**captain** 40:18
**capture** 88:10
**car** 102:16
132:18,22
**card** 40:3 46:7
70:21
**cards** 39:24
40:1,2,7,9
41:15,15
**care** 29:21
**cars** 56:1,3
**carter** 1:21
136:17 137:18
**case** 4:7,22
6:12,15 25:11
25:18 26:12
36:23 51:19
64:1 66:16,16
70:2 71:18
72:4,6,7,18,19
72:23 73:11
74:14,18 75:5
76:20 77:2,14
77:25 78:6
81:4,8,24 92:6

92:7 96:13
103:16,17,17
104:5 132:17
133:24 134:17
**caseload** 14:23
14:23 24:15,16
51:24
**cases** 50:20
51:14,24
**catch** 96:12
**categories**
55:11
**categorizes**
83:23,24
**cause** 1:19
94:23 95:3,7
95:10,12,14,16
95:19,23 96:5
96:8,17,18,25
97:13,15,16,18
97:20,23 98:4
98:16 102:6,20
105:12 109:23
110:5 111:9
123:9,11,20
125:16 126:4
131:19 132:14
132:23 137:11
**cells** 53:25
**center** 102:19
**certain** 46:15
56:3,16
**certainly** 60:1
**certificate** 3:6
**certification**
136:13
**certified** 1:21
136:17 137:13

**certify** 136:18
136:23 137:7
**chain** 11:25
32:3,11
**changed** 68:6
68:10
**changes** 137:3
137:4
**changing** 60:17
**chapter** 60:4,7
60:19 61:7,13
61:19,20 62:6
62:7 94:7,10
101:5,6 125:10
126:13 131:9
**chapters** 62:5
**characterize**
110:1
**charge** 107:13
107:15
**charles** 1:23
2:12,13 58:9
64:16
**chebert** 2:6
**check** 18:10
53:20 54:2,2
**checked** 53:25
**checklist** 33:15
**checks** 22:1,2
95:1
**chest** 129:8
**chief** 11:15,17
11:21,23 55:13
63:9,12,17
64:2,2 78:11
78:25 79:2,4,4
79:8,10,13,20
79:23 80:17

82:15 83:1
85:4,7,22,22
86:7 87:9
88:13
**chiefs** 13:17
23:13 31:11
63:16 68:19
78:10 82:4,7
87:1
**christen** 2:3
**christie** 52:15
**cid** 7:18,19,22
20:13,15 51:18
59:9 66:22
**circumstances**
131:20 132:14
**citation** 42:5,6
46:11
**citizen** 12:15
13:3 75:9,19
76:11 82:17
109:5 113:6,8
**citizens** 14:4
25:9
**civil** 1:6,25 7:6
7:6 34:4 35:7,8
35:12,14,16,21
36:3,17,19,22
36:22,22 62:14
136:6
**claimed** 119:9
**clarify** 112:19
**clarifying**
117:2 133:16
**clear** 5:7,10,19
8:18 76:18
92:22

**clearly** 71:1
130:1
**client** 129:18
**close** 30:15
41:25 51:19
67:17,25 70:2
72:17,19 76:16
77:25 81:7
**closed** 32:23,24
49:17 51:19,25
71:19,24 72:4
72:6,7,23
73:11 74:14,19
75:5 76:20
77:2,15 81:4
92:20
**closes** 77:13
81:6
**closing** 67:14
78:6
**cloud** 50:1
**clue** 26:20,21
**code** 35:6
83:20
**colleagues** 6:11
**collect** 37:23
38:6,8,11,15
39:9
**collected** 40:17
122:4
**collective** 35:16
**column** 58:19
**come** 13:1,25
15:2 18:2 19:3
48:12 51:14
54:10 63:16
84:20 86:21
92:10,11

129:13 132:22
133:21
**comes**  31:15
32:12 54:10,16
86:24
**coming**  18:21
80:11
**command**
36:21
**commit**  8:11
**committed**
95:13
**committing**
19:8
**common**  8:10
8:19,20 18:23
21:23 22:7,11
26:15 28:10,15
67:24
**commonly**
28:16
**complain**  14:5
22:4 28:24
29:7 42:23
44:21 110:18
111:9
**complainant**
15:7 25:3
34:23 38:2,3
46:20 51:20
69:18,18,23
70:6 73:3
74:25 97:17,22
100:15
**complainant's**
46:25
**complainants**
12:17 73:6

97:14 110:10
**complained**
42:11 43:22
44:10 45:7,12
45:16
**complaining**
25:16,16 42:25
97:14 110:13
**complains**  27:1
**complaint**  15:8
15:17 29:6,9
29:11,11,13,15
29:23 32:1,10
32:13 33:14,22
37:9,11,14,15
37:21 38:3
39:3 42:3,21
43:5,6,15 44:5
44:9,10,15,18
44:18 45:4
46:17,19 47:6
47:13,19 49:17
50:16 51:3
56:6 69:7,9,11
69:12,15,20
70:4,5 71:13
71:15,18 72:16
74:25 75:9,18
75:20 76:4,10
81:3,15,19
82:17,25 85:1
90:11,25 93:15
96:23 97:3,8
98:3,17 100:15
108:19,20,23
108:25 112:25
113:7,9 121:7
121:17 133:19

134:3,6
**complaints**
12:15 13:3,3
14:4,18 15:3,6
15:14,18,21,25
16:1,1,7,13,17
16:18 17:7,17
18:1,8,23
19:11 22:1
25:8 26:7,16
26:18 27:4,23
28:20 29:23
42:12,19 49:9
50:22 51:15
52:2,4,19,23
56:12 68:7,9
74:12 97:8,12
98:19 133:17
134:10
**completion**
137:1,6
**compliance**
21:6 53:1 54:4
56:11
**composes**  87:7
**computer**  41:7
41:8
**concerning**
61:22 66:15
67:15 68:2
108:20
**conclude**  104:7
129:1
**concluded**
97:19 105:1
126:3 128:8
130:11 135:5

**conclusion**
29:10 32:21
48:8 68:12
90:23 91:19
92:3 105:11
122:13 123:16
126:2
**conclusions**
49:14 133:5
**conduct**  45:14
61:17 63:7,25
103:12
**conducted**
65:19
**conducting**
70:12
**confirm**  121:6
121:16 128:16
**confirmed**
119:11
**confused**  117:3
**confusing**
74:17
**congress**  2:4
**consent**  65:24
**considered**
133:4
**console**  102:19
**contact**  73:7
75:19 76:11
102:16 109:6
109:12 110:12
110:21 111:22
116:6
**contains**  137:4
**context**  22:8
25:6 54:22
56:6,12 95:11

[context - day]                                                    Page 8

96:25
**contexts** 97:1
**continued**
102:3
**conversation**
65:21 111:6
112:3 114:1,6
114:8,10 116:4
119:17,21
**conversations**
128:21
**cool** 6:19
125:14
**cooperation**
61:22
**cooperative**
73:2,6
**core** 15:11
24:25
**correct** 21:12
25:4 51:6
57:13 63:9
66:21 67:22
73:12 74:19
81:15 85:25
93:1 94:11
98:17 109:1
111:7 115:4,11
121:22 123:6
125:7,21
128:17 131:10
131:25 133:24
**correcting**
121:12
**correction**
80:10
**corrections**
91:11,15

**correctly** 13:12
46:3 101:15
**coughing** 131:4
**counsel** 90:17
137:8
**county** 1:9 3:13
4:13 27:25
136:9
**couple** 7:13 9:8
31:24 39:7
61:7 89:22
115:9
**course** 6:14
24:19 51:9
65:18 97:18
105:5 126:7
**courses** 19:23
**court** 1:1 136:1
**courtesy** 45:15
**courtroom**
4:19
**cover** 49:16
50:4 71:17
76:17 109:4
**crash** 94:7
**create** 81:18
109:5
**created** 81:14
**creating** 80:18
**crime** 95:13
99:8,11 100:7
100:8,17
**crimes** 7:18
59:10
**criminal** 7:20
31:20 54:18
55:2,4,5 59:9
94:24 99:1,4

101:14 127:1
**criticism** 61:23
**cross** 104:15
**crossed** 105:2
**crossing**
104:12
**csf** 2:15
**csr** 137:18
**curiosity** 8:9
20:6
**current** 57:18
59:3,12
**cv** 1:7 136:7

**d**

**d** 3:1
**dabb's** 114:20
**daily** 105:18
**damage** 111:24
113:20 114:21
114:22 116:17
116:22 117:6
**damaged**
110:14,16,23
111:16 113:16
118:25 128:22
**damages**
111:13 114:5
119:4,5,6,9,10
**daniel** 2:7 4:6
**dark** 99:8,10
100:6
**dash** 6:4,6
38:15,25 40:14
40:24 48:15,16
48:16,18,19,20
48:23,24 49:3
49:5,21 70:24

71:2,3,8,9,9
103:19 104:8,9
104:11,21
105:16,20,22
105:24 106:1,2
106:10,12,15
106:20,24
107:6,11,16,22
108:1,6 111:1
111:3 114:11
114:12 115:1
115:20 116:8
116:15,17,18
116:21,24
117:5 118:7
120:13,19,21
121:2,18,20,22
121:24 122:10
122:12,18,24
126:2
**data** 3:16 58:14
**date** 29:19
32:22 58:22
59:12,17 67:17
67:20 83:20
93:5,6,7 109:7
119:15 137:2
**dates** 60:2
88:24 114:18
**daughter** 25:19
25:20
**day** 6:22,23 7:1
20:16 29:19
39:13,22 62:10
62:10 97:22
100:4 102:21
107:14 116:2,4
130:8 137:13

**[days - disposition]**                                           Page 9

**days** 23:21,21
36:13,18,20
92:12,12,12,13
93:5,10 137:2
**deal** 27:15
**dealers** 99:13
**dealing** 42:3
**death** 53:5,14
**deaths** 53:9
55:9,20
**deception**
130:5
**decide** 71:13
**defendant** 2:12
4:21 68:11
**defendants**
1:10 136:10
**definitely** 5:14
5:15
**delayed** 129:21
**delaying** 130:4
**demeanor**
130:14
**deny** 78:13
**depending** 35:5
40:19,20 43:6
44:12 47:25
50:5 53:20
69:14 70:11
87:23
**depends** 14:22
14:22 16:14
30:17 32:6
**deponent**
136:24,25
137:5
**deposed** 5:2

**deposition** 1:13
1:17 4:12 5:25
135:5 136:14
136:21 137:1,6
**deputies** 27:8
35:22 55:10
61:21 83:17,19
**deputy** 6:4,10
7:5 8:5 14:5
27:12,13 30:3
36:19 42:22
46:11 47:5
63:9,13,17,25
64:2,3 65:14
65:15,18,20,23
65:25 66:3,6
69:16 79:22
83:8,9 84:17
104:16,17
105:15,20,24
106:16,21
107:7 113:22
113:25 114:3
117:25 118:21
124:7 125:20
126:3 127:3,16
127:23 128:7,8
128:17 130:10
**deputy's** 110:8
**derive** 133:16
**derogatory**
61:23
**describe** 37:5
103:10 104:20
105:6
**description**
3:12 100:25

**desk** 16:19
37:15 69:9
70:5 71:13
73:24 76:10
**detail** 40:6 46:6
46:7
**detain** 101:12
102:10,21
126:23
**detained** 65:20
104:2 111:5
114:7 119:13
120:6 124:2
127:3 128:23
128:23
**detainee** 66:2
**detainment**
123:23 124:1
126:9
**detective** 7:10
20:14
**detectives** 7:23
**detention**
124:18
**determination**
31:1
**determinations**
90:21
**determine**
23:13,14 33:20
33:22 34:14
48:1 54:1
93:14,15,24
97:19 103:11
107:5,20,22
125:9,19
127:14

**determining**
127:2 132:17
**develop** 56:22
**development**
10:12,19
**deviation**
129:25 130:3
**difference**
21:14
**different** 6:22
7:1,9 27:17
32:5 33:25
35:6 41:20
42:1 60:15
71:23 72:19
81:23 82:14
83:24 88:24,24
90:4,12,13
92:7 97:21
106:22 130:23
**directly** 13:17
14:2 74:24
**disagree** 91:18
**disc** 49:23
**discharge**
61:18
**discipline** 23:3
**discussed**
126:18
**dispatched**
40:4 53:8
**disperse** 17:9
17:11 29:17
**disperses** 14:19
14:20 32:7
83:5
**disposition**
121:6,16

**disprove** 87:17
**district** 1:1,1
  136:1,1
**dive** 6:19
**division** 1:2
  7:20 10:8 11:4
  60:8 61:2,3
  63:6 136:2
**divvy** 16:10
  17:24 19:4
**dnelson** 2:10
**docked** 38:24
**document**
  35:24 39:11
  48:22 57:16
  58:6,13 74:3
  94:20
**documents**
  3:18 50:21
  86:11 113:1
**dog** 119:6
**doing** 18:5,15
  18:16,18 19:10
  22:2 23:18
  24:16 26:8
  34:21 45:19
  52:9 53:17
  69:16 91:21
  95:14 129:24
**door** 99:22
**download**
  38:13,14 88:5
**drift** 95:18
  105:18
**driver** 65:20,21
  65:24 66:7,9
  101:20 102:17
  105:7

**driver's** 95:1
  129:10
**drivers** 8:11
**driving** 105:8
**drug** 99:13
**drugs** 65:23
**due** 51:19
  129:11
**duly** 1:18 4:2
  136:19
**duties** 61:18,19
  65:19
**duty** 15:13
  53:7 55:10

### e

**e** 2:1,1 3:1 4:3
  41:23 136:24
**earlier** 19:20
  20:17 27:5
  51:13 61:1
  73:19 85:21
  92:24 98:8
  107:18 124:9
  125:11 126:2
  126:12 134:17
**early** 92:25
**easy** 83:25 91:7
**effect** 57:22
  59:21
**either** 12:23
  14:22 15:15
  21:23 29:6
  36:24 48:17
  53:21 72:4
  73:24 78:10,12
  78:25 79:9
  109:11

**elizabeth** 11:12
**else's** 117:17
**email** 15:18,21
  15:24 16:1
  51:8 88:6
  114:19,23
  115:1,4,19,22
  116:3,19
  117:10 121:3,8
**emailed** 116:20
**emails** 6:16
  51:2,5,8
  111:17,21
  114:14 115:10
  115:10 118:4
**emitting**
  102:15
**employed**
  137:8
**employee**
  37:18 61:17
  137:10
**employees**
  17:22 24:20
  26:17 37:12
  134:12
**employment**
  3:16 58:15
  60:3
**ended** 92:12
**enforcement**
  8:4,25 9:1,5,5
  9:15 22:9,12
  22:14 24:5,12
  24:20 94:8
**engaged** 65:20
**engine** 66:1

**ensure** 21:5
  56:1,3,11
**ensuring** 53:1
**enter** 19:3
**enters** 52:8
**entire** 89:16
**especially**
  27:17 38:3
  99:25
**esqueda** 11:23
  12:1 79:8
**essentially**
  34:18,25 47:14
  48:8 70:16
  109:20
**events** 44:1
**everybody**
  13:23 16:5
  19:4 26:25
  41:20 42:1,20
  74:1 89:6,23
**everybody's**
  13:23 51:24
  91:4
**everything's**
  84:6
**evidence** 37:23
  46:22 49:19
  70:15 72:1
  84:18 87:17,19
  91:3 103:18
  104:7 107:19
  107:21 118:5,9
  122:4,18
  128:16
**evidence.com**
  38:20

exact 19:14
60:2
exactly 17:4
72:7 74:6 89:3
92:23 103:22
133:19
examination
3:4
example 23:6
30:20 42:5
44:16 46:24
55:6 84:11
85:5 99:3
100:4 102:23
102:24 103:7
103:13 107:9
examples 21:22
21:23 36:8
excellent 93:12
126:21
except 29:1
exception
131:18
excessive 22:3
83:21
excuse 5:14
19:22
exhibit 3:13,15
3:17 57:7,13
58:1,8 59:11
59:20 64:5,15
64:15,19 67:8
72:13,14,15
75:13,14,15,19
78:14 79:25
83:7 93:19
94:5 108:8,9
108:18 124:21

126:7 128:3
133:7,25
exhibits 3:11
exigent 131:19
132:14
exist 131:20
exit 102:21
exited 65:25
experience
20:3 127:12
130:3 132:8
expires 137:18
explain 35:10
35:19 36:4,14
36:24 65:13
explanation
72:20,21 91:17
extend 101:25
102:7,10,25
103:3 124:8
127:16,23
129:2 130:12
extended 124:1
124:18 126:9
extending
93:25 101:18
101:19
extensive 8:2
extremely
76:19
exxon 40:25

f

fact 22:23
24:24 105:14
105:23 107:22
129:11

factor 105:16
factors 100:2
facts 23:19
95:12
fail 103:25
failed 104:5
125:4
failing 71:8
95:18 96:13,13
fails 122:24
failure 95:19
120:17 129:12
fair 20:1 33:12
52:18 57:21
59:19 70:5
80:21 101:17
109:25,25
123:25 132:11
fall 21:16 34:9
129:8
falls 21:20
familiar 6:14
8:6 10:22
63:24 64:21
89:13,15,16
133:23 134:18
family 55:10
far 9:7 13:21
21:25 27:23
35:8 37:13
42:14 46:18
47:23 53:4
68:6 70:12
86:20 87:15
90:6,13,18,20
102:7 116:21
faster 87:25

father 25:18
fault 106:17
february 1:15
1:20 136:15
federal 1:24
feel 20:19
fell 10:9,10
84:12
felt 24:4
female 11:20
fifty 16:23
fight 53:7
figured 63:21
65:7 118:17
file 50:17
filed 49:10,15
49:20 50:4,12
50:19 51:10
files 88:14
fill 12:17 13:11
46:3
financial
137:11
find 23:19 33:4
72:17 73:12
74:15,19 75:6
77:2 78:4,7
83:25 84:2
92:8 111:23
finding 47:21
78:5
findings 25:25
32:11,16,18
49:14 91:9,17
91:24 93:11
fine 10:23
24:19 26:5
69:5 73:14

89:21

**finish** 73:21

**firm** 137:20

**first** 4:2,17
6:20 10:16
11:11 43:23
45:9 63:3
64:24 69:12
98:2 108:24,24
110:6,11,12,20
111:5,22
112:15,16
113:18 114:6,8
116:4,15 125:2

**firsthand** 69:17
96:3

**five** 16:14
17:21,23 29:16
36:13 53:3,3,3
83:17,19,22
89:2 92:12,16
108:22

**flip** 88:9

**follow** 74:14

**following** 56:3
63:7 136:18

**follows** 4:2

**footage** 37:17
38:7,11,16,25
40:24 47:3
48:9 70:22,24
71:2,3 88:16
104:11 105:20
114:20 117:18
118:4,9 121:21
121:22,24

**force** 22:3,4
83:17,21 86:14

**forgot** 71:1

**form** 32:12
68:3 74:4,8,22
74:24 80:19
81:20 82:18
96:10 100:11
134:21,25

**formal** 121:7
121:16

**forms** 12:14,17
13:10

**fort** 137:21

**found** 67:3,4
72:24 74:10
81:5 98:16
106:19 129:10
130:3

**four** 7:3 29:16
86:18 89:2,23
90:3 91:2

**frcp** 136:23

**freely** 104:2

**frigerio** 1:23
2:12,13 36:12
58:11 64:17
68:3 71:21
72:10 80:19
81:20 82:18
96:10 100:11
134:21,25
135:3

**frigeriolawfir...**
2:15

**front** 8:16
36:18 64:21
66:2 95:20,22
95:23 104:1
120:8 128:15

**fully** 33:3 69:6

**further** 136:23
137:7,10

**g**

**g** 62:23 63:2,8

**gamboa** 118:21
118:22

**garcias** 80:4

**garza** 11:16,17
11:22 64:2
79:3,10,13,20
79:23 80:2,6,7
80:9,17 82:15
83:1 85:5,7,22
85:22 86:7

**garza's** 87:9
88:13

**garzas** 80:6

**gather** 39:23
53:19 70:15
72:1 83:12

**gathering**
40:21

**general** 61:18
126:22

**generated** 72:5

**gereb's** 117:23
117:25

**getting** 37:17

**give** 12:18 16:9
21:21 23:21
30:20 32:24
33:10 36:8,18
44:16 49:11
54:25 55:5
64:9 70:1,11
73:25 75:17

99:3 100:9
103:13

**given** 136:21

**gives** 14:21
29:18 32:6
77:11

**giving** 28:7
74:4

**glad** 19:7

**glebe** 2:8

**go** 5:4 13:20
18:16 19:19
20:13,14 30:9
31:4 32:13
35:8 36:17
42:19 48:3
53:2,18 55:14
61:6 62:18,23
67:7 69:3,5
73:21 77:10
88:1,3 92:9,9
93:18 94:4,13
102:8 107:4
108:9 109:18
123:1,3 124:20
126:6,21 131:7
132:8

**god** 36:17

**goes** 12:4 31:20
32:11 36:14
38:22 50:1
76:8 77:12,12
119:4 129:14
132:7

**going** 5:6,8
10:23 11:24,25
19:9 28:8,8
34:17 36:21

37:16 41:3
43:16 45:4
47:12,13 54:12
54:15 57:6,12
57:25 58:8
59:9,11 63:1,2
63:4 64:14
67:1,5 69:19
71:13 72:12,17
74:17 77:1
83:13,16,18
85:20,23 87:18
88:13 93:23
95:4,4,15
101:7,10
107:18 108:4
110:15 111:2
113:24 116:8
116:19 122:9
126:1 129:18
132:24
**gonzalez**   11:10
11:12
**good**   4:5,8,9
12:8 14:12
26:7 64:12
73:14 82:24
125:12 126:17
126:19
**gosh**   34:1
**gotcha**   74:3
**govern**   101:18
**governed**   61:9
61:13 62:5
**gps**   40:16
**grade**   80:20,22
**grant**   9:11

**great**   5:24
**green**   39:14
**grueling**   92:22
**guardian**   53:20
53:23
**guess**   13:15
14:18 49:13
51:1 53:24
56:9 60:18,22
61:11 63:17
66:7,13 68:11
77:9,12 79:5
101:23 104:23
105:7 107:18
114:4 116:14
122:16 131:13
**guide**   33:15
**guy**   42:22 45:7
45:16
**guys**   133:11

**h**

**half**   7:3
**hand**   35:8,8
58:6 64:14
**handed**   129:10
**handing**   58:7
**handle**   16:13
42:13 43:3,19
**handled**   16:3
44:3
**handles**   43:16
54:18 99:22
**handling**   15:14
17:19 69:11
**hands**   129:6,9
**handwrite**
39:17

**handwritten**
109:1,15
**hanging**   8:16
**happen**   78:6
134:20
**happened**
29:25 32:9
38:9,9 46:23
54:5 57:4
69:19 76:12
88:10 110:22
111:23 113:14
**happens**   23:2
30:19 32:8
74:15 75:6
81:8 82:23
86:10 91:12,25
92:1,19 122:11
**hard**   15:22
19:9 26:9 37:4
83:23
**harder**   129:7
**harmony**   61:21
**hazard**   95:2
**hazy**   69:8
**he'll**   77:24
**head**   9:20
20:11 25:10
31:8 33:8,17
37:25 41:11,13
47:17 56:20
67:23 70:20
71:4 73:13
77:21 79:1,10
89:18 92:17
93:2 104:10
124:17

**heading**   130:8
**hear**   36:23
69:17 70:8
73:4 92:2
129:20
**heard**   134:3,5
134:15
**hearing**   36:22
36:23
**hearings**   35:22
**hebert**   2:3
52:12,17
**heck**   60:3
**hector**   2:13
**help**   21:5,22
33:16 37:12
45:2 67:24
112:2,19
116:14,21
**helpful**   5:4
13:9 15:10
20:22 33:12
49:7 55:23
62:17 71:25
76:15,19 78:19
80:11 82:10
84:22 87:3
103:6 117:9
121:19 127:14
130:9 132:25
**helping**   37:19
56:22
**hey**   16:9 30:11
31:3,7 38:2
42:21,23 45:7
45:10,15,24
47:5,10,23
48:23 69:18

74:24 79:17
85:23 99:20
100:15,17
102:17,21
107:11,16
112:1 118:24
128:19
**hi** 121:5
**high** 99:8,11
100:7,8,17
130:1,2
**higher** 36:20
36:21,21
**history** 3:16
8:2 58:15
**hmm** 17:10
**hogging** 64:10
**hold** 107:4
**holding** 60:2
**homicide** 7:10
20:14
**honestly** 53:18
63:22 107:13
**hood** 104:24,24
105:3,5
**hood's** 105:6
**hour** 53:22,22
**hours** 88:4
**houston** 129:23
**huh** 5:13,13 8:8
21:8,13 23:1
25:2,5,13
32:15 33:6
35:2 38:5
44:22 45:21
51:7 53:15
57:11,20 62:20
65:11 70:7,17

70:23 72:2,25
74:20 76:25
77:17 78:2,23
79:11 81:10
83:3 86:9
93:20 96:15
98:1 99:2
103:5 104:6
105:4 106:18
109:24 110:17
113:19,22
114:2 115:2,15
119:8 122:1,3
122:20 123:7
**hypothetical**
29:13
**hypothetically**
44:25,25

**i**

**ia** 12:21 13:16
19:3,6 21:18
23:5 51:12,14
51:21 52:2
60:11 77:12
78:1 79:6,10
**idea** 9:21 80:23
86:3
**ideally** 87:11
88:14
**identified**
110:21 120:3
120:12,17
**identifies**
103:22
**identifying**
128:25

**iii** 1:7 136:7
**ij.org** 2:6,10,10
**illegal** 123:11
123:14,14,22
123:25 124:11
124:19 126:9
131:1,5,24
**illegally** 111:5
114:7 119:13
120:6 124:2
127:3 128:23
128:23
**incident** 40:6
41:14 46:6,7
50:3 68:2
84:17
**include** 70:19
**included** 88:18
**index** 61:15
**individual** 1:6
1:8,9 84:3
136:6,8,9
**inform** 78:21
80:15
**information**
15:23 69:15
70:11 78:18
83:13 86:4
87:10 111:2
115:19,25
116:9,19,20
133:22
**information's**
69:14
**informed** 78:7
80:14
**ingram** 14:8

**initial** 105:13
109:12 110:11
110:12,20
111:3,22
**initiate** 22:20
**inmate** 83:20
**inmates** 22:3
**ins** 15:17,17
27:24
**inside** 128:12
**inspect** 54:13
**inspector** 54:12
**instance** 1:18
**institute** 2:4,8
**instructions**
5:5
**insurance**
101:22,23
**integrity** 10:13
10:14,19,24
31:21 60:8,18
60:23 61:3
63:6 78:12
**intentionally**
106:22,24
**interacted**
111:17
**interdiction**
65:19
**interest** 137:12
**internal** 7:16
7:17,17 9:18
9:20 10:1,9,25
11:3,7 12:10
17:18,21 18:5
18:8 19:20
20:5,20,25
21:2,5 24:18

26:17 31:18,19
31:25 32:4
37:10,11,18
49:10 52:20
53:4,9 56:10
56:21,25 57:1
57:23,24 58:20
59:5,17,23
60:13,14 61:1
61:10,13 62:5
75:20 78:12
80:15 82:16
89:8 95:9 97:2
103:9 134:11
134:15,23

**investigate**
16:7,8 21:18
22:5 25:8
26:17 30:16,18
30:20,21 32:4
33:16 37:11
40:20 44:9,14
45:5 65:5
71:14,15 85:17
90:10 97:13
106:23 110:4
123:8 124:7,12
127:15,19

**investigated**
31:3 49:9
123:13,17,20
123:22 124:15

**investigates**
31:15

**investigating**
24:25 33:14
37:9 39:3
46:16 52:19,22

56:12 86:17
87:15 90:9
122:17,22
133:3

**investigation**
3:17 7:20
12:16 13:1,10
13:13,22 14:1
29:4 31:10,13
37:12,16 44:19
45:14,20 47:21
51:10 63:8,12
63:20,24 64:25
65:14 67:15,17
67:25 70:12
74:9 78:13
82:6 83:2,8,19
84:7 85:8,12
85:23 86:8
87:15 88:21
90:6 94:7
97:19 98:17
101:12 105:11
105:17 107:24
108:10,20,23
126:24 133:2
134:4,16,23

**investigations**
13:2,17 43:21
51:3 59:10
63:7 82:2 88:3
96:23,23
134:11

**investigator**
7:7,8,8 20:15
95:9 103:10

**involved**   55:9
55:20 83:18

101:14 126:25
**involves**   55:10
**irons**   84:12
**ish**   91:2
**issue**   34:22
47:19 66:16
97:13
**issued**   46:12
**issues**   54:22
**issuing**   129:11
**items**   33:25

**j**

**jail**   7:1,3 22:1
22:15 24:3,5
53:5,14,14
55:1,8,20
83:17,23 86:14
87:24,24
**james**   64:3
**javier**   1:8
136:8
**job**   12:11 15:12
19:22 20:2,3
24:25 33:17
34:1,8 129:17
130:4
**joel**   1:6 65:18
136:6
**jog**   12:6
**josh**   71:22
**joshua**   2:7
**jot**   16:8
**june**   64:3 67:18
67:21,25
**jurisdiction**
27:19

**justice**   2:4,8
**justification**
95:1
**jwindham**   2:10

**k**

**keep**   5:12
11:24 28:5,7
80:3
**keeps**   36:21
**kept**   68:12
122:23
**key**   39:24 40:1
40:2,3,7,9
41:14,15 46:7
70:21
**kick**   84:14,15
**kind**   5:5,7 12:9
15:11,11 20:23
23:14 35:14,24
36:17 39:5
43:17 45:2
90:12 93:22,23
95:25 100:3
112:18,24
**know**   5:14,15
5:18,21 6:20
6:24 7:16 10:2
11:14 12:5,25
14:7 15:2 17:6
18:6,15,16
19:15 21:19
22:6 23:8
24:18,20 26:19
27:3 28:1,5,7
28:22 29:15,19
30:7,17,25
31:2 32:20,22

33:10,11,18,24
34:7,11,15,23
34:25 35:6,9
35:10,13,19
36:3,19,24
40:15,18 42:7
42:15,17,22,24
45:1,8,10,24
46:12,14 47:8
47:12,20 48:1
49:13,18 50:19
50:24 51:23
57:10 60:5,10
60:11,14,15
61:5,16 65:12
66:5,7,18,19
66:24 67:1,25
68:5,6,10,13
69:19 71:7
74:1,6,8,16,23
77:10 78:3,3
79:15 83:18
84:13,15 86:4
86:5 87:1,7
88:2 89:4,5
90:3 91:13,24
92:1,11,13,18
92:20,21 95:16
98:19 99:12,18
99:22,23
100:12 101:22
105:6,15 106:6
106:10,12,12
107:6,8,13,15
107:15,17
108:3 111:10
111:16,20
114:17,18

116:23 117:23
118:25 119:5,9
119:10,15
120:5 124:24
125:12 126:19
127:13 129:3,5
130:18 131:8
132:9 133:3,19
133:22 134:6
134:14 135:1
**knowledge**
61:4
**known** 99:12

**l**

**lack** 96:8 97:17
98:3,16
**lane** 95:18
96:14 103:25
104:5,25
120:17 122:25
125:4 129:12
**lanes** 105:19
**laura** 14:7,7,15
16:3,6 28:9,19
29:15 32:6
33:1 49:12
51:15 52:5
75:21,21 76:12
77:11,18,20,20
77:24 81:7
83:5 109:1,5
109:20 110:2
**laura's** 32:6
76:1 123:5
**law** 1:22 2:13
22:13 24:5

**lawful** 95:1
**laws** 8:7
**layout** 54:5
**le** 24:9
**lead** 100:22
**learn** 20:7,9,10
**learning** 13:7
**leave** 30:1 92:6
92:9 104:2
**leaving** 66:1
99:21
**left** 66:22
**leg** 84:12
**legal** 90:17
137:19
**letting** 45:8,24
**level** 44:3
92:14 99:12
**license** 8:13
95:1,20,23
101:22,23
129:10
**lieutenant** 11:8
11:9,10 13:16
31:3,7,9 32:11
32:17 33:5
47:10 48:3
49:12 55:16
72:5,22 73:18
73:24 74:4,22
77:4,8,11,11
77:15,19 78:7
78:9,9,21,24
79:9,13 80:14
80:16,17 81:6
81:7,18 82:1,2
85:20,21 91:9
91:10,14,18,23

97:3 133:8
**lieutenant's**
32:25
**line** 104:14
105:2,3 132:9
**lined** 19:2
**lines** 63:3
118:23
**link** 121:23
**list** 34:9 109:21
**listed** 89:25
100:3
**lit** 99:8,10,11
100:6,9,18
**little** 6:19 19:6
20:23 22:25
29:5 32:19
37:1 44:8 45:3
69:8,8 74:1,17
78:15 93:14
95:3 99:9
111:18 112:19
115:8 117:3
121:21 122:14
123:3 125:1
131:6 132:5,6
132:9
**locate** 83:22,23
**log** 23:10
**long** 7:15,16
9:20 16:20
18:11 30:17
34:1 90:3
97:22 102:21
111:20 112:10
112:10 129:3
133:1

Marta Ortega                                                    February 28, 2024

**look**   13:18,23
  13:24,24 15:6
  27:7 29:4,22
  29:24 30:5,6
  31:7 33:19,22
  34:13,24 35:3
  42:4,5,7 45:9
  49:22 62:18
  64:21 66:17
  69:15 71:5
  72:12 84:13
  87:11,16 88:4
  91:2 93:24
  97:19 118:5,10
  121:5 125:9,19
  125:24 127:9
  128:16 132:3
**looked**   44:19
  103:18 109:10
  114:20 124:15
  127:6 129:7
  130:15 131:23
  133:3
**looking**   45:3
  57:22 59:20
  88:14 103:17
  109:22 121:4
  128:10 131:9
  132:12
**looks**   31:6 32:2
  58:24 59:5
  62:19 74:25
  104:17 114:24
  115:9 121:8
  122:15
**lot**   8:14 16:13
  18:25 21:25
  22:14,22 26:7

27:6,16 28:23
  42:22 48:16
  49:6 78:18
  101:6 106:5
  112:21 129:21
**low**   129:20
**lupe**   11:15 79:3
  80:2,3,9

**m**

**m**   2:3 4:3
**machine**   1:22
**made**   38:3
  110:2 131:5
  133:4
**mail**   30:1
**mailbox**   74:1
**main**   15:13
  21:2 61:12
  62:5 87:24,24
**maintain**   95:18
  95:19 96:14
  103:25 104:5
  120:17 122:25
  125:4 129:12
**major**   59:10
**make**   4:14 5:22
  15:1 17:19
  22:5 27:22
  29:9 31:1 33:3
  34:16 37:23
  45:11 47:20
  48:8 54:3
  56:13 60:24
  63:13,23 69:6
  71:12 78:20
  79:13 84:5
  85:2,4,16 86:6

90:5,21 94:2
  99:23 102:16
  106:14 108:7
  122:9,10 123:1
  124:14 125:5
  126:10 127:21
**makes**   9:1,25
  15:9 24:1 26:4
  28:21 35:9
  43:4 45:24
  47:14 48:13
  50:2 55:23
  88:12,19 95:25
  98:10,12 117:3
  132:10
**making**   23:16
  64:8 118:17
**malfunction**
  106:4,8 107:14
**malfunctioned**
  106:10
**malfunctioning**
  106:16,25
  107:6,12,17,22
**malfunctions**
  106:6
**man**   16:22
**manual**   3:13
  10:20,22 34:7
  34:19,24,25
  35:4,25 37:16
  56:23 57:7,21
  57:22 59:20,20
  60:5 62:15
  89:7,16 93:17
  93:18 94:5,11
  101:2 124:21
  124:24 125:10

126:7 131:8
**march**   63:25
  65:15 66:12,15
  109:7 137:13
**maria**   3:15
  79:23 80:2,3,7
**marijuana**
  102:15,19
**mark**   57:12
  58:8
**marking**   64:15
**marta**   1:14,17
  3:4,15 4:1
  121:6 136:14
  136:19
**martin**   1:7
  136:7
**math**   18:10
**mean**   6:6,8
  8:10 10:3 15:2
  18:10 19:9,15
  21:1 30:7
  33:18 34:5
  35:23 37:13
  40:18 42:15
  45:2 46:14,19
  47:9 50:24
  66:19 67:24
  68:8,14 72:7
  74:10 81:16
  89:5 93:6
  95:10 96:6
  98:19 99:15
  100:13 101:19
  103:15 106:12
  107:17 111:12
  118:15,21
  119:3 130:19

[mean - note]                                                  Page 18

132:9,20 134:7
**means** 48:25
**meet** 14:24
**memory** 6:3
10:5 12:6,8
14:12 16:21,22
18:14 26:6,8
57:25 73:14
104:11,20
112:24 119:22
121:1
**mentioned**
9:18 19:22
21:10 24:2,24
27:5 28:3
51:12 55:1
60:25,25 73:10
73:11,19 92:24
112:11,13
114:6,8 133:23
**mess** 64:11
**met** 6:1
**midnight** 130:7
**milam** 14:9,10
14:11,15
**mind** 45:4
68:22 128:24
133:11
**minutes** 53:21
53:21,22 88:9
**mirror** 8:15,16
8:16
**missing** 86:18
113:4
**mistaken** 11:15
51:17
**misunderstan...**
46:1

**model** 99:24
**molina** 1:7
117:20,25
136:7
**molly** 1:21
136:17 137:18
**moment** 28:22
**months** 7:13
9:8,17
**morning** 4:5
99:17 100:6
**motor** 131:19
**motorist** 99:6
**motorists**
94:14,17 95:7
98:25 125:15
**mouth** 84:13
**move** 81:1
**moved** 7:6,9,13
**movements**
128:12,12
**moves** 104:24
105:9
**multiple** 13:21

**n**

**n** 2:1 3:1 4:3,3
41:1,2,23
**name** 4:6 10:13
27:13 40:2
63:18 89:3,25
110:8 113:10
113:11
**names** 42:1
60:16,17 86:16
**narrow** 55:12
**necessarily**
50:7

**need** 5:20,21
13:18 14:25
37:8 40:14,20
40:21 44:8
45:5,6 50:23
52:10,11,13,14
58:3 69:22
70:13,13,14
84:7,8 87:10
87:15 88:22
91:11,20 94:23
96:16,18 97:19
102:1,3 103:8
129:3
**needed** 115:24
**needs** 12:16
31:2 54:6 74:9
74:25 91:17
96:2,20
**negative** 73:7
116:6
**neighborhood**
99:12
**neither** 137:7
**nelson** 2:7 3:4
4:4,6 36:25
41:21 52:13,15
52:18 57:13,15
58:9,12 62:4
64:12,14,16,18
68:4,23 69:2
71:22,25 72:12
73:8 80:21
81:22 82:20
96:11,12
100:14 108:17
133:10,15
134:22 135:2

**never** 29:1
32:13,14 44:5
46:5,21 55:17
65:10 66:20
74:6,10,22,23
78:4 80:13
92:2,7 97:3,7,8
98:16 111:6
114:6,8,16
118:7 120:22
125:3 128:19
134:15
**nice** 124:25
**night** 7:18
130:7
**nighttime** 7:25
100:5
**nodding** 20:11
31:8 33:8
37:25 41:11,13
47:17 67:23
70:20 73:13
77:21 79:1
93:2 104:10
124:17
**non** 9:5 43:20
73:2,6
**nope** 134:2
**normal** 68:2
129:8
**normally** 34:6
38:1,11
**north** 2:8
**notate** 49:5
**note** 109:1
116:12,13
118:19

**notes** 40:5
  46:10 50:11,13
  50:15,17,20
  51:17,17,19,21
  51:25 75:22
  76:1,5,5,12
  109:4,11,15,16
  110:7 123:5
**noticed** 46:3
**noticing** 129:16
**number** 3:12
  18:7,12 19:8
  19:15 67:11
  116:11 133:16
**numbered** 1:19
**numbers** 28:6
  28:7,8,8 67:10
**numerous**
  14:19 17:11
  83:10

**o**

**o** 4:3 41:1,2
**o'clock** 99:17
  100:6
**oa** 13:15 14:6
**oath** 4:18
**obedience**
  61:19
**objection** 68:3
  80:19 81:20
  82:18 96:10
  100:11 134:21
  134:25
**obligation** 87:4
**observed** 129:5
  129:25 130:6

**obstruction**
  8:15
**obtain** 12:9
**obtaining**
  65:24
**obvious** 96:6
**obviously** 36:9
  48:2 105:15
  113:10
**occurred** 95:8
  125:17
**october** 59:8,9
**odd** 129:10
**odor** 102:15
**offense** 39:6
**office** 3:13 4:13
  4:14 6:12,23
  20:16 25:21
  27:20 58:16
  61:22 84:18
  87:10,19 88:13
  93:7 107:10
**officer** 6:21,25
  12:11 19:21
  22:4,23 23:2,7
  31:25 32:4
  42:10 43:11,16
  43:21 44:5,10
  45:8,11 46:3
  46:21,21 47:22
  47:25 49:4
  51:4,6 53:6,7
  54:3,7,9 55:9
  55:20 56:6
  80:15 84:12
  88:23,24 90:8
  91:2 96:2,4,16
  96:20,24 99:3

  99:7 100:9,16
  100:16,18
  101:11,20,21
  101:24 102:1,3
  102:16 103:8
  106:7 111:23
  113:23 117:20
  117:22 125:14
  126:22 127:13
  130:23 132:12
  132:13 136:20
**officer's** 24:25
  40:16 43:25
  47:1 96:1
  103:12 113:10
**officers** 13:1,21
  14:25 21:3,10
  30:24 39:3,11
  55:25 56:2,11
  62:12 83:10
  84:8 86:18
  87:4 90:13
  95:6 98:24
  100:12 124:8
  132:17
**offices** 1:23
  2:13
**official** 1:7,8,9
  136:7,8,9
**oh** 8:18 19:12
  22:16 28:4
  30:3 32:1
  36:16 37:3
  38:25 40:6
  50:23 55:11
  59:1 75:14
  79:7 92:5
  97:19 116:25

  121:12 123:11
**okay** 4:12 5:4
  5:17 6:2,6,14
  6:19 7:2,21,24
  8:6,9,18,23 9:4
  9:12,18,23
  10:5,11,21
  13:6 15:9,20
  16:2,16 17:2,5
  17:14,24 18:4
  18:14,25 19:16
  19:19 21:10,21
  24:1,8,10,18
  24:23 25:6,11
  25:23 26:2,14
  26:22 27:11,18
  28:5,10,13
  29:4 30:5,13
  31:14,21,24
  32:8,14 33:3
  33:12,18 34:21
  34:22 35:3,18
  35:20 36:1,25
  37:7 39:2,17
  39:25 41:6,9
  41:12 42:8,10
  43:2,14 44:7
  44:13 45:17,24
  46:6 48:4 49:2
  50:6,21 51:8
  51:12,22 52:5
  52:15 55:5
  56:25 57:6,18
  58:11,18 59:2
  59:4,8,11,19
  60:6,24 61:6,8
  62:4 63:1 64:5
  65:1 66:10,24

**[okay - people]**                                        Page 20

67:7,9,13,22
68:21 69:2,23
69:25 70:3,15
71:6,11,25
72:6,23 73:10
74:7,13 75:2
75:13,15,17
76:3 77:1,24
78:15,17,20
79:4,9,12,16
80:8,10 81:1
81:11 84:9,21
84:25 85:3,6
86:2,6,25 87:9
87:13 88:12,19
89:10 90:7,25
91:23 92:21
93:9,12,25
94:1,1,2,3,6,9
94:23 96:21
97:4 98:10,22
100:21 101:1,6
101:17 102:23
103:6 105:10
105:23 106:4,9
106:23 107:4
108:2 109:18
109:18 110:15
110:24 111:2,7
111:14,25
112:9,18 113:8
114:15 115:8
115:21 116:7
116:14 117:2,3
117:9,17,24
118:17 119:16
119:20 120:21
120:23 121:20

121:24 122:7,9
122:14,21
123:1,4,22,25
124:11,14
125:2,7 126:1
126:11 127:9
127:11,14,19
127:21 128:5,8
128:14,24
130:9,22 131:8
131:12 132:25
133:1,10,23
134:3,15,19
135:2
**olg**  1:7 136:7
**once**  22:20,20
23:10 32:24
38:24 44:17
49:11 84:7
92:13 132:22
**ones**  14:19
15:15 17:18
22:7,13 23:20
24:9 55:22
65:4,5 82:4
85:16 87:8
88:9 89:25
**oops**  123:2
**open**  30:13
51:19,24 129:6
**opportunity**
48:12 90:14
**opposed**  5:13
78:5 79:13
**opr**  130:6
**options**  71:24
72:19

**oral**  1:13,17
136:14,20
**organization**
62:21 63:3
**ortega**  1:14,17
3:4,15 4:1,6
58:7,12 69:2
108:17 136:14
136:19
**outcome**  25:22
**outside**  9:2
25:6 52:22
55:17 56:6,11
87:19 107:6
**own**  47:8 90:5

**p**

**p**  2:1,1
**p.c.**  2:13
**p.m.**  1:20
108:15 133:13
133:13 135:5
**packet**  23:5,6
77:4,5,18,19
77:20,25 83:16
86:21,21,23
**page**  3:12 58:4
60:4 62:2,7,7
62:19 64:21,24
66:18 67:14
71:20 72:7,15
75:11,19 83:14
94:4,10,13
98:23 101:2,7
115:9 116:11
121:4 123:2
124:23 125:11
126:6,18 131:7

131:12 137:3
**pages**  64:11
**paid**  111:10
112:8,11 119:2
119:3,4,12
120:4
**paper**  32:21
50:15
**paperwork**
75:8 79:17
**part**  24:25
69:12 126:17
**particular**  51:9
56:6 57:1,21
64:19 101:13
126:25
**parties**  137:9
**party**  118:20
136:25 137:5
**past**  123:2
**patrol**  7:4,5,5
7:12,12 8:5 9:3
9:8 48:19 53:8
56:1,2 66:3
71:9 83:25
96:4 99:7
107:14 127:12
**pause**  75:23
**pay**  80:20,22
**payout**  112:2
112:13
**people**  8:21
13:11 15:1,14
15:16,18,22
27:16,19 28:16
28:24 42:23
82:3 105:18
112:21 116:24

**percentage** 9:4
9:7 24:6,10,11
**perfect** 12:5
62:21 63:21
66:20
**perfectly** 41:24
**performance**
34:1,8 61:18
**person** 29:24
32:1 37:10
42:6,11 83:10
92:5 101:12,13
102:11 107:10
126:23,25
**person's** 44:11
**personal** 3:15
25:25 50:11
58:14
**personally** 11:6
**perspective**
96:2
**pertaining**
84:16 98:8
129:24
**phone** 13:3
14:4,17 15:3,6
15:25 26:24
27:6 28:18,19
28:20,23 29:14
29:22,23 38:4
42:12,19 43:5
43:15 44:17,18
50:16 52:2
75:20 110:19
111:8 112:15
112:16 113:18
114:10 115:23
116:4,15

119:16
**phrase** 9:6
82:13,21
**picking** 28:23
**pictures** 117:5
**piu** 10:14 31:20
31:21 53:9,10
53:18 54:18
55:1
**placed** 66:3
**plaintiff** 1:4,18
2:3 4:7 6:15
64:1 104:4
136:4
**plate** 8:13
95:21,23
101:22,24
**plus** 76:17 77:5
**pod** 53:20
**point** 5:18
47:22 48:1
83:12 90:9
118:10 120:25
121:20
**police** 6:21,24
**policies** 54:4
89:14,17 93:17
93:24 125:23
127:6 132:2
**policy** 3:14
21:3,7,11,17
21:17,20,23,25
22:11 23:9
30:10,12 31:1
31:19 32:19,23
33:4,23,25
34:3,6,9,11,13
35:14,15 36:2

36:2 45:6 47:8
47:11 48:2,9
53:1 54:3,13
54:14 56:23
57:9,17,17
62:8,9 71:2
72:17,24 73:12
73:16 74:11,15
74:19,21 75:4
75:6 77:3 78:4
78:5,7,22
79:18 80:14,16
80:24 81:5
89:4,5,11,25
94:18 103:12
103:20,24
106:19 120:2
122:13 125:8
125:19 127:2,9
131:23 133:6
**poor** 34:1,8
124:5
**poorly** 82:13
**portion** 69:12
74:14 128:25
130:10
**portions** 34:25
**position** 12:10
58:19
**positions** 9:24
**possibilities**
73:11 74:18
**possibility**
73:15
**possible** 18:9
65:23 130:5
**practice** 83:4

**precinct** 27:8
**precincts** 27:17
**preliminary**
4:17
**prepare** 5:25
**presumably**
25:11 52:7
**pretty** 8:2,6
12:14 28:10,15
55:12 83:18
89:3
**prevent** 4:24
95:2
**primary** 52:19
**prior** 23:10
**private** 25:9
**pro** 19:4,6
51:12,14,21
52:2 77:13
78:1
**probable** 94:23
95:3,7,10,12
95:13,16,19,23
96:5,8,17,18
96:24 97:13,15
97:15,18,20,23
98:3,16 102:6
102:20 105:12
123:11 125:16
126:3 131:18
132:14,23
**probably** 5:18
13:4 18:7 19:9
19:17 24:7
28:22 31:6
51:5,11 92:7
**procedure** 1:25
3:14 89:5

procedures
  89:14
proceed 93:21
process 29:8,9
  36:14,17,19,23
  37:16 45:3
  69:7,7,11
  75:17 81:2,3
  81:13,15 82:23
  82:25 85:1
  90:25 92:10
  108:20,22,24
  112:25 133:2
produced 1:17
professional
  10:12,17,18,19
  60:8,13,18,22
  61:3 63:5
program 41:9
prolonged
  65:21
promoted 7:7,7
  7:10
prompt 85:22
proof 46:16
prove 87:17
provide 87:25
provided 6:7
  103:19
psi 60:12,13,20
public 10:14,24
  31:21 78:12
  82:17 133:17
pull 40:9,9
  70:13,13 83:22
  84:5 88:4
  99:22 100:10
  126:4

pulled 8:21
  25:20 100:15
  100:18 102:14
  103:21,22
  113:15 118:11
  120:3,7,16,16
  122:23 124:2
  125:4,20
pulling 102:18
pulls 101:20
  104:18,19
punish 106:7
punishment
  23:14
purpose 21:2
  79:12
pursuant 1:24
  94:25 136:23
pursue 12:18
put 15:23
  32:21,24 49:23
  50:10,10,23
  51:17,17,21,25
  53:24 72:21
  73:24,25
  102:22 120:8
  127:15 132:10
puts 51:15,16

q

question 5:16
  5:19 9:6 10:1
  19:19 51:1
  54:9,21 74:14
  81:2,21 82:12
  82:19 89:12,25
  97:10 98:23
  107:19 113:25

115:3 124:6
  132:24 134:9
questions 5:6
  19:5 31:24
  37:20 64:19,20
  84:8,14,16
  88:23,25 89:10
  89:23,24 90:4
  90:5,6,20 91:1
  91:2 95:5
  97:21 102:4,11
  103:4 129:19
  130:4 133:16
  135:3
quick 54:4,5
  108:13 119:22
  133:11
quote 36:9 63:4

r

r 2:1
radar 95:14,15
raise 129:8
random 94:14
  94:17
randomly 95:6
  98:24 99:5
  125:15
range 9:7
rank 4:9 89:4
ranking 61:21
rare 24:14,16
  25:7 26:22,23
  27:14,16
rather 69:17
raul 80:6
rbf 1:7 136:7

reach 90:22
reaction 19:1
read 29:23,23
  59:12 63:1,2
  65:16 77:8,9
  87:14 89:4,11
  94:21 95:4
  99:7 101:10,14
  107:25 126:22
  129:4 131:17
  132:9
reading 66:11
  94:20 123:4
real 54:4,5
  108:13
realize 19:7
realizing 48:6
really 9:23
  12:6 13:9 44:4
  55:17 61:15
  76:7,7 82:12
  92:16 93:22
  98:18 132:4
rear 8:15,17
reason 14:6
  26:24 66:14
  68:20 75:3
  94:24 97:23
  99:14,16 106:2
  122:24
reasonable
  94:24 98:25
  99:4,13,15,24
  100:1,9,19
  101:12 102:1
  103:2,10 124:8
  126:24 127:16
  127:22 128:9

129:1 130:11
130:13,18
132:21
**reasons**  85:11
101:25 137:4
**recall**  17:7
19:25 24:17
50:22,25 71:4
91:21,22 107:1
107:3,23
110:12 127:10
**recap**  119:22
**receipt**  137:2
**received**  51:9
93:5,6,7
**recess**  68:25
108:15 133:13
**record**  5:6,7,10
60:1 63:4
68:24 69:1
108:16 133:12
133:14 135:4
136:21 137:11
**recording**
65:25
**records**  30:13
**recruiting**  7:14
7:14,15
**red**  67:10
**redo**  91:20
**refer**  4:13
47:10 113:1
**reference**  83:7
113:25 116:10
129:18
**references**
119:17

**referring**  80:3
**reflect**  58:15
**refresh**  6:3
57:25
**regardless**
45:12 53:6
**registration**
8:13 137:20
**rehear**  5:20
**reiterate**  98:13
**related**  9:16
24:11,21 26:15
27:23 42:3
47:16 54:22
55:25 103:16
103:16 137:8
**relationship**
10:12 69:6
**relative**  105:3
137:10
**relay**  34:17
84:23 106:14
**relevant**  35:1
38:16 44:15
89:17 97:13
113:1 125:8,19
127:2 131:22
133:4
**relied**  49:20
107:19,21
129:1
**rely**  104:7
**relying**  20:2
**remarks**  61:23
**remember**  7:15
9:19 12:19
15:20 18:12
22:13,16 24:15

24:16 25:14,17
25:20,21,22,22
25:23 26:1,3,8
26:9,11 40:12
50:19 51:18,20
51:25 59:9
60:2 61:16
66:12 67:4,6
68:6,7 89:2,6
89:19,20 90:2
90:2 107:25
108:1 109:10
111:21,21
112:16,22
114:13 117:21
118:1,2,20,24
119:25 120:1,9
120:9 124:9
126:12,16
128:24
**remind**  5:11
**reminding**
62:16
**reopen**  134:23
**reopened**  134:4
134:5,12,16
**rephrase**  5:20
24:11 26:16
54:21 96:11
97:10 98:15
107:20 134:9
134:22
**replied**  121:17
**report**  3:18 6:4
6:8,10 11:6,13
11:21 13:23
40:6,10 46:4,6
46:7,13,14

47:1,15 48:14
48:20 49:5
70:21 84:4
86:17 107:2,23
107:25 118:11
118:11,12,13
118:15 122:2
122:19 127:18
128:1,7,7,9,11
130:11
**reported**  1:22
**reporter**  1:21
5:6 41:18
57:14 62:2
64:13 65:3
68:24 69:1
73:4 108:16
133:12,14
135:4 136:17
**reporter's**  3:6
136:13
**reports**  39:2,5
39:6,18 40:1
41:4,12 42:2,4
42:8 50:3 56:5
56:16 70:13,19
84:3,19 86:18
87:16 88:17
117:13
**represent**  4:6
**request**  3:17
12:16 13:13,22
14:1 30:14
31:13 64:25
65:14 79:21,22
82:2,6,15 83:1
83:7,19 85:7
85:12,23 86:8

Case 5:23-cv-00706-OLG-RBF    Document 119-24    Filed 06/11/25    Page 162 of 174
Marta Ortega                                                    February 28, 2024
[request - roughly]                                                      Page 24

113:6
**requested** 64:2
  120:13 136:25
  137:5
**requests** 13:2
  13:10
**require** 100:2
**requires** 44:19
**research** 56:16
**reserve** 135:3
**respond** 15:24
  53:5,10 54:21
  65:22 100:12
  130:19
**responded**
  53:13 55:6,7,8
  55:19
**responding**
  53:17 90:13
  129:19,19,21
**response** 51:3
  70:2
**responses**
  129:21
**responsibility**
  52:20 63:6
**rest** 89:6
**restate** 75:15
**resting** 129:6
**restraints**
  84:16
**restroom**
  108:13
**result** 80:17
**retrieve** 88:15
**return** 37:1,7
  77:4,8

**returned** 137:1
  137:3
**review** 13:20
  30:9 39:2
  40:23 63:19
  69:22 77:15
  86:11 91:10
  105:20 117:17
**reviewed** 6:3,9
  32:1,22 103:24
  117:12 118:1,8
  122:12 130:10
**reviewing**
  69:22 117:13
  118:4
**rf** 31:14
**rfi** 13:14 14:25
  25:4 31:12,15
  32:3,4,12,13
  43:9,13,20
  47:13 48:10
  54:7,9,16 56:7
  64:23 65:13
  66:5,8,14,21
  66:25 67:1,20
  68:1,15,20
  69:7,12 72:5
  75:1 78:10
  79:10,14,21
  80:18,24 81:2
  81:13,14,18
  82:5,15,23
  83:6 85:18
  90:10,12 92:2
  93:8 97:5,7,8,9
  112:25 133:24
  134:4,5,6,13
  134:16,23

**rfis** 14:23
  16:17 18:19,21
  19:10 22:14
  24:2,11,17,21
  25:6 29:20
  35:9 52:3,19
  52:23 56:12
  62:1 63:14,20
  65:2,4 83:5
  84:3 85:16
  92:25 133:16
  133:20
**ride** 55:25 56:2
**right** 4:5 6:17
  6:17,17,19 9:6
  9:18 10:13
  14:11 17:9
  18:15 20:21
  23:5,16 24:3
  27:2,20,22
  30:19 36:5,25
  37:24 38:4
  39:8,8,11,12
  39:23 46:22
  47:16,21 49:7
  49:24 54:14,17
  55:1 57:6,15
  57:22 58:3,7
  58:12 59:5
  62:10,16,18
  64:14,18 67:19
  71:23 74:13,18
  75:23 77:1
  79:22,24 80:4
  81:1 82:9,10
  83:11,15 85:8
  88:19,19 90:22
  92:24 93:13,19

94:4 95:25
  96:14,19 99:24
  100:3 101:1
  105:8 107:18
  108:8,17 109:8
  110:8,19
  111:16 113:12
  115:12 116:5
  116:10 117:4
  118:19 121:12
  121:13,19,21
  123:16 124:16
  124:23 125:14
  126:6,21
  127:23 128:2
  128:10 129:16
  130:24,25
  133:15,25
  134:9,10 135:2
**rightfully**
  125:20 132:17
**rms** 39:10,16
  40:1,10,11,13
  41:4,5,7,12
  46:4,13 47:1
  70:21 118:16
  118:17 122:2
  122:19 128:1
**road** 2:8 81:11
  104:22
**rodriguez** 3:15
**role** 20:25 21:5
  53:12 56:22
**room** 64:9,10
**rough** 18:7
**roughly** 17:14
  18:17 118:3

**rude** 42:22,24
42:25
**rudeness** 42:23
**rule** 126:22
136:23
**rules** 1:24
35:17,21 56:3
**run** 4:16
**running** 66:1
**runs** 101:22

**s**

**s** 1:18,23 2:1,3
2:12,12,13
41:23
**saenz** 2:13
**sake** 78:16
**salazar** 1:8
136:8
**san** 1:2,24 2:14
136:2
**saw** 6:4 8:20
84:10 97:15
108:25
**saying** 20:17
43:18 45:24
48:6 49:17
84:11 86:20
96:2 100:1,5
120:19 122:23
**says** 29:7 40:3
47:25 57:18
58:18,19 60:7
63:5,8 73:5
79:22 83:7,8,9
83:21 94:14,24
95:6 98:24
109:7 110:9

113:15 114:25
115:13,13
116:5,16
118:20 121:5
129:5,16
131:13 132:12
**scenarios** 45:1
**schedule** 88:24
**schott** 1:3 4:7
6:15 64:1
66:15 67:15
104:5 108:11
118:24 121:15
125:20 129:5,7
129:17,20,23
130:1,7 136:3
**schott's** 25:12
29:3 44:21
67:2 108:20,25
129:9
**scratch** 66:25
90:19 98:11
103:8
**search** 28:24
38:14 102:8,20
103:1 114:5
123:11,14,15
124:12,19
131:1,6,9,19
131:24 132:13
132:23
**searched** 65:23
114:4 131:20
132:18
**searches**
131:14,17
**searching** 94:1

**seat** 66:2,3
104:1 120:8
128:15
**second** 33:14
111:4,8,19,25
112:2,6,17
119:16 126:8
**section** 10:2,4,4
10:6 20:7,9,10
33:24 58:20
59:6
**sections** 7:9
12:21
**see** 6:8,11 8:11
14:3 15:7
21:21 33:9
38:15 40:3
43:24 45:5,13
45:17 47:9
48:4,13 54:5
54:13 55:15
57:18 58:18,19
58:22 60:7
61:9 62:21,23
67:10 73:16
94:13 96:2,16
99:1,23 101:8
102:19 103:24
104:15,17,23
104:24,25
105:1,18 109:5
109:19,21,23
110:15,16
112:1 114:21
114:22,24
116:25 119:6
122:15 131:12
131:15

**seemed** 132:5
**seems** 18:15
**seen** 65:1,7,10
66:21 77:9
96:20
**seizure** 131:10
**send** 31:6,13
32:16 33:5
43:7 44:9,14
45:6 73:17
74:21 77:15,19
77:24 78:21
81:5,6 82:15
86:11,12,16,19
87:4,10,20
91:10,14 111:2
111:3 114:12
114:16,18,19
114:25 115:6
115:18,20,22
115:24 116:8,8
116:18,19
117:8 120:21
121:18
**sending** 86:23
88:13 91:20
**sends** 77:20
78:11 81:7
87:6,19 91:23
121:22,23
122:10
**sense** 4:14 5:22
9:1,25 15:9
17:19 20:24,24
24:1 26:4
28:21 35:9
36:7 43:4
45:25 47:14

48:13 50:2
55:23 56:13
82:24 88:12,19
94:2 95:25
98:10,12 117:3
125:5 126:10
132:10
**sent** 23:12
31:11 51:8
104:8 115:10
115:18 116:3
117:10 118:7
120:13,25
121:1,3,8
**separate** 10:25
11:1
**separately**
16:18
**september**
58:23,24
**sergeant** 4:5,10
7:11,13 12:12
13:16 23:6
58:7,12 69:2
88:6 107:2,24
108:1,17
118:21 120:4
133:15
**sergeant's** 92:7
**sergeants**
14:20 83:6
**serious** 27:14
86:13
**serrato** 12:1
63:17 64:3
**serve** 92:5
**service** 34:4
35:7,8,12,14

35:17,21 36:3
62:14
**several** 9:24
66:1 100:2
**shaking** 33:17
56:20 92:17
**share** 18:1
**sheet** 49:16
50:4 71:18
75:10,20,21
76:4,11,17
109:4,6
**sheriff** 12:2
63:9,13
**sheriff's** 3:13
4:13,14 6:12
10:20 27:20
34:19,24 35:4
35:15 36:2
56:23,23 58:16
61:22 89:7
93:16,18 94:5
94:10 101:2
107:10 124:21
124:24 125:10
126:7 131:7
**shooting** 22:18
23:7 55:20
**shootings** 55:9
**shorthand** 1:21
1:22 136:17
**show** 48:24
49:1 57:6 58:1
64:5 84:18
104:12 108:4
**showed** 104:23
**showing**
104:21,21,22

**shows** 65:25
78:13 95:16
**sic** 7:4 80:4
110:13
**side** 22:14
128:20
**sign** 32:25 82:3
85:15
**signature**
63:19 77:22
115:16 136:24
137:3,17
**signed** 77:9,10
85:17
**signs** 33:7,10
33:11
**silly** 115:3
**similar** 90:10
**similarly** 48:13
**sir** 4:11 59:18
**sit** 12:25 88:4
129:13,14
**sits** 129:15
**sitting** 6:23
129:6
**situation** 31:5
43:12 46:24
48:4,6 53:13
54:12 71:12
75:5 77:2 81:4
96:9 98:14
103:2
**situations**
28:23 63:7
81:17 98:11
**slip** 73:20
**slow** 42:17
78:15 113:17

122:14
**smell** 102:18
**sniff** 132:22
**soledad** 1:23
2:14
**solely** 128:9
**solutions**
137:19
**somebody**
31:18 37:21
**somewhat**
55:24
**soon** 103:21
**sorry** 7:19 11:2
11:17 14:10
20:8,24 27:15
32:10 38:25
41:14,18 43:17
45:25 46:8
55:3 58:6 59:1
62:6 64:24
65:3 69:4
71:20 72:7,11
73:4,13 75:15
77:18 80:2
81:22 83:24
86:23 97:10
98:22 99:9
112:6 118:9
120:25 124:25
131:1,3
**sort** 33:13,15
**sotto** 94:20
**sound** 85:8
96:6 109:8
**sounds** 8:1
16:12,12 17:14
18:4,7,25 19:9

19:21 24:24
28:11,22 35:23
37:4 54:11
61:12 88:20
108:24 115:3
**south**  129:25
130:8
**speak**  5:8 16:19
37:15 42:12
76:11
**speaking**  44:2
96:1 130:1
**spears**  39:8,10
39:15 40:10
**specific**  88:25
**specifically**
94:9 108:21
122:22 125:11
128:3
**speeding**  8:12
8:12,24 26:25
95:14,15,17
97:23,24
101:21 102:7
102:14,17,18
103:4
**spell**  41:21
**spelling**  91:16
**spoke**  44:20
111:8 112:4
116:2 118:21
120:3 129:17
129:23
**stand**  60:20
**standard**  46:15
50:23 89:6
90:5 103:11
132:16

**standardized**
94:25
**standards**  60:8
60:18,23 61:3
63:5 133:4
**stands**  60:22
**start**  33:14,21
37:15,16 40:21
59:17 60:2
69:9,16,22
70:12 87:14
102:11 108:19
122:17 123:19
**started**  4:16
7:1 11:11
17:23 117:13
**starting**  118:5
**state**  1:22
136:18
**stated**  111:5
**statement**
61:22
**statements**
12:18 130:4
**states**  1:1 23:10
136:1
**status**  121:6,16
**stay**  98:23
**staying**  67:8
**steering**  129:6
**step**  8:24 9:2,5
9:5,8,16,17
41:3 69:10,10
70:3,4,5,6,10
70:15 71:11
72:1,3,6 73:10
73:15,16 74:18
75:7 76:8 77:1

77:14 82:25,25
84:24,24 85:4
85:8 86:6,7,7
86:10 88:20
91:3,7,23
108:22 112:24
112:24 113:2
113:17 114:9
115:21 117:10
117:11 118:2
122:10,17
133:1
**steps**  92:16,23
93:22
**stick**  53:23
**sticker**  8:13
**stop**  8:14 22:24
25:8 26:15,17
27:23 28:17
29:13 30:25
33:22 34:14
42:3 43:1
46:11 63:25
65:19 66:15
67:2 93:15,16
94:1 95:6,7,20
95:23 96:5,8
96:18,25 98:24
98:25 99:5
101:18,25
102:4,5,6,10
103:3 105:13
107:12 108:11
109:22 110:4
111:9 118:25
120:8 123:8,20
124:1,9,16,19
125:15,15

126:9 127:17
127:23 129:2
130:12
**stopped**  25:17
26:24 27:9,11
30:3 97:22
103:23 120:12
**stopping**  93:25
94:14,17
**stops**  94:25
98:18 101:18
102:13
**story**  70:8
128:17,20
**straightforwa...**
122:16
**strikes**  73:8
**stuff**  4:17 8:7
8:16 35:22
36:10 45:9
46:10 49:22
53:10 55:1
66:19 69:16,22
87:5 88:22
101:6,23
**styled**  1:19
**submit**  15:14
15:18 72:5,21
73:23 75:8
76:21 77:3
79:17 85:11,23
91:9 93:11
**submits**  83:1
85:7 86:7
**submitted**
15:21 17:18
32:10 68:15
78:4 91:12

133:7
**subsection**
62:23 63:2,8
101:10 131:14
131:14
**substance**
119:21
**substantial**
9:15
**suggest** 23:24
**suggestion**
36:12
**suite** 1:23 2:4,8
2:14 137:20
**summaries**
14:24 39:8,19
**summarize**
94:22
**summary**
12:20 32:20
91:6 128:25
130:16
**super** 5:19
15:10
**supervisor**
7:23 42:13,13
42:20,20,21
43:3,8,15,22
43:23 44:2,3,6
44:11,15,20
45:7,10,15,22
47:5 51:5
107:7 112:5,12
118:22
**supposed** 22:19
40:16 87:20
88:14 95:21,22

**sure** 15:1 17:6
22:5 27:22
33:3 34:16
45:11 52:17
54:3 57:5
60:24 62:10
63:13,23 64:8
65:17 69:6
71:7,12 78:20
84:5 85:2 86:6
87:3 106:15
108:8 118:18
123:1 124:14
127:21
**susan** 67:5
**suspension**
36:13 92:13
**suspicion** 94:24
99:1,4,15,24
100:1,10,19
101:13 102:2
103:3,10 124:8
126:24 127:16
127:23 128:9
129:2 130:12
130:13,18
132:21
**suspicions**
99:13
**sustain** 62:12
62:12
**sustained**
12:21,21,23,24
23:8,20,20,25
23:25 34:2,3
48:1,2,7,7
61:17,17,24,24
91:5,6,19,19

**sworn** 1:19 4:2
136:19
**synopsis** 32:20
**system** 19:3,6
24:3 51:12,14
51:18,23 52:2
130:6

**t**

**t** 4:3 41:23
**take** 17:8 29:21
35:12,20 36:20
41:3 68:22,23
85:19 88:2
97:25 108:11
108:13 124:22
129:2 133:10
**taken** 1:19
137:9
**taker** 40:5
46:10
**takes** 28:20
30:17 77:25
**talk** 6:11 36:13
42:10,15,15,21
42:24 43:21,22
43:23 44:2,4
44:18 45:11,18
47:22 51:4,4
54:8 69:23
78:25 79:9,13
93:13 107:9
108:10 111:25
112:21 113:20
125:3 126:8,14
131:6
**talked** 37:22
70:18 110:25

111:4,22
112:12 115:23
119:11 124:9
125:10 126:12
134:17
**talking** 25:12
27:24 34:18,23
45:22 54:23
57:7 104:1,2
108:9 111:21
128:3
**talks** 78:10
**team** 65:19
**tech** 107:10
**technically**
62:9
**tell** 16:22 17:4
17:12 18:12,21
19:14 24:13
29:24 30:7,11
31:3 38:8,9
43:24 44:16
45:10,15 69:20
69:21 72:18
74:8,24 85:17
89:18 105:4,8
107:11 112:1
119:24 128:5
**telling** 44:17,24
91:22
**tells** 53:24
55:14 71:23
82:9 103:23
113:22 129:13
**temporarily**
101:11 126:23
**ten** 14:25 17:2
17:3,15 18:1

Marta Ortega                                                    February 28, 2024

92:12
**term** 55:6
95:10
**terrible** 17:25
**testified** 4:2
**testifying** 4:18
4:25
**testimony**
136:21 137:9
**texas** 1:1,10,22
1:24 2:5,14
95:21 136:1,10
136:18 137:21
**texas's** 8:6
**thank** 12:5
15:10 37:1,4
46:15 49:7
52:15,16 59:25
62:16,17 63:23
71:22,25 76:19
82:10 84:21
92:21 93:12
96:21 117:2,9
121:12 130:9
130:24
**thanks** 58:11
64:17 80:11
**therefor** 137:4
**thing** 5:11 16:9
39:23 43:7
57:10 61:15
65:16 66:18
67:4 71:1
77:23 108:24
108:25 110:25
113:20 124:20
**things** 26:9
34:9 35:6

41:20 52:22
61:7 78:24
122:7 129:24
**think** 5:4 7:4,8
7:11 9:4 10:13
11:15 15:19
16:15,18 17:23
19:10 20:22
22:6 24:6
25:18 26:22,23
27:25 28:2,5
31:4,5,25
32:17 35:7,7
36:11 37:8
38:20 41:17,19
41:23,23 42:9
55:13 56:24
61:3,10 67:5
68:14,15,19
69:7 79:18
80:2 81:2,23
82:21,22 92:25
93:13,21 96:9
98:11 113:4
117:5,19
118:20,23
119:10 120:2,4
120:13,15
121:10 122:6
124:19 133:10
**thinks** 42:14
91:16
**third** 15:13
104:18 118:20
**thought** 45:3
73:22 116:23
**thoughts**
112:19

**three** 19:13
55:11 70:1,2
73:3,7,8 93:22
109:20 122:7
124:22
**throckmorton**
137:20
**ticket** 26:25
27:1,7 28:14
28:16
**tickets** 28:15
**till** 29:17
**time** 5:22 9:9
11:10,23 14:7
14:13 15:2
16:15 19:2
28:19 35:12,20
41:3 49:3
53:25 79:8
81:14 88:2
93:4 97:25
98:5,6 100:3
104:18 107:12
108:11 111:4,8
111:19,25
112:4,6 124:22
129:2,3
**timeline** 15:3,4
29:21 68:9
80:12 92:22,25
93:3 108:19
**timelines** 14:24
30:18 65:6
69:8
**times** 19:13
22:2 32:16
44:8 48:16
66:1 70:2 73:7

88:24
**tires** 104:21
105:4
**title** 89:4,25
**today** 4:7,18
25:12 29:16
**together** 80:11
**told** 61:16 65:5
91:5 100:16
103:21 108:1
110:8,11,22
112:7 114:11
114:12,16
116:7,17 119:1
120:1,2,5,11
120:15,16
129:11
**tone** 129:20
**took** 50:13
114:17,18
**tools** 40:20
**top** 9:19 25:10
60:7 71:4
89:18 94:6
101:4
**total** 45:25
98:12
**totally** 9:25
24:19 26:5
58:3
**track** 15:22
114:23
**traffic** 8:4,7 9:1
9:15 22:9,12
24:12,16,20
25:8 26:15,17
27:23 29:13
33:21 34:14

35:5 42:3 43:1
46:11 54:22
56:17 65:19
93:15,16 94:7
94:25 95:8
96:8,17,18,25
98:18 101:18
101:18,21,25
102:4,12,13
109:22 110:4
111:9 118:25
120:8 123:8,19
124:16 125:5
125:16,25
126:4
**training**  12:9
12:11 19:20,22
19:23 20:2
33:17 130:2
132:8
**transcript**
136:20 137:2
**transfer**  20:5
20:12
**transportation**
35:6
**trembling**
129:9
**trends**  56:17
56:17,17
**tries**  70:1
**tripped**  84:12
**trouble**  53:6
**truck**  104:12
104:15
**true**  131:24,25
136:21

**truthfully**  4:25
**truthfulness**
34:8
**try**  5:12 16:16
16:23 26:8
29:21 37:23
38:6,8,15
50:15 56:15
82:13
**trying**  12:19
22:6,13,16
36:11 37:2
51:18 56:9
90:21,22 99:22
102:8 121:5
**turn**  22:18 23:2
47:7,12 48:10
60:4 67:13,13
67:19 75:23
82:20 97:8
98:22 101:2,7
108:7,18
114:24 124:23
125:12 126:17
128:2 131:12
**turnaround**
130:8
**turned**  23:7,9
46:21 97:9
106:24 126:16
134:6
**turning**  66:18
**turns**  22:23
80:24
**twice**  19:10,16
**two**  11:11,20
13:4 17:3 18:3
18:3,3,3,6,17

18:18 21:14
25:10 27:5
28:3 29:2
55:19 62:5
63:3 73:11
74:18 77:5
78:24 80:4,6
97:21 128:21
**type**  23:12,19
46:13 78:10
79:10,20 82:5
84:8,16 90:18
91:4
**typed**  46:9
133:7
**types**  42:8
46:10 76:6
78:10
**typically**  37:23
**typing**  79:14

**u**

**uh**  5:13,13 8:8
21:8,13 23:1
25:2,5,13
32:15 33:6
35:2 38:5
44:22 45:21
51:7 53:15
57:11,20 62:20
65:11 70:7,17
70:23 72:2,25
74:20 76:25
77:17 78:2,23
79:11 81:10
83:3 86:9
93:20 96:15
99:2 103:5

104:6 105:4
106:18 109:24
110:17 113:19
113:22 114:2
115:2,15 119:8
122:1,3,20
123:7 129:22
**ultimately**
47:20 82:3
**um**  119:23
129:22
**uncertain**
132:6
**uncle**  6:24
**under**  4:18
10:9,10 21:16
21:20 34:9,10
53:22 58:18,19
61:1
**understand**
4:18,21 5:15
15:11 21:22
25:7 26:6
27:22 33:4
34:17 36:6
42:18 43:20
45:2 51:2 58:3
62:5 63:13
67:24 69:6
78:20 80:13
81:21 82:19,23
85:2 95:10
106:15 112:2
116:14 124:15
127:21
**understandable**
9:23

**understanding**
13:11 125:8,18
131:22
**understood**
105:10 124:3
**unit** 10:2,13,14
10:19,24,25
31:21 57:1
65:22 78:13
84:5,5 87:16
87:22 88:8,11
130:14
**united** 1:1
136:1
**units** 88:8
107:14
**unlawful**
124:16,18
**unpack** 10:20
22:24 35:11
93:23 95:3
99:9 103:7
119:20
**unpacking**
108:19
**unrelated**
101:25 102:4
102:11 103:4
**unrestrained**
66:4
**update** 58:2
**updates** 51:15
**uploaded** 38:22
**upset** 25:19
**use** 12:14,22
22:3 34:6,13
38:19 61:17
83:16 85:4

86:13 89:8
**used** 8:12,14,24
12:22 22:4
53:2,10 60:12
62:11 93:1
102:13
**useful** 102:23
**uses** 12:21
60:11
**using** 10:13
130:2
**usually** 8:22
14:6 16:3
28:18 29:14,20
29:24 30:11
34:2,3,7 42:12
42:19 45:9
46:9 50:15
51:19 69:18
75:8,18,19
76:5 98:7
110:9

**v**

**v** 41:23
**vague** 36:6
121:21
**vehicle** 28:25
65:20,23,24
66:1,2,4 93:25
94:2 95:20,24
96:5 99:14,16
99:20,23
100:25 102:9
102:15,20,21
102:22 106:11
110:13,16,23
111:1,15,24

113:15,21
114:4,5,11,21
114:22 116:17
116:22 118:25
119:6 128:13
128:22 129:14
129:15 131:14
131:17,19,20
132:13
**vehicles** 48:17
48:18,19 95:7
98:25 99:19
105:25,25
106:1,2 125:15
**verbatim** 94:21
**veritext** 137:19
**version** 43:25
**versus** 9:5
44:14 47:1
**video** 30:14,23
38:14,14 46:22
70:13 84:4,5
84:14 88:1,4,5
88:7,7,8 104:8
105:11 106:13
108:4 115:1
121:18
**videos** 83:22
84:2 88:17
**view** 8:15
**violate** 21:3,11
**violated** 34:15
73:17 93:16,16
103:12
**violating**
106:19
**violation** 22:17
31:1,6,19 32:2

32:19 33:5,23
34:10 35:5
45:6 46:20
47:8,11,16
48:3,9,15,21
54:3,13,14
71:2 72:24
73:17 74:11,15
74:19,21 75:6
78:5,5,7,22
79:18 80:14,16
80:24 81:5
95:8 96:1,7,8
96:17 101:21
102:1,12 103:4
105:24 122:13
125:5,16,25
126:4
**violation's** 34:2
**violations** 8:10
8:19,20 21:4
21:11,12,17,20
21:24,25 22:12
24:17 30:10,12
32:23 34:6,13
72:17 73:12
77:3 91:6 96:3
103:20,24
120:2 133:6
**violence** 55:10
**virginia** 2:9
**visinet** 41:16
41:19,19
**voce** 94:20
**voice** 30:1
**volume** 130:2,2
**voluntarily**
101:11 126:23

Marta Ortega                                    February 28, 2024

| | | | |
|---|---|---|---|
| **vs**   1:5 136:5 | **warrant** | **weekly**   17:12 | **working**   65:18 |
| **w** | 131:21 132:13 | 17:12 | 105:22 107:2 |
| **wait**   54:9 97:6 | **warrantless** | **weeks**   13:5 | **works**   82:25 |
| **waited**   65:21 | 101:5 126:13 | 17:3 53:3 | **worn**   6:5 22:17 |
| **walk**   15:16,17 | 131:9 | **welcome**   104:2 | 22:18,19,21 |
| 15:17,25 25:15 | **watch**   31:3 | **went**   7:4,4,6,9 | 23:9 30:5,10 |
| 29:7,8 53:16 | **watching**   13:7 | 7:15 16:18 | 34:10,11 38:22 |
| 69:10 | 105:15 128:11 | 30:22 32:2,3 | 40:13 47:2,6,7 |
| **walking**   80:12 | **water**   52:11,14 | 123:2 | 47:11,23 48:24 |
| 102:14 | **way**   7:9 9:6 | **west**   130:7 | 49:5,21 65:25 |
| **walks**   29:6 | 12:4 16:25 | **western**   1:1 | 71:7 103:18 |
| **want**   4:16 6:20 | 17:25 28:2 | 136:1 | 114:21 117:14 |
| 6:23 12:18 | 33:19 40:12 | **wheel**   129:7 | 117:15 118:13 |
| 14:5 18:11 | 50:23 52:9 | **white**   99:21,23 | **worth**   137:21 |
| 19:14,19 20:23 | 53:1 61:10 | **wife**   25:19 53:7 | **wow**   39:21 |
| 20:24 23:22 | 63:11,22 74:16 | **windham**   2:7 | **write**   32:19 |
| 29:7 33:3 | 81:23 82:14,21 | 68:22 71:20 | 39:11 50:15 |
| 34:16 47:12 | 85:19,19 86:2 | **wish**   61:15 | 56:16 71:17 |
| 58:10 60:24 | 92:24 96:22 | **wishes**   101:24 | 76:12 85:21 |
| 64:11,20 65:15 | 99:7 101:7 | **witness**   1:18 | **writes**   23:6 |
| 67:7 69:3,5,5 | 103:9 107:5 | 41:19 52:16 | 40:5 46:11 |
| 71:12 74:2 | 109:22 112:18 | 62:3 72:11 | 76:5 |
| 75:17 82:22,22 | 112:23 115:18 | 73:5 136:19,22 | **writing**   56:5 |
| 84:23,23,24 | 124:5 127:15 | **witnessing**   96:7 | **written**   15:14 |
| 93:13,21,22,23 | 129:3 130:17 | **word**   93:1 | 31:11 43:5,6 |
| 93:23 94:21 | 132:11 | 124:5 | 50:2 |
| 108:18 124:14 | **ways**   56:10 | **wording**   81:23 | **wrong**   18:12 |
| 125:2 126:8 | 83:24 | 82:12 | 30:25 42:14 |
| 131:6 132:5 | **we've**   13:22,23 | **words**   77:14 | 111:7 125:7 |
| **wanted**   6:22,25 | 20:22 22:4 | 80:23 88:12 | **wrote**   75:22 |
| 20:13,14 63:23 | 74:18 | 94:19 | 107:1 109:1,9 |
| 92:22 123:19 | **website**   41:16 | **work**   8:24 | 109:12 |
| **wants**   82:5 | **weed**   102:19 | 10:24 48:17 | **x** |
| 104:3 | **week**   17:3,7,15 | 49:4 71:9,10 | **x**   2:13 3:1 4:3 |
| **warning**   42:6 | 18:2,6,13,17 | 83:4 92:10,11 | 41:1,2 |
| 129:12 | 18:18,20 29:17 | 92:23 106:3 | **xx**   137:5 |
| | 29:18 | **worked**   56:11 | |

Marta Ortega                                    February 28, 2024

**[xyz - z]**                                              Page 33

| | |
|---|---|
| **xyz** 45:10 | |
| **y** | |
| **y'all** 39:10 40:1 | |
| **yeah** 12:7 | |
| 14:12,16 18:3 | |
| 18:18 19:12 | |
| 20:21 26:4,4 | |
| 26:14 36:16 | |
| 37:7 39:20 | |
| 40:13 41:21 | |
| 42:1 46:8,15 | |
| 49:11,16 84:1 | |
| 86:15 87:6 | |
| 106:6 113:24 | |
| 116:5 117:1 | |
| 119:12 121:13 | |
| 123:12,18 | |
| 124:5 132:19 | |
| **year** 7:5 9:8,22 | |
| 18:5 59:6,7 | |
| 67:22 68:1 | |
| 134:17,23 | |
| **years** 7:3 9:25 | |
| **yellow** 39:14 | |
| **z** | |
| **z** 2:7 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.