# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY

*Alek Schott v. Bexar County, Texas*
Case No. 5:23-cv-00706-OLG-RBF

# EXHIBIT 34

Officer George Herrara                                    April 17, 2024

                                                              Page 1

1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION
3       ALEK SCHOTT,                    )
                Plaintiff,              )
4                                       )
        VS.                             ) CIVIL ACTION NO.
5                                       ) 5:23-CV-00706-OLG-RBF
        JOEL BABB, IN HIS               )
6       INDIVIDUAL AND OFFICIAL         )
        CAPACITY; MARTIN A.             )
7       MOLINA III, IN HIS              )
        INDIVIDUAL AND OFFICIAL         )
8       CAPACITY; JAVIER SALAZAR,       )
        IN HIS INDIVIDUAL AND           )
9       OFFICIAL CAPACITY; AND          )
        BEXAR COUNTY, TEXAS,            )
10              Defendants.             )
11
                    -----------------------------------
12
                          ORAL DEPOSITION OF
13                          GEORGE HERRERA
                            APRIL 16, 2024
14
                    -----------------------------------
15
16              ORAL DEPOSITION OF GEORGE HERRERA,
17      produced as a witness at the instance of the Plaintiffs,
18      and duly sworn, was taken in the above-styled and
19      numbered cause on the 16th day of April 2024, from
20      9:07 a.m. to 2:38 p.m., before JAZZMEN CANALES, CSR, in
21      and for the State of Texas, reported by machine
22      shorthand at Law Offices of Charles S. Frigerio, 111
23      Soledad, Suite 465, San Antonio, Texas 78205, pursuant
24      to the Federal Rules of Civil Procedure and the
25      provisions stated on the record or attached hereto.

Page 2

```
1                    A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3         MR. WILL ARONIN
          MS. CHRISTEN HEBERT
4         Institute For Justice
          901 North Glebe Road, Suite 900
5         Arlington, Virginia 22203
          703-682-9320
6         E-mail:  waronin@ij.org
7    FOR THE DEFENDANTS:
8         MR. CHARLES S. FRIGERIO
          MR. CHARLES A. FRIGERIO
9         MR. HECTOR SAENZ
          Law Offices of Charles S. Frigerio
10        111 Soledad Street, Suite 465
          San Antonio, Texas 78205
11        210-271-7877
          E-mail:  csf@frigeriolawfirm.com
12
13        MR. BLAIR LEAKE
          Wright & Greenhill PC
14        4700 Mueller Boulevard, Suite 200
          Austin, Texas 78723
15        512-379-2960
          E-mail:  bleake@w-g.com
16
17
18
19
20
21
22
23
24
25
```

Officer George Herrara                                    April 17, 2024

Page 3

1                           I N D E X

2                                                            PAGE

3      Appearances.................................   2

4    GEORGE HERRERA

5      Examination By Mr. Aronin....................   4

6      Examination By Mr. Frigerio.................. 206

7      Further Examination By Mr. Aronin............ 208

8      Signature and Changes........................ 215

9      Reporter's Certification..................... 217

10

11                       E X H I B I T S

12     NUMBER          DESCRIPTION                   PAGE

13     Exhibit 17    7586 through 7603               41

14     Exhibit 18    Bates 4596                     123

15     Exhibit 19    Bates 7573                     143

16     Exhibit 20    Bates 1466                     153

17     Exhibit 21    Bates 2072                     155

18     Exhibit 22    Bates 1702                     160

19     Exhibit 23    Bates 1700                     160

20     Exhibit 24    Bates 1704                     160

21     Exhibit 25    Bates 1466 and 2097            176

22

23

24

25

Page 4

```
 1                    GEORGE HERRERA,

 2   having been first duly sworn, testified as follows:

 3                      EXAMINATION

 4   BY MR. ARONIN:

 5        Q.  Very nice to meet you.

 6        A.  Sir, good morning.

 7        Q.  I asked the proper way to refer to you is

 8   deputy; is that correct?

 9        A.  Yes, sir.  That's fine.  Thank you.

10        Q.  Perfect.  Pleasure to meet you.  My name is

11   Will Aronin.  I am one of the attorneys here, and I

12   represent Alek Schott.  We shook hands before, but this

13   is the first time you and are meeting, correct?

14        A.  Yes, sir.

15        Q.  Awesome.  And if I could, just for the record,

16   if you would just, say, spell your name and title.

17        A.  Deputy George L. Herrera, II.  G-E-O-R-G-E, L,

18   H-E-R-R-E-R-A, II.

19        Q.  And this is a really, really weird question to

20   ask a police officer.  I do it all the time anyway.  Is

21   there any reason why you cannot testify truthfully here

22   today?

23        A.  No.

24        Q.  You're not on alcohol or any illegal drugs, I

25   assume?
```

Officer George Herrara                                    April 17, 2024

                                                              Page 5

1        A.  No.

2        Q.  That would be very surprising, wouldn't it?

3        A.  Yes.

4        Q.  Me too.  This is the one that does potentially

5    happen sometimes.  Any prescription medications that can

6    impair --

7        A.  Huh-uh.

8        Q.  I'm going to jump to -- the only weird part

9    about this -- there's probably a bunch of weird parts --

10   but everything we're saying is being recording.  So even

11   though it's obvious where a lot of my questions are

12   going, please just let me finish the answer -- the

13   question, and then you answer.  It's better for you,

14   right?

15       A.  No problem.

16       Q.  Likewise, all answers have to be verbal.

17   Normally we do things like uh-huh, nodding.  Just say

18   yes, no, whatever it would be.  Fair?

19       A.  Yes, sir.

20       Q.  Perfect.  And you are -- you do understand that

21   you just took an oath, correct?

22       A.  Yes, sir.

23       Q.  And that is the same oath that you would take

24   in court.  You understand that?

25       A.  Yes, sir.

Page 6

1      Q.   What do you understand it to mean?

2      A.   It means that I need to be truthful as much as

3  I can with my answers, and if I don't recall an answer,

4  I'm just going to tell you I don't recall.

5      Q.   That would have taken me like two minutes to

6  explain nearly as well as you just did.  Perfect.

7  That's literally all it is.  And I know we're sitting on

8  the opposite side of the table and we're on the opposite

9  side of this case, but the truth is, all I want here is

10  to get a better sense of how some of the things you do

11  works.  Do you take my word for that?

12      A.   Yes, sir.

13      Q.   Thank you.  And I can tell you, there's nothing

14  I am going to be asking you that's meant to be a trick

15  or a trap or anything like that.  There will probably be

16  some questions that don't make sense.  It's because I'm

17  not very good at this.  If I ask a question that you

18  don't understand, please just tell me, tell me more than

19  once.  I'm happy to rephrase it.  Cool?

20      A.   Yes, sir.

21      Q.   One of the weird -- so we are -- you're free to

22  take as many breaks as you would like.  The only rule

23  about that is I would ask that if I've asked a question,

24  please just answer that question, and then we can take

25  as many breaks.  Sound good?

Officer George Herrara                                    April 17, 2024

                                                          Page 7

1        A.  Understood.

2        Q.  Awesome.  Some basic background.  Have you ever

3    been a witness before?

4        A.  Yes.

5        Q.  Just tell me about that, please.

6        A.  I've been a witness to multiple criminal cases

7    throughout my career here at the Bexar County Sheriff's

8    Office.

9        Q.  How long is your career with the Bexar County

10   Sheriff?

11       A.  I'm going on 23 years in August.

12       Q.  Okay.  I do not expect that you know how many

13   times you've testified.  Can you give me a rough

14   estimate?

15       A.  A lot.

16       Q.  More than -- more than ten?

17       A.  Yes.

18       Q.  More than a hundred?

19       A.  Less than a hundred.

20       Q.  More than 50?

21       A.  More than 50.

22       Q.  Okay.  So some are -- give or take some --

23       A.  Give or take.

24       Q.  Okay.

25       A.  Yes, sir.

Officer George Herrara                                    April 17, 2024

Page 8

```
 1        Q.  Fair enough.  And what percentage of those

 2   estimations are just generally criminal cases?

 3        A.  Probably almost 99 percent of those.

 4        Q.  Okay.  Have you been a witness in a civil case?

 5        A.  Yes, I have.

 6        Q.  Can you please tell me about that?

 7        A.  I was called for a civil case in the Traffic

 8   Safety Unit when I was a part of that unit.

 9        Q.  What type of case was it?

10        A.  It was a -- from what I remember off the top of

11   my head, it was either in some type of intoxication

12   manslaughter or assault case, but I don't recall the

13   exact specific details.

14        Q.  And you were a witness there?

15        A.  I was one of the investigating officers at the

16   crash site.  Yes, sir.

17        Q.  And when you say you were a witness, were you

18   deposed like this, or did you go to court and be a

19   witness in front of a judge or jury?

20        A.  I was deposed like this.

21        Q.  And did it ever go to a court where you

22   testified?

23        A.  Not that I recall.

24        Q.  Okay.  Have you ever been deposed other than

25   that case?
```

Officer George Herrara                                          April 17, 2024

Page 9

```
 1          A.   Not that I recall.

 2          Q.   Okay.  Fair enough.  So you -- to the best --

 3     and again, if you don't remember something, that's fine.

 4     If you think an hour later and think that, oh, wow, I

 5     remember something, that's fine too.  Nothing is meant

 6     to lock you in.  Just like correct it, tell me, whatever

 7     is fine.

 8               I do have one more question about the

 9     criminal cases.  Can you give me an estimated breakdown

10     of how many of them were trials, so before the jury to

11     determine whether the suspect was innocent -- was guilty

12     or not guilty, or how many of them were suppression

13     hearings?

14          A.   I don't recall that, sir, to be honest with

15     you, that exact number, or even a ballpark number.

16          Q.   Fair.  Have you testified in both types of

17     those?

18          A.   Yes, sir.

19          Q.   Okay.  And so I assume you know what a

20     suppression hearing is; is that correct?

21          A.   Yes, sir.

22          Q.   Okay.  Perfect.  Have you ever been an expert

23     witness?

24          A.   No, sir.

25          Q.   No?  Okay.  You seem to be thinking on that
```

Officer George Herrara                                      April 17, 2024

Page 10

1    one.  Is there any one where you were trying to -- what

2    were you thinking about?

3         A.  I just wanted to make sure I was understanding

4    the question just correctly before I answered it.

5         Q.  Perfect.  Have you ever been the subject of a

6    civil lawsuit?  Have you ever been sued before?

7         A.  Yes, I have.

8         Q.  I don't want to pry, too many details.  Can you

9    give me a basic understanding?

10        A.  I was sued for a use of force on -- on line of

11   duty.

12        Q.  Okay.  Have you ever been either a plaintiff or

13   a defendant in a lawsuit that was not about like your

14   job as a police officer?

15        A.  No.

16        Q.  Just like a normal like car accident?

17        A.  Not -- I mean, perhaps, but I don't recall.

18        Q.  Okay.

19        A.  I mean, I have had a car crash, but I don't

20   recall if it was -- I was sued for anything other than

21   USAA handling my business as an insurance provider.

22        Q.  Give me just -- are we talking about a year

23   ago?  Ten years ago?

24        A.  Oh, probably at least five to ten years ago.

25        Q.  Perfect.  Thank you very much.  And this is

Officer George Herrara                                          April 17, 2024

Page 11

1    another question I really enjoy asking a police officer.

2    Any criminal history?

3         A.  No, sir.

4         Q.  I always ask that, but I actually get --

5         A.  You never know.

6         Q.  You never know.  Plus, come on, have you been

7    convicted of a crime, sir?  All right.

8              This is what I call my second intro because

9    I have too many intros.  Can you just please tell me, do

10   not -- first, none of my questions are ever, ever, ever

11   meant to ask you to tell me something that any one of

12   your attorneys have told you.  If I ask it, it's my

13   mistake.  Please don't do that.  So without going into

14   the substance of anything you've discussed with your

15   attorneys, give me just a sense of what you have done to

16   prepare for today, please.

17        A.  We've had meetings.  I did get to watch some of

18   the Molina video of his bodycam, a little of the Babb

19   traffic stop bodycam or footage.  And I did get to

20   review the Molina deployment sheet for the Schott

21   traffic stop.

22        Q.  When you say Schott, that's the name of my

23   client.  It's not like a shot, like a gunshot.

24        A.  No, the traffic stop in question.

25        Q.  Perfect.

Officer George Herrara                                          April 17, 2024

Page 12

1        A.   There you go.

2        Q.   Awesome.  Okay.  So you said you watched the

3   Molina video, the deployment report, and you said some

4   Babb footage as well?

5        A.   I watched excerpts.  In other words, not the

6   entire video, just portions of Molina's bodycam footage,

7   portions of the traffic stop with Deputy Babb, and then

8   I did review the canine deployment sheet for the traffic

9   stop in question.

10        Q.   Awesome.  You said you've had meetings.

11   Approximately how many would you say you had?

12        A.   Two.

13        Q.   If it was with your lawyer, don't tell me the

14   substance, but you can tell me who was there.  Who was

15   there?

16        A.   I believe, to the best of my knowledge, all

17   three of the attorneys sitting to my right.

18        Q.   Have you met with anyone other than your

19   attorneys?

20        A.   No.

21        Q.   Anyone from the union?

22        A.   No.

23        Q.   Anyone from the sheriff's office?

24        A.   No.

25        Q.   Have you discussed this case with, would it be

Officer George Herrara                                          April 17, 2024

Page 13

1    Deputy Molina as well?

2        A.   Deputy Molina is in the K9 unit, yes.

3        Q.   Okay.  But I just want to make sure I use the

4    proper titles.  So have you discussed this case with

5    Deputy Molina?

6        A.   No.

7        Q.   Or Deputy Babb?

8        A.   Let me rephrase that.

9        Q.   Please.

10       A.   Yes, I have talked with Molina, but not about

11   the case.  Just in regards to, hey, I'm being called for

12   this, FYI, because we both understand the idea of making

13   sure we don't communicate about what has happened.

14       Q.   Awesome.  So you --

15       A.   Just the fact that we both -- or I let him know

16   I'm aware of your case because I'm being called to

17   testify about it.

18       Q.   Awesome.

19       A.   Left it at that.

20       Q.   That was like the best clarification I've heard

21   a witness give, so thank you very much.

22       A.   But with Babb, I have not.

23       Q.   Okay.  So it's fair to say you discussed just

24   the existence of the case but not the substance?

25       A.   Absolutely.

1    Q.  When would you say you reviewed the videos you

2  mentioned?

3    A.  Within the past two weeks.

4    Q.  Okay.  Great.  I'm going to regret this

5  question, but I'm going to do it anyway because I have

6  no control over myself.  What did you think of the

7  videos?

8    A.  I thought that they were pretty clear for

9  the -- pretty clear in context on the -- as far as the

10  quality, but --

11    Q.  So like -- it was like the screen -- like the

12  4K quality was good?

13    A.  Yeah.

14    Q.  What did you think of the substance of it?

15    A.  Again, I only saw excerpts of it.  I didn't see

16  the entire video to make an opinion in regards to that.

17    Q.  Give me a sense -- I know it's hard, but can

18  you give me context, like what parts of the -- like what

19  excerpts did you see?

20    A.  The part where Deputy Molina takes K9 Maximus

21  out, takes him around the vehicle.

22    Q.  Okay.  Did you see the search itself of the

23  Plaintiff's car?

24    A.  Parts, but not as in entire video.  It was

25  stopped abruptly throughout here and there.

Officer George Herrara                                    April 17, 2024

Page 15

1        Q.   Because that's so hard to come to judgment?

2        A.   Yeah.  I would have to wait and make sure I see

3    everything in context.

4        Q.   I respect that.  Fair enough.  Okay.  Did you

5    bring any documents here with you today?

6        A.   No, sir.

7        Q.   Okay.  And did you review any other like paper

8    other than the things you've already mentioned?

9        A.   Not that I can recall at this time.

10       Q.   Perfect.  Okay.  I always like to ask this

11   question when I work for cases.  My current firm is

12   called the Institute for Justice.  They're IJ cases.  I

13   always have to ask this question.  Sometimes it's good,

14   sometimes it's not.  What do you understand our case is

15   about?

16       A.   This traffic stop is about?

17       Q.   Well, what is our lawsuit about?

18       A.   Honestly, I don't exactly know all the grounds

19   of the lawsuit, to be honest with you.

20       Q.   Okay.  Fair enough.  Do you understand that

21   we've made any allegations about you?

22       A.   No.

23       Q.   That's fair.  We have not alleged that you've

24   done anything wrong.  The thing I'm hoping to learn from

25   you is really I'd imagine you know more about how dog

Officer George Herrara                                    April 17, 2024

Page 16

1    handling works than I do, right?

2         A.   Possible.

3         Q.   It's probable you would say, right?

4         A.   Yeah.

5         Q.   And I'm really just trying to get a sense of

6    how -- like how some of this works for you.  Fair?

7         A.   Sure.

8         Q.   Okay.  And just so I can -- just to confirm.

9    You did not have any actual involvement with the traffic

10   stop itself.  You were not involved, correct?

11        A.   No, sir.

12        Q.   At no point did either Deputy Babb or Deputy

13   Molina contact you about it?

14        A.   No, sir.

15        Q.   You weren't texting with them?

16        A.   No, sir.

17        Q.   What's happening with them, anything like that?

18        A.   No, sir.

19        Q.   Okay.  Perfect.  Now, I just want to get a

20   sense of your background.  I think you mentioned it, but

21   if you don't mind, how long have you been with the Bexar

22   County Sheriff's Office?

23        A.   It will be 23 years in August.

24        Q.   Excellent.  What made you join?

25        A.   The sense of duty, for one, and needing a

Officer George Herrara                                    April 17, 2024

Page 17

1    career, for two.

2         Q.  Sounds like a fair combo.  How did it start?

3         A.  I applied, got hired, and spent my first three

4    years into my career in the -- a little bit less than

5    three years in the detention center --

6         Q.  Okay.

7         A.  -- working out of the main jail.  And then --

8    go ahead.

9         Q.  No, no.  Please, you go.

10        A.  And then from there, I transferred out to the

11   law enforcement section, did about a little less than

12   two years in the patrol section.

13        Q.  Okay.

14        A.  And the rest of my career was in special

15   operations after that.

16        Q.  Tell me what special operations means, please.

17        A.  I was a member of the SWAT team for about seven

18   years.

19        Q.  That's cool, dude.

20        A.  I was a member of the Traffic Safety Unit for

21   about six years.  And then I was a member of the K-9

22   team for approximately nine years.

23        Q.  I think I know what the SWAT team is, but

24   there's a lot of things I don't know.  Can you just give

25   me a general sense of what you've got to do?

Officer George Herrara                                    April 17, 2024

Page 18

```
 1          A.  For the SWAT operations, we were responsible

 2     for high risk arrests, barricaded individuals, hostage

 3     rescue.  Anything that you can put on TV and see a bunch

 4     of guys in full gear.  They go into -- when cops need to

 5     call 911, we were the ones that responded.

 6          Q.  That sounds really cool.  And you then

 7     mentioned -- what was the one between -- I'm sorry.

 8     What was the difference between SWAT and K-9?

 9          A.  Traffic Safety Unit.

10          Q.  Please tell me what that is.

11          A.  I was responsible for homicide, vehicular crash

12     investigation, DWIs, intoxication manslaughter,

13     assaults, and of course like anything else enforcing

14     all -- any and all state laws applicable to a Texas

15     peace officer.

16          Q.  Awesome.  How do you learn to investigate a

17     like vehicular homicide?

18          A.  You can take different scales of crash

19     investigation.

20          Q.  Uh-huh.

21          A.  Every police officer, when they go through

22     their basic peace license, gets what's referred to as a

23     basic understanding of crash investigation.  From there,

24     you can take additional training courses that are

25     usually anywhere between 40 to as much of 160 hours of
```

Officer George Herrara                                   April 17, 2024

Page 19

1    training to get what's referred to as an intermediate

2    crash investigation.  Then you have an advanced and you

3    have a RECON.  Then you have people that can actually

4    tell you, people who have been hit by vehicles, what the

5    impact, what the crash data is.  So basically you become

6    a subject matter expert in regards to crash

7    investigation.

8         Q.  Very cool.  So forgive my ignorance.  Is

9    there -- is there a title or like a job that's more to

10   detective in the Bexar County Sheriff's Office whereas

11   it's something that you would do as an investigator?

12        A.  I'm sorry.  Your question again?

13        Q.  Yeah.  It's hard for me to even know how to

14   phrase it.  So I'm from New York, and often,

15   higher-level investigations would be handled by someone

16   with a title, would be detective.

17        A.  Uh-huh.

18        Q.  They primarily are there to do investigations,

19   a little bit more of what you described.  Is that a job

20   at Bexar County, or is it something that's special to

21   these investigations?

22        A.  We have what is referred to as special

23   operations --

24        Q.  Okay.

25        A.  -- which, again, is specialized teams and/or

Officer George Herrara                                                April 17, 2024

1    individuals that specialize in that particular group of

2    investigation.  And then we do have the next level after

3    a deputy and before a sergeant, would be an investigator

4    assigned to CID.  An investigator assigned to CID, which

5    is the Criminal Investigations Division, their spectrum

6    is across the board.  They could get a theft case and

7    they could get an aggravated assault case across the

8    spectrum, and they would have to investigate all of

9    that, so to speak.

10        Q.  Okay.

11        A.  But at the same time, when you're assigned to

12   those special operations such as the Traffic Safety

13   Unit, you do have investigators that work there, but you

14   also are responsible as the deputy, depending on your

15   skill set level and your training, would have to

16   therefore also help with that investigation.

17        Q.  Fair enough.  So in like a vehicular homicide

18   type of case, you might be called in to testify in court

19   and explain how you arrived at the conclusions; is that

20   fair?

21        A.  Fair.

22        Q.  Okay.  And you would be the one who would

23   generally come up with a theory or conclusion as to what

24   happened or what's probable; is that correct?

25        A.  Yes.

 1          Q.   And that's some of the things you're trained to
 2     do?
 3          A.   Yes.
 4          Q.   Thank you very much.  And then from there you
 5     went to the K-9 unit, correct?
 6          A.   Yes.
 7          Q.   Which sounds like the coolest unit, by the way.
 8          A.   Uh-huh.
 9          Q.   I'm obviously going to ask you a bunch of
10     questions about that.  I want to get a sense, where are
11     you now?
12          A.   Now, I'm currently with the academy based out
13     of the firearms section.
14          Q.   Tell me about the change.  When did you do it?
15     Why did you do it?
16          A.   I left the K-9 unit in 2019.
17          Q.   Okay.
18          A.   No, I'm sorry, 2020, I apologize.
19          Q.   That's fine.
20          A.   2020.  Because I wanted to transfer to another
21     unit.  That unit, which I was in standby to go to, ended
22     up being absorbed and changed to a different unit.
23          Q.   Okay.
24          A.   So I felt my best course of action was to go
25     back to patrol, which is what I did for a short period

Officer George Herrara                                    April 17, 2024

1    of time.

2         Q.   Okay.

3         A.   For about two months before I was asked to go

4    over to the training unit, which is where I'm currently

5    at now, and been there since.

6         Q.   So now you train other deputies and officers in

7    use of firearms; is that correct?

8         A.   Use of firearms, physical fitness, as well as

9    tactics.

10        Q.   What -- what do you mean tactics?

11        A.   As far as room clearing, room entry, safe

12   approach, things like that.  Teaching new boots as well

13   as experienced individuals.

14        Q.   I think I know what it means, but just for the

15   record, new boot means?

16        A.   I'm sorry.  A patrolman that's a cadet, so to

17   speak, or somebody who's a cadet all the way to somebody

18   who's on the SWAT team.  That's my spectrum of students.

19        Q.   That's really good, dude.  Do you do any

20   training about dogs or K-9 units or anything like that?

21        A.   Not currently, no.

22        Q.   Have you ever?

23        A.   Have I ever?  Yes.

24        Q.   Tell me about that, please.

25        A.   I was in the K-9 unit --

Page 23

1      Q.  Okay.

2      A.  -- from 2011 to 2020.

3      Q.  Let me go back into the chronological order

4   then.  So let's talk about the K-9 unit.  You said

5   2011 --

6      A.  It was 2012, actually.  2012 to 2020, because

7   it was my -- I think -- when was I married?  Yeah, 2012.

8      Q.  I think some of your trainings were from 2011.

9      A.  Might have been 2011 or 2012, one of those.

10      Q.  This is the type of -- I'm not -- I promise,

11   I'm not writing, and he was wrong about the year.

12      A.  Yeah.  Honestly, it's one of those.  I'm just

13   going off my memory right now.

14      Q.  Totally cool, man.  And I'm going to go over

15   some of your certificates in a little bit and get a

16   sense of what some of those words mean.

17      A.  Sure.

18      Q.  So take me through just what you -- what --

19   take me through your time in the K-9 unit.  What did you

20   do?  When did you do it?

21      A.  I was a K-9 handler for the sheriff's office

22   for several years.  I ran a dog for about nine months.

23   His name at the time was Sammo.  He was a dual purpose

24   German Shepherd.  That dog and I didn't see eye to eye.

25   He looked at me as the primary, so to speak.  He was

Officer George Herrara                                         April 17, 2024

1    just a softer dog.  Our personalities didn't match, so

2    to speak.  So I was then -- I took K-9 Sammo back to

3    Hill Country Dog Center, which is where we had gotten

4    him from, and picked up K-9 Bosco there.  They felt that

5    he was a better fit, and him and I were in service until

6    he ended up being injured in the line of duty.

7         Q.  I'm sorry, man.

8         A.  And then we then received K-9 Maximus, and I

9    worked K-9 Maximus.

10        Q.  Okay.  You used a lot of phrases I want to ask

11   about.  First, I grew up with a German Shepherd, so I

12   just love them so much.  Okay.  So you said Sammo looked

13   at you as the primary.  What did that mean?

14        A.  What we look for is a dog -- and we want a

15   handler team, the dog and the handler, to be on the same

16   page, so to speak.

17        Q.  Okay.

18        A.  You want a dog that matches, at the same time,

19   the handler's ability, much less the handler's drive, if

20   that makes sense.  In other words, if you put a

21   high-speed handler with a low-speed dog, it's not a good

22   combination.  If you put a high-speed dog with a

23   low-speed handler, that's not a good combination.  You

24   want the dog and the personalities to match.

25        Q.  What does it mean to be a high-speed handler?

Officer George Herrara                                    April 17, 2024

Page 25

1       A.  Meaning somebody who is going to be taking the

2   dog out and using the dog every day --

3       Q.  Okay.

4       A.  -- whether it's training, whether it's

5   deployments.  Doing something to better that dog and the

6   handler team every day.

7       Q.  Okay.  And low speed, that means --

8       A.  Low speed could mean somebody that doesn't get

9   called for services very often.  Could be a type of dog

10  that doesn't get trained a whole lot because maybe it's

11  got a physical or limitation -- or mental limitation,

12  something like that, possibly, and/or the handler just

13  don't have the desire to want to go out there and work

14  as hard as maybe somebody should or wants to.

15      Q.  When the Bexar County Sheriff's Office either

16  looks to hire or bring a new handler or determine

17  whether to keep someone there, are they looking for high

18  speed?  Low speed?  Middle?  What are they looking for?

19      A.  I think they look for somebody who is going to

20  do the job that the supervisors want based on the needs

21  of the agency, as well as if they're going to be a good

22  fit with the rest of the team to work independently and

23  to work also together as a team.

24      Q.  Okay.  And you said, do the job that the

25  supervisors want.  What is the job the supervisors want?

1        A.  Answer your calls and be professional and

2    handle your business, for lack of a better word.

3        Q.  Fair enough.  I will ask more about like

4    supervisor and stuff in a little bit.  I have a guess,

5    but were you a high speed or a low speed?

6        A.  I would say I was probably about a middle.

7        Q.  Okay.

8        A.  Maybe a high speed, but a middle, at the very

9    least.

10       Q.  And you trained Deputy Molina?

11       A.  No, I did not.

12       Q.  Okay.  You did not?  Were you involved in --

13   I'll ask about the hand-off later.  I actually want to

14   get to that in a bit.

15       A.  Okay.

16       Q.  So you were with Sammo for nine months.  I saw

17   that for a bit.  Sorry.  In 2011, when you were working

18   as a K-9 handler, you mentioned that at some point

19   before, you also did some supervising and some training.

20   Did I understand that correctly?

21       A.  I was never a supervisor.

22       Q.  Okay.

23       A.  I was a trainer in the unit as far as I had

24   trainer certifications, but I was not considered a

25   trainer for the unit.

Officer George Herrara                                      April 17, 2024

1      Q.  Give me more -- help me understand what you

2   mean by that, please.

3      A.  Meaning, at one point, I started off in the

4   beginning with my career as a K-9 handler.  I was then

5   sent to training school and became a K-9 trainer.

6      Q.  Okay.

7      A.  At the time we had a K-9 trainer that had

8   already been in the unit since I had joined, and that

9   was Deputy Floyd Cardenas.  I was told, even though I

10  went to the handler score -- pardon me -- the instructor

11  school, the idea at first was I would basically run the

12  narcotics section of the K-9s and Deputy Cardenas would

13  run the explosive K-9 section of the unit under the

14  supervisor approval.  But that ended up not happening to

15  where they let K-9 Floyd -- I'm sorry -- Deputy Cardenas

16  over the entire agency and I just helped supplement, so

17  to speak, or augment his helping in his trainings.

18     Q.  Okay.  I realize one of things I was confused

19  about, when you say K-9 trainer, do you mean you're

20  training the dogs, the deputies, or both?

21     A.  Both.

22     Q.  Okay.  Perfect.  And you mentioned some of the

23  substances that a dog can be trained to alert to; is

24  that right?

25     A.  Say that again.

Officer George Herrara                                    April 17, 2024

Page 28

1         Q.  Withdrawn.  It's a terrible question.

2              Dogs can potentially be trained to alert to

3    narcotics; is that correct?

4         A.  That is possible, yes sir.

5         Q.  You mentioned explosives, correct?

6         A.  Yes, sir.

7         Q.  Is there anything else?

8         A.  Yes, sir.

9         Q.  What else?

10        A.  You can have dogs that are trained to find

11   guns.

12        Q.  Okay.

13        A.  Dogs that are trained to find people.

14        Q.  Okay.

15        A.  Dogs that are trained to find cell phones.

16        Q.  Really?

17        A.  Cigarettes.  You can train a dog on just about

18   anything if the dog has the drive to do so.

19        Q.  What about cash?

20        A.  That is possible as well.

21        Q.  Is there anyone in the Bexar -- are there any

22   dogs in the Bexar County Sheriff's Office that are

23   trained to alert to cash?

24        A.  Not that I'm aware of at all.

25        Q.  Okay.  Fair enough.  And can a dog train for

Officer George Herrara                                    April 17, 2024

Page 29

1    multiple like scents?

2         A.  Well, any time a dog is put on narcotic odor,

3    there's multiple scents that that dog is smelling.  If a

4    dog is put on explosive odor, there's multiple odors

5    that that dog is certified in.

6         Q.  Okay.  So can a dog do explosives and

7    narcotics?

8         A.  No, not that I'm aware of.

9         Q.  Fair enough.  To the best of your knowledge,

10   just realizing that I'm just asking here off the top of

11   my head, why not?

12        A.  Because in my professional opinion, you

13   wouldn't want a dog that is trained to find explosives

14   and narcotics because you don't know at the same time

15   what he's alerting to.  If he alerts to a backpack and

16   your dog is trained in narcotics and explosives, if it's

17   an explosive dog that is trained to alert to a source

18   and he alerts to a backpack, the last thing you want to

19   do is go opening that backpack because bad things can

20   happen, and next thing you know, you could be exploding.

21   So that's why you wouldn't want a dog that's imprinted

22   on both explosives and narcotics because, again, you

23   don't know what he's alerting to that's inside that

24   package.  So, again, that would be very foolish for

25   anyone to have a dog that is a narcotic and an explosive

Officer George Herrara                                          April 17, 2024

1    K-9 imprinted dog.

2         Q.   For what it's worth, that's what I saw in the

3    New York City subways that very clearly you don't want

4    to have drugs and explosives.  That makes sense, right?

5         A.   Yes, sir.

6         Q.   What if I take explosives out of the equation?

7    So what if it's narcotics and, let's say, cell phones.

8    Can that happen?

9         A.   It could happen.

10        Q.   Is there any limit to how many different things

11   a dog can train on if you take explosives out of the

12   equation?

13        A.   Your question again?

14        Q.   Can a dog do people, guns, cigarettes, drugs?

15   Like is there any limit or can they only figure out so

16   many scents?

17        A.   I would professionally say that it's based on

18   the -- what the dog can handle.  Obviously, the more you

19   put on the dog, the more you have to train with that

20   dog.  But you open up the room for error when you're

21   putting in a dog with narcotics and cell phone and

22   whatever else you said in between there.

23        Q.   I don't know what I said, either.  I don't

24   listen to myself.  It's okay.  What do you -- what do

25   you mean you would open up the room for error?  What

Officer George Herrara                                    April 17, 2024

Page 31

```
 1    kind of errors?
 2         A.  Well, like anything else, the more you train
 3    something in, you have to go back and visit those
 4    trainings.  It's not a one-time check the box.  Okay.
 5    The dog alerted to marijuana, we don't need to train
 6    with that anymore.  There's consistent training that has
 7    to take place with that -- throughout the dog's career
 8    to make sure that the dog understands that odor and
 9    stays on that odor.
10         Q.  Okay.
11         A.  But I would not -- I would not professionally
12    state that it would behoove somebody to put multiple
13    different scents on a dog because all that's working to
14    do is overloading the dog's sensory.
15         Q.  That makes a lot of sense.  One thing -- and
16    please don't let me put words in your mouth.  You strike
17    me as you wouldn't let me do that, to be honest.  But
18    one thing I understood you to have said, something was
19    you don't know what the dog is alerting to.  So if
20    they're trained on narcotics and explosives, which,
21    again, would be a mistake, you don't know if that dog is
22    alerting to drugs or bombs.  Did I understand that
23    correctly?
24         A.  In the context that you said --
25         Q.  Yeah.
```

1          A.  -- if I had a dog that was for whatever reason

2     imprinted on both narcotics and explosives, then, yes, I

3     would not know what he's alerting to.

4          Q.  What if they're trained on just narcotics, but

5     like marijuana, cocaine, heroin, meth, whatever other

6     ones, do you know if they're alerting to pot or coke?

7          A.  No.

8          Q.  Okay.

9          A.  We know that they're alerting to the presence

10     of narcotic odor.

11          Q.  Okay.  So whatever -- please -- I'm not saying,

12     I'm asking.  So my -- am I correct in understanding then

13     that just like dogs are trained to alert to a subset of

14     substances or odors, and if they are alerting, it is

15     potentially one of those subsets?

16          A.  Yes, sir.

17          Q.  Okay.  But there's no way to know from the dog

18     itself which one of them, correct?

19          A.  Correct.

20          Q.  Okay.  What about quantity?  So like is there a

21     way to know if the dog is alerting to a gram of

22     marijuana or a pound of marijuana?

23          A.  No.

24          Q.  Okay.  So it's -- it's a binary.  The dog is

25     alerting or the dog is not alerting?

Page 33

1          A.   Basically, yes.

2          Q.   Okay.  What -- please.  You looked like you

3     wanted to clarify.

4          A.   Because even though you're talking about

5     alerting, right, there's different types of alerting.

6     There's a final response and there's a change of

7     behavior.

8          Q.   Okay.

9          A.   When you deal with narcotic odors -- and let's

10    say, for example, a dog sees a couple of grams one week,

11    goes a couple of months without seeing a kilogram, and

12    he sees a kilo the next, you know, month down the road,

13    he hasn't seen that type of odor before.  That dog could

14    act differently around that odor because of the large

15    quantity of the odor.

16               It's no different than a tractor-trailer

17    full of 3,000 pounds of marijuana.  Your dog, before he

18    even walks up, could already be sitting ten feet down

19    from the vehicle.  And you're figuring out, why is my

20    dog going into a sit already?  Because the odor is so

21    overwhelming that the dog is picking up.  He's like,

22    boom, here it is.  It's here somewhere.

23         Q.   Okay.

24         A.   Does that make sense?

25         Q.   Yeah, it does.

Officer George Herrara                                          April 17, 2024

1      A.  So the size of the odors doesn't necessarily

2   change the dog -- or correction -- change the alert or

3   the change of behavior.  It just overloads the dog, but

4   the dog will still do the task that he's designed to do.

5      Q.  So what's the right -- what's -- presumably

6   with drugs, there's just all different types of

7   quantities, right?

8      A.  Sure.

9      Q.  I imagine in your -- correct me if I'm wrong --

10   you've seen people with a dime bag of marijuana, right?

11      A.  Sure.

12      Q.  And I'm sure -- what's the most you've ever

13   seen?

14      A.  I would say -- and which odor are we talking

15   about?

16      Q.  Tell me the coolest story.

17      A.  The coolest story.  Okay.  Traffic stop.

18   Vehicle was loaded.  Cold stop.  Turned out to have, I

19   believe it was, 17 bundles of heroin.

20      Q.  What's a bundle?

21      A.  A brick.

22      Q.  Okay.

23      A.  So two kilograms of heroin.

24      Q.  So between 30 --

25      A.  It was about 37 pounds of heroin.

Officer George Herrara                                              April 17, 2024

1      Q.   What's the most marijuana you've seen?

2      A.   Probably about 500 pounds.

3      Q.   72 pounds is the case for my client, so I was

4    curious.

5      A.   Uh-huh.

6      Q.   Okay.  And, again, when you know there's an

7    alert, there's no way for you to just like know that,

8    oh, my God, we're about to hit the mother load, or this

9    can be a small amount, right?

10     A.   Correct.

11     Q.   Now, you also mentioned that -- I am probably

12   inartfully using the word "alert".  Would you say that's

13   right, I'm not getting to the nuances of it through my

14   questions?

15     A.   I understand.

16     Q.   I know you understand.  Can you help me

17   understand what alert means a little bit better?

18     A.   We're talking about a dog's K-9 alert, correct?

19     Q.   A dog's K-9 alert, yes.  What does that really

20   mean?

21     A.   Well, it depends on the context that you're

22   asking me, you know, what type of alert.  You have a

23   passive alert and you have an aggressive alert, and you

24   also have a change of behavior.

25     Q.   Okay.  Let me write those down because I want

Officer George Herrara                                    April 17, 2024

Page 36

1    to -- passive alert, active alert?

2         A.   No.   Passive alert, aggressive alert, and then

3    a change of behavior.

4         Q.   Please -- thank you.   Change of behavior.

5    Please explain what a passive alert is.

6         A.   A passive alert is a dog that, when it gets

7    into that odor, will try to get as close to the odor as

8    possible and then go into a final response, which is

9    known as either a sit or they sit down on their butt

10   just like you would have your dog sit at the house to

11   give him a treat, or they would lay down.   And they

12   would lay down into that final response as well.

13        Q.   Okay.   Does a dog always have the final alert

14   the same way?   So is it one dog will always sit or

15   always lie down or a dog could do both?

16        A.   The dog could do both.

17        Q.   Okay.   But are those the two final alerts,

18   either sitting or lying down?

19        A.   On a -- on a passive -- on a passive alert

20   response --

21        Q.   Uh-huh.

22        A.   -- generally, that's a sit or a lay down stay,

23   yes.

24        Q.   Okay.   Now, please explain, if you don't mind,

25   an aggressive alert.

Officer George Herrara                                      April 17, 2024

Page 37

1       A.   An aggressive alert is a dog that finds that

2   source and then they try to dig, like they're trying to

3   dig to it -- to get to it.

4       Q.   Okay.

5       A.   So they scratch the heck out of everything in

6   front of them trying to get to it, which a lot of

7   agencies don't really like because, again, you're

8   talking about causing damage potentially to somebody's

9   property.

10      Q.   Yeah, if there's no drugs there and the dog

11  starts scratching at the car, it's not a good look,

12  right?

13      A.   It could be, yes.

14      Q.   Do any of the Bexar County Sheriff's Office use

15  aggressive?

16      A.   No, we do not, for that exact reason.

17      Q.   Okay.  So for the Bexar County Sheriff's dogs,

18  it is always a passive alert?

19      A.   A passive alert.

20      Q.   And that means lying down or sitting down,

21  correct?

22      A.   Yes, sir.

23      Q.   Okay.  And what's change of behavior?

24      A.   Change of behavior is a noticeable behavior

25  that the dog displays to the handler letting the handler

Officer George Herrara                                     April 17, 2024

Page 38

1    know that this dog has an odor, but the dog is

2    struggling to find exactly where the odor is at.

3         Q.   Okay.

4         A.   So the dog doesn't go into the final response

5    and give you a passive alert, but the dog is telling

6    you, there's something here.  He just can't or she just

7    cannot figure out where the source exactly is.

8         Q.   Can you give me a sense of what that looks

9    like?

10        A.   It would be me bringing this dog into this room

11   right now and you having an aid, let's say, in the

12   center up there in the ceiling tile.

13        Q.   Uh-huh.

14        A.   That dog will come in here and he'll start

15   running circles all around and jumping up and down the

16   walls trying to find where the odor is at, because it's

17   going to pull different locations inside of this room

18   right now because of the air conditioner vents, because

19   of the way that the wind is blowing, so to speak, even

20   though you don't feel any kind of breeze in here.  It's

21   no different than that odor permeating and going in

22   different places, however it's going to travel

23   throughout this room, that dog coming in here trying to

24   find it, and then finally the dog just gets frustrated.

25   You as a handler are going to try to cue him, so to

Officer George Herrara                                April 17, 2024

Page 39

1  speak, and search everything that you would think that

2  somebody may hide an illegal substance at, but in

3  reality it's up there in the one spot you obviously

4  can't tell your dog to go and search.

5      Q.  That makes sense.  I think I understand exactly

6  what you're saying.  From -- from the -- like observing

7  the dog's perspective, it seems, though, that it's

8  pretty broad what they can be doing.  Is there any limit

9  to the number of behaviors that can change in behavior?

10     A.  No.  There's -- it's pretty articulable for a

11 handler to be able to -- or a handler should be able to

12 articulate why that dog is presenting a chain of

13 behavior and why that handler would say, hey, there's

14 something in this room, we need to search it.

15     Q.  Give me a sense of what Max's change of

16 behaviors would be.

17     A.  I couldn't tell you what he does now, sir.

18 That's not my dog.

19     Q.  I'm going to ask you a little bit about the

20 handler.  Why not?  Would it be different than what --

21 would the dog's behavior potentially have changed?

22     A.  Absolutely.

23     Q.  Okay.  All right.  I am terrible about getting

24 ahead of myself.  I have paper.  I just can't follow

25 paper.

Officer George Herrara                                          April 17, 2024

1        A.   No problem.

2        Q.   So I will get to that.  But could it -- the

3    dog -- do dogs have a set like limit of, quote, change

4    in behavior behaviors, or could it just be like just,

5    the dog is acting crazy right now?

6        A.   It would be what the handler knows is out of

7    norm for the dog to let the handler know that the dog is

8    in some type of a narcotic odor, just cannot finalize

9    and find exactly where the odor is at.

10       Q.   Okay.  So if -- I'm going to make up a dog --

11   Dog A, always like circles and runs in very fast circles

12   like around an area.  That would generally be one of the

13   changes in behaviors.  It wouldn't be like the first

14   time he's running back and forth and sprinting across

15   the other sides of the room, that wouldn't just be a

16   change of behavior, right?

17       A.   Sure.

18       Q.   Okay.  Thank you.  Okay.  I want to ask you

19   about how you learn to do this.  So I want to go through

20   your certificates sort of as a guideline.  But could you

21   state what made you decide to be a dog handler?

22       A.   It's like any brother or kid watching Rin Tin

23   Tin:  K-9 Cop, well before you were probably born.

24       Q.   I'm older than I look.

25       A.   Really?

Officer George Herrara                                        April 17, 2024

1       Q.  I'm much older than I look.

2       A.  All right.  Well, just watching a lot of old

3   movies and old stuff when I grew up and just thinking

4   K-9 cops were cool.

5       Q.  Well, they kind of are, to be honest.  Do you

6   have a dog now?

7       A.  Yes, I do.

8       Q.  What kind of dog?

9       A.  It's K-9 Bosco.  He's retired at home.

10      Q.  Oh, that's really nice.  That's awesome.  Very

11   cool.  Okay.  So I want to ask you a little bit about

12   these certificates, and I'm going to show them to you in

13   the order that you gave them to me.

14              MR. ARONIN:  I printed five copies.  I

15   tried to figure out who was going to be here.

16      Q.  (BY MR. ARONIN)  Okay.  So I'm just showing

17   you, if I could -- actually, I apologize.  I should have

18   given a copy for the court reporter.

19              (Exhibit 17 marked.)

20              (Discussion off the record.)

21      Q.  (BY MR. ARONIN)  So as I look at it -- and by

22   the way, I'm showing you what this is, it is just the

23   list of the certificates of trainings that we received.

24   And I just kept them in the order we received them.

25              What -- first of all, would you just

1    briefly look through them and tell me if this looks like

2    all of the ones you have or if you think there's any

3    others that I don't have?

4              MR. FRIGERIO:  Blair, for your purposes,

5    it's 7586 through 7603.

6              MR. ARONIN:  Thank you, Charles.

7              MR. FRIGERIO:  Thank you.  Blair, I'm doing

8    my best for you, but like I said, not great at it.

9              MR. LEAKE:  No worries.

10             MR. ARONIN:  Thank you, dude.

11        A.  So what was your question with regards to the

12   certificates?  I'm sorry.

13        Q.  (BY MR. ARONIN)  Are these all of them?

14        A.  That I can recall providing that I had, yes,

15   sir.

16        Q.  Okay.  So basically you've done your best to

17   give me all of them, and you think this is all of them;

18   is that fair?

19        A.  This isn't all of them, but this is an

20   overwhelming number of everything.  This is everything

21   that I had in my possession, but I know I have

22   certificates that are not in this group that I have

23   certifications for.

24        Q.  Okay.  One, how do you know you have others?

25        A.  Because it's not -- I don't see a certificate

Officer George Herrara                                    April 17, 2024

Page 43

1    in here for such as, for example, my trainer, my

2    weapon -- I'm sorry -- my K-9 trainer team certificate

3    from Hill Country Dog Center for taking and becoming a

4    certified WMD handler.

5         Q.  Okay.  Fair enough.  WMD is not weapons of mass

6    destruction?

7         A.  No.  It's just what's referred to as a K-9

8    handler.

9         Q.  Okay.  You are definitely not certified to

10   handle weapons of mass destruction, correct?

11        A.  No, sir.

12        Q.  I thought that was a funny joke.  Come on, man.

13   All right.  Just -- I'm not trying to blame you.  I just

14   want to make sure I know these things.  Why don't we

15   have them?  Just like you may have lost them?

16        A.  I may have lost it, yeah.

17        Q.  Okay.

18        A.  I don't see that one in here.  I don't -- I

19   mean, just off the top of my head, knowing that that is

20   a certificate or a certificate of completion should have

21   been given because I did complete that course, I just

22   don't have the certificate for that anymore.

23        Q.  Okay.  Fair enough.  I think that's a perfectly

24   fair answer.  Couple of things about documents.  One, I

25   may -- I'm going to give you documents.  This is not as

Page 44

1    many as it looks like, honestly.  I may ask you to look

2    at a page, but anything I hand you, you have the

3    absolute right to read the entire thing, look at

4    whatever you want to do before I ask a single question.

5    So I may direct you, but you take your time.  Fair?

6         A.  Yes, sir.

7         Q.  Cool.  Second, do you know what a Bates stamp

8    number is?

9         A.  No.

10        Q.  May I reach over and point to it?

11        A.  Absolutely.

12        Q.  Thank you, sir.  This is actually just a bad

13   page for it.  These are Bates stamp numbers.  It's just

14   like how lawyers identify documents to each other.  So

15   if I give you page numbers, it's most likely to be that

16   thing right there.

17        A.  All right.

18             MR. ARONIN:  I actually should have asked

19   your permission.  I hope you don't mind.

20             MR. FRIGERIO:  No.

21             MR. ARONIN:  Cool.

22        Q.  (BY MR. ARONIN)  All right.  If you would, turn

23   to Page 7601.  It's towards the back end.  It's like the

24   second or third from the last page.

25        A.  All right.

Officer George Herrara                                    April 17, 2024

Page 45

1          Q.   Cool.   This is why I thought you did it in

2     2011.   Remember I said there was no gotcha?   I gotcha

3     there, man.   All right.   So 7601, it looks like the very

4     beginning of 2011 is when you started.   Is that

5     generally what you remember?

6          A.   No.   It was in 2012.

7          Q.   What's this then?

8          A.   This was the certificate of training that I

9     completed prior to the K-9 team.

10          Q.   Oh, so this has -- highway interdiction is

11     not -- is not K-9 related?

12          A.   It is K-9 related, but it was me taking it.   It

13     had to do with roadside interviewing, interview

14     techniques, things to look for on vehicles, things along

15     that line.   So anything that a deputy, in general,

16     whether they were a handler or an experienced patrolman,

17     we want to know and look for.

18          Q.   Okay.   See, I didn't get you.   All right.   So

19     seven -- let me make sure I understand, though.   So

20     before one starts with a dog, is there training that

21     someone has to go through before they're ever like

22     certified to go out on the road and like --

23          A.   There should be, yes, sir.

24          Q.   Why do you say should be?

25          A.   Well, because, like anything else, you want to

Officer George Herrara                                    April 17, 2024

Page 46

1    make sure you're training somebody that is appropriate

2    to be able to go out there and handle the responses that

3    they need to have happen.

4        Q.  Okay.  So before one is like -- what's the

5    word?  I don't know what it -- deputized?  Assigned?

6    Like what's the correct term of art to say you have now

7    been like empowered as a K-9 officer and you can

8    interact with the public?  What's the word?

9        A.  You would be assigned to the K-9 team and you

10   would be approved for deployment work.

11       Q.  Perfect.  Assigned to the team and approved for

12   deployment.  So before someone is assigned to the team

13   and approved for deployment in the Bexar County

14   Sheriff's Office, are they required to go through some

15   like K-9 training first?

16       A.  Yes.

17       Q.  Okay.  Who makes that decision?

18       A.  The supervisor.

19       Q.  What do you mean the supervisor?

20       A.  The K-9 supervisor.

21       Q.  Okay.

22       A.  The K-9 sergeant or lieutenant.

23       Q.  And based on what?  Are there any -- all right.

24   Okay.  And does the K-9 supervisor just get to like make

25   that decision?  Like how does the decision process --

1    like how does that get decided?

2        A.   What exactly is your question?

3        Q.   So if the K-9 supervisor basically just said,

4    all right, my policy is I -- or my rules -- I don't like

5    to use the word "policy" -- my rules are, you need one

6    hour of training and then you're assigned to the team,

7    would say like that --

8        A.   The K-9 -- I understand your question.

9        Q.   Thank you.

10       A.   The K-9 sergeant would make the determination

11   based on what the K-9 trainer has instructed him --

12       Q.   Okay.

13       A.   -- on the way that that handler team has been

14   doing and training, if they are good to go for

15   deployment use.

16       Q.   Okay.  All right.  So -- and in Bexar County,

17   one is required to go through -- how -- withdraw.

18               How much training is someone required to go

19   through for K-9 -- in K-9 policing before they are

20   assigned to the department and deployed?

21       A.   Generally, enough training that is adequate

22   enough to certify them as a K-9 trainer team -- or a K-9

23   handler team -- pardon me -- that can then certify, pass

24   the certification, i.e., showing and training

25   environments that they can do things that they are going

Officer George Herrara                                         April 17, 2024

                                                              Page 48

1     to be tasked with doing in the streets.

2          Q.  Okay.

3          A.  And then once that is given the approval, so to

4     speak, then they can go ahead and deploy into the

5     streets.

6          Q.  Okay.  And not realizing, not -- you are not

7     the person who makes the decision.  Well, are you the

8     person?

9          A.  No.

10         Q.  Okay.  But generally, what do you think is

11    adequate?

12         A.  It would be enough training to make sure that

13    the dog and the team can work independently of each

14    other and with each other to solve any issues that they

15    may be forced to get into.

16         Q.  What about certifications?  Should they have

17    any certifications beforehand?

18         A.  Generally, they have a handler's school that

19    they would have certification for prior to that

20    deployment of the -- of the deployment into the field.

21         Q.  Perfect.  And then going back to this

22    particular thing, just tell me, what is highway

23    interdiction?

24         A.  Well, like anything else, even back when I was

25    assigned to the Traffic Safety Unit and just as a

Officer George Herrara                                    April 17, 2024

Page 49

1    patrolman, I had always done highway interdiction.

2    Knowing that San Antonio is a hub for illegal narcotics,

3    money, and various things coming through our highway

4    systems, I had always worked highway interdiction when I

5    could.

6        Q.   Forgive my ignorance.  I don't know the phrase

7    "highway interdiction".  What does that mean?

8        A.   That is trying to find those individuals who

9    are traveling with the general public, like anybody else

10   on the roadway, but are doing so to transport either

11   illegal narcotics, money and/or other various options of

12   equipment or what have you.

13       Q.   What are the types of things that one -- like

14   if I'm looking at the document, it's January 4th to 6th,

15   so it's a three-day training.  What specific things

16   would someone learn about that?

17       A.   It would be a wide variety, depending how

18   specific that instructor was.  It could be everything

19   from three days of just roadside interviews.  It could

20   be three days of compartments or natural voids or

21   current trends.  Depends on what the breakdown of that

22   course curriculum would have been for that instructor.

23       Q.   Okay.  Very good.  Thank you very much.

24       A.   Uh-huh.

25       Q.   Now, I want to go to the -- it looks like it's

Officer George Herrara                                        April 17, 2024

Page 50

1    just the next page.  It's 7602.  And this is -- again,

2    this is -- this is the training you completed in -- or

3    am I correct that this is the training you completed in

4    February of 2011?

5        A.  Yes.

6        Q.  And this, again, would have been before you

7    were --

8        A.  This would have been after and now in K-9.

9        Q.  Okay.  So the highway interdiction would have

10   been the thing that you needed before you were assigned

11   and deployed?

12       A.  I had numerous highway interdiction

13   certificates before even 2011.

14       Q.  Okay.  So how do you know that this is the

15   thing that would have happened when you started as a

16   K-9?

17       A.  This would have happened because of the date in

18   which is listed on here shows January 2013.  I started

19   in the K-9 unit in October of 2020.

20       Q.  I'm sorry.  I think we're looking at different

21   pages.

22       A.  Oh.  You told me the next page.  That's what I

23   did.

24       Q.  I think there's two -- can you go to Page 7602?

25       A.  7602?

Officer George Herrara                                    April 17, 2024

1        Q.  Yeah, it's my fault.

2        A.  There's one going back the other way.  Okay.

3    Now I'm there with you.

4        Q.  Okay.  Sorry about that.  For the record, there

5    actually were two of the 2011 certificates.  I forgot to

6    mention that.  That's what happened.  So now I'm looking

7    -- let's make sure we're looking at the same one.  This

8    is the one about the 10th of February 2011, right?

9        A.  Yes.

10       Q.  Okay.  Do you know if this is one that would

11   have been before or after you were deployed?

12       A.  Before K-9.

13       Q.  Okay.  And what would you have learned in

14   like -- what would you have learned in criminal pipeline

15   interdiction?

16       A.  Again, this is -- this was a case put on by the

17   DEA office.

18       Q.  Okay.

19       A.  This, again, is the same type of criminal

20   interdiction.  It would be specific to abroad as far as

21   everything from, again, roadside interviews, criminal

22   indicators, what to look for from somebody who could be

23   not telling the truth, natural voids compartments,

24   current trends, types of marijuana -- or types of

25   concealment that is being used to transport illicit

Officer George Herrara                                      April 17, 2024

Page 52

1    drugs or money, things along those lines.

2         Q.  Okay.  Couple of questions.  What are some of

3    the things someone can do that you would conclude

4    they're not telling the truth?

5         A.  It could be a wide variety of things.  Body

6    language, eye contact, you know, the way that they are

7    speaking to you, they avoid an answer.  Usually a lot of

8    it is just body kinetics that you can't control.

9         Q.  Okay.  Can you give me a sense of what some of

10   them would be?  And I realize this is not going to be

11   exhaustive.  If I try to make you give me the whole

12   training now, your lawyer would rightly object.  But

13   give me a sense.

14        A.  A sense of what?

15        Q.  What are some of the body language things that

16   someone would either be suspicious or not telling the

17   truth?

18        A.  It could be avoiding contact.  It could be, you

19   ask them a question about the vehicle, they immediately

20   look away from the vehicle, or they look at the vehicle.

21   It could just be a wide variety of different things.  It

22   could be things that they do with their hands, things

23   that they do when you can literally watch the pulse out

24   of their neck as the carotid jugular's starting to

25   literally be out of their neck.

1        Q.   Okay.

2        A.   The sweat beads coming on their forehead when

3    it's 40 degrees outside, but now they're starting to

4    sweat as you're asking them questions.  Just things

5    along that line, breathing, respiration, things you're

6    watching when you're talking to them.

7        Q.   How do you interpret eye contact?

8        A.   Eye contact can be different for everybody.

9    What I like to do is get a baseline, speak with

10   somebody, talk to them, see what it is that they're

11   doing, where they're going, ask them just general

12   questions that most people should be able to answer on a

13   site of an interview that would be considered

14   non-evasive.  Hey, how are you doing?  Where are you

15   going?  Where are you traveling to?  Things like that.

16   And then just watching to see what are they doing with

17   their eyes.  Do they make eye contact with you?  Do they

18   look away when you ask them about their trip?  Do they

19   look at the trunk of the vehicle?  Just various things

20   like that.

21       Q.   I will tell you during that thing I was so

22   nervous I had no idea what to do with my eyes.

23       A.   That was the only time you wanted to lock in

24   with my eyes.

25       Q.   I noticed, I was doing it.  I'm like, I have no

Officer George Herrara                                    April 17, 2024

Page 54

1     idea what to do with that, because you and I were

2     staring at each other, right?  Was that suspicious?

3          A.  No.

4          Q.  Not of me.  If you saw someone do it in that

5     time you were talking about eye contact, because I was

6     staring at you, right?

7          A.  I would look at it as that was different --

8          Q.  Okay.

9          A.  -- considering every other time that we've

10    talked you consistently looked down at your paper or

11    you'd look down at your colleague.  But now that time

12    when we were talking about eye contact, you kept your

13    eyes on me the entire single time.

14         Q.  I want a camera there.

15         A.  It's just one of those things that I've caught

16    on on behavior.  You also stopped moving things with

17    your hands the entire time I was talking.  You locked in

18    completely on me.  You stopped doing anything else with

19    your hands, including the pen.

20         Q.  I can't --

21         A.  So it's just body language like that that I

22    look for.

23         Q.  I do not have drugs on me.  I promise.

24         A.  No, I know you don't.

25         Q.  All right.  Cool.  One of the things you

Officer George Herrara                                        April 17, 2024

Page 55

1    mentioned is that the -- these are some of the -- let me

2    make sure I understand.  I don't want to put words in

3    your mouth.  I think I heard you say that these are

4    pretty similar types of trainings that you had as you

5    were doing criminal interdiction.  Before you were doing

6    pipeline training, you were given criminal interdiction

7    training.  Did I understand that correctly?

8         A.  I would take as much criminal interdiction

9    training as possible because like anything else, you

10   want to take it from different perspectives even though

11   it might be the same information being displayed, but

12   the way that you present it as an instructor would be

13   different than the way she would present it.  So it's

14   very possible that even though it might be the same

15   information, the way that she presented it might stand

16   out better to me than something you said.

17        Q.  Okay.

18        A.  So it always behooves anybody to take as much

19   training as possible regardless if it's the same type of

20   training or not.

21        Q.  Oh, I totally understand that.  That's -- but

22   what I want to make sure I do understand is, was this

23   training more geared towards the K-9 unit?  Like did

24   this involve dogs and the other ones didn't or --

25        A.  I don't recall, sir.

Officer George Herrara                                    April 17, 2024

Page 56

1        Q.  Okay.

2        A.  I don't recall.

3        Q.  So generally, I get that we don't know if you

4    started in 2011 or 2012, and that's fine.  Like when

5    would you have started training with dogs?

6        A.  Exclusively with dogs would have been 2012 and

7    thereafter.

8        Q.  Would you have been training with dogs before?

9        A.  Just -- not -- just with interactions, but not

10   training.  If you -- the only -- the only training or

11   interaction I would have had outside of -- or before

12   2012 would have been no different than I have now, and

13   that is when I'm out on a call, if a dog is called to

14   the scene, helping that handler with whatever they need,

15   whether it's keeping people back, safeguarding the area,

16   being an extra set of eyes, something like that.

17       Q.  Okay.  I still feel like I'm not asking the

18   question right.  And this is my fault.  I am imagining

19   that when you get to the K-9 unit, the training involves

20   similar things in criminal interdiction pipeline, but

21   now like with dogs with you the whole time.  Am I

22   generally right?

23       A.  Yes.  But, again, the dog is just another tool.

24       Q.  Okay.

25       A.  The dog doesn't -- the dog doesn't help you to

1    figure out if you need to take the dog out to deploy the

2    dog.  It's your training and your experience on whether

3    or not you need to take that dog out to deploy the dog.

4         Q.  You also have to know how -- you have to

5    presumably be trained to it, how to deploy a dog, like

6    how do you interact with the dog, right?

7         A.  Yes.

8         Q.  So when did that training start?

9         A.  2012.

10        Q.  Okay.  Okay.  Cool.  Next -- this time, I'm

11   pretty sure it's the next page, but it's 7603.

12        A.  Last page.

13        Q.  Yeah.  What is pharmaceutical diversion

14   training?

15        A.  This had to do with the use and the

16   introduction of prescription medications, things along

17   that lines, people that -- as you know, we had a huge

18   influx in -- across the country with painkillers and

19   pharmaceutical use, narcotics being used, and this was

20   that type of stuff, the transportation of those, knowing

21   what to look for.  Because I'm not a pill guy.  I'm a

22   cocaine, methamphetamine, heroin guy, and we had to

23   learn about pills.

24        Q.  For the record, I promise I will not like take

25   that quote, I am not a pill guy, I'm a marijuana,

Officer George Herrara                                    April 17, 2024

Page 58

1    cocaine, and heroin guy.

2         A.   That's okay.

3         Q.   The quote was, you are a police officer who --

4         A.   Yes.  My police officer training was not in

5    line with the current trends that we were seeing across

6    the country, much less here in the state.  So I did

7    receive additional training in regards to

8    pharmaceuticals.

9         Q.   Okay.  Cool.  Let me see if I've learned

10   something so far.  A dog -- and would I be right that a

11   dog could potentially be trained to alert to pills just

12   like any other substance?  Is that probably right?

13        A.   That's possible.  I've never heard of a dog

14   being trained on synthetic pharmaceuticals because each

15   makeup of a pill is considered different in context.

16        Q.   Okay.  Cool.  Plus, what I would wonder is a

17   ton of people just have pills legally.  How would a dog

18   help with that?

19        A.   That would be the exact reason why it would not

20   behoove somebody to do that.

21        Q.   All right.  So then it -- it did make sense.

22   Then I want to jump -- because you said it would not

23   train on synthetics, so I have a question for you then.

24   If you would go to Page 7589.  And, now, this is --

25   correct me if I'm wrong, because I -- I may have been.

Officer George Herrara                                    April 17, 2024

Page 59

1     This would be marked 2018, and you were within the K-9

2     unit at that point, correct?

3          A.   Yes, sir.

4          Q.   And by that point, you would have also been

5     certified as a K-9 trainer as well, right?

6          A.   Yes, sir.

7          Q.   Okay.  Cool.  Synthetic cannabinoids, what is

8     that?

9          A.   This was a course that we took by -- that was

10    presented by the San Antonio Police Department at our

11    academy.  What this had to do with had nothing to do

12    with dog training.  This had to strictly do with

13    interaction with those individuals that we were seeing a

14    highly -- a huge trend here in Bexar County of that were

15    what we call getting wet.  It's a street term in which

16    people would smoke synthetic-based marijuana, and we

17    would see people walking around in a zombie-type form or

18    passed out in a zombie-type form, so to speak, where

19    their just eyes are rolled back because they were high

20    on the introduction of the cannabinoids, which is what

21    this certification helps you to understand how to look

22    for somebody who may be impaired in that context.  This

23    was not a course that certified you to deploy a dog team

24    or anything along that lines.  This was just purely

25    informational based in regards to those individuals who

Officer George Herrara                                    April 17, 2024

                                                              Page 60

1    may be under the influence of cannabinoids.

2        Q.  Okay.  That is extremely helpful.  A bunch of

3    questions I have.  First off, what is a synthetic

4    cannabinoid?

5        A.  Synthetic marijuana would be that, like your

6    Krush, your K2, some of that stuff that is sold legally

7    now, but back before it had different properties back in

8    this time frame, before they changed the time frames

9    with various state laws.  But what it is basically is

10   it's just the introduction of a synthetic-based

11   marijuana.

12       Q.  What about like delta-8?

13       A.  Delta-8 is another form of a cannabinoid, but

14   it's a -- it could be considered legal, in my opinion,

15   based on the current trends of the House bills and how

16   it stipulates how it's sold.

17       Q.  We can discuss that one, not in the depo.  But

18   what is your opinion?  Is delta-8 legal or not?

19       A.  Off the top of my head, it's legal for sale --

20       Q.  Uh-huh.

21       A.  -- by a business.

22       Q.  Okay.

23       A.  But that's about the extent of it that I know,

24   because it's been some time that I've had to deal with

25   that.

Officer George Herrara                                           April 17, 2024

Page 61

1          Q.   Okay.  Do you know if it's legal for

2     possession?

3          A.   Of delta-8?

4          Q.   Yeah.  Delta-8 possession by just a random

5     person in the street.

6          A.   I believe it is.  Yes, sir.

7          Q.   What do you understand delta-8 to be?

8          A.   I understand it to be a similar type of

9     cannabinoid.  It's a synthetic-based property that is

10    used for ingestion for the euphoria-type feeling of some

11    sort.

12         Q.   Okay.  Do you know if a dog will alert to it?

13         A.   I don't know that.

14         Q.   You don't know one way or the other?

15         A.   I can tell you that I -- I had done training

16    when I was in the K-9 unit with cannabinoids to put the

17    dog to where the dog would not pass that -- or would

18    pass that odor because it is not considered marijuana

19    odor.

20         Q.   Okay.

21         A.   So it was referred to as a dissociative odor.

22         Q.   Okay.  So it's to train it not to alert to like

23    Krush?  You called it Krush?

24         A.   Kush, Krush.  That's what I remember using back

25    when I was in the K-9 team was finding K2 or Krush,

Officer George Herrara                                  April 17, 2024

Page 62

1    putting that in there because it's very similar in the

2    look and almost in the texture of marijuana.  But we

3    would use it as a dissociative odor to make sure that

4    the dog understood to walk that odor and find the

5    correct odor.

6        Q.  Tell me what you mean when you said it looks

7    and feels similarly.

8        A.  Well, I mean, because it's -- it's a

9    cannabinoid, just like delta-8 or what have you.  It

10   looks like a green, leafy-type substance.

11       Q.  It looks basically the same, right?

12       A.  It could.

13       Q.  Yeah.  And just like looking past it, you could

14   mistake one for the other, correct?

15       A.  It's possible, yes, sir.

16       Q.  Okay.  And what about CBD?

17       A.  Okay.  What about CDB?

18       Q.  Would a dog alert to it?  Well, first of all,

19   what do you understand CBD -- do you know the phrase

20   "flower"?

21       A.  Yes.

22       Q.  Okay.  What do you understand the phrase

23   "flower" to mean?

24       A.  That is the actual bud of -- marijuana bud.

25       Q.  The thing that people smoke, right?

Officer George Herrara                                    April 17, 2024

Page 63

```
 1        A.  Pretty much.
 2        Q.  When they talk about having like an ounce of
 3   marijuana, they're talking about how -- what they now
 4   call flower, right?
 5        A.  It could be.  It's a street term, yes, sir.
 6        Q.  Okay.
 7        A.  I'm not familiar with all of them right now,
 8   but yes.
 9        Q.  Me either, honestly.  Okay.  So what do you
10   understand CBD flower to be?
11        A.  I don't have very much experience behind that,
12   sir.
13        Q.  Okay.  Fair enough.  I don't know is a
14   perfectly good answer.  Do you know whether a dog would
15   alert to CBD flower?
16        A.  I don't know, sir.
17        Q.  Okay.  Fair enough.  So this synthetic
18   cannabinoid training was not a dog training.  It was so
19   you understood how to interact with people who were --
20        A.  Could be possibly under the influence of it,
21   yes, sir.
22        Q.  Okay.  Very good.  Thank you.  And then I think
23   the -- give me a moment, please.  If you would turn --
24   this one -- the number is sort of harder to read just
25   because of the framing, but it's 7595.  It's April 8th,
```

Officer George Herrara                                           April 17, 2024

                                                               Page 64

1    2014.  And they're not in chronological order.

2         A.  Okay.  I think I got it.

3         Q.  I think you do.  Perfect.  So I see on the

4    bottom of this one -- let me know if you follow me where

5    it says, a list of scents.

6         A.  Uh-huh.

7         Q.  I know it's a stupid question.  But what does

8    that mean?

9         A.  Those are the four odors that K-9 Bosco got

10   national certification to in regards to him being

11   certified by that detector certifying official, that he

12   alerted to all four of those narcotics correctly.

13        Q.  Okay.  So basically, as we said, you can train

14   a dog to train to anything, but there's not like some

15   category of drugs that you have to train them on

16   specific drugs, correct?

17        A.  Correct.

18        Q.  Okay.  And these are the four drugs that Bosco

19   knew how to detect on, correct?

20        A.  Correct.

21        Q.  Okay.  Very competent other attorneys in this

22   room will correct me if I'm wrong, but I'm pretty sure

23   that this is the only one, there may be one other, that

24   lists the scents that the dog trains on in these

25   certificates.  Did the other dog trainings like train on

Officer George Herrara                                    April 17, 2024

Page 65

1   specific scents, or why wouldn't they list them?

2        A.  They didn't list them, but every dog team gets

3   those four certifications.  The only other one that is

4   possible, but the argument is it's the same for some

5   people, is that of ecstasy, because ecstasy has

6   methamphetamine properties in it.  So ecstasy of itself

7   can be considered a No. 5 category.  But if in general,

8   because of the property being used of methamphetamine

9   transitionally in most -- 99.9 percent of ecstasy pills,

10  if a dog alerts to methamphetamine already, the dog

11  generally will also limit and expose to and alert on

12  ecstasy.

13       Q.  Okay.  Fair enough.  Excellent.  And now, I

14  want to get a sense for first year, first and second

15  year, maybe.  How much training does a new -- new --

16  what's the boots phrase?  Fresh boot?

17       A.  Fresh boot.

18       Q.  Fresh boot.  Fresh boot K-9 officer, how much

19  training should a fresh boot have in the first year?

20       A.  Again, it could be as much as -- it's really as

21  much as the agency and the unit can afford to send that

22  handler to.

23       Q.  Okay.  Fair.  But if they got one hour of

24  training, would you think they're qualified?

25       A.  I wouldn't say -- I wouldn't feel as

Officer George Herrara                                    April 17, 2024

Page 66

1    comfortable with it, but if that one hour is all that

2    they get, it's not uncommon.

3        Q.  It's not uncommon?

4        A.  I mean, again, it depends on department size.

5    I'm not going to say that one hour is not uncommon

6    because in reality I really don't know.  I just know

7    what we would do.

8        Q.  Let me target the question then.

9        A.  Okay.

10       Q.  Let's only talk about in Bexar County.

11       A.  Okay.

12       Q.  Would one hour be acceptable in Bexar County

13   Sheriff's Department?

14       A.  No.

15       Q.  How much is -- would a new K-9 officer get the

16   first year?

17       A.  I couldn't quantify a number to that.

18       Q.  Okay.

19       A.  A handler team, when they're paired together,

20   the dog and the handler generally go out for at least

21   four weeks of training minimum before they ever even hit

22   the streets.

23       Q.  Okay.  And like what would the four weeks be?

24   Like what do you learn in the beginning?

25       A.  They learn, one, how to work together.  They

1    learn -- the handler and the dog both learn each other,

2    so to speak.  The handler learns the cues of the dog,

3    learns how he has to run his dog.  The handler would

4    learn the imprinting of the dog.  Usually the dog is

5    already imprinted anyway on odor, but there's a

6    possibility that that handler could help that dog become

7    imprinted if it's a brand new dog.  There's a

8    possibility -- if the dog is dual purpose, then you have

9    to include bite work and tracking and things along that

10   lines and side of that training.  So it's pretty

11   cumulative.  It would have to be a wide variety of

12   training.

13        Q.  Okay.  Couple of -- give me one moment just to

14   write so I don't forget two questions.  Okay.  Two

15   things that I want to follow up on.  One, you said dual

16   purpose, and then you indicated biting.  What do you

17   mean dual purpose?

18        A.  Well, it's -- dogs and handler teams are either

19   classified as a single-purpose dog or a dual-purpose

20   dog.

21        Q.  Help me understand that, please.

22        A.  A single-purpose dog is a dog that has one

23   detection purpose, whatever it uses its nose for it to

24   be.  It could be a narcotic dog.  It could be an

25   explosive dog.  It could be a tracking dog.  It could be

Officer George Herrara                                      April 17, 2024

Page 68

1    a cell phone dog.  It could be just one discipline that

2    that dog is certified to be able to assist that handler

3    team in locating source.  If it's a dual-purpose dog,

4    traditionally dual-purpose dog refers to a detectional

5    purpose, meaning, same situation, it has the ability to

6    find a narcotic, to find explosive, find a cell phone,

7    find a gun.  And then it has a dual purpose, meaning it

8    also has a patrol aspect.  It has the ability to track,

9    it has the ability to trail, or it has the ability to

10   bite and apprehend individuals.

11          Q.  Okay.  Fair enough.  And you also mentioned

12   that the dog would often -- not always, but often come

13   already imprinted on substances.

14          A.  In some cases.

15          Q.  Did I understand that?

16          A.  In some cases.

17          Q.  From where?

18          A.  When you buy that dog from a particular

19   vendor --

20          Q.  Okay.

21          A.  -- depending on what vendor you use.

22          Q.  Okay.  So often they train on substances and

23   then you kind of continue on those substances.  Is that

24   fair to say?

25          A.  Traditionally, yes.  Most businesses, when they

Page 69

1    sell you the dog, they will help and either imprint the

2    dog in whatever odor that you are going to be deploying

3    that dog for.  So if you want an explosive dog, then

4    they will put that dog on explosive odor.  And then of

5    course they bring that handler in to show them and teach

6    them and help them to know how to set the eggs and do

7    certain things.

8         Q.  Okay.  So when Bexar County contracts with a

9    company to kind of buy a dog, or kennel or training

10   facility, they will potentially send the future handler

11   to that facility so they can all work together before

12   it's assigned the --

13        A.  Traditionally, but not all the time.

14        Q.  Okay.  Fair enough.  And then you also said --

15   and I think I do know what this means, in all fairness.

16   But then you said the trainer would help either new

17   imprinting or continuing the imprinting.  Is that just

18   the general training?

19        A.  Yes, sir.

20        Q.  Okay.  Thank you very much.

21             MR. ARONIN:  I can keep going.  This also

22   happens to be a natural sort of a topic change.  Does

23   anyone want a break?

24             MR. FRIGERIO:  I'll take a restroom break.

25             (Recess taken.)

1      Q.  (BY MR. ARONIN)  Okay.  I mean, let me make

2   sure I'm in the right spot.  I think I am.  So we talked

3   a lot about how one learns to do a lot of this.  Now,

4   what I kind of want to get a sense of, and this is where

5   I want as many details as you can give me, what it is

6   like on a day to day that you do.  So like I'm going to

7   ask specifics, but give me a sense, like what does a K-9

8   officer do?

9      A.  They answer calls for service.  They try to be

10   as proactive as possible, depending on the nature of

11   their duties.

12      Q.  What does that mean?  What does proactive mean

13   in this context?

14      A.  Proactive would mean traffic enforcement, being

15   out in the community, trying to assist with patrol and

16   crime prevention and deterioration, so to speak, of

17   neighborhoods, things along that lines.

18      Q.  Let me just ask you.  So beyond the searching

19   for drugs or explosives and things like that, would a

20   K-9 -- I'm sorry.  Is the proper way to say it K-9

21   officer or K-9 deputy or K-9 sheriff, in your context?

22      A.  It doesn't really matter.  Any one of those.

23      Q.  Fair enough.  Again, I really do want to show

24   the proper amount of respect.  So are you also just

25   doing general police work?

Officer George Herrara                                    April 17, 2024

Page 71

1        A.  Yes, sir.

2        Q.  So like responding to a domestic violence call?

3        A.  Very possible.  Very possible.

4        Q.  Helping investigations just like homicide,

5    everything that has no scene issue?

6        A.  It would be on a limited basis as far as

7    limited scope, i.e., maybe on a perimeter, just until

8    they can get another person there to relieve that patrol

9    K-9 team.

10       Q.  Okay.

11       A.  But the K-9 team would augment patrol in any

12   fashion if need be.  They have primary duties, but if

13   the patrol division was backed up for calls for service

14   or there was a deputy that needed a backup, then that

15   handler team could also then go and facilitate that

16   request.

17       Q.  Okay.  What about like traffic enforcement,

18   like ticketing and things like that?

19       A.  Yes, sir.

20       Q.  Okay.  So you might be on the highway just

21   giving out regular tickets?

22       A.  Could be out there on the highway or on a

23   surface street enforcing any laws applicable to a Texas

24   peace officer.

25       Q.  Fair enough.  Were you ever assigned to just

Officer George Herrara                                    April 17, 2024

Page 72

1    doing just regular traffic ticketing?

2         A.   I was assigned.  And, like I said, part of my

3    responsibilities in the Traffic Safety Unit was that

4    responsibility, as well as in the K-9 unit that is your

5    responsibility.

6         Q.   The second the words got out of my mouth, I

7    knew I asked it imprecisely.  So you did do it while you

8    were with the K-9 department as well, correct?

9         A.   Enforce traffic laws?

10        Q.   Yeah.

11        A.   Yes, sir.

12        Q.   How do you make the decision whether to bring

13   the dog out in that situation?

14        A.   Depending upon me and my training and my

15   experience, whether I believe that is a deployment or if

16   it's just a traffic stop that resulted in a citation or

17   a warning.

18        Q.   So let's just say someone's speeding on the

19   highway.  No question about it, they are speeding.  You

20   pull them over.  You're giving them a ticket.  Walk me

21   through the thought process that you would go through to

22   decide that you need to take the dog out of the car.

23        A.   That's when I refer back to my training and my

24   experience and my rapport, so to speak, that I would

25   build with that driver during that roadside interview.

Officer George Herrara                                    April 17, 2024

                                                            Page 73

1        Q.  So I get that it's based on the training.  Now,

2    what I'd really like you to tell me, what does that

3    mean?  What were you trained to do?  What are you

4    looking for?

5        A.  I'm looking for criminal interdictors, looking

6    for certain things, so to speak.  Could be, I mean,

7    that -- that question is a very broad question, to be

8    honest with you, sir.

9        Q.  I know.  I know.  Work with me on it.  I get

10   that it's broad, but I do kind of want a broad answer.

11   Maybe I can narrow it a little bit.  What makes you

12   suspicious that they might be having drugs in the car?

13       A.  It could be their destination that they're

14   going to, where they're coming from, the vehicle in

15   which they're traveling in.  Does the vehicle maybe --

16   are they the person for the vehicle, meaning they're not

17   the person that's the registered owner.  They didn't

18   rent the rental car.  There's no luggage in the vehicle,

19   but yet they're going on a five-day trip.  Things along

20   that lines that I would get while speaking with the

21   driver.

22              Maybe I see they got a four-door vehicle

23   with a trunk and they've got two suitcases in the back

24   seat.  What's in the trunk?  Most people would put their

25   suitcases in the trunk, not in the back seat, right?

Officer George Herrara                                    April 17, 2024

Page 74

1    Just little things like that that would stand out that

2    the normal -- I don't want to say normal, but that's for

3    the, lack of better words, traveling public would do or

4    wouldn't do.

5        Q.   Okay.

6        A.   And so what I'm looking for are little cues,

7    nuances, behaviors, changes to see if this is something

8    that is just a motoring public traveling on the roadway

9    or is this somebody that might be having something else

10   going on inside their vehicle, or even maybe with

11   themselves.  Maybe they're a wanted individual, you

12   know, or something like that.

13       Q.   Are you -- question that people always ask me

14   when I'm doing this is, you don't cross-examine your

15   wife like this, do you?  And I always say, no, she will

16   kill me if I do.  Is this just at this point like just

17   sort of your instinct that this is -- that you're

18   looking for -- that you're wondering if like a motorist

19   has drugs, or is this something that you're trained like

20   in any given traffic stop?  Are you thinking I need to

21   determine if this persons has drugs, or something --

22       A.   In any traffic stop, I'm going to treat it the

23   same across the board.  I'm going to try to get an

24   interaction with that driver.

25       Q.   Uh-huh.

Page 75

1        A.  Sometimes you can tell right away it's just a

2   soccer mom taking the kids to school or somebody going

3   to the grocery store or somebody going to visit an aunt

4   in another city.  And then sometimes you have those

5   where you're like, nope, the back of your hair stands

6   up, something just doesn't seem right.

7        Q.  Okay.

8        A.  The questions, the way that they answered it

9   just didn't seem right, so to speak, when you asked that

10  same question to ten other people that day that are

11  traveling on that particular roadway.  Hey, where are

12  you headed?  And everybody's telling you, I'm going from

13  here to Houston, because you're on I-10 East.  And all

14  of a sudden they're like, um, I'm going to Dallas.  Why

15  would you be on I-10 East and why would you think that

16  long about it?

17       Q.  Okay.

18       A.  Does that make sense?  That's just -- that kind

19  of context is what I'm looking for.

20       Q.  So when you do a traffic stop, are -- as a

21  member of the Bexar County Sheriff's Department, are you

22  supposed to also like get a sense if there's something

23  else going wrong, or does it seem like this person was

24  driving ten miles over the speed limit, they are

25  deserving of a ticket, and I'm going to just write a

1    ticket and get going?

2         A.   Well, it's -- I would say that it's the policy

3    of the sheriff's office to always look past the traffic

4    stop.  It's what we teach because, again, you make a

5    traffic stop so you have the probable cause to make the

6    stop and then develop and see if there's anything else

7    bigger than that other than just the violation of the

8    Class C that you observed.

9         Q.   Okay.  Thank you.  And let me ask you this.  Do

10   you think that just generally people are nervous when

11   they're being pulled over?

12        A.   Absolutely.  I get nervous when I see a patrol

13   car behind me, and I'm a cop of 23 years.

14        Q.   Yeah.

15        A.   It's a natural human nature.  You see an

16   emergency vehicle coming up behind you, you immediately

17   want to think, what did I do wrong?  Am I going to get

18   stopped?

19        Q.   So how does that factor in?

20        A.   That has a factor, of course, but that's no

21   different than you're going to exhibit the same type of

22   nervousness that everybody else would.  Everybody's

23   going to have that sense of nervousness, oh, crap, look

24   in the rearview mirror, there's a cop behind you.  And

25   then there's other people that will try not to even make

1    eye contact with you.

2               You'll pull up right alongside of them, and

3    as soon as they -- they don't even want to look at you.

4    They're 10:00 and 2:00 on the steering wheel.  They

5    don't even want to make eye contact and look.  What do

6    you normally do when somebody pulls up alongside of you?

7    You might look over your left shoulder to see who are

8    they.  They're going to hit me, right?  What are those

9    people doing on their phone?  It's human nature to look

10   around you while you're driving.

11              Some people that are being deceptive,

12   right, or possibly could be showing signs of deception

13   and/or signs of, hey, I don't want you to look at me.

14   Don't make eye contact.  I don't exist.  They're doing

15   this the whole time.  That's another indicator before I

16   even make that traffic stop already that this guy

17   doesn't even want me to make eye contact with this guy.

18       Q.  You have no idea how much I want to take the

19   trainings you have.  The -- okay.  So now let's say it's

20   a normal traffic stop and you got a pretty good like

21   Scooby sense that it's probably some kiddish type of

22   person and they've probably got some drugs, but like

23   they're not running, like they're not running drugs.

24   They may have a gram of pot on them.  How does that --

25   what do you do in that situation?

Officer George Herrara                                    April 17, 2024

Page 78

1          A.  Like anything else, I would tell them, if you

2     got personal use of any kind, just tell me now so we can

3     just get it out of the way, and we'll talk about it.

4     That's usually what I would do.

5          Q.  Then what?

6          A.  And then take it from there, see what that

7     considered personal use is.  I've had some people say, I

8     got personal use, I've got a joint in my center console,

9     I've got a dime bag, or whatever.  No problem.  And then

10    I have people say, yeah, I got personal use, and they

11    pop the trunk, and it's 60 pounds of marijuana.

12         Q.  Remember I told you about the 72-pound?  It was

13    supposed to be personal use.

14         A.  I had one guy tell me his personal use was 60

15    pounds in the trunk of his car packaged in ten-pound

16    bricks.

17         Q.  Dude used a lot of marijuana.

18         A.  So it's pretty hard to say that it's personal

19    use, but who am I to judge.

20         Q.  I think you can judge that.

21         A.  Oh, I just arrested him, but that's up to a

22    judge and a jury to decide.

23         Q.  What about the 20 year old who admits to having

24    a joint but is being respectful otherwise?

25         A.  Depending on the circumstances.  Now, it's a

Officer George Herrara                                      April 17, 2024

Page 79

1    cite and release.  I would give him a citation and cut

2    him loose.

3        Q.  Okay.  Fair enough.  So I got completely

4    distracted from the questions I wanted to know.

5            So let's -- going to the -- I want to talk

6    about what happens when you get called out for a dog

7    sniff.  And I really want to focus -- I have a

8    background question.  You have three dogs.  Are all

9    three of them narcotics trained, or were any of them

10   something else?

11       A.  They were all narcotic and patrol dogs.

12       Q.  Okay.  So dual purpose, but the scent, as it

13   was, was --

14       A.  It was narcotic.

15       Q.  And it was the same four, maybe five, if you

16   exclude ecstasy, right?

17       A.  Yes, sir.

18       Q.  Okay.  Cool.  Thank you.  Okay.  So you get a

19   call to go out to a car to -- because there is

20   reasonable suspicion to believe that this person may

21   have drugs on their person.  Did I describe generally

22   what happens, right?

23       A.  If I'm being called under reasonable suspicion,

24   yeah, that could be --

25       Q.  Cool.  What information are you given when you

1    get that call?

2          A.   Just the nature that it's a traffic stop.

3          Q.   Okay.

4          A.   They -- whatever articulable facts they have is

5    that business of that --

6          Q.   Uh-huh.

7          A.   -- investigator stop, so to speak, whoever that

8    deputy was that made that stop.  Excuse me.  And I would

9    just want to know, one, are the occupants out of the

10   vehicle, right?  Is there anything in the vehicle that

11   they seen that would be considered a hazard to my K-9?

12   And then what type of vehicle it is that needs to be

13   searched.

14         Q.   Okay.  Okay.  If you will give me one moment

15   while I write something down.  Okay.  Cool.  You said

16   whatever types of articulable facts that like the deputy

17   can convey to you.  First of all, who is it calling you?

18   Is it the deputy, or does the deputy call dispatch

19   service and the dispatcher tells you?  How does that

20   work?

21         A.   It could be one of those two.  It could be

22   direct --

23         Q.   Okay.

24         A.   -- over the air by the handler -- or I'm sorry,

25   by the investigating stop deputy to the handler or it

Officer George Herrara                                    April 17, 2024

Page 81

1    could be from the investigating stop deputy to the

2    dispatcher and then dispatch putting out abroad and you

3    just happen to key up.

4         Q.  Would the deputy be able to reach out to, say,

5    for example, you -- excuse me -- or any particular

6    officer, or do they do it to like the whole department

7    or just the K-9 unit?

8         A.  They could --

9         Q.  How does that work?

10        A.  They could -- of course, obviously they could

11   always reach out if they wanted to, asking for us over

12   the radio verbally, and we could go join open channel

13   and they could tell us, hey, I'm on a traffic stop, are

14   you available, whatever.  And depending on where I'm at,

15   if, you know, they want me to come or not come or

16   whatever the case may be.

17        Q.  So is it -- would it be typical that like the

18   deputies, you know, I've had a good working relationship

19   with -- in this context, I'll call you George -- I have

20   a good working relationship with George.  I'm going to

21   call George directly.  Could that happen?

22        A.  That's possible.

23        Q.  Would they ever call your cell phone?

24        A.  Not that I recall.

25        Q.  Okay.

Officer George Herrara                                        April 17, 2024

Page 82

1      A.   No.   We made sure everything was put on the

2   radio so there's a record of it.

3      Q.   And then -- but it would be a situation where

4   you -- this is just my ignorance of how cop radios

5   work -- police radios work.  Would the entire department

6   be able to hear that, or could they just like literally

7   be like somehow radioed to you directly?

8      A.   It depends, again, if they used the primary

9   channels and everybody could hear it or if we go to an

10  open channel, then it would just be whoever's on that

11  open channel.  Generally, it's whoever is the ones that

12  are requesting to go to that channel.

13     Q.   So how do -- that's where I'm lost.  So how do

14  you -- if Mike wants Bill to come out and to get onto an

15  open channel with just Mike and Bill on that channel,

16  how does Bill in that context know to go onto that open

17  channel?

18     A.   He would say on the primary channel, hey, Bill,

19  go to whatever channel.  And dispatch would say, yes,

20  10-4, go to that channel, because they know we're going

21  to tie up the air talking back and forth and other

22  people might be needing that air for other critical

23  incidences.

24     Q.   That was my -- that was the thing I was

25  missing.  That's what I didn't understand.  So it's like

Officer George Herrara                                          April 17, 2024

Page 83

1    all point, like everyone here is, hey, George, go on the

2    channel, and then you two can talk.  Am I right how that

3    works?

4          A.  Yes, sir.

5          Q.  Awesome.  I said I was going to go into detail

6    on this.

7          A.  No problem.

8          Q.  Okay.  Cool.  And what types of articulable

9    facts might --

10         A.  The only thing I would usually want to know is,

11   one, is the vehicle on the highway?  Is it in a parking

12   lot?  Because that lets me know what I'm going to be

13   going into, so to speak.

14         Q.  Okay.

15         A.  And then if they're working off of a consent or

16   a refused consent.

17         Q.  Okay.  How do you -- how do you interpret

18   a consent or -- terrible question.

19              If -- when you learn whether someone has

20   consented or not consented, refused consent, what is --

21   what do those things mean to you?

22         A.  It's simple.  It means that they have either

23   given their right and waived their right to search and

24   seizure or they have not.

25         Q.  Yeah.  I asked it badly.  Like what conclusion

Officer George Herrara                                          April 17, 2024

1    do you draw, if any, if someone has consented to the

2    search?

3         A.   I don't draw any conclusion because I've had

4    people who have had marijuana in their trunk of their

5    car or in their vehicle, or any dope in their vehicle,

6    for that matter, tell me, yeah, 100 percent, go ahead

7    and search it, because they're playing the naive side of

8    it.  Oh, I didn't know that was in there, usually is

9    what comes up after that next, right?  Or I've had

10   people say 100 percent, no, you're not searching my

11   vehicle, and their vehicle is loaded, or it could be not

12   loaded.  And, again, it could be both spectrums.  It's

13   up to me and the dog to understand.  Just because

14   somebody says yes or no, the dog still has to tell me

15   yes or no.

16        Q.  So you said that was one of the -- like you

17   said the articulable facts you want to know.  One of

18   them was consent or refused consent.  Why is that one of

19   them if it doesn't change how you act?

20        A.   It does, but it doesn't.  It does because I

21   want to make sure as soon as I get there, I'm going to

22   go, I already know it's -- it helps me when I get there

23   to expedite my deployment and not take longer than I

24   need to.  So meaning, once I already have those -- that

25   information, I know it's either deployable or a

Officer George Herrara                                        April 17, 2024

                                                              Page 85

1     non-deployable type.  Either a free air or a detailed

2     search.

3                  I'm then going to go over to that

4     particular violator.  I'm going to tell him, look, I

5     don't know why you were stopped -- I'm just going to

6     tell you what I would do.  I'm going to tell him, I

7     don't know why you were stopped.  You made -- the deputy

8     over there made a lawful traffic reason to stop you.

9     That's between the two of you.  I was called here

10    because either he's working off of a consent or a

11    refused consent to search your vehicle, which is why I'm

12    here.

13                 And then I'll just tell them, it's my

14    understanding you have refused consent.  If they said,

15    yes, I refused consent, then I would treat it as such.

16    It's a refused consent at that point.  If they tell me,

17    no, you know what, go ahead and search it, you're good.

18    I don't like him because he's an asshole or whatever the

19    case may be, go ahead and search it, then I'll go ahead

20    and I'll take my dog and I'll still do a free air around

21    it before I go and do the detailed search.

22         Q.   Okay.  And if you are told on the open channel

23    that it was a consent search, do you confirm that with

24    the driver?

25         A.   Yes.

Officer George Herrara                                    April 17, 2024

Page 86

1        Q.  Okay.

2        A.  Because I still want to make sure and give that

3    driver -- now that he sees the K-9 at the same time,

4    that he understands the K-9's also going to be deploying

5    with that vehicle.  I want him to make sure, or her,

6    that it's still a consent or is it now a refused.

7        Q.  Okay.  So someone can, in the interim, once

8    they kind of see you, you will respect their change in

9    mind that they will no longer treat it as a consent

10   search?

11       A.  I will always ask that violator, or the driver

12   or the owner of the vehicle, and have that interaction

13   of it's either refused or it's an approved consent.

14       Q.  Perfect.  What's a free-air search?

15       A.  The free-air search is what the Supreme Court,

16   which I'm sure you are more than aware of that --

17       Q.  I just told you, laws --

18       A.  Respectfully, I understand.  But a free-air

19   search is what the Supreme Court has turned around and

20   said that a K-9 handler team, if you have reasonable

21   suspicion without probable cause and the person is in a

22   motor vehicle or conveyance vehicle, in other words,

23   something that is moveable that does not require a

24   search warrant at that point to search, I can then take

25   my K-9 out and walk it around the exterior of that

Officer George Herrara                                      April 17, 2024

Page 87

1    object or moveable conveyance, i.e., a trailer, a

2    vehicle, a motorcycle.

3              I can take that vehicle -- or dog, pardon

4    me, and the handler and walk around that vehicle

5    allowing the dog to search in his nose any area around

6    that using the open, free air public space around it.

7    If the dog alerts to the vehicle or gives me an

8    indication that there's narcotic at that odor, then I no

9    longer need a -- do a consent or -- I'm sorry -- I no

10   longer need to do a refusal and operate under free air,

11   I then have the articulable facts based on his alert to

12   then go ahead and do a detailed search, including the

13   interior and exterior of that vehicle.

14        Q.  Fair enough.  It was actually a very detailed

15   answer.  I appreciate that.  I'm going to ask my next

16   questions without making it too much like I'm giving you

17   a pop quiz on the law.  I swear to God, that's not what

18   I'm trying to do, I really am not.

19              What do you understand reasonable suspicion

20   to be?  I really don't mean to do it as a pop quiz.  I'm

21   sorry.

22        A.  Reasonable suspicion to me is articulable

23   information based on what is happening in that event

24   that does not constitute probable cause but gives enough

25   reason for somebody to think that something is bigger

1    than -- or could be a bigger issue of what something is

2    going on.  That's about the only way I can put it in

3    laymen's terms for me at this point.

4         Q.  Damn good answer.  I think that was better than

5    I could have done, to be honest.  Okay.  How -- I'm just

6    curious.  How do you guys -- what causes you to know

7    Supreme Court cases?  How do you learn about them?

8         A.  Through training and experience, taking

9    classes.

10        Q.  Okay.  Those are classes that the Bexar County

11   Sheriff's Office like requires or gives?

12        A.  We do.

13        Q.  Okay.

14        A.  There are certain topics just like in my neck

15   of the woods right now with firearms, you know, we teach

16   certain types of -- or we refer back to certain Supreme

17   Court cases based on the firearms aspects.  Just like in

18   K-9, there's certain K-9 aspects.  Anything, depending

19   on what it is that you are teaching, right, has a

20   Supreme Court case tied into it that has articulable

21   notable facts that decisions and rulings that have been

22   made to help guide law enforcement training needs to

23   make sure that you stand in conjunction with those.

24        Q.  Perfect.  So now a free-air search you can

25   generally do because you're allowed to do and it's just

Officer George Herrara                                    April 17, 2024

1    the air?

2        A.   Uh-huh.

3        Q.   So if someone has consented to a search,

4    what -- what do you do that you would not otherwise do

5    with a free-air search?

6        A.   I would then make presentations around the

7    vehicle and search the exterior as well as the interior

8    as well as any contents of the vehicle.

9        Q.   Okay.

10       A.   So I'm directing my dog to search on a consent

11   or basically a detailed search.

12       Q.   Okay.

13       A.   On a free-air search, I'm not commanding my dog

14   to search.  My dog is coming out and just using his own

15   ability walking around and the air around it, and if the

16   dog notates anything, the dog will pull to that odor and

17   then start to then search.

18       Q.   So you wouldn't be able to, for example, signal

19   the dog to, like the wheel well in a free-air search,

20   but you could in the consent search?  Is that -- am I

21   correct?  I honestly don't know.

22       A.   Yes.

23       Q.   Okay.  Thank you.  Okay.  You mentioned you

24   wanted to know if there were occupants in the car.  Why

25   and how does that change things?

Officer George Herrara                                    April 17, 2024

Page 90

1        A.   Because I've had it where I've been called,

2    and, let's say, there's a paraplegic in the vehicle,

3    that person can't come out of the vehicle.  So now do

4    you have to then search that vehicle with the person

5    inside of it, or do you have to make special

6    arrangements to have that person removed out of the

7    vehicle prior to that search?  So those are certain

8    circumstances.  And that situation will base from

9    experience.

10       Q.   Let's take -- fair enough.  I was not expecting

11   that answer.  Let's take the potential paraplegic out of

12   the equation.  Let's just -- what -- how do you act

13   differently if there's just, for lack of a better word,

14   a normal person sitting in the driver's seat, passenger

15   seat by themselves?

16       A.   Because you want those people to be out of the

17   vehicle because those people could be a distraction

18   unbeknownst, and without even knowing it, they could

19   cause issues with that deployment, so to speak.

20       Q.   Okay.  So you want -- so for the search, you

21   want -- for a dog sniff, you want the occupants to be

22   out of the car?

23       A.   I would like, yes, sir.

24       Q.   Okay.  Can it be done with them in it?

25       A.   It can.

Officer George Herrara                                    April 17, 2024

1          Q.  Okay.  But it's not best practice?

2          A.  It's not.

3          Q.  Perfect.  Thank you.  What about windows?

4     Would you prefer the windows be up or down?

5          A.  To me, it doesn't really matter.  I want them

6     to be in the condition of whatever they were left.  I

7     don't need to -- I would never advocate for something to

8     be prepped, is what I like to call it.

9          Q.  Okay.

10         A.  In other words, roll up all the windows, close

11    all the doors.  If the driver left the driver side door

12    open or he left the window down, or the passenger side

13    window down, leave everything the way it is.  The dog is

14    going to still do what the dog needs to do.

15         Q.  Perfect.  That's exactly the thing I want to

16    know.  Great.  So the best condition for the car for you

17    is to leave it alone, correct?

18         A.  Uh-huh.

19         Q.  Yes?

20         A.  Yes, sir.

21         Q.  That was your first one in like two hours.

22    That was the best I've ever seen in a deposition.

23              Okay.  How is that communicated to just

24    typical deputies on the job?  How do they know that it

25    is best to leave the car exactly as it is?

Officer George Herrara                                    April 17, 2024

Page 92

1          A.   Even ever since for the past -- since I was in

2     the K-9 unit, we had started when I was there.  We

3     implemented K-9 training with all cadets.  So for --

4     since 2013, maybe 2014 tops, every single cadet class

5     has what we refer to as K-9 interdiction training -- or

6     not interdiction.  Let me use the right word -- K-9

7     interaction training, and that is an eight-hour day in

8     which we show up, we talk to them, we instruct them what

9     it is, it's not going to be uncommon where they're going

10    to want to call for a K-9.

11               We make sure that they understand keying up

12    on the radio and saying, hey, I need a K-9, doesn't tell

13    me anything.  I need to know what do you need a K-9 for?

14    Is it a narcotic search?  Is it for a suspect?  So we

15    just help bridge those gaps to give them a clear

16    understanding to make our interactions and our dealings

17    much easier, and then at the same time, making sure they

18    understand what it is that we look for prior to our

19    arrival, i.e., yes.  If the door is open, you know, and

20    it's safe to do so, or maybe leave it open.  If it's

21    open on the side of the road, then close the door

22    because that's clearly not safe for the motoring public.

23               So we just make sure that they understand

24    that.  We don't want them searching the vehicle, if they

25    don't -- if they can wait for a K-9.  If somebody says,

Officer George Herrara                                    April 17, 2024

Page 93

1    no, go ahead and search it, then they can go ahead and

2    search it and still call for us, but we would prefer the

3    vehicle not to be searched until K-9 gets there so that

4    way any odor stays permeated inside of the vehicle.

5              So we teach those cadets, ever since that

6    time frame, and even continuously I have continued that

7    program at the academy now to make sure that all of our

8    cadets are properly -- and/or our field deputies are

9    properly instructed on K-9 operations.

10        Q.  Awesome.  Just totally off -- not off the

11   record, but you probably would be an awesome teacher.

12        A.  Thank you.

13        Q.  For sure.

14        A.  I've been doing it for a little while.  I like

15   teaching dogs better than I like teaching people.

16        Q.  I understand that.  Okay.  That like -- that

17   exactly answered my question.  So it sounds like

18   basically all of the Bexar County Sheriff's Officers,

19   all officers are trained to know how -- at least the

20   basics of how to interact with K-9 units, correct?

21        A.  I would say confidently 100 percent, every law

22   enforcement deputy knows how to deploy around a K-9,

23   whether it's in whatever facet it's being used as.

24        Q.  Did you mean that 100 percent, like across the

25   country, or just Bexar County Sheriff's Office?

Officer George Herrara                                    April 17, 2024

 1        A.   Bexar County Sheriff's Office.

 2        Q.   I thought that's --

 3        A.   I will reiterate, Bexar County Sheriff's

 4   Officers.

 5        Q.   Perfect.  I thought that's what you meant.  Do

 6   you know, like does the sheriff make that decision that

 7   everyone's going to be trained?

 8        A.   No.  And respectfully, the sheriff probably has

 9   no clue that that actually happens.

10        Q.   Why do you say that?

11        A.   Because he has other people that he relies on

12   to make sure that those things happen, such as the

13   people in charge of those particular units.  So it's no

14   different than K-9 currently does that.  It's no

15   different than the Traffic Safety Unit supervisors also

16   do that with all the cadets as well.  Homicide

17   investigators come in and tell people how to deal with

18   homicide, the cadets.  So those specialty fields, so to

19   speak, come in and have those interactions with all

20   these cadets for several years now.  I can't tell you

21   when those programs started, but I know that they've

22   been implemented for years now.  But I know that for us,

23   it started relatively soon after I was there, probably

24   either, again, 2013 or 2014.

25        Q.   All right.  Very cool.  So going back to this.

Officer George Herrara                                    April 17, 2024

Page 95

1    You have now done -- you arrived at the scene.  You --

2    if you need to answer this differently for a free-air

3    search or a consent search, please tell me which one

4    you're doing, or do both.  How do you start with the

5    dog?

6         A.  When I arrive on scene, I'm going to make

7    contact with the driver.  Are we talking about from the

8    driver or from -- now I'm working off of whatever I'm

9    working, I'm going to use my dog?

10        Q.  Do me a favor.  Start with the driver.  I know

11   you gave me most of those answers --

12        A.  So I'm going to arrive on scene.  I'm going to

13   park in a location that is safe for my vehicle and my

14   handler -- or my dog, pardon me.  I'm going to go make

15   contact with the driver, whether the driver -- wherever

16   the driver may be.  I'm going to let him know why I'm

17   there.  I'm going to tell them again that I am not here

18   in regards to the traffic violation or what have you.  I

19   don't know anything about that, because in reality I

20   have no idea.  I'm just there because I got called

21   because of either a consent or a refused consent.

22              If I'm working off of consent, I'm going to

23   verify that.  I'm going to verify that they were the

24   driver of the vehicle and/or the owner.  If they say,

25   yes, you have my consent, I'm going to tell them, okay,

Officer George Herrara                                      April 17, 2024

Page 96

1       I'm going to take my K-9.  My K-9 is trained to find the

2       illegal narcotics.  Do you have any narcotics in the

3       vehicle?  I'm going to see what they say.  They're

4       either going to say yes or they're going to say no.  I'm

5       going to ask them then, do you have marijuana in the

6       vehicle?  I'm going to look and see what they say.

7       They're either going to say yes or they're going to say

8       no.

9              I'm going to be a lot like you at the same

10      time and I'm not going to -- even though I'm going to be

11      okay with the body language answer, I'm also looking to

12      see when do they answer it verbally.  So if somebody

13      shakes their head no for marijuana, no for cocaine, no

14      for heroin, and then methamphetamine they go no, then

15      now I know I might have no methamphetamine inside of the

16      vehicle because they answered -- they shook their head

17      to everything else.  So I'm also now also reading body

18      language and body cues, right.

19          Q.  Okay.

20          A.  I'm also looking at the driver while I'm

21      interviewing the driver, so to speak, and this isn't

22      really an interview.  This is just a quick interaction,

23      letting him know what I'm going to deploy the dog for,

24      what four groups, is what I like to refer to it as, that

25      I'm looking for, cocaine, methamphetamine, heroin,

Officer George Herrara                                    April 17, 2024

Page 97

```
 1    and -- cocaine, methamphetamine, and marijuana.  Jesus
 2    Christ.  You'd think I'd know these.
 3         Q.  Dude, that's a great answer.  I'm impressed.
 4         A.  So once I -- once I do that, again, I'm reading
 5    my own based on my own training and experience, right?
 6    I'm looking at eye contact.  I'm looking to see how they
 7    act when I'm asking these things.  I'm not really
 8    asking, but just telling them, right?  I am asking them.
 9    And then I'm going to ask them do they have anything
10    inside the vehicle that would be considered a danger to
11    themselves, to me, or to my dog because I want to know.
12    Maybe they keep a folding knife that's exposed right
13    underneath the seat, and my dog goes, puts his muzzle
14    underneath there, and now he gets stabbed in the nose,
15    right?  Or I go put my hand underneath there and I get
16    stabbed in the hand.
17         Q.  Okay.
18         A.  I would then say, okay.  I'm going to then tell
19    them -- once I've asked them my four questions, I make
20    sure that they understand I'm there for illegal
21    narcotics.  I'm going to ask each specific odor and see
22    how they answer that.  And then I'm going to turn around
23    and tell them, okay, based on your consent, I'm going to
24    search the exterior of your vehicle first with my K-9.
25    I'm going to search the interior of your vehicle with my
```

Officer George Herrara                                         April 17, 2024

Page 98

1    K-9, and I'm going to search any contents inside of the

2    vehicle, including baggage.  Do they understand?  And

3    they would either then say yes or no.

4                    And then I would go get Bosco out or

5    Maximus -- take my K-9 out, put my K-9 on a line -- on a

6    line, usually a six-foot leash.  Grab my K-9's toy.

7    That would be a reward toy because that goes out no

8    matter what, just because even if he alerts, he doesn't

9    get the toy, but he needs to know he's there to do work.

10   He already knows that, nonetheless.  I'm taking my dog

11   out.  I give him a break generally, meaning I take him

12   out and I let him go stand in the grass, find a bush,

13   find a sign, somewhere where he can lift his leg and

14   relieve himself.  Okay.  At the same time, this just

15   allows my dog a second just to clear out of his nose,

16   clear his head, so to speak, from being inside of my

17   Tahoe, but also gets him on task.

18                    And then I walk him to the vehicle.

19   Depending on where the vehicle is stopped, how the

20   vehicle is positioned, I will then search it on a

21   consent giving presentations as I work counterclockwise

22   or clockwise around the vehicle.  Just depends, again.

23   Generally, it's counterclockwise is how I would

24   generally do it.  Generally, I would start off on the

25   back driver side fender and go around clockwise, right,

Officer George Herrara                                    April 17, 2024

1    or counterclockwise, pardon me, or I would start again,

2    depending on the position of the vehicle.  I can't say

3    always and never.

4                    And then once I have searched all of the

5    exterior, I would then put the dog on the interior.

6    Generally, on the interior, again, depending on the

7    vehicle's stop.  If I'm on the side of the highway, then

8    that vehicle entry would be in the driver -- I'm sorry,

9    on the passenger front door.  If it was in a parking

10   lot, then it would be -- could still be the passenger,

11   but then maybe it could be the driver's front door.  The

12   dog would be allowed entry.  The door would then close

13   behind the dog.  I would only, as I'm opening that door,

14   open it very slowly, enough to let the car, what we

15   refer to, as breathe.  Okay.  Burp the car, in other

16   words.  In other words, open it just enough to allow the

17   air to escape, giving the dog any consent search that --

18   smell that's inside of that vehicle and then allowing

19   the dog inside, either on leash or off leash.

20   Generally, I disconnected the leash.  That way he

21   wouldn't get tangled up.  Close the door and then the

22   dog would then search the interior on his own.

23                    If I needed to make a presentation while

24   the dog is on the interior, then I could do so from the

25   windows of the outside.  And then the dog would come

Officer George Herrara                                    April 17, 2024

Page 100

1   out, and then I would search the trunk, if need be, if

2   there was an exterior trunk, unless the dog could get to

3   it.  Let's say it was an SUV that has a trunk cargo

4   area, then the dog actually on his own should and would

5   go from each row all the way to the rear, searching

6   everywhere in the vehicle.

7       Q.  That is extremely helpful.  Thank you.

8       A.  So that would be how I would handle it on a

9   consent search.

10      Q.  Let me ask you some follow-ups, and then I'll

11  talk about nonconsent.

12      A.  Sure.

13      Q.  That was extremely helpful.  The first part, as

14  I understand it, is there's kind of a colloquy, some

15  discussion between you and the driver, right?

16      A.  Absolutely.  I'm going to identify myself and

17  my purpose of being there so that way that driver

18  understands who I am and why I am there.

19      Q.  And you're going to ask for consent, kind of

20  show body language, things like that.  I will -- for the

21  record, I am more self-conscious of my body language

22  than I have ever been in my entire life during this

23  depo.

24          Okay.  How long does that discussion take?

25      A.  Less than 30 seconds.

Officer George Herrara                                           April 17, 2024

1          Q.   Oh, it's that fast?

2          A.   I could make it that quick.  Now, you might ask

3     questions that could delay all of that, but it's as

4     simple as I come up, say, hey, I'm Deputy Herrera with

5     the Bexar County Sheriff's K-9 Unit.  I was called by

6     deputy so-and-so.  Based on this traffic stop he made,

7     you're the driver of this vehicle?  Yes.  Okay.  He's

8     asked you for consent and you have authorized consent to

9     search your vehicle?  Yes.  Okay.  Do you have any

10    illegal narcotics in your vehicle?  No.  Yes.  Whatever.

11    Do you have cocaine?  Do you have methamphetamine?  Do

12    you have heroin?  Do you have marijuana?  Okay.

13               What I'm going to do now is I'm going to

14    deploy my K-9.  His name is K-9 whoever, right?  I'm

15    going to deploy my K-9 and work off of your consent.

16    I'm going to search the exterior of your vehicle first.

17    I'm going to search the interior of your vehicle second,

18    and then I'm going to search any contents inside of the

19    vehicle.  Do you still give me consent to do that?  Do I

20    have your permission?  You would then say yes or no, and

21    then I'm walking back.  It's that quick.

22         Q.   Absolutely.  Okay.  That is fast.  Fair enough.

23    What if someone says, I'm allergic to dogs, what happens

24    in that situation?

25         A.   Again, if I'm working off of a consent,

Officer George Herrara                                          April 17, 2024

Page 102

1    right --

2         Q.  Uh-huh.

3         A.  -- I'm going to see first again, or even a free

4    air, it doesn't really matter.  If they tell me I'm

5    allergic, I'm obviously going to step back a little bit

6    further from them because even I have dog hair on

7    myself, and I don't want to interfere with their

8    abilities, so to speak, right, or have a reaction.  So

9    then I'll tell them, okay, then I will search the

10   exterior of your vehicle and take it from there.  But if

11   my dog alerts to the exterior of your vehicle, there's a

12   high likelihood my dog will make entry inside your

13   interior.  So it's something to be aware of.

14        Q.  Fair enough.  Okay.  You mentioned a dog toy.

15   Can you walk me through that?  I think I -- just you

16   said you bring out a toy.

17        A.  Every dog is rewarded a toy, so to speak.

18        Q.  Okay.

19        A.  That toy generally for most dogs -- for, again,

20   most is usually a column-type toy or a tennis ball,

21   could be a pipe, PCV pipe.  It could be a rolled-up

22   towel.  It depends on what that dog's drive and reward

23   system is.  Once they have alerted and sources

24   recovered, then that's when you go back and you pay your

25   dog.  But the dog has to understand that there's -- the

Page 103

1    whole purpose of a dog doing any type of work, whether

2    it's detection training or bite work training, the whole

3    point for these dogs is to fill their mouth.  That's all

4    they care about.

5                   They want to bite and chew on something, so

6    to speak.  So you're harnessing that drive into that

7    reward system.  So if they find that alert, i.e., they

8    find that source, whether it's human source or synthetic

9    source, whatever it is, whether it's explosive,

10   narcotic, or human source, then they, depending on that

11   source, will get something that they get to chew on, if

12   that makes sense.

13       Q.   Yes.  So they get the -- you bring out the toy

14   so they know it's a job, basically?

15       A.   The toy just goes in my pocket.  In some cases,

16   it might already be on my person.  There's handlers that

17   I know that keep a toy on their duty belt all the time.

18   And so the dog knows so it just keeps the dog wanting to

19   do the drive, you know.

20       Q.   And they get the toy if they alert?

21       A.   Not necessarily.  Not for me.  It would be once

22   I recovered -- if I knew it was a good alert, once I

23   valued the source, then I would pay them.

24       Q.   Okay.  But if they don't alert, there's no

25   reward?

Officer George Herrara                                April 17, 2024

Page 104

1          A.   Not all the time.  If they could alert -- no.

2     If they -- if they do not alert, then they don't get a

3     toy, obviously.  If they alert, they still don't

4     necessarily get that toy.  I'm not a proponent, or

5     whatever -- I don't advocate for just because my dog

6     gave me a final response or a change of behavior, pay

7     him.  Because the dog could also be wrong at the same

8     time.  That's 100 percent.

9          Q.   I actually -- I want to talk to you in a little

10    bit about dogs can be wrong, so I don't want to get

11    myself distracted, which is, I'm talking mostly for

12    myself because I have ADD.  But that is something I want

13    to cover.  You -- that does happen, right?  There are

14    wrong alerts, right?

15         A.   Yes.  It's happened in training, yes.

16         Q.   Okay.  All right.  You mentioned -- in the past

17    you mentioned you go -- let me ask you this.  How do you

18    handle the leash?  How much slack do you give?

19         A.   As much as the dog -- without causing the dog

20    to have opposition reflex, meaning you don't want the

21    dog to be pulling.

22         Q.   Uh-huh.

23         A.   You want there to be enough slack in the line

24    so that way the dog can work without being choked.

25         Q.   Okay.  And you mentioned you usually start

Officer George Herrara                                    April 17, 2024

Page 105

1    counterclockwise, trying to visualize it, usually, I

2    think you said, from the back driver --

3         A.   From one of the fender wells on the back of the

4    vehicle working counterclockwise.

5         Q.   Perfect.  Do you do multiple passes or just

6    that one?

7         A.   Generally, it could be two.

8         Q.   Okay.

9         A.   Could be more than that.  But generally, it's

10   generally two passes.

11        Q.   Okay.  And then you said the -- one of my

12   questions is about windows.  You said you -- just to

13   confirm, you prefer that just the way it is, right?

14        A.   Yeah.  It doesn't matter to me if the window's

15   down or the window's up.

16        Q.   So is there a way to signal to the dog if you

17   think they've missed a stop?

18        A.   You make a presentation.

19        Q.   What does that mean?

20        A.   Meaning you point your hand at the area to get

21   the dog on task.  Whenever you open up your hand to the

22   palm open, the dog is supposed to, depending on its

23   training and its -- excuse me -- depending on its

24   training and experience, the dog's muzzle is supposed to

25   come right over to where your hand is at and basically

Officer George Herrara                                    April 17, 2024

Page 106

1    almost like kiss the side of your -- of their face with

2    your hand.  That just lets you know that they're

3    searching that area that you wanted them to search.

4            Q.  What about tap?  Would you ever tap --

5            A.  Tapping is another form, yes, or even, hey,

6    come here; or even a sound, come here, search here.

7            Q.  Okay.

8            A.  Right, you could do that.  It's just a way to

9    get the dog cued up.  Hey, come over here and check this

10   area too.  Because, like anything else, dogs have good

11   days and bad days just like people, and maybe that dog

12   has an upset stomach and he's -- maybe he had, you know,

13   Giardia and he's -- you know, his stomach is all messed

14   up.  So now he's there, but he's a little off task,

15   right, or maybe there's motoring cars.  Maybe there's

16   people standing off on the side screaming, you know, F

17   the police, or watching with cell phones or whatever the

18   case may be, and those people are a distraction because

19   he's like, hey, what are all these people doing?  That's

20   not what we normally see, so to speak.  Normally he

21   comes out, maybe he only -- doesn't have anything but

22   the violator and the suspect vehicle and the patrol

23   cars, and now he's got all these other people around,

24   that could be a distraction in a way.

25           Q.  That makes sense.  I'm certain there's an

Page 107

1    answer to this.  I'm just curious what the answer is.

2    So presuming -- I am presuming, and you can tell me if

3    you have a problem -- let me take one step back.

4                  The alert behaviors you mentioned are

5    either sitting or lying down, right?

6         A.  On a passive alert, yes.

7         Q.  Passive alert.  I am assuming that with the dog

8    you also have a command for sit, right?

9         A.  Yes, sir.

10        Q.  Do -- you probably also have a command for lie

11   down, right?

12        A.  Yes, sir.

13        Q.  How do you -- what steps do you take to ensure

14   you don't accidentally give the command for like the

15   alert in the middle of it?  Like how do you make sure

16   you don't accidentally tell the dog to sit?

17        A.  Because sit is -- there's no reason, when

18   you're doing a search, for the dog to have to sit or lie

19   down.

20        Q.  Let me ask it a different way.  How would you

21   command your dog to sit?

22        A.  I would give him the Dutch command or the

23   German command or the French command, depending on what

24   that dialect that dog is trained in, and give him that

25   command to sit.

Page 108

1      Q.  Okay.  So that's -- I think that's the answer I

2  was wondering about.  So for the command when you're

3  directing, though, would be verbal, correct?

4      A.  Yes.

5      Q.  And you would just -- it would not be like a

6  hand gesture?

7      A.  It could be.  I had -- I had my dogs trained in

8  hand gesture on Bosco.  I didn't have it for Max.

9      Q.  Respectfully, do you see how that -- could that

10  be an issue?  Like --

11      A.  No.  Because the hand gesture for Bosco is way

12  different than what it would be -- because Bosco did --

13  was a very experienced dog for patrol work, and so he

14  was -- he would search a lot off leash for me, and

15  because of the training and experience that we had

16  together, right?  So what I mean by that is if I wanted

17  Bosco to search, right, I would give him the command to

18  search.  That command is completely different in the

19  dialect than it would be for that of a sit command or a

20  down command.

21          At the same time, right, if I wanted him

22  verbally from a distance, or nonverbally, I should say,

23  by hand signals, right, then that has nothing to do with

24  the search.  He's already in a different search mode.

25  If I'm having him do something by hand gestures, he's

Officer George Herrara                                      April 17, 2024

                                                           Page 109

1    not in a narcotic search mode.  He is in a complete bite

2    work search mode.  So he understands, and that's where

3    that training and that experience comes from.

4          Q.  And I --

5          A.  And the command to sit would be completely

6    different nonverbally than even a presentation would be.

7    This is an open hand, come search here.  Me telling him

8    to sit is me putting my hand all the way up high, like a

9    power to the fist people-type stand, that tells him to

10   go into a sitting motion.  So this one he knows.  If I

11   wanted him to go into a down motion, then I would put my

12   hand flat on the ground, palm down, flat all the way on

13   the ground making it look like I'm pushing air down.

14   That would tell him to go into a down, all the way off

15   position.

16         Q.  Perfect.  You actually did a great job verbally

17   describing the physical actions you would take.  Do me a

18   favor.  Rather than me do it, would you verbally

19   describe what the presentation motion looks like?

20         A.  A verbal present --

21         Q.  I'm sorry.

22         A.  A nonverbal presentation --

23         Q.  Yeah.

24         A.  -- motion would be a palm, as if I'm going to

25   shake somebody's hand, presenting it to that area and

Officer George Herrara                                    April 17, 2024

1    holding it right on top of that source area that I

2    wanted to search.  So if I want him to come and stick

3    his muzzle on this -- onto this, specifically he's going

4    to come up here.  Maybe he's going to stick his head up

5    here to search, but I want him specifically to search

6    this bottle, I'm going to put my hand just like that

7    onto the bottle, and he's going to come and put his

8    muzzle right up against it.

9         Q.  Awesome.  Perfect.  Excellent.  One more

10   question in this topic, and I'm going to ask about the

11   consent searches, because you said it was a little bit

12   different, right?

13        A.  That was consent that we talked about.

14        Q.  Oh, yes.  That's where I got confused.  The

15   nonconsent searches.  Okay.  Generally, how does wind

16   factor in?

17        A.  Wind is a handler's best friend or it's the

18   worst enemy.

19        Q.  Explain that to me, please.

20        A.  It makes your job either simple or harder.

21        Q.  Which version of wind is easier; which version

22   of wind is harder?

23        A.  Well, depending on the circumstances that we're

24   referring to, if I am trying to find a person, then wind

25   can be a huge asset.  But it could also be a bad thing.

Page 111

1    Just like on a traffic stop, a search for narcotics

2    could be a good thing or a bad thing, meaning if a

3    vehicle is stopped facing north, okay, the front of the

4    car is -- the hood of the -- the bumper is facing to the

5    north, let's just say.  Okay?  I'm just using this as an

6    analogy.  And the wind is blowing out of the south, so

7    the wind is blowing from the bumper of the -- back

8    bumper towards the front.  Does that make sense?

9         Q.  Yes.

10        A.  And I walk around from, again, starting at the

11   driver's side fender and I go counterclockwise, so I

12   make a presentation.  As I come around the back fender,

13   because I'm going counterclockwise, the dog gives me no

14   indication, no indication.  I walk all around the

15   passenger side, but then I get to the front and now all

16   of a sudden the dog goes nuts, starts pulling, wants to

17   climb underneath the car, maybe wants to try to go over

18   the car, but he can't figure it out.  Maybe he sits

19   right there.  He sits at the front of the car, yes, so

20   he's giving me a final alert.  The dog's not wrong, but

21   where is the odor probably at?  The odor's all the way

22   inside the bumper of the vehicle.  So the dog can't

23   paint me a picture and get me as close to the source if

24   there's high wind.

25             Now, if there's no wind, then that dog

Officer George Herrara                                    April 17, 2024

Page 112

1      could possibly work and get as close to that source as

2      possible.  But in some cases, wind, like anything else,

3      right -- you walk in right now to a pizza restaurant and

4      I blindfold you, you're immediately going to walk in and

5      know you're in a pizza restaurant.  There's no doubt

6      about that.  It's the same thing with wind in that

7      context.  Are you really going to get your nose as close

8      to that pepperoni pizza as soon as you walk in as you

9      possibly could blindfolded?  It's going to take you a

10     little while, but as soon as you walk in, you're

11     overloaded with already the pizza smell.  The dog is

12     then going to fight to get as close to that pizza smell

13     or the actual pizza as possible.  Does that make sense?

14          Q.  A lot of sense.

15          A.  And wind can either help you to do that or it

16     can also frustrate the dog and make the dog just say,

17     hey, man, it's here, it's in this car.  I'm giving you a

18     response because that's what I'm supposed to do is tell

19     you that there's narcotic odor.  So here's my sit, but

20     he's sitting in the front of the vehicle.  The dog's not

21     wrong, but the dog is also not perfect in the context

22     that he's worked all the way to the source, but he's not

23     wrong.  That's still a valid source and a valid

24     response.

25          Q.  Thank you.  That actually makes a lot of sense.

Page 113

1    I understand what you mean.  With -- so assuming the

2    wind isn't sort of blowing from like the south to the

3    north and alerting at the north part, if a dog alerts

4    and says -- dog's not saying anything, is he?  The dog

5    alerts to narcotic --

6         A.  Well, he is, but it's up to the handler to read

7    that.

8         Q.  Fair enough.  Fair enough.  So if the dog

9    alerts and indicates that there's drugs in like the

10   front driver side, does that mean it's -- it is more

11   likely that that's generally where the drugs are as

12   opposed to likely be in the trunk?

13        A.  I'm going to say that a dog will -- again, a

14   dog wants to get as close to that source as possible.

15   But, again, there are barriers and/or the wind could be

16   a factor that can prevent that dog from getting as close

17   to source as possible.  And that comes from my training,

18   my experience, and even real world deployments where I

19   have seen that happen.

20        Q.  Fair enough.  And you can tell me if this is

21   just generally a stupid academic question.  So let's say

22   you're in a place that has no wind.  It's a perfectly

23   clear day, and it's just like it's gorgeous conditions,

24   and the dog -- and you're doing a search or you're doing

25   an either consent or nonconsent search and the dog

Officer George Herrara                                    April 17, 2024

Page 114

1    alerts the driver's side -- the driver's like seat.  And

2    let's say it's a big car, like an SUV, but with a closed

3    trunk.  If you alert there and you do a search and don't

4    find any drugs, will you continue and search in the

5    trunk or just say, you know what, he only alerted one

6    spot, he's not finding it and it's not going to be

7    elsewhere?

8         A.   If the dog alerts to any part of that vehicle,

9    I'm going to search that area first.  So, in other

10   words, given that same analogy that I showed you where

11   the wind's blowing and he gives me that final response,

12   I'm going to search the front of that car first, right.

13   But then I'm going to go into my own systematic search

14   of every part of that vehicle because I understand and

15   can appreciate that even though the dog is alerting to

16   the narcotic odor, the dog cannot necessarily paint me a

17   picture.  He's attempting to paint his picture by

18   putting his nose as close as possible to that source,

19   but at the same time, there are other factors that play

20   a role where that odor could be permeating from another

21   location, just so happens that's where he's finalizing

22   it at.  So I will then search everywhere in that vehicle

23   because, again, even the Supreme Court says, once I have

24   that final response and/or a quick little change of

25   behavior, then I then can go ahead and search the

Officer George Herrara                                April 17, 2024

Page 115

 1    interior and the exterior and the contents of that

 2    vehicle.

 3         Q.  Okay.  Thank you very much.  Okay.  That was a

 4    consent search.  I just want to make sure we're good in

 5    time.  Walk me through the same process.  I hope -- I

 6    probably will not have as many follow-up questions, but

 7    walk me through the same -- like if you get there for a

 8    nonconsent search, walk me through.

 9         A.  I'm going to do the same thing.  I'm going to

10    park again in the same reasonable location that's safe

11    for me and my handler and my team, so to speak, or my

12    dog.  I'm going to get out and make contact with the

13    driver.  I'm going to tell the driver, again, who I am.

14    I'm Deputy Herrera with the Bexar County Sheriff's K-9

15    Unit.  I was called to the scene because you were

16    stopped for whatever reason, don't know what that reason

17    is.  The deputy has asked you for consent to search the

18    vehicle.  You have refused consent.  Is that true?  He

19    would then say yes or no.

20              Okay.  Do you still refuse consent with me

21    here now knowing that I am also a K-9 unit?  It's your

22    right.  I just want to know, yes or no.  If they say,

23    no, you don't have my permission, I understand that and

24    I'm going to respect that.  I'm going to tell them the

25    same thing I've told you.  The Supreme Court says that I

Officer George Herrara

April 17, 2024

Page 116

1    can now still take out my K-9 since you are in a motor

2    vehicle and this is a moveable object, without having to

3    go get a search warrant.

4              My dog will then be taken out and the

5    exterior of the vehicle will be considered a free-air

6    sniff, meaning I'm going to walk my vehicle [sic] around

7    the public space area around your vehicle, your trailer,

8    your motor vehicle, whatever it may be.  And if and when

9    my dog alerts, then I will no longer need your consent,

10   and that will then be used to search the interior as

11   well as the contents of your vehicle.  I want you to

12   understand that.

13             If my dog does not give me any type of an

14   alert to your exterior, then I will not be searching

15   anything further, and you will -- and my business here

16   will be done, other than your business now with you and

17   the deputy.  Does that make sense to you, sir?  And then

18   they will then say yes or no, and then I would then go

19   handle my business.  I would then go over, get K-9

20   whoever, put him, again, on a six-foot lead, make sure

21   that they know I have the toy, whether it's on my person

22   already or I take it out and hook it on to me.  That

23   really is null and void in the context.  It's just a

24   training evolution-type thing that we do all the time.

25             The dog then comes out.  I would then still

Officer George Herrara                                          April 17, 2024

Page 117

1     take my dog over to use the restroom, lift his leg, do

2     whatever they have to do just for a second to give them

3     that second, right, not five, not ten minutes, just

4     enough to break the dog like anybody else would.  Then I

5     would, then tell the dog from a distance -- just walk

6     him over.  I wouldn't tell him anything.  I would walk

7     him over to my car -- or to that car.  And the dog is

8     already going to be pulling to that car because, again,

9     based on training and experience, and the dog is then

10    going to just walk around the exterior, probably still

11    act as if I'm giving presentations, still searching

12    areas because it's been so many times that that dog is

13    going to do everything that the dog would normally do,

14    even without me giving a presentation because that's

15    perfectly authorized.

16              That dog is allowed to walk the exterior of

17    the vehicle.  If he wants to stick his nose into the

18    wheel well, he can do so.  If he wants to stick his nose

19    under the car, he can do so.  If he wants to walk by

20    everything and come back, he can do so.  He's just going

21    to walk around the vehicle.  If the dog is distracted

22    for whatever reason, then, yes, I could call him, and,

23    hey, come here, and make him do that.  But that's not a

24    search command.  That's just me telling him, hey, come

25    over here, dude.  Leave that alone.  This is what we're

Page 118

1    doing right now.  And then he would then, again,

2    continue on.  If the dog alerted, then it goes from

3    there.  If the dog doesn't alert, then that is it.

4        Q.  Okay.  And are there any differences with what

5    you would do if -- like let's say there is an alert.  Is

6    it any different from what you previously told me --

7        A.  If it's an alert on a free air, once I get that

8    alert, I'm going to continue, but I'm going to go into a

9    detailed search.  If my dog gives me a change of

10   behavior, I'm going to go into a detailed search,

11   meaning I'm going to make presentations.  I'm going to

12   search the interior.  I'm going to do everything that I

13   need based on what that dog is telling me to do.

14       Q.  And that would be the same basically what you

15   had followed and what you've already told me, right?

16       A.  Right.

17       Q.  Okay.  Fair enough.  You know, I swear I don't

18   actually know the answer to this question.  If it's a

19   nonconsent search, do you still get the occupant out of

20   the car in that situation, or can he kind of sit in it?

21       A.  I would prefer him to be out.  Yes.

22       Q.  Okay.  Does he have to be out?

23       A.  He doesn't have to, no, but it's highly

24   encouraged just because at the same time I'm going to

25   make sure that they understand I want to respect their

Officer George Herrara                                              April 17, 2024

Page 119

1    right and them, and I want to give them as much of their

2    right on their refusal as possible.  By them staying

3    inside of the vehicle, they could cause my dog to act

4    differently and that would not be good for them or for

5    me, so that's why we want them to be out of the vehicle.

6         Q.   Okay.  Thank you.  The -- give me one second

7    quickly.  Oh, yes, burp the car.  I didn't follow up on

8    burp the car.  What does that mean?  Fill me in a little

9    bit.

10        A.   It's a -- it's a very -- we keep that same

11   practice, whether it's with a dog or without a dog,

12   meaning if that door is open right now and I'm searching

13   for a bad guy, do I just want to open that door and go

14   into the next hallway?  No.  I want to open the door and

15   give it a second to see if there's somebody in the

16   hallway that's ready to shoot me.  Does that make sense?

17        Q.   Definitely makes sense in that context.

18        A.   So it makes the same context in the car, right?

19   In the car, if the doors are all closed, the windows are

20   open, all that odor is still inside of that vehicle,

21   right?  I want to burp the car, i.e., I want to open it

22   just a little bit, give whatever's in there a chance to

23   come out with my dog there, and then allow my dog to go

24   in after that.  Does that make sense?  So that way if

25   the dog smells that odor immediately out here, he's

Officer George Herrara                                April 17, 2024

Page 120

1    going to follow and trail that odor, but as soon as that

2    door opens, that odor's going to want to come out of

3    that vehicle.  So that odor, he can then trail it to the

4    source and get his nose as close to that source as

5    possible.

6        Q.  Makes sense.  Thank you.  One thing on a

7    somewhat different topic.  We've talked a lot about

8    alerting and we talked about the three types of alerts.

9    Is there such a thing as an indication that is different

10   from anything we've talked about?

11       A.  An indication is what's referred to as a play

12   of terms, but it's also referred to as a change of

13   behavior.

14       Q.  Okay.  So an indication is a change of

15   behavior?

16       A.  It could be, depending on your -- how you're

17   articulating it, yes, sir.

18       Q.  Okay.  With the way you defined change of

19   behavior, is that how you would also define indication?

20       A.  Well, an indication too for some people -- some

21   people can say an indication is your dog going into a

22   final alert or into a down.

23       Q.  Okay.

24       A.  So it just depends on what context you're

25   referring it to in the scope of the conversation.  An

Officer George Herrara                                April 17, 2024

Page 121

1    indication could be, hey, my dog is indicating in this

2    room because he's doing stuff that is out of the norm

3    that he normally does.  He can't find where it's at.

4    I'm going to call -- that's an indication or a change in

5    behavior.

6        Q.  Okay.  Is there -- is there something an

7    indication can be that would be different than what

8    we've described as a change of behavior or a passive

9    alert or aggressive alert?

10       A.  Yes.  So in other words, a change in behavior

11   could be me bringing my dog in here.  His mouth is

12   closed.  He's (descriptive noise), doing this kind of

13   thing.  I don't know how else to describe it, but

14   he's --

15       Q.  That was pretty good.

16       A.  -- breathing intense -- he's breathing

17   intensively through his nostrils trying to take in as

18   much odor as possible.  His head looks like Stevie

19   Wonder, for a lack of better words, where he's doing all

20   of this (indicating), trying to find which way the scent

21   cone is in.  The hair, even I've seen the hair, the

22   cackling start to happen a little bit.  It's just,

23   again, that's way different than any other search, so to

24   speak, or behavior.  So the dog is telling you, even

25   though the dog cannot verbally tell you, the dog's body

Officer George Herrara                                April 17, 2024

Page 122

1    language is no different.  He's trying to tell you, hey,

2    Dad, there's something wrong; or, hey, whoever, there's

3    something wrong here or there's something going on,

4    basically, right?  And so that's what you have to

5    interpret as knowing the differences between right and

6    wrong.

7         Q.  Okay.  Fair enough.  Thank you very much.  I

8    want to talk to you about the deployment reports in

9    general.

10        A.  Okay.

11        Q.  One thing you mentioned is you viewed

12   Mr. Schott's report before testifying; is that correct?

13        A.  Yes.

14        Q.  And I assume you've seen many, many, many

15   records in your day?

16        A.  Yes.

17        Q.  Are they all basically the same for the Bexar

18   County Sheriff's Office?

19        A.  Yes and no.

20        Q.  Let me rephrase that.  Is the form the same,

21   not necessarily how it's filled out?

22        A.  The form is basically the same.  Yes, sir.

23        Q.  Okay.  What changes have they made?

24        A.  It could be the type of software system, what

25   we used before, what we use now.  I'm not all exactly

Page 123

1    sure.

2        Q.  I have going back to, I believe, 2020.  They're

3    all the same general form.

4        A.  Okay.

5        Q.  Is that generally what you understand to be

6    correct?

7        A.  Yes.

8        Q.  Okay.  Thank you.  Can I stop you for a second?

9            (Recess taken.)

10           (Exhibit 18 marked.)

11       Q.  (BY MR. ARONIN)  Perfect.  I want to ask you

12   about the deployment reports.  You tell me when you're

13   ready, but take your time.

14       A.  All right.

15       Q.  First and foremost, this is generally what a

16   deployment report looks like, right?

17       A.  Yes, sir.

18       Q.  The content might be different, but the form

19   itself is the same for at least -- since 2020, correct?

20       A.  Yes, sir.

21       Q.  Okay.  Wonderful.  Just want to get a sense of

22   what some of these phrases mean.  In the middle, do you

23   see where it says like alert given, et cetera?

24       A.  Uh-huh.

25       Q.  What does alert given mean?  I know that some

Page 124

1    of these may be obvious, but some of them are less --

2         A.   Oh, alert given?

3         Q.   Yeah.  What does that mean?

4         A.   That means that the handler notated that the

5    dog gave an alert to whatever it was.  In this case, it

6    was a vehicle.

7         Q.   Okay.  What does indication mean?

8         A.   Again, it's the same.  It's just indication

9    versus a change of behavior/alert.  That's all the same

10   context.  So typically, as these are filled out, these

11   will be both yes or both no.  It won't --

12        A.   It could be a -- it could be a yes, it can be a

13   no.  It could -- again, it wasn't necessarily the alert,

14   but it was an indication.

15        Q.   Okay.

16        A.   And in this case, again, an alert is also an

17   indication, so --

18        Q.   Okay.  So it could be you could get an

19   indication, but not an alert.  But if you get an alert,

20   you should also have gotten an indication; is that fair?

21        A.   Sure.  Fair.  Yeah.

22        Q.   Okay.  Cool.  Thank you.  What does subs pres

23   mean?

24        A.   I'm assuming the same thing.  Again, I don't

25   know, specifically, but I translate that means to be a

Officer George Herrara                                    April 17, 2024

Page 125

1    substance present.

2         Q.  And what is -- but what is -- I assumed that's

3    what it meant, but I honestly wasn't positive.  What

4    would substance present mean?

5         A.  Meaning that there was something there that

6    let -- the handler could identify as a narcotic odor or

7    a narcotic aid.

8         Q.  Okay.  That's a really -- first of all, what's

9    a narcotic aid?

10        A.  A narcotic -- like a presence of narcotics.

11        Q.  Okay.  So does -- fair.  Does this mean that

12   they found drugs, or does it mean that the dog smelled

13   the odor?

14        A.  It could mean that they -- again, I don't know

15   what exactly substance present means and the parameters

16   for that, but I would take it as though they found some

17   type of a source odor there.

18        Q.  Okay.  Source -- what -- why don't you know

19   what that means?  Like that seems --

20        A.  Because you're also asking me about a report

21   that, one, I didn't do; and, two, since 2020, I haven't

22   been a part of this unit.

23        Q.  That's fair.  Do me a favor, I want -- for

24   these parts of questions -- and I will tell you when I'm

25   switching -- I almost want to view this.  I don't have a

Officer George Herrara                                  April 17, 2024

Page 126

1    blank one.  I would just like you to pretend this is

2    blank, and I literally just want to know what the terms

3    mean.  I'm actually not asking about Alek's case; is

4    that fair?

5         A.  Who is Alek?

6         Q.  Mr. Schott.

7         A.  Okay.  I'm sorry.

8         Q.  Totally good question.  Just literally like if

9    this -- pretend this were blank for a second.  It's okay

10   if you don't know, but you're not sure if substance

11   present generally on a form means either like the office

12   found drugs or if it just means there was an odor

13   detected.  You're not sure which one?

14        A.  I'm not honestly sure.

15        Q.  Totally fine.  I don't know is a perfectly fair

16   answer.  Substantiated.  If you don't know, that's fine.

17   Just tell me.

18        A.  Substantiated, again, I don't know in

19   translation what that exactly means off of this software

20   system currently.

21        Q.  Was this not the software you were using?

22        A.  We did use it, but I never saw any of my

23   reports printed out in this context.  I would enter

24   stuff on the software, but I never saw an actual

25   detailed report per se.  I just know what boxes I would

Officer George Herrara                                    April 17, 2024

Page 127

1    check, and I don't ever recall ever checking boxes of

2    substantiated.  I don't know if these are prefilled

3    based on other identifiers that are filled in or how

4    those get answered.

5         Q.  Let's say you found an ounce of marijuana.

6    What boxes would you check?  If you don't remember, you

7    can tell me you don't remember.

8         A.  It was just there was a dropback-type pattern

9    reporting system.  So I would click on a box where it

10   would tell me alert given, and it would say, yes, or

11   something like that.  And then it would be, again, off

12   the top of my memory, you would click on the box for

13   whatever aid, so to speak.  Aid, meaning the odor, the

14   source.

15        Q.  Okay.

16        A.  And it would be heroin, meth, you know,

17   different boxes would drop down, and then you could put

18   the quantity and things like that.  But I don't exactly

19   recall how those translate over onto this per se.

20        Q.  Okay.  Thank you.  You said you've never seen

21   it printed out like this.  But I do know you've done

22   suppression hearings and trials, right?  How would the

23   defense attorney show it to you, or the prosecutor?

24        A.  I would never see these.  I would just go off

25   of my written reports or what have you.

Officer George Herrara                                        April 17, 2024

                                                        Page 128

1        Q.  Would that be like your field notebooks or your

2    handwriting or like --

3        A.  No.  Like the actual report that I would

4    generate.  This is an internal K-9 document.

5        Q.  Okay.

6        A.  This is a document that we use to document the

7    deployment of the K-9, but there's still a secondary

8    report generated, whether -- back -- again, processes

9    have changed since.  We used to do hand, paper,

10   handwriting, and then it went to a report writing

11   system, and then it went to now you update certain

12   things and certain parameters are not a report, you

13   would just update a -- what's referred to as a keycard.

14   In other words, make notes titled to that that can be

15   used in court and printed out as the officer's notes.

16       Q.  Okay.  So this document is an internal one.

17   It's not for something you were confronted with in

18   court?

19       A.  It can be printed out and used in court,

20   obviously used as an official document, but, again, it's

21   not something that I would print out and have access to.

22   This is printed out as a supervisor level.

23       Q.  Okay.  Thank you.  Thank you very much.  And

24   for -- again, this literally -- just for my inference.

25   When you say your report, is that the same thing as the

Officer George Herrara                                        April 17, 2024

                                                    Page 129

1    SPEARS report, or is that something different?

2         A.   SPEARS report is an interview report.  Yes,

3    that's -- that's the actual entry report.

4         Q.   Okay.  So when you say you would give your

5    report, that's the SPEARS report, right?

6         A.   SPEARS report.  Generally, that's what I

7    generally see in court.

8         Q.   Okay.  I literally just wasn't sure if there

9    was something else.  Okay.  Would you fill this out

10   using the software back in the car or back at the

11   precinct later?  When would you do this?

12        A.   You could do it either way.  It just depends,

13   again, if, one, connectivity is available.  But, yes,

14   you could easily do it there in the field if you had

15   connectivity based on wifi-type connection, so to speak,

16   or you can wait and do it back in the office.

17        Q.   Perfect.  Thank you very much.  Again, if you

18   don't know it, just tell me you don't know.  But in the

19   same box, it says, I'm assuming, loc.known.  I'm

20   assuming it's location known?

21        A.   Right.

22        Q.   Do you know what that was intended to say?

23        A.   That could be maybe where the driver says,

24   yeah, I got a joint in my center console.

25        Q.   Okay.

Officer George Herrara                                    April 17, 2024

Page 130

1        A.  And lo and behold, maybe the dog alerts to the

2   the joint in the center console.  Then you can say, yes,

3   that's the alert.

4        Q.  Okay.

5        A.  And it was known because you already knew about

6   it.

7        Q.  Out of curiosity, do you know that's what it

8   means, or is this like your assumption?

9        A.  That's my assumption, how I would interpret

10  that.

11       Q.  Okay.  I just want to be clear.  And vehicle --

12  I'm -- veh.rel, vehicle release, I'm assuming.  Do you

13  know what that means?

14       A.  I don't know what vehicle R-E-L stands for, to

15  be honest with you.

16       Q.  Perfect.  Perfectly fair answer.  Were you

17  trained on how to enter these documents?

18       A.  I wouldn't call it trained.  We got user --

19  just -- it's pretty user-friendly when you're doing it

20  with Dropboxes and how to enter it.  But we weren't -- I

21  don't ever remember taking like an eight-hour class on

22  just how to use this software system, so to speak.

23       Q.  Okay.  You can hold onto this.  I'm going to

24  come back to it more as -- like to discuss Mr. Schott's

25  case.  I just -- I really wanted to know what those

1      phrases meant.  So we can come back to that.  Cool?

2           A.  Cool.

3           Q.  Changing topics.  You said you've worked with

4      three dogs, right?

5           A.  Yes, sir.

6           Q.  Sam --

7           A.  Sammo.

8           Q.  Sammo, Bosco, and Max, right?

9           A.  Maximus.

10          Q.  Maximus, excuse me.  What -- when you were

11     training or working with Max, what were Max's alerts?

12          A.  Max's alerts were a final response, either a

13     sitting or a down position.

14          Q.  And was it always one of those two things?

15          A.  Not always and never.  Sometimes it could have

16     been a change of behavior.

17          Q.  Okay.  Fair enough.  And that would -- and this

18     is where I struggle with the verbiage of indication

19     versus alert.  You would still consider a change of

20     behavior to be an alert, right?

21          A.  Yes.

22          Q.  Okay.  Thank you.  What about whining and

23     barking?

24          A.  That's what dogs do.

25          Q.  Thank you.  Would that be considered a change

Officer George Herrara                                    April 17, 2024

Page 132

1    of behavior?

2         A.  Yes and no.  It's called frustration.  That

3    could be it.  Depending on what context you're referring

4    to, i.e., if he's alerting to that door and wants to get

5    to the other side of the door and we're taking a long

6    time, he could easily start barking at the door because

7    he's like, open the door.  So that would be not so much

8    a change of behavior.  100 percent it could be.  But it

9    could also just be frustration with, hey, I'm telling

10   you where it's at, why you ignoring me, so to speak.

11        Q.  I'm asking this.  I'm not trying to put words

12   in your mouth.  It strikes me that a lot of this has to

13   do with your judgment and your experience and the bond

14   you have with the dog; is that fair?

15        A.  Yes, sir.

16        Q.  And so some of the way you interpret the

17   behavior is just based on your relationship with the dog

18   and your training; is that fair?

19        A.  Yes, sir.

20        Q.  So is it fair to say there's a subjective

21   component to whether or not the dog is alerting?

22        A.  Yes and no, because you have to be able to

23   articulate what it is that you're seeing is a difference

24   in a change of behavior.

25        Q.  Go ahead.

Officer George Herrara                                    April 17, 2024

Page 133

1      A.   I'm just saying, if -- that's why we would love

2    to see every single time a final response, i.e., the dog

3    goes into -- goes into a sit or the dog goes into the

4    down.  You can then proof the dog by trying to see if

5    the dog will leave the task, but if the dog stays there,

6    then you're pretty much -- he's telling you, there's

7    something here you need to investigate further.  If the

8    dog doesn't go into a final response and that's

9    something that is obvious where he's no longer sitting,

10   not gone into a down, but now he's pacing back and

11   forth, he's breathing heavily and intentionally, he's

12   doing the Stevie Wonder, as I referred to it as, head --

13   bobbing his head back and forth trying to figure out in

14   the scent cone where he needs to go into.  But he's so

15   overwhelmed that that is an inarticulable fact that my

16   dog doesn't do this on every other traffic stop.  So now

17   I can say, hey, this is different.  That's the change of

18   behavior.

19          Whereas every other stop, he walks around,

20   nothing.  He walks around, he gives me a final response.

21   Maybe he goes into an alert.  Then that's a good one,

22   right.  But every other traffic stop, he just does it or

23   he goes into a response.  Now, all of a sudden, there's

24   something that is different.  Like I told you, if I was

25   to put an aid up into the ceiling in the area, he would

Officer George Herrara                                        April 17, 2024

1    act different.  That's what I'm referring to.  That's

2    that articulable fact of the change of behavior.

3         Q.  And that's something that you learn with time,

4    with experience, and with bonding with the dog, correct?

5         A.  Yes, sir.

6         Q.  So typically, watching a video, I would be able

7    to see if a dog is hitting that as a binary or as a fact

8    or as -- it happens or it doesn't happen, correct?

9         A.  Yes, sir.

10        Q.  But I would not be able to interpret the change

11   of behavior.  You would need to be able to do it based

12   on experience; is that right?

13        A.  I get to tell you what it is that's happening

14   and based on other videos, you can easily say, yes, I

15   can easily see what you're referring to, yes.

16        Q.  Fair enough.  Okay.  Let me confirm.  We talked

17   quite -- well, let me just confirm.  Would you prefer I

18   referred to him as Maximus as opposed to Max?

19        A.  It doesn't matter.  Max is fine.

20        Q.  Okay.  Max.  Just so I'm clear, Max was trained

21   on the same four substances as your other two dogs?

22        A.  Yes, sir.

23        Q.  So it was marijuana, cocaine, heroin, and meth,

24   correct?

25        A.  Yes, sir.

Officer George Herrara                                   April 17, 2024

Page 135

1        Q.   And potentially meth can also include ecstasy,

2    right?

3        A.   Yes, sir.

4        Q.   How is it documented?

5        A.   What do you mean how is it documented?

6        Q.   I saw -- remember, I showed you the certificate

7    and we saw one of them that listed for Bosco that was

8    trained on those four substances.  Where is it listed

9    what Max was trained on?

10       A.   Max was trained using the in-house

11   certifications that we would use, as well as he was

12   certified through NNDDA, which is the National Narcotic

13   Detection Dog Association.

14       Q.   Okay.

15       A.   That is over four groups as well.  You would

16   have to call in the certifying official that testified

17   that would testify on behalf of that.  But I'm sure

18   you're well aware of NNDDA.  NNDDA would come in here

19   and tell you that the dog passed a certification that

20   was methamphetamine, heroin, cocaine, and -- marijuana,

21   cocaine, methamphetamine, and heroin all inside those

22   aids that the dog positively alerted to and received

23   that certification.

24       Q.   Fair.

25       A.   So even though they don't list them per se, the

Officer George Herrara                                    April 17, 2024

Page 136

1    dog was tested on those and passed that certification,

2    which is why he was recognized as a narcotic dog

3    detector for NNDDA.

4         Q.  Oh, I don't doubt that he is.

5         A.  No, I'm just saying.  Just because they don't

6    list it on a certificate doesn't mean that it doesn't

7    happen or didn't happen.  That's where that certifying

8    official for that day that certified that K-9 team would

9    have to come in and testify that, yes, those K-9s and

10   that particular K-9 passed on that particular day using

11   one of those four aids.

12        Q.  Fair.  This may be a really stupid question,

13   but the -- so I don't doubt at all that Max was

14   certified on those four substances.  I take you at your

15   word, and I'm sure it's true.

16             More of the point, how does the Bexar

17   County Sheriff's Office know, okay, Max is certified on

18   those four?  Is it listed somewhere, or is it just like,

19   well, Deputy Herrera -- or it's your dog, you know what

20   he's certified on, and we just take it.  Is it

21   documented somewhere?

22        A.  It is documented through their training that

23   they've taken.  It's documented in in-house training

24   that's provided and done and completed by the trainer as

25   well as the supervisory agent of that unit, i.e., the

Officer George Herrara                                        April 17, 2024

Page 137

1    sergeant.

2         Q.  Okay.  Thank you.  And I've already asked you

3    this question, so I'm not going to do it again.  But

4    generally, you know that he's alerting.  You do not know

5    that Max or any other dog, of the things that they are

6    trained to alert to or they're alerting to; correct?

7         A.  I just know he's giving me a final response or

8    a change of behavior to the presence of narcotic odor.

9    Could not tell you which narcotic that was, though.

10        Q.  Okay.  Perfect.  Is there a way to determine

11   like how confident a dog is in an alert?  Are they

12   wishy-washy like people are, or are if they are

13   alerting, they are confident and that's it?

14        A.  If they are alerting, they're confident.  They

15   want you to know that it's there so that way, as soon as

16   you verify it, they are going to get their toy, yes.

17        Q.  There are times the dog alerts and there's

18   nothing there, right?

19        A.  Yes.

20        Q.  Why?

21        A.  Because either the dog alerted in a location,

22   and based on handler's experience or knowledge, they

23   didn't continue to search past that area, so to speak,

24   and look further into the stop or further into the

25   vehicle or the conveyance that they are searching.  It

Officer George Herrara                                    April 17, 2024

Page 138

1     even happened to me on three different documented stops

2     where I made a traffic stop, Max alerted, the vehicle

3     left the roadway, continued on its business, was stopped

4     down the road by another organization, another trooper,

5     whatever the case may be.  And those troopers, based on

6     the experience that they had, were able to find that

7     particular source.  So the dog isn't necessarily wrong

8     when they find -- or give you a response and you can't

9     find it.  Sometimes you can't find it, and that's

10    happened more times than not.

11         Q.  But what -- but isn't it fair to say there's

12    also times when they've just given false alerts?

13         A.  It is very possible.  If I can't verify that

14    source, fine.  Whether -- again, whether he's, like you

15    said, not correct or whether he is correct and I just

16    wasn't able to find it.

17         Q.  Which do you think is more likely?

18         A.  After seeing that it's happened to me and I

19    know for a fact three different times, I couldn't really

20    quantify which one is in either direction.

21         Q.  But let me ask about that.  So you --

22    presumably -- because I don't know, I haven't quantified

23    your numbers.  But presumably, you've written a number

24    of K-9 deployment reports and entered them into the

25    system where you said, there was an alert, and you did

Officer George Herrara                                        April 17, 2024

Page 139

1    not find drugs, right?

2          A.  Yes, sir.

3          Q.  Probably been a lot more than three of those,

4    correct?

5          A.  Yes, sir.

6          Q.  And you can think of three times where you know

7    you were at least wrong on those, correct?

8          A.  Where I couldn't found the source of an alert?

9          Q.  Yeah.

10         A.  Yes, sir.

11         Q.  And like based on all of the other proof, it

12   was clear the drugs were in fact there, right?

13         A.  Yes, sir.

14         Q.  Someone else found them soon enough that they

15   were likely there beforehand, right?

16         A.  Yes, sir.

17         Q.  And that's three over the course of, if I'm

18   doing the math right, about ten years you were doing it?

19   Eight years?

20         A.  About nine.

21         Q.  Nine years?

22         A.  Or eight years.  Yeah, I guess you're right.

23         Q.  Either way.  How many like positive alerts but

24   no drugs have you found?

25         A.  I couldn't tell you how many.

Officer George Herrara                                    April 17, 2024

                                                              Page 140

1          Q.  More than three, though, right?

2          A.  I would think so.

3          Q.  More than a hundred?

4          A.  I don't know about that number.

5          Q.  What's a surprising number to happen to an

6     officer?  What's too many?

7          A.  Depends what you're referring to.

8          Q.  Help me understand what I'm not being clear

9     about.

10         A.  Can you ask that question different?

11         Q.  I will do my best.  I'm going to ask it

12    different.  Let me try it.  Is someone tracking the

13    dog's stats?

14         A.  Does anyone track the dog's stats?  No.

15         Q.  Okay.  We have the deployment reports where we

16    know what happens after every stop, right?

17         A.  (Moving head up and down.)

18         Q.  Yes?

19         A.  Yes.

20         Q.  That was only your second just nodding.  That

21    was a great.

22         A.  I thought you were going to keep asking a

23    question.

24         Q.  That's fair.  Okay.  So we have -- we know what

25    happens on every given stop.  Is there anyone who

Officer George Herrara                                    April 17, 2024

                                                         Page 141

1    reviews the percentages to say, this dog is giving too

2    many false positives and not finding drugs, they may not

3    be as reliable as, let's say, the other dogs?

4         A.  That would be the training supervisor's job.

5         Q.  Okay.  Do you know if they do that?

6         A.  You would have to ask the training supervisor.

7         Q.  Fair.  So then you don't know if they do that?

8         A.  I don't know.

9         Q.  Okay.  You just do not independently know,

10   correct?

11        A.  Yes, sir.

12        Q.  But no one has ever discussed that with you of

13   any of your three dogs, correct?

14        A.  No, sir.

15        Q.  You've never had a conversation where they're

16   saying like your stats are down or anything like that,

17   right?

18        A.  No, sir.

19        Q.  Or like there's too many false negatives,

20   correct?

21        A.  Correct.

22        Q.  How many cars, like narcotics sniffs, not

23   training ones, live, real ones, do you think you would

24   do on any given year when you were in the K-9 unit?

25        A.  I couldn't really put a number to it.  It could

Officer George Herrara                                        April 17, 2024

Page 142

1    be one in one week.  It could be five in one week.

2         Q.  Okay.

3         A.  Again, it could be none.  I mean, it just

4    depends on what it is that was going on that week

5    100 percent whether the dog is going to be deployed.

6    The dog doesn't get deployed as often as I think you

7    think he does, so to speak, for narcotic searches.  In

8    other words, I might make 20 stops in one day and the

9    dog may never leave the car.

10        Q.  Uh-huh.  Okay.  But there could be days --

11   weeks where the dog has left the car five times for

12   narcotics?

13        A.  And it could have been one time.

14        Q.  Okay.  Let me go to the general internal

15   trainings, fair?

16        A.  Okay.

17        Q.  So walk me through how the internal trainings

18   work in general.

19        A.  What are we referring to?  What aspect of the

20   training?

21        Q.  Help me understand what -- what am I missing?

22   What do you mean what aspect of the training?  What

23   aspects are there?

24        A.  Because the training would be dependent upon

25   what it is the objective was for that day.  Are we doing

Officer George Herrara                                        April 17, 2024

Page 143

```
 1    detection training, are we doing tracking training, are

 2    we doing bite work, are we doing obedience, are we doing

 3    gunfire.  It depends on the discipline that we are

 4    training for that day or in the evolution, I should say.

 5         Q.  Fair enough.  I asked very imprecise questions

 6    recently.  My understanding is that dogs have to do

 7    16 hours a month of training from the Bexar County

 8    Sheriff's Office.  Is that your understanding as well?

 9         A.  Yes, sir.

10         Q.  Has that typically been the policy going back

11    as far as you were?

12         A.  That I can recall, for the most part, yes, sir.

13         Q.  Fair enough.  Have you ever seen a K-9 policy

14    manual or a chapter within the sheriff's department

15    manual?

16         A.  No.

17         Q.  Okay.  I'm going to show it to you now.

18         A.  Okay.

19              (Exhibit 19 marked.)

20         Q.  (BY MR. ARONIN)  Take your time.  Tell me when

21    you're ready.

22         A.  I can tell you that policy came out after my

23    time in the unit, so how can I help you with it, though?

24         Q.  I agree that it came out outside of your time.

25    Was there a policy manual while you were with the unit?
```

Officer George Herrara                                        April 17, 2024

Page 144

```
 1        A.  I believe so, but I believe it was directive.
 2   I don't ever believe it was, per se, a policy, but,
 3   again, I don't recall exactly.
 4        Q.  Okay.  What's a directive?  I'm sorry.
 5        A.  Directive would be something that comes out
 6   from a chief saying you will -- for example, a directive
 7   came out stating that handlers would not be the primary
 8   on a vehicle pursuit.  So that was a directive, which is
 9   basically like a policy at the same time.
10        Q.  Is it a document or just like a --
11        A.  It's a document that comes out.  Yes, sir.
12        Q.  And you have seen documents about -- you have
13   seen directives for the K-9 units specifically?
14        A.  I have seen that, yes, sir.
15        Q.  Okay.  But not this policy itself?
16        A.  No.  Again, this came out after my time in the
17   unit.
18        Q.  It did.  I just didn't know that until
19   relatively recently.  I did that before you told me.
20   Let's go to Page 9.
21        A.  Okay.
22        Q.  And just the very top, it's -- it just says,
23   each team will perform a minimum of 16 hours of
24   documented proficiency training monthly.  Okay?
25        A.  Okay.
```

Officer George Herrara                                    April 17, 2024

1      Q.   You see where that is the policy now, correct?

2      A.   Yes, sir.

3      Q.   Fair enough.  Regardless of the document, was

4   that generally the policy during your time as well?

5      A.   We had -- yes.  It was generally approximately

6   16 hours.  I don't remember exactly the exact number,

7   but I want to say that was a fair number.  If I remember

8   correctly, it was 16 hours.

9      Q.   Totally fair.  Not trying to trap you on like

10   turns out it was actually 17.  No, it's not important.

11      A.   Yeah.

12      Q.   Okay.  How did -- how did you know that?  Was

13   there a directive about that?

14      A.   We would train -- because we would also train

15   weekly as an agency or a group, right?

16      Q.   Okay.

17      A.   And that was in the event that we would train

18   four times a week, if you think about it -- or four

19   times a month, pardon me, once a week.  But there were

20   times where the handler would get special tasks, special

21   assignments.  So even if you missed one, you would still

22   be in compliance.  If you miss two, now you knew you may

23   have to do the unit training or even do

24   individually-based training.  Even though we trained as

25   a unit, you as a handler, you may not document it every

Officer George Herrara                                    April 17, 2024

Page 146

1    day, your deploying when you leave the house is a

2    training evolution.  You can stop at a park, do

3    obedience.  You can set out an aid and find your own aid

4    or what have you, or you could have somebody come over

5    and take the aid and hide it for you so it's an unknown

6    aid.  There's training that happens individually on a

7    daily basis, and then there's group that happens once a

8    week.

9         Q.  Would the individual trainings count towards

10   the 16 hours?

11        A.  Yes.

12        Q.  Okay.

13        A.  100 percent.

14        Q.  How would you document that?

15        A.  On a report system.  The same system that we

16   would enter like a deployment sheet.

17        Q.  Okay.  How do you count the hours towards 16?

18        A.  It would just be 16 hours.  If you're training

19   for an hour, that's an hour.  If you set out an aid that

20   sits there for 10 minutes and it takes you another

21   20 minutes to find it, then that's 30 minutes right

22   there to do just one aid.  If you let the aid sit there

23   for an hour, whatever, that's an hour of training, even

24   though it was just one little deployment.

25        Q.  Okay.

Officer George Herrara                                    April 17, 2024

                                                        Page 147

 1          A.  It just depends on -- the quantification is

 2     the -- up to the supervisor to say if that hour in time

 3     frame is good or not, so to speak, because the

 4     supervisor is the one that signs off on each report.

 5          Q.  Oh, yes.  What is an aid?

 6          A.  An aid is a narcotic aid, whatever it is that

 7     you're doing.  Could be heroin, methamphetamine,

 8     cocaine -- or methamphetamine.

 9          Q.  Are there aids that are like dummy aids that do

10     not have any drugs in them?

11          A.  Absolutely.  That's what's referred to as a

12     dissociative odor.

13          Q.  Okay.

14          A.  And that just depends on whatever that handler

15     wants to do based on knowledge, training, and

16     experience.

17          Q.  So when you -- are you able to do trainings

18     with aids just in the field on your own time?

19          A.  Yes, sir.

20          Q.  So you're able to just drive around with drugs

21     on you?

22          A.  Yes, sir.

23          Q.  Fair enough.  I'm not.

24          A.  I would hope not.

25          Q.  I don't.  Okay.  And nor was I judging and

Page 148

1    implying that was improper in any way.  So I am just

2    kind of curious.  How much drugs would you drive around

3    with you?

4         A.  No more than 28 ounces.

5         Q.  Okay.

6         A.  28 grams, pardon me, not ounces.  28 grams.

7         Q.  So basically one ounce?

8         A.  One ounce.

9         Q.  Okay.  Perfect.  How did you document like how

10   the dog does on any given training?

11        A.  You would document whether the source aid was

12   located, where it was hid at, for example.  If the dog

13   gave you a final response, if it didn't.  If the dog

14   alerted in a location that it wasn't -- there was no aid

15   that you put out whatsoever, that happens.

16        Q.  Okay.

17        A.  Things like that.

18        Q.  Do you train -- or do you document like how

19   many times or tries it took the dog to find the aid?

20        A.  Well, each -- each time that dog goes out to

21   find that aid is a try.

22        Q.  Okay.

23        A.  So if it takes -- if he goes out and doesn't

24   find it on the first pass and you put it away, he's not

25   right or wrong.  Maybe the aid didn't sit long enough

Page 149

1    because you were using one gram and you gave it a

2    two-minute sit time.  But you waited five minutes and

3    now you took the dog out and you deployed the second

4    time and now the dog found it because the source had

5    more time to permeate, right.  That's a possibility.

6    The dog wasn't necessarily wrong.  It could -- he was

7    wrong because he didn't find it the first time, but you

8    also could be wrong for deploying him that quick, if

9    that also makes sense.

10             So it is a hit necessarily or it should go

11   down, in my opinion, as a miss on the first attempt.

12   You waited five minutes and you deployed the same aid,

13   didn't move, didn't touch it, and you did it five

14   minutes later, and now the dog alerted.  So now you have

15   a positive alert.

16       Q.  Okay.  That actually makes sense.  Now, so

17   you -- when you were driving -- explain to me like how

18   you've kept the aids with you to be able to do it like

19   in the field by yourself.

20       A.  All the aids were kept in a cloth bag inside of

21   another bag.

22       Q.  Okay.

23       A.  So they were in a Ziploc bag, or in some cases,

24   we would actually use -- what do you call it -- airtight

25   sealed bags, so to speak.

Page 150

1       Q.  Okay.

2       A.  Because at the same time you wanted this

3    plastic, whether it was a plastic dog, plastic whatever,

4    you would put that inside of a cloth bag, and then that

5    would be hidden inside -- or it would be inside -- at

6    the same time, it would be another jar of some sort

7    staying contained and then in a lockbox of some sort and

8    be taken out and put into the field, right.

9            You would take special considerations when

10   we would deal with the aids as to not put human odor on

11   the aids.  We wouldn't touch them physically.  We would

12   use some type of a device to move the aid from the

13   storage container to the training area and put it in

14   there, eliminating the possibility of human odor and

15   human source.

16       Q.  So, again, this is just -- I'm visually having

17   a little bit of trouble understanding how it works.  So

18   if you were -- you are encouraged, in fact, to do --

19   like if you have some dead time, you should maybe take

20   an hour into a training, that's partly how that works?

21       A.  Uh-huh.  Uh-huh.

22       Q.  Yes?

23       A.  Yes, sir.

24       Q.  Okay.  And that -- does that -- that means you

25   have the aids with you in the truck, correct?

Officer George Herrara                                    April 17, 2024

Page 151

1           A.  Yes, sir.

2           Q.  Why isn't the dog freaking out or changing its

3      behavior or alerting to the fact that it's like next to

4      drugs all the time?

5           A.  It's very possible.  But the dogs knows it is

6      there, but it's not given.  It's no different than if I

7      arrest somebody and I put the marijuana inside the

8      vehicle with me.  The dog is going to smell the narcotic

9      odor as I'm on the way downtown with the bad guy because

10     we would transport our prisoners in the same vehicle as

11     we would with our dog.  And we would put the recovered

12     narcotics in the vehicle with the dog.  The dogs can be

13     around odor.  It is what it is.  The dog is not going to

14     alert to my vehicle.  Can a dog alert to a K-9 vehicle?

15     Absolutely.  But we are not searching the K-9 vehicle.

16     We are searching out of the vehicle.  So the dog,

17     believe it or not, understands the principles of, this

18     is dope around me and now I'm going to find the dope

19     that I need to find at the same time.

20          Q.  Okay.  So it is more the change of

21     circumstances.  Like that is its natural environment.

22     It is just like, this is the smell of my car basically,

23     right?

24          A.  Uh-huh.  Yes, sir.

25          Q.  All right.  Cool.  Now, quantity.  If you're --

Officer George Herrara                                    April 17, 2024

                                                        Page 152

1    if you have essentially 28 grams or an ounce of either

2    marijuana or cocaine, and -- do you just train with that

3    bag of 28 ounces or do you break it down or how would

4    you do it?

5         A.  No.  We would have increments broken down as

6    little as 1 gram to as much as 28 grams.

7         Q.  Okay.  So you would have different quantities?

8         A.  Different quantities.  Yes.

9         Q.  Forgive me.  But you might put an eighth down

10   one day and then an ounce another day and a gram another

11   day, right?

12        A.  Yes, sir.

13        Q.  Okay.  Now, I understand.  You would use

14   different drugs at different timings, correct?

15        A.  Yes, sir.

16        Q.  Okay.  And then you would document how well the

17   dog does itself, correct?

18        A.  Yes, sir.

19        Q.  Okay.  I'm going to show you a document that is

20   going to look more scary than it really is.  I'm

21   not about to ask you about all these pages.  This is

22   because lawyers hate trees.  Let's go through every

23   single page, and I'm going to ask you every single

24   question.  All right.  Take your time.  You tell me when

25   you're ready.  I promise I'm not about to ask you --

Officer George Herrara                                       April 17, 2024

Page 153

1                    (Exhibit 20 marked.)

2         A.   It's okay.  Go ahead.

3         Q.   (BY MR. ARONIN)  Okay.  Do me a favor, though.

4    Flip through and make sure I'm right about what this is.

5    Printing errors happen.  These appear to be your

6    training detail reports that I have.  Does that

7    generally seem fair?

8         A.   I can see my name over and over, so I'm

9    assuming so.  Yes, sir.  Pretty much.

10        Q.   This is what they look like?

11        A.   Again, I haven't seen them printed in this

12   manner.  But, yeah, they are here.

13        Q.   Have you ever seen it printed in this manner?

14        A.   No.  That's what I'm saying.  I apologize, but

15   I haven't seen them officially printed.  I just know

16   from when I enter them into the system.

17        Q.   Okay.  Fair.  And I will represent to you that

18   the reason I have them all is they were turned over in

19   discovery, and I take their word this is all of them.

20   Does this generally seem like the right ones?

21        A.   Yes.  I mean, I will assume.  I don't know.

22   Yes, sir.

23        Q.   It is also double-sided.  So like you have done

24   a lot of training?

25        A.   Again, I had Maximus for a short period of

Officer George Herrara                                    April 17, 2024

Page 154

1    time, so yes.

2         Q.  Okay.  Fair enough.  I was asked to do that, so

3    now I have done that.  You can put this monstrosity of a

4    document aside.

5         A.  Okay.

6         Q.  Thank you.  I do want to ask you about some

7    specific -- actually, going back to that monstrosity of

8    a document, to Exhibit 20.  Is there any other version

9    of it that you have seen printed out?

10        A.  Not that I recall.  No, sir.

11        Q.  Okay.  So this is -- you don't know what the

12   document looks like, but you have not seen this training

13   report in other form than this one, correct?

14        A.  Right.  Not that I recall.

15        Q.  No like hard signed or hard -- with like

16   individual signatures, correct?

17        A.  We had -- the system we used before was a

18   handwritten --

19        Q.  Okay.

20        A.  -- document of training that we would fill out.

21   I don't recall if I had those or that system available

22   at the time with Maximus or if it was just with Bosco or

23   what have you, to be honest with you.

24        Q.  Okay.  Excellent.  Thank you very much.  The --

25   I want to ask just -- I was going through some of them,

Officer George Herrara                                        April 17, 2024

Page 155

1    and there's some phrases I don't understand.  What does

2    track training mean?

3         A.   Tracking is the ability to find man.

4         Q.   Okay.

5         A.   Somebody runs off into the brush and you have

6    been tasked to now try to find where they went and how

7    they went to go find them -- or where they went.

8         Q.   I'm going to show you an actual printout of one

9    document that I would like to ask you a question on,

10   which is how I typically do it.

11              (Exhibit 21 marked.)

12        A.   Okay.

13        Q.   (BY MR. ARONIN)  Now, for the record, this is

14   not one of yours.  This is about Deputy Molina.  I'm

15   just asking you about phrases.  I'm not asking you to

16   tell me what he did or how he did or anything like that.

17   Fair?

18        A.   Okay.

19        Q.   So, again, just give me a sense of what you

20   mean by track training, et cetera.

21        A.   So what this is -- again, tracking is, again,

22   the ability to find man.

23        Q.   Okay.

24        A.   It has nothing to do with narcotic or explosive

25   detection work.  It's the patrol aspect of that

Officer George Herrara                                    April 17, 2024

Page 156

1    dual-purpose K-9 function.  And what you're looking for

2    is for the dog to be able to use the scent that was left

3    behind, whether it be the disturbed earth, the

4    vegetation breakdown, the skin cells that you're

5    currently dropping onto the ground right now just from

6    you shaking your head up and down, and the hormones and

7    pheromones that you're leaving behind on the ground that

8    you step on and that you leave on the odor behind you.

9    That dog uses those, any facets of that availability, to

10   find and get as close to that source of that person as

11   possible.

12              What this is referring to, it looks like

13   Max was deployed for some type of search of a decoy, is

14   what it's referred to in training, as the person that is

15   the person you're trying to find is known as a decoy.

16   And it appears the decoy was hiding in a tree, and that

17   Max lost the scent and had to get back on the track of

18   the scent but then located the decoy in the tree.

19              So apparently, I guess, the decoy

20   absconded, per se, in the training evolution into the

21   brush and up into a tree, in which the handler had no

22   known direction other than the vehicle and a direction

23   of flight as possible.  No different than a patrolman

24   telling you, hey, the guy fled out of the driver seat

25   and ran that way.  And you then take your dog and try to

1    locate the decoy or locate the individual in question,

2    so to speak.

3         Q.  Thank you, by the way.  Do you see the middle

4    where it talks about tracking?  May I point?  Do you

5    mind?

6         A.  Uh-huh.

7         Q.  These notes over here is what I'm going to ask

8    you about.

9         A.  Okay.

10        Q.  Do you want me to show you what I'm referring

11   to as well?

12               MR. ARONIN:  Perfect.  I'm just pointing to

13   this box over here.

14               MR. FRIGERIO:  Okay.

15        Q.  (BY MR. ARONIN)  It looks like the distance --

16   and please correct me if I am misreading this.  The

17   distance would be 230 meters, correct?

18        A.  That's what it appears to me, yes, sir.

19        Q.  And in your experience, is that generally -- is

20   that like what a track training might reasonably look

21   like?

22        A.  It would be over a distance, correct.  Yes,

23   sir.

24        Q.  But we're not talking like -- it is possible --

25   it is reasonable to understand this to mean this

Officer George Herrara                                    April 17, 2024

Page 158

```
 1    training took place over 230 meters, right?  That's like

 2    un --

 3         A.  The deployment?

 4         Q.  Yeah.

 5         A.  Yes, sir.

 6         Q.  Okay.  How long does all this take?

 7         A.  It just depends on the handler, the team, the

 8    setup, how long they gave it.  There's all types of

 9    variables there.  I don't know.  I wasn't part of that

10    training, sir.

11         Q.  Understood.  But you have done similar

12    trainings, correct?

13         A.  Yes, sir.

14         Q.  How long would it take you to do that training

15    with one of your dogs?

16         A.  It just depends.  If this was an evolution that

17    we wanted it to be a sit time that was a longer sit

18    time, a shorter sit time -- sit time, meaning how long

19    we gave that deployment from when the decoy left on

20    foot, how long of the track it was, how hot of the day

21    it was, the other task that the dog was being tasked

22    with.  I mean, there's all types of variables.  I

23    couldn't give you an exact quantification of a time

24    frame.  It can be as little as an hour.  It could as

25    more as five hours.  It just depends on what the
```

Officer George Herrara                                    April 17, 2024

Page 159

1    objections were for that training evolution.

2         Q.   Okay.  And why -- so for something as short as

3    either 2 or 300 meters, why would it take five hours?

4    Is it primarily the sit time?

5         A.   The sit time is a lot of it, yes, sir.

6         Q.   Okay.

7         A.   It is not uncommon for deployments of

8    individuals, for them to get a head start on us, and

9    then we want that to dog be working a whole lot rather

10   than being necessarily taken out and put right on it.

11   We want the dog, like anything else, search and work and

12   do all other stuff up into that.  Not just go out there

13   and find them, do all the other precursors before it,

14   just like you would in the field.  This is a known

15   deployment, per se, probably, and you want to make it as

16   real world to a real-world deployment as possible.  You

17   want your training to mimic real world as much as

18   possible.

19        Q.   That makes a ton of sense.  So please

20   correct -- confirm I'm understanding correctly.

21   Basically, like if you're looking for either a suspect

22   or maybe potentially a kid, someone who has run away,

23   like they are going to have a couple of hours ahead of

24   you and you want to sit the dog so that if -- they also

25   are looking after an older scent?

 1          A.   That's very possible, yes, sir.

 2          Q.   Okay.  And all of that time, including the sit

 3     down, counts toward the 16 hours, correct?

 4          A.   Yes, sir.

 5          Q.   Okay.  Thank you very much.  Perfect.  That's

 6     exactly what I wanted to understand.  You can put that

 7     on the side.  I want to ask you -- I think these are, in

 8     fact, about your training records.  And just so I

 9     understand.

10          A.   Okay.

11          Q.   I'm going to give you -- I'm going to give you

12     three separate documents.

13          A.   All right.

14          Q.   I'm terrible at this, so I'm going to try to be

15     careful.

16               (Exhibits 22, 23, and 24 marked.)

17          Q.   (BY MR. ARONIN)  And typically this should just

18     be in chronological order.  It should go from 8/13,

19     8/20, and 9/3.

20               MR. ARONIN:  Is that how everyone has it?

21          A.   8/13, 8/20, and 9/3.  Okay.

22          Q.   (BY MR. ARONIN)  Okay.  Great.  Thank you very

23     much.  Cool.  Please just confirm one very basic fact of

24     this so I know what I'm doing.  These are records that

25     were when you were training with Maximus, correct?

Page 161

1          A.  Yes, sir.  It appears so.

2          Q.  Okay.  Check for all three, please.  I believe

3     it, but I don't want to make a mistake.

4          A.  Yes, sir.  It appears so.

5          Q.  Thank you.  So the reason I pulled all three of

6     them out, and we can talk about them, is the -- what --

7     the substances I see, or at least some of the substances

8     I see, are pseudo drugs.

9          A.  Uh-huh.

10         Q.  Right?

11         A.  Uh-huh.

12         Q.  I see pseudo heroin.  I see pseudo cocaine.  I

13    think that's all pseudo.  Yeah, so are those two.  Tell

14    me, what is pseudo heroin and what is pseudo cocaine?

15         A.  It is a terminology that the software system

16    uses, is what I'm assuming, because we would not

17    specifically put in the word "pseudo".  All of our

18    training aids that we had used that I started the agency

19    getting was we initially were using adjudicated

20    narcotics, initially when I very first started with the

21    agency, training unit, and then I started the program of

22    using the DEA grade suitable narcotics.  So we usually

23    get DEA-grade narcotics that are top shelf, for lack of

24    a better word, to use for training purposes.

25         Q.  Top shelf in the -- top shelf in the sense that

Officer George Herrara                                    April 17, 2024

Page 162

```
1    it's a high -- it is highly -- it is uncut cocaine or

2    top shelf in the sense it is very well manufactured, not

3    real cocaine?

4         A.  It is top shelf, meaning it is real, tests

5    positive, gets you high, cocaine, methamphetamine, and

6    heroin, and marijuana.

7         Q.  Okay.  That's what I -- the vast majority of

8    your training, this huge monstrosity of a document, it

9    says cocaine, heroin, methamphetamine, marijuana.  It is

10   just drugs.  These, and I think a few others I saw,

11   these are pseudo ones.  Would you have trained with fake

12   drugs?

13        A.  Yes, we have.

14        Q.  Okay.  That's what I want to know.  I don't

15   know the fake drugs.

16        A.  The fake drugs would be -- let me correct

17   myself.  Fake drugs, meaning, to me, the DEA, even

18   though it is top shelf, pharmaceutical, and everything

19   else, right, a pseudo is one that you can buy from Ray

20   Allen or a K9 --

21        Q.  The basketball player?

22        A.  No.  Ray Allen K-9 training program --

23        Q.  Okay.

24        A.  -- or -- what's the other one?  There's

25   another training.  They are synthetic-based properties
```

Officer George Herrara                                              April 17, 2024

Page 163

1    of those derivatives.  So in other words, those are aids

2    that we would purchase and the agency purchased for us

3    to use as training aids.  They test positive in the

4    properties, if they are scientifically broken down, for

5    real stuff.  But they are inert in the context that they

6    don't get you high, if that makes sense.

7         Q.  So it is -- a company has created a chemical

8    that like mimics the molecular breakdown of cocaine or

9    heroin?

10        A.  Yes.

11        Q.  But it is not real cocaine or heroin?

12        A.  Correct.

13        Q.  What -- what is your understanding as to why

14   that was included in the training?  Because it's

15   not like you do that every the time, right?

16        A.  No.  It's not all the time.  It's just another

17   form of training to put the dog on different types of

18   properties, i.e., a synthetic pseudo will have a

19   different odor than a clinically DEA grade ceutical.

20   Does that make sense?

21        Q.  Yeah.

22        A.  But yet, it still has same properties.  Both

23   are pepperoni pizzas, like I used that pepperoni pizza

24   analogy earlier.  It is just one is made from a store

25   and the other one is out of a box, if that makes sense.

Officer George Herrara                              April 17, 2024

1        Q.  Yeah.

2        A.  So with that, it is still the same odor, it

3    still has that property of the odor that the dog is

4    alerting to.

5        Q.  But -- so -- but it will not get you -- and I

6    don't want to say you and I certainly don't want to say

7    me.  It won't get a user high, correct?

8        A.  Correct.

9        Q.  Okay.  Do you know if it is illegal to possess?

10       A.  That, I don't know.  And I don't believe so.

11       Q.  Yeah.  Because it is not drugs?

12       A.  Correct.

13       Q.  It won't come back from -- like if someone was

14   arrested with it and it goes to the narcotic lab, it

15   wouldn't come back as the illegal substance, right?

16       A.  It would come back as a pseudo property of it.

17       Q.  Yeah.

18       A.  It's no different than if I arrest you right

19   now and you got a bag of baking soda and it tests

20   positive for whatever reason, once it gets to the lab

21   they're going to say, no, wait, this isn't the right

22   stuff, so to speak.

23       Q.  So it will come back --

24       A.  It will come back with properties.  Yes.  It

25   has been scientifically proven that pseudo-grade

Officer George Herrara                                    April 17, 2024

                                                    Page 165

1    narcotics, which is what these are referring to,

2    pseudo-grade narcotics, have the properties and the

3    molecular bonds that are the same as an industrial or a

4    clinical-based property of that that will get you high

5         Q.  And we know that Max will alert to those

6    properties, correct?

7         A.  It was used for training, but they did not

8    have -- they did not train all the time.  Can he alert

9    to them?  Yes.  Can he alert to them now?  I couldn't

10   tell you that.

11        Q.  Fair enough.  At least when you were there, we

12   know that Max -- Maximus was trained on those pseudos,

13   correct?

14        A.  He was trained on narcotic odor, whether it was

15   pseudo or whether it was DEA grade, the molecular

16   properties and bonds are similar.

17        Q.  I totally accept that they are similar

18   substances, and I think you also accept that they will

19   not come back as illegal from a lab.  We both accept

20   that version, right?

21        A.  Yes, sir.

22        Q.  And honestly, if a criminal defense brings up

23   the lab report, that case is getting dismissed, right?

24   It's not illegal possession?

25                   MR. FRIGERIO:  Objection.  Form.

Officer George Herrara                              April 17, 2024

Page 166

1                    MR. ARONIN:  I accept that.  That was a

2       very fair objection.

3            Q.  (BY MR. ARONIN)  The -- just as like if you

4       arrest me for baking soda and it turns out that -- or

5       for cocaine and it turns out the substance I have is

6       baking soda, I have not, in fact, committed a crime,

7       correct?

8            A.  Correct.

9            Q.  Okay.  Okay.  I want to now ask about -- I

10      don't know how many people honestly have pseudo heroin

11      or why they would have it.  But I do know that people

12      have CBD.  So if you arrested me for basically having

13      like an ounce of flower on me and it turns out that it

14      is just CBD, it's not illegal in Texas, correct?

15           A.  That I'm aware of.

16           Q.  Just to clear up the record.  To the best of

17      your knowledge, in Texas, that's a legal substance,

18      correct?

19           A.  Correct.

20           Q.  Do you know how it smells to a dog?  Do you

21      know if a dog will alert to CBD?

22           A.  I don't know.

23           Q.  Okay.  Do you know whether or not the

24      marijuana -- so Maximus has trained on marijuana a lot,

25      right?

Officer George Herrara                                      April 17, 2024

1          A.  Yes, sir.

2          Q.  Okay.  He's certified on marijuana.  You do not

3     know if he will alert to CDB, correct?

4          A.  I have put out synthetic opioids before in my

5     training as a dissociative, which was Krush and K-2,

6     which are very similar to your delta-8 or CDB that you

7     referred to earlier in your questioning.  And I can tell

8     you that K-9 Max would walk those odors.

9          Q.  Well, I -- first, you said opioids.  I just

10    want to give you a chance to correct the record.  You

11    meant --

12         A.  Cannaboids.

13         Q.  Yeah.  Fair enough.  When you say, walk the

14    odor --

15         A.  He would not alert it.

16         Q.  Okay.  Fair enough.  How many times have you

17    done that?

18         A.  Several.  They would be included in my training

19    files as dissociative odor training.

20         Q.  Okay.  That's what -- so like when I look, for

21    example, on any of these narc pseudo heroin, it would

22    be -- what would it look like on this form?

23         A.  It would be dissociative odor, and it would be

24    anything from Krush, K-2.  I would put a dirty diaper.

25    I would put a canned food.  I would put a cigar.  I

Officer George Herrara                                    April 17, 2024

Page 168

1    would put a cigarello.  The same type of cigarello that

2    people would cut open and throw all the tobacco out to

3    fill up with marijuana, right.  I would put out the

4    plastic bags because I didn't want -- you know, somebody

5    maybe had 50 bags -- Ziploc bags, now, oh, your dog is

6    alerting to Ziploc bags because all the dope is found in

7    Ziploc bags.  That's what the next defense attorney is

8    going to ask me, so I would put that out.  I would put

9    car fresheners out.  All the different things that are

10   masking agents and things that people would use that I

11   had seen in the field to either be around the narcotics

12   and/or use to control the odor of their narcotics, I

13   would use as a dissociative odor.

14       Q.  Okay.  When I look at your reports now with

15   dissociative odor, do you list or in any way indicate

16   like, this dissociative odor is a Ziploc bag, this one

17   is a dirty diaper, this is one is what people make

18   blunts out of, and this one is pseudo marijuana, or is

19   it just going to say dissociative odor?

20       A.  I don't recall if I would list it out

21   specifically.  I would think I would have.

22       Q.  Okay.

23       A.  But I don't recall off the top of my head right

24   now.

25       Q.  Okay.  Fair enough.  I now -- I have been

Officer George Herrara                                          April 17, 2024

                                                              Page 169

1    specifically asked to ask this question.  What about

2    hemp?

3         A.  What about hemp?

4         Q.  Just, have you ever tested it with hemp?  Do

5    you recall?

6         A.  Not that I recall.  I can't recall if you did

7    or I didn't, you know what I'm saying.  It wouldn't be

8    uncommon for somebody to tell me, hey, you know, this is

9    the latest trend of whatever, and maybe I tried to come

10   across it on my own and buy it, if it is legal

11   obviously, and put it in my training file, so to speak.

12   But I don't recall specifically about doing hemp

13   necessarily.

14        Q.  Okay.  Fair enough.  And you don't know -- and

15   it's okay if you don't know.  You don't know if a dog

16   would alert to hemp, correct?

17        A.  Correct.

18        Q.  They may, they might not?

19        A.  They may or may not.

20        Q.  Perfect.

21             MR. FRIGERIO:  I have been specifically

22   asked to tell you that your lunch is here.

23             MR. ARONIN:  It's 12:30.  Let's take the

24   lunch break.

25             (Recess taken.)

Officer George Herrara                                    April 17, 2024

                                                    Page 170

1        Q.   (BY MR. ARONIN)  Question I always have to ask

2    after lunch.  Did you discuss the substance of your

3    testimony with anybody?

4        A.   No.

5        Q.   Okay.  I have a few like just literally

6    clean-up questions, just things I think I missed in my

7    notes.  One, just quickly, who is the current K-9

8    supervisor?

9        A.   To my knowledge, it is Sergeant Ben Olvera.

10       Q.   Olvera.  Do you happen to know when Cardenas

11   switched out?

12       A.   Deputy Floyd Cardenas passed away in the line

13   of duty, I believe, three years ago now.

14       Q.   I'm sorry to hear that.  I didn't know that.

15   And the current supervisor has been Ben since then?

16       A.   Well, he was just -- like me, he was a deputy,

17   he was a K-9 trainer.  The sergeant that we reported to

18   that had the agents -- or that had the unit prior to Ben

19   Olvera was Sergeant Renee Ochoa.

20       Q.   Thank you very much.  Another clean-up question

21   that I think my notes and my colleague's notes were

22   different on this answer.  So I just wasn't sure.  I

23   know you do training now.  I understood it to be

24   firearms, physical fitness, and interdiction.  Do you do

25   any K-9 training now?

Officer George Herrara                                          April 17, 2024

Page 171

```
 1        A.  No.

 2        Q.  Do you do any other training of any officers

 3   about the K-9 unit in any way?

 4        A.  No.

 5        Q.  Okay.  You have no involvement with the K-9

 6   unit and the training now?

 7        A.  No.

 8        Q.  Okay.  Cool.  I wasn't sure which one was

 9   correct.  Going back.  I wanted to ask you a little bit

10   about like forming the relationship with the dog.

11        A.  Okay.

12        Q.  One thing -- and the context I'm asking you

13   about is we are talking about the change in behavior,

14   how you really need some time with the dog in order to

15   understand what their standard behavior is and how it

16   changes.  Am I paraphrasing that reasonably?

17        A.  Yes, sir.

18        Q.  Okay.  Can you just tell me, how long does it

19   typically take to develop that relationship?

20        A.  I couldn't quantify that for you, sir.  I would

21   simply state it's -- the relationship, the bonds and the

22   things that the handler and the K-9 team get together,

23   you know, you just start reading the body language of

24   your dog, the way your dog sniffs, the way your dog

25   walks, you know when your dog is going to -- for a lack
```

Officer George Herrara                                    April 17, 2024

Page 172

1    of better words, about to use the restroom, you know

2    what I mean.  You just know that look they are getting,

3    the pace they are starting to walk, you know when they

4    are about to lift their leg when they shouldn't, so to

5    speak.  Things like that.  You start reading the body

6    language.  It is no different than, you know -- I don't

7    know a way to put it.  There's no quantification to it.

8    It can happen relatively quick.  It can take a while.  I

9    don't really have an answer for you or even a time

10   frame.

11        Q.  That's fair.  And it's obviously not going to

12   be like, okay, you now spent six months together, you

13   know each other perfectly.  That's not how it works?

14        A.  I would think by six months you would be able

15   to read some body indicating language.  All of it, I

16   couldn't tell you.

17        Q.  Okay.

18        A.  If you do detection every single day for those

19   six months and that's all you did every single day,

20   you're going to know the difference between an alert

21   right away and a change of behavior, depending on how

22   hard you make those aid finds, so to speak.

23        Q.  But you definitely don't know it in the first

24   day, right?

25        A.  Definitely not in the first day, I would not

Officer George Herrara                                    April 17, 2024

Page 173

1    say.

2         Q.  The life -- or the working years for a dog is

3    not even a decade.

4         A.  It fluctuates for every working dog, yes.  I've

5    seen dogs in the field for ten plus years that are dual

6    purpose, and I have seen dogs in the field for three

7    years that are dual purpose.  It is just -- the physical

8    toll on that dog depends on that dog.

9         Q.  Okay.  Thank you very much.  I want to ask you

10   about handover.

11        A.  Okay.

12        Q.  At some point you stopped working with Max and

13   Deputy Molina started working with Max, correct?

14        A.  Yes, sir.

15        Q.  Let's do it generally.  Can you just explain to

16   me how the handover process worked.

17        A.  For me, it worked where I was -- received

18   orders to be going to another section at the sheriff's

19   office.  I maintained Max at my residence like every

20   other handler does until Bucky was in the unit and -- so

21   I left -- Max was at my house probably for about --

22   maybe about a month after I was transferred out of the

23   unit where I still maintained custody and ownership, so

24   to speak, for a lack of better words, over Max.  The

25   training we did was just in the yard and things like

Officer George Herrara                                    April 17, 2024

Page 174

1    that, playing and doing things.  And then Bucky came

2    over and retrieved the last of the items that he needed

3    to get from my residence, such as the kennel and some

4    other objects, and then took Maximus over to his house

5    at that point.

6        Q.  The Bucky is --

7        A.  I'm sorry.  Deputy Molina.  I apologize.

8        Q.  No, no, I just want to clarify you.  I can

9    assure you tomorrow I will not be calling him Bucky.

10       A.  There you go.  Deputy Molina.  Sorry.

11       Q.  Okay.  I honestly didn't know.  I also didn't

12   ask.  Why did you leave the K-9 unit?

13       A.  I wanted to try something different and just

14   needed a change of venue.

15       Q.  And I'm sorry to even ask.  I just have to.

16   There were no disciplinary issues?

17       A.  No disciplinary issues.

18       Q.  No investigation that -- you were not asked to

19   leave?

20       A.  No, I was not asked to leave.

21       Q.  I did not assume so, I just unfortunately

22   needed to ask, so please forgive me.

23            Okay.  What happens when it's -- a new

24   deputy takes on a new dog?

25       A.  Well, traditionally what ends up happening is

Officer George Herrara                                        April 17, 2024

Page 175

1     that the -- I can't say transitionally.

2          Q.  Okay.

3          A.  What I can say is, what happened to me is what

4     I just stated.

5          Q.  Okay.

6          A.  The dog was taken, and the trainer was then

7     worked with the dog.  I have seen it with other agencies

8     where, perhaps, if the handler has left the unit or is

9     leaving the unit, whether it be good terms, bad terms,

10    whatever the case may be, the dog can sometimes be

11    kenneled back at a location.  I.e., in other words,

12    whether it is kenneled at the other handler's house in

13    the meantime, usually the trainer or somebody who

14    takes -- says, I will be responsible for not only my K-9

15    team but also this K-9 as well, until that handler comes

16    in; or maybe they can take the dog and board them some,

17    whether it is at vendor location or even just a

18    veterinarian clinic maybe that they use.

19               But traditionally, when there is a -- for

20    most agencies, and what I would call the industry

21    practice, is that when one handler comes in to take over

22    a handler's dog that is leaving, traditionally that dog

23    will either get trained by the unit trainer with the --

24    forming the new handler team or that dog will go back to

25    the vendor that it was possibly purchased initially from

Officer George Herrara                                    April 17, 2024

Page 176

1    so that way the vendor that they purchased a dog from

2    can then work independently with that dog/trainer team.

3    So those are basically the two ways that I have seen it

4    in the industry be taking place.

5         Q.  Okay.  Let me show you just for -- the only

6    reason I'm showing you these documents is for timing

7    purposes.

8              MR. LEAKE:  Thanks.

9              MR. ARONIN:  No problem, dude.

10             (Exhibit 25 marked.)

11        Q.  (BY MR. ARONIN) So I'm only doing it for

12   timingwise.  I have handed you two documents.  Having

13   reviewed the training records, my understanding -- and

14   I'm sure I have them all; I've been told I have them

15   all -- is this is your last training report and Deputy

16   Molina's first training report, at least according to

17   the ones I have.  Okay.  And if I look at it -- just for

18   the record, will you state the date for both of them.

19        A.  It appears mine shows 12/16/2020 and one for

20   Martin Molina on 1/12/2021.

21        Q.  Okay.  Yeah.  And it strikes me that is not a

22   lot of time for Deputy Molina to really get up to speed

23   as an -- assign and deployed, to use your words, dog

24   handler.

25        A.  This doesn't mean he's deployed.  This is a

Officer George Herrara                                    April 17, 2024

Page 177

1    training sheet.

2         Q.  Thank you.  Can you just -- so what is the

3    process by which he becomes authorized?

4         A.  Well, in -- again, I'm going to have to refer

5    that question to Sergeant Ochoa who would have to speak

6    about this training since I wasn't a part of it.

7         Q.  Okay.

8         A.  And Deputy Floyd Cardenas isn't here to justify

9    or to explain the training that he provided with Deputy

10   Molina.  But my understanding -- again, my understanding

11   of this situation was Deputy Molina was trained in a

12   basic handler's course certification by Deputy Floyd

13   Cardenas.  And with that, that was on-the-job and

14   in-house training certification meaning, that dog did

15   not get deployed in the field until a certain point of

16   time.  Was the dog going out to various sites across

17   Bexar County for training?  Yes.  Which is why they used

18   the WW White Road location for obviously some type of

19   narcotic training here.  This training, I guarantee you,

20   was strictly for a training purpose.  I seriously doubt

21   that there would be any K-9 deployments for field work

22   around this same time frame.

23        Q.  Okay.  Because one month after you had the dog,

24   that just would be too quick, correct?

25        A.  I would venture to say that this is probably

Officer George Herrara                                     April 17, 2024

Page 178

1    pretty close to when he finally started with Maximus.

2         Q.   Okay.

3         A.   I.e, the easiest way for him to start, like

4    anything else, is to rip the Band-aid off, in my

5    professional opinion.  He got a dog that was already

6    trained, for a lack of a better word, and had the

7    ability to not only learn from that dog, but to learn

8    from an experienced trainer as well.  It's different, in

9    my professional opinion, and easier for a new handler to

10   take an experienced dog than for a new handler to take a

11   dog that is also brand new to police work.

12              Case in point, like me and Bosco or myself

13   and Sammo.  We both were brand new to law enforcement,

14   K-9 aspects.  We were trained, yes.  We were trained by

15   a vender, but we never hit the floor, so to speak, or

16   the streets, in a deployment fashion till probably at

17   least about six weeks to maybe at least a month after

18   the first time we even met each other.  So we had a lot

19   of training that we did in that first month to six weeks

20   minimum before we ever even deployed out into the field.

21              I would venture to say, considering I know

22   Maximus wasn't picked up until January of that year, of

23   2021, that there should be numerous training deployment

24   sheets with absolutely no or very little deployment

25   sheets.  Could he have gone into a deployment for

Officer George Herrara                                    April 17, 2024

Page 179

1    real-world work and searched, say, a search warrant,

2    because at this point that would be no different whether

3    it is a cold stop or a hot stop, so to speak.

4            I would advocate for me, if I was training

5    Deputy Molina in this same circumstance, that I would

6    allow him to be deployed in the field, even in a

7    training aspect, using as close to real world as

8    possible for a search warrant.  But I would not take him

9    to do a traffic stop on the side of the road within that

10   period of time.

11       Q.  To clarify terms, you said cold stop versus hot

12   stop.  Just, what are those, please?

13       A.  Cold stop would be you making a traffic stop on

14   a violator vehicle that you have no knowledge or

15   anything about.  You just saw the vehicle driving and it

16   was simply stopped.

17       Q.  Okay.

18       A.  Now, a whisper stop would be, they are under

19   surveillance, they have agents that are working a case,

20   usually some type of a RICO or some type of an

21   investigation of some sort, whatever the case may be,

22   they are part of a bigger organizational case.  And they

23   have reason to believe, based on knowledge, based on

24   insight, based on knowledge about the driver, the

25   vehicle, the pattern, the whole works that that vehicle

Officer George Herrara                                    April 17, 2024

Page 180

1    may have narcotics in it.  Maybe they saw the vehicle

2    getting loaded with packages or bundles or whatever the

3    case may be.  You would still have to have your own

4    probable cause to make that stop, but already off the

5    bat you know that that stop going in there is a high

6    likelihood, based on all the other information you were

7    provided, there may be narcotics in that vehicle.

8         Q.  And you said that's a whisper stop.  Just

9    describe a hot stop.

10        A.  That's the same thing.

11        Q.  Okay.

12        A.  Hot stop, whisper stop, it's just terminology

13   that's used throughout the industry.

14        Q.  Okay.  I was wondering if the hot stop is even

15   a higher level of --

16        A.  No, a hot stop to some people would be like a

17   felony traffic stop, where now you have someone with

18   felony warrants or that's known to carry weapons.  It's

19   just different terminology.  I consider them all the

20   same to my opinion.

21        Q.  Okay.

22        A.  Because I'm going to be -- I'm going to act all

23   the same way, nonetheless.

24        Q.  Very good.  You would act the same for just a

25   cold stop that you would if you know that the person is

Officer George Herrara                                    April 17, 2024

Page 181

```
 1    a felon that is likely in possession?
 2         A.   No.  I'm saying between hot stop and a whisper
 3    stop, I'm still going to treat it the same.  I'm still
 4    going to develop my own probable cause.  I'm still going
 5    to be safe, because even though they may be the guys on
 6    the top ten most wanted list, he's just there for show.
 7    He's actually -- maybe just has no plans to fight.  And
 8    then you got the person that maybe you take -- it's the
 9    soccer mom and she's the one, as soon as you walk up,
10    unloads a magazine in your chest.  So to me, I'm going
11    to take all the precautions necessary on every single
12    stop and treat it the same.
13         Q.   And that's the policy at the Bexar County
14    Sheriff's?
15         A.   It should be.  Yes, it is.  It is to develop,
16    right.
17         Q.   Right.  And not just that, but you have to at
18    least be concerned that any given traffic stop can have
19    someone who is ready to unload a magazine into you,
20    correct?
21         A.   Yes, sir.
22         Q.   Because you don't know who the other person is,
23    correct?
24         A.   Correct.
25         Q.   Okay.  After someone is assigned to either a
```

Officer George Herrara                                    April 17, 2024

Page 182

1   new dog -- withdrawn.

2              Someone is just starting out to be an

3   assigned and deployed K-9 officer.  Would their first

4   few live deployments be with a supervisor, or at some

5   point or their first one is going to be by themselves?

6        A.   No, traditionally they are with -- depending on

7   the training and the certification that I would say that

8   they received.  On in-house, generally what that means

9   is that you and your trainer travel around and work

10  independently together.  Meaning the two teams, the

11  trainer team and the handler team, right, they go and

12  they go to the trainings.

13             The handler is the one that is sitting

14  there, so to speak, while the trainer sets up all of his

15  detection aids and what have you, right.  If they go out

16  into the field for deployment work, then it's the same

17  circumstance.  The trainer is going to go with them,

18  they are going to talk about it, they are going to make

19  sure that the handler knows, this is what we got to do,

20  just as if he was the one doing it, but yet it's like

21  on-the-job training.  It's no different than like

22  FTOing.  You take a cadet with you out, you're a

23  seasoned patrolman, you are going to that call together.

24  Even though you might let that rookie, so to speak, or

25  that cadet, you know, the boot we called them earlier,

Officer George Herrara                                    April 17, 2024

1    handle that call as primary, you're there still as

2    overwatch, you're still there still making sure that

3    everything is falling in line, all the boxes are being

4    checked, everything is happening the way it needs to

5    happen.  It is the same situation on on-the-job training

6    when you do a handler team, it's the same concept.

7        Q.   Perfect.  Thank you very much.  That was

8    exactly what I was wondering.  Okay.  We were coming

9    towards the very -- like I only have a couple more

10   topics to ask about.  So I have alluded to it a few

11   times, and we talked about it but not in the detail that

12   I would like to.  Which is, there are times when a dog

13   alerts and no drugs are found, correct?

14       A.   Yes, sir.

15       Q.   And there are two ways to interpret -- there

16   are at least two ways that I can think of to interpret

17   that, either that there are in fact drugs there and the

18   officers weren't able to find them, or it was a false

19   positive.  Are those two reasonable?

20       A.   They are reasonable, yes, sir.

21       Q.   Are they -- are there other interpretations of

22   that?

23       A.   No.  I would pretty much venture to say that's

24   about the two ways that you can articulate it.

25       Q.   Okay.  So at least sometimes we know that the

Page 184

1    dog is just wrong, correct?

2         A.   Every once in a while, the dog can be, yes,

3    sir.

4         Q.   It seems that -- I don't want you -- I am not

5    trying to ask you to put a percentage on it, because I

6    don't think you can.  I don't think you're supposed to

7    be really just guessing.  But I am trying to get a sense

8    of how often that does happen.

9         A.   What I would refer to is NCATS reporting system

10   does keep statical track records.

11        Q.   Okay.

12        A.   I don't have those reports available to you,

13   right.  I can't tell you what they would be on the year

14   2019 compared to what they would be in the year 2024,

15   does that make sense --

16        Q.   Yes.

17        A.   -- if that same dog was in service.

18        Q.   Yes.

19        A.   What I can tell you is that the NCATS software

20   system gives you a reliability or a, therefore,

21   percentage that you're referring to for not only your

22   training records that you have entered, but also your

23   patrol records that you have entered.

24        Q.   What do you mean the patrol records that you

25   have entered?  That, I actually didn't understand.

Officer George Herrara                                    April 17, 2024

1        A.  Just like on the records you showed me, you're

2   putting down whether there was source located or source

3   not located.  Does that make sense?

4        Q.  Okay.  Yes.

5        A.  So what you are doing is if your dog alerts in

6   a training record, hopefully you have the aid there,

7   because you either know where it is at or you have

8   somebody there that clearly knows where it is at because

9   they put it in there.

10       Q.  Yeah?

11       A.  On a vehicle or deployment in patrol record,

12   you don't know what the dog is alerting to other than

13   you deployed the K-9 and it alerted.  Now, you don't

14   know if, like we said, he's alerting and there is

15   nothing there or he's alerting and you just can't find

16   it.  So with those, when you enter those records and you

17   enter those and check those boxes, however this NCATS

18   system takes those boxes that you check, it gives you a

19   percentage.

20       Q.  Okay.  I want to make sure I'm completely

21   certain about something.  Please do me a favor, it's our

22   deployment report, Mr. Schott's.  It's probably

23   Exhibit 18 or 19.  It should be on the bottom.

24       A.  (Complying.)

25       Q.  Just out of curiosity, just tell me what the

Officer George Herrara                                          April 17, 2024

                                                          Page 186

1    number is.  You have the official.  It's on the bottom?

2         A.  It is No. 18.

3         Q.  Oh, cool.  I guessed right.  This is the NCATS

4    system?

5         A.  Yes.

6         Q.  Okay.  So the NCATS system, is what you are

7    entering those checkboxes into and generates this

8    report, correct?

9         A.  Yes.

10        Q.  All right.  So there is not some other system

11   that I'm not aware of, correct?

12        A.  Correct.

13        Q.  Okay.

14        A.  And with that system, there's a percentage tied

15   into the entries for deployment as well as for training.

16        Q.  Okay.  Oh, which is why these -- this report

17   looks at least like in form reasonably similar to the

18   training report, correct?

19        A.  Correct.

20        Q.  Okay.  So it is one system that you do for both

21   of those things, right?

22        A.  Yes.  And depending on which type of deployment

23   you took that dog out for.  If I took that dog out for

24   training, then it's a training form.  If I took the dog

25   out for a deployment of any kind, whether it be

Page 187

1    detection or patrol work, then that's a deployment form.

2         Q.  Okay.  And this is the place that has the

3    statistics, correct?

4         A.  Yes.  NCATS.

5         Q.  Excellent.  Now, I want to ask about other kind

6    of like noted positives.  So first of all, have you

7    heard the phrase "residual odor"?

8         A.  Yes.

9         Q.  What does that mean?

10        A.  It would be as if right now -- how can I put

11   this?  I had Chick-fil-A right now.  Okay.  If I had

12   brought my bag over here with my lunch and I ate all my

13   food, what have I left behind in that Chick-fil-A bag?

14   Well, I have my bag.  I have my fry container that my

15   fries came in, and then I have my little tray that they

16   put your little sandwich in in that little box.  You

17   know what I'm referring to, right?

18        Q.  Yeah, absolutely.

19        A.  If I took those items, ate all the stuff,

20   right, but I still have my box, I still have my fry

21   container, and I have my bag.  And I go put that in this

22   office and we close the door, and we come back in here

23   five minutes from now, it is going to smell like

24   Chick-fil-A in here.  Does that make sense to you?

25        Q.  Yes.

Officer George Herrara                                    April 17, 2024

Page 188

1          A.   That's residual odor.

2          Q.   And for a dog, that residual odor lasts a lot

3    longer than for a human.

4          A.   It can, absolutely.

5          Q.   And although we talked about Chick-fil-A, that

6    is true about drugs, correct?

7          A.   It can be because drugs leave narcotic odor.

8    That's why we don't ever state that the dog is alerting

9    to narcotics.  The dog is alerting to narcotic odor.

10         Q.   I think that's an important distinction.  But

11   just to clarify.  For example, if I were playing with a

12   large quantity of marijuana, is there a chance that I

13   would have residual marijuana odor on my hands or

14   clothes?

15         A.   Very possible.

16         Q.   And that is something that the dog might alert

17   to, correct?

18         A.   Absolutely.

19         Q.   How would that be coded in the NCATS system if

20   no drugs were found?

21         A.   It could be something that I could honestly

22   attest to that I knew for a fact there was residual.  So

23   if I'm doing training, right, where I'm using residual

24   training odor aids, meaning, like we talked about

25   earlier, right, if I have pseudo or whether I have

Page 189

1    pharmaceutical-grade DEA cut narcotics.  What we used to

2    do and what I used to do -- I won't say we.  What I used

3    to do, I had all those aids inside of a -- so when you

4    asked that question, how does a dog know, whatever.

5    Well, generally that odor isn't like illuminating a

6    whole lot in those vehicles because they are also kept

7    in either mason jars and/or airtight glass containers,

8    right.  So we do that so that way our cars don't reek of

9    those particular aids at the same time.

10                 With that being said, we also talked about

11   not wanting to put our own human odor on there, so we

12   would wear latex gloves, things along those lines,

13   right.  We would use some tongs to pick out the odor,

14   the bags that is, or what have you.  In the same case, I

15   would take residual odor.  I would take Q-tips or cotton

16   balls, and I would put those inside of that glass

17   container.  I would close it up, and I would leave those

18   in there for a week, two weeks.  I put as many as I

19   could.  Then I take those out and take those with me to

20   training.  I put them in an airtight little bag.  So now

21   I am walking with a Q-tip that smells like cocaine,

22   smells like heroin, smells like meth, or smells like

23   marijuana.  And I would take those residual odor Q-tips

24   or cotton balls and use those for training because, now,

25   that signifies a very, very, small minor amount of odor

Officer George Herrara                                        April 17, 2024

                                                        Page 190

1     compared to now I just busted out a 28 gram on him at

2     the same time.  Does that make sense?

3          Q.  100 percent.

4          A.  So residual odor training is also part of

5     dissociative training odor because you want to do not

6     only a small amount of odor or what we would refer to as

7     trace and/or residual, those are all the same

8     terminologies, in my opinion.  Okay?  Residual being

9     stuff that, yes, you can see, but it is stuff that you

10    can actually see.  Can I see right now that there's odor

11    on that Q-Tip after I've left it inside of there?  No, I

12    can't, right.  But I know it is there because I can even

13    still smell it if I put it to my nose, right.

14         Q.  Uh-huh.

15         A.  So that is the difference between a residual or

16    a trace amount of narcotics, right.  It's considered a

17    trace amount because the odor is behind, so it is

18    leaving a trace amount of the odor behind.  Residual is

19    kind of the same context.  It is a residual amount or

20    very low amount.

21         Q.  Okay.  That is extremely.  Helpful because I

22    have seen that on the list.  So when it is coated as

23    trace amount, that means that it is suspected that there

24    was a residual quantity, correct?

25         A.  I can't tell you what somebody -- when we put

Officer George Herrara                                    April 17, 2024

Page 191

1    residual amounts, if you're putting that as an odor aid,

2    then that means you saw something, whether you had a

3    plastic baggie that had green flakey substances or maybe

4    you had one or two glass shards inside there but wasn't

5    considered a useable amount by Texas definition law,

6    right.  Then you can say, hey, based on my training and

7    expertise, those look like glass shards.  This is a

8    little one-by-one baggie that was -- or was

9    methamphetamine at some point, or maybe I've got black

10   tar sticky heroin, right.  And the person already took

11   out the black tar sticky heroin, but it left aside and

12   behind a residual amount of dew, so to speak, on the

13   inside of the bag.  It's not a useable amount, but it is

14   there.

15            So that is what would be considered a trace

16   amount in my recordkeeping and how I would refer this

17   back to you in NCATS.  That would not be considered a

18   residual odor or residual amount.  Did that odor give my

19   dog reason to give me an indicated alert?  Yes, because

20   chances are if there is that trace amount that I can

21   articulate, right, then it is also going to be a

22   residual amount of odor coming off of that, which is

23   what my dog alerted to.

24        Q.  Okay.  I have a few follow-up questions.  We

25   have covered a couple of topics on this.  I think you

Officer George Herrara                                          April 17, 2024

Page 192

1      will agree, right?

2            A.  Sure.

3            Q.  Okay.  So, one, I don't want to put words --

4      one thing I understood you to say is that residual and

5      trace are used interchangeably in training.  Am I saying

6      that correctly?  The word "residual"?

7            A.  I'm saying the way I interpret those, I would

8      almost -- I'm using them as the same, but they do mean

9      two separate things at the same time.

10           Q.  Okay.

11           A.  A trace amount on this report would mean to me,

12     if it is listed as a trace amount, under any type of a

13     narcotic indication, to me, would mean there's something

14     that was there that you physically saw that you can

15     attribute to one of those four food groups, marijuana,

16     cocaine, methamphetamine, heroin.  Trace amounts, right,

17     would be trace odor.  Can you state -- I don't know how

18     much odor is in there because I can't truly smell it.  I

19     don't know what my dog is smelling, whether it is that

20     residual amount or if there's ten kilos in the car.

21     When I talk about residual amount, right, that is a

22     residual odor.  Generally, that's done with training

23     aids for a low-dose amount to signify that half gram,

24     one gram, maybe, something like that compared to a

25     higher amount of narcotics.

Officer George Herrara                                      April 17, 2024

Page 193

1        Q.  So you use the word "dissociative", which I

2    asked you about earlier.  So the goal -- is the goal of

3    using the Q-tips or the cotton balls to train a dog to

4    not alert to the cotton balls or the Q-tips?

5        A.  I do dissociative training.  So I would put out

6    a dirty cotton ball, so to speak, that has odor on it

7    and then I would also, in my training, document that I

8    put on latex gloves because I use latex gloves with

9    tongs.  I would put the tongs that are metal, a clean

10   pair, not the pair that we constantly use.  I would put

11   cotton balls and Q-tips that are just right out of the

12   drawer that I would use for myself, put those out into

13   the field to make sure that my dog, whichever one it

14   was, walks by those.  They smell them.  I put them in

15   the areas where -- that I know that they will smell

16   there, but there is nothing there, there's no reason to

17   alert to that.  Does that make sense?

18       Q.  Yes, it does.  The question I have then, if the

19   training is designed to dissociate, to make the dog not

20   alert to such small quantities, why do the dogs alert to

21   half a gram?

22       A.  Because you're teaching the dog to alert to the

23   odor when it is there --

24       Q.  Okay.

25       A.  -- not to the property that it is sitting on.

Officer George Herrara                                        April 17, 2024

1          Q.   Oh, okay.

2          A.   So when you asked me the question, you touching

3     a whole bunch of marijuana and then wiping it on your

4     clothes, right, your clothes then have that odor.  But

5     then I would take your clothes that you didn't touch

6     anything with and put those in another location.  And I

7     want him to go and alert to the clothes that have the

8     marijuana odor but not alert to the ones that just came

9     out of the dryer from you.

10         Q.   Okay.  So the goal is still to --

11         A.   The goal is to still get odor, find

12    recognition, but not the actual source that it is

13    sitting on.

14         Q.   Okay.  So we would want -- withdrawn.

15              Bexar County Sheriff's Office would want

16    the dog to alert to an empty vile of drugs that had

17    drugs in it recently, correct?

18         A.   I would want the dog to alert to the odor

19    that's left behind of those narcotics, period.  Because

20    it doesn't matter to me.  I cannot train a dog to say,

21    this is five pounds, only tell me when there's five

22    pounds there.  I want the dog to tell me when the odor

23    is there.

24         Q.   Okay.

25         A.   If the odor is there, then that means that the

Officer George Herrara                                      April 17, 2024

Page 195

1    narcotics either have been or are there.

2         Q.  Okay.  The -- one thing that you said -- and

3    please correct me if I misunderstood you -- is that when

4    you would code these type of NCATS, you would use trace

5    amounts to mean some visible provable amount of drugs;

6    is that correct?

7         A.  I did trace amounts.  I did trace amount aid

8    finding to signify a low-amount dosage that he may come

9    across in the field.

10        Q.  Okay.

11        A.  Compared to finding five kilos in the field or

12   five ounces in the field or five grams even.  The amount

13   is still as the odor is permeating, even from this

14   amount, and I want him to understand that any one of

15   those factors, however much it is, from the very, very

16   little to the most, you need to tell me when you smell

17   the odor.  It doesn't matter to me how much of that odor

18   is there.  If you smell that odor, you need to go into

19   that final response or an articulable change of

20   behavior.  And that is what those aids allowed me to do.

21        Q.  And then you would code it in NCATS a trace

22   amount if you saw some, for example, marijuana, some

23   like leafy green substance, right?

24        A.  If I -- if I was deploying a vehicle in a

25   hypothetical search -- is that what we are referring it

Officer George Herrara                                    April 17, 2024

Page 196

1    now?

2         Q.   Yes.

3         A.   If I am deploying on a hypothetical search and

4    my dog alerts -- he alerts, he sits in the front seat,

5    and he puts his nose in the center console, and he

6    alerts.  Okay.  And I take the dog out, I go back, and I

7    search.  And the only thing I can find in the ashtray is

8    roaches and residue.  That still of itself is marijuana.

9    That odor is still there.  Okay.  That is still a

10   justifiable alert and justifiable find.  It's trace

11   amount.  There's not enough there for me to arrest this

12   person for.  So this person then would obviously get the

13   lecture from me about what they have in their car and

14   what this led to, get their warning or citation, and be

15   on their way.

16        Q.   Okay.  That is exactly what I needed to

17   understand.  So trace amount would be, in this

18   hypothetical, the roach, for example, correct?

19        A.   Could be, because it is considered -- anything

20   that is not considered bulkable, so to speak, and not

21   useable amount of marijuana -- or useable.

22        Q.   I didn't mean to speak over you.  I apologize.

23        A.   Useable amount is what Texas defines that has

24   to be in order for it to be a case within the crime DA

25   system here at the DA's office.

Officer George Herrara                                        April 17, 2024

1          Q.  Do you know what that amount is?  I do not

2     know.

3          A.  I don't know other than a useable amount.  It

4     has to be a useable amount.  So when I look at it as in

5     my professional opinion, is it needs to be something of

6     a gram or higher, something that can be tested in a lab.

7     So, therefore, I would think it would need to be a gram

8     or higher.

9          Q.  So .1 grams, if you threw it on a scale, of

10    marijuana, that would be a trace amount, correct?

11         A.  It would be considered a traced amount, yes.

12         Q.  Even potentially .5 grams could be trace

13    amount, correct?

14         A.  Uh-huh.

15         Q.  I'm sorry.  Yes?

16         A.  Yes.

17         Q.  Okay.  Thank you.  And one thing I've noticed

18    is, you do tend to include in your answers with this,

19    like this is how you would do it.  Did you receive

20    training on how to code trace amounts into the NCATS

21    system?

22         A.  No.

23         Q.  All of the -- I don't know if the -- withdrawn.

24              The supervisor has to review and keep the

25    deployment reports; is that correct?

Officer George Herrara                                    April 17, 2024

Page 198

```
 1        A.  The training supervisor or the agency
 2   supervisor, I should say, of that unit is my
 3   understanding and/or the -- it can be the authorized
 4   delegate, so to speak, which would be that K-9 trainer.
 5        Q.  Okay.  And have they ever discussed with you
 6   or, to your knowledge, any other deputies like what
 7   trace amounts means?
 8        A.  Not that I recall.
 9        Q.  Okay.  And I asked that poorly because I asked
10   those too, so I'm sorry to ask this twice.  Did the
11   supervisor ever speak to you about what trace amounts
12   means?
13        A.  No.
14        Q.  And now to fix the record, to your knowledge,
15   did they ever speak with any of the other K-9 deputies
16   about what trace amounts mean?
17        A.  Not that I'm aware of.
18        Q.  Thank you very much.
19        A.  Yes, sir.
20        Q.  One thing I have seen is also the cloth gloves.
21   Essentially they look like work gloves to me.  Do you
22   know what I'm referring to, what with other deputies,
23   not K-9 officials, use?
24        A.  Yes, sir.
25        Q.  And they look like work gloves?
```

Officer George Herrara                                      April 17, 2024

Page 199

1        A.   Like construction gloves or some sort of

2   batting glove of some sort, yes.

3        Q.   Perfect.

4        A.   Yes, I have seen that.

5        Q.   If a deputy is -- a non-K-9 deputy just made an

6   arrest and seized drugs and used those gloves, and then

7   within a few hours went into a traffic stop and

8   seized -- and just touched the steering wheel or touched

9   the windows or touched the door handle, can that

10  transfer a residual amount of narcotic odor to the car?

11       A.   I couldn't tell you.  I've never seen it.  I

12  can't say it's not possible.  I've never tried that type

13  of training to say if it is quantifiable.

14       Q.   I don't know is a perfectly fine answer.  So

15  you don't know?

16       A.   I don't know.

17       Q.   Okay.  And I'm pretty sure -- okay.  I think we

18  are coming to the last topic before I take a break and

19  learn about all the things I forgot to ask you about.

20  You mentioned before K-9 -- and I should have followed

21  up way earlier, I just didn't -- that you did criminal

22  interdiction; is that correct?

23       A.   I think every patrolman should look past every

24  single stop, so, yes, I did my own, so to speak, traffic

25  stops, and therefore consistently looked past the

1    traffic stop.

2         Q.  Do you know -- is there -- who is the criminal

3    interdiction supervisor at the Bexar County Sheriff's

4    Office?

5         A.  Currently, I'm not exactly sure who.  But if

6    I'm not mistaken, it should be Sergeant Pete Gamboa.

7         Q.  Fair enough.  But if you don't know --

8         A.  If I don't know, I don't know.

9         Q.  That's fair.  Do you know if there's -- like

10   what the relationship between criminal interdiction and

11   the K-9 units are?

12        A.  The relationship?

13        Q.  Yeah.

14        A.  That, I don't know either, sir.

15        Q.  Maybe just going out for beers sometimes?

16        A.  Yeah.  I don't know, sir.

17        Q.  Fair enough.  Do you know how the interplay

18   works?

19        A.  No, sir.

20        Q.  Okay.  One thing I asked you is what -- earlier

21   we talked about the closed versus -- or, I guess, the

22   open channel versus just the broadcast?

23        A.  Okay.

24        Q.  And sometimes -- I think the examples I used

25   was Bill could ask Tom to go to open channel, right?

Page 201

1          A.   Right.

2          Q.   Do you remember talking about that?

3          A.   Yes, sir.

4          Q.   Do officers or deputies tend to work with the

5     same K-9 deputies repeatedly?

6          A.   Chances are, depending on their shift, it's

7     possible.  Because, again, K-9 handlers are assigned to

8     a particular shift.  And so if you're constantly doing

9     stuff in the daytime, you would probably get one or two

10    K-9s in the daytime, so to speak, or nighttime.

11         Q.   This is my like sheer just ignorance.  How big

12    is the Bexar County Sheriff's Office?

13         A.   It's approximately 1,600 sworn personnel.

14         Q.   Okay.  Are there -- I assume there's different

15    station houses, correct?

16         A.   Yes, sir.

17         Q.   How is it divided?  Just try to -- like how

18    does such a large organization work together?

19         A.   If you imagine the pizza analogy, like I

20    initial -- Bexar County is the big pizza, and then it's

21    cut into sections.  Those sections are called districts,

22    and there are multiple districts throughout the entire

23    county.  Those sections or those pieces are cut up in

24    certain ways to where those districts have a certain

25    number of patrol deputies that are assigned to those,

Officer George Herrara                                    April 17, 2024

Page 202

1    and then inside of -- on top of that, you have special

2    operation groups that work around in those areas,

3    whether it is a targeted area or a high crime area, so

4    to speak, or just a general broad area.  And then --

5    yeah, that's basically pretty much about it.  That's the

6    only way for me to describe it to you.

7         Q.  What district were you in?

8         A.  I never had a district.

9         Q.  Okay.  How many K-9 deputies are there, if you

10   know?

11        A.  I don't know off the top of my head.

12        Q.  Can you estimate?

13        A.  I want to say about eight or nine.

14        Q.  For all of Bexar?

15        A.  For all the Bexar County.

16        Q.  Oh, wow.  So just by sheer numbers, you end

17   up -- the deputies would work with the same K-9 unit?

18        A.  Because, like I said, each handler team is

19   assigned a shift, and those shifts have set days off and

20   a set schedule.  So if you call Monday through Friday

21   when I was on there, I was Monday through Friday 8:00 to

22   4:00.

23        Q.  Got it.  Have you ever worked with Deputy Babb

24   before?

25        A.  I have.

Officer George Herrara                                      April 17, 2024

1      Q.   Okay.  How many times?

2      A.   Quite a bit over the couple of years outside of

3   K-9.

4      Q.   Why?

5      A.   Because he was assigned the training academy as

6   well.

7      Q.   Oh, so you trained him?

8      A.   No, I didn't train him.  He was an instructor

9   at the academy while I'm there.

10             MR. ARONIN:  I understand.  Perfect.  If

11   you guys all don't mind, I would like to take a

12   five-minute break, please.

13             (Recess taken.)

14      Q.   (BY MR. ARONIN)  I have very, very little

15   cleanup, like just two small topics.

16             We talked about change in behavior and how

17   it -- it's something that's judgment.  Help me

18   understand your judgment on something.  How do you tell

19   if a dog is like changing behavior because they are

20   potentially smelling something or because they are

21   distracted?

22      A.   How can I tell a change of behavior from

23   distraction --

24      Q.   Yeah.

25      A.   -- versus if there's an odor?

Officer George Herrara                                    April 17, 2024

Page 204

1          Q.  Yeah.

2          A.  The dog's demeanor, the dog's posture, the

3    dog's breathing is the biggest thing.  If the dog's

4    mouth is wide open and they are just looking around and

5    sniffing here and there and then looking around, mouth

6    wide open, they are not truly sniffing.  They're more

7    distracted by something else in the air that they may be

8    smelling.  When they have a change of behavior during a

9    detection phase, they are still going to stay around

10   that target that they are searching -- or that target

11   area, I should say, that they are searching.  And you're

12   gonna see the mouth closed and the intense sniffing.

13   You might see them bracketing, going back and forth a

14   little bit.  The Stevie Wonder is what it's referred to

15   also for laymen's terms.  Depending on the wind.  You

16   know, those are all things that you as a handler have to

17   take into consideration.

18         Q.  Awesome.  And then what about something else

19   that the dog would really want?  What if they smell

20   steak?  Like if the --

21         A.  That would be the dissociative odors that even

22   I did in training, that you take the cheeseburger that

23   you just bought from McDonald's and you put that in your

24   training -- and you put that in a vehicle, in the center

25   console, and put no dope in the car or you put dope in

Officer George Herrara                                      April 17, 2024

Page 205

1    the car for training, and see what the dog is going to

2    do and make sure that the dog isn't trying to go for

3    that odor of the cheeseburger.

4        Q.  Okay.  And then one other question.  Have you

5    ever heard -- or any experience with what happens if a

6    dog is exposed to like commercial chemical like odors?

7        A.  What's your question with regards to that?

8        Q.  Yeah.  So if a person is working at an oil

9    field or anything like that and is exposed to an unusual

10   substance, something a dog probably hasn't smelled

11   before, do you have any like understanding of how the

12   dog would react to that?

13       A.  No, I don't.

14       Q.  Just like is it possible that they would alert

15   to just something entirely unexpected?

16              MR. FRIGERIO:  Objection.  Form.

17       A.  No.

18       Q.  (BY MR. ARONIN)  Do you have any experience

19   with like unknown chemical compounds?

20       A.  No.

21       Q.  By the way, this is an important question.

22   Where -- so I'm looking through your training records, I

23   know you use a lot of dissociative items.  You use

24   cheeseburgers, Q-tips, glass jars.  We've talked about

25   duct tape, those types of things.  How would that be

Officer George Herrara                                          April 17, 2024

Page 206

1    recorded in your training records?

2         A.  It would have been put down as a dissociative

3    odor training while in my detection phases of my

4    training.

5         Q.  Okay.  So you're not sure, sitting here,

6    whether it would say like, dissociative item,

7    cheeseburger, or just dissociative item?

8         A.  I don't recall right now.  It has been so long.

9    I don't recall.

10        Q.  Fair enough.  I have extremely good news for

11   you.  I have no further questions.

12                        EXAMINATION

13   BY MR. FRIGERIO:

14        Q.  Deputy Herrera, I think you've displayed a

15   large amount of knowledge with regards to K-9s today.

16   Can you share with us your opinion of Maximus while you

17   were his handler?

18             MR. ARONIN:  Objection, for the record.

19        A.  Your question one more time.

20        Q.  (BY MR. FRIGERIO)  Do you have an opinion as to

21   Maximus as a K-9 dog during the time you were his

22   handler?

23        A.  I will say that I was extremely excited when I

24   had Maximus considering how much of a success that Bosco

25   and I had together, and the amount of training that I

Officer George Herrara                                    April 17, 2024

1    had learned from Bosco that I was already implementing

2    into Max, that Max exhibited a very high IQ knowledge

3    for a working dog and was extremely open to training

4    evolutions and was extremely successful in the short

5    period of time that I'd had him.

6         Q.   Okay.  You had an opportunity to view Deputy

7    Molina handling Maximus with regard to this particular

8    stop, which is the basis of this lawsuit, of Alek

9    Schott; is that correct?

10        A.   Yes, sir.  I saw the video, yes, sir.

11        Q.   Did you see anything unusual about that video?

12             MR. ARONIN:  Objection, for the record.

13        A.   No, sir, I did not.

14        Q.   (BY MR. FRIGERIO)  Did you see -- when you did

15   review the video, did you see Maximus alert?

16             MR. ARONIN:  I'm so sorry.  Rather than

17   object to every question, I'm just going to have a

18   standing objection to these type of questions, that way

19   I won't keep interrupting.

20        A.   Do I answer that?

21        Q.   (BY MR. FRIGERIO)  Yes.

22        A.   Ask that question again.  I'm sorry, sir.

23        Q.   During the video that you witnessed of March 16

24   of 2022 involving Deputy Molina and the K-9 Maximus, did

25   you see Maximus alert?

Officer George Herrara                                    April 17, 2024

Page 208

1        A.  Yes, I did see him alert.

2        Q.  How did he alert?

3        A.  He indicated a final response by sitting down

4    by the driver's front door.

5        Q.  And based on your experience, is that how he

6    typically would alert?

7        A.  Yes, because I saw him go high on a check, high

8    where he stuck his head up to the open window, is what

9    it looked like it was, on the driver's side door, and

10   then immediately went to a sit.

11       Q.  And based on the fact that you have reviewed

12   Bates 4596, which is marked as an exhibit in your

13   deposition, you found that -- you see that Deputy Molina

14   actually found trace amounts of marijuana?

15       A.  I see it listed on here at 1.00 trace amount of

16   marijuana.  Yes, sir.

17       Q.  And is that the trace amount that you would

18   have expected Maximus to alert to?

19       A.  Absolutely.

20       Q.  Thank you.

21            MR. FRIGERIO:  I'll reserve the rest of my

22   questions.

23                     FURTHER EXAMINATION

24   BY MR. ARONIN:

25       Q.  I'm going to have some follow-up.  Explain your

Officer George Herrara                                      April 17, 2024

Page 209

1    last answer.  What do you mean that you would have

2    expected him to alert to?

3         A.  I would have expected my dog to alert to any

4    trace of marijuana or narcotics that I found in the

5    vehicle.

6         Q.  Including a residual odor?

7         A.  Yeah, including a residual odor.

8         Q.  Okay.  Even though you had only coded trace

9    amounts as something if you had a demonstrable amount

10   such as, for example, a roach?

11        A.  Say it again.

12        Q.  You testified you only code trace amounts if

13   you had a physical object, such as a roach or a less

14   than gram of marijuana, correct?

15        A.  If there is anything that I can articulate,

16   which is why I say even if I had a Ziploc bag that had

17   flakes left behind in the bag, that's considered trace.

18        Q.  Okay.  Mr. Frigerio asked you -- Mr. Frigerio

19   asked if you observed the video, and you said you did,

20   correct?

21        A.  Yes, sir.

22        Q.  Noting my objection to the types of questions

23   before, did you see the drugs in the video?

24        A.  No, sir.

25        Q.  Did you see trace amounts of drugs in the

Page 210

1    video?

2        A.  No, sir.

3        Q.  Mr. Frigerio also asked you about your opinion

4    with Bosco.  And once again, noting my objection.  But

5    my follow-up question is, did you have any concerns

6    about -- withdrawn.  The entire question is the same,

7    but withdrawn.

8              Mr. Frigerio asked you your experience with

9    Maximus.  And noting my objection, did you have any

10   concerns about Maximus based on your time?

11       A.  My concern was his size and his speed.  He was

12   extremely big but thought he was very little.  Meaning,

13   he had a tendency -- if I was to take him inside of a

14   house, he thought he could fit himself in a small

15   opening and had a tendency of knocking down things with

16   his body.

17       Q.  Did you have any other challenges with Maximus

18   the entire time?

19       A.  No.

20       Q.  Did you have any concerns with the K-9 unit as

21   a whole?

22       A.  I think, like anybody, when you work in a -- in

23   a specialized field, there's things that you can take

24   away, good, bad, indifferent.  And I was fine with it.

25   I just needed something different for myself.

Officer George Herrara                                April 17, 2024

Page 211

1        Q.   Why?

2        A.   Because I had felt at the time, even though Max

3    and I were doing pretty good, I could see that there was

4    some directions, being a trainer as well, that I didn't

5    quite see eye to eye with the other trainer, i.e.,

6    Floyd.  Because I understood Floyd was the primary

7    trainer and I was the secondary, I felt that perhaps I

8    could be better served somewhere else, which is why I

9    put in to go to the narcotic unit, which is where I was

10   going to go until that narcotic unit got transferred

11   into a different subsection at the sheriff's office.

12        Q.   What were the concerns -- withdrawn.

13             What were the directions that you said you

14   had concerns with?

15        A.   It was just about the size of the unit, the

16   amount of hours, the workload, things along those lines.

17   I felt it could be better severed by additional units,

18   additional trainings, things like that.

19        Q.   Did you feel there was inadequate training in

20   the unit?

21        A.   No.  As an agency, we actually trained far and

22   above the industry standard.

23        Q.   Were there any concerns with the direction you

24   were getting from how aggressive to be with searches?

25        A.   Aggressive?

Officer George Herrara                                    April 17, 2024

Page 212

1       Q.  Err on the side of deploying a dog versus not

2    deploying a dog?

3       A.  No.  We were told to deploy whenever it was

4    feasible and/or as long as we had legal state and

5    federal laws on your side.

6       Q.  What do you mean feasible?

7       A.  As long it was a feasible deployment, meaning

8    we had the state law on our side as well as our policy.

9    We were gonna deploy no matter what the case was, unless

10   we were oversold by a supervisor not to deploy.

11      Q.  Can you explain what the policy is about when

12   to deploy?

13      A.  Well, for example, I would not -- it was the

14   policy of the sheriff's office when I was there at the

15   unit.  I can't tell you what it is now necessarily.  But

16   when I was there, we had directives, not necessarily a

17   policy.  We also had standing orders, so to speak,

18   right, from a supervisor.

19              For example, we wouldn't deploy our dogs on

20   a missing child or a cognitive elderly person that was

21   missing because our dogs, while they were trained to

22   locate those people, they were also trained if that

23   person didn't give up, i.e., to apprehend that person.

24   The last thing we wanted was biting people that we were

25   trying to help.  That didn't fit the molds of what our

Officer George Herrara                                    April 17, 2024

Page 213

1    dogs were designed to do.  At the same time, we had to

2    take precautions when we knew that there were a

3    possibility that fentanyl was involved in this type

4    organization.  If it was an organizational hit like a

5    search warrant, then we would not deploy our dogs on a

6    pharmaceutical -- possibility of pharmaceutical -- my

7    mind just went blank.

8         Q.   Fentanyl?

9         A.   Fentanyl.  Thank you.  -- being in the house

10   for our own safety, but much less also for the dog's

11   safety.

12        Q.   I think I know why.  But can you tell me why

13   that would be?

14        A.   It would cause a serious health concern for the

15   dog as well as for the handler if they were to ingest

16   either by breathing it or by accidental exposure or

17   touching it.

18        Q.   Even just the dog breathing --

19        A.   Even the dog breathing it would be enough to

20   kill the dog and have to have medical intervention.  No

21   different than if -- we've had officers -- there's

22   plenty of officer YouTube videos where officers didn't

23   know what they were searching and opened up a bag only

24   to get Fentanyl exposure from breathing in the vapors,

25   and they needed to have life-saving measures to stop.

Officer George Herrara                                        April 17, 2024

Page 214

1          Q.  Understood.  Any other policies or directives

2     during your time about deploying dogs for car searches?

3          A.  Not that I'm aware of.

4          Q.  Other than what you testified to before?

5          A.  Yes, sir.

6          Q.  Okay.  Knowing full well the answer to this is

7     almost certainly going to be no, is there anything else

8     that you would like to tell me?

9          A.  No, sir.  I'm good.

10         Q.  I didn't think so.  It was a pleasure.

11              MR. FRIGERIO:  Okay.  We will reserve our

12     questions.  Blair?

13              MR. LEAKE:  I'll reserve my questions for

14     the time of trial as well.

15              (Proceedings concluded at 2:38 p.m.)

16

17

18

19

20

21

22

23

24

25

Officer George Herrara                                              April 17, 2024

Page 215

1                       CHANGES AND SIGNATURE

2       PAGE/LINE                  CHANGE                REASON

3       _____

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

Officer George Herrera                                                April 17, 2024

Page 216

1              I, GEORGE HERRERA, have read the
      foregoing deposition and hereby affix my signature that
2      same is true and correct, except as noted above.

3

                        _____
4                       GEORGE HERRERA

5

6

7

8      THE STATE OF TEXAS)

9      COUNTY OF _____)

10             Before me, _____, on
      this day personally appeared GEORGE HERRERA, known to me
11      (or proved to me under oath or through
      _____) (description of identity card
12      or other document) to be the person whose name is
      subscribed to the foregoing instrument and acknowledged
13      to me that they executed the same for the purposes and
      consideration therein expressed.

14

              Given under my hand and seal of office this
15      _____ day of _____, 2024.

16

17

18

19                      _____
                        NOTARY PUBLIC IN AND FOR
20                      THE STATE OF TEXAS
                        MY COMMISSION EXPIRES:
21                      _____

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2               SAN ANTONIO DIVISION
 3      ALEK SCHOTT,              )
               Plaintiff,         )
 4                                )
        VS.                       ) CIVIL ACTION NO.
 5                                ) 5:23-CV-00706-OLG-RBF
        JOEL BABB, IN HIS         )
 6      INDIVIDUAL AND OFFICIAL   )
        CAPACITY; MARTIN A.       )
 7      MOLINA III, IN HIS        )
        INDIVIDUAL AND OFFICIAL   )
 8      CAPACITY; JAVIER SALAZAR, )
        IN HIS INDIVIDUAL AND     )
 9      OFFICIAL CAPACITY; AND    )
        BEXAR COUNTY, TEXAS,      )
10            Defendants.         )
11
12             REPORTER'S CERTIFICATION
                 ORAL DEPOSITION OF
13                 GEORGE HERRERA
                   APRIL 16, 2024
14
15             I, JAZZMEN CANALES, Certified Shorthand
        Reporter in and for the State of Texas, hereby certify
16      to the following:
17             That the witness, GEORGE HERRERA, was
        duly sworn by the officer and that the transcript of the
18      oral deposition is a true record of the testimony given
        by the witness;
19
               I further certify that pursuant to FRCP
20      Rule 30(f)(1) that the signature of the deponent
21        __X__ was requested by the deponent or a party
        before the completion of the deposition and returned
22      within 30 days from date of receipt of the transcript.
        If returned, the attached Changes and Signature Page
23      contains changes and the reasons therefor;
24        _____ was not requested by the deponent or a party
        before the completion of the deposition.
25
```

1              I further certify that I am neither
     attorney nor counsel for, related to, nor employed by
2    any of the parties to the action in which this testimony
     was taken.
3
               Further, I am not a relative or employee
4    of any attorney of record in this cause, nor do I have a
     financial interest in the action.
5
               Subscribed and sworn to on this 3 day
6    of May, 2024.

7

8

9

10

11                      /s/ Jazzmen Canales
                        JAZZMEN C. CANALES, Texas CSR 9344
12                      Expiration Date:  04/30/2023
                        Veritext Legal Solutions
13                      Firm Registration No. 571
                        300 Throckmorton Street, Suite 1600
14                      Fort Worth, Texas 76102

15

16

17

18

19

20

21

22

23

24

25

Officer George Herrara                                          April 17, 2024

Page 219

1    MR. CHARLES S. FRIGERIO

2    csf@frigeriolawfirm.com

3                        May 3, 2024

4    RE:    Schott, Alek v. Babb, Joel Et Al

5        4/17/2024, Officer George Herrara (#6491505)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

| **&** |
| --- |
| **&**   2:13 |

| **0** |
| --- |
| **00706**   1:5   217:5 |
| **04/30/2023**   218:12 |

| **1** |
| --- |
| **1**   152:6 197:9   217:20 |
| **1,600**   201:13 |
| **1.00**   208:15 |
| **1/12/2021**   176:20 |
| **10**   75:13,15   146:20 |
| **10-4**   82:20 |
| **100**   84:6,10   93:21,24 104:8   132:8 142:5   146:13 190:3 |
| **10:00**   77:4 |
| **10th**   51:8 |
| **111**   1:22 2:10 |
| **12/16/2020**   176:19 |
| **123**   3:14 |
| **12:30**   169:23 |
| **143**   3:15 |
| **1466**   3:16,21 |
| **153**   3:16 |
| **155**   3:17 |
| **16**   1:13 143:7   144:23 145:6,8   146:10,17,18   160:3 207:23 |

217:13
| **160**   3:18,19,20   18:25 |
| --- |
| **1600**   218:13 |
| **16th**   1:19 |
| **17**   3:13 34:19   41:19 145:10 |
| **1700**   3:19 |
| **1702**   3:18 |
| **1704**   3:20 |
| **176**   3:21 |
| **18**   3:14 123:10   185:23 186:2 |
| **19**   3:15 143:19   185:23 |

| **2** |
| --- |
| **2**   3:3 159:3   167:5,24 |
| **20**   3:16 78:23   142:8 146:21   153:1 154:8 |
| **200**   2:14 |
| **2011**   23:2,5,8,9   26:17 45:2,4   50:4,13 51:5,8   56:4 |
| **2012**   23:6,6,7,9   45:6 56:4,6,12   57:9 |
| **2013**   50:18   92:4 94:24 |
| **2014**   64:1 92:4   94:24 |
| **2018**   59:1 |
| **2019**   21:16   184:14 |

| **2020**   21:18,20   23:2,6 50:19   123:2,19   125:21 |
| --- |
| **2021**   178:23 |
| **2022**   207:24 |
| **2024**   1:13,19   184:14 216:15   217:13 218:6   219:3 |
| **206**   3:6 |
| **2072**   3:17 |
| **208**   3:7 |
| **2097**   3:21 |
| **21**   3:17 155:11 |
| **210-271-7877**   2:11 |
| **215**   3:8 |
| **217**   3:9 |
| **22**   3:18 160:16 |
| **22203**   2:5 |
| **23**   3:19 7:11   16:23 76:13   160:16 |
| **230**   157:17   158:1 |
| **24**   3:20 160:16 |
| **25**   3:21 176:10 |
| **28**   148:4,6,6   152:1,3,6   190:1 |
| **2:00**   77:4 |
| **2:38**   1:20   214:15 |

| **3** |
| --- |
| **3**   218:5 219:3 |

| **3,000**   33:17 |
| --- |
| **30**   34:24   100:25 146:21   217:20,22   219:16 |
| **300**   159:3   218:13 |
| **37**   34:25 |

| **4** |
| --- |
| **4**   3:5 |
| **4/17/2024**   219:5 |
| **40**   18:25 53:3 |
| **41**   3:13 |
| **4596**   3:14   208:12 |
| **465**   1:23 2:10 |
| **4700**   2:14 |
| **4:00**   202:22 |
| **4k**   14:12 |
| **4th**   49:14 |

| **5** |
| --- |
| **5**   65:7 197:12 |
| **50**   7:20,21   168:5 |
| **500**   35:2 |
| **512-379-2960**   2:15 |
| **571**   218:13 |
| **5:23**   1:5 217:5 |

| **6** |
| --- |
| **60**   78:11,14 |
| **6491505**   219:5 |
| **6th**   49:14 |

| 7 |
| --- |

**703-682-9320**
  2:5
**72**  35:3 78:12
**7573**  3:15
**7586**  3:13 42:5
**7589**  58:24
**7595**  63:25
**7601**  44:23
  45:3
**7602**  50:1,24
  50:25
**7603**  3:13 42:5
  57:11
**76102**  218:14
**78205**  1:23
  2:10
**78723**  2:14

| 8 |
| --- |

**8**  60:12,13,18
  61:3,4,7 62:9
  167:6
**8/13**  160:18,21
**8/20**  160:19,21
**8:00**  202:21
**8th**  63:25

| 9 |
| --- |

**9**  17:21 18:8
  21:5,16 22:20
  22:25 23:4,19
  23:21 24:2,4,8
  24:9 26:18
  27:4,5,7,13,15
  27:19 30:1
  35:18,19 40:23
  41:4,9 43:2,7

45:9,11,12
46:7,9,15,20
46:22,24 47:3
47:8,10,11,19
47:19,22,22
50:8,16,19
51:12 55:23
56:19 59:1,5
61:16,25 64:9
65:18 66:15
70:7,20,20,21
70:21 71:9,11
72:4,8 80:11
81:7 86:3,20
86:25 88:18,18
92:2,3,5,6,10
92:12,13,25
93:3,9,20,22
94:14 96:1,1
97:24 98:1,5,5
101:5,14,14,15
115:14,21
116:1,19 128:4
128:7 136:8,10
138:24 141:24
143:13 144:13
144:20 151:14
151:15 156:1
162:22 167:8
170:7,17,25
171:3,5,22
174:12 175:14
175:15 177:21
178:14 182:3
185:13 198:4
198:15,23
199:5,20
200:11 201:5,7

202:9,17 203:3
206:21 207:24
210:20
**9's**  86:4 98:6
**9/3**  160:19,21
**900**  2:4
**901**  2:4
**911**  18:5
**9344**  218:11
**99**  8:3
**99.9**  65:9
**9:07**  1:20
**9s**  27:12 136:9
  201:10 206:15

| a |
| --- |

**a.m.**  1:20
**abilities**  102:8
**ability**  24:19
  68:5,8,9,9
  89:15 155:3,22
  178:7
**able**  39:11,11
  46:2 53:12
  68:2 81:4 82:6
  89:18 132:22
  134:6,10,11
  138:6,16
  147:17,20
  149:18 156:2
  172:14 183:18
**above**  1:18
  211:22 216:2
  219:6
**abroad**  51:20
  81:2
**abruptly**  14:25

**absconded**
  156:20
**absolute**  44:3
**absolutely**
  13:25 39:22
  44:11 76:12
  100:16 101:22
  147:11 151:15
  178:24 187:18
  188:4,18
  208:19
**absorbed**  21:22
**academic**
  113:21
**academy**  21:12
  59:11 93:7
  203:5,9
**accept**  165:17
  165:18,19
  166:1
**acceptable**
  66:12
**access**  128:21
**accident**  10:16
**accidental**
  213:16
**accidentally**
  107:14,16
**accuracy**  219:9
**acknowledged**
  216:12
**acknowledg...**
  219:12
**act**  33:14 84:19
  90:12 97:7
  117:11 119:3
  134:1 180:22
  180:24

| | | | |
|---|---|---|---|
| **acting** 40:5 | **afford** 65:21 | 185:6 191:1 | 61:12,22 62:18 |
| **action** 1:4 | **agencies** 37:7 | 195:7 | 63:15 65:11 |
| 21:24 217:4 | 175:7,20 | **aids** 135:22 | 87:11 103:7,20 |
| 218:2,4 | **agency** 25:21 | 136:11 147:9,9 | 103:22,24 |
| **actions** 109:17 | 27:16 65:21 | 147:18 149:18 | 104:1,2,3 |
| **active** 36:1 | 145:15 161:18 | 149:20 150:10 | 107:4,6,7,15 |
| **actual** 16:9 | 161:21 163:2 | 150:11,25 | 111:20 114:3 |
| 62:24 112:13 | 198:1 211:21 | 161:18 163:1,3 | 116:14 118:3,5 |
| 126:24 128:3 | **agent** 136:25 | 182:15 188:24 | 118:7,8 120:22 |
| 129:3 155:8 | **agents** 168:10 | 189:3,9 192:23 | 121:9,9 123:23 |
| 194:12 | 170:18 179:19 | 195:20 | 123:25 124:2,5 |
| **actually** 11:4 | **aggravated** | **air** 38:18 80:24 | 124:9,13,16,19 |
| 19:3 23:6 | 20:7 | 82:21,22 85:1 | 124:19 127:10 |
| 26:13 41:17 | **aggressive** | 85:20 86:14,15 | 130:3 131:19 |
| 44:12,18 51:5 | 35:23 36:2,25 | 86:18 87:6,10 | 131:20 133:21 |
| 87:14 94:9 | 37:1,15 121:9 | 88:24 89:1,5 | 137:6,11 |
| 100:4 104:9 | 211:24,25 | 89:13,15,19 | 138:25 139:8 |
| 109:16 112:25 | **ago** 10:23,23 | 95:2 99:17 | 149:15 151:14 |
| 118:18 126:3 | 10:24 170:13 | 102:4 109:13 | 151:14 165:5,8 |
| 145:10 149:16 | **agree** 143:24 | 116:5 118:7 | 165:9 166:21 |
| 149:24 154:7 | 192:1 | 204:7 | 167:3,15 |
| 181:7 184:25 | **ahead** 17:8 | **airtight** 149:24 | 169:16 172:20 |
| 190:10 208:14 | 39:24 48:4 | 189:7,20 | 188:16 191:19 |
| 211:21 | 84:6 85:17,19 | **al** 219:4 | 193:4,17,20,20 |
| **add** 104:12 | 85:19 87:12 | **alcohol** 4:24 | 193:22 194:7,8 |
| **additional** | 93:1,1 114:25 | **alek** 1:3 4:12 | 194:16,18 |
| 18:24 58:7 | 132:25 153:2 | 126:5 207:8 | 196:10 205:14 |
| 211:17,18 | 159:23 | 217:3 219:4 | 207:15,25 |
| **adequate** 47:21 | **aid** 38:11 125:7 | **alek's** 126:3 | 208:1,2,6,18 |
| 48:11 | 125:9 127:13 | **alert** 27:23 | 209:2,3 |
| **adjudicated** | 127:13 133:25 | 28:2,23 29:17 | **alerted** 31:5 |
| 161:19 | 146:3,3,5,6,19 | 32:13 34:2 | 64:12 102:23 |
| **admits** 78:23 | 146:22,22 | 35:7,12,17,18 | 114:5 118:2 |
| **advanced** 19:2 | 147:5,6,6 | 35:19,22,23,23 | 135:22 137:21 |
| **advocate** 91:7 | 148:11,14,19 | 36:1,1,2,2,5,6 | 138:2 148:14 |
| 104:5 179:4 | 148:21,25 | 36:13,19,25 | 149:14 185:13 |
| **affix** 216:1 | 149:12 150:12 | 37:1,18,19 | 191:23 |
| | 172:22 178:4 | 38:5 58:11 | |

| | | | |
|---|---|---|---|
| **alerting** 29:15 | **allows** 98:15 | 97:22 107:1,1 | 219:8 |
| 29:23 31:19,22 | **alluded** 183:10 | 108:1 118:18 | **applied** 17:3 |
| 32:3,6,9,14,21 | **alongside** 77:2 | 126:16 130:16 | **appreciate** |
| 32:25,25 33:5 | 77:6 | 170:22 172:9 | 87:15 114:15 |
| 33:5 113:3 | **amount** 35:9 | 199:14 207:20 | **apprehend** |
| 114:15 120:8 | 70:24 189:25 | 209:1 214:6 | 68:10 212:23 |
| 132:4,21 137:4 | 190:6,16,17,18 | **answered** 10:4 | **approach** |
| 137:6,13,14 | 190:19,20,23 | 75:8 93:17 | 22:12 |
| 151:3 164:4 | 191:5,12,13,16 | 96:16 127:4 | **appropriate** |
| 168:6 185:12 | 191:18,20,22 | **answers** 5:16 | 46:1 |
| 185:14,15 | 192:11,12,20 | 6:3 95:11 | **approval** 27:14 |
| 188:8,9 | 192:21,23,25 | 197:18 | 48:3 |
| **alerts** 29:15,18 | 195:5,7,8,12 | **antonio** 1:2,23 | **approved** |
| 36:17 65:10 | 195:14,22 | 2:10 49:2 | 46:10,11,13 |
| 87:7 98:8 | 196:11,17,21 | 59:10 217:2 | 86:13 |
| 102:11 104:14 | 196:23 197:1,3 | **anybody** 49:9 | **approximately** |
| 113:3,5,9 | 197:4,10,11,13 | 55:18 117:4 | 12:11 17:22 |
| 114:1,8 116:9 | 199:10 206:15 | 170:3 210:22 | 145:5 201:13 |
| 120:8 130:1 | 206:25 208:15 | **anymore** 31:6 | **april** 1:13,19 |
| 131:11,12 | 208:17 209:9 | 43:22 | 63:25 217:13 |
| 137:17 138:12 | 211:16 | **anyway** 4:20 | **area** 40:12 |
| 139:23 183:13 | **amounts** 191:1 | 14:5 67:5 | 56:15 87:5 |
| 185:5 196:4,4 | 192:16 195:5,7 | **apologize** | 100:4 105:20 |
| 196:6 | 197:20 198:7 | 21:18 41:17 | 106:3,10 |
| **allegations** | 198:11,16 | 153:14 174:7 | 109:25 110:1 |
| 15:21 | 208:14 209:9 | 196:22 | 114:9 116:7 |
| **alleged** 15:23 | 209:12,25 | **apparently** | 133:25 137:23 |
| **allen** 162:20,22 | **analogy** 111:6 | 156:19 | 150:13 202:3,3 |
| **allergic** 101:23 | 114:10 163:24 | **appear** 153:5 | 202:4 204:11 |
| 102:5 | 201:19 | **appearances** | **areas** 117:12 |
| **allotted** 219:19 | **answer** 5:12,13 | 3:3 | 193:15 202:2 |
| **allow** 99:16 | 6:3,24 26:1 | **appeared** | **argument** 65:4 |
| 119:23 179:6 | 43:24 52:7 | 216:10 | **arlington** 2:5 |
| **allowed** 88:25 | 53:12 63:14 | **appears** 156:16 | **aronin** 2:3 3:5 |
| 99:12 117:16 | 70:9 73:10 | 157:18 161:1,4 | 3:7 4:4,11 |
| 195:20 | 87:15 88:4 | 176:19 | 41:14,16,21 |
| **allowing** 87:5 | 90:11 95:2 | **applicable** | 42:6,10,13 |
| 99:18 | 96:11,12 97:3 | 18:14 71:23 | 44:18,21,22 |

69:21 70:1
123:11 143:20
153:3 155:13
157:12,15
160:17,20,22
166:1,3 169:23
170:1 176:9,11
203:10,14
205:18 206:18
207:12,16
208:24
**arrangements**
90:6
**arrest** 151:7
164:18 166:4
196:11 199:6
**arrested** 78:21
164:14 166:12
**arrests** 18:2
**arrival** 92:19
**arrive** 95:6,12
**arrived** 20:19
95:1
**art** 46:6
**articulable**
39:10 80:4,16
83:8 84:17
87:11,22 88:20
134:2 195:19
**articulate**
39:12 132:23
183:24 191:21
209:15
**articulating**
120:17
**ashtray** 196:7
**aside** 154:4
191:11

**asked** 4:7 6:23
22:3 44:18
72:7 75:9
83:25 97:19
101:8 115:17
137:2 143:5
154:2 169:1,22
174:18,20
189:4 193:2
194:2 198:9,9
200:20 209:18
209:19 210:3,8
**asking** 6:14
11:1 29:10
32:12 35:22
53:4 56:17
81:11 97:7,8,8
125:20 126:3
132:11 140:22
155:15,15
171:12
**aspect** 68:8
142:19,22
155:25 179:7
**aspects** 88:17
88:18 142:23
178:14
**assault** 8:12
20:7
**assaults** 18:13
**asset** 110:25
**asshole** 85:18
**assign** 176:23
**assigned** 20:4,4
20:11 46:5,9
46:11,12 47:6
47:20 48:25
50:10 69:12

71:25 72:2
181:25 182:3
201:7,25
202:19 203:5
**assignments**
145:21
**assist** 68:2
70:15
**association**
135:13
**assume** 4:25
9:19 122:14
153:21 174:21
201:14
**assumed** 125:2
**assuming**
107:7 113:1
124:24 129:19
129:20 130:12
153:9 161:16
**assumption**
130:8,9
**assure** 174:9
**ate** 187:12,19
**attached** 1:25
217:22 219:11
**attempt** 149:11
**attempting**
114:17
**attest** 188:22
**attorney**
127:23 168:7
218:1,4 219:13
**attorneys** 4:11
11:12,15 12:17
12:19 64:21
**attribute**
192:15

**augment** 27:17
71:11
**august** 7:11
16:23
**aunt** 75:3
**austin** 2:14
**authorized**
101:8 117:15
177:3 198:3
**availability**
156:9
**available** 81:14
129:13 154:21
184:12 219:6
**avoid** 52:7
**avoiding** 52:18
**aware** 13:16
28:24 29:8
86:16 102:13
135:18 166:15
186:11 198:17
214:3
**awesome** 4:15
7:2 12:2,10
13:14,18 18:16
41:10 83:5
93:10,11 110:9
204:18

**b**

**b** 3:11
**babb** 1:5 11:18
12:4,7 13:7,22
16:12 202:23
217:5 219:4
**back** 21:25
23:3 24:2 31:3
40:14 44:23

48:21,24 51:2
56:15 59:19
60:7,7 61:24
72:23 73:23,25
75:5 82:21
88:16 94:25
98:25 101:21
102:5,24 105:2
105:3 107:3
111:7,12
117:20 123:2
128:8 129:10
129:10,16
130:24 131:1
133:10,13
143:10 154:7
156:17 164:13
164:15,16,23
164:24 165:19
171:9 175:11
175:24 187:22
191:17 196:6
204:13
**backed** 71:13
**background**
7:2 16:20 79:8
**backpack**
29:15,18,19
**backup** 71:14
**bad** 29:19
44:12 106:11
110:25 111:2
119:13 151:9
175:9 210:24
**badly** 83:25
**bag** 34:10 78:9
149:20,21,23
150:4 152:3

164:19 168:16
187:12,13,14
187:21 189:20
191:13 209:16
209:17 213:23
**baggage** 98:2
**baggie** 191:3,8
**bags** 149:25
168:4,5,5,6,7
189:14
**baking** 164:19
166:4,6
**ball** 102:20
193:6
**ballpark** 9:15
**balls** 189:16,24
193:3,4,11
**band** 178:4
**barking** 131:23
132:6
**barricaded**
18:2
**barriers**
113:15
**base** 90:8
**based** 21:12
25:20 30:17
46:23 47:11
59:16,25 60:10
60:15 61:9
73:1 87:11,23
88:17 97:5,23
101:6 117:9
118:13 127:3
129:15 132:17
134:11,14
137:22 138:5
139:11 145:24

147:15 162:25
165:4 179:23
179:23,24
180:6 191:6
208:5,11
210:10
**baseline** 53:9
**basic** 7:2 10:9
18:22,23
160:23 177:12
**basically** 19:5
27:11 33:1
42:16 47:3
60:9 62:11
64:13 89:11
93:18 103:14
105:25 118:14
122:4,17,22
144:9 148:7
151:22 159:21
166:12 176:3
202:5
**basics** 93:20
**basis** 71:6
146:7 207:8
**basketball**
162:21
**bat** 180:5
**bates** 3:14,15
3:16,17,18,19
3:20,21 44:7
44:13 208:12
**batting** 199:2
**beads** 53:2
**becoming** 43:3
**beers** 200:15
**beginning** 27:4
45:4 66:24

**behalf** 135:17
**behavior** 33:7
34:3 35:24
36:3,4 37:23
37:24,24 39:9
39:13,21 40:4
40:16 54:16
104:6 114:25
118:10 120:13
120:15,19
121:5,8,10,24
124:9 131:16
131:20 132:1,8
132:17,24
133:18 134:2
134:11 137:8
151:3 171:13
171:15 172:21
195:20 203:16
203:19,22
204:8
**behaviors** 39:9
39:16 40:4,13
74:7 107:4
**behold** 130:1
**behoove** 31:12
58:20
**behooves** 55:18
**believe** 12:16
34:19 61:6
72:15 79:20
123:2 144:1,1
144:2 151:17
161:2 164:10
170:13 179:23
**belt** 103:17
**ben** 170:9,15
170:18

**best** 9:2 12:16
13:20 21:24
29:9 42:8,16
91:1,16,22,25
110:17 140:11
166:16
**better** 5:13
6:10 24:5 25:5
26:2 35:17
55:16 74:3
88:4 90:13
93:15 121:19
161:24 172:1
173:24 178:6
211:8,17
**bexar** 1:9 7:7,9
16:21 19:10,20
25:15 28:21,22
37:14,17 46:13
47:16 59:14
66:10,12 69:8
75:21 88:10
93:18,25 94:1
94:3 101:5
115:14 122:17
136:16 143:7
177:17 181:13
194:15 200:3
201:12,20
202:14,15
217:9
**beyond** 70:18
**big** 114:2
201:11,20
210:12
**bigger** 76:7
87:25 88:1
179:22

**biggest** 204:3
**bill** 82:14,15,16
82:18 200:25
**bills** 60:15
**binary** 32:24
134:7
**bit** 17:4 19:19
23:15 26:4,14
26:17 35:17
39:19 41:11
73:11 102:5
104:10 110:11
119:9,22
121:22 150:17
171:9 203:2
204:14
**bite** 67:9 68:10
103:2,5 109:1
143:2
**biting** 67:16
212:24
**black** 191:9,11
**blair** 2:13 42:4
42:7 214:12
**blame** 43:13
**blank** 126:1,2,9
213:7
**bleake** 2:15
**blindfold** 112:4
**blindfolded**
112:9
**blowing** 38:19
111:6,7 113:2
114:11
**blunts** 168:18
**board** 20:6
74:23 175:16

**bobbing**
133:13
**body** 52:5,8,15
54:21 96:11,17
96:18 100:20
100:21 121:25
171:23 172:5
172:15 210:16
**bodycam** 11:18
11:19 12:6
**bombs** 31:22
**bond** 132:13
**bonding** 134:4
**bonds** 165:3,16
171:21
**boom** 33:22
**boot** 22:15
65:16,17,18,18
65:19 182:25
**boots** 22:12
65:16
**born** 40:23
**bosco** 24:4 41:9
64:9,18 98:4
108:8,11,12,17
131:8 135:7
154:22 178:12
206:24 207:1
210:4
**bottle** 110:6,7
**bottom** 64:4
185:23 186:1
**bought** 204:23
**boulevard** 2:14
**box** 31:4 127:9
127:12 129:19
157:13 163:25
187:16,20

**boxes** 126:25
127:1,6,17
183:3 185:17
185:18
**bracketing**
204:13
**brand** 67:7
178:11,13
**break** 69:23,24
98:11 117:4
152:3 169:24
199:18 203:12
**breakdown** 9:9
49:21 156:4
163:8
**breaks** 6:22,25
**breathe** 99:15
**breathing** 53:5
121:16,16
133:11 204:3
213:16,18,19
213:24
**breeze** 38:20
**brick** 34:21
**bricks** 78:16
**bridge** 92:15
**briefly** 42:1
**bring** 15:5
25:16 69:5
72:12 102:16
103:13
**bringing** 38:10
121:11
**brings** 165:22
**broad** 39:8
73:7,10,10
202:4

| broadcast | c | 218:11 | care 103:4 |
|---|---|---|---|
| 200:22 | c 2:1 76:8 | canine 12:8 | career 7:7,9 |
| broken 152:5 | 218:11 | cannabinoid | 17:1,4,14 27:4 |
| 163:4 | cackling | 60:4,13 61:9 | 31:7 |
| brother 40:22 | 121:22 | 62:9 63:18 | careful 160:15 |
| brought 187:12 | cadet 22:16,17 | cannabinoids | cargo 100:3 |
| brush 155:5 | 92:4 182:22,25 | 59:7,20 60:1 | carotid 52:24 |
| 156:21 | cadets 92:3 | 61:16 | carry 180:18 |
| bucky 173:20 | 93:5,8 94:16 | cannaboids | cars 106:15,23 |
| 174:1,6,9 | 94:18,20 | 167:12 | 141:22 189:8 |
| bud 62:24,24 | call 11:8 18:5 | canned 167:25 | case 6:9 8:4,7,9 |
| build 72:25 | 56:13 59:15 | capacity 1:6,8 | 8:12,25 12:25 |
| bulkable | 63:4 71:2 | 1:9 217:6,8,9 | 13:4,11,16,24 |
| 196:20 | 79:19 80:1,18 | car 10:16,19 | 15:14 20:6,7 |
| bumper 111:4 | 81:19,21,23 | 14:23 37:11 | 20:18 35:3 |
| 111:7,8,22 | 91:8 92:10 | 72:22 73:12,18 | 51:16 81:16 |
| bunch 5:9 18:3 | 93:2 117:22 | 76:13 78:15 | 85:19 88:20 |
| 21:9 60:2 | 121:4 130:18 | 79:19 84:5 | 106:18 124:5 |
| 194:3 | 135:16 149:24 | 89:24 90:22 | 124:16 126:3 |
| bundle 34:20 | 175:20 182:23 | 91:16,25 99:14 | 130:25 138:5 |
| bundles 34:19 | 183:1 202:20 | 99:15 111:4,17 | 165:23 175:10 |
| 180:2 | called 8:7 | 111:18,19 | 178:12 179:19 |
| burp 99:15 | 13:11,16 15:12 | 112:17 114:2 | 179:21,22 |
| 119:7,8,21 | 20:18 25:9 | 114:12 117:7,7 | 180:3 189:14 |
| bush 98:12 | 56:13 61:23 | 117:8,19 | 196:24 212:9 |
| business 10:21 | 79:6,23 85:9 | 118:20 119:7,8 | cases 7:6 8:2 |
| 26:2 60:21 | 90:1 95:20 | 119:18,19,21 | 9:9 15:11,12 |
| 80:5 116:15,16 | 101:5 115:15 | 129:10 142:9 | 68:14,16 88:7 |
| 116:19 138:3 | 132:2 182:25 | 142:11 151:22 | 88:17 103:15 |
| businesses | 201:21 | 168:9 192:20 | 112:2 149:23 |
| 68:25 | calling 80:17 | 196:13 199:10 | cash 28:19,23 |
| busted 190:1 | 174:9 | 204:25 205:1 | category 64:15 |
| butt 36:9 | calls 26:1 70:9 | 214:2 | 65:7 |
| buy 68:18 69:9 | 71:13 | card 216:11 | caught 54:15 |
| 162:19 169:10 | camera 54:14 | cardenas 27:9 | cause 1:19 76:5 |
| | canales 1:20 | 27:12,15 | 86:21 87:24 |
| | 217:15 218:11 | 170:10,12 | 90:19 119:3 |
| | | 177:8,13 | 180:4 181:4 |

213:14 218:4
**causes** 88:6
**causing** 37:8
104:19
**cbd** 62:16,19
63:10,15
166:12,14,21
**cdb** 62:17
167:3,6
**ceiling** 38:12
133:25
**cell** 28:15 30:7
30:21 68:1,6
81:23 106:17
**cells** 156:4
**center** 17:5
24:3 38:12
43:3 78:8
129:24 130:2
196:5 204:24
**certain** 69:7
73:6 88:14,16
88:16,18 90:7
106:25 128:11
128:12 177:15
185:21 201:24
201:24
**certainly** 164:6
214:7
**certificate**
42:25 43:2,20
43:20,22 45:8
135:6 136:6
**certificates**
23:15 40:20
41:12,23 42:12
42:22 50:13
51:5 64:25

**certification**
3:9 47:24
48:19 59:21
64:10 135:19
135:23 136:1
177:12,14
182:7 217:12
**certifications**
26:24 42:23
48:16,17 65:3
135:11
**certified** 29:5
43:4,9 45:22
59:5,23 64:11
68:2 135:12
136:8,14,17,20
167:2 217:15
**certify** 47:22
47:23 217:15
217:19 218:1
**certifying**
64:11 135:16
136:7
**cetera** 123:23
155:20
**ceutical** 163:19
**chain** 39:12
**challenges**
210:17
**chance** 119:22
167:10 188:12
**chances** 191:20
201:6
**change** 21:14
33:6 34:2,2,3
35:24 36:3,4
37:23,24 39:9
39:15 40:3,16

69:22 84:19
86:8 89:25
104:6 114:24
118:9 120:12
120:14,18
121:4,8,10
124:9 131:16
131:19,25
132:8,24
133:17 134:2
134:10 137:8
151:20 171:13
172:21 174:14
195:19 203:16
203:22 204:8
215:2
**changed** 21:22
39:21 60:8
128:9
**changes** 3:8
40:13 74:7
122:23 171:16
215:1 217:22
217:23 219:10
**changing** 131:3
151:2 203:19
**channel** 81:12
82:10,11,12,15
82:15,17,18,19
82:20 83:2
85:22 200:22
200:25
**channels** 82:9
**chapter** 143:14
**charge** 94:13
**charles** 1:22
2:8,8,9 42:6
219:1

**check** 31:4
106:9 127:1,6
161:2 185:17
185:18 208:7
**checkboxes**
186:7
**checked** 183:4
**checking** 127:1
**cheeseburger**
204:22 205:3
206:7
**cheeseburgers**
205:24
**chemical** 163:7
205:6,19
**chest** 181:10
**chew** 103:5,11
**chick** 187:11
187:13,24
188:5
**chief** 144:6
**child** 212:20
**choked** 104:24
**christ** 97:2
**christen** 2:3
**chronological**
23:3 64:1
160:18
**cid** 20:4,4
**cigar** 167:25
**cigarello** 168:1
168:1
**cigarettes**
28:17 30:14
**circles** 38:15
40:11,11
**circumstance**
179:5 182:17

**circumstances**
78:25 90:8
110:23 151:21
**citation** 72:16
79:1 196:14
**cite** 79:1
**city** 30:3 75:4
**civil** 1:4,24 8:4
8:7 10:6 217:4
**clarification**
13:20
**clarify** 33:3
174:8 179:11
188:11
**class** 76:8 92:4
130:21
**classes** 88:9,10
**classified** 67:19
**clean** 170:6,20
193:9
**cleanup** 203:15
**clear** 14:8,9
92:15 98:15,16
113:23 130:11
134:20 139:12
140:8 166:16
**clearing** 22:11
**clearly** 30:3
92:22 185:8
**click** 127:9,12
**client** 11:23
35:3
**climb** 111:17
**clinic** 175:18
**clinical** 165:4
**clinically**
163:19

**clockwise**
98:22,25
**close** 36:7
91:10 92:21
99:12,21
111:23 112:1,7
112:12 113:14
113:16 114:18
120:4 156:10
178:1 179:7
187:22 189:17
**closed** 114:2
119:19 121:12
200:21 204:12
**cloth** 149:20
150:4 198:20
**clothes** 188:14
194:4,4,5,7
**clue** 94:9
**coated** 190:22
**cocaine** 32:5
57:22 58:1
96:13,25 97:1
101:11 134:23
135:20,21
147:8 152:2
161:12,14
162:1,3,5,9
163:8,11 166:5
189:21 192:16
**code** 195:4,21
197:20 209:12
**coded** 188:19
209:8
**cognitive**
212:20
**coke** 32:6

**cold** 34:18
179:3,11,13
180:25
**colleague** 54:11
**colleague's**
170:21
**colloquy**
100:14
**column** 102:20
**combination**
24:22,23
**combo** 17:2
**come** 11:6 15:1
20:23 38:14
43:12 68:12
81:15,15 82:14
90:3 94:17,19
99:25 101:4
105:25 106:6,6
106:9 109:7
110:2,4,7
111:12 117:20
117:23,24
119:23 120:2
130:24 131:1
135:18 136:9
146:4 164:13
164:15,16,23
164:24 165:19
169:9 187:22
195:8
**comes** 84:9
106:21 109:3
113:17 116:25
144:5,11
175:15,21
**comfortable**
66:1

**coming** 38:23
49:3 53:2
73:14 76:16
89:14 183:8
191:22 199:18
**command**
107:8,10,14,21
107:22,23,23
107:25 108:2
108:17,18,19
108:20 109:5
117:24
**commanding**
89:13
**commercial**
205:6
**commission**
216:20
**committed**
166:6
**communicate**
13:13
**communicated**
91:23
**community**
70:15
**company** 69:9
163:7
**compared**
184:14 190:1
192:24 195:11
**compartments**
49:20 51:23
**competent**
64:21
**complete** 43:21
109:1

completed   45:9
  50:2,3 136:24
  219:16
completely
  54:18 79:3
  108:18 109:5
  185:20
completion
  43:20 217:21
  217:24
compliance
  145:22
complying
  185:24
component
  132:21
compounds
  205:19
concealment
  51:25
concept   183:6
concern   210:11
  213:14
concerned
  181:18
concerns   210:5
  210:10,20
  211:12,14,23
conclude   52:3
concluded
  214:15
conclusion
  20:23 83:25
  84:3
conclusions
  20:19
condition   91:6
  91:16

conditioner
  38:18
conditions
  113:23
cone   121:21
  133:14
confident
  137:11,13,14
confidently
  93:21
confirm   16:8
  85:23 105:13
  134:16,17
  159:20 160:23
confronted
  128:17
confused   27:18
  110:14
conjunction
  88:23
connection
  129:15
connectivity
  129:13,15
conscious
  100:21
consent   83:15
  83:16,18,20
  84:18,18 85:10
  85:11,14,15,16
  85:23 86:6,9
  86:13 87:9
  89:10,20 95:3
  95:21,21,22,25
  97:23 98:21
  99:17 100:9,19
  101:8,8,15,19
  101:25 110:11

110:13 113:25
  115:4,17,18,20
  116:9
consented
  83:20,20 84:1
  89:3
consider
  131:19 180:19
consideration
  204:17 216:13
considerations
  150:9
considered
  26:24 53:13
  58:15 60:14
  61:18 65:7
  78:7 80:11
  97:10 116:5
  131:25 190:16
  191:5,15,17
  196:19,20
  197:11 209:17
considering
  54:9 178:21
  206:24
consistent   31:6
consistently
  54:10 199:25
console   78:8
  129:24 130:2
  196:5 204:25
constantly
  193:10 201:8
constitute
  87:24
construction
  199:1

contact   16:13
  52:6,18 53:7,8
  53:17 54:5,12
  77:1,5,14,17
  95:7,15 97:6
  115:12
contained
  150:7
container
  150:13 187:14
  187:21 189:17
containers
  189:7
contains
  217:23
content   123:18
contents   89:8
  98:1 101:18
  115:1 116:11
context   14:9,18
  15:3 31:24
  35:21 58:15
  59:22 70:13,21
  75:19 81:19
  82:16 112:7,21
  116:23 119:17
  119:18 120:24
  124:10 126:23
  132:3 163:5
  171:12 190:19
continue   68:23
  114:4 118:2,8
  137:23
continued   93:6
  138:3
continuing
  69:17

| | | | |
|---|---|---|---|
| **continuously** 93:6 | 43:10 46:6 50:3 58:25 | **correction** 34:2 | 52:2 67:13 159:23 183:9 |
| **contracts** 69:8 | 59:2 62:5,14 | **correctly** 10:4 | 191:25 203:2 |
| **control** 14:6 | 64:16,17,19,20 | 26:20 31:23 | **course** 18:13 |
| 52:8 168:12 | 64:22 72:8 | 55:7 64:12 | 21:24 43:21 |
| **conversation** | 89:21 91:17 | 145:8 159:20 | 49:22 59:9,23 |
| 120:25 141:15 | 93:20 108:3 | 192:6 | 69:5 76:20 |
| **convey** 80:17 | 122:12 123:6 | **cotton** 189:15 | 81:10 139:17 |
| **conveyance** | 123:19 134:4,8 | 189:24 193:3,4 | 177:12 |
| 86:22 87:1 | 134:24 137:6 | 193:6,11 | **courses** 18:24 |
| 137:25 | 138:15,15 | **counsel** 218:1 | **court** 1:1 5:24 |
| **convicted** 11:7 | 139:4,7 141:10 | 219:14 | 8:18,21 20:18 |
| **cool** 6:19 17:19 | 141:13,20,21 | **count** 146:9,17 | 41:18 86:15,19 |
| 18:6 19:8 | 145:1 150:25 | **counterclock...** | 88:7,17,20 |
| 23:14 41:4,11 | 152:14,17 | 98:21,23 99:1 | 114:23 115:25 |
| 44:7,21 45:1 | 154:13,16 | 105:1,4 111:11 | 128:15,18,19 |
| 54:25 57:10 | 157:16,17,22 | 111:13 | 129:7 217:1 |
| 58:9,16 59:7 | 158:12 159:20 | **country** 24:3 | **cover** 104:13 |
| 79:18,25 80:15 | 160:3,25 | 43:3 57:18 | **covered** 191:25 |
| 83:8 94:25 | 162:16 163:12 | 58:6 93:25 | **crap** 76:23 |
| 124:22 131:1,2 | 164:7,8,12 | **counts** 160:3 | **crash** 8:16 |
| 151:25 160:23 | 165:6,13 166:7 | **county** 1:9 7:7 | 10:19 18:11,18 |
| 171:8 186:3 | 166:8,14,18,19 | 7:9 16:22 | 18:23 19:2,5,6 |
| **coolest** 21:7 | 167:3,10 | 19:10,20 25:15 | **crazy** 40:5 |
| 34:16,17 | 169:16,17 | 28:22 37:14,17 | **created** 163:7 |
| **cop** 40:23 | 171:9 173:13 | 46:13 47:16 | **crime** 11:7 |
| 76:13,24 82:4 | 177:24 181:20 | 59:14 66:10,12 | 70:16 166:6 |
| **copies** 41:14 | 181:23,24 | 69:8 75:21 | 196:24 202:3 |
| 219:14 | 183:13 184:1 | 88:10 93:18,25 | **criminal** 7:6 |
| **cops** 18:4 41:4 | 186:8,11,12,18 | 94:1,3 101:5 | 8:2 9:9 11:2 |
| **copy** 41:18 | 186:19 187:3 | 115:14 122:18 | 20:5 51:14,19 |
| **correct** 4:8,13 | 188:6,17 | 136:17 143:7 | 51:21 55:5,6,8 |
| 5:21 9:6,20 | 190:24 194:17 | 177:17 181:13 | 56:20 73:5 |
| 16:10 20:24 | 195:3,6 196:18 | 194:15 200:3 | 165:22 199:21 |
| 21:5 22:7 28:3 | 197:10,13,25 | 201:12,20,23 | 200:2,10 |
| 28:5 32:12,18 | 199:22 201:15 | 202:15 216:9 | **critical** 82:22 |
| 32:19 34:9 | 207:9 209:14 | 217:9 | **cross** 74:14 |
| 35:10,18 37:21 | 209:20 216:2 | **couple** 33:10 | |
| | | 33:11 43:24 | |

| | | | |
|---|---|---|---|
| **cs** 219:15 | **damage** 37:8 | **deceptive** | **department** |
| **csf** 2:11 219:2 | **damn** 88:4 | 77:11 | 47:20 59:10 |
| **csr** 1:20 218:11 | **danger** 97:10 | **decide** 40:21 | 66:4,13 72:8 |
| **cue** 38:25 | **data** 19:5 | 72:22 78:22 | 75:21 81:6 |
| **cued** 106:9 | **date** 50:17 | **decided** 47:1 | 82:5 143:14 |
| **cues** 67:2 74:6 | 176:18 217:22 | **decision** 46:17 | **dependent** |
| 96:18 | 218:12 | 46:25,25 48:7 | 142:24 |
| **cumulative** | **day** 1:19 25:2,6 | 72:12 94:6 | **depending** |
| 67:11 | 49:15 70:6,6 | **decisions** 88:21 | 20:14 49:17 |
| **curiosity** 130:7 | 73:19 75:10 | **decoy** 156:13 | 68:21 70:10 |
| 185:25 | 92:7 113:23 | 156:15,16,18 | 72:14 78:25 |
| **curious** 35:4 | 122:15 136:8 | 156:19 157:1 | 81:14 88:18 |
| 88:6 107:1 | 136:10 142:8 | 158:19 | 98:19 99:2,6 |
| 148:2 | 142:25 143:4 | **defendant** | 103:10 105:22 |
| **current** 15:11 | 146:1 152:10 | 10:13 | 105:23 107:23 |
| 49:21 51:24 | 152:10,11 | **defendants** | 110:23 120:16 |
| 58:5 60:15 | 158:20 172:18 | 1:10 2:7 | 132:3 172:21 |
| 170:7,15 | 172:19,24,25 | 217:10 | 182:6 186:22 |
| **currently** | 216:10,15 | **defense** 127:23 | 201:6 204:15 |
| 21:12 22:4,21 | 218:5 | 165:22 168:7 | **depends** 35:21 |
| 94:14 126:20 | **days** 49:19,20 | **define** 120:19 | 49:21 66:4 |
| 156:5 200:5 | 106:11,11 | **defined** 120:18 | 82:8 98:22 |
| **curriculum** | 142:10 202:19 | **defines** 196:23 | 102:22 120:24 |
| 49:22 | 217:22 219:16 | **definitely** 43:9 | 129:12 140:7 |
| **custody** 173:23 | **daytime** 201:9 | 119:17 172:23 | 142:4 143:3 |
| **cut** 79:1 168:2 | 201:10 | 172:25 | 147:1,14 158:7 |
| 189:1 201:21 | **dea** 51:17 | **definition** | 158:16,25 |
| 201:23 | 161:22,23 | 191:5 | 173:8 |
| **cv** 1:5 217:5 | 162:17 163:19 | **degrees** 53:3 | **deploy** 48:4 |
| | 165:15 189:1 | **delay** 101:3 | 57:1,3,5 59:23 |
| **d** | **dead** 150:19 | **delegate** 198:4 | 93:22 96:23 |
| | **deal** 33:9 60:24 | **delta** 60:12,13 | 101:14,15 |
| **d** 3:1 | 94:17 150:10 | 60:18 61:3,4,7 | 212:3,9,10,12 |
| **da** 196:24 | **dealings** 92:16 | 62:9 167:6 | 212:19 213:5 |
| **da's** 196:25 | **decade** 173:3 | **demeanor** | **deployable** |
| **dad** 122:2 | **deception** | 204:2 | 84:25 85:1 |
| **daily** 146:7 | 77:12 | **demonstrable** | **deployed** 47:20 |
| **dallas** 75:14 | | 209:9 | 50:11 51:11 |

142:5,6 149:3
149:12 156:13
176:23,25
177:15 178:20
179:6 182:3
185:13
**deploying** 69:2
86:4 146:1
149:8 195:24
196:3 212:1,2
214:2
**deployment**
11:20 12:3,8
46:10,12,13
47:15 48:20,20
72:15 84:23
90:19 122:8
123:12,16
128:7 138:24
140:15 146:16
146:24 158:3
158:19 159:15
159:16 178:16
178:23,24,25
182:16 185:11
185:22 186:15
186:22,25
187:1 197:25
212:7
**deployments**
25:5 113:18
159:7 177:21
182:4
**depo** 60:17
100:23
**deponent**
217:20,21,24
219:13

**deposed** 8:18
8:20,24
**deposing**
219:13
**deposition** 1:12
1:16 91:22
208:13 216:1
217:12,18,21
217:24
**deputies** 22:6
27:20 81:18
91:24 93:8
198:6,15,22
201:4,5,25
202:9,17
**deputized** 46:5
**deputy** 4:8,17
12:7 13:1,2,5,7
14:20 16:12,12
20:3,14 26:10
27:9,12,15
45:15 70:21
71:14 80:8,16
80:18,18,25
81:1,4 85:7
93:22 101:4,6
115:14,17
116:17 136:19
155:14 170:12
170:16 173:13
174:7,10,24
176:15,22
177:8,9,11,12
179:5 199:5,5
202:23 206:14
207:6,24
208:13

**derivatives**
163:1
**describe** 79:21
109:19 121:13
180:9 202:6
**described**
19:19 121:8
**describing**
109:17
**description**
3:12 216:11
**descriptive**
121:12
**deserving**
75:25
**designed** 34:4
193:19 213:1
**desire** 25:13
**destination**
73:13
**destruction**
43:6,10
**detail** 83:5
153:6 183:11
**detailed** 85:1
85:21 87:12,14
89:11 118:9,10
126:25
**details** 8:13
10:8 70:5
**detect** 64:19
**detected**
126:13
**detection** 67:23
103:2 135:13
143:1 155:25
172:18 182:15
187:1 204:9

206:3
**detectional**
68:4
**detective** 19:10
19:16
**detector** 64:11
136:3
**detention** 17:5
**deterioration**
70:16
**determination**
47:10
**determine** 9:11
25:16 74:21
137:10
**develop** 76:6
171:19 181:4
181:15
**device** 150:12
**dew** 191:12
**dialect** 107:24
108:19
**diaper** 167:24
168:17
**difference** 18:8
132:23 172:20
190:15
**differences**
118:4 122:5
**different** 18:18
21:22 30:10
31:13 33:5,16
34:6 38:17,21
38:22 39:20
50:20 52:21
53:8 54:7
55:10,13 56:12
58:15 60:7

76:21 94:14,15
107:20 108:12
108:18,24
109:6 110:12
118:6 120:7,9
121:7,23 122:1
123:18 127:17
129:1 133:17
133:24 134:1
138:1,19
140:10,12
151:6 152:7,8
152:14,14
156:23 163:17
163:19 164:18
168:9 170:22
172:6 174:13
178:8 179:2
180:19 182:21
201:14 210:25
211:11 213:21
**differently**
33:14 90:13
95:2 119:4
**dig** 37:2,3
**dime** 34:10
78:9
**direct** 44:5
80:22
**directing** 89:10
108:3
**direction**
138:20 156:22
156:22 211:23
**directions**
211:4,13
**directive** 144:1
144:4,5,6,8

145:13
**directives**
144:13 212:16
214:1
**directly** 81:21
82:7
**dirty** 167:24
168:17 193:6
**disciplinary**
174:16,17
**discipline** 68:1
143:3
**disconnected**
99:20
**discovery**
153:19
**discuss** 60:17
130:24 170:2
**discussed**
11:14 12:25
13:4,23 141:12
198:5
**discussion**
41:20 100:15
100:24
**dismissed**
165:23
**dispatch** 80:18
81:2 82:19
**dispatcher**
80:19 81:2
**displayed**
55:11 206:14
**displays** 37:25
**dissociate**
193:19
**dissociative**
61:21 62:3

147:12 167:5
167:19,23
168:13,15,16
168:19 190:5
193:1,5 204:21
205:23 206:2,6
206:7
**distance**
108:22 117:5
157:15,17,22
**distinction**
188:10
**distracted** 79:4
104:11 117:21
203:21 204:7
**distraction**
90:17 106:18
106:24 203:23
**district** 1:1,1
202:7,8 217:1
217:1
**districts** 201:21
201:22,24
**disturbed**
156:3
**diversion** 57:13
**divided** 201:17
**division** 1:2
20:5 71:13
217:2
**document**
49:14 128:4,6
128:6,16,20
144:10,11
145:3,25
146:14 148:9
148:11,18
152:16,19

154:4,8,12,20
155:9 162:8
193:7 216:12
**documented**
135:4,5 136:21
136:22,23
138:1 144:24
**documents**
15:5 43:24,25
44:14 130:17
144:12 160:12
176:6,12
**dog** 15:25
23:22,24 24:1
24:3,14,15,18
24:21,22,24
25:2,2,5,9
27:23 28:17,18
28:25 29:2,3,4
29:5,6,13,16
29:17,21,25
30:1,11,14,18
30:19,20,21
31:5,8,13,19
31:21 32:1,17
32:21,24,25
33:10,13,17,20
33:21 34:2,3,4
36:6,10,13,14
36:15,16 37:1
37:10,25 38:1
38:1,4,5,10,14
38:23,24 39:4
39:12,18 40:3
40:5,7,7,10,11
40:21 41:6,8
43:3 45:20
48:13 56:13,23

| | | | |
|---|---|---|---|
| 56:25,25 57:1 | 113:3,4,8,13 | 173:2,4,8,8 | 93:15 101:23 |
| 57:2,3,3,5,6 | 113:14,16,24 | 174:24 175:6,7 | 102:19 103:3 |
| 58:10,11,13,17 | 113:25 114:8 | 175:10,16,22 | 104:10 106:10 |
| 59:12,23 61:12 | 114:15,16 | 175:22,24 | 108:7 131:4,24 |
| 61:17,17 62:4 | 115:12 116:4,9 | 176:1,2,23 | 134:21 141:3 |
| 62:18 63:14,18 | 116:13,25 | 177:14,16,23 | 141:13 143:6 |
| 64:14,24,25 | 117:1,4,5,7,9 | 178:5,7,10,11 | 151:5,12 |
| 65:2,10,10 | 117:12,13,16 | 182:1 183:12 | 158:15 173:5,6 |
| 66:20 67:1,2,3 | 117:21 118:2,3 | 184:1,2,17 | 193:20 212:19 |
| 67:4,4,6,7,8,19 | 118:9,13 119:3 | 185:5,12 | 212:21 213:1,5 |
| 67:20,22,22,24 | 119:11,11,23 | 186:23,23,24 | 214:2 |
| 67:25,25 68:1 | 119:23,25 | 188:2,8,9,16 | **doing** 25:5 39:8 |
| 68:2,3,4,12,18 | 120:21 121:1 | 189:4 191:19 | 42:7 47:14 |
| 69:1,2,3,3,4,9 | 121:11,24,25 | 191:23 192:19 | 48:1 49:10 |
| 72:13,22 79:6 | 124:5 125:12 | 193:3,13,19,22 | 53:11,14,16,25 |
| 84:13,14 85:20 | 130:1 132:14 | 194:16,18,20 | 54:18 55:5,5 |
| 87:3,5,7 89:10 | 132:17,21 | 194:22 196:4,6 | 70:25 72:1 |
| 89:13,14,16,16 | 133:2,3,4,5,5,8 | 203:19 204:19 | 74:14 77:9,14 |
| 89:19 90:21 | 133:16 134:4,7 | 205:1,2,6,10 | 93:14 95:4 |
| 91:13,14 95:5 | 135:13,19,22 | 205:12 206:21 | 103:1 106:19 |
| 95:9,14 96:23 | 136:1,2,19 | 207:3 209:3 | 107:18 113:24 |
| 97:11,13 98:10 | 137:5,11,17,21 | 212:1,2 213:15 | 113:24 118:1 |
| 98:15 99:5,12 | 138:7 141:1 | 213:18,19,20 | 121:2,12,19 |
| 99:13,17,19,22 | 142:5,6,9,11 | **dog's** 31:7,14 | 130:19 133:12 |
| 99:24,25 100:2 | 148:10,12,13 | 35:18,19 39:7 | 139:18,18 |
| 100:4 102:6,11 | 148:19,20 | 39:21 102:22 | 142:25 143:1,2 |
| 102:12,14,17 | 149:3,4,6,14 | 105:24 111:20 | 143:2,2 147:7 |
| 102:25,25 | 150:3 151:2,8 | 112:20 113:4 | 160:24 169:12 |
| 103:1,18,18 | 151:11,12,13 | 121:25 140:13 | 174:1 176:11 |
| 104:5,7,19,19 | 151:14,16 | 140:14 204:2,2 | 182:20 185:5 |
| 104:21,24 | 152:17 156:2,9 | 204:3,3 213:10 | 188:23 201:8 |
| 105:16,21,22 | 156:25 158:21 | **dogs** 22:20 | 211:3 |
| 106:9,11 107:7 | 159:9,11,24 | 27:20 28:2,10 | **domestic** 71:2 |
| 107:16,18,21 | 163:17 164:3 | 28:13,15,22 | **door** 73:22 |
| 107:24 108:13 | 166:20,21 | 32:13 37:17 | 91:11 92:19,21 |
| 111:13,16,22 | 168:5 169:15 | 40:3 55:24 | 99:9,11,12,13 |
| 111:25 112:11 | 171:10,14,24 | 56:5,6,8,21 | 99:21 119:12 |
| 112:16,16,21 | 171:24,24,25 | 67:18 79:8,11 | 119:13,14 |

120:2 132:4,5
132:6,7 187:22
199:9 208:4,9
**doors** 91:11
119:19
**dope** 84:5
151:18,18
168:6 204:25
204:25
**dosage** 195:8
**dose** 192:23
**double** 153:23
**doubt** 112:5
136:4,13
177:20
**downtown**
151:9
**draw** 84:1,3
**drawer** 193:12
**drive** 24:19
28:18 102:22
103:6,19
147:20 148:2
**driver** 72:25
73:21 74:24
85:24 86:3,11
91:11,11 95:7
95:8,10,15,15
95:16,24 96:20
96:21 98:25
99:8 100:15,17
101:7 105:2
113:10 115:13
115:13 129:23
156:24 179:24
**driver's** 90:14
99:11 111:11
114:1,1 208:4

208:9
**driving** 75:24
77:10 149:17
179:15
**drop** 127:17
**dropback**
127:8
**dropboxes**
130:20
**dropping** 156:5
**drugs** 4:24
30:4,14 31:22
34:6 37:10
52:1 54:23
64:15,16,18
70:19 73:12
74:19,21 77:22
77:23 79:21
113:9,11 114:4
125:12 126:12
139:1,12,24
141:2 147:10
147:20 148:2
151:4 152:14
161:8 162:10
162:12,15,16
162:17 164:11
183:13,17
188:6,7,20
194:16,17
195:5 199:6
209:23,25
**dryer** 194:9
**dual** 23:23 67:8
67:15,17,19
68:3,4,7 79:12
156:1 173:5,7

**duct** 205:25
**dude** 17:19
22:19 42:10
78:17 97:3
117:25 176:9
**duly** 1:18 4:2
217:17
**dummy** 147:9
**dutch** 107:22
**duties** 70:11
71:12
**duty** 10:11
16:25 24:6
103:17 170:13
**dwis** 18:12

**e**

**e** 2:1,1,6,11,15
3:1,11 4:17,17
4:18,18 130:14
**earlier** 163:24
167:7 182:25
188:25 193:2
199:21 200:20
**earth** 156:3
**easier** 92:17
110:21 178:9
**easiest** 178:3
**easily** 129:14
132:6 134:14
134:15
**east** 75:13,15
**ecstasy** 65:5,5
65:6,9,12
79:16 135:1
**eggs** 69:6
**eight** 92:7
130:21 139:19

139:22 202:13
**eighth** 152:9
**either** 8:11
10:12 16:12
25:15 30:23
36:9,18 49:10
52:16 63:9
67:18 69:1,16
83:22 84:25
85:1,10 86:13
94:24 95:21
96:4,7 98:3
99:19 107:5
110:20 112:15
113:25 126:11
129:12 131:12
137:21 138:20
139:23 152:1
159:3,21
168:11 175:23
181:25 183:17
185:7 189:7
195:1 200:14
213:16
**elderly** 212:20
**eliminating**
150:14
**emergency**
76:16
**employed**
218:1
**employee**
218:3
**empowered**
46:7
**empty** 194:16
**encouraged**
118:24 150:18

**ended** 21:21
24:6 27:14
**ends** 174:25
**enemy** 110:18
**enforce** 72:9
**enforcement**
17:11 70:14
71:17 88:22
93:22 178:13
**enforcing**
18:13 71:23
**enjoy** 11:1
**ensure** 107:13
**enter** 126:23
130:17,20
146:16 153:16
185:16,17
**entered** 138:24
184:22,23,25
**entering** 186:7
**entire** 12:6
14:16,24 27:16
44:3 54:13,17
82:5 100:22
201:22 210:6
210:18
**entirely** 205:15
**entries** 186:15
**entry** 22:11
99:8,12 102:12
129:3
**environment**
151:21
**environments**
47:25
**equation** 30:6
30:12 90:12

**equipment**
49:12
**err** 212:1
**errata** 219:11
219:13,16
**error** 30:20,25
**errors** 31:1
153:5
**escape** 99:17
**essentially**
152:1 198:21
**estimate** 7:14
202:12
**estimated** 9:9
**estimations** 8:2
**et** 123:23
155:20 219:4
**euphoria** 61:10
**evasive** 53:14
**event** 87:23
145:17
**everybody** 53:8
76:22 82:9
**everybody's**
75:12 76:22
**everyone's**
94:7
**evolution**
116:24 143:4
146:2 156:20
158:16 159:1
**evolutions**
207:4
**exact** 8:13 9:15
37:16 58:19
145:6 158:23
**exactly** 15:18
38:2,7 39:5

40:9 47:2
91:15,25 93:17
122:25 125:15
126:19 127:18
144:3 145:6
160:6 183:8
196:16 200:5
**examination**
3:5,6,7 4:3
206:12 208:23
**examine** 74:14
**example** 33:10
43:1 81:5
89:18 144:6
148:12 167:21
188:11 195:22
196:18 209:10
212:13,19
**examples**
200:24
**excellent** 16:24
65:13 110:9
154:24 187:5
**except** 216:2
**excerpts** 12:5
14:15,19
**excited** 206:23
**exclude** 79:16
**exclusively**
56:6
**excuse** 80:8
81:5 105:23
131:10
**executed**
216:13
**exhaustive**
52:11

**exhibit** 3:13,14
3:15,16,17,18
3:19,20,21
41:19 76:21
123:10 143:19
153:1 154:8
155:11 176:10
185:23 208:12
**exhibited** 207:2
**exhibits** 160:16
**exist** 77:14
**existence** 13:24
**expect** 7:12
**expected**
208:18 209:2,3
**expecting**
90:10
**expedite** 84:23
**experience**
57:2 63:11
72:15,24 88:8
90:9 97:5
105:24 108:15
109:3 113:18
117:9 132:13
134:4,12
137:22 138:6
147:16 157:19
205:5,18 208:5
210:8
**experienced**
22:13 45:16
108:13 178:8
178:10
**expert** 9:22
19:6
**expertise** 191:7

**expiration**
218:12
**expires** 216:20
**explain** 6:6
20:19 36:5,24
110:19 149:17
173:15 177:9
208:25 212:11
**exploding**
29:20
**explosive** 27:13
29:4,17,25
67:25 68:6
69:3,4 103:9
155:24
**explosives** 28:5
29:6,13,16,22
30:4,6,11
31:20 32:2
70:19
**expose** 65:11
**exposed** 97:12
205:6,9
**exposure**
213:16,24
**expressed**
216:13
**extent** 60:23
**exterior** 86:25
87:13 89:7
97:24 99:5
100:2 101:16
102:10,11
115:1 116:5,14
117:10,16
**extra** 56:16
**extremely** 60:2
100:7,13

190:21 206:10
206:23 207:3,4
210:12
**eye** 23:24,24
52:6 53:7,8,17
54:5,12 77:1,5
77:14,17 97:6
211:5,5
**eyes** 53:17,22
53:24 54:13
56:16 59:19

**f**

**f** 106:16 217:20
**face** 106:1
**facet** 93:23
**facets** 156:9
**facilitate** 71:15
**facility** 69:10
69:11
**facing** 111:3,4
**fact** 13:15
133:15 134:2,7
138:19 139:12
150:18 151:3
160:8,23 166:6
183:17 188:22
208:11
**factor** 76:19,20
110:16 113:16
**factors** 114:19
195:15
**facts** 80:4,16
83:9 84:17
87:11 88:21
**fails** 219:18
**fair** 5:18 8:1
9:2,16 13:23

15:4,20,23
16:6 17:2
20:17,20,21
26:3 28:25
29:9 42:18
43:5,23,24
44:5 63:13,17
65:13,23 68:11
68:24 69:14
70:23 71:25
79:3 87:14
90:10 101:22
102:14 113:8,8
113:20 118:17
122:7 124:20
124:21 125:11
125:23 126:4
126:15 130:16
131:17 132:14
132:18,20
134:16 135:24
136:12 138:11
140:24 141:7
142:15 143:5
143:13 145:3,7
145:9 147:23
153:7,17 154:2
155:17 165:11
166:2 167:13
167:16 168:25
169:14 172:11
200:7,9,17
206:10
**fairness** 69:15
**fake** 162:11,15
162:16,17
**falling** 183:3

**false** 138:12
141:2,19
183:18
**familiar** 63:7
**far** 14:9 22:11
26:23 51:20
58:10 71:6
143:11 211:21
**fashion** 71:12
178:16
**fast** 40:11
101:1,22
**fault** 51:1
56:18
**favor** 95:10
109:18 125:23
153:3 185:21
**feasible** 212:4
212:6,7
**february** 50:4
51:8
**federal** 1:24
212:5
**feel** 38:20
56:17 65:25
211:19
**feeling** 61:10
**feels** 62:7
**feet** 33:18
**felon** 181:1
**felony** 180:17
180:18
**felt** 21:24 24:4
211:2,7,17
**fender** 98:25
105:3 111:11
111:12

Officer George Herrara                                    April 17, 2024

[fentanyl - foregoing]                                    Page 20

fentanyl 213:3
  213:8,9,24
field 48:20 93:8
  128:1 129:14
  147:18 149:19
  150:8 159:14
  168:11 173:5,6
  177:15,21
  178:20 179:6
  182:16 193:13
  195:9,11,12
  205:9 210:23
fields 94:18
fight 112:12
  181:7
figure 30:15
  38:7 41:15
  57:1 111:18
  133:13
figuring 33:19
fil 187:11,13,24
  188:5
file 169:11
files 167:19
fill 103:3 119:8
  129:9 154:20
  168:3
filled 122:21
  124:10 127:3
final 33:6 36:8
  36:12,13,17
  38:4 104:6
  111:20 114:11
  114:24 120:22
  131:12 133:2,8
  133:20 137:7
  148:13 195:19
  208:3

finalize 40:8
finalizing
  114:21
finally 38:24
  178:1
financial 218:4
find 28:10,13
  28:15 29:13
  38:2,16,24
  40:9 49:8 62:4
  68:6,6,6,7 96:1
  98:12,13 103:7
  103:8 110:24
  114:4 121:3,20
  138:6,8,9,9,16
  139:1 146:3,21
  148:19,21,24
  149:7 151:18
  151:19 155:3,6
  155:7,22
  156:10,15
  159:13 183:18
  185:15 194:11
  196:7,10
finding 61:25
  114:6 141:2
  195:8,11
finds 37:1
  172:22
fine 4:9 9:3,5,7
  21:19 56:4
  126:15,16
  134:19 138:14
  199:14 210:24
finish 5:12
firearms 21:13
  22:7,8 88:15
  88:17 170:24

firm 15:11
  218:13
first 4:2,13
  11:10 17:3
  24:11 27:11
  40:13 41:25
  46:15 60:3
  62:18 65:14,14
  65:19 66:16
  80:17 91:21
  97:24 100:13
  101:16 102:3
  114:9,12
  123:15 125:8
  148:24 149:7
  149:11 161:20
  167:9 172:23
  172:25 176:16
  178:18,19
  182:3,5 187:6
fist 109:9
fit 24:5 25:22
  210:14 212:25
fitness 22:8
  170:24
five 10:24
  41:14 73:19
  79:15 117:3
  142:1,11 149:2
  149:12,13
  158:25 159:3
  187:23 194:21
  194:21 195:11
  195:12,12
  203:12
fix 198:14
flakes 209:17

flakey 191:3
flat 109:12,12
fled 156:24
flight 156:23
flip 153:4
floor 178:15
flower 62:20
  62:23 63:4,10
  63:15 166:13
floyd 27:9,15
  170:12 177:8
  177:12 211:6,6
fluctuates
  173:4
focus 79:7
folding 97:12
follow 39:24
  64:4 67:15
  100:10 115:6
  119:7 120:1
  191:24 208:25
  210:5
followed
  118:15 199:20
following
  217:16
follows 4:2
food 167:25
  187:13 192:15
foolish 29:24
foot 98:6
  116:20 158:20
footage 11:19
  12:4,6
force 10:10
forced 48:15
foregoing
  216:1,12

forehead  53:2
foremost
  123:15
forget  67:14
forgive  19:8
  49:6 152:9
  174:22
forgot  51:5
  199:19
form  59:17,18
  60:13 106:5
  122:20,22
  123:3,18
  126:11 154:13
  163:17 165:25
  167:22 186:17
  186:24 187:1
  205:16
forming  171:10
  175:24
fort  218:14
forth  40:14
  82:21 133:11
  133:13 204:13
found  125:12
  125:16 126:12
  127:5 139:8,14
  139:24 149:4
  168:6 183:13
  188:20 208:13
  208:14 209:4
four  64:9,12,18
  65:3 66:21,23
  73:22 79:15
  96:24 97:19
  134:21 135:8
  135:15 136:11
  136:14,18

145:18,18
  192:15
frame  60:8
  93:6 147:3
  158:24 172:10
  177:22
frames  60:8
framing  63:25
frcp  217:19
freaking  151:2
free  6:21 85:1
  85:20 86:14,15
  86:18 87:6,10
  88:24 89:5,13
  89:19 95:2
  102:3 116:5
  118:7
french  107:23
fresh  65:16,17
  65:18,18,19
fresheners
  168:9
friday  202:20
  202:21
friend  110:17
friendly  130:19
fries  187:15
frigerio  1:22
  2:8,8,9 3:6
  42:4,7 44:20
  69:24 157:14
  165:25 169:21
  205:16 206:13
  206:20 207:14
  207:21 208:21
  209:18,18
  210:3,8 214:11
  219:1

frigeriolawfir...
  2:11 219:2
front  8:19 37:6
  99:9,11 111:3
  111:8,15,19
  112:20 113:10
  114:12 196:4
  208:4
frustrate
  112:16
frustrated
  38:24
frustration
  132:2,9
fry  187:14,20
ftoing  182:22
full  18:4 33:17
  214:6
function  156:1
funny  43:12
further  3:7
  102:6 116:15
  133:7 137:24
  137:24 206:11
  208:23 217:19
  218:1,3
future  69:10
fyi  13:12

**g**

g  4:17,17
g.com  2:15
gamboa  200:6
gaps  92:15
gear  18:4
geared  55:23
general  17:25
  45:15 49:9

53:11 65:7
  69:18 70:25
  122:9 123:3
  142:14,18
  202:4
generally  8:2
  20:23 36:22
  40:12 45:5
  47:21 48:10,18
  56:3,22 65:11
  66:20 76:10
  79:21 82:11
  88:25 98:11,23
  98:24,24 99:6
  99:20 102:19
  105:7,9,10
  110:15 113:11
  113:21 123:5
  123:15 126:11
  129:6,7 137:4
  145:4,5 153:7
  153:20 157:19
  173:15 182:8
  189:5 192:22
generate  128:4
generated
  128:8
generates
  186:7
george  1:13,16
  3:4 4:1,17
  81:19,20,21
  83:1 216:1,4
  216:10 217:13
  217:17 219:5
german  23:24
  24:11 107:23

**gesture** 108:6,8
  108:11
**gestures**
  108:25
**getting** 35:13
  39:23 59:15
  113:16 161:19
  165:23 172:2
  180:2 211:24
**giardia** 106:13
**give** 7:13,22,23
  9:9 10:9,22
  11:15 13:21
  14:17,18 17:24
  27:1 36:11
  38:5,8 39:15
  42:17 43:25
  44:15 52:9,11
  52:13 63:23
  67:13 70:5,7
  79:1 80:14
  86:2 92:15
  98:11 101:19
  104:18 107:14
  107:22,24
  108:17 116:13
  117:2 119:1,6
  119:15,22
  129:4 138:8
  155:19 158:23
  160:11,11
  167:10 191:18
  191:19 212:23
**given** 41:18
  43:21 48:3
  55:6 74:20
  79:25 83:23
  114:10 123:23

123:25 124:2
127:10 138:12
140:25 141:24
148:10 151:6
181:18 216:14
217:18
**gives** 87:7,24
  88:11 111:13
  114:11 118:9
  133:20 184:20
  185:18
**giving** 71:21
  72:20 87:16
  98:21 99:17
  111:20 112:17
  117:11,14
  137:7 141:1
**glass** 189:7,16
  191:4,7 205:24
**glebe** 2:4
**glove** 199:2
**gloves** 189:12
  193:8,8 198:20
  198:21,25
  199:1,6
**go** 8:18,21 12:1
  17:8,9 18:4,21
  21:21,24 22:3
  23:3,14 25:13
  29:19 31:3
  36:8 38:4 39:4
  40:19 45:21,22
  46:2,14 47:14
  47:17,18 48:4
  49:25 50:24
  58:24 66:20
  71:15 72:21
  79:19 81:12

82:9,12,16,19
82:20 83:1,5
84:6,22 85:3
85:17,19,19,21
87:12 93:1,1
95:14 96:14
97:15 98:4,12
98:25 100:5
102:24 104:17
109:10,11,14
111:11,17
114:13,25
116:3,18,19
118:8,10
119:13,23
127:24 132:25
133:8,14
142:14 144:20
149:10 152:22
153:2 155:7
159:12 160:18
174:10 175:24
182:11,12,15
182:17 187:21
194:7 195:18
196:6 200:25
205:2 208:7
211:9,10
**goal** 193:2,2
  194:10,11
**god** 35:8 87:17
**goes** 33:11
  97:13 98:7
  103:15 111:16
  118:2 133:3,3
  133:3,21,23
  148:20,23
  164:14

**going** 5:8,12
  6:4,14 7:11
  11:13 14:4,5
  21:9 23:13,14
  25:1,19,21
  33:20 38:17,21
  38:22,25 39:19
  40:10 41:12,15
  43:25 47:25
  48:21 51:2
  52:10 53:11,15
  66:5 69:2,21
  70:6 73:14,19
  74:10,22,23
  75:2,3,12,14
  75:23,25 76:1
  76:17,21,23
  77:8 79:5
  81:20 82:20
  83:5,12,13
  84:21 85:3,4,5
  85:6 86:4
  87:15 88:2
  91:14 92:9,9
  94:7,25 95:6,9
  95:12,12,14,16
  95:17,22,23,25
  96:1,3,4,4,5,6
  96:7,7,9,10,10
  96:23 97:9,18
  97:21,22,23,25
  98:1 100:16,19
  101:13,13,15
  101:16,17,18
  102:3,5 109:24
  110:3,4,6,7,10
  111:13 112:4,7
  112:9,12

[going - handler]

113:13 114:6,9
114:12,13
115:9,9,12,13
115:24,24
116:6 117:8,10
117:13,20
118:8,8,10,11
118:11,12,24
120:1,2,21
121:4 122:3
123:2 130:23
137:3,16
140:11,22
142:4,5 143:10
143:17 151:8
151:13,18
152:19,20,23
154:7,25 155:8
157:7 159:23
160:11,11,14
164:21 168:8
168:19 171:9
171:25 172:11
172:20 173:18
177:4,16 180:5
180:22,22
181:3,4,4,10
182:5,17,18,18
182:23 187:23
191:21 200:15
204:9,13 205:1
207:17 208:25
211:10 214:7
**gonna**  204:12
212:9
**good**  4:6 6:17
6:25 14:12
15:13 22:19

24:21,23 25:21
37:11 47:14
49:23 63:14,22
77:20 81:18,20
85:17 88:4
103:22 106:10
111:2 115:4
119:4 121:15
126:8 133:21
147:3 175:9
180:24 206:10
210:24 211:3
214:9
**gorgeous**
113:23
**gotcha**  45:2,2
**gotten**  24:3
124:20
**grab**  98:6
**grade**  161:22
161:23 163:19
164:25 165:2
165:15 189:1
**gram**  32:21
77:24 149:1
152:6,10 190:1
192:23,24
193:21 197:6,7
209:14
**grams**  33:10
148:6,6 152:1
152:6 195:12
197:9,12
**grass**  98:12
**great**  14:4 42:8
91:16 97:3
109:16 140:21
160:22

**green**  62:10
191:3 195:23
**greenhill**  2:13
**grew**  24:11
41:3
**grocery**  75:3
**ground**  109:12
109:13 156:5,7
**grounds**  15:18
**group**  20:1
42:22 145:15
146:7
**groups**  96:24
135:15 192:15
202:2
**guarantee**
177:19
**guess**  26:4
139:22 156:19
200:21
**guessed**  186:3
**guessing**  184:7
**guide**  88:22
**guideline**  40:20
**guilty**  9:11,12
**gun**  68:7
**gunfire**  143:3
**guns**  28:11
30:14
**gunshot**  11:23
**guy**  57:21,22
57:25 58:1
77:16,17 78:14
119:13 151:9
156:24
**guys**  18:4 88:6
181:5 203:11

## h

**h**  3:11 4:18
**hair**  75:5 102:6
121:21,21
**half**  192:23
193:21
**hallway**  119:14
119:16
**hand**  26:13
44:2 97:15,16
105:20,21,25
106:2 108:6,8
108:11,23,25
109:7,8,12,25
110:6 128:9
216:14
**handed**  176:12
**handle**  26:2
30:18 43:10
46:2 100:8
104:18 116:19
183:1 199:9
**handled**  19:15
**handler**  23:21
24:15,15,21,23
24:25 25:6,12
25:16 26:18
27:4,10 37:25
37:25 38:25
39:11,11,13,20
40:6,7,21 43:4
43:8 45:16
47:13,23 56:14
65:22 66:19,20
67:1,2,3,6,18
68:2 69:5,10
71:15 80:24,25

Officer George Herrara                                          April 17, 2024

86:20 87:4
95:14 113:6
115:11 124:4
125:6 145:20
145:25 147:14
156:21 158:7
171:22 173:20
175:8,15,21,24
176:24 178:9
178:10 182:11
182:13,19
183:6 202:18
204:16 206:17
206:22 213:15
**handler's**
24:19,19 48:18
110:17 137:22
175:12,22
177:12
**handlers**
103:16 144:7
201:7
**handling** 10:21
16:1 207:7
**handover**
173:10,16
**hands** 4:12
52:22 54:17,19
188:13
**handwriting**
128:2,10
**handwritten**
154:18
**happen** 5:5
29:20 30:8,9
46:3 81:3,21
94:12 104:13
113:19 121:22

134:8 136:7,7
140:5 153:5
170:10 172:8
183:5 184:8
**happened**
13:13 20:24
50:15,17 51:6
104:15 138:1
138:10,18
175:3
**happening**
16:17 27:14
87:23 134:13
174:25 183:4
**happens** 69:22
79:6,22 94:9
101:23 114:21
134:8 140:16
140:25 146:6,7
148:15 174:23
205:5
**happy** 6:19
**hard** 14:17
15:1 19:13
25:14 78:18
154:15,15
172:22
**harder** 63:24
110:20,22
**harnessing**
103:6
**hate** 152:22
**hazard** 80:11
**he'll** 38:14
**head** 8:11
29:11 43:19
60:19 96:13,16
98:16 110:4

121:18 133:12
133:13 140:17
156:6 159:8
168:23 202:11
208:8
**headed** 75:12
**health** 213:14
**hear** 82:6,9
170:14
**heard** 13:20
55:3 58:13
187:7 205:5
**hearing** 9:20
**hearings** 9:13
127:22
**heavily** 133:11
**hebert** 2:3
**heck** 37:5
**hector** 2:9
**help** 20:16 27:1
35:16 56:25
58:18 67:6,21
69:1,6,16
88:22 92:15
112:15 140:8
142:21 143:23
203:17 212:25
**helped** 27:16
**helpful** 60:2
100:7,13
190:21
**helping** 27:17
56:14 71:4
**helps** 59:21
84:22
**hemp** 169:2,3,4
169:12,16

**hereto** 1:25
**heroin** 32:5
34:19,23,25
57:22 58:1
96:14,25
101:12 127:16
134:23 135:20
135:21 147:7
161:12,14
162:6,9 163:9
163:11 166:10
167:21 189:22
191:10,11
192:16
**herrara** 219:5
**herrera** 1:13
1:16 3:4 4:1,17
101:4 115:14
136:19 206:14
216:1,4,10
217:13,17
**hey** 13:11
39:13 53:14
75:11 77:13
81:13 82:18
83:1 92:12
101:4 106:5,9
106:19 112:17
117:23,24
121:1 122:1,2
132:9 133:17
156:24 169:8
191:6
**hid** 148:12
**hidden** 150:5
**hide** 39:2 146:5
**hiding** 156:16

Officer George Herrara                                    April 17, 2024

**high** 18:2 24:21
24:22,25 25:17
26:5,8 59:19
102:12 109:8
111:24 162:1,5
163:6 164:7
165:4 180:5
202:3 207:2
208:7,7
**higher** 19:15
180:15 192:25
197:6,8
**highly** 59:14
118:23 162:1
**highway** 45:10
48:22 49:1,3,4
49:7 50:9,12
71:20,22 72:19
83:11 99:7
**hill** 24:3 43:3
**hire** 25:16
**hired** 17:3
**history** 11:2
**hit** 19:4 35:8
66:21 77:8
149:10 178:15
213:4
**hitting** 134:7
**hold** 130:23
**holding** 110:1
**home** 41:9
**homicide** 18:11
18:17 20:17
71:4 94:16,18
**honest** 9:14
15:19 31:17
41:5 73:8 88:5
130:15 154:23

**honestly** 15:18
23:12 44:1
63:9 89:21
125:3 126:14
165:22 166:10
174:11 188:21
**hood** 111:4
**hook** 116:22
**hope** 44:19
115:5 147:24
**hopefully**
185:6
**hoping** 15:24
**hormones**
156:6
**hostage** 18:2
**hot** 158:20
179:3,11 180:9
180:12,14,16
181:2
**hour** 9:4 47:6
65:23 66:1,5
66:12 92:7
130:21 146:19
146:19,23,23
147:2 150:20
158:24
**hours** 18:25
91:21 143:7
144:23 145:6,8
146:10,17,18
158:25 159:3
159:23 160:3
199:7 211:16
**house** 36:10
60:15 135:10
136:23 146:1
173:21 174:4

175:12 177:14
182:8 210:14
213:9
**houses** 201:15
**houston** 75:13
**hub** 49:2
**huge** 57:17
59:14 110:25
162:8
**huh** 5:7,17
18:20 19:17
21:8 35:5
36:21 38:13
49:24 60:20
64:6 74:25
80:6 89:2
91:18 102:2
104:22 123:24
142:10 150:21
150:21 151:24
157:6 161:9,11
190:14 197:14
**human** 76:15
77:9 103:8,10
150:10,14,15
188:3 189:11
**hundred** 7:18
7:19 140:3
**hypothetical**
195:25 196:3
196:18

**i**

**i.e** 178:3
**i.e.** 47:24 71:7
87:1 92:19
103:7 119:21
132:4 133:2

136:25 163:18
175:11 211:5
212:23
**idea** 13:12
27:11 53:22
54:1 77:18
95:20
**identifiers**
127:3
**identify** 44:14
100:16 125:6
**identity** 216:11
**ignorance** 19:8
49:6 82:4
201:11
**ignoring**
132:10
**ii** 4:17,18
**iii** 1:7 217:7
**ij** 15:12
**ij.org** 2:6
**illegal** 4:24
39:2 49:2,11
96:2 97:20
101:10 164:9
164:15 165:19
165:24 166:14
**illicit** 51:25
**illuminating**
189:5
**imagine** 15:25
34:9 201:19
**imagining**
56:18
**immediately**
52:19 76:16
112:4 119:25
208:10

**impact** 19:5
**impair** 5:6
**impaired** 59:22
**implemented**
 92:3 94:22
**implementing**
 207:1
**implying** 148:1
**important**
 145:10 188:10
 205:21
**imprecise**
 143:5
**imprecisely**
 72:7
**impressed** 97:3
**imprint** 69:1
**imprinted**
 29:21 30:1
 32:2 67:5,7
 68:13
**imprinting**
 67:4 69:17,17
**improper**
 148:1
**inadequate**
 211:19
**inartfully**
 35:12
**inarticulable**
 133:15
**incidences**
 82:23
**include** 67:9
 135:1 197:18
**included**
 163:14 167:18

**including**
 54:19 87:12
 98:2 160:2
 209:6,7
**increments**
 152:5
**independently**
 25:22 48:13
 141:9 176:2
 182:10
**indicate** 168:15
**indicated** 67:16
 191:19 208:3
**indicates** 113:9
**indicating**
 121:1,20
 172:15
**indication** 87:8
 111:14,14
 120:9,11,14,19
 120:20,21
 121:1,4,7
 124:7,8,14,17
 124:19,20
 131:18 192:13
**indicator** 77:15
**indicators**
 51:22
**indifferent**
 210:24
**individual** 1:6
 1:7,8 74:11
 146:9 154:16
 157:1 217:6,7
 217:8
**individually**
 145:24 146:6

**individuals**
 18:2 20:1
 22:13 49:8
 59:13,25 68:10
 159:8
**industrial**
 165:3
**industry**
 175:20 176:4
 180:13 211:22
**inert** 163:5
**inference**
 128:24
**influence** 60:1
 63:20
**influx** 57:18
**information**
 55:11,15 79:25
 84:25 87:23
 180:6
**informational**
 59:25
**ingest** 213:15
**ingestion** 61:10
**initial** 201:20
**initially** 161:19
 161:20 175:25
**injured** 24:6
**innocent** 9:11
**inside** 29:23
 38:17 74:10
 90:5 93:4
 96:15 97:10
 98:1,16 99:18
 99:19 101:18
 102:12 111:22
 119:3,20
 135:21 149:20

**individuals**
 150:4,5,5
 151:7 189:3,16
 190:11 191:4
 191:13 202:1
 210:13
**insight** 179:24
**instance** 1:17
**instinct** 74:17
**institute** 2:4
 15:12
**instruct** 92:8
**instructed**
 47:11 93:9
**instructor**
 27:10 49:18,22
 55:12 203:8
**instrument**
 216:12
**insurance**
 10:21
**intended**
 129:22
**intense** 121:16
 204:12
**intensively**
 121:17
**intentionally**
 133:11
**interact** 46:8
 57:6 63:19
 93:20
**interaction**
 56:11 59:13
 74:24 86:12
 92:7 96:22
**interactions**
 56:9 92:16
 94:19

**interchangea...**
192:5
**interdiction**
45:10 48:23
49:1,4,7 50:9
50:12 51:15,20
55:5,6,8 56:20
92:5,6 170:24
199:22 200:3
200:10
**interdictors**
73:5
**interest** 218:4
**interfere** 102:7
**interim** 86:7
**interior** 87:13
89:7 97:25
99:5,6,22,24
101:17 102:13
115:1 116:10
118:12
**intermediate**
19:1
**internal** 128:4
128:16 142:14
142:17
**interplay**
200:17
**interpret** 53:7
83:17 122:5
130:9 132:16
134:10 183:15
183:16 192:7
**interpretations**
183:21
**interrupting**
207:19

**intervention**
213:20
**interview**
45:13 53:13
72:25 96:22
129:2
**interviewing**
45:13 96:21
**interviews**
49:19 51:21
**intoxication**
8:11 18:12
**intro** 11:8
**introduction**
57:16 59:20
60:10
**intros** 11:9
**investigate**
18:16 20:8
133:7
**investigating**
8:15 80:25
81:1
**investigation**
18:12,19,23
19:2,7 20:2,16
174:18 179:21
**investigations**
19:15,18,21
20:5 71:4
**investigator**
19:11 20:3,4
80:7
**investigators**
20:13 94:17
**involve** 55:24
**involved** 16:10
26:12 213:3

**involvement**
16:9 171:5
**involves** 56:19
**involving**
207:24
**iq** 207:2
**issue** 71:5 88:1
108:10
**issues** 48:14
90:19 174:16
174:17
**item** 206:6,7
**items** 174:2
187:19 205:23

**j**

**jail** 17:7
**january** 49:14
50:18 178:22
**jar** 150:6
**jars** 189:7
205:24
**javier** 1:8
217:8
**jazzmen** 1:20
217:15 218:11
218:11
**jesus** 97:1
**job** 10:14 19:9
19:19 25:20,24
25:25 91:24
103:14 109:16
110:20 141:4
177:13 182:21
183:5
**joel** 1:5 217:5
219:4

**join** 16:24
81:12
**joined** 27:8
**joint** 78:8,24
129:24 130:2
**joke** 43:12
**judge** 8:19
78:19,20,22
**judging** 147:25
**judgment** 15:1
132:13 203:17
203:18
**jugular's** 52:24
**jump** 5:8 58:22
**jumping** 38:15
**jury** 8:19 9:10
78:22
**justice** 2:4
15:12
**justifiable**
196:10,10
**justify** 177:8

**k**

**k** 17:21 18:8
21:5,16 22:20
22:25 23:4,19
23:21 24:2,4,8
24:9 26:18
27:4,5,7,12,13
27:15,19 30:1
35:18,19 40:23
41:4,9 43:2,7
45:9,11,12
46:7,9,15,20
46:22,24 47:3
47:8,10,11,19
47:19,22,22

50:8,16,19
51:12 55:23
56:19 59:1,5
61:16,25 64:9
65:18 66:15
70:7,20,20,21
70:21 71:9,11
72:4,8 80:11
81:7 86:3,4,20
86:25 88:18,18
92:2,3,5,6,10
92:12,13,25
93:3,9,20,22
94:14 96:1,1
97:24 98:1,5,5
98:6 101:5,14
101:14,15
115:14,21
116:1,19 128:4
128:7 136:8,9
136:10 138:24
141:24 143:13
144:13 151:14
151:15 156:1
162:22 167:5,8
167:24 170:7
170:17,25
171:3,5,22
174:12 175:14
175:15 177:21
178:14 182:3
185:13 198:4
198:15,23
199:5,20
200:11 201:5,7
201:10 202:9
202:17 203:3
206:15,21

207:24 210:20
**k2**  60:6 61:25
**k9**  13:2 14:20
162:20
**keep**  25:17
69:21 97:12
103:17 119:10
140:22 184:10
197:24 207:19
**keeping**  56:15
**keeps**  103:18
**kennel**  69:9
174:3
**kenneled**
175:11,12
**kept**  41:24
54:12 149:18
149:20 189:6
**key**  81:3
**keycard**  128:13
**keying**  92:11
**kid**  40:22
159:22
**kiddish**  77:21
**kids**  75:2
**kill**  74:16
213:20
**kilo**  33:12
**kilogram**  33:11
**kilograms**
34:23
**kilos**  192:20
195:11
**kind**  31:1
38:20 41:5,8
68:23 69:9
70:4 73:10
75:18 78:2

86:8 100:14,19
118:20 121:12
148:2 186:25
187:5 190:19
**kinetics**  52:8
**kiss**  106:1
**knew**  64:19
72:7 103:22
130:5 145:22
188:22 213:2
**knife**  97:12
**knocking**
210:15
**know**  6:7 7:12
9:19 11:5,6
13:15 14:17
15:18,25 17:23
17:24 19:13
22:14 29:14,20
29:23 30:23
31:19,21 32:3
32:6,9,17,21
33:12 35:6,7
35:16,22 38:1
40:7 42:21,24
43:14 44:7
45:17 46:5
49:6 50:14
51:10 52:6
54:24 56:3
57:4,17 60:23
61:1,12,13,14
62:19 63:13,14
63:16 64:4,7
66:6,6 69:6,15
73:9,9 74:12
79:4 80:9
81:15,18 82:16

82:20 83:10,12
84:8,17,22,25
85:5,7,17 88:6
88:15 89:21,24
91:16,24 92:13
92:19 93:19
94:6,21,22
95:10,16,19
96:15,23 97:2
97:11 98:9
103:14,17,19
106:2,12,13,16
112:5 114:5
115:16,22
116:21 118:17
118:18 121:13
123:25 124:25
125:14,18
126:2,10,15,16
126:18,25
127:2,16,21
129:18,18,22
130:7,13,14,25
136:17,19
137:4,4,7,15
138:19,22
139:6 140:4,16
140:24 141:5,7
141:8,9 144:18
145:12 153:15
153:21 154:11
158:9 160:24
162:14,15
164:9,10 165:5
165:12 166:10
166:11,20,21
166:22,23
167:3 168:4

169:7,8,14,15
169:15 170:10
170:14,23
171:23,25
172:1,2,3,6,7
172:13,20,23
174:11 178:21
180:5,25
181:22 182:25
183:25 185:7
185:12,14
187:17 189:4
190:12 192:17
192:19 193:15
197:1,2,3,23
198:22 199:14
199:15,16
200:2,7,8,8,9
200:14,16,17
202:10,11
204:16 205:23
213:12,23
**knowing** 43:19
49:2 57:20
90:18 115:21
122:5 214:6
**knowledge**
12:16 29:9
137:22 147:15
166:17 170:9
179:14,23,24
198:6,14
206:15 207:2
**known** 36:9
129:20 130:5
156:15,22
159:14 180:18
216:10

**knows** 40:6
93:22 98:10
103:18 109:10
151:5 182:19
185:8
**krush** 60:6
61:23,23,24,25
167:5,24
**kush** 61:24

**l**

**l** 4:17,17
130:14
**lab** 164:14,20
165:19,23
197:6
**lack** 26:2 74:3
90:13 121:19
161:23 171:25
173:24 178:6
**language** 52:6
52:15 54:21
96:11,18
100:20,21
122:1 171:23
172:6,15
**large** 33:14
188:12 201:18
206:15
**lasts** 188:2
**latest** 169:9
**latex** 189:12
193:8,8
**law** 1:22 2:9
17:11 87:17
88:22 93:21
178:13 191:5
212:8

**lawful** 85:8
**laws** 18:14 60:9
71:23 72:9
86:17 212:5
**lawsuit** 10:6,13
15:17,19 207:8
**lawyer** 12:13
52:12
**lawyers** 44:14
152:22
**lay** 36:11,12,22
**laymen's** 88:3
204:15
**lead** 116:20
**leafy** 62:10
195:23
**leake** 2:13 42:9
176:8 214:13
**learn** 15:24
18:16 40:19
49:16 57:23
66:24,25 67:1
67:1,4 83:19
88:7 134:3
178:7,7 199:19
**learned** 51:13
51:14 58:9
207:1
**learns** 67:2,3
70:3
**leash** 98:6
99:19,19,20
104:18 108:14
**leave** 91:13,17
91:25 92:20
117:25 133:5
142:9 146:1
156:8 174:12

174:19,20
188:7 189:17
**leaving** 156:7
175:9,22
190:18
**lecture** 196:13
**led** 196:14
**left** 13:19 21:16
77:7 91:6,11
91:12 138:3
142:11 156:2
158:19 173:21
175:8 187:13
190:11 191:11
194:19 209:17
**leg** 98:13 117:1
172:4
**legal** 60:14,18
60:19 61:1
166:17 169:10
212:4 218:12
219:23
**legally** 58:17
60:6
**letting** 37:25
96:23
**level** 19:15
20:2,15 128:22
180:15
**license** 18:22
**lie** 36:15
107:10,18
**lieutenant**
46:22
**life** 100:22
173:2 213:25
**lift** 98:13 117:1
172:4

Officer George Herrara                                    April 17, 2024

[likelihood - low]                                          Page 30

**likelihood**
102:12 180:6
**likely** 44:15
113:11,12
138:17 139:15
181:1
**likewise** 5:16
**limit** 30:10,15
39:8 40:3
65:11 75:24
**limitation**
25:11,11
**limited** 71:6,7
**line** 10:10 24:6
45:15 53:5
58:5 98:5,6
104:23 170:12
183:3 215:2
**lines** 52:1
57:17 59:24
67:10 70:17
73:20 189:12
211:16
**list** 41:23 64:5
65:1,2 135:25
136:6 168:15
168:20 181:6
190:22
**listed** 50:18
135:7,8 136:18
192:12 208:15
**listen** 30:24
**lists** 64:24
**literally** 6:7
52:23,25 82:6
126:2,8 128:24
129:8 170:5

**little** 11:18
17:4,11 19:19
23:15 26:4
35:17 39:19
41:11 73:11
74:1,6 93:14
102:5 104:9
106:14 110:11
112:10 114:24
119:8,22
121:22 146:24
150:17 152:6
158:24 171:9
178:24 187:15
187:16,16
189:20 191:8
195:16 203:14
204:14 210:12
**live** 141:23
182:4
**lo** 130:1
**load** 35:8
**loaded** 34:18
84:11,12 180:2
**loc.known.**
129:19
**locate** 157:1,1
212:22
**located** 148:12
156:18 185:2,3
**locating** 68:3
**location** 95:13
114:21 115:10
129:20 137:21
148:14 175:11
175:17 177:18
194:6

**locations** 38:17
**lock** 9:6 53:23
**lockbox** 150:7
**locked** 54:17
**long** 7:9 16:21
75:16 100:24
132:5 148:25
158:6,8,14,18
158:20 171:18
206:8 212:4,7
**longer** 84:23
86:9 87:9,10
116:9 133:9
158:17 188:3
**look** 24:14
25:19 37:11
40:24 41:1,21
42:1 44:1,3
45:14,17 51:22
52:20,20 53:18
53:19 54:7,11
54:22 57:21
59:21 62:2
76:3,23 77:3,5
77:7,9,13 85:4
92:18 96:6
109:13 137:24
152:20 153:10
157:20 167:20
167:22 168:14
172:2 176:17
191:7 197:4
198:21,25
199:23
**looked** 23:25
24:12 33:2
54:10 199:25
208:9

**looking** 25:17
25:18 49:14
50:20 51:6,7
62:13 73:4,5,5
74:6,18 75:19
96:11,20,25
97:6,6 156:1
159:21,25
204:4,5 205:22
**looks** 25:16
38:8 42:1 44:1
45:3 49:25
62:6,10,11
109:19 121:18
123:16 154:12
156:12 157:15
186:17
**loose** 79:2
**lost** 43:15,16
82:13 156:17
**lot** 5:11 7:15
17:24 24:10
25:10 31:15
37:6 41:2 52:7
70:3,3 78:17
83:12 96:9
99:10 108:14
112:14,25
120:7 132:12
139:3 153:24
159:5,9 166:24
176:22 178:18
188:2 189:6
205:23
**love** 24:12
133:1
**low** 24:21,23
25:7,8,18 26:5

| | | | |
|---|---|---|---|
| 190:20 192:23 195:8 | 84:21 86:2,5 88:23 89:6 | 109:13 179:13 183:2 | **marked** 41:19 59:1 123:10 |

**luggage** 73:18
**lunch** 169:22
169:24 170:2
187:12
**lying** 36:18
37:20 107:5

**m**

**machine** 1:21
**made** 15:21
16:24 40:21
80:8 82:1 85:7
85:8 88:22
101:6 122:23
138:2 163:24
199:5
**magazine**
181:10,19
**mail** 2:6,11,15
**main** 17:7
**maintained**
173:19,23
**majority** 162:7
**make** 6:16 10:3
13:3 14:16
15:2 31:8
33:24 40:10
43:14 45:19
46:1,24 47:10
48:12 51:7
52:11 53:17
55:2,22 58:21
62:3 70:1
72:12 75:18
76:4,5,25 77:5
77:14,16,17

84:21 86:2,5
88:23 89:6
90:5 92:11,16
92:23 93:7
94:6,12 95:6
95:14 97:19
99:23 101:2
102:12 105:18
107:15 111:8
111:12 112:13
112:16 115:4
115:12 116:17
116:20 117:23
118:11,25
119:16,24
128:14 142:8
153:4 159:15
161:3 163:20
168:17 172:22
180:4 182:18
184:15 185:3
185:20 187:24
190:2 193:13
193:17,19
205:2
**makes** 24:20
30:4 31:15
39:5 46:17
48:7 73:11
103:12 106:25
110:20 112:25
119:17,18
120:6 149:9,16
159:19 163:6
163:25
**makeup** 58:15
**making** 13:12
87:16 92:17

109:13 179:13
183:2
**man** 23:14 24:7
43:12 45:3
112:17 155:3
155:22
**manner** 153:12
153:13
**manslaughter**
8:12 18:12
**manual** 143:14
143:15,25
**manufactured**
162:2
**march** 207:23
**marijuana**
31:5 32:5,22
32:22 33:17
34:10 35:1
51:24 57:25
59:16 60:5,11
61:18 62:2,24
63:3 78:11,17
84:4 96:5,13
97:1 101:12
127:5 134:23
135:20 151:7
152:2 162:6,9
166:24,24
167:2 168:3,18
188:12,13
189:23 192:15
194:3,8 195:22
196:8,21
197:10 208:14
208:16 209:4
209:14

**marked** 41:19
59:1 123:10
143:19 153:1
155:11 160:16
176:10 208:12
**married** 23:7
**martin** 1:6
176:20 217:6
**masking**
168:10
**mason** 189:7
**mass** 43:5,10
**match** 24:1,24
**matches** 24:18
**math** 139:18
**matter** 19:6
70:22 84:6
91:5 98:8
102:4 105:14
134:19 194:20
195:17 212:9
**max** 108:8
131:8,11
134:18,19,20
134:20 135:9
135:10 136:13
136:17 137:5
138:2 156:13
156:17 165:5
165:12 167:8
173:12,13,19
173:21,24
207:2,2 211:2
**max's** 39:15
131:11,12
**maximus** 14:20
24:8,9 98:5
131:9,10

134:18 153:25
154:22 160:25
165:12 166:24
174:4 178:1,22
206:16,21,24
207:7,15,24,25
208:18 210:9
210:10,17
**mcdonald's**
204:23
**mean** 6:1 10:17
10:19 22:10
23:16 24:13,25
25:8 27:2,19
30:25 35:20
43:19 46:19
49:7 62:6,8,23
64:8 66:4
67:17 70:1,12
70:12,14 73:3
73:6 83:21
87:20 93:24
105:19 108:16
113:1,10 119:8
123:22,25
124:3,7,23
125:4,11,12,14
126:3 135:5
136:6 142:3,22
153:21 155:2
155:20 157:25
158:22 172:2
176:25 184:24
187:9 192:8,11
192:13 195:5
196:22 198:16
209:1 212:6

**meaning** 25:1
27:3 68:5,7
73:16 84:24
98:11 104:20
105:20 111:2
116:6 118:11
119:12 125:5
127:13 158:18
162:4,17
177:14 182:10
188:24 210:12
212:7
**means** 6:2
17:16 22:14,15
25:7 35:17
37:20 69:15
83:22 124:4,25
125:15,19
126:11,12,19
130:8,13
150:24 182:8
190:23 191:2
194:25 198:7
198:12
**meant** 6:14 9:5
11:11 94:5
125:3 131:1
167:11
**measures**
213:25
**medical** 213:20
**medications**
5:5 57:16
**meet** 4:5,10
**meeting** 4:13
**meetings** 11:17
12:10

**member** 17:17
17:20,21 75:21
**memory** 23:13
127:12
**mental** 25:11
**mention** 51:6
**mentioned**
14:2 15:8
16:20 18:7
26:18 27:22
28:5 35:11
55:1 68:11
89:23 102:14
104:16,17,25
107:4 122:11
199:20
**messed** 106:13
**met** 12:18
178:18
**metal** 193:9
**meters** 157:17
158:1 159:3
**meth** 32:5
127:16 134:23
135:1 189:22
**methampheta...**
57:22 65:6,8
65:10 96:14,15
96:25 97:1
101:11 135:20
135:21 147:7,8
162:5,9 191:9
192:16
**midatlantic**
219:15
**middle** 25:18
26:6,8 107:15
123:22 157:3

**mike** 82:14,15
**miles** 75:24
**mimic** 159:17
**mimics** 163:8
**mind** 16:21
36:24 44:19
86:9 157:5
203:11 213:7
**mine** 176:19
**minimum**
66:21 144:23
178:20
**minor** 189:25
**minute** 149:2
203:12
**minutes** 6:5
117:3 146:20
146:21,21
149:2,12,14
187:23
**mirror** 76:24
**misreading**
157:16
**missed** 105:17
145:21 170:6
**missing** 82:25
142:21 212:20
212:21
**mistake** 11:13
31:21 62:14
161:3
**mistaken** 200:6
**misunderstood**
195:3
**mode** 108:24
109:1,2
**molds** 212:25

| molecular | motion 109:10 | narcotic 29:2 | natural 49:20 |
|---|---|---|---|
| 163:8 165:3,15 | 109:11,19,24 | 29:25 32:10 | 51:23 69:22 |
| **molina** 1:7 | **motor** 86:22 | 33:9 40:8 | 76:15 151:21 |
| 11:18,20 12:3 | 116:1,8 | 67:24 68:6 | **nature** 70:10 |
| 13:1,2,5,10 | **motorcycle** | 79:11,14 87:8 | 76:15 77:9 |
| 14:20 16:13 | 87:2 | 92:14 103:10 | 80:2 |
| 26:10 155:14 | **motoring** 74:8 | 109:1 112:19 | **ncats** 184:9,19 |
| 173:13 174:7 | 92:22 106:15 | 113:5 114:16 | 185:17 186:3,6 |
| 174:10 176:20 | **motorist** 74:18 | 125:6,7,9,10 | 187:4 188:19 |
| 176:22 177:10 | **mouth** 31:16 | 135:12 136:2 | 191:17 195:4 |
| 177:11 179:5 | 55:3 72:6 | 137:8,9 142:7 | 195:21 197:20 |
| 207:7,24 | 103:3 121:11 | 147:6 151:8 | **nearly** 6:6 |
| 208:13 217:7 | 132:12 204:4,5 | 155:24 164:14 | **necessarily** |
| **molina's** 12:6 | 204:12 | 165:14 177:19 | 34:1 103:21 |
| 176:16 | **move** 149:13 | 188:7,9 192:13 | 104:4 114:16 |
| **mom** 75:2 | 150:12 | 199:10 211:9 | 122:21 124:13 |
| 181:9 | **moveable** | 211:10 | 138:7 149:6,10 |
| **moment** 63:23 | 86:23 87:1 | **narcotics** 27:12 | 159:10 169:13 |
| 67:13 80:14 | 116:2 | 28:3 29:7,14 | 212:15,16 |
| **monday** 202:20 | **movies** 41:3 | 29:16,22 30:7 | **necessary** |
| 202:21 | **moving** 54:16 | 30:21 31:20 | 181:11 |
| **money** 49:3,11 | 140:17 | 32:2,4 49:2,11 | **neck** 52:24,25 |
| 52:1 | **mueller** 2:14 | 57:19 64:12 | 88:14 |
| **monstrosity** | **multiple** 7:6 | 79:9 96:2,2 | **need** 6:2 18:4 |
| 154:3,7 162:8 | 29:1,3,4 31:12 | 97:21 101:10 | 31:5 39:14 |
| **month** 33:12 | 105:5 201:22 | 111:1 125:10 | 46:3 47:5 |
| 143:7 145:19 | **muzzle** 97:13 | 141:22 142:12 | 56:14 57:1,3 |
| 173:22 177:23 | 105:24 110:3,8 | 151:12 161:20 | 71:12 72:22 |
| 178:17,19 | | 161:22,23 | 74:20 84:24 |
| **monthly** | **n** | 165:1,2 168:11 | 87:9,10 91:7 |
| 144:24 | | 168:12 180:1,7 | 92:12,13,13 |
| **months** 22:3 | **n** 2:1 3:1 | 188:9 189:1 | 95:2 100:1 |
| 23:22 26:16 | **naive** 84:7 | 190:16 192:25 | 116:9 118:13 |
| 33:11 172:12 | **name** 4:10,16 | 194:19 195:1 | 133:7 134:11 |
| 172:14,19 | 11:22 23:23 | 209:4 | 151:19 171:14 |
| **morning** 4:6 | 101:14 153:8 | **narrow** 73:11 | 195:16,18 |
| **mother** 35:8 | 216:12 | **national** 64:10 | 197:7 |
| | **narc** 167:21 | 135:12 | |

Officer George Herrara                                              April 17, 2024

**needed**  50:10
71:14 99:23
174:2,14,22
196:16 210:25
213:25
**needing**  16:25
82:22
**needs**  25:20
80:12 88:22
91:14 98:9
133:14 183:4
197:5
**negatives**
141:19
**neighborhoods**
70:17
**neither**  218:1
**nervous**  53:22
76:10,12
**nervousness**
76:22,23
**never**  11:5,6
26:21 58:13
91:7 99:3
126:22,24
127:20,24
131:15 141:15
142:9 178:15
199:11,12
202:8
**new**  19:14
22:12,15 25:16
30:3 65:15,15
66:15 67:7
69:16 174:23
174:24 175:24
178:9,10,11,13
182:1

**news**  206:10
**nice**  4:5 41:10
**nighttime**
201:10
**nine**  17:22
23:22 26:16
139:20,21
202:13
**nndda**  135:12
135:18,18
136:3
**nodding**  5:17
140:20
**noise**  121:12
**non**  53:14 85:1
199:5
**nonconsent**
100:11 110:15
113:25 115:8
118:19
**nonverbal**
109:22
**nonverbally**
108:22 109:6
**nope**  75:5
**norm**  40:7
121:2
**normal**  10:16
74:2,2 77:20
90:14
**normally**  5:17
77:6 106:20,20
117:13 121:3
**north**  2:4 111:3
111:5 113:3,3
**nose**  67:23 87:5
97:14 98:15
112:7 114:18

117:17,18
120:4 190:13
196:5
**nostrils**  121:17
**notable**  88:21
**notary**  216:19
**notated**  124:4
**notates**  89:16
**note**  219:10
**notebooks**
128:1
**noted**  187:6
216:2
**notes**  128:14
128:15 157:7
170:7,21,21
**noticeable**
37:24
**noticed**  53:25
197:17
**noting**  209:22
210:4,9
**nuances**  35:13
74:7
**null**  116:23
**number**  3:12
9:15,15 39:9
42:20 44:8
63:24 66:17
138:23 140:4,5
141:25 145:6,7
186:1 201:25
**numbered**  1:19
**numbers**  44:13
44:15 138:23
202:16
**numerous**
50:12 178:23

**nuts**  111:16

| o |
|---|

**o**  4:17
**oath**  5:21,23
216:11
**obedience**
143:2 146:3
**object**  52:12
87:1 116:2
207:17 209:13
**objection**
165:25 166:2
205:16 206:18
207:12,18
209:22 210:4,9
**objections**
159:1
**objective**
142:25
**objects**  174:4
**observed**  76:8
209:19
**observing**  39:6
**obvious**  5:11
124:1 133:9
**obviously**  21:9
30:18 39:3
81:10 102:5
104:3 128:20
169:11 172:11
177:18 196:12
**occupant**
118:19
**occupants**  80:9
89:24 90:21
**ochoa**  170:19
177:5

| | | | |
|---|---|---|---|
| **october** 50:19 | 196:9 199:10 | 213:21,22 | 30:24 31:4,10 |
| **odor** 29:2,4 | 203:25 205:3 | **offices** 1:22 2:9 | 32:8,11,17,20 |
| 31:8,9 32:10 | 206:3 209:6,7 | **official** 1:6,7,9 | 32:24 33:2,8 |
| 33:13,14,15,20 | **odor's** 111:21 | 64:11 128:20 | 33:23 34:17,22 |
| 34:14 36:7,7 | 120:2 | 135:16 136:8 | 35:6,25 36:13 |
| 38:1,2,16,21 | **odors** 29:4 | 186:1 217:6,7 | 36:17,24 37:4 |
| 40:8,9 61:18 | 32:14 33:9 | 217:9 | 37:17,23 38:3 |
| 61:19,21 62:3 | 34:1 64:9 | **officially** | 39:23 40:10,18 |
| 62:4,5 67:5 | 167:8 204:21 | 153:15 | 40:18 41:11,16 |
| 69:2,4 87:8 | 205:6 | **officials** 198:23 | 42:16,24 43:5 |
| 89:16 93:4 | **office** 7:8 12:23 | **oh** 9:4 10:24 | 43:9,17,23 |
| 97:21 111:21 | 16:22 19:10 | 35:8 41:10 | 45:18 46:4,17 |
| 112:19 114:16 | 23:21 25:15 | 45:10 50:22 | 46:21,24 47:12 |
| 114:20 119:20 | 28:22 37:14 | 55:21 76:23 | 47:16 48:2,6 |
| 119:25 120:1,3 | 46:14 51:17 | 78:21 84:8 | 48:10 49:23 |
| 121:18 125:6 | 76:3 88:11 | 101:1 110:14 | 50:9,14 51:2,4 |
| 125:13,17 | 93:25 94:1 | 119:7 124:2 | 51:10,13,18 |
| 126:12 127:13 | 122:18 126:11 | 136:4 147:5 | 52:2,9 53:1 |
| 137:8 147:12 | 129:16 136:17 | 168:5 186:3,16 | 54:8 55:17 |
| 150:10,14 | 143:8 173:19 | 194:1 202:16 | 56:1,17,24 |
| 151:9,13 156:8 | 187:22 194:15 | 203:7 | 57:10,10 58:2 |
| 163:19 164:2,3 | 196:25 200:4 | **oil** 205:8 | 58:9,16 59:7 |
| 165:14 167:14 | 201:12 211:11 | **okay** 7:12,22 | 60:2,22 61:1 |
| 167:19,23 | 212:14 216:14 | 7:24 8:4,24 9:2 | 61:12,20,22 |
| 168:12,13,15 | **officer** 4:20 | 9:19,22,25 | 62:16,17,22 |
| 168:16,19 | 10:14 11:1 | 10:12,18 12:2 | 63:6,9,13,17 |
| 187:7 188:1,2 | 18:15,21 46:7 | 13:3,23 14:4 | 63:22 64:2,13 |
| 188:7,9,13,24 | 58:3,4 65:18 | 14:22 15:4,7 | 64:18,21 65:13 |
| 189:5,11,13,15 | 66:15 70:8,21 | 15:10,20 16:8 | 65:23 66:9,11 |
| 189:23,25 | 71:24 81:6 | 16:19 17:6,13 | 66:18,23 67:13 |
| 190:4,5,6,10 | 140:6 182:3 | 19:24 20:10,22 | 67:14 68:11,20 |
| 190:17,18 | 213:22 217:17 | 21:17,23 22:2 | 68:22 69:8,14 |
| 191:1,18,18,22 | 219:5 | 23:1 24:10,12 | 69:20 70:1 |
| 192:17,18,22 | **officer's** 128:15 | 24:17 25:3,7 | 71:10,17,20 |
| 193:6,23 194:4 | **officers** 8:15 | 25:24 26:7,12 | 74:5 75:7,17 |
| 194:8,11,18,22 | 22:6 93:18,19 | 26:15,22 27:6 | 76:9 77:19 |
| 194:25 195:13 | 94:4 171:2 | 27:18,22 28:12 | 79:3,12,18,18 |
| 195:17,17,18 | 183:18 201:4 | 28:14,25 29:6 | 80:3,14,14,15 |

| | | | |
|---|---|---|---|
| 80:23 81:25 | 142:10,14,16 | 186:13,16,20 | **open** 30:20,25 |
| 83:8,14,17 | 143:17,18 | 187:2,11 190:8 | 81:12 82:10,11 |
| 85:22 86:1,7 | 144:4,15,21,24 | 190:21 191:24 | 82:15,16 85:22 |
| 88:5,10,13 | 144:25 145:12 | 192:3,10 | 87:6 91:12 |
| 89:9,12,23,23 | 145:16 146:12 | 193:24 194:1 | 92:19,20,21 |
| 90:20,24 91:1 | 146:17,25 | 194:10,14,24 | 99:14,16 |
| 91:9,23 93:16 | 147:13,25 | 195:2,10 196:6 | 105:21,22 |
| 95:25 96:11,19 | 148:5,9,16,22 | 196:9,16 | 109:7 119:12 |
| 97:17,18,23 | 149:16,22 | 197:17 198:5,9 | 119:13,14,20 |
| 98:14 99:15 | 150:1,24 | 199:17,17 | 119:21 132:7 |
| 100:24 101:7,9 | 151:20 152:7 | 200:20,23 | 168:2 200:22 |
| 101:12,22 | 152:13,16,19 | 201:14 202:9 | 200:25 204:4,6 |
| 102:9,14,18 | 153:2,3,17 | 203:1 205:4 | 207:3 208:8 |
| 103:24 104:16 | 154:2,5,11,19 | 206:5 207:6 | **opened** 213:23 |
| 104:25 105:8 | 154:24 155:4 | 209:8,18 214:6 | **opening** 29:19 |
| 105:11 106:7 | 155:12,18,23 | 214:11 | 99:13 210:15 |
| 108:1 110:15 | 157:9,14 158:6 | **old** 41:2,3 | **opens** 120:2 |
| 111:3,5 115:3 | 159:2,6 160:2 | 78:23 | **operate** 87:10 |
| 115:3,20 118:4 | 160:5,10,21,22 | **older** 40:24 | **operation** |
| 118:17,22 | 161:2 162:7,14 | 41:1 159:25 | 202:2 |
| 119:6 120:14 | 162:23 164:9 | **olg** 1:5 217:5 | **operations** |
| 120:18,23 | 166:9,9,23 | **olvera** 170:9,10 | 17:15,16 18:1 |
| 121:6 122:7,10 | 167:2,16,20 | 170:19 | 19:23 20:12 |
| 122:23 123:4,8 | 168:14,22,25 | **once** 6:19 48:3 | 93:9 |
| 123:21 124:7 | 169:14,15 | 84:24 86:7 | **opinion** 14:16 |
| 124:15,18,22 | 170:5 171:5,8 | 97:4,4,19 99:4 | 29:12 60:14,18 |
| 125:8,11,18 | 171:11,18 | 102:23 103:21 | 149:11 178:5,9 |
| 126:7,9 127:15 | 172:12,17 | 103:22 114:23 | 180:20 190:8 |
| 127:20 128:5 | 173:9,11 | 118:7 145:19 | 197:5 206:16 |
| 128:16,23 | 174:11,23 | 146:7 164:20 | 206:20 210:3 |
| 129:4,8,9,25 | 175:2,5 176:5 | 184:2 210:4 | **opioids** 167:4,9 |
| 130:4,11,23 | 176:17,21 | **ones** 18:5 32:6 | **opportunity** |
| 131:17,22 | 177:7,23 178:2 | 42:2 55:24 | 207:6 |
| 134:16,20 | 179:17 180:11 | 82:11 141:23 | **opposed** |
| 135:14 136:17 | 180:14,21 | 141:23 153:20 | 113:12 134:18 |
| 137:2,10 | 181:25 183:8 | 162:11 176:17 | **opposite** 6:8,8 |
| 140:15,24 | 183:25 184:11 | 194:8 | **opposition** |
| 141:5,9 142:2 | 185:4,20 186:6 | | 104:20 |

| | | | |
|---|---|---|---|
| **options** 49:11 | 100:4 114:13 | **paper** 15:7 | **pass** 47:23 |
| **oral** 1:12,16 | 146:3 147:18 | 39:24,25 54:10 | 61:17,18 |
| 217:12,18 | 169:10 180:3 | 128:9 | 148:24 |
| **order** 23:3 | 181:4 189:11 | **parameters** | **passed** 59:18 |
| 41:13,24 64:1 | 199:24 213:10 | 125:15 128:12 | 135:19 136:1 |
| 160:18 171:14 | **owner** 73:17 | **paraphrasing** | 136:10 170:12 |
| 196:24 | 86:12 95:24 | 171:16 | **passenger** |
| **orders** 173:18 | **ownership** | **paraplegic** | 90:14 91:12 |
| 212:17 | 173:23 | 90:2,11 | 99:9,10 111:15 |
| **organization** | | **pardon** 27:10 | **passes** 105:5,10 |
| 138:4 201:18 | **p** | 47:23 87:3 | **passive** 35:23 |
| 213:4 | | 95:14 99:1 | 36:1,2,5,6,19 |
| **organizational** | **p** 2:1,1 | 145:19 148:6 | 36:19 37:18,19 |
| 179:22 213:4 | **p.m.** 1:20 | **park** 95:13 | 38:5 107:6,7 |
| **ounce** 63:2 | 214:15 | 115:10 146:2 | 121:8 |
| 127:5 148:7,8 | **pace** 172:3 | **parking** 83:11 | **past** 14:3 62:13 |
| 152:1,10 | **pacing** 133:10 | 99:9 | 76:3 92:1 |
| 166:13 | **package** 29:24 | **part** 5:8 8:8 | 104:16 137:23 |
| **ounces** 148:4,6 | **packaged** | 14:20 72:2 | 199:23,25 |
| 152:3 195:12 | 78:15 | 100:13 113:3 | **patrol** 17:12 |
| **outside** 53:3 | **packages** 180:2 | 114:8,14 | 21:25 68:8 |
| 56:11 99:25 | **page** 3:2,12 | 125:22 143:12 | 70:15 71:8,11 |
| 143:24 203:2 | 24:16 44:2,13 | 158:9 177:6 | 71:13 76:12 |
| **overloaded** | 44:15,23,24 | 179:22 190:4 | 79:11 106:22 |
| 112:11 | 50:1,22,24 | **particular** 20:1 | 108:13 155:25 |
| **overloading** | 57:11,12 58:24 | 48:22 68:18 | 184:23,24 |
| 31:14 | 144:20 152:23 | 75:11 81:5 | 185:11 187:1 |
| **overloads** 34:3 | 215:2 217:22 | 85:4 94:13 | 201:25 |
| **oversold** | **pages** 50:21 | 136:10,10 | **patrolman** |
| 212:10 | 152:21 | 138:7 189:9 | 22:16 45:16 |
| **overwatch** | **painkillers** | 201:8 207:7 | 49:1 156:23 |
| 183:2 | 57:18 | **parties** 218:2 | 182:23 199:23 |
| **overwhelmed** | **paint** 111:23 | **partly** 150:20 | **pattern** 127:8 |
| 133:15 | 114:16,17 | **parts** 5:9 14:18 | 179:25 |
| **overwhelming** | **pair** 193:10,10 | 14:24 125:24 | **pay** 102:24 |
| 33:21 42:20 | **paired** 66:19 | **party** 217:21 | 103:23 104:6 |
| **own** 89:14 97:5 | **palm** 105:22 | 217:24 | **pc** 2:13 |
| 97:5 99:22 | 109:12,24 | | |

**pcv** 102:21
**peace** 18:15,22
  71:24
**pen** 54:19
**people** 19:3,4
  28:13 30:14
  34:10 53:12
  56:15 57:17
  58:17 59:16,17
  62:25 63:19
  65:5 73:24
  76:10,25 77:9
  77:11 78:7,10
  82:22 84:4,10
  90:16,17 93:15
  94:11,13,17
  106:11,16,18
  106:19,23
  109:9 120:20
  120:21 137:12
  166:10,11
  168:2,10,17
  180:16 212:22
  212:24
**pepperoni**
  112:8 163:23
  163:23
**percent** 8:3
  65:9 84:6,10
  93:21,24 104:8
  132:8 142:5
  146:13 190:3
**percentage** 8:1
  184:5,21
  185:19 186:14
**percentages**
  141:1

**perfect** 4:10
  5:20 6:6 9:22
  10:5,25 11:25
  15:10 16:19
  27:22 46:11
  48:21 64:3
  86:14 88:24
  91:3,15 94:5
  105:5 109:16
  110:9 112:21
  123:11 129:17
  130:16 137:10
  148:9 157:12
  160:5 169:20
  183:7 199:3
  203:10
**perfectly** 43:23
  63:14 113:22
  117:15 126:15
  130:16 172:13
  199:14
**perform**
  144:23
**perimeter** 71:7
**period** 21:25
  153:25 179:10
  194:19 207:5
**permeate** 149:5
**permeated**
  93:4
**permeating**
  38:21 114:20
  195:13
**permission**
  44:19 101:20
  115:23
**person** 48:7,8
  61:5 71:8

73:16,17 75:23
  77:22 79:20,21
  86:21 90:3,4,6
  90:14 103:16
  110:24 116:21
  156:10,14,15
  180:25 181:8
  181:22 191:10
  196:12,12
  205:8 212:20
  212:23,23
  216:12
**personal** 78:2,7
  78:8,10,13,14
  78:18
**personalities**
  24:1,24
**personally**
  216:10
**personnel**
  201:13
**persons** 74:21
**perspective**
  39:7
**perspectives**
  55:10
**pete** 200:6
**pharmaceutical**
  57:13,19
  162:18 189:1
  213:6,6
**pharmaceutic...**
  58:8,14
**phase** 204:9
**phases** 206:3
**pheromones**
  156:7

**phone** 30:21
  68:1,6 77:9
  81:23
**phones** 28:15
  30:7 106:17
**phrase** 19:14
  49:6 62:19,22
  65:16 187:7
**phrases** 24:10
  123:22 131:1
  155:1,15
**physical** 22:8
  25:11 109:17
  170:24 173:7
  209:13
**physically**
  150:11 192:14
**pick** 189:13
**picked** 24:4
  178:22
**picking** 33:21
**picture** 111:23
  114:17,17
**pieces** 201:23
**pill** 57:21,25
  58:15
**pills** 57:23
  58:11,17 65:9
**pipe** 102:21,21
**pipeline** 51:14
  55:6 56:20
**pizza** 112:3,5,8
  112:11,12,13
  163:23 201:19
  201:20
**pizzas** 163:23
**place** 31:7
  113:22 158:1

176:4 187:2
**places** 38:22
**plaintiff** 1:3
  2:2 10:12
  217:3
**plaintiff's**
  14:23
**plaintiffs** 1:17
**plans** 181:7
**plastic** 150:3,3
  150:3 168:4
  191:3
**play** 114:19
  120:11
**player** 162:21
**playing** 84:7
  174:1 188:11
**please** 5:12
  6:18,24 7:5 8:6
  11:9,13,16
  13:9 17:9,16
  18:10 22:24
  27:2 31:16
  32:11 33:2
  36:4,5,24
  63:23 67:21
  95:3 110:19
  157:16 159:19
  160:23 161:2
  174:22 179:12
  185:21 195:3
  203:12
**pleasure** 4:10
  214:10
**plenty** 213:22
**plus** 11:6 58:16
  173:5

**pocket** 103:15
**point** 16:12
  26:18 27:3
  44:10 59:2,4
  74:16 83:1
  85:16 86:24
  88:3 103:3
  105:20 136:16
  157:4 173:12
  174:5 177:15
  178:12 179:2
  182:5 191:9
**pointing**
  157:12
**police** 4:20
  10:14 11:1
  18:21 58:3,4
  59:10 70:25
  82:5 106:17
  178:11
**policies** 214:1
**policing** 47:19
**policy** 47:4,5
  76:2 143:10,13
  143:22,25
  144:2,9,15
  145:1,4 181:13
  212:8,11,14,17
**poorly** 198:9
**pop** 78:11
  87:17,20
**portions** 12:6,7
**position** 99:2
  109:15 131:13
**positioned**
  98:20
**positive** 125:3
  139:23 149:15

162:5 163:3
  164:20 183:19
**positively**
  135:22
**positives** 141:2
  187:6
**possess** 164:9
**possession**
  42:21 61:2,4
  165:24 181:1
**possibility** 67:6
  67:8 149:5
  150:14 213:3,6
**possible** 16:2
  28:4,20 36:8
  55:9,14,19
  58:13 62:15
  65:4 70:10
  71:3,3 81:22
  112:2,13
  113:14,17
  114:18 119:2
  120:5 121:18
  138:13 151:5
  156:11,23
  157:24 159:16
  159:18 160:1
  179:8 188:15
  199:12 201:7
  205:14
**possibly** 25:12
  63:20 77:12
  112:1,9 175:25
**posture** 204:2
**pot** 32:6 77:24
**potential** 90:11
**potentially** 5:4
  28:2 32:15

37:8 39:21
  58:11 69:10
  135:1 159:22
  197:12 203:20
**pound** 32:22
  78:12,15
**pounds** 33:17
  34:25 35:2,3
  78:11,15
  194:21,22
**power** 109:9
**practice** 91:1
  119:11 175:21
**precautions**
  181:11 213:2
**precinct**
  129:11
**precursors**
  159:13
**prefer** 91:4
  93:2 105:13
  118:21 134:17
**prefilled** 127:2
**prepare** 11:16
**prepped** 91:8
**pres** 124:22
**prescription**
  5:5 57:16
**presence** 32:9
  125:10 137:8
**present** 55:12
  55:13 109:20
  125:1,4,15
  126:11
**presentation**
  99:23 105:18
  109:6,19,22
  111:12 117:14

| presentations | print 128:21 | process 46:25 | provable 195:5 |
|---|---|---|---|
| 89:6 98:21 | printed 41:14 | 72:21 115:5 | proved 216:11 |
| 117:11 118:11 | 126:23 127:21 | 173:16 177:3 | proven 164:25 |
| presented | 128:15,19,22 | processes | provided |
| 55:15 59:10 | 153:11,13,15 | 128:8 | 136:24 177:9 |
| presenting | 154:9 | produced 1:17 | 180:7 |
| 39:12 109:25 | printing 153:5 | professional | provider 10:21 |
| presumably | printout 155:8 | 26:1 29:12 | providing |
| 34:5 57:5 | prior 45:9 | 178:5,9 197:5 | 42:14 |
| 138:22,23 | 48:19 90:7 | professionally | provisions 1:25 |
| presuming | 92:18 170:18 | 30:17 31:11 | pry 10:8 |
| 107:2,2 | prisoners | proficiency | pseudo 161:8 |
| pretend 126:1 | 151:10 | 144:24 | 161:12,12,13 |
| 126:9 | proactive | program 93:7 | 161:14,14,17 |
| pretty 14:8,9 | 70:10,12,14 | 161:21 162:22 | 162:11,19 |
| 39:8,10 55:4 | probable 16:3 | programs | 163:18 164:16 |
| 57:11 63:1 | 20:24 76:5 | 94:21 | 164:25 165:2 |
| 64:22 67:10 | 86:21 87:24 | promise 23:10 | 165:15 166:10 |
| 77:20 78:18 | 180:4 181:4 | 54:23 57:24 | 167:21 168:18 |
| 121:15 130:19 | probably 5:9 | 152:25 | 188:25 |
| 133:6 153:9 | 6:15 8:3 10:24 | proof 133:4 | pseudos 165:12 |
| 178:1 183:23 | 26:6 35:2,11 | 139:11 | public 46:8 |
| 199:17 202:5 | 40:23 58:12 | proper 4:7 13:4 | 49:9 74:3,8 |
| 211:3 | 77:21,22 93:11 | 70:20,24 | 87:6 92:22 |
| prevent 113:16 | 94:8,23 107:10 | properly 93:8,9 | 116:7 216:19 |
| prevention | 111:21 115:6 | properties 60:7 | pull 38:17 |
| 70:16 | 117:10 139:3 | 65:6 162:25 | 72:20 77:2 |
| previously | 159:15 173:21 | 163:4,18,22 | 89:16 |
| 118:6 | 177:25 178:16 | 164:24 165:2,6 | pulled 76:11 |
| primarily | 185:22 201:9 | 165:16 | 161:5 |
| 19:18 159:4 | 205:10 | property 37:9 | pulling 104:21 |
| primary 23:25 | problem 5:15 | 61:9 65:8 | 111:16 117:8 |
| 24:13 71:12 | 40:1 78:9 83:7 | 164:3,16 165:4 | pulls 77:6 |
| 82:8,18 144:7 | 107:3 176:9 | 193:25 | pulse 52:23 |
| 183:1 211:6 | procedure 1:24 | proponent | purchase 163:2 |
| principles | proceedings | 104:4 | purchased |
| 151:17 | 214:15 | prosecutor | 163:2 175:25 |
| | | 127:23 | 176:1 |

**purely** 59:24
**purpose** 23:23
  67:8,16,17,19
  67:19,22,23
  68:3,4,5,7
  79:12 100:17
  103:1 156:1
  173:6,7 177:20
**purposes** 42:4
  161:24 176:7
  216:13
**pursuant** 1:23
  217:19
**pursuit** 144:8
**pushing** 109:13
**put** 18:3 24:20
  24:22 29:2,4
  30:19 31:12,16
  51:16 55:2
  61:16 69:4
  73:24 82:1
  88:2 97:15
  98:5 99:5
  109:11 110:6,7
  116:20 127:17
  132:11 133:25
  141:25 148:15
  148:24 150:4,8
  150:10,13
  151:7,11 152:9
  154:3 159:10
  160:6 161:17
  163:17 167:4
  167:24,25,25
  168:1,3,8,8
  169:11 172:7
  184:5 185:9
  187:10,16,21

  189:11,16,18
  189:20 190:13
  190:25 192:3
  193:5,8,9,10
  193:12,14
  194:6 204:23
  204:24,25,25
  206:2 211:9
**puts** 97:13
  196:5
**putting** 30:21
  62:1 81:2
  109:8 114:18
  185:2 191:1

**q**

**qualified** 65:24
**quality** 14:10
  14:12
**quantifiable**
  199:13
**quantification**
  147:1 158:23
  172:7
**quantified**
  138:22
**quantify** 66:17
  138:20 171:20
**quantities** 34:7
  152:7,8 193:20
**quantity** 32:20
  33:15 127:18
  151:25 188:12
  190:24
**question** 4:19
  5:13 6:17,23
  6:24 9:8 10:4
  11:1,24 12:9

  14:5 15:11,13
  19:12 28:1
  30:13 42:11
  44:4 47:2,8
  52:19 56:18
  58:23 64:7
  66:8 72:19
  73:7,7 74:13
  75:10 79:8
  83:18 93:17
  110:10 113:21
  118:18 126:8
  136:12 137:3
  140:10,23
  152:24 155:9
  157:1 169:1
  170:1,20 177:5
  189:4 193:18
  194:2 205:4,7
  205:21 206:19
  207:17,22
  210:5,6
**questioning**
  167:7
**questions** 5:11
  6:16 11:10
  21:10 35:14
  52:2 53:4,12
  60:3 67:14
  75:8 79:4
  87:16 97:19
  101:3 105:12
  115:6 125:24
  143:5 170:6
  191:24 206:11
  207:18 208:22
  209:22 214:12
  214:13

**quick** 96:22
  101:2,21
  114:24 149:8
  172:8 177:24
**quickly** 119:7
  170:7
**quite** 134:17
  203:2 211:5
**quiz** 87:17,20
**quote** 40:3
  57:25 58:3

**r**

**r** 2:1 4:17,18
  4:18,18 130:14
**radio** 81:12
  82:2 92:12
**radioed** 82:7
**radios** 82:4,5
**ran** 23:22
  156:25
**random** 61:4
**rapport** 72:24
**rather** 109:18
  159:9 207:16
**ray** 162:19,22
**rbf** 1:5 217:5
**reach** 44:10
  81:4,11
**react** 205:12
**reaction** 102:8
**read** 44:3
  63:24 113:6
  172:15 216:1
  219:9
**reading** 96:17
  97:4 171:23
  172:5

**ready** 119:16
123:13 143:21
152:25 181:19
**real** 113:18
141:23 159:16
159:16,17
162:3,4 163:5
163:11 179:1,7
**reality** 39:3
66:6 95:19
**realize** 27:18
52:10
**realizing** 29:10
48:6
**really** 4:19,19
11:1 15:25
16:5 18:6
22:19 28:16
35:19 37:7
40:25 41:10
65:20 66:6
70:22,23 73:2
79:7 87:18,20
91:5 96:22
97:7 102:4
112:7 116:23
125:8 130:25
136:12 138:19
141:25 152:20
171:14 172:9
176:22 184:7
204:19
**rear** 100:5
**rearview** 76:24
**reason** 4:21
32:1 37:16
58:19 85:8
87:25 107:17

115:16,16
117:22 153:18
161:5 164:20
176:6 179:23
191:19 193:16
215:2 219:11
**reasonable**
79:20,23 86:20
87:19,22
115:10 157:25
183:19,20
**reasonably**
157:20 171:16
186:17
**reasons** 217:23
**recall** 6:3,4
8:12,23 9:1,14
10:17,20 15:9
42:14 55:25
56:2 81:24
127:1,19
143:12 144:3
154:10,14,21
168:20,23
169:5,6,6,12
198:8 206:8,9
**receipt** 217:22
219:17
**receive** 58:7
197:19
**received** 24:8
41:23,24
135:22 173:17
182:8
**recently** 143:6
144:19 194:17
**recess** 69:25
123:9 169:25

203:13
**recognition**
194:12
**recognized**
136:2
**recon** 19:3
**record** 1:25
4:15 22:15
41:20 51:4
57:24 82:2
93:11 100:21
155:13 166:16
167:10 176:18
185:6,11
198:14 206:18
207:12 217:18
218:4
**recorded** 206:1
**recording** 5:10
**recordkeeping**
191:16
**records** 122:15
160:8,24
176:13 184:10
184:22,23,24
185:1,16
205:22 206:1
**recovered**
102:24 103:22
151:11
**reek** 189:8
**refer** 4:7 72:23
88:16 92:5
96:24 99:15
177:4 184:9
190:6 191:16
**referenced**
219:6

**referred** 18:22
19:1,22 43:7
61:21 120:11
120:12 128:13
133:12 134:18
147:11 156:14
167:7 204:14
**referring**
110:24 120:25
132:3 134:1,15
140:7 142:19
156:12 157:10
165:1 184:21
187:17 195:25
198:22
**refers** 68:4
**reflex** 104:20
**refusal** 87:10
119:2
**refuse** 115:20
**refused** 83:16
83:20 84:18
85:11,14,15,16
86:6,13 95:21
115:18
**regard** 207:7
**regardless**
55:19 145:3
**regards** 13:11
14:16 19:6
42:11 58:7
59:25 64:10
95:18 205:7
206:15
**registered**
73:17
**registration**
218:13

| | | | |
|---|---|---|---|
| **regret** 14:4 | **report** 12:3 | **rescue** 18:3 | 208:3 |
| **regular** 71:21 | 122:12 123:16 | **reserve** 208:21 | **responses** 46:2 |
| 72:1 | 125:20 126:25 | 214:11,13 | **responsibilities** |
| **reiterate** 94:3 | 128:3,8,10,12 | **residence** | 72:3 |
| **related** 45:11 | 128:25 129:1,2 | 173:19 174:3 | **responsibility** |
| 45:12 218:1 | 129:2,3,5,5,6 | **residual** 187:7 | 72:4,5 |
| **relationship** | 146:15 147:4 | 188:1,2,13,22 | **responsible** |
| 81:18,20 | 154:13 165:23 | 188:23 189:15 | 18:1,11 20:14 |
| 132:17 171:10 | 176:15,16 | 189:23 190:4,7 | 175:14 |
| 171:19,21 | 185:22 186:8 | 190:8,15,18,19 | **rest** 17:14 |
| 200:10,12 | 186:16,18 | 190:24 191:1 | 25:22 208:21 |
| **relative** 218:3 | 192:11 | 191:12,18,18 | **restaurant** |
| **relatively** | **reported** 1:21 | 191:22 192:4,6 | 112:3,5 |
| 94:23 144:19 | 170:17 | 192:20,21,22 | **restroom** 69:24 |
| 172:8 | **reporter** 41:18 | 199:10 209:6,7 | 117:1 172:1 |
| **release** 79:1 | 217:15 | **residue** 196:8 | **resulted** 72:16 |
| 130:12 | **reporter's** 3:9 | **respect** 15:4 | **retired** 41:9 |
| **reliability** | 217:12 | 70:24 86:8 | **retrieved** 174:2 |
| 184:20 | **reporting** | 115:24 118:25 | **return** 219:13 |
| **reliable** 141:3 | 127:9 184:9 | **respectful** | 219:16 |
| **relies** 94:11 | **reports** 122:8 | 78:24 | **returned** |
| **relieve** 71:8 | 123:12 126:23 | **respectfully** | 217:21,22 |
| 98:14 | 127:25 138:24 | 86:18 94:8 | **review** 11:20 |
| **remember** 8:10 | 140:15 153:6 | 108:9 | 12:8 15:7 |
| 9:3,5 45:2,5 | 168:14 184:12 | **respiration** | 197:24 207:15 |
| 61:24 78:12 | 197:25 | 53:5 | 219:7 |
| 127:6,7 130:21 | **represent** 4:12 | **responded** 18:5 | **reviewed** 14:1 |
| 135:6 145:6,7 | 153:17 | **responding** | 176:13 208:11 |
| 201:2 | **request** 71:16 | 71:2 | **reviews** 141:1 |
| **removed** 90:6 | **requested** | **response** 33:6 | **reward** 98:7 |
| **renee** 170:19 | 217:21,24 | 36:8,12,20 | 102:22 103:7 |
| **rent** 73:18 | **requesting** | 38:4 104:6 | 103:25 |
| **rental** 73:18 | 82:12 | 112:18,24 | **rewarded** |
| **repeatedly** | **require** 86:23 | 114:11,24 | 102:17 |
| 201:5 | **required** 46:14 | 131:12 133:2,8 | **rico** 179:20 |
| **rephrase** 6:19 | 47:17,18 | 133:20,23 | **right** 5:14 11:7 |
| 13:8 122:20 | **requires** 88:11 | 137:7 138:8 | 12:17 16:1,3 |
| | | 148:13 195:19 | 23:13 27:24 |

30:4 33:5 34:5
34:7,10 35:9
35:13 37:12
38:11,18 39:23
40:5,16 41:2
43:13 44:3,16
44:17,22,25
45:3,18 46:23
47:4,16 51:8
54:2,6,25
56:18,22 57:6
58:10,12,21
59:5 62:11,25
63:4,7 70:2
73:25 75:1,6,9
77:2,8,12
79:16,22 80:10
83:2,23,23
84:9 88:15,19
92:6 94:25
96:18 97:5,8
97:12,15 98:25
100:15 101:14
102:1,8 104:13
104:14,16
105:13,25
106:8,15 107:5
107:8,11
108:16,17,21
108:23 110:1,8
110:12 111:19
112:3,3 114:12
115:22 117:3
118:1,15,16
119:1,2,12,18
119:21 122:4,5
123:14,16
127:22 129:5

129:21 131:4,8
131:20 133:22
134:12 135:2
137:18 139:1
139:12,15,18
139:22 140:1
140:16 141:17
145:15 146:21
148:25 149:5
150:8 151:23
151:25 152:11
152:24 153:4
153:20 154:14
156:5 158:1
159:10 160:13
161:10 162:19
163:15 164:15
164:18,21
165:20,23
166:25 168:3
168:23 172:21
172:24 181:16
181:17 182:11
182:15 184:13
186:3,10,21
187:10,11,17
187:20 188:23
188:25 189:8
189:13 190:10
190:12,13,16
191:6,10,21
192:1,16,21
193:11 194:4
195:23 200:25
201:1 206:8
212:18
**rightly**  52:12

**rin**  40:22
**rip**  178:4
**risk**  18:2
**roach**  196:18
209:10,13
**roaches**  196:8
**road**  2:4 33:12
45:22 92:21
138:4 177:18
179:9
**roadside**  45:13
49:19 51:21
72:25
**roadway**  49:10
74:8 75:11
138:3
**role**  114:20
**roll**  91:10
**rolled**  59:19
102:21
**rookie**  182:24
**room**  22:11,11
30:20,25 38:10
38:17,23 39:14
40:15 64:22
121:2
**rough**  7:13
**row**  100:5
**rule**  6:22
217:20
**rules**  1:24 47:4
47:5
**rulings**  88:21
**run**  27:11,13
67:3 159:22
**running**  38:15
40:14 77:23,23

**runs**  40:11
155:5

**s**

**s**  1:22 2:1,8,9
3:11 218:11
219:1
**saenz**  2:9
**safe**  22:11
92:20,22 95:13
115:10 181:5
**safeguarding**
56:15
**safety**  8:8
17:20 18:9
20:12 48:25
72:3 94:15
213:10,11
**salazar**  1:8
217:8
**sale**  60:19
**sam**  131:6
**sammo**  23:23
24:2,12 26:16
131:7,8 178:13
**san**  1:2,23 2:10
49:2 59:10
217:2
**sandwich**
187:16
**saving**  213:25
**saw**  14:15
26:16 30:2
54:4 126:22,24
135:6,7 162:10
179:15 180:1
191:2 192:14
195:22 207:10

208:7
saying   5:10
32:11 39:6
92:12 113:4
133:1 136:5
141:16 144:6
153:14 169:7
181:2 192:5,7
says   64:5 84:14
92:25 101:23
113:4 114:23
115:25 123:23
129:19,23
144:22 162:9
175:14
scale   197:9
scales   18:18
scary   152:20
scene   56:14
71:5 95:1,6,12
115:15
scent   79:12
121:20 133:14
156:2,17,18
159:25
scents   29:1,3
30:16 31:13
64:5,24 65:1
schedule
202:20
school   27:5,11
48:18 75:2
schott   1:3 4:12
11:20,22 126:6
207:9 217:3
219:4
schott's   122:12
130:24 185:22

scientifically
163:4 164:25
scooby   77:21
scope   71:7
120:25
score   27:10
scratch   37:5
scratching
37:11
screaming
106:16
screen   14:11
se   126:25
127:19 135:25
144:2 156:20
159:15
seal   216:14
sealed   149:25
search   14:22
39:1,4,14
83:23 84:2,7
85:2,11,17,19
85:21,23 86:10
86:14,15,19,24
86:24 87:5,12
88:24 89:3,5,7
89:10,11,13,14
89:17,19,20
90:4,7,20
92:14 93:1,2
95:3,3 97:24
97:25 98:1,20
99:17,22 100:1
100:9 101:9,16
101:17,18
102:9 106:3,6
107:18 108:14
108:17,18,24

108:24 109:1,2
109:7 110:2,5
110:5 111:1
113:24,25
114:3,4,9,12
114:13,22,25
115:4,8,17
116:3,10
117:24 118:9
118:10,12,19
121:23 137:23
156:13 159:11
179:1,8 195:25
196:3,7 213:5
searched   80:13
93:3 99:4
179:1
searches
110:11,15
142:7 211:24
214:2
searching
70:18 84:10
92:24 100:5
106:3 116:14
117:11 119:12
137:25 151:15
151:16 204:10
204:11 213:23
seasoned
182:23
seat   73:24,25
90:14,15 97:13
114:1 156:24
196:4
second   11:8
44:7,24 65:14
72:6 98:15

101:17 117:2,3
119:6,15 123:8
126:9 140:20
149:3
secondary
128:7 211:7
seconds   100:25
section   17:11
17:12 21:13
27:12,13
173:18
sections   201:21
201:21,23
see   14:15,19,22
15:2 18:3
23:24 42:25
43:18 45:18
53:10,16 58:9
59:17 64:3
73:22 74:7
76:6,12,15
77:7 78:6 86:8
96:3,6,12 97:6
97:21 102:3
106:20 108:9
119:15 123:23
127:24 129:7
133:2,4 134:7
134:15 145:1
153:8 157:3
161:7,8,12,12
190:9,10,10
204:12,13
205:1 207:11
207:14,15,25
208:1,13,15
209:23,25
211:3,5

| | | | |
|---|---|---|---|
| **seeing** 33:11 | 65:14 70:4,7 | **sets** 182:14 | 181:14 194:15 |
| 58:5 59:13 | 75:18,22 76:23 | **setup** 158:8 | 200:3 201:12 |
| 132:23 138:18 | 77:21 103:12 | **seven** 17:17 | 211:11 212:14 |
| **seem** 9:25 75:6 | 106:25 111:8 | 45:19 | **shift** 201:6,8 |
| 75:9,23 153:7 | 112:13,14,25 | **several** 23:22 | 202:19 |
| 153:20 | 116:17 119:16 | 94:20 167:18 | **shifts** 202:19 |
| **seems** 39:7 | 119:17,24 | **severed** 211:17 | **shook** 4:12 |
| 125:19 184:4 | 120:6 123:21 | **shake** 109:25 | 96:16 |
| **seen** 33:13 | 149:9,16 | **shakes** 96:13 | **shoot** 119:16 |
| 34:10,13 35:1 | 155:19 159:19 | **shaking** 156:6 | **short** 21:25 |
| 80:11 91:22 | 161:25 162:2 | **shards** 191:4,7 | 153:25 159:2 |
| 113:19 121:21 | 163:6,20,25 | **share** 206:16 | 207:4 |
| 122:14 127:20 | 184:7,15 185:3 | **sheer** 201:11 | **shorter** 158:18 |
| 143:13 144:12 | 187:24 190:2 | 202:16 | **shorthand** 1:22 |
| 144:13,14 | 193:17 | **sheet** 11:20 | 217:15 |
| 153:11,13,15 | **sensory** 31:14 | 12:8 146:16 | **shot** 11:23 |
| 154:9,12 | **sent** 27:5 | 177:1 219:11 | **shoulder** 77:7 |
| 168:11 173:5,6 | 219:14 | **sheets** 178:24 | **show** 41:12 |
| 175:7 176:3 | **separate** | 178:25 | 69:5 70:23 |
| 190:22 198:20 | 160:12 192:9 | **shelf** 161:23,25 | 92:8 100:20 |
| 199:4,11 | **sergeant** 20:3 | 161:25 162:2,4 | 127:23 143:17 |
| **sees** 33:10,12 | 46:22 47:10 | 162:18 | 152:19 155:8 |
| 86:3 | 137:1 170:9,17 | **shepherd** 23:24 | 157:10 176:5 |
| **seized** 199:6,8 | 170:19 177:5 | 24:11 | 181:6 |
| **seizure** 83:24 | 200:6 | **sheriff** 7:10 | **showed** 114:10 |
| **self** 100:21 | **serious** 213:14 | 70:21 94:6,8 | 135:6 185:1 |
| **sell** 69:1 | **seriously** | **sheriff's** 7:7 | **showing** 41:16 |
| **send** 65:21 | 177:20 | 12:23 16:22 | 41:22 47:24 |
| 69:10 | **served** 211:8 | 19:10 23:21 | 77:12 176:6 |
| **sense** 6:10,16 | **service** 24:5 | 25:15 28:22 | **shows** 50:18 |
| 11:15 14:17 | 70:9 71:13 | 37:14,17 46:14 | 176:19 |
| 16:5,20,25 | 80:19 184:17 | 66:13 75:21 | **sic** 116:6 |
| 17:25 21:10 | **services** 25:9 | 76:3 88:11 | **side** 6:8,9 67:10 |
| 23:16 24:20 | **set** 20:15 40:3 | 93:18,25 94:1 | 84:7 91:11,12 |
| 30:4 31:15 | 56:16 69:6 | 94:3 101:5 | 92:21 98:25 |
| 33:24 38:8 | 146:3,19 | 115:14 122:18 | 99:7 106:1,16 |
| 39:5,15 52:9 | 202:19,20 | 136:17 143:8 | 111:11,15 |
| 52:13,14 58:21 | | 143:14 173:18 | 113:10 114:1 |

Officer George Herrara

April 17, 2024

[side - sniff]

Page 47

132:5 160:7
179:9 208:9
212:1,5,8
**sided** 153:23
**sides** 40:15
**sign** 98:13
219:12
**signal** 89:18
105:16
**signals** 108:23
**signature** 3:8
215:1 216:1
217:20,22
**signatures**
154:16
**signed** 154:15
219:19
**signifies** 189:25
**signify** 192:23
195:8
**signs** 77:12,13
147:4
**similar** 55:4
56:20 61:8
62:1 158:11
165:16,17
167:6 186:17
**similarly** 62:7
**simple** 83:22
101:4 110:20
**simply** 171:21
179:16
**single** 44:4
54:13 67:19,22
92:4 133:2
152:23,23
172:18,19
181:11 199:24

**sir** 4:6,9,14
5:19,22,25
6:12,20 7:25
8:16 9:14,18
9:21,24 11:3,7
15:6 16:11,14
16:16,18 28:4
28:6,8 30:5
32:16 37:22
39:17 42:15
43:11 44:6,12
45:23 55:25
59:3,6 61:6
62:15 63:5,12
63:16,21 69:19
71:1,19 72:11
73:8 79:17
83:4 90:23
91:20 107:9,12
116:17 120:17
122:22 123:17
123:20 131:5
132:15,19
134:5,9,22,25
135:3 139:2,5
139:10,13,16
141:11,14,18
143:9,12
144:11,14
145:2 147:19
147:22 150:23
151:1,24
152:12,15,18
153:9,22
154:10 157:18
157:23 158:5
158:10,13
159:5 160:1,4

161:1,4 165:21
167:1 171:17
171:20 173:14
181:21 183:14
183:20 184:3
198:19,24
200:14,16,19
201:3,16
207:10,10,13
207:22 208:16
209:21,24
210:2 214:5,9
**sit** 33:20 36:9,9
36:10,14,22
107:8,16,17,18
107:21,25
108:19 109:5,8
112:19 118:20
133:3 146:22
148:25 149:2
158:17,17,18
158:18 159:4,5
159:24 160:2
208:10
**site** 8:16 53:13
**sites** 177:16
**sits** 111:18,19
146:20 196:4
**sitting** 6:7
12:17 33:18
36:18 37:20
90:14 107:5
109:10 112:20
131:13 133:9
182:13 193:25
194:13 206:5
208:3

**situation** 68:5
72:13 77:25
82:3 90:8
101:24 118:20
177:11 183:5
**six** 17:21 98:6
116:20 172:12
172:14,19
178:17,19
**size** 34:1 66:4
210:11 211:15
**skill** 20:15
**skin** 156:4
**slack** 104:18,23
**slowly** 99:14
**small** 35:9
189:25 190:6
193:20 203:15
210:14
**smell** 99:18
112:11,12
151:8,22
187:23 190:13
192:18 193:14
193:15 195:16
195:18 204:19
**smelled** 125:12
205:10
**smelling** 29:3
192:19 203:20
204:8
**smells** 119:25
166:20 189:21
189:22,22,22
**smoke** 59:16
62:25
**sniff** 79:7 90:21
116:6

**sniffing** 204:5
204:6,12
**sniffs** 141:22
171:24
**soccer** 75:2
181:9
**soda** 164:19
166:4,6
**softer** 24:1
**software**
122:24 126:19
126:21,24
129:10 130:22
161:15 184:19
**sold** 60:6,16
**soledad** 1:23
2:10
**solutions**
218:12 219:23
**solve** 48:14
**somebody**
22:17,17 25:1
25:8,14,19
31:12 39:2
46:1 51:22
53:10 58:20
59:22 74:9
75:2,3 77:6
84:14 87:25
92:25 96:12
119:15 146:4
151:7 155:5
168:4 169:8
175:13 185:8
190:25
**somebody's**
37:8 109:25

**someone's**
72:18
**somewhat**
120:7
**soon** 77:3
84:21 94:23
112:8,10 120:1
137:15 139:14
181:9
**sorry** 18:7
19:12 21:18
22:16 24:7
26:17 27:15
42:12 43:2
50:20 51:4
70:20 80:24
87:9,21 99:8
109:21 126:7
144:4 170:14
174:7,10,15
197:15 198:10
207:16,22
**sort** 40:20
61:11 63:24
69:22 74:17
113:2 150:6,7
179:21 199:1,2
**sound** 6:25
106:6
**sounds** 17:2
18:6 21:7
93:17
**source** 29:17
37:2 38:7 68:3
103:8,8,9,10
103:11,23
110:1 111:23
112:1,22,23

113:14,17
114:18 120:4,4
125:17,18
127:14 138:7
138:14 139:8
148:11 149:4
150:15 156:10
185:2,2 194:12
**sources** 102:23
**south** 111:6
113:2
**space** 87:6
116:7
**speak** 20:9
22:17 23:25
24:2,16 27:17
38:19 39:1
48:4 53:9
59:18 67:2
70:16 72:24
73:6 75:9 80:7
83:13 90:19
94:19 96:21
98:16 102:8,17
103:6 106:20
115:11 121:24
127:13 129:15
130:22 132:10
137:23 142:7
147:3 149:25
157:2 164:22
169:11 172:5
172:22 173:24
177:5 178:15
179:3 182:14
182:24 191:12
193:6 196:20
196:22 198:4

198:11,15
199:24 201:10
202:4 212:17
**speaking** 52:7
73:20
**spears** 129:1,2
129:5,6
**special** 17:14
17:16 19:20,22
20:12 90:5
145:20,20
150:9 202:1
**specialize** 20:1
**specialized**
19:25 210:23
**specialty** 94:18
**specific** 8:13
49:15,18 51:20
64:16 65:1
97:21 154:7
**specifically**
110:3,5 124:25
144:13 161:17
168:21 169:1
169:12,21
**specifics** 70:7
**spectrum** 20:5
20:8 22:18
**spectrums**
84:12
**speed** 24:21,21
24:22,23,25
25:7,8,18,18
26:5,5,8 75:24
176:22 210:11
**speeding** 72:18
72:19

| | | | |
|---|---|---|---|
| **spell** 4:16 | **starts** 37:11 | **stipulates** | **story** 34:16,17 |
| **spent** 17:3 | 45:20 111:16 | 60:16 | **street** 2:10 |
| 172:12 | **state** 1:21 | **stomach** | 59:15 61:5 |
| **spot** 39:3 70:2 | 18:14 31:12 | 106:12,13 | 63:5 71:23 |
| 114:6 | 40:21 58:6 | **stop** 11:19,21 | 218:13 |
| **sprinting** 40:14 | 60:9 171:21 | 11:24 12:7,9 | **streets** 48:1,5 |
| **stabbed** 97:14 | 176:18 188:8 | 15:16 16:10 | 66:22 178:16 |
| 97:16 | 192:17 212:4,8 | 34:17,18 72:16 | **strictly** 59:12 |
| **stamp** 44:7,13 | 216:8,20 | 74:20,22 75:20 | 177:20 |
| **stand** 55:15 | 217:15 | 76:4,5,6 77:16 | **strike** 31:16 |
| 74:1 88:23 | **stated** 1:25 | 77:20 80:2,7,8 | **strikes** 132:12 |
| 98:12 109:9 | 175:4 | 80:25 81:1,13 | 176:21 |
| **standard** | **states** 1:1 217:1 | 85:8 99:7 | **struggle** 131:18 |
| 171:15 211:22 | **statical** 184:10 | 101:6 105:17 | **struggling** 38:2 |
| **standby** 21:21 | **stating** 144:7 | 111:1 123:8 | **stuck** 208:8 |
| **standing** | **station** 201:15 | 133:16,19,22 | **students** 22:18 |
| 106:16 207:18 | **statistics** 187:3 | 137:24 138:2 | **stuff** 26:4 41:3 |
| 212:17 | **stats** 140:13,14 | 140:16,25 | 57:20 60:6 |
| **stands** 75:5 | 141:16 | 146:2 179:3,3 | 121:2 126:24 |
| 130:14 | **stay** 36:22 | 179:9,11,12,13 | 159:12 163:5 |
| **staring** 54:2,6 | 204:9 | 179:13,18 | 164:22 187:19 |
| **start** 17:2 | **staying** 119:2 | 180:4,5,8,9,12 | 190:9,9 201:9 |
| 38:14 57:8 | 150:7 | 180:12,14,16 | **stupid** 64:7 |
| 89:17 95:4,10 | **stays** 31:9 93:4 | 180:17,25 | 113:21 136:12 |
| 98:24 99:1 | 133:5 | 181:2,3,12,18 | **styled** 1:18 |
| 104:25 121:22 | **steak** 204:20 | 199:7,24 200:1 | **subject** 10:5 |
| 132:6 159:8 | **steering** 77:4 | 207:8 213:25 | 19:6 |
| 171:23 172:5 | 199:8 | **stopped** 14:25 | **subjective** |
| 178:3 | **step** 102:5 | 54:16,18 76:18 | 132:20 |
| **started** 27:3 | 107:3 156:8 | 85:5,7 98:19 | **subs** 124:22 |
| 45:4 50:15,18 | **steps** 107:13 | 111:3 115:16 | **subscribed** |
| 56:4,5 92:2 | **stevie** 121:18 | 138:3 173:12 | 216:12 218:5 |
| 94:21,23 | 133:12 204:14 | 179:16 | **subsection** |
| 161:18,20,21 | **stick** 110:2,4 | **stops** 138:1 | 211:11 |
| 173:13 178:1 | 117:17,18 | 142:8 199:25 | **subset** 32:13 |
| **starting** 52:24 | **sticky** 191:10 | **storage** 150:13 | **subsets** 32:15 |
| 53:3 111:10 | 191:11 | **store** 75:3 | **substance** |
| 172:3 182:2 | | 163:24 | 11:14 12:14 |

13:24 14:14
39:2 58:12
62:10 125:1,4
125:15 126:10
164:15 166:5
166:17 170:2
195:23 205:10
**substances**
27:23 32:14
68:13,22,23
134:21 135:8
136:14 161:7,7
165:18 191:3
**substantiated**
126:16,18
127:2
**subways** 30:3
**success** 206:24
**successful**
207:4
**sudden** 75:14
111:16 133:23
**sued** 10:6,10,20
**suitable** 161:22
**suitcases** 73:23
73:25
**suite** 1:23 2:4
2:10,14 218:13
**supervising**
26:19
**supervisor**
26:4,21 27:14
46:18,19,20,24
47:3 128:22
141:6 147:2,4
170:8,15 182:4
197:24 198:1,2
198:11 200:3

212:10,18
**supervisor's**
141:4
**supervisors**
25:20,25,25
94:15
**supervisory**
136:25
**supplement**
27:16
**supposed** 75:22
78:13 105:22
105:24 112:18
184:6
**suppression**
9:12,20 127:22
**supreme** 86:15
86:19 88:7,16
88:20 114:23
115:25
**sure** 10:3 13:3
13:13 15:2
16:7 23:17
31:8 34:8,11
34:12 40:17
43:14 45:19
46:1 48:12
51:7 55:2,22
57:11 62:3
64:22 70:2
82:1 84:21
86:2,5,16
88:23 92:11,17
92:23 93:7,13
94:12 97:20
100:12 107:15
115:4 116:20
118:25 123:1

124:21 126:10
126:13,14
129:8 135:17
136:15 153:4
170:22 171:8
176:14 182:19
183:2 185:20
192:2 193:13
199:17 200:5
205:2 206:5
**surface** 71:23
**surprising** 5:2
140:5
**surveillance**
179:19
**suspect** 9:11
92:14 106:22
159:21
**suspected**
190:23
**suspicion** 79:20
79:23 86:21
87:19,22
**suspicious**
52:16 54:2
73:12
**suv** 100:3
114:2
**swat** 17:17,23
18:1,8 22:18
**swear** 87:17
118:17
**sweat** 53:2,4
**switched**
170:11
**switching**
125:25

**sworn** 1:18 4:2
201:13 217:17
218:5
**synthetic** 58:14
59:7,16 60:3,5
60:10 61:9
63:17 103:8
162:25 163:18
167:4
**synthetics**
58:23
**system** 102:23
103:7 122:24
126:20 127:9
128:11 130:22
138:25 146:15
146:15 153:16
154:17,21
161:15 184:9
184:20 185:18
186:4,6,10,14
186:20 188:19
196:25 197:21
**systematic**
114:13
**systems** 49:4

**t**

**t** 3:11
**table** 6:8
**tactics** 22:9,10
**tahoe** 98:17
**take** 5:23 6:11
6:22,24 7:22
7:23 18:18,24
23:18,19 30:6
30:11 31:7
44:5 55:8,10

55:18 57:1,3
57:24 69:24
72:22 77:18
78:6 84:23
85:20 86:24
87:3 90:10,11
96:1 98:5,11
100:24 102:10
107:3,13
109:17 112:9
116:1,22 117:1
121:17 123:13
125:16 136:14
136:20 143:20
146:5 150:9,19
152:24 153:19
156:25 158:6
158:14 159:3
169:23 171:19
172:8 175:16
175:21 178:10
178:10 179:8
181:8,11
182:22 189:15
189:15,19,19
189:23 194:5
196:6 199:18
203:11 204:17
204:22 210:13
210:23 213:2
**taken** 1:18 6:5
69:25 116:4
123:9 136:23
150:8 159:10
169:25 175:6
203:13 218:2
**takes** 14:20,21
146:20 148:23

174:24 175:14
185:18
**talk** 23:4 53:10
63:2 66:10
78:3 79:5 83:2
92:8 100:11
104:9 122:8
161:6 182:18
192:21
**talked** 13:10
54:10 70:2
110:13 120:7,8
120:10 134:16
183:11 188:5
188:24 189:10
200:21 203:16
205:24
**talking** 10:22
33:4 34:14
35:18 37:8
53:6 54:5,12
54:17 63:3
82:21 95:7
104:11 157:24
171:13 201:2
**talks** 157:4
**tangled** 99:21
**tap** 106:4,4
**tape** 205:25
**tapping** 106:5
**tar** 191:10,11
**target** 66:8
204:10,10
**targeted** 202:3
**task** 34:4 98:17
105:21 106:14
133:5 158:21

**tasked** 48:1
155:6 158:21
**tasks** 145:20
**teach** 69:5 76:4
88:15 93:5
**teacher** 93:11
**teaching** 22:12
88:19 93:15,15
193:22
**team** 17:17,22
17:23 22:18
24:15 25:6,22
25:23 43:2
45:9 46:9,11
46:12 47:6,13
47:22,23 48:13
59:23 61:25
65:2 66:19
68:3 71:9,11
71:15 86:20
115:11 136:8
144:23 158:7
171:22 175:15
175:24 176:2
182:11,11
183:6 202:18
**teams** 19:25
67:18 182:10
**techniques**
45:14
**tell** 6:4,13,18
6:18 7:5 8:6
9:6 11:9,11
12:13,14 17:16
18:10 19:4
21:14 22:24
34:16 39:4,17
42:1 48:22

53:21 61:15
62:6 73:2 75:1
78:1,2,14
81:13 84:6,14
85:4,6,6,13,16
92:12 94:17,20
95:3,17,25
97:18,23 102:4
102:9 107:2,16
109:14 112:18
113:20 115:13
115:24 117:5,6
121:25 122:1
123:12 125:24
126:17 127:7
127:10 129:18
134:13 135:19
137:9 139:25
143:20,22
152:24 155:16
161:13 165:10
167:7 169:8,22
171:18 172:16
184:13,19
185:25 190:25
194:21,22
195:16 199:11
203:18,22
212:15 213:12
214:8
**telling** 38:5
51:23 52:4,16
75:12 97:8
109:7 117:24
118:13 121:24
132:9 133:6
156:24

| | | | |
|---|---|---|---|
| **tells** 80:19 | **testifying** | 197:17 198:18 | 70:17,19 71:18 |
| 109:9 | 122:12 | 208:20 213:9 | 73:6,19 74:1 |
| **ten** 7:16 10:23 | **testimony** | **thanks** 176:8 | 83:21 89:25 |
| 10:24 33:18 | 170:3 217:18 | **theft** 20:6 | 94:12 97:7 |
| 75:10,24 78:15 | 218:2 219:9,17 | **theory** 20:23 | 100:20 127:18 |
| 117:3 139:18 | **tests** 162:4 | **therefor** | 128:12 131:14 |
| 173:5 181:6 | 164:19 | 217:23 | 137:5 148:17 |
| 192:20 | **texas** 1:1,9,21 | **thing** 15:24 | 168:9,10 170:6 |
| **tend** 197:18 | 1:23 2:10,14 | 29:18,20 31:15 | 171:22 172:5 |
| 201:4 | 18:14 71:23 | 31:18 44:3,16 | 173:25 174:1 |
| **tendency** | 166:14,17 | 48:22 50:10,15 | 186:21 189:12 |
| 210:13,15 | 191:5 196:23 | 53:21 62:25 | 192:9 199:19 |
| **tennis** 102:20 | 216:8,20 217:1 | 82:24 83:10 | 204:16 205:25 |
| **term** 46:6 | 217:9,15 | 91:15 110:25 | 210:15,23 |
| 59:15 63:5 | 218:11,14 | 111:2,2 112:6 | 211:16,18 |
| **terminologies** | **texting** 16:15 | 115:9,25 | **think** 9:4,4 |
| 190:8 | **texture** 62:2 | 116:24 120:6,9 | 14:6,14 16:20 |
| **terminology** | **thank** 4:9 6:13 | 121:13 122:11 | 17:23 22:14 |
| 161:15 180:12 | 10:25 13:21 | 124:24 128:25 | 23:7,8 25:19 |
| 180:19 | 21:4 36:4 | 171:12 180:10 | 39:1,5 42:2,17 |
| **terms** 88:3 | 40:18 42:6,7 | 192:4 195:2 | 43:23 48:10 |
| 120:12 126:2 | 42:10 44:12 | 196:7 197:17 | 50:20,24 55:3 |
| 175:9,9 179:11 | 47:9 49:23 | 198:20 200:20 | 63:22 64:2,3 |
| 204:15 | 63:22 69:20 | 204:3 212:24 | 65:24 69:15 |
| **terrible** 28:1 | 76:9 79:18 | **things** 5:17 | 70:2 75:15 |
| 39:23 83:18 | 89:23 91:3 | 6:10 15:8 | 76:10,17 78:20 |
| 160:14 | 93:12 100:7 | 17:24 21:1 | 87:25 88:4 |
| **test** 163:3 | 112:25 115:3 | 22:12 27:18 | 97:2 102:15 |
| **tested** 136:1 | 119:6 120:6 | 29:19 30:10 | 105:2,17 108:1 |
| 169:4 197:6 | 122:7 123:8 | 43:14,24 45:14 | 138:17 139:6 |
| **testified** 4:2 | 124:22 127:20 | 45:14 47:25 | 140:2 141:23 |
| 7:13 8:22 9:16 | 128:23,23 | 49:3,13,15 | 142:6,7 145:18 |
| 135:16 209:12 | 129:17 131:22 | 52:1,3,5,15,21 | 160:7 161:13 |
| 214:4 | 131:25 137:2 | 52:22,22 53:4 | 162:10 165:18 |
| **testify** 4:21 | 154:6,24 157:3 | 53:5,15,19 | 168:21 170:6 |
| 13:17 20:18 | 160:5,22 161:5 | 54:15,16,25 | 170:21 172:14 |
| 135:17 136:9 | 170:20 173:9 | 56:20 57:16 | 183:16 184:6,6 |
| | 177:2 183:7 | 67:9,15 69:7 | 188:10 191:25 |

Officer George Herrara                                              April 17, 2024

**[think - tops]**                                                      Page 53

| | | | |
|---|---|---|---|
| 197:7 199:17 | 22:1 23:19,23 | 211:2 213:1 | **told** 11:12 27:9 |
| 199:23 200:24 | 24:18 27:7 | 214:2,14 | 50:22 78:12 |
| 206:14 210:22 | 29:2,14 31:4 | 219:18 | 85:22 86:17 |
| 213:12 214:10 | 40:14 44:5 | **timeframe** | 115:25 118:6 |
| **thinking** 9:25 | 53:23 54:5,9 | 219:8 | 118:15 133:24 |
| 10:2 41:3 | 54:11,13,17 | **times** 7:13 | 144:19 176:14 |
| 74:20 | 56:21 57:10 | 117:12 137:17 | 212:3 |
| **third** 44:24 | 60:8,8,24 | 138:10,12,19 | **toll** 173:8 |
| **thought** 14:8 | 69:13 77:15 | 139:6 142:11 | **tom** 200:25 |
| 43:12 45:1 | 86:3 92:17 | 145:18,19,20 | **tomorrow** |
| 72:21 94:2,5 | 93:6 96:10 | 148:19 167:16 | 174:9 |
| 140:22 210:12 | 98:14 103:17 | 183:11,12 | **ton** 58:17 |
| 210:14 | 104:1,8 108:21 | 203:1 | 159:19 |
| **three** 12:17 | 114:19 115:5 | **timing** 176:6 | **tongs** 189:13 |
| 17:3,5 49:15 | 116:24 118:24 | **timings** 152:14 | 193:9,9 |
| 49:19,20 79:8 | 123:13 132:6 | **timingwise** | **took** 5:21 24:2 |
| 79:9 120:8 | 133:2 134:3 | 176:12 | 59:9 148:19 |
| 131:4 138:1,19 | 142:13 143:20 | **tin** 40:22,23 | 149:3 158:1 |
| 139:3,6,17 | 143:23,24 | **tip** 189:21 | 174:4 186:23 |
| 140:1 141:13 | 144:9,16 145:4 | 190:11 | 186:23,24 |
| 160:12 161:2,5 | 147:2,18 | **tips** 189:15,23 | 187:19 191:10 |
| 170:13 173:6 | 148:20 149:2,4 | 193:3,4,11 | **tool** 56:23 |
| **threw** 197:9 | 149:5,7 150:2 | 205:24 | **top** 8:10 29:10 |
| **throckmorton** | 150:6,19 151:4 | **title** 4:16 19:9 | 43:19 60:19 |
| 218:13 | 151:19 152:24 | 19:16 | 110:1 127:12 |
| **throw** 168:2 | 154:1,22 | **titled** 128:14 | 144:22 161:23 |
| **ticket** 72:20 | 158:17,18,18 | **titles** 13:4 | 161:25,25 |
| 75:25 76:1 | 158:18,23 | **tobacco** 168:2 | 162:2,4,18 |
| **ticketing** 71:18 | 159:4,5 160:2 | **today** 4:22 | 168:23 181:6 |
| 72:1 | 163:15,16 | 11:16 15:5 | 202:1,11 |
| **tickets** 71:21 | 165:8 171:14 | 206:15 | **topic** 69:22 |
| **tie** 82:21 | 172:9 176:22 | **together** 25:23 | 110:10 120:7 |
| **tied** 88:20 | 177:16,22 | 66:19,25 69:11 | 199:18 |
| 186:14 | 178:18 179:10 | 108:16 171:22 | **topics** 88:14 |
| **tile** 38:12 | 189:9 190:2 | 172:12 182:10 | 131:3 183:10 |
| **till** 178:16 | 192:9 206:19 | 182:23 201:18 | 191:25 203:15 |
| **time** 4:13,20 | 206:21 207:5 | 206:25 | **tops** 92:4 |
| 15:9 20:11 | 210:10,18 | | |

totally  23:14
  55:21 93:10
  126:8,15 145:9
  165:17
touch  149:13
  150:11 194:5
touched  199:8
  199:8,9
touching  194:2
  213:17
toward  160:3
towards  44:23
  55:23 111:8
  146:9,17 183:9
towel  102:22
toy  98:6,7,9
  102:14,16,17
  102:19,20
  103:13,15,17
  103:20 104:3,4
  116:21 137:16
trace  190:7,16
  190:17,18,23
  191:15,20
  192:5,11,12,16
  192:17 195:4,7
  195:7,21
  196:10,17
  197:10,12,20
  198:7,11,16
  208:14,15,17
  209:4,8,12,17
  209:25
traced  197:11
track  68:8
  140:14 155:2
  155:20 156:17
  157:20 158:20

184:10
tracking  67:9
  67:25 140:12
  143:1 155:3,21
  157:4
tractor  33:16
traditionally
  68:4,25 69:13
  174:25 175:19
  175:22 182:6
traffic  8:7
  11:19,21,24
  12:7,8 15:16
  16:9 17:20
  18:9 20:12
  34:17 48:25
  70:14 71:17
  72:1,3,9,16
  74:20,22 75:20
  76:3,5 77:16
  77:20 80:2
  81:13 85:8
  94:15 95:18
  101:6 111:1
  133:16,22
  138:2 179:9,13
  180:17 181:18
  199:7,24 200:1
trail  68:9 120:1
  120:3
trailer  33:16
  87:1 116:7
train  22:6
  28:17,25 30:11
  30:19 31:2,5
  58:23 61:22
  64:13,14,15,25
  68:22 145:14

145:14,17
  148:18 152:2
  165:8 193:3
  194:20 203:8
trained  21:1
  25:10 26:10
  27:23 28:2,10
  28:13,15,23
  29:13,16,17
  31:20 32:4,13
  57:5 58:11,14
  73:3 74:19
  79:9 93:19
  94:7 96:1
  107:24 108:7
  130:17,18
  134:20 135:8,9
  135:10 137:6
  145:24 162:11
  165:12,14
  166:24 175:23
  177:11 178:6
  178:14,14
  203:7 211:21
  212:21,22
trainer  26:23
  26:24,25 27:5
  27:7,19 43:1,2
  47:11,22 59:5
  69:16 136:24
  170:17 175:6
  175:13,23
  176:2 178:8
  182:9,11,14,17
  198:4 211:4,5
  211:7
training  18:24
  19:1 20:15

22:4,20 25:4
  26:19 27:5,20
  31:6 45:8,20
  46:1,15 47:6
  47:14,18,21,24
  48:12 49:15
  50:2,3 52:12
  55:6,7,9,19,20
  55:23 56:5,8
  56:10,10,19
  57:2,8,14 58:4
  58:7 59:12
  61:15 63:18,18
  65:15,19,24
  66:21 67:10,12
  69:9,18 72:14
  72:23 73:1
  88:8,22 92:3,5
  92:7 97:5
  103:2,2 104:15
  105:23,24
  108:15 109:3
  113:17 116:24
  117:9 131:11
  132:18 136:22
  136:23 141:4,6
  141:23 142:20
  142:22,24
  143:1,1,4,7
  144:24 145:23
  145:24 146:2,6
  146:18,23
  147:15 148:10
  150:13,20
  153:6,24
  154:12,20
  155:2,20
  156:14,20

| | | | |
|---|---|---|---|
| 157:20 158:1 | **trains** 64:24 | **trial** 214:14 | 49:8 70:15 |
| 158:10,14 | **transcript** | **trials** 9:10 | 87:18 105:1 |
| 159:1,17 160:8 | 217:17,22 | 127:22 | 110:24 121:17 |
| 160:25 161:18 | 219:6,19 | **trick** 6:14 | 121:20 122:1 |
| 161:21,24 | **transfer** 21:20 | **tried** 41:15 | 132:11 133:4 |
| 162:8,22,25 | 199:10 | 169:9 199:12 | 133:13 145:9 |
| 163:3,14,17 | **transferred** | **tries** 148:19 | 156:15 184:5,7 |
| 165:7 167:5,18 | 17:10 173:22 | **trip** 53:18 | 205:2 212:25 |
| 167:19 169:11 | 211:10 | 73:19 | **turn** 44:22 |
| 170:23,25 | **transitionally** | **trooper** 138:4 | 63:23 97:22 |
| 171:2,6 173:25 | 65:9 175:1 | **troopers** 138:5 | **turned** 34:18 |
| 176:13,15,16 | **translate** | **trouble** 150:17 | 86:19 153:18 |
| 177:1,6,9,14 | 124:25 127:19 | **truck** 150:25 | **turns** 145:10 |
| 177:17,19,19 | **translation** | **true** 115:18 | 166:4,5,13 |
| 177:20 178:19 | 126:19 | 136:15 188:6 | **tv** 18:3 |
| 178:23 179:4,7 | **transport** | 216:2 217:18 | **twice** 198:10 |
| 182:7,21 183:5 | 49:10 51:25 | **truly** 192:18 | **two** 6:5 12:12 |
| 184:22 185:6 | 151:10 | 204:6 | 14:3 17:1,12 |
| 186:15,18,24 | **transportation** | **trunk** 53:19 | 22:3 34:23 |
| 186:24 188:23 | 57:20 | 73:23,24,25 | 36:17 50:24 |
| 188:24 189:20 | **trap** 6:15 145:9 | 78:11,15 84:4 | 51:5 67:14,14 |
| 189:24 190:4,5 | **travel** 38:22 | 100:1,2,3 | 73:23 80:21 |
| 191:6 192:5,22 | 182:9 | 113:12 114:3,5 | 83:2 85:9 |
| 193:5,7,19 | **traveling** 49:9 | **truth** 6:9 51:23 | 91:21 105:7,10 |
| 197:20 198:1 | 53:15 73:15 | 52:4,17 | 125:21 131:14 |
| 199:13 203:5 | 74:3,8 75:11 | **truthful** 6:2 | 134:21 145:22 |
| 204:22,24 | **tray** 187:15 | **truthfully** 4:21 | 149:2 161:13 |
| 205:1,22 206:1 | **treat** 36:11 | **try** 36:7 37:2 | 176:3,12 |
| 206:3,4,25 | 74:22 85:15 | 38:25 52:11 | 182:10 183:15 |
| 207:3 211:19 | 86:9 181:3,12 | 70:9 74:23 | 183:16,19,24 |
| **trainings** 23:8 | **tree** 156:16,18 | 76:25 111:17 | 189:18 191:4 |
| 27:17 31:4 | 156:21 | 140:12 148:21 | 192:9 201:9 |
| 41:23 55:4 | **trees** 152:22 | 155:6 156:25 | 203:15 |
| 64:25 77:19 | **trend** 59:14 | 160:14 174:13 | **type** 8:9,11 |
| 142:15,17 | 169:9 | 201:17 | 20:18 23:10 |
| 146:9 147:17 | **trends** 49:21 | **trying** 10:1 | 25:9 33:13 |
| 158:12 182:12 | 51:24 58:5 | 16:5 37:2,6 | 35:22 40:8 |
| 211:18 | 60:15 | 38:16,23 43:13 | 51:19 55:19 |

57:20 59:17,18
61:8,10 62:10
76:21 77:21
80:12 85:1
102:20 103:1
109:9 116:13
116:24 122:24
125:17 127:8
129:15 150:12
156:13 168:1
177:18 179:20
179:20 186:22
192:12 195:4
199:12 207:18
213:3
**types** 9:16 33:5
34:6 49:13
51:24,24 55:4
80:16 83:8
88:16 120:8
158:8,22
163:17 205:25
209:22
**typical** 81:17
91:24
**typically**
124:10 134:6
143:10 155:10
160:17 171:19
208:6

**u**

**uh** 5:7,17 18:20
19:17 21:8
35:5 36:21
38:13 49:24
60:20 64:6
74:25 80:6

89:2 91:18
102:2 104:22
123:24 142:10
150:21,21
151:24 157:6
161:9,11
190:14 197:14
**um** 75:14
**un** 158:2
**unbeknownst**
90:18
**uncommon**
66:2,3,5 92:9
159:7 169:8
**uncut** 162:1
**under** 27:13
60:1 63:20
79:23 87:10
117:19 179:18
192:12 216:11
216:14
**underneath**
97:13,14,15
111:17
**understand**
5:20,24 6:1,18
13:12 15:14,20
26:20 27:1
31:22 35:15,16
35:17 39:5
45:19 47:8
55:2,7,21,22
59:21 61:7,8
62:19,22 63:10
67:21 68:15
82:25 84:13
86:18 87:19
92:11,18,23

93:16 97:20
98:2 100:14
102:25 113:1
114:14 115:23
116:12 118:25
123:5 140:8
142:21 152:13
155:1 157:25
160:6,9 171:15
184:25 195:14
196:17 203:10
203:18
**understanding**
10:3,9 18:23
32:12 85:14
92:16 143:6,8
150:17 159:20
163:13 176:13
177:10,10
198:3 205:11
**understands**
31:8 86:4
100:18 109:2
151:17
**understood** 7:1
31:18 62:4
63:19 158:11
170:23 192:4
211:6 214:1
**unexpected**
205:15
**unfortunately**
174:21
**union** 12:21
**unit** 8:8,8 13:2
17:20 18:9
20:13 21:5,7
21:16,21,21,22

22:4,25 23:4
23:19 26:23,25
27:8,13 48:25
50:19 55:23
56:19 59:2
61:16 65:21
72:3,4 81:7
92:2 94:15
101:5 115:15
115:21 125:22
136:25 141:24
143:23,25
144:17 145:23
145:25 161:21
170:18 171:3,6
173:20,23
174:12 175:8,9
175:23 198:2
202:17 210:20
211:9,10,15,20
212:15
**united** 1:1
217:1
**units** 22:20
93:20 94:13
144:13 200:11
211:17
**unknown**
146:5 205:19
**unload** 181:19
**unloads** 181:10
**unusual** 205:9
207:11
**update** 128:11
128:13
**ups** 100:10
**upset** 106:12

| | | | |
|---|---|---|---|
| **usaa** 10:21 | **user** 130:18,19 | **vehicle** 14:21 | 180:1,7 185:11 |
| **use** 10:10 13:3 | 164:7 | 33:19 34:18 | 195:24 204:24 |
| 22:7,8 37:14 | **uses** 67:23 | 52:19,20,20 | 209:5 |
| 47:5,15 57:15 | 156:9 161:16 | 53:19 73:14,15 | **vehicle's** 99:7 |
| 57:19 62:3 | **using** 25:2 | 73:16,18,22 | **vehicles** 19:4 |
| 68:21 78:2,7,8 | 35:12 61:24 | 74:10 76:16 | 45:14 189:6 |
| 78:10,13,14,19 | 87:6 89:14 | 80:10,10,12 | **vehicular** |
| 92:6 95:9 | 111:5 126:21 | 83:11 84:5,5 | 18:11,17 20:17 |
| 117:1 122:25 | 129:10 135:10 | 84:11,11 85:11 | **vender** 178:15 |
| 126:22 128:6 | 136:10 149:1 | 86:5,12,22,22 | **vendor** 68:19 |
| 130:22 135:11 | 161:19,22 | 87:2,3,4,7,13 | 68:21 175:17 |
| 149:24 150:12 | 179:7 188:23 | 89:7,8 90:2,3,4 | 175:25 176:1 |
| 152:13 156:2 | 192:8 193:3 | 90:7,17 92:24 | **vents** 38:18 |
| 161:24 163:3 | **usually** 18:25 | 93:3,4 95:13 | **venture** 177:25 |
| 168:10,12,13 | 52:7 67:4 78:4 | 95:24 96:3,6 | 178:21 183:23 |
| 172:1 175:18 | 83:10 84:8 | 96:16 97:10,24 | **venue** 174:14 |
| 176:23 189:13 | 98:6 102:20 | 97:25 98:2,18 | **verbal** 5:16 |
| 189:24 193:1,8 | 104:25 105:1 | 98:19,20,22 | 108:3 109:20 |
| 193:10,12 | 161:22 175:13 | 99:2,8,18 | **verbally** 81:12 |
| 195:4 198:23 | 179:20 | 100:6 101:7,9 | 96:12 108:22 |
| 205:23,23 | | 101:10,16,17 | 109:16,18 |
| **useable** 191:5 | **v** | 101:19 102:10 | 121:25 |
| 191:13 196:21 | | 102:11 105:4 | **verbiage** |
| 196:21,23 | **v** 219:4 | 106:22 111:3 | 131:18 |
| 197:3,4 | **valid** 112:23,23 | 111:22 112:20 | **verify** 95:23,23 |
| **used** 24:10 | **valued** 103:23 | 114:8,14,22 | 137:16 138:13 |
| 51:25 57:19 | **vapors** 213:24 | 115:2,18 116:2 | 219:9 |
| 61:10 65:8 | **variables** 158:9 | 116:5,6,7,8,11 | **veritext** 218:12 |
| 78:17 82:8 | 158:22 | 117:17,21 | 219:14,23 |
| 93:23 116:10 | **variety** 49:17 | 119:3,5,20 | **veritext.com** |
| 122:25 128:9 | 52:5,21 67:11 | 120:3 124:6 | 219:15 |
| 128:15,19,20 | **various** 49:3,11 | 130:11,12,14 | **version** 110:21 |
| 154:17 161:18 | 53:19 60:9 | 137:25 138:2 | 110:21 154:8 |
| 163:23 165:7 | 177:16 | 144:8 151:8,10 | 165:20 |
| 177:17 180:13 | **vast** 162:7 | 151:12,14,14 | **versus** 124:9 |
| 189:1,2,2 | **vegetation** | 151:15,16 | 131:19 179:11 |
| 192:5 199:6 | 156:4 | 156:22 179:14 | 200:21,22 |
| 200:24 219:19 | **veh.rel** 130:12 | 179:15,25,25 | 203:25 212:1 |

| | | | |
|---|---|---|---|
| **veterinarian** | **walk** 62:4 | 81:15 83:10 | 130:25 150:2 |
| 175:18 | 72:20 86:25 | 84:17,21 86:2 | 158:17 160:6 |
| **video** 11:18 | 87:4 98:18 | 86:5 90:16,20 | 171:9 174:13 |
| 12:3,6 14:16 | 102:15 111:10 | 90:21,21 91:5 | 181:6 212:24 |
| 14:24 134:6 | 111:14 112:3,4 | 91:15 92:10,24 | **wanting** |
| 207:10,11,15 | 112:8,10 115:5 | 97:11 102:7 | 103:18 189:11 |
| 207:23 209:19 | 115:7,8 116:6 | 103:5 104:9,10 | **wants** 25:14 |
| 209:23 210:1 | 117:5,6,10,16 | 104:12,20,23 | 82:14 111:16 |
| **videos** 14:1,7 | 117:19,21 | 110:2,5 115:4 | 111:17 113:14 |
| 134:14 213:22 | 142:17 167:8 | 115:22 116:11 | 117:17,18,19 |
| **view** 125:25 | 167:13 172:3 | 118:25 119:1,5 | 132:4 147:15 |
| 207:6 | 181:9 | 119:13,14,21 | **warning** 72:17 |
| **viewed** 122:11 | **walking** 59:17 | 119:21 120:2 | 196:14 |
| **vile** 194:16 | 89:15 101:21 | 122:8 123:11 | **waronin** 2:6 |
| **violation** 76:7 | 189:21 | 123:21 125:23 | **warrant** 86:24 |
| 95:18 | **walks** 33:18 | 125:25 126:2 | 116:3 179:1,8 |
| **violator** 85:4 | 133:19,20 | 130:11 137:15 | 213:5 |
| 86:11 106:22 | 171:25 193:14 | 145:7 154:6,25 | **warrants** |
| 179:14 | **walls** 38:16 | 157:10 159:9 | 180:18 |
| **violence** 71:2 | **want** 6:9 10:8 | 159:11,15,17 | **washy** 137:12 |
| **virginia** 2:5 | 13:3 16:19 | 159:24 160:7 | **watch** 11:17 |
| **visible** 195:5 | 21:10 24:10,14 | 161:3 162:14 | 52:23 |
| **visit** 31:3 75:3 | 24:18,24 25:13 | 164:6,6 166:9 | **watched** 12:2,5 |
| **visualize** 105:1 | 25:20,25,25 | 167:10 168:4 | **watching** 40:22 |
| **visually** 150:16 | 26:13 29:13,18 | 173:9 174:8 | 41:2 53:6,16 |
| **void** 116:23 | 29:21 30:3 | 184:4 185:20 | 106:17 134:6 |
| **voids** 49:20 | 35:25 40:18,19 | 187:5 190:5 | **way** 4:7 21:7 |
| 51:23 | 41:11 43:14 | 192:3 194:7,14 | 22:17 32:17,21 |
| **vs** 1:4 217:4 | 44:4 45:17,25 | 194:15,18,22 | 35:7 36:14 |
| **w** | 49:25 54:14 | 195:14 202:13 | 38:19 41:22 |
| | 55:2,10,22 | 204:19 | 47:13 51:2 |
| **w** 2:15 | 58:22 65:14 | **wanted** 10:3 | 52:6 55:12,13 |
| **wait** 15:2 92:25 | 67:15 69:3,23 | 21:20 33:3 | 55:15 61:14 |
| 129:16 164:21 | 70:4,5,23 | 53:23 74:11 | 70:20 75:8 |
| **waited** 149:2 | 73:10 74:2 | 79:4 81:11 | 78:3 88:2 |
| 149:12 | 76:17 77:3,5 | 89:24 106:3 | 91:13 93:4 |
| **waived** 83:23 | 77:13,17,18 | 108:16,21 | 99:20 100:5,17 |
| | 79:5,7 80:9 | 109:11 110:2 | 104:24 105:13 |

105:16 106:8
106:24 107:20
108:11 109:8
109:12,14
111:21 112:22
119:24 120:18
121:20,23
129:12 132:16
137:10,15
139:23 148:1
151:9 156:25
157:3 168:15
171:3,24,24
172:7 176:1
178:3 180:23
183:4 189:8
192:7 196:15
199:21 202:6
205:21 207:18
**ways** 176:3
183:15,16,24
201:24
**we've** 11:17
15:21 54:9
120:7,10 121:8
205:24 213:21
**weapon** 43:2
**weapons** 43:5
43:10 180:18
**wear** 189:12
**week** 33:10
142:1,1,4
145:18,19
146:8 189:18
**weekly** 145:15
**weeks** 14:3
66:21,23
142:11 178:17

178:19 189:18
**weird** 4:19 5:8
5:9 6:21
**wells** 105:3
**went** 21:5
27:10 128:10
128:11 155:6,7
155:7 199:7
208:10 213:7
**western** 1:1
217:1
**wet** 59:15
**whatever's**
119:22
**whatsoever**
148:15
**wheel** 77:4
89:19 117:18
199:8
**whichever**
193:13
**whining**
131:22
**whisper** 179:18
180:8,12 181:2
**white** 177:18
**whoever's**
82:10
**wide** 49:17
52:5,21 67:11
204:4,6
**wife** 74:15
**wifi** 129:15
**wind** 38:19
110:15,17,21
110:22,24
111:6,7,24,25
112:2,6,15

113:2,15,22
204:15
**wind's** 114:11
**window** 91:12
91:13 208:8
**window's**
105:14,15
**windows** 91:3
91:4,10 99:25
105:12 119:19
199:9
**wiping** 194:3
**wishy** 137:12
**withdraw**
47:17
**withdrawn**
28:1 182:1
194:14 197:23
210:6,7 211:12
**witness** 1:17
7:3,6 8:4,14,17
8:19 9:23
13:21 217:17
217:18 219:8
219:10,12,18
**witnessed**
207:23
**wmd** 43:4,5
**wonder** 58:16
121:19 133:12
204:14
**wonderful**
123:21
**wondering**
74:18 108:2
180:14 183:8
**woods** 88:15

**word** 6:11 26:2
35:12 46:5,8
47:5 90:13
92:6 136:15
153:19 161:17
161:24 178:6
192:6 193:1
**words** 12:5
23:16 24:20
31:16 55:2
72:6 74:3
86:22 91:10
99:16,16
114:10 121:10
121:19 128:14
132:11 142:8
163:1 172:1
173:24 175:11
176:23 192:3
**work** 15:11
20:13 25:13,22
25:23 46:10
48:13 66:25
67:9 69:11
70:25 73:9
80:20 81:9
82:5,5 98:9,21
101:15 103:1,2
104:24 108:13
109:2 112:1
142:18 143:2
155:25 159:11
176:2 177:21
178:11 179:1
182:9,16 187:1
198:21,25
201:4,18 202:2
202:17 210:22

Officer George Herrara                                         April 17, 2024

| | | |
|---|---|---|
| **worked** 24:9 | **written** 127:25 | 200:13,16 |
| 49:4 112:22 | 138:23 | 202:5 203:24 |
| 131:3 173:16 | **wrong** 15:24 | 204:1 205:8 |
| 173:17 175:7 | 23:11 34:9 | 209:7 |
| 202:23 | 58:25 64:22 | **year** 10:22 |
| **working** 17:7 | 75:23 76:17 | 23:11 65:14,15 |
| 26:17 31:13 | 104:7,10,14 | 65:19 66:16 |
| 81:18,20 83:15 | 111:20 112:21 | 78:23 141:24 |
| 85:10 95:8,9 | 112:23 122:2,3 | 178:22 184:13 |
| 95:22 101:25 | 122:6 138:7 | 184:14 |
| 105:4 131:11 | 139:7 148:25 | **years** 7:11 |
| 159:9 173:2,4 | 149:6,7,8 | 10:23,24 16:23 |
| 173:12,13 | 184:1 | 17:4,5,12,18 |
| 179:19 205:8 | **ww** 177:18 | 17:21,22 23:22 |
| 207:3 | **x** | 76:13 94:20,22 |
| **workload** | | 139:18,19,21 |
| 211:16 | **x** 3:1,11 217:21 | 139:22 170:13 |
| **works** 6:11 | **y** | 173:2,5,7 |
| 16:1,6 83:3 | | 203:2 |
| 150:17,20 | **yard** 173:25 | **york** 19:14 |
| 172:13 179:25 | **yeah** 14:13 | 30:3 |
| 200:18 | 15:2 16:4 | **youtube** 213:22 |
| **world** 113:18 | 19:13 23:7,12 | **z** |
| 159:16,16,17 | 31:25 33:25 | |
| 179:1,7 | 37:10 43:16 | **ziploc** 149:23 |
| **worries** 42:9 | 51:1 57:13 | 168:5,6,7,16 |
| **worst** 110:18 | 61:4 62:13 | 209:16 |
| **worth** 30:2 | 72:10 76:14 | **zombie** 59:17 |
| 218:14 | 78:10 79:24 | 59:18 |
| **wow** 9:4 | 83:25 84:6 | |
| 202:16 | 105:14 109:23 | |
| **wright** 2:13 | 124:3,21 | |
| **write** 35:25 | 129:24 139:9 | |
| 67:14 75:25 | 139:22 145:11 | |
| 80:15 | 153:12 158:4 | |
| **writing** 23:11 | 161:13 163:21 | |
| 128:10 | 164:1,11,17 | |
| | 167:13 176:21 | |
| | 185:10 187:18 | |

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to
witness. The deposition officer must provide the
original deposition transcript to the witness for
examination and signature. If the witness is
represented by an attorney at the deposition, the
deposition officer must provide the transcript to
the attorney instead of the witness.

(b) Changes by witness; signature. The witness may
change responses as reflected in the deposition
transcript by indicating the desired changes, in
writing, on a separate sheet of paper, together
with a statement of the reasons for making the
changes. No erasures or obliterations of any kind
may be made to the original deposition transcript.
The witness must then sign the transcript under
oath and return it to the deposition officer. If
the witness does not return the transcript to the
deposition officer within 20 days of the date the
transcript was provided to the witness or the

witness's attorney, the witness may be deemed to
have waived the right to make the changes.

(c) Exceptions. The requirements of presentation
and signature under this subdivision do not apply:

    (1) if the witness and all parties waive the
signature requirement;

    (2) to depositions on written questions; or

    (3) to non-stenographic recordings of oral
depositions.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.