Aaron von Muldau                                           July 17, 2024

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3

    ALEK SCHOTT,                      §
 4          Plaintiff,               §
                                      §
 5                                    §
    VS.                               §
 6                                    §
    JOEL BABB, in his individual      §   CIVIL ACTION NO.
 7  and official capacity;            §   5:23-cv-00706-OLG-RBF
    MARTIN A. MOLINA III, in his      §
 8  individual and official           §
    capacity; JAVIER SALAZAR, in      §
 9  his individual and official       §
    capacity; and BEXAR COUNTY,       §
10  TEXAS,                            §
            Defendants.               §
11

           -------------------------------------------
12

                      ORAL DEPOSITION OF
13

                      AARON VON MULDAU
14        **As 30(b)(6) Representative of Bexar County**
15                     JULY 17, 2024
16         -------------------------------------------
17            ORAL DEPOSITION of AARON VON MULDAU, produced
18  as a witness at the instance of the Plaintiff(s), and
19  duly sworn, was taken in the above-styled and numbered
20  cause on July 17, 2024, from 9:31 a.m. to 3:42 p.m.,
21  before Molly Carter, Certified Shorthand Reporter in and
22  for the State of Texas, reported by machine shorthand, at
23  the Law Offices of Charles S. Frigerio, 111 Soledad,
24  Suite 465, San Antonio, Texas, pursuant to the Federal
25  Rules of Civil Procedure.
```

Page 2

```
          A P P E A R A N C E S

FOR THE PLAINTIFF(S):
   Ms. Christen M. Hebert
   INSTITUTE FOR JUSTICE
   816 Congress Avenue, Suite 970
   Austin, Texas 78701
   (512) 480-5936
   chebert@ij.org
   Mr. Joshua A. Windham
   INSTITUTE FOR JUSTICE
   901 North Glebe Road, Suite 900
   Arlington, Virginia 22203
   (703) 682-9320
   jwindham@ij.org

FOR THE BEXAR COUNTY DEFENDANT(S):
   Mr. Charles S. Frigerio
   Mr. Hector X. Saenz
   LAW OFFICES OF CHARLES S. FRIGERIO P.C.
   111 Soledad, Suite 465
   San Antonio, Texas 78205
   (210) 271-7877
   csf@frigeriolawfirm.com

FOR THE DEFENDANT(S) AARON VON MULDAU:
   Mr. Blair J. Leake (via Zoom)
   WRIGHT & GREENHILL, PC
   4700 Mueller Boulevard, Suite 200
   Austin, Texas 78723
   (512) 476-4600
   bleake@w-g.com

ALSO PRESENT:
   Sergeant Pedro Gamboa
   Sergeant Benjamin Olvera
   Sergeant John Turack
```

Page 3

```
          I N D E X

Appearances ............................................. 2

AARON VON MULDAU
   Examination by Ms. Hebert ...................... 5

Signature and Changes ............................... 220
Reporter's Certificate ............................... 221

          EXHIBITS
NUMBER    DESCRIPTION          PAGE
```
Exhibit 5 ......................................... 148
   3/16/22 Incident Detail Report

Exhibit 8 ......................................... 165
   SPEARS Incident Summary: BCS220059233
   Re: Alek Joseph Schott

Exhibit 10 ......................................... 184
   3/16/22 Incident Detail Report (with
   redactions)

Exhibit 12 ......................................... 58
   3/16/22 Citation/Warning
Exhibit 14 ......................................... 121
   Bexar County Sheriff's Office Manual of
   Policy and Procedure (as of 8/3/21)
Exhibit 16 ......................................... 156
   6/12/23 Request for Investigation, and
   Report Documents

Page 4

Exhibit 27 ......................................... 181
   K-9 Deployment Detail Report

Exhibit 46 ......................................... 162
   Internal Affairs Investigation Report
Exhibit 53 ......................................... 22
   Bexar County Sheriff's Office
   Organizational Chart
Exhibit 54 ......................................... 136
   Babb Interdiction Training Documentation
   and Certifications
Exhibit 55 ......................................... 149
   6/26/24 Response to Grievance

Exhibit 56 ......................................... 13
   Notice of 30(b)(6) Deposition to Bexar
   County

Exhibit 57 ......................................... 57
   Bexar County Citation Data Excel
   Spreadsheet

Exhibit 58 ......................................... 122
   Bexar County Sheriff's Office Manual of
   Policy and Procedure

Exhibit 59 ......................................... 133
   Conversation #32 from Cell Phone Examiner
Exhibit 60 ......................................... 196
   6/21/23 Emails Re: Tickets, with
   Attachment DepBabbCiteQ1Cy2022.pdf
Exhibit 61 ......................................... 197
   Citations and Warnings from 1/10/2022 to
   3/30/2022
Exhibit 62 ......................................... 203
   Organized Crime Division Phone List

Exhibit 63 ......................................... 204
   Order Granting Plaintiff's Motion to
   Compel

Page 5

1  THE REPORTER:  We are on the record.
2       AARON VON MULDAU,
3  having been first duly sworn, testified as follows:
4       E X A M I N A T I O N
5  BY MS. HEBERT:
6    Q   Good morning.  I'm Christie Hebert and I
7  represent the Plaintiff, Alek Schott, in this case.
8  Today we are joined by several people.  This is my
9  colleague, Josh Windham.
10      Your Counsel, the County's Counsel, Charles
11  Frigerio, is with us.
12      We have Molly, the court reporter, and she is
13  going to take down everything you say today.
14      We are also joined by -- I wrote this down
15  because I want to make sure I've got everybody's name
16  right.
17      Well, I'll just go by memory.  Officer Turack?
18      SERGEANT TURACK:  Yes, ma'am.
19      MS. HEBERT:  Officer Olvera?
20      SERGEANT OLVERA:  Yes, ma'am.
21      MS. HEBERT:  And Officer Gamboa?
22      SERGEANT GAMBOA:  Correct.
23      MS. HEBERT:  And I apologize if I don't get
24  everybody's rank.
25      THE WITNESS:  They're all sergeants.

Aaron von Muldau                                                    July 17, 2024

Page 6

1       MS. HEBERT: All sergeants. That's helpful.
2    Q    (By Ms. Hebert) And what is your rank, sir?
3    A    Captain.
4    Q    I just want to make sure I address you
5  correctly. So that's everybody we've got in the room.
6       We're going to have the usual stipulations
7  here. By appearing here today, you're waiving any
8  objections or defects in your deposition notice.
9       And then by appearing here today, you're also
10 waiving any objections to Molly's qualifications as our
11 court reporter.
12   A    What do you mean by waiving my -- for
13 deposition notice?
14      MR. FRIGERIO: Yeah, we'll just -- we're not
15 objecting to her as a court reporter.
16      THE WITNESS: Oh, okay.
17   Q    (By Ms. Hebert) You're not objecting to her as
18 a court reporter and you're not objecting to the notice
19 of the deposition as deficient.
20   A    No, I'm here voluntarily.
21   Q    You're here, right. Or on behalf of the
22 County.
23   A    Yes, ma'am.
24   Q    What is your full name?
25   A    Aaron Andrew von Muldau.

Page 7

1    Q    And are you here today testifying on behalf of
2  Bexar County?
3    A    Bexar County Sheriff's Office, yes, ma'am.
4    Q    And Bexar County, therefore, on top of --
5    A    Yes.
6    Q    -- the Bexar County Sheriff's Office?
7    A    We fall under them.
8    Q    And before I go on, I want to go over a couple
9  of housekeeping matters. Everybody who may testify today
10 might listen in and -- so we don't have to repeat this
11 multiple times. Have you ever testified under oath
12 before?
13   A    Yes.
14   Q    Okay. And when did you testify under oath?
15   A    Lots of times.
16   Q    Okay. Can you tell me about that?
17   A    I've testified under oath as an officer, as a
18 witness in criminal case proceedings. I've testified as
19 an officer under civil proceedings. I've testified as a
20 supervisor. I've testified numerous times as an
21 investigator, different roles under investigations. And
22 the last time, I can't actually recall when I've
23 testified. It's been a while.
24      I've been a supervisor or a mid level or higher
25 level supervisor since 2014. So -- oh, you know what,

Page 8

1  that's not true. Part of my duties as the executive
2  officer for the Sheriff's Office, I represent the County
3  in all civil and disciplinary proceedings that have
4  passed the Loudermill. So I testify quite often in
5  discipline hearings and investigations against the
6  agency.
7    Q    Okay. Thank you. Have you ever had your
8  deposition taken before?
9    A    Yes.
10   Q    Okay. How many times would you estimate?
11   A    Two to five.
12   Q    Okay. So sounds like you're pretty familiar
13 with how a deposition goes in general.
14   A    It's been a long time, so if you want to go
15 over the rules, that would be fine.
16   Q    Okay. Have you ever testified on behalf of
17 Bexar County before?
18   A    I have.
19   Q    Okay. And you understand that you are under
20 oath today?
21   A    I do.
22   Q    And you swore to tell the truth, correct?
23   A    I do.
24   Q    And you understand that being under oath here
25 in Mr. Frigerio's office before Molly, the court

Page 9

1  reporter, is the same oath as if you were in a courtroom
2  before a judge?
3    A    I do, ma'am.
4    Q    It's important that we have a clear record
5  today. So that means it's important for me to ask clear
6  questions. So if you do not understand a question that I
7  ask, please let me know.
8       And then by contrast, it's important that you
9  give clear, verbal answers. So please do not nod your
10 head or say uh-huh or huh-uh, because that's very
11 difficult for the court reporter to capture on the
12 record. And I'll do my best to help you navigate that
13 process. Can you agree to do that?
14   A    I understand.
15   Q    Also, one thing that is a little bit
16 challenging is, please do not start answering a question
17 before I finish asking it. And I'll do the same for you,
18 I'll try to avoid interrupting you. I'll let you finish
19 your answer. It's not quite a natural conversation,
20 because, you know, sometimes you know where the other
21 person is going and you want to just kind of jump in. So
22 we'll do our best to take a pause. Is that okay?
23   A    I understand.
24   Q    Otherwise, Molly -- as Blair likes to say,
25 Molly will throw a stapler at us.

Page 10

1    If you do not know the answer to a question, it
2 is okay to say so. But if you do know the answer, you're
3 required to provide it. And if you do not know the
4 answer to a question, I will try to ask you and help --
5 ask you to help me remember to ask -- to identify who the
6 right person is to answer that question for the County.
7 Understand?
8    A  Understood.
9    Q  The County's attorney, Mr. Frigerio, may state
10 an objection. That does not mean that I've asked a bad
11 question. You still have to answer the question, unless
12 Mr. Frigerio instructs you not to answer.
13    Mr. Frigerio is just stating an objection on
14 the record so that if we want to use the answer to the
15 question or the question later, Mr. Frigerio could argue
16 to the Court that the question was improper. Do you
17 understand?
18    A  I understand.
19    Q  If you would like to take a break, have a
20 drink, or just getting tired, just let me know and we can
21 take a break. I only ask that you ask to take a break
22 after we finish a question. So not, not while a question
23 is pending. You understand?
24    A  I understand.
25    Q  We're going to look at some documents today.

Page 11

1 And you have the right to read those documents in their
2 entirety and understand them. And if you need to take
3 more time with a document, we can take a break, again.
4    I'm going to call your attention to specific
5 parts of a document, just to expedite things, so we're
6 not here asking every question about the document ever.
7 But again, it is your right to read the document in its
8 entirety. Do you understand?
9    A  I understand.
10    Q  And that goes for kind of the entire
11 conversation here. I'm not looking to trick you or trap
12 you. I'm looking to ask you questions, understand the
13 answer, and get clear answers on the record. Do you
14 understand?
15    A  I understand.
16    Q  Is there any reason why you are not able to
17 give your fullest and best testimony today, such as you
18 took an impairing medication?
19    A  No.
20    Q  Did you have any alcohol this morning?
21    A  No, ma'am.
22    Q  Okay. And are you generally feeling
23 clear-headed to testify?
24    A  I am.
25    Q  We're going to talk a lot about Bexar County

Page 12

1 today. And can we agree when I say "the County," I'm
2 referring to Bexar County?
3    A  I'm going to assume that you -- my
4 understanding when you say Bexar County is the umbrella
5 of the County.
6    Q  Right.
7    A  If you want something specific from the
8 Sheriff's Office, you will delineate that saying
9 specifically for the Sheriff's Office.
10    Q  Sure. And when -- can we agree that when I say
11 "the Sheriff's Office," I mean the Bexar County Sheriff's
12 Office?
13    A  Yes, ma'am.
14    Q  And can we also agree that when I say
15 "Sheriff," I'm referring to the position of the Sheriff
16 of Bexar County? Can we agree to that?
17    A  Yes, ma'am.
18    Q  Just trying to create like a shorthand so I
19 don't have to every time I ask a question say Bexar
20 County, the Sheriff's Office of Bexar County --
21    A  I --
22    Q  -- and the Sheriff of Bexar County.
23    A  I understand.
24    Q  I'm going to show you an exhibit.
25    MS. HEBERT: Can you get Exhibit A for us? And

Page 13

1 we're going to mark this as Exhibit 56.
2    MR. FRIGERIO: I've got one, Josh.
3    MR. WINDHAM: You do have one?
4    MR. FRIGERIO: Yeah.
5    Q  (By Ms. Hebert) Have you seen this document
6 before?
7    A  I have.
8    Q  Do you know what it is?
9    A  I do.
10    Q  What is it?
11    A  This is to compel a -- requesting a deposition
12 of members. This one specifically is -- was directed
13 saying, you know -- I originally saw this, I believe,
14 with Susan Bowen. But we are -- this is -- these are the
15 things that you are going to be referencing for my
16 deposition for the Sheriff's Office.
17    Q  Sure. And have you reviewed the subject matter
18 that starts on Page 1 and runs to Page 3, topics?
19    A  Are you talking about --
20    Q  The bottom of Page 1.
21    A  -- that says 1, 2, 3, 4 -- those?
22    Q  Runs through 10, yes, sir.
23    A  10? Yes, ma'am, I have.
24    Q  Okay. And you understand that you are here
25 today to testify as Bexar County's representative on

Aaron von Murdau                                                    July 17, 2024

Page 14

1  these topics, unless there's another person in the room
2  that needs to be designated as the person to speak about
3  those topics?
4      A   I do understand that.
5      Q   Okay.  And that means that the County
6  designated you as its representative for the purpose of
7  providing testimony on these topics.  You understand
8  that?
9      A   I do.
10     Q   And I know that testifying on behalf of a
11  county can be kind of awkward.  But since you're
12  testifying on behalf of the County, we'll generally try
13  to make sure and make clear that your answers are on
14  behalf of the County and not just you personally.  Do you
15  understand that?
16     A   I do understand.
17     Q   Okay.  And other than speaking with Bexar
18  County's attorney, Mr. Frigerio, did you do anything else
19  to prepare for this deposition today?
20     A   No.
21     Q   Okay.  Did you review any documents?
22     A   For this deposition?
23     Q   Yes, sir.
24     A   I did not.
25     Q   Okay.  Did you review any videos?

Page 15

1      A   No.
2      Q   Did you have conversations with anyone other
3  than Mr. Frigerio?  And I want to be clear, I'm not
4  asking about your attorney conversations, but did you
5  have conversations with anybody else?
6      A   Concerning the deposition and the case?
7      Q   Yes.
8      A   I have not.
9      Q   Any -- about any topics that you would be
10  expected to testify about today?
11     A   Not -- not any topics that I was expected to
12  testify.
13     Q   Okay.  And did you bring any documents with you
14  to today's deposition?
15     A   I did not.
16     Q   Okay.  Let's start with just the preliminaries.
17  What is your current position with the Bexar County
18  Sheriff's Office?
19     A   I am -- I promoted to the rank of captain and I
20  am the executive officer.  So I wear multiple hats.  The
21  main part of my job is to work with administration for
22  the two assistant chiefs in regards to discipline
23  matters, lawsuits, discovery, things like that.
24          In addition, I have command over the public
25  safety communication center of dispatch.  I also have

Page 16

1  command over the academy administration, not the
2  day-to-day and not what they're teaching, but how they
3  operate as a structure.
4      Q   What does that mean?  I'm sorry, I don't
5  understand.
6      A   I deal with all their supervisors, making sure
7  the supervisors get along and do what they're supposed to
8  be doing.
9      Q   I understand.  Okay.
10     A   I don't -- I don't devolve into what they're
11  teaching, their -- I make sure that their licensing and
12  their compliance is up to date and that things are being
13  done the way they need to be done.  But I don't deal with
14  like classes and teaching and stuff like that.
15     Q   Understand.
16         MR. WINDHAM:  Just for the record, somebody did
17  just enter the room.
18         MS. HEBERT:  Ah, yes.
19         MR. SAENZ:  Sorry.
20         MS. HEBERT:  Can you state your name for the
21  record?
22         MR. SAENZ:  Hector Saenz.
23         MS. HEBERT:  Hector Saenz just joined us today.
24     Q   (By Ms. Hebert) Okay.  I want to ask generally
25  about the Sheriff's Office.  How many peace officers does

Page 17

1  the County employ?
2      A   What is your definition of peace officer?
3      Q   I mean, as I understand it, there's a peace
4  officer license.
5      A   Correct.
6      Q   How many officers have a peace officer license?
7      A   In law enforcement, I believe approximately 567
8  to 600.  I'm kind of fuzzy with the numbers.
9      Q   Sure.
10     A   And then in detention, with POs, I think it's
11  about 280 -- 250 to 280.
12     Q   And that latter number, 250 to 280 are the
13  folks who work in the detention center?
14     A   Yes.  They are assigned -- they are fully
15  licensed, commissioned peace officers through the
16  Sheriff's Office that are assigned to the detention
17  center.
18     Q   Sure.  And how many officers would you estimate
19  go on patrol?
20     A   On patrol?  Okay.  I'm not trying to be
21  obstinate.  What is your definition of patrol?
22     Q   Sure.  Go out on the streets and are patrolling
23  in various capacities.
24     A   Enforcement units?
25     Q   Sure.

5 (Pages 14 - 17)

Aaron von Muldau                                          July 17, 2024

Page 18

1    A    About 250.

2    Q    And you'll have to bear with me. I'm not as up

3    on the jargon --

4    A    No, no, but that's why --

5    Q    Sure.

6    A    When I ask the question, because the Sheriff's

7    Office operates kind of funky. We have a Patrol

8    Division.

9    Q    Uh-huh.

10   A    But I also have numerous enforcement units. So

11   in other depositions, some people clarify the difference

12   and some people say "I want everything."

13   Q    Sure.

14   A    So that's why I'm asking.

15   Q    So approximately 250 officers go out on the

16   streets in some capacity or another?

17   A    Right. I know we've added some positions this

18   last budget cycle, but the way they were added I haven't

19   really kept up with the exact numbers, which is why I'm

20   not -- I can't give you today its this many. I know I'm

21   within 90 percent, so --

22   Q    Within 90 percent of this case is fine. Just

23   an estimate is generally fine.

24   A    Yes, it's about 250, 275.

25   Q    I'm not going to do a gotcha and then tomorrow

Page 19

1    it's actually 261 and --

2    A    Right.

3    Q    Don't worry about that. I'm just trying to get

4    a general estimate of what the lay of the land looks

5    like. How many officers or what percentage would you

6    estimate of those officers who do patrol make traffic

7    stops?

8    A    That make traffic stops? I would say they all

9    have the capability of making traffic stops.

10   Q    Okay. And what percentage or what number of

11   those officers make traffic stops as part of their daily

12   duties?

13   A    Okay, I'm trying to understand what you're

14   asking me. So they --

15   Q    I understand that the officers all have the

16   capacity.

17   A    Uh-huh.

18   Q    Who is charged with making a traffic stop?

19   What number, what percentage of the officers who are on

20   patrol it's part of their job duty?

21   A    All of them.

22   Q    Okay. And can you explain the term "take-home

23   patrol car"?

24   A    I can.

25   Q    Would you mind explaining it?

Page 20

1    A    We do not have the staffing to carry out a 24/7

2    operation. So we supplement that by putting deputies and

3    officers on call. So there are people, like myself or

4    supervisors that have specialty -- specialty --

5    specialties that are then given the opportunity to take a

6    marked unit patrol car home.

7         Like mine is unmarked, but I have all the

8    equipment a patrol car would have for the most part. I

9    don't have some of the traffic equipment like meaning I

10   don't carry a radar unit, because they are expensive. If

11   I make a traffic stop, it's based on law and probable

12   cause and those things, but it's not necessarily

13   utilizing the exact same equipment. But for the most

14   part it's close.

15        These officers are put on call -- on a call

16   status. And when they are needed on their off time, then

17   they are recalled and brought back and that's what that

18   vehicle is utilized for.

19   Q    I understand. And you mentioned specialties,

20   officers with specialties getting patrol cars. Can you

21   explain what specialties get a patrol car -- or a

22   take-home patrol car? Excuse me.

23   A    They're -- it just depends on what your -- your

24   job functions. Like we have currently a TAG unit, and

25   they only -- we've got two kind of different shifts. You

Page 21

1    have your daylight TAG, and then your gang -- which is

2    split up into gang unit, covert. And then you have

3    nighttime, which is street crimes, which goes after

4    violent offenders.

5         They both work under different grants,

6    different other task force. So they usually work an 8-

7    to 10-hour shift. And then if we have gang violence or

8    something like that, or we have a critical incident --

9    because patrol is limited. We don't have just that many

10   patrolmen. We use -- to call these people in to help

11   cover when we do have a critical incident, so we're

12   not -- we can still function and carry out the mandates

13   constitutionally that we're given. And these officers

14   will then supplement those.

15        Another unit would be traffic. We only have a

16   total of, I think, about 18 people assigned to traffic,

17   or 18 positions. There are some openings right now. But

18   you have your motor unit and then you have your DWI

19   enforcement unit, and they have two commercial motor

20   vehicle guys. And you also have one or two aggressive

21   unit drivers. I don't know how many, you know, the exact

22   makeup, but it's like that.

23        So if we have a major crash overnight and -- or

24   even during the day, that these units will then come in,

25   supplement, because they have the training and expertise

6 (Pages 18 - 21)

Aaron von Muldau                                                July 17, 2024

Page 22

1  to map a crime scene or map a crash scene or -- people
2  like with my unit, we deal with all videos and stuff like
3  that.  So when there is a critical incident, we send a
4  team out there to not only show the administrators and
5  the investigators on scene immediately what the body
6  camera or video has shown, but we also capture it and
7  preserve that video immediately so nothing disastrous
8  happens to it.
9      Q   I understand.  And who makes the decision on
10  which officers get a take-home patrol car?
11     A   The Sheriff.
12     Q   I'm going to show you another exhibit.  We've
13  previously introduced this exhibit as Exhibit 53.  Mine's
14  going to be in color; yours is not.  I'm sorry about
15  that.  Just the version that we previously introduced is
16  not in color.
17        MS. HEBERT:  Let me give Charles a copy.
18        MR. FRIGERIO:  Okay.
19        MS. HEBERT:  Charles, this is the same thing
20  from yesterday.
21     Q   (By Ms. Hebert) Can you tell me what this is?
22     A   This is the organizational chart that I've
23  provided.
24     Q   And there are a couple of pages.  Would you
25  mind just glancing through it?

Page 23

1      A   Okay.
2      Q   Let me know when you're ready.
3      A   Okay.
4      Q   Okay.  The first page -- and I believe the
5  number at the bottom is BC 6036.  Do you see that?
6      A   I do.
7      Q   These numbers at the bottom are what's known as
8  Bates labeled.  You probably have dealt with that
9  a million times.  Just numbers that attorneys put on so
10  you can reference all the documents.
11     A   I'm familiar.
12     Q   Okay.  At the bottom is BC 6036.
13     A   Uh-huh.
14     Q   And what is the date on the bottom left side of
15  this page?
16     A   Nobody told me to bring my glasses.
17        It looks like it's March 16th, 2020.
18     Q   Okay.  And --
19     A   Maybe 18th.  I don't know.  I can't --
20     Q   Well, let's see.  I think it says March 18th,
21  2020.
22     A   I agree.
23     Q   And does this organization chart accurately
24  reflect the organization of the Sheriff's Office as of
25  March 18th, 2020?

Page 24

1      A   (Reviewing document.) It's kind of hard to
2  read because of the gray scaling.  It does appear this
3  is -- this appears to be the document that I provided.
4  So yes, in 2020, that does appear to be correct.
5      Q   Okay.  And just generally, can you tell me on
6  this organizational chart what groups or what sections
7  make traffic stops, as part of their daily duties?  And I
8  know that everybody has the capacity to make a traffic
9  stop.
10     A   Right.
11     Q   In fact, Sheriff Salazar said that he likes to
12  make traffic stops.
13     A   He does.
14     Q   So if you can just point me to generally who is
15  charged with making traffic stops as part of their
16  duties.
17     A   So I'm trying to figure out the best way to go
18  about doing this.  So East Patrol and everything under
19  East Patrol --
20     Q   When you say "East Patrol," are you referring
21  to that east section on the far right-hand side?
22     A   Yes, it's under -- it's under the Law
23  Enforcement Bureau --
24     Q   Sure.
25     A   -- far left, once we follow the tree, East

Page 25

1  Patrol division.
2      Q   Okay.
3      A   So A shift, B shift, C shift.
4      Q   Oh, I see it.  Okay.  I see it.
5      A   The --
6      Q   East Patrol division.  So A, B, C.
7      A   It's not the whole division though.
8      Q   Okay.
9      A   It's A, B and C shift.  It is under Court
10  Services branch, which is a break-off.  It would be the
11  Security and Transport Unit.
12     Q   Sure.
13     A   Then we move over to the next branch, which is
14  West Patrol.  All of those units would fall underneath
15  it.  Under the CID branch, you would have, let's see.
16  Back then, I don't remember -- I don't think we had the
17  breakout then.  Where is Traffic?  East section.
18  Criminal Investigations, General Investigations, Property
19  Crime, Asset Forfeiture, Narcotics --
20     Q   For me, I see Traffic Law Enforcement under
21  Community Readiness --
22     A   Okay.
23     Q   -- and Training division.
24     A   I'll get to that.
25     Q   Okay.

Page 26

1    A    I'm just trying to get all this.  So it's East
2  Patrol, all the way down under Court Services.  The only
3  one under Court Services is Security and Transport.  All
4  of West Patrol.  At that time I'm not seeing anything in
5  CID that would normally -- on a day-to-day basis, as far
6  as their units.
7        We go to Community Readiness.  Starting with
8  the left branch, I don't think there's anything on that
9  side that you would say would be in their normal duties.
10   Q    And when you refer to the left branch under
11  Community Readiness --
12   A    I'm sorry, it's actually not that.  But if you
13  look right here, so you have this little branch that
14  comes here.
15   Q    Sure.
16   A    This is all the administration, so it doesn't
17  look like any of these enforcement officers are.
18   Q    Understood.
19   A    But under Strategic Operations, you would have
20  SCORE, the Tactical Response Section, Traffic Law
21  Enforcement Section.  That looks to be, based on this --
22  I mean, the Adult Detention Center, their perimeter, I
23  don't know if it's broken out.  But that might be under
24  their transport.  They have officers that patrol one or
25  two blocks around the jail and that they -- they've

Page 27

1  issued tickets before.
2    Q    Okay.
3    A    But for the most part -- oh, then you go over
4  to Operations.  Where's Canine?  Canine, I didn't see
5  them broken down somewhere.
6    Q    I think I see them under Operations division,
7  Special Operations, towards the very bottom.
8    A    Okay.  So SCORE, Tactical Response -- if you're
9  seeing them, I'm not, because it's not on my --
10   MR. FRIGERIO:  Over there.
11   A    No, that is for the detention.  That's
12  different.  But they don't have -- the Detention Canines
13  are in the detention center.
14   MR. FRIGERIO:  Okay.
15   Q    (By Ms. Hebert)  Okay.
16   A    We have a Canine Unit, and for some reason -- I
17  know it's here.  It's just everything's kind of running
18  together.  But Canine also does a big portion of traffic.
19   Q    Okay.  So I guess generally, I'm going to try
20  to summarize that.  The East -- so the folks who do
21  traffic stops as part of their duties, that's East Patrol
22  division, the A, B, C sections.
23   A    Uh-huh.
24   Q    And then the Security and Transport Unit under
25  the Court Services piece.

Page 28

1    A    Yes.
2    Q    In the West Patrol division, that's Section --
3  A Shift section, B Shift section, C Shift section.
4    A    Yes.
5    Q    And then under the Criminal Investigations
6  Division, there's nothing in there where they're charged
7  with doing --
8    A    At that time.
9    Q    At that time, correct?
10   A    Yes.  In 2020, yes, ma'am, I don't -- I'm
11  looking at the units.  I'm sorry, I know it sounds -- it
12  seems like I'm a little bit discombobulated, but we put
13  all these things together, so sometimes I've got to look
14  at the document, because --
15   Q    I understand.  I understand.  And then the --
16  on the other side, in the operations side, some of the
17  folks in the detention may occasionally do a traffic
18  stop.
19   A    Yeah.  The only ones that would have it as part
20  of their normal duties would be the perimeter officers.
21  And there's usually like two per shift, maybe one to two
22  per shift.
23   Q    Understood.  And the Canine Unit is not, as far
24  as we can tell, is not on this organizational chart and
25  they would also have a duty to --

Page 29

1    A    Yes.
2    Q    -- do traffic stops?
3    A    Which is odd, because it should be here.
4    Q    That's okay.  Let's look at another page.
5    A    Oh, but did you go over the Strategic
6  Operations, SCORE, Tactical Response?
7    Q    I did not.  Thank you.
8    A    Traffic.
9    Q    And I missed the SCORE Unit, Tactical Response,
10  and Traffic Law Enforcement Section under the Community
11  Readiness Division.  They also do traffic stops; is that
12  correct?
13   A    Yes.
14   Q    Okay.  I'm going to flip to the other side of
15  this, or the next page.
16   A    Okay.
17   Q    And this, at the bottom you'll see BC 6037.
18  Did I read that correctly?
19   A    I do.
20   Q    And what's the date at the bottom of this?  I'm
21  going to say --
22   A    April --
23   Q    Just to try to save your eyes, does it say --
24   A    April 21st, 2022.
25   Q    Okay, thank you.  It says April 21st, 2022?

8 (Pages 26 - 29)

Aaron von Murdau                                July 17, 2024

Page 30

1    A    Uh-huh.
2    Q    And does this chart accurately reflect the
3    organization of the Sheriff's Office on April 21st, 2022?
4    A    It does.  Yeah, this is what we're currently
5    built out as.
6    Q    Okay.  And I'm going to ask you the same
7    question here.  What units, what officers have making
8    traffic stops --
9    A    So --
10   Q    -- as a part of their daily duties?
11   A    I'll try to make this easier.  From left to
12   right, we'll start with the first triple tier, which is
13   Adult Detention Center.  Their perimeter -- again, they
14   still have a -- they still have those guys.  Their
15   perimeter -- which might be under their transport.  They
16   have just a very handful of guys that do that.  Under the
17   Operations, no.
18       Professional Standards, obviously not.  Let me
19   make sure there's nothing in there.  There's nothing
20   under the Professional Standards and Development.
21       The Court Security, or Court and Judicials, we
22   do have, again, a small contingent of two or three
23   perimeter officers that enforce the County laws downtown
24   around the County buildings --
25   Q    Understood.

Page 31

1    A    -- parking, things like that.  But it's a very
2    small contingent.
3        And then under the Patrol Division, basically
4    everybody under Patrol does it.  Now, the night
5    commander, obviously that is a commander, and so he's
6    like me, yes, I have the capability.  Do I do it every
7    day?  No.  But the Sheriff does too, so it just is
8    what -- you know, propensity is that they would do it.
9        But East Patrol, West Patrol all do it.
10   Reserve does not.  SCORE, yes.  EOC does not.
11       Under CID, you have the Organized Crime.  You
12   have the Texas Anti-Gang Unit would be one of them.
13   Special Enforcement Unit would be another.  Special
14   Operations Unit would be another.  Under major crimes,
15   extraditions, fugitive apprehension, homicide, property
16   crimes.  And then -- so there has been a move currently,
17   but the Traffic Safety section would also be responsible.
18       Again, I'm not seeing where Canine falls.  But
19   the Canine Unit could be under the Special Enforcement --
20   they might have moved them under the Special Enforcement
21   I'm sorry, I don't know.  Things kind of move around a
22   little bit.  But --
23   Q    Okay.
24   A    Canine would be one that I would tell you
25   that that is part of their job duties.

Page 32

1    Q    And who would know where the Canine Unit falls?
2    A    Sergeant Olvera.
3    Q    Okay.
4        MS. HEBERT:  Charles, how do you want to do
5    this?  Do you want to, like as questions come up --
6        MR. FRIGERIO:  Do you want to just ask him
7    right now?
8        MS. HEBERT:  -- we put him under oath and then
9    ask questions?
10       MR. FRIGERIO:  Sure, if you would.
11       MS. HEBERT:  Okay.  I guess we'll do that.
12   Sergeant Olvera -- Molly, will you administer the oath
13   for Sergeant Olvera?
14       THE REPORTER:  Can we go off the record for a
15   second?
16       MS. HEBERT:  Sure.
17   (Discussion of the record.)
18       THE REPORTER:  We're back on the record.
19   A    After consulting, they fall under the Special
20   Operations branch.
21   Q    (By Ms. Hebert) And by "they," who are you
22   referring to?
23   A    The Canine Unit falls under the Special
24   Operations.
25   Q    Okay.  Thank you.

Page 33

1    A    Special Enforcement.
2    Q    Special Enforcement Unit in the Criminal
3    Investigations Division?
4    A    Yes, uh-huh.
5    Q    Is there any other organizational chart that we
6    should be aware of?
7    A    No.  This -- the April 21st, 2022, is our most
8    current.
9    Q    Okay.  And was there any organizational -- what
10   organizational chart governed at the time of the traffic
11   stop in this issue, which was March 16th, 2022?
12   A    It should have been the preceding one, the
13   organizational chart Bates stamped 6036, March 18th,
14   2020.
15   Q    Okay.  And I'm going to look at the next page
16   of this document, Bates labeled 6038.
17   A    I have it.
18   Q    Can you tell me what this page is?
19   A    This looks to be the Sheriff's administration,
20   all the chiefs, chief assignments.
21   Q    Okay.  And what is the effective date of this
22   list?
23   A    No idea.
24   Q    Okay.  So we just have a list of leadership
25   positions, but we don't know what date they were in

9 (Pages 30 - 33)

Aaron Von Muldau                                                                July 17, 2024

Page 34

1  charge?
2      A   On this one?
3      Q   Yes, sir.
4      A   No, ma'am.  Based on this document, I don't
5  know which one it's referring to.
6      Q   Okay.  And would you estimate that it
7  corresponds to the March 18th, 2022, organizational
8  chart?  Does that seem accurate?
9      A   The March -- which Bates stamp did you say?  38
10  refers to the 20?  No.
11      Q   That's not accurate?
12      A   No, the Bates stamp 6039 is accurate for the
13  2020.
14      Q   Okay.
15      A   The Bates stamp 6038 would be the accurate one
16  for the 2021.
17      Q   There is no 2021.  There's a 2022 --
18      A   Or '22.
19      Q   -- and a 2020.
20      A   I'm sorry, April 21st, 2022.
21      Q   Okay.  So let me make sure I got that right.
22  The Bates stamp BC 6038 is accurate for which year?
23      A   38 is for April 21st, 2022.  I know that
24  because that's when Raul Garza was promoted from
25  lieutenant to, in the Patrol division -- or from a

Page 35

1  lieutenant in Patrol -- or lieutenant in administration
2  to the deputy chief of the Patrol division.
3      Q   Okay.  And then the subsequent page of BC
4  6039 --
5      A   Refers to March 18th, 2020, because at the time
6  Ronald Bennett -- before this was issued, Ronald Bennett
7  was the Patrol chief, and he had departed -- he retired.
8  And so that was the opening that subsequently led to Raul
9  Garza.
10      Q   Okay.  And I think we can put this to the side
11  for now and come back to it if we need it.  Thank you.
12          Now I want to talk about traffic stops just in
13  general.
14      A   Okay.
15      Q   How many traffic stops do County Sheriff's
16  officers make each year, in total?
17      A   I want to say last year it was around 28,000.
18      Q   Okay.
19      A   I think.  It's been subsequently going down
20  over the years.  Traffic has not been a priority for a
21  while.
22      Q   Okay.  How many searches of vehicles would you
23  estimate, would the County estimate that its officers
24  make each year?
25      A   I provided a document that shows what all that

Page 36

1  was.  Offhand, I can't tell you.
2      Q   Okay.
3      A   We -- we provide a report to the State in
4  regards to vehicle traffic stops and vehicle searches.
5  It's -- I've been in charge of that report since I think
6  2018.  2017, 2018.  And we've provided it every year to
7  the State that shows what our, what the true accounting
8  is.
9      Q   Okay.  And for any given traffic stop, what
10  records does the County require an officer to make?
11      A   I don't understand.
12      Q   Another way of thinking about this is, what
13  forms must an officer fill out in making or conducting a
14  traffic stop?
15      A   Okay.  That's a kind of loaded question.
16  Making a traffic stop.
17          Making a traffic stop, the officer pulls over
18  the vehicle and then they are required to fill out the
19  citation data, which is an electronic -- most traffic
20  stops are done electronically.  We still do have some
21  paper citations when -- the electronic means, but they
22  are duplicates of each other.
23          But it is -- complies with State statute:
24  Name, date of birth.  We require a phone number.  We have
25  now put on email addresses, because we've been able to

Page 37

1  communicate and remind people of court dates and things
2  like that through that.  A description of the vehicle,
3  the description of the violator, a description of the
4  location where the violation was observed.  They then --
5  a description of the violation.  And then they have
6  weather conditions.  Then we have the compliance with
7  racial profiling and the Sandra Bland Act.
8      Q   Thank you for that.  So every traffic stop
9  should have that information completed?
10      A   Yes.
11      Q   Should there be body worn camera footage for
12  every traffic stop done by an officer who's charged with
13  making traffic stops as part of their duties?
14      A   If the officer has a body worn camera assigned
15  to them, the rule is yes.  Does equipment fail?  It does.
16  So as long as they have documented it, saying that there
17  is a failure and what the failure is and then they take
18  the subsequent steps, which are to notify the team that
19  there was a failure, then there are times where they
20  don't have it.
21      Q   Sure.  And I understand technology sometimes
22  just --
23      A   Uh-huh, but yes.  General rule, there is a
24  requirement.
25      Q   General rules, there is a requirement to have

Aaron von Muldau                                          July 17, 2024

Page 38

1  body camera footage if you have a body camera on you for
2  a traffic stop?
3      A   Yes, ma'am.
4      Q   And I understand technology fails.  Trust me,
5  technology fails for me a lot.  How does an officer
6  document when their body worn camera fails?
7      A   There's several ways.  One, you document it in
8  the report.  They are then required -- they were taught
9  to get -- report it to their supervisor.  They were
10  taught to write an incident report, and that would be
11  done through our RMS.
12         Other basics that have been accepted would be
13  through email to their supervisor, email to the
14  appropriate technology team.
15      Q   Okay.  Should there be dash camera for every
16  traffic stop if the officer has a dash camera on their
17  vehicle?
18      A   As a general rule of thumb, yes, that is
19  what --
20      Q   And again, the same probably caveat, sometimes
21  dash cameras fail.
22      A   Sure.
23      Q   And if the dash camera fails, an officer is
24  supposed to document the same way you've outlined for a
25  body worn camera.

Page 39

1      A   Yes, ma'am.
2      Q   I want to ask generally a question about body
3  worn camera, and I'm happy to examine this if we need to
4  look at it.  But I think you're going to be familiar
5  anyway.
6         Up in the right-hand corner, the top of any
7  body worn camera footage or a dash camera footage,
8  there's usually a line of numbers, two lines of numbers.
9      A   Yes.
10      Q   Do you know what I'm talking about?
11      A   I do.
12      Q   And usually, as my understanding, there's the
13  date; is that correct?
14      A   So there's -- it depends, because those are
15  overlays in mass.  So what you see versus what I see --
16  because I have my computer set up differently, but yes,
17  it usually has basic information.  The registration of
18  who the camera or who the video is of.  Usually when you
19  go back and review a video, it says who pulled up the
20  video, right?  Because you can't just have anybody --
21  it's not anybody that goes in there.  So we know where
22  the video came from.
23         It will have date, time.  I think ours actually
24  has the designation for Green Mountain Time, the minus --
25  I think we're -- because we're in daylight savings, we're

Page 40

1  at minus zero five hours now.  When we go into daylight
2  savings time, then it goes to minus six.
3         But it does have basic information on the stop,
4  day, time, when it occurred.
5      Q   Okay.  And you talked about it identifying the
6  officer who is in it, who owns it.  And that
7  identification is through a number process; is that
8  correct?
9      A   Yes.  We -- the way we have it set up is
10  they're identified -- the County's employee number that
11  is issued for, for the officer, when he gets hired, never
12  changes.  It never gets reissued.  It always stays with
13  that.
14         So when we started going to the electronic
15  databases, what we discovered is badge numbers and other
16  types of identification would change, including, you
17  know, you would think email, oh, your first and last name
18  don't change, but they do, and they change a lot, both
19  men and women.
20         So we found that -- we chose a number that does
21  not change.  So that stays with them with their career.
22  So in 20 years, if a video came up and we had to pull it
23  up and it says mine, it says 13411, they can go into the
24  database and say, "Okay, who was employee 13411?"  In 20
25  years it's still going to be Aaron von Muldau.

Page 41

1      Q   Okay.  Thank you for that.
2      A   Uh-huh.
3      Q   You talked a little bit about the time.  The
4  timestamp is in GMT?  Is that fair?
5      A   No.  It depends on -- we got that fixed.  At one
6  time it showed in GMT.  It should currently be showing in
7  central standard time, but it shows the GMT designation
8  of minus five.  So it's GMT minus five, five hours.
9      Q   Okay.
10      A   I believe is how it's read.
11      Q   Depending on daylight savings or not.
12      A   Correct.  Right.
13      Q   And are, are the timestamps that are in the
14  corners of the videos generally accurate?
15      A   Yes.  They are generally set server based.  So
16  when that camera logs in and has been docked, it
17  should -- if something was to get off, it should reset
18  that every time.
19      Q   Okay.
20      A   Have I ever seen it where something is off?
21  Yes.  But that usually tends to be, we've had that error
22  with a server side or something like that.  But
23  oftentimes we have a couple of different ways of
24  checking.  So if something goes off, that's how we are
25  able to discover it.  It says, hey, it's 6:00 p.m. and

Veritext Legal Solutions

Aaron Von Muldau                                                    July 17, 2024

Page 42

1  it's really light outside, but the RMS data and GPS data
2  show that it's actually 6:00 a.m. Then we know that we
3  need to go look at that and we'll take care of it.
4      Q   Okay. And then for any given traffic stop, I
5  want to just understand the universe of like what records
6  could potentially exist for a traffic stop. And I'm
7  going to give you a list. And if I'm missing something
8  that could exist for a traffic stop, please let me know.
9      A   Okay.
10     Q   So as I understand it, there's the RMS summary,
11 which says SPEARS at the top of it, that goes with a
12 traffic stop. Are you familiar with that document?
13     A   So yes and no. So this is where clarification
14 needs to be.
15     Q   Sure.
16     A   You're asking me -- yes, there are instances
17 where a SPEARS report will be completed.
18     Q   Okay. And is that required for every traffic
19 stop?
20     A   No.
21     Q   Okay. And an Incident Detail Report, do you
22 know what I'm talking about when I say Incident Detail
23 Report?
24     A   I do.
25     Q   Are those required for every traffic stop?

Page 43

1      A   Those are generated through the CAD system.
2      Q   Okay.
3      A   They're not a requirement, because it's not
4  interaction normally done by the officer. He's allowed
5  to comment on it, but those are generated automatically
6  with him checking in and out through dispatch saying,
7  "I'm out on a traffic stop," or through the mobile.
8          We do not, we do have -- we've given general
9  direction that shadow stops are not allowed, meaning that
10 I can pull people over and not document it. That is not
11 the practice of the Sheriff's Office. That has been
12 documented -- they will be documented. Does it happen?
13 I'm sure it does. But that is not a practice of the
14 Sheriff's Office.
15         We document it for officer safety. We need to
16 know where you're at. We need to know for, to comply
17 with Sandra Bland and the Michael Morton Act and other
18 statutorily required, and that is listed.
19     Q   Okay. I want to understand a little bit more
20 of what you just said about shadow stops. What are
21 shadow stops?
22     A   In the past -- and that "shadow stops" is my
23 term.
24     Q   Sure.
25     A   It is not an official term. It is when what we

Page 44

1  say in the past, many years ago -- and when I mean many
2  years ago, it was probably when I was still a patrolman,
3  so that's been a while.
4      Q   Can you give me an estimate when that was?
5      A   My first promotion was --
6      Q   1998?
7      A   -- 2006.
8      Q   Okay.
9      A   I'm not that old.
10     Q   Okay.
11     A   So yeah, it's been -- but you -- before all of
12 the statutorily requirements, you could pull somebody
13 over and not document anything, because you didn't have
14 to document race, you didn't have to document, you know,
15 use of force. You didn't have to document these things.
16 And those weren't a requirement back then.
17         So we, when I started getting involved with the
18 traffic stops back in 2012 and stuff like that, we made
19 sure to change how we were training, change that, you
20 know, with the compliances with the new laws. And they
21 started coming in around the 2000 -- I mean, they've
22 always been changing, but there was some headway
23 in 2010, 2009-2010. I can't remember the exact precursor
24 where it says no, we're going to start doing this. And
25 then you had the racial profiling report come out and it

Page 45

1  says you will do this. And we made sure to mandate that
2  no, they will be documented.
3      Q   Okay. When you say that you made sure to
4  mandate they will be documented, how -- how was that
5  mandate communicated to officers?
6      A   Through policy and directives.
7      Q   And when you say policy and directives --
8      A   And training. I'm sorry, training.
9      Q   Sure. When you say policy and directives, is
10 there somewhere, and we can look -- we'll look at this in
11 a little bit -- in the Sheriff's manual or a directive
12 that specifically says shadow stops --
13     A   No, because again --
14     Q   -- for lack of a better description. I know
15 that there's probably a different --
16     A   No, the mandate was that they would all be
17 documented.
18     Q   Okay. So the mandate is, it is Sheriff's
19 Office official policy that all stops should be
20 documented.
21     A   Be documented, correct.
22     Q   Okay. So I wanted to just go back to the
23 records that could exist for a traffic stop.
24     A   Uh-huh.
25     Q   There should be a warning or citation record;

12 (Pages 42 - 45)

Aaron Von Muldau                                    July 17, 2024

Page 46

1  is that correct?
2      A   Nowadays, yes, ma'am.
3      Q   And "nowadays" makes me think that it wasn't
4  always the policy.
5      A   It wasn't always the policy.  I told you back
6  in 2006 that these things weren't mandated.
7      Q   Sure.
8      A   So you had a lot of verbal, "Hey, you know,
9  you're not wearing your seat belt.  Don't do it again."
10     Q   Okay.  Would you say that -- would the County
11  say that effective by March 16th, 2022, every stop should
12  have had a written warning or --
13     A   Yes.
14     Q   -- official citation?
15     A   Yes, ma'am.
16     Q   For every traffic stop, should there be a
17  record of what computer records, computer checks were run
18  through the CAD system?
19     A   Yes.
20     Q   Okay.  And one of the other officers testified
21  about the -- I'm going to get this wrong, just bear with
22  me -- the NCIC/TCIC --
23     A   What about it?
24     Q   -- system?
25     A   Uh-huh.

Page 47

1      Q   Should there be a record of any checks through
2  that system --
3      A   Yes.
4      Q   -- every time there's a traffic stop?  Or is
5  the CAD --
6      A   If he's run.  I mean, when you say should there
7  be, if he runs a person, then those are the checks.  It
8  goes into the TLETS system, which does TCIC/NCIC, it does
9  warrant checks, it does local checks, it does municipal
10  checks, things like that.
11     Q   But that's not a requirement to do that -- to
12  run through the NCIC --
13     A   No.
14     Q   -- system every stop?
15     A   No, ma'am.
16     Q   I'm going to just ask you to try to let me
17  finish a question, because we're interrupting each other
18  a little bit.
19     A   Sorry.
20     Q   And Molly's giving me an evil eye right now.  I
21  just saw it out of the corner of my eye.
22         So things that could also exist would be an LPR
23  record for a particular vehicle?  And by "LPR" I mean
24  license plate reader.  Could there be a license plate
25  reader record for a particular vehicle for a particular

Page 48

1  stop?
2      A   Yes.
3      Q   So we've got the SPEARS, RMS summary with
4  potential reports, we've got the incident detail report,
5  we've got a warning or citation record, we've got body
6  worn camera, dash worn camera, an LPR readout, CAD -- the
7  CAD record, the NCIC -- NCIC/TCIC record.  Anything else
8  that I'm missing that could exist for a traffic stop?
9      A   No.  You're pulling some records that are all
10  one.
11     Q   Okay.
12     A   So they're not necessarily -- you might be
13  looking -- so TCIC, TLETS, CAD record, incident report
14  detail, they're all --
15     Q   Together?
16     A   -- one.
17     Q   Okay.  That's helpful.  Thank you.  I guess
18  that leads me to another question, how the records of a
19  traffic stop are linked.  So when you want to go look,
20  when the County wants to go look at a specific traffic
21  stop, what happened, how does the County pull all the
22  records for that traffic stop?
23     A   They have a person like me in charge of that.
24  And so the steps is I always look for the IDR because
25  it's going to always have the most information, which is

Page 49

1  the incident --
2      Q   When you say IDR --
3      A   Incident detail report.
4      Q   Okay.
5      A   Because on there, I can look for name, date of
6  birth.  I can look for location, I can look date, time.
7  It will have an incident number.  Usually if it has an
8  incident number, that will then tell me I can look
9  into the RMS under that incident number because that's
10  how it gets designated in the RMS.
11         From there, I look date and time.  And then I
12  can look under the officer in the Brazos eCitation system
13  for that particular day and go through, you know, one by
14  one his records, or if they documented the person's name
15  and date of birth, I can pull it that way and pull up the
16  citation.
17         The body cameras and video cameras, if they are
18  doing what they're supposed to be doing and they are
19  logged in and assigned as properly, when the incident
20  number is created on the IDR, when they log out to say,
21  "Hey, I've stopped a vehicle," then those things get
22  attached to the video.
23         Are there failures?  Yes.  So again, by looking
24  at the date, time, when the officer's there and then
25  physically reviewing the videos for that time frame,

13 (Pages 46 - 49)

Aaron Von Muldau                                           July 17, 2024

Page 50

1  usually that's how we find them.
2      Q   That sounds pretty labor intensive for you.
3      A   It can be.
4      Q   Okay. So there's no comprehensive system where
5  all the records are generally linked together and you can
6  just type in a number and it pulls it for you?
7      A   I wish. But no, it doesn't, because these are
8  all different databases, right? The eCitation doesn't
9  necessarily talk to the RMS. And the programming is so
10 convoluted that it's very difficult to -- it's very cost
11 prohibitive.
12         So unfortunately, there isn't -- we haven't
13 found a vendor that says, hey, here's one size fits all,
14 we do eCitation, we do RMS, we do this, we do that, where
15 everything is doing that. You're seeing a lot of vendors
16 start to go that way, but you know, we're talking about
17 50 years of how we've done business.
18         I mean, the County has been using a COBOL
19 database for 50 years that we just recently converted
20 over to. Has nothing to do with this. But that tells
21 you how long it takes for us to move up. We just --
22 we've moved into an electronic society probably the
23 better part of 20 -- starting in 2018 to 2020 where most
24 records in about 2020 started becoming electronic.
25     Q   So it sounds to me that a lot of -- you try to

Page 51

1  use the incident number to what matches with the incident
2  number, recognizing that not all of the pieces of data
3  are affiliated with the incident number.
4      A   Correct.
5      Q   Is that fair?
6      A   Yes.
7      Q   And then the rest, it sounds like you match
8  using date, time and officer involved or any other
9  information that you have.
10     A   It could be. But I mean, there's -- it's a
11 little -- I'm sorry. Yes, ma'am. It's a little bit more
12 complicated than that and a little bit more exacting than
13 that, but yes, that's the gist of it.
14     Q   Okay. Just wanted to understand kind of how it
15 all fits together.
16     A   It is a manual process.
17     Q   It sounds arduous.
18         Let's see. All right. I want to look at
19 another exhibit, but it's going to require me to set up
20 the computer.
21     A   Okay.
22     Q   So I'm going to take a brief break, if that's
23 okay with everybody.
24     A   Works for me.
25         THE REPORTER: We're off the record.

Page 52

1      (Recess from 10:27 a.m. to 10:35 a.m.)
2          THE REPORTER: We are back on the record.
3      Q   (By Ms. Hebert) Okay. Have a good break?
4      A   I did. Thank you.
5      Q   I have up here on the screen what was
6  previously given to us as BC 2307. Are you familiar with
7  this document?
8      A   It looks like the citation data that I was
9  requested to pull.
10     Q   Okay. And how do you know?
11     A   Because I reviewed the document and it looks
12 like the citation data that I pulled.
13     Q   Okay. Would you say that this is the citation
14 data that you pulled?
15     A   Go to the last line.
16     Q   And I mean, I think you mean --
17     A   No, no, no. Down.
18     Q   Okay.
19     A   It should be 173. You might want to pull the
20 bar --
21     Q   Okay. Let's just pull the bar then. And this
22 is going to be a little awkward, because we're navigating
23 through a giant document.
24     A   Yes, that does appear to be -- and if you would
25 go over to the right, ma'am.

Page 53

1      Q   This way?
2      A   It does appear to be the document that I --
3  without having the document in front of me, but yes, it
4  does appear to be what I provided.
5      Q   Well, I want to be clear that it is the
6  document. And based on your recollection. Because it's
7  very hard to provide the whole document in front of you.
8  So I've got the electronic version.
9      A   Right. No.
10     Q   This was provided to us as --
11     A   But it does look like it. It does not look
12 like there was anything taken out. It doesn't look like
13 there was anything edited. So it does look like the
14 document. It has the citation number, the date, the
15 time, the status, the judge it was assigned to, the court
16 date. And if you go over to the right, it had the
17 violator information, it had the vehicle information.
18     Q   Okay. And there are 178,000 rows, give or
19 take.
20     A   Yes, ma'am.
21     Q   Okay. Does that mean that this reflects
22 178,820 different traffic stops?
23     A   It reflects 178,820 entries.
24     Q   Entries. Okay. Are there -- have you seen
25 duplicate entries for traffic stops?

14 (Pages 50 - 53)

Page 54

1    A   No.  But I'm looking at the one right there
2  where it says "null," which means that it's probably a
3  test.  And if I --
4    Q   Sure.
5    A   If I recall, to the best of my ability, there
6  were some tests or non- -- not necessarily, but I believe
7  most of them are traffic stops --
8    Q   Okay.
9    A   -- warnings and citations.
10   Q   And how would we filter out the tests?  Just
11 filter out the nulls?  Is that fair?
12   A   You would have to -- it just depends.  Some of
13 them -- because some of them are incomplete, if I
14 remember right.  But you would have to -- there's a lot
15 of ways to filter it out.
16   Q   Okay.
17   A   It's not necessarily on one thing.
18   Q   Well, if we need to, during this conversation,
19 let me know if I'm missing something.
20   A   Sure.
21   Q   And I just want to make sure that we're going
22 to -- we know what date range we're looking at here for
23 this data.
24   A   Okay.
25   Q   And I'm going to go to the top.

Page 55

1    A   Uh-huh.
2    Q   Scroll back all the way to the top.  And I
3  think that this is the best way.  I'm going to look at
4  the Issue Date column.
5    A   That is correct.
6    Q   And the first column -- the first entry in the
7  Issue Date column is what looks like to me January 1st of
8  2020.  Am I reading that right?
9    A   Yes.  That was the parameters.
10   Q   So does that mean the earliest stop in this
11 data is from January 1st, 2020?
12   A   Yes, ma'am.
13   Q   And I'm going to go to the very bottom again.
14 And other than these two null ones at the bottom, the
15 last date I see is this September 11th, 2023.  Am I
16 reading that correct?
17   A   Yes, ma'am, that's when it was generated.
18   Q   And does that mean that this reflects Bexar
19 County's traffic stop data from January 1st of 2020 to
20 September 11th of 2023?
21   A   It does.
22   Q   I guess it would be fair to say that's a
23 3.5-year period, three and a half year, give or take?
24   A   Yes, ma'am.
25   Q   Okay.  And we already talked about the total

Page 56

1  number of lines in this Excel spreadsheet, just for the
2  record.  How is this spreadsheet created?
3    A   The data is initially stuck into a SQL
4  database, and I contacted Brazos, instead of trying to
5  pull up each individual, and they gave me a dump for all
6  the data that was requested.
7    Q   And when you say "dump for all the data that
8  was requested," tell me about that.
9    A   So if they had a field, I wanted the data.
10   Q   So you asked for everything.
11   A   I did.
12   Q   Okay.  And how does this data get into the
13 Brazos system?  Where's the source?
14   A   The source comes from when the officer
15 initiates there's an application on the in-car computer,
16 the MDT -- or MDC.
17   Q   MDC.
18   A   A Mobile data computer.  There's an application
19 on there.  They log in with a pre-defined unique user
20 name and password.  And with that, it then -- it's like
21 an application on your phone.  It starts off with -- you
22 start the citation, you put the basic information, when,
23 where, how.  Then it goes into the location and you fill
24 out that information.  Then it asks for the defendant and
25 vehicle information.  You fill that part out.

Page 57

1       Then you go into -- there's another -- there's
2  an additional tab that then goes into the actual
3  violation, and you fill out all the precursors with the
4  violation.
5       And all along this is it's capturing the Sandra
6  Bland information.  It will have little questions like,
7  you know:  Was there a search?  Was there not a search?
8  If there was a search, did you find anything?  What did
9  you find?  There's specific categories that the State has
10 set up that we're required to do.
11      And then finally, the last part is they can add
12 additional pictures, because some of the cars have
13 optical readers, so we would take a picture of the
14 driver's license to designate that this is the person I
15 spoke with.  The -- and it does the weather conditions,
16 and then the officer's able to put any comments in there.
17   Q   Okay.  I think I know what you're talking
18 about.  So I'm going to just look for this document, so
19 bear with me.
20   A   Uh-huh.
21      MR. WINDHAM:  Before you introduce that, we
22 have 57 for this spreadsheet; is that correct?  Or did
23 you give a number?
24      MS. HEBERT:  Yes, that is -- I did not.  Can we
25 mark this spreadsheet as Exhibit 57?  Sorry, I was a

Page 58

1　little late on that.  Thank you, Mr. Windham.

2　　　　MR. WINDHAM:  Sure.

3　　　　MS. HEBERT:  Why don't you put that on one of

4　those blank pieces of paper so Molly has an easy record

5　of it.

6　　　　MR. WINDHAM:  Yeah.

7　　Q　(By Ms. Hebert) So this exhibit that we just

8　looked at, the Excel spreadsheet with Bexar County's

9　traffic stop data, this is going to be marked as Exhibit

10　57.  Do you understand that?

11　　A　I do.

12　　Q　Once we do that, we'll get it --

13　　　　MS. HEBERT:  This is just for your records,

14　Molly.

15　　　　THE REPORTER:  Thank you.

16　　　　MS. HEBERT:  Put that over there, if you don't

17　mind.

18　　Q　(By Ms. Hebert) I'm going to hand you what has

19　previously been introduced as Plaintiff's Exhibit 12,

20　which is in our stuff, Exhibit F.

21　　　　Is this -- and I'll represent to you that

22　Officer Gereb and I think another person's already

23　testified about this record, but is this what you're

24　talking about as what, what the data that we're seeing on

25　Exhibit 57 is drawn from?  This is the result?

Page 59

1　　A　Yes.  This is a representation.  This is a PDF

2　that gets generated after the data's entered.  I don't

3　believe it contains everything.

4　　Q　Okay.  So what, the system that you talked

5　about, the mobile data computer, that's just the computer

6　that an officer has in his or her vehicle; is that fair?

7　　A　Yes.

8　　Q　Okay.  And is the CAD system an app on that

9　computer?

10　　A　Yes.

11　　Q　Okay.  And what's the app on the computer that

12　you entered this information in?

13　　A　ECitation.

14　　Q　The citation app?

15　　A　ECitation.

16　　Q　ECitation.  Okay.  So the eCitation system is

17　where they put the information for the warning or

18　citation?

19　　A　Yeah.  There's several names, because the

20　company gets bought out, but we commonly refer to it as

21　Brazos.  But as the company gets bought out, they bring

22　out a new name for it.  But -- so I, we've gone down to

23　it's the eCitation system.

24　　Q　Okay.  So an officer enters the information

25　into the eCitation system.  Eventually, if they hit the

Page 60

1　print button, it prints out the warning or the citation,

2　and this document we see as Exhibit 12 is the PDF record

3　of that.

4　　A　Yes.  It is the PDF -- this is what's

5　considered the official court record.

6　　Q　Okay.  And you mentioned that it doesn't

7　contain everything, this P --

8　　A　Correct.

9　　Q　What is missing?

10　　A　I don't believe it has any of the Sandra

11　Bland and Michael Morton questions and stuff like

12　that that are required.

13　　Q　And what are those questions, generally?

14　　A　They do have them -- here, what is this over

15　here?  I want to say there's 11, but it's, you know, race

16　known -- some of this stuff is here.  Arrest, no.

17　Search, no search.  Contraband.  There are other parts to

18　it that get found out throughout that it's contained, but

19　it's not contained in the same way that it goes in.

20　　Q　Help me understand that.  I'm sorry, I didn't

21　necessarily follow that.  So you said there was 11

22　questions that need to be --

23　　A　Yes, I don't remember.  I don't recall them

24　offhand.

25　　Q　That's okay.  But an officer is supposed to

Page 61

1　fill them out; is that correct?

2　　A　Yes, uh-huh.

3　　Q　And then that information would go into this

4　e-ticket system?

5　　A　Yes.  It goes into the database, because that's

6　where we begin the -- that is where we begin the racial

7　profiling report.

8　　Q　Okay.  I understand.  I think we can put that

9　aside.  I just used Exhibit 12 to illustrate --

10　　A　Yes.

11　　Q　-- and help us understand --

12　　A　But that is --

13　　Q　-- exactly what you were talking about.

14　　A　Right.  That's basically where all this

15　information comes from is the entry from the officer.

16　　Q　Okay.  Let me just make that clear for the

17　record.  So the information that we see in this

18　spreadsheet that is Exhibit 57 comes from documents like

19　Exhibit 12 through the e-ticket system.

20　　A　It's the opposite.

21　　Q　Okay.  So the officer enters information into

22　the e-ticket system.  That e-ticket system generates

23　records like P12 and the spreadsheet?

24　　A　Yes.  But it goes -- that -- the SQL database

25　does that.  So you have fields, the officer enters into

Page 62

1 the fields, it goes there.
2 Q Okay. When I go --
3 MR. WINDHAM: You're pointing at Exhibit 57,
4 correct?
5 THE WITNESS: Exhibit 57.
6 A It goes into the database. I want a citation.
7 I want a copy of the citation. Then it takes that data
8 and puts it --
9 Q (By Ms. Hebert) And pulls it to P12?
10 A Yes.
11 Q So let me just summarize that so I make sure I
12 understand. An officer enters the information into the
13 e-ticket system. It goes into the database, which is
14 this -- effectively the data in this database is Exhibit
15 57. And then when you want to pull the citation record,
16 the form that is produced is P12.
17 A Yes.
18 Q Okay. Just trying to understand how everything
19 connects. Thank you.
20 A Okay.
21 Q All right. Let's go back to Exhibit 57. And
22 I'm going to go back to the top of 57.
23 A Okay.
24 Q There we go. I'm going to look at the headers
25 and go header by header here just to make sure I

Page 63

1 understand. So citation number, that's a unique number
2 of the traffic stop, if it's an individual traffic stop;
3 is that fair?
4 A Yes.
5 Q And that would correspond to a number that we
6 see in this P12; is that correct?
7 A Yes.
8 Q Okay. The issue date is the date that the
9 citation or the warning was issued; is that correct?
10 A So I'm kind of at odds, because sometimes their
11 data is bad. And if you look, all of those are issued at
12 the same time, when in fact they -- I mean, you can't
13 have them issued all at the same time.
14 Q Sure. So why is the data bad?
15 A Well, I'm not saying -- but that -- I don't
16 know what they're referencing on the 6:00 a.m.
17 Q Sure.
18 A That could be the, when it was processed into
19 the system --
20 Q Okay.
21 A -- and accepted.
22 Q Okay. So we'll -- oh, I went too far. We'll
23 come back to that.
24 The Device ID, what is the Device ID?
25 A That should be the device that was actually

Page 64

1 issuing -- no. That should be the device that was
2 actually issuing the citation.
3 Q Okay. And then I'm going to skip over, I
4 think, some of this. I'm going to go to Offense Time,
5 which is another header. And that Offense Time, this
6 seems to be changing based on different times. Would you
7 say that that's the time of the stop?
8 A Yes. The time of when the incident was
9 occurred.
10 Q Okay. And the Offense Date, would you say
11 that's the date of the offense?
12 A Yes.
13 Q There's a bunch of court information. I'm
14 going to skip over that. I don't think it's particularly
15 relevant, but if I'm missing something, let me know.
16 Again, court information, I'm going to -- I'm
17 going to stop on the header that says Stop Result. And I
18 understand this column to reflect whether a citation,
19 official citation, i.e., something with like a ticket
20 consequence was issued or a warning. Am I understanding
21 that correctly?
22 A Yes.
23 Q And then the next column is Officer Last Name.
24 Does this column reflect the last name of the officer who
25 made the stop?

Page 65

1 A Yes.
2 Q Officer Information, I think we can just
3 generally associate with last name. I'm now going to
4 headers underneath the green section. The green section
5 saying Violator Information. And I see Last Name on
6 the -- I'm on the Last Name column. And would this
7 column reflect the last name of the person who was pulled
8 over?
9 A Yes.
10 Q Then we're in a section, a big header, a yellow
11 big header called Location Information. I'm just
12 scrolling through to see if there's anything that's
13 important.
14 I'm going to look -- now I'm in the
15 reddish-orange, I don't know what color you would
16 classify that as, section. And I'm going to look at the
17 Offense Description. Is this Offense Description what
18 generally the officer claims they pulled the person over
19 for?
20 A Yes.
21 Q And then I see Violation Stop Result. Again,
22 the citation or warning, citation being a ticket, an
23 actual consequential ticket versus a warning?
24 A Yes. I believe there's actually four headings
25 under Stop -- Violator Stop Result. But yes, that's --

Aaron Von Muldau                                                July 17, 2024

Page 66

1    Q   Okay.  Let's look at those headings then.  I
2  just turned on the filter mechanism for this particular
3  column, and I'm going to click the down arrow to see what
4  options come up.  I see Citation, Null and Warning.
5    A   Okay.
6    Q   And would Null reflect the tests that you were
7  talking about earlier?
8    A   Could be a test, could be a couple of things.
9  That's what I would probably say, if it's not valid --
10  it's not a valid citation or warning.
11    Q   Okay.  Understood.  What is the difference
12  between a citation and a warning, just so we're clear on
13  the record?
14    A   A citation has a monetary, judiciary penalty,
15  and a warning does not.
16    Q   Okay.  And when an officer hands a driver a
17  piece of paper, how does the driver tell whether it's a
18  citation or a warning?
19    A   It is usually printed on it, it says it.
20    Q   It says at the top?
21    A   Yes, ma'am.
22    Q   And then we're looking at some additional
23  information on the offense.  I don't think we need any of
24  that.  Additional Violator Information.  And then we see
25  Notes, which I assume is just an, where an officer can

Page 67

1  put notes on a given stop.  And it looks like there's
2  some weather notes and the conditions of the roadway.
3        And then I'm going to go to Stop Data
4  Information.  And I see various classifications.  I'm
5  going to look at the first -- or the second sub-header in
6  the Stop Data Information.  This is the reason of the
7  stop.  Why -- and I'm going to look at some of these
8  options.  I see moving Traffic Violation, Null,
9  Pre-existing Knowledge, Traffic Violation, and Violation
10  of Law.  Did I get that correct?
11    A   Yes.  Those are the -- those are going to be
12  the racial profiling, Michael Morton statutory
13  requirement things that we have to fill out.
14    Q   Okay.  So would you say that this Stop Data
15  Information, the blue header then, is like the -- is the
16  Michael Morton questions in general?
17    A   In general, yes.
18    Q   Okay.  And I see one, two, three, four, five
19  categories.  And there's a Null, which we previously
20  discussed is like an invalid stop.  But what is a Moving
21  Traffic Violation?
22    A   It's while the vehicle is in operation and
23  moving.
24    Q   Okay.
25    A   So rolling a stop sign, speeding type thing.

Page 68

1    Q   So it's like what you would think, it's a
2  traffic violation while someone was moving?
3    A   For the most part, yes.
4    Q   Okay.
5    A   While the vehicle was in motion.
6    Q   And what is the Pre-existing Knowledge
7  column -- or option within the Reason for the Stop
8  column?
9    A   Pre-existing Knowledge, that would be almost
10  like a, kind of like a pretext stop that you know a
11  violator's carrying cocaine or moving illegal immigrants,
12  things like that.
13    Q   Okay.
14    A   Pre-existing knowledge that they know that this
15  person is an offender or something like that.
16    Q   Okay.  And how would they know that that was an
17  offender?
18    A   Through investigations.
19    Q   Okay.  We can come back to it if we need to.
20        And what is a Vehicle Traffic Violation,
21  compared to a Moving Traffic Violation?
22    A   Vehicle Traffic Violation, it's pretty much --
23  it's when the vehicle's not in motion.  Could be a
24  parking violation --
25    Q   A non-moving violation?

Page 69

1    A   Yes, ma'am.
2    Q   And then what is Violation of Law?
3    A   Violation of Law is anything over a Class C
4  misdemeanor that has a confinement.
5    Q   Okay.  So help me understand how an officer
6  would select between these options.
7    A   So there are traffic stops and there are things
8  that occur.  And so if it has a potential for confinement
9  and not be -- Moving Traffic Violation and Vehicle
10  Traffic Violation would be for basically traffic stops.
11  You know, he would select, you know, this was -- the
12  vehicle was in motion, this was a moving traffic
13  violation; the vehicle wasn't in motion, it's not a
14  moving -- it's just a traffic violation.
15        The violation of law is an offense if he
16  selects an offense, whether it be citation, cite and
17  release, that is a crime punishable higher -- that has a
18  physical detainment aspect to it.
19        The pre-existing, like I said, it doesn't get
20  used very often, so it's kind of hard.  But when you work
21  on task force, whether it's with the DEA or Secret
22  Service, sometimes like that they have wires that --
23  legal, legal taps and stuff like that that they are
24  utilizing, and information will be garnered from that
25  legal tap that will then lead to a traffic stop.

18 (Pages 66 - 69)

Aaron Von Muldau                                             July 17, 2024

Page 70

1    Q   Okay.  And you used the term "pretext stop" a
2  minute ago.  What is a pretext stop?
3    A   It all depends on what you mean it means.
4    Q   Well, you used the --
5    A   I used the word, but --
6    Q   So what did you mean by it?
7    A   It's basically having knowledge and based --
8  having knowledge of an offense that is occurring prior to
9  the traffic stop.
10   Q   Okay.  So you must have knowledge of an offense
11 that is actually occurring before the traffic stop?
12   A   Yes.
13   Q   Okay.  And I'm a little confused about these
14 categories because it seems like they're overlapping; is
15 that fair?  So like if you make a traffic stop or a
16 moving traffic stop violation, and then you arrest
17 somebody, that seems to be both a moving traffic
18 violation and a violation of law.  Is that my -- is my
19 understanding correct?
20   A   Yes.
21   Q   So how would you know which one to check?
22   A   The legislature put this into play, without
23 very much explanation.  So sometimes it's a dart game.
24 But we try to use the best.  And what we end up doing is
25 going with the higher.

Page 71

1    Q   Okay.  I understand.
2        And then when would you use pre-existing
3  knowledge versus a vehicle violation or a moving
4  violation?
5    A   It just depends on what the information and
6  what occurred when it happened.  It doesn't mean a moving
7  violation or a traffic stop didn't happen.  But there are
8  times where they've had to pull over cars because the
9  guy's complying and he's not breaking the law.
10   Q   Sure.
11   A   And they'll use the pre-existing knowledge
12 that's saying:  Hey, listen, we have information that
13 he's moving 10 tons of cocaine.  We stopped him.
14   Q   Okay.  And then I want to look at the next
15 column.  I see that as the Search column.  And I'm going
16 to pull that down.  The options that I see here are
17 Consent, Contraband in Plain View, Incident to Arrest,
18 Inventory, No Search, and Probable Cause, and also Null.
19 Did I get that correct?
20   A   Yes, ma'am.
21   Q   And again, Null would be the same thing.  I'm
22 just going to say any time we see Null that means
23 there's -- it's invalid data; is that correct?
24   A   Or there's no data there.
25   Q   Or there's no data there at all.  So I would

Page 72

1  assume that Consent Search means the person consented to
2  a search.  Is my understanding correct?
3    A   Yes.
4    Q   And Contraband in Plain View, that's pretty
5  self-evident.  There was contraband in plain view so an
6  officer searched; is that correct?
7    A   Yes.
8    Q   Incident to Arrest, my understanding would be
9  someone was arrested and then they searched after the
10 person was arrested.
11   A   Uh-huh.
12   Q   Is that correct?
13   A   Yes.
14   Q   And then Inventory, tell me what an inventory
15 is.
16   A   We have a duty to protect people's property
17 when they've been arrested.  So like a vehicle, they will
18 inventory a vehicle in areas that are common that are not
19 locked, to make sure that when the vehicle is being towed
20 or impounded, that any personal things of value are
21 documented, to say that they were in the vehicle when we
22 gave it over to the tow company.
23   Q   Understood.  And No Search, that's
24 self-evident.  No search was conducted?
25   A   Uh-huh.

Page 73

1    Q   And what is --
2    A   Yes, ma'am.  I'm sorry.  I shook my head.  But
3  yes, ma'am.
4    Q   Okay.  And what is a Probable Cause Search?
5    A   Meaning that they had probable cause to,
6  whether it be a warrant or there are circumstances, the
7  vehicle exception rule, things like that that allow for
8  them to carry on a search that would not normally be
9  allowed.
10   Q   Okay.  Thanks.  And what is Contraband Type
11 generally, that category?  There seems to be a lot listed
12 here, so I'm not going to go through everything.  What
13 does Contraband Type mean?
14   A   Based on that, I'd have to look at the list.
15 It's not --
16   Q   I can open the list.
17   A   No, no, no, that's the codes.  So you have
18 narcotics, you have weapons, you have things that are not
19 allowed.  And each one of those A's, C's, S's, W's --
20   Q   Uh-huh.
21   A   -- refer to something like that.
22   Q   Sure.
23   A   Off the top of my head, I don't -- I'd have
24 to -- looking at the statute, I would be able to match --
25 these are all categories that are required by the State

19 (Pages 70 - 73)

Aaron Von Muldau                                                    July 17, 2024

Page 74

1  for this report.
2     Q   Okay.  That's helpful.
3     A   And yes, they do overlap and they do not make
4  sense sometimes.
5     Q   I'm sensing some frustration there.
6     A   It's difficult.
7     Q   I understand.  I see a column that says, "Knew
8  Race."  Does that mean the officer asked about the race
9  or just observed the race?  Help me understand what that
10  means.
11    A   As part of the racial profiling, one of the
12  things they want to know is did you know the race of the
13  violator, was the race of the violator known prior to
14  making the stop.
15        What they're looking for is, hey, are you only
16  pulling over because you found -- you know, I was driving
17  while white.  And they're like, you know, that is not
18  against the law.  So they're asking that question.  There
19  are times when you know the race, and there are times
20  when a car passes you at 60 miles an hour with windows up
21  and tinted windows that I have no idea who --
22    Q   Totally understand.
23    A   It could be a green alien.  But that's what
24  that question refers to.
25    Q   That's helpful.  That's all, I just wanted to

Page 75

1  know what it was.  And then there's Arrest Reason, Use of
2  Force, and that's the end of the columns.
3     A   Uh-huh.
4     Q   So now I want to ask you just generally how the
5  County uses this information.  What does the County do
6  with this spreadsheet?
7     A   They don't.  It's not normally pulled.
8     Q   So no one usually looks at this spreadsheet?
9     A   No, not in this format.  I use information --
10  because it's kept in a database.
11    Q   Sure.
12    A   So we don't -- I don't print out or use the
13  database.  But we use the database to build reports,
14  right.
15    Q   Okay.
16    A   I want to know how many stops we've been doing.
17  I want to know how many -- for the racial profiling, I
18  need to know what all these answers are.  Do they match
19  the number of stops?  Because those are things that we
20  look at, right?  You know, those go back to what you call
21  those -- what I described as a shadow stop, right?  Do
22  the numbers match?  If they don't match, why don't they
23  match?  Who's making mistakes?  Who's not filling out the
24  information?
25    Q   So you audit the data; is that fair?

Page 76

1     A   I'm one of the people.  But yes, I am the main
2  person that audits the data.
3     Q   Okay.  And then the County generally audits the
4  data.  You'd said there are other people that do it.  The
5  County does it.
6     A   Yes.
7     Q   And what kind of reports are generated from
8  this Excel spreadsheet?  You talked about a couple of
9  them, whether officers are making stops, the racial
10  profiling data.  Are there any -- how do you assess
11  whether shadow stops are occurring?
12    A   Because I discover that there are stops that
13  happen and they're not documented.
14    Q   And what happens after that?
15    A   We take action on those officers, whether it
16  be -- sometimes it could be from a reprimand, it could be
17  from a counseling to suspension.
18    Q   Okay.  And what if -- do you audit the
19  correctness of the data?  So how do you know what the
20  officer's putting into this database is correct?
21    A   I don't understand the question.
22    Q   Sure.  Thanks.  That's probably my fault for
23  asking a bad question.
24        When an officer says they pulled over a red
25  Honda Civic driven by Josh Windham, how does the County

Page 77

1  know that that information is correct?  How do they know
2  it's not Charles' ex-girlfriend?
3     A   We don't know unless a complaint's filed.  And
4  then from there, that's when we start doing our
5  investigation.
6     Q   Okay.  I want to do a little bit of filtering
7  on --
8     A   Sure.
9     Q   -- this Excel spreadsheet just to talk about
10  some of the results.  And I'm going to go to the Search
11  column and I'm going to filter the Search column to
12  review all the searches that the County has record of.
13    Q   Okay.
14    Q   So I'm going to deselect Select All, and I'm
15  going to hit Consent, Contraband In Plain View, Incident
16  To Arrest, Inventory, and Probable Cause.  Did I get all
17  the searches?
18    A   I believe so.
19    Q   Okay.  And let's filter that down.  And I'm
20  seeing here at the bottom -- I'll move my cursor -- that
21  there were 3,785 searches in the three years; is that
22  correct?
23    A   Based on the search that you completed, I agree
24  with that.
25    Q   Okay.  Based on the data that I have here.

20 (Pages 74 - 77)

Aaron Von Muldau                                                July 17, 2024

Page 78

1    A    Uh-huh.
2    Q    Okay.  And I'm going to go back up here.  And
3    I'm going to uncheck some boxes.  I'm going to uncheck
4    Contraband In Plain View and Incident To Arrest and
5    Inventory.  And I'm going to do Consent and Probable
6    Cause.  Do you see that?
7    A    I do.
8    Q    Okay.  Oops.  And filtering that, I see that
9    there are -- the results that pop up are 2,989 based on
10   this number at the bottom of the corner.  Do you see
11   that?
12   A    I agree with that.
13   Q    Okay.  And so does that 2,989 mean that there
14   were 2,989 searches based on probable cause and consent
15   according to the County's data?
16   A    There are 2,989 entries into that field that
17   meet the standard that you put in.
18   Q    Sure.  So there are 2,989 consent and probable
19   cause search records in the County's data for that 3.5
20   years?
21   A    I would agree with that.
22   Q    And then I'm going to filter again and take off
23   the Consent and just do Probable Cause.  And so based on
24   this information, I'm filtering again, there would be
25   2,103 probable cause searches in the approximately 3.5

Page 79

1    years in the County's data.  Is that correct?
2    A    I agree.
3    Q    So I'm going to take this filter off.  And go
4    back to all of the data.  And you should see -- we're
5    back at the regular, full view of all the data; is that
6    correct?
7    A    It doesn't show me the number, but it looks
8    like it's correct.
9    Q    Okay.  Is there anything in this spreadsheet,
10   in the County's data that indicates how long a traffic
11   stop lasted?
12        Put this another way.  I see you've given me a
13   blank look.  Does the County track how long a traffic
14   stop lasts?
15   A    Yes.
16   Q    How?
17   A    Incident Report Detail.  If they check out on
18   the traffic stop, it shows from when the time he checked
19   out or entered the -- into the traffic incident on the
20   MDT to the time he checks back in.
21   Q    Okay.  So you'd have to look at each individual
22   traffic stop to determine the length of that stop.
23   A    Yes, ma'am.
24   Q    There's no aggregate way that the County has
25   data on multiple traffic stops and the duration?

Page 80

1    A    Aggregate way?
2    Q    By that I mean just all the traffic stops that
3    the County has data on, is there any way to look at how
4    long traffic stops are lasting?
5    A    Yes.
6    Q    How?
7    A    Going to the Incident Report Detail reporting
8    server, and write a query to say I want all traffic stops
9    and then tell me from the start to -- start, end time,
10   calculate, and tell me where everything falls.
11   Q    Okay.  Have you ever done that?
12   A    No.
13   Q    To your knowledge, has the County ever done
14   that?
15   A    No.  We've only investigated complaints.
16   Q    Okay.  So you only look -- the County only
17   looks on a complaint-by-complaint basis for the length of
18   a stop?
19   A    Yes --
20   Q    I'll rephrase, because you're looking confused.
21        So to evaluate the length of a stop, that issue
22   only comes up when a individual complaint is made.
23   A    I think I understand what you're saying, but I
24   don't quite.
25   Q    Let me try again.

Page 81

1    A    Because in regards to an individual traffic
2    stop, do I track individual traffic stops?  Unless
3    there's a complaint, we do not.
4        We do use approximations and time variations to
5    better improve processes.  So we use -- we use a lot of
6    data for statistical analysis, this being some of that
7    data.
8    Q    Sure.  And in this data, in this Exhibit 57,
9    there's no column or information that tells the County
10   how long a traffic stop lasted; is that fair?
11   A    Yes, that is correct.
12   Q    And you just testified that the County has
13   never pulled the collective number of how, how long
14   traffic stops are lasting?
15   A    No, that's not what I said.
16   Q    Okay.  Help me understand.
17   A    We have used it in the past.  It is not a
18   common practice.
19   Q    Okay.
20   A    You asked if I pulled it.  Nope, sure haven't.
21   Q    Sure.  And to your knowledge, has the County
22   ever done it?  Has the County ever pulled how long its
23   traffic stops are lasting?
24   A    I can't speak for the whole county because
25   there are several different departments that would use

21 (Pages 78 - 81)

Aaron Von Muldau                                                     July 17, 2024

1  that information. But I would say in the Sheriff's
2  Office, we've probably used it maybe two -- I know we
3  used it back in 2010, 2012, when we evaluated from going
4  from a paper citation to an eCitation. And we discovered
5  that by implementing an eCitation, we dropped the traffic
6  stop and the contact on the side of the road by like
7  50 percent.
8        We have used it for other minor things, but not
9  as an aggregate, as I think what you're trying to
10 describe.
11 Q    Yeah. And I'm talking about all the data, the
12 big picture. Is there someone looking at the big picture
13 of how long traffic stops are lasting?
14 A    I don't think so, in and of itself.
15 Q    Okay. I want to go to the Offense Description
16 column. Bear with me while I try to find where that is.
17 A    Uh-huh.
18 Q    I think it's here. Okay. So my cursor is on
19 the Offense Description column. And I'm going to pull
20 down the menu here. And I'm going to look at some
21 offenses. I'm going to take off the Select All. I'll
22 just do it this way.
23       I see one here, going to start with this first
24 one, Failed To Exhibit License. Can you tell me what
25 that offense is?

1  A    Parks and Wildlife, you don't have a hunting
2  license, fishing license, something like that.
3  Q    Okay. Can you tell me what the offenses of
4  Failed To Display Driver's License means?
5  A    When --
6  Q    The offense of -- what the offense of Failed To
7  Exhibit Driver's License means?
8  A    When the officer has requested your driver's
9  license and you refuse, though you have a valid driver's
10 license, you give him his name and date of birth. Under
11 Texas statute, you are required to present it. When you
12 fail to do that, then that could be, based on the
13 circumstances, could be an offense.
14 Q    Okay. I'm going to click that. Do you know
15 what Failed To Display License Receipt is?
16 A    Not offhand.
17 Q    Okay.
18 A    There's a lot of laws in the Traffic Code that
19 are no longer valid, like the presenting your
20 registration paperwork. It's --
21 Q    Understood.
22 A    So --
23 Q    Understood that that's no longer a thing.
24 A    They just never get rid of them.
25 Q    So I'm going to check Failed To Display

1  Driver's License.
2  A    Okay.
3  Q    And I'm going to filter to only that offense,
4  as I understand it. And then can you look down here in
5  the bottom left-hand corner and tell me what the number
6  is there? I see 787; is that correct?
7  A    Correct, I agree.
8  Q    So 787 times someone, based on the data, has
9  been pulled over for failing to display their driver's
10 license?
11 A    They are not pulled over for failing to display
12 their driver's license.
13 Q    Okay. Yeah, you're correct to correct me
14 there. So they are found to have committed the offense
15 of failed to display their driver's license; is that
16 correct?
17 A    Okay. I agree.
18 Q    And I see in the Violation Stop Result column
19 both citations and warnings; is that correct?
20 A    And nulls, yes, ma'am.
21 Q    And nulls.
22 A    Uh-huh.
23 Q    So that means that the Sheriff's Office and
24 Sheriff's officers are finding -- are giving warnings and
25 citations for the offense of Failed To Display Driver's

1  License.
2  A    Correct.
3  Q    I'm going to go back to -- I'm going to take
4  off this filter on Offense Description. So I'm going to
5  select All so we have it back so that all the data is
6  back. And then I'm going to go back to Offense
7  Description again and unselect All -- I think this is
8  right -- and I'm going to search Lane, and I'm going to
9  look at some particular offenses.
10       I see a couple of offenses that might mean the
11 same thing, so you can just correct me if I'm not
12 understanding this right. Failed To Drive In A Single
13 Lane, is that the same as Failed To Maintain A Single
14 Lane?
15 A    Offhand I'd have to review the statute. But I
16 believe that they could be the same.
17 Q    Okay. So I'll check both of those. And what
18 about Failed To Use Designated Lane? Could that be the
19 same, or is that a different offense?
20 A    That is probably a different offense.
21 Q    Okay.
22 A    You are required to not drive in a bus lane --
23 Q    Ah.
24 A    -- and people are driving in a bus lane or an
25 HOV lane or something like that. Unfortunately, there's

22 (Pages 82 - 85)

Aaron von Muldau                                              July 17, 2024

Page 86

1  2,000 -- I would say that though I'm very
2  knowledgeable, I don't know them all by heart, which is
3  why I always carry my Penal Code with me.
4      Q   Do you really?
5      A   I do.
6      Q   Where do you keep it?
7      A   In my car.
8      Q   Okay.  So you always have it just in case?
9      A   (Nodding head.)
10     Q   That's interesting.  All right.  So I'm just
11  going to look to see if there's any other lanes.  I see
12  Failure To Drive In A Single Marked Lane.  Would you say
13  that's the same as Failed To Drive In A Single Lane or
14  Failed To Maintain A Single Lane?
15     A   Could be.
16     Q   Should I check that one if I'm trying to get
17  all the same offense of Failed To Drive In A Single Lane
18  or Failed To Maintain --
19     A   I would.  I would say that that would be most
20  of the time used the same thing.
21     Q   Okay.
22     A   You're going through one of the things that
23  we've always done.  We've since changed this, because
24  before, the way the County kind of -- there's 2,082
25  traffic laws.  And the County had offense numbers for

Page 87

1  about 400 of them.  And then when we would come across
2  one of those that went outside that, well, we'll just add
3  it to one of the other ones.
4          So up until recently, and this was about three
5  years ago, we were able to make a change saying that no,
6  we're not making our own offense codes.  So we've gone
7  back to the DPS codes, but I don't think that our
8  database has quite caught up.
9      Q   Sure.
10     A   Because another one that you'll find in there
11  is No Insurance.  There's no such law for no insurance.
12  It's Failure To Maintain A Financial Responsibility.
13     Q   Uh-huh.
14     A   Someone like me knows that so when I go to look
15  for it, it doesn't say, "Failure To Maintain Financial
16  Responsibility."  It says, "No Insurance."  So it's kind
17  of a -- I understand when why they did what they did,
18  plain English, make it easy for the officer.  But for
19  someone that dots I's and cross T's, it makes it
20  difficult.
21         But yes, I would say offhand, based on the
22  three, they would probably all work in synonymous with
23  each other.
24     Q   Okay.  And are there any other offenses here or
25  options here that I should check for failure to maintain

Page 88

1  a lane?
2      A   I don't --
3      Q   I can scroll through if you --
4      A   I don't think so.  I was looking through.  I --
5  I don't think so.
6      Q   Okay.  So then I'm going to filter based on
7  that.  And it looks like there are 1,448 stops, according
8  to the County's data, where an officer found that a
9  person failed to maintain a single lane; is that correct?
10     A   I agree.
11     Q   Okay.  I'm going to go to the Officer Last Name
12  column.  Bear with me while I find it.
13         I'm going to filter the officer last name.  And
14  at the time of the stop, I understand that the Criminal
15  Interdiction Unit had two officers; is that correct?
16     A   Yes.  I believe at the time there was two
17  officers assigned.
18     Q   And my understanding from prior testimony is
19  that was Officer Babb and Officer Gereb; is that correct?
20     A   I can verify that those two were assigned at
21  that time.
22     Q   Okay.  So I'm going to find those names.
23         Okay.  I'm missing something here.
24     A   I actually think you were on the wrong column.
25     Q   Okay, thank you.  I was on the wrong -- not

Page 89

1  Officer Last Name, I was on Officer First Name.  Thank
2  you.  So I want to check Babb, then go to Gereb.  And I
3  see 259 as the result; is that correct?
4      A   I agree.
5      MS. HEBERT:  Did you happen to write down the
6  first filtered number?
7      MR. WINDHAM:  I did not.
8      THE WITNESS:  1,448.
9      MR. WINDHAM:  You dot I's and --
10     MS. HEBERT:  You do.
11     Q   (By Ms. Hebert)  And we have 259.  So I'm just
12  going to go to another spreadsheet and do the division.
13  259 divided by 1448.  And let's say approximately 17
14  percent of the County's data of traffic stops for the
15  Failure To Maintain A Lane, Officer Gereb and Officer
16  Babb were responsible for in that three-and-a-half years.
17     A   Okay.  I agree with that.
18     Q   Okay.  I'm going to go back to our data, and
19  I'm going to clear the Officer Last Name.  So go Select
20  All, bring it back to all the data.  And I'm going to go
21  back to the --
22     A   And you can verify that I was right.  1,448.
23     Q   Yep.  You were right.  Good memory.
24         I'm going to go back to the offense
25  information.  Looking for vehicle information.  I'm going

23 (Pages 86 - 89)

Page 90

1  to go back to offense description, and I'm going to add
2  another offense here, or look at a different offense
3  here. I'm going to search for lane generally. Lane.
4  I'm going to make this bigger so we can all see. I just
5  realized I could do that.
6          I'm going to deselect Search All results, and
7  I'm going to click Changed Lane When Unsafe. I'm going
8  to click Failure to Main -- Drive In A Single Lane, the
9  same stuff we clicked before, Failure to Signal Lane
10  Change. I'm not going to use the Failure To Designate
11  Lane, because as I understand it, that's really not
12  something we're going to look at on the highway. Failure
13  To Drive -- come on -- In A Single Marked Lane. Improper
14  Lane Change and Unsafe Lane Change.
15          Do you see me do all that?
16  A  I do.
17  Q  Okay. Then I'm going to filter that down. And
18  do you see the number here in the bottom left-hand
19  corner, 2439?
20  A  I agree.
21  Q  And that means 2,439 stops for these particular
22  offenses in the County's data?
23  A  That you selected, yes, ma'am.
24  Q  Correct. And I'm going to go back over to the
25  officers and go to Officer Last Name. Deselect All, then

Page 91

1  select Babb and select Gereb. I'm going to filter that.
2  And do you see that 520 is the number in the bottom
3  left-hand corner?
4  A  I see it.
5  Q  Then I'm going to go back to the math sheet
6  because math is not my strong suit. 520 divided by 2439,
7  and do you see that 21 -- and I'm going to round that to
8  a percentage. Would that amount -- would the conclusion
9  of that data analysis that we just did mean that Officer
10  Gereb and Officer Babb were responsible for approximately
11  20 percent of the offenses we just looked at?
12  A  I agree.
13  Q  And generally I'm going to ask kind of the
14  bigger picture question. Does that mean that 20 percent
15  of the County's offenses that deal with traveling within
16  a lane safely Officer Gereb and Officer Babb are
17  responsible for?
18          MR. FRIGERIO: Objection, form, but you can go
19  ahead and answer.
20  A  You're asking me 20 percent of --
21  Q  (By Ms. Hebert) We looked at --
22  A  -- the offenses that you filtered for --
23  Q  Sure.
24  A  -- were by Gereb -- I'm sorry, I think you lost
25  me halfway through the question.

Page 92

1  Q  That's okay. It's a hard question to answer
2  based on the data. But of the offenses we looked at,
3  Officer Gereb and Officer Babb, 20 -- or of the offenses
4  we looked at, are Officer Gereb and Officer Babb
5  responsible for 20, approximately 20 percent of those
6  offenses?
7          MR. FRIGERIO: Objection, form.
8  A  Agreed.
9          MR. WINDHAM: The thing I would want clarified
10  on the record is, for this 3.5-year period.
11  Q  (By Ms. Hebert) Okay. And just so we're clear,
12  that for this 3.5-year period that we looked at for this
13  data, Officer Gereb and Officer Babb were responsible for
14  approximately a little more than 20 percent of the
15  traffic stops for the offenses we just selected for?
16          MR. FRIGERIO: Objection, form.
17  A  I agree.
18  Q  (By Ms. Hebert) And I'm going to look at just
19  for one more time the offenses we selected for. I'm
20  looking for the description. The offenses we selected
21  for are Failure To Maintain Single Lane, Fail To Signal
22  Lane Change, Unsafe Lane Change --
23  A  There was two more.
24  Q  And those are the ones that Officer Babb and
25  Officer Gereb --

Page 93

1  A  No, there was two more that you had selected, I
2  think.
3  Q  Right. But none of those offenses show up for
4  Officer Babb and Officer Gereb. So once --
5  A  Okay. Oh, yes. Okay.
6  Q  So we filtered -- we have filtered this Excel
7  spreadsheet based on officer last name and the offense
8  description; is that correct?
9  A  But if they're not listed there, wouldn't --
10  isn't there -- wouldn't the math be wrong? Because if
11  you're showing this for what they have done -- well, I
12  guess this is for the 520, right? The 520 that you
13  put --
14  Q  Yes, this is the 520 result here.
15  A  So the 520 shows those three offenses, okay, I
16  agree with that.
17  Q  So essentially, just to summarize, there are
18  Officer Gereb and Officer Babb, according to this data,
19  for 3.5 years, pulled 520 people over for unsafe lane
20  change, fail to main -- fail to signal lane change and
21  fail to maintain a single lane.
22  A  Based on your filtering that is -- I agree with
23  that assessment.
24  Q  Okay. I am going to take off all of the
25  filters. So bear with me as I figure that out. Well,

Aaron Von Muldau                                        July 17, 2024

Page 94

1  you know, actually I have just the officer last names on
2  here right now, so let's go to that.  And what I'm seeing
3  is the filters for Gereb and Babb are still on; is that
4  correct?  Let me look here so you can see it.  There's
5  Gereb.
6      A   Uh-huh.
7      Q   And there's Babb.
8      A   I agree.
9      Q   And Gereb and Babb looks like pulled, according
10  to this data, pulled over 2,671 people during that 3.5
11  years.
12      A   No.
13      Q   Okay.  Tell me why.  What am I missing?
14      A   Because you see some of those -- I believe we
15  saw it earlier, if you get -- if you're issued multiple
16  citations --
17      Q   Sure.
18      A   -- it looks like there's multiple entries.  So
19  that doesn't --
20      Q   Okay.
21      A   The number of citations don't necessarily
22  equate to the number of traffic stops.
23      Q   So how would I filter that out then?
24      A   I have no idea.
25      Q   Okay.

Page 95

1      A   What I would do, if -- because I'm not that
2  guy.  But if we go over to the violator and see if we
3  start seeing double entries.
4      Q   I think violator is this way, so let's see.
5      A   You'll see potentially like some -- Jesus
6  Herrera.
7      Q   Uh-huh.
8      A   Jesus -- Line 3774, he has three entries all
9  looking at the same time, same date.
10      Q   I don't see Line 3774.
11          MR. WINDHAM:  It's in the middle.
12      Q   (By Ms. Hebert) Oh, this one, right here?
13      A   Right.  You see that he has three entries?
14      Q   Sure.
15      A   All right back to back?
16      Q   Uh-huh.
17      A   It's not that he got pulled over back to back.
18  Then you have Craig Martinson, and then you have Albert
19  Herrera.  So you have duplicates.  So it's not a
20  one-for-one equation.  So the math is, yes, there's that
21  many citations, but it doesn't necessarily mean it's the
22  same thing.
23      Q   Okay.  I understand.  That's really a helpful
24  piece of information.  So how would you filter out
25  duplicates to evaluate the number of stops?

Page 96

1      A   I -- I don't -- I'm not a Excel expert.
2      Q   Sure.  Who would know?  Who would be the
3  person?
4      A   I don't -- I don't have anybody like that on my
5  staff.
6      Q   Okay.  So you don't have anybody who would be
7  able to manage this Excel spreadsheet and tell us how it
8  works?
9      A   What do you mean "to manage"?
10      Q   Like just how to filter this information so we
11  can remove the duplicates to tell --
12      A   Well, so you take -- we know Jesus Herrera,
13  let's go look at the citation data.
14      Q   Okay.
15      A   Go all the way to the left.  I mean, it would
16  be a manual process.  So right there -- look, it shows
17  right there.  So that's how you would do it is you would
18  say --
19      Q   Okay.
20      A   I think there's a way to do it in Excel where
21  you can say find duplicates and remove.
22      Q   Okay.
23      A   But that's -- again, I'm not a -- I have
24  talents, but I'm not an expert in that.  That's why some
25  of this stuff is very convoluted and takes time, because

Page 97

1  I only know one way.  So it's just looking through the
2  data.
3      Q   Sure.  And you know, I'm not an Excel Wizard --
4      A   Right.
5      Q   -- by any stretch of the imagination.  Took me
6  a lot to figure this out.
7      A   The County doesn't pay for anyone on our staff
8  to do this.  This is us, me and Microsoft Help.
9      Q   I completely understand.  Thank you.  And thank
10  you for bearing with me as we navigated this.
11      A   But now we found an easy way of looking at it.
12  Because now you can see right there it's not -- if you
13  close that menu, you see that there's several times --
14      Q   There's several stops.
15      A   So the numbers are not necessarily equating.
16      Q   Okay.  So if someone -- that someone is not
17  me --
18      A   Uh-huh.
19      Q   -- knew how to remove duplicates, they could
20  remove duplicates based off the citation number?
21      A   I would see that, because that's what I'm
22  looking at.  I'm seeing like, you know, 94 is in there a
23  couple of times.
24      Q   Right.
25      A   I would say that that is a valid statement.

25 (Pages 94 - 97)

Aaron Von Muldau                                                July 17, 2024

Page 98

1    Q   Okay.  Thank you.  That's helpful.
2        MS. HEBERT:  Do you know how to remove
3    duplicates?
4        MR. WINDHAM:  No.
5        MS. HEBERT:  Okay.  That's fine.
6    Q   (By Ms. Hebert) I think we'll just take a break
7    from this then.  Oh, there's one thing that I do want to
8    look at while we're here.  Okay.  We're still filtered by
9    officer last name of Gereb and Babb; is that correct?
10   Right here, in the Officer Last Name?
11   A   Yes.  Did the number change though?
12   Q   No.  Haven't changed.  It's still -- here's
13   Gereb.
14   A   I think something's changed, because I --
15       THE WITNESS:  Do you have the original number?
16       THE REPORTER:  I could look.
17       MS. HEBERT:  Let me see.  Hold on.
18       MR. FRIGERIO:  It's 2671, I think.
19       THE WITNESS:  You're pretty sure it was 2671?
20   Okay.
21   Q   (By Ms. Hebert) Not in terms of the total
22   stops.  I think that we're still there.
23   A   I understand.
24   Q   I'm going to go to the Search column.  And I am
25   going to click the Options, and I'm going to deselect

Page 99

1    All, and I'm going to just go through the numbers here.
2    Consent Search, 44 consent searches.
3    A   I agree.
4    Q   And then I'm going to go down to -- this looks
5    funky, though, to me, so I just want to make sure we're
6    doing this right.  I know, bear with me.  I just want to
7    make sure that our filters are on right, so we're not
8    getting any incorrect information.
9        MR. WINDHAM:  Before you move on, can you just
10   hit the drop down arrow at the top there, Christie?  I'll
11   just point to it.
12       MS. HEBERT:  This thing.
13       MR. WINDHAM:  I just want to see what the
14   options are up there.  Okay.
15   Q   (By Ms. Hebert) I'm going to go back to the
16   officers and just make sure that there's no other filters
17   on.  No filters, no filters.  Just -- and I have no idea
18   what the number is right here.  I'm just trying to make
19   sure that I'm not making any mistake and leaving
20   something on.  So the filter that is on is Officer Last
21   Name, and we have Babb and Gereb.
22   A   Agreed.
23   Q   And I don't see any other filters on here.  If
24   you see one and I'm missing it, give a shout.
25   A   Just the original one that you have for

Page 100

1    consent.
2    Q   And then we get to the consent.  So I'm showing
3    44 consent searches, according to the County's data, for
4    Officer Gereb and Officer Babb for 3.5 years; is that
5    correct?
6    A   Agreed.
7    Q   And then I'm going to take off Consent and do
8    Probable Cause.  And I'm showing 103 probable cause
9    searches for Officers Gereb and Babb over 3.5 years; is
10   that correct?
11   A   Agree.
12   Q   And then I'm just going to take the search
13   filter off entirely, and it's still filtered based on
14   Officer Gereb and Officer Babb.  I'm just going to
15   control F here for a second, and I'm going to search for
16   Schott, which is the Plaintiff's name in this case.  And
17   it looks like we've selected where Alek Schott is.  Do
18   you see that?  I'm going to scroll down so it's like more
19   centered.
20   A   I see it.  101311 is the designation on the
21   line.
22   Q   Thank you.  And would this row reflect the
23   County's records, data records for Alek Schott in this
24   Exhibit 57 for the stop of Mr. Schott?
25   A   You would have to move over for the date and

Page 101

1    time so that could be --
2    Q   Sure.
3    A   -- verified --
4    Q   I'll verify the date and time.
5    A   -- but it does look like --
6    Q   3/16/2022.
7    A   3/16.  That does appear to be the record.
8    Q   Then I'm going to go all over here.  I'm
9    going -- bear with me, I'm going all the way over.  Do
10   you see where it says, "No Search"?
11   A   I see that.
12   Q   Does that mean the County's data shows that no
13   search was conducted on the traffic stop of Mr. Schott on
14   3/16/2022?  I'm just referring to this Exhibit 57.
15   A   For Exhibit 57, that is correct.
16       MS. HEBERT:  Okay.  I'm going to take a brief
17   break so I can make sure I've got everything on this
18   Excel spreadsheet.  So give us five minutes or so.  Does
19   that work for everybody?
20       MR. FRIGERIO:  Okay.
21       MR. LEAKE:  Yes.
22       THE REPORTER:  We're off the record.
23   (Recess from 11:40 a.m. to 11:47 a.m.)
24       THE REPORTER:  We are back on the record.
25   Q   (By Ms. Hebert) Thank you.  Is there a better

Aaron Von Muldau                                                    July 17, 2024

Page 102

1 way of analyzing this spreadsheet that I'm missing?  We
2 just walked through a bunch of things, and I just want to
3 make sure that I'm doing -- like if there's something I'm
4 missing in the analysis we just did --
5      MR. FRIGERIO:  He'd like to clarify something.
6   Q   (By Ms. Hebert) Okay, sure.  What would you
7 like to clarify?
8      THE WITNESS:  Which part?
9      MR. FRIGERIO:  The no search.
10     THE WITNESS:  Oh.  So the no search.  Without
11 saying it, I -- your last question, the last question
12 that was asked of me, does the data show that there was
13 no search, yes.  But this isn't a one-for-one
14 relationship as I explained, right?
15     He, in his report -- based on his report, he
16 said that he had written and issued the citation prior to
17 calling Molina over, which means that at the time that he
18 issued and entered the information on the citation, it
19 would be -- a reasonable person would say that at the
20 time of the issuance of the warning, that no search had
21 been completed.
22     Now, I will not say that I'm an expert when it
23 comes to interdiction type enforcement, though I've done
24 it early in my career, but that was 20 years ago.  So the
25 rules on how they do stops -- not really rules, but how

Page 103

1 they operate are a little bit different than what I
2 normally interact with, with like patrolmen.  There's
3 expectations, things like that.
4      With reasonable suspicion, they're allowed to
5 extend stops.  What that is, I don't know.  I know he
6 documented some stuff in his report.  But, you know, I
7 didn't go into that.  That's not -- that is not my
8 expertise, not my pur- -- you know, not -- it's not my
9 purview, but it's not -- it's not my expertise.
10   Q   (By Ms. Hebert) Sure.
11   A   So at the time this was issued, and based on
12 the timestamps and what I can remember of the reports, I
13 believe that this warning was actually issued before he
14 called Molina over.  My memory was it was 20 to -- or 30
15 to 40 minutes before Molina showed up after he was
16 contacted about this particular stop.
17   Q   And what are you -- how are you using the term
18 "issued"?  Can you define that in this context?
19   A   Issued, that on -- based on the report, he said
20 the initial stop happened.  Babb said the initial stop
21 occurred, brought him over to the car to issue the
22 warning.  And I think from there, it was like 12 minutes
23 later on, from the time the vehicle was stopped -- I'd
24 have to look at the -- I think it shows on the Incident
25 Detail Report, or one of them, that he documented that he

Page 104

1 issued -- he issued the warning and then sent him on
2 his -- or then called Molina over.  But that's just my
3 understanding.
4   Q   Okay.  I just want to look at Plaintiff's
5 Exhibit 12.  This is not a gotcha.  Just tell me where on
6 this document is the issue time.  Is it on this document?
7 I don't know.
8   A   There is an issue time, but I'm not sure it's
9 correct.
10   Q   Okay.  Tell me where the issue time is.
11   A   Time of offense is 8:32, but that's what I --
12   Q   I see 9:32.  I know you don't have your
13 glasses, so --
14   A   Okay.
15   Q   -- I'm just going to tell you I see 9:32.
16   A   Yeah, 9:32.  And if I recall, this incident
17 happened around 11:00.
18   Q   Okay.
19   A   But if we go in here, I don't know if it's
20 timestamped on the actual citation.
21   Q   Sure.  Let's look here.  Okay.  I don't know
22 what I just did.
23   A   I don't know if it goes that far into the
24 metadata.
25   Q   There's something funky.  Because now it's just

Page 105

1 missing entirely.  Let me see what we've got filtered
2 here.
3      Is there -- just let me ask this question.  Are
4 you -- you're testifying right now on behalf of the
5 County on this --
6   A   Yes.
7   Q   -- data.
8   A   Uh-huh.
9   Q   Is there someone else who would have a better
10 understanding of this Excel spreadsheet than you?
11   A   No.  Not with the County.
12   Q   It just feels sometimes like the blind is
13 leading the blind here, so I just wanted to ask.
14   A   Yes.  The -- I mean, is there someone better
15 than me?  Yes.  It's called Brazos.  Tyler Technologies.
16   Q   Okay.
17   A   They're the ones that provided it.
18   Q   I'm trying to clear out all the filters.
19   A   You have a filter on, because it says there is
20 a filter on.
21   Q   Right.
22     SERGEANT GAMBOA:  Probably the officers.
23     MS. HEBERT:  This must be really painful for
24 everybody else in the room as they're watching me
25 navigate this.  I'm sorry.

27 (Pages 102 - 105)

Aaron Von Muldau                                                         July 17, 2024

Page 106

1    THE WITNESS: Well, now try to do it and see if
2 it will pick it up.
3    Q    (By Ms. Hebert) Okay.
4    A    I know it's around the 1100, or 111,000 I
5 think. That one right there. Go right there.
6    Q    This one?
7    A    Yep, that's the one.
8    Q    And we were looking for -- a timestamp I
9 suppose is what we were looking for.
10   A    Yeah, but now how do we see the time?
11   Q    So I see 3/16, 9:32, which is the same as what
12 we just saw there. Let's make this a lot easier.
13   A    And this could convolute stuff because his
14 computer could have been -- the timestamp's taken from
15 the computer, and we've had issues with that in the past
16 where our time clock has kind of gone wonky on us.
17 They're all set by the, by the server.
18   Q    Sure. And I'm just trying to understand
19 when -- like when the issue point would be.
20   A    You would have to -- I mean, ultimately, unless
21 it's here, we'd have to ask him.
22   Q    And when you say "issue," does that mean the
23 citation is printed?
24   A    Not necessarily. But I believe that there was
25 metadata that might tell us when he started making the

Page 107

1 entry. So that would give us a better understanding of
2 when it was selected.
3    Q    Okay. So I'm going to go back a little bit.
4 We talked about duplicates. And I think I know how to
5 remove duplicates right now, but the question I have for
6 you is, would removing duplicates, to your knowledge,
7 change this data at all? The conclusions we were talking
8 about --
9    A    Yes.
10   Q    -- how would it change it?
11   A    Might make them less.
12   Q    Okay. So let's walk through that to make sure
13 that I understand what we're doing.
14   A    Potentially. I don't know.
15   Q    Yeah.
16   A    When we looked at the --
17   Q    Let's look it.
18   A    When you had --
19   Q    Let's make sure we're doing it right.
20   A    You had Babb and you had Gereb selected. And
21 it was 2651.
22   Q    Sure.
23   A    And then when we filtered certain things out,
24 it was still -- it still appeared -- it appeared that
25 there were still duplicates there.

Page 108

1    Q    Sure. So let's try to do this together to
2 figure out how to do all this. So I'm looking at the
3 whole raw data, like everything. There's no filters on.
4 You can see there's no filters on the top row.
5    A    Uh-huh.
6    Q    I'm going to do something -- make our lives
7 easier right now. I know there's a way to do this, so
8 just I'm going to freeze, freeze top row. And so maybe
9 that will allow us to scroll down and to be the same.
10 Let's see. Nope, just that row.
11   A    You have to -- yeah, you have to freeze --
12   Q    I'm going to select this row. I don't remember
13 how you do that.
14   A    Yeah. I'm not that great at it. Me, I would
15 just delete the top row and make the top row freeze, but
16 that's not helping.
17   Q    Well --
18   A    That doesn't help.
19        SERGEANT GAMBOA: So if you go to the second,
20 right under that row, and then hit the freeze, it should
21 come under 3.
22        MS. HEBERT: I don't know where you're going.
23        SERGEANT GAMBOA: Line Number 3.
24        MS. HEBERT: Line 2. We're on Line 2.
25        SERGEANT GAMBOA: Go to Line 3.

Page 109

1        MS. HEBERT: Line 3.
2        SERGEANT GAMBOA: Okay. Now, hit freeze.
3        MS. HEBERT: Anybody knows where the freeze
4 is -- okay. Here's the freeze.
5        SERGEANT GAMBOA: So unfreeze it and then
6 freeze it.
7        MS. HEBERT: See if that works. I feel like it
8 might. Nope. Okay. We're just going to go with it.
9    Q    (By Ms. Hebert) So this is the raw data, right?
10 I haven't -- there's no filters on. You can see that.
11   A    Uh-huh.
12   Q    We're back at ground zero. Okay. I am going
13 to -- as I understand it, I'm going to go to Home.
14   A    If we're only looking at Schott, what if we
15 just filtered by his last name, Schott.
16   Q    No, I'm going to look at the whole data set
17 again.
18   A    Okay.
19   Q    So that we can deal with the duplicate
20 analysis. So this button comes up, the menu Remove
21 Duplicates. You see that?
22   A    Uh-huh.
23   Q    And I'm going to unselect All. And we
24 previously talked about filtering by citation number, so
25 this should filter out the citation number duplicates.

28 (Pages 106 - 109)

Aaron Von Muldau                                                    July 17, 2024

Page 110

1    A    Okay.
2    Q    So that we just have the raw number of stops.
3    Does that make sense?
4    A    Makes --
5    Q    Okay, so I'll do that.  So there were some
6    duplicates found and this unique values remains.  And I'm
7    seeing 100,000 -- 125,303 unique stops.
8    A    Agree.
9    Q    Is that correct?
10   A    I agree with that.
11   Q    Okay.  And I'm going to undo that, so just
12   click the control Z Undo button.  That comes back to our
13   original data.  Now I'm going to go back to the officers
14   and filter by officer last name again.  You've got Gereb,
15   and then I'm going to do the same thing that I did
16   before, which is --
17   A    Remove duplicates.
18   Q    -- remove duplicates.  We're going to do remove
19   duplicates again.  And then unselect All and then I'm
20   going to do the citation number again.  And it's going to
21   think real hard.  And that doesn't work.
22   A    No, it did.  It shows only 200 -- 2,444.
23   Q    Okay.  So you're looking down here?
24   A    But it dropped -- I mean, it's still doing the
25   whole spreadsheet just because you're filtering.

Page 111

1    Q    Got it.
2    A    But it's -- it took the duplicates out of your
3    filter.
4    Q    Okay.  So then that would mean that of all the
5    traffic stop data that we have in Exhibit 57, Gereb and
6    Babb are responsible for 2,444 stops.
7    A    I agree.
8    Q    Is that right?
9    A    Unique stops, yes.
10   Q    Unique stops.  Okay.
11   A    Sorry --
12   Q    What?
13   A    -- that I'm making you go through all that.
14   Q    No, it's okay.  I mean, I'm making you go
15   through it too.
16        We have to look at the offense information.
17   Okay.  I'm going to -- right now we're still filtered by
18   Officer Babb and Officer Gereb.
19   A    Uh-huh.
20   Q    And I'm going to try to do the same as we did
21   before.
22   A    I think you just put "lane" in the search and
23   it made it a little less.
24   Q    Expedite things faster.  Failure -- Failed To
25   Maintain A Lane and Unsafe Lane Change.

Page 112

1    A    Okay.
2    Q    And again, now we have 477.  Is that number
3    correct?
4    A    That's what it shows.
5    Q    Do you think I need to remove the duplicates
6    here?  I don't believe we have the same problem because
7    it should be --
8    A    No, no.  Now, the duplicates are still removed.
9    Q    Okay.
10   A    So I don't -- I don't see anything --
11   Q    Any problem?
12   A    They should still be removed, because it's
13   showing 125,000, which means that --
14   Q    The duplicates are removed?
15   A    Uh-huh.
16   Q    So 477 stops for that -- for -- all right.  Let
17   me make sure that I'm clear.  Exhibit 57 is showing 477
18   stops by Officer Gereb and Officer Babb in a 3.5-year
19   period for failure to maintain a lane and unsafe lane
20   change; is that correct?
21   A    I agree with that.
22   Q    All right.  So then I'm going to take off the
23   officers' last names, but keep on the filter for those
24   two offenses.
25   A    Okay.

Page 113

1    Q    And we have 1,612.  Am I reading that correct?
2    A    I agree with that.
3    Q    Okay.  And our percentage is -- let's do this
4    in Excel spreadsheet.
5         MS. HEBERT:  Can you give me the first number,
6    the denominator, Josh?
7         MR. WINDHAM:  1,612.
8         MS. HEBERT:  Let's go back to here.  So -- give
9    me the whole -- both numbers.
10        MR. WINDHAM:  Well, the denominator is 1,612.
11   The numerator is 477.
12        MS. HEBERT:  477 divided by, what was that,
13   1 --
14        MR. FRIGERIO:  -- 612.
15        MR. WINDHAM:  1612.
16        MS. HEBERT:  1612.
17   Q    (By Ms. Hebert) And I have 29 percent, nearly
18   30 percent.
19   A    I agree with that.
20   Q    So based on the analysis that we just did,
21   Officer Gereb and Officer Babb are responsible for 30
22   percent of the County's stops for failure to maintain a
23   single lane and unsafe lane change, according to this
24   data in Exhibit 57, for 3.5 years.
25   A    For the designation of, that you filtered for,

29 (Pages 110 - 113)

Aaron Von Muldau                                                          July 17, 2024

1    30 percent is correct.
2        Q    Okay.  And you were very careful in your words
3    there.  What was I missing?
4        A    I'm trying to resolve in my head, because you
5    keep saying the total traffic stops.
6        Q    Uh-huh.
7        A    And it's not total traffic stops.  It's total
8    traffic stops for the designation.  So they wrote 30
9    percent of the tickets for failure to maintain or the
10   unsafe lane change, and I agree with that.
11       Q    Okay.  Okay.  And just so we are clear, Deputy
12   Babb left criminal interdiction; is that right?
13       A    I don't know how he --
14       Q    Deputy Babb is no longer a criminal
15   interdiction officer today.
16       A    That is correct.
17       Q    And Deputy Babb was dismissed from the
18   Sheriff's Office; is that correct?
19       A    He was terminated.
20       Q    And when he was terminated, what was his
21   position?
22       A    I believe he was an academy instructor at the
23   time.
24       Q    Okay.  Then at some point he changed from being
25   a criminal interdiction officer to being an academy

1    instructor; is that correct?
2        A    Yes.
3        Q    Do you know when that change happened?
4        A    I do not.
5        Q    Okay.  So this, we previously talked about how
6    this data ran to 2023, September of 2023; is that
7    correct?
8        A    Yes.
9        Q    And as of September 2023, was Officer Babb a
10   criminal interdiction officer?
11       A    From September on is what you're asking me?
12       Q    No, I'm asking -- basically, what I'm trying to
13   get at is the data set we have is from one -- January 1st
14   of 2020, to --
15       A    9/11/20- --
16       Q    -- 9/11/2023.  And Deputy Babb was not a
17   criminal interdiction officer that entire time, was he?
18       A    I don't believe so, but I don't know.  No --
19   oh, I see what you're saying.  Yes.  No, he was not.
20       Q    So during that 3.5 years, Deputy Babb was not a
21   criminal interdiction officer for that entire 3.5 years.
22       A    Correct.
23       Q    When he was an instructor at the academy, was
24   he doing traffic stops as part of his daily duties?
25       A    No.

1        MS. HEBERT:  Okay.  I think I'm going to take a
2    break.  Can we take a short break?  Because I think we're
3    done with the Excel spreadsheet, and I just need --
4        MR. WINDHAM:  You made it.
5        MS. HEBERT:  I just need a break, because that
6    was a lot.
7        THE REPORTER:  We are off the record.
8        (Recess from 12:06 p.m. to 1:00 p.m.)
9        THE REPORTER:  We are back on the record.
10       Q    (By Ms. Hebert) We're back from lunch.  I have
11   to ask you this question.  In between lunch and when you
12   returned, did you talk to anybody about this deposition?
13       A    Mr. Frigerio.
14       Q    I'm not going to ask you about any comments you
15   had with Mr. Frigerio.  Anyone else?
16       A    No.
17       Q    Did you talk to anybody about the content of
18   this lawsuit?
19       A    No.
20       Q    I do want to clean up one item.  Earlier you
21   were talking -- we were talking about the issue date for
22   the citation --
23       A    Yes.
24       Q    -- and the issue time for the citation.  When
25   the citation is issued, does that mean the traffic stop

1    is over?
2        A    Not necessarily.
3        Q    Okay.  Tell me why.
4        A    When the citation is issued, that means
5    that that part has been done and completed.
6        Normally, on the acceptance and submission of
7    the citation, that's what it means.  But if there's
8    reasonable suspicion to carry on further investigation,
9    statute and state or -- and law has given us as long as
10   you have reasonable suspicion to continue.
11       Q    Sure.  And I just want to make sure I
12   understand your answer, because there were a couple of
13   this's and that's.
14       As I understand it, you're saying that the
15   issuance of the citation means that the part of the
16   traffic stop that deals with the traffic violation --
17       A    Right.
18       Q    -- is over.
19       A    Meaning that this document was complete at that
20   time.
21       Q    Just so I understand then, when the citation or
22   the warning is issued, the part of the traffic stop
23   dealing with the traffic violation is over.
24       A    Yes.
25       Q    Okay.  So I want to talk about training.  I

30 (Pages 114 - 117)

Aaron Von Muldau                                        July 17, 2024

Page 118

1  understand that after an officer completes his or her
2  initial training at the academy, and then has their -- I
3  think the Sheriff used a term like "breakout," like maybe
4  out of an egg, they have their breakout period.  They've
5  done their time with their patrol training officer.
6  After that period, so like after the initial training --
7      A   He's a full officer.
8      Q   He's a full officer.
9      A   Okay.
10      Q   How does the Sheriff's Office continue to train
11  officers?
12      A   We -- there are several ways.  One is if
13  something is mandated.  Every two years they meet and --
14  TCOLE meets and says, Okay, for the next training cycle
15  these particular things are hot topics and that we want
16  officers trained more, whether it be use of force,
17  whether it be on how to deal with mental health.  Those
18  types of hot button topics, we do a lot of that.
19          Sometimes we will have specialty classes that
20  break down for those individuals, like crisis
21  negotiation, dealing with that type of person.  That was
22  always a stand-alone class.
23          But then we also afford every -- or we require
24  the patrolmen to go through 40 hours of training every
25  year.  TCOLE mandates 40 hours for a two-year period, but

Page 119

1  we offer -- our in-service training is usually 40 hours,
2  and it's on refreshers and, and to start correcting
3  issues that we think that people are going off the rails
4  or to redirect behavior, or train for new statutes and
5  things like that.
6      Q   Okay.  I want to make sure I got all that.
7          So there's state mandated training.  We can put
8  that to the side.
9      A   Uh-huh.
10      Q   And then there are specialty classes.
11      A   Right.
12      Q   And the Sheriff's Office provides some classes
13  that kind of fit in both buckets; is that fair?
14      A   Yes.
15      Q   Mandated and specialty classes?
16      A   Yes, ma'am.
17      Q   Okay.  And the Sheriff's Office has in-service
18  days?
19      A   Yes.
20      Q   Is there any annual training as like a generic
21  update on the Sheriff's Office policies?
22      A   It's usually covered in in-service.  But it's
23  not as, as policy changes.  Policy changes are put out
24  through our, a system called power DMS.  We have an
25  electronic database.  It's been in play probably since

Page 120

1  2015, 2016 I think.
2      Q   Uh-huh.
3      A   It does go back that far, where we started
4  actually going from the paper-based system so we could
5  track the changes and modifications and directives and
6  stuff like that in a central location that the officers
7  are required to electronically sign off on.
8      Q   Okay.  That's helpful.
9          To your knowledge, to the County's knowledge,
10  has the Sheriff's Office ever offered interdiction
11  training, generally?
12      A   Define what you mean by "offering."
13      Q   Provide itself.  Has internal training.  Has
14  the Sheriff's Office ever given internal training --
15      A   Yes.
16      Q   -- on interdiction?
17      A   We have brought -- we have brought experts in
18  to train officers.  We have hosted classes.
19          Have we put a class together and taught it
20  ourselves?  No.
21      Q   Okay.  And can you tell me about the experts
22  you've brought in?  Do you happen to know those now?
23      A   It's -- I don't know which ones are recent.
24  I -- that, again, as part of my duties, that's not
25  something that I delve into.  Interdiction belongs to the

Page 121

1  specialty units.
2      Q   Sure.
3      A   So I don't go that far down unless there's a
4  reason for it.
5      Q   Understood.  I guess this is a good time to
6  just ask you, who is the best person to talk about the
7  County's policies and practices on interdiction?
8      A   Pete Gamboa, Sergeant Gamboa.
9      Q   Okay.  And who is the best person to talk to
10  about the County's policies and practices on the Canine
11  Unit?
12      A   Sergeant Ben Olvera.
13      Q   Okay.  I want to look at two exhibits.  One has
14  previously been admitted as Plaintiff's 14, and it's G in
15  our booklet.
16          MR. WINDHAM:  Charles, do you want the manual?
17          MR. FRIGERIO:  Probably not, sir.
18          MR. WINDHAM:  I'm happy to hand it to you.
19  It's heavy.  Sorry.
20      Q   (By Ms. Hebert) Again, this exhibit has
21  previously been introduced as Plaintiff's Exhibit 14.  It
22  was marked so.
23          Captain, are you familiar with this document?
24      A   I am familiar.
25      Q   What is it?

31 (Pages 118 - 121)

Aaron Von Muldau                                                July 17, 2024

1      A    It is the policy and procedure manual as of --
2   this one was current as of August 3, 2021.
3          MS. HEBERT:  And then I want to introduce
4   another exhibit, Exhibit X in our thing, Josh, and this
5   exhibit has not previously been introduced.  And we're
6   going to mark this as Exhibit 58.
7      Q    (By Ms. Hebert) We're giving you a stack of
8   paper.  Captain, what is Exhibit 58?
9      A    Exhibit 58 is the updated policy dated
10  April 5th, 2022.
11     Q    Okay.  And which policy manual was in effect at
12  the time of this traffic stop, which was March 16, 2022?
13     A    Should be the August 3rd, 2021, policy.
14     Q    Okay.  And since the policy manual was
15  updated -- was the policy manual updated from 2021 to
16  August of 2022?
17     A    Correct.  It -- the policy --
18     Q    Or April of 2022.  Excuse me.
19     A    The policy manual is a living document, so it
20  is constantly being updated, which is why we went to the
21  power DMS, because it allows us to stop having to publish
22  these manuals.  And then it's just kept in an electronic
23  file cabinet that the officers would then, not only be
24  able to reference, but be responsible for, and we know
25  that they've received the policy.

1      Q    Okay.  So then now, when you look to the pull the
2   sheriff's policy manual, do you just pull up the whole
3   DMS system?
4      A    It is -- the DMS -- PowerDMS is a records
5   database.
6      Q    Uh-huh.
7      A    So this is a document --
8      Q    Uh-huh.
9      A    -- within the DMS.
10     Q    And all the officers have access to the DMS?
11     A    Yes.
12     Q    And if you wanted to search the policy on
13  uniform, you go pull up your DMS and you go to the
14  chapter on uniform?
15     A    Yes.
16     Q    Okay.  I just wanted to make sure I understood.
17  So it's basically this, but an electronic version.
18     A    Yes, ma'am.
19     Q    Okay.  I'd like to go to Page 33 and 34 of the
20  Exhibit -- what did we mark it as?
21         MR. WINDHAM:  58.
22     Q    (By Ms. Hebert) 58.  I'm trying to see if I
23  have a -- we're going to Section 409.  So I think it's
24  the first initial 33 page, so -- and I'm looking at Page
25  Bates labeled 3546.  Do you see where I am?

1      A    I do.
2      Q    I'm looking at Section 409, Training and Career
3   Progression.  Do you see where I am?
4      A    I see.
5      Q    And I am going to read this paragraph,
6   Paragraph A.
7          "It is the policy of the Sheriff's Office to
8   encourage employees to develop skills and knowledge which
9   will better qualify them to perform their work.  In
10  addition to on-the-job, supervisory and technical
11  training provided by the BCSO sheriff's academy,
12  employees are encouraged to enroll in outside courses."
13         Did I read that correctly?
14     A    Yes.
15     Q    How are officers encouraged to enroll in
16  outside courses?
17     A    Not only -- oftentimes they're -- funding is
18  always an issue.  But we do secure funding through
19  different grants and different sources throughout the
20  year to send officers to training.
21         In addition, officers will go to -- they'll pay
22  for a class on their own, and we'll give them the time.
23  Instead of utilizing their own time, we give them the
24  time as a kind of a carrot to -- because they're still
25  doing something in relation to their job duties, to go to

1   the training, you know:  Hey, I -- it's a week training.
2   It's $250.  I'll pay the 250.  Can I not use my time to
3   do it?  So --
4      Q    I'm sorry, I'm trying to understand.  I don't
5   mean to interrupt you.  When you mean use your time, so
6   that it's counted as work days, they're not taking PTO.
7      A    Correct.
8      Q    And by PTO, I mean paid time off.
9      A    Yes, ma'am.
10     Q    When will the County pay for courses, outside
11  courses?
12     A    When, one, we have the funding, and two, it's
13  approved and it coincides with your -- something that
14  would benefit the Sheriff's Office.
15     Q    Okay.  And how does the County decide what to
16  approve?
17     A    That's up to the supervisors and then
18  ultimately the division chief.
19     Q    Okay.  And I'm assuming that approval process,
20  if someone -- if -- scratch that.
21         If a course is approved, does that mean the
22  supervisor and the other individual you just mentioned
23  believe that the outside training would benefit the
24  County?  You just said that there's a -- that the outside
25  courses are approved and that they would benefit the

Aaron Von Muldau                                                     July 17, 2024

Page 126

1  County.  So I'm just trying to shorthand that.  So if
2  they're approved, does that mean the supervisor believes
3  that that training will benefit the County?
4      A.  Yes.  But it's not in the same way that you're
5  saying.  I'm not going to pay for a class and give
6  someone work time to go and learn how to crochet, right,
7  because that has nothing to do with their job.
8      Q.  Sure.
9      A.  So it has to have something with a function,
10 right?  If I have a detention officer that is looking to
11 take patrol classes, there is a benefit because that's
12 someone that will progress further on.
13         But I have a civilian that is a patrol
14 personnel, and they want to go take patrol classes.  What
15 exactly -- what benefits does the County -- because there
16 has to be a give and a take.  We want them to improve.
17         There are other forms and fashions that we
18 allow to, you know, we pay -- we help people educate
19 themselves, things like that.  But it's not -- it
20 wouldn't be considered something that we would normally
21 use for training funds because they are limited.
22     Q.  Understood.  So if a supervisor approves an
23 outside training, that supervisor is concluding that the
24 training will help the officer in the scope of their
25 duties.

Page 127

1      A.  Yes.
2      Q.  How does a supervisor or the County -- so we're
3  going to say the supervisor on behalf of the County --
4  evaluate courses?  So I guess, and I'll explain.  I'll
5  unpack that.
6         Are there materials that a officer who wants to
7  do an outside training has to submit to the County?
8      A.  Normally, yes.
9      Q.  What are those materials?
10     A.  We usually ask for the syllabus.  The
11 supervisor then will review the class, make sure, one,
12 it's a licensed educator, you know.  Something that isn't
13 just put on by some fly-by-night company that isn't going
14 to, you know -- a right wing, left wing, whatever you
15 want to call it.  Could be a whole lot of reasons why.
16         But they do research it to say, yeah, this is a
17 valid class, valid training, and then they provide the
18 syllabus and the course description and what the officer
19 will be learning.  And they then evaluate that based on
20 all the requests that come in, and then they decide who
21 gets what.
22     Q.  Okay.  And of the outside courses that a
23 supervisor approves, how do they decide what to pay for
24 versus not pay for?
25     A.  Oftentimes it has to do a lot with what funding

Page 128

1  we have available.
2      Q.  Okay.  If one officer gets a training approved,
3  does that mean the training's going to be approved for
4  other officers?
5         I'll give you an example.  If Charles applies
6  to his supervisor and gets a training approved, does that
7  mean when Hector applies next week, the training is also
8  going to be approved for Hector?
9      A.  No.
10     Q.  Okay.  Explain to me why there might be
11 different results.
12     A.  Could be different job duties.
13     Q.  Uh-huh.
14     A.  One might benefit more than the other.  It
15 could also impact the shift.  It could impact time off.
16 It could impact -- there's a lot of factors that go into
17 it.  It's not I like Hector and I don't like Charles.
18     Q.  It's okay if that's true.
19     A.  Yeah.  But -- and it is true.  But that's
20 just -- the reality is -- no, there's a lot of things
21 that go into what that decision is, you know.  If
22 Mr. Frigerio put in for a training at the beginning of
23 the cycle, obviously there's more funding.
24     Q.  Sure.
25     A.  There's more time to plan to let him off to go

Page 129

1  to that training.  Whereas Hector finds out about, hey,
2  Charles is going to this class in December, and we're at
3  the end of November and I'm putting in for it.  So
4  there's a lot of factors that go into it.  It's not
5  necessarily based on --
6      Q.  Understood.
7      A.  -- just because one is approved and one is not
8  approved.
9      Q.  So if the logistics -- let's just say if the
10 logistics works out, the County has the funding and no
11 one's going to be left shorthanded, and just the
12 logistics of approving the training, all things being
13 equal and Charles and Hector are doing the same job,
14 would the fact that the training was already approved for
15 Charles mean that the training would be approved for
16 Hector?
17     A.  Could be.  Not necessarily would be.
18 There's -- everything -- there's so many things that go
19 into it.
20         So you normalize other things, but now what we
21 also have to look at is, okay, what is his attendance
22 like?  Does he -- has he not necessarily earned the
23 right?  But if his job performance here is subpar and I
24 need him concentrating on these things, would this
25 training help him?  Okay.  Then that more than likely is.

33 (Pages 126 - 129)

Aaron Von Muldau                                                July 17, 2024

Page 130

1 But it's not a definitive just because one gets approved
2 one doesn't.
3        It could be a train-the-trainer class, which
4 means that I can save a whole lot of money by sending
5 Charles, pay an extra hundred dollars, he now comes back
6 and then starts training our department.
7    Q  Understood. Understood. That's helpful.
8        I'm going to read the next page. We're going
9 to go to the next page and look at B. So we'll read B on
10 BC 3547. I'm going to read it out loud.
11       "It is important that the BCSO personnel office
12 is aware of any special training that employees receive,
13 whether on the job or otherwise. Continuing education is
14 a matter of record with the BCSO and one of the factors
15 considered in determining the best candidates for
16 promotion or special assignments."
17       Did I read that correctly?
18    A  Yes.
19    Q  And just generally, why is it important that
20 the Sheriff's Office is aware of special training?
21    A  So as we learned earlier with the spreadsheet,
22 the County has had an issue with properly staffing
23 certain positions. IT being one, right? The County, as
24 much as we all love working for the government, doesn't
25 pay as well. And after COVID, if you have an IT

Page 131

1 background, you get paid stupid money out in the real
2 world.
3        So what is occurring is they have to find
4 people like me that have specialty skills or that can
5 learn specialty skills. One of the biggest things that
6 has happened was during the 2018 -- when we had Trayvon
7 and then -- the Martin case, and then you had George
8 Floyd and stuff like that.
9        One of the disconnects that we found was having
10 suitable representation for groups, whether it was for
11 LBGT, LBGT, autism, Jewish, Muslim. And we -- he
12 started -- the Sheriff decided that, hey, listen, we can
13 continue to try to beat our head against the wall to try
14 to find, you know, to try to get funding for this, or we
15 can ask our employees to take on another hat and help us
16 with that.
17       So we have representations, or representative
18 people that will go out and they're representatives, so
19 that if you're having an issue within your community that
20 you have someone specifically that you can come back and
21 address your issues and bring those to the Sheriff's
22 Office, and we -- you know, trying to be mindful, we try
23 to work with them to better their community and their
24 lives.
25    Q  Okay. So I guess that was a great example of

Page 132

1 if the Sheriff's Office knows about specialized training
2 or specialized aptitudes, it can use those when it needs
3 them.
4    A  Yes.
5    Q  Is that fair?
6    A  Yes.
7    Q  I want to look at another exhibit, Exhibit GG.
8        Now, I'll kind of just talk generally while
9 Josh is getting this out. Did the County submit cell
10 phones in this case for forensic examination?
11    A  Okay, now we just went way -- we went somewhere
12 different.
13    Q  Yes.
14    A  Did the County submit cell phones? Yes. I
15 think it was one personal phone and two, maybe three
16 County cell phones that you requested.
17    Q  Right. I have it somewhere.
18    MR. WINDHAM:  Let me know when you want me to
19 hand this to you.
20    Q  (By Ms. Hebert) I believe it was -- let's
21 see -- the personal phone of Joel Babb, the County phone
22 of Sergeant Gamboa, the County phone of Deputy Molina,
23 the County phone of Officer Gereb, and the personal phone
24 of Officer Gereb. That's what I have as their records,
25 correct?

Page 133

1    A  Correct. The only one that I was not
2 responsible for giving over was Babb because he was, I
3 believe, in the process of being terminated.
4    Q  Understood. Understood. And is the County
5 aware that the forensic examination was completed?
6    A  Yes.
7    Q  And results from the forensic examination was
8 provided to all the parties in this litigation?
9    A  That was what the court order said.
10    Q  Okay. I'm going to hand you what has been
11 marked Exhibit 59. I'm going to represent to you that
12 this is the conversation that the parties received from
13 the forensic examiner from Sergeant Gamboa, labeled as
14 Conversation Number 32. Do you see that at the top of
15 the page?
16    A  I do.
17    Q  And I'm just going to highlight, this is a text
18 message, as far as we understand, from Officer Ortega to
19 Sergeant Gamboa. And it says: Hey Sergeants -- which is
20 how I understand "Sgts"; is that correct?
21    A  I would -- yes.
22    Q  "Since I'll be out of town for the weekend, I'm
23 going to need y'all to send the weekly reports for your
24 respective units, please. Ochoa-K9, Gamboa-Interdiction,
25 and Steve just combine SCU/GANG please."

34 (Pages 130 - 133)

Veritext Legal Solutions

Page 134

1     Do you see that?
2     A   I do.
3     Q   Did I read that correctly?
4     A   Yes.
5     Q   Okay.  What are the weekly reports?
6     A   Excuse me?
7     Q   What are the weekly reports?
8     A   That is their statistical and descriptive of
9  what their units, their officers are doing for the week.
10     Q   Okay.  And when I see Gamboa-Interdiction, does
11  that mean that Sergeant Gamboa was responsible for
12  providing a weekly report to Officer Ortega?
13     A   Ray Ortega was -- is and was a lieutenant over
14  Special Operations.  And based on the wording, I would --
15  I would agree with you.
16     Q   Okay.  Has the County provided any weekly
17  reports in this litigation?
18     A   I am not aware that that was asked for.  If you
19  could point out in the request for production.
20     Q   Sure.  We'll look at the records on the request
21  for production and I'll get back to you on that.
22         Have you seen a weekly report for interdiction?
23     A   No.
24     Q   So the County -- you on behalf of the County
25  doesn't know what a weekly report for interdiction looks

Page 135

1  like?
2     A   I do not.
3     Q   Okay.  And we'll get the RFP number for you.
4         We'll come back to that for you.
5         While I'm on the topic of reports, yesterday
6  the Sheriff testified that the command staff meets
7  weekly.  Are you aware of that?
8     A   I am.
9     Q   Are there minutes from the weekly command staff
10  meetings?
11     A   I am not aware of any minutes, but I also don't
12  participate as an active person --
13     Q   Sure.
14     A   -- in command staff.
15     Q   Sure.  But are you the person the County has
16  designated to speak on behalf of records?
17     A   I am.
18     Q   And how would you find out if there are minutes
19  from the weekly command staff meetings?
20     A   I don't believe there are minutes because they
21  don't have any office assistants.  There's nobody there
22  designated to take minutes.
23     Q   Okay.  I'm going to go on to a little more
24  training.  I'm going to jump around a little bit here
25  just because I'm trying not to keep us here forever.

Page 136

1     A   I'm understanding.
2     Q   Did the criminal interdiction officers receive
3  any specialized training from the Sheriff's Office
4  itself?  And by that I mean the Sheriff's Office provided
5  the training, did the instructing.  Because I know
6  there's a lot of provision --
7     A   I am not aware of the Sheriff's Office
8  providing the instruction other than facilitating an
9  outside instructor.
10     Q   That's fine.  I'm going to look at Exhibit M in
11  our stuff, and then I'll pass it to you.  And this was
12  previously admitted as Exhibit 54.
13     (Discussion off the record.)
14     Q   (By Ms. Hebert) Captain, can you tell me what
15  this exhibit, Exhibit 54 is?
16     A   It's a TCOLE roster listing.
17     Q   Okay.  And there are more pages than just that
18  page.  Can you flip through and tell me what the
19  collective documents are?  And I'll represent to you this
20  is how we received them from the County, so --
21     A   Uh-huh.
22     Q   -- as a collection.
23     A   This is a submission -- the first, I don't
24  know, Page 2 and Page 3 are the evaluation for training
25  verification --

Page 137

1     Q   Sure.
2     A   -- for outside training.  There is a process
3  that we put together that when, in order for the officer
4  to get credit, TCOLE credit, because remember there's so
5  many mandated hours that you have to have every year.
6     Q   Sure.
7     A   It goes on their transcript.  They have to
8  submit a course description, they have to submit a, the
9  syllabus.  They have to submit a -- I believe they have
10  to submit something on the instructor.  They have to
11  submit a summary of what they learned and how it's going
12  to be applied.  And they -- I think that's pretty much --
13  they keep changing it, so I'm trying to remember what it
14  currently was versus what it was.  But I think that's
15  about it.  They submit that to the academy.  That's
16  reviewed by the academy commander.  Here it shows Raul
17  Garza, which was the academy commander.  And he approved
18  them under the TCOLE course 3408 for 16 hours.
19     Q   Okay.  So I guess my question is, this whole
20  collection of documents I believe -- I want you to
21  correct me if I'm wrong -- are the documents that the
22  County produced in response to our request that Deputy
23  Babb's interdiction training records be produced; is that
24  correct?
25     A   This -- correct.  This is what we had on file,

Page 138

1  and this is what was provided.

2      Q   For his interdiction training.

3      A   For his interdiction training.  Right.  I can't

4  remember -- I think it was Request for Production 61,

5  or thereabouts.

6      Q   Okay.  I just want to make sure --

7      A   Yes.

8      Q   -- that I'm understanding it correctly.

9      A   Yes.  This is the -- these are the documents

10 for outside training, and you can see that he has the --

11 here's the syllabus, here's the biography of the

12 instructor, the course attendance sheets, and the

13 evaluation.

14     Q   Okay.  And I'm going to just take a step back.

15 You had asked me for the RFP number.  RFP 40: All

16 documents concerning reports on BCSO's criminal

17 interdiction activities and the results of those

18 activities, including any such reports submitted to the

19 Bexar County Commissioners Court or used to support

20 budget processes.

21     So just basically all the criminal interdiction

22 reports.

23     A   Then that is a failing on my part because

24 that's not how I understand it.  But -- because though

25 it's a report, it's not used for budget.  It wasn't used

Page 139

1  for budget.  It wasn't used to present to Commissioners

2  Court.

3      Q   Sure.  And just to be clear, that request is

4  including such reports, but it's not --

5      A   Right.

6      Q   -- the only such reports.

7      A   Then I will tell you that's a failing on my

8  part.  I misunderstood what you were asking for.

9      Q   Sure.  So I'm going to ask you and your

10 attorney, will the County be providing the weekly

11 interdiction reports following this deposition?

12     MR. FRIGERIO:  Can you give me a time frame?

13     MS. HEBERT:  Within a week.

14     MR. FRIGERIO:  No, what range?  I mean, you

15 said weekly reports.

16     MS. HEBERT:  The same as the request, Charles.

17 Our request is limited in scope in terms of dates.  I

18 believe --

19     MR. WINDHAM:  January 1st, 2020, through

20 present.

21     MS. HEBERT:  And we are, we've got depositions

22 next week, the first of which is Tuesday -- what's the

23 date on Tuesday?

24     MR. WINDHAM:  The 23rd.

25     MS. HEBERT:  23rd.

Page 140

1      MR. WINDHAM:  Yes.

2      MS. HEBERT:  So, I mean, the sooner the better,

3  Charles, given that we are doing a deposition on Tuesday,

4  the 23rd.

5      THE WITNESS:  I believe I can meet that time

6  frame.

7      MS. HEBERT:  Okay.

8      THE WITNESS:  I'll have a better answer for you

9  tomorrow, but it might be as soon as tomorrow, because

10 those should be one central location.

11     MS. HEBERT:  Sure.  Thank you.

12     Q   (By Ms. Hebert) Okay.  We can go back to

13 Exhibit 54.  I'm going to have a couple of questions for

14 you about Exhibit 54.

15     A   Okay.

16     Q   Look at the first page.

17     A   Okay.

18     Q   Now, I think you were answering this already,

19 but I just want to make sure I understand.  BC 11512 I

20 see instructor as Raul Garza, but I thought Raul Garza

21 was a BC -- or a Sheriff's Office officer.  So why would

22 it say Instructor Garza?

23     A   Because that is what goes in our system.  He is

24 the academy commander.  He is an instructor.  But he is

25 the instructor commander that is reviewing all the

Page 141

1  documentation saying that it is legitimate and correct

2  and submitting it to TCOLE.

3      Q   Got it.

4      A   They don't --

5      Q   So he didn't actually teach a course?

6      A   No, ma'am.  This is for outside instruction.

7      Q   Okay.  And looking to the next page, BC 11513

8  and then going forward to 11543, and you'll stop at

9  11543.  These are generally the kinds of materials that

10 the County requires an officer to submit in getting

11 outside training approved; is that correct?

12     A   Yes.  There is the critique evaluation.  Here's

13 the form that gives the initial description.  It has the

14 learning objectives.

15     Q   Sure.

16     A   It has basically the course syllabus.  It has a

17 biography.  Obviously we don't want to be trained by

18 people of less moral character.  How they're going to

19 train, what they're going to train.  It has the rosters.

20 I'm not sure if this was two, two courses.  It looks like

21 they might be --

22     Q   I think there's several courses in here.

23     A   Yeah.

24     Q   And we'll go through some of them.

25     A   So, but yeah, but that's -- it has the stuff.

Aaron Von Muldau                                                    July 17, 2024

Page 142

1  And then based on the number you told me to stop at, that
2  looks like the documentation needed for TCOLE in order
3  for us to submit, and we have to keep record of it as
4  part of his training file.
5     Q    Sure.  Can we go to 11546.  And looking at
6  11546, this seems to be the same form we looked at at the
7  beginning that was 11513, just the updated version of
8  that form.  As far as I can tell, 11546 is an individual
9  request to attend a training course/seminar, and the
10  other one was an outside training verification.
11        It's my understanding they're essentially the
12  same kind of form, just one's the more recent version?
13    A    No, they're not the same.
14    Q    Tell me more.
15    A    The outside training form, if you read here at
16  the bottom, Outside Training Verification, this is a
17  TCOLE form.
18    Q    Okay.
19    A    This is what we submit when we as an academy or
20  an instructor accepts and reports to TCOLE the hours and
21  that it meets the request.  The 11546 is the internal
22  document that gives him approval to attend this class.
23    Q    Okay.  That's very helpful.  And so the 11546
24  document, you see the course name.  Name of Course:
25  Identifying Criminal Vehicles and Occupants/Street Cop

Page 143

1  Training.
2        Did I read that correctly?
3    A    Yes.
4    Q    And what's the date on this submission?
5    A    The submission was 5/31/2021.
6    Q    Okay.  And the date of the course was
7  July 19th, 2021.  Am I reading that right?
8    A    Yes.
9    Q    And it seems like the justification for the
10  training was criminal interdiction training, job
11  performance improvement.  Am I reading that correctly?
12    A    Yes.
13    Q    And I see four signatures on this approval
14  form.  Are you -- am I counting the same as you?
15    A    Yes.
16    Q    And can you tell me -- I can't always read the
17  handwriting, so I just want to make sure that we are
18  reading all the same.  The first one, is that Sergeant
19  Gamboa?
20    A    Yes.
21    Q    And then the second one, sometimes I know that
22  the signatures don't necessarily match up with the name,
23  so is that Lieutenant Ortega?
24    A    Correct.
25    Q    And then followed by Deputy Chief or

Page 144

1  Director -- and I have no idea what that signature is.
2    A    Deputy Chief Nancy Sanford.  She's over CID.
3    Q    Okay.  And then the final signature?
4    A    Is Deputy, or Assistant Chief Deputy Roland
5  Schuler.
6    Q    Okay.  So that means that all four of these
7  people whose signatures are here on 11546 approved the
8  training?
9    A    Right.  This is the -- that is his -- at the
10  time of 2021, that was his -- oh, gosh, the chain of
11  command.  There was not a captain over --
12    Q    Oh, I get it.
13    A    -- organized Crime at the time, which is why
14  you see there's a blank spot there.
15    Q    So essentially these four signatures, everyone
16  in Deputy Babb's chain of command approved the training
17  you see at 11546.
18    A    Yes, it appears that way.
19    Q    Okay.  And then just flipping to the next page,
20  it seems like BC 11548 and 11549 are the materials, the
21  course materials that go with 11546.  Is my understanding
22  correct?
23    A    Yes.  This is what we had talked -- when you
24  had asked me earlier, this is one of the things that they
25  would use to verify whether it's an approved class.  This

Page 145

1  is one of the things they would use to verify.  So more
2  than likely, not only do you submit this, but the
3  supervisors, mainly Sergeant Gamboa, would probably go to
4  Street Cop Training to make sure that it complies and
5  it's what we -- it complies with our mission.
6    Q    Right.  And by approving the training, Sergeant
7  Gamboa is saying this Street Cop Training complies with
8  the Sheriff's Office's mission.
9    A    Yes.
10    Q    Did Sergeant Gamboa go to this training?
11    A    I don't have his record in front of me.
12    Q    Okay.  And did you go to this training?
13    A    Did I?  No.
14    Q    Okay.  I wanted to look at the next page as
15  well, BC 11550.  This seems to be a very similar form,
16  and so I'm not going to repeat everything here for you.
17  But I just wanted to ask you, there's a void at the top.
18  And I just wanted to know what that meant.  Does that
19  mean the training was canceled or not approved?  I
20  just -- what does the void mean here?
21    A    Well, looking at this, it was approved all the
22  way down to Chief Sanford, but it could have been that
23  they decided not to go -- they decided not to send him.
24  It could be that he decided -- as we talked earlier, that
25  he transferred.  So I don't know exactly how those dates

37 (Pages 142 - 145)

Aaron Von Muldau                                    July 17, 2024

Page 146

1  align.  No, this isn't 2021, so he would still have been
2  there.  I don't know why.  It just wasn't -- they didn't
3  go through with it.
4      Q    Okay.  So it means this training didn't happen.
5      A    Correct.
6      Q    Okay.
7      A    Or there could have been an issue with the form
8  that they wanted to change.  But it's a conference.  We
9  could have had something else that had come up at the
10  same time where there was a conflict.  There's a lot of
11  reasons.  But it does not appear that he went to the
12  training.
13     Q    Sure.  And no problem.  I just wanted to
14  understand.
15     A    Uh-huh.
16     Q    And then I see a couple of certificates at the
17  back here.  And these certificates generally mean that
18  Deputy Babb completed these trainings; is that your
19  understanding -- the County's understanding?
20     A    Yes.  Well, on 1556, yes, it looks like he,
21  that was for Federal Motor Carrier Safety Administration.
22     Q    Sure.
23     A    For 11557 that looks like a certificate for the
24  Street Cop Training.
25     Q    Okay.  And just to stop you on that one.

Page 147

1      A    Oh.
2      Q    So this certificate then means that Deputy Babb
3  completed the Street Cop conference training on
4  October 4th, 2021, and he provided that, those materials,
5  evidence of the completion of that training to the
6  County?
7      A    Yes.
8      Q    Okay.  We don't need to go through every single
9  certificate.  I just wanted to make sure that --
10     A    Oh, okay.
11     Q    -- I understood everything.
12          Okay.  Now I want to talk about the traffic
13  stop of Mr. Schott.  Can you, based on the County's
14  perspective, can you just confirm what traffic violation
15  Mr. Schott was stopped for?
16     A    To the best of my recollection -- well, I
17  actually have it here.  He -- the violation --
18     Q    Hold on.  Let the record reflect that the
19  Captain's consulting Plaintiff's Exhibit 12.
20     A    Oh, sorry.  Failure, or failed to maintain a
21  single lane, warning, no fine.
22     Q    Okay.  And based on the County's record, how
23  long was Mr. Schott detained?  And if you don't know,
24  ask -- tell me what record would help you identify
25  that --

Page 148

1      A    I would need the --
2      Q    -- and I can help you get to it.
3      A    -- the Incident Detail Report for the stop.
4      Q    Okay.  Let's look at Plaintiff's Exhibit 5,
5  which is our B.  We're going to hand you what's been
6  previously marked Plaintiff's Exhibit 5.
7      A    Okay.
8      Q    Do you know what this is?
9      A    I do.  It's the incident detail report from
10  when Deputy Joel Babb issued the warning, began his stop
11  and then completed his stop.
12     Q    Okay.  Based on this record, the Incident
13  Detail Report, how long was Mr. Schott detained?
14     A    Are you okay with an approximation or --
15     Q    Approximation is fine.
16     A    Looks like an hour and 15 minutes, thereabouts.
17     Q    And was any, were any -- I don't know if it was
18  or were.  Were any contraband -- was any contraband
19  discovered --
20     A    Um --
21     Q    -- during the stop of Mr. Schott?
22     A    The -- no.  No contraband was discovered during
23  the stop.
24     Q    Okay.  You can put that aside for now.  I'm
25  going to go to what's been previously admitted as

Page 149

1  Exhibit 55.  And in our records it is U.
2          (Discussion off the record.)
3      Q    (By Ms. Hebert) Okay.  And I'm going to start
4  with Exhibit 55 by not starting with the first page, but
5  I'm going to go to the page that's labeled BC 11584.  And
6  do you know what this is?
7      A    Yes.
8      Q    What is this, the pages that you're seeing in
9  1155 -- 11584 and 11589 [sic] and 11586, what are those
10  pages?
11     A    This is the second part of the process for
12  dismissal of -- seeking dismissal from Deputy Joel Babb.
13     Q    And the first part being Notice of Order of
14  Dismissal?
15     A    Right.  Per the CBA rules, we are required to
16  give them a proposed notice.  And after that, I think
17  it's ten days and his first part of the Loudermill, then
18  the order should be going into effect.  Or if it's at the
19  end of his Loudermill.  I'd have to -- I could tell you.
20     Q    That's okay.  I mean, to the general -- there's
21  a Notice of Proposed Dismissal --
22     A    Right.
23     Q    -- and this is the Order of Dismissal.  Is that
24  fair that this is the Order of Dismissal?
25     A    This is the -- this is the enactment of the

38 (Pages 146 - 149)

Page 150

1  order saying that you are no longer going to be here.
2  Q  Okay. And so through this piece of paper, the
3  County notified Joel Babb that he was being terminated;
4  is that correct?
5  A  Yes, ma'am.
6  Q  Okay. And do you see nearly all the way down
7  of this page of 1150 -- of 11584, do you see the specific
8  reasons?
9  A  I do.
10  Q  And is it correct to say that this section of
11  the order, all the way to "Present at the hearing were
12  the following," on BC 11585, sets out the reasons that
13  the County terminated Joel Babb? It's not a trick
14  question.
15  A  No, I'm just verifying because -- but yes, I
16  agree with that, that those are the reasons for why he
17  was terminated.
18  Q  Sure. And I think a way to shortcut this might
19  be, was Deputy Babb terminated for turning off his mobile
20  recording device, which is A, failing to activate his
21  mobile recording device, and dishonesty, which is C -- A,
22  B and C?
23  A  You bring them up as individually. We look at
24  them as cumulative.
25  Q  Sure.

Page 151

1  A  So the dishonesty, in and of itself, is enough
2  for termination. The other two in and of themselves, by
3  themselves, would not necessarily necessitate
4  termination. We have a discipline matrix that would
5  govern that, but could.
6  Q  Understood. So in this particular instance
7  with Officer Babb, these three reasons, A, B and C, were
8  the reasons that Officer Babb was terminated,
9  collectively.
10  A  Yes. He lied about the camera.
11  Q  Okay. So just to kind of get to the nutshell
12  of it, Officer Babb was terminated for lying about his
13  dash cam.
14  A  Yes.
15  Q  Did the County dismiss Officer Babb for
16  violating any other policies not listed here in 11585?
17  A  Um --
18  Q  And I'm not trying to trick you here. It's
19  basically --
20  A  Right. So the policy violations are listed in
21  11584.
22  Q  Okay.
23  A  So these are the policy violations. The
24  actions go over both pages. And no, this is what we used
25  to determine that he was being dismissed.

Page 152

1  Q  Okay. I just -- the no was a little ambiguous
2  on the record so I just want to make --
3  A  Oh, okay.
4  Q  -- clear. 11584 to 11585 are the reasons, the
5  only reasons --
6  A  Yes.
7  Q  -- that Officer Babb was terminated.
8  A  That is correct, ma'am.
9  Q  Okay. Officer Babb testified, or Mr. Babb
10  testified that at the time he was placed on leave for the
11  allegations concerning this lawsuit, he was already on
12  leave for some kind of investigation or allegations that
13  he was having an affair with another officer's wife. Are
14  you familiar with that?
15  A  I am familiar.
16  Q  Can you tell me more about why Officer Babb was
17  initially placed on leave?
18  A  I provided the -- we provided the documentation
19  for that. Apparently -- I can't -- I don't remember that
20  one in depth because I never really covered it. We
21  provided it because it was part of the discovery.
22  Q  Sure.
23  A  Apparently, he was living or -- and had a good
24  friendship with another officer. And during that time
25  frame, he developed a relationship with the officer's

Page 153

1  wife, and that relationship turned physical at some
2  point.
3  Q  Sure.
4  A  That's not a -- that was a moral issue that we
5  had. I know -- I think, if I recall correctly, he was
6  offered a suspension. Even though that happened after
7  this, it was because of the discovery -- not discovery
8  for -- the discovery of the discrepancy when I started
9  doing the discovery for this case when we pulled the --
10  when we were requested to pull the physical logs for the
11  cameras.
12  Obviously, one is probably a little bit more
13  complicated than the other, which is why, even though
14  they were running kind of simultaneously, you made a
15  statement that Babb related that he was put on leave as
16  part of this lawsuit. He was never put on leave as part
17  of this lawsuit. He was put on leave because of the
18  dishonesty. And he was previously on leave because of
19  the potential type of charges, the moral, moralistic
20  charges initially for the sleeping with the -- the
21  accusation of sleeping with another officer's wife.
22  Q  Understood. And I appreciate you making sure
23  that everything's precise and cleaned up.
24  What were the results of any -- let me back up
25  a second. The accusation that he was sleeping with

Page 154

1 another officer's wife, was that investigated?
2    A   Yes.
3    Q   And what were the conclusions of that
4 investigation?
5    A   There were sustainments in some of the -- I
6 believe.  And I believe he was offered, to the best of my
7 recollection, was a hefty suspension.  I want to say it
8 was like 30 or 45 days.  But I could be wrong.  I --
9 unfortunately, I do see a lot of these, so --
10   Q   Sure.
11   A   But I know -- if I recall correctly, that there
12 was something founded and that he was facing a suspension
13 when this one was completed and then reared its ugly
14 head.
15   Q   Sure.  And do you know when that conclusion
16 about the suspension for the allegations of an affair was
17 reached?  When did that -- when was that investigation
18 concluded, is basically what I'm trying to ask.
19   A   I don't remember the dates.  I know they're on
20 the forms, and that I -- they were provided.  Initially,
21 when we met with the Federal Magistrate in, I think it
22 was February or March --
23   Q   When we had --
24   A   We had --
25   Q   -- the motion to compel?

Page 155

1    A   Yes.
2    Q   That was in April, April of 2024.
3    A   I don't believe -- I believe the one case had
4 been resolved, and we were just waiting for this one to
5 be served and move forward.  So there's a date of -- I
6 think it happened August, and I think he was served in
7 November.  I just don't remember --
8    Q   Of 2023?
9    A   I believe so.
10   Q   Okay.
11   A   But I can -- I can't be held to it because I
12 don't know the exact dates.  I know I've provided the
13 documents.
14   Q   Sure.  And --
15   A   I just know that one was completed before this
16 one.
17   MS. HEBERT:  And Charles, just to be
18 100 percent transparent, I do not recall seeing those
19 documents.  And my recollection is that we got Deputy
20 Babb's disciplinary records before this event might have
21 happened.  So we'll just confirm that.  And if we don't
22 have it, I'll ask you to produce it.
23   MR. FRIGERIO:  Okay.  I believe we did.
24   MS. HEBERT:  I know that we have the light pole
25 incident.  I just don't remember the other one.

Page 156

1    MR. FRIGERIO:  You specifically asked about --
2    THE WITNESS:  Yeah.
3    MR. FRIGERIO:  -- what was the name of the
4 complainant in your request.
5    THE WITNESS:  Yeah, you asked about these two,
6 and we provided them.
7    MS. HEBERT:  Okay.
8    THE WITNESS:  I, I know there was a delay in
9 this one because it had not been served.
10   MS. HEBERT:  Sure.  And we'll just make sure.
11 It might just be my memory failing me, to be honest.
12   THE WITNESS:  Or things just ran together.
13   MS. HEBERT:  So we'll just make sure that we've
14 dotted our I's and crossed our T's there.
15   Q   (By Ms. Hebert) So with that in mind, I'm going
16 to move on to another exhibit, an exhibit that's
17 previously been admitted as Plaintiff's 16.
18   THE REPORTER:  And I have that, I think.
19   MS. HEBERT:  Yes, ma'am, you do.
20   THE REPORTER:  Here you go.
21   Q   (By Ms. Hebert) Captain, I'll just ask you,
22 what is this document?
23   A   The whole thing or --
24   Q   The whole thing.  You can shortchange it by
25 telling us what the whole thing is.

Page 157

1    A   This appears to be the beginning of the
2 investigation for June 12th, 2023.  I believe that is
3 kind of when we discovered that there was a discrepancy
4 with his camera.
5    Q   Well, I'll represent to you that Mr. Schott
6 filed this lawsuit on June 1st of 2023.  Does that change
7 your answer?
8    A   Trying to run the dates.  Because I know --
9    Q   That's okay.  How about --
10   A   But this is the beginning of -- because I know
11 he filed his lawsuit, but he also filed a complaint.  I'm
12 not sure that they necessarily started that.
13   Q   That's okay.  We'll just --
14   A   But it could have been.
15   Q   We'll just focus on the actual record, which is
16 BC 2161.  Is this a request for investigation?
17   A   Yes.
18   Q   Is the date of this request for investigation
19 June 12th, 2023?
20   A   Yes, ma'am.
21   Q   Okay.  And can you read to me the "re" for that
22 request for investigation, the "re" line?
23   A   "Request for Investigation, Deputy Joel Babb,
24 Employee 38552."
25   Q   Okay.  So only Deputy Babb is listed here in

Aaron Von Muldau                                                July 17, 2024

Page 158

1  the "re" line; is that correct?
2      A   It is.
3      Q   And I want to skip to the next page, BC 2162.
4  Do you know what this page is?
5      A   Yes.
6      Q   What is it?
7      A   This was -- if I recall, Mr. Schott had called
8  in to file a complaint during -- after the initial stop,
9  about the vehicle being damaged and wanting to be made
10 whole.
11         In addition, I think there were a couple of
12 other things that he said that the traffic stop wasn't
13 legitimate and that he had been held on the side of the
14 road for a period of time.  But this is the initial --
15 coming from his complaint into Internal Affairs.
16     Q   Okay.  And is the date on this document BC 2162
17 June 2nd, 2022?
18     A   That is what it reads.
19     Q   And if I use the term --
20     A   Well, that's the date that the case was closed.
21     Q   Okay.  That's the date the case was closed.  If
22 I refer to this investigation -- so sometime in 2022
23 Sergeant Rodriguez conducted an investigation into
24 Mr. Schott's complaint; is that fair?
25     A   Yes.

Page 159

1      Q   And if I refer to that investigation as the
2  first investigation, do you know what I'm talking about?
3      A   I do.
4      Q   Okay.  Then I want to go back to the prior
5  page.  And the date on this piece of paper is June 12th,
6  2023.  Was there a second investigation opened up into
7  the traffic stop concerning Mr. Schott?
8      A   Yes.
9      Q   If I refer to this 2023 investigation as the
10 second investigation, do you know what I'm talking about?
11     A   I do.
12     Q   I want to go back to the page with the first
13 investigation, and this -- is this document the document
14 that indicates that Sergeant Rodriguez's investigation
15 into Mr. Schott's complaint was closed?
16     A   Yes.
17     Q   And the date of that closing is June 2nd, 2022;
18 is that correct?
19     A   Yes, ma'am.
20     Q   And is the explanation of this document -- you
21 see the Explanation section listed about midway through,
22 do you see that?
23     A   I do.
24     Q   Is that the reason the case was closed?
25     A   That is what she typed up and said why she

Page 160

1  closed the case.
2      Q   Sure.  And let's skip down in that explanation,
3  I'm going to read a sentence.  "When I reviewed Deputy
4  Babb's body worn camera (BWC), I did not see any policy
5  violations."
6          Did I read that sentence correctly?
7      A   Yes.
8      Q   Okay.  And does the County agree with Sergeant
9  Rodriguez's conclusions that the body worn camera of
10 Deputy Babb, from the traffic stop of March 16th, 2022,
11 did not show any policy violations?
12     A   I haven't reviewed it.
13     Q   Okay.  Who on the County's behalf would be
14 prepared to testify about the content of Babb's body worn
15 camera?
16     A   Sergeant Marta Rodriguez.  She's the one that
17 reviewed it.
18     Q   Okay.  So Sergeant Rodriguez, now Sergeant
19 Ortega, she is the best person to testify whether the
20 body worn camera of Deputy Babb reveals any policy
21 violations?
22     A   She was the one that reviewed it for the policy
23 violations, yes, ma'am.
24     Q   Okay.  I want to look at this explanation just
25 again.  Is it fair to say -- and I don't see anything --

Page 161

1  that -- all right.  Just take a step back.
2          Does C in this explanation refer to
3  complainant?
4      A   I would agree with that.
5      Q   And the complainant would be Mr. Schott; is
6  that correct?
7      A   Yes.
8      Q   Okay.  I don't see anything in this paragraph
9  that talks about reviewing Deputy Babb's dash camera.  Do
10 you?
11     A   It does not.
12     Q   Okay.  Did Sergeant Rodriguez fail to
13 investigate Deputy Babb's dash camera?
14     A   You would have to ask Sergeant Rodriguez.  I
15 don't know what she investigated or did not investigate.
16     Q   Sure.  Okay.  Can we go back to the first page?
17     A   Yes, ma'am.
18     Q   BC 2161.  And this is the document, the RFI for
19 the second investigation.  As we sit here today, is the
20 second investigation closed?
21     A   Yes.
22     Q   So there -- is the County conducting any
23 additional investigation into this, the facts surrounding
24 the stop of Alek Schott?
25     A   Not that I'm aware of.

41 (Pages 158 - 161)

Aaron Von Muldau                                                    July 17, 2024

Page 162

1    Q   Okay.  Okay.  I want to look at Plaintiff's
2  Exhibit 46.  And I'm going to look at my N.
3       MS. HEBERT:  Charles, you should have it too.
4  It's BC 8302.
5       (Discussion off the record.)
6       THE REPORTER:  Back on the record.
7    Q   (By Ms. Hebert) Captain, what is this document
8  that's marked Plaintiff's Exhibit 46?
9    A   It is the document that encompasses the second
10  investigation into Deputy Joel Babb concerning this
11  traffic stop.
12   Q   Okay.  And is this report the only report from
13  the second investigation?  Is there any other report out
14  there is what I'm asking you.
15   A   Not that I'm aware of.
16   Q   Okay.  So as far as the County is aware of,
17  this is the only report that was produced as a result of
18  the second investigation?
19   A   This is what I provided, yes, ma'am.  I don't
20  believe there's any other reports.
21   Q   Okay.
22   A   There shouldn't be.
23   Q   Okay.  I just want to make sure.
24       And I see the name on the front cover is
25  Sergeant Victor Perez.  Was Sergeant Perez the only

Page 163

1  person tasked with investigating the traffic stop of Alek
2  Schott the second time around?
3    A   I don't know.  If you allow me to look --
4    Q   Sure.
5    A   -- I think there's -- there might be a listing
6  here on what they had.  Because sometimes they assign
7  multiple tasks, and they'll put a summary for the -- on
8  who does what.  So I don't know what, what you were
9  provided.
10       MR. WINDHAM:  BC 8310.
11       THE WITNESS:  8310?
12       MR. WINDHAM:  Perhaps.
13   A   No.  8310 is everybody that was involved.
14   Q   (By Ms. Hebert) Is the key.  But I just want to
15  make sure that I understand everybody who was doing the
16  investigating.  Was there anybody else other than Victor
17  Perez who was tasked with investigating Officer Babb?
18   A   No.  He was the main investigator.  So if
19  someone helped him, by looking at statements and stuff --
20  I don't know if they did or not, but they've done that in
21  the past.  But he was the main investigator that compiles
22  everything together and then gives you a report.
23   Q   Great.  I want to go to BC 8304 -- BC 8304 to
24  BC 8309.  We're going to add in BC 8310, because that's
25  the identification legend.  So BC 8304 to 8310.

Page 164

1    A   I have them.
2    Q   Are these the findings that Sergeant Perez
3  issued as a result of the second investigation?
4    A   This is the summary of the complete
5  investigation.
6    Q   Okay.
7    A   Which includes the findings.
8    Q   Sure.  I want to go to BC 8306.
9    A   Uh-huh.
10   Q   And I'm going to read a paragraph for you
11  that's about one-third of the way down.
12       "I researched the Vigilant database, license
13  plate reader information and observed C's vehicle
14  captured on March 15th, 2022, at 18:52 hours by Fayette
15  County Sheriff's Office and again at RO's traffic stop."
16       Did I read that correctly?
17   A   That is correct.
18   Q   And I understand that paragraph to say that
19  Sergeant Perez researched the LPR information and
20  observed Mr. Schott's vehicle, based on the records of
21  the LPR information, traveling at 6:52 p.m. on
22  March 15th, 2022, in Fayette County; is that correct?
23   A   That is correct.
24   Q   And then the next time that Mr. Schott's
25  vehicle was observed on the LPR information was at the

Page 165

1  traffic stop conducted by Deputy Babb; is that correct?
2    A   Yes.
3    Q   Okay.  I am going to look at -- and we can keep
4  this out.  We're going to need this to come back to it.
5  We're going to go to Plaintiff's Exhibit 8.
6       MS. HEBERT:  Which I believe you also have a
7  copy of, Molly.
8       (Discussion off the record.)
9    Q   (By Ms. Hebert) Captain, do you recognize this
10  document?
11   A   I do.
12   Q   What is it?
13   A   It is the SPEARS Incident Summary of the
14  incident BCSO 20220082749.  And it is in reference to --
15   Q   748.  I believe you said 749.
16   A   You're probably right.  Yes.  824748.  And it
17  is in reference to the traffic stop on an Alek Joseph
18  Schott.
19   Q   Okay.  I want to flip to BC 166.
20   A   Uh-huh.
21   Q   Do you see this page?  What is this page?
22   A   This is the general report entered by Deputy
23  Joel Babb.
24   Q   Okay.  And just one question, at least right at
25  this point.  Do you see the third paragraph?

42 (Pages 162 - 165)

Aaron Von Muldau                                                    July 17, 2024

Page 166

1    A   I do.

2    Q   And the final sentence, "I further observed
3  that using the LPR systems that Alek Schott had been on
4  I-10 west at midnight the night before heading south and
5  had a one-day turnaround."  Do you see that sentence?

6    A   I do.

7    Q   That seems to be an inconsistency from what the
8  investigator, Sergeant Perez, found when he concluded
9  that the LPR records, as we just reviewed, showed that
10  the last stop, the last reading on Mr. Schott's vehicle
11  was at 6:52 p.m. on March 15th.  And Mr. Babb is saying
12  that there had been a scan at midnight the night before.
13  Do you understand that correctly?

14    A   I do.

15    Q   Why was that inconsistency not highlighted as a
16  inconsistency in Sergeant Perez's report?

17    A   You would have to ask Sergeant Perez.

18    Q   Okay.  And there is no discussion of this
19  inconsistency in the Order of Dismissal for Deputy Babb,
20  is there?

21    A   No.

22    Q   Okay.  I want to flip back to Exhibit 46.  And
23  then the third paragraph on this page, it starts with "I
24  obtained."  Can you read that paragraph to yourself?  I'm
25  not going to read it out loud to you.  It's rather long.

Page 167

1    A   (Reviewing document.)  Okay.

2    Q   Does this paragraph indicate that the
3  investigator, Sergeant Perez, obtained the logs of Deputy
4  Babb's dash camera on the date of the stop, March 16th,
5  2022?

6    A   He did.

7    Q   And can we go to BC 8371 to BC 8378.  And are
8  these records -- these pages, 8371 to 8378 the
9  information about Deputy Babb's vehicle's dash camera
10  logs?

11       To me it looks like the first two are emails
12  about the metadata for Deputy Babb's dash camera,
13  followed by some additional emails.  And then I think BC
14  8376 to 8378 are the logs.  Is that understanding
15  correct?

16    A   For the vehicle, yes, ma'am.

17    Q   Okay.  And what is the -- if we look at BC
18  8376, what is the date of the vehicle log?

19    A   What do you mean?

20    Q   What -- this is a log from what date from
21  Deputy Babb's patrol vehicle?

22    A   I thought I went a couple of days, but it's
23  specifically over the 3/16/2022.

24    Q   Okay.  Is there any other date?  Let's just
25  look through.

Page 168

1    A   I don't remember how I did the log.

2    Q   Okay.  I see some three -- on Page --

3    A   3/15.

4    Q   -- Page 8378 I see from 3/15.

5    A   Yes.

6    Q   So would it be fair to say that BC 8376 through
7  BC 8378 are the vehicle logs for Deputy Babb for
8  3/15/2022 and 3/16/2022?

9    A   Give me just a second just to verify that.
10  Yes, that is correct.

11    Q   Okay.

12    A   It's out of order, but yes, ma'am.

13    Q   They are out of order?  Okay.  Good to know.
14  So let's just make sure how we would put them in order.
15  Is there a page number somewhere?

16    A   78 would go in front of 76.

17    Q   Okay.  Did the County review dash cam logs for
18  Deputy Babb for any date other than 3/15 and 3/16 of
19  2022?

20    A   No.

21    Q   Okay.  Why not?

22    A   As far as what do you mean?

23    Q   Well --

24    A   So the log -- go ahead.

25    Q   No, go ahead.  I didn't mean to interrupt you.

Page 169

1    A   No, it's all right.

2    Q   Well, if the County concluded that Deputy Babb
3  was dishonest about manipulating his dash camera one
4  time, did the County evaluate whether Deputy Babb
5  manipulated his dash camera multiple times?

6    A   I'm trying to think how to answer this, because
7  I reviewed his log over a period of time.

8    Q   Sure.

9    A   Did I go back and look at specifics?  No.  What
10  we looked at is that this was a practice common to him.
11  We don't know why he was doing what he was doing, but
12  this was not the first time.  It wasn't prevalent where
13  he was doing it all the time, but there were other times
14  where there were indications that there's something else
15  could have.  But I don't remember exactly because it was
16  a lot of data.

17       I believe this camera had been in play since
18  20 -- the summer of 2020.  So there are a lot of logs.
19  But this is one of the things that set off with the
20  discovery that I, when I was first notified, which is
21  probably when this -- this was kicked off because of my
22  report, the second investigation.

23    Q   Okay.  Let me just take a couple of steps back
24  because you used a lot of this's.  I just want to make
25  sure it's clear for the record.

Page 170

1    A    Oh.
2    Q    So this -- I'm going to try to unpack the
3  this's.  Would it be correct to say that the discovery
4  requests in this case prompted the County to look into
5  Deputy Babb's vehicle dash camera logs?
6    A    Yes.
7    Q    Would it be correct to say that before the
8  discovery requests in this case, the vehicle dash camera
9  logs of Deputy Babb had not been examined for any issues
10 of dishonesty?
11   A    Yes.
12   Q    Would it be correct to say that you, on behalf
13 of the County, have reviewed more than just the 3/15 and
14 3/16 vehicle logs for the dash cam of Deputy Babb?
15   A    Yes.
16   Q    And would it be correct to say that you, on
17 behalf of the County, have concluded that this was not --
18       Would it be correct to say that based on your
19 review, that you, on behalf of the County, have concluded
20 that the 3/16 dash cam issue, manipulation, was not the
21 only time that Deputy Babb may have turned off his dash
22 camera?
23   A    Yes.
24   Q    Can you estimate how many times, based on your
25 review?

Page 171

1    A    No.
2    Q    We previously deposed Deputy Molina in this
3  case.  And Deputy Molina testified that he turned off his
4  dash camera on his way to the stop of Alek Schott.  Has
5  Deputy Molina been investigated for turning off his dash
6  camera on the way to the stop of Alek Schott?
7    A    No.
8        MR. FRIGERIO:  Objection, form.
9        MS. HEBERT:  I'll ask that question again.  You
10 can object again, but I think you guys went over each
11 other and you couldn't quite hear either of you.
12   Q    (By Ms. Hebert) We previously deposed Deputy
13 Molina in this case, and Deputy Molina testified that he
14 had previously turned off his dash cam on the way to the
15 traffic stop of Alek Schott.  Has Deputy Molina been
16 investigated for turning off his dash camera on the way
17 to the traffic stop of Alek Schott?
18       MR. FRIGERIO:  Objection, form.  Now you can
19 answer.
20   A    I'm not aware of any investigation on Deputy
21 Molina at this time.
22   Q    (By Ms. Hebert) Is that a no?  Has the County
23 opened any investigation into Deputy Molina?
24   A    I am not aware of any investigation into Deputy
25 Molina.

Page 172

1    Q    Okay.
2    A    There are reasons why they are allowed to turn
3  them off.
4    Q    Sure.
5    A    I don't know if he met that threshold.
6    Q    Sure.  What are the reasons that a deputy is
7  allowed to turn the dash camera off?
8    A    There's a few, one being in a static spot, one
9  being that -- off the top of my head, we have -- it's in
10 policy, Chapter 44.
11   Q    Okay.  We can look at 44.  All right.  Okay.
12 So we're going to go to Plaintiff's Exhibit 14, which is
13 G.
14       (Discussion off the record.)
15   Q    (By Ms. Hebert) Plaintiff's 14, which is
16 Exhibit G.  And what was the chapter you wanted to look
17 at?
18   A    It should be Chapter 44.
19   Q    Okay.  Captain, what were you calling my
20 attention to?
21   A    If you'll give me a second.
22   Q    Sure.
23   A    (Reviewing document.)  "Procedures.  When to
24 Use" --
25   Q    Can you tell me what page you're looking at?

Page 173

1  I'm sorry.  I know they're kind of like not labeled here.
2    A    It's Page 2.
3    Q    Page 2.  Thanks.  Okay, Page 2.  You're looking
4  at 44.04, Procedures?
5    A    "When to Use the Cameras.  Deputies shall not
6  keep the event mode activated for the entire shift.
7  Mandatory use shall begin recording upon reception of a
8  call or when initiating a response to an incident,
9  whether dispatched or not, and shall continue recording
10 through the entire call of the incident.  Each deputy in
11 cover shall activate camera prior to making contact in
12 any of the following situations," which says this is when
13 you have to have it on.  Right?
14   Q    Sure.
15   A    "An enforcement or investigative encounter.
16 This includes temporary detentions, vehicle stops,
17 pedestrian stops, consensual encounters, service of a
18 search warrant or arrest warrant, contact with all
19 complainants, any situation where the deputy reasonably
20 believes that the recording may provide evidence in a
21 criminal or internal investigation, any nonenforcement
22 encounter that becomes confrontational, assault of law
23 enforcement.  Discretionary use:  Deputies" --
24   Q    We don't need you to read all of it.
25   A    No, I understand.

44 (Pages 170 - 173)

Aaron Von Muldau                                              July 17, 2024

1    Q    Okay.
2    A    But nonenforcement encounters when a recording
3  could have value as evidence.
4         So with him driving over there, he is not part
5  of the pursuit. He's not part of the initial. It does
6  give him some discretionary to shut it off.
7    Q    Okay. That's helpful. That's clarity for me.
8         And the -- so it's the County's position that
9  if he turned it off while he was driving there, that
10 could be permissible as a nonenforcement encounter?
11   A    It could be if he follows the policy, yes,
12 ma'am. But I have not looked into that. I don't believe
13 that there is any open investigation into that, so --
14   Q    Sure.
15   A    -- I would say that there's --
16   Q    Understood. Okay. And it's just helpful for
17 you to point me to the right section of the manual. It's
18 a large manual.
19        MS. HEBERT: I'm going to flip back to Exhibit
20 46, which is our N, Joshua.
21   Q    (By Ms. Hebert) And I'm going to go to Page BC
22 8337.
23   A    83.
24   Q    37. And it seems like 8337, 8338 and 8339 are
25 part of the same document or record; is that a correct --

1    A    No.
2    Q    -- conclusion? No? Tell me more.
3    A    The 8337 and 8338 are a combined document. It
4  is a TLETS return for his driver's license.
5    Q    Okay.
6    A    8339 is a separate TLETS entry that comes back
7  and shows everybody that has run this plate I think.
8  Plate or -- I think it's the plate, over a period of
9  time.
10   Q    Okay. So let's look at the top of BC 8337.
11   A    Okay.
12   Q    And what does that top line represent?
13   A    That his driver's license is eligible and
14 expires in 2030.
15   Q    Okay. So could this be the record from running
16 Mr. Schott's driver's license, rather than his plate?
17   A    Yes, ma'am. That's the TLETS return for his --
18   Q    Okay. And what does TLETS mean?
19   A    It's the Texas Law Enforcement Telenetwork
20 System.
21   Q    Okay. So is BC 8337 and 8338 the record for
22 running Mr. Schott's --
23   A    That --
24   Q    -- driver's license?
25   A    -- appears to be his driver's license return.

1    Q    Okay. And then BC 8339, as I understood it,
2  you just said that this is -- BC 8339, this document, is
3  the record of the --
4    A    License plate.
5    Q    -- license plate searches?
6    A    Yes.
7    Q    Okay. And does BC 8339 show that Deputy Babb
8  ran Mr. Schott's driver's license number twice?
9    A    Yes.
10   Q    What are the two dates that Deputy Babb ran
11 Mr. Schott's license?
12   A    The first -- the first date was 3/16/2022, at
13 11:17 a.m. The second date was 3/18/2022 at 3:21 p.m.
14   Q    Okay. And I want to go back to the license
15 plate search records. Is this what Deputy Babb would
16 have seen when he ran Mr. Schott's driver's license
17 number?
18        Is this what comes up when you run someone's
19 driver's license number?
20   A    I'm confused. You said license plate record,
21 so I'm --
22   Q    I mean driver's license. Sorry, I got them
23 confused.
24        Is this the document that an officer will see
25 in their computer system in a patrol car when they run

1  Mr. Schott's driver's license?
2    A    It does appear to be the correct document.
3    Q    Okay. Would something that needed to be
4  investigated show up on this document, BC 8337 to 8338,
5  would it show up in red? Do you know? Like if there was
6  a search warrant or a -- I mean, a warrant out for
7  someone's arrest, would it show up in red on this
8  document?
9    A    Not necessarily.
10   Q    Okay. I just don't know how it works. Because
11 I see there's red writing at the top, and I was just
12 curious of if something --
13   A    The mask is set by a lot of things. The
14 officers in the vehicles, the time of day, the day or
15 night settings that they're using could all affect that.
16 Usually the, when there is a hit for like, as you said, a
17 warrant, it's not going to show up necessarily in this
18 record. It would be a separate record which is followed
19 by an audio cue that there is a potential problem.
20   Q    Okay. Let's go back -- I'm sorry to jump
21 around a lot here.
22   A    That's okay.
23   Q    Can we go back to Plaintiff's Exhibit 16, which
24 is H for our records. Okay. And we previously talked
25 about this exhibit, the first page being the document

45 (Pages 174 - 177)

Page 178

1  that opens the second investigation; is that fair?
2      A   Yes.
3      Q   Okay.  And we looked at the fact that Deputy
4  Babb's name is on the "re" line.  Can you read -- I'm
5  going to read the second paragraph of this document to
6  you.
7      A   Okay.
8      Q   "At this time we are requesting an
9  investigation be conducted to determine the facts of the
10 case and to identify all potential misconduct by any
11 Sheriff's personnel as well as all potential violations
12 of statutes, laws and/or local ordinances."
13         Did I read that correctly?
14     A   Yes, you read it correctly.
15     Q   Okay.  And is this language, this second
16 paragraph language, generic language that is included in
17 every RFI, or does this paragraph change depending on the
18 RFI?
19     A   I've read a lot of them, so I would say that
20 there's never -- we use go-bys.
21     Q   Uh-huh.
22     A   But it's not necessarily the same.  It can
23 change and will change depending on what the, what is
24 determined.  But yes, it is a standard -- it's probably a
25 standard line that they have consolidated to that,

Page 179

1  saying:  Hey, listen, this is what we're looking for.
2      Q   Okay.  Was there any investigation into Officer
3  Gereb as part of the second investigation?
4      A   Not that I'm aware of.
5      Q   Any investigation into Officer Gamboa as part
6  of the second investigation?
7      A   Not that I'm aware of.
8      Q   Was there any investigation into Marta Ortega,
9  formerly known as Marta Rodriguez?
10     A   No.
11     Q   Was there any investigation into the Internal
12 Affairs Division itself and how it handles complaints?
13     A   No.
14     Q   Finally, was there any investigation into
15 Deputy Molina as part of the second investigation?
16     A   Not that I'm aware of.
17     Q   Okay.  Let's go to BC 8325, and that is not
18 part of this exhibit.  That is part of 46.
19     A   Could you give me the number again?
20     Q   46, and it is 8325.  And I want to look at
21 Question 10, the actual question, not necessarily the
22 answer.  "Reviewing your call history associated with
23 Deputy Molina and his canine over a three-month period, I
24 observed that the canine had several positive alerts with
25 no contraband found.  Were you" -- "Where you aware of

Page 180

1  this canine's inconsistent performance?"
2          With the "where" -- I think meant to be "were."
3          Did I read that correctly?
4      A   You did.
5      Q   Okay.  This investigator, Sergeant Perez,
6  classified Deputy Molina's canine performance as
7  inconsistent, at least asking were you aware of this
8  inconsistent performance.  Do you know what Sergeant
9  Perez reviewed to determine that the Canine Unit had an
10 inconsistent performance?
11     A   I am not.
12     Q   You do not know what he reviewed?
13     A   No.  You would need to ask Sergeant Perez.
14     Q   Sure.  Why is there -- if there is an
15 inconsistent canine performance, why was there no
16 investigation about that?
17         MR. FRIGERIO:  Objection, form.
18     A   Because I don't believe that the canine is
19 inconsistent.
20     Q   (By Ms. Hebert) Okay.  And what has led you to
21 that conclusion?
22     A   We've provided logs to show that the dog is not
23 inconsistent.
24     Q   Okay.  I'm going to hand you another exhibit.
25 This has previously been admitted as Plaintiff's

Page 181

1  Exhibit 27.  Captain, do you know what this document is?
2      A   I do.
3      Q   What is this document?
4      A   It's a detailed deployment report when,
5  basically what the dog -- when he goes and uses the dog.
6      Q   Okay.  And what is the date on this Deployment
7  Detail Report?
8      A   3/16/2022.
9      Q   And the time?
10     A   11:49 a.m.
11     Q   And if I represented to you that Deputy Molina
12 testified that this was the Deployment Detail Report from
13 the stop of Alek Schott, would you agree with that
14 statement?
15     A   I have no reason not to.
16     Q   Okay.  And do you see about a little over
17 halfway down where it says, "Marijuana"?  It's in the
18 gray band, so it's easy to miss.  It says, "Activity
19 Finds."
20     A   Just a second.  Narcotics -- narcotics --
21     Q   Right -- keep going down.
22         MR. FRIGERIO:  A little bit lower.
23     A   "Activity Finds."  Yes, I see, it says,
24 "Activity Finds, 1."
25     Q   (By Ms. Hebert) Then you see the band below

Page 182

1  that where it says, "Marijuana"?

2    A  "Trace amounts," correct.

3    Q  It says, "Trace amounts"?

4    A  Uh-huh.

5    Q  Does this mean that Deputy Molina concluded

6  that there was a trace amount of marijuana in

7  Mr. Schott's vehicle?

8    A  I would say that's what it indicates.

9    Q  Okay.  Earlier today we talked about how the

10  County's records show that there was no contraband found

11  in Mr. Schott's vehicle.  How do you explain this trace

12  amount record on the Canine Deployment Report?

13    A  I'm trying to recall what I said.  But I don't

14  think it was that -- I believe Deputy Molina put in his

15  report that they found the leftover -- potential leftover

16  garbage of some marijuana and stuff, but I don't recall

17  exactly.

18    Q  Sure.  Let's take a look at that.  This is

19  Plaintiff's Exhibit 8.

20      MS. HEBERT:  Let's go to Exhibit 8, which is C

21  in our binders, Mr. Windham.

22    Q  (By Ms. Hebert) You have Exhibit 8.

23    Q  Do I have it?

24    Q  Uh-huh, somewhere.  Okay.  Let's flip to --

25  first we're going to start with BC 166, which is -- we're

Page 183

1  going to flip to BC 166, Captain.

2    A  166.  Yes, ma'am.

3    Q  And again, we previously looked at this page.

4  Is this Officer Babb's report?

5    A  Yes.

6    Q  Okay.  Do you see about midway through the last

7  paragraph -- I'm going to read it to you.  It says, "Once

8  I" -- do you see where I am?

9    A  Uh-huh.

10    Q  "Once I completed the search we found nothing."

11  Did I read that correctly?

12    A  You did.

13    Q  Does this mean that Officer Babb concluded

14  nothing had been found in the search of Mr. Schott's

15  vehicle?

16    A  That's what it would say.

17    Q  Then the next page BC 167, is this the

18  supplemental report written by Deputy Molina?

19    A  It is.

20    Q  And can you tell me where in this report it

21  indicated that Deputy Molina found anything in

22  Mr. Schott's vehicle?

23    A  He said that the dog alerted, but that was all

24  he says.

25    Q  Right.  So as far as you can tell, the report

Page 184

1  says that the dog alerted.  Is there anything about

2  finding anything as a result of the search from the

3  alert?

4    A  No.

5    Q  In the wake of Mr. Schott's complaint, and that

6  includes the lawsuit, has the County made any policy

7  changes about how officers should conduct traffic stops

8  in general?

9    A  No.

10    Q  I want to look at one more series of records

11  from the traffic stop.  We looked at this a little bit

12  earlier today, but can we go back to the Incident Detail

13  Report for Mr. Schott?  And that is Exhibit 5.  And the

14  BC number on this is BC 161.

15    A  Okay.

16    Q  And I want to flip to Page BC 162.  And do you

17  see where it says, "Activity Log"?

18    A  Activity Log, yes.

19    Q  What does it say below Activity Log?

20    A  "No call activity."

21      MS. HEBERT:  Okay.  I want to look at what has

22  previously been admitted as Plaintiff's Exhibit 10, which

23  is our D.  And I think we need to provide a copy of that.

24      MR. WINDHAM:  Sure.  Are there multiple there,

25  Captain?

Page 185

1      THE WITNESS:  No.  There's only one.  I'm

2  sorry.

3      MR. WINDHAM:  Okay.  Here's a copy.

4      MR. FRIGERIO:  Okay.

5    Q  (By Ms. Hebert) And I'm going to represent to

6  you, Captain, that this is the version of the Schott

7  Incident Detail Report that Mr. Schott received via the

8  open records request.

9    A  Okay.

10    Q  And if you flip to the bottom, or look at the

11  bottom of this first page, do you see where it says

12  "Activity Log"?

13    A  Which one are we looking at, 10?

14    Q  We're looking at 10, yes, sir.

15    A  Yes.  Uh-huh.

16    Q  You see how it says "3/16/2022" below it --

17  below Activity Log?

18    A  I do.

19    Q  And then we flip to the back, the other page,

20  Page 2.

21    A  Uh-huh.

22    Q  Are there several entries under Activity Log on

23  the next page?

24    A  Yes.

25    Q  Why the difference?  Why the difference between

Aaron Von Muldau                                                    July 17, 2024

Page 186

1   Exhibit 5, I think it was --
2       A    Because I don't know what she's pulling.  I
3   pulled 5.  That -- I think it will even say I'm the one
4   that pulled it, but I don't know if it timestamps it.
5   But it also could be the way -- what this report was, how
6   she ran the report.  Because --
7       Q    Who's she?
8       A    Open records, which is -- at the time of this,
9   could either be Sergeant Alires.  We have an open records
10  unit.  It's run by a lieutenant or a sergeant.  Right now
11  it's run by Lieutenant Abraham.  It was run by
12  Lieutenant -- I can't remember her name.  She was a
13  sergeant.  Castillo.  Castillo?  Yeah.  Castillo.  And
14  now it's Sergeant Alires.  So based on this, it could
15  just be the report that she pulled versus what I pulled.
16  It's not trying to hide anything, but yeah.
17      Q    Sure.  And how come the Activity Log was never
18  provided to us in discovery?
19      A    I wasn't aware that it was pulling up
20  differently.  This is the first time I've seen it.
21      Q    Okay.
22      A    So it's not something that usually -- could
23  have been the way I pulled it up.  It's possible.  I
24  don't know.
25      Q    Sure.

Page 187

1       A    I only know one way to pull it, but they tend
2   to be a little bit more savvy.
3       Q    Okay.  I want to just ask about a couple of
4   things on the Activity Log just to understand --
5       A    Sure.
6       Q    -- how it works.  So the first entry on the
7   first page of Exhibit 10 -- we don't have a Bates label
8   on this one -- I see the date of 3/16/2022 and a time of
9   11:15.  And then I see "Activity: Incident timer clear."
10           What does this line indicate, this line of the
11  activity log?
12      A    So it says 3/16/2022, time 11:15, timer clear.
13  That looks to be that that is -- so when a -- initially
14  there's several steps to how a call gets created, right?
15  One being you call into dispatch and they enter -- a call
16  taker, an operator, enters all this information, then
17  sends it over for dispatch.  And then a timer starts,
18  until the time it gets dispatched.  So it starts
19  tracking.  You'll see those times up towards the -- from
20  the time the call came in to the time it was assigned in
21  the mid part.
22           So that's when that timer -- but because this
23  was self-generated, he did it through a traffic stop, it
24  almost automatically just self-generates, so there's no
25  timer to say it hasn't been assigned because it's already

Page 188

1   been assigned.
2       Q    Understood.  Okay, that's helpful.  So does
3   this 11:15:07 or 11:15:08, does that mean that's the time
4   that the record for the traffic stop was initiated?
5       A    That's what the record is showing.
6       Q    Okay.  So Deputy Babb indicated that the
7   traffic stop was going to happen; however, I don't really
8   understand the system, so you're going to have to tell me
9   that.  But would it be fair to say that Deputy Babb was
10  initiating the traffic stop at 11:15:07?
11      A    That's when he pushed the button on the
12  application, the mobile application, that's when he
13  pushed the button for a traffic stop.
14      Q    Okay.  Can you flip to the second page of this
15  Activity Log that's Plaintiff's Exhibit 10?
16      A    Okay.
17      Q    I just have a couple of questions about some of
18  the entries.  You see that a lot of them are 11:15:07, or
19  11:15:08, down to one that says 11:15:12.  And that one
20  says, as far as I can tell, "Remove Waiting Pending
21  Incident."  What does that mean?
22      A    Well, let me see.  Basically everything up
23  until that point is the automatic saying -- you know, as
24  I discussed, you know, it goes through its progressions.
25  It was dispatched, updated, he hit response.  It's all at

Page 189

1   one time because he's doing it on site.  And then it
2   automatically puts him on scene.  I'm sure that's a
3   background script that does all of that.
4       Q    Sure.
5       A    Then the incident is created.  Incident
6   created, it says that he stopped a plate, and then he
7   added the license plate.  "Remove Waiting Pending
8   Incident warning."  It looks like that's the timer.  And
9   because he is actively with the computer, it
10  automatically kicked off the timer.
11      Q    Okay.  So I just want to break that down a
12  little bit because I think we processed through a lot.
13           In this -- in the entries before the Remove
14  Waiting Pending Incident, does that mean that Officer
15  Babb had entered Mr. Schott's license plate before the
16  waiting pending incident, one of these other lines?
17      A    It says that he entered the license plate at
18  11:15:08.
19      Q    Okay.  And then I want to go to 11:16:44 --
20      A    Uh-huh.
21      Q    -- where it says, "Secure."  Do you see that
22  line?
23      A    I do.
24      Q    What does "secure" mean there?
25      A    So there is a timer that, when the officer

Aaron Von Muldau                                                    July 17, 2024

Page 190

1  first initially checks out, he goes -- and the way it's
2  set up is he's supposed to go and speak with the
3  complainant.  That keeps the timer going so that dispatch
4  knows that he's out on the traffic stop and that until he
5  knows that everything is good to go, he'll usually come
6  back, get the license and stuff, come back and hit
7  "Secure."
8         There are officers that are very confident that
9  they usually secure themselves upon pulling somebody over
10  if they feel comfortable.
11     Q   Sure.  So secure is --
12     A   It's a physical action.
13     Q   This is me just understanding.  Secure is the
14  way the officer tells the folks back at dispatch "I'm
15  okay"?
16     A   Yes, ma'am.
17     Q   Okay.  And so --
18     A   It stops the timer for them.
19     Q   So 11:16:44, Officer Babb indicated that he was
20  secure.
21     A   Yes.
22     Q   And then the next line, "11:17:32 Record Check
23  Person," what is that line?
24     A   He completed a records check on Alex, first
25  name, Schott last name, date of birth.  And then it has

Page 191

1  the search parameter.
2     Q   Okay.  And so at 11:17:32 --
3     A   He entered his information into the computer.
4     Q   And it came back.
5     A   Yes, at some point.
6     Q   Okay.  And 11:17:32, there's two -- there's
7  three entries with 11:17:32.  Does this mean that Deputy
8  Babb ran the computer checks on Mr. Schott and those
9  computer checks came back?  Is that correct?
10     A   Yes, it's the script that runs all that.
11     Q   Okay.  So at 11:17:32, Officer Deputy Babb had
12  the computer information on Mr. Schott.
13         MR. FRIGERIO:  Objection, form.
14     A   It appears that way.
15     Q   (By Ms. Hebert)  Okay.  And then I want to ask
16  about that last one, 11:17:32, Supplemental Person Record
17  was added for Alek Schott.  What is a Supplemental Person
18  Record?
19     A   I would have to check, but it looks like
20  that -- so he not only ran it by date of birth, I think
21  he ran him by his driver's license.  Is there a way to
22  verify his driver's license?  I think --
23     Q   Yes.  I can tell you what page that is.
24     A   Is it here?  His driver's license --
25     Q   It's BC 8337, in that --

Page 192

1     A   Yeah, okay.  That's his date of birth.
2  11974520 -- I don't know.  That number offhand is not --
3  I would have to ask somebody because I don't -- there's
4  a -- there are scripts that come behind this, so could
5  that be a return from TLETS that that's how they're
6  recording it?  I don't go that -- I'm not that
7  technical --
8     Q   That's very in depth.
9     A   Yeah.
10     Q   Okay, I get it.  But basically --
11     A   But these are scripts -- so TLETS has a certain
12  mask that you have to enter, enter -- the way information
13  is entered.  It's not -- it's not very easy.  They use a
14  bunch of shorthand codes, kind of like what court
15  reporters would do sometimes when they're doing their
16  stuff.
17         Well, it's hard to teach laymen to do that.  So
18  what we do is we then give them a GUI that allow them to
19  put in basic things.  And then once we put those things
20  in there, there are scripts behind it that says, okay,
21  this is this shorthand code, and then you add this, and
22  then it gets a return.
23         My knowledge is that looks like it's some kind
24  of record return back from them saying this is your
25  record.  It could be a TLETS number, it could be, it does

Page 193

1  not -- it does not appear to be anything connected
2  directly with Mr. Schott or any other ID that we would
3  normally run.
4     Q   Okay.  So as I understood what you just said,
5  that supplemental person record seems to be the return of
6  any information on Mr. Schott from the --
7     A   It's possible, yes, ma'am.
8     Q   Okay.  I think that we can skip a lot of the
9  rest of that.  I have one question.  Do you see where it
10  says by 5I11?  There's several entries there, starts
11  around 12:22 --
12     A   Yes.
13     Q   -- to 12:22:48.
14     A   Yes, I see that.
15     Q   And does that indicate that the officer
16  identified as 5I11 arrived and then was available nearly
17  a couple minutes later?  I don't know how else to
18  describe it.
19     A   It's not a couple of minutes, it's seconds.  He
20  probably arrived on scene, attached himself to the call,
21  and then cleared himself to make himself available while
22  he's assisting to, if another call or dispatch needed
23  him, he would show available as an available unit and he
24  could leave.
25     Q   Okay, got it.  Understand.  That's helpful.

49 (Pages 190 - 193)

Page 194

1    And then the last two lines here under 3:17
2  "Read Comment User Action." Do you see those? The last
3  two lines in the activity log.
4    A    Read Comment, yes.
5    Q    What do those lines mean?
6    A    I believe those refer back to -- so this is
7  kind of funny. I believe they refer back to these
8  comments up here. What time was that again?
9    Q    Okay. What comments are you looking at?
10   A    12:31, right? No. What are the times on
11 those? I can't even --
12       MR. FRIGERIO: 12:31:20.
13       THE WITNESS: No, they're not 12:31:20.
14 They're actually --
15   Q    (By Ms. Hebert) 3/17, 8:06:56. And 3/17,
16 8:09:17. So I don't understand what that is. I just
17 want to know, that's it.
18   A    I can find out. I don't know. It -- could it
19 be some kind of timestamp that it goes into. I don't
20 know. But I can find out.
21   Q    Sure.
22   A    Because I, I -- I don't know. There are
23 things -- I believe there are timers and stuff that allow
24 us to change a record up to a certain point.
25   Q    Uh-huh.

Page 195

1    A    That could be closing it out.
2    Q    Okay.
3    A    But I don't know. I would have to ask my CAD
4  administrator.
5    Q    Okay.
6        MS. HEBERT: Charles, how do you want to handle
7  that?
8        THE WITNESS: Provide the answer?
9        MR. FRIGERIO: We'll provide the answer.
10       MS. HEBERT: Okay.
11       THE WITNESS: Yeah, there's nothing --
12   Q    (By Ms. Hebert) We're not hiding the ball here.
13 I just don't know what it means.
14   A    Yeah, you know, like I said, I don't know why
15 the reports even printed out differently.
16   Q    Sure. Okay.
17   A    Do you know --
18       MR. LEAKE: Christie, when you guys are ready,
19 I would love a bathroom break.
20       MS. HEBERT: Sure. This is a good time for a
21 bathroom break.
22       THE REPORTER: We're off the record.
23   (Recess from 2:56 p.m. to 3:05 p.m.)
24       THE REPORTER: We are back on the record.
25       MS. HEBERT: I'm going to introduce another

Page 196

1  exhibit, and we don't have this one before. It's exhibit
2  MM in our binders.
3        MR. WINDHAM: Are we on 60, just so I'm clear?
4        THE REPORTER: Yes.
5    (Discussion off the record.)
6        MR. WINDHAM: Here you go.
7    Q    (By Ms. Hebert) Okay. And the only reason I
8  want to look at this document is -- this is an email
9  exchange, is it not?
10   A    It is.
11   Q    And you see the attachment, it says
12 DepBabbCiteQ1CY2022. Did I read that correctly, the
13 attachment at the top?
14   A    Yes.
15   Q    Did I read that attachment name correctly?
16   A    D-E-P.
17   Q    Dep --
18   A    B-A-B-B.
19   Q    Uh-huh.
20   A    CiteQ1CY2022.
21   Q    Okay. And does that moniker, that name, mean
22 that that document is Deputy Babb's citations from the
23 first quarter of 2022?
24   A    I have no idea.
25   Q    Let's look at Exhibit S in the binders. We're

Page 197

1  going to mark this Exhibit 61.
2        MR. WINDHAM: Give me a moment.
3        THE WITNESS: I might need a couple of paper
4  clips so I don't -- so these don't start running
5  together.
6    (Discussion off the record.)
7    Q    (By Ms. Hebert) I'm handing you what's been
8  marked Exhibit 61. Can you flip through it? And we'll
9  start on the first page. Is this a warning citation? We
10 talked about these documents earlier.
11   A    Yes.
12   Q    Is this a warning record?
13   A    It is.
14   Q    And what's the date on this warning record? Is
15 the date 1/10/2022?
16   A    Yes.
17   Q    Okay. And we'll flip to the middle. I'm
18 looking at Page 81.
19   A    Mine's labeled -- okay.
20   Q    Is this another citation?
21   A    This is a citation.
22   Q    This is a citation, document citation record?
23   A    Uh-huh.
24   Q    So this person got an actual citation?
25   A    They did.

Page 198

1    Q   And is the date on this document 2/20/2022?
2    A   Yes.
3    Q   I'm going to flip to the very last one. And is
4  this another warning, Page 159?
5    A   Yes.
6    Q   And is the date on this record 3/30/2022?
7    A   Yes.
8    Q   Okay. Now, the first page is 1, the last page
9  is 159. So would it be fair to say there's 159 pages in
10  here?
11    A   Yes.
12    Q   I'm not trying to trick you.
13    A   No, no, I agree.
14    Q   Would it be fair to say that there are 159
15  citations or warnings in here?
16    A   Individual documents, yes.
17    Q   Correct. And would it be fair to say that
18  these citations or warnings run from 1/10/2022 to
19  3/30/2022?
20    A   Yes.
21    Q   So would this document be the document that was
22  attached to the email we just looked at? That would be
23  the -- with citations from Q1 of 2022 for Deputy Babb.
24    A   As I was never asked for this document, I did
25  not provide the document. I would assert that that makes

Page 199

1  sense, but I cannot testify that they are one and the
2  same.
3    Q   Sure. And the County provided this document to
4  us. So this document you're seeing was the attachment to
5  BC 8453.
6    A   This was a -- this was provided through an open
7  records act, right?
8    Q   No. This was provided through the production.
9    A   Uh, no.
10    MR. WINDHAM:   There are Bates stamps at the
11  bottom.
12    Q   (By Ms. Hebert) On this one? I don't know
13  about the M. I don't see the Bates stamps.
14    A   Because I've never seen this, so I don't --
15    Q   I'll tell you what the Bates label is. Hold on
16  one second. On the email I didn't see one either.
17    A   And I didn't know anybody else was providing.
18  I see that Brittany Malloy -- this was just this year, so
19  it may be that someone asked, but I --
20    Q   I have this email, that was MM, was BC 8453.
21  Does -- that email was produced as 8453. I'm not sure
22  why there's no Bates stamps on the bottom.
23    A   Well, I have no reason to dispute it.
24    Q   Sure.
25    A   If that's what you're saying it is, that's what

Page 200

1  it is. But just for the record, I'm saying I did not
2  provide this, so I have never seen the two.
3    Q   Sure. And can you -- look at the first page
4  of -- I don't know what exhibit that is -- 61. The first
5  page of 61.
6    A   Yes.
7    Q   And what officer issued this warning?
8    A   Deputy Babb.
9    Q   Okay. And can you just flip through here? I'm
10  going to tell you that I have looked through this
11  document --
12    A   I have no doubt.
13    Q   That every one is from Deputy Babb?
14    A   Right. And I have no doubt that everything
15  that you find right here should be in Exhibit 57.
16    Q   Okay. Thanks. That's helpful.
17    A   Based on the timestamps.
18    Q   Sure. And will you just flip through, and
19  based on my review of these documents, every single one
20  every them says, "No Search."
21    A   Okay.
22    Q   So would you just flip through -- if you see
23  one that says, "Search," you tell me. But I have
24  reviewed it at length and I have not seen one. So if I'm
25  missing something, let me know.

Page 201

1    A   (Reviewing document.)
2    Q   And while you're doing that, can we go off the
3  record for a second?
4    THE REPORTER:   Uh-huh.
5    (Discussion off the record.)
6    Q   (By Ms. Hebert) Let's go back on the record and
7  we'll see if we can expedite this process.
8    A   I'm sorry.
9    Q   That's all right.
10    A   But this is a court hearing, and I want to make
11  sure that I'm --
12    Q   Captain, I just want to be clear I know you're
13  busting it here. I know you're busting it here. I know
14  you're trying your best to answer these questions and go
15  through these documents with me to the best of your
16  ability. I get it.
17    MR. WINDHAM:   Are we on the record? I just
18  want to make sure.
19    THE REPORTER:   Yes.
20    MS. HEBERT:   I understand.
21    Q   (By Ms. Hebert) Okay. So I want to filter
22  this.
23    A   But based on the 159 documents that you have in
24  front of me, I would safely assert that you are correct,
25  that they all, these say, "No Search."

Page 202

1   Q   I think that's fine for now.  We'll just leave
2   it at that.
3   A   But I just want to qualify, it's these 159
4   documents.  This does not necessarily mean --
5   Q   Sure.
6   A   -- that this is everything he did in that
7   quarter.
8   Q   Understood.
9   A   Okay.
10  Q   Understood.
11  A   All right.  I'm good with what I said.
12  Q   Okay.  I want to look at another exhibit.
13  Sorry about that.  We're going to go to OO for us.  And
14  again, we talked about previously -- this is on my
15  computer.  Shoot.
16       We previously talked about the fact that there
17  was a phone forensic examination in this case.
18  A   Yes, you did tell me.
19  Q   And the results from that phone forensic
20  examination were produced.  I'm going to represent to you
21  that this document that we are about to look at is a
22  document that was obtained from Officer Gereb's personal
23  phone, via his text messages, or via his phones.
24       MR. WINDHAM:  Want to introduce that?
25       MS. HEBERT:  Yeah, I'm going to introduce what

Page 203

1   is being marked as Exhibit 62.
2   A   I hope you have better luck with these phone
3   dumps than we do.  They usually shut down my computer.
4   Q   (By Ms. Hebert) So this is a document that was
5   produced as an attachment in the attachment folders.
6   A   Oh, okay.
7   Q   From -- oh, shoot.
8       MR. FRIGERIO:  Do you have a copy?
9       MR. WINDHAM:  So it's going to be this.  I just
10  handed her a cover sheet.
11      MR. FRIGERIO:  Oh.
12      MS. HEBERT:  And this is within the forensic
13  examinations.  We'll email a copy of this to Molly.  So
14  you can get it that way, or you can pull it from the
15  examination results.
16  Q   (By Ms. Hebert) So this is from Officer Gereb's
17  personal phone and this was an attachment recovered by
18  the forensic examiner.  And as I understand it, this is a
19  phone list.  It says at the top -- what does it say at
20  the top?
21  A   Organized Crime Division.
22  Q   So just based purely on this record obtained
23  from Officer Gereb's phone, is this an Organized Crime
24  Division phone list?
25  A   The covert looks like everybody there I am

Page 204

1   familiar that they are assigned to that unit, Gang Intel.
2   If you would go down, please, that looks correct.  Brian
3   Curtis -- this is a relatively new list.  But yes, it
4   does look to be, for the Organized Crime Division that
5   looks correct.
6   Q   Okay.  And for that Organized Crime Division, I
7   just want to ask a couple of questions.  I see that under
8   Gang Intel, we see that Officer Pete Gamboa is listed.
9   A   Yes.
10  Q   And that he has two phone numbers listed for
11  him.
12  A   He does.
13  Q   But only one of those phone numbers was
14  provided for the forensic examination.
15  A   Understood.
16  Q   Why was the personal phone not provided?
17  A   I was not asked to.  When that came up in the
18  question, the only -- on the order --
19  Q   Sure.
20  A   -- it specifically said for Gereb's.
21  Q   Let's look at the order granting Plaintiff's
22  motion to compel, which is L in our records.
23       Okay.  I'm going to mark this Exhibit 63.  I'm
24  handing you what's been marked Exhibit 63.
25  A   Okay.

Page 205

1   Q   And I want to go to Page 4.  And I'm going to
2   look at Item 2 on Page 4.  I'm going to read that to you.
3       "Defendants shall surrender the cell phones of
4   Defendant Joel Babb, Defendant Martin A Molina III,
5   Deputy Joe Gereb and Sergeant Pedro Gamboa (also known as
6   Pete Gamboa) to Flashback or other vendor within seven
7   days of this order."
8       Did I read that correctly?
9   A   You did.
10  Q   So my understanding, based on this phone list,
11  is that Sergeant Gamboa had two phones; is that correct?
12  A   Yes.
13  Q   But only one of those phones was surrendered to
14  Flashback for forensic examination; is that correct?
15  A   Yes.
16  Q   I'm going to -- also represent to you that
17  Officer Babb testified that he had a County phone as an
18  instructor and that he may have used that phone to text
19  other County employees about County business.  And do you
20  know what the number of Deputy Babb's phone was while he
21  was an instructor for the County?
22  A   I don't know it, but I do have record of it.
23  Q   Okay.  Has that phone been searched for records
24  related to criminal interdiction?
25  A   I was told that because it -- he did not

Aaron Von Muldau                                                     July 17, 2024

Page 206

1  receive it until after he was done with criminal
2  interdiction that we did not provide it.
3      Q   Understood.  So was that phone searched?
4      A   No.
5      Q   Okay.  And why was that phone not provided?
6  The order says shall surrender the cell phones of
7  Defendant Joel Babb, Molina, Gereb, and Sergeant Pedro
8  Gamboa.  How come the County phone assigned to Deputy
9  Babb was not surrendered?
10     A   I was not instructed to take that phone up.
11     Q   I mean, the Court did instruct Defendants -- is
12  that --
13         MR. FRIGERIO:  If they use -- my understanding
14  is if they were used in, for business purposes.  Just
15  because his number's listed doesn't mean Gamboa ever used
16  his personal phone for County business.
17         MS. HEBERT:  Sure.  We can take this back to
18  the Court and say that -- and fight about it.  But the
19  Court did order the phones of these folks listed -- and
20  we weren't even appraised [sic] that these other phones
21  existed.
22         We can fight about it, but I'm going to say
23  that the order plainly says that these cell phones were
24  supposed to be surrendered.  And quibbling about what
25  they were used for on a particular situation I think is

Page 207

1  going to get us in hot water.
2         So Charles, if you would let me know by
3  tomorrow what the County's position is on these
4  additional phones that were not surrendered for forensic
5  examination, that would be appreciated.
6         It is Plaintiff's position that all phones
7  should have been surrendered as part of this Court's
8  order, especially phones listed on the Organized Crime
9  Unit and phones given to one of these folks by the
10  County.
11         MR. FRIGERIO:  It also said that Defendant
12  Babb, Molina and Gereb used their cell phones within the
13  scope of their employment with the Bexar County Sheriff's
14  Office in making traffic stops, including using their
15  phones to communicate with Sergeant Gamboa.  I mean,
16  that's the way I read it.
17         MS. HEBERT:  Sure.
18         MR. FRIGERIO:  Not that their personal phones
19  would be subjected, although the only one -- the only one
20  that was personal was Gereb, and that's because he did
21  use it.
22         MS. HEBERT:  Sure.  We can -- let us know the
23  County's position on the additional phones.
24     Q   (By Ms. Hebert) Let's see.  What else?
25         (Counsel conferring off the record.)

Page 208

1      Q   (By Ms. Hebert) Okay.  I want to scroll to the
2  bottom of this Organized Crime Division chart.  And you
3  see where Canine is listed?
4      A   I do.
5      Q   Do you see how Deputy Molina is listed under
6  Canine?
7      A   I do.
8      Q   Is there any other Canine officer listed as
9  part of the Organized Crime Division?
10     A   At this time, no.
11     Q   Why is Deputy Molina listed as part of the
12  Organized Crime Division?
13     A   That's where he, his assignment is.  He's
14  attached to them.
15     Q   How long has he been attached to the Organized
16  Crime Division?
17     A   I don't know, ma'am.  I don't keep track of
18  day-to-day --
19     Q   Sure.  Who would know?
20     A   Probably Deputy Molina.  But -- or his, one of
21  his sergeants.  Do you know?
22         SERGEANT GAMBOA:  So he was assigned --
23         MS. HEBERT:  Okay, we're going to pause and go
24  off the record.
25         THE REPORTER:  We're off.

Page 209

1         (Discussion off the record.)
2         THE REPORTER:  We're back on the record.
3      Q   (By Ms. Hebert) Captain, do you know what date
4  this Organized Crime Division phone list is from?
5      A   I don't, but based on the listing of officers
6  and movement that we've had, this is probably March or
7  April of this year.
8      Q   And "this year" being 2024?
9      A   Maybe May.  Yes, 2024.  It's a 2024 list.
10     Q   Okay.
11     A   Because there was a change in leadership and
12  the new person is already on there.
13     Q   And do you know when Deputy Molina was assigned
14  to the Organized Crime Division?
15     A   The exact date, no.  I know he was there at
16  least March 16th, 2022, but he was -- prior to that,
17  there was only one other Canine assigned prior to him,
18  which was Gerard Tubbs, but he retired or resigned and
19  went to another agency.
20     Q   Okay.  So let me unpack that.  The original
21  Canine assigned to the Organized Crime Division was with
22  someone named Officer Tubbs.
23     A   Gerard Tubbs.
24     Q   Gerard Tubbs.  And Gerard Tubbs retired at some
25  point.

Aaron Von Muldau                                                    July 17, 2024

Page 210

1    A   Yes, left the agency.
2    Q   And you don't know exactly when Officer Tubbs
3  retired.
4    A   I would say around the early part of 2022 or
5  latter part of 2021.
6    Q   Fine.  And as of March 16th, 2022, Deputy
7  Molina was the Canine officer assigned to the Organized
8  Crime Division?
9    A   Yes.
10   MR. FRIGERIO:  What was the date on that again,
11 that he was assigned to Organized Crime?
12       THE WITNESS:  We know it's before March 16th,
13 but I want to say -- 2022, but I want to say it was
14 either -- the way retirements go, it's usually the latter
15 part.  But knowing 2022 was an election year, he probably
16 would have resigned latter part of 2023 -- or '21 to '22.
17 Because I know he took a chief's spot somewhere.
18   MS. HEBERT:  Okay.  We're going to go off the
19 record.  Y'all are talking on the record.
20       THE WITNESS:  Oh.
21   MS. HEBERT:  And I don't want that to be
22 captured by Molly.
23       THE REPORTER:  Okay.  We're off the record.
24   (Discussion off the record.)
25   Q   (By Ms. Hebert) Going back on the record.  We

Page 211

1  are finished with Exhibit 63, the Organized Crime
2  Division.  We can leave that.  I want to just ask a
3  couple of questions about patrol cars and the use of
4  patrol cars.
5    A   Okay.
6    Q   Under County policy, is it okay for an officer
7  to complete reports in his patrol car?
8    A   Yes.
9    Q   Okay.  And I guess would it be fair to say that
10 an officer's patrol car is effectively his or her mobile
11 office?
12   A   Yes.
13   Q   Under County policy, under the County's rules,
14 what are the rules for how an officer can decorate his
15 patrol car?  And by that I mean like -- could I display
16 pictures of my family in my patrol car?
17   A   There's nothing against it.
18   Q   Okay.  Pictures of my dog?
19   A   Nothing against it.
20   Q   What about stickers like "Protect the Cops"?
21   A   There's -- I don't think -- I don't think we've
22 ever had a reference to something like that.  Officers
23 have used like the thin blue line or the Veterans or
24 police officer flag, which has the blue line instead of
25 the red line, or the thin -- you know.  But we as an

Page 212

1  agency are very careful about not alienating and using
2  derogatory -- derogatory tones or messaging, so that
3  could be something that would be -- it's usually on a
4  case-by-case basis.
5    Q   Sure.
6    A   But that's kind of the direction that we have
7  given.
8    Q   Understood.  So I mean, I guess the way I hear
9  what you're saying is if an officer puts some, like some
10 sticker or some sign with a racist slogan or a naked
11 woman in their patrol car --
12   A   They're in trouble.
13   Q   -- someone would have something to say about
14 it.
15   A   More than something to say, but yes, ma'am.
16   Q   And I suppose there's some -- how would the
17 County know if an officer had those kind of pictures?
18   A   How would they know?  There are inspections.
19 There are -- the vehicles go to different areas to get
20 maintenance and things like that, so it would just -- you
21 know, and other people seeing it.  Officers are real good
22 about telling on each other.
23   Q   Okay.  So let me unpack that.  So if an officer
24 had a picture or a sign or a logo in their patrol car
25 that they weren't supposed to have, the County would have

Page 213

1  something to say about it?
2    A   Yes.
3    Q   When an officer makes a traffic stop and the
4  officer turns on their lights or their siren or one of
5  the two, does the driver have to stop?
6    A   No.  Driver doesn't have to stop.
7    Q   Okay.  So -- if a police officer turns on
8  their --
9    A   But there's consequences, but --
10   Q   Okay.  Tell me -- all right.  So let me back up
11 there.  So if an officer turns on his lights --
12   A   Uh-huh.
13   Q   -- and is signaling to a driver to pull over --
14   A   Right.
15   Q   -- if the driver does not pull over, what are
16 the consequences?
17   A   He can be charged with evading in a motor
18 vehicle.
19   Q   Okay.  So pull over and stop or suffer the
20 consequences.
21   A   You are -- when you are directed to, as long
22 as, you know, you have something that's complying, but
23 there are -- the statute allows, and we allow as an
24 agency -- you know, you're a single woman and we're in
25 the middle of the country, we're not going to make you

54 (Pages 210 - 213)

Aaron Von Muldau                                                    July 17, 2024

Page 214

1  pull over on a dirt road in the middle of nowhere, right?
2  You indicate to the officer that, hey, I acknowledge you,
3  and then we go up to the nearest lighted area, populated
4  area that you feel safe.
5      Q   Sure.
6      A   Now, that doesn't mean that, hey, I don't like
7  this gas station, but I want to go to the gas station 20
8  miles away to my house. It means that, you know, you
9  acknowledge the officer and do that.
10         There are -- in order to do patrol stops, you
11  know, there's markings that you have to have, things like
12  that. And then if the vehicle -- because the city or the
13  state does have vehicles or allow vehicles that are
14  unmarked, there are certain rules that go along with
15  that, right?
16         They're allowed to call dispatch and say, hey,
17  I'm being pulled over on this. And whether they get
18  through San Antonio Police Department or whether Bexar
19  County agency that we dispatch for 22 people, Medina
20  County, they will identify where they're at and they will
21  call the affected jurisdiction and say, "Listen, are you
22  conducting a traffic stop?"
23     Q   Sure.
24     A   But yes, under normal indications, when your
25  lights and sirens come on, you comply with the officer

Page 215

1  and you pull over.
2      Q   Thanks. That's all I wanted to know.
3          Under County policy, what should an officer do
4  if a driver tries to leave the traffic stop before the
5  officer releases the driver?
6      A   Under the County policy?
7      Q   So basically, what's an officer supposed to do
8  if the driver tries to leave before the officer says
9  you're free to go?
10     A   I don't recall a policy that directly addresses
11  that. It is a violation of statute, and it could be
12  considered evading, resisting arrest or -- a traffic stop
13  is a form of arrest.
14     Q   Okay. I have one really more line of
15  questioning and then I'm going to say we're done, God
16  willing.
17         We talked about the inconsistencies in Deputy
18  Molina's SPEARS report which didn't say he found
19  anything, and then the trace Canine Deployment Report.
20  Why isn't Molina being investigated for that?
21     A   For what?
22     Q   We can look at the documents again, but on the
23  Canine Deployment Detail Report, we saw how the trace
24  marijuana was discovered --
25     A   Uh-huh.

Page 216

1      Q   -- in Mr. Schott's vehicle. And we looked at
2  the SPEARS/RMS report, which was Exhibit 8, where Molina
3  didn't say anything about finding trace marijuana in
4  Mr. Schott's vehicle. Is Molina being investigated for
5  any kind of inconsistency with his reporting?
6      A   No.
7      Q   Why not?
8      A   Because I think we're confusing many factors
9  that go into play. The reports, like it says, there was
10  no contraband found on the citation, or it is usually --
11  they're not putting down that they're seizing anything.
12  But there are things that, you know, you find leaves, you
13  find remnants, things that don't equate what the DA takes
14  as possession. So it's not documented in the report as
15  contraband.
16         I don't know -- I remember reading somewhere
17  during all of this stuff that we've provided that there
18  was some remnants. That's all I can remember. But it
19  wasn't a testable or usable amount. So it's not --
20  depending on the perception of the officer, it's not
21  necessarily considered contraband because he's not taking
22  anything away from anybody.
23     Q   Sure. Let's look at the Molina report again.
24         MS. HEBERT: Can you help me find that? It's
25  Exhibit 27. I'll hand that to you.

Page 217

1          MR. WINDHAM: His supplemental?
2          MS. HEBERT: No, just the deployment. The
3  deployment record.
4          MR. WINDHAM: Oh.
5          MS. HEBERT: It's not going to be in there for
6  you.
7          MR. WINDHAM: This?
8          MS. HEBERT: Thanks.
9      Q   (By Ms. Hebert) Let's look at this again.
10  We're looking at Plaintiff's Exhibit 27. Do you see
11  where it says the trace amount, the line?
12     A   Yes.
13     Q   It doesn't say leaves, does it?
14     A   I don't know what selections are available for
15  that --
16     Q   Sure.
17     A   -- field.
18     Q   It says marijuana; is that correct?
19     A   It does say marijuana.
20     Q   It does not say leaves, correct?
21     A   It does not say leaves.
22     Q   It does not say unidentified subject, does it?
23     A   Nope.
24     Q   It says marijuana.
25     A   It does.

55 (Pages 214 - 217)

Page 218

1  Q   And there was no marijuana tested from
2  Mr. Shots' vehicle, was there?
3  A   There -- we do not have field tests for
4  marijuana.
5  Q   Sure.  Was there any field tests done on any
6  materials from Mr. Schott's vehicle?
7  A   I'm not aware.
8  Q   So you can't say whether this marijuana was
9  actually found or not?
10  A   No.  As I said, it was listed in one of the
11  reports that there were some possible remnants, but that
12  was about it.
13  Q   Okay.  What report?
14  A   I don't remember.  I've provided over 10,000
15  documents, ma'am.
16  Q   Sure.
17  A   I don't -- there's a lot of stuff that I've
18  provided.  So I just -- that is the best of my recall.
19  The only thing I can do is try to explain the
20  discrepancy.  But you know, when it comes to that, you
21  would have to talk to Deputy Molina.
22  Q   Sure.
23      MS. HEBERT:  And Charles, I'm going to call for
24  the production of any report that says there was
25  substance found in Mr. Schott's vehicle.

Page 219

1      MR. FRIGERIO:  There is none other than Exhibit
2  27.
3  Q   (By Ms. Hebert) Okay.  So this is the only
4  document saying that there was a substance found --
5      MR. FRIGERIO:  Yes.
6      MS. HEBERT:  -- in Mr. Schott's vehicle?
7      THE WITNESS:  Okay.
8  Q   (By Ms. Hebert) Is this the only document
9  saying that there was a substance found in Mr. Schott's
10  vehicle?
11  A   I believe so, but I don't -- I can't recall
12  completely.
13      MS. HEBERT:  Okay.  No further questions at
14  this time.
15      MR. FRIGERIO:  Reserve our questions.
16      THE REPORTER:  We are off the record.  The
17  deposition is concluded.
18      MR. WINDHAM:  Did Blair have any questions?
19  I'm sorry to do that.
20      MR. LEAKE:  No, it's okay.  I'm likewise
21  reserving.
22      MS. HEBERT:  Sorry, Blair, we forgot about you
23  for a minute.
24      THE REPORTER:  Sorry about that.
25      (Deposition concluded at 3:42 p.m.)

Page 220

CHANGES AND SIGNATURE OF WITNESS

WITNESS NAME:  AARON VON MULDAU

DATE OF DEPOSITION:  JULY 17, 2024

PAGE/LINE  CHANGE               REASON FOR CHANGE

I, AARON VON MULDAU, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.

_____
AARON VON MULDAU

Page 221

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ALEK SCHOTT,                §
     Plaintiff,             §
                            §
VS.                         §
                            §
JOEL BABB, in his individual § CIVIL ACTION NO.
and official capacity;      § 5:23-cv-00706-OLG-RBF
MARTIN A. MOLINA III, in his §
individual and official     §
capacity; JAVIER SALAZAR, in §
his individual and official §
capacity; and BEXAR COUNTY, §
TEXAS,                      §
     Defendants.            §

------
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF AARON VON MULDAU
JULY 17, 2024
------

I, MOLLY CARTER, Certified Shorthand Reporter in and
for The State of Texas, hereby certify to the following:
That the witness, AARON VON MULDAU, was duly sworn
by the officer and that the transcript of the oral
deposition is a true record of the testimony given by the
witness;
I further certify that pursuant to FRCP Rule
30(e)(1), that the signature of the deponent:
_XX_ was requested by the deponent or a party before

Aaron von Muldau                                           July 17, 2024

Page 222

1   the completion of the deposition and returned within 30
2   days from date of receipt of the transcript.  If
3   returned, the attached Changes and Signature Page
4   contains any changes and the reasons therefor;
5         _____ was not requested by the deponent or a party
6   before the completion of the deposition.
7         I further certify that I am neither attorney nor
8   counsel for, related to, nor employed by any of the
9   parties to the action in which this testimony was taken.
10  Further, I am not a relative or employee of any attorney
11  of record in this cause, nor do I have a financial
12  interest in the action.
13        Certified to by me on this 29th day of July 2024.
14
15
16
17

18        MOLLY CARTER, CSR NO. 2613
          Expires:  04/30/2024
19
          Veritext Legal Solutions
20        Firm Registration No. 571
          300 Throckmorton, Suite 1600
21        Fort Worth, Texas  76102
          800-336-4000
22
23
24
25

Page 223

1   Charles Frigerio, Esquire
2   csf@frigeriolawfirm.com
3               July 30, Esquire
4   RE:   Schott, Alek v. Babb, Joel Et Al
5   7/17/2024, Aaron von Muldau (#6710900)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  clientservices-va@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

57 (Pages 222 - 223)

Veritext Legal Solutions