Page 1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE WESTERN DISTRICT OF TEXAS

2                    SAN ANTONIO DIVISION

3      ALEK SCHOTT,                    )

                    PLAINTIFF,         )

4                                      )

       VS.                             )

5                                      )

       JOEL BABB, IN HIS               )

6      INDIVIDUAL AND OFFICIAL         )    CIVIL ACTION NO.

       CAPACITY; MARTIN A.             )    5:23-CV-00706-OLG-RBF

7      MOLINA III, IN HIS              )

       INDIVIDUAL AND OFFICIAL         )

8      CAPACITY; JAVIER SALAZAR,       )

       IN HIS INDIVIDUAL AND           )

9      OFFICIAL CAPACITY; AND          )

       BEXAR COUNTY, TEXAS,            )

10                   DEFENDANTS.       )

       ********************************************************

11                   ORAL DEPOSITION OF

12                   SERGEANT PETER GAMBOA

13                     July 23, 2024

14     ********************************************************

15

16             ORAL DEPOSITION of SERGEANT PETER GAMBOA,

17     produced as a witness at the instance of the Plaintiff,

18     and duly sworn, was taken in the above-styled and

19     numbered cause on the 23rd day of July, 2024, from

20     9:29 a.m. to 4:46 p.m., before Anica Diaz, CSR, RPR,

21     CRR, in and for the State of Texas, reported by machine

22     shorthand, at the Law Offices of Charles S. Frigerio,

23     111 Soledad Street, Suite 465, San Antonio, Texas,

24     pursuant to the Federal Rules of Civil Procedure and the

25     provisions stated on the record or attached.

Peter Gamboa                                                          July 23, 2024

Page 2

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF:

    MS. CHRISTEN M. HEBERT
    INSTITUTE FOR JUSTICE
    816 Congress Avenue, Suite 970
    Austin, Texas 78701
    Tel: (512) 480-5936
    chebert@ij.org

    MR. JOSHUA A. WINDHAM
    INSTITUTE FOR JUSTICE
    901 North Glebe Road, Suite 900
    Arlington, Virginia 22203
    Tel: (703) 682-9320
    jwindham@ij.org

COUNSEL FOR THE DEFENDANTS:

    MR. CHARLES S. FRIGERIO
    MR. CHARLES A. FRIGERIO
    LAW OFFICES OF CHARLES S. FRIGERIO, P.C.
    111 Soledad Street, Suite 465
    San Antonio, Texas 78205
    Tel: (210) 271-7877
    csfrigeriolaw@sbcglobal.net
    firm@frigeriolawfirm.com

COUNSEL FOR DEFENDANT JOEL BABB:

    MR. RYAN ELLSWORTH
    WRIGHT & GREENHILL, PC
    4700 Mueller Boulevard, Suite 200
    Austin, Texas 78723
    Tel: (512) 476-4600
    rellsworth@w-g.com

ALSO PRESENT:

    Mr. Hector Saenz

Page 3

# I N D E X

                                                 PAGE

Appearances.....................................    02

Exhibits........................................    04

SERGEANT PETER GAMBOA
    Examination by Ms. Hebert.................    05
    Examination by Mr. Frigerio...............   245
    Examination by Ms. Hebert.................   248

Changes and Signature...........................   252

Reporter's Certificate..........................   254

Page 4

E X H I B I T S

                                                 PAGE

Plaintiff's Exhibit No. 16
        Internal Affairs Records..............   235

Plaintiff's Exhibit No. 50
        Babb-Gamboa Phone Call, No Subtitles..   225

Plaintiff's Exhibit No. 51
        Babb-Gamboa Phone Call, Subtitles.....   229

Plaintiff's Exhibit No. 53
        Organization Chart....................    66

Plaintiff's Exhibit No. 64
        Gamboa Conversation #19...............    94

Plaintiff's Exhibit No. 65
        Interrogatories Propounded by Plaintiff   95

Plaintiff's Exhibit No. 66
        Social Media Training Flyer...........    98

Plaintiff's Exhibit No. 67
        Criminal MAPP Training Flyer..........   100

Page 5

# P R O C E E D I N G S

1     (Proceedings began at 9:29 a.m.)

2     THE REPORTER:  Okay.  On the record at

3  9:29 a.m.

4     Counsel, would you prefer to have me read

5  the script for a Federal Deposition and then introduce

6  yourselves, or would you prefer to waive this?

7     MS. HEBERT:  We can waive.

8     MR. FRIGERIO:  We'll waive.

9     (Per agreement of all counsel, Federal

10  Rule 30(b)(5) Read-On was waived.)

11     SERGEANT PETER GAMBOA,

12  having been duly sworn, was called as a witness and

13  testified as follows:

14     THE WITNESS:  I do.

15     THE REPORTER:  Thank you.

16     EXAMINATION

17  BY MS. HEBERT:

18     Q.  Good morning.  I'm Christie Hebert, and I

19  represent Alek Schott in this case.  We met previously;

20  is that right?

21     A.  Yes, ma'am.

22     Q.  I'm going to kind of go through the same

23  rigmarole just so that it's all on the record, but so

24  just bear with me here.

2 (Pages 2 - 5)

Page 6

1    A. Sure. No problem.
2    Q. First, I'm going to introduce everybody.
3  Obviously, I'm Christie and this is my colleague,
4  Joshua Windham. We are joined by Anica, the court
5  reporter, and she's going to write down everything you
6  say today, and everything I say today.
7          This is Mr. Ellsworth, he represents
8  Mr. Babb in this matter. And then you are joined by
9  your counsel, Charles Frigerio, or the County's counsel,
10  excuse me, Charles Frigerio, Hector Saenz and Charlie
11  Frigerio. So I've got everybody here.
12          We're going to just say the usual
13  stipulations, so by being here today, you waive any
14  objections or defects in your deposition notice. So
15  you're here, basically.
16    A. Yes.
17    Q. And you're going to waive any objections to the
18  court reporter's qualifications, Ms. Anica is a
19  qualified court reporter to take down your information
20  today; is that fair?
21    A. Sure. Absolutely. Thank you.
22    Q. So generally, what we're going to start with
23  the basic questions, what is your full name?
24    A. Pedro Maldonado Gamboa.
25    Q. Okay. And is it okay if I call you

Page 7

1  Sergeant Gamboa today?
2    A. Absolutely.
3    Q. And before we go on, I'll go over a couple
4  housekeeping matters. You've heard me do this before.
5  Have you testified under oath before today?
6    A. I have.
7    Q. Okay. And can you tell me about that?
8    A. So during my career as a patrol deputy, I made
9  several arrests and had to testify in court for those
10  arrests.
11    Q. Those were all criminal matters?
12    A. Correct.
13    Q. Any civil matters?
14    A. I have.
15    Q. Okay.
16    A. As an investigator, I did crimes against
17  children, and I had to testify before a civil hearing.
18    Q. Okay. So would it be fair to say that all of
19  your testimony has previously been related to crimes?
20    A. Yes, ma'am.
21    Q. Okay. Have you ever had your deposition taken
22  before?
23    A. No, ma'am.
24    Q. And you understand you are under oath today?
25    A. I do understand.

Page 8

1    Q. And you understand that means that you swore to
2  tell the truth?
3    A. Yes, ma'am.
4    Q. And that's -- your testimony today is the same
5  as if it were before a judge in a court?
6    A. Absolutely.
7    Q. It's important that we create a clear record
8  today, and that means that I need to ask clear questions
9  and you need to give clear answers.
10    A. Okay.
11    Q. So please do not nod or shake your head in
12  response to a question. And things like "uh-huh" or
13  "nuh-uh," we'll try to say "yes" or "no" instead so the
14  court reporter can capture that; is that fair?
15    A. Yes, ma'am.
16    Q. And I'll try to help you too, and you can try
17  to help me as well.
18          If you don't understand a question, please
19  let me know, and I will try to clarify it. It's
20  important that you understand the question and I ask
21  clear questions. It's also important that I try to
22  finish answer -- or asking a question before you start
23  to answer it, and I try to wait for you to finish
24  answering a question before I ask another one. I know
25  it's not like a natural conversation, where you kind of

Page 9

1  see where someone is going and you start talking. So
2  let's try to not interrupt each other; is that okay?
3    A. Yes, ma'am.
4    Q. If you do not know the answer to a question,
5  it's okay to say, I don't know. But if you do know the
6  answer, you are required to provide it. Do you
7  understand?
8    A. Yes, ma'am.
9    Q. Your attorney, Mr. Frigerio, may state an
10  objection. That does not necessarily mean I've asked a
11  bad question. It also does not mean that you can refuse
12  to answer it. Only if Mr. Frigerio instructs you not to
13  answer are you to refuse to answer a question.
14          Mr. Frigerio or other counsel may state an
15  objection and that is merely to preserve the right to
16  object to the question later, if we want to use the
17  answer before a court so we can argue that the question
18  was improper to a judge. Do you understand?
19    A. I do.
20    Q. If you would like to take a break, use the
21  bathroom, get a drink, get a snack, that's okay. Just
22  let me know. The only thing I would ask is that you
23  finish answering a question before we take a break.
24    A. Yes, ma'am.
25    Q. We're going to look at some documents today,

Peter Gamboa
July 23, 2024

Page 10

1 and you have the right to read that document in its
2 entirety and if you need to take a break to fully review
3 it, that's fine too. I'm just going to point us to
4 specific points of the document to avoid spending all
5 day on the document. Do you understand?
6    A. Yes, ma'am.
7    Q. And similarly, we may look at some video clips
8 today. I'm going to identify parts of the video clip to
9 ask you questions about.
10    A. Okay.
11    Q. But, again, you have the right to review that
12 video clip in its entirety and if we need to, we'll take
13 a break so you can watch the whole thing.
14    A. Okay.
15    Q. And that goes, I guess, for this entire
16 conversation. I'm not looking to trick you or trap you.
17 I'm looking to ask questions and get your answers on the
18 record and create a clear record for both sides. Do you
19 understand?
20    A. Yes, ma'am.
21    Q. Is there any reason why you are not able to
22 give your fullest and best testimony today such as
23 you're taking an impairing medication?
24    A. No, ma'am.
25    Q. Did you drink alcohol this morning?

Page 11

1    A. No, ma'am.
2    Q. And are you generally clearheaded to testify?
3    A. I am.
4    Q. And other than speaking with your attorneys,
5 and I'm not asking about that at all, did you do
6 anything to prepare for your deposition today?
7    A. Just reviewed our policies, and reviewed a
8 video.
9    Q. Okay. When you say reviewed policies, can you
10 tell me what you mean by that?
11    A. Just went over our manual and looked at some of
12 the policies that we would work under at that time.
13    Q. Okay. And do you happen to remember, like,
14 what parts you looked at or what your --
15    A. Stop and frisk.
16    Q. Okay.
17    A. Warrantless arrest.
18    Q. Okay. Anything else?
19    A. That's pretty much it.
20    Q. And it's my memory that those are just distinct
21 chapters?
22    A. Correct.
23    Q. There's a chapter on stop and frisk --
24    A. Correct.
25    Q. -- and there's a chapter on warrantless arrest.

Page 12

1    A. Correct. Correct.
2    Q. And when you said reviewed video, what video
3 did you review?
4    A. Deputy Babb's stop on March 16th.
5    Q. Okay. And when you say Deputy Babb's stop,
6 what -- what video of that stop did you review?
7    A. The specific stop with Mr. Schott.
8    Q. Yes, yes, I understand that. But I know
9 there's, like, a bunch of different videos of that
10 floating around. So for instance --
11    A. Body camera.
12    Q. -- did you review Deputy Babb's body camera
13 footage?
14    A. Correct.
15    Q. Did you review any other officer's body camera
16 footage?
17    A. Deputy Molina's.
18    Q. Okay. Okay.
19    A. And also Deputy Gereb's.
20    Q. Okay. So other than reviewing two chapters of
21 the sheriff's manual and the body worn camera of Babb's,
22 Molina and Gereb, anybody else?
23    A. No.
24    Q. Anything else?
25    A. That was it.

Page 13

1    Q. Okay. Other than conversations with your
2 counsel, and again I'm not asking you about those, did
3 you have any conversations with anybody else in
4 preparation for this deposition?
5    A. No, ma'am.
6    Q. Okay.
7    A. Except for the time I was here.
8    Q. Right. And so when you refer to the time --
9 when you're referring to the time you were here, you're
10 referring to when you sat in on the 30(b)(6) deposition;
11 is that correct?
12    A. Captain Von Muldau's deposition.
13    Q. Correct?
14    A. Yes, ma'am.
15    Q. We are going to talk a lot about Bexar County's
16 sheriff's office today. Can we agree that when I say
17 the sheriff's office, I'm referring to the Bexar County
18 sheriff's office?
19    A. Yes, ma'am.
20    Q. And when I refer to the county, can we agree
21 that I'm referring to Bexar County?
22    A. Correct. Yes, ma'am.
23    Q. And when I say the sheriff, can we agree that
24 I'm referring to the sheriff of Bexar County?
25    A. Yes, ma'am.

4 (Pages 10 - 13)

Page 14

1    Q. Okay. I'd like to just get to know you a
2 little bit about your position. Why did you become a
3 police officer?
4    A. All my life, growing up, I looked up to police
5 officers. We had an officer named Sharp, who would come
6 and do our bike rodeos when I was in elementary. And I
7 got along well with him. And really all my life, it's
8 what I wanted to do.
9    Q. So did you become a police officer straight out
10 of high school?
11    A. No. So, when I graduated, one of my first jobs
12 was working for the state as a janitor. From there, I
13 moved to Big Red Bottling Company and I was a night
14 loader, I worked overnight.
15        There was an opportunity for the City of
16 San Antonio Municipal Courts as a detention officer is
17 where I started my law enforcement career. From there,
18 I came over to Bexar County. So August will be
19 26 years.
20    Q. Congratulations.
21    A. Thank you.
22    Q. So did you attend academy with San Antonio or
23 Bexar County?
24    A. So, I went through SAC, San Antonio College --
25    Q. Uh-huh.

Page 15

1    A. -- to get my -- first my jailer's license.
2 Then I went through the Bexar County academy, detention
3 academy, graduated there, and then I went through San
4 Antonio College for my peace officer's license.
5    Q. Okay. Around what is your current position
6 with the sheriff's office?
7    A. Currently, I am a supervisor over the intel
8 unit. I am the commander over the sheriff's mounted
9 patrol. I am the supervisor over the sheriff's
10 executive protection unit.
11    Q. A lot of responsibility.
12    A. Yes, ma'am. And over the intel unit, I have
13 got two sections in the jail that work for me.
14    Q. Okay. And when you say you're over the intel
15 unit, you've got two sections in the jail, does that
16 mean there are sections that are not in the jail?
17    A. Yes, ma'am.
18    Q. And what are the sections that are not in the
19 jail?
20    A. So the TAG, which is the Texas Antigang intel
21 Unit is on the law enforcement side. They work mostly
22 outside the jail environment. I do have two of those
23 officers that do work some in the jail capacity as far
24 as conducting interviews in the jail, taking statements
25 in the jail. But I also have a gang intel unit that are

Page 16

1 detention deputies that are assigned to the jail. So we
2 have two tiers. We have the detention bureau and then
3 we have the law enforcement bureau.
4    Q. Okay.
5    A. So the two officers that I mentioned that work
6 on the outside are assigned to the law enforcement
7 bureau. I've got currently four deputies that are
8 assigned to detention bureau, assigned to the gang intel
9 unit.
10    Q. Okay. So in total, would you say that you
11 supervise then six folks in the --
12    A. No. So total I've got --
13    Q. I'm just talking about the intel side right
14 now.
15    A. Right.
16    Q. Okay.
17    A. So total on the intel side, I've got -- let's
18 see, one, two, three, four, five, six, seven, eight,
19 nine -- ten.
20    Q. Ten?
21    A. Ten on the law enforcement side.
22    Q. Ten on the law enforcement side and is it six?
23    A. And four.
24    Q. Four on the detention side?
25    A. Detention.

Page 17

1    Q. Okay. Thanks. And is the -- does the intel
2 group fall under the organized crime division?
3    A. Yes, ma'am.
4    Q. Okay. And what is the role of the organized
5 crime division?
6    A. So we mostly -- so even though we do some
7 short-term investigations, most of our investigations
8 are long term, dealing with the organized crime side of
9 it.
10    Q. Okay. And you talked a little bit about the
11 Texas Anti-Gang Unit.
12    A. Yes, ma'am.
13    Q. Can you tell me more about that? You said it
14 was a little bit outside?
15    A. So it's a -- so Texas Anti-Gang is a program
16 through the governor's office, and that is geared
17 towards gang members. And so anything that -- that we
18 do usually has a tie to some type of gang group.
19    Q. Okay. So maybe it would help to phrase it this
20 way, tell me about a typical workday for you.
21    A. So --
22    Q. -- recognizing that there are some days that
23 are just atypical.
24    A. Right. So we deal in anything with drugs,
25 guns, auto theft, any kind of robberies, burglaries.

5 (Pages 14 - 17)

Peter Gamboa                                                    July 23, 2024

Page 18

1    Actual -- any kind of gambling, human trafficking,
2    human smuggling.
3        Q.  Okay.  So those are the crimes that you target,
4    right?
5        A.  Right.
6        Q.  And how do you go about targeting those crimes
7    on a typical workday?
8        A.  So usually it's either by confidential sources.
9    We also use tips.  We have a tips hotline.  Or if we're
10   out canvassing areas, we may conduct traffic stops, and
11   lead to further investigation into these crimes.
12       Q.  Okay.  So what I heard you say is they're kind
13   of like two buckets of things that you're doing.  The
14   first is acting on information from confidential
15   informants, confidential information, tips, that kind of
16   stuff, online information.
17       A.  Correct.
18       Q.  And then canvassing/traffic stops.
19       A.  Correct.
20       Q.  So, did I get that right?
21       A.  Yes, ma'am.
22       Q.  Are there any other kind of categories of
23   activities that you do in the intel group?
24       A.  So, we do some financial crimes, money
25   laundering.  We do some digital forensics.  We do some

Page 19

1    social media activities in the open source information.
2        Q.  Okay.  So in terms of, like, the buckets of
3    activities, there would be confidential information
4    tips, people calling in the hotline, canvassing and
5    traffic stops, and then online investigations?
6        A.  More -- yeah.  More the online.
7        Q.  Okay.  Anything else?
8        A.  That's pretty much it.
9        Q.  Okay.
10       A.  And of course everything kind of geared to, is
11   there a mechanism for the organized crime, three or more
12   people committing these types of crimes.
13       Q.  Okay.  And on a typical workday, do you have a
14   shift?
15       A.  I work from 9:00 in the morning until 5:00.
16   But mostly, our investigations go past that.  So --
17       Q.  Sure.
18       A.  I tell everybody our times are from 9:00 to
19   whenever we get off.
20       Q.  I understand.  And is that -- how many days a
21   week do you generally work?
22       A.  How many hours per week?
23       Q.  How many days.
24       A.  Oh.  Five days.
25       Q.  Okay.  And what days, Monday through Friday?

Page 20

1        A.  Monday through Friday.
2        Q.  Okay.  And so how do you usually start your
3    day?
4        A.  Will come in, I'll meet with all my group, find
5    out what's going on, does anybody have any surveillance
6    that we need to conduct?  Is there any search warrants
7    that are going to be taking place?  Any arrest warrants
8    that we have prepared and ready to execute, things of
9    that nature.
10       Q.  And so that's your morning meeting?
11       A.  Yes, ma'am.
12       Q.  And what do you usually do after the morning
13   meeting?
14       A.  So after the morning meeting, I'll send them
15   out to the field, do what they're going to do.  Then
16   I'll meet with my counterpart, the sergeant who's over
17   covert, and our lieutenant, who is over the organized
18   crime.
19       Q.  Okay.  And who is your lieutenant who's over
20   organized crime?
21       A.  Angela Freveletti.
22       Q.  Okay.  Does the sheriff's office, the organized
23   crime division specifically, have relationships with
24   other law enforcement agencies about sharing
25   information?

Page 21

1        A.  We do.
2        Q.  Can you tell me about those?
3        A.  So as far as agencies?
4        Q.  Yeah.  And the -- and the relationships.
5        A.  So as part of the TAG, we're all in one
6    building.  So we work with DEA, FBI, ATF, his, the
7    Office of Inspector General's office, and SAPD.  I'm
8    trying to think who else.  Border Patrol are the main
9    ones that we work with.
10       Q.  Sure.  And I understand most of those acronyms.
11   The two that I don't, I'm not familiar with:  His, what
12   is that?
13       A.  Homeland Security.
14       Q.  Oh, okay.  Duh.  And ATF?
15       A.  Alcohol Tobacco Firearms.
16       Q.  Okay.  And do you have formal agreements in
17   place with these folks, these different agencies?
18       A.  So we do have TFOs.
19       Q.  And TFOs are?
20       A.  They are --
21       Q.  I know, I'm not trying to quiz you on acronyms.
22       A.  No, no.  I'm trying to remember.
23       Q.  I just don't know what that is.
24       A.  They are task force.  Task force officers.
25       Q.  Okay.

6 (Pages 18 - 21)

Peter Gamboa                                                    July 23, 2024

Page 22

1    A.  So we have officers assigned to DEA, and there
2  is an MOU in place --
3    Q.  Okay.
4    A.  -- with these agencies.  DEA, FBI, Secret
5  Service, HIDTA.
6    Q.  What is HIDTA?
7    A.  Which is a high intense trafficking drug
8  organization.
9    Q.  Is it HIDO or --
10    A.  No, no.  It's HIDTA.  High intensive traffic
11  organization.  I'm not sure what the H stands for.
12    Q.  Okay.
13    A.  And there is MOUs with those.
14    Q.  Okay.  And who's responsible for drafting,
15  putting together these MOUs?
16    A.  That would be the lieutenant for our -- for our
17  group.  And then it would go through the DA's office to
18  get the final approval.
19    Q.  Okay.  Are there any agencies that the
20  sheriff's office does not partner with?  And by that,
21  I mean, are there any agencies that the sheriff's office
22  has said, you know, we're not going to work with so and
23  so because they're not that good, or we're not going to
24  share information with Y?
25    A.  No, ma'am.

Page 23

1    Q.  Okay.
2    A.  No law enforcement agencies.
3    Q.  Sure.  Any private entities that you can think
4  of?  I'm just asking because you qualified with law
5  enforcement.
6    A.  So we have worked with some groups for the
7  human smuggling side of it that provide food, shelter,
8  clothing to immigrants that are involved in the human
9  smuggling side of it.
10    Q.  You have?
11    A.  Yes.
12    Q.  Previously?
13    A.  Yes, ma'am.
14    Q.  But you no longer do that?
15    A.  No, we do.  But I don't think there's
16  anything -- no contracts or anything with that.
17    Q.  Sure.  Okay.  If someone calls an officer
18  claiming to work for one of these agencies, and saying
19  that they have information on a particular criminal,
20  what would you expect that officer to do with that
21  information?
22    A.  As far as our officers?
23    Q.  Yes, sir.
24    A.  Well, I mean, they -- they would have -- I
25  would have to vet, if it was me, I would have to vet

Page 24

1  who's giving me this information.
2    Q.  Okay.
3    A.  If it's Border Patrol, then, you know, I would
4  make contact with the officers that we work with in a
5  daily basis and confirm that information.
6    Q.  And that sounds like that's your practice.
7    A.  Yes, ma'am.
8    Q.  Have you instructed your officers that that's
9  how they're supposed to operate?
10    A.  So we've really never had that conversation --
11    Q.  Sure.
12    A.  -- but I would expect it that they would do
13  that.
14    Q.  Okay.
15    A.  If there was questions about it, then they
16  would come to me with that information and that's how I
17  would guide them --
18    Q.  Okay.
19    A.  -- to vet the information.
20    Q.  Okay.  At one point, the sheriff mentioned an
21  employee that works at the San Antonio fusion center.
22    A.  Okay.
23    Q.  What is a fusion center?
24    A.  So the fusion center is -- SAPD runs the unit,
25  and what they do is they'll collect information from

Page 25

1  different areas, different agencies, and then they'll
2  put out the information, decimate [sic] the information
3  to law enforcement agencies that it may be affecting.
4    Q.  Okay.  So what kind of information do they put
5  out?
6    A.  So like they'll get information nationwide,
7  like, for example, now Fentanyl --
8    Q.  Uh-huh.
9    A.  -- is a hot button topic, right?  So they'll
10  get information from other states and they'll decimate
11  that information to the local agencies and surrounding
12  agencies that work here in San Antonio.
13    Q.  Okay.  Is there a sheriff's office employee, an
14  officer, who is with the fusion center?
15    A.  So they -- they do -- they are assigned there,
16  but they're assigned on the mental health side of the
17  fusion center.  Same thing, they'll get information
18  through the fusion center, that officer will, of course,
19  pass on the information to us, as far as anything having
20  to do with mental health.
21    Q.  Okay.
22    A.  Any kind of officer safety bulletins that are
23  generated by the fusion center will come through him and
24  then he'll pass them on to us.
25    Q.  Okay.  And do you supervise that person?

7 (Pages 22 - 25)

Peter Gamboa                                                    July 23, 2024

Page 26

1    A. I do.

2    Q. So even though there are mental health person,

3  you still supervise them?

4    A. Correct.

5    Q. And do they --

6    A. So our lieutenant --

7    Q. Sure.

8    A. -- like me, has different hats. She is the

9  commander over mental health.

10   Q. Okay. So she has two roles?

11   A. Yes.

12   Q. And so you're -- in addition to your work in

13 the intel unit and as the mount commander and the

14 sheriff's executive protection detail, you're overseeing

15 some of the mental health stuff?

16   A. Only him.

17   Q. Only this person --

18   A. Yes, ma'am.

19   Q. -- who works at the fusion center?

20   A. Yes, ma'am.

21   Q. And why would you be overseeing him?

22   A. So the position --

23   Q. Uh-huh.

24   A. -- that position falls under the organized

25 crime --

Page 27

1    Q. Okay.

2    A. -- under the umbrella of our lieutenant. So

3  she has assigned that person -- that assignment to me.

4    Q. I understand. But it sounds like that person

5  doesn't really have much to do with organized crime.

6  They're just seated there.

7    A. Correct.

8    Q. Okay. I guess, do you have a, kind of a

9  working knowledge about how the fusion center operates,

10 the San Antonio fusion center?

11   A. I'm -- just like I said, the only operation or

12 operating that I know about it is the decimation of

13 information.

14   Q. So you're receiving information. That's about

15 what you know?

16   A. Well, we can -- I mean, we can inquire, right?

17 We can ask, hey, can you, you know, get information on

18 this? But -- but our intel, my intel unit does that.

19        So we -- we really don't use them very much

20 unless it's something -- usually the patrol division is

21 who uses the fusion center.

22   Q. And patrol division of the sheriff's office.

23   A. Correct.

24   Q. Okay. And does the fusion center then call

25 officers directly?

Page 28

1    A. They can. But they'll most likely ask, who is

2  this officer assigned to, I need to get ahold of him.

3    Q. Okay.

4    A. You know, for whatever information.

5    Q. So generally, it runs down the

6  chain -- information from a fusion center runs down the

7  chain of command?

8    A. Yes, ma'am.

9    Q. Is that a fair assessment?

10   A. Pretty much, yes, ma'am.

11   Q. Okay.

12   A. Now we all have -- you know, local, right, we

13 all know each other so sometimes somebody that's

14 assigned from SAPD to the fusion center may know an

15 officer assigned to our patrol division. So, you know,

16 they're buddies, so they may call each other and have,

17 you know, that conversation.

18   Q. Understood. And do you know anything about how

19 other fusion centers operate?

20   A. So we've used El Paso's intelligence center.

21   Q. Uh-huh.

22   A. Also a fusion center type. We use them for

23 information on vehicles that we may have stopped on the

24 highway. Say it's a vehicle out of Florida, they may

25 have intel on the driving pattern of this vehicle, how

Page 29

1  many times have they come to San Antonio, how many times

2  have they crossed the border, how many times, you know,

3  they -- you know, who was the drivers. Things of that

4  nature.

5    Q. Okay. And what is the purpose of getting that

6  information from the El Paso fusion center?

7    A. So it -- it builds the reasonable suspicion

8  moving towards the probable cause for the stop. Or not

9  for the stop, but to get into a vehicle, whether it'd be

10 for smuggling, narcotic courier, currency courier,

11 things of that nature. Guns, things of that nature.

12   Q. Okay. So walk me through how that works then.

13 When do you -- when do you contact these -- the El Paso

14 fusion center for information?

15   A. So the way I would do it back when I was on

16 patrol, I would make the stop. Say it's a vehicle out

17 of Florida.

18   Q. Sure.

19   A. And so then I would run the plate. Out of

20 state returns give very little information. So then I

21 would run it through border checks. That would give me

22 more information on how many times -- if we're on 35,

23 how many times they've gone to Mexico through Laredo.

24        What happens is there's different systems,

25 different -- that are used, that report the returns to

Veritext Legal Solutions

Page 30

1  EPIC, through the El Paso Intelligence Center.
2     Q. Sure.
3     A. And then so I'll contact them, I would contact
4  them and say, hey, I'm on a traffic stop. Vehicle is
5  traveling southbound. The driver is very nervous,
6  giving evasive answers, contradicting answers, things of
7  that nature. Do you have any information on this car,
8  on this person?
9         And then they would look it up and they
10  would tell me, yes, he's been stopped by Laredo, or Webb
11  County sheriff's office. He was arrested for drug
12  smuggling. He was arrested for money laundering, things
13  of that nature.
14     Q. Okay. So does that mean you're only going to
15  reach out to the El Paso Intelligence Center when you've
16  already made a stop?
17     A. Correct.
18     Q. Okay. And you're only going to reach out to
19  the El Paso Intelligence Center when you have reason to
20  ask for additional information?
21     A. Correct.
22     Q. And do you ever get alerts from the El Paso
23  Intelligence Center?
24     A. They can. I've never received them. But there
25  can be in the return, once we run a license plate, there

Page 31

1  might be an alert saying this is a drug courier. This
2  person is known to have arrest warrants for, you know,
3  any kind of federal charges, any kind of state, local
4  charges, things of that nature.
5     Q. I guess one question that I have for you
6  is, do you do traffic -- do you, personally, do traffic
7  stops today?
8     A. Very little.
9     Q. Okay. How often would you estimate that you do
10  traffic stops?
11     A. I would probably say --
12     Q. And I'll give you just, like, a fair caveat:
13  The sheriff told us that he -- if he sees a traffic
14  violation, a particularly egregious one, he'll do the
15  traffic stop.
16     A. Yes, ma'am.
17     Q. Is that the kind of thing that you do?
18     A. More than likely, yes.
19     Q. Okay.
20     A. Probably a little bit more only because if we
21  have an operation where we're going to be doing traffic
22  stops, I'll -- I'll -- usually, I'm in plain clothes,
23  but I'll come in uniform and I've got a marked unit that
24  is assigned to me and I will do traffic stops.
25     Q. Okay. So you just mentioned an operation where

Page 32

1  you will be doing traffic stops. Can you tell me about
2  what you mean by that?
3     A. So we're doing surveillance and we -- the
4  information that we have is this person is known to
5  traffic narcotics.
6     Q. Uh-huh.
7     A. We'll -- we'll do surveillance on the
8  vehicle -- I mean, on the residence. The information
9  that we have is he'll deliver. We'll see him leave the
10  house, and we'll do a traffic stop. We'll develop
11  probable cause and do a traffic stop.
12     Q. Okay. So are the only traffic stops then for
13  operations, very specific tailored traffic stops, is
14  that correct?
15     A. Well, so for those operations.
16     Q. Sure.
17     A. I mean, we have officers, gang unit officers
18  that are assigned to organized crime that will work
19  areas of a county, and they'll -- just like a traffic
20  officer would do traffic stops.
21     Q. Okay.
22     A. So we have a unit, street crimes, and they are
23  Monday through Friday, and they do training on
24  Wednesdays. We have the gang unit, who is operational
25  Sunday through -- no, I'm sorry. Tuesday -- no, I'm

Page 33

1  sorry. Wednesday through Saturday, and they're off
2  Sunday, Monday, Tuesdays.
3         On Wednesdays, on their first day back,
4  they work our shift, 9:00 to 5:00, because the street
5  crimes --
6     Q. Are doing the training?
7     A. Right.
8     Q. I understand. Anybody else doing traffic
9  stops?
10     A. So I have two officers assigned to me that are
11  special enforcement. And it's -- now, I mean, it's
12  pretty much they'll, if we have an operation, hey, we
13  need you in the area in case we have enough information
14  to start doing some traffic stops.
15         THE WITNESS: Thank you, sir.
16     Q. (By Ms. Hebert) Okay. So you were talking
17  about basically organized crime officers spanning out in
18  areas of the county. Is that a fair --
19     A. Yes, ma'am.
20     Q. -- conclusion? And in spanning out to areas of
21  the county, the following groups that are what I
22  understood are folks who do traffic stops generally --
23     A. Yes, ma'am.
24     Q. -- for organized crime. Street crimes?
25     A. Yes, ma'am.

Peter Gamboa                                                            July 25, 2024

Page 34

1    Q. Gang unit and two officers with the special
2  enforcement unit; is that right?
3    A. Correct.
4    Q. And all these of these groups are doing generic
5  traffic stops as part of their organized crime duties.
6    A. Correct.
7    Q. Okay. Now, you previously attended the
8  county's deposition. We talked about this --
9    A. Yes, ma'am.
10    Q. -- where Captain Von Muldau testified on behalf
11  of county. Do you remember that?
12    A. Yes, ma'am.
13    Q. And Captain Von Muldau said that you were the
14  best person to speak about the county's policies and
15  practices on criminal interdiction. Do you remember
16  that?
17    A. Yes, ma'am.
18    Q. Is there any reason that you would disagree
19  with Captain Von Muldau's statement that you are the
20  best person to speak about criminal interdiction?
21    A. Yes, ma'am. I agree.
22    Q. You agree. Okay. So there's no reason that
23  you disagree?
24    A. No.
25    Q. You agree that you're the right person for this

Page 35

1  topic?
2    A. Yes. Yes, ma'am.
3    Q. As the county uses it, what does the term
4  criminal interdiction mean?
5    A. So criminal interdiction is a proactive unit
6  that, through traffic stops, they would encounter
7  persons with active warrants, any kind of narcotics, the
8  illegal possession of firearms, human smuggling, human
9  trafficking, and any violation of the traffic laws.
10    Q. Okay. That's helpful.
11       And so generally those are the crimes that
12  criminal interdiction targets; is that fair?
13    A. Correct.
14    Q. Can I ask a couple questions about that?
15    A. Yes, ma'am.
16    Q. Help me understand the difference between human
17  smuggling and human trafficking.
18    A. Human smuggling is actually bringing immigrants
19  illegally into the United States. Trafficking would be
20  having those immigrants work for, like, slave labor.
21  Not paying them correctly, paying off a debt that they
22  may owe for having them brought over into the
23  United States. That would be the trafficking side of
24  it. There's a spin off also for the sex trafficking --
25    Q. Uh-huh.

Page 36

1    A. -- part of it. And so of course, it would be
2  using them to pay their debt through sex.
3    Q. I understand.
4       Do all officers who go on patrol do some
5  form of criminal interdiction?
6    A. Yes, ma'am.
7    Q. Can you tell me about that?
8    A. So proactive policing, right, I think that is
9  probably what will sum it up. So in between calls for
10  service, right, that they're responding to, if there is
11  a slow day for calls, if there's such a thing, then
12  they'll do proactive policing, where they'll be driving
13  in their districts where they patrol and be actively
14  doing traffic stops.
15    Q. Okay.
16    A. And it may be from complaints that this
17  neighbor has a lot of traffic coming in and out. And so
18  they'll work the area, they'll watch somebody leave,
19  they'll traffic stop them. See if they have anything,
20  any kind of drugs, any kind of illegal firearms, things
21  of that nature.
22    Q. Sure. What is -- help me understand what
23  proactive policing really means then. Unpack that term
24  for me.
25    A. So proactive policing would -- would be someone

Page 37

1  who is active in making traffic stops, active in their
2  district. That they make contact with residents,
3  organizations, and they will receive tips, complaints,
4  of illegal activities going on. So they'll -- as they
5  have time to, they'll do some of that work, making
6  traffic stops, making contacts. They may go up to a
7  resident, knock on the door, talk to them, hey, we're
8  getting complaints that there's a lot of gang members
9  hanging around here. What's going on?
10       And so that is my definition of proactive
11  policing.
12    Q. Okay. I understand. So it seems like there
13  are two categories, and you can correct me if I'm wrong.
14  There are proactive policing through traffic stops and
15  then proactive policing through community relations.
16    A. Correct.
17    Q. And I guess I want to talk a little bit more
18  about proactive policing through traffic stops.
19       Can you help me understand how that works?
20    A. So like I said earlier, so they'll concentrate
21  on traffic violations, for example.
22    Q. Uh-huh.
23    A. They'll -- I'm going to work this area, and any
24  kind of traffic violations -- I was always taught the
25  rule of thumb, right, three traffic violations, you make

10 (Pages 34 - 37)

Peter Gamboa

July 23, 2024

Page 38

1  a stop.
2         So that's kind of what happens is if I'm
3  working traffic, I'm assigned to patrol, but I'm -- on
4  this day, it's a Sunday, not have many things are
5  happening, daylight hours from 6:00 in the morning to
6  2:00 in the afternoon, so I would go and do proactive
7  policing doing traffic stops. Any kind of speeders,
8  anything that may be people are failing to maintain a
9  single lane, they would not use their signals, things of
10  that nature.
11     Q. Okay. And it seems like in the -- in the
12  proactive policing genre for traffic stops, there are
13  two categories of proactive traffic stops. It seems
14  like one category of proactive policing is looking for
15  bad drivers, drivers who endangering the public.
16     A. Yes, ma'am.
17     Q. And stopping those; is that fair?
18     A. Correct. Yes, ma'am.
19     Q. And then the other seems to be looking for
20  traffic violations with an eye towards searching the
21  vehicle; is that fair?
22     A. Correct.
23     Q. And when -- when the latter category is
24  happening, are you -- is an officer supposed to be
25  looking for things that build -- that builds

Page 39

1  justification to search the car?
2     A. Yes, ma'am.
3     Q. I kind of want to take a couple steps back.
4     A. Okay.
5     Q. How did you become the interdiction guy?
6     A. So during my time as a patrolman, I did a lot
7  of proactive policing. I guess it would just, you know,
8  what people knew me as. I did work -- I was assigned
9  when I first came out to patrol to the gang unit, so I
10  dealt with a lot of the gang and what they deal with,
11  extortion, money laundering, drugs, things of that
12  nature.
13         As I had more experience, I went into
14  street crimes as a deputy, and one of our assignments
15  was doing interdiction work. And so because of my
16  experience is why I was picked to be the supervisor over
17  the interdiction unit.
18     Q. I understand. That's helpful. Thank you.
19         And you talked about when you were a patrol
20  guy, you did a lot of proactive policing and then
21  eventually kind of got transitioned to being the
22  interdiction dude. Does that mean the sheriff's
23  office's best officers are the ones doing proactive
24  policing; is that a fair assessment?
25     A. So when -- when I first was assigned to put

Page 40

1  this unit together as far as patrolmen, that's who I
2  would look for is an officer.
3     Q. When you're saying this unit, what do you mean
4  by that?
5     A. Criminal interdiction.
6     Q. Okay.
7     A. So I picked officers that did proactive
8  policing. And that's what I would base it on. Of
9  course, one of the questions is, have you done criminal
10  interdiction? Have you had any training in criminal
11  interdiction? And most of the officers that I chose or
12  all -- the original officers that I chose had training
13  in criminal interdiction.
14     Q. And what is training in criminal interdiction?
15     A. Courses that they take by experts that teach
16  the different aspects of criminal interdiction.
17     Q. Okay. We'll get to that more later. I have
18  questions about the trainings and such.
19     A. Okay.
20     Q. But at one point, the sheriff's office created
21  a standalone criminal interdiction unit; is that fair?
22     A. Yes, ma'am.
23     Q. And before that unit was created how did the
24  sheriff's office handle its criminal interdiction
25  activities?

Page 41

1     A. So, it was mostly through traffic, the traffic
2  unit. But street crimes would also do some of that
3  proactive policing on highways and back streets, things
4  of that nature.
5     Q. Okay. So before there was a separate criminal
6  interdiction unit, folks who were doing stops generally
7  were expected to do criminal interdiction activities; is
8  that fair?
9     A. Not expected but they would -- they would end
10  up doing that, which would be like the definition of
11  criminal interdiction, right? Working highways, making
12  traffic stops, arresting people for warrants, drugs,
13  money laundering, couriers, illegal possession of
14  firearms, things of that nature.
15     Q. Okay. And then once the criminal interdiction
16  unit was formed and there were officers specifically
17  assigned to that unit, were -- did that unit become like
18  the exclusive mechanism of doing criminal interdiction?
19     A. So the criminal interdiction
20  originally -- well, the hope, time of the interdiction,
21  criminal interdiction unit, it was set up as a pilot
22  program. There was no policy for criminal interdiction.
23  We used and we operate under the sheriff's policies and
24  procedures.
25     Q. Uh-huh.

11 (Pages 38 - 41)

Peter Gamboa                                                    July 23, 2024

Page 42

1    A. And so that's -- that's -- but it would
2  take -- it would keep from officers that may, I don't
3  want to go to -- I don't want to respond to a call for
4  disturbance, I'd rather go do traffic stops.
5        So, it was kind of supplementing patrol, so
6  that way patrol would respond for calls for service.
7  The criminal interdiction unit didn't have to respond to
8  regular calls. They would be working the highways and
9  back streets of that nature.
10   Q. Okay. Let me make sure I understand that then.
11 It sounds like the criminal interdiction unit was
12 created so that there were officers that could
13 exclusively focus on patrolling the highways --
14   A. Correct.
15   Q. -- is that fair?
16   A. Correct.
17   Q. And other patrolmen, other officers had to
18 respond to calls for service.
19   A. Correct.
20   Q. But when they weren't responding to a call for
21 service, they would be expected to do things like
22 criminal interdiction?
23   A. Not expected.
24   Q. Sorry. I'm probably not using the right word.
25   A. Yeah. So they would do it, you know, just for

Page 43

1  the policing part of it.
2    Q. Okay. So if they weren't expected to do it,
3  was -- like, help me understand the right word choice
4  then.
5    A. Okay.
6    Q. If they're not -- if an officer, a generic
7  patrolman is not responding to a call for service, what
8  would be -- what would that officer be expected to be
9  doing?
10   A. Well, I mean, just keeping the community safe
11 is what they're expected to do.
12   Q. Okay.
13   A. They had the discretion to do proactive
14 policing.
15   Q. Okay. I understand. So that helps a lot.
16       So generally, a generic patrolman or
17 someone else who is required to respond to calls for
18 service --
19   A. Correct.
20   Q. -- and then when they're not responding to a
21 call for service, those officers can exercise their
22 discretion to do criminal interdiction.
23   A. Correct.
24   Q. Okay. And the generic way they do criminal
25 interdiction is through traffic stops --

Page 44

1    A. Correct.
2    Q. -- is that fair?
3    A. Correct.
4    Q. When was the criminal interdiction unit formed?
5    A. I would say that it was formed 2019. And I'm
6  going to say it's probably around the springtime, about
7  March, April of 2019.
8    Q. Okay. And did any particular person in the
9  sheriff's office lead the efforts to create this
10 criminal interdiction unit?
11   A. So the sheriff approached me about creating the
12 unit.
13   Q. Okay. And can you tell me about how the
14 sheriff approached you?
15   A. He just one day, you know, we met and -- at the
16 time, I was the sergeant over at the sheriff's academy.
17 And one of the days that he came and spoke to classes,
18 said, hey, I'm thinking about creating this unit. Would
19 you be up to heading it up?
20   Q. And what did you say?
21   A. Yes.
22   Q. And what was your understanding of what the
23 unit was going to do?
24   A. Proactive policing on highways and making
25 traffic stops for those crimes that I mentioned.

Page 45

1    Q. Okay. Making traffic stops for -- to find
2  evidence of these crimes that you mentioned?
3    A. Correct.
4    Q. Okay. Anybody else involved in the
5  conversation to create a criminal interdiction unit?
6    A. No. As far as I know, it was a conversation me
7  and the sheriff had.
8    Q. Okay. And do you know why the sheriff was
9  proposing creation of a criminal interdiction unit?
10   A. I don't.
11   Q. Okay. So you mentioned that the sheriff's
12 office classified the criminal interdiction unit as a
13 pilot program.
14   A. Correct.
15   Q. How was that classification communicated? Did
16 you tell folks that you were doing a pilot program on
17 criminal interdiction activities?
18   A. So when they put out orders for the officers --
19   Q. Uh-huh.
20   A. -- it was a temporary assignment.
21   Q. Okay. And when you say orders for the
22 officers, help me understand what that means.
23   A. So when -- when someone would be transferred
24 from patrol into criminal interdiction, they would have
25 orders to report to myself.

12 (Pages 42 - 45)

Peter Gamboa                                July 23, 2024

Page 46

1    Q.  Uh-huh.

2    A.  In those orders, the assignments would be

3  temporary assignment.

4    Q.  So would there be an end date on the temp -- on

5  their order?

6    A.  No.

7    Q.  Okay.

8    A.  No.

9    Q.  So if I were to look at an order where someone

10  is being assigned to you, would it literally say

11  temporary assignment?

12    A.  Yes, ma'am.

13    Q.  And where would you find that?

14    A.  So they would have probably records of those

15  orders in their 201 file.

16    Q.  Sure.  And I'm talking about the actual order.

17  Would it be, like, on the top --

18    A.  Oh, yes.

19    Q.  -- temporary assignment?

20    A.  No, yeah.  So temporary assignment to criminal

21  interdiction.

22    Q.  Understand.  Understand.

23        And when this pilot program from criminal

24  interdiction was started, how long did you expect it to

25  run?

Page 47

1    A.  Well, I expected it to become a actual unit.

2  So my expectation was that it would never stop.

3    Q.  Okay.  And what happened?

4    A.  So I would say, like, in September of '22, we

5  started seeing an uptick in human smuggling, where the

6  drivers of these vehicles would end up in high speed

7  chases, and disregard the human life to get away, were

8  involved in accidents where people would get injured.

9        So I would say in December of '23 is when

10  we stopped doing criminal interdiction, and those guys

11  were still assigned to me under organized crime doing

12  the special enforcement.

13    Q.  And you put criminal interdiction in that last

14  answer in quotes.  What did you mean by that?

15    A.  Because I still kept the same officers.

16    Q.  Okay.

17    A.  They were just assigned to different duties.

18    Q.  Okay.  So does that mean that the sheriff's

19  office no longer does traffic stops for the purpose of

20  finding evidence of illegal activity on the highways?

21    A.  We -- we don't work the highways anymore.

22  Traffic are the ones who now patrol the highways.

23    Q.  Okay.

24    A.  Now, we, of course have done traffic stops on

25  highways, right, but our main concentration is not just

Page 48

1  working the highways for interdiction purposes.  Those

2  guys are assigned to me, and like we talked about

3  before, with the organized crime, it might be an

4  operation that we're doing surveillance and they're

5  going to -- they're going to do a traffic stop, and it

6  just so happens that that person is on the highway.

7    Q.  Understood.  So now for the most part, the

8  folks that you supervise aren't doing highway traffic

9  stops for the most part?

10    A.  Right.

11    Q.  And it sounds like they're still doing

12  interdiction traffic stops just not on the highway.

13    A.  So interdiction, right, like I explained

14  before, encompasses these types of crimes, organized

15  crime.  What we do does involve these crimes.  So if we

16  need a traffic stop because the information that we have

17  is he's a drug courier, he's going to deliver drugs to

18  another location, then we would use them to conduct

19  those traffic stops.

20    Q.  Understood.  Do you know of other pilot

21  programs or test units that the sheriff's office has

22  tried?

23    A.  So currently, we are doing a crime analysis

24  pilot program.

25    Q.  And tell me about that.

Page 49

1    A.  So the group is a mixture of detention

2  officers, investigators, deputies, and a -- currently,

3  we have a civilian intel analyst that's assigned to the

4  unit.  And it's kind of geared to doing proactive -- not

5  proactive, but kind of looking for hot spots, and

6  gathering those numbers on any crime that may be in a

7  certain area of the county.

8        And so for example, maybe on Saturdays --

9  Casa Blanca is a theater.  I'm not sure if you're

10  familiar with that, but Casa Blanca is on the northwest

11  side of the county, off of 151.  So, Saturdays, there's

12  a high propensity of vehicle burglaries.  So the crime

13  analysis pilot program is concentrating on looking for

14  those types of hot spots.  And so that way then we'll

15  use resources that we have in organized crime and the

16  criminal investigation division, CID, to hit those

17  areas.

18    Q.  Okay.  And do you, Sergeant Gamboa, oversee

19  this crime analysis program?

20    A.  I do.

21    Q.  Okay.  And how long do you expect this crime

22  analysis pilot program to run?

23    A.  I'm expecting it to become a full unit.

24    Q.  Okay.  Thanks.  I guess I want to go back a

25  little bit to the criminal interdiction unit.  How was

13 (Pages 46 - 49)

Page 50

1  the criminal interdiction unit evaluated?  So what did
2  success look like?  What were folks looking for in terms
3  of success?
4      A.  So there was -- there was not -- I was not
5  given any expectation of anything that we needed to
6  measure success, just to be proactive in doing that,
7  that type of work.
8      Q.  Sure.  So you didn't have any concept of what a
9  good criminal interdiction unit would look like?
10     A.  So I would -- one of the units that I would
11 compare us to was to -- Collin County had a criminal
12 interdiction unit.  And same thing, I don't think they
13 had, like, an expectation of any kind of stat
14 statistical.
15     Q.  Right.  And I'm not asking you about quota or
16 anything like that just what does success look like?
17     A.  Just, you know, San Antonio a hub, and drugs,
18 and human smugglers and everything else comes through
19 here, and just to kind of disrupt that criminal
20 organization type.
21     Q.  Understood.  How many officers were initially
22 part of the criminal interdiction unit?
23     A.  Four officers and myself.
24     Q.  Okay.  And who were those four officers?
25     A.  John Aguillon, Dustin Treadwell, Christopher

Page 51

1  Terrazas, and Joe Guerra.
2      Q.  Okay.  And you talked a little bit about this,
3  but I want to go back.  How did you select those four
4  officers initially?
5      A.  So John Aguillon and Dustin Treadwell were
6  assigned to the traffic unit --
7      Q.  Uh-huh?
8      A.  -- as an aggressive driver unit.  Because they
9  were proactive in that type of work is why I chose them.
10        Chris Terrazas was assigned to street
11 crimes at the time, and he made a lot of traffic stops,
12 and had a niche for getting probable cause and seeing
13 those types of -- to get into vehicles.  He had a good
14 eye for traffic violations, making contact with people,
15 and observing inside the vehicle which either, you know,
16 using one of his five senses to get into the vehicle.
17        Joe Guerra was one of the first ones.  He
18 came from patrol, but he took classes in interdiction.
19 So that -- I had kind of a little mixture of experience.
20 John Aguillon was a veteran officer that had been with
21 the sheriff's office for a little longer than I have.  I
22 think he just retired.  He had 30 -- 30 years.
23        So Chris Terrazas was also a veteran
24 officer.  He'd be on, I would say probably, 12,
25 15 years.  Of those -- of that time, he did serve some

Page 52

1  time in the courthouse and some time in street crimes.
2  So his proactive policing, his experience from the
3  courthouse, look -- watching officers testify, and his
4  experience actually doing the work, those two, I felt
5  that it would be able to guide the two younger officers,
6  which was Justin Treadwell and Joe Guerra.
7      Q.  I understand.  So would it be fair to say that
8  you kind of tried to create a unit where everybody was
9  balancing each other out?
10     A.  Yes, ma'am.
11     Q.  And it sounds like the some of the things that
12 you prioritized were experience doing traffic stops,
13 period.
14     A.  Correct.
15     Q.  And the ability to understand when to get into
16 a vehicle.
17     A.  Correct.
18     Q.  How did you recruit these four?  Did they all
19 say, yes, I want to do interdiction?  Did you explain to
20 them what interdiction looked like?  So just generally,
21 how did you recruit them?
22     A.  Yes, ma'am, that's how it was.  It was
23 John Aguillon and myself worked together in the gang
24 unit, patrol, narcotics.  So we -- I knew his work
25 ethic.  I knew him as probably going to be the most

Page 53

1  senior in the unit.  He would guide the other -- the
2  younger officers.  But I did have conversations with the
3  others, and I told them this is what we'll be doing, and
4  that's how they were selected.
5      Q.  So when you said, this is what we would be
6  doing, what did you mean?
7      A.  Working the highways, looking for anything
8  criminal.
9      Q.  Okay.  I just have, like, a question:  Was
10 John Aguillon a deputy when he retired?
11     A.  Yes, ma'am.
12     Q.  And it sounds like you guys have comparable
13 experience.
14     A.  Yes, ma'am.
15     Q.  And this is just something that I don't
16 understand.  Like, how did you become a sergeant while
17 he remained a deputy?
18     A.  Motivation.
19     Q.  Okay.  So what does it take to become sergeant?
20     A.  Test.  So all our promotions are through
21 testing and a oral interview.  So from patrolman, you
22 have to have a minimum of two years, you test for
23 investigator.  As an investigator, you have to do two
24 years minimum to test for sergeant.  Sergeant, minimum
25 of two years, test for lieutenant.  Lieutenant, minimum

14 (Pages 50 - 53)

Peter Gamboa                                                                                          July 23, 2024

Page 54

1  of two years and college hours. If you don't have the
2  time then they substitute college for time.
3      Q. Understood. Understood. That's helpful to
4  just understand that progression.
5          So it sounds like John Aguillon didn't
6  pursue --
7      A. Right.
8      Q. -- didn't opt in to taking the test and the
9  hours and all of that.
10     A. Yes, ma'am.
11     Q. Okay. And why did you?
12     A. So as a patrolman --
13     Q. I mean, and clearly, like the sergeants are
14  probably going to make more money. So, like, let's put
15  that to the side.
16     A. Yeah, yeah, yeah.
17     Q. The financial piece, which is a motivator in
18  and of itself, don't get me wrong.
19     A. Yes, yes. Myself was this: I was -- and I
20  loved what I did as a patrolman. I had -- I was blessed
21  to be assigned to different units, like I mentioned.
22  So, gang was a unit that was specialized, criminal
23  warrants was a unit that was specialized, narcotics was
24  a unit that was specialized, traffic was a unit that was
25  specialized.

Page 55

1      Q. And these are all the units that you were
2  previously a part of?
3      A. Yes, ma'am. Yes, ma'am. And so I was blessed,
4  right, to be able to work myself into those specialized
5  units. I did come back to patrol during -- during
6  different stints, right? And I saw officers that I grew
7  up with that didn't have the experience that I did,
8  right? And they were promoting to investigators and
9  sergeants. And they didn't -- some of them at the time
10  didn't even do any patrol time. They went from the
11  courthouse to investigator to sergeant.
12         And so that was my motivation, like, these
13  guys are doing it, and they don't have half the
14  experience that I do, what am I waiting for?
15         And my -- so anywhere that I went and
16  gained that experience, came back to patrol, I would
17  teach the younger officers: You can do this as a
18  patrolman. You don't have to just wait for a call to
19  come out. You can do proactive policing. You can do
20  traffic stops. This is what you look for. Use your
21  five senses, smell, hear, and I would -- I would do that
22  to any of the officers that would work alongside me.
23         So after, I guess I was probably a deputy
24  for -- let's see -- 14 years when I decided, I'm going
25  to take the test for investigator.

Page 56

1      Q. I understand. Is the test hard?
2      A. It was hard.
3      Q. Because it seems like not everybody goes on to
4  investigator.
5      A. So and -- so it kind of progresses, right? So
6  at first, when you first test, the material is Penal
7  Code, CCP.
8      Q. CCP is?
9      A. Code of Criminal Procedures. And then policy
10  and procedure, right?
11         Then from patrol, investigator. From
12  investigator to sergeant. Now they add civil service
13  and all those others, plus civil service, plus
14  collective bargaining contract: Same thing, sergeant to
15  lieutenant. They add the same thing. And managerial
16  style is also one of the things.
17     Q. So it sounds like generally throughout your
18  career, you've had a passion for sharing your knowledge
19  and teaching other officers policing tactics.
20     A. Yes, ma'am.
21     Q. All right. So I got sidetracked by just John
22  and his experience, but I want to go back to the
23  criminal interdiction unit.
24     A. Okay.
25     Q. At some point, it seems like the criminal

Page 57

1  interdiction unit became only two officers; is that
2  fair?
3      A. Yes, ma'am. Yes, ma'am.
4      Q. Why did the unit end up with fewer officers?
5      A. So what happened was that Deputy Aguillon and
6  Deputy Treadwell were involved in an officer involved
7  shooting, and so they were reassigned to TAG. And this
8  was prior to it being organized crime. TAG was under
9  CID at the time. They were reassigned to there, to the
10  intel unit. Intel/gang unit.
11     Q. Okay.
12     A. And because of personnel shortages, they never
13  filled those -- that position.
14     Q. Okay.
15     A. Or those two positions.
16     Q. So let me understand -- let me backtrack a
17  little bit.
18         The officer involved shooting, how did
19  that -- what was -- can you tell me just the overview of
20  what happened there?
21     A. So what happened was there was a pursuit that
22  came from Atascosa County, where the person was firing
23  at officers. And so as it's coming into Bexar County,
24  they notified us and so I sent them to assist. Because
25  they were here in the county, they were upfront in the

15 (Pages 54 - 57)

Peter Gamboa                                                                                                           July 23, 2024

Page 58

1  pursuit, calling it out just because we had
2  communications at the time and the other counties
3  didn't.
4           And so it ended up in front of a school.
5  The guy ran his vehicle until it couldn't run no more.
6  It stopped, he jumped out, shot at officers. They
7  returned fire and neutralized him.
8      Q. Okay. And so when they were reassigned to TAG
9  is it fair to say that they -- I guess, they were
10  reassigned to a desk job for a while?
11      A. Yes, ma'am.
12      Q. Okay. And then you talked about the fact that
13  budget shortage, officer shortage was why the criminal
14  interdiction unit didn't become four officers again.
15      A. Correct.
16      Q. Did you -- so is it your conclusion that if
17  there had been more resources, more personnel the
18  criminal interdiction unit would have become four
19  officers again?
20      A. Yes, ma'am.
21      Q. At some point, I guess Terrazas --
22      A. Yes, ma'am.
23      Q. -- left the criminal interdiction unit.
24      A. Yes, ma'am.
25      Q. Do you know why?

Page 59

1      A. He felt that he was not producing to what he
2  felt he held himself to. And so he decided to go back
3  to street crimes.
4           So they were -- he was swapped with Officer
5  Gil Martinez. Gil Martinez and I worked together in
6  street crimes, so he had the experience. I knew he had
7  the experience for criminal interdiction. So I didn't
8  have a problem with that swap.
9      Q. Okay. So it sounds like Terrazas left of his
10  own accord.
11      A. Yes, ma'am.
12      Q. Is that correct?
13      A. Yes, ma'am.
14      Q. And you said, you know, you phrased it very
15  nicely, he felt like he was not producing what he wanted
16  to produce. Can you unpack: What does that mean?
17      A. So he felt that he had to get -- his arrest had
18  to be kilos, had to be millions of dollars, had to be
19  loads of human smuggling victims, things of that nature.
20  Guns, right?
21           And he was making stops and getting zero
22  to, you know, and he felt that he was not living up to
23  what criminal interdiction should be.
24      Q. Understood. So Officer Terrazas, Deputy
25  Terrazas --

Page 60

1      A. Deputy Terrazas, yes.
2      Q. -- was looking for big stuff and he wasn't
3  finding it.
4      A. Right.
5      Q. Okay. And then Officer Terrazas, Deputy
6  Terrazas was replaced by Deputy Martinez?
7      A. Correct.
8      Q. And how long did Deputy Martinez participate in
9  the criminal interdiction unit?
10      A. So he was there for a very short time because
11  he put in to go to TAG as a covert officer when the new
12  alignment for organized crime was created.
13      Q. So Martinez left. He wanted to go do
14  the covert operations.
15      A. Correct.
16      Q. Got it. And is that when Deputy Babb came on
17  board?
18      A. Yes.
19      Q. Okay. So Deputy Babb came into Martinez's
20  slot?
21      A. Correct.
22      Q. And Deputy Guerra was there the entire time?
23      A. So deputy -- he was reassigned to patrol for a
24  short time because they had -- it was a short time that
25  they were short of officers, and so he was reassigned

Page 61

1  back to patrol.
2      Q. Okay. So short window, went to patrol --
3      A. Yeah.
4      Q. -- and then he came back to criminal
5  interdiction.
6      A. Correct.
7      Q. Okay. I guess when Martinez's spot on the
8  criminal interdiction unit came available, how did you
9  select Deputy Babb?
10      A. So during that time, I did put an opening
11  through the intranet for officers that were interested
12  in --
13      Q. And you said intranet?
14      A. Yes.
15      Q. Is that the sheriff's office internal system?
16      A. Yes, ma'am. Yes, ma'am.
17      Q. Okay. So you put an opening on the sheriff's
18  office internal system.
19      A. Correct.
20      Q. Tell me more about that?
21      A. And I put out the opening, the announcement for
22  the opening. You had to have a minimum of two years on
23  patrol, and what I would like to see an experienced
24  patrolman, training in interdiction. And also, I
25  believe I had added some of the chapters that we would

16 (Pages 58 - 61)

Page 62

1  be working under.
2      Q. The chapters --
3      A. To be familiar with.
4      Q. And by chapters, you mean chapters of the
5  sheriff's policy manual?
6      A. Correct. Yes, ma'am.
7      Q. I guess then there was a formal job description
8  that you posted --
9      A. I did.
10     Q. -- on the intranet? And how many applicants
11 did you get?
12     A. I believe we had, like, 12.
13     Q. Rough estimate is fine.
14     A. Yeah, about 12.
15     Q. Sure. And you talked a little bit about the
16 two years at least of a patrolman, training and
17 interdiction experience, and then the chapters of the --
18     A. Familiar, be familiar.
19     Q. Being familiar with certain chapters.
20         Tell me about the second category, training
21 in interdiction experience. What kind of training did
22 you look for?
23     A. Anything that they may have taken that would
24 deal with interdiction. Anything dealing with traffic,
25 traffic stops, and then of course the interdiction side

Page 63

1  of it.
2      Q. I'm sorry. I missed that last part. And of
3  course the -- what did you say?
4      A. The, like, traffic, anything with traffic.
5      Q. Uh-huh?
6      A. And then, of course with -- anything with
7  interdiction.
8      Q. Okay. And by interdiction, did you mean things
9  that had interdiction in the title of the training?
10     A. Interdiction, yeah. Yes, ma'am.
11     Q. Are there specific trainings that you looked
12 for an officer to have?
13     A. So -- so there -- so there's training for
14 18-wheelers. The title doesn't include anything with
15 interdiction, but that's one of the vehicles that we
16 make stops on because of transporting illegals, weapons,
17 smuggling, narcotics, things of that nature.
18     Q. Understood. So what is the status of the
19 criminal interdiction unit today?
20     A. We're not operating anymore.
21     Q. Okay. So when was it ended?
22     A. It was -- my best guess was December of '23.
23     Q. And who ended it?
24     A. The sheriff.
25     Q. And did the sheriff say why?

Page 64

1      A. Because of the -- human smuggling.
2      Q. Uh-huh?
3      A. Working the highways, we would have vehicles
4  driving at high rate of speeds.
5      Q. Right.
6      A. And of course, we would --
7      Q. So what you mentioned previously --
8      A. Correct.
9      Q. -- about the dangers --
10     A. Yes.
11     Q. -- of human smuggling, traffic stops ending up
12 in a high speed chase?
13     A. Correct.
14     Q. Even though the criminal interdiction unit has
15 ended, that doesn't mean that the sheriff's office has
16 abandoned all criminal interdiction efforts; is that
17 fair?
18     A. Yes. Correct.
19     Q. So that answer was a little ambiguous, and I
20 want to make sure I understand it.
21         Does that mean that the sheriff's
22 office -- does the fact that the criminal interdiction
23 unit is no longer in existence, does that mean that the
24 sheriff's office has completely abandoned criminal
25 interdiction efforts?

Page 65

1      A. So, no.
2      Q. So sheriff's office still does criminal
3  interdiction?
4      A. We do not have criminal interdiction, but we do
5  proactive policing for illegal weapons, narcotics, human
6  smuggling, money laundering, any kind of couriers,
7  things of that nature.
8      Q. And we've previously talked about the different
9  categories of proactive policing.
10     A. Correct.
11     Q. And I guess the one I'm referring to is
12 proactive policing, traffic stops for the purpose of
13 searching a vehicle?
14     A. Correct.
15     Q. I want to talk a little bit about kind of where
16 the criminal interdiction unit fell in the
17 organizational chart.
18     A. Okay.
19     Q. So I'm going use an exhibit here?
20     A. Sure.
21         MS. HEBERT: Josh --
22     Q. And this exhibit was previously marked
23 Exhibit 53, so we're going to add an exhibit sticker
24 here.
25     A. Okay.

17 (Pages 62 - 65)

Peter Gamboa                                    July 25, 2024

Page 66

1     (Exhibit No. 53 marked.)

2     MS. HEBERT:  Charles, we have a copy for

3 you.

4     MR. FRIGERIO:  Thank you.

5     MS. HEBERT:  And then I have only color

6 copies, so that's not quite right, so I'm going to give

7 those to you to share.

8     Q.  (By Ms. Hebert) So I want to talk about this

9 organizational chart.  You mentioned that the criminal

10 interdiction unit was created in 2019.

11    A.  Correct.

12    Q.  When it was created, where did the criminal

13 interdiction unit fall in -- within the sheriff's

14 office?

15    A.  So is this org chart from --

16    Q.  This is -- the date --

17    A.  2019?

18    Q.  -- I have for this org chart is March 18, 2020.

19 It's very small print at the bottom.

20    A.  Okay.  This one says --

21    Q.  So if it doesn't fall on this chart then, you

22 now, I guess, is there an earlier chart for 2019?

23    A.  Okay.  I was looking at the wrong side.

24        Okay.  This is 2020.  I'm not sure if there

25 was another org chart prior to this.

Page 67

1     Q.  And if it didn't -- if your answer is it didn't

2 fall in this org chart and there's an earlier one,

3 that's okay too.

4     A.  Yeah.  I -- yeah, let me -- so from this date,

5 I've got March 18, 2020.

6     Q.  Yes, sir.

7     A.  Let me see where it would fall under.  So at

8 the time was, we were under the support division because

9 I was over --

10    Q.  Okay.  So I'm seeing the adult detention

11 bureau, the compliance and support division; is that

12 right?

13    A.  Okay.  Let's see.  Administration and support.

14 Chief of staff --

15    Q.  Okay.  Got it.  So the center one.

16    A.  Uh-huh, yes, ma'am.

17    Q.  So tell me where you were and where the

18 criminal interdiction unit fell.

19    A.  So, let's see.

20    Q.  I think I might be able to help this.  I think

21 that when you --

22    A.  Training academy.

23    Q.  Okay.  So when the -- when the criminal

24 interdiction unit was created, it fell under the

25 training academy?

Page 68

1     A.  Correct.

2     Q.  Okay.  And what other places within the

3 organization, within the sheriff's office, did

4 the -- did the criminal interdiction unit end up?

5     A.  So it -- it ended up for a very short time

6 under organized crime.

7     Q.  And organized crime, tell me where that is?

8     A.  And that -- and that -- let's see.  So --

9     Q.  So I'm looking at the 2020 version.

10    A.  Organized crime section of 20 -- the org chart

11 for April 21st, 2022.

12    Q.  Okay.  So now you flipped to the April 1st,

13 2022 organizational chart --

14    A.  Correct.

15    Q.  -- is that fair?

16    A.  Yes, ma'am.

17    Q.  And on this chart, after the reorganization,

18 was that when the criminal interdiction unit was moved

19 from the training academy?

20    A.  Correct.

21    Q.  Okay.  And where did it move to?

22    A.  To -- under criminal investigations division --

23    Q.  Yes, sir.

24    A.  -- under tactical operation section?

25    Q.  Yes, sir.

Page 69

1     A.  Special enforcement unit.

2     Q.  Okay.  So it moved to the special enforcement

3 unit in April 2020 with the reorg.

4     A.  Yes.

5     Q.  Was there any other division that the org unit,

6 where the criminal interdiction unit was placed to your

7 knowledge?

8     A.  No, ma'am.

9     Q.  So when the unit was -- when the criminal

10 interdiction unit was dissolved, it was part of the

11 special enforcement unit?

12    A.  Correct.

13    Q.  Okay.  There were a couple of names associated

14 with the criminal interdiction unit that I just

15 would -- it would be helpful to understand, like, how

16 they fit.

17    A.  Okay.

18    Q.  Just -- and you can put this way.

19    A.  Okay.

20    Q.  And we can pull it out if we need to.

21    A.  Okay.

22    Q.  But at one point, I saw the name Lieutenant

23 Ray Ortega floating around.

24    A.  Yes.

25    Q.  What was Lieutenant Ortega's relationship to

18 (Pages 66 - 69)

Peter Gamboa                                                                July 23, 2024

Page 70

1 the criminal interdiction unit?
2      A. So at the time -- so he, at one point was
3 assigned to the training academy. That's in the very
4 beginning so I would -- 2019, 2020, some time, he was
5 the commander over the academy. So we fell under him as
6 far as the lieutenant.
7      Q. Understood. And when he was the lieutenant,
8 did he have an active role in understanding what the
9 criminal interdiction unit was doing? It sounds like he
10 was mostly the training guy.
11     A. So, he did. He knew what we were doing. But
12 he was there for a short time, then -- then he moved
13 from the training academy over to tactical
14 operations -- or I'm not sure. Let me see if it's
15 strategic or tactical.
16     Q. And I'm sorry, you probably need your glasses
17 for this tiny print.
18     A. So let's see. So -- okay. So here they have
19 tactical operations section in the April 21, 2022. And
20 under -- under the chief of staff, under administration
21 support, they have strategic operations, which
22 encompassed the training academy section. So
23 originally, he was under that, strategic operations.
24     Q. Uh-huh. In the 2020 version?
25     A. Correct. Yes. And then under the 2021, it

Page 71

1 came under criminal investigation division.
2      Q. You mean 2022?
3      A. Ah, 2022, sorry. April 21, 2022.
4      Q. Understood.
5      A. Came under -- it was moved -- or he was moved
6 under tactical operations for the special operations
7 unit, which was SWAT.
8      Q. Okay. So he became the tactical operations
9 section lieutenant?
10     A. Correct. Commander.
11     Q. Commander, okay.
12          And can you tell me who Officer Steven
13 Sanchez is?
14     A. Steven Sanchez is the street crimes sergeant
15 under the most current 2022, it would be under organized
16 crime, Texas Anti-Gang unit.
17     Q. Okay. So under the 2022 organization chart,
18 what rank is -- he's a sergeant?
19     A. Sergeant, yes, ma'am.
20     Q. So Sergeant Sanchez is part of the Texas
21 Anti-Gang unit?
22     A. Correct.
23     Q. And how many deputies does he oversee?
24     A. I believe he has eight.
25     Q. Eight deputies?

Page 72

1      A. Deputies.
2      Q. And do you know what his deputies do?
3      A. Street crimes.
4      Q. Okay. So what does that mean? I'm sorry.
5      A. So --
6      Q. I know you talked a little bit about it, but
7 I'm not entirely clear.
8      A. So in 2005, Sheriff Lopez at the time,
9 Ralph Lopez, did away with the gang unit. So we were
10 all reassigned to either patrol, different divisions.
11 Interdiction -- I mean, not interdiction, narcotics or
12 criminal warrants.
13          Shortly thereafter, they created a street
14 crimes unit. And at the time, we had a chief -- and I
15 can't remember his last name. His first name was Andy,
16 and I want to say -- Chief Andy was a patrol division
17 chief. They created street crimes under him at the
18 time.
19          So moving forward -- and so street crimes
20 was the gang unit with a different name. So moving
21 forward to currently --
22     Q. So essentially, the sheriff recognized that he
23 made a mistake, and so he recreated a unit with the
24 street crimes name.
25     A. Yes.

Page 73

1      Q. Okay.
2      A. And so they do gang unit work with identifying
3 gang members, targeting areas of high crime that involve
4 any kind of gang activity.
5      Q. Understood.
6      A. But they're a daylight team.
7      Q. Understood.
8      A. The gang unit that is now in place, works the
9 nights with our owed hours as the gang unit.
10     Q. Understood. Okay. Can you tell me where on
11 the organizational chart Deputy Gereb is today?
12     A. He's under organized crime, under myself, under
13 intel.
14     Q. Okay. So I see the organized crime section.
15     A. So we're all under Texas Anti-Gang unit.
16     Q. Okay. So all -- you're under the Texas
17 Anti-Gang unit?
18     A. Correct.
19     Q. And Deputy Gereb is under there too?
20     A. Correct.
21     Q. And do you still oversee him?
22     A. Yes, ma'am.
23     Q. Okay. And --
24     A. And currently, from the two, I now just have
25 Gereb.

19 (Pages 70 - 73)

Peter Gamboa                                                July 23, 2024

Page 74

1    Q.  Understood.  And but there are other sergeants
2  in the Texas Anti-Gang.
3    A.  Yes, ma'am.
4    Q.  And one of those other sergeants is Steven
5  Sanchez?
6    A.  Yes, ma'am.
7    Q.  Understood.  And then we talked a little bit
8  about Lieutenant Freveletti?
9    A.  Yes, ma'am.
10    Q.  When did she come into the picture?
11    A.  So when they reorganized and made the organized
12  crime, she became the supervisor over -- or the
13  commander over the plainclothes officers.  That's
14  probably the best way to describe it.
15    Q.  Okay.  So she -- she's a lieutenant, like
16  at -- over the umbrella of the organized crime section,
17  but she's mostly in charge of plainclothes people?
18    A.  Correct.  Correct.
19    Q.  And plainclothes people are used for kind of
20  what?
21    A.  So they're -- the intel officers that work for
22  me, covert officers that work for Sergeant Hendricks.
23  The TFOs that are assigned to DEA, HIDTA, Secret
24  Service.
25    Q.  Okay.  So she isn't your direct supervisor?

Page 75

1    A.  She is now my direct supervisor.
2    Q.  She is now.  Okay.  So she at some point, do
3  you know when she became the plainclothes lieutenant?
4    A.  So when they created organized crime is when
5  she -- she became the commander over TAG, plainclothes.
6    Q.  Okay.  And so that was in 2020, April 2022
7  zone?
8    A.  Right.
9    Q.  And she transitioned to a new role?
10    A.  No.  That's where she is currently.
11    Q.  Okay.  But now she's over you?
12    A.  Correct.  I came into --
13    Q.  Ah.  Okay.  So now you're -- I understand now.
14        So you are a part of the plainclothes
15  group --
16    A.  Correct.
17    Q.  -- now?
18    A.  Yes.
19    Q.  And Deputy Gereb is part of the plainclothes
20  group now?
21    A.  In uniform.
22    Q.  He's in uniform?
23    A.  Yeah.
24    Q.  But you still supervise him?
25    A.  Yes.

Page 76

1    Q.  Okay.  So sounds like they're -- the
2  plainclothes and the uniform people are intermeshed
3  organizationally?
4    A.  Yes, yes.
5    Q.  Okay.
6    A.  So the way it works is, now, Angela Freveletti
7  is a lieutenant over the plainclothes, and then you have
8  Lieutenant Brian Curtis, who's over the uniform officers
9  that are assigned to TAG, which would be street crimes,
10  gang unit.  I think that's it for now.
11    Q.  Okay.  So someone like Deputy Gereb, and Deputy
12  Gereb, who's a uniformed organized crime division
13  officer, reports to you.
14    A.  Correct.
15    Q.  And then you report to Lieutenant Curtis for
16  Deputy Gereb?
17    A.  No.
18    Q.  Okay.
19    A.  I only now report to -- well, Lieutenant
20  Freveletti is my direct lieutenant unless she's off.
21  Then I will report to -- all of us will report to
22  Curtis.
23    Q.  Understood.  So is Lieutenant Freveletti,
24  Deputy Gereb's --
25    A.  Yes.

Page 77

1    Q.  -- boss?
2    A.  Yes.
3    Q.  Still?
4    A.  Yes.
5    Q.  Okay.  Even though he's in uniform and she's
6  plainclothes?
7    A.  Correct.
8    Q.  Understood.  Okay.  I think I understand.
9        And then who is currently the person above
10  Freveletti?
11    A.  It would be, I believe it's
12  chief -- deputy -- or Deputy Chief Nancy Sanford.
13    Q.  Okay.
14    A.  But I might be wrong because there is a captain
15  in CID now.
16    Q.  Okay.
17    A.  Augustine Pruneda.
18    Q.  And I'm going to bet that Anica here, Ms. Anica
19  is going to ask you to spell some of these names on the
20  break so just be prepared for that.
21    A.  Sure.  Yes.
22    Q.  Who is a Ben Rangel, R-A-N-G-E-L?
23    A.  Ben Rangel?
24    Q.  Rangel?  Who's Ben Rangel?
25    A.  He is a civilian assigned to fleet.

20 (Pages 74 - 77)

Peter Gamboa                                           July 23, 2024

1    Q. So he works for the Bexar County Sheriff's
2    Office?
3    A. Correct.
4    Q. But he's not an officer?
5    A. Correct.
6    Q. And when you say fleet, does that mean he
7    manages or is part of the operation running the patrol
8    vehicles?
9    A. Patrol -- yes, ma'am. For maintenance and
10   things of that nature.
11   Q. Okay. Understood. All right. So I think it's
12   a good time for a break. What time is it right now?
13        MR. WINDHAM: 11:06.
14        MS. HEBERT: Yeah. Let's take a short
15   break just to use the bathroom because you've been going
16   for a long time. And I know I, mentally, need to use
17   the -- need a break, use the bathroom. So we'll take a
18   quick break. Maybe ten minutes? So we'll come back on
19   at 11:07.
20        (Break taken from 11:17 a.m. to 11:25 a.m.)
21   Q. (By Ms. Hebert) Okay. Thanks for coming back
22   from the break.
23        A couple of things to just clean up. You
24   talked about HIDTA.
25   A. Okay.

1    Q. Can we go back and, like, figure out the
2    acronym. I think it might be something like highway
3    interdiction drug trafficking area or high intensity
4    drug trafficking area?
5    A. Yes.
6    Q. Can you help me understand what it was?
7    A. Yeah. I think it was highway intensity or
8    highway drug --
9    Q. High Intensity Drug Trafficking Area?
10   A. Trafficking area.
11   Q. Does that sound right?
12   A. Yes.
13   Q. Okay. I think we got there eventually
14   together. So HIDTA --
15   A. I get confused with that and OCDETF.
16   Q. Okay. OCDETF, what is that one?
17   A. Organized crime drug -- wait. Let me see.
18   OC -- OCDEFG. Organized Crime Drug Enforcement -- yeah,
19   something like that.
20   Q. Let the record reflect that opposing counsel
21   did not give the witness paper to figure out what the
22   acronym on this thing was, and Sergeant Gamboa had to
23   write it on his hand. Thank you for not writing it on
24   the exhibit. That was kind of you.
25        Okay. So I want to also talk about the

1    sheriff -- the sheriff's office current criminal
2    interdiction efforts. We've talked a lot about
3    proactive policing, and how certain officers do
4    proactive policing in the form of traffic stops to get
5    access to vehicles to search for certain contraband; is
6    that correct?
7    A. Correct.
8    Q. And in general, would you say that the -- the
9    folks who are doing that kind of criminal interdiction
10   work, are still using the same methods as folks who were
11   a part of the criminal interdiction unit when there was
12   a standalone unit? Putting aside the fact that they're
13   not, like, searching highways?
14   A. Correct.
15        MR. FRIGERIO: Objection; form.
16   Q. (By Ms. Hebert) Putting aside the fact that
17   they're not sitting on highways or looking at the
18   highways?
19   A. Right.
20   Q. Okay.
21   A. But they can.
22   Q. They can. If they exercise their discretion?
23   A. Correct.
24   Q. Okay. So let me just summarize then. I guess,
25   the criminal interdiction unit no longer exists.

1    A. Correct.
2    Q. But the sheriff's office still does criminal
3    interdiction efforts, sometimes at an officer's
4    discretion, when they -- when they -- when the officers
5    do criminal interdiction efforts, they're using the same
6    methods that criminal interdiction unit used to use
7    except for they're not sitting on the highways, waiting
8    for traffic?
9    A. Right. So the patrolmen use their discretion
10   for proactive policing. Not so much criminal
11   interdiction, right, because that's -- the difference
12   would be that's all you do is criminal interdiction.
13   They're doing proactive policing as patrolmen.
14   Q. Okay. And when they're doing proactive
15   policing related to traffic stops, we talked about
16   community proactive policing --
17   A. Correct.
18   Q. -- when they're doing proactive policing
19   related to traffic stops, they're using the same methods
20   of stopping a vehicle. For instance --
21   A. Correct.
22   Q. -- interviewing --
23   A. Right.
24   Q. -- the driver; is that fair?
25   A. Yes.

Peter Gamboa                                                    July 23, 2024

Page 82

1    Q.  Okay.  Now, I want to talk about training.  We
2    talked a little bit about at the start of the criminal
3    interdiction unit, you looked for specific training; is
4    that correct?
5    A.  Yes, ma'am.
6    Q.  Were there specific companies that you looked
7    for training from?
8    A.  Not specific companies, but I would get either
9    flyers through email that an agency was teaching certain
10   techniques for interdiction.  And then if it -- if it
11   met what -- you know, our mission was, then I would try
12   to get the guys that training.
13   Q.  Understood.  So what kind of techniques are you
14   talking about?
15   A.  So, like techniques would be to identify
16   compartments.
17   Q.  Okay.
18   A.  Techniques, interview techniques.  Things of
19   that nature.
20   Q.  Okay.  And unpacking both of those, when you
21   say compartments, I'm assuming, tell me if I'm wrong,
22   that that means identifying places where people were
23   hiding things in the vehicles?
24   A.  Correct.
25   Q.  And when you say interview, what are you

Page 83

1    talking about there?
2    A.  So they would teach interview techniques, and
3    not so much being authority figure; more of rapport
4    building, get them to relax, get them to tell you, you
5    know, where they're coming from, where they've been.
6    Who they met with.  Identifying if there's -- if they
7    tell you that they were staying at a certain hotel,
8    motel, identify -- have them identify something in that
9    motel room where it would trip them up because those
10   hotels don't use certain curtains, things of that
11   nature.
12   Q.  Okay.  So would behavioral analysis be
13   something you would look for --
14   A.  Also.
15   Q.  -- training in?
16   A.  Yes, ma'am.
17   Q.  Okay.
18   A.  So during the interview techniques, they would
19   talk about behavioral analysis.  Profusely sweating,
20   it's 15 degrees outside.  Their carotid artery just
21   going off because they're so nervous.  Things of that
22   nature.
23   Q.  Understood.  And when you said techniques that
24   met the mission, can you just explain what you meant by
25   that?

Page 84

1    A.  Just for criminal interdiction.  The mission
2    that, you know, there's a lot of drugs that come through
3    our area, illegal weapons, money laundering going down
4    south, human smuggling coming up north, things of that
5    nature.
6    Q.  Okay.  At the start of the criminal
7    interdiction, you had four officers --
8    A.  Uh-huh.
9    Q.  -- coming on board; is that right?
10   A.  Correct.  Yes, ma'am.
11   Q.  Any -- did you do any foundational preparation
12   as a unit when you were first getting started?  By that,
13   I mean, how did you kick off?
14   A.  I mean just pretty much like we would do
15   on -- as like a traffic unit.  We kicked it off hitting
16   the highway.
17   Q.  Okay.  So did you do any group training or unit
18   training before you guys got started?
19   A.  So, we did.  We went to a place in the Dallas
20   area and did some -- there was a couple interdiction
21   officers there that worked for the DA's office over
22   there.  And I can't remember his name.  His name was
23   Billy.  He was an instructor in criminal interdiction.
24       And so as a whole -- as a group, all five
25   of us went down there, and worked three days with them

Page 85

1    on how they did things as a criminal interdiction unit.
2    Q.  Okay.  Did you ride-alongs during that time?
3    A.  Yes.
4    Q.  And you were there three days; did I get that
5    right?
6    A.  Correct.
7    Q.  And what did you learn from that Dallas
8    interdiction group?
9    A.  So pretty much how they did things was what we
10   were going to do with following our policies and
11   procedures for the sheriff's office.  We would observe a
12   violation, traffic violation.  We would make a traffic
13   stop.  We would conduct interviews, roadside interviews.
14   Whether -- you know, we began with reasonable suspicion,
15   up to probable cause using one of our five senses to get
16   into the vehicles.
17   Q.  Understood.  Did the Dallas interdiction unit
18   do front seat interviews?
19   A.  They did.
20   Q.  Okay.
21   A.  They did.
22   Q.  And did the Dallas interdiction unit use a K-9?
23   A.  They do have K-9.
24   Q.  And did they use a K-9 unit as part of the
25   interdiction traffic stops?

22 (Pages 82 - 85)

Peter Gamboa                                                          July 23, 2024

Page 86

1    A. I believe they had a K-9 assigned to their
2 interdiction unit.
3    Q. Okay. And other than this training that the
4 five of you went to in Dallas, was there any other at
5 the start training or preparation that the criminal
6 interdiction unit did?
7    A. So not right away, but I did look for classes,
8 and would send them individually to the classes. It may
9 have not been all four at one time, but I would have
10 maybe picked one or two just to -- John Aguillon and
11 myself went through interdiction classes way back when,
12 so I knew he had some already, but I would send him for
13 refreshers.
14    Q. Understood. Okay. So there was a lot there
15 but I'm going to just unpack that.
16    A. Yes.
17    Q. So after the criminal interdiction unit started
18 working, you didn't go to a training as a unit because
19 then nobody would be left --
20    A. Right.
21    Q. -- in town; is that fair?
22    A. Right, yes.
23    Q. So you sent folks individually or twos to
24 training?
25    A. Yes, ma'am.

Page 87

1    Q. Okay. And you said that you looked for classes
2 for them. What classes did you specifically look for?
3    A. The 18-wheeler classes was one of them. Any
4 type of compartment classes, just to familiarize
5 themselves on things to look for while they're doing the
6 search, you know. Things of that nature.
7    Q. Anything else? So there were 18-wheeler
8 classes, compartment classes, any other topics?
9    A. Any type of interview techniques, any type of
10 kinesiology, any type of --
11    Q. Okay. I'm not familiar with kinesiology. So
12 tell me --
13    A. Just like behavioral, watching the body.
14    Q. Okay.
15    A. React to certain questions, certain situations.
16    Q. Okay. So tell me -- tell me about that. Like,
17 what were you hoping that your criminal interdiction
18 deputies would learn from kinesiology instruction?
19    A. So, during their interviews, that they would be
20 able to recognize somebody who is being deceptive.
21    Q. Okay. And you talked a little bit about
22 training that you and John Aguillama --
23    A. Aguillon.
24    Q. Aguillon. Thank you. I'm going to ask you
25 that, like, eight more times. That you and John

Page 88

1 Aguillon went to previously, what training did you two
2 attend together?
3    A. So we attended several of the compartment
4 classes, and we also attended 18-wheeler classes.
5    Q. And that's it?
6    A. I'm trying to remember. Desert Storm was one
7 of the companies that --
8    Q. Would it be Desert Snow?
9    A. Snow.
10    Q. Does that sound familiar?
11    A. Snow, yes.
12    Q. So you and John -- I'm going say John A --
13    A. Yeah.
14    Q. -- just to save myself the embarrassment of
15 mispronouncing that a million times.
16        You and John A went to compartment class or
17 two.
18    A. Yes.
19    Q. 18-wheeler class or two?
20    A. Correct.
21    Q. Desert Snow training?
22    A. Correct.
23    Q. Do you remember what that was about?
24    A. I believe it was interview techniques, and I
25 believe they gave us a small portion of compartments.

Page 89

1    Q. Okay. Any other criminal interdiction training
2 that you personally, Sergeant Gamboa, have been there?
3    A. So we did have, through the sheriff's office,
4 and I can't remember who the group was, but we did have
5 a compartment class that I went through at the sheriff's
6 office. And then I did do a stint in auto theft.
7    Q. Uh-huh.
8    A. And we did some courses in recognizing the VIN
9 numbers and second VIN numbers in vehicles and
10 trailers --
11    Q. Okay.
12    A. -- also. Identify a vehicle that may have been
13 stolen.
14    Q. I get it. Did you ever attend a 720
15 interdiction course?
16    A. I have not.
17    Q. Okay. Did you ever attend a street cop
18 interdiction course?
19    A. So, I believe the one that we went through the
20 county was a street cop course --
21    Q. Okay.
22    A. -- that they came over. 720 is more -- is that
23 Mike -- he is now a chief of police over by the
24 Rio Grande Valley. He -- I think he teaches that 720.
25    Q. Okay. So some officer from elsewhere in Texas

23 (Pages 86 - 89)

Peter Gamboa
July 23, 2024

Page 90

1 teaches the 720?

2    A. Yes ma'am.

3    Q. Okay.

4    A. I have not attended his classes. I take that

5 back. During a K-9 conference, I -- one time, I had a

6 K-9 unit from detention under me.

7    Q. Okay.

8    A. I did attend a K-9 class, where he was one of

9 the speakers. So I did attend that class.

10    Q. Okay. And you mentioned a minute ago that the

11 sheriff's office may have had a street cop training come

12 to provide --

13    A. The sheriff's office.

14    Q. -- internal training?

15    A. Yes, ma'am.

16    Q. Can you tell me about that? What do you

17 recall, when was it?

18    A. So it was -- it was compartments, cars,

19 18-wheelers, because remember they brought in, I think

20 it was like three or four cars that had different

21 compartments. 18-wheelers where they could hide people,

22 narcotics, guns, and different compartments within the

23 18-wheelers that where they would hide stuff. So --

24    Q. Okay. And was there any other aspect -- the

25 only thing that the street cop training that was

Page 91

1 internal to the Bexar County sheriff's office, the only

2 thing they covered was compartments?

3    A. Compartments.

4    Q. Didn't do anything else?

5    A. No.

6    Q. Okay. So we talked a little bit about this,

7 but was there a particular skill or knowledge level that

8 you needed to see from a new criminal interdiction

9 officer before you sent him out to the streets?

10    A. Just proactive policing.

11    Q. Okay.

12    A. Like I said, the first four that started the

13 unit, they had that experience, traffic, street crimes.

14 And Gereb, who came from patrol, would always -- was

15 very proactive in patrol.

16    Q. And you might remember this, but you might not,

17 Captain Von Muldau testified that the sheriff's office

18 provided some internal criminal interdiction training,

19 and we just talked about the street cop training. Were

20 there any other internal interdiction related trainings

21 that the sheriff's office provided?

22    A. Could have.

23    Q. Uh-huh.

24    A. But nothing that I would -- that I attended

25 that I can think of.

Page 92

1    Q. Who would know?

2    A. The training academy would have -- probably

3 have records of who would have taught those classes.

4    Q. Okay. And so the training academy then trains

5 both new recruits and continuing officers?

6    A. Yes.

7    Q. Okay.

8    A. But the reason why they would have it is

9 because to give TCOLE credit, they would have to have

10 collected the information they needed for TCOLE

11 requirement.

12    Q. Got it. And I understand that the sheriff's

13 office encourages officers to complete outside training?

14    A. Correct.

15    Q. Did you ever suggest a training to your

16 interdiction officers? I think we've talked a little

17 bit about it.

18    A. What was that?

19    Q. Did you ever suggest a particular training to

20 your interdiction officers?

21    A. I did. I've always kind of was for the

22 idea -- if you see a class that you're interested in,

23 whether it'd be interdiction or something to further

24 your career, let me know, and -- and I would try to get

25 it approved.

Page 93

1    Q. Okay. So tell me about that approval process.

2 Let's say, you know, one of your officers comes to you

3 and says, Sergeant Gamboa, this is the training. I

4 think it sounds great. What would you do next?

5    A. So I would review it. I said okay, let me have

6 the flyer, let me review what it's about. If it was

7 something at the time for, like, specific to criminal

8 interdiction, then I would approve it. If -- you know,

9 if that was something that I think that was good for the

10 unit, and then I would submit it to the lieutenant for

11 their approval, and then it would go up through the

12 chain of command, through the chief, and then the chief

13 deputy.

14    Q. Okay. So you look at -- and correct me if I'm

15 wrong. I'm just going to try to summarize.

16        You get a flyer from the deputy, you look

17 at the flyer, you decide whether it makes sense for

18 criminal interdiction or not, and then you submit it up

19 the chain.

20    A. Correct.

21    Q. In the review process, did you do any homework

22 on the particular training or did you just -- was the

23 flyer enough?

24    A. Yeah. If the flyer talked about, like, the

25 objectives of the class, then that was -- that would be

24 (Pages 90 - 93)

Peter Gamboa                                                           July 23, 2024

Page 94

1  enough for me.

2      Q.  Okay.  I think that I have an example here, and

3  I think it would be super helpful to just talk through

4  it.  Hold on.

5          Let's look at our exhibit -- our internal

6  Exhibit P.  This is a new exhibit.  Do you remember

7  what --

8      A.  53 is the last one that I have here.

9      Q.  Yeah.  That's a previous one.  So hold on one

10  second.  So we're going to mark this as

11  exhibit -- that's not P.  Nope, that's not what I have

12  as P.

13          (Exhibit No. 64 marked.)

14      Q.  (By Ms. Hebert)  Okay.  I'm handing you what my

15  colleague has marked Exhibit 64.  We'll hand out copies

16  for other folks.

17          So I'm going to represent to you that this

18  is a conversation that the cell phone forensics examiner

19  received from -- obtained from your county cell phone.

20  Do you recall submitting your county cell phone for a

21  forensic examination in this case?  Do you remember

22  that?

23      A.  Yes, ma'am.

24      Q.  Okay.  And the forensic examiner pulled certain

25  conversations with certain words and one of these

Page 95

1  conversations is this conversation you see before you.

2      A.  Uh-huh.

3      Q.  Does this -- and I understand if it doesn't

4  look exactly familiar because this is the format that

5  we've gotten from the examiner.

6      A.  Okay.

7      Q.  Do you know what number this is?  And it's okay

8  if you don't.  I have ways to figure it out.

9      A.  I believe that this number belongs to

10  Joseph Garza.

11      Q.  Okay.  And I'm going to say that, you know, we

12  have a organized crime division phone list that says

13  you're right.  It comes with -- from Deputy Garza, and

14  I'm going to just talk to Charles about something for a

15  second about that.

16          MS. HEBERT:  Would you mind handing out

17  Exhibit BB as the next exhibit.  And this is going to be

18  marked Exhibit 65.

19          (Exhibit No. 65 marked.)

20      Q.  (By Ms. Hebert)  And I apologize, Sergeant

21  Gamboa, this has nothing to do with you.  This is just

22  like us trying to get our records straight --

23      A.  No problem.

24      Q.  -- with the county.  And with the county's

25  counsel, can you flip to the page that's labeled 4.

Page 96

1      A.  Okay.

2      Q.  And I think Line 21, will you take a look at

3  that.  And I'm seeing the number (210) 508-3922.  Do you

4  see that?

5      A.  I do.

6      Q.  And will you look at the conversation that we

7  were just looking at, Exhibit 64.

8      A.  Yes, ma'am.  Yes, ma'am.

9      Q.  And is that the number (210) 508-3992?

10      A.  3922.

11      Q.  3922.  Excuse me.  You're right.  Do those

12  numbers match the number on 64, and the number we were

13  just looking at --

14      A.  Yes, ma'am.

15      Q.  On Line 21?

16      A.  Yes, ma'am.

17      Q.  And it seems that this was labeled as

18  unidentified, not Bexar County; is that correct?

19      A.  Correct.

20          MS. HEBERT:  And, Charles, I'll just want

21  to clean up the record there, that was listed -- this

22  number is listed as Deputy Garza on the organized crime

23  division phone list.  So we're going to ask that the

24  county take a look at their responses, their

25  interrogatory responses, and verify that these numbers

Page 97

1  are actually correct because we're seeing some

2  discrepancies.

3          MR. FRIGERIO:  That's fine.

4      Q.  (By Ms. Hebert)  Okay.  So now that we cleaned

5  that up, that has nothing to do with you, I apologize,

6  but we just need to get some records straight.

7          So let's go back to Exhibit 64, and this is

8  a text conversation that you had with Deputy Garza; is

9  that fair?

10      A.  Yes.

11      Q.  Okay.  And it seems like the first one is

12  Deputy Garza texting you about a particular training.

13      A.  Uh-huh.

14      Q.  Is that kind of how it happened with officers

15  suggesting trainings that they thought they would want

16  to take?

17      A.  Yes, ma'am.

18      Q.  Okay.  And the -- right in front of the

19  text -- the text messages message, do you see an OBJ,

20  there's like a little box right on the same line?

21          I'm going to represent to you that, as my

22  understanding of the forensic examination results is

23  that there's an object attached to that.  And I'm going

24  to look at our Exhibit Q, and mark that as the next

25  exhibit.

25 (Pages 94 - 97)

Peter Gamboa                                                    July 25, 2024

Page 98

1          (Exhibit No. 66 marked.)
2     Q. (By Ms. Hebert)  And this will be marked as
3  Exhibit 66.
4          My colleague is going to hand you what's
5  marked Exhibit 66.  Does this look familiar to you?
6     A. I don't recall it, but it would be something
7  that I would look at.
8     Q. Sure.  And it -- I guess even if you don't
9  remember this specific one, is this the kind of
10 materials that a deputy would send you as flagging a
11 potential training?
12    A. Correct.
13    Q. Okay.  Do you remember if you approved this
14 training or not?
15    A. I don't.
16    Q. I'm not trying to catch you up.  I'm just
17 trying to understand the process.
18    A. Yeah, yeah.  No.  I don't remember, but
19 according to my text with Joseph, I said I'll put in for
20 it, or is that him saying?
21    Q. Local user would be you.  It's the person who
22 owns the phone, that's my understanding.
23    A. Okay.  So then I would have said, hey, I'll put
24 in for it and see if we can get it approved.
25    Q. Okay.  And then --

Page 99

1     A. So just -- and just to clarify, Joseph was not
2  part of criminal interdiction.
3     Q. That's okay.  I'm just trying to understand,
4  like, the process of --
5     A. Oh, got you.
6     Q. -- training, like identifying training and
7  approving for it.
8     A. Yes.
9     Q. So just to summarize, Deputy Garza sent you
10 this picture text message, and you said you would put in
11 for it; is that fair?
12    A. Correct.
13    Q. And then the next -- I want to look at the next
14 message.
15         The next message looks like to me, be a
16 message from Deputy Garza from February 4th, 2023.
17 Again, sent sharing an object and saying a good class
18 for intel and interdiction.
19         Did I read that correctly?
20    A. Yes.
21    Q. And did you understand that message to be
22 Deputy Garza sharing a training with you?
23    A. Yes, ma'am.
24    Q. Okay.  And then I'm going to flag what the
25 associated image is with that.  We're going to introduce

Page 100

1  another exhibit.
2     A. Okay.
3     Q. I'm going to mark this as Exhibit 67.
4          (Exhibit No. 67 marked.)
5     Q. And we're going to do R.
6          Okay.  Does this image look familiar to
7  you?  And it's okay if you don't remember this specific
8  training, just try to decide whether you remember seeing
9  this one or not.
10    A. I don't remember.
11    Q. Okay.  Does this look like the kind of image
12 that Deputy Garza might have shared with you --
13    A. Yes, ma'am.
14    Q. -- about a training?  And looking at this
15 training information, is this the kind of thing that
16 would have been good for interdiction and intel?
17    A. Yes, ma'am.
18    Q. And why is that?
19    A. Because they're dealing with motel, airport
20 parking lot and parcel.
21    Q. Okay.  And tell me more about that.
22    A. And so that is something that we did not have
23 too much training on, parcel interdiction, airport
24 interdiction.  And so that would be something that I
25 would want more information about.

Page 101

1     Q. Okay.  And what would you do to get more
2  information?
3     A. I would have them, hey, send me more
4  information on this.  The objectives, what are they
5  going to be teaching, things of that nature.
6     Q. Okay.  And I guess, what kind of -- what would
7  you look for in getting that additional information?
8     A. As far as objectives, okay, what -- what will
9  we be dealing with in airport interdiction?  Which would
10 probably be people coming off the airport, anything that
11 they would claim or not claim, and then it would be some
12 type of contraband.
13    Q. So then would it be fair, after -- after
14 you did this review, and then you recommended -- say,
15 you recommended it to your deputies, hey, I want one of
16 you to take this training, does that mean you approved
17 the training and the objectives that the training was
18 going to achieve?
19    A. Correct.
20    Q. Okay.  Do you have a sense of whether
21 noncriminal interdiction officers generally have taken
22 some of the criminal interdiction courses as part of
23 their own personal improvement?
24    A. You're talking about, like, patrolmen?
25    Q. Yes, sir.

26 (Pages 98 - 101)

Page 102

1    A. Yes.
2    Q. And what kind of courses do you think that
3  those officers have taken?
4    A. So they've -- I've heard or them tell me, I've
5  taken the courses from 720.
6    Q. Uh-huh.
7    A. Desert Snow.
8    Q. Uh-huh.
9    A. Things of that nature.
10    Q. Street cop?
11    A. Street cop.
12    Q. So it's your understanding that patrolmen also
13  take courses like 720, Desert Snow and street cop
14  offered courses that help with interdiction?
15    A. Yes, ma'am.
16    Q. Okay. What time are we at? I don't want to
17  keep him? 11:56? Okay. Keeping time for lunch.
18        So I want to talk a limit about your
19  supervision of the criminal interdiction unit.
20    A. Okay.
21    Q. Recognizing that, you know, we may not get
22  through all of this before lunch.
23    A. Sure.
24    Q. So when the criminal interdiction unit was a
25  separate unit, did the -- did those officers have a

Page 103

1  particular shift?
2    A. They did have a particular shift. With the
3  understanding that the shift could change at any day.
4    Q. Okay. And what was the particular shift?
5    A. So we were a 8:00 to 4:00, Monday through
6  Friday.
7    Q. And was there a training day, like the
8  other -- one of the other units you mentioned?
9    A. No. No. No.
10    Q. Okay. So can you walk me through the typical
11  day of a criminal interdiction unit officer? It started
12  at 8:00, what was the first things that you expected
13  them to do? One of the first things you expected them
14  to do?
15    A. So during role call, make sure everybody was
16  there. Then I would say today randomly, we're going to
17  work 35 southbound side, or northbound side.
18    Q. Uh-huh?
19    A. So we would stagger up from the county line to
20  the county line on 35. And then they would work that
21  area. And then I would tell them, hey, two of
22  y'all -- you know, if you're going to go north, two of
23  y'all stay together, y'all going to go south, two of
24  y'all stay together.
25    Q. Okay. I want to go back a little bit. When

Page 104

1  you say roll call --
2    A. Uh-huh.
3    Q. -- what did you mean by roll call?
4    A. Make sure that they're at work. If I would do
5  a general uniform inspection, vehicle inspection.
6    Q. So you guys were all together?
7    A. Correct.
8    Q. It wasn't just roll call, like, everybody call
9  up and say, all right, are you on? You guys, did you
10  meet at HQ?
11    A. I mean, there might be some days that we would
12  just meet out in the field.
13    Q. Uh-huh?
14    A. But at the time, I was the academy sergeant, so
15  I was mostly at the academy so I would have them come
16  meet me at the academy. Make sure that they had their
17  body cams on the dock to make sure that any videos that
18  they had were uploaded. If they needed batteries for
19  tasers, they had that.
20    Q. Do you carry around a stash of batteries in
21  your patrol car?
22    A. Well, no, but they were there at the academy.
23    Q. Okay.
24    A. Yeah. So that's why -- reasons why we would
25  meet there.

Page 105

1    Q. Uh-huh.
2    A. Or if I -- at the -- you know, by chance I was
3  teaching a class, hey, I'm not going to meet you on the
4  field, come over here.
5    Q. Understand.
6    A. I'll meet you all during a break. And then,
7  hey, go work this highway, you know, go work this, and
8  then go from there.
9    Q. You would give them an assignment --
10    A. Correct.
11    Q. -- for a particular day?
12    A. Correct.
13    Q. And then you talked a little bit about
14  assigning them to a particular highway on a given day.
15    A. Correct.
16    Q. And then would it be fair to say that you kind
17  of created -- and I don't know the right way to phrase
18  this, so just bear with me. Like, kind of a
19  downstream/upstream line of the officers, like, when --
20  from the county line to the county line, they'd
21  communicate information to each other in a row?
22    A. They could have, yeah.
23    Q. Is that how that worked? Or were they just,
24  like, taking different parts?
25    A. Radio. Computer. They would see each other on

Page 106

1  the computer.
2      Q. Okay. And they would chat on the computer, or
3  they just see where each other was located?
4      A. They could see if somebody was on traffic stop,
5  and maybe they -- hey, you know, I've got something, you
6  know, then he'd have backup come.
7      Q. Okay. Deputy Babb talked a little bit about
8  having breakfast together. Can you tell me about that?
9      A. They would just maybe meet to go eat before
10 they hit the street.
11     Q. Was that before they started shift or during
12 the shift?
13     A. Probably during the shift.
14     Q. Okay. And was that part of the roll call that
15 you would sometimes do?
16     A. Sometimes probably. Yeah.
17     Q. Like, you do roll call and the initial meeting
18 over breakfast?
19     A. Right.
20     Q. Okay. And what were an interdiction officer's
21 main responsibility during a shift? I guess like
22 another way to think about this is, how did you expect
23 the interdiction officer to spend his time during that
24 shift?
25     A. Just observing the traffic. That's all I

Page 107

1  expected.
2      Q. And so the -- the whole goal, the whole shift
3  would be spent watching traffic; is that fair?
4      A. Correct.
5      Q. And making traffic stops?
6      A. Yes. If they would have something, a -- if a
7  violation was committed in their presence or view then
8  that's what they would initiate a traffic stop for.
9      Q. Okay. And at the end of a particular shift,
10 what were a officer's responsibilities? Do they have
11 to, for example, fill out certain documents?
12     A. If they had reports to write, they would fill
13 out those reports. If they had any type of use of
14 force, they would have to fill out those reports.
15 Things of that nature.
16     Q. Okay. So at the end of the shift, an officer
17 had to complete his reports --
18     A. Correct.
19     Q. -- is that fair?
20     A. Yes.
21     Q. And can we walk through the kinds of reports an
22 officer would have to complete? You mentioned use of
23 force, so there's a special use of force --
24     A. Form.
25     Q. -- report?

Page 108

1      A. Yes.
2      Q. Is there a special traffic stop form that they
3  needed to complete?
4      A. No.
5      Q. Okay. So for every traffic stop, there isn't a
6  form that they needed to complete?
7      A. No.
8      Q. When would an officer complete a form for a
9  traffic stop?
10     A. Usually -- so that would be an RMS report. So
11 that would --
12     Q. These are things that say SPEARS summaries --
13     A. Yes.
14     Q. -- on the top? Okay. RMS report, SPEARS
15 summary, same thing?
16     A. They're all the same thing.
17     Q. Okay.
18     A. And so they would usually do that after the
19 traffic stop.
20     Q. Okay. Is that every traffic stop?
21     A. Yes.
22     Q. Okay.
23     A. So not necessarily, they didn't have to do it
24 at that point in time. But it would be -- there would
25 be a record showing, hey, you still have this incident

Page 109

1  open --
2      Q. Okay.
3      A. -- until you finish the RMS report.
4      Q. So you close it out?
5      A. Correct.
6      Q. Okay. So would there -- and I just want to go
7  back a little bit. So would there be an RMS report or
8  SPEARS summary report done for every traffic stop?
9      A. Yes.
10     Q. Okay. And when did an officer have to do a
11 narrative as part of completing their RMS?
12     A. If they had an arrest.
13     Q. Okay. And would you expect an officer to have
14 completed all of their narratives when they signed off
15 for the day, when their shift was over?
16     A. I would expect for them to do that.
17     Q. But that didn't always happen?
18     A. It probably didn't always happen.
19     Q. So tell me about that.
20     A. I'm -- so they would have tasks in the RMS
21 that -- that needed to be completed. So if -- I don't
22 know, for example, they had an incident -- a disturbance
23 they rolled up on.
24     Q. And that's like a call for service?
25     A. Correct.

Page 110

1    Q.  Okay.
2    A.  And so it's off the highway somewhere.  They
3  pulled up on it because they saw the -- you know,
4  arguing, or two people outside their vehicle, check to
5  see if everything is okay.
6         So things like that, they would probably
7  get all the information they needed, and then later come
8  to that -- to complete that report, that narrative.
9    Q.  Okay.  And how long would you expect an officer
10  to take to complete that narrative.
11    A.  So I would -- I would probably give him to the
12  next day.
13    Q.  Okay.  So if they stopped someone on the first,
14  you would expect the report to be completed by the
15  second?
16    A.  Right.
17    Q.  Okay.  And how long is too long to wait to
18  complete a report?
19    A.  So, they have timers on the reports that would
20  tell me this task has not been completed, and so then,
21  before you do anything, complete this.
22    Q.  Okay.  So I want to go back a little bit.
23         You said that the -- an officer only needed
24  to complete the narrative, the write-out portion of an
25  RMS or SPEARS summary if they made an arrest?

Page 111

1    A.  Correct.
2    Q.  So does that mean unless -- if an arrest was
3  made, the timer would start?
4    A.  Yes.
5    Q.  And if no arrest was made, there'd be no timer?
6    A.  Correct.
7    Q.  Okay.  So that's something internal to the RMS
8  system?
9    A.  Right.  But it would still have a timer because
10  the task would still be open.
11    Q.  Okay.
12    A.  Right?  Even though they don't have a write a
13  pretrial report, but the task would still be open.
14    Q.  Okay.
15    A.  So they would have to go into the RMS, select
16  traffic stop, and then location.  Link it, you know, to
17  the call -- to the stop, and then at the very end, where
18  was the traffic stop conducted?  Was it a highway,
19  roadway?  So that they would select that and then -- and
20  then close it out.
21    Q.  Okay.  And would you expect an officer to close
22  out his traffic stop when the traffic stop was done?
23  Like, when the traffic stop was finished?
24    A.  So it would just depend.  Because they may see
25  something else that they're going to wait, but they're

Page 112

1  going to -- they're going to follow another violator.
2    Q.  Okay.  So putting aside, you know, the writing
3  of reports when there's, like, been an arrest or you did
4  a call for service, would you expect an officer to close
5  out all of his traffic stop RMS records at the end of a
6  shift?
7    A.  I would expect them to, yeah.
8    Q.  Okay.  I just wanted to understand.  Would
9  there be any reason why just like a generic traffic stop
10  record would be open across shifts?
11    A.  They -- they didn't close it out.
12    Q.  Okay.  But they should have?
13    A.  They should have.
14    Q.  Okay.  I mean, I understand that mistakes
15  happen.
16    A.  Yeah, yeah.
17    Q.  But generally they --
18    A.  Or, "I'm frustrated, I've got a headache and
19  I'll take -- I'll do it later."
20    Q.  Okay.  How did you personally communicate with
21  your -- your criminal interdiction officers when they
22  were in the field?  And I'll explain:  Did you use the
23  radio?  Did you call them?  Like, how did -- how did
24  communication happen?
25    A.  All of the above.

Page 113

1    Q.  Okay.
2    A.  Yeah.  So it just depends on for what reason.
3  I may just call them.  I may -- you know, if I call them
4  and I need to talk to them and they're not answering
5  then I get them on the radio.  Dispatch, you know, get
6  ahold of Engine 11, Engine 12, have them call me.
7    Q.  Okay.  And what kind of things did you call the
8  officers about?
9    A.  Just depends.  You know, it could be, they need
10  to sign paperwork.  I'm going to relocate them somewhere
11  else.  They need go to court.  You know, if for some
12  reason court would call and, hey, we need them for
13  pretrial ASAP, in the next five minutes.  Okay.  I'll
14  get ahold of them, things of that nature.
15    Q.  Okay.  And what about calling and contacting
16  them about the actual criminal interdiction work that
17  they were doing?  Were you involved in consulting during
18  the actual traffic stops or did you necessarily just
19  wait for a problem to develop?
20    A.  It just depends.  If I had time, I would be out
21  there with them.
22    Q.  Okay.
23    A.  And kind of talk to them about, hey, this is
24  what I would do, you know, this is the angle that I
25  would use, to get them to tell you, you know.  Both

Peter Gamboa                                                    July 23, 2024

Page 114

1  Gereb and Babb were really good, real patient at
2  interviewing.  Treadwell was kind of very deep voice,
3  he's about this tall, but very deep voice.  And --
4      Q.  Let the record reflect that Sergeant Gamboa
5  gestured to approximately between three and four feet
6  tall.
7      A.  Very short guy, but very deep voice, right?
8      Q.  Okay.
9      A.  And people would complain about him all the
10 time.  He was very matter of fact, and they would
11 complain of him being rude, him not giving -- you know,
12 him not giving them a break, things of that nature.
13         So I would, you know, coach them and tell
14 them, hey, you know, not all people are bad, you know.
15 I said it's your discretion on whether you want to cut
16 them a break or not.  You can give them warnings.  I
17 don't expect that you give everybody a citation, but
18 it's up to you.  You know, things of that nature.
19     Q.  Okay.  So when you said you were out there with
20 them, does that mean you were riding along with them, or
21 did you take your own patrol car?
22     A.  My own patrol car.
23     Q.  Okay.  And so tell me about how that worked.
24 Did you just wait until Deputy Gereb made a traffic stop
25 and then joined Deputy Gereb on a traffic stop?

Page 115

1      A.  Correct, yeah.
2      Q.  And then tell me how the process worked?
3      A.  So I would kind of, like, evaluate them on
4  their tactics.
5      Q.  Uh-huh?
6      A.  They're doing roadside interviews, are they
7  standing right by the fog line, or are they on the side
8  of the road where if somebody comes crashing into them,
9  they'll be in a safe place.
10        Talk to them, hey, you know, it's -- you're
11 going a little bit above and beyond.  You know, that's
12 not good.  You know, things like that.
13     Q.  Okay.  I understand.  So you were coaching
14 them --
15     A.  Yeah.
16     Q.  -- on conducting a stop?
17     A.  Correct.
18     Q.  And if you saw something that they weren't
19 doing correctly, you'd give them feedback and help them
20 correct that.
21     A.  Yes, ma'am.
22     Q.  Okay.  I guess you're going to laugh at this.
23 But if you were giving out an A or you, you know, if the
24 county were to give out bonuses, if that would be
25 nice --

Page 116

1      A.  I wish.
2      Q.  I know.  What would truly excellent criminal
3  interdiction work look like?
4      A.  So my guys did excellent work.  I would very
5  rare get complaints about them.  They loved to do the
6  work that they did, and how I could tell was there were
7  very minimal, if any, call ins.  You know, of course, if
8  they went to a training, you know, they wouldn't be at
9  work.  But, like, they were self-motivated.  I didn't
10 have to, you know, kick them in the butt, go, you know,
11 do some stops, things of that nature.
12     Q.  I understand.
13     A.  So my guys, from the very get-go, the four
14 original guys that I picked were very good at doing
15 criminal interdiction.  If I was to give raises, they
16 would all be getting raises all the time because they do
17 good work.
18     Q.  And that went for the four originals, but was
19 that the truth --
20     A.  The whole time.
21     Q.  -- the whole time?
22     A.  Yes, ma'am.
23     Q.  Okay.  How often did you review body worn
24 camera footage of criminal interdiction?
25     A.  So in the beginning was real easy because I

Page 117

1  only had four guys to have to review.  And so they -- we
2  get through Axon, we get notification that we need to
3  review 12 videos.  And --
4      Q.  Is that a subset of the videos or is that all
5  the videos?
6      A.  No, no.
7      Q.  So when Axon gives you a notification to review
8  12 videos --
9      A.  Random, random.
10     Q.  So it's random assignment.  So Axon through the
11 computer system collects videos for you to review?
12     A.  Correct.
13     Q.  Okay.
14     A.  But because in the very beginning, I would try
15 to review as much as I could because I was excited to
16 see what they were doing and how they were progressing.
17        Now, because I have so many units, it's
18 hard.  But I share with street crimes, I share with
19 covert.  So there's other supervisors that we review
20 videos.
21     Q.  Okay.  So you still review body worn camera
22 footage today?
23     A.  Correct.
24     Q.  And would it be correct to say you still review
25 body worn camera footage of officers conducting traffic

30 (Pages 114 - 117)

Peter Gamboa                                                          July 25, 2024

Page 118

1 stops today?
2     A. To those that are assigned to my group, yes.
3     Q. Did you ever make notes about reviewing body
4 worn camera footage?
5     A. If I did, it would be on those individual
6 reviews.
7     Q. Okay.
8     A. So there's a section where you can comment on
9 there.
10     Q. All right. Let me just understand that. So
11 when you're doing a review of body worn camera footage,
12 there's some kind of screen that pops up; is that
13 correct?
14     A. Yes.
15     Q. And you can put notes in that screen?
16     A. Correct.
17     Q. Okay. And do those notes go to the officer
18 whose body worn camera it was?
19     A. I'm sure. Because -- yes. So there's another
20 box to let them know. So then I would check the box and
21 then they would get it --
22     Q. Okay.
23     A. -- through email.
24     Q. Yeah. So there's like an automated system --
25     A. Correct.

Page 119

1     Q. -- Axon selects randomly --
2     A. Yes.
3     Q. -- body worn camera footage for you to review.
4 You review it?
5     A. Correct.
6     Q. You make notes?
7     A. Correct.
8     Q. And then the officer gets note -- gets a
9 notification, Sergeant Gamboa made a note for your body
10 worn camera, and then they can review that note; is that
11 fair?
12     A. Right. And so from my recollection, it would
13 mostly be language.
14     Q. Oh, okay. So most of the time that you're
15 correcting --
16     A. That I've seen that I would correct would be
17 language.
18     Q. And by that you mean, they were using profane
19 language that you didn't want them to be using?
20     A. Well, a choice of better words.
21     Q. Okay.
22     A. And I get what they were doing, right?
23 They're -- they're coming down -- and I'm just a person.
24 I'm not a cop in uniform. And so my thing was, okay, I
25 get it. I know what you're doing. But let's be a

Page 120

1 little bit more professional.
2     Q. Okay. Explain to me like what kind of language
3 you would correct?
4     A. Like profanity.
5     Q. Okay. So I was right.
6     A. Yeah, yeah. Profanity, yes.
7     Q. I thought maybe I wasn't understanding.
8     A. No, no, no. Yeah, yeah, yeah. Profanity.
9     Q. Okay. And so most of the time you're
10 correcting profanity?
11     A. Correct.
12     Q. Sometimes would you be correcting how they were
13 conducting a stop, like, their tactics?
14     A. If I would see that, yes. If I would see that,
15 I would make note that, hey, next time, get on the other
16 side of the car. You're right at the fog line.
17 Somebody is not paying attention on the phone, drunk,
18 whatever, will just take you out.
19     Q. Okay. Does the -- does the similar system
20 exist for dash camera footage? A review or auditing
21 system?
22     A. Right, yes. So same thing. It would -- it
23 would be picked random from Axon, and then sent for me
24 to review.
25     Q. Okay. Did you ever identify a problem with

Page 121

1 missing dash camera footage?
2     A. It would be hard to because unless -- well, it
3 wouldn't. If there's no dash camera, then Axon wouldn't
4 send it to me.
5     Q. So you wouldn't know to review or how to review
6 whether an officer was turning his dash camera on or
7 off?
8     A. Right. The only -- the only way that I would
9 know is if there was a report: Hey, Sarge, my dash
10 camera is not working.
11     Q. Okay. And what would happen when you got that
12 kind of report?
13     A. So then I would tell him, hey, well we need to
14 get that over to fleet so they can fix it.
15     Q. Okay.
16     A. And in a perfect world, right, that would
17 happen instantaneously, right? But they were busy doing
18 other things. So, hey, I'll make an appointment for
19 you, bring it in on Wednesday, and I'll take a look at
20 it.
21     Q. I get it.
22     A. So there might be like a couple days that the
23 camera was down. And -- then Wednesday they would
24 go get it fixed.
25     Q. I get it. I have that issue with IT all the

31 (Pages 118 - 121)

Peter Gamboa                                                    July 25, 2024

Page 122

1  time.
2      A.  Yes.
3      Q.  I need it fixed now not --
4      A.  Yes.
5      Q.  -- two weeks from now.
6      A.  Yes.
7      Q.  Okay.  So if an officer had a dash camera
8  issue, would you expect him to call you?
9      A.  Yes.
10     Q.  And if an officer wrote in his report that he
11 had a dash camera issue, would you necessarily see that?
12     A.  No.
13     Q.  Okay.  I guess that brings up a broader
14 question:  Were you reviewing narrative reports from
15 your officers?
16     A.  Sometimes.  If there was -- well, at the time,
17 I wouldn't get them.  It was Lieutenant Ortega would get
18 them at that time.  Now, I do receive reports and I read
19 them.
20         And so the whole RMS system is kind of
21 different of how it should be working.  So, the way it
22 should work was they would fill out a probable cause
23 statement for an arrest.  I would get that
24 automatically, and then I would approve it.  The mag
25 office is -- what that would be what the mag office

Page 123

1  would receive.
2      Q.  And by mag, you mean magistrate judge?
3      A.  Magistrate judge.  They're supposed to get that
4  for approval for the arrest, or if it was just an
5  incident then I would get it in my bucket.  But if it
6  was arrest, that's all that would be needed, and that
7  kind of never happened.
8          So it should be that -- it should have been
9  that a supervisor had to approve on a report before they
10 completed that final arrest.
11     Q.  Before it went to the magistrate judge?
12     A.  Right.
13     Q.  Okay.
14     A.  But that's not the way it works.  So they'll
15 fill it out, and then they'll take them, they'll print
16 it out, give that to the ADA to review, and then they
17 get magistrate.
18     Q.  Okay.  So it's still kind of got a paper copy
19 issue?
20     A.  Yes.
21     Q.  You mentioned that at the time it would go to
22 Ortega.  What timeframe are we talking about?
23     A.  2019.
24     Q.  To?
25     A.  I would probably say maybe -- maybe a year or

Page 124

1  so.
2      Q.  2020?
3      A.  Yeah.  About 2020, 2021, around there.
4      Q.  Okay.  And then at that time, 2019 to 2021, the
5  RMS summary with a narrative would go to Ortega --
6      A.  Correct.
7      Q.  -- to approve?
8      A.  Right.
9      Q.  And then after 2021, what happened?
10     A.  Then the sergeants would review those
11 narratives.
12     Q.  Okay.  So after 2021, then narrative reports go
13 to the sergeant to review?
14     A.  Correct.  Correct.
15     Q.  If a narrative report was completed did that
16 mean you had to approve it?  Like was every --
17     A.  No.
18     Q.  -- narrative report reviewed by you?
19     A.  So -- yes.
20     Q.  Okay.  So you reviewed --
21     A.  Because it would go -- so once I approve it,
22 then it goes into another bucket.  Which if it was
23 narcotics, it would go to covert.  If it was child
24 abuse, it would go to child safe to investigations.  If
25 it was a firearm, it would go to criminal

Page 125

1  investigations.
2          Now, the way it works is, anything that
3  organized crime uniform officers will come to us.
4      Q.  Okay.
5      A.  And then we have investigators that we assign
6  those cases too.
7      Q.  Okay.  So when you were doing your criminal
8  interdiction unit supervision, would you look at or
9  receive -- would you receive -- let's start this way.
10         Would you receive every narrative report
11 that one of your criminal interdiction officers did?
12     A.  Yes.
13     Q.  Okay.  So it came into your email?
14     A.  Correct.
15     Q.  Every time they finished?
16     A.  Well, my not my email, but in the RMS bucket,
17 yes, ma'am.
18     Q.  Okay.  So every time one of your criminal
19 interdiction officers completed a narrative summary, it
20 came into your system?
21     A.  Correct.
22     Q.  And did you review every narrative summary that
23 your interdiction officers did?
24     A.  If -- if I felt there was something that I
25 needed to stay on top of.  If -- if I would review one

32 (Pages 122 - 125)

Peter Gamboa

July 25, 2024

Page 126

1  that it was just horrible spelling, then, hey, I'm going
2  to keep on top of you because we can't have that.
3      Q.  Okay.
4      A.  You know, every once in a while a mistake,
5  okay, no biggie.  But like every other word, like, no.
6  Things of that nature.
7      Q.  Okay.  So generally, you wouldn't review every
8  RMS --
9      A.  Correct.
10     Q.  -- summary narrative; is that fair?
11     A.  Correct.  Yes, ma'am.
12     Q.  Only if there was some kind of red flag?
13     A.  Issue, right.
14     Q.  Okay.  I want to talk a little bit about how
15  you communicated about the interdiction unit and
16  interdiction activities to supervising officers.  Did
17  you just -- did you have conversations with supervising
18  officers about the criminal interdiction unit generally?
19     A.  With just general supervisors or, like, my
20  lieutenant?
21     Q.  Your lieutenant.
22     A.  Okay.  Yeah, he would -- like, so he -- he
23  would compile a -- like a -- like, a weekly summary --
24     Q.  Uh-huh.
25     A.  -- of what we did.  Any shortages, any

Page 127

1  equipment that we're asking for.  Maybe our -- maybe we
2  had a vehicle down that we needed to try and get another
3  vehicle, things of that nature.
4      Q.  Uh-huh.
5      A.  I would communicate with the lieutenant.
6      Q.  Okay.  Would you provide information for the
7  lieutenant's weekly report every week?
8      A.  So we would talk and he would ask, hey,
9  anything different?  In the beginning, right, we had the
10  four officers.  After I lost the two officers, then that
11  was mainly my, my gripe to him is, hey, I need the two
12  positions filled, things of that nature.
13     Q.  Okay.  Did you provide any summary or
14  information about the activities that the criminal
15  interdiction officers had been doing?
16     A.  I think just, you know, if we had, for example,
17  a money laundering case, where they may have seized some
18  drugs and some money, that would -- that would be
19  something that I would communicate to him.
20         And then he -- that was kind of a highlight
21  for him to talk to the chief about.  Hey, this is what
22  we did, this is what the guys seized this week, things
23  of that nature.
24     Q.  So if there was a big success, you --
25     A.  Correct.

Page 128

1      Q.  -- flagged that?
2      A.  Yes.
3      Q.  But did you provide any information about, for
4  example, we stopped 20 vehicles this week?
5      A.  No.  Not -- not in particular.
6      Q.  Okay.  And what was your understanding on how
7  the lieutenant's weekly reports were used?
8      A.  So that was used for the meeting with the
9  chief.
10     Q.  And this would be Chief Sanford?
11     A.  Sanford, correct.  And what I think she would
12  use it for is during command staff, hey, these are my
13  units and this is what they're doing.
14     Q.  Okay.
15     A.  And this is the success that they have.
16     Q.  Did you ever get any feedback in response to
17  the reports, something like, the criminal interdiction
18  unit is doing a great job, keep it up?
19     A.  So the chief would call me and say, hey, y'all
20  are doing good.  I know that you're missing two people.
21  I'm trying to get those filled, but right now, we're
22  short.  So --
23     Q.  Okay.  Did you get ever get any feedback, like,
24  we need to improve X, Y or Z?
25     A.  No.

Page 129

1      Q.  Okay.  Did you ever get any questions in
2  response to -- did Deputy Chief Sanford ever call you
3  and say, hey, I want to know more about X or Y?
4      A.  No.  Unless it was like a complaint, hey, tell
5  me about this traffic stop, or whatever.
6      Q.  Okay.
7      A.  And then I would tell her what I knew.
8      Q.  And did that happen, do you remember?
9      A.  Very rare.
10     Q.  Okay.
11     A.  Very rare.  And it was mostly a gang member
12  that was arrested.  They took my phone, where's my
13  phone.  It's in the property room.
14     Q.  Okay.  Do you still do weekly reports today?
15     A.  I don't do them.
16     Q.  Okay.
17     A.  No.
18     Q.  Or do you still provide information for a
19  weekly report today?
20     A.  So now what we do is we have a weekly activity
21  sheet that all the officers turn in, but they turn that
22  in to our office assistant and she records it.
23     Q.  Okay.  So I just want to understand that.  So
24  every officer has to complete a weekly activity sheet
25  now?

Peter Gamboa

July 23, 2024

Page 130

1    A. Correct.
2    Q. And then the office assistant does what with
3  the weekly activity?
4    A. So she'll record it, and then the lieutenant,
5  when quarterly or whenever they meet with the chief
6  about stats, she'll bring out a final draft of all the
7  stats that we have provided.
8    Q. Okay. I want to ask a couple of questions
9  about funding and then we'll take a break.
10    A. Okay.
11    Q. Does that sound good?
12    A. Sure.
13    Q. Where did the money for starting the criminal
14  interdiction unit come from?
15    A. So it was pulled from different sections.
16  Traffic, we encompassed two of their traffic vehicles,
17  that came with the two officers from traffic. Street
18  crimes, the officer came with his vehicle. And the
19  academy, one vehicle came from the training academy.
20         Training was approved through either the
21  training academy in the beginning, or CID, and now
22  organized crime.
23    Q. Okay. So the money for the training -- let me
24  understand that. The money from the training came from
25  either the training academy budget or eventually --

Page 131

1    A. At the time, right. When we were assigned
2  under the training academy, so that -- that money came
3  from the training academy budget.
4    Q. Understood.
5    A. Then when we moved over under criminal
6  investigations, then that money would have come
7  from -- from that division.
8    Q. Okay. And what about salaries? Where did the
9  criminal interdiction unit salaries come from? Did it
10  come from the same place their vehicles came from?
11    A. So at the time, it would have -- if you're a
12  deputy, then it would come from the patrol budget.
13    Q. Okay.
14    A. My salary came, of course, from training
15  academy, and then criminal investigations.
16    Q. Okay. So just mechanics?
17    A. Yes.
18    Q. All deputies are paid from the patrol bucket?
19    A. Correct. Correct.
20    Q. And then sergeants and above --
21    A. Just depends where they're assigned.
22    Q. Okay. Did the criminal interdiction unit bring
23  any revenue in?
24    A. Well, just if they wrote tickets, then it would
25  go to the general fund.

Page 132

1    Q. Okay.
2    A. Not -- not to the sheriff's office.
3    Q. And you mean, the county's general funds?
4    A. Correct.
5    Q. Okay.
6    A. Now seizures, asset forfeiture seizures would
7  be like anything else. The sheriff's office would get a
8  certain percentage, and the district attorney's office
9  would get the big chunk. And that would go to asset
10  forfeiture.
11    Q. Okay. I want to go back to that a little bit.
12  So by seizure, you mean if 10k was found with drugs, and
13  they seized the 10k --
14    A. Right.
15    Q. -- the sheriff's office and the district
16  attorney's office --
17    A. Correct.
18    Q. -- would get some of that cash.
19    A. Right. Under the asset forfeiture statutes.
20    Q. Okay. And do you -- I don't know this might be
21  a statutory thing. Do you know how much goes to the
22  sheriff's office, like, what percentage?
23    A. I think it's -- I think it's -- well, now it's
24  sheriff's office 30 percent. DA's office would have
25  gotten 70 percent. I'm not sure if they've changed it

Page 133

1  from then to now, but I know now that's what it's
2  currently.
3    Q. Okay. And you don't remember what it was
4  previously?
5    A. No.
6    Q. And where does -- where does the -- where did
7  the seized funds go for the sheriff's office?
8    A. Asset forfeiture. So that would be used for
9  equipment, training.
10    Q. So there's a fund?
11    A. Correct.
12    Q. And so that money would go to the asset
13  forfeiture fund?
14    A. Correct.
15    Q. And are there rules about what the money can be
16  used for from the --
17    A. Yes.
18    Q. -- asset forfeiture fund?
19    A. Yes.
20    Q. And what are those rules?
21    A. Training, equipment.
22    Q. Anything else?
23    A. That's all that I know of.
24    Q. Okay. So let me just make sure I understand
25  that. If an officer seizes $10,000 through a traffic

34 (Pages 130 - 133)

Peter Gamboa                                          July 23, 2024

Page 134

1 stop, $3,000 are going to go to the sheriff's office --
2    A. Correct.
3    Q. -- to be used in the -- to be put in their
4 asset forfeiture fund.
5    A. Correct.
6    Q. And then that fund can be spent on equipment or
7 training.
8    A. Correct.
9    Q. Okay. If a particular unit is doing all of the
10 seizing, do they get more of the training and equipment?
11 So let's say --
12    A. They can.
13    Q. -- like, the gang unit theoretically is doing
14 all the seizing of the money. Does that mean they get
15 more equipment and training?
16    A. Possibly.
17    Q. Okay.
18    A. Possibly. Because that's at the discretion of
19 the chiefs.
20    Q. Okay. And would you say based on your
21 experience that that's how it worked?
22    A. So I don't know only because I would know if,
23 like our training, if we would submit for training,
24 like, I would use, hey, we seized X amount of money. We
25 have -- you know, and we don't have no more training

Page 135

1 money, can we use asset forfeiture money to send the
2 guys to training. So that's what I would use. But I
3 don't know if patrol would get money from that because I
4 wasn't there.
5    Q. Sure. So and you can only talk about your
6 experience.
7    A. Exactly.
8    Q. I entirely understand.
9    A. Yeah.
10    Q. So for your experience, you know, let's say the
11 gang, folks today, seize $10,000. Would you expect to
12 be able to say to your supervisor, hey, my guys just
13 seized a bunch of cash.
14    A. I would use that, yes. I would.
15        MS. HEBERT: I think that's a good time for
16 a break.
17        MR. FRIGERIO: Okay.
18        (Break taken from break 12:35 to 1:40 p.m.)
19    Q. (By Ms. Hebert) And we're back from lunch. I
20 have to ask you these kind of generic questions just
21 because that's what I do.
22    A. Sure.
23    Q. Did you talk to anybody about this case during
24 lunch --
25    A. No.

Page 136

1    Q. -- besides your attorneys?
2    A. No.
3    Q. Okay. Any phone calls during lunch?
4    A. I did have one, and it was about a scheduling.
5 It had nothing to do with the case.
6    Q. Sure. Great. Okay. So now we can go back to
7 the substance of what we were talking about.
8        I want to talk about criminal interdiction
9 activities and when sheriffs officers do criminal
10 interdiction traffic stops.
11    A. Okay.
12    Q. So when a sheriff officer does a criminal
13 interdiction traffic stop, how are those officers
14 expected or supposed to identify a vehicle that might be
15 involved in some of the crimes you talked about
16 previously?
17    A. So initially, they won't know unless maybe it's
18 an out of state plate. But initially, they won't know
19 until they start a conversation with the violator. And
20 then that's where they may start getting the -- building
21 that reasonable suspicion, they may be couriers or
22 smugglers, things of that nature.
23    Q. Okay. And I guess to follow up on that, you
24 talked about out-of-state plates.
25    A. Uh-huh.

Page 137

1    Q. So do out-of-state plates raise a red flag?
2    A. No. Not in and of itself. Of course, if a lot
3 of the rental companies use out-of-state plates, right,
4 but in them having that roadside interview, they may
5 find out that they are out of state, and coming -- you
6 know, driving down south or vice versa. They're coming
7 from south, Mexico, coming up north. They'll ask, you
8 know, what they're doing here, you know, business,
9 pleasure, stuff like that.
10    Q. Okay. And I understand that the criminal
11 interdiction unit patrol cars had license plate readers
12 on them.
13    A. Correct.
14    Q. Can you tell me when the criminal interdiction
15 unit patrol cars got those license plate readers?
16    A. So that was in late -- no. I would say
17 probably early 2022.
18    Q. Okay. Early 2022. Who --
19    A. January or February, somewhere around there.
20 Yeah.
21    Q. Okay. And who made the decision to get the
22 license plate readers?
23    A. So that was approved through the sheriff and
24 the chief deputy.
25    Q. Do you know why they got the license plate

35 (Pages 134 - 137)

Peter Gamboa                                                    July 23, 2024

Page 138

1  readers?
2    A. So they had a grant. I believe, they had money
3  from a grant for license plate readers.
4    Q. Huh. Okay. And do you know the service
5  provider for the license plate readers?
6    A. Vigilant.
7    Q. Vigilant. Does the sheriff's office have a
8  formal contract with Vigilant?
9    A. No.
10   Q. Okay. Do you know how many license plate
11 readers the sheriff's office has?
12   A. 20.
13   Q. 20. And who gets those license plate readers?
14   A. So those were all for the criminal interdiction
15 unit.
16   Q. Okay. So all the license plate readers went to
17 the criminal interdiction unit?
18   A. Right. We had four vehicles that each vehicle
19 had four cameras on each car.
20   Q. Okay. My math may not be great, but that's 16.
21   A. Five.
22   Q. Oh, for your vehicle too?
23   A. Yeah.
24   Q. Okay.
25   A. Five vehicles, yeah.

Page 139

1    Q. So you had five vehicles --
2    A. Yes, ma'am.
3    Q. -- with four each?
4    A. Correct.
5    Q. Do you know if officers who do not have license
6  plate readers on their patrol car can access the license
7  plate reader system?
8    A. Yes.
9    Q. They can?
10   A. They can.
11   Q. Okay. And do you know how many -- I'm going to
12 use the word licenses. Licenses to access the LPR
13 system, the sheriff's office has?
14   A. Well, I'm trying to think. I believe there's
15 about 166 users.
16   Q. That was pretty good. That was pretty
17 impressive.
18   A. So I'm one of the administrators, so that's
19 why. And if -- if somebody doesn't use it for 30 days,
20 then I've got to reactivate them. So that's why I
21 always get emails for, hey, I haven't -- okay. I can
22 get you reactivated.
23   Q. Okay. So it sounds like you're getting those
24 requests like fairly regularly to reactivate?
25   A. Not really.

Page 140

1    Q. Okay.
2    A. But, for example, we've just had a bunch of
3  promotions for deputy to investigators. Well, they'll
4  use that program to find suspects that they're looking
5  for.
6    Q. The investigators will?
7    A. Right.
8    Q. Okay.
9    A. So right now, those -- those are the ones that
10 are kind of, send me the emails. I used to have
11 Vigilant. I haven't used it in a while. Okay. I'll
12 reactivate you.
13   Q. Got it. So who gets -- who are the officers
14 who get access, who are the 166 officers?
15   A. So, they're from all over.
16   Q. Okay.
17   A. It could be deputies, investigators,
18 supervisors. It just depends on what they're working on
19 or in the unit that they're working on that they may ask
20 for access.
21   Q. Okay. And what does that access give an
22 officer?
23   A. So it'll give them locations from the license
24 plate readers -- you know, frequent locations where
25 they -- this car may be at. And then traveling

Page 141

1  patterns.
2    Q. Okay. And by traveling patterns, what do you
3  mean by that?
4    A. If a vehicle is always traveling up I-10 east
5  towards Houston, always coming down I-10 westbound,
6  coming from Houston would be a traveling pattern.
7    Q. Okay. Does the sheriff's office, through the
8  LPR database, have access to private scans? So things
9  like towing companies or realtors -- or not realtors.
10 Real -- what's the word I'm looking for -- retailers. I
11 was like, what's the word I'm looking for? Retailers.
12   A. So if Vigilant is part of those private
13 companies, they may have access to that.
14   Q. Okay.
15   A. But if it's -- if it's not tied into Vigilant
16 then it would not show.
17   Q. Okay. So would it be fair then to say that
18 sheriff's office officers through the Vigilant system,
19 have access to whatever Vigilant has?
20   A. Correct.
21   Q. Okay. So we just talked about the fact there
22 were 20 license plate readers, and they were with the
23 criminal interdiction unit. Where are those license
24 plate readers now?
25   A. So we actually -- when vehicles got replaced

36 (Pages 138 - 141)

Peter Gamboa                                                July 23, 2024

Page 142

1    and they removed those cameras, they didn't remove the
2    wires to connect them, and so we had to order new
3    wiring, and got lost somewhere in the shuffle.
4            So the last unit that was working was mine,
5    and so when they removed those cameras off of my
6    vehicle, I asked them to put them in another vehicle
7    that would be utilized, but that never happened.  So
8    right now, all the cameras, those Vigilant cameras are
9    inoperable right now.
10    Q.  Okay.  So as we sit here today --
11    A.  They are at Industrial Communication.
12    Q.  And no -- no officer has a license plate
13    readers on his or her vehicle?
14    A.  Not from Vigilant.
15    Q.  From other entities?
16    A.  Axon.
17    Q.  Okay.
18    Q.  So now Axon provides a license plate reader
19    through the dash cams.
20    Q.  Okay.  So tell me more about how that works.
21    A.  Same thing.  It's the program that they offer.
22    And at the moment, that's what we use for LPR readers.
23    Q.  Okay.
24    A.  So now those vehicles are throughout the fleet.
25    Patrol, street crimes, gangs, my one special enforcement

Page 143

1    unit has that camera.  I'm not sure if FAU uses them or
2    not.  I don't know.
3    Q.  FAU is?
4    A.  Felony Apprehension Unit.  I don't know if they
5    have them, but patrol, street crimes, gangs and special
6    enforcement.
7    Q.  Okay.  So to use the Axon license plate reader
8    software, did an officer need to get a new dash cam?
9    A.  Yes.
10    Q.  So it's a special dash cam that allows --
11    A.  The newest, yeah.
12    Q.  -- the newest version?
13    A.  The latest version, yeah.
14    Q.  That allows them to scan a license plate with a
15    dash cam.
16    A.  Correct.
17    Q.  And how does that work?  So obviously, you
18    know, there was a separate camera previously and then it
19    went to Vigilant software?
20    A.  So this one is Axon.
21    Q.  Okay.  No.  So I'm talking about previously.
22    A.  Okay.
23    Q.  So previously you have Vigilant, right?
24    A.  Right.
25    Q.  And there were license plate readers?

Page 144

1    A.  Correct.
2    Q.  And it went to, I assume, Vigilant software?
3    A.  Yes, ma'am.
4    Q.  Okay.  Now the dash cam scans, where does it
5    go?
6    A.  Axon.
7    Q.  And Axon has its own software?
8    A.  Correct.
9    Q.  And can an officer access that software live in
10    their vehicle?
11    A.  Yes.
12    Q.  Okay.  And when using the Axon license plate
13    reader, what does an officer have -- what information
14    does an officer get?
15    A.  Same thing.  They'll get travel patterns.  If a
16    vehicle is scanned in a particular place, they'll
17    receive those returns also.
18    Q.  So they get alerts?
19    A.  So the alerts come from anything that is
20    entered.  For example, if a vehicle is stolen, the
21    officers -- if they're driving down the road, that
22    camera will pick up on the stolen license plate, and
23    then alert the officer that -- that may be a stolen
24    vehicle.
25    Q.  And as the administrator, do you set the

Page 145

1    settings for alerts?
2    A.  So, not for Axon.
3    Q.  Okay.
4    A.  For Vigilant, I don't set -- I don't set alerts
5    or filters.  All I do is activate personnel to
6    have -- to be able to access that program.  Axon is a
7    different system.  I'm not administrator for that.
8    Q.  Okay.  That's helpful.
9            For Axon, if an officer turns on his dash
10    camera, does that mean the license plate reader is on?
11    A.  Yes.
12    Q.  And we previously talked with, I want to say,
13    Officer Gereb about when a dash camera turns on, and he
14    would tell -- he told us how the dash camera turned on
15    when you were going a certain speed or --
16    A.  Activated.
17    Q.  Activated, excuse me.
18    A.  Yes.
19    Q.  Activated when you went a certain speed, or if
20    you turned it on or things like that.
21    A.  Lights.
22    Q.  Yeah.
23    A.  If you turn your lights on.
24    Q.  Uh-huh.
25    A.  If you turn your body camera on, if another

Veritext Legal Solutions

Peter Gamboa                                                    July 23, 2024

Page 146

1  officer turns his lights on, if you're going a certain
2  speed is when the camera comes on.
3      Q. Is that still the case today?
4      A. Yes.
5      Q. So I guess that creates a question for me. Can
6  the license plate reader run when the dash camera is not
7  activated?
8      A. Yes.
9      Q. Okay. And can you -- can an officer turn his
10 license plate reader off?
11     A. They can.
12     Q. They can. And I assume simultaneously an
13 officer can also turn off his dash camera --
14     A. Correct.
15     Q. -- generally. Okay. Does the sheriff's office
16 have rules for using license plate readers?
17     A. They're -- well, not license plate readers.
18 The dash cam and body cams.
19     Q. Okay.
20     A. The license plate reader is just a program in
21 the dash cams.
22     Q. I understand. Now?
23     A. Okay.
24     Q. Okay. So let me give you an example. So I
25 assume and, you know, tell me if the assumption is

Page 147

1  wrong. I assume that if an officer scanned his
2  girlfriend's license plate to just figure out where she
3  was going, that would be against sheriff's policy?
4      A. Yes.
5      Q. Is that fair?
6      A. Yes.
7      Q. So how would an officer know that that kind of
8  scanning was prohibited?
9      A. So that would probably fall under CJIS
10 compliance.
11     Q. What was that?
12     A. CJIS, C-J-I-S, compliance.
13     Q. C-J-I-S. Okay.
14     A. And I believe that would fall under that for
15 personal gain.
16     Q. Okay. All right. So putting like this
17 personal gain example aside. Is it okay, is it allowed
18 for an officer to scan every license plate that goes
19 down the highway?
20     A. So it does automatically.
21     Q. Okay.
22     A. Both Vigilant and Axon.
23     Q. Okay. How would the sheriff's office tell if
24 an officer had been using a license plate reader for
25 something like personal use?

Page 148

1      A. Probably through a complaint.
2      Q. Okay. So unless someone complained, you
3  wouldn't necessarily know if an officer was using the
4  license plate reader system for personal gain?
5      A. Right.
6      Q. Okay. So in doing criminal interdiction work,
7  how is a sheriff's officer supposed to use the license
8  plate reader?
9      A. So like I mentioned, right, the license plate
10 readers are on. They're scanning multiple lanes, and so
11 all four could record four different license plates at
12 one time. Potentially, right?
13     Q. And we're just talking about the Vigilant
14 system, right?
15     A. Correct, right. If you're at the right place
16 at the right time, vehicles are passing at the same
17 time, they can. Because each -- each camera is
18 independent of each other.
19     Q. Okay. So --
20     A. So they're automatic. So they're automatic --
21 so as you're driving, say I'm driving to a spot on the
22 highway, as I'm driving, the cameras are recording
23 everything. And so if we get a plate that may be
24 driving opposite of me, and it's a stolen vehicle, that
25 camera could pick up that front plate, and see if it's

Page 149

1  entered as stolen, it would alert me. And it would
2  bring up a picture of the vehicle, right, and so then I
3  know what vehicle I'm looking at, and I know that it's
4  driving opposite me. So I would turn around and look
5  for that vehicle to confirm that that's the same
6  vehicle, same plate that was entered as being stolen.
7      Q. Okay. And putting aside the stolen example --
8      A. Okay.
9      Q. -- what would you expect officers doing
10 criminal interdiction work to look for? So other than,
11 you know, the stolen vehicle alerts, what would you
12 expect a criminal interdiction officer to look for using
13 the license plate reader?
14     A. Well, I mean, it's just a tool. They wouldn't
15 necessarily use that vehicle -- that tool to actually
16 find a violator unless it was entered for some type of
17 alert.
18     Q. Okay.
19     A. They're expected to observe the flow of traffic
20 and any violations that they may see, whether it'd be
21 equipment violation, moving violations, things of that
22 nature.
23     Q. Understood. So we just talked a little bit
24 about the scanning of license plate readers by -- or the
25 scanning of license plates by Bexar County Sheriff's

38 (Pages 146 - 149)

Page 150

1  Office license plate readers.  Who has access to Bexar
2  County's scanned results?
3      A.  The 166 --
4      Q.  Officers?
5      A.  -- or so people that have --
6      Q.  And are there folks outside of the sheriff's
7  office who also would have access to?
8      A.  Yeah.  Anybody -- any agency that has access
9  through Vigilant would have access to those reads.
10     Q.  And now Axon?
11     A.  And now Axon, correct.
12     Q.  Okay.  Can you tell me what an intel stop is?
13     A.  An intel stop?  I've never heard of an intel
14  stop.  But what I would imagine is to gather information
15  about the occupants of the car.
16     Q.  Okay.  I want to talk a little bit about this
17  particular traffic stop.  For this one, the one of
18  Mr. Schott.
19     A.  Okay.
20     Q.  Deputy Babb testified that he got information
21  from a WhatsApp group, a chat group called the Northwest
22  Highway Group.
23     A.  Okay.
24     Q.  Have you ever heard of that before?
25     A.  I've heard that they had a WhatsApp chat.  I

Page 151

1  never looked into or knew of if they had a certain name
2  to it.
3      Q.  Do you have WhatsApp on your phone?
4      A.  I believe I do.
5      Q.  Do you use it?
6      A.  We use it on one case.  It was a smuggling case
7  that we were using it for.
8      Q.  And who's we?
9      A.  So we have within organized crime, the TAG
10  unit, we have a transnational organized crime group.
11  That group, a lot of the work that we do is for human
12  smuggling type offenses or crimes.
13     Q.  Okay.  So you used the WhatsApp group for one
14  operation targeting human smuggling?
15     A.  Correct.
16     Q.  So were you part of the Northwest Highway Group
17  on WhatsApp?
18     A.  No.
19     Q.  Okay.  Did you talk about the Northwest Highway
20  Group at all with other officers?
21     A.  So they -- they would tell me about it, how
22  they would get all these vehicles that were driving high
23  rate of speed but they couldn't catch up to them, so
24  they're on their way to your county.  And so that's kind
25  of like the conversation that we had about it.

Page 152

1      Q.  Okay.  Can I unpack.  What -- who was the they
2  you're referring to?
3      A.  Gereb and Babb.
4      Q.  Okay.  So you knew that this Gereb and Babb
5  used this app and this chat group?
6      A.  Correct.
7      Q.  Okay.  Did you ever tell them not to use that
8  group?
9      A.  No.
10     Q.  Okay.  Do you know what kind of information
11  they received through that group?
12     A.  So like I said, if there was -- say there was a
13  car driving northbound from South Texas somewhere, and
14  they would tell them, hey, they're on their way to
15  Bexar County.  You know, they would tell me about stuff
16  like that.
17     Q.  Okay.  Did you ever hear -- did you ever learn
18  from your officers any -- them using any other app?
19     A.  No.
20     Q.  Any other chat?
21     A.  No.
22     Q.  Okay.  When Deputy Babb and Deputy Gereb were
23  talking about this criminal interdiction Northwest
24  Highway Group --
25     A.  Uh-huh.

Page 153

1      Q.  -- did you give them any instructions about
2  that group --
3      A.  No.
4      Q.  -- about how to use the information from that
5  group?
6      A.  (Witness shakes head.)
7      Q.  Okay.
8          MR. WINDHAM:  That's not on the record.  He
9  shook his head.
10     A.  Oh, no.  Sorry.  Good catch.
11     Q.  (By Ms. Hebert)  I'll ask that question again.
12  Did you give Deputy Babb and Deputy Gereb any
13  instruction about how to use the information from the
14  Northwest Highway Group?
15     A.  No, ma'am.  So any -- any intel, any
16  information, anyone conducting traffic stops, may be
17  used for their reasonable suspicion after they've
18  obtained probable cause to make a traffic stop.
19     Q.  Okay.  So let me just make sure I understand
20  that.
21          After an officer has probable cause to make
22  the traffic stop, putting that aside, all information is
23  above board, is okay to rely on?
24     A.  Correct.
25     Q.  Does an officer have to do anything to verify

Peter Gamboa                                                          July 23, 2024

Page 154

1  any of the investigation he or she is relying on?
2      A.  Yes.  So they have to vet the information that
3  they're receiving.  For example, if it's someone who is
4  known to be a narcotic trafficker, okay, and in -- for
5  example, this group, right, they get the text message,
6  hey, this vehicle is driving into your county, we
7  couldn't catch up to him, but he's a narcotic
8  trafficker.  They get the probable cause to make the
9  stop, they make the roadside interview as they're making
10  contact with the violator.  They, at that time, start
11  building their reasonable suspicion to prolong the
12  traffic stop if that's what they're going to do.
13          Given the information provided, as they're
14  talking to the violator, they may see a duffel bag with
15  narcotics hanging out, they may see a bucket of guns in
16  the back seat, right?  So that's developing their
17  probable cause to further their investigation.
18      Q.  Okay.
19      A.  So they have to vet -- just because you get a
20  text saying, hey, this guy is driving dirty, doesn't
21  mean that that's what they're going to use to get in a
22  vehicle.
23      Q.  Okay.  You talked a little bit about the
24  evidence just now, about the evidence of drug
25  trafficking, for instance, that an officer could see.

Page 155

1  And it seems obvious that if an officer saw a bunch of
2  drugs sitting on the front seat or in the back seat,
3  that would be evidence of drug smuggling?
4      A.  Correct.
5      Q.  What other evidence would an officer look for,
6  besides the obvious --
7      A.  Right.
8      Q.  -- as evidence of drug smuggling?
9      A.  So anything that is contraband, right, and them
10  as officers using any one of their five senses.  If they
11  see it, maybe they hear it.  You know, just depends what
12  it is, right?  Somebody tied up in the trunk of a car,
13  they hear it, they smell it.
14          Using their -- any of their five senses
15  would develop reasonable suspicion to further their
16  investigation.  Giving them probable cause to -- you
17  know, the evidence of probable cause to search the car.
18      Q.  Sure.  And I understand that.  But using any of
19  the five senses, if we take out the smelling or seeing
20  of drugs.
21      A.  Okay.
22      Q.  Let's just put those aside, what other types of
23  things would an officer look for as evidence of drug
24  smuggling?
25      A.  I mean, it -- so the obvious, right?  They can

Page 156

1  get consent.  If they -- if they -- was it seeing,
2  smelling?
3      Q.  Yeah.  They can't see and they can't smell it.
4      A.  So, no smell.  No -- okay.
5      Q.  What evidence are we talking?
6      A.  So if they -- I mean, they touch, right?
7      Q.  Sure.
8      A.  They can, you know, if -- they touch a part of
9  the car that may be involved in an accident as a
10  hit-and-run, they can use that.  In their roadside
11  interview, they developed a reasonable suspicion, right?
12  When -- when the violator is giving conflicting or
13  evasive answers.
14      Q.  Okay.  So I think that's like a good example.
15      A.  Okay.
16      Q.  So a type of evidence would be inconsistent
17  answers --
18      A.  Uh-huh.
19      Q.  -- is that fair?
20      A.  Yes.
21      Q.  So other than seeing or smelling drugs, so I
22  just want to put that one to the side.
23      A.  Okay.
24      Q.  When you can't see them and you can't smell
25  them, how do you evaluate the potential drug smuggling?

Page 157

1  So one of the things you just gave me was inconsistent
2  answers.
3      A.  Correct.
4      Q.  Are there other kinds of evidence that you
5  would look for?
6      A.  Well, I mean, other evidence would come from
7  the reasonable suspicion in having that conversation.
8      Q.  Okay.  So can you give me an example?
9      A.  So one time, my experience, we did a traffic
10  stop on a gentleman driving north from Laredo.  He had
11  just stopped at a gas station.  We're south, just inside
12  the county line on 1604 and 35.  He had just stopped for
13  gas in -- I believe it was Natalia Devine, probably 30
14  minutes away.  He was stopping again for gas.
15          When we made contact with him and I asked
16  him, well, you have this receipt for gas just in the
17  town before you entered Bexar County.  Why are you
18  stopping for gas now?  He didn't have an answer.  So
19  then, in talking to him, he was down there for a job
20  interview, and when he was asked who the person
21  of -- the contact person was, he had no answer.
22          So that reasonable suspicion gave me the
23  probable cause to -- well, reasonable suspicion, call
24  K-9.  K-9 came over, alerted on the gas tank.  We had a
25  DPS trooper that drove up on us.  He had a -- a scope

Peter Gamboa                                                July 25, 2024

Page 158

1  that went into the gas tank, and you could see the
2  packages of marijuana floating.
3      Q.  Okay.  And so I guess in that example, you had
4  inconsistent answers with what his behavior had been.
5      A.  Right.
6      Q.  And then just --
7      A.  And then also the gas one town, stopping.
8      Q.  Yeah.  So I guess behavior that didn't make
9  sense.
10      A.  Right.
11      Q.  Other than those two things, so we've got drug
12  that is you see, drugs that you smell, we understand
13  that.  You had inconsistent answers and we've got
14  behavior that doesn't -- doesn't connect --
15      A.  Was not consistent.
16      Q.  Was not consistent with answers.
17      A.  Right.
18      Q.  Is that a good way to phrase that?
19      A.  Yeah, yes.
20      Q.  So we've got drugs that you see.  Drugs that
21  you smell, inconsistent answers, and behavior that
22  doesn't match your answers.
23      A.  Correct.
24      Q.  Anything else that would be evidence of drug
25  smuggling?

Page 159

1      A.  So, again, right, developing your reasonable
2  suspicion.  Travel patterns.  If they're giving
3  inconsistent answers, and using Vigilant, you see that
4  this particular vehicle is going -- is hitting the
5  border twice a week for the last six months.  That
6  reasonable suspicion with the total understanding of
7  what's going on, answers, things of that nature,
8  behavioral, would be something that you would want to
9  further that investigation.
10      Q.  Okay.  So if you added the travel pattern to
11  these other four things that we talked about --
12      A.  Correct.
13      Q.  -- seeing, smelling, inconsistent answers,
14  behavior, inconsistent answers, and then a travel
15  pattern, you would add that.  But would travel pattern
16  alone be enough?
17      A.  No.
18      Q.  Okay.  So that's drug smuggling.  I want to put
19  that to the side and talk about human smuggling/human
20  trafficking.
21      A.  Okay.
22      Q.  That feels a lot harder because you can't see
23  it or smell it.  So what is the evidence that you look
24  for for human smuggling?
25      A.  So in the evidence for smuggling, you would

Page 160

1  still have the violation, right, to cause the traffic
2  stop.  But what we see is these people are driving in
3  high rate of speed already before you even see them.
4          If you're using a radar, all of a sudden
5  you get a bleep of 100 miles an hour and it goes away.
6  And you're like, wait a minute, what is that?  Well,
7  just coming over the hill, you see this car that's
8  passing everybody else up like if they're standing
9  still, so now you know where that 100 miles an hour
10  bleep came from on your radar.
11          Then depends if the vehicle, if it's a car,
12  four windows.  If it's not really dark tinted, just
13  normal car then you're going to see probably in the back
14  seat, five, six heads.  Where normally, you would have
15  two or three people.  You're going to see a lot of
16  people in the back seat.
17          If it's a van and as they're moving, they
18  become top heavy, and you see the -- the van rocking.
19  18-wheelers, if they have people in the back, they're
20  probably not going to stop.  But that's all with
21  experience of what I've seen, right?  So it just depends
22  on the individual officer and what they see to know that
23  it's possibly a human smuggler.
24      Q.  Okay.  So it sounds like there's a lot of
25  different things, human smuggling, that you would just

Page 161

1  get a tip off --
2      A.  Correct.
3      Q.  -- that there was people -- people in the
4  vehicle?
5      A.  Right.
6      Q.  Is that a fair summary?
7      A.  Yes.
8      Q.  Okay.  So I want to make sure that I understand
9  what we're looking at.  When you're -- when an officer
10  is looking for evidence of drug smuggling, they look for
11  five things:  Seeing drugs, smelling drugs, inconsistent
12  answers to an officer's questions, inconsistent behavior
13  with the answers that they've given to an officer's
14  questions --
15      A.  Correct.
16      Q.  -- and then the traffic pattern in addition to
17  all those other things?
18      A.  Correct.
19      Q.  Is there anything else that you would think an
20  officer should be looking for as evidence of drug
21  smuggling?
22      A.  I'm just trying to run some scenarios through
23  my head of something different.  I can't think of
24  anything right now.  I think that's pretty much it.
25      Q.  That's okay.  And then we just talked about

41 (Pages 158 - 161)

Peter Gamboa                                                July 25, 2024

Page 162

1  human smuggling. Human smuggling, human trafficking
2  would you look for the same things?
3      A. So on the trafficking side, you may have just
4  one person.
5      Q. Okay. So then I'll come back to human
6  trafficking then. So smuggling, you're going to be
7  looking for evidence there's a bunch of people in the
8  vehicle; is that fair?
9      A. Correct.
10      Q. Okay. And there's a lot of different
11  indicators, but essentially you're looking for there are
12  a bunch of people?
13      A. Multiple people.
14      Q. Okay. And trafficking, tell me what you look
15  for in trafficking?
16      A. So in trafficking when you make that contact,
17  violator contact, and you see one other person. Maybe a
18  passenger, front seat passenger, maybe a back seat
19  passenger. If they don't speak English, I speak
20  Spanish, so I can question them in Spanish. And if I
21  ask them if they know who the driver is, or what is the
22  driver to them, they may say something like, a friend of
23  mine. What is your friend 's name and how long have you
24  known your friend? Then that's when they start becoming
25  evasive in their answers.

Page 163

1      Q. Okay.
2      A. So that may be a clue. If they're maybe
3  working out of a motel room and we make contact with
4  them, other indicators may be that they're carrying
5  everything with them because they're not going to leave
6  anything in that room, including toothbrush, any
7  hygiene, things of that nature, would alert me to start
8  asking more questions. If -- what type of work they do,
9  do they have somebody that they answer to, things like
10  that.
11      Q. Okay. I guess I understand -- I understand
12  some of that. So if they're weird answers, like, they
13  don't know the name of the person they're driving with,
14  that makes total sense to me, and I'll just put that in
15  the bucket of weird answers.
16      A. Yes.
17      Q. We can come back to that in a second. But the
18  other two things you talked about, stuff from the hotel,
19  carrying lots of stuff from the hotel, and I'm trying to
20  remember what the third was. Information about their
21  job or their employer. I mean, sounds like there can be
22  lots of innocent explanations for those two; is that
23  fair?
24      A. Yes, absolutely.
25      Q. Okay. So help me understand how that fits

Page 164

1  together.
2      A. The problem -- the problem what happens is
3  when -- if I'm a cook, and they take five minutes to
4  think of I'm a cook, as an indicator, right, that okay
5  I'm sure you know how to cook, but what do you actually
6  do? And how much do you get paid? You know,
7  they -- they may tell you, I don't get paid, right? So
8  then that would be a red flag to say, okay, what's going
9  on here? Nobody works for free.
10      I owe my friend money so I'm working for
11  his company. I owe my friend a debt for another family
12  member, things of that nature. Would raise flags for us
13  officers.
14      Q. Understood. So and you're asking all of these
15  questions when it's two or more people in -- together?
16      A. For the trafficking, it's usually one person.
17  It could be multiple, it could be two people, but you
18  would separate them.
19      Q. Okay.
20      A. And then how do you know him? How do you know
21  her? You know, where are y'all from, things like that.
22  And so, if I know you, and we've been friends since we
23  were little kids, we know where we were raised. We
24  know, you know, things of that nature. Well, they
25  start, oh, we live in the same town. What school did

Page 165

1  you go to? Oh, I went to a school on the other side of
2  Mexico. Or they may say, I'm from this side.
3      Q. I understand. But that only works if there are
4  two people; is that fair?
5      A. Correct.
6      Q. And if there's only one person are you
7  investigating human trafficking for one driver?
8      A. So, well -- and it may not even be a driver,
9  right? Motel interdiction, right? So it might be a
10  person that we have information that there's immigrants
11  staying at this hotel, and they all answer to this one
12  person that comes and sees them every day at 9:00 in the
13  morning. Gives them food, a bag of clothes and then
14  they leave. You know, so that's -- you know, we'll go
15  and do surveillance. And then we'll do the interdiction
16  interviews --
17      Q. Got it.
18      A. -- to get that information.
19      Q. Okay. That's helpful.
20      And in the context of a -- of a car, are
21  you going to look for evidence of human trafficking when
22  it's just one person?
23      A. You can.
24      Q. Okay.
25      A. Right? They avoid making eye contact. And

Veritext Legal Solutions

Peter Gamboa                                          July 25, 2024

Page 166

1  just depends, right?  Children, right, one of the big
2  things for trafficking that I ask is, who's this person
3  driving you?
4      Q.  Uh-huh.
5      A.  When they don't have an answer, or all they say
6  is, mommy's friend, daddy's friend, you know something
7  like that --
8      Q.  Uh-huh?
9      A.  -- then that raises --
10     Q.  A flag?
11     A.  -- a big flag for me because the driver is
12 going to tell me something totally different.  Their
13 name -- when I ask them for their name, they're going to
14 give me something totally different.  When I run the
15 name, it's not going to come up on anything.
16     Q.  Sure.
17     A.  They're not going to have any information for
18 this child, right, or teenager reported as a runaway.
19 So that's how we prolong the traffic stop to get more
20 information.
21     Q.  Okay.  And that makes sense if there's a child
22 in the vehicle with the driver.  But one of my question
23 is, if there's just a driver, there's nobody else in the
24 vehicle --
25     A.  Okay.

Page 167

1      Q.  -- what do you look for in that situation for
2  human trafficking?
3      A.  Well --
4      Q.  Can you investigate -- do you investigate
5  trafficking, human trafficking when there's only one
6  person in the vehicle?
7      A.  Unless it's the victim that's driving, which is
8  very rare, because part of the trafficking is to keep
9  them -- correct.  And so for them to be driving --
10     Q.  Just so we're clear because I did that
11 while we're on the record.  Human trafficking requires
12 you to get the trafficked victim under surveillance?
13     A.  Correct.  Yes.  And so for a traffic victim to
14 be driving, they can get away from that trafficker.  So
15 that's --
16     Q.  That's not going to happen.
17     A.  Yeah, not really.
18     Q.  Okay.  And so what about the trafficker?
19 Presumably, a trafficker would drive.  Is that something
20 you're going to investigate a driver for?
21     A.  So that -- okay.  So if we're -- have
22 information that the trafficker may have a stash house
23 with victims of trafficking, and he leaves, we may stop
24 him and ask them questions.
25     Q.  Them being the driver?

Page 168

1      A.  Them being the driver by themselves.
2      Q.  Okay.
3      A.  Where is he coming from?  Where does he live?
4  We may even say, why is your car at this location every
5  day at this time?  And you walk in with six bags of
6  tacos, and who's living there?  Who stays there?  Go
7  from there.
8      Q.  Understood.  So that makes all sense to me.  So
9  you're going to investigate someone for human
10 trafficking when you have prior knowledge to suspect
11 that they were a human trafficker --
12     A.  Correct.
13     Q.  -- is that fair?
14     A.  Yes.
15     Q.  But if you pull over Joe Schmo on the highway
16 are you going to investigate Joe Schmo on the highway
17 for human trafficking?
18     A.  Probably not.
19     Q.  Okay.  Okay.  So I want to return to carrying
20 out a criminal interdiction traffic stop.
21     A.  Okay.
22     Q.  Can you help me walk through what a criminal
23 interdiction traffic stop looks like?
24     A.  Okay.
25     Q.  Let's start from an officer pulls over a driver

Page 169

1  for an unsafe lane change.  And both the officer and the
2  driver come to a complete stop.  What would you expect
3  the officer to do next?
4      A.  Make contact with the driver.
5      Q.  Okay.  So what does that look like?
6      A.  So they'll check out on their computer, on
7  their CAD, and then they'll exit their vehicle, walk up
8  to -- it just depends.  It could be the driver's side
9  door or it could be the passenger's side door, and make
10 contact with the driver.  Introduce themselves, and give
11 the reason why the traffic stop.
12     Q.  Okay.  When you said check the CAD, the
13 computer, what are they checking the CAD, the computer
14 for?
15     A.  So they'll -- on the computer, they'll enter
16 the driver -- the license plate.  And then they may add
17 in there if there's one occupant or multiple occupants.
18     Q.  So they may enter information into the
19 computer --
20     A.  Into the computer.
21     Q.  -- before speaking to the driver?
22     A.  Correct.
23     Q.  Okay.
24     A.  They -- I do and some officers do, enter a make
25 and model of the vehicle.  I'll enter a blue Chevy

43 (Pages 166 - 169)

Peter Gamboa                                    July 25, 2024

Page 170

1  Camaro. So some officers do that. It's not required.
2  Just the traffic officer in me, I would do that.
3      Q. Okay.
4      A. I advise them, I'm now Sergeant Gamboa.
5      Q. All right. Before we get to that.
6      A. Okay.
7      Q. So we're on the CAD.
8      A. Okay.
9      Q. So they've entered the license plate number.
10  Would you expect the officer to look for something from
11  the license plate number?
12     A. No. So they enter it, that way dispatchers
13  know that they're on a traffic stop, where they're at,
14  and what type of vehicle in the event --
15     Q. Something happens?
16     A. -- something happens. Dispatchers will say, he
17  was on a traffic stop with a blue Camaro, license plate
18  at 35, mile marker whatever, intersection whatever. So
19  if something does happen then they can send help
20  starting there on.
21     Q. Okay. Would you expect an officer to look at
22  whether there was an alert for a stolen vehicle before
23  they get out of the vehicle, before they get out of the
24  patrol car?
25     A. If they enter the license plate and the vehicle

Page 171

1  is stolen, they're going to get an alert automatically
2  and then it's going to say, stolen vehicle.
3      Q. Okay. Any other alerts that they would get
4  automatically?
5      A. If they're a licensed carry.
6      Q. On their license plate?
7      A. Yeah.
8      Q. From their license plate --
9      A. Correct.
10     Q. -- you get that information?
11     A. Yes, ma'am.
12     Q. Okay.
13     A. If there are any active alerts for a wanted
14  person maybe driving that car, when they enter
15  the -- they'll get that alert also.
16          I'm trying to think what else. If that
17  vehicle is entered as a sexual predator, that will also
18  come out.
19     Q. Okay.
20     A. I think those are the only ones that come out
21  for -- oh. If that vehicle is registered and CPS, Child
22  Protective Services, has that vehicle entered for alert
23  because they have not been able to contact that family,
24  that vehicle will also send out an alert at that time.
25     Q. Okay. So like Silver Alert, Amber Alert --

Page 172

1      A. Correct.
2      Q. -- all that would come up --
3      A. Yes.
4      Q. -- for that particular license plate too?
5      A. Yes, ma'am. And not that you have to look for
6  it because it's going to pop it.
7      Q. It's going to pop up and let you know.
8      A. Yes.
9      Q. And then you talked about walk up and make
10  contact, and I think what you were walking me through
11  was, like, there's like a generic script, a dialogue
12  that you're expected to go through --
13     A. Yes.
14     Q. -- at a traffic stop?
15     A. Correct.
16     Q. Is that fair?
17     A. Yes.
18     Q. And I understood you to say introducing
19  yourself --
20     A. Correct.
21     Q. -- and explaining why you made the stop --
22     A. Correct.
23     Q. -- as part of that script?
24     A. Yes.
25     Q. Okay. Is part of that script also telling the

Page 173

1  driver what's going to happen next in terms of a warning
2  or a citation?
3      A. It can be.
4      Q. Okay.
5      A. It's not part of the script, but you as an
6  officer can tell them.
7      Q. Okay. Is there anything else that was part of
8  the script that I missed?
9      A. So, it's the reason for the stop.
10     Q. Uh-huh.
11     A. Your information, reason for the stop, the
12  check for wants and warrants.
13     Q. Uh-huh.
14     A. Identification, right, through either driver's
15  license or ID, or out-of-state license or ID. Then
16  if -- on the return, after you've ran them, checked
17  them, if you're going to cite them or give them a
18  warning. And then there's one more before -- there's
19  one more step. It's seven step violator --
20     Q. Uh-huh.
21     A. -- contact.
22     Q. And this seven step process, is that part of
23  the -- the Bexar County --
24     A. No.
25     Q. -- training?

Veritext Legal Solutions

Peter Gamboa                                          July 23, 2024

Page 174

1    A. No.
2    Q. Okay. Where does it come from?
3    A. So that's -- that term is used, I believe, by
4  DPS. But we cover it as traffic -- or conducting
5  traffic stops, right? So that way you -- you
6  potentially answer any questions a violator may have
7  without being rude or just wasting somebody's time.
8    Q. Understood. But when you said we cover it,
9  what were you referring to?
10    A. So us officers.
11    Q. Okay. So is it --
12    A. So it's not a -- it's not a policy, it's not a
13  procedure that is taught. It's just something
14  when -- as an FTO, right, a field training officer,
15  teaches their trainee, this is how you conduct a traffic
16  stop. This is what you're going to cover.
17          And we use the term seven step violator is
18  because that's the term that is through DPS.
19    Q. Okay. Would it be fair then to characterize
20  that as, like, a practice?
21    A. A practice.
22    Q. Best practice?
23    A. Best practice is very good.
24    Q. Okay. So you just talked about the fact that
25  you would ask for a driver's ID, and you would run a

Page 175

1  check on that ID.
2    A. Correct.
3    Q. And then after you ran the check on the ID, you
4  would let them know if they were having a warning or
5  a -- or a citation?
6    A. Correct.
7    Q. When would you let them know -- let a driver
8  know that you were giving them a warning or citation
9  before checking an ID?
10    A. Your discretion.
11    Q. Okay. Officer discretion?
12    A. Yes.
13    Q. Could an officer ever let a driver go without
14  giving them a warning or a citation?
15    A. So now you can't because of Sandra Bland Act.
16  But sometimes what happens, and I'll use me as an
17  example, my printer doesn't work. And so I can't give
18  them a copy of their warning because I don't have a
19  printer.
20          Now, if I do write them a citation and I
21  can't print them the citation, I do tell them that we
22  will mail them the citation. So then I can go back to
23  the office, print it out, and then have the office
24  assistant mail it off to them.
25    Q. And there's nothing wrong with that?

Page 176

1    A. Yeah.
2    Q. Okay. If your printer doesn't work, what do
3  you do? Do you need to register the printer failure
4  somewhere?
5    A. So I'll call IT, and tell them my printer is
6  not working, I can't figure out why, because it was just
7  working. Bring it in, we'll check it out.
8    Q. Okay. And so you -- do you have to, like, flag
9  that your printer isn't working if you're not going to
10  be handing out citations?
11    A. No, no. I mean, I do it because I need it.
12    Q. Right.
13    A. But I don't have to report it as --
14    Q. Okay.
15    A. -- equipment failure.
16    Q. So let me ask you this then, can an officer
17  choose to write citations and warnings without giving
18  someone printed copies? It sounds like -- you're
19  telling me about how if a printer was broken, you could
20  go back to the office and have the admin mail some
21  tickets. Could an officer just say, hey, I'm not going
22  to bother with printing citations. I'll just have the
23  admin do them all?
24    A. No because -- because -- so I don't -- my job
25  is not to make traffic stops only to supervise, right?

Page 177

1    Q. Right.
2    A. But I do have the discretion to make traffic
3  stops.
4    Q. Right.
5    A. Their job, if they're going to make traffic
6  stops, they have to issue something --
7    Q. Understood.
8    A. -- a citation or a warning. Now for a same
9  example, if it doesn't work at this traffic stop, right,
10  I'm going to give you a warning, but it would probably
11  be on their body cam: My printer is not working, so I'm
12  giving you a warning. Or I'm going to give you a
13  citation and it will be mailed to you.
14    Q. Okay. So the default would be, an officer is
15  supposed to give a printed ticket.
16    A. Yes.
17    Q. Except if there's a technological glitch.
18    A. Yes, ma'am.
19    Q. Okay. And the default that an officer is
20  supposed to give a printed ticket, is that through the
21  Brazos ticket writing system?
22    A. Yes, ma'am.
23    Q. That --
24    A. The program, yes.
25    Q. That Captain Von Muldau talked about?

45 (Pages 174 - 177)

Peter Gamboa                                                    July 23, 2024

Page 178

1    A. Yes, ma'am. Yes, ma'am.
2    Q. And this may be dating myself a little bit
3  here, but you know, I grew up watching movies where the
4  officer has their, like, black note pad, and then they
5  write up a ticket and rip it off and they hand it to
6  you. Right?
7    A. Yes.
8    Q. I'm sure you are well familiar with that.
9    A. Yes, ma'am.
10   Q. Is that gone? Like, is that -- does that exist
11 at all?
12   A. So I don't know anyone in the sheriff's office
13 that still has a ticket book --
14   Q. Okay.
15   A. -- because they quit printing them. But if for
16 some reason they did, they could still turn that ticket
17 in to the JP, where there would be filed.
18   Q. Okay.
19   A. If somebody --
20   Q. By they, you mean the officer?
21   A. The officer, correct.
22   Q. So the officer would have to turn the copy into
23 the JP?
24   A. Right. So if somebody --
25   Q. Justice of the Peace?

Page 179

1    A. -- during the time had access to ticket books,
2  and, well, I write a lot of tickets, I'm taking these
3  ten with me, he may still have tickets.
4    Q. But you don't know of anybody in the sheriff's
5  office --
6    A. I don't know of anybody.
7    Q. -- who is using a ticket book?
8    A. No. Only because I've asked for ticket books
9  and nobody has them.
10   Q. Okay.
11   A. So --
12   Q. And so to your knowledge has anyone you've
13 supervised in the last few years used a ticket book?
14   A. No, ma'am.
15   Q. And we'll say few. The last five years has
16 anybody used a ticket book?
17   A. No, ma'am.
18   Q. Okay. So when an officer is doing a criminal
19 interdiction traffic stop, style traffic stop, is the
20 officer expected to ask a series of questions to the
21 driver?
22   A. Are they expected, no.
23   Q. Okay.
24   A. Do they have the ability, yes.
25   Q. Okay. So an officer who was working criminal

Page 180

1  interdiction could ask no questions of a driver?
2    A. They can.
3    Q. Okay. But if an officer exercises his or her
4  discretion to ask questions of an officer, are there
5  standard criminal interdiction style questions?
6    A. So, yes. There are questions of where you're
7  coming from, where you're going? Who are you making
8  contact with? Who have you contacted? Have you stopped
9  anywhere between there and here? Has anybody had reason
10 to be in your car without your knowledge? Is there
11 anything illegal in your car? Are you transporting
12 large amounts of money? Anything illegal? Any
13 firearms? And none of those are in that order just
14 things that I'm thinking of, but those are the types of
15 questions that we'd be asking.
16   Q. Okay. And when would you expect an officer to
17 be asking those types of questions if they're doing a
18 criminal interdiction traffic stop?
19   A. So the -- the first 30 seconds of the violator
20 contact.
21   Q. Okay. So questions, the standard criminal
22 interdiction style questions run through the first
23 30 seconds of the traffic stop and then what happens?
24   A. Just depends on the answers and if the officer
25 is building reasonable suspicion because of something

Page 181

1  that they know, then they would further their
2  investigation.
3    Q. Okay.
4        MR. ELLSWORTH: Can we do a quick restroom
5  break pretty soon?
6        MS. HEBERT: Sure. Let's do one now.
7        (Break taken from 2:39 p.m. to 2:50 p.m.)
8    Q. (By Ms. Hebert) Okay. I think we can shortcut
9  a lot of this. I know that you said you reviewed the
10 body camera footage from Deputy Babb, Deputy Molina and
11 Deputy Gereb.
12   A. Yes, ma'am.
13   Q. In reviewing that footage, did you see anything
14 from the traffic stop of Alek Schott that you had a
15 problem with?
16   A. No. No. I think at the point when Deputy Babb
17 printed the citation -- the warning, at that point, I
18 would have given it to him. And I know that he had
19 already called for the K-9 because he had reasonable
20 suspicion.
21        At that time, I would have gave him the
22 citation and, you know, at that time it would tell me
23 that that traffic stop was over. He held on to it, and
24 I know that he -- he had already notified K-9 to meet
25 the location so that may be why he didn't give it to

46 (Pages 178 - 181)

Peter Gamboa                                                          July 23, 2024

Page 182

1  him.  But at that -- I would have given it to him at
2  that time.
3          There's no problem with it, there's no
4  policy violation for it.  Just me giving them, hey, this
5  is why.  Now, from this point on, it's because of the
6  reasonable suspicion that I have and let K-9 do his
7  work.
8      Q.  Understood.  So other than Deputy Babb holding
9  on to the written citation --
10     A.  Correct.
11     Q.  -- there was no problem that you saw?
12     A.  No, ma'am.
13     Q.  Okay.  And even the fact that Deputy Babb held
14  on to the written citation, that holding on to the
15  citation was not a policy violation?
16     A.  Correct.
17     Q.  It's just, you would have done it differently.
18     A.  Right.
19     Q.  Okay.  In general, would you expect an officer
20  conducting a criminal interdiction traffic stop to ask
21  for a -- to ask for consent to search the vehicle first?
22  And by first, I mean before searching the vehicle?
23     A.  Yes.  Yes.
24     Q.  Okay.  Do you have any estimate on the
25  percentage of times that a driver has refused consent to

Page 183

1  search?
2      A.  In my experience?
3      Q.  In general.  I mean, in your experience but
4  also in the experience of your criminal interdiction
5  unit.
6      A.  From my experience, we usually get consent.
7  And we found narcotics or we have found contraband at
8  times, and times we haven't.
9      Q.  Following consent?
10     A.  Following consent, yes, ma'am.  The times that
11  consent was not given, but we have enough reasonable
12  suspicion, same thing.  Times that we have, times that
13  we haven't found any contraband.
14     Q.  Okay.  And so you said most of the time, you
15  get consent?
16     A.  Higher percentage, we get consent.
17     Q.  And can you give me a rough estimate of the
18  breakdown of consent versus no consent?
19     A.  I would just say more times than not.  I can't
20  give a 51 percent, 49, no.  It's just more times than
21  not, we get consent.
22     Q.  Okay.  When would it be appropriate -- when
23  would it be inappropriate to ask for consent to search?
24  Is it ever inappropriate to ask for consent to search
25  first?

Page 184

1      A.  If -- if you have no reasonable suspicion.  And
2  that would probably come through a complaint, right?  I
3  was held -- there was no reason why the officer should
4  have held me.  And then I have that conversation, okay,
5  what was your reasonable suspicion to further the
6  investigation?  The guy is a turd.  Okay.  What does
7  that mean?  That's not a reason.  Right?  So
8  then -- then we'd have that conversation.
9      Q.  Okay.  So if there's no reasonable suspicion,
10  an officer should not ask for consent --
11     A.  Right.
12     Q.  -- to search?
13     A.  Right.  If there's no -- yeah.  If there's no
14  reasonable suspicion to further your prolonged traffic
15  stop for, in furtherance of your investigation, give
16  them a warning, write them a ticket, let them go.
17     Q.  But the only way that a inappropriate ask for
18  consent would come to your attention would be through a
19  complaint?
20     A.  That I would know of, yes.
21     Q.  Okay.  Before asking a driver if they consented
22  to a search, are officers, are sheriff officers required
23  to give any kind of warning about a driver's right to
24  refuse to consent?
25     A.  No.

Page 185

1      Q.  So an officer isn't required to inform a driver
2  that they have a right to refuse?
3      A.  No.  Nuh-uh.
4      Q.  If someone refused to consent to a search,
5  would you expect the officer to then call for a K-9?
6      A.  Only if -- using their discretion, but because
7  they have reasonable suspicion to further the
8  investigation.
9      Q.  Okay.  Help me understand --
10     A.  If somebody is maybe being evasive, not
11  consistent in their answers, would be a reason why I
12  would further the investigation.
13     Q.  Okay.  Let me just go back here because I think
14  you told me that it would be inappropriate to ask for a
15  consent to search if the officer did not have reasonable
16  suspicion.
17     A.  Correct.
18     Q.  And if the officer asked for consent to search
19  and was denied consent to search, wouldn't that officer
20  still have reasonable suspicion and therefore have to
21  call the K-9?
22     A.  Could have.
23     Q.  Could have?
24     A.  Could have.  But again, maybe they're going to
25  further their investigation by having that conversation,

Page 186

1 asking more questions.
2    Q. Okay. So --
3    A. So not necessarily just to call the K-9, but
4 maybe it's because the guy is being evasive because he's
5 got warrants and he's giving a fictitious name. Maybe.
6 You wouldn't need K-9 for that.
7    Q. Okay. So --
8    A. Does that make sense?
9    Q. I guess -- yeah. So that asks for me a broader
10 question. When should an officer call for a K-9?
11   A. So a K-9 is used for -- and it just depends.
12 Narcotics, if it's a narcotic K-9. If it's a bomb
13 sniffing K-9, they would call for bomb K-9. Or if in
14 the jail setting, suspected telephone in a cell, then
15 they would use a cell phone or article dog for that.
16   Q. Okay. So if -- how often does an officer call
17 for a bomb K-9 for a traffic stop?
18   A. Very seldom.
19   Q. Okay. So would it be fair to say that
20 90 -- over 95 percent of K-9 calls for a traffic stop
21 are going to be for narcotics K-9's?
22   A. Yes, I agree with that.
23   Q. And so would an officer have to have reasonable
24 suspicion that the vehicle is being used for drug
25 trafficking to call for a K-9?

Page 187

1    A. Yes, ma'am.
2    Q. And that's the only thing you would call for a
3 drug -- let me start that again.
4       Is suspecting the driver or the vehicle of
5 drug smuggling the only reason you would call for a
6 narcotics K-9?
7    A. Correct.
8    Q. Okay. If the K-9 alerted, would you expect the
9 sheriff's officer to search the vehicle?
10   A. I'm sorry. I didn't catch that. One more
11 time?
12   Q. Yeah, if the K-9 alerted on vehicle --
13   A. Okay.
14   Q. -- would you expect the officer to then search
15 the vehicle?
16   A. Yes.
17   Q. Would you ever expect an officer not to search
18 a vehicle following a K-9 alert?
19   A. No.
20   Q. So if a K-9 alerts, the officer should search
21 the vehicle?
22   A. Yes.
23   Q. How long would you expect a stopping officer to
24 wait for a K-9 unit to arrive?
25   A. If I'm not mistaken, I believe case law has

Page 188

1 gave -- I want to say one hour.
2    Q. One hour. So I guess is that -- the one hour
3 would be the maximum amount of time you would want your
4 officers to wait for a K-9 to arrive?
5    A. Yes.
6    Q. Okay. And anything less than an hour wait for
7 a K-9 officer would be okay?
8    A. Correct.
9    Q. Deputy Gereb testified that he understood the
10 role of the criminal interdiction unit was to hunt
11 for -- hunt via traffic stops for people involved in
12 criminal activity. Would you agree with Deputy Gereb's
13 understanding of the role of the criminal interdiction
14 unit?
15   A. I wouldn't use "hunt." I would talk to him
16 about using a word -- the word hunt. And more
17 comfortable with looking for people on the roadway
18 committing criminal activity.
19   Q. Okay. What does hunting mean to you in the
20 context of criminal interdiction?
21   A. So hunting, the word hunting for me is going
22 out to hunt for -- if you're bird hunting then you're
23 looking for birds; if you're deer hunting, you're
24 looking for deer. So to me, the word "hunting" is more
25 aggressive --

Page 189

1    Q. Okay.
2    A. -- than what I would use.
3    Q. Sure. Would it be fair to say that the primary
4 objective of the criminal interdiction unit was not
5 enforcing traffic laws, but using traffic laws to
6 enforce -- to stop other crimes?
7    A. So I would say, okay -- now I'm going to break
8 it down for you.
9       Enforcing, right, doesn't necessarily mean
10 having to write citations. But stopping the behavior
11 and making somebody realize, whether it'd be by citation
12 or by warning, for what they're committing, right? For
13 example, failure to maintain a single lane. Not
14 necessarily do I need to write you a ticket, but my
15 concern is, are you not paying attention? Driver
16 inattention, right, because that's one of the reasons
17 for accidents. Are you tired? And that's why you're
18 not maintaining a single lane, or maybe you drank too
19 much, and now you can't handle your faculties to be able
20 to stay between the line.
21   Q. Uh-huh.
22   A. So my enforcement would be to make the traffic
23 stop, and to make you realize, hey, like, there's other
24 people on the highway. You need to pay attention. Quit
25 texting on your phone. If you're falling asleep, pull

Peter Gamboa                                                          July 23, 2024

Page 190

1  over.  Rest for a little bit.  Drink a coffee and
2  continue on your way.  Things in that nature.
3          So the word "enforcement" to me is not
4  necessarily having to write a ticket, but make people
5  aware of what's going on.
6      Q.  Okay.  At one point, did you supervise the
7  sheriff's office K-9 unit?
8      A.  I did.
9      Q.  Okay.  And when was that?
10     A.  So it was between Sergeant Ochoa's time and
11 Sergeant Olvera's time.
12     Q.  Can you give me approximate dates?
13     A.  Probably.  So we're in '24 -- let's see.  I
14 would say October of '23, until about February '24.
15     Q.  So less than a year?
16     A.  Yes.
17     Q.  And --
18     A.  Very short time.
19     Q.  And it was last October until just a few months
20 ago?
21     A.  March, yeah.
22     Q.  Okay.
23     A.  February, March.
24     Q.  When -- before you became the K-9 supervisor,
25 did you have any experience with police K-9's other

Page 191

1  than, you know, working with them in a traffic stop?
2      A.  No.
3      Q.  Okay.  You'd never been a handler?
4      A.  Never been a handler.
5      Q.  Okay.  And you'd never been part of a K-9 unit?
6      A.  No.  The reason why they ask me to oversee them
7  is because of my skills with horses.
8      Q.  Oh.
9      A.  That's why.  So --
10     Q.  Did you find --
11     A.  So animals --
12     Q.  Did you find your horse skills translated to
13 dog skills?
14     A.  A little bit.
15     Q.  A little bit?
16     A.  A little bit.
17     Q.  Okay.
18     A.  But it's because I'm not a handler, it was just
19 more supervising the personnel.  But I understood about
20 training.  I understood about, you know, making sure
21 that the animal is healthy, things of that nature.
22     Q.  Okay.  I guess as the K-9 supervisor, what were
23 your responsibilities?
24     A.  Oversee the operation of the K-9 unit.
25     Q.  Okay.  So did you review training, for example?

Page 192

1      A.  So I started to and implemented different
2  training aspects.  In my experience with K-9 officers,
3  deputies were always afraid when a K-9 would arrive on
4  their scene.
5      Q.  Huh.
6      A.  Because from experience, our K-9's at one time
7  would attack our own officers, right?  So because they
8  know when you release them, tracking, you release them,
9  they're on a scent.  They see you in front, they think
10 you're the toy.
11         So I really -- and Sergeant Ochoa had
12 already started this.  But I failed, I took one of the
13 K-9's off assignment and transferred him -- ultimately,
14 transferred him out because his dog, in my opinion,
15 failed during a training, where the dog went at an
16 officer.
17         And so he was one of the most senior K-9
18 handlers, but prior to me getting there, really didn't
19 care, really didn't train, wouldn't bring his dog out
20 during training.  And so, in reviewing that and
21 everybody knew that everyone was expected to follow this
22 training to evaluate the dog.  And so when he released
23 the dog, he called him off, right?  Off, to stop, right?
24 The dog didn't stop.  And so when he recalled him, the
25 dog wouldn't come back.

Page 193

1          So to me, that was a big liability if we
2  were out on a scene and he couldn't call his dog or have
3  his dog return.  So at that point in time, I told him,
4  put him up.  And I gave him another chance to show that
5  the dog was on track with training, and again, didn't
6  happen.  So at that point in time, I notified the
7  lieutenant, and it was Ortega at the time.  And he
8  notified Chief Sanford and the Assistant Deputy Chief,
9  Roland Schuler, that we were going to remove him and put
10 the dog through training with a new handler to get him
11 certified as a patrol dog.
12     Q.  Okay.  Let me go back on that a couple of
13 times.  When you said remove him, did you mean remove
14 the dog or the handler?
15     A.  When I told him to remove -- I mean,
16 remove -- remove the dog, right, put him up.  Remove
17 him, the handler, because there was a lack of training
18 on his part.
19     Q.  On the handler's part?
20     A.  Correct.
21     Q.  Okay.  So that handler got taken out of the
22 K-9 unit.
23     A.  Yes.
24     Q.  And the dog is still in the K-9 unit --
25     A.  Yes.

49 (Pages 190 - 193)

Peter Gamboa                                                July 25, 2024

Page 194

1    Q. -- but was going to go through different
2    additional training?
3    A. Through training with a new hander, correct.
4    Q. Okay. Got it. That's helpful.
5         Was that, was your actions the actions that
6    you took in response to this dog not listening, was that
7    the first time that you had heard of or learned of Bexar
8    County removing a dog from service?
9    A. That I know of, for training purposes or for
10   the liability of the dog and the lack of training, yes.
11   Q. Okay. I mean --
12   A. That's the first I heard.
13   Q. I guess let me be precise. You probably have
14   heard about dogs retiring previously?
15   A. Yes, right.
16   Q. Probably had heard about dogs going out sick?
17   A. Yes.
18   Q. Is that fair?
19   A. Yes. Hurt, injured.
20   Q. Injured, yeah. That's probably a better -- I
21   just didn't know the right way to phrase that.
22        So other than those -- other than health --
23   A. Medical.
24   Q. -- and old age, retirement --
25   A. Uh-huh.

Page 195

1    Q. -- had you ever heard of Bexar County or
2    learned of -- had you ever learned of Bexar County
3    removing a dog for performance issues?
4    A. No.
5    Q. Okay. So you were the first guy. That sounds
6    like it was probably pretty difficult?
7    A. In dealing with horses, right, training -- the
8    repetitive of training for that horse which is what
9    makes him a good mount.
10   Q. Uh-huh.
11   A. Dogs are the same way. The repetitive training
12   to keep on, right? They have their own brain, right?
13   Dogs, horses have their own brain, so they can have an
14   off day.
15        But in reviewing what this officer had been
16   doing for training, in the short time that I was there,
17   I saw that he would not do his job. He had a bomb dog.
18   His dog was a bomb dog and patrol. We -- the sheriff's
19   office has multi-uses for their dogs, right? Patrol and
20   either narcotic, bomb, or in case of the dog that's
21   assigned to the jail, he's a, an article dog, right?
22        So when we evaluate -- and I don't know if
23   Sergeant Ochoa would evaluate them on a schedule basis.
24   I've learned during that time that the supervisor would
25   not go do home inspections.

Page 196

1    Q. Oh, home inspections of the dog and their
2    handler?
3    A. Yes.
4    Q. Okay.
5    A. And so they are required certain things. And
6    so when I did the first home inspection, he did not
7    pass.
8    Q. Why not?
9    A. He didn't have a fenced yard. The kennel was
10   in the middle of the sun. So he didn't have a cover,
11   but he said he just tore it so he was going to get it
12   replaced, which he did. He did replace it. And the dog
13   was kept inside, which is okay, right, if you're in a
14   kennel inside your house, that's fine. But he didn't
15   have no signs up warning of the dog.
16        So those three things were crucial enough
17   for me to make sure that the lieutenant knew about it
18   and the chief knew about it because those dogs are very
19   expensive. Not that they -- they can, right, they're
20   dogs, attack somebody, but if he got away then it's our
21   fault.
22   Q. Understood.
23   A. So just that liability in and of its own with
24   the signs saying there's a, you know, K-9, police dog on
25   property, somebody breaks into the house and there's no

Page 197

1    warning, we could be liable.
2    Q. You're avoiding a liability.
3    A. Yes.
4    Q. So you talked about the fact that when you came
5    on in October of 2023, home inspections with K-9
6    officers and their dogs had not been done for a while;
7    is that fair?
8    A. Yes.
9    Q. Okay. And you started doing them?
10   A. Yes.
11   Q. You talked a little bit about this problematic
12   officer and this dog, and there being a problem with
13   their training. Why -- what was the problem with their
14   training? They hadn't done it?
15   A. Right.
16   Q. Okay. So how did you discover that?
17   A. Through the evaluation.
18   Q. Okay. Tell me more about that.
19   A. So the evaluation -- the part of the evaluation
20   was to down your dog, send them off. Down your dog,
21   send them off, and have them return to you. It sounds
22   more difficult, but if you're training, if you're doing
23   this, second nature to that dog.
24   Q. I couldn't do it with my dog, but you know, a
25   K-9 dog, okay.

Veritext Legal Solutions

Peter Gamboa

July 25, 2024

Page 198

1    A. Second nature for these guys, right?  And so
2 very simple ask of a dog.  And so when he couldn't do
3 it, and when asked for the officer, oh, it's because I
4 don't have a collar on him, which is a -- a shock
5 collar, right?
6         Okay.  So they should -- at this point in
7 his training, he's not a young dog.  He's a veteran dog.
8 You're a veteran trainer.  You're a senior K-9 handler,
9 shouldn't need a shock collar.  So he failed that
10 portion.  I told him, put him up.  He's a liability now.
11        The second time, he wanted to use a shock
12 collar, I told him no.  You're a veteran, he's a
13 veteran.  He should know.  If that's what it takes to
14 train him, you should have already been training him, so
15 that way he can evaluate.  So the second time that he
16 didn't -- he didn't down, he didn't return.  So that's
17 when I -- I said it's -- now he's going to abuse -- not
18 that he was.  To me, is now he's going to abuse him
19 because without his shock collar, he's not listening to
20 him.
21    Q. Sure, and I get that.  That makes sense to me.
22 It seems like I hear you saying is, this handler and
23 this dog weren't able to do a very simple task --
24    A. Yes.
25    Q. -- that they should have been able to do if

Page 199

1 they had been doing their training.
2    A. Yes.
3    Q. Did you see other red flags of officers, of K-9
4 officers and their dogs not doing the training that they
5 were supposed to?
6    A. So I did get with the unit because we did have
7 some dogs that had problems with tracking.  And
8 so -- and what happened is, we would set a track.  We'd
9 have an officer run in the field, in the brush, and the
10 dog picks up on orders, dead skin, the area, right, of
11 crushed grass, things of that nature.  Freshly crushed
12 grass, right?  They pick up on all those orders.
13        And so we're doing a night search, which
14 I -- okay.  I would expect the daylight dogs
15 maybe because now you're -- no light, very dark.  You
16 know, that would maybe confuse them.  But those -- some
17 of those dogs did very well.  We had some that didn't do
18 as well as tracking dogs.  They didn't find their
19 target, right?  So I told them that they -- that's what
20 they needed to work on.
21        So I did recognize some deficiencies with
22 the unit, and brought it to their attention.  But
23 they've -- they would correct it.  They have -- we'd go
24 back and they would correct their deficiencies.
25    Q. Understood.  So you -- it seems like you were

Page 200

1 trying to get things back on track --
2    A. Yes.
3    Q. -- with training.  Why -- why do you think they
4 fell -- the training fell off track?
5    A. I -- I would say that as a supervisor, on the
6 outside looking in, is why I would -- I observe that,
7 not necessarily that Sergeant Ochoa didn't pay
8 attention, but for whatever reason those deficiencies
9 were not looked at at the time.
10    Q. Sure.  And I completely get it.  You're not
11 trying to -- I'm not trying to throw Sergeant Ochoa
12 under the bus --
13    A. Right.
14    Q. -- or ask you to throw Sergeant Ochoa under the
15 bus.  There might have been some systemic reasons why
16 training wasn't meeting the right standard.
17    A. Right.
18    Q. And do you have any idea why the training
19 wasn't meeting the right standard?  I don't even know
20 the right way to phrase that.
21    A. I don't know why.
22    Q. Okay.
23    A. I wasn't there long enough to be able to say,
24 oh, this is why.
25    Q. You came in spotted some problems?

Page 201

1    A. Yeah.
2    Q. Started fixing them?
3    A. Correct.
4    Q. Let me ask you this, how many K-9 units -- when
5 you came in, how many K-9 units -- and by unit I mean,
6 handler plus dog --
7    A. Okay.
8    Q. -- equals unit.  How many K-9 units were there?
9    A. I believe we had -- let's see.  I believe we
10 had eight on the law enforcement side -- well, we had
11 eight units.  We had a ninth dog that when I first came
12 over, didn't have a handler.  And so I interviewed and
13 picked a handler for the detention dog during the short
14 time that I was there.
15    Q. And that ninth dog was the detention dog?
16    A. Correct.
17    Q. And by detention dog, you mean a dog who works
18 in jail?
19    A. Yes.
20    Q. Okay.  So you had eight law enforcement dogs at
21 the time you started?
22    A. Yes.
23    Q. And all of those eight were matched with a
24 handler?
25    A. Yes.

51 (Pages 198 - 201)

Peter Gamboa
July 25, 2024

1    Q. Can you give me the breakdown on those eight
2  dogs, how many of them were bomb sniffing, explosives
3  dog?
4    A. Two explosive, six narcotic, and all eight are
5  patrol trained as well.
6    Q. And by patrol trained does that mean
7  apprehensive --
8    A. Tracking.
9    Q. Apprehension training?
10    A. Apprehension, yes.
11    Q. I'm just trying to understand the terms.
12    A. Yes, yes, yes.
13    Q. And was that the entirety of the K-9 unit then?
14    A. Yes.
15    Q. Or were there other officers who were not
16  handlers part of the K-9 unit?
17    A. No, that was it.
18    Q. Okay. So it's handlers plus the supervisor?
19    A. Correct.
20    Q. And who -- when you came in in October of 2023,
21  who was the longest serving K-9 officer, do you know?
22    A. The longest --
23    Q. If you don't know, that's okay. I was just
24  curious.
25    A. The longest serving was Joe Garcia.

1    Q. Joe Garcia. Joe Garcia. And do you remember
2  what Joe Garcia's dog's name is?
3    A. His dog was -- let me think.
4    Q. It's okay if you can't.
5    A. I can't remember.
6    Q. That's all right. Do you know what Joe
7  Garcia's dog was trained to smell? Explosives or --
8    A. Explosives.
9    Q. Explosives. Okay.
10    A. And apprehension.
11    Q. And who was the most senior narcotic dog and
12  handler?
13    A. I believe it was Martin Molina.
14    Q. He was the most senior?
15    A. I believe so. Let me think. We
16  had -- Faustino was the youngest, and you had -- I can't
17  think of the other officers. Oh. John -- Joseph
18  Garcia, Joseph Z. Garcia. And then you had.
19    Q. So, two Joe Garcias?
20    A. Yes. One narcotic and one explosive.
21    Q. Okay. I just want to make sure I was getting
22  that.
23    A. Yes, uh-huh. So we separate them by Joe Z and
24  Joe G.
25    Q. Okay. And so Joe G is the explosives guy?

1    A. Yes.
2    Q. And Joe Z is the narcotics guy?
3    A. Yes.
4    Q. Okay.
5    A. And then you had -- I'm trying to think of who
6  else. Five; there's got to be one more. I can't think
7  of the sixth guy. I'm trying to picture their faces.
8    Q. That's okay. We can come back to it and try to
9  remember.
10    A. Yeah.
11    Q. So to your memory, Deputy Molina and his K-9,
12  Max, had the most experience as narcotics K-9's?
13    A. Correct.
14    Q. Does that mean that the other folks who were
15  narcotics K-9's, they -- so I'll tell you this: My
16  memory, and I could be wrong, but my memory is that
17  Deputy Molina started as a narcotics K-9 officer in the
18  beginning of 2021.
19    A. Okay.
20    Q. Is that -- is that correct? Does that sound
21  right?
22    A. Somewhere around there, yes, ma'am.
23    Q. So does that mean the other five narcotics
24  K-9's and officers started after March of -- or after
25  the beginning of 2021?

1    A. I believe so.
2    Q. Okay. That seems like a pretty dramatic
3  overhaul. Do you know what happened with the K-9 unit?
4    A. Retirements, people leaving, people just being
5  reassigned for, you know, whatever reason.
6    Q. Is that level of turnover normal for a
7  sheriff's office unit?
8    A. It's not normal, but the expectancy of their
9  activities, I'm sure, was different than before.
10    Q. I don't understand what that means.
11    A. So before -- and this is just from experience,
12  our K-9 dogs were not up to par like these -- like this
13  group is. They're always training. They're always
14  doing things with their dogs, right? These
15  handlers -- before, we had an inmate -- it may be the
16  dogs too, right? Before we had dogs that would attack
17  their handlers. They would -- very out of control. And
18  I don't know if they changed the program -- they changed
19  the program or what they did, but I give kudos to these
20  guys because these dogs are amazing in what they do.
21    Q. The dogs that the sheriff's office has now?
22    A. Correct.
23    Q. And the system that the sheriff's office has
24  now?
25    A. Yes, yes.

Peter Gamboa                                                    July 23, 2024

Page 206

1    Q. And if you were to draw like a dividing time,
2  you said before and after, when would -- when was that
3  marker approximate to your mind?
4    A. I would say when Sheriff Salazar came into
5  office. So, 2017.
6    Q. So 2017 things began to change with the
7  K-9 unit?
8    A. Yes.
9    Q. Do you know what Sheriff Salazar or his
10 administration did that helped change things?
11   A. So for one thing, I didn't know if there was a
12 select day that K-9 would train all day. Before, that
13 was not heard of. It was -- they trained on their own,
14 they do on their own.
15        Under the Sheriff Salazar, Tuesday's K-9
16 trains, patrol duties, narcotics, bombs,
17 whatever -- whatever the lesson plan for that training
18 is that they do.
19   Q. Okay. Okay. I want to talk about Deputy
20 Molina and Max's K-9 specifically. Again, you were here
21 when Captain Von Muldau testified on behalf of the
22 county, and he testified that Deputy Molina was part of
23 the organized crime division --
24   A. Correct.
25   Q. -- as of March 16th, 2022; is that right?

Page 207

1    A. Correct.
2    Q. Okay. Why did the -- let me ask you this
3  before I go on to that: Does the organized crime
4  division have a dedicated K-9 today?
5    A. Yes.
6    Q. And who is the dedicated K-9 today?
7    A. Martin Molina.
8    Q. Still Martin Molina?
9    A. Yes.
10   Q. So Deputy Molina is dedicated K-9 in 2022, and
11 he's still the dedicated K-9 today?
12   A. Yes.
13   Q. What why does the organized crime division need
14 a dedicated K-9?
15   A. A lot of our traffic stops deals with gang
16 members that deal drugs. And so they -- that's why they
17 have a dedicated K-9 for that.
18   Q. Okay. I guess why -- why a dedicated K-9 for
19 that versus just calling for K-9 unit?
20   A. So prior to Bucky Molina, we had another K-9
21 handler named Jared Tubbs. He was actually assigned to
22 DEA as a K-9 handler. And so anything K-9 related, he
23 was called upon for TAG. So he was the TAG K-9, DEA,
24 SAPD. If they had a stop and they need a K-9, they
25 would call Tubbs, he would come out to that.

Page 208

1    Q. Okay.
2    A. So when he retired, when he left and retired,
3  then Bucky was picked to replace him. But was not
4  assigned fully to DEA like Tubbs was. He was assigned
5  to TAG but to provide service for everyone in the TAG.
6    Q. Okay.
7    A. And then Converse has a K-9 unit, sorry, who
8  also helps out.
9    Q. Who's Converse?
10   A. Converse is a small city --
11   Q. Oh, okay.
12   A. -- east of --
13   Q. Sorry. I wasn't sure if that was a -- so
14 Converse, the city, has a K-9 unit?
15   A. Correct.
16   Q. Okay. I didn't mean to interrupt you.
17   A. And so he -- so he also helps the TAG group
18 with K-9 services.
19   Q. Deputy Molina or the -- the K-9 unit from
20 Converse city --
21   A. From Converse, yes.
22   Q. -- also helps y'all?
23   A. Right.
24   Q. Okay.
25   A. So instead of one assigned to DEA, they have

Page 209

1  two assigned to TAG.
2    Q. Got it.
3    A. If that makes sense.
4    Q. Okay. To the TAG unit which has multiple
5  entities in it.
6    A. Correct.
7    Q. Got it. Okay. So do you know when Deputy
8  Molina was assigned to the TAG unit, the organized crime
9  division?
10   A. I don't know the time because he was -- he
11 replaced Tubbs.
12   Q. Okay.
13   A. So when he left, when he retired, that's when
14 he was brought over.
15   Q. And you don't remember --
16   A. I don't.
17   Q. -- when Tubbs retired?
18   A. No, ma'am.
19   Q. Okay. To your knowledge, was there any
20 particular reason that Officer Tubbs retired?
21   A. I believe they were going to retire his dog.
22   Q. Okay.
23   A. And I'm not sure if -- if it was for medical
24 reasons or he was aged out, but he didn't want to get
25 another dog. He wanted to stay as a task force officer

53 (Pages 206 - 209)

Page 210

1 assigned to the DEA, and administration said no.
2    Q.  Okay.
3    A.  So when he was getting transferred back to
4 patrol, he said, I'm going to retire.
5    Q.  Got it.  He rather than make the change he
6 said, all right.  I'm out.
7    A.  I'm out.
8    Q.  Okay.  So in a more general manner, like, when
9 a K-9 officer like Deputy Molina is assigned to the
10 organized crime division, what does that mean the K-9's
11 officer responsibilities are?
12    A.  His responsibilities are if anyone in TAG
13 needed a sniff, whether it'd be because they had a
14 search warrant or traffic stop, then he would be
15 available for -- for that.
16    Q.  Did Deputy Molina have a particular shift?
17    A.  He was, I believe, either 8:00 to 3:00 or 9:00
18 to 4:00.
19    Q.  Okay.  It doesn't matter the exact time.
20    A.  Yeah.
21    Q.  So what would a TAG officer do, Deputy Molina
22 is not on?  Does Deputy Molina get called in?
23    A.  No.  We would just use another K-9.
24    Q.  Okay.  So to summarize then:  Deputy Molina
25 would be the default K-9 unless he was off?

Page 211

1    A.  Correct.
2    Q.  Okay.  And who would be Deputy Molina's
3 officer?
4    A.  The K-9 sergeant would still be his supervisor.
5    Q.  And who was that?  Is that Sergeant Ochoa?
6    A.  Ochoa.
7    Q.  Okay.
8    A.  But Lieutenant Ortega would be -- would have
9 been his lieutenant, his commander, and he kept the same
10 hours.
11        So, you wouldn't really see Sergeant Ochoa
12 at the TAG because Lieutenant Ortega was the
13 commander -- uniform command at the time.
14    Q.  Okay.  So when Deputy Molina was assigned to
15 the organized crime division, Ochoa was still with the
16 K-9 unit?
17    A.  Correct.
18    Q.  But Deputy Molina reported to Lieutenant Ortega
19 as well?
20    A.  Correct.
21    Q.  And now does Deputy Molina report to Lieutenant
22 Freveletti?
23    A.  Curtis.
24    Q.  What's Curtis's first name?
25    A.  Brian.  Brian Curtis.

Page 212

1    Q.  So now Deputy Molina reports to Lieutenant
2 Curtis?
3    A.  Correct.
4    Q.  And Sergeant Ortega?
5    A.  Olvera.
6    Q.  Because Olvera is replaced?
7    A.  Correct.
8    Q.  So he has two bosses?
9    A.  Right.  His direct supervisor, field supervisor
10 is Olvera, and K-9 falls under the umbrella of
11 Lieutenant Curtis as their commander.
12    Q.  Got it.  Okay.  And -- okay.  That's helpful.
13        In 2022, when Deputy Molina was already
14 assigned to the organized crime division, was one of
15 Deputy Molina's responsibilities to your knowledge
16 making traffic stops?
17    A.  He could.
18    Q.  He could.  So it was part of his discretion?
19    A.  Correct.
20    Q.  He didn't have to?
21    A.  Correct.
22    Q.  But he could?
23    A.  Correct.
24    Q.  Okay.
25    A.  And he can respond to patrol.  If patrol needed

Page 213

1 a K-9 and another K-9 was not available, he can respond
2 and help out patrol.
3    Q.  Okay.  So he could volunteer to help other
4 officers not in the organized crime division?
5    A.  Correct.
6    Q.  In general, do you know how Deputy Molina and
7 Max are dispatched to a traffic stop?
8    A.  Yeah.  I mean, they -- the officer conducting
9 the traffic stop could call them.
10    Q.  Okay.
11    A.  Or what they do is, the officer conducting the
12 traffic stop may just reach out to dispatch and say, do
13 we have a narcotic K-9 available.
14    Q.  Okay.  So the two -- is it fair to say then,
15 the two main ways are the officer conducting the stop
16 could call Deputy Molina directly, or the dispatcher
17 could call for a K-9 generally.
18    A.  Correct.
19    Q.  Is that fair?
20    A.  Yes.
21    Q.  Any other ways?
22    A.  For narcotics, that's usually -- so for a short
23 time, we did not have a handler, if the jail needed a
24 narcotics K-9, they would -- they would call dispatch,
25 dispatch would generate a key card, and then have K-9

54 (Pages 210 - 213)

Page 214

1  respond to the jail.

2      Q.  Understood.  Would Deputy Molina ever be

3  ordered to bring Max to a traffic stop before officers

4  actually started the traffic stop?

5      A.  Yes.

6      Q.  Can you tell me about that?

7      A.  So if the operation was for a narcotic courier,

8  and we knew we were going to do a traffic stop for

9  narcotics, then he could be called to be in the area.

10      Q.  Okay.  So you could have -- let me rephrase

11  that.

12          The sheriff's office could have -- could

13  ask Deputy Molina and his dog to be waiting in the

14  wings?

15      A.  Yes.

16      Q.  And was the idea there, the call to Deputy

17  Molina to wait for the traffic stop, the idea that this

18  traffic stop was going to happen, so please be ready to

19  sniff the vehicle?

20      A.  Correct.

21      Q.  Okay.  Has Deputy Molina's role in traffic

22  stops changed at all since Mr. Schott filed this

23  lawsuit?

24      A.  Not to my knowledge.

25      Q.  I think this is a good stopping point, if we

Page 215

1  could take a brief break --

2      A.  Sure.

3      Q.  -- and then continue on.  We're getting close.

4  We're not there yet, but we're getting closer.

5      A.  Okay.

6      Q.  Thanks.

7          (Break taken from 3:37 p.m. to 3:49 p.m.)

8      Q.  (By Ms. Hebert)  Okay.  We're back on record.

9  I wanted to ask one follow-up question about the license

10  plate reader system.

11      A.  Sure.

12      Q.  The Vigilant system, it provided alerts; is

13  that correct, or, no, it didn't provide any alerts?

14      A.  I don't believe so.  I take that back.  I

15  received one, and it was for a wanted person.

16      Q.  Uh-huh.

17      A.  And I believe Babb and Gereb received one at

18  one time for a hot plate that was entered.  And I don't

19  remember if it was for a courier of some type either

20  narcotics or money or what.  I can't remember what it

21  was for.

22      Q.  Okay.  So the LPR system gave alerts, very

23  specific alerts usually for someone who law enforcement

24  knew was committing a crime.

25      A.  Correct.

Page 216

1      Q.  Okay.  Did the LPR system, to your knowledge,

2  give an alert for travel patterns?

3      A.  No.

4      Q.  Did the LPR system give an alert for one day

5  turnarounds?

6      A.  No.

7      Q.  Okay.

8      A.  Unless that plate was entered.  So if a

9  particular plate was entered for a vehicle, it would be

10  a hot plate.  And then so not for travel patterns, not

11  for -- what was the other one you said?

12      Q.  One day turnaround?

13      A.  One day turnaround.  Not for that, but if that

14  plate was entered as a hot plate, then it would alert.

15      Q.  Okay.  Help me understand what is a hot plate?

16      A.  A hot plate is a plate that you enter into

17  Vigilant.

18      Q.  You as in the officer who's on patrol --

19      A.  Yes.

20      Q.  -- enters a license plate number into Vigilant?

21      A.  Correct.

22      Q.  Okay.  So if an officer enters a license plate

23  number into Vigilant, that license plate becomes hot?

24      A.  A hot plate.

25      Q.  Okay.  And then what happens?

Page 217

1      A.  And so it will alert.  If it hits a LPR, then

2  it will alert that officer.  Contact, officer Babb.

3  Contact --

4      Q.  Okay.  I get what you're saying now?

5      A.  Yeah.

6      Q.  Anytime an officer entered a license plate into

7  a system it became a hot plate.  But what you're saying

8  if an officer creates an alert --

9      A.  Correct.

10      Q.  -- for the license plate on Josh Windham's car,

11  and every time Josh Windham's license plate gets

12  scanned, it's going to notify the officer who created

13  that?

14      A.  Yes, yes.

15      Q.  Is that fair?

16      A.  Yes.

17      Q.  It's not that an officer enters, searching a

18  license plate, and then suddenly once you search it,

19  license plate becomes hot?

20      A.  No.  No, no, no.

21      Q.  Hot plate means an officer --

22      A.  Entered.

23      Q.  -- created an alert --

24      A.  Yes.

25      Q.  -- for that license plate?

Peter Gamboa                                July 25, 2024

Page 218

1    A.  That plate.
2    Q.  And only -- so only the officer who creates the
3  hot plate alert get the hot plate alerts?
4    A.  Yes.
5    Q.  So if you entered a license plate into the hot
6  plate, into the system, Officer Frigerio would not get
7  your hot plate alerts?
8    A.  Correct.  Unless he was an administrator.
9    Q.  Huh.  Okay.  So administrators get everybody's
10  hot plate alerts?
11    A.  Yes.  For the agency.
12    Q.  And you, as the administrator for Vigilant,
13  would get everybody's hot plate alerts?
14    A.  Correct.
15    Q.  And did Deputy Babb and Deputy Gereb create a
16  lot of hot plate alerts?
17    A.  Not that I can recall.
18    Q.  Okay.  Did they create --
19    A.  I'm sure they have, but I haven't gotten no
20  returns.  I have gotten returns for wanted persons.
21  Narcotic couriers, human smugglers, things of that
22  nature, I do get those returns.
23    Q.  Okay.  Got it.  So other than alerts for a
24  wanted person, and an officer-created hot plate, are
25  there any other alerts in the Vigilant system?

Page 219

1    A.  Yes.  So there is alerts for wanted persons,
2  for any type of narcotic courier, money courier, human
3  smugglers, any type of illegal weapons.
4    Q.  Okay.  I guess maybe I'm not understanding or
5  being clear.  If the license -- would the license plate
6  reader give an officer an alert saying, hey, this
7  vehicle is a narcotics vehicle?
8    A.  (Witness nods head.)
9    Q.  It would?
10    A.  Yes.
11    Q.  And that would pop up on the officer's screen?
12    A.  Yes.
13    Q.  Okay.  And an alert would pop up on an
14  officer's screen that this was a human smuggling
15  vehicle?
16    A.  Correct.
17    Q.  Okay.  But nothing -- there would be no alerts
18  about one-day turnarounds?
19    A.  Not for that.  No.
20    Q.  Okay.  Got it.  Okay.  I'd like to talk a
21  little bit about the stop of Mr. Schott, the Plaintiff
22  in this case.
23    A.  Sure.
24    Q.  Do you remember when you, Sergeant Gamboa,
25  first learned about the traffic stop of Mr. Schott?

Page 220

1    A.  Okay.  Yes.
2    Q.  Can you tell me the details of what you learned
3  and when that was?
4    A.  I believe the first time that I heard was
5  through the complaint.  Internal Affairs Sergeant
6  Marta Rodriguez called me, said that Alek Schott had
7  made a complaint through Internal Affairs and there was
8  nothing they can do about it, what he was complaining.
9  He was complaining about the traffic stop.
10         So at that time, I asked her to give me his
11  number and I would call him.
12    Q.  Okay.  So do you remember when
13  Sergeant Rodriguez called you about Mr. Schott's
14  complaint, approximately?
15    A.  I would probably say probably a month after.
16  So, about April.
17    Q.  April 2022?
18    A.  Yeah.
19    Q.  Okay.  I will represent to you that the stop of
20  Mr. Schott occurred on March 16th, 2022.  Does that
21  sound about right to you?
22    A.  Yes.
23    Q.  On March 16th, 2022, did you hear anything
24  about the stop of Mr. Schott, from Deputy Babb or
25  elsewhere?

Page 221

1    A.  I believe he did tell me that he was probably
2  going to get a complaint for the stop.
3    Q.  Uh-huh.
4    A.  And my reply to that was, did you do something
5  wrong?  He goes, no.  I said, okay.  Well then, I'll
6  handle it when it comes in.
7    Q.  Okay.  Did -- at that time, on March 16th or
8  thereabouts, did Deputy Babb tell you anything about his
9  dash camera not working?
10    A.  No.
11    Q.  Okay.
12    A.  Not that I believe so.
13    Q.  Sure.  I'll also represent to you that
14  Mr. Schott called the county to complain two days later
15  on March 18th, 2022.
16    A.  Okay.
17    Q.  Did you learn anything about Mr. Schott's
18  complaint on March 18th, 2022?
19    A.  No.
20    Q.  Okay.  So the first time you remember hearing
21  about Mr. Schott's complaint was sometime in April of
22  2022?
23    A.  Correct.
24    Q.  And when Sergeant Rodriguez, now Sergeant
25  Ortega --

56 (Pages 218 - 221)

Page 222

1    A. Correct.
2    Q. -- called you to let you know about this
3  complaint, what did you do next?
4    A. I called him.
5    Q. You called who?
6    A. Mr. Schott.
7    Q. You called Mr. Schott. And did you do any
8  investigation before calling Mr. Schott?
9    A. No.
10    Q. So you got the complaint -- news of the
11  complaint from Marta Rodriguez, and then you just called
12  Mr. Schott.
13    A. Correct.
14    Q. Okay. Can you tell me about that call with
15  Mr. Schott?
16    A. Sure. He called and --
17    Q. He called you?
18    A. Well, I called him when I talked to him. He
19  said that his complaint was that Deputy Babb had damaged
20  his tonneau cover. That he wanted to know how the
21  county was going to pay him for that.
22      I said, I have not reviewed his body cam.
23  If he would allow me to review it, I would call him back
24  and give him more answers.
25      So at that time is the first time that I

Page 223

1  reviewed that particular traffic stop. And because a
2  complaint was the tonneau cover, I fast forwarded to the
3  spot where Babb was at the tonneau cover.
4    Q. By tonneau cover, you mean the back bed cover?
5    A. Yes. And so -- so I started playing it from
6  there. I saw that it was not -- Babb was trying to find
7  a way to open it, couldn't find a way for whatever
8  reason. He had Mr. Schott come out, and Mr. Schott
9  opened the tonneau cover for him.
10      I reviewed the video, and saw when Martin
11  Molina did the sniff around the truck. The dog alert.
12  Sit, alert, and then he opened the door. The dog jumped
13  in. Saw that part of it. Saw that Gereb was searching
14  through the truck bed. He looked at toolbox, I believe
15  a tote bag, and another can, cannister or something.
16  And then that was pretty much it. I guess he got a
17  phone call and he left the traffic stop. I guess
18  somebody else was calling for help or something. And he
19  left the traffic stop.
20      So I reviewed Deputy Molina's body cam,
21  which coincided with what I saw on Deputy Babb's body
22  cam. Deputy Gereb's body cam coincided with what I saw
23  also on Deputy Babb's and left.
24      So then, called Mr. Schott back. I told
25  him, okay, I was able to review the video. Your

Page 224

1  complaint is that Deputy Babb damaged your tonneau cover
2  when, I guess, he was trying to open it. And I told him
3  that he's the one that opened it.
4    Q. Okay.
5    A. He said, well, I have another complaint. The
6  dog scratched my truck when he alerted. I said okay. I
7  said, I did review that. I said that dog is trained to
8  alert by sitting down. I said, and that's what I saw.
9  I didn't see him scratch at your door. He goes, well,
10  he damaged my seats when he was inside the truck. Could
11  be. I did not see the damage. I'll have to review that
12  and be able to tell you something. And that was his
13  chief complaints at that time.
14    Q. Okay.
15    A. And so I said, can I help you with anything
16  else? He said, no, I'm going to seek legal action. And
17  we hung up. And I hadn't talked to him since.
18    Q. So you had one phone call --
19    A. Yes, ma'am.
20    Q. -- with Mr. Schott; is that fair?
21    A. Yes, ma'am.
22    Q. And we just kind of walked through what you
23  remember of the phone call --
24    A. Yes.
25    Q. -- is that fair?

Page 225

1      Okay. Can you tell me about how long that
2  phone call lasted?
3    A. I would probably say around maybe 10,
4  12 minutes.
5    Q. Okay. Okay. I think we're going to watch a
6  video now.
7    A. Okay.
8    Q. Bear with me because tech is not my strong
9  suit. We are going to look at what has previously been
10  marked Exhibit 50. Bear with me, folks.
11      (Exhibit No. 50 marked.)
12    Q. (By Ms. Hebert) Okay. Let's try this one
13  instead. Okay. I'm going to show you a clip from
14  Deputy Babb's dash camera.
15    A. Okay.
16    Q. The whole thing is -- I don't know, 14 minutes
17  long.
18    A. Okay.
19    Q. And so for the sake of time, I'm going to skip
20  to the end and focus on a particular part. And I'm just
21  going to make sure that -- for the record this is BC307,
22  just so we have it on record which Bates label video, so
23  Charles can find it later if he needs to.
24    A. Okay. Now is this the same traffic stop?
25    Q. No. This is a different traffic stop.

Peter Gamboa                                                    July 25, 2024

Page 226

1    A.  Different, okay.  Got you.

2    Q.  And if you wouldn't mind -- before we get

3  started, I think this is a good way to help.

4        There are numbers up in the right hand -- I

5  check my right from my left.  There are numbers up at

6  the top at the right-hand corner; is that correct?

7    A.  Yes.

8    Q.  And the first line of numbers, what does that

9  line represent?

10    A.  The date and the time.

11    Q.  Okay.  And what's the date on this video?

12    A.  4/12 of '22.

13    Q.  Okay.  And the time that seems -- that's in a

14  24 hour clock?

15    A.  Yes, ma'am.

16    Q.  And I understand that that's Zulu time; is that

17  correct?

18    A.  Correct.

19    Q.  And so 22 --

20    A.  So it would be 5:41.

21    Q.  P.m.?

22    A.  P.m.

23    Q.  Okay.  You're good at that.  That would have

24  taken me a couple minutes to figure out.

25        So this video is from April 12th, 2022, at

Page 227

1  approximately 5:40 p.m.?

2    A.  Correct.

3    Q.  Okay.  I'm going to skip to 11:30.  So

4  11 minutes and 30 seconds into the video.  And the part

5  that I'd like you to watch is relatively short.  I'm

6  going to watch from 11:30 to the end of this video.

7    A.  Okay.

8    Q.  Let me make sure my sound is on actually.

9        (Video begins playing.)

10    Q.  (By Ms. Hebert)  Okay.  We just heard

11  Deputy Babb making a call with someone to whom he

12  referred to as Sergeant.  Was that call to you?

13    A.  Yes.

14    Q.  And was that your voice we heard --

15    A.  Yes.

16    Q.  -- on the recording with Deputy Babb?

17    A.  Yes, ma'am.

18    Q.  In the recording of the phone

19  conversation we just watched, were you and Deputy Babb

20  discussing Mr. Schott's complaint?

21    A.  I believe so.

22    Q.  Okay.  Now I want to watch another clip.  This

23  is a clip like a shortened version of the video clip we

24  just watched.  So instead of the traffic stop at the end

25  we just cut to the --

Page 228

1    A.  Actual.

2    Q.  -- the actual conversation.

3    A.  Okay.

4    Q.  And then with that clip, added subtitles, and

5  before we discuss kind of the video and the

6  conversation, which is short, it's only two minutes, I'd

7  like you to watch the video again to confirm that the

8  subtitles are accurate.

9    A.  Okay.

10    Q.  Is that they're saying -- that they're

11  capturing exactly what you're saying, and if there's

12  something inaccurate, we can -- we can discuss that.

13        So, there are some things that I believe

14  that you are quoting what Mr. Schott said, and I've put

15  those in quotation marks just so that I can understand

16  from the context you were repeating what I understood

17  Mr. Schott to be saying.

18    A.  Okay.

19    Q.  And, again, if you see a place where the

20  subtitles are wrong, please immediately let me know.

21  We'll pause and we'll make sure we note the correct

22  words.

23    A.  Okay.

24    Q.  So I'm going to introduce what has

25  previously -- I'm just going to -- I think it's easier

Page 229

1  if I do it this way.  Previously been marked Exhibit 51.

2        (Exhibit No. 51 marked.)

3    Q.  (By Ms. Hebert)  This is just going to take me

4  a second as I pull everything up.  Here we go.

5        Okay.  I'm going to start it and, again,

6  correct me if there's anyplace where the subtitles

7  aren't captured what you said correctly.

8    A.  Okay.  Sure.

9        (Video begins playing.)

10    Q.  (By Ms. Hebert)  Okay.  Did subtitles

11  accurately reflect your conversation --

12    A.  Yes, ma'am.

13    Q.  -- with Deputy Babb?

14    A.  Yes, ma'am.

15    Q.  All right.  So I want to go through parts of

16  Exhibit 51, and ask you a couple of questions.

17    A.  Okay.

18    Q.  I'm going to watch from the beginning to

19  13 seconds in.

20        (Video begins playing.)

21    Q.  (By Ms. Hebert)  Okay.  So when you said,

22  "yeah, I'm reviewing the K-9," what were you referring

23  to?

24    A.  I don't remember if it was a K-9 video or what

25  it could be.

Page 230

1    Q.  Okay.

2    A.  Only because dealing with -- also dealing with

3  the traffic stop and K-9, Deputy Molina was involved.

4    Q.  If you were to think back to how you would use

5  K-9, would you think you were reviewing the K-9 body

6  camera footage or something else?

7    A.  Probably the K-9 body camera footage.

8    Q.  Okay.  And when you said, "So he's challenging

9  the stop," was the "he" referring to Alek Schott?

10   A.  Yes.

11   Q.  Let's watch 13 to 30.  So we'll watch 0:13

12  seconds to 0:30 seconds.

13       (Video begins playing.)

14   Q.  (By Ms. Hebert)  Okay.  I understood in this

15  clip that we just watched you to be telling Deputy Babb

16  about your phone conversation with Mr. Schott; is that

17  right?

18   A.  Correct.

19   Q.  When you told Deputy Babb that you told Alek

20  Schott, "you can argue that in court," were you saying

21  that you told Mr. Schott, he could challenge the stop in

22  court?

23   A.  That if it was -- if he was cited for it, that

24  he can challenge that in court.  But because he was not

25  cited and he was only given a warning, I don't know what

Page 231

1  I -- you know, what else I could do for him.

2    Q.  Okay.  So let me just make sure I understood

3  that.

4       You were explaining to Deputy Babb that you

5  had told Mr. Schott that because he had not received a

6  citation, he had only received a warning, that you

7  didn't know what you could do for him?

8    A.  Correct.

9    Q.  But if Mr. Schott had received a citation, he

10  could then challenge that in court?

11   A.  Correct.

12   Q.  But you can't challenge a warning in court.

13   A.  Right.  Because there's no court appearance.

14   Q.  Okay.  I was going to watch this next piece.

15  But we'll watch from 0:30 to 0:40.  And that -- by that

16  I mean, we'll watch from 30 seconds to 40 seconds.

17   A.  Okay.

18       (Video begins playing.)

19   Q.  (By Ms. Hebert)  Okay.  When Deputy Babb said,

20  "It was one of those from the app," what app did you

21  understand Deputy Babb to be referring to?

22   A.  I'm going to assume he was referring to the

23  WhatsApp app with that group.

24   Q.  The Northwest Highway Group?

25   A.  Correct.

Page 232

1    Q.  Okay.  And when Deputy Babb said, "The intel

2  stops of a one-day turnaround," what did you understand

3  Deputy Babb to be referring to?

4    A.  Just information on the one-day turnaround.

5    Q.  Okay.  I'm going to watch a longer section.  So

6  from 40 seconds to a minute and 30 seconds.

7    A.  Okay.

8       (Video begins playing.)

9    Q.  (By Ms. Hebert)  Actually, we're going to pause

10  there.  So we just watched from 0:30 --

11   A.  0:40.

12   Q.  0:40, thanks, 0:56.  When Deputy Babb said,

13  "cover my ass in that report," what did you understand

14  him to be referring to?

15   A.  On his report, I'm not sure if he would have

16  listed prior to knowledge about the one-day turnaround

17  and the traffic stop.

18   Q.  I don't understand.  I'm sorry.

19   A.  So I took that as he was -- because he had the

20  knowledge from the app that he would have put that

21  traffic stop, or the violation prior to or subsequent to

22  the prior knowledge of the traffic stop.  If that makes

23  sense.

24   Q.  I think so.  So you understood him saying,

25  "cover my ass in the report" to say that he wrote that

Page 233

1  he had probable cause for making the traffic stop.

2    A.  Correct.

3    Q.  Okay.  And he also referenced putting

4  subsequent prior knowledge in his report.  Do you

5  know -- what do you understand that to mean?

6    A.  So, pretty much that he had PC for the stop,

7  but he also had the information from the app.

8    Q.  Okay.  And we're going to watch now from 56 to,

9  hopefully, one minute and 30 seconds.

10       (Video begins playing.)

11   Q.  (By Ms. Hebert)  Okay.  So we just heard you at

12  the end of this -- this part of the clip say, "I've got

13  him on hold."  Was the "him" a reference to Mr. Schott?

14   A.  I don't remember.

15   Q.  Okay.  If it wasn't a reference to Mr. Schott,

16  who could it have been a reference to?

17   A.  I -- I don't know.

18   Q.  Okay.

19   A.  It could have been.  I'm not sure.  I don't

20  recall talking to him during the conversation with

21  Mr. Schott.

22   Q.  Okay.  So you don't remember talking to

23  Deputy Babb --

24   A.  The same day.

25   Q.  -- during the conversation as Mr. Schott?

Peter Gamboa                                                    July 23, 2024

Page 234

1    A. Correct.
2    Q. Okay. I'm going to watch from 1:30 to -- or
3  play from 1:30 to 1:36.
4        (Video continues playing.)
5    Q. (By Ms. Hebert) I got to 1:47. Apologies.
6  When you said, "I reviewed his body cam," were you
7  indicating that you told Mr. Schott that you reviewed
8  Deputy Babb's body cam?
9    A. I may have. Yes.
10   Q. Okay. And when you said, "you know, there's
11 nothing that he did illegal," were you indicating that
12 you told Mr. Schott that you didn't think Deputy Babb
13 violated any law?
14   A. Correct.
15   Q. I want to watch from 1:47 to 2:07.
16       (Video continues playing.)
17   Q. (By Ms. Hebert) We just watched to 2:07. In
18 the clip that we just watched, it seems like you were
19 summarizing what you saw on Deputy Babb's body camera
20 footage and telling Deputy Babb that you told Mr.
21 Schott, you didn't see any problems on Deputy Babb's
22 body camera footage; is that right?
23   A. Correct, yes.
24   Q. Let's just watch from 2 :07 to the end of this.
25       (Video continues playing.)

Page 235

1    Q. (By Ms. Hebert) Okay. The dash camera shut
2  off; is that correct?
3    A. Yes.
4    Q. Do you remember what happened with the rest of
5  the call with Deputy Babb?
6    A. I don't.
7        (Exhibit No. 16 marked.)
8    Q. (By Ms. Hebert) Okay. I want to look at an
9  exhibit. This exhibit has previously been marked
10 Plaintiff's Exhibit 16. It's our B, Mr. Windham.
11 Again, this was previously admitted as Plaintiff's
12 Exhibit 16.
13       I'm going to represent to you that
14 Sergeant Rodriguez, now Sergeant Ortega, previously
15 confirmed that these were Internal Affairs records from
16 her investigation. And I would like to go to the first
17 page, or the second page, excuse me. There's BC-2162 at
18 the bottom.
19   A. Yes, ma'am.
20   Q. Do you see that?
21   A. Yes, ma'am.
22   Q. And as I understand it, as I understand
23 Sergeant Rodriguez's testimony, this was kind of her
24 notes on closing the investigation of Mr. Schott's
25 complaint.

Page 236

1    A. Okay.
2    Q. And do you see the section that says
3  explanation?
4    A. Yes.
5    Q. Do you see there's a large paragraph --
6    A. Uh-huh.
7    Q. -- and then you see there's a sentence starting
8  Sergeant Gamboa?
9    A. Yes.
10   Q. I'm going to read that section --
11   A. Okay.
12   Q. -- that sentence. Sergeant Gamboa also spoke
13 for Steve for about 2.5 hours and was not satisfied.
14   A. Okay.
15   Q. Did I read that correctly?
16   A. Yes.
17   Q. Did you speak to Mr. Schott for 2.5 hours?
18   A. I don't recall. I have no reason to
19 dispute it.
20   Q. Okay. So --
21   A. I may have.
22   Q. You may have spoke to Mr. Schott for 2.5 hours.
23 That seems like a long call.
24   A. Uh-huh.
25   Q. Okay. Let's go to BC-2167, which is a couple

Page 237

1  pages later.
2    A. Okay.
3    Q. And I want to direct you to about -- you see
4  BC-2167?
5    A. Yes, ma'am.
6    Q. And about the middle of the page, there is the
7  start of an email. And it looks like that email is from
8  April 12th, 2022 at 6:04 p.m. Does that look right to
9  you?
10   A. Yes, ma'am.
11   Q. Okay. And it's my understanding that this is
12 an email that Mr. Schott wrote to Sergeant Rodriguez.
13 Can you take a second and review this email, which goes
14 from Page 2167 to the top of 2168.
15   A. Sure. Okay.
16   Q. Okay. I will represent to you that
17 Sergeant Rodriguez previously testified that these were
18 her email records --
19   A. Okay.
20   Q. -- with Mr. Schott. It seems like Mr. Schott
21 sent this email after the call with you. Would that be
22 your understanding?
23   A. Yes.
24   Q. Okay. Did anything in the email that
25 Mr. Schott sent Sergeant Rodriguez about the call he had

60 (Pages 234 - 237)

Peter Gamboa                                    July 25, 2024

Page 238

1  with you seem incorrect?
2      A. So I believe -- I think on here, he says -- and
3  I'm not sure if he's asking me or if he asks
4  Sergeant Rodriguez. I asked if placing people in front
5  of the police vehicles while running their ID is
6  standard practice, and then she said, not me. So, I'm
7  not sure if that's a typo, or if that's her answering.
8      Q. Sure.
9      A. I don't remember that. And he says he claimed
10 I wasn't being detained even though the officer was
11 withholding my driver's license, and warning paperwork
12 while forcing me to wait for a drug dog without probable
13 cause.
14         He said, I should have just left without my
15 license if I wanted to go and not wait for the dog. So
16 I don't -- I don't remember having that conversation
17 with him.
18     Q. Okay.
19     A. I think he was referring to the body cam to
20 Babb's body cam, saying that I kept talking in circles,
21 saying he could see the violation from the body cam even
22 though it was inside his patrol car facing him.
23         I don't recall that. That I told him -- or
24 I assume he's referring to me, to file a lawsuit if I
25 have additional concerns with how the conduct -- they

Page 239

1  conduct business.
2      Q. Do you remember saying that?
3      A. No.
4      Q. Okay.
5      A. And then, sergeant then laughed at me, put me
6  on hold for an extended amount of time just to pick up
7  and say, are you still there? And then put me back on
8  hold in hopes that I would hang up.
9          He later joined after leaving me -- so I
10 could have been reviewing the dash cam while I was
11 talking to him.
12     Q. Okay. So it's possible you placed Mr. Schott
13 on hold?
14     A. Yeah, I told him to hold on, let me review it.
15 Later joined me on hold and had no sufficient evidence
16 for a stop.
17         I would never have told him that.
18         No sufficient reason to detain me to wait
19 for a drug dog, and told me to challenge your department
20 in court.
21     Q. Yeah, I don't -- just to be fair. I don't
22 think that he was saying that you said that. I think
23 that was just his characterization.
24     A. Oh, I see.
25     Q. Is that fair?

Page 240

1      A. Yeah.
2          MR. FRIGERIO: Objection; form.
3      A. Could have.
4      Q. (By Ms. Hebert) Okay. So do you
5  recall putting him on hold?
6      A. I may have. I don't recall it, but I may have.
7      Q. Okay.
8      A. It may have.
9      Q. Sure.
10     A. I mean, as a supervisor I wanted to make sure
11 that if they -- somebody in the public has a complaint,
12 I want to try and address it as best as I can. So I
13 could have been.
14     Q. Okay. And I want to go back to the first
15 paragraph of the email, if you don't mind.
16         You flagged from the sentence, I asked if
17 people -- if placing people in the front of their police
18 vehicles, you flagged from there down.
19     A. Okay.
20     Q. I want to go back to the, if I asked if
21 removing someone from their vehicle is standard practice
22 and he said, not for me.
23         Do you recall saying that, not for me?
24     A. I could have said. Because that's my -- that's
25 not my general practice.

Page 241

1      Q. Okay. But you were aware that criminal
2  interdiction deputies placed drivers in the front seat
3  of their vehicles; is that right?
4      A. Yes, ma'am. Yes, ma'am.
5      Q. And you never told them that they should not do
6  that; is that correct?
7      A. Correct. Correct.
8      Q. And at the time that you were the sergeant over
9  the criminal interdiction unit, you didn't conduct
10 traffic stops as part of your daily duties; is that
11 right?
12     A. Correct.
13     Q. Okay. I think you can put that away.
14     A. Okay.
15     Q. I just have one more topic to just ask you
16 about.
17     A. Sure.
18     Q. Have you ever heard of the Laredo Fusion
19 Center?
20     A. I have not.
21     Q. And have you ever heard or know -- do you know
22 an law enforcement officer named Kiki, that goes by the
23 name of Kiki?
24     A. No.
25     Q. So you wouldn't know if there was a law

61 (Pages 238 - 241)

Page 242

1  enforcement officer named Kiki?
2      A. (Witness shakes head.)
3      Q. Okay.
4          MR. FRIGERIO: That's a no?
5      A. No. Sorry.
6      Q. (By Ms. Hebert) No, that's okay. I forget
7  sometimes too.
8          And to your knowledge, the sheriff's office
9  has worked with a fusion center in El Paso; is that
10 right?
11     A. Correct.
12     Q. Are there any other fusion centers in the
13 Valley area that the Bexar County Sheriff's Office has
14 worked with?
15     A. Not that I know of.
16         MS. HEBERT: Okay. Any other questions?
17 Okay. We don't have any other questions at this time.
18 But I am going to raise some production issues. We're
19 here on --
20         MR. FRIGERIO: We can do that. I might
21 have some questions for him.
22         MS. HEBERT: For --
23         MR. FRIGERIO: For Sergeant.
24         MS. HEBERT: Sure. But I'm still going to
25 raise these production issues now and then we can pass

Page 243

1  the witness.
2          I'm going to say that we still are waiting
3  for those criminal interdiction weekly reports. Those
4  were responsive to our RFP40. It is now July 23rd, and
5  defendant's were supposed to comply with the Court's
6  order on a motion to compel.
7          MR. FRIGERIO: We didn't even know about
8  this weekly report until we took the deposition.
9          MS. HEBERT: On June -- but, Counsel,
10 that's your obligation. It's not our obligation to
11 figure out what documents exist on your side.
12         MR. FRIGERIO: I don't know that they were
13 responsive, but you'll have them today.
14         MS. HEBERT: Well, we just took poor
15 Sergeant Gamboa's deposition without those weekly
16 criminal interdiction reports, and we took the 30(b)(6)
17 without those criminal interdiction reports. So I'm
18 going leave Sergeant Gamboa's deposition open given that
19 we might need to examine someone about what these weekly
20 interdiction reports are about.
21         We're also saying Defendants have failed to
22 proactively look for documents in response to
23 Plaintiff's request for production. It shouldn't be up
24 to poor Captain Von Muldau to figure out what is the
25 whole universe of things without counsel responsive to

Page 244

1  our request for production.
2          I'll also add, we're going to call for
3  production of the criminal interdiction job description
4  that Sergeant Gamboa discussed today that he placed on
5  Internet, or the intranet. Excuse me. That's
6  responsive to our RFP26, which includes documents
7  reflecting the purpose of the criminal interdiction
8  unit, among others.
9          We also requested documents about the
10 budget and funding of the special enforcement unit,
11 which is the unit that the criminal interdiction unit
12 was part of. And Sergeant Gamboa today testified about
13 the criminal interdiction budget, so that would be
14 responsive -- those documents would be responsive to
15 RFP41.
16         We are also going to ask for Sergeant
17 Gamboa's Axon body camera notes for criminal
18 interdiction officers.
19         And then again, we talked about that a
20 little bit earlier, the Interrogatory 2, and ask that
21 the county revisit Interrogatory 2, and verify that its
22 information it's providing in response to
23 Interrogatory 2 is correct.
24         And then final finally I'll note that my
25 email to counsel on July 18th, asked for Captain Von

Page 245

1  Muldau's testimony about specific entries on the
2  incident detail report that he did not know. He was
3  going to provide information about the last two entries
4  of activity on the activity log section, so we're still
5  waiting for that information.
6          MR. FRIGERIO: Sergeant, I have a few
7  questions for you.
8          THE WITNESS: Sure.
9              EXAMINATION
10 BY MR. FRIGERIO:
11     Q. Can you tell us a time period you were the
12 supervisor of the K-9 division for the Bexar County
13 Sheriff's Office?
14     A. I believe it was from about October of '23,
15 until about, I would say, like March, April of 2024.
16     Q. Did you have time during that time period that
17 you were supervisor to look at the work ethic and the
18 work product of Deputy Molina?
19     A. I did.
20     Q. What did -- what was your opinion as to Deputy
21 Molina and his K-9 Max?
22     A. K-9 Max and Deputy Molina are very good team.
23 You can tell by seeing them work that they know each
24 other. They are very good officers at what they do.
25 And they hold up a high standard for the sheriff's

Peter Gamboa                                                              July 25, 2024

Page 246

1    office K-9 unit.
2        Q.  Is he one of the best K-9 handlers that you
3    have?
4        A.  Absolutely.
5        Q.  And Molina is a certified K-9 handler?
6        A.  He is, yes, sir.  And I'll give you a example,
7    if I can.
8        Q.  Okay.
9        A.  So we had been requested for some assistance
10   from HSI on a particular day, and the subject, I
11   believe, was a narcotic courier that came, and I believe
12   it was El Paso.  Not -- not Eagle Pass.  I believe it
13   was coming from El Paso.  Was going to deliver a car
14   that was loaded with narcotics.
15          We got probable cause.  The -- during the
16   reasonable suspicion for the narcotic K-9, Deputy Molina
17   and Max came over.  They did an open air sniff, and K-9
18   Max alerted to the gas tank of the car.
19          So we had -- we removed the car from the
20   roadway.  We took it over to sheriff's office, the
21   fleet, our Bexar County fleet.  We dropped the gas tank
22   and it was loaded.  And I believe it was about 33 kilos
23   of methamphetamine.
24          So knowing that the gas, the fumes, the
25   heavy scent of the gas and a dog can decipher between

Page 247

1    that and narcotics is what amazed me to know that these
2    guys are doing the necessary training to make sure
3    that -- that he is certified in narcotics.
4        Q.  With regard to your -- the interdiction unit
5    that you were the supervisor of, were there financial
6    records for the interdiction unit?
7        A.  No, sir.  As far as for budget?
8        Q.  Right.  How did you acquire funding?
9        A.  So, like I had stated earlier, so when I was
10   assigned to the training academy, and interdiction was
11   assigned to me, we, for training purposes, to pay for
12   that training, we used money out of the training
13   academy.
14       Q.  There was no line item that said interdiction
15   unit?
16       A.  No.  No.
17       Q.  Was there ever in any financial of the Bexar
18   County Sheriff's department ever a line item that said
19   interdiction unit?
20       A.  No.  No, sir.  So then when we were moved from
21   the training academy under administration and support,
22   and were under criminal investigation division under
23   that, that training was paid for by funds out of CID,
24   criminal investigation division.  So we never had any
25   funding for ourselves.

Page 248

1        Q.  And there was never a line item that talked
2    about interdiction unit?
3        A.  No.
4            MR. FRIGERIO:  I'll pass the witness.
5                 EXAMINATION
6    BY MS. HEBERT:
7        Q.  A couple of questions, Sergeant Gamboa and I'm
8    sorry to keep you here.
9            You were the supervisor for the K-9 unit
10   from October 2023 to March 2024; is that fair?
11       A.  I believe, yes.
12       Q.  And you were never a K-9 handler?
13       A.  Correct.
14       Q.  Had you ever been trained in K-9 handling?
15       A.  No.  But I did -- I was present for training,
16   and I also attended some days when I had two detention
17   officers sent to training -- handler school.
18       Q.  Okay.  So you had visited some training?
19       A.  Yes.
20       Q.  Is that fair?
21       A.  Yes.
22       Q.  But you'd never been trained yourself?
23       A.  Correct.
24       Q.  Is that fair?
25       A.  Yes, ma'am.

Page 249

1        Q.  Do you know what the process is for certifying
2    a K-9 handler?
3        A.  So from my understanding, is they use a third
4    party and they go through the process for narcotics.
5    They record the training, send that to a third party,
6    and then the third party certifies that they are doing
7    what needs to be done to get certified.
8        Q.  And that's how Bexar County handles its
9    certification process?
10       A.  Yes.
11       Q.  Were you ever involved in that certification
12   process?
13       A.  No.
14       Q.  Did you ever see it happen?
15       A.  No, ma'am.
16       Q.  Okay.  To your knowledge, do you know what
17   certifications Deputy Molina and Max, his K-9, hold?
18       A.  I don't know currently.
19       Q.  Okay.  Have you ever reviewed the deployment
20   records of Deputy Molina and his K-9 Max?
21       A.  No, I haven't.  But I know that there is a
22   computer record for every deployment that they -- if
23   that's what they still use.
24       Q.  Sure.  And have you ever reviewed that
25   deployment --

63 (Pages 246 - 249)

Page 250

1    A. No.

2    Q. -- record?

3    A. No.

4    Q. Have you ever reviewed the training records of

5  Deputy Molina and his K-9 Max?

6    A. I did review training for them. So originally

7  he wasn't -- he didn't go through a K-9 handlers school.

8  He was trained by the sheriff's office K-9 trainer at

9  the time.

10    Q. Sure.

11    A. Who was a -- I believe was a certified train

12  the trainer. So he can certify K-9 officers.

13    Q. But, I mean, you just said I believe, do you

14  know if he was a certified K-9 --

15    A. I don't know because by the time I was there,

16  he had already passed away. So I didn't have --

17    Q. Sure.

18    A. -- his training records.

19    Q. Okay. So we talked a little bit about the

20  deployment records, you hadn't reviewed that. So did

21  you ever review Deputy Molina's training records?

22    A. I did.

23    Q. Okay. And what did you review?

24    A. What he -- what he had as far as getting him

25  certified at the time.

Page 251

1    Q. Okay. So you reviewed his precertification

2  records?

3    A. Correct.

4    Q. Did you review Deputy Molina's training records

5  from certification onward?

6    A. No.

7    Q. Okay. Was Deputy Molina the first K-9 handler

8  completely trained inhouse for Bexar County?

9    A. That I know of, yes.

10    Q. Was he the last?

11    A. That I know of. Yes.

12        MS. HEBERT: Anything else? We'll pass the

13  witness, leaving Sergeant Gamboa's testimony open at

14  this time.

15        MR. FRIGERIO: Reserve our questions.

16        MR. ELLSWORTH: Same, reserve.

17        (Proceedings ended at 4:46 p.m.)

18

19

20

21

22

23

24

25

Page 252

1              CHANGES AND SIGNATURE

2  WITNESS NAME: SERGEANT PETER GAMBOA

3  DATE OF DEPOSITION: 07/23/2024

4  PAGE LINE    CHANGE              REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 253

1        I, SERGEANT PETER GAMBOA, have read the

2  foregoing deposition and hereby affix my signature that

3  same is true and correct, except as noted above.

4

5

6        _____

7              SERGEANT PETER GAMBOA

8  THE STATE OF TEXAS

9  COUNTY OF _____)

10        Before me, _____, on

11  this day personally appeared SERGEANT PETER GAMBOA,

12  known to me (or proved to me under oath or through

13  _____) (description of identity card or

14  other document) to be the person whose name is

15  subscribed to the foregoing instrument and acknowledged

16  to me that they executed the same for the purposes and

17  consideration therein expressed.

18        Given under my hand and seal of office this

19  _____ day of _____, 2024.

20

21        _____

22        Notary Public in and for

23        The State of Texas

24

25

Page 254

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3   ALEK SCHOTT,        )
                         )
 4        PLAINTIFF,     )
                         )
 5   VS.                 )
                         )
 6   JOEL BABB, IN HIS   )
     INDIVIDUAL AND OFFICIAL  )   CIVIL ACTION
 7   CAPACITY; MARTIN A.      )      NO.
     MOLINA III, IN HIS  )  5:23-CV-00706-OLG-RBF
 8   INDIVIDUAL AND OFFICIAL  )
     CAPACITY; JAVIER SALAZAR, )
 9   IN HIS INDIVIDUAL AND     )
     OFFICIAL CAPACITY; AND    )
10   BEXAR COUNTY, TEXAS,     )
                         )
11        DEFENDANTS.   )
                         )
12   *******************************************************
13          REPORTER'S CERTIFICATION
         DEPOSITION OF SERGEANT PETER GAMBOA
14             July 23, 2024
15        I, Anica Diaz, Certified Shorthand Reporter in
     and for the State of Texas, hereby certify to the
16   following:
17        That the witness, SERGEANT PETER GAMBOA, was
     duly sworn by the officer and that the transcript of the
18   oral deposition is a true record of the testimony given
     by the witness;
19
          I further certify that pursuant to FRCP Rule
20   30(f)(1) that the signature of the deponent:
21        __X__ was requested by the deponent or a party
     before the completion of the deposition and that the
22   signature is to be before any notary public and returned
     within 30 days from date of receipt of the transcript.
23   If returned, the attached Changes and Signature Page
     contains any changes and the reasons therefor;
24
          _____ was not requested by the deponent or a party
25   before the completion of the deposition.
```

Page 255

```
 1        I further certify that I am neither counsel
     for, related to, nor employed by any of the parties or
 2   attorney in the action in which this proceeding was
     taken, and further that I am not financially or
 3   otherwise interested in the outcome of the action.
 4        Certified to by me this 9th day of
     August, 2024.
 5
 6
 7
 8        Anica Diaz, Texas CSR(8021), RPR, CRR
          Expiration Date:  08-31-24
 9        Veritext Legal Solutions
          Firm Registration No. 571
10        300 Throckmorton Street, Suite 1600
          Fort Worth, Texas 76102
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 256

```
 1   Chrles Frigerio, Esquire
 2   csfrigeriolaw@sbcglobal.net
 3                August 9, 2024
 4   RE:   Schott, Alek v. Babb, Joel Et Al
 5   7/23/2024, Peter Gamboa (#6680575)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   clientservices-va@veritext.com
16   Return completed errata within 30 days from
17   receipt of testimony.
18      If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

| & |
| --- |

**&**  2:18

| 0 |
| --- |

**00706**  1:6
254:7
**02**  3:3
**04**  3:4
**05**  3:7
**07**  234:24
**07/23/2024**
252:3
**08-31-24**  255:8
**0:30**  230:12
231:15 232:10
**0:40**  231:15
232:11,12
**0:56**  232:12

| 1 |
| --- |

**1**  254:20
**10**  141:4,5
225:3
**10,000**  133:25
135:11
**100**  4:14 160:5
160:9
**10k**  132:12,13
**11**  113:6 227:4
**111**  1:23 2:13
**11:06**  78:13
**11:07**  78:19
**11:17**  78:20
**11:25**  78:20
**11:30**  227:3,6
**11:56**  102:17
**12**  51:24 62:12
62:14 113:6

117:3,8 225:4
**12:35**  135:18
**12th**  226:25
237:8
**13**  229:19
230:11
**14**  55:24
225:16
**15**  51:25 83:20
**151**  49:11
**16**  4:3 138:20
235:7,10,12
**1600**  255:10
**1604**  157:12
**166**  139:15
140:14 150:3
**16th**  12:4
206:25 220:20
220:23 221:7
**18**  63:14 66:18
67:5 87:3,7
88:4,19 90:19
90:21,23
160:19
**18th**  221:15,18
244:25
**19**  4:9
**1:30**  234:2,3
**1:36**  234:3
**1:40**  135:18
**1:47**  234:5,15
**1st**  68:12

| 2 |
| --- |

**2**  234:24
244:20,21,23
**2.5**  236:13,17
236:22

**20**  68:10 128:4
138:12,13
141:22
**200**  2:18
**2005**  72:8
**201**  46:15
**2017**  206:5,6
**2019**  44:5,7
66:10,17,22
70:4 123:23
124:4
**2020**  66:18,24
67:5 68:9 69:3
70:4,24 75:6
124:2,3
**2021**  70:25
124:3,4,9,12
204:18,25
**2022**  68:11,13
70:19 71:2,3,3
71:15,17 75:6
137:17,18
206:25 207:10
212:13 220:17
220:20,23
221:15,18,22
226:25 237:8
**2023**  99:16
197:5 202:20
248:10
**2024**  1:13,19
245:15 248:10
253:19 254:14
255:4 256:3
**21**  70:19 71:3
96:2,15
**210**  2:14 96:3,9

**2162**  235:17
**2167**  236:25
237:4,14
**2168**  237:14
**21st**  68:11
**22**  47:4 226:12
226:19
**22203**  2:8
**225**  4:5
**229**  4:6
**23**  1:13 47:9
63:22 190:14
245:14 254:14
**235**  4:3
**23rd**  1:19
243:4
**24**  190:13,14
226:14
**245**  3:7
**248**  3:8
**252**  3:10
**254**  3:11
**26**  14:19
**271-7877**  2:14
**2:00**  38:6
**2:07**  234:15,17
**2:39**  181:7
**2:50**  181:7

| 3 |
| --- |

**3,000**  134:1
**30**  5:11 13:10
51:22,22
132:24 139:19
157:13 180:19
180:23 227:4
230:11 231:16
232:6 233:9

Peter Gamboa
July 23, 2024

**[30 - able]**

Page 2

243:16 254:20
254:22 256:16
**300** 255:10
**32255** 255:7
**33** 246:22
**35** 29:22
103:17,20
157:12 170:18
**3922** 96:10,11
**3:00** 210:17
**3:37** 215:7
**3:49** 215:7

**4**

**4** 95:25
**4/12** 226:12
**40** 231:16
232:6
**465** 1:23 2:13
**4700** 2:18
**476-4600** 2:19
**480-5936** 2:5
**49** 183:20
**4:00** 103:5
210:18
**4:46** 1:20
251:17
**4th** 99:16

**5**

**5** 5:11
**50** 4:4 225:10
225:11
**508-3922** 96:3
**508-3992** 96:9
**51** 4:6 183:20
229:1,2,16
**512** 2:5,19

**53** 4:7 65:23
66:1 94:8
**56** 233:8
**571** 255:9
**5:00** 19:15 33:4
**5:23** 1:6 254:7
**5:40** 227:1
**5:41** 226:20

**6**

**6** 13:10 243:16
**64** 4:9 94:13,15
96:7,12 97:7
**65** 4:10 95:18
95:19
**66** 4:8,12 98:1
98:3,5
**6680575** 256:5
**67** 4:13 100:3,4
**682-9320** 2:8
**6:00** 38:5
**6:04** 237:8

**7**

**7/23/2024**
256:5
**70** 132:25
**703** 2:8
**720** 89:14,22
89:24 90:1
102:5,13
**76102** 255:10
**78205** 2:13
**78701** 2:4
**78723** 2:19

**8**

**8021** 255:8

**816** 2:4
**8:00** 103:5,12
210:17

**9**

**9** 85:22,23,24
86:1 90:5,6,8
157:24,24
181:19,24
182:6 185:5,21
186:3,6,10,11
186:12,13,13
186:17,20,25
187:6,8,12,18
187:20,24
188:4,7 190:7
190:24 191:5
191:22,24
192:2,3,17
193:22,24
196:24 197:5
197:25 198:8
199:3 201:4,5
201:8 202:13
202:16,21
204:11,17
205:3,12 206:7
206:12,15,20
207:4,6,10,11
207:14,17,18
207:19,20,22
207:22,23,24
208:7,14,18,19
210:9,23,25
211:4,16
212:10 213:1,1
213:13,17,24
213:25 229:22

229:24 230:3,5
230:5,7 245:12
245:21,22
246:1,2,5,16
246:17 248:9
248:12,14
249:2,17,20
250:5,7,8,12
250:14 251:7
256:3
**9's** 186:21
190:25 192:6
192:13 204:12
204:15,24
210:10
**90** 186:20
**900** 2:7
**901** 2:7
**94** 4:9
**95** 4:11 186:20
**970** 2:4
**98** 4:12
**9:29** 1:20 5:2,4
**9th** 255:4

**a**

**a.m.** 1:20 5:2,4
78:20,20
**abandoned**
64:16,24
**ability** 52:15
179:24
**able** 10:21 52:5
55:4 67:20
87:20 135:12
145:6 171:23
189:19 198:23
198:25 200:23

223:25 224:12

**above**  1:18
77:9 112:25
115:11 131:20
153:23 253:3
256:6

**absolutely**  6:21
7:2 8:6 163:24
246:4

**abuse**  124:24
198:17,18

**academy**  14:22
15:2,3 44:16
67:22,25 68:19
70:3,5,13,22
92:2,4 104:14
104:15,16,22
130:19,19,21
130:25 131:2,3
131:15 247:10
247:13,21

**access**  80:5
139:6,12
140:14,20,21
141:8,13,19
144:9 145:6
150:1,7,8,9
179:1

**accident**  156:9

**accidents**  47:8
189:17

**accord**  59:10

**accuracy**  256:9

**accurate**  228:8

**accurately**
229:11

**achieve**  101:18

**acknowledged**
253:15

**acknowledg...**
256:12

**acquire**  247:8

**acronym**  79:2
79:22

**acronyms**
21:10,21

**act**  175:15

**acting**  18:14

**action**  1:6
224:16 254:6
255:2,3

**actions**  194:5,5

**activate**  145:5

**activated**
145:16,17,19
146:7

**active**  35:7
37:1,1 70:8
171:13

**actively**  36:13

**activities**  18:23
19:1,3 37:4
40:25 41:7
45:17 126:16
127:14 136:9
205:9

**activity**  47:20
73:4 129:20,24
130:3 188:12
188:18 245:4,4

**actual**  18:1
46:16 47:1
113:16,18
228:1,2

**actually**  35:18
52:4 97:1
141:25 149:15
164:5 207:21
214:4 227:8
232:9

**ada**  123:16

**add**  56:12,15
65:23 159:15
169:16 244:2

**added**  61:25
159:10 228:4

**addition**  26:12
161:16

**additional**
30:20 101:7
194:2 238:25

**address**  240:12

**admin**  176:20
176:23

**administration**
67:13 70:20
206:10 210:1
247:21

**administrator**
144:25 145:7
218:8,12

**administrators**
139:18 218:9

**admitted**
235:11

**adult**  67:10

**advise**  170:4

**affairs**  4:3
220:5,7 235:15

**affecting**  25:3

**affix**  253:2

**afraid**  192:3

**afternoon**  38:6

**age**  194:24

**aged**  209:24

**agencies**  20:24
21:3,17 22:4
22:19,21 23:2
23:18 25:1,3
25:11,12

**agency**  82:9
150:8 218:11

**aggressive**  51:8
188:25

**ago**  90:10
190:20

**agree**  13:16,20
13:23 34:21,22
34:25 186:22
188:12

**agreement**  5:10

**agreements**
21:16

**aguillama**
87:22

**aguillon**  50:25
51:5,20 52:23
53:10 54:5
57:5 86:10
87:23,24 88:1

**ah**  71:3 75:13

**ahold**  28:2
113:6,14

**air**  246:17

**airport**  100:19
100:23 101:9
101:10

**al**  256:4

**alcohol** 10:25
21:15
**alek** 1:3 5:20
181:14 220:6
230:9,19 254:3
256:4
**alert** 31:1
144:23 149:1
149:17 163:7
170:22 171:1
171:15,22,24
171:25,25
187:18 216:2,4
216:14 217:1,2
217:8,23 218:3
219:6,13
223:11,12
224:8
**alerted** 157:24
187:8,12 224:6
246:18
**alerts** 30:22
144:18,19
145:1,4 149:11
171:3,13
187:20 215:12
215:13,22,23
218:3,7,10,13
218:16,23,25
219:1,17
**alignment**
60:12
**allotted** 256:19
**allow** 222:23
**allowed** 147:17
**allows** 143:10
143:14

**alongs** 85:2
**alongside**
55:22
**amazed** 247:1
**amazing**
205:20
**amber** 171:25
**ambiguous**
64:19
**amount** 134:24
188:3 239:6
**amounts**
180:12
**analysis** 48:23
49:13,19,22
83:12,19
**analyst** 49:3
**andy** 72:15,16
**angela** 20:21
76:6
**angle** 113:24
**anica** 1:20 6:4
6:18 77:18,18
254:15 255:8
**animal** 191:21
**animals** 191:11
**announcement**
61:21
**answer** 8:22,23
9:4,6,12,13,13
9:17 47:14
64:19 67:1
157:18,21
163:9 165:11
166:5 174:6
**answering** 8:24
9:23 113:4
238:7

**answers** 8:9
10:17 30:6,6
156:13,17
157:2 158:4,13
158:16,21,22
159:3,7,13,14
161:12,13
162:25 163:12
163:15 180:24
185:11 222:24
**anti** 17:11,15
71:16,21 73:15
73:17 74:2
**antigang** 15:20
**antonio** 1:2,23
2:13 14:16,22
14:24 15:4
24:21 25:12
27:10 29:1
50:17 254:2
**anybody** 12:22
13:3 20:5 33:8
45:4 135:23
150:8 179:4,6
179:16 180:9
**anymore** 47:21
63:20
**anyplace** 229:6
**anytime** 217:6
**apologies** 234:5
**apologize**
95:20 97:5
**app** 152:5,18
231:20,20,23
232:20 233:7
**appearance**
231:13

**appearances**
3:3
**appeared**
253:11
**applicable**
256:8
**applicants**
62:10
**appointment**
121:18
**apprehension**
143:4 202:9,10
203:10
**apprehensive**
202:7
**approached**
44:11,14
**appropriate**
183:22
**approval** 22:18
93:1,11 123:4
**approve** 93:8
122:24 123:9
124:7,16,21
**approved**
92:25 98:13,24
101:16 130:20
137:23
**approving** 99:7
**approximate**
190:12 206:3
**approximately**
114:5 220:14
227:1
**april** 44:7
68:11,12 69:3
70:19 71:3
75:6 220:16,17

221:21 226:25
237:8 245:15
**area**  33:13
36:18 37:23
49:7 79:3,4,9
79:10 84:3,20
103:21 199:10
214:9 242:13
**areas**  18:10
25:1 32:19
33:18,20 49:17
73:3
**argue**  9:17
230:20
**arguing**  110:4
**arlington**  2:8
**arrest**  11:17,25
20:7 31:2
59:17 109:12
110:25 111:2,5
112:3 122:23
123:4,6,10
**arrested**  30:11
30:12 129:12
**arresting**  41:12
**arrests**  7:9,10
**arrive**  187:24
188:4 192:3
**artery**  83:20
**article**  186:15
195:21
**asap**  113:13
**aside**  80:12,16
112:2 147:17
149:7 153:22
155:22
**asked**  9:10
142:6 157:15

157:20 179:8
185:18 198:3
220:10 238:4
240:16,20
244:25
**asking**  8:22
11:5 13:2 23:4
50:15 127:1
163:8 164:14
180:15,17
184:21 186:1
238:3
**asks**  186:9
238:3
**asleep**  189:25
**aspect**  90:24
**aspects**  40:16
192:2
**ass**  232:13,25
**assessment**
28:9 39:24
**asset**  132:6,9
132:19 133:8
133:12,18
134:4 135:1
**assign**  125:5
**assigned**  16:1,6
16:8,8 22:1
25:15,16 27:3
28:2,14,15
31:24 32:18
33:10 38:3
39:8,25 41:17
46:10 47:11,15
48:2 49:3 51:6
51:10 54:21
70:3 74:23
76:9 77:25

86:1 118:2
131:1,21
195:21 207:21
208:4,4,25
209:1,8 210:1
210:9 211:14
212:14 247:10
247:11
**assigning**
105:14
**assignment**
27:3 45:20
46:3,11,19,20
105:9 117:10
192:13
**assignments**
39:14 46:2
**assist**  57:24
**assistance**
246:9
**assistant**
129:22 130:2
175:24 193:8
**associated**
69:13 99:25
**assume**  144:2
146:12,25
147:1 231:22
238:24
**assuming**
82:21
**assumption**
146:25
**atascosa**  57:22
**atf**  21:6,14
**attached**  1:25
97:23 254:23
256:11

**attack**  192:7
196:20 205:16
**attend**  14:22
88:2 89:14,17
90:8,9
**attended**  34:7
88:3,4 90:4
91:24 248:16
**attention**
120:17 184:18
189:15,24
199:22 200:8
**attorney**  9:9
255:2 256:13
**attorney's**
132:8,16
**attorneys**  11:4
136:1
**atypical**  17:23
**auditing**
120:20
**august**  14:18
255:4 256:3
**augustine**
77:17
**austin**  2:4,19
**authority**  83:3
**auto**  17:25 89:6
**automated**
118:24
**automatic**
148:20,20
**automatically**
122:24 147:20
171:1,4
**available**  61:8
210:15 213:1
213:13 256:6

**avenue** 2:4
**avoid** 10:4
    165:25
**avoiding** 197:2
**aware** 190:5
    241:1
**axon** 117:2,7
    117:10 119:1
    120:23 121:3
    142:16,18
    143:7,20 144:6
    144:7,12 145:2
    145:6,9 147:22
    150:10,11
    244:17

**b**

**b** 4:1 5:11
    13:10 235:10
    243:16
**babb** 1:5 2:16
    4:5,6 6:8 60:16
    60:19 61:9
    106:7 114:1
    150:20 152:3,4
    152:22 153:12
    181:10,16
    182:8,13
    215:17 217:2
    218:15 220:24
    221:8 222:19
    223:3,6 224:1
    227:11,16,19
    229:13 230:15
    230:19 231:4
    231:19,21
    232:1,3,12
    233:23 234:12

234:20 235:5
254:6 256:4
**babb's** 12:4,5
    12:12,21
    223:21,23
    225:14 234:8
    234:19,21
    238:20
**back** 29:15
    33:3 39:3 41:3
    42:9 49:24
    51:3 55:5,16
    56:22 59:2
    61:1,4 78:18
    78:21 79:1
    86:11 90:5
    97:7 103:25
    109:7 110:22
    132:11 135:19
    136:6 154:16
    155:2 160:13
    160:16,19
    162:5,18
    163:17 175:22
    176:20 185:13
    192:25 193:12
    199:24 200:1
    204:8 210:3
    215:8,14
    222:23 223:4
    223:24 230:4
    239:7 240:14
    240:20
**backtrack**
    57:16
**backup** 106:6
**bad** 9:11 38:15
    114:14

**bag** 154:14
    165:13 223:15
**bags** 168:5
**balancing** 52:9
**bargaining**
    56:14
**base** 40:8
**based** 134:20
**basic** 6:23
**basically** 6:15
    33:17
**basis** 24:5
    195:23
**bates** 225:22
**bathroom** 9:21
    78:15,17
**batteries**
    104:18,20
**bb** 95:17
**bc** 235:17
    236:25 237:4
**bc307** 225:21
**bear** 5:25
    105:18 225:8
    225:10
**becoming**
    162:24
**bed** 223:4,14
**began** 5:2
    85:14 206:6
**beginning** 70:4
    116:25 117:14
    127:9 130:21
    204:18,25
    229:18
**begins** 227:9
    229:9,20
    230:13 231:18

232:8 233:10
**behalf** 34:10
    206:21
**behavior** 158:4
    158:8,14,21
    159:14 161:12
    189:10
**behavioral**
    83:12,19 87:13
    159:8
**believe** 61:25
    62:12 71:24
    77:11 86:1
    88:24,25 89:19
    95:9 138:2
    139:14 147:14
    151:4 157:13
    174:3 187:25
    201:9,9 203:13
    203:15 205:1
    209:21 210:17
    215:14,17
    220:4 221:1,12
    223:14 227:21
    228:13 238:2
    245:14 246:11
    246:11,12,22
    248:11 250:11
    250:13
**belongs** 95:9
**ben** 77:22,23
    77:24
**best** 10:22
    34:14,20 39:23
    63:22 74:14
    174:22,23
    240:12 246:2

**bet** 77:18
**better** 119:20
  194:20
**bexar** 1:9
  13:15,17,21,24
  14:18,23 15:2
  57:23 78:1
  91:1 96:18
  149:25 150:1
  152:15 157:17
  173:23 194:7
  195:1,2 242:13
  245:12 246:21
  247:17 249:8
  251:8 254:10
**beyond** 115:11
**big** 14:13 60:2
  127:24 132:9
  166:1,11 193:1
**biggie** 126:5
**bike** 14:6
**billy** 84:23
**bird** 188:22
**birds** 188:23
**bit** 14:2 17:10
  17:14 31:20
  37:17 49:25
  51:2 57:17
  62:15 65:15
  72:6 74:7 82:2
  87:21 91:6
  92:17 103:25
  105:13 106:7
  109:7 110:22
  115:11 120:1
  126:14 132:11
  149:23 150:16
  154:23 178:2

190:1 191:14
  191:15,16
  197:11 219:21
  244:20 250:19
**black** 178:4
**blanca** 49:9,10
**bland** 175:15
**bleep** 160:5,10
**blessed** 54:20
  55:3
**blue** 169:25
  170:17
**board** 60:17
  84:9 153:23
**body** 12:11,12
  12:15,21 87:13
  104:17 116:23
  117:21,25
  118:3,11,18
  119:3,9 145:25
  146:18 177:11
  181:10 222:22
  223:20,21,22
  230:5,7 234:6
  234:8,19,22
  238:19,20,21
  244:17
**bomb** 186:12
  186:13,17
  195:17,18,20
  202:2
**bombs** 206:16
**bonuses** 115:24
**book** 178:13
  179:7,13,16
**books** 179:1,8
**border** 21:8
  24:3 29:2,21

159:5
**boss** 77:1
**bosses** 212:8
**bother** 176:22
**bottling** 14:13
**bottom** 66:19
  235:18
**boulevard** 2:18
**box** 97:20
  118:20,20
**brain** 195:12
  195:13
**brazos** 177:21
**break** 9:20,23
  10:2,13 77:20
  78:12,15,17,18
  78:20,22 105:6
  114:12,16
  130:9 135:16
  135:18,18
  181:5,7 189:7
  215:1,7
**breakdown**
  183:18 202:1
**breakfast**
  106:8,18
**breaks** 196:25
**brian** 76:8
  211:25,25
**brief** 215:1
**bring** 121:19
  130:6 131:22
  149:2 176:7
  192:19 214:3
**bringing** 35:18
**brings** 122:13
**broader** 122:13
  186:9

**broken** 176:19
**brought** 35:22
  90:19 199:22
  209:14
**brush** 199:9
**bucket** 123:5
  124:22 125:16
  131:18 154:15
  163:15
**buckets** 18:13
  19:2
**bucky** 207:20
  208:3
**buddies** 28:16
**budget** 58:13
  130:25 131:3
  131:12 244:10
  244:13 247:7
**build** 38:25
**building** 21:6
  83:4 136:20
  154:11 180:25
**builds** 29:7
  38:25
**bulletins** 25:22
**bunch** 12:9
  135:13 140:2
  155:1 162:7,12
**bureau** 16:2,3
  16:7,8 67:11
**burglaries**
  17:25 49:12
**bus** 200:12,15
**business** 137:8
  239:1
**busy** 121:17
**butt** 116:10

**button** 25:9

**c**

**c** 2:1 5:1
  147:12,13
**cad** 169:7,12
  169:13 170:7
**call** 4:5,6 6:25
  27:24 28:16
  42:3,20 43:7
  43:21 55:18
  103:15 104:1,3
  104:8,8 106:14
  106:17 109:24
  111:17 112:4
  112:23 113:3,3
  113:6,7,12
  116:7 122:8
  128:19 129:2
  157:23 176:5
  185:5,21 186:3
  186:10,13,16
  186:25 187:2,5
  193:2 207:25
  213:9,16,17,24
  214:16 220:11
  222:14,23
  223:17 224:18
  224:23 225:2
  227:11,12
  235:5 236:23
  237:21,25
  244:2
**called** 5:13
  150:21 181:19
  192:23 207:23
  210:22 214:9
  220:6,13

221:14 222:2,4
222:5,7,11,16
222:17,18
223:24
**calling** 19:4
  58:1 113:15
  207:19 222:8
  223:18
**calls** 23:17 36:9
  36:11 42:6,8
  42:18 43:17
  136:3 186:20
**cam** 143:8,10
  143:15 144:4
  146:18 177:11
  222:22 223:20
  223:22,22
  234:6,8 238:19
  238:20,21
  239:10
**camaro** 170:1
  170:17
**camera** 12:11
  12:12,15,21
  116:24 117:21
  117:25 118:4
  118:11,18
  119:3,10
  120:20 121:1,3
  121:6,10,23
  122:7,11 143:1
  143:18 144:22
  145:10,13,14
  145:25 146:2,6
  146:13 148:17
  148:25 181:10
  221:9 225:14
  230:6,7 234:19

234:22 235:1
  244:17
**cameras**
  138:19 142:1,5
  142:8,8 148:22
**cams** 104:17
  142:19 146:18
  146:21
**cannister**
  223:15
**canvassing**
  18:10,18 19:4
**capacity** 1:6,8
  1:9 15:23
  254:7,8,9
**captain** 13:12
  34:10,13,19
  77:14 91:17
  177:25 206:21
  243:24 244:25
**capture** 8:14
**captured** 229:7
**capturing**
  228:11
**car** 30:7 39:1
  104:21 114:21
  114:22 120:16
  138:19 139:6
  140:25 150:15
  152:13 155:12
  155:17 156:9
  160:7,11,13
  165:20 168:4
  170:24 171:14
  180:10,11
  217:10 238:22
  246:13,18,19

**card** 213:25
  253:13
**care** 192:19
**career** 7:8
  14:17 56:18
  92:24
**carotid** 83:20
**carry** 104:20
  171:5
**carrying** 163:4
  163:19 168:19
**cars** 90:18,20
  137:11,15
**casa** 49:9,10
**case** 5:20 33:13
  94:21 127:17
  135:23 136:5
  146:3 151:6,6
  187:25 195:20
  219:22
**cases** 125:6
**cash** 132:18
  135:13
**catch** 98:16
  151:23 153:10
  154:7 187:10
**categories**
  18:22 37:13
  38:13 65:9
**category** 38:14
  38:23 62:20
**cause** 1:19 29:8
  32:11 51:12
  85:15 122:22
  153:18,21
  154:8,17
  155:16,17
  157:23 160:1

233:1 238:13
246:15
**caveat** 31:12
**ccp** 56:7,8
**cell** 94:18,19,20
186:14,15
**center** 24:21,23
24:24 25:14,17
25:18,23 26:19
27:9,10,21,24
28:6,14,20,22
29:6,14 30:1
30:15,19,23
67:15 241:19
242:9
**centers** 28:19
242:12
**certain** 49:7
62:19 80:3,5
82:9 83:7,10
87:15,15 94:24
94:25 107:11
132:8 145:15
145:19 146:1
151:1 196:5
**certificate** 3:11
**certification**
249:9,11 251:5
254:13
**certifications**
249:17
**certified**
193:11 246:5
247:3 249:7
250:11,14,25
254:15 255:4
**certifies** 249:6

**certify** 250:12
254:15,19
255:1
**certifying**
249:1
**chain** 28:6,7
93:12,19
**challenge**
230:21,24
231:10,12
239:19
**challenging**
230:8
**chance** 105:2
193:4
**change** 103:3
169:1 206:6,10
210:5 252:4
**changed**
132:25 205:18
205:18 214:22
**changes** 3:10
252:1 254:23
254:23 256:10
**chapter** 11:23
11:25
**chapters** 11:21
12:20 61:25
62:2,4,4,17,19
**characterizati...**
239:23
**characterize**
174:19
**charge** 74:17
**charges** 31:3,4
**charles** 1:22
2:11,12,12 6:9
6:10 66:2

95:14 96:20
225:23
**charlie** 6:10
**chart** 4:8 65:17
66:9,15,18,21
66:22,25 67:2
68:10,13,17
71:17 73:11
**chase** 64:12
**chases** 47:7
**chat** 106:2
150:21,25
152:5,20
**chebert** 2:5
**check** 110:4
118:20 169:6
169:12 173:12
175:1,3 176:7
226:5
**checked** 173:16
**checking**
169:13 175:9
**checks** 29:21
**chevy** 169:25
**chief** 67:14
70:20 72:14,16
72:17 77:12,12
89:23 93:12,12
127:21 128:9
128:10,19
129:2 130:5
137:24 193:8,8
196:18 224:13
**chiefs** 134:19
**child** 124:23,24
166:18,21
171:21

**children** 7:17
166:1
**choice** 43:3
119:20
**choose** 176:17
**chose** 40:11,12
51:9
**chris** 51:10,23
**christen** 2:3
**christie** 5:19
6:3
**christopher**
50:25
**chrles** 256:1
**chunk** 132:9
**cid** 49:16 57:9
77:15 130:21
247:23
**circles** 238:20
**citation** 114:17
173:2 175:5,8
175:14,20,21
175:22 177:8
177:13 181:17
181:22 182:9
182:14,15
189:11 231:6,9
**citations**
176:10,17,22
189:10
**cite** 173:17
**cited** 230:23,25
**city** 14:15
208:10,14,20
**civil** 1:6,24
7:13,17 56:12
56:13 254:6

civilian   49:3
   77:25
cjis   147:9,12
claim   101:11
   101:11
claimed   238:9
claiming   23:18
clarify   8:19
   99:1
class   88:16,19
   89:5 90:8,9
   92:22 93:25
   99:17 105:3
classes   44:17
   51:18 86:7,8
   86:11 87:1,2,3
   87:4,8,8 88:4,4
   90:4 92:3
classification
   45:15
classified   45:12
clean   78:23
   96:21
cleaned   97:4
clear   8:7,8,9,21
   10:18 72:7
   167:10 219:5
clearheaded
   11:2
clearly   54:13
clientservices
   256:15
clip   10:8,12
   225:13 227:22
   227:23,23
   228:4 230:15
   233:12 234:18

clips   10:7
clock   226:14
close   109:4
   111:20,21
   112:4,11 215:3
closer   215:4
closing   235:24
clothes   31:22
   165:13
clothing   23:8
clue   163:2
coach   114:13
coaching
   115:13
code   56:7,9
coffee   190:1
coincided
   223:21,22
collar   198:4,5,9
   198:12,19
colleague   6:3
   94:15 98:4
collect   24:25
collected   92:10
collective   56:14
collects   117:11
college   14:24
   15:4 54:1,2
collin   50:11
color   66:5
come   14:5 20:4
   24:16 25:23
   29:1 31:23
   55:5,19 74:10
   78:18 84:2
   90:11 104:15
   105:4 106:6
   110:7 125:3

130:14 131:6,9
   131:10,12
   144:19 157:6
   162:5 163:17
   166:15 169:2
   171:18,20
   172:2 174:2
   184:2,18
   192:25 204:8
   207:25 223:8
comes   50:18
   93:2 95:13
   115:8 146:2
   165:12 221:6
comfortable
   188:17
coming   36:17
   57:23 78:21
   83:5 84:4,9
   101:10 119:23
   137:5,6,7
   141:5,6 160:7
   168:3 180:7
   246:13
command   28:7
   93:12 128:12
   211:13
commander
   15:8 26:9,13
   70:5 71:10,11
   74:13 75:5
   211:9,13
   212:11
comment   118:8
committed
   107:7
committing
   19:12 188:18

189:12 215:24
communicate
   105:21 112:20
   127:5,19
communicated
   45:15 126:15
communicati...
   112:24 142:11
communicati...
   58:2
community
   37:15 43:10
   81:16
companies
   82:6,8 88:7
   137:3 141:9,13
company   14:13
   164:11
comparable
   53:12
compare   50:11
compartment
   87:4,8 88:3,16
   89:5
compartments
   82:16,21 88:25
   90:18,21,22
   91:2,3
compel   243:6
compile   126:23
complain   114:9
   114:11 221:14
complained
   148:2
complaining
   220:8,9
complaint
   129:4 148:1

184:2,19 220:5
220:7,14 221:2
221:18,21
222:3,10,11,19
223:2 224:1,5
227:20 235:25
240:11
**complaints**
36:16 37:3,8
116:5 224:13
**complete**  92:13
107:17,22
108:3,6,8
110:8,10,18,21
110:24 129:24
169:2
**completed**
109:14,21
110:14,20
123:10 124:15
125:19 256:16
**completely**
64:24 200:10
251:8
**completing**
109:11
**completion**
254:21,25
**compliance**
67:11 147:10
147:12
**comply**  243:5
**computer**
105:25 106:1,2
117:11 169:6
169:13,13,15
169:19,20
249:22

**concentrate**
37:20
**concentrating**
49:13
**concentration**
47:25
**concept**  50:8
**concern**  189:15
**concerns**
238:25
**conclusion**
33:20 58:16
**conduct**  18:10
20:6 48:18
85:13 174:15
238:25 239:1
241:9
**conducted**
111:18
**conducting**
15:24 115:16
117:25 120:13
153:16 174:4
182:20 213:8
213:11,15
**conference**
90:5
**confidential**
18:8,14,15
19:3
**confirm**  24:5
149:5 228:7
**confirmed**
235:15
**conflicting**
156:12
**confuse**  199:16

**confused**  79:15
**congratulatio...**
14:20
**congress**  2:4
**connect**  142:2
158:14
**consent**  156:1
182:21,25
183:6,9,10,11
183:15,16,18
183:18,21,23
183:24 184:10
184:18,24
185:4,15,18,19
**consented**
184:21
**consideration**
253:17
**consistent**
158:15,16
185:11
**consulting**
113:17
**contact**  24:4
29:13 30:3,3
37:2 51:14
154:10 157:15
157:21 162:16
162:17 163:3
165:25 169:4
169:10 171:23
172:10 173:21
180:8,20 217:2
217:3
**contacted**
180:8
**contacting**
113:15

**contacts**  37:6
**contains**
254:23
**context**  165:20
188:20 228:16
**continue**  190:2
215:3
**continues**
234:4,16,25
**continuing**
92:5
**contraband**
80:5 101:12
155:9 183:7,13
**contract**  56:14
138:8
**contracts**  23:16
**contradicting**
30:6
**control**  205:17
**conversation**
4:9 8:25 10:16
24:10 28:17
45:5,6 94:18
95:1 96:6 97:8
136:19 151:25
157:7 184:4,8
185:25 227:19
228:2,6 229:11
230:16 233:20
233:25 238:16
**conversations**
13:1,3 53:2
94:25 95:1
126:17
**converse**  208:7
208:9,10,14,20
208:21

| | | | |
|---|---|---|---|
| **cook** 164:3,4,5 | 82:24 84:10 | 185:17 187:7 | 244:25 255:1 |
| **cop** 89:17,20 | 85:6 88:20,22 | 188:8 193:20 | 256:14 |
| 90:11,25 91:19 | 92:14 93:14,20 | 194:3 199:23 | **counterpart** |
| 102:10,11,13 | 96:18,19 97:1 | 199:24 201:3 | 20:16 |
| 119:24 | 98:12 99:12 | 201:16 202:19 | **counties** 58:2 |
| **copies** 66:6 | 101:19 104:7 | 204:13,20 | **county** 1:9 |
| 94:15 176:18 | 105:10,12,15 | 205:22 206:24 | 13:17,20,21,24 |
| 256:14 | 107:4,18 109:5 | 207:1 208:15 | 14:18,23 15:2 |
| **copy** 66:2 | 109:25 111:1,6 | 209:6 211:1,17 | 30:11 32:19 |
| 123:18 175:18 | 115:1,17,20 | 211:20 212:3,7 | 33:18,21 34:11 |
| 178:22 | 117:12,23,24 | 212:19,21,23 | 35:3 49:7,11 |
| **corner** 226:6 | 118:13,16,25 | 213:5,18 | 50:11 57:22,23 |
| **correct** 7:12 | 119:5,7,16 | 214:20 215:13 | 57:25 78:1 |
| 11:22,24 12:1 | 120:3,11 124:6 | 215:25 216:21 | 89:20 91:1 |
| 12:1,14 13:11 | 124:14,14 | 217:9 218:8,14 | 94:19,20 95:24 |
| 13:13,22 18:17 | 125:14,21 | 219:16 221:23 | 96:18,24 |
| 18:19 26:4 | 126:9,11 | 222:1,13 226:6 | 103:19,20 |
| 27:7,23 30:17 | 127:25 128:11 | 226:17,18 | 105:20,20 |
| 30:21 32:14 | 130:1 131:19 | 227:2 228:21 | 115:24 149:25 |
| 34:3,6 35:13 | 131:19 132:4 | 229:6 230:18 | 151:24 152:15 |
| 37:13,16 38:18 | 132:17 133:11 | 231:8,11,25 | 154:6 157:12 |
| 38:22 42:14,16 | 133:14 134:2,5 | 233:2 234:1,14 | 157:17 173:23 |
| 42:19 43:19,23 | 134:8 137:13 | 234:23 235:2 | 194:8 195:1,2 |
| 44:1,3 45:3,14 | 139:4 141:20 | 241:6,7,7,12 | 206:22 221:14 |
| 52:14,17 58:15 | 143:16 144:1,8 | 242:11 244:23 | 222:21 242:13 |
| 59:12 60:7,15 | 146:14 148:15 | 248:13,23 | 244:21 245:12 |
| 60:21 61:6,19 | 150:11 151:15 | 251:3 253:3 | 246:21 247:18 |
| 62:6 64:8,13 | 152:6 153:24 | **correcting** | 249:8 251:8 |
| 64:18 65:10,14 | 155:4 157:3 | 119:15 120:10 | 253:9 254:10 |
| 66:11 68:1,14 | 158:23 159:12 | 120:12 | **county's** 6:9 |
| 68:20 69:12 | 161:2,15,18 | **correctly** 35:21 | 13:15 34:8,14 |
| 70:25 71:10,22 | 162:9 165:5 | 99:19 115:19 | 95:24 132:3 |
| 73:18,20 74:18 | 167:9,13 | 229:7 236:15 | 150:2 |
| 74:18 75:12,16 | 168:12 169:22 | **counsel** 2:2,10 | **couple** 7:3 |
| 76:14 77:7 | 171:9 172:1,15 | 2:16 5:5,10 6:9 | 35:14 39:3 |
| 78:3,5 80:6,7 | 172:20,22 | 6:9 9:14 13:2 | 69:13 78:23 |
| 80:14,23 81:1 | 175:2,6 178:21 | 79:20 95:25 | 84:20 121:22 |
| 81:17,21 82:4 | 182:10,16 | 243:9,25 | 130:8 193:12 |

226:24 229:16
236:25 248:7
**courier** 29:10
29:10 31:1
48:17 214:7
215:19 219:2,2
246:11
**couriers** 41:13
65:6 136:21
218:21
**course** 19:10
25:18 36:1
40:9 47:24
62:25 63:3,6
64:6 89:15,18
89:20 116:7
131:14 137:2
**courses** 40:15
89:8 101:22
102:2,5,13,14
**court** 1:1 6:4
6:18,19 7:9 8:5
8:14 9:17
113:11,12
230:20,22,24
231:10,12,13
239:20 254:1
**court's** 243:5
**courthouse**
52:1,3 55:11
**courts** 14:16
**cover** 174:4,8
174:16 196:10
222:20 223:2,3
223:4,4,9
224:1 232:13
232:25

**covered** 91:2
**covert** 20:17
60:11,14 74:22
117:19 124:23
**cps** 171:21
**crashing** 115:8
**create** 8:7
10:18 44:9
45:5 52:8
218:15,18
**created** 40:20
40:23 42:12
60:12 66:10,12
67:24 72:13,17
75:4 105:17
217:12,23
218:24
**creates** 146:5
217:8 218:2
**creating** 44:11
44:18
**creation** 45:9
**credit** 92:9
**crime** 17:2,5,8
19:11 20:18,20
20:23 26:25
27:5 32:18
33:17,24 34:5
47:11 48:3,15
48:23 49:6,12
49:15,19,21
57:8 60:12
68:6,7,10
71:16 73:3,12
73:14 74:12,16
75:4 76:12
79:17,18 95:12
96:22 125:3

130:22 151:9
151:10 206:23
207:3,13 209:8
210:10 211:15
212:14 213:4
215:24
**crimes** 7:16,19
18:3,6,11,24
19:12 32:22
33:5,24 35:11
39:14 41:2
44:25 45:2
48:14,15 51:11
52:1 59:3,6
71:14 72:3,14
72:17,19,24
76:9 91:13
117:18 130:18
136:15 142:25
143:5 151:12
189:6
**criminal** 4:14
7:11 23:19
34:15,20 35:4
35:5,12 36:5
40:5,9,10,13
40:14,16,21,24
41:5,7,11,15
41:18,19,21,22
42:7,11,22
43:22,24 44:4
44:10 45:5,9
45:12,17,24
46:20,23 47:10
47:13 49:16,25
50:1,9,11,19
50:22 53:8
54:22 56:9,23

56:25 58:13,18
58:23 59:7,23
60:9 61:4,8
63:19 64:14,16
64:22,24 65:2
65:4,16 66:9
66:12 67:18,23
68:4,18,22
69:6,9,14 70:1
70:9 71:1
72:12 80:1,9
80:11,25 81:2
81:5,6,10,12
82:2 84:1,6,23
85:1 86:5,17
87:17 89:1
91:8,18 93:7
93:18 99:2
101:22 102:19
102:24 103:11
112:21 113:16
116:2,15,24
124:25 125:7
125:11,18
126:18 127:14
128:17 130:13
131:5,9,15,22
136:8,9,12
137:10,14
138:14,17
141:23 148:6
149:10,12
152:23 168:20
168:22 179:18
179:25 180:5
180:18,21
182:20 183:4
188:10,12,13

188:18,20
189:4 241:1,9
243:3,16,17
244:3,7,11,13
244:17 247:22
247:24
**crossed** 29:2
**crr** 1:21 255:8
**crucial** 196:16
**crushed** 199:11
199:11
**csfrigeriolaw**
2:14 256:2
**csr** 1:20 255:8
**curious** 202:24
**currency** 29:10
**current** 15:5
71:15 80:1
**currently** 15:7
16:7 48:23
49:2 72:21
73:24 75:10
77:9 133:2
249:18
**curtains** 83:10
**curtis** 76:8,15
76:22 211:23
211:25 212:2
212:11
**curtis's** 211:24
**cut** 114:15
227:25
**cv** 1:6 254:7

**d**

**d** 3:1 5:1
**da's** 22:17
84:21 132:24

**daddy's** 166:6
**daily** 24:5
241:10
**dallas** 84:19
85:7,17,22
86:4
**damage** 224:11
**damaged**
222:19 224:1
224:10
**dangers** 64:9
**dark** 160:12
199:15
**dash** 120:20
121:1,3,6,9
122:7,11
142:19 143:8
143:10,15
144:4 145:9,13
145:14 146:6
146:13,18,21
221:9 225:14
235:1 239:10
**database** 141:8
**date** 46:4 66:16
67:4 226:10,11
252:3 254:22
255:8
**dates** 190:12
**dating** 178:2
**day** 1:19 10:5
20:3 33:3
36:11 38:4
44:15 103:3,7
103:11 105:11
105:14 109:15
110:12 165:12
168:5 195:14

206:12,12
216:4,12,13
219:18 232:2,4
232:16 233:24
246:10 253:11
253:19 255:4
**daylight** 38:5
73:6 199:14
**days** 17:22
19:20,23,24,25
44:17 84:25
85:4 104:11
121:22 139:19
221:14 248:16
254:22 256:16
**dea** 21:6 22:1,4
74:23 207:22
207:23 208:4
208:25 210:1
**dead** 199:10
**deal** 17:24
39:10 62:24
207:16
**dealing** 17:8
62:24 100:19
101:9 195:7
230:2,2
**deals** 207:15
**dealt** 39:10
**debt** 35:21 36:2
164:11
**december** 47:9
63:22
**deceptive**
87:20
**decide** 93:17
100:8

**decided** 55:24
59:2
**decimate** 25:2
25:10
**decimation**
27:12
**decipher**
246:25
**decision** 137:21
**dedicated**
207:4,6,10,11
207:14,17,18
**deep** 114:2,3,7
**deer** 188:23,24
**default** 177:14
177:19 210:25
**defects** 6:14
**defendant** 2:16
**defendant's**
243:5
**defendants**
1:10 2:10
243:21 254:11
**deficiencies**
199:21,24
200:8
**definition**
37:10 41:10
**degrees** 83:20
**deliver** 32:9
48:17 246:13
**denied** 185:19
**department**
239:19 247:18
**depend** 111:24
**depends** 113:2
113:9,20
131:21 140:18

155:11 160:11
160:21 166:1
169:8 180:24
186:11
**deployment**
249:19,22,25
250:20
**deponent**
254:20,21,24
256:13
**deposing**
256:13
**deposition** 1:11
1:16 5:6 6:14
7:21 11:6 13:4
13:10,12 34:8
243:8,15,18
252:3 253:2
254:13,18,21
254:25
**deputies** 16:1,7
49:2 71:23,25
72:1,2 87:18
101:15 131:18
140:17 192:3
241:2
**deputy** 7:8
12:4,5,12,17
12:19 39:14
53:10,17 55:23
57:5,6 59:24
60:1,5,6,8,16
60:19,22,23
61:9 73:11,19
75:19 76:11,11
76:16,24 77:12
77:12 93:13,16
95:13 96:22

97:8,12 98:10
99:9,16,22
100:12 106:7
114:24,25
129:2 131:12
137:24 140:3
150:20 152:22
152:22 153:12
153:12 181:10
181:10,11,16
182:8,13 188:9
188:12 193:8
204:11,17
206:19,22
207:10 208:19
209:7 210:9,16
210:21,22,24
211:2,14,18,21
212:1,13,15
213:6,16 214:2
214:13,16,21
218:15,15
220:24 221:8
222:19 223:20
223:21,22,23
224:1 225:14
227:11,16,19
229:13 230:3
230:15,19
231:4,19,21
232:1,3,12
233:23 234:8
234:12,19,20
234:21 235:5
245:18,20,22
246:16 249:17
249:20 250:5
250:21 251:4,7

**describe** 74:14
**description**
62:7 244:3
253:13
**desert** 88:6,8
88:21 102:7,13
**desk** 58:10
**detail** 26:14
245:2
**details** 220:2
**detain** 239:18
**detained**
238:10
**detention**
14:16 15:2
16:1,2,8,24,25
49:1 67:10
90:6 201:13,15
201:17 248:16
**develop** 32:10
113:19 155:15
**developed**
156:11
**developing**
154:16 159:1
**devine** 157:13
**dialogue**
172:11
**diaz** 1:20
254:15 255:8
**difference**
35:16 81:11
**different** 12:9
21:17 25:1,1
26:8 29:24,25
40:16 47:17
54:21 55:6
65:8 72:10,20

90:20,22
105:24 122:21
127:9 130:15
145:7 148:11
160:25 161:23
162:10 166:12
166:14 192:1
194:1 205:9
225:25 226:1
**differently**
182:17
**difficult** 195:6
197:22
**digital** 18:25
**direct** 74:25
75:1 76:20
212:9 237:3
**directly** 27:25
213:16
**dirty** 154:20
**disagree** 34:18
34:23
**discover**
197:16
**discrepancies**
97:2
**discretion**
43:13,22 80:22
81:4,9 114:15
134:18 175:10
175:11 177:2
180:4 185:6
212:18
**discuss** 228:5
228:12
**discussed**
244:4

discussing
  227:20
dispatch  113:5
  213:12,24,25
dispatched
  213:7
dispatcher
  213:16
dispatchers
  170:12,16
dispute  236:19
disregard  47:7
disrupt  50:19
dissolved  69:10
distinct  11:20
district  1:1,1
  37:2 132:8,15
  254:1,1
districts  36:13
disturbance
  42:4 109:22
dividing  206:1
division  1:2
  17:2,5 20:23
  27:20,22 28:15
  49:16 67:8,11
  68:22 69:5
  71:1 72:16
  76:12 95:12
  96:23 131:7
  206:23 207:4
  207:13 209:9
  210:10 211:15
  212:14 213:4
  245:12 247:22
  247:24 254:2
divisions  72:10

dock  104:17
document  10:1
  10:4,5 253:14
documents
  9:25 107:11
  243:11,22
  244:6,9,14
dog  186:15
  191:13 192:14
  192:15,19,22
  192:23,24,25
  193:2,3,5,10
  193:11,14,16
  193:24 194:6,8
  194:10 195:3
  195:17,18,18
  195:20,21
  196:1,12,15,24
  197:12,20,20
  197:23,24,25
  198:2,7,7,23
  199:10 201:6
  201:11,13,15
  201:15,17,17
  202:3 203:3,7
  203:11 209:21
  209:25 214:13
  223:11,12
  224:6,7 238:12
  238:15 239:19
  246:25
dog's  203:2
dogs  194:14,16
  195:11,13,19
  196:18,20
  197:6 199:4,7
  199:14,17,18
  201:20 202:2

205:12,14,16
  205:16,20,21
doing  18:13
  31:21 32:1,3
  33:6,8,14 34:4
  36:14 38:7
  39:15,23 41:6
  41:10,18 43:9
  45:16 47:10,11
  48:4,8,11,23
  49:4 50:6 52:4
  52:12 53:3,6
  55:13 70:9,11
  80:9 81:13,14
  81:18 87:5
  113:17 115:6
  115:19 116:14
  117:16 118:11
  119:22,25
  121:17 125:7
  127:15 128:13
  128:18,20
  134:9,13 137:8
  148:6 149:9
  179:18 180:17
  195:16 197:9
  197:22 199:1,4
  199:13 205:14
  247:2 249:6
dollars  59:18
door  37:7
  169:9,9 223:12
  224:9
downstream
  105:19
dps  157:25
  174:4,18

draft  130:6
drafting  22:14
dramatic  205:2
drank  189:18
draw  206:1
drink  9:21
  10:25 190:1
drive  167:19
driver  30:5
  51:8 81:24
  162:21,22
  165:7,8 166:11
  166:22,23
  167:20,25
  168:1,25 169:2
  169:4,10,16,21
  173:1 175:7,13
  179:21 180:1
  182:25 184:21
  185:1 187:4
  189:15
driver's  169:8
  173:14 174:25
  184:23 238:11
drivers  29:3
  38:15,15 47:6
  241:2
driving  28:25
  36:12 64:4
  137:6 144:21
  148:21,21,22
  148:24 149:4
  151:22 152:13
  154:6,20
  157:10 160:2
  163:13 166:3
  167:7,9,14
  171:14

**dropped** 246:21
**drove** 157:25
**drug** 22:7
30:11 31:1
48:17 79:3,4,8
79:9,17,18
154:24 155:3,8
155:23 156:25
158:11,24
159:18 161:10
161:20 186:24
187:3,5 238:12
239:19
**drugs** 17:24
36:20 39:11
41:12 48:17
50:17 84:2
127:18 132:12
155:2,20
156:21 158:12
158:20,20
161:11,11
207:16
**drunk** 120:17
**dude** 39:22
**duffel** 154:14
**duh** 21:14
**duly** 1:18 5:13
254:17
**dustin** 50:25
51:5
**duties** 34:5
47:17 206:16
241:10

**e**

**e** 2:1,1 3:1 4:1
5:1,1 77:22
**eagle** 246:12
**earlier** 37:20
66:22 67:2
244:20 247:9
**early** 137:17,18
**easier** 228:25
**east** 141:4
208:12
**easy** 116:25
**eat** 106:9
**efforts** 44:9
64:16,25 80:2
81:3,5
**egregious**
31:14
**eight** 16:18
71:24,25 87:25
201:10,11,20
201:23 202:1,4
**either** 18:8
51:15 72:10
82:8 130:20,25
173:14 195:20
210:17 215:19
**el** 28:20 29:6
29:13 30:1,15
30:19,22 242:9
246:12,13
**elementary**
14:6
**ellsworth** 2:17
6:7 181:4
251:16

**email** 82:9
118:23 125:13
125:16 237:7,7
237:12,13,18
237:21,24
240:15 244:25
**emails** 139:21
140:10
**embarrassment**
88:14
**employed**
255:1
**employee**
24:21 25:13
**employer**
163:21
**encompassed**
70:22 130:16
**encompasses**
48:14
**encounter** 35:6
**encourages**
92:13
**endangering**
38:15
**ended** 58:4
63:21,23 64:15
68:5 251:17
**enforce** 189:6
**enforcement**
14:17 15:21
16:3,6,21,22
20:24 23:2,5
25:3 33:11
34:2 47:12
69:1,2,11
79:18 142:25
143:6 189:22

190:3 201:10
201:20 215:23
241:22 242:1
244:10
**enforcing**
189:5,9
**engine** 113:6,6
**english** 162:19
**enter** 169:15,18
169:24,25
170:12,25
171:14 216:16
**entered** 144:20
149:1,6,16
157:17 170:9
171:17,22
215:18 216:8,9
216:14 217:6
217:22 218:5
**enters** 216:20
216:22 217:17
**entire** 10:15
60:22
**entirely** 72:7
135:8
**entirety** 10:2
10:12 202:13
**entities** 23:3
142:15 209:5
**entries** 245:1,3
**environment**
15:22
**epic** 30:1
**equals** 201:8
**equipment**
127:1 133:9,21
134:6,10,15
149:21 176:15

**errata** 256:11
256:13,16
**esquire** 256:1
**essentially**
72:22 162:11
**estimate** 31:9
62:13 182:24
183:17
**et** 256:4
**ethic** 52:25
245:17
**evaluate** 115:3
156:25 192:22
195:22,23
198:15
**evaluated** 50:1
**evaluation**
197:17,19,19
**evasive** 30:6
156:13 162:25
185:10 186:4
**event** 170:14
**eventually**
39:21 79:13
130:25
**everybody** 6:2
6:11 19:18
52:8 56:3
103:15 104:8
114:17 160:8
192:21
**everybody's**
218:9,13
**evidence** 45:2
47:20 154:24
154:24 155:3,5
155:8,17,23
156:5,16 157:4

157:6 158:24
159:23,25
161:10,20
162:7 165:21
239:15
**exact** 210:19
**exactly** 95:4
135:7 228:11
**examination**
3:7,7,8 5:17
94:21 97:22
245:9 248:5
**examine**
243:19
**examiner**
94:18,24 95:5
**example** 25:7
37:21 49:8
94:2 107:11
109:22 127:16
128:4 140:2
144:20 146:24
147:17 149:7
154:3,5 156:14
157:8 158:3
175:17 177:9
189:13 191:25
246:6
**excellent** 116:2
116:4
**except** 13:7
81:7 177:17
253:3
**excited** 117:15
**exclusive** 41:18
**exclusively**
42:13

**excuse** 6:10
96:11 145:17
235:17 244:5
**execute** 20:8
**executed**
253:16
**executive** 15:10
26:14
**exercise** 43:21
80:22
**exercises** 180:3
**exhibit** 4:3,4,6
4:7,9,10,12,13
65:19,22,23,23
66:1 79:24
94:5,6,6,11,13
94:15 95:17,17
95:18,19 96:7
97:7,24,25
98:1,3,5 100:1
100:3,4 225:10
225:11 229:1,2
229:16 235:7,9
235:9,10,12
**exhibits** 3:4
**exist** 120:20
178:10 243:11
**existence** 64:23
**exists** 80:25
**exit** 169:7
**expect** 23:20
24:12 46:24
49:21 106:22
109:13,16
110:9,14
111:21 112:4,7
114:17 122:8
135:11 149:9

149:12 169:2
170:10,21
180:16 182:19
185:5 187:8,14
187:17,23
199:14
**expectancy**
205:8
**expectation**
47:2 50:5,13
**expected** 41:7,9
42:21,23 43:2
43:8,11 47:1
103:12,13
107:1 136:14
149:19 172:12
179:20,22
192:21
**expecting**
49:23
**expensive**
196:19
**experience**
39:13,16 51:19
52:2,4,12
53:13 55:7,14
55:16 56:22
59:6,7 62:17
62:21 91:13
134:21 135:6
135:10 157:9
160:21 183:2,3
183:4,6 190:25
192:2,6 204:12
205:11
**experienced**
61:23

| | | | |
|---|---|---|---|
| **experts** 40:15 | **failed** 192:12 | **falls** 26:24 | 125:24 |
| **expiration** | 192:15 198:9 | 212:10 | **fenced** 196:9 |
| 255:8 | 243:21 | **familiar** 21:11 | **fentanyl** 25:7 |
| **explain** 52:19 | **failing** 38:8 | 49:10 62:3,18 | **fewer** 57:4 |
| 83:24 112:22 | **fails** 256:18 | 62:18,19 87:11 | **fictitious** 186:5 |
| 120:2 | **failure** 176:3 | 88:10 95:4 | **field** 20:15 |
| **explained** | 176:15 189:13 | 98:5 100:6 | 104:12 105:4 |
| 48:13 | **fair** 6:20 7:18 | 178:8 | 112:22 174:14 |
| **explaining** | 8:14 28:9 | **familiarize** | 199:9 212:9 |
| 172:21 231:4 | 31:12 33:18 | 87:4 | **figure** 79:1,21 |
| **explanation** | 35:12 38:17,21 | **family** 164:11 | 83:3 95:8 |
| 236:3 | 39:24 40:21 | 171:23 | 147:2 176:6 |
| **explanations** | 41:8 42:15 | **far** 15:23 21:3 | 226:24 243:11 |
| 163:22 | 44:2 52:7 57:2 | 23:22 25:19 | 243:24 |
| **explosive** 202:4 | 58:9 64:17 | 40:1 45:6 70:6 | **file** 46:15 |
| 203:20 | 68:15 81:24 | 101:8 247:7 | 238:24 |
| **explosives** | 86:21 97:9 | 250:24 | **filed** 178:17 |
| 202:2 203:7,8 | 99:11 101:13 | **fast** 223:2 | 214:22 |
| 203:9,25 | 105:16 107:3 | **fau** 143:1,3 | **fill** 107:11,12 |
| **expressed** | 107:19 119:11 | **fault** 196:21 | 107:14 122:22 |
| 253:17 | 126:10 141:17 | **faustino** 203:16 | 123:15 |
| **extended** 239:6 | 147:5 156:19 | **fbi** 21:6 22:4 | **filled** 57:13 |
| **extortion** 39:11 | 161:6 162:8 | **february** 99:16 | 127:12 128:21 |
| **eye** 38:20 51:14 | 163:23 165:4 | 137:19 190:14 | **filters** 145:5 |
| 165:25 | 168:13 172:16 | 190:23 | **final** 22:18 |
| | 174:19 186:19 | **federal** 1:24 | 123:10 130:6 |
| **f** | 189:3 194:18 | 5:6,10 31:3 | 244:24 |
| | 197:7 213:14 | **feedback** | **finally** 244:24 |
| **f** 254:20 | 213:19 217:15 | 115:19 128:16 | **financial** 18:24 |
| **faces** 204:7 | 224:20,25 | 128:23 | 54:17 247:5,17 |
| **facing** 238:22 | 239:21,25 | **feels** 159:22 | **financially** |
| **fact** 58:12 | 248:10,20,24 | **feet** 114:5 | 255:2 |
| 64:22 80:12,16 | **fairly** 139:24 | **fell** 65:16 67:18 | **find** 20:4 45:1 |
| 114:10 141:21 | **fall** 17:2 66:13 | 67:24 70:5 | 46:13 137:5 |
| 174:24 182:13 | 66:21 67:2,7 | 200:4,4 | 140:4 149:16 |
| 197:4 | 147:9,14 | **felony** 143:4 | 191:10,12 |
| **faculties** | **falling** 189:25 | **felt** 52:4 59:1,2 | 199:18 223:6,7 |
| 189:19 | | 59:15,17,22 | 225:23 |

finding 47:20
60:3
fine 10:3 62:13
97:3 196:14
finish 8:22,23
9:23 109:3
finished 111:23
125:15
fire 58:7
firearm 124:25
firearms 21:15
35:8 36:20
41:14 180:13
firing 57:22
firm 2:15 255:9
first 6:2 14:11
15:1 18:14
33:3 39:9,25
51:17 56:6,6
72:15 84:12
91:12 97:11
103:12,13
110:13 180:19
180:22 182:21
182:22 183:25
194:7,12 195:5
196:6 201:11
211:24 219:25
220:4 221:20
222:25 226:8
235:16 240:14
251:7
fit 69:16
fits 163:25
five 16:18
19:24 51:16
55:21 84:24
85:15 86:4

113:13 138:21
138:25 139:1
155:10,14,19
160:14 161:11
164:3 179:15
204:6,23
fix 121:14
fixed 121:24
122:3
fixing 201:2
flag 99:24
126:12 137:1
164:8 166:10
166:11 176:8
flagged 128:1
240:16,18
flagging 98:10
flags 164:12
199:3
fleet 77:25 78:6
121:14 142:24
246:21,21
flip 95:25
flipped 68:12
floating 12:10
69:23 158:2
florida 28:24
29:17
flow 149:19
flyer 4:12,14
93:6,16,17,23
93:24
flyers 82:9
focus 42:13
225:20
fog 115:7
120:16

folks 16:11
21:17 33:22
41:6 45:16
48:8 50:2 80:9
80:10 86:23
94:16 135:11
150:6 204:14
225:10
follow 112:1
136:23 192:21
215:9
following
33:21 85:10
183:9,10
187:18 254:16
follows 5:14
food 23:7
165:13
footage 12:13
12:16 116:24
117:22,25
118:4,11 119:3
120:20 121:1
181:10,13
230:6,7 234:20
234:22
force 21:24,24
107:14,23,23
209:25
forcing 238:12
foregoing
253:2,15
forensic 94:21
94:24 97:22
forensics 18:25
94:18
forfeiture
132:6,10,19

133:8,13,18
134:4 135:1
forget 242:6
form 36:5 80:4
80:15 107:24
108:2,6,8
240:2
formal 21:16
62:7 138:8
format 95:4
formed 41:16
44:4,5
fort 255:10
forward 72:19
72:21
forwarded
223:2
found 132:12
183:7,7,13
foundational
84:11
four 16:7,18,23
16:24 50:23,24
51:3 52:18
58:14,18 84:7
86:9 90:20
91:12 114:5
116:13,18
117:1 127:10
138:18,19
139:3 148:11
148:11 159:11
160:12
frcp 254:19
free 164:9
frequent
140:24

freshly 199:11
freveletti 20:21
  74:8 76:6,20
  76:23 77:10
  211:22
friday 19:25
  20:1 32:23
  103:6
friend 162:22
  162:23,24
  164:10,11
  166:6,6
friends 164:22
frigerio 1:22
  2:11,12,12 3:7
  5:9 6:9,10,11
  9:9,12,14 66:4
  80:15 97:3
  135:17 218:6
  240:2 242:4,20
  242:23 243:7
  243:12 245:6
  245:10 248:4
  251:15 256:1
frigeriolawfir...
  2:15
frisk 11:15,23
front 58:4
  85:18 97:18
  148:25 155:2
  162:18 192:9
  238:4 240:17
  241:2
frustrated
  112:18
fto 174:14
full 6:23 49:23

fullest 10:22
fully 10:2
  208:4
fumes 246:24
fund 131:25
  133:10,13,18
  134:4,6
funding 130:9
  244:10 247:8
  247:25
funds 132:3
  133:7 247:23
further 18:11
  92:23 154:17
  155:15 159:9
  181:1 184:5,14
  185:7,12,25
  254:19 255:1,2
furtherance
  184:15
fusion 24:21,23
  24:24 25:14,17
  25:18,23 26:19
  27:9,10,21,24
  28:6,14,19,22
  29:6,14 241:18
  242:9,12

g

g 5:1 77:22
  203:24,25
g.com 2:20
gain 147:15,17
  148:4
gained 55:16
gambling 18:1
gamboa 1:12
  1:16 3:6 4:5,6

4:9 5:12 6:24
  7:1 49:18
  79:22 89:2
  93:3 95:21
  114:4 119:9
  170:4 219:24
  236:8,12 244:4
  244:12 248:7
  252:2 253:1,7
  253:11 254:13
  254:17 256:5
gamboa's
  243:15,18
  244:17 251:13
gang 15:25
  16:8 17:11,15
  17:17,18 32:17
  32:24 34:1
  37:8 39:9,10
  52:23 54:22
  57:10 71:16,21
  72:9,20 73:2,3
  73:4,8,9,15,17
  74:2 76:10
  129:11 134:13
  135:11 207:15
gangs 142:25
  143:5
garcia 202:25
  203:1,1,18,18
garcia's 203:2
  203:7
garcias 203:19
garza 95:10,13
  96:22 97:8,12
  99:9,16,22
  100:12

gas 157:11,13
  157:14,16,18
  157:24 158:1,7
  246:18,21,24
  246:25
gather 150:14
gathering 49:6
geared 17:16
  19:10 49:4
general 80:8
  104:5 126:19
  131:25 132:3
  182:19 183:3
  210:8 213:6
  240:25
general's 21:7
generally 6:22
  11:2 19:21
  28:5 33:22
  35:11 41:6
  43:16 52:20
  56:17 101:21
  112:17 126:7
  126:18 146:15
  213:17
generate
  213:25
generated
  25:23
generic 34:4
  43:6,16,24
  112:9 135:20
  172:11
genre 38:12
gentleman
  157:10
gereb 12:22
  73:11,19,25

75:19 76:11,12
76:16 91:14
114:1,24,25
145:13 152:3,4
152:22 153:12
181:11 188:9
215:17 218:15
223:13
**gereb's** 12:19
76:24 188:12
223:22
**gestured** 114:5
**getting** 29:5
37:8 51:12
59:21 84:12
101:7 116:16
136:20 139:23
192:18 203:21
210:3 215:3,4
250:24
**gil** 59:5,5
**girlfriend's**
147:2
**give** 8:9 10:22
29:20,21 31:12
66:6 79:21
92:9 105:9
110:11 114:16
114:17 115:19
115:24 116:15
123:16 140:21
140:23 146:24
153:1,12 157:8
166:14 169:10
173:17 175:17
177:10,12,15
177:20 181:25
183:17,20

184:15,23
190:12 202:1
205:19 216:2,4
219:6 220:10
222:24 246:6
**given** 50:5
105:14 154:13
161:13 181:18
182:1 183:11
230:25 243:18
253:18 254:18
**gives** 117:7
165:13
**giving** 24:1
30:6 114:11,12
115:23 155:16
156:12 159:2
175:8,14
176:17 177:12
182:4 186:5
**glasses** 70:16
**glebe** 2:7
**glitch** 177:17
**go** 5:23 7:3,3
18:6 19:16
22:17 36:4
37:6 38:6 42:3
42:4 49:24
51:3 56:22
59:2 60:11,13
79:1 86:18
93:11 97:7
103:22,23,25
105:7,7,8
106:9 109:6
110:22 111:15
113:11 116:10
116:13 118:17

121:24 123:21
124:5,12,21,23
124:24,25
131:25 132:9
132:11 133:7
133:12 134:1
136:6 144:5
165:1,14 168:6
172:12 175:13
175:22 176:20
184:16 185:13
193:12 194:1
195:25 199:23
207:3 229:4,15
235:16 236:25
238:15 240:14
240:20 249:4
250:7
**goal** 107:2
**goes** 10:15 56:3
124:22 132:21
147:18 160:5
221:5 224:9
237:13 241:22
**going** 5:23 6:2
6:5,12,17,22
9:1,25 10:3,8
13:15 20:5,7
20:15 22:22,23
30:14,18 31:21
37:4,9,23 44:6
44:23 48:5,5
48:17 52:25
54:14 55:24
65:19,23 66:6
77:18,19 78:15
83:21 84:3
85:10 86:15

87:24 88:12
93:15 94:10,17
95:11,14,17
96:23 97:21,23
98:4 99:24,25
100:3,5 101:5
101:18 103:16
103:22,23
105:3 111:25
112:1,1 113:10
115:11,22
126:1 134:1
139:11 145:15
146:1 147:3
154:12,21
159:4,7 160:13
160:15,20
162:6 163:5
164:8 165:21
166:12,13,15
166:17 167:16
167:20 168:9
168:16 171:1,2
172:6,7 173:1
173:17 174:16
176:9,21 177:5
177:10,12
180:7 185:24
186:21 188:21
189:7 190:5
193:9 194:1,16
196:11 198:17
198:18 209:21
210:4 214:8,18
217:12 221:2
222:21 224:16
225:5,9,13,19
225:21 227:3,6

228:24,25
229:3,5,18
231:14,22
232:5,9 233:8
234:2 235:13
236:10 242:18
242:24 243:2
243:18 244:2
244:16 245:3
246:13
**good** 5:19
22:23 50:9
51:13 78:12
93:9 99:17
100:16 114:1
115:12 116:14
116:17 128:20
130:11 135:15
139:16 153:10
156:14 158:18
174:23 195:9
214:25 226:3
226:23 245:22
245:24
**gotten** 95:5
132:25 218:19
218:20
**governor's**
17:16
**graduated**
14:11 15:3
**grande** 89:24
**grant** 138:2,3
**grass** 199:11
199:12
**great** 93:4
128:18 136:6
138:20

**greenhill** 2:18
**grew** 55:6
178:3
**gripe** 127:11
**group** 17:2,18
18:23 20:4
22:17 49:1
75:15,20 84:17
84:24 85:8
89:4 118:2
150:21,21,22
151:10,11,13
151:16,20
152:5,8,11,24
153:2,5,14
154:5 205:13
208:17 231:23
231:24
**groups** 23:6
33:21 34:4
**growing** 14:4
**guerra** 51:1,17
52:6 60:22
**guess** 10:15
27:8 31:5
37:17 39:7
49:24 55:23
58:9,21 61:7
62:7 63:22
65:11 66:22
80:24 98:8
101:6 106:21
115:22 122:13
136:23 146:5
158:3,8 163:11
186:9 188:2
191:22 194:13
207:18 219:4

223:16,17
224:2
**guide** 24:17
52:5 53:1
**guns** 17:25
29:11 59:20
90:22 154:15
**guy** 39:5,20
58:5 70:10
114:7 154:20
184:6 186:4
195:5 203:25
204:2,7
**guys** 47:10
48:2 53:12
55:13 82:12
84:18 104:6,9
116:4,13,14
117:1 127:22
135:2,12 198:1
205:20 247:2

**h**

**h** 4:1 22:11
**half** 55:13
**hand** 79:23
94:15 98:4
178:5 226:4,6
253:18
**hander** 194:3
**handing** 94:14
95:16 176:10
**handle** 40:24
189:19 221:6
**handler** 191:3
191:4,18
193:10,14,17
193:21 196:2

198:8,22 201:6
201:12,13,24
203:12 207:21
207:22 213:23
246:5 248:12
248:17 249:2
251:7
**handler's**
193:19
**handlers**
192:18 202:16
202:18 205:15
205:17 246:2
250:7
**handles** 249:8
**handling**
248:14
**hang** 239:8
**hanging** 37:9
154:15
**happen** 11:13
109:17,18
112:15,24
121:11,17
129:8 167:16
170:19 173:1
193:6 214:18
249:14
**happened** 47:3
57:5,20,21
97:14 123:7
124:9 142:7
199:8 205:3
235:4
**happening**
38:5,24
**happens** 29:24
38:2 48:6

Peter Gamboa

July 25, 2024

164:2 170:15
170:16 175:16
180:23 216:25
**hard** 56:1,2
117:18 121:2
**harder** 159:22
**hats** 26:8
**he'll** 25:24
31:14 32:9
**head** 8:11
153:6,9 161:23
219:8 242:2
**headache**
112:18
**heading** 44:19
**heads** 160:14
**health** 25:16,20
26:2,9,15
194:22
**healthy** 191:21
**hear** 55:21
152:17 155:11
155:13 198:22
220:23
**heard** 7:4
18:12 102:4
150:13,24,25
194:7,12,14,16
195:1 206:13
220:4 227:10
227:14 233:11
241:18,21
**hearing** 7:17
221:20
**heavy** 160:18
246:25
**hebert** 2:3 3:7
3:8 5:8,18,19

33:16 65:21
66:2,5,8 78:14
78:21 80:16
94:14 95:16,20
96:20 97:4
98:2 135:15,19
153:11 181:6,8
215:8 225:12
227:10 229:3
229:10,21
230:14 231:19
232:9 233:11
234:5,17 235:1
235:8 240:4
242:6,16,22,24
243:9,14 248:6
251:12
**hector** 2:22
6:10
**held** 59:2
181:23 182:13
184:3,4
**help** 8:16,17
17:19 35:16
36:22 37:19
43:3 45:22
67:20 79:6
102:14 115:19
163:25 168:22
170:19 185:9
213:2,3 216:15
223:18 224:15
226:3
**helped** 206:10
**helpful** 35:10
39:18 54:3
69:15 94:3
145:8 165:19

194:4 212:12
**helps** 43:15
208:8,17,22
**hendricks**
74:22
**hey** 27:17 30:4
33:12 37:7
44:18 98:23
101:3,15
103:21 105:3,7
106:5 108:25
113:12,23
114:14 115:10
120:15 121:9
121:13,18
126:1 127:8,11
127:21 128:12
128:19 129:3,4
134:24 135:12
139:21 152:14
154:6,20
176:21 182:4
189:23 219:6
**hide** 90:21,23
**hiding** 82:23
**hido** 22:9
**hidta** 22:5,6,10
74:23 78:24
79:14
**high** 14:10 22:7
22:10 47:6
49:12 64:4,12
73:3 79:3,9
151:22 160:3
245:25
**higher** 183:16
**highlight**
127:20

**highway** 28:24
48:6,8,12 79:2
79:7,8 84:16
105:7,14 110:2
111:18 147:19
148:22 150:22
151:16,19
152:24 153:14
168:15,16
189:24 231:24
**highways** 41:3
41:11 42:8,13
44:24 47:20,21
47:22,25 48:1
53:7 64:3
80:13,17,18
81:7
**hill** 160:7
**hit** 49:16
106:10 156:10
**hits** 217:1
**hitting** 84:15
159:4
**hold** 94:4,9
233:13 239:6,8
239:13,14,15
240:5 245:25
249:17
**holding** 182:8
182:14
**home** 195:25
196:1,6 197:5
**homeland**
21:13
**homework**
93:21
**hope** 41:20

**hopefully** 233:9

**hopes** 239:8

**hoping** 87:17

**horrible** 126:1

**horse** 191:12 195:8

**horses** 191:7 195:7,13

**hot** 25:9 49:5 49:14 215:18 216:10,14,15 216:16,23,24 217:7,19,21 218:3,3,5,7,10 218:13,16,24

**hotel** 83:7 163:18,19 165:11

**hotels** 83:10

**hotline** 18:9 19:4

**hour** 160:5,9 188:1,2,2,6 226:14

**hours** 19:22 38:5 54:1,9 73:9 211:10 236:13,17,22

**house** 32:10 167:22 196:14 196:25

**housekeeping** 7:4

**houston** 141:5 141:6

**hq** 104:10

**hsi** 246:10

**hub** 50:17

**huh** 8:12 14:25 25:8 26:23 28:21 32:6 35:25 37:22 41:25 45:19 46:1 51:7 63:5 64:2 67:16 70:24 84:8 89:7 91:23 95:2 97:13 102:6,8 103:18 104:2,13 105:1 115:5 126:24 127:4 136:25 138:4 145:24 152:25 156:18 166:4,8 173:10 173:13,20 189:21 192:5 194:25 195:10 203:23 215:16 218:9 221:3 236:6,24

**human** 18:1,2 23:7,8 35:8,8 35:16,17,18 47:5,7 50:18 59:19 64:1,11 65:5 84:4 151:11,14 159:19,19,24 160:23,25 162:1,1,1,5 165:7,21 167:2 167:5,11 168:9 168:11,17

218:21 219:2 219:14

**hung** 224:17

**hunt** 188:10,11 188:15,16,22

**hunting** 188:19 188:21,21,22 188:23,24

**hurt** 194:19

**hygiene** 163:7

**i**

**idea** 92:22 200:18 214:16 214:17

**identification** 173:14

**identify** 10:8 82:15 83:8,8 89:12 120:25 136:14

**identifying** 73:2 82:22 83:6 99:6

**identity** 253:13

**iii** 1:7 254:7

**ij.org** 2:5,9

**illegal** 35:8 36:20 37:4 41:13 47:20 65:5 84:3 180:11,12 219:3 234:11

**illegally** 35:19

**illegals** 63:16

**image** 99:25 100:6,11

**imagine** 150:14

**immediately** 228:20

**immigrants** 23:8 35:18,20 165:10

**impairing** 10:23

**implemented** 192:1

**important** 8:7 8:20,21

**impressive** 139:17

**improper** 9:18

**improve** 128:24

**improvement** 101:23

**inaccurate** 228:12

**inappropriate** 183:23,24 184:17 185:14

**inattention** 189:16

**incident** 108:25 109:22 123:5 245:2

**include** 63:14

**includes** 244:6

**including** 163:6

**inconsistent** 156:16 157:1 158:4,13,21 159:3,13,14 161:11,12

incorrect  238:1
independent
  148:18
indicating
  234:7,11
indicator  164:4
indicators
  162:11 163:4
individual  1:6
  1:7,8 118:5
  160:22 254:6,8
  254:9
individually
  86:8,23
industrial
  142:11
inform  185:1
informants
  18:15
information
  6:19 18:14,15
  18:16 19:1,3
  20:25 22:24
  23:19,21 24:1
  24:5,16,19,25
  25:2,2,4,6,10
  25:11,17,19
  27:13,14,17
  28:4,6,23 29:6
  29:14,20,22
  30:7,20 32:4,8
  33:13 48:16
  92:10 100:15
  100:25 101:2,4
  101:7 105:21
  110:7 127:6,14
  128:3 129:18
  144:13 150:14

150:20 152:10
153:4,13,16,22
154:2,13
163:20 165:10
165:18 166:17
166:20 167:22
169:18 171:10
173:11 232:4
233:7 244:22
245:3,5
inhouse  251:8
initial  106:17
initially  50:21
  51:4 136:17,18
initiate  107:8
injured  47:8
  194:19,20
inmate  205:15
innocent
  163:22
inoperable
  142:9
inquire  27:16
ins  116:7
inside  51:15
  157:11 196:13
  196:14 224:10
  238:22
inspection
  104:5,5 196:6
inspections
  195:25 196:1
  197:5
inspector  21:7
instance  1:17
  12:10 81:20
  154:25

instantaneou...
  121:17
institute  2:3,7
instructed  24:8
instruction
  87:18 153:13
instructions
  153:1
instructor
  84:23
instructs  9:12
instrument
  253:15
intel  15:7,12,14
  15:20,25 16:8
  16:13,17 17:1
  18:23 26:13
  27:18,18 28:25
  49:3 57:10,10
  73:13 74:21
  99:18 100:16
  150:12,13,13
  153:15 232:1
intelligence
  28:20 30:1,15
  30:19,23
intense  22:7
intensity  79:3,7
  79:9
intensive  22:10
interdiction
  34:15,20 35:4
  35:5,12 36:5
  39:5,15,17,22
  40:5,10,11,13
  40:14,16,21,24
  41:6,7,11,15
  41:18,19,20,21

41:22 42:7,11
42:22 43:22,25
44:4,10 45:5,9
45:12,17,24
46:21,24 47:10
47:13 48:1,12
48:13 49:25
50:1,9,12,22
51:18 52:19,20
56:23 57:1
58:14,18,23
59:7,23 60:9
61:5,8,24
62:17,21,24,25
63:7,8,9,10,15
63:19 64:14,16
64:22,25 65:3
65:4,16 66:10
66:13 67:18,24
68:4,18 69:6
69:10,14 70:1
70:9 72:11,11
79:3 80:2,9,11
80:25 81:3,5,6
81:11,12 82:3
82:10 84:1,7
84:20,23 85:1
85:8,17,22,25
86:2,6,11,17
87:17 89:1,15
89:18 91:8,18
91:20 92:16,20
92:23 93:8,18
99:2,18 100:16
100:23,24
101:9,21,22
102:14,19,24
103:11 106:20

106:23 112:21
113:16 116:3
116:15,24
125:8,11,19,23
126:15,16,18
127:15 128:17
130:14 131:9
131:22 136:8
136:10,13
137:11,14
138:14,17
141:23 148:6
149:10,12
152:23 165:9
165:15 168:20
168:23 179:19
180:1,5,18,22
182:20 183:4
188:10,13,20
189:4 241:2,9
243:3,16,17,20
244:3,7,11,13
244:18 247:4,6
247:10,14,19
248:2
**interested**
61:11 92:22
255:3
**intermeshed**
76:2
**internal**  4:3
61:15,18 90:14
91:1,18,20
94:5 111:7
220:5,7 235:15
**internet**  244:5
**interrogatories**
4:11

**interrogatory**
96:25 244:20
244:21,23
**interrupt**  9:2
208:16
**intersection**
170:18
**interview**
53:21 82:18,25
83:2,18 87:9
88:24 137:4
154:9 156:11
157:20
**interviewed**
201:12
**interviewing**
81:22 114:2
**interviews**
15:24 85:13,13
85:18 87:19
115:6 165:16
**intranet**  61:11
61:13 62:10
244:5
**introduce**  5:6
6:2 99:25
169:10 228:24
**introducing**
172:18
**investigate**
167:4,4,20
168:9,16
**investigating**
165:7
**investigation**
18:11 49:16
71:1 154:1,17
155:16 159:9

181:2 184:6,15
185:8,12,25
222:8 235:16
235:24 247:22
247:24
**investigations**
17:7,7 19:5,16
68:22 124:24
125:1 131:6,15
**investigator**
7:16 53:23,23
55:11,25 56:4
56:11,12
**investigators**
49:2 55:8
125:5 140:3,6
140:17
**involve**  48:15
73:3
**involved**  23:8
45:4 47:8 57:6
57:6,18 113:17
136:15 156:9
188:11 230:3
249:11
**issue**  121:25
122:8,11
123:19 126:13
177:6
**issues**  195:3
242:18,25
**it'd**  29:9 92:23
149:20 189:11
210:13
**it'll**  140:23
**item**  247:14,18
248:1

**j**

**j**  147:12,13
**jail**  15:13,15,16
15:19,22,23,24
15:25 16:1
186:14 195:21
201:18 213:23
214:1
**jailer's**  15:1
**janitor**  14:12
**january**  137:19
**jared**  207:21
**javier**  1:8
254:8
**job**  58:10 62:7
128:18 157:19
163:21 176:24
177:5 195:17
244:3
**jobs**  14:11
**joe**  51:1,17
52:6 168:15,16
202:25 203:1,1
203:2,6,19,23
203:24,25
204:2
**joel**  1:5 2:16
254:6 256:4
**john**  50:25
51:5,20 52:23
53:10 54:5
56:21 86:10
87:22,25 88:12
88:12,16
203:17
**joined**  6:4,8
114:25 239:9

239:15
**joseph** 95:10
98:19 99:1
203:17,18
**josh** 65:21
217:10,11
**joshua** 2:6 6:4
**jp** 178:17,23
**judge** 8:5 9:18
123:2,3,11
**july** 1:13,19
243:4 244:25
254:14
**jumped** 58:6
223:12
**june** 243:9
**justice** 2:3,7
178:25
**justification**
39:1
**justin** 52:6
**jwindham** 2:9

**k**

**k** 85:22,23,24
86:1 90:5,6,8
157:24,24
181:19,24
182:6 185:5,21
186:3,6,10,11
186:12,13,13
186:17,20,21
186:25 187:6,8
187:12,18,20
187:24 188:4,7
190:7,24,25
191:5,22,24
192:2,3,6,13

192:17 193:22
193:24 196:24
197:5,25 198:8
199:3 201:4,5
201:8 202:13
202:16,21
204:11,12,15
204:17,24
205:3,12 206:7
206:12,15,20
207:4,6,10,11
207:14,17,18
207:19,20,22
207:22,23,24
208:7,14,18,19
210:9,10,23,25
211:4,16
212:10 213:1,1
213:13,17,24
213:25 229:22
229:24 230:3,5
230:5,7 245:12
245:21,22
246:1,2,5,16
246:17 248:9
248:12,14
249:2,17,20
250:5,7,8,12
250:14 251:7
**keep** 42:2
102:17 126:2
128:18 167:8
195:12 248:8
**keeping** 43:10
102:17
**kennel** 196:9
196:14

**kept** 47:15
196:13 211:9
238:20
**key** 213:25
**kick** 84:13
116:10
**kicked** 84:15
**kids** 164:23
**kiki** 241:22,23
242:1
**kilos** 59:18
246:22
**kind** 5:23 8:25
17:25 18:1,12
18:15,22 19:10
25:4,22 27:8
31:3,3,17 35:7
36:20,20 37:24
38:2,7 39:3,21
42:5 49:4,5
50:13,19 51:19
52:8 56:5
62:21 65:6,15
73:4 74:19
79:24 80:9
82:13 92:21
97:14 98:9
100:11,15
101:6 102:2
105:16,18
113:7,23 114:2
115:3 118:12
120:2 121:12
122:20 123:7
123:18 126:12
127:20 135:20
140:10 147:7
151:24 152:10

184:23 224:22
228:5 235:23
**kinds** 107:21
157:4
**kinesiology**
87:10,11,18
**knew** 39:8
52:24,25 59:6
70:11 86:12
129:7 151:1
152:4 192:21
196:17,18
214:8 215:24
**knock** 37:7
**know** 8:19,24
9:4,5,5,22 12:8
14:1 21:21,23
22:22 24:3
27:12,15,17
28:4,12,13,14
28:15,17,18
29:2,3 31:2
39:7 42:25
44:15 45:6,8
48:20 50:17
51:15 58:25
59:14,22 72:2
72:6 75:3
78:16 82:11
83:5 84:2
85:14 87:6
92:1,24 93:2,8
95:7,11 102:21
103:22 105:2,7
105:17 106:5,6
109:22 110:3
111:16 112:2
113:3,5,9,11

113:24,25
114:11,13,14
114:14,18
115:10,11,12
115:23 116:2,7
116:8,10,10
118:20 119:25
121:5,9 126:4
127:16 128:20
129:3 132:20
132:21 133:1
133:23 134:22
134:22,25
135:3,10
136:17,18
137:6,8,8,25
138:4,10 139:5
139:11 140:24
143:2,4,18
146:25 147:7
148:3 149:3,3
149:11 152:10
152:15 155:11
155:17 156:8
160:9,22
162:21 163:13
164:5,6,20,20
164:21,22,23
164:24,24
165:14,14
166:6 170:13
172:7 175:4,7
175:8 178:3,12
179:4,6 181:1
181:9,18,22,24
184:20 191:1
191:20 192:8
194:9,21

195:22 196:24
197:24 198:13
199:16 200:19
200:21 202:21
202:23 203:6
205:3,5,18
206:9,11 209:7
209:10 213:6
222:2,20
225:16 228:20
230:25 231:1,7
233:5,17
234:10 241:21
241:21,25
242:15 243:7
243:12 245:2
245:23 247:1
249:1,16,18,21
250:14,15
251:9,11

**knowing**
246:24
**knowledge**
27:9 56:18
69:7 91:7
168:10 179:12
180:10 209:19
212:15 214:24
216:1 232:16
232:20,22
233:4 242:8
249:16
**known** 31:2
32:4 154:4
162:24 253:12
**kudos** 205:19

**l**

**l** 77:22
**label** 225:22
**labeled** 95:25
96:17
**labor** 35:20
**lack** 193:17
194:10
**lane** 38:9 169:1
189:13,18
**lanes** 148:10
**language**
119:13,17,19
120:2
**laredo** 29:23
30:10 157:10
241:18
**large** 180:12
236:5
**lasted** 225:2
**late** 137:16
**latest** 143:13
**laugh** 115:22
**laughed** 239:5
**laundering**
18:25 30:12
39:11 41:13
65:6 84:3
127:17
**law** 1:22 2:12
14:17 15:21
16:3,6,21,22
20:24 23:2,4
25:3 187:25
201:10,20
215:23 234:13
241:22,25

**laws** 35:9 189:5
189:5
**lawsuit** 214:23
238:24
**lead** 18:11 44:9
**learn** 85:7
87:18 152:17
221:17
**learned** 194:7
195:2,2,24
219:25 220:2
**leave** 32:9
36:18 163:5
165:14 243:18
**leaves** 167:23
**leaving** 205:4
239:9 251:13
**left** 58:23 59:9
60:13 86:19
208:2 209:13
223:17,19,23
226:5 238:14
**legal** 224:16
255:9 256:23
**lesson** 206:17
**level** 91:7
205:6
**liability** 193:1
194:10 196:23
197:2 198:10
**liable** 197:1
**license** 15:1,4
30:25 137:11
137:15,22,25
138:3,5,10,13
138:16 139:5,6
140:23 141:22
141:23 142:12

142:18 143:7
143:14,25
144:12,22
145:10 146:6
146:10,16,17
146:20 147:2
147:18,24
148:4,7,9,11
149:13,24,25
150:1 169:16
170:9,11,17,25
171:6,8 172:4
173:15,15
215:9 216:20
216:22,23
217:6,10,11,18
217:19,25
218:5 219:5,5
238:11,15
**licensed**  171:5
**licenses**  139:12
139:12
**lieutenant**
20:17,19 22:16
26:6 27:2
53:25,25 56:15
69:22,25 70:6
70:7 71:9 74:8
74:15 75:3
76:7,8,15,19
76:20,23 93:10
122:17 126:20
126:21 127:5
130:4 193:7
196:17 211:8,9
211:12,18,21
212:1,11

**lieutenant's**
127:7 128:7
**life**  14:4,7 47:7
**light**  199:15
**lights**  145:21
145:23 146:1
**likely**  28:1
31:18
**limit**  102:18
**line**  96:2,15
97:20 103:19
103:20 105:19
105:20,20
115:7 120:16
157:12 189:20
226:8,9 247:14
247:18 248:1
252:4
**link**  111:16
**list**  95:12 96:23
**listed**  96:21,22
232:16
**listening**  194:6
198:19
**literally**  46:10
**little**  14:2
17:10,14 29:20
31:8,20 37:17
49:25 51:2,19
51:21 57:17
62:15 64:19
65:15 72:6
74:7 82:2
87:21 91:6
92:16 97:20
103:25 105:13
106:7 109:7
110:22 115:11

120:1 126:14
132:11 149:23
150:16 154:23
164:23 178:2
190:1 191:14
191:15,16
197:11 219:21
244:20 250:19
**live**  144:9
164:25 168:3
**living**  59:22
168:6
**loaded**  246:14
246:22
**loader**  14:14
**loads**  59:19
**local**  25:11
28:12 31:3
98:21
**located**  106:3
**location**  48:18
111:16 168:4
181:25
**locations**
140:23,24
**log**  245:4
**long**  17:8 46:24
49:21 60:8
78:16 110:9,17
110:17 162:23
187:23 200:23
225:1,17
236:23
**longer**  23:14
47:19 51:21
64:23 80:25
232:5

**longest**  202:21
202:22,25
**look**  9:25 10:7
30:9 40:2 46:9
50:2,9,16 52:3
55:20 62:22
83:13 86:7
87:2,5 93:14
93:16 94:5
95:4 96:2,6,24
97:24 98:5,7
99:13 100:6,11
101:7 116:3
121:19 125:8
149:4,10,12
155:5,23 157:5
159:23 161:10
162:2,14
165:21 167:1
169:5 170:10
170:21 172:5
225:9 235:8
237:8 243:22
245:17
**looked**  11:11
11:14 14:4
52:20 63:11
82:3,6 87:1
151:1 200:9
223:14
**looking**  10:16
10:17 38:14,19
38:25 49:5,13
50:2 53:7 60:2
66:23 68:9
80:17 96:7,13
100:14 140:4
141:10,11

149:3 161:9,10
161:20 162:7
162:11 188:17
188:23,24
200:6
**looks**  99:15
168:23 237:7
**lopez**  72:8,9
**lost**  127:10
142:3
**lot**  13:15 15:11
36:17 37:8
39:6,10,20
43:15 51:11
80:2 84:2
86:14 100:20
137:2 151:11
159:22 160:15
160:24 162:10
179:2 181:9
207:15 218:16
**lots**  163:19,22
**loved**  54:20
116:5
**lpr**  139:12
141:8 142:22
215:22 216:1,4
217:1
**lunch**  102:17
102:22 135:19
135:24 136:3

**m**

**m**  2:3
**ma'am**  5:22
7:20,23 8:3,15
9:3,8,24 10:6
10:20,24 11:1

13:5,14,19,22
13:25 15:12,17
17:3,12 18:21
20:11 22:25
23:13 24:7
26:18,20 28:8
28:10 31:16
33:19,23,25
34:9,12,17,21
35:2,15 36:6
38:16,18 39:2
40:22 46:12
52:10,22 53:11
53:14 54:10
55:3,3 56:20
57:3,3 58:11
58:20,22,24
59:11,13 61:16
61:16 62:6
63:10 67:16
68:16 69:8
71:19 73:22
74:3,6,9 78:9
82:5 83:16
84:10 86:25
90:2,15 94:23
96:8,8,14,16
97:17 99:23
100:13,17
102:15 115:21
116:22 125:17
126:11 139:2
144:3 153:15
171:11 172:5
177:18,22
178:1,1,9
179:14,17
181:12 182:12

183:10 187:1
204:22 209:18
224:19,21
226:15 227:17
229:12,14
235:19,21
237:5,10 241:4
241:4 248:25
249:15
**machine**  1:21
**made**  7:8 30:16
51:11 72:23
74:11 110:25
111:3,5 114:24
119:9 137:21
157:15 172:21
220:7
**mag**  122:24,25
123:2
**magistrate**
123:2,3,11,17
**mail**  175:22,24
176:20
**mailed**  177:13
**main**  21:8
47:25 106:21
213:15
**maintain**  38:8
189:13
**maintaining**
189:18
**maintenance**
78:9
**make**  24:4
29:16 37:2,25
42:10 54:14
63:16 64:20
85:12 103:15

104:4,16,17
118:3 119:6
120:15 121:18
133:24 153:18
153:19,21
154:8,9 158:8
161:8 162:16
163:3 169:4,9
169:24 172:9
176:25 177:2,5
186:8 189:22
189:23 190:4
196:17 203:21
210:5 225:21
227:8 228:21
231:2 240:10
247:2
**makes**  93:17
163:14 166:21
168:8 195:9
198:21 209:3
232:22
**making**  37:1,5
37:6 41:11
44:24 45:1
51:14 59:21
107:5 154:9
165:25 180:7
189:11 191:20
212:16 227:11
233:1
**maldonado**
6:24
**managerial**
56:15
**manages**  78:7
**manner**  210:8

| | | | |
|---|---|---|---|
| **manual**  11:11 | **material**  56:6 | 149:14 154:21 | 200:16,19 |
| 12:21 62:5 | **materials** | 155:25 156:6 | **member** |
| **mapp**  4:14 | 98:10 | 157:6 163:21 | 129:11 164:12 |
| **march**  12:4 | **math**  138:20 | 176:11 178:20 | **members**  17:17 |
| 44:7 66:18 | **matter**  6:8 | 182:22 183:3 | 37:8 73:3 |
| 67:5 190:21,23 | 114:10 210:19 | 184:7 188:19 | 207:16 |
| 204:24 206:25 | **matters**  7:4,11 | 189:9 193:13 | **memory**  11:20 |
| 220:20,23 | 7:13 | 193:15 194:11 | 204:11,16,16 |
| 221:7,15,18 | **max**  204:12 | 201:5,17 202:6 | **mental**  25:16 |
| 245:15 248:10 | 213:7 214:3 | 204:14,23 | 25:20 26:2,9 |
| **marijuana** | 245:21,22 | 208:16 210:10 | 26:15 |
| 158:2 | 246:17,18 | 213:8 223:4 | **mentally**  78:16 |
| **mark**  94:10 | 249:17,20 | 231:16 233:5 | **mentioned** |
| 97:24 100:3 | 250:5 | 240:10 250:13 | 16:5 24:20 |
| **marked**  31:23 | **max's**  206:20 | **means**  8:1,8 | 31:25 44:25 |
| 65:22 66:1 | **maximum** | 36:23 45:22 | 45:2,11 54:21 |
| 94:13,15 95:18 | 188:3 | 82:22 205:10 | 64:7 66:9 |
| 95:19 98:1,2,5 | **mean**  9:10,11 | 217:21 | 90:10 103:8 |
| 100:4 225:10 | 11:10 15:16 | **meant**  83:24 | 107:22 123:21 |
| 225:11 229:1,2 | 22:21 23:24 | **measure**  50:6 | 148:9 |
| 235:7,9 | 27:16 30:14 | **mechanics** | **merely**  9:15 |
| **marker**  170:18 | 32:2,8,17 | 131:16 | **message**  97:19 |
| 206:3 | 33:11 35:4 | **mechanism** | 99:10,14,15,16 |
| **marks**  228:15 | 39:22 40:3 | 19:11 41:18 | 99:21 154:5 |
| **marta**  220:6 | 43:10 47:14,18 | **media**  4:12 | **messages**  97:19 |
| 222:11 | 53:6 54:13 | 19:1 | **met**  5:20 44:15 |
| **martin**  1:6 | 59:16 62:4 | **medical**  194:23 | 82:11 83:6,24 |
| 203:13 207:7,8 | 63:8 64:15,21 | 209:23 | **methampheta...** |
| 223:10 254:7 | 64:23 71:2 | **medication** | 246:23 |
| **martinez**  59:5 | 72:4,11 78:6 | 10:23 | **methods**  80:10 |
| 59:5 60:6,8,13 | 84:13,14 | **meet**  20:4,16 | 81:6,19 |
| **martinez's** | 101:16 104:3 | 104:10,12,16 | **mexico**  29:23 |
| 60:19 61:7 | 104:11 111:2 | 104:25 105:3,6 | 137:7 165:2 |
| **match**  96:12 | 112:14 114:20 | 106:9 130:5 | **middle**  196:10 |
| 158:22 | 119:18 123:2 | 181:24 | 237:6 |
| **matched** | 124:16 132:3 | **meeting**  20:10 | **mike**  89:23 |
| 201:23 | 132:12 134:14 | 20:13,14 | **mile**  170:18 |
| | 141:3 145:10 | 106:17 128:8 | |

**miles** 160:5,9
**million** 88:15
**millions** 59:18
**mind** 95:16
206:3 226:2
240:15
**mine** 142:4
162:23
**minimal** 116:7
**minimum**
53:22,24,24,25
61:22
**minute** 90:10
160:6 232:6
233:9
**minutes** 78:18
113:13 157:14
164:3 225:4,16
226:24 227:4
228:6
**mispronounc...**
88:15
**missed** 63:2
173:8
**missing** 121:1
128:20
**mission** 82:11
83:24 84:1
**mistake** 72:23
126:4
**mistaken**
187:25
**mistakes**
112:14
**mixture** 49:1
51:19
**model** 169:25

**molina** 1:7
12:22 181:10
203:13 204:11
204:17 206:20
206:22 207:7,8
207:10,20
208:19 209:8
210:9,16,21,22
210:24 211:14
211:18,21
212:1,13 213:6
213:16 214:2
214:13,17
223:11 230:3
245:18,21,22
246:5,16
249:17,20
250:5 251:7
254:7
**molina's** 12:17
211:2 212:15
214:21 223:20
250:21 251:4
**moment** 142:22
**mommy's**
166:6
**monday** 19:25
20:1 32:23
33:2 103:5
**money** 18:24
30:12 39:11
41:13 54:14
65:6 84:3
127:17,18
130:13,23,24
131:2,6 133:12
133:15 134:14
134:24 135:1,1

135:3 138:2
164:10 180:12
215:20 219:2
247:12
**month** 220:15
**months** 159:5
190:19
**morning** 5:19
10:25 19:15
20:10,12,14
38:5 165:13
**motel** 83:8,9
100:19 163:3
165:9
**motion** 243:6
**motivated**
116:9
**motivation**
53:18 55:12
**motivator**
54:17
**mou** 22:2
**mount** 26:13
195:9
**mounted** 15:8
**mous** 22:13,15
**move** 68:21
**moved** 14:13
68:18 69:2
70:12 71:5,5
131:5 247:20
**movies** 178:3
**moving** 29:8
72:19,20
149:21 160:17
**mueller** 2:18
**muldau** 34:10
34:13 91:17

177:25 206:21
243:24
**muldau's** 13:12
34:19 245:1
**multi** 195:19
**multiple**
148:10 162:13
164:17 169:17
209:4
**municipal**
14:16

**n**

**n** 2:1 3:1 5:1
77:22
**name** 6:23
69:22 72:15,15
72:20,24 84:22
84:22 151:1
162:23 163:13
166:13,13,15
186:5 203:2
211:24 241:23
252:2 253:14
**named** 14:5
207:21 241:22
242:1
**names** 69:13
77:19
**nancy** 77:12
**narcotic** 29:10
154:4,7 186:12
195:20 202:4
203:11,20
213:13 214:7
218:21 219:2
246:11,16

**narcotics** 32:5
35:7 52:24
54:23 63:17
65:5 72:11
90:22 124:23
154:15 183:7
186:12,21
187:6 204:2,12
204:15,17,23
206:16 213:22
213:24 214:9
215:20 219:7
246:14 247:1,3
249:4
**narrative**
109:11 110:8
110:10,24
122:14 124:5
124:12,15,18
125:10,19,22
126:10
**narratives**
109:14 124:11
**natalia** 157:13
**nationwide**
25:6
**natural** 8:25
**nature** 20:9
29:4,11,11
30:7,13 31:4
36:21 38:10
39:12 41:4,14
42:9 59:19
63:17 65:7
78:10 82:19
83:11,22 84:5
87:6 101:5
102:9 107:15

113:14 114:12
114:18 116:11
126:6 127:3,12
127:23 136:22
149:22 159:7
163:7 164:12
164:24 190:2
191:21 197:23
198:1 199:11
218:22
**necessarily**
9:10 108:23
113:18 122:11
148:3 149:15
186:3 189:9,14
190:4 200:7
**necessary**
247:2
**need** 8:8,9 10:2
10:12 20:6
28:2 33:13
48:16 69:20
70:16 78:16,17
97:6 113:4,9
113:11,12
117:2 121:13
122:3 127:11
128:24 143:8
176:3,11 186:6
189:14,24
198:9 207:13
207:24 243:19
**needed** 50:5
91:8 92:10
104:18 108:3,6
109:21 110:7
110:23 123:6
125:25 127:2

199:20 210:13
212:25 213:23
**needs** 225:23
249:7
**neighbor** 36:17
**neither** 255:1
**nervous** 30:5
83:21
**neutralized**
58:7
**never** 24:10
30:24 47:2
57:12 123:7
142:7 150:13
151:1 191:3,4
191:5 239:17
241:5 247:24
248:1,12,22
**new** 60:11 75:9
91:8 92:5 94:6
142:2 143:8
193:10 194:3
**newest** 143:11
143:12
**news** 222:10
**nice** 115:25
**nicely** 59:15
**niche** 51:12
**night** 14:13
199:13
**nights** 73:9
**nine** 16:19
**ninth** 201:11
201:15
**nod** 8:11
**nods** 219:8
**noncriminal**
101:21

**nope** 94:11
**normal** 160:13
205:6,8
**normally**
160:14
**north** 2:7 84:4
103:22 137:7
157:10
**northbound**
103:17 152:13
**northwest**
49:10 150:21
151:16,19
152:23 153:14
231:24
**notary** 253:22
254:22
**note** 119:8,9,10
120:15 178:4
228:21 244:24
256:10
**noted** 253:3
**notes** 118:3,15
118:17 119:6
235:24 244:17
**notice** 6:14
**notification**
117:2,7 119:9
**notified** 57:24
181:24 193:6,8
**notify** 217:12
**nuh** 8:13 185:3
**number** 95:7,9
96:3,9,12,12
96:22 170:9,11
216:20,23
220:11

| | | | |
|---|---|---|---|
| **numbered**  1:19 | **occupants** | 132:16,22,24 | 140:22 142:12 |
| **numbers**  49:6 | 150:15 169:17 | 132:24 133:7 | 143:8 144:9,13 |
| 89:9,9 96:12 | **occurred** | 134:1 138:7,11 | 144:14,23 |
| 96:25 226:4,5 | 220:20 | 139:13 141:7 | 145:9,13 146:1 |
| 226:8 | **ocdefg**  79:18 | 141:18 146:15 | 146:9,13 147:1 |
| **o** | **ocdetf**  79:15,16 | 147:23 150:1,7 | 147:7,18,24 |
| **o**  5:1 | **ochoa**  192:11 | 175:23,23 | 148:3,7 149:12 |
| **oath**  7:5,24 | 195:23 200:7 | 176:20 178:12 | 153:21,25 |
| 253:12 | 200:11,14 | 179:5 190:7 | 154:25 155:1,5 |
| **obj**  97:19 | 211:5,6,11,15 | 195:19 205:7 | 155:23 160:22 |
| **object**  9:16 | **ochoa's**  190:10 | 205:21,23 | 161:9,20 |
| 97:23 99:17 | **october**  190:14 | 206:5 214:12 | 168:25 169:1,3 |
| **objection**  9:10 | 190:19 197:5 | 242:8,13 | 170:2,10,21 |
| 9:15 80:15 | 202:20 245:14 | 245:13 246:1 | 173:6 174:14 |
| 240:2 | 248:10 | 246:20 250:8 | 175:11,13 |
| **objections**  6:14 | **offenses**  151:12 | 253:18 | 176:16,21 |
| 6:17 | **offer**  142:21 | **office's**  39:23 | 177:14,19 |
| **objective**  189:4 | **offered**  102:14 | **officer**  14:3,5,9 | 178:4,20,21,22 |
| **objectives** | **office**  13:16,17 | 14:16 23:17,20 | 179:18,20,25 |
| 93:25 101:4,8 | 13:18 15:6 | 25:14,18,22 | 180:3,4,16,24 |
| 101:17 | 17:16 20:22 | 28:2,15 32:20 | 182:19 184:3 |
| **obligation** | 21:7,7 22:17 | 38:24 40:2 | 184:10 185:1,5 |
| 243:10,10 | 22:20,21 25:13 | 43:6,8 51:20 | 185:15,18,19 |
| **observe**  85:11 | 27:22 30:11 | 51:24 57:6,18 | 186:10,16,23 |
| 149:19 200:6 | 40:20,24 44:9 | 58:13 59:4,24 | 187:9,14,17,20 |
| **observing** | 45:12 47:19 | 60:5,11 63:12 | 187:23 188:7 |
| 51:15 106:25 | 48:21 51:21 | 71:12 76:13 | 192:16 195:15 |
| **obtained**  94:19 | 61:15,18 64:15 | 78:4 89:25 | 197:12 198:3 |
| 153:18 | 64:22,24 65:2 | 91:9 103:11 | 199:9 202:21 |
| **obvious**  155:1 | 66:14 68:3 | 106:23 107:16 | 204:17 209:20 |
| 155:6,25 | 78:2 80:1 81:2 | 107:22 108:8 | 209:25 210:9 |
| **obviously**  6:3 | 84:21 85:11 | 109:10,13 | 210:11,21 |
| 143:17 | 89:3,6 90:11 | 110:9,23 | 211:3 213:8,11 |
| **oc**  79:18 | 90:13 91:1,17 | 111:21 112:4 | 213:15 216:18 |
| **occupant** | 91:21 92:13 | 118:17 119:8 | 216:22 217:2,2 |
| 169:17 | 122:25,25 | 121:6 122:7,10 | 217:6,8,12,17 |
| | 129:22 130:2 | 129:24 130:18 | 217:21 218:2,6 |
| | 132:2,7,8,15 | 133:25 136:12 | 218:24 219:6 |

| | | | |
|---|---|---|---|
| 238:10 241:22 | 129:21 130:17 | 17:4,10,19 | 70:18 71:8,11 |
| 242:1 254:17 | 136:9,13 139:5 | 18:3,12 19:2,7 | 71:17 72:4 |
| **officer's** 12:15 | 140:13,14 | 19:9,13,25 | 73:1,10,14,16 |
| 15:4 81:3 | 141:18 144:21 | 20:2,19,22 | 73:23 74:15,25 |
| 106:20 107:10 | 149:9 150:4 | 21:14,16,25 | 75:2,6,11,13 |
| 161:12,13 | 151:20 152:18 | 22:3,12,14,19 | 76:1,5,11,18 |
| 219:11,14 | 155:10 164:13 | 23:1,17 24:2 | 77:5,8,13,16 |
| **officers** 14:5 | 169:24 170:1 | 24:14,18,20,22 | 78:11,21,25 |
| 15:23 16:5 | 174:10 184:22 | 25:4,13,21,25 | 79:13,16,25 |
| 21:24 22:1 | 184:22 188:4 | 26:10 27:1,8 | 80:20,24 81:14 |
| 23:22 24:4,8 | 192:2,7 197:6 | 27:24 28:3,11 | 82:1,17,20 |
| 27:25 32:17,17 | 199:3,4 202:15 | 29:5,12 30:14 | 83:12,17 84:6 |
| 33:10,17 34:1 | 203:17 204:24 | 30:18 31:5,9 | 84:17 85:2,20 |
| 36:4 39:23 | 213:4 214:3 | 31:19,25 32:12 | 86:3,14 87:1 |
| 40:7,11,12 | 244:18 245:24 | 32:21 33:16 | 87:11,14,16,21 |
| 41:16 42:2,12 | 248:17 250:12 | 34:7,22 35:10 | 89:1,11,17,21 |
| 42:17 43:21 | **offices** 1:22 | 36:15 37:12 | 89:25 90:3,7 |
| 45:18,22 47:15 | 2:12 | 38:11 39:4 | 90:10,24 91:6 |
| 49:2 50:21,23 | **official** 1:6,7,9 | 40:6,17,19 | 91:11 92:4,7 |
| 50:24 51:4 | 254:6,8,9 | 41:5,15 42:10 | 93:1,5,14 94:2 |
| 52:3,5 53:2 | **oh** 19:24 21:14 | 43:2,5,12,15 | 94:14,24 95:6 |
| 55:6,17,22 | 46:18 99:5 | 43:24 44:8,13 | 95:7,11 96:1 |
| 56:19 57:1,4 | 119:14 138:22 | 45:1,4,8,11,21 | 97:4,11,18 |
| 57:23 58:6,14 | 153:10 164:25 | 46:7 47:3,16 | 98:13,23,25 |
| 58:19 60:25 | 165:1 171:21 | 47:18,23 49:18 | 99:3,24 100:2 |
| 61:11 74:13,21 | 191:8 196:1 | 49:21,24 50:24 | 100:6,7,11,21 |
| 74:22 76:8 | 198:3 200:24 | 51:2 53:9,19 | 101:1,6,8,13 |
| 80:3 81:4 84:7 | 203:17 208:11 | 54:11 56:24 | 101:20 102:16 |
| 84:21 92:5,13 | 239:24 | 57:11,14 58:8 | 102:17,20 |
| 92:16,20 93:2 | **okay** 5:3 6:25 | 58:12 59:9 | 103:4,10,25 |
| 97:14 101:21 | 6:25 7:7,15,18 | 60:5,13,19 | 104:23 106:2,7 |
| 102:3,25 | 7:21 8:10 9:2,5 | 61:2,7,17 63:8 | 106:14,20 |
| 105:19 112:21 | 9:21 10:10,14 | 63:21 65:18,25 | 107:9,16 108:5 |
| 113:8 117:25 | 11:9,13,16,18 | 66:20,23,24 | 108:14,17,20 |
| 122:15 125:3 | 12:5,18,18,20 | 67:3,10,13,15 | 108:22 109:2,6 |
| 125:11,19,23 | 13:1,6 14:1 | 67:23 68:2,12 | 109:10,13 |
| 126:16,18 | 15:5,14 16:4 | 68:21 69:2,13 | 110:1,5,9,13 |
| 127:10,10,15 | 16:10,16 17:1 | 69:17,19,21 | 110:17,22 |

111:7,11,14,21
112:2,8,12,14
112:20 113:1,7
113:13,15,22
114:8,19,23
115:13,22
116:23 117:13
117:21 118:7
118:17,22
119:14,21,24
120:2,5,9,19
120:25 121:11
121:15 122:7
122:13 123:13
123:18 124:4
124:12,20
125:4,7,13,18
126:3,5,7,14
126:22 127:6
127:13 128:6
128:14,23
129:1,6,10,14
129:16,23
130:8,10,23
131:8,13,16,22
132:1,5,11,20
133:3,24 134:9
134:17,20
135:17 136:3,6
136:11,23
137:10,18,21
138:4,10,16,20
138:24 139:11
139:21,23
140:1,8,11,16
140:21 141:2,7
141:14,17,21
142:10,17,20

142:23 143:7
143:21,22
144:4,12 145:3
145:8 146:9,15
146:24 147:13
147:16,17,21
147:23 148:2,6
148:19 149:7,8
149:18 150:12
150:16,19,23
151:13,19
152:1,4,7,10
152:17,22
153:7,19,23
154:4,18,23
155:21 156:4
156:14,15,23
157:8 158:3
159:10,18,21
160:24 161:8
161:25 162:5
162:10,14
163:1,11,25
164:4,8,19
165:19,24
166:21,25
167:18,21
168:2,19,19,21
168:24 169:5
169:12,23
170:3,6,8,21
171:3,12,19,25
172:25 173:4,7
174:2,11,19,24
175:11 176:2,8
176:14 177:14
177:19 178:14
178:18 179:10

179:18,23,25
180:3,16,21
181:3,8 182:13
182:19,24
183:14,22
184:4,6,9,21
185:9,13 186:2
186:7,16,19
187:8,13 188:6
188:7,19 189:1
189:7 190:6,9
190:22 191:3,5
191:17,22,25
193:12,21
194:4,11 195:5
196:4,13 197:9
197:16,18,25
198:6 199:14
200:22 201:7
201:20 202:18
202:23 203:4,9
203:21,25
204:4,8,19
205:2 206:19
206:19 207:2
207:18 208:1,6
208:11,16,24
209:4,7,12,19
209:22 210:2,8
210:19,24
211:2,7,14
212:12,12,24
213:3,10,14
214:10,21
215:5,8,22
216:1,7,15,22
216:25 217:4
218:9,18,23

219:4,13,17,20
219:20 220:1
220:12,19
221:5,7,11,16
221:20 222:14
223:25 224:4,6
224:14 225:1,5
225:5,7,12,13
225:15,18,24
226:1,11,13,23
227:3,7,10,18
227:22 228:3,9
228:18,23
229:5,8,10,17
229:21 230:1,8
230:14 231:2
231:14,17,19
232:1,5,7
233:3,8,11,15
233:18,22
234:2,10 235:1
235:8 236:1,11
236:14,20,25
237:2,11,15,16
237:19,24
238:18 239:4
239:12 240:4,7
240:14,19
241:1,13,14
242:3,6,16,17
246:8 248:18
249:16,19
250:19,23
251:1,7
**old**   194:24
**olg**   1:6 254:7
**olvera**   212:5,6
212:10

**olvera's** 190:11
**once** 30:25
  41:15 124:21
  126:4 217:18
**ones** 21:9 39:23
  47:22 51:17
  140:9 171:20
**online** 18:16
  19:5,6
**onward** 251:5
**open** 19:1
  109:1 111:10
  111:13 112:10
  223:7 224:2
  243:18 246:17
  251:13
**opened** 223:9
  223:12 224:3
**opening** 61:10
  61:17,21,22
**operate** 24:9
  28:19 41:23
**operates** 27:9
**operating**
  27:12 63:20
**operation**
  27:11 31:21,25
  33:12 48:4
  68:24 78:7
  151:14 191:24
  214:7
**operational**
  32:24
**operations**
  32:13,15 60:14
  70:14,19,21,23
  71:6,6,8

**opinion** 192:14
  245:20
**opportunity**
  14:15
**opposing** 79:20
**opposite**
  148:24 149:4
**opt** 54:8
**oral** 1:11,16
  53:21 254:18
**order** 46:5,9,16
  142:2 180:13
  243:6
**ordered** 214:3
**orders** 45:18
  45:21,25 46:2
  46:15 199:10
  199:12
**org** 66:15,18,25
  67:2 68:10
  69:5
**organization**
  4:8 22:8,11
  50:20 68:3
  71:17
**organizational**
  65:17 66:9
  68:13 73:11
**organization...**
  76:3
**organizations**
  37:3
**organized** 17:2
  17:4,8 19:11
  20:17,20,22
  26:24 27:5
  32:18 33:17,24
  34:5 47:11

  48:3,14 49:15
  57:8 60:12
  68:6,7,10
  71:15 73:12,14
  74:11,16 75:4
  76:12 79:17,18
  95:12 96:22
  125:3 130:22
  151:9,10
  206:23 207:3
  207:13 209:8
  210:10 211:15
  212:14 213:4
**original** 40:12
  116:14
**originally**
  41:20 70:23
  250:6
**originals**
  116:18
**ortega** 69:23
  122:17 123:22
  124:5 193:7
  211:8,12,18
  212:4 221:25
  235:14
**ortega's** 69:25
**outcome** 255:3
**outside** 15:22
  16:6 17:14
  83:20 92:13
  110:4 150:6
  200:6
**overhaul** 205:3
**overnight**
  14:14
**oversee** 49:18
  71:23 73:21

  191:6,24
**overseeing**
  26:14,21
**overview** 57:19
**owe** 35:22
  164:10,11
**owed** 73:9
**own** 59:10
  101:23 114:21
  114:22 144:7
  192:7 195:12
  195:13 196:23
  206:13,14
**owns** 98:22

**p**

**p** 2:1,1 5:1 94:6
  94:11,12
**p.c.** 2:12
**p.m.** 1:20
  135:18 181:7,7
  215:7,7 226:21
  226:22 227:1
  237:8 251:17
**packages** 158:2
**pad** 178:4
**page** 3:2 4:2
  95:25 235:17
  235:17 237:6
  237:14 252:4
  254:23
**pages** 237:1
**paid** 131:18
  164:6,7 247:23
**paper** 79:21
  123:18
**paperwork**
  113:10 238:11

**par** 205:12
**paragraph**
  236:5 240:15
**parcel** 100:20
  100:23
**parking** 100:20
**part** 21:5 34:5
  36:1 43:1 48:7
  48:9 50:22
  55:2 63:2
  69:10 71:20
  75:14,19 78:7
  80:11 85:24
  99:2 101:22
  106:14 109:11
  141:12 151:16
  156:8 167:8
  172:23,25
  173:5,7,22
  191:5 193:18
  193:19 197:19
  202:16 206:22
  212:18 223:13
  225:20 227:4
  233:12 241:10
  244:12
**participate**
  60:8
**particular**
  23:19 44:8
  91:7 92:19
  93:22 97:12
  103:1,2,4
  105:11,14
  107:9 128:5
  134:9 144:16
  150:17 159:4
  172:4 209:20

210:16 216:9
  223:1 225:20
  246:10
**particularly**
  31:14
**parties** 255:1
**partner** 22:20
**parts** 10:8
  11:14 105:24
  229:15
**party** 249:4,5,6
  254:21,24
**paso** 29:6,13
  30:1,15,19,22
  242:9 246:12
  246:13
**paso's** 28:20
**pass** 25:19,24
  196:7 242:25
  246:12 248:4
  251:12
**passed** 250:16
**passenger**
  162:18,18,19
**passenger's**
  169:9
**passing** 148:16
  160:8
**passion** 56:18
**past** 19:16
**patient** 114:1
**patrol** 7:8 15:9
  21:8 24:3
  27:20,22 28:15
  29:16 36:4,13
  38:3 39:9,19
  42:5,6 45:24
  47:22 51:18

52:24 55:5,10
  55:16 56:11
  60:23 61:1,2
  61:23 72:10,16
  78:7,9 91:14
  91:15 104:21
  114:21,22
  131:12,18
  135:3 137:11
  137:15 139:6
  142:25 143:5
  170:24 193:11
  195:18,19
  202:5,6 206:16
  210:4 212:25
  212:25 213:2
  216:18 238:22
**patrolling**
  42:13
**patrolman**
  39:6 43:7,16
  53:21 54:12,20
  55:18 61:24
  62:16
**patrolmen** 40:1
  42:17 81:9,13
  101:24 102:12
**pattern** 28:25
  141:6 159:10
  159:15,15
  161:16
**patterns** 141:1
  141:2 144:15
  159:2 216:2,10
**pause** 228:21
  232:9
**pay** 36:2
  189:24 200:7

222:21 247:11
**paying** 35:21
  35:21 120:17
  189:15
**pc** 2:18 233:6
**peace** 15:4
  178:25
**pedro** 6:24
**penal** 56:6
**people** 19:4,12
  38:8 39:8
  41:12 47:8
  51:14 74:17,19
  76:2 82:22
  90:21 101:10
  110:4 114:9,14
  128:20 150:5
  160:2,15,16,19
  161:3,3 162:7
  162:12,13
  164:15,17
  165:4 188:11
  188:17 189:24
  190:4 205:4,4
  238:4 240:17
  240:17
**percent** 132:24
  132:25 183:20
  186:20
**percentage**
  132:8,22
  182:25 183:16
**perfect** 121:16
**performance**
  195:3
**period** 52:13
  245:11,16

| | | | |
|---|---|---|---|
| **person** 25:25 | 223:17 224:18 | **plain** 31:22 | 217:6,7,10,11 |
| 26:2,17 27:3,4 | 224:23 225:2 | **plainclothes** | 217:18,19,21 |
| 30:8 31:2 32:4 | 227:18 230:16 | 74:13,17,19 | 217:25 218:1,3 |
| 34:14,20,25 | **phrase** 17:19 | 75:3,5,14,19 | 218:3,5,6,7,10 |
| 44:8 48:6 | 105:17 158:18 | 76:2,7 77:6 | 218:13,16,24 |
| 57:22 77:9 | 194:21 200:20 | **plaintiff** 1:3,17 | 219:5 |
| 98:21 119:23 | **phrased** 59:14 | 2:2 4:11 | **plates** 136:24 |
| 157:20,21 | **pick** 144:22 | 219:21 254:4 | 137:1,3 148:11 |
| 162:4,17 | 148:25 199:12 | **plaintiff's** 4:3,4 | 149:25 |
| 163:13 164:16 | 239:6 | 4:6,7,9,10,12 | **play** 234:3 |
| 165:6,10,12,22 | **picked** 39:16 | 4:13 235:10,11 | **playing** 223:5 |
| 166:2 167:6 | 40:7 86:10 | 243:23 | 227:9 229:9,20 |
| 171:14 215:15 | 116:14 120:23 | **plan** 206:17 | 230:13 231:18 |
| 218:24 253:14 | 201:13 208:3 | **plate** 29:19 | 232:8 233:10 |
| **personal** | **picks** 199:10 | 30:25 136:18 | 234:4,16,25 |
| 101:23 147:15 | **picture** 74:10 | 137:11,15,22 | **please** 8:11,18 |
| 147:17,25 | 99:10 149:2 | 137:25 138:3,5 | 214:18 228:20 |
| 148:4 | 204:7 | 138:10,13,16 | **pleasure** 137:9 |
| **personally** 31:6 | **piece** 54:17 | 139:6,7 140:24 | **plus** 56:13,13 |
| 89:2 112:20 | 231:14 | 141:22,24 | 201:6 202:18 |
| 253:11 | **pilot** 41:21 | 142:12,18 | **point** 10:3 |
| **personnel** | 45:13,16 46:23 | 143:7,14,25 | 24:20 40:20 |
| 57:12 58:17 | 48:20,24 49:13 | 144:12,22 | 56:25 58:21 |
| 145:5 191:19 | 49:22 | 145:10 146:6 | 69:22 70:2 |
| **persons** 35:7 | **place** 20:7 | 146:10,16,17 | 75:2 108:24 |
| 218:20 219:1 | 21:17 22:2 | 146:20 147:2 | 181:16,17 |
| **peter** 1:12,16 | 73:8 84:19 | 147:18,24 | 182:5 190:6 |
| 3:6 5:12 252:2 | 115:9 131:10 | 148:4,8,9,23 | 193:3,6 198:6 |
| 253:1,7,11 | 144:16 148:15 | 148:25 149:6 | 214:25 |
| 254:13,17 | 228:19 | 149:13,24 | **points** 10:4 |
| 256:5 | **placed** 69:6 | 150:1 169:16 | **police** 14:3,4,9 |
| **phone** 4:5,6 | 239:12 241:2 | 170:9,11,17,25 | 89:23 190:25 |
| 94:18,19,20 | 244:4 | 171:6,8 172:4 | 196:24 238:5 |
| 95:12 96:23 | **places** 68:2 | 215:10,18 | 240:17 |
| 98:22 120:17 | 82:22 | 216:8,9,10,14 | **policies** 11:7,9 |
| 129:12,13 | **placing** 238:4 | 216:14,15,16 | 11:12 34:14 |
| 136:3 151:3 | 240:17 | 216:16,20,22 | 41:23 85:10 |
| 186:15 189:25 | | 216:23,24 | |

**policing** 36:8
36:12,23,25
37:11,14,15,18
38:7,12,14
39:7,20,24
40:8 41:3 43:1
43:14 44:24
52:2 55:19
56:19 65:5,9
65:12 80:3,4
81:10,13,15,16
81:18 91:10
**policy** 41:22
56:9 62:5
147:3 174:12
182:4,15
**poor** 243:14,24
**pop** 172:6,7
219:11,13
**pops** 118:12
**portion** 88:25
110:24 198:10
**position** 14:2
15:5 26:22,24
57:13
**positions** 57:15
127:12
**possession** 35:8
41:13
**possible** 239:12
**possibly** 134:16
134:18 160:23
**posted** 62:8
**potential** 98:11
156:25
**potentially**
148:12 174:6

**practice** 24:6
174:20,21,22
174:23 238:6
240:21,25
**practices** 34:15
**precertification**
251:1
**precise** 194:13
**predator**
171:17
**prefer** 5:5,7
**preparation**
13:4 84:11
86:5
**prepare** 11:6
**prepared** 20:8
77:20
**presence** 107:7
**present** 2:21
248:15
**preserve** 9:15
**presumably**
167:19
**pretrial** 113:13
**pretty** 11:19
19:8 28:10
33:12 84:14
85:9 139:16,16
161:24 181:5
195:6 205:2
223:16 233:6
**previous** 94:9
**previously** 5:20
7:19 23:12
34:7 55:2 64:7
65:8,22 88:1
133:4 136:16
143:18,21,23

145:12 194:14
225:9 228:25
229:1 235:9,11
235:14 237:17
**primary** 189:3
**print** 66:19
70:17 123:15
175:21,23
**printed** 176:18
177:15,20
181:17
**printer** 175:17
175:19 176:2,3
176:5,9,19
177:11
**printing**
176:22 178:15
**prior** 57:8
66:25 168:10
192:18 207:20
232:16,21,22
233:4
**prioritized**
52:12
**private** 23:3
141:8,12
**proactive** 35:5
36:8,12,23,25
37:10,14,15,18
38:6,12,13,14
39:7,20,23
40:7 41:3
43:13 44:24
49:4,5 50:6
51:9 52:2
55:19 65:5,9
65:12 80:3,4
81:10,13,14,16

81:18 91:10,15
**proactively**
243:22
**probable** 29:8
32:11 51:12
85:15 122:22
153:18,21
154:8,17
155:16,17
157:23 233:1
238:12 246:15
**probably** 31:11
31:20 36:9
42:24 44:6
46:14 51:24
52:25 54:14
55:23 70:16
74:14 92:2
101:10 106:13
106:16 109:18
110:6,11
123:25 137:17
147:9 148:1
157:13 160:13
160:20 168:18
177:10 184:2
190:13 194:13
194:16,20
195:6 220:15
220:15 221:1
225:3 230:7
**problem** 6:1
59:8 95:23
113:19 120:25
164:2,2 181:15
182:3,11
197:12,13

**problematic**
197:11
**problems**
199:7 200:25
234:21
**procedure** 1:24
56:10 174:13
**procedures**
41:24 56:9
85:11
**proceeding**
255:2
**proceedings**
5:2 251:17
**process** 93:1,21
98:17 99:4
115:2 173:22
249:1,4,9,12
**produce** 59:16
**produced** 1:17
**producing** 59:1
59:15
**product** 245:18
**production**
242:18,25
243:23 244:1,3
**profane** 119:18
**profanity**
120:4,6,8,10
**professional**
120:1
**profusely**
83:19
**program** 17:15
41:22 45:13,16
46:23 48:24
49:13,19,22
140:4 142:21

145:6 146:20
177:24 205:18
205:19
**programs**
48:21
**progresses**
56:5
**progressing**
117:16
**progression**
54:4
**prohibited**
147:8
**prolong** 154:11
166:19
**prolonged**
184:14
**promoting**
55:8
**promotions**
53:20 140:3
**propensity**
49:12
**property**
129:13 196:25
**proposing** 45:9
**propounded**
4:11
**protection**
15:10 26:14
**protective**
171:22
**proved** 253:12
**provide** 9:6
23:7 90:12
127:6,13 128:3
129:18 208:5
215:13 245:3

**provided** 91:18
91:21 130:7
154:13 215:12
**provider** 138:5
**provides**
142:18
**providing**
244:22
**provisions** 1:25
**pruneda** 77:17
**public** 38:15
240:11 253:22
254:22
**pull** 69:20
168:15 189:25
229:4
**pulled** 94:24
110:3 130:15
**pulls** 168:25
**purpose** 29:5
47:19 65:12
244:7
**purposes** 48:1
194:9 247:11
253:16
**pursuant** 1:24
254:19
**pursue** 54:6
**pursuit** 57:21
58:1
**put** 25:2,4
39:25 45:18
47:13 54:14
60:11 61:10,17
61:21 69:18
98:19,23 99:10
118:15 134:3
142:6 155:22

156:22 159:18
163:14 193:4,9
193:16 198:10
228:14 232:20
239:5,7 241:13
**putting** 22:15
80:12,16 112:2
147:16 149:7
153:22 233:3
240:5

**q**

**qualifications**
6:18
**qualified** 6:19
23:4
**quarterly**
130:5
**question** 8:12
8:18,20,22,24
9:4,11,13,16
9:17,23 31:5
53:9 122:14
146:5 153:11
162:20 166:22
186:10 215:9
**questions** 6:23
8:8,21 10:9,17
24:15 35:14
40:9,18 87:15
129:1 130:8
135:20 161:12
161:14 163:8
164:15 167:24
174:6 179:20
180:1,4,5,6,15
180:17,21,22
186:1 229:16

242:16,17,21
245:7 248:7
251:15
**quick** 78:18
181:4
**quit** 178:15
189:24
**quite** 66:6
**quiz** 21:21
**quota** 50:15
**quotation**
228:15
**quotes** 47:14
**quoting** 228:14

**r**

**r** 2:1 5:1 77:22
100:5
**radar** 160:4,10
**radio** 105:25
112:23 113:5
**raise** 137:1
164:12 242:18
242:25
**raised** 164:23
**raises** 116:15
116:16 166:9
**ralph** 72:9
**ran** 58:5
173:16 175:3
**random** 117:9
117:9,10
120:23
**randomly**
103:16 119:1
**rangel** 77:22
77:23,24,24

**rank** 71:18
**rapport** 83:3
**rare** 116:5
129:9,11 167:8
**rate** 64:4
151:23 160:3
**rather** 42:4
210:5
**ray** 69:23
**rbf** 1:6 254:7
**reach** 30:15,18
213:12
**react** 87:15
**reactivate**
139:20,24
140:12
**reactivated**
139:22
**read** 5:5,11
10:1 99:19
122:18 236:10
236:15 253:1
256:9
**reader** 139:7
142:18 143:7
144:13 145:10
146:6,10,20
147:24 148:4,8
149:13 215:10
219:6
**readers** 137:11
137:15,22
138:1,3,5,11
138:13,16
139:6 140:24
141:22,24
142:13,22
143:25 146:16

146:17 148:10
149:24 150:1
**reads** 150:9
**ready** 20:8
214:18
**real** 114:1
116:25 141:10
**realize** 189:11
189:23
**really** 14:7
24:10 27:5,19
36:23 114:1
139:25 160:12
167:17 192:11
192:18,19
211:11
**realtors** 141:9
141:9
**reason** 10:21
30:19 34:18,22
92:8 112:9
113:2,12
169:11 173:9
173:11 178:16
180:9 184:3,7
185:11 187:5
191:6 200:8
205:5 209:20
223:8 236:18
239:18 252:4
256:11
**reasonable**
29:7 85:14
136:21 153:17
154:11 155:15
156:11 157:7
157:22,23
159:1,6 180:25

181:19 182:6
183:11 184:1,5
184:9,14 185:7
185:15,20
186:23 246:16
**reasons** 104:24
189:16 200:15
209:24 254:23
**reassigned**
57:7,9 58:8,10
60:23,25 72:10
205:5
**recall** 90:17
94:20 98:6
218:17 233:20
236:18 238:23
240:5,6,23
**recalled** 192:24
**receipt** 157:16
254:22 256:17
**receive** 37:3
122:18 123:1
125:9,9,10
144:17
**received** 30:24
94:19 152:11
215:15,17
231:5,6,9
**receiving** 27:14
154:3
**recognize**
87:20 199:21
**recognized**
72:22
**recognizing**
17:22 89:8
102:21

**recollection**
119:12
**recommended**
101:14,15
**record** 1:25 5:3
5:24 8:7 10:18
10:18 79:20
96:21 108:25
112:10 114:4
130:4 148:11
153:8 167:11
215:8 225:21
225:22 249:5
249:22 250:2
254:18
**recording**
148:22 227:16
227:18
**records** 4:3
46:14 92:3
95:22 97:6
112:5 129:22
235:15 237:18
247:6 249:20
250:4,18,20,21
251:2,4
**recreated**
72:23
**recruit** 52:18
52:21
**recruits** 92:5
**red** 14:13
126:12 137:1
164:8 199:3
**refer** 13:8,20
**reference**
233:13,15,16

**referenced**
233:3 256:6
**referred**
227:12
**referring** 13:9
13:10,17,21,24
65:11 152:2
174:9 229:22
230:9 231:21
231:22 232:3
232:14 238:19
238:24
**reflect** 79:20
114:4 229:11
**reflecting**
244:7
**refreshers**
86:13
**refuse** 9:11,13
184:24 185:2
**refused** 182:25
185:4
**regard** 247:4
**register** 176:3
**registered**
171:21
**registration**
255:9
**regular** 42:8
**regularly**
139:24
**related** 7:19
81:15,19 91:20
207:22 255:1
**relations** 37:15
**relationship**
69:25

**relationships**
20:23 21:4
**relatively**
227:5
**relax** 83:4
**release** 192:8,8
**released**
192:22
**rellsworth** 2:20
**relocate** 113:10
**rely** 153:23
**relying** 154:1
**remained**
53:17
**remember**
11:13 21:22
34:11,15 72:15
84:22 88:6,23
89:4 90:19
91:16 94:6,21
98:9,13,18
100:7,8,10
129:8 133:3
163:20 203:1,5
204:9 209:15
215:19,20
219:24 220:12
221:20 224:23
229:24 233:14
233:22 235:4
238:9,16 239:2
**remove** 142:1
193:9,13,13,15
193:16,16,16
**removed** 142:1
142:5 246:19
**removing**
194:8 195:3

240:21
**rental** 137:3
**reorg** 69:3
**reorganization**
68:17
**reorganized**
74:11
**repeating**
228:16
**repetitive**
195:8,11
**rephrase**
214:10
**replace** 196:12
208:3
**replaced** 60:6
141:25 196:12
209:11 212:6
**reply** 221:4
**report** 29:25
45:25 76:15,19
76:21,21
107:25 108:10
108:14 109:3,7
109:8 110:8,14
110:18 111:13
121:9,12
122:10 123:9
124:15,18
125:10 127:7
129:19 176:13
211:21 232:13
232:15,25
233:4 243:8
245:2
**reported** 1:21
166:18 211:18

**reporter** 5:3,16
6:5,19 8:14
254:15
**reporter's** 3:11
6:18 254:13
**reports** 76:13
107:12,13,14
107:17,21
110:19 112:3
122:14,18
124:12 128:7
128:17 129:14
212:1 243:3,16
243:17,20
**represent** 5:20
94:17 97:21
220:19 221:13
226:9 235:13
237:16
**represents** 6:7
**request** 243:23
244:1
**requested**
244:9 246:9
254:21,24
**requests**
139:24
**required** 9:6
43:17 170:1
184:22 185:1
196:5
**requirement**
92:11
**requires**
167:11
**reserve** 251:15
251:16

**residence** 32:8
**resident** 37:7
**residents** 37:2
**resources**
49:15 58:17
**respond** 42:3,6
42:7,18 43:17
212:25 213:1
214:1
**responding**
36:10 42:20
43:7,20
**response** 8:12
128:16 129:2
194:6 243:22
244:22
**responses**
96:24,25
**responsibilities**
107:10 191:23
210:11,12
212:15
**responsibility**
15:11 106:21
**responsible**
22:14
**responsive**
243:4,13,25
244:6,14,14
**rest** 190:1
235:4
**restroom** 181:4
**results** 97:22
150:2
**retailers**
141:10,11
**retire** 209:21
210:4

**retired** 51:22
53:10 208:2,2
209:13,17,20
**retirement**
194:24
**retirements**
205:4
**retiring** 194:14
**return** 30:25
168:19 173:16
193:3 197:21
198:16 256:13
256:16
**returned** 58:7
254:22,23
**returns** 29:20
29:25 144:17
218:20,20,22
**revenue** 131:23
**review** 10:2,11
12:3,6,12,15
93:5,6,21
101:14 116:23
117:1,3,7,11
117:15,19,21
117:24 118:11
119:3,4,10
120:20,24
121:5,5 123:16
124:10,13
125:22,25
126:7 191:25
222:23 223:25
224:7,11
237:13 239:14
250:6,21,23
251:4 256:7

**reviewed** 11:7
11:7,9 12:2
124:18,20
181:9 222:22
223:1,10,20
234:6,7 249:19
249:24 250:4
250:20 251:1
**reviewing**
12:20 118:3
122:14 181:13
192:20 195:15
229:22 230:5
239:10
**reviews** 118:6
**revisit** 244:21
**rfp26** 244:6
**rfp40** 243:4
**rfp41** 244:15
**ride** 85:2
**riding** 114:20
**right** 5:21 9:15
10:1,11 13:8
16:13,15 17:24
18:4,5,20 25:9
27:16 28:12
33:7 34:2,25
36:8,10 37:25
41:11 42:24
43:3 47:25
48:10,13 50:15
54:7 55:4,6,8
56:5,10,21
59:20 60:4
64:5 66:6
67:12 75:8
78:11,12 79:11
80:19 81:9,11

81:23 84:9
85:5 86:7,20
86:22 95:13
96:11 97:18,20
104:9 105:17
106:19 110:16
111:9,12 114:7
115:7 118:10
119:12,22
120:5,16,22
121:8,16,17
123:12 124:8
126:13 127:9
128:21 131:1
132:14,19
137:3 138:18
140:7,9 142:8
142:9 143:23
143:24 147:16
148:5,9,12,14
148:15,15,16
149:2 154:5,16
155:7,9,12,25
156:6,11 158:5
158:10,17
159:1 160:1,21
161:5,24 164:4
164:7 165:9,9
165:25 166:1,1
166:18 170:5
173:14 174:5
174:14 176:12
176:25 177:1,4
177:9 178:6,24
182:18 184:2,7
184:11,13,23
185:2 189:9,12
189:16 192:7

192:23,23
193:16 194:15
194:21 195:7
195:12,12,19
195:21 196:13
196:19 197:15
198:1,5 199:10
199:12,19
200:13,16,17
200:19,20
203:6 204:21
205:14,16
206:25 208:23
210:6 212:9
220:21 226:4,5
226:6 229:15
230:17 231:13
234:22 237:8
241:3,11
242:10 247:8
**rigmarole** 5:24
**rio** 89:24
**rip** 178:5
**rms** 108:10,14
109:3,7,11,20
110:25 111:7
111:15 112:5
122:20 124:5
125:16 126:8
**road** 2:7 115:8
144:21
**roadside** 85:13
115:6 137:4
154:9 156:10
**roadway**
111:19 188:17
246:20

**robberies**
17:25
**rocking** 160:18
**rodeos** 14:6
**rodriguez**
220:6,13
221:24 222:11
235:14 237:12
237:17,25
238:4
**rodriguez's**
235:23
**roland** 193:9
**role** 17:4 70:8
75:9 103:15
188:10,13
214:21
**roles** 26:10
**roll** 104:1,3,8
106:14,17
**rolled** 109:23
**room** 83:9
129:13 163:3,6
**rough** 62:13
183:17
**row** 105:21
**rpr** 1:20 255:8
**rude** 114:11
174:7
**rule** 5:11 37:25
254:19
**rules** 1:24
133:15,20
146:16
**run** 29:19,21
30:25 46:25
49:22 58:5
146:6 156:10

161:22 166:14
174:25 180:22
199:9
**runaway**
166:18
**running** 78:7
238:5
**runs** 24:24
28:5,6
**ryan** 2:17

**s**

**s** 1:22 2:1,11,12
4:1 5:1 147:12
147:13 162:23
**sac** 14:24
**saenz** 2:22 6:10
**safe** 43:10
115:9 124:24
**safety** 25:22
**sake** 225:19
**salaries** 131:8
131:9
**salary** 131:14
**salazar** 1:8
206:4,9,15
254:8
**san** 1:2,23 2:13
14:16,22,24
15:3 24:21
25:12 27:10
29:1 50:17
254:2
**sanchez** 71:13
71:14,20 74:5
**sandra** 175:15
**sanford** 77:12
128:10,11

129:2 193:8
sapd 21:7
  24:24 28:14
  207:24
sarge 121:9
sat 13:10
satisfied
  236:13
saturday 33:1
saturdays 49:8
  49:11
save 88:14
saw 55:6 69:22
  110:3 115:18
  155:1 182:11
  195:17 223:6
  223:10,13,13
  223:21,22
  224:8 234:19
saying 23:18
  31:1 40:3
  98:20 99:17
  154:20 196:24
  198:22 217:4,7
  219:6 228:10
  228:11,17
  230:20 232:24
  238:20,21
  239:2,22
  240:23 243:21
says 66:20 93:3
  95:12 236:2
  238:2,9
sbcglobal.net
  2:14 256:2
scan 143:14
  147:18

scanned 144:16
  147:1 150:2
  217:12
scanning 147:8
  148:10 149:24
  149:25
scans 141:8
  144:4
scenarios
  161:22
scene 192:4
  193:2
scent 192:9
  246:25
schedule
  195:23
scheduling
  136:4
schmo 168:15
  168:16
school 14:10
  58:4 164:25
  165:1 248:17
  250:7
schott 1:3 5:20
  12:7 150:18
  181:14 214:22
  219:21,25
  220:6,20,24
  221:14 222:6,7
  222:8,12,15
  223:8,8,24
  224:20 228:14
  228:17 230:9
  230:16,20,21
  231:5,9 233:13
  233:15,21,25
  234:7,12,21

236:17,22
  237:12,20,20
  237:25 239:12
  254:3 256:4
schott's 220:13
  221:17,21
  227:20 235:24
schuler 193:9
scope 157:25
scratch 224:9
scratched
  224:6
screen 118:12
  118:15 219:11
  219:14
script 5:6
  172:11,23,25
  173:5,8
seal 253:18
search 20:6
  39:1 80:5 87:6
  155:17 182:21
  183:1,23,24
  184:12,22
  185:4,15,18,19
  187:9,14,17,20
  199:13 210:14
  217:18
searching
  38:20 65:13
  80:13 182:22
  217:17 223:13
seat 85:18
  154:16 155:2,2
  160:14,16
  162:18,18
  241:2

seated 27:6
seats 224:10
second 62:20
  89:9 94:10
  95:15 110:15
  163:17 197:23
  198:1,11,15
  229:4 235:17
  237:13
seconds 180:19
  180:23 227:4
  229:19 230:12
  230:12 231:16
  231:16 232:6,6
  233:9
secret 22:4
  74:23
section 68:10
  68:24 70:19,22
  71:9 73:14
  74:16 118:8
  232:5 236:2,10
  245:4
sections 15:13
  15:15,16,18
  130:15
security 21:13
see 9:1 16:18
  32:9 36:19
  55:24 61:23
  67:7,13,19
  68:8 70:14,18
  73:14 79:17
  91:8 92:22
  95:1 96:4
  97:19 98:24
  105:25 106:3,4
  110:5 111:24

117:16 120:14
120:14 122:11
148:25 149:20
154:14,15,25
155:11 156:3
156:24 158:1
158:12,20
159:3,22 160:2
160:3,7,13,15
160:18,22
162:17 181:13
190:13 192:9
199:3 201:9
211:11 224:9
224:11 228:19
234:21 235:20
236:2,5,7
237:3 238:21
239:24 249:14
**seeing** 47:5
51:12 67:10
96:3 97:1
100:8 155:19
156:1,21
159:13 161:11
245:23
**seek** 224:16
**seem** 238:1
**seems** 37:12
38:11,13,19
56:3,25 96:17
97:11 155:1
198:22 199:25
205:2 226:13
234:18 236:23
237:20
**seen** 119:16
160:21

**sees** 31:13
165:12
**seize** 135:11
**seized** 127:17
127:22 132:13
133:7 134:24
135:13
**seizes** 133:25
**seizing** 134:10
134:14
**seizure** 132:12
**seizures** 132:6
132:6
**seldom** 186:18
**select** 51:3 61:9
111:15,19
206:12
**selected** 53:4
**selects** 119:1
**self** 116:9
**send** 20:14
86:8,12 98:10
101:3 121:4
135:1 140:10
170:19 171:24
197:20,21
249:5
**senior** 53:1
192:17 198:8
203:11,14
**sense** 93:17
101:20 158:9
163:14 166:21
168:8 186:8
198:21 209:3
232:23
**senses** 51:16
55:21 85:15

155:10,14,19
**sent** 57:24
86:23 91:9
99:9,17 120:23
237:21,25
248:17 256:14
**sentence** 236:7
236:12 240:16
**separate** 41:5
102:25 143:18
164:18 203:23
**september** 47:4
**sergeant** 1:12
1:16 3:6 5:12
7:1 20:16
44:16 49:18
53:16,19,24,24
55:11 56:12,14
71:14,18,19,20
74:22 79:22
89:2 93:3
95:20 104:14
114:4 119:9
124:13 170:4
190:10,11
192:11 195:23
200:7,11,14
211:4,5,11
212:4 219:24
220:5,13
221:24,24
227:12 235:14
235:14,23
236:8,12
237:12,17,25
238:4 239:5
241:8 242:23
243:15,18

244:4,12,16
245:6 248:7
251:13 252:2
253:1,7,11
254:13,17
**sergeants**
54:13 55:9
74:1,4 124:10
131:20
**series** 179:20
**serve** 51:25
**service** 22:5
36:10 42:6,18
42:21 43:7,18
43:21 56:12,13
74:24 109:24
112:4 138:4
194:8 208:5
**services** 171:22
208:18
**serving** 202:21
202:25
**set** 41:21
144:25 145:4,4
199:8
**setting** 186:14
**settings** 145:1
**seven** 16:18
173:19,22
174:17
**several** 7:9
88:3
**sex** 35:24 36:2
**sexual** 171:17
**shake** 8:11
**shakes** 153:6
242:2

Peter Gamboa
July 23, 2024

**[share - slow]**

Page 49

| | | | |
|---|---|---|---|
| **share** 22:24 | 139:13 141:7 | **shortcut** 181:8 | **signed** 109:14 |
| 66:7 117:18,18 | 141:18 146:15 | **shortened** | 256:19 |
| **shared** 100:12 | 147:3,23 148:7 | 227:23 | **signs** 196:15,24 |
| **sharing** 20:24 | 149:25 150:6 | **shorthand** 1:22 | **silver** 171:25 |
| 56:18 99:17,22 | 178:12 179:4 | 254:15 | **similar** 120:19 |
| **sharp** 14:5 | 187:9 190:7 | **shortly** 72:13 | **similarly** 10:7 |
| **she'll** 130:4,6 | 195:18 205:7 | **shot** 58:6 | **simple** 198:2 |
| **sheet** 129:21,24 | 205:21,23 | **show** 141:16 | 198:23 |
| 256:11 | 214:12 242:8 | 193:4 225:13 | **simultaneously** |
| **shelter** 23:7 | 242:13 245:13 | **showing** | 146:12 |
| **sheriff** 13:23 | 245:25 246:20 | 108:25 | **single** 38:9 |
| 13:24 24:20 | 247:18 250:8 | **shuffle** 142:3 | 189:13,18 |
| 31:13 44:11,14 | **sheriffs** 136:9 | **shut** 235:1 | **sir** 23:23 33:15 |
| 45:7,8 63:24 | **shift** 19:14 33:4 | **sic** 25:2 | 67:6 68:23,25 |
| 63:25 72:8,22 | 103:1,2,3,4 | **sick** 194:16 | 101:25 246:6 |
| 80:1 136:12 | 106:11,12,13 | **side** 15:21 | 247:7,20 |
| 137:23 184:22 | 106:21,24 | 16:13,17,21,22 | **sit** 142:10 |
| 206:4,9,15 | 107:2,9,16 | 16:24 17:8 | 223:12 |
| **sheriff's** 12:21 | 109:15 112:6 | 23:7,9 25:16 | **sitting** 80:17 |
| 13:16,17,18 | 210:16 | 35:23 49:11 | 81:7 155:2 |
| 15:6,8,9 20:22 | **shifts** 112:10 | 54:15 62:25 | 224:8 |
| 22:20,21 25:13 | **shock** 198:4,9 | 66:23 103:17 | **situation** 167:1 |
| 26:14 27:22 | 198:11,19 | 103:17 115:7 | **situations** |
| 30:11 39:22 | **shook** 153:9 | 120:16 156:22 | 87:15 |
| 40:20,24 41:23 | **shooting** 57:7 | 159:19 162:3 | **six** 16:11,18,22 |
| 44:9,16 45:11 | 57:18 | 165:1,2 169:8 | 159:5 160:14 |
| 47:18 48:21 | **short** 17:7 | 169:9 201:10 | 168:5 202:4 |
| 51:21 61:15,17 | 60:10,24,24,25 | 243:11 | **sixth** 204:7 |
| 62:5 64:15,21 | 61:2 68:5 | **sides** 10:18 | **skill** 91:7 |
| 64:24 65:2 | 70:12 78:14 | **sidetracked** | **skills** 191:7,12 |
| 66:13 68:3 | 114:7 128:22 | 56:21 | 191:13 |
| 78:1 80:1 81:2 | 190:18 195:16 | **sign** 113:10 | **skin** 199:10 |
| 85:11 89:3,5 | 201:13 213:22 | 256:12 | **skip** 225:19 |
| 90:11,13 91:1 | 227:5 228:6 | **signals** 38:9 | 227:3 |
| 91:17,21 92:12 | **shortage** 58:13 | **signature** 3:10 | **slave** 35:20 |
| 132:2,7,15,22 | 58:13 | 252:1 253:2 | **slot** 60:20 |
| 132:24 133:7 | **shortages** | 254:20,22,23 | **slow** 36:11 |
| 134:1 138:7,11 | 57:12 126:25 | 255:7 | |

**small** 66:19
88:25 208:10
**smell** 55:21
155:13 156:3,4
156:24 158:12
158:21 159:23
203:7
**smelling**
155:19 156:2
156:21 159:13
161:11
**smuggler**
160:23
**smugglers**
50:18 136:22
218:21 219:3
**smuggling** 18:2
23:7,9 29:10
30:12 35:8,17
35:18 47:5
59:19 63:17
64:1,11 65:6
84:4 151:6,12
151:14 155:3,8
155:24 156:25
158:25 159:18
159:19,24,25
160:25 161:10
161:21 162:1,1
162:6 187:5
219:14
**snack** 9:21
**sniff** 210:13
214:19 223:11
246:17
**sniffing** 186:13
202:2

**snow** 88:8,9,11
88:21 102:7,13
**social** 4:12 19:1
**software** 143:8
143:19 144:2,7
144:9
**soledad** 1:23
2:13
**solutions** 255:9
256:23
**somebody**
28:13 36:18
87:20 106:4
115:8 120:17
139:19 155:12
163:9 178:19
178:24 185:10
189:11 196:20
196:25 223:18
240:11
**somebody's**
174:7
**soon** 181:5
**sorry** 32:25
33:1 42:24
63:2 70:16
71:3 72:4
153:10 187:10
208:7,13
232:18 242:5
248:8
**sound** 79:11
88:10 130:11
204:20 220:21
227:8
**sounds** 24:6
27:4 42:11
48:11 52:11

53:12 54:5
56:17 59:9
70:9 76:1 93:4
139:23 160:24
163:21 176:18
195:5 197:21
**source** 19:1
**sources** 18:8
**south** 84:4
103:23 137:6,7
152:13 157:11
**southbound**
30:5 103:17
**spanish** 162:20
162:20
**spanning** 33:17
33:20
**speak** 34:14,20
162:19,19
236:17
**speakers** 90:9
**speaking** 11:4
169:21
**spears** 108:12
108:14 109:8
110:25
**special** 33:11
34:1 47:12
69:1,2,11 71:6
107:23 108:2
142:25 143:5
143:10 244:10
**specialized**
54:22,23,24,25
55:4
**specific** 10:4
12:7 32:13
63:11 82:3,6,8

93:7 98:9
100:7 215:23
245:1
**specifically**
20:23 41:16
87:2 206:20
**speed** 47:6
64:12 145:15
145:19 146:2
151:23 160:3
**speeders** 38:7
**speeds** 64:4
**spell** 77:19
**spelling** 126:1
**spend** 106:23
**spending** 10:4
**spent** 107:3
134:6
**spin** 35:24
**spoke** 44:17
236:12,22
**spot** 61:7
148:21 223:3
**spots** 49:5,14
**spotted** 200:25
**springtime**
44:6
**staff** 67:14
70:20 128:12
**stagger** 103:19
**standalone**
40:21 80:12
**standard** 180:5
180:21 200:16
200:19 238:6
240:21 245:25
**standing** 115:7
160:8

| | | | |
|---|---|---|---|
| **stands** 22:11 | **states** 1:1 25:10 | 48:16 85:13 | 230:3,9,21 |
| **start** 6:22 8:22 | 35:19,23 254:1 | 106:4 107:8 | 232:17,21,22 |
| 9:1 20:2 33:14 | **station** 157:11 | 108:2,5,9,19 | 233:1,6 239:16 |
| 82:2 84:6 86:5 | **statistical** | 108:20 109:8 | **stopped** 28:23 |
| 111:3 125:9 | 50:14 | 111:16,17,18 | 30:10 47:10 |
| 136:19,20 | **stats** 130:6,7 | 111:22,22,23 | 58:6 110:13 |
| 154:10 162:24 | **status** 63:18 | 112:5,9 114:24 | 128:4 157:11 |
| 163:7 164:25 | **statutes** 132:19 | 114:25 115:16 | 157:12 180:8 |
| 168:25 187:3 | **statutory** | 120:13 129:5 | **stopping** 38:17 |
| 229:5 237:7 | 132:21 | 134:1 136:13 | 81:20 157:14 |
| **started** 14:17 | **stay** 103:23,24 | 150:12,13,14 | 157:18 158:7 |
| 46:24 47:5 | 125:25 189:20 | 150:17 153:18 | 187:23 189:10 |
| 84:12,18 86:17 | 209:25 | 153:22 154:9 | 214:25 |
| 91:12 103:11 | **staying** 83:7 | 154:12 157:10 | **stops** 18:10,18 |
| 106:11 192:1 | 165:11 | 160:2,20 | 19:5 31:7,10 |
| 192:12 197:9 | **stays** 168:6 | 166:19 167:23 | 31:22,24 32:1 |
| 201:2,21 | **step** 173:19,19 | 168:20,23 | 32:12,13,20 |
| 204:17,24 | 173:22 174:17 | 169:2,11 | 33:9,14,22 |
| 214:4 223:5 | **steps** 39:3 | 170:13,17 | 34:5 35:6 |
| 226:3 | **steve** 236:13 | 172:14,21 | 36:14 37:1,6 |
| **starting** 130:13 | **steven** 71:12,14 | 173:9,11 | 37:14,18 38:7 |
| 170:20 236:7 | 74:4 | 174:16 177:9 | 38:12,13 41:6 |
| **stash** 104:20 | **sticker** 65:23 | 179:19,19 | 41:12 42:4 |
| 167:22 | **stint** 89:6 | 180:18,23 | 43:25 44:25 |
| **stat** 50:13 | **stints** 55:6 | 181:14,23 | 45:1 47:19,24 |
| **state** 1:21 9:9 | **stipulations** | 182:20 184:15 | 48:9,12,19 |
| 9:14 14:12 | 6:13 | 186:17,20 | 51:11 52:12 |
| 29:20 31:3 | **stolen** 89:13 | 189:6,23 191:1 | 55:20 59:21 |
| 136:18,24 | 144:20,22,23 | 192:23,24 | 62:25 63:16 |
| 137:1,3,5 | 148:24 149:1,6 | 207:24 210:14 | 64:11 65:12 |
| 173:15 253:8 | 149:7,11 | 213:7,9,12,15 | 80:4 81:15,19 |
| 253:23 254:15 | 170:22 171:1,2 | 214:3,4,8,17 | 85:25 107:5 |
| **stated** 1:25 | **stop** 11:15,23 | 214:18 219:21 | 113:18 116:11 |
| 247:9 | 12:4,5,6,7 29:8 | 219:25 220:9 | 118:1 136:10 |
| **statement** | 29:9,16 30:4 | 220:19,24 | 153:16 174:5 |
| 34:19 122:23 | 30:16 31:15 | 221:2 223:1,17 | 176:25 177:3,6 |
| **statements** | 32:10,11 36:19 | 223:19 225:24 | 188:11 207:15 |
| 15:24 | 38:1 47:2 48:5 | 225:25 227:24 | 212:16 214:22 |

232:2 241:10
**storm** 88:6
**straight** 14:9
95:22 97:6
**strategic** 70:15
70:21,23
**street** 1:23 2:13
32:22 33:4,24
39:14 41:2
51:10 52:1
59:3,6 71:14
72:3,13,17,19
72:24 76:9
89:17,20 90:11
90:25 91:13,19
102:10,11,13
106:10 117:18
130:17 142:25
143:5 255:10
**streets** 41:3
42:9 91:9
**strong** 225:8
**stuff** 18:16
26:15 60:2
90:23 137:9
152:15 163:18
163:19
**style** 56:16
179:19 180:5
180:22
**styled** 1:18
**subject** 246:10
**submit** 93:10
93:18 134:23
**submitting**
94:20
**subscribed**
253:15

**subsequent**
232:21 233:4
**subset** 117:4
**substance**
136:7
**substitute** 54:2
**subtitles** 4:5,6
228:4,8,20
229:6,10
**success** 50:2,3
50:6,16 127:24
128:15
**sudden** 160:4
**suddenly**
217:18
**sufficient**
239:15,18
**suggest** 92:15
92:19
**suggesting**
97:15
**suit** 225:9
**suite** 1:23 2:4,7
2:13,18 255:10
**sum** 36:9
**summaries**
108:12
**summarize**
80:24 93:15
99:9 210:24
**summarizing**
234:19
**summary**
108:15 109:8
110:25 124:5
125:19,22
126:10,23
127:13 161:6

**sun** 196:10
**sunday** 32:25
33:2 38:4
**super** 94:3
**supervise**
16:11 25:25
26:3 48:8
75:24 176:25
190:6
**supervised**
179:13
**supervising**
126:16,17
191:19
**supervision**
102:19 125:8
**supervisor**
15:7,9 39:16
74:12,25 75:1
123:9 135:12
190:24 191:22
195:24 200:5
202:18 211:4
212:9,9 240:10
245:12,17
247:5 248:9
**supervisors**
117:19 126:19
140:18
**supplementing**
42:5
**support** 67:8
67:11,13 70:21
247:21
**supposed** 24:9
38:24 123:3
136:14 148:7
177:15,20

199:5 243:5
**sure** 6:1,21
19:17 21:10
22:11 23:3,17
24:11 26:7
29:18 30:2
32:16 36:22
42:10 46:16
49:9 50:8
62:15 64:20
65:20 66:24
70:14 77:21
98:8 102:23
103:15 104:4
104:16,17
118:19 130:12
132:25 133:24
135:5,22 136:6
143:1 153:19
155:18 156:7
161:8 164:5
166:16 178:8
181:6 189:3
191:20 196:17
198:21 200:10
203:21 205:9
208:13 209:23
215:2,11
218:19 219:23
221:13 222:16
225:21 227:8
228:21 229:8
231:2 232:15
233:19 237:15
238:3,7,8
240:9,10
241:17 242:24
245:8 247:2

249:24 250:10
250:17
**surrounding**
25:11
**surveillance**
20:5 32:3,7
48:4 165:15
167:12
**suspect** 168:10
**suspected**
186:14
**suspecting**
187:4
**suspects** 140:4
**suspicion** 29:7
85:14 136:21
153:17 154:11
155:15 156:11
157:7,22,23
159:2,6 180:25
181:20 182:6
183:12 184:1,5
184:9,14 185:7
185:16,20
186:24 246:16
**swap** 59:8
**swapped** 59:4
**swat** 71:7
**sweating** 83:19
**swore** 8:1
**sworn** 1:18
5:13 254:17
**system** 61:15
61:18 111:8
117:11 118:24
120:19,21
122:20 125:20
139:7,13

141:18 145:7
148:4,14
177:21 205:23
215:10,12,22
216:1,4 217:7
218:6,25
**systemic**
200:15
**systems** 29:24

**t**

**t** 4:1
**tacos** 168:6
**tactical** 68:24
70:13,15,19
71:6,8
**tactics** 56:19
115:4 120:13
**tag** 15:20 21:5
57:7,8 58:8
60:11 75:5
76:9 151:9
207:23,23
208:5,5,17
209:1,4,8
210:12,21
211:12
**tailored** 32:13
**take** 6:19 9:20
9:23 10:2,12
39:3 40:15
42:2 53:19
55:25 78:14,17
90:4 96:2,24
97:16 101:16
102:13 110:10
112:19 114:21
120:18 121:19

123:15 130:9
155:19 164:3
215:1,14 229:3
237:13
**taken** 1:18 7:21
62:23 78:20
101:21 102:3,5
135:18 181:7
193:21 215:7
226:24 255:2
**takes** 198:13
**talk** 13:15 37:7
37:17 65:15
66:8 79:25
82:1 83:19
94:3 95:14
102:18 113:4
113:23 115:10
126:14 127:8
127:21 135:5
135:23 136:8
150:16 151:19
159:19 188:15
206:19 219:20
**talked** 17:10
34:8 39:19
48:2 51:2
58:12 62:15
65:8 72:6 74:7
78:24 80:2
81:15 82:2
87:21 91:6,19
92:16 93:24
105:13 106:7
136:15,24
141:21 145:12
149:23 154:23
159:11 161:25

163:18 172:9
174:24 177:25
197:4,11
222:18 224:17
244:19 248:1
250:19
**talking** 9:1
16:13 33:16
46:16 82:14
83:1 101:24
123:22 136:7
143:21 148:13
152:23 154:14
156:5 157:19
233:20,22
238:20 239:11
**tall** 114:3,6
**tank** 157:24
158:1 246:18
246:21
**target** 18:3
199:19
**targeting** 18:6
73:3 151:14
**targets** 35:12
**tasers** 104:19
**task** 21:24,24
110:20 111:10
111:13 198:23
209:25
**tasks** 109:20
**taught** 37:24
92:3 174:13
**tcole** 92:9,10
**teach** 40:15
55:17 83:2
**teaches** 89:24
90:1 174:15

**teaching** 56:19
82:9 101:5
105:3
**team** 73:6
245:22
**tech** 225:8
**techniques**
82:10,13,15,18
82:18 83:2,18
83:23 87:9
88:24
**technological**
177:17
**teenager**
166:18
**tel** 2:5,8,14,19
**telephone**
186:14
**tell** 7:7 8:2
11:10 17:13,20
19:18 21:2
30:10 32:1
36:7 44:13
45:16 48:25
57:19 61:20
62:20 67:17
68:7 71:12
73:10 82:21
83:4,7 87:12
87:16,16 90:16
93:1 100:21
102:4 103:21
106:8 109:19
110:20 113:25
114:13,23
115:2 116:6
121:13 129:4,7
137:14 142:20

145:14 146:25
147:23 150:12
151:21 152:7
152:14,15
162:14 164:7
166:12 173:6
175:21 176:5
181:22 197:18
204:15 214:6
220:2 221:1,8
222:14 224:12
225:1 245:11
245:23
**telling** 172:25
176:19 230:15
234:20
**temp** 46:4
**temporary**
45:20 46:3,11
46:19,20
**ten** 16:19,20,21
16:22 78:18
179:3
**term** 17:7,8
35:3 36:23
174:3,17,18
**terms** 19:2 50:2
173:1 202:11
**terrazas** 51:1
51:10,23 58:21
59:9,24,25
60:1,5,6
**test** 48:21
53:20,22,24,25
54:8 55:25
56:1,6
**testified** 5:14
7:5 34:10

91:17 150:20
188:9 206:21
206:22 237:17
244:12
**testify** 7:9,17
11:2 52:3
**testimony** 7:19
8:4 10:22
235:23 245:1
251:13 254:18
256:9,17
**testing** 53:21
**texas** 1:1,9,21
1:23 2:4,13,19
15:20 17:11,15
71:16,20 73:15
73:16 74:2
89:25 152:13
253:8,23 254:1
254:10,15
255:8,10
**text** 97:8,19,19
98:19 99:10
154:5,20
**texting** 97:12
189:25
**tfos** 21:18,19
74:23
**thank** 5:16
6:21 14:21
33:15 39:18
66:4 79:23
87:24
**thanks** 17:1
49:24 78:21
215:6 232:12
**theater** 49:9

**theft** 17:25
89:6
**theoretically**
134:13
**thereabouts**
221:8
**therefor**
254:23
**thing** 9:22
10:13 25:17
31:17 36:11
50:12 56:14,15
79:22 90:25
91:2 100:15
108:15,16
119:24 120:22
132:21 142:21
144:15 183:12
187:2 206:11
225:16
**things** 8:12
18:13 20:8
29:3,11,11
30:6,12 31:4
36:20 38:4,9
38:25 39:11
41:3,14 42:21
52:11 56:16
59:19 63:8,17
65:7 78:10,23
82:18,23 83:10
83:21 84:4
85:1,9 87:5,6
101:5 102:9
103:12,13
107:15 108:12
110:6 113:7,14
114:12,18

115:12 116:11
121:18 126:6
127:3,12,22
136:22 141:8
145:20 149:21
155:23 157:1
158:11 159:7
159:11 160:25
161:11,17
162:2 163:7,9
163:18 164:12
164:21,24
166:2 180:14
190:2 191:21
196:5,16
199:11 200:1
205:14 206:6
206:10 218:21
228:13 243:25
**think** 21:8 23:3
23:15 36:8
50:12 51:22
67:20,20 76:10
77:8 78:11
79:2,7,13
89:24 90:19
91:25 92:16
93:4,9 94:2,3
96:2 102:2
106:22 127:16
128:11 132:23
132:23 135:15
139:14 156:14
161:19,23,24
164:4 171:16
171:20 172:10
181:8,16
185:13 192:9

200:3 203:3,15
203:17 204:5,6
214:25 225:5
226:3 228:25
230:4,5 232:24
234:12 238:2
238:19 239:22
239:22 241:13
**thinking** 44:18
180:14
**third** 163:20
249:3,5,6
**thought** 97:15
120:7
**three** 16:18
19:11 37:25
84:25 85:4
90:20 114:5
160:15 196:16
**throckmorton**
255:10
**throw** 200:11
200:14
**thumb** 37:25
**ticket** 177:15
177:20,21
178:5,13,16
179:1,7,8,13
179:16 184:16
189:14 190:4
**tickets** 131:24
176:21 179:2,3
**tie** 17:18
**tied** 141:15
155:12
**tiers** 16:2
**time** 11:12 13:7
13:8,9 37:5

39:6 41:20
44:16 51:11,25
52:1,1 54:2,2
55:9,10 57:9
58:2 60:10,22
60:24,24 61:10
67:8 68:5 70:2
70:4,12 72:8
72:14,18 78:12
78:12,16 85:2
86:9 90:5 93:7
102:16,17
104:14 106:23
108:24 113:20
114:10 116:16
116:20,21
119:14 120:9
120:15 122:1
122:16,18
123:21 124:4
125:15,18
131:1,11
135:15 148:12
148:16,17
154:10 157:9
168:5 171:24
174:7 179:1
181:21,22
182:2 183:14
187:11 188:3
190:10,11,18
192:6 193:3,6
193:7 194:7
195:16,24
198:11,15
200:9 201:14
201:21 206:1
209:10 210:19

211:13 213:23
215:18 217:11
220:4,10 221:7
221:20 222:25
222:25 224:13
225:19 226:10
226:13,16
239:6 241:8
242:17 245:11
245:16,16
250:9,15,25
251:14 256:18
**timeframe**
123:22 256:8
**timer** 111:3,5,9
**timers** 110:19
**times** 19:18
29:1,1,2,22,23
87:25 88:15
182:25 183:8,8
183:10,12,12
183:19,20
193:13
**tinted** 160:12
**tiny** 70:17
**tip** 161:1
**tips** 18:9,9,15
19:4 37:3
**tired** 189:17
**title** 63:9,14
**tobacco** 21:15
**today** 6:6,6,13
6:20 7:1,5,24
8:4,8 9:25 10:8
10:22 11:6
13:16 31:7
63:19 73:11
103:16 117:22

| | | | |
|---|---|---|---|
| 118:1 129:14 | 226:6 237:14 | 43:25 44:25 | 182:20 184:14 |
| 129:19 135:11 | **topic**  25:9 35:1 | 45:1 47:19,22 | 186:17,20 |
| 142:10 146:3 | 241:15 | 47:24 48:5,8 | 188:11 189:5,5 |
| 207:4,6,11 | **topics**  87:8 | 48:12,16,19 | 189:22 191:1 |
| 243:13 244:4 | **tore**  196:11 | 51:6,11,14 | 207:15 210:14 |
| 244:12 | **total**  16:10,12 | 52:12 54:24 | 212:16 213:7,9 |
| **together**  22:15 | 16:17 159:6 | 55:20 62:24,25 | 213:12 214:3,4 |
| 40:1 52:23 | 163:14 | 63:4,4 64:11 | 214:8,17,18,21 |
| 59:5 79:14 | **totally**  166:12 | 65:12 80:4 | 219:25 220:9 |
| 88:2 103:23,24 | 166:14 | 81:8,15,19 | 223:1,17,19 |
| 104:6 106:8 | **tote**  223:15 | 84:15 85:12,12 | 225:24,25 |
| 164:1,15 | **touch**  156:6,8 | 85:25 91:13 | 227:24 230:3 |
| **told**  31:13 53:3 | **towards**  17:17 | 106:4,25 107:3 | 232:17,21,22 |
| 145:14 185:14 | 29:8 38:20 | 107:5,8 108:2 | 233:1 241:10 |
| 193:3,15 | 141:5 | 108:5,9,19,20 | **trafficked** |
| 198:10,12 | **towing**  141:9 | 109:8 111:16 | 167:12 |
| 199:19 223:24 | **town**  86:21 | 111:18,22,22 | **trafficker** |
| 224:2 230:19 | 157:17 158:7 | 111:23 112:5,9 | 154:4,8 167:14 |
| 230:19,21 | 164:25 | 113:18 114:24 | 167:18,19,22 |
| 231:5 234:7,12 | **toy**  192:10 | 114:25 117:25 | 168:11 |
| 234:20 238:23 | **track**  193:5 | 129:5 130:16 | **trafficking** |
| 239:14,17,19 | 199:8 200:1,4 | 130:16,17 | 18:1 22:7 35:9 |
| 241:5 | **tracking**  192:8 | 133:25 136:10 | 35:17,19,23,24 |
| **tonneau**  222:20 | 199:7,18 202:8 | 136:13 149:19 | 79:3,4,9,10 |
| 223:2,3,4,9 | **traffic**  18:10,18 | 150:17 153:16 | 154:25 159:20 |
| 224:1 | 19:5 22:10 | 153:18,22 | 162:1,3,6,14 |
| **took**  51:18 | 30:4 31:6,6,10 | 154:12 157:9 | 162:15,16 |
| 129:12 192:12 | 31:13,15,21,24 | 160:1 161:16 | 164:16 165:7 |
| 194:6 232:19 | 32:1,5,10,11 | 166:19 167:13 | 165:21 166:2 |
| 243:8,14,16 | 32:12,13,19,20 | 168:20,23 | 167:2,5,5,8,11 |
| 246:20 | 33:8,14,22 | 169:11 170:2 | 167:23 168:10 |
| **tool**  149:14,15 | 34:5 35:6,9 | 170:13,17 | 168:17 186:25 |
| **toolbox**  223:14 | 36:14,17,19 | 172:14 174:4,5 | **trailers**  89:10 |
| **toothbrush** | 37:1,6,14,18 | 174:15 176:25 | **train**  192:19 |
| 163:6 | 37:21,24,25 | 177:2,5,9 | 198:14 206:12 |
| **top**  46:17 | 38:3,7,12,13 | 179:19,19 | 250:11 |
| 108:14 125:25 | 38:20 41:1,1 | 180:18,23 | **trained**  202:5,6 |
| 126:2 160:18 | 41:12 42:4 | 181:14,23 | 203:7 206:13 |

224:7 248:14
248:22 250:8
251:8
**trainee**  174:15
**trainer**  198:8
250:8,12
**training**  4:12
4:14 32:23
33:6 40:10,12
40:14 61:24
62:16,20,21
63:9,13 67:22
67:25 68:19
70:3,10,13,22
82:1,3,7,12
83:15 84:17,18
86:3,5,18,24
87:22 88:1,21
89:1 90:11,14
90:25 91:18,19
92:2,4,13,15
92:19 93:3,22
97:12 98:11,14
99:6,6,22
100:8,14,15,23
101:16,17,17
103:7 116:8
130:19,20,21
130:23,24,25
131:2,3,14
133:9,21 134:7
134:10,15,23
134:23,25
135:2 173:25
174:14 191:20
191:25 192:2
192:15,20,22
193:5,10,17

194:2,3,9,10
195:7,8,11,16
197:13,14,22
198:7,14 199:1
199:4 200:3,4
200:16,18
202:9 205:13
206:17 247:2
247:10,11,12
247:12,21,23
248:15,17,18
249:5 250:4,6
250:18,21
251:4
**trainings**  40:18
63:11 91:20
97:15
**trains**  92:4
206:16
**transcript**
254:17,22
256:6,19
**transferred**
45:23 192:13
192:14 210:3
**transitioned**
39:21 75:9
**translated**
191:12
**transnational**
151:10
**transporting**
63:16 180:11
**trap**  10:16
**travel**  144:15
159:2,10,14,15
216:2,10

**traveling**  30:5
140:25 141:2,4
141:6
**treadwell**
50:25 51:5
52:6 57:6
114:2
**trick**  10:16
**tried**  48:22
52:8
**trip**  83:9
**trooper**  157:25
**truck**  223:11
223:14 224:6
224:10
**true**  253:3
254:18
**truly**  116:2
**trunk**  155:12
**truth**  8:2
116:19
**try**  8:13,16,16
8:19,21,23 9:2
82:11 92:24
93:15 100:8
117:14 127:2
204:8 225:12
240:12
**trying**  21:8,21
21:22 88:6
95:22 98:16,17
99:3 128:21
139:14 161:22
163:19 171:16
200:1,11,11
202:11 204:5,7
223:6 224:2

**tubbs**  207:21
207:25 208:4
209:11,17,20
**tuesday**  32:25
**tuesday's**
206:15
**tuesdays**  33:2
**turd**  184:6
**turn**  129:21,21
145:23,25
146:9,13 149:4
178:16,22
**turnaround**
216:12,13
232:2,4,16
**turnarounds**
216:5 219:18
**turned**  145:14
145:20
**turning**  121:6
**turnover**  205:6
**turns**  145:9,13
146:1
**twice**  159:5
**two**  12:20
15:13,15,22
16:2,5,18
18:13 21:11
26:10 33:10
34:1 37:13
38:13 52:4,5
53:22,23,25
54:1 57:1,15
61:22 62:16
73:24 86:10
88:1,17,19
103:21,22,23
110:4 122:5

127:10,11
128:20 130:16
130:17 158:11
160:15 163:18
163:22 164:15
164:17 165:4
202:4 203:19
209:1 212:8
213:14,15
221:14 228:6
245:3 248:16
**twos** 86:23
**type** 17:18
28:22 50:7,20
51:9 87:4,9,9
87:10 101:12
107:13 149:16
151:12 156:16
163:8 170:14
215:19 219:2,3
**types** 19:12
48:14 49:14
51:13 155:22
180:14,17
**typical** 17:20
18:7 19:13
103:10
**typo** 238:7

**u**

**uh** 8:12,13
14:25 25:8
26:23 28:21
32:6 35:25
37:22 41:25
45:19 46:1
51:7 63:5 64:2
67:16 70:24

84:8 89:7
91:23 95:2
97:13 102:6,8
103:18 104:2
104:13 105:1
115:5 126:24
127:4 136:25
145:24 152:25
156:18 166:4,8
173:10,13,20
185:3 189:21
194:25 195:10
203:23 215:16
221:3 236:6,24
**ultimately**
192:13
**umbrella** 27:2
74:16 212:10
**under** 7:5,24
11:12 17:2
26:24 27:2
41:23 47:11
57:8 62:1 67:7
67:8,24 68:6
68:22,24 70:5
70:20,20,20,23
70:25 71:1,5,6
71:15,15,17
72:17 73:12,12
73:12,15,16,19
90:6 131:2,5
132:19 147:9
147:14 167:12
200:12,14
206:15 212:10
247:21,22,22
253:12,18

**understand**
7:24,25 8:1,18
8:20 9:7,18
10:5,19 12:8
19:20 21:10
27:4 33:8
35:16 36:3,22
37:12,19 39:18
42:10 43:3,15
45:22 46:22,22
52:7,15 53:16
54:4 56:1
57:16 64:20
69:15 75:13
77:8 79:6
92:12 95:3
98:17 99:3,21
105:5 112:8,14
115:13 116:12
118:10 129:23
130:24 133:24
135:8 137:10
146:22 153:19
155:18 158:12
161:8 163:11
163:11,25
165:3 185:9
202:11 205:10
216:15 226:16
228:15 231:21
232:2,13,18
233:5 235:22
235:22
**understanding**
44:22 70:8
97:22 98:22
102:12 103:3
120:7 128:6

159:6 188:13
219:4 237:11
237:22 249:3
**understood**
28:18 33:22
48:7,20 50:21
54:3,3 59:24
63:18 70:7
71:4 73:5,7,10
74:1,7 76:23
77:8 78:11
82:13 83:23
85:17 86:14
131:4 149:23
164:14 168:8
172:18 174:8
177:7 182:8
188:9 191:19
191:20 196:22
199:25 214:2
228:16 230:14
231:2 232:24
**unidentified**
96:18
**uniform** 31:23
75:21,22 76:2
76:8 77:5
104:5 119:24
125:3 211:13
**uniformed**
76:12
**unit** 15:8,10,12
15:15,21,25
16:9 17:11
24:24 26:13
27:18 31:23
32:17,22,24
34:1,2 35:5

| | | | |
|---|---|---|---|
| 39:9,17 40:1,3 | 137:15 138:15 | **upstream** | **user** 98:21 |
| 40:21,23 41:2 | 138:17 140:19 | 105:19 | **users** 139:15 |
| 41:6,16,17,17 | 141:23 142:4 | **uptick** 47:5 | **uses** 27:21 35:3 |
| 41:21 42:7,11 | 143:1,4 151:10 | **use** 9:16,20 | 143:1 195:19 |
| 44:4,10,12,18 | 183:5 187:24 | 18:9 27:19 | **using** 36:2 |
| 44:23 45:5,9 | 188:10,14 | 28:22 38:9 | 42:24 51:16 |
| 45:12 47:1 | 189:4 190:7 | 48:18 49:15 | 80:10 81:5,19 |
| 49:4,23,25 | 191:5,24 | 55:20 65:19 | 85:15 119:18 |
| 50:1,9,12,22 | 193:22,24 | 78:15,16,17 | 119:19 144:12 |
| 51:6,8 52:8,24 | 199:6,22 201:5 | 81:6,9 83:10 | 146:16 147:24 |
| 53:1 54:22,23 | 201:8 202:13 | 85:22,24 | 148:3 149:12 |
| 54:24,24 56:23 | 202:16 205:3,7 | 107:13,22,23 | 151:7 152:18 |
| 57:1,4,10,10 | 206:7 207:19 | 112:22 113:25 | 155:10,14,18 |
| 58:14,18,23 | 208:7,14,19 | 128:12 134:24 | 159:3 160:4 |
| 60:9 61:8 | 209:4,8 211:16 | 135:1,2,14 | 179:7 185:6 |
| 63:19 64:14,23 | 241:9 244:8,10 | 137:3 139:12 | 188:16 189:5 |
| 65:16 66:10,13 | 244:11,11 | 139:19 140:4 | **usual** 6:12 |
| 67:18,24 68:4 | 246:1 247:4,6 | 142:22 143:7 | **usually** 17:18 |
| 68:18 69:1,3,5 | 247:15,19 | 147:25 148:7 | 18:8 20:2,12 |
| 69:6,9,10,11 | 248:2,9 | 149:15 151:5,6 | 27:20 31:22 |
| 69:14 70:1,9 | **united** 1:1 | 152:7 153:4,13 | 108:10,18 |
| 71:7,16,21 | 35:19,23 254:1 | 154:21 156:10 | 164:16 183:6 |
| 72:9,14,20,23 | **units** 48:21 | 174:17 175:16 | 213:22 215:23 |
| 73:2,8,9,15,17 | 50:10 54:21 | 186:15 188:15 | **utilized** 142:7 |
| 76:10 80:11,12 | 55:1,5 103:8 | 189:2 198:11 | |
| 80:25 81:6 | 117:17 128:13 | 210:23 230:4 | **v** |
| 82:3 84:12,15 | 201:4,5,8,11 | 249:3,23 | **v** 256:4 |
| 84:17 85:1,17 | **universe** | **used** 28:20 | **va** 256:15 |
| 85:22,24 86:2 | 243:25 | 29:25 41:23 | **valley** 89:24 |
| 86:6,17,18 | **unpack** 36:23 | 74:19 81:6 | 242:13 |
| 90:6 91:13 | 59:16 86:15 | 128:7,8 133:8 | **van** 160:17,18 |
| 93:10 102:19 | 152:1 | 133:16 134:3 | **vehicle** 28:24 |
| 102:24,25 | **unpacking** | 140:10,11 | 28:25 29:9,16 |
| 103:11 125:8 | 82:20 | 151:13 152:5 | 30:4 32:8 |
| 126:15,18 | **unsafe** 169:1 | 153:17 174:3 | 38:21 49:12 |
| 128:18 130:14 | **upfront** 57:25 | 179:13,16 | 51:15,16 52:16 |
| 131:9,22 134:9 | **uploaded** | 186:11,24 | 58:5 65:13 |
| 134:13 137:11 | 104:18 | 247:12 256:19 | 81:20 89:12 |

| | | | |
|---|---|---|---|
| 104:5 110:4 | 256:9 | 141:12,15,18 | **vs** 1:4 254:5 |
| 127:2,3 130:18 | **veritext** 255:9 | 141:19 142:8 | **w** |
| 130:19 136:14 | 256:14,23 | 142:14 143:19 | **w** 2:20 |
| 138:18,22 | **veritext.com** | 143:23 144:2 | **wait** 8:23 55:18 |
| 141:4 142:6,6 | 256:15 | 145:4 147:22 | 79:17 110:17 |
| 142:13 144:10 | **versa** 137:6 | 148:13 150:9 | 111:25 113:19 |
| 144:16,20,24 | **version** 68:9 | 159:3 215:12 | 114:24 160:6 |
| 148:24 149:2,3 | 70:24 143:12 | 216:17,20,23 | 187:24 188:4,6 |
| 149:5,6,11,15 | 143:13 227:23 | 218:12,25 | 214:17 238:12 |
| 154:6,22 159:4 | **versus** 183:18 | **vin** 89:8,9 | 238:15 239:18 |
| 160:11 161:4 | 207:19 | **violated** 234:13 | **waiting** 55:14 |
| 162:8 166:22 | **vet** 23:25,25 | **violation** 31:14 | 81:7 214:13 |
| 166:24 167:6 | 24:19 154:2,19 | 35:9 85:12,12 | 243:2 245:5 |
| 169:7,25 | **veteran** 51:20 | 107:7 149:21 | **waive** 5:7,8,9 |
| 170:14,22,23 | 51:23 198:7,8 | 160:1 182:4,15 | 6:13,17 |
| 170:25 171:2 | 198:12,13 | 232:21 238:21 | **waived** 5:11 |
| 171:17,21,22 | **vice** 137:6 | **violations** | **walk** 29:12 |
| 171:24 182:21 | **victim** 167:7,12 | 37:21,24,25 | 103:10 107:21 |
| 182:22 186:24 | 167:13 | 38:20 51:14 | 168:5,22 169:7 |
| 187:4,9,12,15 | **victims** 59:19 | 149:20,21 | 172:9 |
| 187:18,21 | 167:23 | **violator** 112:1 | **walked** 224:22 |
| 214:19 216:9 | **video** 10:7,8,12 | 136:19 149:16 | **walking** 172:10 |
| 219:7,7,15 | 11:8 12:2,2,6 | 154:10,14 | **want** 9:16 |
| 240:21 | 223:10,25 | 156:12 162:17 | 37:17 39:3 |
| **vehicles** 28:23 | 225:6,22 | 173:19 174:6 | 42:3,3 49:24 |
| 47:6 51:13 | 226:11,25 | 174:17 180:19 | 51:3 52:19 |
| 63:15 64:3 | 227:4,6,9,23 | **virginia** 2:8 | 56:22 64:20 |
| 78:8 80:5 | 228:5,7 229:9 | **visited** 248:18 | 65:15 66:8 |
| 82:23 85:16 | 229:20,24 | **voice** 114:2,3,7 | 72:16 79:25 |
| 89:9 128:4 | 230:13 231:18 | 227:14 | 82:1 96:20 |
| 130:16 131:10 | 232:8 233:10 | **volunteer** | 97:15 99:13 |
| 138:18,25 | 234:4,16,25 | 213:3 | 100:25 101:15 |
| 139:1 141:25 | **videos** 12:9 | **von** 13:12 | 102:16,18 |
| 142:24 148:16 | 104:17 117:3,4 | 34:10,13,19 | 103:25 109:6 |
| 151:22 238:5 | 117:5,8,11,20 | 91:17 177:25 | 110:22 114:15 |
| 240:18 241:3 | **view** 107:7 | 206:21 243:24 | 119:19 126:14 |
| **verify** 96:25 | **vigilant** 138:6 | 244:25 | 129:3,23 130:8 |
| 153:25 244:21 | 138:7,8 140:11 | | |

132:11 136:8
145:12 150:16
156:22 159:8
159:18 161:8
168:19 188:1,3
203:21 206:19
209:24 227:22
229:15 234:15
235:8 237:3
240:12,14,20
**wanted** 14:8
59:15 60:13
112:8 171:13
198:11 209:25
215:9,15
218:20,24
219:1 222:20
238:15 240:10
**wants** 173:12
**warning** 173:1
173:18 175:4,8
175:14,18
177:8,10,12
181:17 184:16
184:23 189:12
196:15 197:1
230:25 231:6
231:12 238:11
**warnings**
114:16 176:17
**warrant**
210:14
**warrantless**
11:17,25
**warrants** 20:6
20:7 31:2 35:7
41:12 54:23
72:12 173:12

186:5
**wasting** 174:7
**watch** 10:13
36:18 225:5
227:5,6,22
228:7 229:18
230:11,11
231:14,15,16
232:5 233:8
234:2,15,24
**watched**
227:19,24
230:15 232:10
234:17,18
**watching** 52:3
87:13 107:3
178:3
**way** 17:20
29:15 42:6
43:24 49:14
69:18 74:14
76:6 86:11
105:17 106:22
121:8 122:21
123:14 125:2,9
151:24 152:14
158:18 170:12
174:5 184:17
190:2 194:21
195:11 198:15
200:20 223:7,7
226:3 229:1
**ways** 95:8
213:15,21
**we've** 24:10
28:20 65:8
80:2 92:16
95:5 140:2

158:11,13,20
164:22
**weapons** 63:16
65:5 84:3
219:3
**webb** 30:10
**wednesday**
33:1 121:19,23
**wednesdays**
32:24 33:3
**week** 19:21,22
127:7,22 128:4
159:5
**weekly** 126:23
127:7 128:7
129:14,19,20
129:24 130:3
243:3,8,15,19
**weeks** 122:5
**weird** 163:12
163:15
**went** 11:11
14:24 15:2,3
39:13 55:10,15
61:2 84:19,25
86:4,11 88:1
88:16 89:5,19
116:8,18
123:11 138:16
143:19 144:2
145:19 158:1
165:1 192:15
**westbound**
141:5
**western** 1:1
254:1
**whatsapp**
150:21,25

151:3,13,17
231:23
**wheeler** 87:3,7
88:4,19
**wheelers** 63:14
90:19,21,23
160:19
**windham** 2:6
6:4 78:13
153:8 235:10
**windham's**
217:10,11
**window** 61:2
**windows**
160:12
**wings** 214:14
**wires** 142:2
**wiring** 142:3
**wish** 116:1
**withholding**
238:11
**witness** 1:17
5:13,15 33:15
79:21 153:6
219:8 242:2
243:1 245:8
248:4 251:13
252:2 254:17
254:18 256:8
256:10,12,18
**word** 42:24
43:3 126:5
139:12 141:10
141:11 188:16
188:16,21,24
190:3
**words** 94:25
119:20 228:22

**work** 11:12
15:13,21,23
16:5 19:15,21
21:6,9 22:22
23:18 24:4
25:12 26:12
32:18 33:4
35:20 36:18
37:5,23 39:8
39:15 47:21
50:7 51:9 52:4
52:24 55:4,22
73:2 74:21,22
80:10 103:17
103:20 104:4
105:7,7 113:16
116:3,4,6,9,17
122:22 143:17
148:6 149:10
151:11 163:8
175:17 176:2
177:9 182:7
199:20 245:17
245:18,23
**workday** 17:20
18:7 19:13
**worked** 14:14
23:6 52:23
59:5 84:21,25
105:23 114:23
115:2 134:21
242:9,14
**working** 14:12
27:9 38:3
41:11 42:8
48:1 53:7 62:1
64:3 86:18
121:10 122:21

140:18,19
142:4 163:3
164:10 176:6,7
176:9 177:11
179:25 191:1
221:9
**works** 24:21
26:19 29:12
37:19 73:8
76:6 78:1
123:14 125:2
142:20 164:9
165:3 201:17
**world** 121:16
**worn** 12:21
116:23 117:21
117:25 118:4
118:11,18
119:3,10
**worth** 255:10
**wright** 2:18
**write** 6:5 79:23
107:12 110:24
111:12 175:20
176:17 178:5
179:2 184:16
189:10,14
190:4
**writing** 79:23
112:2 177:21
**written** 182:9
182:14
**wrong** 37:13
54:18 66:23
77:14 82:21
93:15 147:1
175:25 204:16
221:5 228:20

**wrote** 122:10
131:24 232:25
237:12

**x**

**x** 3:1 4:1
128:24 129:3
134:24 254:21

**y**

**y** 22:24 128:24
129:3
**y'all** 103:22,23
103:23,24
128:19 164:21
208:22
**yard** 196:9
**yeah** 19:6 21:4
42:25 46:20
54:16,16,16
61:3 62:14
63:10 67:4,4
75:23 78:14
79:7,18 88:13
93:24 94:9
98:18,18
104:24 105:22
106:16 112:7
112:16,16
113:2 115:1,15
118:24 120:6,6
120:8,8,8
124:3 126:22
135:9 137:20
138:23,25
143:11,13
145:22 150:8
156:3 158:8,19
167:17 171:7

176:1 184:13
186:9 187:12
190:21 194:20
201:1 204:10
210:20 213:8
217:5 220:18
229:22 239:14
239:21 240:1
**year** 123:25
190:15
**years** 14:19
51:22,25 53:22
53:24,25 54:1
55:24 61:22
62:16 179:13
179:15
**young** 198:7
**younger** 52:5
53:2 55:17
**youngest**
203:16

**z**

**z** 128:24
203:18,23
204:2
**zero** 59:21
**zone** 75:7
**zulu** 226:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.