Page 1

1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION
3    ALEK SCHOTT,                    )
          Plaintiff,                 )
4                                    )
     v.                              ) Civil Action No.
5                                    ) 5:23-cv-00706-OLG-RBF
     JOEL BABB, in his individual )
6    and official capacity;          )
     MARTIN A. MOLINA III, in his )
7    individual and official         )
     capacity; JAVIER SALAZAR,       )
8    in his individual and           )
     official capacity; and BEXAR )
9    COUNTY, TEXAS,                   )
          Defendants.                )
10
11
12   **************************************************
                    ORAL DEPOSITION OF
13
                       GARY HASTON
14
                    JANUARY 10, 2025
15   **************************************************
16       ORAL DEPOSITION OF GARY HASTON, produced as a
17   witness at the instance of the Plaintiff, and duly
18   sworn, was taken in the above-styled and numbered cause
19   on January 10, 2025, from 9:07 a.m. to 4:46 p.m.,
20   before Donna Wright, CSR in and for the State of Texas,
21   reported by machine shorthand, at the LAW OFFICES OF
22   WRIGHT & GREENHILL, P.C., 4700 Mueller, Austin, Texas,
23   pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached hereto.
25

Page 2

1        A P P E A R A N C E S
2
   FOR THE PLAINTIFF:
3      Mr. Joshua A. Windham
       Ms. Christen M. Hebert
4   INSTITUTE FOR JUSTICE
       816 Congress Avenue
5      Suite 970
       Austin, Texas 78701
6      (512) 480-5936
       chebert@ij.org
7
       -and-
8
       Mr. Joshua A. Windham
9      Mr. Joshua Z. Fox
       Institute for Justice
10     901 North Glebe Road, Suite 900
       Arlington, VA 22203
11     (703) 682-9320
       jwindham@ij.org
12     jfox@ij.org
13
   FOR THE DEFENDANT JOEL BABB:
14     Mr. Stephen Barron
       WRIGHT & GREENHILL, P.C.
15     4700 Mueller Boulevard
       Suite 200
16     Austin, Texas 78723
       (512) 200-9697
17     sbarron@w-g.com
18
   FOR THE DEFENDANTS MARTIN A. MOLINA III
19  AND BEXAR COUNTY, TEXAS:
       Mr. Hector X. Saenz (via Zoom)
20  LAW OFFICES OF CHARLES S. FRIGERIO
       111 Soledad Street
21     Suite 840
       San Antonio, Texas 78205
22     (210) 271-7877
       csfrigeriolaw@sbcglobal.net
23
24
25

Page 3

1                    INDEX
2   Appearances..................................    2
3
4   GARY HASTON
5
       Examination by Ms. Hebert......................    4
6
       Reporter's Certificate.........................  274
7
8
9                   EXHIBITS

    NUMBER          DESCRIPTION            PAGE
10
    Exhibit 110  ...............................    9
11       Haston Report with Correction
    Exhibit 111  ...............................    11
12       Haston Report
    Exhibit 112  ...............................    14
13       CV
    Exhibit 113  ...............................   210
14       BlackVue Camera Systems Printout
    Exhibit 114  ...............................   251
15       Steve Walters Training Materials
16
17
            PREVIOUSLY MARKED EXHIBITS
18  NUMBER                          PAGE
19
    Exhibit 49  ...............................   160
20
21
22
23
24
25

Page 4

1                GARY HASTON,
2   having been first duly sworn, testified as follows:
3                  EXAMINATION
4   BY MS. HEBERT:
5      Q.  Good morning.
6      A.  Good morning.
7      Q.  Mr. Haston, my name is Christen Hebert.  I
8   represent the plaintiff, Alek Schott, in this matter.
9   We just met for the first time a few minutes ago; is
10  that correct?
11     A.  We did.
12     Q.  Can you state your full name for the record?
13     A.  It's Gary Don Haston, H-A-S-T-O-N.
14     Q.  Great.  I'm just going to introduce you to our
15  team.
16     A.  Okay.
17     Q.  You met Mr. Fox, Josh Fox --
18     A.  I have.
19     Q.  -- a few minutes ago.  And this is
20  Mr. Windham, Josh Windham.  And then in the room, we
21  also have Donna, the court reporter, which you met a
22  few minutes ago.  And then counsel, Stephen Barron, who
23  is representing Deputy Babb.  And on Zoom we have
24  Hector Saenz --
25          MS. HEBERT:  I can never say your last

Page 5

1   name, Hector.
2          MR. SAENZ:  That's good enough.
3      Q.  (BY MS. HEBERT)  Who is representing Bexar
4   County and Defendant Molina in this case.
5      A.  Okay.
6      Q.  So just usual stipulations, you're here, that
7   means you're waiving any defects in your deposition
8   notice.
9          Before we go on today, I want to go over
10  a couple of housekeeping rules.  Have you ever been
11  deposed before?
12     A.  I have not.
13     Q.  Okay.  So you understand that you are under
14  oath today?
15     A.  I do.
16     Q.  And you understand that's the same oath that
17  you would take as if you were in the courtroom
18  testifying for before a judge?
19     A.  I do.
20     Q.  Okay.  It's important that we have a clear
21  record today.  Donna is going to take down everything I
22  say and everything you say, and that means that we need
23  to have clear verbal answers on the record.  So please
24  don't shake your head.  Nodding or shaking your head is
25  just not captured by the record, and we try to avoid

2 (Pages 2 - 5)

Page 6

1 things like "uh-huh" or "huh-huh." So we'll try to say
2 yes or no, just so it's clear for Donna.
3      A.  Okay.
4      Q.  If you don't understand a question, please let
5 me know.
6           Can we agree to that?
7      A.  I understand, yes.
8      Q.  And if you answer a question, I'm going to
9 assume you understood what I was saying. Is that fair?
10      A.  That's fair.
11      Q.  Okay.  Similarly, let's try to not interrupt
12 each other.  Please don't start answering a question
13 until I have finished asking it, and vice versa, I'll
14 try not to interrupt you when you're answering a
15 question with the next question.  I know that it's not
16 a natural conversation because it kind of usually ebbs
17 and flows, but we will both do our best.  And if Donna
18 thinks we're doing a bad job, she will let us know, I'm
19 sure.
20      A.  I agree.
21      Q.  If you do not know the answer to a question,
22 it is okay for you to say so.
23      A.  Okay.
24      Q.  And the other attorneys here, Hector and
25 Stephen, may state an objection on the record, but that

Page 7

1 doesn't mean that you should not answer.  It's just
2 they are looking to preserve the objection so if we try
3 to use your answer later down the line, they can argue
4 to the judge that the form of the question earlier was
5 improper, the question was improper.
6           Does that make sense?
7      A.  Yes.
8      Q.  Okay.  If you would like to take a break, use
9 the restroom, get a drink, get lunch, just ask.  For
10 the most part, this is going to be an informal,
11 relatively informal conversation, so feel free to, you
12 know, shout.  The only thing I would ask you to do is
13 to finish answering a particular question before we
14 take a break.
15      A.  Sounds good.
16      Q.  And if there is something that I have asked
17 that you don't understand, feel free to ask me to
18 rephrase it.
19      A.  Of course.
20      Q.  We're going to look at some documents today.
21      A.  Okay.
22      Q.  It's your right to look at that document in
23 its entirety.  I'm not trying to trick you, I'm not
24 trying to rush you.  I may point you to some specific
25 parts of the document to ask questions, but if you want

Page 8

1 to take time to review a whole document, we can take a
2 break and you can review the whole thing.  That is your
3 right.
4      A.  Okay.
5      Q.  Is there any reason that you're not able to
6 give your full and best testimony today?
7      A.  No.
8      Q.  Okay.  And would it be fair for plaintiff's
9 attorneys to rely on your testimony at trial?
10      A.  Of course.
11      Q.  Okay.  Are you generally clearheaded to
12 testify today?
13      A.  Yes.
14      Q.  You haven't taken any impairment medication?
15      A.  No.
16      Q.  You haven't had any alcohol this morning?
17      A.  No.
18      Q.  Did you prepare a report?
19      A.  I did.
20      Q.  And I see that you brought a document with
21 you?
22      A.  I have.
23      Q.  What is that document?
24      A.  It is the report.  However, I have reviewed it
25 this morning.  There are a few typographical errors

Page 9

1 that I want to make you aware of.
2      Q.  Sure.
3      A.  Other than that, you know, it's a complete
4 report.
5      Q.  And if there are errors in the report that you
6 want to just note as we go along, feel free to just
7 shout.
8           So I'm going to introduce your -- your --
9 the version of your report that you brought as an
10 exhibit.
11           MS. HEBERT:  Could you put an exhibit
12 sticker on that?  So whatever is -- 110.
13           MR. BARRON:  110.
14           (Exhibit 110 marked)
15      Q.  (BY MS. HEBERT)  Are there any notes on this
16 version of the report?
17      A.  Let me see if I may have -- I don't believe
18 there are.
19           (Discussion off the record)
20           THE WITNESS:  Yes, there is one
21 correction written on this report.
22      Q.  (BY MS. HEBERT)  Sure.  We will just --
23 because you brought it with you, we're going to put an
24 exhibit sticker on it.  I'm probably just going to just
25 give you a clean version of your report so we all know

3 (Pages 6 - 9)

Page 10

1    that we're looking at the same thing.
2         I have been known to lose pages of
3    documents because I don't have a stapler at my desk.
4         MR. BARRON: I can get you a stapler.
5         MS. HEBERT: Well, at my desk in the
6    office.
7         MR. BARRON: Oh, okay.
8    Q.   (BY MS. HEBERT) So we're just going to --
9    Mr. Haston, we're just --
10   A.   I'm listening.
11   Q.   We're just going to put an exhibit sticker on
12   that one and you can hand it to Donna.
13   A.   Okay. Are you going to give me a different
14   report?
15   Q.   Yeah, we're just going to give you the clean
16   version.
17   A.   Okay. So just so I don't forget later --
18   Q.   Sure.
19   A.   -- the correction will be on page 17.
20   Q.   Excellent.
21   A.   It will be the first line.
22   Q.   Okay.
23   A.   And it will be where Scott -- Schott -- I
24   mispronounce his name a lot -- Schott overtook the Ford
25   truck, at which time the left contour line was

Page 11

1    completely over the broken white line. That is
2    incorrect. That should be the right contour line.
3    Q.   Oh, okay.
4    A.   So that's the only error that I see.
5    Q.   Sure.
6    A.   I just wanted to note that before you give
7    me --
8    Q.   And just so you know, that will be scanned in.
9    A.   Okay.
10   Q.   And you will have a copy of it.
11   A.   Okay, good.
12   Q.   Okay, so that will be 110. I will leave that
13   for Donna.
14        (Exhibit 111 marked)
15   Q.   So we're going to hand you an exhibit that's
16   marked 111. Take a second to review that.
17   A.   Okay.
18   Q.   Let me know when you're ready.
19   A.   I'm just going to make sure all of the page
20   numbers are correct.
21   Q.   Sure.
22   A.   It looks good.
23   Q.   All right. So is this the report that you
24   prepared in this case?
25   A.   It is.

Page 12

1    Q.   And does this report contain the opinions that
2    you intend to testify about at trial in this case?
3    A.   It is.
4    Q.   Does this report contain all of the opinions
5    that you intend to testify about at trial in this case?
6    A.   Yes, unless there is something else that comes
7    up --
8    Q.   Okay.
9    A.   -- that I might need to readdress or amend my
10   report. But at this time, yes.
11   Q.   And what kind of things would cause you to
12   amend your report?
13   A.   Oh, I don't know. Being in law enforcement,
14   you know, I may learn things here today that I wasn't
15   aware of from, you know, things that I have been
16   provided to review.
17   Q.   Sure. I guess, then, before writing this
18   report, did you have an opportunity to review all of
19   the evidence you wanted to review before offering an
20   opinion?
21   A.   I did.
22   Q.   Okay. Did you have an opportunity to ask
23   Defendant Babb's counsel for additional data?
24   A.   I did.
25   Q.   Did you have an opportunity to ask for

Page 13

1    additional evidence? That can be different, depending
2    on what's going on.
3    A.   I did, yes.
4    Q.   And did you ask for additional data or
5    additional evidence?
6    A.   I did, actually, throughout this. I asked for
7    policies from Bexar County Sheriff's Office to review
8    those.
9    Q.   And did you get everything you asked for from
10   defendant's attorney?
11   A.   I did.
12   Q.   Okay. Did you have an opportunity to do any
13   testing that you wanted to do?
14   A.   I did.
15   Q.   And as we sit here today, do you have any
16   plans to revise or supplement your report?
17   A.   As of right now, no.
18   Q.   Okay. We're going to hand you another
19   exhibit.
20   A.   Okay.
21   Q.   Exhibit F from our stuff, we're going to mark
22   this Exhibit 112.
23        (Exhibit 112 marked)
24   Q.   We started, obviously, with Exhibit 110.
25   That's just because we continue through all of the

4 (Pages 10 - 13)

Page 14

1    depositions.
2        A.    That's cool.
3        Q.    I'm handing you what's marked 112.  Do you
4    know what this document is?
5        A.    Yes, it's my CV.
6        Q.    And I -- I guess I want to start at the top.
7    There is a header that says "Subject Matter Expert
8    Testimony Specialist and Consultant."
9            Do you see that?
10       A.    I do.
11       Q.    How long have you been working as a
12   consultant?
13       A.    This is my first case.
14       Q.    Okay.  So when did you start working as a
15   consultant?
16       A.    I guess this would have been maybe, what,
17   October -- I believe October when I received this, or
18   November.  I can't remember exactly.
19       Q.    So October of 2024?
20       A.    2024, yes.  It's '25, so it's -- I have to get
21   used to changing the '24 to the '25, I guess.
22       Q.    Yeah, me too.  I'm not there.  I wrote '24
23   just yesterday.
24            So what do you do as a consultant?
25       A.    I evaluate a case, particularly this case, I

Page 15

1    have been asked to evaluate regarding narcotic matters,
2    narcotic enforcement, which is my specialty.
3        Q.    Okay.  So have you ever been asked to evaluate
4    a case as an expert before?
5        A.    Not in a civil case.
6        Q.    Sure.
7        A.    I have testified on many occasions in criminal
8    court as an expert witness.
9        Q.    And those times that you testified in criminal
10   cases, were you involved with those criminal cases?
11       A.    I was not.
12       Q.    So were you retained as an outside expert to
13   offer an opinion about an event?
14       A.    Not necessarily retained, but subpoenaed.
15       Q.    Subpoenaed?
16       A.    To come to court, yes.
17       Q.    And when you were subpoenaed, who subpoenaed
18   you?
19       A.    Most of the time it was the district attorney
20   or the county attorney's office.
21       Q.    Did you ever testify on behalf of a defendant
22   in a criminal case?
23       A.    Well, in a criminal case, it's not necessarily
24   testifying on the behalf of a defendant or the behalf
25   of an officer.  It's similar to the civil case that I

Page 16

1    see here.  You know, they asked me to come in and to
2    give an opinion on, you know, matters revolving around
3    that case.
4            So both defendants and prosecutors are
5    allowed to question me in court, you know, to support
6    their position, you know, for me to help clarify what
7    happened during that case.  So it's really no different
8    than a civil case.
9        Q.    Understood.  And when you testify in a
10   criminal case, who usually pays you for that time?
11       A.    You're just paid by your agency.
12       Q.    Okay.
13       A.    Yeah.  It's -- most of the time, you're
14   just -- you're on duty, so you're paid by the agency.
15       Q.    Understood.  So when you've testified in a
16   criminal case, were you -- or when you had previously
17   testified in criminal cases, were you employed at the
18   Williamson County Sheriff's Office during that time?
19       A.    Yes.
20       Q.    Okay.  So since -- and you're no longer with
21   the Williamson County Sheriff's Office, correct?
22       A.    I'm retired.
23       Q.    Okay.  So since leaving the Williamson County
24   Sheriff's Office, have you testified in a criminal
25   case?

Page 17

1        A.    I have not.
2        Q.    Okay.
3        A.    No, I have not.
4        Q.    And --
5        A.    Well, yes, I have.  I'm sorry.
6        Q.    It's okay.
7        A.    I actually was just subpoenaed to court within
8    the last six months, I believe, surprisingly.
9        Q.    And have you testified yet in that case?
10       A.    Yes, actually, from 24 years ago.
11       Q.    Okay.  And --
12       A.    So believe it or not, I was surprised.
13       Q.    And what was that case -- what was that case
14   about?
15       A.    It was -- it was a drug trafficking case where
16   I had arrested a guy for, you know, a lot of drugs and
17   he had gone to prison.  I think he served his sentence
18   and now he's contesting his representation by an
19   attorney who has now been arrested because I guess he's
20   gone corrupt, and so I was pulled back into court to
21   testify for that case involving his counsel and, you
22   know, whatever was going on with that.
23       Q.    So you had specific factual knowledge about
24   that particular case; is that correct?
25       A.    Well, yeah, from 24 years before that.  I

1 didn't remember very much.
2   Q.  Understood.
3   A.  Yeah.
4   Q.  So can you give me a rough estimate, how many
5 times would you estimate that you have testified in
6 court?
7   A.  More than 50.
8   Q.  Okay, got it.  And every one of those 50 has
9 been a criminal case thus far?
10   A.  Yes, ma'am.
11   Q.  Fair to say, then, this is your first case as
12 a consultant expert?
13   A.  In a civil case, yes.  But there's always a
14 first, right?  You've got to start somewhere.
15   Q.  Agreed.
16       So I want to just look at your experience
17 with --
18   A.  Sure.
19   Q.  -- the Williamson County Sheriff's Office.
20 How long did -- your last role was commander of the --
21 of the criminal investigations division; is that
22 correct?
23   A.  That's correct.
24   Q.  And how long did you work in that role?
25   A.  That was a short period of time.  That was

1 less than a year before I retired.
2   Q.  Okay.  And so then when exactly did you leave
3 the Williamson County Sheriff's Office?
4   A.  December of 2020, I believe it was.
5   Q.  Okay.  And since December of 2020, it's now
6 the beginning of 2025, what have you been doing in the
7 last four some-odd years?
8   A.  Fishing.
9   Q.  What kind of fishing do you do?
10   A.  Crappie fishing.
11   Q.  Okay.
12   A.  No, actually now what I do for -- you know, I
13 work with an auction company, Gaston and Sheehan
14 auction company out of Pflugerville.
15   Q.  Okay.  That -- what is an auction company?
16 I'm sorry.  I have no idea, actually.
17   A.  Sure, yeah.  So it's -- it's where assets are
18 liquidated, like the city of Austin.  We have the city
19 of Austin contract where we sell everything that they
20 need to get rid of, you know, be it stolen property --
21   Q.  So are you like an auctioneer?
22   A.  Well, I'm actually more -- I go and get the
23 contracts, you know, with companies to sell online with
24 Gaston and Sheehan auction company.
25       THE REPORTER:  With what?

1       THE WITNESS:  With Gaston and Sheehan
2 auction company.  And we have the US Marshals contract,
3 so we sell everything seized by the DEA and FBI in the
4 nation on the jewelry contract.  We also sell cars for
5 wrecker companies when people don't pick up their car,
6 then they have a right to sell the car to recover their
7 fees.  That's primarily what I do is I get contracts
8 for wrecker companies to sell their cars online.  And
9 we sell about 12,000 of those a year, just impound
10 cars.
11   Q.  (BY MS. HEBERT)  And who are the people who
12 you are contracting with?
13   A.  Gaston and Sheehan auction company.
14   Q.  No, no.  I guess like --
15   A.  Oh, you mean the customers?
16   Q.  Yeah, like who are the clients, I guess?
17   A.  Well, here in town, we have the city of
18 Austin.
19   Q.  So anything that the city of Austin seizes or
20 it's like lost and found?
21   A.  No, it's like their fleet.  You know,
22 everything.
23   Q.  Oh, okay.
24   A.  It could be stuff from the airport that they
25 take from TSA checkpoints, it's vehicles that are

1 seized, you know, as part of investigations, fleet,
2 fire trucks, ambulances, police cars.  It's --
3 everything that they need to get rid of, we sell it.
4 That's one.
5       Government agencies, bankruptcies, so
6 companies that go out -- go out of business, we
7 liquidate that to recover money for the bankruptcy
8 court.  The wrecker companies, the towing companies,
9 majority of the companies in Austin, we sell the cars
10 for them that people don't pick up.
11   Q.  What's the weirdest thing you've ever sold?
12   A.  Well, it's funny, someone asked me that
13 question the other day.  So I just went to McAllen to
14 one of the federal offices and picked up Johnny 5.  Do
15 you know who he is?  All you guys are young, right.
16       MS. HEBERT:  Do you know, Stephen?
17       MR. BARRON:  No.
18       THE WITNESS:  Johnny 5 is a robot that
19 they -- in the movie Short Circuit and it was part of
20 an investigation that FBI had done and they seized it
21 as part of this white collar case.  So I went and
22 picked Johnny 5 up here last year, so that's
23 interesting.
24       Art, we sell a lot of art.  We sell, you
25 know, a movie poster that Leonardo DiCaprio had and it

Page 22

1  was sold to a white collar group that the FBI had done
2  and it sold for like $1.1 million. Right now, we have
3  a lot of Pokemon cards on auction, where youngsters,
4  you know, that know about -- maybe your age, that know
5  about Pokemon cards and, you know, they are going for
6  thousands of dollars online right now. So it's
7  unbelievable what we sell.
8      Q. (BY MS. HEBERT) So would you say that most of
9  the things that you're selling come from government
10 agencies?
11     A. A lot. Let's say a lot of it. That's just
12 one aspect of the business.
13     Q. Okay.
14     A. Yeah.
15     Q. That's cool. I have not heard of that before.
16        When did you start doing the auction
17 business?
18     A. When I left the -- when I retired from the
19 sheriff's office in 2020, I started to do that.
20     Q. Okay. So by my count -- and I'm notoriously
21 bad about this, so correct me if I'm wrong -- you
22 worked for the Williamson County Sheriff's Office for
23 23 years; is that right?
24     A. Yes, since 1997.
25     Q. Okay. And there are a bunch of roles listed

Page 23

1  on pages 1, 2 and 3 in your CV. Are those roles all
2  from working at the Williamson County Sheriff's Office?
3      A. What's unique about that, and the reason
4  there's such detail in that, is -- it's related to why
5  I'm here today, actually -- I was recruited to go to
6  the sheriff's office to be an interdiction officer, to
7  work interdiction cases.
8         The Williamson County Sheriff's Office
9  was cooperating -- or they were part of a task force
10 through the Governor's office, so there were like 43
11 task forces or so in the state. They needed an
12 interdiction guy to come over and to work interdiction
13 cases, so they recruited me from Round Rock PD and
14 said, "Hey, we have an interdiction position, we will
15 give you a car, seven counties to work in and all you
16 need to do is go find Mexican drug smugglers." So
17 that's how I ended up at the sheriff's office.
18        The roles that I had during that time was
19 obviously an interdiction officer with the sheriff's
20 office assigned to the Capital Area Narcotics Task
21 Force. Later, I became an undercover officer, again,
22 with the Capital Area Narcotics Task Force, and then I
23 was reassigned to the United States Department of
24 Justice Drug Enforcement Administration -- the DEA, as
25 people commonly know it -- as a task force officer

Page 24

1  federally deputized at DEA.
2         At that point, I worked, again, a lot of
3  undercover, criminal interdiction on public
4  transportation, Amtrak, Greyhound buses, Mexican buses.
5  I did a lot of conspiracy investigations, you know,
6  leading to North and South America, everywhere in the
7  country.
8         From that point, I was then reassigned
9  back to the sheriff's office, a short stint in CID as a
10 properties crime detective, and then new administration
11 came into office and I went back to the narcotic unit
12 to build up -- to help increase the size of the
13 narcotic unit at the sheriff's office itself.
14        So then I spent many years there,
15 promoted to sergeant, became the supervisor of the unit
16 until a new administration came in in 2016 and then
17 then I moved to patrol or traffic. So now I'm back in
18 uniform after I don't know how many years, wearing a
19 badge and a gun and a car with computers that I need to
20 learn how to use and, you know, how to cut video
21 cameras on in that particular car because they had
22 gotten so much better.
23        From that point, I went through the
24 promotional process and became a lieutenant where I
25 went to working nights as a patrol lieutenant,

Page 25

1  supervising sergeants and deputies on the street, and
2  then I was appointed as commander of criminal
3  investigations during my last year there.
4         But that's basically what you're seeing
5  in that CV.
6      Q. Okay, thank you.
7      A. Yes, of course.
8      Q. That's super helpful. So how did you become
9  an interdiction guy?
10     A. I was in Crockett, Texas in the early '90s
11 when interdiction was really in its infancy stages.
12 And at Crockett Police Department, there were several
13 federal housing projects there with a lot of open air
14 drug market, so really it was a lot of drug crimes. So
15 my interest in working drug crimes came from Crockett,
16 Texas, a small town.
17        And this interdiction thing came about to
18 where officers were seizing large quantities of drugs
19 in the trunks of cars, you know, that they just put 100
20 pounds of drugs in a trunk and drive down the highway.
21 And that interested me, so I started going to training,
22 started going to schools and learning more about it.
23        And then I took that training and
24 realized that Crockett, being a dry county, Houston
25 County, having a lot of housing projects, they had an

7 (Pages 22 - 25)

Page 26

1  alcohol problem, actually, because it was a dry county.
2  So my first interdiction stop was not drugs, but it was
3  bootlegging.
4        THE REPORTER: It was what?
5        THE WITNESS: Bootlegging.
6        THE REPORTER: Oh, okay.
7        THE WITNESS: Yeah. So my first actual
8  stop for criminal interdiction was a load of alcohol
9  going to the projects to be sold individually without a
10  TABC license.
11        So from that point forward, you know,
12  there really wasn't a lot of Mexican drug smuggling
13  going to Crockett. A lot of small drugs. So I learned
14  this trade of interdiction from user amounts, midlevel
15  amounts of drugs until I came to Round Rock Police
16  Department in 1995.
17        At that point, I had a major highway,
18  that being Interstate 35, and then I took all of the
19  knowledge that I learned from East Texas and I put it
20  to work on I-35 with Mexican drug smugglers.
21        At that point, I started getting large
22  loads of drugs on Interstate 35. I learned more about
23  it the more I interviewed the people in the cars and I
24  gained the interest for how the drug trafficking world
25  worked. You know, instead of just stopping the car, I

Page 27

1  learned more about how -- you know, the operations of
2  the cartels.
3        So that's -- that's -- in a nutshell,
4  that's how I got involved in interdiction.
5  Q. That's helpful.
6        So it sounds like, to me, at the Crockett
7  Police Department, you were there in the mid-'90s; is
8  that fair?
9  A. Early to mid-'90s, yes.
10 Q. Early to mid-'90s?
11 A. Yeah, mid-'90s, probably mid-'90s.
12 Q. You kind of developed an interest in
13  interdiction; is that correct?
14 A. I did.
15 Q. And then it sounds like when you worked for
16  the Round Rock Police Department you did traffic stops;
17  is that correct?
18 A. I did.
19 Q. And you started doing more interdiction?
20 A. I did.
21 Q. Okay. And then after that is when you went to
22  the Williamson County Sheriff's Office?
23 A. I was employed by Williamson County, assigned
24  to the Capital Area Narcotics Task Force.
25 Q. Sure. What did you do at the Capital Area

Page 28

1  Narcotics Task Force?
2  A. Criminal interdiction.
3  Q. So what did it look like there?
4  A. It was a task force that we -- we had seven
5  counties that we were responsible for.
6  Q. Can you -- can you list off those counties?
7  A. Sure, absolutely. Obviously Travis County.
8  Q. Sure.
9  A. Williamson County, Hays County, Bastrop
10  County, Lee County, Caldwell County and Fayette County.
11  So my responsibility was to work criminal interdiction,
12  look for drug smugglers on any of the routes going
13  through those counties.
14        In addition to that, I was an officer
15  that would be called to help the investigative side of
16  the task force by stopping cars that they had under
17  investigation or that they needed stopped because they
18  knew they had drugs in them or they just needed people
19  identified as part of that investigation.
20  Q. Okay. And how many officers did you have as
21  part of that task force?
22  A. I don't recall. I don't know -- well, this
23  won't answer that. Each county had at least one
24  representative. That's how they were part of the task
25  force.

Page 29

1  Q. So you had at least six folks?
2  A. Well, seven, there was at least seven, and the
3  then the interdiction guy, that's eight, another
4  interdiction, nine, the commander was from the Texas
5  Department of Public Safety, that's operated through
6  DPS, so there's the commander. That's ten. Roughly --
7  roughly ten in that particular time.
8  Q. Okay, thank you.
9  A. Uh-huh.
10  Q. And these other roles, the DEA task force, did
11  you do traffic stops in that role?
12  A. No.
13  Q. Okay. And then the detective of narcotic
14  enforcement, did you do traffic stops in that role?
15  A. Sometimes.
16  Q. How often?
17  A. At the time the unit was -- was small. We
18  didn't have a lot of undercover guys or guys to really
19  do big investigative cases. So during slow times, we
20  purchased a police Tahoe and we would go out and work
21  in uniform doing interdiction for drug smugglers.
22  Q. But that was not your -- was that your
23  daily -- daily activity?
24  A. It varied. It just depended upon how busy we
25  were on the other side of the house, right. So I did a

8 (Pages 26 - 29)

Page 30

1 lot of it.
2    Q.   And excuse my ignorance.  What do you mean by
3 "the other side of the house"?
4    A.   The investigative side.
5    Q.   What does the investigative side look like?
6    A.   Investigative side is where they develop
7 informants, they use informants to develop probable
8 cause to -- you know, to get a search warrant and to,
9 you know, search houses.
10    Q.   Got it.  And in your sergeant of special
11 operations role, did you do traffic stops?
12    A.   At times I would because as part of the
13 sergeant in the narcotic unit, I was developing a new
14 criminal interdiction unit for the sheriff's office.
15 So, yes, I did have to recruit and train new guys in
16 the unit to help them understand narcotics, understand
17 criminal interdiction and, you know, to follow the
18 policies and the procedures and the way we wanted them
19 to do interdiction.
20        So, yes, I was heavily involved with
21 developing the criminal interdiction program as a
22 sergeant.
23    Q.   Okay.  And then as a patrol lieutenant, you
24 were out there doing traffic stops?
25    A.   I very rarely did traffic stops as a patrol

Page 31

1 lieutenant.
2    Q.   As the assistant to the sheriff, did you do
3 traffic stops?
4    A.   Not at all.
5    Q.   Okay.  And then as the commander, did you do
6 traffic stops?
7    A.   Not at all.
8    Q.   Okay.  I'll come back to some of your criminal
9 interdiction work in a minute.  I just kind of want to
10 finish your resume.
11    A.   Sure.
12    Q.   Can you flip to the last page of your CV?  I
13 actually don't know the difference between CV and
14 resume, so if I use the terms interchangeably, is that
15 okay?
16    A.   We are good, yes, ma'am.
17    Q.   So I want to take just a quick look at your
18 certifications.  Would it be fair to say this is a fair
19 summary of your certifications?
20    A.   Yeah, the majority of them.
21    Q.   Okay.  Would you say that these are the most
22 important certifications?
23    A.   Sure.
24    Q.   I have to ask you about one.
25    A.   Okay.

Page 32

1    Q.   Do you know which one I'm going to ask you
2 about?
3    A.   I do not.
4    Q.   The investigative hypnotist certification.
5    A.   Okay, yes, ma'am.
6    Q.   This is like --
7        MS. HEBERT:  You will just have to humor
8 me, Stephen, for like a second.  I have never seen that
9 before.
10    Q.   (BY MS. HEBERT)  What is an investigative
11 hypnotist?
12    A.   So there are times where there may be a victim
13 of a crime, right, or a witness to a crime.  I'll give
14 you an example.  You are at a 7-Eleven and you're not
15 thinking anything, you walk in, you go and get your --
16 you know, your water, you go to the counter and once
17 you get your water, you're walking out and then some
18 guy rushes in or rushes out and kind of bumps into you
19 and you don't think anything about it, but you looked
20 at them and made eye contact with them.
21        And then you go about your merry way,
22 right.  You may have walked out and you looked at the
23 car that he got out of and you may have, you know,
24 really not paid attention to it, but you made an effort
25 to go, "Oh, that guy drives, you know, an F-150

Page 33

1 pickup."
2        Well, then you find out that the 7-Eleven
3 was robbed and you come forward to the police and you
4 say, "Hey, you know, it's odd, but I was at that store
5 during that timeframe and I saw this guy rush in or
6 rush out, they bumped into me, you know, and I saw
7 their car, but, you know, I don't remember anything
8 about it.  It just went into my subconscious memory and
9 I don't know anything."
10        An investigative hypnotist can actually
11 hypnotize that witness and then bring that information
12 from the subconscious into basically the conscious mind
13 so they can actually see that license plate that's been
14 stored in their subconscious mind.  And then they will
15 actually, a lot of times, be able to say -- from
16 visually seeing it in their subconscious mind, they
17 will be able to say what that license plate number is,
18 even though they didn't really look at it and remember
19 it.  So that's what that is about.
20        I went to school.  That was put on by the
21 Texas Department of Public Safety, the Texas Rangers,
22 who utilize hypnosis for this purpose and I became a
23 certified hypnotist for law enforcement.  I did it
24 during the time I was in narcotics as a detective.  Not
25 that it was applicable to anything with narcotics, but

9 (Pages 30 - 33)

Page 34

1  being that an investigate -- investigator cannot
2  hypnotize your own witness, right, so you needed
3  someone that was not associated with the -- with the
4  case, and that's why I went.
5           I have a friend that was a detective in
6  CID that wanted to do it and said, "Hey, I want you to
7  go with me," and so I said, "Hey, that's cool, I've
8  never heard of it. Let's go." I didn't really believe
9  in it at that time. I didn't know much about it until,
10 during the course, and I'm at home with my daughters
11 and the dog and I practiced on them.
12      Q. I'm sure they loved that.
13      A. And, of course, I videotaped it, you know,
14 because I love video cameras. I mean, I have always
15 watched videos, used videos in my job, you know, so of
16 course I videotaped this deal and, you know, they --
17 out like a light. It was unbelievable. And I'm
18 like -- you know what, even the dog -- the dog was out,
19 and I'm like, "Wow, this stuff is cool."
20           During the training, my partner that was
21 in CID, I watched him be a participant, you know, as an
22 example, and he was about six foot three, he weighed
23 about 150 pounds, good shape, and they actually
24 hypnotized him and had two people hold him, one at his
25 head or his shoulders and one at his feet, and he was

Page 35

1  like a board for minutes, physically like a board with
2  just two people holding him while he was hypnotized.
3  That was an example.
4           The other example is I watched the
5  instructor remove the letter L from someone's memory.
6  You know how you repeat the alphabet, ABCDEFGHIJKLMNOP,
7  right. Well, they actually removed the L from his
8  mind.
9      Q. Wow.
10     A. And when he said that in saying the alphabet,
11 he never said L.
12     Q. That's wild.
13     A. So that being said --
14     Q. So have you ever -- so I guess -- and I can
15 probably talk to you all day about this and it would be
16 really interesting --
17     A. Sure.
18     Q. -- so maybe we will have to do that. But have
19 you ever used investigative hypnotism -- I'm not sure
20 if I'm saying that right -- hypnotism in a police
21 matter?
22     A. I don't -- nothing sticks out. I don't recall
23 anything specific at all. I merely did it and
24 practiced it because they needed me to. I don't recall
25 anything specific to where they ever called me to

Page 36

1  actually come in and do it in -- in a police matter,
2  no, but I did it quite a bit, you know, in real life
3  scenarios.
4      Q. Sure. And this is an odd question that just
5  popped into my brain. I didn't think about it --
6      A. Of course.
7      Q. -- kind of beforehand, so, you know, just bear
8  with me.
9           Could you hypnotize Deputy Babb and see
10 what he saw?
11     A. No.
12     Q. Why is that?
13     A. A person must commit to being hypnotized, a
14 person must want to be hypnotized. If you do not want
15 to be hypnotized, you will never go into the trance,
16 ever.
17     Q. And so what makes you say that Deputy Babb
18 would not want to be hypnotized?
19     A. I can't say that, obviously. I'm not
20 in Deputy -- I don't know what Deputy -- his mindset
21 is. I can't say, right?
22     Q. Sure.
23     A. I would just say that he would not typically
24 be someone that would be a candidate for hypnosis.
25     Q. Okay, that's fair. I was just curious, like

Page 37

1  you were talking about a crime --
2      A. Sure.
3      Q. -- and what people could see. I was just
4  curious whether you could hypnotize an officer and see
5  like what they saw.
6      A. Not if they don't want to be.
7      Q. Understood. So if you fight it, it won't
8  work?
9      A. No. And if -- there are shows, you know, like
10 people that do this for entertainment, right, and
11 it's -- you can watch -- the first thing about hypnosis
12 is that you must want to be hypnotized. And when you
13 go to a show, let's say in Vegas, where a group of
14 people pay to go watch, you know, others get hypnotized
15 and, you know, they make them do -- they don't make
16 them, but they program them to do really silly things,
17 they pick their candidates from the audience and
18 that -- the first step is you must want to be
19 hypnotized.
20           So they ask, "Hey, who wants to
21 participate?" It's like, "Oh, oh, oh, ah, ah, ah." So
22 that's your -- automatically, you know that person is
23 susceptible to hypnosis because they want to be
24 hypnotized.
25     Q. Understood.

10 (Pages 34 - 37)

Page 38

1      A.   Whereas other people, like you or I, are like,
2  no, you're not putting me under.  That's not happening.
3  So I personally do not believe that -- that it would be
4  good, I don't think.
5      Q.   Okay.  So you're trained as a -- as an
6  investigative hypnotist, but you have never used that
7  in a law enforcement capacity?
8      A.   No.
9      Q.   Got it.  Okay.  Sorry to have like a huge
10  sidebar.
11      A.   That's fine.
12      Q.   It's just absolutely fascinating to me.
13           Can we look at the training section?
14      A.   Okay.
15      Q.   And, similarly, would you say this training
16  section provides kind of the list of topics you have
17  specialized training in?
18      A.   Yes.
19      Q.   So one question -- and I'm not trying to trick
20  you here, I'm not trying to be critical.  I'm just kind
21  of trying to set the record straight.  I don't see any
22  special certifications or training in accident
23  reconstruction.  Is that fair?
24      A.   That's fair.
25      Q.   Okay.  And I don't see any specialized

Page 39

1  training in dash cameras.  Is that also fair?
2      A.   No, that isn't fair.
3      Q.   Okay.  So point it out to me.
4      A.   Yeah.  So let's see if it's in here.  It's not
5  in the CV.  However, it is in my report.
6      Q.   Okay.
7      A.   Yeah, it's not in the CV, but it is in my
8  report.
9      Q.   Sure.  And so I guess why didn't you put it on
10  your CV?
11      A.   It's something unique, right.  So it's -- this
12  case revolves around that, right, so digital evidence
13  of videotapes, things of that nature, law enforcement
14  uses it all the time.
15      Q.   Okay.
16      A.   You know, when you do a CV or a resume, that's
17  typically not -- there's many other training
18  certifications that I have, probably, you know,
19  hundreds of them that are not in here.
20      Q.   Okay.  Yeah, I'm not trying to trick you.  I'm
21  just trying to understand.
22      A.   The mobile video instructor -- I'm a mobile
23  video instructor through the University of Houston
24  course that I have taken many years ago.  That's one.
25  Digital evidence recovery is another course that I have

Page 40

1  taken.  That's another.  Obviously those are important.
2           I guess since we're going down the video
3  route and you're questioning whether or not, you know,
4  it's important or I have knowledge with videos -- I
5  guess I'm going to date myself, okay, I was an officer
6  in 1994 who had some of the original video cameras
7  before anyone had them.  It was a Sony eight millimeter
8  digital camera -- not even digital, they had the tapes,
9  and a mount that fit on the dash in my old patrol car
10  and I used that camera in law enforcement.  A lot of
11  cops didn't want to use them, but I had no problem
12  using a video camera.
13           And it ultimately played in my favor
14  because I was on a traffic stop with a guy who was very
15  intoxicated one day and the video camera obviously
16  captured the scene as he's on the side of the passenger
17  side of the car with their standard in the movies, beer
18  cans fall out and clink everywhere and he's so
19  intoxicated he falls to the ground and hurts himself
20  and I can't even do a field sobriety right test on him.
21  I pick him up, dust him off, put him in the car.
22           Unbeknownst to me, in that apartment
23  complex on the opposite side of the car was his family
24  who assumed that I had beat this man because he had
25  injuries and they actually filed a complaint with the

Page 41

1  police department that I had violated this man's civil
2  rights, and that videotape saved me because it recorded
3  the entire incident.  So from that point forward, I
4  have always been interested in videotapes.
5      Q.   I understand.
6      A.   So part of --
7      Q.   And that makes sense that, you know, a video
8  recording can protect both the police and the public.
9  Is that fair?
10      A.   Well, that's fair, but I would like to
11  continue on with the other history that I have with
12  videos.
13      Q.   Sure.  And if you wouldn't mind, I'm going to
14  try to keep us from -- because we do have a time limit
15  on today --
16      A.   Sure.
17      Q.   -- so I'm going to try to like move us
18  forward.  And you mentioned this mobile video
19  instructor --
20      A.   Yes.
21      Q.   -- certification?
22      A.   Yes.
23      Q.   I think you mentioned the University of --
24      A.   Houston.
25      Q.   -- Houston?

11 (Pages 38 - 41)

Page 42

1    A.  Yes.
2    Q.  When did you obtain that certification?
3    A.  That was probably in like 1990 -- it was the
4  mid-1990s.
5    Q.  Okay.  And I think you mentioned a digital --
6    A.  Evidence recovery.
7    Q.  Evidence recovery.  Is that a course you took?
8    A.  Yes.
9    Q.  When did you take that course?
10   A.  That was probably in the early 2000s, maybe,
11  or somewhere in there.  I don't remember exactly.
12   Q.  And have you ever instructed folks in mobile
13  video?
14   A.  Yes.
15   Q.  And when was the last time you instructed
16  someone in that?
17   A.  Well, actually, it's -- it's -- you instruct
18  officers every day in mobile video and video cameras.
19   Q.  Sure.
20   A.  That's an important part of law enforcement
21  because that video camera is recording actions and
22  what's going on, right, and the placement of what's on
23  that video is important.
24      What happens a lot of times with officers
25  is they -- they don't pay attention to that video.

Page 43

1  They are just -- they are out doing their job and they
2  are not paying attention.
3    Q.  When you say "that video," are you talking
4  about the video from their patrol car, the dash camera
5  from their patrol car?
6    A.  Correct.
7    Q.  Okay.
8    A.  It's -- when you have a video system in your
9  car, it's normal, right.  So when you pull someone
10  over, when an officer pulls someone over, they don't --
11  they really should be paying attention to the placement
12  of that video camera, right, but they don't.
13      So part of this video instructor is to
14  teach them why that's important, to capture what's
15  happening on that scene.  So that's an ever-evolving
16  thing as a -- not only an interdiction guy, but as a
17  law enforcement trainer.  I've been an instructor since
18  1997 with criminal interdiction and it's always a
19  role --
20   Q.  Understood.
21   A.  -- in what I've instructed.  It's important.
22   Q.  Okay.
23   A.  So I have a lot of experience when it comes to
24  videos, training officers in videos, reviewing videos
25  from when -- when video started.

Page 44

1    Q.  Understood.  And so would you say the mobile
2  video instruction focuses on teaching officers how to
3  use their dash cams?
4    A.  The instruction -- the school for the
5  instructor school was to -- to go over the importance,
6  you know, to develop -- basically to teach that
7  curriculum to the officers on the video placement, the
8  importance of it, the way to either park or situate
9  patrol cars with the video cameras to be able to obtain
10  what they need to record for evidence purposes.
11      So, yes, that's what the video instructor
12  school was about.
13   Q.  Got it.  Did it include also instruction on
14  body camera usage?
15   A.  There wasn't body cameras back then.
16   Q.  And since then, have you instructed officers
17  on how to use their body cameras?
18   A.  No.
19   Q.  Okay.  I'm going to talk a little bit about
20  criminal interdiction and the work that you've done
21  there.
22      Can you define "criminal interdiction"?
23   A.  People really get hung up on this, right?
24  Every officer does criminal interdiction.  If an
25  officer is in a patrol car and he stops anyone on a

Page 45

1  traffic violation, he's doing criminal interdiction.
2  The only difference is some officers just write a
3  ticket, they don't pay attention to anything.  Other
4  officers, they pay attention to the little things and
5  they say, "Something else may be going on here," so
6  they dig a little deeper in the traffic stop.  That's
7  essentially what a criminal interdiction officer is, is
8  someone that just pays closer attention to the traffic
9  stop that he has made.
10      There is no certain thing you're looking
11  for in criminal interdiction.  In my experience, I have
12  gotten U-Haul vans that are full of tires and wheels
13  that were just stolen from a brand new car lot where
14  they have left the cars on jacks, right, so that's a
15  criminal interdiction stop.  You know, even though it's
16  not drugs, I have stopped a theft organization, that's
17  criminal interdiction.
18      I've gotten members of an organized
19  retail theft ring that travel Houston, Dallas,
20  San Antonio doing nothing but ripping off Dillard's and
21  Foley's, you know.  I've gotten just car loads and van
22  loads of brand new merchandise that still has the theft
23  detection tags, that's criminal interdiction.
24   Q.  Okay.  So when an officer works in criminal
25  interdiction capacity, what does success look like?

Page 46

1    A.  Success in criminal interdiction?  I guess I
2    don't understand what that question is.  I mean, what
3    do you mean, success in criminal interdiction?
4    Obviously, those examples I just gave you are
5    successful, right?
6          I managed to infiltrate a criminal
7    organization through the weakest link of a crime.  The
8    weakest link of a crime is the transportation phase.
9    So everyone has to move around, everyone has to go from
10   point A to point B and criminals must use cars.
11         So criminal interdiction, in a successful
12   criminal interdiction stop, is where a very
13   detail-oriented officer detects that that crime exists
14   instead of just writing a ticket and letting that
15   person go.
16   Q.  That's helpful.
17         I guess relatedly, you've talked about a
18   lot of things that you've done in investigating the
19   crimes of narcotics.  You've been an undercover agent.
20   Is that the right word?
21   A.  Operative, whatever you want to say.  I've
22   been an undercover guy, how about that.
23   Q.  You've been an undercover guy?
24   A.  Yeah.
25   Q.  You've talked about robust investigations that

Page 47

1    you've led.  Is that also fair?
2    A.  Sure.
3    Q.  What are the tactics, for lack of a better
4    word, that lead to the most success in stopping
5    criminal enterprises who are at large?
6    A.  In my experience?
7    Q.  Yes, sir.
8    A.  As a criminal interdiction officer, not as an
9    investigator?  I mean, which one do you want?
10   Q.  Either is fine.
11   A.  You just want --
12   Q.  I mean, or just -- like what are these tactics
13   to stop folks who are doing things like drug smuggling,
14   what are the -- what are the tactics that you typically
15   use to do that?
16   A.  Okay, so --
17   Q.  Assuming that, you know, traffic stops is one,
18   right?
19   A.  I see what you -- okay, let me -- I guess, let
20   me -- can I just talk about the drug industry as a
21   whole, how it operates and then how law enforcement
22   reacts to the --
23   Q.  Sure, if you can keep it relatively short
24   because we don't need to, you know, learn the entirety
25   of how the drug -- I mean, I'm sure it's complicated

Page 48

1    how drugs --
2    A.  It's pretty simple.
3    Q.  -- are smuggled.  Okay, go ahead.
4    A.  Mexican cartels that import large quantities
5    of drugs into the United States have to get it from
6    Mexico to the United States.  They use people within
7    their organization to recruit smugglers, people to
8    drive the car.  These people are recruited at bars,
9    places that they are down on their luck and they are
10   drinking and they need money.  They say, "You can make
11   a quick $5,000, just drive a car."  That's how they
12   recruit the drivers.  The drivers are considered to be
13   mules.
14         Okay.  The mule then says, "Yeah, I need
15   the money," they go to the Valley, typically from other
16   areas, or it could be from anywhere in the United
17   States, they get to the Mexican border, they are told
18   to pick up a car at -- most of the time at a public
19   place, H-E-B, Walmart, "This is the license plate
20   number, the color of the car."
21         The driver gets there, they get in the
22   car and they drive it north.  They say, "Go to Dallas,
23   go to this hotel, leave the keys in the car and go to
24   this room."  That's a mule.  The mule knows nothing
25   about what's going on, other than he's driving that

Page 49

1    car, and he knows that it's probably something illegal.
2          Those guys are typically stopped a lot on
3    traffic stops, okay, committing a traffic violation for
4    something.  A lot of it was window tint, right.  Law
5    enforcement did not -- they didn't enforce window tint
6    in a certain area, so they have cars that have
7    compartments smuggling drugs and the car has window
8    tint.  So officers somewhere else stop cars all day
9    long for window tint and they get stopped, but they
10   only get a ticket, they don't get searched.  That's
11   because that officer doesn't look for anything other
12   than a ticket.  That cars makes it to the destination,
13   they drop the car off, they may or may not take the
14   money back to Mexico.
15         That's how smuggling occurs, right.  You
16   know, you have somebody in charge, you have somebody
17   recruiting people, you have a driver and then you have
18   people on the other end who are taking the drugs and
19   distributing them somewhere else.
20   Q.  Okay.  So based on that summary, from your
21   experience, most of the drugs that come into the
22   country come from cars; is that correct?
23   A.  Well, no.
24   Q.  Okay.  Then --
25   A.  I mean, there's every form of transportation.

13 (Pages 46 - 49)

Page 50

1    Q.    Okay.
2    A.    Boats, trains, cars, on people.  Yeah,
3    there's -- it comes in every form or fashion, but, yes
4    cars are utilized heavily in the drug trafficking
5    industry.
6    Q.    Okay.  So every -- but every form of
7    transportation?
8    A.    Yes.
9    Q.    And is it fair to say that drugs go from south
10   to north, then, generally?
11   A.    No.  I mean, related to Mexican drug
12   smuggling, yes.  But this whole new world of marijuana
13   being legalized in different states and growing
14   marijuana in Colorado and in California, it's reversed.
15   Q.    Okay.
16   A.    I mean, so you will have reversed.  It's not,
17   you know, carte blanche, this is the way drugs go.
18   Q.    Okay.  And so we were talking a little bit
19   about tactics.  If that's how it works, what are the
20   most effective ways to stop drug smuggling?
21   A.    In the transportation phase.
22   Q.    And tell me a little bit more about what you
23   mean there.
24   A.    Criminal interdiction.
25   Q.    So -- and when you say criminal interdiction

Page 51

1    in the transportation phase, are you referring to just
2    traffic stops?
3    A.    Any form of transportation.  Traffic stops,
4    trains, buses, airplane interdiction, hotel/motel
5    interdiction, package/parcel interdiction.  There's
6    many, many ways to intercept it, but they are all the
7    transportation phase, which is why I said it's the
8    weakest link --
9    Q.    Understood.
10   A.    -- in criminal activity.
11   Q.    Okay.  So in conducting criminal interdiction
12   in the transportation phase, how do -- is the only way
13   to investigate a method of transportation to stop
14   someone on an airplane violation or a boat violation
15   and then search their mode of transportation, or are
16   there other tools in the toolkit?
17   A.    You mean for -- as a whole?
18   Q.    Yes, sir.
19   A.    There is obviously undercover work, right,
20   where I'm the undercover guy, I'm acting as I'm either
21   a buyer or a seller of a typical drug.  In that
22   instance, you're trying to really climb the ladder, per
23   se.  The goal of law enforcement is not necessarily to
24   arrest one person who has, you know, an ounce of weed
25   on them or, you know, an eight ball of cocaine on them.

Page 52

1    That's not the goal, right.
2         The goal is to target the people who are
3    infiltrating it into the country, right, that's the
4    goal.  The way you get to them is climb the ladder.  So
5    if you picture a ladder, it's like -- the drug business
6    is just like any business.  You have a CEO and you have
7    everyone below, and the only way you get to the CEO is
8    you have to do investigations and you have to work your
9    way up that ladder through the people within that
10   organization to get to the big people.
11   Q.    Got it.
12   A.    That is your goal.  You do that through
13   undercover work, hand-to-hand buys, surveillance,
14   interdiction on traffic stops, Title 3 wire intercepts.
15   All of these things all work together to be able to get
16   to the higher level people or a whole cell of people
17   operating, not just the one guy with an eight ball.
18   Q.    Got it.  That's helpful.
19        Okay.  I don't know -- and you can tell
20   me if this question doesn't make sense because I know
21   you only worked as the commander for the criminal
22   investigations unit for a year or so.  But when you
23   were the commander, did you oversee the narcotics unit?
24   A.    I did.
25   Q.    And how many officers were in the narcotics

Page 53

1    unit?
2    A.    There was an interdiction group that had two
3    interdiction guys in it.  There was an investigative
4    group that had -- I think they were up to eight or ten,
5    I believe.  As the commander, I had a lieutenant that
6    was over a sergeant, actually two sergeants, so I had
7    a -- I had a lieutenant and two sergeants that
8    supervised those groups.
9    Q.    Okay.  And so what were the narcotics officers
10   doing on a daily basis?
11   A.    Everything I just told you.
12   Q.    So that means undercover work --
13   A.    Surveillance.
14   Q.    Surveillance?
15   A.    Informants, developing informants to be able
16   to gain the information within the organizations.  It
17   all works together, right?
18   Q.    Sure.
19   A.    It's all -- everyone has to do their job to go
20   after the entire network.
21   Q.    And were the narcotics officers that you
22   supervised, were they doing generic traffic stops, were
23   they out on the side of the road all day pulling people
24   over?
25   A.    Yes.

14 (Pages 50 - 53)

1    Q.   Okay.  In addition to the other things that
2  they were doing?
3    A.   Yes, that particular group did, yes.
4    Q.   Okay.  And the criminal interdiction unit that
5  you oversaw, what did they do?
6    A.   They were stopping people all day long,
7  interdiction stops.
8    Q.   So they didn't do anything, really, other
9  than --
10    A.   Exclusive -- exclusive traffic stops.
11    Q.   Okay.  When you were supervising the criminal
12  interdiction unit, how did you evaluate the success of
13  the criminal interdiction unit?  I guess one of the
14  things that I'm thinking about here, just to be like
15  transparent, did you evaluate the number of traffic
16  stops to what they found?
17    A.   You can't do that.
18    Q.   Okay.  Tell me more.
19    A.   An officer -- you know, a police officer is
20  much like someone else -- I mean, it's much like being
21  an attorney, right?  So, you know, a police officer
22  goes to the academy, you learn the basic thing and you
23  go to work.  You figure out something specialized that
24  you like to do.  In this case, it's maybe criminal
25  interdiction.  There's this learning phase, right?

1  Like I said, just like an attorney, I mean, you go to
2  law school, you come out, I mean, you don't learn until
3  you get in here, what you're doing, you know, or get
4  into court and try.  Not you, but attorneys as a whole,
5  right.
6        And law enforcement is the same way.  So
7  these cops get out and they learn on duty, they learn
8  on the job and so they have to learn.  So what you're
9  going to find, and this goes to your question about
10  traffic stops versus -- or searches versus the number
11  of stops.
12    Q.   Okay.
13    A.   An officer just learning interdiction is going
14  to search or ask for consent to search more cars than
15  an officer that's been doing it for a long time, and
16  the reason for that is he hasn't quite learned yet
17  everything he needs to know about the industry to be
18  able to eliminate a lot of the people who are just
19  traveling the highways and may have some stupid story
20  and it doesn't make sense to him.  Well, it may make
21  sense to somebody else, right?
22        So that officer has to learn about that
23  and that officer is going to search more cars than
24  another officer.  So those statistics that I would look
25  at would also -- I would have to look at how long they

1  have been doing it.
2    Q.   Okay.
3    A.   Now, if you have an officer that's been doing
4  interdiction for years and he's searching half of the
5  cars that he's stopping, I have a problem I need to
6  address, right?
7    Q.   Understood.
8    A.   Because that's just not the right balance.
9  If -- my experience as an officer, I searched a lot of
10  cars as well, learning this business.  But as I became
11  more experienced, I may stop 30 cars in a day and not
12  search anything, but that's because I had gained the
13  experience through things like body language, speech
14  patterns, you know, interview techniques and I
15  developed a roadside interview that I could talk to
16  people and determine basically within two minutes
17  whether I wanted to ask for consent to search or not.
18    Q.   Understood.
19    A.   So I hope that answers your question about --
20    Q.   It does.  It's helpful.  So I guess one of the
21  questions I have for you is, I guess, within the first
22  year of someone doing criminal interdiction, what is
23  the right balance of stops to search?  What would --
24  what would be abnormal for you, as the supervisor,
25  looking at how many stops and searches an officer was

1  doing?
2    A.   When they searched everything, every car they
3  stopped.
4    Q.   Okay.  And then, I guess, more an intermediate
5  person who has had a couple of years doing it, what
6  would be the right balance?
7    A.   Half of the cars that they stop.
8    Q.   And then someone who is senior, what would you
9  expect there?
10    A.   I would expect them to be searching very few
11  cars that they stop.
12    Q.   Okay.
13        MR. BARRON:  We have been going for an
14  hour.  Do you want to take just a five-minute break so
15  I can use the restroom?
16        MS. HEBERT:  Yes, we can do that.
17        (Recess from 10:10 a.m. to 10:24 a.m.)
18    Q.   (BY MS. HEBERT)  A couple of questions to kind
19  of follow up.  You talked about mules.  What -- what is
20  a mule?  Can you make that explicit for me?
21    A.   Sure.  It's a term that's been given to
22  someone -- a courier, someone driving the vehicle.  You
23  know, they have no -- typically, they have no
24  investment in the drugs and -- or where they are going.
25  They are basically being paid to transport it.

Page 58

1    Q.   And you've had a lot of experience doing
2  criminal interdiction stuff.  What is the profile of a
3  mule?  What does -- what does the average mule look
4  like?
5    A.   The average mule is anybody that's breathing.
6         THE REPORTER:  Breathing, you said,
7  right?
8         MR. BARRON:  You might have to elaborate
9  on that.
10   Q.   (BY MS. HEBERT)  So you might have to explain
11  that a little bit.
12   A.   There is no profile of a mule.  It's anybody
13  that can drive a vehicle.
14   Q.   Okay.  And we have talked a lot about drug
15  smuggling.  Can you tell me a little bit about human
16  smuggling and how that works?
17   A.   Human smuggling is not something that was
18  really big back in the day.  That's something that's
19  really transpired more over the last, you know, I'd say
20  six, eight, ten years.  But it's no different than drug
21  smuggling, right, it's just they are smuggling people
22  instead of drugs.  Everything fits the same.
23        The cartels in Mexico have learned that
24  smuggling people is very lucrative, so they will
25  smuggle people instead of drugs and/or drugs.  You

Page 59

1  know, I would, over the years, encounter human
2  smuggling and you typically knew it because you would
3  stop the car and as soon as you walked up to the car --
4  like on Interstate 10 one day, I was working in Fayette
5  County, and I stopped the vehicle, it was an SUV, I
6  believe it was a Ford Explorer, dark tinted windows,
7  right, and they pulled over for the violation of dark
8  tinted windows.
9         I was -- as soon as I walked up to the
10  back of the vehicle, their foot stayed on the brake,
11  which police officers always pay attention to, and once
12  I got close enough, they took off.  So, of course, I go
13  back to the Tahoe, I get in, you know, it's a very
14  short -- not even a pursuit.  They just wanted to gain
15  some space, they ditched the vehicle, just drove over a
16  cliff, basically, hit some trees and they were -- oh,
17  man, if you watched the video on that, it was awesome.
18  They just kept coming out of the truck, you know, there
19  was like 13, 15 of them.  So that's a case of human
20  smuggling, you know, to where they are smuggling
21  people.
22   Q.   Okay.  So am I correct to understand that --
23  you said Mexican -- the Mexican nationals or the
24  Mexican cartel, that's the word you used, are they
25  smuggling -- is human smuggling going from south to

Page 60

1  north, then?
2    A.   Yes, that is -- that is pretty much most of
3  the time.  You're not going to -- unless you're in
4  Canada, right, but we're not going to see that this far
5  down, typically.  But it's potentially -- I mean, it
6  happens in Canada and they come south, right?
7    Q.   Sure.
8    A.   Any international border, your smuggling is
9  going to be coming into the United States.
10   Q.   Got it.  And one thing that I think we didn't
11  quite finish before we took our restroom break was
12  talking about maybe your role in supervising the
13  criminal interdiction unit and I want to kind of go
14  back to that.
15        What would you say is the -- the year
16  mark for a beginner in criminal interdiction?  Zero to
17  one year, zero to two years, like at what point would
18  you consider someone a beginner?
19   A.   Once you're certified through the state as
20  being a peace officer, you're hired at the department
21  through the FTO process, your training process, all of
22  that.
23   Q.   FTO means?
24   A.   Oh, field training officer.  It's different
25  terminologies.  But -- so every agency should have some

Page 61

1  form of training program, you know, in addition to the
2  police academy.
3    Q.   Sure.
4    A.   You know, you're with an officer -- typically
5  that program is for four months, right.  You're with
6  another officer, riding with them, just exclusively
7  watching what they do.  And then, you know, the next
8  month you're allowed to do some of the activities, the
9  next month you're doing more of the activities than the
10  last month.  It's a ghost phase.  You're doing
11  everything and only being observed by that -- that
12  field training officer.  Once you pass that and you --
13  you can go on your own, but you're still under
14  probation as an officer, typically up to a year, before
15  you're really cut loose.
16        So an interdiction guy with interest,
17  he's still learning how to be a cop, so he hasn't
18  really understood, you know, there's more to being a
19  cop and more to traffic stops.  So I would say, you
20  know, three years, a five-year officer is really at
21  that point to where they start understanding more about
22  it, you know.
23        But, then again, it could be an officer
24  that, you know, he had knowledge of it before he went
25  to the police academy and that's all he ever wanted to

Page 62

1  do was be an interdiction officer, so he went to the
2  policy academy for that purpose, so as soon as he gets
3  out of training.
4          It's hard to answer that question. You
5  know, it's just such an array of personalities and the
6  way officers are.
7      Q. Understood. But putting that exceptional
8  individual who just like knew from birth that they
9  wanted to be a criminal interdiction officer, would you
10  say a beginner criminal interdiction -- a beginner in
11  the criminal interdiction world is the zero to five
12  mark; is that fair, based on your summary?
13      A. Probably, yes.
14      Q. Okay. And then an intermediate -- someone who
15  is going to practice intermediate criminal
16  interdiction, five to approximately what years?
17      A. Well, it depends. A person that is successful
18  at interdiction is someone that gets it, where they are
19  dedicated to training, I mean, so much that they go to
20  training on their own without the department even
21  sponsoring them. They are looking, seeking, like a
22  sponge, this information. That person makes a very
23  good interdiction officer.
24          Typically, once they start getting loads
25  of drugs or people or merchandise, or whatever it is,

Page 63

1  it kind of becomes this -- that's their addiction,
2  basically, to where they love it and they don't want to
3  do anything else. They don't want to go take reports
4  for, you know, little Johnny's bicycle was stolen or,
5  you know, mom and dad are having an argument.
6          So they want to do criminal interdiction,
7  so some of them last a long time. I mean, them want to
8  do it forever. I have seen guys that, actually, if
9  they were not doing criminal interdiction, they would
10  retire because that's what they love to do, and that's
11  for years.
12          I mean, if you look at my history, I
13  mean, I spent more than 20 years in drugs, working drug
14  crimes because I love it, right.
15      Q. And why do you love it?
16      A. It's -- I have always been raised with morals
17  and I just don't like people to take advantage of other
18  people, and drugs do that. Drugs take lives and drugs
19  harm kids and when kids get drugs, it hurts them and it
20  hurts families. So I take it very personally.
21          And, in fact, my grown grandchildren
22  have -- have run into this problem here recently, which
23  even supports my -- my mission and supports what I've
24  done even more. You know, I've had three of my
25  grandkids in California, here within the last two

Page 64

1  years, found a bag of gummies, all under the age of
2  five, and they all went unconscious and went to the
3  emergency room.
4      Q. That's good to know.
5      A. So, you know, it's personal to me and the fact
6  that my whole career has been to save children from
7  drugs. That's my passion for drug enforcement.
8      Q. So I guess one of the questions I have for you
9  is how do you not get discouraged? There's a lot of --
10      A. You know what, it's --
11      Q. There's a lot -- just let me finish that one.
12      A. Of course.
13      Q. There's a lot of drugs out there in the world,
14  and would it be fair to say that there are stretches
15  where you don't stop smuggling, drug smuggling or even
16  human smuggling, so how do you stay positive?
17      A. You're asking me what I think?
18      Q. Yeah, and in general for the criminal
19  interdiction industry.
20      A. Every officer -- that's what makes a good
21  interdiction officer, what we're talking about here. A
22  good interdiction officer is one that is at his best
23  when nothing is happening, you know, it's persistence,
24  you know. This guy -- because the majority of the
25  time, you're not getting anything, you're not seizing

Page 65

1  drugs, you're not seeing anything, you're not finding
2  anything.
3          And if you're a person that's not easily
4  discouraged, you're a good interdiction guy. If -- if
5  you are discouraged or you become bored and it becomes
6  monotonous and it's just not doing it for me anymore, I
7  can't find it, then you don't make a good interdiction
8  officer. And you will see that those guys will move to
9  something else without staying with interdiction.
10      Q. I want to talk a little bit about reporting.
11  You've been in various capacities as a police officer.
12  Would you agree that reports generally are more
13  accurate if they are written the same day as an event,
14  generally?
15      A. Yes. And I would even go further to say that,
16  you know, with video cameras, they've become even more
17  important to help officers because --
18      Q. The video -- sorry, just to clarify, the video
19  cameras have become more important or the reports have
20  become more important?
21      A. Well, the video cameras and what's recorded
22  from the video helps the officer with his report
23  because an officer doesn't remember everything that
24  happens. I mean, there's things that happen
25  subconsciously, kind of like the hypnosis, that you

17 (Pages 62 - 65)

Page 66

1  know, we all pick up on. You know, we just don't know
2  that it's there. It's not important right now, but
3  once you watch your videotape and you're writing your
4  report, then you go back and you say, "Oh, that's why
5  that guy that did that, you know, that's why this
6  happened, that's why that happened." And then it goes
7  into the report because it's important. So they play a
8  role with another.
9      Q. Understood. So would you -- as a supervisor,
10 would you expect your officers to, if possible, consult
11 their video, their body camera, their dash camera when
12 they are writing their report?
13     A. In a case where a report is necessary, yes.
14     Q. Okay. And I guess that begs the question of
15 when is a report necessary?
16     A. A report is necessary when someone is
17 arrested, obviously. A report is necessary when
18 there's an investigation into something to where -- you
19 know, it's building blocks, you know, this pieces of
20 the puzzle is important for the next piece, you know.
21         And like in an undercover case or in a
22 surveillance case, let's make a surveillance example,
23 you know, I get information on someone who may be
24 committing a crime, I go out, I conduct surveillance, I
25 watch the individual. Documentation of what's going on

Page 67

1  from the very basics of everything is an important --
2  is very important in a report.
3      Q. Understood.
4      A. Yes.
5      Q. So I guess if an officer wrote a report after
6  a member of the public complained, would you have
7  questions about that report?
8      A. Okay. So help me understand, please. I
9  don't -- I guess I don't understand --
10     Q. This is great because sometimes I ask bad
11 questions.
12     A. Well, I mean, so the question, as I understand
13 it, is that would I have concerns about the report
14 being written after a complaint is filed. Okay, so
15 what -- there's different situations -- I mean, there's
16 different situations for that. Do we want to use this
17 case as an example?
18     Q. I mean, you can if you want to.
19     A. Okay.
20     Q. But you don't have to if there are other
21 examples you prefer to use.
22     A. Well, with this particular investigation that
23 I've reviewed, it appears that Deputy Babb made a
24 traffic stop as part of an interdiction stop, he
25 searched the vehicle and he let the person go without

Page 68

1  any charges. In a nutshell, that's what this is about.
2          I would not expect a report to be written
3  by anybody on a case or an example of that nature
4  because the existence of a CAD system, which is a
5  computer-aided dispatch system, right, there's call
6  modes, there's notes that an officer can type in that
7  may be relevant to something. I've damaged a person's
8  car, right, you know, whatever it is. You can put
9  those in CAD notes without writing a report. So, no, I
10 would not expect a report to be written in that case.
11         Now, if a person were to complain, file a
12 lawsuit, as in this case, the supervisors are going to
13 tell that officer, "Hey, you need to write a report,
14 right, we've got litigation coming, you need to write a
15 report."
16         The problem and the concerns, as you
17 asked that I would have with that, is the memory that
18 the officer had, how long ago was this, because the
19 officer, I would think, in my mind, in a situation like
20 this, would be thinking, "Man, I don't remember
21 anything about that stuff, right, I don't really know
22 what to put in that report because I don't even
23 remember this guy. I make 30 stops a day. You know, I
24 may remember it because the guy -- you know, I damaged
25 his vehicle or something, but, you know, I don't really

Page 69

1  remember everything that happened."
2          So no, I mean, it wouldn't be unusual.
3      Q. Okay. I guess one of the questions I have for
4  you on reporting, are you familiar with the term
5  "subsequent to prior knowledge"?
6      A. No.
7      Q. And --
8      A. Only from reading the deposition.
9      Q. Okay.
10     A. Let me correct that.
11     Q. So before reading the deposition, had you ever
12 heard of that as a phrase to use in reports?
13     A. No.
14     Q. In your experience, what were the most common
15 types of contraband smuggled in a car?
16     A. Marijuana, cocaine, methamphetamine, heroin,
17 ecstasy, Valium, people and then the other things I
18 spoke about before, property -- you know, property
19 crime.
20     Q. Okay.
21     A. And then, of course, that's not even talking
22 about wanted people that are fleeing the country or
23 they have warrants and they exhibit a lot of same
24 things. So that's another thing that could be in the
25 car. It's contraband, you know, they are just wanted.

18 (Pages 66 - 69)

Page 70

1    Q.  Got it.  I don't know what Valium is.  What is
2    Valium?
3    A.  Diazepam is the real name.  It's for like if
4    you have a seizure, you know, it's just a sedative.  It
5    calms -- it's a downer.
6    Q.  Okay.  What is -- these others, I kind of know
7    what they look like.  What does Valium look like?
8    A.  It's pill form.  It's like prescription pill
9    abuse.  But like in my experience, you know, I had a
10   traffic stop one day that had eight pounds of it, you
11   know, it was like 20,000 pills coming from Mexico.
12   Q.  So if someone has like a giant wrapped thing
13   of pills or a giant -- you know, several boxes of all
14   of these pills, you're going to ask questions.  Is that
15   fair?
16   A.  Absolutely.
17   Q.  And Valium, X, those would be just things that
18   that are in pill form?
19   A.  Yes.
20   Q.  Okay.  For other things, I guess like
21   marijuana, how would you tell if something is
22   marijuana?
23   A.  How would you tell what?
24   Q.  How would you tell if something is marijuana?
25   A.  If it's marijuana, marijuana has a distinct

Page 71

1    odor, you can smell it.  It has a distinct appearance
2    to it, right, green, you know, it -- the old Mexican
3    marijuana was green and leafy, had a lot of seeds,
4    compacted into bricks with the odor of marijuana.  And
5    then you could take a field test kit and then you could
6    put it in a field test kit, see if it has a reaction.
7         However, that didn't typically occur.
8    Very rarely does an officer field test marijuana.  And
9    there's various reasons for that, but --
10   Q.  I mean, I probably am illustrating how much of
11   a square I am right now, so just like I am a square.
12   But how do you -- what are the -- why don't you field
13   test marijuana?
14   A.  Today?
15   Q.  Yeah.
16   A.  No one is prosecuting for it, right.  It's --
17   and there's such confliction in the law, right, you
18   know, now you have legalized and then you have
19   municipalities that are trying to legalize it against
20   state law, you know.
21        So officers -- even though it's still
22   illegal in Texas, you know, typically it's not
23   prosecuted, so officers are not going to field test
24   marijuana.  Field test kits are expensive, believe it
25   or not, and they are not going to just, you know, waste

Page 72

1    revenue on field test kits for something that's not
2    going to get prosecuted, in a nutshell.
3    Q.  So let's assume an officer thinks he found
4    marijuana.  What does he do?
5    A.  Depends on the amount.
6    Q.  Okay.  Tell me more.
7    A.  Let's say in order to be prosecuted for
8    marijuana, it must be a usable amount, okay.  A usable
9    amount is something that you can actually take and put
10   it in a bong, light it with a lighter and inhale it or
11   in a joint and smoke it, and it needs a weight.  It
12   need to be able to be weighed, right.  If there's no
13   weight, then it's typically not a usable amount, so
14   therefore you cannot be prosecuted for it, so therefore
15   you won't field test it.
16        And there's a term called shake, okay.
17   Shake is what -- jargon.  You know what jargon is,
18   police jargon?  Typically they call it shake.  It's
19   where a person may be rolling a joint in the front seat
20   of a car and some spills on the floorboard or
21   something, and it's just little particles of green,
22   leafy substance that appears to be marijuana, may smell
23   like -- the car may reek of marijuana, you know, a
24   reasonable officer can believe that what he's seeing in
25   the floorboard is shake or marijuana, but it's not

Page 73

1    prosecutable because there's not enough there, it's not
2    usable.  So an officer is not going to field test that.
3    Q.  Okay.  And I guess there -- I cleaned my car
4    because my colleagues were driving in it because I had
5    a lot of -- my kids have been in the car over the
6    holiday break, so it was a wreck.  So it's clean right
7    now, but normally there's a lot of stuff on the
8    floorboards, Goldfish, whatever dirt the kids have been
9    rolling in, they are little.  How do you know what's --
10   what's dirt and what's schmutz, for lack of a better
11   descriptor, versus like shake?
12   A.  Shake is -- I mean, an experienced officer
13   that's seen a lot of marijuana, you know, maybe they
14   have been on search warrants in houses, you know, where
15   they have a tray, you know, where they are rolling
16   marijuana and, you know, an officer sees this over and
17   over and over again.  So there's a certain appearance
18   to what they call shake, just little green particles
19   that, I mean, you just become familiar with.
20        So on interdiction stops, in my history,
21   I ran across it all the time.  You know, it would be
22   beside the -- the seat, you know, falling off of the
23   console, in the floorboard or, in some cases, I found
24   it in empty compartments in vehicles where it had been
25   smuggled before and then there's, you know, shake

19 (Pages 70 - 73)

Page 74

1 residue in there where you can see the little green
2 particles.
3         And so a totality of everything that
4 you've got going on, you know, you determine that it's
5 marijuana shake, right. But nobody is going to
6 prosecute for it. You're not even going to arrest for
7 it.
8     Q. So I guess when you say the totality of
9 everything that's going on, there have to be other
10 factors that also help you conclude that this is
11 probably shake?
12     A. Yes.
13     Q. One of the things you said was the car smells
14 like marijuana?
15     A. Uh-huh.
16     Q. What other factors might prompt you to
17 conclude that the green, leafy substance you are seeing
18 on the floor is shake?
19     A. Maybe a criminal history for marijuana, you
20 know, you ran his criminal history and he's got a
21 history for it. Physically, he may have burnt lips.
22 Common times, people that smoke weed, they burn their
23 lips on the pipes or whatever. That's one. Bloodshot
24 eyes, you know, your speech is different, you know,
25 you're like high. You know, you can tell, you know,

Page 75

1 "Dude," you know. I mean, you can typically tell when
2 someone is a pothead.
3         You know, I have nothing against
4 marijuana other than it's illegal and I don't use it, I
5 don't believe in it. But, you know what, people are
6 people and they use it.
7     Q. Yeah. So I guess, you know, in the
8 circumstances for me and and you're seeing my car full
9 of Goldfish, would you be prompted to conclude that
10 green, leafy or like what looks like little specs of
11 green on the floor is marijuana?
12     A. That's kind of subjective for me in a way
13 because I'm not on the -- like a traffic stop with you
14 to be able to see, you know, how you're behaving,
15 what's going on, where you're coming from, where you're
16 going, you know, did you just come from the bar, you
17 know, or maybe the head shop. So it's hard for me to
18 speculate on that, sorry.
19     Q. No, that's fine. I don't want you to
20 speculate. What I'm asking is just based on your
21 knowledge.
22     A. I would need all of those other things to be
23 able to really start to gauge whether or not I would
24 think that was marijuana or not.
25     Q. So context matters?

Page 76

1     A. Context matters.
2     Q. And how do you know if green particles are
3 something like -- something from the grocery store
4 that's green, basil or spinach, or whatever else I've
5 been schlepping around?
6     A. Well, again, everything goes back to the
7 circumstances at hand, right? I mean, it's just hard
8 to answer that question without, you know, a scenario
9 on what's going on with the situation. I couldn't -- I
10 couldn't, you know, elaborate or I couldn't speculate
11 on that.
12     Q. No, that's fine. Thank you.
13     A. Yeah.
14     Q. What are front seat interrogations?
15     A. Interrogation is really not a good word for
16 it. You know, people tend to get away from
17 interrogations. It's a little rough around the edges,
18 right. So front seat interviews, if I might comment
19 on, is where an officer places someone in the front
20 seat of their car while they conduct their business.
21     Q. Okay. And just to put a pin in that, what is
22 the difference between an interview and an
23 interrogation? You focused on interview and I guess
24 I'm not clear on the difference, so help me understand.
25     A. There isn't. You know, some people use the

Page 77

1 word "interrogation." You know, officers try to get
2 around that and, you know, it's an interview. I mean,
3 hardly anyone today, we don't call it an interrogation.
4 You know, everything that we know it as is an
5 interview, I'm interviewing someone, I'm talking with
6 them, right, obtaining information.
7     Q. Okay. So someone comes down -- you ask
8 someone to come down to the police station or you
9 arrest someone and you bring them into -- I don't know
10 what they call it -- the room, a conference room?
11     A. Yeah, an interview room.
12     Q. And that would be an interview as well?
13     A. Yes.
14     Q. Okay. What is your position on front seat
15 interrogations?
16     A. I'm not a fan of them, but that's a personal
17 preference. An officer, any police officer, they
18 develop a skill set and they take little pieces of
19 training from one place or another place -- and I tell
20 people in the classes that I teach, "You need to do
21 that, you need to listen to what everybody has to say,
22 you need to take the good things that will benefit you
23 and apply it to what you're doing." And that seems to
24 be the thing today, that seems to be what people are
25 doing. They are doing these front seat interviews.

20 (Pages 74 - 77)

Page 78

1        Now, you're asking me what I believe
2  about them. I've had an experience with one of my
3  interdiction officers who was very, very adamant about
4  doing front seat interviews, which I typically did not,
5  you know, believe was the greatest way to do the
6  interviews. However, it's not illegal, it's not
7  against policy.
8        So in his case, what I told him was you
9  can do front seat interviews, but only after your
10  safety is ensured. So they must be patted down for
11  weapons and you need a backup officer there if they are
12  going to be sitting in your front seat. So that was my
13  expectation for our interdiction.
14        But as far as saying that you can't do
15  them, you know, there's nothing illegal about it. It's
16  just not my preference.
17    Q.  Okay. And when you say -- you said something
18  like "it seems to be the thing." Can you unpack that a
19  little bit more for me?
20    A.  Law enforcement training evolves. As
21  officers, like myself, who did interdiction full time,
22  every day, as I promote through the ranks, new officers
23  begin criminal interdiction, they will go to outside
24  training from somewhere else, they will see some
25  instructor doing front seat interviews so they will

Page 79

1  decide, "Hey, I like that, I want to make that part of
2  my every day work," and then they will come back and
3  incorporate that into their -- their interview process.
4    Q.  Unless -- unless the agency says, "No, we're
5  not doing them." Is that fair?
6    A.  That's correct.
7    Q.  And you talked a little bit about officer
8  safety concerns. Are there -- what else -- is there
9  anything else that prompts you to feel that they are
10  not the greatest -- I think you said you felt that they
11  are not the greatest. Any other concerns with front
12  seat interviews, front seat interrogations?
13    A.  Well, I mean, is this from my perspective, my
14  training, my experience and the skill set that I have
15  or is it --
16    Q.  Yes, sir.
17    A.  -- or is it from the skill set and the
18  expectations that an officer at his level is trying to
19  figure out things? You know, I mean, there's a
20  difference, right.
21    Q.  I want to -- I want to hear your opinion first
22  and we can talk about this stuff later.
23    A.  Okay. So I've had a lot of training and I
24  utilize body language, speech patterns, kinesics,
25  basically. I use a lot of that in the interview that I

Page 80

1  have structured that works for me. That happens
2  outside of the car on traffic stops. So is --
3    Q.  When you do them?
4    A.  When I do them. I'm comfortable outside the
5  car. I want to be able to see everything about this
6  guy or girl. I want to see their hands, I want to see
7  how they react to the questions that I ask them.
8    A.  I want to see the responses, I want to see
9  their -- you know, their lips, their eyes, their --
10  everything about them and then during my interview,
11  then I stress them and de-stress them according to what
12  I hear, the responses that I get from them during my
13  interview.
14        Now, it's very focused work, right, you
15  really have to focus and you have to be a person that
16  pays attention to everything while you're thinking
17  about the question you're going to ask after the answer
18  they just gave you. So all of that you have to focus
19  on.
20        So for me, if that person is in the front
21  seat of a vehicle and there's a computer, there's a
22  radio, there's all of these distractions inside that
23  car, that interview may not give you everything.
24  You're going to miss some things when it comes to body
25  language and speech patterns. Now, you're going to be

Page 81

1  able to see some and you're going to be able to
2  determine something is going on, but it's not to the
3  level that I expect from my training, my experience and
4  the way that I like to do it.
5        These youngsters that are out here
6  learning this stuff now, they like it, they believe in
7  it and it's just not my preference.
8    Q.  Would it be fair to say that with more
9  distractions in the patrol vehicle, there might be a
10  greater degree of error?
11    A.  Well, I mean, there's no error, per se. You
12  know, you're an officer who knows nothing about what's
13  going on, other than you stopped this person, they are
14  in the front seat of the car with you and you're trying
15  to determine what's going on.
16        So to say that there's some form of error
17  with the interview process, that's really not good
18  terminology for that because, I mean, the officer has
19  no idea what he's doing right now. He's trying to
20  develop there's a reasonable suspicion, you know, he's
21  trying to see if there's anything going on. There's
22  something he has -- he has -- caught his eye, there's
23  something that he has seen previously or to put him in
24  the front seat to begin with. So he's either going to,
25  you know, decide something is going on and develop his

21 (Pages 78 - 81)

Page 82

1 reasonable suspicion or he's going to let him go.
2    Q.  Okay.  I guess I'm a little confused there,
3 and I want to understand.  Let's say that Mr. Fox is a
4 drug smuggler and he's got -- he did not like that, I
5 could see in his reaction.
6    A.  He didn't.
7    Q.  I know.  Let's say Mr. Fox is a drug smuggler
8 and he has, you know, a couple of kilos of meth in his
9 car and you stop him, you do a front seat interview
10 with Mr. Fox, and you say, "There's nothing going on
11 here," and you let Mr. Fox go, would you say that's an
12 error?
13    A.  No.  It happens all the time.
14    Q.  Okay.  So tell me more about that.
15    A.  There's a difference in drug smugglers, right,
16 just like there's a difference in law enforcement when
17 it comes to experience, right.  A mule becomes --
18    Q.  Mr. Fox is not an experienced drug smuggler,
19 but keep going.
20    A.  Okay.  All right.
21    Q.  No, that's part of the joke.
22    A.  Okay, well, let's use that example.
23    Q.  For the record.
24    A.  I like the fact that you used that, okay,
25 because he would be more susceptible to getting away

Page 83

1 with it because it's his first time, right, he has no
2 history, he's wearing a suit, he's dressed for the
3 part.  As long as his vehicle matches the way he's
4 dressed, odds are that officer may not even ask him for
5 consent to search the car because there's nothing
6 that -- there's no reasonable suspicion that this
7 officer is going to pick up on to lead him to even ask
8 for consent to search the car.  So he would leave and
9 he would get away.  I've had that happen.
10    Q.  Okay.
11    A.  Yeah.
12    Q.  And that wouldn't be an error?
13    A.  Well, I mean, it's not an error.  It's just
14 the officer doesn't know.  You don't know what you
15 don't know.
16    Q.  Understood.  When you said Mr. Fox's suit
17 matches his car, can you explain that to me a little
18 bit?
19    A.  Sure.
20    Q.  I just -- I don't necessarily -- I don't pay
21 attention to cars also.  So what kind of cars would
22 match Mr. Fox?
23    A.  You're going to be an experienced interdiction
24 person by the time we're done.
25        So a person matches their car -- let's go

Page 84

1 back to your scenario, okay, we're going to use your
2 car, your scenario.  I have my car, I've got Goldfish
3 in the car, the kids tear it up, right, well, if I were
4 to stop someone like that that's a mother that has
5 young kids, I expect that, right.
6        If I -- if Mr. Fox was in your car, then
7 I would like -- the first thing I would think is why
8 are there car seats in this car and there's no kids in
9 the car seat and he's a male dressed in a suit, right,
10 so that's the first thing I would wonder because why
11 does the mom with the kids not have the car seat?
12        I had -- that was one of my things on
13 interdiction.  When I stopped a car and it was a male
14 subject and there was no family and there was car
15 seats, that was the number one thing I'm looking at
16 because that's what drug smugglers do.  They use car
17 seats as a prop, just like they use other things.
18        You know, they try to copy a vehicle to
19 make it look like something else.  Let's say -- DirecTV
20 is a good one, so a DirecTV van, they will take a van
21 and they will wrap it with the exact markings as
22 DirecTV, put ladders on it, dress the guy up with the
23 DirecTV clothing, put him in the truck and send him up
24 the highway with a load of drugs.  So that officer has
25 to determine whether that's a real DirecTV van or not.

Page 85

1        Okay.  So to answer your question about
2 the car matching the person, your car and the way it is
3 when I stop you on a traffic stop would match you.  But
4 if I put Mr. Fox in that car on Interstate 35 and he's
5 from Chicago, Illinois and he's down in Austin, Texas
6 in a suit with a car seat full of junk in the floor, it
7 would raise my suspicion.
8    Q.  Got it.
9    A.  So he would not get away with the two kilos of
10 meth.
11    Q.  And let's pretend the car matches Mr. Fox in
12 whatever way.
13    A.  Okay.
14    Q.  What if Mr. Fox was like very nervous?  I
15 mean, I let Mr. Fox drive my car last night, which I
16 was super nervous about, but he did fine, but let's
17 pretend like he's a drug smuggler and this is his first
18 time driving a vehicle and he is so nervous, right, and
19 that's the only thing you've got.  What would you do
20 with that?
21    A.  So a lot of people are nervous on traffic
22 stops.  Just the mere red and blue lights on behind
23 you, they become nervous, right.  It's the officer's
24 responsibility, particularly an interdiction guy --
25 well, really even any officer, you know, calm that

Page 86

1  person down, right. It's just a Class C violation,
2  right, it's no big deal, right. To that person, it's a
3  big deal, right, "Oh, my God, my insurance is going to
4  go up, I'm getting points on my driver's license, I'm
5  going to lose my job, I'm late for my job," you know.
6  So an officer needs to understand that.
7          So you do everything you can do to try to
8  calm them down, calm Mr. Fox down, you know, "Calm
9  down, man, it's not a big deal," right, and it's just a
10 traffic violation, right. So the officer should try to
11 calm him down, not be so threatening. You know how a
12 trooper -- a DPS trooper has got their hats on and they
13 are down above their brow, they're all business and
14 they walk out there all business, you know, that's
15 intimidating.
16         So an interdiction officer who is really
17 looking to try to develop that rapport with that person
18 to find out what's really going on, if anything at all
19 is going on, they are going to be nice to that person.
20 They are not going to be that intimidating guy. That's
21 what a good interdiction officer does.
22 Q.  Got it. And if -- even if, you know, you're
23 super nice to Mr. Fox, he's still nervous because he's
24 young, this is, you know, his first job, he doesn't
25 want to lose it, is that normal?

Page 87

1  A.  Well, again, it goes back to the situation at
2  hand, right. It goes back to the circumstance -- I
3  mean, these are all hypotheticals and I'm enjoying, you
4  know -- I think you guys are learning a lot, actually,
5  which helps you in your position, which is very
6  important. And, you know, it's just -- hypotheticals
7  are those things that they can just go on and on and
8  on, there's never a resolution to a hypothetical.
9  Q.  Sure.
10 A.  So I would really need just like details of
11 everything that's going on, a scenario in front of me
12 that -- you know, to really be able to answer that.
13 Q.  Understood. So context matters?
14 A.  It has to matter, you know.
15 Q.  Got it.
16 A.  I mean, what's going on at the time.
17 Q.  That's helpful.
18         Have you heard the term -- heard the term
19 "hunting" used in the criminal interdiction context?
20 A.  Yes.
21 Q.  And what does that term mean?
22 A.  Well, it's jargon, it's cop jargon. You know,
23 police officers are out there looking for criminals,
24 you know, they are out hunting criminals, you know.
25 It's a cat and mouse game, believe it or not, it is.

Page 88

1  Crooks don't want to get caught, cops want to catch
2  them, right, so it's like cops are out hunting for bad
3  guys. So it's common jargon in law enforcement.
4  Q.  Okay. Have you ever used that term, I guess
5  in your criminal interdiction work?
6  A.  Sure. I mean, cops -- I mean, I'm sure every
7  police officer has used the words, you know, "Let's go
8  hunting, let's go find something, get into something,"
9  you know, it's just slang.
10 Q.  Got it. I think I know the answer to this,
11 but I'm just going to ask a couple of formulaic
12 questions that you kind of have to ask.
13         Other than for this case, have you ever
14 been retained by Mr. Barron and his firm?
15 A.  No.
16 Q.  Other than for this case, have you ever worked
17 with Bexar County before?
18 A.  In what capacity?
19 Q.  Well, let's just kind of break it down. Have
20 you ever been paid by Bexar County before?
21 A.  No.
22 Q.  Have you ever coordinated your interdiction
23 activities with Bexar County?
24 A.  I'm certain that I have, but not -- nothing
25 case specific. You know, being involved or working

Page 89

1  with DEA and working with the state and local task
2  forces, we were always going through San Antonio,
3  working in San Antonio, going to the border, going to
4  Dallas, you know. So odds are, you know, we have used
5  Bexar County before and/or San Antonio PD during some
6  stop.
7  Q.  Okay. Have you -- before being involved in
8  this case, did you know defendant Joel Babb?
9  A.  No.
10 Q.  Any of the criminal interdiction officers with
11 the Bexar County Sheriff's Office?
12 A.  No, I do not know anybody involved with this
13 case on any report that I have written -- I mean,
14 written -- reviewed, any videos I reviewed, I haven't
15 recognized anybody, never personally met them that I
16 know of.
17 Q.  So you haven't met Sheriff Salazar?
18 A.  Maybe. And the reason I say that is I was the
19 president of Texas Narcotic Officers Association, and
20 as the president of that association, we oftentimes did
21 conferences in San Antonio and we would always invite
22 the sheriff or the police chief to do opening remarks.
23 So I may or may not have met him in the past. But I
24 don't know when he was elected, I didn't look into that. But
25 I don't remember ever meeting him.

23 (Pages 86 - 89)

Page 90

1  Q. Could you pick him out of a crowd?
2  A. No.
3  Q. A couple more like formulaic questions.
4      Who hired you to give an opinion in this
5  case?
6  A. Well, obviously Blair -- is it Leake or Leaky?
7      MR. BARRON: It's Leake.
8      THE WITNESS: Blair Leake is the one that
9  reached out to me and hired me for -- you know, to
10 represent really no one, to give an expert opinion in
11 this matter.
12     The way I view my role here is that I do
13 not work for anyone in this room. I work for the jury,
14 who may or may not hear this case, and my job is just
15 to help them understand, just as I think I'm doing for
16 you guys, more about what's going on to formulate
17 good -- good decisions and opinions. I have no -- no
18 dog in this hunt with anybody here.
19 Q. (BY MS. HEBERT) Well, thank you.
20     And when you and Mr. Leake and Mr. Barron
21 were discussing this case and thinking about whether
22 you would make a good fit, what information did they
23 give you about the case?
24 A. I was called and asked if I would be
25 interested in this case because, you know, I'm

Page 91

1  well-known about drug enforcement in this area. I
2  mean, being the president of the Texas Narcotic
3  Officers Association, you know, the experience level.
4      I believe there was another expert
5  witness on a use of force case or something that I know
6  and he's the one that referred me to the office because
7  he knew that I've taught criminal interdiction.
8  Q. Is that Albert Rodriguez? Does that sound
9  familiar?
10 A. No, no, no, it was Mark Sawa.
11     THE REPORTER: What was the last name?
12     THE WITNESS: Mark Sawa, I think it's
13 S-A-U-A or something. He's retired Travis County
14 Sheriff's Office and we go way back. He's an expert
15 witness, I guess, on use of force, and I sat in on a
16 recent trial here in Travis County where he testified.
17     So I assume that an expert witness was
18 needed in this case, my name came up in that manner and
19 then that's how they ended up calling me.
20 Q. (BY MS. HEBERT) Okay. And before you were
21 officially hired, were you asked to give a preliminary
22 review or preliminary opinion?
23 A. No.
24 Q. Let's take a little bit of a look at your
25 report. I want to ask you just a couple more form

Page 92

1  questions.
2      Would you mind going to page 30 of your
3  report?
4  A. I hope that's a good start if we're going to
5  start at 30, right?
6  Q. I like to jump to the end. Let's get to the
7  bottom line and go to lunch.
8      MS. HEBERT: What time is it?
9      MR. FOX: It's 11:00.
10     MS. HEBERT: Great, thanks.
11 Q. (BY MS. HEBERT) Do you see the last paragraph
12 on page 30?
13 A. I do.
14 Q. So I -- you can correct me if I'm wrong, I
15 understand you're charging a flat rate of $3,700 for
16 the initial case evaluation and report; is that
17 correct?
18 A. That's correct.
19 Q. Okay. But I'm also seeing that you value your
20 time at $150 an hour; is that also right?
21 A. Yes.
22     MS. HEBERT: So I need my calculator. I
23 might need you to get my calculator. It's in that box.
24 Q. (BY MS. HEBERT) Is $150 an hour -- if you
25 were charging an hourly rate across this case, would

Page 93

1  you expect to be charging $150 an hour?
2  A. I'm not charging a flat rate -- I mean, I'm
3  charging a flat rate.
4  Q. Yeah. I guess if you were charging an hourly
5  rate, would your hourly rate be 150?
6  A. For the entire investigation?
7  Q. Yes, sir.
8  A. Yeah, sure. I mean, but I think it's only
9  fair that I just do a flat rate because $3,700 is going
10 to be less than $150 an hour.
11 Q. Oh, for sure.
12 A. You know, so I don't believe that it's fair
13 to, you know, tax anyone any more than that. You know,
14 I enjoy doing the work, I enjoy, you know, learning
15 more, you know, as we go. And so, yeah, I don't -- I
16 think -- I don't gouge people on prices. I just do a
17 flat rate.
18 Q. Okay. So how many hours have you spent on
19 this case so far?
20 A. I would say it's really hard to tell. I read
21 cases from -- sometimes from 6:00 at night until 3:00
22 in the morning. Sometimes I would read cases for four
23 hours, sometimes three hours, preparation, on the
24 Internet, you know, reviewing, you know, case law,
25 things of that nature. So it's just hard to say how

24 (Pages 90 - 93)

Page 94

1    many hours. It's a lot of hours, though.
2        Q.  Okay. So I guess one way to think about about
3    it is how many hours did you spend putting pen to paper
4    to write your report?
5        A.  Many.
6        Q.  Any estimate? More than ten?
7        A.  Yes.
8        Q.  More than 24 hours?
9        A.  I would say so.
10       Q.  Okay.
11       A.  I'm an old school guy, right. I'm not like
12   the youngsters who use artificial intelligence or
13   transcription, right. So I'm -- I'm, hey, let's get in
14   and let's type a report. So, you know, it took a long
15   time to write the report, actually. Even though I took
16   a long time, I really -- I'm disappointed that I have
17   some spelling errors in here. You know, I'm critical
18   of myself, of course, but --
19       Q.  That's okay. We all have spelling errors, I'm
20   sure. I love spell check for that reason.
21           Okay. So would you say you've spent, you
22   know, a week writing this report of working time?
23       A.  Sure.
24       Q.  I mean, of course you slept.
25       A.  Yeah.

Page 95

1        Q.  More than a week?
2        A.  Just the report itself, writing the report
3    itself?
4        Q.  Just the report itself?
5        A.  Yeah, I mean, a week is fair enough.
6        Q.  So, you know, give or take a 40-hour workweek?
7        A.  Yeah.
8        Q.  Okay. And then I guess how -- how many hours
9    would you say that you put into reviewing materials for
10   this case, whatever they may be?
11       A.  You know, I would say that's hard to tell. I
12   didn't keep track. I would be speculating on how many
13   hours I actually put into it.
14       Q.  More than ten?
15       A.  Oh, yeah.
16       Q.  More than 20?
17       A.  Well, more than the time that it took to write
18   the report.
19       Q.  Okay. So more than a 40-hour workweek?
20       A.  Sure.
21       Q.  Okay. I want to look more at the substance of
22   your report now.
23       A.  Okay.
24       Q.  But we're going to still stay focused at the
25   end, I think. Let's go to page 28.

Page 96

1        A.  Okay.
2        Q.  And we're looking at Exhibit No. 111, page 28
3    of 111. I'm looking at the first sentence there and I
4    see the date, March 22nd, 2022. Did you mean
5    March 16th, 2022, the date of the traffic stop in this
6    case? This is not a trick question.
7        A.  Yeah.
8        Q.  I'm going to represent to you that the traffic
9    stop happened on March 16th, 2022.
10       A.  You know, I think that might be an error in my
11   part, a typographical error, because I may have been
12   reading the date of the report that Deputy Babb had
13   done and I think that may have been dated on the 22nd
14   when they asked him to do the report. So it could have
15   been that during that timeframe, I transposed those
16   numbers.
17       Q.  So when -- but when you're writing this first
18   sentence in the header "Final Expert Opinion and
19   Conclusion," you're referring to the date of the
20   traffic stop; is that correct?
21       A.  I am.
22       Q.  Okay. I just wanted to make clear. And I'm
23   going to just read this first sentence here. "After
24   review of the material provided to me and from my
25   experience and training, it was reasonable to believe

Page 97

1    that Deputy Babb was practicing standard law
2    enforcement procedures on March 22nd, 2022, upon being
3    informed that -- about Schott traveling north on
4    IH-35."
5            Did I read that correctly?
6        A.  Yes.
7        Q.  And we just clarified that March 16th, 2022,
8    you meant the day of the traffic stop of Mr. Schott?
9        A.  Exactly. My mistake.
10       Q.  It's fine.
11           What are standard law enforcement
12   procedures?
13       A.  Just standard -- you're abiding by what is set
14   out -- set forth in policy and procedure by your
15   department that allows you to go out and do your work.
16       Q.  Okay. So the standard law enforcement
17   procedure depends on the department?
18       A.  Yes.
19       Q.  And to evaluate the standard law enforcement
20   procedure, you evaluate what the department policies
21   and procedures are?
22       A.  Correct.
23       Q.  And how do you evaluate what a department's
24   policies and procedures are?
25       A.  In relation to this case?

25 (Pages 94 - 97)

1    Q.  No, just in general.
2    A.  In general?
3    Q.  Like how do you know?
4    A.  You obtain their policy and procedure, you
5  read policy.
6    Q.  When you say that, you mean like their written
7  manual?
8    A.  Written manual.  In this case, all of their
9  policies, I believe, from what I have read, is on
10  PowerDMV.
11    Q.  I'm sorry, I don't know what that is.
12    A.  PowerDMV, it's a system that law enforcement
13  agencies use -- we had it, actually, in Williamson
14  County -- where when they do either -- they want an
15  officer to know what the policy is, the officer reads
16  the policy, it is electronically documented that they
17  read the policy and then they have it for future use,
18  right.  So that's what PowerDMV is.
19        If there's any additions to the policy,
20  something has changed, then it's just an easier way
21  that everyone gets the new information, they have read
22  it, they have signed it electronically and it's
23  tracked.  That's what PowerDMV is.  So the old way of
24  doing policies by paper and a policy manual, it's --
25  you know, things get missed.

1    Q.  Okay.  So in evaluating whether Deputy Babb
2  was practicing standard law enforcement procedures, you
3  looked to the Bexar County Sheriff's Office's written
4  policies and procedures; is that correct?
5    A.  That was provided to me, yes.
6    Q.  Okay.  Anything else?
7    A.  No, not -- not related to the Bexar County
8  Sheriff's Office.
9    Q.  Sure.  The Bexar County Sheriff's Office
10  written policy -- if Deputy Babb was complying with the
11  Bexar County Sheriff's Office's written policy, does
12  that mean that Deputy Babb's actions were
13  constitutional?
14        MR. BARRON:  Objection, form.
15        THE WITNESS:  I obviously am not Deputy
16  Babb, right?  I mean, this situation -- every situation
17  is different, you know, every situation is subjective,
18  just as the examples that we had earlier.  You know,
19  I'm not there, I don't know exactly what went on, I can
20  only, you know, evaluate this case from their policy
21  and their procedure, from his reports, from the videos
22  that I watched or the video that I watched, you know.
23  So I couldn't speculate on whether what he did was
24  constitutional or not, right, in his brain.
25    Q.  Sure.  And I guess one thing that I'm trying

1  to understand is separate and apart of what Deputy Babb
2  may have believed in that -- in this context, if Deputy
3  Babb was following the written policies and procedures
4  of Bexar County Sheriff's Office, does that mean he was
5  practicing standard law enforcement procedures?
6    A.  Yes.
7    Q.  I'm just trying to shortcut stuff.
8    A.  Of course.
9        MR. BARRON:  We've been going for nearly
10  another hour.  Do you want a five-minute break to
11  collect your thoughts?
12        MS. HEBERT:  No, we're okay.
13        MR. BARRON:  Okay.
14        MS. HEBERT:  I'm trying to keep this
15  until lunch, I think.
16    Q.  (BY MS. HEBERT)  Did everything that Deputy
17  Babb did on March 22nd, 2022 --
18        MR. FOX:  Do you mean 16th?
19        MS. HEBERT:  Yeah.
20        THE WITNESS:  I've got everybody messed
21  up, I apologize.
22    Q.  (BY MS. HEBERT)  No, that's fine.
23        Did everything that Deputy Babb did on
24  March 16th, 2022 comply with standard law enforcement
25  procedures, based on your view?

1    A.  Based on my training and experience with what
2  I have observed or read in this traffic stop, this is a
3  normal traffic stop, normal interdiction stop that
4  happens across the country every day.  There's nothing
5  that sets it apart from anything else.
6    Q.  Assume for a second that Deputy Babb did turn
7  his dash camera off before the traffic stopped, is that
8  a standard law enforcement procedure?
9    A.  You know, I wasn't asked to evaluate the
10  policy and the procedure on the cameras.  I do have an
11  opinion on what could have happened, but I wasn't asked
12  to evaluate that.
13    Q.  What's your opinion?
14    A.  Having been in many, many law enforcement
15  interdiction cases, having worked them, having stopped
16  cars, officers will sometimes catch up to a vehicle
17  that is interesting to them, right.  So they may be
18  parked in the median and the vehicle passes and they
19  may see something that that vehicle is -- matches
20  common vehicles that have been seized recently across
21  the country.  So they may want to catch up to that
22  vehicle just to see if it's got license plates, you
23  know, whatever the case is.
24        And when that happens, that officer
25  starts from zero miles an hour, that car may be going

Page 102

1  75 miles an hour, so they have to go fast to catch the
2  car. That triggers the camera system. When the camera
3  system triggers, officers hit the off button because it
4  triggers the camera, they don't know whether they are
5  going to stop this car or not, they are just catching
6  up to the car, right. That kind of becomes muscle
7  memory, per se, for some officers. They will hit that
8  trigger, they will reach up, they will cut that camera
9  off because they are not going to stop the car or they
10 don't know if they are going to stop the car.
11        And in my -- I don't know, but just from
12 reading this case, I can see where that -- that happens
13 a lot with officers, right. Whether it happened in
14 this case or not, I don't know. But that camera will
15 not reactivate when the lights come on, so that could
16 potentially be what happened in this case. I don't
17 know.
18    Q.  Sure.
19    A.  I would be speculating.
20    Q.  No, that's okay.
21        I want to ask you a couple questions.
22 When you wrote here that it was reasonable to believe
23 that Deputy Babb was practicing standard law
24 enforcement procedures, are you saying that it was
25 reasonable to believe that -- it was reasonable for

Page 103

1  Deputy Babb to believe that he was practicing standard
2  law enforcement procedures or are you saying that you
3  believe that Deputy Babb was practicing standard law
4  enforcement procedures, or something else?
5        MR. BARRON:  Objection, form.
6        THE WITNESS:  I can't -- I don't know
7  what Deputy Babb was thinking or whether he thought
8  that he was performing them according to his policy and
9  law. I don't know. That would be speculation.
10        The second part of that question, whether
11 I believe he was doing it according to his policy, yes,
12 I mean, I do.
13    Q.  (BY MS. HEBERT)  Okay. And I just -- I wasn't
14 trying to trick you.
15    A.  Yes, of course.
16    Q.  I just wasn't exactly sure what the phrasing
17 meant there.
18    A.  Sure.
19    Q.  So based on, you know -- looking at this
20 opinion -- sorry, did you --
21    A.  Sorry, I thought he almost fell.
22        MR. FOX:  Oh, no, no, no.
23    Q.  (BY MS. HEBERT)  Looking at these conclusions,
24 I guess one of the questions I have for you is, is it
25 your opinion that everything that Deputy Babb did

Page 104

1  during the traffic stop of Mr. Schott was consistent
2  with standard law enforcement procedures as written in
3  the Bexar County Sheriff's written policies?
4     A.  Everything is a broad term. You know, again,
5  it kind of goes to speculation again, everything that
6  he did. You know, if you could give me some type of
7  example on what you think that -- you know, you want
8  clarification on, then I would be more than happy to
9  give you a direct answer.
10    Q.  Well, sure. I mean, I guess the easy way to
11 start with that is you wrote that you believed Deputy
12 Babb was practicing standard law enforcement
13 procedures. What did you mean by that?
14    A.  I meant that I did not see anything with this
15 traffic stop, with this case, that wasn't just a normal
16 interdiction stop that's conducted across the country
17 every day.
18        This case in particular, you know, as we
19 discussed earlier, about Mr. Fox and his nervousness, I
20 mean, Deputy Babb exhibited compassion, he was -- he
21 was friendly, right, I mean, he did a lot of things
22 that led me to believe that he has got more experience
23 than your standard officer out there stopping cars
24 every day, if that makes sense. So I kind of looked at
25 that and said, "Well, he's had some training, he's had

Page 105

1  some experience stopping people."
2        You know, I think it's -- this stop in
3  relation to stops that I've done in the past, it's no
4  different, I mean, there's just not -- there's not
5  anything there that I saw that just sticks out.
6     Q.  Sure.
7     A.  Minus, of course, your video camera issue.
8     Q.  And when you say "video camera issue," what do
9  you mean?
10    A.  Well, the video camera not being on, according
11 to policy.
12    Q.  And you mean Deputy Babb's dash camera?
13    A.  Yes. And you know, that's -- that's beside
14 the point. But related to the traffic stop,
15 Mr. Schott, the things that Deputy Babb did, it's a
16 standard narcotic investigation. It's not just a cold
17 stop, it's not just a stop that someone was driving
18 down the road and he decided to stop the car. So
19 there's way more to this traffic stop than just a cold
20 stop, if that makes sense.
21    Q.  Okay. And what does -- what do you mean by
22 "cold stop"?
23    A.  A cold stop is a term that people often use
24 when a deputy or an officer sees a vehicle, they
25 believe that vehicle may have some, you know,

Page 106

1  contraband in it and may be doing something illegal and
2  they decide that they are going to see if they can get
3  probable cause for a traffic violation to stop the car
4  and investigate to see if something is going on. Many
5  times, nothing is going on. Most of the time, nothing
6  is going on. But that would be considered like a cold
7  stop. The officer initiated that traffic stop, no
8  prior information, right.
9         Compared to my review of this case, from
10  my training and experience, you know, I believe that
11  there was information that he had. It was obvious from
12  his videos, from his interview, from the recordings,
13  from the body cameras that he was communicating with
14  somebody in law enforcement. So he had prior knowledge
15  of this stop, so it was not a cold stop, in my opinion.
16  He had prior information.
17     Q.  Okay. And I think we will get back to that
18  more just like to explore it, but I'm going to continue
19  walking through what we have here.
20         In this first full paragraph on 28, you
21  wrote, and I'm going to quote here, "Such
22  investigations are -- are often not in the same
23  jurisdiction the officer works. Therefore,
24  communication using telephones, networking apps and
25  radios are common."

Page 107

1         Did I read that sentence correctly?
2     A.  Yes.
3     Q.  And would it be fair to say that you're
4  informing us that it's common to use phones,
5  networking, radios when officers are working across
6  jurisdictions; is that correct?
7     A.  Yes.
8     Q.  Okay. What constitutes an investigation?
9  What is an investigation? What rises to the level of
10  investigation?
11     A.  Well, an investigation is where you're
12  developing, you know information, you're gathering
13  information to decide whether or not there's a crime
14  here, right. You know, you're investigating whether
15  there's more to what's going on other than the traffic
16  stop.
17         In this case, there's prior information,
18  right. He obviously knew this vehicle was coming, he
19  knew the description of the vehicle, he knew that
20  there's other people that he was told, according to the
21  videos I watched and the reports, he knew that someone
22  knew something more than he did, right?
23         So there's a lot of things going on here
24  before the traffic stop and they were credible, they
25  were credible in this way. He was told that the

Page 108

1  vehicle was an F-250, it was an F-250. He was told the
2  license plate number was exactly the same. He was told
3  that the vehicle was in Carrizo Springs and it was
4  traveling north on Interstate 35 and left at a certain
5  time, the timeframe matched the time it left Carrizo
6  Springs until the time he saw it.
7         So there's a lot of things that are
8  credible behind the information that he had, even
9  before the traffic stop. So, you know, that's why I
10  say "investigation." I mean, I don't know, I wasn't
11  there and I don't know who the people are in Carrizo
12  Springs, I don't know what was going -- I do know that
13  there was -- I say "investigation" because this isn't
14  just a cold traffic stop, right? That's the reason I
15  use that word, "investigation."
16     Q.  Got it. Taking a step back from this
17  particular case for a second, when is it appropriate to
18  rely on information about a vehicle that an average Joe
19  posts on their -- their Facebook wall?
20     A.  Well, I don't know -- in my experience, I've
21  never taken information from a Facebook wall.
22     Q.  Why not?
23     A.  Well, I mean, that's not something that I am
24  currently monitoring, you know, during the duties of
25  that I do. I mean, that's not -- do you mean a

Page 109

1  Facebook wall, like I'm watching a social media
2  Facebook, like a Meta Facebook page?
3     Q.  Yeah. You login to Facebook, you see
4  Mr. Barron has posted about whatever Mr. Barron posts
5  about on Facebook and you say, "There might be a
6  vehicle for me to stop."
7     A.  Oh, all right. With investigations, with the
8  investigative side of the house, sure, narcotic
9  officers do that all the time, you know. I was still
10  on traffic stop here. But, yeah, sure, narcotic
11  investigators to that. You know, they monitor social
12  media sites, Facebook sites, you know, believe it or
13  not, Instagram and Snapchat, Snapchat is a big one. So
14  it's commonly used in law enforcement with drug
15  investigations, any crimes.
16     Q.  Okay. Well, let's pretend that Mr. Barron is
17  who Mr. Barron is and he's not in the drug industry.
18         MR. FOX:  Pretend.
19     Q.  (BY MS. HEBERT)  Let's pretend and let's just
20  say he posts something about there was a suspicious
21  vehicle on I-35, would you rely on that information?
22     A.  Well, I mean, rely on the information, it
23  would be one thing that if I'm a guy looking at a
24  Facebook post or monitoring Facebook and, you know, I'm
25  using keyword searches, right, because we do that a

28 (Pages 106 - 109)

**Page 110**

1  lot, you know, we will type in something, and I
2  discover there's something that interests me, you know,
3  sure, I may -- I may want to take a look at it. It
4  doesn't mean that anything is going on, it doesn't mean
5  that there's a crime. It could be totally innocent,
6  right.
7  Secret Service and FBI does it every day,
8  you know, for protecting the president, you know, so
9  those keyword searches are important. Does that mean
10  everybody is wanting to, you know, commit a crime
11  against an elected official, no, but somebody may be
12  venting on there and that keyword pops up and it
13  warrants that officer to at least take a look at it to
14  determine if something is going on.
15  Q. Sure. But if Mr. Barron posts a suspicious
16  tinted window -- or a suspicious vehicle driving on 35,
17  would you investigate that suspicious vehicle?
18  A. Again, it's subjective.
19  Q. If you didn't have anything else going on,
20  would you investigate it?
21  A. Well, again, it's subjective. I mean, what's
22  the other information that we have, you know. Again,
23  it goes back to hypothetical situations --
24  Q. Understood.
25  A. -- that are never ending and, you know, I

**Page 111**

1  can't give you an answer whether I would or I wouldn't.
2  Q. Understood. So context matters?
3  A. It matters. I'm sorry, but --
4  Q. No, that's fine.
5  A. -- I can't answer.
6  Q. If Mr. Barron, an average Joe, sent you a
7  Facebook message that there was a suspicious vehicle on
8  I-35, would you investigate based on Mr. Barron's
9  Facebook message?
10  A. What relation would I have with Mr. Barron, I
11  guess is the first thing that I would ask. You know,
12  is Mr. Barron an associate of mine that I met, maybe
13  not even met, but exchanged numbers in like training
14  conference somewhere, is he one of those guys, you
15  know?
16  Q. Let's say he's a member of the public, a
17  member of the public you have never met.
18  A. I don't even know?
19  Q. Right.
20  A. I wouldn't typically give any credit to that.
21  Q. Sure. And if it's someone you met at a law
22  enforcement training seminar, you exchanged numbers,
23  you know who he is, he works for the city of Austin,
24  would you credit that information?
25  A. Yes.

**Page 112**

1  Q. Okay. What about if Mr. Barron, who is a
2  lawyer, messaged you and claimed to be a police
3  officer, how would you -- what would you do in that
4  situation and you don't know if he is or not?
5  A. You know, that's -- that's -- I know where
6  you're going with this related to this case. So
7  typically, any communication platform should be vetted
8  by the department. Do officers do it? They do.
9  There's oftentimes -- there's oftentimes text groups on
10  the back end that they communicate on, right, when
11  something is going on because it's, you know, "Hey,
12  this guy is going across country." There's a lot of
13  that stuff that goes on, right.
14  So to answer that question, if it is
15  somebody that I don't know, it's someone that I have no
16  idea who it is, no, I would not investigate or go stop
17  that car or even look for it. If it was someone that
18  I'm in a group messaging with, even if it's not
19  against -- you know, even if it's not, you know,
20  policy, even if you're -- there's no policy around it,
21  right, even if the department -- the administration or
22  the department hasn't vetted this, most of the time
23  they don't even know this exists. These officers just
24  do this stuff, you know.
25  And, sure, I would hold credibility in --

**Page 113**

1  in that information because I would believe that the
2  person on the other end of that giving me the
3  information is a police officer.
4  Q. Would you do -- and what would -- what would
5  shape that belief for you?
6  A. Previous encounters or previous things that
7  have occurred on such app or such messaging platform,
8  right, so there may be some history to that. That's
9  why I said when you give me the example of just, you
10  know -- you know, just cold turkey, I don't know the
11  guy, absolutely not. But there is credibility to a
12  group chat of some sort, even being social media, if
13  there has been prior cases that's been made, there's
14  been prior communication, you know, there's credibility
15  in that.
16  And related to, I guess information from
17  the public that you don't even know, I mean, you could
18  actually go and act upon that information as well to
19  determine whether something is -- it's kind of like a
20  DWI, you know, I mean, you don't know the person
21  calling, but the person says, "Hey, there's a car all
22  over the road and they are driving erratically and
23  almost crashing into people," you know, you don't know
24  that person, but the person is credible.
25  And, yes, you can affect the traffic stop

Page 114

1  and you can go and investigate that, you know, under
2  reasonable suspicion to determine if a crime happened.
3  So that's -- that's my opinion of differences in the
4  two.
5      Q.  I might be revealing the depths of my
6  ignorance, but in the example you just gave for the
7  DWI, would you have to observe that vehicle weaving, or
8  what have you, before stopping them --
9      A.  Sure.
10     Q.  -- or could you just pull the person over
11  based on the say-so of someone who called in?
12     A.  No, under the DWI you would want to develop
13  your probable cause.
14     Q.  Okay.  So you would have to then observe the
15  traffic violation, in addition to whatever you had
16  heard before?
17     A.  Yeah.  And it's been my experience -- I've had
18  that happen many times and it's been my experience
19  that, you know, oftentimes they are correct, oftentimes
20  they may have been correct, but now that you're behind
21  them in a police car, you know, they are straight and
22  narrow and I don't have probable cause to stop the car
23  for any traffic violation.  So, no, you wouldn't stop
24  the car.
25     Q.  Okay.  And let's say you are part of a law

Page 115

1  enforcement -- or a group, let's say you're part of a
2  text chat, do you do anything to verify who is running
3  the chat?
4      A.  Again, my personal opinion is that everyone
5  should be vetted.  You should know who you're talking
6  with.  However, does that happen, it doesn't happen.
7  You know, have there been occasions where I've spoken
8  with people, not on social media, but over the phone
9  who I don't know, sure, you know.  Has that information
10  been credible, sure.  Have I acted on it, sure.  Again,
11  it's subjective according to the case, right.
12     Q.  And I guess I want to ask you about the -- the
13  phone example.  When you speak to someone over the
14  phone about information, do you ask them questions?
15     A.  Yes.
16     Q.  What kind of questions do you ask?
17     A.  Well, as much as you can learn from them to
18  understand what's going on, you know, why they believe
19  this person is doing what they are doing, right.
20         So, you know, you're going to -- you're
21  going to ask -- okay, I guess I'll give you an example
22  of like maybe -- I don't know, I'm trying to get a drug
23  situation -- maybe an airport case, yeah, let's use an
24  airport case, right.
25         So you may have an officer who has

Page 116

1  information that a person is smuggling something via
2  commercial airplanes, so they may call.  I have no clue
3  who this guy is, but they know you work criminal
4  interdiction at Austin-Bergstrom International Airport
5  and they know your name or they have called another
6  deputy who had a class, you know, "Oh, yeah, call Gary
7  Haston, he works in the airport."  So they will call.
8  I don't know who the guy is.  But the guy will say,
9  "Hey, there's a passenger getting on the plane in San
10  Francisco, it's a one-way ticket, they paid cash," you
11  know, so you may watch for this guy when they get to
12  Austin, the flight is going to be there at 2:15, right.
13         Two-hour, three-hour flight, I go to the
14  airport, see the guy get off the plane.  Obviously I'm
15  going to find out clothing description, everything
16  about the guy, what he's carrying.  He gets to the
17  airport, you know, there he is.  He gets off the plane,
18  just like they said.  He's got the same clothes on,
19  just like they said.  He's got the bag description he
20  picks up at baggage claim, just like they said.
21         There's a lot of credibility to that,
22  even though I don't know that guy, right, but he's a
23  law enforcement officer, he has this information and
24  you can count on that information.  I mean, it's
25  credible information to add to, you know, what you're

Page 117

1  doing.  I mean, at that point, I would ask for consent
2  to search just off of that alone.
3      Q.  Okay.  So in the example that you talked
4  about, you have the phone call, you verify what law
5  enforcement agency they work for.
6         Is that -- am I understanding that right?
7      A.  Sure.  You would ask who they are.
8      Q.  Right.  You ask who they are, you get the
9  information about the individual, you learn that they
10  paid in cash, based on what you talked about, they are
11  going to fly to Austin, you learned what they were
12  wearing, you learned what they were carrying.
13         Anything else that you learned there --
14  that you would have learned?
15     A.  Well, I mean, you could ask questions like
16  have they had prior, you know, flights, do you have any
17  knowledge of prior flights, itineraries, you know, have
18  they -- have you had anybody that actually saw them,
19  you know, before they got on the plane, right, things
20  of that nature.
21         Perfect example, and it's kind of related
22  to what, you know, could be happening in this
23  particular case is hotel/motel interdiction.  So what
24  will happen is an officer will be watching a hotel.
25  They may be in an area, Carrizo Springs is a perfect

Page 118

1 example, it's a source area, so you may have officers
2 watching the hotel.
3        When they see a vehicle that is not from
4 Carrizo Springs or the Valley, let's say from Houston,
5 Austin, San Antonio, and it's at that hotel where they
6 are running license plates, they are seeing if -- who
7 it is.
8        In this case, from San Francisco, it
9 could have been a hotel case to where someone is
10 watching a hotel, right. And they see this guy, they
11 see the baggage, they see the clothing and then they
12 follow them to the airport, they watch him get the
13 ticket and they get on the plane and fly to Austin. So
14 that whole thing originated around just an officer
15 watching and doing what they call hotel/motel
16 interdiction, right.
17    Q. Okay, I understand that. And I guess what I'm
18 having trouble understanding is how do you know that
19 the things that you're talking about, where someone
20 stayed, where they are traveling from, what they are
21 wearing, means that they might be involved in some kind
22 of criminal activity?
23    A. Well, you don't know, right. It could be
24 innocent travel, but that's why you go talk to them.
25 That's why you go out and you talk to them and then you

Page 119

1 either confirm or dispel there's criminal activity
2 afoot. If there's no criminal activity, then you let
3 them go. If there is criminal activity, then you put
4 them in jail.
5    Q. We have covered a lot of this already, so I'm
6 just trying to skip through the --
7    A. I'm sorry to -- I'm sorry to be jumping ahead
8 of you on a lot of this stuff.
9    Q. No, you're great. Then it just makes it, you
10 know, quicker.
11        Should an officer rely on information
12 from another law enforcement agency, let's assume for a
13 second it is another law enforcement agency, if the
14 information is only this vehicle was suspicious, don't
15 learn anything else?
16    A. It happens all the time in law enforcement,
17 you know. Again, it goes back to the -- to the
18 experience of that officer who is giving the
19 information. You know, it may be normal travel, it may
20 be -- again, I gave you an example earlier about what
21 an officer believes is suspicious in a car, you know.
22 I mean, it may be suspicious to one officer because
23 he's learning, let's say his travel patterns, you know.
24 I guess let me clean this up for you, I'm sorry.
25    Q. Nothing to apologize for.

Page 120

1    A. In my -- in my experience, when I was working
2 interdiction and I was learning my traffic pattern on
3 Interstate 35 north of Georgetown, okay, so I would
4 work typically from the Williamson County line to north
5 Georgetown and I would just be back and forth, less
6 traffic, I don't have to deal with local commuters that
7 are going to and from work, right. But what I learned
8 is that there were commuters that were traveling from
9 Waco to San Antonio every day and they were driving
10 cars, that were commonly used to smuggle drugs.
11        So I told you earlier that there may be a
12 vehicle that the drug cartels use that's got a certain
13 place for a compartment, the officers know this so they
14 want to see if that car is being used. Well, those
15 people driving from Waco to San Antonio every day is in
16 one of those cars and they happen to be in a car
17 without a seatbelt. So I stop the car for probable
18 cause, he has no seatbelt on. I learn that he drives
19 back and forth from Waco to San Antonio every day.
20        Well, everyday I'm on that highway, I see
21 that same car at that same time pass by. I'm pretty
22 confident that that guy is not a drug smuggler, right,
23 but that experience that I gained and from the
24 beginning, not knowing, to the experience I had later,
25 knowing that that guy is in a drug smuggling type

Page 121

1 vehicle, but he's not a drug smuggler may not be the
2 same case with the guy in San Francisco at the hotel,
3 right. So he may think that this is suspicious with
4 this guy because he has never seen it before, but then
5 later on, after he gains more experience, he may
6 realize that that's not suspicious at all.
7        So when that information comes from that
8 officer, I don't know what his experience level is, but
9 I think it's credible and I think he thinks it's
10 credible. So it's worth taking a look at, it's worth
11 at least going out and seeing if anything is going on
12 illegally.
13    Q. And when you say "seeing if anything is
14 illegal," seeing -- stopping that vehicle?
15    A. Stopping the vehicle or a consensual
16 encounter, talking with the person, whatever the case
17 is.
18    Q. Sure. And is it fair to say that if the
19 information is coming from a law enforcement officer,
20 you're going to assume you can rely on it?
21    A. Yes.
22    Q. We can come back to this later. Let's go to
23 the second paragraph on page 28.
24    A. 28, second paragraph.
25    Q. Uh-huh.

31 (Pages 118 - 121)

Page 122

1    A.  Okay.
2    Q.  I'm going to read the third sentence, and it
3  starts, "A reasonable officer in the same position
4  would have given credibility to the information
5  considering it was consistent from training and
6  experience that F-250 could have been used to smuggle
7  humans or drugs between Houston, a common destination
8  city, and south Texas, a common source of contraband
9  imported into the United States."
10        Did I read that correctly?
11    A.  You did.
12    Q.  Do human and drug smugglers use vehicles,
13  cars, other than F-250s?
14    A.  Yes.
15    Q.  What are the most common vehicles?
16    A.  Well, bigger vehicles where more people can be
17  placed in them, that's one way, right.  18-wheelers,
18  you know, is an example of that, larger pickup trucks,
19  vans, the example I gave you earlier on the traffic
20  stop that I did on the Ford Explorer that had 13, 15
21  people in it.  You know, you would never think you
22  could put that many people in a Suburban -- I mean,
23  Ford Explorer, but you can.  That's one part of it.
24        But maybe this human smuggling
25  organization knows that the cops are looking for the

Page 123

1  big vehicles, so they are only taking two people at a
2  time.  So those two people that are smuggling may be in
3  a Ford Escort, so you just really never know, right.
4  But the bigger the vehicle, the more people are
5  probably concealed, or drugs.  Same thing with small
6  cars, if you have a small car, fewer people are going
7  to be smuggled.
8        Does that make sense?
9    Q.  Yeah, I think so, but I'm not entirely sure.
10  So let me just try to tell you what I'm understanding
11  and you can correct me where I'm wrong.
12        It seems like what you're saying is all
13  cars can be used to smuggle drugs and people; is that
14  right?
15    A.  That's correct.
16    Q.  But bigger vehicles are more suspicious
17  because they can fit more drugs or more people, is that
18  fair?
19    A.  Well, I wouldn't say more suspicious.
20    Q.  Okay.
21    A.  You know, I would say that, again, it goes
22  back to the officer's experience and his training.  And
23  in this case, from the report that I read -- or not the
24  report, but the video that I watched of Deputy Babb --
25    Q.  And when you say video that you watched, what

Page 124

1  video are you referring to?
2    A.  That be would the body cam video, when it
3  was --
4    Q.  Deputy Babb's body cam video?
5    A.  Deputy Babb's body cam video, when it's in the
6  front of his car on the dash, he makes a comment about
7  an 18-wheeler that they had had that had a lot of
8  people being smuggled in it.  That led me to believe
9  that he has some experience with human smuggling,
10  right, and the F-250 that he has stopped on side of the
11  road during this traffic stop is also a vehicle that
12  could be commonly used to smuggle people because of the
13  bed topper, right, it's got a bed topper, it's got
14  heavier suspension.
15        In combination with that vehicle, with
16  the information that he had prior is -- leads me to
17  believe that he may have been thinking -- and, again,
18  I'm not in his mind, but if I was in his position, I
19  would have been first thinking human smuggling would be
20  the possibility, right, not drug smuggling.  But it
21  could have been drug smuggling.  Who knows.
22    Q.  Sure.  And do people travel between Houston
23  and South Texas for reasons other than human smuggling
24  and drug smuggling?
25    A.  Yes.

Page 125

1    Q.  Okay.  And are the majority of people who are
2  traveling between Houston and South Texas involved in
3  drug smuggling or human smuggling?
4    A.  No.
5    Q.  By your estimate, what percentage of people
6  traveling between Houston and south Texas are involved
7  in either human smuggling or drug smuggling?
8    A.  That's the unknown question.  You know, I
9  can't answer that to be specific.  I can tell you the
10  answer that I give people in my training classes.
11    Q.  Yes, sir.
12    A.  That's a common question, believe it or not,
13  even with cops, you know, how many people are smuggling
14  drugs on the highway.  From my training and experience,
15  talking with people, interviews, dealing with Mexican
16  drug cartels and mules, you know, I would tell people
17  that for every traffic stop that I'm on, drugs or no
18  drugs, ten loads of dope passed me by.  Ten cars loaded
19  with drugs passed me by while I'm on one traffic stop.
20    Q.  So let's assume for a second traffic is
21  going -- how long would the traffic stop be?
22    A.  It depends on the circumstances.
23    Q.  What's your average traffic stop,
24  nothing found, just generally?
25    A.  From my experience or from the experience

32 (Pages 122 - 125)

Page 126

1   where Deputy Babb was?
2       Q.   From your experience?
3       A.   From my experience, you know, ten minutes is
4   actually -- I mean, I would -- I would have them cut
5   loose in ten minutes.
6       Q.   Ten minutes.  Okay, let's say ten minutes.
7   How many cars would you estimate pass by you in a
8   ten-minute timeframe?
9       A.   It depends, again, on the highway.  You know,
10  on Interstate 35 north of Georgetown, you know,
11  thousands.
12      Q.   So would 1,500 be a reasonable amount?
13      A.   I would not even venture to say -- I would say
14  it would be more than that.
15      Q.   Okay.  2000?  I have no idea.
16      A.   It's busy, it's packed.  You know, that's --
17  you really can't do statistics like that in trying to
18  figure things out because there's a difference in
19  traffic, there's a difference in how many cars pass you
20  on Interstate 35 in south San Antonio compared to
21  northern Georgetown.
22      Q.   Okay.
23      A.   So I don't -- I can't really come up with a
24  number.
25      Q.   Sure.  How about like a percentage?  I'm just

Page 127

1   trying to get like a -- get my arms around this.
2       A.   On how much drugs are being trafficked, is
3   that what we're talking about?
4       Q.   Yeah.  Just like the number of people who are
5   using these highways, would you say like 10 percent of
6   folks driving on I-35 are smuggling drugs or people?
7           MR. BARRON:  Objection, form.
8           THE WITNESS:  I wish we knew.
9       Q.   (BY MS. HEBERT)  Okay.  So you just don't have
10  a sense?
11      A.   If you take into consideration the amount of
12  drugs that are seized by the Department of Justice, the
13  Drug Enforcement Administration, the Homeland Security
14  during their investigations, Border Patrol, on the port
15  of entries, on the checkpoints, by every deputy and
16  officer who stops cars every day in the United States,
17  there -- there are a lot of drugs here.
18      Q.   Understood.
19      A.   And that means that a lot of drugs pass you by
20  on the highway.
21      Q.   Understood.  And I guess like I want to focus
22  for a second on -- on folks traveling from -- to and
23  from Houston and South Texas.  Would you say the
24  majority of folks traveling to and from Houston and
25  South Texas are smuggling drugs or people?

Page 128

1       A.   No.
2       Q.   So somewhere less than half?
3       A.   Absolutely.
4       Q.   Okay.  Does the fact that Alek drove an F-250
5   and that he drove between Houston and South Texas mean
6   that Deputy Babb had a reason to extend the traffic
7   stop here?
8       A.   Well, I don't know that -- no, I don't think
9   he -- the extension is not the issue.  I believe that
10  plays a role in his original reasonable suspicion to
11  ask for consent.  It played a significant role, in my
12  opinion.
13      Q.   Help me -- so take a step back there.  So you
14  believe the F-250 and the fact that he traveled from
15  Houston to South Texas played a role in his decision to
16  ask for consent; is that correct?
17      A.   In addition to the prior information that he
18  had?
19      Q.   Sure.
20      A.   It's possible, it's common all of the time
21  that people from Houston go to the Valley to pick up
22  drugs in large vehicles with bed toppers.  So do all of
23  them do it, no, of course not.  But in this case, he
24  had -- according to the information on the video, he
25  had prior experience with human smuggling.

Page 129

1   According --
2       Q.   And by "he," you're referring to Deputy Babb?
3       A.   Deputy Babb, I'm sorry, yeah.  That's my bad.
4           So Deputy Babb had experience, in some
5   form or fashion, by his own admission in his video,
6   about a tractor-trailer with a lot of people in it.
7   Deputy Babb's training records indicate that he had a
8   lot of training for human smuggling through courses.  I
9   don't have the, you know, syllabus for those.  I don't
10  know what -- what occurred in those trainings, but you
11  can reasonably -- an officer could reasonably say he
12  has some experience with smuggling, human smuggling.
13          So between his training, his experience
14  of prior human smuggling cases, the information that he
15  had from the officer, or whoever it was he was talking
16  with on the -- on the social media platform, all of
17  that would make a reasonable officer believe that this
18  truck traveling on a one-day turnaround from Houston to
19  Carrizo Springs, staying the night at a hotel and
20  encountering another person there and then traveling
21  back northbound, that would add to the reasonable
22  suspicion to ask for consent to search.  That plays a
23  big role.
24      Q.   Understood.  Are officers supposed to consider
25  innocent explanations for facts like that, facts about

Page 130

1  travel?
2      A.  It's been my experience that I don't know what
3  an innocent explanation is until I either confirm or
4  deny everything going on as a -- as a whole, right.  So
5  as I'm on the scene as an officer in these situations,
6  I don't know whether the person is lying to me or not.
7  There are good liars and there are bad liars.
8          So I can only depend on the circumstances
9  at hand, which, of course, I wasn't there, I wasn't
10  Deputy Babb to see everything going on.  But from my
11  training and experience, you know, people are good
12  liars, so I don't take everybody for what they tell me.
13      Q.  So I guess that prompts the question for me of
14  how should an officer assess the explanation they are
15  given for travel?
16      A.  Yeah, of course.  They should ask questions,
17  you know, where are you going, where are you coming
18  from, you know, why are you there, have you ever been
19  there before, things of those natures to determine
20  whether or not that person regularly goes there for
21  business or personal or they are going to see family,
22  you know.
23          What I have found in my training and
24  experience before on these stops -- and I'll use
25  Interstate 35 as an example -- is, you know, you stop a

Page 131

1  guy -- and I had one one day, I stopped a guy north of
2  Georgetown.  In fact, it was at the county line, so
3  we're 25 miles north of downtown Austin.  And I asked
4  the guy, "Hey, how are you doing today?  Where are you
5  going?"  "Oh, I'm going from -- I'm going from the
6  Valley and I'm going to Austin," right.
7          Well, immediately that's a red flag to
8  me, so I'm going to dig into that, right.  That's an
9  obvious problem, right.  But the --
10      Q.  When you say "obvious problem," it's an
11  obvious problem because it's inconsistent -- the
12  explanation is inconsistent with their action, is that
13  fair, just to make it explicit?
14      A.  Of course.  He's 25 miles north of Austin, but
15  he tells me he's going to Austin.  That's common for
16  drug smugglers.  From my training and experience, I
17  would see that all the time.  So that would be one of
18  the things that would drive me to ask more questions to
19  them, add that to my piece of the pie, right, in order
20  to build a reasonable suspicion to then ask for consent
21  to search the vehicle, right.
22          So people lie to you, it's just sometimes
23  some lies are better than others and it's hard to
24  detect.  And if you're not -- if you have ever been
25  around a very narcissistic person who is a good liar,

Page 132

1  sometimes you can't read it.  They are very good.
2      Q.  Yeah, Mr. Fox.
3      A.  They are very good at covering that.  So to
4  answer your question, it takes a long time and a lot of
5  experience for an officer to determine whether that
6  person is telling you the truth or not the truth.  And
7  even having a lot of experience, you still miss it, you
8  still miss the fact that they lied to you, you know.
9      Q.  So in terms of assessing someone's claimed
10  reason for traveling and claimed explanation for
11  things, you look for inconsistencies; is that fair?
12      A.  That's correct.
13      Q.  What else do you look for?
14      A.  Are we talking about an interdiction as a
15  whole?
16      Q.  Yeah.  I guess, you know, when you're
17  assessing someone's explanation, their innocent
18  explanation, their noncriminal explanation for their
19  behavior, how do you determine whether it's true or
20  not?  We talked about inconsistency.  What other things
21  do you look for?
22      A.  During the interview?
23      Q.  Yes, sir.
24      A.  Body language.  So when you're asking someone
25  a question, they respond to you in a certain way and

Page 133

1  their body tells you things that you don't know your
2  body is telling you, right.  So when you ask the
3  question, you're looking for other things.  You're
4  looking for gestures, facial expressions, you're
5  looking for hand movements, body movements.
6      Q.  It makes me automatically like super conscious
7  of my body language.  I'm like, what am I doing?
8      A.  Yeah, and no matter how -- and that's the
9  thing about it is no matter how hard you try, you know,
10  to control it, you can't.  And that makes people
11  uncomfortable, just as you're uncomfortable, right.
12  And it's like somebody on the side of the road that's
13  committing a crime, it intensifies, you know.
14          So think about the drug trafficker who
15  knows they have ten kilos of Coke in the car and they
16  are driving north, their whole plan is, "What am I
17  going to do when I get stopped?"  So when that does
18  happen and they are -- they are driven up, they are
19  very on the edge.  That's what causes the -- oftentimes
20  you hear they were very nervous, right, they were
21  breathing hard, they had dry lips, they were, you know,
22  avoiding eye contact with me, they were -- all of these
23  things are things that you look for, right.
24          Now, as you said earlier, a lot of people
25  are just that way, even innocent people, so that's why

34 (Pages 130 - 133)

Page 134

1  you have to calm them down. You have to make them
2  realize, "You're not going to jail, this is just a
3  Class C violation." That should help them with their
4  body language. They are not going to exhibit these
5  things anymore, you know, that you would pick up on to
6  determine whether what they said was a lie or not a
7  lie, right.
8      And if that person does calm down, if
9  that person does stop all of these things that the
10  officer is seeing, odds are they were telling the
11  truth. You know, if they continue and they are still
12  doing these things that -- you know, they are
13  stretching or, you know, they are answering a question
14  and they are covering their mouth or hitting their
15  nose, you know, at certain times during the interview,
16  then that is still cause for concern that they are
17  being deceptive.
18  Q.  How do you know, for body language, what's
19  normal for that person versus a sign of them being
20  nervous or trying to hide something?
21  A.  Sure. I'm glad you asked. You develop what
22  they call a baseline with nonthreatening questions that
23  have nothing to do with anything illegal. Once you
24  develop that baseline, a person answers a question in a
25  certain way, right.

Page 135

1      Unbeknownst to them, they are answering,
2  "Yes, sir, no, sir, yes, ma'am, no, ma'am," right,
3  we're talking about the weather, the family, things of
4  that nature. In their mind, they know that the, "Do
5  you have drugs" question is coming, so their body is
6  starting to tense, their blood pressure is going up,
7  maybe their carotid artery starts to pop, you know,
8  they start getting veins in their head that are popping
9  because their blood pressure is going up, they start
10  breathing more. That's -- that's noticeable to an
11  officer trained to see it.
12      When that question does come that "Yes,
13  ma'am" or "no, ma'am" turns into a lot of different
14  things. It could be no answer at all. It could be a
15  nervous laugh, "No, of course not, no, I've never used
16  drugs in my life." That's off of baseline. That's not
17  the "yes, ma'am, no, ma'am." That is now something
18  that triggered this guy's response because then you go
19  to, "Do you have any dead bodies in the car?" "No,
20  sir." "Do you have this --" so they go back to
21  baseline.
22      Now, that in itself doesn't mean anything
23  unless you go back and confirm it again. That's just
24  something that you pick up on. So then your interview
25  should be something nonstressful, go back and confirm

Page 136

1  that their baseline is "yes, sir, no, sir" and then
2  when you come back to that question and start talking
3  about that more, they are going to go back to the "no,
4  man," you know, and try to change the subject or do
5  whatever they are doing. That is something that I want
6  to look into a little bit more, whatever that topic is.
7      So that's how I determine whether or not
8  a person is being truthful with me and the things that
9  I look for during that interview and the baseline.
10  Q.  Okay. Let me summarize what I'm taking away
11  from that and you can tell me what I miss and what I
12  don't get right.
13      You -- in your interviews, or in good
14  interviews, you -- an officer will move between
15  nonthreatening questions and questions that are
16  investigatory in nature and compare the responses to
17  those questions.
18      Am I understanding that correctly?
19  A.  Yes.
20  Q.  And if the two -- if the behaviors in response
21  to the two types of questions are different, that
22  raises a red flag?
23  A.  It does. It doesn't mean that they are doing
24  anything illegal, right? It's just telling you that
25  you need to revisit whatever that was, right. There

Page 137

1  could be some legitimate reason behind it, you know.
2  Maybe there's not, right.
3  Q.  And would you say most of the drivers that
4  are -- let me rephrase that.
5      When an officer walks drivers through the
6  alternating nonthreatening investigatory questions,
7  would you say that most drivers are unaware of what the
8  officer is doing there?
9  A.  Oh, yeah, they don't know.
10  Q.  I want to go back to your report, and just
11  take a look at the third paragraph down. And can you
12  just review this paragraph for a second and I'll ask
13  you some questions?
14  A.  That starts with "Deputy Babb"?
15  Q.  Yes, sir.
16  A.  Okay.
17  Q.  Is there anything illegal in driving from
18  Houston to a remote area of Texas?
19  A.  No.
20  Q.  Okay. Is there anything illegal in driving
21  from Houston to a remote area and meeting a woman?
22  A.  No.
23  Q.  Is there anything illegal in driving from
24  Houston to a remote area and staying at a Holiday Inn?
25  A.  No.

35 (Pages 134 - 137)

Page 138

1    Q.   Meeting a woman at a Holiday Inn?
2    A.   Nope.
3    Q.   Are the majority of people driving from
4  Houston to a remote area in Texas driving to stash
5  houses?
6    A.   In the mind of who?  In a criminal
7  interdiction, you know, an officer that's looking for
8  drug smugglers, it's a big red flag, right.  Houston to
9  the Valley is a big red flag, only because Houston is
10  known as such a destination for large quantities of
11  drugs, right.
12          So how the drug industry works is it
13  comes across the border into Texas and, many times, the
14  drugs are stashed at a location, big bulk quantities,
15  or a lot of people.  A lot of times it's in a rural
16  area, right, and they don't want the cops around.
17          So the vehicle coming from Houston to the
18  Valley, going to a hotel and then leaving a hotel to go
19  to a remote area with another person that they met at
20  the hotel and then come back to the hotel and then
21  leave and go back to Houston, and that's a one-day
22  turnaround, that's suspicious to an officer, a criminal
23  interdiction officer.
24          And to answer the question, does that
25  occur a lot, yes, that is a big -- that happens the

Page 139

1  majority of the time with drug smuggling cases, right,
2  and officers know that.  That's common knowledge within
3  the narcotic investigation world, right.
4          So that puts more weight on the officer
5  that knows that, that gives more credibility to what
6  he's seeing and makes him want to either confirm or
7  dispel that vehicle is involved simply from those
8  factors.
9    Q.   Sure.  I guess my natural response to that is
10  to think about all of my -- all of my friends who work
11  in the oil and gas industry and who are out in south
12  Texas all the time staying at hotels and going out to
13  remote areas.
14    A.   Oh, yeah.
15    Q.   And that's just a lot of what my friends do.
16    A.   Uh-huh, it's normal.
17    Q.   Yeah.  So, I guess, is that something an
18  officer should consider when evaluating folks who are
19  going from Houston to a remote area of Texas, whether
20  those folks are going for innocent work?
21    A.   Well, the majority of the people doing that
22  are going for innocent work, but the officer doesn't
23  know that, right, until he talks with them.  But once
24  he talks with that person, just as we said earlier, you
25  know, with Mr. Fox here, that person that's

Page 140

1  legitimately in an oil field truck driving north on the
2  interstate that gets stopped for a traffic violation,
3  they are not going to exhibit anything to that officer
4  that he will even ask for consent to search the truck.
5          So, typically, they won't even -- they
6  won't even get searched as far as, you know, ask for
7  consent to search.  Nothing.  Just like the scenario
8  you gave me with Mr. Fox with the two kilos of meth in
9  your car, they would have never known he had two kilos
10  of meth in his car because it was normal, right, it's
11  normal.  They work for an oil company, they answered
12  all of the questions, you know, they stayed at the
13  hotel -- because an oil company worker that works there
14  typically is in the hotel more than one night.  They
15  are there a lot, right, not just one time to the
16  Valley.  So it's normal, you just have to decide that
17  as you, you know, talk to the people.
18          Now, I want to address this oil field
19  worker issue that you brought up with your friends, or
20  people that you know, not necessarily your friends.  But
21  the drug cartel commonly uses oil field vehicles as
22  smuggle vehicles.  It is common.  I've seen a lot of
23  them.  You know, they smuggle the drugs in the oil
24  tanks, the fuel cells, you know, I've gotten cocaine
25  and marijuana out of fuel cells in the back of these

Page 141

1  trucks.
2          In the case of -- in this case -- and
3  I'll go ahead and tell you this -- in this case, there
4  were two bottles in the back of this truck that
5  Mr. Schott had, right, two yellow bottles.  I've gotten
6  drugs out of those bottles, I've gotten cocaine out of
7  those, right.  That is a big red flag to me because
8  that is commonly used by drug smugglers in oil field
9  type trucks going northbound on I-35.
10          So all of those factors fit Mr. Schott's
11  vehicle, right.  So it doesn't mean he's a drug
12  smuggler, but it means that drug smugglers commonly use
13  innocent businesses to cover their activities.  And
14  it's up to that officer to stop that vehicle and either
15  confirm or dispel that that's a drug trafficker or if
16  it's a person just working.
17    Q.   Sure.  And we have been talking about I-35 and
18  Houston as like the two monikers, the two things.  But
19  would you say that everything we are talking about is
20  the same for any major Texas city and any major
21  highway?
22    A.   It differs in the drug industry because
23  Houston is just such a large city, right, and there's a
24  lot of drugs that go to Houston.  Dallas is a very
25  large city, a lot of drugs go to Dallas.  Fort Worth,

Page 142

1  you don't see as much, right. There are loads of drugs
2  that go there, I've gotten loads of drugs going to Fort
3  Worth on I-35, but not as much as Dallas.
4         So the bigger cities are often known as
5  being the places where the cartels like to set up shop.
6  That's where they have got their people working to
7  receive the drugs, right. So does every major city
8  have them, sure, they do. But being this is in
9  proximity to Mexico, Houston and Dallas are just --
10  they are just the biggest ones for this next stop in
11  the process of drug trafficking.
12  Q. Understood.
13         MR. BARRON: It's 12:15 and we're nearly
14  at three hours. Do you want to take lunch now or keep
15  going?
16         MS. HEBERT: Let's go for a couple more
17  minutes because I have a good -- like once we're
18  through this section, it will make a natural, I think,
19  break if we can finish off.
20         MR. BARRON: Sure.
21  Q. (BY MS. HEBERT) I want to go to the fourth
22  paragraph and -- so one, two, three, four on page 28,
23  and it's the final sentence. I'm going to read it for
24  you so we all will know where we are.
25         "In the case under review, a reasonable

Page 143

1  officer with the same training and experience as Deputy
2  Babb would have believed the F-250 driven by Schott was
3  capable -- well, was cable --"
4  A. That was a misspelling. I meant to tell you
5  about that one earlier too, sorry.
6  Q. That's okay. I normally read straight
7  through. Let me start again. "In the case under
8  review, a reasonable officer with the same training and
9  experience as Deputy Babb would have believed the F-250
10  driven by Schott was cable of transporting --"
11  A. "Was able," it's supposed to be "able," I'm
12  sorry.
13  Q. "-- large quantities of drugs and/or people."
14         Did I read that correctly?
15  A. That's true.
16  Q. Okay. And "cable" should have been "able"?
17  A. Yes, ma'am.
18  Q. Okay.
19  A. I apologize.
20  Q. No, that's okay. And I think that answers my
21  question because I wasn't quite sure what the --
22  A. Oh, I'm sorry.
23  Q. That's helpful.
24  A. And I did recognize that earlier and I had
25  that, you know, and I just -- it was one of the

Page 144

1  misspells that I had.
2  Q. Yeah. So, I mean, I guess just to put a fine
3  point on it then, this sentence, you're saying that an
4  officer in the shoes of Deputy Babb would have believed
5  that an F-250 was able to transport large quantities of
6  drugs and people?
7  A. Yes, ma'am.
8  Q. Okay. Just want to make sure I got it.
9  A. I understand.
10  Q. Let's skip to paragraph 11, which is page 30,
11  and it's the first full paragraph on page 30. It
12  starts "Deputy Babb."
13         Do you see that part?
14  A. Yes, ma'am.
15  Q. And I want to look at the last sentence in
16  that paragraph and I'm going to read it. "Rodriguez
17  versus United States focused on extension of a traffic
18  stop in order to obtain the reasonable suspicion to
19  call for a K9 to search a vehicle, which wasn't
20  applicable in this case."
21  A. Yes, ma'am.
22  Q. Did I read that correctly?
23  A. Yes, ma'am.
24  Q. Okay. As I understand this sentence, you
25  concluded that the case of Rodriguez versus United

Page 145

1  States did not apply to this particular case.
2         Am I understanding that correctly?
3  A. Well, I'm going to put on the record I'm not
4  an attorney, right. I can't determine what case law
5  says or not says. But what happens is law enforcement
6  has to look at case law to guide them in future, you
7  know, cases, right. So as part of our training, as
8  part of our experience, you know, we oftentimes train
9  officers on case law. However, case law can only be
10  determined or -- you know, by a judge, right, an
11  attorney, someone smarter than me, right.
12         However, this case with Rodriguez I
13  believe in. I have actually had very -- I have
14  experience with this case because I always believe that
15  an officer should develop reasonable suspicion before
16  asking for consent to search a car, okay, I have always
17  instructed that.
18         Unfortunately, throughout my career,
19  there have been officers who have attempted to take
20  criminal interdiction cases, turn them into consensual
21  encounters and then, you know, have somebody stopped on
22  the side of the road and say, "Oh, you're free to go,
23  here's your warning," let them walk back to the car,
24  "Oh, by the way, you know, I'm a police officer and my
25  duty is to look for drugs and contraband. Can I search

Page 146

1 your car?"
2          When instructors would come to Williamson
3 County and they would teach that, it took me a year to
4 clean that up and to get these officers back to doing
5 what they should be doing, and that being don't ask for
6 consent to search the car unless you've got reasonable
7 suspicion to do so.  You're wasting your time with the
8 innocent public, right.  Don't do it.  I was happy that
9 Rodriguez came down because that clarified it from the
10 Supreme Court for everyone that you need to have
11 reasonable suspicion before you ask for consent when
12 you search a car.  I believe in the Rodriguez case.
13     Q.  Okay.  So help me understand why you conclude
14 it doesn't apply here.
15     A.  Because this case, this traffic stop is more
16 than just a cold traffic stop.  There was prior
17 information.  And in Deputy Babb's mind, at his level
18 of training, his level of experience, as we talked
19 about earlier, he believed, in my opinion, from his
20 videotape and from the reports, he believed that the
21 information that he received through that WhatsApp
22 was credible.
23          From his training and experience, as he
24 said on his video about the human smuggling, he
25 believed that truck could have been used in human

Page 147

1 smuggling.  I truly believe that's where -- that's
2 where this investigation was going to begin with.
3          So there are many things that transpired
4 that are credible or, in his mind at that time, that
5 lead to reasonable suspicion before he even stops the
6 truck, and that being the things we covered earlier,
7 right.  So he's received information -- and I've
8 already covered this once -- he received information
9 from someone -- do I need to go over it again?
10     Q.  We can deal with it more specifically later.
11 But he got information?
12     A.  Yeah, he got the information that the truck
13 came up I-35, it was the same license plate, it was the
14 same truck, it was a truck with a bed cover that, in
15 his experience, he believed could be used for human
16 smuggling.  There was probable cause to stop the truck
17 or, in his mind, a traffic violation.  He stops the
18 truck -- do you want me to continue with the -- what I
19 believe the reasonable suspicion to lead up -- once he
20 stops the truck, he asks the passenger -- or he asks
21 Mr. Schott about where he was coming from.  You know,
22 he talked about the -- you know, sleepy -- he talked
23 about the sleepy thing and Mr. Schott made a comment
24 about he stayed in a hotel last night.  Well, that's
25 subjective and could've been subjective in an officer's

Page 148

1 mind.
2          (Discussion off the record)
3          THE WITNESS:  It could have been
4 subjective in an officer's mind at the time, right,
5 because when I listen to that, from my training and
6 experience, that meant something, that confirmed to me
7 the information that he had received from the WhatsApp,
8 that he actually went down for a one-day turnaround,
9 which is big, coming from Houston to the Valley, it
10 adds to the reasonable suspicion, right.
11          So I said that in this paragraph because
12 all of these things happened before he even put
13 Mr. Schott in the front seat of the car, and they can
14 all be articulated as to why an officer of the same
15 experience, the same training would have believed he
16 had reasonable suspicion to ask for consent.
17          So that's why I think that the Rodriguez
18 case is not applicable here because that happened all
19 within three minutes and 30 seconds, I believe, of the
20 traffic stop.  He had all of those things already.
21 That's where it's important to -- in this particular
22 case, the previous information that he had that he
23 believed was credible in his mind is important.  It was
24 not just a cold stop.
25     Q.  Understood.  Let's skip to paragraph -- let's

Page 149

1 skip to paragraph 8, which is --
2     A.  What page would that be?
3     Q.  I wrote numbers on them just because I was
4 having a hard time.  I knew we would want to talk --
5          MR. BARRON:  I'm not hallucinating those.
6 Those are your numbers?
7          MS. HEBERT:  Those are my numbers.
8          MR. BARRON:  I'm not hallucinating.
9          MS. HEBERT:  So that's why I'm like,
10 okay, paragraph 8, which is where.
11     Q.  (BY MS. HEBERT)  So 29, page 29, and the
12 fourth paragraph down, it starts, "In the case of
13 Rodriguez versus United States."
14     A.  Uh-huh.
15     Q.  I'm going to read the first sentence.
16     A.  Okay.
17     Q.  "In the case of Rodriguez versus United
18 States, 575 U.S. 348 (2015), extension of traffic stop,
19 the United States Supreme Court ruled that a traffic
20 stop could not be unreasonably delayed to develop
21 reasonable suspicion in order to call for a K9 to
22 search a vehicle."
23          Did I read that correctly?
24     A.  Yes, ma'am.
25     Q.  What does "unreasonably delayed" mean as you

38 (Pages 146 - 149)

Page 150

1    use that term there?
2       A.   It goes back to the example I gave you before
3    when I would have to clean up these trainings, right.
4    You're delaying a person when you stop the person,
5    you've talked with them, you tell them they are
6    free to leave, they can go and then you try to continue
7    the traffic stop, you know, and then they say no,
8    because that's what happened in the Rodriguez case.
9    They say no.  What are your options as a police
10   officer?  None, let them go, right?
11         So that would be delaying -- if you told
12   them, "No, you're going to wait here until I get a
13   dog," they have delayed that person in order to get the
14   K9 there.  That's my opinion.
15      Q.   Okay.  And if a traffic stop is not extended
16   because of reasonable suspicion, how long should the
17   traffic stop go?
18      A.   A normal, everyday traffic stop, you can get
19   it done in ten minutes.
20      Q.   Okay.  The same paragraph, I want to look at
21   the second sentence here.  It's -- I'll read it, just
22   for sake of clarity.
23      A.   Thank you.
24      Q.   "Considering the totality of the circumstances
25   faced by Deputy Babb, an officer with the same

Page 151

1    experience and training would believe, under the same
2    set of circumstances faced by Deputy Babb, that
3    articulable facts existed and that further
4    investigation would confirm or deny the suspicions
5    perceived by Deputy Babb."
6          Did I read that correctly?
7       A.   Yes, ma'am.
8       Q.   And when you wrote, "The same set of
9    circumstances faced by Deputy Babb," what did you mean?
10      A.   It goes back to the level of experience that
11   Deputy Babb had that particular time, right.  As I
12   said earlier, every officer has -- you know, they learn
13   things as they go throughout their career.  And at that
14   particular time, Deputy Babb believed that it was a
15   credible stop, the information was credible, so
16   therefore, in his mind, with his experience, he did
17   everything according to policy and just as any other
18   officer that I have seen in the past do, including
19   myself, I have done the same thing.  So that's nothing
20   inconsistent with standard law enforcement.
21      Q.   Understood.  And how did you determine the
22   circumstances of what Deputy Babb believed?  Is it fair
23   to say you got facts from Deputy Babb's testimony?
24      A.   So it goes back to the video, the body cam
25   video of Deputy Babb.

Page 152

1       Q.   Sure.
2       A.   The reports -- well, I guess I would say the
3    deposition, more so, that you did with him that I read
4    where there's way more detail than this report.
5          From those two things combined and from
6    my training and experience of being an officer that's
7    had similar circumstances, I can understand -- from his
8    level of training and from where he was at that
9    particular time, I can understand why he did what he
10   did.  Obviously, I don't know that for certain, I'm not
11   Deputy Babb, I'm not in his head and I can't, you know,
12   speculate on what he was thinking.  But it is
13   consistent with, you know, what I've done in the past.
14      Q.   Sure.  And just so that I'm clear, you
15   reviewed Deputy Babb's body camera and you reviewed his
16   deposition testimony to evaluate what Deputy Babb
17   believed?
18      A.   Correct, or what a reasonable officer would
19   believe in Deputy Babb's position, more or less.  I
20   mean, obviously, again, I'm not Deputy Babb, I can't
21   say what Deputy Babb believed, right.  It's just from
22   the position that he was in at that particular time.
23      Q.   Understood.  I think that this is a great spot
24   for a lunch break.
25         MR. BARRON:  Very good.

Page 153

1          (Lunch recess from 12:29 p.m. to
2    1:37 p.m.)
3       Q.   (BY MS. HEBERT)  So we are back on the record
4    after lunch.  A couple of form questions that I always
5    have to ask.
6          Did you talk to anybody about this case
7    during the lunch break?
8       A.   No.
9       Q.   Great.  So let's look back at your report,
10   which we have marked as Exhibit 111.  Let's go to
11   page 1, the official page 1, and I'm going to skip to
12   the second paragraph on this first page and I'll read
13   this sentence.  "My opinions are based on the
14   documents, recordings and sworn depositions provided to
15   me in this case to date, as well as my experience,
16   training, education and research in the field of law
17   enforcement."
18         Did I read that correctly?
19      A.   Yes, ma'am.
20      Q.   Okay.  Did you do any new research in forming
21   an opinion in this case?
22      A.   No, ma'am.
23      Q.   Okay.  So would it be fair to say there were
24   two buckets of information you considered in forming
25   your opinion, the evidence and information about this

39 (Pages 150 - 153)

Page 154

1  case that you had and your law enforcement training and
2  experience?
3       A.  It took me a minute to track with what you're
4  doing, but I'm a visual person so I'm going with you.
5       Q.  Got it.  Anything else that you did in forming
6  your opinions here?
7       A.  No, not that I can remember.
8       Q.  Did you meet with Deputy Babb?
9       A.  Absolutely not.
10      Q.  Did you meet with any Bexar County Sheriff's
11  officers?
12      A.  Absolutely not.
13      Q.  Did you conduct any site visits?
14      A.  I did not.
15      Q.  Did you do any testing?
16      A.  I did not.
17      Q.  Okay.  Let's skip to page 5 of your report.
18  Do you see the header "Research and Review," that's
19  where I'm looking on page 5?
20      A.  Yes, ma'am.
21      Q.  And it goes -- there's a list of items that
22  goes from page 5 to page 6.
23          Do you see that?
24      A.  Yes, ma'am.
25      Q.  Does the list on pages 5 through 6 contain

Page 155

1  everything that you reviewed in forming your opinion in
2  this case?
3       A.  Yes, ma'am.
4       Q.  Okay.  No other documents?
5       A.  No other documents.
6       Q.  No other recordings?
7       A.  No other recordings.
8       Q.  Okay.  And am I correct to say that these --
9  there's a list of 23 items here, with some of those
10  items containing multiple subcategories of things?
11      A.  Yes, that's correct.
12      Q.  Okay.  And it appears to me that items 1
13  through 11 are either Texas statutes or case law; is
14  that correct?
15      A.  That's correct.
16      Q.  How did you identify these sources of law, for
17  a lack of a better descriptor, of one through 11, as
18  relevant in this case?
19      A.  Texas Transportation Code is where traffic
20  violations are found.  The Texas Code of Criminal
21  Procedures guides -- governs law enforcement.  The case
22  law is case law that is -- I have found through my
23  training and experience or my research that are
24  relevant to drug interdiction cases or cases that are
25  similar to this one.

Page 156

1       Q.  Got it.  So how did you get copies of these
2  cases?
3       A.  Much of that is from research online.  I did
4  not use any case law that I had previously, but many of
5  these cases I have reviewed.  You know, Terry versus
6  Ohio, Whren versus United States, all of these cases
7  are cases that we have used in training before and they
8  are cases that, you know, I mean, I'm more familiar
9  with than others.
10          But in order to keep up with current case
11  law that may have changed, then obviously I do review
12  on the Internet and I find them on the Internet.
13      Q.  Understood.  And when you do review on the
14  Internet, do you read summaries of the cases or the
15  cases themselves or something else?
16      A.  I read the entirety of the case, for the most
17  part, depending on which one it is.  If I find that
18  it's not relevant, then, of course, I won't continue to
19  read it.
20          But in these particular cases, I try to
21  read -- I'm not going to say I read every one verbatim.
22  I couldn't say that.  I do read summaries in a lot of
23  them, but if I find them applicable to the situation at
24  hand, then I'll take more time to read -- read more
25  into the case law, read the whole thing.  It's

Page 157

1  confusing, I'm not an attorney and, you know, it's
2  Greek to me a lot of times.  That's what you guys'
3  specialty are, as far as being an attorney, and I'm not
4  an attorney.  But I do enjoy reading it just for it to
5  benefit my knowledge.
6       Q.  Understood.  Did you -- so the cases that are
7  listed here in this list on page 5, did you read all of
8  these cases in their entirety?
9       A.  I can't say that I read every one in their
10  entirety, no.
11      Q.  I want to ask you a question about No. 11.
12          Do you have access to Westlaw?
13      A.  Not Westlaw, no, ma'am.
14      Q.  Okay.  So how did you obtain a copy of United
15  States versus Redrick?
16      A.  So Redrick, I believe, is the California case,
17  if I'm not mistaken, or it's out of California, if I'm
18  not mistaken.  I believe that I found that case
19  through -- it may have been from the Institute of
20  Justice website.  If I'm not mistaken, that's where I
21  found that case.
22      Q.  Okay.  So you consulted the Institute for
23  Justice website and it was somewhere on there?
24      A.  Yes, ma'am.
25      Q.  Okay.

40 (Pages 154 - 157)

Page 158

1      A.  It was either a website or it could have been
2  a video that you guys have done, because I believe you
3  guys did a video that I reviewed.
4      Q.  Oh, okay, I see what you're saying.  14G,
5  YouTube video by Institute for Justice dated June 6th,
6  2023.
7      A.  Yes, ma'am.
8      Q.  Is that what you're talking about?
9      A.  Yes, ma'am.  So I believe that's where I saw
10  the case of United States versus Redrick, which I found
11  interesting because I've never heard of it before.
12      Q.  Sure.
13      A.  So I thought that I would read it.
14      Q.  And then you obtained that case from Westlaw.
15      A.  No, I didn't obtain anything from Westlaw.
16      Q.  Okay.  So did you read this United States
17  versus Redrick case?
18      A.  I read a lot of the case.  I don't think that
19  I -- I don't think that case -- I don't think I
20  commented on that case anywhere in my report.  Maybe I
21  did.  I may be mistaken.
22      Q.  Page 30, second full paragraph, did you
23  discuss United States versus Redrick in this portion of
24  your report?
25      A.  Let me read the paragraph, if you don't mind.

Page 159

1      Q.  Sure, take your time.
2      A.  Oh, I was on the wrong paragraph, I'm sorry.
3  I was on the second paragraph, not necessarily the
4  complete paragraph.
5      Q.  Sorry, I know it's a little tricky.
6      A.  Yes, ma'am, I did write that and I did review
7  that case.
8      Q.  Okay.  So did you read that case in its
9  entirety?
10      A.  No.
11      Q.  Okay.  I want to look at -- go back to page 5.
12  Sorry, I'm jumping around a little.
13      A.  That's okay.  No, I appreciate you pointing
14  that out.  Okay.
15      Q.  And look at item 13 and you see the title
16  "Deposition" is there?
17      A.  Yes, ma'am.
18      Q.  For each of these depositions, did you review
19  the entirety of these depositions?
20      A.  I did.
21      Q.  Okay.  And for Martin Molina, I see that
22  there's a date of 04/18/2024.
23          Do you see that?
24      A.  Yes, ma'am.
25      Q.  Did you review one deposition transcript for

Page 160

1  Deputy Molina?
2      A.  I believe there were two for Deputy Molina.
3      Q.  Okay.  But that second deposition transcript
4  isn't listed here?
5      A.  It is not.  It may be -- there also is not a
6  parentheses at the end, so I may have -- that may be an
7  omission on my part, a mistake on my part.
8      Q.  And there are one, two, three, four, five,
9  five people listed here under the title "Depositions."
10  Is that fair?
11      A.  Yes, ma'am.
12      Q.  So did you only review depositions from these
13  five individuals listed here on page 5 of your report?
14      A.  Yes, ma'am.  These are the five depositions
15  that I reviewed, yes, ma'am.
16      Q.  So if there are other depositions in this case
17  you did not read those?
18      A.  Not for purposes of my report, no, ma'am.
19      Q.  Okay.  I'm going to hand you what has been
20  previously marked Exhibit 49.  Would you mind pulling
21  that out?  And before we get to that -- go ahead and
22  pull that out.
23          Before we get to that, if we did not cite
24  United States versus Redrick -- Redrick from the Eighth
25  Circuit in our video, where would you have gotten that

Page 161

1  case?
2      A.  At that particular time, that was early in my
3  research of this case, so I was trying to catch up with
4  case law, any new case law that may be relevant.  So I
5  Google search and I get on and then I'll read case law
6  and then see if there's any other case law that is, you
7  know, mentioned within that case law that the judgment,
8  the summary judgment was made, so then I'll jump to
9  that case law and read it.
10          So odds are I could have seen that same
11  case in other -- within other case law or opinions, but
12  in all transparency, the first time I saw it, I think,
13  is whenever I looked at your website and I watched the
14  video on a PowerPoint slide that had something about
15  Redrick.  And I'm like, "Oh, that's new.  I didn't -- I
16  didn't know anything about that."
17      Q.  Sure.  And -- but you can't say, sitting here
18  today, whether you got this United States versus
19  Redrick from our PowerPoint or from Google searching?
20      A.  I don't remember specifically.  I just know
21  that that's the two ways that I -- I would have found
22  it.
23      Q.  Understood.  Okay.  Let's look at exhibit --
24  what has previously been marked Exhibit 49.  And I have
25  to get it for myself now.  Take a -- take a second to

41 (Pages 158 - 161)

Page 162

1 review it.
2     A.  Yes, ma'am.
3     Q.  If you need to spend some time reviewing a
4 couple of pages here, I'm happy to go off the record
5 for a minute.
6     A.  It will take a second because I just want to
7 read and see what it is.
8          MS. HEBERT:  Let's just take a
9 five-minute break, Donna.
10         (Recess from 1:50 p.m. to 1:56 p.m.)
11    Q.  (BY MS. HEBERT)  We took a short break.  We're
12 back on the record.  Did you have a chance to review
13 what's been previously marked Exhibit 49?
14    A.  I did, yes.
15    Q.  And have you ever seen this document before?
16    A.  I have not.
17    Q.  Okay.  Were you provided copies of all of the
18 exhibits that were reviewed during the depositions for
19 the deposition transcripts you reviewed?
20    A.  No, I was not.
21    Q.  Let's go back to your report.  Do you see
22 item 14 on page 5?
23    A.  Yes, ma'am.
24    Q.  And I see the header "Videos."
25         Do you see where I'm looking at?

Page 163

1     A.  I do.
2     Q.  Are these videos that you viewed in forming
3 your opinion?
4     A.  It is.
5     Q.  Okay.  For the first one, the private dash cam
6 of Alek Schott, what dash cam are you referring to?
7     A.  That would be a one-minute clip or so of a
8 video from -- that was made from within his vehicle.
9     Q.  Okay.  And was there only a single recording
10 that you reviewed from Mr. Schott's dash cam?
11    A.  Yes.
12    Q.  B -- body-worn camera, BWC, Joel Babb, do you
13 see that?
14    A.  I do.
15    Q.  Did you review one recording from Deputy
16 Babb's body-worn camera?
17    A.  Body-worn camera as far as video from the
18 patrol car, yes, with Mr. Schott, yes.
19    Q.  Okay.  So you reviewed one recording from
20 Deputy Babb's body-worn camera?
21    A.  That's correct.
22    Q.  From Deputy Gereb, one recording from Deputy
23 Gereb?
24    A.  Yes, ma'am, one.
25         THE REPORTER:  What was the name?

Page 164

1          MS. HEBERT:  Gereb, G-E-R-E-B.
2          THE WITNESS:  Well, there may be two on
3 that one.  I have marked two videos for that one,
4 volume 1, dated 2/27/24, and volume 2 taken 8/1/24 --
5 oh, that's depositions, I'm sorry, I'm sorry.  That's
6 my mistake.
7     Q.  (BY MS. HEBERT)  No, no, that's okay.
8          So 14C, BWC, Deputy Joe Gereb, you
9 reviewed one --
10    A.  One video, yes, ma'am.
11    Q.  -- from him?
12         And exhibit D, same, one video?
13    A.  Yes, ma'am.
14    Q.  Any of these categories, the 14 -- the videos
15 listed there that were multiple videos?
16    A.  Not to my recollection, no.
17    Q.  Okay.  Other than speaking with the lawyers in
18 this case, did you speak to anybody else in forming
19 your opinion in this case?
20    A.  No, ma'am.
21    Q.  Other than providing you copies of documents
22 of evidence in this case, did Mr. Leake or Mr. Barron
23 or their colleagues provide you copies of documents to
24 review?
25    A.  Other than what we have here?

Page 165

1     Q.  No.  Other than evidence that relates to the
2 facts of this case, did they provide you any of those
3 documents?
4     A.  No.
5     Q.  Okay.  Other than providing you documents, did
6 defendants' attorneys identify any assumptions that you
7 should rely on in forming your opinion in this case?
8     A.  No, ma'am.
9     Q.  I don't see any text messages listed in the
10 items on pages 5 through 6.
11         Am I understanding that correctly?
12    A.  Text message specifically, no, ma'am.
13    Q.  Did you review any text messages in forming
14 your opinion in this case?
15    A.  Not in forming my opinion, no.
16    Q.  And in -- otherwise?  I'm not talking about
17 your text messages with your kids or your partner or
18 anything like that.
19    A.  I understand, I understand.  No, I don't
20 remember any text messages, per se.  I'm trying to
21 think if any of the exhibits that came with that had
22 text messages.  I don't -- I don't recall using any
23 text messages in formulating my opinion in the report,
24 so I guess the answer is no, I don't recall.
25    Q.  That's fine.  Did you watch body-worn camera

Page 166

1  of footage -- let me rephrase that.
2          Did you watch body-worn camera footage of
3  any traffic stops, other than the traffic stop at issue
4  with Mr. Schott?
5      A.  Let me make sure I understand the question.
6      Q.  Yeah, so I'm just asking about other traffic
7  stops than the traffic stop with Mr. Schott.  Did you
8  review body-worn camera footage from any other traffic
9  stops besides the one between Deputy Babb and Alek
10  Schott?
11      A.  From Bexar County Sheriff's Office?
12      Q.  Yes.
13      A.  I believe I may have asked -- I can't
14  remember.  I may have asked for previous traffic stops
15  just to get an idea of how they make their traffic
16  stops, but I don't recall -- I don't recall whether I
17  reviewed those or not.  I just don't remember that.
18  They were not part of my report, no.
19      Q.  Okay.  By "they," do you mean Bexar County
20  Sheriff's Office?
21      A.  No, no, no.  The attorneys that have hired me,
22  Greenhill & Wright.
23      Q.  Right, but let me just make sure I understand
24  that.  So when you asked someone, the attorneys in this
25  case for additional footage --

Page 167

1      A.  Correct, to review, right.
2      Q.  -- to review of traffic stops other than the
3  one with Mr. Schott?
4      A.  I don't recall whether I did or I didn't.
5  They are not part of this investigation.  I don't --
6  that's what I'm saying is you asked a question that
7  has -- you know, I'm trying to review in my head
8  everything that I reviewed, which is a lot.  So -- and
9  I don't want to be dishonest with you and I don't want
10  to, you know -- but I don't recall seeing any other
11  videotapes from any other stops.
12      Q.  And if you did, would you list them here
13  and --
14      A.  Yeah, I would list them if they were -- if
15  they were part of the investigation, but I don't
16  remember that.  I don't remember getting any.
17      Q.  Okay.  So as we sit here today, you do not
18  remember seeing any other videos of other traffic
19  stops?
20      A.  No, not from Bexar County Sheriff's Office,
21  no.
22      Q.  That's fine.
23          One question I have for you, we talked a
24  lot earlier this morning about the stop of Mr. Schott
25  and the additional information that Deputy Babb may

Page 168

1  have known from another law enforcement officer.
2  Putting that information that Deputy Babb may have
3  known from another officer kind of aside --
4      A.  Okay.
5      Q.  -- if it had just been -- I think you used the
6  term "cold stop"?
7      A.  Yes, ma'am.
8      Q.  Would your opinion on whether Deputy Babb had
9  reasonable suspicion or not change?
10      A.  I will respond to that just from my training
11  and experience.  An officer such as Deputy Babb, at his
12  level of experience and training, could have believed
13  reasonable suspicion existed.  Again, I'm not Deputy
14  Babb, I don't -- I don't want to speculate on what he
15  thought, what he saw because obviously he probably saw
16  and thought things that no one else -- no one is
17  thinking about, none of us were even thinking about.
18          But under the same circumstances,
19  stopping a truck for a valid traffic violation, having
20  the responses that Mr. Schott made to the questioning
21  that Deputy Babb had asked regarding weapons, his
22  travel, the fact that he stayed in a hotel, the fact
23  that he was coming from Houston and he was going to
24  Carrizo Springs on a one-day turnaround to return back
25  to Houston, the fact that Mr. Schott had brought up and

Page 169

1  really avoided questioning about this female, there
2  seemed to be within the reports and within the
3  interviews that I reviewed on the body camera, there
4  seemed to be something hidden regarding this female.
5          So the answer is yes, he would have had
6  reasonable suspicion to ask more questions and to ask
7  for consent to search, based on those things.
8      Q.  Okay.  I think it might be helpful to examine
9  the next section of your report, page 6.  Do you see
10  the title "Sequence of Events"?
11      A.  I do.
12      Q.  What is this section of your report?
13      A.  It's basically the way that I review the case.
14  I read the depositions, I watch the video footage,
15  everything that I have that I'm going to review.
16          And I made the report a sequence of
17  events according to what I learned from everything that
18  I reviewed.  It's kind of a -- just a way to allow the
19  reader to understand kind of an overview, a summary, if
20  you would, of the case, from the understanding that I
21  had from what I reviewed.  It is not the actual events
22  that occurred.  I mean, sure, there are other things
23  that could have occurred that I'm not aware of.  I'm
24  not there and I would be speculating on that.  It is
25  just from the things that I reviewed as part of my

1  report.
2      Q.  Sure.  Can we briefly go to page 12 and do you
3  see the header "Observations and Expert Opinion"?
4      A.  Yes, ma'am.
5      Q.  And do you see the second sentence -- I'm
6  going to read it so we're clear -- "The complete
7  summary of facts is documented within the report."
8          Did I read that correctly?
9      A.  You did.
10     Q.  And is that complete summary of facts
11 referring to the sequence of -- sequence of events
12 section?
13     A.  It's -- no, ma'am.  I mean, it's -- it's the
14 facts of my entire report.  It says I understand what
15 happened during this traffic stop.  The sequence of
16 events is just something that -- like I said, is
17 something, from my understanding, from the things that
18 I reviewed, was pertinent to this investigation, to
19 my -- asking for my opinion on what happened here,
20 right.
21         There are many other things that did
22 happen, that could have happened, that I don't know
23 that happened and, of course, I can't testify to that
24 and that would be all speculation on my part.  So, no,
25 that is not where everything came from.  It's the

1  totality of my report is what that means.
2      Q.  Okay, I get it.  So you're -- what you're
3  saying to me is there might be facts that are somewhere
4  in your report that are in this sequence of events --
5      A.  Of course.
6      Q.  -- section, but the sequence of events section
7  and the report facts that are in your report are the
8  facts that you found pertinent, I think is the word you
9  used --
10     A.  Yes, ma'am.
11     Q.  -- or relevant to your analysis.  Is that
12 fair?
13     A.  From my training and experience, yes, ma'am.
14     Q.  Okay.  But there are facts that you decided
15 weren't relevant.  Is that also fair?
16     A.  Well --
17     Q.  I mean, let's put it this way.
18     A.  I mean, again, it would call for speculation
19 on my part because there could be things that are more
20 relevant than what I put in here.  There could be
21 things that are not as relevant, maybe not relevant at
22 all.  Maybe that's speculation on my part.
23     Q.  Okay.  I guess like, for instance, you
24 reviewed five depositions in this case.  Is that fair?
25     A.  Yes, ma'am.

1      Q.  You reviewed eight videos, at least what's
2  listed here.  Is that fair?
3      A.  Yeah.
4      Q.  And you didn't summarize every fact from the
5  depositions and the videos and put it in your report.
6  Is that fair?
7      A.  Oh, that's true, not everything.
8      Q.  So how did you decide what facts mattered?
9      A.  So I was asked to review this case from the
10 objective of what an officer would do under the same
11 circumstances as Deputy Babb, right.  Were his actions
12 on this traffic stop consistent with law enforcement
13 standard, with what officers would do under the same
14 circumstances with the same training.  So those are
15 really the facts that I was looking at.  Those are the
16 facts that I'm talking about.
17         Deputy Babb, in my opinion, from
18 everything that I reviewed that's listed that you just
19 mentioned, the facts that I've talked about -- maybe
20 "facts" isn't the best word to put there, you know, if
21 we're talking, you know, terminology.  But they are
22 important things, they are important details that I
23 reviewed that were relevant to what happened here.
24         So I guess we're -- you know, we're
25 debating over this word, "fact," and maybe you and I

1  just look at the word differently.  But these are
2  important observations.  This is important facts, as I
3  call them, as to what happened and why Deputy Babb did
4  what he did, from what I could tell from all of the
5  information I got.
6      Q.  Sure.  And I guess from what you just said a
7  little bit, you decided what facts were -- or details
8  were important based on what you thought would help
9  answer what you were asked to do in this case?
10     A.  Okay.  So, as I stated earlier, when we first
11 talked, I am not here to represent Deputy Babb,  I am
12 not here to represent anyone other than help the jury
13 understand what happens in drug investigations.
14     Q.  Sure.  And I understand that.
15     A.  So --
16     Q.  I'm not trying to cast aspersions.  What I'm
17 just trying to ask -- understand is your methodology
18 for how you got to these facts.
19     A.  Uh-huh.
20     Q.  And that's what -- if you want to phrase it in
21 a different way, like how you got here, how did you get
22 to this summary based on what you reviewed?
23     A.  Just as I just stated.  The training and
24 experience of Deputy Babb at the time that he made this
25 traffic stop compared to my experience, my training,

Page 174

1  what commonly transpires on traffic stops such as this
2  one. That's what I'm talking about.
3      Q. Okay. So I want to look at item 14D.
4      A. Okay. So is that a page number?
5      Q. It's back on your -- page 5, this 14D.
6          Do you see where I am?
7      A. I do. It's -- it's this Exhibit 50, the
8  patrol car video?
9      Q. Yes, sir.
10     A. Okay.
11     Q. And did you watch this telephone conversation
12 between Deputy Babb and Sergeant Gamboa?
13     A. I did.
14     Q. Do you remember the nature of that
15 conversation?
16     A. If I'm not mistaken, it was regarding needing
17 to write the report, I believe, if I'm not mistaken.
18     Q. When you say "the report," what do you mean?
19     A. Write the report for the traffic stop after
20 the fact, I believe on the 22nd or something.
21     Q. Okay. So something about the report for this
22 traffic stop?
23     A. I'm sorry?
24     Q. So something about the report for this traffic
25 stop. Is that fair?

Page 175

1      A. May have been, yes, I think so. 4/12/2022 --
2      Q. Okay.
3      A. So what I did, ma'am, and it could be my first
4  time of doing this, right, I just listed everything
5  that I reviewed as part of this investigation whether
6  or not there was anything relevant that I put with
7  something within the report. So I may or may not have
8  put something about this within my main report, but I
9  did review it, which is why I put it under things that
10 were reviewed.
11     Q. Understood.
12     A. So that's why I'm having trouble -- unless I
13 have a place within the report that I can refer to and
14 I can better answer your question.
15     Q. Understood. And at that point, I was really
16 just asking if you did review it and what you
17 remembered. Based on what I see -- I mean, you can
18 correct me if I'm wrong if you can see it somewhere
19 else -- I don't see where you referenced this
20 conversation that was recorded --
21     A. That would be why.
22     Q. -- in your report, and so I guess my follow-up
23 question on that is does that mean that you concluded
24 it wasn't relevant to your analysis?
25     A. More than likely, if I not mention it within

Page 176

1  the report and I didn't reference this, then it's
2  something that I didn't consider within the report.
3      Q. So --
4      A. So I don't remember exactly what that video
5  was about, so I can't answer the question, right.
6      Q. So I guess it would be fair to say that your
7  opinion is not based on that video?
8      A. Yes, that's great.
9      Q. And it wasn't something that you considered in
10 making your opinion. You reviewed it --
11     A. Well, I may have considered it, but, again,
12 without knowing what exactly transpired -- if I heard
13 that conversation again, you know, if I could hear it,
14 then I would remember.
15     Q. Understood. You know, I'm not asking -- I'm
16 not asking you to testify under oath what the content
17 of that conversation is.
18     A. Of course.
19     Q. I'm just trying to -- to figure out if you
20 decided not to discuss that conversation in your
21 report, does that mean you found that conversation not
22 to be relevant for the purposes of your opinion?
23     A. Well, I'm going to refer back to what I told
24 you. Everything that I reviewed I listed in this.
25 Whether or not I found it relevant to the case or not,

Page 177

1  I mean, I wanted to be transparent about everything.
2  Otherwise I wouldn't have put the YouTube for the
3  Institute of Justice, right.
4      Q. Uh-huh.
5      A. I wouldn't have put that, but that's for
6  transparency's sake, right. So the Institute of
7  Justice video and the YouTube video, the news report
8  video, they are all similar to exactly what you're
9  asking me about that one. I didn't mention them
10 anywhere in the report so, therefore, you know, are
11 they relevant or are they not relevant, I don't know.
12 I reviewed them.
13     Q. Okay.
14     A. So I guess the Institute for Justice video is
15 it a good example. Did you find the Institute for
16 Justice video to be relevant for your analysis in
17 forming your opinion?
18     A. No.
19     Q. Okay. Did you find the KENS5 news report
20 airing June 7th, 2023 to be relevant for your report?
21     A. No.
22     Q. And then did you find the patrol car video
23 dated 4/12/2022 to be relevant for your opinion?
24     A. I don't recall.
25     Q. To your memory, did Deputy Molina testify that

45 (Pages 174 - 177)

Page 178

1   he found marijuana in Alek's truck?
2       A.   I don't remember who said it, so I'm going to
3   say no to that answer.  But I do recall someone saying
4   that they saw shake.
5       Q.   Sure.
6       A.   Or marijuana residue, I think is what it was
7   called.
8       Q.   Okay.  So let's look at page 10 of your report
9   and I want to go down to the fifth paragraph, if you
10  count down from the top.  And I'm going to read that
11  first sentence.
12      A.   Sure.
13      Q.   "Deputy Babb, Molina and Gereb concluded
14  that -- concluded they were unable to find any
15  contraband in the F-250."
16           Did I read that correctly?
17      A.   Correct.
18      Q.   If you recall someone testifying that they
19  found shake in Mr. Schott's vehicle why did you write
20  that the three deputies concluded that they were unable
21  to find any contraband?
22           MR. BARRON:  Objection, form.
23           THE WITNESS:  Because it isn't
24  contraband.
25      Q.   (BY MS. HEBERT)  Okay.

Page 179

1       A.   It's not prosecutable, just as we discussed
2   earlier with the useable amount of marijuana.
3       Q.   Okay.  So what is your definition of
4   "contraband"?
5       A.   Something that's prosecutable, something that
6   someone can be arrested for, something that somebody
7   can be prosecuted for.  In law enforcement world, like
8   we discussed earlier, that shake or small portions of
9   what is believed to be marijuana, officers are not
10  going to take that.  They are not going to recover it,
11  they are not going to field test it.  It is just not
12  going to happen, so therefore -- and it's not
13  contraband.  No one is going to take it, no one is
14  going to test it, no one is going to be charged with
15  it.  So officers are not going to collect that as
16  evidence.
17      Q.   Okay.
18      A.   That's where I was going with that particular
19  statement.
20      Q.   Okay.  But did you -- let me ask you this.
21  Did you include in your report anywhere that an officer
22  testified that he found shake in Mr. Schott's vehicle?
23      A.   No.
24      Q.   Why not?
25      A.   Again, it goes back to the fact that an

Page 180

1   officer is not trained to take residual anything,
2   right.  I mean, it could be cocaine, it could be
3   methamphetamine, it could be anything, right.
4           I mean, sometimes on search warrants on
5   houses, when a search warrant is executed in a house,
6   sometimes people will take cocaine and they will just,
7   you know, try to destroy and it goes all in the carpet
8   or wherever it goes.  It mixes with the dirt, you know.
9   That would be a similar circumstance.  We all know that
10  was probably cocaine, right, but we can't prove it so
11  we can't charge them with it.  There's nothing to field
12  test.  So is it contraband or is not contraband?  You
13  know, so it's not something that's relevant if you
14  can't be charged with it, if that makes sense.
15      Q.   Sure.  And you're -- you're making your
16  determination that it's not relevant because a shake
17  amount is not chargeable in Texas?
18      A.   It is not.
19      Q.   And so is that -- is that a yes, then, you're
20  making the determination that the shake amount is not
21  relevant because shake is not chargeable in Texas?
22      A.   Well, even if it was -- I mean, you can't even
23  prove that it was marijuana.  I mean, it's just from
24  the observation of the officer, whoever saw it, from
25  their training, their experience that that's what they

Page 181

1   saw.  You know, it may or may not have been marijuana.
2   Don't know.
3           In relation to this particular
4   investigation, again, you go back to the totality of
5   the circumstances -- and I think I know what you're
6   asking.  There's a dog alert in this case by a K9 and
7   that K9 alerted to something.  That could have been
8   what the K9 alerted to.  Maybe he did, you know.  Maybe
9   the person in the vehicle has been smoking marijuana
10  and they have got marijuana oil on their hands and then
11  they touch something and then the dog will react to
12  that as well.
13           So you just really don't know whether
14  what they saw was actually marijuana or not because
15  there's no field test, they didn't take it, so
16  therefore, no contraband was recovered from the truck.
17      Q.   Understood.  Have you ever been a K9 handler?
18      A.   I have not been a handler, no.
19      Q.   Okay.  Do you consider yourself an expert in
20  K9 practices?
21      A.   I consider myself someone who has been a
22  police officer a long time, has watched a lot of dogs,
23  you know, I've worked closely with K9 handlers, I have
24  supervised K9 handlers.  So I do have a lot of
25  knowledge of K9s and how they operate, but I am not a

46 (Pages 178 - 181)

Page 182

1  K9 expert.
2      Q.  Okay.  Can we look at page 9, second -- well,
3  first full paragraph, it starts, "Prior to the K9
4  arriving."
5      A.  Yes, ma'am.
6      Q.  Do you see what I'm referring to?
7      A.  Gotcha, yes, ma'am.
8      Q.  I'm going to read the last sentence of that
9  paragraph.  "Deputy Babb was clearly communicating with
10  someone within a law enforcement capacity who was in
11  South Texas."
12         Did I read that correctly?
13      A.  Yes, ma'am.
14      Q.  Okay.  If you wouldn't mind just quickly
15  reviewing the paragraph on page 8 before this and the
16  one after it so that I can ask you what you meant
17  there.
18      A.  Okay.
19      Q.  Because I think it's easier if we have a
20  little context.
21      A.  "During the 18 minutes of the arrival of the
22  K9"?
23      Q.  Yes, read there to, you know, the paragraph
24  after it because I just want some clarity on what the
25  paragraph meant.

Page 183

1      A.  Of course.  Do you want me -- let me look at
2  one more paragraph.
3      Q.  That's fine.
4      A.  I'm good now.
5      Q.  Okay.  As I understand this -- this first full
6  paragraph on nine to be communicating, I understand you
7  to be saying that Deputy Babb was texting with someone
8  in the law enforcement -- who worked in the law
9  enforcement capacity in South Texas while he was in the
10  patrol vehicle with Mr. Schott.  Am I understanding
11  what you're saying in this portion of your report
12  correctly?
13      A.  Well, not just in the car, but when he was
14  outside of the vehicle.  And he also spoke with him on
15  the phone.
16      Q.  Sure, and I understand that.  But what I'm
17  asking about is would this -- in this context, are you
18  referring to -- when you're talking about Deputy Babb
19  clearly communicating with someone, are you referring
20  to the entirety of all of the communications or just
21  what was happening in the K9 vehicle or in the patrol
22  vehicle?
23      A.  Yes, ma'am, I understand.  As an entirety, of
24  the entire things that I reviewed.
25      Q.  Okay.

Page 184

1      A.  And it's -- from my training and experience,
2  having worked undercover cases, hotel/motel
3  interdiction cases, things of that nature, and how law
4  enforcement works together with communication, and it
5  was clear to me by listening to this to watching the
6  video to reading the depositions that Deputy Babb was
7  communicating with someone.  He had more knowledge
8  than -- somebody was on the ground in Carrizo Springs.
9  He -- they even mentioned the female to him and I
10  believe that was -- at some point, they mentioned the
11  female to him and he asked Mr. Schott about the female.
12         So that -- that is what led me to believe
13  that there's someone he was communicating with via text
14  message, in addition to I hear him talking on the phone
15  with the guy.
16      Q.  Okay.  Can we go to page 9 and the second
17  paragraph from the bottom and I'll throw a monkey
18  wrench in here.  I'm going to read what I'm referring
19  to.
20      A.  Sure.
21      Q.  "Without any verbal confirmation from Deputy
22  Molina that the dog had given a positive alert, Deputy
23  Babb asked Schott to move from the front seat to the
24  back seat, explaining that he was being detained."
25         Did I read that correctly?

Page 185

1      A.  Yes, ma'am.
2      Q.  Okay.  So if -- based on your review of the
3  facts, how did Deputy Babb know that there was a reason
4  to move Mr. Schott from the front seat to the back
5  seat?
6      A.  I can't answer that question.  I'm not Deputy
7  Babb.  I wasn't there.  I have no idea.
8      Q.  Okay.  I think now is a good time to just walk
9  through generally what your methodology was in creating
10  this report.  We have talked a little bit about it.
11  And can you just walk me through the steps of what you
12  did to create your opinion?
13      A.  Well, first I reviewed and read the
14  depositions.  I believe I read Deputy Babb's -- well,
15  first I reviewed the complaint, I'm sorry, I reviewed
16  the complaint first.
17         Once I reviewed the complaint, then I
18  reviewed the depositions of Deputy Babb, Deputy Molina,
19  Gereb -- I haven't heard anyone say his name, so I
20  apologize.  I don't remember.
21      Q.  I won't tell him.
22      A.  Deputy Gereb, I think is what it is.  Also, I
23  reviewed the body cam videos of Deputy Babb?
24      Q.  After you reviewed the depositions?
25      A.  After I reviewed the depositions.  The first

47 (Pages 182 - 185)

Page 186

1  thing that I did was I read everything.  Before I
2  watched any videos, I read everything.  I say
3  everything; all of the depositions and everything.
4          Once I read the depositions, then I went
5  back and I watched the videos and then I compared the
6  videos that I watched from the body cam of Deputy Babb,
7  the video from Mr. Schott's truck, the body cam videos
8  of Deputy Molina, Deputy Gereb to compare them to
9  the -- complaint and to the depositions.  I believe
10 I actually watched a video of the deposition of
11 Mr. Schott.
12     Q.  Yeah.  And I remember that being on your list,
13 too.
14     A.  Okay.  And this is all from memory.  And then
15 I reviewed -- I asked for -- from the law office, I
16 asked them to send me the policies and procedures for
17 different topics that I thought were relevant within
18 the investigation to see --
19     Q.  Right.  So you could evaluate the --
20     A.  And evaluate whether or not the policy was
21 followed.
22          I wanted to know whether Deputy Babb had
23 training.  They had originally sent me all of the
24 training certificates that Deputy Babb had taken.  I
25 reviewed all of the training certificates, I reviewed

Page 187

1  the internal affairs complaints, I reviewed the
2  dismissal orders, everything to have to do with
3  internal affairs.  I reviewed the initial internal
4  affair complaint -- or investigation prior to the
5  second one.
6      Q.  Okay.  And then to kind of shortcut this, just
7  for your sake --
8      A.  Sure.
9      Q.  -- you reviewed basically everything else that
10 was in -- on page 5 that you already listed out?
11     A.  Yes.
12     Q.  Okay.  And then what did you do after you
13 reviewed those materials?
14     A.  After I reviewed those materials, then, of
15 course, I researched case law.  I wanted to see if
16 there was any new case law out there that I didn't know
17 about, so I researched other case law.  I, of course,
18 watched the videos, because I wanted to know who you
19 guys were, from the Institute of Justice, so I reviewed
20 your website, which is where I obtained some case law,
21 I believe.
22          Once I reviewed all of that case law and
23 I reviewed the complaints and I the reviewed videos and
24 I reviewed the policies by the Bexar County Sheriff's
25 Office, then I decided whether or not Deputy Babb acted

Page 188

1  in accordance to the policy as I read them, and also if
2  Deputy Babb conducted this traffic stop in the manner
3  as any other officer with the same training, the same
4  experience, under the same conditions that he had and
5  decided whether what he did was justified compared to
6  what other officers would have done under the same
7  circumstances.
8          And that's the way I viewed that, right.
9  I could not view that from hindsight, I could not
10 review that from my experience to where I am today
11 because that's not where Deputy Babb was that day at
12 his level of training and experience.
13          So that was my methodology on determining
14 whether or not the traffic stop was a stop that, you
15 know, was normal, like everyone else makes, or if he
16 violated Mr. Schott's civil rights and that he did
17 something that he shouldn't have done, because I
18 100 percent believe that people have the right and
19 their freedoms and I have always operated that way and
20 officers don't appreciate other officers that violate
21 people's civil rights.  So I'm very passionate about
22 that.  So I took Mr. Babb's rights into
23 consideration --
24     Q.  You mean Mr. Schott's?
25     A.  I'm sorry, Mr. Schott's, you know, into

Page 189

1  consideration.  However, Deputy Babb, being a police
2  officer, is only working with what he knows at that
3  particular time and he's making decisions according to
4  what he's seeing -- or an officer, not Deputy Babb, but
5  any officer is making decisions according to what they
6  are seeing realtime and the responses that they are
7  getting at that particular time.  And that's the way I
8  viewed this case, that's the methodology I used.
9      Q.  Okay.  So what I kind of heard and understand,
10 based on what you just said, is you reviewed the
11 complaint first, you reviewed the depositions next.
12 After you reviewed depositions, you watched the videos
13 in this case and you compared the body-worn camera
14 footage, the dash camera footage and the complaint, and
15 then you reviewed the rest of the documents that you
16 had listed.  You did some research on the case law.
17 You asked for --
18     A.  Policy.
19     Q.  -- policies from Bexar County.  And then
20 looking at all of that evidence together, you weighed
21 whether Deputy Babb complied with those policies.  Is
22 that fair?
23     A.  I weighed whether or not I could see any
24 inconsistencies within the policies that Deputy Babb,
25 you know, may not have followed, right.

48 (Pages 186 - 189)

Page 190

1    Q.  Sure.
2    A.  I'm not Bexar County Sheriff's Office, nor am
3    I an administrator for Bexar County Sheriff's Office to
4    determine whether or not he violated any policies.  I
5    can't say that.  I can only look at the policy, review
6    it, look at what I saw and what I reviewed to formulate
7    an opinion.
8         From my training and experience, I know
9    that all departments have different policies, they have
10   different procedures and deputies, they perform their
11   job differently, you know.  It's not against policy and
12   it's not against the law, you know, for this officer to
13   do something different than another officer.  So I did
14   not see any discrepancies, I didn't see anything that
15   was just off the chart different than another
16   reasonable officer under those same circumstances.
17   Q.  Okay.  Let's go to page 11 and the second
18   paragraph and I'm going to just read this section.  I
19   think it's two sentences that it might just be helpful
20   to read.  "In determining whether the actions or
21   decisions of the involved officers are consistent with
22   generally accepted police practices, I applied a
23   reasonable police officer standard of officers based on
24   training and experience in order to objectively
25   evaluate the totality of the circumstances.  The

Page 191

1    standard asks what information was knowable to the
2    involved police officers at the time the decision was
3    made and not from 2020 hindsight."
4         Did I read that correctly?
5    A.  Yes, ma'am.
6    Q.  Is this what you were just kind of trying to
7    explain to me, I think?
8    A.  Yes, ma'am.
9    Q.  Okay.  Can you explain to me the reasonable
10   police officer standard?
11   A.  Again, a reasonable officer under the same
12   conditions, I mean, I think we went over earlier how a
13   patrol officer is someone who may not have the same
14   experience or the same knowledge or the same desire to
15   really take a traffic stop and see if there's any other
16   crime associated with that particular traffic stop,
17   right.  That would be a patrol officer's standard,
18   right.
19        A criminal interdiction guy, he has more
20   training, he has more knowledge, he has more experience
21   in determining body language.  He knows more about the
22   drug industry.  He may have some knowledge of other
23   investigative strategies, such as hotel/motel, things
24   of that nature.
25        So this particular case was evaluated on

Page 192

1    those standards of that -- that type of officer, right,
2    not from the view of a patrol officer that knows
3    nothing about criminal interdiction.  In fact, when
4    reviewing the deposition of Deputy Molina, you could
5    tell that there's a difference between a K9 officer's
6    standards and the way he operates and the standards of
7    Deputy Babb because Deputy Molina -- Deputy Molina
8    appeared to not have any interest at all in being a
9    criminal interdiction guy.  He was focused on the K9s,
10   just as another deputy may focus on child molestation
11   cases, another one may focus on, "I don't want to do
12   anything other than be seen by the public and wave."
13        It takes each of these personalities in
14   order to effectively police the community.  You need
15   all of these people.  So there's not one set of
16   standards for quasi "a police officer" because there
17   are so many different things out there that these
18   officers have interest in.  That's the reasonableness
19   of that particular -- that's what I'm trying to
20   refer to.
21   Q.  Okay, thank you.  What did you mean by
22   "objectively evaluate the totality of the
23   circumstances"?  How do you do that?
24   A.  So it goes back to if you were to take this
25   same situation and make it a cold traffic stop, like we

Page 193

1    talked about earlier --
2         THE REPORTER:  A what?
3         THE WITNESS:  A cold stop, a traffic stop
4    to where he had no knowledge, then there would be a
5    different set of circumstances, right.  Many of the
6    same, but probably fewer.  He had no knowledge, you
7    know, leading up to the traffic stop, right, underneath
8    a different scenario.
9         So you have to objectively look at the
10   totality of the circumstances that Deputy Babb was --
11   was dealing with that particular day.  Any -- any
12   officer has to -- you have to understand what he was
13   thinking, the information that he had at that
14   particular time in order to determine whether he was
15   objectively doing what he was doing.
16   Q.  Okay.  Is your task then to kind of collect
17   all of the information and create an objective picture
18   of what was going on?
19   A.  For myself?
20   Q.  Yes.
21   A.  Sure.
22   Q.  You used the word "knowable."  What does
23   "knowable" mean?
24   A.  And which -- where did I use this word?
25   Q.  "The standard asked what information was

Page 194

1  knowable to the involved police officers."
2      A.   Sure.  That is what I'm referring to when I'm
3  saying he had prior information or it appeared that he
4  was communicating with someone.
5      Q.   Uh-huh.
6      A.   Something that he knew ahead of time before
7  the traffic stop.  Also, what he knows from his
8  training, his experience, what he knows from prior
9  interdiction stops that he has made compared to what
10  he's seeing on this stop.  Knowable, meaning any
11  training or any knowledge he has for body language,
12  right, seeing nervous behaviors, things of that nature
13  that he knows, that's known to him.
14      Q.   Okay.  So you're looking at specifically the
15  facts and experience -- experiences that Deputy Babb
16  has?
17      A.   Yes.
18      Q.   And if Deputy Babb did not have a fact, you
19  would not consider it?
20          MR. BARRON:  Objection, form.
21      Q.   (BY MS. HEBERT)  Let me rephrase.  If Deputy
22  Babb had a fact -- or if there was a fact -- I don't
23  know how to rephrase this.
24          If there's something that Deputy Babb did
25  not know, would you consider it?

Page 195

1          MR. BARRON:  Objection, form.
2          THE WITNESS:  Well, again, it goes back
3  to I don't know everything at the time that Deputy
4  Babb -- I don't know everything that happened there.  I
5  can only look to see from the things that I reviewed as
6  to formulate my opinion.  So Deputy Babb may or may not
7  have known other things, right.
8      Q.   Sure.
9      A.   So I can't -- that would be a subjective
10  answer.  I can't do that.
11      Q.   Sure.  So I guess the following question I
12  have for you is you reviewed the evidence in this case.
13  Did you evaluate each of those pieces of evidence for
14  whether Deputy Babb knew them or not?
15          MR. BARRON:  Objection, form.
16          THE WITNESS:  From -- I guess that's why
17  I evaluate everything from the perspective of the
18  officer from that particular time, during the training
19  and experience that he had during that particular time.
20          And I know I mentioned earlier that an
21  officer who has more experience, who has been doing
22  something, you know, longer, they may or may not view
23  it the same five years from now that they view it
24  today, right.  So a reasonable officer with the same
25  experience as Deputy Babb at that particular time would

Page 196

1  have viewed this situation the same.
2      Q.   Sure.  So I guess to crystallize what I'm
3  trying to express, if an officer is -- if there's an
4  event and the officer is standing there and the
5  light -- the traffic light is red, but the officer,
6  from where he's standing, couldn't have seen whether
7  the traffic light was red, but you now know the traffic
8  light was red based on traffic cameras at the scene,
9  would you consider the fact that the traffic light was
10  red in evaluating the officer's actions?
11          MR. BARRON:  Objection, form.
12          THE WITNESS:  Again, that's a speculation
13  scenario, right.  I can't -- I can't say what the
14  officer saw, if the light was red or from what position
15  he was at as far as perspective, you know, from that
16  particular spot.  The only thing I can rely on is what
17  the -- is what the officer puts in the report or what
18  they testify to and I can't -- I can't say what -- what
19  else they saw.
20          Now, many officers, you know, they --
21  they are really -- I guess we're going to get to the --
22  let's talk about the officer's -- the way he describes
23  something.  You know, everybody has different
24  terminology, right.  So an officer may see something,
25  but not really -- not really be able to explain it or

Page 197

1  put it in legal terms or the way that -- you know what
2  I mean.  So -- so I'm sorry, so I can't say what an
3  officer -- whether he saw that red light or he didn't
4  see that red light.
5      Q.   I'm not -- I'm not asking you to.  I'm just
6  saying like if the officer said, "I couldn't see the
7  light," would you consider outside facts that said the
8  light was red?
9      A.   Yes.
10      Q.   Okay.  On page 12, if you wouldn't mind
11  looking at the second paragraph, and I read this
12  paragraph as you saying that you're not going to
13  reference case law in your opinions if you testify at
14  trial.  Is that fair?
15      A.   That's correct.
16      Q.   Okay.  What would happen if your understanding
17  of case law was incorrect for your opinion?
18          MR. SAENZ:  Objection, form.
19          THE WITNESS:  If some case law was
20  different than the way I perceived it or I read it,
21  then I believe that, you know, a judge who has the
22  ultimate authority to decipher case law will correct me
23  on that.
24      Q.   (BY MS. HEBERT)  And how would a jury know if
25  your conclusions were based on a misunderstanding of

Page 198

1 the case law if you don't reference case law in your --
2 your testimony?
3        MR. BARRON: Objection, form.
4        THE WITNESS: Well, again, I would
5 reiterate that this is one of those subject matters
6 that a law enforcement officer is not an attorney,
7 right, and -- but yet a law enforcement officer must
8 review case law in order to do his job correctly,
9 right. So it kind of puts an officer in a position
10 such as this, to where you must depend upon case law to
11 guide you and to make an opinion or formulate an
12 opinion in this case.
13       However, not being an attorney, not being
14 a judge, who is actually the ultimate decision on case
15 law and what the law says, it puts an officer in a
16 position. So I can only explain it that way to a jury,
17 that we must depend on case law, right, but I can't
18 really testify to exactly what the case law says
19 because I'm not a judge who is the -- you know, the
20 man --
21    Q. (BY MS. HEBERT) Understood.
22    A. -- or the lady.
23    Q. Understood. Let's go to page 12 -- we're
24 already on page 12. I want to look at the Evaluating
25 Training Specific to Criminal Interdiction.

Page 199

1        Do you see that header?
2    A. Yes, ma'am.
3    Q. What was your overall conclusion with respect
4 to Deputy Babb's criminal interdiction training? I
5 had a little hard time just like understanding what
6 your conclusion on his training was about.
7    Q. Deputy Babb -- as I mentioned earlier, with an
8 officer that is a good candidate for being an
9 interdiction officer -- or not necessarily --
10 any topic, any officer that's specifically interested
11 in any one topic of law enforcement, they are going to
12 seek training relevant to whatever it is that they want
13 to learn about.
14       In this case, Deputy Babb's training was
15 primarily for criminal interdiction matters and for
16 human smuggling matters. That's what it seemed like he
17 was interested in from the training materials that I
18 saw, the certificates that I saw. And he had taken a
19 lot of classes on it. I believe I was provided with
20 the 53 certificates of training specialized in narcotic
21 enforcement.
22    Q. Yeah. And that just makes me -- prompts
23 another question. Can you just quickly going to
24 page 18, and the paragraph that starts, "Deputy Babb
25 had 324 accredited TCOLE hours of specialized

Page 200

1 training"?
2    A. Yes, ma'am.
3    Q. Are these the same?
4    A. Yes, ma'am.
5    Q. Okay. So the 53 certificates represent the
6 324 hours?
7    A. Yes, ma'am.
8    Q. Okay.
9    A. So what I did is I looked at the certificate
10 and the amount of hours either on the certificate
11 itself or his TCOLE record and I totaled the hours up
12 from all of these -- these 53 certificates, and that's
13 how I calculated that he had 324 accredited TCOLE hours
14 regarding those two things, or regarding narcotics and
15 specialized investigations.
16    Q. Great. I just want to make sure there weren't
17 53 certificates plus 324 hours.
18    A. You know, the training certificates for law
19 enforcement, they are confusing a lot of times. And,
20 in fact, there were a lot of certificates that were
21 provided that were multiple certificates, so the --
22 apparently the -- you know, whoever their -- whoever
23 made --
24    Q. By "multiple," you mean duplicates?
25    A. Duplicates, right. So there would be like --

Page 201

1 I think there was like, I don't know, three or four
2 sets of duplicate certificates, so I did not take into
3 account -- I mean, I found the duplicates and then I
4 found the hours for the training and looked at what he
5 had done.
6    Q. So you excluded the duplicates. Am I
7 understanding that correctly?
8    A. Yes, I excluded the duplicates within these
9 hours that I totaled. Now, of course, that's probably
10 not all of the training that an officer has taken
11 because there are many classes that they take where
12 they don't get a certificate.
13    Q. Sure. And looking back at this -- this
14 page 12, when you say specific to narcotic training,
15 does criminal interdiction fall under that umbrella of
16 narcotic training?
17    A. Yes, ma'am.
18    Q. Okay. Is it fair to say that Deputy Babb had
19 more training certificates than his TCOLE records
20 indicated?
21    A. Yes, ma'am.
22    Q. Okay. Did you evaluate whether all of the
23 training that Deputy Babb took, based on the
24 certificates, was TCOLE approved?
25    A. I did look at that, yes, ma'am.

51 (Pages 198 - 201)

1  Q.  Okay.  And what was your conclusion?
2  A.  It was not.
3  Q.  I'm going to read a portion of this sentence
4  here in the same paragraph.  "However, it was law
5  enforcement training provided by both government and
6  private training companies that was taken -- that was
7  either taken online, in person or via webcast and
8  completed by Deputy Babb."
9       Did I read that correctly?
10  A.  Yes, ma'am.
11  Q.  Simply because a training is provided by a
12  private entity, does that make it a good training, for
13  lack of a better descriptor, however you want to look
14  at it?
15  A.  No.
16  Q.  Earlier today, you talked a little bit about
17  trainings that you found the teachings to be
18  problematic and you did things to work with your
19  officers.  Can you talk to us a little more about that?
20  A.  Are you referring to the front seat
21  interviews?  That's what I was referring to.
22  Q.  I think it might have been front seat
23  interviews.  It might have also been folks trying --
24  folks using after the traffic stops to talk about
25  consensual encounters after the traffic stop had been

1  over.  I think you were talking about something like
2  that, too.
3  A.  Oh, that was relevant to the Rodriguez case.
4  Q.  Okay.  So -- and you talk about doing --
5  A.  Not necessarily training.
6  Q.  -- cleanup trainings.  Can you just explain
7  that to me?
8  A.  Law enforcement training -- and it goes back
9  to the case law, right.  So you have case law from
10  different parts of the country, it's viewed differently
11  all over the country.  There's state case law and
12  there's federal case law.
13       There are training companies that
14  train -- people that train law enforcement that may be
15  from one area that has a specific set of case law or
16  facts or policies and procedures that then start
17  training officers in another part of the country and
18  then those officers are learning something that may not
19  necessarily be the way the courts view things in their
20  area.  That is common within law enforcement.  And
21  that's what I was referring to is when you have to
22  clean up something.
23       And in that case, it happened to be with,
24  you know, interdiction stops to where they were trying
25  to -- they were teaching people consensual encounters

1  tactics, you know, to people in uniform and trying to
2  make it look like, you know, it's a consensual
3  encounter and not an actual, you know, detention on a
4  traffic stop.  And that's just not something that we
5  ever practiced in this area and they began teaching
6  that to officers in this area and then it would take me
7  a year to fix that, you know, to say, "That's not the
8  way we do it."
9       And, of course, I don't mean just my
10  agency.  I mean as a trainer in law enforcement in the
11  whole area.  I mean, I don't think I mentioned it.  It
12  is in my CV, but I've been an instructor since 1997 for
13  law enforcement classes.  So, I mean, I have taught all
14  over the country myself.  You have to be careful not to
15  teach people things that's not relevant to their area.
16  Q.  Understood.  And when you, as a supervisor, in
17  your role as a supervisor, if you discover that your
18  officers are learning something that you disagree with
19  or is inconsistent with your department's policy, what
20  do you do?
21  A.  Because I was a trainer, I always vetted the
22  instructors before the officers were allowed to take
23  that class.  So if an officer put in a request saying,
24  "Hey, Sergeant, I want to go take this class," the
25  first thing that I ask them to do is give me, you know,

1  the curriculum for the class, give me the flier, is
2  what we call it, and that tells me what the class is
3  about, how much it costs, who the instructor is.
4       And then from that point, I do not want
5  them taking a class from someone that was not credible,
6  so I would vet the instructor.  I would research them
7  and then I would determine whether or not there may be
8  some problems, with, you know, what they are teaching
9  for my area and then I would approve or disapprove the
10  training.
11  Q.  Understood.  And let's say an officer didn't
12  ask for someone -- didn't ask for your approval for a
13  training.  I mean, some officers take, you know,
14  training on their own time.  If you learned that one of
15  your officers or some of your officers was doing
16  something that you found to be inconsistent with your
17  entity policy, what would you do?
18  A.  Well, you would -- you would have to retrain
19  them.  You would have to put them on the right path,
20  you know, review the material.  You know, you're
21  probably not going to know until something happens, to
22  be honest with you, right.  There's no way a supervisor
23  can keep up with everything that their officers are
24  watching and being trained, you know, especially with
25  online classes now.  So you really -- you don't know.

Page 206

1    If they turn a certificate in to get
2  credit for TCOLE, then they will turn it into the
3  training staff and then the training staff will submit
4  it to TCOLE for a credit.  And then that will be on the
5  record, so you will know that they have taken that
6  training.  But they may take something that you don't
7  know about.  So until something happens and they have
8  done something or a supervisor or a coworker says,
9  "Hey, man, you know, that's not -- you know, I've never
10  seen that before," then typically I'm not even going to
11  know about it.
12    Q.  Understood.  Let's go to page 13, and I'm
13  going to go to the paragraph at the very bottom of this
14  page and I'm going to read a sentence to you from that
15  paragraph.  "The training provided by instructors
16  associated with Street Cop Training were only a small
17  percentage of criminal interdiction training Deputy
18  Babb had received from other training providers."
19  There's more sentence there, but I'm just going to read
20  that portion.
21    Did I read that correctly?
22    A.  Yes, ma'am.
23    Q.  Okay.  Did you evaluate how much Deputy Babb
24  relied on the Street Cop training?
25    A.  Well, I don't know how much he relied on the

Page 207

1  Street Cop training.  There's nothing that I could
2  review that would tell me that, other than the number
3  of certificates that I reviewed, right, which there
4  were a lot of certificates for Street Cop -- Street Cop
5  Training.  Many of them were online or they were
6  webcast and I think only one of those was submitted for
7  TCOLE approval, and that being the one from Hays
8  County.
9    Other than that, none of it was approved
10  for TCOLE, so I can't say how much he depended upon
11  that particular training.
12    Q.  That's fine.  Thank you.
13    Let's go to page 15 of your report.  I'm
14  looking at the second paragraph from the bottom and it
15  starts, "There wasn't a video."
16    Do you see where I'm referring to?
17    A.  Yes, ma'am.
18    Q.  Do you see where you reference the one-minute
19  video recorded from the F-250?
20    A.  Yes, ma'am.
21    Q.  Did you review a single one-minute clip from
22  Alek's dash camera footage from March 16th, 2022?
23    A.  Yes, ma'am.
24    Q.  Okay.  Did you ask Deputy Babb's attorneys
25  whether there was additional footage for you to review?

Page 208

1    A.  I did not.
2    Q.  Let's read the last sentence of that
3  paragraph.  I'm going to read that sentence in its
4  entirety.  "My opinion, based from the video provided
5  by Schott, is that the video had some form of
6  manipulation or it wasn't the entire video depicting
7  the incident as it was only one-minute in duration and
8  ended abruptly while Schott was mid-sentence in a
9  telephone conversation."
10    Did I read that correctly?
11    A.  Yes, ma'am.
12    Q.  In your opinion, did you conclude that the
13  footage from Alek's dash cam that you reviewed was
14  manipulated?
15    A.  It was obviously manipulated.  It's a
16  one-minute clip and I'm assuming, from my training and
17  my experience in watching videos in the past that the
18  video recorder has been going the whole time he's been
19  driving.  So if there's only a one-minute clip, there's
20  a five-minute clip or there's a ten-minute clip, it's
21  been manipulated because he's cut off mid-sentence when
22  the video ends, right, and there's only one minute.
23    So the video has been manipulated in some
24  form.  It's not an entire video that shows from when
25  the video camera was turned on until the time the

Page 209

1  vehicle was turned off.  That's my -- that's what I'm
2  talking about, manipulated.
3    Q.  Understood.  And is there any other reason to
4  conclude that Alek's dash camera footage had been
5  manipulated, other than this one-minute aspect?
6    A.  No, not from what I could tell.
7    Q.  Are all dash cameras generally the same?
8    A.  No, there's a lot of different cameras.
9    Q.  Okay.  Do different types of dash cameras have
10  different mounting systems?
11    A.  They do.
12    Q.  Do different types of dash cameras have
13  different types of lenses?
14    A.  They to.
15    Q.  Do different types of dash cameras create
16  video with different resolutions?
17    A.  They do.
18    Q.  Do different dash cameras have different types
19  of storage systems, for instance, the cloud versus an
20  SD card?
21    A.  Sure.
22    Q.  And do different types of dash cameras have
23  different recording configurations?
24    A.  They do.
25    Q.  Do you recall Alek Schott testifying that he

Page 210

1  had a BlackVue dash camera?
2      A.  I do.  In fact, BlackVue is on the screen
3  itself.
4      Q.  Oh, okay.  Are you familiar with BlackVue dash
5  cameras?
6      A.  No, ma'am.
7      Q.  Have you ever used a BlackVue dash camera?
8      A.  Not BlackVue.
9      Q.  Okay.  Did you do any research into how
10  BlackVue dash cameras record and store files?
11      A.  No.
12      Q.  I'm going to hand you what has been -- from --
13  I'm going to hand you from our files Exhibit K.  We're
14  going to mark that.  This is going to be marked
15  Exhibit 113.
16          (Exhibit 113 marked)
17      Q.  I'll hand that to you.
18      A.  Thank you.
19      Q.  Sure.  Now, I  thought about -- to be honest,
20  full transparency, I thought about connecting my laptop
21  to the computer so we could walk through how to get
22  this.  But can we agree that this is a printout -- or
23  at least -- you don't have to, you know, represent
24  beyond that.
25      A.  Sure.  No, we're good.

Page 211

1      Q.  What does this printout purport to be from?
2      A.  BlackVue Camera Systems.
3      Q.  Okay.  What's the title of this article?
4      A.  "Recording Video Segment Length."
5      Q.  Okay.  And can you read the first sentence of
6  the content for me?
7      A.  Of course.  "BlackVue cameras are built to
8  produce one-minute segments," and it's highlighted in
9  red, "of video recordings."
10      Q.  And based on this -- this information, if this
11  is correct, would you still believe that Alek's dash
12  camera has been manipulated?
13          MR. BARRON:  Objection, form.
14          THE WITNESS:  So, again, my opinion about
15  the manipulation of the video with the one-minute
16  segment, there's more video.  There are -- if it's a
17  one-minute segment, then it would have been important
18  for me to see, as someone evaluating this case, the
19  other minute before the minute -- particularly the
20  minute afterwards, right, even the ten minutes
21  afterwards.
22          So these recording devices, true enough,
23  they do record in one-minute segments.  However, they
24  store all of the information typically up to -- you
25  know, I have one similar to this, believe it or not,

Page 212

1  and it records in one-minute segments, but it stores
2  45 minutes worth.  So I can go back and review all 45
3  one-minute segments, right, which would have been
4  relevant and important in this case, in order to see.
5          Now, that potentially could answer as to
6  why the video cut off.  However, it would have been
7  important to listen to and see the video two minutes,
8  three minutes, four minutes after this.
9      Q.  But you didn't ask defendant's attorneys for
10  any other videos?
11      A.  I did not.
12      Q.  Did you do any research to evaluate whether
13  the speed reported by a dash -- a BlackVue dash camera
14  is accurate?
15      A.  From my training and experience with video
16  cameras, and particularly having video cameras, having
17  a telephone that has GPS on it, all of these video
18  cameras and telephones, they -- they are really
19  accurate with GPS coordinates.  So there was no reason
20  for me to believe that the speed on that camera was not
21  correct.
22      Q.  Sure.  And when you talk about your experience
23  as a -- I can't remember the phrase, mobile --
24      A.  Video instructor.
25      Q.  -- video instructor.  As a mobile video

Page 213

1  instructor, that experience was focused on teaching law
2  enforcement how to use their dash cameras; is that
3  correct?
4      A.  Yes, that and positioning the cameras.
5      Q.  Okay.  And the only other experience you have
6  with dash cameras is your personal experience; is that
7  correct?
8      A.  Oh, no.  So "only" is a strong word, right.
9  So in law enforcement, I mean, we always view dash
10  cameras, we review telephones, all sorts of video.  So
11  it's not just a small dash camera.  I mean, videos are
12  reviewed in law enforcement throughout your entire
13  career as an officer.  I have watched and, you know,
14  have a lot of experience with video cameras, and many
15  of those cameras are even button cameras, right.
16          From the undercover perspective, we're
17  always dealing with cameras and positioning of cameras,
18  the importance of cameras, the location of cameras to
19  be able to keep up with with undercover officers.  So,
20  you know, I just -- the word "only experience" is not
21  fair.
22      Q.  Sure, understood.
23      A.  I believe in my -- in my experience in law
24  enforcement, I've had a lot of experience with video
25  cameras.

54 (Pages 210 - 213)

Page 214

1    Q.   Okay.  Let me ask you a more, I guess --
2  you're entirely right to point that out.
3         Have you ever used dash camera recordings
4  to do accident reconstruction?
5    A.   No.
6    Q.   What is more accurate -- can you tell me they
7  are the same accuracy or, you know, you can't make a
8  comparison, so don't feel like you're constrained for
9  the question.
10   A.   I understand.
11   Q.   A speedometer or a GPS speed indicator?
12   A.   In my personal opinion, I would -- the GPS
13 indicator, they are pretty much right on target.
14   Q.   Okay.  To your knowledge, has GPS calculation
15 improved in more recent dash camera models?
16   A.   I think everything improved in more recent
17 dash camera -- any camera system, you know, whether
18 it's like you mentioned, the resolution or, you know,
19 the angles, the view from the camera.  Camera systems
20 are -- I agree, they are unique, you know, to each
21 individual camera, which is why it's important in this
22 case.
23        And, you know, something that looks far
24 away in the lens may actually be closer than it really
25 was, right, so certainly.  I mean, looking at a video

Page 215

1  on this computer screen from a camera that has a lens
2  this small is going to look different, you know, than
3  the small screen on the camera may have.
4    Q.   Understood.  And so would it be possible to
5  say that the speed calculation on a 2017 dash camera
6  would be less accurate than a camera today?
7         MR. BARRON:  Objection, form.
8         THE WITNESS:  You know, I'm going to date
9  myself again, but 2017 wasn't that long -- wasn't that
10 long ago and, you know, GPS technology was really good
11 in 2017.
12        Now, if you would have used that scenario
13 of 1998, I would agree with you.  I'm sorry, but, you
14 know, 2017 is not that long ago.  There was good
15 technology in 2017.
16   Q.   (BY MS. HEBERT)  Sure.  But can you offer an
17 opinion on whether the technology has changed or not?
18   A.   The GPS technology?
19   Q.   Yes.
20   A.   Well, everything improves, you know.  I can't
21 deny that.  I mean, Elon Musk has satellites in the air
22 now that's doing wonders, you know.  So, of course,
23 since 2017, GPS has improved.
24   Q.   Let's return back to your report.  Let's go to
25 page 15, if you will.  And do you see the header

Page 216

1  "Probable Cause, Texas Transportation Code"?
2    A.   Yes, ma'am.
3    Q.   And we're going to walk through some of this
4  section.  But as I understand your report, you conclude
5  that a reasonable officer in Deputy Babb's shoes could
6  have pulled Alek Schott over for two offenses; is that
7  right?
8    A.   Had they observed the offenses, yes.
9    Q.   Okay.  And what are those two offenses?
10   A.   One would be, obviously, the speeding,
11 considering that the GPS indicated 84 miles per hour.
12 Number two would be the failure to drive in a single
13 marked lane.
14   Q.   Okay.  And let's look at page 17, the second
15 paragraph.  It's the first full paragraph, for the
16 avoidance of ambiguity?
17   A.   Okay.  I'm sorry, tell me -- page 17?
18   Q.   Yes.
19   A.   The first -- first full --
20   Q.   The first full paragraph, but the second
21 paragraph.
22   A.   Yes, ma'am, I'm tracking.
23   Q.   And I'm going to read, I think, that first
24 sentence.  "After reviewing the video recorded by
25 Schott and from the testimony of Deputy Babb in his

Page 217

1  deposition, a reasonable officer would believe that
2  Schott crossed the yellow line before approaching
3  Deputy Babb and after passing Deputy Babb, he crossed
4  the broken white line in proximity to the Ford truck
5  traveling in the right lane."
6         Did I read that correctly?
7    A.   You did, ma'am.
8    Q.   Okay.  In this sentence, you reference the
9  dash cam or video recorded by Schott and the testimony
10 of Deputy Babb in his deposition.  Did you consider any
11 other evidence in evaluating whether a reasonable
12 officer would have concluded that Mr. Schott failed to
13 maintain his lane?
14   A.   Not that I recall.
15   Q.   Did you conduct a site visit?
16   A.   I did not.  I did review Google Earth, you
17 know, just so that I'm familiar with the area.  I'm
18 also -- I mean, I've traveled that road many times, you
19 know.  But other than that, I did not go to the site,
20 no, ma'am.
21   Q.   Okay.  Did you evaluate the place where Deputy
22 Babb's vehicle had been parked compared to where Alek
23 Schott's vehicle had been traveling?
24   A.   I did not go on a site visit, no.
25   Q.   Okay.  Did you evaluate how Deputy Babb's line

55 (Pages 214 - 217)

Page 218

1  of sight might have been blocked by cars moving in the
2  right lane?
3      A.  I did see cars in the right lane and I did
4  consider that, yes, ma'am.
5      Q.  And when you see -- when you said "see cars in
6  the right lane," you saw cars on --
7      A.  It would be Mr. Schott's video.
8      Q.  Okay.  So you reviewed Mr. Schott's video and
9  saw that there were cars in the right lane?
10     A.  In the right lane, yes, ma'am.
11     Q.  Okay.  Did you evaluate what Deputy Babb's
12 line of sight could have been after Mr. Schott passed
13 him?
14     A.  The only evaluation I did with what Deputy
15 Babb testified to is from his deposition, from the
16 questions that he answered.
17     Q.  Okay.
18     A.  And he did -- in the questions or in his
19 responses, he did say in his deposition that he saw
20 Mr. Schott cross over the line, but he couldn't recall
21 exactly how many times.
22     Q.  So based on what we just reviewed in your
23 report, I understand your testimony to be that
24 Mr. Schott crossed over the line twice, based on what
25 you saw.  Is that fair?  Okay, I was imprecise.  Let me

Page 219

1  be more precise.
2         Do you plan to testify to the jury that a
3  reasonable officer in Deputy Babb's shoes would have
4  concluded that, one, Alek Schott crossed the yellow
5  line before approaching Deputy Babb and, two, Alek
6  Schott crossed the broken white line after approaching
7  Deputy Babb?
8      A.  Yes, ma'am.
9      Q.  Okay.  Is there any other conduct you conclude
10 that was relevant for the failure to maintain a lane?
11     A.  Yes, ma'am.
12     Q.  What other conduct?
13     A.  From reviewing the video from Mr. Schott's
14 vehicle, you can see that when he passes the Amazon
15 truck, the 18-wheeler in the right lane, when you look
16 at the contour lines of the truck and as he passes the
17 Amazon -- the Amazon truck, there's a slight curve in
18 the road and it is clear that Mr. Schott veered far to
19 the left as he went around that truck and then veered
20 back into his lane.
21     Q.  Okay.
22     A.  That's one occasion.  As he approached Deputy
23 Babb's vehicle, I mean, you could see Deputy Babb's
24 vehicle from the camera angle.  Now, I can't tell you
25 what Deputy Babb saw.  I wasn't there.  I'm only

Page 220

1  testifying to what I observed on the actual camera, the
2  view that I saw in the video.
3      Q.  And by "the video," you're referring to
4  Alek --
5      A.  Schott, yeah.
6      Q.  -- Schott's dash camera?
7      A.  And in combination with what Deputy Babb had
8  said that he -- when he saw Mr. Schott cross the line,
9  before he approached and after he passed, while he was
10 behind them or catching up with either --
11        So, yes, in my opinion so, yes, he did
12 cross the line on numerous occasions while he was
13 passing the Amazon truck, while he was approaching
14 Deputy Babb and then after he passed Deputy Babb.
15     Q.  So the -- in your mind, there were
16 three crosses?
17     A.  Can I refer to my report?  It's in my report.
18     Q.  Yes, please do.  I'm trying to understand, so
19 feel free to refer to your report.
20     A.  Okay.
21     Q.  I guess what I'm trying to do is understand is
22 how many crosses there were --
23     A.  Yes, ma'am.
24     Q.  -- and which -- where they were.
25     A.  May I just read my report?

Page 221

1      Q.  Well, we have to keep in mind --
2      A.  Just the part -- just the part of the times --
3      Q.  Sure.
4      A.  -- on the video?
5      Q.  We will give you a few minutes to read it.
6      A.  No, I mean, out loud --
7      Q.  Oh, yeah, sure.
8      A.  -- to answer your question.
9      Q.  Oh, absolutely.  And just tell me where you
10 are so I can follow along.
11     A.  Okay.  So this is page 16.
12     Q.  Uh-huh.
13     A.  And this would be the -- let's see -- one, two
14 three, this is the third full paragraph that starts
15 with, "At 11:12:26."
16     Q.  Yes, I see where you are.
17     A.  "Schott rapidly passed the vehicle in the
18 right lane and then Amazon truck, which several car
19 lengths ahead -- was several car lengths ahead.
20 According to the distance of the right line of the hood
21 in relation to the yellow line, in my opinion, Schott
22 swerved to the left in the curve as he passed the
23 Amazon truck at 84 miles an hour.  I reviewed the
24 posted speed limit on the portion of I-35 being 75."
25        That's not what I was -- that's not the

56 (Pages 218 - 221)

Page 222

1  violation I was -- .
2  Q.  Okay, so we'll call that, you know --
3  A.  That's one.
4  Q.  -- No. 1.
5  A.  Okay, let's see.  In relation to the -- okay,
6  so this would be the paragraph starting with, "In
7  relation to tires --
8  Q.  Sure.
9  A.  -- and striping being recorded on the video
10  at the same time --" let's see.  The "as Schott
11  approached at 11:12:49"  paragraph.
12  Q.  Okay, so the last one?
13  A.  It would be the very last paragraph.
14  Q.  Sure.
15  A.  "Schott received a telephone call just before
16  passing Deputy Babb, slowed to 72 miles an hour, never
17  regaining the speed after passing the patrol unit.
18  Schott continued the telephone conversation passing the
19  Ford truck.  A noticeable change in position of the
20  yellow line in relation to contour line was observed
21  and depicted from -- on, according to Deputy Schott's
22  video, 11:12:56 to 11:12:59."
23  Q.  And there's just one correction, you said
24  Deputy Schott at one point.
25  A.  Uh-oh, did I?  I'm sorry.

Page 223

1  Q.  Deputy Schott's video, but I think you mean --
2  A.  I'm sorry, I meant Mr. Schott's video.
3  Q.  Sure.  So that's No. 2?
4  A.  Yes, ma'am.
5  Q.  Okay.  And then can you identify for me No. 3?
6  A.  At that same paragraph and it continues to the
7  next page, "At 11:13:13 and during the phone
8  conversation, Schott overtook the Ford truck at which
9  time the left contour line was completely over the
10  broken -- the broken white line, potentially at an
11  unsafe distance to the truck in the right lane."
12  Now, this is where that correction that I
13  told you about earlier --
14  Q.  Yes.
15  A.  -- when he first started, that should have
16  been right contour line and not the left contour line.
17  Q.  Yep, I see it.  So the top of 17?
18  A.  Yes, ma'am.
19  Q.  Got it.
20  A.  "... potentially at an unsafe distance to the
21  truck in the right lane.  There wasn't a video
22  depicting the exact location of where the Ford truck
23  was traveling in the right lane next as he passed, but
24  at 11:13 Schott is verbally heard saying, "Oh, crap" as
25  the video and the audio abruptly ended during

Page 224

1  conversation."
2  Q.  Okay.  That was super helpful.
3  So there are three incidences, as you
4  reviewed the dash camera video --
5  A.  Yes.
6  Q.  -- where you concluded that Alek Schott's
7  vehicle crossed either the yellow or the white lines?
8  A.  Well, again, I'm -- I'm not there, right.  I'm
9  not in person, I can't see it.  I actually can just say
10  that from the video, from the testimony of Deputy Babb
11  on what he saw, according to the deposition, then it
12  matches what the video is depicting that I observed on
13  the video.  That's what I'm saying.
14  I can't definitively say, you know, that
15  he crossed the white line.  I can't say that.  I can
16  only say that there was a variance in the contour lines
17  at different times and that it appeared to me that he
18  crossed over the lines.  But I wasn't there and that
19  would be speculation on my part.
20  Q.  So help me understand a little bit, based on
21  what you just said there.  I understood -- I understood
22  you to say just now that you can't say whether Alek
23  Schott's vehicle crossed the line or not; is that
24  correct?
25  A.  Bad terminology.  I can't say what Deputy Babb

Page 225

1  saw when Deputy Babb said that he saw him crossing or
2  his tires on the line, right.  I can't see that.
3  That's speculation, right.  So I can only go from what
4  I saw in my training and experience and it's what I
5  believe from the video and from the testimony by Deputy
6  Babb that he did commit the traffic violation.  I
7  believe it's supported in the video, from my training
8  and experience, but I wasn't there personally to see
9  him commit the traffic violation.  That's all I'm
10  trying to say.
11  Q.  Understood.  Let's get -- maybe this will help
12  some, too.  Let's go to page 16 and the first -- the
13  third paragraph, but the second full paragraph.
14  A.  Yes, ma'am.
15  Q.  Can you review this paragraph for me?
16  A.  Yes, ma'am.
17  Q.  And in this paragraph that we just reviewed,
18  were you summarizing what you had seen on Alek's dash
19  camera footage?
20  A.  Yes, ma'am.
21  Q.  And you used the -- the word -- the phrase
22  "distinct contour lines."
23  Do you see where I'm referring, to that
24  first line?
25  A.  Yes, ma'am.

57 (Pages 222 - 225)

Page 226

1    Q.   What do you mean by "the distinct contour
2    lines"?
3    A.   When looking at Mr. Schott's video, the very
4    beginning, I mean at the still shot before the video
5    begins, you can see two contour lines on the hood, you
6    know.  They are symmetrical, they come from the -- the
7    top of the hood where the windshield is and they kind
8    of curve in towards the front of the hood.  Those are
9    the contour lines that I'm referring to.
10    At the very beginning, according to this
11    paragraph, he's within his lane, obviously so, and they
12    are equal to the broken white stripe on the right and
13    the solid yellow stripe to the left.  Those contour
14    lines are equal.
15    Q.   Okay.  I'm just going to pause you for a
16    second there.
17    A.   Okay.
18    Q.   When you say "the yellow line to the left," do
19    you mean the yellow line on the left of Alek's travel
20    lane as you saw in his dash camera footage?
21    A.   Yes, ma'am.
22    Q.   When you say "the broken right -- the broken
23    white line on the right, are you referring to the
24    broken white line you saw on the right in Alek's dash
25    camera footage?

Page 227

1    A.   Yes, ma'am.
2    Q.   Okay.
3    A.   That separates the right from the left lane of
4    the northbound Interstate 35.
5    Q.   Got it.  And so when you used the phrase
6    "crossed over the yellow line," do you mean that Alek's
7    truck passed over the yellow line?
8    A.   Either over it or on it.
9    Q.   Okay.  And how would you know which way --
10    which one worked, which -- how would you know which it
11    was?
12    A.   Well, looking at the -- at the video, looking
13    at -- you can see that there's a yellow line and then
14    there's several inches -- I don't know how many there
15    are -- and then there are rumble strips.  They are the
16    indentions within the shoulder to let you know that
17    you're crossing the line.
18    Q.   We've all driven on those.
19    A.   You've driven on those before, right?
20    Q.   Yep.
21    A.   So I do not believe he was on the rumble
22    strips.  I do not believe he was all the way across
23    that far.  I do believe, from the video, that his left
24    tires had gone over that line, over the yellow line on
25    it, but not far enough to hit the rumble strips.

Page 228

1    Q.   Okay.  So it's -- it's your opinion, based on
2    the dash camera footage that you reviewed, that
3    Mr. Schott's tires crossed over the yellow line, but
4    did not hit the rumble strips?
5    A.   Yes, ma'am.  And that particular time was
6    after he passed the Amazon truck.
7    Q.   Understood.  Was that the only time that you
8    believe that the tire moved over the yellow line, but
9    did not hit the rumble strips?
10    A.   I believe there was one more time that I
11    mentioned.
12    Q.   Sure.  And is that the No. 2 time we talked
13    about where right -- right -- just before passing
14    Deputy Babb on 16, the last paragraph?
15    A.   So that would be the second one.  I do not
16    believe that one was as noticeable, so I do not believe
17    he went as far as he did on the first one.
18    Q.   Understood.
19    A.   Yes, ma'am.
20    Q.   But, in your opinion, Mr. Schott's tire
21    crossed over the yellow line?
22    A.   Either over or on the line.
23    Q.   Okay.  Did you do anything to evaluate the
24    relationship between what Mr. Schott's dash camera
25    showed and the positioning of his tires?

Page 229

1    A.   No, ma'am.
2    Q.   So based on your review of the dash camera
3    footage, could you say where Mr. Schott's tires were
4    located?
5    A.   No, ma'am.  That is not -- you can't see that
6    from the angle of the video.
7    Q.   Can we go to page 16 and the first full
8    paragraph, it starts with, "In relation to tires and
9    striping."
10    Do you see that?
11    A.   Yes, ma'am.
12    Q.   I'm going to read some of this so we have the
13    entirety.  "In relation to tires and striping being
14    recorded on video at the same time, it was nonexistent.
15    Therefore, my opinion is based solely on my experience
16    and training having instructed law enforcement officers
17    on the use of mobile video during my career and from
18    what I reviewed on the video as part of this case."
19    Did I read that correctly?
20    A.   Yes, ma'am.
21    Q.   When you wrote "it was nonexistent," what were
22    you referring to?  I just -- I don't quite understand.
23    A.   The question that you just asked me, could I
24    see the tires and the yellow line in the same frame.
25    Q.   Okay.

58 (Pages 226 - 229)

Page 230

1    A.   And I could not.
2    Q.   So just to finish that out, I think, for the
3    failure to maintain a lane offense, it is your opinion
4    that will Alek Schott crossed the yellow line twice and
5    the broken white line once, based on the review of his
6    dash camera footage and Deputy Babb's testimony.
7        Is that a fair summary of your opinion?
8    A.   I would like to make a comment about the
9    deposition that I read and reviewing this, if I may.
10   And there seems to be a lot of focus, from what I read
11   in the deposition, on the yellow line and what deputy
12   saw -- Deputy Babb saw as the vehicle approached him,
13   where the vehicle was located when --
14   Q.   When you say "the vehicle," you're referring
15   to --
16   A.   Mr. Schott's vehicle, I'm sorry.  Learning
17   curve for me.
18       But there wasn't much conversation about
19   what transpired after Mr. Schott passed Deputy Babb.
20   There has not been very much testimony.  However,
21   Deputy Babb did testify that he did cross over and
22   failed to maintain his lane after he passed him and
23   while he was trying to catch up with him.
24       That offense, to me, was very unsafe had
25   the white truck alongside him been in the position in

Page 231

1    the right lane that he was because Mr. Babb -- not
2    Mr. Babb.  Mr. Schott, I'm sorry.  Mr. Schott had
3    received a telephone call as he approached Deputy
4    Babb's vehicle, which will distract a lot of people on
5    a phone call, right.  You know, not many people can
6    answer a telephone, in my experience, being personal
7    experience as well, without looking at the telephone to
8    answer it.  That potentially is significant when
9    Mr. Schott answers the phone, takes his attention away
10   from the road as he's approaching Deputy Babb, which
11   could have caused him to cross the line.  He's on a
12   phone conversation after he passes Deputy Babb.
13       As he passes the white Ford truck in the
14   right lane while Deputy Babb is attempting to catch up
15   with him or is -- has caught up with him -- we don't
16   know because there's no vehicle on exactly his
17   positioning -- you can hear Mr. Schott say, "Oh, crap,"
18   which, in my experience in law enforcement, you know,
19   and actually been in those positions is you just got
20   lit up by the police, right.
21       So -- and there's a distinct right -- the
22   distinct discrepancy.  I mean, that -- that contour
23   line on the right side is way further over than it had
24   been at any one time.
25   Q.   And when you say "contour line on the right

Page 232

1    side," you're referring to the --
2    A.   On the hood of Mr. Schott's truck.
3    Q.   And in relation to --
4    A.   To the right broken stripe on the right,
5    separating the right and the left lane of the
6    northbound lane.
7    Q.   Okay.
8    A.   And that coincides with what Deputy Babb had
9    said in his deposition, that he observed that as he was
10   behind the vehicle.  So I just want to make sure that,
11   you know -- I saw that, you know, it's in my report.
12       So, in my opinion, that was very unsafe
13   with the truck being in the right lane.  Mr. Schott,
14   being on the telephone, being distracted and looking in
15   the rearview mirror as a patrol car is behind him,
16   which is obvious from the video by him saying "Oh,
17   crap."
18   Q.   Okay.  Did you evaluate what Deputy Babb could
19   have seen while he was driving to catch up with Alek
20   Schott's truck?
21   A.   Well, I mean, again, that would be speculation
22   on what Deputy Babb saw.  I don't know what he saw.
23   Obviously, he has a camera.  Obviously, there were
24   some things that I reviewed where he may have been
25   running license plates on the computer.  That in itself

Page 233

1    doesn't necessarily mean he's distracted or can't see
2    anything.
3        Officers all the time are on the computer
4    typing, you know, while they are driving.  Officers
5    don't just look at the computer the entire time they
6    are driving and not look at the road, you know.  They
7    are trained and they have experience in doing that.  So
8    it's been my experience with these computers in the car
9    and following someone that I can still see the traffic
10   violations that occur in front of me, even though I may
11   be running a license plate or, you know, anything of
12   that nature.
13       So, yes, he very well could have been
14   looking or running license plates, according to the
15   records, but I don't think that distracted him from
16   seeing what he saw.
17   Q.   Understood.  Did you evaluate whether texting
18   and driving could have impacted what Deputy Babb saw?
19   A.   Same scenario.
20   Q.   Okay.  So you just talked about the -- after
21   Alek Schott passed Deputy Babb, it is your opinion,
22   based on the dash camera footage and from Deputy Babb's
23   testimony, that Mr. Schott's car crossed over the white
24   lines on the right side of the travel lane that he was
25   on?

59 (Pages 230 - 233)

Page 234

1    A.  Yes, ma'am.
2    Q.  And before passing Deputy Babb, Alek Schott's
3  vehicle crossed over the yellow line twice?
4    A.  Yes, ma'am.
5    Q.  Any other conduct that led you to conclude
6  that Mr. Schott committed the offense of failure to
7  maintain a lane?
8    A.  You know, I watched that video many times, you
9  know, second by second and, you know, I really tried to
10  determine whether -- or where -- had I been in Mr. --
11  or in Deputy Babb's position, where would I have been
12  able to see Mr. Schott's vehicle to be able to see this
13  violation.  So I really considered that a lot, right.
14      And I came to the conclusion that, from
15  my training and my experience in this business, having
16  worked interdiction many, many years, police officers
17  who are looking for a certain vehicle, they are
18  fine-tuned focused on looking for a vehicle, and in
19  this case, Deputy Babb was looking for an F-250.
20      So his ability -- again, I'm not Deputy
21  Babb, but my ability to be able to see an F-250 and
22  recognize that one is coming would be at a greater
23  distance than probably a vehicle that I'm not looking
24  for.  Is that fair to say?
25    Q.  Sure.

Page 235

1    A.  So -- so having already known the vehicle,
2  make, model and even having a photograph of that truck,
3  I believe I would have been able to see that truck from
4  a greater distance and what it was doing, particularly
5  in relation to other vehicles, like the distance
6  between the vehicles, to determine whether they crossed
7  over the line, I would be able to see that.  So I took
8  that into consideration in this case.
9    Q.  Sure.  And I get that.  That makes total sense
10  to me.  But what -- in terms of the conduct, there were
11  three times, based on your perception of the testimony
12  and your review of the dash camera footage, that you
13  saw Mr. Schott's vehicle cross out of its lane.
14      Am I understanding that correctly?
15    A.  Yes, ma'am, in combination of everything I
16  reviewed, not what Deputy Babb saw.  Only what I
17  reviewed.
18    Q.  Sure.  And in evaluating the offense of
19  speeding, I'm going to move on to speeding, if that's
20  okay.  What evidence did you consider for speeding?
21    A.  In this case, that was the first thing that I
22  noticed on the video, to be honest with you.
23    Q.  And when you say "the video," you're referring
24  to --
25    A.  I'm sorry, I do apologize.  Mr. Schott's

Page 236

1  video, from Mr. Schott's --
2    Q.  So let's start that again.  In this case --
3    A.  Yes, ma'am.  In this case, Mr. Schott's video
4  that I reviewed, the first thing that I noticed was he
5  was passing traffic at a rapid speed, and that is when
6  I looked at the entire, you know, bottom frame of the
7  video and I saw the GPS speed of 84 miles an hour.
8  That explains why he's passing traffic at such a rapid
9  pace.
10      As an officer that has stopped thousands
11  of cars and having also, you know, been certified in
12  the use of radar to be able to write tickets for that,
13  you know, an officer is trained to first observe a
14  vehicle and if it appears that vehicle is speeding and
15  you judge that by the other traffic.  So in this case I
16  think that's why I noticed that first.
17      And then once I noticed that and I
18  noticed the speed, then I began looking for the failure
19  to drive in a single lane had he or had he not at that
20  particular time.
21    Q.  Sure.  So other than the dash camera footage
22  and Deputy Babb's testimony, did you have any other
23  evidence you -- you reviewed in making the conclusion
24  that Alek Schott was speeding?
25    A.  No, ma'am.

Page 237

1    Q.  Okay.  I want to talk a little bit about
2  source of information.
3    A.  Okay.
4    Q.  What is a source of information?
5    A.  You know, it's more police jargon.  A source
6  of information -- I'm going to use the Drug Enforcement
7  Administration here as an example.  When you write
8  DEA-6, which is a report with the Drug Enforcement
9  Administration, the DEA-6, if you're using a
10  confidential informant then oftentimes they refer to
11  them as confidential sources, which would mean CS for
12  short, right.  At my department, we use the words CI,
13  confidential informant, not confidential source, so it
14  would be CI.
15      But if it's an unknown person, someone
16  that is phoning in information and you don't
17  necessarily know who it is, then they are a source of
18  information.  It's someone who you do not have the
19  identity to, that being whether you're, you know,
20  having it in a confidential informant file or you're
21  putting the name in the report.  So that's what a
22  source of information is --
23    Q.  Got it.
24    A.  -- for this report.
25    Q.  Okay.  So then as you use the term "source of

1    information" in your report, you're using that term
2    because you didn't know who the source of the
3    information is. Is that fair?
4        A. That's fair.
5        Q. Okay. Who is Kiki?
6        A. I have no idea.
7        Q. Okay. Do you know what the Laredo Fusion
8    Center is?
9        A. Uh-huh. So not necessarily the Laredo Fusion
10   Center, but what a fusion center is, is where
11   information, intelligence --
12       Q. Sure, sure. And I'm not asking you what a
13   fusion center is more generally, but do you know what
14   the Laredo Fusion Center is specifically?
15       A. Not unless it's one of the fusion centers
16   within the network.
17       Q. Sure. Did you do anything to evaluate whether
18   the Laredo Fusion Center exists?
19       A. I'm certain they have one, but no.
20       Q. Okay. Did you do anything to learn who Kiki
21   was?
22       A. No, ma'am.
23       Q. Okay. As you sit here today, do you know if
24   Kiki was a law enforcement officer?
25       A. I do not.

1        A. Anyone with a phone.
2        Q. To better understand your analysis, it would
3    be helpful to kind of have an understanding of your
4    perspective on the inputs to your analysis. So feel
5    free to consult your report as we go, but I want to
6    understand your view of the facts.
7            What information did Deputy Babb have
8    about Mr. Schott before he turned on his lights to make
9    the traffic stop?
10       A. It's my understanding from the deposition,
11   from the body cameras that I reviewed that -- and
12   that's the body cameras of Deputy Babb, body cameras of
13   where he was speaking with Deputy Molina, which had a
14   lot of the same information, and it could have been
15   even Deputy Gereb. He commonly referred to information
16   that he had prior to the stop. He has very hesitant to
17   give up too much information that he had knowledge
18   about.
19           That is -- in my opinion and my
20   experience in law enforcement, it's because he was
21   trying to protect some ongoing investigation that may
22   have been occurring where he got that information from.
23   He mentioned information about one-day turnaround, he
24   mentioned information about frequent trips, about a
25   potential female with him as he went to Carrizo Springs

1        Q. Let's look at page 6 of your report. No. 6,
2    do you see the last paragraph here?
3        A. Yes, ma'am.
4        Q. I'm going to read the first sentence there.
5    "Prior to the traffic stop, Deputy Babb utilized a
6    messaging program called WhatsApp to receive
7    information that the 2019 F-250 displaying Texas LP
8    LJR-4135 was northbound on IH-35 in Carrizo Springs, a
9    city located in South Texas."
10       A. Yes, ma'am.
11       Q. Did I read that correctly?
12       A. You did.
13       Q. Okay. Just for ground rules, what is
14   WhatsApp?
15       A. WhatsApp is a messaging program that's -- they
16   don't use -- it's Internet based, it's not telephone
17   based, WhatsApp. So, you know, it's where you can
18   create group messages, group -- you know, it's much
19   like a group text message, but it's utilizing WhatsApp,
20   which is merely just one of the programs that offers
21   that service.
22       Q. Is WhatsApp a messaging program only for law
23   enforcement?
24       A. No, ma'am.
25       Q. Who can use WhatsApp?

1    from Houston, about a female at a hotel in Carrizo
2    Springs, about the truck leaving the hotel, going to an
3    offsite place, information that the female was taken
4    back to the hotel and information that the truck was
5    heading northbound on I-35 and then arrived within the
6    timeframe.
7            So from my training and experience and
8    from reviewing all of that, from having experience on
9    the investigative side of narcotics, I can confidently
10   say that there was information that he had that was -- that
11   was confirmed by what he saw. According to the
12   depositions, you know, he had information.
13       Q. Understood, understood. And I'm -- I'm just
14   trying to capture all of the information.
15       A. Yes, ma'am.
16       Q. So it is your testimony that before Deputy
17   Babb turned on his lights to make the traffic stop of
18   Alek Schott, he had information about the one-day
19   turnaround, the frequent trips, some lady who had
20   traveled with Mr. Schott, a female at the hotel, that
21   Mr. Schott had moved from the hotel to offsite and
22   Mr. Schott had driven north on I-35 and Mr. Schott
23   arrived at the timeframe he was expected to arrive in
24   Bexar County; is that fair?
25       A. If I can, let me refer to my report. I have

Page 242

1  those, I think, outlined in the report. Let me see.
2      (Discussion off the record)
3      THE WITNESS: So on page 19 of my report.
4  Q. (BY MS. HEBERT) Sure. 19, okay. Okay, got
5  it.
6  A. No. 1, I outlined some of those things that
7  you're asking about.
8  Q. Yeah.
9  A. Deputy Babb had prior -- had prior knowledge
10 about the description, color and license plate of the
11 vehicle, so that would be one thing. The F-250 had
12 been scanned by LTR in Fayette County traveling
13 westbound on IH-10 the night before. That would be two
14 things.
15 Q. Sure.
16 A. Deputy Babb was told by a member of law
17 enforcement texting group, the F-250 had frequent
18 patterns to and from South Texas on multiple occasions.
19 That would be three.
20     Deputy Babb was told that the F-250 was
21 possibly traveling in tandem with a secondary vehicle
22 during trips to South Texas. That would be four.
23     Let's see. There's that date of
24 March the 22nd again, so I'm sure that's a typo.
25 Q. He's referring to item 5.

Page 243

1  A. Item 5, right. Deputy Babb was informed via
2  messaging app the F-250 left Carrizo Springs at the
3  specific time utilizing I-35. That should've been
4  March the 16th, not the 22nd. That would be five.
5      Let's see. Deputy Babb observed the
6  F-250 driven by Schott on IH-35 confirming the
7  information that he had received leading up to that,
8  basically. That's No. 6. So that would be six things
9  that related to the information that he had prior to
10 the traffic stop.
11 Q. Okay. So these six things are the only six
12 things that Deputy Babb knew before the traffic stop?
13 A. I don't know what else he knew. He may have
14 had other conversations via phone. I don't know. That
15 would be speculation.
16 Q. Sure. Well, we just talked about -- we talked
17 about a couple of things, about a female at the hotel
18 and a lady who traveled with him. I don't see those in
19 items 1 through 6. Is that fair? Unless I'm missing
20 them.
21 A. Well, so No. 4 is that Deputy Babb was told
22 that the F-250 was possibly traveling in tandem with a
23 secondary vehicle during trips to south Texas,
24 right. So that -- that is the same as the female
25 that's involved.

Page 244

1      Originally, there was confusion with
2  whether the female was in another car, at what point
3  she was in another car. And I don't think Deputy Babb
4  was clear on whether or not the female was coming from
5  Houston or the female met him in Carrizo Springs. So,
6  you know, you can't pinpoint that particular topic
7  because I don't think it was clear at any point where
8  she was or where she -- other than that we know she was
9  seen, according to Deputy Babb's conversation on the
10 phone, that's recorded on his body cam, while he's
11 searching the truck of Mr. Schott, he calls and he --
12 it has been assumed that that telephone call was to a
13 supervisor, right, and in the -- from the depositions
14 that I read -- well, actually, it's in the complaint as
15 well, the the complaint reads that he was in contact
16 with a supervisor.
17     Well, I believe that was the person in
18 Carrizo Springs that he was talking about, not a
19 supervisor on that particular call. And this was
20 recorded on his body cam. But -- so there's confusion.
21 You cannot pinpoint exact details from these
22 conversations. So what these are, one through five or
23 six, really, is really just a generalization of
24 everything for totality of the circumstances.
25     So I can't -- I can't tell you what time,

Page 245

1  you know, the female was in the truck, but I can tell
2  you that that was part of my recording that there was a
3  secondary vehicle.
4  Q. Understood. So this summary of items that you
5  have on one through six, this is a summary of
6  information that you understand that Deputy Babb had at
7  some point about Mr. Schott; is that correct?
8  A. Yes.
9  Q. Okay.
10 A. And I believe that those -- those particular
11 things were information that I either observed on the
12 video, I read in depositions, that he knew before the
13 traffic stop.
14 Q. Okay. So I'm going to ask this question
15 again. Can you tell me what information Deputy Babb
16 had before the traffic stop, based on your review of
17 the evidence?
18 A. It's the things that I just read.
19 Q. So items 1 through 6?
20 A. One through six.
21 Q. So Deputy Babb had all of the information
22 listed in items 1 through 6 on page 19, as you
23 understand it, before he made the stop of Alek Schott?
24 A. According to what I have observed during the
25 case evaluation, yes.

62 (Pages 242 - 245)

Page 246

1    Q. Okay.
2         MR. BARRON: Do you want to take a break
3    now?
4         MS. HEBERT: This will be a great time.
5         (Recess from 3:52 p.m. to 4:03 p.m.)
6    Q. (BY MS. HEBERT) Mr. Haston, are you ready?
7    A. I'm ready. Thank you for the break, actually.
8    Q. Great. I needed it, too.
9         I want to look at page 20 of your report.
10   And do you see the third paragraph, you talk about Stan
11   Walters?
12   A. I do.
13   Q. How does Stan Walters' instruction materials
14   help you detect detection -- detect deception?
15   A. So Stan Walters is a -- is a well-known
16   instructor of kinesics. I have taken a lot of his
17   classes over the years. In fact, he was the first
18   person who, you know, introduced me to body language to
19   help me understand what I was seeing. Everybody
20   understands and sees body language, it's just a lot of
21   people don't know how to interpret it.
22        Stan Walters assisted me by -- through
23   his training programs that I had taken to help me
24   understand what I was seeing and to develop the
25   interviews in order to, you know, determine whether

Page 247

1    something else is going on with the traffic stop, in
2    this case. So that's how he helped me, his classes,
3    his courses. He's a very well-known instructor of
4    kinesics.
5    Q. Can you just explain what kinesics is?
6    A. Body language, speech patterns, things of --
7    exactly what we've been talking about, you know, it's
8    about how the body -- how the subconscious mind reacts
9    under stressful situations.
10        And that -- it's really a lot like
11   hypnosis, which is why I enjoy the hypnosis class
12   because it's still a lot about the subconscious mind
13   and what's retained and how people react, you know, to
14   questions or to interviews or to situations, you know.
15   Q. Okay. Can you, in broad strokes, give me the
16   big takeaways you've learned from Mr. Walters?
17   A. The big takeaways from Mr. Walters?
18   Q. And I'm not -- this is not -- this is not a
19   quiz. Like if you missed one, you're not going to like
20   lose points. I just kind of want to understand the
21   general framework from your perspective.
22   A. It's a lot of what I just said. I mean, the
23   big takeaways from body language and speech patterns is
24   to be able to interview a person -- this is in my own
25   words -- be able to interview a person, observe the way

Page 248

1    their body reacts to the questions that I ask them, to
2    be able to respond and ask another question from the
3    answer that they gave me.
4         Are you tracking with me?
5    Q. Yeah, I did. I followed you on that one.
6    A. And once they respond to the question, I
7    determine from what I see, body language-wise, whether
8    or not I need to revisit that particular topic or
9    whether I need to move on to something else. That's
10   one thing.
11        The other thing, related to criminal
12   interdiction, is the way a person reacts upon meeting a
13   law enforcement officer in an official capacity,
14   especially one who is committing a crime, such as drug
15   trafficking. Many of those indicators are stretching.
16   You know, there's many times when you stop a vehicle
17   and the person is a drug trafficker, they know they
18   have drugs, we talked about this earlier. They're
19   thinking about what they're going to say when they're
20   stopped. So you take that, you know, into
21   consideration. And now they are stopped. Now, when
22   they get out of the car, maybe they are in the car,
23   they stretch a lot, right, so they stretch. Big
24   indicator. I learned that from Stan Walters. It
25   happens a lot.

Page 249

1         Another indicator when you're talking
2    with them is let's say you want to pat someone down,
3    and say, "Hey, I need to pat you down," then they turn
4    around and put their hands behind their back. Well,
5    typically, when you're going to pat someone down, they
6    are going to raise their hands up, but when they put
7    their hands behind their back, it's almost like they
8    want to be handcuffed. So that's the subconscious
9    thing that they do, that they think they are under
10   arrest because they know they've got something going
11   on, potentially. It's not every time, but, I mean,
12   it's just things that you look for.
13        Other things are clusters of being
14   deceptive. So when someone is lying, then your body
15   does certain things that tells me that you're lying.
16   Not -- no one certain thing means that you're being
17   deceptive because everyone does it at one time or
18   another, but when there's clustering of things, meaning
19   that there are several things going on during that
20   time, such as they clear their throat, they, as I
21   mentioned before, may have a nervous laugh whenever
22   they answer a question after the baseline changes. We
23   discussed that earlier. I can go over it again, if you
24   would like.
25   Q. But this came from Stan Walters?

Page 250

1  A.  All of that came from Stan Walters' training,
2  yes, ma'am.
3  Q.  Okay.  And you find Mr. Walters' ideas to be
4  helpful in detecting deception?
5  A.  He's one of the instructors, yes, ma'am.
6  Q.  Okay.  Do you list any other instructors here?
7  A.  Where is my training and experience section?
8  Okay.
9      No, ma'am, because there are a lot of
10  them.
11  Q.  Sure.
12  A.  So this is the one that I attended numerous
13  classes that he had.  There's also one by the name of
14  Rhoades, if I remember his name.
15  Q.  R-H-O-D --
16  A.  Maybe Stephen Rhoades.  R-H-O-A-D-E-S, maybe,
17  Rhoades.  I can't remember.  His was a long time ago.
18  I've taken a few of his classes.
19      I have not depended upon any body
20  language classes, any -- any anything of that nature
21  from law enforcement officers who teach in an
22  interdiction setting; only from people whom I consider
23  to be experts in the matter.
24  Q.  Sure.  And you consider Mr. Walters to be an
25  expert in the matter?

Page 251

1  A.  Yes, ma'am.
2  Q.  Okay.
3      MS. HEBERT:  Let's look at Exhibit G.
4  What number are we on?
5      MR. FOX:  114.
6      (Exhibit 114 marked)
7  Q.  (BY MS. HEBERT)  We're going to hand you
8  what's been marked Exhibit 114.
9  A.  Sure.
10  Q.  I'm not going to ask you to review --
11      MR. BARRON:  Do you have another copy for
12  me?
13      MR. FOX:  Yeah, here you go.
14  Q.  (BY MS. HEBERT)  I'm not going to ask you to
15  review the entirety of this document.  I want you to
16  just look at the cover page and then to the bio, which
17  is the next page after the cover page.
18  A.  Yes, ma'am.
19  Q.  Is this the Stan Walters whose trainings you
20  have attended and his materials you have reviewed?
21  A.  Yes, ma'am.
22  Q.  Let's go -- the pages are numbered, but they
23  don't start until a few pages in.
24  A.  Okay.
25  Q.  Can you go to the page numbered No. 4?

Page 252

1  A.  Okay.
2  Q.  And can you tell me what the copyright here is
3  on this page at the bottom?
4  A.  2024.
5  Q.  Okay.  And let's go to page 7.  And I'm going
6  to go -- I'm going to read this second block of text.
7  It's about midway through the page.  "Interview and
8  interrogation is a very labor-intensive mental process.
9  One very common mistake interviewers make is spending
10  so much time and energy on their analysis of their
11  subject's behaviors that they forget the most important
12  part of interviewing:  Listening."
13      Did I read that correctly?
14  A.  You did.
15  Q.  Do you agree with this statement?
16  A.  I do.
17  Q.  Have you seen officers make this mistake?
18  A.  I have seen myself make this mistake, and I
19  almost got killed over it.
20  Q.  That sounds pretty traumatic.
21  A.  Well, I almost lost my life.  This is great
22  stuff.  Body language, interview techniques, patterns.
23  It's great stuff.  I learned a lot from it.  I was very
24  successful in my career using it.  However, when -- and
25  I'll give you my example of what happened to me.

Page 253

1      I focused so much on finding drug
2  traffickers and utilizing body language and speech
3  patterns that I had challenged myself to be able to
4  find drug smugglers and get them to tell me where the
5  drugs were in the car without me even having to ask for
6  consent to search.  That's how I challenged myself in
7  this business.  And I became fairly successful at it
8  and I made many loads on Interstate 35 to where I found
9  the car, I talked with them, I interviewed them and
10  they told me the drugs -- where they were, what they
11  were and where they were going, right.
12      And that was, you know, I was -- I really
13  liked it, right.  I mean, it was very successful work.
14  But what I failed to do was pay attention to my police
15  training 101, and that is a lot of what happened with
16  Deputy Babb, or what didn't happen with Deputy Babb,
17  and that is I failed to watch the signs of a person
18  that's armed because I was so focused on interviewing
19  people through training I had gotten from Sam Walters,
20  right.
21      And that almost cost me my life because
22  the person that I'm speaking about had two 45 handguns
23  on him, he had a tactical shotgun with a lot of rounds
24  in the truck and he was out to kill people.  And I did
25  not pat him down because I was so focused on not

Page 254

1  listening and doing what I was doing. So, yes, I do
2  agree. This is a great tool, you know. Investigation
3  of bad guys is a great tool, but it's a real business.
4      Q. Understood.
5      A. And if you do not pay attention to everything
6  and you lose focus and you don't listen, you will get
7  killed in this business, which is why you pat people
8  down for safety.
9      Q. Understood. And I'm sorry that happened to
10 you.
11     A. Oh, no, I learned from it. That was a
12 learning experience for me.
13     Q. When you reviewed the body camera footage of
14 Deputy Babb and he had Alek in the front seat of his
15 vehicle, or before that, so just when you reviewed the
16 body camera footage of Deputy Babb, did you evaluate
17 whether Deputy Babb was making the same mistake you
18 made, failing to listen?
19     A. I don't -- I can't -- again, I can't say what
20 Deputy Babb was thinking or what he saw.
21     Q. Of course.
22     A. But, however, from my training with deception,
23 with body language, that's why I say, and I keep saying
24 that at Deputy Babb's experience level that he had,
25 that put him at a different category from where --

Page 255

1  where other officers may be, right. So Deputy Babb was
2  learning. He was in the process of learning body
3  language, speech patterns and he didn't necessarily do
4  everything like this training tells you to do.
5      Q. Sure.
6      A. Right, because he hasn't formally had a lot of
7  this training and he hasn't put it to real-life use,
8  you know, in interview settings. There's a difference
9  in interviewing a person with all of this education
10 from deception and body language and making that work
11 on the side of the road is two total different types of
12 an interview. You're using basically the same
13 training, you're using the same methods, but it's
14 different because you don't have a controlled room like
15 we're in today and you can't just sit and focus on that
16 person in the front seat of that car and that's why I
17 prefer not to use the front seat approach is because I
18 cannot watch and listen and use these tactics with body
19 language to the level that I prefer.
20     Q. I think something that might help us, let
21 me -- actually, will you look at page 13?
22     A. On this -- The Lie Guy.
23     Q. Yes, The Lie Guy. And are you familiar with
24 Mr. Walters' discussion of contamination?
25     A. I would have to read this. It's been so long

Page 256

1  since I've been to any of his classes.
2      Q. Sure. And I'll just -- look midway down the
3  pages, "What can contaminate a subject's behavior? The
4  list can be endless. External distractions, such as
5  noises, too many people around while watching or
6  listening, cell phones, knocks at the door, other
7  investigators or supervisors interrupting, temperature
8  extremes, most importantly in the interview, aggressive
9  behavior, condescending behavior, accusatory behavior,
10 encroachment on a subject's personal space, not
11 listening, interrupting the subject, yelling, anger,
12 finger pointing and many, many more."
13         Did I read that correctly?
14     A. You did.
15     Q. Is that what you're referring to,
16 distractions, other things that might cause -- or
17 interfere with your ability to detect dishonesty?
18     A. As I put in my report, yes, ma'am, that's what
19 I was referring to.
20     Q. Okay. Let's go to page 14, which is the next
21 page, and I'm going to read the second paragraph. "One
22 of the biggest killers of all effective interviews is
23 what I call the preconception assassin. If you're
24 wandering through the woods looking for signs of Big
25 Foot because you believe there's one hiding in your

Page 257

1  backyard, you are going to find signs of Big Foot."
2          Did I read that correctly?
3      A. You did.
4      Q. Can we refer to, for just like shorthand, this
5  paragraph as "the Big Foot problem," just between you
6  and I, just rather than like go through this again?
7      A. Yeah.
8      Q. Can we call this the Big Foot problem?
9      A. Absolutely.
10     Q. Are you familiar with the concept of the Big
11 Foot problem?
12     A. It occurs in law enforcement as a whole.
13     Q. Okay. Tell me about your understanding of the
14 Big Foot problem.
15     A. Well, I mean, I haven't necessarily heard of
16 this particular -- you know, this is probably something
17 that was, you know, after my time of going to his
18 classes.
19     Q. Sure.
20     A. So I don't recall hearing this in his classes
21 before, plus he has different levels of the classes.
22 So, you know, this may be one of the classes that I did
23 not attend with this curriculum.
24         However, every law enforcement officer
25 and investigator should -- they can create false

Page 258

1  confessions simply by interviewing, right, because they
2  become so focused on what they believe that, you know,
3  if they don't look at everything as a whole, they can
4  actually misread what's going on.  It happens all the
5  time with homicide investigations, right.  That's how
6  innocent people end up in prison.
7        And that's a lot of what you're reading
8  here.  You know, I mean, if your -- if your
9  preconceived thought is this and, by golly, I'm going
10  to prove that through product body language or
11  whatever, then you're losing focus.  The officer is
12  losing focus on everything else to exonerate this
13  person, right.
14        So in law enforcement training you're
15  taught not to do that.  You're taught to look at
16  everything.  In fact, prove this person isn't guilty,
17  you know, don't look at it like he is guilty, and
18  that's the way you should view it.  So I hope that
19  helps me explain that that's what this is.
20  Q.  That does help.
21        Can we skip to page 35?  And this -- the
22  top of this page says, "Chapter No. 4, Verbal
23  Behaviors."
24        Did I read that right?
25  A.  You did.

Page 259

1  Q.  And I'm going to skip down to the section that
2  says, "Voice Quality."
3        Do you see where I am?
4  A.  I do.
5  Q.  I'm going to read that -- this portion.
6  "Changes in voice quality are not a sign of deception.
7  Pitch changes:  Up - most consistent with frustration,
8  anger and excitement; down - most consistent with
9  isolation, depression.  Volume changes:  Louder - most
10  consistent with anger -- excitement, anger.  Softer -
11  most consistent with depression, disinterest."
12        Did I read those correctly?
13  A.  You did.
14  Q.  Do you agree with Mr. Walters that changes in
15  voice quality are not signs of deception?
16  A.  If you will look at the top of this page.
17  Q.  Sure.
18  A.  And I'm assuming this was downloaded off of
19  the Internet?
20  Q.  This is what Mr. Walters provided us.
21  A.  Provided for you?
22  Q.  Yeah.
23  A.  So it's a basic guide, right.  So when you
24  take this one page with voice quality analysis, it
25  could be construed that way.  But if you -- this is

Page 260

1  intended for if it's just this, right, if it's just the
2  change in pitch or the tone and you have nothing else.
3        That's what I said earlier.  There's no
4  one certain thing that means that a person is lying.
5  However, if you have a cluster of things, you have the
6  voice and pitch changes along with the stretching,
7  along with the interview at particular times where this
8  occurs each and every time and they cover their mouth
9  and they nervous laugh and they have speech patterns,
10  they are part of the cluster and they are signs of
11  deception.
12        And, you know, if you were to watch the
13  video of where I had the guy with the guns and I
14  realized that he had the guns --
15  Q.  It's not a video in this case?
16  A.  No, it is not a video in this case.  However,
17  I'm giving that as an example of my --
18  Q.  Sure.  Just clarifying the video for the jury.
19  A.  Oh, okay.  My pitch in my voice, upon
20  realizing what was going on, went very high,
21  skyrocketed, right, because my brain is now saying,
22  "Oh, man, you just made a mistake, you know, you almost
23  got yourself killed."  And so my pitch changed because
24  I was under extreme stress during that time.  And you
25  can see that -- I use that video in my law enforcement

Page 261

1  training, believe it or not, it's the last video that I
2  use, to show change in voice quality and pitches when a
3  person is under stress.
4        So I do not agree with this just one page
5  by itself in the circumstances of the case that I
6  reviewed or -- because it's all about timing and
7  clusters, things of that nature.
8  Q.  Understood, understood.  In the example that
9  you just talked about with the mistake you made in one
10  of your policing encounters, you had a voice change
11  that went really high.
12        Is that my fair understanding of what
13  you're saying?
14  A.  Yes.
15  Q.  And your pitch change wasn't because you were
16  trying to be deceptive?
17  A.  No, not -- not in that circumstance, but it
18  was a stress.  It's about stressing a person, right.
19  It's about interviewing a person, having a baseline on
20  the way they answer on nonthreatening questions,
21  nonstressful questions compared to stress questions,
22  and then you evaluate those changes in voice and pitch
23  changes.
24        Some people will not say anything at all.
25  Their voice will get so low.  I've had -- I've had

Page 262

1  occasions on interdiction stops, when I ask a question
2  about drugs, they won't even answer.  They will shake
3  their head no where every other time they have been
4  saying yes or no.  So that would be a change in pitch
5  because they didn't say anything at all.
6     Q.  Right.
7     A.  So that's what this refers to.
8     Q.  Okay.  Let's go to page 39.  Now, is this --
9  is the title of this page "Chapter 5, Nonverbal
10 Behaviors"?
11    A.  Yes, ma'am.
12    Q.  I'm going to read some of the second
13 paragraph, probably just the first sentence.  "Errors
14 in the analysis of spotting deception are most
15 frequently made when diagnosing body language."
16       Did I read that correctly?
17    A.  Yes, ma'am.
18    Q.  Do you agree with that statement?
19    A.  I do.
20    Q.  I'm going to read the first sentence of the
21 next paragraph.  "The largest portion of those
22 nonverbal cues are associated with changing levels of
23 stress that our subject may be experiencing.  However,
24 we must remember a sign of stress does not always
25 equate with deception."

Page 263

1       Did I read that sentence correctly?
2     A.  You did.
3     Q.  Do you agree with that statement?
4     A.  I do.
5     Q.  Let's go back to your report.  I think we're
6  done with this exhibit.
7     A.  Okay.
8     Q.  And we're returning to Exhibit 111, and let's
9  go to page 7.  In the last full paragraph, do you see
10 it starts, "Deputy Babb asked Schott"?
11    A.  On page 7?
12    Q.  Oh, sorry, wrong one, page 7.  This one.
13       MR. BARRON:  What page?
14       MS. HEBERT:  Hold on.  Let me figure out
15 right where I am.
16    Q.  (BY MS. HEBERT)  Okay.  Do you see page 7, the
17 last full paragraph?
18    A.  Yes, ma'am.
19    Q.  It begins "Deputy Babb began"?
20    A.  Yes, ma'am.
21    Q.  The second sentence, "Schott appeared," do you
22 see that?
23    A.  Yes, ma'am.
24    Q.  I'm going to read the entirety of that
25 sentence.

Page 264

1     A.  Okay.
2     Q.  "Schott appeared to have visible deep and
3  rapid breathing, noticeable by the rise -- deep rise
4  and fall of his chest and opening his mouth with
5  respirations, including tightening his lips on several
6  occasions.  That in itself could be construed as
7  nervous behavior of a person receiving a traffic
8  citation.  However, in this case, Deputy Babb had
9  indicated the infraction would be a warning."
10       Did I read that correctly?
11    A.  You did.
12    Q.  Okay.  Did you see these behaviors and body
13 language on the body-worn camera from Deputy Babb?
14    A.  Yes, that was placed on the magnet mount
15 within the vehicle.
16    Q.  Okay.  So you, independent of Deputy Babb, saw
17 these things that you're describing --
18    A.  Yes, ma'am.
19    Q.  -- on Deputy Babb's body-worn camera footage?
20    A.  Yes, ma'am, very clear.
21    Q.  Okay.  Did you consider whether these body
22 reactions were signs of stress?
23    A.  They were signs of stress, in my opinion.
24    Q.  Okay.  Did you conclude that they were signs
25 of deception?

Page 265

1     A.  No.
2     Q.  I think let's take a five-minute break and
3  then I can tell you whether we're done for the day.
4     A.  Okay.
5     Q.  Does that make sense?
6     A.  Sure, yeah.
7       (Recess from 4:29 p.m. to 4:35 p.m.)
8     Q.  (BY MS. HEBERT)  A couple of final questions.
9       When an officer is going to pull someone
10 over for speeding, how do they evaluate whether someone
11 was speeding?
12    A.  As I mentioned earlier, from my training, my
13 experience and the things that officers should do is,
14 first, you should identify the car, right, in
15 comparison to other traffic, which car is going faster
16 or appears to be passing other cars.  That's the first
17 thing.
18       The second thing is to determine with a
19 measurement device, that being a radar or a lidar,
20 depending.  It could be a radar that -- you know, a
21 radiowave radar or it could be a lidar that's basically
22 a laser that hits the front plate of the car and then,
23 you know, determines the speed.  And that way you're
24 checking whether or not that person that you saw
25 passing traffic faster is indeed actually speeding or

67 (Pages 262 - 265)

Page 266

1  maybe the other traffic is going slower and that person
2  is actually going the speed limit.
3     Q.  Okay.  And would you ever pull someone over
4  for speeding without doing the second step?
5     A.  Yes, you can.
6     Q.  And when would you do that?
7     A.  When -- you can pace which -- pace a car to
8  where you can get the behind the car and then pace it
9  to see what speed that it's going.  You can do that.
10        And then it also depends on the traffic
11  behavior.  I mean, depending on traffic, how fast the
12  car is going, you know, it may not be the speed.  It
13  may be considered reckless driving.  And then if it's
14  considered reckless driving, that's -- that's not even
15  a Class C misdemeanor.
16        If you're into a Class B misdemeanor to
17  where they are committing, you know, numerous
18  violations in a reckless manner, you know, like if
19  they're weaving and they almost caused a crash and they
20  appear to be going fast, you may not have gotten them
21  on radar, but you saw something that was potentially a
22  crash, right.  So you can stop them not necessarily for
23  a radar stop where they have seen the actual speed, but
24  you can stop them for the reckless driving behavior.
25     Q.  Okay.  When you're stopping them for reckless

Page 267

1  behavior, you're not stopping them for just speeding.
2  Is that fair?
3     A.  That's fair.  Most of the time it's a
4  combination.  We always -- you know, three or more
5  traffic violations, right.  That is not the case, I
6  believe, in this circumstance, a reckless driving case.
7     Q.  So I just want to understand the end of that.
8  Reckless driving is three or more traffic violations?
9     A.  Well, not necessarily.  It's -- you know, it's
10  almost like a drunk driver, you know, maybe in a crash,
11  almost a crash, traveling 110 miles an hour, things of
12  that nature, right.  That's why I don't necessarily
13  consider this a reckless driving case by any means.
14     Q.  Understood.  Okay.  I just wasn't
15  understanding exactly what you were saying.
16        So when someone is speeding, you identify
17  how the car is moving compared to traffic and you do
18  kind of one or -- one of two things.  You either use
19  radar or you pace the car.
20        Am I understanding your testimony?
21     A.  That's exactly right, yes, ma'am.
22     Q.  Can you give me an estimate about how far you
23  can see, what's your distance of your sight?
24     A.  Me personally?
25     Q.  Uh-huh.

Page 268

1     A.  You know, I mean, we're, what, one, two blocks
2  away.  There's a silver SUV that's about to make the
3  right turn at the corner.  I can clearly see the color
4  of the vehicle.  It looks like it's a Toyota, maybe,
5  you know.  So, I mean, I can see that distance, at
6  least.  That's two, 2-1/2 blocks away and I can clearly
7  see the color and the make of the car.
8     Q.  Let the record reflect that the witness is
9  looking out the window --
10     A.  I'm sorry.
11     Q.  -- to see what's going on outside the window
12  to evaluate how far he can see.
13        And based on your view out the window,
14  you're saying you can clearly see things two blocks
15  away.  Is that fair?
16     A.  Oh, yeah, easily.  So if I'm in the position
17  of where I'm looking for a specific vehicle, as in this
18  case, an F-350 that's dark in color, I'm going to be
19  able to see that truck even further than -- than from
20  here to two or 2-1/2 blocks.
21     Q.  Okay.  So, I mean, do you think you could see
22  three blocks away, you could see the vehicle?
23     A.  Yes.
24     Q.  Okay.  And three blocks away, do you think you
25  could see whether the driver had a seatbelt on?

Page 269

1     A.  No, I could not.
2     Q.  So is it fair to say that you could identify
3  the vehicle from three blocks away, but you might not
4  be able to see other things that are happening with the
5  vehicle?
6     A.  That's correct.
7        MR. BARRON:  Objection, form.
8        THE WITNESS:  That's correct.
9     Q.  (BY MS. HEBERT)  Did you do anything to
10  evaluate what Deputy Babb could have seen in terms of
11  the operation of the vehicle compared to the lane of
12  travel from where he was sitting, how far he could see
13  there?
14     A.  I don't -- I can't --
15     Q.  I don't think I did a good job of phrasing
16  that question, so let me think of a better way to
17  phrase it.
18        Did you do anything to evaluate at what
19  point when Mr. Schott was approaching Deputy Babb,
20  Deputy Babb could have seen if Alek Schott's tires
21  crossed the lines on marking the lane of travel?
22     A.  I based my evaluation on the video from
23  Mr. Schott's vehicle, right.  There's a curve in the
24  road -- Interstate 35, there's a slight curve.  There
25  was an Amazon 18-wheeler in the right lane and the road

68 (Pages 266 - 269)

Page 270

1 straightens out and then it goes -- it's straight.
2 There was a tree in the east median, there was another
3 vehicle in the right lane ahead of that.
4       During that time, just from the video
5 that I observed, I viewed, I could see Deputy Babb's
6 patrol car in the -- in the right ditch facing the
7 freeway. That's -- again, it goes back to resolution
8 of the camera, the lens of the camera, but that's a
9 very small lens on that camera and I can see Deputy
10 Babb's patrol car. A reasonable person would believe
11 that Deputy Babb, who is looking for the F-250, could
12 see the F-250 from the same distance.
13    Q.  Sure, understood.
14    A.  So that distance is what I used to gauge my
15 opinions on.
16    Q.  Sure. And is there a difference between
17 seeing the vehicle and seeing the vehicle commit a
18 traffic violation?
19    A.  Again, I can't speculate as to what Deputy
20 Babb saw. I can't say how far away he saw the car.
21 It's not clear to me from any testimony exactly where
22 the vehicle was, other than he had stated it was before
23 it reached him and after it passed him.
24    Q.  Understood. But my question is, is there a
25 difference between seeing the vehicle and seeing the

Page 271

1 traffic violation?
2    A.  Again, I can't answer that question in this
3 particular case.
4    Q.  Okay.
5    A.  I can't answer that.
6    Q.  So is it your testimony that if you can see
7 the vehicle, you can see the failure to maintain the
8 lane?
9       MR. BARRON: Objection, form.
10       THE WITNESS: Again, that's a speculation
11 question. I can't say that. There are so many
12 variances in that.
13    Q.  (BY MS. HEBERT) Sure. At we sit here today,
14 is your opinion that Deputy Babb had probable cause to
15 stop Alek Schott?
16       MR. BARRON: Objection, form.
17       THE WITNESS: From -- again, from
18 everything that I reviewed, from the videotape from
19 Mr. Schott's vehicle, from the depositions by Deputy
20 Babb, who stated that he saw the violation of failure
21 to drive in a single marked lane, I can only conclude
22 that he's truthful in his answer and that the violation
23 occurred according to what I saw in the video.
24    Q.  (BY MS. HEBERT) So is the answer -- the
25 answer to that question yes?

Page 272

1       MR. BARRON: Objection, form.
2       THE WITNESS: Again, I can't speculate on
3 what he saw.
4    Q.  (BY MS. HEBERT) Okay.
5    A.  I can only answer in the way that I answered
6 it.
7    Q.  Okay. Is there anything that we reviewed
8 today that caused you to doubt your opinion as put
9 forth in this report?
10       MR. BARRON: Objection, form.
11    Q.  (BY MS. HEBERT) So anything that we reviewed
12 today that caused you to doubt your conclusions in this
13 case?
14    A.  No, absolutely not.
15    Q.  Okay. Do you intend to amend your report?
16    A.  At this time, I do not.
17    Q.  We have no further questions today, but we're
18 going to hold the deposition open should you amend your
19 report --
20    A.  Of course.
21    Q.  -- or something of that nature.
22       MS. HEBERT: But, otherwise, we pass the
23 witness.
24       MR. BARRON: Okay. So subject to -- so
25 subject to him amending his report, you pass this

Page 273

1 witness?
2       MS. HEBERT: Sure.
3       MR. BARRON: Understood.
4       Hector, are you going to do this to me?
5 Do you have questions?
6       MR. SAENZ: No, sir. We will reserve our
7 questions until the time of trial.
8       MR. BARRON: I appreciate that. And I
9 reserve my questions for the time of trial as well.
10 Thank you.
11       (Proceedings concluded at 4:46 p.m.)

Page 274

```
1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION
3    ALEK SCHOTT,              )
         Plaintiff,            )
4                              )
     v.                        ) Civil Action No.
5                              ) 5:23-cv-00706-OLG-RBF
     JOEL BABB, in his individual )
6    and official capacity; )
     MARTIN A. MOLINA III, in his )
7    individual and official    )
     capacity; JAVIER SALAZAR,   )
8    in his individual and       )
     official capacity; and BEXAR )
9    COUNTY, TEXAS,            )
         Defendants.            )
10
11
          REPORTER'S CERTIFICATION OF THE ORAL
12           DEPOSITION OF GARY HASTON
               JANUARY 10, 2025
13
14        I, Donna Wright, a Certified Shorthand
15    Reporter and Notary Public in and for the State of
16    Texas, hereby certify to the following:
17        That the witness, GARY HASTON, was duly
18    sworn by the officer and that the transcript of the
19    oral deposition is a true record of the testimony given
20    by the witness;
21        That the original deposition was delivered to
22    Ms. Stephen Barron;
23        That a copy of this certificate was served on
24    all parties and/or the witness shown herein on
25    _____;
```

Page 276

```
1    Stephen Barron, Esq.
2    sbarron@w-g.com
3                     January 14, 2025
4    RE:   Schott, Alek v. Babb, Joel, et al.
5    1/10/2025, Gary Haston (#7035888)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-midatlantic@veritext.com.
16    Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 275

```
1        I further certify that pursuant to FRCP Rule
2    30(3) that the signature of the deponent:
3        __X__ was requested by the deponent or a party
4    before the completion of the deposition and that the
5    signature is to be before any notary public and
6    returned within 30 days from date of receipt of the
7    transcript.  If returned, the attached Changes and
8    Signature page contains any changes and the reasons
9    therefore:
10       ____ was not requested by the deponent or a
11   party before the completion of the deposition.
12       I further certify that I am neither counsel
13   for, related to, nor employed by any of the parties or
14   attorneys in the action in which this proceeding was
15   taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
17       Certified to by me on this, the 14th day of
18   January, 2025.
19
20
21
22   DONNA WRIGHT, Texas CSR 1971
     Expiration Date:  11/30/26
23   VERITEXT LEGAL SOLUTIONS
     300 Throckmorton Street
24   Ft. Worth, Texas 76102
     Firm Registration No. 571
25
```

Page 277

```
1    Schott, Alek v. Babb, Joel, et al.
2    Gary Haston (#7035888)
3        E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Gary Haston               Date
25
```

70 (Pages 274 - 277)

Page 278

1  Schott, Alek v. Babb, Joel, et al.
2  Gary Haston (#7035888)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Gary Haston, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Gary Haston            Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

[& - 2023]                                                                    Page 1

**&**

**&**   1:22 2:14
166:22

**0**

**00706**   1:5
274:5
**04/18/2024**
159:22

**1**

**1**   23:1 153:11
153:11 155:12
164:4 222:4
242:6 243:19
245:19,22
**1,500**   126:12
**1.1**   22:2
**1/10/2025**
276:5
**10**   1:14,19 59:4
127:5 178:8
242:13 274:12
**100**   25:19
188:18
**101**   253:15
**10:10**   57:17
**10:24**   57:17
**11**   3:11 144:10
155:13,17
157:11 190:17
**11/30/26**
275:22

**110**   3:10 9:12
9:13,14 11:12
13:24 267:11
**111**   2:20 3:11
11:14,16 96:2
96:3 153:10
263:8
**112**   3:12 13:22
13:23 14:3
**113**   3:13
210:15,16
**114**   3:14 251:5
251:6,8
**11:00**   92:9
**11:12:26**
221:15
**11:12:49**
222:11
**11:12:56**
222:22
**11:12:59**
222:22
**11:13**   223:24
**11:13:13**   223:7
**12**   170:2
197:10 198:23
198:24 201:14
**12,000**   20:9
**12:15**   142:13
**12:29**   153:1
**13**   59:19
122:20 159:15
206:12 255:21

**14**   3:12 162:22
164:14 256:20
276:3
**14c**   164:8
**14d**   174:3,5
**14g**   158:4
**14th**   275:17
**15**   59:19
122:20 207:13
215:25
**150**   32:25
34:23 92:20,24
93:1,5,10
**16**   221:11
225:12 228:14
229:7
**160**   3:19
**16th**   96:5,9
97:7 100:18,24
207:22 243:4
**17**   10:19
216:14,17
223:17
**18**   122:17
124:7 182:21
199:24 219:15
269:25
**19**   242:3,4
245:22
**19082**   275:21
**1971**   275:22
**1990**   42:3
**1990s**   42:4

**1994**   40:6
**1995**   26:16
**1997**   22:24
43:18 204:12
**1998**   215:13
**1:37**   153:2
**1:50**   162:10
**1:56**   162:10

**2**

**2**   3:2 23:1
164:4 223:3
228:12
**2-1/2**   268:6,20
**2/27/24**   164:4
**20**   63:13 95:16
246:9 278:15
**20,000**   70:11
**200**   2:15
**200-9697**   2:16
**2000**   126:15
**2000s**   42:10
**2015**   149:18
**2016**   24:16
**2017**   215:5,9,11
215:14,15,23
**2019**   239:7
**2020**   19:4,5
22:19 191:3
**2022**   96:4,5,9
97:2,7 100:17
100:24 207:22
**2023**   158:6
177:20

[2024 - 8/1/24]                                    Page 2

**2024** 14:19,20
252:4
**2025** 1:14,19
19:6 274:12
275:18 276:3
**210** 2:22 3:13
**22203** 2:10
**22nd** 96:4,13
97:2 100:17
174:20 242:24
243:4
**23** 22:23 155:9
**24** 14:21,22
17:10,25 94:8
**25** 14:20,21
131:3,14
**250** 108:1,1
122:6 124:10
128:4,14 143:2
143:9 144:5
178:15 207:19
234:19,21
239:7 242:11
242:17,20
243:2,6,22
270:11,12
**250s** 122:13
**251** 3:14
**271-7877** 2:22
**274** 3:6
**28** 95:25 96:2
106:20 121:23
121:24 142:22

**29** 149:11,11
**2:15** 116:12

**3**

**3** 23:1 52:14
223:5 275:2
**3,700** 92:15
93:9
**30** 56:11 68:23
92:2,5,12
144:10,11
148:19 158:22
275:2,6 276:16
**300** 275:23
**324** 199:25
200:6,13,17
**348** 149:18
**35** 26:18,20,22
85:4 97:4
108:4 109:21
110:16 111:8
120:3 126:10
126:20 127:6
130:25 141:9
141:17 142:3
147:13 221:24
227:4 239:8
241:5,22 243:3
243:6 253:8
258:21 269:24
**350** 268:18
**39** 262:8
**3:52** 246:5

**4**

**4** 3:5 243:21
251:25 258:22
**4/12/2022**
175:1 177:23
**40** 95:6,19
**4135** 239:8
**43** 23:10
**45** 212:2,2
253:22
**4700** 1:22 2:15
**480-5936** 2:6
**49** 3:19 160:20
161:24 162:13
**4:03** 246:5
**4:29** 265:7
**4:35** 265:7
**4:46** 1:19
273:11

**5**

**5** 21:14,18,22
154:17,19,22
154:25 157:7
159:11 160:13
162:22 165:10
174:5 187:10
242:25 243:1
262:9
**5,000** 48:11
**50** 18:7,8 174:7
**512** 2:6,16
**53** 199:20
200:5,12,17

**571** 275:24
**575** 149:18
**5:23** 1:5 274:5

**6**

**6** 154:22,25
165:10 169:9
237:8,9 239:1
239:1 243:8,19
245:19,22
**682-9320** 2:11
**6:00** 93:21
**6th** 158:5

**7**

**7** 32:14 33:2
252:5 263:9,11
263:12,16
**703** 2:11
**7035888** 276:5
277:2 278:2
**72** 222:16
**75** 102:1
221:24
**76102** 275:24
**78205** 2:21
**78701** 2:5
**78723** 2:16
**7th** 177:20

**8**

**8** 149:1,10
182:15
**8/1/24** 164:4

[816 - advantage]                                                    Page 3

**816** 2:4
**84** 216:11
221:23 236:7
**840** 2:21

**9**

**9** 3:10 182:2
184:16
**900** 2:10
**901** 2:10
**90s** 25:10 27:7
27:9,10,11,11
**970** 2:5
**9:07** 1:19

**a**

**a.m.** 1:19 57:17
57:17
**abcdefghijkl...**
35:6
**abiding** 97:13
**ability** 234:20
234:21 256:17
**able** 8:5 33:15
33:17 44:9
52:15 53:15
55:18 72:12
75:14,23 80:5
81:1,1 87:12
143:11,11,16
144:5 196:25
213:19 234:12
234:12,21
235:3,7 236:12
247:24,25

248:2 253:3
268:19 269:4
**abnormal**
56:24
**above** 1:18
86:13 276:6
278:7
**abruptly** 208:8
223:25
**absolutely** 28:7
38:12 70:16
113:11 128:3
154:9,12 221:9
257:9 272:14
**abuse** 70:9
**academy** 54:22
61:2,25 62:2
**accepted**
190:22
**access** 157:12
**accident** 38:22
214:4
**accordance**
188:1
**account** 201:3
**accredited**
199:25 200:13
**accuracy** 214:7
276:9
**accurate** 65:13
212:14,19
214:6 215:6
**accusatory**
256:9

**acknowledge...**
278:3
**acknowledg...**
276:12
**act** 113:18
**acted** 115:10
187:25
**acting** 51:20
**action** 1:4
131:12 274:4
275:14,16
**actions** 42:21
99:12 172:11
190:20 196:10
**activities** 61:8,9
88:23 141:13
**activity** 29:23
51:10 118:22
119:1,2,3
**actual** 26:7
169:21 204:3
220:1 266:23
**actually** 13:6
17:7,10 19:12
19:16,22 23:5
26:1 31:13
33:10,13,15
34:23 35:7
36:1 40:25
42:17 53:6
63:8 72:9 87:4
94:15 95:13
98:13 113:18
117:18 126:4

145:13 148:8
181:14 186:10
198:14 214:24
224:9 231:19
244:14 246:7
255:21 258:4
265:25 266:2
**adamant** 78:3
**add** 116:25
129:21 131:19
**addiction** 63:1
**addition** 28:14
54:1 61:1
114:15 128:17
184:14
**additional**
12:23 13:1,4,5
166:25 167:25
207:25
**additions** 98:19
278:6
**address** 56:6
140:18
**adds** 148:10
**administration**
23:24 24:10,16
112:21 127:13
237:7,9
**administrator**
190:3
**admission**
129:5
**advantage**
63:17

[affair - answered]                                                    Page 4

**affair** 187:4
**affairs** 187:1,3
**affect** 113:25
**afoot** 119:2
**age** 22:4 64:1
**agencies** 21:5
  22:10 98:13
**agency** 16:11
  16:14 60:25
  79:4 117:5
  119:12,13
  204:10
**agent** 46:19
**aggressive**
  256:8
**ago** 4:9,19,22
  17:10 39:24
  68:18 215:10
  215:14 250:17
**agree** 6:6,20
  65:12 210:22
  214:20 215:13
  252:15 254:2
  259:14 261:4
  262:18 263:3
**agreed** 18:15
**ah** 37:21,21,21
**ahead** 48:3
  119:7 141:3
  160:21 194:6
  221:19,19
  270:3
**aided** 68:5

**air** 25:13
  215:21
**airing** 177:20
**airplane** 51:4
  51:14
**airplanes** 116:2
**airport** 20:24
  115:23,24
  116:4,7,14,17
  118:12
**al** 276:4 277:1
  278:1
**albert** 91:8
**alcohol** 8:16
  26:1,8
**alek** 1:3 4:8
  128:4 163:6
  166:9 209:25
  216:6 217:22
  219:4,5 220:4
  224:6,22 230:4
  232:19 233:21
  234:2 236:24
  241:18 245:23
  254:14 269:20
  271:15 274:3
  276:4 277:1
  278:1
**alek's** 178:1
  207:22 208:13
  209:4 211:11
  225:18 226:19
  226:24 227:6

**alert** 181:6
  184:22
**alerted** 181:7,8
**allotted** 276:19
**allow** 169:18
**allowed** 16:5
  61:8 204:22
**allows** 97:15
**alongside**
  230:25
**alphabet** 35:6
  35:10
**alternating**
  137:6
**amazon** 219:14
  219:17,17
  220:13 221:18
  221:23 228:6
  269:25
**ambiguity**
  216:16
**ambulances**
  21:2
**amend** 12:9,12
  272:15,18
**amending**
  272:25
**america** 24:6
**amount** 72:5,8
  72:9,13 126:12
  127:11 179:2
  180:17,20
  200:10

**amounts** 26:14
  26:15
**amtrak** 24:4
**analysis** 171:11
  175:24 177:16
  240:2,4 252:10
  259:24 262:14
**anger** 256:11
  259:8,10,10
**angle** 219:24
  229:6
**angles** 214:19
**answer** 6:8,21
  7:1,3 28:23
  62:4 76:8
  80:17 85:1
  87:12 88:10
  104:9 111:1,5
  112:14 125:9
  125:10 132:4
  135:14 138:24
  165:24 169:5
  173:9 175:14
  176:5 178:3
  185:6 195:10
  212:5 221:8
  231:6,8 248:3
  249:22 261:20
  262:2 271:2,5
  271:22,24,25
  272:5
**answered**
  140:11 218:16
  272:5

answering  6:12
6:14 7:13
134:13 135:1
answers  5:23
56:19 134:24
143:20 231:9
antonio  1:2
2:21 45:20
89:2,3,5,21
118:5 120:9,15
120:19 126:20
274:2
anybody  58:5
58:12 68:3
89:12,15 90:18
117:18 153:6
164:18
anymore  65:6
134:5
apart  100:1
101:5
apartment
40:22
apologize
100:21 119:25
143:19 185:20
235:25
app  113:7
243:2
apparently
200:22
appear  266:20
appearance
71:1 73:17

appearances
3:2
appeared  192:8
194:3 224:17
263:21 264:2
appears  67:23
72:22 155:12
236:14 265:16
appended
278:7
applicable
33:25 144:20
148:18 156:23
276:8
applied  190:22
apply  77:23
145:1 146:14
appointed  25:2
appreciate
159:13 188:20
273:8
approach
255:17
approached
219:22 220:9
222:11 230:12
231:3
approaching
217:2 219:5,6
220:13 231:10
269:19
appropriate
108:17

approval
205:12 207:7
approve  205:9
approved
201:24 207:9
approximately
62:16
apps  106:24
area  23:20,22
27:24,25 49:6
91:1 117:25
118:1 137:18
137:21,24
138:4,16,19
139:19 203:15
203:20 204:5,6
204:11,15
205:9 217:17
areas  48:16
139:13
argue  7:3
argument  63:5
arlington  2:10
armed  253:18
arms  127:1
array  62:5
arrest  51:24
74:6 77:9
249:10
arrested  17:16
17:19 66:17
179:6
arrival  182:21

arrive  241:23
arrived  241:5
241:23
arriving  182:4
art  21:24,24
artery  135:7
article  211:3
articulable
151:3
articulated
148:14
artificial  94:12
aside  168:3
asked  7:16 13:6
13:9 15:1,3
16:1 21:12
68:17 90:24
91:21 96:14
101:9,11 131:3
134:21 166:13
166:14,24
167:6 168:21
172:9 173:9
184:11,23
186:15,16
189:17 193:25
229:23 263:10
asking  6:13
64:17 75:20
78:1 132:24
145:16 166:6
170:19 175:16
176:15,16
177:9 181:6

183:17 197:5
238:12 242:7
**asks** 147:20,20
191:1
**aspect** 22:12
209:5
**aspersions**
173:16
**assassin** 256:23
**assess** 130:14
**assessing** 132:9
132:17
**assets** 19:17
**assigned** 23:20
27:23
**assistant** 31:2
**assisted** 246:22
**associate**
111:12
**associated** 34:3
191:16 206:16
262:22
**association**
89:19,20 91:3
**assume** 6:9
72:3 91:17
101:6 119:12
121:20 125:20
**assumed** 40:24
244:12
**assuming** 47:17
208:16 259:18
**assumptions**
165:6

**attached** 1:24
275:7 276:11
**attempted**
145:19
**attempting**
231:14
**attend** 257:23
**attended**
250:12 251:20
**attention** 32:24
42:25 43:2,11
45:3,4,8 59:11
80:16 83:21
231:9 253:14
254:5
**attorney** 13:10
15:19 17:19
54:21 55:1
145:4,11 157:1
157:3,4 198:6
198:13 276:13
**attorney's**
15:20
**attorneys** 6:24
8:9 55:4 165:6
166:21,24
207:24 212:9
275:14
**auction** 19:13
19:14,15,24
20:2,13 22:3
22:16
**auctioneer**
19:21

**audience** 37:17
**audio** 223:25
**austin** 1:22 2:5
2:16 19:18,19
20:18,19 21:9
85:5 111:23
116:4,12
117:11 118:5
118:13 131:3,6
131:14,15
**authority**
197:22
**automatically**
37:22 133:6
**available** 276:6
**avenue** 2:4
**average** 58:3,5
108:18 111:6
125:23
**avoid** 5:25
**avoidance**
216:16
**avoided** 169:1
**avoiding**
133:22
**aware** 9:1
12:15 169:23
**awesome** 59:17

**b**

**b** 46:10 48:19
163:12 164:1
266:16

**babb** 1:5 2:13
4:23 36:9,17
67:23 89:8
96:12 97:1
99:1,10,16
100:1,3,17,23
101:6 102:23
103:1,3,7,25
104:12,20
105:15 123:24
126:1 128:6
129:2,3,4
130:10 137:14
143:2,9 144:4
144:12 150:25
151:2,5,9,11,14
151:22,25
152:11,16,20
152:21 154:8
163:12 166:9
167:25 168:2,8
168:11,14,21
172:11,17
173:3,11,24
174:12 178:13
182:9 183:7,18
184:6,23 185:3
185:7,18,23
186:6,22,24
187:25 188:2
188:11 189:1,4
189:21,24
192:7 193:10
194:15,18,22

194:24 195:4,6
195:14,25
199:7,24
201:18,23
202:8 206:18
206:23 216:25
217:3,3,10
218:15 219:5,7
219:25 220:7
220:14,14
222:16 224:10
224:25 225:1,6
228:14 230:12
230:19,21
231:1,2,10,12
231:14 232:8
232:18,22
233:18,21
234:2,19,21
235:16 239:5
240:7,12
241:17 242:9
242:16,20
243:1,5,12,21
244:3 245:6,15
245:21 253:16
253:16 254:14
254:16,17,20
255:1 263:10
263:19 264:8
264:13,16
269:10,19,20
270:11,20
271:14,20

274:5 276:4
277:1 278:1
**babb's**   12:23
99:12 105:12
124:4,5 129:7
146:17 151:23
152:15,19
163:16,20
185:14 188:22
199:4,14
207:24 216:5
217:22,25
218:11 219:3
219:23,23
230:6 231:4
233:22 234:11
236:22 244:9
254:24 264:19
270:5,10
**back**   17:20
24:9,11,17
31:8 44:15
49:14 58:18
59:10,13 60:14
66:4 76:6 79:2
84:1 87:1,2
91:14 106:17
108:16 110:23
112:10 119:17
120:5,19
121:22 123:22
128:13 129:21
135:20,23,25
136:2,3 137:10

138:20,21
140:25 141:4
145:23 146:4
150:2 151:10
151:24 153:3,9
159:11 162:12
162:21 168:24
174:5 176:23
179:25 181:4
184:24 185:4
186:5 192:24
195:2 201:13
203:8 212:2
215:24 219:20
241:4 249:4,7
263:5 270:7
**backup**   78:11
**backyard**
257:1
**bad**   6:18 22:21
67:10 88:2
129:3 130:7
224:25 254:3
**badge**   24:19
**bag**   64:1
116:19
**baggage**   116:20
118:11
**balance**   56:8,23
57:6
**ball**   51:25
52:17
**bankruptcies**
21:5

**bankruptcy**
21:7
**bar**   75:16
**barron**   2:14
4:22 9:13 10:4
10:7 21:17
57:13 58:8
88:14 90:7,20
99:14 100:9,13
103:5 109:4,4
109:16,17
110:15 111:6
111:10,12
112:1 127:7
142:13,20
149:5,8 152:25
164:22 178:22
194:20 195:1
195:15 196:11
198:3 211:13
215:7 246:2
251:11 263:13
269:7 271:9,16
272:1,10,24
273:3,8 274:22
276:1
**barron's**   111:8
**bars**   48:8
**based**   49:20
62:12 75:20
100:25 101:1
103:19 111:8
114:11 117:10
153:13 169:7

173:8,22
175:17 176:7
185:2 189:10
190:23 196:8
197:25 201:23
208:4 211:10
218:22,24
224:20 228:1
229:2,15 230:5
233:22 235:11
239:16,17
245:16 268:13
269:22
**baseline** 134:22
134:24 135:16
135:21 136:1,9
249:22 261:19
**basic** 54:22
259:23
**basically** 25:4
33:12 44:6
56:16 57:25
59:16 63:2
79:25 169:13
187:9 243:8
255:12 265:21
**basics** 67:1
**basil** 76:4
**basis** 53:10
**bastrop** 28:9
**bear** 36:7
**beat** 40:24
**bed** 124:13,13
128:22 147:14

**beer** 40:17
**began** 204:5
236:18 263:19
**beginner** 60:16
60:18 62:10,10
**beginning** 19:6
120:24 226:4
226:10
**begins** 226:5
263:19
**begs** 66:14
**behalf** 15:21,24
15:24
**behaving** 75:14
**behavior**
132:19 256:3,9
256:9,9 264:7
266:11,24
267:1
**behaviors**
136:20 194:12
252:11 258:23
262:10 264:12
**belief** 113:5
**believe** 9:17
14:17 17:8,12
19:4 34:8 38:3
53:5 59:6
71:24 72:24
75:5 78:1,5
81:6 87:25
91:4 93:12
96:25 98:9
102:22,25

103:1,3,11
104:22 105:25
106:10 109:12
113:1 115:18
124:8,17
125:12 128:9
128:14 129:17
145:13,14
146:12 147:1
147:19 148:19
151:1 152:19
157:16,18
158:2,9 160:2
166:13 174:17
174:20 184:10
184:12 185:14
186:9 187:21
188:18 197:21
199:19 211:11
211:25 212:20
213:23 217:1
225:5,7 227:21
227:22,23
228:8,10,16,16
235:3 244:17
245:10 256:25
258:2 261:1
267:6 270:10
**believed** 100:2
104:11 143:2,9
144:4 146:19
146:20,25
147:15 148:15
148:23 151:14

151:22 152:17
152:21 168:12
179:9
**believes** 119:21
**benefit** 77:22
157:5
**bergstrom**
116:4
**best** 6:17 8:6
64:22 172:20
**better** 24:22
47:3 73:10
131:23 155:17
175:14 202:13
240:2 269:16
**bexar** 1:8 2:19
5:3 13:7 88:17
88:20,23 89:5
89:11 99:3,7,9
99:11 100:4
104:3 154:10
166:11,19
167:20 187:24
189:19 190:2,3
241:24 274:8
**beyond** 210:24
**bicycle** 63:4
**big** 29:19 52:10
58:18 86:2,3,9
109:13 123:1
129:23 138:8,9
138:14,25
141:7 148:9
247:16,17,23

248:23 256:24
257:1,5,8,10,14
**bigger** 122:16
123:4,16 142:4
**biggest** 142:10
256:22
**bio** 251:16
**birth** 62:8
**bit** 36:2 44:19
50:18,22 58:11
58:15 65:10
78:19 79:7
83:18 91:24
136:6 173:7
185:10 202:16
224:20 237:1
**blackvue** 3:14
210:1,2,4,7,8
210:10 211:2,7
212:13
**blair** 90:6,8
**blanche** 50:17
**block** 252:6
**blocked** 218:1
**blocks** 66:19
268:1,6,14,20
268:22,24
269:3
**blood** 135:6,9
**bloodshot**
74:23
**blue** 85:22
**board** 35:1,1

**boat** 51:14
**boats** 50:2
**bodies** 135:19
**body** 44:14,15
44:17 56:13
66:11 79:24
80:24 106:13
124:2,4,5
132:24 133:1,2
133:5,7 134:4
134:18 135:5
151:24 152:15
163:12,16,17
163:20 165:25
166:2,8 169:3
185:23 186:6,7
189:13 191:21
194:11 240:11
240:12,12
244:10,20
246:18,20
247:6,8,23
248:1,7 249:14
250:19 252:22
253:2 254:13
254:16,23
255:2,10,18
258:10 262:15
264:12,13,19
264:21
**bong** 72:10
**bootlegging**
26:3,5

**border** 48:17
60:8 89:3
127:14 138:13
**bored** 65:5
**bottles** 141:4,5
141:6
**bottom** 92:7
184:17 206:13
207:14 236:6
252:3
**boulevard** 2:15
**box** 92:23
**boxes** 70:13
**brain** 36:5
99:24 260:21
**brake** 59:10
**brand** 45:13,22
**break** 7:8,14
8:2 57:14
60:11 73:6
88:19 100:10
142:19 152:24
153:7 162:9,11
246:2,7 265:2
**breathing** 58:5
58:6 133:21
135:10 264:3
**bricks** 71:4
**briefly** 170:2
**bring** 33:11
77:9
**broad** 104:4
247:15

**broken** 11:1
217:4 219:6
223:10,10
226:12,22,22
226:24 230:5
232:4
**brought** 8:20
9:9,23 140:19
168:25
**brow** 86:13
**buckets** 153:24
**build** 24:12
131:20
**building** 66:19
**built** 211:7
**bulk** 138:14
**bumped** 33:6
**bumps** 32:18
**bunch** 22:25
**burn** 74:22
**burnt** 74:21
**buses** 24:4,4
51:4
**business** 21:6
22:12,17 52:5
52:6 56:10
76:20 86:14
130:21 234:15
253:7 254:3,7
**businesses**
141:13
**busy** 29:24
126:16

[button - car]                                        Page 10

| | | | |
|---|---|---|---|
| **button**  102:3 | **called**  28:15 | 214:3,15,17,17 | **cans**  40:18 |
| 213:15 | 35:25 72:16 | 214:19,19,21 | **capable**  143:3 |
| **buyer**  51:21 | 90:24 114:11 | 215:1,3,5,6 | **capacities** |
| **buys**  52:13 | 116:5 178:7 | 219:24 220:1,6 | 65:11 |
| **bwc**  163:12 | 239:6 | 224:4 225:19 | **capacity**  1:6,7 |
| 164:8 | **calling**  91:19 | 226:20,25 | 1:8 38:7 45:25 |
| **c** | 113:21 | 228:2,24 229:2 | 88:18 182:10 |
| **c**  2:1 86:1 134:3 | **calls**  244:11 | 230:6 233:22 | 183:9 248:13 |
| 266:15 | **calm**  85:25 | 235:12 236:21 | 274:6,7,8 |
| **cable**  143:3,10 | 86:8,8,8,11 | 254:13,16 | **capital**  23:20 |
| 143:16 | 134:1,8 | 264:13,19 | 23:22 27:24,25 |
| **cad**  68:4,9 | **calms**  70:5 | 270:8,8,9 | **capture**  43:14 |
| **calculated** | **cam**  124:2,4,5 | **cameras**  24:21 | 241:14 |
| 200:13 | 151:24 163:5,6 | 34:14 39:1 | **captured**  5:25 |
| **calculation** | 163:10 185:23 | 40:6 42:18 | 40:16 |
| 214:14 215:5 | 186:6,7 208:13 | 44:9,15,17 | **car**  20:5,6 |
| **calculator** | 217:9 244:10 | 65:16,19,21 | 23:15 24:19,21 |
| 92:22,23 | 244:20 | 101:10 106:13 | 26:25 32:23 |
| **caldwell**  28:10 | **camera**  3:14 | 196:8 209:7,8 | 33:7 40:9,17 |
| **california** | 40:8,10,12,15 | 209:9,12,15,18 | 40:21,23 43:4 |
| 50:14 63:25 | 42:21 43:4,12 | 209:22 210:5 | 43:5,9 44:25 |
| 157:16,17 | 44:14 66:11,11 | 210:10 211:7 | 45:13,21 48:8 |
| **call**  68:5 72:18 | 101:7 102:2,2 | 212:16,16,18 | 48:11,18,20,22 |
| 73:18 77:3,10 | 102:4,8,14 | 213:2,4,6,10,14 | 48:23 49:1,7 |
| 116:2,6,7 | 105:7,8,10,12 | 213:15,15,17 | 49:13 57:2 |
| 117:4 118:15 | 152:15 163:12 | 213:17,18,18 | 59:3,3 68:8 |
| 134:22 144:19 | 163:16,17,20 | 213:25 240:11 | 69:15,25 72:20 |
| 149:21 171:18 | 165:25 166:2,8 | 240:12,12 | 72:23 73:3,5 |
| 173:3 205:2 | 169:3 189:13 | **cams**  44:3 | 74:13 75:8 |
| 222:2,15 231:3 | 189:14 207:22 | **canada**  60:4,6 | 76:20 80:2,5 |
| 231:5 244:12 | 208:25 209:4 | **candidate** | 80:23 81:14 |
| 244:19 256:23 | 210:1,7 211:2 | 36:24 199:8 | 82:9 83:5,8,17 |
| 257:8 | 211:12 212:13 | **candidates** | 83:25 84:2,2,3 |
| | 212:20 213:11 | 37:17 | 84:6,8,8,9,11 |

84:13,14,16
85:2,2,4,6,11
85:15 101:25
102:2,5,6,9,10
105:18 106:3
112:17 113:21
114:21,22,24
119:21 120:14
120:16,17,21
123:6 124:6
133:15 135:19
140:9,10
145:16,23
146:1,6,12
148:13 163:18
174:8 177:22
183:13 221:18
221:19 232:15
233:8,23 244:2
244:3 248:22
248:22 253:5,9
255:16 265:14
265:15,22
266:7,8,12
267:17,19
268:7 270:6,10
270:20
**card**   209:20
**cards**   22:3,5
**career**   64:6
145:18 151:13
213:13 229:17
252:24

**careful**   204:14
**carotid**   135:7
**carpet**   180:7
**carrizo**   108:3,5
108:11 117:25
118:4 129:19
168:24 184:8
239:8 240:25
241:1 243:2
244:5,18
**carrying**
116:16 117:12
**cars**   20:4,8,10
21:2,9 25:19
26:23 28:16
44:9 45:14
46:10 49:6,8
49:12,22 50:2
50:4 55:14,23
56:5,10,11
57:7,11 83:21
83:21 101:16
104:23 120:10
120:16 122:13
123:6,13
125:18 126:7
126:19 127:16
218:1,3,5,6,9
236:11 265:16
**carte**   50:17
**cartel**   59:24
140:21
**cartels**   27:2
48:4 58:23

120:12 125:16
142:5
**case**   5:4 11:24
12:2,5 14:13
14:25,25 15:4
15:5,22,23,25
16:3,7,8,10,16
16:25 17:9,13
17:13,15,21,24
18:9,11,13
21:21 34:4
39:12 54:24
59:19 66:13,21
66:22 67:17
68:3,10,12
78:8 88:13,16
88:25 89:8,13
90:5,14,21,23
90:25 91:5,18
92:16,25 93:19
93:24 95:10
96:6 97:25
98:8 99:20
101:23 102:12
102:14,16
104:15,18
106:9 107:17
108:17 112:6
115:11,23,24
117:23 118:8,9
121:2,16
123:23 128:23
141:2,2,3
142:25 143:7

144:20,25
145:1,4,6,9,9
145:12,14
146:12,15
148:18,22
149:12,17
150:8 153:6,15
153:21 154:1
155:2,13,18,21
155:22 156:4
156:10,16,25
157:16,18,21
158:10,14,17
158:18,19,20
159:7,8 160:16
161:1,3,4,4,5,6
161:7,9,11,11
164:18,19,22
165:2,7,14
166:25 169:13
169:20 171:24
172:9 173:9
176:25 181:6
187:15,16,17
187:20,22
189:8,13,16
191:25 195:12
197:13,17,19
197:22 198:1,1
198:8,10,12,14
198:17,18
199:14 203:3,9
203:9,11,12,15
203:23 211:18

212:4 214:22
229:18 234:19
235:8,21 236:2
236:3,15
245:25 247:2
260:15,16
261:5 264:8
267:5,6,13
268:18 271:3
272:13
**cases** 15:10,10
16:17 23:7,13
29:19 73:23
93:21,22
101:15 113:13
129:14 139:1
145:7,20
155:24,24
156:2,5,6,7,8
156:14,15,20
157:6,8 184:2
184:3 192:11
**cash** 116:10
117:10
**cast** 173:16
**cat** 87:25
**catch** 88:1
101:16,21
102:1 161:3
230:23 231:14
232:19
**catching** 102:5
220:10

**categories**
164:14
**category**
254:25
**caught** 81:22
88:1 231:15
**cause** 1:18
12:11 30:8
106:3 114:13
114:22 120:18
134:16 147:16
216:1 256:16
271:14
**caused** 231:11
266:19 272:8
272:12
**causes** 133:19
**cell** 52:16 256:6
**cells** 140:24,25
**center** 238:8,10
238:10,13,14
238:18
**centers** 238:15
**ceo** 52:6,7
**certain** 45:10
49:6 73:17
88:24 108:4
120:12 132:25
134:15,25
152:10 234:17
238:19 249:15
249:16 260:4
**certainly**
214:25

**certificate** 3:6
200:9,10
201:12 206:1
274:23
**certificates**
186:24,25
199:18,20
200:5,12,17,18
200:20,21
201:2,19,24
207:3,4
**certification**
32:4 41:21
42:2 274:11
**certifications**
31:18,19,22
38:22 39:18
**certified** 33:23
60:19 236:11
274:14 275:17
**certify** 274:16
275:1,12
**challenged**
253:3,6
**chance** 162:12
**change** 136:4
168:9 222:19
260:2 261:2,10
261:15 262:4
277:4,7,10,13
277:16,19
**changed** 98:20
156:11 215:17
260:23

**changes** 249:22
259:6,7,9,14
260:6 261:22
261:23 275:7,8
276:10 278:6
**changing** 14:21
262:22
**chapter** 258:22
262:9
**charge** 49:16
180:11
**chargeable**
180:17,21
**charged** 179:14
180:14
**charges** 68:1
**charging** 92:15
92:25 93:1,2,3
93:4
**charles** 2:20
**chart** 190:15
**chat** 113:12
115:2,3
**chebert** 2:6
**check** 94:20
**checking**
265:24
**checkpoints**
20:25 127:15
**chest** 264:4
**chicago** 85:5
**chief** 89:22
**child** 192:10

children   64:6
christen   2:3 4:7
ci   237:12,14
cid   24:9 34:6
   34:21
circuit   21:19
   160:25
circumstance
   87:2 180:9
   261:17 267:6
circumstances
   75:8 76:7
   125:22 130:8
   150:24 151:2,9
   151:22 152:7
   168:18 172:11
   172:14 181:5
   188:7 190:16
   190:25 192:23
   193:5,10
   244:24 261:5
citation   264:8
cite   160:23
cities   142:4
city   19:18,18
   20:17,19
   111:23 122:8
   141:20,23,25
   142:7 239:9
civil   1:4,23
   15:5,25 16:8
   18:13 41:1
   188:16,21
   274:4

claim   116:20
claimed   112:2
   132:9,10
clarification
   104:8
clarified   97:7
   146:9
clarify   16:6
   65:18
clarifying
   260:18
clarity   150:22
   182:24
class   86:1
   116:6 134:3
   204:23,24
   205:1,2,5
   247:11 266:15
   266:16
classes   77:20
   125:10 199:19
   201:11 204:13
   205:25 246:17
   247:2 250:13
   250:18,20
   256:1 257:18
   257:20,21,22
clean   9:25
   10:15 73:6
   119:24 146:4
   150:3 203:22
cleaned   73:3
cleanup   203:6

clear   5:20,23
   6:2 76:24
   96:22 152:14
   170:6 184:5
   219:18 244:4,7
   249:20 264:20
   270:21
clearheaded
   8:11
clearly   182:9
   183:19 268:3,6
   268:14
clients   20:16
cliff   59:16
climb   51:22
   52:4
clink   40:18
clip   163:7
   207:21 208:16
   208:19,20,20
close   59:12
closely   181:23
closer   45:8
   214:24
clothes   116:18
clothing   84:23
   116:15 118:11
cloud   209:19
clue   116:2
cluster   260:5
   260:10
clustering
   249:18

clusters   249:13
   261:7
cocaine   51:25
   69:16 140:24
   141:6 180:2,6
   180:10
code   155:19,20
   216:1
coincides   232:8
coke   133:15
cold   105:16,19
   105:22,23
   106:6,15
   108:14 113:10
   146:16 148:24
   168:6 192:25
   193:3
collar   21:21
   22:1
colleagues   73:4
   164:23
collect   100:11
   179:15 193:16
color   48:20
   242:10 268:3,7
   268:18
colorado   50:14
combination
   124:15 220:7
   235:15 267:4
combined
   152:5
come   15:16
   16:1 22:9

23:12 31:8
33:3 36:1
49:21,22 55:2
60:6 75:16
77:8 79:2
102:15 121:22
126:23 135:12
136:2 138:20
146:2 226:6
**comes** 12:6
43:23 50:3
77:7 80:24
82:17 121:7
138:13
**comfortable**
80:4
**coming** 59:18
60:9 68:14
70:11 75:15
107:18 121:19
130:17 135:5
138:17 147:21
148:9 168:23
234:22 244:4
**commander**
18:20 25:2
29:4,6 31:5
52:21,23 53:5
**comment** 76:18
124:6 147:23
230:8
**commented**
158:20

**commercial**
116:2
**commit** 36:13
110:10 225:6,9
270:17
**committed**
234:6
**committing**
49:3 66:24
133:13 248:14
266:17
**common** 69:14
74:22 88:3
101:20 106:25
107:4 122:7,8
122:15 125:12
128:20 131:15
139:2 140:22
203:20 252:9
**commonly**
23:25 109:14
120:10 124:12
140:21 141:8
141:12 174:1
240:15
**communicate**
112:10
**communicating**
106:13 182:9
183:6,19 184:7
184:13 194:4
**communication**
106:24 112:7
113:14 184:4

**communicati...**
183:20
**community**
192:14
**commuters**
120:6,8
**compacted**
71:4
**companies**
19:23 20:5,8
21:6,8,8,9
202:6 203:13
**company** 19:13
19:14,15,24
20:2,13 140:11
140:13
**compare**
136:16 186:8
**compared**
106:9 126:20
173:25 186:5
188:5 189:13
194:9 217:22
261:21 267:17
269:11
**comparison**
214:8 265:15
**compartment**
120:13
**compartments**
49:7 73:24
**compassion**
104:20

**complain** 68:11
**complained**
67:6
**complaint**
40:25 67:14
185:15,16,17
186:9 187:4
189:11,14
244:14,15
**complaints**
187:1,23
**complete** 9:3
159:4 170:6,10
278:8
**completed**
202:8 276:16
**completely**
11:1 223:9
**completion**
275:4,11
**complex** 40:23
**complicated**
47:25
**complied**
189:21
**comply** 100:24
**complying**
99:10
**computer** 68:5
80:21 210:21
215:1 232:23
232:25 233:3,5
**computers**
24:19 233:8

concealed
    123:5
concept  257:10
concern  134:16
concerns  67:13
    68:16 79:8,11
conclude  74:10
    74:17 75:9
    146:13 208:12
    209:4 216:4
    219:9 234:5
    264:24 271:21
concluded
    144:25 175:23
    178:13,14,20
    217:12 219:4
    224:6 273:11
conclusion
    96:19 199:3,6
    202:1 234:14
    236:23
conclusions
    103:23 197:25
    272:12
condescending
    256:9
conditions
    188:4 191:12
conduct  66:24
    76:20 154:13
    217:15 219:9
    219:12 234:5
    235:10

conducted
    104:16 188:2
conducting
    51:11
conference
    77:10 111:14
conferences
    89:21
confessions
    258:1
confident
    120:22
confidential
    237:10,11,13
    237:13,20
confidently
    241:9
configurations
    209:23
confirm  119:1
    130:3 135:23
    135:25 139:6
    141:15 151:4
confirmation
    184:21
confirmed
    148:6 241:11
confirming
    243:6
confliction
    71:17
confused  82:2
confusing
    157:1 200:19

confusion
    244:1,20
congress  2:4
connecting
    210:20
conscious
    33:12 133:6
consensual
    121:15 145:20
    202:25 203:25
    204:2
consent  55:14
    56:17 83:5,8
    117:1 128:11
    128:16 129:22
    131:20 140:4,7
    145:16 146:6
    146:11 148:16
    169:7 253:6
consider  60:18
    129:24 139:18
    176:2 181:19
    181:21 194:19
    194:25 196:9
    197:7 217:10
    218:4 235:20
    250:22,24
    264:21 267:13
consideration
    127:11 188:23
    189:1 235:8
    248:21
considered
    48:12 106:6

confusion
    153:24 176:9
    176:11 234:13
    266:13,14
considering
    122:5 150:24
    216:11
consistent
    104:1 122:5
    152:13 172:12
    190:21 259:7,8
    259:10,11
console  73:23
conspiracy
    24:5
constitutes
    107:8
constitutional
    99:13,24
constrained
    214:8
construed
    259:25 264:6
consult  66:10
    240:5
consultant  14:8
    14:12,15,24
    18:12
consulted
    157:22
contact  32:20
    133:22 244:15
contain  12:1,4
    154:25

containing
  155:10
contains  275:8
contaminate
  256:3
contamination
  255:24
content  176:16
  211:6
contesting
  17:18
context  75:25
  76:1 87:13,19
  100:2 111:2
  182:20 183:17
continue  13:25
  41:11 106:18
  134:11 147:18
  150:6 156:18
continued
  222:18
continues
  223:6
contour  10:25
  11:2 219:16
  222:20 223:9
  223:16,16
  224:16 225:22
  226:1,5,9,13
  231:22,25
contraband
  69:15,25 106:1
  122:8 145:25
  178:15,21,24

179:4,13
180:12,12
181:16
contract  19:19
  20:2,4
contracting
  20:12
contracts  19:23
  20:7
control  133:10
controlled
  255:14
conversation
  6:16 7:11
  174:11,15
  175:20 176:13
  176:17,20,21
  208:9 222:18
  223:8 224:1
  230:18 231:12
  244:9
conversations
  243:14 244:22
cool  14:2 22:15
  34:7,19
cooperating
  23:9
coordinated
  88:22
coordinates
  212:19
cop  61:17,19
  87:22 206:16
  206:24 207:1,4

207:4
copies  156:1
  162:17 164:21
  164:23 276:14
cops  40:11 55:7
  88:1,2,6
  122:25 125:13
  138:16
copy  11:10
  84:18 157:14
  251:11 274:23
copyright
  252:2
corner  268:3
correct  4:10
  11:20 16:21
  17:24 18:22,23
  22:21 27:13,17
  43:6 49:22
  59:22 69:10
  79:6 92:14,17
  92:18 96:20
  97:22 99:4
  107:6 114:19
  114:20 123:11
  123:15 128:16
  132:12 152:18
  155:8,11,14,15
  163:21 167:1
  175:18 178:17
  197:15,22
  211:11 212:21
  213:3,7 224:24
  245:7 269:6,8

278:8
correction  3:11
  9:21 10:19
  222:23 223:12
corrections
  278:6
correctly  97:5
  107:1 122:10
  136:18 143:14
  144:22 145:2
  149:23 151:6
  153:18 165:11
  170:8 178:16
  182:12 183:12
  184:25 191:4
  198:8 201:7
  202:9 206:21
  208:10 217:6
  229:19 235:14
  239:11 252:13
  256:13 257:2
  259:12 262:16
  263:1 264:10
corrupt  17:20
cost  253:21
costs  205:3
could've
  147:25
counsel  4:22
  12:23 17:21
  275:12 276:14
count  22:20
  116:24 178:10

| | | | |
|---|---|---|---|
| **counter** 32:16 | 142:16 153:4 | **covered** 119:5 | 46:7,8,13 |
| **counties** 23:15 | 162:4 243:17 | 147:6,8 | 66:24 69:19 |
| 28:5,6,13 | 265:8 | **covering** 132:3 | 107:13 110:5 |
| **country** 24:7 | **courier** 57:22 | 134:14 | 110:10 114:2 |
| 49:22 52:3 | **course** 7:19 | **coworker** | 133:13 191:16 |
| 69:22 101:4,21 | 8:10 25:7 | 206:8 | 248:14 |
| 104:16 112:12 | 34:10,13,16 | **crap** 223:24 | **crimes** 25:14 |
| 203:10,11,17 | 36:6 39:24,25 | 231:17 232:17 | 25:15 46:19 |
| 204:14 | 42:7,9 59:12 | **crappie** 19:10 | 63:14 109:15 |
| **county** 1:9 2:19 | 64:12 69:21 | **crash** 266:19 | **criminal** 15:7,9 |
| 5:4 13:7 15:20 | 94:18,24 100:8 | 266:22 267:10 | 15:10,22,23 |
| 16:18,21,23 | 103:15 105:7 | 267:11 | 16:10,16,17,24 |
| 18:19 19:3 | 128:23 130:9 | **crashing** | 18:9,21 24:3 |
| 22:22 23:2,8 | 130:16 131:14 | 113:23 | 25:2 26:8 28:2 |
| 25:24,25 26:1 | 135:15 156:18 | **create** 185:12 | 28:11 30:14,17 |
| 27:22,23 28:7 | 170:23 171:5 | 193:17 209:15 | 30:21 31:8 |
| 28:9,9,10,10,10 | 176:18 183:1 | 239:18 257:25 | 43:18 44:20,22 |
| 28:10,23 59:5 | 187:15,17 | **creating** 185:9 | 44:24 45:1,7 |
| 88:17,20,23 | 201:9 204:9 | **credibility** | 45:11,15,17,23 |
| 89:5,11 91:13 | 211:7 215:22 | 112:25 113:11 | 45:24 46:1,3,6 |
| 91:16 98:14 | 254:21 272:20 | 113:14 116:21 | 46:11,12 47:5 |
| 99:3,7,9,11 | **courses** 129:8 | 122:4 139:5 | 47:8 50:24,25 |
| 100:4 104:3 | 247:3 | **credible** 107:24 | 51:10,11 52:21 |
| 120:4 131:2 | **court** 1:1 4:21 | 107:25 108:8 | 54:4,11,13,24 |
| 146:3 154:10 | 15:8,16 16:5 | 113:24 115:10 | 56:22 58:2 |
| 166:11,19 | 17:7,20 18:6 | 116:25 121:9 | 60:13,16 62:9 |
| 167:20 187:24 | 21:8 55:4 | 121:10 146:22 | 62:10,11,15 |
| 189:19 190:2,3 | 146:10 149:19 | 147:4 148:23 | 63:6,9 64:18 |
| 207:8 241:24 | 274:1 | 151:15,15 | 74:19,20 78:23 |
| 242:12 274:9 | **courtroom** 5:17 | 205:5 | 87:19 88:5 |
| **couple** 5:10 | **courts** 203:19 | **credit** 111:20 | 89:10 91:7 |
| 57:5,18 82:8 | **cover** 141:13 | 111:24 206:2,4 | 116:3 118:22 |
| 88:11 90:3 | 147:14 251:16 | **crime** 24:10 | 119:1,2,3 |
| 91:25 102:21 | 251:17 260:8 | 32:13,13 37:1 | 138:6,22 |

[criminal - deal]

| | | | |
|---|---|---|---|
| 145:20 155:20 | **csfrigeriolaw** | **dallas** 45:19 | 275:6,22 |
| 191:19 192:3,9 | 2:22 | 48:22 89:4 | 277:24 278:12 |
| 198:25 199:4 | **csr** 1:20 275:22 | 141:24,25 | **dated** 96:13 |
| 199:15 201:15 | **cues** 262:22 | 142:3,9 | 158:5 164:4 |
| 206:17 248:11 | **curious** 36:25 | **damaged** 68:7 | 177:23 |
| **criminals** 46:10 | 37:4 | 68:24 | **daughters** |
| 87:23,24 | **current** 156:10 | **dark** 59:6,7 | 34:10 |
| **critical** 38:20 | **currently** | 268:18 | **day** 21:13 |
| 94:17 | 108:24 | **dash** 39:1 40:9 | 35:15 40:15 |
| **crockett** 25:10 | **curriculum** | 43:4 44:3 | 42:18 49:8 |
| 25:12,15,24 | 44:7 205:1 | 66:11 101:7 | 53:23 54:6 |
| 26:13 27:6 | 257:23 | 105:12 124:6 | 56:11 58:18 |
| **crooks** 88:1 | **curve** 219:17 | 163:5,6,10 | 59:4 65:13 |
| **cross** 218:20 | 221:22 226:8 | 189:14 207:22 | 68:23 70:10 |
| 220:8,12 | 230:17 269:23 | 208:13 209:4,7 | 78:22 79:2 |
| 230:21 231:11 | 269:24 | 209:9,12,15,18 | 97:8 101:4 |
| 235:13 | **customers** | 209:22 210:1,4 | 104:17,24 |
| **crossed** 217:2,3 | 20:15 | 210:7,10 | 110:7 120:9,15 |
| 218:24 219:4,6 | **cut** 24:20 61:15 | 211:11 212:13 | 120:19 127:16 |
| 224:7,15,18,23 | 102:8 126:4 | 212:13 213:2,6 | 129:18 131:1 |
| 227:6 228:3,21 | 208:21 212:6 | 213:9,11 214:3 | 138:21 148:8 |
| 230:4 233:23 | **cv** 1:5 3:13 14:5 | 214:15,17 | 168:24 188:11 |
| 234:3 235:6 | 23:1 25:5 | 215:5 217:9 | 193:11 240:23 |
| 269:21 | 31:12,13 39:5 | 220:6 224:4 | 241:18 265:3 |
| **crosses** 220:16 | 39:7,10,16 | 225:18 226:20 | 275:17 278:15 |
| 220:22 | 204:12 274:5 | 226:24 228:2 | **days** 275:6 |
| **crossing** 225:1 | | 228:24 229:2 | 276:16 |
| 227:17 | **d** | 230:6 233:22 | **de** 80:11 |
| **crowd** 90:1 | **d** 164:12 | 235:12 236:21 | **dea** 20:3 23:24 |
| **crystallize** | 250:15,16 | **data** 12:23 13:4 | 24:1 29:10 |
| 196:2 | **dad** 63:5 | **date** 40:5 96:4 | 89:1 237:8,9 |
| **cs** 237:11 | **daily** 29:23,23 | 96:5,12,19 | **dead** 135:19 |
| 276:15 | 53:10 | 153:15 159:22 | **deal** 34:16 86:2 |
| | | 215:8 242:23 | 86:3,9 120:6 |

147:10
**dealing**   125:15
193:11 213:17
**debating**
172:25
**december**   19:4
19:5
**deception**
246:14 250:4
254:22 255:10
259:6,15
260:11 262:14
262:25 264:25
**deceptive**
134:17 249:14
249:17 261:16
**decide**   79:1
81:25 106:2
107:13 140:16
172:8
**decided**   105:18
171:14 173:7
176:20 187:25
188:5
**decipher**
197:22
**decision**   128:15
191:2 198:14
**decisions**   90:17
189:3,5 190:21
**declare**   278:4
**dedicated**
62:19

**deemed**   278:6
**deep**   264:2,3
**deeper**   45:6
**defects**   5:7
**defendant**   2:13
5:4 12:23
15:21,24 89:8
**defendant's**
13:10 212:9
**defendants**   1:9
2:18 16:4
165:6 274:9
**define**   44:22
**definition**
179:3
**definitively**
224:14
**degree**   81:10
**delayed**   149:20
149:25 150:13
**delaying**   150:4
150:11
**delivered**
274:21
**deny**   130:4
151:4 215:21
**department**
23:23 25:12
26:16 27:7,16
29:5 33:21
41:1 60:20
62:20 97:15,17
97:20 112:8,21
112:22 127:12

237:12
**department's**
97:23 204:19
**departments**
190:9
**depend**   130:8
198:10,17
**depended**
29:24 207:10
250:19
**depending**   13:1
156:17 265:20
266:11
**depends**   62:17
72:5 97:17
125:22 126:9
266:10
**depicted**
222:21
**depicting**   208:6
223:22 224:12
**deponent**   275:2
275:3,10
276:13 278:3
**deposed**   5:11
**deposing**
276:13
**deposition**   1:12
1:16 5:7 69:8
69:11 152:3,16
159:16,25
160:3 162:19
186:10 192:4
217:1,10

218:15,19
224:11 230:9
230:11 232:9
240:10 272:18
274:12,19,21
275:4,11
**depositions**
14:1 153:14
159:18,19
160:9,12,14,16
162:18 164:5
169:14 171:24
172:5 184:6
185:14,18,24
185:25 186:3,4
186:9 189:11
189:12 241:12
244:13 245:12
271:19
**depression**
259:9,11
**depths**   114:5
**deputies**   25:1
178:20 190:10
**deputized**   24:1
**deputy**   4:23
36:9,17,20,20
67:23 96:12
97:1 99:1,10
99:12,15 100:1
100:2,16,23
101:6 102:23
103:1,3,7,25
104:11,20

105:12,15,24
116:6 123:24
124:4,5 126:1
127:15 128:6
129:2,3,4,7
130:10 137:14
143:1,9 144:4
144:12 146:17
150:25 151:2,5
151:9,11,14,22
151:23,25
152:11,15,16
152:19,20,21
154:8 160:1,2
163:15,20,22
163:22 164:8
166:9 167:25
168:2,8,11,13
168:21 172:11
172:17 173:3
173:11,24
174:12 177:25
178:13 182:9
183:7,18 184:6
184:21,22
185:3,6,14,18
185:18,22,23
186:6,8,8,22,24
187:25 188:2
188:11 189:1,4
189:21,24
192:4,7,7,7,10
193:10 194:15
194:18,21,24

195:3,6,14,25
199:4,7,14,24
201:18,23
202:8 206:17
206:23 207:24
216:5,25 217:3
217:3,10,21,25
218:11,14
219:3,5,7,22,23
219:25 220:7
220:14,14
222:16,21,24
223:1 224:10
224:25 225:1,5
228:14 230:6
230:11,12,19
230:21 231:3
231:10,12,14
232:8,18,22
233:18,21,22
234:2,11,19,20
235:16 236:22
239:5 240:7,12
240:13,15
241:16 242:9
242:16,20
243:1,5,12,21
244:3,9 245:6
245:15,21
253:16,16
254:14,16,17
254:20,24
255:1 263:10
263:19 264:8

264:13,16,19
269:10,19,20
270:5,9,11,19
271:14,19
**describes**
196:22
**describing**
264:17
**description** 3:9
107:19 116:15
116:19 242:10
**descriptor**
73:11 155:17
202:13
**desire** 191:14
**desk** 10:3,5
**destination**
49:12 122:7
138:10
**destroy** 180:7
**detail** 23:4
46:13 152:4
**details** 87:10
172:22 173:7
244:21
**detained**
184:24
**detect** 131:24
246:14,14
256:17
**detecting** 250:4
**detection** 45:23
246:14

**detective** 24:10
29:13 33:24
34:5
**detects** 46:13
**detention** 204:3
**determination**
180:16,20
**determine**
56:16 74:4
81:2,15 84:25
110:14 113:19
114:2 130:19
132:5,19 134:6
136:7 145:4
151:21 190:4
193:14 205:7
234:10 235:6
246:25 248:7
265:18
**determined**
145:10
**determines**
265:23
**determining**
188:13 190:20
191:21
**develop** 30:6,7
44:6 77:18
81:20,25 86:17
114:12 134:21
134:24 145:15
149:20 246:24
**developed**
27:12 56:15

developing
  30:13,21 53:15
  107:12
device  265:19
devices  211:22
diagnosing
  262:15
diazepam  70:3
dicaprio  21:25
difference
  31:13 45:2
  76:22,24 79:20
  82:15,16
  126:18,19
  192:5 255:8
  270:16,25
differences
  114:3
different  10:13
  13:1 16:7
  50:13 58:20
  60:24 67:15,16
  74:24 99:17
  105:4 135:13
  136:21 173:21
  186:17 190:9
  190:10,13,15
  192:17 193:5,8
  196:23 197:20
  203:10 209:8,9
  209:10,12,13
  209:15,16,18
  209:18,22,23
  215:2 224:17

254:25 255:11
  255:14 257:21
differently
  173:1 190:11
  203:10
differs  141:22
dig  45:6 131:8
digital  39:12,25
  40:8,8 42:5
dillard's  45:20
direct  104:9
directv  84:19
  84:20,22,23,25
dirt  73:8,10
  180:8
disagree
  204:18
disappointed
  94:16
disapprove
  205:9
discouraged
  64:9 65:4,5
discover  110:2
  204:17
discrepancies
  190:14
discrepancy
  231:22
discuss  158:23
  176:20
discussed
  104:19 179:1,8
  249:23

discussing
  90:21
discussion  9:19
  148:2 242:2
  255:24
dishonest  167:9
dishonesty
  256:17
disinterest
  259:11
dismissal  187:2
dispatch  68:5
dispel  119:1
  139:7 141:15
displaying
  239:7
distance  221:20
  223:11,20
  234:23 235:4,5
  267:23 268:5
  270:12,14
distinct  70:25
  71:1 225:22
  226:1 231:21
  231:22
distract  231:4
distracted
  232:14 233:1
  233:15
distractions
  80:22 81:9
  256:4,16
distributing
  49:19

district  1:1,1
  15:19 274:1,1
ditch  270:6
ditched  59:15
division  1:2
  18:21 274:2
document  7:22
  7:25 8:1,20,23
  14:4 162:15
  251:15
documentation
  66:25
documented
  98:16 170:7
documents
  7:20 10:3
  153:14 155:4,5
  164:21,23
  165:3,5 189:15
dog  34:11,18
  34:18 90:18
  150:13 181:6
  181:11 184:22
dogs  181:22
doing  6:18 19:6
  22:16 27:19
  29:21 30:24
  43:1 45:1,20
  47:13 53:10,22
  54:2 55:3,15
  56:1,3,22 57:1
  57:5 58:1 61:9
  61:10 63:9
  65:6 77:23,25

[doing - dust]                                                        Page 22

| | | | |
|---|---|---|---|
| 77:25 78:4,25 | **dressed** 83:2,4 | **drop** 49:13 | 48:1,5 49:7,18 |
| 79:5 81:19 | 84:9 | **drove** 59:15 | 49:21 50:9,17 |
| 90:15 93:14 | **drink** 7:9 | 128:4,5 | 57:24 58:22,25 |
| 98:24 103:11 | **drinking** 48:10 | **drug** 17:15 | 58:25 62:25 |
| 106:1 115:19 | **drive** 25:20 | 23:16,24 25:14 | 63:13,18,18,18 |
| 115:19 117:1 | 48:8,11,22 | 25:14,15 26:12 | 63:19 64:7,13 |
| 118:15 131:4 | 58:13 85:15 | 26:20,24 28:12 | 65:1 84:24 |
| 133:7 134:12 | 131:18 216:12 | 29:21 47:13,20 | 120:10 122:7 |
| 136:5,23 137:8 | 236:19 271:21 | 47:25 50:4,11 | 123:5,13,17 |
| 139:21 146:4,5 | **driven** 133:18 | 50:20 51:21 | 125:14,17,18 |
| 154:4 175:4 | 143:2,10 | 52:5 58:14,20 | 125:19 127:2,6 |
| 193:15,15 | 227:18,19 | 63:13 64:7,15 | 127:12,17,19 |
| 195:21 203:4 | 241:22 243:6 | 82:4,7,15,18 | 127:25 128:22 |
| 205:15 215:22 | **driver** 48:21 | 84:16 85:17 | 135:5,16 |
| 233:7 235:4 | 49:17 267:10 | 91:1 109:14,17 | 138:11,14 |
| 254:1,1 266:4 | 268:25 | 115:22 120:12 | 140:23 141:6 |
| **dollars** 22:6 | **driver's** 86:4 | 120:22,25 | 141:24,25 |
| **don** 4:13 | **drivers** 48:12 | 121:1 122:12 | 142:1,2,7 |
| **donna** 1:20 | 48:12 137:3,5 | 124:20,21,24 | 143:13 144:6 |
| 4:21 5:21 6:2 | 137:7 | 125:3,7,16 | 145:25 248:18 |
| 6:17 10:12 | **drives** 32:25 | 127:13 131:16 | 253:5,10 262:2 |
| 11:13 162:9 | 120:18 | 133:14 138:8 | **drunk** 267:10 |
| 274:14 275:22 | **driving** 48:25 | 138:12 139:1 | **dry** 25:24 26:1 |
| **door** 256:6 | 57:22 73:4 | 140:21 141:8 | 133:21 |
| **dope** 125:18 | 85:18 105:17 | 141:11,12,15 | **dude** 75:1 |
| **doubt** 272:8,12 | 110:16 113:22 | 141:22 142:11 | **duly** 1:17 4:2 |
| **downer** 70:5 | 120:9,15 127:6 | 155:24 173:13 | 274:17 |
| **downloaded** | 133:16 137:17 | 191:22 237:6,8 | **duplicate** 201:2 |
| 259:18 | 137:20,23 | 248:14,17 | **duplicates** |
| **downtown** | 138:3,4 140:1 | 253:1,4 | 200:24,25 |
| 131:3 | 208:19 232:19 | **drugs** 17:16 | 201:3,6,8 |
| **dps** 29:6 86:12 | 233:4,6,18 | 25:18,20 26:2 | **duration** 208:7 |
| **dress** 84:22 | 266:13,14,24 | 26:13,15,22 | **dust** 40:21 |
| | 267:6,8,13 | 28:18 45:16 | |

| | | | |
|---|---|---|---|
| **duties** 108:24 | **easy** 104:10 | **eleven** 32:14 | 51:23 55:6 |
| **duty** 16:14 55:7 | **ebbs** 6:16 | 33:2 | 64:7 78:20 |
| 145:25 | **ecstasy** 69:17 | **eliminate** 55:18 | 82:16 88:3 |
| **dwi** 113:20 | **edge** 133:19 | **elon** 215:21 | 91:1 97:2,11 |
| 114:7,12 | **edges** 76:17 | **emergency** | 97:16,19 98:12 |
| **e** | **education** | 64:3 | 99:2 100:5,24 |
| | 153:16 255:9 | **employed** | 101:8,14 |
| **e** 2:1,1 48:19 | **effective** 50:20 | 16:17 27:23 | 102:24 103:2,4 |
| 164:1,1 250:16 | 256:22 | 275:13 | 104:2,12 |
| 277:3,3,3 | **effectively** | **empty** 73:24 | 106:14 109:14 |
| **earlier** 99:18 | 192:14 | **encounter** 59:1 | 111:22 115:1 |
| 104:19 119:20 | **effort** 32:24 | 121:16 204:3 | 116:23 117:5 |
| 120:11 122:19 | **eight** 29:3 40:7 | **encountering** | 119:12,13,16 |
| 133:24 139:24 | 51:25 52:17 | 129:20 | 121:19 127:13 |
| 143:5,24 | 53:4 58:20 | **encounters** | 145:5 151:20 |
| 146:19 147:6 | 70:10 172:1 | 113:6 145:21 | 153:17 154:1 |
| 151:12 167:24 | **eighth** 160:24 | 202:25 203:25 | 155:21 168:1 |
| 173:10 179:2,8 | **either** 44:8 | 261:10 | 172:12 179:7 |
| 191:12 193:1 | 47:10 51:20 | **encroachment** | 182:10 183:8,9 |
| 195:20 199:7 | 81:24 98:14 | 256:10 | 184:4 198:6,7 |
| 202:16 223:13 | 119:1 125:7 | **ended** 23:17 | 199:11,21 |
| 248:18 249:23 | 130:3 139:6 | 91:19 208:8 | 200:19 202:5 |
| 260:3 265:12 | 141:14 155:13 | 223:25 | 203:8,14,20 |
| **early** 25:10 | 158:1 200:10 | **endless** 256:4 | 204:10,13 |
| 27:9,10 42:10 | 202:7 224:7 | **ends** 208:22 | 213:2,9,12,24 |
| 161:2 | 227:8 228:22 | **energy** 252:10 | 229:16 231:18 |
| **earth** 217:16 | 245:11 267:18 | **enforce** 49:5 | 237:6,8 238:24 |
| **easier** 98:20 | **elaborate** 58:8 | **enforcement** | 239:23 240:20 |
| 182:19 | 76:10 | 12:13 15:2 | 242:17 248:13 |
| **easily** 65:3 | **elected** 89:24 | 23:24 29:14 | 250:21 257:12 |
| 268:16 | 110:11 | 33:23 38:7 | 257:24 258:14 |
| **east** 26:19 | **electronically** | 39:13 40:10 | 260:25 |
| 270:2 | 98:16,22 | 42:20 43:17 | **enjoy** 93:14,14 |
| | | 47:21 49:5 | 157:4 247:11 |

**enjoying** 87:3
**ensured** 78:10
**enterprises**
  47:5
**entertainment**
  37:10
**entire** 41:3
  53:20 93:6
  170:14 183:24
  208:6,24
  213:12 233:5
  236:6
**entirely** 123:9
  214:2
**entirety** 7:23
  47:24 156:16
  157:8,10 159:9
  159:19 183:20
  183:23 208:4
  229:13 251:15
  263:24
**entity** 202:12
  205:17
**entries** 127:15
**equal** 226:12
  226:14
**equate** 262:25
**errata** 276:11
  276:13,16
**erratically**
  113:22
**error** 11:4
  81:10,11,16
  82:12 83:12,13

96:10,11
**errors** 8:25 9:5
  94:17,19
  262:13
**escort** 123:3
**especially**
  205:24 248:14
**esq** 276:1
**essentially** 45:7
**estimate** 18:4,5
  94:6 125:5
  126:7 267:22
**et** 276:4 277:1
  278:1
**evaluate** 14:25
  15:1,3 54:12
  54:15 97:19,20
  97:23 99:20
  101:9,12
  152:16 186:19
  186:20 190:25
  192:22 195:13
  195:17 201:22
  206:23 212:12
  217:21,25
  218:11 228:23
  232:18 233:17
  238:17 254:16
  261:22 265:10
  268:12 269:10
  269:18
**evaluated**
  191:25

**evaluating** 99:1
  139:18 196:10
  198:24 211:18
  217:11 235:18
**evaluation**
  92:16 218:14
  245:25 269:22
**event** 15:13
  65:13 196:4
**events** 169:10
  169:17,21
  170:11,16
  171:4,6
**everybody**
  77:21 100:20
  110:10 130:12
  196:23 246:19
**everyday**
  120:20 150:18
**evidence** 12:19
  13:1,5 39:12
  39:25 42:6,7
  44:10 153:25
  164:22 165:1
  179:16 189:20
  195:12,13
  217:11 235:20
  236:23 245:17
**evolves** 78:20
**evolving** 43:15
**exact** 84:21
  223:22 244:21
**exactly** 14:18
  19:2 42:11

97:9 99:19
  103:16 108:2
  176:4,12 177:8
  198:18 218:21
  231:16 247:7
  267:15,21
  270:21
**examination**
  3:5 4:3
**examine** 169:8
**example** 32:14
  34:22 35:3,4
  66:22 67:17
  68:3 82:22
  104:7 113:9
  114:6 115:13
  115:21 117:3
  117:21 118:1
  119:20 122:18
  122:19 130:25
  150:2 177:15
  237:7 252:25
  260:17 261:8
**examples** 46:4
  67:21 99:18
**excellent** 10:20
**exceptional**
  62:7
**exchanged**
  111:13,22
**excitement**
  259:8,10
**excluded** 201:6
  201:8

| | | | |
|---|---|---|---|
| **exclusive**  54:10 54:10 | **expectation** 78:13 | 152:6 153:15 154:2 155:23 | 250:25 |
| **exclusively** 61:6 | **expectations** 79:18 | 168:11,12 171:13 173:24 | **experts**  250:23 |
| **excuse**  30:2 | **expected** 241:23 | 173:25 180:25 184:1 188:4,10 | **expiration** 275:22 |
| **executed**  180:5 | **expensive** 71:24 | 188:12 190:8 190:24 191:14 | **explain**  58:10 83:17 191:7,9 |
| **exhibit**  3:10,11 3:12,13,14,19 | **experience** 18:16 43:23 | 191:20 194:8 194:15 195:19 | 196:25 198:16 203:6 247:5 |
| 9:10,11,14,24 10:11 11:14,15 | 45:11 47:6 49:21 56:9,13 | 195:21,25 208:17 212:15 | 258:19 |
| 13:19,21,22,23 13:24 69:23 | 58:1 69:14 70:9 78:2 | 212:22 213:1,5 213:6,14,20,23 | **explaining** 184:24 |
| 96:2 134:4 140:3 153:10 | 79:14 81:3 82:17 91:3 | 213:24 225:4,8 229:15 231:6,7 | **explains**  236:8 |
| 160:20 161:23 161:24 162:13 | 96:25 101:1 104:22 105:1 | 231:18 233:7,8 234:15 240:20 | **explanation** 130:3,14 |
| 164:12 174:7 210:13,15,16 | 106:10 108:20 114:17,18 | 241:7,8 250:7 254:12,24 | 131:12 132:10 132:17,18,18 |
| 251:3,6,8 263:6,8 | 119:18 120:1 120:23,24 | 265:13 | **explanations** 129:25 |
| **exhibited** 104:20 | 121:5,8 122:6 123:22 124:9 | **experienced** 56:11 73:12 | **explicit**  57:20 131:13 |
| **exhibits**  3:8,17 162:18 165:21 | 125:14,25,25 126:2,3 128:25 | 82:18 83:23 | **explore**  106:18 |
| **existed**  151:3 168:13 | 129:4,12,13 130:2,11,24 | **experiences** 194:15 | **explorer**  59:6 122:20,23 |
| **existence**  68:4 | 131:16 132:5,7 143:1,9 145:8 | **experiencing** 262:23 | **express**  196:3 |
| **exists**  46:13 112:23 238:18 | 145:14 146:18 146:23 147:15 | **expert**  14:7 15:4,8,12 | **expressions** 133:4 |
| **exonerate** 258:12 | 148:6,15 151:1 151:10,16 | 18:12 90:10 91:4,14,17 | **extend**  128:6 |
| **expect**  57:9,10 66:10 68:2,10 | | 96:18 170:3 181:19 182:1 | **extended** 150:15 |
| 81:3 84:5 93:1 | | | **extension**  128:9 144:17 149:18 |
| | | | **external**  256:4 |
| | | | **extreme**  260:24 |

**extremes** 256:8
**eye** 32:20 81:22
  133:22
**eyes** 74:24 80:9

**f**

**f** 13:21 32:25
  108:1,1 122:6
  122:13 124:10
  128:4,14 143:2
  143:9 144:5
  178:15 207:19
  234:19,21
  239:7 242:11
  242:17,20
  243:2,6,22
  268:18 270:11
  270:12
**facebook**
  108:19,21
  109:1,2,2,3,5
  109:12,24,24
  111:7,9
**faced** 150:25
  151:2,9
**facial** 133:4
**facing** 270:6
**fact** 63:21 64:5
  82:24 128:4,14
  131:2 132:8
  168:22,22,25
  172:4,25
  174:20 179:25
  192:3 194:18

194:22,22
196:9 200:20
210:2 246:17
258:16
**factors** 74:10
  74:16 139:8
  141:10
**facts** 129:25,25
  151:3,23 165:2
  170:7,10,14
  171:3,7,8,14
  172:8,15,16,19
  172:20 173:2,7
  173:18 185:3
  194:15 197:7
  203:16 240:6
**factual** 17:23
**failed** 217:12
  230:22 253:14
  253:17
**failing** 254:18
**fails** 276:18
**failure** 216:12
  219:10 230:3
  234:6 236:18
  271:7,20
**fair** 6:9,10 8:8
  18:11 27:8
  31:18,18 36:25
  38:23,24 39:1
  39:2 41:9,10
  47:1 50:9
  62:12 64:14
  70:15 79:5

81:8 93:9,12
95:5 107:3
121:18 123:18
131:13 132:11
151:22 153:23
160:10 171:12
171:15,24
172:2,6 174:25
176:6 189:22
197:14 201:18
213:21 218:25
230:7 234:24
238:3,4 241:24
243:19 261:12
267:2,3 268:15
269:2
**fairly** 253:7
**fall** 40:18
  201:15 264:4
**falling** 73:22
**falls** 40:19
**false** 257:25
**familiar** 69:4
  73:19 91:9
  156:8 210:4
  217:17 255:23
  257:10
**families** 63:20
**family** 40:23
  84:14 130:21
  135:3
**fan** 77:16
**far** 18:9 60:4
  78:14 93:19

140:6 157:3
163:17 196:15
214:23 219:18
227:23,25
228:17 267:22
268:12 269:12
270:20
**fascinating**
  38:12
**fashion** 50:3
  129:5
**fast** 102:1
  266:11,20
**faster** 265:15
  265:25
**favor** 40:13
**fayette** 28:10
  59:4 242:12
**fbi** 20:3 21:20
  22:1 110:7
**federal** 1:23
  21:14 25:13
  203:12
**federally** 24:1
**feel** 7:11,17 9:6
  79:9 214:8
  220:19 240:4
**fees** 20:7
**feet** 34:25
**fell** 103:21
**felt** 79:10
**female** 169:1,4
  184:9,11,11
  240:25 241:1,3

**[female - folks]**                                    Page 27

241:20 243:17
243:24 244:2,4
244:5 245:1
**fewer** 123:6
193:6
**field** 40:20
60:24 61:12
71:5,6,8,12,23
71:24 72:1,15
73:2 140:1,18
140:21 141:8
153:16 179:11
180:11 181:15
**fifth** 178:9
**fight** 37:7
**figure** 54:23
79:19 126:18
176:19 263:14
**file** 68:11
237:20
**filed** 40:25
67:14
**files** 210:10,13
**final** 96:18
142:23 265:8
**financially**
275:15
**find** 23:16 33:2
55:9 65:7
86:18 88:8
116:15 156:12
156:17,23
177:15,19,22
178:14,21

250:3 253:4
257:1
**finding** 65:1
253:1
**fine** 38:11
47:10 75:19
76:12 85:16
97:10 100:22
111:4 144:2
165:25 167:22
183:3 207:12
234:18
**finger** 256:12
**finish** 7:13
31:10 60:11
64:11 142:19
230:2
**finished** 6:13
**fire** 21:2
**firm** 88:14
275:24
**first** 4:2,9
10:21 14:13
18:11,14 26:2
26:7 37:11,18
56:21 79:21
83:1 84:7,10
85:17 86:24
96:3,17,23
106:20 111:11
124:19 144:11
149:15 153:12
161:12 163:5
173:10 175:3

178:11 182:3
183:5 185:13
185:15,16,25
189:11 204:25
211:5 216:15
216:19,19,20
216:23 223:15
225:12,24
228:17 229:7
235:21 236:4
236:13,16
239:4 246:17
262:13,20
265:14,16
**fishing** 19:8,9
19:10
**fit** 40:9 90:22
123:17 141:10
**fits** 58:22
**five** 57:14
61:20 62:11,16
64:2 100:10
160:8,9,13,14
162:9 171:24
195:23 208:20
243:4 244:22
265:2
**fix** 204:7
**flag** 131:7
136:22 138:8,9
141:7
**flat** 92:15 93:2
93:3,9,17

**fleeing** 69:22
**fleet** 20:21 21:1
**flier** 205:1
**flight** 116:12
116:13
**flights** 117:16
117:17
**flip** 31:12
**floor** 74:18
75:11 85:6
**floorboard**
72:20,25 73:23
**floorboards**
73:8
**flows** 6:17
**fly** 117:11
118:13
**focus** 80:15,18
127:21 192:10
192:11 230:10
254:6 255:15
258:11,12
**focused** 76:23
80:14 95:24
144:17 192:9
213:1 234:18
253:1,18,25
258:2
**focuses** 44:2
**foley's** 45:21
**folks** 29:1
42:12 47:13
127:6,22,24
139:18,20

202:23,24
**follow**  30:17
57:19 118:12
175:22 221:10
**followed**
186:21 189:25
248:5
**following**  100:3
195:11 233:9
274:16
**follows**  4:2
**foot**  34:22
59:10 256:25
257:1,5,8,11,14
**footage**  166:1,2
166:8,25
169:14 189:14
189:14 207:22
207:25 208:13
209:4 225:19
226:20,25
228:2 229:3
230:6 233:22
235:12 236:21
254:13,16
264:19
**force**  23:9,21
23:22,25 27:24
28:1,4,16,21,25
29:10 91:5,15
**forces**  23:11
89:2
**ford**  10:24 59:6
122:20,23

123:3 217:4
222:19 223:8
223:22 231:13
**foregoing**
278:5
**forever**  63:8
**forget**  10:17
252:11
**form**  7:4 49:25
50:3,6 51:3
61:1 70:8,18
81:16 91:25
99:14 103:5
127:7 129:5
153:4 178:22
194:20 195:1
195:15 196:11
197:18 198:3
208:5,24
211:13 215:7
269:7 271:9,16
272:1,10
**formally**  255:6
**forming**  153:20
153:24 154:5
155:1 163:2
164:18 165:7
165:13,15
177:17
**formulaic**
88:11 90:3
**formulate**
90:16 190:6
195:6 198:11

**formulating**
165:23
**fort**  141:25
142:2
**forth**  97:14
120:5,19 272:9
**forward**  26:11
33:3 41:3,18
**found**  20:20
54:16 64:1
72:3 73:23
125:24 130:23
155:20,22
157:18,21
158:10 161:21
171:8 176:21
176:25 178:1
178:19 179:22
201:3,4 202:17
205:16 253:8
**four**  19:7 61:5
93:22 142:22
160:8 201:1
212:8 242:22
**fourth**  142:21
149:12
**fox**  2:9 4:17,17
82:3,7,10,11,18
83:22 84:6
85:4,11,14,15
86:8,23 92:9
100:18 103:22
104:19 109:18
132:2 139:25

140:8 251:5,13
**fox's**  83:16
**frame**  229:24
236:6
**framework**
247:21
**francisco**
116:10 118:8
121:2
**frcp**  275:1
**free**  7:11,17 9:6
145:22 150:6
220:19 240:5
**freedoms**
188:19
**freeway**  270:7
**frequent**
240:24 241:19
242:17
**frequently**
262:15
**friend**  34:5
**friendly**  104:21
**friends**  139:10
139:15 140:19
140:20
**frigerio**  2:20
**front**  72:19
76:14,18,19
77:14,25 78:4
78:9,12,25
79:11,12 80:20
81:14,24 82:9
87:11 124:6

**[front - go]**

Page 29

| | | | |
|---|---|---|---|
| 148:13 184:23 | **g.com** 2:17 | 126:21 131:2 | **giving** 113:2 |
| 185:4 202:20 | 276:2 | **gereb** 163:22 | 119:18 260:17 |
| 202:22 226:8 | **gain** 53:16 | 163:23 164:1,8 | **glad** 134:21 |
| 233:10 254:14 | 59:14 | 178:13 185:19 | **glebe** 2:10 |
| 255:16,17 | **gained** 26:24 | 185:22 186:8 | **go** 5:9,9 9:6 |
| 265:22 | 56:12 120:23 | 240:15 | 19:22 21:6,6 |
| **frustration** | **gains** 121:5 | **gestures** 133:4 | 23:5,16 29:20 |
| 259:7 | **gamboa** 174:12 | **getting** 26:21 | 32:15,16,21,25 |
| **ft** 275:24 | **game** 87:25 | 62:24 64:25 | 34:7,8 36:15 |
| **fto** 60:21,23 | **gary** 1:13,16 | 82:25 86:4 | 37:13,14 44:5 |
| **fuel** 140:24,25 | 3:4 4:1,13 | 116:9 135:8 | 46:9,15 48:3 |
| **full** 4:12 8:6 | 116:6 274:12 | 167:16 189:7 | 48:15,22,23,23 |
| 45:12 75:8 | 274:17 276:5 | **ghost** 61:10 | 50:9,17 53:19 |
| 78:21 85:6 | 277:2,24 278:2 | **giant** 70:12,13 | 54:23 55:1 |
| 106:20 144:11 | 278:4,12 | **girl** 80:6 | 59:12 60:13 |
| 158:22 182:3 | **gas** 139:11 | **give** 8:6 9:25 | 61:13 62:19 |
| 183:5 210:20 | **gaston** 19:13 | 10:13,15 11:6 | 63:3 65:15 |
| 216:15,19,20 | 19:24 20:1,13 | 16:2 18:4 | 66:4,24 67:25 |
| 221:14 225:13 | **gathering** | 23:15 32:13 | 78:23 82:1,11 |
| 229:7 263:9,17 | 107:12 | 80:23 90:4,10 | 83:25 86:4 |
| **funny** 21:12 | **gauge** 75:23 | 90:23 91:21 | 87:7 88:7,8 |
| **further** 65:15 | 270:14 | 95:6 104:6,9 | 91:14 92:7 |
| 151:3 231:23 | **general** 64:18 | 111:1,20 113:9 | 93:15 95:25 |
| 268:19 272:17 | 98:1,2 247:21 | 115:21 125:10 | 97:15 102:1 |
| 275:1,12,15 | **generalization** | 204:25 205:1 | 112:16 113:18 |
| **fusion** 238:7,9 | 244:23 | 221:5 240:17 | 114:1 116:13 |
| 238:10,13,14 | **generally** 8:11 | 247:15 252:25 | 118:24,25 |
| 238:15,18 | 50:10 65:12,14 | 267:22 | 119:3 121:22 |
| **future** 98:17 | 125:24 185:9 | **given** 57:21 | 128:21 135:18 |
| 145:6 | 190:22 209:7 | 122:4 130:15 | 135:20,23,25 |
| **g** | 238:13 | 184:22 274:19 | 136:3 137:10 |
| **g** 164:1 251:3 | **generic** 53:22 | 278:9 | 138:18,21 |
| | **georgetown** | **gives** 139:5 | 141:3,24,25 |
| | 120:3,5 126:10 | | 142:2,16,21 |

| | | | |
|---|---|---|---|
| 145:22 147:9 | 9:23,24 10:8 | 112:6,11,12 | 208:18 210:12 |
| 150:6,10,17 | 10:11,13,15 | 115:18,20,21 | 210:13,14,14 |
| 151:13 153:10 | 11:15,19 13:2 | 116:12,15 | 215:2,8 216:3 |
| 159:11 160:21 | 13:18,21 17:22 | 117:11 120:7 | 216:23 226:15 |
| 162:4,21 170:2 | 22:5 25:21,22 | 121:11,11,20 | 229:12 235:19 |
| 178:9 181:4 | 26:9,13 28:12 | 122:2 123:6 | 237:6 239:4 |
| 184:16 190:17 | 32:1 40:2,5 | 125:21 130:4 | 241:2 245:14 |
| 198:23 204:24 | 41:13,17 42:22 | 130:10,17,21 | 247:1,19 |
| 206:12,13 | 44:19 45:5 | 131:5,5,5,6,8 | 248:19 249:5,6 |
| 207:13 212:2 | 48:25 55:9,13 | 131:15 133:17 | 249:10,19 |
| 215:24 217:19 | 55:23 57:13,24 | 134:2,4 135:6 | 251:7,10,14 |
| 217:24 225:3 | 59:25 60:3,4,9 | 135:9 136:3 | 252:5,6 253:11 |
| 225:12 229:7 | 62:15 66:25 | 138:18 139:12 | 256:21 257:1 |
| 240:5 249:23 | 68:12 70:14 | 139:19,20,22 | 257:17 258:4,9 |
| 251:13,22,25 | 71:23,25 72:2 | 140:3 141:9 | 259:1,5 260:20 |
| 252:5,6 256:20 | 73:2 74:4,5,6,9 | 142:2,15,23 | 262:12,20 |
| 257:6 262:8 | 75:15,16 76:9 | 144:16 145:3 | 263:24 265:9 |
| 263:5,9 | 78:12 80:17,24 | 147:2 149:15 | 265:15 266:1,2 |
| **goal**  51:23 52:1 | 80:25 81:1,2 | 150:12 153:11 | 266:9,12,20 |
| 52:2,4,12 | 81:13,15,21,24 | 154:4 156:21 | 268:11,18 |
| **god**  86:3 | 81:25 82:1,10 | 160:19 168:23 | 272:18 273:4 |
| **goes**  54:22 55:9 | 82:19 83:7,23 | 169:15 170:6 | **goldfish**  73:8 |
| 66:6 76:6 87:1 | 84:1 86:3,5,18 | 176:23 178:2 | 75:9 84:2 |
| 87:2 104:5 | 86:19,19,20 | 178:10 179:10 | **golly**  258:9 |
| 110:23 112:13 | 87:11,16 88:11 | 179:10,11,12 | **good**  4:5,6 5:2 |
| 119:17 123:21 | 89:2,3,3 90:16 | 179:13,14,14 | 7:15 11:11,22 |
| 130:20 150:2 | 92:2,4 93:9 | 179:15,18 | 31:16 34:23 |
| 151:10,24 | 95:24 96:8,23 | 182:8 184:18 | 38:4 62:23 |
| 154:21,22 | 100:9 101:25 | 190:18 193:18 | 64:4,20,22 |
| 179:25 180:7,8 | 102:5,9,10 | 196:21 197:12 | 65:4,7 76:15 |
| 192:24 195:2 | 106:2,4,5,6,18 | 199:11,23 | 77:22 81:17 |
| 203:8 270:1,7 | 106:21 107:15 | 202:3 205:21 | 84:20 86:21 |
| **going**  4:14 5:21 | 107:23 108:12 | 206:10,13,14 | 90:17,17,22 |
| 6:8 7:10,20 9:8 | 110:4,14,19 | 206:19 208:3 | 92:4 130:7,11 |

131:25 132:1,3
136:13 142:17
152:25 177:15
183:4 185:8
199:8 202:12
210:25 215:10
215:14 269:15
**google** 161:5,19
217:16
**gotcha** 182:7
**gotten** 24:22
45:12,18,21
140:24 141:5,6
142:2 160:25
253:19 266:20
**gouge** 93:16
**government**
21:5 22:9
202:5
**governor's**
23:10
**governs** 155:21
**gps** 212:17,19
214:11,12,14
215:10,18,23
216:11 236:7
**grandchildren**
63:21
**grandkids**
63:25
**great** 4:14
67:10 92:10
119:9 152:23
153:9 176:8

200:16 246:4,8
252:21,23
254:2,3
**greater** 81:10
234:22 235:4
**greatest** 78:5
79:10,11
**greek** 157:2
**green** 71:2,3
72:21 73:18
74:1,17 75:10
75:11 76:2,4
**greenhill** 1:22
2:14 166:22
**greyhound**
24:4
**grocery** 76:3
**ground** 40:19
184:8 239:13
**group** 22:1
37:13 53:2,4
54:3 112:18
113:12 115:1
239:18,18,19
242:17
**groups** 53:8
112:9
**growing** 50:13
**grown** 63:21
**guess** 12:17
14:6,16,21
17:19 20:14,16
35:14 39:9
40:2,5 46:1,17

47:19 54:13
56:20,21 57:4
64:8 66:14
67:5,9 69:3
70:20 73:3
74:8 75:7
76:23 82:2
88:4 91:15
93:4 94:2 95:8
99:25 103:24
104:10 111:11
113:16 115:12
115:21 118:17
119:24 127:21
130:13 132:16
139:9,17 144:2
152:2 165:24
171:23 172:24
173:6 175:22
176:6 177:14
195:11,16
196:2,21 214:1
220:21
**guide** 145:6
198:11 259:23
**guides** 155:21
**guilty** 258:16
258:17
**gummies** 64:1
**gun** 24:19
**guns** 260:13,14
**guy** 17:16
23:12 25:9
29:3 32:18,25

33:5 40:14
43:16 46:22,23
51:20 52:17
61:16 64:24
65:4 66:5
68:23,24 80:6
84:22 85:24
86:20 94:11
109:23 112:12
113:11 116:3,8
116:8,11,14,16
116:22 118:10
120:22,25
121:2,4 131:1
131:1,4 184:15
191:19 192:9
255:22,23
260:13
**guy's** 135:18
**guys** 21:15
29:18,18 30:15
49:2 53:3 63:8
65:8 87:4 88:3
90:16 111:14
157:2 158:2,3
187:19 254:3

**h**

**h** 4:13 48:19
250:15,16
277:3
**half** 56:4 57:7
128:2

| | | | |
|---|---|---|---|
| **hallucinating** 149:5,8 | 170:15,19,22 170:23 172:23 173:3 195:4 203:23 252:25 253:15 254:9 | **hats** 86:12 **haul** 45:12 **hays** 28:9 207:7 **head** 5:24,24 34:25 75:17 135:8 152:11 167:7 262:3 | 90:19 91:20 92:8,10,11,22 92:24 100:12 100:14,16,19 100:22 103:13 103:23 109:19 127:9 142:16 |
| **hand** 10:12 11:15 13:18 52:13,13 76:7 87:2 130:9 133:5 156:24 160:19 210:12 210:13,17 251:7 | **happening** 38:2 43:15 64:23 117:22 183:21 269:4 | **header** 14:7 96:18 154:18 162:24 170:3 199:1 215:25 | 142:21 149:7,9 149:11 153:3 162:8,11 164:1 164:7 178:25 194:21 197:24 198:21 215:16 242:4 246:4,6 251:3,7,14 263:14,16 265:8 269:9 271:13,24 272:4,11,22 273:2 |
| **handcuffed** 249:8 | **happens** 42:24 60:6 65:24 80:1 82:13 101:4,24 102:12 119:16 138:25 145:5 173:13 205:21 206:7 248:25 258:4 | **heading** 241:5 **hear** 79:21 80:12 90:14 133:20 176:13 184:14 231:17 | |
| **handguns** 253:22 | | | |
| **handing** 14:3 | | **heard** 22:15 34:8 69:12 87:18,18 114:16 158:11 176:12 185:19 189:9 223:24 257:15 | |
| **handler** 181:17 181:18 | | | |
| **handlers** 181:23,24 | **happy** 104:8 146:8 162:4 | | |
| **hands** 80:6 181:10 249:4,6 249:7 | **hard** 62:4 75:17 76:7 93:20,25 95:11 131:23 133:9 133:21 149:4 199:5 | | **hector** 2:19 4:24 5:1 6:24 273:4 |
| **happen** 65:24 83:9 114:18 115:6,6 117:24 120:16 133:18 170:22 179:12 197:16 253:16 | | **hearing** 257:20 **heavier** 124:14 **heavily** 30:20 50:4 | **help** 16:6 24:12 28:15 30:16 65:17 67:8 74:10 76:24 90:15 128:13 134:3 146:13 173:8,12 224:20 225:11 246:14,19,23 255:20 258:20 |
| | **harm** 63:19 **haston** 1:13,16 3:4,11,12 4:1,7 4:13 10:9 116:7 246:6 274:12,17 276:5 277:2,24 278:2,4,12 | **hebert** 2:3 3:5 4:4,7,25 5:3 9:11,15,22 10:5,8 20:11 21:16 22:8 32:7,10 57:16 57:18 58:10 | |
| **happened** 16:7 66:6,6 69:1 96:9 101:11 102:13,16 114:2 148:12 148:18 150:8 | | | |

| | | | |
|---|---|---|---|
| **helped** 247:2 | **highways** 55:19 | **hotel** 48:23 | **houses** 30:9 |
| **helpful** 25:8 | 127:5 | 51:4 117:23,24 | 73:14 138:5 |
| 27:5 46:16 | **hindsight** 188:9 | 118:2,5,9,10,15 | 180:5 |
| 52:18 56:20 | 191:3 | 121:2 129:19 | **housing** 25:13 |
| 87:17 143:23 | **hired** 60:20 | 138:18,18,20 | 25:25 |
| 169:8 190:19 | 90:4,9 91:21 | 138:20 140:13 | **houston** 25:24 |
| 224:2 240:3 | 166:21 | 140:14 147:24 | 39:23 41:24,25 |
| 250:4 | **history** 41:11 | 168:22 184:2 | 45:19 118:4 |
| **helps** 65:22 | 63:12 73:20 | 191:23 241:1,2 | 122:7 124:22 |
| 87:5 258:19 | 74:19,20,21 | 241:4,20,21 | 125:2,6 127:23 |
| **hereto** 1:24 | 83:2 113:8 | 243:17 | 127:24 128:5 |
| 278:7 | **hit** 59:16 102:3 | **hotels** 139:12 | 128:15,21 |
| **heroin** 69:16 | 102:7 227:25 | **hour** 57:14 | 129:18 137:18 |
| **hesitant** 240:16 | 228:4,9 | 92:20,24 93:1 | 137:21,24 |
| **hey** 23:14 33:4 | **hits** 265:22 | 93:10 95:6,19 | 138:4,8,9,17,21 |
| 34:6,7 37:20 | **hitting** 134:14 | 100:10 101:25 | 139:19 141:18 |
| 68:13 79:1 | **hold** 34:24 | 102:1 116:13 | 141:23,24 |
| 94:13 112:11 | 112:25 263:14 | 116:13 216:11 | 142:9 148:9 |
| 113:21 116:9 | 272:18 | 221:23 222:16 | 168:23,25 |
| 131:4 204:24 | **holding** 35:2 | 236:7 267:11 | 241:1 244:5 |
| 206:9 249:3 | **holiday** 73:6 | **hourly** 92:25 | **huge** 38:9 |
| **hidden** 169:4 | 137:24 138:1 | 93:4,5 | **huh** 6:1,1,1 |
| **hide** 134:20 | **home** 34:10 | **hours** 93:18,23 | 29:9 74:15 |
| **hiding** 256:25 | **homeland** | 93:23 94:1,1,3 | 121:25 139:16 |
| **high** 74:25 | 127:13 | 94:8 95:8,13 | 149:14 173:19 |
| 260:20 261:11 | **homicide** 258:5 | 142:14 199:25 | 177:4 194:5 |
| **higher** 52:16 | **honest** 205:22 | 200:6,10,11,13 | 221:12 238:9 |
| **highlighted** | 210:19 235:22 | 200:17 201:4,9 | 267:25 |
| 211:8 | **hood** 221:20 | **house** 29:25 | **human** 58:15 |
| **highway** 25:20 | 226:5,7,8 | 30:3 109:8 | 58:17 59:1,19 |
| 26:17 84:24 | 232:2 | 180:5 | 59:25 64:16 |
| 120:20 125:14 | **hope** 56:19 | **housekeeping** | 122:12,24 |
| 126:9 127:20 | 92:4 258:18 | 5:10 | 124:9,19,23 |
| 141:21 | | | 125:3,7 128:25 |

129:8,12,14
146:24,25
147:15 199:16
**humans** 122:7
**humor** 32:7
**hundreds**
39:19
**hung** 44:23
**hunt** 90:18
**hunting** 87:19
87:24 88:2,8
**hurts** 40:19
63:19,20
**hypnosis** 33:22
36:24 37:11,23
65:25 247:11
247:11
**hypnotism**
35:19,20
**hypnotist** 32:4
32:11 33:10,23
38:6
**hypnotize**
33:11 34:2
36:9 37:4
**hypnotized**
34:24 35:2
36:13,14,15,18
37:12,14,19,24
**hypothetical**
87:8 110:23
**hypotheticals**
87:3,6

**i**

**idea** 19:16
81:19 112:16
126:15 166:15
185:7 238:6
**ideas** 250:3
**identified**
28:19
**identify** 155:16
165:6 223:5
265:14 267:16
269:2
**identity** 237:19
**ignorance** 30:2
114:6
**ih** 97:4 239:8
242:13 243:6
**iii** 1:6 2:18
274:6
**ij.org** 2:6,11,12
**illegal** 49:1
71:22 75:4
78:6,15 106:1
121:14 134:23
136:24 137:17
137:20,23
**illegally** 121:12
**illinois** 85:5
**illustrating**
71:10
**immediately**
131:7

**impacted**
233:18
**impairment**
8:14
**import** 48:4
**importance**
44:5,8 213:18
**important** 5:20
31:22 40:1,4
42:20,23 43:14
43:21 65:17,19
65:20 66:2,7
66:20 67:1,2
87:6 110:9
148:21,23
172:22,22
173:2,2,8
211:17 212:4,7
214:21 252:11
**importantly**
256:8
**imported** 122:9
**impound** 20:9
**imprecise**
218:25
**improper** 7:5,5
**improved**
214:15,16
215:23
**improves**
215:20
**inches** 227:14
**incidences**
224:3

**incident** 41:3
208:7
**include** 44:13
179:21
**including**
151:18 264:5
**inconsistencies**
132:11 189:24
**inconsistency**
132:20
**inconsistent**
131:11,12
151:20 204:19
205:16
**incorporate**
79:3
**incorrect** 11:2
197:17
**increase** 24:12
**indentions**
227:16
**independent**
264:16
**index** 3:1
**indicate** 129:7
**indicated**
201:20 216:11
264:9
**indicator**
214:11,13
248:24 249:1
**indicators**
248:15

**individual** 1:5
 1:7,8 62:8
 66:25 117:9
 214:21 274:5,7
 274:8
**individually**
 26:9
**individuals**
 160:13
**industry** 47:20
 50:5 55:17
 64:19 109:17
 138:12 139:11
 141:22 191:22
**infancy** 25:11
**infiltrate** 46:6
**infiltrating**
 52:3
**informal** 7:10
 7:11
**informant**
 237:10,13,20
**informants**
 30:7,7 53:15
 53:15
**information**
 33:11 53:16
 62:22 66:23
 77:6 90:22
 98:21 106:8,11
 106:16 107:12
 107:13,17
 108:8,18,21
 109:21,22

 110:22 111:24
 113:1,3,16,18
 115:9,14 116:1
 116:23,24,25
 117:9 119:11
 119:14,19
 121:7,19 122:4
 124:16 128:17
 128:24 129:14
 146:17,21
 147:7,8,11,12
 148:7,22
 151:15 153:24
 153:25 167:25
 168:2 173:5
 191:1 193:13
 193:17,25
 194:3 211:10
 211:24 237:2,4
 237:6,16,18,22
 238:1,3,11
 239:7 240:7,14
 240:15,17,22
 240:23,24
 241:3,4,10,12
 241:14,18
 243:7,9 245:6
 245:11,15,21
**informed** 97:3
 243:1
**informing**
 107:4
**infraction**
 264:9

**inhale** 72:10
**initial** 92:16
 187:3
**initiated** 106:7
**injuries** 40:25
**inn** 137:24
 138:1
**innocent** 110:5
 118:24 129:25
 130:3 132:17
 133:25 139:20
 139:22 141:13
 146:8 258:6
**inputs** 240:4
**inside** 80:22
**instagram**
 109:13
**instance** 1:17
 51:22 171:23
 209:19
**institute** 2:4,9
 157:19,22
 158:5 177:3,6
 177:14,15
 187:19
**instruct** 42:17
**instructed**
 42:12,15 43:21
 44:16 145:17
 229:16
**instruction**
 44:2,4,13
 246:13

**instructor** 35:5
 39:22,23 41:19
 43:13,17 44:5
 44:11 78:25
 204:12 205:3,6
 212:24,25
 213:1 246:16
 247:3
**instructors**
 146:2 204:22
 206:15 250:5,6
**insurance** 86:3
**intelligence**
 94:12 238:11
**intend** 12:2,5
 272:15
**intended** 260:1
**intensifies**
 133:13
**intensive** 252:8
**intercept** 51:6
**intercepts**
 52:14
**interchangea...**
 31:14
**interdiction**
 23:6,7,12,12,14
 23:19 24:3
 25:9,11,17
 26:2,8,14 27:4
 27:13,19 28:2
 28:11 29:3,4
 29:21 30:14,17
 30:19,21 31:9

| | | | |
|---|---|---|---|
| 43:16,18 44:20 | **interest** 25:15 | **interstate** | 247:14 256:22 |
| 44:22,24 45:1 | 26:24 27:12 | 26:18,22 59:4 | **intimidating** |
| 45:7,11,15,17 | 61:16 192:8,18 | 85:4 108:4 | 86:15,20 |
| 45:23,25 46:1 | **interested** | 120:3 126:10 | **intoxicated** |
| 46:3,11,12 | 25:21 41:4 | 126:20 130:25 | 40:15,19 |
| 47:8 50:24,25 | 90:25 199:10 | 140:2 227:4 | **introduce** 4:14 |
| 51:4,5,5,11 | 199:17 275:16 | 253:8 269:24 | 9:8 |
| 52:14 53:2,3 | **interesting** | **interview** 56:14 | **introduced** |
| 54:4,7,12,13,25 | 21:23 35:16 | 56:15 76:22,23 | 246:18 |
| 55:13 56:4,22 | 101:17 158:11 | 77:2,5,11,12 | **investigate** |
| 58:2 60:13,16 | **interests** 110:2 | 79:3,25 80:10 | 34:1 51:13 |
| 61:16 62:1,9 | **interfere** | 80:13,23 81:17 | 106:4 110:17 |
| 62:10,11,16,18 | 256:17 | 82:9 106:12 | 110:20 111:8 |
| 62:23 63:6,9 | **intermediate** | 132:22 134:15 | 112:16 114:1 |
| 64:19,21,22 | 57:4 62:14,15 | 135:24 136:9 | **investigating** |
| 65:4,7,9 67:24 | **internal** 187:1 | 247:24,25 | 46:18 107:14 |
| 73:20 78:3,13 | 187:3,3 | 252:7,22 255:8 | **investigation** |
| 78:21,23 83:23 | **international** | 255:12 256:8 | 21:20 28:17,19 |
| 84:13 85:24 | 60:8 116:4 | 260:7 | 66:18 67:22 |
| 86:16,21 87:19 | **internet** 93:24 | **interviewed** | 93:6 105:16 |
| 88:5,22 89:10 | 156:12,12,14 | 26:23 253:9 | 107:8,9,10,11 |
| 91:7 101:3,15 | 239:16 259:19 | **interviewers** | 108:10,13,15 |
| 104:16 116:4 | **interpret** | 252:9 | 139:3 147:2 |
| 117:23 118:16 | 246:21 | **interviewing** | 151:4 167:5,15 |
| 120:2 132:14 | **interrogation** | 77:5 252:12 | 170:18 175:5 |
| 138:7,23 | 76:15,23 77:1 | 253:18 255:9 | 181:4 186:18 |
| 145:20 155:24 | 77:3 252:8 | 258:1 261:19 | 187:4 240:21 |
| 184:3 191:19 | **interrogations** | **interviews** | 254:2 |
| 192:3,9 194:9 | 76:14,17 77:15 | 76:18 77:25 | **investigations** |
| 198:25 199:4,9 | 79:12 | 78:4,6,9,25 | 18:21 21:1 |
| 199:15 201:15 | **interrupt** 6:11 | 79:12 125:15 | 24:5 25:3 |
| 203:24 206:17 | 6:14 | 136:13,14 | 46:25 52:8,22 |
| 234:16 248:12 | **interrupting** | 169:3 202:21 | 106:22 109:7 |
| 250:22 262:1 | 256:7,11 | 202:23 246:25 | 109:15 127:14 |

173:13 200:15
258:5
**investigative**
28:15 29:19
30:4,5,6 32:4
32:10 33:10
35:19 38:6
53:3 109:8
191:23 241:9
**investigator**
34:1 47:9
257:25
**investigators**
109:11 256:7
**investigatory**
136:16 137:6
**investment**
57:24
**invite** 89:21
**involved** 15:10
27:4 30:20
88:25 89:7,12
118:21 125:2,6
139:7 190:21
191:2 194:1
243:25
**involving** 17:21
**isolation** 259:9
**issue** 105:7,8
128:9 140:19
166:3
**item** 159:15
162:22 174:3
242:25 243:1

**items** 154:21
155:9,10,12
165:10 243:19
245:4,19,22
**itineraries**
117:17

**j**

**jacks** 45:14
**jail** 119:4 134:2
**january** 1:14
1:19 274:12
275:18 276:3
**jargon** 72:17
72:17,18 87:22
87:22 88:3
237:5
**javier** 1:7 274:7
**jewelry** 20:4
**jfox** 2:12
**job** 6:18 34:15
43:1 53:19
55:8 86:5,5,24
90:14 190:11
198:8 269:15
**joe** 108:18
111:6 164:8
**joel** 1:5 2:13
89:8 163:12
274:5 276:4
277:1 278:1
**johnny** 21:14
21:18,22

**johnny's** 63:4
**joint** 72:11,19
**joke** 82:21
**josh** 4:17,20
**joshua** 2:3,8,9
**judge** 5:18 7:4
145:10 197:21
198:14,19
236:15
**judgment**
161:7,8
**jump** 92:6
161:8
**jumping** 119:7
159:12
**june** 158:5
177:20
**junk** 85:6
**jurisdiction**
106:23
**jurisdictions**
107:6
**jury** 90:13
173:12 197:24
198:16 219:2
260:18
**justice** 2:4,9
23:24 127:12
157:20,23
158:5 177:3,7
177:14,16
187:19
**justified** 188:5

**jwindham** 2:11

**k**

**k** 210:13
**k9** 144:19
149:21 150:14
181:6,7,8,17,20
181:23,24
182:1,3,22
183:21 192:5
**k9s** 181:25
192:9
**keep** 41:14
47:23 82:19
95:12 100:14
142:14 156:10
205:23 213:19
221:1 254:23
**kens5** 177:19
**kept** 59:18
**keys** 48:23
**keyword**
109:25 110:9
110:12
**kids** 63:19,19
73:5,8 84:3,5,8
84:11 165:17
**kiki** 238:5,20
238:24
**kill** 253:24
**killed** 252:19
254:7 260:23
**killers** 256:22

| | | | |
|---|---|---|---|
| **kilos** 82:8 85:9 | 9:25 11:8,18 | 66:23 68:8,21 | 102:17 103:6,9 |
| 133:15 140:8,9 | 12:13,14,15 | 68:23,24,25 | 103:19 104:4,6 |
| **kind** 6:16 12:11 | 14:4 16:1,2,5,6 | 69:18,25 70:1 | 104:7,18 105:2 |
| 19:9 27:12 | 17:16,22 19:12 | 70:4,6,9,11,13 | 105:13,25 |
| 31:9 32:18 | 19:20,23 20:21 | 71:2,18,20,22 | 106:10 107:12 |
| 36:7 38:16,20 | 21:1,15,16,25 | 71:25 72:17,23 | 107:14 108:9 |
| 57:18 60:13 | 22:4,4,4,5 | 73:9,13,14,15 | 108:10,11,12 |
| 63:1 65:25 | 23:25 24:5,18 | 73:16,21,22,25 | 108:12,20,24 |
| 70:6 75:12 | 24:20 25:19 | 74:4,20,24,24 | 109:9,11,12,24 |
| 83:21 88:12,19 | 26:11,25 27:1 | 74:25,25 75:1 | 110:1,2,8,8,10 |
| 102:6 104:5,24 | 28:22 30:8,9 | 75:3,5,7,14,16 | 110:22,25 |
| 113:19 115:16 | 30:17 31:13 | 75:17 76:2,8 | 111:11,15,18 |
| 117:21 118:21 | 32:1,16,23,25 | 76:10,16,25 | 111:23 112:4,5 |
| 168:3 169:18 | 33:4,6,7,9 34:9 | 77:1,2,4,4,9 | 112:5,11,15,19 |
| 169:19 187:6 | 34:13,15,16,18 | 78:5,15 79:19 | 112:19,23,24 |
| 189:9 191:6 | 34:21 35:6 | 80:9 81:12,20 | 113:10,10,10 |
| 193:16 198:9 | 36:2,7,20 37:9 | 81:25 82:7,8 | 113:14,17,20 |
| 226:7 240:3 | 37:14,15,22 | 83:14,14,15 | 113:20,23,23 |
| 247:20 267:18 | 39:16,18 40:3 | 84:18 85:25 | 114:1,19,21 |
| **kinesics** 79:24 | 41:7 44:6 | 86:5,8,11,14,22 | 115:5,7,9,9,18 |
| 246:16 247:4,5 | 45:15,21 47:17 | 86:24 87:4,6 | 115:20,22 |
| **kit** 71:5,6 | 47:24 49:16 | 87:12,14,22,24 | 116:3,5,6,8,11 |
| **kits** 71:24 72:1 | 50:17 51:24,25 | 87:24 88:7,9 | 116:17,22,25 |
| **knew** 28:18 | 52:19,20 54:19 | 88:10,25 89:4 | 117:16,17,19 |
| 59:2 62:8 91:7 | 54:21 55:3,17 | 89:4,8,12,16,24 | 117:22 118:18 |
| 107:18,19,19 | 56:14 57:23 | 90:9,25 91:3,5 | 118:23 119:10 |
| 107:21,22 | 58:19 59:1,13 | 93:12,13,13,14 | 119:17,19,21 |
| 127:8 149:4 | 59:18,20 61:1 | 93:15,24,24 | 119:23 120:13 |
| 194:6 195:14 | 61:4,7,18,20,22 | 94:14,17,22 | 121:8 122:18 |
| 243:12,13 | 61:24 62:5 | 95:6,11 96:10 | 122:21 123:3 |
| 245:12 | 63:4,5,24 64:4 | 98:3,11,15,25 | 123:21 125:8 |
| **knocks** 256:6 | 64:5,10,23,24 | 99:17,18,19,20 | 125:13,16 |
| **know** 6:5,15,18 | 65:16 66:1,1,1 | 99:22 101:9,23 | 126:3,9,10,16 |
| 6:21 7:12 9:3 | 66:5,19,19,20 | 102:4,10,11,14 | 128:8 129:9,10 |

130:2,6,11,17
130:18,22,25
132:8,16 133:1
133:9,13,21
134:5,11,12,13
134:15,18
135:4,7 136:4
137:1,9 138:7
139:2,23,25
140:6,12,17,20
140:23,24
142:24 143:25
145:7,8,10,21
145:24 147:21
147:22 150:7
151:12 152:10
152:11,13
156:5,8 157:1
159:5 161:7,16
161:20 167:7
167:10 170:22
172:20,21,24
176:13,15
177:10,11
180:7,8,9,13
181:1,2,5,8,13
181:23 182:23
185:3 186:22
187:16,18
188:15,25
189:25 190:8
190:11,12
193:7 194:23
194:25 195:3,4

195:20,22
196:7,15,20,23
197:1,21,24
198:19 200:18
200:22 201:1
203:24 204:1,2
204:3,7,25
205:8,13,20,20
205:21,24,25
206:5,7,9,9,11
206:25 210:23
211:25 213:13
213:20 214:7
214:17,18,20
214:23 215:2,8
215:10,14,20
215:22 217:17
217:19 222:2
224:14 226:6
227:9,10,14,16
231:5,16,18
232:11,11,22
233:4,6,11
234:8,9,9
236:6,11,13
237:5,17,19
238:2,7,13,23
239:17,18
241:12 243:13
243:14 244:6,8
245:1 246:18
246:21,25
247:7,13,14
248:16,17,20

249:10 253:12
254:2 255:8
257:16,17,22
258:2,8,17
260:12,22
265:20,23
266:12,17,18
267:4,9,10
268:1,5

**knowable**
191:1 193:22
193:23 194:1
194:10

**knowing**
120:24,25
176:12

**knowledge**
17:23 26:19
40:4 61:24
69:5 75:21
106:14 117:17
139:2 157:5
181:25 184:7
191:14,20,22
193:4,6 194:11
214:14 240:17
242:9

**known** 10:2
91:1 138:10
140:9 142:4
168:1,3 194:13
195:7 235:1
246:15 247:3

**knows** 48:24
49:1 81:12
122:25 124:21
133:15 139:5
189:2 191:21
192:2 194:7,8
194:13

**l**

**l** 35:5,7,11
**labor** 252:8
**lack** 47:3 73:10
155:17 202:13
**ladder** 51:22
52:4,5,9
**ladders** 84:22
**lady** 198:22
241:19 243:18
**lane** 216:13
217:5,13 218:2
218:3,6,9,10
219:10,15,20
221:18 223:11
223:21,23
226:11,20
227:3 230:3,22
231:1,14 232:5
232:6,13
233:24 234:7
235:13 236:19
269:11,21,25
270:3 271:8,21
**language** 56:13
79:24 80:25

[language - legitimate]                                    Page 40

| | | | |
|---|---|---|---|
| 132:24 133:7 | 93:24 97:1,11 | 213:1,9,12,23 | 247:16 248:24 |
| 134:4,18 | 97:16,19 98:12 | 229:16 231:18 | 252:23 254:11 |
| 191:21 194:11 | 99:2 100:5,24 | 238:24 239:22 | **learning** 25:22 |
| 246:18,20 | 101:8,14 | 240:20 242:16 | 54:25 55:13 |
| 247:6,23 248:7 | 102:23 103:2,3 | 248:13 250:21 | 56:10 61:17 |
| 250:20 252:22 | 103:9 104:2,12 | 257:12,24 | 81:6 87:4 |
| 253:2 254:23 | 106:14 109:14 | 258:14 260:25 | 93:14 119:23 |
| 255:3,10,19 | 111:21 114:25 | **lawsuit** 68:12 | 120:2 203:18 |
| 258:10 262:15 | 116:23 117:4 | **lawyer** 112:2 | 204:18 230:16 |
| 264:13 | 119:12,13,16 | **lawyers** 164:17 | 254:12 255:2,2 |
| **laptop** 210:20 | 121:19 145:4,5 | **lead** 47:4 83:7 | **leave** 11:12 |
| **laredo** 238:7,9 | 145:6,9,9 | 147:5,19 | 19:2 48:23 |
| 238:14,18 | 151:20 153:16 | **leading** 24:6 | 83:8 138:21 |
| **large** 25:18 | 154:1 155:13 | 193:7 243:7 | 150:6 |
| 26:21 47:5 | 155:16,21,22 | **leads** 124:16 | **leaving** 16:23 |
| 48:4 128:22 | 155:22 156:4 | **leafy** 71:3 | 138:18 241:2 |
| 138:10 141:23 | 156:11,25 | 72:22 74:17 | **led** 47:1 104:22 |
| 141:25 143:13 | 161:4,4,5,6,7,9 | 75:10 | 124:8 184:12 |
| 144:5 | 161:11 168:1 | **leake** 90:6,7,8 | 234:5 |
| **larger** 122:18 | 172:12 179:7 | 90:20 164:22 | **lee** 28:10 |
| **largest** 262:21 | 182:10 183:8,8 | **leaky** 90:6 | **left** 10:25 22:18 |
| **laser** 265:22 | 184:3 186:15 | **learn** 12:14 | 45:14 108:4,5 |
| **late** 86:5 | 187:15,16,17 | 24:20 47:24 | 219:19 221:22 |
| **laugh** 135:15 | 187:20,22 | 54:22 55:2,7,7 | 223:9,16 |
| 249:21 260:9 | 189:16 190:12 | 55:8,22 115:17 | 226:13,18,19 |
| **law** 1:21 2:20 | 197:13,17,19 | 117:9 119:15 | 227:3,23 232:5 |
| 12:13 33:23 | 197:22 198:1,1 | 120:18 151:12 | 243:2 |
| 38:7 39:13 | 198:6,7,8,10,15 | 199:13 238:20 | **legal** 197:1 |
| 40:10 42:20 | 198:15,17,18 | **learned** 26:13 | 275:23 276:23 |
| 43:17 47:21 | 199:11 200:18 | 26:19,22 27:1 | **legalize** 71:19 |
| 49:4 51:23 | 202:4 203:8,9 | 55:16 58:23 | **legalized** 50:13 |
| 55:2,6 71:17 | 203:9,11,12,14 | 117:11,12,13 | 71:18 |
| 71:20 78:20 | 203:15,20 | 117:14 120:7 | **legitimate** |
| 82:16 88:3 | 204:10,13 | 169:17 205:14 | 137:1 |

**legitimately**
  140:1
**length**  211:4
**lengths**  221:19
  221:19
**lens**  214:24
  215:1 270:8,9
**lenses**  209:13
**leonardo**  21:25
**letter**  35:5
**letting**  46:14
**level**  52:16
  79:18 81:3
  91:3 107:9
  121:8 146:17
  146:18 151:10
  152:8 168:12
  188:12 254:24
  255:19
**levels**  257:21
  262:22
**liar**  131:25
**liars**  130:7,7,12
**license**  26:10
  33:13,17 48:19
  86:4 101:22
  108:2 118:6
  147:13 232:25
  233:11,14
  242:10
**lidar**  265:19,21
**lie**  131:22
  134:6,7 255:22
  255:23

**lied**  132:8
**lies**  131:23
**lieutenant**
  24:24,25 30:23
  31:1 53:5,7
**life**  36:2 135:16
  252:21 253:21
  255:7
**light**  34:17
  72:10 196:5,5
  196:7,8,9,14
  197:3,4,7,8
**lighter**  72:10
**lights**  85:22
  102:15 240:8
  241:17
**liked**  253:13
**likely**  175:25
**limit**  41:14
  221:24 266:2
**line**  7:3 10:21
  10:25 11:1,2
  92:7 120:4
  131:2 217:2,4
  217:25 218:12
  218:20,24
  219:5,6 220:8
  220:12 221:20
  221:21 222:20
  222:20 223:9
  223:10,16,16
  224:15,23
  225:2,24
  226:18,19,23

226:24 227:6,7
  227:13,17,24
  227:24 228:3,8
  228:21,22
  229:24 230:4,5
  230:11 231:11
  231:23,25
  234:3 235:7
  277:4,7,10,13
  277:16,19
**lines**  219:16
  224:7,16,18
  225:22 226:2,5
  226:9,14
  233:24 269:21
**link**  46:7,8 51:8
**lips**  74:21,23
  80:9 133:21
  264:5
**liquidate**  21:7
**liquidated**
  19:18
**list**  28:6 38:16
  154:21,25
  155:9 157:7
  167:12,14
  186:12 250:6
  256:4
**listed**  22:25
  157:7 160:4,9
  160:13 164:15
  165:9 172:2,18
  175:4 176:24
  187:10 189:16

245:22
**listen**  77:21
  148:5 212:7
  254:6,18
  255:18
**listening**  10:10
  184:5 252:12
  254:1 256:6,11
**lit**  231:20
**litigation**  68:14
**little**  44:19 45:4
  45:6 50:18,22
  58:11,15 63:4
  65:10 72:21
  73:9,18 74:1
  75:10 76:17
  77:18 78:19
  79:7 82:2
  83:17 91:24
  136:6 159:5,12
  173:7 182:20
  185:10 199:5
  202:16,19
  224:20 237:1
**lives**  63:18
**ljr**  239:8
**load**  26:8 84:24
**loaded**  125:18
**loads**  26:22
  45:21,22 62:24
  125:18 142:1,2
  253:8
**local**  89:1
  120:6

**located** 229:4
230:13 239:9
**location** 138:14
213:18 223:22
**login** 109:3
**long** 14:11
18:20,24 49:9
54:6 55:15,25
63:7 68:18
83:3 94:14,16
125:21 132:4
150:16 181:22
215:9,10,14
250:17 255:25
**longer** 16:20
195:22
**look** 7:20,22
18:16 28:3,12
30:5 31:17
33:18 38:13
45:25 49:11
55:24,25 58:3
63:12 70:7,7
84:19 89:24
91:24 95:21
110:3,13
112:17 121:10
132:11,13,21
133:23 136:6,9
137:11 144:15
145:6,25
150:20 153:9
159:11,15
161:23 173:1

174:3 178:8
182:2 183:1
190:5,6 193:9
195:5 198:24
201:25 202:13
204:2 215:2
216:14 219:15
233:5,6 239:1
246:9 249:12
251:3,16
255:21 256:2
258:3,15,17
259:16
**looked** 32:19
32:22 99:3
104:24 161:13
200:9 201:4
236:6
**looking** 7:2
10:1 45:10
56:25 62:21
84:15 86:17
87:23 96:2,3
103:19,23
109:23 122:25
133:3,4,5
138:7 154:19
162:25 172:15
189:20 194:14
197:11 201:13
207:14 214:25
226:3 227:12
227:12 231:7
232:14 233:14

234:17,18,19
234:23 236:18
256:24 268:9
268:17 270:11
**looks** 11:22
75:10 214:23
268:4
**loose** 61:15
126:5
**lose** 10:2 86:5
86:25 247:20
254:6
**losing** 258:11
258:12
**lost** 20:20
252:21
**lot** 10:24 17:16
21:24 22:3,11
22:11 24:2,5
25:13,14,25
26:12,13 29:18
30:1 33:15
40:10 42:24
43:23 45:13
46:18 49:2,4
55:18 56:9
58:1,14 64:9
64:11,13 69:23
71:3 73:5,7,13
79:23,25 85:21
87:4 94:1
102:13 104:21
107:23 108:7
110:1 112:12

116:21 119:5,8
124:7 127:17
127:19 129:6,8
132:4,7 133:24
135:13 138:15
138:15,25
139:15 140:15
140:22 141:24
141:25 156:22
157:2 158:18
167:8,24
181:22,24
199:19 200:19
200:20 207:4
209:8 213:14
213:24 230:10
231:4 234:13
240:14 246:16
246:20 247:10
247:12,22
248:23,25
250:9 252:23
253:15,23
255:6 258:7
**loud** 221:6
**louder** 259:9
**love** 34:14 63:2
63:10,14,15
94:20
**loved** 34:12
**low** 261:25
**lp** 239:7
**ltr** 242:12

**luck** 48:9
**lucrative** 58:24
**lunch** 7:9 92:7
  100:15 142:14
  152:24 153:1,4
  153:7
**lying** 130:6
  249:14,15
  260:4

**m**

**m** 2:3
**ma'am** 18:10
  31:16 32:5
  135:2,2,13,13
  135:17,17
  143:17 144:7
  144:14,21,23
  149:24 151:7
  153:19,22
  154:20,24
  155:3 157:13
  157:24 158:7,9
  159:6,17,24
  160:11,14,15
  160:18 162:2
  162:23 163:24
  164:10,13,20
  165:8,12 168:7
  170:4,13
  171:10,13,25
  175:3 182:5,7
  182:13 183:23
  185:1 191:5,8

199:2 200:2,4
200:7 201:17
201:21,25
202:10 206:22
207:17,20,23
208:11 210:6
216:2,22 217:7
217:20 218:4
218:10 219:8
219:11 220:23
223:4,18
225:14,16,20
225:25 226:21
227:1 228:5,19
229:1,5,11,20
234:1,4 235:15
236:3,25
238:22 239:3
239:10,24
241:15 250:2,5
250:9 251:1,18
251:21 256:18
262:11,17
263:18,20,23
264:18,20
267:21
**machine** 1:21
**made** 32:20,24
  45:9 67:23
  113:13 147:23
  161:8 163:8
  168:20 169:16
  173:24 191:3
  194:9 200:23

245:23 253:8
254:18 260:22
261:9 262:15
278:5
**magnet** 264:14
**main** 175:8
**maintain**
  217:13 219:10
  230:3,22 234:7
  271:7
**major** 26:17
  141:20,20
  142:7
**majority** 21:9
  31:20 64:24
  125:1 127:24
  138:3 139:1,21
**make** 7:6 9:1
  11:19 37:15,15
  48:10 52:20
  55:20,20 57:20
  65:7 66:22
  68:23 79:1
  84:19 90:22
  96:22 123:8
  129:17 131:13
  134:1 142:18
  144:8 166:5,15
  166:23 192:25
  198:11 200:16
  202:12 204:2
  214:7 230:8
  232:10 235:2
  240:8 241:17

252:9,17,18
265:5 268:2,7
**makes** 36:17
  41:7 49:12
  62:22 64:20
  104:24 105:20
  119:9 124:6
  133:6,10 139:6
  180:14 188:15
  199:22 235:9
**making** 176:10
  180:15,20
  189:3,5 236:23
  254:17 255:10
**male** 84:9,13
**man** 40:24
  59:17 68:20
  86:9 136:4
  198:20 206:9
  260:22
**man's** 41:1
**managed** 46:6
**manipulated**
  208:14,15,21
  208:23 209:2,5
  211:12
**manipulation**
  208:6 211:15
**manner** 91:18
  188:2 266:18
**manual** 98:7,8
  98:24
**march** 96:4,5,9
  97:2,7 100:17

| | | | |
|---|---|---|---|
| 100:24 207:22 | **match** 83:22 | 67:12,15,18 | 188:24 191:12 |
| 242:24 243:4 | 85:3 | 69:2 71:10 | 192:21 193:23 |
| **marijuana** | **matched** 108:5 | 73:12,19 75:1 | 197:2 200:24 |
| 50:12,14 69:16 | **matches** 83:3 | 76:7 77:2 | 201:3 204:9,10 |
| 70:21,22,24,25 | 83:17,25 85:11 | 79:13,19 81:11 | 204:11,13 |
| 70:25 71:3,4,8 | 101:19 224:12 | 81:18 83:13 | 205:13 213:9 |
| 71:13,24 72:4 | **matching** 85:2 | 85:15 87:3,16 | 213:11 214:25 |
| 72:8,22,23,25 | **material** 96:24 | 87:21 88:6,6 | 215:21 217:18 |
| 73:13,16 74:5 | 205:20 | 89:13 91:2 | 219:23 221:6 |
| 74:14,19 75:4 | **materials** 3:15 | 93:2,8 94:24 | 223:1 226:1,4 |
| 75:11,24 | 95:9 187:13,14 | 95:5 96:4 98:6 | 226:19 227:6 |
| 140:25 178:1,6 | 199:17 246:13 | 99:12,16 100:4 | 231:22 232:21 |
| 179:2,9 180:23 | 251:20 | 100:18 103:12 | 233:1 237:11 |
| 181:1,9,10,14 | **matter** 4:8 14:7 | 104:10,13,20 | 247:22 249:11 |
| **mark** 13:21 | 35:21 36:1 | 104:21 105:4,9 | 253:13 257:15 |
| 60:16 62:12 | 87:14 90:11 | 105:12,21 | 258:8 266:11 |
| 91:10,12 | 133:8,9 250:23 | 108:10,23,25 | 268:1,5,21 |
| 210:14 | 250:25 | 108:25 109:22 | **meaning** |
| **marked** 3:17 | **mattered** 172:8 | 110:4,4,9,21 | 194:10 249:18 |
| 9:14 11:14,16 | **matters** 15:1 | 113:17,20 | **means** 5:7,22 |
| 13:23 14:3 | 16:2 75:25 | 116:24 117:1 | 53:12 60:23 |
| 153:10 160:20 | 76:1 87:13 | 117:15 119:22 | 118:21 127:19 |
| 161:24 162:13 | 111:2,3 198:5 | 122:22 126:4 | 141:12 171:1 |
| 164:3 210:14 | 199:15,16 | 128:5 135:22 | 249:16 260:4 |
| 210:16 216:13 | **mcallen** 21:13 | 136:23 141:11 | 267:13 |
| 251:6,8 271:21 | **mean** 7:1 20:15 | 144:2 149:25 | **meant** 97:8 |
| **market** 25:14 | 30:2 34:14 | 151:9 152:20 | 103:17 104:14 |
| **marking** | 46:2,3 47:9,12 | 156:8 166:19 | 143:4 148:6 |
| 269:21 | 47:25 49:25 | 169:22 170:13 | 182:16,25 |
| **markings** 84:21 | 50:11,16,23 | 171:17,18 | 223:2 |
| **marshals** 20:2 | 51:17 54:20 | 174:18 175:17 | **measurement** |
| **martin** 1:6 2:18 | 55:1,2 60:5 | 175:23 176:21 | 265:19 |
| 159:21 274:6 | 62:19 63:7,12 | 177:1 180:2,4 | **media** 109:1,12 |
| | 63:13 65:24 | 180:22,23 | 113:12 115:8 |

129:16
**median** 101:18
270:2
**medication**
8:14
**meet** 154:8,10
**meeting** 89:25
137:21 138:1
248:12
**member** 67:6
111:16,17
242:16
**members** 45:18
**memory** 33:8
35:5 68:17
102:7 177:25
186:14
**mental** 252:8
**mention** 175:25
177:9
**mentioned**
41:18,23 42:5
161:7 172:19
184:9,10
195:20 199:7
204:11 214:18
228:11 240:23
240:24 249:21
265:12
**merchandise**
45:22 62:25
**mere** 85:22
**merely** 35:23
239:20

**merry** 32:21
**message** 111:7
111:9 165:12
184:14 239:19
**messaged**
112:2
**messages** 165:9
165:13,17,20
165:22,23
239:18
**messaging**
112:18 113:7
239:6,15,22
243:2
**messed** 100:20
**met** 4:9,17,21
89:15,17,23
111:12,13,17
111:21 138:19
244:5
**meta** 109:2
**meth** 82:8
85:10 140:8,10
**methampheta...**
69:16 180:3
**method** 51:13
**methodology**
173:17 185:9
188:13 189:8
**methods**
255:13
**mexican** 23:16
24:4 26:12,20
48:4,17 50:11

59:23,23,24
71:2 125:15
**mexico** 48:6
49:14 58:23
70:11 142:9
**mid** 27:7,9,10
27:11,11 42:4
208:8,21
**midatlantic**
276:15
**midlevel** 26:14
**midway** 252:7
256:2
**miles** 101:25
102:1 131:3,14
216:11 221:23
222:16 236:7
267:11
**millimeter** 40:7
**million** 22:2
**mind** 33:12,14
33:16 35:8
41:13 68:19
92:2 124:18
135:4 138:6
146:17 147:4
147:17 148:1,4
148:23 151:16
158:25 160:20
182:14 197:10
220:15 221:1
247:8,12
**mindset** 36:20

**mine** 111:12
**minus** 105:7
**minute** 31:9
57:14 100:10
126:8 154:3
162:5,9 163:7
207:18,21
208:7,16,19,20
208:20,22
209:5 211:8,15
211:17,19,19
211:20,23
212:1,3 265:2
**minutes** 4:9,19
4:22 35:1
56:16 126:3,5
126:6,6 142:17
148:19 150:19
182:21 211:20
212:2,7,8,8
221:5
**mirror** 232:15
**misdemeanor**
266:15,16
**mispronounce**
10:24
**misread** 258:4
**missed** 98:25
247:19
**missing** 243:19
**mission** 63:23
**misspelling**
143:4

| | | | |
|---|---|---|---|
| **misspells** 144:1 | **money** 21:7 | **moved** 24:17 | **narcissistic** |
| **mistake** 97:9 | 48:10,15 49:14 | 228:8 241:21 | 131:25 |
| 160:7 164:6 | **monikers** | **movements** | **narcotic** 15:1,2 |
| 252:9,17,18 | 141:18 | 133:5,5 | 24:11,13 29:13 |
| 254:17 260:22 | **monitor** 109:11 | **movie** 21:19,25 | 30:13 89:19 |
| 261:9 | **monitoring** | **movies** 40:17 | 91:2 105:16 |
| **mistaken** | 108:24 109:24 | **moving** 218:1 | 109:8,10 139:3 |
| 157:17,18,20 | **monkey** 184:17 | 267:17 | 199:20 201:14 |
| 158:21 174:16 | **monotonous** | **mueller** 1:22 | 201:16 |
| 174:17 | 65:6 | 2:15 | **narcotics** 23:20 |
| **misunderstan...** | **month** 61:8,9 | **mule** 48:14,24 | 23:22 27:24 |
| 197:25 | 61:10 | 48:24 57:20 | 28:1 30:16 |
| **mixes** 180:8 | **months** 17:8 | 58:3,3,5,12 | 33:24,25 46:19 |
| **mobile** 39:22 | 61:5 | 82:17 | 52:23,25 53:9 |
| 39:22 41:18 | **morals** 63:16 | **mules** 48:13 | 53:21 200:14 |
| 42:12,18 44:1 | **morning** 4:5,6 | 57:19 125:16 | 241:9 |
| 212:23,25 | 8:16,25 93:22 | **multiple** | **narrow** 114:22 |
| 229:17 | 167:24 | 155:10 164:15 | **nation** 20:4 |
| **mode** 51:15 | **motel** 51:4 | 200:21,24 | **nationals** 59:23 |
| **model** 235:2 | 117:23 118:15 | 242:18 | **natural** 6:16 |
| **models** 214:15 | 184:2 191:23 | **municipalities** | 139:9 142:18 |
| **modes** 68:6 | **mother** 84:4 | 71:19 | **nature** 39:13 |
| **molestation** | **mount** 40:9 | **muscle** 102:6 | 68:3 93:25 |
| 192:10 | 264:14 | **musk** 215:21 | 117:20 135:4 |
| **molina** 1:6 2:18 | **mounting** | **n** | 136:16 174:14 |
| 5:4 159:21 | 209:10 | | 184:3 191:24 |
| 160:1,2 177:25 | **mouse** 87:25 | **n** 2:1 4:13 | 194:12 233:12 |
| 178:13 184:22 | **mouth** 134:14 | **name** 4:7,12 | 250:20 261:7 |
| 185:18 186:8 | 260:8 264:4 | 5:1 10:24 70:3 | 267:12 272:21 |
| 192:4,7,7 | **move** 41:17 | 91:11,18 116:5 | **natures** 130:19 |
| 240:13 274:6 | 46:9 65:8 | 163:25 185:19 | **nearly** 100:9 |
| **mom** 63:5 | 136:14 184:23 | 237:21 250:13 | 142:13 |
| 84:11 | 185:4 235:19 | 250:14 | **necessarily** |
| | 248:9 | | 15:14,23 51:23 |

83:20 140:20
159:3 199:9
203:5,19 233:1
237:17 238:9
255:3 257:15
266:22 267:9
267:12
**necessary**
66:13,15,16,17
278:6
**need** 5:22 12:9
19:20 21:3
23:16 24:19
44:10 47:24
48:10,14 56:5
68:13,14 72:12
75:22 77:20,21
77:22 78:11
87:10 92:22,23
136:25 146:10
147:9 162:3
192:14 248:8,9
249:3
**needed** 23:11
28:17,18 34:2
35:24 91:18
246:8
**needing** 174:16
**needs** 55:17
72:11 86:6
**neither** 275:12
**nervous** 85:14
85:16,18,21,23
86:23 133:20

134:20 135:15
194:12 249:21
260:9 264:7
**nervousness**
104:19
**network** 53:20
238:16
**networking**
106:24 107:5
**never** 4:25 32:8
34:8 35:11
36:15 38:6
87:8 89:15
108:21 110:25
111:17 121:4
122:21 123:3
135:15 140:9
158:11 206:9
222:16
**new** 24:10,16
30:13,15 45:13
45:22 50:12
78:22 98:21
153:20 161:4
161:15 187:16
**news** 177:7,19
**nice** 86:19,23
**night** 85:15
93:21 129:19
140:14 147:24
242:13
**nights** 24:25
**nine** 29:4 183:6

**nodding** 5:24
**noises** 256:5
**noncriminal**
132:18
**nonexistent**
229:14,21
**nonstressful**
135:25 261:21
**nonthreatening**
134:22 136:15
137:6 261:20
**nonverbal**
262:9,22
**nope** 138:2
**normal** 43:9
86:25 101:3,3
104:15 119:19
134:19 139:16
140:10,11,16
150:18 188:15
**normally** 73:7
143:6
**north** 2:10 24:6
48:22 50:10
60:1 97:3
108:4 120:3,4
126:10 131:1,3
131:14 133:16
140:1 241:22
**northbound**
129:21 141:9
227:4 232:6
239:8 241:5

**northern**
126:21
**nose** 134:15
**notary** 274:15
275:5 278:13
278:19
**note** 9:6 11:6
276:10
**noted** 278:7
**notes** 9:15 68:6
68:9
**notice** 5:8
**noticeable**
135:10 222:19
228:16 264:3
**noticed** 235:22
236:4,16,17,18
**notoriously**
22:20
**november**
14:18
**number** 3:9,18
33:17 48:20
54:15 55:10
84:15 108:2
126:24 127:4
174:4 207:2
216:12 251:4
**numbered** 1:18
251:22,25
**numbers** 11:20
96:16 111:13
111:22 149:3,6
149:7

**numerous**
220:12 250:12
266:17
**nutshell**  27:3
68:1 72:2

**o**

**o**  4:13 250:15
250:16
**oath**  5:14,16
176:16
**objection**  6:25
7:2 99:14
103:5 127:7
178:22 194:20
195:1,15
196:11 197:18
198:3 211:13
215:7 269:7
271:9,16 272:1
272:10
**objective**
172:10 193:17
**objectively**
190:24 192:22
193:9,15
**observation**
180:24
**observations**
170:3 173:2
**observe**  114:7
114:14 236:13
247:25

**observed**  61:11
101:2 216:8
220:1 222:20
224:12 232:9
243:5 245:11
245:24 270:5
**obtain**  42:2
44:9 98:4
144:18 157:14
158:15
**obtained**
158:14 187:20
**obtaining**  77:6
**obvious**  106:11
131:9,10,11
232:16
**obviously**
13:24 23:19
28:7 36:19
40:1,15 46:4
51:19 66:17
90:6 99:15
107:18 116:14
152:10,20
156:11 168:15
208:15 216:10
226:11 232:23
232:23
**occasion**
219:22
**occasions**  15:7
115:7 220:12
242:18 262:1
264:6

**occur**  71:7
138:25 233:10
**occurred**  113:7
129:10 169:22
169:23 271:23
**occurring**
240:22
**occurs**  49:15
257:12 260:8
**october**  14:17
14:17,19
**odd**  19:7 33:4
36:4
**odds**  83:4 89:4
134:10 161:10
**odor**  71:1,4
**offense**  230:3
230:24 234:6
235:18
**offenses**  216:6
216:8,9
**offer**  15:13
215:16
**offering**  12:19
**offers**  239:20
**office**  10:6 13:7
15:20 16:18,21
16:24 18:19
19:3 22:19,22
23:2,6,8,10,17
23:20 24:9,11
24:13 27:22
30:14 89:11
91:6,14 99:8,9

100:4 166:11
166:20 167:20
186:15 187:25
190:2,3
**office's**  99:3,11
**officer**  15:25
23:6,19,21,25
28:14 37:4
40:5 43:10
44:24,25 45:7
45:24 46:13
47:8 49:11
54:19,19,21
55:13,15,22,23
55:24 56:3,9
56:25 60:20,24
61:4,6,12,14,20
61:23 62:1,9
62:23 64:20,21
64:22 65:8,11
65:22,23 67:5
68:6,13,18,19
71:8 72:3,24
73:2,12,16
76:19 77:17,17
78:11 79:7,18
81:12,18 83:4
83:7,14 84:24
85:25 86:6,10
86:16,21 88:7
98:15,15
101:24 104:23
105:24 106:7
106:23 110:13

112:3 113:3
115:25 116:23
117:24 118:14
119:11,18,21
119:22 121:8
121:19 122:3
127:16 129:11
129:15,17
130:5,14 132:5
134:10 135:11
136:14 137:5,8
138:7,22,23
139:4,18,22
140:3 141:14
143:1,8 144:4
145:15,24
148:14 150:10
150:25 151:12
151:18 152:6
152:18 168:1,3
168:11 172:10
179:21 180:1
180:24 181:22
188:3 189:2,4
189:5 190:12
190:13,16,23
191:10,11,13
192:1,2,16
193:12 195:18
195:21,24
196:3,4,5,14,17
196:24 197:3,6
198:6,7,9,15
199:8,9,10

201:10 204:23
205:11 213:13
216:5 217:1,12
219:3 236:10
236:13 238:24
248:13 257:24
258:11 265:9
274:18
**officer's** 85:23
123:22 147:25
148:4 191:17
192:5 196:10
196:22
**officers** 25:18
28:20 42:18,24
43:24 44:2,7
44:16 45:2,4
49:8 52:25
53:9,21 59:11
62:6 65:17
66:10 71:21,23
77:1 78:3,21
78:22 87:23
89:10,19 91:3
101:16 102:3,7
102:13 107:5
109:9 112:8,23
118:1 120:13
129:24 139:2
145:9,19 146:4
154:11 172:13
179:9,15 188:6
188:20,20
190:21,23

191:2 192:18
194:1 196:20
202:19 203:17
203:18 204:6
204:18,22
205:13,15,15
205:23 213:19
229:16 233:3,4
234:16 250:21
252:17 255:1
265:13
**offices** 1:21
2:20 21:14
**official** 1:6,7,8
110:11 153:11
248:13 274:6,7
274:8
**officially** 91:21
**offsite** 241:3,21
**oftentimes**
89:20 112:9,9
114:19,19
133:19 145:8
237:10
**oh** 10:7 11:3
12:13 20:15,23
26:6 32:25
37:21,21,21
59:16 60:24
66:4 86:3
93:11 95:15
103:22 109:7
116:6 131:5
137:9 139:14

143:22 145:22
145:24 158:4
159:2 161:15
164:5 172:7
203:3 210:4
213:8 221:7,9
222:25 223:24
231:17 232:16
254:11 260:19
260:22 263:12
268:16
**ohio** 156:6
**oil** 139:11
140:1,11,13,18
140:21,23
141:8 181:10
**okay** 4:16 5:5
5:13,20 6:3,11
6:22,23 7:8,21
8:4,8,11 10:7
10:13,17,22
11:3,9,11,12,17
12:8,22 13:12
13:18,20 14:14
15:3 16:12,20
16:23 17:2,6
17:11 18:8
19:2,5,11,15
20:23 22:13,20
22:25 25:6
26:6 27:21
28:20 29:8,13
30:23 31:5,8
31:15,21,25

| | | | |
|---|---|---|---|
| 32:5 36:25 | 109:16 112:1 | 181:19 182:2 | 250:8 251:2,24 |
| 38:5,9,14,25 | 114:14,25 | 182:14,18 | 252:1,5 256:20 |
| 39:3,6,15,20 | 115:21 117:3 | 183:5,25 | 257:13 260:19 |
| 40:5 42:5 43:7 | 118:17 120:3 | 184:16 185:2,8 | 262:8 263:7,16 |
| 43:22 44:19 | 122:1 123:20 | 186:14 187:6 | 264:1,12,16,21 |
| 45:24 47:16,19 | 125:1 126:6,15 | 187:12 189:9 | 264:24 265:4 |
| 48:3,14 49:3 | 126:22 127:9 | 190:17 191:9 | 266:3,25 |
| 49:20,24 50:1 | 128:4 136:10 | 192:21 193:16 | 267:14 268:21 |
| 50:6,15,18 | 137:16,20 | 194:14 197:10 | 268:24 271:4 |
| 51:11 52:19 | 143:6,16,18,20 | 197:16 200:5,8 | 272:4,7,15,24 |
| 53:9 54:1,4,11 | 144:8,24 | 201:18,22 | **old** 40:9 71:2 |
| 54:18 55:12 | 145:16 146:13 | 202:1 203:4 | 94:11 98:23 |
| 56:2 57:4,12 | 149:10,16 | 206:23 207:24 | **olg** 1:5 274:5 |
| 58:14 59:22 | 150:15,20 | 209:9 210:4,9 | **omission** 160:7 |
| 62:14 66:14 | 153:20,23 | 211:3,5 213:5 | **once** 32:16 |
| 67:8,14,19 | 154:17 155:4,8 | 214:1,14 216:9 | 59:11 60:19 |
| 69:3,9,20 70:6 | 155:12 157:14 | 216:14,17 | 61:12 62:24 |
| 70:20 72:6,8 | 157:22,25 | 217:8,21,25 | 66:3 134:23 |
| 72:16 73:3 | 158:4,16 159:8 | 218:8,11,17,25 | 139:23 142:17 |
| 76:21 77:7,14 | 159:11,13,14 | 219:9,21 | 147:8,19 |
| 78:17 79:23 | 159:21 160:3 | 220:20 221:11 | 185:17 186:4 |
| 82:2,14,20,22 | 160:19 161:23 | 222:2,5,5,12 | 187:22 230:5 |
| 82:24 83:10 | 162:17 163:5,9 | 223:5 224:2 | 236:17 248:6 |
| 84:1 85:1,13 | 163:19 164:7 | 226:15,17 | **ones** 142:10 |
| 88:4 89:7 | 164:17 165:5 | 227:2,9 228:1 | **ongoing** 240:21 |
| 91:20 92:19 | 166:19 167:17 | 228:23 229:25 | **online** 19:23 |
| 93:18 94:2,10 | 168:4 169:8 | 232:7,18 | 20:8 22:6 |
| 94:19,21 95:8 | 171:2,14,23 | 233:20 235:20 | 156:3 202:7 |
| 95:19,21,23 | 173:10 174:3,4 | 237:1,3,25 | 205:25 207:5 |
| 96:1,22 97:16 | 174:10,21 | 238:5,7,20,23 | **open** 25:13 |
| 99:1,6 100:12 | 175:2 177:13 | 239:13 242:4,4 | 272:18 |
| 100:13 102:20 | 177:19 178:8 | 243:11 245:9 | **opening** 89:22 |
| 103:13 105:21 | 178:25 179:3 | 245:14 246:1 | 264:4 |
| 106:17 107:8 | 179:17,20 | 247:15 250:3,6 | |

operate  181:25
operated   29:5
  188:19
operates   47:21
  192:6
operating
  52:17
operation
  269:11
operations   27:1
  30:11
operative   46:21
opinion   12:20
  15:13 16:2
  79:21 90:4,10
  91:22 96:18
  101:11,13
  103:20,25
  106:15 114:3
  115:4 128:12
  146:19 150:14
  153:21,25
  155:1 163:3
  164:19 165:7
  165:14,15,23
  168:8 170:3,19
  172:17 176:7
  176:10,22
  177:17,23
  185:12 190:7
  195:6 197:17
  198:11,12
  208:4,12
  211:14 214:12

215:17 220:11
221:21 228:1
228:20 229:15
230:3,7 232:12
233:21 240:19
264:23 271:14
272:8
opinions   12:1,4
  90:17 153:13
  154:6 161:11
  197:13 270:15
opportunity
  12:18,22,25
  13:12
opposite   40:23
options   150:9
oral   1:12,16
  274:11,19
order   72:7
  131:19 144:18
  149:21 150:13
  156:10 190:24
  192:14 193:14
  198:8 212:4
  246:25
orders   187:2
organization
  45:16 46:7
  48:7 52:10
  122:25
organizations
  53:16
organized
  45:18

oriented   46:13
original   40:6
  128:10 274:21
originally
  186:23 244:1
originated
  118:14
ounce   51:24
outcome
  275:16
outlined   242:1
  242:6
outside   15:12
  78:23 80:2,4
  183:14 197:7
  268:11
overall   199:3
oversaw   54:5
oversee   52:23
overtook   10:24
  223:8
overview
  169:19
own   34:2 61:13
  62:20 129:5
  205:14 247:24

**p**

p   2:1,1
p.c.   1:22 2:14
p.m.   1:19 153:1
  153:2 162:10
  162:10 246:5,5
  265:7,7 273:11

pace   236:9
  266:7,7,8
  267:19
package   51:5
packed   126:16
page   3:9,18
  10:19 11:19
  31:12 92:2,12
  95:25 96:2
  109:2 121:23
  142:22 144:10
  144:11 149:2
  149:11 153:11
  153:11,12
  154:17,19,22
  154:22 157:7
  158:22 159:11
  160:13 162:22
  169:9 170:2
  174:4,5 178:8
  182:2,15
  184:16 187:10
  190:17 197:10
  198:23,24
  199:24 201:14
  206:12,14
  207:13 215:25
  216:14,17
  221:11 223:7
  225:12 229:7
  239:1 242:3
  245:22 246:9
  251:16,17,17
  251:25 252:3,5

252:7 255:21
256:20,21
258:21,22
259:16,24
261:4 262:8,9
263:9,11,12,13
263:16 275:8
277:4,7,10,13
277:16,19
**pages** 10:2 23:1
154:25 162:4
165:10 251:22
251:23 256:3
**paid** 16:11,14
32:24 57:25
88:20 116:10
117:10
**paper** 94:3
98:24
**paragraph**
92:11 106:20
121:23,24
137:11,12
142:22 144:10
144:11,16
148:11,25
149:1,10,12
150:20 153:12
158:22,25
159:2,3,4
178:9 182:3,9
182:15,23,25
183:2,6 184:17
190:18 197:11

197:12 199:24
202:4 206:13
206:15 207:14
208:3 216:15
216:15,20,21
221:14 222:6
222:11,13
223:6 225:13
225:13,15,17
226:11 228:14
229:8 239:2
246:10 256:21
257:5 262:13
262:21 263:9
263:17
**parcel** 51:5
**parentheses**
160:6
**park** 44:8
**parked** 101:18
217:22
**part** 7:10 21:1
21:19,21 23:9
28:19,21,24
30:12 41:6
42:20 43:13
67:24 79:1
82:21 83:3
96:11 103:10
114:25 115:1
122:23 144:13
145:7,8 156:17
160:7,7 166:18
167:5,15

169:25 170:24
171:19,22
175:5 203:17
221:2,2 224:19
229:18 245:2
252:12 260:10
**participant**
34:21
**participate**
37:21
**particles** 72:21
73:18 74:2
76:2
**particular** 7:13
17:24 24:21
29:7 54:3
67:22 104:18
108:17 117:23
145:1 148:21
151:11,14
152:9,22
156:20 161:2
179:18 181:3
189:3,7 191:16
191:25 192:19
193:11,14
195:18,19,25
196:16 207:11
228:5 236:20
244:6,19
245:10 248:8
257:16 260:7
271:3

**particularly**
14:25 85:24
211:19 212:16
235:4
**parties** 274:24
275:13
**partner** 34:20
165:17
**parts** 7:25
203:10
**party** 275:3,11
**pass** 61:12
120:21 126:7
126:19 127:19
272:22,25
**passed** 125:18
125:19 218:12
220:9,14
221:17,22
223:23 227:7
228:6 230:19
230:22 233:21
270:23
**passenger**
40:16 116:9
147:20
**passes** 101:18
219:14,16
231:12,13
**passing** 217:3
220:13 222:16
222:17,18
228:13 234:2
236:5,8 265:16

| | | | |
|---|---|---|---|
| 265:25 | **paying** 43:2,11 | 127:4,6,25 | **persistence** |
| **passion** 64:7 | **pays** 16:10 45:8 | 128:21 129:6 | 64:23 |
| **passionate** | 80:16 | 130:11 131:22 | **person** 36:13 |
| 188:21 | **pd** 23:13 89:5 | 133:10,24,25 | 36:14 37:22 |
| **past** 89:23 | **peace** 60:20 | 138:3,15 | 46:15 51:24 |
| 105:3 151:18 | **pen** 94:3 | 139:21 140:17 | 57:5 62:17,22 |
| 152:13 208:17 | **people** 20:5,11 | 140:20 142:6 | 65:3 67:25 |
| **pat** 249:2,3,5 | 21:10 23:25 | 143:13 144:6 | 68:11 72:19 |
| 253:25 254:7 | 26:23 28:18 | 160:9 180:6 | 80:15,20 81:13 |
| **path** 205:19 | 34:24 35:2 | 188:18 192:15 | 83:24,25 85:2 |
| **patrol** 24:17,25 | 37:3,10,14 | 203:14,25 | 86:1,2,17,19 |
| 30:23,25 40:9 | 38:1 44:23 | 204:1,15 231:4 | 113:2,20,21,24 |
| 43:4,5 44:9,25 | 48:6,7,8 49:17 | 231:5 246:21 | 113:24 114:10 |
| 81:9 127:14 | 49:18 50:2 | 247:13 250:22 | 115:19 116:1 |
| 163:18 174:8 | 52:2,9,10,16,16 | 253:19,24 | 121:16 129:20 |
| 177:22 183:10 | 53:23 54:6 | 254:7 256:5 | 130:6,20 |
| 183:21 191:13 | 55:18 56:16 | 258:6 261:24 | 131:25 132:6 |
| 191:17 192:2 | 58:21,24,25 | **people's** 188:21 | 134:8,9,19,24 |
| 222:17 232:15 | 59:21 62:25 | **perceived** | 136:8 138:19 |
| 270:6,10 | 63:17,18 69:17 | 151:5 197:20 | 139:24,25 |
| **patted** 78:10 | 69:22 74:22 | **percent** 127:5 | 141:16 150:4,4 |
| **pattern** 120:2 | 75:5,6 76:16 | 188:18 | 150:13 154:4 |
| **patterns** 56:14 | 76:25 77:20,24 | **percentage** | 181:9 202:7 |
| 79:24 80:25 | 85:21 93:16 | 125:5 126:25 | 224:9 237:15 |
| 119:23 242:18 | 105:1,23 | 206:17 | 244:17 246:18 |
| 247:6,23 | 107:20 108:11 | **perception** | 247:24,25 |
| 252:22 253:3 | 113:23 115:8 | 235:11 | 248:12,17 |
| 255:3 260:9 | 120:15 122:16 | **perfect** 117:21 | 253:17,22 |
| **pause** 226:15 | 122:21,22 | 117:25 | 255:9,16 |
| **pay** 37:14 | 123:1,2,4,6,13 | **perform** 190:10 | 258:13,16 |
| 42:25 45:3,4 | 123:17 124:8 | **performing** | 260:4 261:3,18 |
| 59:11 83:20 | 124:12,22 | 103:8 | 261:19 264:7 |
| 253:14 254:5 | 125:1,5,10,13 | **period** 18:25 | 265:24 266:1 |
| | 125:15,16 | | 270:10 |

| | | | |
|---|---|---|---|
| **person's** 68:7 | **phrase** 69:12 | **pitch** 259:7 | **play** 66:7 |
| **personal** 64:5 | 173:20 212:23 | 260:2,6,19,23 | **played** 40:13 |
| 77:16 115:4 | 225:21 227:5 | 261:15,22 | 128:11,15 |
| 130:21 213:6 | 269:17 | 262:4 | **plays** 128:10 |
| 214:12 231:6 | **phrasing** | **pitches** 261:2 | 129:22 |
| 256:10 | 103:16 269:15 | **place** 48:19 | **please** 5:23 6:4 |
| **personalities** | **physically** 35:1 | 77:19,19 | 6:12 67:8 |
| 62:5 192:13 | 74:21 | 120:13 175:13 | 220:18 |
| **personally** 38:3 | **pick** 20:5 21:10 | 217:21 241:3 | **plus** 200:17 |
| 63:20 89:15 | 37:17 40:21 | **placed** 122:17 | 257:21 |
| 225:8 267:24 | 48:18 66:1 | 264:14 | **point** 7:24 24:2 |
| **perspective** | 83:7 90:1 | **placement** | 24:8,23 26:11 |
| 79:13 195:17 | 128:21 134:5 | 42:22 43:11 | 26:17,21 39:3 |
| 196:15 213:16 | 135:24 | 44:7 | 41:3 46:10,10 |
| 240:4 247:21 | **picked** 21:14 | **places** 48:9 | 60:17 61:21 |
| **pertinent** | 21:22 | 76:19 142:5 | 105:14 117:1 |
| 170:18 171:8 | **picks** 116:20 | **plaintiff** 1:3,17 | 144:3 175:15 |
| **pflugerville** | **pickup** 33:1 | 2:2 4:8 274:3 | 184:10 205:4 |
| 19:14 | 122:18 | **plaintiff's** 8:8 | 214:2 222:24 |
| **phase** 46:8 | **picture** 52:5 | **plan** 133:16 | 244:2,7 245:7 |
| 50:21 51:1,7 | 193:17 | 219:2 | 269:19 |
| 51:12 54:25 | **pie** 131:19 | **plane** 116:9,14 | **pointing** |
| 61:10 | **piece** 66:20 | 116:17 117:19 | 159:13 256:12 |
| **phone** 115:8,13 | 131:19 | 118:13 | **points** 86:4 |
| 115:14 117:4 | **pieces** 66:19 | **plans** 13:16 | 247:20 |
| 183:15 184:14 | 77:18 195:13 | **plate** 33:13,17 | **pokemon** 22:3 |
| 223:7 231:5,9 | **pill** 70:8,8,18 | 48:19 108:2 | 22:5 |
| 231:12 240:1 | **pills** 70:11,13 | 147:13 233:11 | **police** 21:2 |
| 243:14 244:10 | 70:14 | 242:10 265:22 | 25:12 26:15 |
| **phones** 107:4 | **pin** 76:21 | **plates** 101:22 | 27:7,16 29:20 |
| 256:6 | **pinpoint** 244:6 | 118:6 232:25 | 33:3 35:20 |
| **phoning** 237:16 | 244:21 | 233:14 | 36:1 41:1,8 |
| **photograph** | **pipes** 74:23 | **platform** 112:7 | 54:19,21 59:11 |
| 235:2 | | 113:7 129:16 | 61:2,25 65:11 |

72:18 77:8,17
87:23 88:7
89:22 112:2
113:3 114:21
145:24 150:9
181:22 189:1
190:22,23
191:2,10
192:14,16
194:1 231:20
234:16 237:5
253:14
**policies** 13:7
30:18 97:20,24
98:9,24 99:4
100:3 104:3
186:16 187:24
189:19,21,24
190:4,9 203:16
**policing** 261:10
**policy** 62:2
78:7 97:14
98:4,5,15,16,17
98:19,24 99:10
99:11,20
101:10 103:8
103:11 105:11
112:20,20
151:17 186:20
188:1 189:18
190:5,11
204:19 205:17
**pop** 135:7

**popped** 36:5
**popping** 135:8
**pops** 110:12
**port** 127:14
**portion** 158:23
183:11 202:3
206:20 221:24
259:5 262:21
**portions** 179:8
**position** 16:6
23:14 77:14
87:5 122:3
124:18 152:19
152:22 196:14
198:9,16
222:19 230:25
234:11 268:16
**positioning**
213:4,17
228:25 231:17
**positions**
231:19
**positive** 64:16
184:22
**possibility**
124:20
**possible** 66:10
128:20 215:4
**possibly** 242:21
243:22
**post** 109:24
**posted** 109:4
221:24

**poster** 21:25
**posts** 108:19
109:4,20
110:15
**potential**
240:25
**potentially**
60:5 102:16
212:5 223:10
223:20 231:8
249:11 266:21
**pothead** 75:2
**pounds** 25:20
34:23 70:10
**powerdmv**
98:10,12,18,23
**powerpoint**
161:14,19
**practice** 62:15
**practiced** 34:11
35:24 204:5
**practices**
181:20 190:22
**practicing** 97:1
99:2 100:5
102:23 103:1,3
104:12
**precise** 219:1
**preconceived**
258:9
**preconception**
256:23
**prefer** 67:21
255:17,19

**preference**
77:17 78:16
81:7
**preliminary**
91:21,22
**preparation**
93:23
**prepare** 8:18
**prepared** 11:24
**prescription**
70:8
**preserve** 7:2
**president** 89:19
89:20 91:2
110:8
**pressure** 135:6
135:9
**pretend** 85:11
85:17 109:16
109:18,19
**pretty** 48:2
60:2 120:21
214:13 252:20
**previous** 113:6
113:6 148:22
166:14
**previously** 3:17
16:16 81:23
156:4 160:20
161:24 162:13
**prices** 93:16
**primarily** 20:7
199:15

[printout - pulled]                                    Page 56

**printout** 3:14
210:22 211:1
**prior** 69:5
106:8,14,16
107:17 113:13
113:14 117:16
117:17 124:16
128:17,25
129:14 146:16
182:3 187:4
194:3,8 239:5
240:16 242:9,9
243:9
**prison** 17:17
258:6
**private** 163:5
202:6,12
**probable** 30:7
106:3 114:13
114:22 120:17
147:16 216:1
271:14
**probably** 9:24
27:11 35:15
39:18 42:3,10
49:1 62:13
71:10 74:11
123:5 168:15
180:10 193:6
201:9 205:21
234:23 257:16
262:13
**probation**
61:14

**problem** 26:1
40:11 56:5
63:22 68:16
131:9,10,11
257:5,8,11,14
**problematic**
202:18
**problems** 205:8
**procedure** 1:23
97:14,17,20
98:4 99:21
101:8,10
**procedures**
30:18 97:2,12
97:21,24 99:2
99:4 100:3,5
100:25 102:24
103:2,4 104:2
104:13 155:21
186:16 190:10
203:16
**proceeding**
275:14
**proceedings**
273:11
**process** 24:24
60:21,21 79:3
81:17 142:11
252:8 255:2
**produce** 211:8
**produced** 1:16
**product** 258:10
**profile** 58:2,12

**program** 30:21
37:16 61:1,5
239:6,15,22
**programs**
239:20 246:23
**projects** 25:13
25:25 26:9
**promote** 78:22
**promoted**
24:15
**promotional**
24:24
**prompt** 74:16
**prompted** 75:9
**prompts** 79:9
130:13 199:22
**prop** 84:17
**properties**
24:10
**property** 19:20
69:18,18
**prosecutable**
73:1 179:1,5
**prosecute** 74:6
**prosecuted**
71:23 72:2,7
72:14 179:7
**prosecuting**
71:16
**prosecutors**
16:4
**protect** 41:8
240:21

**protecting**
110:8
**prove** 180:10
180:23 258:10
258:16
**provide** 164:23
165:2
**provided** 12:16
96:24 99:5
153:14 162:17
199:19 200:21
202:5,11
206:15 208:4
259:20,21
**providers**
206:18
**provides** 38:16
**providing**
164:21 165:5
**provisions** 1:24
**proximity**
142:9 217:4
**public** 24:3
29:5 33:21
41:8 48:18
67:6 111:16,17
113:17 146:8
192:12 274:15
275:5 278:19
**pull** 43:9
114:10 160:22
265:9 266:3
**pulled** 17:20
59:7 216:6

**pulling**  53:23
160:20
**pulls**  43:10
**purchased**
29:20
**purport**  211:1
**purpose**  33:22
62:2
**purposes**  44:10
160:18 176:22
**pursuant**  1:23
275:1
**pursuit**  59:14
**put**  9:11,23
10:11 25:19
26:19 33:20
39:9 40:21
68:8,22 71:6
72:9 76:21
81:23 84:22,23
85:4 95:9,13
119:3 122:22
144:2 145:3
148:12 171:17
171:20 172:5
172:20 175:6,8
175:9 177:2,5
197:1 204:23
205:19 249:4,6
254:25 255:7
256:18 272:8
**puts**  139:4
196:17 198:9
198:15

**putting**  38:2
62:7 94:3
168:2 237:21
**puzzle**  66:20

**q**

**quality**  259:2,6
259:15,24
261:2
**quantities**
25:18 48:4
138:10,14
143:13 144:5
**quasi**  192:16
**question**  6:4,8
6:12,15,15,21
7:4,5,13 16:5
21:13 36:4
38:19 46:2
52:20 55:9
56:19 62:4
66:14 67:12
76:8 80:17
85:1 96:6
103:10 112:14
125:8,12
130:13 132:4
132:25 133:3
134:13,24
135:5,12 136:2
138:24 143:21
157:11 166:5
167:6,23
175:14,23

176:5 185:6
195:11 199:23
214:9 221:8
229:23 245:14
248:2,6 249:22
262:1 269:16
270:24 271:2
271:11,25
**questioning**
40:3 168:20
169:1
**questions**  7:25
56:21 57:18
64:8 67:7,11
69:3 70:14
80:7 88:12
90:3 92:1
102:21 103:24
115:14,16
117:15 130:16
131:18 134:22
136:15,15,17
136:21 137:6
137:13 140:12
153:4 169:6
218:16,18
247:14 248:1
261:20,21,21
265:8 272:17
273:5,7,9
**quick**  31:17
48:11
**quicker**  119:10

**quickly**  182:14
199:23
**quite**  36:2
55:16 60:11
143:21 229:22
**quiz**  247:19
**quote**  106:21

**r**

**r**  2:1 164:1
250:15,16
277:3,3
**radar**  236:12
265:19,20,21
266:21,23
267:19
**radio**  80:22
**radios**  106:25
107:5
**radiowave**
265:21
**raise**  85:7
249:6
**raised**  63:16
**raises**  136:22
**ran**  73:21
74:20
**rangers**  33:21
**ranks**  78:22
**rapid**  236:5,8
264:3
**rapidly**  221:17
**rapport**  86:17

**rarely** 30:25
71:8
**rate** 92:15,25
93:2,3,5,5,9,17
**rather** 257:6
**rbf** 1:5 274:5
**reach** 102:8
**reached** 90:9
270:23
**react** 80:7
181:11 247:13
**reaction** 71:6
82:5
**reactions**
264:22
**reactivate**
102:15
**reacts** 47:22
247:8 248:1,12
**read** 93:20,22
96:23 97:5
98:5,9,17,21
101:2 107:1
122:2,10
123:23 132:1
142:23 143:6
143:14 144:16
144:22 149:15
149:23 150:21
151:6 152:3
153:12,18
156:14,16,19
156:21,21,22
156:24,24,25

157:7,9 158:13
158:16,18,25
159:8 160:17
161:5,9 162:7
169:14 170:6,8
178:10,16
182:8,12,23
184:18,25
185:13,14
186:1,2,4
188:1 190:18
190:20 191:4
197:11,20
202:3,9 206:14
206:19,21
208:2,3,10
211:5 216:23
217:6 220:25
221:5 229:12
229:19 230:9
230:10 239:4
239:11 244:14
245:12,18
252:6,13
255:25 256:13
256:21 257:2
258:24 259:5
259:12 262:12
262:16,20
263:1,24
264:10 276:9
278:5
**readdress** 12:9

**reader** 169:19
**reading** 69:8,11
96:12 102:12
157:4 184:6
258:7
**reads** 98:15
244:15
**ready** 11:18
246:6,7
**real** 36:2 70:3
84:25 254:3
255:7
**realize** 121:6
134:2
**realized** 25:24
260:14
**realizing**
260:20
**really** 16:7
25:11,14 26:12
29:18 32:24
33:18 34:8
35:16 37:16
43:11 44:23
51:22 54:8
58:18,19 61:15
61:18,20 68:21
68:25 75:23
76:15 80:15
81:17 85:25
86:16,18 87:10
87:12 90:10
93:20 94:16
123:3 126:17

126:23 169:1
172:15 175:15
181:13 191:15
196:21,25,25
198:18 205:25
212:18 214:24
215:10 234:9
234:13 244:23
244:23 247:10
253:12 261:11
**realtime** 189:6
**rearview**
232:15
**reason** 8:5 23:3
55:16 89:18
94:20 108:14
128:6 132:10
137:1 185:3
209:3 212:19
276:11 277:6,9
277:12,15,18
277:21
**reasonable**
72:24 81:20
82:1 83:6
96:25 102:22
102:25,25
114:2 122:3
126:12 128:10
129:17,21
131:20 142:25
143:8 144:18
145:15 146:6
146:11 147:5

147:19 148:10
148:16 149:21
150:16 152:18
168:9,13 169:6
190:16,23
191:9,11
195:24 216:5
217:1,11 219:3
270:10
**reasonableness**
192:18
**reasonably**
129:11,11
**reasons** 71:9
124:23 275:8
**reassigned**
23:23 24:8
**recall** 28:22
35:22,24
165:22,24
166:16,16
167:4,10
177:24 178:3
178:18 209:25
217:14 218:20
257:20
**receipt** 275:6
276:17
**receive** 142:7
239:6
**received** 14:17
146:21 147:7,8
148:7 206:18
222:15 231:3

243:7
**receiving** 264:7
**recent** 91:16
214:15,16
**recently** 63:22
101:20
**recess** 57:17
153:1 162:10
246:5 265:7
**reckless** 266:13
266:14,18,24
266:25 267:6,8
267:13
**recognize**
143:24 234:22
**recognized**
89:15
**recollection**
164:16
**reconstruction**
38:23 214:4
**record** 1:24
4:12 5:21,23
5:25 6:25 9:19
38:21 44:10
82:23 145:3
148:2 153:3
162:4,12
200:11 206:5
210:10 211:23
242:2 268:8
274:19
**recorded** 41:2
65:21 175:20

207:19 216:24
217:9 222:9
229:14 244:10
244:20
**recorder**
208:18
**recording** 41:8
42:21 163:9,15
163:19,22
209:23 211:4
211:22 245:2
**recordings**
106:12 153:14
155:6,7 211:9
214:3
**records** 129:7
201:19 212:1
233:15
**recover** 20:6
21:7 179:10
**recovered**
181:16
**recovery** 39:25
42:6,7
**recruit** 30:15
48:7,12
**recruited** 23:5
23:13 48:8
**recruiting**
49:17
**red** 85:22 131:7
136:22 138:8,9
141:7 196:5,7
196:8,10,14

197:3,4,8
211:9
**redrick** 157:15
157:16 158:10
158:17,23
160:24,24
161:15,19
**reek** 72:23
**refer** 175:13
176:23 192:20
220:17,19
237:10 241:25
257:4
**reference** 176:1
197:13 198:1
207:18 217:8
**referenced**
175:19 276:6
**referred** 91:6
240:15
**referring** 51:1
96:19 124:1
129:2 163:6
170:11 182:6
183:18,19
184:18 194:2
202:20,21
203:21 207:16
220:3 225:23
226:9,23
229:22 230:14
232:1 235:23
242:25 256:15
256:19

**refers** 262:7
**reflect** 268:8
**regaining**
222:17
**regarding** 15:1
168:21 169:4
174:16 200:14
200:14
**registration**
275:24
**regularly**
130:20
**reiterate** 198:5
**related** 23:4
50:11 99:7
105:14 112:6
113:16 117:21
243:9 248:11
275:13
**relatedly** 46:17
**relates** 165:1
**relation** 97:25
105:3 111:10
181:3 221:21
222:5,7,20
229:8,13 232:3
235:5
**relationship**
228:24
**relatively** 7:11
47:23
**relevant** 68:7
155:18,24
156:18 161:4

171:11,15,20
171:21,21
172:23 175:6
175:24 176:22
176:25 177:11
177:11,16,20
177:23 180:13
180:16,21
186:17 199:12
203:3 204:15
212:4 219:10
**relied** 206:24
206:25
**rely** 8:9 108:18
109:21,22
119:11 121:20
165:7 196:16
**remarks** 89:22
**remember**
14:18 18:1
33:7,18 42:11
65:23 68:20,23
68:24 69:1
89:25 154:7
161:20 165:20
166:14,17
167:16,16,18
174:14 176:4
176:14 178:2
185:20 186:12
212:23 250:14
250:17 262:24
**remembered**
175:17

**remote** 137:18
137:21,24
138:4,19
139:13,19
**remove** 35:5
**removed** 35:7
**repeat** 35:6
**rephrase** 7:18
137:4 166:1
194:21,23
**report** 3:11,12
8:18,24 9:4,5,9
9:16,21,25
10:14 11:23
12:1,4,10,12,18
13:16 39:5,8
65:22 66:4,7
66:12,13,15,16
66:17 67:2,5,7
67:13 68:2,9
68:10,13,15,22
89:13 91:25
92:3,16 94:4
94:14,15,22
95:2,2,4,18,22
96:12,14
123:23,24
137:10 152:4
153:9 154:17
158:20,24
160:13,18
162:21 165:23
166:18 169:9
169:12,16

170:1,7,14
171:1,4,7,7
172:5 174:17
174:18,19,21
174:24 175:7,8
175:13,22
176:1,2,21
177:7,10,19,20
178:8 179:21
183:11 185:10
196:17 207:13
215:24 216:4
218:23 220:17
220:17,19,25
232:11 237:8
237:21,24
238:1 239:1
240:5 241:25
242:1,3 246:9
256:18 263:5
272:9,15,19,25
**reported** 1:21
212:13
**reporter** 4:21
19:25 26:4,6
58:6 91:11
163:25 193:2
274:15
**reporter's** 3:6
274:11
**reporting**
65:10 69:4
**reports** 63:3
65:12,19 69:12

[reports - reviewed]                                          Page 61

| | | | |
|---|---|---|---|
| 99:21 107:21 | **respect** 199:3 | **returned** 275:6 | **reviewed** 8:24 |
| 146:20 152:2 | **respirations** | 275:7 | 67:23 89:14,14 |
| 169:2 | 264:5 | **returning** | 152:15,15 |
| **represent** 4:8 | **respond** 132:25 | 263:8 | 155:1 156:5 |
| 90:10 96:8 | 168:10 248:2,6 | **revealing** 114:5 | 158:3 160:15 |
| 173:11,12 | **response** | **revenue** 72:1 | 162:18,19 |
| 200:5 210:23 | 135:18 136:20 | **reversed** 50:14 | 163:10,19 |
| **representation** | 139:9 | 50:16 | 164:9 166:17 |
| 17:18 | **responses** 80:8 | **review** 8:1,2 | 167:8 169:3,18 |
| **representative** | 80:12 136:16 | 11:16 12:16,18 | 169:21,25 |
| 28:24 | 168:20 189:6 | 12:19 13:7 | 170:18 171:24 |
| **representing** | 218:19 | 91:22 96:24 | 172:1,18,23 |
| 4:23 5:3 | **responsibility** | 106:9 137:12 | 173:22 175:5 |
| **request** 204:23 | 28:11 85:24 | 142:25 143:8 | 175:10 176:10 |
| **requested** | **responsible** | 154:18 156:11 | 176:24 177:12 |
| 275:3,10 | 28:5 | 156:13 159:6 | 183:24 185:13 |
| **required** | **rest** 189:15 | 159:18,25 | 185:15,15,17 |
| 278:13 | **restroom** 7:9 | 160:12 162:1 | 185:18,23,24 |
| **research** | 57:15 60:11 | 162:12 163:15 | 185:25 186:15 |
| 153:16,20 | **resume** 31:10 | 164:24 165:13 | 186:25,25 |
| 154:18 155:23 | 31:14 39:16 | 166:8 167:1,2 | 187:1,3,9,13,14 |
| 156:3 161:3 | **retail** 45:19 | 167:7 169:13 | 187:19,22,23 |
| 189:16 205:6 | **retained** 15:12 | 169:15 172:9 | 187:23,24 |
| 210:9 212:12 | 15:14 88:14 | 175:9,16 185:2 | 189:10,11,12 |
| **researched** | 247:13 | 188:10 190:5 | 189:15 190:6 |
| 187:15,17 | **retire** 63:10 | 198:8 205:20 | 195:5,12 207:3 |
| **reserve** 273:6,9 | **retired** 16:22 | 207:2,21,25 | 208:13 213:12 |
| **residual** 180:1 | 19:1 22:18 | 212:2 213:10 | 218:8,22 |
| **residue** 74:1 | 91:13 | 217:16 225:15 | 221:23 224:4 |
| 178:6 | **retrain** 205:18 | 229:2 230:5 | 225:17 228:2 |
| **resolution** 87:8 | **return** 168:24 | 235:12 245:16 | 229:18 232:24 |
| 214:18 270:7 | 215:24 276:13 | 251:10,15 | 235:16,17 |
| **resolutions** | 276:16 | 276:7 | 236:4,23 |
| 209:16 | | | 240:11 251:20 |

| | | | |
|---|---|---|---|
| 254:13,15 | 58:7,21 59:7 | 131:9,19,21 | 219:15 221:18 |
| 261:6 271:18 | 60:4,6 61:5 | 133:2,11,20,23 | 221:20 223:11 |
| 272:7,11 | 63:14 66:2 | 134:7,25 135:2 | 223:16,21,23 |
| **reviewing** | 68:5,8,14,21 | 136:12,24,25 | 224:8 225:2,3 |
| 43:24 93:24 | 71:2,11,16,17 | 137:2 138:8,11 | 226:12,22,23 |
| 95:9 162:3 | 72:12 73:6 | 138:16 139:1,3 | 226:24 227:3 |
| 182:15 192:4 | 74:5 76:7,18 | 139:23 140:10 | 227:19 228:13 |
| 216:24 219:13 | 77:6 79:20 | 140:15 141:5,7 | 228:13 231:1,5 |
| 230:9 241:8 | 80:14 81:19 | 141:11,23 | 231:14,20,21 |
| **revise** 13:16 | 82:15,17,20 | 142:1,7 145:4 | 231:23,25 |
| **revisit** 136:25 | 83:1 84:3,5,9 | 145:7,10,11 | 232:4,4,5,13 |
| 248:8 | 85:18,23 86:1 | 146:8 147:7 | 233:24 234:13 |
| **revolves** 39:12 | 86:2,2,3,9,10 | 148:4,10 150:3 | 237:12 243:1 |
| **revolving** 16:2 | 87:2 88:2 92:5 | 150:10 151:11 | 243:24 244:13 |
| **rhoades** 250:14 | 92:20 94:11,13 | 152:21 166:23 | 248:23 253:11 |
| 250:16,17 | 98:18 99:16,24 | 167:1 170:20 | 253:13,20 |
| **rid** 19:20 21:3 | 101:17 102:6 | 172:11 175:4 | 255:1,6 258:1 |
| **riding** 61:6 | 102:13 104:21 | 176:5 177:3,6 | 258:5,13,24 |
| **right** 7:22 8:3 | 106:8 107:14 | 180:2,3,10 | 259:23 260:1 |
| 11:2,23 13:17 | 107:18,22 | 186:19 188:8 | 260:21 261:18 |
| 18:14 20:6 | 108:14 109:7 | 188:18 189:25 | 262:6 263:15 |
| 21:15 22:2,6 | 109:25 110:6 | 191:17,18 | 265:14 266:22 |
| 22:23 29:25 | 111:19 112:10 | 192:1 193:5,7 | 267:5,12,21 |
| 32:13,22 34:2 | 112:13,21 | 194:12 195:7 | 268:3 269:23 |
| 35:7,20 36:21 | 113:8 115:11 | 195:24 196:13 | 269:25 270:3,6 |
| 37:10 39:11,12 | 115:19,24 | 196:24 198:7,9 | **rights** 41:2 |
| 40:20 42:22 | 116:12,22 | 198:17 200:25 | 188:16,21,22 |
| 43:9,12 44:23 | 117:6,8,19 | 203:9 205:19 | **ring** 45:19 |
| 45:14 46:5,20 | 118:10,16,23 | 205:22 207:3 | **ripping** 45:20 |
| 47:18 49:4,15 | 120:7,22 121:3 | 208:22 211:20 | **rise** 264:3,3 |
| 51:19 52:1,3 | 122:17 123:3 | 212:3 213:8,15 | **rises** 107:9 |
| 53:17 54:21,25 | 123:14 124:10 | 214:2,13,25 | **road** 2:10 |
| 55:5,21 56:6,8 | 124:13,20 | 216:7 217:5 | 53:23 105:18 |
| 56:23 57:6 | 130:4 131:6,8 | 218:2,3,6,9,10 | 113:22 124:11 |

133:12 145:22
217:18 219:18
231:10 233:6
255:11 269:24
269:25
**roadside** 56:15
**robbed** 33:3
**robot** 21:18
**robust** 46:25
**rock** 23:13
26:15 27:16
**rodriguez** 91:8
144:16,25
145:12 146:9
146:12 148:17
149:13,17
150:8 203:3
**role** 18:20,24
29:11,14 30:11
43:19 60:12
66:8 90:12
128:10,11,15
129:23 204:17
**roles** 22:25
23:1,18 29:10
**rolling** 72:19
73:9,15
**room** 4:20
48:24 64:3
77:10,10,11
90:13 255:14
**rough** 18:4
76:17

**roughly** 29:6,7
**round** 23:13
26:15 27:16
**rounds** 253:23
**route** 40:3
**routes** 28:12
**rule** 275:1
**ruled** 149:19
**rules** 1:23 5:10
239:13
**rumble** 227:15
227:21,25
228:4,9
**run** 63:22
**running** 115:2
118:6 232:25
233:11,14
**rural** 138:15
**rush** 7:24 33:5
33:6
**rushes** 32:18,18

**s**

**s** 2:1,20 4:13
91:13 250:16
277:3
**saenz** 2:19 4:24
5:2 197:18
273:6
**safety** 29:5
33:21 78:10
79:8 254:8
**sake** 150:22
177:6 187:7

**salazar** 1:7
89:17 274:7
**sam** 253:19
**san** 1:2 2:21
45:20 89:2,3,5
89:21 116:9
118:5,8 120:9
120:15,19
121:2 126:20
274:2
**sat** 91:15
**satellites**
215:21
**save** 64:6
**saved** 41:2
**saw** 33:5,6
36:10 37:5
105:5 108:6
117:18 158:9
161:12 168:15
168:15 178:4
180:24 181:1
181:14 190:6
196:14,19
197:3 199:18
199:18 218:6,9
218:19,25
219:25 220:2,8
224:11 225:1,1
225:4 226:20
226:24 230:12
230:12 232:11
232:22,22
233:16,18

235:13,16
236:7 241:11
254:20 264:16
265:24 266:21
270:20,20
271:20,23
272:3
**sawa** 91:10,12
**saying** 6:9
35:10,20 78:14
102:24 103:2
123:12 144:3
158:4 167:6
171:3 178:3
183:7,11 194:3
197:6,12
204:23 223:24
224:13 232:16
254:23 260:21
261:13 262:4
267:15 268:14
**says** 14:7 48:14
79:4 113:21
145:5,5 170:14
198:15,18
206:8 258:22
259:2
**sbarron** 2:17
276:2
**sbcglobal.net**
2:22
**scanned** 11:8
242:12

**scenario** 76:8
84:1,2 87:11
140:7 193:8
196:13 215:12
233:19
**scenarios** 36:3
**scene** 40:16
43:15 130:5
196:8
**schlepping**
76:5
**schmutz** 73:10
**school** 33:20
44:4,5,12 55:2
94:11
**schools** 25:22
**schott** 1:3 4:8
10:23,24 97:3
97:8 104:1
105:15 141:5
143:2,10
147:21,23
148:13 163:6
163:18 166:4,7
166:10 167:3
167:24 168:20
168:25 183:10
184:11,23
185:4 186:11
208:5,8 209:25
216:6,25 217:2
217:9,12
218:12,20,24
219:4,6,18

220:5,8 221:17
221:21 222:10
222:15,18,24
223:8,24 230:4
230:19 231:2,2
231:9,17
232:13 233:21
234:6 236:24
240:8 241:18
241:20,21,22
241:22 243:6
244:11 245:7
245:23 263:10
263:21 264:2
269:19 271:15
274:3 276:4
277:1 278:1
**schott's** 141:10
163:10 178:19
179:22 186:7
188:16,24,25
217:23 218:7,8
219:13 220:6
222:21 223:1,2
224:6,23 226:3
228:3,20,24
229:3 230:16
232:2,20
233:23 234:2
234:12 235:13
235:25 236:1,3
269:20,23
271:19

**scott** 10:23
**screen** 210:2
215:1,3
**sd** 209:20
**se** 51:23 81:11
102:7 165:20
**search** 30:8,9
51:15 55:14,14
55:23 56:12,17
56:23 73:14
83:5,8 117:2
129:22 131:21
140:4,7 144:19
145:16,25
146:6,12
149:22 161:5
169:7 180:4,5
253:6
**searched** 49:10
56:9 57:2
67:25 140:6
**searches** 55:10
56:25 109:25
110:9
**searching** 56:4
57:10 161:19
244:11
**seat** 72:19
73:22 76:14,18
76:20 77:14,25
78:4,9,12,25
79:12,12 80:21
81:14,24 82:9
84:9,11 85:6

148:13 184:23
184:24 185:4,5
202:20,22
254:14 255:16
255:17
**seatbelt** 120:17
120:18 268:25
**seats** 84:8,15
84:17
**second** 11:16
32:8 101:6
103:10 108:17
119:13 121:23
121:24 125:20
127:22 137:12
150:21 153:12
158:22 159:3
160:3 161:25
162:6 170:5
182:2 184:16
187:5 190:17
197:11 207:14
216:14,20
225:13 226:16
228:15 234:9,9
252:6 256:21
262:12 263:21
265:18 266:4
**secondary**
242:21 243:23
245:3
**seconds** 148:19
**secret** 110:7

[section - sentence]                                              Page 65

| | | | |
|---|---|---|---|
| **section** 38:13 | 169:9 170:3,5 | **seeds** 71:3 | **segment** 211:4 |
| 38:16 142:18 | 174:6 175:17 | **seeing** 25:4 | 211:16,17 |
| 169:9,12 | 175:18,19 | 33:16 65:1 | **segments** 211:8 |
| 170:12 171:6,6 | 182:6 186:18 | 72:24 74:17 | 211:23 212:1,3 |
| 190:18 216:4 | 187:15 189:23 | 75:8 92:19 | **seized** 20:3 |
| 250:7 259:1 | 190:14,14 | 118:6 121:11 | 21:1,20 101:20 |
| **security** 127:13 | 191:15 195:5 | 121:13,14 | 127:12 |
| **sedative** 70:4 | 196:24 197:4,6 | 134:10 139:6 | **seizes** 20:19 |
| **see** 8:20 9:17 | 199:1 207:16 | 167:10,18 | **seizing** 25:18 |
| 11:4 14:9 16:1 | 207:18 211:18 | 189:4,6 194:10 | 64:25 |
| 33:13 36:9 | 212:4,7 215:25 | 194:12 233:16 | **seizure** 70:4 |
| 37:3,4 38:21 | 218:3,5,5 | 246:19,24 | **sell** 19:19,23 |
| 38:25 39:4 | 219:14,23 | 270:17,17,25 | 20:3,4,6,8,9 |
| 47:19 60:4 | 221:13,16 | 270:25 | 21:3,9,24,24 |
| 65:8 71:6 74:1 | 222:5,10 | **seek** 199:12 | 22:7 |
| 75:14 78:24 | 223:17 224:9 | **seeking** 62:21 | **seller** 51:21 |
| 80:5,6,6,8,8 | 225:2,8,23 | **seemed** 169:2,4 | **selling** 22:9 |
| 81:1,21 82:5 | 226:5 227:13 | 199:16 | **seminar** 111:22 |
| 92:11 96:4 | 229:5,10,24 | **seems** 77:23,24 | **send** 84:23 |
| 101:19,22 | 233:1,9 234:12 | 78:18 123:12 | 186:16 |
| 102:12 104:14 | 234:12,21 | 230:10 | **senior** 57:8 |
| 106:2,4 109:3 | 235:3,7 239:2 | **seen** 32:8 63:8 | **sense** 7:6 41:7 |
| 116:14 118:3 | 242:1,23 243:5 | 73:13 81:23 | 52:20 55:20,21 |
| 118:10,11,11 | 243:18 246:10 | 121:4 140:22 | 104:24 105:20 |
| 120:14,20 | 248:7 259:3 | 151:18 161:10 | 123:8 127:10 |
| 130:10,21 | 260:25 263:9 | 162:15 192:12 | 180:14 235:9 |
| 131:17 135:11 | 263:16,22 | 196:6 206:10 | 265:5 |
| 142:1 144:13 | 264:12 266:9 | 225:18 232:19 | **sent** 111:6 |
| 154:18,23 | 267:23 268:3,5 | 244:9 252:17 | 186:23 276:14 |
| 158:4 159:15 | 268:7,11,12,14 | 252:18 266:23 | **sentence** 17:17 |
| 159:21,23 | 268:19,21,22 | 269:10,20 | 96:3,18,23 |
| 161:6 162:7,21 | 268:25 269:4 | **sees** 73:16 | 107:1 122:2 |
| 162:24,25 | 269:12 270:5,9 | 105:24 246:20 | 142:23 144:3 |
| 163:13 165:9 | 270:12 271:6,7 | | 144:15,24 |

149:15 150:21
153:13 170:5
178:11 182:8
202:3 206:14
206:19 208:2,3
208:8,21 211:5
216:24 217:8
239:4 262:13
262:20 263:1
263:21,25
**sentences**
190:19
**separate** 100:1
**separates** 227:3
**separating**
232:5
**sequence**
169:10,16
170:11,11,15
171:4,6
**sergeant** 24:15
30:10,13,22
53:6 174:12
204:24
**sergeants** 25:1
53:6,7
**served** 17:17
274:23
**service** 110:7
239:21
**set** 38:21 77:18
79:14,17 97:13
97:14 142:5
151:2,8 192:15

193:5 203:15
**sets** 101:5
201:2
**setting** 250:22
**settings** 255:8
**seven** 23:15
28:4 29:2,2
**several** 25:12
70:13 221:18
221:19 227:14
249:19 264:5
**shake** 5:24
72:16,17,18,25
73:11,12,18,25
74:5,11,18
178:4,19 179:8
179:22 180:16
180:20,21
262:2
**shaking** 5:24
**shape** 34:23
113:5
**sheehan** 19:13
19:24 20:1,13
**sheet** 276:11
**sheriff** 31:2
89:17,22
**sheriff's** 13:7
16:18,21,24
18:19 19:3
22:19,22 23:2
23:6,8,17,19
24:9,13 27:22
30:14 89:11

91:14 99:3,8,9
99:11 100:4
104:3 154:10
166:11,20
167:20 187:24
190:2,3
**shoes** 144:4
216:5 219:3
**shop** 75:17
142:5
**short** 18:25
21:19 24:9
47:23 59:14
162:11 237:12
**shortcut** 100:7
187:6
**shorthand** 1:21
257:4 274:14
**shot** 226:4
**shotgun** 253:23
**should've**
243:3
**shoulder**
227:16
**shoulders**
34:25
**shout** 7:12 9:7
**show** 37:13
261:2
**showed** 228:25
**shown** 274:24
**shows** 37:9
208:24

**side** 28:15
29:25 30:3,4,5
30:6 40:16,17
40:23 53:23
109:8 124:10
133:12 145:22
231:23 232:1
233:24 241:9
255:11
**sidebar** 38:10
**sight** 218:1,12
267:23
**sign** 134:19
259:6 262:24
276:12
**signature** 275:2
275:5,8,21
**signed** 98:22
276:19
**significant**
128:11 231:8
**signs** 253:17
256:24 257:1
259:15 260:10
264:22,23,24
**silly** 37:16
**silver** 268:2
**similar** 15:25
152:7 155:25
177:8 180:9
211:25
**similarly** 6:11
38:15

simple  48:2
simply  139:7
  202:11 258:1
single  163:9
  207:21 216:12
  236:19 271:21
sir  47:7 51:18
  79:16 93:7
  125:11 132:23
  135:2,2,20
  136:1,1 137:15
  174:9 273:6
sit  13:15
  167:17 238:23
  255:15 271:13
site  154:13
  217:15,19,24
sites  109:12,12
sitting  78:12
  161:17 269:12
situate  44:8
situation  68:19
  76:9 87:1
  99:16,16,17
  112:4 115:23
  156:23 192:25
  196:1
situations
  67:15,16
  110:23 130:5
  247:9,14
six  17:8 29:1
  34:22 58:20
  243:8,11,11

244:23 245:5
  245:20
size  24:12
skill  77:18
  79:14,17
skip  119:6
  144:10 148:25
  149:1 153:11
  154:17 258:21
  259:1
skyrocketed
  260:21
slang  88:9
sleepy  147:22
  147:23
slept  94:24
slide  161:14
slight  219:17
  269:24
slow  29:19
slowed  222:16
slower  266:1
small  25:16
  26:13 29:17
  123:5,6 179:8
  206:16 213:11
  215:2,3 270:9
smarter  145:11
smell  71:1
  72:22
smells  74:13
smoke  72:11
  74:22

smoking  181:9
smuggle  58:25
  120:10 122:6
  123:13 124:12
  140:22,23
smuggled  48:3
  69:15 73:25
  123:7 124:8
smuggler  82:4
  82:7,18 85:17
  120:22 121:1
  141:12
smugglers
  23:16 26:20
  28:12 29:21
  48:7 82:15
  84:16 122:12
  131:16 138:8
  141:8,12 253:4
smuggling
  26:12 47:13
  49:7,15 50:12
  50:20 58:15,16
  58:17,21,21,24
  59:2,20,20,25
  59:25 60:8
  64:15,15,16
  116:1 120:25
  122:24 123:2
  124:9,19,20,21
  124:23,24
  125:3,3,7,7,13
  127:6,25
  128:25 129:8

129:12,12,14
  139:1 146:24
  147:1,16
  199:16
snapchat
  109:13,13
sobriety  40:20
social  109:1,11
  113:12 115:8
  129:16
softer  259:10
sold  21:11 22:1
  22:2 26:9
soledad  2:20
solely  229:15
solid  226:13
solutions
  275:23 276:23
somebody
  49:16,16 55:21
  106:14 110:11
  112:15 133:12
  145:21 179:6
  184:8
someone's  35:5
  132:9,17
sony  40:7
soon  59:3,9
  62:2
sorry  17:5
  19:16 38:9
  65:18 75:18
  98:11 103:20
  103:21 111:3

119:7,7,24
129:3 143:5,12
143:22 159:2,5
159:12 164:5,5
174:23 185:15
188:25 197:2
215:13 216:17
222:25 223:2
230:16 231:2
235:25 254:9
263:12 268:10
**sort** 113:12
**sorts** 213:10
**sound** 91:8
**sounds** 7:15
27:6,15 252:20
**source** 118:1
122:8 237:2,4
237:5,13,17,22
237:25 238:2
**sources** 155:16
237:11
**south** 24:6 50:9
59:25 60:6
122:8 124:23
125:2,6 126:20
127:23,25
128:5,15
139:11 182:11
183:9 239:9
242:18,22
243:23
**space** 59:15
256:10

**speak** 115:13
164:18
**speaking**
164:17 240:13
253:22
**special** 30:10
38:22
**specialist** 14:8
**specialized**
38:17,25 54:23
199:20,25
200:15
**specialty** 15:2
157:3
**specific** 7:24
17:23 35:23,25
88:25 125:9
198:25 201:14
203:15 243:3
268:17
**specifically**
147:10 161:20
165:12 194:14
199:10 238:14
**specs** 75:10
**speculate** 75:18
75:20 76:10
99:23 152:12
168:14 270:19
272:2
**speculating**
95:12 102:19
169:24

**speculation**
103:9 104:5
170:24 171:18
171:22 196:12
224:19 225:3
232:21 243:15
271:10
**speech** 56:13
74:24 79:24
80:25 247:6,23
253:2 255:3
260:9
**speed** 212:13
212:20 214:11
215:5 221:24
222:17 236:5,7
236:18 265:23
266:2,9,12,23
**speeding**
216:10 235:19
235:19,20
236:14,24
265:10,11,25
266:4 267:1,16
**speedometer**
214:11
**spell** 94:20
**spelling** 94:17
94:19
**spend** 94:3
162:3
**spending** 252:9
**spent** 24:14
63:13 93:18

94:21
**spills** 72:20
**spinach** 76:4
**spoke** 69:18
183:14
**spoken** 115:7
**sponge** 62:22
**sponsoring**
62:21
**spot** 152:23
196:16
**spotting** 262:14
**springs** 108:3,6
108:12 117:25
118:4 129:19
168:24 184:8
239:8 240:25
241:2 243:2
244:5,18
**square** 71:11
71:11
**staff** 206:3,3
**stages** 25:11
**stan** 246:10,13
246:15,22
248:24 249:25
250:1 251:19
**standard** 40:17
97:1,11,13,16
97:19 99:2
100:5,24 101:8
102:23 103:1,3
104:2,12,23
105:16 151:20

172:13 190:23
191:1,10,17
193:25
**standards**
192:1,6,6,16
**standing** 196:4
196:6
**stapler** 10:3,4
**start** 6:12 14:6
14:14 18:14
22:16 61:21
62:24 75:23
92:4,5 104:11
135:8,9 136:2
143:7 203:16
236:2 251:23
**started** 13:24
22:19 25:21,22
26:21 27:19
43:25 223:15
**starting** 135:6
222:6
**starts** 101:25
122:3 135:7
137:14 144:12
149:12 182:3
199:24 207:15
221:14 229:8
263:10
**stash** 138:4
**stashed** 138:14
**state** 1:20 4:12
6:25 23:11
60:19 71:20

89:1 203:11
274:15
**stated** 1:24
173:10,23
270:22 271:20
**statement**
179:19 252:15
262:18 263:3
**states** 1:1 23:23
48:5,6,17
50:13 60:9
122:9 127:16
144:17 145:1
149:13,18,19
156:6 157:15
158:10,16,23
160:24 161:18
274:1
**station** 77:8
**statistics** 55:24
126:17
**statutes** 155:13
**stay** 64:16
95:24
**stayed** 59:10
118:20 140:12
147:24 168:22
**staying** 65:9
129:19 137:24
139:12
**step** 37:18
108:16 128:13
266:4

**stephen** 2:14
4:22 6:25
21:16 32:8
250:16 274:22
276:1
**steps** 185:11
**steve** 3:15
**sticker** 9:12,24
10:11
**sticks** 35:22
105:5
**stint** 24:9
**stipulations** 5:6
**stolen** 19:20
45:13 63:4
**stop** 26:2,8
40:14 45:6,9
45:15 46:12
47:13 49:8
50:20 51:13
56:11 57:7,11
59:3 64:15
67:24,24 70:10
75:13 82:9
84:4 85:3,3
89:6 96:5,9,20
97:8 101:2,3,3
102:5,9,10
104:1,15,16
105:2,14,17,17
105:18,19,20
105:22,23
106:3,7,7,15,15
107:16,24

108:9,14 109:6
109:10 112:16
113:25 114:22
114:23 120:17
122:20 124:11
125:17,19,21
125:23 128:7
130:25 134:9
141:14 142:10
144:18 146:15
146:16 147:16
148:20,24
149:18,20
150:4,7,15,17
150:18 151:15
166:3,7 167:24
168:6 170:15
172:12 173:25
174:19,22,25
188:2,14,14
191:15,16
192:25 193:3,3
193:7 194:7,10
202:25 204:4
239:5 240:9,16
241:17 243:10
243:12 245:13
245:16,23
247:1 248:16
266:22,23,24
271:15
**stopped** 28:17
45:16 49:2,9
57:3 59:5

81:13 84:13
101:7,15
124:10 131:1
133:17 140:2
145:21 236:10
248:20,21
**stopping**  26:25
28:16 47:4
54:6 56:5
104:23 105:1
114:8 121:14
121:15 168:19
266:25 267:1
**stops**  27:16
29:11,14 30:11
30:24,25 31:3
31:6 44:25
47:17 49:3
51:2,3 52:14
53:22 54:7,10
54:16 55:10,11
56:23,25 61:19
68:23 73:20
80:2 85:22
105:3 127:16
130:24 147:5
147:17,20
166:3,7,9,14,16
167:2,11,19
174:1 194:9
202:24 203:24
262:1
**storage**  209:19

**store**  33:4 76:3
210:10 211:24
**stored**  33:14
**stores**  212:1
**story**  55:19
**straight**  38:21
86:13 114:21
143:6 270:1
**straightens**
270:1
**strategies**
191:23
**street**  2:20 25:1
206:16,24
207:1,4,4
275:23
**stress**  80:11,11
260:24 261:3
261:18,21
262:23,24
264:22,23
**stressful**  247:9
**stressing**
261:18
**stretch**  248:23
248:23
**stretches**  64:14
**stretching**
134:13 248:15
260:6
**stripe**  226:12
226:13 232:4
**striping**  222:9
229:9,13

**strips**  227:15
227:22,25
228:4,9
**strokes**  247:15
**strong**  213:8
**structured**  80:1
**stuff**  13:21
20:24 34:19
58:2 68:21
73:7 79:22
81:6 100:7
112:13,24
119:8 252:22
252:23
**stupid**  55:19
**styled**  1:18
**subcategories**
155:10
**subconscious**
33:8,12,14,16
247:8,12 249:8
**subconsciously**
65:25
**subject**  14:7
84:14 136:4
198:5 256:11
262:23 272:24
272:25
**subject's**
252:11 256:3
256:10
**subjective**
75:12 99:17
110:18,21

115:11 147:25
147:25 148:4
195:9
**submit**  206:3
**submitted**
207:6
**subpoenaed**
15:14,15,17,17
17:7
**subscribed**
278:14
**subsequent**
69:5
**substance**
72:22 74:17
95:21
**suburban**
122:22
**success**  45:25
46:1,3 47:4
54:12
**successful**  46:5
46:11 62:17
252:24 253:7
253:13
**suit**  83:2,16
84:9 85:6
**suite**  2:5,10,15
2:21
**summaries**
156:14,22
**summarize**
136:10 172:4

| | | | |
|---|---|---|---|
| **summarizing** | **sure**  6:19 9:2 | 170:2 173:6,14 | **suspension** |
| 225:18 | 9:22 10:18 | 178:5,12 | 124:14 |
| **summary**  31:19 | 11:5,19,21 | 180:15 183:16 | **suspicion**  81:20 |
| 49:20 62:12 | 12:17 15:6 | 184:20 187:8 | 82:1 83:6 85:7 |
| 161:8 169:19 | 18:18 19:17 | 190:1 193:21 | 114:2 128:10 |
| 170:7,10 | 27:25 28:7,8 | 194:2 195:8,11 | 129:22 131:20 |
| 173:22 230:7 | 31:11,23 34:12 | 196:2 200:16 | 144:18 145:15 |
| 245:4,5 | 35:17,19 36:4 | 201:13 209:21 | 146:7,11 147:5 |
| **super**  25:8 | 36:22 37:2 | 210:19,25 | 147:19 148:10 |
| 85:16 86:23 | 39:9 41:13,16 | 212:22 213:22 | 148:16 149:21 |
| 133:6 224:2 | 42:19 47:2,23 | 215:16 221:3,7 | 150:16 168:9 |
| **supervised** | 47:25 53:18 | 222:8,14 223:3 | 168:13 169:6 |
| 53:8,22 181:24 | 57:21 60:7 | 228:12 232:10 | **suspicions** |
| **supervising** | 61:3 83:19 | 234:25 235:9 | 151:4 |
| 25:1 54:11 | 87:9 88:6,6 | 235:18 236:21 | **suspicious** |
| 60:12 | 93:8,11 94:20 | 238:12,12,17 | 109:20 110:15 |
| **supervisor** | 94:23 95:20 | 242:4,15,24 | 110:16,17 |
| 24:15 56:24 | 99:9,25 102:18 | 243:16 250:11 | 111:7 119:14 |
| 66:9 204:16,17 | 103:16,18 | 250:24 251:9 | 119:21,22 |
| 205:22 206:8 | 104:10 105:6 | 255:5 256:2 | 121:3,6 123:16 |
| 244:13,16,19 | 109:8,10 110:3 | 257:19 259:17 | 123:19 138:22 |
| **supervisors** | 110:15 111:21 | 260:18 265:6 | **suv**  59:5 268:2 |
| 68:12 256:7 | 112:25 114:9 | 270:13,16 | **swerved**  221:22 |
| **supplement** | 115:9,10,10 | 271:13 273:2 | **sworn**  1:18 4:2 |
| 13:16 | 117:7 121:18 | **surprised** | 153:14 274:18 |
| **support**  16:5 | 123:9 124:22 | 17:12 | 278:14 |
| **supported** | 126:25 128:19 | **surprisingly** | **syllabus**  129:9 |
| 225:7 | 134:21 139:9 | 17:8 | **symmetrical** |
| **supports**  63:23 | 141:17 142:8 | **surveillance** | 226:6 |
| 63:23 | 142:20 143:21 | 52:13 53:13,14 | **system**  43:8 |
| **supposed** | 144:8 152:1,14 | 66:22,22,24 | 68:4,5 98:12 |
| 129:24 143:11 | 158:12 159:1 | **susceptible** | 102:2,3 214:17 |
| **supreme** | 161:17 166:5 | 37:23 82:25 | **systems**  3:14 |
| 146:10 149:19 | 166:23 169:22 | | 209:10,19 |

| | | | |
|---|---|---|---|
| 211:2 214:19 | 246:2 248:20 | 243:16 248:18 | **tax** 93:13 |
| **t** | 259:24 265:2 | 253:9 261:9 | **tcole** 199:25 |
| **t** 4:13 277:3,3 | **takeaways** | **talking** 37:1 | 200:11,13 |
| **tabc** 26:10 | 247:16,17,23 | 43:3 50:18 | 201:19,24 |
| **tactical** 253:23 | **taken** 1:18 8:14 | 60:12 64:21 | 206:2,4 207:7 |
| **tactics** 47:3,12 | 39:24 40:1 | 69:21 77:5 | 207:10 |
| 47:14 50:19 | 108:21 164:4 | 115:5 118:19 | **teach** 43:14 |
| 204:1 255:18 | 186:24 199:18 | 121:16 125:15 | 44:6 77:20 |
| **tags** 45:23 | 201:10 202:6,7 | 127:3 129:15 | 146:3 204:15 |
| **tahoe** 29:20 | 206:5 241:3 | 132:14 135:3 | 250:21 |
| 59:13 | 246:16,23 | 136:2 141:17 | **teaching** 44:2 |
| **take** 5:17,21 | 250:18 275:15 | 141:19 158:8 | 203:25 204:5 |
| 7:8,14 8:1,1 | **takes** 132:4 | 165:16 172:16 | 205:8 213:1 |
| 11:16 20:25 | 192:13 231:9 | 172:21 174:2 | **teachings** |
| 31:17 42:9 | **talk** 35:15 | 183:18 184:14 | 202:17 |
| 49:13 57:14 | 44:19 47:20 | 203:1 209:2 | **team** 4:15 |
| 63:3,17,18,20 | 56:15 65:10 | 244:18 247:7 | **tear** 84:3 |
| 71:5 72:9 | 79:22 118:24 | 249:1 | **techniques** |
| 77:18,22 84:20 | 118:25 140:17 | **talks** 139:23,24 | 56:14 252:22 |
| 91:24 95:6 | 149:4 153:6 | **tandem** 242:21 | **technology** |
| 110:3,13 | 196:22 202:19 | 243:22 | 215:10,15,17 |
| 127:11 128:13 | 202:24 203:4 | **tanks** 140:24 | 215:18 |
| 130:12 137:11 | 212:22 237:1 | **tapes** 40:8 | **telephone** |
| 142:14 145:19 | 246:10 | **target** 52:2 | 174:11 208:9 |
| 156:24 159:1 | **talked** 46:17,25 | 214:13 | 212:17 222:15 |
| 161:25,25 | 57:19 58:14 | **task** 23:9,11,20 | 222:18 231:3,6 |
| 162:6,8 179:10 | 79:7 117:3,10 | 23:22,25 27:24 | 231:7 232:14 |
| 179:13 180:1,6 | 132:20 146:18 | 28:1,4,16,21,24 | 239:16 244:12 |
| 181:15 191:15 | 147:22,22 | 29:10 89:1 | **telephones** |
| 192:24 201:2 | 150:5 167:23 | 193:16 | 106:24 212:18 |
| 201:11 204:6 | 172:19 173:11 | **taught** 91:7 | 213:10 |
| 204:22,24 | 185:10 193:1 | 204:13 258:15 | **tell** 50:22 52:19 |
| 205:13 206:6 | 202:16 228:12 | 258:15 | 54:18 58:15 |
| | 233:20 243:16 | | 68:13 70:21,23 |

| | | | |
|---|---|---|---|
| 70:24 72:6 | **term** 57:21 | **testifying** 5:18 | 243:23 274:1,9 |
| 74:25 75:1 | 69:4 72:16 | 15:24 178:18 | 274:16 275:22 |
| 77:19 82:14 | 87:18,18,21 | 209:25 220:1 | 275:24 |
| 93:20 95:11 | 88:4 104:4 | **testimony** 8:6,9 | **text** 112:9 |
| 123:10 125:9 | 105:23 150:1 | 14:8 151:23 | 115:2 165:9,12 |
| 125:16 130:12 | 168:6 237:25 | 152:16 198:2 | 165:13,17,20 |
| 136:11 141:3 | 238:1 | 216:25 217:9 | 165:22,23 |
| 143:4 150:5 | **terminologies** | 218:23 224:10 | 184:13 239:19 |
| 173:4 185:21 | 60:25 | 225:5 230:6,20 | 252:6 |
| 192:5 207:2 | **terminology** | 233:23 235:11 | **texting** 183:7 |
| 209:6 214:6 | 81:18 172:21 | 236:22 241:16 | 233:17 242:17 |
| 216:17 219:24 | 196:24 224:25 | 267:20 270:21 | **thank** 25:6 29:8 |
| 221:9 244:25 | **terms** 31:14 | 271:6 274:19 | 76:12 90:19 |
| 245:1,15 252:2 | 132:9 197:1 | 276:9,17 278:8 | 150:23 192:21 |
| 253:4 257:13 | 235:10 269:10 | **testing** 13:13 | 207:12 210:18 |
| 265:3 | **terry** 156:5 | 154:15 | 246:7 273:10 |
| **telling** 132:6 | **test** 40:20 71:5 | **texas** 1:1,9,20 | **thanks** 92:10 |
| 133:2 134:10 | 71:6,8,13,23,24 | 1:22 2:5,16,19 | **theft** 45:16,19 |
| 136:24 | 72:1,15 73:2 | 2:21 25:10,16 | 45:22 |
| **tells** 131:15 | 179:11,14 | 26:19 29:4 | **thing** 7:12 8:2 |
| 133:1 205:2 | 180:12 181:15 | 33:21,21 71:22 | 10:1 21:11 |
| 249:15 255:4 | **testified** 4:2 | 85:5 89:19 | 25:17 37:11 |
| **temperature** | 15:7,9 16:15 | 91:2 122:8 | 43:16 45:10 |
| 256:7 | 16:17,24 17:9 | 124:23 125:2,6 | 54:22 60:10 |
| **ten** 29:6,7 53:4 | 18:5 91:16 | 127:23,25 | 69:24 70:12 |
| 58:20 94:6 | 179:22 218:15 | 128:5,15 | 77:24 78:18 |
| 95:14 125:18 | **testify** 8:12 | 137:18 138:4 | 84:7,10,15 |
| 125:18 126:3,5 | 12:2,5 15:21 | 138:13 139:12 | 85:19 99:25 |
| 126:6,6,8 | 16:9 17:21 | 139:19 141:20 | 109:23 111:11 |
| 133:15 150:19 | 170:23 176:16 | 155:13,19,20 | 118:14 123:5 |
| 208:20 211:20 | 177:25 196:18 | 180:17,21 | 133:9 147:23 |
| **tend** 76:16 | 197:13 198:18 | 182:11 183:9 | 151:19 156:25 |
| **tense** 135:6 | 219:2 230:21 | 216:1 239:7,9 | 186:1 196:16 |
| | | 242:18,22 | 204:25 235:21 |

[thing - time]                                                    Page 74

236:4 242:11
248:10,11
249:9,16 260:4
265:17,18
**things**  6:1
12:11,14,15
22:9 37:16
39:13 45:4
46:18 47:13
52:15 54:1,14
56:13 65:24
69:17,24 70:17
70:20 74:13
75:22 77:22
79:19 80:24
84:12,17 87:7
93:25 98:25
104:21 105:15
107:23 108:7
113:6 117:19
118:19 126:18
130:19 131:18
132:11,20
133:1,3,23,23
134:5,9,12
135:3,14 136:8
141:18 147:3,6
148:12,20
151:13 152:5
155:10 168:16
169:7,22,25
170:17,21
171:19,21
172:22 175:9

183:24 184:3
191:23 192:17
194:12 195:5,7
200:14 202:18
203:19 204:15
232:24 242:6
242:14 243:8
243:11,12,17
245:11,18
247:6 249:12
249:13,15,18
249:19 256:16
260:5 261:7
264:17 265:13
267:11,18
268:14 269:4
**think**  17:17
32:19 36:5
38:4 41:23
42:5 53:4
60:10 64:17
68:19 75:24
79:10 84:7
87:4 88:10
90:15 91:12
93:8,16 94:2
95:25 96:10,13
100:15 104:7
105:2 106:17
121:3,9,9
122:21 123:9
128:8 133:14
139:10 142:18
143:20 148:17

152:23 158:18
158:19,19
161:12 165:21
168:5 169:8
171:8 175:1
178:6 181:5
182:19 185:8
185:22 190:19
191:7,12 201:1
202:22 203:1
204:11 207:6
214:16 216:23
223:1 230:2
233:15 236:16
242:1 244:3,7
249:9 255:20
263:5 265:2
268:21,24
269:15,16
**thinking**  32:15
54:14 68:20
80:16 90:21
103:7 124:17
124:19 152:12
168:17,17
193:13 248:19
254:20
**thinks**  6:18
72:3 121:9
**third**  122:2
137:11 221:14
225:13 246:10
**thought**  103:7
103:21 158:13

168:15,16
173:8 186:17
210:19,20
258:9
**thoughts**
100:11
**thousands**  22:6
126:11 236:10
**threatening**
86:11
**three**  34:22
61:20 63:24
93:23 116:13
142:14,22
148:19 160:8
178:20 201:1
212:8 220:16
221:14 224:3
235:11 242:19
267:4,8 268:22
268:24 269:3
**throat**  249:20
**throckmorton**
275:23
**throw**  184:17
**ticket**  45:3
46:14 49:10,12
116:10 118:13
**tickets**  236:12
**tightening**
264:5
**time**  4:9 8:1
10:25 12:10
15:19 16:10,13

| | | | |
|---|---|---|---|
| 16:18 18:25 | 229:14 231:24 | 227:24 228:3 | 94:14,15 95:17 |
| 23:18 29:7,17 | 233:3,5 236:20 | 228:25 229:3,8 | 146:3 154:3 |
| 33:24 34:9 | 243:3 244:25 | 229:13,24 | 162:11 188:22 |
| 39:14 41:14 | 246:4 249:11 | 269:20 | 201:23 235:7 |
| 42:15 48:18 | 249:17,20 | **title** 52:14 | **tool** 254:2,3 |
| 55:15 60:3 | 250:17 252:10 | 159:15 160:9 | **toolkit** 51:16 |
| 63:7 64:25 | 257:17 258:5 | 169:10 211:3 | **tools** 51:16 |
| 73:21 78:21 | 260:8,24 262:3 | 262:9 | **top** 14:6 178:10 |
| 82:13 83:1,24 | 267:3 270:4 | **today** 5:9,14,21 | 223:17 226:7 |
| 85:18 87:16 | 272:16 273:7,9 | 7:20 8:6,12 | 258:22 259:16 |
| 92:8,20 94:15 | 276:18 | 12:14 13:15 | **topic** 136:6 |
| 94:16,22 95:17 | **timeframe** 33:5 | 23:5 41:15 | 199:10,11 |
| 106:5 108:5,5 | 96:15 108:5 | 71:14 77:3,24 | 244:6 248:8 |
| 108:6 109:9 | 126:8 241:6,23 | 131:4 161:18 | **topics** 38:16 |
| 112:22 119:16 | 276:8 | 167:17 188:10 | 186:17 |
| 120:21 123:2 | **times** 15:9 18:5 | 195:24 202:16 | **topper** 124:13 |
| 128:20 131:17 | 29:19 30:12 | 215:6 238:23 | 124:13 |
| 132:4 139:1,12 | 32:12 33:15 | 255:15 271:13 | **toppers** 128:22 |
| 140:15 146:7 | 42:24 74:22 | 272:8,12,17 | **total** 235:9 |
| 147:4 148:4 | 106:5 114:18 | **together** 52:15 | 255:11 |
| 149:4 151:11 | 134:15 138:13 | 53:17 184:4 | **totaled** 200:11 |
| 151:14 152:9 | 138:15 157:2 | 189:20 | 201:9 |
| 152:22 156:24 | 200:19 217:18 | **told** 48:17 | **totality** 74:3,8 |
| 159:1 161:2,12 | 218:21 221:2 | 53:11 78:8 | 150:24 171:1 |
| 162:3 173:24 | 224:17 234:8 | 107:20,25 | 181:4 190:25 |
| 175:4 181:22 | 235:11 248:16 | 108:1,2 120:11 | 192:22 193:10 |
| 185:8 189:3,7 | 260:7 | 150:11 176:23 | 244:24 |
| 191:2 193:14 | **timing** 261:6 | 223:13 242:16 | **totally** 110:5 |
| 194:6 195:3,18 | **tint** 49:4,5,8,9 | 242:20 243:21 | **touch** 181:11 |
| 195:19,25 | **tinted** 59:6,8 | 253:10 | **towards** 226:8 |
| 199:5 205:14 | 110:16 | **tone** 260:2 | **towing** 21:8 |
| 208:18,25 | **tire** 228:8,20 | **took** 25:23 | **town** 20:17 |
| 222:10 223:9 | **tires** 45:12 | 26:18 42:7 | 25:16 |
| 228:5,7,10,12 | 222:7 225:2 | 59:12 60:11 | |

| | | | |
|---|---|---|---|
| **toyota**  268:4 | 146:15,16 | **trafficking** | 152:6,8 153:16 |
| **track**  95:12 | 147:17 148:20 | 17:15 26:24 | 154:1 155:23 |
| 154:3 | 149:18,19 | 50:4 142:11 | 156:7 168:10 |
| **tracked**  98:23 | 150:7,15,17,18 | 248:15 | 168:12 171:13 |
| **tracking** | 155:19 166:3,3 | **trailer**  129:6 | 172:14 173:23 |
| 216:22 248:4 | 166:6,7,8,14,15 | **train**  30:15 | 173:25 180:25 |
| **tractor**  129:6 | 167:2,18 | 145:8 203:14 | 184:1 186:23 |
| **trade**  26:14 | 168:19 170:15 | 203:14 | 186:24,25 |
| **traffic**  24:17 | 172:12 173:25 | **trained**  38:5 | 188:3,12 190:8 |
| 27:16 29:11,14 | 174:1,19,22,24 | 135:11 180:1 | 190:24 191:20 |
| 30:11,24,25 | 188:2,14 | 205:24 233:7 | 194:8,11 |
| 31:3,6 40:14 | 191:15,16 | 236:13 | 195:18 198:25 |
| 45:1,6,8 47:17 | 192:25 193:3,7 | **trainer**  43:17 | 199:4,6,12,14 |
| 49:3,3 51:2,3 | 194:7 196:5,7 | 204:10,21 | 199:17,20 |
| 52:14 53:22 | 196:7,8,9 | **training**  3:15 | 200:1,18 201:4 |
| 54:10,15 55:10 | 202:24,25 | 25:21,23 34:20 | 201:10,14,16 |
| 61:19 67:24 | 204:4 225:6,9 | 38:13,15,17,22 | 201:19,23 |
| 70:10 75:13 | 233:9 236:5,8 | 39:1,17 43:24 | 202:5,6,11,12 |
| 80:2 85:3,21 | 236:15 239:5 | 60:21,24 61:1 | 203:5,8,13,17 |
| 86:10 96:5,8 | 240:9 241:17 | 61:12 62:3,19 | 205:10,13,14 |
| 96:20 97:8 | 243:10,12 | 62:20 77:19 | 206:3,3,6,15,16 |
| 101:2,3,7 | 245:13,16 | 78:20,24 79:14 | 206:17,18,24 |
| 104:1,15 | 247:1 264:7 | 79:23 81:3 | 207:1,5,11 |
| 105:14,19 | 265:15,25 | 96:25 101:1 | 208:16 212:15 |
| 106:3,7 107:15 | 266:1,10,11 | 104:25 106:10 | 225:4,7 229:16 |
| 107:24 108:9 | 267:5,8,17 | 111:13,22 | 234:15 241:7 |
| 108:14 109:10 | 270:18 271:1 | 122:5 123:22 | 246:23 250:1,7 |
| 113:25 114:15 | **trafficked** | 125:10,14 | 253:15,19 |
| 114:23 120:2,6 | 127:2 | 129:7,8,13 | 254:22 255:4,7 |
| 122:19 124:11 | **trafficker** | 130:11,23 | 255:13 258:14 |
| 125:17,19,20 | 133:14 141:15 | 131:16 143:1,8 | 261:1 265:12 |
| 125:21,23 | 248:17 | 145:7 146:18 | **trainings** |
| 126:19 128:6 | **traffickers** | 146:23 148:5 | 129:10 150:3 |
| 140:2 144:17 | 253:2 | 148:15 151:1 | 202:17 203:6 |

251:19
**trains**  50:2
51:4
**trance**  36:15
**transcript**
159:25 160:3
274:18 275:7
276:6,19 278:5
278:8
**transcription**
94:13
**transcripts**
162:19
**transparency**
161:12 210:20
**transparency's**
177:6
**transparent**
54:15 177:1
**transpired**
58:19 147:3
176:12 230:19
**transpires**
174:1
**transport**
57:25 144:5
**transportation**
24:4 46:8
49:25 50:7,21
51:1,3,7,12,13
51:15 155:19
216:1
**transporting**
143:10

**transposed**
96:15
**traumatic**
252:20
**travel**  45:19
118:24 119:19
119:23 124:22
130:1,15
168:22 226:19
233:24 269:12
269:21
**traveled**  128:14
217:18 241:20
243:18
**traveling**  55:19
97:3 108:4
118:20 120:8
125:2,6 127:22
127:24 129:18
129:20 132:10
217:5,23
223:23 242:12
242:21 243:22
267:11
**travis**  28:7
91:13,16
**tray**  73:15
**tree**  270:2
**trees**  59:16
**trial**  8:9 12:2,5
91:16 197:14
273:7,9
**trick**  7:23
38:19 39:20

96:6 103:14
**tricky**  159:5
**tried**  234:9
**trigger**  102:8
**triggered**
135:18
**triggers**  102:2
102:3,4
**trips**  240:24
241:19 242:22
243:23
**trooper**  86:12
86:12
**trouble**  118:18
175:12
**truck**  10:25
59:18 84:23
129:18 140:1,4
141:4 146:25
147:6,12,14,14
147:16,18,20
168:19 178:1
181:16 186:7
217:4 219:15
219:16,17,19
220:13 221:18
221:23 222:19
223:8,11,21,22
227:7 228:6
230:25 231:13
232:2,13,20
235:2,3 241:2
241:4 244:11
245:1 253:24

268:19
**trucks**  21:2
122:18 141:1,9
**true**  132:19
143:15 172:7
211:22 274:19
278:8
**truly**  147:1
**trunk**  25:20
**trunks**  25:19
**truth**  132:6,6
134:11
**truthful**  136:8
271:22
**try**  5:25 6:1,11
6:14 7:2 41:14
41:17 55:4
77:1 84:18
86:7,10,17
123:10 133:9
136:4 150:6
156:20 180:7
**trying**  7:23,24
38:19,20,21
39:20,21 51:22
71:19 79:18
81:14,19,21
99:25 100:7,14
103:14 115:22
119:6 126:17
127:1 134:20
161:3 165:20
167:7 173:16
173:17 176:19

**[trying - understand]**                                                Page 78

| | | **u** | 168:18 172:10 |
|---|---|---|---|
| 191:6 192:19 | 190:19 200:14 | | 172:13 175:9 |
| 196:3 202:23 | 212:7 216:6,9 | **u** 45:12 91:13 | 176:16 188:4,6 |
| 203:24 204:1 | 216:12 219:5 | **u.s.** 149:18 | 190:16 191:11 |
| 220:18,21 | 221:13 226:5 | **uh** 6:1 29:9 | 201:15 247:9 |
| 225:10 230:23 | 242:13 253:22 | 74:15 121:25 | 249:9 260:24 |
| 240:21 241:14 | 255:11 267:18 | 139:16 149:14 | 261:3 |
| 261:16 | 268:1,6,14,20 | 173:19 177:4 | **undercover** |
| **tsa** 20:25 | **type** 68:6 94:14 | 194:5 221:12 | 23:21 24:3 |
| **tuned** 234:18 | 104:6 110:1 | 222:25 238:9 | 29:18 46:19,22 |
| **turkey** 113:10 | 120:25 141:9 | 267:25 | 46:23 51:19,20 |
| **turn** 101:6 | 192:1 | **ultimate** | 52:13 53:12 |
| 145:20 206:1,2 | **types** 69:15 | 197:22 198:14 | 66:21 184:2 |
| 249:3 268:3 | 136:21 209:9 | **ultimately** | 213:16,19 |
| **turnaround** | 209:12,13,15 | 40:13 | **underneath** |
| 129:18 138:22 | 209:18,22 | **umbrella** | 193:7 |
| 148:8 168:24 | 255:11 | 201:15 | **understand** |
| 240:23 241:19 | **typical** 51:21 | **unable** 178:14 | 5:13,16 6:4,7 |
| **turned** 208:25 | **typically** 36:23 | 178:20 | 7:17 30:16,16 |
| 209:1 240:8 | 39:17 47:14 | **unaware** 137:7 | 39:21 41:5 |
| 241:17 | 48:15 49:2 | **unbeknownst** | 46:2 59:22 |
| **turns** 135:13 | 57:23 59:2 | 40:22 135:1 | 67:8,9,12 |
| **twice** 218:24 | 60:5 61:4,14 | **unbelievable** | 76:24 82:3 |
| 230:4 234:3 | 62:24 71:7,22 | 22:7 34:17 | 86:6 90:15 |
| **two** 34:24 35:2 | 72:13,18 75:1 | **uncomfortable** | 92:15 100:1 |
| 53:2,6,7 56:16 | 78:4 111:20 | 133:11,11 | 115:18 118:17 |
| 60:17 63:25 | 112:7 120:4 | **unconscious** | 144:9,24 |
| 85:9 114:4 | 140:5,14 | 64:2 | 146:13 152:7,9 |
| 116:13 123:1,2 | 206:10 211:24 | **under** 5:13 | 165:19,19 |
| 136:20,21 | 249:5 | 28:16 38:2 | 166:5,23 |
| 140:8,9 141:4 | **typing** 233:4 | 61:13 64:1 | 169:19 170:14 |
| 141:5,18,18 | **typo** 242:24 | 114:1,12 | 173:13,14,17 |
| 142:22 152:5 | **typographical** | 142:25 143:7 | 183:5,6,16,23 |
| 153:24 160:2,8 | 8:25 96:11 | 151:1 160:9 | 189:9 193:12 |
| 161:21 164:2,3 | | | |

214:10 216:4
218:23 220:18
220:21 224:20
229:22 240:2,6
245:6,23
246:19,24
247:20 267:7
**understanding**
61:21 117:6
118:18 123:10
136:18 145:2
165:11 169:20
170:17 183:10
197:16 199:5
201:7 235:14
240:3,10
257:13 261:12
267:15,20
**understands**
246:20
**understood** 6:9
16:9,15 18:2
37:7,25 43:20
44:1 51:9 56:7
56:18 61:18
62:7 66:9 67:3
83:16 87:13
110:24 111:2
127:18,21
129:24 142:12
148:25 151:21
152:23 156:13
157:6 161:23
175:11,15

176:15 181:17
198:21,23
204:16 205:11
206:12 209:3
213:22 215:4
224:21,21
225:11 228:7
228:18 233:17
241:13,13
245:4 254:4,9
261:8,8 267:14
270:13,24
273:3
**unfortunately**
145:18
**uniform** 24:18
29:21 204:1
**unique** 23:3
39:11 214:20
**unit** 24:11,13
24:15 29:17
30:13,14,16
52:22,23 53:1
54:4,12,13
60:13 222:17
**united** 1:1
23:23 48:5,6
48:16 60:9
122:9 127:16
144:17,25
149:13,17,19
156:6 157:14
158:10,16,23
160:24 161:18

274:1
**university**
39:23 41:23
**unknown** 125:8
237:15
**unpack** 78:18
**unreasonably**
149:20,25
**unsafe** 223:11
223:20 230:24
232:12
**unusual** 69:2
**usable** 72:8,8
72:13 73:2
**usage** 44:14
**use** 7:3,8 24:20
30:7 31:14
40:11 44:3,17
46:10 47:15
48:6 57:15
67:16,21 69:12
75:4,6 76:25
79:25 82:22
84:1,16,17
91:5,15 94:12
98:13,17
105:23 107:4
108:15 115:23
120:12 122:12
130:24 141:12
150:1 156:4
193:24 213:2
229:17 236:12
237:6,12,25

239:16,25
255:7,17,18
260:25 261:2
267:18
**useable** 179:2
**used** 14:21
34:15 35:19
38:6 40:10
59:24 82:24
87:19 88:4,7
89:4 109:14
120:10,14
122:6 123:13
124:12 135:15
141:8 146:25
147:15 156:7
168:5 171:9
189:8 193:22
210:7 214:3
215:12 225:21
227:5 270:14
276:19
**user** 26:14
**uses** 39:14
140:21
**using** 40:12
106:24 109:25
127:5 165:22
202:24 237:9
238:1 252:24
255:12,13
**usual** 5:6
**usually** 6:16
16:10

| | | | |
|---|---|---|---|
| **utilize** 33:22 | **vegas** 37:13 | 234:23 235:1 | **versus** 55:10,10 |
| 79:24 | **vehicle** 57:22 | 235:13 236:14 | 73:11 134:19 |
| **utilized** 50:4 | 58:13 59:5,10 | 236:14 242:11 | 144:17,25 |
| 239:5 | 59:15 67:25 | 242:21 243:23 | 149:13,17 |
| **utilizing** 239:19 | 68:25 80:21 | 245:3 248:16 | 156:5,6 157:15 |
| 243:3 253:2 | 81:9 83:3 | 254:15 264:15 | 158:10,17,23 |
| **v** | 84:18 85:18 | 268:4,17,22 | 160:24 161:18 |
| | 101:16,18,19 | 269:3,5,11,23 | 209:19 |
| **v** 1:4 274:4 | 101:22 105:24 | 270:3,17,17,22 | **vet** 205:6 |
| 276:4 277:1 | 105:25 107:18 | 270:25 271:7 | **vetted** 112:7,22 |
| 278:1 | 107:19 108:1,3 | 271:19 | 115:5 204:21 |
| **va** 2:10 | 108:18 109:6 | **vehicles** 20:25 | **vice** 6:13 |
| **valid** 168:19 | 109:21 110:16 | 73:24 101:20 | **victim** 32:12 |
| **valium** 69:17 | 110:17 111:7 | 122:12,15,16 | **video** 24:20 |
| 70:1,2,7,17 | 114:7 118:3 | 123:1,16 | 34:14 39:22,23 |
| **valley** 48:15 | 119:14 120:12 | 128:22 140:21 | 40:2,6,12,15 |
| 118:4 128:21 | 121:1,14,15 | 140:22 235:5,6 | 41:7,18 42:13 |
| 131:6 138:9,18 | 123:4 124:11 | **veins** 135:8 | 42:18,18,21,23 |
| 140:16 148:9 | 124:15 131:21 | **venting** 110:12 | 42:25 43:3,4,8 |
| **value** 92:19 | 138:17 139:7 | **venture** 126:13 | 43:12,13,25 |
| **van** 45:21 | 141:11,14 | **verbal** 5:23 | 44:2,7,9,11 |
| 84:20,20,25 | 144:19 149:22 | 184:21 258:22 | 59:17 65:16,18 |
| **vans** 45:12 | 163:8 178:19 | **verbally** 223:24 | 65:18,21,22 |
| 122:19 | 179:22 181:9 | **verbatim** | 66:11 99:22 |
| **variance** | 183:10,14,21 | 156:21 | 105:7,8,10 |
| 224:16 | 183:22 209:1 | **verify** 115:2 | 123:24,25 |
| **variances** | 217:22,23 | 117:4 276:9 | 124:1,2,4,5 |
| 271:12 | 219:14,23,24 | **veritext** 275:23 | 128:24 129:5 |
| **varied** 29:24 | 221:17 224:7 | 276:14,23 | 146:24 151:24 |
| **various** 65:11 | 224:23 230:12 | **veritext.com.** | 151:25 158:2,3 |
| 71:9 | 230:13,14,16 | 276:15 | 158:5 160:25 |
| **veered** 219:18 | 231:4,16 | **versa** 6:13 | 161:14 163:8 |
| 219:19 | 232:10 234:3 | **version** 9:9,16 | 163:17 164:10 |
| | 234:12,17,18 | 9:25 10:16 | 164:12 169:14 |

174:8 176:4,7
177:7,7,8,14,16
177:22 184:6
186:7,10
207:15,19
208:4,5,6,18,22
208:23,24,25
209:16 211:4,9
211:15,16
212:6,7,15,16
212:17,24,25
212:25 213:10
213:14,24
214:25 216:24
217:9 218:7,8
219:13 220:2,3
221:4 222:9,22
223:1,2,21,25
224:4,10,12,13
225:5,7 226:3
226:4 227:12
227:23 229:6
229:14,17,18
232:16 234:8
235:22,23
236:1,3,7
245:12 260:13
260:15,16,18
260:25 261:1
269:22 270:4
271:23
**videos**  34:15,15
40:4 41:12
43:24,24,24

89:14 99:21
106:12 107:21
162:24 163:2
164:3,14,15
167:18 172:1,5
185:23 186:2,5
186:6,7 187:18
187:23 189:12
208:17 212:10
213:11
**videotape**  41:2
66:3 146:20
271:18
**videotaped**
34:13,16
**videotapes**
39:13 41:4
167:11
**view**  90:12
100:25 188:9
192:2 195:22
195:23 203:19
213:9 214:19
220:2 240:6
258:18 268:13
**viewed**  163:2
188:8 189:8
196:1 203:10
270:5
**violate**  188:20
**violated**  41:1
188:16 190:4
**violation**  45:1
49:3 51:14,14

59:7 86:1,10
106:3 114:15
114:23 134:3
140:2 147:17
168:19 222:1
225:6,9 234:13
270:18 271:1
271:20,22
**violations**
155:20 233:10
266:18 267:5,8
**visible**  264:2
**visit**  217:15,24
**visits**  154:13
**visual**  154:4
**visually**  33:16
**voice**  259:2,6
259:15,24
260:6,19 261:2
261:10,22,25
**volume**  164:4,4
259:9

| w |
|---|

**w**  2:17 276:2
**waco**  120:9,15
120:19
**wait**  150:12
**waiving**  5:7
**walk**  32:15
86:14 145:23
185:8,11
210:21 216:3

**walked**  32:22
59:3,9
**walking**  32:17
106:19
**walks**  137:5
**wall**  108:19,21
109:1
**walmart**  48:19
**walters**  3:15
246:11,13,15
246:22 247:16
247:17 248:24
249:25 250:1,3
250:24 251:19
253:19 255:24
259:14,20
**wandering**
256:24
**want**  5:9 7:25
9:1,6 14:6
18:16 31:9,17
34:6 36:14,14
36:18 37:6,12
37:18,23 40:11
46:21 47:9,11
57:14 60:13
63:2,3,6,7
65:10 67:16,18
75:19 79:1,21
79:21 80:5,6,6
80:8,8 82:3
86:25 88:1,1
91:25 95:21
98:14 100:10

101:21 102:21
104:7 110:3
114:12 115:12
120:14 127:21
136:5 137:10
138:16 139:6
140:18 142:14
142:21 144:8
144:15 147:18
149:4 150:20
157:11 159:11
162:6 167:9,9
168:14 173:20
174:3 178:9
182:24 183:1
192:11 198:24
199:12 200:16
202:13 204:24
205:4 232:10
237:1 240:5
246:2,9 247:20
249:2,8 251:15
267:7
**wanted** 11:6
12:19 13:13
30:18 34:6
56:17 59:14
61:25 62:9
69:22,25 96:22
177:1 186:22
187:15,18
**wanting** 110:10
**wants** 37:20

**warning**
145:23 264:9
**warrant** 30:8
180:5
**warrants** 69:23
73:14 110:13
180:4
**waste** 71:25
**wasting** 146:7
**watch** 37:11,14
66:3,25 116:11
118:12 165:25
166:2 169:14
174:11 253:17
255:18 260:12
**watched** 34:15
34:21 35:4
59:17 99:22,22
107:21 123:24
123:25 161:13
181:22 186:2,5
186:6,10
187:18 189:12
213:13 234:8
**watching** 61:7
109:1 117:24
118:2,10,15
184:5 205:24
208:17 256:5
**water** 32:16,17
**wave** 192:12
**way** 30:18
32:21 44:8
50:17 51:12

52:4,7,9 55:6
62:6 75:12
78:5 81:4 83:3
85:2,12 90:12
91:14 94:2
98:20,23
104:10 105:19
107:25 116:10
122:17 132:25
133:25 134:25
145:24 152:4
169:13,18
171:17 173:21
188:8,19 189:7
192:6 196:22
197:1,20
198:16 203:19
204:8 205:22
227:9,22
231:23 247:25
248:12 258:18
259:25 261:20
265:23 269:16
272:5
**ways** 50:20
51:6 161:21
**we've** 68:14
100:9 227:18
247:7
**weakest** 46:7,8
51:8
**weapons** 78:11
168:21

**wearing** 24:18
83:2 117:12
118:21
**weather** 135:3
**weaving** 114:7
266:19
**webcast** 202:7
207:6
**website** 157:20
157:23 158:1
161:13 187:20
**weed** 51:24
74:22
**week** 94:22
95:1,5
**weighed** 34:22
72:12 189:20
189:23
**weight** 72:11
72:13 139:4
**weirdest** 21:11
**went** 21:13,21
24:11,23,25
27:21 33:8,20
34:4 61:24
62:1 64:2,2
99:19 148:8
186:4 191:12
219:19 228:17
240:25 260:20
261:11
**westbound**
242:13

[western - wrap]

| | | | |
|---|---|---|---|
| **western** 1:1 | **window** 49:4,5 | **woods** 256:24 | **worker** 140:13 |
| 274:1 | 49:7,9 110:16 | **word** 46:20 | 140:19 |
| **westlaw** 157:12 | 268:9,11,13 | 47:4 59:24 | **working** 14:11 |
| 157:13 158:14 | **windows** 59:6,8 | 76:15 77:1 | 14:14 23:2 |
| 158:15 | **windshield** | 108:15 171:8 | 24:25 25:15 |
| **whatsapp** | 226:7 | 172:20,25 | 59:4 63:13 |
| 146:21 148:7 | **wire** 52:14 | 173:1 193:22 | 88:25 89:1,3 |
| 239:6,14,15,17 | **wise** 248:7 | 193:24 213:8 | 94:22 107:5 |
| 239:19,22,25 | **wish** 127:8 | 213:20 225:21 | 120:1 141:16 |
| **wheeler** 124:7 | **witness** 1:17 | **words** 88:7 | 142:6 189:2 |
| 219:15 269:25 | 9:20 15:8 20:1 | 237:12 247:25 | **works** 45:24 |
| **wheelers** | 21:18 26:5,7 | **work** 18:24 | 50:19 53:17 |
| 122:17 | 32:13 33:11 | 19:13 23:7,12 | 58:16 80:1 |
| **wheels** 45:12 | 34:2 90:8 91:5 | 23:15 26:20 | 106:23 111:23 |
| **white** 11:1 | 91:12,15,17 | 28:11 29:20 | 116:7 138:12 |
| 21:21 22:1 | 99:15 100:20 | 31:9 37:8 | 140:13 184:4 |
| 217:4 219:6 | 103:6 127:8 | 44:20 51:19 | **workweek** 95:6 |
| 223:10 224:7 | 148:3 164:2 | 52:8,13,15 | 95:19 |
| 224:15 226:12 | 178:23 193:3 | 53:12 54:23 | **world** 26:24 |
| 226:23,24 | 195:2,16 | 79:2 80:14 | 50:12 62:11 |
| 230:5,25 | 196:12 197:19 | 88:5 90:13,13 | 64:13 139:3 |
| 231:13 233:23 | 198:4 211:14 | 93:14 97:15 | 179:7 |
| **whren** 156:6 | 215:8 242:3 | 116:3 117:5 | **worn** 163:12,16 |
| **wild** 35:12 | 268:8 269:8 | 120:4,7 139:10 | 163:17,20 |
| **williamson** | 271:10,17 | 139:20,22 | 165:25 166:2,8 |
| 16:18,21,23 | 272:2,23 273:1 | 140:11 202:18 | 189:13 264:13 |
| 18:19 19:3 | 274:17,20,24 | 253:13 255:10 | 264:19 |
| 22:22 23:2,8 | 276:8,10,12,18 | **worked** 22:22 | **worth** 121:10 |
| 27:22,23 28:9 | **woman** 137:21 | 24:2 26:25 | 121:10 141:25 |
| 98:13 120:4 | 138:1 | 27:15 52:21 | 142:3 212:2 |
| 146:2 | **wonder** 84:10 | 88:16 101:15 | 275:24 |
| **windham** 2:3,8 | **wonders** | 181:23 183:8 | **wow** 34:19 35:9 |
| 4:20,20 | 215:22 | 184:2 227:10 | **wrap** 84:21 |
| | | 234:16 | |

| | | 268:16 | 94:12 |
|---|---|---|---|
| **wrapped** 70:12 | **x** | **year** 19:1 20:9 | **youtube** 158:5 |
| **wreck** 73:6 | **x** 2:19 70:17 | 21:22 25:3 | 177:2,7 |
| **wrecker** 20:5,8 | 275:3 | 52:22 56:22 | **z** |
| 21:8 | **y** | 60:15,17 61:14 | |
| **wrench** 184:18 | **yeah** 10:15 | 61:20 146:3 | **z** 2:9 |
| **wright** 1:20,22 | 14:22 16:13 | 204:7 | **zero** 60:16,17 |
| 2:14 166:22 | 17:25 18:3 | **years** 17:10,25 | 62:11 101:25 |
| 274:14 275:22 | 19:17 20:16 | 19:7 22:23 | **zoom** 2:19 4:23 |
| **write** 45:2 | 22:14 26:7 | 24:14,18 39:24 | |
| 68:13,14 94:4 | 27:11 31:20 | 56:4 57:5 | |
| 94:15 95:17 | 39:4,7,20 | 58:20 59:1 | |
| 159:6 174:17 | 46:24 48:14 | 60:17 61:20 | |
| 174:19 178:19 | 50:2 64:18 | 62:16 63:11,13 | |
| 236:12 237:7 | 71:15 75:7 | 64:1 195:23 | |
| **writing** 12:17 | 76:13 77:11 | 234:16 246:17 | |
| 46:14 66:3,12 | 83:11 93:4,8 | **yelling** 256:11 | |
| 68:9 94:22 | 93:15 94:25 | **yellow** 141:5 | |
| 95:2 96:17 | 95:5,7,15 96:7 | 217:2 219:4 | |
| **written** 9:21 | 100:19 109:3 | 221:21 222:20 | |
| 65:13 67:14 | 109:10 114:17 | 224:7 226:13 | |
| 68:2,10 89:13 | 115:23 116:6 | 226:18,19 | |
| 89:14 98:6,8 | 123:9 127:4 | 227:6,7,13,24 | |
| 99:3,10,11 | 129:3 130:16 | 228:3,8,21 | |
| 100:3 104:2,3 | 132:2,16 133:8 | 229:24 230:4 | |
| **wrong** 22:21 | 137:9 139:14 | 230:11 234:3 | |
| 92:14 123:11 | 139:17 144:2 | **yep** 223:17 | |
| 159:2 175:18 | 147:12 166:6 | 227:20 | |
| 263:12 | 167:14 172:3 | **yesterday** | |
| **wrote** 14:22 | 186:12 199:22 | 14:23 | |
| 67:5 102:22 | 220:5 221:7 | **young** 21:15 | |
| 104:11 106:21 | 242:8 248:5 | 84:5 86:24 | |
| 149:3 151:8 | 251:13 257:7 | **youngsters** | |
| 229:21 | 259:22 265:6 | 22:3 81:5 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.