Page 1

```
 1              UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION
 3     ALEK SCHOTT,                )
              Plaintiff,            )
 4                                  )
       VS.                          ) CIVIL ACTION NO.
 5                                  ) 5:23-CV-00706-OLG-RBF
       JOEL BABB, IN HIS            )
 6     INDIVIDUAL AND OFFICIAL      )
       CAPACITY; MARTIN A.          )
 7     MOLINA III, IN HIS           )
       INDIVIDUAL AND OFFICIAL      )
 8     CAPACITY; JAVIER SALAZAR,   )
       IN HIS INDIVIDUAL AND        )
 9     OFFICIAL CAPACITY; AND       )
       BEXAR COUNTY, TEXAS,         )
10            Defendants.           )
11
                -------------------------------------
12
                       ORAL DEPOSITION OF
13                       GEORGE HERRERA
                         APRIL 16, 2024
14
                -------------------------------------
15
16             ORAL DEPOSITION OF GEORGE HERRERA,
17     produced as a witness at the instance of the Plaintiffs,
18     and duly sworn, was taken in the above-styled and
19     numbered cause on the 16th day of April 2024, from
20     9:07 a.m. to 2:38 p.m., before JAZZMEN CANALES, CSR, in
21     and for the State of Texas, reported by machine
22     shorthand at Law Offices of Charles S. Frigerio, 111
23     Soledad, Suite 465, San Antonio, Texas 78205, pursuant
24     to the Federal Rules of Civil Procedure and the
25     provisions stated on the record or attached hereto.
```

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3        MR. WILL ARONIN
          MS. CHRISTEN HEBERT
 4        Institute For Justice
          901 North Glebe Road, Suite 900
 5        Arlington, Virginia 22203
          703-682-9320
 6        E-mail:  waronin@ij.org
 7   FOR THE DEFENDANTS:
 8        MR. CHARLES S. FRIGERIO
          MR. CHARLES A. FRIGERIO
 9        MR. HECTOR SAENZ
          Law Offices of Charles S. Frigerio
10        111 Soledad Street, Suite 465
          San Antonio, Texas 78205
11        210-271-7877
          E-mail:  csf@frigeriolawfirm.com
12
13        MR. BLAIR LEAKE
          Wright & Greenhill PC
14        4700 Mueller Boulevard, Suite 200
          Austin, Texas 78723
15        512-379-2960
          E-mail:  bleake@w-g.com
16
17
18
19
20
21
22
23
24
25
```

1  recorded in your training records?
2       A.  It would have been put down as a dissociative
3  odor training while in my detection phases of my
4  training.
5       Q.  Okay.  So you're not sure, sitting here,
6  whether it would say like, dissociative item,
7  cheeseburger, or just dissociative item?
8       A.  I don't recall right now.  It has been so long.
9  I don't recall.
10      Q.  Fair enough.  I have extremely good news for
11  you.  I have no further questions.
12                      EXAMINATION
13  BY MR. FRIGERIO:
14      Q.  Deputy Herrera, I think you've displayed a
15  large amount of knowledge with regards to K-9s today.
16  Can you share with us your opinion of Maximus while you
17  were his handler?
18              MR. ARONIN:  Objection, for the record.
19      A.  Your question one more time.
20      Q.  (BY MR. FRIGERIO)  Do you have an opinion as to
21  Maximus as a K-9 dog during the time you were his
22  handler?
23      A.  I will say that I was extremely excited when I
24  had Maximus considering how much of a success that Bosco
25  and I had together, and the amount of training that I

1   had learned from Bosco that I was already implementing

2   into Max, that Max exhibited a very high IQ knowledge

3   for a working dog and was extremely open to training

4   evolutions and was extremely successful in the short

5   period of time that I'd had him.

6       Q.   Okay.  You had an opportunity to view Deputy

7   Molina handling Maximus with regard to this particular

8   stop, which is the basis of this lawsuit, of Alek

9   Schott; is that correct?

10      A.   Yes, sir.  I saw the video, yes, sir.

11      Q.   Did you see anything unusual about that video?

12           MR. ARONIN:  Objection, for the record.

13      A.   No, sir, I did not.

14      Q.   (BY MR. FRIGERIO)  Did you see -- when you did

15  review the video, did you see Maximus alert?

16           MR. ARONIN:  I'm so sorry.  Rather than

17  object to every question, I'm just going to have a

18  standing objection to these type of questions, that way

19  I won't keep interrupting.

20      A.   Do I answer that?

21      Q.   (BY MR. FRIGERIO)  Yes.

22      A.   Ask that question again.  I'm sorry, sir.

23      Q.   During the video that you witnessed of March 16

24  of 2022 involving Deputy Molina and the K-9 Maximus, did

25  you see Maximus alert?

1     A.   Yes, I did see him alert.

2     Q.   How did he alert?

3     A.   He indicated a final response by sitting down

4  by the driver's front door.

5     Q.   And based on your experience, is that how he

6  typically would alert?

7     A.   Yes, because I saw him go high on a check, high

8  where he stuck his head up to the open window, is what

9  it looked like it was, on the driver's side door, and

10 then immediately went to a sit.

11    Q.   And based on the fact that you have reviewed

12 Bates 4596, which is marked as an exhibit in your

13 deposition, you found that -- you see that Deputy Molina

14 actually found trace amounts of marijuana?

15    A.   I see it listed on here at 1.00 trace amount of

16 marijuana.  Yes, sir.

17    Q.   And is that the trace amount that you would

18 have expected Maximus to alert to?

19    A.   Absolutely.

20    Q.   Thank you.

21         MR. FRIGERIO:  I'll reserve the rest of my

22 questions.

23                    FURTHER EXAMINATION

24 BY MR. ARONIN:

25    Q.   I'm going to have some follow-up.  Explain your

1  last answer.  What do you mean that you would have
2  expected him to alert to?
3       A.  I would have expected my dog to alert to any
4  trace of marijuana or narcotics that I found in the
5  vehicle.
6       Q.  Including a residual odor?
7       A.  Yeah, including a residual odor.
8       Q.  Okay.  Even though you had only coded trace
9  amounts as something if you had a demonstrable amount
10 such as, for example, a roach?
11      A.  Say it again.
12      Q.  You testified you only code trace amounts if
13 you had a physical object, such as a roach or a less
14 than gram of marijuana, correct?
15      A.  If there is anything that I can articulate,
16 which is why I say even if I had a Ziploc bag that had
17 flakes left behind in the bag, that's considered trace.
18      Q.  Okay.  Mr. Frigerio asked you -- Mr. Frigerio
19 asked if you observed the video, and you said you did,
20 correct?
21      A.  Yes, sir.
22      Q.  Noting my objection to the types of questions
23 before, did you see the drugs in the video?
24      A.  No, sir.
25      Q.  Did you see trace amounts of drugs in the

1  video?

2       A.  No, sir.

3       Q.  Mr. Frigerio also asked you about your opinion

4  with Bosco.  And once again, noting my objection.  But

5  my follow-up question is, did you have any concerns

6  about -- withdrawn.  The entire question is the same,

7  but withdrawn.

8            Mr. Frigerio asked you your experience with

9  Maximus.  And noting my objection, did you have any

10 concerns about Maximus based on your time?

11      A.  My concern was his size and his speed.  He was

12 extremely big but thought he was very little.  Meaning,

13 he had a tendency -- if I was to take him inside of a

14 house, he thought he could fit himself in a small

15 opening and had a tendency of knocking down things with

16 his body.

17      Q.  Did you have any other challenges with Maximus

18 the entire time?

19      A.  No.

20      Q.  Did you have any concerns with the K-9 unit as

21 a whole?

22      A.  I think, like anybody, when you work in a -- in

23 a specialized field, there's things that you can take

24 away, good, bad, indifferent.  And I was fine with it.

25 I just needed something different for myself.

1       Q.   Why?

2       A.   Because I had felt at the time, even though Max

3   and I were doing pretty good, I could see that there was

4   some directions, being a trainer as well, that I didn't

5   quite see eye to eye with the other trainer, i.e.,

6   Floyd.  Because I understood Floyd was the primary

7   trainer and I was the secondary, I felt that perhaps I

8   could be better served somewhere else, which is why I

9   put in to go to the narcotic unit, which is where I was

10  going to go until that narcotic unit got transferred

11  into a different subsection at the sheriff's office.

12      Q.   What were the concerns -- withdrawn.

13           What were the directions that you said you

14  had concerns with?

15      A.   It was just about the size of the unit, the

16  amount of hours, the workload, things along those lines.

17  I felt it could be better severed by additional units,

18  additional trainings, things like that.

19      Q.   Did you feel there was inadequate training in

20  the unit?

21      A.   No.  As an agency, we actually trained far and

22  above the industry standard.

23      Q.   Were there any concerns with the direction you

24  were getting from how aggressive to be with searches?

25      A.   Aggressive?

Officer George Herrara                                    April 17, 2024

Page 212

1   Q. Err on the side of deploying a dog versus not
2   deploying a dog?
3   A. No. We were told to deploy whenever it was
4   feasible and/or as long as we had legal state and
5   federal laws on your side.
6   Q. What do you mean feasible?
7   A. As long it was a feasible deployment, meaning
8   we had the state law on our side as well as our policy.
9   We were gonna deploy no matter what the case was, unless
10  we were oversold by a supervisor not to deploy.
11  Q. Can you explain what the policy is about when
12  to deploy?
13  A. Well, for example, I would not -- it was the
14  policy of the sheriff's office when I was there at the
15  unit. I can't tell you what it is now necessarily. But
16  when I was there, we had directives, not necessarily a
17  policy. We also had standing orders, so to speak,
18  right, from a supervisor.
19          For example, we wouldn't deploy our dogs on
20  a missing child or a cognitive elderly person that was
21  missing because our dogs, while they were trained to
22  locate those people, they were also trained if that
23  person didn't give up, i.e., to apprehend that person.
24  The last thing we wanted was biting people that we were
25  trying to help. That didn't fit the molds of what our