IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALEK SCHOTT, | § | |
| | § | |
| *Plaintiff,* | § | 5:23-CV-00706-OLG-RBF |
| | § | |
| vs. | § | |
| | § | |
| BEXAR COUNTY, TEXAS, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## <u>ORDER</u>

Before the Court are the following: (1) Plaintiff's Opposed Motion to Partially Strike the Testimony of Defendants' Expert Albert Rodriguez, Dkt. No. 89; (2) Plaintiff's Opposed Motion to Strike and Exclude Defendants' Expert Kevin Sheldahl, Dkt. No. 90; and (3) Plaintiff's Opposed Motion to Partially Strike the Testimony of Defendant Joel Babb's Expert Gary D. Haston, Dkt. No. 91. The District Court referred the case for resolution of pretrial matters, pursuant to Rules CV-72 and 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. *See* Dkt. No. 16. Authority to enter this Order stems from 28 U.S.C. § 636(b)(1)(A).

On March 5, 2025, the Court held a hearing on the motions, attended by counsel for all parties. *See* Dkt. Nos. 99 & 111; *see also* Dkt. No. 115, Transcript of March 5, 2025, Motion Hearing ("Tr."). For the reasons stated in Plaintiff's motions and discussed below, Plaintiff's Motion to Partially Strike Rodriguez, Dkt. No. 89 is **GRANTED**; Plaintiff's Motion to Strike and Exclude Sheldahl, Dkt. No. 90 is **GRANTED**; and Plaintiff's Motion to Partially Strike Haston, Dkt. No. 91 is **GRANTED IN PART** and **DENIED IN PART**.

**Facts and Procedural Background**

Plaintiff Alek Schott sued Bexar County and several Bexar County Sheriff's Office ("BCSO") Deputies on June 1, 2023, alleging violations of his Fourth Amendment rights during a March 16, 2022, traffic stop. Dkt. No. 1 ("Compl."). BCSO Deputy Joel Babb pulled Plaintiff Schott over for allegedly crossing the fog line while driving north on IH-35. *Id.* ¶ 2. After Deputy Babb asked Schott a series of questions and Schott withheld consent for Deputy Babb to search Schott's vehicle, Deputy Babb called for a K-9 unit. *Id.* ¶¶ 49-52, 55-57. Deputy Martin Molina and his canine, Max, arrived at the scene and performed an open-air sniff of Schott's vehicle, during which Max "alerted." *Id.* ¶¶ 67, 69-71. Based on this "alert," Deputies Babb and Molina, as well as another deputy, searched Schott's vehicle; Schott ultimately received a written warning, and the deputies sent him on his way. *Id.* ¶¶ 86-87, 89, 94. Portions of these events were captured on Schott's dashcam, Deputy Babb's body-worn camera, and Deputy Molina's body-worn camera.

Initially, Schott brought constitutional claims via 42 U.S.C. § 1983 against Deputies Babb and Molina for unreasonable search and seizure and against Bexar County for an unconstitutional policy or custom. *See* Compl. at 26-33. Schott also named Bexar County Sheriff Javier Salazar as a defendant, in his individual and official capacity, but Schott later dismissed Salazar from the case. *See* Dkt. No. 19. Schott also later dismissed his claims against Deputies Babb and Molina. Dkt. Nos. 100, 103, 113, 114. All that remains, therefore, is Schott's Fourth Amendment claim against Bexar County brought pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 701 (1978).

In late January, and prior to his dismissal of claims against Deputies Babb and Molina, Schott filed three motions respecting the testimony of three defense experts: Plaintiff's Opposed

Motion to Partially Strike the Testimony of Defendants' Expert Albert Rodriguez, Dkt. No. 89; Plaintiff's Opposed Motion to Strike and Exclude Defendants' Expert Kevin Sheldahl, Dkt. No. 90; and Plaintiff's Opposed Motion to Partially Strike the Testimony of Defendant Joel Babb's Expert Gary D. Haston, Dkt. No. 91. Defendant Bexar County was a party only to the first two motions, but, following Deputy Babb's dismissal, advised the Court that it had subsequently retained Gary Haston as its own expert and that Haston's opinions "remain as detailed in his expert report and deposition taken by Plaintiff's counsel." Dkt. No. 109; *see also* Tr. 33:9-14. Consequently, Bexar County has stepped into the shoes of Deputy Babb as a proponent of Haston's anticipated expert testimony.

## Analysis

### A. The Standards Governing Expert Testimony and Its Potential Exclusion Are Well-Settled.

Under Federal Rule of Civil Procedure Rule 26, a party seeking to utilize a retained expert at trial is required to produce in discovery a written report containing the following information:

(i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)    the facts or data considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)    a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Initial expert disclosures are expected to be "full and complete." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016). "While Rule 26 contemplates that the expert will supplement, elaborate upon, explain

and subject himself to cross-examination upon his report, the rule does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *Gillis v. Community Products*, LLC, No. 5:22-CV-00080-DAE, 2024 WL 3548775 at *4 (W.D. Tex. July 9, 2024) (internal quotations and citations removed).

Federal Rule of Evidence 702, along with *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), and its progeny, govern Plaintiff Schott's challenges to Defendant Bexar County's experts' anticipated trial testimony. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 310, 314 (5th Cir. 1999). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Recent amendments to Rule 702's language clarify that "the proponent of the evidence bears the burden to demonstrate that an expert's testimony will be both relevant and reliable when it is offered." *Gillis*, 2024 WL 3548775 at *4; *see* Fed. R. Evid. 702 advisory committee's note to 2023 amendments; *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) (emphasis in original). The Court's role "is to make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Nevertheless, the Court's review of an expert's credentials and opinions under Rule 702 "is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Finally, Rule 704 of the Federal Rules of Evidence is pertinent to the Court's analysis here. Under Rule 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704.

### B.    Defense Expert Albert Rodriguez's Testimony Must Be Limited.

Bexar County designated Albert Rodriguez "as an expert on acceptable police practices concerning the written policies of the Bexar County Sheriff's Department, the customs and practices of the Bexar County Sheriff's Department and the training of the Bexar County Sheriff's Deputies." Dkt. No. 92 at 2. Rodriguez, a long-time Texas Department of Public Safety Officer and currently licensed peace officer, completed a report with his findings and opinions. *See* Dkt. No. 89, Ex. B ("Rodriguez Report").

Plaintiff Schott seeks to limit Rodriguez's anticipated testimony to the opinions expressed in his report,[1] as well as exclude the following topics of his anticipated testimony: (1) testimony that equates to legal conclusions; (2) testimony on Bexar County customs and practices in traffic stops; and (3) testimony on the content of training Deputies Babb and Molina received. In sum, Schott would limit Rodriguez's testimony to his opinions that Bexar County

---

[1] In his deposition, Rodriguez asserted that paragraphs 64-68 in his report summarize his conclusions. Rodriguez Depo. 20:17-21:11.

Sheriff's Office has written policies consistent with state standards and that Babb and Molina completed Texas Commission on Law Enforcement ("TCOLE") certified training. Schott contends that testimony beyond these two topics would exceed Rodriguez's qualifications, be unreliable, and offer improper legal conclusions.

      **1.** *Rodriguez is limited to the opinions in his report.* An expert witness's report produced pursuant to Rule 26 must contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B). "[A]n expert's testimony generally is limited to his or her report . . . and to explanations that are a reasonable extension of his report." *Chrastecky v. C.R. Bard, Inc.*, No. A-19-CV-1240-LY-SH, 2020 WL 748182 at *8 (W.D. Tex. Feb. 14, 2020). Such is the case here, and this portion of the Rodriguez motion is therefore granted.

      **2.** *Rodriguez is precluded from offering legal conclusions.* While Rule of Evidence 704 might allow for testimony on an ultimate issue, this rule "does not allow an expert to render conclusions of law." *U.S. v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017) (per curiam) (internal quotation omitted). Rodriguez's report, however, is replete with legal citations, and it strays into offering legal conclusions. For example, Rodriguez opined in the report, "Pursuant to law enforcement protocol, there is nothing unreasonable or illegal regarding the Bexar County Sheriff's Office's policies and procedures on traffic stops, detentions, searches, and investigations[]" and such "training, policies, and procedures are in compliance with statutory and constitutional standards, pursuant to law enforcement training." Rodriguez Report ¶¶ 64, 68. He also concludes that BCSO "policies and procedures parallel requirements set forth in the . . . Fourth Amendment Protections." *Id.* ¶ 65. Bexar County further stated at the hearing on these motions that Rodriguez would testify that the BCSO policies "comply with acceptable standards

of care for law enforcement officers." Tr. 15:16-17. Legal conclusions are not appropriately a topic on which an expert may opine in a case such as this. So too are conclusions about whether policies comply with legal standards.

During the hearing, Bexar County assured the Court that Rodriguez would not be asked at trial about the law, and the county further maintained that any legal citations in Rodriguez's report are "only about laying the substantial basis for his conclusions." Tr. 14:14-15. Bexar County thus effectively conceded that the aforementioned opinions would be inappropriate at trial. Nevertheless, the Court reiterates that Rodriguez may not offer legal conclusions on whether Bexar County policies comply with legal standards; he can explain the policies and he can explain standards, but he cannot offer legal conclusions about the policies complying with standards.

The Court notes that, as hearsay, Rodriguez's report is unlikely to be admitted at trial. *See* Fed. R. Civ. P. 801(c). Because the report itself is not in evidence and is unlikely to be admitted into evidence, there is no need to strike portions of the report. Should any portion of the report be offered, then Schott may object.

     **3.**    *Rodriguez's other opinions must be limited.* Schott also challenges several of Rodriguez's opinions as unreliable. Schott seeks to exclude Rodriguez's opinions about (1) BCSO policy enforcement, (2) BCSO traffic-stop customs and practices, and (3) the training Deputies Babb and Molina received.

On BCSO policy enforcement, Rodriguez first opined in his report that "[t]here should be no question that the Bexar County Sheriff's Office enforces its policies and procedures" as written. Rodriguez Report ¶66. He also elsewhere asserted, "I have consistently found that the general manner in which law enforcement agencies train, supervise, and establish policies and

procedures provides a valid, objective means for evaluating the propriety of an agency's customs and practices." Rodriguez Report ¶ 37.

Rodriguez thoroughly examined BCSO's *written* policies and may offer testimony on those policies. He can also testify about relevant state standards or law enforcement standards. But Rodriguez offered insufficient support for his sweeping factual conclusion that BCSO enforces its policies as written. By Rodriguez's own admission, this opinion was based solely on the fact that BCSO terminated Deputy Babb after he violated BCSO policy and procedure. *Id.*; Dkt. No. 89, Ex. C. ("Rodriguez Depo.") 30:15-31:1. Rodriguez didn't further explain how or why the existence of certain policies and procedures contributes to conclusions about their enforcement or other customs and practices. The circumstances of Deputy Babb's firing are not enough to render Rodriguez's opinion in this regard reliable.

On the second topic, traffic stops, Rodriguez made a single inquiry to assess whether BCSO had customs or practices for traffic stops that violated either federal law or internal policies. He examined a produced list of citizen complaints and checked whether any of the complaints alleged a traffic stop "for no reason" or included some other rights violation, emphasizing how infrequently complaints arose from traffic stops and how rarely those traffic-stop complaints alleged there was "no reason" for the stop. *See* Rodriguez Report ¶¶ 60-62. Rodriguez then claimed that "[t]he information reviewed shows that [BCSO] does not have a policy and custom of stopping drivers without any reason to suspect a traffic violation was committed." Rodriguez Report ¶ 62. What appears to be a cursory review of citizen complaints, via summaries created within BCSO, is not enough to support Rodriguez's significant, sweeping

conclusion.[2] Bexar County can introduce the underlying data through Rodriguez or otherwise, assuming it is otherwise admissible, but it can't ask Rodriguez to testify that the data reflects there is no *Monell* liability, which is essentially what his report's conclusions seek to do.

> Finally, on training the deputies received, Rodriguez also opined that
>
> TCOLE [, *i.e.*, Texas Commission on Law Enforcement,] mandated State Training Standards provides more than sufficient instruction, to police officers, on the requirements for reasonable and justified traffic stops, detentions, searches, and investigations. . . . TCOLE's arrest, search, and seizure training instructs officers to follow the actual constitutional and statutory standards, and not just departmental policy. Former Deputy Babb and Molina were trained pursuant to the TCOLE State Training Standards.

Rodriguez Report ¶ 65. He further stated, "TCOLE mandates all police officer candidates be trained on a prescribed curriculum[] and successfully complete a State Licensing Examination that is administered by TCOLE." *Id.* ¶ 45. Rodriguez also asserted that Babb and Molina completed a TCOLE accredited initial mandated training curriculum and noted his own familiarity with the prescribed curriculum, given his experience assisting in its development. *Id.* ¶¶ 46-47. Babb and Molina also attended numerous other TCOLE-accredited training courses. *Id.* ¶ 48.

But none of this is sufficient to permit Rodriguez to testify about the specific content of TCOLE-mandated training that Deputies Babb or Molina received because Rodriguez doesn't have any personal knowledge of that topic. Rodriguez did not review BSCO training materials or materials from courses Babb and Molina completed. *See* Rodriguez Depo. 148:14-23. Though he stated in his report that "TCOLE conducts audits, reviews lesson plans, and requires course and instructor evaluation on licensed training academies to ensure the mandated curriculum is being

---

[2] Moreover, as Rodriguez mentioned in his report, another witness testified about the volume of traffic stops BCSO performs in any given year. Rodriguez Report ¶ 62. The Court sees no discernable expertise that Rodriguez would offer on the above statistics that a lay witness could not offer, nor does this ruling preclude Defendant's counsel from arguing that there are a *de minimis* number of citizen complaints alleging rights violations during traffic stops.

instructed in the appropriate and required manner," Rodriguez offered no further insight on such audits, such as how often these audits and evaluations occur or when BCSO's training courses were last audited and evaluated. *See* Rodriguez Report ¶ 49. The Court agrees with Schott that Rodriguez is not equipped to reliably testify as to the specific content of the specific TCOLE-mandated training that Babb and Molina received.

Rodriguez is qualified to discuss BCSO written policies and TCOLE standards and requirements. Further, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 294 (5th Cir. 2019). Experts are not necessarily expected to consider all possible available evidence or alternatives, though these shortfalls may be fodder for cross-examination. *See id.* at 295-96. But "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see, for example, Davis v. Cisneros*, No. 1:21-CV-565-RP, 202 WL 3799461 at *9 (W.D. Tex. Aug. 12, 2024). Such is the case with Rodriguez's conclusions that the Court herein excludes.

Plaintiff Schott's Motion to Partially Strike the Testimony of Albert Rodriguez, Dkt. No. 89, is **GRANTED**. Rodriguez is excluded from testifying about any topic not featured in his report and may not offer opinions that amount to legal conclusions, though the portions of his report that equate to legal conclusions need not be struck. His testimony is further limited to opinions explaining what BCSO's *written* policies are and what state and/or law enforcement standards are. He may also testify that Deputies Babb and Molina completed their TCOLE-certified training, and he may explain TCOLE standards and requirements.

### C.    Kevin Sheldahl's Testimony Is Excluded in Its Entirety.

Bexar County designated Kevin Sheldahl, a former police officer and current owner of a police service-dog training and consulting company, as an expert "for the purposes of qualified immunity for Deputy Martin Molina" and as "an expert in K-9 practices [who] can testify as to the acceptable police practices throughout the country concerning K-9[s] and the K-9 handlers." Dkt. No. 93 at 2. Sheldahl was further designated "to testify as to the acceptable standard of care for law enforcement officers concerning the K-9 and their handlers and the appropriate standard of care concerning Deputy Molina in his handling of K-9 Max concerning the air sniff in question." Dkt. No. 93 at 4. Though Molina is no longer a defendant, the appropriate standard of care for K-9 training and handling is still relevant to the remaining claim against Bexar County, as that claim requires a prerequisite finding that a constitutional violation occurred. *See Monell*, 436 at 694 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Schott seeks to exclude Sheldahl's testimony in its entirety on the basis that Sheldahl promises to offer only legal conclusions or baseless and confusing opinions that wouldn't assist the jury. Because Bexar County has failed to meet its burden to show that Sheldahl's testimony will be sufficiently reliable and helpful to the jury, the Court agrees.

Overall, Bexar County provided an expert report for Sheldahl with six opinions. Of those six opinions, three are impermissible legal conclusions, one strays beyond the scope of Sheldahl's expertise, and the remaining two are so infirm that considerable effort would be required to extract any specks of proposed testimony that would be permissible. Bexar County, the party with the relevant burden, chose an all-or-nothing approach with Sheldahl and so failed to identify in briefing or argument which precise topics and proposed testimony would be permissible. As a result, Bexar County effectively asks the Court to act as an advocate and *sua*

*sponte* dissect a weak expert submission to find any few discrete topics about which Sheldahl might permissibly testify. That's not the Court's role. Bexar County's briefing and argument at the hearing on the motion show it has not carried its burden to shepherd Sheldahl through the Court's gate-keeping function.

> 1.    *Much of Sheldahl's contemplated testimony amounts to impermissible legal conclusions.* For the same reasons as above, Sheldahl is precluded from offering his personal legal conclusions to the jury, though his opinions that amount to legal conclusions need not be struck from his report.

To illustrate, major portions of Sheldahl's Opinions 1, 4, and 6 in his report are impermissible legal conclusions. They provide as follows:

- Opinion 1 - "Deputy Molina conducted a free air sniff of Mr. Schott's F250 relying on the collective knowledge doctrine in law enforcement. There was no reason to re-investigate Deputy Babb's traffic stop or development of reasonable articulable suspicion of possible contraband in the vehicle."

- Opinion 4  - "Such a free air sniff of an object lawfully detained has been affirmed since U.S. v. Place[,] 462 U.S. 696 (1983). The free air sniff supported by reasonable articulable suspicion is supported in [various Supreme Court cases]."

- Opinion 6 - "The hand search by Deputy Babb, Deputy Molina, and Deputy J. Gereb falls within the guidelines initially given to law enforcement under the Carroll Doctrine[.]"

Dkt. No. 90, Ex. B ("Sheldahl Report") at 6, 8, and 9. What remains of these three opinions, once legal conclusions are excluded, are factual recitations. There is, therefore, little if anything in these three opinions that warrants presentation to a jury via expert testimony. Given that such a significant portion of the topics addressed in these three opinions would be either unhelpful to a jury or impermissible, the Court declines to take on the role of an advocate or to speculate as to what Sheldahl might be able to testify about that wasn't properly presented in a report or supported via appropriate argument in response to the motion to exclude.

Sheldahl's other opinions also include legal conclusions but in a more limited scope than the aforementioned three opinions. The Court will therefore review them further.

      **2.**    *Sheldahl's third opinion lies outside his area of designation.* Sheldahl's Opinion 3 strays beyond his designated area of expertise. Bexar County designated Sheldahl to offer expert testimony on "training and handling of police service dogs and training of police service dog handlers and the general accepted standards of care regarding the use of K-9[]s in law enforcement endeavors[]" and "the acceptable K-9 and police handler's standards of care regarding Deputy Martin Molina's response and actions." Dkt. No. 71 at 6-7.

Opinion 3 begins with the following factual recitation and note, which presage that Sheldahl seeks to venture at trial into areas he shouldn't address: "Although this report is not about the actions of Deputy J. Babb and his conclusions during the traffic stop[,] [such actions and conclusions] warrant[] review." Sheldahl Report at 6. Keeping in mind the designation of Sheldahl as a K-9 expert, the Court notes that Sheldahl's report reviewed Deputy Babb's actions *before* Babb called for Deputy Molina and K-9 Max, and then offers commentary on Plaintiff Schott's breathing, body language, prior vehicle travel, and rationale for refusing a consent search of his vehicle. *Id.* at 7. Sheldahl's analysis leads to his report's conclusion that Deputy Molina had no need to revisit Deputy Babb's basis for calling on a K-9 unit. *Id.* Sheldahl also opined in this report that it is "not uncommon" for officers to have persons sit in the passenger seat of a patrol vehicle, like Babb had Schott do, when issuing a warning citation. *Id.*

Bexar County provides no argument, however, to support Sheldahl's analysis straying into Deputy Babb and Plaintiff Schott's initial interaction that led Babb to call for a K-9 unit. *See* Dkt. No. 93; Dkt. No. 115. Sheldahl attempted to explain in his deposition that the references to Babb "give[] context to the deployment" of Deputy Molina and K-9 Max. Sheldahl Depo. 20:24-

21:1. He did not explain, however, the basis for this commentary, including to what extent his commentary was based on Babb's deposition testimony or on Sheldahl's own observations from video or other evidence, or how such "context" would assist the jury in understanding Sheldahl's own opinions. Sheldahl's failure to explain this opinion, which strays beyond what he was designated to discuss, or explain the opinion's basis render it inadmissible.

       **3.** *Bexar County has not carried its burden to support the reliability of Sheldahl's other opinions.* Though the standard for excluding an expert is exacting, it is nonetheless the proponent's burden to demonstrate the reliability of the proposed testimony. Fed. R. Evid. 702. Bexar County has not carried that burden here. Rather, Bexar County endeavors to support the reliability of Sheldahl's opinions and proposed testimony by arguing that trainers of law enforcement dogs have been *allowed* to testify about the acceptable standard of care in K-9 training in other jurisdictions, and by pointing out that Sheldahl has decades of experience in law enforcement and in training K-9s. *See* Dkt. No. 93 at 6-7. To start, Sheldahl's qualifications are not the issue. Next, the mere fact that experts like Sheldahl have opined on K-9 standards of care in other cases does little to meet Bexar County's burden *in this case*. Here, Sheldahl's report did not explain the bases for his opinions, as is plainly required. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The [expert] report must contain . . . . a complete statement of all opinions the witness will express and the basis and reasons for them . . . ."). To the extent the bases for Sheldahl's opinions were ever revealed, this occurred only in fits and starts at his deposition, through Plaintiff's counsel's rigorous inquiry, if it ever happened at all. But, as illustrated below, Sheldahl's deposition testimony does not sufficiently address the Court's concerns.

       ***For example, Sheldahl, an experienced K-9 trainer and handler, failed to support, and contradicted, his own opinions on K-9 Max and Molina's training record and***

***proficiency.*** Sheldahl opined that Deputy Molina and K-9 Max were "certified through the NCATS Audit Standards for narcotics and patrol" and "[t]heir training and deployment records show K-9 Max as handled by Deputy Molina to excel in the detection of Marijuana, Cocaine, Heroin, and Methamphetamine." Sheldahl Report at 6. The former statement is factual, while the second statement is conclusory and provided within Opinion 2 without support. And Sheldahl's deposition provides no additional insights.

In Sheldahl's deposition and as Schott's counsel walked through Max's training records, Sheldahl conceded that the records failed to include more detailed information, at least some of which "would have been nice" for him to evaluate and overall made it "very difficult to make an evaluation from, other than [an assessment] that [K-9 Max and Molina] invested time and obviously had structured training." Sheldahl Depo. 224:14-23. Sheldahl also conceded that even a K-9 unit supervisor "would probably have to ask questions" of the assigned trainer or observe the training to fully understand what occurred during it. *Id.* 226:7-19. And, after reviewing the deployment records with Schott's counsel, Sheldahl conceded that the deployment records "are a little bit incomplete" and contain "relatively vague information," though he also noted that deployment records may not always contain the same level of information as training records. *Id.* 278:14-23, 280:3. On what these deployment records *can* offer, Sheldahl stated, "We can tell how much -- how many deployments and how many finds and that's about all we can come up with." *Id.* 244:11-13. Sheldahl therefore conceded that the deployment records provide little insight.

Despite these concessions, Sheldahl's report includes no reconciliation or clarification to explain how he was able to draw more expansive conclusions from Max's training and deployment records. The same is true of his deposition testimony. Recall, Max "excel[s]" and is

"certified . . . for narcotics and patrol," according to Sheldahl's report. The Court is left with the impression that Sheldahl's conclusions were a moving target subject to undisclosed revision on the fly at his deposition, and that they likely would be revised further at trial if he were permitted to testify. That proposition defeats the purpose of the written-expert-report requirement in Rule 26. Some supplementation, clarification, and refinement of a report or an expert's opinions is not only permissible, but may be required. *See* Fed. R. Civ. P. 26(e )(2) (noting, "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition"). But wholesale, undisclosed revisions or failures to revise or clarify what turn out to be unsupported, expansive conclusions cross the line. Sheldahl's testimony on the above, if offered at trial, would be a contradictory, objection-laden mess that would confuse the jury.

Elsewhere, in Opinion 5, Sheldahl stated, "K-9 [M]ax has a strong record of properly locating the odor of substances he has been trained to detect" and "[h]is deployment records show approximately 90% correct." *Id.* at 8. In his deposition, however, Sheldahl conceded that he calculated this 90% number via "some rough counting in [his] head." Sheldahl Depo. 202:12. Further, Sheldahl stated that he reached this number by reviewing the "last couple of months" of Max's training records but could not recall whether that was the final couple of months featured in the records provided to him, which included training through 2024, or the couple of months that preceded the 2022 sniff of Schott's car. *Id.* 202:17-19, 203:24-204:1. Sheldahl also asserted in his deposition that "what a dog's performance was a year ago has very little to do . . . with what it is today." *Id.* 122:1-2. He doubled-down on this assertion elsewhere in his deposition. *Id.* 203:5 (noting, "recent history is important), 203:9-10 (stating, "what's important is -- is not what happened two years ago, three years ago.").

The Court cannot reconcile Sheldahl's deposition testimony about the pertinence of *recent* information about a K-9's performance with Sheldahl's inability to identify upon which training records he based his opinion. Sheldahl confirmed that he did review Max's records for periods on either side of Max's sniff of Schott's car, though Sheldahl couldn't say in his deposition what Max's accuracy percentage was in the months prior to the sniff of Schott's car. *Id.* 203:16-23, 204:9-13. Yet he was nonetheless prepared to assert to a jury that Max is 90% accurate. Further, Sheldahl's deposition statements on the importance of recent K-9 success contradict his other opinion that Max's NCATS videos "further[] a demonstration of reliability." Sheldahl Report at 8. These are videos sent to NCATS, the National Canine Audit Tracking System, as audits of K-9 Max and Molina's training. But Sheldahl provided no date references for any such NCATS videos, notwithstanding his expansive conclusion bolstering Max's reliability. Opinions that have no logical or factual basis or that contradict other sworn testimony cannot pass the Court's gatekeeping function, particularly when an expert purports to opine with mathematical precision—as Sheldahl does here with his 90% statement.

**Sheldahl's opinions on the sniff of Schott's vehicle also lack characteristics of supportable expert testimony.** For example, in Opinion 5, Sheldahl compared videos of K-9 Max in training to the body-worn camera footage of K-9 Max performing a sniff of Schott's car, noting in his report that these videos display "very similar behaviors." Sheldahl Report at 8. Sheldahl opined that Max's deployment on Schott's car "is in keeping with what can be observed in the NCATS certification videos." *Id.* In this section of the report, Sheldahl described Max and Molina's behavior during the sniff of Schott's car but didn't specify or further explain how this behavior was consistent with the referenced NCATS videos, including what particular videos he reviewed and their temporal proximity to the search of Schott's car. *See id.* Sheldahl did not

further disclose in his deposition what was consistent between the two video sets. What he offers, therefore, is a conclusion without a basis, a paradigmatic *ipse dixit*.

>    **4.**     *In the context of a report, deposition, and response to a motion to exclude that leave so much to be desired, the Court cannot say with any confidence what topics Sheldahl would reliably testify about in a way that would be helpful to the jury.* Presented here are classic hallmarks of an expert's proponent having failed to carry its burden. Indeed, Schott's counsel was required to painstakingly extract information from Sheldahl during his deposition that should have been provided *before* the deposition, including the bases for some of his opinions that weren't disclosed in his report. Although some information came out at the deposition, the deposition also revealed serious flaws with Sheldahl's proposed testimony, as discussed above. The Court will not and cannot, as the gatekeeper to evidence that may come before the jury, simply cross its fingers and hope Sheldahl and Bexar County would do at trial what they did not and could not do in the report, deposition, and argument on the motion to exclude. Sometimes a weak or borderline expert report can nonetheless be rescued by a fulsome deposition. But at other times a report and deposition are too infirm; they leave too many questions unanswered or concerns unaddressed. The latter case is presented here.

Bexar County argues in response that Schott's critiques go only to the weight of Sheldahl's opinions. But Sheldahl's failure to provide the basis for, and explain the reliability of, his opinions, including his methods, is vital to the admissibility of his testimony. And here, for the reasons stated, he and Bexar County fall short. Although it is evident that the jury could use assistance parsing the variability in terminology, training, and use of police service dogs, Bexar County has not demonstrated that Sheldahl is equipped to assist the jury in this way. To the contrary, Sheldahl's testimony only risks confusing the jury.

In sum, given Bexar County's briefing and argument, the shortcomings of Sheldahl's report detained herein, the volume of previously undisclosed information Schott's counsel necessarily extracted during Sheldahl's deposition that seemed to raise as many questions as it answered, and the indeterminate nature of what Sheldahl would say to a jury, the Court is called upon here to exercise its duty as a gatekeeper to the evidence. Ultimately, Bexar County has the burden to demonstrate Sheldahl's reliability, and their briefing and arguments fail to carry this burden.

For these reasons, Sheldahl's testimony is excluded in its entirety and Plaintiff's Motion, Dkt. No. 90, is **GRANTED**.

### D.    Gary Haston's Testimony Must Be Limited.

Prior to his dismissal from the case, Deputy Joel Babb, in his expert designation, very generally designated Gary Haston, a retired sheriff's deputy, as an expert on "law enforcement policies, practices, customs, and training both generally and as it pertains to the specific facts and issues in this case." Dkt. No. 75 at 1. Consistent with this designation, Haston's report is lengthy and wide-ranging. *See* Dkt. No. 91, Ex. A ("Haston Report"). Generally, Plaintiff Schott seeks to exclude Haston's proposed testimony that would: (1) provide legal conclusions; (2) merely narrate videos that will be offered as evidence; and (3) opine on Babb's knowledge or beliefs.

**1.**    *Haston cannot offer legal conclusions.* For the same reasons as above, Haston is excluded from testifying in the form of legal conclusions, though his opinions that amount to legal conclusions need not be struck from his report.

**2.**    *Haston's testimony related to video evidence must be limited.* Haston's report includes a lengthy account of what is shown in Plaintiff Schott's dashcam video. *See* Haston Report at 15-17. In the report he also opined on footage captured on Deputy Babb's

body-worn camera, and his factual recitation referenced events captured on other deputies' body-worn cameras. *See* Haston Report at 7, 10, 20, & 23. "A number of courts have addressed expert testimony on video recordings and have concluded that the expert should not be permitted to interpret the video's contents where the expert is no better suited than a lay person to do so." *Castro v. Wal-Mart Real Estate Business Trust*, 645 F.Supp.3d 638, 645 (W.D. Tex. 2022). Bexar County states that "Commander Haston will not offer a play-by-play of the video." Dkt. No. 97 at 11. Consistent with this concession, Haston is not permitted to merely narrate Schott's dashcam video during, and he is limited to testifying as to matters relating to the video that are otherwise permissible and where he would be better suited than a layperson to do so.

       ***Haston is precluded from offering unsubstantiated opinions.*** Haston's report includes an opinion that "[Schott's dashcam] video had some form of manipulation, or it wasn't the entire video depicting the incident as it was only one (1) minute in duration, and ended abruptly while Schott was mid-sentence in a telephone conversation." Haston Report at 15. This opinion is not based on any expertise that is either listed in Haston's curriculum vitae or sufficiently described in his report or deposition. *See id.* at 15-16.[3] Haston was also not designated as an expert in forensic video analytics, or some other commensurate area of expertise, and so he is precluded from testifying on such matters. Moreover, in this regard the video will speak for itself.

---

[3] In his deposition, Haston purported to have video editing and analysis experience (or "specialized training in dash cameras"). *See* Dkt. No. 97, Ex. 6 ("Haston Depo.") 38:13-44:18. Haston did not include any information about this training or experience on his CV. *See* Dkt. No. 91, Ex. 2. Haston testified at the deposition about a "mobile video instructor" certification he obtained in the mid-1990s and a "digital evidence recovery" course he attended sometime in the early 2000s, as well as training he led for police officers on using their police-issued vehicle dashcams. *See* Haston Depo. 38:13-44:18. Based on this limited, dated, and insufficiently detailed or disclosed training, the Court is not persuaded that Haston is sufficiently qualified on this topic or that his testimony on this topic would be reliable or helpful.

***Haston may opine on Plaintiff Schott's body language shown in Deputy Babb's body-worn camera.*** Haston's report described training he received in kinesics and, based on that training, it detailed deceptive behavior he has observed "during roadside and controlled environment interviews of people." Haston Report at 20. Bexar County argues that "Haston used his training and experience to note that Schott was displaying characteristics that officers are trained can be indicative as deceptive." Dkt. No. 97 at 13. Haston's opinions on Schott's body language, based on his training and experience, provide more than a play-by-play of Deputy Babb's body-worn camera and are therefore permissible, assuming an appropriate foundation is laid.

      **3.**    *Testimony on Deputy Babb's state of mind should be addressed at trial.* In several places in his report, Haston opined on Deputy Babb's state of mind without a sufficient basis to do so. "[A]n expert's credentials do not place him in a better position than the jury to draw conclusions about a [party's] state of mind." *Marlin v. Moody*, 248 F. App'x 534, 541 (5th Cir. 2007). For example, Haston opined in the report that Deputy Babb interviewed Schott in the passenger seat of his patrol car "to increase the cognitive load of Schott in order to gauge deception." Haston Report at 20. Babb also testified at length in his deposition about how Schott's body language impacted Babb's decision-making. *See, e.g.*, Dkt. No. 97, Ex. 4 ("Babb Depo.") 218:9-16. Bexar County cannot use an expert to establish Babb's state of mind via expert *ipse dixit*; Babb himself can testify to his state of mind. And if an appropriate foundation is laid, Haston can offer opinions founded on the evidence admitted at trial and his experience. Conclusions pulled from thin air, however, are not appropriately offered, and if Defendant proceeds at trial in a manner similar to that presaged by Haston's report, the Court expects Haston's state-of-mind testimony will be foreclosed at trial.

By way of further example, Haston elsewhere in his report speculated that Babb "knew that someone knew more than he did" when Babb was evaluating evidence received on WhatsApp before he pulled over Schott. Haston Depo. 107:17-22. Haston further speculated that, after Deputy Molina arrived, Deputy Babb was "very hesitant to give up too much information" to Deputy Molina because "he was trying to protect some ongoing investigation that may have been occurring[.]" *Id.* 240:10-22. And in another section of his report, Haston speculated that "[i]t is not unreasonable to believe that Deputy Babb believed the information from the SOI [source of information] was creditable and played a significant role in the decisions he made." Haston Report at 22. This type of speculation about someone else's mental state, untethered to any underlying information or evidence, is impermissible.

Haston only provided general citations to Babb's deposition testimony throughout his report, including for the above opinions, rather than pinpoint cites to Babb's relevant statements. The Court declines to parse through hundreds of pages of Babb's deposition to determine whether Haston was merely repeating or closely paraphrasing statements that Babb himself made. At trial, Haston may only offer opinions based on evidence presented at trial and his established expertise. With this guidance in place, the Court is confident that this topic will be addressed at trial via trial objections or beforehand via motion *in limine*.

      **4.**    *Testimony that Plaintiff Schott was speeding would invade the province of the jury and could be confusing for the jury.* Haston dedicated a portion of his report to an inference he drew, based on Schott's dashcam display, that Schott was speeding when Deputy Babb observed his vehicle. Haston Report at 16-18. Based on this inference, Haston concluded that a reasonable officer could have performed a traffic stop of Schott for either failure to maintain his lane or for speeding. *See id.* As stated above, narration of dashcam video, including

testimony about the dashcam's display of speed and the vehicle passing other vehicles on the road, invades the province of the jury. The jury is capable of watching the video and observing the same information that Haston points to in his report.

More importantly, however, Haston's conclusion about what a reasonable officer would do, based on his observations of Schott's speed, risks confusing the jury. When assessing whether an officer has probable cause for a traffic stop, "what matters is what the [] officers knew . . . at the time of their challenged conduct." *Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019). "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (per curiam). Here, Deputy Babb has never testified that he observed Schott speeding.[4] The relevant inquiry is whether a reasonable officer, knowing the same facts as Deputy Babb— that here do not include anything about speeding—would have found probable cause to stop Schott for an offense, even if that offense was different than the offense Deputy Babb determined had taken place. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also U.S. v. Waller*, 105 F.Supp. 3d 683, 695-96 (W.D. Tex. 2015).

---

[4] Deputy Babb's deposition testimony is quite clear on this point.

> Q.[] You saw the F-250 driven by Mr. Schott hit the yellow line that's on the left side of the highway when you were watching the oncoming traffic come towards you?
> A. Yes.
> Q. [] And then you said that once you drove out, pulled into the highway –
> A. Yes.
> Q. – the traffic, and you were following Mr. Schott, you saw him hit the painted line on the left side of the road again.
> A. The fog line, yes, ma'am.
> Q. [] Did you see anything else that led you to conclude that Mr. Schott committed a traffic violation?
> A. No. That was the only traffic violation that I saw.

Babb Depo. 103:7-23 (excerpted in Dkt. No. 91, Ex. 4).

Bexar County argues unpersuasively that *Terrell v. Allgrunn*, 114 F.4th 428 (5th Cir. 2014), commands a different result. Bexar County states, "Since a reasonable officer *could* have concluded from the available facts that Schott was speeding, Commander Haston's testimony on this score is relevant and admissible." Dkt. No. 97 at 15. But *Terrell*, drawing from *Devenpeck*, stands for the following narrower proposition: If a reasonable officer could have concluded from the *facts known to Deputy Babb* that Schott was speeding, Haston's testimony on this score is relevant and admissible. Haston must base his opinion on how a reasonable officer would have acted on the facts Babb purports to have known at the time. Babb, unequivocally, never mentioned he knew anything about any speeding.

Accordingly, this line of testimony from Haston is impermissible and is therefore excluded.

**Haston's opinions on other possible offenses Schott may have committed are similarly infirm.** At the conclusion of his report, Haston opined that "[f]ailure to [d]rive in a [s]ingle marked lane . . . was not the only probable cause a reasonable officer could have perceived to initiate the stop, as [Schott] was not only traveling 9 mph over the posted speed limit, but was swerving in his lane, crossed the yellow and broken white lines and did so unsafely when not only passing the Amazon truck, but also while on the telephone as he can be heard saying[,] 'Oh Crap[.]'" Haston Report at 29. Although it is unclear whether Haston was suggesting Schott's alleged "swerving" differed from a failure to maintain his lane or that Schott was violating the law when speaking on the telephone while driving, it is clear that Deputy Babb has not testified that these details were facts he was aware of at the time he observed Schott's vehicle. *See* Babb Depo. 103:7-23.

Plaintiff Schott's Motion to Partially Exclude the Proposed Testimony of Gary Haston, Dkt. No. 91, is **GRANTED IN PART** and **DENIED IN PART**. Haston is excluded from offering opinions that are the equivalent of legal conclusions, narrating video evidence for the jury, offering unsubstantiated opinions based on video evidence, and opining on Deputy Babb's state of mind (his knowledge and beliefs) without sufficient basis in evidence to do so. Haston may, however, discuss his kinesics training and apply it to Plaintiff's body language that was captured on camera.

## Conclusion

For the reasons stated above, **IT IS ORDERED** that Plaintiff's Motion, Dkt. No. 89, is **GRANTED**. For the reasons stated above, **IT IS ORDERED** that Plaintiff's Motion, Dkt. No. 90, is **GRANTED**. For the reasons stated above, **IT IS ORDERED** that Plaintiff's Motion, Dkt. No. 91, is **GRANTED IN PART**, such that Haston is excluded from offering opinions that are the equivalent of legal conclusions, narrating videos for the jury, offering unsubstantiated opinions based on video evidence, and opining on Deputy Babb's state of mind (his knowledge and beliefs) without an appropriate foundation, and **DENIED IN PART**, such that Haston may discuss his kinesics training and apply it to Plaintiff's body language that was captured on camera.

**IT IS SO ORDERED.**

SIGNED this 14th day of August, 2025.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE