1　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　WESTERN DISTRICT OF TEXAS
2　　　　　　　　SAN ANTONIO DIVISION

3　ALEK SCHOTT,　　　　　　　　)
　　　　　　　　　　　　　　　　)
4　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)
5　　　　　v.　　　　　　　　　 )　No. 5:23-cv-00706-OLG-RBF
　　　　　　　　　　　　　　　　)
6　JOEL BABB, in his individual )　San Antonio, Texas
　and official capacity;　　　 )　November 5, 2025
7　MARTIN A. MOLINA III, in his )
　individual and official　　　 )
8　capacity; JAVIER SALAZAR, in )
　his individual and official　 )
9　capacity; and BEXAR COUNTY,　 )
　TEXAS,　　　　　　　　　　　　 )
10　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　 )
11　_____)

12　　　　　TRANSCRIPT OF MOTION HEARING
　　　　BEFORE THE HONORABLE RICHARD B. FARRER
13　　　　UNITED STATES MAGISTRATE JUDGE

14　A P P E A R A N C E S:

15　FOR THE PLAINTIFF:
　Christen Mason Hebert
16　Institute for Justice
　816 Congress Avenue, Suite 970
17　Austin, TX 78701

18　Joshua A. Windham
　Institute for Justice
19　901 North Glebe Road, Suite 900
　Arlington, VA 22203

20

21

22

23

24

25

```
1   FOR THE DEFENDANTS:
    Charles S. Frigerio
2   Hector Xavier Saenz
    Charles A. Frigerio
3   Law Offices of Charles S. Frigerio
    111 Soledad, Suite 465
4   San Antonio, TX 78205

5   COURT RECORDER:  FTR Gold

6   Proceedings reported by electronic sound recording, transcript
    produced by computer-aided transcription.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    *(1:32 p.m.)*

2         THE COURT:  Hi, there.  Please be seated.

3         THE CLERK:  Alek Schott v. Joel Babb, et al,

4    SA:23-CV-706.

5         THE COURT:  All right.  Afternoon, everybody.  Can we

6    just get appearances.  Why don't we start with plaintiff?

7         MS. HEBERT:  Your Honor, Christi Hebert for the

8    plaintiff.  I'm joined by our client, Alek Schott, today.  And

9    I'm joined by my colleague Mr. Josh Windham and our colleague

10   Kendall Morton.

11        THE COURT:  Okay.  Good afternoon to you all.

12     For defendants?

13        MR. FRIGERIO:  Good afternoon, Your Honor.  Charles

14   Frigerio, Hector Saenz and Charles A. Frigerio for

15   Bexar County.

16        THE COURT:  All right.  Good to see you all as well.

17     We're here on cross-motions for summary judgment.  Have you

18   all talked about who wants to go first?

19        MS. HEBERT:  No, Your Honor, we have not.  But we, as

20   plaintiff, would like to go first, if possible.

21        MR. FRIGERIO:  That's fine.

22        THE COURT:  Okay.  Let's do that then.

23        MS. HEBERT:  Thank you, Your Honor.

24     The Court should grant Alek Schott summary judgment because

25   the undisputed evidence shows that Bexar County had an

1    unconstitutional policy, the sheriff knew about that
2    unconstitutional policy, and the policy caused the violation of
3    Alek Schott's Fourth Amendment rights.
4        Sheriff Salazar created a unit, the Criminal Interdiction
5    Unit, to get into targeted cars, to search for evidence of some
6    crime.  Targets were picked based on something that the
7    officers knew legally didn't give them the right to stop and
8    search:  A one-day trip.
9        So once the Interdiction Unit selected its target, it used
10   a three-step tactic to manufacture a facade of reasonable
11   suspicion and probable cause to get into the car.
12       Step one, officers would pull over cars and make up a
13   traffic violation.  They pretend to see one.
14       Step two, officers would automatically extend the traffic
15   stop regardless of what the driver did.
16       And then step three, if interrogation in the front seat of
17   a police car did not force that driver to consent to a search,
18   the unit would call for the drug dog that always alerted.  And
19   it always alerted because it was rewarded for alerting, not for
20   finding drugs.
21       And, Your Honor, the county doesn't point to any evidence
22   disputing the existence of this tactic.  That's because
23   everyone knew that's how the Interdiction Unit was operating.
24   And the sheriff certainly knew.  He created the unit to get
25   into cars.  He testified that he knew how the unit was

1  operating.

2      Deputy Babb, the stopping officer in this case, testified

3  that he talked with the sheriff about the unit's tactics and

4  that the sheriff approved.  And the County points to no

5  testimony, no evidence showing that the sheriff didn't know.

6  That's because there's no genuine dispute.  The sheriff knew

7  how the Criminal Interdiction Unit was operating.

8      And the unit applied its customary, unconstitutional

9  three-step tactic to Alek Schott to violate his Fourth

10  Amendment rights.  After Alek's truck was flagged for a one-day

11  trip, Deputy Babb decided to stop him and search him.

12      So step one, Deputy Babb made up a traffic violation.

13      Step two, he automatically extended the traffic stop.

14      And then step three, when Alek Schott didn't consent to a

15  search of his car, Deputy Babb called for the drug dog that

16  always alerted, and alert he did.  But the officers found

17  nothing in Alek's truck, and that's because the officers

18  usually found nothing in the cars that they pulled over because

19  they didn't have reasonable suspicion and probable cause.  Even

20  Babb's own statements captured on the video camera footage of

21  Alek Schott's stop:  Nine times out of ten this is what

22  happens.

23      Your Honor, there is no genuine dispute on any of the three

24  *Monell* elements, and the Court should grant Alek summary

25  judgment on liability.  But it's not all or nothing.  The Court

1  can grant summary judgment on any one of the three *Monell*

2  elements today and narrow the issues for trial.

3      I'm going to walk through each of the *Monell* elements in

4  more depth, but I want to start by just introducing the

5  Criminal Interdiction Unit.  So Sheriff Salazar created the

6  Interdiction Unit himself.  Now, Mr. Frigerio's going to get up

7  here, and he's going to tell you that it was an experimental

8  task force.  Doesn't matter.  This unit was a unit that was out

9  on the road, and there is no experimental exception to

10  violating the Constitution.

11      Sheriff Salazar intended to use traffic enforcement to

12  search cars.  And he handpicked the person to lead the

13  Interdiction Unit, Sergeant Gamboa.  And Sergeant Gamboa was

14  someone who had traffic enforcement experience, plus covert

15  operations experience because this was what it was intended to

16  be, a covert operation.  And Gamboa then handpicked the

17  officers that he wanted on this unit, officers that had traffic

18  enforcement and who "knew how to get into a vehicle."

19      And there were two officers that were part of the Criminal

20  Interdiction Unit at the time of Alek Schott's stop:  Deputy

21  Babb and Deputy Gereb.  And they also worked with Deputy

22  Molina, who was a canine unit with his dog Max at the time.

23  That was the primary canine unit and the one that they called

24  most.

25      So this was the Criminal Interdiction Unit.  We're not

1    talking about the entirety of Bexar County.  We're not talking
2    about every officer who did traffic enforcement.  We're talking
3    about a discrete unit within Bexar County's sheriff's office.
4            THE COURT:  And I understand that you're kind of
5    setting the scene on the *Monell* issue, which is fine.  But just
6    to clarify, you all are not alleging that anything that we've
7    talked about so far with respect to this formation of this
8    Interdiction Unit -- nothing here is unconstitutional, right,
9    necessarily?
10           MS. HEBERT:  Not necessarily, Your Honor.  That's
11   right.  The creation of a unit in and of itself is not
12   unconstitutional.  But the creation of a unit as this unit was,
13   which was intended to search cars and the traffic enforcement
14   part was a complete facade, that raises at least some serious
15   questions.  And how the officers are actually carrying out
16   stops then becomes the issue to examine.
17           THE COURT:  So the custom or the policy, the practice,
18   you all are zeroing in on custom, at issue here is really what
19   you've dubbed -- if we adopt your framing, is this sort of
20   three-step?  That's really the heart of the --
21           MS. HEBERT:  That's right, Your Honor.
22           THE COURT:  -- unconstitutional custom?  Okay.
23           MS. HEBERT:  Next slide.
24        And the three-step tactic -- next slide -- is this --
25   there's no actual dispute that this was a tactic that the unit

1    had.  None of Bexar County's briefs point to any evidence that

2    shows, Hey, no.  We didn't do this.

3        There's no affidavit.  There's no testimony.  Nothing.  The

4    first step of the tactic was to pull over cars flagged for

5    one-day turnarounds.  And how they figured that out is they had

6    two main methods:  License plate readers on every interdiction

7    patrol vehicle, four different cameras, and then -- that

8    screenshotted various license plates and flagged one-day

9    turnarounds.

10        And then they had a WhatsApp chat with some unidentified

11    numbers that -- from somewhere, that dropped in a license plate

12    that someone had flagged for a one-day turnaround.  They didn't

13    know who they were.  They didn't have a verification of this

14    system.  Instead, numbers were dropped in a chat, and the

15    officers decided to act on them.  And then they pretended that

16    they saw traffic violations.

17        THE COURT:  Is there any difference between -- because

18    in this case I take it, it was the WhatsApp -- was the one that

19    did it.  Is there any difference between that and just a

20    random, unidentified informant?

21        MS. HEBERT:  A random, unidentified informant?  No.

22    But even when a officer relies on information from somewhere

23    else, the officer has to be able to say that that information

24    is reliable.  They have to be able to say, Okay.  I am, in good

25    faith, relying on this information.

1      Some cases that look at this -- I'm sure Your Honor has

2  dealt with this before.  It's, This confidential informant had

3  verifiable information that I checked out or --

4          THE COURT:  Right.  That's kind of what I'm getting at

5  is, is there anything that you know of or that you'd be willing

6  to concede about this informant or this informant process that

7  sets it apart from, they just got a phone call from who knows

8  who it was, saying, Hey, I just saw this F250, you know, drop

9  somebody off and now they've turned around.  I think you should

10  check them out.  I think they're, you know, trafficking people

11  or drugs or something.  Right.  Is there any difference?

12          MS. HEBERT:  Your Honor, I don't think there's a

13  difference between what you're talking about and what was

14  happening in the chat.  And one of the key problems with what

15  you've highlighted is that tip has no indication there's

16  unlawful behavior.  Dropping someone off, turning around,

17  there's no indication that there's anything suspicious.

18      Now, could an officer check them out, drive around the

19  area?  Sure.

20      But could he stop that person based on some ambiguous tip?

21  No.  And the officers here recognize that.  They know that they

22  can't stop someone for a one-day trip.  And so what this tactic

23  is, is a mechanism to manufacture at least paying lip service

24  to reasonable suspicion and probable cause.

25      So miraculously, you see people that you get the tip about

1  driving down the highway, and ten seconds -- within ten seconds
2  of view, you're saying, Okay.  That person hit the fog line.
3  But it's happening stop after stop after stop after stop.  And
4  then each time the same next step happens, Your Honor.  And
5  that next step is interrogating that driver in the front seat
6  of a police car.  It was automatic.

7          THE COURT:  Pause for me there --

8          MS. HEBERT:  Sure.

9          THE COURT:  -- before you march through your steps.
10 Because what would they need to have?  Let's explore this
11 hypothetically.  They get a tip from an unknown informant or
12 from people on a WhatsApp group, that we don't know a lot of
13 details about, about a one-day turnaround.  They have other
14 information about, there's a passenger maybe who's been dropped
15 off.  They have driving in proximity to the border.  They have
16 known drug trafficking route.  I'm not even saying they invoke
17 all of these.

18     What other stuff could they have that might support a stop,
19 not for the pretext of the -- but for the actual real reason.
20 And they can say a pretext if they want.  Hey, you were
21 speeding.  Hey, you were -- whatever.  I shouldn't say
22 "speeding" because that's a hot issue in this case.  But, Hey,
23 you strayed over the fog line, or, Your taillight is out, or
24 whatever.

25     Right.  They can say any of that.  But if they really know,

1  We're stopping them because we have a reasonable suspicion that

2  there's some human or drug trafficking going on, what else do

3  they need there?  How far short are they?

4          MS. HEBERT:  Sure.  I understand.  So I think Your

5  Honor is right in terms of, what do they need for reasonable

6  suspicion to then extend the traffic stop beyond just, Okay.

7  This --

8          THE COURT:  They can't just make the stop initially?

9          MS. HEBERT:  They can't just make a stop initially

10 based on things that any lawful person would be doing, like a

11 one-day trip or having a passenger.  You and I make one-day

12 trips all the time, drop off a passenger all the time.  That's

13 not enough to pull someone over.

14     So they have to have a traffic violation here unless they

15 had some greater suspicion of an actual crime that was being

16 committed.  So we're in the world of traffic violation, so that

17 in the world of traffic violation they have to actually have a

18 traffic violation.  You can't just say so, turn off your dash

19 camera and then pretend you saw one every time.

20     And so then when you go on to the reasonable suspicion

21 land, Your Honor, an officer must have specific articulable

22 facts that show that what they're concluding is suspicious is

23 something that has a nexus with a specific criminal activity.

24     So just pulling over Alek for a traffic violation and

25 extending a stop based on the fact that he did a one-day

1  turnaround is not enough.

2      And I'll point Your Honor to the *United States v. Madrigal*

3  case.  And in that case the drivers were pulled over for,

4  arguably, a real traffic violation.  But there was no

5  reasonable suspicion to continue the detention because the

6  facts were, they went to Mexico and Houston and back in one

7  day.  And the Fifth Circuit said, That's ordinary,

8  non-suspicious travel.

9      So if an officer is going to extend a traffic stop beyond

10  the traffic enforcement purpose, it needs to -- they need to

11  have specific facts that point to, this is a crime that is

12  going on or that I need to be investigating.  General

13  nervousness and ordinary things that your average, everyday

14  citizen -- viewed with some kind of ominous gloss is just not

15  enough.

16      But the purpose of this stop here was always to put

17  folks -- put drivers in the hot seat, in the front seat of the

18  police car and then play mind games.  If you answered a

19  question yes, that was a reason to extend the stop.  If you

20  answered a question no, that was a reason to extend the stop.

21      Deputy Babb had stickers in his car that were designed --

22  drug stickers that were designed to solicit a response.  If you

23  commented on the stickers, that was grounds to extend the stop.

24  If you didn't, that was also grounds to extend the stop.  So

25  none of that passes constitutional muster because it was a game

 1    that the driver couldn't win.

 2        And I want to go to the next tactic.  If, through that mind

 3    game, that forced detention in a police car an -- or a driver

 4    didn't consent to a search, that's when they played that third

 5    step, where they called for this drug dog that was rewarded for

 6    alerting on cars, not for finding drugs.  Nobody disputes that.

 7    There's canine handler testimony saying, This is what you're

 8    supposed to do.  You're not supposed to reward the dog,

 9    especially on a roadside stop, until you find drugs.

10        You have Molina's testimony that says that he rewarded him

11    every time he alerted.

12        And ultimately, Your Honor, there's no dispute in this case

13    that a one-day turnaround is not a reason that you could stop

14    someone or extend the stop.  What is going on is, the mechanism

15    of this tactic was designed to get into these targeted cars

16    without having to see a traffic violation, without the driver

17    having to do something particularly connected to a crime.

18    Instead, just based on behavior, they could justify asking for

19    consent and, if they didn't get it, calling for the drug dog

20    that alerted.

21        Now, the County doesn't dispute any of this evidence, Your

22    Honor, doesn't dispute these facts.  Instead, the County

23    says -- and I'll let -- they don't have legally sufficient

24    evidence to prove the existence of a policy because they don't

25    have a specific number, some specific magic number above, you

1    know, 27 that shows that there was a policy.

2        But *Moore* tells us that you don't need a specific number;

3    that there are -- it's a holistic inquiry and we look at all

4    the evidence.  And this Court, in denying the motion to

5    dismiss, itself said that a number pattern or a written policy,

6    those aren't the only ways that you prove policy.  And under

7    *Moore*, we have more than enough evidence to establish the

8    existence of this policy.

9        And I'll just briefly walk through a couple of those pieces

10   of evidence, Your Honor, with the recognition that this is not

11   the universe.

12            THE COURT:  Just pause here and --

13            MS. HEBERT:  Sure.

14            THE COURT:  -- just refresh my recollection because,

15   you know, these types of cases can sort of follow a certain

16   pattern and a common formulation of this type of case.  And by

17   that, I mean, you know, sort of a 1983 Fourth Amendment

18   violation case.  There's a single incident.  Somebody has an

19   unfortunate interaction with police authorities, something

20   happens.  Maybe there's an allegation of excessive force, for

21   example.  And then in the resulting lawsuit the allegations

22   involve only that interaction, right, this single incident.

23        And then we sort of start to talk about, well, what needs

24   to be -- what needs to be -- what the plaintiff's burden is and

25   what the plaintiff needs to put forth to show that there's some

1    reason to believe that this is pursuant to a policy, practice
2    or custom as opposed to just a one-off or maybe a rogue
3    officer, right.  That's a very common sort of scenario for how
4    these cases go, right.

5        Now, I take it that you all have -- not "I take it."  I see
6    that you all have gone to great pains to set this case apart
7    from that type of situation.  And one of the ways that I
8    perceive maybe this happening is that it's not just inferences
9    that the Court is being asked to draw based on the fact that,
10   assuming the allegations are true, say, at a 12(b)(6) stage,
11   this interaction occurred or that the allegation -- if it's
12   assumed true, that excessive force was used, right.

13       Here, there's statements by the people involved that this
14   was pursuant to some sort of pervasive policy or custom.
15   There's other indicia that somebody might refer to even as
16   direct evidence, right.  This is not primarily a case about
17   inferences.  There are a lot of -- at least I think from you
18   all's perspective, there's a lot of pieces of direct evidence
19   reflecting a custom.

20       So how does that affect the legal framework?  You talked
21   about it a bit in your briefing with about -- sort of looking
22   at the totality.  But let's flesh that out because I think this
23   is a point of disagreement in the legal framing of the issues
24   and, in particular, this *Monell* issue between you and the other
25   side.

1              MS. HEBERT:  Yes, Your Honor.  I would direct the

2    Court to *Moore*.  *Moore* is a case where the Fifth Circuit

3    reversed a grant of summary judgment for a municipality and

4    said, You know what?  There is evidence of a policy here.  And

5    this is the kind of evidence we look at, in addition to a

6    number or a pattern.  We look at testimony, direct testimony

7    from the employees.

8         And the Court also pointed to things like discussion among

9    the employees.  And we have that with the various text

10   messages, Your Honor.  And I'm happy to walk through those,

11   showing that this is how the Interdiction Unit operated.

12        So Your Honor is correct here that, unlike the mine-run of

13   cases, we have direct evidence from the folks in the unit

14   themselves talking about how the unit operated.  So that's the

15   testimony from Gamboa, from Babb, from Gereb.

16        We have Babb's own statements that were captured on video

17   about how the unit operated; that they didn't actually care

18   about traffic enforcement; that they were out here looking for,

19   excuse my language, big shit, and that was their priority, and

20   that most stops they didn't find anything.  So Your Honor

21   doesn't have to get to, Is there enough number of similar

22   incidents?

23        And what my friend on the other side cites in his brief is

24   case after case after case saying, The number of incidents that

25   the plaintiff was pointing to weren't enough.  But if you look

1    at each of those cases, that's all they had.  And here, we have
2    more than just 30 example videos, Your Honor, in Exhibit 32
3    that is before this Court, showing that this was the pattern of
4    exactly how the Interdiction Unit operated in stop after stop.
5    You don't even have to just draw an inference from that.  You
6    can take their word for it, that this is how the stop -- their
7    stops worked.

8         And I'm happy to walk through the rest of the evidence on
9    that.  But the point is, is that you have inferential evidence,
10   but you also have direct evidence and text messages and
11   testimony all that confirm the existence of the statement.

12        And we have the added benefit that the other side doesn't
13   point to any evidence disputing the existence of this tactic.
14   There's no testimony from Gamboa or the sheriff saying, Nope.
15   They shouldn't have been operating like this.  No.  This wasn't
16   our tactic.  We made sure that every stop had a -- had a
17   traffic violation.  It was not our practice to automatically
18   extend the traffic stop.

19        In fact, you have evidence the opposite, where Sergeant
20   Gamboa says, Yeah.  We extended every stop.  It was our way of
21   operating.

22        So I think that you don't have to look beyond that.

23        And I'll walk through some of these text messages.  But the
24   officer text messages are a clear indication, just in the vein
25   of *Moore*, of discussion among officers.  They're making fun of

the criminal interdiction officers for making up probable

cause.  They are making fun of the interdiction officers for

turning off their dash cams, because everybody knew that's what

they did.

We also have an example of the WhatsApp chat, Your Honor,

that they used.  We don't have the WhatsApp chat for this

particular stop because Deputy Babb deleted it off his phone.

But the cell phone examiner was able to pull this one.  And

it's exactly what you would expect.  A license plate number is

dropped in a chat, a vehicle description is dropped in the

chat, and everybody's expecting an officer who's downstream to

stop that vehicle.  No other information, no questions asked.

THE COURT:  And we don't know who the members are?

MS. HEBERT:  And we do not know who the members are.

And, Your Honor, there's also two -- there were two

internal affairs investigations in this case.  There was an

internal affairs investigation right after Alek complained, and

the internal affairs officer concluded that she did not see any

traffic violations.

And then after Alek Schott filed this case, Bexar County

opened a second internal affairs investigation, and it found

one essential policy violation:  Deputy Babb turned off his

dash camera, and he lied about it.  The sheriff testified that

there were no other policy violations that were found through

this internal affairs investigation and stood behind the

1  internal affairs investigation as the right result.

2      And finally, Your Honor, on the canine piece, I already

3  highlighted for you the difference between the canine handler's

4  testimony on how canines are supposed to be handled versus

5  Molina's direct testimony that he broke the rules on how you

6  are supposed to handle a canine.

7      And the second internal affairs investigation that I

8  mentioned specifically termed Max's performance inconsistent,

9  but nobody did anything further after that.  No one looked into

10  whether officers knew his performance was inconsistent.  No one

11  disciplined Molina, because everybody already knew this was the

12  case, and this dog was expected to alert.

13      There is direct testimony that the sheriff knew.  Unlike

14  the mine-run of cases, Your Honor, the sheriff says that, I

15  generally knew how this unit was operating.

16      And there's no affidavit, no declaration from the sheriff

17  saying, I did not know.

18      The testimony that I'll call your attention to is, I kind

19  of knew basically what they do.

20      And then, second, the sheriff testified, I can tell you

21  they didn't find a lot.

22      So he knew that they were searching without actually

23  finding anything.  But that didn't raise any red flags.

24      And Babb testified that the sheriff knew.  In fact, he

25  testified and got down to the nitty-gritty.  The sheriff sat in

1  my patrol car, saw my stickers.  We talked about my tactics,

2  and he understood exactly the mind games, Your Honor, that I

3  try to play with my drivers to get into their vehicles.  And he

4  later testifies that it's his understanding the sheriff

5  approved.

6      But that's not the only evidence.  You don't have to take

7  the sheriff's word for it.  You don't have to take Deputy

8  Babb's word for it.  There's enough evidence that this Court

9  can also find constructive knowledge.  Gamboa, his supervisor,

10  had direct conversations with the sheriff about the

11  Interdiction Unit, and Gamboa reviewed all the body camera

12  footage for these officers as they were doing stops.

13      And then after this stop, Your Honor, Bexar County promoted

14  Deputy Babb and made him an instructor.  And he would teach

15  people how to do traffic stops.  And one of his advanced

16  techniques would be, he would show video footage of him doing

17  criminal interdiction stops to cadets in the academy.

18      Your Honor, we also have the first and second internal

19  affairs investigations, as I commented.  And that is, under

20  *Milam*, at least evidence of a preexisting policy as well.

21      And to get to causation, Your Honor, this policy was the

22  moving force for Alek Schott's -- the violation of Alek

23  Schott's Fourth Amendment rights.  The tactic was directly

24  applied to Alek Schott.  He was flagged for a one-day

25  turnaround.  Deputy Babb parked perpendicular, on the side of

the road, as was his practice, so your dash cam couldn't
capture a violation.

   The internal affairs report found that seconds before he
went to pull over Alek Schott, he turned off his dash camera,
and then later, before the next traffic stop, he turned his
dash camera back off.  And he had decided he was going to stop
Alek Schott.  So he stopped him, and then he walked up to Alek
Schott and said that -- a pretend traffic violation, that
somewhere in the brief time from when Alek came over to the
horizon to that stop, Alek had "drifted over the fog line
pretty hard."

   And then, after stopping Alek Schott, he went to the next
step, automatically extending the traffic stop.  Within 40
seconds of Alek Schott being pulled over, Babb ordered him into
the front seat of the car.  That's because that was his way of
operating.  That was his practice.  It had nothing to do with
what Alek Schott did or did not do.  Anything that Deputy
Babb's going to point to now is just an attempt to
retroactively justify what he had already decided to do.

   And then when Alek Schott refused to consent, he called the
canine to alert.  And alert he did, as per usual.  And Babb's
own statements captured on the video footage, Your Honor, prove
the moving force.  Deputy Babb asked Alek if he had been
stopped going down, without any indication, without any
knowledge, any information about how Alek had been driving.

1  Because it wasn't about a traffic violation.  It was about Alek
2  being targeted based on where he was traveling.
3      And then if you went down, you'll probably get the same
4  type of stop.  This stop is not a ordinary traffic stop.  It's
5  always going to be extended.  And so a lot of these questions
6  we're going to ask are going to be the same exact questions we
7  ask when we stop anybody else who's been targeted.  And then,
8  again, as I highlighted earlier, Nine times out of ten this is
9  what happens.  We stop someone.  We interrogate them.  We
10 search them.  We find nothing.
11     And, Your Honor, to underscore an important point, this was
12 a foregone conclusion.  The entire unit knew that.  And how do
13 we know that?  One piece of evidence helps.  And that piece of
14 evidence is that Deputy Babb called for a canine.  Within four
15 minutes of Deputy Babb calling for a canine, Deputy Gereb
16 texted "on my way."  Before the canine arrived, before the
17 canine alerted, he was already speeding at 90 miles per hour to
18 get to this cite, to help with the search that he knew was
19 going to happen.
20     I'll take any other questions Your Honor has at this time,
21 but I think that's enough for now.
22         THE COURT:  No.  Okay.  Thank you.  I think I have it.
23 Let's hear from the other side first.  We may have some -- I
24 may have some questions to followup after I've heard from
25 Mr. Frigerio.

 1          MR. FRIGERIO:  Yes, Your Honor.  First of all, this is

 2   a *Monell* case, we know.  There's three ways of making a *Monell*

 3   case.  One is if you have a written policy that's

 4   unconstitutional, like in *Monell*, was on its face -- New York

 5   Department of Social Services, if you had an employee that was

 6   pregnant, they were terminated.  That's automatically

 7   unconstitutional.

 8        The third element is a single incident which you had in

 9   *Grandstaff v. Borger*, where you had 140 shots at the wrong

10   individual.  Obviously, no training.

11        The only other way is a custom and policy.  That's what

12   this case is about, whether or not you have a custom and policy

13   that was deliberately indifferent to the rights of Mr. Schott.

14        It's very difficult to make a *Monell* claim.  It's extremely

15   difficult.  And the two, I would purport, easier cases to make,

16   if you're going to try a case as a plaintiff, would be the

17   individual officers.  Well, they were ruled -- they were

18   dismissed from the case.  However, I can use those, their

19   instances and their conduct, under *L.A. v. Heller* to show that

20   if they did not commit a constitutional deprivation, then, of

21   course, the county is out as well.  And --

22          THE COURT:  So there's no predicate violation, so

23   there can't be *Monell* liability?

24          MR. FRIGERIO:  Exactly.

25          THE COURT:  Yeah.

 1          MR. FRIGERIO:  As this Court stated in the motion to

 2    dismiss, I believe when the Court looked at the fog line, you

 3    couldn't tell one way or the other.  It wasn't clear.  From a

 4    probable cause standpoint, that's what is a needed -- there's,

 5    like, three steps.  You need probable cause to stop the

 6    vehicle.  Once you stop the vehicle, there's needed reasonable

 7    suspicion to prolong it.  And if you're going to call out a

 8    canine, there has to be reasonable suspicion.  And then the

 9    search can only be conducted if the dog alerts.  If the dog

10    alerts, then the vehicle can be searched.  Those are, like,

11    three steps.

12          In this particular case, Babb had -- in his opinion he saw

13    the fog line.  Under the case law that we cited in our brief,

14    there can't even arguably be probable cause.  It would only be

15    if they could prove you intentionally lied.  If that video

16    showed there was no way he crossed the fog line, then that

17    could be an issue.

18          But since his testimony was, he crossed the fog line, that

19    does give probable cause.  And ironically enough, what's

20    even -- is not even contested is the fact that their own video

21    from Mr. Schott shows that he was speeding.  His speeding gives

22    probable cause for the stop.

23          Now, they argue that --

24          THE COURT:  You keep -- you keep making this argument,

25    and we keep addressing it, but I don't understand that

 1   argument.  If he's speeding, and the officer has no way to know

 2   that he's speeding, how can that justify the stop?  Like,

 3   what -- take, for example -- let's hypothetically imagine that

 4   the driver has a kilo of cocaine in his car, but the officer

 5   has no way of knowing that he has a kilo of cocaine in his car.

 6   The officer pulls him over because he has a broken taillight.

 7   Turns out his taillight is not broken, right.  But the officer

 8   says, Oh, well, you had a kilo of cocaine in your car.  So, you

 9   know, that would have justified the stop.

10       How is that any different than what you're saying about the

11   speeding?

12            MR. FRIGERIO:  Because you need to analyze the

13   objective reasonableness from an officer's perspective --

14            THE COURT:  It's objectively reasonable to pull

15   somebody over for transporting a kilo of cocaine.  The problem

16   is, the officer didn't know it.  Your officer didn't know he

17   was speeding.  The only way we know he was speeding is his dash

18   cam.

19            MR. FRIGERIO:  Is the evidence -- that's the evidence

20   and the world that we're living in, in this particular

21   scenario.

22            THE COURT:  Yeah.  But the officer didn't know that.

23   He's never said -- in fact, in his own testimony he said, The

24   only reason I pulled him over was the fog line thing.

25       So how on earth can that be a reasonably objective basis

1    for him to pull him over?  He had no knowledge of it.

2        MR. FRIGERIO:  Under *Terrell v. Allgrunn*, the

3    Fifth Circuit 2024 case, was out of Louisiana, very similar

4    because the trial court denied the summary judgment.  And the

5    Fifth Circuit held, you held the wrong standard.  Just because

6    this officer didn't know, and I quote this:  This is

7    diametrically opposite of our case law, there must not even

8    arguably be probable cause for the search and arrest for

9    immunity to be lost.  That is, if a reasonable officer could

10   have concluded that there was probable cause, qualified

11   immunity does apply.

12       THE COURT:  Yeah.  Lots of reasonable officers could

13   conclude that there's probable cause --

14       MR. FRIGERIO:  And that's the standard.

15       THE COURT:  -- to pull him over for speeding --

16       MR. FRIGERIO:  That's the standard.

17       THE COURT:  -- if they have a basis to know he's

18   speeding.  They don't have -- he's just a car.

19       MR. FRIGERIO:  Their own evidence shows that he was

20   speeding, Your Honor.  And that's where I submit that case is

21   on point.

22       THE COURT:  So how is that -- so how is that different

23   from my cocaine example?  Explain that to me.

24       MR. FRIGERIO:  Because it's not -- in the totality of

25   what we're looking at, in the dash cam, he could have arrested

1  him or made the stop for speeding.  He didn't.  He made it for

2  crossing the fog line.  But --

3          THE COURT:  And if somebody is driving with a kilo of

4  cocaine, he could have arrested him for cocaine.  Maybe he knew

5  he had cocaine from watching him load it earlier or something.

6          MR. FRIGERIO:  But he didn't know.

7          THE COURT:  But he didn't know.  So how --

8          MR. FRIGERIO:  He didn't know because --

9          THE COURT:  So if he has no idea that he has cocaine

10  and he stops him for a broken taillight and there's no broken

11  taillight, he cannot invoke the cocaine as a basis to stop him,

12  right?

13          MR. FRIGERIO:  Because -- yes.

14          THE COURT:  Because it's suppressed.

15          MR. FRIGERIO:  Under your -- under your --

16          THE COURT:  Even though it's objectively reasonable to

17  stop somebody for driving with a kilo of cocaine in their car.

18          MR. FRIGERIO:  If he knew.  But under the -- I'm

19  saying, because it's in evidence in this case that he was

20  speeding, even though Babb didn't --

21          THE COURT:  It's not in evidence that the officer

22  knew.

23          MR. FRIGERIO:  But an objectively reasonable officer,

24  as long as they could have known, it still comes under the

25  qualified immunity penumbra.

1          THE COURT:  Okay.

2          MR. FRIGERIO:  That's my argument.  I would ask the

3    Court --

4          THE COURT:  I've got your argument.  I just -- and

5    maybe I'm just wrong.  This is not the first time I've made

6    this ruling.  I made this ruling earlier.  I just -- there's no

7    way -- unless there's some other way to distinguish this

8    argument --

9          MR. FRIGERIO:  I would --

10         THE COURT:  -- that you're not giving me, I just do

11   not get it.

12         MR. FRIGERIO:  I would cite the case to -- the Court

13   to 114 F.4th 428.  It's Fifth Circuit 2024.

14     And then in the alternative, we're still talking about the

15   fog line, and --

16         THE COURT:  What about his testimony in his deposition

17   that he says he -- something like he hit the fog line.  But he

18   doesn't say he crossed it.  Does that move the needle in any

19   way?

20         MR. FRIGERIO:  I think it's still arguable probable

21   cause.  As long as there's arguable probable cause, then he's

22   still entitled to qualified immunity for no constitutional

23   violation.  If he doesn't have a constitutional violation, I

24   take it -- Molina, there is absolutely no evidence this dog --

25   the only evidence that Max, who has been maligned in this

1  case -- he actually had one of the best -- he had the best

2  record in Bexar County canine service.  He had a 90-percent

3  rating.

4      There is no evidence -- obviously, they didn't get an

5  expert on canines.  And I know this Court struck our canine

6  expert.  That's on appeal.  But I don't even need to have an

7  expert, quite frankly, for the canine because, under the case

8  of Florida -- the Florida Supreme Court case that we cited --

9          THE COURT:  Yes.

10          MR. FRIGERIO:  -- you just need to have certification.

11  He had all the certifications available.  There's no question

12  he was certified.

13          THE COURT:  What if they -- what if they produce

14  evidence that brings the certification into question?

15          MR. FRIGERIO:  They didn't.

16          THE COURT:  Like evidence of -- well, the evidence of

17  positive sniffs every single time?  That's --

18          MR. FRIGERIO:  But he didn't have --

19          THE COURT:  They have a whole big section on their

20  brief about that.

21          MR. FRIGERIO:  He didn't have positive sniffs every

22  single time.  In fact, of the 30 videos that we have -- that's

23  where the similarities go.  We have 15 from Babb, and we have

24  15 from Gereb.  Not all of the sniffs were positive or alerts.

25  And there were two -- I'll give the two that were not were a

```
 1  different dog.  But it doesn't necessarily mean that -- it's
 2  still the --
 3            THE COURT:  Seriously?
 4            MR. FRIGERIO:  It's the three -- it's the 30 that they
 5  submitted.  Okay.  So of the 30 --
 6            THE COURT:  How many for this dog?
 7            MR. FRIGERIO:  There were -- there were two.
 8            THE COURT:  Since this is the dog that alerted.
 9            MR. FRIGERIO:  I believe there were two under Max,
10  that he did alert to.  There were none that he didn't alert to.
11  But that was of the 15 -- of the 30.  But --
12            THE COURT:  And what about the --
13            MR. FRIGERIO:  Under NCATS --
14            THE COURT:  What about the prior record for Max?
15            MR. FRIGERIO:  Under NCATS, he has an outstanding --
16  he had the best record of any canine in Bexar County.  And
17  NCATS, you have to go through a rigorous videoing of how the
18  dogs go about sniffing and negative -- I mean, it's a national
19  certified testing.  And Max did an excellent job.  There's no
20  evidence that the dog cued, other than the attorneys in this
21  case saying that he cued.  He didn't cue.  He actually gave a
22  positive alert.
23            THE COURT:  Yeah.  Okay.  So what about their
24  discussion of all of the sniffs conducted in the year preceding
25  this incident that Max did, right?  Isn't that what their brief
```

1  is about?

2      MR. FRIGERIO:  Well, I mean, I think the record speaks

3  for itself.  Exhibit J, that we entered into evidence, shows

4  the record of Max and his reliability, which Bexar County kept,

5  as well as the videos that were submitted to NCATS, which gave

6  him the certification.  There's no competent evidence to say

7  that he was not certified or that there was any problem with

8  his dog-sniffing abilities.

9      So I would also bring to the Court's attention -- I'm sure

10  you've read the case of *Weisshaus v. Teichelman*.  That's that

11  case -- it starts with the trial court, and it's almost a

12  paradigm to the case that we're talking about.  It's a task

13  force case.  They don't use the word "interdiction," but it's

14  the same thing.

15      And at this point I'd also like to say, the fact that we

16  use the word "interdiction" isn't an evil word.  There's

17  nothing illegal with interdiction.  These officers were

18  actually sent -- we have the testimony from the sheriff they

19  were sent to a task force in North Texas to be trained.  They

20  were trained in interdiction.  So there's nothing wrong with

21  doing interdiction.  As long as you do it by the law and as

22  long as there's probable cause to make the initial stop, it's

23  still legal.

24      And it's legal to question and to prolong the search.

25  That's what happened in *Weisshaus v. Teichelman*.  There was a

1  speeding allegation and dirty license plate.  And so the

2  vehicle was pulled over.  The individual said, I wasn't

3  speeding.  There was some question about that.  And the Court

4  actually held, Well, as long as the officer made a good faith

5  belief that he was speeding, the stop is fine.

6      And then he led the questioning, where the individual

7  became nervous.  It's almost exactly like this case.  And a

8  canine was called out.  The canine came out, and he gave a

9  passive alert, not even an active alert, but a passive alert,

10  and the vehicle was then searched.  Nothing was found.

11      So then the individual brought a lawsuit against the

12  officer in that particular case, and the Court granted the

13  qualified immunity based on the fact that there was no

14  constitutional deprivation.  And the Fifth Circuit affirmed.

15  And they go through the exact same steps of this particular

16  case.

17          THE COURT:  Give me the cite for that case.

18          MR. FRIGERIO:  It's Weisshaus, W-E-I-S-S-H-A-U-S, v.

19  Teichelman, T-E-I-C-H-E-L-M-A-N, 637 F. Supp. 3d 434, Northern

20  District of Texas 2022.  And then the Fifth Circuit, when it

21  went up on appeal, is 2024 Westlaw 620372, February 14th of

22  2024.

23          THE COURT:  Okay.

24          MR. FRIGERIO:  Other cases that I'd like to bring to

25  the Court's attention, I think they're very pertinent, *Pineda*

1    *v. City of Houston*.  That is a case where at issue was the gang

2    task force.  And the allegations there were there's a custom

3    and policy that the gang task force conducted warrantless

4    searches of homes.  They were going to the gang members' homes

5    and did searches.

6        Judge Higginbotham wrote the opinion that affirmed the

7    grant of summary judgment.  There were 11 particular -- there

8    were 11 instances, so-called, in that one.  Judge Higginbotham

9    said, I'm not concerned so much with the number.  But what's

10   important in this case is that there's no evidence of prolonged

11   public discussion or high degree of publicity.

12       That's citing a case that's *Bennett v. Slidell*, which is

13   really the -- that's the guiding light, I suppose, to what

14   custom and policy is, even though it's 40 years old.  That case

15   talks about what you actually have to have to have a custom and

16   policy.

17       And as Bryan County -- *Board of County Commissioners v.*

18   *Bryan County* [sic] held, that's the last real Supreme Court

19   case that really talked about custom and policy.  Even though

20   it's 1997, the Court hasn't addressed it specifically like

21   that.  That was a case where an Oklahoma sheriff hired his

22   cousin, or it was a relative, as a deputy sheriff.  And this

23   deputy sheriff then committed excessive force against a driver.

24   And the case was actually tried before a jury.  The

25   Fifth Circuit affirmed that there was a custom and policy.  You

1    shouldn't have hired your relative as a -- as a deputy.

2        The Fifth -- the United States Supreme Court granted cert

3    and reversed.  And the language in its reversal is very

4    important.  It says, "As our Section 1983 municipal liability

5    jurisprudence illustrates, it is not enough for a Section 1983

6    plaintiff merely to identify conduct properly attributable to

7    the municipality.  Plaintiff must also demonstrate that,

8    through its *deliberate* conduct, a municipality was the 'moving

9    force' behind the alleged injury.  That is, a plaintiff must

10   show that the municipal action was taken with a requisite

11   degree of culpability and must demonstrate a causal link

12   between the municipal action and the deprivation of rights."

13       Now, in this case the sheriff is the policymaker under

14   Fifth Circuit case law.  There is no showing of a deliberate

15   indifference on behalf of Sheriff Salazar, that he just

16   disregarded the rights of individuals.  Like I said, just

17   because you call -- "interdiction" in and of itself, there's

18   nothing wrong Interdiction Unit.  They actually -- there's

19   training that he sent people to for the Interdiction Unit.

20       And so we have -- one complaint is what we have, and that's

21   Mr. Schott.  And that one complaint actually resulted

22   ultimately in Mr. Babb -- Deputy Babb being terminated because

23   we have a policy that you don't turn off your dash cam.  When

24   they found out he did turn off his dash cam, he was terminated.

25   So it shows you the kind of action that the sheriff, as the

1  policymaker, takes.

2      We have one instance.  We didn't have this morass of

3  complaints about the Interdiction Unit; that they're violating

4  people's constitutional rights.  And without that, you don't

5  have a custom of policy under the second prong under *Monell*.

6      Thank you.

7          THE COURT:  Okay.

8          MS. HEBERT:  Your Honor, I want to zoom out for a

9  second and start with slide 106.  Bexar County has not carried

10 its burden, Your Honor.  You just heard Mr. Frigerio get up

11 here and quibble about various cases and highlight about

12 speeding, which this Court has already rejected.

13     But what you didn't hear was Bexar County point to any

14 evidence that they did not have this tactic, because they did.

15 What you did not hear is Bexar County point to any evidence

16 that the sheriff did not know, because he did.

17     The only thing that Mr. Frigerio talked about was a brief

18 discussion about the violation of Alek Schott's rights.  So I

19 want to talk about that.  I want to go to slide 75.  Slide 75

20 highlights what Deputy Babb actually testified.

21     And I want to take a step back from that.  When Deputy Babb

22 pulled Alek over, he walked up to Alek and said, "I pulled you

23 over for drifting over the fog line pretty hard."  That was the

24 traffic violation he claimed to have seen.  But unrebutted

25 expert testimony, plus Alek's dash cam, shows that didn't

1  happen.

2      So what happened in deposition?  Deputy Babb walked it

3  back.  Instead of saying, "I saw Alek Schott drift over the fog

4  line pretty hard," he said, "I saw Alek Schott hit the fog

5  line."

6      Next slide.

7      And he claimed that simply touching the fog line was

8  enough.  But we know, under Texas Criminal Court of Appeals

9  binding precedent, that that is not enough.  Under *State v.*

10  *Cortez*, which was decided before this case, Your Honor, in

11  2018, the Criminal Court of Appeals said, momentarily touching

12  the fog line, without any other indication of criminal

13  activity, is not enough.  So there's not arguable probable

14  cause in this case.  There's not arguable reasonable suspicion

15  in this case.

16      What you have is Deputy Babb admitted, Oh, you know what?

17  I didn't actually see him cross the fog line.  I saw him touch

18  the fog line.

19      But Deputy Babb wasn't paying attention to the actual law,

20  that that's not a violation under Texas traffic law, because he

21  didn't actually care about seeing traffic violations.

22      And I want to take a look at slide 48.  Time and time again

23  these two officers pulled over drivers for illegal lane

24  changes.  Two out of 250 accounted for 30 percent of these

25  offenses.  Bexar County has no answer for that, has no answer

for why two deputies would pull over 30 percent of all of the
traffic violations for these illegal lane changes.  And
Bexar County has no answer for why other officers would tease
Deputy Gereb via text message for making up probable cause.

And Mr. Frigerio highlighted how Deputy Babb was fired for
turning off his dash camera in this particular incident.  But
there's been no discussion, no exploration, no investigation
into the fact that other interdiction deputies were also
turning off their dash cameras because everybody knew that that
was happening.

And, Your Honor, I want to go to slide 85.  So that's the
stop.  Let's go to slide 85 and talk about the extension.
Deputy Babb needed specific articulable facts to believe there
was a specific crime occurring.  He needed individualized
suspicion that Alek Schott was involved in a specific crime.
He didn't have that, by his own testimony:  I'm starting to
think he's possibly being deceptive with something.  I don't
have proof of that.

And the United States Supreme Court has emphatically said
that a mere hunch or a mere feeling is not enough to have
reasonable suspicion.  Nor is ordinary nervous behavior that
any reasonable person would exhibit in the front seat of a
police car.

And Sergeant Gamboa testified that the Criminal
Interdiction Unit usually got consent.  That's because, without

1   a *Miranda* warning, they put people in the front seat of their

2   police cars to do a videotaped interrogation, where anything

3   you said or did could be used to justify extending the stop,

4   asking for consent to search and call in a drug dog.  And

5   that's exactly what happened here with Alek Schott.

6       And I want to address the comments about Max and the drug

7   dog.  *Florida v. Harris*, Your Honor, teaches that certification

8   does create a presumption of reliability.  But it's just that.

9   It's a presumption.  It can be rebutted by evidence showing

10  that this dog was not reliable.

11      And what happened here, we're not quibbling with the fact

12  that this dog was certified.  What we're focused on and what

13  the evidence shows is that Molina broke his dog; that rather

14  than rewarding this dog for actually finding drugs, he rewarded

15  him for alerting.  And everybody knew that was the case.

16      Your Honor, I also just want to make a couple of minor

17  points.  The Court already rejected the case that my friend on

18  the other side cited in the motion to strike on the speeding

19  case.  He offered the *Terrell* case, which is actually from 2014

20  rather than 2024, full transparency.

21      And in that case it's just the same standard that this

22  Court applied in rejecting -- or granting the motion to strike;

23  that it's what the officer knew at the time, not evidence

24  brought in from outside.  That Court -- that case even said as

25  much, the facts that the officer knew.  This Court already

 1   determined that.

 2        Talk a little bit about *Weisshaus*, Your Honor, which the

 3   other side has relied on extensively in their briefing and

 4   brought up again today, Your Honor.  That case is different on

 5   both the facts and the law.  It was a qualified immunity case.

 6   At the motion to dismiss stage, the municipality was already

 7   dismissed because of a lack of plausible allegations.  So it

 8   was just on qualified immunity and whether the violation of the

 9   constitutional rights was clearly established.  The Court

10   didn't go as far as saying there was no violation of

11   constitutional rights.  It said it's not clearly established

12   for purposes of qualified immunity.

13        And there were no allegations about municipal liability or

14   any evidence showing that this is what these officers did time

15   and time again.  And on the facts, Your Honor, the plaintiff in

16   that case and his passenger admitted they didn't know where

17   they were going.  They admitted that they didn't have a travel

18   itinerary.  And so the Court found that was reasonable

19   suspicion to continue extending the stop.

20        That's different from the facts here, where Alek Schott

21   answered every question, and that the only things that Deputy

22   Babb could point to were some behavioral characteristics that

23   he claimed justified extending the stop, when he'd really

24   already decided he was going to call the dog and do a search.

25        Counsel also cited a couple of other *Monell* cases.  *Pineda*

 1  is one of those.  They're all the same ones that this -- that

 2  opposing counsel has brought up in his briefs.  And each of

 3  those cases are all, again, about the specific number.

 4  Whereas, here the evidence is just simply overwhelming that

 5  there was the existence of this practice of a three-step tactic

 6  to manufacture reasonable suspicion and probable cause to get

 7  into cars.

 8      And I want to return to slide 106 just to conclude, Your

 9  Honor.  And ultimately Bexar County had a burden to point to

10  specific evidence, and it didn't meet that burden.  Instead,

11  the undisputed evidence shows that Bexar County's Interdiction

12  Unit had this unconstitutional three-step tactic, and then it

13  applied that tactic to Alek Schott.

14      What happened to Alek Schott wasn't unique.  No one says it

15  was.  Deputy Babb testified he did this hundreds of times.  And

16  so the Interdiction Unit systematically violated the Fourth

17  Amendment in stop after stop after stop.

18      And the undisputed evidence shows that the interdiction

19  deputies wanted to make a stop based on these one-day

20  turnarounds.  They were directed to do so in text messages from

21  supervisors.  They were -- and it was a recognized thing that

22  they wanted to do.  And so as cars were driving down the

23  highway, within, you know, a ten-second frame, their dash

24  camera's off, they decided to pull them over.  And then they

25  claimed that they had seen a traffic violation in this narrow

1    sliver of time.

2         THE COURT:  What would this look like if they did this

3    in a constitutional manner?  How would it be different?  If you

4    could, you know, explain to these folks, Okay.  You want to set

5    up an interdiction unit.  You have, for whatever reason,

6    concern about one-day stops, and you'd like to have an

7    opportunity to speak to those kinds of people to see if there

8    might be a reason to investigate further, how does that look if

9    it's done the right way, in your view?

10         MS. HEBERT:  In my view?  I mean, I don't entirely

11   know.  But I can say, number one, one of the most important

12   things is not divorcing these stops from actual traffic

13   enforcement purpose.  So here, it's undisputed that these

14   officers didn't give tickets.  They gave warnings.  In Exhibit

15   38, that's all of Babb's Q1 citations, warnings, none of them

16   says a search happened.  And they're all warnings.

17       And because they were warnings, these officers never had to

18   get into a court of law and say, I actually saw a traffic

19   violation.

20       They never had to go through any of the process of backing

21   up what they said they saw.  So, number one, you actually have

22   to have a traffic violation.  And if, as a county, you realize

23   your officers are turning off their dash cameras and citing the

24   same traffic violations over and over again, you might realize

25   you have a problem.

```
 1        Number two, you can't automatically extend the traffic
 2   stop.  You're only supposed to do a traffic stop about traffic
 3   enforcement.  And if the computer checks come back clean,
 4   you're supposed to end the traffic stop unless you have new
 5   reasonable suspicion.  And simply a one-day turnaround, a
 6   one-day trip somewhere is not enough.
 7             THE COURT:  So for you, at that stage -- so you sort
 8   of break this out as sort of three steps, right, or -- and
 9   three violations, right?
10             MS. HEBERT:  Yes, Your Honor.
11             THE COURT:  Step one, they've got to actually -- so
12   here, actually go over the line --
13             MS. HEBERT:  That's right, Your Honor.
14             THE COURT:  -- or have a taillight that doesn't work
15   or change lanes without signaling or whatever else.  Then, even
16   though the stop is pretextual, there's probable cause for
17   making the stop because there's a violation, right?
18             MS. HEBERT:  Yes, Your Honor.
19             THE COURT:  And then at step two they're talking to
20   the person.  Okay.  They notice nervousness.  They notice -- or
21   they have knowledge of a one-day turnaround, I guess, assuming
22   it's --
23             MS. HEBERT:  One of the chat or the license plate
24   readers.
25             THE COURT:  -- something that you can rely upon in
```

forming some sort of -- either a reasonable suspicion or a
probable cause determination, and something else, like, Can you
tell me where you're going?  I don't where -- I'm not really
sure.  What do you mean, where am I -- they don't know why
they're where they are, where they're traveling from or to.

MS. HEBERT:  That's right, Your Honor.

THE COURT:  Then they can extend a little longer.

MS. HEBERT:  That's right, Your Honor.

THE COURT:  Okay.  And then three for you is the
sniff.  And there, you have a lot of problems with this dog.
And so I guess it would be -- what?  And your -- I mean, and
the way you all frame it, the dog just cues or alerts every
time based on a cue.  And so there would have to be rewards for
alerting only when it results in the location of contraband?

MS. HEBERT:  That's right, Your Honor.  And rewarding
when the dog was actually finding something rather than
rewarding when the dog was simply alerting.  And Deputy Molina
knew this was happening.  He knew this was happening because he
would continuously find nothing.  And he would write on his
reports some small amount, where in other reports he would say,
there was a possible alert or no drugs were found.

And so what happened was, because Molina would write this,
because he knew that Max wasn't actually alerting to drugs but
he wrote it on his paperwork, it still looked like -- when he'd
come in before this Court at a motion to suppress hearing,

1  still look like this dog alerted reliably 90 percent of the

2  time.

3      And so that is a problem.  It's a problem in breaking the

4  dog, and it's a problem in that the officers here, Deputy

5  Gereb, Deputy Babb, Gamboa, Molina, all knew that this dog was

6  going to alert every time.  And under *Florida v. Harris*, the

7  test is whether a reasonable person would believe that an alert

8  indicated that drugs were present.  And they all knew here that

9  this dog would alert, but that didn't mean drugs were actually

10  there.

11          THE COURT:  Okay.  Anything else to emphasize?

12          MS. HEBERT:  No, Your Honor.  Thank you.

13          THE COURT:  Mr. Frigerio.

14          MR. FRIGERIO:  Yes, Your Honor.  There were a few

15  points.  First, on the *Weisshaus* case, their initial case that

16  I cited to you at the trial court level, there was a *Monell*

17  issue.  And they held for the municipality.

18      Now, with regard to Max, who's been -- I've grown fond of

19  Max.  Okay?  And I don't -- I don't think he has been treated

20  fairly in this case, because there's no evidence, outside of

21  argument by counsel, that he was ever cueing or did anything

22  wrong, other than alert when he, the dog, sniffed something.

23      Now, the evidence shows -- in Molina's deposition -- went

24  through -- painstakingly went through a lot of depositions in

25  this case -- how these dogs are trained.  And to be certified,

1    you have to actually have the video.  And you're going into a

2    room, and some of those rooms have to be empty.  So it's not

3    like the dog's always alerting.  If the dog was always

4    alerting, he'd just be alerting.

5           THE COURT:  What's the effect of this evidence that

6    there were these positive alerts that resulted in reports of

7    sort of trace amounts of something that was then never tested?

8    How does that affect or not affect the reliability of the dog?

9           MR. FRIGERIO:  I don't think it affects it one way or

10   the other, Your Honor.  Trace amounts, they didn't because it

11   was not prosecutorial, they couldn't prosecute it.  And two,

12   there's evidence that even if -- let's assume there was nothing

13   found.  Deputy Molina's testimony is there could have been

14   something in there, because the dog only smells odors.  So you

15   could actually have a pound of marijuana, take it out.  And

16   maybe the next day the dog's going to alert.  But it was there

17   at one time.

18       So if we look at the totality of how this dog was trained

19   and the videos of -- through vehicles that were -- some had

20   drugs, some didn't, through rooms where some had drugs and some

21   didn't, the dog always did well and did better than any of the

22   canines Bexar County had.

23       Number two, before I forget, I'd like to talk about Deputy

24   Gereb, because he specifically testified that he had times --

25   and when we were talking about this -- I'm trying to remember.

1  It's Laredo Fusion.  So it's the Laredo Fusion Center where

2  they got this information from.

3          THE COURT:  Well, what is that?

4          MR. FRIGERIO:  Well, like San Antonio has a Fusion

5  Center.  It's where they intercept social media, and there's a

6  lot of -- it's made up of federal, state and county employees.

7          THE COURT:  Do we have a list of who the people were

8  so --

9          MR. FRIGERIO:  No, we don't.

10          THE COURT:  -- we'll know what Laredo Fusion means

11  or --

12          MR. FRIGERIO:  No.

13          THE COURT:  So it could be like the -- in the recent

14  news media, where people are sending confidential messages to

15  each other without knowing that there's a reporter on the -- on

16  the text?  Like, we don't know who was on this text chain,

17  right?

18          MR. FRIGERIO:  We just -- no.  We just know it's a

19  Laredo Fusion Center.  I mean, it's not like it was John Doe.

20  I mean, it's -- fusion centers is how San Antonio -- I know for

21  a fact how we get a lot of our information with regard to --

22          THE COURT:  Well, it sure would be helpful to have

23  evidence about who the Fusion Center is and what the Fusion

24  Center does and who was on this text chain and who wasn't on

25  this text chain and how secure it was and what the reliability

1 of these tips were because, otherwise, it's just the same as if
2 somebody picks up a -- right?  Goes down to the -- when we used
3 to have phone booths.

4          MR. FRIGERIO:  Right.

5          THE COURT:  Goes down to the phone booth and makes a
6 call, Hey, so-and-so's smuggling.  You know, hey, this
7 Mr. Schott guy is, you know, smuggling whatever.

8          MR. FRIGERIO:  Right.  It was an unsubstantiated tip,
9 granted.

10          THE COURT:  Yeah.  Okay.

11          MR. FRIGERIO:  But Gereb testified that when he would
12 get these -- when he got tips, and it happened on more than one
13 occasion, and he would be behind a vehicle, unless he saw a
14 violation, he would not pull the vehicle over.  And as much as
15 counsel pressed that, he said no, he didn't.  He knew and
16 realized he had to have probable cause.  And that's the
17 constitutional standard.

18     And I think -- lastly, Your Honor, in the final analysis of
19 custom and policy, I think the strongest case for Bexar County
20 is, we had one complaint.  That one complaint does not create a
21 custom and policy against Sheriff Salazar, because he was not
22 deliberately indifferent to the rights of anyone.  Thank you.

23          THE COURT:  Okay.  Final words?

24          MS. HEBERT:  Might I respond?

25          THE COURT:  Sure.

1          MS. HEBERT:  Okay.  I want to start with slide 58 just
2   to hit some of these points, Your Honor, before we conclude.
3   Mr. Frigerio talked about the fact that there was no evidence
4   that this dog was broken, and there was no evidence that this
5   dog was not reliable.
6       But drug dogs must be rewarded after finding drugs.  The
7   other canine handlers deposed in this case, supervisor, the
8   prior handler of Max, all stated that everybody knew that.
9   This was a cardinal rule.
10      Next slide.
11      But Molina broke it anyway.  In his own testimony he
12  rewarded Max for alerting, not for finding drugs.  It was
13  automatic.  The dog alerted, he got his toy.  No searching,
14  nothing happens after that in terms of Max.  Simply alert, you
15  get your toy.  Molina moves on.  Sometimes he helped.
16  Sometimes he didn't.  And that's enough, Your Honor, to show
17  that Max was broken in this case.
18      Next slide.
19      But that's not it.  He alerted on every roadside sniff in
20  the air.  The Court has pointed to that.  Counsel has no
21  response to that, has nothing to say.  Instead, he points to a
22  dog that was used on a couple of -- a couple of shifts when
23  Molina wasn't available, and that dog didn't alert.  But that
24  proves the point.  Everybody knew that this dog would alert.
25  And that's the dog they continued to use.

1    And Gamboa's testimony was, if the dog alerts, search.  You

2  don't ask questions about the reliability of the dog alert

3  because we're just going to search no matter what.

4    And we talked about Molina and the investigation.  And

5  counsel has no response to the fact that Bexar County itself

6  concluded that Max's performance was inconsistent.  No one's

7  beating up on this dog.  Everyone knew that this dog wasn't

8  reliably indicating drugs.

9    And then I want to talk briefly about slide 93 and slide

10  94.  We just heard a little bit of information about the Fusion

11  Center and what was going on.  And Your Honor rightly pointed

12  out, there's actually no evidence about these things.  Counsel

13  cites to no evidence about what the officers were doing, about

14  having actual probable cause.  Counsel cites to no evidence

15  that the Fusion Center actually existed.

16    And what Deputy Babb actually testified was, I don't know

17  for sure if this guy works at the Fusion Center, but I believe

18  he works there.  And I think this might be his name, but I

19  don't actually know.

20    And then the other evidence in the record, Your Honor --

21  next slide -- is that no one could confirm that the Laredo

22  Fusion Center actually existed.  No piece of evidence.  This is

23  Gamboa's testimony:  "Have you ever heard of the Laredo Fusion

24  Center?"

25    "I have not."

1    And that's because it was all about a chat, tip that was

2    dropped about Alek making a one-day turnaround.  And Deputy

3    Babb, like the other officers on the Interdiction Unit, just

4    like Deputy Gamboa -- or Sergeant Gamboa knew, that was enough

5    for him to decide to stop and search Alek, without anything

6    else.

7    With that, Your Honor, we conclude by emphasizing the fact

8    that there are no material fact disputes on any of the *Monell*

9    elements.  There's no evidence disputing the existence of this

10   three-step tactic, unconstitutional three-step tactic.  There's

11   no evidence disputing that the sheriff knew about that tactic,

12   and there's no evidence disputing that the tactic was applied

13   directly to Alek Schott and that he was stopped and searched

14   because of it.

15   Thank you, Your Honor.

16       THE COURT:  Parting words, Mr. Frigerio?

17       MR. FRIGERIO:  Yes, Your Honor.  We had the sheriff's

18   deposition.  It's in -- it's in the evidence.  He talked about

19   his time when he was in San Antonio Police Department, he was

20   in interdiction with HIDTA and the federal authorities.  The

21   word "interdiction" is not in and of itself unconstitutional.

22   It's been made in this case to have bad connotations.  It

23   doesn't, as long as you follow the Constitution.  And I believe

24   that there is no evidence that Sheriff Salazar was deliberately

25   indifferent.

1       Thank you.

2              THE COURT:  Okay.

3              MS. HEBERT:  Your Honor, I'm happy to provide you an

4    electronic copy of the PowerPoint presentation, should you want

5    it.  But --

6              THE COURT:  No.  That would be great.  Thank you.

7       And just arrange with my courtroom deputy, Ms. Baillo, to

8    provide that to us.

9       Okay.  You know, look, I've spent so much time looking at

10   your arguments.  What I should have taken a look at is just --

11   but I'm sure you all can guide me about, where are we now?

12   What happens next?  Anything else that needs to happen after

13   there's an R&R on these issues?

14             MR. FRIGERIO:  No, Your Honor.

15             MS. HEBERT:  Yes, Your Honor.  We actually don't know

16   what is next in terms of a scheduling order.

17             THE COURT:  Yeah.

18             MS. HEBERT:  We don't have a trial date --

19             THE COURT:  Okay.

20             MS. HEBERT:  -- and would be looking for a trial date

21   before Judge Garcia.  Would estimate that trial would take at

22   least a week, Your Honor.  And it is currently -- I think

23   that's enough to know for now.  I mean, the spring or summer

24   would be our preference.  We'd have to check with calendars for

25   the rest of our side and I assume with Mr. Frigerio and our

 1  witnesses.  But that's what we would suggest.

 2          THE COURT:  Okay.  And you said you have an issue.  Is

 3  that -- an issue up on appeal.  Is that a --

 4          MR. FRIGERIO:  On appeal on the expert witness --

 5          THE COURT:  That's an objection to Judge Garcia?

 6          MR. FRIGERIO:  Yes.  Yes.

 7          THE COURT:  Okay.  And how long have y'all been

 8  waiting on that?  Do you know?

 9          MR. FRIGERIO:  At least three weeks.

10          THE COURT:  Okay.

11          MS. HEBERT:  I believe it was completed -- the

12  briefing on that was completed in early September, Your Honor.

13          THE COURT:  Okay.

14          MS. HEBERT:  Maybe the first week.

15          THE COURT:  All right.  Okay.  That's good to know.

16      So, obviously, look, just based on the complexity, I don't

17  think it's any great mystery, I'm going to take it under

18  advisement.  I'll give y'all a report and recommendation.  And

19  I'll try to be as careful and thorough as I can so that, to the

20  extent anybody has any issues with that, you can raise them

21  with Judge Garcia.  So bear with me on that.

22      I won't wait to start working on -- I'm not going to wait

23  on Judge Garcia's ruling.  I'm going to plow ahead assuming

24  that I'm okay.  But if I'm not, then that may affect things.

25  So that may just affect timing.  But I'll push on through just

1  to get that to you all as soon as I can.  I don't know sort of

2  how -- what wrinkle that will throw in the works if there's,

3  you know, sort of some inconsistency in how he and I view these

4  things.  But just so you all know.

5      But I can understand and appreciate you all have moved

6  forward in the case well.  And so I need to get you a detailed

7  answer on whether all, none or some of this is going to push

8  forward into the next phase.  And so I'm going to turn to that

9  next, just as soon as I'm able.  Obviously, we're super busy.

10  So please bear with me.

11          MS. HEBERT:  Understood.

12          THE COURT:  Appreciate your patience.

13      I think that's all I have.  Thank you both.  Appreciate

14  your arguments today, very helpful.

15          MS. HEBERT:  Thank you, Your Honor.

16          MR. FRIGERIO:  Thank you.

17          THE COURT:  Take care.

18  * * *

19      *(2:45 p.m.)*

-oOo-


     I, court approved transcriber, certify that the foregoing
is a correct transcript from the electronic sound recording of
the proceedings in the above-entitled matter.


Date:  11/20/2025    /s/ Chris Poage
                     Approved Transcriber