IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALEK SCHOTT, | § | |
| *Plaintiff,* | § | 5-23-CV-00706-OLG-RBF |
| | § | |
| vs. | § | |
| | § | |
| BEXAR COUNTY, TEXAS, | § | |
| *Defendant.* | § | |
| | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Orlando Garcia:**

This Report and Recommendation concerns the Motion for Summary Judgment by Defendant Bexar County, Dkt. No. 117, and the Motion for Summary Judgment on Liability by Plaintiff Alek Schott, Dkt. No. 119. The District Judge referred the case for resolution of certain pretrial matters, pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 16. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, the Motion for Summary Judgment on Liability by Plaintiff Alek Schott, Dkt. No. 119, should be **DENIED**, and Motion for Summary Judgment by Defendant Bexar County, Dkt. No. 117, should be **DENIED in part** and **GRANTED in part**, as discussed further below.

## Factual and Procedural Background

In early 2022, the Bexar County Sheriff's Office (BCSO) was operating a "Criminal Interdiction Unit" (CIU), a component of the BCSO's Organized Crime division. Dkt. No. 126-1 at 107:6-108:16 (stating that the CIU was formed in late 2021 or early 2022); *see also* Dkt. No. 119-2 at 44:4-47:12; Dkt. No. 119-1 at 136:2-8. Its purpose was to identify, track, and interdict vehicles that CIU officers suspected were involved in human, narcotics, or firearms trafficking. Dkt. No. 119-2 at 29:12-39:17. Sergeant Peter Gamboa led the unit; he possessed prior experience in covert narcotics operations. Dkt. No. 119-1 at 110:12-111:2. According to Gamboa, the CIU practiced a technique called "proactive policing," which involved effecting traffic stops of suspected traffickers and then using the interactions with the subjects of those stops to, if possible, get into and search the subjects' vehicles. Dkt. No. 119-2 at 36:3-40:5. Sergeant Gamboa testified at his deposition that he selected officers for the unit based on a number of criteria, including and especially their ability to "get into a vehicle." *Id*. at 50:21-52:17

The CIU relied on specialized equipment and various intelligence sources to identify suspected traffickers. Dkt. No. 119-1 at 126:6-133:13. One of these intelligence sources was the "Laredo Fusion Center," described by Bexar County Sheriff Javier Salazar as a police-intelligence unit based in Laredo, Texas. *Id*. at 129:4-131:3; *see also* Dkt. No. 119 at 4 (citing various depositions).[1] Sherrif Salazar further explained that, generally speaking, Fusion Centers are intelligence organs within police departments that collect and collate intelligence from a variety of sources before disseminating it to police officers who can then act on it. Dkt. No. 119-1 at 129:5-16.

---

[1] Other than depositions, the pagination throughout is based on the Court's stamped page numbers in the top right-hand corner of the document cited.

Plaintiff Alek Schott, at all times relevant to this case, was an employee with his father's business. *See* Dkt. No. 119-9. That business, RMS Controls, "manufactures, distributes, and sells both its own products and other companies' products to clients in the oil, gas, and pipeline industry." *Id*. at 3. Schott's job included operations and business development, which required him to take long road trips to visit clients on-site and demonstrate RMS Controls' products. *Id*. Schott, based in Houston, frequently serviced clients in South Texas, particularly within the Eagle Ford Shale play, which is a large oil-and-gas formation in South Texas. *Id*. In 2022, he began using a route that took him through Bexar County by way of Interstate 35. *Id*.

On March 16, 2022, Schott met with a businesswoman whose company sold a remote-power engine that RMS Controls wanted to test for a trial run. *Id*. at 4. Schott met her at a hotel in Pearsall, Texas, and traveled with her to the Chesapeake Energy site in Carrizo Springs, Texas, for a demonstration. *Id*. He then dropped her back off at the Persall hotel before he began to travel back to Houston. *Id*.

The Laredo Fusion Center, meanwhile, took notice of Schott's trip and communicated to the CIU that Schott had performed a "one-day turnaround." Dkt. No. 119 at 9-10 (citing various depositions). One-day turnarounds are travel patterns in which a traveler engages in a long round trip with a single destination, visited only briefly; in the world of criminal interdiction, one-day turnarounds can indicate that a traveler is engaging in a pick-up or drop-off related to human or narcotics trafficking. Dkt. No. 119-3 at 136:8-137:18. Interdiction officers in Texas look for trips made from a more northerly part of the state to a "source city" in southern parts of the state, particularly those cities through which large volumes of narcotics are trafficked. *Id*.

Enter an informant associated with the Laredo Fusion Center, an obscure figure known only as "Kiki" and about whom the parties have offered very little information. *See, e.g.*, *id*. at

146:8-152:6; Dkt. No. 117 at 2-3 (alluding to Kiki); Dkt. No. 119 at 10 (collecting deposition testimony). Kiki apparently communicated to BCSO Deputy Joel Babb that Schott had performed a one-day turnaround, traveling from Houston to deeper South Texas, and had done so with a female in the car. Dkt. No. 119-3 at 137:7-13. Kiki also relayed that Schott dropped off the female passenger at a hotel. *Id*. Believing this information indicated potential involvement in some manner of illicit trafficking, *id*. at 135:4-137:18, 156:8-157:7, Officer Babb attempted to initiate a traffic stop in hopes of eventually searching Schott's vehicle. *Id*. at 133:6-20.

Events to this point are largely undisputed, but several important facts hereafter become disputed. First, there is Deputy Babb's version of events. Deputy Babb testified in his deposition that, as he watched Schott drive down the highway, "[Schott's] tire went and hit the line. And what I mean by 'hit the line' is the tire went onto the yellow line. And that is all I need for failure to maintain a lane." *Id*. at 102:18-21. In bodycam video of the eventual traffic stop Babb effected on Schott, Babb can be heard telling Schott, "The only reason I'm stopping you is [] because you were drifting over the fog line pretty hard." *Id*. at 133:6-10.

Schott tells a different story. According to him, he didn't drift over the fog line, which he argues is supported by dashcam footage from inside his vehicle. Dkt. No. 119 at 27-29. At most, he argues, he touched the line, and he urges that merely "touching," instead of "crossing," the fog line is not unlawful. *Id*. at 27-28 (citing *State v. Cortez*, 543 S.W.3d 198, 206 (Tex. Crim. App. 2018)). The video evidence on this point is inconclusive to a layperson. *See* Dkt. No. 119-10 (in which Schott's large hood obstructs any clear view of the fog line).

In any event, Deputy Babb stopped Schott. Babb later testified that as he approached the vehicle, he noticed that Schott's hands were up in the air. Dkt. No. 119-3 at 132:2-22. As mentioned, Deputy Babb then arrived at passenger-side window and informed Schott that "[t]he

only reason I'm stopping you is that when I was watching you over there, you were drifting over that fog line pretty hard." Dkt. No. 119-11 at 2:20-2:43.

Babb asked Schott if there were any weapons in the vehicle, to which, according to him, Schott responded "I don't think so. There shouldn't be." Dkt. No. 119-3 at 174:6-13; *see also* Dkt. No. 119-11 at 2:40-2:51 (in which Schott responds "I don't think I have one right now … I'm really sorry about that."). Deputy Babb later testified that this response "raised a red flag" for him. Dkt. No. 119-3 at 174:14-17. Schott, for his part, later testified that he didn't know about weapons in the vehicle because he sometimes carries his shotgun when conducting business trips, "especially since my trips take me to remote, isolated customer sites along the U.S.-Mexico border," and he "did not want to misspeak in case I was misremembering that my shotgun was not in the truck that day." Dkt. No. 119-9 at 7.

Deputy Babb next asked Schott to produce his driver's license, and Schott complied, with Babb later testifying that Schott's hands were trembling when he did so and that he was breathing heavily. Dkt. No. 119-3 at 178:11-179:5. According to Babb, this combination of behaviors, "hands up in the air, heavy breathing, trembling hands, unsure of a weapon in the vehicle," cumulatively made him suspicious of Schott, and indicated to him that Schott may have been engaged in trafficking. *Id.* at 179:9-18. Schott responds that "I calmly handed [my driver's license] to him. At no point during Babb's questioning was I breathing heavily or visibly shaking," and that the experience was intimidating and had made him nervous. Dkt. No. 119-9 at 7.

Especially concerned by Schott's answer to the question about a weapon, Deputy Babb then asked Schott to step out of his vehicle before conducting a *Terry* pat down; Schott consented to the pat down. Dkt. No. 119-3 at 181:3-11, 198:15-23.

Then, Deputy Babb asked Schott to sit next to him in his squad car while he processed a traffic warning. *Id*. at 198:8-10. Babb detached his body camera before positioning it on his dashboard to capture the interaction to follow. *Id*. at 199:20-200:22. Babb testified during his deposition that the interior of his car at that time was decorated with stickers given to him by interdiction-training programs; the stickers depict contraband like weed leaves, cocaine, and bands of cash with mottos such as "Kilo Killer" or "Kilo Hunter." *Id*. at 204:4-207:3. Babb testified that these stickers were used as "visual stimulation," specifically because they would trigger responses from the person in the vehicle that might indicate to officers whether the person was engaged in trafficking. *Id*. at 207:4-208:2. According to Babb, "a lot of times in the norm, again, the general motoring public or somebody who gets in the car, the majority of people will laugh and go, 'Huh, what is this?'" *Id*. at 208:10-13. Someone with something to hide, however, such as a trafficker, Babb testified, might look at the stickers and become alarmed, which Babb further testified is cause for suspicion. *Id*. at 208:16-22. Babb implied in his testimony (though never outright stated) that Schott's silence at the sight of these stickers was also cause for concern. *Id*. at 204:12-208:22 ("When somebody comes in and just looks at that and doesn't say anything and just kind of – sometimes I've seen eyes become this big . . . ."), 230:1-232:2 (describing Schott's silence).

Deputy Babb then processed Schott's warning while asking him questions, such as where he was from, how to pronounce his name, and the purpose of his trip. *Id*. at 210:11-21. This led to a line of questions about Schott's work trip. *Id*. at 210:22-24, 213:11-23, 215:11-216:3. During the questioning, Babb testified that he observed Schott's heavy breathing, that Schott began to speak quietly when discussing his trip, and that Schott looked out the window at various points. *Id*. at 213:18-214:25, 216:1-217:6, 248:18-249:3; *see also id*. at 222:2-223:13 (explaining

6

that the low volume of Schott's voice when discussing the trip as opposed to other details indicated Schott was "being deceptive with something"). While seemingly still processing the warning, Babb segued into questions about the presence of contraband in Schott's vehicle. Dkt. No. 119-11 at 12:15-13:25. When asked if he was carrying over $10,000 in cash with him, Schott's response was "I wish," with laughter that Deputy Babb characterized as "nervous laughter" and "over-laughing," which he said was additional cause for suspicion. *Id*. at 12:58-13:10; Dkt. No. 119-3 at 242:8-245:21, 252:11-254:4. Deputy Babb testified that these behaviors, together, gave him "a good-sized bucket at this point of reasonable suspicion." *Id*. at 249:20-22.

Deputy Babb ultimately asked Schott if he would allow Babb to search his truck. Dkt. No. 119-11 at 13:23-13:38. Schott replied that he would prefer if Deputy Babb did not, *id*., that he was withholding consent based on what he had learned in an undergraduate law course, and that "For all I know, the guy that changed my oil dropped a joint in the engine." *Id*.; Dkt. No. 119-3 at 265:10-16; Dkt. No. 119-9 at 8. When Schott refused to consent, Babb stated that he would be calling in a narcotics K9 and explained that he had "reasons to believe there that might be something in your vehicle" and that, after performing "behavioral analysis" on Schott, "there's just some things I've seen that make me want to go a little further in the investigation." Dkt. No. 119-11 at 13:30-13:59. Babb then stated that Schott no longer had the option to consent. *Id*. at 14:48-15:00.

Babb called Deputy Martin Molina, a K9 handler, and Deputy Joe Gereb for assistance. *Id*. at 15:00-15:33. Molina arrived and guided Max, the K9, around the car, and Max alerted to the presence of contraband at Schott's driver-side door. Dkt. No. 119 at 5 (summarizing and citing timestamped bodycam footage). Babb placed Schott in the back of his patrol car and told

him he was being detained because of a positive alert. Dkt. No. 119-11 at 37:00-38:00. Deputies Babb and Gereb then conducted an extensive search of Schott's car, including most compartments, containers, and crevices therein. *See* Dkt. No. 119-11 from 39:22 onwards (abruptly ending mid-search); Dkt. No. 119 at 5 (citing various parts of the record). No drugs were found, and both deputies later testified they found no evidence of illegal activity in the truck. Dkt. No. 119-3 at 89:25-90:14; Dkt. No. 119-4 at 258:10-259:3.

Molina, however, wrote on his incident report that "[t]race" amounts of marijuana were found. *Compare* Dkt. No. 119-12 (Schott Incident Report) (no drugs mentioned), and Dkt. No. 119-21 (Schott SPEARS Incident Summary) (same), *with* Dkt. No. 119-20 (Schott K9 Report) (asserting "Trace" was found). Deputy Molina later claimed that he saw two "small . . . green flakes" on the floor of Schott's truck but did not collect them or otherwise confirm that they were marijuana. Dkt. No. 119-16 at 158:23-161:25, 148:1-12, 162:12-25, 164:14-18.

After concluding the search, the Deputies released Schott and issued him a traffic warning, which stated that "No Search" had transpired. Dkt. No. 119-22. "The entire incident of the stop of Schott through his detention and release was 75 minutes." Dkt. No. 117 at 4.

In a sworn statement, Schott described the effect the encounter had on him:

> I drove home upset, confused, and humiliated about what the officers had done to me: Being held captive on the side of the highway; being forced to watch as the officers ransacked my car in plain sight as if I were a criminal as countless of my fellow citizens drove by; having my personal bags, work items, and childcare items pored over and tossed around; experiencing increasing fear about how these armed officials were treating me and what they might do next—all for being innocent, telling the truth, and trying to remain calm—was a traumatizing experience.

Dkt. No. 119-9 at 9. That same day, Schott "started calling numbers associated with Bexar County to complain about the stop and search." *Id*. at 10.

On March 18, 2022, after locating the correct person with whom to lodge a complaint, Schott spoke with the BCSO internal affairs unit about how he had been stopped and searched for "no reason," and that the BCSO Deputies and K9 had damaged both his truck and his belongings. *Id*. The BCSO opened an investigation. *See* Dkt. No. 119-23. A little less than a month later, on April 12, 2022, Officer Marta Rodriguez of BCSO internal affairs spoke with Schott about his complaints and informed him that "she had seen nothing wrong with the actions of the officers during the traffic stop and search based on the officers' bodycam footage." Dkt. No. 119-9 at 10. Schott contested the conclusion, reiterated that his dashcam footage showed no traffic violation, and followed up by emailing the footage to Officer Rodriguez. *Id*.

That same day, Sergeant Gamboa followed up by calling Schott to reiterate that Deputy Babb had done nothing illegal, that "we can see all of these violations you made from this body camera," and "if you don't like how we conduct our business, you should file a lawsuit." *Id*. at 11. Schott alleges that when he continued to claim his rights had been violated, "Sergeant Gamboa laughed and put me on hold for twenty minutes. After checking to see if I was still on the line, Gamboa put me on hold for another fifteen minutes." *Id*. When Gamboa returned after the second hold, according to Schott's retelling, he told Schott to "challenge us in court if you don't like how we conduct business" before hanging up. *Id*. Schott immediately followed up with an email to Officer Rodriguez, who eventually responded about two months later, confirming that a review of Deputy Babb's bodycam showed no policy violations. *Id*. at 11-12.

Schott filed the present suit on June 1, 2023, alleging via 42 U.S.C. § 1983 three separate violations of the Fourth Amendment, as incorporated against the States via the Fourteenth Amendment: first, for an unlawful traffic stop; second, for unlawfully extending the traffic stop; and third, for conducting an unreasonable and warrantless search without probable cause. Dkt.

No. 1 at 2, 26-33. Schott also pleaded via 42 U.S.C. § 1983 municipal liability under *Monell*, alleging that "Bexar County has a policy, practice, and custom of using traffic stops as a tool to conduct searches and seizures without any reason to suspect the driver of a crime," that this policy was the moving force behind the constitutional violations alleged, and that Sheriff Javier Salazar, as the relevant policymaker, had actual or constructive knowledge of this custom or policy. *Id*. at 33-36. The initial Complaint named Deputy Babb, Deputy Molina, Sheriff Javier Salazar, and Bexar County as Defendants. *See id*. at 1.

The BCSO opened another investigation shortly after Schott sued. *See* Dkt. No. 119 at 13-14; *see also* Dkt. No. 119-7. The investigation revealed that Deputy Babb had "manually turned off" his dashcam before stopping Schott and had done so on several other occasions. Dkt. No. 119-7 at 7. BCSO terminated Deputy Babb for previously lying about his dashcam practices but also found, with respect to the traffic stop involving Schott, insufficient evidence to conclude Deputy Babb "violated [Schott's] civil rights." *Id*. Sheriff Salazar later testified that Babb conducted the stop consistent with BCSO policy. Dkt. No. 119-1 at 229:7-231:3.

At present, this case has been actively litigated for several years. The only remaining defendant is Bexar County. The live claims are materially identical to those originally brought, except that the individual defendants are no longer in the case. *Compare, e.g.*, Dkt. No. 1 *with* Dkt. No. 119. Both Schott and Bexar County now move for summary judgment, asserting there are no issues of disputed material fact on the alleged constitutional violations, as well as the broader *Monell* claim alleging that Bexar County had an unconstitutional custom or policy that was the moving force behind these violations and of which Sherif Javier Salazar had actual or constructive knowledge. *See* Dkt. Nos. 117 & 119.

### Analysis

To prevail at trial on his claim for municipal liability against Bexar County, Schott must show: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (quotations and citation omitted). Bexar County's motion contends that it is entitled to judgment as a matter of law because Schott cannot show any triable issue of fact on, *inter alia*, any alleged violation of Schott's constitutional rights and the existence of an unlawful custom or policy under *Monell*. *See generally* Dkt. No. 117. Plaintiff Schott's motion, by contrast, contends that he satisfies each of the three *Monell* elements, even viewing the evidence in a light favorable to Bexar County, such that no triable fact issue is presented. *See generally* Dkt. No. 119.

As discussed below, Bexar County is entitled to summary judgment on any *Monell* claim predicated on the theory that Babb violated Schott's Fourth Amended rights when extending the traffic stop. Schott's motion, on the other hand, falls short because disputed fact issues are presented as to liability. On all other issues, disputed fact questions require resolution at trial and are not appropriate for resolution at summary judgment.

### A.    The Motions Are Subject to the Familiar Summary Judgment Standard.

To sum up the appropriate standard in more detail, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A fact dispute is genuine only if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). In carrying its burden, the nonmovant must respond to the motion by setting forth particular facts reflecting a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent summary judgment evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court views the summary judgment evidence in the light most favorable to the nonmovant. *Rosado*, 5 F.3d at 123. On summary judgment, the Court considers evidence admissible at trial or that could be presented in a form that would be admissible at a trial. *See* Fed. R. Civ. P. 56(c)(2).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174. If, however, the party moving for summary judgment fails to satisfy its initial burden, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**B.    Triable Fact Issues Are Present for Two of Schott's Three Alleged Constitutional Violations.**

The Court begins by addressing whether either party is entitled to summary judgment on the issue of a predicate constitutional violation. *See Pineda*, 291 F.3d at 328 (requiring a *Monell* plaintiff to show in part that a constitutional violation occurred). Plaintiff Schott alleges that the CIU practiced a three-step tactic for stops and searches, with a separate constitutional violation occurring at each step in Schott's case. *See* Dkt. No. 119 at 27. In Schott's telling, the three predicate constitutional violations were: (1) Officer Babb's initial allegedly unlawful initial stop of Schott; (2) Babb's allegedly unlawful extension of the stop; and (3) the use of a K9 that officers allegedly "cued" to alert to the presence of contraband, regardless of whether contraband was in fact present. *Id*. at 27-31. Bexar County asserts that the traffic stop, interview and extension, and K9 open-air sniff were lawfully conducted as a matter of law. *See generally* Dkt. No. 117.

There are genuine issues of material fact as to the first and third alleged violations, and the credibility determinations and fact finding needed to resolve whether those alleged constitutional violations occurred are for a jury. The second claimed violation, involving prolonging the stop, is without merit—even viewing the evidence in a light favorable to Schott. Partial summary judgement for Bexar County is warranted on any *Monell* claim predicated on the theory that the extension of the stop itself violated Schott's constitutional rights.

   1.    *The constitutionality of the initial stop presents at least one disputed fact question*.  The legality of a traffic stop is analyzed under the seminal case of *Terry v. Ohio* and its progeny. Under the applicable two-part *Terry* inquiry, a court must examine "whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citations and quotations omitted). "[The Fifth Circuit],

following the Supreme Court, has treated routine traffic stops, *whether justified by probable cause or a reasonable suspicion* of a violation, as *Terry* stops." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (citation omitted) (emphasis added).

Regarding the first prong of this inquiry, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States v. Breeland,* 53 F.3d 100, 102 (5th Cir. 1995)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the [stop]." *Id*. (citation omitted). While a "mere hunch" will not suffice, "[i]t is also clear . . . that reasonable suspicion need not rise to the level of probable cause." *Id*. (citation omitted).

"[I]t is well-settled that a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has probable cause or reasonable suspicion to believe that a traffic violation has occurred." *United States v. Cedillo*, 855 F. App'x 954, 955 (5th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 810-12 (1996)). "This is an objective test based on the facts known to the officer at the time of the stop, not on the motivations of the officer in making the stop. On the other hand, if it is clear that what the police observed did not constitute a violation of the cited traffic law, there is no 'objective basis' for the stop, and the stop is illegal." *United States v. Escalante*, 239 F.3d 678, 681 (5th Cir. 2001) (citing *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998)) (emphasis added).

Bexar County argues Deputy Babb had sufficient cause to conduct a traffic stop because: (1) Schott was speeding, as indicated by a readout on Schott's dashboard camera showing 84 miles per hour; and (2) Schott strayed out of his lane and crossed a fog line. *See* Dkt.

No. 117 at 6. The first of these argued bases for the stop fails as a matter of law; the second presents a disputed fact question. The same genuine issues of material fact which prevent Bexar County from carrying its burden likewise prevent Schott from carrying his burden.

**Speeding cannot provide probable cause or *reasonable suspicion here because Schott's rate of speed was unknown to Deputy Babb.*** Bexar County's evidence of the speeding in question is a readout from *Schott's* dashboard camera. Dkt. No. 117 at 6, 9. During his deposition, Deputy Babb testified that he pulled over Schott for crossing over the fog line, and when asked if he saw anything else that "led [him] to conclude that Mr. Schott committed a traffic violation," he answered, "No, that was the only traffic violation that I saw." Dkt. No. 119-3 at 103:19-23. At a hearing held on November 5, 2025, defense counsel was unable to explain how speeding could have possibly served as a basis for the stop when the only indication that Schott was speeding was a readout on Schott's dashboard camera, which Deputy Babb did not have access to at the time of the stop. *See* Dkt. No. 134 at 24-28.

Given that the governing standard involves the objective reasonableness of the officer's determination based on the information *the officer knew at the time*, Schott's rate of speed fails as a matter of law as a basis to justify the stop. *See, e.g.*, *Escalante*, 239 F.3d 681.

**Whether Schott drifted over a fog line involves a fact dispute.** In his deposition, Deputy Babb testified that as Schott's vehicle proceeded down the highway, "[Babb] was watching [him]" and saw that "his tire went and hit the line. And what I mean by 'hit the line' is the tire went onto the yellow line." Dkt. No. 119-3 at 102:16-20. Babb then testified that "[o]nce I got behind him, he actually hit the line, I don't remember how many times, but he did hit it again." *Id.*at 102:22-24. Babb testified that his understanding at the time was that there was no particular "degree" of crossing the fog line that was required for him to lawfully initiate a traffic

stop, and that "all[] the tire needs to do for failure to maintain a lane is actually touch that line, that yellow painted line . . . it's as simple as not being in your lane." *Id*. at 102:25-103:6. Schott's dashboard camera, as mentioned, was recording at all times relevant to the stop. An expert for Bexar County, Gary D. Haston, wrote in his report and testified in his deposition that "[a]fter reviewing the video recorded by Schott and from the testimony of Deputy Babb in his deposition, *a reasonable officer would believe that Schott crossed the yellow line* before approaching Deputy Babb and after passing Deputy Babb, he crossed the broken white line in proximity to the Ford truck traveling in the right lane." Dkt. No. 117-12 at 216:23-217:7 (Gaston reading from his report).

Schott, by contrast, is adamant that he never touched—let alone crossed—the fog line and that, even if he did, touching the line is not a violation of Texas law. Dkt. No. 119 at 27-29. Ricardo Palacios, Schott's expert, is an accident reconstruction expert and formerly a Texas highway patrol sergeant. *Id*. at 28 (citing Dkt. No. 119-40, or Exhibit 39a). Palacios reviewed Schott's dashcam video and conducted tests with Schott's truck to conclude that Schott never touched or crossed over the yellow line, and, moreover, that even if Schott had done so, Deputy Babb would have been unable to see it unless Schott crossed the line "in an extreme and exaggerated fashion." *See* Dkt. No. 119-40 at 17.

Schott moreover argues that even if he touched—not crossed—the yellow line, doing so is not a violation of Texas law. Dkt. No. 119 at 27-28. In support of this contention, Schott cites a 2018 case from the Texas Court of Criminal Appeals holding that a defendant's "momentary touch of the fog line, without any other indicator of criminal activity, was not enough to justify the stop of [his] minivan for driving on an improved shoulder." *State v. Cortez*, 543 S.W.3d 198, 206 (Tex. Crim. App. 2018).

A genuine issue of disputed material fact is presented as to whether or not Schott touched or crossed the solid yellow line in question. Resolving this question requires making a credibility determination that is for a jury. *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (reversing and remanding where a court privileged certain evidence in a manner "tantamount to making a credibility determination" and emphasizing that "a court may make no credibility determinations" at summary judgment) (internal quotations and citations omitted). A jury could find that either Schott's or Bexar County's account of events leading up to the stop, or that either of the two experts, is more credible.

As for Schott's argument that touching the fog line was not unlawful and therefore could not serve as a basis for probable cause, the Court is unpersuaded. A reasonable mistake of law should not operate to controvert an officer's basis for the stop. *See Heien v. North Carolina* 574 U.S. 54, 57, 61-63 (2014) (holding that "a mistake of law can nonetheless give rise to the reasonable suspicion necessary to uphold the seizure under the Fourth Amendment," and reviewing authority supporting "that reasonable mistakes of law, like those of fact, would justify certificates of probable cause") (collecting cases); *see also United States v. Cedillo*, 855 F. App'x 954, 955 (5th Cir. 2021) ("Reasonable suspicion can rest on a mistaken understanding of the law if the mistake is objectively reasonable."); *United States v. Tinkle*, 655 F.2d 617, 621 (5th Cir. 1981) ("The currency of probable cause is probability, not legal certainty."). Whether Babb was reasonably mistaken on the law, as could be inferred from his deposition testimony, or whether and to what extent he was untruthful in his deposition is for a jury to determine. In conclusion, neither party has shown that summary judgment is warranted on the issue of whether the initial stop was lawful.

    **2.**    *The extension of the traffic stop was lawful*. Traffic stops must "end[]" when tasks tied to the traffic infractions are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted). Prolonged investigative activities regarding "other crimes" are not traffic tasks. *Id*. at 356. In short, "[i]f all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006). At that point, the driver must be released "unless additional reasonable suspicion, supported by articulable facts, developed during the stop." *United States v. Cavitt*, 550 F.3d 430, 437 (5th Cir. 2008); *see also Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005) ("A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.").

    Bexar County moves for summary judgment, arguing that additional reasonable suspicion developing *during* the stop. This gave Deputy Babb cause for extending the stop for so long as was needed to dispel that suspicion, the County argues. Indeed, the County urges that there is no genuine issue of material fact as to whether Babb unlawfully extended the stop. *See* Dkt. No. 117 at 14-15. Specifically, the County cites behaviors exhibited by Schott at the outset of the stop and while Babb processed Schott's warning that justified extension of the stop. Such behaviors include but are not limited to Schott putting his hands in the air as Babb approached the vehicle, Schott's heavy breathing, Schott's hands trembling as he handed Babb his license, and Schott's suspicious responses or comments relating to the potential presence of guns, drugs, or large amounts of cash in the vehicle. *Id*. at 6; *see also* Dkt. No. 119-3 at 178:2-179:18 (addressing Babb seeing Schott's "hands up in the air, heavy breathing, trembling hands, unsure of a weapon

in the vehicle" and Babb's subjective belief that these behaviors provided additional reasonable suspicion). Schott concedes that he was indeed "nervous" but contests the testimony that his hands were shaking or that he was breathing heavily. Dkt. No. 119-9 at 7.

Bexar County's invocation of Schott's mere nervousness does little by itself to persuade the Court that it is entitled to summary judgment. Viewing the evidence in Schott's favor, and without considering Schott's statements to officers, there was in this regard at most evidence that he was merely nervous. But "[n]ervousness, standing alone, generally is not sufficient to support reasonable suspicion." *United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011) (citation omitted).

Schott, however, did more than exhibit signs of mere nervousness. There is no dispute that he also made odd statements to Babb during the encounter, and these statements taken with Schott's mere nervousness, behavior, and the other surrounding circumstances were sufficient to extend the stop, as a matter of law. Specifically, when Deputy Babb asked Schott early in the encounter if there was a weapon in the car, Schott stated that he wasn't sure. Dkt. No. 119-3 at 174:6-13; No. 119-11 at 2:40-2:51. When asked if he was carrying over $10,000 in cash, Schott responded with affected laughter, which (for what it's worth) Babb described as "nervous" and "over laughing." Dkt. No. 119-3 at 242:8-245:21, 252:11-254:4; Dkt. No. 119-11 at 12:58-13:10. And later, when Babb indicated he was going to call for a dog sniff and asked if there might be drugs in the car, Schott again didn't give a firm answer, saying instead that "for all I know, the guy that changed my oil dropped a joint in my car." Dkt. No. 119-3 at 174:1-25, 265:10-16.

Even if these behaviors and indeterminate, equivocal answers arguably flowed from or were *related* to nervousness, which the Court assumes in viewing the facts in Schott's favor, they were each still sufficiently independent of "mere" nervousness to support reasonable suspicion

and extend the stop. And they certainly are so when taken together along with all other surrounding circumstances known to Babb, viewed objectively. Those include the initial report from the CIU about a one-day turnaround involving the drop-off of a woman at a hotel, a report that becomes more plausible, from an objective point of view, when the subject of the report raised his hands as though he expected to be arrested when first pulled over (which Schott does not contest, *see generally* Dkt. No. 119-9), was nervous throughout the stop, and gave equivocal answers to important questions about the presence of firearms or other contraband in the vehicle. Thus, it is immaterial that Schott contests some aspects of his nervousness, such as his labored breathing and shaky hands, as there were independent bases, taken together with his nervousness, that justified the extension of the stop.

In short, when Schott laughed when asked about bulk cash or said there might be a joint or gun in the car, it doesn't really matter if he did so because he was nervous. A reasonable officer would take each of those responses in these circumstances as an indication of possible criminal activity. Thus, even viewing the evidence in Schott's favor, he cannot show an independent constitutional violation in connection with the stop's extension because the overall circumstances and his own responses as well as nervous demeanor gave Babb sufficient reason to call for an open-air sniff, and Bexar County, for its part, has provided enough uncontested evidence to carry its burden on summary judgment.

**3.** *The use of an allegedly "rigged" K9 presents triable fact issues.* In *Florida v. Harris*, 568 U.S. 237 (2013), the Supreme Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id*. at 246. Reliability can be challenged, however, with "evidence of the dog's (or handler's) history in the field," which, "although susceptible to [misinterpretation] . . . may

sometimes be relevant." *Id*. at 247. The evaluation of a dog's reliability is holistic as well as fact- and context-specific. "If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence." *Id*. Here, as with the initial stop, the same genuine issues of material fact which prevent Bexar County from carrying its burden likewise prevent Schott from carrying his burden.

Bexar County notes Max was certified by the National Canine Audit Tracking System ("NCATS") and was graded as having a 90% accuracy rating, among the highest of the K9s employed by the BCSO. *See* Dkt. No. 126 at 14-15 (citing various depositions as well as Max's NCATS certificate and statistics). Specifically, the NCATS graded Max as having an 89.74% reliability rating for the detection of narcotics. *See* Dkt. No. 126-10 at 5-6. Moreover, several officers in multiple depositions independently attested to Max's accuracy and record. *See* Dkt. No. 126 at 14-15 (citing various depositions). At the November 5 hearing, the Court gave defense counsel a chance to explain Max's record of always or almost always returning positive hits for drugs in the year leading up to the stop, and Bexar County deferred to Max's certification by the NCATS and his being held in high regard as a particularly accurate K9 by the BCSO deputies. *See* Dkt. No. 134 at 28:20-31:8. This evidence, if uncontested, would likely entitle Bexar County to summary judgment. *See Harris*, 568 U.S. at 246-47.

But Schott contests Max's reliability. In fact, Schott seeks summary judgment on the issue, urging that Max alerted in response to a prompt by his handlers, not the presence of drugs. Dkt. No. 119 at 20-22. In aid of these efforts, Schott points out that Max "*never failed* to alert on

a car during a free air sniff in the year leading into [the] stop." *Id.* at 31 (emphasis in original). Schott also offers evidence that Max was rewarded for merely alerting, and not for returning true positives on cars that in fact contained contraband. *See id.* at 21 (describing how Max was rewarded with a treat every time he returned a positive hit on a car, contrary to the customary practice of rewarding the dog after contraband is recovered). Whether the officers intended for this to train the dog to return as many positive hits as possible is immaterial as to Max's reliability. *Florida*, 568 U.S. at 247 (noting that cueing a drug dog can invalidate a search regardless of whether the searching officers engaged in the cueing "consciously or not").

Schott further urges drawing the inference that Max was not used in good faith, that his record was fudged, and that his positive hit was both false and preordained. *See* Dkt. No. 119 at 20-24. Schott explains that "Molina's K9 reports can't be trusted." *Id.* at 24. For 10 out of Max's 15 positive hits in the year preceding the stop at issue, Schott urges, Molina reported "trace" amounts of narcotics found (or used similar quantity terms). *Id.* But reporting the discovery of "trace" amounts is misleading, Schott argues, because "trace" can refer to something as innocuous as dirt, spices, or other debris that might appear at first glance to be narcotics. *Id.* at 23-24 (citing various parts of the record). Schott also cites the fact that Deputy Gereb texted Deputy Babb to say he was on his way to the stop a mere four minutes after Babb called for Deputy Molina to conduct the free-air sniff. *Id.* at 11 (citing evidence), 31 (same). Schott argues that this shows the Deputies considered it preordained that there would be a positive hit and resulting search. *Id.* at 31.

Resolving the parties' respective contentions on this point would again involve credibility determinations inappropriate at summary judgment. *Heinsohn*, 832 F.3d at 245. Among other things, a jury could find that the NCATS certification is or is not reason enough to deem Max

reliable when weighed against other evidence. In *Florida v. Harris*, the Supreme Court noted that evidence of a dog's certification by a training program that conducts tests within a controlled setting can suffice to support a finding of reliability; the Court did not say such certification is *necessarily* conclusive evidence, especially when the other side calls the K9's reliability into question with evidence of its own. *Florida*, 568 U.S. at 245-47 (affirming that the test for a drug dog's reliability is a holistic inquiry involving totality of the circumstances and that a criminal defendant "must" have an opportunity to contest a drug dog's certification of reliability with contrary evidence on that point). But a jury could also credit Schott's account of Max's record over the NCATS rating just as easily as it could credit the BCSO officers' opinions of Max's credibility over Schott's. And the relevance and strength of certain of Schott's facts may be questioned. For example, the fact that Deputy Gereb decided to meet Deputy Babb merely four minutes after the latter called for a K9 sniff does not necessarily imply that the Deputies conspired to rig the search. It might have simply made sense to have backup ready in case a positive hit came back. Thus, the Court finds that neither party is entitled to summary judgment on whether the K9 free air sniff was in good faith and sufficient to provide probable cause to search.

### C.    There Are Triable Issues on the Existence of an Official Policy or Policies.

In addition to a predicate constitutional violation, a *Monell* claim must also involve a policy, custom, or practice. *See Pineda*, 291 F.3d at 328. In the Fifth Circuit, there are three ways by which Schott could show an official policy, custom, or practice here. *First*, he "can show a written policy, statement, ordinance, or regulations." *Webb v. Town of St. Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (quotations and citation omitted). *Second*, he "can show a widespread practice so common and well-settled as to constitute a custom that fairly represents municipal

policy." *Id*. (quotations and citation omitted). *Third*, "even a single decision may constitute municipal policy in rare circumstances when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim." *Id*. (quotations and citation omitted).

Schott's theory of the case relies on the narrative that the BCSO, by and through the CIU, was engaged in a program that systematically violated the constitutional rights of those they pulled over, detained and interviewed, and searched for evidence of trafficking. Dkt. No. 119 at 8-12, 15-24. Bexar County disagrees, and it urges that no such policy or practice existed, was known to Sheriff Salazar, or led to any constitutional violations. *See generally* Dkt. No. 117. As with the first and third alleged constitutional violations alleged above, the same genuine issues of material fact which prevent Bexar County from carrying its burden likewise prevent, at each step, Schott from carrying his own burden.

       **1.**     *There is a disputed question of fact regarding a policy of unlawful stops.*
The first step, as Schott describes it, involved CIU officers identifying one-day turnarounds before, as a matter of policy or custom, manufacturing or inventing bases to conduct traffic stops. Schott offers three main categories of evidence in support of this putative policy or custom. Dkt. No. 119 at 8. Bexar County puts on its competing evidence on this point and also moves for summary judgment arguing that there is no issue of material fact on this question. *See* Dkt. No. 117 at 8-9, 13-14, 17-18; Dkt. No. 126 at 7-8.

First, Schott points to "County data show[ing] that Babb and Gereb—just two of the County's 250+ officers doing some traffic enforcement—made nearly 30% of all BCSO stops for three lane violations: unsafe lane change, failure to signal lane change, and failure to maintain a single lane." Dkt. No. 119 at 16 (citing Dkt. No. 119-6 at 17:18-19:24, 110:5-114:10).

Second, Schott highlights evidence that "Babb and Gereb manipulated their dashcams to avoid capturing footage of these alleged traffic violations," *id*. (citing Dkt. No. 119-32 BC000517 at 33:35-33:46) (in which Babb explains to another officer that he drives and parks his patrol car in such a way that his dashcam is "never on"), and evidence that they would "strategically park[] their cars perpendicular to the road . . . which ensured their front-facing dashcams wouldn't see the alleged violations." *Id*. at 16-17 (citing Dkt. No. 119-7 & 119-8). With respect to his stop of Schott in particular, BCSO's internal investigation notes that the "orientation of [Babb's] vehicle on the side of the roadway would not have allowed [Babb's] dashcam to capture the traffic violation [Babb] reported." Dkt. No. 119-7 at 7. Gereb also testified that parking perpendicular on the side of highway when preparing to make interdiction stops often meant "the camera will not capture the traffic violation." Dkt. No. 119-8 at 92:17-93:6, 95:18-96:22.

Third, Schott offers text messages in which BCSO officers joked about Gereb's alleged practice of making up probable cause. Dkt. No. 119 at 17. In a text conversation between Gereb and another officer, for example, the other officer jokes: "Bet ur dash didn't catch it. Sounds right for interdiction deputies." Dkt. No. 119-30. In another instance, after Gereb had performed a traffic stop and messaged a group chat to say, "I still got pc before the stop lol," a sergeant jokingly mimicked Gereb to say, "I found I mean made up [probable cause]." Dkt. No. 119-31 at 2. Further down in that same thread, Gereb makes a typo and says, "[n]ah [I] meed pc on dash remember," presumably having meant "need," and the sergeant jokes that the typo "[s]ounds like a combination of made up and need." *Id*. at 2-3. In view of all this, Schott argues, "[n]o 'rational trier of fact' could believe that cars flagged for one-day turnarounds committed the same lane

violations again and again—miraculously—right when they drove by Babb and Gereb." Dkt. No. 119 at at 17.

Schott fails to carry his burden sufficiently to warrant a grant of summary judgment in his favor. The evidence he cites is challenged by competing evidence or is subject to credibility determinations, and it in any event does not rise to the level of demonstrating a right to relief as a matter of law. For example, Bexar County provides competing evidence that contextualizes Schott's data about the frequency and numerosity of Babb and Gereb's traffic stops, as well as evidence showing that Babb was investigated and ultimately terminated for lying about his dashcam practices but that the investigations into the stop found no violation of Schott's rights, a conclusion a jury could determine is reasonable given the Court's involved analysis above regarding each of the three constitutional violations alleged. Dkt. No. 126 at 8-9. And Gereb's testimony could be interpreted as saying that parking perpendicular has only the incidental effect of not capturing the violation, not that not capturing it was the purpose. But a jury could also credit Schott's urged interpretation of the text messages he has produced over any of Bexar County's evidence. Thus, both Schott and Bexar County have failed to carry their burden for their respective motions, for essentially the same reasons. The evidence is disputed, creating a genuine issue of material fact, and requires evaluation by a fact finder.

   **2.**   *The Court need not address any policy of unlawfully extending stops.* Regarding the second step, Schott alleges that the interdiction officers would engage in "proactive" stops by which the officers would "build" reasons to search the stopped drivers' cars for guns, drugs, or other evidence of crimes. *Id.* at 17-20. This involved, according to Schott, goading the stopped driver to join the officer in the front seat of the police car and then using the driver's behavior as probable cause to support a search. *See id.* Schott alleges these front-seat

interviews were "rigged" "interrogations" in which any answer, behavior, or tic exhibited by the driver could be used against them: "Officers could—and did—spin anything as suspicious," says Schott. *Id*. at 19. "With just a few simple questions, interdiction officers could 'put an ominous gloss on what appear[ed] almost entirely ordinary.'" *Id*. at 20 (quoting *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014)).

Schott's arguments are beside the point because there was no predicate constitutional violation in connection with extending the stop. As already discussed, Schott's own statements and behavior along with the overall circumstances surround the stop provided sufficient cause to prolong the stop and conduct an open-air sniff.

**3.** *There is a triable question as to a policy of unlawful K9 sniffs*. As to the third step in the CIU's alleged three-step method, Schott argues that Max, the K9 used for the sniff, was effectively "rigged," meaning he was cued by officers to alert regardless of whether any contraband was present. For support, Schott points to three things: (1) Max's reward structure, by which Molina rewarded him merely for alerting; (2) the fact that the searching officer would call Officer Molina, the K-9 handler, "to bring Max to a stop *before* officers pulled the target over;" and (3), that in the year leading up to Schott's traffic stop, Max "automatically alerted on *every* roadside free air sniff[,] perform[ing] 15 free air sniffs on cars during traffic stops and alert[ing] all 15 times." *Id*. at 20, 22 (emphasis in original); *see also id*. at 20-24. Bexar County, in its own motion, argues that there is no genuine issue of material fact on the question of Max's reliability and offers its own competing evidence in response to Schott. *See* Dkt. No. 117 at 15-16; Dkt. No. 126 at 8.

Schott argues that any claim that Max correctly alerted to the presence of drugs on 14 out of 15 roadside sniffs during this one-year period is inherently deceptive, and that such an

argument actually assists Schott's case. Schott explains that on 7 of those 14 occasions, officers recorded only a "trace" amount of drugs found. Dkt. No. 119 at 22. Schott points out that "trace" amounts of marijuana "could easily mean the K9 officer found green or brown specks on the floorboard, like debris from shoes." *Id.* at 23.  Schott also explains that Officer Molina "wrote 'trace' and similar terms on reports for 10 of 15 alerts before Alek's stop even though matching records—where they exist—reveal a pattern of hiding Max's misses." *Id.* at 24. Whether the designation on reports was "trace" or something "similar," the point is largely the same: Schott points to evidence a jury could credit and that, if credited, would undermine Max's reliability.

Much like the evidence and argument in support of a policy of pretextual stops, the issue of a policy of unlawful K9 alerts is for a jury. The evidence cited in support of Schott's arguments is open to interpretation and debate, and possibly subject to the weight and consideration of competing evidence. Much of it comes from deposition testimony in which officers make concessions about how things like false alerts are possible. *E.g*, *id*. at 21 (citing Ochoa testimony noting that reliability can be affected by reward practices); Dkt. No. 119-33 at 61:1-63:15 (discussing hypothetical degradation of training due to reward misuse). Or it is evidence that could be disregarded by a jury in light of Bexar County's contrary evidence, like Max's certification or testimony from other officers who handled Max in the past and attested to Max's history of, and general reputation for, reliability. *Compare* Dkt. No. 119 at 20-24 *with* Dkt. No. 126 at 9 (noting the absence of other complaints about unlawful searches or dog sniffs), 8 (noting evidence of Max's certifications), 14-15 (same). Thus, the parties have adduced evidence presenting a disputed fact question, and neither has shown entitlement to summary judgment on this issue.

4.      *Schott also alleges an overall policy, embodied by the alleged three-step practice, for which there are also triable fact questions*. Schott also argues that the facts surrounding each of the three alleged steps, taken together, show an unconstitutional custom or policy of inventing reasonable suspicion or probable cause at every step of a traffic stop to justify a more expansive search. *See generally* Dkt. No. 119. Schott also emphasizes "30 example videos . . . showing that this was the pattern of exactly how the [CIU] operated in stop after stop." Dkt. No. 134 at 17; *see also* Dkt. No. 119-32.

Although the Court concludes that Schott cannot show a *Monell* violation based on the extension of his stop, this would not necessarily preclude him from arguing at trial that an overarching multi-step policy or custom existed, and this policy or custom was the moving force behind the two other constitutional violations that Schott alleges he suffered. Said another way, fact disputes are present for at least two of the alleged steps, and Schott could allege a multi-step policy predicated on the unlawful steps.

As to this overarching policy, and as to each alleged component part of the alleged policy, Bexar County "denies that it has a policy, practice or custom of using traffic stops as a tool to conduct searches and seizures without any reason as alleged in Plaintiff's Complaint." Dkt. No. 126 at 2. Bexar County emphasizes that interdiction programs are lawful, including where they use pretextual traffic stops to pull over cars they suspect of smuggling, provided no unconstitutional or otherwise unlawful tactics are used—at the November 5 hearing, defense counsel stressed that "'interdiction' isn't an evil word. There's nothing illegal with interdiction . . . [a]s long as you do it by the law and as long as there's probable cause to make the initial stop, it's still legal." Dkt. No. 134 at 31; *see also* Dkt. No. 134 at 34, 51. But, as the Court has explained, there are triable fact questions about whether the stops at issue here were in fact

lawful at various stages, rendering this argument—one which begs the question—beside the point.

Bexar County also offers its own statistics regarding Deputies Babb and Gereb's record of traffic stops and the percentage of BCSO traffic stops for which they were responsible. Specifically, Bexar County asserts that "[d]uring the timeframe of 1-1-2020 through 9-11-2023, the Bexar County Sheriff's Department conducted 178,820 traffic stops. Of those traffic stops, 3,785 searches were conducted within that timeframe. A total of 2,099 of the 3,785 searches were conducted by consent or probable cause. Deputies Babb and Gereb conducted 103 probable cause searches out of the total." Dkt. No. 126 at 9 (citations to the record omitted); *see also* Dkt. No. 117 at 20 ("Of those traffic stops for improper lane changes … Deputy Babb and Deputy Gereb had 21 percent of said stops."). Again, this competing, but not undisputed or conclusive, evidence counsels against a grant of summary judgment.

Bexar County also emphasizes that Schott raises his claim of an unlawful policy based on a single incident. As counsel explained: "We have one instance. We didn't have this morass of complaints about the Interdiction Unit; that they're violating people's constitutional rights. And without that, you don't have a custom or policy under the second prong under *Monell*." *Id*. at 35. This argument is reflected in Bexar County's briefing as well, in which it argues, in essence, that Schott cannot show that any unconstitutional custom or policy was so widespread as to "transcend[] the error made in a single case." Dkt. No. 126 at 17 (*citing Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001)); *see also id*. at 17-19 (collecting cases emphasizing the need for a multiplicity of instances needed to establish a pattern for *Monell* purposes). The Court is unpersuaded by the argument because it somewhat conflates, on one hand, a situation where a single incident, and nothing else, is used to support an inference of a widespread policy

or practice with a situation where, on the other hand, one incident is but one piece of evidence supporting allegations of a widespread policy. This case falls into the latter category; a single incident isn't the only thing pointing to a policy. Rather, a single incident spurred a complaint about something for which there is a great deal of (disputed) evidence reflecting a possible widespread policy or practice.

Ultimately, however, the evidence on the existence of an overarching custom or policy is hotly disputed and would require the Court to make determinations of credibility inappropriate at the summary judgment stage. *Heinsohn*, 832 F.3d at 245. Both parties have adduced sufficient evidence to point to genuine issues of material fact. Yet neither party has demonstrated conclusively a right to relief as a matter of law.

**D.      A Further Triable Issue Is Presented on the Policymaker's Knowledge.**

Remaining to be addressed is the *Monell* requirement that there be a policymaker who "can be charged with actual or constructive knowledge" of the allegedly unconstitutional custom or policy. *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022). For purposes of county government under *Monell*, "sheriffs in Texas are final policymakers in the area of law enforcement." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1013 (5th Cir. 2003). As both parties agree, the relevant policymaker in this case is Sheriff Javier Salazar, who at all relevant times was the presiding Sheriff of Bexar County. *See* Dkt. No. 117 at 19; Dkt. No. 119 at 25-27. Schott's contention is that Sheriff Salazar "had both actual *and* constructive knowledge" of the CIU's three-step interdiction program. Dkt. No. 119 at 25 (emphasis in original). Bexar County asserts, for its own part, that there is "no evidence" that Salazar had actual knowledge. Dkt. No. 134 at 20-21. Once more, the same genuine issues of material fact which prevent Bexar County from carrying its burden likewise prevent Schott from carrying his burden.

31

Regarding actual knowledge, a policymaker can be charged with actual knowledge of a policy if there is evidence, for example, that the policymaker personally knew of, adopted, or enforced the policy or "fail[ed] to take corrective action after their subordinates violate[d] the constitution." *Moore*, 41 F.4th at 510. Constructive knowledge, on the other hand, can be attributed to a policymaker "on the ground that [he] would have known of the violations if [he] had properly exercised [his] responsibilities." *Id*. at 511 (alterations in original) (citations and quotations omitted).

In support of his contention on Sheriff Salazar's actual knowledge, Schott cites, for example, deposition testimony in which Sheriff Salazar stated that he created the CIU and "kind of knew basically what they do, what they did." Dkt. No. 119 at 25 (quoting Dkt. No. 119-1 at 116:2-7). Schott also quotes Deputy Babb as saying, "'Sheriff Salazar is in full understanding of what I do, how I do it[,] and what my training is,' right down to 'my stickers' and use of 'visual stimulation.'" *Id*. (quoting Dkt. No. 119-3 at 271:2-22). Schott also contends that, even if Sheriff Salazar did not approve of these tactics, his failure to take corrective action should be enough to impute to him actual knowledge of the alleged custom or policy. *Id*. (citing *Moore*, 41 F4th at 510). Regarding constructive knowledge, Schott argues that Salazar's discussions about the CIU with Sergeant Gamboa should be enough to charge him with constructive knowledge of its unlawful tactics. *Id*. at 25-26 (citing various selections of Dkt. No. 119-2).

Bexar County asserts that there is no evidence that Sheriff Salazar was in fact aware of a custom or policy to use traffic stops for conducting unlawful searches and seizures. Dkt. No. 117 at 17-21. The County responds to Schott's motion to say that the BCSO *does* investigate potentially unlawful traffic stops, but on a case-by-case basis. Dkt. No. 126 at 20. It urges that Deputies Gereb and Babb were trained to understand that probable cause was necessary to stop a

vehicle, regardless of their actual reason for effecting the stop. *Id*. at 19-20. And, at the hearing on November 5, 2025, the County emphasized that interdiction units are not *per se* unlawful, with a possible implication being that creation of the CIU and knowledge of its operation does not support any inference that Sheriff Salazar knew certain CIU officers were using unlawful tactics in the field (that is, if one were to assume they were). Dkt. No. 134 at 31. The County also reiterates that Sheriff Salazar ultimately did terminate Deputy Babb from the BCSO and ultimately disbanded the CIU, *i.e.*, that Salazar took some form of corrective action. Dkt. Nos. 117 at 21; 126 at 20.

The evidence on Sheriff Salazar's knowledge is not conclusive in either direction when viewed in a light favorable to the each nonmovant. Both sides have offered competing evidence, much of which is equivocal and open to interpretation. There is, therefore, a disputed fact question presented on Sheriff Salazar's knowledge. For one thing, Schott puts too ominous a gloss on Sheriff Salazar's and Babb's testimony at this stage of the case, as their testimony could be interpreted as showing merely that Sheriff Salazar created the CIU, gave it a certain mandate, and broadly approved of the CIU officers' tactics; it need not *necessarily* mean, especially in a summary judgment posture, that he knew of or affirmatively blessed the use of certain unlawful tactics in the field, such as "rigging" drug dogs or manufacturing pretexts for stops out of whole cloth. *See* Dkt. No. 119-1 at 220:2-20 (Salazar testifying that he would have remembered if anything Deputy Babb shared with him struck him as "flatly inconsistent" with BCSO policy). If a jury credits Sheriff's Salazar's direct testimony on this point, this potential lack of knowledge about Babb or Gereb using unlawful tactics in the field also means that any duty to take corrective action would have never been triggered.

In this regard, Sheriff Salazar's testimony seems to point one way and Babb's somewhat

the other. Moreover, the investigations prompted by Schott's complaints resulted in Babb's termination, and Sheriff Salazar ultimately disbanded the CIU—both of which could be interpreted as corrective actions taken in response to indications of issues within the unit. Schott's argument that BCSO didn't make any policy changes after potential issues were brought to light is beside the point—Babb's issue, from the County's perspective, was that he violated *BCSO policy* in his use of dashboard cameras and his later lying about it, and the County did not conclude that he violated Schott's rights. *See* Dkt. No. 119 at 27.

Thus, a jury could find that Sheriff Salazar's testimony on this point is more congruent with Bexar County's framing of the case, *i.e.*, that running interdiction units using pretextual stops is not itself unlawful, and that any unconstitutional "tricks" used by Babb or Gereb in executing on the CIU's mandate were used without the knowledge or approval of Sheriff Salazar. But a jury could also find, for example, that Sheriff Salazar's knowledge of the CIU's tactics—such as that gathered through Sergeant Gamboa—was such that he remained deliberately indifferent to unlawful tactics. Evidence that might point in that direction could be found, among other places, in statistics about the number of stops and searches conducted by the CIU, the widespread use of the "trace" amounts designation for narcotics found, or the testimony of Babb, Gereb, or Salazar, depending on how it is interpreted by the jury.

In view of the foregoing, the Court concludes that the parties have both identified a genuine issue of material fact on the issue of policymaker knowledge. Neither party is entitled to summary judgment on the issue.

## Conclusion and Recommendation

For the reasons discussed herein, the Motion for Summary Judgment on Liability by Plaintiff Alek Schott, Dkt. No. 119, should be **DENIED**, and Motion for Summary Judgment by

Defendant Bexar County, Dkt. No. 117, should be **DENIED in part** and **GRANTED in part**. Defendant Bexar County is entitled to judgment as a matter of law on any claim based on an alleged constitutional violation involving the prolonging of the traffic stop. As to all other issues, the parties present genuine issues of material disputed fact that should be resolved at trial.

Having considered and acted upon all matters for which the above-entitled and numbered case was referred, it is **ORDERED** that the above-entitled and numbered case is **RETURNED** to the District Court for all purposes.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by the district court's standing orders. *See* Rule CV-7. The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely

file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

**SIGNED** this 26th day of February, 2026.

**RICHARD B.  FARRER**
**UNITED STATES MAGISTRATE JUDGE**