UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ALEK SCHOTT,<br>    *Plaintiff*,<br>v.<br>BEXAR COUNTY, TEXAS,<br>    *Defendant*. | Civil Action No. 5:23-cv-00706-OLG-RBF |

### PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Alek Schott respectfully asks the Court to sustain two objections to Magistrate Judge Farrer's report and recommendation on the parties' cross-motions for summary judgment (ECF No. 135). Specifically, Alek asks the Court to (1) reject the recommendation for partial summary judgment in Defendant Bexar County's favor and (2) set the stage for trial by clarifying the proper legal framing and rejecting reliance on excluded testimony.

Alek's Fourth Amendment claims arise from a single March 2022 traffic stop but challenge three distinct parts of that encounter: its initiation, its extension, and the resulting search. Alek contends that the traffic stop embodies a three-step tactic used by Bexar County's criminal interdiction unit to search targeted vehicles without legal justification: stop vehicles flagged for one-day turnarounds by making up traffic violations; automatically prolong the stop to pressure drivers into consenting to a search or provoke behavior that could be used to justify calling for a K9; and use a rigged drug dog to fake probable cause to search. The bottom line of Judge Farrer's report is that this case turns on disputed facts and credibility determinations. It therefore recommends that *almost* all of the case go to trial. Alek does not object to that main conclusion.

But the report incorrectly removes the middle step of the stop—the stop extension—from the jury's consideration even though that issue also turns on disputed facts and credibility. The

1

Court should correct this error because Judge Farrer's recommendation both creates practical problems and makes legal errors. The jury will inevitably hear the full story of the stop, especially given Alek's argument that the County used a three-step tactic. Yet the report would have this Court declare the middle of the stop constitutional as a matter of law. That approach will complicate trial and risks retrial. The report also fails to apply the two-part timing-based analysis that Supreme Court and Fifth Circuit precedent requires for stop extensions and resolves disputed facts in the County's favor. Alek therefore asks the Court to reject the recommendation for partial summary judgment and to send the *entire* case to trial.

Alek also objects to the report's analysis of the first step, the initiation of the stop. The report frames the legal inquiry incorrectly and relies on previously excluded testimony. Alek asks the Court to correct these errors to properly set the stage for trial.

## Facts and Procedural Background[1]

In March 2022, Bexar County Sheriff's Deputy Joel Babb, an officer assigned to the criminal interdiction unit, stopped Alek while he was driving north on I-35. Schott MSJ (ECF No. 119) 3–4. According to Babb, the stop was based on a lane-movement violation. *Id.* at 3–4, 21–22. Alek disputes that any traffic violation occurred or that Babb could have seen the type of violation he alleges occurred from his position off the side of the road. *Id.* at 21–23. Before the stop, Babb received a WhatsApp group message flagging Alek's truck for a "one-day turnaround" trip. *Id.* at 3–4, 10, 22–23. Alek maintains that the message came from an unidentified sender and contained no reliable information. *Id.*

---

[1] Alek's summary-judgment motion provides a more detailed description of the facts with cites to evidence. *See* Schott MSJ (ECF No. 119). All exhibit cites in this document are to exhibits filed in support of Alek's summary-judgment motion.

During the stop, Babb ordered Alek into the front seat of his patrol car and conducted an extended interrogation session about Alek's travel, work, family, and whether there might be contraband in his truck. *Id.* at 4–5, 23–25. After the interrogation continued for an extended period and Alek refused to consent to a search, Babb called for a K9 to conduct an open-air sniff of the truck. *Id.* at 5. The narcotics K9 allegedly alerted, and deputies searched Alek's truck but found no contraband. *Id.* There were no drugs in Alek's truck and never had been. *Id.* at 5, 25. Every record of the stop is consistent with the result, except one: the K9 officer's deployment record says "Trace" marijuana was found because he claims to have seen two small green flakes while searching Alek's truck. *Id.* at 5–6.

Alek argues that the stop, its extension, and the subsequent search were part of a broader three-step tactic: (1) target and stop vehicles for one-day trips without actual traffic violations, (2) automatically prolong stops to coerce consent to search or generate justification to call for a K9, and (3) if no consent, call for a K9 rigged to alert. *Id.* at 9–18. Alek contends that the purpose of this tactic was to search as many vehicles as possible to fish for evidence of unspecified crimes in violation of the Fourth Amendment. *Id.* at 1–3.

Alek filed this case on June 1, 2023. Compl. (ECF No. 1). He brings three Fourth Amendment claims under *Monell*: that, following County policy or custom, Babb stopped Alek without reasonable suspicion, Babb extended the traffic stop without reasonable suspicion, and the officers searched his truck without probable cause. *Id.* While Alek originally sued Bexar County, Babb, and the K9 officer, only Bexar County remains as a defendant.

Discovery in this case revealed disputes about the preservation of electronic evidence, and Alek moved to compel production of various records, particularly the officers' cellphone data after learning that relevant communications—including WhatsApp messages associated with the

interdiction unit's operations—had not been preserved. Mot. to Compel (ECF No. 49). Judge Farrer granted the motion and ordered, among other things, forensic examination of the officers' cellphones. Order Granting Mot. to Compel (ECF No. 59). The original WhatsApp messages concerning Alek could not be recovered, but a few WhatsApp messages from the group that the interdiction unit participated in were obtained. *See* Ex. 27 (WhatsApp Group Chat). Those example messages show unidentified numbers in the chat flagging vehicles for stops by sharing limited vehicle information—sometimes only make and color. *Id.*; Schott MSJ (ECF No. 119) at 10.

The County also designated three expert witnesses during discovery. Judge Farrer later issued an order limiting the testimony of two of those experts and striking all testimony of the third. Order on Mots. to Strike (ECF No. 129). The County objected in part to that ruling, and the County's objections remain pending before this Court. *See* Objs. (ECF No. 130); Schott's Resp. to Objs. (ECF No. 131).

The parties subsequently filed cross-motions for summary judgment. After briefing and a hearing, Judge Farrer issued a report and recommendation addressing the motions. R. & R. (ECF No. 135). Judge Farrer recommends that Alek's claims that the initial stop and the search violated the Fourth Amendment proceed to trial because of material fact disputes and the need for credibility determinations. *Id.* But Judge Farrer recommends granting summary judgment in Bexar County's favor on the issue of whether Babb unconstitutionally prolonged the stop. *Id.* There is no trial or pretrial date set for this case. *See* Third Am. Scheduling Order (ECF No. 64). Judge Farrer has returned the case to this Court for all purposes. R. & R. (ECF No. 135) at 35.

## Legal Standard

When a party objects to a Magistrate Judge's report and recommendation concerning summary judgment, "the Court must make a de novo determination as to 'any part of the magistrate judge's disposition that has been properly objected to.'" *Hope v. State Farm Lloyds*, No. SA: 5:21-

4

CV-00510-OLG, 2024 WL 2886166, at *1 (W.D. Tex. May 28, 2024) (quoting Fed. R. Civ. P. 72(b)(3)).

## Argument

The Court should reject the recommendation to grant summary judgment on the stop extension (Part I) and correct the report's erroneous analysis of the stop's initiation (Part II).

**I.     The Court should reject the recommendation that summary judgment be granted in the County's favor on the stop extension.**

For several independent reasons, the Court should reject the recommendation to grant the County partial summary judgment on Alek's claim that Babb unconstitutionally extended the traffic stop. Pragmatically, granting summary judgment on a single embedded issue will complicate trial and risk a complete retrial if the ruling is later reversed. But the recommendation should also be rejected because the report makes two fatal errors on the stop extension: it applies the wrong legal framework by ignoring the two-part timing-based inquiry established by Supreme Court and Fifth Circuit precedent, and it improperly resolves disputed facts and credibility issues in the County's favor. Because a jury could conclude that Alek should prevail on the stop extension claim, the Court should reject the recommendation.

**A.     Summary judgment on the extension will complicate the trial and risk a complete retrial.**

Adopting the report's recommendation to grant the County partial summary judgment will not streamline this case. Rather, it will complicate trial and create a substantial risk that the entire case must be retried following appeal.

**Needless complication:** Granting summary judgment on the stop extension will needlessly complicate—rather than simplify—trial. The stop extension is not a standalone issue. It is inextricably intertwined with the rest of the case. The jury will necessarily hear evidence about what occurred before, during, and after the stop—what Babb knew, what he observed, and how he

5

interpreted Alek's behavior. The whole of the facts bears on the three-step policy and whether the search of Alek's car was based on a rigged dog alert. Indeed, the report itself recognizes that granting summary judgment on just step 2 changes nothing: Alek can still "argu[e] at trial that an overarching multi-step policy or custom existed, and this policy or custom was the moving force behind the two other constitutional violations[.]" R. & R. (ECF No. 135) 29.

The more straightforward course is to allow the jury to hear and decide the full sequence: whether the stop was unlawful at its inception, whether it was unlawfully prolonged, and whether the dog alert supplied probable cause. Given that the jury will necessarily hear all the evidence—all witnesses to the traffic stop will likely tell the story chronologically—it doesn't make sense to draw an artificial circle around the dead-middle of the stop before trial by saying the jury can't assess whether that portion (step 2) was unconstitutional but must assess whether its surrounding portions (steps 1 and 3) were. Sending a donut to the jury will make trial messy.

**Risk of retrial on everything:** If the Fifth Circuit were to conclude that summary judgment on the stop extension was improper, the result could be reversal and remand for a retrial of the case in its entirety. *See Davidson Oil Country Supply Co. v. Klockner, Inc.*, 917 F.2d 185, 185 (5th Cir. 1990) (finding that partial summary judgment "should not have been granted" and remanding the case "in its entirety for a retrial"); *see also id.* at 187 (characterizing *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), as "counsel[ing] against restrictive remand where there is doubt whether there might be confusion or injustice from a restrictive new trial"). And even if the Fifth Circuit did not order a complete retrial of the whole case, a remand would likely produce a second trial with the same evidence as the first. The stop extension arises from the same traffic stop as the remaining claims, so the same witnesses and the same exhibits would be used in a limited retrial. Allowing the jury to answer all fact-intensive Fourth Amendment questions in a

6

single trial now avoids both the risk of a full retrial and the inefficiency of redoing portions of trial on remand.

For these prudential reasons, the Court should reject the recommendation that summary judgment be granted on the stop-extension issue.

**B.      The report fails to apply the two-part timing analysis that governs stop extensions.**

Under *Rodriguez v. United States*, a traffic stop may last no longer than necessary to complete the traffic mission. Constitutional authority of the traffic-stop seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. 348, 354 (2015). Those tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355. If an officer prolongs the stop beyond those tasks, the extension must be supported by independent reasonable suspicion that the driver is engaged in other criminal activity. *United States v. Reyes*, 963 F.3d 482, 487–88 (5th Cir. 2020). That suspicion must be specific: there must be "*individualized* suspicion that a *particular* person committed a *particular* crime." *United States v. Wilson*, 143 F.4th 647, 653 (5th Cir. 2025) (emphasis in original).

Applying these rules requires examining both the officer's conduct during the stop and the facts known to the officer at the time the stop was prolonged. First, a court must examine what the officer actually did and whether those actions remained tied to the traffic mission. "[A]n officer's actions must be 'reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'" *Reyes*, 963 F.3d at 487 (citation omitted). "On-scene investigation into other crimes, however, detours from [a traffic-enforcement] mission." *Rodriguez*, 575 U.S. at 356. Because "[t]he reasonableness of a seizure, however, depends on what the police in fact do[,]" courts must evaluate the officer's actual conduct during the stop. *Id.* at 357.

7

Second, a court must evaluate whether, at the moments the stop was prolonged, the historical facts known to the officer objectively established reasonable suspicion of another crime. "Of principal relevance . . . will be the events which occurred leading up to the [extension], and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Reyes*, 963 F.3d at 488 (citation omitted). That standard requires more than generalized intuition: "a mere 'hunch' does not create reasonable suspicion." *Id.*

The Fifth Circuit's cases make clear that this two-part inquiry turns on timing: reasonable suspicion to prolong the stop must arise *before* the stop's traffic purpose has been fulfilled. *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006); *see also United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2004) (en banc) (clarifying that the inquiry about whether an officer unconstitutionally prolonged a traffic stop turns on "timing and sequence"). "If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *Jenson*, 462 F.3d at 404. In *Jenson*, the licenses cleared at 11:02 a.m., and the Fifth Circuit analyzed whether there was "adequate evidence of a nexus between [the driver's] allegedly suspicious behavior and any specific criminal activity" before 11:02. *Id.* at 404–05. The court expressly declined to consider allegedly inconsistent answers that arose at 11:04, after the traffic purpose had concluded. *Id.* at 404.

The report does not conduct the two-part sequenced analysis that Supreme Court and Fifth Circuit precedent requires. *See* R. & R. (ECF No. 135) 18–20. It does not evaluate when tasks tied to the traffic infraction reasonably should have been completed. *Id.* It does not consider what Babb in fact did during the stop and whether his actions detoured from a traffic-enforcement mission. *Id.* It does not identify when the computer checks came back clean. *Id.* And it does not isolate what

8

specific facts, known at the moment the traffic stop should have ended, could have supplied the required individualized suspicion that Alek committed a particular crime. *Id.*

Instead, it evaluates the entire encounter between Babb and Alek as a single event and only looks at Alek's conduct. *Id.* The report assumes that the traffic stop was only extended once—when Babb called for the dog—and does not examine Babb's actions at all. *Id.* But the traffic-enforcement mission was over long before Babb called for the dog. Indeed, Babb extended the stop from the moment he ordered Alek to sit in the front seat of the patrol car—and certainly by the time computer checks came back clean less than two minutes later—as part of the interdiction unit's "general practice" of treating every traffic stop as a "long term" investigation into unspecified non-traffic crimes. Schott MSJ (ECF No. 119) 11–12.

The report therefore answers the wrong question. The question is not whether Babb eventually developed a basis to deploy a K9. It is whether Babb prolonged the stop beyond its traffic purpose, and whether Babb had reasonable suspicion—i.e., "specific and articulable facts that lead him to reasonably suspect that [Alek] is committing, or is about to commit, a crime"—when he departed from the traffic-enforcement mission. *Hankins v. Wheeler*, 109 F.4th 839, 847 (5th Cir. 2024) (citation omitted). And, as explained below, Babb repeatedly extended the stop beyond traffic enforcement even though he lacked objective evidence that Alek was committing a particular crime when he did so.

By ignoring both Babb's actions and the timing requirement and aggregating the facts of the entire encounter, the report fails to apply the precise constitutional inquiry that Supreme Court and Fifth Circuit precedent requires. For this independent reason, the Court should reject the recommendation that Bexar County be granted summary judgment on the extension.

9

### C. The report erroneously credits the County's version of the facts about the stop extension.

The recommendation to grant the County summary judgment on the stop extension rests on resolving disputed facts in the County's favor. But at summary judgment the Court must view the facts in Alek's favor and leave credibility determinations to the jury.

The problems begin with the report's description of the alleged tip that led Babb to target Alek, which the report characterizes as a report from the criminal interdiction unit itself (CIU report). R. & R. (ECF No. 135) 20. First, Alek sets the record straight: There is nothing in the summary-judgment record about a CIU report. The only evidence is Babb's testimony that he received a WhatsApp message from someone he believed worked at a fusion center in Laredo. *See* Schott MSJ (ECF No. 119) at 3–4 (summarizing testimony). By repeatedly describing that message as a CIU report, Judge Farrer's report transforms a text message in a group chat into something far more formal and reliable than the record reflects.

Second, the report improperly credits the County's description of the information that Babb received as reliable. R. & R. (ECF No. 135) 2–4, 20. By contrast, the summary judgment record strongly suggests there was no reliable intelligence—there was a text from a guy named "Kiki" whom Babb had never met but thought worked at a fusion center that other witnesses had never heard of. Schott MSJ (ECF No. 119) 3–4 (citing testimony). A jury could reasonably conclude that this was not verified intelligence but simply an unsubstantiated message in a group chat.

The uncertainty surrounding that message is compounded by the fact that the original WhatsApp communication is gone. Babb deleted WhatsApp from his phone, and the County made no effort to preserve the relevant phone records after this lawsuit was filed. *See, e.g.*, Ex. 4 (Gereb Dep. Vol. 1) 71:7–72:11. Only examples of the *types* of WhatsApp messages Babb received were recovered through forensic analysis after Judge Farrer granted Alek's motion to compel. *See* Ex.

10

27 (WhatsApp Group Chat); Order on Mot. to Compel (ECF. No. 59). Those example messages show unidentified numbers providing minimal information—sometimes nothing more than a vehicle description—to flag cars for stops. *See* Schott MSJ (ECF No. 119) 10. And none of the example messages contain the detailed information Babb claimed he possessed about Alek, such as trip destination or passengers.

Against that backdrop, Judge Farrer concludes that the "surrounding circumstances known to Babb" included the alleged CIU report and that the report "becomes more plausible" in light of Alek's behavior during the stop. R. & R. (ECF No. 135) 19–20. Put differently, Judge Farrer reasons that Alek's behavior confirmed the credibility of the tip.

But that reasoning assumes a key fact in dispute. Determining how "plausible" the tip was in the first place requires crediting Babb's account of the tip, something a court cannot do at summary judgment.

What Babb claims he knew when he prolonged the stop is central to the reasonable suspicion inquiry. *See Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) (en banc) (considering "only what the officers knew at the time of their challenged conduct"). And credibility issues permeate this entire case. Judge Farrer's report itself repeatedly recognizes that the rest of the case turns on credibility determinations reserved for the jury. R. & R. (ECF No. 135) 13, 17, 22, 31. Yet for this one issue—the stop extension—the report improperly departs from the summary-judgment standard and accepts the County's version of events.

### D. A jury could find that Babb lacked independent reasonable suspicion to extend the stop.

As previously explained, once the tasks tied to a traffic infraction are completed, any non-traffic-enforcement tasks or further detention must be supported by independent reasonable suspicion of other criminal activity. *See supra* Part B. That suspicion must be specific: the officer

11

must have "*individualized* suspicion that a *particular* person committed a *particular* crime." *Wilson*, 143 F.4th at 653 (emphasis in original). Viewing the evidence in the light most favorable to Alek—as the summary-judgment standard requires—a jury could find that Babb lacked reasonable suspicion at the key moments when he extended the stop.

There are at least three relevant moments in assessing whether Babb had independent reasonable suspicion before extending the stop beyond its traffic mission: (1) when Babb ordered Alek into the patrol car; (2) when the computer checks came back clean; and (3) when Babb called for a K9. At each point, a jury could conclude that Babb extended the stop without reason to suspect Alek of a particular crime.

**When Babb ordered Alek into the patrol car**: Babb ordered Alek into the patrol car roughly forty seconds after approaching Alek's truck. Ex. 11 (Babb BWC A) 2:23–3:03. A jury could find that this step extended the stop beyond traffic enforcement. Alek presented evidence that the criminal interdiction unit routinely placed drivers in patrol cars to conduct "interviews" designed to elicit responses officers associate with trafficking in "the game of interdiction." Schott MSJ (ECF No. 119) 11–14. A jury could thus conclude that Babb almost immediately extended the stop to investigate Alek for an unspecified crime.

A jury could also conclude that Babb did not have reasonable suspicion for that extension off the bat because nothing Alek said or did before being ordered into the patrol car suggested he had committed any particular crime. Alek's statement that he did not think he had a gun in his car proves nothing. Possessing a firearm in Texas cannot create suspicion of a crime. *See Wilson*, 143 F.4th at 653 (rejecting the idea that gun possession creates suspicion of a crime). Viewing the facts in Alek's favor, a jury could conclude that Babb began interdiction interrogation without reasonable suspicion.

12

**When the computer checks came back clean:** There is no dispute that the computer checks came back clean two minutes into the stop. Schott Resp. (ECF No. 125) 7–8. At that point, the ordinary tasks of the traffic stop had been completed, but Babb extended the stop anyway. A jury could conclude that nothing that Babb knew at that moment created individualized suspicion that Alek had committed a particular crime. Alek asserts that the evidence shows the only information that Babb possessed was the limited and unreliable WhatsApp tip about a one-day turnaround and his own interpretation of Alek's demeanor. A jury could agree that the WhatsApp tip was unreliable or limited in content and find that Alek's behavior—things like speaking calmly and looking at the computer while Babb typed—was entirely ordinary and did not suggest criminal activity. *Id.* at 18–19.

Further, Babb himself admitted that at the specific point that he extended the traffic stop beyond the computer checks, he didn't suspect Alek of a particular crime: "So at this point I'm *starting to think* that possibly he's being deceptive with *something*." Ex. 3 (Babb Dep.) at 222:2–224:7 (emphasis added). A jury could therefore conclude that, after the computer checks came back clean, Babb had no individualized suspicion that Alek committed a particular crime and therefore no legitimate basis to prolong the stop.

**When Babb called for a K9:** A jury could likewise conclude that nothing Alek did while seated in the patrol car gave Babb reasonable suspicion of a particular crime before Babb announced that he was calling for a K9. Schott MSJ (ECF No. 119) 22–25 (collecting evidence). The entire in-car interaction was recorded on Babb's body camera, and the jury can watch the footage for itself. *See* Ex. 11 (Babb BWC A) 3:00–33:42. During that time, Alek sat in the patrol car's front seat while Babb interrogated him about his work, travel, family, and hypothetical contraband. *See id.* A jury could conclude that nothing about Alek's responses or his demeanor

13

during this extended questioning suggested involvement in drug trafficking or any other specific crime. After all, the whole point of ordering Alek into the patrol car and deliberately playing "the game of interdiction" was to provoke a reaction that justified calling for a K9 if Alek refused to consent to a search. *See* Schott MSJ (ECF No. 119) 11–14. The report never acknowledges that Babb sought to make Alek nervous by interrogating him and treating him like a criminal and then used that nervousness against him to justify calling for a K9. *See* R. & R. (ECF No. 135) 18–20.

Because a jury could conclude that Babb lacked independent reasonable suspicion at each point that Babb extended the stop, a jury could find that Babb prolonged the stop in violation of the Fourth Amendment.

**II.    The report misframes the initial stop inquiry and relies on excluded testimony.**

Alek does not object to the report's conclusion that a fact dispute exists concerning the constitutionality of the initial stop. He objects only to the report's incorrect framing of the legal inquiry and reliance on inadmissible evidence. Alek raises this objection here to properly set the stage for trial and preserve the error.

Contrary to the report, the governing question is not "whether or not Schott touched or crossed the solid yellow line[.]" R. & R. (ECF No. 135) 17. A stop is lawful only if the officer had objectively reasonable suspicion, based on what he knew at the time, that a traffic violation occurred. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). "[W]hat matters is what the [] officers knew . . . at the time of their challenged conduct." *Cole*, 935 F.3d at 456. The correct question is therefore whether a reasonable officer in Babb's position could have seen a traffic violation. That turns on credibility.

A reasonable jury could disbelieve Babb's claim that—after he had already decided he wanted to pull Alek over and was posted on the side of watching for Alek to appear over the horizon—he coincidentally saw Alek hit the fog line at the exact moment Alek drove by. That's

especially true given that Babb "manually turned off" his dashcam moments before he stopped Alek, there is evidence the interdiction unit used traffic stops to investigate unspecified crimes, and that Babb wanted to stop Alek based on an ambiguous and unreliable WhatsApp tip about his travel. *See* Schott MSJ (ECF No. 119) 3–4, 7–12. A jury could conclude that Babb decided to stop Alek based solely on that tip and made up a traffic violation to investigate further.

The report also relies on an opinion from the County's expert, Haston, that Judge Farrer already excluded. Judge Farrer barred Haston from narrating Alek's dashcam footage, offering unsubstantiated opinions based on video evidence, and opining on Deputy Babb's state of mind. Order on Mots. to Strike (ECF No. 129) 25. Judge Farrer expressly held that "[t]he jury is capable of watching the video and observing the same information that Haston points to in his report." *Id.* at 22–23. Yet the report relies on Haston's assertion about what Babb could have seen after Haston watched Alek's dashcam footage—even though that footage does not reflect Babb's vantage point and Haston conducted no reconstruction or technical analysis. Haston's opinion on what Babb could have seen was excluded and is inadmissible at both the summary-judgment stage and trial.

In short, whether the initial stop was constitutional turns on whether Babb is credible in claiming he saw a violation, not whether a violation occurred. That is a jury question.

## Conclusion

Alek respectfully asks the Court to sustain his objections. Specifically, Alek asks the Court to (1) reject the Magistrate Judge's recommendation to grant summary judgment to the County on the stop-extension claim and (2) clarify the framing of the legal inquiry concerning the initial stop, including by rejecting reliance on inadmissible testimony.

Dated: March 12, 2026.                Respectfully submitted,

<div style="margin-left: 3em;">

/s/ Christen M. Hebert
Christen M. Hebert (TX Bar No. 24099898)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org

Joshua A. Windham* (NC Bar No. 51071)
William R. Aronin* (NY Bar No. 4820031)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jwindham@ij.org
waronin@ij.org
*Admitted *pro hac vice*

*Attorneys for Plaintiff*

</div>

**Certificate of Service**

I certify that on March 12, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

<div style="text-align: right;">

/s/ Christen M. Hebert
Christen M. Hebert

</div>